1    ROB BONTA, State Bar No. 202668
     Attorney General of California
2    MICHAEL L. NEWMAN, State Bar No. 222993
     Senior Assistant Attorney General
3    LAURA L. FAER, State Bar No. 233846
     VILMA PALMA-SOLANA, State Bar No. 267992
4    Supervising Deputy Attorneys General
     LISA CISNEROS, State Bar No. 251473
5    MARISOL LEÓN, State Bar No. 298707
     Deputy Attorneys General
6     455 Golden Gate Ave., Suite 11000
      San Francisco, CA 94102-7004
7     Telephone:  (415) 510-3438
      E-mail:  Lisa.Cisneros@doj.ca.gov
8    *Attorneys for Defendant California*
     *Secretary of State Shirley N. Weber*

9                  IN THE UNITED STATES DISTRICT COURT

10                 FOR THE EASTERN DISTRICT OF CALIFORNIA

11                              EASTERN DIVISION

12

13

| | |
|---|---|
| 14  **CREIGHTON MELAND, JR.,** | Case No. 2:19-cv-02288-JAM-AC |
| 15                    Plaintiff, | |
| 16          **v.** | **DECLARATION OF ANDREW JENNINGS IN SUPPORT OF DEFENDANT SECRETARY OF STATE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 17 | |
| 18  **SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,** | |
| 19                    Defendant. | |
| 20 | Date:          October 19, 2021<br>Time:          1:30 p.m. |
| 21 | Dept:          Courtroom 6, 14th Floor<br>Judge:         Honorable John A. Mendez |
| 22 | Action Filed:  November 13, 2019 |

23

24

25

26

27

28

1

**DECLARATION OF ANDREW JENNINGS**

2

      I, Andrew Jennings, declare:

3
    1.     I am over the age of 18 years and a U.S. citizen. I know the following facts based on
4
my own personal knowledge, and, if called as a witness, I could and would testify competently to
5
the truth of the matters set forth herein.

6

**Background and Experience**

7
    2.     I hold an M.A. in economics and a J.D. from Duke University. I am a member of the
8
bars of New York and North Carolina.

9
    3.     As of July 2021, I am an assistant professor of law at Brooklyn Law School in
10
Brooklyn, New York, where I teach business-law courses.

11
    4.     My recent and current scholarly research is in the fields of corporate governance,
12
corporate crime and compliance, federalism in corporate and securities laws, and securities
13
enforcement. I have authored five scholarly works in these fields that have been published or are
14
accepted for publication: *State Securities Enforcement*, 47 BYU L. Rev. __ (forthcoming 2021);
15
*Follow-Up Enforcement*, 70 Duke L.J. 1569 (2021); *Notice Risk and Registered Agency*, 46 J.
16
Corp. L. 75 (2021); *Shareholders United?*, 95 Notre Dame L. Rev. Reflection 47 (2019); and *Firm*
17
*Value and Intracorporate Arbitration*, 38 Rev. Litig. 1 (2018).

18
    5.     Specifically, my works *Shareholders United?* and *Firm Value and Intracorporate*
19
*Arbitration* concern the powers of shareholders in corporate governance.

20
    6.     I am in the midst of a research series focused on internal decision-making and policy
21
development within public corporations. The first article in the series, *Disclosure Procedure*, is a
22
publicly available empirical study of how public companies prepare their Securities and Exchange
23
Commission ("SEC") filings and other disclosures. A summary of this article has been published
24
on Columbia Law School's *Blue Sky Blog*, a widely read publication on corporations and the
25
capital markets that serves as a forum for scholars, practitioners, and regulators.[1]

26

27

---

28
[1] Andrew Jennings, *Disclosure Procedure*, CLS BLUE SKY BLOG (Sept. 13, 2021), https://clsbluesky.law.columbia.edu/2021/09/13/disclosure-procedure/.

1

7.      In June 2021, I presented a lecture on *Disclosure Procedure* as part of Moody's Investors Service's outside speaker series and I shared my findings as part of a panel on disclosure-committee practices at the annual conference of the Society for Corporate Governance, a professional association for corporate secretaries and in-house counsel.

8.      My scholarly research uses both interview and survey methods, which allows me to speak to corporate-governance professionals at a broad range of public companies about the internal workings of their firms. These professionals include general counsels and other in-house lawyers, senior and junior financial and accounting officials, and investor-relations professionals. Through these conversations and prior professional experiences, I have gained insight into the competing pressures that help shape corporate-governance decisions.

9.      Related to my work as a law professor, I am the creator and host of the *Business Scholarship Podcast*, a free, publicly available podcast in which I interview business scholars about their recent research. The podcast currently has over 125 episodes and is intended to promote the dissemination of business scholarship and to promote discourse between academics and practitioners in relevant fields, including law, finance, management, accounting, and journalism.

10.     Prior to joining the Brooklyn Law School faculty, I was a lecturer in law at Stanford Law School, where I served as the teaching fellow for the LL.M. Program in Corporate Governance & Practice. In this role I taught courses on corporate governance and conducted research in the areas of corporate governance, corporate crime and compliance, and securities regulation.

11.     Before entering legal academia, I worked for Cravath, Swaine & Moore LLP ("Cravath"). I practiced in the firm's mergers-and-acquisitions and corporate-governance practices; my practice included representing public companies in a variety of corporate-governance matters, including preparation of proxy statements and other SEC filings; annual shareholder meetings and shareholder voting; shareholder proposals and activism; functions of boards of directors ("boards") and their committees; and internal investigations of potential governance or compliance issues.

2

12.     Following my time at Cravath, I served as a law clerk to Hon. Helene White, U.S. Court of Appeals for the Sixth Circuit. After my clerkship I joined Sullivan & Cromwell LLP ("S&C"). At S&C, I practiced primarily in the area of criminal defense and investigations, with my practice being focused on representing public companies in internal investigations and governmental investigations or enforcement, including by the SEC.

13.     My education, professional background, and publications are described in additional detail in my curriculum vitae, which is attached hereto as **Exhibit 1**.

### Introduction

14.     This declaration addresses how directors of public companies are nominated, appointed, and elected, including how those processes have occurred at OSI Systems, Inc. ("OSI").

15.     This declaration addresses the power and practice of boards to unilaterally expand their size, including the power of OSI's board to do so and instances in which it has unilaterally added new board seats.

### Methodology and Research

16.     The SEC maintains the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system for the filing of securities-offering registration statements, periodic reports, other disclosures by public companies, and other filings. *See* Regulation S-T, 17 C.F.R. § 232.100. EDGAR is freely accessible to the public on the SEC's website and filings by companies or others become publicly available immediately or soon after they are electronically submitted. Commercial services, such as LexisNexis Securities Mosaic and Bloomberg Law, provide "value-added" services that allow practitioners and scholars to conduct more granular searches and analytics of documents filed via EDGAR than the SEC's public EDGAR portal supports. In the fields of corporate practice and corporate-governance research, EDGAR is considered the authoritative source for accessing various mandatory securities disclosures.

17.     Among those mandatory disclosures are proxy statements and disclosures reporting results of elections. Under 15 U.S.C. § 78n and SEC Regulation 14A, anyone seeking voting authority from another in connection with a shareholder election must file a proxy statement on Schedule 14A. Proxy statements must include certain disclosures and identify means for

shareholders to vote on voting items such as the election of directors. *See* Regulation 14A, 17 C.F.R. § 240.14a-4. Companies must announce the results of elections within four days of a meeting of shareholders on a Current Report on Form 8-K ("Form 8-K").[2] Companies must also report on Form 8-K, if, for example, a director has resigned or the board has made an appointment to a seat pending the next shareholder election.[3] Prior to 2010, election results were reported on the Quarterly Report on Form 10-Q ("Form 10-Q") for the quarter in which the shareholder meeting occurred.[4] In preparing my analysis of OSI's history of director nominations, appointments, and elections, I used the EDGAR public portal to access relevant proxy statements and Forms 8-K and 10-Q, which have been authenticated by and attached as exhibits in the declaration, dated September 7, 2021, of Victor Sze, OSI's general counsel and corporate secretary ("Sze Declaration"), and in the deposition of Mr. Sze that occurred on September 13, 2021.

18.    Under Section 12 of the Securities Exchange Act of 1934, a company becomes "public" once it has hit one of three triggers: (1) it has issued securities on a national securities exchange, such as the New York Stock Exchange;[5] (2) it has total assets exceeding $10 million *and* 2,000+ shareholders or 500+ unaccredited investors;[6] or (3) it makes a public offering under the Securities Act of 1933.[7]

19.    A public company must indicate on the coversheets of its Forms 8-K and 10-Q, as well as its Annual Reports on Form 10-K ("Form 10-K"), the name of each securities exchange on which its securities are listed. Using the EDGAR public portal, I reviewed OSI's most recent periodic filing, its Form 10-K filed August 23, 2021, which indicated that its securities are listed on The Nasdaq Global Select Market. In his deposition, Mr. Sze confirmed that OSI's securities are listed on the Nasdaq.

---

[2] *See* SEC, Current Report on Form 8-K, Item 5.07 (expiring Sept. 30, 2021), https://www.sec.gov/files/form8-k.pdf.
[3] *See id.* at Item 5.02.
[4] *See* SEC, Proxy Disclosure Enhancements, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, at 61–63 (Dec. 16, 2009) (explaining the transition from Form 10-Q to Form 8-K election-result reporting).
[5] 15 U.S.C. § 78l(a).
[6] *Id.* at § 78l(g).
[7] *Id.* at § 78l(f)(1)(G).

20.     Public companies must file with the SEC their articles/certificates of incorporation ("charters") and bylaws whenever they file registration statements or periodic reports, provided that they may incorporate by reference charters or bylaws that were previously filed. *See* Regulation S-K, 17 C.F.R. § 229.601. OSI's August 23, 2021 Form 10-K indicates that its most recent charter and bylaws were included as exhibits with its March 8, 2010 Form 8-K12G3. Using the EDGAR public portal, I reviewed these two documents and used them in my analysis regarding director appointments, nominations, and elections at OSI. OSI's charter indicates that it is incorporated in Delaware. In his deposition Mr. Sze confirmed that the charter and bylaws found on the EDGAR public portal are true and authentic records and that the company is incorporated in Delaware.

21.     Using the documents described in Paragraphs 17 through 20, I prepared a historical summary of OSI's board resignations, appointments, nominations, and elections since its 1997 initial public offering ("IPO"). I also prepared a summary of the holdings of OSI's shareholders who owned at least 5% of OSI's stock, its directors, and its executive officers for the 2016 through 2020 proxy seasons (as further discussed in paragraph 28). These summaries are attached hereto as Tables 1 and 2 of **Exhibit 2**.

22.     In preparing my declaration, I consulted empirical studies, cited herein, that employ, among other sources, information contained in public-companies' SEC filings. Such studies are authorities in corporate-governance research.

23.     In preparing my declaration, I also consulted law-firm materials, cited herein. Corporate law firms commonly prepare materials that they send to prospective and current clients, which are typically also published on their websites. These materials reflect law firms' monitoring of corporate-governance developments and the kinds of services and advice they are prepared to offer in connection with those developments. They are thus reflective of market practice around corporate governance.

24.     In preparing my declaration, I also consulted documents, cited herein, produced by OSI and Plaintiff in connection with this litigation.

**Discussion and Analysis**

**A.  Shareholders Largely Lack Power Over Director Nominations and Elections**

**I.   How Directors Are Elected**

25.     Plurality voting is a traditional method of electing directors followed by many public companies, including OSI.[8] Under plurality voting, for a given number, $n$, of available board seats, the $n$ nominees who receive the highest number of votes are elected. For example, if a board has seven seats and nine nominees, the seven nominees with the highest number of votes will be elected. Such an election in which there are fewer seats than nominees is a "contested election." But if the board has seven seats and seven nominees, then all the nominees will be elected. That result would hold even if a nominee received only a single vote.  Such an election in which the number of seats is equal to the number of nominees is an "uncontested election."

26.     Under the plurality-voting method, a shareholder may vote "for" all or some of the nominees, may withhold a vote for all or some of the nominees, or may not give director-election voting instructions on the proxy card. In the case of an uncontested election, however, all nominees will be elected so long as they receive at least one vote.

27.     A substantial majority of public-company shares are not held directly by shareholders, but rather they are held and voted through a complex system of nominee holders, custodial banks, and brokerage firms. Shares held in this system are voted by intermediaries on behalf of the shares' beneficial owners, who might be pension and mutual funds, insurance companies, hedge funds, individuals, or other investor types. Such shares are said to be held in "street name" because they are legally titled to Cede & Co., an affiliate of Depository Trust Company ("DTC"). DTC serves as the central securities depository for U.S. securities markets. For shares held in street name, investors exercise their franchise by instructing brokers how to vote their shares. Under New York Stock Exchange Rule 452,[9] member brokerages may not vote in

---

[8] Bylaws art. II § 7 ("[E]ach stockholder shall be entitled to one vote for each share of capital stock held by such stockholder. All elections shall be determined by a plurality of the votes cast . . . . [Except as required by law or other rules], all other matters shall be determined by a majority of the votes cast affirmatively or negatively.").

[9] NEW YORK STOCK EXCHANGE R. 452, https://nyseguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-

(continued…)

1 director elections without receiving voting instructions from beneficial owners, although they may

2 vote on routine matters such as ratifying the appointment of the company's independent auditor.

3 Thus, for some voting items—such as the election of directors—brokers may return proxy cards

4 without votes, that is, "broker non-votes."[10]

5     28.    As of the record date for its 2020 annual meeting, there were 17,919,229 OSI shares

6 outstanding. SEC regulations require public companies like OSI to disclose investors who

7 beneficially own 5% or more of its voting securities, as well as the voting securities held by

8 directors, named executive officers, and executive officers.[11] As disclosed in the 2020 proxy

9 statement, just the 5% shareholders—BlackRock, The Vanguard Group, Janus Henderson Group,

10 and Dimensional Fund Advisors—collectively held approximately 43.5% of OSI shares.[12] The

11 shares or exercisable options beneficially owned by OSI's fifteen directors and executive officers

12 comprised another approximately 6.6%. In 2020, just these nineteen investors held approximately

13 50.13% of the voting power. Those institutional shareholders have publicly expressed their support

14 for board gender diversity,[13] and a company's directors and executive officers typically vote in

15 PHC-%7B4A07B716-0F73-46CC-BAC2-43EB20902159%7D--WKUS_TAL_19401%23teid-375.

16 [10] *See generally* Marcel Kahan & Edward B. Rock, *The Hanging Chads of Corporate Voting*, 96 Geo. L.J. 1227 (2008).

17 [11] *See* Schedule 14A, Item 6(d), 17 C.F.R. § 240.14a-101 (incorporating Item 403, Regulation S-K, 17 C.F.R. § 229.403)

18 [12] Schedule 14A (Oct. 21, 2020).

19 [13] *See* Sarah Krouse, *BlackRock: Companies Should Have at Least Two Female Directors*, Wall St. J. (Feb. 2, 2018), https://www.wsj.com/articles/blackrock-companies-should-have-at-least-two-female-directors-1517598407; BlackRock, Inc., BlockRock Investment Stewardship: Proxy

20 Voting Guidelines for U.S. Securities, at 6 (eff. Jan. 2021),

21 https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf ("In addition to other elements of diversity, we encourage companies to have at least two

22 women directors on their board."); F. William McNabb III, Chairman and Chief Executive Officer, The Vanguard Group, Inc., An Open Letter to Directors of Public Companies

23 Worldwide, at 2 (Aug. 31, 2017), https://global.vanguard/documents/investment-stewardship-mcnabb-letter.pdf ("Gender diversity is one element of board composition that we

24 will continue to focus on over the coming years."); The Vanguard Group, Inc., Vanguard Investment Stewardship Insights, A Continued Call for Boardroom Diversity, at 1 (Dec. 2020),

25 https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/ISBOARD_122020.pdf ("Beginning at 2021 annual meetings, the Vanguard funds

26 may vote against directors at companies where progress on board diversity falls behind market norms and expectations. In such cases, we may hold nominating committee chairs or other

27 relevant directors accountable."); Janus Henderson Investors, Proxy Voting Policy and Procedures, at 10 (Mar. 2021), https://2deaa804a6dc693855a0-eba658c6bc03668a61900f643427d64d.ssl.cf1.rackcdn.com/Documents/legal%20documents/JHI

28 (continued…)

7

accord with the board's proxy recommendations. Based on the information in OSI's proxy statements from 2016 through 2020, in Table 2 of **Exhibit 2** I show that for those years, the combined shares held by 5% shareholders, directors, and executive officers averaged 47.63% of the shares outstanding as of annual-meeting record dates. The range was 40.51% to 52.42%. Management also receives the proxies of many other shareholders.

29.     In addition, in an October 10, 2018 joint letter from the California State Teachers' Retirement System, the University of California Office of the Chief Investment Officer, and the Los Angeles County Employees Retirement Association to OSI director William Ballhaus, these OSI investors sought a dialog with the company over its lack of board gender diversity. Their letter closed with a caution that "some investors may oppose the re-election of certain directors who fail to put forward appropriately diverse board nominees."[14]

30.     Most public companies hold their annual shareholder meetings in the spring or early summer.[15] But as shown in Table 1 of **Exhibit 2**, OSI has held all but one of its post-IPO annual meetings in November or December.

31.      For Delaware corporations, like OSI, by default a majority of voting securities being "present or represented by proxy" at a shareholder meeting constitutes a quorum, although individual companies may set quorum as low as one third of voting securities. Del. Gen. Corp. L. § 216.

32.     As I note in Paragraph 27, brokers will not vote in elections without receiving voting instructions from beneficial owners, and thus in a director election the number of votes cast "for"

%20Proxy%20Voting%20Policy%20and%20Procedures%202021.pdf ("After taking into consideration country-specific practices, Janus Henderson Investors will generally vote in favor of individual director candidates unless they: . . . are the chair of the nominating committee, or are otherwise responsible for the nomination process, of a board that does not have any female directors, and the company has not provided a reasonable explanation for its lack of gender diversity . . . ."); Dimensional Fund Advisors, 2020 Annual Stewardship Report, at 15 (Oct. 2020), https://my.dimensional.com/dfsmedia/f27f1cc5b9674653938eb84ff8006d8c/43993-source/options/download/2020-annual-stewardship-report.pdf ("An additional consideration that may lead Dimensional to scrutinize the effectiveness of a portfolio company's board refreshment process is a lack of gender diversity on the board.").
[14] OSI_00000534.
[15] For instance, by June 18, 2019, approximately 75% of companies in the Russell 3000 index had already held their 2019 annual meetings. Kosmas Papadopoulos, *U.S. Board Diversity Trends in 2019*, HARV. L. SCH. FORUM ON CORP. GOV. (June 18, 2019), https://corpgov.law.harvard.edu/2019/06/18/u-s-board-diversity-trends-in-2019/.

1   or "withhold/against" nominees may be thousands or millions fewer than the number of shares

2   eligible to be voted. These broker non-votes nevertheless contribute to the presence of a quorum

3   because the shares are "represented by proxy" for routine matters that do not require beneficial-

4   owner instructions. OSI's bylaws and proxy statements provide for broker non-votes to count

5   toward satisfying the company's "majority of the issued and outstanding stock entitled to vote"

6   quorum.[16] In a list of shareholders produced by OSI, as of September 2, 2021, 99.745% of the

7   company's shares were held in street name by Cede & Co. With such a high percentage of shares

8   represented at annual meetings by intermediary-voted proxies (even if some are broker non-votes),

9   OSI does not appear to be at risk of failing to meet its 50%+1 shareholder-meeting quorum.[17]

10      33.     As explained in Paragraph 21, I used the documents discussed in Paragraphs 17

11   through 20 to prepare historical summaries, which are attached hereto as **Exhibit 2**. Table 1 of the

12   exhibit shows that since OSI's 1997 IPO, every director of the company has been appointed by the

13   board, elected by shareholders after being nominated by the board, or both. It also shows that in

14   each shareholder election, each nominee of the board received more "For" votes than there were

15   votes "Withheld." For example, at the 2002 meeting, there were 4,381,223 votes withheld from

16   director Deepak Chopra (who is also the company's founder, chief executive officer, and

17   chairman), the highest raw number of votes withheld from any nominee in any year of OSI's

18   public-company history. Mr. Chopra nevertheless received 6,167,446 "For" votes, a net result in

19   his favor.

20      34.     The documents described in Paragraphs 17 through 20 also show that all votes cast

21   during OSI's public-company history have been for nominees who were nominated by the board.

22      35.     Based on the informational summaries about each director and director nominee

23   included in OSI's proxy statements and the gendered pronouns—i.e., he, him, his—used in those

24   summaries, I note that until the 2019 election of Kelli Bernard, all OSI directors were men. The

---

[16] Bylaws art. II § 5 ("A majority of the issued and outstanding stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders."); *see also, e.g.*, Schedule 14A, at 2 (Oct. 21, 2020) ("Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum.").

[17] *See* OSI_00000565.

9

1  Sze Declaration also provides a chart indicating that Ms. Bernard has been the only woman to

2  serve on OSI's board.

3      **II.  How Directors Are Appointed and Nominated**

4      36.    Shareholder elections are almost always uncontested.[18] Uncontested elections occur

5  when the number of seats available on the board equals the number of nominees the board has put

6  forward. In uncontested elections, boards themselves select the nominees for whom shareholders

7  may vote or from whom they may withhold votes. Nominees may be incumbent directors or new

8  individuals chosen to join the board.

9      37.    In evaluating whom to nominate in light of their overall complement of members,

10  boards—and in particular, their nominating committees—must hew to regulatory constraints. For

11  instance, both the New York Stock Exchange and the Nasdaq require boards of listed companies

12  to have a majority of "independent directors," with "independence" determinations being subject

13  to complex rules.[19] Such constraints sometimes extend to board committees. For example, audit

14  committees must be comprised of three or more "independent directors," who must also meet

15  certain requirements for financial or accounting experience, sophistication, or knowledge.[20] Such

16  regulatory constraints on board composition also arise outside the heartland of corporate and

17  securities law. For example, under the Jones Act, boards of companies that operate domestic

18  maritime vessels must be constituted such that any directors who are not U.S. citizens comprise a

19  minority of the board's quorum. 46 U.S.C. § 12103(b)(4); 46 C.F.R. §§ 67.39(a), 221.3(c)(2).

20  Those kinds of non-securities-regulation constraints on a given company's board composition

21  might not appear so obvious to outside observers. In 2013, for example, *The Wall Street Journal*

22  reported that Goldman Sachs Group, Inc. increased its board quorum to account for its ratio of

23

24  [18] For instance, one study counted contested elections from 1999 to 2008, finding that there were
   a little under 40 per year on average, out of thousands of public-company elections. *See* Lee
25  Harris, *Missing in Activism: Retail Investor Absence in Corporate Elections*, 2010 COLUM. BUS.
   L. REV. 104, 120–21 (2010) (presenting original findings and comparing those findings to other
26  empirical studies).
   [19] *See* NEW YORK STOCK EXCHANGE, LISTED COMPANY MANUAL §§ 303A.01, 303A.02
27  [hereinafter "NYSE MANUAL"]; THE NASDAQ STOCK MARKET RULES R. 5065(b) [hereinafter
   "NASDAQ RULES"].
28  [20] *See* NYSE MANUAL § 303A.07; *see also* NASDAQ RULES R. 5065(c).

1  citizen/noncitizen directors.[21] Although Goldman Sachs is best known as a financial-services

2  institution, it had acquired two Hudson River ferry boats to run between its downtown Manhattan

3  and Jersey City office buildings, requiring it to conform its corporate governance to the Jones Act

4  requirement.[22]

5      38.      Director vacancies sometimes occur between annual or special shareholder meetings,

6  whether because a director has resigned, passed away, or been removed before the expiration of

7  his or her term, or because the board has added new seats. Boards have authority to fill those

8  vacancies via appointment until the seat next comes up for election. *See* Del. Gen. Corp. L. §

9  223(a)(1) (providing for incumbent directors to fill via appointment "[v]acancies and newly

10  created directorships"). The same kinds of considerations discussed in Paragraph 37 with respect

11  to director nominations will also hold for director appointments.

12      **B.  Boards Typically Have Unilateral Authority to Expand Themselves**

13      39.      The number of seats on a public-company board is generally governed by a

14  company's bylaws. For example, under the corporate law of Delaware, where OSI is incorporated

15  and where public companies are typically incorporated regardless their principal business

16  locations,[23] "[t]he number of directors shall be fixed by, or in the manner provided in, the bylaws,

17  unless the [charter] fixes the number of directors, in which case a change in the number of

18  directors shall be made only by amendment of the [charter]." Del. Gen. Corp. L. § 141(b).

19  Whether the number of seats is governed by the bylaws or by the charter reflects how much

20  flexibility a board has in adjusting its own size. That is because public-company charters

21  generally empower boards to amend company bylaws. *See* Del. Gen. Corp. L. § 109(a)

22  (permitting a corporation, through its charter, to "confer the power to adopt, amend or repeal

23  bylaws upon the directors"). These provisions enable boards, including OSI,[24] to unilaterally add

24  [21] Brett Philbin, *Goldman Sails Around Maritime Law*, Wall St. J. (May 30, 2013),
   https://www.wsj.com/articles/BL-MBB-2092.

25  [22] *Id.*

26  [23] *See* Del. Sec'y of State, Div. of Corps., 2020 Annual Report Statistics,
   https://corpfiles.delaware.gov/Annual-Reports/Division-of-Corporations-2020-Annual-Report.pdf
   (noting that in 2020, 67.6% of Fortune 500 companies were incorporated in Delaware, as were

27  93% of companies undertaking a U.S.-based initial public offering).

28  [24] Charter art. V ("The number of directors that constitutes the entire Board of Directors shall be
   (continued…)

or subtract seats by an amendment to the bylaws or by a board resolution without shareholder approval.[25] Boards might have a wide array of business purposes for expanding their size. Those purposes might include bringing new expertise, background, or diversity into the boardroom;[26] managing succession planning; consummating a merger transaction;[27] obtaining financing;[28] complying with requirements imposed by state law, SEC regulations, stock-exchange rules, or other regulations;[29] and settling demands of activist investment funds.[30]

40.     Table 1 of **Exhibit 2** shows that from its 1997 IPO to the present, the size of OSI's board has varied between five and seven directors. The board added a sixth seat in 2001 and its seventh seat in 2016 (i.e., prior to the 2018 passage of S.B. 826).

### Conclusions

**A. Historically, OSI Shareholders Have Had No Direct Say in Board Membership via Director Nominations or Elections**

41.     Elections of public-company directors are unlike elections that occur for public office, for union or association leadership, or in other democratic contexts. In practice, boards themselves usually determine who is nominated and the typical director election is uncontested.

---

no less than five (5) nor more than nine (9), the exact number of directors to be fixed from time to time within such limit by a duly adopted resolution of the Board of Directors.").

[25]  *See* Geeyoung Min, *Shareholder Voice in Corporate Charter Amendments*, 43 J. CORP. L. 289 (2018).

[26] For example, Vanguard, one of the largest institutional investors, has suggested that boards expand themselves in order to recruit directors who will contribute to greater boardroom diversity. The Vanguard Group, Inc., Vanguard Investment Stewardship Insights, A Continued Call for Boardroom Diversity, at 2 (Dec. 2020), https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/ISBOARD_122020.pdf ("Boards should consider deliberately expanding in service of greater diversity. Competition for directors can be fierce, and companies should act opportunistically when they identify highly qualified diverse candidates. We would expect a board to readjust its size as appropriate at a later time.").

[27] *See*, e.g., Devon Energy Corporation, Devon Energy and WPX Energy Complete Merger of Equals Transaction (Jan. 7, 2021), https://www.devonenergy.com/news/2021/Devon-Energy-and-WPX-Energy-Complete-Merger-of-Equals-Transaction (announcing the merger of Devon Energy and WPX Energy and the combining of their boards).

[28] *See* Hillary H. Holmes & Eric Scarazzo, Capital Raising in the Current Environment I: PIPEs, Gibson, Dunn & Crutcher LLP (June 18, 2020) (recognizing that board representation is a typical component of private-investment-in-public-equity transactions), https://www.gibsondunn.com/webcast-capital-raising-in-the-current-environment-i-pipes/.

[29] *E.g.*, *supra* at ¶ 37.

[30] *See* Francis J. Aquila, *Negotiating a Settlement with an Activist Investor*, PRACTICAL L.J. 25 (Apr. 2015), https://www.sullcrom.com/files/upload/Apr15_InTheBoardroom.pdf (noting that boards are sometimes expanded as part of settlements with activist investors).

1  Although shareholders may "withhold" their votes as a signal of dissatisfaction, with the

2  plurality-voting method and uncontested slates, the outcome—that all nominees will be elected—

3  is predetermined.

4      42.    My review of OSI's securities-filing history on the EDGAR public portal shows that

5  every election since its 1997 IPO has been uncontested. In recent years, institutional investors that

6  publicly emphasize board gender diversity in their voting decisions, together with OSI's directors

7  and executive officers (who would be expected to vote in accord with the board's

8  recommendations), have held a majority or substantial plurality of OSI's shares.

9      **B. Public-Company Boards Generally Have Authority to Expand Themselves**

10     43.    Market practice for public companies is to maintain adequate governance flexibility

11 by allowing boards to amend company bylaws—which encompasses augmenting the size of the

12 board itself—without seeking shareholder approval. There are numerous reasons for adding seats

13 to a board and boards are generally free, in their business judgment, to pursue those purposes by

14 unilaterally adding one or more seats. Boards may also fill those seats by appointment pending

15 the next shareholder election.

16     44.    OSI's board has ranged in size from five to seven since it went public in 1997. Each

17 time its board size has been expanded, that expansion was authorized by the board itself. OSI

18 added its current seventh seat in 2016, prior to the 2018 passage of S.B. 826.

19     I declare under penalty of perjury under the laws of the State of California and the laws of

20 the United States that the foregoing is true and correct and that this declaration was executed on

21 September 23, 2021, in Jersey City, New Jersey.

22     DATED:    September 23, 2021

24     *Andrew Jennings*

25     Andrew Jennings

13

Exhibit 1

**Andrew Kennon Jennings**
250 Joralemon Street | Brooklyn, NY 11201
434-547-2868 | andrew.jennings@brooklaw.edu | andrewkjennings.com

---

## Academic Appointments

**Brooklyn Law School**
*Assistant Professor of Law*                                      July 2021 – present

**Stanford University School of Law**
*Teaching Fellow, Corporate Governance & Practice and*
*Lecturer in Law*                                                 June 2019 – June 2021

**Duke University School of Law**
*Scholar in Residence*                                            May 2016 – August 2016

## Education

**Duke University School of Law**, Durham, NC
J.D., *cum laude*, 2013
    DUKE LAW JOURNAL, Executive Editor, Vol. 62; Staff Editor, Vol. 61

**Duke University**, Durham, NC
M.A., Economics, 2013

**Hampden-Sydney College**, Hampden-Sydney, VA
B.A., *summa cum laude*, 2009
    Phi Beta Kappa
    Interdisciplinary Honors in History and Government

## Publications and Scholarship

### Articles

*State Securities Enforcement*, 47 B.Y.U. L. REV.___(forthcoming 2021)

*Follow-Up Enforcement*, 70 DUKE L.J. 1569 (2021)

*Notice Risk and Registered Agency*, 46 J. CORP. L. 75 (2020)

*Firm Value and Intracorporate Arbitration*, 38 REV. LITIG. 1 (2018)

### Essays and Shorter Pieces

*Conscience Leave*, 35 NOTRE DAME J.L. ETHICS & PUB. POL'Y 649 (2021) (symposium)

*The Supreme Court and the 117th Congress*, 11 CALIF. L. REV. ONLINE 408 (2020) (with Athul K. Acharya)

*Shareholders United?*, 95 N<small>OTRE</small> D<small>AME</small> L. R<small>EV</small>. R<small>EFLECTION</small> 47 (2019)

*A Happiness Approach to Cost-Benefit Analysis*, 62 D<small>UKE</small> L.J. 1503 (2013) (with Andrew T. Foglia)

**Works in Progress**

*Disclosure Procedure* (draft available)
*What Does "Public Company" Mean to the Public?* (draft available)
*The Market for Corporate Criminals* (in drafting)
*Non-Securities Regulation* (in data collection)
*The Splintered Bar* (in data collection)

## Presentations/Workshops

*Disclosure Procedure*
- AALS Annual Conference, Emerging Voices in Securities Regulation, 2021 (online)
- Bay Area Corporate Law Scholars Workshop, UC Hastings College of the Law, 2021
- National Business Law Scholars Conference, 2021 (online)
- ComplianceNet 2021 (online)
- Moody's Investors Service (online)
- Society for Corporate Governance Annual Conference, 2021 (online)

*What Does "Public Company" Mean to the Public?*
- National Business Law Scholars Conference, 2021 (online)

*State Securities Enforcement*
- Stanford Legal Research-in-Progress Workshop, 2020
- Corporate & Securities Litigation Workshop, 2020 (online)
- National Business Law Scholars Conference, 2020 (online)
- State & Local Government Works-in-Progress Conference, 2020 (online)

*Follow-Up Enforcement*
- Corporate & Securities Litigation Workshop, Boston University, 2019
- Stanford Fellows Workshop, 2019

*Firm Value and Intracorporate Arbitration*
- Corporate & Securities Litigation Workshop, University of Richmond, 2018

## Legal Experience

**Sullivan & Cromwell LLP**, New York, NY                    September 2017 – August 2018
*Litigation Associate*

**U.S. Court of Appeals for the Sixth Circuit**, Detroit, MI          August 2016 – August 2017
*Law Clerk to Hon. Helene N. White*

**Cravath, Swaine & Moore LLP**, New York, NY
*Corporate Associate*                                          October 2013 – May 2016
*Summer Associate*                                                    Summer 2012

**Policy Engagement**

Drafter, *Securities Scholars' Letter on Model State Whistleblower Award and Protection Act*, 2020

**Professional Service**

Creator/Host, Business Scholarship Podcast
- Weekly podcast featuring interviews with legal, accounting, and other academics on recent business-related scholarship

**Media Appearances**

*Gambling Addiction Experts See Familiar Aspects in Robinhood App*, NBC News (Jan. 30, 2021)

*A Few of Our Favorite Things: Podcasts You'll Love*, inSecurities Podcast (Dec. 30, 2020)

*Among Democrats, A Growing Appetite To Alter High Court*, Law360 (Sept. 26, 2020)

*How Democrats Could Curb a Conservative SCOTUS Without Court-Packing*, Reuters (Sept. 23, 2020)

*Andrew Jennings on Podcasting*, Ipse Dixit (Aug. 26, 2020)

*It's Real and It's Spectacular: A Free Summer Class on 'Seinfeld' and the Law*, Law.com (May 14, 2020)

*Chad Focus Wanted to Be a Rap Mogul. How Much Fraud Would It Take?*, Vice (Dec. 20, 2019)

*Arrest of U.S. Millionaire Grows into Massive Sex Trafficking Case*, Organized Crime and Corruption Reporting Project (July 10, 2019)

**Bar Memberships**

New York, 2014
North Carolina, 2019
U.S. Court of Appeals for the Sixth Circuit, 2017
U.S. Court of Appeals for the Ninth Circuit, 2018
U.S. District Court for the Eastern District of New York, 2017
U.S. District Court for the Southern District of New York, 2017

Exhibit 2

**EXHIBIT 2**

**Historical Summary of**
**OSI Systems, Inc. ("OSI") Board of Directors (the "Board")**
**Membership, Nominations, and Elections**

**Table 1. OSI Board Appointment, Nomination, and Election History**

| Event Affecting Board Membership | Date of Event | Composition After Event Affecting Board Membership | Nominees Voted on by Shareholders (1) | Results of Election (1) For/Withheld/Broker Non-Votes | | | OSI Source Document (2) |
|---|---|---|---|---|---|---|---|
| Initial public offering | 1997 | Deepak Chopra | N/A | N/A | | | Form S-1 (June 13, 1997) |
| | | Ajay Mehra | | | | | |
| | | Steven C. Good | | | | | |
| | | Meyer Luskin | | | | | |
| | | Madan G. Syal | | | | | |
| Annual Meeting of Stockholders | Nov. 18, 1998 | Deepak Chopra | Deepak Chopra (3) | 8,037,338 | 6,550 | — | Sch. 14A (Oct. 15, 1998) |
| | | Ajay Mehra | Ajay Mehra (3) | 8,037,688 | 6,200 | — | |
| | | Steven C. Good | Steven C. Good (3) | 8,035,788 | 8,100 | — | Form 10-Q (Feb. 16, 1999) |
| | | Meyer Luskin | Meyer Luskin (3) | 8,038,188 | 5,700 | — | |
| | | Madan G. Syal | Madan G. Syal (3) | 8,038,188 | 5,700 | — | |
| Annual Meeting of Stockholders | Nov. 17, 1999 | Deepak Chopra | Deepak Chopra (3) | 8,596,987 | 28,885 | — | Sch. 14A (Oct. 13, 1999) |
| | | Ajay Mehra | Ajay Mehra (3) | 8,596,987 | 28,885 | — | |
| | | Steven C. Good | Steven C. Good (3) | 8,596,987 | 28,885 | — | Form 10-Q (Feb. 14, 2000) |
| | | Meyer Luskin | Meyer Luskin (3) | 8,596,987 | 28,885 | — | |
| | | Madan G. Syal | Madan G. Syal (3) | 8,596,987 | 28,885 | — | |
| Annual Meeting of Stockholders | Nov. 16, 2000 | Deepak Chopra | Deepak Chopra (3) | 7,829,654 | 560,865 | — | Sch. 14A (Oct. 16, 2000) |
| | | Ajay Mehra | Ajay Mehra (3) | 7,829,654 | 560,865 | — | |
| | | Steven C. Good | Steven C. Good (3) | 7,829,654 | 560,865 | — | Form 10-Q (Feb. 14, 2001) |
| | | Meyer Luskin | Meyer Luskin (3) | 7,829,654 | 560,865 | — | |
| | | Madan G. Syal | Madan G. Syal (3) | 7,829,654 | 560,865 | — | |
| Board size expanded; appointment by Board to new seat | June 14, 2001 | Deepak Chopra | N/A | N/A | | | Sch. 14A (Oct. 12, 2001) |
| | | Ajay Mehra | | | | | |
| | | Steven C. Good | | | | | |
| | | Meyer Luskin | | | | | |
| | | Madan G. Syal | | | | | |
| | | Chand R. Viswanathan* | | | | | |
| Annual Meeting of Stockholders | Nov. 16, 2001 | Deepak Chopra | Deepak Chopra (3) | 6,955,380 | 53,362 | — | Sch. 14A (Oct. 12, 2001) |
| | | Ajay Mehra | Ajay Mehra (3) | 6,955,380 | 53,362 | — | |
| | | Steven C. Good | Steven C. Good (3) | 6,996,380 | 12,362 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 6,996,380 | 12,362 | — | Form 10-Q (Feb. 14, 2002) |
| | | Madan G. Syal | Madan G. Syal (3) | 6,994,500 | 14,242 | — | |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | (4) | | | |
| Annual Meeting of Stockholders | Nov. 14, 2002 | Deepak Chopra | Deepak Chopra (3) | 6,167,446 | 4,381,223 | — | Sch. 14A (Oct. 15, 2002) |
| | | Ajay Mehra | Ajay Mehra (3) | 6,170,998 | 4,377,681 | — | |
| | | Steven C. Good | Steven C. Good (3) | 9,803,098 | 745,581 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 9,800,927 | 747,752 | — | Form 10-Q (Feb. 14, 2003) |
| | | Madan G. Syal (6) | Madan G. Syal (3) | 9,816,622 | 732,057 | — | |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 9,799,143 | 749,536 | — | |
| | | Ajay Mehra | | | | | |
| | | Steven C. Good | | | | | |
| Annual Meeting of Stockholders | Nov. 5, 2003 | Deepak Chopra | Deepak Chopra (3) | 10,153,684 | 2,777,646 | — | Sch. 14A (Oct. 2, 2003) |
| | | Ajay Mehra | Ajay Mehra (3) | 10,157,802 | 2,773,528 | — | |
| | | Steven C. Good | Steven C. Good (3) | 12,811,614 | 119,716 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,807,927 | 123,403 | — | Form 10-Q (Feb. 13, 2004) |
| | | Madan G. Syal | Madan G. Syal (3) | 10,179,243 | 2,752,087 | — | |

| Event | Date | Nominee | Director | Votes | Votes | Broker | Filing |
|---|---|---|---|---|---|---|---|
| | | | Chand R. Viswanathan (3) | 12,804,849 | 126,481 | — | |
| Resignation of Madan G. Sayal from the Board | June 30, 2004 | Deepak Chopra / Ajay Mehra / Steven C. Good / Meyer Luskin / Chand R. Viswanathan | N/A | N/A | | | Sch. 14A (Sept. 30, 2004) |
| Annual Meeting of Stockholders (5) | Nov. 8, 2004 | Deepak Chopra | Deepak Chopra (3) | 12,553,221 | 839,363 | — | Sch. 14A (Sept. 30, 2004) |
| | | Ajay Mehra | Ajay Mehra (3) | 12,507,287 | 867,297 | — | |
| | | Steven C. Good | Steven C. Good (3) | 12,199,447 | 1,175,137 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,187,650 | 1,186,934 | — | Form 10-Q (Feb. 9, 2005) |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 12,582,113 | 792,471 | — | |
| Annual Meeting of Stockholders | Nov. 11, 2005 | Deepak Chopra | Deepak Chopra (3) | 13,927,666 | 255,213 | — | Sch. 14A (Oct. 12, 2005) |
| | | Ajay Mehra | Ajay Mehra (3) | 13,912,330 | 270,549 | — | |
| | | Steven C. Good | Steven C. Good (3) | 13,744,771 | 438,108 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 13,757,229 | 425,650 | — | Form 10-Q (Feb. 17, 2006) |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 14,079,131 | 103,748 | — | |
| Board size expanded; appointment by Board to new seat | Sept. 27, 2006 | Deepak Chopra / Ajay Mehra / Steven C. Good / Meyer Luskin / Chand R. Viswanathan / Leslie E. Bider* | N/A | N/A | | | Form 8-K (Sept. 28, 2006) |
| Annual Meeting of Stockholders (5) | Nov. 30, 2006 | Deepak Chopra | Deepak Chopra (3) | 12,630,352 | 1,662,641 | — | Sch. 14A (Oct. 10, 2006) |
| | | Ajay Mehra | Ajay Mehra (3) | 12,625,486 | 1,667,507 | — | |
| | | Steven C. Good | Steven C. Good (3) | 12,212,741 | 2,080,252 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,408,002 | 1,884,991 | — | Form 10-Q (Feb. 8, 2007) |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 12,661,894 | 1,631,099 | — | |
| | | Leslie E. Bider | Leslie E. Bider (3) | 12,827,708 | 1,465,285 | — | |
| Annual Meeting of Stockholders (5) | Dec. 5, 2007 | Deepak Chopra | Deepak Chopra (3) | 14,305,854 | 183,645 | — | Sch. 14A (Oct. 29, 2007) |
| | | Ajay Mehra | Ajay Mehra (3) | 14,301,990 | 187,509 | — | |
| | | Steven C. Good | Steven C. Good (3) | 13,755,844 | 733,655 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 14,119,226 | 370,273 | — | Form 10-Q (Feb. 5, 2008) |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 14,375,878 | 113,621 | — | |
| | | Leslie E. Bider | Leslie E. Bider (3) | 14,379,712 | 109,787 | — | |
| Annual Meeting of Stockholders | Dec. 8, 2008 | Deepak Chopra | Deepak Chopra (3) | 14,554,446 | 385,138 | — | Sch. 14A (Oct. 14, 2008) |
| | | Ajay Mehra | Ajay Mehra (3) | 14,497,511 | 442,073 | — | |
| | | Steven C. Good | Steven C. Good (3) | 13,309,310 | 1,630,274 | — | |
| | | Meyer Luskin | Meyer Luskin (3) | 14,066,465 | 873,119 | — | Form 10-Q (Jan. 29, 2009) |
| | | Chand R. Viswanathan | Chand R. Viswanathan (3) | 14,861,290 | 78,294 | — | |
| | | Leslie E. Bider | Leslie E. Bider (3) | 14,021,422 | 918,162 | — | |
| Annual Meeting of Stockholders | Mar. 5, 2010 | Deepak Chopra | Deepak Chopra (3) | 11,972,247 | 601,594 | 3,699,445 | Sch. 14A (Feb. 5, 2010) |
| | | Ajay Mehra | Ajay Mehra (3) | 12,114,506 | 495,335 | 3,699,445 | |
| | | Steven C. Good | Steven C. Good (3) | 12,071,866 | 501,975 | 3,699,445 | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,067,868 | 505,973 | 3,699,445 | Form 8-K12G3 (Mar. 8, 2010) |
| | | Leslie E. Bider | Leslie E. Bider (3) | 11,030,520 | 1,543,321 | 3,699,445 | |
| | | David T. Feinberg* (6) | David T. Feinberg (3) | 12,474,926 | 98,915 | 3,699,445 | |
| Resignation from Board; appointment of successor | May 5, 2010 | Deepak Chopra / Ajay Mehra / Steven C. Good / Meyer Luskin / David T. Feinberg / William F. Ballhaus* (7) | N/A | N/A | | | Form 8-K (May 10, 2010) |
| Annual Meeting of Stockholders | Nov. 30, 2010 | Deepak Chopra | Deepak Chopra (3) | 14,236,949 | 768,652 | 2,286,128 | Sch. 14A (Oct. 12, 2010) |
| | | Ajay Mehra | Ajay Mehra (3) | 14,373,642 | 631,959 | 2,286,128 | |
| | | Steven C. Good | Steven C. Good (3) | 13,691,702 | 1,313,899 | 2,286,128 | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,421,892 | 2,583,709 | 2,286,128 | Form 8-K (Dec. 1, 2010) |
| | | David T. Feinberg | David T. Feinberg (3) | 14,618,039 | 387,572 | 2,286,128 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 14,695,499 | 310,102 | 2,286,128 | |
| | | Deepak Chopra | Deepak Chopra (3) | 14,902,060 | 1,163,218 | 2,113,749 | |

| Event | Date | Nominee | Nominee | | | | Filing |
|---|---|---|---|---|---|---|---|
| Annual Meeting of Stockholders | Dec. 1, 2011 | Ajay Mehra | Ajay Mehra (3) | 15,521,142 | 544,136 | 2,113,749 | Sch. 14A (Oct. 7, 2011) |
| | | Steven C. Good | Steven C. Good (3) | 15,365,421 | 699,857 | 2,113,749 | |
| | | Meyer Luskin | Meyer Luskin (3) | 13,516,085 | 2,549,193 | 2,113,749 | Form 8-K (Dec. 2, 2011) |
| | | David T. Feinberg | David T. Feinberg (3) | 15,741,114 | 324,164 | 2,113,749 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 15,740,922 | 324,356 | 2,113,749 | |
| Annual Meeting of Stockholders | Dec. 12, 2012 | Deepak Chopra | Deepak Chopra (3) | 15,508,215 | 1,343,332 | 1,939,540 | Sch. 14A (Oct. 23, 2012) |
| | | Ajay Mehra | Ajay Mehra (3) | 15,805,948 | 1,045,599 | 1,939,540 | |
| | | Steven C. Good | Steven C. Good (3) | 15,281,634 | 1,569,913 | 1,939,540 | |
| | | Meyer Luskin | Meyer Luskin (3) | 13,938,228 | 2,913,319 | 1,939,540 | Form 8-K (Dec. 13, 2013) |
| | | David T. Feinberg | David T. Feinberg (3) | 16,510,380 | 341,167 | 1,939,540 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 16,262,808 | 588,739 | 1,939,540 | |
| Annual Meeting of Stockholders | Dec. 3, 2013 | Deepak Chopra | Deepak Chopra (3) | 15,527,369 | 1,201,765 | 1,637,707 | Sch. 14A (Oct. 15, 2013) |
| | | Ajay Mehra | Ajay Mehra (3) | 16,009,018 | 720,116 | 1,637,707 | |
| | | Steven C. Good | Steven C. Good (3) | 15,132,290 | 1,596,844 | 1,637,707 | |
| | | Meyer Luskin | Meyer Luskin (3) | 15,704,263 | 1,024,871 | 1,637,707 | Form 8-K (Dec. 3, 2013) |
| | | David T. Feinberg | David T. Feinberg (3) | 16,472,423 | 256,711 | 1,637,707 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 16,354,933 | 374,201 | 1,637,707 | |
| Annual Meeting of Stockholders | Dec. 12, 2014 | Deepak Chopra | Deepak Chopra (3) | 15,431,385 | 451,399 | 1,687,958 | Sch. 14A (Oct. 17, 2014) |
| | | Ajay Mehra | Ajay Mehra (3) | 15,782,436 | 100,348 | 1,687,958 | |
| | | Steven C. Good | Steven C. Good (3) | 14,828,183 | 1,054,601 | 1,687,958 | |
| | | Meyer Luskin | Meyer Luskin (3) | 14,826,908 | 1,055,876 | 1,687,958 | Form 8-K (Dec. 12, 2014) |
| | | David T. Feinberg | David T. Feinberg (3) | 14,723,921 | 1,158,863 | 1,687,958 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 14,877,308 | 1,005,476 | 1,687,958 | |
| Annual Meeting of Stockholders | Dec. 8, 2015 | Deepak Chopra | Deepak Chopra (3) | 16,472,839 | 803,815 | 1,363,268 | Sch. 14A (Oct. 19, 2015) |
| | | Ajay Mehra | Ajay Mehra (3) | 16,683,683 | 592,971 | 1,363,268 | |
| | | Steven C. Good | Steven C. Good (3) | 14,271,563 | 3,005,091 | 1,363,268 | |
| | | Meyer Luskin | Meyer Luskin (3) | 14,419,034 | 2,857,620 | 1,363,268 | Form 8-K (Dec. 8, 2015) |
| | | William F. Ballhaus | William F. Ballhaus (3) | 15,191,614 | 2,085,040 | 1,363,268 | |
| | | James B. Hawkins* | James B. Hawkins (3) | 16,570,668 | 705,986 | 1,363,268 | |
| Board size expanded; appointment by Board to new seat | Oct. 10, 2016 | Deepak Chopra | N/A | | N/A | | Form 8-K (Oct. 14, 2016) |
| | | Ajay Mehra | | | | | |
| | | Steven C. Good | | | | | |
| | | Meyer Luskin | | | | | |
| | | William F. Ballhaus | | | | | |
| | | James B. Hawkins | | | | | |
| | | Gerald Chizever* | | | | | |
| Annual Meeting of Stockholders | Dec. 6, 2016 | Deepak Chopra | Deepak Chopra (3) | 15,999,126 | 597,972 | 1,219,462 | Sch. 14A (Oct. 21, 2016) |
| | | Ajay Mehra | Ajay Mehra (3) | 15,965,941 | 631,157 | 1,219,462 | |
| | | Steven C. Good | Steven C. Good (3) | 15,548,733 | 1,048,365 | 1,219,462 | |
| | | Meyer Luskin | Meyer Luskin (3) | 15,149,689 | 1,447,409 | 1,219,462 | Form 8-K (Dec. 6, 2016) |
| | | William F. Ballhaus | William F. Ballhaus (3) | 15,899,049 | 698,049 | 1,219,462 | |
| | | James B. Hawkins | James B. Hawkins (3) | 16,212,632 | 384,466 | 1,219,462 | |
| | | Gerald Chizever | Gerald Chizever (3) | 15,910,218 | 686,880 | 1,219,462 | |
| Annual Meeting of Stockholders | Dec. 11, 2017 | Deepak Chopra | Deepak Chopra (3) | 15,625,377 | 540,005 | 1,535,061 | Sch. 14A (Oct. 23, 2017) |
| | | Ajay Mehra | Ajay Mehra (3) | 15,392,906 | 772,476 | 1,535,061 | |
| | | Steven C. Good | Steven C. Good (3) | 15,236,008 | 929,374 | 1,535,061 | |
| | | Meyer Luskin | Meyer Luskin (3) | 14,683,090 | 1,482,292 | 1,535,061 | Form 8-K (Dec. 12, 2017) |
| | | William F. Ballhaus | William F. Ballhaus (3) | 15,849,871 | 315,511 | 1,535,061 | |
| | | James B. Hawkins | James B. Hawkins (3) | 13,258,170 | 2,907,212 | 1,535,061 | |
| | | Gerald Chizever | Gerald Chizever (3) | 15,599,514 | 565,868 | 1,535,061 | |
| Annual Meeting of Stockholders | Dec. 10, 2018 | Deepak Chopra | Deepak Chopra (3) | 13,915,913 | 971,885 | 1,495,460 | Sch. 14A (Oct. 19, 2018) |
| | | Ajay Mehra | Ajay Mehra (3) | 13,793,842 | 1,093,956 | 1,495,460 | |
| | | Steven C. Good | Steven C. Good (3) | 13,210,662 | 1,677,136 | 1,495,460 | |
| | | Meyer Luskin | Meyer Luskin (3) | 12,824,120 | 2,063,678 | 1,495,460 | Form 8-K (Dec. 11, 2018) |
| | | William F. Ballhaus | William F. Ballhaus (3) | 12,048,748 | 2,839,050 | 1,495,460 | |
| | | James B. Hawkins | James B. Hawkins (3) | 11,213,893 | 3,673,905 | 1,495,460 | |
| | | Gerald Chizever | Gerald Chizever (3) | 13,904,150 | 983,648 | 1,495,460 | |
| Annual | | Deepak Chopra | Deepak Chopra (3) | 14,934,187 | 385,760 | 1,448,965 | Sch 14A (Oct. 22, 2019) |
| | | Steven C. Good | Steven C. Good (3) | 13,700,528 | 1,619,419 | 1,448,965 | |

| Event | Date | Nominee | Elected | | | | Source |
|---|---|---|---|---|---|---|---|
| Meeting of Stockholders | Dec. 12, 2019 | Meyer Luskin | Meyer Luskin (3) | 13,606,886 | 1,713,061 | 1,448,965 | Form 8-K (Dec. 13, 2019) |
| | | William F. Ballhaus | William F. Ballhaus (3) | 14,433,825 | 886,122 | 1,448,965 | |
| | | James B. Hawkins | James B. Hawkins (3) | 14,691,982 | 627,965 | 1,448,965 | |
| | | Gerald Chizever | Gerald Chizever (3) | 14,428,874 | 891,073 | 1,448,965 | |
| | | Kelli Bernard* (8) | Kelli Bernard (3) | 15,225,248 | 94,699 | 1,448,965 | |
| Annual Meeting of Stockholders | Dec. 10, 2020 | Deepak Chopra | Deepak Chopra (3) | 14,482,794 | 313,076 | 1,309,960 | Sch. 14A (Oct. 21, 2020) Form 8-K (Dec. 11, 2020) |
| | | Steven C. Good | Steven C. Good (3) | 10,528,855 | 4,267,015 | 1,309,960 | |
| | | Meyer Luskin | Meyer Luskin (3) | 13,909,174 | 886,696 | 1,309,960 | |
| | | William F. Ballhaus | William F. Ballhaus (3) | 14,657,429 | 138,441 | 1,309,960 | |
| | | James B. Hawkins | James B. Hawkins (3) | 11,443,129 | 3,352,741 | 1,309,960 | |
| | | Gerald Chizever | Gerald Chizever (3) | 13,791,970 | 1,003,900 | 1,309,960 | |
| | | Kelli Bernard | Kelli Bernard (3) | 14,696,815 | 99,055 | 1,309,960 | |

* Shaded cells indicate a new individual joining the Board.

(1) Applicable only when the "Event Affecting Board Membership" is a shareholder election.

(2) "OSI Source Document" refers to a Registration Statement on Form S-1; Proxy Statements on Schedule 14A; Current Reports on Form 8-K; and Quarterly Reports on Form 10-K, including relevant exhibits thereto, filed by OSI with the U.S. Securities and Exchange Commission ("SEC").

(3) Nominated by the Board.

(4) Item 4 of OSI's February 14, 2002 Form 10-Q reports the results of elections for Messrs. Chopra, Mehra, Luskin, and Syal, but it does not report such results for Dr. Viswanathan, despite Dr. Viswanathan being among the Board's nominees in the October 12, 2001 proxy statement. However, subsequent history, as shown in Table 1, indicates that Dr. Viswanathan continued to serve on the Board.

(5) Item 4 of OSI's Quarterly Report on Form 10-Q reports the results of election in terms of "For," "Against," and "Abstain," however Voting Item 1 on the proxy-card specimen in the proxy statement presents the option to vote "FOR ALL" or "WITHHOLD AUTHORITY FOR ALL" of the Board's nominees.

(6) Dr. Viswanathan notified OSI on December 21, 2009 that he would retire from the Board after the election of his successor. Schedule 14A (Feb. 5, 2010).

(7) On May 5, 2010, Leslie E. Bider resigned from the Board; William F. Ballhaus was appointed that same day by the Board to fill the vacancy created by Mr. Bider's resignation. Form 8-K (May 10, 2010).

(8) The 2019 proxy statement states "Ajay Mehra, President of our Cargo Scanning and Solutions business, has decided not to continue on our Board in order to concentrate his time on the Cargo Scanning and Solutions business, which is likely to be a key growth driver for the Company in the long term, and the Board has agreed that the Company would be best served through his focus on that business. Ms. Bernard has been nominated to the board seat currently held by Mr. Mehra." Schedule 14A, at 4 (Oct. 22, 2019).

**Table 2. OSI 5% Shareholder and Management Shareholding Summary**

| Proxy Season | Outstanding Shares as of Record Date | Shares Held by 5% Shareholders (1) | Shares Held by Directors and Executive Officers | Combined Percentage | OSI Source Document |
|---|---|---|---|---|---|
| 2020 | 17,919,229 | 7,793,836 (2) | 1,188,332 | 50.13% | Sch. 14A (Oct. 21, 2020) |
| 2019 | 18,357,463 | 8,362,337 (3) | 1,260,149 | 52.42% | Sch. 14A (Oct. 22, 2019) |
| 2018 | 18,153,122 | 7,403,479 (4) | 1,604,721 | 49.62% | Sch. 14A (Oct. 19, 2018) |
| 2017 | 18,967,963 | 7,200,013 (5) | 1,492,683 | 45.83% | Sch. 14A (Oct. 23, 2017) |
| 2016 | 18,926,290 | 6,196,208 (6) | 1,471,180 | 40.51% | Sch. 14A (Oct. 21, 2016) |

(1) As indicated in OSI proxy statements, the number of shares held as of the record date may vary from the number disclosed in a proxy statement due to timing differences between the record date and when 5% shareholders made their shareholding disclosures to the SEC.

(2) These shares were held by BlackRock, Inc.; The Vanguard Group, Inc.; Janus Henderson Group Plc; and Dimensional Fund Advisors LP.

(3) These shares were held by BlackRock, Inc.; The Vanguard Group, Inc.; Janus Henderson Group Plc; Dimensional Fund Advisors LP; and Credit Suisse AG.

(4) These shares were held by BlackRock, Inc.; The Vanguard Group, Inc.; EARNEST Partners, LLC; Janus Henderson Group Plc; and Dimensional Fund Advisors LP.

(5) These shares were held by BlackRock, Inc., Janus Capital Management LLC; The Vanguard Group, Inc.; Dimensional Fund Advisors LP; and EARNEST Partners, LLC.

(6) These shares were held by BlackRock, Inc.; Janus Capital Management LLC; The Vanguard Group, Inc.; and EARNEST Partners, LLC.