1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MICHAEL L. NEWMAN, State Bar No. 222993
   Senior Assistant Attorney General
3  LAURA L. FAER, State Bar No. 233846
   VILMA PALMA-SOLANA, State Bar No. 267992
4  Supervising Deputy Attorneys General
   LISA CISNEROS, State Bar No. 251473
5  MARISOL LEÓN, State Bar No. 298707
   Deputy Attorneys General
6   455 Golden Gate Ave., Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 510-3438
    E-mail: Lisa.Cisneros@doj.ca.gov
8  *Attorneys for Defendant California*
   *Secretary of State Shirley N. Weber*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| **CREIGHTON MELAND, JR.,**<br><br>　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>**SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,**<br><br>　　　　　　　　　　Defendant. | Case No. 2:19-cv-02288-JAM-AC<br><br>**DECLARATION OF SUSANNE MELINE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　　October 19, 2021<br>Time:　　　1:30<br>Dept:　　　Courtroom 6, 14th Floor<br>Judge:　　　Honorable John A. Mendez<br>Action Filed: November 13, 2019 |

**DECLARATION OF SUSANNE MELINE**

I, Susanne Meline, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

1. I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

**Background and Experience**

2. I am the co-founder of and special situations advisor for Francis Capital Management, LLC ("FCM") which is a value-based equity investment advisor that focuses on investing in companies that are part of the Russell 2000 index. These companies typically have market capitalizations of under two billion dollars which places them in the bottom two-thirds of the Russell 3000 index by value. A company's market capitalization equals the number of shares outstanding times the price that such shares are trading in the market.

3. FCM is the advisor to a private investment fund that consists of the pooled capital of numerous investors. FCM is otherwise known as a "hedge fund" and considered to be an institutional investor.

4. Prior to co-founding FCM, I was previously employed for 7 years in the investment banking and legal fields with Houlihan Lokey, a global investment bank serving corporations, institutions, and governments worldwide and Jones Day, an international law firm that provides legal advisory services across multiple disciplines and jurisdictions.

5. I am a Certified Director through the UCLA Anderson School of Management and a Board Leadership Fellow of the National Association of Corporate Directors (NACD). I also hold a CERT Certificate in CyberSecurity Oversight for Corporate Directors from the NACD and Carnegie Mellon University Software Engineering Institute and a certificate from Harvard Business School regarding audit committees.

6. I regularly meet with and assess companies as potential investments and evaluate their boards of directors, considering whether the directors have recent relevant experience, whether they have social or other links with directors outside the boardroom, and seeking to determine

whether they have successful track records as a directors or executives. Every year, I attend numerous investment conferences and meet with and/or analyze over 30-40 public companies. My firm and I engage in this analysis to appropriately understand the risk/reward ratio and determine whether a particular company's stock provides a good investment opportunity. Whether any board members have been associated with successful transactions in the industry; whether the board has evolved over time to reflect the company's current stage of corporate development; and how compensation is awarded to the board and management can all be harbingers of future success or problems. I also further discuss this below in paragraphs 18-19, 42.

7. I am active in the corporate board community, regularly attending continuing education programs for directors as well as creating content in my areas of expertise for the board community as a Select Contributor to the Small Cap Institute and a speaker for the Athena Alliance. I was featured in Chapter 6 of the book Winning the Board Game on how directors can identify boards where they can add maximum value.

8. Since 2018, I have been a member of the board of directors of ClearSign Technologies (NASDAQ: *CLIR)* where I have been elected to serve as the lead independent director. I also currently chair its compensation committee and am a member of the audit as well the nomination and governance committees. In 2018-19, I led a turnaround at this company, which included raising additional capital on favorable terms utilizing a novel deal structure, executing C-Suite changes, recruiting new board of director members and settling a shareholder activist campaign.

9. Since January of 2021, I have served as a director and compensation committee member of the publicly traded Ra Medical Systems (NYSE AMEX: *RMED*).

10. From 2019 to 2020, I served as a director of Aqua Metals, Inc. (NASDAQ: *AQMS*), a publicly held company. While serving on Aqua Metals, Inc., I was a member of the audit and nomination/governance committees.

11. The first corporate board I joined was that of Finomial Corporation, where I was a director from 2017 to 2019.

12. I have also served on, been an advisor to or an observer of numerous other boards, including non-profits such as the Craft Contemporary museum in Los Angeles.

13. I was asked to testify before the Banking and Finance Committees of both the California State Senate and Assembly about Russell 3000 public corporate boards from my unique perspective as both director and institutional investor and specifically with respect to Senate Bill 826.

14. I received a B.A. in political science from UCLA, and a J.D. from the UC Hastings College of the Law. I clerked on the United States District Court and the United States Bankruptcy Court in the Central District of California.

15. I have attached hereto as **Exhibit 1** a true and correct copy of my curriculum vitae, which provides additional information about my professional background and experience.

16. Through the aforementioned roles and positions, including as a director, institutional investor, investment banker and lawyer, I have first-hand experience with how the board of directors selection process is executed having sought to identify and select qualified directors for public boards on which I serve, as a candidate for board positions myself and as a member of activist shareholder director slates as part of the proxy process. In addition, I regularly review the qualifications of board of director members when I look at companies in which my firm invests and am also familiar with the pool of qualified women available to serve on boards as a result of my professional activities in the board community.

17. This declaration regarding corporate boards and the director nomination and selection process is based on my personal experience as an investor in public and private companies, previous work on behalf of corporations both as an investment banker and a lawyer, and as an experienced corporate director.

**Corporate Director Positions**

18. Independent directors play a critical role in both the success of a company as well as its ability to avoid failure. Directors are expected to represent the company's shareholders. Because research shows that a competent, engaged board affects a company's ability to become more valuable over time, it is an important investment consideration at my firm. The quality and

makeup of a corporate board, and its likely effectiveness, is also a key determinant of whether a company is able to avoid serious missteps such as fraud, poor treatment of employees, deployment of toxic financing structures, all of which destroy value for investors. Directors oversee all crucial aspects of a corporation, including strategy, risk identification and mitigation, hiring and compensating senior executives, corporate culture, and production of audited financial statements. They exercise their business judgment seeking to ensure that the corporation makes reasonable decisions in the above-listed areas, all of which can prevent a corporation from declining or failing and as well as maximizing its chance of long-term success. Boards also need to use their expertise to foresee and help companies navigate future challenges and opportunities.

19. In the business world, obtaining a corporate board director seat is a very important professional opportunity and network building step for any high-level executive or business leader hoping to add value and further advance their careers. Boards enable professionals to contribute their knowledge and experience to the success of a business as well as to expand their networks, and develop additional business connections.

20. Corporate directorships can also be lucrative. Corporate directors receive compensation for their service. It is well-known by many in business that executives later in their careers seek to position themselves for seats on corporate boards through individuals in their personal and social networks so that they can receive additional annual earnings long after they retire from their full-time jobs. Famed investor Warren Buffet highlighted this fact in his 2020 annual investment letter discussing his views on corporate directors and their shortcomings observing that "[d]irector compensation has now soared to a level that . . . .[is] . . . . three to four times the annual median income of U.S. households. . . . Is it any wonder that a . . . director . . . now hopes – or even yearns – to be asked to join a second board."[1] Current directors use these prized opportunities to refer board seats within their own network thereby increasing their chances of being named to other boards themselves by members of their network who they had helped place on a board.

---

[1] Berkshire Hathaway, Inc., Letter to Shareholders, Chairman of the Board, Warren E. Buffet, Feb. 22, 2020, https://www.berkshirehathaway.com/letters/2019ltr.pdf.

21. For women professionals, corporate director positions are important for the same reasons as men—expanding business networks, obtaining new skills and experience, gaining additional income, and as either the culmination of or integral part of a successful career. Obtaining board seats appears to be particularly important to women as recent research conducted by the Harvard Business Review indicates that, for women, being elected to a board is a precursor to a women being named the CEO of a company.[2]

**Qualified Pool of Women Corporate Director Candidates**

22. Through my participation in the board community both as a learner and a speaker as well as through my three decades of experience as investor, investment banker, and corporate lawyer, I am well aware that within the state of California and beyond, there is a robust and very substantial pool of women with a broad variety of senior professional experience who are eminently qualified to serve on publicly held corporate boards. In fact, in my experience, women are more likely than men to have availed themselves of the professional education opportunities available to current and prospective board directors to ensure that they not only have maximized their current knowledge, but maintain and expand this knowledge amidst a rapidly changing business climate.

23. Based on my experience, I can unequivocally say that the number of qualified women who would be excellent board members vastly exceeds the number of board seats available at publicly held corporations headquartered in California, which I understand to be at about 600 corporations total.

24. I have personally participated in numerous director certification and education programs and at which there have collectively been hundreds of women gaining the knowledge required to sit on boards to add to their professional expertise. These programs and certifications are offered throughout the year by elite universities such as Harvard Business School, Stanford Graduate School of Business, the Kellogg School at Northwestern and the UCLA Anderson

---

[2] Catherine H. Tinsley and Kate Purmal, *Board Experience is Helping More Women Get CEO Jobs*, Harvard Business Review (July 29, 2019), https://hbr.org/2019/07/research-board-experience-is-helping-more-women-get-ceo-jobs.

1  School as well as by top professional service companies such as the accounting firm
2  PricewaterhouseCoopers (PWC) and the well-respected National Association of Corporate
3  Directors ("NACD").   Further, there are many groups comprised of board-ready women, and
4  here is but a sampling of these groups, which include Woman Corporate Directors Network
5  (2,500 members), Athena Alliance (1,000 members), Women's Leadership Forum (250
6  members), Exceptional Women Awardees Foundation (75 members); Stanford Woman on Boards
7  (over 1,000 members)[3], Extraordinary Woman on Boards (hundreds of women directors and
8  growing)[4] and Beyond Boards (approximately 100 members).

9      25.   As a member of (i) The Athena Alliance; (ii) Beyond Boards and (iii) the NACD, I
10 have met and learned from many senior board-ready female executives in the following
11 industries: computer hardware, software, software as a service (SAAS), finance, financial
12 services, healthcare, consulting, accounting, legal, biotech, medical devices, life sciences,
13 manufacturing, metals, chemicals, upstream, midstream and downstream oil and gas, energy,
14 cleantech, hospitality, gaming, retail, real estate, human resources, and consumer products.  The
15 breadth, experience, expertise and professionalism of these women is unparalleled.  Further,
16 although specific industry expertise is sometimes desired on some boards, many board members
17 can also provide valuable leadership based on their general business experience in other areas
18 enabling them to oversee management's approach to developing strategy, pivoting when
19 necessary, identification and oversight of risk management, cybersecurity, and management of
20 human resources.  Many women also have non-profit board experience, which can also be highly
21 relevant particularly if the non-profit board oversees an operating entity and its audit, finance,
22 human capital, cyber security and strategy issues.

23 **Corporate Board Director Search and Nomination Processes and Discriminatory Barriers Facing Women Corporate Director Candidates**
24
25     26.   I am familiar with the statistical evidence of gender disparities that the Legislature
26 considered when it passed SB 826, and I track trends in the selection of women directors for

---

[3] https://stanfordwomenonboards.stanford.edu/recruit.
[4] https://www.ewobnetwork.com/about.

corporate boards through news articles and other publications. Notwithstanding the significant number of highly qualified potential women directors, prior to SB 826, I reviewed the data showing that more than one-fourth of all public companies headquartered in California in the Russell 3000 index had no women whatsoever on their boards. With respect to the boards in California that had in fact included women – usually it was only one per company.

27. In my experience, one of the primary reasons that women do not obtain board seats notwithstanding their excellent and sometimes superior credentials is a result of the most common method by which board positions are filled, which is through the social networks and personal connections of existing directors. These relationships constitute one of the most critical components of how directors and CEOs identify candidates. In my experience, many board members know each other through their university, business or graduate school alumni groups, membership at the same country or golf club, having served on other boards together or working on prior deals together. Athletic ability, sports and other hobbies and social interests generally have nothing to do with the qualifications needed to be an effective board director.

28. Further, I have observed throughout my professional career that the professional and social networks of men are comprised almost exclusively of other men. My observations regarding the single-gender nature of men's networks have been confirmed by many scholars, including Lisa Torres and Matt Huffman at UCI noting on page 796 of their paper, *It's Not Only 'Who You Know' that Matters: Gender, Personal Contacts, and Job Lead Quality*, that "men tend to hear about leads from other men (due to the high degree of sex homophily in men's networks)" and that "women tend to have female-dominated networks".[5] The single-sex (ie "homophilic") nature of men's professional networks is apparent in the board room as well and, as a result, men recommend men for board seats and do not recommend equally or more qualified women for the board seat because they do not have women in their professional networks.

29. This is also corroborated by discussions I have had in the numerous investor meetings with the management teams of publicly traded companies at investor conferences such as the

---

[5] Matt L. Huffman & Lisa Torres, *It's Not Only 'Who You Know' that Matters: Gender, Personal Contacts, and Job Lead Quality*, 16 GENDER & SOC'Y 793, 796 (2002).

1   H.C. Wainwright Annual Global Investment Conference and the LD Micro Main Event.  When I
2   encounter companies with one or no female directors, which is almost every company that I have
3   met with prior to SB 826, I ask management why that is the case.  I have been told by many
4   executives that they do not know any qualified women.  Because the numerous qualified women
5   are not part of men's networks, they are severely disadvantaged or effectively eliminated from the
6   board selection process which results in the replication of boards composed primarily of men year
7   after year.

8       30.   In addition, whether a board seat is or will be available and the specifics of how a
9   director will be selected is rarely known outside the boardroom.  There is typically no application
10  or application process.  The only way the public knows that a change has been made is when a
11  company files a Form 8K as required by federal securities law that notifies shareholders when a
12  director has resigned or when one is appointed.  As a result, outsiders have no way of knowing
13  that the position even exists, and therefore do not have the ability to make it known that they are
14  both qualified for and interested in the board seat.

15      31. Further, we have unfortunately learned from recent surveys of current board directors,
16  that a vast majority of male directors do not think that it is important to have women on their
17  boards.  A survey conducted by PWC in 2016 showed that 76% of current male directors do not
18  believe that board diversity improves corporate performance and 62% do not believe it improves
19  board effectiveness.[6]  As explained by Paula Loop of PWC: "[M]ale board members are saying
20  that 'we . . . hear investors and shareholders telling us we're looking for a diverse board . . .
21  [b]ut we're not entirely convinced about why we're doing that.'"[7] It is therefore not surprising
22  that board leaders, who continue to be overwhelmingly male, are not going outside of their
23  networks to seek female candidates unless required.

---

[6] Jena McGregor, *This Might Help Explain Why Corporate Boards are Still an Old Boy's Club*, Wash. Post (Oct. 11, 2016), https://www.washingtonpost.com/news/on-leadership/wp/2016/10/11/this-might-help-explain-why-corporate-boards-are-still-an-old-boys-club/.

[7] Jena McGregor, *Survey: Few Board Members Believe Diversity Improves Company Performance*, Chi. Tribune (Oct. 11, 2016), https://www.chicagotribune.com/business/ct-male-board-members-diversity-20161011-story.html.

32.     As a result, the practice of recruiting board members from social and professional networks, in which women are most often not included, deprive qualified women the same access and ability to attain board seats as similarly or less qualified men because of their gender.  These practices have the effect of discriminating against women, which is evident in the stark disparities of women participating on boards as compared to men.

**Gender Power Imbalances Within the Boardroom Create Further Barriers to Female Board Candidates**

33.     Many companies currently have only one female director.  An overwhelming number of these female directors who currently sit on boards have less power in the boardroom than other directors because they do not chair the board or any board committees.  Fewer than 5% of boards are chaired by women and only 18% of board committees in the Russell 3000 are chaired by women.[8]  Female omission from board leadership further negatively impacts the board selection process, which may consist of the Board Chair or the Nomination and Governance Committee Chair presenting one candidate to the board as a whole with a recommendation that the board vote to offer the board seat to the one recommended person.  This results in females on existing boards not getting the ability to present candidates from their personal networks.

34.     Further, I have seen selection criteria developed by board leaders that includes vague statements such as whether the candidate has "cultural alignment with the existing Board".  This places a further barrier to women obtaining a board seat as boards may have cultures in place with which women will not likely be aligned because of their gender.  For example, I have been on boards (i) where directors tell jokes at formal board dinners about "wh*#res"; (ii) where I was admonished by the board chair for offering input in my area of expertise because the male CEO reported "feeling emasculated" by the information I provided; and (iii) where financing deals were discussed using prostitution analogies.  These experiences are mirrored by many other female directors.  As reported in the Harvard Business Review in its article "Dysfunction in the Boardroom", the sole female director on one board recounts that ". . . the CEO and chairman and

---

[8] *Press Release*, The Conference Board (Sep. 30, 2020), https://www.conference-board.org/press/women-on-russell-boards-increase.

Declaration of Susanne Meline

9

other male directors had taken her aside many times and asked her to be "less vocal" and to "stop arguing her point" during meetings even though she was the one person on the board with deep industry expertise.[9] High profile board members like David Bonderman have disparagingly remarked that when the number of female directors increases, ". . . it's much more likely to be more talking"[10] This harmful stereotype continues to persist notwithstanding research that clearly shows that men talk far more, and interrupt more, than women do at meetings.[11]

35. Because there is no transparency in the board nominations and selection process, neither I nor any other woman who is qualified to serve as a corporate director will ever know that, with respect to a specific corporate board, whether we have been overlooked or rejected in favor of a male candidate. Further, even if a woman has specific reasons to believe that she has not been placed on a board due to gender-based discriminatory factors, there are no protections for her against retaliation as there are for employees. Alleging discrimination by a specific corporate board by a female candidate will more than likely eliminate her chances of becoming a corporate director in the future.

36. The impetus to avoid challenging existing board power structures is taken up by famed investor Warren Buffett in his annual letter. CEOs, who are also board members, often drive the board selection process and, in this process, ". . . will almost certainly check with the [director's] current CEO as to whether [director] is a 'good' director. 'Good,' of course, is a code word. If the [director] has seriously challenged his/her present CEO. . . . . , his or her candidacy will silently die. When seeking directors, CEOs don't look for pit bulls. It's the cocker spaniel that gets taken home."[12] It is worth noting that as of 2019 only 5% of Russell 3000 and Fortune 500 companies had female CEOs.[13]

---

[9] Boris Groysberg & Deborah Bell, *Dysfunction in the Boardroom*, Harvard Business Review (Jun. 2013), https://hbr.org/2013/06/dysfunction-in-the-boardroom.
[10] Mike Isaac & Susan Chira, *David Bonderman Resigns from Uber Board After Sexist Remark*, N.Y. Times (Jun. 13, 2017), https://www.nytimes.com/2017/06/13/technology/uber-sexual-harassment-huffington-bonderman.html.
[11] Christopher F. Karpowitz, Tali Mendelberg & Lee Shaker, *Gender Inequality in Deliberative Participation*, 106 Am. Pol. Sci. Rev. 533 (2012).
[12] Berkshire Hathaway, Inc., Letter to Shareholders, Chairman of the Board, Warren E. Buffet, Feb. 22, 2020, https://www.berkshirehathaway.com/letters/2019ltr.pdf.
[13] Matt Tonello, *CEO Succession Practices in the Russell 3000 and S&P 500*, Harvard
(continued…)

**Other Pathways to the Boardroom are Very Uncommon and Depend on a Strong Personal Network with Activist Funds Managers of Which 96% (or More) are Men**

37. There are some rare instances where people are placed on boards through different processes than described above. These situations can include when (a) an investor has a contractual right to designate a board member or ability to strongly suggest consideration of a particular candidate in connection with a significant investment; (b) a capital provider will require board representation as a condition precedent to some sort of contractual forbearance; and (c) a significant investor is willing to spend millions of dollars of money, plus time and effort, in a proxy contest to unseat and replace, or negotiate for replacement of current directors because that investor needs to protect its already significant investment in the company and is extremely unhappy with the current board. In these situations, director candidates may need special skills as the companies could possibly have serious legal, financial, shareholder relations, corporate culture or business strategy problems that need to be rapidly addressed. All the boards on which I have participated are in connection with some of the special situations described above.

38. Women are largely excluded from this process as well. First, in special situations described above, the fund manager himself often-times takes the board seat. There are virtually no women investment managers at all who have investment authority over the significant amounts of capital required to put themselves on a Board (fewer than 5% of hedge funds are run by women).[14] Second, if an activist investment manager decides to put someone on the slate besides himself (I have never met a female activist manager), he will look to his professional network. Because investment managers lack ". . . gender diversity of their own networks, they are only able to appoint male directors. . . . [T]he hedge funds' lack of connection with qualified female candidates also contributes to the negative impact of hedge fund activism on the number of female directors" according to the research conducted at the University of North Carolina at Charlotte' Department of Finance and analyzed in the paper *From Wall Street to Main Street*. As

---

Law School Forum on Corporate Governance (Jan. 15, 2021), https://corpgov.law.harvard.edu/2021/01/15/ceo-succession-practices-in-the-russell-3000-and-sp-500/.
[14] *Women in Hedge Funds*, Prequin (Feb. 2019), https://docs.preqin.com/reports/Preqin-Women-in-Hedge-Funds-February-2019.pdf.

a result, the path of obtaining a board seat by investing heavily in a company or being put on an activist slate by a large investor – is closed to nearly all women as well.

**Senate Bill 826 is Necessary Because Female Representation on Boards Is Essential and it Matters Right Now**

39. The board of directors is of paramount importance to a publicly traded company. They represent the owners of the company, which consist of disparate and changing shareholders, and are expected to curtail management's ability to act in ways that are suboptimal for shareholders, such as extracting benefits for themselves including excessive compensation.[15] Public company board members also make sure that the company produces reliable financial statements that can be relied upon by investors and ultimately oversee an operation intended to create a higher than expected risk-adjusted return on capital for shareholders.

40. Having an effective board that maximally supports a company's long-term success is critical to society. Over half of the US stock market is owned by retirement funds while another 6% is owned by insurance companies and 4% by nonprofits.[16] As a result, poor governance executed by suboptimal directors selected through single-gender personal networks has an immediate cost to society. Investment funds that own stocks of companies are investing on behalf of retirees, schools, arts organizations and other nonprofits and need to generate positive and higher than expected risk-adjusted returns on their invested capital to support their constituents.

41. In addition, corporate communities, including employees, the cities in which such companies are located, vendors, customers and other constituents, suffer needlessly as a result of avoidable corporate failure and fraud and potentially beneficial technology ceases to be developed. Firms with a mix of women and men on their boards had fewer financial reporting restatements and a lower incidence of fraud than those boards with no or only one woman.[17] This

---

[15] Yaron G. Nili, *Beyond the Numbers: Substantive Gender Diversity in Boardrooms Boardrooms*, 94 IND. L.J. 146, 153 (2019).
[16] Bob Bryan, *Here's Who Actually Owns the Stock Market*, Business Insider (May 25, 2016), https://www.businessinsider.com/who-actually-owns-the-stock-market-2016-5.
[17] *Gender-Diverse Boards Reduce Financial Misconduct, Add a Broader Perspective: New Study*, Cision PR Newswire (Feb. 5, 2020), https://www.prnewswire.com/news-
(continued…)

has also been shown to be true with bank failures and frauds.[18] There are many well-known examples of bad corporate behavior overseen by all male boards that corroborate this research, including Theranos (all male board other than the CEO); Enron; and The Weinstein Company. Investors can suffer needlessly as a result of suboptimal boards that have effectively excluded highly qualified female candidates from consideration.

42. Having started out my career as a lawyer and investment banker working with challenged companies, I have seen first-hand the impact, both good and bad, that a board can have on a company. My career has been built around helping improve corporate performance, working to maximize value for creditors and investors, and seeking to support the development of promising businesses and technologies. Too many companies fail when they could succeed and the lack of an effective board can absolutely make the difference in how investors fare along the way.

43. The common way of sourcing directors from the personal networks of the CEO, the lead director or other board chair are limited by the single-sex nature of board leadership and their networks. As noted above–membership in the same professional network or social group does in no way mean that the person in question is the best board candidate. In fact, social relationships between CEOs and board members can diminish independence as directors may be more interested in maintaining relationships to further their own personal interests rather than engaging in robust discussions and providing oversight on behalf of shareholders. Better candidates have no way of putting their hat in the ring because the opportunity is unknown. A boardroom is not a club although it is still treated as such by some directors.

44. Prior to Senate Bill 826's passage, there was much discussion with women business leaders who worked with the Legislature to try to strongly encourage change through Senate Concurrent Resolution 62 in 2013. This resolution, plus the development of extensive registries of board-ready women in business, resulted in little to no change with respect to male-dominated

---

releases/gender-diverse-boards-reduce-financial-misconduct-add-a-broader-perspective-new-study-300999655.html.

[18] Scott Berinato, *Banks With More Women on Their Boards Commit Less Fraud*, Harvard Business Review (2021), https://hbr.org/2021/05/banks-with-more-women-on-their-boards-commit-less-fraud.

and male-only boards. Board members continue to prefer individuals within their existing single-gender social and personal networks.

45. Corporate boards' selection practices have created significant, longstanding barriers for qualified women who could otherwise serve as corporate directors. SB 826 has been necessary to disrupt the discriminatory status-quo and compel corporate directors and nominating committees to take a different approach to selecting corporate directors that is more inclusive of qualified women. It has been necessary to shake-up entrenched boards to open the doors for qualified women who have not been chosen for seats solely because they were not part of an existing male network. Diverse, independent voices are needed in corporate board rooms, and Senate Bill 826 ensures that such voices have a fighting chance to be chosen.

46. I am willing to take the risk of potential retaliation to bring about change for other qualified women and improve the likelihood of success for companies that currently have sub-optimal boards by seeking to remove the barriers to women's participation on public company boards. I truly believe that the risk of corporate failure will decrease and likelihood of success will increase, all to the benefit of shareholders, which include retirees, insurance companies, nonprofits and other stock market participants, as well to their corporate customers, communities and employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct and that this declaration was executed on September 28, 2021, in Los Angeles, California.

*Susanne Meline*

# Exhibit 1

# SUSANNE MELINE

## SUMMARY

Highly experienced public and private company director with audit, compensation and nom/gov committee capabilities as well as service as lead independent director. Have chaired or participated in numerous special committees, including financing, internal investigation, and strategic options committees. Over 20 years of experience advising and investing in companies as a board member, investment banker, investor, and attorney.

## CORPORATE BOARD EXPERIENCE

**Ra Medical Systems** (NYSE MKT: *RMED*), Carlsbad, CA
*Director, Compensation Committee Member of medical device company (2021 – present)*

Joined board of company developing a unique catheter-based laser atherectomy device led by new CEO. In the process of strategically repositioning company including selling a division, rationalizing corporate expenditures, reducing cash burn, and deploying new program for raising capital

**ClearSign Technologies Corporation** (NASDAQ: *CLIR*), Seattle, WA
*Lead Independent Director, Audit Committee Chair, Compensation and Corporate Governance Committee Member of clean technology company (2018 – present)*

Led 2018 top-down turnaround, including raising additional capital on favorable terms utilizing novel deal structure, hiring retained search firm and executing C-Suite changes, refreshing board of directors, revising company bylaws and board charters and settling shareholder activism campaign

**Aqua Metals Corporation** (NASDAQ: *AQMS*), Reno, NV
*Director, Audit and Nomination/Governance Committee Member of battery recycling technology company (2019 – 2020)*

Led and was a member of several board committees including finance committee, internal investigation committee and post-fire strategy subcommittee for company seeking to deploy its electrochemical lead acid battery recycling process as an alternative to the current industry standard of smelting

**Finomial Corporation** (Series B stage venture-backed), Boston, MA
*Board Member representing Series A investors (2017 – 2019)*

Finomial is a regulation technology company providing administrators, managers and investors in the investment management industry with end-to-end investor servicing and regulatory compliance solutions including FATCA and KYC

**Catalysis Offshore Ltd.** (Small-cap offshore hedge fund), George Town, Cayman Islands
*Board Member (2009 – 2015)*

## BOARD OF DIRECTOR CERTIFICATIONS

- **National Association of Corporate Directors** – Board Leadership Fellow
- **Carnegie Mellon Software Engineering Institute** – CERT Certificate in Cyber Risk Oversight
- **UCLA Anderson Graduate School of Management** – Certified Board Director
- **Harvard Business School** – Audit Committees in a New Era of Governance

## PROFESSIONAL EXPERIENCE

**FRANCIS CAPITAL MANAGEMENT, LLC**, Los Angeles, CA (2003 – present)
*Co-Founder and Special Situations Advisor for Small-Cap Value Hedge Fund (*2003 – present)
- Make investment recommendations for equity securities of small-cap companies using a bottom-up, value-based approach, including evaluating potential catalysts for share price appreciation such as M&A transactions, spin-offs, restructurings, liquidations and shareholder activism.  Fund invests in a broad range of industries including significant concentration in biotech including immunotherapy, infectious diseases, cell therapies and medical devices
- Created and previously oversaw all operational infrastructure including IT, risk management, compliance, human resources, disaster recovery, business continuity plans and vendor oversight

**HOULIHAN LOKEY**, Los Angeles, CA
*Global Financial Restructuring* (2001 – 2002)
- Restructured, marketed and sold companies including business to consumer companies (StairMaster, Winston Tire, GameWorks) and business to business companies (Compass Aviation and Ponderosa Fibres)

**JONES DAY**, Los Angeles, CA
*Corporate Group* (1995 – 2001)
- Represented investors in bond workouts, M&A transactions, private placements of public company securities and in the formation of investment funds
- Represented companies such as Clothestime Stores, Physicians Clinical Laboratories and Montgomery Ward in restructuring transactions and their bankruptcy cases

**UNITED STATES DISTRICT COURT** Los Angeles, CA
*Judicial Law Clerk for The Honorable Dickran M. Tevrizian* (1994 –1995)
- Drafted opinions for weekly motion calendar and for the 9th Circuit Court of Appeals; hired and managed interns and attended settlement conferences

**UNITED STATES BANKRUPTCY COURT**, Los Angeles, CA
*Judicial Law Clerk for The Honorable Arthur M. Greenwald* (1993 – 1994)
- Assisted in trial preparation and analysis, drafted opinions for weekly motion calendar and for the Bankruptcy Appellate Panel

## ADDITIONAL PROFESSIONAL EXPERIENCE

- **Small Cap Institute, Select Contributor** – write articles from an investor point of view related to crucial governance topics for institute members who are small cap company officers and directors
- **Athena Alliance Pioneer** – create video content regarding finance-related board issues for corporate directors and senior executives
- **Belle Capital USA Investment Committee Advisory Member** – Analyze early-stage investment opportunities for seed stage VC fund that invests in women-led or founded businesses
- **FINRA Arbitrator** – Issue binding decisions as part of three-member arbitration panel for securities-related disputes

## EDUCATION

- **UCLA** (BA Political Science 1989)
- **UC Hastings Law School** (JD 1993)

## **PROFESSIONAL LICENCES AND MEMBERSHIPS**

- **FINRA** – Series 65 License
- **California State Bar Association** – Admitted to practice law in California

## **NON-PROFIT BOARD EXPERIENCE**

- **The Los Angeles Music Center Blue Ribbon** - Endowment Committee Member and former Board Member (2015 – 2018)
- **The Craft Contemporary Museum** - Board and Finance Committee Member (2015 – 2017)