ROB BONTA, State Bar No. 202668
Attorney General of California
MICHAEL L. NEWMAN, State Bar No. 222993
Senior Assistant Attorney General
LAURA L. FAER, State Bar No. 233846
VILMA PALMA-SOLANA, State Bar No. 267992
Supervising Deputy Attorneys General
LISA CISNEROS, State Bar No. 251473
MARISOL LEÓN, State Bar No. 298707
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3438
E-mail: Lisa.Cisneros@doj.ca.gov
*Attorneys for Defendant California Secretary of State Shirley N. Weber*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| **CREIGHTON MELAND, JR.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,**<br><br>Defendant. | Case No. 2:19-cv-02288-JAM-AC<br><br>**DECLARATION OF DARREN ROSENBLUM IN SUPPORT OF DEFENDANT SECRETARY OF STATE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 19, 2021<br>Time: 1:30 p.m.<br>Dept: Courtroom 6, 14th Floor<br>Judge: Honorable John A. Mendez<br>Action Filed: November 13, 2019 |

# DECLARATION OF DARREN ROSENBLUM

I, Darren Rosenblum, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

## Introduction

2. It is widely understood that the lack of women on corporations is a result of discrimination. Such discrimination is especially apparent at the CEO level in the United States, where as of September 2020 women constituted only 8.2% of CEOs of Fortune 500 companies.[1] In the United States, there are more CEOs named John than all women CEOs combined.[2] At the board level in the United States, as of 2020, women constituted only 21% of board directors, which is unsurprising, given that CEOs are often involved in the director selection process and typically hand-select board directors most like them. In addition, corporate board directors are chosen in part because they already have CEO experience, and, as such, discrimination in CEO selection leads to further discrimination in board selection.

3, Over the last two decades, 28 countries have enacted various requirements specifically to add women to corporate boards, including seven of the top ten economies. These measures have been taken to increase gender diversity and to combat structural sexism in business leadership, in recognition that the issue of discrimination against women qualified to serve in the highest levels of leadership would not rectify itself without government intervention.

4. Remedial diversity requirements to address these disparities, put in place by countries around the world have ranged from strict quotas, with mandatory elevated gender-based percentages, to relaxed "comply-or-explain" or disclosure requirements, all of them aimed at getting more women on corporate boards. Not all requirements have had the same success rates,

---

[1] *Fortune 500 State of Progress*, WOMEN CEOS IN AMERICA, https://womenceoreport.org/states-of-progress/fortune-500/ (last visited July 3, 2021).

[2] Claire Cain Miller et al., *The Top Jobs Where Women Are Outnumbered by Men Named John*, N. Y. TIMES (Apr. 24, 2019), https://www.nytimes.com/interactive/2018/04/24/upshot/women-and-men-named-john.html.

or have had success in achieving what is known as “critical mass”—that is, the effect where a corporate board has a certain number or percentage of seats held by women so that women are not undermined and can actually impact the board’s decision making, as opposed to being a mere token. As discussed below, governments with stricter requirements have far greater success in realizing critical mass, and while governments that only enact “comply or explain” or disclosure requirements have achieved some success, they generally prove less likely to achieve critical mass. Another central purpose of corporate board diversity requirements is to enhance business performance through diversity in leadership, known as the “business case” argument. Understanding that diverse teams are more successful, governments have imposed corporate board diversity requirements to boost corporate performance, and the attendant economic and societal benefits.

5. This declaration discusses the range of requirements various governments have enacted: from the strictest requirements imposing rigid quotas in Norway, France, and other countries, to the comply-or-explain or disclosure requirements adopted in countries like England and the United States. It also examines the success rates each of those countries have had after implementing their requirements, comparing the percentages of women on corporate boards before and after implementation, as well as rates where critical mass is achieved.

6. Finally, this declaration analyzes California’s law, SB 826, which strikes a middle ground: while SB 826 has a similar inspiration to the laws implementing strict quotas such as Norway and France, it is markedly distinct in that it allows far more flexibility for corporations to comply. SB 826 does not implement a strict quota, such as a mandatory percentage or a set fraction of seats, but instead requires a floor: corporations must add a certain number of women to their boards depending on their board size, but can increase the size of their boards so that no men are deprived of seats.[3] California’s diversity requirement has thus far shown that it is very easy to meet, but also has greater success than countries that have only implemented comply-or-explain

[3] I have referred to SB 826 as a “quota” in my previous published writing, because the scholarly literature on diversity requirements refers to SB 826 in that frame. In no way have I meant the term “quota” to relate to the meaning of that word in U.S. constitutional jurisprudence or the affirmative action context.

requirements (including the United States). When compared to many other countries, including the recent rigid executive laws in Germany and France, SB 826 is carefully constructed to successfully ensure some gender inclusion without burdening California's businesses.

7. On one end of the diversity requirement spectrum, Norway's law was not only the first known corporate board quota implemented by a state, it was also the first to directly rely on the "business case" for corporate board quotas – the principle that including women on corporate boards improves corporate governance and is a sound business decision.

8. As laws implementing quotas became more widespread, they created a critical mass of women in corporate leadership abroad and a growing cohort of leading world companies with gender-inclusive boards.[4] Eventually, many of the world's leading economies would enact quotas. Even after being famously criticized by Chancellor Angela Merkel, Germany enacted its own hard quota for boards.

9. The adoption of quotas has become an international corporate governance norm. Of the top ten economies, seven have quotas. Twenty-eight other smaller economies also have some form of a corporate board diversity law. The only top economies without corporate diversity laws are China and Japan, both of which have extraordinarily low levels of gender equality and inclusion. California's passage of SB 826, which imposes less strict requirements than many countries, is in conformance with what has become a global standard.

10. This declaration describes these changes in the world's regulation of corporate governance to mandate inclusion, as well as the social science supporting corporate gender quotas. First, I analyze Norway's quota, its requirements, and its success. Second, I analyze France's quota, requirements, and success. Third, I assess how numerous countries have developed their own regulations, many of them normalizing quotas as a necessary element of corporate governance. While the laws, not all of which include quotas, range in their restrictions, successful inclusion of women on corporate boards is often a result of stricter quotas. Finally, this declaration will describe how California's SB 826 follows the norm, and strikes an excellent

---

[4] *See generally* Rosabeth Moss Kanter, *Some Effects of Proportions on Group Life: Skewed Sex Ratios and Responses to Token Women*, 82 AM. J. SOC. (1977).

balance with its lighter mandate and more modest requirements than other countries, and inspires widespread compliance. When compared to many other countries, including the recent executive quotas in Germany and France, SB 826 is carefully constructed to encourage gender inclusion without burdening California's businesses or the men currently on corporate boards, because under SB 826, the board can be expanded to meet the diversity requirements so male directors can maintain their seats on the board, if desired.

**Background and Experience**

11. I have been a full-time law professor since 2004. Until recently, I was a professor at Elisabeth Haub School of Law at Pace University where I taught Contracts, Corporations, and International Business Transactions. I also served as the Faculty Director of the Institute for International and Commercial Law. I currently am a Full Professor at the Faculty of Law at McGill University. Over the last 13 years, my research has focused on corporate governance, diversity initiatives, and remedies for sex inequality.

12. After attending law school at University of Pennsylvania, I clerked for Judge José A. Fusté in the U.S. District Court of Puerto Rico from 1996-98, and worked at two law firms where I practiced litigation and international arbitration. While working as a lawyer, I began studying various efforts to increase gender diversity for women at the CEO and corporate board level.

13. I joined the Pace Law School in a tenure track position in 2004. I published an article entitled *Parity/Disparity* about France's political representation quota (2006); another article I published, *Internalizing Gender* (2007), analyzed how international law affects the domestic adoption of measures like quotas for women's representation. Since 2008, I have worked almost entirely on examining questions of gender diversity and inclusion in corporate leadership. Initially, this work focused on doctrinal and theoretical analysis of Norway's pioneering quota for gender balance on corporate boards. In *Feminizing Capital: A Corporate Imperative* (Berkeley Business Law Journal, 2009), I analyzed Norway's corporate board quota, and in *Loving Gender Balance* (Fordham Law Review, 2008), I compared Norway's quota with two other quotas: the U.S. rule on educational funding in Title IX and France's parity law, which requires equal representation of women among candidates for political office.

14. In 2011, I served as a Fulbright Research Scholar in France. With this support, I conducted extensive interviews with two dozen elite corporate board members and other stakeholders. While in France, I also co-authored an article about France's quota with Véronique Magnier, one of France's leading corporate scholars, entitled *Quotas and the Transatlantic Divergence of Corporate Governance* (Northwestern Journal of International Business Law, 2012). Subsequently, I published the results of this study in an article co-authored with Daria Roithmayr entitled *More than a Woman* (Indiana Law Review, 2014). In *When Does Board Diversity Benefit Firms?* (University of Pennsylvania Journal of Business Law, 2018), I closely analyze the business case for inclusion on corporate boards.

15. I have continued to publish numerous articles on corporate board diversity measures, including quotas. In *Sex Quotas and Burkini Bans* (Tulane Law Review, 2018), I analyzed France's rigid corporate board quota from a political economic context, and subsequently published a French version of this piece in the Ottawa Law Review. In *Diversity by Term Limits?* (Alabama Law Review, 2020), my co-author Yaron Nili and I drew on quantitative data on director turnover in the S&P 1500 and qualitative data on S&P 500 firms with term limits for board members to further explore the relationship between term limits and sex diversity on corporate boards.

16. In addition, I have convened two conferences that have produced scholarly publications on corporate diversity. The first, *After Gender?: Examining International Justice Enterprises*, involved a day-long international conference that produced a 2011 edition of Pace Law Review, for which I wrote an introduction. The second, *Comparative Sex Regimes and Corporate Governance*, also involved a day-long international conference that produced a 2014 edition of Pace International Law Review, for which I wrote an introduction. For 2022, I have been invited to co-organize the prestigious Berle Symposium on Corporate Law and Society, which will involve a conference of sixteen international and interdisciplinary scholars to be held at the McGill University Faculty of Law. The Conference Board, a worldwide, non-profit, business membership and research group, has published two of my studies: *The Effect of Gender*

*Diversity on Board Decision-making*: *Interviews with Board Members* (2017) and *When Does Gender Diversity on Boards Benefit Companies?* (2018).

17. I am also a regular contributor to *Forbes* for my work on diversity. In 2020, I published "California Pioneers New Quotas for People of Color & LGBT People," where I detail California's commitment to diversity, inclusion, and removing structural discrimination.

18. I have served as a Visiting Professor at the University of Paris II Law School (2021–2022), Brooklyn Law School (2018), Sciences Po Law School (2015), University of Versailles Law School (2009–2015), American University School of Law (2014) and Seattle University School of Law (2011). I served as a Visiting Scholar at Columbia Law School (2019) and a Wainwright Fellow at McGill University (2018). I have also taught at the University of Pennsylvania Law School (2004) and at Fordham Law School (2003–2004, 2013).

19. I am currently writing a book, with the working title of *Unsex Big Business: Why and How to Desegregate Corporate Leadership*. The book draws on my comparative and critical methods to argue for stronger remedies for sex inequality in the corporate sector.

20. A true and correct copy of my current CV is attached as **Exhibit A**.

**Methodology**

21. I have been studying gender diversity legislation for women's representation for two decades and gender diversity requirements in the corporate context since 2007. For this declaration, I rely on existing research in law, management studies, political science and other areas of social science. I also rely on my own research and analysis, including two studies I undertook that involved qualitative, in-person interviews. These materials I rely on in forming my opinions herein are commonly and reasonably relied upon by social science, legal, and other experts in corporate governance and diversity.

22. My study on Norway, originally published in *Feminizing Capital*, involved five non-anonymous interviews with key participants in the debate on whether to implement percentage requirements for corporate boards. My study also draws on Dr. Aaron Dhir's more extensive qualitative study conducted around the same time in Norway.

23. For my study in France, conducted between October of 2011 and February of 2012, I organized thirty-one interviews with CAC-40 (France's equivalent of the Dow Jones Industrial Average) board members and thirty-six individual interviews of subjects who had knowledge about corporate board decision-making in France, including former corporate board members, industry experts, academics, and the principal sponsor of the statute, Marie-Jo Zimmermann, who agreed to be interviewed without anonymity.

## Part I: Countries Mandating Corporate Board Quotas

### A. Norway's Law Mandating a Quota

#### 1. Background and Requirements of Norway's Corporate Board Quota

24. Norway introduced one of the first laws adopted by a country or state regulating corporate board diversity. Norway has a long history of gender equality legislation. In 1978, the Gender Equality Act established the principle of sex equality. In 1981, the Gender Equality Act enacted Norway's first gender-based quota regulating the composition of publicly appointed boards (but not private corporate boards), councils, and committees.[5] Because of these efforts, by 1999, Norwegian women had achieved near-parity in government leadership. However, their representation in corporate board rooms trailed far behind.[6] By the 1990s, it was estimated that only 5 percent of corporate board seats in Norway were held by women.[7]

25. To achieve some gender diversity, in 2003 Norway passed a law implementing a quota: it mandated hard percentages of women on corporate boards of public companies. Under this law, public companies[8] were required to populate their boards with between 33 and 50

---

[5] Cathrine Seierstad & Morten Huse, *Gender Quotas on Corporate Boards in Norway: Ten Years Later and Lessons Learned*, *in* GENDER DIVERSITY IN THE BOARDROOM 11 (Cathrine Seierstad et al. eds., 2017).

[6] Danuta A. Tomczak, *Gender Equality Policies and Their Outcomes in Norway*, 4 ZARZĄDZANIE PUBLICZNE 379, 380-83 (2016)

[7] *See* Mari Teigen, *Gender Quotas for Corporate Boards in Norway: Innovative Gender Equality Policy*, *in* WOMEN ON CORPORATE BOARDS AND IN TOP MANAGEMENT: EUROPEAN TRENDS AND POLICY 70, 74 (Colette Fagan et al. ed., 2012).

[8] Norway Ministry of Trade, Industry and Fisheries, *Fact Sheet: The Legislation on Representation of Both Sexes in Boards,* GOVERNMENT.NO (Sept. 19, 2011), https://web.archive.org/web/20150921004531/https://www.regjeringen.no/en/dep/nfd/contact/press-centre/fact-sheets/fact-sheet-thelegislation-on-representa/id641431/

percent of each gender, depending on the corporation.[9] Today, the percentage of gender representation required for each company varies proportionally to the size of the board. However, boards with over ten members must maintain a minimum forty percent ratio for each gender, maintaining the law's quota requirements.[10] Publicly-listed corporations in Norway were obligated to repopulate their boards to include at least forty percent women by January 1, 2008.[11]

**2. Key Elements of Norway's Quota**

26. The Norwegian law contains six elements that have come to define subsequent corporate board legislation used in other countries that have adopted quota requirements.

27. First, Norway enacted the quota under its corporate law statute (the Public Limited Companies Act) rather than through anti-discrimination legislation (e.g., the Act Relating to Gender Equality).[12] This represented a marked departure from prior gender equality legislation, which consistently situated itself within the framing of equality law.

28. Second, the law focused on corporate boards, as opposed to other aspects of corporations. The corporate board in Norway, as in the United States and many other countries, serves as the central entity which owes fiduciary duties to the firm. The board consequently oversees compliance with the firm's central legal obligations. Boards provide oversight, hire executives, approve strategy and decisions, and approve financial statements for publication.[13] Unlike the mandates of senior executives, which are often set, directed, and evaluated by the company itself, board members and their obligations can be explicitly transformed by corporate law legislation. This led to a major change in how corporate board members were recruited. Prior to the law's passage, board members were typically senior, current, or former executives with deep experience in business and macro-economics.[14] As there were few women in executive

[9] *See* Mari Teigen, *supra* note 6, at 16.

[10] Alexander Gidlund & Tommy Lund, *The Norwegian Gender Quota Law and its Effects on Corporate Boards*, 27 (2017), https://www.diva-portal.org/smash/get/diva2:1119270/FULLTEXT01.pdf.

[11] *See infra* Part I.B. Public Limited Companies Act 1997.

[12] *See Norwegian Public Limited Liability Companies Act*, 13 June 1997 No. 45, § 6-11a.

[13] STEPHEN M. BAINBRIDGE, CORPORATE GOVERNANCE AFTER THE FINANCIAL CRISIS 44–45 (2012).

[14] *See* Mari Teigen, *supra* note 6; *see generally* AARON DHIR, CHALLENGING BOARDROOM HOMOGENEITY: CORPORATE LAW, GOVERNANCE, AND DIVERSITY 121-22 (Cambridge Univ. Press, 2015).

positions due to structural discrimination, the pool of potential board candidates was predominantly male, even though many highly qualified women could have served in this capacity, as the law's success demonstrated. Thus, mandating women's representation on boards required Norwegian firms to fundamentally change the typical profile of their board members and circumvent the structural sexism of traditional board nomination practices.

29. Third, the "business case" for gender diversity justified the inclusion of women on corporate boards. By the time Norway passed its law, many saw gender diversity as a method of advancing corporate success: justifications for women's inclusion on corporate boards shifted from solely being about gender equality and began to include arguments that more women and diversity on corporate boards meant better firm performance and competitiveness.[15] Emerging international research at the time supported this conclusion. For example, in an influential 2003 article, researchers linked increased firm value with increased corporate board diversity.[16] Based on my research, an implicit part of the business case for regulating women's inclusion on corporate boards, as argued in Norway, is that diversity improves corporate governance. This market-based idea should have induced firms to act and improve inclusion within their own ranks, but inequitable systems and structures barred women's full participation on corporate boards. The idea that diversity could not be achieved through market forces alone was a new argument in support for the business case in Norway and was used to justify government attempts to redress these inequalities and market inefficiencies.[17] The lack of women on corporate boards is a result

[15] Hilde Bjørkhaug & Siri Øyslebø Sørensen, *Feminism without Gender? Arguments for Gender Quotas on Corporate Boards in Norway, in* FIRMS, BOARDS AND GENDER QUOTAS: COMPARATIVE PERSPECTIVES 185, 198-99 (Fredrik Engelstad & Mari Teigen eds., 2012).

[16] David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 FIN. REV. 33 (2003).

[17] Over fifty years ago, Gary Becker argued that for firms, discrimination is inefficient. GARY BECKER, THE ECONOMICS OF DISCRIMINATION (2d ed. 1971). If people of color and women receive lower pay, then those individuals will end up working at nondiscriminatory firms, which will realize higher profits thanks to their inclusivity. As a result, Becker argued, discriminatory firms will note the profitability of inclusion, and correct their errant ways. Over time, by extension, the market will eliminate discrimination on its own. Nearly fifty years after Becker made this argument, his promise of a nondiscriminatory workplace utopia has not arrived, even as policy makers cited his work to undermine the case for legislated remedies for discrimination. Critiques abound to undermine Becker's argument: if "the taste for discrimination is very widespread, its cost implications become trivial, and the market corrective never operates." Drucilla Cornell & William W. Bratton, *Deadweight Costs and Intrinsic Wrongs of Nativism: Economics Freedom*

of structural sex discrimination: although women have held equal educational credentials to men for several decades, they remain a small minority of CEOs. Canadian scholar Aaron Dhir, in conducting research on Norway's quota, found that this inequality was attributable to the existence of an informal "male community" that translates to "friends recruiting friends into the boardroom."[18] The exclusion of women could not be attributed to a perfect meritocracy (where women are not being denied these jobs because men are more qualified). Economists and experts recognize that requiring gender diversity was necessary to "disrupt[] the closed networks that had previously dominated boardrooms."[19] Moreover, Norway's business case holds that including women is not only about gender equality—it is also about getting the most competent people on the board by overcoming the structural sexism that has excluded them for so long. The failure to include qualified women on boards was considered to be a loss for the country.[20]

30. Fourth, the Norwegian law was imposed only on publicly traded corporations. Publicly traded firms play a unique role in developed economies since they comprise the largest firms in which most average citizens invest and from which they consume. National governments, including the United States, impose extensive requirements on publicly traded firms because they sell securities to raise money in stock markets, but privately-held firms, including many smaller firms, do not face such regulation. States, including California, are some of the largest investors in these securities markets, by way of their public pension plans, and have a strong interest in the good governance of the firms in which they invest.

31. Fifth, the management and organizational theory of "critical mass" played a central role in the Norwegian law. Research going back to the 1970s shows that a minority group typically needs at least thirty-five percent representation in a group decision-making setting to have decision-making power, or else group members' voices will likely be marginalized within the decision-making process.[21] A more recent study argues that when three or more women are

---

*and Legal Suppression of Spanish*, 84 CORNELL L. REV. 595, 641 (1999).

[18] DHIR, *supra* note 12.

[19] *Id* at 177.

[20] *Id.*

[21] Kanter, *supra* note 3, at 965, 966, 988. Kanter argued that only structural change in organizations might achieve real shifts in the allocation of power, and these structural changes

present on a board, women no longer represent "women" but are instead seen as individuals, and at that point they may begin to "influence the content and process of board discussions more substantially."[22] I have also studied critical mass theory in the context of Norway's forty percent floor for either sex.[23] I conclude that this floor ensures that no individual would be excluded from corporate leadership in on the basis of their sex. The law also ensured that the minority group actually had a voice in making decisions on the corporate board.

32. Sixth, the Norway law imposed a quota requirement; not wanting to risk non-compliance, it also utilized a strict penalty. If a firm failed to meet the hard minimum of forty percent representation for either of the two sexes by January 1, 2008, it would see its stock delisted from the Oslo Stock Exchange.[24] This penalty would effectively eliminate the firm's ability to raise capital through equity shares.

**3. Effects of Norway's Corporate Quota Requirement**

33. The Norway quota had two stated aims. The first was to "secure greater gender equality and democracy" while the second was to ". . . strengthen management in the business sector and boost the companies' competitive ability."[25] To the quota's supporters, Norway's economy would not be strengthened if women were kept out of the boardroom—it would suffer.[26] Not only would the quota "secure women's influence in decision making processes of great importance for the economy in the society" but it would "make use of all the human resources in our country, not just half of it."[27] The quota mechanism was identified as the most effective means to ensure the objective of the inclusion of women in corporate governance.

---

would in turn change people as individuals, while changing the mere identity of individuals would not alter the corporation overall.

[22] Vicki W. Kramer et al., *Executive Summary, Critical Mass on Corporate Boards: Why Three or More Women Enhance Governance*, 11 WELLESLEY CTRS. FOR WOMEN REP. 3 (2006) [hereinafter Kramer et al., *Critical Mass on Corporate Boards*].

[23] *See* Darren Rosenblum, *Loving Gender Balance: Reframing Identity-Based Equality* Remedies, 76 FORDHAM LAW REVIEW 101 (2008).

[24] Darren Rosenblum, Feminizing Capital: A Corporate Imperative, 6 BERKELEY BUS. L.J. 55, 57

[25] *Id.*

[26] Carrie Seim Medill, Closing the Corporation Gender Gap, (2003), http:?www.norway.org/News/archive/2003/200303gender.htm

[27] Norwegian Ministry of Children and Equality, *supra* note 29.

34. Norway's corporate board law has succeeded in diversifying its corporate boards. Norway now leads the world in its percentage of female corporate board members as a result of its quota requirements.[28] In the short term, the overall percentage of "women board members at listed companies" rose from "6% in 2001 to 37%" by December 2007.[29] Currently, the number of women board members in Norway sits at 44%, meeting the necessary critical mass threshold needed to achieve a voice for women in the boardroom.[30] Although corporate leaders initially complained of a lack of "qualified women" they could reasonably appoint to boards, firms had little trouble satisfying the requirements. As of July 2007, sixty percent of companies had complied with the law,[31] and at the witching hour of January 1, 2008, nearly all publicly traded firms complied with the law.[32]

35. Norway's pioneering law provided an opportunity for social scientists to examine the effects of changing board representation in a relatively short period of time. Qualitative research revealed some of the real effects of the quota. While several scholars also engaged in quantitative studies to assess the effects of the quota, including whether it affected profitability or share price, this report does not consider these studies relevant for analyzing SB 826.[33]

---

[28] Stephanie Holmes, Smashing the Glass Ceiling, BBC NEWS, Jan. 11, 2008, http://news.bbc.co.uk/2/hi/business/7176879.stm. The issue of low female corporate board representation is widespread. When Norway passed the quota, women held only seven percent of Norwegian corporate board and executive positions. "[W]hat actually happened was . . . it's never more than 40% women in boards . . . ." Interview with Siri Sorenson, Ph. D. candidate and Mari Teigen, Director, Norwegian Institute for Social Research, in Oslo Norway (March 18, 2008).

[29] Gwladys Fouche Oslo, *Quarter of Norway's Firms Face Shutdown as Female Directors Deadline Approaches: Companies must meet 40% Quota By Monday*, THE GUARDIAN (Dec. 27, 2007), http://www.guardian.co.uk/business/2007/dec/27/norway.female.director.

[30] *Diversity: 2020 Nordic Spencer Stuart Board Index*, SPENCER STUART, https://www.spencerstuart.com/research-and-insight/nordic-board-index/diversity.

[31] *See Norway Firms Nearer Quota on Women Board Members*, REUTERS, (July 12, 2007), https://www.reuters.com/article/norway-business-women/norway-firms-nearer-quota-on-women-board-members-idUSL1225231520070712.

[32] Interview with Siri Øyslebø Sørensen, (Oslo, Feb. 25, 2008) (Interview transcript on file with author).

[33] The reasons for not pursuing the quantitative data here are these: First, the studies focus on a time period in which there was a large scale global financial crisis – the worst since the Great Depression – so it is difficult to assess the impact that correlates with the quota. Full compliance with Norway's quota (directors must include at least 40 percent of either sex) was required by January 1, 2008, a date that coincided closely with the global market crash. Second, the studies only considered short-term impact on share values. The third reason is that Norway's quota was the pioneer – the first of its kind – while SB 826 was less of a surprise to the market. SB 826 passed

36. The Norwegian quota brought the business case front and center, which points to the need for government intervention and strict quotas to overcome structural inequalities due to systemic discrimination. As stated by one of the law's drafters, "[T]he point is that you need to use all the best people. [W]hen you have all these kind of invisible things that keep half of the population out of the board room, something needs to be done to get the most competent people."[34]

**B. France's Corporate Board Quota**

37. This section looks at France's corporate board quota, and outlines its key features as compared to Norway. Finally, the effects and success of the quota are analyzed using both social science research and the author's personal research conducted in France.

**1. Background and Requirements of France's Corporate Board Quota**

38. France's interest in developing its own corporate board quota began after Norway introduced its legislation in 2003.[35] Prior to the passage of France's law, the number of women represented in French corporate leadership was far below other countries: as of 2009, only 10% of directors in French-listed companies were women.[36] Following the success of Norway's quota,

---

in 2018, fifteen years after Norway passed its law and ten years after its full implementation. In the interim, as noted elsewhere in this report, a plethora of countries, including most of the world's top ten economies, have adopted a mandate for gender balance on corporate boards. Within the United States, diversity and inclusion on boards has been a priority for a variety of institutional investors and other leading actors in the corporate sphere.

In short, SB 826 may have been the first such statute in the United States, but it could not have taken the market by surprise. This is especially true because in 2016, California Senate Concurrent Resolution 62 called for every publicly-held corporation in California to increase voluntarily gender diversity on their boards. For these three reasons, the quantitative studies on Norway do not provide a useful comparison.

[34] Norwegian Ministry of Children and Equality, *Balanced Gender Representation on Company Boards*, http://www.regjeringen.no/en/dep/bld/Topics/andre/Balanced-gender-representation-on-compan.html?id=1250 (last visited April 5, 2007).

[35] *See, e.g.* ,Nicola Clark, *Getting Women Into Boardrooms, by Law,* N.Y. TIMES (Jan. 27, 2010), https://www.nytimes.com/2010/01/28/world/europe/28iht-quota.html (describing Norway's adoption of a quota in 2003); DHIR, *supra* note 12.

[36] *See* François Roche, *Conseils d'Administration: les Femmes Investissent le CAC 40* [Board of Directors: Women Join the CAC 40], LA TRIBUNE (July 15, 2011), http://www.latribune.fr/actualites/economie/france/20110715trib000636534/conseils-d-administration-les-femmes-investissent-le-cac-40.html, *archived at* http://perma.cc/UN59-ZH2T; Institut Français des Administrateurs, *Journée Annuelle des Administrateurs 2010: les Nouvelles*

Marie-Jo Zimmermann, a leading member of France's conservative party, along with prominent members of that party, the Union pour la Majorité Parlementaire ("UMP"),[37] led the push for a French corporate board quota.[38]

39. However, French business leaders still resisted the notion that the state should regulate boards,[39] and hoped voluntary measures would forestall legislation, but the sponsors of the legislation insisted on moving forward with the bill.[40] In 2011, France's law was adopted.[41] It enshrined the principle that boards of directors must meet a minimum representation of men and women of 40% each.[42] As a penalty, it imposes sanctions, as discussed further below.

### 2. Key Elements of France's Quota

40. In terms of its content and structure, France's quota mirrored or had similar features to the six features of Norway's initial law.[43] First, the law was passed as a part of French

---

*Dynamiques du Conseil* [Annual Day of Directors 2010: Dynamic News Board], 21 ADMINISTRATEUR: LA LETTRE DE L'IFA 1, 3 (2010); Véronique Morali, *Les Femmes dans les Conseils d'Administration* [Women in the Board of Directors], LA GOUVERNANCE DES ENTREPRISES, CLÉ DE LA COMPÉTIVITÉ 24 n.409 (2011).

[37] At the time, the party was led by President Nicolas Sarkozy.

[38] One participant labeled Sarkozy as "a big feminist;" another, a legislator, said the opposite. *See* Interviews with 14F and 25F, in Paris, France. The author interviewed twenty-four current and former corporate board members from CAC-40 firms in 2011. A full transcript, a redacted transcript and a translated redacted transcript are on file with the author. Interviews are referred to by an identification number and M or F to indicate sex.

[39] *See, e.g.,* Yann Le Galès, *Quotas : 13 Dirigeantes Jugent la Loi Qui Impose des Femmes dans les Conseils d'Administration* [Quotas: 13 Leaders Believe the Law Requires Women on the Boards of Directors], LE FIGARO (Jan. 19, 2010), http://blog.lefigaro.fr/legales/2010/01/conseils-dadministration-10-femmes-jugent-la-loi.html, *archived at* http://perma.cc/R2HT-XYZU.

[40] Several business groups have also tried to regulate inclusion, sometimes to avert regulation. For example, the AFEP-MEDEF Code of April 2010 established a rule to mandate forty percent for French firms. It did not dissuade the quota's sponsors from moving forward with the legislation.

[41] The law's full name, as translated into English is: "On the equal representation of men and women on boards of directors and supervisory boards and professional equality." *See* Roche, *supra* note 34; *see also* Reding, *supra* note 37.

[42] Code de commerce [C. com.] arts. L. 225-17, L. 225-69, L.226-4 (Fr.).

[43] Aagoth Storvik & Mari Teigen, *Women on Board: The Norwegian Experience*, FRIEDRICH EBERT STIFTUNG 1, 4 (2010); *Rules Regarding Gender Balance Within Boards of Public Limited Companies*, REGJERINGEN.NO (Dec. 20, 2005). Norway's Companies Act, amended in 2003, now reads:

> § 6–11a. Requirement regarding the representation of both sexes on the board of directors (1) On the board of directors of public . . . companies, both sexes shall be

corporate law, as opposed to discrimination or employment legislation. Second, the law targeted the composition of the board of directors, and not corporate executive committees which have involvement in the day-to-day operations of corporations. Third, proponents of the law drew heavily on the established business case (that is, that gender diversity benefits businesses) as a basis for the new rule. Fourth, similar to Norway's initial law, the French law regulated publicly traded corporations. However, in addition, the French law covers large private companies. Fifth, the French law, like Norway's current iteration, required at least 40% representation of both men and women on corporate boards, seeking a "critical mass" so that women would have adequate decision-making power.[44] Finally, sanctions against non-compliant firms were severe: non-compliant firms risked the revocation of non-compliant corporate board nominations[45] and the possibility of freezing board members' fees.[46] Moreover, board decisions made by an

---

represented in the following manner:
1. If the board of directors has two or three members, both sexes shall be represented.
2. If the board of directors has four or five members, each sex shall be represented by at least two.
3. If the board of directors has six to eight members, each sex shall be represented by at least three.
4. If the board of directors has nine members, each sex shall be represented by at least four, and if the board of directors has more members, each sex shall be represented by at least 40 percent.
5. The rules in no. 1 to 4 apply correspondingly for elections of deputy directors.

[44] Loi 2011-103 du 27 janvier 2011 relative à la représentation équilibrée des femmes et des hommes au sein des conseils d'administration et de surveillance et à l'égalité professionnelle [Law 2011-103 of January 27, 2011, on the Balanced Representation of Women and Men on Board of Directors and Supervisory Boards and Equality Professional], JOURNAL OFFICIEL DE LA REPUBLIQUE FRANÇAISE [OFFICIAL GAZETTE OF FRANCE], Jan. 28, 2011 [hereinafter J.O.].

[45] J.O., *supra* note 47. Article 6 of the Act Number 2011-103 from 27th January 2011 provides:

> III. In public establishments and companies . . . the proportion of members of the board of directors or of surveillance of each sex named . . . cannot be inferior to [twenty percent] counting from the first renewal following the publication of this law. When one of the two sexes is not represented inside the board of directors or of surveillance at the date of the publication of this law, at least one representative of this sex should be named on the next vacancy . . . Any nomination in violation of [the above] and not having for effect to remedy the irregularity of the composition of the board of directors or of surveillance is void.

[All translations from the French are mine unless otherwise noted.]

[46] *Id.* Article 1 of the Act Number 2011-103 from 27th January 2011 provides: "When a board of directors is not composed conforming to [this statute] the planned payment of salary is suspended. The payment is reestablished when the composition of the board of directors becomes

uncompliant board would have no legal force.[47] But similar to Norway, the law included a graduated implementation period.[48] The legislation imposed a six-year schedule for attaining these objectives: a twenty percent minimum for both sexes by 2014 and forty percent by 2017.[49]

**3. Effects of France's Quota Law**

41. Prior to the quota's presentation to the legislature in 2009, only 10% of the directors of French listed companies were female, and only 5% of new board members were women.[50] By that point, only four publicly listed companies in France had reached 20% female representation on their boards.[51] After the bill was introduced, nominations from general meetings in 2010 doubled this percentage: almost a third of new directors were women, and 30% of CAC 40[52] companies had reached the law's first requirement of 20% female representation.[53] The number of female directors had risen from 60 directors to 119 directors in two years.[54] The spike in the number of women on corporate boards after the law's adoption suggested that the bill's introduction played a key role in this change, even before the mandate took effect.[55]

---

regular." Article 1 of the Act Number 2011-103 from 27th January 2011.

[47] French law followed a previously established quota for political representation, *Parité*, adopted in 2000, which requires half of all candidates for public office be women. *See Darren Rosenblum, Parity/Disparity: Electoral Gender Inequality on the Tightrope of Liberal Constitutional Traditions*, 39 U.C. Davis Law Review 1119 (2006).

[48] Law 2011-103, *supra* note 47. This was contrary to the position of Former Minister of Labor Xavier Darcos.

[49] Magnier & Rosenblum, *supra* note 37. Firms subject to the requirement included (i) private companies and joint-stock companies issuing shares and admitted for trading on a regulated market and (ii) French corporations that, for three consecutive fiscal years, employed at least five hundred permanent staff members and produced an annual revenue or balance sheet total of at least €50 million. *See also, Code de commerce, supra* note 45.

[50] *See* Roche, *supra* note 36; *Administrateur, La lettre de l'IFA*, 21 INSTITUT FRANÇAIS DES ADMINISTRATEURS 1, 3 Décembre (2010); Véronique Morali, Les femmes dans les conseils d'administration, in La gouvernance des entreprises, clé de la compétivité, L'ena hors les murs, Dossier, mars 2011, n°409, at 24.

[51] *Administrateur*, *supra* note 54.

[52] The CAC 40 is one of the main indices for listed companies in France, along with the SBF 120 and the SBF 80.

[53] *Administrateur, supra* note 54.

[54] Roche, *supra* note 34.

[55] *Id.*

42. More change followed the law's passage,[56] as firms sharply increased their levels of women's representation.[57] As a matter of good corporate governance, French law already limited individuals serving on boards to a maximum of four board appointments. This rule, combined with the scale of France's economy—the fifth largest in the world at the time—meant that the law created an enormous demand for female board members. Thus, to satisfy the new quota requirements, French firms sought out more women to sit on their corporate boards, and the law also changed board hiring practices. Firms that had previously chosen new board members through existing board connections, now hired consultants and executive search firms. At the same time, this expansion of positions for women created a far broader network that was much more inclusive of women than the tight groups that previously held board positions.[58] Based on my research in France, I conclude that, absent state intervention, men would monopolistically replace themselves on corporate boards with like-minded men, as had occurred prior to the law's passage. With France's quota, men lost the near-exclusivity of their economic and social power and their domination of corporate board networks in the country.

---

[56] Karima Bouaiss & Agnes Bricard, "Femmes Administrateurs dans le SBF 120 en 2013: Un État des Lieux," *Federation des Femmes Administrateurs* (2014), http://www.federation-femmes-administrateurs.com/wp-content/uploads/2014/02/les-femmes-administrateurs-au-sein-des-conseils-dadministration-des-societes-du-sbf-120-en-2013.pdf.

[57] *Id*. By 2013, of the SBF-120 companies, two-thirds of the companies had between twenty percent and forty percent of women on their boards, five percent exceeded forty percent of women on their boards, and eighty-three percent of women held only one directorship.

[58] There are more than 400 women's social networks today in France. *Les réseaux féminins permettent-ils aux femmes de réussir dans l'entreprise?*, RESSOURCES HUMAINES PAR SIA PARTNERS (Dec. 18, 2013), http://rh.sia-partners.com/les-reseaux-feminins-permettent-ils-aux-femmes-de-reussir-dans-lentreprise. *See* ADMINISTRATION MODERNE, http://www.administrationmoderne.com (last visited Oct. 11, 2017) (created in 1998 as the first interministerial association of women civil servants that fights for sex equality in the administration); ARBORUS, http://www.arborus.org (last visited Oct. 11, 2017) (association created by the European observatory of equality that contains various associations and firms with the goal of helping promote equality in management); FEMMES 3000, http://www.femmes3000.fr (last visited Oct. 11, 2017) (association that strives to increase women's participation in public life); PROFESSIONAL WOMEN'S NETWORK, http://www.pwnglobal.net/ (last visited Oct. 11, 2017) (global federation with 3000 members created to promote women in business firms in Europe and provide networking and training platforms for professional women).

**C. Evidence in Support of Business Case For Gender Diversity on Boards**

43. The effects of France and Norway's laws also provided evidence in support of the business case (that sex diversity benefits corporations). While one cannot say with one hundred percent certainty that there is a causal relationship between a corporate board quota and specific firm benefits, a growing body of empirical research suggests that firms with women in leadership positions generate higher profits, return-on-equity, share prices, or other financial benefits for a firm.[59] Other studies have correlated sex diversity to higher stock prices.[60]

44. Furthermore, evidence has accumulated that firms with diverse boards were more sensitive to stakeholders, such as consumers and employees, since both groups had become increasingly diverse.[61] With leading French corporate expert Véronique Magnier, I analyzed how European companies might collectively become more stakeholder-oriented if their boards are

---

[59] Indeed, the business case literature proved relevant for the legislators who brought the law to the National Assembly. Jean-Francois Copé and Marie-Jo Zimmerman, both consistently referenced the potential improvement in corporate governance that would flow from the quota. Jean-François Copé referenced the business case: "In ten years, the wealth of Europe will be its human capital. We need women and a real feminine leadership. Also, the link between the presence of women on boards and the performance of businesses is demonstrated by several studies." Interview with Jean-François Copé, *Avancez avec Les Femmes*, (Au Feminin TV 2011). Zimmermann presented a report to the National Assembly advocating parity that referenced the business case. MARIE-JO ZIMMERMAN, RAPPORT D'INFORMATION FAIT AU NOM DE LA DELEGATION AUX DROITS DES FEMMES ET A L'ÉGALITE DES CHANCES ENTRE LES HOMMES ET LES FEMMES [INFORMATION REPORT ON BEHALF OF WOMEN'S RIGHTS DELEGATION AND EQUAL OPPORTUNITIES FOR MEN AND WOMEN] (2011). Zimmermann also referenced the Gresy Report that advocated for the quota. BRIGITTE GRESY, RAPPORT PRÉPARATOIRE A LA CONCERTATION AVEC LES PARTENAIRES SOCIAUX SUR L'ÉGALITÉ PROFESSIONELLE ENTRE LES FEMMES ET LES HOMMES [PREPARATORY REPORT FOR AGREEMENT WITH SOCIAL PARTNERS ON PROFESSIONAL EQUALITY BETWEEN WOMEN AND MEN] (2009).

[60] Another study conducted by Virtcom Consulting revealed that, over a five year period, the stocks of companies with significant board diversity outperformed both the Dow Jones Industrial Average and the NASDAQ 100, though they did not outperform the Standard & Poor's 500 ("S&P 500"). VIRTCOM CONSULTING, BOARD DIVERSIFICATION STRATEGY: REALIZING COMPETITIVE ADVANTAGE AND SHAREHOLDER VALUE 4-5 (2009). Another study looking at the effects of corporate workforce diversity on stock price showed that in research-intensive Fortune 1500 companies, adding women to the top management team increased stock price in the period 1992 to 2006. CHRISTIAN L. DEZSO & DAVID GADDIS ROSS, "GIRL POWER": FEMALE PARTICIPATION IN TOP MANAGEMENT AND FIRM PERFORMANCE 1, 6-12 (2008). Likewise, in a study of sex and racial composition of Fortune 500 board committees between 1998 and 2002, researchers found positive effects of diversity on return on investments ("ROI"). *See* David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 CORP. GOVERNANCE 396, 410–11 (2010).

[61] Lynne L. Dallas, *The New Managerialism and Diversity on Corporate Boards of Directors*, 76 TUL. L. REV. 1363, 1384-85 (2002).

diverse.[62] As a near-consensus of research shows, diverse boards can also help reduce other costs that accompany a non-diverse board: diversification improves corporate image,[63] reduces social and economic costs of discrimination and harassment,[64] and enables boards to identify broader market opportunities and tap wider market power.[65]

45. Research supports that inclusion changes the process of decision-making within a group in positive ways.[66] For example, one study linked women's presence to different kinds of communication.[67] Another study measured the "collective intelligence" of a small group of people and found that, all else being equal, teams with more women scored higher than teams with fewer women.[68] As mentioned in my methodology section, I conducted research in France pursuant to my Fulbright scholarship, immediately after the passage of the quota. My interviews reinforced this research; the interviewees thought women's presence on boards positively affected

---

[62] *See* Veronique Magnier & Darren Rosenblum, *Quotas and the Transatlantic Divergence of Corporate Governance*, 34 NW. J. INT'L L. & BUS. 249 (2014).

[63] A European Commission study validated this theory finding that diversity programs not only had a positive impact on employee motivation, but also noted an increase in customer satisfaction (fifty-seven percent) and an improvement in brand image (sixty-nine percent). EUROPEAN COMMISSION, THE COSTS AND BENEFITS OF DIVERSITY (2003), *available at* http://ec.europa.eu/justice/gender-equality/files/gender_balance_decision_making/report_gender-balance_2012_en.pdf, *archived at* http://perma.cc/59S9-PJH9.

[64] Lisa M. Fairfax, Women and the "New" Corporate Governance: Clogs in the Pipeline: The Mixed Data on Women Directors and Continued Barriers to Their Advancement, 65 MD. L. REV. 579 at 81 (2006) (discussing a Fortune 100 study on women directors and finding that there are still significant barriers to women achieving these positions and noting the positive impact that women have on the board's conduct) (citing Steven A. Ramirez, *Diversity and the Boardroom*, 6 STAN. J. L. BUS. & FIN. 85, 108-09 (2000)).

[65] *Id.* at 579 (citing Marleen A. O'Connor, *The Enron Board: The Perils of Groupthink*, 71 U. CIN. L. REV. 1233, 1308 (2003)). Marleen O'Connor termed it "market reciprocity," how a diverse board responded to broader groups. O'Connor, *supra* at 1308. Fairfax provides the poignant example of Jill Kerr Conway, the first woman director at Nike. Conway encouraged her fellow board members to begin marketing to women, a strategy that has proved extremely profitable as the newly targeted market has reciprocated into a significant portion of Nike's business. *See also* Carol Hymowitz, *In the U.S., What Will It Take to Create Diverse Boardrooms?*, WALL ST. J., July 9, 2003, at B1.

[66] Some studies show that female board members have higher attendance at meetings and women are more open to joining monitoring committees. Renée B. Adams & Daniel Ferreira, *Women in the Boardroom and Their Impact on Governance and Performance*, 94 J. FIN. ECON. 291 (2009), at 308, 324-25. This study linked improved attendance and monitoring to stock price increases. *See also* DEZSO & ROSS, *supra* note 64, at 6-12 (suggesting that women may bring particular strengths to research intensive industries, thus the "female participation effect should be particularly significant when collaboration and creativity are especially important").

[67] Anita Williams Woolley et al., *Evidence for a Collective Intelligence Factor in the Performance of Human Groups*, 330 SCIENCE EXPRESS 686, 688 (Sept. 30, 2010).

[68] *Id.*

the decision-making process of the board, as well as the level of member participation and the quality of meetings themselves.[69]

46. Overall, the French law has succeeded in achieving its goals. As of February 2020, 44% of seats on French corporate boards were held by women.[70] The French law was also a signal that large economies were recognizing that the status quo of structural discrimination and sexism could not be broken without a strong and specific requirement regarding inclusion of women in corporate leadership.

**D. Germany's Corporate Quota Law**

47. After France passed its corporate board law and companies began restructuring their boards, several prominent European leaders, such as Angela Merkel, expressed skepticism towards hard quota mandates. In 2011, her spokesperson stated: "There will be no statutory quota. . . . In [Angela Merkel's] opinion, the private sector should be given another chance to make progress voluntarily. "[71] However, with France's success at implementing its own quota, European leaders faced increasing pressure to adopt similar measures. In 2013, just two years after her initial statement, Merkel publicly supported corporate quotas.[72]

---

[69] See generally, Rosenblum, Darren & Roithmayr, Daria, *More Than a Woman* (Indiana Law Review, 2014).

[70] *France shows gender quotas work in business while targets do not*, THE IRISH TIMES (Feb. 1, 2020). https://www.irishtimes.com/business/economy/france-shows-gender-quotas-work-in-business-while-targets-do-not-1.4157942.

[71] Government spokesperson Steffen Seibert on February 2, 2011 (Ger.), https://www.goettinger-tageblatt.de/Nachrichten/Politik/Deutschland-Welt/Merkel-will-vorerst-keine-gesetzliche-Frauenquote. The precursors to the legislative establishment of quotas were recommendations in the German Corporate Governance Code in 2009 and 2010 and a voluntary commitment by the DAX 30 companies in 2010. which led to an increase in the proportion of women on the supervisory board from 13.1% in 2008 and 2009 to 24.7% in 2014. The legislative establishment of quotas was already an issue in the 17th legislative period from 2009 to 2013. Different positions on the quota were taken within the German government.

[72] Melissa Eddy., *Merkel Concedes on Quotas for Women*, N. Y. TIMES (Apr. 18, 2013), https://www.nytimes.com/2013/04/19/business/global/merkel-concedes-on-quotas-for-women.html. "I think what our Minister for Women and Families is doing with the voluntary commitment of companies - in other words, saying that toward the end of the decade we need a 30 percent or 40 percent proportion of women on supervisory boards - is the right thing to do. I'm also saying that if we don't succeed in doing that on a voluntary basis, then the threat of the possibility that we'll have to act by law will increase." Chancellor Angela Merkel on March 8, 2013 (Ger.), https://www.bundeskanzlerin.de/bkin-de/aktuelles/pressekonferenz-zum-muenchener-spitzengespraech-der-deutschen-wirtschaft-845208.

48. Before it adopted a law imposing a quota, Germany attempted to achieve corporate board gender diversity by adopting recommendations in the German Corporate Governance Code in 2009[73] and 2010[74] and a voluntary commitment by the DAX 30 (the German equivalent of the Dow Jones Industrial Average) companies in 2010 to increase gender diversity on boards,[75] which led to an increase in the proportion of women on the supervisory board from 13.1% in 2008 and 2009 to 24.7% in 2014.[76] Germany has a two-tiered corporate board structure in which there is a managing board and a supervisory board. Germany first passed a law mandating gender diversity percentages on the supervisory board only, in 2015. More recently, in 2021, Germany passed a law mandating gender diversity percentages on the managing board as well.

49. Given this rate of slow increase, in 2015, after much political debate, the German legislature enacted a quota for large firms listed on a German exchange.[77]

50. Germany's first law requires supervisory boards[78] of listed companies to consist of at least 30% women and 30% men.[79] To achieve compliance,[80] an election of supervisory board

---

[73] German Corporate Governance Code 2009, as amended, para. 5.1.2 and 5.4.1., https://www.dcgk.de/files/dcgk/usercontent/en/download/code/D_CorGov_final_2009.pdf.

[74] German Corporate Governance Code 2010, as amended, para. 4.1.5., 5.1.2 and 5.4.1., https://www.dcgk.de/files/dcgk/usercontent/en/download/code/D_CorGov_final_2010.pdf.

[75] Gemeinsame Erklärung der DAX 30- Unternehmen, Frauen in Führungspositionen [Women in leadership positions], (2011) (Ger.), https://www.bmwgroup.com/content/dam/grpw/websites/bmwgroup_com/responsibility/downloads/de/2011/Frauen_in_Fuehrungspositionen.pdf.

[76] Hopt/Roth in: Großkommentar AktG, 5th ed. 2019, § 96 recital 84 (Ger.).

[77] Gesetz für die gleichberechtigte Teilhabe von Frauen und Männern an Führungspositionen in der Privatwirtschaft und im öffentlichen Dienst [FüPoG I] [Leadership Position Act I], Apr. 24, 2015, BGBl I at 642 (Ger.), https://www.bgbl.de/xaver/bgbl/start.xav?startbk=Bundesanzeiger_BGBl&jumpTo=bgbl115s0642.pdf#__bgbl__%2F%2F*%5B%40attr_id%3D%27bgbl115s0642.pdf%27%5D__1622826205055.

[78] Aktiengesetz [AktG] [Stock Corporation Act], Sept. 6, 1965, BGBl I at 1089, last amended by Gesetz [G], May 12, 2021, BGBl I at 990, §96, para.2 (Ger.), https://www.gesetze-im-internet.de/aktg/AktG.pdf.

[79] Aktiengesetz [AktG] [Stock Corporation Act], Sept. 6, 1965, BGBl I at 1089, last amended by Gesetz [G], May 12, 2021, BGBl I at 990, §96, para.2 (Ger.), https://www.gesetze-im-internet.de/aktg/AktG.pdf. At the time the law was enacted, around 108 companies in Germany were affected by this regulation, as per Regierungsentwurf [Cabinet Draft], Deutscher Bundestag: Drucksachen [BT] 18/3784, at 43 (Ger.) http://dipbt.bundestag.de/doc/btd/18/037/1803784.pdf..

[80] *Id.* at 122.

members that violates the quota is generally null and void, which is such an extreme remedy that firms avoid noncompliance.[81] Beginning in 2015, listed companies were required to set targets for women's representation on the supervisory and management boards.[82] Companies can set their own targets, but cannot lower their proportion of women if it falls below 30%.[83] Such requirements incentivize companies to set ambitious targets, while failure to report subjects firms to a severe fine.[84]

51. Overall, the proportion of women on supervisory boards in Germany has greatly increased since the first study in 2011.[85] In 2011, the proportion of women on the supervisory boards of 160 companies studied was 10%, and exactly half of these supervisory boards had no female members.[86] Before the law came into force in 2015 (but after the merits of a quota law

---

[81] Aktiengesetz [AktG] [Stock Corporation Act], Sept. 6, 1965, BGBl I at 1089, last amended by Gesetz [G], May 12, 2021, BGBl I at 990, § 96, para. 2 and § 250, para. 1, no. 5 (Ger.), https://www.gesetze-im-internet.de/aktg/AktG.pdf.

[82] Among others Aktiengesetz [AktG] [Stock Corporation Act], Sept. 6, 1965, BGBl I at 1089, last amended by Gesetz [G], May 12, 2021, BGBl I at 990, § 76, para. 4 and § 111, para. 5 (Ger.), https://www.gesetze-im-internet.de/aktg/AktG.pdf As this regulation affects companies that are (alternatively) either listed or co-determined (including under parity co-determination), its scope is considerably broader than that of the 30%-quota, which only affects companies that are (cumulatively) listed and co-determined on a parity basis. When the law was enacted, around 3,500 companies in Germany were affected by this regulation. Regierungsentwurf [Cabinet Draft], Deutscher Bundestag: Drucksachen [BT] 18/3784, at 46 (Ger.), http://dipbt.bundestag.de/doc/btd/18/037/1803784.pdf.

[83] Aktiengesetz [AktG] [Stock Corporation Act], Sept. 6, 1965, BGBl I at 1089, last amended by Gesetz [G], May 12, 2021, BGBl I at 990, § 76, para. 4 and § 111, para. 5 (Ger.), https://www.gesetze-im-internet.de/aktg/AktG.pdf. Companies must set deadlines for achieving the targets they have set themselves; these deadlines may not be longer than 5 years. *Id.*

[84] Regierungsentwurf [Cabinet Draft], Deutscher Bundestag: Drucksachen [BT] 18/3784, at 46 (Ger.), http://dipbt.bundestag.de/doc/btd/18/037/1803784.pdf. Failure to comply with these reporting requirements may result in sanctions of up to €50,000 or, for listed companies, up to €2 million or twice the benefit generated by the violation. Handelsgesetzbuch [HGB] [Commercial Code], § 289, §334, para. 1, no. 3 and 5 (Ger.), https://www.gesetze-im-internet.de/hgb/HGB.pdf.

[85] The "Women on Supervisory Boards" initiative (FidAR e.V.), which has been publishing the annual "Women-on-Board Index" since 2011, ensures that trends are easy to follow. FidAR examines the proportion of women in leadership positions of the 160 companies listed on the DAX, MDAX and SDAX as well as the 26 companies with parity co-determination listed on the regulated market. FIDAR ANALYTICS, WOMEN-ON-BOARD-INDEX, https://wob-index.de/ (last visited Jun. 04, 2021). The 2011 date is relevant as a starting point for Germany because at that point, Merkel hinted that the private sector needed to improve its inclusion or face a legislative mandate. The success of the statute is also evidence when considering that firms have overshot the mandate by several percentage points.

[86] FIDAR, WOMEN-ON-BOARD-INDEX 185, 17 (2021) (Ger.), https://wob-index.de/webmedia/documents/wob185/2021/epaper/.

had been debated for several years), 19.9% of supervisory board members were women.[87] As of 2021, because of Germany's corporate inclusion law, the proportion of women on the supervisory boards of the 186 companies referenced has increased significantly more, to 33.2%.[88]

**E. Spain**

52. In 2007, Spain enacted its Equality Law, which requires that large corporate boards ensure at least 40% representation of both men and women.[89] The law applies to public-limited companies (companies that offer shares to the general public) and listed firms, who had until 2015 to comply with the legislation.[90] Although it imposes a quota, the law lacks an enforcement mechanism—it instead rewards compliance with preferential treatment when awarding government contracts.[91]

53. The Stock Market National Committee has also established its own norms with a goal of 30% female representation by 2020.[92] In 2014, Spain passed an additional law applying a "comply-or-explain" model, requiring firms' disclosure when a gender is underrepresented on

---

[87] *Id.* The self-set targets of companies that are subject to the quota are also more ambitious and those companies also perform better in terms of the proportion of women in management board positions (although the quota only directly addresses the members of the supervisory board). Since the FüPoG I came into force in 2015, the proportion of women on the management board has risen from 5% to 13%. In companies subject to the quota, the proportion of women has increased from 4.9% (2015) to 14.1% (2021), and in companies not subject to the quota from 5.2% (2015) to 11.3% (2021). As part of the 2021 surveys, FidAR asked companies what they think about a planned minimum participation requirement for women on management boards, as planned for FüPoG II. Although the majority of the surveyed companies did not want to take a position, those companies which consider the regulation to be appropriate clearly predominated in the responses. Since the plans for the FüPoG II law were announced, six companies that will be subject to the minimum participation requirement have already appointed a woman to their management board.

[88] *Id.*

[89] Celeste Lopez Madrid, *La cuota obligatoria funciona,* LA VANGUARDIA (Apr. 10, 2018, 9:21AM), https://www.lavanguardia.com/vida/20181004/452164784170/paridad-consejos-administracion-empresas-igualdad-mujer.html.

[90] EMANUELA LOMBARDO AND TÀNIA VERGE, FACT SHEET ON SPAIN (2014) https://blogs.eui.eu/genderquotas/wp-content/uploads/sites/24/2015/04/Executive-summary-Spain-Lombardo-Verge.pdf.

[91] *Id.*

[92] Recommendation 15 of the Stock Market's National Committee's Unified Good Governance Code — the Conthe Code — indeed requires companies with more than 250 employees to justify the lack of women on their boards. Enacted in 2007, the Code demands that its companies adopt an Equality Plan to mitigate their shortcomings. The Code was reformed in 2015 to set the target for gender-balanced representation at 30% by 2020.

their boards.[93] The 2014 law strives for "balanced representation" and requires firms to set their own targets for the underrepresented sex on their boards.[94] Taken together, Spain's 2007 and 2014 laws have not had as much success as in France, Germany, and Norway. At present, the percentage of women on the boards of Spain's largest companies is around 23.1%, only a 3.4% increase since 2016.[95]

**F. Italy**

54. Shortly after France passed its corporate board statute, Italy followed suit. Its law mandates that either gender should be represented at 20% for the first board election after August 2012, and 33% for the following two board elections.[96] But Italy's law has a unique sunset provision: it only is in effect for three consecutive board elections—nine years for each firm.[97] Within the past decade, Italy has had more compliance success than Spain as women went from 6% representation on boards to the current 30%.[98] Although some expect the levels of women on boards will remain high after the mandate sunsets,[99] there remain real concerns about how well the quota will succeed once it has exceeded its limited timeframe.[100]

---

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] In 2011, Italy introduced "Law 120/2011", also called the "Golfo-Mosca" law, a mandatory gender quota with respect to members of the boards of directors and statutory auditors of publicly traded companies. Unlike some of the other gender quotas in Europe, the Italian quota's implementation is gradual. Board elections occur every three years. The quota requires that the fraction of women on the board (and that of men) is at least 1/5 at the first board election and 1/3 at the following two elections. After three election cycles, the quota ends. If a company fails to comply with the quota, CONSOB (the regulator of the Italian stock exchange) issues a warning. If the company still fails to comply, CONSOB can fine the noncompliant company. If the company fails to comply after the second warning, the election is invalidated by law. *See* Paola Profeta et al., *Do Board Gender Quotas Matter? Selection, Performance and Stock Market Effects*, *IN* IZA INST. OF LABOR ECON. DISCUSSION SERIES (2018), http://ftp.iza.org/dp11462.pdf.

[97] Paola Profeta, *In Italy's 'male gerontocracy', gender quotas induced the restructuring of company boards*, THE LONDON SCHOOL OF ECON. AND POL. SCIENCE (Oct. 18, 2016), https://blogs.lse.ac.uk/businessreview/2016/10/18/in-italys-male-gerontocracy-gender-quotas-induced-therestructuring-of-company-boards/ (citing PAOLA PROFETA ET AL., WOMEN DIRECTORS THE ITALIAN WAY AND BEYOND (Palgrave Mackmillan UK 2014)).

[98] Giavanni S. F. Bruno et al., *Boardroom Gender Diversity and Performance of Listed Companies in Italy* (CONSOB, working paper No. 86, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3251744.

[99] *Id.* at 7-10.

[100] G.S.F. Bruno, A. Ciavarella, and N. Linciano, "Boardroom gender diversity and performance of listed companies in Italy", Commissione Nazionale per le Societa e la Borsa, Sep. 2018, http://www.consob.it/documents/46180/46181/wp87.pdf/d733b58a-44b4-42de-

**Part II: Countries With 'Comply or Explain' Disclosure Laws and Results**

55. As explained below, several common law countries have adopted "comply-or-explain" rules or a mix of different requirements in an effort to increase corporate board diversity.[101] Unlike quotas, which mandate specific gender targets for firms, the comply-or-explain mechanism requires corporate boards to either comply with regulator's guidelines, such as attaining a certain percentage of female board directors, or explain why they have not done so. Sanctions for corporate non-disclosure vary across jurisdictions, but typically they involve nominal fines. As most comply-or-explain regimes were recently implemented, it is unclear how successful they will ultimately be, but in the years since their adoption, they have not achieved the same results with respect to critical mass, diversity inclusion, or other benefits that hard quotas have, despite marginally improving board diversity.

**A. The United States**

56. In 2009, the United States became one of the first countries to implement comply-or-explain diversity disclosure regulations.[102] The Securities and Exchange Commission (SEC) rule required that companies describe their selection process for board nominees, whether and how diversity was considered in the nomination process, and whether the nominating committee has a policy for diversity in place.[103] Unlike many of its later counterparts in the EU, the new U.S. securities regulation did not define diversity in strictly gendered terms. Instead, boards were free to define it however they wished.[104] Corporations could develop gender-based policies and

98c7- 3c89a82a0182.

[101] DHIR, *supra* note 12, at 247-48.

[102] The U.S. Securities and Exchange Commission (SEC) amendment to Regulation S-K, added in item 407(c)(2)(vi), which required registrants to describe: the nominating committee's process for identifying and evaluating nominees for director; whether, and if so how, the nominating committee (or the board) considered diversity in identifying nominees for director, and; if the nominating committee (or the board) had a policy with regard to the consideration of diversity in identifying director nominees, how this policy [was] implemented and how the nominating committee (or the board) assess[ed] the effectiveness of its policy. *See* "17 CFR § 229.407 - (Item 407) Corporate governance.", online: *LII / Legal Information Institute* <https://www.law.cornell.edu/cfr/text/17/229.407>

[103] *Id.*

[104] See Securities and Exchange Commission: Proxy Disclosure Enhancements; Final Rule, 74 Fed. Reg. 245,68344 (December 23, 2009) https://www.sec.gov/rules/final/2009/33-9089fr.pdf.

targets, or they could opt not to do so. Boards could even consider non-identity-based conceptualizations of diversity, including differences in viewpoints, professional experience, education, and skill. Under SEC rule 407, publicly traded U.S. corporations only had to explain whether they had diversity goals, what they were, and whether they were met. But it put no affirmative requirements on corporations to take any action with respect to their corporate board makeup. Professor Dhir, in his study of these SEC rules, notes that although these disclosure requirements gave U.S. corporations and their boards of directors enormous flexibility, the rules did not advance inclusion.[105] When compared to hard quota results, the SEC disclosure regulation has done little to move the dial on women's participation on corporate boards—women represented 15.2% of *Fortune* 500 board seats in 2009 and as of 2019, still held fewer than one-quarter (22.5%) of *Fortune* 500 board seats nationwide.[106] This percentage necessarily takes account of the increases due to SB 826, which went into effect in 2018.

57. The NASDAQ stock exchange recently announced that they will require all listed companies to have one female board member and one board member from another underrepresented group. If firms fail to meet this requirement, they must justify their failure or else be delisted from the exchange. Such a measure was met with approval from the SEC, who approved the proposal in August 2021.[107]

**B. Canada**

58. Canada has no federal quota mandate, but it has implemented comply-or-explain requirements. Canada is also unique: one of its provinces, Quebec, has also implemented a quota requirement that applies to a narrow set of companies.

59. At the federal level, Canada's Corporate Governance Guideline of 2018 only encourages companies that "[t]he Board should be diverse and, collectively, bring a balance of

---

[105] Dhir, *supra* note 12, at 217.

[106] *See Women on Corporate Boards (Quick Take*), CATALYST, (Mar. 13, 2020), https://www.catalyst.org/research/women-on-corporate-boards/.

[107] *Release No. 34-92590; File Nos. SR-NASDAQ-2020-081; SR-NASDAQ-2020-082,* SECURITIES AND EXCHANGE COMMISSION (AUGUST 2021), https://www.sec.gov/rules/sro/nasdaq/2021/34-92590.pdf.

expertise, skills, experience, competencies and perspectives."[108] It specifies that diversity should factor in discussions about corporate board plans, particularly with respect to board chair and committee chair positions.[109]

60. Prior to this 2018 federal guideline, the provinces of Alberta, Manitoba, New Brunswick, Nova Scotia, Ontario, Quebec, and Saskatchewan provided data regarding gender equality to the Canadian Securities Administrators.[110] Taking the 2014 province requirements and 2018 guidelines together, Canada's comply-or-explain disclosures have not been as effective as laws mandating stricter requirements.

61. In terms of board representation, in their 2020 annual review of firm disclosures, the Canadian Securities Administrators (CSA) noted that, although 79% of firms had at least one woman on their board, the total number of board seats held by women in Canada remained at 20%.[111] Though this current level is an increase from the 11% of female-held board seats seen in Canada in 2015,[112] Canada's current level of female board inclusion falls far short of levels found in France, Norway, and other countries.[113] An investigation led by the Conference Board of Canada noted there is "no compelling evidence" that the "comply-or-explain disclosure

---

[108] *Canada's Corporate Governance Guideline*, OFFICE OF THE SUPERINTENDENT OF FINANCIAL INSTITUTIONS CANADA (Sept. 2018), https://ecgi.global/sites/default/files/codes/documents/cg_guideline_2018.pdf.

[109] *Id.*; see also Lisa Culbert & Ramandeep Grewal, *How Board Diversity is Shifting in Canada*, CORPORATE SECRETARY, (Mar. 23, 2020), https://www.corporatesecretary.com/articles/boardroom/32016/how-board-diversity-shifting-canada; Virginia Schweitzer & Caroline Zechel, *Promoting Diversity in the Boardroom and within Management: New Diversity Disclosure Requirements for CBCA Distributing Companies*, MONDAQ, (Sep. 19, 2019), https://www.mondaq.com/canada/shareholders/849242/promoting-diversity-in-the-boardroom-and-within-management-new-diversity-disclosure-requirements-for-cbca-distributing-companies. https://www.fasken.com/en/knowledge/2019/09/ott-newsletter---promoting-diversity-in-the-boardroom-and-within-management/

[110] See Melissa Bennardo, *How Canada stacks up on women's representation on corporate boards*, CBC (May 14, 2019, 4:00 AM), https://www.cbc.ca/news/business/women-corporate-boards-globally-1.5131113.

[111] CANADIAN SECURITIES ADMINISTRATORS, REPORT ON SIXTH STAFF REVIEW OF DISCLOSURE REGARDING WOMEN ON BOARDS AND IN EXECUTIVE OFFICER POSITIONS, 2 (2021). HTTPS://WWW.ALBERTASECURITIES.COM/-/MEDIA/ASC-DOCUMENTS-PART-1/REGULATORY-INSTRUMENTS/2021/03/5950463-_-CSA-NOTICE-58-312-RPT-ON-SIXTH-STAFF-WOB-REVIEW.ASHX?LA=EN&HASH=230828E0EC34442FF70B9261AA75E622.

[112] *Id.*

[113] Dhir, *supra* note 12, at 4

requirements accelerated […] women into boardrooms."[114] Indeed, the year-to-year pace of change before and after the 2014 disclosure requirements were implemented (between 1.5% and 1.9%) remained the same. These results are especially stark when contrasted with the experiences in Quebec.

62. In 2006, Quebec became the only jurisdiction in Canada to implement a strict gender-based quota. The law applies to state-owned enterprises that operate privately,[115] which is a small number of corporations, and required compliance by 2011.[116] Specifically, it mandated that 50% of board seats in covered corporations be held by women.[117] In the five years after the law's implementation, 100% of covered corporations had complied with the quota, and female representation on those boards jumped from 28% to 52.4%.[118]

### C. The United Kingdom

63. The UK and Ireland both have reporting requirements, as opposed to quotas.[119] The 2018 UK Corporate Governance Code states that a corporation's annual report should discuss how the nomination committee encourages diversity and inclusion and how this will influence board composition. Firms are urged to follow "a formal, rigorous and transparent procedure,"

[114] THE CONFERENCE BOARD OF CANADA, ALL ON BOARD, 2, (2021), https://www.conferenceboard.ca/temp/d5e59f3f-36c3-47ab-ae9f-bdf7008a35b5/11115_All-on-Board_April2021.pdf.

[115] *See* Kazi Stastna, *What are Crown corporations and why do they exist?,* CBC (Apr. 1, 2012, 4:39PM), https://www.cbc.ca/news/canada/what-are-crown-corporations-and-why-do-they-exist-1.1135699. Hydro-Québec and the Société des Alcools du Québec (SAQ) are notable Quebec Crown corporations that fall under the law's scope.

[116] *See* Loprespub, *Women's Representation on Corporate Boards in Canada*, LIBRARY OF PARLIAMENT (Mar. 5, 2015), https://hillnotes.ca/2015/03/05/womens-representation-on-corporate-boards-in-canada/.

[117] ANDREW MACDOUGALL & MICHELE QU, *GENDER DIVERSITY ON BOARDS AND IN SENIOR MANAGEMENT*, (2014) https://www.osler.com/osler/media/Osler/reports/corporate-governance/Proxy-2014-Women-On-Boards-in-Canada.pdf.

[118] *Conseil du statut de la femme of Quebec, Les femmes dans les conseils d'administration des entreprises québécoises*, 2014, https://www.csf.gouv.qc.ca/wp-content/uploads/les-femmes-dans-les-c-a-des-entreprises-quebecoises.html#mot2.

[119] Ireland, in its corporate governance annex published in 2019, stated that it would continue to comply with the corporate governance principles set out by the UK. The Irish Stock Exchange plc trading as Euronext Dublin, The Irish Corporate Governance Annex (2019); Financial Reporting Council, The UK Corporate Governance Code (2018).

and to ensure appointments and succession plans are "merit-based," follow "objective" criteria, and promote gender, social and ethnic diversity.[120]

64. The UK government also commissioned two reports on the need for gender diversity and seeking recommendations on how to achieve that diversity: the Davies Review and its successor, the Hampton-Alexander Review.[121] Lord Davies in his first report stated: "Government must reserve the right to introduce more prescriptive alternatives if the recommended business-led approach does not achieve significant change."[122] Thus, the report introduced a threat of a harder quota. The Davies Review recommended that companies aim for at least a 25% representation of women on boards by 2015, which was achieved. The Hampton-Alexander Review aimed for 33% representation of women on boards by the end of 2020, a standard which was met by firms apart of the FTSE 250.[123]

65. The UK has had success in increasing corporate board diversity, with the number of women on the boards of Britain's 350 top publicly traded firms jumping by 50 percent since 2015, with 34.3 percent of all board seats now being held by women.[124] Women hold at least one-

---

[120] The UK Corporate Governance Code 8-9 (2018)

[121] See generally Women On Boards Davies Review, *Improving the Gender Balance on British Boards, Five Year Summary October 2015*, (October 2015), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/482059/BIS-15-585-women-on-boards-davies-review-5-year-summary-october-2015.pdf; Hampton-Alexander Review, FTSE Women Leaders, *Improving gender balance – 5 year summary report*, (February 2021), https://ftsewomenleaders.com/wp-content/uploads/2021/02/HA-REPORT-2021_FINAL.pdf.

[122] Giovanni Razzu, *Women on company boards: time for the government to adopt legislative quotas*, LSE BPP (Nov. 15, 2017), https://blogs.lse.ac.uk/politicsandpolicy/women-on-company-boards-time-for-the-government-to-adopt-legislative-quotas/.

[123] The Financial Reporting Council's UK Corporate Governance Code was updated in 2018 and requires reporting on gender diversity and related diversity policies, objectives, and outcomes. "The number of women on the boards of directors of Britain's 350 top publicly traded firms has jumped by more than 50 per cent since 2015, meaning that 34.3 per cent of all board seats are now held by women, an independent panel said in a report published Wednesday. Women hold at least one-third of the board seats at 220 companies, up from 53 five years ago." From the February 2021 Hampton-Alexander Review, "The FTSE 100 met the 33% target for women on boards at the beginning of 2020 and women's representation now stands at 36.2%, up from 27.7% in 2017...The FTSE 250 met the 33% target for women on boards at the end of 2020 and women's representation now stands at 33.2%, up from 22.8% in 2017." See https://economictimes.indiatimes.com/news/international/business/number-of-women-on-uk-corporate-boards-rises-50-in-5-years/articleshow/81194344.cms?from=mdr.

[124] *Number of women on UK corporate boards rises 50% in 5 years*, ECONOMIC TIMES, (Feb. 24, 2021), https://economictimes.indiatimes.com/news/international/business/number-of-women-on-uk-corporate-boards-rises-50-in-5-years/articleshow/81194344.cms?from=mdr.

third of the board seats at 220 UK companies, an increase from women holding a third of positions at 53 companies five years ago.[125] Nonetheless, the UK ranks below many European countries that have instituted stricter requirements.[126] As one economics professor noted, "countries that have adopted legislative measures have done much better than us. Why should not we aspire to the same?"[127] Despite having greater gender equality than the U.S., UK companies are not model jurisdictions for gender parity in the boardroom. Over a third of the UK's "companies have not even hit the 33% target for women on boards and around 70% have not hit the 33% target for leadership positions."[128]

66. Another criticism of the UK's model is that women fill roles that may be marginalized: "Only 14% of full-time executives on Financial Times Stock Exchange (FTSE) 100 boards are women", and thus "much of the rise will be [for] part-time positions. Only 23% of women are 'senior independent directors,' 11% are chairpersons of the board, and only 8% are full-time chief executives. The figures are broadly similar for the next 250 largest UK companies."[129] Women filling mostly part-time positions implies that they are symbolic appointments only, in comparison to other European jurisdictions that ensure a full-time "critical mass" of women is achieved on boards so that their voices are not marginalized. In short, the UK's comply-or-explain model does not appear as successful as the strict quota models found in other countries.

67. In short, while the UK has seen some success, it faces rising pressure to adopt a law mandating a quota: as one article recently urged, "after ten years of equality drives, it's time for quotas."[130]

---

[125] *Id.*

[126] OLGA EMELIANOVA & CHRISTINA MILHOMEM, WOMEN ON BOARD 2019 PROGRESS REPORT 10 (2019); CHRISTINA MILHOMEM, WOMEN ON BOARD 2019 PROGRESS REPORT 9 (2020). https://www.msci.com/documents/10199/9ab8ea98-25fd-e843-c9e9-08f0d179bb85

[127] Razzu, *supra* note 124.

[128] Emelianova & Milhomem, *supra* note 126.

[129] *Id.*

[130] "The underlying findings and shortcomings in the Hampton-Alexander review demonstrate that it needs to continue, reinforced by continued government backing. It's time to impose 33% quotas on straggler firms – including financial penalties on existing directors." Keith Cuthbertson, *Women in boardrooms: after ten years of equality drives, it's time for quotas*, THE CONVERSATION (March 2, 2021), https://theconversation.com/women-in-boardrooms-after-ten-

**D. Ireland**

68. Though Ireland has no diversity requirements, the Balance for Better Business report, commissioned by the Irish Government and released in 2019, has recommended targets for gender diversity.[131] The report recommends achieving "33 percent representation of women on ISEQ 20 (the Irish equivalent of the Dow Jones Industrial Average) boards and 25 percent for all other listed company boards by 2023."[132] The targets increase each year leading up to 2023: by the end of 2020, the report recommended 25% representation for ISEQ 20 companies and 18 percent for all other listed companies.[133]

69. The voluntary targets have yet to yield the same levels of success seen in countries with strict quotas. According to the Balance for Better Business website, board seats held by women for all listed companies have increased from 13.9% in February 2018 to 22.4% in September 2020,[134] far below the levels of representation seen in countries with hard quotas. After data was released showing that less than one-fifth of board seats in Ireland were held by women, the Irish Human Rights and Equality Commission (in late 2020) recommended that the government pass statutory quotas.[135]

**Part III: Understanding Which Diversity Requirements Work: Recent Research**

70. Though there is variation among corporate board diversity remedies, the bulk of efforts fall into two broad categories: quotas and comply-or-explain rules. The former have seen consistent and clear successes. As described above, firms in countries with quotas have changed their processes to include women on boards, without disruption to corporate functioning.

years-of-equality-drives-its-time-for-quotas-156326.

[131] The report was launched by Minister Leo Varadkar T.D. - Tánaiste and Minister for Enterprise, Trade and Employment.

[132] *Balance for Better Business: Second Report*, GOVERNMENT OF IRELAND (Nov. 2019), http://www.betterbalance.ie/wp-content/uploads/2020/01/B4BB-Second-Report-2019-Single-Pages.pdf at 15.**Error! Hyperlink reference not valid.**

[133] *Balance for Better Business: Third Report*, GOVERNMENT OF IRELAND (Nov. 2020), http://www.betterbalance.ie/wp-content/uploads/2020/12/Balance-for-Better-Business-Report-Nov-2020.pdf at 10.

[134] *Id* at 13.

[135] Ian Curran, *Disrupting 'the cosy club': Are gender quotas the solution to achieving diversity in Irish boardrooms?*, **THEJOURNAL.IE** (Jan. 27, 2021), https://www.thejournal.ie/gender-quotas-business-futures-5336681-Jan2021/.

Additionally, research shows several corporate governance benefits resulting from inclusionary laws. By contrast, while comply-or-explain rules produce minimal benefits, they are inconsistent.[136]

71. Recent research points to why comply-or-explain rules are not as effective as requirements or quotas, and demonstrates the need for government regulations. Despite substantial gains for women graduating with MBAs and entering the workforce at a near-equal rate to men, women still only comprise only 6% of CEOs, while men comprise the remaining 94% in the United States. Men who serve on corporate boards typically choose men to succeed them, and nominating committees prefer those who have skills familiar and similar to theirs, including CEO experience.[137] As firms recruit and promote people, "forces [exist] which lead the men who manage to reproduce themselves in kind,"[138] a form of structural discrimination. The leaders of the corporation view themselves as the standard-bearers for the corporation's success; their skills prove essential for the firm's continued profitability. These leaders, in turn, identify for promotion those subordinates whose skills mirror their own.[139] As my own research and the research I have cited above demonstrates, this leads to men maintaining their domination over elite positions.

72. Especially relevant to evaluating which remedies work best is research that points to a desire to maintain a workplace with ingroup members, even when there are increased societal

---

[136] The Irish Times, for example, recently contrasted Ireland's comply-or-explain rule with harder rules in an article entitled "France shows gender quotas work in business while targets do not." *France shows gender quotas work in business while targets do not*, The Irish Times (Feb. 1, 2020).

[137] *See* KANTER, *supra* note **Error! Bookmark not defined.** (explaining that as men recruit and promote people, they find candidates that are reproductions of themselves, having the same skills as they do, which they view as valuable to the company).

[138] *Id.*

[139] "The greater the tendency for a group of people to try to reproduce themselves, the more constraining becomes the emphasis on conformity." *Id.* at 68. *See also* Amanda K. Packel, *Government Intervention into Board Composition: Gender Quotas in Norway and Diversity Disclosures in the United States*, 21 STAN. J. OF LAW, BUS. & FIN., 192, 199 (2016) (explaining that the board nomination process relies heavily on social networks, which tends to result in newly appointed directors with sociodemographic characteristics similar to those of existing directors"); DARIA ROITHMAYR, REPRODUCING RACISM: HOW EVERYDAY CHOICES LOCK IN WHITE ADVANTAGE (2014).

pressures to increase diversity.[140] This explains why male leaders will continue to favor other men even when a public, but nonbinding norm, like a comply-or-explain rule, arises.

73. Gender role bias, stereotypes, unconscious bias, and the strong desire to maintain sameness prevent women from moving up in the corporate world as men consistently favor other men.[141] This social science research provides strong evidence that external requirements are necessary to combat structural sexism and provide equal opportunity for women on corporate boards.[142] The persistence of bias even in the face of decades of women's equal or better qualifications demonstrates that neither the market nor societal and business pressures will rectify the ways in which firms limit the pool of potential candidates, and that regulation is needed to change entrenched hiring practices and ingroup preferences. Indeed, laws that mandate inclusion, rather than suggest it, are the most effective regulatory mechanism.

**Part IV: California's Diversity Requirement Law, SB 826**

74. One recent report shows that SB 826 has been successful in disrupting the aforementioned long-held and unchanging patterns of discrimination against women: since its enactment, participation by women on corporate boards covered by the law has increased by 66%.[143]

75. SB 826 does not impose a requirement akin to the strict corporate board quotas, but it does go further than comply-or-explain and disclosure laws: it implements a diversity requirement, but does not base the requirement on a percentage of the corporate board being made up of a certain gender. Like "quota" countries, the advocates of SB 826 focused on establishing the law within corporate legislation. Similarly, they focused on the specific context

---

[140] Some examples the 2013 scandal where Twitter faced backlash for its proposed all-male board, Google, Uber; and other firms facing sex inequality and sexual harassment controversies. See Darren Rosenblum, *California Dreaming?*, 99 B.U. L. REV. 1435, 1437–1438 (2019).

[141] See Darren Rosenblum, "Diversity and the Board of Directors: A Comparative Perspective", in *Elgar's Research Handbook on Comparative Corporate Governance*, Afsharipour & Gelter, eds (2020), at 17.

[142] Hilde Bjørkhaug & Siri Øyslebø Sorensen, Why gender quotas are necessary, Politico (March 7, 2012), https://www.politico.eu/article/why-gender-quotas-are-necessary/

[143] California Partners Project, *Gender Equity: Increase Representation of Women on Corporate Boards,* https://www.calpartnersproject.org/wobjustthefacts (Accessed July 2020)

of diversifying boards, as opposed to other areas of the corporation, such as executive leadership. Advocates also leaned on the business case to advance their cause; moreover, the corporations covered by the law are publicly held.

76. Similar to countries that have implemented actual quotas, SB 826 has critical mass goals, acknowledging the effect that having three women (rather than a strict thirty percent), can have on decision-making.[144] However, it differs in how it seeks to achieve those goals. SB 826 only imposes a minimum floor rather than a set percentage: corporate boards can increase their board seats to comply with the law. This makes SB 826 far less restrictive than other countries' laws, because while it guarantees a floor of three females on larger boards, it does not mandate gender parity or even substantial representation. The law explicitly identifies that corporate boards can expand the number of members to meet the legal requirement. California's number requirement pressures firms to include women but allows them more flexibility than a strict quota in terms of overall board composition.

77. Another divergent component of SB 826 is its penalty—a potential fine, should the Secretary of State choose to implement fines. But SB 826's fines for noncompliant corporations are not mandatory (the Secretary of State has discretion over whether to levy fines at all) and are not severe when compared to the penalties threatened by both the Norwegian and French statutes, which would either delist the firm from the stock exchange or threaten its ability to function as a legal entity. With the flexible requirements that SB 826 has implemented, California has a defter touch with regard to the firms covered by the mandate.

78. SB 826's requirements are more stringent than those countries that have mostly adopted disclosure rules, as discussed above, in that SB 826 requires a minimum floor of females on corporate boards. However, comply-or-explain rules have not been as effective in achieving their intended goals. This is in contrast with SB 826, which has so far been successful in achieving compliance. California's potential enforcement with fines, combined with the societal pressure to diversify, appears to have overcome resistance.

---

[144] *See e.g.,* Alison M. Konrad, Vicki Kramer, & Sumru Erkut, *The Impact of Three or More Women on Corporates Boards*, 37 ORGANIZATIONAL DYNAMICS 145–164 (2008).

79. The combination of softer requirements that imposes inclusion of a certain number rather than a percentage of women, as well as the more flexible enforcement mechanism, suggests that California has found the ideal route: California's requirements are not so light (disclosure only) that the law does not achieve its goals, but they are also not so restrictive (like Norway) that noncompliance threatens the firm's continued existence. It is no surprise that other states' proposed corporate board diversity laws have copied key elements of SB 826.[145] SB 826 is also on track to achieve better results than countries with comply-or-explain rules, such as Canada. California's law is much more recent compared to Canada's comply-or-explain rules, with the deadline for portions of SB 826 requiring critical mass of women on boards not even occurring yet. Yet in the short time that it has been in effect, it has been very successful at an impressive rate. Given this rate and the impending requirements, it is likely that California will surpass Canada in terms of gender diversity on corporate boards.

80. The key takeaway from analyzing laws aimed at diversifying corporate boards, including SB 826, is that requirements for board diversity are the least restrictive means for achieving gender diversity. They impose few costs, and companies comply. With its innovative statute, California leads a different path for inclusion without overly harsh mandates.

**Conclusions**

81. As discussed above, multiple governments have implemented various laws to increase gender diversity on corporate boards. These laws range from strict quotas to simple disclosure requirements. Overall, comply-or-explain and disclosure requirements are not as effective at achieving board diversity, or achieving "critical mass" on corporate boards, as stricter requirements, such as laws that require quotas, are. However, California's law, SB 826, which does not implement a mandatory percentage, but instead implements a diversity requirement with an optional fine, strikes a deft balance between the two ends of the spectrum.

---

[145] Amit Batish, *Q4 2020 Equilar Gender Diversity Index*, Equilar (March 3, 2021), https://www.equilar.com/reports/78-q4-2020-equilar-gender-diversity-index.html (mentioning Washington State law and proposed legislation in Illinois, Hawaii, Pennsylvania, and New Jersey).

82. Strict corporate board quotas have been implemented in multiple countries. Norway's corporate board quota, enacted in 2003, inspired many other countries to copy the legislation, including France, Germany, and other European countries, and then beyond. These quotas transformed the makeup of corporate boards. Prior to the enactment of these laws, gender diversity on corporate boards in each of these countries was quite low: in France, women held only 12.3%;[146] in Norway, 4%;[147] and in Germany, in 2011, the proportion of women on the supervisory boards of the 160 companies studied by the "Women on Supervisory Boards" initiative was 10%.[148] After the implementation of these quotas, overall, progress in each country has improved markedly: in France, by 2020, all 120 SBF groups met or exceeded the 40% goal;[149] Norway reached 42.5% by 2019;[150] in Germany, the proportion of women on the supervisory boards of the 186 companies grew to 33.2%.[151] This represents a 20 to 30% increase for each country that adopted a hard quota.

83. For countries that have imposed corporate quotas, the way that directors have been chosen has also changed, as discussed above. Prior to the influx of this legislation, boards reflected an "old boys club" culture in which nomination decisions were made through the familiarity of a small group whose members were selected by a largely insider-dominated process. By mandating the inclusion of women, corporate quotas formalized the process of hiring new board members. This generated a sharp reduction in groupthink as boards experienced substantial turnover to comply with the laws. Ultimately, women's inclusion on boards became a corporate governance norm as essential as ensuring members had a basic business acumen.

---

[146] Anne-Francoise, Rey Dang, & Marie Jose Scotto, *Les Profils Des Femmes Membres Des Conseils D'Administration En France*, 69 (2016), https://www.cairn.info/journal-travail-genre-et-societes-2016-1-page-67.htm.

[147] Aagoth Storvik, *Women on Boards – Experience From The Norwegian Quota Reform,* 38 (2011), https://www.ifo.de/DocDL/dicereport111-rm2.pdf.

[148] FidAR, Women-on-Board-Index 185 (Jan. 15, 2021), at 17 (Ger.), https://wob-index.de/webmedia/documents/wob185/2021/epaper/.

[149] Laurence Boisseau, *La France championne du monde de la féminisation des conseils d'administration, (2019),* https://www.lesechos.fr/finance-marches/marches-financiers/la-france-championne-du-monde-de-la-feminisation-des-conseils-dadministration-996466.

[150] Cathrine Seierstad, Geraldine Healy, Eskil Sønju Le Bruyn Goldeng, & Hilde Fjellvær, *A "quota silo" or positive equality reach? The equality impact of gender quotas on corporate boards in Norway,* 172 (2020),https://onlinelibrary.wiley.com/doi/10.1111/1748-8583.12288.

[151] FidAR, *supra* note 151.

84. The core elements of Norway's original statute have been replicated in numerous similar laws because of their proven success. First, Norway's law focuses on corporate governance and not equality because the goal is to correct the structural sexism in corporate governance, and also because corporate laws tend to achieve greater compliance. Second, the target is the corporate board, which plays a strategic role in corporations but is distant enough from everyday management that it does not constitute a major imposition on firm day-to-day decision-making. Third, the quota's basis draws on the business case for inclusion—that good governance is partly dependent on gender diversity, a view supported by social science data published since Norway's enactment. Fourth, legislation focuses on publicly traded firms, leaving smaller, privately-held ones out of the requirement. Fifth, most statutes rely on a notion of critical mass—the necessary representation, usually one-third, a minority must hold in a group for the minority to have a voice. Most regulations require between 30 and 40 percent representation. Finally, the quota has major penalties for noncompliance. The combination of these elements led to widespread and relatively uneventful compliance in Norway, France, and other countries that have enacted quotas.

85. France, the world's fifth largest economy, passed its quota shortly after Norway's was fully implemented. It followed each of the six core elements of the Norwegian quota: 1) it focused on corporate governance; 2) it focused on board diversity; 3) it relied on the business case; 4) it focused on publicly traded firms; 5) it followed the same gender balance percentage as the Norway quota, seeking to guarantee a critical mass; and 6) the mandate involved major penalties.

86. Like Norway, the French quota realized full compliance. By the time it was fully implemented, women comprised over forty percent of French boards. What was remarkable about this success was both how effective the law proved *and* how little it burdened France's corporate sector, which continued as usual without any interruption. Research, including my own, demonstrates that several governance benefits accrue to firms that include women.

87. When France, the world's fifth largest economy, adopted such a quota, it inspired many other countries to seriously consider whether to institute their own requirements. Even the

most skeptical of countries—notably Germany—ended up copying most of the elements of the Norwegian quota. Other variations appeared, including in India and Italy.

88. By comparison, overall, countries that have implemented so-called "comply or explain" requirements have not been as successful in achieving gender diversity; the fear of public judgment for noncompliance alone has not been successful. For Canada, England, Ireland, and Australia, prior to passing these requirements, corporate board diversity had the following percentages: in Canada, 11%;[152] in the UK, the FTSE had a rate of 22.8%;[153] and in Ireland, 13.9%.[154] After implementing the requirements, these countries to date have the following percentages: in Canada, 20%[155] (including Quebec, which implements a quota); in the UK, the FTSE 250 grew to 33.2%;[156] and in Ireland, 22.4%.[157] These percentages, it should be noted, do not include the number of corporate boards that have achieved critical mass. It is worth reiterating that these countries' laws are more established than California's law, which has requirements that have not yet taken effect, but as discussed above, California appears to be on track to achieving greater corporate board diversity and also has provisions ensuring critical mass is attained on corporate boards. Canada is also notable, because while overall percentages have not improved the way that quota-based countries have, Quebec implemented a rigid quota, and its percentages have risen. Excepting Canada, these increases represent approximately a 10%

---

[152] CANADIAN SECURITIES ADMINISTRATORS, REPORT ON SIXTH STAFF REVIEW OF DISCLOSURE REGARDING WOMEN ON BOARDS AND IN EXECUTIVE OFFICER POSITIONS, 2 (2021). HTTPS://WWW.ALBERTASECURITIES.COM/-/MEDIA/ASC-DOCUMENTS-PART-1/REGULATORY-INSTRUMENTS/2021/03/5950463-_-CSA-NOTICE-58-312-RPT-ON-SIXTH-STAFF-WOB-REVIEW.ASHX?LA=EN&HASH=230828E0EC34442FF70B9261AA75E622.

[153] The Economic Times, *Number of women on UK corporate boards rises 50% in 5 years*, 2021, https://economictimes.indiatimes.com/news/international/business/number-of-women-on-uk-corporate-boards-rises-50-in-5-years/articleshow/81194344.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst.

[154] *Balance for Better Business: Third Report*, *supra* note 134.

[155] CANADIAN SECURITIES ADMINISTRATORS, REPORT ON SIXTH STAFF REVIEW OF DISCLOSURE REGARDING WOMEN ON BOARDS AND IN EXECUTIVE OFFICER POSITIONS, 2 (2021). HTTPS://WWW.ALBERTASECURITIES.COM/-/MEDIA/ASC-DOCUMENTS-PART-1/REGULATORY-INSTRUMENTS/2021/03/5950463-_-CSA-NOTICE-58-312-RPT-ON-SIXTH-STAFF-WOB-REVIEW.ASHX?LA=EN&HASH=230828E0EC34442FF70B9261AA75E622.

[156] The Economic Times, *supra* note 156.

[157] *Balance for Better Business: Third Report*, *supra* note 134.

increase in women's representation in countries with comply-or-explain models, only half of what was achieved in countries with a harder mandate.

89. Similarly, the U.S.'s SEC rule is also a disclosure regulation in which firms can choose which diversity efforts to disclose and how to disclose them. Unsurprisingly, the SEC rule has not had much success. Before the rule passed, the average percentage of women on corporate boards was 15.2%, in 2009. By 2019, the percentage was only 22.5% in the United States, and that includes California corporations that acted after SB 826 went into effect. In addition to SB 826's requirements, the NASDAQ now requires all listed firms to have one woman and one person from another underrepresented group. However, this measure's efficacy will become clearer over the next years as firms begin to follow this novel rule.

90. SB 826, however, strikes a careful balance between strict quota laws and "comply or explain" regulations. The law implements a diversity requirement: it only requires that covered corporations have one female director for boards of four or less directors, two females for boards of five directors, and three females for boards of six or more. It does not, however, prevent corporations from increasing their board seats to comply with the law. While SB 826 therefore pursues critical mass, it does not mandate hard percentages the way that Norway and other countries with quota laws do; it institutes a floor, while also seeking critical mass on corporate boards. In addition, SB 826 follows the Norway precedent in mandating inclusion but avoids using the most severe enforcement mechanism possible, with the only penalty being potential imposition of a fine rather than dissolution. At the same time, it is stronger than the soft regulation of comply-or-explain rules, which have not inspired enough compliance to integrate women adequately and effectively into board governance.

//

//

//

//

//

//

91. SB 826 has also been successful. Prior to its enactment, in 2013, women only represented 15.5%[158] of seats on corporate boards. Since its enactment, covered corporate boards are comprised of 26.5% women.[159] Viewed from the perspective of the global movement for corporate board diversity requirement, in which most of the top ten economies have a quota and many others have followed suit, California's SB 826 has struck the perfect balance. It imposes relatively gentle requirements that has begun to achieve substantive inclusion on corporate boards.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on September 26th, 2021, in New York City, New York.

Darren Rosenblum

[158] California Partners Project, *supra* note 143.
[159] *Id.*

# EXHIBIT A

# DARREN ROSENBLUM

Faculty of Law - 3644 Peel Street
Montreal, QC H3A 1W9 Canada
darren.rosenblum@mcgill.ca

## ACADEMIC APPOINTMENTS

Fall 2021 — **MCGILL UNIVERSITY FACULTY OF LAW**, Montreal, Quebec
**Full Professor**
Courses: Business Associations, Corporate Governance, Sexuality & the Law

Fall 2004 -2021 — **PACE UNIVERSITY SCHOOL OF LAW**, White Plains, NY
**Professor (2009-2021); Associate Professor (2004-09)**
Primary Courses: Corporations, Contracts, International Business Transactions
Secondary Courses: Law & Sexuality, International and Comparative Equality
**Faculty Director, Institute of International Commercial Law (2011-present)**
Member of the governing board of the Vis Moot; coordinate work involving the world's largest CISG database and promoting international arbitration

2019-20 — **COLUMBIA LAW SCHOOL**, New York
**Visiting Scholar, Center for Gender and Sexuality Law**

Fall 2018 — **MCGILL UNIVERSITY FACULTY OF LAW**, Montreal, Quebec
**Wainwright Fellowship**

Spring 2018 — **BROOKLYN LAW SCHOOL**, Brooklyn, NY
**Visiting Professor**
Course taught: Corporations

Fall 2014 — **WASHINGTON COLLEGE OF LAW, AMERICAN UNIVERSITY**, Washington, D.C.
**Visiting Professor**
Courses taught: Contracts

Spring 2011 — **SEATTLE UNIVERSITY SCHOOL OF LAW**, Seattle, WA
**Visiting Professor**
Courses taught: Business Entities and International Business Transactions

## OTHER TEACHING

Spring 2021-2 — **ÉCOLE DE DROIT, UNIVERSITE DE PARIS II (ASSAS)**, Paris, France
**Professeur Invité (intensive course)** Comparative Corporate Law

Spring 2015 — **ÉCOLE DE DROIT, INSTITUT D'ÉTUDES POLITIQUES DE PARIS (SCIENCES PO)**, Paris, France
**Professeur Invité (intensive course)** The Traveling Corporation: The International Finance of State Shopping

Spring 2009 -2015 **UNIVERSITE DE VERSAILLES ST. QUENTIN EN YVELINES**, Versailles, France
Faculté de Droit et de Science Politique
**Guest Professor**, International Arbitration Law
Classes taught in French and English

Spring 2004 **UNIVERSITY OF PENNSYLVANIA LAW SCHOOL**, Philadelphia, PA
**Lecturer-in-Law**, Sexuality and the Law

Spring 2013
Spring 2003-Spring 2004 **FORDHAM LAW SCHOOL**, New York, NY
**Adjunct Professor**, Contracts, International Business Transactions, Law and Sexuality

## PRACTICE EXPERIENCE

2000–2004 **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**, New York, NY *and*

1998-2000 **CLIFFORD CHANCE ROGERS & WELLS LLP**, New York, NY
**Litigation and International Arbitration Associate**
Represented U.S., British, Brazilian, Canadian, Colombian, French and Peruvian clients in various multi-lingual arbitration and litigation matters, including strategic advice regarding multinational litigation and arbitration, and securities fraud litigation. Conducted accounting arbitration in Jamaica. Conducted business in Portuguese, French, and Spanish.

1996-98 **THE HONORABLE JOSÉ ANTONIO FUSTÉ**, U.S. District Court, San Juan, Puerto Rico
**Law Clerk**

1995-96 **FLEMMING, ZULACK & WILLIAMSON, LLP**, New York, NY
**Litigation Associate**

## EDUCATION

2005 **Master's in International Affairs, COLUMBIA UNIVERSITY, SCHOOL OF INTERNATIONAL AND PUBLIC AFFAIRS**, New York, NY
- Program at the Institute for International Affairs (ISRI), Havana, Cuba

1995 **JD, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL**, Philadelphia, PA
- Board Member, *Journal of Law and Social Change*
- Benjamin R. Jones Award (faculty award for legal writing)
- Research Assistant, Professor Susan Sturm
- First year of law school at City University of New York Law School
- Honor Fellowship, Universidad de la Habana, Havana, Cuba

1991 **BA, UNIVERSITY OF PENNSYLVANIA,** Philadelphia, PA
- Majors in Philosophy and French (coursework at Université de Paris III)
- Columnist, *Daily Pennsylvanian*

## AWARDS AND FELLOWSHIPS

2019 **Goettel Prize** (chosen by a team of external reviewers for outstanding scholarship for *When Does Board Diversity Benefit Firms?*)

2011 **Fulbright Research Scholar**, Paris France
Selected as one of seven Research Scholars in France for work on the French Corporate Board Quota

Fall 2010 **Ottinger Award for Faculty Achievement** (chosen by faculty peers for outstanding service to Pace Law School)

## SCHOLARLY ARTICLES

*LGBT Identity and Corporate Diversity Efforts* (with Jeremy McClane) (forthcoming 2022)

*Manning Up?* (forthcoming 2022)

*No More Old Boys' Club: Institutional Investors' Fiduciary Duty to Diversify Corporate Boards* (with Anat Alon-Beck and Michal Agmon-Gonnen) (forthcoming U.C. DAVIS L. REV. 2021)

*Diversity and the Board of Directors: A Comparative Perspective*, RESEARCH HANDBOOK ON COMPARATIVE CORPORATE GOVERNANCE (Afsharipour and Gelter, eds.) (2021)

*Les quotas de femmes pour les entreprises et l'interdiction du burkini*, 50 REVUE GENERALE DE DROIT 87, UNIVERSITY OF OTTAWA (2020) (French version of "Sex Quotas and Burkini Bans", 2017).

*Board Diversity by Term Limits?,* 71 U. ALABAMA LAW REVIEW 211 (with Yaron Nili, U. Wisconsin Law School) (2020)

*California Dreaming?,* 99 BOSTON UNIVERSITY LAW REVIEW 1435 (2019)

*Samsung v. Apple*: *How Firms and Nations Compete through Intellectual Property Law*, GLOBAL PRIVATE INTERNATIONAL LAW: ADJUDICATION WITHOUT FRONTIERS (Horatia Muir-Watt, ed.) (2019)

*The Futility of Walls: How Traveling Corporations Threaten State Sovereignty*, 93 TULANE LAW REVIEW 645 (2018) (with Scott Wenzel)

*When Does Board Diversity Benefit Firms?*, 20 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 429 (2017)

*Sex Quotas and Burkini Bans,* 92 TULANE LAW REVIEW 469 (2017), GOVERNANCE FEMINISM: A READER (Janet Halley, et. al., eds.,) (2019)

*More than a Woman: Insights into Corporate Governance after the French Sex Quota*, 48 INDIANA LAW REVIEW 889 (with Daria Roithmayr) (2015) (*reprinted in the* Corporate Practice Commentator, edited by Robert Thompson)

*Quotas and the Transatlantic Divergence of Corporate Governance,* 34 NORTHWESTERN JOURNAL OF INTERNATIONAL BUSINESS LAW 249 (2014) *reprinted in* TOWARDS A EUROPEAN LEGAL CULTURE (with Véronique Magnier) (Purnhagen and Helleringer, eds.) (2014)

*Equality Regimes Compared: France's Political and Corporate Quotas,* EUI WORKING PAPERS, ROBERT SCHUMAN CENTRE FOR ADVANCED STUDIES GLOBAL GOVERNANCE PROGRAMME 136 (2014)

Special Issue Editor, *Comparative Sex Regimes and Corporate Governance*, an edition of three articles with an introduction by Darren Rosenblum, *Comparative Sex Regimes and Corporate Governance: An Introduction*, 26 PACE INTERNATIONAL LAW REVIEW V.1 (2014)

*Unsex Mothering: Toward a New Culture of Parenting,* 35 HARVARD JOURNAL OF GENDER AND LAW 57 (2012) (also subject of related online colloquium)

*Unsex CEDAW, or What's Wrong with Women's Rights,* 20 COLUMBIA JOURNAL OF GENDER AND LAW 98 (2011), *reprinted in* GENDER ISSUES AND HUMAN RIGHTS (Dianne Otto, ed.) (2012)

Special Issue Editor, *After Gender?: Examining International Justice Enterprises*, an edition of eight articles with an introduction by Darren Rosenblum, "*After Gender?: Examining International Justice Enterprises*: *An Introduction*, 31 PACE LAW REVIEW V.2 (2011).

*Pregnant Man?: A Conversation*, 22 YALE JOURNAL OF LAW AND FEMINISM 207 (2010) *excerpted in* AREEN, SPINDELMAN AND TSOUKALA'S FAMILY LAW, 6TH EDITION

*Rethinking International Women's Human Rights through Eve Sedgwick*, 33:1 HARVARD JOURNAL OF GENDER AND LAW 349 (with Janet Halley, et al.) (2010)

*A Little More Mascara: Response to Making Up Is Hard to Do,* 33:1 HARVARD JOURNAL OF GENDER AND LAW 59 (with Adrienne Davis, Robert Chang, et al.) (2010)

*Feminizing Capital: A Corporate Imperative*, 6:1 BERKELEY BUSINESS LAW JOURNAL 55 (2009)

*Queer Intersectionality Revisited: Expanding Legal Victories,* in QUEER MOBILIZATIONS: LGBT ACTIVISTS CONFRONT THE LAW (Anna Maria Marshall and Mary Bernstein, eds.) (NYU Press 2009)

*Loving Gender Balance: Reframing Identity-Based Equality Remedies*, 76 FORDHAM LAW REVIEW 101 (2008)

*Internalizing Gender: Why International Law Theory Should Adopt Comparative Methods*, 45 COLUMBIA JOURNAL OF TRANSNATIONAL LAW 759 (2007)

*Parity/Disparity: Electoral Gender Inequality on the Tightrope of Liberal Constitutional Traditions*, 39 U.C. DAVIS LAW REVIEW 1119 (2006)

*"Trapped" in Sing-Sing: Transgendered Prisoners Caught in the Gender Binarism*, 6 MICHIGAN JOURNAL OF GENDER & LAW 499 (2000)

*Geographically Sexual?: Advancing Lesbian and Gay Interests Through Proportional Representation*, 31 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REVIEW 119 (1996)

*Overcoming "Stigmas": Lesbian and Gay Districts and Black Electoral Empowerment*, 39 HOWARD LAW REVIEW 149 (1995)

*Queer Intersectionality and the Failure of Lesbian and Gay "Victories"* 4 LAW & SEXUALITY 83 (1994)

## EXPERT WORK

*Expert Report on California's SB 826*, Report prepared for the California Department of Justice (2021)

## PRACTICE ARTICLES AND EDITORIALS

*The Best Mother's Day Gift Is The American Families Plan*, FORBES (May 9, 2021)

*Misgendering students is not 'academic freedom.' It's an abuse of power.*, THE WASHINGTON POST (March 31, 2021)

*When The State Levies Fines On Feminism*, FORBES (Dec. 17, 2020)

*Carrots And Sticks: Why Nasdaq Adopted Its Radical Board Diversity Rule*, FORBES (Dec. 2, 2020)

*Will Quotas For Women Lead To Broader Diversity?*, FORBES (Nov. 18, 2020)

*Amy Coney Barrett, LGBT Rights and Judicial Legitimacy*, FORBES (Oct. 24, 2020)

*California Pioneers New Quota For People Of Color & LGBT People*, FORBES (Oct. 5, 2020)

*Mandatory Paternity Leave: The Key To Workplace Equality*, FORBES (Oct. 1, 2020)

*Citibank's New Leader: Do Women On Boards Yield Diverse CEOs?*, FORBES (Sept. 11, 2020)

*California Dreaming*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE & FINANCIAL REGULATION (August 9, 2019)

*Diversity by Term Limits?*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE & FINANCIAL REGULATION (June 10, 2019)

When *Does Board Diversity Benefit Firms?* THE CONFERENCE BOARD DIRECTORS NOTES (2018)

*The French Corporate Board Quota*, THE CONFERENCE BOARD DIRECTORS NOTES (2017)

*Quotas for Women: A Step toward Equality,* Letter to the Editor, NY TIMES (Feb. 26, 2017)

*Leave Your Laptops at the Door to My Classroom*, NY TIMES (Jan. 2, 2017)

*For Starters, "Unsex" the Birth Certificate*, Room for Debate, NY TIMES (Oct. 20, 2014)

*Should Job Creation Favor Men?,* SAN FRANCISCO CHRONICLE (May 19, 2008) (with Melissa Murray)

*California Exposes New York's Discriminatory Stance on Marriage*, THE RECORDER (May 23, 2008)

*Una Prohibición que Roba el Futuro*, EL NUEVO DÎA (Puerto Rico) (Jan. 30, 2008)

*Livre Comércio e o Meio Ambiente*, VI CADERNOS DO PROGRAMA DE PÓS GRADUAÇÃO EM DIREITO – UNIVERSIDADE FEDERAL DO RIO GRANDE DO SUL 99-108 (Sept. 2006)

*Same Sex Marriage and Meritocracy*, NEW YORK LAW JOURNAL 2 (July 12, 2006)

*Sodomy, Buggery, Crimes Against Nature, Disorderly Conduct, and Lewd and Lascivious Law and Policy*, in ENCYCLOPEDIA OF LESBIAN, GAY, BISEXUAL, AND TRANSGENDERED HISTORY IN AMERICA (Gale, 2004)

*The Bay Hotel Case: Accommodating the Parties' Wishes*, 17.1 MEALEY'S INTERNATIONAL ARBITRATION REPORT (2002)

## SELECTED SYMPOSIA, LECTURES AND PRESENTATIONS

*Berle Conference,* Seattle University School of Law (co-organizer with Chuck O'Kelley) (forthcoming 2022)

*Summer Academy on Law, Money and Technology: Toward Democratic Futures*, Young Scholars Initiative (July 2021)

*(Re)Naming and (Re)Framing: 'Diversity, Equity and Inclusion' in the Age of Anti-Racism*, Plenary Panel at 2021 Law and Society Association Annual Meeting (May 2021)

*California's Quota: A Roundtable*, Law and Society Association Annual Meeting (May 2021)

*Feminism and Corporate Law: Reforming Corporate Governance Roundtable*, Minnesota Journal of Law & Inequality (Summer 2020)

*The Queering of Corporate America*, 2020 Law and Society Association Annual Meeting (May 2020)

*The Political Economy of Corporate Governance: Neutral Rules, Male Capture*, Columbia Law School Faculty Workshop (May 2020); Law & Society (May 2020), University of Maryland Law Review Symposium (March 2020); Columbia Law School (May 2020)

*The Transnational Sex Quota Movement*, presentation at conference around Comparative Corporate Law Handbook (Afsharipour & Gelter, eds.) (Oct. 2019)

*Quotas pour les Femmes et la Prohibition des Voiles,* Illusions Perdues? Conference at Université de Montréal (Sept. 2019)

*Unsex the Firm,* APPEAL Conference, University of Maryland Law School (2019)

*Dignity and Social Movements*, Mini-Plenary Roundtable at Law and Society Association, Washington, D.C. (2019) (organized panel as member of LSA Planning Committee)

*California Dreaming*, Boston University Law Review Symposium (Nov. 2018)

*Contests of Powers / Conflicts of Values: Law in a Transnational and Transsystemic Society*, day-long conference organized for the Faculty of Law at McGill University including Ignacio Cofone, Amy Cohen, Jaye Ellis, Evan Fox-Decent, Frédéric Megret, Will Moon, Robert Wai, Kerry Rittich, Geneviève Saumier, and Chantal Thomas (Nov. 2018)

*Traveling Corporations*, Harvard Institute for Global Law & Policy (June 2018), Law & Society Association, Mexico City (June 2017)

*Regulating Gender Globally*, Roundtable at Harvard Institute for Global Law & Policy (June 2018)

*Diversity by Term Limits?,* National Business Scholars Conference (June 2018)

*Crises and Diverse Leadership: Insights from the French Sex Quota*, Accenture-Mizuho Joint Lecture (November 2017)

*Sex Quotas and Burkini Bans,* Fordham Center on Race, Law & Justice (Oct. 2017), Workshop on SDI Conference, Sciences Po (June 2017), Governance Feminism Workshop (Jan. 2015), Institute of Global Law and Policy (June 2015)

*When Does Diversity Benefit Firms?,* Brooklyn Law School (Apr. 2018), Sciences Po Law School (Oct. 2017), Université de Lyon III (Nov. 2017), Florida International University Law School (Jan. 2017) National Business Law Scholars Conference, University of Chicago (June 2016, June 2017), Rutgers Law School (March 2016), Cardozo Law School (April 2016)

*Trans/Feminisms* panel at Queer Disruptions Conference at Columbia University (Oct. 2016).

*Manning Up?* Santa Clara Law School Symposium (February 2016), Sciences Po Law School (June 2016)

*More than a Woman: Insights into Corporate Governance after the French Sex Quota*, presented as Guest of Honor at French National Assembly conference on the Effects of the Copé-Zimmerman Law (June 2015); Challenging Boardroom Homogeneity, Yale Law School (May 2015); Sciences Po Law School Faculty Workshop (Feb. 2015); University of Chicago Law School Workshop on Regulating Family, Sex and Gender (Feb. 2015); AALS Business Associations Section (Jan. 2015); Faculty Workshop, Washington College of Law, American University (Oct. 2014)

*Corporate Elite Reproduction*, Institute for Global Law and Policy, Harvard Law School (June 2015); Governance Feminism Writer's Workshop, Harvard Law School (Jan. 2015); *Elites*, Queen Critical Legal Studies Conference, Northeastern Law School (June 2014)

*Sex Regimes and Corporate Governance,* Faculty Workshop, Columbia University School of Law Center for Gender and Sexuality Law (March 2014); AALS Comparative Law Program (January 2014); AALS Section on Economic Globalization and Governance Law Program (January 2014); AALS Socio-Economics Panel on Responses to the Crisis (January 2014); Global

Governance Programme of the European University Institute (November 2013); University of Utah School of Law (September 2013); Faculty Workshop, Hofstra University School of Law (September 2013

*Quotas in the European Union: An Update,* European Law Panel, International Law Weekend at Fordham Law School (October 2013)

*After Legal Equality: Family, Sex, Kinship,* McGill School of Law (April 2013)

*Sex, Quotas and Corporate Governance*, University of Colorado Law School Critical Theory Workshop (April 2013); Panel organizer and participant at International Law Weekend – American Branch of the International Law Association (October 2012)

*Getting a Seat at the Boardroom Table*, Panelist at NYC Bar Association (May 2012)

*Unsex Mothering*, Live forum hosted by Harvard Journal of Gender and Law, with commentary by Elizabeth Emens, Mary Anne Case, Suzanne Kim and Duncan Kennedy; Online forum with eighteen legal scholars) (Feb. 2012); Seattle University Faculty Workshop (Apr. 2011); Williamette Law School Faculty Workshop (Jan. 2011); U. Connecticut Law School Faculty Workshop (Mar. 2011); New York LGBT Law Scholars Workgroup (Mar. 2011); U. Washington Law School (Mar. 2011)

*Governance, Stakeholders and Quotas: towards a European Corporate Culture?,* Towards a European Legal Culture, Institute of European and Comparative Law, Oxford University (Dec. 2011)

*Parité et Gouvernance*, debate with Veronique Moralie hosted by the Chaire Ethique de l'Université Cergy Pontoise, Paris France (Dec. 2011)

*Compensation et Ethique, une Perspective des Etats Unis, Congres Européen Droit et Ethique,* Organisation of Economic Cooperation and Development and Université de Cergy-Pontoise, Paris France (Nov. 2011)

*La Contradiction du Pouvoir des Accionaires,* Centre Sorbonne Finance, IRJS, Institut Tunc, Paris France (Oct. 2011)

*Corporate Governance, Sex and Quotas: A Transnational Perspective*, Harvard Law School Co-Curricular Lecture on Corporate Governance (Mar. 2011); U. Dayton Law School (Feb. 2011)
*Feminizing Capital: A Corporate Imperative*, Brooklyn Law School Faculty Workshop (Sept. 2010); Feminism & Legal Theory Workshop, Emory Law School (May 2007)

*Queering Intersectionality* and *Transnational Intersectionalities,* Panel organizer/speaker, Critical Race Studies Conference, U.C.L.A. Law School (March 2010);

*Unsex CEDAW, or What's Wrong with Women's Rights,* Syracuse University (Mar. 2011); U.S.C. Law School (March 2010); Williams Institute, U.C.L.A. Law School (March 2010); University of Maryland Law School (Nov. 2009); Whittier College of Law (Mar. 2009); Hofstra Law and

Sexuality Colloquium (Oct. 2008); Columbia University Human Rights Seminar (Oct. 2008); International Political Science Association, Bilgi University, Istanbul, Turkey (June 2008); Law, Culture and the Humanities (Mar. 2008); American Association of Law Schools Annual Conference, Section on International Human Rights Panel (Jan. 2008)

*Nationalización/Feminización: Post-Crash Desarollo Económico*, South/North Exchange, Santiago Chile (May 2009)

*Arbitraje Estadounidense y el Comercio Latinoamericano*, Universidad Peruana de Ciencias Aplicadas, Lima Peru (Apr. 2009); Jornada Internacional de Arbitraje, University of Buenos Aires (Sept. 2008)

*Democracy, Gender and International Law*, Roundtable organizer/participant, American Society of International Law (Mar. 2007)

*Desigualdade Eleitoral entre Sexos e o Meio Ambiente (Electoral Gender Inequality and the Environment)*, III Seminario Internacional de Direito do Meio Ambiente, Rio de Janiero, Brazil (May 2006)

*Desigualdad de género en matería electoral y respuestas a la Globalización (Globalization and Electoral Gender Inequality)*, South-North Exchange Conference, Bogota (May 2006)

*Internalizing Gender* Faculty Workshop at Rutgers Law School – Camden (Oct. 2006) Global Advancement of Women Symposium at the University of Maryland Law School (Apr. 2006); New York LGBT Scholars' Workshop (Feb. 2006); International Law Society Conference (Oct. 2005); Lat Crit X (Oct. 2005)

*Livre Comércio e Meio Ambiente* (*Free Trade and the Environment*), *II* Seminario Internacional de Direito do Meio Ambiente, Rio de Janiero, Brazil (May 2005) and at Globalização Econômica, Meio Ambiente e Sociedade Civil, Law Faculty of the Federal University of Rio Grande do Sul, Porto Alegre, Brazil (Jun. 2005)

*Parity, Phallocracy, and Comparative Women's Political Representation*, Critical Race Feminism Symposium, U.C. Davis Law School (Apr. 2005)

*Interseccionalidade Queer e a Amplitude das Recentes Vitorias Legais Nos Estados Unidos(Queer Intersectionality and the Breadth of Recent Legal Victories in the United States),* presented at Congreso da Associação Brasileira de Homocultura (ABEH), University of Brasilia, Brasilia, Brazil (June 2004)

## LAW SCHOOL AND PROFESSIONAL SERVICE

Member, Grievance Committee, 1st Department Appellate Division of New York State (2019-2022)
Member, Diversity Committee, Law & Society (2019-2023)
Pace Law School Business Concentration Director; Executive Director, Commercial and Private International Law Programs (2015-2019)
Programming Committee, Law & Society, 2019 Annual Meeting
External Evaluator, Université de Montréal International Business Program (2018)
Treasurer, Board of the Vis Moot (2013-present)
Chair, Board of The Ecole (N.Y.C. private French elementary and middle school) (2017 – present)

Raised nearly $4M in private funding for a transfer of ownership of the school to secure its future.

Chair, Corporate and Securities Law Section of Law & Society (2017-18)

Member, Provost Search Committee (2017-18), Presidential Search Committee (2016-17), Nominating Committee (2012-13, 2016-17), Chair, Appointments Committee (2013-14); Chair, Faculty Development Committee (Fall 2017, 2008-2010); Member, Strategic Planning Committee (Fall 2008-Spring 2010); Appointments Committee (2006-07); Technology Committee (2004-2005)

*Comparative Sex Regimes and Corporate Boards,* symposium organizer and participant (Feb. 2013)

Member, Human Rights Watch LGBT Advisory Committee (2009-2013)

*After Gender: Examining International Justice Enterprises,* symposium organizer and participant, with over twenty speakers including a keynote by Janet Halley (Nov. 2010)

Member, Human Rights Watch LGBT Advisory Committee (2009-present)

Member, Faculty Advisory Council, Williams Institute, UCLA Law School (2010-present)

Lecturer in Pace Law School Brazil Program, in Portuguese (Summer 2006) and in Introduction to U.S. Law Course (Fall 2005, Fall 2006)

Faculty Advisor to Latin American Law Students' Association, LAMBDA Students' Association, and International Law Society (2004-present)

*Pro bono* work including ABCNY September 11 Victim Assistance Program

## AFFILIATIONS AND LANGUAGES

Fluent in French and Spanish, advanced knowledge of Portuguese (lecture and teach in all three languages)

Admitted to practice law in New York, New Jersey (inactive), the District of Columbia (inactive), and Puerto Rico (U.S. District Court) (inactive)

Member, Law and Society Association (2005-present); American Society of International Law (2004-2011), Society of American Law Teachers (2004-present); Association of the Bar of the City of New York (1995-present); LatCrit (1997-present, Board Member 2009-11); New York LGBT Scholars Workshop (2005-present)

Member, Steering Committee Penn GALA (2003-09)