Mark D. Campbell (SBN 180528)
mdcampbell@shb.com
Shook, Hardy & Bacon L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: 424.285.8330
Facsimile: 424.204.9093

Attorneys for OSI SYSTEMS, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CREIGHTON MELAND, JR.,<br>Plaintiff,<br>v.<br>SHIRLEY N. WEBER,<br>Defendant. | Case No. 2:19-cv-02288-JAM-AC<br>**DECLARATION OF VICTOR SZE** |

## DECLARATION OF VICTOR SZE

I, Victor Sze, do hereby declare and state as follows:

1. I am the Executive Vice President and General Counsel of OSI Systems, Inc. ("OSI"). I joined OSI as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, I was appointed Corporate Secretary, a position which I still hold today. As Corporate Secretary of OSI, I attend and record Board of Directors' meetings, including committee meetings. In September 2004, I was appointed Executive Vice President. I have personal knowledge of the following facts and know them to be true and correct. If called to testify, I could and would testify competently thereto.

2. The below table reflects the historic membership of the Board of Directors of OSI since its inception. This table was prepared based on (a) my personal knowledge dating back to March 2002, and (b) for events that occurred prior to my association with OSI, the corporate records of the company made and maintained in

the regular course of OSI's business.

| Name | Appointment | Termination Date | Gender |
|---|---|---|---|
| Deepak Chopra | May 1987 | n/a | M |
| Madan G. Syal | May 1987 | June 2004 | M |
| Steven C. Good | September 1987 | n/a | M |
| Meyer Luskin | February 1990 | n/a | M |
| Chand R. Viswanathan | June 2001 | March 2010 | M |
| Leslie E. Bider | September 2006 | March 2010 | M |
| David T. Feinberg | March 2010 | December 2015 | M |
| Dr. William F. Ballhaus, Jr. | May 2010 | n/a | M |
| James B. Hawkins | December 2015 | n/a | M |
| Gerald Chizever | October 2016 | n/a | M |
| Kelli Bernard | December 2019 | n/a | F |
| Ajay Mehra | March 1996 | December 2019 | M |

3. I have been asked by the parties to this action to authenticate certain public filings by OSI. As General Counsel of OSI, I oversee the preparation and submission of all SEC filings. The legal department, which I oversee, also maintains copies of all such records dating back to 1997, when OSI became a public company. Based on (a) my personal knowledge dating back to March 2002, and (2) for events that occurred prior to my association with OSI, the corporate records of the company made and maintained in the regular course of OSI's business, the following public filings, which are attached hereto as Exhibits 1 through 48, are true and authentic business records of OSI:

| Ex | Document | Description | Filing Date |
|---|---|---|---|
| 1 | S-1 Registration Statement (and amendments) | Established Board composition | June 13, 1997 |
| 2 | Form 8-K12G3 (incl. Exh. 3.1) | certificate of incorporation | March 8, 2010 |

| | | | |
|---|---|---|---|
| 3 | Form 8-K12G3 (incl. Exh. 3.2) | bylaws | March 8, 2010 |
| 4 | Schedule 14A | 2000 proxy statement | October 16, 2000 |
| 5 | Form 10-Q | 2000 proxy results | February 14, 2001 |
| 6 | Schedule 14A | 2001 proxy statement/disclosure re June 14, 2001 board expansion | October 12, 2001 |
| 7 | Form 10-Q | 2001 proxy results | February 14, 2002 |
| 8 | Schedule 14A | 2002 proxy statement | October 15, 2002 |
| 9 | Form 10-Q | 2002 proxy results | February 14, 2003 |
| 10 | Schedule 14A | 2003 proxy statement | October 2, 2003 |
| 11 | Form 10-Q | 2003 proxy results | February 13, 2004 |
| 12 | Schedule 14A | 2004 proxy statement/disclosure re June 30, 2004 resignation of Madan G. Sayal | September 30, 2004 |
| 13 | Form 10-Q | 2004 proxy results | February 9, 2005 |
| 14 | Schedule 14A | 2005 proxy statement | October 12, 2005 |
| 15 | Form 10-Q | 2005 proxy results | February 17, 2006 |
| 16 | Form 8-K | disclosure re September 27, 2006 board expansion and appointment of Leslie E. Bider | September 27, 2006 |
| 17 | Schedule 14A | 2006 proxy statement | October 10, 2006 |
| 18 | Form 10-Q | 2006 proxy results | February 8, 2007 |
| 19 | Schedule 14A | 2007 proxy statement | October 29, 2007 |
| 20 | Form 10-Q | 2007 proxy results | February 5, 2008 |
| 21 | Schedule 14A | 2008 proxy statement | October 14, 2008 |
| 22 | Form 10-Q | 2008 proxy results | January 29, 2009 |
| 23 | Schedule 14A | 2010 proxy statement (first 2010 meeting) | February 5, 2010 |
| 24 | Form 8-K12G3 | 2010 proxy results (first 2010 meeting) | March 8, 2010 |
| 25 | Form 8-K | Disclosure re resignation of Leslie E. Bider and appointment of William F. Ballhaus | May 10, 2010 |
| 26 | Schedule 14A | 2010 proxy statement (second 2010 meeting) | October 12, 2010 |

| | | | |
|---|---|---|---|
| 27 | Form 8-K | 2010 proxy results (second 2010 meeting) | December 1, 2010 |
| 28 | Schedule 14A | 2011 proxy statement | October 7, 2011 |
| 29 | Form 8-K | 2011 proxy results | December 2, 2011 |
| 30 | Schedule 14A | 2012 proxy statement | October 23, 2012 |
| 31 | Form 8-K | 2012 proxy results | December 13, 2012 |
| 32 | Schedule 14A | 2013 proxy statement | October 25, 2013 |
| 33 | Form 8-K | 2013 proxy results | December 3, 2013 |
| 34 | Schedule 14A | 2014 proxy statement | October 17, 2014 |
| 35 | Form 8-K | 2014 proxy results | December 12, 2014 |
| 36 | Schedule 14A | 2015 proxy statement | October 19, 2015 |
| 37 | Form 8-K | 2015 proxy results | December 8, 2015 |
| 38 | Form 8-K | Disclosure re board expansion and appointment of Gerald Chizever | October 14, 2016 |
| 39 | Schedule 14A | 2016 proxy statement | October 21, 2016 |
| 40 | Form 8-K | 2016 proxy results | December 6, 2016 |
| 41 | Schedule 14A | 2017 proxy statement | October 23, 2017 |
| 42 | Form 8-K | 2017 proxy results | December 12, 2017 |
| 43 | Schedule 14A | 2018 proxy statement | October 19, 2018 |
| 44 | Form 8-K | 2018 proxy results | December 11, 2018 |
| 45 | Schedule 14A | 2019 proxy statement | October 22, 2019 |
| 46 | Form 8-K | 2019 proxy results | December 13, 2019 |
| 47 | Schedule 14A | 2020 proxy statement | October 21, 2020 |
| 48 | Form 8-K | 2020 proxy results | December 11, 2020 |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on this 7th day of September, 2021, in Hawthorne, California.

Victor Sze

# Exhibit 1

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
JcJirwh32Na0o3quhNsOa3tzwLhF9f+mjVP5JXmxmfxbQNLFVNGBBUFOtqSl139V
1v9ZdHobkp1ZE7WL9ah3wQ==

<SEC-DOCUMENT>0000944209-97-000773.txt : 19970616
<SEC-HEADER>0000944209-97-000773.hdr.sgml : 19970616
ACCESSION NUMBER: 0000944209-97-000773
CONFORMED SUBMISSION TYPE: S-1
PUBLIC DOCUMENT COUNT: 23
FILED AS OF DATE: 19970613
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: []
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97623747

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1
<SEQUENCE>1
<DESCRIPTION>FORM S-1
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON JUNE 13, 1997

REGISTRATION NO. 333-

- ---------------------------------------------------------------------------------
- ---------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

--------------

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| CALIFORNIA | 3674 | 33-0238801 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

</TABLE>

--------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

--------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

--------------

COPIES TO:

ISTVAN BENKO, ESQ.
TROY & GOULD PROFESSIONAL CORPORATION
1801 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL. (310) 553-4441
FAX.(310) 201-4746

BERTRAM R. ZWEIG, ESQ.
JONES, DAY, REAVIS & POGUE
555 WEST 5TH STREET, SUITE 4600
LOS ANGELES, CALIFORNIA 90013-1025
TEL. (213) 489-3939
FAX. (213) 243-2539

--------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

--------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

--------------

CALCULATION OF REGISTRATION FEE

<TABLE>
<CAPTION>

| TITLE OF SECURITIES TO BE REGISTERED | AMOUNT TO BE REGISTERED(1) | PROPOSED MAXIMUM OFFERING PRICE PER SHARE(2) | PROPOSED MAXIMUM AGGREGATE OFFERING PRICE(2) | AMOUNT OF OF REGISTRATION FEE |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Common Stock, no par value.................. | 4,255,000 | $14.00 | $59,570,000 | $18,052 |

</TABLE>

(1) Includes 555,000 shares of Common Stock issuable upon exercise of the Underwriters' over-allotment option.
(2) Estimated in accordance with Rule 457.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

<PAGE>

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE.

SUBJECT TO COMPLETION, DATED JUNE 13, 1997

[LOGO OF OPTO-SENSORS, INC.]

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders. Prior to this Offering, there has been no public market for the Common Stock of the Company. See "Underwriting" for information relating to the method of determining the initial public offering price. The Company has made application for inclusion of the Common Stock on the Nasdaq

National Market under the symbol "OSIS."

----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>
<CAPTION>

| <S> | PRICE TO PUBLIC <C> | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) <C> | PROCEEDS TO COMPANY(2) <C> | PROCEEDS TO SELLING SHAREHOLDERS(2) <C> |
|---|---|---|---|---|
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to

manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

[PHOTOS OF]
[RAPISCAN 119]

[RAPISCAN 500 SERIES]

[RAPISCAN 500 SERIES
LARGE PALLET UNIT]

[RAPISCAN 500 SERIES
MOBILE UNIT]

[IMAGES OF INSPECTED BAGGAGE USING EPX SYSTEM]

<PAGE>

[ART WORK]

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

2

<PAGE>

[TWO PAGE GATEFOLD]

[PHOTOS OF A VARIETY OF OPTOELECTRONIC
DEVICES AND SUBSYSTEMS MANUFACTURED
BY THE COMPANY AND OF THE END-PRODUCTS
IN WHICH SUCH DEVICES AND SUBSYSTEMS
ARE USED]

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE

INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

----------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 14 |
| Dividend Policy | 14 |
| Capitalization | 15 |
| Dilution | 16 |
| Selected Consolidated Financial Data | 17 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Business | 27 |
| Management | 41 |
| Certain Transactions | 49 |
| Principal and Selling Shareholders | 51 |
| Description of Capital Stock | 54 |
| Shares Eligible for Future Sale | 55 |
| Underwriting | 56 |
| Legal Matters | 58 |
| Experts | 58 |
| Additional Information | 58 |
| Index to Consolidated Financial Statements | F-1 |

</TABLE>

----------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(TM) is a trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine-month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In the nine-month period ended March 31, 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During the nine-month period, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology

to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

4

<PAGE>

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its global presence, and selectively entering into new end-product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of March 31, 1997 the Company marketed its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,458,874 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and |

development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds."

Proposed Nasdaq National Market Symbol............................ OSIS
</TABLE>

- --------------------

(1) Based on the number of shares outstanding on May 31, 1997. Excludes: (i) approximately 864,986 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.32 per share; and (ii) up to 45,486 shares of Common Stock that may be issued after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares of Rapiscan U.S.A. See "Certain Transactions."

5

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | | | (unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues............... | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold..... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit........... | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1).... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development.......... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)...... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense....... | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income taxes and minority interest.............. | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest.............. | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest...... | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income............. | $ 331 | $ 659 | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Pro forma net income(3)............. | | | | | $ 2,308 | $ 1,643 | $ 3,026 |

| | | | |
|---|---|---|---|
| Pro forma net income per share(3)(4)....... | $ 0.37 | $ 0.26 | $ 0.48 |
| Pro forma weighted average shares outstanding(4)....... | 6,308,126 | 6,304,158 | 6,327,234 |

<CAPTION>

| | MARCH 31, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(5) |
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash................................................... | $ 1,612 | $33,027 |
| Working capital........................................ | 9,940 | 48,915 |
| Total assets........................................... | 44,314 | 75,729 |
| Total debt............................................. | 11,387 | 1,594 |
| Total shareholders' equity............................. | 14,982 | 56,190 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a non-recurring, non-cash charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. Exclusive of the non-cash charge, income from operations, net income, pro forma net income, and pro forma net income per share would have been $5,673,000, $3,448,000, $3,540,000 and $0.56, respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and for each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

(5) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

6

<PAGE>

RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking

statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics") Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business--Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the

8

<PAGE>

Company's subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995 and 1996 and in the nine-month period ended March 31, 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 39.3%, respectively, of the Company's revenues. Of the revenues generated during fiscal 1996 from shipments made outside of the United States, 12.0% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign control legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial

control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial condition and results of operations. While the Company has no current agreement or negotiations underway with

9

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the Company.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations.

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI

Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of operations. The Company intends to vigorously pursue its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights. Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain

10

<PAGE>

circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and

results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel. The Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have

<PAGE>

been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the

future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.3% and 16.2%, respectively, of the Company's Common Stock (17.4% and 14.3%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 40.9% of the outstanding Common Stock (36.9% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Amended and Restated Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which

<PAGE>

the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve

transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. The Company has filed an application to have the Common Stock approved for quotation on the Nasdaq National Market. However, there can be no assurance that an active trading market for the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,458,874 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,758,874 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,731,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for 180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,758,874 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Amended and Restated Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its

shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

13

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The Company expects to use the net proceeds of this Offering to repay bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. The Company intends to repay a total of approximately $9.8 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT MARCH 31, 1997 | RATE BASIS PER ANNUM(1) | RATE AT MARCH 31, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $4,927,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,500,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,442,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 66,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 354,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 504,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- ---------------------
(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay

any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

14

<PAGE>

CAPITALIZATION

The following table sets forth: (i) the actual short-term debt and capitalization of the Company as of March 31, 1997; (ii) the pro forma short-term debt and capitalization of the Company giving effect to the conversion of the Company's outstanding shares of preferred stock into 3,853,125 additional shares of Common Stock and the filing of the Amended and Restated Articles of Incorporation; and (iii) the pro forma capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

<TABLE>
<CAPTION>

| | MARCH 31, 1997 | | |
|---|---|---|---|
| | ACTUAL | PRO FORMA | PRO FORMA AS ADJUSTED |
| | (In thousands, except share information) | | |
| <S> | <C> | <C> | <C> |
| Short-term debt................................ | $ 8,324 | $ 8,324 | $ 764 |
| Long-term debt, less current portion............ | 3,063 | 3,063 | 830 |
| Shareholders' equity: | | | |
| Preferred Stock, $1.00 liquidation value; 3,000,000 shares authorized; 2,568,750 shares issued and outstanding, actual; none issued and outstanding, pro forma and pro forma as adjusted | 4,014 | -- | -- |
| Preferred Stock, no par value; 10,000,000 shares authorized, pro forma and pro forma as adjusted; none issued and outstanding................................ | -- | -- | -- |
| Common Stock, no par value(1); 4,500,000 shares authorized; 40,000,000 shares authorized, pro forma and pro forma as adjusted; 2,207,124 shares issued and outstanding, actual; 6,060,249 issued and outstanding, pro forma; 9,390,249 issued and outstanding, pro forma as adjusted.................................... | 2,913 | 6,927 | 48,135 |
| Retained earnings............................ | 7,928 | 7,928 | 7,928 |
| Cumulative foreign currency translation adjustment................................ | 127 | 127 | 127 |
| Total shareholders' equity.................. | 14,982 | 14,982 | 56,190 |
| Total capitalization...................... | $18,045 | $18,045 | $57,020 |

</TABLE>

- --------------------

(1) Excludes 499,125 shares of Common Stock issuable upon exercise of outstanding stock options as of March 31, 1997 and up to 45,486 shares of Common Stock that may be issuable as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in

<PAGE>

DILUTION

The net tangible book value of the Company at March 31, 1997 (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock), was $13,230,000 or $2.18 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock). After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of March 31, 1997 would have been $54,438,000, or $5.80 per share. This represents an immediate increase in the net tangible book value of $3.62 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.70 per share to new investors. The following table illustrates this per share dilution:

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| Assumed initial public offering price.......................... | | $13.50 |
| Net tangible book value before Offering...................... | $2.18 | |
| Increase in net tangible book value attributable to this Offering.................................................... | 3.62 | |
| | ----- | |
| Pro forma net tangible book value after Offering............... | | 5.80 |
| | | ------ |
| Dilution to new investors..................................... | | $ 7.70 |
| | | ====== |

</TABLE>

The following table sets forth on a pro forma basis as of March 31, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock and assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

<TABLE>
<CAPTION>

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Existing shareholders.. | 6,060,249 | 64.5% | $ 6,927,000 | 13.4% | $ 1.14 |
| New public investors... | 3,330,000 | 35.5 | 44,955,000 | 86.6 | $13.50 |
| | --------- | ----- | ----------- | ----- | |
| Total................ | 9,390,249 | 100.0% | $51,882,000 | 100.0% | |
| | ========= | ===== | =========== | ===== | |

</TABLE>

The foregoing table does not take into effect the exercise of outstanding options to purchase 68,625 shares of Common Stock for $66,750 subsequent to March 31, 1997. As of the date of this Prospectus, there are outstanding options to purchase an aggregate of 864,986 of Common Stock at a weighted

average exercise price of approximately $7.82 per share. In addition, the Company may be obligated to issue up to an additional 45,486 shares of Common Stock after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares in Rapiscan U.S.A. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

16

<PAGE>

SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1996 and for the nine months ended March 31, 1997, and the balance sheet data at June 30, 1995 and 1996 and March 31, 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1992 and 1993 and the balance sheet data at June 30, 1992, 1993, and 1994 are derived from audited financial statements not otherwise contained herein. The consolidated statement of operations data for the nine months ended March 31, 1996 are derived from unaudited financial statements of the Company included elsewhere herein. The unaudited financial statements have been prepared by the Company on a basis consistent with the Company's audited consolidated financial statements and, in the opinion of management, include all adjustments, consisting only of normal recurring accruals, necessary for a fair presentation of the Company's results of operations for the period. The results of operations for the nine months ended March 31, 1997 are not necessarily indicative of future results.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues................ | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold...... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit............ | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1)..... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development........... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)....... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses.............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations.. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense........ | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| taxes and minority interest............... | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes.................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest............... | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest....... | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income.............. | $ 331 | $ 659 | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Pro forma net income(3). | | | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share(3)(4)............ | | | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Pro forma weighted average shares outstanding(4)........ | | | | | 6,308,126 | 6,304,158 | 6,327,234 |

<CAPTION>

<S> <C> <C> <C> <C> <C> <C>

| | JUNE 30, | | | | | MARCH 31, |
|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | | |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | | |
| Cash............................ | $ 546 | $ 941 | $ 625 | $ 1,405 | $ 581 | $ 1,612 |
| Working capital................. | 3,728 | 3,852 | 2,280 | 12,117 | 6,044 | 9,940 |
| Total assets.................... | 10,548 | 15,739 | 25,807 | 30,780 | 35,309 | 44,314 |
| Total debt...................... | 6,090 | 6,882 | 11,140 | 14,113 | 15,462 | 11,387 |
| Total shareholders' equity...... | 1,677 | 2,256 | 3,128 | 4,951 | 7,194 | 14,982 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a non-recurring, non-cash charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company

designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6% of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. The Company markets its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 39.3% of revenues for the fiscal years 1995 and 1996 and for the nine months ended March 31, 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997 was 26.6%, 34.2% and 25.1%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...................... | $34,729 | $37,977 | $45,007 | $33,493 | $36,228 |
| (Inter-company eliminations)...... | (1,257) | (1,529) | (6,392) | (5,424) | (4,551) |
| Unaffiliated optoelectronic devices and subsystems ......... | 33,472 | 36,448 | 38,615 | 28,069 | 31,677 |
| Security and inspection products.. | 14,263 | 13,367 | 22,903 | 16,925 | 24,296 |
| Total revenues.................. | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues.......................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold................ | 75.5 | 75.9 | 73.9 | 74.8 | 72.2 |
| Gross profit...................... | 24.5 | 24.1 | 26.1 | 25.2 | 27.8 |
| Operating expenses: | | | | | |
| Selling, general and administrative.................. | 16.7 | 15.3 | 15.9 | 15.0 | 14.6 |

| | | | | | |
|---|---|---|---|---|---|
| Research and development.......... | 3.0 | 3.2 | 2.7 | 2.8 | 3.1 |
| Stock option compensation........ | -- | -- | -- | -- | 1.5 |
| Total operating expenses........ | 19.7 | 18.5 | 18.6 | 17.8 | 19.2 |
| Income from operations............ | 4.8 | 5.6 | 7.5 | 7.4 | 8.6 |
| Interest expense.................. | 1.5 | 2.5 | 2.2 | 2.3 | 1.6 |
| Income before income taxes and minority interest................ | 3.3 | 3.1 | 5.3 | 5.1 | 7.0 |
| Provision for income taxes........ | 1.7 | 0.8 | 1.8 | 1.7 | 1.8 |
| Income before minority interest... | 1.6 | 2.3 | 3.5 | 3.4 | 5.2 |
| Minority interest................. | -- | -- | 0.2 | -- | -- |
| Net income........................ | 1.6% | 2.3% | 3.7% | 3.4% | 5.2% |

</TABLE>

<PAGE>

COMPARISON OF THE NINE-MONTH PERIOD ENDED MARCH 31, 1997 TO THE NINE-MONTH PERIOD ENDED MARCH 31, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all intercompany eliminations. For the nine-month period ended March 31, 1997, revenues increased by $11.0 million, or 24.4%, to $56.0 million from $45.0 million in the comparable period ended March 31, 1996. Revenue from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $3.6 million, or 12.9%, to $31.7 million from $28.1 million in the comparable period ended March 31, 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenue from the sale of security and inspection products increased by $7.4 million, or 43.6%, to $24.3 million from $16.9 million in the comparable 1996 period. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, and growth in sales of the Rapiscan 119 tabletop model.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. For the nine-month period ended March 31, 1997, gross profit increased by $4.2 million, or 37.3%, to $15.6 million from $11.4 in the comparable 1996 period. As a percentage of revenues, gross profit increased to 27.8% in the 1997 period from 25.2% in the comparable 1996 period. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the nine-month period ended March 31, 1997, such expenses increased by $1.5 million, or 21.3%, to $8.2 million from $6.7 million in the comparable 1996 period. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.0%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For the nine-month period ended March 31, 1997, such expenses increased by

$457,000, or 35.7%, to $1.7 million from $1.3 million in the comparable 1996 period. As a percentage of revenues, research and development expenses increased to 3.1% from 2.8%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for the nine-month period ended March 31, 1997 increased by $1.5 million, or 44.6%, to $4.8 million from $3.3 million for the comparable 1996 period. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during the 1997 period, income from operations increased by $2.3 million, or 70.3%, to $5.7 million from $3.3 million. As a percent of revenues, income from operations increased to 8.6% from 7.4%, and excluding the non-cash compensation expense referenced above, it would have increased to 10.1% from 7.4%.

Interest Expense. Interest expense for the nine-month period ended March 31, 1997 decreased by $126,000, or 12.3%, to $900,000 from $1,026,000 during the comparable 1996 period. As a percentage of revenues, interest expense decreased to 1.6% from 2.3%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during the 1997 period, and to a decrease in the Company's borrowings outstanding under its lines of credit.

<PAGE>

Provision for Income Taxes. Provision for income taxes for the nine-month period ended March 31, 1997 increased by $196,000, or 24.9%, to $983,000 from $787,000 during the comparable 1996 period. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.1% from 34.2% in the comparable 1996 period. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for the nine-month period ended March 31, 1997, increased $1.4 million, or 89.8%, to $2.9 million from $1.5 million in the comparable 1996 period. Excluding the non-cash compensation charge described above, net income would have increased by $1.9 million, or 123%, to $3.4 million from $1.5 million in the comparable 1996 period.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of intercompany eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments

made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling, general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

21

<PAGE>

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers

in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest expense increased to 2.5% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

<PAGE>

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eleven consecutive quarters in the period ended March 31, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

QUARTER ENDED (In thousands)

| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues.......... | $10,981 | $12,584 | $13,164 | $13,086 | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 |
| Cost of goods sold............ | 8,500 | 9,537 | 10,104 | 9,677 | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 |
| Gross profit...... | 2,481 | 3,047 | 3,060 | 3,409 | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative.. | 1,598 | 1,984 | 1,875 | 2,144 | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 |
| Research and development..... | 494 | 308 | 370 | 419 | 419 | 408 | 453 | 383 | 517 | 636 | 584 |
| Stock option compensation.... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses....... | 2,092 | 2,292 | 2,245 | 2,563 | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 |
| Income from operations....... | 389 | 755 | 815 | 846 | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | 1,470 |
| Interest expense.. | 244 | 268 | 353 | 386 | 336 | 345 | 345 | 333 | 360 | 331 | 209 |
| Income before income taxes and minority interest......... | 145 | 487 | 462 | 460 | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 |
| Provision for income taxes..... | 39 | 129 | 123 | 122 | 85 | 293 | 409 | 324 | 259 | 408 | 316 |
| Income before minority interest......... | 106 | 358 | 339 | 338 | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 |
| Minority interest. | 14 | 4 | 6 | (7) | 19 | 17 | (8) | 89 | -- | -- | -- |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net income........ | $ 120 | $ 362 | $ 345 | $ 331 | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 |

</TABLE>

23

<PAGE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of the years fiscal 1995 and 1996 and for the first three quarters of fiscal 1997.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues......... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold............ | 77.4 | 75.8 | 76.8 | 73.9 | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 |
| Gross profit..... | 22.6 | 24.2 | 23.2 | 26.1 | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative. | 14.6 | 15.8 | 14.2 | 16.4 | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 |
| Research and development.... | 4.5 | 2.4 | 2.8 | 3.2 | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 |
| Stock option compensation... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 4.1 |
| Total operating expenses....... | 19.1 | 18.2 | 17.0 | 19.6 | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 |
| Income from operations...... | 3.5 | 6.0 | 6.2 | 6.5 | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 |
| Interest expense. | 2.2 | 2.1 | 2.7 | 2.9 | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 |
| Income before | | | | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| income taxes and minority interest........ | 1.3 | 3.9 | 3.5 | 3.6 | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 |
| Provision for income taxes.... | .4 | 1.0 | .9 | 1.0 | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 |
| Income before minority interest........ | 1.0 | 2.9 | 2.6 | 2.6 | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 |
| Minority interest........ | 0.1 | -- | -- | (0.1) | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- |
| Net income....... | 1.1% | 2.9% | 2.6% | 2.5% | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% |

</TABLE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of March 31, 1997, the Company's principal sources of liquidity consisted of $1.6 million in cash and several credit agreements described below.

The Company's operations provided net cash of $5.1 million in the nine month period ended March 31, 1997. For the nine-month period ended March 31, 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization and the increase in advances from customers and accrued expenses. Net cash provided by operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $1.7 million and $2.2 million in the nine-month period ended March 31, 1997 and fiscal 1996, respectively, in each case due primarily to purchases of property and equipment in the amount of approximately $1.5 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property

<PAGE>

and equipment in fiscal 1998. In addition, the Company may spend approximately

$3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for the nine-month period ended March 31, 1997 was $2.4 million due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of March 31, 1997, there was outstanding approximately $4.9 million under the $10.0 million line of credit, $2.5 million under the term loan, and approximately $154,000 under the letter of credit facility. As of March 31, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness. In addition, the credit agreement requires that the Company maintain (on a consolidated basis) certain financial ratios and levels of tangible net worth and also prohibits OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum and are due in full with all interest on October 27, 1997. As of March 31, 1997, no amounts were outstanding under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $2.0 million was used as of March 31, 1997. The facility terminates on October 27, 1997. Borrowings under the agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.0 million at March 31, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus 2.00% per annum. The second agreement provides for a 750,000 pound sterling (approximately $1.2 million as of March 31, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $820,000 as of March 31, 1997) facility for tender and performance bonds. These facilities are secured by certain assets of Rapiscan

UK and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of March 31, 1997, no amounts were outstanding under the line of credit and $134,000 was outstanding under the performance bond facility. The above facilities expire in December and November 1997, respectively.

<PAGE>

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at March 31, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at March 31, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of March 31, 1997 there was approximately $1.4 million outstanding under the line of credit and approximately $66,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $741,000 at March 31, 1997), of which $354,000 was outstanding as of March 31, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At March 31, 1997 outstanding term loan borrowings totalled approximately 3.4 million Norwegian krone (approximately $504,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for fiscal 1994, 1995 and 1996 and for the nine-month period ended March 31, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations

27

<PAGE>

for adoption by all of its member states. The Company believes that to date the imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the nine-month period ended March 31, 1997, approximately

28.4% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take advantage of the growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at locations other than at airports will constitute an increasingly larger portion of its sales in the future.

<PAGE>

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in the nine-month period ended March 31, 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other

<PAGE>

electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995 and 1996, approximately 28.7% and 33.1%, respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for

identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

<PAGE>

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

<TABLE>
<CAPTION>

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| <S> | <C> | <C> |
| Rapiscan 19 (single energy) | Inspection of incoming package | Embassies |
| Rapiscan 119 (single energy) | | Post offices |
| | | Courthouses |
| | | High risk office buildings |
| | | Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Airport hand carried and checked baggage<br>Pallet inspection<br>Customs inspections<br>Agriculture inspection | Airports<br>Cruise ships<br>Freight shippers<br>Border crossings |

| | | |
|---|---|---|
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

</TABLE>

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During the nine-month period ended March 31, 1997, sales of the walk-through and hand-held metal detectors constituted 1.8% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the twelve-month period ended March 31, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who purchased more than $100,000 of optoelectronic products; and (iv) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 22.7% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 12.0% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 9 |
| Medical Monitoring | 9.5% | Datascope<br>BioChem International<br>Criticare Systems | 11 |

| | | | |
|---|---|---|---|
| Analytical and Medical Diagnostics Equipment | 6.7% | Johnson & Johnson<br>Leica<br>Bausch & Lomb | 10 |
| Office Automation and Computer Peripherals | 6.3% | Xerox<br>Eastman Kodak<br>Hewlett-Packard | 6 |
| Construction, Robotics and Industrial Automation | 4.9% | 3M<br>Spectra Physics<br>Baumer Electric | 8 |
| Military/Defense and Weapons Simulations | 3.3% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 5 |
| Colorometry and Particle Analyzers | 1.2% | Coulter Electronics<br>CILAS<br>Accuracy Microsensors | 3 |
| Bar Code Scanners | 1.1% | Symbol Technologies<br>Intermec | 2 |
| Gaming Industry | 1.1% | Bally Gaming<br>Dixie Narco | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security

purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 25 independent sales representatives and distributors. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 21 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 70 independent sales representatives. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection products sales staff is supported by a service organization of approximately 25 persons located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996, and for the nine-month period ended March 31, 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.1%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom optoelectronic solutions for their specific needs when standard components or subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate

subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

<PAGE>

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of March 31, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 32 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and nine-month period ended March 31, 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $1.7 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not

<PAGE>

experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of

<PAGE>

engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such

shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At March 31, 1997, the Company's backlog products totalled approximately $57.7 million, compared to approximately $27.5 million at March 31, 1996. Substantially all of the Company's backlog as of March 31, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of March 31, 1997, the Company employed approximately 730 people, of whom 570 were employed in manufacturing, 32 in research and development, 62 in finance and administration, 44 in sales and marketing, and 25 in its service organization. Of the total employees, approximately 470 were employed in the United States, 100 were employed in Europe, 160 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

37

<PAGE>

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

The Company believes its facilities are in good condition and are adequate

to support its operations for the foreseeable future.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

LEGAL PROCEEDINGS

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors are currently involved in litigation with Lunar Corporation ("Lunar") and The University of Alabama Research Foundation ("UAB") pertaining to United States Patent No. 4,626,688 ("'688 patent") and related nonpatent claims. UAB owns the '688 patent and granted Lunar an exclusive license thereunder.

On January 8, 1997, Lunar asserted that Rapiscan U.S.A.'s baggage scanners which used dual energy detectors infringe the '688 patent. On January 21, 1997, Rapiscan U.S.A. filed suit against Lunar in the United States District Court for the Central District of California. Rapiscan U.S.A. seeks a judicial declaration that the '688 patent is not infringed and is invalid, that Lunar is estopped from asserting the '688 patent against Rapiscan U.S.A., that Lunar's claim is barred or limited by laches, and that Rapiscan U.S.A. has acquired an implied license under the '688 patent. Rapiscan U.S.A. also asserts breach of an oral agreement, promissory estoppel and quantum meruit regarding Lunar's breach of an agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent. Rapiscan U.S.A. also asserts fraud

<PAGE>

against Lunar for Lunar asserting that Rapiscan U.S.A. infringed its patent after Lunar accepted litigation assistance from Rapiscan U.S.A. and represented to Rapiscan U.S.A. that Rapiscan U.S.A. and UDT Sensors did not infringe its patent. Rapiscan U.S.A. seeks compensatory damages exceeding $100,000 and punitive damages.

On January 23, 1997, Lunar and UAB filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the United States District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement, contributory infringement and inducement thereof. Lunar and UAB sought damages in an unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector covered by the '688 patent. On April 21, 1997, the Western District of Wisconsin transferred that action to the Central District of California. Lunar and UAB have now counterclaimed in the Central District of California against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors for the same claims previously pending in Wisconsin. The Company believes it has meritorious defenses and claims in the above-described action and intends to vigorously pursue its legal remedies in this lawsuit.

Rapiscan U.S.A. is also involved in a dispute with Quantum Magnetics, Inc. ("Quantum"), EG&G Astrophysics, and EG&G Inc., which is EG&G Astrophysics' parent company. The dispute relates to Rapiscan U.S.A.'s July 5, 1996 agreement with Quantum to collaborate in the production and marketing of airport security and inspection scanners (the "July 5 Agreement"). On July 25, 1996, Quantum informed Rapiscan U.S.A. that Quantum was terminating the July 5 Agreement, although Rapiscan U.S.A. contends that this action constituted a

breach of the July 5 Agreement.

On August 5, 1996, EG&G Astrophysics filed suit against Rapiscan U.S.A. in the Superior Court of the State of California, County of Los Angeles. EG&G Astrophysics claims that by entering into the July 5 Agreement, Rapiscan U.S.A. interfered with EG&G Astrophysics' own pre-existing contractual right to market scanners with Quantum. EG&G Astrophysics also asserts that Rapiscan U.S.A. falsely represented that Rapiscan U.S.A.'s security and inspection scanners were just as effective as EG&G Astrophysics' scanners, and that replacing EG&G Astrophysics' scanners with Rapiscan U.S.A.'s security and inspection scanners would be cost efficient. EG&G Astrophysics' First Amended Complaint contains six causes of action: intentional inducement of breach of contract, intentional interference with contract, intentional interference with economic relations, negligent interference with economic relations, slander per se, and trade libel. EG&G Astrophysics seeks compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. On December 14, 1996, the Court dismissed EG&G Astrophysics' slander per se and trade libel claims, without leave to amend. The Company believes that the remaining claims of EG&G Astrophysics are without merit and has received an opinion from its litigation counsel that the Company will be able to defend the lawsuit without any liability to Rapiscan U.S.A.

Rapiscan U.S.A. has filed a cross-complaint against Quantum, EG&G Astrophysics, and EG&G, Inc. Rapiscan U.S.A.'s First Amended Cross-Complaint asserts four causes of action against Quantum: breach of written contract, intentional misrepresentation, negligent misrepresentation and indemnity. Rapiscan U.S.A. alleges that Quantum made a series of misrepresentations in connection with the July 5 Agreement and that it failed to honor that agreement.

With respect to EG&G Astrophysics and EG&G, Inc., Rapiscan U.S.A. seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. Rapiscan U.S.A. alleges that EG&G Astrophysics and EG&G, Inc. interfered with Rapiscan U.S.A.'s relationship with Quantum and made false representations concerning Rapiscan U.S.A.'s solvency and its ability to fulfill its obligations. In addition, Rapiscan U.S.A. asserts that EG&G, Inc. breached an agreement not to disclose information pertaining to the prior resolution of a patent dispute between Rapiscan U.S.A. and EG&G, Inc.

<PAGE>

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 1999 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

<PAGE>

MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |
| Manoocher Mansouri Aliabadi............. | 41 | Vice President - Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 54 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 70 | Director |

- ---------------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a

company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

41

<PAGE>

Manoocher Mansouri Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the animal food and waste product business. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California,

Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

42

<PAGE>

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1996, each non-employee Director received, as additional director compensation, options to purchase 11,250 shares of Common Stock at an exercise price of $2.00 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1996, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension Fund, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension fund by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra,

the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

43

<PAGE>

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1996, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| | ANNUAL COMPENSATION | | LONG TERM COMPENSATION |
|---|---|---|---|
| NAME AND PRINCIPAL POSITION | SALARY | BONUS | SECURITIES UNDERLYING OPTIONS (#) |
| <S> | <C> | <C> | <C> |
| Deepak Chopra(1)........ Chief Executive Officer | $317,107 | $25,000 | 0 |
| Ajay Mehra ............. Chief Financial Officer | 150,342 | 8,000 | 0 |
| Andreas F. Kotowski .... President of U.S. Operation, Rapiscan U.S.A. | 113,357 | 0 | 0 |
| Manoocher Mansouri Aliabadi............... Vice President--Corporate Marketing, UDT Sensors | 95,075 | 5,000 | 0 |
| Thomas K. Hickman ...... Managing Director, OSI Malaysia and OSI Singapore | 125,466 | 0 | 15,000 |

</TABLE>

- ---------------------
(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 58 of 2711

the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into employment agreements with Ajay Mehra, Andreas F. Kotowski, Manoocher Mansouri Aliabadi and Thomas K. Hickman, each of which became effective on April 1, 1997. The terms of the employment agreements with Messrs. Mehra, Kotowski, Mansouri and Hickman are for three, two, two and one years, respectively. The employment agreements provide for base salaries of $200,000, $140,000, $120,000 and $125,000 per year, for Messrs. Mehra, Kotowski, Mansouri and Hickman, respectively, with annual raises to be determined by the Company's Chief Executive Officer. The Company has also entered into a one-year employment agreement with Anthony S. Crane, the Managing Director of Rapiscan UK. Pursuant to these employment agreements, Messrs. Mehra, Kotowski, Mansouri, Hickman and Crane are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

<PAGE>

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in August 1996 based on their performances during the fiscal year ended June 30, 1996.

Option Grants. The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1996:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Thomas K. Hickman(2).... | 15,000 | 87.0% | 2.50 | 6/3/01 | $ 10,361 | $ 22,894 |

</TABLE>

- ---------------------
(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of

5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.

(2) This grant was made in June 1996. One half of the total number of options granted was exercisable on the first anniversary of the grant date; one quarter is exercisable on each of the second and third anniversary dates.

Option Exercises and Fiscal Year-End Values. The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1996 and held by them on June 30, 1996:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) | |
|---|---|---|---|---|---|---|
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra........... | 0 | -- | 0 | 0 | 0 | 0 |
| Ajay Mehra.............. | 2,250 | $27,375 | 46,500 | 7,500 | 532,850 | 83,750 |
| Andreas F. Kotowski..... | 0 | -- | 0 | 0 | 0 | 0 |
| Manoocher Mansouri Aliabadi............... | 3,000 | $36,500 | 12,750 | 1,500 | 150,125 | 17,250 |
| Thomas K. Hickman....... | 0 | -- | 10,500 | 19,500 | 119,175 | 216,125 |

</TABLE>

- --------------------

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

<PAGE>

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding

and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of May 31, 1997, 384,375 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 430,500 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 235,125 shares remained available for grant. As of such date, stock options to purchase 381,188 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in May 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and

<PAGE>

employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 61 of 2711

termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Amended and Restated Articles of Incorporation ("Amended Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Amended Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against

certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnification Agreements will also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Amended Articles of Incorporation and Bylaw provisions are necessary to attract and retain qualified persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a total of 159,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) an agreement by the Company to issue to the holders of the Option Shares up to 45,486 additional shares of Common Stock based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ending June 30, 1997. The number of shares to be issued after June 30, 1997 cannot yet be accurately established.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and

officers of the Company owned the remaining shares. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Singapore and OSI Malaysia, were shareholders of Ferson Optics, Inc. and received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result, certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

<PAGE>

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 for such services during fiscal 1996 and approximately $87,000 for such services during the nine-month period ended March 31, 1997. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 for such services during fiscal 1996 and approximately $64,000 for such services during the nine-month period ended March 31, 1997.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

50

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as of May 31, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| NAME AND BENEFICIAL OWNERS | NUMBER | PERCENT | NUMBER OF SHARES BEING OFFERED(2) | NUMBER | PERCENT |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.6% | 148,148 | 1,726,852 | 18.3% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 19.1 | 47,593 | 1,122,782 | 11.9 |
| Deepak Chopra(6)(8)............. | 1,539,484 | 25.0 | 0 | 1,539,484 | 16.2 |
| Ajay Mehra(9)................... | 193,413 | 3.1 | 0 | 193,413 | 2.0 |
| Andreas F. Kotowski(10)......... | 110,852 | 1.8 | 0 | 110,852 | 1.2 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12)........... | 27,000 | * | 0 | 27,000 | * |
| Steven C. Good(13).............. | 40,500 | * | 21,896 | 18,604 | * |
| Madan G. Syal(14)............... | 241,125 | 3.9 | 25,926 | 215,199 | 2.3 |
| Meyer Luskin(15)................ | 20,625 | * | 0 | 20,625 | * |
| Good Swartz & Berns Pension Fund(16)........................ | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birender Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.3 | 9,259 | 68,420 | * |
| Mohinder and Ranjana Chopra..... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.1 | 9,259 | 56,098 | * |

| | | | | | |
|---|---|---|---|---|---|
| Martha B. Holmes.............. | 60,000 | * | 9,259 | 50,741 | * |
| Taheri and Durriya Rangwala..... | 45,000 | * | 7,407 | 37,593 | * |
| Cynthia G. Fleischer........... | 15,750 | * | 15,750 | 0 | -- |
| Gary F. Fleischer.............. | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Fleischer.......... | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold and Hope Anisgarten...... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra.................... | 1,607 | * | 450 | 1,157 | * |
| Surendra and Kala Jain(17)...... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka.................. | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons).................. | 2,259,106 | 35.9 | 47,822 | 2,211,284 | 23.0 |

</TABLE>

- --------------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of May 31, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (79,260); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333); Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension Fund (3,309); Leila and Birender Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder and Ranjana Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Martha B. Holmes (9,259); Taheri and Durriya Rangwala (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette Moore (7,407); Robert Kephart (5,556); Phillip M. Wascher (7,407); Charan Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Allan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Li (741); Mark and Penny Berns Trust (1,518); Arnold and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette Moore, Robert Kephart, Phillip M. Wascher, Charan Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Allan J. Barnard, Christine Williams, Christopher Chin, Khai Li, Louis Peters and Lincoln Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,647,592, 17.4%); Sally F. Chamberlain (1,073,152, 11.3%); Deepak Chopra (1,354,299, 14.3%); Ajay Mehra (160,080, 1.7%); Andreas F. Kotowski (92,333); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,296); Steven C. Good (3,000); Madan G. Syal (196,680, 2.1%);

Good Swartz & Berns Pension Fund (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder and Ranjana Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Martha B. Holmes (41,482); Taheri and Durriya Rangwala (30,186); Susan Sutherland (35,343); Anuj Wadhawan (29,835); Bette Moore (28,218); Robert Kephart (22,944); Phillip M. Wascher (19,593); Charan Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Allan J. and Pamela Barnard (8,382); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (11,019); Khai Li (8,409); Mark and Penny Berns Trust (2,232); Arnold and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. 37,500 shares of the 49,125 shares are issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See "Management."

(9) Includes 75,000 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

(13) Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 18,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See "Management."

<PAGE>

(14) Includes 217,500 shares held jointly by Mr. Syal and his wife, Mohini Syal. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 5,625 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 67 of 2711

(17) Includes 6,429 shares held by Surendra Jain M.D. Inc.

53

<PAGE>

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

COMMON STOCK

As of May 31, 1997, 6,128,874 shares of Common Stock were outstanding, held of record by 73 shareholders. After completion of the Offering, there will be 9,458,874 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

54

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,458,874 shares of Common Stock outstanding (assuming no exercise of stock options after May 31, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000

shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,758,874 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,731,000 Restricted Shares (or approximately 5,176,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 94,589 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered

hereby. 

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

<TABLE>
<CAPTION>

| UNDERWRITER | NUMBER OF SHARES |
|---|---|
| Robertson, Stephens & Company LLC.................................... | |
| William Blair & Company, L.L.C....................................... | |
| Volpe Brown Whelan & Company, LLC.................................... | |
| Total.......................................................... | 3,700,000 |

</TABLE>

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in the Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,731,000 shares of the Company's Common Stock outstanding prior to the Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 70 of 2711

one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,731,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company

<PAGE>

has agreed that until the expiration of the lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in the Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with the Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with the Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

<PAGE>

LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

58

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Report of Independent Auditors............................................ | F-2 |
| Consolidated Balance Sheets as of June 30, 1995, 1996, and March 31, 1997. | F-3 |
| Consolidated Statements of Operations for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997.................................................................. | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended June | |

30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1997........ F-5
Consolidated Statements of Cash Flows for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997.................................................................. F-6
Notes to Consolidated Financial Statements............................... F-8
</TABLE>

F-1

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems, Inc. (the "Company") and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the related consolidated statements of operations, shareholders' equity, and cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the results of their operations and their cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994 in conformity with generally accepted accounting principles.

Deloitte & Touche llp

Los Angeles, California
June 12, 1997

F-2

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| ASSETS (NOTE 4) | | | |
| Current Assets: | | | |
| Cash............................................... | $ 1,405 | $ 581 | $ 1,612 |
| Accounts receivable, net of allowance for doubtful | | | |

| | | | |
|---|---|---|---|
| accounts of $53, $276 and $294 at June 30, 1995, June 30, 1996 and March 31, 1997, respectively (Note 1) | 12,841 | 13,295 | 15,450 |
| Other receivables (Note 2) | 589 | 783 | 1,643 |
| Inventory (Note 1) | 10,069 | 13,642 | 15,472 |
| Prepaid expenses | 388 | 633 | 665 |
| Deferred income taxes (Notes 1 and 7) | 490 | 700 | 1,127 |
| Total current assets | 25,782 | 29,634 | 35,969 |
| Property and Equipment, Net (Notes 1 and 4): | 4,257 | 4,454 | 5,654 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 741 | 1,221 | 2,691 |
| Total | $30,780 | $35,309 | $44,314 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
| Current Liabilities: | | | |
| Bank lines of credit (Note 4) | $ 1,452 | $ 7,783 | $ 6,723 |
| Current portion of long-term debt (Note 6 and 13) | 1,232 | 1,491 | 1,601 |
| Current portion of senior subordinated debt (Note 5) | | 2,500 | |
| Accounts payable | 6,402 | 6,522 | 7,665 |
| Accrued payroll and related expenses | 960 | 1,667 | 1,587 |
| Income taxes payable | 147 | 799 | 1,759 |
| Advances from customers | 36 | 219 | 2,733 |
| Other accrued expenses and current liabilities | 3,436 | 2,609 | 3,961 |
| Total current liabilities | 13,665 | 23,590 | 26,029 |
| Bank Line of Credit (Note 4) | 4,829 | | |
| Senior Subordinated Debt (Note 5) | 3,075 | 575 | |
| Long-Term Debt (Note 6 and 13) | 3,525 | 3,113 | 3,063 |
| Deferred Income Taxes (Notes 1 and 7) | 629 | 827 | 240 |
| Minority Interest (Note 1) | 106 | 10 | |
| Total liabilities | 25,829 | 28,115 | 29,332 |
| Commitments and Contingencies (Notes 8 and 13) | | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1995 and 1996 and 2,568,750 shares at March 31, 1997 (Note 10) | 1,514 | 1,514 | 4,014 |
| Common stock, no par value; authorized, 4,500,000 shares; issued and outstanding, 1,842,007, 1,858,132 and 2,207,124 shares at June 30, 1995 and 1996 and March 31, 1997, respectively | 543 | 560 | 2,913 |
| Retained earnings | 2,735 | 4,994 | 7,928 |
| Cumulative foreign currency translation adjustment (Note 1) | 159 | 126 | 127 |
| Total shareholders' equity | 4,951 | 7,194 | 14,982 |
| Total | $30,780 | $35,309 | $44,314 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> (Unaudited) | <C> |
| Revenues | $47,735 | $49,815 | $ 61,518 | $ 44,994 | $ 55,973 |
| Cost of goods sold | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses (Note 11 and 12) | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development (Note 1) | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation (Note 9) | | | | | 856 |
| Total operating expenses | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense (Notes 4, 5, 6 and 11) | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before provision for income taxes and minority interest | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes (Notes 1 and 7) | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest in net loss of subsidiaries | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest in net loss of subsidiaries (Note 1) | 38 | 17 | 117 | 28 | -- |
| Net income | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Historical net income | | | $ 2,259 | $ 1,546 | $ 2,934 |
| Interest on subordinated debt, net of income taxes | | | 166 | 125 | 92 |
| Minority interest in net loss of subsidiaries | | | (117) | (28) | -- |
| Pro forma net income | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share (Note 1) | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Weighted average common shares used in the calculation of pro forma net income per share | | | 6,308,126 | 6,304,158 | 6,327,234 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED NUMBER OF SHARES | PREFERRED AMOUNT | COMMON NUMBER OF SHARES | COMMON AMOUNT | RETAINED EARNINGS | CUMULATIVE FOREIGN CURRENCY TRANSLATION ADJUSTMENT | TOTAL |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1993... | 1,123,750 | $1,124 | 1,628,257 | $ 335 | $ 790 | $ 6 | $ 2,255 |
| Exercise of stock options............. | -- | -- | 75,000 | 28 | -- | -- | 28 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 58 | 58 |
| Net income........... | -- | -- | -- | -- | 787 | -- | 787 |
| BALANCE, JUNE 30, 1994.. | 1,123,750 | 1,124 | 1,703,257 | 363 | 1,577 | 64 | 3,128 |
| Exercise of stock options............. | 35,000 | 70 | 60,000 | 75 | -- | -- | 145 |
| Conversion of debt.... | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 95 | 95 |
| Net income........... | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995.. | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options............. | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment........... | -- | -- | -- | -- | -- | (33) | (33) |
| Net income........... | -- | -- | -- | -- | 2,259 | -- | 2,259 |
| BALANCE, JUNE 30, 1996.. | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options............. | -- | -- | 49,500 | 79 | -- | -- | 79 |
| Conversion of debt.... | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions......... | -- | -- | 178,956 | 1,193 | -- | -- | 1,193 |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 1 | 1 |
| Net income........... | -- | -- | -- | -- | 2,934 | -- | 2,934 |
| BALANCE, MARCH 31, 1997. | 2,568,750 | $4,014 | 2,207,124 | $2,913 | $7,928 | $127 | $14,982 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | | | |
| Net income.................. | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest in net loss of subsidiaries...... | (38) | (17) | (117) | (28) | |
| Provision for losses on accounts receivable....... | 150 | (70) | 404 | 346 | 97 |
| Depreciation and amortization.............. | 1,074 | 1,551 | 2,014 | 1,426 | 1,686 |
| Stock option compensation.. | | | | | 856 |
| Deferred income taxes...... | (150) | 240 | (12) | -- | (1,014) |
| Gain on sale of property and equipment............. | (22) | (11) | (13) | -- | |
| Changes in operating assets and liabilities, net of business acquisition: | | | | | |
| Accounts receivable...... | (7,289) | (1,239) | (858) | (397) | (1,582) |
| Other receivables........ | (541) | 226 | (194) | (800) | (827) |
| Inventory................ | (2,059) | (2,599) | (4,068) | (4,113) | (1,444) |
| Prepaid expenses......... | 28 | (139) | (245) | (253) | (32) |
| Accounts payable......... | 2,973 | 221 | 120 | 1,657 | 980 |
| Accrued payroll and related expenses........ | (232) | 191 | 707 | 36 | (80) |
| Income taxes payable..... | 113 | (217) | 652 | 595 | 960 |
| Advances from customers.. | (22) | 9 | 183 | (3) | 1,771 |
| Other accrued expenses and current liabilities............ | 3,470 | (87) | (827) | (1,214) | 806 |
| Net cash provided by (used in) operating activities............ | (1,758) | (783) | 5 | (1,202) | 5,111 |
| Cash flows from investing activities: | | | | | |
| Proceeds from sale of property and equipment..... | 70 | 142 | 120 | | |
| Additions to property and equipment.................. | (1,459) | (1,396) | (1,612) | (1,287) | (1,530) |
| Cash paid for business acquisition, net of cash acquired................... | | | | | (302) |
| Cash paid for minority interest................... | | (160) | | | |
| Other assets................ | (14) | (662) | (688) | (273) | 135 |
| Net cash used in investing activities.. | (1,403) | (2,076) | (2,180) | (1,560) | (1,697) |
| Cash flows from financing | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| activities: | | | | | |
| Net proceeds from (repayment of) bank lines of credit... | 2,227 | 2,668 | 1,502 | 2,382 | (1,363) |
| Payments on senior subordinated debt.......... | | (700) | | | (350) |
| Payments on junior subordinated debt.......... | | (280) | | | |
| Payments on long-term debt.. | (660) | (1,095) | (1,250) | (1,000) | (3,399) |
| Proceeds from issuance of long-term debt............. | 1,191 | 2,806 | 1,097 | 558 | 2,646 |
| Proceeds from exercise of stock options and warrants. | 28 | 145 | 17 | 17 | 79 |
| Proceeds from issuance of minority interest.......... | 1 | | 21 | 20 | |
| Net cash provided by (used in) financing activities............ | 2,787 | 3,544 | 1,387 | 1,977 | (2,387) |
| Effect of exchange rate changes on cash.............. | 58 | 95 | (36) | -- | 4 |
| Net (decrease) increase in cash......................... | (316) | 780 | (824) | (785) | 1,031 |
| Cash, beginning of period..... | 941 | 625 | 1,405 | 1,405 | 581 |
| Cash, end of period........... | $ 625 | $11,405 | $ 581 | $ 620 | $ 1,612 |
| Supplemental disclosures of cash flow information--Cash paid during the period for: | | | | | |
| Interest.................... | $ 691 | $ 1,229 | $ 1,346 | $ 992 | $ 902 |
| Income taxes................ | $ 620 | $ 82 | $ 377 | $ 368 | $ 1,261 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- --------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During the nine months ended March 31, 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During the nine months ended March 31, 1997, the Company acquired the minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock. The excess of the fair value of the common stock of $1,193 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

<S> <C>

| | |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (370) |
| Liability incurred | (546) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In September and November 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares, if any, to be issued is based upon the net income of the subsidiary for the year ended June 30, 1997, not to exceed 45,486 shares.

Unaudited Interim Financial Information -- The accompanying consolidated statements of income and of cash flows for the nine months ended March 31, 1996 have been prepared in accordance with generally accepted accounting principles for interim periods and are unaudited; however, in management's opinion, they include all adjustments (consisting of only normal recurring adjustments) necessary for a fair presentation of results for such interim periods.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| Raw materials | $ 5,004 | $ 7,795 | $ 9,122 |
| Work-in-process | 2,597 | 3,114 | 4,300 |
| Finished goods | 2,468 | 2,733 | 2,050 |
| Total | $10,069 | $13,642 | $15,472 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| Equipment | $5,247 | $ 6,280 | $ 7,438 |
| Leasehold improvements | 1,426 | 1,601 | 1,963 |
| Tooling | 1,397 | 1,558 | 1,775 |
| Furniture and fixtures | 626 | 488 | 570 |
| Computer equipment | 1,025 | 1,283 | 1,639 |
| Vehicles | 122 | 93 | 152 |
| Total | 9,843 | 11,303 | 13,537 |
| Less accumulated depreciation and amortization | 5,586 | 6,849 | 7,883 |
| Property and equipment, net | $4,257 | $ 4,454 | $ 5,654 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Software development costs | $494 | $ 588 | $ 588 |
| Goodwill | -- | -- | 1,769 |
| Deposits | 168 | 262 | 227 |
| Other | 111 | 524 | 426 |
| Total | 773 | 1,374 | 3,010 |
| Less accumulated amortization | 32 | 153 | 319 |
| Intangible and other assets, net | $741 | $1,221 | $2,691 |

</TABLE>

Goodwill in the amount of $1,181,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the nine months ended March 31, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

<PAGE>

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 81 of 2711
losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996, (unaudited) and 1997, respectively.

Earnings Per Share -- Historical net income per share is not presented because it is not indicative of the ongoing operations of the Company. Pro forma net income and net income per share has been presented to reflect the effect of the conversion of certain subordinated debt into preferred stock and the subsequent conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Pro forma earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from convertible debt and stock options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the pro forma weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period for which pro forma earnings per share is presented.

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at March 31, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and the nine months ended March 31, 1997, the Company earned a technical fee from the joint venture in the amount of $200,000 and $115,000, respectively. At March 31, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The purchase price of $916,000 consisted of cash of $370,000 with the balance of $546,000 payable by June 15, 1997. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1993, pro forma consolidated sales for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 would have been $50,735,000, $53,338,000, $65,371,000, $47,827,000 and $58,557,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1995 and 1996 and March 31, 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | | MARCH 31, |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Line of credit -- U.S. | $4,829 | $6,361 | $4,927 |
| Line of credit -- Singapore | 1,452 | 1,422 | 1,442 |
| Line of credit -- Norway | | | 354 |
| Total bank lines of credit | $6,281 | $7,783 | $6,723 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the

Company. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At March 31, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. No amounts were outstanding under this agreement at March 31, 1997. The agreement also provides a commitment for letters of credit up to $5,000,000. At March 31, 1997 approximately $1,997,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank, which provides for revolving line of credit borrowings up to 2,600,000 Singapore dollars (approximately $1,800,000 at March 31, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $741,000 at March 31, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at March 31, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,050,000 at March 31, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,230,000 at March 31, 1997) and a 500,000 pound sterling (approximately $820,000 at March 31, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at March 31, 1997) plus 2%. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $134,000 was outstanding under performance bonds at March 31, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $1,000,000 at March 31, 1997) for performance bonds and standby

letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at March 31, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the nine months ended March 31, 1997, all of the debt outstanding under the various agreements was repaid or converted as summarized in the following table (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996.................................. | $2,500 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996................................ | 350 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996................................... | 50 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996.... | 175 | 175 | -- |
| Total senior subordinated debt....................... | 3,075 | 3,075 | -- |
| Less current portion................................ | -- | 2,500 | -- |
| Total long-term portion............................. | $3,075 | $ 575 | $-- |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

6. LONG-TERM DEBT

At June 30, 1995 and 1996 and March 31, 1997, long-term debt consisted of the following (in thousands):

<TABLE>
<CAPTION>

JUNE 30,

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in January 1997.... | $2,240 | $1,667 | -- |
| Term loan payable to a bank, interest due mothly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997.... | 950 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997........................................ | -- | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001......... | -- | -- | $2,500 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,148 until paid in full on June 1, 2001................................................ | -- | -- | 504 |
| Term loan payable, interest accrued monthly at 8.00%, paid in full on April 2, 1997........................ | -- | -- | 296 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997....... | 242 | 141 | 62 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.66% at March 31, 1997), principal due $300,000 in 1998, and $400,000 in 1999.................................... | 1,300 | 1,000 | 700 |
| Other.............................................. | 25 | 535 | 602 |
| | 4,757 | 4,604 | 4,664 |
| Less current portion of long-term debt............... | 1,232 | 1,491 | 1,601 |
| Long-term portion of debt............................ | $3,525 | $3,113 | $3,063 |

Fiscal year principal payments of long-term debt as of March 31, 1997 are as follows (in thousands):

| | |
|---|---|
| 1997 (3 months)...................................................... | $ 555 |
| 1998........................................................... | 1,278 |
| 1999........................................................... | 1,317 |
| 2000........................................................... | 896 |
| 2001........................................................... | 618 |
| Total........................................................ | $4,664 |

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

| | YEAR ENDED JUNE 30, | | | NINE MONTS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| Pretax income: | | | | | |
| United States | $ 547 | $1,277 | $1,965 | $1,053 | $1,904 |
| Foreign | 1,016 | 277 | 1,288 | 1,252 | 2,013 |
| Total pretax income | $1,563 | $1,554 | $3,253 | $2,305 | $3,917 |

The Company's provision for income taxes is comprised of the following (in thousands):

| | YEAR ENDED JUNE 30, | | | NINE MONTS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| Current: | | | | | |
| Federal | $ 487 | $ 43 | $ 510 | $364 | $ 1,286 |
| State | 139 | 3 | 21 | 16 | 54 |
| Foreign | 338 | 127 | 592 | 407 | 657 |
| | 964 | 173 | 1,123 | 787 | 1,997 |
| Deferred | (150) | 240 | (12) | -- | (1,014) |
| Total provision | $ 814 | $413 | $1,111 | $787 | $ 983 |

Deferred income tax assets (liabilities) at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Expenses not currently deductible | $ 518 | $ 873 | $ 1,491 |
| State income taxes | 49 | -- | -- |
| Other | 143 | -- | 411 |
| Total deferred income tax assets | 710 | 873 | 1,902 |
| Depreciation | (309) | (145) | (82) |
| Capitalized software development costs | (158) | (214) | (154) |

| | | | |
|---|---|---|---|
| State income taxes.................................. | | (173) | (365) |
| Revitalization zone deductions.................... | (182) | (278) | (354) |
| Other.............................................. | (200) | (190) | (60) |
| Total deferred income tax liabilities........... | (849) | (1,000) | (1,015) |
| Net deferred income taxes.......................... | $(139) | $ (127) | $ 887 |

</TABLE>

F-15

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 (Unaudited) | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Provision for income taxes at federal statutory rate............ | 35.0 % | 35.0 % | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit.................... | 1.3 | (2.6) | 0.2 | 0.2 | (5.2) |
| Nontaxable earnings of FSC.......... | (3.8) | (7.1) | (5.7) | (5.7) | (5.8) |
| Research and development tax credits........................... | -- | (2.8) | -- | -- | (2.3) |
| Foreign income subject to tax at other than federal statutory rate.. | 3.2 | 0.7 | 1.1 | 1.1 | 0.2 |
| Government settlement.............. | 16.8 | -- | -- | -- | -- |
| Other.............................. | (0.4) | 3.4 | 3.6 | 3.6 | 3.2 |
| Effective income tax rate.......... | 52.1 % | 26.6 % | 34.2 % | 34.2 % | 25.1 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At March 31, 1997 undistributed earnings of the foreign subsidiaries amounted to $3,022,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of March 31, 1997 are as follows: (3 months) 1997, $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying

consolidated financial statements was $825,000, $959,000, $901,000, $725,000, and $670,000 for the years ended June 30, 1994, 1995, and 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

Additional litigation involves claims that the Company interfered with pre-existing contractual rights of the plaintiff, who is claiming breach of contract and interference with contract, and is seeking compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. The Company has filed

<PAGE>

a cross-complaint claiming breach of contract and misrepresentation and seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. The Company has been informed by its counsel that the Company will be able to defend the lawsuit without any liability to the Company.

Management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect on the Company's consolidated financial statements.

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in April 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this

   plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the nine months ended March 31, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|
| Outstanding, July 1, 1993 | 355,125 | $1.10 | $ 390,000 |
| Granted | 37,500 | 2.33 | 88,000 |
| Exercised | (75,000) | 0.37 | (28,000) |
| Canceled | (9,750) | 1.03 | (10,000) |
| Outstanding, July 1, 1994 | 307,875 | 1.43 | 440,000 |
| Granted | 69,000 | 2.00 | 138,000 |
| Exercised | (60,000) | 1.25 | (75,000) |
| Canceled | (19,500) | 1.77 | (34,000) |
| Outstanding, July 1, 1995 | 297,375 | 1.57 | 469,000 |
| Granted | 51,000 | 2.17 | 111,000 |
| Exercised | (16,125) | 1.06 | (17,000) |
| Canceled | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996 | 318,375 | 1.70 | 541,000 |
| Granted | 235,125 | 2.98 | 701,000 |
| Exercised | (49,500) | 1.60 | (79,000) |
| Canceled | (5,250) | 2.00 | (10,000) |
| Outstanding, March 31, 1997 | 499,125 | $2.31 | $1,153,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of March 31, 1997:

<TABLE>
<CAPTION>

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING AT MARCH 31, 1997 | WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | EXERCISABLE AT MARCH 31, 1997 | WEIGHTED AVERAGE EXERCISE PRICE |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 90 of 2711

| | | | | | |
|---|---|---|---|---|---|
| $0.17 to 0.67.......... | 58,500 | 0.8 years | $0.45 | 58,500 | $0.45 |
| 1.87 to 2.00........... | 150,750 | 2.3 | 1.95 | 118,688 | 1.94 |
| 2.33 to 3.33........... | 289,875 | 4.1 | 2.87 | 272,625 | 2.89 |
| | ------- | | | ------- | |
| $0.17 to 3.33........... | 499,125 | 3.2 | $2.31 | 449,813 | $2.32 |
| | ======= | | | ======= | |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and for the nine months ended March 31, 1997 pursuant to SFAS 123 was approximately $19,000 and $1,045,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $2,913,000, and pro forma net income per share would have been $0.36 and $0.46 for 1996 and for the nine months ended March 31, 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.28% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

Preferred stock is entitled to the same one vote per share as common stock and has a liquidation preference of $1.00 per preferred share.

In June 1997 holders of the preferred stock converted each preferred share into 1.5 shares of common stock.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 are approximately $61,000, $77,000, $83,000, $65,000, and $87,000 for messenger service and auto rental; $68,000, $78,000, $63,000, $42,000 and $64,000 for printing services; and $10,000, $23,000, $7,000, $7,000 and $3,000 for professional services, respectively. During the nine months ended March 31, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $302,000, $315,000, $263,000, $197,000 and $146,000 for the

years ended June 30, 1994, 1995, 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and included in selling, general and administrative expense in the accompanying statement of operations for the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At March 31, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the nine months ended March 31, 1997 and 1996 (unaudited) or for the years ended June 30, 1996, 1995 and 1994. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient

<PAGE>

to provide for benefits accruing after that date. Pension expense for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 was approximately $89,000, $111,000, $91,000, $67,000 and $64,000, respectively.

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1994 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $29,788 | $13,624 | $4,323 | | $47,735 |
| Transfer between geographical areas........................ | 1,551 | 742 | 882 | $ (3,175) | -- |
| Net revenues.................. | $31,339 | $14,366 | $5,205 | $ (3,175) | $47,735 |
| Operating income.............. | $ 1,028 | $ 564 | $ 653 | $ 28 | $ 2,273 |

| | | | | | |
|---|---|---|---|---|---|
| Identifiable assets.......... | $29,266 | $ 9,629 | $2,923 | $(16,011) | $25,807 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1995 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $33,158 | $11,341 | $5,316 | | $49,815 |
| Transfer between geographical areas........................ | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues.................. | $34,856 | $12,129 | $9,147 | $ (6,317) | $49,815 |
| Operating income.............. | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets........... | $36,751 | $10,832 | $4,839 | $(21,642) | $30,780 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1996 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas....................... | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues................. | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income............. | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets.......... | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

</TABLE>

<TABLE>
<CAPTION>

| | NINE MONTHS ENDED MARCH 31, 1997 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $41,241 | $12,388 | $ 2,344 | | $55,973 |
| Transfer between geographical areas....................... | 5,691 | 3,461 | 9,091 | $(18,243) | -- |
| Net revenues................. | $46,932 | $15,849 | $11,435 | $(18,243) | $55,973 |
| Operating income............. | $ 2,691 | $ 1,040 | $ 1,190 | $ (104) | $ 4,817 |
| Identifiable assets.......... | $47,836 | $13,362 | $ 8,262 | $(25,146) | $44,314 |

</TABLE>

[INSIDE BACK PAGE]

[MAP OF MAJOR INSTALLATIONS OF THE COMPANY'S SECURITY AND INSPECTION PRODUCTS, WITH INSERTS OF CERTAIN SPECIFIC INSTALLATIONS]

The Company's security and inspection products are used for security purposes at locations such as airports, courthouses, government buildings, nuclear facilities, mail rooms, schools and prisons. In addition, the security and inspections products are also increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

| <S> | <C> |
|---|---|
| Securities and Exchange Commission registration fee............... | $ 18,052 |
| NASD filing fee.................................................. | 6,457 |
| Nasdaq National Market System listing fee......................... | 26,275 |
| Printing and engraving expenses................................... | 100,000 |
| Transfer agent and registrar fees................................. | 2,000 |
| Legal fees and expenses........................................... | 175,000 |
| Accounting fees and expenses...................................... | 150,000 |
| "Blue sky" fees and expenses...................................... | 15,000 |
| Other expenses.................................................... | 167,216 |
| Total............................................................. | $660,000* |

</TABLE>

- --------
* The Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Amended and Restated Articles of Incorporation ("Amended Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Amended Articles does not eliminate the directors' fiduciary duty and does apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

II-1

<PAGE>

action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee, or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or

settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect

<PAGE>

to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful.

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration

Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

Since June 1, 1994, the Company has issued options to purchase a total of

789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

<PAGE>

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) thereof as transactions not involving public offerings.

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement. |
| 3.1 | Amended and Restated Articles of Incorporation of the Company. |
| 3.2 | Amended and Restated Bylaws of the Company. |
| 4.1 | Specimen Common Stock Certificate.* |
| 5.1 | Opinion of Troy & Gould Professional Corporation.* |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement. |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements. |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra. |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra. |
| 10.5 | Employment Agreement dated April 1, 1997 between the Company and Andreas F. Kotowski. |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi. |
| 10.7 | Employment Agreement dated April 1, 1997 between the Company and Anthony S. Crane. |
| 10.8 | Employment Agreement dated April 1, 1997 between the Company and Thomas K. Hickman. |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski. |
| 10.10 | Form of Indemnification Agreement for directors and executive officers of the Company.* |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan").* |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT |

Sensors, Inc.

| | |
|---|---|
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).* |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd. |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc. |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank. |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc. |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc. |
| 11.1 | Statement regarding computation of earnings per share. |
| 21.1 | Subsidiaries of the Company. |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).* |
| 24.1 | Power of Attorney (contained in Part II). |
| 27.1 | Financial Data Schedule. |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.* |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy.* |

</TABLE>

- --------

* To be filed by amendment.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such

liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on June 12, 1997.

OSI SYSTEMS, INC.

/s/ DEEPAK CHOPRA
By: ___________________________________
Deepak Chopra
Chairman, Chief Executive Officer
and President

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Deepak Chopra and Ajay Mehra, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place, and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|

| Signature | Title | Date |
|---|---|---|
| /s/ DEEPAK CHOPRA<br>Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | June 12, 1997 |
| /s/ AJAY MEHRA<br>Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | June 12, 1997 |
| /s/ STEVEN C. GOOD<br>Steven C. Good | Director | June 12, 1997 |
| /s/ MEYER LUSKIN<br>Meyer Luskin | Director | June 12, 1997 |
| /s/ MADAN G. SYAL<br>Madan G. Syal | Director | June 12, 1997 |

II-6

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994.................. | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, 1995.................. | $203 | (70) | -- | 80 | $ 53 |
| Year Ended June 30, 1996.................. | $ 53 | $404 | -- | 181 | $276 |
| Nine Months Ended March 31, 1997.............. | $276 | $ 97 | -- | 79 | $294 |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>
EXHIBIT
NUMBER EXHIBIT DESCRIPTION
------- -------------------
<C> <S>

1.1 Form of Underwriting Agreement.
3.1 Amended and Restated Articles of Incorporation of the Company.
3.2 Amended and Restated Bylaws of the Company.
4.1 Specimen Common Stock Certificate.*
5.1 Opinion of Troy & Gould Professional Corporation.*
10.1 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.
10.2 1997 Stock Option Plan and forms of Stock Option Agreements.
10.3 Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.
10.4 Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.
10.5 Employment Agreement dated April 1, 1997 between the Company and Andreas F. Kotowski.
10.6 Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.
10.7 Employment Agreement dated April 1, 1997 between the Company and Anthony S. Crane.
10.8 Employment Agreement dated April 1, 1997 between the Company and Thomas K. Hickman.
10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.
10.10 Form of Indemnification Agreement for directors and executive officers of the Company.*
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan").*
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).*
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc. Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc. and Wells Fargo HSBC Trade Bank.
10.17 License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.
10.18 Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.
11.1 Statement regarding computation of earnings per share.
21.1 Subsidiaries of the Company.
23.1 Consent of Deloitte & Touche LLP.
23.2 Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).*
24.1 Power of Attorney (contained in Part II).
27.1 Financial Data Schedule.
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.*
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.*
</TABLE>

- --------
* To be filed by amendment.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-1.1
<SEQUENCE>2
<DESCRIPTION>FORM OF UNDERWRITING AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 1.1

3,700,000 Shares/1/

OSI SYSTEMS, INC.

Common Stock

FORM OF UNDERWRITING AGREEMENT

________________, 1997

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC
As Representatives of the several Underwriters
c/o Robertson, Stephens & Company LLC
555 California Street
Suite 2600
San Francisco, California 94104

Ladies and Gentlemen:

OSI SYSTEMS, INC., a California corporation (the "Company"), and certain shareholders of the Company named in Schedules B and C hereto (hereafter called the "Selling Shareholders") address you as the Representatives of each of the persons, firms and corporations listed in Schedule A hereto (herein collectively called the "Underwriters") and hereby confirm their respective agreements with the several Underwriters as follows:

1. Description of Shares. The Company proposes to issue and sell 3,330,000 shares of its authorized and unissued common stock, no par value, to the Underwriters. The Selling Shareholders, acting severally and not jointly, propose to sell an aggregate of 370,000 shares of the Company's issued and outstanding common stock, no par value, to the several Underwriters. The 3,330,000 shares of common stock, no par value, of the Company to be sold by the Company are hereinafter called the "Company Shares" and the 370,000 shares of common stock, no par value, to be sold by the Selling Shareholders are hereinafter called the "Selling

- ---------------
/1/ Plus an option to purchase up to 555,000 additional shares from certain shareholders of the Company to cover over-allotments.

<PAGE>

Shareholder Shares." The Company Shares and the Selling Shareholder Shares are hereinafter collectively referred to as the "Firm Shares." Certain Selling Shareholders also propose to grant, severally and not jointly, to the Underwriters, an option to purchase up to 555,000 additional shares of the Company's common stock, no par value (the "Option Shares"), as provided in Section 8 hereof. As used in this Agreement, the term "Shares" shall include the Firm Shares and the Option Shares. All shares of the Company's common stock, no par value, outstanding after giving effect to the sales contemplated hereby, including the Shares, are hereinafter referred to as "Common Stock."

2. Representations, Warranties and Agreements of the Company. The
   -------------------------------------------------------
Company represents and warrants to and agrees with each Underwriter and each Selling Shareholder that:

(a) A registration statement on Form S-1 (File No. 333-_____) with respect to the offer and sale of the Shares, including a prospectus subject to completion, has been prepared by the Company in conformity with the requirements prescribed by the Securities Act of 1933, as amended (the "Act"), and the applicable rules and regulations (the "Rules and Regulations") prescribed by the Securities and Exchange Commission (the "Commission") pursuant to the Act and has been filed with the Commission; such amendments to such registration statement, such amended prospectuses subject to completion and such abbreviated registration statements pursuant to Rule 462(b) of the Rules and Regulations as may have been required prior to the date hereof have been similarly prepared and filed with the Commission; and the Company will file such additional amendments to such registration statement, such amended prospectuses subject to completion and such abbreviated registration statements as may hereafter be required. Copies of such registration statement and amendments, of each related prospectus subject to completion (the "Preliminary Prospectuses") and of any abbreviated registration statement filed pursuant to Rule 462(b) of the Rules and Regulations have been delivered to you.

If the registration statement relating to the Shares has been declared effective under the Act by the Commission, the Company will prepare and promptly file with the Commission the information omitted from the registration statement in reliance upon Rule 430A(a) or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations pursuant to subparagraph (1), (4) or (7) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to the registration statement (including a final form of prospectus). If the registration statement relating to the Shares has not been declared effective under the Act by the Commission, the Company will prepare and promptly file an amendment to the registration statement, including a final form of prospectus, or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations. The term "Registration Statement" as used in this Agreement shall mean such registration statement, including financial statements, schedules and exhibits, in the form in which it was or is, as the case may be, declared effective (including, if the Company omitted information from the registration statement in reliance upon Rule 430A(a) or files a term sheet pursuant to Rule 434 of the Rules and Regulations, the information deemed

<PAGE>

to be a part of the registration statement at the time it was declared effective pursuant to Rule 430A(b) or Rule 434(d) of the Rules and Regulations) and, in the event of any amendment thereto or the filing of any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations after the effective date of such registration statement, shall also mean (from and after the effectiveness of such amendment or the filing of such abbreviated registration statement) such registration statement as so amended, together with any such abbreviated registration statement. The term "Prospectus" as used in this Agreement shall mean the prospectus relating to the Shares as included in the Registration Statement at the time it is declared effective (including, if the Company omitted information from the Registration Statement in reliance upon Rule 430A(a) of the Rules and Regulations, the information deemed to be a part of the Registration Statement pursuant to Rule 430A(b) of the Rules and Regulations as of the time it was declared effective; provided, however, that if
                                                 --------  -------
in reliance on Rule 434 of the Rules and Regulations and with the written

consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the term "Prospectus" shall mean the "prospectus subject to completion" (as defined in Rule 434(g) of the Rules and Regulations) last provided to the Underwriters by the Company and circulated by the Underwriters to all prospective purchasers of the Shares (including the information deemed to be a part of the Registration Statement pursuant to Rule 434(d) of the Rules and Regulations) at the time the Registration Statement was declared effective. Notwithstanding the foregoing, if any revised prospectus shall be provided to the Underwriters by the Company for use in connection with the offering of the Shares that differs from the prospectus referred to in the immediately preceding sentence (whether or not such revised prospectus is required to be filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations), the term "Prospectus" shall refer to such revised prospectus from and after the time it is first provided to the Underwriters for such use. If in reliance on Rule 434 of the Rules and Regulations and with the consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the Prospectus and the term sheet, together, will not be materially different from the prospectus in the Registration Statement.

(b) The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus or instituted proceedings for that purpose, and each such Preliminary Prospectus has conformed in all material respects to the requirements of the Act and the Rules and Regulations and, as of its date, has not included any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and at the time the Registration Statement was or is, as the case may be, declared effective and at all times subsequent thereto up to and on the Closing Date (hereinafter defined) and on any later date on which Option Shares are to be purchased, (i) the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained and will contain all material information required to be included therein by the Act and the Rules and Regulations and will in all material respects conform to the requirements of the Act and the Rules and Regulations, (ii) the Registration Statement, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make

<PAGE>

the statements therein not misleading, and (iii) the Prospectus, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that none of the representations and warranties contained in this subparagraph (b) shall apply to information contained in or omitted from the Registration Statement or Prospectus, or any amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter, furnished to the Company by such Underwriter specifically for use in the preparation thereof.

(c) Each of the Company and its subsidiaries has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation with full power and authority (corporate and other) to own, lease and operate its properties and conduct its business as described in the Prospectus; the Company owns all of the outstanding capital stock of its subsidiaries free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; each of the Company and its subsidiaries is duly qualified to do business as a foreign corporation and is in

good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its business requires such qualification; no proceeding has been instituted in any such jurisdiction, revoking, limiting or curtailing, or seeking to revoke, limit or curtail, such power and authority or qualification; each of the Company and its subsidiaries is in possession of and operating in compliance with all authorizations, licenses, certificates, consents, orders and permits from state, federal and other regulatory authorities which are material to the conduct of its business, all of which are valid and in full force and effect as of the date hereof; neither the Company nor any of its subsidiaries is in violation of its respective incorporating charter or bylaws or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any material bond, debenture, note or other evidence of indebtedness, or in any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound; and neither the Company nor any of its subsidiaries is in material violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties of which it has knowledge. The Company does not own or control, directly or indirectly, any corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., a California corporation, Rapiscan Security Products Limited, a private company formed under the laws of the United Kingdom and registered in England, Ferson Optics, Inc., a California corporation, UDT Sensors, Inc., a California corporation, [Ecil Rapiscan Security Products Limited], a limited liability joint stock corporation organized under the laws of India, Advanced Micro Electronics AS ("AME"), a company incorporated under Norwegian law, Opto Sensors (Singapore) Pte Ltd, a private company limited by shares and incorporated in the Republic of Singapore, Opto Sensors (Malaysia) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia, OSI Electronics, a California corporation, and Rapiscan Consortium (M) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia.

(d) The Company has full legal right, power and authority to enter into this Agreement and to perform the transactions contemplated hereby. This Agreement has been

<PAGE>

duly authorized, executed and delivered by the Company and is a valid and binding agreement on the part of the Company, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except to the extent that the enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a material breach or violation of any of the terms and provisions of, or constitute a default under, (i) any bond, debenture, note or other evidence of indebtedness, or under any lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound, (ii) the charter or bylaws of the Company or any of its subsidiaries, or (iii) any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties. No consent, approval, authorization or order of or qualification with any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties is required for the execution and delivery of this Agreement and the consummation by the Company or any of its subsidiaries of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 106 of 2711

transactions herein contemplated, except such as may be required under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") (if applicable), or under state or other securities or Blue Sky laws, all of which requirements have been satisfied in all material respects.

(e) There is not any pending or, to the best of the Company's knowledge, threatened action, suit, claim or proceeding against the Company, any of its subsidiaries or any of their respective officers or any of their respective properties, assets or rights before any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective officers or properties or otherwise which (i) may result in any material adverse change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise or may materially and adversely affect their properties, assets or rights, (ii) may prevent consummation of the transactions contemplated hereby or (iii) is required to be disclosed in the Registration Statement or Prospectus and is not so disclosed; and there are no agreements, contracts, leases or documents of the Company or any of its subsidiaries of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement by the Act or the Rules and Regulations which have not been accurately described in all material respects in the Registration Statement or Prospectus or filed as exhibits to the Registration Statement.

(f) All outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly authorized and validly issued and are fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and the authorized and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization" and conforms in all material respects to the statements relating thereto contained in the Registration Statement and the Prospectus (and

<PAGE>

such statements correctly state the substance of the instruments defining the capitalization of the Company); the Shares have been duly authorized for issuance and sale to the Underwriters pursuant to this Agreement and, when issued and delivered by the Company against payment therefor in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and nonassessable, and will be sold free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; and no preemptive right, co-sale right, registration right, right of first refusal or other similar right of shareholders exists with respect to any of the Shares or the sale thereof or the issuance of the Company Shares other than those that have been expressly waived prior to the date hereof and those that will automatically expire upon and will not apply to the consummation of the transactions contemplated on the Closing Date. No further approval or authorization of any shareholder, the Board of Directors of the Company or others is required for the issuance and sale or transfer of the Shares except as may be required under the Act, the Exchange Act or under state or other securities or Blue Sky laws. All issued and outstanding shares of capital stock of each subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and were not issued in violation of or subject to any preemptive right, or other rights to subscribe for or purchase shares and are owned by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest. Except as disclosed in the Prospectus and the financial statements of the Company, and the related notes thereto, included in the Prospectus, neither the Company nor any subsidiary has outstanding any options to purchase, or any preemptive rights or other rights to subscribe for or to purchase, any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of its capital stock or any such options, rights,

convertible securities or obligations. The description in the Prospectus of the Company's stock option, stock bonus and other stock plans or arrangements, and the options or other rights granted and exercised thereunder, accurately and fairly presents the information required to be shown with respect to such plans, arrangements, options and rights.

(g) Deloitte & Touche LLP, which has examined the consolidated financial statements of the Company, together with the related schedules and notes, for the nine months ended March 31, 1997 and for each of the years in the three (3) fiscal years ended June 30, 1996 filed with the Commission as a part of the Registration Statement, which are included in the Prospectus, are independent accountants within the meaning of the Act and the Rules and Regulations; the audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, forming part of the Registration Statement and Prospectus, fairly present the financial position and the results of operations of the Company and its subsidiaries at the respective dates and for the respective periods to which they apply; and all audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, filed with the Commission as part of the Registration Statement, have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved except as may be otherwise stated therein. The selected and summary financial and statistical data included in the Registration Statement present fairly the information shown therein and have been compiled on a basis consistent with the audited financial statements presented therein. No other financial statements or schedules are required to be included in the Registration Statement.

-6-

<PAGE>

(h) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (i) any material adverse change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise, (ii) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (iii) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (iv) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (v) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (vi) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise.

(i) Except as set forth in the Registration Statement and Prospectus, (i) each of the Company and its subsidiaries has good and marketable title to all properties and assets described in the Registration Statement and Prospectus as owned by it, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest, other than such as would not have a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise, (ii) the agreements to which the Company or any of its subsidiaries is a party described in the Registration Statement and Prospectus are valid agreements, enforceable by the Company and its subsidiaries (as applicable), except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable

principles and, to the best of the Company's knowledge, the other contracting party or parties thereto are not in material breach or material default under any of such agreements, and (iii) the Company and each of its subsidiaries has valid and enforceable leases for all properties described in the Registration Statement and Prospectus as leased by it, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles. Except as set forth in the Registration Statement and Prospectus, the Company owns or leases all such properties as are necessary to its operations as now conducted or as proposed to be conducted.

(j) The Company and its subsidiaries have timely filed all necessary federal, state and foreign income and franchise tax returns and have paid all taxes shown thereon as due, and there is no tax deficiency that has been or, to the best of the Company's knowledge, might be asserted against the Company or any of its subsidiaries that might have a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise; and all tax liabilities are adequately provided for on the books of the Company and its subsidiaries.

(k) The Company and its subsidiaries maintain insurance with insurers of recognized financial responsibility of the types and in the amounts generally deemed adequate

<PAGE>

for their respective businesses and consistent with insurance coverage maintained by similar companies in similar businesses, including, but not limited to, insurance covering real and personal property owned or leased by the Company or its subsidiaries, against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, all of which insurance is in full force and effect; neither the Company nor any such subsidiary has been refused any insurance coverage sought or applied for; and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not materially and adversely affect the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise.

(l) To the best of Company's knowledge, no labor disturbance by the employees of the Company or any of its subsidiaries exists or is imminent; and the Company is not aware of any existing or imminent labor disturbance by the employees of any of its principal suppliers, subassemblers, value added resellers, subcontractors, original equipment manufacturers, authorized dealers, or international distributors that might be expected to result in a material adverse change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise. Except for with respect to the employees of AME, no collective bargaining agreement exists with any of the Company's or its subsidiaries' employees and, to the best of the Company's knowledge, no such agreement is imminent.

(m) Each of the Company and its subsidiaries owns or possesses adequate rights to use all patents, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names and copyrights which are necessary to conduct its businesses as described in the Registration Statement and Prospectus; the expiration of any patents, patent rights, trade secrets, trademarks, service marks, trade names or copyrights would not have a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise; the Company has not received any notice of, and has no knowledge

of, any infringement of or conflict with asserted rights of the Company by others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights; and the Company has not received any notice of, and has no knowledge of, any infringement of or conflict with asserted rights of others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, might have a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise.

(n) The Common Stock has been approved for quotation on The Nasdaq National Market, subject to official notice of issuance.

(o) The Company has been advised as to the provisions of the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations thereunder, and has in the past conducted, and intends in the future to conduct, its affairs in such

-8-

<PAGE>

a manner as to ensure that it will not become an "investment company" or a company "controlled" by an "investment company" within the meaning of the 1940 Act and such rules and regulations.

(p) The Company has not distributed and will not distribute prior to the later of (i) the Closing Date, or any date on which Option Shares are to be purchased, as the case may be, and (ii) completion of the distribution of the Shares, any offering material in connection with the offering and sale of the Shares other than any Preliminary Prospectuses, the Prospectus, the Registration Statement and other materials, if any, permitted by the Act.

(q) Neither the Company nor any of its subsidiaries has at any time during the last five (5) years (i) made any unlawful contribution to any candidate for foreign office or failed to disclose fully any contribution in violation of law, or (ii) made any payment to any federal or state governmental officer or official, or other person charged with similar public or quasi-public duties, other than payments required or permitted by the laws of the United States or any jurisdiction thereof.

(r) The Company has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

(s) Each officer and director of the Company, each Selling Shareholder and each beneficial owner shares of Common Stock as reflected on Exhibit A attached hereto has agreed in writing that such person will not, for a period of 180 days from the date that the Registration Statement is declared effective by the Commission (the "Lock-up Period"), offer to sell, contract to sell, or otherwise sell, dispose of, loan, pledge or grant any rights with respect to (collectively, a "Disposition") any shares of Common Stock, any options or warrants to purchase any shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock (collectively, "Securities") now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction has been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected

to lead to or result in a disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than such holder. Such prohibited hedging or other transactions would include, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person has also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction. The Company has provided to counsel for the Underwriters a complete and accurate list of all securityholders of the Company and the number

<PAGE>

and type of securities held by each securityholder. The Company has provided to counsel for the Underwriters true, accurate and complete copies of all of the agreements pursuant to which its officers, directors and shareholders have agreed to such or similar restrictions (the "Lock-up Agreements") presently in effect or effected hereby. The Company hereby represents and warrants that it will not release any of its officers, directors or other shareholders from any Lock-up Agreements currently existing or hereafter effected without the prior written consent of Robertson, Stephens & Company LLC.

(t) Except as set forth in the Registration Statement and Prospectus, (i) the Company is in compliance with all rules, laws and regulations relating to the use, treatment, storage and disposal of toxic substances and protection of health or the environment ("Environmental Laws") which are applicable to its business, (ii) the Company has received no notice from any governmental authority or third party of an asserted claim under Environmental Laws, which claim is required to be disclosed in the Registration Statement and the Prospectus, (iii) the Company will not be required to make future material capital expenditures to comply with Environmental Laws and (iv) no property which is owned, leased or occupied by the Company has been designated as a Superfund site pursuant to the Comprehensive Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. (S) 9601, _et seq._), or otherwise designated as a contaminated site under applicable state or local law.

(u) The Company and each of its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(v) There are no outstanding loans, advances (except normal advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company to or for the benefit of any of the officers or directors of the Company or any of the members of the families of any of them, except as disclosed in the Registration Statement and the Prospectus.

(w) [IF ANY SHARES ARE TO BE SOLD TO RETAIL INVESTORS IN FLORIDA: The Company has complied with all provisions of Section 517.075, Florida Statutes relating to doing business with the Government of Cuba or with any person or affiliate located in Cuba.]

3. _Representations and Warranties of the Selling Shareholders._ Each

Selling Shareholder, severally and not jointly, represents and warrants to and agrees with each Underwriter and the Company that:

(a) Such Selling Shareholder now has and on the Closing Date, and on any later date on which Option Shares are purchased, will have, valid marketable title to the Shares to be sold by such Selling Shareholder, free and clear of any pledge, lien, security interest,

-10-

<PAGE>

encumbrance, claim or equitable interest other than pursuant to this Agreement; and upon delivery of such Shares hereunder and payment of the purchase price as herein contemplated, each of the Underwriters will obtain valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest pertaining to such Selling Shareholder or such Selling Shareholder's property, encumbrance, claim or equitable interest, including any liability for estate or inheritance taxes, or any liability to or claims of any creditor, devisee, legatee or beneficiary of such Selling Shareholder.

(b) Such Selling Shareholder has duly authorized (if applicable) executed and delivered, in form heretofore furnished to the Representatives, an Irrevocable Custody Agreement and Power of Attorney (the "Power of Attorney and Custody Agreement") appointing Deepak Chopra as attorney-in-fact (the "Attorney") with Deepak Chopra as custodian (the "Custodian"); each Power of Attorney and Custody Agreement constitutes a valid and binding agreement on the part of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and each of such Selling Shareholders' Attorney, acting alone, is authorized to execute and deliver this Agreement and the certificate referred to in Section 7(h) hereof on behalf of such Selling Shareholder, to determine the purchase price to be paid by the several Underwriters to such Selling Shareholder as provided in Section 4 hereof, to authorize the delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement and to duly endorse (in blank or otherwise) the certificate or certificates representing such Shares or a stock power or powers with respect thereto, to accept payment therefor, and otherwise to act on behalf of such Selling Shareholder in connection with this Agreement.

(c) All consents, approvals, authorizations and orders required for the execution and delivery by such Selling Shareholder of the Power of Attorney and Custody Agreement, the execution and delivery by or on behalf of such Selling Shareholder of this Agreement and the sale and delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement (other than, at the time of the execution hereof (if the Registration Statement has not yet been declared effective by the Commission), the issuance of the order of the Commission declaring the Registration Statement effective and such consents, approvals, authorizations or orders as may be necessary under state or other securities or Blue Sky laws) have been obtained and are in full force and effect; such Selling Shareholder, if other than a natural person, has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be; and such Selling Shareholder has full legal right, power and authority to enter into and perform its obligations under this Agreement and such Power of Attorney and Custody Agreement, and to sell, assign, transfer and deliver the Shares to be sold by such Selling Shareholder under this Agreement.

(d) Such Selling Shareholder will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such Selling Shareholder or with respect to which such Selling Shareholder has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof

<PAGE>

agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such Selling Shareholder, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction is expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the Selling Shareholder. Such prohibited hedging or other transactions would including, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Such Selling Shareholder also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the securities held by such Selling Shareholder except in compliance with this restriction.

(e) Certificates in negotiable form for all Shares to be sold by such Selling Shareholder under this Agreement, together with a stock power or powers duly endorsed in blank by such Selling Shareholder, have been placed in custody with the Custodian for the purpose of effecting delivery hereunder.

(f) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of such Selling Shareholder and is a valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a breach or violation of any of the terms and provisions of or constitute a default under any bond, debenture, note or other evidence of indebtedness, or under any lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which such Selling Shareholder is a party or by which such Selling Shareholder, or any Selling Shareholder Shares or any Option Shares to be sold by such Selling Shareholder hereunder, may be bound or, to the best of such Selling shareholders' knowledge, result in any violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over such Selling Shareholder or over the properties of such Selling Shareholder, or, if such Selling Shareholder is other than a natural person, result in any violation of any provisions of the charter, bylaws or other organizational documents of such Selling Shareholder.

(g) Such Selling Shareholder has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

-12-

<PAGE>

(h) Such Selling Shareholder has not distributed and will not distribute any prospectus or other offering material in connection with the offering and sale of the Shares.

(i) All information furnished by or on behalf of such Selling

Shareholder relating to such Selling Shareholder and the Selling Shareholder Shares that is contained in the representations and warranties of such Selling Shareholder in such Selling Shareholder's Power of Attorney and Custody Agreement or set forth in the Registration Statement or the Prospectus is, and at the time the Registration Statement became or becomes, as the case may be, effective, and at all times subsequent thereto through the Closing Date, and on any later date on which Option Shares are to be purchased, was or will be, true, correct and complete, and does not, and at the time the Registration Statement became or becomes, as the case may be, effective and at all times subsequent thereto through the Closing Date (hereinafter defined), and on any later date on which Option Shares are to be purchased, will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make such information not misleading.

(j) Such Selling Shareholder will review the Prospectus and will comply with all agreements and satisfy all conditions on its part to be complied with or satisfied pursuant to this Agreement on or prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, and will advise its Attorney and Robertson, Stephens & Company LLC prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, if any statement to be made on behalf of such Selling Shareholder in the certificate contemplated by Section 7(h) would be inaccurate if made as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be.

(k) Such Selling Shareholder does not have, or has waived prior to the date hereof, any preemptive right, co-sale right or right of first refusal or other similar right, in order to purchase any of the Shares that are to be sold by the Company or any of the other Selling Shareholders to the Underwriters pursuant to this Agreement; such Selling Shareholder does not have, or has waived prior to the date hereof, any registration right or other similar right, in order to participate in the offering made by the Prospectus, other than such rights of participation as have been satisfied by the participation of such Selling Shareholder in the transactions to which this Agreement relates in accordance with the terms of this Agreement; and such Selling Shareholder does not own any warrants, options or similar rights to acquire, and does not have any right or arrangement to acquire, any capital stock, rights, warrants, options or other securities from the Company, other than those described in the Registration Statement and the Prospectus.

(l) Such Selling Shareholder is not aware (with respect to Selling Shareholders who are not officers or directors of the Company, without having conducted any investigation or inquiry) that any of the representations and warranties of the Company set forth in Section 2 above is untrue or inaccurate in any material respect.

<PAGE>

4. Purchase, Sale and Delivery of Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Company and the Selling Shareholders agree, severally and not jointly, to sell to the Underwriters, and each Underwriter agrees, severally and not jointly, to purchase from the Company and the Selling Shareholders, respectively, at a purchase price of $______ per share, the respective number of Company Shares as hereinafter set forth and Selling Shareholder Shares set forth opposite the names of the Selling Shareholders in Schedule B hereto. The obligation of each Underwriter to the Company and to each Selling Shareholder shall be to purchase from the Company and such Selling Shareholder that number of Company Shares or Selling Shareholder Shares, as the case may be, which (as nearly as practicable, as determined by you) is in the same proportion to the number of Company Shares or Selling Shareholder Shares, as the case may be, set forth opposite the name

of the Company or such Selling Shareholder in Schedule B hereto as the number of Firm Shares which is set forth opposite the name of such Underwriter in Schedule A hereto (subject to adjustment as provided in Section 11) is to the total number of Firm Shares to be purchased by all the Underwriters under this Agreement.

(b) The certificates in negotiable form for the Selling Shareholder Shares have been placed in custody (for delivery under this Agreement) under the Custody Agreement. Each Selling Shareholder agrees that the certificates for the Selling Shareholder Shares of such Selling Shareholder so held in custody are subject to the interests of the Underwriters hereunder, that the arrangements made by such Selling Shareholder for such custody, including the Power of Attorney, is to that extent irrevocable and that the obligations of such Selling Shareholder hereunder shall not be terminated by the act of such Selling Shareholder or by operation of law, whether by the death or incapacity of such Selling Shareholder or the occurrence of any other event, except as specifically provided herein or in the Custody Agreement. If any Selling Shareholder should die or be incapacitated, or if any other such event should occur before the delivery of the certificates for the Selling Shareholder Shares hereunder, the Selling Shareholder Shares to be sold by such Selling Shareholder shall, except as specifically provided herein or in the Custody Agreement, be delivered by the Custodian in accordance with the terms and conditions of this Agreement as if such death, incapacity or other event had not occurred, regardless of whether the Custodian shall have received notice of such death or other event.

(c) Delivery of definitive certificates for the Firm Shares to be purchased by the Underwriters pursuant to this Section 4 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Company with regard to the Shares being purchased from the Company, and to the order of the Custodian for the respective accounts of the Selling Shareholders with regard to the Shares being purchased from such Selling Shareholders (and the Company and such Selling Shareholders agree not to deposit and to cause the Custodian not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Company or the Custodian, as the case may be, and, in the event of any breach of the foregoing, the Company or the Selling Shareholders,

<PAGE>

as the case may be, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach), at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067 (or at such other place as may be agreed upon among the Representatives and the Company and the Attorneys), at 7:00 A.M., San Francisco time (a) on the third (3rd) full business day following the first day that Shares are traded, (b) if this Agreement is executed and delivered after 1:30 P.M., San Francisco time, the fourth (4th) full business day following the day that this Agreement is executed and delivered or (c) at such other time and date not later than seven (7) full business days following the first day that Shares are traded as the Representatives and the Company and the Attorneys may determine (or at such time and date to which payment and delivery shall have been postponed pursuant to Section 11 hereof), such time and date of payment and delivery being herein called the "Closing Date;" provided, however, that if the Company has not made available to the Representatives copies of the Prospectus within the time provided in Section 5(d) hereof, the Representatives may, in their sole discretion, postpone the Closing Date until no later than two (2) full business days following delivery of copies of the Prospectus to the Representatives. The certificates for the Firm Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request, at least one (1) full

business day prior to the Closing Date and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to the Closing Date. If the Representatives so elect, delivery of the Firm Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

(d) It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been received by you prior to the Closing Date for the Firm Shares to be purchased by such Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters of any of its or their obligations hereunder.

(e) After the Registration Statement is declared effective, the several Underwriters intend to make an initial public offering (as such term is described in Section 12 hereof) of the Firm Shares at an initial public offering price of $_____ per share. After the initial public offering, the several Underwriters may, in their discretion, vary the public offering price.

(f) The information set forth in the last paragraph on the front cover page (insofar as such information relates to the Underwriters), on the inside front cover concerning stabilization and over-allotment by the Underwriters, and under the ____ and ____ paragraphs under the caption "Underwriting" in any Preliminary Prospectus and in the Prospectus constitutes the only information furnished by the Underwriters to the Company for inclusion in any Preliminary Prospectus, the Prospectus or the Registration Statement, and you, on behalf of the respective Underwriters, represent and warrant to the Company and the Selling Shareholders that the statements made therein do not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

<PAGE>

5. Further Agreements of the Company. The Company agrees with the several Underwriters that:

(a) The Company will use its best efforts to cause the Registration Statement and any amendment thereof, if not effective at the time and date that this Agreement is executed and delivered by the parties hereto, to become effective as promptly as possible; the Company will use its best efforts to cause any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations as may be required subsequent to the date the Registration Statement is declared effective to become effective as promptly as possible; the Company will notify you, promptly after it shall receive notice thereof, of the time when the Registration Statement, any subsequent amendment to the Registration Statement or any abbreviated registration statement, has become effective or any supplement to the Prospectus has been filed; if the Company omitted information from the Registration Statement at the time it was originally declared effective in reliance upon Rule 430A(a) of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed, within the time period prescribed, with the Commission pursuant to subparagraph (1) or (4) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to such Registration Statement as originally declared effective which is declared effective by the Commission; if the Company files a term sheet pursuant to Rule 434 of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus and term sheet meeting the requirements of Rule 434(b) or (c) of the Rules and Regulations, as applicable, have been filed, within the time period prescribed, with the Commission pursuant to subparagraph (7) of Rule 424(b) of the Rules and Regulations; if for any reason the filing of the final form of Prospectus is required under Rule 424(b)(3) of the Rules and

Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed with the Commission within the time period prescribed; the Company will notify you promptly of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; promptly upon your request, the Company will prepare and file with the Commission any amendments or supplements to the Registration Statement or Prospectus which, in the opinion of counsel for the several Underwriters ("Underwriters' Counsel"), may be necessary or advisable in connection with the distribution of the Shares by the Underwriters; the Company will promptly prepare and file with the Commission, and promptly notify you of the filing of, any amendments or supplements to the Registration Statement or Prospectus which may be necessary to correct any statements or omissions, if, at any time when a prospectus relating to the Shares is required to be delivered under the Act, any event shall have occurred as a result of which the Prospectus or any other prospectus relating to the Shares as then in effect would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; in the event that any Underwriter is required to deliver a prospectus nine (9) months or more after the effective date of the Registration Statement in connection with the sale of the Shares, the Company will prepare promptly upon request, but at the expense of such Underwriter, such amendment or amendments to the Registration Statement and such prospectus or prospectuses as may be necessary to permit compliance with the requirements of Section 10(a)(3) of the Act; and the Company will file no amendment or supplement to the Registration Statement or Prospectus which shall not previously have been submitted to you a reasonable time prior to the proposed filing thereof or to which you

<PAGE>

shall reasonably object in writing, subject, however, to compliance with the Act and the Rules and Regulations and the provisions of this Agreement.

(b) The Company will advise you, promptly after it shall receive notice or obtain knowledge, of the issuance of any stop order by the Commission suspending the effectiveness of the Registration Statement or of the initiation or threat of any proceeding for that purpose; and it will promptly use its best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(c) The Company will use its best efforts to qualify the Shares for offering and sale under the securities laws of such jurisdictions as you may designate and to continue the effectiveness of such qualifications for so long as may be required for purposes of the distribution of the Shares, except that the Company shall not be required in connection therewith, or as a condition thereof, to qualify as a foreign corporation or to execute a general consent to service of process in any jurisdiction in which it is not otherwise required to be so qualified or to so execute a general consent to service of process. In each jurisdiction in which the Shares shall have been qualified as above provided, the Company will make and file such statements and reports in each year as are or may be required by the laws of such jurisdiction.

(d) The Company will furnish to you, as soon as available, and, in the case of the Prospectus and any term sheet or abbreviated term sheet under Rule 434, in no event later than the first (1st) full business day following the first day that Shares are traded, copies of the Registration Statement (three of which will be signed and which will include all exhibits), each Preliminary Prospectus, the Prospectus and any amendments or supplements to such documents, including any prospectus prepared to permit compliance with Section 10(a)(3) of the Act, all in such quantities as you may from time to time reasonably request. Notwithstanding the foregoing, if Robertson, Stephens & Company LLC, on behalf of the several Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the Company shall provide to you copies of a Preliminary Prospectus updated in all respects through the date specified by you, in such

        quantities as you may from time to time reasonably request.

(e) The Company will make generally available to its securityholders as soon as practicable, but in no event later than the forty-fifth (45th) day following the end of the fiscal quarter first occurring after the first anniversary of the effective date of the Registration Statement, an earnings statement (which will be in reasonable detail but need not be audited) complying with the provisions of Section 11(a) of the Act and covering a twelve (12) month period beginning after the effective date of the Registration Statement.

(f) During a period of five (5) years after the date hereof, the Company will furnish to its shareholders as soon as practicable after the end of each respective period, annual reports (including financial statements audited by independent certified public accountants) and unaudited quarterly reports of operations for each of the first three quarters of the fiscal year, and will furnish to you and the other several Underwriters hereunder, upon request (i) concurrently with furnishing such reports to its shareholders, statements of operations of the Company for each of the first three (3) quarters in the form furnished to the Company's shareholders, (ii) concurrently with furnishing to its shareholders, a balance sheet of the Company

-17-

<PAGE>

as of the end of such fiscal year, together with statements of operations, of shareholders' equity, and of cash flows of the Company for such fiscal year, accompanied by a copy of the certificate or report thereon of independent certified public accountants, (iii) as soon as they are available, copies of all reports (financial or other) mailed to shareholders, (iv) as soon as they are available, copies of all reports and financial statements furnished to or filed with the Commission, any securities exchange or the National Association of Securities Dealers, Inc. ("NASD"), (v) every material press release and every material news item or article in respect of the Company or its affairs which was generally released to shareholders or prepared by the Company or any of its subsidiaries, and (vi) any additional information of a public nature concerning the Company or its subsidiaries, or its business which you may reasonably request. During such five (5) year period, if the Company shall have active subsidiaries, the foregoing financial statements shall be on a consolidated basis to the extent that the accounts of the Company and its subsidiaries are consolidated, and shall be accompanied by similar financial statements for any significant subsidiary which is not so consolidated.

(g) The Company will apply the net proceeds from the sale of the Shares being sold by it in the manner set forth under the caption "Use of Proceeds" in the Prospectus.

(h) The Company will maintain a transfer agent and, if necessary under the jurisdiction of incorporation of the Company, a registrar (which may be the same entity as the transfer agent) for its Common Stock.

(i) The Company will file Form SR in conformity with the requirements of the Act and Rule 463 of the Rules and Regulations.

(j) If the transactions contemplated hereby are not consummated by reason of any failure, refusal or inability on the part of the Company or any Selling Shareholder to perform any agreement on their respective parts to be performed hereunder, or to fulfill any condition of the Underwriters' obligations hereunder, or if the Company shall terminate this Agreement pursuant to Section 12(a) hereof, or if the Underwriters shall terminate this Agreement pursuant to Section 12(b)(i), the Company will reimburse the several Underwriters for all out-of-pocket expenses (including fees and disbursements of Underwriters' Counsel) incurred by the Underwriters in investigating, or preparing to market, or marketing the Shares.

(k) If at any time during the ninety (90) day period after the

Registration Statement becomes effective, any rumor, publication or event relating to or affecting the Company shall occur as a result of which in your opinion the market price of the Common Stock has been or is likely to be materially affected (regardless of whether such rumor, publication or event necessitates a supplement to, or amendment of, the Prospectus), the Company will, after written notice from you advising the Company to the effect set forth above, forthwith prepare, consult with you concerning the substance of and disseminate a press release or other public statement, reasonably satisfactory to you, responding to or commenting on such rumor, publication or event.

-18-

<PAGE>

(l) During the Lock-up Period, the Company will not, without the prior written consent of Robertson Stephens & Company LLC, effect the Disposition of, directly or indirectly, any Securities other than the sale of the Company Shares and the Company's issuance of options or Common Stock under the Company's presently authorized __________ (the "Option Plan").

(m) During a period of ninety (90) days from the effective date of the Registration Statement, the Company will not file a registration statement registering the offer and sale of shares under the Option Plan or any other employee benefit plan.

6. Expenses.

(a) The Company and the Selling Shareholders agree with each Underwriter that:

(i) The Company and the Selling Shareholders will pay and bear all costs and expenses in connection with the preparation, printing and filing of the Registration Statement (including financial statements, schedules and exhibits), Preliminary Prospectuses and the Prospectus and any amendments or supplements thereto; the printing of this Agreement, the Agreement Among Underwriters, the Selected Dealer Agreement, the Preliminary Blue Sky Survey and any Supplemental Blue Sky Survey, the Underwriters' Questionnaire and Power of Attorney, and any instruments related to any of the foregoing; the issuance and delivery of the Shares hereunder to the several Underwriters, including transfer taxes, if any, the cost of all certificates representing the Shares and transfer agents' and registrars' fees; the fees and disbursements of counsel for the Company; all fees and other charges of the Company's independent public accountants; the cost of furnishing to the several Underwriters copies of the Registration Statement (including appropriate exhibits), Preliminary Prospectus and the Prospectus, and any amendments or supplements to any of the foregoing; NASD filing fees and the cost of qualifying the Shares under the laws of such jurisdictions as you may designate (including filing fees and fees and disbursements of Underwriters' Counsel in connection with such NASD filings and Blue Sky qualifications); and all other expenses directly incurred by the Company and the Selling Shareholders in connection with the performance of their obligations hereunder. Any additional expenses incurred as a result of the sale of the Shares by the Selling Shareholders will be borne collectively by the Company and the Selling Shareholders. The provisions of this Section 6(a)(i) are intended to relieve the Underwriters from the payment of the expenses and costs which the Selling Shareholders and the Company hereby agree to pay, but shall not affect any agreement which the Selling Shareholders and the Company may make, or may have made, for the sharing of any of such expenses and costs. Such agreements shall not impair the obligations of the Company and the Selling Shareholders hereunder to the several Underwriters.

(ii) In addition to its other obligations under Section 9(a) hereof, the Company agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described

in Section 9(a) hereof, it will reimburse the Underwriters on a monthly basis for all reasonable legal or other expenses

<PAGE>

incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Company's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Company together with interest, compounded daily, determined on the basis of the prime rate (or other commercial lending rate for borrowers of the highest credit standing) set forth from time to time in The Wall Street Journal which represents the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's thirty (30) largest banks (the "Prime Rate"). Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(iii) In addition to their other obligations under Section 9(b) hereof, each Selling Shareholder agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(b) hereof relating to such Selling Shareholder, it will reimburse the Underwriters on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of such Selling Shareholder's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Selling Shareholders, together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(b) In addition to their other obligations under Section 9(c) hereof, the Underwriters severally and not jointly agree that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(c) hereof, they will reimburse the Company and each Selling Shareholder on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Underwriters' obligation to reimburse the Company and each such Selling Shareholder for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Company and each such Selling Shareholder shall promptly return such payment to the Underwriters together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Company and each such Selling Shareholder within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

<PAGE>

(2) It is agreed that any controversy arising out of the operation of the interim reimbursement arrangements set forth in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof, including the amounts of any requested reimbursement payments, the method of determining such amounts and the basis on which such amounts shall be apportioned among the reimbursing parties, shall be settled by arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the NASD. Any such arbitration must be commenced by service of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the party demanding arbitration does not make such designation of an arbitration tribunal in such demand or notice, then the party responding to said demand or notice is authorized to do so. Any such arbitration will be limited to the operation of the interim reimbursement provisions contained in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof and will not resolve the ultimate propriety or enforceability of the obligation to indemnify for expenses which is created by the provisions of Sections 9(a), 9(b) and 9(c) hereof or the obligation to contribute to expenses which is created by the provisions of Section 9(e) hereof.

7. Conditions of Underwriters' Obligations. The obligations of the several Underwriters to purchase and pay for the Shares as provided herein shall be subject to the accuracy, as of the date hereof and the Closing Date and any later date on which Option Shares are to be purchased, as the case may be, of the representations and warranties of the Company and the Selling Shareholders herein, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and to the following additional conditions:

(a) The Registration Statement shall have become effective not later than 2:00 P.M., San Francisco time, on the date following the date of this Agreement, or such later date as shall be consented to in writing by you; and no stop order suspending the effectiveness thereof shall have been issued and no proceedings for that purpose shall have been initiated or, to the knowledge of the Company, any Selling Shareholder or any Underwriter, threatened by the Commission, and any request of the Commission for additional information (to be included in the Registration Statement or the Prospectus or otherwise) shall have been complied with to the satisfaction of Underwriters' Counsel.

(b) All corporate proceedings and other legal matters in connection with this Agreement, the form of Registration Statement and the Prospectus, and the registration, authorization, issue, sale and delivery of the Shares, shall have been reasonably satisfactory to Underwriters' Counsel, and such counsel shall have been furnished with such papers and information as they may reasonably have requested to enable them to pass upon the matters referred to in this Section.

(c) Subsequent to the execution and delivery of this Agreement and prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, there shall not have been any change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your sole judgment, is material and adverse and that makes it, in your sole judgment,

<PAGE>

impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus.

(d) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, the following opinion of counsel for the Company and the Selling Shareholders, dated the Closing Date or such later date on which Option Shares are to be purchased addressed to the Underwriters and with reproduced copies or signed counterparts

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 121 of 2711

thereof for each of the Underwriters, to the effect that:

(i) The Company and each Significant Subsidiary (as that term is defined in Regulation S-X promulgated under the Act) has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation;

(ii) The Company and each Significant Subsidiary has the corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Prospectus;

(iii) The Company and each Significant Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction, if any, in which the ownership or leasing of its properties or the conduct of its business requires such qualification, except where the failure to be so qualified or be in good standing would not have a material adverse effect on the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise. To such counsel's knowledge, the Company does not own or control, directly or indirectly, any corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., Rapiscan Security Products Limited, Ferson Optics, Inc., UDT Sensors, Inc., [Ecil Rapiscan Security Products Limited], AME, Opto Sensors (Singapore) Pte Ltd, Opto Sensors (Malaysia) Sdn. Bhd., [OSI Electronics and Rapiscan Consortium (M) Sdn. Bhd.];

(iv) The authorized, issued and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization" as of the dates stated therein, the issued and outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right;

(v) All issued and outstanding shares of capital stock of each Significant Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right and are owned

<PAGE>

by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest;

(vi) The Firm Shares to be issued by the Company and the Firm Shares and Option Shares to be purchased from the Selling Shareholders pursuant to the terms of this Agreement have been duly authorized and, upon issuance and delivery against payment therefor in accordance with the terms hereof, will be duly and validly issued and fully paid and nonassessable, and will not have been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right.

(vii) The Company has the corporate power and authority to enter into this Agreement and to issue, sell and deliver to the Underwriters the Shares to be issued and sold by it hereunder;

(viii) This Agreement has been duly authorized by all necessary corporate action on the part of the Company and has been

duly executed and delivered by the Company and, assuming due authorization, execution and delivery by you, is a valid and binding agreement of the Company, enforceable in accordance with its terms, except insofar as indemnification provisions may be limited by applicable law and except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(ix) The Registration Statement has become effective under the Act and, to such counsel's knowledge, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or threatened under the Act;

(x) The Registration Statement and the Prospectus, and each amendment or supplement thereto (other than the financial statements (including supporting schedules) and financial data derived therefrom as to which such counsel need express no opinion), as of the effective date of the Registration Statement, complied as to form in all material respects with the requirements of the Act and the applicable Rules and Regulations;

(xi) The information in the Prospectus under the caption "Description of Capital Stock," to the extent that it constitutes matters of law or legal conclusions, has been reviewed by such counsel and is a fair summary of such matters and conclusions; and the forms of certificates evidencing the Common Stock and filed as exhibits to the Registration Statement comply with California law;

(xii) The description in the Registration Statement and the Prospectus of the charter and bylaws of the Company and of statutes are accurate

<PAGE>

and fairly present the information required to be presented by the Act and the applicable Rules and Regulations;

(xiii) To such counsel's knowledge, there are no agreements, contracts, leases or documents to which the Company is a party of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement which are not described or referred to therein or filed as required;

(xiv) The performance of this Agreement and the consummation of the transactions herein contemplated (other than performance of the Company's indemnification obligations hereunder, concerning which no opinion need be expressed) will not (a) result in any violation of the Company's charter or bylaws or (b) to such counsel's knowledge, result in a material breach or violation of any of the terms and provisions of, or constitute a default under, any bond, debenture, note or other evidence of indebtedness, or any lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument known to such counsel to which the Company is a party or by which its properties are bound, or any applicable statute, rule or regulation known to such counsel or, to such counsel's knowledge, any order, writ or decree of any court, government or governmental agency or body having jurisdiction over the Company or any of its subsidiaries, or over any of their properties or operations;

(xv) No consent, approval, authorization or order of or

qualification with any court, government or governmental agency or body having jurisdiction over the Company or any of its subsidiaries, or over any of their properties or operations is necessary in connection with the consummation by the Company of the transactions herein contemplated, except such as have been obtained under the Act or such as may be required under state or other securities or Blue Sky laws in connection with the purchase and the distribution of the Shares by the Underwriters;

(xvi) To such counsel's knowledge, there are no legal or governmental proceedings pending or threatened against the Company, or any of its subsidiaries, of a character required to be disclosed in the Registration Statement or the Prospectus by the Act or the Rules and Regulations other than those described therein;

(xvii) To such counsel's knowledge, neither the Company nor any of its subsidiaries is presently (a) in material violation of its respective charter or bylaws, or (b) in material breach of any applicable statute, rule or regulation known to such counsel or, to such counsel's knowledge, any order, writ or decree of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries, or over any of their properties or operations;

<PAGE>

(xviii) To such counsel's knowledge, except as set forth in the Registration Statement and Prospectus, no holders of Common Stock or other securities of the Company have registration rights with respect to the offer and sale of any securities of the Company and, except as set forth in the Registration Statement and Prospectus, all prior holders of such registration rights have waived such rights or such rights have expired by reason of lapse of time following notification of the Company's intent to file the Registration Statement or have included securities in the Registration Statement pursuant to the exercise, and in full satisfaction, of such rights;

(xix) Each Selling Shareholder which is not a natural person has full right, power and authority to enter into and to perform its obligations under the Power of Attorney and Custody Agreement to be executed and delivered by it in connection with the transactions contemplated herein; the Power of Attorney and Custody Agreement of each Selling Shareholder that is not a natural person has been duly authorized by all necessary action on the part of such Selling Shareholder; the Power of Attorney and Custody Agreement of each Selling Shareholder has been duly executed and delivered by or on behalf of such Selling Shareholder; and the Power of Attorney and Custody Agreement of each Selling Shareholder constitutes the valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(xx) Each of the Selling Shareholders has full right, power and authority to enter into and to perform its obligations under this Agreement and to sell, transfer, assign and deliver the Shares to be sold by such Selling Shareholder hereunder;

(xxi) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of each Selling Shareholder; and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 124 of 2711

(xxvii) Upon the delivery of, and payment for, the Shares as contemplated by this Agreement, each of the Underwriters will receive valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest. In rendering such opinion, such counsel may assume that the Underwriters are without notice of any defect in the title of the Shares being purchased from the Selling Shareholders.

In addition, such counsel shall state that such counsel has participated in conferences with officials and other representatives of the Company, the Representatives, Underwriters' Counsel and the independent certified public accountants of the Company, at which conferences the contents of the Registration Statement and Prospectus and related matters were

-25-

<PAGE>

discussed, and although they have not verified the accuracy or completeness of the statements contained in the Registration Statement or the Prospectus, nothing has come to the attention of such counsel which leads them to believe that, at the time the Registration Statement became effective and at all times subsequent thereto up to and on the Closing Date and on any later date on which Option Shares are to be purchased, the Registration Statement and any amendment or supplement thereto (other than the financial statements, including supporting schedules and other financial and statistical information derived therefrom, as to which such counsel need express no comment) contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or at the Closing Date or any later date on which the Option Shares are to be purchased, as the case may be, the Registration Statement, the Prospectus and any amendment or supplement thereto (except as aforesaid) contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Counsel rendering the foregoing opinion may rely as to questions of law not involving the laws of the United States or the State of California upon opinions of local counsel, and as to questions of fact upon representations or certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person), and of government officials, in which case their opinion is to state that they are so relying and that they have no knowledge of any material misstatement or inaccuracy in any such opinion, representation or certificate. Copies of any opinion, representation or certificate so relied upon shall be delivered to you, as Representatives of the Underwriters, and to Underwriters' Counsel.

(e) You shall have received on the Closing Date and on any later date on which Option Shares to be purchased, as the case may be, an opinion of Jones, Day, Reavis & Pogue, in form and substance satisfactory to you, with respect to the sufficiency of all such corporate proceedings and other legal matters relating to this Agreement and the transactions contemplated hereby as you may reasonably require, and the Company shall have furnished to such counsel such documents as they may have requested for the purpose of enabling them to pass upon such matters.

(f) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a letter from Deloitte & Touche LLP addressed to the Underwriters, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, confirming that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations and based upon the procedures described in such letter delivered to you concurrently with the execution of this Agreement (herein called the "Original Letter"), but carried out to a date not more than five (5) business

days prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, (i) confirming, to the extent true, that the statements and conclusions set forth in the Original Letter are accurate as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, and (ii) setting forth any revisions and additions to the statements and conclusions set forth in the Original Letter which are necessary to reflect any changes in the facts described in the

<PAGE>

Original Letter since the date of such letter, or to reflect the availability of more recent financial statements, data or information. The letter shall not disclose any change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your sole judgment, is material and adverse and that makes it, in your sole judgment, impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus. The Original Letter from Deloitte & Touche LLP shall be addressed to or for the use of the Underwriters in form and substance satisfactory to the Underwriters and shall (i) represent, to the extent true, that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations, (ii) set forth their opinion with respect to their examination of the consolidated balance sheet of the Company at June 30, 1996 and 1995 and March 31, 1997 and related consolidated statements of operations, shareholders' equity, and cash flows for the twelve (12) months ended June 30, 1996, 1995 and 1994 and the nine (9) months ended March 31, 1997, [(iii) state that Deloitte & Touche LLP has performed the procedures set out in Statement on Auditing Standards No. 71 ("SAS 71") for a review of interim financial information and providing the report of Deloitte & Touche LLP, as described in SAS 71 on the financial statements for each of the quarters in the three-quarter period ended March 31, 1997 (the "Quarterly Financial Statements"),] (iv) state that in the course of such review, nothing came to their attention that leads them to believe that any material modifications need to be made to any of the Quarterly Financial Statements in order for them to be in compliance with generally accepted accounting principles consistently applied across the periods presented, and (v) address other matters agreed upon by Deloitte & Touche LLP and you. In addition, you shall have received from Deloitte & Touche LLP a letter addressed to the Company and made available to you for the use of the Underwriters stating that their review of the Company's system of internal accounting controls, to the extent they deemed necessary in establishing the scope of their examination of the Company's consolidated financial statements at June 30, 1996 and 1995 and March 31, 1997, did not disclose any weaknesses in internal controls that they considered to be material weaknesses.

(g) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a certificate of the Company, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, signed by the Chief Executive Officer and Chief Financial Officer of the Company, to the effect that, and you shall be satisfied that:

(i) The representations and warranties of the Company in this Agreement are true and correct, as if made on and as of the Closing Date or any later date on which Option Shares are to be purchased, as the case may be, and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be;

(ii) No stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or threatened under the

-27-

<PAGE>

       (iii) When the Registration Statement became effective and at all times subsequent thereto up to the delivery of such certificate, the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained all material information required to be included therein by the Act and the Rules and Regulations and in all material respects conformed to the requirements of the Act and the Rules and Regulations, the Registration Statement, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, the Prospectus, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and, since the effective date of the Registration Statement, there has occurred no event required to be set forth in an amended or supplemented Prospectus which has not been so set forth; and

       (iv) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (a) any material adverse change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise, (b) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (c) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (d) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (e) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (f) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a material adverse effect on the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise.

   (h) You shall be satisfied that, and you shall have received a certificate, dated the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, from the Attorney for each Selling Shareholder to the effect that, as of the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, they have not been informed that:

       (i) The representations and warranties made by such Selling Shareholder herein are not true or correct in any material respect on the Closing Date or on any later date on which Option Shares are to be purchased, as the case may be; or

-28-

<PAGE>

       (ii) Such Selling Shareholder has not complied with any obligation or satisfied any condition which is required to be performed or satisfied on the part of such Selling Shareholder at or

prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be.

(i) The Company shall have obtained and delivered to you an agreement from each officer and director of the Company, each Selling Shareholder and each beneficial owner of shares of Common Stock as reflected on Exhibit A attached hereto in writing prior to the date hereof that such person will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction shall have been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the such holder. Such prohibited hedging or other transactions would including, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person will have also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction.

(j) The Company and the Selling Shareholders shall have furnished to you such further certificates and documents as you shall reasonably request (including certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person) as to the accuracy of the representations and warranties of the Company and the Selling Shareholders herein, as to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and as to the other conditions concurrent and precedent to the obligations of the Underwriters hereunder.

All such opinions, certificates, letters and documents will be in compliance with the provisions hereof only if they are reasonably satisfactory to Underwriters' Counsel. The Company and the Selling Shareholders will furnish you with such number of conformed copies of such opinions, certificates, letters and documents as you shall reasonably request.

8. Option Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Selling Shareholders set forth on Schedule C hereto hereby grant to the several Underwriters, for the purpose of covering

<PAGE>

over-allotments in connection with the distribution and sale of the Firm Shares only, a nontransferable option to purchase up to an aggregate of 555,000 Option Shares at the purchase price per share for the Firm Shares set forth in Section 4 hereof. The number of Option Shares to be purchased from each Selling Shareholder listed on Schedule C shall be in the same proportion that the number of shares listed across from each such Selling Shareholder's name bears to the total number of Shares listed on Schedule C. Such option may be exercised by the Representatives on behalf of the several Underwriters on one (1) or more occasions in whole or in part during the period of thirty (30) days after the

date on which the Firm Shares are initially offered to the public, by giving written notice to the Company and the Custodian. The number of Option Shares to be purchased by each Underwriter from each of such Selling Shareholders set forth on Schedule C upon the exercise of such option shall be in the same proportion as the number of Firm Shares purchased by such Underwriter (set forth in Schedule A hereto) bears to the total number of Firm Shares purchased by the several Underwriters (set forth in Schedule A hereto), adjusted by the Representatives in such manner as to avoid fractional shares.

Delivery of definitive certificates for the Option Shares to be purchased by the several Underwriters pursuant to the exercise of the option granted by this Section 8 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Custodian (and the Custodian agrees not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Custodian). In the event of any breach of the foregoing, the Selling Stockholders set forth on Schedule C, severally and not jointly, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach. Such delivery and payment shall take place at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067, or at such other place as may be agreed upon among the Representatives, the Company and the Custodian (i) on the Closing Date, if written notice of the exercise of such option is received by the Company and the Custodian at least two (2) full business days prior to the Closing Date, or (ii) on a date which shall not be later than the third (3rd) full business day following the date the Company and Custodian receive written notice of the exercise of such option, if such notice is received by the Company and Custodian less than two (2) full business days prior to the Closing Date.

The certificates for the Option Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request at least one (1) full business day prior to the date of payment and delivery and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to such date of payment and delivery. If the Representatives so elect, delivery of the Option Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been

<PAGE>

received by you prior to the date of payment and delivery for the Option Shares to be purchased by such Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters of any of its or their obligations hereunder.

(b) Upon exercise of any option provided for in Section 8(a) hereof, the obligations of the several Underwriters to purchase such Option Shares will be subject (as of the date hereof and as of the date of payment and delivery for such Option Shares) to the accuracy of and compliance with the representations, warranties and agreements of the Company and the Selling Shareholders herein, to the accuracy of the statements of the Company, the Selling Shareholders and officers of the Company made pursuant to the provisions hereof, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder, to the conditions set forth in Section 7 hereof, and to the condition that all proceedings taken at or prior to the payment date in connection with the sale and transfer of such Option Shares

shall be satisfactory in form and substance to you and to Underwriters' Counsel, and you shall have been furnished with all such documents, certificates and opinions as you may request in order to evidence the accuracy and completeness of any of the representations, warranties or statements, the performance of any of the covenants or agreements of the Company and the Selling Shareholders or the satisfaction of any of the conditions herein contained.

9. Indemnification and Contribution.

(a) The Company agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject (including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E of the Bylaws of the NASD), under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of the Company herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement, such Preliminary Prospectus or the Prospectus, or any such amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter furnished to the Company by such Underwriter, directly or through you, specifically for use in the preparation thereof and, provided further, that the indemnity agreement provided in this Section 9(a) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person

<PAGE>

asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of material fact or omission or alleged omission to state therein a material fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(a) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which the Company may otherwise have.

(b) Each Selling Shareholder, severally and not jointly, agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject

(including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E or the Bylaws of the NASD) under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Selling Shareholder herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(b) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company or such Underwriter by such Selling Shareholder, directly or through such Selling Shareholder's representatives, specifically for use in the preparation thereof, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement provided in this Section 9(b) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state therein a material fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(b) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls

<PAGE>

any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which such Selling Shareholder may otherwise have.

(c) Each Underwriter, severally and not jointly, agrees to indemnify and hold harmless the Company and each Selling Shareholder against any losses, claims, damages or liabilities, joint or several, to which the Company or such Selling Shareholder may become subject under the Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Underwriter herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(c) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written

information furnished to the Company by such Underwriter, directly or through you, specifically for use in the preparation thereof, and agrees to reimburse the Company and each such Selling Shareholder for any legal or other expenses reasonably incurred by the Company and each such Selling Shareholder in connection with investigating or defending any such loss, claim, damage, liability or action.

The indemnity agreement in this Section 9(c) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each officer of the Company who signed the Registration Statement and each director of the Company, each Selling Shareholder and each person, if any, who controls the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which each Underwriter may otherwise have.

(d) Promptly after receipt by an indemnified party under this Section 9 of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against any indemnifying party under this Section 9, notify the indemnifying party in writing of the commencement thereof but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 9. In case any such action is brought against any indemnified party, and it notified the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it shall elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; _provided, however_, that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume such legal

<PAGE>

defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such indemnified party of the indemnifying party's election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Section 9 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel (together with appropriate local counsel) approved by the indemnifying party representing all the indemnified parties under Section 9(a), 9(b) or 9(c) hereof who are parties to such action), (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party. In no event shall any indemnifying party be liable in respect of any amounts paid in settlement of any action unless the indemnifying party shall have approved the terms of such settlement; _provided_ that such consent shall not be unreasonably withheld. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnification could have been sought hereunder by such indemnified party, unless such settlement includes

an unconditional release of such indemnified party from all liability on all claims that are the subject matter of such proceeding.

(e) In order to provide for just and equitable contribution in any action in which a claim for indemnification is made pursuant to this Section 9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 9 provides for indemnification in such case, all the parties hereto shall contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that, except as set forth in Section 9(f) hereof, the Underwriters severally and not jointly are responsible pro-rata for the portion represented by the percentage that the underwriting discount bears to the initial public offering price, and the Company and the Selling Shareholders are responsible for the remaining portion, provided, however, that (i) no Underwriter shall be required to contribute any amount in excess of the amount by which the underwriting discount applicable to the Shares purchased by such Underwriter exceeds the amount of damages which such Underwriter has otherwise required to pay and (ii) no person guilty of a fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who is not guilty of such fraudulent misrepresentation. The contribution agreement in this Section 9(e) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter, the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act and each officer of the Company who signed the Registration Statement and each director of the Company.

(f) The liability of each Selling Shareholder under the representations, warranties and agreements contained herein and under the indemnity agreements contained in the

<PAGE>

provisions of this Section 9 shall be limited to an amount equal to the initial public offering price of the Selling Shareholder Shares sold by such Selling Shareholder to the Underwriters minus the amount of the underwriting discount paid thereon to the Underwriters by such Selling Shareholder. The Company and such Selling Shareholders may agree, as among themselves and without limiting the rights of the Underwriters under this Agreement, as to the respective amounts of such liability for which they each shall be responsible.

(g) The parties to this Agreement hereby acknowledge that they are sophisticated business persons who were represented by counsel during the negotiations regarding the provisions hereof including, without limitation, the provisions of this Section 9, and are fully informed regarding said provisions. They further acknowledge that the provisions of this Section 9 fairly allocate the risks in light of the ability of the parties to investigate the Company and its business in order to assure that adequate disclosure is made in the Registration Statement and Prospectus as required by the Act and the Exchange Act.

10. Representations, Warranties, Covenants and Agreements to Survive Delivery. All representations, warranties, covenants and agreements of the Company, the Selling Shareholders and the Underwriters herein or in certificates delivered pursuant hereto, and the indemnity and contribution agreements contained in Section 9 hereof shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Underwriter or any person controlling any Underwriter within the meaning of the Act or the Exchange Act, or by or on behalf of the Company or any Selling Shareholder, or

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 133 of 2711

any of their officers, directors or controlling persons within the meaning of the Act, or the Exchange Act, and shall survive the delivery of the Shares to the several Underwriters hereunder or termination of this Agreement.

11. Substitution of Underwriters. If any Underwriter or Underwriters shall fail to take up and pay for the number of Firm Shares agreed by such Underwriter or Underwriters to be purchased hereunder upon tender of such Firm Shares in accordance with the terms hereof, and if the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters so agreed but failed to purchase does not exceed 10% of the Firm Shares, the remaining Underwriters shall be obligated, severally in proportion to their respective commitments hereunder, to take up and pay for the Firm Shares of such defaulting Underwriter or Underwriters.

If any Underwriter or Underwriters so defaults and the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters agreed but failed to take up and pay for exceeds 10% of the Firm Shares, the remaining Underwriters shall have the right, but shall not be obligated, to take up and pay for (in such proportions as may be agreed upon among them) the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase. If such remaining Underwriters do not, at the Closing Date, take up and pay for the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase, the Closing Date shall be postponed for twenty-four (24) hours to allow the several Underwriters the privilege of substituting within twenty-four (24) hours (including non-business hours) another underwriter or underwriters (which may include any nondefaulting Underwriter) satisfactory to the Company. If no such underwriter or underwriters shall have been substituted as aforesaid by such postponed Closing Date, the Closing Date may, at the option of the

<PAGE>

Company, be postponed for a further twenty-four (24) hours, if necessary, to allow the Company the privilege of finding another underwriter or underwriters, satisfactory to you, to purchase the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase. If it shall be arranged for the remaining Underwriters or substituted underwriter or underwriters to take up the Firm Shares of the defaulting Underwriter or Underwriters as provided in this Section 11, (i) the Company shall have the right to postpone the time of delivery for a period of not more than seven (7) full business days, in order to effect whatever changes may thereby be made necessary in the Registration Statement or the Prospectus, or in any other documents or arrangements, and the Company agrees promptly to file any amendments to the Registration Statement, supplements to the Prospectus or other such documents which may thereby be made necessary, and (ii) the respective number of Firm Shares to be purchased by the remaining Underwriters and substituted underwriter or underwriters shall be taken as the basis of their underwriting obligation. If the remaining Underwriters shall not take up and pay for all such Firm Shares so agreed to be purchased by the defaulting Underwriter or Underwriters or substitute another underwriter or underwriters as aforesaid and the Company shall not find or shall not elect to seek another underwriter or underwriters for such Firm Shares as aforesaid, then this Agreement shall terminate.

In the event of any termination of this Agreement pursuant to the preceding paragraph of this Section 11, neither the Company nor any Selling Shareholder shall be liable to any Underwriter (except as provided in Sections 6 and 9 hereof) nor shall any Underwriter (other than an Underwriter who shall have failed, otherwise than for some reason permitted under this Agreement, to purchase the number of Firm Shares agreed by such Underwriter to be purchased hereunder, which Underwriter shall remain liable to the Company, the Selling Shareholders and the other Underwriters for damages, if any, resulting from such default) be liable to the Company or any Selling Shareholder (except to the

extent provided in Sections 6 and 9 hereof).

The term "Underwriter" in this Agreement shall include any person substituted for an Underwriter pursuant to the terms of this Section 11.

12. Effective Date of this Agreement and Termination.

(a) This Agreement shall become effective at the earlier of (i) 6:30 A.M., San Francisco time, on the first full business day following the effective date of the Registration Statement, or (ii) the time of the initial public offering of any of the Shares by the Underwriters after the Registration Statement becomes effective. The time of the initial public offering shall mean the time of the release by you, for publication, of the first newspaper advertisement relating to the Shares, or the time at which the Shares are first generally offered by the Underwriters to the public by letter, telephone, telegram or telecopy, whichever shall first occur. By giving notice as set forth in Section 13 before the time this Agreement becomes effective, you, as Representatives of the several Underwriters, or the Company, may prevent this Agreement from becoming effective without liability of any party to any other party, except as provided in Sections 5(j), 6 and 9 hereof.

(b) You, as Representatives of the several Underwriters, shall have the right to terminate this Agreement by giving notice as hereinafter specified at any time on or prior

-36-

<PAGE>

to the Closing Date or on or prior to any later date on which Option Shares are to be purchased, as the case may be, (i) if the Company or any Selling Shareholder shall have failed, refused or been unable to perform any agreement on its part to be performed, or because any other condition of the Underwriters' obligations hereunder required to be fulfilled is not fulfilled, including, without limitation, any change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your sole judgment, is material and adverse, or (ii) if additional material governmental restrictions, not in force and effect on the date hereof, shall have been imposed upon trading in securities generally or minimum or maximum prices shall have been generally established on the New York Stock Exchange or on the American Stock Exchange or in the over the counter market by the NASD, or trading in securities generally shall have been suspended on either such exchange or in the over the counter market by the NASD, or if a banking moratorium shall have been declared by federal, New York or California authorities, or (iii) if the Company shall have sustained a loss by strike, fire, flood, earthquake, accident or other calamity of such character as to interfere materially with the conduct of the business and operations of the Company regardless of whether or not such loss shall have been insured, or (iv) if there shall have been a material adverse change in the general political or economic conditions or financial markets as in your reasonable judgment makes it inadvisable or impracticable to proceed with the offering, sale and delivery of the Shares, or (v) if there shall have been an outbreak or escalation of hostilities or of any other insurrection or armed conflict or the declaration by the United States of a national emergency which, in the reasonable opinion of the Representatives, makes it impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus. In the event of termination pursuant to subparagraph (i) above, the Company shall remain obligated to pay costs and expenses pursuant to Sections 5(j), 6 and 9 hereof. Any termination pursuant to any of subparagraphs (ii) through (v) above shall be without liability of any party to any other party except as provided in Sections 6 and 9 hereof.

If you elect to prevent this Agreement from becoming effective or to terminate this Agreement as provided in this Section 12, you shall promptly

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 135 of 2711

notify the Company by telephone, telecopy or telegram, in each case confirmed by letter. If the Company shall elect to prevent this Agreement from becoming effective, the Company shall promptly notify you by telephone, telecopy or telegram, in each case, confirmed by letter.

13. Notices. All notices or communications hereunder, except as herein otherwise specifically provided, shall be in writing and if sent to you shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to you c/o Robertson, Stephens & Company LLC, 555 California Street, Suite 2600, San Francisco, California 94104, telecopier number (415) 781-0278, Attention: General Counsel; if sent to the Company, such notice shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727, Attention: Deepak Chopra, Chief Executive Officer; if sent to one or more of the Selling Shareholders, such notice shall be sent mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to Deepak Chopra, as Attorney-in-Fact for the Selling Shareholders, at 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727.

<PAGE>

14. Parties. This Agreement shall inure to the benefit of and be binding upon the several Underwriters and the Company and the Selling Shareholders and their respective executors, administrators, successors and assigns. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto and their respective executors, administrators, successors and assigns, and the controlling persons within the meaning of the Act or the Exchange Act, officers and directors referred to in Section 9 hereof, any legal or equitable right, remedy or claim in respect of this Agreement or any provisions herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and their respective executors, administrators, successors and assigns and said controlling persons and said officers and directors, and for the benefit of no other person or entity. No purchaser of any of the Shares from any Underwriter shall be construed a successor or assign by reason merely of such purchase.

In all dealings with the Company and the Selling Shareholders under this Agreement, you shall act on behalf of each of the several Underwriters, and the Company and the Selling Shareholders shall be entitled to act and rely upon any statement, request, notice or agreement made or given by you jointly or by Robertson, Stephens & Company LLC on behalf of you.

15. Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to principles of conflict of law.

16. Counterparts. This Agreement may be signed in several counterparts, each of which will constitute an original.

<PAGE>

If the foregoing correctly sets forth the understanding among the Company, the Selling Shareholders and the several Underwriters, please so indicate in the space provided below for that purpose, whereupon this letter shall constitute a binding agreement among the Company, the Selling Shareholders and the several Underwriters.

Very truly yours,

OPTO SENSORS, INC.

By:_________________________________
Name:_______________________________
Its:________________________________

SELLING SHAREHOLDERS

By:_________________________________
Attorney-in-Fact for the Selling Shareholders named in Schedules B and C hereto

Accepted as of the date first above written:

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC

On their behalf and on behalf of each of the several Underwriters named in Schedule A hereto.

By: ROBERTSON, STEPHENS & COMPANY LLC

By: ROBERTSON, STEPHENS & COMPANY GROUP, L.L.C.

By:_________________________________
Name:_______________________________
Its:________________________________

-39-

<PAGE>

SCHEDULE A

<TABLE>
<CAPTION>

| Underwriters | Number of Firm Shares To Be Purchased |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC......................... | __________ |
| William Blair & Company, L.L.C........................... | __________ |
| Volpe Brown Whelan & Company LLC......................... | __________ |
| Total.................................................... | __________ |

</TABLE>

-1-

<PAGE>

SCHEDULE B

Firm Shares

<TABLE>
<CAPTION>

| Company | Number of Company Shares To Be Sold |
|---|---|
| <S> | <C> |
| | ________ |
| | ________ |
| Total.................................................... | ________ |
| | ________ |

<CAPTION>

| Name of Selling Shareholder | Number of Selling Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Scope Industries........................................... | 148,148 |
| Sally Chamberlain Trustee, Ed and Sally Fleischer Trust..... | 47,593 |
| Cynthia G. Fleischer....................................... | 15,750 |
| Gary F. Fleischer.......................................... | 14,625 |
| Cathleen A. Fleischer...................................... | 14,625 |
| Madan and Mohini Syal...................................... | 25,926 |
| Good Swartz Berns Pension Fund............................. | 3,000 |
| Steve Cary Good and Anne Good Trust........................ | 13,831 |
| Steve Good................................................. | 8,065 |
| Mark & Penny Berns Trust................................... | 5,982 |
| Arnold & Hope Anisgarten................................... | 5,709 |
| Rajiv Mehra................................................ | 450 |
| Zev and Elaine Edelstein Trust............................. | 9,259 |
| Glen Sorenson.............................................. | 9,259 |
| Mohinder and Ranjana Chopra................................ | 9,259 |
| Charles/Kiran Kerpelman.................................... | 9,259 |
| Martha Holmes.............................................. | 9,259 |
| Tehari & Durya Rangawala................................... | 7,407 |
| Leila/Birendra Mehra....................................... | 3,704 |
| Surendra Jain M.D., Inc.................................... | 5,186 |
| Renu Jivrajka.............................................. | 1,852 |
| Amita Jivrajka............................................. | 1,852 |
| Total.................................................. | 370,000 |

</TABLE>

-2-

<PAGE>

SCHEDULE C

Option Shares

<TABLE>
<CAPTION>

| Name of Selling Shareholder | Number of Shareholder Shares To Be Sold |
|---|---|

<S> <C>

| Name of Selling Shareholder | Number of Shareholder Shares To Be Sold |
|---|---|
| Scope Industries | 79,260 |
| Sally Chamberlain Trustee, Ed and Sally Fleischer Trust | 49,630 |
| Deepak and Nandini Chopra | 185,185 |
| Madan and Mohini Syal | 18,519 |
| Ajay Mehra | 33,333 |
| Good Swartz Berns Pension Fund | 3,309 |
| Steve Cary Good and Anne Good Trust | 8,669 |
| Steve Good | 6,935 |
| Mark & Penny Berns Trust | 1,518 |
| Arnold & Hope Anisgarten | 1,791 |
| Andreas Kotowski | 18,519 |
| Zev and Elaine Edelstein Trust | 9,259 |
| Glen Sorenson | 11,111 |
| Mohinder and Ranjana Chopra | 11,111 |
| Manoocher Mansouri | 14,815 |
| Charles/Kiran Kerpelman | 9,259 |
| Martha Holmes | 9,259 |
| Tehari & Durya Rangawala | 7,407 |
| Sue Sutherland | 7,407 |
| Anuj Wadhawan | 7,407 |
| Bette Moore | 7,407 |
| Thomas Hickman | 3,704 |
| Robert Kephart | 5,556 |
| Phillip M. Wascher | 7,407 |
| Narayan Taneja | 1,481 |
| Leila/Birendra Mehra | 3,704 |
| Charan Dewan | 3,704 |
| Jack Kimbro | 1,111 |
| Surendra Jain M.D., Inc | 1,243 |
| Surendra and Kala Jain | 4,683 |
| Meyer & Doreen Luskin Trustee of Meyer & Doreen Luskin Family Trust | 9,259 |
| Denis Noble | 741 |
| Anthony S. Crane & Suzie B. Crane | 1,481 |
| Neil Jivrajka | 740 |
| Renu Jivrajka | 1,482 |
| Amita Jivrajka | 1,482 |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

<S> <C>

| Name of Selling Shareholder | Number of Shareholder Shares To Be Sold |
|---|---|
| Alan J. Bernard & Pamela Barnard | 1,481 |
| Peter Bui | 741 |
| Chris Williams | 741 |
| Chris Chin | 926 |
| Louis S. and Linda O. Peters | 741 |
| Khai Le | 741 |
| Lincoln Gladden | 741 |
| Total | 555,000 |

</TABLE>

</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-3.1
<SEQUENCE>3
<DESCRIPTION>AMENDED AND RESTATED ARTICLES OF INCORPORATION
<TEXT>

<PAGE>

EXHIBIT 3.1

CERTIFICATE OF AMENDMENT AND
RESTATEMENT OF
ARTICLES OF INCORPORATION

OF

OPTO SENSORS, INC.

Deepak Chopra and Ajay Mehra certify that:

1. They are the duly appointed and acting President and Secretary, respectively, of Opto Sensors, Inc., a California corporation (the "Corporation").

2. The Articles of Incorporation of the Corporation are hereby amended and restated in their entirety as set forth on Exhibit A attached hereto.

3. The amendments herein set forth have been duly approved by the Board of Directors.

4. The amendments herein set forth have been duly approved by the required vote of the shareholders in accordance with Sections 902 and 903 of the California Corporations Code. The Corporation has two classes of shares outstanding, each of which is entitled to vote with respect to the amendments herein. The total number of outstanding shares of the Corporation entitled to vote with respect to the amendments are 2,568,750 shares of Preferred Stock and 1,517,161 shares of Common Stock. The number of shares voting in favor of the amendments equaled or exceeded the vote required. The percentage vote required was (i) a majority of the voting power of the outstanding shares of Preferred Stock and (ii) a majority of the voting power of the outstanding shares of Common Stock.
<PAGE>

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Dated: June 12, 1997

/s/ Deepak Chopra
_______________________________
Deepak Chopra, President

/s/ Ajay Mehra
_______________________________
Ajay Mehra, Secretary

<PAGE>

EXHIBIT A

AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
OSI SYSTEMS, INC.

I.

The name of this corporation is OSI Systems, Inc.

II.

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

III.

A. The total number of shares of stock which this corporation shall have authority to issue is 50,000,000, consisting of 40,000,000 shares of Common Stock and 10,000,000 shares of Preferred Stock.

B. Each share of Preferred Stock outstanding as of the effective date of filing of this Amended and Restated Articles of Incorporation shall, upon the filing of this Amended and Restated Articles of Incorporation, automatically and without further action be converted into one and one-half (1.5) outstanding shares of Common Stock.

C. Each share of Common Stock outstanding as of the effective date of filing of this Amended and Restated Articles of Incorporation shall, upon the filing of this Amended and Restated Articles of Incorporation, automatically and without further action be split into one and one-half (1.5) outstanding shares of Common Stock.

D. Shareholders who would otherwise receive a fractional share of Common Stock after giving effect to the conversion of the Preferred Stock as set forth in Paragraph B above and the stock split as set forth in Paragraph C above, shall receive, in lieu of such fractional share, one whole share of Common Stock.

E. The Board of Directors is hereby empowered, by resolution or resolutions adopted from time to time, to authorize the issuance of one or more series of Preferred Stock, to fix the number of shares of any series of Preferred

<PAGE>

Stock, and to determine the designation of any such series of Preferred Stock. The Board of Directors is also authorized to determine or alter the rights, preferences, privileges, and restrictions granted to or imposed upon any wholly unissued series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any series, to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any such series subsequent to the issuance of shares of that series.

IV.

The liability of the directors of this corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

V.

This corporation is authorized to indemnify the agents (as defined in Section 317 of the Corporations Code) of this corporation to the fullest extent permissible under California law. Any amendment, repeal or modification of any provision of this Article V shall not adversely affect the right or protection of an agent of this corporation existing at the time of such amendment, repeal or modification.

2.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-3.2
<SEQUENCE>4
<DESCRIPTION>AMENDED AND RESTATED BYLAWS
<TEXT>

<PAGE>

EXHIBIT 3.2

# AMENDED AND RESTATED BYLAWS

# OF

# OSI SYSTEMS, INC.

## ARTICLE I

## OFFICES

Section 1. PRINCIPAL OFFICES. The board of directors shall fix the location of the principal executive office of the corporation at any place within or outside the State of California. If the principal executive office is located outside this state, and the corporation has one or more business offices in this state, the board of directors shall fix and designate a principal business office in the State of California.

Section 2. OTHER OFFICES. The board of directors or officers of the corporation may at any time establish branch or subordinate offices at any place or places where the corporation is qualified to do business.

## ARTICLE II

## MEETINGS OF SHAREHOLDERS

Section 1. PLACE OF MEETINGS. Meetings of shareholders shall be held at any place within or outside the State of California designated by the board of directors. In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corporation.

Section 2. ANNUAL MEETING. The annual meeting of shareholders shall be held each year on a date and at a time designated by the board of directors. At each annual meeting directors shall be elected, and any other proper business may be transacted.

Section 3. SPECIAL MEETING. A special meeting of the shareholders may be called at any time by the board of directors, or by the chairman of the board, or by the president, or by one or more shareholders holding shares in the aggregate entitled to cast not less than l0% of the votes at that meeting.

If a special meeting is called by any person or persons other than the board of directors, the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered

personally or sent by registered mail or by telegraphic or other facsimile transmission to the chairman of the board, the president, any vice president, or the secretary of the corporation. The officer receiving the request shall cause notice to be promptly given to the shareholders entitled to vote, in accordance with the provisions of Sections 4 and 5 of this Article II, that a meeting will be held at the time requested by the person or persons calling the meeting, not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after receipt of the request, the person or persons requesting the meeting may give the notice. Nothing contained in this paragraph of this section 3 shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the board of directors may be held.

Section 4. NOTICE OF SHAREHOLDERS' MEETINGS. All notices of meetings of shareholders shall be sent or otherwise given in accordance with Section 5 of this Article II not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, or (ii) in the case of the annual meeting, those matters which the board of directors, at the time of giving the notice, intends to present for action by the shareholders. The notice of any meeting at which directors are to be elected shall include the name of any nominee or nominees whom, at the time of the notice, management intends to present for election.

If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code of California, (ii) an amendment of the articles of incorporation, pursuant to Section 902 of that Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of that Code, (iv) a voluntary dissolution of the corporation, pursuant to Section 1900 of that Code, or (v) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of that Code, the notice shall also state the general nature of that proposal.

Section 5. MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE. Notice of any meeting of shareholders shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the shareholder at the address of that shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice. If no such address appears on the corporation's books or is given, notice shall be deemed to have been given if sent to that shareholder by first-class mail or telegraphic or other written communication to the corporation's principal executive office, or if published at least once in a newspaper of general circulation in the county where that office is located.

Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a shareholder at the address of that shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the shareholder at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the shareholder on written demand of the shareholder at the principal executive office of the corporation for a period of one year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any shareholders' meeting shall be executed by the secretary, assistant secretary, or any transfer agent of the corporation giving the notice, and shall be filed and maintained in the minute book of the corporation.

Section 6. QUORUM. The presence in person or by proxy of the holders of a majority of the shares entitled to vote at any meeting of shareholders shall constitute a quorum for the transaction of business. The shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

Section 7. ADJOURNED MEETING; NOTICE. Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 6 of this Article II.

When any meeting of shareholders, either annual or special, is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the board of directors shall set a new record date. Notice of any such adjourned meeting shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with the provisions of Sections 4 and 5 of this Article II. At any adjourned meeting the corporation may transact any business which might have been transacted at the original meeting.

Section 8. VOTING. The shareholders entitled to vote at

3

<PAGE>

any meeting of shareholders shall be determined in accordance with the provisions of Section 11 of this Article II, subject to the provisions of Sections 702 to 704, inclusive, of the Corporations Code of California (relating to voting shares held by a fiduciary, in the name of a corporation, or in joint ownership). The shareholders' vote may be by voice vote or by ballot; provided, however, that any election for directors must be by ballot if demanded by any shareholder before the voting has begun. On any matter other than elections of directors, any shareholder may vote part of the shares in favor of the proposal and refrain from voting the remaining shares or vote them against the proposal, but, if the shareholder fails to specify the number of shares which the shareholder is voting affirmatively, it will be conclusively presumed that the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 144 of 2711

shareholder's approving vote is with respect to all shares that the shareholder is entitled to vote. If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and entitled to vote on any matter (other than the election of directors) shall be the act of the shareholders, unless the vote of a greater number of voting by classes is required by California General Corporation Law or by the articles of incorporation.

At a shareholders' meeting at which directors are to be elected, no shareholder shall be entitled to cumulate votes (i.e., cast for any one or more candidates a number of votes greater than the number of shareholder's shares) unless the candidates' names have been placed in nomination prior to commencement of the voting and a shareholder has given notice prior to commencement of the voting of the shareholder's intention to cumulate votes. If any shareholder has given such a notice, then every shareholder entitled to vote may cumulate votes for candidates in nomination and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which that shareholder's shares are entitled, or distribute the shareholder's votes on the same principle among any or all of the candidates, as the shareholder thinks fit. The candidates receiving the highest number of votes, up to the number of directors to be elected, shall be elected.

Section 9. WAIVER OF NOTICE OR CONSENT BY ABSENT SHAREHOLDERS. The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or a consent to a holding of the meeting, or an approval of the minutes. The waiver of notice or consent need not specify either the business to be transacted or the purpose of any annual or special meeting of shareholders, except that if action is taken or proposed to be taken for approval of any of those matters specified in the second paragraph of Section 4 of this Article II, the waiver of notice or consent shall state the general nature of the proposal. All such waivers,

4

<PAGE>

consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Attendance by a person at a meeting shall also constitute a waiver of notice of that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting.

Section 10. SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING. Any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all shares entitled to vote on that action were present and voted. In the case of election of directors, such a consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, however, that a director may be elected at any time to fill a vacancy on the board of directors that has not been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors. All such consents shall be filed with the

secretary of the corporation and shall be maintained in the corporate records. Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares or a personal representative of the shareholder or their respective proxy holders, may revoke the consent by a writing received by the secretary of the corporation before written consents of the number of shares required to authorize the proposed action have been filed with the secretary.

If the consents of all shareholders entitled to vote have not been solicited in writing, and if the unanimous written consent of all such shareholders shall not have been received, the secretary shall give prompt notice of the corporate action approved by the shareholders without a meeting. This notice shall be given in the manner specified in Section 5 of this Article II. In the case of approval of (i) contracts or transactions in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code of California, (ii) indemnification of agents of the corporation, pursuant to Section 317 of that Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of that Code, or (iv) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of that Code, the notice shall be given at least ten (10) days before the consummation of any action authorized by that approval.

5

<PAGE>

Section 11. RECORD DATE FOR SHAREHOLDER NOTICE, VOTING, AND GIVING CONSENTS. For purposes of determining the shareholders entitled to notice of any meeting or to vote or entitled to give consent to corporate action without a meeting, the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days before the date of any such meeting nor more than sixty (60) days before any such action without a meeting, and in this event only shareholders of record on the date so fixed are entitled to notice and to vote or to give consents, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the California General Corporation Law.

If the board of directors does not so fix a record date:

(a) The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b) The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, (i) when no prior action by the board has been taken, shall be the date on which the first written consent is given, or (ii) when prior action of the board has been taken, shall be at the close of business on the date on which the board adopts the resolution relating to that action, or the sixtieth (60th) day before the date of such action, whichever is later.

Section 12. PROXIES. Every person entitled to vote for directors or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the secretary of the corporation. A proxy shall be deemed signed if the shareholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, or otherwise) by the shareholder or the shareholder's attorney-in-fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy, by a

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 146 of 2711

writing delivered to the corporation stating that the proxy is revoked, or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the corporation before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on its face that is irrevocable shall be governed by the provisions of Sections 705(e) and 705(f) of the Corporations Code of California.

<PAGE>

Section 13. INSPECTORS OF ELECTION. Before any meeting of shareholders, the board of directors may appoint any persons other than nominees for office to act as inspectors of election at the meeting or its adjournment. If no inspectors of election are so appointed, the chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election at the meeting. The number of inspectors shall be either one (l) or three (3). If inspectors are appointed at a meeting on the request of one or more shareholders or proxies, the holders of a majority of shares or their proxies present at the meeting shall determine whether one (l) or three (3) inspectors are to be appointed. If any person appointed as inspector fails to appear or fails or refuses to act, the chairman of the meeting may, and upon the request of any shareholder or a shareholder's proxy shall, appoint a person to fill that vacancy.

These inspectors shall:

(a) Determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity, and effect of proxies;

(b) Receive votes, ballots, or consents;

(c) Hear and determine all challenges and questions in any way arising in connection with the right to vote;

(d) Count and tabulate all votes or consents;

(e) Determine when the polls shall close;

(f) Determine the result; and

(g) Do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

Section 14. NOMINATIONS FOR DIRECTOR; SHAREHOLDER PROPOSALS.

(a) Nomination of Directors. Nominations for election of members of the board of directors may be made by the board of directors or by any shareholder of any outstanding class of voting stock of the corporation entitled to vote for the election of directors in accordance with this Section 14.

(b) Other Proposals. Any shareholder of the corporation entitled to vote at any annual or special meeting of shareholders may make nominations for the election of directors and other proposals for inclusion on the agenda of any such meeting provided such shareholder complies with the timely notice provisions set forth in this Section 14 (as well as any additional requirements under any applicable law or regulation).

<PAGE>

(c) Timely Notice by Shareholders. A shareholder's notice shall be delivered to or mailed and received at the principal executive offices of the corporation (i) in the case of any special meeting and of the first annual meeting held after the effective date of these Amended and Restated Bylaws, not less than thirty (30) days nor more than sixty (60) days prior to the meeting date specified in the notice of such meeting; provided, however, that if less than forty (40) days' notice or prior public disclosure of the date of such meeting is given or made to shareholders, notice by shareholder to be timely must be so received not later than the close of business on the tenth day following the day on which such notice of the date of such meeting was mailed or such public disclosure was made, and (ii) in the case of any subsequent annual meeting, not less than ninety (90) days prior to the day and month on which, in the immediately preceding year, the annual meeting for such year had been held. Such shareholder's notice shall set forth (A) as to each person whom the shareholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of such person, (ii) the principal occupation or employment of such person, the class and number of shares of the corporation which are beneficially owned by such person that are required to be disclosed in solicitations of the proxies with respect to nominees for election as directors, pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (including, without limitation, such person's written consent to being named in the proxy statement as a nominee and to serving as a director, if elected); (B) as to each action item required to be included on the agenda, a description, in sufficient detail, of the purpose and effect of the proposal to the extent necessary to properly inform all shareholders entitled to vote thereon prior to any such vote; and (C) as to the shareholder giving the notice, (i) the name and address, as they appear on the corporation's books, of such shareholder and (ii) the class and number of shares of the corporation which are beneficially owned by such shareholder.

(d) Failure to Provide Timely Notice, Etc. No person nominated by a shareholder shall be elected as a director of the corporation unless nominated in accordance with the procedures set forth in this Section 14. The Chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination or other proposal by a shareholder was not properly brought before the meeting, and, if the Chairman shall so determine, he shall so declare to the meeting and such nomination or other proposal shall be disregarded.

## ARTICLE III

## DIRECTORS

Section 1. POWERS. Subject to the provisions of the California General Corporation Law and any limitations in the articles of incorporation and these bylaws relating to action

<PAGE>

required to be approved by the shareholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board of directors.

Without prejudice to these general powers, and subject to the same limitations, the directors shall have the power to:

(a) Select and remove all officers, agents, and employees of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 148 of 2711

corporation, prescribe any powers and duties for them that are consistent with law, with the articles of incorporation, and with these bylaws; fix their compensation; and require from them security for faithful service.

(b) Change the principal executive office or the principal business office in the State of California from one location to another; cause the corporation to be qualified to do business in any other state, territory, dependency, or country and conduct business within or without the State of California; and designate any place within or without the State of California for the holding of any shareholders' meeting, or meetings, including annual meetings.

(c) Adopt, make and use a corporation seal; prescribe the forms of certificates of stock; and alter the form of the seal and certificates.

(d) Authorize the issuance of shares of stock of the corporation on any lawful terms, in consideration of money paid, labor done, services actually rendered, debts or securities canceled, or tangible or intangible property actually received.

(e) Borrow money and incur indebtedness on behalf of the corporation, and cause to be executed and delivered for the corporation's purposes, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, and other evidences of debt and securities.

Section 2. NUMBER OF DIRECTORS.

(a) The authorized number of directors shall be not less than five nor more than nine. The exact number of directors shall be fixed from time to time by resolution of the Board of Directors, except that in the absence of any such designation, such number shall be five.

(b) The maximum or minimum authorized number of directors may only be changed by an amendment of this Section approved by the vote or written consent of a majority of the outstanding shares entitled to vote; provided, however, that an amendment reducing the minimum number to a number less than five shall not be adopted if the votes cast against its adoption at a meeting (or the shares not consenting in the case of action by written consent) exceed 16-2/3% of such outstanding shares; and

<PAGE>

provided further, that in no case shall the stated maximum authorized number of directors exceed two times the stated minimum number of authorized directors minus one.

Section 3. ELECTION AND TERM OF OFFICE OF DIRECTORS. Directors shall be elected at each annual meeting of the shareholders to hold office until the next annual meeting. Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

Section 4. VACANCIES. Vacancies in the board of directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, except that a vacancy created by the removal of a director by the vote or written consent of the shareholders or by court order may be filled only by the vote of a majority of the shares entitled to vote represented at a duly held meeting at which a quorum is present, or by the written consent of holders of a majority of the outstanding shares entitled to vote. Each director so elected shall hold office until the next annual meeting of the shareholders and until a successor has been elected and qualified.

A vacancy or vacancies in the board of directors shall be deemed to exist in the event of the death, resignation, or removal of any director, or if the board of directors by resolution declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, or if the authorized number of directors is increased, or if the shareholders fail, at any meeting of shareholders at which any director or directors are elected, to elect the number of directors to be voted for at that meeting.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors, but any such election by written consent shall require the consent of a majority of the outstanding shares entitled to vote.

Any director may resign effective on giving written notice to the chairman of the board, the president, the secretary, or the board of directors, unless the notice specifies a later time for that resignation to become effective. If the resignation of a director is effective at a future time, the board of directors may elect a successor to take office when the resignation becomes effective.

No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 5. PLACE OF MEETING AND MEETINGS BY TELEPHONE. Regular meetings of the board of directors may be held at any place within or outside the State of California that has been designated from time to time by resolution of the board. In the absence of

such a designation, regular meetings shall be held at the principal executive office of the corporation. Special meetings of the board shall be held at any place within or outside the State of California that has been designated in the notice of the meeting or, if not stated in the notice or there is no notice, at the principal executive office of the corporation. Any meeting, regular or special, may be held by conference telephone or similar communication equipment, so long as all directors participating in the meeting can hear one another, and all such directors shall be deemed to be present in person at the meeting.

Section 6. ANNUAL MEETING. Immediately following each annual meeting of shareholders, the board of directors shall hold a regular meeting for the purpose of organization, any desired election of officers, and the transaction of other business. Notice of this meeting shall not be required.

Section 7. OTHER REGULAR MEETINGS. Other regular meetings of the board of directors shall be held without call at such time as shall from time to time be fixed by the board of directors. Such regular meetings may be held without notice.

Section 8. SPECIAL MEETINGS. Special meetings of the board of directors for any purpose or purposes may be called at any time by the chairman of the board or the president or any vice president or the secretary or any two directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail or telegram, charges prepaid, addressed to each director at that director's address as it is shown on the records of the corporation. In case the notice is mailed,

it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting. In case the notice is delivered personally, or by telephone or telegram, it shall be delivered personally or by telephone or to the telegraph company at least forty-eight (48) hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose of the meeting nor the place if the meeting is to be held at the principal executive office of the corporation.

Section 9. QUORUM. A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as provided in Section 11 of this Article III. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the board of directors, subject to the provisions of Section 310 of the Corporations Code of California (as to approval of contracts or transactions in which a director has a direct or indirect material financial interest), Section 311 of that Code (as to appointment of committees), and

<PAGE>

Section 317(e) of that Code (as to indemnification of directors). A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

Section 10. WAIVER OF NOTICE. The transaction of any meeting of the board of directors, however called and noticed or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice if a quorum is present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding the meeting or an approval of the minutes. The waiver of notice or consent need not specify the purpose of the meeting. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting. Notice of a meeting shall also be deemed given to any director who attends the meeting without protesting, before or at its commencement, the lack of notice to that director.

Section 11. ADJOURNMENT. A majority of the directors present, whether or not constituting a quorum, may adjourn any meeting to another time and place.

Section 12. NOTICE OF ADJOURNMENT. Notice of the time and place of holding an adjourned meeting need not be given, unless the meeting is adjourned for more than twenty-four (24) hours, in which case notice of the time and place shall be given before the time of the adjourned meeting, in the manner specified in Section 8 of this Article III, to the directors who were not present at the time of the adjournment.

Section 13. ACTION WITHOUT MEETING. Any action required or permitted to be taken by the board of directors may be taken without a meeting, if all members of the board shall individually or collectively consent in writing to that action. Such action by written consent shall have the same force and effect as a unanimous vote of the board of directors. Such written consent or consents shall be filed with the minutes of the proceedings of the board.

Section 14. FEES AND COMPENSATION OF DIRECTORS. Directors and

members of committees may receive such compensation, if any, for their services, and such reimbursement of expenses, as may be fixed or determined by resolution of the board of directors. This Section 14 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for those services.

12

<PAGE>

ARTICLE IV

COMMITTEES

Section 1. COMMITTEES OF DIRECTORS. The board of directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the board. The board may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee. Any committee, to the extent provided in the resolution of the board, shall have all the authority of the board, except with respect to:

(a) the approval of any action which, under the General Corporation Law of California, also requires shareholder's approval or approval of the outstanding shares;

(b) the filling of vacancies on the board of directors or in any committee;

(c) the fixing of compensation of the directors for serving on the board or on any committee;

(d) the amendment or repeal of bylaws or the adoption of new bylaws;

(e) the amendment or repeal of any resolution of the board of directors which by its express terms is not so amendable or repealable;

(f) a distribution to the shareholders of the corporation, except at a rate or in a periodic amount or within a price range determined by the board of directors; or

(g) the appointment of any other committees of the board of directors or the members of these committees.

Section 2. MEETINGS AND ACTION OF COMMITTEES. Meetings and action of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these bylaws, Sections 5 (place of meetings), 7 (regular meetings), 8 (special meetings and notice), 9 (quorum), 10 (waiver of notice), 11 (adjournment), 12 (notice of adjournment), and 13 (action without meeting), with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the board of directors and its members, except that the time of regular meetings of committees may be determined either by resolution of the board of directors or by resolution of the committee; special meetings of the committees may also be called by resolution of the board of directors; and notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The board of directors may adopt rules for the government of any committee not

13

<PAGE>

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 152 of 2711

inconsistent with the provisions of these bylaws.

ARTICLE V

OFFICERS AND EMPLOYEES

Section 1. OFFICERS. The officers of the corporation shall be a president, a secretary, and a chief financial officer. The corporation may also have, at the discretion of the board of directors, a chairman of the board, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article V. Any number of offices may be held by the same person.

Section 2. ELECTION OF OFFICERS. The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article V, shall be chosen by the board of directors, and each shall serve at the pleasure of the board, subject to the rights, if any, of an officer under any contract of employment.

Section 3. SUBORDINATE OFFICERS. The board of directors may appoint, and may empower the president to appoint, such other officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in the bylaws or as a board of directors may from time to time determine.

Section 4. REMOVAL AND RESIGNATION OF OFFICERS. Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the board of directors, at any regular or special meeting of the board, or, except in case of an officer chosen by the board of directors, by an officer upon whom such power of removal may be conferred by the board of directors.

Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

Section 5. VACANCIES IN OFFICES. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these bylaws for regular appointments to that office.

Section 6. CHAIRMAN OF THE BOARD. The chairman of the board, if such an officer be elected, shall preside at meetings of

<PAGE>

the board of directors and exercise and perform such other powers and duties as from time to time may be assigned to him by the board of directors or prescribed by these bylaws. If there is no president, the chairman of the board shall in addition be the chief executive officer of the corporation and shall have the powers and duties prescribed in Section 7 of this Article V.

                                 Section 7. PRESIDENT. Subject to such supervisory powers, if any, as may be given by the board of directors to the chairman of the board, if there be such an officer, the president shall be the chief executive officer of the corporation and shall, subject to the control of the board of directors, have general supervision, direction, and control of the business and the officers of the corporation. He shall preside at all meetings of the shareholders and, in the absence of the chairman of the board, or if there be none, at all meetings of the board of directors. He shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the board of directors or the bylaws.

Section 8. VICE PRESIDENTS. In the absence or disability of the president, the vice presidents, if any, in order of their rank as fixed by the board of directors or, if not ranked, a vice president designated by the board of directors, shall perform all the duties of the president, and when so acting shall have all the powers of, and be subject to all the restrictions upon, the president. The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the board of directors, the chairman of the board, the president or the bylaws.

Section 9. SECRETARY. The secretary shall keep or cause to be kept, at the principal executive office or such other place as the board of directors may direct, a book of minutes of all meetings and actions of directors, committees of directors, and shareholders, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice given, the names of those present at directors' meetings or committee meetings, the number of shares present or represented at shareholders' meetings, and the proceedings.

The secretary shall keep, or cause to be kept, at the principal executive office or at the office of the corporation's transfer agent or registrar, as determined by resolution of the board of directors, a share register, or a duplicate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.

The secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the board of directors required

<PAGE>

by the bylaws or by law to be given, and he shall keep the seal of the corporation if one be adopted, in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the board of directors or by the bylaws.

Section 10. CHIEF FINANCIAL OFFICER. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any directors.

The chief financial officer shall deposit all monies and other valuables in the name and to the credit of the corporation with such depositaries as may be designated by the board of directors. He shall disburse the funds of the corporation as may be ordered by the board of directors, shall

render to the president and directors, whenever they request it, an account of all of his transactions as chief financial officer and of the financial condition of the corporation, and shall have other powers and perform such other duties as may be prescribed by the board of directors or the bylaws.

ARTICLE VI

INDEMNIFICATION OF DIRECTORS, OFFICERS,

EMPLOYEES, AND OTHER AGENTS

Section 1. AGENTS, PROCEEDINGS, AND EXPENSES. For the purposes of this Article, "agent" means any person who is or was a director, officer, employee, or other agent of this corporation, or is or was serving at the request of this corporation as a director, officer, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise, or was a director, officer, employee, or agent of a foreign or domestic corporation which was a predecessor corporation of this corporation or of another enterprise at the request of such predecessor corporation; "proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "expenses" includes, without limitation, attorneys' fees and any expenses of establishing a right to indemnification under Section 4 or Section 5(c) of this Article.

Section 2. ACTIONS OTHER THAN BY THE CORPORATION. Subject to the provisions of Section 5, Section 8 and Section 9 of this Article, this corporation shall indemnify any person who was or is a party, or is threatened to be made a party, to any proceeding (other than an action by or in the right of this corporation) by reason of the fact that such person is or was an agent of this

16

<PAGE>

corporation, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with such proceeding if that person acted in good faith and in a manner that person reasonably believed to be in the best interests of this corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of that person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in the best interests of this corporation or that the person had reasonable cause to believe that the person's conduct was unlawful.

Section 3. ACTIONS BY THE CORPORATION. Subject to the provisions of Section 5, Section 8 and Section 9 of this Article, this corporation shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action by or in the right of this corporation to procure a judgment in its favor by reason of the fact that person is or was an agent of this corporation, against expenses actually and reasonably incurred by that person in connection with the defense or settlement of that action if that person acted in good faith, in a manner that person believed to be in the best interests of this corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. No indemnification shall be made under this Section 3:

(a) In respect of any claim, issue or matter as to which that person shall have been adjudged to be liable to this corporation in the performance of

that person's duty to this corporation, unless and only to the extent that the court in which that action was brought shall determine upon application that, in view of all the circumstances of the case, that person is fairly and reasonably entitled to indemnity for the expenses which the court shall determine;

(b) Of amounts paid in settling or otherwise disposing of a threatened or pending action, without court approval; or

(c) Of expenses incurred in defending a threatened or pending action which is settled or otherwise disposed of without court approval.

Section 4. SUCCESSFUL DEFENSE BY AGENT. To the extent that an agent of this corporation has been successful on the merits in defense of any proceeding referred to in Sections 2 or 3 of this Article, or in defense of any claim, issue, or matter therein, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith.

<PAGE>

Section 5. REQUIRED APPROVAL. Except as provided in Section 4 of this Article, any indemnification under this Article shall be made by this corporation only if authorized in the specific case on a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in Sections 2 or 3 of this Article, by:

(a) A majority vote of a quorum consisting of directors who are not parties to the proceeding;

(b) Approval by the affirmative vote of a majority of the shares of this corporation entitled to vote represented at a duly held meeting at which a quorum is present or by the written consent of holders of a majority of the outstanding shares entitled to vote. For this purpose, the shares owned by the person to be indemnified shall not be considered outstanding or entitled to vote thereon; or

(c) The court in which the proceeding is or was pending, on application made by this corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not such application by the agent, attorney, or other person is opposed by this corporation.

Section 6. ADVANCE OF EXPENSES. Expenses incurred in defending any proceeding may be advanced by this corporation before the final disposition of the proceeding on receipt of an undertaking by or on behalf of the agent to repay the amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this Article.

Section 7. OTHER CONTRACTUAL RIGHTS. Nothing contained in this Article shall affect any right to indemnification to which persons other than directors and officers of this corporation or any subsidiary hereof may be entitled by contract or otherwise.

Section 8. LIMITATIONS. No indemnification or advance shall be made under this Article, except as provided in Section 4 or Section 5(c), in any circumstance where it appears:

(a) That it would be inconsistent with a provision of the articles, a resolution of the shareholders, or an agreement in effect at the time of the

accrual of the alleged cause of action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b) That it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

Section 9. INSURANCE. Upon and in the event of a determination by the board of directors of this corporation to purchase such insurance, this corporation shall purchase and

<PAGE>

maintain insurance on behalf of any agent of the corporation against any liability asserted against or insured by the agent in such capacity or arising out of the agent's status as such whether or not this corporation would have the power to indemnify the agent against that liability under the provisions of this section.

Section 10. FIDUCIARIES OF CORPORATION EMPLOYEE BENEFIT PLAN. This Article does not apply to any proceeding against any trustee, investment manager, or other fiduciary of an employee benefit plan in that person's capacity as such, even though that person may also be an agent of the corporation as defined in Section 1 of this Article. Nothing contained in this Article shall limit any right to indemnification to which such a trustee, investment manager, or other fiduciary may be entitled by contract or otherwise, which shall be enforceable to the extent permitted by applicable law other than this Article.

## ARTICLE VII

## RECORDS AND REPORTS

Section 1. MAINTENANCE AND INSPECTION OF SHARE REGISTER. The corporation shall keep at its principal executive office, or at the office of its transfer agent or registrar, if either be appointed and as determined by resolution of the board of directors, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each shareholder.

A shareholder or shareholders of the corporation holding at least five percent (5%) in the aggregate of the outstanding voting shares of the corporation may (i) inspect and copy the records of shareholders' names and addresses and share holdings during usual business hours on five (5) days prior written demand on the corporation and (ii) obtain from the transfer agent of the corporation, on written demand and on the tender of such transfer agent's usual charges for such list, a list of the shareholders' names and addresses, who are entitled to vote for the election of directors, and their share holdings, as of the most recent record date for which that list has been compiled or as of a date specified by the shareholder after the date of demand. This list shall be made available to any such shareholder by the transfer agent on or before the later of five (5) days after the demand is received or the date specified in the demand as the date as of which the list is to be compiled. The record of shareholders shall also be open to inspection on the written demand of any shareholder or holder of a voting trust certificate, at any time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust certificate. Any inspection and copying under this Section 1 may be made in person or by an agent or attorney of the shareholder or holder of a voting trust certificate making the demand.

<PAGE>

Section 2. MAINTENANCE AND INSPECTION OF BYLAWS. The corporation shall keep at its principal executive office, or if its principal executive office is not in the State of California, at its principal business office in this state, the original or a copy of the bylaws as amended to date, which shall be open to inspection by the shareholders at all reasonable times during office hours. If the principal executive office of the corporation is outside the State of California and the corporation has no principal business office in this state, the Secretary shall, upon the written request of any shareholder, furnish to that shareholder a copy of the bylaws as amended to date.

Section 3. MAINTENANCE AND INSPECTION OF OTHER CORPORATE RECORDS. The accounting books and records and minutes of proceedings of the shareholders and the board of directors and any committee or committees of the board of directors shall be kept at such place or places designated by the board of directors, or, in the absence of such designation, at the principal executive office of the corporation. The minutes shall be kept in written form and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form. The minutes and accounting books and records shall be open to inspection upon the written demand of any shareholder or holder of a voting trust certificate, at any reasonable time during usual business hours, for a purpose reasonably related to the holder's interests as a shareholder or as the holder of a voting trust certificate. The inspection may be made in person or by an agent or attorney, and shall include the right to copy and make extracts. These rights of inspection shall extend to the records of each subsidiary corporation of the corporation.

Section 4. INSPECTION BY DIRECTORS. Every director shall have the absolute right at any reasonable time to inspect all books, records and documents of every kind and the physical properties of the corporation and each of its subsidiary corporations. This inspection by a director may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts of documents.

Section 5. ANNUAL REPORT TO SHAREHOLDERS. The annual report to shareholders referred to in Section 1501 of the California General Corporation Law is expressly dispensed with, but nothing herein shall be interpreted as prohibiting the board of directors from issuing annual or other periodic reports to the shareholders of the corporation as they consider appropriate.

Section 6. FINANCIAL STATEMENTS. A copy of any annual financial statement and any income statement of the corporation for each quarterly period of each fiscal year, and any accompanying balance sheet of the corporation as of the end of each period, that has been prepared by the corporation shall be kept on file in the principal executive office of the corporation for twelve (12) months and each such statement shall be exhibited at all reasonable times to any shareholder demanding an examination of any such

<PAGE>

statement or a copy shall be mailed to any such shareholder.

If a shareholder or shareholders holding at least five percent (5%) of the outstanding shares of any class of stock of the corporation makes a written request to the corporation for an income statement of the corporation for the three-month, six-month or nine-month period of the then current fiscal year

ended more than thirty (30) days before the date of the request, and a balance sheet of the corporation as of the end of that period, the chief financial officer shall cause that statement to be prepared, if not already prepared, and shall deliver personally or mail that statement or statements to the person making the request within thirty (30) days after the receipt of the request. If the corporation has not sent to the shareholders its annual report for the last fiscal year, this report shall likewise be delivered or mailed to the shareholder or shareholders within thirty (30) days after the request.

The corporation shall also, on the written request of any shareholder, mail to the shareholder a copy of the last annual, semi-annual, or quarterly income statement which it has prepared, and a balance sheet as of the end of that period.

The quarterly income statements and balance sheets referred to in this section shall be accompanied by the report, if any, of any independent accountants engaged by the corporation or the certificate of an authorized officer of the corporation that the financial statements were prepared without audit from the books and records of the corporation.

Section 7. ANNUAL STATEMENT OF GENERAL INFORMATION. The corporation shall, within the statutorily required time period, file with the Secretary of State of the State of California, on the prescribed form, a statement setting forth the authorized number of directors, the names and complete business or residence addresses of all incumbent directors, the names and complete business or residence addresses of the chief executive officer, secretary, and chief financial officer, the street address of its principal executive office or principal business office in this state, and the general type of business constituting the principal business activity of the corporation, together with a designation of the agent of the corporation for the purpose of service of process, all in compliance with Section 1502 of the Corporations Code of California.

ARTICLE VIII

GENERAL CORPORATE MATTERS

Section 1. RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING. For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any

<PAGE>

other lawful action (other than action by shareholders by written consent without a meeting), the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) days before any such action, and in that case only shareholders of record on the date so fixed are entitled to receive the dividend, distribution, or allotment of rights or to exercise the rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date so fixed, except as otherwise provided in the California General Corporation Law.

If the board of directors does not so fix a record date, the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the board adopts the applicable resolution or the sixtieth (60) day before the date of that action, whichever is later.

Section 2. CHECKS, DRAFTS, EVIDENCES OF INDEBTEDNESS. All checks, drafts, or other orders for payment of money, notes, or other evidences of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 159 of 2711

indebtedness, issued in the name of or payable to the corporation, shall be signed or endorsed by such person or persons and in such manner as, from time to time, shall be determined by resolution of the board of directors.

Section 3. CORPORATION CONTRACTS AND INSTRUMENTS; HOW EXECUTED. The board of directors, except as otherwise provided in these bylaws, may authorize any officer or officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation, and this authority may be general or confined to specific instances; and, unless so authorized or ratified by the board of directors or within the agency power of an officer, no officer, agent, or employee shall have the power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 4. CERTIFICATES FOR SHARES. A certificate or certificates for shares of the capital stock of the corporation shall be issued to each shareholder when any of these shares are fully paid, and the board of directors may authorize the issuance of certificates or shares as partly paid provided that these certificates shall state the amount of the consideration to be paid for them and the amount paid. All certificates shall be signed in the name of the corporation by the chairman of the board or vice chairman of the board or the president or vice president and by the chief financial officer or an assistant treasurer or the secretary or any assistant secretary, certifying the number of shares and the class or series of shares owned by the shareholder. Any or all of the signatures on the certificate may be facsimile. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed on a certificate shall have ceased to be that officer, transfer agent, or registrar before that certificate is issued, it may be issued by the corporation with the same effect as if that person were an officer, transfer agent, or registrar at the date of issuance.

22

<PAGE>

Section 5. LOST CERTIFICATES. Except as provided in this Section 5, no new certificates for shares shall be issued to replace an old certificate unless the latter is surrendered to the corporation and canceled at the same time. The board of directors may, in case any share certificate or certificate for any other security is lost, stolen, or destroyed, authorize the issuance of a replacement certificate on such terms and conditions as the board may require, including provision for indemnification of the corporation secured by a bond or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft, or destruction of the certificate or the issuance of the replacement certificate.

Section 6. REPRESENTATION OF SHARES OF OTHER CORPORATIONS. The chairman of the board, the president, or any vice president, or any other person authorized by resolution of the board of directors or by any of the foregoing designated officers, is authorized to vote on behalf of the corporation any and all shares of any other corporation or corporations, foreign or domestic, standing in the name of the corporation. The authority granted to these officers to vote or represent on behalf of the corporation any and all shares held by the corporation in any other corporation or corporations may be exercised by any of these officers in person or by any person authorized to do so by a proxy duly executed by these officers.

Section 7. CONSTRUCTION AND DEFINITIONS. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California General Corporation Law shall govern the construction of these

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 160 of 2711

bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

ARTICLE IX

AMENDMENTS

Section 1. AMENDMENT BY SHAREHOLDERS. New bylaws may be adopted or these bylaws may be amended or repealed by the vote or written consent of holders of a majority of the outstanding shares entitled to vote except as otherwise provided by law or by the articles of incorporation.

Section 2. AMENDMENT BY DIRECTORS. Subject to the rights of the shareholders as provided in Section I of this Article IX, bylaws, other than a bylaw or an amendment of a bylaw changing the authorized number of directors, may be adopted, amended, or repealed by the board of directors.

23

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1
<SEQUENCE>5
<DESCRIPTION>1987 INCENTIVE STOCK OPTION PLAN
<TEXT>

<PAGE>

EXHIBIT 10.1

INCENTIVE STOCK OPTION PLAN

OF

OPTO SENSORS, INC.

1. PURPOSE AND EFFECT.

The purpose of this Incentive Stock Option Plan ("Plan") of Opto Sensors, Inc., a California corporation ("Company"), is to promote the interests of the Company and its stockholders by providing a method whereby certain officers, directors and key employees of the Company may be encouraged to invest in the Company's Common Stock and thereby increase their proprietary interest in its business, encourage them to remain in the employ of the Company and increase their personal interest in its continued success and progress.

2. ADMINISTRATION.

(a) The Company's Board of Directors ("Board") shall have full power and authority, not inconsistent with the provisions of the Plan, to interpret the provisions and supervise the administration of the Plan. All determinations by the Board shall be made by the affirmative vote of a majority of its members, but any determination reduced to writing and signed by a majority of the members shall be fully as effective as if it had been made by a majority vote at a meeting duly called and held.

(b) Each option shall be evidenced by an option agreement which shall

contain such terms and conditions as may be approved by the Board and shall be signed by an officer of the Company and the optionee.

(c) Subject to any applicable provisions of the Company's By-Laws, all decisions made by the Board shall be final, conclusive and binding on all persons, including the Company, stockholders, employees, and optionees.

3. SHARES SUBJECT TO THE PLAN.

(a) The shares to be delivered upon exercise of options granted under the Plan shall be made available, at the discretion of the Board, either from the authorized but unissued shares of the Company's Common Stock or from shares of the Company's Common Stock reacquired by the Company.

(b) Subject to adjustments made pursuant to the provisions of paragraph (c) of this Section 3, the aggregate number of shares to be delivered upon exercise of all options which may be granted under this Plan shall not exceed 700,000 shares. If an option granted under the Plan shall expire or terminate for any reason during the term of the Plan, the shares subject to but not delivered under such option shall be available for other options.

<PAGE>

(c) In the event of a merger, reorganization, consolidation, recapitalization, stock dividend, or other change in corporate structure affecting the Company's Common Stock, such adjustment shall be made in the aggregate number of shares subject to the Plan, and the number and option price of shares subject to options granted under the Plan as may be determined to be appropriate by the Board.

4. ELIGIBILITY AND PARTICIPATION.

The persons eligible to receive options under the Plan shall consist of officers, directors and key employees of the Company. Subject to the limitations of the Plan, the Board shall select the persons to be granted options, determine the number and option price of the shares subject to each option, and determine the time when each option shall be granted. More than one option may be granted to the same person.

5. TERM OF PLAN AND OPTION PERIOD.

The last day which options may be granted under the Plan shall expire on December 31, 1998. Subject to the provisions of the Plan with respect to death, retirement and termination of employment, the maximum period during which each option may be exercised shall in no event exceed five years.

6. OPTION PRICE.

The price at which shares may be purchased upon exercise of a particular option shall be determined by the Board and may vary from time to time.

7. EXERCISE OF OPTIONS.

(a) No portion of any option granted under this Plan may be exercised until the optionee has been an officer, director or employee of the Company for at least one year immediately following the date the option is granted and, except in case of death, retirement or termination of employment as hereinafter provided, only during the continuance of the optionee's relationship with the Company as an officer, director or employee. Subject to the foregoing limitations and the terms and conditions of the option agreement, each option

shall be exercisable as follows:

(i) After one year of a continuous relationship as an director or employee, no more than fifty percent (50%) of the shares subject to the option.

(ii) After two years of a continuous relationship as an officer, director or employee, no more than seventy-five percent (75%) of the shares subject to the option.

<PAGE>

(iii) After three years of a continuous relationship as an officer, director or employee, the remaining balance of the shares subject to the option which have not been exercised.

(b) No shares shall be delivered pursuant to the exercise of any option, in whole or in part, until qualified for delivery under such laws and regulations as may be deemed by the Board to be applicable thereto and until payment in full of the option price therefor is received by the Company. No optionee shall be or deemed to be a holder of any shares subject to such option unless and until the certificate or certificates therefor have been issued.

8. TRANSFERABILITY OF OPTIONS.

An option granted under the Plan may not be transferred and may be exercised only by the optionee during this lifetime and during his relationship as an officer, director or employee of the Company.

9. DEATH, RETIREMENT AND TERMINATION OF EMPLOYMENT.

Any option, the period of which has not theretofore expired, shall terminate at the time of the death of the optionee or of the termination for any reason of such optionee's relationship with the Company as an officer, director or employee (for any reason whatsoever, with or without cause), and no shares may thereafter be delivered pursuant to such option.

If, during the three year period immediately following the date that an optionee first receives a grant of options under the Plan (such date is referred to as the "Optionee's Initial Grant Date"), said optionee dies, retires or has his relationship with the Company terminated by either the Company or him (for any reason whatsoever, with or without cause), the Company shall have the right, but shall not be obligated, to purchase such shares from the optionee or his estate at a purchase price equal to the amount paid by the optionee to the Company for such shares. In order to exercise the aforesaid right, the Company must notify the optionee or his estate within ninety (90) days after death, retirement or termination, whichever is the case. The Company shall have no right under the Plan to purchase shares from an optionee or his estate if the optionee's death, retirement or termination of relationship with the Company occurs more than three (3) years after the Optionee's Initial Grant Date.

<PAGE>

INCENTIVE STOCK OPTION AGREEMENT

THIS INCENTIVE STOCK OPTION AGREEMENT ("Agreement") is made and entered

into this day of ________, 19__, by and between OPTO SENSORS, INC. ("Company"), a California corporation, and ________________ ("Optionee").

WHEREAS, the Company has adopted an Incentive Stock Option Plan ("Plan") for the granting to the Company's officers, directors and key employees of options to purchase shares of Common Stock from the Company in order to encourage stock ownership in the Company by such persons; and

WHEREAS, pursuant to the Plan, the Company's Board of Directors ("Board") has approved the execution of this Agreement to evidence the grant to the Optionee of the right and option to purchase shares of the Common Stock of the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and of the mutual obligations herein contained, it is agreed as follows:

1. Granting and Exercising of Option.

The Company grants, as of the date set forth above, to the Optionee the right and option to purchase, on the terms and conditions hereinafter set forth, all or any part of an aggregate of ____________ shares of the Company's no par value Common Stock ("Shares") at the purchase price of $________________ per Share, exercisable in the amount and at the times set forth in this paragraph below:

(a) No portion of any option granted under this Agreement may be exercised until the Optionee has been an officer, director or employee of the Company for at least one year immediately following the date the option is granted and, except death, retirement or termination of employment as hereinafter provided, only during the continuance of the Optionee's relationship with the Company as an officer, director or employee. Subject to the foregoing limitations and the terms and conditions of the Plan, each option shall be exercisable as follows:

(i) After one year of a continuous relationship as an officer, director or employee, no more than fifty percent (50%) of the Shares subject to the option.

(ii) After two years of a continuous relationship as an officer, director or employee, no more than seventy-five percent (75%) of the Shares subject to the option.

(iii) After three years of a continuous relationship as an officer, director or employee, the remaining balance of the Shares subject to the option which have not been exercised.

<PAGE>

(b) No Shares shall be delivered pursuant to the exercise of any option, in whole or in part, until qualified for delivery under such laws and regulations as may be deemed by the Board to be applicable thereto and until payment in full of the option price therefor is received by the Company. No Optionee shall be or deemed to be a holder of any Shares subject to such option unless and until the certificate or certificates therefor have been issued.

Notwithstanding anything provided herein to the contrary, any option granted shall terminate at the close of business on the date preceding the fifth anniversary of the date of grant.

2. Manner of Exercise.

Each exercise of this option shall be by means of a written notice of

exercise delivered to the Secretary of the Company, specifying the number of Shares to be purchased and accompanied by payment in cash or by certified or cashier's check payable to the order of the Company of the full purchase price of the Shares to be purchased. In addition, each notice of exercise shall be accompanied by a representation and agreement in writing, signed by the Optionee, that the Shares being acquired are being acquired in good faith for investment, and not for sale or distribution, and shall not be pledged or hypothecated, nor sold or transferred, in the absence of an effective registration statement for the Shares under the Securities Act of 1933, or an opinion of counsel of the Company that registration is not required under said Act, and that the Company may attach to the Shares a legend to that effect.

3. Death, Retirement and Termination of Employment.

Any option, the period of which has not theretofore expired, shall terminate at the time of the death of the Optionee or of the termination for any reason of such Optionee's relationship with the Company as an officer, director or employee (for any reason whatsoever, with or without cause), and no Shares may thereafter be delivered pursuant to such option.

If, during the three year period immediately following the earlier of the execution of this Agreement or a similar Incentive Stock Option Agreement between Company and Optionee, the Optionee acquires any Shares under the option and thereafter dies, retires or has his relationship with the Company terminated by either the Company or him (for any reason whatsoever, with or without cause) during said three year period, the Company shall have the right, but shall not be obligated to, purchase such Shares from the Optionee or his estate at a purchase price equal to the amount paid by the Optionee to the Company for such Shares. In order to exercise the aforesaid right, the Company must notify the Optionee or his estate within ninety (90) days after death, retirement or termination, whichever is the case. The Company shall have no right under this Agreement to purchase shares from the Optionee or his estate if the Optionee's death, retirement or termination of relationship with the Company occurs more than three (3) years

<PAGE>

after the date the Optionee first receives a grant of options under the Plan.

4. Transfer of Stock on Exercise.

As soon as practicable after any exercise of this option in accordance with the foregoing provisions, the Company shall, without transfer or issue tax or other incidental expense to the Optionee, deliver to the Optionee at the principal office of the Company or at such other place as may be mutually acceptable to the Company and to the Optionee, a certificate or certificates representing the Shares as to which this option has been exercised.

5. Purchase for Investment.

By accepting this option, the Optionee agrees that any and all Shares purchased upon the exercise of this option shall be acquired for investment and not for resale or for distribution. Upon each exercise of any portion of this option, the person entitled to exercise the same shall furnish evidence satisfactory to the Company (including a written and signed representation) to the effect that the Shares are being acquired in good faith for investment and not for resale or distribution.

6. No Hypothecation or Transfer.

This option and the rights and privileges granted hereby shall not be transferred, assigned, pledged or hypothecated in any way whether by operation of law or otherwise. Upon any attempt so to transfer, assign, pledge, hypothecate or otherwise dispose of this option or any right or privilege granted hereby contrary to the provisions hereof, this option and said rights and privileges shall immediately become null and void.

7. Adjustments of Option Stock; Reorganization; Stock Dividends.

(a) In the event of a merger, reorganization, consolidation, recapitalization, stock dividend or other change in corporate structure affecting the Company's Common Stock, such adjustment shall be made in the number and option price of Shares subject to options granted under this Agreement as may be determined to be appropriate by the Board.

(b) Notwithstanding anything hereinabove to the contrary, upon the occasion of a merger or consolidation of the Company with any other corporation, any options theretofore granted under this Agreement which shall not have been exercised (whether or not then capable of exercise) shall be deemed canceled, unless the surviving corporation shall assume the options under this Agreement, or shall issue substitute options in place thereof.

3

<PAGE>

8. Liquidation.

Upon the liquidation of the Company, any unexercised options theretofore granted under this Agreement shall be deemed canceled, except as otherwise provided in Paragraph 7 above on the occasion of a merger or consolidation.

9. Requirement of Issuance.

The Optionee shall not be entitled to exercise any of the rights or privileges of a stockholder of the Company in respect of any Shares issuable upon any exercise of this option unless and until a certificate or certificates representing such Shares shall have been actually issued and delivered to him.

10. Notice.

Any notice to the Company provided for in this Agreement shall be in writing addressed to it in care of its Secretary at its principal corporate office, and any notice to the Optionee shall be in writing addressed to him at the address then appearing for him on the personnel records of the Company. Either party may designate to the other a different address for the purpose of this paragraph by a written notice given in accordance herewith.

11. Plan Incorporated Herein.

The option hereby granted is subject to, and the Company and the Optionee agree to be bound by, all of the terms and conditions of the Plan, a copy of which is attached hereto and made a party hereof. The Plan shall control in the event there is any conflict between the Plan and this Agreement and on matters not contained in this Agreement.

12. Appointment of Secretary.

The Optionee hereby appoints the Secretary of the Company at the time in office his agent and attorney-in-fact, with power of substitution, in his name

and on his behalf to accept delivery and receipt for any certificate or certificates, representing any Shares purchased by the Optionee hereunder, and to hold the same for the account of the Optionee subject to any further written instructions from the Optionee, and delivery to said agent and attorney-in-fact of any such certificates shall for all purposes be deemed delivered to the Optionee.

13. Disputes.

Any dispute or disagreement which shall arise under or as a result of this Agreement, or which shall relate to the interpretation or construction of this Agreement, shall be determined by the Board. The determination of the Board shall be final, binding and conclusive for all purposes.

4

<PAGE>

14. Date of Grant; Applicable Law.

This Option has been granted, executed and delivered the day and year first above written, and the interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California.

OPTO SENSORS, INC.

By:___________________________
President

------------------------------
OPTIONEE

5

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.2
<SEQUENCE>6
<DESCRIPTION>1997 STOCK OPTION PLAN
<TEXT>

<PAGE>

EXHIBIT 10.2

1997 STOCK OPTION PLAN
OF
OSI SYSTEMS, INC.

1. PURPOSES OF THE PLAN

The purposes of the 1997 Stock Option Plan (the "Plan") of OSI Systems, Inc., a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or its Affiliates; and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (the "Code"), or "nonqualified options" ("NQOs").

2. ELIGIBLE PERSONS

Every person who at the date of grant of an Option is an employee of the Company or of any Affiliate (as defined below) of the Company is eligible to receive NQOs or ISOs under this Plan. Every person who at the date of grant is a consultant to, or non-employee director of, the Company or any Affiliate (as defined below) of the Company is eligible to receive NQOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 424(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

3. STOCK SUBJECT TO THIS PLAN; MAXIMUM NUMBER OF GRANTS

Subject to the provisions of Section 6.1.1 of the Plan, the total number of shares of stock which may be issued under Options granted pursuant to this Plan shall not exceed 850,000 shares of Common Stock (which gives effect to a 1.5-for-1 stock split of the Common Stock (the "Stock Split") to be effected in June 1997). The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. No eligible person shall be granted Options during any twelve-month period covering more than 425,000 shares (which gives effect to the Stock Split to be effected in June 1997).
<PAGE>

4. ADMINISTRATION

(a) The Plan shall be administered by the Board of Directors of the Company (the "Board") or by a committee (the "Committee") to which administration of the Plan, or of part of the Plan, is delegated by the Board (in either case, the "Administrator"). The Board shall appoint and remove members of the Committee in its discretion in accordance with applicable laws. If necessary in order to comply with Rule 16b-3 under the Exchange Act and Section 162(m) of the Code, the Committee shall, in the Board's discretion, be comprised solely of "non-employee directors" within the meaning of said Rule 16b-3 and "outside directors" within the meaning of Section 162(m) of the Code. The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

(b) Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the optionee, to modify or

amend any Option; (ix) to defer (with the consent of the optionee) the exercise date of any Option; (x) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(c) All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

<PAGE>

5. GRANTING OF OPTIONS; OPTION AGREEMENT

(a) No Options shall be granted under this Plan after 10 years from the date of adoption of this Plan by the Board.

(b) Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Administrator, executed by the Company and the person to whom such Option is granted.

(c) The stock option agreement shall specify whether each Option it evidences is an NQO or an ISO.

(d) Subject to Section 6.3.3 with respect to ISOs, the Administrator may approve the grant of Options under this Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultants at the date of approval, and the date of approval shall be deemed to be the date of grant unless otherwise specified by the Administrator.

6. TERMS AND CONDITIONS OF OPTIONS

Each Option granted under this Plan shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall be also subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 Terms and Conditions to Which All Options Are Subject. All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1 Changes in Capital Structure. Subject to Section 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board in its sole discretion.

6.1.2 Corporate Transactions. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator, in the exercise of his sole discretion, may permit exercise of any Options prior

to their termination, even if such Options were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in

<PAGE>

the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Options prior to consummation of such event, even if such Options were not otherwise exercisable.

6.1.3 Time of Option Exercise. Subject to Section 5 and Section 6.3.4, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) in accordance with a schedule as may be set by the Administrator (in any case, the "Vesting Base Date") and specified in the written stock option agreement relating to such Option. In any case, no Option shall be exercisable until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee.

6.1.4 Option Grant Date. The date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

6.1.5 Nontransferability of Option Rights. Except with the express written approval of the Administrator which approval the Administrator is authorized to give only with respect to NQOs, no Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution. During the life of the optionee, an Option shall be exercisable only by the optionee.

6.1.6 Payment. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. The Administrator, in the exercise of its absolute discretion after considering any tax, accounting and financial consequences, may authorize any one or more of the following additional methods of payment:

(a) Acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company);

(b) Subject to the discretion of the Administrator and the terms of the stock option agreement granting the Option, delivery by the optionee of shares of Common Stock already owned by the optionee for all or part of the Option

<PAGE>

price, provided the fair market value (determined as set forth in Section

6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock; and

(c) Subject to the discretion of the Administrator, through the surrender of shares of Common Stock then issuable upon exercise of the Option, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by surrender of such stock.

(d) By means of so-called cashless exercises as permitted under applicable rules and regulations of the Securities and Exchange Commission and the Federal Reserve Board.

6.1.7 Termination of Employment. If for any reason other than death or permanent and total disability, an optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), Options held at the date of Termination (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, or such other period of not less than 30 days after the date of such Termination as is specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date); provided, however, that if such exercise of the Option would result in liability for the optionee under Section 16(b) of the Exchange Act, then such three-month period automatically shall be extended until the tenth day following the last date upon which optionee has any liability under Section 16(b) (but in no event after the Expiration Date). If an optionee dies or becomes permanently and totally disabled (within the meaning of Section 22(e)(3) of the Code) while employed by the Company or an Affiliate or within the period that the Option remains exercisable after Termination, Options then held (to the extent then exercisable) may be exercised, in whole or in part, by the optionee, by the optionee's personal representative or by the person to whom the Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of the optionee or any longer period specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date). For purposes of this Section 6.1.7, "employment" includes service as a director or as a consultant. For purposes of this Section 6.1.7, an optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if the optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

<PAGE>

6.1.8 Withholding and Employment Taxes. At the time of exercise of an Option and as a condition thereto, or at such other time as the amount of such obligations becomes determinable (the "Tax Date"), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. Such obligation to remit may be satisfied, if authorized by the Administrator in its sole discretion, after considering any tax, accounting and financial consequences, by the optionee's (i) delivery of a promissory note in the required amount on such terms as the Administrator deems appropriate, (ii) tendering to the Company previously owned shares of Stock or other securities of the Company with a fair market value equal to the required amount, or (iii) agreeing to have shares of Common Stock (with a fair market value equal to the required amount) which are acquired upon exercise of the Option withheld by the Company.

6.1.9 Other Provisions. Each Option granted under this Plan may

contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

6.1.10 Determination of Value. For purposes of the Plan, the fair market value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is regularly quoted by a recognized securities dealer, and selling prices are reported, its fair market value shall be the closing price of such stock on the date the value is to be determined, but if selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for such stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

(b) In the absence of an established market for the stock, the fair market value thereof shall be determined in good faith by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry, the Company's management, and the values of stock of other corporations in the same or a similar line of business.

6.1.11 Option Term. Subject to Section 6.3.4, no Option shall be exercisable more than 10 years after the date of grant, or such lesser period of time as is set forth in the stock option agreement (the end of the maximum exercise period stated in the stock option agreement is referred to in this Plan as the "Expiration Date").

6.

<PAGE>

6.2 Terms and Conditions to Which Only NQOs Are Subject. Options granted under this Plan which are designated as NQOs shall be subject to the following terms and conditions:

6.2.1 Exercise Price. The exercise price of a NQO shall be not less than 85% of the fair market value (determined in accordance with Section 6.1.10) of the stock subject to the Option on the date of grant.

6.3 Terms and Conditions to Which Only ISOs Are Subject. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 Exercise Price. (a) Except as set forth in Section 6.3.1(b), the exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

(b) The exercise price of an ISO granted to any person who owns, directly or by attribution under the Code (currently Section 424(d)), stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 172 of 2711

Shareholders) shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3.2 Disqualifying Dispositions. If stock acquired by exercise of an ISO granted pursuant to this Plan is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code (a disposition within two years from the date of grant of the Option or within one year after the transfer such stock on exercise of the Option), the holder of the stock immediately before the disposition shall promptly notify the Company in writing of the date and terms of the disposition and shall provide such other information regarding the Option as the Company may reasonably require.

6.3.3 Grant Date. If an ISO is granted in anticipation of employment as provided in Section 5(d), the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

6.3.4 Term. Notwithstanding Section 6.1.11, no ISO granted to any Ten Percent Shareholder shall be exercisable more than five years after the date of grant.

<PAGE>

7. MANNER OF EXERCISE

(a) An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price and withholding taxes as provided in Sections 6.1.6 and 6.1.8. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price will be considered as the date such Option was exercised.

(b) Promptly after receipt of written notice of exercise of an Option and the payments called for by Section 7(a), the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of stock. An optionee or permitted transferee of the Option shall not have any privileges as a shareholder with respect to any shares of stock covered by the Option until the date of issuance (as evidenced by the appropriate entry on the books of the Company or a duly authorized transfer agent) of such shares.

8. EMPLOYMENT OR CONSULTING RELATIONSHIP

Nothing in this Plan or any Option granted hereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any optionee's employment or consulting at any time, nor confer upon any optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

9. CONDITIONS UPON ISSUANCE OF SHARES

Shares of Common Stock shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such shares pursuant thereto shall comply with all relevant provisions of law,

including, without limitation, the Securities Act of 1933, as amended (the "Securities Act").

10. NONEXCLUSIVITY OF THE PLAN

The adoption of the Plan shall not be construed as creating any limitations on the power of the Company to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options other than under the Plan.

11. MARKET STANDOFF

Each optionee, if so requested by the Company or any representative of the underwriters in connection with any registration of the offering of any securities of the Company under the Securities Act, shall not sell or otherwise transfer any shares of Common Stock acquired upon exercise of Options during the 180-day period following

<PAGE>

the effective date of a registration statement of the Company filed under the Securities Act; provided, however, that such restriction shall apply only to the first registration statement of the Company to become effective under the Securities Act after the date of adoption of this Plan which includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restriction until the end of such 180-day period.

12. AMENDMENTS TO PLAN

The Board may at any time amend, alter, suspend or discontinue this Plan. Without the consent of an optionee, no amendment, alteration, suspension or discontinuance may adversely affect outstanding Options except to conform this Plan and ISOs granted under this Plan to the requirements of federal or other tax laws relating to incentive stock options. No amendment, alteration, suspension or discontinuance shall require shareholder approval unless (a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes or (b) the Board otherwise concludes that shareholder approval is advisable.

13. EFFECTIVE DATE OF PLAN

This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within twelve months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect from and after expiration of such twelve-month period. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws.

<PAGE>

OSI SYSTEMS, INC.
INCENTIVE STOCK OPTION AGREEMENT

THIS INCENTIVE STOCK OPTION AGREEMENT (the "Agreement"), is made as of the ___ day of _________ 19__ by and between OSI Systems, Inc., a California corporation (the "Company"), and __________________________ ("Optionee").

R E C I T A L

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of an incentive stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, _______________ shares of Common Stock of the Company ("Shares") at the price of $_________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary (fifth anniversary if Optionee owns more than 10% of the voting stock of the Company or an Affiliate of the Company on the date of this Agreement) of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

10.

<PAGE>

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

     (C) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. In the event that this Option shall lose its qualification as an incentive stock option, as a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

11.

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. In the event this Option is treated as a nonqualified stock option, then and to that extent, "employment" would include service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. This Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor confer upon Optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.3 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that, upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon each exercise thereof he shall furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state or federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms

<PAGE>

and provisions of the Plan, as it may be construed by the Administrator. It is intended that this Option shall qualify as an incentive stock option as defined by Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement shall be construed in a manner which will enable this Option to be so qualified. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. Optionee understands that, under current

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 177 of 2711

law, beneficial tax treatment resulting from the exercise of this Option will be available only if certain requirements of the Code are satisfied, including without limitation, the requirement that no disposition of Shares acquired pursuant to exercise of this Option be made within two years from the grant date or within one year after the transfer of Shares to him or her. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form of transfer) of any such Shares, he or she will first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition. In addition to the foregoing, Optionee hereby agrees that before Optionee disposes (whether by sale, exchange, gift, or otherwise) of any Shares acquired by exercise of this Option within two years of the grant date or within one year after the transfer of such Shares to Optionee upon exercise of this Option, Optionee shall promptly notify the Company in writing of the date and terms of the proposed disposition and shall provide such other information regarding the Option as the Company may reasonably require immediately before such disposition. Said written notice shall state the date of such proposed disposition, and the type and amount of the consideration to be received for such Share or Shares by Optionee in connection therewith. In the event of any such disposition, the Company shall have the right to require Optionee to immediately pay the Company the amount of taxes (if any) which the Company is required to withhold under federal and/or state law as a result of the granting or exercise of the Option and the disposition of the Shares.

13.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By ________________________
Name:
Title:

OPTIONEE

___________________________
Name:

Address:

___________________________
___________________________
___________________________

14.

<PAGE>

OSI SYSTEMS, INC.
NONQUALIFIED STOCK OPTION AGREEMENT

THIS NONQUALIFIED STOCK OPTION AGREEMENT (the "Agreement"), is made as of the _____ day of ______________, 19___ by and between OSI Systems, Inc., a California corporation (the "Company"), and ____________________ ("Optionee").

R E C I T A L

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 178 of 2711

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of a nonqualified stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, ________ shares of Common Stock of the Company ("Shares") at the price of $________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of or providing services to the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

15.

<PAGE>

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

(C) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price,

plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. As a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. For purposes of this Paragraph 6, "employment" includes service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. Except with the express written approval of the Administrator, this Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor

confer upon Optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.2 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon such exercise thereof he will furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state and federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

17.

<PAGE>

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms and provisions of the Plan, as it may be construed by the Administrator. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form or transfer) of any Shares acquired by exercise of this Option, he or she shall first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition.

18.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By__________________________

Name:
Title:

OPTIONEE

By_____________________________
Name:

Address:

_____________________________
_____________________________
_____________________________

19.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.3
<SEQUENCE>7
<DESCRIPTION>EMPLOYMENT AGREEMENT WITH DEEPAK CHOPRA
<TEXT>

<PAGE>

EXHIBIT 10.3

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between OPTO SENSORS, INC. ("Company"), a California corporation, and DEEPAK CHOPRA ("Employee"), with reference to the following facts:

A. Employee has been serving Company as President in a satisfactory and capable manner pursuant to an oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as President, Chief Executive Officer and Chairman of the Board of Company. Employee shall report to the Board of Directors of Company and perform the services and duties customarily incident to such office and as otherwise decided upon by the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable

and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company. Employee shall perform his services under this Agreement in Los Angeles County, California, or such other location as is acceptable to Employee.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of five (5) years. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made

<PAGE>

by Company as to any minimum or specified term or length of employment following the term set forth above.

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of $450,000.00 per annum, which salary shall be reviewed no less frequent than annually by the Company's Board of Directors. The Board of Directors may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. The Employee shall be entitled to receive at least one-third (1/3) of the amount of the total bonuses.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee shall consider in good faith granting a reasonable amount of options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee

for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries, inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with

<PAGE>

Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to practice, to the business of Company or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

> "Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all Inventions, whether Employee personally considers them patentable

or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of

<PAGE>

Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2, "cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to the Company's Board of Directors describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

<PAGE>

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the date of such termination or expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration. Notwithstanding anything to the contrary contained in this Agreement if, prior to the end of the initial five (5) year term, Employer terminates this Agreement without cause, Employee shall continue to be entitled to receive all of the compensation and other benefits provided for in Paragraph 3 for the remainder of said five (5) year term without any deduction or offset for any compensation earned or received by Employee from any other sources.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or

any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or

<PAGE>

adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief against the performance of service elsewhere by Employee during the term of this Agreement.

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party

further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

9.5 Expenses. In the event an action at law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or similar reorganization.

7

<PAGE>

In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

OPTO SENSORS, INC.

By: /s/ Deepak Chopra
------------------------------

Its: Chief Executive Officer

/s/ Deepak Chopra

DEEPAK CHOPRA

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.4
<SEQUENCE>8
<DESCRIPTION>EMPLOYMENT AGREEMENT WITH AJAY MEHRA
<TEXT>

<PAGE>

EXHIBIT 10.4

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between OPTO SENSORS, INC. ("Company"), a California corporation, and AJAY MEHRA ("Employee"), with reference to the following facts:

A. Employee has been serving Company as Chief Financial Officer in a satisfactory and capable manner pursuant to an oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as Chief Financial Officer of Company. Employee shall report to the Chief Executive Officer of Company and perform the services and duties customarily incident to such office and as otherwise decided upon by the Chief Executive Officer or the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company. Employee shall perform his services under this Agreement in Los Angeles County, California, or such other location as is acceptable to Employee.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of three (3) years. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made by Company as to any minimum or specified term or length of employment following the term set forth above.

1

<PAGE>

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of $200,000.00 per annum, which salary shall be reviewed no less frequent than annually by the Company. The Company may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. At the sole discretion of the Board of Directors, Employee may be entitled to participate therein.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee shall consider in good faith granting a reasonable amount of options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries,

inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to practice, to the business of Company

2

<PAGE>

or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

> "Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all Inventions, whether Employee personally considers them patentable or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said

3

<PAGE>

information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others

without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with

<PAGE>

Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by

Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2, "cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to Company describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the date of such termination or

<PAGE>

expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration. Notwithstanding anything to the contrary contained in this Agreement if, prior to the end of the initial three (3) year term, Employer terminates this Agreement without cause, Employee shall continue to be entitled to receive all of the compensation and other benefits provided for in Paragraph 3 for the remainder of said three (3) year term without any deduction or offset for any compensation earned or received by Employee from any other sources.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable

injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief

<PAGE>

against the performance of service elsewhere by Employee during the term of this Agreement.

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

9.5 Expenses. In the event an action at law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the

prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or similar reorganization. In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions

<PAGE>

shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

OPTO SENSORS, INC.

By: /s/ Deepak Chopra

Its: Chief Executive Officer

/s/ Ajay Mehra

AJAY MEHRA

</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.5
<SEQUENCE>9
<DESCRIPTION>EMPLOYMENT AGRMT WITH ANDREAS F. KOTOWSKI
<TEXT>

<PAGE>

EXHIBIT 10.5

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between RAPISCAN SECURITY PRODUCTS (U.S.A.), INC. ("Company"), a California corporation, and ANDREAS F. KOTOWSKI ("Employee"), with reference to the following facts:

A. Employee has been serving Company in a satisfactory and capable manner pursuant to a written or oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as President of U.S. Operations and General Manager of Company. Employee shall report to the Chief Executive Officer of Company and perform the services and duties customarily incident to such office and as otherwise decided upon by the Chief Executive Officer or the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of two (2) years. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made

<PAGE>

by Company as to any minimum or specified term or length of employment following the term set forth above.

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of $140,000.00 per annum, which salary shall be reviewed no less frequent than annually by the Company's Board of Directors. The Board of Directors may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. At the sole discretion of the Board of Directors, Employee may be entitled to participate therein.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee may, in its sole discretion, consider granting options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries, inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with

2

<PAGE>

Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to

practice, to the business of Company or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

"Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all Inventions, whether Employee personally considers them patentable

<PAGE>

or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of

<PAGE>

Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2,

"cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to Company describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

<PAGE>

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the date of such termination or expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief against the performance of service elsewhere by Employee during the term of this Agreement.

<PAGE>

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them, including but not limited to that certain Employment Agreement dated March 1, 1993.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

Employee hereby waives any and all rights that Employee may have to request and/or demand a jury trial.

9.5 Expenses. In the event an action in law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or

similar reorganization. In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California.

7

<PAGE>

Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER

By: /s/ Deepak Chopra
---------------------------------------

Its: Chief Executive Officer
---------------------------------------

EMPLOYEE

/s/ Andreas F. Kotowski
--------------------------------------------
ANDREAS F. KOTOWSKI

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.6
<SEQUENCE>10
<DESCRIPTION>EMPLOYMENT AGRMT WITH MANOOCHER MANSOURI
<TEXT>

<PAGE>

EXHIBIT 10.6

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between UDT SENSORS, INC. ("Company"), a California corporation, and MANOOCHER MANSOURI ALIABADI ("Employee"), with reference to the following facts:

A. Employee has been serving Company in a satisfactory and capable manner pursuant to a written or oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as Vice President of Corporate Marketing of Company. Employee shall report to the Chief Executive Officer of Company and perform the services and duties customarily incident to such office and as otherwise decided upon by the Chief Executive Officer or the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of two (2) years. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made

<PAGE>

by Company as to any minimum or specified term or length of employment following the term set forth above.

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 203 of 2711

rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of $120,000.00 per annum, which salary shall be reviewed no less frequent than annually by the Company's Board of Directors. The Board of Directors may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. At the sole discretion of the Board of Directors, Employee may be entitled to participate therein.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee may, in its sole discretion, consider granting options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries, inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with

<PAGE>

Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to practice, to the business of Company or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same

against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

"Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all Inventions, whether Employee personally considers them patentable

<PAGE>

or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived

or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of

<PAGE>

Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2, "cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to Company describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its

sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

<PAGE>

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the date of such termination or expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief against the performance of service elsewhere by Employee during the term of this Agreement.

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

Employee hereby waives any and all rights that Employee may have to request and/or demand a jury trial.

9.5 Expenses. In the event an action in law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or similar reorganization. In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such

<PAGE>

provision shall be limited by the court to the extent necessary to make it

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 208 of 2711

enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER

By: /s/ Deepak Chopra

Its: Chief Executive Officer

EMPLOYEE

/s/ Manoocher Mansouri Aliabadi

MANOOCHER MANSOURI ALIABADI

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.7
<SEQUENCE>11
<DESCRIPTION>EMPLOYMENT AGREEMENT WITH ANTHONY S. CRANE
<TEXT>

<PAGE>

EXHIBIT 10.7

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between RAPISCAN SECURITY PRODUCTS LTD. ("Company"), a United Kingdom corporation, and ANTHONY S. CRANE ("Employee"), with reference to the following facts:

A. Employee has been serving Company in a satisfactory and capable manner pursuant to a written or oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued

employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as Managing Director of Company. Employee shall report to the Chief Executive Officer of Company and perform the services and duties customarily incident to such office and as otherwise decided upon by the Chief Executive Officer or the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of one (1) year. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made
<PAGE>

by Company as to any minimum or specified term or length of employment following the term set forth above.

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of (Pounds)48,000 (U.K.) per annum, which salary shall be reviewed no less frequent than annually by the Company's Board of Directors. The Board of Directors may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. At the sole discretion of the Board of Directors, Employee may be entitled to participate therein.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee may, in its sole discretion, consider granting options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries, inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with

2

<PAGE>

Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to practice, to the business of Company or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

"Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an

invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all Inventions, whether Employee personally considers them patentable

<PAGE>

or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's

many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of

4

<PAGE>

Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2, "cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to Company describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

5

<PAGE>

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the

date of such termination or expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief against the performance of service elsewhere by Employee during the term of this Agreement.

6

<PAGE>

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or

more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

Employee hereby waives any and all rights that Employee may have to request and/or demand a jury trial.

9.5 Expenses. In the event an action in law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or similar reorganization. In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such

7

<PAGE>

provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 215 of 2711

breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER

By: /s/ Deepak Chopra

Its: Chief Executive Officer

EMPLOYEE

/s/ Anthony S. Crane

ANTHONY S. CRANE

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.8
<SEQUENCE>12
<DESCRIPTION>EMPLOYMENT AGREEMENT WITH THOMAS K. HICKMAN
<TEXT>

<PAGE>

EXHIBIT 10.8

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of April, 1997, by and between OPTO SENSORS, INC. ("Company"), a California corporation, and THOMAS K. HICKMAN ("Employee"), with reference to the following facts:

A. Employee has been serving Company in a satisfactory and capable manner pursuant to a written or oral agreement between Employee and Company.

B. Company has requested that Employee enter into a written employment agreement with Company with respect to matters relating to continued employment with Company, and Employee has agreed to do so, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions and the mutual agreements and covenants set forth herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT.

1.1 Capacity. Company hereby continues to employ Employee and Employee hereby accepts continued employment as Managing Director of OSI Malaysia and OSI Singapore. Employee shall report to the Chief Executive Officer of Company and perform the services and duties customarily incident to such

office and as otherwise decided upon by the Chief Executive Officer or the Board of Directors.

1.2 Devotion of Services. Employee shall devote his entire productive time, ability and attention exclusively to the business of Company during the term of this Agreement, except for passive investments, charitable and non-profit enterprises and any other business investments which do not interfere with his duties hereunder and which are not competitive with Employer's activities (except as the owner of less than 2% of the issued and outstanding capital stock of a publicly traded corporation). Employee shall perform and discharge well and faithfully those duties assigned him by Company.

2. TERM. Subject to Section 6 herein, the term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of one (1) year. However, in the event that Company thereafter continues to employ Employee, this Agreement shall be deemed automatically renewed upon the same terms and conditions set forth herein except (a) that the parties may mutually agree to revise any of the terms set forth herein, and (b) the employment relationship will be on an "at will" basis, which means that, subject to Section 6.4 herein, either Company or Employee may elect to terminate the employment relationship at any time for any reason whatsoever, with or without cause. Employee acknowledges that no representation has been made

<PAGE>

by Company as to any minimum or specified term or length of employment following the term set forth above.

3. COMPENSATION.

3.1 Salary and Bonus. In consideration of the services to be rendered by Employee hereunder, including without limitation any services rendered as an officer or director of Company or any subsidiary or affiliate thereof, during the term of this Agreement Company shall pay to Employee the following:

(a) A salary in the amount of $125,000.00 per annum, which salary shall be reviewed no less frequent than annually by the Company's Board of Directors. The Board of Directors may increase Employee's salary but, in no event, may Employee's salary be reduced during the term of this Agreement.

(b) The Company presently intends to continue its policy of establishing a fiscal year end bonus pool for members of management of Company and/or its subsidiaries, which may be up to ten percent (10%) of the Company's net income before taxes. At the sole discretion of the Board of Directors, Employee may be entitled to participate therein.

(c) All payments to Employee shall be subject to the regular withholding requirements of all appropriate governmental taxing authorities.

(d) If the Company's Board of Directors and/or any committee thereof grants options to senior members of management of the Company and/or its subsidiaries, the Board of Directors and/or such committee may, in its sole discretion, consider granting options to Employee.

3.2 Other Benefits. Employee shall be entitled to participate in any medical and insurance plan which Company is presently providing or may provide to its senior executives. Employee acknowledges that the terms of such plans may change from time to time. Furthermore, Employee shall be entitled to receive the same automobile, life insurance policy and all other benefits which

   he presently is receiving.

3.3 Expenses. Company will advance to or reimburse Employee for all reasonable travel and entertainment required by Company and other reasonable expenses incurred by Employee in connection with the performance of his services under this Agreement in accordance with Company policy as established from time to time.

4. INVENTIONS.

4.1 Right to Inventions. Employee agrees that any discoveries, inventions or improvements of whatever nature (collectively "Inventions") made or conceived by Employee, solely or jointly with others, during the term of his employment with

<PAGE>

Company, that are made with Company's equipment, supplies, facilities, trade secrets or time; or that relate, at the time of conception of or reduction to practice, to the business of Company or Company's actual or demonstrably anticipated research or development; or that result from any work performed by Employee for Company, shall belong to Company. Employee also agrees that Company shall have the right to keep any such Inventions as trade secrets, if Company so chooses. In order to permit Company to claim rights to which it may be entitled, Employee agrees to disclose to Company in confidence all Inventions that Employee makes during the course of his employment and all patent applications filed by Employee within three (3) years after termination of his employment. Employee shall (a) assist Company in obtaining patents on all Inventions deemed patentable by Company in the United States and in all foreign countries and (b) execute all documents and do all things necessary to obtain letters patent to vest Company with full and extensive titles thereto and to protect the same against infringement by others. For the purposes of this Agreement, an Invention is deemed to have been made during the period of Employee's employment if the Invention was conceived or first actually reduced to practice during that period, and Employee agrees that any patent application filed within three (3) years after termination of his employment with the Company shall be presumed to relate to an Invention made during the term of Employee's employment unless Employee can provide evidence to the contrary.

4.2 Assignment of Inventions and Patents. In furtherance of, and not in contravention, limitation and/or in place of, the provisions of Section 4.1 above, Company hereby notifies Employee of California Labor Code Section 2870, which provides:

> "Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) directly or indirectly to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable."

Employee acknowledges that he has been notified by the Company of this law, and understands that this Agreement does not apply to Inventions which are otherwise fully protected under the provisions of said Labor Code Section 2870. Therefore, Employee agrees to promptly disclose in writing to the Company all

Inventions, whether Employee personally considers them patentable

3

<PAGE>

or not, which Employee alone, or with others, conceives or makes during his employment with Company or as is otherwise required and set forth under Section 4.1 above. Company shall hold said information in strict confidence to determine the applicability of California Labor Code Section 2870 to said Invention and, to the extent said Section 2870 does not apply, Employee hereby assigns and agrees to assign all his right, title and interest in and to those Inventions which relate to business of the Company and Employee agrees not to disclose any of these Inventions to others without the prior written express consent of Company. Employee agrees to notify Company in writing prior to making any disclosure or performing any work during the term of his employment with Company which may conflict with any proprietary rights or technical know-how claimed by Employee as his property. In the event Employee fails to give Company notice of such conflict, Employee agrees that Employee shall have no further right or claim with respect to any such conflicting proprietary rights or technical know-how.

5. CONFIDENTIALITY.

5.1 Restrictions on Use of Trade Secrets and Records. During the term of his employment, Employee will have access to and become acquainted with various trade secrets of Company, consisting of formulas, patterns, devices, secret Inventions, processes, compilations of information, records and specifications (collectively "Trade Secrets"), all of which are owned by Company and used in the operation of Company's business. Additionally, Employee will have access to and may become acquainted with various files, records, customer lists, documents, drawings, specifications, equipment and similar items relating to the business of Company (collectively "Confidential Information"). All such Trade Secrets and Confidential Information, whether they are designed, conceived or prepared by Employee or come into Employee's possession or knowledge in any other way, are and shall remain the exclusive property of Company and shall not be removed from the premises of Company under any circumstances whatsoever without the prior written consent of Company. Employee promises and agrees that he will not use for himself or for others, or divulge or disclose to any other person or entity, directly or indirectly, either during the term of his employment by Company or at any time thereafter, for his own benefit or for the benefit of any other person or entity or for any reason whatsoever, any of the Trade Secrets or Confidential Information described herein, which he may conceive, develop, obtain or learn about during or as a result of his employment by Company unless specifically authorized to do so in writing by Company.

5.2 Non-Interference. Employee recognizes that Company has invested substantial effort in assembling its present employees and in developing its customer base. As a result, and particularly because of Company's many types of confidential business information, Employee understands that any solicitation of a customer or employee of Company, in an effort to get them to change business affiliations, would presumably involve a misuse of

4

<PAGE>

Company's confidences, Trade Secrets and Confidential Information. Employee therefore agrees that, for a period of one (1) year from the later of the date of termination of Employee's employment with Company for any reason whatsoever or the receipt by Employee of any compensation paid to Employee by Company, Employee will not influence, or attempt to influence, existing employees or customers of Company in an attempt to divert, either directly or indirectly, their services or business from Company.

6. TERMINATION OF AGREEMENT.

6.1 Termination by Company. Company may terminate Employee's employment hereunder at any time for cause without payment of severance or similar benefits. For purposes of this Section 6.1, "cause" shall mean the following events: (a) any willful breach of duty by Employee in the course of his employment, (b) the breach of any provision of this Agreement or any misrepresentation by Employee hereunder, (c) misconduct, neglect or negligence in the performance of Employee's duties and obligations, (d) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Employee, (e) such carelessness or inefficiency in the performance of his duties that Employee is unfit to continue in the service of Company, (f) failure of Employee to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors, or (g) such other conduct which is substantially detrimental to the best interests of Company. Any such termination shall become effective upon delivery of written notice to Employee.

6.2 Termination by Employee. Employee may terminate his employment hereunder at any time for cause. For purposes of this Section 6.2, "cause" shall mean the breach of any provision of this Agreement by Company which is not cured within thirty (30) days after Employee delivers written notice to Company describing such breach. If the breach is not so cured within such thirty (30) days after delivery of such notice, the termination of employment shall become effective after the expiration of such cure period.

6.3 Death or Disability. Employee's employment with Company shall cease upon the date of his death. In the event Employee becomes physically or mentally disabled so as to become unable for more than one hundred eighty (180) days in the aggregate in any twelve (12) month period to perform his duties on a full-time basis with reasonable accommodations, Company may, at its sole discretion, terminate this Agreement and Employee's employment.

6.4 Termination Following Automatic Renewal. In the event that this Agreement is automatically renewed pursuant to Paragraph 2 herein, either Company or Employee may terminate Employee's employment hereunder at any time and for any reason whatsoever, with or without cause, upon thirty (30) days prior written notice delivered to the other party.

<PAGE>

6.5 Effect of Termination. Upon the termination of Employee's employment hereunder or the expiration or termination of the Agreement, (a) Company shall pay Employee all compensation accrued and outstanding as of the date of such termination or expiration, and (b) notwithstanding anything to the contrary contained herein, the rights and obligations of each party under Paragraphs 4, 5 and 8 herein shall survive such termination or expiration.

7. EMPLOYEE'S REPRESENTATIONS. As an inducement for Company to execute this Agreement, Employee represents and warrants to Company that the negotiation, execution and delivery of this Agreement by Employee together with the performance of his obligations hereunder does not breach or give rise to a breach under any employment, confidentiality, non-disclosure, non-competition or any other agreement, written or oral, to which Employee is a party.

8. EQUITABLE REMEDIES.

8.1 Injunctive Relief. Employee acknowledges and agrees that the covenants set forth in Paragraphs 4 and 5 herein are reasonable and necessary for protection of Company's business interests, that irreparable injury will result to Company if Employee breaches any of the terms of said covenants and that, in the event of Employee's actual or threatened breach of said covenants, Company will have no adequate remedy at law. Employee accordingly agrees that in the event of actual or threatened breach of any of such covenants, Company shall be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovering of any damages which it is able to prove. Each of the covenants in Paragraphs 4 and 5 shall be construed as independent of any other covenants or provisions of this Agreement. In the event of any judicial determination that any of the covenants set forth in Paragraphs 4 and 5 herein or any other provisions of the Agreement are not fully enforceable, it is the intention and desire of the parties that the court treat said covenants as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

8.2 Specific Enforcement. Employee agrees and acknowledges that he is obligated under this Agreement to render services of a special, unique, unusual, extraordinary and intellectual character, thereby giving this Agreement peculiar value, so that the loss thereof could not be reasonable or adequately compensated in damages in an action at law. Therefore, in addition to other remedies provided by law, Company shall have the right, during the term of this Agreement, to obtain specific performance hereof by Employee and to obtain injunctive relief against the performance of service elsewhere by Employee during the term of this Agreement.

6

<PAGE>

9. GENERAL.

9.1 Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

9.2 Amendment. This Agreement may not be modified, amended, altered or supplemented except by written agreement between Employee and Company.

9.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.4 Jurisdiction. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles County, California, in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each party further agrees that personal jurisdiction over him may be effected by service of process by registered or certified mail addressed as provided in Section 9.9 herein, and that when so made shall be as if served upon him personally within the State of California.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 221 of 2711
Employee hereby waives any and all rights that Employee may have to request and/or demand a jury trial.

9.5 Expenses. In the event an action in law or in equity is required to enforce or interpret the terms and conditions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which that party may be entitled.

9.6 Interpretation. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof. No provision of this document is to be interpreted for or against any party because that party or party's legal representative drafted it.

9.7 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets or similar reorganization. In no event may Employee assign any rights or duties under this Agreement.

9.8 Controlling Law; Severability. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such

<PAGE>

provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

9.9 Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to Employee, or to its principal office if to Company. A notice is deemed received or delivered on the earlier of the day received or three (3) days after being sent by registered or certified mail in the manner described in this Section.

9.10 Waiver of Breach. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER

By: /s/ Deepak Chopra

Its: Chief Executive Officer

EMPLOYEE

/s/ Thomas K. Hickman
-------------------------------
THOMAS K. HICKMAN

8

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.9
<SEQUENCE>13
<DESCRIPTION>INCENTIVE COMPENSATION AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.9

M E M O R A N D U M

TO: ANDY KOTOWSKI

FROM: DEEPAK CHOPRA

DATE: December 18, 1996

SUBJECT: Incentive Compensation

- ------------------------------------------------------------------------------

You shall be entitled to receive incentive compensation for the fiscal years ended June 30, 1997, 1998 and 1999, upon the following terms and conditions.

1. If the consolidated pre-tax earnings of Rapiscan Security Products (U.S.A.), Inc. and Rapiscan Security Products (U.K.) Ltd. ("Rapiscan Earnings") for the fiscal year ended June 30, 1997 exceeds $1,700,000.00, then you shall receive an amount equal to ten percent (10%) of such excess.

2. For the fiscal year ended June 30, 1998, if the Rapiscan Earnings for such fiscal year exceeds $1,700,000.00 and the cumulative Rapiscan Earnings for the June 30, 1997 and 1998 fiscal years exceed $3,400,000.00, then you shall receive an amount equal to ten percent (10%) of the lesser of (i) that portion of the Rapiscan Earnings for the June 30, 1998 fiscal year which exceeds $1,700,000.00 or (ii) that portion of the cumulative Rapiscan Earnings for the June 30, 1997 and 1998 fiscal years which exceeds $3,400,000.00.

3. For the fiscal year ended June 30, 1999, if the Rapiscan Earnings for such fiscal year exceeds $1,700,000.00 and the cumulative Rapiscan Earnings for the June 30, 1997, 1998 and 1999 fiscal years exceed $5,100,000.00, then you shall receive an amount equal to ten percent (10%) of the lesser of (i) that portion of the Rapiscan Earnings for the June 30, 1999 fiscal year which exceeds $1,700,000.00 or (ii) that portion of the cumulative Rapiscan Earnings for the June 30, 1997, 1998 and 1999 fiscal years which exceeds $5,100,000.00.
<PAGE>

4. For example purposes only:

<TABLE>
<CAPTION>

| <S> | June 30, 1997 | June 30, 1998 | June 30, 1999 |
|---|---|---|---|
| Rapiscan Earnings Per Year | 1,700,000.00 | 1,700,000.00 | 1,700,000.00 |
| Incentive Compensation | -0- | -0- | -0- |
| Rapiscan Earnings Per Year | 1,200,000.00 | 2,000,000.00 | 2,000,000.00 |
| Incentive Compensation | -0- | -0- | 10,000.00 |
| Rapiscan Earnings Per Year | 3,200,000.00 | 3,400,000.00 | 3,600,000.00 |
| Incentive Compensation | 150,000.00 | 150,000.00 | 150,000.00 |
| Rapiscan Earnings Per Year | 5,000,000.00 | 1,700,000.00 | 2,000,000.00 |
| Incentive Compensation | 150,000.00 | -0- | 30,000.00 |

</TABLE>

5. In no event shall this incentive compensation exceed $150,000.00 for any fiscal year.

6. Your incentive compensation shall be paid within 120 days after the end of the fiscal year and shall be determined by OSI's independent certified public accountants in accordance with generally accepted accounting principles consistently applied to practices for prior periods.

7. You must be employed by Rapiscan for the entire fiscal year in order to receive incentive compensation for such year.

8. The foregoing incentive compensation shall be in addition to that which you may be entitled under the general bonus plan for management.

9. You agree to keep the terms of this agreement strictly confidential.

/s/ Deepak Chopra

Deepak Chopra, Chief Executive Officer

AGREED TO AND ACCEPTED:

/s/ Andy Kotowski

Andy Kotowski
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.12
<SEQUENCE>14
<DESCRIPTION>AMENDMENT NUMBER TWO TO LEASE WITH UDT SENSORS, INC.
<TEXT>

<PAGE>

EXHIBIT 10.12

AMENDMENT NUMBER TWO TO LEASE

This Amendment Number Two to Lease, dated October 24, 1995, (the

"Amendment"), for reference purposes only, is hereby made a part of that certain lease dated January 1, 1989, by an between KB Management Company, as "Lessor", and UDT Sensors, Inc., successor in interest United Detector Technology, a division of ILC Technology, as "Lessee", for that certain Premises being two single story and free standing buildings of office and warehouse space and surrounding parking areas commonly known as 12515 Chadron Avenue (north building) and 12525 Chadron Avenue (south building), Hawthorne, California containing approximately 21,000 and 37,500 square feet respectively, (the "Lease").

1. Effective Date. Notwithstanding the date first set forth above, the effective date of this Amendment will be July 1, 1995, (the "Effective Date").

2. Parties. Lessor's name is hereby amended to A & R Management and Development Co., a California general partnership, and Stanley Black and Joyce Black, (the "Lessor"). Lessee's name is here amended to UDT Sensors, Inc., a California corporation.

3. Insurance. In accordance with First Amendment to Lease Paragraph 1, Lessee is the Insuring Party for the Premises. Lessee shall maintain property insurance and liability insurance in accordance with Paragraph 8, and name Lessor on Lessee's insurance policies as follows:

3.01 Property Insurance. In accordance with Lease Paragraph 8.3, Lessee shall maintain property insurance which will equal to the full replacement cost of the Premises, as the same shall exist from time to time. Lessor and Lessee hereby agree that the amount of replacement cost insurance that Lessee is to maintain for 12515 Chadron is currently $1,155,000.00 and for 12525 Chadron is currently $2,062,500.00 exclusive of Lessee's Personal Property, Lessee's Tenant Improvements, Lessee Owned Alterations and Utility Installations. Further, in accordance with Lease Paragraph 8.3(b) Lessee shall maintain Rental Value insurance.

Lessee will name A & R Management and Development Co., a California general partnership, Stanley Black and Joyce Black as additional insureds as their interest may appear, and as loss payees as their interest may appear.

3.02 Liability Insurance. Lessee will name additional insureds as follows:

A & R Management and Development Co., a California general partnership, Stanley Black and Joyce Black as "Owners", and Charles Dunn Company, as "Managing Agent".

4. Term. In accordance with the Lease and Addendum Number One, the Term of the Lease is January 1, 1989 through October 31, 1995. Lessor and Lessee hereby agree to extend the Term by ten (I years commencing July 1, 1995 through June 30, 2005, (the "Extension Period"). Lessee's option to extend the Lease in Addendum Number One for a five (5) year period commencing November 1, 1995 through October 31, 2000 is hereby canceled and of no further force and effect.

5. Base Rent. Lessee shall pay monthly Base Rent for the Premises in advance on the first day of each month of the Extension Period as follows:

<PAGE>

Year 1: (July 1, 1995 - June 30, 1996) $26,000.00 triple net (NNN) per month. Each year thereafter, fixed 3.0% annual increases over the prior year's Base Rent.

6. Option to Extend Lease Term (One (1) five (5) Year Option).

6.01 Option to Extend. Providing Lessee is not in default under the terms and conditions of the Lease, and/or any addendum or any amendments attached thereto, Lessee is hereby granted one (1) five (5) year option (the "Option Period") to further extend the Term. Lessee shall provide written notice to Lessor not later than six (6) months prior to the expiration of the Extension Period of Lessee's intention to exercise said option, time being of essence. Said Option Period shall be under the same terms, conditions, and provisions as set forth in the Lease and this Amendment, except that the Base Rent for the Option Period shall be adjusted as outlined herein below.

6.02 Rent for Option Period. Upon Lessor's receipt of Lessee's notice of intention to exercise said option, Lessor and Lessee shall meet to mutually agree upon the fair market value rental rate for the Option Period by no later than three (3) months prior to the expiration of the Extension Period. In the event Lessor and Lessee cannot agree on the rental rate, the Option Period shall be of no force and effect.

7. Tenant Improvements. Lessor and Lessee agree that Lessor and Lessee and/or their representatives have inspected the Premises together and in consideration of Lessee executing this Amendment, Lessor shall perform certain tenant improvements at Lessor's sole cost and expense, (the "Tenant Improvements") on a one time basis only as follows:

Building #1 12525 Chadron (south building)
Building #2 12515 Chadron (north building)

1. Remove one (1) underground storage tank from parking lot.
2. Repair existing roofs on buildings #1 and 2.
3. Perform general repairs at emergency exit located at the northeast comers of buildings #1 and 2.
   a) Cover open sump at the northeast corners of buildings #1 and 2 and perform related minor repairs as required.
4. Pave easement at rear of building #1.
5. Renovate 2 restrooms in building #1 and 2 restrooms in building #2 as follows:
   a) Remove existing toilets and replace with new toilets (Kohler model no. K3520 elongated bowls or equivalent).
   b.) Replace existing sinks, tile, walls, stalls and light fixtures.
6. Encapsulate asbestos tile in receiving area.

7. Build new lunch room in building #2 with 2 restrooms, including one shower in each restroom. Size and scope to be in accordance with City of Hawthorne requirements. See Exhibit "A"- Lunch Room Plan attached hereto.

8. Touch up exterior paint on both buildings.
9. Touch up paint on interior doors and halls in both buildings.
10. Repair and stripe parking lots for both buildings including parking areas in front of both buildings.
11. Repair chain link fence and gate at the parking lot commonly known as 12605 Chadron.

12. Lessor shall give Lessee an allowance of UP TO $13,000.00 for purposes of installing drainage and/or sensing systems in the "wafer room"

located in building #1. Said allowance shall be given

2

<PAGE>

to Lessee within 30 days of Lessee completing its work and presenting paid invoices and lien releases of up to $13,000.00 to Lessor.

13. Install a fire sprinkler system in building #2. Said sprinkler system shall be a "Group 3" ordinary hazard system suitable for office or warehouse use. Pendent heads in office area shall be semi-recessed throughout.

14. Raise walkway between buildings allowing for drainage.

15. Repair west side of street (Chadron Avenue). Fill pot holes and resurface only.

16. Provide covered walkway between the buildings if allowed by governing agency.

17. Remodel main lobby. Maximum allowance $5,000.00.

8. Cabinet Work. In addition to the Tenant Improvements above, Lessor shall also furnish and install cabinets and rough plumbing and electrical for same in the new lunch room (the "Cabinet Work"); however, Lessee will reimburse Lessor for the cost of the Cabinet Work in tile form of a tenant improvement loan payable to Lessor in equal monthly payments commencing effective July 1, 1995 along with the Base Rent under the same terms and conditions as paying Base Rent under the Lease. The cost of the Cabinet Work will be amortized over ten (10) years at nine percent (9%) interest.

<TABLE>
<CAPTION>
For example

| <S> | <C> |
|---|---|
| Cost of Cabinet Work | $15,000.00 |
| Number of months in extension period | 120 |
| Interest rate | 2Y2 |
| Monthly payment | $ 188.60 |

</TABLE>

Lessor and Lessee hereby agree that the Cabinet Work is limited to furnishing and installing the cabinets including the rough plumbing and electrical for same, and does not include any appliances. Lessee shall furnish, and pay for the cost of any and all appliances directly to the supplier at Lessee's sole cost and expense, and Lessor will install such appliances.

9. Construction.

Lessor hereby warrants that Lessor will diligently pursue obtaining building permits once this Amendment is fully executed. Further, Lessor warrants that Lessor will commence construction of the work to be performed by Lessor hereinabove within ten (10) days of Lessor obtaining all applicable building permits and will diligently pursue construction (as prescribed by such building permits) to substantial completion within four (4) months of obtaining the permits. Lessor will not be required to perform any work that does not comply with the governing agencies requirements.

Lessor and Lessee hereby agree that construction shall be performed to the mutual reasonable satisfaction of both Lessor and Lessee. If the building permits for the lunch room are not obtained within six (6) months of the full execution date of this Amendment, then at the end of said six (6) month period the lease terms will be renegotiated.

Lessor hereby recognizes that there are certain work areas of the Premises that contain clean rooms or other specialized rooms in which there cannot be any

construction performed during Lessee's normal business day hours (i.e. Monday through Friday 7:00 a.m. - 4:00 p.m.). Therefore, in terms of installing the fire sprinkler system and for availability of the parking lot for performing work, Lessor will endeavor to perform such work during a mutually convenient time during Lessee's normal business day hours or at such other mutually agreed times after Lessee's normal business day hours so as to cause the least amount of disruption as possible in those two (2) areas. However, as to performing work in the bathrooms and general

3

<PAGE>

office areas Lessor will make an effort to keep dust and noise at a minimum to avoid disturbance during Lessee's normal business hours. Lessee will not be responsible to pay the cost of any overtime or premium time.

Lessor will give Lessee at least five (5) days prior notice of the commencement of the scope of work to be accomplished. Such prior notice will be verbally agreed to by Lessor's and Lessee's respective construction representatives, and Lessor shall follow up with a written confirmation to Lessee by either fax or mail. Lessor and Lessee hereby agree that their respective construction representative's are Fred Posner, and Tim Scroggins, or their assignees.

Force Majeure
- -------------

Notwithstanding any provision contained in this Lease to the contrary relative to all work to be completed by Lessor under this Lease, if Lessor shall be delayed at any time in the process of obtaining building permits, or in the construction of the work to be performed by Lessor by Acts of God, extra work or by changes ordered in the construction by Lessee, by labor trouble, or shortage, arbitration proceedings, acts of public utilities, public bodies or inspectors, unusual delay in transportation, unavailability of materials (whether simply unavailable or unavailable at normal prices), unavoidable casualties, rain or stormy weather conditions, act of Lessee or Lessee's agents, or by any other cause beyond the reasonable control of Lessor, then, the four (4) month time period set forth above that Lessor has to substantially complete construction will be extended by the period of such delay.

10. Purchase Option.
---------------

10.01 Purchase Option. Providing Lessee is not in default under the
---------------
terms and conditions of the Lease, and/or any addendum or any amendments attached thereto, Lessee and/or Deepak Chopra, Ajay Mehra, or another nominee of Lessee's choice, shall have the right to purchase the Premises upon six (6) months prior written notice to Lessor. The purchase price will be a base purchase price of two million eight-hundred thousand dollars ($2,800,000.00) plus the unamortized balances of the cost of the Tenant Improvements and the Cabinet Work. The base purchase price of $2,800,000.00 will be fixed for the first four (4) years of the Extension Period, each year thereafter the base purchase price will be increased by the Consumer Price Index (CPI) over the prior year. For purposes of calculating the unamortized balance of tile cost of the Tenant Improvements, the cost will be amortized over ten (10) years at no interest on a straight-line basis. Lessor and Lessee hereby agree that the cost of the Tenant Improvement work is $200,000.00, and the cost of the Cabinet Work is $15,000.00. The following example illustrates how the purchase price would be calculated if Lessee were to purchase the Premises at the commencement of the fourth (4) year of the Extension Period.
<TABLE>
<CAPTION>

An example:

<S> <C>

| | |
|---|---|
| Cost of Tenant Improvements | $ 200,000.00 |
| Number of months in Extension Period | /1 20=$1,666.67 per mo. |
| Number of months remaining | x 84 |
| Unamortized balance of cost of Tenant Improvements = | 140,000.00 |
| Cost of Cabinet Work | $ 15,000.00 |
| Monthly payment | 188.60 |
| Number of months remaining | x 84 |
| Unamortized balance of cost of Cabinet Work | $ 11,868.24 |
| (i.e. the present value at end of 36th month) | |

</TABLE>

<PAGE>

<TABLE>
<S> <C>

| | |
|---|---|
| Base purchase price | $2,800,000.00 |
| Cost of Tenant Improvements balance | 140,000.00 |
| Cost of Cabinet Work balance | 11,868,14 |
| Total Purchase Price | $2,951,868.24 |

</TABLE>

10.02 Right of First Refusal to Purchased. Providing Lessee is not in default under the terms and conditions of the Lease, and/or any addendum or any amendments attached thereto, Lessee and/or Deepak Chopra, Ajay Mehra or another nominee of Lessee's choice, shall have a right of first refusal to purchase the Premises by advising Lessor in writing within ten (10) days after Lessee receives Lessor's notice of Lessor's acceptance of an offer to purchase, which notice shall include a copy of the offer to purchase accepted by Lessor. Throughout the Extension Period, Lessor shall forward to Lessee, copies of each and every offer to purchase accepted by Lessor as required herein. Lessor's and Lessee's notices to the other shall be sent by certified mail return receipt requested. Lessee's purchase shall be on the same terms and conditions as the offer to purchase Lessor receives, but not to exceed the amount as specified in paragraph 10.01 hereinabove. Within five (5) days of Lessor receiving Lessee's notice, Lessor and Lessee shall open an escrow with an escrow company of Lessor's choice. Upon opening of escrow Lessee shall deposit $100,000.00 in cash with the escrow company. If Lessee fails to deposit said sum upon opening of escrow, Lessee's right of first refusal shall be of no further force and effect. This amount shall also serve as liquidating damages if Lessee (buyer) does not complete said transaction.

10.03 Consumer Price Index. As used herein the Term CPI shall mean the Consumer Price Index of the US Department of Labor All Urban Consumers, Los Angeles-Anaheim-Long Beach (1982-84=100) All Items. In the event the CPI shall be discontinued, then Lessor and Lessee shall agree on using the index most nearly the same as the CPI, or any such other index mutually agreed upon by Lessor and Lessee.

11. Damage or Destruction (See Lease Paragraph 9).

11.01 Total Destructions. Notwithstanding any other provision of the Lease, in the event the "wafer room" located in building #1 is more than fifty percent (50%) destroyed and it is impossible to substantially repair or replace the related equipment, then upon providing reasonable evidence to Lessor that repair or replacement is not possible, Lessee may cancel this Lease as it

pertains to Building #1 only. Lessee shall provide Lessor a prior written notice of Lessee's intention to cancel the Lease. As a condition to Lessee's right to cancel the Lease, Lessee shall pay to Lessor at the same time as providing Lessee's notice, six (6) months of the then applicable scheduled rent as of the effective date of the cancellation of the Lease plus the unamortized portion of the cost of the Tenant Improvements as of the effective date of the cancellation of the Lease.

11. Damage or Destruction (Continued): The applicable scheduled rent for both buildings as of the Effective Date of the Extension Period is allocated as follows:

<TABLE>

| <S> | <C> |
|---|---|
| Building #1 (37,500 sq. ft.) allocation | $15,000.00 |
| Building #2 (21,000 sq. ft.) allocation | $11,000.00 |
| Total Base Rent for both building at commencement of Extension Period | $26,000.00 |

</TABLE>

In addition, Lessee shall turn building #1 back to Lessor in a broom-clean condition with all of Lessee's equipment and personal property removed, and any and all damage repaired to building #1 related to the removal of Lessee's equipment and personal property.

<PAGE>

11.02 Partial Damage. In the event of Partial Damage which is an Insured Loss, Lessor warrants that Lessor will diligently pursue obtaining building permits within ten (10) days of the loss. Further, Lessor warrants that Lessor will commence construction of the repair work within ten (10) days of Lessor obtaining all applicable building permits and will diligently pursue the required repairs (as prescribed by such building permits) to completion. If Lessor fails to perform as required in this paragraph hereinabove, Lessee shall have the right to terminate the Lease if, and only if, Lessor continues to fail to perform within ten (10) days after Lessor receives a written notice from Lessee advising Lessor's failure to perform.

12. Use. Notwithstanding anything to the contrary set forth in the Lease, Lessee hereby agrees to use the Premises in accordance with the following:

a) "Hazardous Materials" shall mean any substance, material, waste, gas or particulate matter which is regulated by any local, state or federal authority including, but not limited to, petroleum; radioactive, nuclear or toxic waste or materials; asbestos; polychiorinated biplienyl's (PCB's); urea formaldehyde foam insulation; freon or freon-containing equipment, which is or becomes regulated; any material or substance designated or defined as a "Hazardous Substance", "Toxic Substance" or Hazardous Waste" in Section 25117 of the Health and Safety Code of the State of California or under any successor section or other provision of California law; Section 311 of the Clean Water Act (33 U.S.C., Section 1251 et seq.); the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act of 1976; the Hazardous Materials Transportation Act; and any other laws and ordinances governing similar matter now or hereinafter enacted or any regulations adopted or publications promulgated pursuant thereto (hereinafter collectively referred to as the "Regulations"). "Hazardous Materials Activities" shall mean the use, generation, storage, disposal and/or transportation of Hazardous Materials by Lessee or Lessee's employees, agents, contractors, licensees and/or invitees.

b) Lessor and Lessee hereby acknowledge and agree that Lessee shall be allowed to conduct or cause to be conducted any Hazardous Materials Activities related to Lessee's business on, under or about the Premises, the property, and/or the building without receiving Lessor's prior written consent. Lessee shall conduct all Hazardous Materials Activities in strict compliance (at Lessee's sole cost and expense) with all applicable Regulations using all necessary and appropriate precautions. Lessee shall, within five (5) days after Lessee's execution of this Amendment, and at other times within five (5) days after receipt of Lessor's written request, provide Lessor with copies of ail documents and information, including, but not limited to, permits, registrations, manifests, applications, reports and certificates, evidencing Lessee's compliance with all applicable Regulations.

c) Lessee shall indemnify, protect, defend (with counsel reasonably acceptable to Lessor) and hold harmless Lessor from and against any and all claims, damages, costs and liabilities (including reasonable attorney's fees and costs, and court costs) arising out of any Hazardous Material Activities. Lessor, and Lessor's representatives and employees, may enter the Premises, at an), time during the Extension Period (including any renewal terms, as and if applicable) upon reasonable prior written notice to Lessee, in order to inspect Lessee's compliance herewith. The indemnification of Lessor by Lessee set forth in this Paragraph 12 shall survive the expiration or any earlier termination of the Lease.

13. Broker's Fees. Lessor and Lessee acknowledge and agree that neither party is represented by a broker and shall hold harmless and indemnify the other party from any commission fees and any and all related costs and fees that may arise out of this Amendment or any extension of the term thereof.

6

<PAGE>

14. Notices. Any notice or notices required of or given by either Lessor or Lessee shall be in writing and shall be deemed received when sent in accordance with Lease paragraph 23 addressed to Lessor and addressed to Lessee as follows:

| To Lessor: | with a copy to: |
| --- | --- |
| A & R Management, et al. | A & R Management, et al. |
| c/o Charles Dunn Company | 9350 Wilshire Blvd., Suite 302 |
| 800 West Sixth Street, 6th Floor | Beverly Hills, CA 90212 |
| Los Angeles, CA 90017 | Attn: Michael Kaplan |

To Lessee:

UDT Sensors, Inc.
12525 Chadron Avenue
Hawthorne, CA 90250
Attn. Ajay Mehra

15. Limitation of Lessor's Liability. Notwithstanding anything to the contrary set forth in the Lease, the obligations of Lessor, as individuals, and Lessor's partners (either general or limited) under the Lease do not constitute personal obligations. Lessee, and Lessee's successors and assigns, hereby agree not to seek recourse against the personal assets of Lessor, including any individuals and/or Lessor's partners (either general or limited) for the satisfaction of any actual or alleged liability of Lessor to Lessee under the Lease, but Lessee shall look only to Lessor's interest in the Premises for the satisfaction of any liability of Lessor to Lessee hereunder.

16. Counterparts. This Amendment may be signed by any number of

counterparts with the same effect as if the signatures to any counterpart were upon the same instrument.

17. Signatories. The signatories herein below represent that s/he has the authority of her/his respective corporation or partnership to enter into this Amendment.

18. Lease to Remain in Full Force and Effect. Except as set forth in this Amendment, all terms, conditions, provisions and covenants of the Lease shall remain unchanged and in full force and effect.

AGREED AND ACCEPTED:

| LESSOR: | LESSEE: |
|---|---|
| A & R Management and Development Co., a California general partnership, Stanley Black and Joyce Black | UDT Sensors, Inc., a California corporation |
| By: /s/ | By: /s/ |
| Title: | Title: |
| Date: | Date: |

7

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.14
<SEQUENCE>15
<DESCRIPTION>TENANCY AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.14

DATED THIS 17TH DAY OF JANUARY , 1997

BETWEEN

ARTLOON SUPPLIERS SDN. BHD. (170818-K)

. . . LANDLORD

AND

OPTO SENSORS (M) SDN. BHD. (303269-T)

. . . TENANT

TENANCY AGREEMENT

REF.: ASSB/OSSB/97/GPB

PREMISES
- --------

NO. 18, JALAN FIRMA 2/2
KAWASAN PERINDUSTRIAN TEBRA I
8110 JOHOR BAHRU
<PAGE>

THIS AGREEMENT is made the day and year stated in Section 1 of the FIRST SCHEDULE hereto Between the Landlord whose name and description are stated in Section 2 of the FIRST SCHEDULE hereto (hereinafter referred to as "the Landlord") of the one part And the Tenant whose name and description are stated in Section 3 of the FIRST SCHEDULE hereto (hereinafter referred to as "the Tenant") of the other part.

WHEREAS the Landlord has agreed to let and the Tenant has agreed to take all the property more particularly described in the SECOND SCHEDULE HERETO (hereinafter referred to as "the Demised Premises") on the terms and conditions hereinafter appearing.

NOW THIS AGREEMENT WITNESSETH as follows:

1. The Landlord lets and the Tenant takes all the Demised Premises for the period stated in Section 1 of the THIRD SCHEDULE hereto at the monthly rental stated in Section 2 of the THIRD SCHEDULE hereto payable in advance on the first day of each and every succeeding month, the first payment to be made upon the commencement of the tenancy hereby created.

2. Upon the execution of this Agreement the Tenant shall deposit with the Landlord the sum stated in Section 3 of the THIRD SCHEDULE hereto (hereinafter referred to as "the said Deposit" and the receipt whereof the Landlord hereby acknowledges) as security for the due performance and observance by the Tenant of all and singular the several covenants stipulations terms and conditions on the part of the Tenant herein contained. The said Deposit less such sum or sums as may be due to the Landlord shall be refunded to the Tenant without interest on the expiration of this Agreement. PROVIDED ALWAYS that the said Deposit shall not in any circumstances be treated as payment of rent in advance.

3. THE TENANT HEREBY COVENANTS WITH THE LANDLORD as follows:

(a) To pay the reserved rent on the day and in the manner aforesaid.

(b) To pay all existing and future charges for supply of electricity and water including deposit thereof in respect of the Demised Premises.

(c) To keep in good and tenantable repair and condition the Demised Premises fair wear and tear excepted.

(d) To permit the Landlord and his agent(s) with or without workmen and others at all reasonable times but with prior reasonable notice to enter upon or examine the condition of the Demised Premises and to execute repairs to the same.

(e) To comply with all rules, regulations and by-laws of the local authorities concerned in respect of the Demised Premises.

(f) Not to do or permit to be done on the Demised Premises any thing which will or may infringe any of the laws, by-laws or regulations in force or which may be a nuisance or annoyance to or in any way interfere with the quite and comfort of the occupants of neighboring premises.

(g) Not to make or permit to be made any alteration or addition to the said Demised Premises without previous consent in writing of the Landlord and upon such consent

1.

<PAGE>

having been granted the Tenant shall cause plans and drawings of the alterations or additions to the Demised Premises to be drawn and submitted to the relevant authorities for approval and the costs and expenses incurred thereby shall be borne by the Tenant and all alterations, additions and all fixtures and fittings so attached or affixed to the Demised Premises shall belong to the Landlord without any claim by the Tenant for compensation or other claims whatsoever.

(h) Not to do or permit or suffer to be done anything whereby the policy or policies of insurance on the premises against any loss or damage by fire for the time being subsisting may become void or voidable or whereby the rate of premium there on may be increased and to indemnify and keep indemnified the Landlord any increase in the said premium and all expenses incurred by the Landlord on or about any renewal of such policy or policies rendered necessary by a breach or non-observance of this covenant.

(i) Not to permit or suffer any sale by auction to be held on the Demised Premises.

(j) At the expiration or sooner determination of the term hereby created to yield up the Demised Premises in good and tenantable repair and conditions (fair wear and tear only accepted).

(k) Not at any time to use or permit or suffer the said Demised Premises or any part thereof to be used for illegal or immoral purposes.

(l) Not to keep or permit to be kept upon the said Demised Premises or any part thereof any materials of a dangerous, explosive or noxious nature or the keeping of which may contravene any statute regulation or by-laws currently applicable.

(m) Not to carry on any trade or business as an undertaker or relating to funeral parlous or the sale or purchase of coffin.

(n) The Tenant shall use the Demised Premises for the purpose as permitted under Section 6 of the Third Schedule.

4.   THE LANDLORD HEREBY COVENANTS WITH THE TENANT as follows:

(a) To pay all quit rent assessments and other outgoings upon the Demised Premises and payable by the Landlord.

(b) That the Tenant paying the rent hereby reserved and observing and performing the several covenants hereby on his part contained shall peacefully hold and enjoy the Demised Premises during the said term without any claim through under or in trust for them.

(c) To refund to the Tenant without interest thereon the Deposit in the sum stated in Section 3 of the THIRD SCHEDULE hereto on the due expiration of this tenancy or such extended term or terms less such sum or sums which may

be due and owing to the Landlord for any breach of covenant on the part of the Tenant to be performed.

(d) At the determination of the term hereby granted to allow the Tenant to remove all his own fittings subject to the Tenant paying reasonable compensation for any damage caused by such removal.

2.

<PAGE>

5. PROVIDED ALWAYS AND IT IS HEREBY EXPRESSLY AGREED BETWEEN THE PARTIES HERETO as follows:

(a) If at any time the monthly rent hereby covenant to be paid by the Tenant to the Landlord or any part thereof shall remain unpaid for seven (7) days after becoming due and payable whether formally demanded or not, or if the covenants on the Tenant's part herein contained shall not be performed or observed or if the Tenant shall become wound-up or suffer any distress or execution to be levied against the assets of the Tenant then in any such case it shall be lawful for the Landlord at any time thereafter without notice to re-enter upon the Demised Premises or any part thereof in the name of the whole and thereupon this Tenancy shall absolutely determine but without prejudice to the right of action of the Landlord in respect of any antecedent breach of the Tenant's covenant hereinbefore contained.

(b) If the Tenant shall be desirous of extending the Tenancy hereby crated for a further term the Tenant shall not more than (2) months before the expiration of the term hereby created give to the Landlord notice in writing of such his desire and if he (the Tenant) shall have performed and observed the several stipulations herein contained and on his part to be performed and observed up to the termination of the tenancy hereby created then the Landlord will let the Demised Premises to the Tenant for the further term stated in Section 4 of the THIRD SCHEDULE hereto from the expiration of the term hereby created at the rental described in Section 5 of the THIRD SCHEDULE hereto and subject in all other respects to the same stipulations as herein contained except this clause for renewal.

(c) In the event that the Demised Premises or any part thereof shall at any time during the said term be destroyed or damaged by fire, earthquake, the enemies of the Government of Malaysia, civil commotion or other disaster so as to render the Demised Premises or a part thereof unfit for occupation and use the rent hereby reserved or a fair portion thereof according to the nature and extend of the damage sustained shall be suspended until the Demised Premises or such part thereof shall again be rendered fit occupation or use provided that in case of fire where such fire has been caused by the default or negligence of the Tenant or the Tenant's servant or agent, invitees or licensees the Tenant shall still remain liable for the payment of the rent in full for the period in which the said premises shall remain unfit for use.

(d) Should this tenancy be determined by the Tenant at any time before the expiry of the term hereby created either voluntarily or by virtue of Clause 5(a) herein the said Deposit stated in Clause 2 shall the be absolutely forfeited to the Landlord without prejudice to any right of action the Landlord may have against the Tenant in respect of the unpaid rents or any antecedent breach of the terms of the tenancy.

(e) It is hereby expressly agreed by the Parties that the "SPECIAL CONDITIONS" shall prevail over the term or terms contained in Clause 1 to 5(d) aforesaid.

(f) Time wherever stated herein shall be of the essence.

(g) Any notice to be given under this Agreement shall be in writing and shall be sufficiently served on the Landlord if sent to him by prepaid registered post addressed to him at his address herein stated or to his last

known address in West Malaysia and any notice to the Tenant shall be in writing and shall be sufficiently served to the Tenant if sent to him at his address herein stated or to his last known address in West Malaysia and any notice sent aforesaid shall be deemed to have been received in the ordinary course of post.

3.

<PAGE>

(h) In this Agreement wherever the context admits the expressions the "Landlord" and the "Tenant" shall mean and include their respective heirs-at-law, personal ___________ representative, ____________ executors, administrators, successors-in-title and permitted assigns as the case may be and when two (2) or more persons are included in the expression their liabilities under this Agreement shall be joint and several. Words importing the masculine gender shall be deemed and takes to include the feminine and neuter genders and the singular to include the plural and vice versa.

(i) The Tenant shall bear and pay the stamp duties on this Agreement.

(j) In the event of the Landlord being rendered necessary to take steps to defend any actions or claims that may be taken against the Landlord arising from any default or neglect or action or non-action on the part of the Tenant to be performed by virtue of the Landlord being the registered owner of the Demised Premises and in the event of the Landlord having to issue out and serve upon the Tenant any notice of demand or legal process for the recovery of rent or any money payable to the Landlord under this Agreement then in any of such event the Tenant shall bear and pay the Landlord all costs and expense (and in the case where the Landlord engages a solicitor such solicitor's fee on a solicitor and client basis) besides such money payable to the Landlord upon demand.

THE FIRST SCHEDULE ABOVE REFERRED TO

<TABLE>
<CAPTION>

| Section No. | Item | Particulars |
|---|---|---|
| <S> | <C> | <C> |
| 1. | The day and year of this Agreement | This 17th day of January 1997 |
| 2. | Name and Description of the Landlord | ARTLOON SUPPLIERS SDN. BHD. (170818-K) No. 46-02 Jalan Tun Abdul Razak, Sunsur 1, 80000 Johor Bahru |
| 3. | Name and Description of the Tenant | OPTO SENSORS (M) SDN. BHD. (307669-T) No. 8 Jalan Firma 2/2 Kawasan Perindustrian Tebra I, 81100 Johor Bahru |

</TABLE>

THE SECOND SCHEDULE ABOVE REFERRED TO

The Ground Floor of that Demised Premises known as No. 18, Jalan Firma 2/2, Kawasan Perindustrian Tebrau I, 81100 Johor Bahru.

4.

<PAGE>

THE THIRD SCHEDULE ABOVE REFERRED TO

<TABLE>
<CAPTION>

| Section No. | Item | Particulars |
|---|---|---|
| <C> | <S> | <C> |
| 1. | Period of Tenancy | ONE (1) year commencing from the 1st day of January 1997 to the 31st day of December 1997 |
| 2. | The monthly rental in respect of the Demised Premises | Ringgit Malaysia: THIRTEEN THOUSAND (RM13,000.00) ONLY. |
| 3. | Deposit paid upon signing of this Agreement | Ringgit Malaysia: TWENTY-SIX THOUSAND (RM26,000.00) ONLY. |
| 4. | Period of extension of tenancy | ONE (1) YEAR. |
| 5. | Rental in respect of extension of tenancy | TO BE AGREED UPON |
| 6. | Permitted use of the Demised Premises | MANUFACTURING OF OPTICAL MICE, OPTICAL SENSORS, MUSICAL INTERFACE DEVICES, X-RAY SCANNER/SYSTEMS AND PULSE OXIMETERS |

</TABLE>

<PAGE>

THE FOURTH SCHEDULE ABOVE REFERRED TO
(THE "SPECIAL CONDITIONS" REFERRED TO
IN CLAUSE 5(E) HEREIN)

1. The Tenant shall within the last two (2) months of the Tenancy permit the Landlord or his agent(s) to affix without interference upon the Demised Premises a notice to let or for sale the Demised Premises and to permit any person duly authorized by the Landlord or his agent(s) during reasonable times of the day to view the Demised Premises.

2. The Tenant shall pay a sum of RM1,000.00 (Ringgit Malaysia One Thousand Only) being deposit for water (hereinafter called "the Water Deposit") the receipt of which is hereby acknowledged by the Landlord. Upon termination of the Tenancy hereby crated the Landlord shall refund the Water Deposit to the Tenant subject to the Landlord deducting such sum or sums for outstanding bills to be paid to the relevant authorities if the sum or sums is not paid by the Tenant.

3. The Tenant shall apply directly to the relevant authorities for the supply of electricity to the Demised Premises.

4. All equipment, machinery and etceteras and public liabilities (third party claims) insurance shall be insured by the Tenant.

5. The Tenant hereby agree to permit/share with the tenant of the First Floor of the Demised Premises the right of access the compound around the Demised Premises in the manner as indicated in Appendix I attached hereto.

6. In the event the Landlord has a potential tenant for the first floor of the Demised Premises, the Landlord shall grant the Tenant i.e. Opto Sensors (M) Sdn. Bhd. the first right of refusal valid for seven (7) days from the date of notice.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 237 of 2711

IN WITNESS WHEREOF the parties hereto have hereunto set their hands the day and year first above written.

SIGNED and DELIVERED by /s/
the above named Landlord
in the presence of:

SIGNED and DELIVERED by /s/
the above named Tenant
in the presence of:

6.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.15
<SEQUENCE>16
<DESCRIPTION>CREDIT AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.15

CREDIT AGREEMENT

This Credit Agreement (the "Agreement") is made and entered into this 24 day of January, 1997, by and between SANWA BANK CALIFORNIA (the "Bank") and OPTO SENSORS, INC., UDT SENSORS, INC. RAPISCAN SECURITY PRODUCTS (U.S.A.), INC. and FERSON OPTICS, INC. (each a "Borrower" and together, the "Borrowers"), on the terms and conditions that follow:

SECTION 1.

DEFINITIONS

1.01 Certain Defined Terms: Unless elsewhere defined in this Agreement, the following terms shall have the following meanings (such meanings to be generally applicable to the singular and plural forms of the terms defined):

(a) "ADVANCE": shall mean an advance to any Borrower under the Line of Credit.

(b) "BUSINESS DAY": shall mean a day, other than a Saturday or Sunday, on which commercial banks are open for business in California.

(c) "COLLATERAL": shall mean the property described in Section 3.01, together with any other personal or real property in which the Bank may be granted a lien or security interest to secure payment of the Obligations.

(d) "DEBT": shall mean all liabilities of each Borrower less Subordinated Debt.

(e) "EFFECTIVE TANGIBLE NET WORTH": shall mean each Borrower's stated net worth plus Subordinated Debt but less the book value of all intangible assets of such Borrower (i.e., goodwill, trademarks, patents, copyrights, organization expense and similar intangible items including, but not limited to investments in and all amounts due from affiliates, officers or employees).

(f) "ERISA": shall mean the Employee Retirement Income Security Act of

1974, as amended from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

(g) "EQUIPMENT": shall mean equipment as defined in the California Uniform Commercial Code.

(h) "EVENT OF DEFAULT": shall have the meaning set forth in Section 7.

(i) "EXPIRATION DATE": shall mean November 30, 1998 or the date of termination of the Bank's commitment to lend under this Agreement pursuant to Section 8, whichever shall occur first.

(j) "INDEBTEDNESS": shall mean, with respect to each Borrower, (i) all indebtedness for borrowed money or for the deferred purchase price of property or services in respect of which any Borrower is liable, contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which Borrower otherwise assures a creditor against loss and (ii) obligations under leases which shall have been or should be,

1

<PAGE>

in accordance with generally accepted accounting principles, reported as capital leases in respect of which any Borrower is liable, contingently or otherwise, or in respect of which any Borrower otherwise assures a creditor against loss.

(k) "LINE OF CREDIT": shall mean the credit facility described in Section 2.01.

(l) "OBLIGATIONS": shall mean all amounts owing by each Borrower to the Bank pursuant to this Agreement including, but not limited to, the unpaid principal amount of Advances.

(m) "PERMITTED LIENS": shall mean: (i) liens and security interests securing indebtedness owed by each Borrower to the Bank; (ii) liens for taxes, assessments or similar charges either not yet due or being contested in good faith; (iii)liens of materialmen, landlords, mechanics, warehousemen, or carriers or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (iv) purchase money liens or purchase money security interests upon or in any property acquired or held by each Borrower in the ordinary course of business to secure Indebtedness outstanding on the date hereof or permitted to be incurred under Section 6.10 hereof; (v) liens and security interests which, as of the date hereof, have been disclosed to and approved by the Bank in writing; and (vi) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of each Borrower's assets; (vii) liens against UDT Sensors, Inc. ("UDI") which may hereafter be granted in favor of the United States of America as set forth in that certain Stipulation for Consent Judgment referred to in and executed pursuant to that certain Criminal Plea and Sentencing Agreement between UDT and the United States Attorney's Office for the Central District of California, provided that such liens, if granted to the United States of America, shall be subordinated to those of the Bank pursuant to a subordination agreement in form and substance satisfactory to the Bank.

(n) "REFERENCE RATE": shall mean an index for a variable interest rate which is quoted, published or announced from time to time by the Bank as its reference rate and as to which loans may be made by the Bank at, below or above such reference rate.

(o) "SUBORDINATED DEBT": shall mean such liabilities of each Borrower which have been subordinated to those owed to the Bank in a manner acceptable to the Bank.

(p) "VALUE": shall mean the lesser of: the invoice cost of the Equipment

(including taxes, license fees, transportation costs, insurance premiums, and installation and connection expenses, fees and costs); or the book value of the Equipment; or the liquidation value of the Equipment as reasonably determined by the Bank.

1.02 Accounting Terms: All references to financial statements, assets, liabilities, and similar accounting items not specifically defined herein shall mean such financial statements or such items prepared or determined in accordance with generally accepted accounting principles consistently applied and, except where otherwise specified, all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles.

1.03 Other Terms: Other terms not otherwise defined shall have the meanings attributed to such terms in the California Uniform Commercial Code.

2

<PAGE>

SECTION 2.

THE LINE OF CREDIT

2.01 The Line of Credit: On terms and conditions as set forth herein, the Bank agrees to make Advances to each Borrower from time to time from the date hereof to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed $10,000,000 (the "Line of Credit"). Within the foregoing limits, each Borrower may borrow, partially or wholly prepay, and reborrow under this Section 2.01.

(a) Making Line Advances: Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of any Borrower (i) when credited to any deposit account of either Borrower maintained with the Bank or (ii) when paid in accordance with such Borrower's written instructions.

(b) Line Account: The Bank shall maintain on its books a record of account in which the Bank shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the Line of Credit (the "Line Account"). The Bank shall provide the Borrowers with a monthly statement of the Borrowers' Line Account, which statement shall be considered to be correct and conclusively binding on the Borrowers unless any Borrower notifies the Bank to the contrary within 18 months after such Borrower's receipt of any such statement which it deems to be incorrect. Each Borrower hereby authorizes the Bank, if and to the extent payment owed to the Bank under the Line of Credit is not made when due, to charge, from time to time, against any or all of any Borrower's deposit accounts with the Bank any amount so due.

(c) Mandatory Repayments: On the Expiration Date, each Borrower hereby jointly and severally promises and agrees to pay to the Bank in full the aggregate unpaid principal amount of all Advances then outstanding, together with all accrued and unpaid interest thereon.

(d) Interest on Advances: Interest shall accrue from the date of each Advance under the Line of Credit at one of the following rates, as quoted by the Bank and as elected by any Borrower below:

1. <u>Variable Rate Advances</u>: A variable rate per annum equivalent to the Reference Rate plus .25% (the "Variable Rate"). Interest shall be adjusted concurrently with any change in the Reference Rate. An Advance based upon the Variable Rate is hereinafter referred to as a "Variable Rate Advance".

2. <u>LIBOR Advances</u>: A fixed rate quoted by the Bank for 1, 2, 3, or 6 months or for such other period of time that the Bank may quote and offer (provided that any such period of time does not extend beyond the Expiration

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 240 of 2711

Date) [the "LIBOR" Interest Period"] for Advances in the minimum amount of $500,000 and in $100,000 increments thereafter. Such interest rate shall be a percentage approximately equivalent to 2.25% in excess of the Bank's LIBOR Rate which is that rate determined by the Bank's Treasury Desk as being the arithmetic mean (rounded upwards, if necessary, to the nearest whole multiple of one-sixteenth of one percent (1/16%) of the U.S. dollar London Interbank Offered Rates for such period appearing on page 3750 (or such other page as may replace page 3750) of the Telerate screen at or about 11:00 a.m. (London time) on the second Business Day prior to the first days of such period (adjusted for any and all assessments, surcharges and reserve requirements) [the "LIBOR" Rate"]. An Advance based upon the LIBOR Rate is hereinafter referred to as a "LIBOR Advance".

Interest on any Advance shall be computed on the basis of 360 days per year, but charged on the

3

<PAGE>

actual number of days elapsed.

Interest on Variable Rate Advances and LIBOR Advances shall be paid monthly commencing on the first day of the month following the date of the first such Advance and continuing on the first day of each month thereafter.

(e) Notice of Borrowing: Upon telephonic notice which shall be received by the Bank at or before 2:00 p.m. (California time) on a Business Day, each Borrower may borrow under the Line of Credit by requesting:

1. A Variable Rate Advance. A Variable Rate Advance may be made on the day notice is received by the Bank; provided, however, that if the Bank shall not have received notice at or before 2:00 p.m. on the day such Advance is requested to be made, such Variable Rate Advance may, at the Bank's option, be made on the next Business Day.

2. A LIBOR Advance. Notice of any LIBOR Advance shall be received by the Bank no later than two Business Days prior to the day (which shall be a Business Day) on which the Borrower requests such LIBOR Advance to be made.

(f) Notice of Election to Adjust Interest Rate: The Borrowers may elect:

1. That interest on a Variable Rate Advance shall be adjusted to accrue at the LIBOR Rate; provided, however, that such notice shall be received by the Bank no later than two Business Days prior to the day (which shall be a Business Day) on which any Borrower requests that interest be adjusted to accrue at the LIBOR Rate.

2. That interest on a LIBOR Advance shall continue to accrue at a newly quoted LIBOR Rate or shall be adjusted to commence to accrue at the Variable Rate; provided, however, that such notice shall be received by the Bank no later than two Business Days prior to the last day of the LIBOR Interest Period pertaining to such LIBOR Advance. If the Bank shall not have received notice (as prescribed herein) of any Borrower's election that interest on any LIBOR Advance shall continue to accrue at the newly quoted LIBOR Rate, such Borrower shall be deemed to have elected that interest thereon shall be adjusted to accrue at the Variable Rate upon the expiration of the LIBOR Interest Period pertaining to such Advance.

(g) Prepayment. The Borrowers may prepay any Advance under the Line of Credit in whole or in part, at any time and without penalty, provided, however, that: (i) any Partial prepayment shall first be applied, at the Bank's option, to accrued and unpaid interest and next to the outstanding principal balance under the Line of Credit; and (ii) during any period of time in which

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 241 of 2711

interest is accruing on any Advance on the basis of the LIBOR Rate, no prepayment shall be made except on a day which is the last day of the LIBOR Interest Period pertaining thereto. If the whole or any part of any LIBOR Advance is prepaid by reason of acceleration or otherwise, the Borrowers shall, jointly and severally, upon the Bank's request, promptly pay to and indemnify the Bank for all costs, expenses and any loss (including loss of future interest income) actually incurred by the Bank and any loss (including loss or profit resulting from the re-employment of funds) deemed sustained by the Bank as a consequence of such prepayment.

The Bank shall be entitled to fund all or any portion of its Advances in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as though the Bank actually funded all Advances through the purchase of dollar deposits in the London Interbank Market in the

<PAGE>

amount of the relevant Advance and in maturities corresponding to the date of such purchase to the Expiration Date hereunder.

(h) Indemnification of LIBOR Rate Costs: During any period of time in which interest on any Advance is accruing on the basis of the LIBOR Rate, the Borrowers shall, jointly and severally, upon the Bank's request, promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to funds used by the Bank in quoting and determining the LIBOR Rate.

(i) Conversion from LIBOR Rate to Variable Rate: In the event that the Bank shall at any time determine that the accrual of interest on the basis of the LIBOR Rate (i) is infeasible because the Bank is unable to determine the LIBOR Rate due to the unavailability of U.S. dollar deposits, contracts or certificates of deposit in an amount approximately equal to the amount of the relevant Advance and for a period of time approximately equal to relevant LIBOR Interest Period or (ii) is or has become unlawful or infeasible by reason of the Bank's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule, regulation, guideline or order, then the Bank shall give telephonic notice thereof (confirmed in writing) to the Borrowers, in which event any Advance bearing interest at the LIBOR Rate, shall thereafter be deemed to be a Variable Rate Advance and interest shall thereupon immediately accrue at the Variable Rate.

2.02 Letters of Credit: The Bank agrees to issue commercial and stand-by letters of credit (each a "Letter of Credit") on behalf of the Borrower, provided, however, at no time shall the total face amount of all Letters of Credit outstanding less any partial draws paid by the Bank and not reimbursed by the Borrower exceed the sum of $10,000,000.00, and provided further, at no time shall the total undrawn amount of all Letters of Credit outstanding plus any partial draws paid by the Bank and not reimbursed by the Borrowers, together with the total principal amount of all Advances outstanding exceed the Line of Credit.

(a) Upon the Bank's request, each Borrower shall, jointly and severally, promptly pay to the Bank issuance fees and such other fees, commissions, costs and any out-of-pocket expenses charged or incurred by the Bank with respect to any Letter of Credit.

(b) The commitment by the Bank to issue Letters of Credit shall unless earlier terminated in accordance with the terms of the Agreement, automatically terminate on the Expiration Date and no Letter of Credit shall expire on a date which is after the Expiration Date.

(c) Each Letter of Credit shall be in form and substance and in favor of beneficiaries satisfactory to the Bank, provided that the Bank may refuse to issue a Letter of Credit due to the nature of the transaction or its terms or in connection with any transaction where the Bank, due to the beneficiary or the nationality or residence of the beneficiary, would be prohibited by any applicable law, regulation or order from issuing such Letter of Credit.

(d) Prior to the issuance of each Letter of Credit but in no event later than 9:00 a.m. (California time) on the day such Letter of Credit is to be issued (which shall be a Business Day), the relevant Borrower shall deliver to the Bank International Department a duly executed form of the Bank's standard form of application for issuance of letter of credit with proper insertions.

(e) The Borrowers shall, jointly and severally, upon the Bank's request, promptly pay

5

<PAGE>

to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to any Letter of Credit.

2.03  Acceptance Facility:  Any Borrower may from time to time request the Bank to accept one or more drafts drawn on the Bank for the account of the Borrowers (each an "Acceptance").  At no time, however, shall the total principal balance of all Acceptances outstanding, together with the total face amount of all outstanding Letters of Credit less any partial draws paid by the Bank and the total principal balance of all Advances outstanding, exceed the Line of Credit.

(a) Requests for Acceptances:  Each request for an Acceptance shall be made in writing or by telephone confirmed in writing (each a "Request"), shall be irrevocable, and shall involve one or more drafts as described below.  Each Request shall be delivered or communicated to the Bank no later than 12:00 p.m. (California time) on the day (which shall be a business day) on which the creation of an Acceptance is requested.  By making any such Request, the Borrower agrees that all matters relating to each such Acceptance shall be governed by the terms hereof and the Borrower restates all warranties and representations made by the Borrower herein as if made on the date of the Request and on the date that the Acceptance is created.

(b) Acceptances:  Each Acceptance shall be created upon a Request by the Bank's acceptance of a draft in form and substance satisfactory to the Bank (each a "Draft").  Each Draft shall: (i) be drawn on the Bank by or on behalf or for the account of the Borrowers in accordance with the provisions hereof, (ii) have a minimum face amount of $100,000; (iii) be for the purpose of financing only those transactions permitted by paragraph 7 of Section 13 of the Federal Reserve Act, as amended from time to time; and (iv) mature not more than 90 days after the date thereof (provided that, if such date is not a business day, the maturity shall be extended to the next succeeding business day).  However, no Draft shall mature more than 90 days after the Expiration Date.  Each Borrower hereby warrants that any Acceptances relating to the importation or exportation of goods or relating to the domestic shipment of goods shall: (i) not have a term in excess of the period of time which is usual and reasonably necessary to finance transactions of the character of the underlying import or export transaction or the underlying domestic shipment; (ii) not, together with all other Acceptances relating to any such shipment have an aggregate face amount exceeding the CIF value of such shipment; and (iii) not be created more than 30 days after the date of shipment of goods to which such Acceptance relates. Acceptances relating to the storage of goods shall be subject to the further conditions that: (i) at the time such Acceptance is created, the goods being

stored are covered by a warehouse receipt issued by a bonded warehouse independent of the Borrower and acceptable to the Bank; (ii) the goods covered by the warehouse receipt are readily marketable staples (as such term is defined in Section 13 of the Federal Reserve Act by the Board of Governors of the Federal Reserve System or by Federal Reserve Bulletins) held pending a reasonably immediate sale, distribution or shipment; and (iii) the face amount of the Acceptance relating to such goods does not exceed the fair market value of the goods.

(c) Acceptance Liability: Each Borrower is obligated, and hereby jointly and severally promises and agrees to pay the Bank, on the maturity date of each Acceptance or on such earlier date as may be required pursuant hereto, the face amount of each such Acceptance.

(d) Acceptance Commissions: Each Borrower agrees, jointly and severally, upon acceptance by the Bank of each Draft and as a condition precedent to such Acceptance, to pay to the Bank a fee (the "Commission") in an amount equal to 1.5% per annum of the face amount of each Acceptance calculated on the basis of 360 days per year for the actual number of days (including the first day but

<PAGE>

excluding the last day) during the period which is for the term of the Draft.

(e) Discount of Acceptances: The Bank agrees to discount any Acceptance that is created and presented to the Bank for discount at a rate quoted by the Bank at the time the Acceptance is presented to the Bank for discount and for a similar dollar amount and a similar maturity as the Draft being presented to the Bank by the Borrower for acceptance (the "Acceptance Discount Rate"). On the date any such Acceptance is presented for discount, the Bank shall: (i) cause the aggregate discounted amount (less any Commission then payable by the Borrowers to the Bank hereunder) to be made available to the Borrowers by crediting such amount to any Borrower's demand deposit account maintained with the Bank, unless the Acceptance is created by a beneficiary under a Letter of Credit, in which event the Bank will cause the amount to be paid to such beneficiary and will notify the Borrowers as to the creation of the Acceptance; and (ii) advise the Borrowers of the Acceptance Discount Rate at which the Bank discounted such Acceptance. The Bank shall have the right, in its sole discretion, to sell, rediscount, hold or otherwise deal with or dispose of any such Acceptance discounted by it.

(f) Acceptance Collateral: Each Draft accepted by the Bank in accordance with the above shall be secured by a security interest in the goods (as defined in the California Uniform Commercial Code) involved in the transaction out of which the Acceptance arose to the extent that such a security interest is either required by the Bank or in order that the relevant Acceptance conform to the requirements of Section 13 of the Federal Reserve Act.

(g) Reserves: Each Borrower shall, jointly and severally, upon the Bank's request promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to any Acceptance.

2.04 Foreign Exchange Faculty: The Borrowers may from time to time request Bank to purchase or sell foreign currency in a specified amount, at a fixed price, and for delivery at a future date no greater than 365 days from the date of purchase (each a "Foreign Exchange Contract"). At no time, however, shall 10% of the aggregate of the settlement price of all Foreign Exchange Contracts outstanding exceed $750,000 as determined by Bank at the time of entering into each Foreign Exchange Contract, and provided further, that all outstanding Advances, Letters of Credit and Acceptances and 10% of the aggregate

of the settlement price of the Foreign Exchange Contracts outstanding may not exceed the Line of Credit.

(a) Requests for Foreign Exchange Contracts: Each request for a Foreign Exchange Contract shall be made by telephone or rapifax, confirmed in writing (each a "Request"). Each Request shall be delivered or communicated to the Bank no later than 3:00 p.m. (California time) on the day (which shall be a business day) on which the Foreign Exchange Contract is requested. By making any such Request, each Borrower agrees that all matters relating to each such Foreign Exchange Contract shall be governed hereby and each Borrower restates all warranties and representations made by Borrower herein as if made on the date the Foreign Exchange Contract is entered into.

(b) Expiration Date: The commitment by the Bank to enter into Foreign Exchange Contracts shall, unless earlier terminated in accordance with this Agreement, automatically terminate on the Expiration Date and no Foreign Exchange Contract shall expire on a date which is after the Expiration Date.

(c) Availability: Bank may refuse to enter into a Foreign Exchange Contract with the Borrower where the Bank, in its sole discretion, determines that such foreign currency is unavailable, or

<PAGE>

where Bank would be prohibited by any applicable law, regulation or order from purchasing such foreign currency.

(d) Purpose: The Foreign Exchange Contract shall be used to hedge foreign exchange exposure and/or risk.

(e) Payment: Payment is due on the settlement date of any Foreign Exchange Contract (the "Payment Date"). Bank is hereby authorized by each Borrower to charge the full settlement price of any Foreign Exchange Contract against the depository account or accounts maintained by each Borrower with Bank on the Payment Date.

(f) Reserves: The Borrowers shall, jointly and severally, upon the Bank's request, promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit, capital maintenance or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to any Foreign Exchange Contract.

2.05 Equipment Purchase Facility: The Bank hereby agrees to make loans and Advances to assist each Borrower in purchasing items of Equipment, upon a written request therefor made by any Borrower to the Bank prior to November 30, 1997 (the "Equipment Purchase Facility"). Each Advance made hereunder shall be in an amount not to exceed 80% of the Value of the item(s) of Equipment being purchased; provided, however, that at no time shall the total aggregate outstanding principal amount of Advances made hereunder exceed the sum of $1,000,000; and provided further that the amount of any Advance made hereunder which is repaid in whole or in part, may not be reborrowed.

(a) Equipment Account: The Bank shall maintain on its books a record of account in which the Bank shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the Equipment Purchase Facility (the "Equipment Account"). The Bank shall provide the Borrowers with a monthly statement of the Borrowers' Equipment Account, which statement shall be considered to be correct and conclusively binding on the Borrower unless any Borrower notifies the Bank to the contrary within 18 months after such Borrower's receipt of any such statement which it deems to be incorrect.

(b) Interest on Advances: Interest shall accrue from the date of each Advance under the Equipment Purchase Facility at one of the following rates, as quoted by the Bank and as elected by any Borrower below:

1. Variable Rate Advances: A variable rate per annum equivalent to the Variable Rate plus .25% ("Equipment Variable Rate"). Interest shall be adjusted concurrently with any change in the Reference Rate. An Advance based upon the Variable Rate plus .25% is hereinafter referred to as an Equipment Variable Rate Advance".

2. Fixed Rate Advances: A fixed rate quoted by the Bank for at least 30 days or for such other period of time that the Bank may quote and offer (provided that any such period of time does not extend beyond November 30, 1997) [the "Interest Period"] for Advances in the minimum amount of $100,000. Such interest rate shall be a percentage approximately equivalent to 2.5% per annum in excess of the rate which the Bank determines in its sole and absolute discretion to be equal to the Bank's cost of acquiring funds (adjusted for any and all assessments, surcharges and reserve requirements pertaining to the borrowing or purchase by the Bank of such funds) in an amount approximately equal to the amount of the

<PAGE>

relevant Advance and for a period of time approximately equal to the relevant Interest Period (the "Fixed Rate"). Advances based upon the Fixed Rate are hereinafter referred to as "Fixed Rate Advances".

Interest on any Advance shall be computed on the basis of 360 days per year, but charged on the actual number of days elapsed.

Interest on Equipment Variable Rate Advances and Fixed Rate Advances shall be paid in monthly installments commencing on the first day of the month following the date of the first such Advance and continuing on the first day of each month thereafter.

(c) Notice of Borrowing: Upon telephonic notice which shall be received by the Bank at or before 2:00 p.m. (California time) on a business day, each Borrower may borrow under the Equipment Purchase Facility by requesting an Equipment Variable Rate Advance or a Fixed Rate Advance. An Equipment Variable Rate Advance or a Fixed Rate Advance may be made on the day notice is received by the Bank; provided, however, that if the Bank shall not have received notice at or before 2:00 p.m. on the day such Advance is requested to be made, such Equipment Variable Rate Advance or Fixed Rate Advance may, at the Bank's option, be made on the next Business Day.

(d) Notice of Election to Adjust Interest Rate: The Borrowers may elect:

1. That interest on a Equipment Variable Rate Advance shall be adjusted to accrue at the Fixed Rate, provided, however, that such notice shall be received by the Bank no later than 2:00 p.m. on the Business Day on which such Borrower requests that interest be adjusted to accrue at the Fixed Rate.

2. That interest on a Fixed Rate Advance shall continue to accrue at a newly quoted Fixed Rate or shall be adjusted to commence to accrue at the Equipment Variable Rate; provided, however, that such notice shall be received by the Bank no later than 2:00 p.m. on the last day of the Interest Period pertaining to such Fixed Rate Advance. If the Bank shall not have received notice (as prescribed herein) of any Borrower's election that interest on any Fixed Rate Advance shall continue to accrue at the newly quoted Fixed Rate such Borrower shall be deemed to have elected that interest thereon shall be adjusted to accrue at the Equipment Variable Rate upon the expiration of the Interest

Period pertaining to such Advance.

(e) Prepayment: The Borrowers may prepay any Advance under the Equipment Purchase Facility in whole or in part, at any time and without penalty, provided, however, that: (i) any partial prepayment shall first be applied, at the Bank's option, to accrued and unpaid interest and next to the outstanding principal balance under the Equipment Purchase facility, and (ii) during any period of time in which interest is accruing on any Advance on the basis of the Fixed Rate, no prepayment shall be made except on a day which is the last day of the Interest Period pertaining thereto. If the whole or any part of any Fixed Rate Advance is prepaid by reason of acceleration or otherwise, each Borrower shall, jointly and severally, upon the Bank's request, promptly pay to and indemnify the Bank for all costs, expenses and any loss (including loss of future interest income) actually incurred by the Bank and any loss (including loss of profit resulting from the re-employment of funds) deemed sustained by the Bank as a consequence of such prepayment.

The Bank shall be entitled to fund all or any portion of its Advances in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as though the Bank actually funded all Advances through the purchase of dollar deposits earning interest at a rate equal to the

<PAGE>

interest rate payable on U.S. Treasury securities in the amount of the relevant Advance and in maturities corresponding to the date of such purchase to November 30, 1997.

(f) Indemnification for Fixed Rate Costs: During any period of time in which interest on any Advance is accruing on the basis of the Fixed Rate each Borrower shall, jointly and severally, upon the Bank's request, promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to funds used by the Bank in quoting and determining the Fixed Rate.

(g) Conversion from Fixed Rate to Equipment Variable Rate: In the event that the Bank shall at any time determine that the accrual of interest on the basis of the Fixed Rate (i) is infeasible because the Bank is unable to determine the Fixed Rate due to the unavailability of U.S. dollar deposits, contracts or certificates of deposit in an amount approximately equal to the amount of the relevant Advance and for a period of time approximately equal to the relevant Interest Period or (ii) is or has become unlawful or infeasible by reason of the Bank's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule, regulation, guideline or order, then the Bank shall give telephonic notice thereof (confirmed in writing) to the Borrowers, in which event any Advance bearing interest at the Fixed Rate, shall thereafter be deemed to be a Equipment Variable Rate Advance and interest shall thereupon immediately accrue at the Equipment Variable Rate.

(h) Maturity: On November 30, 1997, each Borrower hereby jointly and severally promises and agrees to pay to the Bank in full the aggregate unpaid principal amount of all Advances then outstanding under the Equipment Purchase Facility, together with all accrued and unpaid interest thereon.

(i) Conversion to Term Loan: It is hereby agreed that the Borrowers may at least 15 days prior to November 30, 1997, convert the principal balance of all Advances outstanding hereunder as of November 30, 1997 to be payable on a term loan basis. The term loan shall be in the amount of such outstanding principal balance and shall be evidenced by a promissory note in form and substance of the promissory note attached hereto as Exhibit "1" (the "Term

Note"). Accrued and unpaid interest hereunder shall be paid to the Bank concurrently with the Borrowees execution of the Term Note. Interest shall accrue and principal and interest shall be paid in accordance with the terms and provisions of the Term Note, provided however that principal shall be payable over a period of up to 60 months if the term loan conversion is elected.

2.06 Term Loan: The Bank agrees to lend to the Borrowers, upon the Borrowers' request made prior to January __, 1997, up to the maximum amount of $2,500,000 (the "Term Loan").

(a) Purpose: Proceeds from the Term Loan shall be used to refinance existing Indebtedness.

(b) Term Loan Account: The Bank shall maintain on its books a record of account in which the Bank shall make entries setting forth all payments made, the application of such payments to interest and principal, accrued and unpaid interest (if any) and the outstanding principal balance under the Term Loan (the "Term Loan Account"). The Bank shall provide the Borrowers with a monthly statement of the Borrowers' Term Loan Account, which statement shall be considered to be correct and conclusively binding on the Borrower unless any Borrower notifies the Bank to the contrary within 18 months after such Borrowees receipt of any such statement which it deems to be incorrect.

<PAGE>

(c) Interest: Interest shall accrue on the Term Loan at one of the following rates, as quoted by the Bank and as elected by any Borrower below.

1. Variable Rate Balances: The outstanding principal balance or a portion thereof of the Term Loan ("Term Balance") shall bear interest at a rate per annum equal to the Equipment Variable Rate. A Term Balance bearing interest at the Equipment Variable Rate is hereinafter referred to as a Variable Rate Balance.

2. Fixed Rate Balances: At the Fixed Rate for such period of time that the Bank may quote and offer, provided that any such period of time shall be for the Interest Period as defined hereinabove and provided further that any such period of time does not extend beyond the maturity date of the Term Loan. The Term Balance bearing interest at the Fixed Rate is hereinafter referred to as "Fixed Rate Balances".

Each Borrower hereby jointly and severally promises and agrees to pay interest on any Fixed Rate Balances and any Variable Rate Balance in arrears on the first calendar day of each month. Interest shall be calculated on the basis of a year of 360 days for actual days elapsed.

(d) Notice of Election to Adjust Interest Rate: Upon telephonic notice which shall be received by the Bank at or before 2:00 p.m. (California time) on a Business Day, the Borrowers may elect:

(1) That interest on a Variable Rate Balance shall be adjusted to accrued at the Fixed Rate; provided, however, that such notice shall be received by the Bank no later than two Business Days prior to the day (which shall be a Business Day) on which any Borrower requests that interest be adjusted to accrue at the Fixed Rate.

(2) That interest on a Fixed Rate Balance shall continue to accrue at a newly quoted Fixed Rate or shall be adjusted to commence to accrue at the Equipment Variable Rate; provided, however that such notice shall be received by the Bank no later than two Business Days prior to the last day of the Interest Period pertaining to such Fixed Rate Balance. If the Bank shall not have received notice as prescribed herein of such Borrower's election that interest on any Fixed Rate Balance shall continue to accrue at the Fixed Rate, such Borrower shall be deemed to have elected that interest thereon shall be adjusted

to accrue at the Equipment Variable Rate upon the expiration of the Interest Period pertaining to such Term Balance.

(e) Prohibition Against Prepayment of Fixed Rate Balances: The Borrowers may prepay the Term Loan in whole or in part, at any time and without penalty, provided, however, that: (i) any partial prepayment shall first be applied, at the Bank's option, to accrued and unpaid interest and next to the outstanding principal balance under the Term Loan; and (ii) during any period of time in which interest is accruing on any Term Balance on the basis of the Fixed Rate, no prepayment shall be made except on a day which is the last day of the Interest Period pertaining thereto. If the whole or any part of any Fixed Rate Balance is prepaid by reason of acceleration or otherwise, each Borrower shall, jointly and severally, upon the Bank's request, promptly pay to and indemnify the Bank for all costs, expenses and any loss (including loss of future interest income) actually incurred by the Bank and any loss (including loss of profit resulting from the re-employment of funds) deemed sustained by the Bank as a consequence of such prepayment.

The Bank shall be entitled to fund all or any portion of its Term Loan in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as though the Bank actually funded the Term Loan through the purchase of dollar deposits earning interest at a rate equal to the

<PAGE>

interest rate payable on U.S. Treasury securities in the amount of the relevant Term Loan Balance and in maturities corresponding to the date of such purchase to the maturity date of the Term Loan.

(f) Indemnification for Fixed Rate Costs: During any period of time in which interest on any Term Balance is accruing on the basis of the Fixed Rate, each Borrower shall, jointly and severally, upon the Bank's request, promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit or similar requirements or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to funds used by the Bank in quoting and determining the Fixed Rate.

(g) Conversion from Fixed Rate to Equipment Variable Rate: In the event that the Bank shall at any time determine that the accrual of interest on the basis of the Fixed Rate (i) is infeasible because the Bank is unable to determine the Fixed Rate due to the unavailability of U.S. dollar deposits, contracts or certificates of deposit in an amount approximately equal to the amount of the relevant Term Balance and for a period of time approximately equal to the relevant Interest Period; or (ii) is or has become unlawful or infeasible by reason of the Banks compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule, regulation, guideline or order, then the Bank shall give telephonic notice thereof (confirmed in writing) to the Borrowers, in which event any Fixed Rate Balance shall thereafter be deemed to be a Variable Rate Balance and interest shall thereupon immediately accrue at the Equipment Variable Rate.

(h) Principal: Each Borrower hereby jointly and severally promises and agrees to pay principal in 47 equal installments of $52,083 per installment commencing on April 1, 1997, and continuing on the ___________________ day of each month thereafter up to and including ________________________, 2001. On _____________________, 2001, each Borrower hereby jointly and severally promises and agrees to pay to the Bank the entire unpaid principal balance, together with accrued and unpaid interest.

2.07 Stock Purchase Facility: The Bank hereby agrees to make loans and Advances to assist the Borrowers in the repurchase of the stock of Opto

Sensors, Inc., upon a written request therefor made by the Borrowers to the Bank prior to June 30, 1997 (the "Stock Purchase Facility"). At no time shall the total aggregate outstanding principal amount of Advances made hereunder exceed the sum of $1,500,000; and provided further that the amount of any Advance made hereunder which is repaid, in whole or in part, may not be reborrowed.

(a) Stock Account: The Bank shall maintain on its books a record of account in which the Bank shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the Stock Purchase Facility (the "Stock Account"). The Bank shall provide the Borrowers with a monthly statement of the Borrower's Stock Account, which statement shall be considered to be correct and conclusively binding on the Borrower unless the Borrower notifies the Bank to the contrary within 18 months after any Borrower's receipt of any such statement which it deems to be incorrect.

(b) Interest on Advances: Interest shall accrue from the date of each Advance under the Equipment Purchase Facility at one of the following rates, as quoted by the Bank and as elected by the Borrower below:

1. Stock Variable Rate Advances: A variable rate per annum equivalent to the Variable Rate plus .75% ("Stock Variable Rate"). Interest shall be adjusted concurrently with any change in the Reference Rate. An Advance based upon the Stock Variable Rate is hereinafter referred to as an "Stock

<PAGE>

Variable Rate Advance".

2. Stock Fixed Rate Advances: A fixed rate quoted by the Bank for at least 30 days or for such other period of time that the Bank may quote and offer (provided that any such period of time does not extend beyond June 30, 1997) [the "Stock Interest Period"] for Advances in the minimum amount of $100,000. Such interest rate shall be a percentage approximately equivalent to 3% per annum in excess of the rate which the Bank determines in its sole and absolute discretion to be equal to the Bank's cost of acquiring funds (adjusted for any and all assessments, surcharges and reserve requirements pertaining to the borrowing or purchase by the Bank of such funds) in an amount approximately equal to the amount of the relevant Advance and for a period of time approximately equal to the relevant Stock Interest Period (the "Stock Fixed Rate"). Advances based upon the Stock Fixed Rate are hereinafter referred to as "Stock Fixed Rate Advances.

Interest on any Advance shall be computed on the basis of 360 days per year, but charged on the actual number of days elapsed.

Interest on Stock Variable Rate Advances and Stock Fixed Rate Advances shall be paid in monthly installments commencing on the first day of the month following the date of the first such Advance and continuing on the first day of each month thereafter.

(c) Notice of Borrowing: Upon telephonic notice which shall be received by the Bank at or before 2:00 p.m. (California time) on a business day, each Borrower may borrow under the Stock Purchase Facility by requesting a Stock Variable Rate Advance or a Stock Fixed Rate Advance. An Stock Variable Rate Advance or a Stock Fixed Rate Advance may be made on the day notice is received by the Bank; provided, however, that if the Bank shall not have received notice at or before 2:00 p.m. on the day such Advance is requested to be made, such Stock Variable Rate Advance or Stock Fixed Rate Advance may, at the Bank's option, be made on the next Business Day.

(d) Notice of Election to Adjust Interest Rate: The Borrowers may

elect:

1. That interest on a Stock Variable Rate Advance shall be adjusted to accrue at the Stock Fixed Rate, provided, however, that such notice shall be received by the Bank no later than 2:00 p.m. on the Business Day on which such Borrower requests that interest be adjusted to accrue at the Stock Fixed Rate.

2. That interest on a Stock Fixed Rate Advance shall continue to accrue at a newly quoted Stock Fixed Rate or shall be adjusted to commence to accrue at the Stock Variable Rate; provided, however, that such notice shall be received by the Bank no later than 2:00 p.m. on the last day of the Stock Interest Period pertaining to such Stock Fixed Rate Advance. If the Bank shall not have received notice (as prescribed herein) of any Borrower's election that interest on any Stock Fixed Rate Advance shall continue to accrue at the newly quoted Stock Fixed Rate such Borrower shall be deemed to have elected that interest thereon shall be adjusted to accrue at the Stock Variable Rate upon the expiration of the Stock Interest Period pertaining to such Advance.

(e) Prepayment: The Borrowers may prepay any Advance under the Stock Purchase Facility in whole or in part, at any time and without penalty, provided, however, that: (i) any partial prepayment shall first be applied, at the Bank's option, to accrued and unpaid interest and next to the outstanding principal balance under the Stock Purchase Facility, and (ii) during any period of time in which interest is accruing on any Advance on the basis of the Stock Fixed Rate, no prepayment shall be made except

13

<PAGE>

on a day which is the last day of the Stock Interest Period pertaining thereto. If the whole or any part of any Stock Fixed Rate Advance is prepaid by reason of acceleration or otherwise, the Borrower shall, upon the Bank's request, promptly pay to and indemnify the Bank for all costs, expenses and any loss (including loss of future interest income) actually incurred by the Bank and any loss (including loss of profit resulting from the re-employment of funds) deemed sustained by the Bank as a consequence of such prepayment.

The Bank shall be entitled to fund all or any portion of its Advances in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as though the Bank actually funded all Advances through the purchase of dollar deposits earning interest at a rate equal to the interest rate payable on U.S. Treasury securities in the amount of the relevant Advance and in maturities corresponding to the date of such purchase to June 30, 1997.

(f) Indemnification for Stock Fixed Rate Costs: During any period of time in which interest on any Advance is accruing on the basis of the Stock Fixed Rate each Borrower shall, jointly and severally, upon the Bank's request, promptly pay to and reimburse the Bank for all costs incurred and payments made by the Bank by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Bank or as a result of the Bank's compliance with any future directive or requirement of any regulatory authority pertaining or relating to funds used by the Bank in quoting and determining the Stock Fixed Rate.

(g) Conversion from Stock Fixed Rate to Stock Variable Rate: In the event that the Bank shall at any time determine that the accrual of interest on the basis of the Stock Fixed Rate (i) is infeasible because the Bank is unable to determine the Stock Fixed Rate due to the unavailability of U.S. dollar deposits, contracts or certificates of deposit in an amount approximately equal to the amount of the relevant Advance and for a period of time approximately equal to the relevant Stock Interest Period or (ii) is or has become unlawful or infeasible by reason of the Bank's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule, regulation, guideline or order, then the Bank shall give telephonic notice

thereof (confirmed in writing) to the Borrowers, in which event any Advance bearing interest at the Stock Fixed Rate, shall thereafter be deemed to be a Stock Variable Rate Advance and interest shall thereupon immediately accrue at the Stock Variable Rate.

(h) Maturity: On June 30, 1997, each Borrower hereby jointly and severally promises and agrees to pay to the Bank in full the aggregate unpaid principal amount of all Advances then outstanding, together with all accrued and unpaid interest thereon.

(i) Conversion to Term Loan: It is hereby agreed that the Borrowers may at least 2 days prior to June 30, 1997, convert the principal balance of all Advances outstanding hereunder as of June 30, 1997 to be payable on a term loan basis. The term loan shall be in the amount of such outstanding principal balance and shall be evidenced by a promissory note in the form of the Term Note. Accrued and unpaid interest hereunder shall be paid to the Bank concurrently with the Borrowers' execution of the Term Note. Interest shall accrue and principal and interest shall be paid in accordance with the terms and provisions of the Term Note, provided however that principal shall be payable over a period of up to 36 months if the term loan conversion is elected.

2.08 Late Payment: If any payment of principal (other than a principal payment due on the Expiration Date) or interest, or any portion thereof, under this Agreement is not paid within ten (10) calendar days after it is due, a late payment charge equal to five percent (5%) of such past due payment may be assessed and shall be immediately payable.

<PAGE>

2.09 Joint Liability: Notwithstanding that Advances may be made to a particular Borrower, each Borrower is jointly and severally liable for the repayment to Bank of any and all monies, together with interest thereon, disbursed under this Agreement. By each Borrower's respective execution of this Agreement, each such Borrower, jointly and severally. unconditionally and irrevocably promises to pay and guarantees the obligation for repayment of all indebtedness incurred hereunder.

SECTION 3.

COLLATERAL

3.01 The Collateral: To secure payment and performance of all each Borrower's Obligations under this Agreement and all other liabilities, loans, guarantees, covenants and duties owed by the Borrower to the Bank, whether or not evidenced by this or by any other agreement, absolute or contingent, due or to become due, now existing or hereafter and howsoever created, each Borrower hereby grants the Bank a security interest in and to all of the following property (the "Collateral"):

(a) All goods now owned or hereafter acquired by each Borrower or in which any Borrower now has or may hereafter acquire any ownership interest, including, but not limited to, all machinery, equipment, furniture, furnishings, fixtures, tools, supplies and motor vehicles of every kind and description, and all additions, accessions, improvements, replacements and substitutions thereto and thereof.

(b) All inventory now owned or hereafter acquired by either Borrower, including, but not limited to, all raw materials, work in process, finished goods, merchandise, parts and supplies of every kind and description, including inventory temporarily out of either Borrower's custody or possession, together with all returns on accounts.

(c) All accounts, contract rights and general intangibles now owned or

hereafter created or acquired by either Borrower, including, but not limited to, all receivables, goodwill, trademarks, trade styles, trade names, patents, patent applications, software, customer lists and business records.

(d) All documents, instruments and chattel paper now owned or hereafter acquired by either Borrower.

(e) All monies, deposit accounts, certificates of deposit and securities of each Borrower now or hereafter in the Bank's or its agents' possession, excluding the securities and stock of any Borrower's foreign affiliates or subsidiaries.

The Bank's security interest in the Collateral shall be a continuing lien and shall include the proceeds and products of the Collateral including, but not limited to, the proceeds of any insurance thereon.

SECTION 4.

CONDITIONS OF LENDING

4.01 Conditions Precedent to the Initial Advance: The obligation of the Bank to make the initial Advance and the flat extension of credit to or on account of any Borrower hereunder is subject to the conditions precedent that the Bank shall have received before the date of such initial Advance and such first

<PAGE>

extension of credit all of the following, in form and substance satisfactory to the Bank:

(a) Evidence that the execution, delivery and performance by each Borrower of this Agreement and any document, instrument or agreement required hereunder have been duty authorized.

(b) Continuing guaranty in favor of the Bank executed by Deepak Chopra for $1,500,000 for the Stock Purchase Facility.

(c) Executed UCC-1 financing statement(s) describing the Collateral, together with evidence of the recordation of such statement(s).

(d) A loan fee of $10,000.

(e) The executed intercreditor agreement by and between Bank and Wells Fargo HSBC Trade Bank, National Association.

(f) Such other evidence as the Bank may request to establish the consummation of the transaction contemplated hereunder and compliance with the conditions of this Agreement.

4.02 Conditions Precedent to All Advances: The obligation of the Bank to make each Advance and each other extension of credit to or on account of either Borrower (including the initial Advance and the flat extension of credit) shall be subject to the further conditions precedent that, on the date of each Advance or each extension of credit and after the making of such Advance or extension of credit:

(a) The Bank shall have received such supplemental approvals, opinions or documents as the Bank may reasonably request

(b) The representations contained in Section 5 and in any other document, instrument or certificate delivered to the Bank hereunder are correct.

(c) No event has occurred and is continuing which constitutes, or, with the lapse of time or giving of notice or both, would constitute an Event of Default.

(d) The security interest in the Collateral has been duly authorized, created and perfected and is in full force and effect.

Each Borrower's acceptance of the proceeds of any Advance or the Borrower's execution of any document or instrument evidencing or creating any Obligation hereunder shall be deemed to constitute such Borrower's representation and warranty that all of the above statements are true and correct.

SECTION 5.

REPRESENTATIONS AND WARRANTIES

Each Borrower hereby makes the following representations and warranties to the Bank, which representations and warranties are continuing:

5.01 Status: Each Borrower is a corporation, duly organized and validly existing under the laws

16

<PAGE>

of the State of California and is properly licensed and is qualified to do business and in good standing in, and, where necessary to maintain each Borrower's rights and privileges, has complied with the fictitious name statute of every jurisdiction in which the Borrower is doing business.

5.02 Authority: The execution, delivery and performance by each Borrower of this Agreement and any instrument, document or agreement required hereunder have been duly authorized and do not and will not: (i) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having application to either Borrower; (ii) result in a breach of or constitute a default under any material indenture or loan or credit agreement or other material agreement, lease or instrument to which either Borrower is a party or by which it or its properties may be bound or affected; or (iii) require any consent or approval of its stockholders or violate any provision of its articles of incorporation or by-laws.

5.03 Legal Effect: This Agreement constitutes, and any instrument, document or agreement required hereunder when delivered hereunder will constitute, legal, valid and binding obligations of each Borrower enforceable against such Borrower in accordance. with their respective terms.

5.04 Fictitious Trade Styles: There are no fictitious trade styles used by any Borrower in connection with its business operations. Each Borrower shall notify the Bank not less than 30 days prior to effecting any change in the matters described herein or prior to using any other fictitious trade style at any future date, indicating the trade style and state(s) of its use.

5.05 Financial Statements: All financial statements, information and other data which may have been or which may hereafter be submitted by the Borrowers to the Bank are true, accurate and correct and have been or will be prepared in accordance with generally accepted accounting principles consistently applied and accurately represent the financial condition or, as applicable, the other information disclosed therein. Since the most recent submission of such financial information or data to the Bank each Borrower represents and warrants that no material adverse change in such Borrower's financial condition or operations has occurred which has not been fully disclosed to the Bank in writing.

5.06 Litigation: Except as have been disclosed to the Bank in writing, there are no actions, suits or proceedings pending or, to the, knowledge of each Borrower, threatened against or affecting any Borrower or any Borrower's properties before any court or administrative agency which, if determined adversely to such Borrower, would have a material adverse effect on such Borrower's financial condition or operations or on the Collateral.

5.07 Title to Assets: Each Borrower has good and marketable title to all of its assets (including, but not limited to, the Collateral) and the same are not subject to any security interest, encumbrance, lien or claim of any third person except for Permitted Liens.

5.08 ERISA. If any Borrower has a pension, profit sharing or retirement plan subject to ERISA, such plan has been and will continue to be funded in accordance with its terms and otherwise complies with and continues to comply with the requirements of ERISA.

5.09 Taxes: Each Borrower has filed all tax returns required to be filed and paid all taxes shown thereon to be due, including interest and penalties, other than such taxes which are currently payable without penalty or interest or those which are being duly contested in good faith.

5.10 Margin Stock: The proceeds of any Advance will not be used to purchase or carry margin

<PAGE>

stock as such term is defined under Regulation U of the Board of Governors of the Federal Reserve System.

5.11 Environmental Compliance: Each Borrower has implemented and complied in all material respects with all applicable federal, state and local laws, ordinances, statutes and regulations with respect to hazardous or toxic wastes, substances or related materials, industrial hygiene or environmental conditions. There are no suits, proceedings, claims or disputes pending or, to the knowledge of any Borrower, threatened against or affecting any Borrower or its property claiming violations of any federal, state or local law, ordinance, statute or regulation relating to hazardous or toxic wastes, substances or related materials.

SECTION 6.

COVENANTS

Each Borrower covenants and agrees that, during the term of this Agreement, and so long thereafter as either Borrower is indebted to the Bank under this Agreement, the Borrower will, unless the Bank shall otherwise consent in writing:

6.01 Preservation of Existence; Compliance with Applicable Laws: Maintain and preserve its existence and all rights and privileges now enjoyed; not liquidate or dissolve, merge or consolidate with or into, or acquire any other business organization; and conduct its business and operations in accordance with all applicable laws, rules and regulations.

6.02 Maintenance of Insurance: Maintain insurance in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which each Borrower operates and maintain such other insurance and coverages as may be required by the Bank. All such insurance shall be in form and amount and with companies satisfactory to the Bank. With respect to insurance covering properties in which the Bank maintains a security interest or lien, such insurance shall name the Bank as loss payee pursuant to a loss payable

endorsement satisfactory to the Bank and shall not be altered or canceled except upon 10 days' prior written notice to the Bank. Upon the Bank's request, each Borrower shall furnish the Bank with the original policy or binder of all such insurance.

6.03 Maintenance of Collateral and Other Properties: Except for Permitted Liens, keep and maintain the Collateral free and clear of all levies, liens, encumbrances and security interests (including, but, not limited to, any lien of attachment, judgment or execution) and defend the Collateral against any such levy, lien encumbrance or security interest; comply with all laws, statutes and regulations pertaining to the Collateral and its use and operation; execute, file and record such statements, notices and agreements, take such actions and obtain such certificates and other documents as necessary to perfect, evidence and continue the Bank's security interest in the Collateral and the priority thereof, maintain accurate and complete records of the Collateral which show all sales, claims and allowances; and properly care for, house, store and maintain the Collateral in good condition, free of misuse, abuse and deterioration, other than normal wear and tear. Each Borrower shall also maintain and preserve all its properties in good working order and condition in accordance with the general practice of other businesses of similar character and size, ordinary wear and tear excepted.

6.04 Payment of Obligations and Taxes: Make timely payment of all assessments and taxes and all of its liabilities and obligations including, but not limited to, trade payables, unless the same are being contested in good faith by appropriate proceedings with the appropriate court or regulatory agency. For purposes hereof, any Borrower's issuance of a check, draft or similar instrument without delivery to the intended payee shall not constitute payment.

18

<PAGE>

6.05 Inspection Rights: At any reasonable time and from time to time, permit the Bank or any representative thereof to examine and make copies of the records and visit the properties of any Borrower and discuss the business and operations of such Borrower with any employee or representative thereof. If any Borrower shall maintain any records (including, but not limited to, computer generated records or computer programs for the generation of such records) in the possession of a third party, each Borrower hereby agrees to notify such third party to permit the Bank free access to such records at all reasonable times and to provide the Bank with copies of any records which it may request, all at the Borrowers' expense, the amount of which shall be payable immediately upon demand. In addition, the Bank may, at any reasonable time and from time to time, conduct inspections and audits of the Collateral and each Borrower's accounts payable, the cost and expenses of which shall be paid by the Borrowers to the Bank upon demand.

6.06 Reporting and Certification Requirements: Deliver or cause to be delivered to the Bank in form and detail satisfactory to the Bank:

(a) Not later than 120 days after the end of each Borrower's fiscal year, a copy of the annual audited consolidated financial report of the Borrowers for such year, prepared by a firm of certified public accountants acceptable to Bank.

(b) Not later than 30 days after the end of the first three fiscal quarters of each year, the Borrowers' consolidated and consolidating financial statement for such quarter.

(c) Upon the Bank's request, such other information pertaining to the Borrower, the Collateral or any guarantor hereunder as the Bank may reasonably request.

6.07 Redemption or Repurchase of Stock: Not redeem or repurchase

any class of each Borrower's stock now or hereafter outstanding other than stock repurchased under the Stock Purchase Facility.

6.08 Additional Indebtedness: Except as otherwise provided herein, not, after the date hereof, create, incur or assume, directly or indirectly, any additional Indebtedness other than (i) indebtedness owed or to be owed to the Bank or (ii) indebtedness to trade creditors incurred in the ordinary course of any Borrower's business or (iii) indebtedness owed or to be owed to the Wells Fargo HSBC Trade Bank.

6.09 Loans: Not make any loans or advances or extend credit to any third person, including, but not limited to, directors, officers, partners, or employees of any Borrower, except for credit extended in the ordinary course of each Borrower's business as presently conducted and except credit extended to any Borrower's affiliated entities and subsidiaries.

6.10 Liens and Encumbrances: Not create, assume or permit to exist any security interest, encumbrance, mortgage, deed of trust, or other lien (including, but not limited to, a lien of attachment, judgment or execution) affecting any of each Borrower's properties, or execute or allow to be filed any financing statement or continuation thereof affecting any of such properties, except for Permitted Liens or as otherwise provided in this Agreement.

6.11 Transfer Assets: Not, after the date hereof, sell, contract for sale, convey, transfer, assign, lease or sublet any of its assets (including, but not limited to, the Collateral) except in the ordinary course of business as presently conducted by each Borrower and, then, only for full, fair and reasonable consideration.

6.12 Change in Nature of Business: Not make any material change in the nature of its business as existing or conducted as of the date hereof.

19

<PAGE>

6.13 Financial Condition: Maintain at all times on a consolidated basis:

(a) A minimum Effective Tangible Net Worth of at least $10,000,000 through March 31, 1997 and $11,000,000 thereafter.

(b) A ratio of Debt to Effective Tangible Net Worth of not more than 3.25 to 1 through March 31, 1997 and 3.00 to 1 thereafter.

(c) A ratio of current assets to current liabilities of not less than 1.20 to 1.

(d) A ratio of the sum of cash, cash equivalents and accounts receivable to current liabilities of not less than .50 to 1 at March 31, 1997 and .60 to 1 thereafter.

6.14 Compensation of Employees: Compensate its employees for services rendered at an hourly rate at least equal to the minimum hourly rate prescribed by any applicable federal or state law or regulation.

6.15 Rentals: Not incur liability (in addition to that incurred as of the date of this Agreement) for the payment of, or pay, rentals for the renting, leasing or use of real or personal property in an amount greater than $1,100,000 in any one fiscal year.

6.16 Capital Expense: Not make any fixed capital expenditure or any commitment therefor, including, but not limited to, incurring liability for leases which would be, in accordance with generally accepted accounting principles, reported as capital leases, or purchase any real or personal property in an amount greater than $1,750,000 in any one fiscal year.

6.17 Notice: Give the Bank prompt written notice of any and all (i) Events of Default; (ii) litigation, arbitration or administrative proceedings to which either Borrower is a party and in which the claim or liability exceeds $150,000.00 or which affects the Collateral; and (iii) other matters which have resulted in, or might result in a material adverse change in the Collateral or the financial condition or business operations of any Borrower.

6.18 Environmental Compliance. Each Borrower shall:

(a) Implement and comply in all material respects with all applicable federal, state and local laws, ordinances, statutes and regulations with respect to hazardous or toxic wastes, substances or related materials, industrial hygiene or to environmental conditions.

(b) Not own, use, generate, manufacture, store, handle, treat, release or dispose of any hazardous or toxic wastes, substances or related materials except in the ordinary course of the Borrower's business.

(c) Give prompt written notice of any discovery of or suit, proceeding, claim, dispute, threat, inquiry or filing respecting hazardous or toxic wastes, substances or related materials.

(d) At all times indemnify and hold harmless Bank from and against any and all liability arising out of the use, generation, manufacture, storage, handling, treatment, disposal or presence of hazardous or toxic wastes, substances or related materials.

<PAGE>

SECTION 7.

EVENTS OF DEFAULT

Any one or more of the following described events shall constitute an event of default (an 'Event of Default') under this Agreement:

7.01 Non-Payment: Any Borrower shall fail to pay any Obligations within 2 days of when due.

7.02 Performance Under This Agreement: Any Borrower shall fail in any material respect to perform or observe any term, covenant or agreement contained in this Agreement or in any document, instrument or agreement relating to this Agreement and any such failure shall continue unremedied for more than 30 days after the occurrence thereof.

7.03 Other Agreements: If there is a default under any agreement to which any Borrower is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in excess of $250,000.

7.04 Representations and Warranties; Financial Statements: Any representation or warranty made by each Borrower under or in connection with this Agreement or any financial statement given by such Borrower or any guarantor shall prove to have been incorrect in any material respect when made or given or when deemed to have been made or given.

7.05 Insolvency. Any Borrower shall: (i) become insolvent or be unable to pay its debts as they mature; (ii) make an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its properties and assets; (iii) file a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; (iv) file an answer admitting the material allegations of an involuntary petition relating to bankruptcy or reorganization or join in any such petition;

(v) become or be adjudicated a bankrupt; (vi) apply for or consent to the appointment of, or consent that an order be made, appointing any receiver, custodian or trustee, for itself or any of its properties, assets or businesses; or (vii) any receiver, custodian or trustee shall have been appointed for all or substantially all of its properties, assets or businesses and shall not be discharged within 60 days after the date of such appointment.

7.06 Execution: Any writ of execution or attachment or any judgment lien shall be issued against any property of any Borrower and shall not be discharged or bonded against or released within 30 days after the issuance or attachment of such writ or lien in excess of $100,000.

7.07 Revocation or Limitation of Guaranty. Any guaranty shall be revoked or limited or its enforceability or validity shall be contested by any guarantor, by operation of law, legal proceeding or otherwise or any guarantor who is a natural person shall die.

7.08 Suspension: Any Borrower shall voluntarily suspend the transaction of business or allow to be suspended terminated, revoked or expired any permit, license or approval of any governmental body necessary to conduct such Borrowers business as now conducted.

7.09 Change in Ownership: There shall occur a sale, transfer, disposition or encumbrance (whether voluntary or involuntary), or an agreement shall be entered into to do so, with respect to more than 10% of the issued and outstanding capital stock of any Borrower owned by Deepak Chopra.

21

<PAGE>

SECTION 8.

REMEDIES ON DEFAULT

Upon the occurrence of any Event of Default, the Bank may, at its sole and absolute election, without demand and only upon such notice as may be required by law:

8.01 Acceleration: Declare any or all of the Borrowers' indebtedness owing to the Bank, whether under this Agreement or any other document, instrument or agreement, immediately due and payable, whether or not otherwise due and payable.

8.02 Cease Extending Credit: Cease making Advances or otherwise extending credit to or for the account of each Borrower under this Agreement or under any other agreement now existing or hereafter entered into between any Borrower and the Banks

8.03 Termination: Terminate this Agreement as to any future obligation of the Bank without affecting the Borrowers' obligations to the Bank or the Bank's rights and remedies under this Agreement or under any other document instrument or agreement.

8.04 Notification of Account Debtors:

(a) Notify any Account Debtor, any buyers or transferee of the Collateral or any other persons of the Bank's interest in the Collateral and the proceeds thereof.

(b) Sign any Borrower's name (which authority each Borrower hereby irrevocably and unconditionally grants to the Bank) on any invoice or bill of lading relating to accounts or other drafts against the Account Debtors, not post office authorities to change the address for delivery of mail addressed to such Borrower to such address as the Bank may designate and take possession of and open mail addressed to any Borrower and remove therefrom, proceeds of and

payments on the Collateral, and demand, receive and endorse payment and give receipts, releases and satisfactions for and sue for all money payable to any Borrower.

(c) Require each Borrower to indicate on the face of all invoices (or such other documentation as may be specified by the Bank relating to the services giving rise to the Account) that the Account has been assigned to the Bank and that all payments are to be made directly to the Bank at such address as the Bank may designate.

8.05 Protection of Security Interest: Make such payments and do such acts as the Bank, in its sole judgment, considers necessary and reasonable to protect its security interest or Hen in the Collateral. Each Borrower hereby irrevocably authorizes the Bank to pay, purchase, contest or compromise any encumbrance, lien or claim which the Bank, in its sole judgment, deems to be prior or superior to its security interest. Further, each Borrower hereby agrees to pay to the Bank, upon demand therefor, all expenses and expenditures (including attorneys' fees) incurred in connection with the foregoing.

8.06 Foreclosure: Enforce any security interest or lien given or provided for under this Agreement or under any security agreement, mortgage, deed of trust or other document, in such manner and such order, as to all or any part of the properties subject to such security interest or lien, as the Bank, in its sole judgment, deems to be necessary or appropriate and each Borrower hereby waives any and all rights, obligations or defenses now or hereafter established by law relating to the foregoing. In the enforcement of

<PAGE>

its security interest or lien, the Bank is authorized to enter upon the premises where any Collateral is located and take possession of the Collateral or any part thereof, together with each Borrower's records pertaining thereto, or the Bank may require each Borrower to assemble the Collateral and records pertaining thereto and make such Collateral and records available to the Bank at a place designated by the Bank. The Bank may sell the Collateral or any portions thereof, together with all additions, accessions and accessories thereto, giving only such notices and following only such procedures as are required by law, at either a public or private sale, or both, with or without having the Collateral present at the time of the sale, which sale shall be on such terms and conditions and conducted in such manner as the Bank determines in its sole judgment to be commercially reasonable. Any deficiency which exists after the disposition or liquidation of the Collateral shall be a continuing liability of each Borrowers to the Bank and shall be immediately paid by each Borrower, jointly and severally, to the Bank.

8.07 Letters of Credit and Acceptances: Require the Borrowers, jointly and severally, to pay immediately to the Bank, for application against drawings under any outstanding Letters of Credit and Acceptances, the outstanding principal amount of any such Letters of Credit which have not expired and the principal amount of any Acceptances which have not matured. Any portion of the amount so paid to the Bank which is not applied to satisfy draws under any such Letters of Credit or repayments on any such matured Acceptances or any other obligations of the Borrower to the Bank shall be repaid to the Borrowers without interest.

8.08 Foreign Exchange Contracts: Require the Borrowers, jointly and severally, to pay immediately to the Bank, for application against the future settlement price under any outstanding Foreign Exchange Contracts, the outstanding face amount of any such Foreign Exchange Contracts which have not matured or settled and Borrower hereby grants to Bank a security interest in and to such funds. Any portion of the amount so paid to the Bank which is not subsequently applied to satisfy repayment on any such matured Foreign Exchange Contracts or any other obligations of the Borrower to the Bank shall be repaid to the Borrowers without interest.

8.09 Non-Exclusivity of Remedies: Exercise one or more of the Bank's rights set forth herein or seek such other rights or pursue such other remedies as may be provided by law, in equity or in any other agreement now existing or hereafter entered into between each Borrower and the Bank, or otherwise.

8.10 Application of Proceeds: All amounts received by the Bank as proceeds from the disposition or liquidation of the Collateral shall be applied to the Borrowers' indebtedness to the Bank as follows: first, to the costs and expenses of collection, enforcement, protection and preservation of the Bank's lien in the Collateral, including court costs and reasonable attorneys' fees, whether or not suit is commenced by the Bank; next, to those costs and expenses incurred by the Bank in protecting, preserving, enforcing, collecting, liquidating, selling or disposing of the Collateral; next, to the payment of accrued and unpaid interest on all of the Obligations; next, to the payment of the outstanding principal balance of the Obligations; and last, to the payment of any other indebtedness owed by any Borrower to the Bank. Any excess Collateral or excess proceeds existing after the disposition or liquidation of the Collateral will be returned or paid by the Bank to the Borrowers.

SECTION 9.

MISCELLANEOUS

9.01 Amounts Payable on Demand. If any Borrower shall fail to pay on demand any amount so payable under this Agreement, the Bank may, at its option and without any obligation to do so and without

<PAGE>

waiving any default occasioned by the Borrower having so failed to pay such amount, create an Advance under the Line of Credit in an amount equal to the amount so payable, which Advance shall thereafter bear interest as provided under the Line of Credit.

9.02 Default Interest Rate: If an Event of Default, or an event which, with notice or passage of time could become an Event of Default, has occurred and is continuing, each Borrower, jointly and severally, shall pay to the Bank interest on any Indebtedness or amount payable under this Agreement at a rate which is 3% in excess of the rate or rates then in effect under this Agreement.

9.03 Disposal of Invoices: All documents, schedules, invoices or other papers received by the Bank from the Borrowers may be destroyed or disposed of 6 months after receipt by the Bank, unless any Borrower requests in writing the return thereof, which shall be done at the Borrowers' expense.

9.04 Waiver of Jury Trial. EACH BORROWER AND THE BANK EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH BORROWER AND THE BANK EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

9.05 Reliance: Each warranty, representation, covenant, obligation

and agreements contained in this Agreement shall be conclusively presumed to have been relied upon by the Bank regardless of any investigation made or information possessed by the Bank and shall be cumulative and in addition to any other warranties, representations, covenants and agreements which each Borrower now or hereafter shall give, or cause to be given, to the Bank.

9.06 Attorneys' Fees: Each Borrower, jointly and severally, shall pay to the Bank all costs and expenses, including but not limited to reasonable attorneys fees, incurred by Bank in connection with the administration, enforcement or any refinancing or restructuring in the nature of a "work-out", of this Agreement or any document, instrument or agreement executed with respect to, evidencing or securing the indebtedness hereunder.

9.07 Notices: All notices, payments, requests, information and demands which either party hereto may desire, or may be required to give or make to the other party hereto, shall be given or made to such party by hand delivery or through deposit in the United States mail, postage prepaid, or by Western Union telegram, addressed as set forth below or to such other address as may be specified from time to time in writing by either party to the other.

24

<PAGE>

To the Borrowers: To the Bank:

OPTO SENSORS, INC. SANWA BANK CALIFORNIA

/s/ Illegible /s/JANICE UPTON

- -------------------------------------- ------------------------------------

Janice Upton, Vice President

- --------------------------------------

UDT SENSORS, INC.

/s/ Illegible

- --------------------------------------

- --------------------------------------

RAPISCAN SECURITY PRODUCTS (U.S.A.), INC.

/s/ Illegible

- --------------------------------------

- --------------------------------------

FERSON OPTICS, INC.

/s/ Illegible

- --------------------------------------

9.08 Waiver: Neither the failure nor delay by the Bank in exercising any right hereunder or under any document instrument or agreement mentioned herein shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or under any other document, instrument or agreement mentioned herein preclude other or further exercise thereof or the exercise of any other right; nor shall any waiver of any right or default hereunder, or under any other document, instrument or agreement mentioned herein, constitute a

waiver of any other right or default or constitute a waiver of any other default of the same or any other term or provision.

9.09 Conflicting Provisions: To the extent the provisions contained in this Agreement are inconsistent with those contained in any other document, instrument or agreement executed pursuant hereto, the terms and provisions contained herein shall control. Otherwise, such provisions shall be considered cumulative.

25

<PAGE>

9.10 Binding Effect; Assignment: This Agreement shall be binding upon and inure to the benefit of each Borrower and the Bank and their respective successors and assigns, except that no Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Bank. The Bank may sell. assign or grant participation in all or any portion of its rights and benefits hereunder. Each Borrower agrees that, in connection with any such sale, grant or assignment, the Bank may deliver to the prospective buyer, participant or assignee financial statements and other relevant information relating to any Borrower and any guarantor.

9.11 Jurisdiction: This Agreement, any notes issued hereunder, the rights of the parties hereunder to and concerning the Collateral, and any documents, instruments or agreements mentioned or referred to herein shall be governed by and construed according to the laws of the State of California, to the jurisdiction of whose courts the parties hereby submit.

9.12 No Guaranty or Surety. If any Borrower hereunder is deemed to be a surety or guarantor due to its joint and several liability hereunder such Borrower hereby unconditionally and irrevocably acknowledges and agrees to the matters set forth below:

(a) Each Borrower waives any defense based upon any Borrower's loss of a right against any other Borrower(s) arising from the Bank's election of a remedy on any indebtedness under bankruptcy or other debtor relief laws or under any other laws, including, but not limited to, those purporting to reduce the Bank's right against any Borrower in proportion to the principal obligation of any indebtedness (as presently contained in Section 2809 of the California Civil Code and as it may be amended or superseded in the future).

(b) Each Borrower waives the benefit of the statute of limitations affecting such Borrower's liability hereunder or the enforcement hereof.

(c) Each Borrower waives all right to require the Bank to: (i) proceed against any other Borrower(s), any endorser, cosigner, other guarantor or other person liable on any indebtedness; (ii) join any endorser, cosigner, other guarantor or other person liable on any indebtedness in any action or actions that may be brought and prosecuted by the Bank solely and separately against any Borrower(s) on any indebtedness; (iii) proceed against any item or items of collateral securing any indebtedness or any guaranty thereof, or (iv) pursue or refrain from pursuing any other remedy whatsoever in the Bank's power.

(d) Each Borrower waives any defense arising by reason of any disability or other defense of any other Borrower(s), successors or any endorser, cosigner, other guarantor or other person liable on any indebtedness. Until all indebtedness has been paid in full, each Borrower shall not have any right of subrogation and each Borrower waives any benefit of and right to participate in any collateral now or hereafter held by the Bank. Each Borrower waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of sale of any collateral securing any indebtedness or any guaranty thereof, and notice of the existence, creation or incurring of new or additional indebtedness.

9.13 Headings: The headings herein set forth are solely for the purpose of

identification and have no legal significance.

9.14 Entire Agreement: This Agreement and all documents, instruments and agreements mentioned herein constitute the entire and complete understanding of the parties with respect to the

<PAGE>

transactions contemplated hereunder. All previous conversations, memoranda and writings between the parties pertaining to the transactions contemplated hereunder not incorporated or referenced in this Agreement or in such documents, instruments and agreements are superseded hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first hereinabove written.

| BANK: | BORROWER: |
|---|---|
| SANWA BANK CALIFORNIA | OPTO SENSORS, INC. |
| By: /s/JANICE UPTON | By: /s/ AJAY MEHRA |
| Janice Upton, Vice President | Ajay Mehra, Chief Financial Officer |
| | UDT SENSORS, INC. |
| | By: /s/ AJAY MEHRA |
| | Ajay Mehra, Chief Financial Officer |
| | RAPISCAN SECURITY PRODUCTS (U.S.A.), INC. |
| | By: /s/ AJAY MEHRA |
| | Ajay Mehra, Chief Financial Officer |
| | FERSON OPTICS, INC. |
| | By: /s/ AJAY MEHRA |
| | Ajay Mehra, Chief Financial Officer |

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.16
<SEQUENCE>17
<DESCRIPTION>CREDIT AGMNT WITH WELLS FARGO HSBC TRADE BANK
<TEXT>

<PAGE>

EXHIBIT 10.16

---

CREDIT AGREEMENT

by and between

OPTO SENSORS, INC., a California corporation
UDT SENSORS, INC., a California corporation
RAPISCAN SECURITY PRODUCTS (U.S.A.), INC., a California corporation
FERSON OPTICS, INC., a California corporation

and

WELLS FARGO HSBC TRADE BANK, N.A.

Dated as of

November 1, 1996

---

Exhibit A - Revolving Line of Credit Note
Exhibit B - Borrowing Base Certificate
Exhibit C - Country Limitation Schedule of Ex-Im Bank
Exhibit D - Ex-Im Bank Borrower Agreement
Exhibit E - Facility Supplements
Exhibit F - Unsecured Guarantees

Collateral Documents:

Intercreditor Agreement with Wells Fargo Bank, National Association ("Intercreditor Agreement")
Security Agreement in Rights to Payment and Inventory ("Security Agreement")
Subordination Agreement with Scope Industries ("Subordination Agreement")
UCC-I Financing Statement(s)

<PAGE>

WELLS FARGO HSBC TRADE BANK

OPTO SENSORS, INC., a California corporation, UDT SENSORS, INC., a California corporation, RAPISCAN SECURITY PRODUCTS (U.S.A.), INC., a California corporation and FERSON OPTICS, INC., a California corporation (each individually, a "Borrower" and together, the "Borrowers"), and WELLS FARGO HSBC TRADE BANK, N.A. ("Trade Bank"), have entered into this CREDIT AGREEMENT as of November 1, 1996 ("Effective Date").

## I
## CREDIT FACILITIES

1.1 The Facilities. Subject to the terms and conditions of this

Agreement, Trade Bank will make available to Borrower each of those credit facilities ("Facilities") for which a Facility Supplement ("Supplement") is attached as Exhibit E hereto. Additional terms for each individual Facility (and each subfacility thereof ("Subfacility")) are set forth in the Supplement for that Facility. Each Facility will be available from the Closing Date until the Facility Termination Date for that Facility. Collateral and credit support required for each Facility are also set forth in the Supplement for each Facility. Definitions for those capitalized terms not otherwise defined are contained in Article 8 below.

1.2 Credit Extension Limits. The aggregate outstanding amount of all Credit Extensions may at no time exceed the lesser of (a) Two Million Dollars ($2,000,000), or (b) the Available Export Order Credit Limit as then in effect. In addition to the foregoing, the aggregate outstanding amount of all Revolving Credit Loans and unreimbursed drawings under Standby Credits plus twenty-five percent (25%) of the aggregate undrawn face amount of all unexpired Standby Credits may at no time exceed the Borrowing Base as then in effect. The aggregate outstanding amount of all Credit Extensions outstanding at any time under any Facility may not exceed that amount specified as the "Credit Limit" in the Supplement for that Facility, and the aggregate outstanding amount of all Credit Extensions outstanding at any time under each Subfacility (or any subcategory thereof) may not exceed that amount specified as the "Credit Sublimit" in the Supplement for the relevant Facility. Except as otherwise specifically set forth herein, an amount equal to one hundred percent (100%) of the undrawn face amount of each Standby Credit shall be used in calculating the outstanding amount of Credit Extensions under this Agreement.

1.3 Repayment; Interest and Fees. Each funded Credit Extension shall be repaid by Borrower, and shall bear interest from the date of disbursement at those per annum rates and such interest shall be paid, at the times specified in the applicable Supplement, Note or Facility Document. With respect to each Facility, Borrower agrees to pay to Trade Bank the fees specified in the related Supplement as well as those fees specified in the relevant Facility Document(s). Interest and fees will be calculated on the basis of a 360 day year, actual days elapsed. Any overdue payments of principal (and interest to the extent permitted by law) shall bear interest at a per annum floating rate equal to the Prime Rate plus 3%.

1.4 Prepayments. Credit Extensions under any Facility may only be prepaid in accordance with the terms of the related Supplement. At the time of any prepayment (including, but not limited to, any prepayment which is a result of the occurrence of an Event of Default and an acceleration of the Obligations) Borrower will pay to Trade Bank all interest accrued on the amount so prepaid to the date of such prepayment and all costs, expenses and fees specified in the Loan Documents.

<PAGE>

## II
## REPRESENTATIONS AND WARRANTIES

Borrowers represent and warrant to Trade Bank that the following representations and warranties are true and correct:

2.1 Legal Status. Borrowers are duly organized and existing and in good standing under the laws of the state in which they are incorporated, and are qualified or licensed to do business in all jurisdictions in which such

qualification or licensing is required and in which the failure to so qualify or to be so licensed could have a material adverse affect on Borrowers.

2.2 Authorization and Validity. The execution, delivery and performance of this Agreement, and all other Loan Documents to which Borrowers are a party, have been duly and validly authorized, executed and delivered by Borrowers and constitute legal, valid and binding agreements of Borrowers, enforceable against Borrowers in accordance with their respective terms.

2.3 Financial Condition and Statements. All financial statements of Borrowers delivered to Trade Bank have been prepared in conformity with GAAP, and completely and accurately reflect the financial condition of Borrowers (and any consolidated Subsidiaries) at the times and for the periods stated in such financial statements. Neither Borrowers nor any Subsidiary has any material contingent liability not reflected in the aforesaid financial statement. Since the date of the financial statements delivered to Trade Bank for the last fiscal periods of Borrowers to end before the Effective Date, there have been no material adverse changes in the financial condition, business or prospects of Borrowers. Borrowers are solvent.

2.4 Litigation. Except as disclosed in writing to Trade Bank prior to the Effective Date, there is no action, claim, suit, litigation, proceeding or investigation pending or (to best of Borrowers' knowledge) threatened by or against or affecting Borrowers or any Subsidiary in any court or before any governmental authority, administrator or agency which may result in (a) any material adverse change in the financial condition or business of Borrowers, or (b) any material impairment of the ability of Borrowers to carry on their business in substantially the same manner as it is now being conducted.

2.5 No Defaults. No Event of Default, and no event which with the giving of notice or the passage of time or both would constitute an Event of Default, has occurred and is continuing.

2.6 Ex-Im Bank Guarantee. The Obligations are, and shall continue to be until all the Obligations have been paid in full, guaranteed as to 90% of the amount thereof by Ex-Im Bank. Every statement, representation and warranty of Borrowers in (a) the Borrowers Agreement between Ex-Im Bank and Borrowers ("Borrowers Agreement") and (b) the U.S. Small Business Administration/Ex-Im Bank Joint Application for Working Capital Guarantee ("Joint Application") and (c) each other document pertaining to the Facility shall be true and correct as of the date hereof.

## III
## CONDITIONS TO EXTENDING FACILITIES

3.1 Conditions to Initial Credit Extension. The obligation of Trade Bank to make the first Credit Extension is subject to Trade Bank having received, in form and substance satisfactory to Trade Bank, the following documents duly executed, dated the Closing Date and in full force and effect:

<PAGE>

(a) a corporate borrowing resolution and incumbency certificate;

(b) the Facility Documents for each Facility, including, but not limited to, note(s) ("Notes") for any Revolving Credit Facility, and Trade

Bank's standard Continuing Standby Letter of Credit Agreement;

(c) each Collateral Document;

(d) an audit inspection report of Borrowers' books, records and property by Wells Fargo or another auditor or inspector acceptable to Trade Bank reflecting values and property conditions satisfactory to Trade Bank, the cost of which shall not exceed $2,000 for the account of Borrowers;

(e) the Ex-Im Bank Borrower Agreement required by Ex-Im Bank together with the U.S. Small Business Administration/Export-Import Bank of the United States "Joint Application For Working Capital Guarantee" and the latest "Country Limitation Schedule of Ex-Im Bank";

(f) executed copies of financing statements (UCC-1) for filing in California and all other jurisdictions in which the Trade Bank believes desirable to perfect its security interest in the Collateral;

(g) financial statements of Borrowers as of, and for the fiscal quarter ending September 28, 1996;

(h) such other documents as Trade Bank may reasonably require.

3.2 Conditions to Making Each Credit Extension. The obligation of Trade Bank to make each Credit Extension is subject to the fulfillment to Trade Bank's satisfaction of the following conditions:

(a) Representations and Warranties. The representations and warranties contained in this Agreement, the Facility Documents and the Collateral Documents will be true and correct on and as of the date of the Credit Extension with the same effect as though such representations and warranties had been made on and as of such date; and

(b) Documentation. Trade Bank must have received, in form and substance satisfactory to Trade Bank:

(1) a Borrowing Base Certificate dated within five Business Days of the date of the Credit Extension, demonstrating compliance with the requirements for such Credit Extension. Each Certificate will include:

(i) an inventory collateral report showing the types, locations and dollar values of all the inventory collateral;

(ii) an aged listing of accounts receivables;

(iii) an aged listing of accounts payable;

(2) a copy of each Export Order against which Borrowers are requesting a Credit Extension; and

<PAGE>

(3) if the Credit Extension is the issuance of a Standby Letter of Credit, Trade Bank's standard "Application for Standby Letter of Credit" or standard "Application and Agreement for Standby Letter of Credit".

IV
AFFIRMATIVE COVENANTS

Borrowers covenant that so long as Trade Bank remains committed to make Credit Extensions to Borrowers, and until payment of all Obligations and Credit Extensions, Borrowers will comply with each of the following covenants:

4.1 Punctual Payments. Punctually pay all principal, interest, fees and other Obligations due under this Agreement or under any other Loan Document at the time and place and in the manner specified herein or therein.

4.2 Notification to Trade Bank. Promptly, but in no event more than five (5) business days after the occurrence of each such event, provide written notice in reasonable detail of each of the following:

(a) Occurrence of a Default. The occurrence of any Event of Default or any event which with the giving of notice or the passage of time or both would constitute an Event of Default;

(b) Borrowers' Trade Names; Place of Business. Any change of Borrowers' (or any Subsidiary's) name, trade name or place of business, or chief executive officer;

(c) Litigation. Any action, claim, proceeding, litigation or investigation threatened or instituted by or against or affecting Borrowers (or any Subsidiary) in any court or before any government authority, administrator or agency which may materially and adversely affect Borrowers' (or any Subsidiary's) financial condition or business or Borrowers' ability to carry on their business in substantially the same manner as it is now being conducted;

(d) Uninsured or Partially Uninsured Loss. Any uninsured or partially uninsured loss through liability or property damage or through fire, theft or any other cause affecting Borrowers' (or any Subsidiary's) property in excess of an aggregate amount of Fifty Thousand Dollars ($50,000.00) for all Borrowers and Subsidiaries combined.

4.3 Books and Records. Maintain at Borrowers' address books and records in accordance with GAAP, and permit any representative of Trade Bank, at any time during customary business hours, to inspect, audit and examine such books and records, to make copies of them, and to inspect the properties of Borrowers. Borrowers shall further permit Bank or an entity approved by Bank to conduct, at least once each calendar year a filed audit for the purpose of inspecting and valuing the Collateral.

4.4 Tax Returns and Payments. Timely file all tax returns and reports required by foreign, federal, state and local law, and timely pay all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrowers. Borrowers may, however, defer payment of any contested taxes, provided that Borrowers (i) in good faith contests Borrowers' obligation to pay the taxes by appropriate proceedings promptly instituted and diligently conducted, (ii) notifies Trade Bank in writing of the commencement of, and any material development in, the proceedings, (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a lien upon any of the Collateral, and (iv) makes

<PAGE>

provision, to Trade Bank's satisfaction, for eventual payment of such taxes in

the event Borrowers are obligated to make such payment.

4.5 Compliance with Laws. Comply in all material respects with the provisions of all foreign, federal, state and local laws and regulations relating to Borrowers, including, but not limited to, those relating to Borrowers' ownership of real or personal property, the conduct and licensing of Borrowers' business, and health and environmental matters.

4.6 Insurance. Maintain and keep in force insurance of the types and in amounts customarily carried in lines of business similar to that of Borrowers, including, but not limited to, fire, extended coverage, public liability, flood, property damage and workers' compensation, with all such insurance to be in amounts satisfactory to Trade Bank and to be carried with companies approved by Trade Bank before such companies are retained, and deliver to Trade Bank from time to time at Trade Bank's request schedules setting forth all insurance then in effect. All insurance policies shall name Trade Bank as an additional loss payee, and shall contain a lenders loss payee endorsement in form reasonably acceptable to Trade Bank. If Borrowers fails to provide or pay for any insurance, Trade Bank may, but is not obligated to, obtain the insurance at Borrowers' expense.

4.7 Further Assurances. At Trade Bank's request and in form and substance satisfactory to Trade Bank, execute all documents and take all such actions at Borrowers' expense as Trade Bank may deem reason ably necessary or useful to perfect and maintain Trade Bank's perfected security interest in the Collateral and in order to fully consummate all of the transactions contemplated by the Loan Documents.

4.8 Reports. Furnish the following information or deliver the following reports to Trade Bank at the times indicated below:

(a) Annual Financial Statements. Not later than ninety (90) calendar days after and as of the end of each of Borrowers' fiscal years, (i) an annual audited consolidated and consolidating financial statement of Borrowers and Affiliates, prepared by a certified public accountant acceptable to Trade Bank to include a balance sheet, an income statement and a cash flow statement and applicable schedules and footnotes, with a copy of the letter from such certified public accountant to the management of Opto Sensors, Inc. with regard to such financial statements, and (ii) a consolidated and consolidating projected financial plan, including a balance sheet and income statement.

(b) Quarterly Financial Statements. Not later than forty-five (45) calendar days after and as of the end of each of Borrowers' fiscal quarters, a consolidated and consolidating financial statement of Borrowers and Affiliates, prepared by Borrowers, to include a balance sheet, an income statement and a cash flow statement and all applicable schedules and footnotes.

(c) Certificate of Accuracy and No Event of Default. At the time each financial statement of Borrowers and Affiliates required above is delivered to Trade Bank, a certificate of the president or chief financial officer of Opto Sensors, Inc. that said financial statements are accurate and that there exists no Event of Default under this Agreement nor any condition, act or event which with the giving of notice or the passage of time or both would constitute an Event of Default, together with a reconciliation of all intercompany loans.

(d) Federal Income Tax Returns. Not later than 10 calendar days after filing, but in no event later than 120 calendar days after the end of each of

Borrowers' tax years, a copy of each Borrowers' filed federal income tax returns for such year.

5

<PAGE>

(e) Borrowing Base Certificate. Not later than twenty-five (25) calendar days after and as of the end of each month:

(1) a Borrowing Base Certificate;

(2) an inventory report showing the types, locations and dollar values of all the inventory collateral;

(3) an aged history of accounts receivable.

4.9 Financial Covenants. Maintain the following (if Borrowers have any Affiliates which must be consolidated under GAAP, the following applies to Borrowers and the consolidated Affiliates):

(a) Current Ratio. Not at any time less than 1.15 to 1.0 ("Current Ratio" means total current assets divided by total current liabilities, and "current assets" and "current liabilities" have the meanings given to them in accordance with GAAP; provided, however, that "current liabilities" will include indebtedness which is subordinated to the Obligations in a manner satisfactory to Trade Bank.)

(b) Total Liabilities divided by Tangible Net Worth. Not at any time greater than 2.5 to 1.0 ("Tangible Net Worth" means the aggregate of total stockholders' equity including indebtedness which is subordinated to the Obligations pursuant to documentation satisfactory to Trade Bank and excluding any intangible assets, and "Total Liabilities" means the aggregate of current liabilities and non-current liabilities, less indebtedness which is subordinated to the Obligations pursuant to documentation satisfactory to Trade Bank.)

(c) EBITDA Coverage Ratio. Not at any time less than 2.0 to 1.0, calculated at each fiscal quarter end on a rolling four fiscal quarter basis for the immediately preceding four fiscal quarters. "EBITDA Coverage Ratio" means EBITDA divided by the aggregate of total interest expense plus the current maturity of long-term debt and the current maturity of subordinated debt, and "EBITDA" means net profit before tax plus the non-cash portion of the $1,500,000 obligation of UDT Sensors, Inc. to the United States of America, plus interest expense (net of capitalized interest expense), depreciation expense and amortization expense.

(d) Maximum Funded Debt to EBITDA Ratio. Not at any time greater than 2.5 to 1.0, calculated at each fiscal quarter end. "Funded Debt" means all obligations related to borrowed money (exclusive of subordinated debt), letter of credit reimbursement obligations and contingent liabilities, and with "EBITDA" having the meaning given above and calculated on a rolling four-quarter basis as set forth above.

(e) Net Income After Taxes. Profitable on an annual basis determined as of each fiscal year end.

(f) Pre-Tax Profit. Not less than $1,500,000 on an annual basis, determined as of each fiscal year end, and $1 on a quarterly basis, determined as of each fiscal quarter end.

4.10 Judgments and Liens. Satisfy all material judgments and liens.

<PAGE>

V
NEGATIVE COVENANTS

Each of the Borrowers covenants and agrees that so long as Trade Bank remains committed to make any Credit Extensions to Borrowers and until all Obligations have been paid, such Borrower will not, without the prior written consent of Trade Bank:

5.1 Merge or Consolidation, Transfer of Assets. Merge into or consolidate with, or permit any Subsidiary to merge into or consolidate with, any other entity except for Permitted Mergers (as defined below); make, or permit any Subsidiary to make, any substantial change in the nature of its business as conducted as of the date hereof, acquire, or permit any Subsidiary to acquire, all or substantially all of the assets of any other entity for a purchase price in excess of $150,000 in the aggregate for all such purchases combined; sell, lease, transfer, or otherwise dispose of, or permit any Subsidiary to sell, lease, transfer, or otherwise dispose of, all or a substantial or material portion of its assets except in the ordinary course of business ness and except for a Permitted Merger. As used herein, a "Permitted Merger" shall mean a merger of any of the Borrowers or Subsidiaries with any of the other Borrowers or Subsidiaries so long as all of the following conditions are satisfied: (a) in the case of a merger of a Subsidiary with a Borrower, the Borrower is the survivor of the merger, (b) the merger is consummated in compliance with applicable law and to the extent the consent of any governmental agency would be required in connection therewith, such consent is obtained, (c) Borrowers give Trade Bank at least ten (10) business days prior notice of Borrowers' intention to so merge, (d) Borrowers furnish Trade Bank with copies of such documents related to the merger as Trade Bank may request, and (e) Borrowers reimburse Trade Bank upon demand for all costs and expenses, including reasonable attorneys' fees (to include without limitation the allocated cost of Trade Bank's in-house counsel) incurred by Trade Bank in connection with a reasonable review by Trade Bank of the merger and the negotiation and preparation of any documents which may reasonably be required by Trade Bank in connection therewith.

5.2 Liens. Except for Permitted Liens, mortgage, pledge, grant or permit to exist, a security interest in, or lien upon, all or any portion of its assets now owned or hereafter acquired.

5.3 Use of Proceeds. Use the proceeds of any Credit Extension except for the express purpose(s) permitted in the particular Facility Supplement under which the subject Credit Extension is made.

5.4 Dividends, Distributions of Capital and Stock Redemptions. Declare or pay, or permit any Subsidiary to declare or pay, any dividend or distribution either in cash, stock or any other property on its stock now or hereafter outstanding; or redeem, retire, repurchase or otherwise acquire any shares of any class of its stock now or hereafter outstanding, or permit any Subsidiary to do so; provided, however, that (a) Rapiscan UK may pay cash dividends to

Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan"), (b) each Borrower (other than Opto-Sensors, Inc.) and each Subsidiary (other than Rapiscan UK) may pay cash dividends to its shareholders so long as cash dividends paid to minority shareholders do not exceed $50,000 in the aggregate, (c) notwithstanding anything herein to the contrary, neither Opto-Sensors, Inc. nor any successor thereto, whether by merger or otherwise, shall pay any dividends to its shareholders, (d) Rapiscan may redeem its stock owned by its employees not to exceed $40,000 per year, (e) Opto-Sensors, Inc. may redeem its stock owned by its employees, other than Deepak Chopra and his immediate family members, not to exceed $ 100,000 per year, and (f) Ferson Optics, Inc. may redeem its stock owned by its employees not to exceed $40,000 per year.

5.5 Loans to Stockholders. Make, or permit any Subsidiary to make, any loans to any stock holder or any Affiliate of any Borrowers. As used in this Section 5.5, "Affiliate" means any person or entity

<PAGE>

which directly or indirectly controls, is controlled by, or is under common control with one or more Borrowers.

5.6 Capital Expenditures. Make, or permit any Subsidiary to make, without the prior written con sent of Trade Bank, any additional investments in fixed assets in any fiscal year in an aggregate amount in excess of $1,750,000 for all Borrowers and Subsidiaries combined; provided, however, that for the purpose of calculating compliance with the foregoing limitation on additional investments in fixed assets, there shall be excluded investments in fixed assets that are acquired in replacement of fixed assets that had been lost or destroyed and that are financed by insurance proceeds paid under insurance policies covering such loss or destruction.

5.7 Guarantees. Guarantee or become liable, or permit any Subsidiary to guarantee or become liable, in any way as surety, endorser (other than as endorser of negotiable instruments for deposit or collection in the ordinary course of business), accommodation endorser or otherwise for, nor pledge or hypothecate, any of its assets as security for, any liabilities or obligations of any other person or entity, except (a) indebtedness or liabilities to Trade Bank, (b) those unsecured guarantees, if any, in existence on the date hereof which are listed on Exhibit "F" attached hereto, (c) indebtedness on account of loans made after the date hereof by any one or more persons or entities other than Borrowers or Subsidiaries to Opto Singapore or Opto Malaysia not exceeding $3,500,000 in the aggregate on a combined basis, and (d) indebtedness to Wells Fargo under credit facilities existing, and at credit availability levels existing, as of the date hereof.

5.8 Loans and Investments. Make, or permit any Subsidiary to make, any loans or advances to, or investments in, any person or entity except for (a) loans hereafter from any borrower or Subsidiary to Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan") or Rapiscan UK not to exceed $4,500,000 in the aggregate on a combined basis, (b) loans made after the date hereof from any Borrower or Subsidiary to any other person or entity not to exceed $150,000 in the aggregate for all such loans combined, and (c) loans between and among any Borrowers and/or Affiliates existing as of the date hereof and disclosed on Borrowers' and Affiliates' financial statements dated as of September 28, 1996. Trade receivables and trade payables created in the ordinary course of Borrowers' business shall not be considered loans, advances or investments hereunder.

5.9 Indebtedness For Borrowed Money. Create, incur, assume or permit to

exist, or permit any Subsidiary to create, incur, assume or permit to exist, any indebtedness or liabilities resulting from borrowings, loans or advances, whether secured or unsecured, matured or unmatured, liquidated or unliquidated, joint or several, except (a) indebtedness or liabilities to Trade Bank, (b) indebtedness or liabilities subordinated to the Obligations by an instrument or agreement in form and substance acceptable to Trade Bank, (c) indebtedness or liabilities of any Borrower or any Subsidiary existing as of, and disclosed to Trade Bank in writing prior to, the date hereof, (d) indebtedness on account of loans made after the date hereof from any one or more Borrowers or Subsidiaries to Rapiscan or Rapiscan UK not exceeding $4,500,000 in the aggregate on a combined basis, (e) indebtedness on account of loans made after the date hereof by any one or more persons or entities other than Borrowers or Subsidiaries to Opto Singapore or Opto Malaysia not exceeding $3,500,000 in the aggregate on a combined basis, and (f) indebtedness to Wells Fargo under credit facilities existing, and at credit availability levels existing, as of the date hereof. Trade receivables and trade payables created in the ordinary course of business shall not be considered borrowings, loans, or advances hereunder.

5.10 Lease Expenditures. Incur, or permit any Subsidiary to incur, new obligations for the lease or hire of real or personal property requiring payments in any fiscal year in excess or an aggregate of $500,000 for all Borrowers and Subsidiaries combined; provided, however, that for the purpose of calculating

8

<PAGE>

such limit on new obligations for the lease or hire of real or personal property, the renewal or replacement of an existing lease shall not be considered a new obligation except to the extent there is an increase in the required payments thereunder.

## VI
## EVENTS OF DEFAULT AND REMEDIES

6.1 Events of Default. The occurrence of any of the following shall constitute an "Event of Default":

(a) Failure to Make Payments When Due. Borrowers' failure to comply with any obligation to pay principal, interest, fees or other amounts when due under any Loan Document, provided, however, that in the case of interest and fees, Borrowers shall have a two Business Day grace period following the due date thereof before Borrowers' failure to pay such interest or fees when due shall constitute an Event of Default.

(b) Failure to Perform Obligations. Any failure by Borrowers to comply with any covenant or obligation in this Agreement or in any Loan Document (other than those referred to in subsections (a), (c) and (d) hereof), and with respect to any such default which by its nature can be cured, such default shall continue for a period of thirty (30) calendar days from its occurrence.

(c) Untrue or Misleading Warranty or Statement. Any warranty, representation, financial statement, report or certificate made or delivered by Borrowers under any Loan Document is untrue or misleading in any material respect when made or delivered.

(d) Defaults under Ex-Im Bank Borrower Agreement. Any Borrower fails

to comply with any covenant, agreement or condition set forth in the Ex-Im Bank Borrower Agreement.

(e) Defaults Under Other Loan Documents. Any default in the payment or performance of any obligation, or any defined event of default, occurs under any of the Loan Documents other than this Agreement, which is not cured within any cure period applicable thereto; the Ex-Im Bank Guaranty referenced in Section 2.6 of this Agreement is no longer in full force and effect (or any claim thereof made by Ex-Im Bank); or any breach of the provisions of any Subordination Agreement or Intercreditor Agreement by any party other than the Trade Bank.

(f) Defaults Under Other Agreements or Instruments. Any default in the payment or performance of any obligation, or the occurrence of any event of default, under the terms of any other agree ment or instrument pursuant to which any Borrower or any Subsidiary has incurred any debt or other material liability to any person or entity, AND THE INDEBTEDNESS OR OBLIGATION TO WHICH THE DEFAULT APPLIES EXCEEDS $100,000, INDIVIDUALLY OR IN THE AGGREGATE FOR ALL SUCH DEFAULTS BY BORROWERS AND SUBSIDIARIES COMBINED.

(g) Judgments and Levies Against Borrowers. The filing of a notice of judgment lien against Borrowers, or the recording of any abstract of judgment against Borrowers, in any county in which Borrowers have an interest in real property, or the service of a notice of levy and/or of a writ of attachment or execution, or other like process, against the assets of any Borrower or Subsidiary, or the entry of a judgment against any Borrower or Subsidiary; PROVIDED, HOWEVER, THAT SUCH JUDGMENTS, LIENS, LEVIES, WRITS, EXECUTIONS AND OTHER PROCESS INVOLVE DEBTS OF OR CLAIMS AGAINST ANY BORROWER OR ANY SUBSIDIARY IN EXCESS OF $100,000, INDIVIDUALLY OR IN THE AGGREGATE FOR ALL SUCH JUDGMENTS, LIENS, LEVIES, WRITS, EXECUTIONS AND

<PAGE>

OTHER PROCESS AGAINST BORROWERS AND SUBSIDIARIES COMBINED, AND WITHIN TWENTY (20) DAYS AFTER THE CREATION THEREOF, OR AT LEAST TEN (10) DAYS PRIOR TO THE DATE ON WHICH ANY ASSETS COULD BE LAWFULLY SOLD IN SATISFACTION THEREOF, SUCH DEBT OR CLAIM IS NOT SATISFIED, OR STAYED PENDING APPEAL AND INSURED AGAINST IN A MANNER SATISFACTORY TO BANK.

(h) Voluntary Insolvency. Borrowers, any Subsidiary or any Guarantor (i) becomes insolvent, (ii) suffers or consents to or applies for the appointment of a receiver, trustee, custodian or liquidator of itself or any of its property, (iii) generally fails to pay its debts as they become due, (iv) makes a general assignment for the benefit of creditors, or (v) files a voluntary petition in bankruptcy, or seeks reorganization, in order to effect a plan or other arrangement with creditors or any other relief under the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time ("Bankruptcy Code"), or under any state or Federal law granting relief to debtors, whether now or hereafter in effect.

(i) Involuntary Insolvency. Any involuntary petition or proceeding pursuant to the Bankruptcy Code or any other applicable state or federal law relating to bankruptcy, reorganization or other relief for debtors is filed or commenced against any Borrower or any Subsidiary, and such involuntary petition or proceeding is unopposed or is not dismissed within sixty (60) days of its commencement; or any Borrower or any Subsidiary shall file an answer admitting the jurisdiction of the court and the material allegations of any involuntary petition; or any Borrower or any Subsidiary shall be adjudicated a bankrupt, or

an order for relief shall be entered by any court of competent jurisdiction under said Bankruptcy Code or any other applicable state, federal or other law relating to bankruptcy, reorganization or other relief for debtors.

(j) Change in Ownership. Any change in ownership DURING THE TERM OF THIS AGREEMENT OF AN AGGREGATE OF TWENTY-FIVE PERCENT (25%) OR MORE OF THE COMMON STOCK OF BORROWER OR ANY SUBSIDIARY, EXCEPT FOR A CHANGE IN OWNERSHIP TO WHICH TRADE BANK EXPRESSLY CONSENTS IN WRITING.

6.2 Remedies. Upon the occurrence of any Event of Default, or at any time thereafter, Trade Bank, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrowers), may do any one or more of the following: (a) terminate Trade Bank's obligation to make Advances or to make available to Borrowers the Facilities or other financial accommodations; (b) accelerate and declare all or any part of the Obligations to be immediately due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument evidencing or relating to any Advance; and/or (c) exercise all its rights, powers and remedies available under the Loan Documents, or accorded by law, including, but not limited to, the right to resort to any or all Collateral or other security for any of the Obligations and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IF ANY EVENT OF DEFAULT SET OUT IN SUBSECTIONS (H) OR (I) OF SECTION 6.1 ABOVE SHALL OCCUR, THEN ALL THE REMEDIES SPECIFIED IN CLAUSES (A) AND (B) OF THE PRECEDING SENTENCE SHALL AUTOMATICALLY TAKE EFFECT WITHOUT NOTICE OR DEMAND OF ANY KIND (ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWERS) WITH RESPECT TO ANY AND ALL OBLIGATIONS. All rights, powers and remedies of Trade Bank may be exercised at any time by Trade Bank and from time to time after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

10

<PAGE>

## VII
## GENERAL PROVISIONS

7.1 Notices. All notices to be given under this Agreement shall be in writing and shall be given personally or by regular first-class mail, by certified mail return receipt requested, by a private delivery service which obtains a signed receipt, or by facsimile transmission addressed to Trade Bank or Borrowers at the address indicated after their signature to this Agreement, or at any other address designated in writing by one party to the other party. Trade Bank is hereby authorized by Borrowers to act on such instructions or notices sent by facsimile transmission or telecommunications device which Trade Bank believes come from Borrowers. All notices shall be deemed to have been given upon delivery, in the case of notices personally delivered or delivered by private delivery service, upon the expiration of 3 calendar days following the deposit of the notices in the United States mail, in the case of notices deposited in the United States mail with postage prepaid, or upon receipt, in the case of notices sent by facsimile transmission.

7.2 Waivers. No delay or failure of Trade Bank in exercising any right, power or remedy under any of the Loan Documents shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, consent or approval by Trade Bank under any of the Loan Documents must be in writing and shall be effective only to the extent set out in such writing.

7.3 Benefit of Agreement. The provisions of the Loan Documents shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, executors, administrators, beneficiaries and legal representatives of Borrowers and Trade Bank; provided, however, that Borrowers may not assign or transfer any of their rights under any Loan Document without the prior written consent of Trade Bank, and any prohibited assignment shall be void. No consent by Trade Bank to any assignment shall release Borrowers from their liability for the Obligations unless such release is specifically given by Trade Bank to Borrowers in writing. Trade Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Trade Bank's rights and benefits under each of the Loan Documents. In connection therewith, Trade Bank may disclose any information relating to the Facilities, Borrowers or their business, or any Guarantor or its business.

7.4 No Third Party Beneficiaries. This Agreement is made and entered into for the sole protection and benefit of Borrowers and Trade Bank and their respective permitted successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, any of the Loan Documents to which it is not a party.

7.5 Joint and Several Liability.

(a) Each Borrower has determined and represents to Trade Bank that it is in its best interest and in pursuance of its legitimate business purposes to induce Trade Bank to extend credit pursuant to this Agreement. Each Borrower acknowledges and represents that its business is related to the business of the other Borrowers, the availability of the commitments provided for herein benefits each Borrower, and Credit Extensions made hereunder will be for and inure to the benefit of Borrowers, individually and as a group.

(b) Each Borrower has determined and represents to Trade Bank that it has, and after giving effect to the transactions contemplated by this Agreement will have, assets having a fair saleable value in excess of its debts, after giving effect to any rights of contribution or subrogation which may be available

<PAGE>

to such Borrower, and each Borrower has, and will have, access to adequate capital for the conduct of its business and the ability to pay its debts as such debts mature.

(c) Each Borrower promises to repay to Trade Bank all Advances disbursed to or Letters of Credit issued for its account or to or for the account of any of the other Borrowers under any of the Facilities, together with interest thereon and costs and expenses incurred by Trade Bank in connection therewith, all in accordance with this Agreement. The obligations of Borrowers hereunder are joint and several, and a separate action may be brought against any Borrower whether action is brought against any of the other Borrowers or any other person, or whether any of the other Borrowers or any other person is joined in any such action. Each Borrower waives any right to require Trade Bank to (i) proceed against any person, including any of the other Borrowers, (ii) proceed against any or exhaust any security held from any Borrower or any other person, or (iii) disclose any information about any Borrower. Each Borrower waives any defense based upon (i) any defense of any of the other Borrowers, (ii) the cessation or limitation from any cause, other than payment in full, of the indebtedness of any of the other Borrowers, (iii) the release of any security for the indebtedness of any Borrower, (iv) the application of payments received by Trade Bank from any of the other Borrowers to indebtedness of any of

such Borrowers to indebtedness of such Borrowers unrelated to the Facilities, (v) the release of any of the other Borrowers of any liability to Trade Bank, (vi) the compromise or modification with any of the other Borrowers of Trade Bank's claims against any of such Borrowers, (vii) any election of remedies by Trade Bank which adversely affects or destroys a Borrower's subrogation rights or rights to proceed against any of the other Borrowers for reimbursement. Each Borrower agrees that it will not seek to exercise any rights of contribution which it may have as a matter of law or otherwise as against the other Borrowers hereunder or under any of the other Loan Documents until all indebtedness arising under or in connection herewith shall have been indefeasibly paid in full, and if by law any right of contribution may not be postponed, then such right shall be subordinate to the rights of Trade Bank under this Agreement and the other Loan Documents. Until all indebtedness arising under or in connection with this Agreement shall have been indefeasibly paid in full, no Borrower shall be subrogated in whole or in part to the rights of Trade Bank, and if by law any Borrower is so subrogated, such right shall be subordinate and junior to the rights of Trade Bank hereunder and under the other Loan Documents until the indefeasible payment of all indebtedness arising under or in connection with this Agreement.

7.6 Governing Law and Jurisdiction. This Agreement shall, unless provided differently in any Loan Document, be governed by, and be construed in accordance with, the internal laws of the State of California, except to the extent Trade Bank has greater rights or remedies under federal law whether as a national bank or otherwise. Borrowers and Trade Bank (a) agree that all actions and proceedings relating directly or indirectly to this Agreement shall be litigated in courts located within California; (b) consent to the jurisdiction of any such court and consent to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and (c) waive any and all rights Borrowers may have to object to the jurisdiction of any such court or to transfer or change the venue of any such action or proceeding.

7.7 Severability. Should any provision of any Loan Document be prohibited by, or invalid under applicable law, or held by any court of competent jurisdiction to be void or unenforceable, such defect shall not affect, the validity of the other provisions of the Loan Documents.

7.8 Entire Agreement; Amendments. This Agreement and the other Loan Documents are the final, entire and complete agreement between Borrowers and Trade Bank concerning the Facility. There are no oral understandings, representations or agreements between the parties concerning the Facility which are not set forth in the Loan Documents. The Loan Documents may not be waived, amended or superseded except in a writing executed by Borrowers and Trade Bank.

<PAGE>

7.9 Collection of Payments. Unless otherwise specified in any Loan Document, all principal, interest and any fees due to Trade Bank by Borrowers under any Loan Document will be paid by Trade Bank having Wells Fargo debit any of Borrowers' accounts with Wells Fargo and forwarding such amount debited to Trade Bank, without presentment, protest, demand for reimbursement or payment, notice of dishonor or any other notice whatsoever, all of which are hereby expressly waived by Borrowers. Such debit will be made at the time principal, interest or any fee is due to Trade Bank pursuant to any Loan Document. No late charge shall apply to any payment which Trade Bank has the option hereunder to collect by causing Wells Fargo to debit any of Borrower's account(s), during any such time as such account(s) contain collected and available funds sufficient to make such payment.

7.10 Costs, Expenses and Attorneys' Fees. Borrowers will reimburse Trade

Bank for all costs and expenses, including, but not limited to, reasonable attorneys' fees and expenses (which counsel may be Trade Bank or Wells Fargo employees), expended or incurred by Trade Bank (a) in the preparation and negotiation of this Agreement, the Notes, the Collateral Documents, the Exhibits, and the Facility Documents, subject to Trade Bank's agreement that it will not seek reimbursement from Borrowers for attorney's fees incurred by Trade Bank in connection with the preparation and negotiation of this Agreement and each of the other Loan Documents in excess of Two Thousand Dollars ($2,000), (b) in amending this Agreement, the Collateral Documents, the Notes, the Exhibits, or the Facility Documents, in collecting any sum which becomes due Trade Bank on the Notes, under this Agreement, the Collateral Documents, the Exhibits, or any of the Facility Documents, or (c) in the protection, perfection, preservation and enforcement of any and all rights of Trade Bank in connection with this Agreement, the Notes, any of the Collateral Documents, any of the Exhibits, or any of the Facility Documents, including, without limitation, the fees and costs incurred in any out-of-court work out or a bankruptcy or reorganization proceeding.

## VIII
## DEFINITIONS

8.1 "Agreement" means this Agreement and the Exhibits attached hereto, as corrected or modified from time to time by Trade Bank and Borrowers.

8.2 "Affiliate" and "Affiliates" mean, individually and collectively, Opto Sensors-FSC, Inc., a U.S. Virgin Islands corporation ("Opto FSC"), Opto Sensors (Singapore) Pte. Ltd., a company organized under the laws of the Republic of Singapore ("Opto Singapore"), Opto Sensors (Malaysia), Snd. Bhd., a company organized under the laws of Malaysia ("Opto Malaysia"), Rapiscan UK and Rapisan India.

8.3 "Available Export Order Credit Limit" means, at any given time, the aggregate invoiced Dollar amount of all Export Orders, the invoice date of which has not yet passed, and which have not yet been paid in full, less the Dollar amount of any partial payments made on account of such Export Orders.

8.4 "Borrowing Base" has that meaning assigned to it in the Ex-Im Bank Borrower Agreement (using a Disbursement Rate of ninety percent (90%) for eligible Accounts Receivable and eighty percent (80%) for eligible Inventory).

8.5 "Borrowing Base Certificate" means a certificate, in the form of Exhibit "B" hereto, showing Collateral Business Day values satisfactory to Trade Bank.

8.6 "Business Day" shall mean any day except Saturday, Sunday and any day specified as a holiday by federal or California Statute.

13

<PAGE>

8.7 "Buyer" shall mean an entity which has entered into one or more orders with Borrowers.

8.8 "Closing Date" means the date on which the first Advance is made.

8.9 "Collateral" means all export related inventory and accounts receivable and other property securing the Obligations.

8.10 "Collateral Documents" means the Security Agreement, the Subordination Agreement, the Intercreditor Agreement, and other credit support documents required by Trade Bank to provide collateral and credit support for the Advances.

8.11 "Credit Extension" means each extension of credit under the Facilities (whether funded or unfunded), including, but not limited to (a) Revolving Credit Loans, and (b) Standby Credits.

8.12 "Credit Limit" means, with respect to any Facility, the amount specified under the column labeled "Credit Limit" in the Supplement for that Facility.

8.13 "Credit Sublimit" means, with respect to any Subfacility, the amount specified after the name of that Subfacility under the column labeled "Credit Sublimit" in the Supplement for the related Facility.

8.14 "Dollars" and "$" means United States dollars.

8.15 "Ex-Im Bank" means the Export-Import Bank of the United States.

8.16 "Ex-Im Bank Borrower Agreement" means that "Borrower Agreement" of even date herewith executed by Borrowers and Trade Bank in the form attached hereto as Exhibit "D".

8.17 "Export Order" means a written export order or contract for the purchase by a Buyer from Borrowers of the items.

8.18 "Facility Documents" means, with respect to any Facility, those documents specified in the Supplement for that Supplement for that Facility, and any other documents customarily required by Trade Bank for such Facility.

8.19 "Facility Termination Date" means, with respect to any Facility, the date specified in the Supplement for that Facility after which no further Credit Extensions will be made under that Facility.

8.20 "GAAP" means generally accepted accounting principles, which are applicable to the circumstances, as of the date of determination, set out in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and in the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession.

8.21 "Items" shall mean finished goods consisting of electronic scanning equipment or components thereof, which are intended for exports, or services related to the delivery or installation of such goods.

8.22 "Loan Authorization Agreement" has that meaning assigned to it in the Ex-Im Bank Borrower Agreement.

14

<PAGE>

8.23 "Loan Documents" means this Agreement, the Exhibits (including, without limitation, the Ex-Im Bank Borrower Agreement), the Facility Documents and the Collateral Documents.

8.24 "Obligations" means (a) the obligations of Borrowers to pay principal, interest and fees on all funded Credit Extensions and fees on all unfunded Credit Extensions, and (b) the obligations of Borrowers to pay and perform when due all other indebtedness, liabilities, obligations and covenants required under the Loan Documents.

8.25 "Permitted Liens" shall mean the following:

(a) purchase money security interests in specific items of Borrowers' equipment;

(b) leases of specific items of Borrowers' equipment;

(c) liens for Borrowers' taxes not yet payable;

(d) security interests and liens consented to in writing by Trade Bank in its sole discretion;

(e) security interests being terminated concurrently with the effectiveness of the Agreement;

(f) SECURITY INTERESTS EXISTING AS OF THE DATE OF THIS AGREEMENT IN FAVOR OF WELLS FARGO;

(g) LIENS ON THE PERSONAL PROPERTY ASSETS OF UDT SENSORS, INC. ("UDT") WHICH MAY BE GRANTED HEREAFTER IN FAVOR OF THE UNITED STATES OF AMERICA AS SET FORTH IN THAT CERTAIN STIPULATION FOR CONSENT JUDGMENT REFERRED TO IN AND EXECUTED PURSUANT TO THAT CERTAIN CRIMINAL PLEA AND SENTENCING AND AGREEMENT BETWEEN UDT AND THE UNITED STATES ATTORNEY'S OFFICE FOR THE CENTRAL DISTRICT OF CALIFORNIA, PROVIDED THAT SUCH LIENS HAVE BEEN SUBORDINATED TO ALL SECURITY INTERESTS OF TRADE BANK IN THE PERSONAL PROPERTY OF UDT PURSUANT TO A SUBORDINATION AGREEMENT IN FORM AND SUBSTANCE SATISFACTORY TO TRADE BANK; AND

(h) LIENS ON THE ASSETS OF OPTO SINGAPORE AND OPTO MALAYSIA WHICH SECURING INDEBTEDNESS OF LESS THAN THREE MILLION FIVE HUNDRED THOUSAND DOLLARS ($3,500,000) IN THE AGGREGATE FOR BOTH ENTITIES COMBINED.

8.26 "Prime Rate" means the rate most recently announced by Wells Fargo at its principal office in San Francisco, California as its "Prime Rate", with the understanding that the Prime Rate is one of Wells Fargo's base rates and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto, and is evidenced by the recording thereof after its announcement in such internal publication or publications as Wells Fargo may designate. Any change in an interest rate resulting from a change in the Prime Rate shall become effective as of 12:01 a.m. of the Banking Day on which each change in the Prime Rate is announced by Wells Fargo.

8.27 "Revolving Credit Loans" mean advances made pursuant to the Revolving

    Credit Loan Supplement to this Agreement.

8.28 "Standby Credits" mean standby letters of credit issued pursuant to the Standby Letter of

<PAGE>

Credit Supplement to this Agreement.

8.29 "Subsidiary" and "Subsidiaries" means, individually and collectively, Opto Sensors-FSC, Inc., a U.S. Virgin Islands corporation ("Opto FSC"), Opto Sensors (Singapore) Pte. Ltd., a company organized under the laws of the Republic of Singapore ("Opto Singapore"), Opto Sensors (Malaysia), Sld. Bhd., a company organized under the laws of Malaysia ("Opto Malaysia"), and Rapiscan UK.

8.30 "Wells Fargo" means Wells Fargo Bank, N.A.

Borrowers and Trade Bank have caused this Agreement to be executed by their duly authorized officers or representatives on the date specified below.

OPTO SENSORS, INC.

By: /s/ Ajay Mehra

Title: Secretary

UDT SENSORS, INC.

By: /s/ Ajay Mehra

Title: Secretary

RAPISCAN SECURITY PRODUCTS (U.S.A.), INC.

By: /s/ Ajay Mehra

Title: Secretary

FERSON OPTICS, INC.

By: /s/ Ajay Mehra

Title: Secretary

Borrower's Address:
12525 Chadron Ave.
Hawthorne, CA. 90250

"LENDER"

WELLS FARGO HSBC TRADE BANK,
NATIONAL ASSOCIATION

By: /s/ Jan Macy-Buescher
Jan Macy-Buescher
Title: Vice-President

Lender's Address:
333 South Grand Avenue, 8th Floor

Los Angeles, CA 90071

16

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.17
<SEQUENCE>18
<DESCRIPTION>LICENSE AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.17

LICENSE AGREEMENT

THIS AGREEMENT is made and entered into as of the 19th day of December 1994, by and between:

EG&G Inc., a corporation of the Commonwealth of Massachusetts, having a principal place of business at EG&G Instruments Group, 45 William Street, Wellesley, Massachusetts 02181, ("LICENSOR")

and

Rapiscan Security Products, Inc., a corporation of the State of California, having a principal place of business at 2830 Temple Avenue,, Long Beach, California 90806, ("LICENSEE")

CONSIDERATIONS UNDERLYING THIS AGREEMENT

LICENSOR is the parent company of the owner of the entire right, title and interest in United States Patent 4,366,382 entitled X-RAY LINE SCAN SYSTEM FOR USE IN BAGGAGE INSPECTION (the "LICENSED PATENT") and has the right to make this license;

LICENSEE desires to obtain from LICENSOR a license under the patent regarding both past and future sales of products read upon by any of the claims of LICENSED PATENT ("LICENSED PRODUCTS");

1

<PAGE>

LICENSEE and LICENSOR intend for this Agreement to prescribe the rights and obligations among the parties regarding the LICENSED PATENT and all LICENSED PRODUCTS; and LICENSOR is willing to grant such a license;

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Definitions

A) "NET SALES" means with respect to LICENSED PRODUCTS sold by LICENSEE,, the number of current LICENSED PRODUCTS SOLD by LICENSEE to purchasers (if said purchasers are unrelated to LICENSEE) times the ROYALTY BASE for each LICENSED PRODUCT.

B) "SOLD" means thirty (30) days from the day first billed out, shipped, paid for or put into use, whichever shall first occur, excluding transfers for resale (but not for use) between LICENSEE and its affiliated companies and excluding non-revenue bearing transfers for demonstration including but not limited to reliability testing purposes.

C) "AFFILIATE" shall mean and include any legal entity at least thirty three percent (33%) of which directly or indirectly

2

<PAGE>

controls, is controlled by, or is under common control with a party of this Agreement.

D) LICENSEE and LICENSOR acknowledge that the ROYALTY BASE has been the subject of negotiation and is intended to define a royalty only on the subject matter of the claims of the LICENSED PATENT while maintaining simplicity in accounting. The ROYALTY BASE is also intended to exclude returns and separately set forth charges, if any, included in the invoiced price including, but not by way of limitation, charges for packing, transportation, design, engineering, special testing, insurance, taxes, customs, duties, installation and warranty charges. In the event LICENSEE shall transfer LICENSED PRODUCTS to related or affiliated third parties, the NET SALE shall be the ROYALTY BASE applicable to a sale to an unrelated or unaffiliated third party or if such transfer had been made as a normal sale.

E) "EFFECTIVE DATE" shall mean the date first written above.

F) "LICENSED PATENT" shall include foreign counterparts, including Canadian Patent 1,171,980, reissue or reexamined patents, PCT, divisions, continuations or continuations-in-part thereof.

3

<PAGE>

2. Grant of License

LICENSOR hereby grants to LICENSEE a non-exclusive, personal, non-transferable right and license in the LICENSED PATENT to make, have made, use and sell or otherwise dispose of LICENSED PRODUCTS.

3. Royalties

A) LICENSEE shall pay to LICENSOR a continuing royalty equal to eight percent (8%) of LICENSEE's NET SALES.

B) i. The ROYALTY BASE for LICENSEE's current X-Ray scanner shall be twenty eight thousand dollars ($28,000).

ii. Comparable models of X-ray scanners shall have a ROYALTY BASE of sales price less a fourteen percent (14%) allowance for warranty and installation charges, but the ROYALTY BASE shall not exceed fifty thousand dollars ($50,000) less allowance.

iii. LICENSOR and LICENSEE shall negotiate a ROYALTY BASE for X-ray scanners having significantly distinguishable operating features, such as suitability for the automatic market.

4

<PAGE>

C) As consideration for LICENSEE's making of LICENSED PRODUCTS prior to the effective date of this Agreement, LICENSEE shall pay or shall cause an AFFILIATE to pay to LICENSOR the sum calculated by multiplying the aggregate NET SALES of LICENSED PRODUCTS made, sold or otherwise disposed of in the United States from April 1988 to the EFFECTIVE DATE by the continuing royalty percentage in Article 3A above. The sum shall be paid to LICENSOR within thirty (30) days following the EFFECTIVE DATE. A report in accordance with the requirements of Article 4A below shall be required with the payment.

D) The obligation to pay royalties shall extend to the expiration of the LICENSED PATENT or until a judgment from a court of last resort that the LICENSED PATENT is declared invalid becomes final.

4. Reports and Payments

A) Within forty five (45) days after the and of each calendar quarter, LICENSEE shall render to LICENSOR a report stating the number and types of LICENSED PRODUCTS manufactured, used or sold during said quarter, the NET SALES of the LICENSED PRODUCTS, and a computation of royalties due LICENSOR. At the time of rendering such report, LICENSEE shall make the royalty payment required by this Agreement.

5

<PAGE>

B) LICENSEE agrees to keep full and accurate records, files and books of account for a period of four (4) years following each report to LICENSOR containing all the data reasonably required for the computation and verification of the royalties paid and the information given in the reports provided for herein.

C) LICENSOR shall have the right, during reasonable hours and upon reasonable advance notice, to have the correctness of any such report audited at LICENSOR'S expense, by a firm of independent public accountants, selected by LICENSOR and reasonably acceptable to LICENSEE, which shall examine LICENSEE's records only on matters pertinent to this Agreement. No more than one such audit shall be conducted per annum. LICENSOR shall authorize said independent public accountants to enter into a reasonable proprietary agreement in order to shield LICENSOR from proprietary business information of LICENSEE. In the event that it shall be determined by said independent public accountants at any time that LICENSEE has under reported in an amount in excess of ten percent (10%) of the royalties properly due with one or more reports, LICENSEE, in addition to any other remedy shall reimburse LICENSOR's full cost and expense associated with such audit and to pay to LICENSOR an amount equal to two (2) times that which LICENSEE has failed to report or pay.

6

<PAGE>

D) All payments shall be in United States currency payable to LICENSOR at the address specified below and shall be in immediately available funds.

E) All payments due pursuant hereto shall be made without deduction of taxes of any kind. In the event applicable exchange control regulations prevent remittance of United State currency by LICENSEE, LICENSEE agrees at LICENSOR's option to deposit an equivalent amount in a currency and in a bank as designated by LICENSOR for the account of LICENSOR.

5. Most Favored Licensee

If subsequent to the Effective Date of this agreement another manufacturer of X-ray scanning systems similarly situated to LICENSEE is granted a license by LICENSOR which provides to said manufacturer a combined royalty rate and royalty base more favorable than that provided herein to LICENSEE, LICENSOR shall notify LICENSEE of any such license, and describe in the notice such more favorable combined rate and base as well as any additional burdens imposed upon such manufacturer. LICENSEE shall have thirty (30) days to notify LICENSOR whether LICENSEE desires to have the more favorable combined rate and bass provided that LICENSEE shall also accept the additional burdens. If LICENSEE elects to adopt such more favorable license terms, such adoption and such terms will be effective as of the first day of the

7

<PAGE>

reporting quarter containing the effective date of the agreement between
LICENSOR and said manufacturer.

6.   Non-assignability

     A)   The license granted herein is non-assignable and LICENSEE shall not
grant a sublicense hereunder.  Change of control of LICENSEE shall constitute an
assignment of this license which shall be permitted with written consent of
LICENSOR, which consent shall not be unreasonably withheld.  An initial public
offering of shares by LICENSEE shall not constitute a "Change of Control" within
the meaning of this paragraph.

     B)   LICENSOR may assign this Agreement and its obligations herein to any
Affiliate of LICENSOR.  LICENSOR shall give LICENSEE prompt notice of any such
assignment.

7.   Patent Marking

     Commencing within ninety (90) days following the EFFECTIVE DATE, LICENSEE
agrees to mark LICENSED PRODUCTS to specify that the LICENSED PRODUCTS are
manufactured under license from Astrophysics Research Corporation and in a form
in accordance with the notice requirements of Title 35 of the United States
Code, Section 287.  The following form of notice will be acceptable to LICENSOR:
"U.S.

                                        8
<PAGE>

Pat.  No. 4,366,382." LICENSOR shall permit LICENSEE to promptly effect a cure
should inadvertent failure to so mark be discovered.

8.   Duration

     A)   This Agreement shall continue in full force and effect until the
expiration of the LICENSED PATENT unless this Agreement is sooner terminated as
herein provided.

     B)   LICENSOR may terminate this Agreement forthwith upon notice to
LICENSEE if:

          i.   LICENSEE remains in default in making any payment or report
required hereunder or fails to comply with any other provision hereof for a
period of forty five (45) days, in each case after written notice of each such
default or failure is given by LICENSOR; provided that if LICENSEE shall be in
default in making any two successive payments or reports required hereunder on a
timely basis, LICENSOR shall be entitled to terminate this Agreement forthwith
upon notice to LICENSEE, unless a genuine good faith dispute exists as to the
amount due and any amounts not in dispute are timely paid;

          ii.  LICENSEE should become insolvent, enter into bankruptcy
voluntarily or involuntarily and the petition is not dismissed in 91 days or
make any assignment for the benefit of one

                                        9
<PAGE>

or more creditors or should an order for compulsory liquidation of LICENSEE be
made by any court;

          iii. LICENSEE shall be determined by a court of competent jurisdiction
to have willfully or deliberately violated any provision of this Agreement, or
to have concealed from LICENSOR any failure to comply with this Agreement,
including, but not limited to, the deliberate or willful understatement of
royalties payable or the refusal to timely pay royalties, or shall be determined

to have acted other than in good faith in breaking any provision of this Agreement; or

iv. LICENSEE shall have engaged in any unauthorized infringement of the LICENSED PATENT and shall not have cured such a default within a period of thirty (30) days after written notice from LICENSOR.

C) Any termination of the Agreement shall not relieve LICENSEE of liability for any payments accrued or owing prior to the date of such termination or for any payments on LICENSED PRODUCTS manufactured or located in the United States prior to the date of such termination and sold thereafter.

D) LICENSEE acknowledges, that this Agreement was entered into as a result of a dispute based upon LICENSOR's assertion that the LICENSED PATENT was valid and enforceable and was being

10

<PAGE>

infringed by LICENSEE. The parties acknowledge that this Agreement is in lieu of a final settlement of the dispute. LICENSEE agrees that should it, during the term of this Agreement, contest the validity of the LICENSED PATENT by filing or causing others to file any legal action or any proceeding for reexamination of the LICENSED PATENT, then LICENSOR shall have the right to forthwith and thereafter terminate this Agreement and/or any, and all rights granted to LICENSEE by this Agreement, to the extent that the exercise of such right to terminate is permitted under the laws of the United States.

9. Notices

All notices required to be sent by either party under this Agreement shall be in writing and sent either by prepaid certified or registered U.S. mail, return receipt requested or by prepaid DHL, Federal Express or United States Postal Service Express mail for next business day delivery, and shall be deemed to have been duly given when received.

If to LICENSEE, to:

Rapiscan Security Products, Inc.
2830 Temple Avenue,
Long Beach, California 90806
Attention: President
FAX (310) 644-0616

11

<PAGE>

If to LICENSOR, to:

EG&G Inc
45 William Street
Wellesley, MA 02181-4078
Attention: Vice President, Instruments Group
FAX (617) 431-4153

With a copy to:

EG&G, Inc.
45 William Street
Wellesley, Massachusetts 02181-4078
Attention: Vice President and General Counsel
FAX (617) 431-4115

unless a different address shall have been duly given previously.

10. Governing Law and Jurisdiction

A) The construction and legal effect of this Agreement shall be governed by the laws of the State of California, U.S.A. without regard to conflicts of laws rules.

B) Any disputes, controversies or claims between the parties arising out of or relating to this Agreement shall be settled by binding arbitration according to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles County, California, or such other place as the parties may mutually agree.

C) Notwithstanding the foregoing, in the event that the parties do not agree on whether a particular design of X-ray

<PAGE>

scanner product, marketed or to be marketed by LICENSEE, is read upon by the claims of the LICENSED PATENT, resolution of that question shall be resolved by such dispute mechanism as the parties shall agree to, or if they cannot agree, the dispute as to whether a particular design is read upon by the claims of a LICENSED PATENT shall be presented in a mini-trial format, using the Federal Rules of Evidence, where appropriate, to a group of three professionals ("Judges") acceptable to both parties, at least one of whom shall be a patent lawyer and at least one of whom shall be skilled in the art of X-ray scanners. At the end of the mini-trial, the question of whether the claims, properly construed and interpreted pursuant to the laws of the United States, shall be put to the three Judges. The majority vote of the three judges shall resolve the dispute and shall be binding on both parties and shall be the sole method for resolving any disputes directed to such a question in the absence of agreement of the parties. It is the intent of this section to provide a quick, inexpensive and binding resolution of such disputes.

11. Miscellaneous

A) LICENSOR makes no warranty, either express or implied, that the PRODUCTS manufactured and sold by LICENSEE will not infringe any patents of any country or nation of the world not owned or controlled by licensor.

<PAGE>

B) LICENSOR undertakes to use its best efforts to enforce the LICENSED PATENT against third parties and to cause them to stop any infringement. LICENSEE may identify to LICENSOR from time to time in writing third parties whom it believes are infringing the LICENSED PATENT. LICENSOR shall make reasonable efforts to determine whether those third parties are infringing. LICENSOR shall within 120 days notify LICENSEE as to whether it believes the third party is infringing, and if not why not, or shall state to LICENSEE why infringement cannot be confirmed. Should LICENSOR cease to use best efforts to obtain cessation of unlicensed infringement of the LICENSED PATENT, LICENSEE beginning one year after notice to LICENSOR may pay all future royalties in to an escrow account payable to LICENSOR at such time as LICENSOR obtains cessation of unlicensed infringement of the LICENSED patent. Should efforts on behalf of LICENSOR cease, the escrow account shall be payable to LICENSEE. If such efforts on behalf of LICENSOR are continuing at the time the LICENSED PATENT expires, the escrow account shall be payable to LICENSOR. "Best efforts" as used herein shall allow LICENSOR full latitude to conduct its enforcement of the LICENSED PATENT, and actions that would not result in a finding of laches or estoppel in an infringement action, e.g. prosecuting only one lawsuit at a time, shall be deemed to meet the requirement of best efforts.

C) LICENSOR shall not be liable for any consequence or damage arising out of or resulting from anything made available

<PAGE>

hereunder, or for the exercise by LICENSEE of any rights granted hereunder, nor be liable to LICENSEE for consequential damages under any circumstances.

D) If any provision of the Agreement is or becomes or is deemed invalid, illegal or unenforceable under the applicable laws or regulations of the United States, State of California or any other jurisdiction, such provision will be deemed to be amended to the extent necessary to conform to the applicable laws or regulations or, if it cannot be so amended without materially altering the intention of LICENSEE and LICENSOR, it will be stricken, and the remainder of this Agreement will remain in full force and effect.

E) This Agreement constitutes the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous oral or written negotiations, agreements and understandings. This Agreement may be modified only in writing signed by LICENSOR and LICENSEE.

F) No failure or delay to act upon any default or to exercise any right, power or remedy hereunder will operate as a waiver of any such default, right, power or remedy.

15

<PAGE>

G) This Agreement has been drafted on the basis of mutual understanding so that neither party shall be prejudiced as being the drafter thereof.

H) LICENSOR shall cause all payments, reports, audits, and other communications to be transmitted to and directly kept by LICENSOR and not transmitted or disclosed to LICENSOR's subsidiary, EG&G Astrophysics Research, a competitor of LICENSEE in X-ray baggage inspection systems. LICENSOR shall endeavor in good faith to not transmit to EG&G Astrophysics information derived from such communications. This Agreement and any payments made under this Agreement will not be used as a marketing tool by LICENSOR. Factual reference to the LICENSED PATENT as being the property of LICENSOR's subsidiary shall not be deemed to be use as a marketing tool.

I) LICENSOR warrants that it owns EG&G Astrophysics Research, Inc., the owner of the entire right title and interest of

16

<PAGE>

the LICENSED PATENT, and that LICENSOR is legally capable of and authorized to enter into this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized representative.

| LICENSOR: | LICENSEE: |
|---|---|
| EG&G INC. | RAPISCAN SECURITY PRODUCTS, INC. |
| By /s/ | By /s/ |
| Title: Vice President | Title: |
| Date: December 19, 1994 | Date: |

<PAGE>

MODIFICATION TO LICENSE AGREEMENT

EG&G, Inc. (LICENSOR) and Rapiscan Security Products, Inc., (LICENSEE) hereby agree to modify the License Agreement entered into by and between the two companies on December 19, 1994, as follows:

Section 1, paragraph A is deleted and replaced with:

A) "NET SALES" shall men the total of the NET INVOICE PRICE for LICENSED PRODUCTS sold by LICENSEE that do not meet the criteria outlined in Sections Ai, Aii or Aiii of Paragraph 3.

The following paragraph is added to Section 1:

G) "NET INVOICE PRICE" shall mean the gross invoice selling price of each LICENSED PRODUCT sold by LICENSEE less warranty and installation charges of fourteen percent (14%). The term LICENSED PRODUCT shall not include any kits or any parts sold for additional assembly.

Paragraphs A, B and C of Section 3 are deleted and replaced with the following:

3. Royalties

A) LICENSEE shall pay LICENSOR a continuing royalty equal to eight percent (8%) of LICENSEE's NET SALES subject to the following exceptions:

i. For every "Series I" machine sold by LICENSEE at a NET INVOICE PRICE between $15,000 and $20,000, LICENSEE shall pay LICENSOR a flat rate of $750 per machine;

ii. For every "Series 300" machine sold by LICENSEE at a NET INVOICE PRICE between $20,000 and $30,000, LICENSEE shall pay LICENSOR a flat rate of $1000 per machine;

iii. For every "Series 500" machine sold by LICENSEE at a NET INVOICE PRICE

a) between $30,000 and $35,999, LICENSEE shall pay LICENSOR a flat rate of $1500 per machine.

b) between $36,000 and $42,000, LICENSEE shall pay LICENSOR a flat rate of $2000 per machine.

iv. If the NET INVOICE PRICE is below the lowest of the aforesaid minimums, then the royally for such sale shall be negotiated in good faith between the parties.

<PAGE>

v. No royalty shall be paid on any portion of a NET INVOICE PRICE in excess of $50,000 for the above mentioned, or comparable, machine models.

All remaining sections of the License Agreement remain in full force and effect.

This modification is effective as of December 19, 1994.

LICENSOR LICENSEE:

By: /s/ Angelo Castellano
Title: Vice President

By: /s/ Deepak Chopra
Title: CEO

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.18
<SEQUENCE>19
<DESCRIPTION>STOCK PURCHASE AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.18

STOCK PURCHASE AGREEMENT

Agreement, dated 05/03, 1997 (herein and in the Exhibits attached hereto, referred to as the "Agreement"), between Industriinvestor ASA, a company with limited liability duly incorporated under Norwegian law ("Seller") and Opto Sensors Inc., a corporation duly incorporated under California law ("Buyer").

WITNESSETH:

WHEREAS, Seller is the owner of all the outstanding shares ("Shares") of Advanced Micro Electronics AS, a company with limited liability duly incorporated under Norwegian law ("AME");

WHEREAS, Seller desires to sell and assign the Shares to Buyer, and Buyer desires to purchase the Shares from Seller, as set forth in this agreement;

NOW, THEREFORE, the Buyer and Seller hereby agree as follows:

1. Sale and Purchase of Shares.

1.1 Sale and Purchase of Shares. Upon the terms and subject to the conditions contained herein, on the Closing Date (as defined in Section 3), Seller shall sell, convey, transfer and deliver to Buyer, and the Buyer shall purchase, acquire and accept from Seller, all of the Shares of AME.

2. Purchase Price.

2.1 Purchase Price. The Purchase Price of the Shares shall be NOK6.185.000, subject to a possible adjustment as provided in Section 2.2 (the "Purchase Price").

The financial statements of AME for 1995 and 1996 have been presented to Buyer in due time before the parties agreed upon the Purchase Price.

2.2 Payment of the Purchase Price. The Purchase Price shall be paid by Buyer as follows:

(a) Initial Payment. Buyer shall pay NOK2.500.000 on the Closing Date, and the remaining NOK3.685.000 of the Purchase Price ("Second Payment") is subject to a possible adjustment due to the Receivable Guarantee, and will be paid as provided for in Section 2.2(b).

    (b) Payment of Second Payment. The Second Payment shall be made in three installments during 1997, the first on April 15th, the second on May 15th and the last on June 15th.

1.

<PAGE>

Each of the installments shall be for an amount equal to the full amount collected by AME on the Receivables (as defined below) in the calendar month(s) preceding the installment date, up to the full amount of the Second Payment.

Seller guarantees that AME will collect not less than NOK3.685.000 from the receivables of AME on its January 31st, 1997, balance sheet ("Receivables"), in the period from the Closing Date up to May 31st, 1997 ("Collecting Period"). To the extent that AME's collection of the Receivables at the end of the Collecting Period doe snot amount to NOK3.685.000, regardless of the reason therefor, the total amount of the Second Payment shall be reduced by the amount of the shortfall ("Shortfall").

In the event of a Shortfall at the end of the Collecting Period, the parties shall meet at AME to decide how to handle the remaining Receivables. To the extent any such remaining Receivables are collected, during the next 60 days after the end of the Collecting Period or the meeting if later, Seller shall receive the full amounts collected up to the amount of Shortfall, payable to Seller no later than the 15th of the month following the month that the amount was collected.

Buyer shall cause AME to make all reasonable efforts to collect the Receivables in accordance with its past practice. Seller holds the rights to assist in the collecting, or to take over the collecting if necessary, after the Collecting Period. No Receivables will be reduced or forgiven without written acceptance from Seller.

The payments under this Agreement shall be made by wire transfer to the transferee's bank account. For this purpose the parties shall notify each other before the Closing Date of their banks and their bank account numbers.

3. Closing. The closing of the sale and purchase provided for herein (the "Closing") will take place at the offices of Industriinvestor ASA (Oslo - Norway) on a date agreed between the parties, no later than February 19th, 1997 (the date of the closing being the "Closing Date").

At the Closing Date Seller shall deliver the share certificate(s), representing the all Shares, to Advokatfirmaet Schjodt AS as an Escrow Agent. According to an Escrow Agreement, mutually accepted between the parties, attached hereto as Exhibit A, the share certificate(s) will be released to Buyer on June 15th, provided that Buyer has paid the last instalment of the Second Payment in accordance with the Agreement, or earlier if Second Payment has been made in full. The Escrow Agreement shall also contain provisions and restrictions on voting, and guidelines for the Board of Directors.

4. Authority, Warranties and Covenants of Seller. Seller represents and warrants to and covenants with Buyer that:

4.1 Authority of Seller and Organization of AME. The execution, delivery, and performance of this Agreement have been duly authorized by all requisite corporate actions on the part of Seller. The Agreement has been duly executed and delivered by Sellers signatory thereto, and constitutes the valid, binding and enforceable obligation of Seller.

<PAGE>

AME is a corporation duly organized, validly existing and in good standing under the laws of Norway, and has full corporate power and authority to conduct its business as it is now being conducted.

4.2 Ability to Carry Out the Agreement. Seller is not subject to, or bound by any provisions (stockholders agreement, Article of Association, law, statute, judgement, injunction etc.) that would prevent, be violated, or under which there would be any default as a result of the execution, delivery and performance by Seller of this Agreement.

4.3 Title to the Shares. The Shares constitute on the Closing Date all the outstanding shares of the capital stock of AME.

Seller is the sole and exclusive legal and equitable owner of, and has good marketable and insurable title to, the Shares.

The Shares have been duly authorized, validly issued and are fully paid.

There are no contracts or agreements relating to the issuance, sale or transfer of the Shares, including options or warrants.

4.4 Financial Statements; Loss Carry Forward. The profit and loss statement, and the balance sheet of AME for 1996 is attached hereto as Exhibit B. Seller has also delivered to Buyer an audited financial statement of AME for 1995, attached hereto as Exhibit C ("Statements").

The Statements have been prepared in accordance with Generally Accepted Accounting Principles and applicable laws and regulations, and fairly presents the financial situation of AME as of December 31st, 1995 and 1996 respectively. The Statements reflect all assets and liabilities of AME and do not fail to state or reflect any item material to the evaluation of AME as a going concern.

There are no claims against AME not reflected in the 1996 Statement that, according to Norwegian Generally Accepted Accounting Principles, should have been reflected.

The net accumulated tax losses of AME as of December 31st, 1996, (approximately NOK4.700.000) have not and will not be absorbed by Seller through consolidation of tax positions or otherwise.

4.5 Litigation and Claims. There is no action, suit, proceeding or investigation pending or, to the best of AME or Sellers knowledge, threatened, against AME or with respect to any of Its assets, at law, in equity or otherwise, nor is there any reasonable basis for any such action, suit, proceeding or investigation. All taxes of AME have been paid when due or have been reserved against in the Statements.

There are no judgments, orders or decrees entered against AME which have, or will likely have, an adverse effect on AME.

4.6 Compliance with Laws. AME's business is being conducted and has been conducted in compliance, in all material respects, with all applicable laws and regulations. AME

<PAGE>

has not been notified by any governmental authority that AME is in violation of any applicable law or regulation in respect of the activities of its business.

4.7 Environmental Matters. AME's business is conducted and has been conducted in compliance with all environmental laws and regulations applicable to it. Neither Seller nor AME is aware, nor have either of them any reason to be aware, of any actions or failures to act on the part of AME that might lead to liability for pollution damage.

4.8 Insurance. AME has at all time maintained insurance relating to its business; covering property, fire, casualty, liability, workmen's compensation and all other form of insurance customarily obtained by similar businesses in the same industry.

4.9 Conduct of Business. From January 1st, 1997 until Closing Date Seller will cause AME to conduct its business in the same manner as previous to the negotiations of this Agreement, and there will be made no transactions, payments or other reductions of the assets of AME, other than in the ordinary course of business. AME has made no payments, or accrued any liability, to Seller prior to the Closing Date.

4.10 Board of Directors of the AME. Seller shall have the right to retain one member of the Board of Directors of AME until the Purchase Price has been fully paid according to Section 2.2(b).

4.11 Fees and Expenses. Seller shall pay all fees and expenses incurred by it in connection with this Agreement and the transactions contemplated herein.

4.12 Employees. All of the employees of AME have written employment agreements. None of the agreements contains unusual termination clauses (including "golden parachutes"), or other irregular compensation provisions. None of the employees has a salary exceeding NOK700.000.

4.13 No Infringement of Intellectual Property. None of the intellectual properties used by AME has at any time in the past infringed or misappropriated or otherwise violated, or is likely to violate, any intellectual property rights of any other person, nor is AME otherwise in the conduct of its business infringing upon the intellectual property of any other party.

4.14 Assets. All the Assets of AME are in good working order and sufficient for AME to continue its business substantially in the same manner as before.

4.15 Warranty Repairs. AME will not incur warranty repairs or return obligations in excess of NOK1OO.000 a year. Seller shall indemnify Buyer for any such obligation in excess of NOK100.000 a year.

4.16 Major Customer and Agreements. Neither Seller, nor AME has any knowledge to the effect that, or any reason to believe that, any major customer of AME is likely to terminate existing contracts with AME.

Attached as Exhibit D is a list of all the contracts, agreements and commitments of AME for the purchase of goods or services, or representing a total potential commitment of AME in excess of NOK100.000.

<PAGE>

5. Representations, Warranties and Covenants of Buyer. Buyer represents and warrants to and covenants with Seller that:

5.1 Organization and Authority of Buyer. Buyer is a corporation, duly under incorporation, valid existing and in good standing under the laws of California, with the corporate power and authority to enter into this Agreement to which it is a signatory, and to perform its obligations hereunder. The execution, delivery, and performance of all sides of this Agreement have been duly authorized by all requisite corporate actions on the part of Buyer. The Agreement has bean duly executed and delivered by Buyer's signatory thereto, and constitutes the valid, binding and enforceable obligation of Buyer.

5.2 Ability to Carry Out the Agreement. Buyer is not subject to or bound by any provisions (law, statute, judgment, injunction etc.) that would prevent, be violated, or under which there would be any default as a result of the execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby.

5.3 Fees and Expenses. Buyer shall pay all fees and expenses incurred by it in connection with this Agreement and the transactions contemplated herein.

5.4 The Tandberg Loan of AME. Buyer guarantees, as within March 31st, 1997, to release Seller from its obligation to Tandberg in respect of the Tandberg loan of AME. If necessary to release Seller from its obligation, Buyer will pay off the loan. Seller guarantees that AME's obligation to Tandberg, and therefore Sellers guaranty. does not exceed NOK1.997.036 (not including accumulated interest from January 1st, 1997, at 8% p.a., and accrued but unpaid interest for prior periods as reflected in the Statement as of December 31st, 1996).

5.5 Conduct of Business After the Closing Date. From the Closing Date until the Purchase Price is fully paid according to Section 2.2, Buyer will cause AME to conduct its business in the same manner as previous to the Closing Date, Buyer will cause AME not to, without acceptance from Seller, sell all or substantially all its assets, or to liquidate AME, or to decrease its share capital (other than as a result of losses, if any).

The parties will cause the Escrow Agent to exercise the voting rights of the Shares in compliance with the foregoing, and with a view to conserve the structure and the content of AME.

6. Post-Closing Obligations of Seller and Buyer. From after the Closing Date each party hereto shall fully cooperate and make available to the other party upon request, during normal business hours, all books, records and information necessary and useful in connection with tax return, governmental reports, or any other matter requiring such information or material, for any reasonable business.

7. Miscellaneous.

7.1 Indemnification of Buyer. Seller agrees to defend, indemnify and

hold harmless Buyer against any and all claims and liabilities incurred by Buyer by reason of, or arising out of any false, misleading or inaccurate representation or warranty by the Seller

5.

<PAGE>

contained in this Agreement (including any Exhibits hereto), or any breach of any such representation or warranty, or any breach by the Seller of any provision of this Agreement.

7.2 Limitation of Seller's Liability. Any liability of Seller relating to this Agreement is limited to the net Purchase Price actually received, provided, however, that unless the aggregate damages do not reach NOK100.000, Seller shall have no liability. If the aggregate damages reach or exceed NOK100.000, Seller shall be liable for the full amount of the damage limited to the net Purchase Price actually received. For the purpose of NOK100.000 limit, any amounts accrued under Section 4.15 shall count, but such amounts shall not be indemnified other than pursuant to Section 4.15.

To be valid and covered by Sellers liability after this Agreement, any claims relating to the Agreement have to be reported to Seller within 3 months after Buyer's or AME's first knowledge of the breach or default.

Any claim -- with the exception of those-based on defects on title to the Shares and third party claims of patent infringement by AME -- must be made within 12 months after the Closing Date. This, however, shall. not apply to liability for taxes or amendments to AME's tax returns, nor for claims pursuant to Section 4.7 (Environmental matters).

7.3 Delay in Payment of the Purchase Price. Any delay in Buyer's payment of the Purchase Price, according to the provisions in Section 2.2, is regarded as a substantial breach of contract. In the event of such delay, Seller shall give Buyer written notice, following the receipt of which Buyer shall have 5 business days to remedy the default.

7.4 Professional Secrecy. Both parties of this Agreement are bound to observe professional secrecy regarding all and any information given or received in connection with the negotiations or the Agreement.

7.5 Notices. All notices and other communications hereunder shall be in writing, and shall be deemed to have been duly given if signed by the respective person giving such notice or other communications upon receipt of; hand delivery, certified or registered mail, return receipt requested, or telecopy transmission with confirmation of receipt:

If to Seller to: Industriinvestor ASA
Ovre Slottsgate 27
0157 Oslo, NORWAY

If to Buyer to: Opto Sensors, Inc.
12525 Chardon Avenue
Hawthorne, CA 90250 USA
Attn: Ajay Mehra

7.6 Amendments. This Agreement may be amended or modified only by a written agreement between the parties.

7.7 Applicable Law. This Agreement shall be governed by and construed

in accordance with Norwegian law.

6.

<PAGE>

7.8 Enforceability. The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions. If it is held that any restriction hereunder is too broad to permit enforcement to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

7.9 Arbitration. Any dispute arising under this Agreement that is not solved by negotiations between the parties, shall be submitted to arbitration in accordance with the rules of the Oslo Chamber of Commerce. Any such arbitration shall be conducted in English and held in Oslo, Norway. The award of the arbitrators in any such proceeding shall be final and binding on the parties.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above, in two originals, one to each of the parties.

Dated: May 3, 1997

| OPTO SENSORS, INC. | INDUSTRIINVESTOR ASA |
|---|---|
| /s/ | /s/ |
| ________________________________ | ________________________________ |

7.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11.1
<SEQUENCE>20
<DESCRIPTION>COMPUTATION OF PRO FORMA PER SHARE EARNINGS
<TEXT>

<PAGE>

EXHIBIT 11.1

OSI SYSTEMS, INC.
STATEMENT RE COMPUTATION OF PRO FORMA PER SHARE EARNINGS

<TABLE>
<CAPTION>

| | Year Ended | Nine Months Ended | |
|---|---|---|---|
| | June 30, 1996 | March 31, 1996 | March 31, 1997 |
| <S> | <C> | <C> | <C> |
| Weighted Average Common Shares Outstanding............................ | 1,852,219 | 1,850,250 | 1,891,125 |
| Conversion of Subordinated Debt and Preferred Stock........................ | 3,973,661 | 3,973,661 | 3,973,661 |
| Acquisition of Minority Interests......... | 178,956 | 178,956 | 178,956 |
| Effect of Stock Options: | | | |
| Granted within 12 months of initial public offering, treasury stock method................................ | 206,719 | 206,719 | 206,719 |

| | | | |
|---|---|---|---|
| Remaining options, treasury stock method. | 96,521 | 94,572 | 76,773 |
| Pro Forma Weighted Average Shares......... | 6,308,126 | 6,304,158 | 6,327,234 |
| Historical Net Income..................... | $2,259,000 | $1,546,000 | $2,934,000 |
| Interest on Subordinated Debt, Net of Income Taxes........................... | 166,000 | 125,000 | 92,000 |
| Minority Interest in Net Loss of Subsidiaries........................... | (117,000) | (28,000) | -- |
| Pro Forma Net Income...................... | $2,308,000 | $1,643,000 | $3,026,000 |
| Pro Forma Net Income Per Share............ | $0.37 | $0.26 | $0.48 |

</TABLE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-21.1
<SEQUENCE>21
<DESCRIPTION>SUBSIDIARIES OF THE COMPANY
<TEXT>

<PAGE>

EXHIBIT 21.1

Subsidiaries of the Company:

UDT Sensors, Inc., California
Rapiscan Security Products (U.S.A.), Inc., California
Ferson Optics, Inc., California
Rapiscan Security Products Limited, United Kingdom
Opto Sensors (Singapore) Pte Ltd, Singapore
Opto Sensors (Malaysia) Sdn. Bhd., Malaysia
Advanced Micro Electronics AS, Norway
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>22
<DESCRIPTION>CONSENT OF INDEPENDENT AUDITORS
<TEXT>

<PAGE>

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

We consent to the use in this Registration Statement of OSI Systems, Inc. on Form S-1 of our report dated June 12, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ Deloitte & Touche LLP

Los Angeles, California
June 12, 1997
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27.1
<SEQUENCE>23
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>

<PAGE>
<ARTICLE> 5
<MULTIPLIER> 1,000

| <S> | <C> | |
|---|---|---|
| <PERIOD-TYPE> | 9-MOS | |
| <FISCAL-YEAR-END> | | JUN-30-1997 |
| <PERIOD-START> | | JUL-01-1996 |
| <PERIOD-END> | | MAR-31-1997 |
| <CASH> | | 1,612 |
| <SECURITIES> | | 0 |
| <RECEIVABLES> | | 15,450 |
| <ALLOWANCES> | | 0 |
| <INVENTORY> | | 15,472 |
| <CURRENT-ASSETS> | | 35,969 |
| <PP&E> | | 5,654 |
| <DEPRECIATION> | | 0 |
| <TOTAL-ASSETS> | | 44,314 |
| <CURRENT-LIABILITIES> | | 26,029 |
| <BONDS> | | 3,063 |
| <PREFERRED-MANDATORY> | | 0 |
| <PREFERRED> | | 4,014 |
| <COMMON> | | 2,913 |
| <OTHER-SE> | | 8,055 |
| <TOTAL-LIABILITY-AND-EQUITY> | | 44,314 |
| <SALES> | | 55,973 |
| <TOTAL-REVENUES> | | 55,973 |
| <CGS> | | 40,380 |
| <TOTAL-COSTS> | | 40,380 |
| <OTHER-EXPENSES> | | 10,776 |
| <LOSS-PROVISION> | | 0 |
| <INTEREST-EXPENSE> | | 900 |
| <INCOME-PRETAX> | | 3,917 |
| <INCOME-TAX> | | 983 |
| <INCOME-CONTINUING> | | 2,934 |
| <DISCONTINUED> | | 0 |
| <EXTRAORDINARY> | | 0 |
| <CHANGES> | | 0 |
| <NET-INCOME> | | 2,934 |
| <EPS-PRIMARY> | | 0.48 |
| <EPS-DILUTED> | | 0 |

</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
RR6yEEvEnkwdibs8qMSz0fRluI2DoIFJ8jrBU3CzztgyfY2tbi2KV3QuW/0Juoqe
n3WV69Xtt1Nn2DAHB1pKbw==

<SEC-DOCUMENT>0001017062-97-001396.txt : 19970804
<SEC-HEADER>0001017062-97-001396.hdr.sgml : 19970804
ACCESSION NUMBER: 0001017062-97-001396
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 7
FILED AS OF DATE: 19970801
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97650287

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMEND #1 TO FORM S-1 REGISTRATION STATEMENT
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 1, 1997

REGISTRATION NO. 333-29179

- ------------------------------------------------------------------------------
- ------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

--------------

AMENDMENT NO. 1 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| CALIFORNIA | 3674 | 33-0238801 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

</TABLE>

--------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER,
INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

--------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

--------------

COPIES TO:

ISTVAN BENKO, ESQ.
TROY & GOULD PROFESSIONAL CORPORATION
1801 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL. (310) 553-4441
FAX. (310) 201-4746

BERTRAM R. ZWEIG, ESQ.
JONES, DAY, REAVIS & POGUE
555 WEST 5TH STREET, SUITE 4600
LOS ANGELES, CALIFORNIA 90013-1025
TEL. (213) 489-3939
FAX. (213) 243-2539

--------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

--------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

--------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

- ------------------------------------------------------------------------------
- ------------------------------------------------------------------------------

+ INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE. +

SUBJECT TO COMPLETION, DATED AUGUST 1, 1997

[LOGO OF OPTO-SENSORS, INC.]

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $13.00 and $14.00 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Company has made application for inclusion of the Common Stock on the Nasdaq National Market under the symbol "OSIS."

----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>
<CAPTION>

| | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING SHAREHOLDERS(2) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and

Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]
Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

<PAGE>

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

<PAGE>

[TWO PAGE GATEFOLD]

OSI SYSTEMS, INC.
----------------

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]
Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]
Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER

TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

----------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |
| Dilution | 17 |
| Selected Consolidated Financial Data | 18 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 28 |
| Management | 42 |
| Certain Transactions | 50 |
| Principal and Selling Shareholders | 52 |
| Description of Capital Stock | 55 |
| Shares Eligible for Future Sale | 56 |
| Underwriting | 57 |
| Legal Matters | 59 |
| Experts | 59 |
| Additional Information | 59 |
| Index to Consolidated Financial Statements | F-1 |

</TABLE>

----------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine-month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In the nine-month period ended March 31, 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During the nine-month period, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its global presence, and selectively entering into new end-product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of March 31, 1997 the Company marketed its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,458,874 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Proposed Nasdaq National Market Symbol............................ | OSIS |

</TABLE>

- --------------------

(1) Based on the number of shares outstanding on May 31, 1997. Excludes: (i) approximately 864,986 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.32 per share; and (ii) up to 45,486 shares of Common Stock that may be issued after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares of Rapiscan U.S.A. See "Certain

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | | | (unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues............... | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold..... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit........... | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1).... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development.......... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)...... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense....... | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income taxes and minority interest............. | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest............. | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest...... | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income............. | $ 331 | $ 659 | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Pro forma net income(3)(4).......... | | | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share(3)(4)(5).... | | | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Pro forma weighted average shares outstanding(5)....... | | | | | 6,308,126 | 6,304,158 | 6,327,234 |

<CAPTION>

| | MARCH 31, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(6) |
| <S> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash.................................................... | $ 1,612 | $33,027 |
| Working capital......................................... | 9,940 | 48,915 |
| Total assets............................................ | 44,314 | 75,729 |
| Total debt.............................................. | 11,387 | 1,594 |
| Total shareholders' equity.............................. | 14,982 | 56,190 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 308 of 2711

connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and pro forma net income by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and for each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Supplementary pro forma net income for the year ended June 30, 1996 and for each of the nine month periods ended March 31, 1996 and 1997 is $2,913,000, $2,086,000 and $3,464,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary pro forma net income per share for the corresponding periods is $0.41, $0.29 and $0.49, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

## RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

### FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to

predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics") Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business-- Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the

<PAGE>

Company's subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995 and 1996 and in the nine-month period ended March 31, 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 39.3%, respectively, of the Company's revenues. Of the revenues generated during fiscal 1996 from shipments made outside of

the United States, 12.0% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign control legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial condition and results of operations. While the Company has no current agreement or negotiations underway with

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the Company.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection

purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations. Rapiscan U.S.A. is currently involved in a lawsuit against EG&G Inc. and a subsidiary of EG&G Inc. in a matter not related to the patent license agreement with EG&G Inc. See "Business--Legal Proceedings."

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of operations. For the nine-month period ended March 31, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $8.9 million or approximately 15.9% of the Company's revenues. Through March 31, 1997, the Company has incurred legal fees in the amount of approximately $148,000 in connection with this lawsuit. The Company intends to vigorously pursue its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights. Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could

enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

<PAGE>

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 314 of 2711
manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.3% and 16.2%, respectively, of the Company's Common Stock (17.4% and 14.3%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 40.9% of the outstanding Common Stock (36.9% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

12

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 315 of 2711

the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. The Company has filed an application to have the Common Stock approved for quotation on the Nasdaq National Market. However, there can be no assurance that an active trading market for the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,458,874 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,758,874 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,731,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for 180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,758,874 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless

disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of the Offering to be received by the Company, approximately $31.4 million or approximately 76.2% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $9.8 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT MARCH 31, 1997 | RATE BASIS PER ANNUM(1) | RATE AT MARCH 31, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $4,927,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,500,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,442,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 66,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 354,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 504,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- ---------------------

(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

    Borrowings under the foregoing bank facilities are generally used for working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

<PAGE>

CAPITALIZATION

The following table sets forth: (i) the actual short-term debt and capitalization of the Company as of March 31, 1997; (ii) the pro forma short-term debt and capitalization of the Company giving effect to the conversion of the Company's outstanding shares of preferred stock into 3,853,125 additional shares of Common Stock and the filing of the Amended and Restated Articles of Incorporation; and (iii) the pro forma capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

<TABLE>
<CAPTION>

| | MARCH 31, 1997 | | |
|---|---|---|---|
| | ACTUAL | PRO FORMA | PRO FORMA AS ADJUSTED |
| | (In thousands, except share information) | | |
| <S> | <C> | <C> | <C> |
| Short-term debt................................ | $ 8,324 | $ 8,324 | $ 764 |
| | ======= | ======= | ======= |
| Long-term debt, less current portion............ | 3,063 | 3,063 | 830 |
| Shareholders' equity: | | | |
| Preferred Stock, $1.00 liquidation value; 3,000,000 shares authorized; 2,568,750 shares issued and outstanding, actual; none issued and outstanding, pro forma and pro forma as adjusted | 4,014 | -- | -- |
| Preferred Stock, no par value; 10,000,000 shares authorized, pro forma and pro forma as adjusted; none issued and outstanding................................. | -- | -- | -- |
| Common Stock, no par value(1); 4,500,000 shares authorized; 40,000,000 shares authorized, pro forma and pro forma as adjusted; 2,207,124 shares issued and outstanding, actual; 6,060,249 issued and outstanding, pro forma; 9,390,249 issued and outstanding, pro forma as adjusted.................................... | 2,913 | 6,927 | 48,135 |
| Retained earnings............................. | 7,928 | 7,928 | 7,928 |
| Cumulative foreign currency translation adjustment.................................. | 127 | 127 | 127 |

| | | | |
|---|---|---|---|
| Total shareholders' equity.................. | 14,982 | 14,982 | 56,190 |
| Total capitalization...................... | $18,045 | $18,045 | $57,020 |

</TABLE>

- ---------------------

(1) Excludes 499,125 shares of Common Stock issuable upon exercise of outstanding stock options as of March 31, 1997 and up to 45,486 shares of Common Stock that may be issuable as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

DILUTION

The net tangible book value of the Company at March 31, 1997 (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock), was $13,230,000 or $2.18 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock). After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of March 31, 1997 would have been $54,438,000, or $5.80 per share. This represents an immediate increase in the net tangible book value of $3.62 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.70 per share to new investors. The following table illustrates this per share dilution:

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| Assumed initial public offering price......................... | | $13.50 |
| Net tangible book value before Offering..................... | $2.18 | |
| Increase in net tangible book value attributable to this Offering................................................ | 3.62 | |
| Pro forma net tangible book value after Offering.............. | | 5.80 |
| Dilution to new investors.................................... | | $ 7.70 |

</TABLE>

The following table sets forth on a pro forma basis as of March 31, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock and assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

<TABLE>
<CAPTION>

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Existing shareholders.. | 6,060,249 | 64.5% | $ 6,927,000 | 13.4% | $ 1.14 |
| New public investors... | 3,330,000 | 35.5 | 44,955,000 | 86.6 | $13.50 |
| Total................. | 9,390,249 | 100.0% | $51,882,000 | 100.0% | |

</TABLE>

The foregoing table does not take into effect the exercise of outstanding

options to purchase 68,625 shares of Common Stock for $66,350 subsequent to March 31, 1997. As of the date of this Prospectus, there are outstanding options to purchase an aggregate of 864,986 of Common Stock at a weighted average exercise price of approximately $7.32 per share. In addition, the Company may be obligated to issue up to an additional 45,486 shares of Common Stock after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares in Rapiscan U.S.A. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1996 and for the nine months ended March 31, 1997, and the balance sheet data at June 30, 1995 and 1996 and March 31, 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1992 and 1993 and the balance sheet data at June 30, 1992, 1993, and 1994 are derived from audited financial statements not otherwise contained herein. The consolidated statement of operations data for the nine months ended March 31, 1996 are derived from unaudited financial statements of the Company included elsewhere herein. The unaudited financial statements have been prepared by the Company on a basis consistent with the Company's audited consolidated financial statements and, in the opinion of management, include all adjustments, consisting only of normal recurring accruals, necessary for a fair presentation of the Company's results of operations for the period. The results of operations for the nine months ended March 31, 1997 are not necessarily indicative of future results.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues................ | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold...... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit............ | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1)..... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development........... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)....... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses.............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations.. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense........ | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income taxes and minority interest............... | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes.................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income before minority interest | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income | $331 | $659 | $787 | $1,158 | $2,259 | $1,546 | $2,934 |
| Pro forma net income(3)(4) | | | | | $2,308 | $1,643 | $3,026 |
| Pro forma net income per share(3)(4)(5) | | | | | $0.37 | $0.26 | $0.48 |
| Pro forma weighted average shares outstanding(4) | | | | | 6,308,126 | 6,304,158 | 6,327,234 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | | MARCH 31, |
|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | | |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | | |
| Cash | $546 | $941 | $625 | $1,405 | $581 | $1,612 |
| Working capital | 3,728 | 3,852 | 2,280 | 12,117 | 6,044 | 9,940 |
| Total assets | 10,548 | 15,739 | 25,807 | 30,780 | 35,309 | 44,314 |
| Total debt | 6,090 | 6,882 | 11,140 | 14,113 | 15,462 | 11,387 |
| Total shareholders' equity | 1,677 | 2,256 | 3,128 | 4,951 | 7,194 | 14,982 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Supplementary pro forma net income for the year ended June 30, 1996 and for each of the nine month periods ended March 31, 1996 and 1997 is $2,913,000, $2,086,000 and $3,464,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary pro forma net income per share for the corresponding periods is $0.41, $0.29 and $0.49, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

18

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6% of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. The Company markets its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 39.3% of revenues for the fiscal years 1995 and 1996 and for the nine months ended March 31, 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997 was 26.6%, 34.2% and 25.1%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's

optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...................... | $34,729 | $37,977 | $45,007 | $33,493 | $36,228 |
| (Inter-company eliminations)...... | (1,257) | (1,529) | (6,392) | (5,424) | (4,551) |
| Unaffiliated optoelectronic devices and subsystems ......... | 33,472 | 36,448 | 38,615 | 28,069 | 31,677 |
| Security and inspection products.. | 14,263 | 13,367 | 22,903 | 16,925 | 24,296 |
| Total revenues.................. | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues.......................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold............... | 75.5 | 75.9 | 73.9 | 74.8 | 72.2 |
| Gross profit...................... | 24.5 | 24.1 | 26.1 | 25.2 | 27.8 |
| Operating expenses: | | | | | |
| Selling, general and administrative.................. | 16.7 | 15.3 | 15.9 | 15.0 | 14.6 |
| Research and development......... | 3.0 | 3.2 | 2.7 | 2.8 | 3.1 |
| Stock option compensation........ | -- | -- | -- | -- | 1.5 |
| Total operating expenses........ | 19.7 | 18.5 | 18.6 | 17.8 | 19.2 |
| Income from operations............ | 4.8 | 5.6 | 7.5 | 7.4 | 8.6 |
| Interest expense.................. | 1.5 | 2.5 | 2.2 | 2.3 | 1.6 |
| Income before income taxes and minority interest................ | 3.3 | 3.1 | 5.3 | 5.1 | 7.0 |
| Provision for income taxes........ | 1.7 | 0.8 | 1.8 | 1.7 | 1.8 |
| Income before minority interest... | 1.6 | 2.3 | 3.5 | 3.4 | 5.2 |

| | | | | | |
|---|---|---|---|---|---|
| Minority interest...................... | [illegible] | -- | 0.2 | -- | -- |
| Net income......................... | 1.6% | 2.3% | 3.7% | 3.4% | 5.2% |

</TABLE>

<PAGE>

COMPARISON OF THE NINE-MONTH PERIOD ENDED MARCH 31, 1997 TO THE NINE-MONTH PERIOD ENDED MARCH 31, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all intercompany eliminations. For the nine-month period ended March 31, 1997, revenues increased by $11.0 million, or 24.4%, to $56.0 million from $45.0 million in the comparable period ended March 31, 1996. Revenue from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $3.6 million, or 12.9%, to $31.7 million from $28.1 million in the comparable period ended March 31, 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenue from the sale of security and inspection products increased by $7.4 million, or 43.6%, to $24.3 million from $16.9 million in the comparable 1996 period. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, and growth in sales of the Rapiscan 119 tabletop model.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. For the nine-month period ended March 31, 1997, gross profit increased by $4.2 million, or 37.3%, to $15.6 million from $11.4 in the comparable 1996 period. As a percentage of revenues, gross profit increased to 27.8% in the 1997 period from 25.2% in the comparable 1996 period. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the nine-month period ended March 31, 1997, such expenses increased by $1.5 million, or 21.3%, to $8.2 million from $6.7 million in the comparable 1996 period. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.0%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For the nine-month period ended March 31, 1997, such expenses increased by $457,000, or 35.7%, to $1.7 million from $1.3 million in the comparable 1996 period. As a percentage of revenues, research and development expenses increased to 3.1% from 2.8%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for the nine-month period ended March 31, 1997 increased by $1.5 million, or 44.6%, to $4.8 million from $3.3 million for the comparable 1996 period. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during the 1997 period, income from operations increased by $2.3 million, or 70.3%, to $5.7 million from $3.3 million. As a percent of revenues, income from operations increased to 8.6% from 7.4%, and excluding the non-cash compensation expense referenced above, it would have increased to 10.1% from 7.4%.

Interest Expense. Interest expense for the nine-month period ended March 31,
1997 decreased by $126,000, or 12.3%, to $900,000 from $1,026,000 during the
comparable 1996 period. As a percentage of revenues, interest expense
decreased to 1.6% from 2.3%. The decrease was due to the conversion of the
Company's subordinated debt to preferred and common stock during the 1997
period, and to a decrease in the Company's borrowings outstanding under its
lines of credit.

                                    21
<PAGE>

   Provision for Income Taxes. Provision for income taxes for the nine-month
period ended March 31, 1997 increased by $196,000, or 24.9%, to $983,000 from
$787,000 during the comparable 1996 period. As a percentage of income before
provision for income taxes and minority interest, provision for income taxes
decreased to 25.1% from 34.2% in the comparable 1996 period. The decrease was
a result of increases in the Company's export sales through its FSC, which has
the effect of reducing the tax rate on revenues from foreign sales made from
the United States, and the increased utilization of research and development
and certain state tax credits. In addition, the Company has made the
California Waters Edge election under California tax law, which has the effect
of exempting its foreign subsidiaries from California taxes through fiscal
2003.

   Net Income. For the reasons outlined above, net income for the nine-month
period ended March 31, 1997, increased $1.4 million, or 89.8%, to $2.9 million
from $1.5 million in the comparable 1996 period. The compensation charge
described above, decreased net income by $514,000 in the 1997 period.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED
JUNE 30, 1995

   Revenues. Revenues for the fiscal year ended June 30, 1996 increased by
$11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal
year ended June 30, 1995. Revenues from the sale of optoelectronic devices and
subsystems, net of intercompany eliminations, increased by $2.2 million, or
5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase
was the result of a 10.0% growth in sales of active optoelectronic devices and
subsystems, offset in part by a decline in sales of lenses and other passive
optic components. Revenues from the sale of security and inspection products
increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in
the comparable 1995 period. The increase was due mainly to the increased
penetration of the U.S. security and inspection market and to larger shipments
made to two international customers.

   Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0
million from $12.0 million for fiscal 1995. As a percentage of revenues, gross
profit increased to 26.1% from 24.1%. Gross margin increased as a result of
the Company more fully realizing the benefits of having established a
manufacturing facility in Malaysia in fiscal 1995, which had the effect of
decreasing labor rates.

   Selling, General and Administrative. Selling, general and administrative
expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6
million for fiscal 1995. As a percentage of revenues, selling, general and
administrative expenses increased to 15.9% from 15.3%. The increase in
expenses was due to increases in sales and marketing activities to support the
growth in sales of security and inspection products in the United States, as
well as general increases in payroll and administration to support sales
growth.

   Research and Development. Research and development expenses increased by
$72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a
percentage of revenues, research and development expenses decreased to 2.7%
from 3.2%, as increased research and development expenses related to security
and inspection products were offset in part by decreases in such expenses
related to optoelectronic products.

   Income from Operations. Income from operations increased by $1.8 million, or
64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of
revenues, income from operations increased to 7.5% from 5.6%. The increase was
due to the reasons outlined above, as both cost of goods sold and selling,

general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest

expense increased to 2.6% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eleven consecutive quarters in the period ended March 31, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
| | (In thousands) | | | | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues.......... | $10,981 | $12,584 | $13,164 | $13,086 | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 |
| Cost of goods sold............. | 8,500 | 9,537 | 10,104 | 9,677 | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 |
| Gross profit...... | 2,481 | 3,047 | 3,060 | 3,409 | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative.. | 1,598 | 1,984 | 1,875 | 2,144 | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 |
| Research and development..... | 494 | 308 | 370 | 419 | 419 | 408 | 453 | 383 | 517 | 636 | 584 |
| Stock option compensation.... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses....... | 2,092 | 2,292 | 2,245 | 2,563 | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 |
| Income from operations....... | 389 | 755 | 815 | 846 | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 1,470 |
| Interest expense.. | 244 | 268 | 353 | 386 | 336 | 345 | 345 | 333 | 360 | 331 | 209 |
| Income before income taxes and minority interest......... | 145 | 487 | 462 | 460 | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 |
| Provision for income taxes..... | 39 | 129 | 123 | 122 | 85 | 293 | 409 | 324 | 259 | 408 | 316 |
| Income before minority interest......... | 106 | 358 | 339 | 338 | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 |
| Minority interest. | 14 | 4 | 6 | (7) | 19 | 17 | (8) | 89 | -- | -- | -- |
| Net income........ | $ 120 | $ 362 | $ 345 | $ 331 | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 |

</TABLE>

24

<PAGE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of the years fiscal 1995 and 1996 and for the first three quarters of fiscal 1997.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues......... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold............ | 77.4 | 75.8 | 76.8 | 73.9 | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 |
| Gross profit..... | 22.6 | 24.2 | 23.2 | 26.1 | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative. | 14.6 | 15.8 | 14.2 | 16.4 | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 |
| Research and development.... | 4.5 | 2.4 | 2.8 | 3.2 | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 |
| Stock option compensation... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 4.1 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total operating expenses....... | 19.1 | 18.2 | 17.0 | 19.6 | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 |
| Income from operations...... | 3.5 | 6.0 | 6.2 | 6.5 | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 |
| Interest expense. | 2.2 | 2.1 | 2.7 | 2.9 | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 |
| Income before income taxes and minority interest........ | 1.3 | 3.9 | 3.5 | 3.6 | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 |
| Provision for income taxes.... | .4 | 1.0 | .9 | 1.0 | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 |
| Income before minority interest........ | 1.0 | 2.9 | 2.6 | 2.6 | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 |
| Minority interest........ | 0.1 | -- | -- | (0.1) | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- |
| Net income....... | 1.1% | 2.9% | 2.6% | 2.5% | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% |

</TABLE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of March 31, 1997, the Company's principal sources of liquidity consisted of $1.6 million in cash and several credit agreements described below.

The Company's operations provided net cash of $5.1 million in the nine month period ended March 31, 1997. For the nine-month period ended March 31, 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in the nine-month period ended March 31, 1997. Net cash provided by operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $1.7 million and $2.2 million in the nine-month period ended March 31, 1997 and fiscal 1996, respectively, in each case due primarily to purchases of property and equipment in the amount

of approximately $1.5 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property

<PAGE>

and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for the nine-month period ended March 31, 1997 was $2.4 million due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of March 31, 1997, there was outstanding approximately $4.9 million under the $10.0 million line of credit, $2.5 million under the term loan, and approximately $154,000 under the letter of credit facility. As of March 31, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of March 31, 1997, no amounts were outstanding under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $2.0 million was used as of March 31, 1997. The facility terminates on October 27, 1997. Borrowings under the agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.0 million at March 31, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus

2.00% per annum. The second agreement provides for a 750,000 pound sterling (approximately $1.2 million as of March 31, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $820,000 as of March 31, 1997) facility for tender and performance bonds. These facilities are secured by certain assets of Rapiscan UK

<PAGE>

and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of March 31, 1997, no amounts were outstanding under the line of credit and $134,000 was outstanding under the performance bond facility. The above facilities expire in December and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at March 31, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at March 31, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of March 31, 1997 there was approximately $1.4 million outstanding under the line of credit and approximately $66,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $741,000 at March 31, 1997), of which $354,000 was outstanding as of March 31, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At March 31, 1997 outstanding term loan borrowings totalled approximately 3.4 million Norwegian krone (approximately $504,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for fiscal 1994, 1995 and 1996 and for the nine-month period ended March 31, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

28

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 332 of 2711

imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the nine-month period ended March 31, 1997, approximately 28.4% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take

<PAGE>

advantage of the growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 333 of 2711

locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

30

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in the nine-month period ended March 31, 1997.

   In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995 and 1996, approximately 28.7% and 33.1%, respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| Rapiscan 19 (single energy)<br>Rapiscan 119 (single energy) | Inspection of incoming package | Embassies<br>Post offices<br>Courthouses<br>High risk office buildings<br>Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Airport hand carried and checked baggage<br>Pallet inspection<br>Customs inspections<br>Agriculture inspection | Airports<br>Cruise ships<br>Freight shippers<br>Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During the nine-month period ended March 31, 1997, sales of the walk-through and hand-held metal detectors constituted 1.8% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the twelve-month period ended March 31, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who

purchased more than $100,000 of optoelectronic products; and (ii) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 22.7% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 12.0% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 9 |
| Medical Monitoring | 9.5% | Datascope<br>BioChem International<br>Criticare Systems | 11 |
| Analytical and Medical Diagnostics Equipment | 6.7% | Johnson & Johnson<br>Leica<br>Bausch & Lomb | 10 |
| Office Automation and Computer Peripherals | 6.3% | Xerox<br>Eastman Kodak<br>Hewlett-Packard | 6 |
| Construction, Robotics and Industrial Automation | 4.9% | 3M<br>Spectra Physics<br>Baumer Electric | 8 |
| Military/Defense and Weapons Simulations | 3.3% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 5 |
| Colorometry and Particle Analyzers | 1.2% | Coulter Electronics<br>CILAS<br>Accuracy Microsensors | 3 |
| Bar Code Scanners | 1.1% | Symbol Technologies<br>Intermec | 2 |
| Gaming Industry | 1.1% | Bally Gaming<br>Dixie Narco | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |

| | |
|---|---|
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 25 independent sales representatives and distributors. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 21 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 70 independent sales representatives. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection products sales staff is supported by a service organization of approximately 25 persons located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996, and for the nine-month period ended March 31, 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.1%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 338 of 2711

optoelectronic solutions for their specific needs when standard components or subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the

<PAGE>

implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of March 31, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 32 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and nine-month period ended March 31, 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $1.7 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser

printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

36

<PAGE>

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in

customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

<PAGE>

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At March 31, 1997, the Company's backlog products totalled approximately $57.7 million, compared to approximately $27.5 million at March 31, 1996. Substantially all of the Company's backlog as of March 31, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any

future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of March 31, 1997, the Company employed approximately 730 people, of whom 570 were employed in manufacturing, 32 in research and development, 62 in finance and administration, 44 in sales and marketing, and 25 in its service organization. Of the total employees, approximately 470 were employed in the United States, 100 were employed in Europe, 160 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

38

<PAGE>

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 342 of 2711

also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement, contributory infringement and inducement thereof. Lunar and UAB seek damages in an

<PAGE>

unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

Rapiscan U.S.A. is also involved in a dispute with Quantum Magnetics, Inc. ("Quantum"), EG&G Astrophysics, and EG&G Inc., which is EG&G Astrophysics' parent company. The dispute relates to Rapiscan U.S.A.'s July 5, 1996 agreement with Quantum to collaborate in the production and marketing of airport security and inspection scanners (the "July 5 Agreement"). On July 25, 1996, Quantum informed Rapiscan U.S.A. that Quantum was terminating the July 5 Agreement, although Rapiscan U.S.A. contends that this action constituted a breach of the July 5 Agreement.

On August 5, 1996, EG&G Astrophysics filed suit against Rapiscan U.S.A. in the Superior Court of the State of California, County of Los Angeles. EG&G Astrophysics claims that by entering into the July 5 Agreement, Rapiscan U.S.A. interfered with EG&G Astrophysics' own pre-existing contractual right to market scanners with Quantum. EG&G Astrophysics also asserts that Rapiscan U.S.A. falsely represented that Rapiscan U.S.A.'s security and inspection scanners were just as effective as EG&G Astrophysics' scanners, and that replacing EG&G Astrophysics' scanners with Rapiscan U.S.A.'s security and inspection scanners would be cost efficient. EG&G Astrophysics' First Amended Complaint contains six causes of action: intentional inducement of breach of contract, intentional interference with contract, intentional interference with economic relations, negligent interference with economic relations, slander per se, and trade libel. EG&G Astrophysics seeks compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. On December 14, 1996, the Court dismissed EG&G Astrophysics' slander per se and trade libel claims, without leave to amend. The Company believes that the remaining claims of EG&G Astrophysics are without merit and has received an opinion from its litigation counsel that the Company will be able to defend the lawsuit without any liability to Rapiscan U.S.A.

Rapiscan U.S.A. has filed a cross-complaint against Quantum, EG&G Astrophysics, and EG&G, Inc. Rapiscan U.S.A.'s First Amended Cross-Complaint asserts four causes of action against Quantum: breach of written contract, intentional misrepresentation, negligent misrepresentation and indemnity.

Rapiscan U.S.A. alleges that Quantum made a series of misrepresentations in connection with the July 5 Agreement and that it failed to honor that agreement.

With respect to EG&G Astrophysics and EG&G, Inc., Rapiscan U.S.A. seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. Rapiscan U.S.A. alleges that EG&G Astrophysics and EG&G, Inc. interfered with Rapiscan U.S.A.'s relationship with Quantum and made false representations concerning Rapiscan U.S.A.'s solvency and its ability to fulfill its obligations. In addition, Rapiscan U.S.A. asserts that EG&G, Inc. breached an agreement not to disclose information pertaining to the prior resolution of a patent dispute between Rapiscan U.S.A. and EG&G, Inc.

<PAGE>

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

<PAGE>

## MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |
| Manoocher Mansouri Aliabadi............. | 41 | Vice President - Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 54 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 70 | Director |

</TABLE>

- ---------------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of

the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

42

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 345 of 2711

provided service as an independent consultant to CUI Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the animal food and waste product business. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

<PAGE>

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1996, each non-employee Director received, as additional director compensation, options to purchase 11,250 shares of Common Stock at an exercise price of $2.00 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

   During the fiscal year ended June 30, 1996, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension Fund, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension fund by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1996, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION SALARY | ANNUAL COMPENSATION BONUS | LONG TERM COMPENSATION SECURITIES UNDERLYING OPTIONS (#) |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Deepak Chopra(1)........ Chief Executive Officer | $317,107 | $25,000 | 0 |
| Ajay Mehra ............. Chief Financial Officer | 150,342 | 8,000 | 0 |
| Andreas F. Kotowski .... President of U.S. Operation, Rapiscan U.S.A. | 113,357 | 0 | 0 |
| Manoocher Mansouri Aliabadi............... Vice President--Corporate Marketing, UDT Sensors | 95,075 | 5,000 | 0 |
| Thomas K. Hickman ...... Managing Director, OSI Malaysia and OSI Singapore | 125,466 | 0 | 15,000 |

</TABLE>

- ---------------------
(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr.

Chopra. The value of such benefit is not susceptible to precise determination.

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

45

<PAGE>

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in August 1996 based on their performances during the fiscal year ended June 30, 1996.

Option Grants. The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1996:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

POTENTIAL REALIZABLE
VALUE AT ASSUMED

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | EXPIRATION DATE | ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Thomas K. Hickman(2).... | 15,000 | 87.0% | 2.50 | 6/3/01 | $ 10,361 | $ 22,894 |

- ---------------------
(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.
(2) This grant was made in June 1996. One half of the total number of options granted was exercisable on the first anniversary of the grant date; one quarter is exercisable on each of the second and third anniversary dates.

Option Exercises and Fiscal Year-End Values. The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1996 and held by them on June 30, 1996:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES

| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) EXERCISABLE | UNEXERCISABLE | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) EXERCISABLE | UNEXERCISABLE |
|---|---|---|---|---|---|---|
| Deepak Chopra........... | 0 | -- | 0 | 0 | 0 | 0 |
| Ajay Mehra.............. | 2,250 | $27,375 | 46,500 | 7,500 | 532,850 | 83,750 |
| Andreas F. Kotowski..... | 0 | -- | 0 | 0 | 0 | 0 |
| Manoocher Mansouri Aliabadi............... | 3,000 | $36,500 | 12,750 | 1,500 | 150,125 | 17,250 |
| Thomas K. Hickman....... | 0 | -- | 10,500 | 19,500 | 119,175 | 216,125 |

- ---------------------
(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

46

<PAGE>

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 349 of 2711

transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of May 31, 1997, 384,375 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 430,500 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 235,125 shares remained available for grant. As of such date, stock options to purchase 381,188 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and

<PAGE>

employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 350 of 2711

To the extent non-qualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows

<PAGE>

the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnification Agreements will also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a total of 159,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) an agreement by the Company to issue to the holders of the Option Shares up to 45,486 additional shares of Common Stock based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ending June 30, 1997. The number of shares to be issued after June 30, 1997 cannot yet be accurately established. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants

and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result, certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin

<PAGE>

is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 for such services during fiscal 1996 and approximately $87,000 for such services during the nine-month period ended March 31, 1997. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 for such services during fiscal 1996 and approximately $64,000 for such services during the nine-month period ended March 31, 1997.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as

of May 31, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | NUMBER OF SHARES BEING OFFERED(2) | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | | NUMBER | PERCENT |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.6% | 148,148 | 1,726,852 | 18.3% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 19.1 | 47,593 | 1,122,782 | 11.9 |
| Deepak Chopra(6)(8)............. | 1,539,484 | 25.0 | 0 | 1,539,484 | 16.2 |
| Ajay Mehra(9)................... | 193,413 | 3.1 | 0 | 193,413 | 2.0 |
| Andreas F. Kotowski(10)......... | 110,852 | 1.8 | 0 | 110,852 | 1.2 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12)........... | 27,000 | * | 0 | 27,000 | * |
| Steven C. Good(13).............. | 40,500 | * | 21,896 | 18,604 | * |
| Madan G. Syal(14)............... | 241,125 | 3.9 | 25,926 | 215,199 | 2.3 |
| Meyer Luskin(15)................ | 20,625 | * | 0 | 20,625 | * |
| Good Swartz & Berns Pension Fund(16)....................... | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birender Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.3 | 9,259 | 68,420 | * |
| Mohinder and Ranjana Chopra..... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.1 | 9,259 | 56,098 | * |
| Martha B. Holmes................ | 60,000 | * | 9,259 | 50,741 | * |
| Taheri and Durriya Rangwala..... | 52,500 | * | 7,407 | 45,093 | * |
| Cynthia G. Fleischer............ | 15,750 | * | 15,750 | 0 | -- |
| Gary F. Fleischer............... | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Fleischer........... | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold and Hope Anisgarten...... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra..................... | 1,607 | * | 450 | 1,157 | * |
| Surendra and Kala Jain(17)...... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka................... | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka.................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons).................... | 2,259,106 | 35.9 | 47,822 | 2,211,284 | 23.0 |

</TABLE>

- ---------------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of May 31, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders

if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (79,260); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333); Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension Fund (3,309); Leila and Birender Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder and Ranjana Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Martha B. Holmes (9,259); Taheri and Durriya Rangwala (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette Moore (7,407); Robert Kephart (5,556); Phillip M. Wascher (7,407); Charan Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Allan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Li (741); Mark and Penny Berns Trust (1,518); Arnold and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette Moore, Robert Kephart, Phillip M. Wascher, Charan Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Allan J. Barnard, Christine Williams, Christopher Chin, Khai Li, Louis Peters and Lincoln Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,647,592, 17.4%); Sally F. Chamberlain (1,073,152, 11.3%); Deepak Chopra (1,354,299, 14.3%); Ajay Mehra (160,080, 1.7%); Andreas F. Kotowski (92,333); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,296); Steven C. Good (3,000); Madan G. Syal (196,680, 2.1%); Good Swartz & Berns Pension Fund (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder and Ranjana Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Martha B. Holmes (41,482); Taheri and Durriya Rangwala (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); Bette Moore (28,218); Robert Kephart (22,944); Phillip M. Wascher (19,593); Charan Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Allan J. and Pamela Barnard (8,382); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (11,019); Khai Li (8,409); Mark and Penny Berns Trust (2,232); Arnold and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. 37,500 shares of the 49,125 shares are issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See "Management."

(9) Includes 75,000 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mehra is the Vice President, Chief Financial

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 355 of 2711

Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

53

<PAGE>

(13) Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 18,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See "Management."

(14) Includes 217,500 shares held jointly by Mr. Syal and his wife, Mohini Syal. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 5,625 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good.

(17) Includes 6,429 shares held by Surendra Jain M.D. Inc.

54

<PAGE>

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

COMMON STOCK

As of May 31, 1997, 6,128,874 shares of Common Stock were outstanding, held of record by 73 shareholders. After completion of the Offering, there will be 9,458,874 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including

economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,458,874 shares of Common Stock outstanding (assuming no exercise of stock options after May 31, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,758,874 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,731,000 Restricted Shares (or approximately 5,176,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 94,589 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance

under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

56

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

<TABLE>
<CAPTION>

| UNDERWRITER | NUMBER OF SHARES |
|---|---|
| Robertson, Stephens & Company LLC.................................... | |
| William Blair & Company, L.L.C....................................... | |
| Volpe Brown Whelan & Company, LLC.................................... | |
| Total.............................................................. | 3,700,000 |

</TABLE>

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in the Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,731,000 shares of the Company's Common Stock outstanding prior to the Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 358 of 2711

shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,731,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the

57

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company has agreed that until the expiration of the lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in the Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with the Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with the Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

58

<PAGE>

LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the

Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

## EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

## ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

## OSI SYSTEMS, INC.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Report of Independent Auditors | F-2 |
| Consolidated Balance Sheets as of June 30, 1995, 1996, and March 31, 1997. | F-3 |
| Consolidated Statements of Operations for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997 | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1997 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

</TABLE>

<PAGE>

## REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems,

Inc. (the "Company") and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the related consolidated statements of operations, shareholders' equity, and cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the results of their operations and their cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994 in conformity with generally accepted accounting principles.

Deloitte & Touche llp

Los Angeles, California
June 12, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| ASSETS (NOTE 4) | | | |
| Current Assets: | | | |
| Cash | $ 1,405 | $ 581 | $ 1,612 |
| Accounts receivable, net of allowance for doubtful accounts of $53, $276 and $294 at June 30, 1995, June 30, 1996 and March 31, 1997, respectively (Note 1) | 12,841 | 13,295 | 15,450 |
| Other receivables (Note 2) | 589 | 783 | 1,643 |
| Inventory (Note 1) | 10,069 | 13,642 | 15,472 |
| Prepaid expenses | 388 | 633 | 665 |
| Deferred income taxes (Notes 1 and 7) | 490 | 700 | 1,127 |
| Total current assets | 25,782 | 29,634 | 35,969 |
| Property and Equipment, Net (Notes 1 and 4): | 4,257 | 4,454 | 5,654 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 741 | 1,221 | 2,691 |
| Total | $30,780 | $35,309 | $44,314 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
| Current Liabilities: | | | |
| Bank lines of credit (Note 4) | $ 1,452 | $ 7,783 | $ 6,723 |
| Current portion of long-term debt (Note 6 and 13) | 1,232 | 1,491 | 1,601 |
| Current portion of senior subordinated debt (Note 5) | | 2,500 | |
| Accounts payable | 6,402 | 6,522 | 7,665 |
| Accrued payroll and related expenses | 960 | 1,667 | 1,587 |

| | | | |
|---|---|---|---|
| Income taxes payable........................... | 347 | 790 | 1,759 |
| Advances from customers........................... | 36 | 219 | 2,733 |
| Other accrued expenses and current liabilities..... | 3,436 | 2,609 | 3,961 |
| Total current liabilities........................ | 13,665 | 23,590 | 26,029 |
| Bank Line of Credit (Note 4)......................... | 4,829 | | |
| Senior Subordinated Debt (Note 5).................... | 3,075 | 575 | |
| Long-Term Debt (Note 6 and 13)....................... | 3,525 | 3,113 | 3,063 |
| Deferred Income Taxes (Notes 1 and 7)................ | 629 | 827 | 240 |
| Minority Interest (Note 1)........................... | 106 | 10 | |
| Total liabilities................................ | 25,829 | 28,115 | 29,332 |
| Commitments and Contingencies (Notes 8 and 13) | | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1995 and 1996 and 2,568,750 shares at March 31, 1997 (Note 10)............................................ | 1,514 | 1,514 | 4,014 |
| Common stock, no par value; authorized, 4,500,000 shares; issued and outstanding, 1,842,007, 1,858,132 and 2,207,124 shares at June 30, 1995 and 1996 and March 31, 1997, respectively......... | 543 | 560 | 2,913 |
| Retained earnings................................. | 2,735 | 4,994 | 7,928 |
| Cumulative foreign currency translation adjustment (Note 1)........................................ | 159 | 126 | 127 |
| Total shareholders' equity....................... | 4,951 | 7,194 | 14,982 |
| Total.......................................... | $30,780 | $35,309 | $44,314 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| | | | | (Unaudited) | |
| Revenues................. | $47,735 | $49,815 | $ 61,518 | $ 44,994 | $ 55,973 |
| Cost of goods sold....... | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit............. | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses (Note 11 and 12)....... | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development (Note 1)............... | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation (Note 9).. | | | | | 856 |
| Total operating expenses. | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations... | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense (Notes 4, 5, 6 and 11)......... | 710 | 1,251 | 1,359 | 1,026 | 900 |

Income before provision

| | | | | | |
|---|---|---|---|---|---|
| for income taxes and minority interest....... | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes (Notes 1 and 7)... | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest in net loss of subsidiaries............ | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest in net loss of subsidiaries (Note 1)................ | 38 | 17 | 117 | 28 | -- |
| Net income............... | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Historical net income.... | | | $ 2,259 | $ 1,546 | $ 2,934 |
| Interest on subordinated debt, net of income taxes................... | | | 166 | 125 | 92 |
| Minority interest in net loss of subsidiaries.... | | | (117) | (28) | -- |
| Pro forma net income..... | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share (Note 1).......... | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Weighted average common shares used in the calculation of pro forma net income per share.... | | | 6,308,126 | 6,304,158 | 6,327,234 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1993... | 1,123,750 | $1,124 | 1,628,257 | $ 335 | $ 790 | $ 6 | $ 2,255 |
| Exercise of stock options.............. | -- | -- | 75,000 | 28 | -- | -- | 28 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 58 | 58 |
| Net income............ | -- | -- | -- | -- | 787 | -- | 787 |
| BALANCE, JUNE 30, 1994.. | 1,123,750 | 1,124 | 1,703,257 | 363 | 1,577 | 64 | 3,128 |
| Exercise of stock options.............. | 35,000 | 70 | 60,000 | 75 | -- | -- | 145 |
| Conversion of debt.... | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 95 | 95 |
| Net income............ | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995.. | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options.............. | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment........... | -- | -- | -- | -- | -- | (33) | (33) |
| Net income............ | -- | -- | -- | -- | 2,259 | -- | 2,259 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 363 of 2711

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BALANCE, JUNE 30, 1996... | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options.............. | -- | -- | 49,500 | 79 | -- | -- | 79 |
| Conversion of debt.... | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions......... | -- | -- | 178,956 | 1,193 | -- | -- | 1,193 |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 1 | 1 |
| Net income............ | -- | -- | -- | -- | 2,934 | -- | 2,934 |
| BALANCE, MARCH 31, 1997. | 2,568,750 | $4,014 | 2,207,124 | $2,913 | $7,928 | $127 | $14,982 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | | | |
| Net income.................. | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest in net loss of subsidiaries...... | (38) | (17) | (117) | (28) | |
| Provision for losses on accounts receivable....... | 150 | (70) | 404 | 346 | 97 |
| Depreciation and amortization............. | 1,074 | 1,551 | 2,014 | 1,426 | 1,686 |
| Stock option compensation.. | | | | | 856 |
| Deferred income taxes...... | (150) | 240 | (12) | -- | (1,014) |
| Gain on sale of property and equipment............ | (22) | (11) | (13) | -- | |
| Changes in operating assets and liabilities, net of business acquisition: | | | | | |
| Accounts receivable...... | (7,289) | (1,239) | (858) | (397) | (1,582) |
| Other receivables........ | (541) | 226 | (194) | (800) | (827) |
| Inventory................ | (2,059) | (2,599) | (4,068) | (4,113) | (1,444) |
| Prepaid expenses......... | 28 | (139) | (245) | (253) | (32) |
| Accounts payable......... | 2,973 | 221 | 120 | 1,657 | 980 |
| Accrued payroll and related expenses........ | (232) | 191 | 707 | 36 | (80) |
| Income taxes payable..... | 113 | (217) | 652 | 595 | 960 |
| Advances from customers.. | (22) | 9 | 183 | (3) | 1,771 |
| Other accrued expenses and current liabilities............ | 3,470 | (87) | (827) | (1,214) | 806 |
| Net cash provided by (used in) operating activities........... | (1,758) | (783) | 5 | (1,202) | 5,111 |

| | | | | | |
|---|---|---|---|---|---|
| Cash flows from investing activities: | | | | | |
| Proceeds from sale of property and equipment..... | 70 | 142 | 120 | | |
| Additions to property and equipment.................. | (1,459) | (1,396) | (1,612) | (1,287) | (1,530) |
| Cash paid for business acquisition, net of cash acquired................... | | | | | (302) |
| Cash paid for minority interest................... | | (160) | | | |
| Other assets................ | (14) | (662) | (688) | (273) | 135 |
| Net cash used in investing activities.. | (1,403) | (2,076) | (2,180) | (1,560) | (1,697) |
| Cash flows from financing activities: | | | | | |
| Net proceeds from (repayment of) bank lines of credit... | 2,227 | 2,668 | 1,502 | 2,382 | (1,363) |
| Payments on senior subordinated debt.......... | | (700) | | | (350) |
| Payments on junior subordinated debt.......... | | (280) | | | |
| Payments on long-term debt.. | (660) | (1,095) | (1,250) | (1,000) | (3,399) |
| Proceeds from issuance of long-term debt............. | 1,191 | 2,806 | 1,097 | 558 | 2,646 |
| Proceeds from exercise of stock options and warrants. | 28 | 145 | 17 | 17 | 79 |
| Proceeds from issuance of minority interest.......... | 1 | | 21 | 20 | |
| Net cash provided by (used in) financing activities............ | 2,787 | 3,544 | 1,387 | 1,977 | (2,387) |
| Effect of exchange rate changes on cash............. | 58 | 95 | (36) | -- | 4 |
| Net (decrease) increase in cash......................... | (316) | 780 | (824) | (785) | 1,031 |
| Cash, beginning of period..... | 941 | 625 | 1,405 | 1,405 | 581 |
| Cash, end of period........... | $ 625 | $ 1,405 | $ 581 | $ 620 | $ 1,612 |
| Supplemental disclosures of cash flow information--Cash paid during the period for: | | | | | |
| Interest.................... | $ 691 | $ 1,229 | $ 1,346 | $ 992 | $ 902 |
| Income taxes................ | $ 620 | $ 82 | $ 377 | $ 368 | $ 1,261 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-6

<PAGE>

- --------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During the nine months ended March 31, 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During the nine months ended March 31, 1997, the Company acquired the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 365 of 2711

minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock. The excess of the fair value of the common stock of $1,193 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

| | |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (370) |
| Liability incurred | (546) |
| Liabilities assumed | $2,022 |

See accompanying notes to consolidated financial statements.

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In September and November 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares, if any, to be issued is based upon the net income of the subsidiary for the year ended June 30, 1997, not to exceed 45,486 shares.

Unaudited Interim Financial Information -- The accompanying consolidated statements of income and of cash flows for the nine months ended March 31, 1996 have been prepared in accordance with generally accepted accounting principles for interim periods and are unaudited; however, in management's opinion, they include all adjustments (consisting of only normal recurring adjustments) necessary for a fair presentation of results for such interim periods.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic

dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Raw materials | $ 5,004 | $ 7,795 | $ 9,122 |
| Work-in-process | 2,597 | 3,114 | 4,300 |
| Finished goods | 2,468 | 2,733 | 2,050 |
| Total | $10,069 | $13,642 | $15,472 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Equipment | $5,247 | $ 6,280 | $ 7,438 |
| Leasehold improvements | 1,426 | 1,601 | 1,963 |
| Tooling | 1,397 | 1,558 | 1,775 |
| Furniture and fixtures | 626 | 488 | 570 |
| Computer equipment | 1,025 | 1,283 | 1,639 |
| Vehicles | 122 | 93 | 152 |
| Total | 9,843 | 11,303 | 13,537 |
| Less accumulated depreciation and amortization | 5,586 | 6,849 | 7,883 |
| Property and equipment, net | $4,257 | $ 4,454 | $ 5,654 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):
<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Software development costs | $494 | $ 588 | $ 588 |
| Goodwill | -- | -- | 1,769 |
| Deposits | 168 | 262 | 227 |
| Other | 111 | 524 | 426 |

| | | | |
|---|---|---|---|
| Total | 773 | 1,374 | 3,010 |
| Less accumulated amortization | 32 | 153 | 319 |
| Intangible and other assets, net | $741 | $1,221 | $2,691 |

</TABLE>

Goodwill in the amount of $1,181,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the nine months ended March 31, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

F-9

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996, (unaudited) and 1997, respectively.

Earnings Per Share -- Historical net income per share is not presented because it is not indicative of the ongoing operations of the Company. Pro forma net income and net income per share has been presented to reflect the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 368 of 2711

effect of the conversion of certain subordinated debt into preferred stock and the subsequent conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Pro forma earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from convertible debt and stock options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the pro forma weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period for which pro forma earnings per share is presented.

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at March 31, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and the nine months ended March 31, 1997, the Company earned a technical fee from the joint venture in the amount of $200,000 and $115,000, respectively. At March 31, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The purchase price of $916,000 consisted of cash of $370,000 with the balance of $546,000 payable by June 15, 1997. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1993, pro forma consolidated sales for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 would have been $50,735,000, $53,338,000, $65,371,000, $47,827,000 and $58,557,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1995 and 1996 and March 31, 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Line of credit -- U.S. | $4,829 | $6,361 | $4,927 |
| Line of credit -- Singapore | 1,452 | 1,422 | 1,442 |
| Line of credit -- Norway | | | 354 |
| Total bank lines of credit | $6,281 | $7,783 | $6,723 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At March 31, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. No amounts were outstanding under this agreement at March 31, 1997. The agreement also provides a commitment for letters of credit up to $5,000,000. At March 31, 1997 approximately $1,997,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank,

which provides for revolving line of credit borrowings up to 2,[illegible]00,000 Singapore dollars (approximately $1,800,000 at March 31, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $741,000 at March 31, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at March 31, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,050,000 at March 31, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,230,000 at March 31, 1997) and a 500,000 pound sterling (approximately $820,000 at March 31, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at March 31, 1997) plus 2%. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $134,000 was outstanding under performance bonds at March 31, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $1,000,000 at March 31, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at March 31, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the nine months ended March 31, 1997, all of the debt outstanding under the various agreements was repaid or converted as summarized in the following table (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | | MARCH 31, |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996.................................... | $2,500 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996................................. | 350 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, | | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 371 of 2711

| | | | |
|---|---|---|---|
| 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | 175 | -- |
| Total senior subordinated debt | 3,075 | 3,075 | -- |
| Less current portion | -- | 2,500 | -- |
| Total long-term portion | $3,075 | $ 575 | $-- |

</TABLE>

F-13

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

6. LONG-TERM DEBT

At June 30, 1995 and 1996 and March 31, 1997, long-term debt consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in January 1997 | $2,240 | $1,667 | -- |
| Term loan payable to a bank, interest due mothly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 950 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | -- | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001 | -- | -- | $2,500 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,148 until paid in full on June 1, 2001 | -- | -- | 504 |
| Term loan payable, interest accrued monthly at 8.00%, paid in full on April 2, 1997 | -- | -- | 296 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 242 | 141 | 62 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.66% at March 31, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,300 | 1,000 | 700 |
| Other | 25 | 535 | 602 |
| | 4,757 | 4,604 | 4,664 |
| Less current portion of long-term debt | 1,232 | 1,491 | 1,601 |
| Long-term portion of debt | $3,525 | $3,113 | $3,063 |

</TABLE>

Fiscal year principal payments of long-term debt as of March 31, 1997 are as follows (in thousands):

<TABLE>

| <S> | <C> |
|---|---|
| 1997 (3 months) | $ 555 |
| 1998 | 1,278 |
| 1999 | 1,317 |
| 2000 | 896 |
| 2001 | 618 |
| Total | $4,664 |

</TABLE>

F-14

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Pretax income: | | | | | |
| United States | $ 547 | $1,277 | $1,965 | $1,053 | $1,904 |
| Foreign | 1,016 | 277 | 1,288 | 1,252 | 2,013 |
| Total pretax income | $1,563 | $1,554 | $3,253 | $2,305 | $3,917 |

</TABLE>

The Company's provision for income taxes is comprised of the following (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Current: | | | | | |
| Federal | $ 487 | $ 43 | $ 510 | $364 | $ 1,286 |
| State | 139 | 3 | 21 | 16 | 54 |
| Foreign | 338 | 127 | 592 | 407 | 657 |
| | 964 | 173 | 1,123 | 787 | 1,997 |
| Deferred | (150) | 240 | (12) | -- | (1,014) |
| Total provision | $ 814 | $413 | $1,111 | $787 | $ 983 |

</TABLE>

Deferred income tax assets (liabilities) at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>

<CAPTION> 

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Expenses not currently deductible | $ 518 | $ 873 | $ 1,491 |
| State income taxes | 49 | -- | -- |
| Other | 143 | -- | 411 |
| Total deferred income tax assets | 710 | 873 | 1,902 |
| Depreciation | (309) | (145) | (82) |
| Capitalized software development costs | (158) | (214) | (154) |
| State income taxes | | (173) | (365) |
| Revitalization zone deductions | (182) | (278) | (354) |
| Other | (200) | (190) | (60) |
| Total deferred income tax liabilities | (849) | (1,000) | (1,015) |
| Net deferred income taxes | $(139) | $ (127) | $ 887 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1994 | 1995 | 1996 | NINE MONTHS ENDED MARCH 31, 1996 (Unaudited) | 1997 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Provision for income taxes at federal statutory rate | 35.0 % | 35.0 % | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit | 1.3 | (2.6) | 0.2 | 0.2 | (5.2) |
| Nontaxable earnings of FSC | (3.8) | (7.1) | (5.7) | (5.7) | (5.8) |
| Research and development tax credits | -- | (2.8) | -- | -- | (2.3) |
| Foreign income subject to tax at other than federal statutory rate | 3.2 | 0.7 | 1.1 | 1.1 | 0.2 |
| Government settlement | 16.8 | -- | -- | -- | -- |
| Other | (0.4) | 3.4 | 3.6 | 3.6 | 3.2 |
| Effective income tax rate | 52.1 % | 26.6 % | 34.2 % | 34.2 % | 25.1 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At March 31, 1997 undistributed earnings of the foreign subsidiaries amounted to $3,022,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal

options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of March 31, 1997 are as follows: (3 months) 1997, $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $825,000, $959,000, $901,000, $725,000, and $670,000 for the years ended June 30, 1994, 1995, and 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

Additional litigation involves claims that the Company interfered with pre-existing contractual rights of the plaintiff, who is claiming breach of contract and interference with contract, and is seeking compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. The Company has filed

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

a cross-complaint claiming breach of contract and misrepresentation and seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. The Company has been informed by its counsel that the Company will be able to defend the lawsuit without any liability to the Company.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect on the Company's consolidated financial statements.

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the nine months ended March 31, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Outstanding, July 1, 1993 | 355,125 | $1.10 | $ 390,000 |
| Granted | 37,500 | 2.33 | 88,000 |
| Exercised | (75,000) | 0.37 | (28,000) |
| Canceled | (9,750) | 1.03 | (10,000) |
| Outstanding, July 1, 1994 | 307,875 | 1.43 | 440,000 |
| Granted | 69,000 | 2.00 | 138,000 |
| Exercised | (60,000) | 1.25 | (75,000) |
| Canceled | (19,500) | 1.77 | (34,000) |
| Outstanding, July 1, 1995 | 297,375 | 1.57 | 469,000 |
| Granted | 51,000 | 2.17 | 111,000 |
| Exercised | (16,125) | 1.06 | (17,000) |
| Canceled | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996 | 318,375 | 1.70 | 541,000 |
| Granted | 235,125 | 2.98 | 701,000 |
| Exercised | (49,500) | 1.60 | (79,000) |
| Canceled | (5,250) | 2.00 | (10,000) |
| Outstanding, March 31, 1997 | 499,125 | $2.31 | $1,153,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of March 31, 1997:

<TABLE>
<CAPTION>

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING: NUMBER OUTSTANDING AT MARCH 31, 1997 | OPTIONS OUTSTANDING: WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | OPTIONS OUTSTANDING: WEIGHTED AVERAGE EXERCISE PRICE | OPTIONS EXERCISABLE: EXERCISABLE AT MARCH 31, 1997 | OPTIONS EXERCISABLE: WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| $0.17 to 0.67 | 58,500 | 0.8 years | $0.45 | 58,500 | $0.45 |
| 1.87 to 2.00 | 150,750 | 2.3 | 1.95 | 118,688 | 1.94 |
| 2.33 to 3.33 | 289,875 | 4.1 | 2.87 | 272,625 | 2.89 |
| $0.17 to 3.33 | 499,125 | 3.2 | $2.31 | 449,813 | $2.32 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and for the nine months ended March 31, 1997 pursuant to SFAS 123 was approximately $19,000 and $1,045,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $2,913,000, and pro forma net income per share would have been $0.36 and $0.46 for 1996 and for the nine months ended March 31, 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.28% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

Preferred stock is entitled to the same one vote per share as common stock and has a liquidation preference of $1.00 per preferred share.

In June 1997 holders of the preferred stock converted each preferred share into 1.5 shares of common stock.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 are approximately $61,000, $77,000, $83,000, $65,000, and $87,000 for messenger service and auto rental; $68,000, $78,000, $63,000, $42,000 and $64,000 for printing services; and $10,000, $23,000, $7,000, $7,000 and $3,000 for professional services, respectively. During the nine months ended March 31, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $302,000, $315,000, $263,000, $197,000 and $146,000 for the years ended June 30, 1994, 1995, 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and included in selling, general and administrative expense in the accompanying statement of operations for the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At March 31, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

   13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the nine months ended March 31, 1997 and 1996 (unaudited) or for the years ended June 30, 1996, 1995 and 1994. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

to provide for benefits accruing after that date. Pension expense for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 was approximately $89,000, $111,000, $91,000, $67,000 and $64,000, respectively.

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1994 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues | $29,788 | $13,624 | $4,323 | | $47,735 |
| Transfer between geographical areas | 1,551 | 742 | 882 | $ (3,175) | -- |
| Net revenues | $31,339 | $14,366 | $5,205 | $ (3,175) | $47,735 |
| Operating income | $ 1,028 | $ 564 | $ 653 | $ 28 | $ 2,273 |
| Identifiable assets | $29,266 | $ 9,629 | $2,923 | $(16,011) | $25,807 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1995 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues | $33,158 | $11,341 | $5,316 | | $49,815 |
| Transfer between geographical areas | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues | $34,856 | $12,129 | $9,147 | $ (6,317) | $49,815 |
| Operating income | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets | $36,751 | $10,832 | $4,839 | $(21,642) | $30,780 |

</TABLE> 

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1996 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas...................... | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues................ | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income............ | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets.......... | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

</TABLE>

<TABLE>
<CAPTION>

| | NINE MONTHS ENDED MARCH 31, 1997 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $41,241 | $12,388 | $ 2,344 | | $55,973 |
| Transfer between geographical areas...................... | 5,691 | 3,461 | 9,091 | $(18,243) | -- |
| Net revenues................ | $46,932 | $15,849 | $11,435 | $(18,243) | $55,973 |
| Operating income............ | $ 2,691 | $ 1,040 | $ 1,190 | $ (104) | $ 4,817 |
| Identifiable assets.......... | $47,836 | $13,362 | $ 8,262 | $(25,146) | $44,314 |

</TABLE>

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

    The Company's security and inspection products are used for security purposes at locations such as airports, courthouses, government buildings, nuclear facilities, mail rooms, schools and prisons. In addition, the security and inspections products are also increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

| <S> | <C> |
|---|---|
| Securities and Exchange Commission registration fee.............. | $ 18,052 |
| NASD filing fee.................................................. | 6,457 |
| Nasdaq National Market System listing fee........................ | 26,275 |
| Printing and engraving expenses.................................. | 100,000 |
| Transfer agent and registrar fees................................ | 2,000 |
| Legal fees and expenses.......................................... | 175,000 |
| Accounting fees and expenses..................................... | 150,000 |
| "Blue sky" fees and expenses..................................... | 15,000 |
| Other expenses................................................... | 167,216 |
| | -------- |
| Total.......................................................... | $660,000* |
| | ======== |

</TABLE>

- ---------------------

* The Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a

director's duties, if a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

<PAGE>

action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee, or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect

II-2

<PAGE>

to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful.

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued

in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

<PAGE>

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.* |
| 5.1 | Opinion of Troy & Gould Professional Corporation.* |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 383 of 2711

| | |
|---|---|
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.* |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.* |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnification Agreement for directors and executive officers of the Company.* |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended. |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).* |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(1) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).* |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule.(1) |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office. |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy. |

</TABLE>

- --------
* To be filed by amendment.

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Replaces the exhibit previously filed with the corresponding exhibit number.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements

and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on August 1, 1997.

OSI SYSTEMS, INC.

/s/ DEEPAK CHOPRA

By: ___________________________________

Deepak Chopra
Chairman, Chief Executive Officer
and President

Pursuant to the requirements of the Securities Act of 1933, this amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ DEEPAK CHOPRA<br>- ------------------------------------<br>Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | August 1, 1997 |

| /s/ AJAY MEHRA | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | August 1, 1997 |
|---|---|---|
| Ajay Mehra | | |
| * | Director | August 1, 1997 |
| Steven C. Good | | |
| * | Director | August 1, 1997 |
| Meyer Luskin | | |
| * | Director | August 1, 1997 |
| Madan G. Syal | | |

*By: /s/ DEEPAK CHOPRA August 1, 1997

Deepak Chopra

as Attorney-In-Fact

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994.................. | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, 1995.................. | $203 | (70) | -- | 80 | $ 53 |
| Year Ended June 30, 1996.................. | $ 53 | $404 | -- | 181 | $276 |
| Nine Months Ended March 31, 1997............... | $276 | $ 97 | -- | 79 | $294 |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.* |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 386 of 2711

5.1 Opinion of Troy & Gould Professional Corporation.*
10.1 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1)
10.2 1997 Stock Option Plan and forms of Stock Option Agreements.(2)
10.3 Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1)
10.4 Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1)
10.5 Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.*
10.6 Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1)
10.7 Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.*
10.8 Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2)
10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1)
10.10 Form of Indemnification Agreement for directors and executive officers of the Company.*
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1)
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).*
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1)
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1)
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1)
10.17 License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1)
10.18 Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1)
11.1 Statement regarding computation of earnings per share.(1)
21.1 Subsidiaries of the Company.(1)
23.1 Consent of Deloitte & Touche LLP.
23.2 Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).*
24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.(1)
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.
</TABLE>
- --------

* To be filed by amendment.

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Replaces the exhibit previously filed with the corresponding exhibit number.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.2
<SEQUENCE>2
<DESCRIPTION>1997 STOCK OPTION PLAN & FORM OF STOCK OPTION AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.2

1997 STOCK OPTION PLAN
OF
OSI SYSTEMS, INC.

1. PURPOSES OF THE PLAN

The purposes of the 1997 Stock Option Plan (the "Plan") of OSI Systems, Inc., a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or its Affiliates; and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (the "Code"), or "nonqualified options" ("NQOs").

2. ELIGIBLE PERSONS

Every person who at the date of grant of an Option is an employee of the Company or of any Affiliate (as defined below) of the Company is eligible to receive NQOs or ISOs under this Plan. Every person who at the date of grant is a consultant to, or non-employee director of, the Company or any Affiliate (as defined below) of the Company is eligible to receive NQOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 424(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

3. STOCK SUBJECT TO THIS PLAN; MAXIMUM NUMBER OF GRANTS

Subject to the provisions of Section 6.1.1 of the Plan, the total number of shares of stock which may be issued under Options granted pursuant to this Plan shall not exceed 850,000 shares of Common Stock (which gives effect to a 1.5-for-1 stock split of the Common Stock (the "Stock Split") to be effected in June 1997). The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. No eligible person shall be granted Options during any twelve-month period covering more than 425,000 shares (which gives effect to the Stock Split to be effected in June 1997).
<PAGE>

4. ADMINISTRATION

(a) The Plan shall be administered by the Board of Directors of the Company (the "Board") or by a committee (the "Committee") to which administration of the Plan, or of part of the Plan, is delegated by the Board (in either case, the "Administrator"). The Board shall appoint and remove members of the Committee in its discretion in accordance with applicable laws. If necessary in order to comply with Rule 16b-3 under the Exchange Act and Section 162(m) of the Code, the Committee shall, in the Board's discretion, be comprised solely of "non-employee directors" within the meaning of said Rule 16b-3 and "outside directors" within the meaning of Section 162(m) of the Code. The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

(b) Subject to the other provisions of this Plan, the Administrator

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 388 of 2711

shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the optionee, to modify or amend any Option; (ix) to defer (with the consent of the optionee) the exercise date of any Option; (x) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(c) All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

<PAGE>

5. GRANTING OF OPTIONS; OPTION AGREEMENT

(a) No Options shall be granted under this Plan after 10 years from the date of adoption of this Plan by the Board.

(b) Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Administrator, executed by the Company and the person to whom such Option is granted.

(c) The stock option agreement shall specify whether each Option it evidences is an NQO or an ISO.

(d) Subject to Section 6.3.3 with respect to ISOs, the Administrator may approve the grant of Options under this Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultants at the date of approval, and the date of approval shall be deemed to be the date of grant unless otherwise specified by the Administrator.

6. TERMS AND CONDITIONS OF OPTIONS

Each Option granted under this Plan shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall be also subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 Terms and Conditions to Which All Options Are Subject. All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1 Changes in Capital Structure. Subject to Section 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board in its sole discretion.

6.1.2 Corporate Transactions. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator,

in the exercise of its sole discretion, may permit exercise of any Options prior to their termination, even if such Options were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in

<PAGE>

the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Options prior to consummation of such event, even if such Options were not otherwise exercisable.

6.1.3 Time of Option Exercise. Subject to Section 5 and Section 6.3.4, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) in accordance with a schedule as may be set by the Administrator (in any case, the "Vesting Base Date") and specified in the written stock option agreement relating to such Option. In any case, no Option shall be exercisable until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee. Notwithstanding the foregoing, to the extent required by applicable laws, rules and regulations, the right to exercise Options granted pursuant to this Plan shall vest at the rate of at least 20% per year from the date of grant.

6.1.4 Option Grant Date. The date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

6.1.5 Nontransferability of Option Rights. Except with the express written approval of the Administrator which approval the Administrator is authorized to give only with respect to NQOs, no Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution. During the life of the optionee, an Option shall be exercisable only by the optionee.

6.1.6 Payment. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. The Administrator, in the exercise of its absolute discretion after considering any tax, accounting and financial consequences, may authorize any one or more of the following additional methods of payment:

(a) Acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company);

<PAGE>

(b) Subject to the discretion of the Administrator and the terms of the stock option agreement granting the Option, delivery by the optionee of shares of Common Stock already owned by the optionee for all or part of the Option price, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock; and

(c) Subject to the discretion of the Administrator, through the surrender of shares of Common Stock then issuable upon exercise of the Option,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 390 of 2711

provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by surrender of such stock.

(d) By means of so-called cashless exercises as permitted under applicable rules and regulations of the Securities and Exchange Commission and the Federal Reserve Board.

6.1.7 Termination of Employment. If for any reason other than death or permanent and total disability, an optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), Options held at the date of Termination (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, or such other period of not less than 30 days after the date of such Termination as is specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date); provided, however, that if such exercise of the Option would result in liability for the optionee under Section 16(b) of the Exchange Act, then such three-month period automatically shall be extended until the tenth day following the last date upon which optionee has any liability under Section 16(b) (but in no event after the Expiration Date). If an optionee dies or becomes permanently and totally disabled (within the meaning of Section 22(e)(3) of the Code) while employed by the Company or an Affiliate or within the period that the Option remains exercisable after Termination, Options then held (to the extent then exercisable) may be exercised, in whole or in part, by the optionee, by the optionee's personal representative or by the person to whom the Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of the optionee or any longer period specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date). For purposes of this Section 6.1.7, "employment" includes service as a director or as a consultant. For purposes of this Section 6.1.7, an optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if the optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

5

<PAGE>

6.1.8 Withholding and Employment Taxes. At the time of exercise of an Option and as a condition thereto, or at such other time as the amount of such obligations becomes determinable (the "Tax Date"), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. Such obligation to remit may be satisfied, if authorized by the Administrator in its sole discretion, after considering any tax, accounting and financial consequences, by the optionee's (i) delivery of a promissory note in the required amount on such terms as the Administrator deems appropriate, (ii) tendering to the Company previously owned shares of Stock or other securities of the Company with a fair market value equal to the required amount, or (iii) agreeing to have shares of Common Stock (with a fair market value equal to the required amount) which are acquired upon exercise of the Option withheld by the Company.

6.1.9 Other Provisions. Each Option granted under this Plan may contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

6.1.10 Determination of Value. For purposes of the Plan, the fair market value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is regularly quoted by a recognized securities dealer, and selling prices are reported, its fair market value shall

be the closing price of such stock on the date the value is to be determined, but if selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for such stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

(b) In the absence of an established market for the stock, the fair market value thereof shall be determined in good faith by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry, the Company's management, and the values of stock of other corporations in the same or a similar line of business.

6.1.11 Option Term. Subject to Section 6.3.4, no Option shall be exercisable more than 10 years after the date of grant, or such lesser period of time as is set forth in the stock option agreement (the end of the maximum exercise period stated in the stock option agreement is referred to in this Plan as the "Expiration Date").

<PAGE>

6.2 Terms and Conditions to Which Only NQOs Are Subject. Options granted under this Plan which are designated as NQOs shall be subject to the following terms and conditions:

6.2.1 Exercise Price. (a) Except as set forth in Section 6.2.1(b), the exercise price of a NQO shall be not less than 85% of the fair market value (determined in accordance with Section 6.1.10) of the stock subject to the Option on the date of grant.

(b) To the extent required by applicable laws, rules and regulations, the exercise price of a NQO granted to any person who owns, directly or by attribution under the Code (currently Section 424(d)), stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder") shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3 Terms and Conditions to Which Only ISOs Are Subject. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 Exercise Price. (a) Except as set forth in Section 6.3.1(b), the exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

(b) The exercise price of an ISO granted to any Ten Percent Shareholder shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3.2 Disqualifying Dispositions. If stock acquired by exercise of an ISO granted pursuant to this Plan is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code (a disposition within two years from the date of grant of the Option or within one year after the transfer such stock on exercise of the Option), the holder of the stock immediately before the disposition shall promptly notify the Company in writing of the date and terms of the disposition and shall provide such other information regarding the Option as the Company may reasonably require.

6.3.3 Grant Date. If an ISO is granted in anticipation of

employment as provided in Section 5(d), the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

<PAGE>

6.3.4 Term. Notwithstanding Section 6.1.11, no ISO granted to any Ten Percent Shareholder shall be exercisable more than five years after the date of grant.

7. MANNER OF EXERCISE

(a) An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price and withholding taxes as provided in Sections 6.1.6 and 6.1.8. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price will be considered as the date such Option was exercised.

(b) Promptly after receipt of written notice of exercise of an Option and the payments called for by Section 7(a), the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of stock. An optionee or permitted transferee of the Option shall not have any privileges as a shareholder with respect to any shares of stock covered by the Option until the date of issuance (as evidenced by the appropriate entry on the books of the Company or a duly authorized transfer agent) of such shares.

8. EMPLOYMENT OR CONSULTING RELATIONSHIP

Nothing in this Plan or any Option granted hereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any optionee's employment or consulting at any time, nor confer upon any optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

9. CONDITIONS UPON ISSUANCE OF SHARES

Shares of Common Stock shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act").

10. NONEXCLUSIVITY OF THE PLAN

The adoption of the Plan shall not be construed as creating any limitations on the power of the Company to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options other than under the Plan.

<PAGE>

11. MARKET STANDOFF

Each optionee, if so requested by the Company or any representative of the underwriters in connection with any registration of the offering of any securities of the Company under the Securities Act, shall not sell or otherwise transfer any shares of Common Stock acquired upon exercise of Options during the 180-day period following the effective date of a registration statement of the Company filed under the Securities Act; provided, however, that such restriction shall apply only to the first registration statement of the Company to become

effective under the Securities Act after the date of adoption of this Plan which includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restriction until the end of such 180-day period.

12. AMENDMENTS TO PLAN

The Board may at any time amend, alter, suspend or discontinue this Plan. Without the consent of an optionee, no amendment, alteration, suspension or discontinuance may adversely affect outstanding Options except to conform this Plan and ISOs granted under this Plan to the requirements of federal or other tax laws relating to incentive stock options. No amendment, alteration, suspension or discontinuance shall require shareholder approval unless (a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes or (b) the Board otherwise concludes that shareholder approval is advisable.

13. EFFECTIVE DATE OF PLAN; TERMINATION

This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within twelve months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect from and after expiration of such twelve-month period. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws. This Plan (but not Options previously granted under this Plan) shall terminate within ten years from the date of its adoption by the Board.

14. DELIVERY OF FINANCIAL STATEMENTS

To the extent required by applicable laws, rules and regulations, the Company shall deliver to each optionee financial statements of the Company at least annually while such optionee holds an outstanding Option.

<PAGE>

OSI SYSTEMS, INC.
INCENTIVE STOCK OPTION AGREEMENT

THIS INCENTIVE STOCK OPTION AGREEMENT (the "Agreement"), is made as of the ___ day of _________ 19__ by and between OSI Systems, Inc., a California corporation (the "Company"), and __________________________ ("Optionee").

R E C I T A L

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of an incentive stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, _______________ shares of Common Stock of the Company ("Shares") at the price of

$________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary (fifth anniversary if Optionee owns more than 10% of the voting stock of the Company or an Affiliate of the Company on the date of this Agreement) of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

10.

<PAGE>

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

(C) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. In the event that this Option shall lose its qualification as an incentive stock option, as a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 395 of 2711

Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. In the event this Option is treated as a nonqualified stock option, then and to that extent, "employment" would include service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. This Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor confer upon Optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.3 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that, upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon each exercise thereof he shall furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state or federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms

<PAGE>

and provisions of the Plan, as it may be construed by the Administrator. It is intended that this Option shall qualify as an incentive stock option as defined by Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement shall be construed in a manner which will enable this Option to be so qualified. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. Optionee understands that, under current law, beneficial tax treatment resulting from the exercise of this Option will be available only if certain requirements of the Code are satisfied, including without limitation, the requirement that no disposition of Shares acquired pursuant to exercise of this Option be made within two years from the grant date or within one year after the transfer of Shares to him or her. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form of transfer) of any such Shares, he or she will first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition. In addition to the foregoing, Optionee hereby agrees that before Optionee disposes (whether by sale, exchange, gift, or otherwise) of any Shares acquired by exercise of this Option within two years of the grant date or within one year after the transfer of such Shares to Optionee upon exercise of this Option, Optionee shall promptly notify the Company in writing of the date and terms of the proposed disposition and shall provide such other information regarding the Option as the Company may reasonably require immediately before such disposition. Said written notice shall state the date of such proposed disposition, and the type and amount of the consideration to be received for such Share or Shares by Optionee in connection therewith. In the event of any such disposition, the Company shall have the right to require Optionee to immediately pay the Company the amount of taxes (if any) which the Company is required to withhold under federal and/or state law as a result of the granting or exercise of the Option and the disposition of the Shares.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By ____________________________
Name:
Title:

OPTIONEE

____________________________
Name:

Address:

____________________________
____________________________
____________________________

OSI SYSTEMS, INC.
NONQUALIFIED STOCK OPTION AGREEMENT

THIS NONQUALIFIED STOCK OPTION AGREEMENT (the "Agreement"), is made as of the _____ day of ______________, 19___ by and between OSI Systems, Inc., a California corporation (the "Company"), and ____________________ ("Optionee").

R E C I T A L

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of a nonqualified stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, ________ shares of Common Stock of the Company ("Shares") at the price of $________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of or providing services to the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

15.

<PAGE>

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

(C) if expressly authorized in writing by the Administrator, in its

sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. As a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. For purposes of this Paragraph 6, "employment" includes service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. Except with the express written approval of the Administrator, this Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor confer upon Optionee any right to continue in the employ of, or consult with,

the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.2 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon such exercise thereof he will furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state and federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

17.

<PAGE>

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms and provisions of the Plan, as it may be construed by the Administrator. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form or transfer) of any Shares acquired by exercise of this Option, he or she shall first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition.

18.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By___________________________
Name:
Title:

OPTIONEE

By___________________________
Name:

Address:

____________________________
____________________________
____________________________

19.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.8
<SEQUENCE>3
<DESCRIPTION>EXPATRIATE EMPLOYMENT AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.8

EXPATRIATE EMPLOYMENT AGREEMENT

This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Singapore, a Singapore corporation having offices at 996 Bandemeer Road, #04-01/02, Singapore 1233 ("OSS") a wholly-owned subsidiary of OSI, and Opto Sensors, Malaysia, a Malaysian corporation having offices at Tebrau Industrial Estate No. 1, #8 Jalam Firma 2/2, 81200 Johor Bahru, Johor, Malaysia, a wholly-owned subsidiary of OSI.

OSI desires to employ Hickman as Managing Director of OSS and OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six months notice to the other of intent to terminate this agreement.

OSI agrees to offer Hickman a comparable position in the corporation upon termination of this agreement.

OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Singapore and Malaysia will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

OSI agrees to pay Hickman, from the time of his arrival in Malaysia, a salary of One Hundred Twenty Five Thousand dollars ($125,000) per annum for the first year of this agreement in monthly installments of Ten Thousand Four Hundred Sixteen Dollars and Sixty Seven Cents ($10,416.67) to be deposited in accounts in the United States, Singapore and Malaysia as directed by Hickman. At the beginning of this agreement, such deposits will be:

a. Seven Thousand Seven Hundred Fifty Dollars ($7,750.00US)

b. One Thousand Three Hundred Thirty Three and 33/100 US dollars ($1333.33US) in Singapore at an initial Exchange rate of $1.00 US equals $1.40

<PAGE>

Singapore or One Thousand Eight Hundred Sixty Six and 67/100 Singapore Dollars ($1866.67S),

c. One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Malaysia at a initial Exchange rate of $1.00 US equals $2.45 Malaysian or Three Thousand Two Hundred Sixty Six and 66/100 Malaysian Ringgit ($3266.66M)

d. During the first month of residence in Malaysia, OSI will pay to Hickman the Malaysian Ringgit equivalent Five Thousand US Dollars, or Twelve Thousand two hundred fifty Ringgit ($12,250.00M) as a one time payment for initial

outfitting in Malaysia. Such payment will be deducted by OSI from that month's deposit to Hickman's US account.

e. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

OSI agrees to provide housing selected by Hickman and utilities, for which payment will be made by OSM, for which Hickman agrees to reimburse the company or, alternatively, agrees to have the company deduct from Hickman's salary prior to deposit in the US, Singapore or Malaysia.

OSI agrees to provide an automobile selected by Hickman through OSM to Hickman for which Hickman agrees to reimburse the company or, alternatively, agrees to have the company deduct from Hickman's salary prior to deposit in the US, Singapore or Malaysia. Automobile insurance will be provided by the company as a company car.

OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia.  Hickman agrees to schedule movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accomodation and meal expenses.  Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

OSI agrees to provide temporary living accomodations and meal expenses for a period of not more than two weeks for Hickman and his wife during the period Hickman's household goods are in transit.

<PAGE>

OSI agrees to award Hickman options for Five Thousand Shares of OSI stock effective upon the date of Hickman's employment at OSS and OSM at the then-current value for management incentive options and, further, agrees to award Hickman an additional 5000 options for OSI stock, at the then-current value for such options, if OSS/OSM achieve a pre-tax profit of $1,000,000US or more during OSI's 1995/96 fiscal year.

OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

OSI will continue Hickman's current AETNA PPO Health Insurance coverage with the same employee contribution as at present, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

OSI will pay for a Singapore American Club membership for business use of Hickman as Managing Director of OSI/OSM.  Hickman will pay for, or reimburse the company for, personal use of the club facilities.

Portions of this agreement may be duplicated in separate agreements pertaining solely to that portion of Hickman's employment applicable to Singapore or Malaysia.  This agreement shall take precedence over any such other agreement and, in respect of any errors, omissions or conflict in wording between this and any other such agreements, the wording or content of this agreement shall be deemed to be correct.

For OptoSensors, Inc.:

```
 /s/ Ajay Mehra      date: 7/12/95    /s/ Thomas K. Hickman   date: 7/12/95
- ------------------        --------   ---------------------       --------
                                     Thomas K. Hickman
```

its: Chief Financial Officer

<PAGE>

AGREEMENT FOR EXPATRIATE EMPLOYMENT IN SINGAPORE

1. This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

2. OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Singapore, a Singapore corporation having offices at 996 Bendemeer Road, #04-01/02, Singapore 1233 ("OSS") a wholly-owned subsidiary of OSI.

3. OSI desires to employ Hickman as Managing Director of OSS and OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six month's notice to the other of intent to terminate this agreement.

4. OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Singapore will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

5. For service as Managing Director of OSS, OSI agrees to pay Hickman a monthly salary of One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Singapore at an initial Exchange rate of $1.00 US equals $1.40 Singapore or One Thousand Eight Hundred Sixty Six and 67/100 Singapore Dollars ($1866.67S),

6. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

7. OSI agrees to provide housing and utilities for Hickman and his wife in Johor Bahru, Malaysis, for which payment will be made by OSM.

8. OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia. Hickman agrees to schedule

<PAGE>

movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accommodation and meal expenses. Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

9. OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

10. OSI agrees to provide temporary living accommodations and meal expenses for Hickman and his wife during the period Hickman's household goods are in transit.

11. OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

12. OSI will continue Hickman's current AETNA PPO Health Insurance coverage, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

For OptoSensors, Inc.:

/s/ Ajay Mehra date: 7/12/95 /s/ Thomas K. Hickman date: 7/12/95

Thomas K. Hickman

its: Chief Financial Officer

<PAGE>

AGREEMENT FOR EXPATRIATE EMPLOYMENT IN MALAYSIA

1. This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

2. OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Malaysia, a Malaysian corporation having offices at Tebrau Industrial Estate No. 1, #8 Jalam Firma 2/2, 81200 Johor Bahru, Johor, Malaysia, a wholly-owned subsidiary of OSI.

3. OSI desires to employ Hickman as Managing Director of OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six month's notice to the other of intent to terminate this agreement.

4. OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Malaysia will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

5. For service as Managing Director of OSM, OSI agrees to pay Hickman a monthly salary of One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Malaysia at a initial Exchange rate of $1.00 US equals $2.45 Malaysian or Three Thousand Two Hundred Sixty Six and 66/100 Malaysian Ringgit ($3266.66M).

6. During the first month of residence in Malaysia, OSI will pay to Hickman the Malaysian Ringgit equivalent Five Thousand Dollars, or Twelve Thousand Two Hundred Fifty Ringgit ($12,250.00M) as a one time payment for initial outfitting in Malaysia.

7. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

8. OSI agrees to provide housing and utilities for Hickman and his wife in Johor Bahru for which payment will be made by OSM.

9. OSI agrees to provide an automobile through OSM, of Malaysian registration, for business and personal use. Automobile insurance will be provided by the company as a company car.

<PAGE>

10. OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia. Hickman agrees to schedule movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accommodation and meal expenses. Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

11. OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

12. OSI agrees to provide temporary living accommodations and meal expenses for Hickman and his wife during the period Hickman's household goods are in transit.

13. OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

14. OSI will continue Hickman's current AETNA PPO Health Insurance coverage, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

For OptoSensors, Inc.:

/s/ Ajay Mehra date:7/12/95 /s/ Thomas K. Hickman date:7/12/95

its: Chief Financial Officer Thomas K. Hickman

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.11
<SEQUENCE>4
<DESCRIPTION>JOINT VENTURE BY AND AMONG CO. & ELECT. CORP.
<TEXT>

<PAGE>

EXHIBIT 10.11

JOINT VENTURE AGREEMENT

by and among

OPTO-SENSORS, INC.

and

ELECTRONICS CORPORATION OF INDIA, LIMITED

Dated as of 4th January, 1994.

<PAGE>

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (this "Agreement") is made as of the 4th day of January, 1994 by and among Opto-Sensors,Inc. ("OSI"), a corporation organized under the laws of the State of California, U.S.A., and having its principal executive office at 12525 Chadron Avenue, Hawthorne, California 90250, U.S.A.; Electronics Corporation of India, Limited ("ECIL"), a corporation organized under the laws of India and having its registered office at Hyderabad, India (OSI and ECIL are collectively referred to as the "Stockholders"); and the Company (as defined in the first recital hereinbelow)).

WHEREAS, OSI and ECIL desire to enter into this Agreement in order to, inter alia, organize a limited liability joint stock corporation under the laws of India (the "Company") to manufacture, assemble, test, market, sell and service the Products (as defined in Section 1.16 hereof) throughout India, and any other territories as are subsequently agreed upon in writing by both of the Stockholders (collectively, the "Territory"), on the terms and conditions set forth hereinafter; and

WHEREAS, the parties hereto desire to proceed with the establishment and operation of the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the following terms shall, unless the context otherwise requires, have the meanings respectively ascribed to them below:

1.1 "ACT" shall have the meaning ascribed to it in Section 2.1 hereof.

1.2 "AFFILIATE" shall mean any individual or entity which directly, or

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 405 of 2711

indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the party specified by virtue of fifty-one percent (51%) or greater direct or indirect equity ownership (excluding holdings by the Government of India and by the other Directors of the Company.)

1.3 "ARTICLES" shall have the meaning ascribed to it in Section 2.5 hereof.

-1-

<PAGE>

1.4 "BUSINESS" shall have the meaning ascribed to it in Section 12.2 hereof.

1.5 "COMPANY" shall have the meaning ascribed to it in the first recital hereto.

1.6 "COMPONENTS" shall have the meaning ascribed to it in Section 6.1 hereof.

1.7 "DEFAULTING STOCKHOLDER" shall have the meaning ascribed to it in Section 3.5 hereof.

1.8 "DISCLOSED PROPRIETARY TECHNOLOGY" shall have the meaning ascribed to it in Section 12.3 hereof.

1.9 "ECIL" shall have the meaning ascribed to it in the preamble hereto.

1.10 "EFFECTIVE DATE" shall have the meaning ascribed to it in Section 11.1 hereof.

1.11 "FISCAL YEAR" shall have the meaning ascribed to it in Section 2.10 hereof.

1.12 "LICENSES" shall have the meaning ascribed to it in Section 5.1 (a) hereof.

1.13 "MEMORANDUM" shall have the meaning ascribed to it in Section 2.6 hereof.

1.14 "OSI" shall have the meaning ascribed to it in the preamble hereto.

1.15 "OWNERSHIP PERCENTAGES" shall have the meaning ascribed to it in Section 3.2 hereof.

1.16 "PRODUCTS" shall mean single and multi-energy X-ray baggage inspection systems, explosive detectors, walk-through metal detectors and related security products as itemized on Schedule A attached hereto.

1.17 "PROPRIETARY TECHNOLOGY" shall mean engineering and technical data and information, know-how, trademarks and trade secrets, patentable and unpatentable inventions and confidential information.

1.18 "RECIPIENT" shall have the meaning ascribed to it in Section 12.3 hereof.

1.19 "RSPI" shall mean and refer to Rapiscan Security Products, Inc., a California corporation.

-2-

<PAGE>

1.20 "STOCKHOLDERS" shall have the meaning ascribed to it in the preamble hereto.

1.21 "TERRITORY" shall have the meaning ascribed to it in the first recital hereto.

ARTICLE 2
FORMATION OF COMPANY

2.1 Formation: Within [fifteen (15)] days following the Effective Date,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 406 of 2711

or, if not reasonably practicable within the aforesaid period, as soon thereafter as is reasonably practicable, the Stockholders shall cause the Company to be organized and registered under the Indian Companies Act, 1956 (the "Act"), as a limited liability joint stock corporation.

2.2 Name: The name of the Company shall be "ECIL-RAPISCAN SECURITY PRODUCTS LIMITED".

2.3 Office: The registered office of the Company shall be located at Hyderabad, India.

2.4 Business Purposes: The general business purposes of the Company shall be to: (i) arrange for the manufacture, assembly and testing of the Products in India, (ii) market and sell the Products throughout the Territory, (iii) service the Products sold throughout the Territory, and (iv) engage in such other activities as may be incidental or necessary to the foregoing.

2.5 Articles of Association: The Articles of Association of the Company (the "Articles") shall conform with the terms and provisions of this Agreement and shall set forth such other provisions as are required under the laws of India or are generally included in articles of association of limited liability joint stock corporations organized under the Act.

2.6 Memorandum of Association: The Memorandum of Association of the Company (the "Memorandum") shall conform with the terms and provision of this Agreement and set forth such other provisions as are required under the laws of India or are generally included in memoranda of association of limited liability joint stock corporations organized under the Act.

2.7 Other Filings: The Stockholders shall at all times cause the Company to prepare and file all filings, reports, notices and other documents or instruments as may be necessary or appropriate to maintain the valid and legal existence of the Company under the laws of India.

<PAGE>

2.8 Organizational Expenses: All costs and expenses related to the organization and registration of the Company shall be borne and promptly paid by ECIL, provided that, the Company shall reimburse ECIL for the reasonable amounts of money actually spent by ECIL after January 1, 1994 in forming the Company and in obtaining the requisite approvals pursuant to Section 12.1 hereof. Such reimbursements shall exclude all costs and expenses incurred by ECIL (including legal and other professional fees) (i) in the drafting and finalizing of the Articles, the Memorandum and any other organizational document, and (ii) in their filing with the relevant authorities pursuant hereto.

2.9 Ratification: As soon as practicable following its organization, the Stockholders shall cause the Company to ratify and confirm this Agreement through the execution hereof by its President and Financial Controller. Upon such execution, the Company shall become a party to, and shall be bound by all of the provisions of this Agreement.

2.10 Fiscal Year: The fiscal year ("Fiscal Year") of the Company shall end on the 31st of March each calendar year.

ARTICLE 3
CAPITALIZATION

3.1 Capital Stock: The authorized capital stock of the Company shall consist of ten (10) lakh shares of a single class of equity shares having a par value of Ten Rupees (Rs.10) per share. Except as may be otherwise agreed upon in writing by the Stockholders, the Company shall have no other classes of

capital stock.

3.2 Initial Capital: The initial paid-up capital of the Company shall consist of the sum of Rs.50,00,000 (Rupees fifty lakhs). Within five (5) days after the Effective Date, each Stockholder shall subscribe for equity shares of the Company in the respective percentages (as may be modified in accordance with the terms hereof, from time to time, (the "Ownership Percentages") set forth opposite its name below:

| Stockholder | No. of Shares | Subscription Price | Ownership Percentage |
|---|---|---|---|
| OSI | 2,55,000 | 25,50,000 | 51% |
| ECIL | 2,45,000 | 24,50,000 | 49% |
| TOTAL | 5,00,000 | 50,00,000 | 100% |

3.3 Payment: All subscriptions by the Stockholders for the Company's shares pursuant to Section 3.2 hereof shall be at par value, and shall be payable by each Stockholder by wire transfer

<PAGE>

of available funds immediately to a bank account of the Company within three (3) days of the Effective Date. Notwithstanding the foregoing, any payment to be made by OSI under this Section 3.3 shall be subject to and conditioned upon any and all governmental approvals, permits, or consents required under any law, rule, regulation or administrative practice applicable to a funds transfer from a bank located in the United States to a bank located in India.

3.4 Additional Capital: Stockholders' Loans:

(a) The Stockholders shall contribute additional equity capital to the Company in proportion to their respective, then existing Ownership Percentages for purposes of the business and operating needs of the Company. In addition, the stockholders hereby agree to loan the following respective amounts to the company, on such terms and conditions as are mutually agreed to by the Stockholders, within ninety (90) days of the Effective Date:

| Stockholder | Amount |
|---|---|
| OSI | Rs. 16,32,000 |
| ECIL | Rs. 15,68,000 |

(b) The issuance price and number of shares of capital stock to be issued by the Company to the Stockholders in exchange for additional equity capital contributions and the time and manner of payment therefor shall be set forth in a written notice of capital call which shall be given by the Board of Directors of the Company to the Stockholders no less than twenty (20) days prior to the date specified in such notice for the contribution of additional capital. Except as may be otherwise mutually agreed upon in writing by the Stockholders, no Stockholder shall have any obligation to contribute additional capital to the Company other than as provided in this Section 3.4.

3.5 Defaults: Failure by a Stockholder (the "Defaulting Stockholder") to contribute its pro-rata share of additional equity capital pursuant to Section 3.4 in the time and manner specified in the notice provided therefor shall constitute a material breach of this Agreement for purposes of Section 11.3(10) hereof. Notwithstanding the foregoing, the other Stockholder shall have the option in its absolute discretion to waive the default by a Defaulting Stockholder for purposes of Section 11.3(10) by a written waiver signed by the other Stockholder, provided, however, that no such waiver shall be deemed a continuing waiver or a waiver of any subsequent default under this Section 3.5 or of any other right or obligation under this Agreement. In the event of a

waiver hereunder by the other Stockholder, the Ownership Percentage of each of the Stockholders shall be redetermined as of the date the additional equity

<PAGE>

capital contribution is made by the other Stockholder and shares of the Company's capital stock are exchanged therefor to equal each Stockholder's respective percentage ownership of the then total outstanding shares of the capital stock of the Company.

3.6 Preemptive Rights: Except as may be mutually agreed otherwise in writing by the Stockholders, each Stockholder shall have a pre-emptive right vis-a-vis third parties to subscribe for and to purchase a portion of any new issuance of shares of capital stock by the Company in such amount as would be necessary for such Stockholder to maintain its respective, then existing Ownership Percentage.

3.7 Financing: The Stockholders shall cause the Company to the maximum extent practicable to borrow funds upon commercially reasonable terms and conditions from such commercial banks or other financial institutions as may be consistent with reasonable and prudent business practices for purposes of financing the Company's business and operating needs. Except as may be expressly agreed to in writing by both of the Stockholders, neither Stockholder shall have any obligation or commitment, except as otherwise expressly provided in Section 3.4(a) hereof, to loan funds to or to guarantee the borrowings of the Company, or to extend such Stockholder's own credit on behalf of the Company.

3.8 Company Banks. The Stockholders shall cause the Company to establish [lines of credit, deposit accounts and CC A/c] with no less than two commercial banks of established reputation organized under the laws of India. The foregoing commercial banks of the Company shall be jointly selected in good faith consultation between the Stockholders.

ARTICLE 4
JOINT REPRESENTATIONS AND COVENANTS OF THE STOCKHOLDERS

4.1 Representations and Warranties: Each Stockholder represents and warrants to the other Stockholder that: (i) it is a corporation duly organized, validly existing and in good corporate standing under the laws of its jurisdiction of incorporation, (ii) it has full corporate power and authority to enter into and to perform this Agreement, and (iii) its execution and performance of this Agreement will not violate any provision of applicable law or regulation or its organizational instruments, and will not result in any material breach of any material contract or agreement by which it is bound.

4.2 Good Faith: Each Stockholder hereby agrees to exercise good faith at all times when dealing with the other Stockholder and with the Company, and to affirmatively promote and further the business and best interests of the Company.

<PAGE>

ARTICLE 5
UNDERTAKINGS OF OSI

5.1 Furnishing of Technology:

(a) OSI shall cause RSPI to grant a license to ECIL and the Company, for the term of this Agreement or such shorter period as the Company and ECIL duly perform and observe their obligations hereunder, of that portion of RSPI's Proprietary Technology necessary to enable ECIL and the Company to manufacture, assemble and test or to arrange for the manufacture, assembly and testing of the Products in the Territory (the "Operations"). OSI confirms that the Proprietary Technology of RSPI covered by the License shall be sufficient to permit the manufacture and assembly of the Products in complete form by the Company (or its

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 409 of 2711

sub-contractors as contemplated hereunder. Notwithstanding Section 11.4 (b) hereof, and subject to terms and conditions that are agreed upon by the Stockholders prior to the termination of the Agreement, contemporaneously with the expiry of the natural term of this Agreement pursuant to Section 11.2 hereof, OSI shall cause RSPI to grant to the Company (i) a license to RSPI's Proprietary Technology required by the Company in its Operations, and (ii) any additional licenses granted pursuant to Section 5.1 (b) hereof (collectively the "Licenses").

(b) OSI shall cause RSPI to grant a license to ECIL and the Company, for the term of this Agreement or such shorter period as the Company and ECIL duly perform and observe their obligations hereunder, of any improvements developed by RSPI pertaining to the manufacture of the Products or their sale and distribution, and such improvements to the Products, as would be conducive to the furtherance of the business purposes described in Section 2.4 hereof. Nothing contained in this Section 5.1(b), however, shall be construed as requiring OSI to cause RSPI to furnish or disclose to the Company or to ECIL any information or data which RSPI or OSI is prohibited from transferring or disclosing by virtue of any restriction or obligation under any other agreements to which RSPI or OSI is a party or which RSPI is prohibited from transferring or disclosing under any applicable laws, rules or regulations.

(c) The board of directors of RSPI hereby agree to pass a resolution setting forth the terms necessary for the licensing of technology to the Company and by ECIL as more fully set forth in Section 5.1 (a) and 5.1 (b) hereof, and in the event RSPI is disassociated from OSI this Agreement shall remain in full force and shall be deemed to have the same effect as though executed by RSPI.

<PAGE>

(d) RSPI hereby agrees to indemnify the Company and ECIL against any disputes or suits filed for the infringement of RSPI patents or other RSPI patent rights relating to the Proprietary Technology used in the Product.

(e) ECIL hereby agrees to indemnify the Company and OSI for the infringement of any patent or patent rights in respect of the Trent I technology being provided by ECIL to the Company pursuant hereto.

5.2 <u>Inspection of Machinery and Supplies:</u> OSI shall inspect the machinery and other items to be purchased from RSPI and its Affiliates by or on behalf of the Company before they are dispatched to the Company.

5.3 <u>Training of Company's Personnel:</u> OSI shall train in India, with ECIL's assistance, such number of personnel as are reasonably required by the Company so as to fulfill the business purposes of the Company more fully set forth in Section 2.4 hereof.

ARTICLE 6
UNDERTAKINGS OF THE COMPANY

6.1 <u>Purchase Obligations:</u> The Company hereby agrees to purchase all the components initially required to manufacture the Products (the "Components") from OSI, or from other suppliers suggested by OSI, at a mutually agreeable price. However, if Components of similar quality and at similar or cheaper cost are manufactured and are available in a timely manner in India or abroad, the Company may at its discretion purchase such cheaper Components. All the Products manufactured by ECIL on behalf of the Company will be purchased by the Company on such terms, including price, as shall be negotiated by ECIL and the Company in good faith. However, if the Products manufactured by ECIL on behalf of the Company are available from any source whatsoever, at a cheaper price, after factoring into such price all applicable duties (payable abroad or in India), and are of the same quality as the Products manufactured by ECIL, the Company may at its discretion purchase such cheaper Products. The initial prices of the Components and the Products are set forth on Schedules "B" and "C" attached hereto and such Schedules are subject to revision from time to time depending on changes in the cost of inputs.

6.2 <u>Supply of Components and Technology:</u> The Company hereby agrees to

provide ECIL with the components necessary for ECIL to manufacture the Products on behalf of the Company.

<PAGE>

ARTICLE 7
UNDERTAKINGS OF ECIL

7.1 Manufacture of Products: ECIL hereby agrees to manufacture the Products for and on behalf of the Company. ECIL shall have the right to sub-contract various sub-assemblies of the Products (including the conveyor frame, PCB Blanks and other mechanical fabricated parts). However, all such subcontracts entered into by ECIL shall be at the risk of ECIL, and ECIL shall make good any loss caused to the Company due to defective parts, workmanship, delay in delivery or otherwise in connection with any such subcontract. ECIL agrees that without the prior written consent of OSI and the Company it will not sell the Products to any person or entity other than the Company.

7.2 Governmental Approvals: ECIL shall be responsible for obtaining, and shall use its best efforts to obtain, all the necessary governmental approvals for the formation of the Company, or for any of the other matters covered by this Agreement, including all necessary approvals of the Government of India and all other relevant Indian State Governments, but excluding all necessary approvals of any United States governmental entities.

7.3 Installation and Servicing of Products: ECIL shall use its marketing and servicing network to the extent necessary or desirable for the installation and servicing of the Products, if so requested by the Company, at a price and on such other terms to be mutually agreed upon by ECIL and the Company.

ARTICLE 8
DIVIDENDS

8.1 Dividend. The Company's Board of Directors shall determine the amount and the timing of the declaration and the payment of any dividend by the Company to the Stockholders. The dividend payable to OSI shall be paid by the Company in U.S. dollars net of taxes, and all such taxes shall be paid by the Company.

ARTICLE 9
MANAGEMENT AND OPERATIONS

9.1 Directors: The Board of Directors of the Company (the "Board") shall consist of six (6) or eight (8) members represented equally by OSI and ECIL. The Chairman of the Board of Directors shall be the Chairman of the Board of Directors of ECIL, who shall be included in the total number of directors nominated by ECIL pursuant hereto. The Stockholders shall vote their respective shares for the election of the directors so nominated and, in the event of a vacancy for any reason on the Board, shall vote their respective shares for the election of a

<PAGE>

replacement director nominated by the Stockholder which had nominated the director whose death, resignation or removal had resulted in such vacancy. The term of a director of the Company shall be for one year or until the general meeting of the Company's stockholders following his or her appointment, whichever is later.

Veto Powers of the Chairman of Board: The Chairman shall have no veto powers on any of the issues that come before the Board.

9.2 Initial Directors: The Stockholders shall appoint, within five (5) business days of the Effective Date, the following persons to be the initial directors of the Company:

| | |
|---|---|
| CHAIRMAN | Dr. C. RAO KASARABADA. |
| MANAGING DIRECTOR | L. SATYANARAYANA |
| DIRECTOR | K.S. MURTHY |
| DIRECTOR | DEEPAK CHOPRA<br>ALTERNATE: Y.K. MEHTA/TOM SCHORLING |
| DIRECTOR | AJAY MEHRA<br>ALTERNATE: ANTHONY CRANE/R.L. CHOPRA |
| DIRECTOR | BRIGADIER R.K. MEHTA |

9.3 Auditors: The Company shall have one (1) independent auditor to be jointly selected by the Stockholders, provided, however, that the Company's initial independent auditor shall be M/S. Bhaskar Rao & Co., Chartered Accountants.

9.4 Initial Officers: The Stockholders shall cause the Board nominated pursuant hereto to appoint, within [ten (10)] business days of the Effective Date, the following persons to the respective offices set forth opposite their names as the initial officers of the Company:

| | |
|---|---|
| PRESIDENT | L. SATYANARAYANA |
| FINANCIAL CONTROLLER | D.V. SARMA |
| COMMERCIAL MANAGER<br>(DIRECTOR MARKETING) | BRIGADIER R.K. MEHTA |

The term of the foregoing initial officers shall be one year initially and two years thereafter.

9.5 Permanent Management:

(a) Board of Directors: The business of the Company shall be managed by or under the direction and supervision of the Board, which may exercise all such powers of the Company and do all such lawful acts and things as are not by statute, the Articles, the Memorandum or this Agreement specifically directed

<PAGE>

or required to be exercised or undertaken by the stockholders of the Company.

(b) Officers. The officers of the Company shall be appointed by the Board and shall consist of:

(1) a President
(2) a Financial Controller
(3) a Commercial Manager
(4) a Marketing Executive
(i.e., Director Marketing)

Any number of offices may be held by the same person, unless the Articles otherwise provide. The Board shall, on the first anniversary of the date of the formation of the Company, appoint each of the officers of the Company. The officers of the Company so appointed shall serve for terms which shall be set forth in the respective contracts of appointment.

9.6 Board Meetings:

(a) General: All matters pertaining to actions and meetings by and of the Board shall be governed by the Articles which shall incorporate all of the relevant terms hereof, provided that, the Articles shall include a provision that all Board of Directors meetings shall be held in New Delhi, Bombay or in any other place that may be mutually convenient.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 412 of 2711

(b) Quorum Requirement: 1/3rd of the total strength of Directors (any fraction contained in that 1/3rd being rounded off as one) or two Directors (whichever is higher) shall constitute the quorum for a Board of Directors meeting, provided that, at least one Director nominated by ECIL and one Director (or an alternate Director) nominated by OSI present at the meeting shall be required to constitute such quorum.

(c) Notice Requirement: Written notice of an extraordinary general meeting of the Company's Board of Directors stating the place, date and hour of the meeting shall be given to each Director not less than twenty one (21) nor more than sixty (60) days before the date of such meeting. Any documents to be reviewed or discussed at such meeting shall accompany such notice.

(d) Written Consent in Lieu of Meeting. Except as otherwise expressly provided in the Act, a resolution in writing, executed by all of the members of the Board of Directors or of a committee thereof entitled to receive notice of a meeting of the Board of Directors or of such committee, shall be valid and shall have the same effect as if passed at a meeting, of the Board or of such committee, duly convened and held.

<PAGE>

9.7 Stockholder Meetings:

(a) General and Extraordinary General Meetings: The time and place of all general and extraordinary general meetings of the Company's stockholders shall be as provided for in the Articles.

(b) Notice Requirement: Written notice of an extraordinary general meeting of the Company's stockholders stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than twenty one (21), nor more than sixty (60), days before the date of the meeting. Any documents to be reviewed or discussed at such meeting shall accompany such notice.

(c) Quorum Requirement: A minimum of two stock/shareholders holding in aggregate 50% of the Company's issued and paid-up share capital/stock and entitled to vote thereat, present in person, or represented by proxy, shall constitute a quorum at all meetings of the share/stockholders of the Company for the transaction of business, except as otherwise provided by a statute or the Articles. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(d) Proxy Rights: A stockholder of the Company shall be entitled to exercise its right to vote at general and extraordinary general meetings of stockholders by proxy, and the holder of any such proxy shall not be limited to a stockholder of the Company.

(e) Matters Reserved Exclusively for and Requiring Majority of Stockholders: The following actions of the Company shall be decided solely by the affirmative vote of the majority of the stockholders of the Company, and without any approval by the Board:

(1) the sale by the Company of its shares of stock in a public

offering;

(2) the declaration by the Company of a dividend on its capital stock;

-12-

<PAGE>

(3) the acquisition by the Company of any interest in the legal or beneficial ownership of any other corporation or business association;

(4) the formation of a subsidiary corporation by the Company;

(5) adoption and amendment of the Articles;

(6) adoption and amendment of the Memorandum;

(7) issuance by the Company of any bonds or debentures;

(8) borrowing money in an amount which, together with the aggregate balance of all outstanding borrowings, exceeds 300% of the paid-in capital of the Company;

(9) voluntary winding up of the Company;

(10) transfer of all or a substantial portion of the Company's business or assets; and

_provided that_, Subsections (1),(5),(6) and (9) herein above require the affirmative vote of a 2/3rd majority of the stockholders of the Company.

9.8 _Financial Statements:_ The Company shall maintain true and accurate books of account and records in accordance with Indian generally accepted accounting principles consistently applied. The Company shall provide each of the Stockholders with (i) interim internal financial reports every one (1) month, consisting of an income statement, a balance sheet, and a cash flow statement, and (ii) an audited financial report (within ninety (90) days after the close of each Fiscal Year.

9.9 _Access to Books/Records:_ Access to the books and records of account of the Company shall be made available to the Stockholders or their authorized representatives at all reasonable times during normal business hours. Whenever reasonably so requested by a Stockholder, the Company shall make information regarding its business operations and financial condition available to such Stockholder.

-13-

<PAGE>

ARTICLE 10
SHARE TRANSFERS

10.1 _Stock Transfers:_

(a) Each of the Stockholders agrees not to sell, assign, pledge or in any manner transfer title or right to, or otherwise encumber, any of the Company shares held by it, without the prior approval of the Board. All stock certificates which the Company issues shall bear a legend as follows: "Any transfer of the shares of stock of the Company shall be subject to approval of the Board of Directors of the Company."

(b) If a Stockholder which desires to transfer its shares to a specified third party, other than an Affiliate of said Stockholder, has received the prior approval of the Board, said Stockholder (the "Transferor") may sell any or all of the Company shares owned by it to said third party which has made a bona fide offer to purchase any or all of the Company shares owned by it, provided that in such case the Transferor shall give prior written notice to the Company and first offer and give the other Stockholder an opportunity to

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 414 of 2711

purchase the shares on the same terms and conditions as offered by the specified third party. if all the shares offered as aforesaid are purchased by the other Stockholder, the necessary transfer shall be effected forthwith.

(c) When such offered shares are not all purchased and paid for in full by the other Stockholder within sixty (60) days of the initial offer by the Transferor to the other Stockholder, the Transferor shall have the right to either itself retain the remaining unsold shares or sell the remaining unsold shares to the aforesaid third party on the identical terms and conditions described in the prior written notice to the Company.

(d) Any notice made pursuant to subsection (b) of this Section 10 shall be made in writing and shall identify the proposed transferee to whom the Transferor desires to sell shares, and shall contain the specific terms and conditions of the offer.

(e) The options open to the Transferor pursuant to subsection (c) above shall be exercised within sixty (60) days of it having been ascertained that the shares are not to be purchased and paid for in full by the other Stockholder within said period of sixty (60) days, failing which the Transferor shall be deemed to have elected to retain all the shares originally offered.

(f) In any transfer of Company shares from a Stockholder, the transferee shall submit to the Company and the non-transferring Stockholder an agreement by such transferee to

-14-

<PAGE>

take the place of the Transferor with respect to, and to be bound as a party to, this Agreement and to assume such of the rights and obligations of the Transferor hereunder as they relate to such transferee as the holder of the shares being transferred.

ARTICLE 11
EFFECTIVE DATE, TERM, TERMINATION AND EXPIRATION

11.1 Effective Date: This Agreement shall come into effect upon this Agreement getting the required approval from all the requisite Government agencies (the "Effective Date").

11.2 Term: This Agreement shall be valid and in force commencing on the Effective Date, and will continue until expiration on eight (8) calendar years from the Effective Date, unless earlier terminated as provided in this Agreement, or extended by written agreement of the parties hereto. Notwithstanding the aforesaid, in the event the Licenses to the Company are further granted pursuant to the provisions of Section 5.1(a) hereof, the material provisions of this Agreement enabling the Company to effectively make use of the Licenses shall remain in full force and effect.

11.3 Termination of the Agreement:

This Agreement shall terminate upon the occurrence of any of the following events:

(1) mutual written agreement of the Stockholders;

(2) the sale or other disposition of all of the Company's assets and the receipt by the Stockholders in cash of the proceeds thereof;

(3) the dissolution of the Company;

(4) a trustee, receiver or liquidator is appointed for all or a substantial part of the assets or property of either Stockholder;

(5) a voluntary petition in bankruptcy or a voluntary winding-up petition is filed with respect to either Stockholder, or an involuntary petition is filed and is not dismissed within ninety (90) days after filing;

          (6) the interests of either Stockholder are assigned for the benefit of creditors;

(7) either Stockholder ceases the active conduct of its business;

<PAGE>

(8) either Stockholder dissolves or liquidates; or

(9) either Stockholder is in material breach or default under this Agreement.

In the event of termination pursuant to the provisions of clauses (4), (5), (6), (7), (8), (9), (10) (a "Stockholder Termination"), the other Stockholder may, for thirty (30) days after the occurrence of the event referenced therein, purchase the shares of Company stock of the affected Stockholder at a price which shall be the higher of the book value or the fair market value of the shares as shall be determined by an independent valuer which shall be retained by mutual agreement of the Stockholders. In the event that ECIL purchases the Company's Stock pursuant hereto, any and all sums of money due to OSI thereby shall be paid to OSI in US dollars, net of Indian taxes. Any purchase of shares of Company stock by OSI shall be subject to and conditioned upon compliance with the legal requirements referred to in Section 3.3 hereof, and any payment to ECIL pursuant thereto shall be net of Indian taxes, if any.

11.4 Effect of Termination and Expiration:

(a) Termination or expiration of this Agreement shall not affect any obligations of either of the Stockholders hereunder which have accrued but are not discharged prior to such termination or expiration, nor affect the rights of either Stockholder to recover damages from the other Stockholder by reason of any breach of this Agreement which has accrued prior to or would by its nature accrue after such termination or expiration.

(b) Upon termination or expiration of this Agreement, and subject to Section 5.1(a) hereof, all of the Proprietary Technology which OSI caused RSPI to deliver or transmit to ECIL or the Company, including the Proprietary Technology more fully set forth on Schedule B hereto (the "Schedule B Technology"), shall be returned forthwith by ECIL and the Company to RSPI, or shall be destroyed under supervision of OSI. Immediately upon such termination or expiration, ECIL and the Company shall cease making use of such Proprietary Technology, except as otherwise provided for herein, in each of its (or any of its subcontractors') manufacturing or assembly operations.

(c) If the joint venture cannot be formed due to the acts of the Government of India or subsequent to the Company being formed, RSPI withdraws from this Agreement due to acts beyond its control, the joint venture goals shall be pursued by ECIL, and RSPI shall fulfill its obligations for the duration of the Agreement and shall abide by the non-competition clause set forth in Section 12.2 hereto. ECIL shall thereafter pay OSI a license fee on the sale of every x-ray system sold by ECIL or its

<PAGE>

Affiliates which fee shall be US $5000 per X-ray system if such system sells for between US $60,000 - $63,000; US $4,500 per system if such system sells for between US $55,000 - $59,999; US $4,000 per system is such system sells for between US $50,000 -$54,999. In the event the x-ray system sells for an amount in excess of US $ 63,000, the license fee shall be an amount greater than US $5,000 and shall be negotiated in good faith by ECIL and OSI. In addition, ECIL hereby agrees that it shall purchase a minimum of one hundred and fifty (150) multi-energy units, as more fully described in Schedule B hereto, from RSPI, over a period of five years from the date of termination or withdrawal hereof, for a sum of US $21,000 per unit.

ARTICLE 12
MISCELLANEOUS

12.1 Government Approvals: ECIL hereby agrees, from time to time as

required by applicable Indian law, rule, regulation or administrative practice, to make any and all required notifications or filings with the Indian government and to expeditiously obtain all required Indian government and Reserve Bank of India approvals, permits or consents required for this agreement to be effective and so that the Company and the joint venture contemplated hereby shall be in full compliance with the laws of India.

12.2 No Competition: Except to the extent otherwise provided herein, the Stockholders shall not, other than through the Company, have any interest in the manufacturing, assembling, testing, marketing, selling or servicing of the Products, or in the operating of any business identical or substantially similar to the business of the Company (the "Business"), within the Territory as long as each shall remain a Stockholder of the Company, and for a period of five (5) years thereafter. In the event of a Stockholder Termination, the affected Stockholder shall not purchase, sell or operate any business similar to the Business in the Territory, for its own account or otherwise, or hold shares of stock in any other company engaged in the business of operating a Business in the Territory, whether or not such other company is an Affiliate of the said Stockholder, for a period of seven (7) years from the date thereof. The applicability of this Section 12.2 to each Stockholder shall survive the termination or expiration of this Agreement.

12.3 Non-Disclosure: ECIL and the Company each acknowledges that the Proprietary Technology of RSPI disclosed to it (as such, a "Recipient") pursuant to the terms hereof (the "Disclosed Proprietary Technology") is considered to be a valuable proprietary asset of RSPI and hereby agrees that disclosure to a Recipient by RSPI of any of the Disclosed Proprietary Technology, whether written, oral, or in machine-readable form, is made in strictest confidence. In addition:

<PAGE>

(a) Each Recipient will ensure that the confidentiality and secrecy of the Disclosed Proprietary Technology is maintained. Each Recipient agrees to take all steps necessary to avoid any unauthorized disclosure, use, or publication of the Disclosed Proprietary Technology.

(b) Each Recipient may disclose the Disclosed Proprietary Technology to its own employees to whom it shall be reasonably necessary in order to further Recipient's business relationship with OSI as contemplated hereunder. Each Recipient agrees that it shall take appropriate action (by instructions, agreement, or otherwise) with such employees in order to satisfy Recipient's obligations under this Agreement with respect to use, copying, protection, and security of the Disclosed Proprietary Technology.

(c) Each Recipient agrees not to print or copy, in whole or in part, any documents or magnetic media containing any of the Disclosed Proprietary Technology without the prior written consent of OSI.

(d) Each Recipient agrees not to disclose any of the Disclosed Proprietary Technology to any entity outside of said Recipient without the prior written consent of OSI, and without first obtaining from each such entity an agreement substantially identical to the provisions of this Section 12.3 in form.

(e) Each Recipient agrees to use the Disclosed Proprietary Technology only in furtherance of its business relationship with OSI as contemplated hereunder.

(f) The Disclosed Proprietary Technology will not be used by ECIL or the Company to provoke an interference with any patent application which RSPI has filed with respect to the Disclosed Proprietary Technology, and will not be used to amend any claim in any pending patent application to expand the claim to read on, cover, or dominate any invention (whether or not patentable) disclosed in the Disclosed Proprietary Technology.

(g) Each Recipient agrees not to otherwise use or dispose of the Disclosed Proprietary Technology except with the prior written consent of OSI. OSI's consent may be withheld for any reason or no reason, and may be granted upon such terms as OSI may establish from time to time.

(h) The Disclosed Proprietary Technology shall remain the property of RSPI.

The provisions of this Section 12.3 are binding upon each Recipient and its directors, employees, agents and subcontractors as long as any part of the Disclosed Proprietary Technology disclosed or delivered to Recipient remains confidential, except

-18-

<PAGE>

that said Recipient has no such obligation with respect to any Disclosed Proprietary Technology which (a) is already known to Recipient; (b) is or becomes publicly known through no wrongful act of Recipient; (c) is disclosed to Recipient by a third person not in violation of any obligation of non-disclosure owed to OSI or RSPI; or (d) is approved for release by written authorization of OSI. Each Recipient has the burden of proving the applicability of any of the above exceptions. OSI has the right to inspect Recipient's records to determine the source of any Disclosed Proprietary Technology claimed to be within any of the above exceptions.

12.4 Improvements and Developments: As part consideration for OSI's causing RSPI to grant to ECIL and the Company the Licenses, any improvement to the Products or the Proprietary Technology made by ECIL or by the Company shall be the sole property of OSI. If any patents result from any such improvements, such patents shall be solely owned by OSI, and the Company shall be granted a no-cost transferable shop rights license for such patents for the life of the patents. ECIL and the Company agree to promptly disclose any and all such improvements (including inventions) to OSI, and to cooperate in securing and perfecting any protectable intellectual property rights to such improvements. Any inventions, developments, or patents relating to the Products and resulting from sole development by OSI, or by OSI in conjunction with other parties, shall be the sole property of OSI, and the Company shall be granted an option to include in the Licenses any such inventions, developments or patents.

12.5 Arbitration: Any and all disputes between the Stockholders arising from or in connection with this Agreement shall be amicably and promptly negotiated upon consultation in good faith between the Stockholders. Each of the Stockholders agrees that, if an amicable settlement is not reached within thirty (30) days after commencing consultation, the dispute shall be settled exclusively by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce conducted in the place where the principal office of the Stockholder not initiating the arbitration is located, and the arbitration award shall be final and binding upon the Stockholders for all purposes hereof and (nay thereafter be enforced by any court having jurisdiction. The arbitration shall be conducted in the English language. Any arbitration award shall include attorneys' fees for the prevailing party.

12.6 Governing Law: The construction, validity and performance of this Agreement shall be governed by the laws of India, provided, however, that the construction, validity and performance of Sections 3.3 and 12.5 hereof shall be governed by the laws of the State of California, U.S.A.

-19-

<PAGE>

12.7 Counterparts: This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.8 Assignment: Neither this Agreement nor any right or obligation provided for herein is assignable in whole or in part by any party hereto without the prior written consent of the other parties hereto.

12.9 Integration: This Agreement constitutes the entire understanding among the parties, and supersedes any previous understandings, written or oral,

which the parties may have reached, with respect to the subject matter hereof.

12.10 Modification: No modification or amendment hereof shall be valid or binding upon the parties unless agreed to in writing by each of the parties hereto.

12.11 Force Majeure: No failure or omission by any party to carry out or observe any of the terms or conditions of this Agreement shall, except as herein expressly provided to the contrary, give rise to any claim against the party in question or be deemed a breach of this Agreement by such party if such failure or omission arises from any extraneous cause entirely beyond the control of that party.

12.12 Notices: All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses hereinafter set forth or at such other addresses as may be designated in writing by notice given hereunder to the other parties. The date of the giving of such notices, requests, demands, and other communications shall be deemed to be the date of the posting of the mail, if so mailed, or the date of delivery, if delivered other than by registered or certified mail.

TO OSI - M/S Opto-Sensors Inc.
12525 Chadron Avenue
Hawthorne, California 90250, USA.

TO ECIL - M/S Electronics Corporation of India Limited,
ECIL P.O., Hyderabad-500 762 A.P., India.

TO THE COMPANY - M/S Ecil-Rapiscan Security Products
[address to be determined]

12.13 Non-Waiver of Right: The failure of any party to enforce at any time any of the provisions hereof shall not be construed to be a waiver of any such provisions or a waiver of

<PAGE>

the right of such party thereafter to enforce any such provisions. No waiver by a party of any right hereunder shall be deemed a waiver of any other right.

12.14 Severability: The provisions of this Agreement shall be deemed severable, and in the event that any term or provision of this Agreement shall be held invalid, illegal or unenforceable, the remainder of the terms and provisions of this Agreement shall not be affected by such invalidity, illegality or unenforceability, and this Agreement shall be interpreted and construed as if such term or provision had never been contained to the extent that the same shall have been held to be invalid, illegal or unenforceable.]

12.15 Headings: The headings of Sections used in this Agreement are inserted for convenience of reference only and shall not affect the interpretation of the respective Sections of this Agreement.

<PAGE>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf on the day and year set forth across its signature below.

OPTO-SENSORS, INC.

WITNESS:

                                   By: /s/ Deepak Chopra
------------------

1. Its: CEO Chairman
------------------

2. Name: Deepak Chopra
------------------

ELECTRONICS CORPORATION OF INDIA LIMITED

By: /s/
------------------
1. Its: __________________
2. Name:__________________

-22-

<PAGE>

SCHEDULE A

X-Ray System
- ------------

Rapiscan current Multi-Energy Security X-Ray Inspection System including:

1. All mechanical drawings of the Rap 2, Rap 17, Rap 14

2. X-Ray generator manufacturing drawings including mechanical, electrical, and schematics, test procedures.

(The Trent I Image Processor PCB and the A to D Converter PCB manufacturing drawings will be licensed after 12 months of the Effective Date. Maintenance documentation will be provided immediately).

-23-

<PAGE>

SCHEDULE B

<TABLE>
<CAPTION>

RAPISCAN2 MULTI-ENERGY MACHINE (90 MC X 80 CM)
---------------------------------------------

| <S> | <C> | <C> |
|---|---|---|
| 36 | EACH | LARGE DETECTORS |
| 36 | EACH | SMALL DETECTORS |
| 9 | EACH | PCB DIODE ARRAY |
| 9 | EACH | PCB DIODE ARRAY |
| 1 | EACH | PROCESSOR PCB TRENT I |
| 1 | EACH | X-RAY CONTROL PCB |
| 1 | EACH | CONTROL PANEL |
| 2 | EACH | PHOTOCELLS |
| 1 | EACH | ENCODER |
| 1 | EACH | X-RAY TUBE |
| 1 | LOT | INDICATOR LIGHTS, SWITCHES, COMPONENTS, CABLES, MISCELLANEOUS PARTS |

TOTAL KIT PRICE (F O B) U.S. $ 16,000
</TABLE>

-24-

<PAGE>

SCHEDULE C

MULTI ENERGY XBIS 9080 - ECIL'S SCOPE OF SUPPLY

1. Conveyor Frame and L.S Box

2. X-Ray Generator Housing and Collimator

3. Conveyor Belt

4. Conveyor Rollers

5. Control Desk

6. Lead Flaps

7. 14" Color Monitors

8. Drum Monitor

9. X-Ray Control PSU (Power Supply)

10. DC-DC Voltage Control PCB

11. IR Interface PCB

12. IR Supply PCB

13. Torroidal Transformer (Mains)

14. Miscellaneous hardware, final assembly, testing and packaging for delivery.

Transfer Price U.S. $13000 (inclusive of customs duty, but exclusive of local duties and taxes).

-25-

<PAGE>

SCHEDULE A

<TABLE>
<CAPTION>

RAPISCAN2 MULTI-ENERGY MACHINE [OR SIMILAR MODEL] (90 MC X 80 CM)

| <S> | <C> | <C> |
|---|---|---|
| 36 | EACH | LARGE DETECTORS |
| 36 | EACH | SMALL DETECTORS |
| 9 | EACH | PCB DIODE ARRAY |
| 9 | EACH | PCB DIODE ARRAY |
| 1 | EACH | PROCESSOR PCB TRENT I |
| 1 | EACH | X-RAY CONTROL PCB |
| 1 | EACH | CONTROL PANEL |
| 2 | EACH | PHOTOCELLS |
| 1 | EACH | ENCODER |
| 1 | EACH | X-RAY TUBE |
| 1 | LOT | INDICATOR LIGHTS, SWITCHES, COMPONENTS, CABLES, MISCELLANEOUS PARTS |

</TABLE>

-26-

<PAGE>

AGREEMENT

THIS AGREEMENT is made and entered into this 3rd day of JANUARY, 1995, by and among OPTO SENSORS, INC. ("OSI"), a California corporation, DEEPAK CHOPRA ("Chopra") and AJAY MEHRA ("Mehra").

WHEREAS, OSI and Electronic Corporation of India Limited ("ECIL"), an

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 421 of 2711

Indian corporation, are parties to a joint venture regarding the manufacturing and selling of diode kits ("Joint Venture");

WHEREAS, pursuant to the agreement between OSI and ECIL for the Joint Venture, OSI and ECIL agreed to contribute total capital up to the amount of $150,000.00 to be divided between OSI and ECIL on the basis of 51% and 49%, respectively;

WHEREAS, the profits, losses distributions of the Joint Venture are to be allocated 51% to OSI and 49% to ECIL;

WHEREAS, Chopra and Mehra have expressed an interest in participating as joint venturers in the Joint Venture; and

WHEREAS, it is deemed by OSI to be in the best interests of said corporation to assign to Chopra and Mehra a portion of OSI's interest in the Joint Venture.

<PAGE>

NOW, THEREFORE, in consideration of the usual promises contained herein, the parties hereto agree as follows:

1. OSI hereby sells, assigns, transfers and conveys to Chopra and Mehra a 15% interest (10 1/2% to Chopra and 4 1/2% to Mehra) in the Joint Venture, the result of which will be that (i) OSI shall own 36% of the Joint Venture and shall be allocated 36% of the profits, losses and distributions, (ii) Chopra shall own 10 1/2% of the Joint Venture and shall be allocated 10 1/2% of the profits, losses and distributions and (iii) Mehra shall own 4 1/2% of the Joint Venture and shall be allocated 4 1/2% of the profits, losses and distributions.

2. Chopra and Mehra hereby accept the aforesaid assignment and, subject to the terms and conditions of this Agreement, agree to be bound by the terms and conditions relating to the Joint Venture. Any and all contributions of capital, as well as any other payments required to be made by OSI regarding its present 51% ownership interest in the Joint Venture, shall be allocated among OSI, Chopra and Mehra on a pari passu basis in the same proportion as their ownership percentages (36%, 10 1/2% and 4 1/2%, respectively) in the Joint Venture.

3. In the event that Chopra and/or Mehra are required or requested to give their consent to any action regarding the Joint Venture or to vote their Joint Venture interests, they will do so in accordance with the instructions given to them by OSI. In

<PAGE>

other words, any and all voting and decision making rights of Chopra and/or Mehra regarding the Joint Venture shall be exercised in accordance with OSI's instructions and wishes.

4. This Agreement may not be amended or modified without the approval of the Board of Directors of OSI.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

OPTO SENSORS, INC.

By: /s/ Deepak Chopra
--------------------------------

/s/ Deepak Chopra
-----------------------------------
DEEPAK CHOPRA

/s/ Ajay Mehra
-----------------------------------
AJAY MEHRA

3

<PAGE>

AMENDMENT TO AGREEMENT

THIS AMENDMENT TO AGREEMENT is made and entered into this 20th day of May, 1997, by and among OPTO SENSORS, INC. ("OSI"), a California corporation, DEEPAK CHOPRA ("Chopra") and AJAY MEHRA ("Mehra").

WHEREAS, on January 3, 1995, the parties hereto entered into a certain Agreement which provided for the sale by OSI to Chopra and Mehra of a 15% interest in a certain joint venture between OSI and Electronics Corporation of India, Limited ("Assignment Agreement"); and

WHEREAS, the parties hereto now wish to amend the Assignment Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. Paragraph 3 of the Assignment Agreement is hereby deleted in its entirety.

2. All of the other terms and conditions of the Assignment Agreement, except as specifically amended by Paragraph 1 above, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereby have executed this Amendment to Agreement the day and year first above written.

OPTO SENSORS, INC.

By:/s/ Deepak Chopra
__________________________________
Deepak Chopra, President

/s/ Deepak Chopra
--------------------------------------
DEEPAK CHOPRA

/s/ Ajay Mehra
--------------------------------------
AJAY MEHRA

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>5
<DESCRIPTION>INDEPENDENT AUDITOR'S CONSENT & REPORT ON SCHEDULE
<TEXT>

<PAGE> EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

    We consent to the use in this Amendment No. 1 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated June 12, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ DELOITTE & TOUCHE LLP

Los Angeles, California

July 31, 1997
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>6
<DESCRIPTION>CRIMINAL PLEA AND SENTENCING AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 99.1

CRIMINAL PLEA AND SENTENCING AGREEMENT

UNITED STATES v. UDT SENSORS. INC.

I

INTRODUCTION

This constitutes the criminal plea and sentencing agreement ("Agreement") between UDT Sensors, Inc. ("UDT") and the United States Attorney's Office for the Central District of California ("this Office"). This Agreement is entered into pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure.

This Agreement contemplates the resolution of all criminal charges against UDT with regard to allegations of false testing within the scope of the Information attached hereto as Exhibit 1 ("the Information").

This Office is the sole governmental entity entering into this Agreement, and this Agreement does not bind any other federal, state or local prosecuting, administrative or regulatory authorities.

II

OFFENSES AND PENALTIES

The Information charges UDT with three counts of making false statements regarding matters within the jurisdiction of the United States Department of Defense, in violation of 18 U.S.C. (S) 1001. The maximum sentence that may be imposed is a fine of $500,000 per count. 18 U.S.C. (S) 3571(c)(3).

The court may also order restitution under 18 U.S.C. (S) 3663(a)(1), and may impose a term of probation for up to five years under 18 U.S.C. (S) 3561(b)(1). In addition, the court is
<PAGE>

required by statute to impose a special assessment of $200 per count. 18 U.S.C. (S) 3013(a)(2)(B).

III

PLEA

This Office and UDT hereby agree, pursuant to Federal Rule of Criminal procedure 11(e)(1)(C), that the disposition of this matter shall include the following terms and conditions:

A. UDT agrees to waive indictment by grand jury and to plead guilty to the Information that charges UDT with three counts of violating 18 U.S.C. (S) 1001.

B. To be guilty of violating 18 U.S.C. (S) 1001, UDT must have made a material false statement within the jurisdiction of a department or agency of the United States, knowing that the statement was untrue. By signing this Agreement, UDT admits that it is guilty of the offenses charged in the Information and stipulates to the Statement of Facts set forth herein.

C. UDT agrees to waive the requirement for a presentence investigation and report, as set forth in Rule 32 of the Federal Rules of Criminal Procedure, and asks to be sentenced on the same date as the entry of its guilty plea to the offenses charged in the Information. If, however, the sentencing takes place on a day other than the day of the plea, that will not provide a basis for UDT to withdraw its guilty plea.

D. UDT agrees to pay a criminal fine of $250,000 for each count of the Information, for a total of $750,000. In addition, as to Count Three, UDT agrees that it shall be placed on

-2-

<PAGE>

probation for a period of five years. The sole conditions of probation shall be: (1) that UDT abide by all federal, state, and local laws during the period of probation, and (2) that UDT pay the $750,000 fine pursuant to the five-payment installment schedule set forth below:

<TABLE>
<CAPTION>

| Installment | Amount | Due Date for Payment |
|---|---|---|
| <S> | <C> | <C> |
| 1 | $100,000 | March 31, 1995 |
| 2 | $150,000 | March 31, 1996 |
| 3 | $150,000 | March 31, 1997 |
| 4 | $150,000 | March 31, 1998 |
| 5 | $200,000 | March 31, 1999 |

</TABLE>

E. UDT agrees that the five-year term of probation on Count Three shall commence to run upon UDT's first installment payment due March 31, 1995.

F. The installment schedule set forth in paragraph D for the payment of UDT's criminal fine may only be adjusted with the consent of the government and must be approved by the court. In the event that UDT is financially unable to make a payment, it may request the opportunity to renegotiate the terms of the payment schedule. In no event shall any payments due by UDT be extended beyond the five-year period of probation. Nor shall the total principal amount of the fine be reduced to less than $750,000. UDT may prepay the criminal fine, including all interest due up to and including the date of prepayment, without penalty.

-3-

<PAGE>

G. UDT agrees to pay interest in addition to its $750,000 principal fine amount. The interest payments shall be due on the date of each principal installment, as set forth in paragraph D. The rate of interest shall be equal to the six-month U.S. Treasury Bill rate computed as of fifteen days prior to the due date of each installment. Interest on the $750,000 principal fine amount

shall commence running as of the date of sentencing.

H. UDT also agrees to pay to the Clerk of the Court for the United States District Court for the Central District of California on the date of sentencing the mandatory assessment of $600 ($200 per count of the Information).

I. Restitution shall not be ordered as part of the criminal sentence. The issue of restitution is addressed in the civil Settlement Agreement attached hereto as Exhibit 2. This Office and UDT expressly acknowledge that this Plea Agreement is conditioned upon the district court's approval of this related civil settlement.

J. In exchange for UDT's quilty pleas and other commitments pursuant to this Agreement, this Office agrees not to prosecute UDT for any other criminal violations involving parts UDT manufactured and tested for U.S. military application as of the date that this agreement is executed.

K. This Agreement does not prevent the government from prosecuting any individual for any offense, including the offenses charged in the Information.

-4-

<PAGE>

L. UDT knowingly and intelligently waives any rights it may have to any direct appeal or collateral attack of the sentence agreed to herein.

M. Until the entry of UDT's quilty plea pursuant to the terms of this Agreement, or the expiration of one year from the date this Agreement is signed, whichever occurs first, UDT agrees to waive any defense based on the statute of limitations with respect to the criminal charges set forth in the Information or related to activities described in paragraph J.

IV

## STATEMENT OF FACTS

The parties agree to the statement of facts attached hereto as Exhibit 3. This statement of facts does not preclude this Office or UDT from stating any further facts, not inconsistent with those in the attached statement, deemed necessary by either party or the court to establish a factual basis for the quilty pleas, or necessary to respond to questions by the court.

V

## JOINT AND SEVERAL LIABILITY

As part of this Agreement, the President of UDT, Deepak Chopra, agrees personally to guarantee UDT's payment of the criminal fine as described herein. Accordingly, UDT and Mr. Chopra are jointly and severally liable for the payment of fines plus interest pursuant to the schedule set forth in Section III. This provision is intended solely to insure payment of the fine,

-5-

<PAGE>

and does not mean or imply that Mr. Chopra directed, approved of, or had knowledge of the unlawful acts alleged in the Information.

VI

## BREACH OF THE AGREEMENT

UDT understands that this Office has entered into this Agreement strictly relying on UDT's faithful performance of every material term and condition herein. If it is determined that UDT has violated the provisions of this Agreement by failing to make a required installment payment, the following consequences will result:

A. This Office will no longer be bound in any respect by this Agreement,

and shall be entirely released from its commitments, representations and obligations to UDT set forth herein, and UDT may be subject to prosecution for any federal criminal violation to which a guilty plea has not been entered into pursuant to Section III above. UDT agrees that such prosecution will be at the discretion of this Office, and shall not be barred by any applicable statute of limitations.

B. Alternatively, at the discretion of this Office, if UDT fails to make a timely installment payment plus interest pursuant to the schedule set forth in Section III above, the United States may, by written notice to UDT, declare any remaining balance and interest due and payable as of the tenth business day following UDT's receipt of such written notice. In the event UDT refuses or is unable to pay any balance and interest due, Mr. Chopra agrees to pay the entire remaining balance and interest within

-6-

<PAGE>

ten business days thereafter. In such event, however, the court will not impose an additional monetary fine on UDT. The total fine to be imposed on UDT with respect to Counts One through Three will be $750,000.

If the government elects to proced under paragraph "VI.B", it will forego its right to proceed under paragraph "VI.A".

VII

SUSPENSION AND DEBARMENT

By this Agreement this Office makes no representation or promise concerning suspension or debarment of UDT from contracting with the United States government or with any office, agency, or department thereof. Suspension and debarment are administrative actions solely within the authority of other government offices, agencies, and departments. This Agreement is not conditioned upon, and shall not be effected by, any suspension or debarment decision concerning UDT that may be made by any office, agency or department of the United States following UDT's entry of guilty pleas herein.

The government agrees to make known to the Department of Defense the extent of UDT's cooperation and remedial efforts.

VIII

WAIVER OF CONSTITUTIONAL RIGHTS

UDT understands that by pleading guilty to the attached Information, it will be giving up the following constitutional rights:

-7-

<PAGE>

UDT waives its right to indictment by a grand jury. UDT also waives the right to plead not guilty to the charges and the right to be tried by a jury, or if UDT wished and with the consent of the government, to be tried by a judge. At that trial, UDT would have the right to an attorney. During the trial, UDT would be presumed innocent and a jury would be instructed that the burden of proof is on the government to prove UDT guilty beyond a reasonable doubt. UDT would have the right to confront and cross-examine witnesses against it. If UDT wished, it could call witnesses on its behalf and subpoena those witnesses to testify. If UDT were found guilty after a trial, it would have the right to appeal that verdict to see if any errors had been committed during trial that would require either a new trial or a dismissal of the charges. By pleading guilty, UDT will be giving up all of these rights.

IX

NO ADDITIONAL AGREEMENTS

Except as expressly set forth herein and in the attached civil Settlement

Agreement, there are no additional promises, understandings or agreements, express or implied, between this Office and UDT, or their respective counsel, concerning this case or any other pending or future federal, state, or local criminal prosecution, civil litigation or administrative proceeding relating to any other federal, state or local charges that may now be pending or hereafter be brought against UDT or any of its parent divisions, subsidiaries, or affiliates. Nor may any

-8-

<PAGE>

additional agreement, understanding or condition be entered into unless in writing and signed by all parties.

X

LIENS AND CLAIMS

All matters relating to obtaining a lien on UDT's property, and enforcing or subordinating such lien or claim, shall be handled by the United States in a manner consistent with the Stipulation for Consent Judgment, which is part of the attached civil settlement agreement.

Dated: October 21, 1994

NORA M. MANELLA
United States Attorney

/s/ Bryan D. Daly
--------------------------
BRYAN D. DALY

/s/ Robert T. Scott
--------------------------
ROBERT T. SCOTT
Assistant United States Attorneys
Public Corruption and Government Fraud Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

-9-

<PAGE>

On behalf of UDT, I have read this Agreement and have carefully reviewed every part of it with counsel for UDT. I understand it, and, on behalf of UDT, I knowingly agree to it. Further, I have consulted with counsel for UDT and fully understand UDT's rights under the law. No promises or inducements have been made to UDT other than those contained in this Agreement. In addition, no one has threatened or forced UDT in any way to enter into this Agreement. Finally, I am satisfied with the representation of counsel for UDT in this matter.

Dated: October 6, 1994

UDT SENSORS, INC.

/s/ Deepak Chopra
------------------------------
DEEPAK CHOPRA
PRESIDENT

As counsel for UDT, I have carefully reviewed every part of this Agreement with my client. To my knowledge, UDT's decision to enter into this Agreement is an informed and voluntary one.

Dated: October 6, 1994

RICHMAN, LAWRENCE, MANN,
GREBNZ, ARBITER & CHIZEVER

/s/ Roel C. Campos
--------------------------------
ROEL C. CAMPOS

Counsel for Defendant
UDT SENSORS, INC.

-10-

<PAGE>

## STATEMENT OF FACTS

### A. Introduction

At all times pertinent to the charges in the Information, UDT Sensors, Inc. ("UDT") was a corporation located at 12525 Chadron Avenue, Hawthorne, California. UDT was formed in May 1987 and currently has approximately 300 employees.

UDT manufactures photosensors under contracts with both military and commercial buyers. Among the photosensors manufactured by UDT are high-reliability ("hi-rel") sensors that are sold primarily to military customers, including the U.S. Army for application in laser detector sets on various aircraft and attack helicopters, and the U.S. Navy for application in arc fault detector sets on submarines.

The military hi-rel purchase orders awarded to UDT specified various quality assurance tests that were required to be performed to assure the reliability of the hi-rel photosensors for critical military applications. Those tests included various electrical and optical tests designed to measure the operational effectiveness of each sensor. The results of the tests were recorded on computer data sheets that were furnished to hi-rel customers with each shipment of sensors, along with certificates of conformance, which certified that the sensors had been manufactured and quality tested in accordance with applicable military specifications.

### B. Creation of False Test Data

Beginning on or about May 1991, UDT testing personnel began using a random number generator ("RNG") program to create false computer test data for hi-rel photosensors. Specifically, by using this RNG program, UDT testers would create false computer test data with specific measurements without testing the sensors as required by the applicable military specifications. From on or about May 1991 to approximately April 1994, UDT testers, at the direction of UDT's hi-rel test supervisor and former project engineer, skipped various required electrical and/or optical tests and used the RNG to create false computer test data on approximately $6,900,878 in shipments of various types of hi-rel sensors, as described below:

<TABLE>
<CAPTION>

| Date | Part Identification No. | Sales |
|---|---|---|
| 1. Powertronics | | |
| 7/1/92 to 6/30/93 | 1304-1 | $2,144,274 |
| 7/1/93 to 3/26/94 | 1304-1 | $1,519,995 |
| 2. Hughes Danbury | | |
| 7/1/92 to 6/30/93 | 8060 | $28,364 |

</TABLE>

<PAGE>

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| 7/1/93 to 3/26/94 | 8060 | $313,040 |
| | | |
| 7/1/92 to 6/30/93 | 6523-2 | $32,472 |
| 7/1/93 to 3/26/94 | 6523-2 | $102,762 |
| | | |
| 7/1/92 to 6/30/93 | 6523-1 | $680,720 |
| 7/1/93 to 3/26/94 | 6523-1 | $423,720 |
| | | |
| 3. General Dynamics | | |
| 7/1/91 to 6/30/93 | 1304-1 | $546,937 |
| 7/1/93 to 3/26/94 | 1304-1 | $211,464 |
| | | |
| 4. Litton Guidance | | |
| 7/1/91 to 6/30/92 | 4819-3 | $229,725 |
| 7/1/92 to 6/30/93 | 4819-3 | $64,845 |
| 7/1/93 to 3/26/94 | 4819-3 | $137,955 |
| | | |
| 7/1/93 to 3/26/94 | 8640-3 | $26,724 |
| | | |
| 7/1/93 to 3/26/94 | 6834-1 | $14,019 |
| | | |
| 5. Honeywell Avionic | | |
| 7/1/91 to 6/30/92 | 4959-4 | $43,475 |
| 7/1/92 to 6/30/93 | 4959-4 | $23,429 |
| 7/1/93 to 3/26/94 | 4959-4 | $59,875 |
| | | |
| 7/1/91 to 6/30/92 | 4959-3 | $23,985 |
| 7/1/92 to 6/30/93 | 4959-3 | $27,730 |
| 7/1/93 to 3/26/94 | 4959-3 | $44,680 |
| | | |
| 7/1/92 to 6/30/93 | 7032-1 | $18,620 |
| 7/1/93 to 3/26/94 | 7032-1 | $7,000 |
| | | |
| 7/1/92 to 6/30/93 | 7032-2 | $14,504 |
| 7/1/93 to 3/26/94 | 7032-2 | $14,000 |

| 6. Allied-Signal/Bendix | | |
|---|---|---|
| 7/1/90 to 4/23/94 | 8705-2 | $62,708 |
| 7/1/93 to 4/23/94 | 8705-2 | $63,205 |
| 7. Ametek | | |
| 7/1/93 to 4/23/94 | 8505-1 | $20,650 |

</TABLE>

By deducting an estimated value of approximately 10% from the purchase price for the above photosensors for skipped quality testing, the loss to the government from UDT's failure to contduct

<PAGE>

this testing is estimated at approximately $690,087. This loss figure does not include damages relating to untested defective diodes which may have been shipped to the hi-rel customers, or consequential damages that may be attributed to UDT's failure to perform the required testing.

C. The Hughes Shipments (Count One and Two)

On or about March 14, 1990, the U.S. Army awarded contract DAAB07-90-C-S001 to Hughes Danbury Optical Systems ("HDOS") for the production of AN/AVR-2 laser detecting sets ("LDS"). The LDS's are used on aircraft and attack helicopters to detect optical signals received from enemy targeting systems and to provide warnings of laser threats to the aircrew, thereby allowing time for possible evasive maneuvers away from those threats. The contract called for HDOS to produce and deliver 99 LDS's to the Army for a firm fixed price of $38,412,099.

On or about August 20, 1992, HDOS awarded purchase order no. 92205 to UDT for the production and delivery of 2,030 photosensors, a component of the LDS. The purchase order was in the amount of $869,256. The purchase order incorporated military specifications that required UDT to perform certain optical tests (rise time , responsivity, cross-talk and uniformity) on a 100% basis. It also required UDT to certify that the photosensors were manufactured and quality tested in accordance with applicable military specifications.

Count One: On or about July 21, 1993, UDT shipped 84 photosensors to HDOS under purchase order no. 92205, along with a certificate of conformance certifying that the photosensors had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that the required 100% optical tests had not been performed. UDT's tester skipped these required tests entirely and knowingly used the RNG program to create false test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

Count Two: On or about November 17, 1993, UDT shipped 98 photosensors to HDOS under purchase order no. 92205, along with a certificate of conformance certifying that the photosensors had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that the required 100% optical testing had not been performed. UDT's tester skipped the required tests and knowingly used the RNG program to create false computer test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

D. The Powertronics Shipment (Count Three)

<PAGE>

On or about April 24, 1991, the U.S. Navy awarded contract N0024-91-C-4017 to Powertronics Systems, Incorporation ("Powertronics") for the production of arc-fault detector systems ("AFD systems"). The AFD systems are used on submarines to detect electrical switchboard arc faults and to automatically open selected circuit breakers to extinguish the arc, thereby preventing fires in the

submarine power rooms. The contract called for Powertronics to produce and deliver 43 AFD systems to the Navy for a firm fixed price of $22,872,950.

On or about October 5, 1992, Powertronics awarded purchase order no. 3599R to UDT for the production and delivery of 102 photosensor assemblies, a component of the AFD system. The purchase order was in the amount of $167,076. The purchase order incorporated military specifications that required UDT to perform a series of pre- and post-burn-in electrical and optical tests (dark current, shunt resistance, series resistance, responsivity, and LED/detector output) on a 100% basis. It also required UDT to certify that the photosensor assemblies were manufactured and quality tested in accordance with the military specifications.

Count Three: On or about November 23, 1993, UDT shipped photosensor assemblies to Powertronics under purchase order no. 3599R, along with a certificate of conformance certifying that the photosensor assemblies had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that certain of the required 100% electrical and optical tests had not been performed or had been performed on a sample basis only. UDT's tester skipped the required tests and knowingly used the RNG program to create false computer test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

E. UDT's Remedial Efforts

Upon learning of the facts underlying the government's investigation, UDT immediately terminated the employment of the employees who had admittedly participated in the falsification of the hi-rel test data. UDT also timely notified its hi-rel customers about this falsification and the programs impacted. UDT also voluntarily undertook a retesting effort for all programs affected by the false testing. UDT estimates that this retesting effort will cost the company approximately $550,000. Finally, UDT has agreed to provide the U.S. Navy a complete shipset of photosensor assemblies (valued at approximately $250,000) to replace any that may have to be replaced in the fleet in the future.

<PAGE>

GUARANTEE

Due to the close business and financial relationships between UDT Sensors, Inc., ("UDT") and the undersigned ("Guarantor"), in consideration of the benefits which will accrue to Guarantor and as an inducement for and in consideration of the agreement by the United States to enter into the Plea Agreement and Stipulated Consent Judgement, Guarantor hereby agrees as follows:

1. Guarantee.

(a) Guarantor absolutely and unconditionally guarantees and agrees to be liable for the full and indefeasible payment and performance when due of the following (all of which are collectively referred to herein as the "Guaranteed Obligations"): (i) all obligations, liabilities and indebtedness of any kind, nature and description of UDT to the United States, including principal, interest, charges, fees, costs and expenses arising under the Plea Agreement and Consent Judgment, whether as principal, surety, endorser, guarantor or otherwise, (ii) all expenses (including, without limitation, attorneys' fees and legal expenses) incurred in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, enforcement and defense of UDT's obligations.

(b) This Guarantee is a guaranty of payment and not of collection. Guarantor agrees that the United States need not attempt to collect any Guaranteed Obligations from UDT, Guarantor or any other Obligor or to realize upon any collateral, but may require Guarantor to make immediate payment of all of the Guaranteed Obligations when due, whether by maturity, acceleration or otherwise, or at any time thereafter.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 432 of 2711

(c) Payment by Guarantor shall be made from time to time on demand as Guaranteed Obligations become due. Guarantor shall make all payments on the Guaranteed Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind. One or more successive or concurrent actions may be brought hereon against Guarantor either in the same action in which UDT is sued or in separate actions. In the event any claim or action, or action on any judgment, based on this Guarantee is brought against Guarantor, Guarantor agrees not to deduct, setoff, or seek any counterclaim for or recoup any amounts which are or may be owed by the United States to Guarantor.

2. Waivers and Consents.

(a) Notice of acceptance of this Guarantee, the making of loans and advances and providing other financial

<PAGE>

accommodations to UDT and presentment, demand, protest, notice of protest, notice of nonpayment or default and all other notices to which UDT or Guarantor is entitled are hereby waived by Guarantor. Guarantor also waives notice of and hereby consents to, (i) any amendment, modification, supplement, extension, renewal, or restatement of the Plea Agreement and Stipulated Consent Judgment, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Guaranteed Obligations or any collateral, and the guarantee made herein shall apply to the Plea Agreement and Stipulated Consent Judgment and the Guaranteed Obligations as so amended, modified, supplemented, renewed, restated or extended, increased or decreased, (ii) the taking, exchange, surrender and relating of collateral or guarantees now or at any time held by or available to the United States for the obligations of UDT. Guarantor agrees that the amount of the Guaranteed Obligations shall not be diminished and the liability of Guarantor hereunder shall not be otherwise impaired or affected by any of the foregoing.

(b) No invalidity, irregularity or unenforceability of all or any part of the Guaranteed Obligations shall affect, impair or be a defense to this Guarantee, nor shall any other circumstance which might otherwise constitute a defense available to or legal or equitable discharge of UDT in respect of any of the Guaranteed Obligations, or Guarantor in respect of this Guarantee, affect, impair or be a defense to this Guarantee. Without limitation of the foregoing, the liability of Guarantor hereunder shall not be discharged or impaired in any respect by reason of any failure by the United States to perfect or continue perfection of any lien or security interest in any collateral or any delay in perfecting any such lien or security interest.

3. Subordination. Payment of all amounts now or hereafter owed to Guarantor by UDT (except for salary, bonus and other cash compensation not to exceed a total of $275,000 annually and all non-cash benefits) is hereby subordinated in right of payment to the indefeasible payment in full to the United States of the Guaranteed obligations and all such amounts and any security and guarantees therefor and hereby assigned to the Unites States as security for the Guaranteed Obligations. Notwithstanding the foregoing, prior to a default by UDT, payments of amounts now or hereafter owed to Guarantor by UDT may be made as and when such amounts become due and payable.

4. Reinstatement. If after receipt of any payment of, or proceeds of collateral applied to the payment of, any of the Guaranteed Obligations, the United States is required to surrender or return such payment or proceeds to any Person for any reason, then the Guaranteed Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Guarantee shall continue in full force and

<PAGE>

effect as if such payment or proceeds had not been received by United States.

5. Amendments and Waivers. Neither this Guarantee nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement. The United States shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall in writing and signed by an authorized employer of the United States.

6. GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTEE WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

7. The United States shall not have any liability to Guarantor (whether in tort, contract, equity or otherwise) for losses suffered by Guarantor in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Guarantee, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order that the losses were the result of acts or omissions constituting gross negligence or willful misconduct. In any such litigation, the United States shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of the Guarantee.

8. Partial Invalidity. If any provision of this Guarantee is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Guarantee as a whole, but this Guarantee shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

9. Entire Agreement. This Guarantee represents the entire agreement and understanding of this parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.

10. Successors and Assigns. This Guarantee shall be binding upon Guarantor and his or her heirs, executors, administrators, successors and assigns and shall inure to the benefit of the United States.

<PAGE>

11. Construction. All references to the term "Guarantor" wherever used herein shall mean Guarantor and his or her heirs, executors, administrators, successors and assigns (including, without limitation, any receiver, trustee or custodian for Guarantor or any of his or her assets-or Guarantor in his or her capacity as debtor or debtor-in-possession under the United States Bankruptcy Code).

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guarantee as of the day and year first above written.

WITNESS: /s/ Deepak Chopra
_________________________

/s/
___________________________

Name: ___________________________

Address: __________________________

__________________________

<PAGE>

STATE OF CALIFORNIA )

) ss.
COUNTY OF )

On this 26th day of October, 1994 before me, a Notary Public in and for said County and State, personally appeared Deepak Chopra, personally known to me (or proved to me on the basis of satisfactory evidence) to be the individual whose name is subscribed to this instrument, and acknowledged that he executed it.

Witness my official seal.

[SEAL APPEARS HERE]

/s/ Peggy L. Bennett 10-26-94
-------------------------------
Notary Public in and for said
County and State

5

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.2
<SEQUENCE>7
<DESCRIPTION>AGREEMENT BETWEEN UDT SENSORS & DEPT. OF THE NAVY
<TEXT>

<PAGE>

EXHIBIT 99.2

AGREEMENT BETWEEN UDT SENSORS, INC.
AND THE DEPARTMENT OF THE NAVY

1. This Agreement is entered into between the Department of the Navy, on behalf of the Department of Defense, and UDT SENSORS, INC. ("UDT" or "Company"). The sole purpose of this agreement is to evince that UDT is presently responsible to contract with the Federal Government by insuring that UDT has and will continue a program of acceptable contracting practices and procedures, and by establishing and implementing a program of compliance review, audits, and reports. For purpose of this agreement, UDT shall mean UDT as a body corporate, its predecessors, successors, affiliates, subsidiaries, and/or divisions and all directors, officers, employees and/or consultants of any of the aforesaid entities.

2. This agreement is based upon the resolution by UDT and the Department of Justice of the criminal investigation pursuant to the criminal and civil settlements reached by UDT with the United States Attorney's Office, Central District of California on or about October 24, 1994, as reflected in the Information and Plea Agreement and Stipulation for Consent Judgement and Consent Judgement, attached as Annex I. This agreement shall not be used for any purpose related to UDT's defense against or in mitigation or appeal of any criminal, civil or administrative charge, claim, or action related to or arising out of any criminal or civil investigation conducted by any component of the Department of Justice or the Department of Defense.

3. By this agreement, UDT recognizes its corporate responsibility to ensure that UDT fully complies with all Federal procurement laws and regulations when contracting, directly or indirectly, with the United States Government. In this regard, all aspects of UDT's corporate and business operations shall be conducted according to the highest code of corporate ethics, generally prevailing lawful and honest behavior, and the guidelines set by the letter and the spirit of this agreement.

4. To fulfill its corporate responsibilities, UDT has implemented a program which establishes compliant contracting procedures and practices for UDT and by which UDT will monitor adherence to these procedures and practices. This program includes four major components:

A. CODE OF ETHICS: UDT has established a written Code of Ethics which provides notice to all employees that the highest standard of business

    ethics is maintained.

(1) The written Code of Ethics is maintained, reviewed on an annual basis by its duly appointed legal counsel,

<PAGE>

and updated as required for compliance with statutory and/or regulatory changes.

B. All UDT directors, officers, employees, and consultants are required to sign a certificate stating that they have read the Code of Ethics and understand its provisions.

(1) An Ethics Committee and its Chairman, the Director of Quality Assurance, reports and is responsible directly to the directors of UDT, and has been appointed to assist UDT employees in recognizing and reporting violations of the Code of Ethics or Standards of Conduct.

(i) The Chairman of the Ethics Committee and the Ethics Committee members shall investigate all instances of suspected misconduct and shall report the findings to the Board of Directors, which shall thereafter provide for management response.

(ii) For the term of this agreement, the Ethics Committee and its Chairman, the Director of Quality Assurance, shall, within 10 working days after the end of each fiscal quarter, prepare and deliver to Counsel, Procurement Integrity Office, Department of the Navy a synopsis of each instance of suspected and/or confirmed misconduct which became known to the Ethics Committee during the fiscal quarter. This synopsis shall be made without regard to the degree to which the Ethics Committee has been able, as of the due date of the report, to investigate the misconduct. This synopsis shall include disclosure of any remedial action taken to date.

(2) A telephone "hot line" to the Ethics Committee has been established at UDT to facilitate employee reports of suspected misconduct.

C. WRITTEN CONTRACTING PROCEDURES: A manual containing the regulatory standards and acceptable practices for doing business with the Government and/or Government prime contractors has been developed for UDT. These practices and procedures shall be applied to all business dealings involving Government contracts or subcontracts.

D. AUDIT AND COMPLIANCE REVIEW: The Chairman of the UDT Ethics Committee shall have the responsibility of directing and monitoring all audit and compliance review to ensure that all ethical standards are being met and that UDT's compliance program is being implemented. The duties in this regard of the Chairman of the Ethics Committee shall include the following:

(1) Have final decision making authority with respect to matters over which the Committee does not achieve a consensus, subject to the review of the Board of Directors.

(2) Review and approve all policies relating to quality, testing and inspection as well as meet with supervisory

2

<PAGE>

personnel who work in quality assurance, inspection and testing, to determine that they are fully trained in these areas.

(3) Have final decision making authority with respect to quality, inspection and testing, subject to the review of the Board of Directors.

(4) Review, with UDT's President, no less than four times yearly, testing and inspection audits which shall be conducted by the Quality Assurance Manager, including the compliance program audits which will be conducted two times per year.

(5) Conduct with UDT's President no less than two testing and

inspection audits per year.

(6) Report both testing and inspection audit results to the Ethics Committee and recommend any corrective action which the Ethics Committee Chairman deems appropriate, with a full report directed to the Board of Directors.

(7) Meet no less than twelve times per year with quality control supervisors and other employees who work in the areas of quality, testing and inspection to discuss and evaluate conformance with the procedures which have been approved and adopted pursuant to this Agreement. Such meetings shall be documented in writing.

(8) Convene special meetings of the Ethics Committee if it is determined that one or more matters pertaining to any aspect of this Agreement require the immediate attention of the Committee.

(9) Cause a report to be issued immediately to the Navy should the Ethics Committee Chairman become unable to carry out the foregoing responsibilities or if he is or will be replaced. This report should contain the UDT's proposal for another qualified officer to carry out the foregoing duties.

E. TRAINING: A comprehensive, recurring-type training program has been established for UDT directors, officers, employees, and consultants regarding the Code of Ethics and acceptable contracting practices.

The schedule for completed and planned compliance actions for this program will be as previously submitted and approved by the Navy.

5. UDT further agrees to:

A. Complete any planned compliance actions as scheduled and coordinated and approved by the Navy.

3

<PAGE>

B. Within ten (10) working days after the end of each fiscal quarter, prepare and provide a report to the Navy Debarring and Suspending Official, or his designee, describing UDT's implementation of this agreement.

C. Within ten (10) working days after the end of each fiscal quarter, UDT shall report the status of: (1) All instances of disciplinary action for violations of the Standards of Conduct; (2) all known, ongoing criminal investigations; (3) all known qui tam suits; (4) all known or suspected defective pricing cases; (5) all hotline calls received by the Ethics Advisor (including a description of the complaint and any remedial action taken or planned); and (6) any other matter which might affect UDT's present responsibility status, including but not limited to actual or potential suspension and/or debarment actions by other Government and quasi-governmental agencies.

D. Allow designated representatives of the Department of Defense to interview UDT personnel and to examine UDT's financial books, records, and other company documents for the purpose of evaluating UDT's compliance with the terms of this agreement; such materials described above shall be made available by UDT after reasonable notice for inspection, audit and/or reproduction, provided, however, the Department of Defense shall not be entitled to examine documents properly subject to the attorney-client or attorney work product privileges, not to copy: (1) Documents containing technical data or computer software, except in accordance with government contract data rights provisions, or (2) Documents containing trade secrets.

E. Disclose to the Department of Defense and to the prime Government customer if such customer is not a DOD component, all instances in which there are reasonable grounds to believe that UDT, its directors, officers, employees, consultants, suppliers and/or Government personnel have violated Federal laws or regulations relating to U.S. Government procurements. Further, UDT shall take immediate corrective measures to remedy the matter disclosed, and to notify the Department of Defense, and the prime Government customer, if the matter relates to a non-DOD contract, of the corrective action taken and UDT's opinion

regarding any impact the matter may have on the Government.

F. Cooperate fully with any investigation by the Department of Justice or the Department of Defense of which UDT knows or learns in the future.

G. Upon conviction of UDT for violation of any Federal criminal statute, take appropriate disciplinary action against all responsible individuals.

H. Upon indictment of, or the entering a guilty plea or plea of nolo contendere by any director, officer, employee or consultant of UDT for violation of an Federal criminal statue, which violation occurred in connection with the individual's

4

<PAGE>

performance of duties for or on behalf of UDT, immediately remove the director, officers, employee or consultant from active status with the Company relating to any dealings with the U.S. Government.

I. Upon unappealed conviction of, or after an unsuccessful appeal by any director, officer, employee or consultant of UDT for violation of any Federal criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of UDT, take prompt action to terminate the employment of such officer, employee or consultant, or as appropriate to remove such director from the UDT Board of Directors in recognition of Title 10, U.S.C. (S) D2408.

J. Treat all costs associated with the termination, severance and/or removal of any director, officer, employee or consultant of UDT under paragraph I, above, as unallowable for Federal Government Contract purposes.

K. Continue for a period of three years following full and complete implementation, the actions and procedures described in Annex I and elsewhere in the body of this agreement.

6. During the term of this agreement, UDT shall not knowingly employ, engage or accept the services of an individual who is listed by a Federal Agency as debarred, suspended, or otherwise ineligible for Federal contracting. Reasonable inquiry shall be made into the suspension/debarment status of any potential employee or consultant prior to the offer of employment or engagement of services. Further, UDT shall promptly terminate the employment of or contract for services with any individual who was suspended or debarred as of the effective date of their association with UDT. Moreover, UDT shall immediately remove such individuals from responsibility for or involvement with Government contract matters until the resolution of any question there might be regarding their suspension or debarment status as of the time of their association with UDT.

7. During the term of this agreement, UDT shall not knowingly enter into any subcontract or other business relationship relating to Federal Government contracts with any individual or business entity listed as debarred, suspended, or otherwise ineligible for contracting by a Federal Agency (hereinafter "listed contractor") until it has prepared a notice in form and content as specified in FAR 9.405-2(b), and has submitted a copy thereof to the Counsel, Procurement Integrity Office. Further, UDT shall make reasonable inquiry into the listed contractor status of each prospective business associate prior to the execution of any subcontract or the commencement of any other type of business relationship. In addition, UDT shall give written notice of the prohibition effected by this paragraph to all parties to any potential transaction involving a subcontract or other business relationship relating to Federal Government contracting prior to

5

<PAGE>

the execution of such subcontract or the commencement of such business relationship.

8. In addition to these costs stated in paragraphs 5.J and 9, UDT agrees

that the costs described below shall be unallowable for United States Government contract purposes and shall not be charged directly or indirectly to any such contract or subcontract.

A. All costs of performing the actions set forth in Annex I accomplished by UDT subsequent to its learning of the investigation that resulted in the Information and Plea Agreement and Stipulation for Consent Judgment and Consent Judgment set forth in Annex II.

B. All costs of legal services (whether performed by in-house or private counsel), administrative and clerical services, services of accountants and consultants, salaries and wages of employees, officers, and directors, travel, and any costs directly related to the aforesaid, incurred in the implementation of and/or continued compliance with the terms of this agreement.

9. Within thirty days of the effective date of this agreement, UDT Corporation will remit the sum of $10,000, made payable to the Treasury of the United State, and for final payment of these administrative costs incurred, or to be incurred, by the Government because of UDT's improper activity, which include but are not limited to the costs of investigating the charges, and of monitoring, reviewing, enforcing, and administering this Agreement.

10. Except as provided in paragraph 14, the execution of this agreement by the Navy in no way waives any criminal, civil, contractual, or administrative remedy or right that the Government may have for the acts described in Annex I or for any other conduct that would give rise to such remedies. In addition, this agreement does not alter or limit in any way the releases and waivers previously provided for by the agreements with the U.S. Department of Justice, set forth in Annex I.

11. Failure by UDT to meet any of its obligations under the terms and spirit of this agreement, or to timely perform any of the actions identified in Annex I, not cured to the reasonable satisfaction of the Navy Debarring Authority within 20 working days, or as otherwise agreed, after receipt of written notice of such failure, shall constitute a cause for institution of suspension or debarment proceedings subject to the procedures established by the Federal Acquisition Regulation and any other applicable statute or regulation.

<PAGE>

12. By execution of this agreement, UDT releases the United States, its employees, agents, and instrumentalities, in both official and personal capacities, of any and all liability arising out of or otherwise related to this agreement. Further, UDT agrees not to file any claim against the United States, its employees, agents, and instrumentalities, in both official and personal capacities, in any form or jurisdiction, with regard to any matter arising out of or otherwise related to this agreement.

13. By execution of this agreement, UDT avers that any adverse action taken or to be taken against any UDT director, officer, employee, consultant, or agent, with regard to any matter arising out of or related to the facts and circumstances set forth in Annex II are the result solely of UDT's initiatives and decisions, and are not the result of any action by or on behalf of the United States, its employees, agents or instrumentalities.

14. UDT agrees to indemnify the Government against, and hold the Government harmless from, any and all claims, liabilities, obligations, and causes of action of whatsoever kind or nature for injury to, or death of, any person, and for any injury or damage to or destruction of any property, arising out of or as a result of the facts which form the basis for this agreement, even if the Government's liability to any person arises out of the acts or omissions of the Government, its employees, agents, invitees, or representatives of any other description whatsoever.

15. In recognition of the actions by and covenants of UDT set forth herein, the Navy, on behalf of the Department of Defense, will not suspend or debar UDT based upon the facts set forth in Annex II.

16. This agreement is a public document and may be distributed by the Navy throughout the Executive Branch of the Government and to other interested parties.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 439 of 2711

17. Modifications to this agreement may be made but shall have no effect until their terms are expressly incorporated in a writing which has been executed by both parties. Neither party shall seek or accept the benefit of a judicial or quasi-judicial order directing the other to execute a writing which would, if executed, modify this agreement.

18. For purposes of interpretation of this agreement, or any part hereof, by a court of competent jurisdiction (or any other judicial or quasi-judicial body), this agreement shall be deemed to have been drafted equally by all parties hereto.

<PAGE>

19. This agreement shall become effective on the date of the last signature hereto and shall continue thereafter for a period of three years from that date or, should UDT for any reason cease to be in full compliance with the letter and spirit of this agreement, for a period of three years following reestablishment for full compliance as determined by the Navy Debarring and Suspending Official, whichever period is longest.

20. This agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, oral or written, with respect to the subject hereof. This agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

Date: 7/25/95

UDT SENSORS, INC.

By: /s/ Deepak Chopra
----------------------------------
Deepak Chopra
President and CEO

Date: November 9, 1995

DEPARTMENT OF THE NAVY

By: /s/
----------------------------------
Department and Suspension Officer
Office of Procurement Integrity

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 QNDzb1tW7Pl1W3q0TS1N7h/RoSZpzYiqbgML0ff+TzDLJ9iAtlk8NhybwfuakVA3
 22+PHV6Oicv6S+LX9XO9tw==

<SEC-DOCUMENT>0000944209-97-001116.txt : 19970819
<SEC-HEADER>0000944209-97-001116.hdr.sgml : 19970819
ACCESSION NUMBER: 0000944209-97-001116
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 10
FILED AS OF DATE: 19970815
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97665515

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMEND #2 TO FORM S-1 REGISTRATION STATEMENT
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 15, 1997

REGISTRATION NO. 333-29179

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------

AMENDMENT NO. 2 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

----------------

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| CALIFORNIA | 3674 | 33-0238801 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

</TABLE>

----------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

----------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

----------------

COPIES TO:

ISTVAN BENKO, ESQ. TROY & GOULD PROFESSIONAL CORPORATION 1801 CENTURY PARK EAST, SUITE 1600 LOS ANGELES, CALIFORNIA 90067 TEL. (310) 553-4441 FAX. (310) 201-4746

BERTRAM R. ZWEIG, ESQ. JONES, DAY, REAVIS & POGUE 555 WEST 5TH STREET, SUITE 4600 LOS ANGELES, CALIFORNIA 90013-1025 TEL. (213) 489-3939 FAX. (213) 243-2539

----------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC: AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

----------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

----------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

<PAGE>

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE.

SUBJECT TO COMPLETION, DATED AUGUST 15, 1997

[LOGO OF OPTO-SENSORS, INC.]

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $13.00 and $14.00 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Company has made application for inclusion of the Common Stock on the Nasdaq National Market under the symbol "OSIS."

-----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

-----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>

- --------------------------------------------------------------------------------

<CAPTION>

| | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING SHAREHOLDERS(2) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."

(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.

(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

-----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]
Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."
<PAGE>

[TWO PAGE GATEFOLD]

OSI SYSTEMS, INC.
----------------

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]
Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]

Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

----------------
TABLE OF CONTENTS
----------------

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |
| Dilution | 17 |
| Selected Consolidated Financial Data | 18 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 28 |
| Management | 41 |
| Certain Transactions | 49 |
| Principal and Selling Shareholders | 51 |

Description of Capital Stock........................................ 54
Shares Eligible for Future Sale...................................... 55
Underwriting......................................................... 56
Legal Matters........................................................ 58
Experts.............................................................. 58
Additional Information............................................... 58
Index to Consolidated Financial Statements........................... F-1
</TABLE>

----------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

## PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

## THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8%, of the Company's revenues.

### Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic

devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In fiscal 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During fiscal 1997, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

<PAGE>

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its

global presence, and selectively entering into new end product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997 the Company marketed its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,486,528 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Proposed Nasdaq National Market Symbol............................ | OSIS |

</TABLE>

- -------------------

(1) Based on the number of shares outstanding on August 15, 1997. Excludes approximately 860,486 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.34 per share.

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues.................... | $27,225 | $47,735 | $49,815 | $61,518 | $77,628 |
| Cost of goods sold.......... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit............... | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |

| | | | | | |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| Selling, general and administrative(1)......... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2).......... | -- | -- | -- | -- | 856 |
| Total operating expenses... | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations...... | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense........... | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest...... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest.................. | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest.......... | 6 | 38 | 17 | 117 | -- |
| Net income................. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4).. | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5)............ | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)............ | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1997 ACTUAL <C> | JUNE 30, 1997 AS ADJUSTED(6) <C> |
|---|---|---|
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash.................................................. | $ 553 | $29,839 |
| Working capital....................................... | 10,800 | 49,961 |
| Total assets.......................................... | 47,333 | 76,619 |
| Total debt............................................ | 13,180 | 1,258 |
| Total shareholders' equity............................ | 16,809 | 58,017 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of $161,000, $246,000, $216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $6,000, $38,000, $17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

## RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

### FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

### COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics"), Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

7

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business--Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is

required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the Company's

<PAGE>

subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995, 1996 and 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 42.2%, respectively, of the Company's revenues. Of the revenues generated during

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 453 of 2711

fiscal 1997 from shipments made outside of the United States, [illegible]% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial condition and results of operations. While the Company has no current agreement or negotiations underway with

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the

Company. 

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations.

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, the court could grant Lunar and UAB a permanent injunction in which case Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of operations. For the year ended June 30, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $10.5 million or approximately 13.5% of the Company's revenues. Through June 30, 1997, the Company has incurred legal fees in the amount of approximately $368,000 in connection with this lawsuit. The Company intends to pursue vigorously its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights.

Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13.0 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.2% and 16.2%, respectively, of the Company's Common Stock (17.3% and 14.2%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 41.7% of the outstanding Common Stock (37.7% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the

Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

12

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. The Company has filed an application to have the Common Stock approved for quotation on the Nasdaq National Market. However, there can be no assurance that an active trading market for the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,486,528 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,786,528 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,761,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for

180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,786,528 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of this Offering to be received by the Company, approximately $29.3 million or approximately 71.1% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay

bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $11.9 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT JUNE 30, 1997 | RATE BASIS PER ANNUM(1) | RATE AT JUNE 30, 1997 | MATURITY |
|---|---|---|---|---|
| Revolving Credit | $5,077,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,344,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,500,000 | Variable rate plus 0.25% | 8.75% | October 1997 |
| Revolving Credit | 963,000 | Variable rate plus 1.85% | 7.85% | December 1997 |
| Revolving Credit | 974,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 41,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 586,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 437,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- --------------------
(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

Borrowings under the foregoing bank facilities are generally used for working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

<PAGE>

CAPITALIZATION

The following table sets forth as of June 30, 1997: (i) the actual short-term debt and capitalization of the Company; and (ii) the short-term debt and

capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

| | JUNE 30, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED |
| | (In thousands) | |
| Short-term debt | $10,340 | $ 465 |
| Long-term debt, less current portion | 2,840 | 793 |
| Shareholders' equity: | | |
| Preferred Stock, no par value; 10,000,000 shares authorized; none issued and outstanding | -- | -- |
| Common Stock, no par value(1)(2); 40,000,000 shares authorized, actual and as adjusted; 6,156,528 shares issued and outstanding, actual; 9,486,528 issued and outstanding, as adjusted | 7,367 | 48,575 |
| Retained earnings | 9,171 | 9,171 |
| Cumulative foreign currency translation adjustment | 271 | 271 |
| Total shareholders' equity | 16,809 | 58,017 |
| Total capitalization | $19,649 | $58,810 |

- --------------------

(1) Excludes 860,486 shares of Common Stock issuable upon exercise of outstanding stock options as of June 30, 1997.

(2) Includes 27,654 shares of Common Stock that are issuable as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

DILUTION

The net tangible book value of the Company at June 30, 1997 , was $14,707,000 or $2.39 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding . After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of June 30, 1997 would have been $55,915,000, or $5.89 per share. This represents an immediate increase in the net tangible book value of $3.50 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.61 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed initial public offering price | | $13.50 |
| Net tangible book value before Offering | $2.39 | |
| Increase in net tangible book value attributable to this Offering | 3.50 | |

| | |
|---|---|
| Pro forma net tangible book value after Offering.............. | 5.89 |
| Dilution to new investors.................................... | $ 7.61 |

</TABLE>

The following table sets forth on a pro forma basis as of June 30, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

<TABLE>
<CAPTION>

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Existing shareholders.. | 6,156,528 | 64.9% | $ 7,367,000 | 14.1% | $ 1.20 |
| New public investors... | 3,330,000 | 35.1 | 44,955,000 | 85.9 | $13.50 |
| Total................. | 9,486,528 | 100.0% | $52,322,000 | 100.0% | |

</TABLE>

As of the date of this Prospectus, there are outstanding options to purchase an aggregate of 860,486 of Common Stock at a weighted average exercise price of approximately $7.34 per share. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1997, and the balance sheet data at June 30, 1996 and 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1993 and 1994 and the balance sheet data at June 30, 1993, 1994 and 1995 are derived from audited financial statements not otherwise contained herein.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues................ | $ 27,225 | $ 47,735 | $ 49,815 | $61,518 | $77,628 |
| Cost of goods sold...... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit........... | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |

| | | | | | |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| Selling, general and administrative(1)..... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development........... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)....... | -- | -- | -- | -- | 856 |
| Total operating expenses............. | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations.. | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense........ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest.............. | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.................. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest............... | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest....... | 6 | 38 | 17 | 117 | -- |
| Net income............. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4)..... | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5)......... | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)......... | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | |
| Cash.................................. | $941 | $625 | $1,405 | $581 | $553 |
| Working capital........................ | 3,852 | 2,280 | 12,117 | 6,044 | 10,800 |
| Total assets........................... | 15,739 | 25,807 | 30,780 | 35,309 | 47,333 |
| Total debt............................. | 6,882 | 11,140 | 14,113 | 15,462 | 13,180 |
| Total shareholders' equity............. | 2,256 | 3,128 | 4,951 | 7,194 | 16,809 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000, respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in

certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of 161, 000, 246,000, 216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of 6,000, 38,000, 17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2% of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997, the Company markets its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 42.2% of revenues for the fiscal years 1995, 1996 and 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, 1996 and 1997 was 26.6%, 34.2% and 25.3%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, (In thousands) | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...... | $34,729 | $37,977 | $45,007 | $51,554 |
| (Inter-company eliminations)............... | (1,257) | (1,529) | (6,392) | (8,675) |
| Unaffiliated optoelectronic devices and subsystems .............................. | 33,472 | 36,448 | 38,615 | 42,879 |
| Security and inspection products........... | 14,263 | 13,367 | 22,903 | 34,749 |
| Total revenues............................ | $47,735 | $49,815 | $61,518 | $77,628 |

</TABLE>

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues

and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 75.5 | 75.9 | 73.9 | 72.4 |
| Gross profit | 24.5 | 24.1 | 26.1 | 27.6 |
| Operating expenses: | | | | |
| Selling, general and administrative | 16.7 | 15.3 | 15.9 | 14.6 |
| Research and development | 3.0 | 3.2 | 2.7 | 3.2 |
| Stock option compensation | -- | -- | -- | 1.1 |
| Total operating expenses | 19.7 | 18.5 | 18.6 | 18.9 |
| Income from operations | 4.8 | 5.6 | 7.5 | 8.7 |
| Interest expense | 1.5 | 2.5 | 2.2 | 1.5 |
| Income before income taxes and minority interest | 3.3 | 3.1 | 5.3 | 7.2 |
| Provision for income taxes | 1.7 | 0.8 | 1.8 | 1.8 |
| Income before minority interest | 1.6 | 2.3 | 3.5 | 5.4 |
| Minority interest | -- | -- | 0.2 | -- |
| Net income | 1.6% | 2.3% | 3.7% | 5.4% |

</TABLE>

<PAGE>

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1997 TO THE FISCAL YEAR ENDED JUNE 30, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all inter-company eliminations. Revenues for the fiscal year ended June 30, 1997 increased by $16.1 million, or 26.2%, to $77.6 million from $61.5 million for the fiscal year ended June 30, 1996. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $4.3 million, or 11.0%, to $42.9 million from $38.6 million for fiscal 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenues from the sale of security and inspection products increased by $11.8 million, or 51.7%, to $34.7 million from $22.9 million for fiscal 1996. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, the growth in sales of the Rapiscan 119 tabletop model and the introduction of large cargo inspection machines.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $5.4 million, or 33.8%, to $21.5 million from $16.0 million for fiscal 1996. As a percentage of revenues, gross profit increased to 27.6% in fiscal 1997 from 26.1% in fiscal 1996. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For fiscal 1997, such expenses increased by $1.5 million, or 15.9%, to $11.3 million from $9.8 million in fiscal 1996. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.9%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For fiscal 1997, such expenses increased by $841,000, or 50.6%, to $2.5 million from $1.7 million in fiscal 1996. As a percentage of revenues, research and development expenses increased to 3.2% from 2.7%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for fiscal 1997 increased by $2.2 million, or 47.2%, to $6.8 million from $4.6 million for fiscal 1996. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during fiscal 1997, income from operations increased by $3.0 million, or 65.8%, to $7.6 million from $4.6 million. As a percent of revenues, income from operations increased to 8.7% from 7.5%, and excluding the non-cash compensation expense referenced above, it would have increased to 9.8% from 7.5%.

Interest Expense. Interest expense for fiscal 1997 decreased by $162,000, or 11.9%, to $1.2 million from $1.4 million for fiscal 1996. As a percentage of revenues, interest expense decreased to 1.5% from 2.2%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during fiscal 1997, and to a decrease in the Company's borrowings outstanding under its lines of credit.

<PAGE>

Provision for Income Taxes. Provision for income taxes for fiscal 1997 increased by $305,000, or 27.5%, to $1.4 million from $1.1 million for fiscal 1996. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.3% from 34.2% in fiscal 1996. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for fiscal 1997,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 467 of 2711

increased $1.9 million, or 84.9%, to $4.2 million from $2.3 million in fiscal 1996. The compensation charge described above, decreased net income by $514,000 in fiscal 1997.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling, general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest expense increased to 2.5% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eight consecutive quarters in the period ended June 30, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| | (In thousands) | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues................ | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 | $21,655 |
| Cost of goods sold...... | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 | 15,794 |
| Gross profit............ | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 | 5,861 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 | 3,121 |
| Research and development........... | 419 | 408 | 453 | 383 | 517 | 636 | 584 | 767 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 856 | - |
| Total operating expenses............ | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 | 3,888 |
| Income from operations.. | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | 1,470 | 1,973 |
| Interest expense........ | 336 | 345 | 345 | 333 | 360 | 331 | 209 | 297 |
| Income before income taxes and minority interest............... | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 | 1,676 |
| Provision for income taxes.................. | 85 | 293 | 409 | 324 | 259 | 408 | 316 | 433 |
| Income before minority interest............... | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 | 1,243 |
| Minority interest....... | 19 | 17 | (8) | 89 | -- | -- | -- | -- |
| Net income.............. | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 | $ 1,243 |

</TABLE>

<PAGE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of fiscal years 1996 and 1997.

<TABLE>
<CAPTION>

QUARTER ENDED

| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold...... | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 | 72.9 |
| Gross profit............ | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 | 27.1 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 | 14.4 |
| Research and development........... | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 | 3.5 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 4.1 | -- |
| Total operating expenses.............. | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 | 17.9 |
| Income from operations.. | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 | 9.2 |
| Interest expense........ | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 | 1.4 |
| Income before income taxes and minority interest............... | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 | 7.8 |
| Provision for income taxes.................. | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 | 2.0 |
| Income before minority interest............... | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 | 5.8 |
| Minority interest....... | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- | -- |
| Net income.............. | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% | 5.8% |

</TABLE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of June 30, 1997, the Company's principal sources of liquidity consisted of $553,000 in cash and several credit agreements described below.

The Company's operations provided net cash of $3.4 million during fiscal 1997. For fiscal 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accounts payable and accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in fiscal 1997. Net cash provided by

operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $3.0 million and $2.2 million in fiscal 1997 and 1996, respectively, in each case due primarily to purchases of property and equipment in the amount of approximately $2.2 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property

<PAGE>

and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for fiscal 1997 was $526,000 due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of June 30, 1997, there was outstanding approximately $5.1 million under the $10.0 million line of credit, $2.4 million under the term loan, and approximately $154,000 under the letter of credit facility. As of June 30, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11.0 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of June 30, 1997, there was outstanding approximately $1.5 million under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $1.9 million was used as of June 30, 1997. The facility terminates on October 27, 1997. Borrowings under the

agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.1 million at June 30, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus 2.00% per annum. At June 30, 1997, no amounts were outstanding under the overdraft facility. The second agreement provides for a 750,000 pound sterling (approximately $1.3 million as of June 30, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $832,000 as of June 30, 1997) facility for tender and

<PAGE>

performance bonds. These facilities are secured by certain assets of Rapiscan UK and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of June 30, 1997, there was outstanding approximately $963,000 under the line of credit and $452,000 was outstanding under the performance bond facility. The above facilities expire in December and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at June 30, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at June 30, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of June 30, 1997 there was approximately $974,000 outstanding under the line of credit and approximately $41,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $682,000 at June 30, 1997), of which $586,000 was outstanding as of June 30, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At June 30, 1997 outstanding term loan borrowings totalled approximately 3.2 million Norwegian krone (approximately $437,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average

rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000) and $68,000 were included in income for fiscal 1994, 1995, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology,

and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing

optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the year ended June 30, 1997, approximately 27.3% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take advantage of the

<PAGE>

growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The

Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in fiscal 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995, 1996, and 1997 approximately 28.7%, 33.1%, and 27.3% respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all

other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

<PAGE>

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

<TABLE>
<CAPTION>

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| <S> | <C> | <C> |
| Rapiscan 19 (single energy) | Inspection of incoming package | Embassies |
| Rapiscan 119 (single energy) | | Post offices |
| | | Courthouses |
| | | High risk office buildings |
| | | Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard | Airport hand carried and checked baggage | Airports<br>Cruise ships |

| | | |
|---|---|---|
| Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Pallet inspection<br>Customs inspections<br>Agriculture inspection | Freight shippers<br>Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

</TABLE>

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During fiscal 1997, sales of the walk-through and hand-held metal detectors constituted 1.6% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the year ended June 30, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who purchased more than $100,000 of optoelectronic products; and (iv) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 21.4% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 11.3% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 10 |

| | | | |
|---|---|---|---|
| Medical Monitoring | 11.1% | Datascope<br>BioChem International<br>Criticare Systems | 8 |
| Analytical and Medical Diagnostics Equipment | 6.1% | Johnson & Johnson<br>Leica<br>Coulter Corporation | 10 |
| Office Automation and Computer Peripherals | 7.3% | Xerox<br>Eastman Kodak<br>Dr. Johannes Heidenhain | 8 |
| Construction, Robotics and Industrial Automation | 5.6% | 3M<br>Spectra Physics<br>Baumer Electric | 7 |
| Military/Defense and Weapons Simulations | 4.8% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 7 |
| Colorometry and Particle Analyzers | 0.9% | Coulter Electronics<br>Accuracy Microsensors | 2 |
| Bar Code Scanners | 2.4% | Symbol Technologies<br>Intermec | 2 |
| Gaming Industry | 1.9% | Bally Gaming<br>Ardac, Inc. | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |

| | |
|---|---|
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 23 independent sales representatives and distributors, as of June 30, 1997. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 19 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 72 independent sales representatives, as of June 30, 1997. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection

<PAGE>

products sales staff is supported by a service organization of approximately 23 persons, as of June 30, 1997, located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide

maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996 and 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.6%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom optoelectronic solutions for their specific needs when standard components or subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of June 30, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 33 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $2.5 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities

<PAGE>

in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In

certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 484 of 2711

security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

37

<PAGE>

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At June 30, 1997, the Company's backlog products totalled approximately $52.7 million, compared to approximately $30.0 million at June 30, 1996. Substantially all of the Company's backlog as of June 30, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of June 30, 1997, the Company employed approximately 725 people, of whom 565 were employed in manufacturing, 33 in research and development, 62 in finance and administration, 42 in sales and marketing, and 23 in its service organization. Of the total employees, approximately 453 were employed in the United States, 109 were employed in Europe, 162 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 485 of 2711

| | | | |
|---|---|---|---|
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

<PAGE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future. The Company currently anticipates that it will be able to renew the leases that are scheduled to expire in the next few years on terms substantially the same as currently in effect. However, even if the Company were not able to renew one or more of the leases, the Company believes that suitable substitute space is available to relocate any of the facilities where the lease is not renewed. Accordingly, the Company does not believe that its failure to renew any of the leases that are scheduled to expire in the next few years will have a material adverse effect on the Company's operations.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

<PAGE>

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement,

contributory infringement and inducement thereof. Lunar and UAB seek damages in an unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California and has been consolidated with the lawsuit brought by Rapiscan U.S.A.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

<PAGE>

MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |

| | | |
|---|---|---|
| Manoocher Mansouri Aliabadi............. | 41 | Vice President - Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 55 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 71 | Director |

</TABLE>

- --------------------

(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri-Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1997, each non-employee Director received, as additional director compensation, options to purchase 5,000 shares of Common Stock at an exercise price of $13.50 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1997, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension & Profit Sharing Plan, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension plan by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

43

<PAGE>

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1997, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

| | ANNUAL COMPENSATION | | LONG TERM COMPENSATION |
|---|---|---|---|
| NAME AND PRINCIPAL POSITION | SALARY | BONUS | SECURITIES UNDERLYING OPTIONS (#)(2) |
| Deepak Chopra(1) Chief Executive Officer | $370,843 | $175,000 | 137,500 |
| Ajay Mehra Chief Financial Officer | 172,216 | 58,040 | 73,750 |
| Andreas F. Kotowski President of U.S. Operation, Rapiscan U.S.A. | 124,452 | 10,000 | 57,029 |
| Manoocher Mansouri Aliabadi Vice President--Corporate Marketing, UDT Sensors | 110,019 | 28,000 | 15,000 |
| Thomas K. Hickman Managing Director, OSI Malaysia and OSI Singapore | 124,220 | 12,500 | 10,125 |

(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) For additional information see "Option Grants."

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years. Mr. Kotowski was not entitled to receive such additional incentive compensation for the 1997 fiscal year.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in May and June 1997 based on their performances during the fiscal year ended June 30, 1997.

OPTION GRANTS

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1997:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | MARKET PRICE ($/SHARE) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) 0% ($) | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra.......... | 37,500 | 5.7% | $3.33 | $6.67 | 12/14/01 | $125,000 | $34,535 | $76,314 |
| | 100,000 | 15.3 | 13.50 | N/A | 5/31/02 | N/A | 372,980 | 824,189 |
| Ajay Mehra(2).......... | 30,000 | 4.6 | 3.33 | 6.67 | 12/14/01 | 100,000 | 27,601 | 60,990 |
| | 10,000 | 1.5 | 13.50 | N/A | 5/31/02 | N/A | 37,298 | 82,419 |
| | 30,000 | 4.6 | 11.50 | N/A | 5/31/02 | N/A | 95,317 | |

210,626

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Andreas F. Kotowski(2).. | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 20,000 | 3.1 | 11.50 | N/A | 5/31/02 | N/A | 63,545 | 140,417 |
| Manoocher Mansouri Aliabadi(2)........... | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 7,500 | 1.1 | 11.50 | N/A | 5/31/02 | N/A | 23,829 | 52,656 |
| Thomas K. Hickman(2).... | 3,750 | 0.6 | 2.83 | 6.67 | 12/14/01 | 14,375 | 2,935 | 6,487 |
| | 6,000 | 0.9 | 11.50 | N/A | 5/31/02 | N/A | 19,063 | 42,125 |

</TABLE>

- --------------------

(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 0.0%, 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.

(2) Excludes options granted as consideration for the acquisition by the Company of the minority interests in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

OPTION EXERCISES AND FISCAL YEAR-END VALUES

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1997 and held by them on June 30, 1997:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) | |
|---|---|---|---|---|---|---|
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra........... | 0 | -- | 37,500 | 100,000 | $381,375 | $ 0 |
| Ajay Mehra.............. | 9,000 | $107,100 | 75,000 | 40,000 | 814,500 | 60,000 |
| Andreas F. Kotowski..... | 0 | -- | 7,500 | 20,000 | 80,025 | 40,000 |
| Manoocher Mansouri Aliabadi.............. | 7,500 | 89,250 | 13,500 | 8,250 | 149,500 | 23,625 |
| Thomas K. Hickman....... | 9,750 | 109,925 | 15,187 | 14,813 | 174,648 | 109,600 |

</TABLE>

- --------------------

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of August 15, 1997, 384,375 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 426,000 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 239,625 shares remained available for grant. As of such date, stock options to purchase 385,313 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

<PAGE>

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 494 of 2711

Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a

47

<PAGE>

director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived

an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company intends to enter into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnity Agreement will provide that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnity Agreements will also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnity Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a

total of 150,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) the issuance to the holders of the Option Shares of 27,654 additional shares of Common Stock which was based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ended June 30, 1997. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, 1996 and 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result, certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

<PAGE>

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less

favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 and $111,000 for such services during fiscal 1996 and 1997, respectively. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 and $82,000 for such services during fiscal 1996 and 1997, respectively.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as of August 15, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | NUMBER OF SHARES BEING | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | OFFERED(2) | NUMBER | PERCENT |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.5% | 148,148 | 1,726,852 | 18.2% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 19.0 | 63,343 | 1,107,032 | 11.7 |
| Deepak Chopra(6)(8)............ | 1,539,484 | 24.9 | 0 | 1,539,484 | 16.2 |
| Ajay Mehra(9).................. | 195,693 | 3.1 | 0 | 195,693 | 2.0 |
| Andreas F. Kotowski(10)......... | 128,806 | 2.1 | 0 | 128,806 | 1.4 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12).......... | 27,228 | * | 0 | 27,228 | * |
| Steven C. Good(13)............. | 40,313 | * | 21,896 | 18,417 | * |
| Madan G. Syal(14).............. | 243,938 | 4.0 | 25,926 | 218,012 | 2.3 |
| Meyer Luskin(15)............... | 23,438 | * | 0 | 23,438 | * |
| Good Swartz & Berns Pension & Profit Sharing Plan(16)........ | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birinder Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.3 | 9,259 | 68,420 | * |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 498 of 2711

| | | | | | |
|---|---|---|---|---|---|
| Mohinder Chopra................ | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson.............. | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.1 | 9,259 | 56,098 | * |
| Martha B. Holmes................ | 60,000 | * | 9,259 | 50,741 | * |
| Combined TR/DR Account Trust.... | 52,500 | * | 7,407 | 45,093 | * |
| Gary E. Fleischer.............. | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Redinger............ | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold G. and Hope Anisgarten... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra..................... | 2,057 | * | 450 | 1,607 | * |
| Surendra V. and Kala Jain(17)... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka................... | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka.................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons).................... | 2,286,136 | 36.4 | 47,822 | 2,238,314 | 23.3 |

</TABLE>

- --------------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of August 15, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (88,519); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333); Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension & Profit Sharing Plan (3,309); Leila and Birender Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Combined TR/DR Account Trust (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette J. Moore (7,407); Robert W. Kephart (5,556); Phillip M. Wascher (7,407); Charan J. Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Alan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Le (741); Mark and Penny Berns Trust (1,518); Arnold G. and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln A. Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette J. Moore, Robert W. Kephart, Phillip M. Wascher, Charan J. Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Alan J. Barnard, Christine Williams, Christopher Chin, Khai Le, Louis Peters and Lincoln A. Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,638,333, 17.3%); Sally F. Chamberlain 1,057,402, 11.1%); Deepak Chopra

(1,354,289, 14.2%); Ajay Mehra (162,360, 1.7%); Andreas F. Kotowski 110,287, 1.2%); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,524) Steven C. Good (2,843); Madan G. Syal (199,493, 2.1%); Meyer Luskin (14,179); Good Swartz & Berns Pension & Profit Sharing Plan (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Combined TR/DR Account Trust (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); BetteJ. Moore (28,218); Robert W. Kephart (22,944); Phillip M. Wascher (23,241); Charan J. Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Alan J. and Pamela Barnard (9,704); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (12,148); Khai Le (8,956); Mark and Penny Berns Trust (2,232); Arnold G. and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln A. Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. 37,500 shares of the 49,125 shares are issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See "Management."

(9) Includes 75,000 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

<PAGE>

(13) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 15,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See

"Management."

(14) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Includes 217,500 shares held jointly by Mr. Syal and his wife, Mohini Syal. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 8,438 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good, Mark and Penny Berns Trust, Arnold G. and Hope Anisgarten and Rajiv Mehra. Steven C. Good and Mark S. Berns are the trustees of the Good Swartz & Berns Pension & Profit Sharing Plan.

(17) Includes 6,429 shares held by Surendra V. Jain M.D. Inc.

<PAGE>

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

COMMON STOCK

As of August 15, 1997, 6,156,528 shares of Common Stock were outstanding, held of record by 79 shareholders. After completion of the Offering, there will be 9,486,528 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 501 of 2711

Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

54

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,486,528 shares of Common Stock outstanding (assuming no exercise of stock options after August 15, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,786,528 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,761,000 Restricted Shares (or approximately 5,206,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 94,865 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without

compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

<TABLE>
<CAPTION>

| Underwriter | Number of Shares |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC | |
| William Blair & Company, L.L.C | |
| Volpe Brown Whelan & Company, LLC | |
| Total | 3,700,000 |

</TABLE>

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in the Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,761,000 shares of the Company's Common Stock outstanding prior to the Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,761,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company has agreed that until the expiration of the lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in the Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with the Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with the Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 504 of 2711
securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

<PAGE>

LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

PAGE
----

<S> <C>
Report of Independent Auditors........................................... F-2
Consolidated Balance Sheets as of June 30, 1996 and 1997................. F-3
Consolidated Statements of Operations for the Years Ended June 30, 1995, 1996 and 1997......................................................... F-4
Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1995, 1996 and 1997.................................................. F-5
Consolidated Statements of Cash Flows for the Years Ended June 30, 1995, 1996 and 1997......................................................... F-6
Notes to Consolidated Financial Statements............................... F-8
</TABLE>

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems, Inc. (the "Company") and its subsidiaries as of June 30, 1997 and 1996, and the related consolidated statements of operations, shareholders' equity, and cash flows for the years ended June 30, 1997, 1996 and 1995. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of June 30, 1997 and 1996, and the results of their operations and their cash flows for the years ended June 30, 1997, 1996 and 1995 in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Los Angeles, California

August 15, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| <S> | <C> | <C> |
| ASSETS (NOTE 4) | | |

| | 1996 | 1997 |
|---|---|---|
| Current Assets: | | |
| Cash and cash equivalents (Note 1) | $ 581 | $ 553 |
| Accounts receivable, net of allowance for doubtful accounts of $276 and $586 at June 30, 1996 and 1997, respectively (Note 1) | 13,295 | 15,556 |
| Other receivables (Note 2) | 783 | 2,346 |
| Inventory (Note 1) | 13,642 | 18,517 |
| Prepaid expenses | 633 | 537 |
| Deferred income taxes (Notes 1 and 7) | 700 | 874 |
| Total current assets | 29,634 | 38,383 |
| Property and Equipment, Net (Notes 1 and 4): | 4,454 | 5,841 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 1,221 | 3,109 |
| Total | $35,309 | $47,333 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Current Liabilities: | | |
| Bank lines of credit (Note 4) | $ 7,783 | $ 9,100 |
| Current portion of long-term debt (Notes 6 and 13) | 1,491 | 1,240 |
| Current portion of senior subordinated debt (Note 5) | 2,500 | |
| Accounts payable (Note 1) | 6,522 | 7,712 |
| Accrued payroll and related expenses | 1,667 | 1,607 |
| Income taxes payable (Notes 1 and 7) | 799 | 1,804 |
| Advances from customers | 219 | 2,410 |
| Other accrued expenses and current liabilities | 2,609 | 3,710 |
| Total current liabilities | 23,590 | 27,583 |
| Bank Line of Credit (Notes 1 and 4) | | |
| Senior Subordinated Debt (Notes 1 and 5) | 575 | |
| Long-Term Debt (Notes 1, 6 and 13) | 3,113 | 2,840 |
| Deferred Income Taxes (Notes 1 and 7) | 827 | 101 |
| Minority Interest (Note 1) | 10 | |
| Total liabilities | 28,115 | 30,524 |
| Commitments and Contingencies (Notes 8 and 13) | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1996 and 0 shares at June 30, 1997 (Note 10) | 1,514 | |
| Preferred stock, no par value; 10,000,000 shares authorized; none issued and outstanding at June 30, 1996 and 1997 | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding, 1,858,132 and 6,156,528 shares at June 30, 1996 and 1997, respectively | 560 | 7,367 |
| Retained earnings | 4,994 | 9,171 |
| Cumulative foreign currency translation adjustment (Note 1) | 126 | 271 |
| Total shareholders' equity | 7,194 | 16,809 |
| Total | $35,309 | $47,333 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>

<CAPTION> 

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Revenues (Note 1) | $ 49,815 | $ 61,518 | $ 77,628 |
| Cost of goods sold | 37,818 | 45,486 | 56,174 |
| Gross profit | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | |
| Selling, general and administrative expenses (Notes 11 and 12) | 7,601 | 9,757 | 11,304 |
| Research and development (Note 1) | 1,591 | 1,663 | 2,504 |
| Stock option compensation (Note 9) | -- | -- | 856 |
| Total operating expenses | 9,192 | 11,420 | 14,664 |
| Income from operations | 2,805 | 4,612 | 6,790 |
| Interest expense (Notes 4, 5, 6 and 11) | 1,251 | 1,359 | 1,197 |
| Income before provision for income taxes and minority interest | 1,554 | 3,253 | 5,593 |
| Provision for income taxes (Notes 1 and 7) | 413 | 1,111 | 1,416 |
| Income before minority interest in net loss of subsidiaries | 1,141 | 2,142 | 4,177 |
| Minority interest in net loss of subsidiaries (Note 1) | 17 | 117 | -- |
| Net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Historical net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Interest on subordinated debt, net of income taxes | 216 | 166 | 92 |
| Minority interest in net loss of subsidiaries | (17) | (117) | -- |
| Net income available to common shareholders | $ 1,357 | $ 2,308 | $ 4,269 |
| Net income per share (Note 1) | $ 0.22 | $ 0.38 | $ 0.68 |
| Weighted average shares outstanding | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1994 | 1,123,750 | 1,124 | 1,703,257 | 363 | 1,577 | 64 | 3,128 |
| Exercise of stock | | | | | | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 508 of 2711

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| options.............. | 35,000 | 70 | 60,0[illegible] | 75 | -- | -- | 145 |
| Conversion of debt.... | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 95 | 95 |
| Net income............ | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995.. | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options.............. | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment........... | -- | -- | -- | -- | -- | (33) | (33) |
| Net income............ | -- | -- | -- | -- | 2,259 | -- | 2,259 |
| BALANCE, JUNE 30, 1996.. | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options.............. | -- | -- | 118,125 | 146 | -- | -- | 146 |
| Conversion of debt.... | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions......... | -- | -- | 206,610 | 1,566 | -- | -- | 1,566 |
| Conversion of preferred stock...... | (2,568,750) | (4,014) | 3,853,125 | 4,014 | -- | -- | -- |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 145 | 145 |
| Net income............ | -- | -- | -- | -- | 4,177 | -- | 4,177 |
| BALANCE, JUNE 30, 1997.. | -- | $ -- | 6,156,528 | $7,367 | $9,171 | $271 | $16,809 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | |
| Net income...................................... | $ 1,158 | $ 2,259 | $ 4,177 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Minority interest in net loss of subsidiaries.... | (17) | (117) | |
| Provision for losses on accounts receivable...... | (70) | 404 | 389 |
| Depreciation and amortization................... | 1,551 | 2,014 | 2,302 |
| Stock option compensation....................... | | | 856 |
| Deferred income taxes........................... | 240 | (12) | (900) |
| Gain on sale of property and equipment.......... | (11) | (13) | |
| Changes in operating assets and liabilities, net of business acquisition: | | | |
| Accounts receivable........................... | (1,239) | (858) | (1,980) |
| Other receivables............................. | 226 | (194) | (1,530) |
| Inventory..................................... | (2,599) | (4,068) | (4,573) |
| Prepaid expenses.............................. | (139) | (245) | 96 |
| Accounts payable.............................. | 221 | 120 | 1,026 |
| Accrued payroll and related expenses.......... | 191 | 707 | (60) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 509 of 2711

| | | | |
|---|---|---|---|
| Income taxes payable | (217) | 652 | 1,005 |
| Advances from customers | 9 | 183 | 1,448 |
| Other accrued expenses and current liabilities | (87) | (827) | 1,101 |
| Net cash provided by (used in) operating activities | (783) | 5 | 3,357 |
| Cash flows from investing activities: | | | |
| Proceeds from sale of property and equipment | 142 | 120 | |
| Additions to property and equipment | (1,396) | (1,612) | (2,182) |
| Cash paid for business acquisition, net of cash acquired | | | (848) |
| Cash paid for minority interest | (160) | | |
| Other assets | (662) | (688) | 23 |
| Net cash used in investing activities | (2,076) | (2,180) | (3,007) |
| Cash flows from financing activities: | | | |
| Net proceeds from (repayment of) bank lines of credit | 2,668 | 1,502 | 1,014 |
| Payments on senior subordinated debt | (700) | | (350) |
| Payments on junior subordinated debt | (280) | | |
| Payments on long-term debt | (1,095) | (1,250) | (3,983) |
| Proceeds from issuance of long-term debt | 2,806 | 1,097 | 2,647 |
| Proceeds from exercise of stock options and warrants | 145 | 17 | 146 |
| Proceeds from issuance of minority interest | | 21 | |
| Net cash provided by (used in) financing activities | 3,544 | 1,387 | (526) |
| Effect of exchange rate changes on cash | 95 | (36) | 148 |
| Net (decrease) increase in cash | 780 | (824) | (28) |
| Cash, beginning of period | 625 | 1,405 | 581 |
| Cash, end of period | $ 1,405 | $ 581 | $ 553 |
| Supplemental disclosures of cash flow information-- Cash paid during the period for: | | | |
| Interest | $ 1,229 | $ 1,346 | $ 1,197 |
| Income taxes | $ 82 | $ 377 | $ 1,511 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- --------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During October and December 1996, the Company acquired the minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock, at an estimated fair value of $6.67 per share. An additional

27,654 shares, at an estimated fair value of $13.50 per share, are issuable at June 30, 1997. The excess of the fair value of the common stock of $1,566 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (916) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In October and December 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares to be issued is based upon the pre-tax income of the subsidiary for the year ended June 30, 1997, and has been determined to be 27,654 shares and have been included in the number of shares issued for minority interest acquisitions in the accompanying 1997 consolidated statement of shareholders' equity.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | 1997 <C> |
|---|---|---|
| Raw materials | $ 7,795 | $11,408 |
| Work-in-process | 3,114 | 4,224 |
| Finished goods | 2,733 | 2,885 |
| Total | $13,642 | $18,517 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | 1997 <C> |
|---|---|---|
| Equipment | $ 6,280 | $ 7,545 |
| Leasehold improvements | 1,601 | 2,093 |
| Tooling | 1,558 | 1,967 |
| Furniture and fixtures | 488 | 666 |
| Computer equipment | 1,283 | 1,699 |
| Vehicles | 93 | 176 |
| Total | 11,303 | 14,146 |
| Less accumulated depreciation and amortization | 6,849 | 8,305 |
| Property and equipment, net | $ 4,454 | $ 5,841 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | 1997 <C> |
|---|---|---|

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 512 of 2711

| | | |
|---|---|---|
| Software development costs | $ 588 | $ 588 |
| Goodwill | -- | 2,142 |
| Deposits | 262 | 320 |
| Other | 524 | 444 |
| Total | 1,374 | 3,494 |
| Less accumulated amortization | 153 | 385 |
| Intangible and other assets, net | $1,221 | $3,109 |

</TABLE>

Goodwill in the amount of $1,554,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the year ended June 30, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

<PAGE>

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 513 of 2711

while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately $76,000, ($123,000), and $68,000 were included in income for the years ended June 30, 1995, 1996 and 1997, respectively.

Earnings Per Share -- Earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from preferred stock, convertible debt and stock options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period. Net income and net income per share have been presented to reflect the effect of the conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

In June 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 130, "Reporting for Comprehensive Income" and No. 131, "Disclosure about Segments of an Enterprise and Related Information." These statements are effective for financial statements issued for periods beginning after December 15, 1997. The Company has not yet analyzed the impact of adopting these statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at June 30, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and 1997, the Company earned a technical

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 514 of 2711

fee from the joint venture in the amount of $200,000 and $115,000, respectively. At June 30, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The cash purchase price amounted to $916,000. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1994, pro forma consolidated sales for the years ended June 30, 1995, 1996 and 1997 would have been $53,338,000, $65,371,000, and $79,871,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1996 and 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| <S> | <C> | <C> |
| Line of credit -- U.S. | $6,361 | $6,577 |
| Line of credit -- Singapore | 1,422 | 974 |
| Line of credit -- Norway | | 586 |
| Line of credit -- Rapiscan U.K. | | 963 |
| Total bank lines of credit | $7,783 | $9,100 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. At June 30, 1997 approximately $5,077,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At June 30, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. At June 30, 1997 $1,500,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $4,000,000. At June 30, 1997 approximately $1,917,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank, which provides for revolving line of credit borrowings up to 2,600,000 Singapore dollars (approximately $1,800,000 at June 30, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $682,000 at June 30, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at June 30, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,081,000 at June 30, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,248,000 at June 30, 1997) and a 500,000 pound sterling (approximately $832,000 at June 30, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at June 30, 1997) plus 2%. The overdraft facility expires in December 1997. At June 30, 1997 no amounts were outstanding under the overdraft facility. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly and the line expires in November 1997. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $452,000 was outstanding under performance bonds at June 30, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $990,000 at June 30, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at June 30, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the year ended June 30, 1997, all of the debt outstanding under the various agreements was repaid or converted in accordance with the conversion terms as summarized in the following table:

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| | (in thousands) | |
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | -- |
| Total senior subordinated debt | 3,075 | -- |
| Less current portion | 2,500 | -- |
| Total long-term portion | $ 575 | $-- |

</TABLE>

<PAGE>

6. LONG-TERM DEBT

At June 30, 1996 and 1997, long-term debt consisted of the following:

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| | (in thousands) | |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in | | |

| | | |
|---|---|---|
| January 1997 | $1,667 | -- |
| Term loan payable to a bank, interest due mothly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001. Outstanding balances are collateralized by substantially all of the assets of the Company | -- | $2,344 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,129 until paid in full on June 1, 2001. Outstanding balances are collateralized by certain assets of the subsidiary | -- | 437 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 141 | 41 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.35% at June 30, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,000 | 700 |
| Other | 535 | 558 |
| | 4,604 | 4,080 |
| Less current portion of long-term debt | 1,491 | 1,240 |
| Long-term portion of debt | $3,113 | $2,840 |

</TABLE>

Fiscal year principal payments of long-term debt as of June 30, 1997 are as follows (in thousands):

<TABLE>

| <S> | <C> |
|---|---|
| 1998 | $1,240 |
| 1999 | 1,333 |
| 2000 | 896 |
| 2001 | 592 |
| 2002 | 19 |
| Total | $4,080 |

</TABLE>

<PAGE>

## 7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |

| | | | |
|---|---|---|---|
| Pretax income: | | | |
| United States | $1,277 | $1,965 | $2,655 |
| Foreign | 277 | 1,288 | 2,938 |
| Total pretax income | $1,554 | $3,253 | $5,593 |

</TABLE>

The Company's provision for income taxes is comprised of the following (in thousands):

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Current: | | | |
| Federal | $ 43 | $ 510 | $1,256 |
| State | 3 | 21 | 24 |
| Foreign | 127 | 592 | 1,036 |
| | 173 | 1,123 | 2,316 |
| Deferred | 240 | (12) | (900) |
| Total provision | $413 | $1,111 | $1,416 |

Deferred income tax assets (liabilities) at June 30, 1996 and 1997 consisted of the following (in thousands):

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| Expenses not currently deductible | $ 873 | $1,455 |
| State income taxes | -- | -- |
| Other | -- | 301 |
| Total deferred income tax assets | 873 | 1,756 |
| Depreciation | (145) | (43) |
| Capitalized software development costs | (214) | (219) |
| State income taxes | (173) | (329) |
| Revitalization zone deductions | (278) | (392) |
| Other | (190) | -- |
| Total deferred income tax liabilities | (1,000) | (983) |
| Net deferred income taxes | $ (127) | $ 773 |

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Provision for income taxes at federal statutory rate... | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit... | (2.6) | 0.2 | (4.7) |
| Nontaxable earnings of FSC............................ | (7.1) | (5.7) | (4.9) |
| Research and development tax credits.................. | (2.8) | -- | (1.7) |
| Foreign income subject to tax at other than federal statutory rate....................................... | 0.7 | 1.1 | (1.0) |
| Other................................................. | 3.4 | 3.6 | 2.6 |
| Effective income tax rate............................. | 26.6 % | 34.2 % | 25.3 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At June 30, 1997 undistributed earnings of the foreign subsidiaries amounted to approximately $3,656,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of June 30, 1997 are as follows: $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $959,000, $901,000 and $921,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect

on the Company's consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the year ended June 30, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1995, 1996 and 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Outstanding, July 1, 1994.................... | 307,875 | 1.43 | 440,000 |
| Granted...................................... | 69,000 | 2.00 | 138,000 |
| Exercised.................................... | (60,000) | 1.25 | (75,000) |
| Canceled..................................... | (19,500) | 1.77 | (34,000) |
| Outstanding, June 30, 1995................... | 297,375 | 1.57 | 469,000 |
| Granted...................................... | 51,000 | 2.17 | 111,000 |
| Exercised.................................... | (16,125) | 1.06 | (17,000) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 521 of 2711

| | | | |
|---|---|---|---|
| Canceled.................................... | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996.................... | 318,750 | 1.70 | 541,000 |
| Granted...................................... | 669,611 | 8.88 | 5,947,000 |
| Exercised.................................... | (118,125) | 1.24 | (146,000) |
| Canceled..................................... | (9,750) | 2.38 | (23,000) |
| Outstanding, June 30, 1997.................... | 860,486 | $7.34 | $6,319,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of June 30, 1997:

<TABLE>
<CAPTION>

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING AT JUNE 30, 1997 | WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | EXERCISABLE AT JUNE 30, 1997 | WEIGHTED AVERAGE EXERCISE PRICE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| $0.17 to 0.67........... | 13,500 | 1.0 years | $0.64 | 13,500 | $0.64 |
| 1.87 to 2.00........... | 134,625 | 2.0 | 1.95 | 102,563 | 1.93 |
| 2.33 to 3.33........... | 277,875 | 4.1 | 2.89 | 269,250 | 2.90 |
| 11.50 to 13.50.......... | 434,486 | 5.0 | 12.08 | -- | -- |
| $0.17 to 13.50.......... | 860,486 | 4.2 | $7.34 | 385,313 | $2.56 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and 1997 pursuant to SFAS 123 was approximately $19,000 and $1,054,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $4,058,000, and pro forma net income per share would have been $0.36 and $0.64 for 1996 and 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.33% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the common stock.

In June 1997, in order to simplify the capital structure of the Company, holders of the preferred stock converted each preferred share into 1.5 shares (post-split) of common stock.

In June 1997, the Company amended its articles of incorporation, which articles authorize 10,000,000 shares of new preferred stock. Such preferred

stock has no par value, and no preferred shares are issued and outstanding at June 30, 1997.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1995, 1996 and 1997 are approximately $77,000, $83,000, and $111,000 for messenger service and auto rental; $78,000, $63,000, and $82,000 for printing services; and $23,000, $7,000, and $11,000 for professional services, respectively. During the year ended June 30, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $315,000, $263,000, and $146,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and charged to operations in the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At June 30, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the years ended June 30, 1997, 1996 and 1995. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient to provide for benefits accruing after that date. Pension expense for the years ended June 30, 1995, 1996 and 1997 was approximately $111,000, $91,000, and $89,000, respectively.

<PAGE>

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United

Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1995 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $33,158 | $11,341 | $5,316 | | $49,815 |
| Transfer between geographical areas........................ | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues.................. | $34,856 | $12,129 | $9,147 | $ (6,317) | $49,815 |
| Operating income.............. | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets........... | $36,751 | $10,832 | $4,839 | $(21,642) | $30,780 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1996 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas....................... | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues................. | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income............. | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets.......... | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1997 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $54,310 | $18,915 | $ 4,403 | | $77,628 |
| Transfer between geographical areas....................... | 8,655 | 5,156 | 12,191 | $(26,002) | -- |
| Net revenues................. | $62,965 | $24,071 | $16,594 | $(26,002) | $77,628 |
| Operating income............. | $ 3,814 | $ 1,849 | $ 1,390 | $ (263) | $ 6,790 |
| Identifiable assets.......... | $52,367 | $15,066 | $ 8,395 | $(28,495) | $47,333 |

</TABLE>

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

The Company's security and inspection products are used for security purposes at locations such as airports, courthouses, government buildings, nuclear facilities, mail rooms, schools and prisons. In addition, the security and inspections products are also increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

| <S> | <C> |
|---|---|
| Securities and Exchange Commission registration fee............... | $ 18,052 |

| | |
|---|---|
| NASD filing fee | 6,457 |
| Nasdaq National Market System listing fee | 42,000 |
| Printing and engraving expenses | 100,000 |
| Transfer agent and registrar fees | 2,000 |
| Legal fees and expenses | 175,000 |
| Accounting fees and expenses | 150,000 |
| "Blue sky" fees and expenses | 15,000 |
| Other expenses | 151,491 |
| Total | $660,000* |

</TABLE>

- ---------------------

* The Selling Shareholders participating in the Offering of the 370,000 shares to be sold by such Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000. The Selling Shareholders who are selling in the case that the underwriters over-allotment option is exercised will not pay any of the above expenses.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

<PAGE>

action by or in the right of the corporation) by reason of the fact that he is

or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company intends to enter into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnity Agreement will provide that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and,

with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnity Agreement will permit the director or officer that is party thereto to bring

<PAGE>

suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful.

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 528 of 2711

aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

<PAGE>

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share. As part of the same arrangement, the Company issued 27,654 additional shares of its Common Stock to such officers and key employees in August 1997. The number of shares of Common Stock issued was based on the combined net income before taxes of Rapiscan U.S.A. and Rapiscan UK for the fiscal year ended June 30, 1997.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate. |
| 5.1 | Opinion of Troy & Gould Professional Corporation. |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and |

Anthony S. Crane

| | |
|---|---|
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company. |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited). |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1). |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule. |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2) |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy.(2) |

</TABLE>

- --------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

II-5

<PAGE>

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-6

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on August 15, 1997.

OSI SYSTEMS, INC.

/s/ AJAY MEHRA

By: ___________________________________

Ajay Mehra
Vice President, Chief Financial Officer,
Secretary and Director

Pursuant to the requirements of the Securities Act of 1933, this Amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| SIGNATURE | TITLE | DATE |
|---|---|---|
| * <br> Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | August 15, 1997 |
| /s/ AJAY MEHRA <br> Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | August 15, 1997 |
| * <br> Steven C. Good | Director | August 15, 1997 |
| * <br> Meyer Luskin | Director | August 15, 1997 |
| * <br> Madan G. Syal | Director | August 15, 1997 |
| *By: /s/ AJAY MEHRA <br> Ajay Mehra as Attorney-In-Fact | | August 15, 1997 |

</TABLE>

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994.................. | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, | | | | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 532 of 2711

| | | | | | |
|---|---|---|---|---|---|
| 1995.................. | $203 | (70) | -- | 80 | $ 53 |
| | ==== | ==== | === | === | ==== |
| Year Ended June 30, 1996.................. | $ 53 | $404 | -- | 181 | $276 |
| | ==== | ==== | === | === | ==== |
| Year Ended June 30, 1997.................. | $276 | $389 | -- | 79 | $586 |
| | ==== | ==== | === | === | ==== |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate. |
| 5.1 | Opinion of Troy & Gould Professional Corporation. |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane. |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company. |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited). |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit |

23.3
24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2)
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.(2)
</TABLE>
- --------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<DESCRIPTION>SPECIMEN COMMON STOCK CERTIFICATE
<TEXT>

<PAGE>

Exhibit 4.1

OSI SYSTEMS, INC. FACE TEXT

OSI SYSTEMS, INC.
NUMBER
SHARES
Incorporated under the laws of the state of California
COMMON STOCK
CUSIP 671044 10 5
SEE REVERSE FOR CERTAIN DEFINITIONS
This Certifies that
is the recorder holder of
FULLY PAID AND NONASSESSABLE SHARES OF COMMON STOCK, NO PAR VALUE, OF
OSI SYSTEMS, INC.
transferable on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this certificate properly endorsed. This certificate is not valid until countersigned by the Transfer Agent and Registrar.
WITNESS the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.
Dated:
Secretary
{image of Corporate Seal}
President
COUNTERSIGNED AND REGISTERED:
U.S. STOCK TRANSFER CORPORATION
TRANSFER AGENT
AND REGISTRAR
BY
AUTHORIZED SIGNATURE

Page 1
<PAGE>

OSI SYSTEMS, INC. BACK TEXT

The Corporation is authorized to issue two classes of stock, Common Stock and Preferred Stock. The Board of Directors of the Corporation has authority to fix the number of shares and the designation of any series of Preferred Stock and to determine or alter the rights, preferences, privileges and restrictions granted to or imposed upon any unissued series of Preferred Stock.
The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:
TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common
UNIF GIFT MIN ACT................Custodian................
(Cust) (Minor)
under Uniform Gifts to Minors
Act................
(State)
UNIF TRF MIN ACT................Custodian (until
age................)
(Cust)
.........................under Uniform Transfers
(Minor)
to Minors Act
(State)
Additional abbreviations may also be used though not in the above list.
PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE..............
FOR VALUE RECEIVED,.............................hereby sell, assign and transfer unto......................................
.................................................................
(PLEASE TYPE OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)
........... Shares
of the common stock represented by the within Certificate, and do hereby irrevocably constitute and appoint Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.
Dated
THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.
Signature(s) Guaranteed

Page 2

<PAGE>

By
THE SIGNATURES(S) SHOULD BE AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17Ad-15

Page 3

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5.1
<SEQUENCE>3
<DESCRIPTION>OPINION OF TROY & GOULD PROFESSIONAL CORP.
<TEXT>

<PAGE>

EXHIBIT 5.1

August 15, 1997

OPT2-3

OSI Systems, Inc.
12525 Chadron Avenue
Hawthorne, California 90250

Re: Registration Statement on Form S-1
(Registration No. 333-29179)

Gentlemen:

We have acted as securities counsel to OSI Systems, Inc., a California corporation (the "Company"), in connection with the preparation and filing with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), of a Registration Statement on Form S-1, as amended, Registration No. 333-29179 (the "Registration Statement"). The Registration Statement relates to the public offering by the Company and certain selling shareholders named therein (the "Selling Shareholders") of up to 4,255,000 shares of Common Stock of the Company, of which 3,330,000 shares are to be issued and sold by the Company (the "New Shares") and 925,000 shares are to be sold by the Selling Shareholders (the "Outstanding Shares"), including 555,000 shares to cover over-allotments, if any.

The New Shares and the Outstanding Shares are to be sold by the Company and the Selling Shareholders pursuant to an Underwriting Agreement (the "Underwriting Agreement") by and among the Company, the Selling Shareholders and Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC, acting as representatives of the several underwriters named in the Underwriting Agreement. This opinion is being furnished in accordance with the requirements of Item 601(b)(5) of Regulation S-K under the Securities Act.

In connection with this opinion, we have examined and are familiar with originals or copies, certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary or appropriate as a basis for the opinions set forth herein, including (i) the Registration Statement of the Company filed
<PAGE>

OSI Systems, Inc.
August 15, 1997
Page 2

with the Securities and Exchange Commission; (ii) the Articles of Incorporation and the Amended and Restated Bylaws of the Company, as amended to date; (iii) the form of the Underwriting Agreement; (iv) the form of Common Stock Certificate; (v) copies of certain resolutions adopted by the Board of Directors of the Company relating to the issuance of the New Shares and the Outstanding Shares, the filing of the Registration Statement and any amendments or supplements thereto and related matters; and (vi) such other documents as we have deemed necessary or appropriate as a basis for the opinions set forth below.

In our examination, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents. In making our

examination of documents executed by parties other than the Company, we have assumed that such parties had the power, corporate or other, to enter into and perform all obligations thereunder and have also assumed the due authorization by all requisite action, corporate or other, and execution and delivery by such parties of such documents and the validity and binding effect thereof. As to any facts material to the opinions expressed herein which were not independently established or verified, we have relied upon oral or written statements and representations of officers and other representatives of the Company and others.

Members of our firm are admitted to the bar in the State of California, and we do not express any opinion as to the laws of any other jurisdiction, other than the laws of the United States of America to the extent referred to specifically herein.

Based on the foregoing, it is our opinion that, subject to effectiveness with the Securities and Exchange Commission of the Registration Statement and to registration or qualification under the securities laws of the states in which securities may be sold,

1. The New Shares are duly and validly authorized and, upon the sale and issuance thereof in the manner contemplated in the Registration Statement and the Underwriting Agreement, and upon payment therefor, will

<PAGE>

constitute legally issued, fully paid and nonassessable shares of Common Stock of the Company; and

2. The Outstanding Shares are duly and validly authorized and constitute legally issued, fully paid and nonassessable shares of Common Stock of the Company.

We consent to the use of our name under the caption "Legal Matters" in the Registration Statement, and to the filing of this opinion as an exhibit to the Registration Statement. By giving you this opinion and consent, we do not admit that we are experts with respect to any part of the Registration Statement within the meaning of the term "expert" as used in Section 11 of the Securities Act, or the rules and regulations promulgated thereunder, nor do we admit that we are in the category of persons whose consent is required under Section 7 of the Securities Act.

Very truly yours,

/s/ TROY & GOULD

TROY & GOULD
Professional Corporation

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.5
<SEQUENCE>4
<DESCRIPTION>EMPLOYMENT AGREEMENT DATED MARCH 1, 1993
<TEXT>

<PAGE>

EXHIBIT 10.5

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of March, 1993, by and between Rapiscan Security Products (U.S.A.), Inc. ("Company"), a California corporation, and Andreas Kotowski ("Employee").

In consideration of the mutual promises contained herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT. The Company hereby agrees to employ the Employee, subject to the terms and conditions herein set forth, to perform such duties as may be determined and assigned to him from time to time by the Company's Board of Directors ("Board") or by any other officer to whom the Board may have delegated such authority. The Employee hereby agrees to serve in such capacities on a full time basis until the end of the term of employment under this Agreement. During the term of employment, the Employee shall be the general manager of U.S. operations of the Company and shall also serve on the Board of Directors of the Company as well as the Company's subsidiary corporation.

2. TERM. The term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of one (1) year. If at the end of such one (1) year period the Employee continues to be an employee of the Company, this Agreement shall continue in effect until terminated by either party hereto. Such termination may be for any reason whatsoever, with or without cause, and shall be effective immediately upon the giving of such notice of termination. It is understood and acknowledged by each of the parties hereto, irrespective of either one's performance, that no promises or representations (implied or expressed) have been made to either party regarding any commitment to keep this Agreement in effect for any specific or minimum period of time after the first year. Notwithstanding the foregoing, either party may terminate this Agreement at any time for cause.

3. COMPENSATION. The Company agrees to pay the Employee, and the Employee agrees to accept, during the term of this Agreement, in full payment for all services to be rendered by the Employee hereunder, the following compensation:

(a) a salary at the rate of $85,000.00 per annum, payable in equal periodic installments, not less frequently than semi-monthly, less such sums as may be required by law to be deducted or withheld.

(b) If the Employee is a full time employee for the entire one (1) year term, then at the end of such year the Company shall pay to the Employee the sum of $15,000.00, less such sums as may be required by law to be deducted or withheld.

<PAGE>

4. BONUS POOL.

(a) Subject to Paragraph 4(b) below and provided that this Agreement has not been terminated, the Employee shall be entitled to receive a one-time bonus from the Company in accordance with this Paragraph 4. The Employee shall have no right to receive a bonus (i) if the event giving rise to the payment of the bonus occurs prior to February 20, 1994, the shareholder's equity of the Company is less than $750,000 at the time of such event and (ii) if the event giving rise to the payment of the bonus occurs after February 19, 1994, the shareholder's equity of the Company is less than $1,000,000 at the time of such event.

(b) Subject to the conditions of Paragraph 4(a) above having been satisfied, the Company shall pay the Employee a bonus within sixty (60) days of the first to occur of any of the following events: (i) the consummation of any of the following (each of which shall be a "Sale Event"): a) a firm commitment underwritten public offering for Opto Sensors, Inc. ("OSI"), UDT Sensors, Inc.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 538 of 2711

("UDT") or the Company (OSI, UDT and the Company are collectively referred to as the OSI Group) pursuant to an effective registration statement under the Securities Act of 1933 as amended, b) the sale of assets or merger of the OSI Group or other acquisition transaction pursuant to which the shareholders of the OSI Group receive securities of a buyer whose shares are publicly traded or c) the sale, transfer or other disposition of all or substantially all of the assets of the OSI Group (for purposes of this Paragraph 4, the date of consummation of a Sale Event shall be deemed the date of the event causing the Employee to be eligible to receive the bonus) or (ii) the delivery of written notice to the Company from the Employee given at any time between February 20, 1994 and February 20, 1996 that the Employee desires to receive payment of the bonus.

(c) At the election of the Employee, the bonus may be paid in cash or securities of OSI (pursuant to a valuation determined by the Board of Directors of OSI in good faith); provided, however, that if a Sale Event has not occurred, The Company may elect to defer any cash payment, in which event the Company shall deliver to the Employee a non-interest bearing promissory note in the amount of the cash payment and which shall be due and payable sixty (60) days after the consummation of a Sale Event.

(d) The amount of the bonus to be paid to the Employee shall be equal to twenty-five percent (25%) of the net after-tax profit of the Company from February 20, 1993 through the date of the event giving rise to the payment of the bonus; provided, however, that (i) if a Sale Event occurs prior to February 20, 1994, the amount of the bonus shall be not less than $100,000 and (ii) net after-tax profit shall be determined in accordance with generally accepted accounting principles except that such profit shall be determined only with respect to the Company's sales operations in North America, South America and the

<PAGE>

Far East (other than Indonesia, Malaysia, Thailand or Singapore). The Employee acknowledges and agrees that sales operations of the Company in other locations and operations of any subsidiary or affiliate of the Company shall not be included in the determination of such profit.

5. INVENTIONS, PATENTS, DISCOVERIES, TRADE SECRETS.

(a) Except for the inventions, improvements and technology previously disclosed to the Company and described or listed in Schedule 5A (to be supplied by the Employee within 30 days) to this Agreement, the Employee agrees to make a prompt and complete disclosure to the Company of any technique, plan, concept, program, innovation or other item of information relating to the Company's business and to make in writing a disclosure of every invention, improvement and technology which relates to the Company's business which he learns of, conceives or reduces to practice during the term of this Agreement.

(b) As to inventions, improvements and technology described or listed on Schedule 5A to this Agreement, the Employee agrees to offer a license to the Company to make, have made, use, sell and have sold, such inventions, improvements and technology, upon terms and conditions which shall include:

(1) a royalty payment by the Company of five percent (5%) of the net lease, rental or sales price of products which use such invention, improvements or technology or are within the claims of any patent issued on such inventions, improvements or technology where such "net" price is defined specifically as gross amounts collected, less bona fide sales commissions and bona fide returns. However, (A) if such product is a component of another product or system, the royalty shall be based on the fair market value of such product, (B) with respect to the first Five Million Dollars ($5,000,000) of net leases, rentals or sales of such products in the aggregate, the royalty payment shall be seven percent (7%), and (C) with respect to detectors or devices for measuring concentration of radon or other radioactive materials, the royalty

shall be 10%,

(2) a provision allowing the Employee to terminate, or to terminate the exclusivity of, the license if the Company does not exploit the licensed technology at a reasonable level; and

(3) such other terms and conditions as may be common in patent, trade secret or know-how licenses and are satisfactory to the Employee and the Company.

(c) As to inventions, improvements and technology developed by the Employee, either solely or jointly with another, and which are not described or listed on Schedule 5A to this Agreement, the Employee agrees to grant to the Company an exclusive license subject to the following conditions:

-3-

<PAGE>

(1) the Company will have the exclusive right to make, have made, use, sell, and have sold, such inventions, improvements and technology so long as the Employee is both employed by the Company and the Company does not exercise any right it may have, except solely as a result of conversion of the Employee's stock in OSI, to require him to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company.

(2) If the Employee's employment with the Company is terminated, for any reason or no reason, the Employee shall have the right to make, have made, use, sell and have sold, such inventions, improvements and technology, either by himself or in a business enterprise. In such case, the Company's rights will be nonexclusive and, except as described above, neither the Company nor the Employee shall have the right to license others with respect to such inventions, improvements or technology.

(3) If the Company exercises any right it may have to require the Employee to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company, the Company will lose any rights to make, have made, use, sell, or have sold, such inventions, improvements and technology (other than such rights it may have by virtue of being any employer of another joint inventor), and the Employee will have the exclusive rights to make, have made, use, sell and have sold, such inventions, improvements and technology (other than such rights of another joint venture).

(d) The Employee agrees that upon the Company's request, but without expense to himself, he will execute any and all applications, assignments and other legal instruments (consistent with any obligations to assign or license arising out of this Agreement) which the Company shall deem necessary or convenient for the protection of its information in the United States and/or foreign countries, and will render aid and assistance in all proceedings pertaining to said property.

(e) As to all documents, writings, illustrations, models, and other such materials coming into his possession by or through his employment with the Company which relate to inventions, improvements or technology which are not the subject of the license to the Company set forth in Paragraph 5(c) herein, the Employee agrees that, upon termination of his employment with the Company, he will surrender such materials to the Company, and agrees that such materials are at all times the Company's property. As to all such materials which relate to inventions, improvements or technology which are the subject of license to the Company set forth in Paragraph 5(c) herein, the Employee shall have the right to retain materials describing, summarizing, relating to, or evidencing conception or reduction to practice of, such inventions, improvements and technologies which are the subject of license to the Company set forth in Paragraph 5(c) herein, so long as the Employee provides copies of such materials to the Company upon termination of this employment with the Company.

-4-

<PAGE>

(f) The Employee and the Company agree that their respective business interests require a confidential relationship between them both with respect to the Company's trade secrets and confidential business information, and with respect to the Employee's inventions, improvements and technology listed in Schedule 5A hereto, and inventions, improvements and technology learned of, conceived, developed or reduced to practice during his employment with the Company. Accordingly, the Employee and the Company agree to keep secret and to maintain in confidence each other's inventions, improvements, technology, confidences, trade secrets and confidential business information. These obligations of confidence shall continue beyond the duration of the Employee's employment with the Company for a reasonable time. The Employee and the Company agree that a reasonable time shall be for the Employee's obligations, three (3) years after the termination of the Employee's employment with the Company, and for the Company's obligations, three (3) years after the later of such termination or, if the Company exercises any right it may have to require the Employee to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company the date such right is exercised.

(g) The foregoing covenants of this Paragraph 5 may be specifically enforced in equity and, for that purpose, the parties consent to the jurisdiction of the Los Angeles Superior Court. In this connection, the parties acknowledge that monetary damages would be inadequate to measure the injury to the Company resulting from a breach by the Employee or the Company of the covenants contained in this Paragraph 5 and, for that reason, the Employee and the Company each consent to the equitable relief herein provided for. In addition, the Employee and the Company each waive the posting of bond or other security by the other and each consent to the award by the court of reasonable attorneys' fees to the other if such equitable relief should by granted.

(h) Except as described or listed on Schedule 5A hereto, the Employee hereby represents and warrants that he has no involvement in any invention, process, innovation or improvement which relates to the Company's business.

6. VACATIONS AND BENEFITS. The Company's vacation health and medical and benefit policies as they relate to the Employee shall be the same as those policies of UDT.

7. NON-COMPETITION COVENANTS. During the term of this Agreement, the Employee agrees that he will not, anywhere in any country in which the Company engages in business:

(a) On his own behalf or as a partner, officer, director, employee or consultant of any other person, firm or corporation, directly or indirectly engage in any business activity which is the same as or similar to the business of the Company or any division or subsidiary thereof.

<PAGE>

(b) Contract or enter into any business dealings with any of the Company's customers, suppliers and/or affiliates or divulge any confidential matter relating to the Company's business to anyone not connected with the Company.

(c) Solicit the employment of or otherwise interfere with the peaceful employment of the Company's servants, agents and employees.

(d) The foregoing covenants of this Paragraph 8 may be specifically enforced in equity and, for that purpose, the parties consent to the jurisdiction of the Los Angeles Superior Court. In this connection, the parties acknowledge that monetary damages would be inadequate to measure the injury to the Company resulting from a breach by the Employee of the covenants contained in this Paragraph 8 and, for that reason, the Employee consents to the equitable relief herein provided for. In addition, the Employee waives the

posting of bond or other security by the Company and consents to the award by the court of reasonable attorneys' fees to the Company if such equitable relief should be granted.

8. INDEMNIFICATION FOR PREVIOUS EMPLOYER. The Company hereby agrees to indemnify and hold harmless the Employee to the extent of $25,000.00 (over and above any obligations to an employee which it may have by law) for any and all actions, claims or threats, whether or not actually reduced to judgment and whether or not actually collected or enforced, brought against the Employee or the Employer by E.G. & G. (or any company owned or controlled by E.G. & G.), the former employer of the Employee, for violation of any non-competition and/or confidentiality provisions of the written agreements between the Employee and E.G. & G., copies of which have heretofore been given to the Company or any oral or written agreements with substantially the same terms, and oral or written continuations or renewals of the same, and shall include indemnification for acts taken by the Employee to become employed by the Company, including without limitation, negotiating with the Company and terminating his relationship with E.G. & G. This indemnification and hold harmless provision shall not apply (a) if there were any written agreements entered into between the Employee and E.G. & G., other than those written agreements heretofore furnished to the Company by the Employee, (b) with respect to claims arising solely from acts taken by the Employee which are not related to employment with the Company and (c) to any acts taken by the Employee in violation of any written agreement between the Employee and the Company or any policy of the Company disclosed in writing to the Employee.

If the Employee is enjoined by a court of competent jurisdiction from being employed by the Company, then this Agreement shall be terminated at such time.

9. ENTIRE AGREEMENT. This Agreement contains the entire understanding between the parties hereto and supersedes all

<PAGE>

other oral and written agreements or understandings between them. No modification or addition hereto or waiver or cancellation of any provision shall be valid except by a writing signed by the party to be charged therewith.

10. SUCCESSORS AND ASSIGNS, ETC. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of the Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets, or similar reorganization. In no event may the Employee assign any rights or duties under this Agreement.

11. CONTROLLING LAW; SEVERABILITY. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

12. HEADINGS. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 542 of 2711

13. NOTICES. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to the Employee, or to its principal residence if to the Company.

14. WAIVER OF BREACH. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

RAPISCAN SECURITY PRODUCTS (U.S.A.), INC.

By: /s/ Ajay Mehra
------------------------------------
AJAY MEHRA

/s/ Andreas Kotowski
------------------------------------
ANDREAS KOTOWSKI

<PAGE>

(S) 2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

-8-

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.7
<SEQUENCE>5
<DESCRIPTION>EMPLOYMENT AGREEMENT DATED OCTOBER 5, 1994
<TEXT>

<PAGE>

Exhibit 10.7

STRICTLY PRIVATE AND CONFIDENTIAL

NOTE: - This Agreement constitutes A PRINCIPAL STATEMENT OF MAIN PARTICULARS OF EMPLOYMENT, as required and in accordance with the Employment Protection (Consolidation) Act 1978 and the Trade Union Reform and Employment Rights Act

1993, governing an employer's obligation to inform employees of the conditions applicable to the contract of employment relationship.

An Agreement between Rapiscan Security Products Limited of Unit B1, The Fleming Centre, Fleming Way, Crawley, West Sussex, RH10 2NN (hereinafter termed "the Company"), and Mr Anthony Sigmund Crane c/o International Aeradio Emirates, PO Box 9197, Dubai, U A E (hereinafter termed "the Employee").

Within this Agreement "Parent Company" shall for the time being mean Opto Sensors Inc, 12525 Chadron Avenue, Hawthorne, California 90250 and "Associated Company" shall encompass the organisation known as Rapiscan Security Product Inc, 2830 Temple Avenue, Long Beach, California 90806.

It is agreed between the parties as follows:

1. Occupation and Location

   a. The Employee shall serve the Company as Regional Sales Director, Middle East, to be based in Dubai and operating throughout the Middle East as appropriate to serve the best interests of the Company.

   b. No normal place of work is defined and the Company's registered place of business is recorded as being the Company's address stated above.

   c. The Company shall have the right to employ the Employee through a parent, associated or subsidiary company.

   d. The Employee shall be required to work in any other capacity reasonably within the scope of his activities. The Employee may be required to carry out the training of local nationals or other staff as a fundamental component of the Employee's activities without giving rise to a change in the Employee's defined job description or entitling the Employee to additional salary.

2. Requirement to Work Outside the United Kingdom

   a. It is the intention of both parties that the Employee, based in and working from Dubai, United Arab Emirates, shall serve the Company for a period of at least five years with effect from 1st January 1994.

   b. Either party may, however, at any stage give to the other a minimum of six Gregorian calendar months notice in writing that the Employee shall return to be domiciled in the United Kingdom and continue employment with the Company. Under these circumstances terms and conditions of employment to be negotiated to the mutual satisfaction of both parties, but which terms and conditions of employment would be different from those contained within this Agreement.

Cont/....

<PAGE>

3. Commencement of Employment

   Initial employment with the company commenced on 30th November 1980, from when the period of continuous employment counts for reckonable purposes.

4. Level of Remuneration

   The Employee will be paid a salary of 151,998 Dhs per annum, revised from time to time, to be paid monthly in arrears. Entitlement to salary shall accrue from day to day. United Kingdom National Insurance contributions shall be deducted by the Employer at source.

5. Hours of Work

The Employee's normal working week will be a maximum of 48 hours, exclusive of travelling time, although, on occasions, it will be necessary to work additional hours as necessary to satisfactorily complete the work in hand and achieve agreed targets. No overtime is paid, although time off in lieu may be granted in respect of excessive hours worked.

6. Motor Vehicle

The Company will supply a fully financed car in Dubai, at up to a cost of 1,750 Dhs per month, for the Employee's personal and business use, including funding the costs involved with all reasonable mileage.

7. Accommodation

a. Whilst based in Dubai, the Company shall supply such accommodation for the Employee, his spouse and dependant children up to a cost of 45,000 Dhs per annum.

b. The Employee agrees to treat the accommodation and furnishings provided in a proper manner and undertakes to meet the cost of any damage caused (fair wear and tear excepted).

c. The cost of electricity, gas and mains water will normally by met by the Company, although the Company reserves the right to charge the employee for the supply of these utilities.

d. The Employee shall be responsible for his own catering arrangements.

8. Travel and Expenses

a. The Company will meet the costs of travel for the Employee, his spouse and immediate dependant children between Dubai and the United Kingdom at the termination of the Employee's stay in Dubai, howsoever caused. This entitlement will be forfeited if it is not exercised within one calendar month.

b. The Company will meet the costs of travel for the Employee, his spouse and immediate dependent children between Dubai and another location should the Employee be required to relocate to another country at the Company's request.

Cont/....

<PAGE>

c. The Company will not be responsible for any costs of travel, excepting business travel, or for any other costs incurred within the United Kingdom or Dubai, whether associated with engagement, leave or repatriation, other than as set out elsewhere within this Agreement.

9. Leave Entitlement

The Employee shall be entitled to 56 days paid holiday per annum, inclusive of any local public holidays in the United Arab Emirates.

10. Leave Travel

a. The Employee shall be supplied with airline tickets to facilitate leave travel to the United Kingdom on one occasion each twelve months for himself, his spouse and immediate dependant children.

b. There will be no entitlement to cash in lieu of any unused leave travel tickets.

c. The travel class adopted will be Economy and the type of ticket issued will be at the Company's discretion on an airline nominated by the Company.

d. The Employee agrees to ensure that leave travel visits to the United Kingdom coincide with business travel visits to the United Kingdom wherever possible.

11. Baggage

a. On the occasion of relocation to another country at the Company's request or on the occasion of final repatriation to the United Kingdom, the Company will meet the transportation costs of one consignment of unaccompanied freight sent by air (maximum weight/space 200 kg or 2 cubic metres) and one consignment of unaccompanied freight by sea (maximum 500 kg). These limits apply to personal belongings only and exclude any office equipment owned by the Company.

b. The Company will not accept any costs in respect of excess baggage.

12. Children's Education

Upon supply to the Company of receipted invoices which meet with the Company's satisfaction and approval, 60.0% of the cost of school fees incurred by the Employee in respect of the education in Dubai of dependant children shall be reimbursed by the Company, subject to a maximum of 10,000 Dhs during the twelve months commencing 1st January 1994. These amounts shall be the subject of negotiation annually between the Company and the Employee in the light of the circumstances of the Employee's children's education and associated costs then prevailing.

13. Medical Examination

The Employee agrees to undergo a medical examination with a Medical Officer nominated by the Company, if ever so requested.

14. Medical Expenses

a. Medical insurance cover shall be supplied by the Company in respect of the Employee, his spouse and immediate dependant children, utilising covered supplied by the Medicaire medical insurance company.

Cont/...

<PAGE>

b. Any essential medical treatment for the Employee will be paid for by the Company whilst he is resident in Dubai, but not during any period of leave (except for leave periods in the United Kingdom or Dubai). All costs of any dental treatment will be the Employee's responsibility.

c. In the event that any medical treatment is arranged outside of Dubai, any costs involved will be the Employee's responsibility.

d. The Employee is required to undergo such inoculations, vaccinations and preventive medical treatment as the Company, in consultation with its medical advisers, shall require.

e. In the event that the Employee is prevented from working on the Company's behalf due to medical incapacity payment of salary will be maintained by the Company for up to a maximum of six months full pay and thereafter at the Company's sole discretion.

15. Pension

The Employee shall retain UK membership of the Company's Pension Scheme,

making personal contributions, currently at the level of 4.0% of gross earnings.

16. Normal Retirement Age

Normal Retirement Age is 63 years. In the absence of other formal written advice being issued it shall be deemed that notice of termination of employment under this heading has been issued to the Employee twelve weeks ahead of his 63rd birthday.

17. Termination of Employment

a. This Agreement may be terminated by three months notice in writing on either side. Such a communication issued to the Company should be sent by registered mail to the Company's registered office. Written notice issued by the Company shall be given to the Employee personally or sent by first class mail to his last known place of residence.

   The Company reserves the right to make a payment in lieu of notice.

b. Notwithstanding point a. above, the Company may summarily dismiss or suspend the Employee from his duties without pay and allowances, including any terminal gratuity, if the Employee should:

   i. Fail to obtain or have withdrawn any necessary visas or work permits as may be required, as a result of his own negligence or actions;

   ii. Wilfully neglect the interests of the Company;

   iii. Drink spirituous or intoxicating liquors or take or use drugs to such extent as the Company may deem excessive or as likely to incapacitate the Employee, or the prevent him from properly performing his duties;

   iv. Be guilty of misconduct or any conduct which is likely to be prejudicial to the interests of the Company;

Cont/...

<PAGE>

   v. Be absent from duty without leave or any other valid reason, or be absent through illness for an aggregate period exceeding six Gregorian calendar months in any consecutive period of twelve Gregorian calendar months;

   vi. Become, through his own fault (which shall include refusal or failure to undergo preventive treatment advised by the Medical Officer nominated by the Company) sick or disabled or otherwise unable properly to perform his duties or to do so without being a nuisance or menace to his fellow employees (a certificate from a properly qualified medical practitioner approved by the Company being sufficient evidence);

   vii. Engage in any black market activities;

   viii. Seriously offend against the laws or social customs of the country in which the Employee is employed;

   ix. Refuse to undergo vaccinations, inoculations or other medical treatment which has been specified at any time by the Company's medical adviser;

   x. Seriously or persistently breach the Terms and Conditions of the Employee's employment.

c. The Employee undertakes at the time when his employment terminates to

furnish the Company, prior to his return to the United Kingdom, with a list of all of his outstanding debts and the Company shall be entitled to recover from the Employee whether by deduction from amounts owed to the Employee or otherwise, any sums which the Company may at its discretion, pay in settlement of any outstanding debts the Employee has incurred in the employment location. The Employee will be required to enter into a separate written agreement covering this topic.

d. Should this contract be terminated for any reason the Employee shall deliver to the Company all books, documents, papers, materials and other property of the Company or any of its parent, associated or subsidiary companies in the Employee's possession or under his control.

18. Restrictive Covenants
---------------------

a. The Employee shall not at any time after the end of his employment:

i. Represent himself as being in any way connected with or interested in the business of the Company or its parent, associated or subsidiary companies;

ii. Either on his own account or for any other person, firm or company, solicit, interfere with or endeavour to entice away from the Company or any of its parent, associated or subsidiary companies any employee of the Company or its parent, associated or subsidiary companies.

b. The Employee shall not (without the previous consent in writing of a member of Executive Management of the Company) for the period of twelve months after the end of his employment with the Company, either on his own account or for any other person, firm or company, solicit or endeavour to entice away from the Company or any of its parent, associated or subsidiary companies, any person, firm or company who or which in the preceding two years shall have been a customer or in the habit of dealing with the Company or any of its parent, associated or subsidiary companies.

19. Exclusive Employment
--------------------

Employment with the Company excludes employment with any other organisation or person. The Employee may not accept additional employment from others, with or without remuneration, unless prior written permission has been obtained from the Company.

Cont/...

<PAGE>

Such permission will only be granted where the circumstances are totally acceptable to the Company and where there can be no possible adverse effects on either the Company or the Employee's employment with the Company.

20. Confidentiality
---------------

Except as authorised by the Company in writing or upon the order of a court of competent jurisdiction the Employee shall keep secret and shall not, at any time (both during the period of his employment and after its termination for any reason whatsoever) use for the Employee's or another's advantage, or reveal to any person, any of the trade secrets or confidential operations, processes or dealings or any secret or confidential information concerning the organisation, business or finance of the Company, or its customers or any of the Company's parent, associated or subsidiary companies to which the Employee is seconded or from whom he takes instructions, so far as they shall have come to his knowledge during his employment with the Company or any parent, associated or subsidiary companies or organisations to whom the Employee is seconded or from whom he takes instructions.

21. Jurisdiction

This contract shall be governed by English law and both parties accept that the English courts shall have exclusive jurisdiction (both during the period of the Employee's period of this employment and following its termination for any reason whatsoever) to hear claims arising out of this contract, the employment or its termination.

Signed: /s/ Illegible Date: 10-5-94
For and on behalf of Rapiscan Security Products Limited

Signed: /s/ A S Crane Date: 10-5-94
Mr A S Crane Employee.

-6-

<PAGE>

Undertaking by Mr A S Crane

I hereby undertake at the time when my employment with Rapiscan Security Products Limited terminates, to furnish to the Company, prior to my return to the United Kingdom, a list of all of the outstanding debts incurred by me associated with my employment by the Company.

I understand that the Company shall be entitled to recover from me any sums which the Company, at its discretion, pay in settlement of any outstanding debts that I may have incurred.

I hereby give permission for any such sum, or balance outstanding thereof, to be deducted by the Company from any monies due to me, including salary payments, in accordance with the terms of the Wage Act 1986.

Signed: /s/ A S Crane Date: 10-5-95
A S Crane
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.10
<SEQUENCE>6
<DESCRIPTION>FORM OF INDEMNITY AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.10

INDEMNITY AGREEMENT

This Indemnity Agreement (the "Agreement) is made as of _________________, by and between OSI Systems, Inc., a California corporation (the "Corporation"), and ___________ ___________________________, an individual (the "Indemnitee"), a director and/or officer of the Corporation.

R E C I T A L S

A. The Corporation and the Indemnitee recognize that the interpretation of statutes, regulations, court opinions and the Corporation's Articles of Incorporation and bylaws is too uncertain to provide the Corporation's officers and directors with adequate guidance with respect to the legal risks and potential liabilities to which they may become personally exposed as a result of performing their duties in good faith for the Corporation.

B. The Corporation and the Indemnitee are aware of the substantial increase in the number of lawsuits filed against corporate officers and directors.

C. The Corporation and the Indemnitee recognize that the cost of defending against such lawsuits, whether or not meritorious, may impose substantial economic hardship upon the Corporation's officers and directors.

D. The Corporation and the Indemnitee recognize that the legal risks, potential liabilities and expenses of defense associated with litigation against officers and directors arising or alleged to arise from the conduct of the affairs of the Corporation are frequently excessive in view of the amount of compensation received by the Corporation's officers and directors, and thus may act as a significant deterrent to the ability of the Corporation to obtain experienced and capable officers and directors.

E. Section 317 of the California General Corporation Law, which sets forth certain provisions relating to the indemnification of officers and directors (among others) of a California corporation by such corporation, is specifically not exclusive of other rights to which those indemnified thereunder may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise.

F. In order to induce capable persons such as the Indemnitee to serve or continue to serve as officers or directors of the Corporation and to enable them to perform their duties to the Corporation secure in the knowledge that certain expenses and liabilities that may be incurred by them will be

1.

<PAGE>

borne by the Corporation, the Board of Directors of the Corporation has determined, after due consideration and investigation of the terms and provisions of this Agreement and the various other options available to the Corporation and the Indemnitee in lieu of this Agreement, that the following Agreement is in the best interests of the Corporation and its shareholders.

G. The Corporation desires to have the Indemnitee serve or continue to serve as an officer and/or director of the Corporation, and the Indemnitee desires to serve or continue to serve as an officer and/or director of the Corporation provided, and on the express condition, that he is furnished with the indemnity set forth below.

A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the Corporation and the Indemnitee agree as follows:

1. Continued Service. The Indemnitee agrees to serve or continue to serve as a director and/or officer of the Corporation for so long as he is duly elected or appointed or until such time as he resigns in writing, subject to the terms of any applicable employment agreement.

2. Definitions.

(a) The term "Proceeding" shall include any threatened, pending or completed action, suit or proceeding, whether brought in the name of the Corporation or otherwise and whether of a civil, criminal or administrative or investigative nature, including, but not limited to, actions, suits or proceedings brought under or predicated upon the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, their respective state counterparts or any rule or regulation promulgated thereunder, in which the Indemnitee may be or may have been involved as a party or otherwise by reason of the fact that the Indemnitee is or was a director and/or officer of the Corporation, by reason of any action taken by him or of any inaction on his part while acting as such director and/or officer, or by reason of the fact that he is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, whether or not he is serving in such capacity at the time any indemnified liability or reimbursable expense is incurred.

(b) The term "Expenses" shall include, but shall not be limited to, damages, judgments, fines, settlements and charges, costs, expenses of investigation and expenses of defense of legal actions, suits, proceedings or claims and appeals therefrom, and expenses of appeal, attachment or simi-

<PAGE>

lar bonds. "Expenses" shall not include any judgments, fines or penalties actually levied against the Indemnitee which the Corporation is prohibited by applicable law from paying.

3. Indemnity in Third-Party Proceedings. Subject to Paragraph 8, the Corporation shall indemnify the Indemnitee in accordance with the provisions of this Paragraph 3 if the Indemnitee is a party to, threatened to be made a party to or otherwise involved in any Proceeding (other than a Proceeding by the Corporation itself to procure a judgment in its favor), by reason of the fact that the Indemnitee is or was a director and/or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all Expenses actually and reasonably incurred by the Indemnitee in connection with the defense or settlement of such Proceeding, provided it is determined, pursuant to Paragraph 7 or by the court before which such action was brought, that the Indemnitee acted in good faith and in a manner that he reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe that his conduct was unlawful. The termination of any such Proceeding by judgment, order of court, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee did not act in good faith or in a manner that he reasonably believed to be in the best interests of the Corporation, and with respect to any criminal proceeding, that such person had reasonable cause to believe that his conduct was unlawful.

4. Indemnity in Proceedings by or in the Name of the Corporation. Subject to Paragraph 8, the Corporation shall indemnify the Indemnitee against all Expenses actually and reasonably incurred by the Indemnitee in connection with the defense or settlement of any Proceeding by or in the name of the Corporation to procure a judgment in its favor by reason of the fact that the Indemnitee was or is a director and/or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, but only if he acted in good faith and in a manner that he reasonably believed to be in the best interests of the Corporation and its shareholders; provided, however, that no indemnification for Expenses shall be made under this Paragraph 4 with respect to any claim, issue or matter as to which the Indemnitee shall have been adjudged to be liable to the Corporation, unless and only to the extent that any court in which such Proceeding is brought

shall determine upon application that despite the adjudication of liability, but in view of all the circumstances of the case, the Indemnitee is fairly and reasonably entitled to indemnity for such expenses as such court shall deem proper.

3.

<PAGE>

5. Indemnification of Expenses of Successful Party. Notwithstanding any other provisions of this Agreement, to the extent that the Indemnitee has been successful on the merits or otherwise in defense of any Proceeding or in defense of any claim, issue or matter therein, including the dismissal of an action without prejudice, the Indemnitee shall be indemnified against all Expenses incurred in connection therewith.

6. Advances of Expenses. Expenses incurred by the Indemnitee pursuant to Paragraphs 3 and 4 in any Proceeding shall be paid by the Corporation in advance of the determination of such Proceeding at the written request of the Indemnitee, if the Indemnitee shall undertake to repay such amount to the extent that it is ultimately determined that the Indemnitee is not entitled to indemnification.

7. Right of Indemnitee to Indemnification Upon Application; Procedure Upon Application. Any indemnification or advance under Paragraph 3, 4 or 6 shall be made no later than 30 days after receipt of the written request of the Indemnitee therefor, unless a determination is made within said 30-day period by (a) the Board of Directors of the Corporation by a majority vote of a quorum thereof consisting of directors who were not parties to such Proceedings, or (b) independent legal counsel in a written opinion (which counsel shall be appointed if such a quorum is not obtainable) that the Indemnitee has not met the relevant standards for indemnification set forth in Paragraphs 3 and 4.

The right to indemnification or advances as provided by this Agreement shall be enforceable by the Indemnitee in any court of competent jurisdiction. The Corporation shall bear the burden of proving that indemnification or advances are not appropriate. The failure of the Corporation to have made a determination that indemnification or advances are proper in the circumstances shall not be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct. The Indemnitee's Expenses incurred in connection with successfully establishing his right to indemnification or advances, in whole or in part, in any such Proceeding shall also be indemnified by the Corporation.

8. Indemnification Hereunder Not Exclusive.

(a) Notwithstanding any other provision of this Agreement, the Company shall not indemnify Indemnitee for any act or omission or transactions for which indemnification is expressly prohibited by Section 204(a)(11) of the California General Corporation Law.

(b) The right to indemnification provided by this Agreement shall not be exclusive of any other rights to which the Indemnitee may be entitled under the Corporation's Articles of Incorporation, bylaws, any agreement, any vote of

4.

<PAGE>

shareholders or disinterested directors, the California General Corporation Law or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office. The indemnification under this Agreement shall continue as to the Indemnitee even though he may have ceased to be a director or officer, and shall inure to the benefit of the heirs and

personal representatives of the Indemnitee.

9. Partial Indemnification. If the Indemnitee is entitled under any provision of this Agreement to indemnification by the Corporation for a portion of his Expenses actually and reasonably incurred by him in any Proceeding but not, however, for the total amount thereof, the Corporation shall nevertheless indemnify the Indemnitee for the portion of such Expenses to which the Indemnitee is entitled.

10. Severability. If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, unenforceable or otherwise illegal, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected, and the provision so held to be invalid, unenforceable or otherwise illegal shall be revised to the extent (and only to the extent) necessary to make it enforceable, valid and legal.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the principles of conflict of laws thereof.

12. Notices. The Indemnitee shall, as a condition precedent to his right to be indemnified under this Agreement, give to the Corporation written notice as soon as practicable of any claim made against him for which indemnity will or could be sought under this Agreement. Notice to the Corporation shall be directed to OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250, Attention: President (or at such other address or to the attention of such other person as the Corporation shall designate in writing to the Indemnitee). Notices to the Indemnitee shall be sent to the Indemnitee at the address set forth after his name on the

<PAGE>

signature page of this Agreement (or at such other addresses the Indemnitee shall designate in writing to the Corporation).

OSI SYSTEMS, INC.

By:______________________________

Title:___________________________

INDEMNITEE

_________________________________

_________________________________
(Print Name)

Address:_________________________
_________________________

6.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.13
<SEQUENCE>7
<DESCRIPTION>LEASE AGREEMENT DATED JULY 4, 1986
<TEXT>

<PAGE>

EXHIBIT 10.13

DATED 4 July 1986

ELECTRICITY SUPPLY NOMINEES LIMITED

-and-

JOHN ADAMS ELECTRONICS LIMITED

L E A S E

of

Unit No. 1, Block B,
The Fleming Centre Fleming Way
Crawley West Sussex

(2528B)

<PAGE>

Property & Lease ID: LP1564003 COUNTERPART/

MEMORANDUM OF REVIEWED RENT

DATE OF LEASE .................. 4 July 1986

PREMISES DEMISED........................................................... Unit Number 1 Block B and 30 Car Park Spaces

............................................................................ The Fleming Centre Fleming Way Crawley West Sussex

PARTIES-LANDLORD:.......................................................... Electricity Supply Nominees Ltd

TENANTS(S):...................................................... John Adams Electronics Ltd

.......................................................................

SURETY(IES)......................................................

The Norwich Union Life Insurance Society

PRESENT LANDLORD..............................................................
(where Lease assigned)

Rapiscan Security Products Ltd
PRESENT TENANT(S)............................................................
(where Lease assigned)

................................................................................

International Aeradio Ltd

SURETY(IES).....................................................................

THE RENT PAYABLE UNDER THE ABOVE MENTIONED LEASE HAS BEEN REVIEWED UNDER THE PROVISIONS THEREOF AND THE PRINCIPAL RENT REMAINS THE SAME AT (pounds) 94,000.00pa ..........

(Ninety four thousand pounds per annum)
................................................................................

UNTIL NEXT REVIEW, WITH EFFECT FROM 25 March 1996 .............................................

.........................................
BY/FOR AND ON BEHALF OF THE TENANT
Rapiscan Security Products Ltd
.........................................

SIGNATURE ILLEGIBLE
....................................

HEAD-NUIM PROPERTY (DOCUMENTATION)
....................................
FOR AND ON BEHALF OF THE LANDLORD

/S/ A.S. CRANE
.........................................
BY/FOR AND ON BEHALF OF THE SURETY(IES)*
International Aeradio Ltd

Date August 16th 1996
....................................

/s/ D.L.H STEEDS
.........................................

<PAGE>

A RENT REVIEW MEMORANDUM TO BE ATTACHED TO A LEASE DATED THE 4TH DAY OF JULY 1986 AND MADE BETWEEN ELECTRICITY SUPPLY NOMINEES LIMITED (1) AND JOHN ADAMS ELECTRONICS LIMITED (2)

---

Premises know as Unit Number 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

---

IT IS HEREBY AGREED AND DECLARED BETWEEN ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London SW1P 4RD (being the party remaining entitled to the reversion immediately expectant upon the determination of the term granted by the within written lease) and INTERNATIONAL AERADIO LIMITED whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ (being the party now entitled to the benefit of the term granted by the within written lease) that pursuant to Clause 1 of and the Third Schedule to the within written lease the yearly rent reserved by the within written lease is from the 25th day of March 1991 payable at the rate of NINETY FOUR THOUSAND POUNDS ((pounds)94,000)) per annum subject to the provisions for further rent review contained in the within written lease

Dated this 26th day of March 1992

....................................
Signed for and on behalf of
ELECTRICITY SUPPLY NOMINEES LIMITED

[SIGNATURE ILLEGIBLE]
....................................
Signed for and behalf of
INTERNATIONAL AREADIO LTD

(5629I)

<PAGE>

Appendix

By a Licence for Alterations dated 1st December, 1992 made between Electricity Supply Nominees Limited (1) and International Aeradio Plc (2) consent was granted to certain alterations upon the terms and conditions set out therein

(7732I)

<PAGE>

INDEX

| Clause | Subject |
| --- | --- |
| Particulars | Lease Details |

1. General
   - (1) Interpretation
   - (2) Definitions

2. Demise

3. Covenants by the Tenant
   - (1) To pay the Rent
   - (2) To pay interest
   - (3) To pay Value Added Tax
   - (4) To pay outgoings
   - (5) To pay Service Charge
   - (6) As to insurance
   - (7) To comply with statutes

(8) As to the Town and Country Planning Acts

(9) As to repairs and decoration

(10) As to alterations

(11) As to signs and advertisements

(12) As to user

(13) As to dealings

(14) New Guarantor

(15) To permit entry by Landlord and others

(16) As to the payment of certain costs and as to indemnities

(17) To comply with further stipulations restrictions and regulations

(18) To comply with the provisions of the Relevant Documents

<PAGE>

4. Covenants by the Landlord

(1) For quiet enjoyment

(2) To provide certain services

(3) To insure

(4) To make good damage caused by Insured Risks

5. Provisos

(1) Re-entry

(2) Cesser of rent

(3) Demise not to confer rights to enforce covenants against others or to grant further rights

(4) Limitation of Landlord's liability for provision of Services

(5) No warranty as to the Permitted Use

(6) Limitation on Landlord's obligation to insure

(7) Service of notices

(8) Party Walls

(9) As to arbitration in certain events

(10) Exclusion of compensation

(11) Impossibility of performance of certain covenants

6. Covenants by Guarantor

The First Schedule - Rights Granted

The Second Schedule - Exceptions and Reservations

The Third Schedule - Rent Review Provisions

The Fourth Schedule - Stipulations and Restrictions

The Fifth Schedule - Service Charge

The Sixth Schedule - Covenants by Guarantor

<PAGE>

PARTICULARS

| Column 1 | Column 2 |
| --- | --- |
| Date | the 4th day of July One thousand nine hundred and eighty-six |
| the Landlord | ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London S.W.1. |
| the Tenant | JOHN ADAMS ELECTRONICS LIMITED whose registered office is at Aeradio House, Hayes Road, Southall Middlesex |
| the Guarantor (if any) | Not Applicable |
| the Term | Twenty-five years from (and including) the Twenty-fifth day of March One thousand nine hundred and eighty-six |
| the Premises | ALL THAT piece or parcel of land together with the building erected thereon or on some part thereof situate on the Estate (as hereinafter mentioned) known as Unit Number B1 WHICH piece of land is for the purpose of identification only delineated upon the plan annexed hereto and thereon verged in red |
| The Estate | ALL THOSE premises known as The Fleming Centre situate at Fleming Way, Crawley, West Sussex and shown for the purpose of identification only upon the plan annexed hereto and thereon verged in blue |

<PAGE>

| | |
|---|---|
| the Initial Rent | the yearly rent of Sixty-five thousand pounds ((pounds) 65,000) the first payment in respect of the period from the First day of July One thousand nine hundred and eighty-six to the Twenty-ninth day of September One thousand nine hundred and eighty-six to be made on the date hereof |
| Review Dates | the fifth tenth fifteenth and twentieth anniversaries of the commencement date of the Term |
| Initial Loss of Rent Period | Three years |
| Number of Parking Spaces | 30 parking spaces for private cars |
| Internal Decoration Year | the fifth year of the Term and each subsequent fifth year thereafter |
| External Decoration Years | the third year of the Term and each subsequent third year thereafter |
| the Permitted Use | Light Industrial Use within the meaning of Use Class III of the Town and Country Planning (Use Classes) Order 1972 (as enacted at the date thereof) or warehousing use within Class X of such order (subject to all necessary planning permissions being obtained) |
| Service Charge Proportion | the proportion which the gross external floor area of the building comprised in the Premises bears to the total gross external floor are or all the premises on the Estate (other than those parts thereof ??? for the provision of services for the Estate) let or intended to be |

iv.

<PAGE>

| | |
|---|---|
| Service Charge Accounting Day | the 25th day of March in each year |
| Estate Opening Date (if any) | the 25th day of March One thousand nine hundred and eighty-six |
| Service Charge Commencement Date | the first day of July One thousand nine hundred and eighty-six |

| | |
|---|---|
| the Relevant Documents (if any) | the deeds and documents specified in the Property and Charges Register of Title Number WSX72441 |
| Quarter Days | the 25th day of March the 24th day of June the 29th day of September and the 25th day of December in each year |
| Stipulated Rate | the rate of Six per centum (6%) per annum above the base rate of National Westminster Bank plc for time being in force |

v.

<PAGE>

THIS LEASE is made on the date first shown in the [SEAL APPEARS HERE] Particulars hereto between the Landlord specified in the Particulars of the first part the Tenant specified in the Particulars of the second part and the Guarantor (if any) specified in the Particulars of the third part

NOW THIS DEED WITNESSETH as follows:

INTERPRETATION AND DEFINITIONS

1. (1) (a) WHERE there are at any time two or more persons included in the expression "Tenant" or the expression "Guarantor" covenants expressed to be made by the Tenant or the Guarantor as the case may be shall be deemed to be made by such persons jointly and severally

(b) Any reference to any Act or Acts of Parliament or legislation generally shall include any modification extension or re-enactment thereof for the time being in force and shall also include all instruments orders plans regulations bye-laws permissions licences consents notices and directions or other things for the time being made issued or given thereunder or deriving authority therefrom

(c) Any covenant or obligation by or of the Tenant not to do or omit to be done any act matter or thing shall be deemed to include an obligation not to permit or suffer such act matter or thing to be done or not to permit or suffer the omission of such act matter or thing as the case may be

(d) The Clause or Paragraph headings or marginal notes and the Index (if any) to this Lease shall not affect the construction thereof

(2) In this Deed the following expressions shall (where the context so admits) have the following meanings:

(a) "the Particulars" means the details and descriptions appearing in the foregoing pages which comprise part of this Lease and the words and

<PAGE>

expressions in Column 1 of the Particulars shall (subject as hereinafter provided) have the meanings respectively set against them in Column 2 or the Particulars

(b) "the Landlord" means the person named as the Landlord in the Particulars and includes any other person for the time being entitled to the reversion immediately expectant upon the determination of the Term

(c) "the Tenant" means the person named as the Tenant in the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 560 of 2711

Particulars and includes the successors in title of the Tenant and those deriving title under the Tenant

(d) "the Guarantor" means the person (if any) named as the Guarantor in the Particulars or (as the case may require) any other person who shall for the time being have covenanted for the due observance and performance of the tenants covenants contained in this Lease

(e) "the Term" means the Term specified in the Particulars and includes any statutory extension thereof

(f) "the Demised Premises" means the Premises described in the Particulars and each and every part thereof and all additions and alterations which may be carried out during the Term and all landlord's fixtures and fittings from time to time in or about the same

(g) "the Rent" means the Initial Rent specified in the Particulars or such greater yearly rent as shall be agreed or determined in accordance with the provisions of the Third Schedule hereto

(h) "the Insured Risks" means (subject as hereinafter provided in this Lease) the risks in respect of loss or damage by fire lightning storm tempest flood explosion impact from vehicles aircraft and articles dropped therefrom riot malicious damage civil commotion earthquake (fire and shock) bursting or overflowing of water tanks apparatus or pipes and such other risks as

<PAGE>

the Landlord may from time to time reasonably deem expedient

(i) "the Loss of Rent Period" means the Initial Loss of Rent Period specified in the Particulars or such other period as the Landlord may from time to time reasonably require (including in each case if applicable any period subsequent to the termination of the Term)

(j) "the Parking Spaces" means the number of Parking Spaces (if any) on the Estate as are specified in the Particulars as shall from time to time be allocated for use by the Tenant by notice in writing given by the Landlord or the Landlord's managing agents to the Tenant

(k) "Stipulated Rate" means the Stipulated Rate specified in the Particulars or if at any time no rate shall be ascertainable under the formula so specified the Stipulated Rate shall be such reasonably equivalent rate of interest as the Landlord and the Tenant shall agree upon or in the absence of agreement within a reasonable time of the occasion for such agreement arising the matter shall be referred for determination by a single arbitrator pursuant to the Arbitration Acts 1950 and 1979 to be appointed in the absence of agreement between the Landlord and Tenant on the application of either of them by the President for the time being of The Law Society

(k) "the Quarter Days" means the Quarter Days specified in the Particulars and the expression "Quarter" shall be construed by reference thereto

(l) "Conduits" means pipes wires ducts cables channels sewers drains watercourses gutters shafts flues or other conducting media under through along

over or by means of which any gas electricity or other power source or any air water soil telephonic signal and the like or other thing may pass

3.

<PAGE>

(m) "Perpetuity Period" means the period of eighty years commencing on the date of this Lease which shall be the perpetuity period applicable hereto

(n) "the termination of the Term" means the determination of the Term whether by effluxion of time re-entry or otherwise howsoever

DEMISE

2. IN consideration of the Rent and of the covenants on the part of the Tenant hereinafter contained the Landlord HEREBY DEMISES unto the Tenant ALL THAT the Demised Premises TOGETHER WITH so far as the Landlord has power to grant the same the easements and rights specified in the First Schedule hereto BUT EXCEPTING AND RESERVING the easements and rights specified in the Second Schedule hereto TO HOLD the same SUBJECT to (a) all easements rights quasi-easements privileges covenants and restrictions to which the Demised Premises are or may be subject and (b) the provisions of the Relevant Documents specified in the Particulars unto the Tenant for the Term (subject to determination as hereinafter provided) YIELDING AND PAYING therefor during the Term FIRST yearly and proportionately for any part of a year the Rent which shall be payable by equal quarterly payments in advance on the Quarter Days the first of such payments or a proportionate part thereof to be due on the date specified in the Particulars and to be in respect of the period therein mentioned SECONDLY by way of additional rent all sums covenanted to be paid pursuant to Clause 3(5) hereof THIRDLY all sums covenanted to be paid pursuant to Clause 3(6) hereof and FOURTHLY interest payable pursuant to Clause 3(2) hereof on the Rent and additional rents hereby reserved

CONVENANTS BY THE TENANT

3. THE Tenant HEREBY CONVENANTS with the Landlord as follows:

4.

<PAGE>

To pay the Rent

(1) To pay the Rent at the times and in the manner herein provided without any deduction or set off whatsoever

To pay interest

(2) Without prejudice to any other right remedy or power herein contained or otherwise available to the Landlord if the Rent or any additional rents hereby reserved or any part thereof or any other sums payable to the Landlord pursuant to this Lease or any part thereof shall have become due and shall remain unpaid as to the Rent or additional rents hereby reserved for seven days or as to the said other sums for fourteen days after in each case the due date for payment to pay to the Landlord on demand interest thereon at the Stipulated Rate (as well after as before judgment) for the period from the date when the same shall have become due (unless otherwise provided for herein) to the date of receipt by the Landlord

To pay Value Added Tax

(3) To pay to the Landlord such amount of Value Added Tax (or similar tax or taxes) at the rate for the time being in force as shall be payable in respect of all moneys covenanted to be paid by the Tenant hereunder and in every case where in this Lease the Tenant covenants to pay an amount of money such amount shall be regarded as exclusive of value Added Tax (or other tax or taxes) which may from time to time be payable thereon

To pay outgoings

(4) To pay all rates taxes duties levies charges assessments impositions and outgoings whatsoever whether parliamentary county municipal parochial local or of any other description which are now or hereafter during the Term may be taxed assessed charged or imposed in respect of the Demised Premises or the Parking Spaces or on the owner or occupier in respect thereof (other than taxes

<PAGE>

payable in respect of any dealing with any reversion to this Lease) In the event of there being no separate assessment for the Demised Premises or the Parking Spaces the Tenant shall pay such proportion of such rates taxes duties levies charges assessments impositions and outgoings as the Landlord or the Landlord's managing agents shall determine as being reasonably attributable to the same

To pay service charge

(5) To pay to the Landlord by way of additional rent a charge in respect of services ascertained as provided in the Fifth Schedule hereto and payable at the times therein mentioned

As to insurance

(6) (a) To pay to the Landlord on demand by way of additional rent in respect of each year during the Term:

(i) a sum (or in the event that the Demised Premises shall be insured with other premises belonging to the Landlord a proportionate part of the total sum such proportion being conclusively determined by the Landlord or the Landlord's managing agents) equivalent to the amount from time to time assessed by the Landlord's insurers as being payable by the Landlord by way of premium for keeping the Demised Premises insured for an amount (estimated from time to time by the Landlord or the Landlord's managing agents) necessary to cover the full costs of rebuilding or reinstating the Demised Premises against loss or damage by the Insured Risks together with architects' surveyors' engineers' and other professional fees

(ii) a sum (or in the event that the loss of the Rent hereinafter mentioned is not separately insured a proportionate part of the total sum such proportion being conclusively determined by the Landlord or the Landlord's managing agents) equivalent to the amount from time to time assessed by the Landlord's

<PAGE>

insurers as being payable by the Landlord by way of premium for insuring the loss of the Rent (including if applicable loss of rent subsequent to the termination of the Term) for the Loss of Rent Period including the Landlord's or the Landlord's managing agents' estimate thereof where a part of the period in respect of which loss of rent insurance is or is to be effected by the Landlord is subsequent to a date or dates when the Rent fails to be reviewed pursuant to the provisions of the Third Schedule hereto or subsequent to the termination of

the Term and

(iii) any sum or sums by which the amount from time to time payable by way of premium by the Landlord (or the lessees or tenants of the Landlord) in respect of the insurance of any other part of the Estate or of any adjoining or neighbouring premises is increased by reason of the user of the Demised Premises or by reason of any act default or omission on the part of the Tenant or other occupiers of the Demised Premises or their respective servants or agents

(b) To comply forthwith with all proper requirements of the Landlord's insurers for the better protection of the Demised Premises of which notice in writing shall be given to the Tenant whether the same relate to the Demised Premises or to the use thereof or to any fixtures fittings equipment chattel or thing whatsoever therein or thereon and to do or execute or cause to be done or executed all such works acts deeds matters or things required by such notice to the satisfaction of the Landlord and the Landlord's insurers

(c) Not to do or omit to be done any act matter or thing whatsoever the doing or omission of which would make void or voidable the insurance of the Demised Premises or any other premises on the Estate and any fixtures fittings plant machinery equipment and other installations in or about the same or whereby any

<PAGE>

payment thereunder may be refused in whole or in part or whereby the premium payable in respect of such policy may be increased

(d) In the event of the Demised Premises or any part thereof being destroyed or damaged by any of the Insured Risks to give notice thereof to the Landlord as soon as such destruction or damage shall come to the notice of the Tenant

(e) In the event of the Demised Premises or any other premises on the Estate being destroyed or damaged by any of the Insured Risks and the insurance money under any insurance against the same effected thereon by the Landlord being wholly or partly irrecoverable by reason solely or in part of any act or default of the Tenant or other occupiers of the Demised Premises or their respective servants or agents forthwith to pay to the Landlord the whole or (as the case may require) the irrecoverable portion of the cost (including professional and other fees) of completely rebuilding and reinstating the same

(f) Not to effect or maintain or contribute towards the maintenance of any insurance on or in respect of the Demised Premises in duplication of any insurance effected and maintained by the Landlord PROVIDED ALWAYS that without prejudice to the foregoing and any right of action or remedy in respect of any breach thereof if at any time the Tenant is entitled to the benefit of any such insurance on the Demised Premises to pay or procure to be paid to the Landlord

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 564 of 2711

all moneys received by virtue of such insurance and to hold the benefit of such policy and moneys payable thereunder in trust to be applied towards rebuilding or reinstating the Demised Premises

To comply with statues
---------------------

7 (a) To comply with all obligations imposed by and do and execute or cause to be done and executed all

8.

<PAGE>

such works acts deeds matters and things as under or by virtue of any Act or Acts of Parliament or legislation are or shall be properly directed or necessary to be done or executed upon or in respect of the Demised Premises or any part thereof or the use thereof whether by the owner the landlord tenant or occupier and at all times to keep the Landlord indemnified against all costs claims demands and liability in respect thereof

(b) Upon receipt of any notice order proposal requisition direction or other thing from any competent authority affecting or likely to affect the Demised Premises or the user thereof at the Tenant's own expense forthwith to deliver to the Landlord a copy of such notice order requisition direction or other thing And at the request of the Landlord to make or join with the Landlord in making such representations in respect thereof as the Landlord shall deem expedient

As to the Town & Country
Planning Acts 1971-1974
-----------------------

(8) In relation to the Town & Country Planning Acts 1971-1974

(a) not to do or omit to be done any act matter or thing on or in connection with the Demised Premises the doing or omission of which shall be a contravention of the said Acts and to indemnify the Landlord against all actions proceedings damages penalties costs charges claims and demands in respect of such acts and omissions or any of them and against the costs of any application for planning permission and the works and things done in pursuance thereof

(b) to give notice forthwith to the Landlord of any notice order or proposal for a notice or order served on the Tenant under the said Acts and if so required by the Landlord to produce the same and at the request of the Landlord to make or join in making such representations in respect thereof as the Landlord may

9.

<PAGE>

require

(c) to comply at the Tenant's own cost with any notice or order under the said Acts

(d) not to make any application for planning permission in respect of the Demised Premises or any part thereof and without prejudice to the foregoing not to implement any planning permission or approval until the same has been submitted to and approved by the Landlord Provided that approval to such application or implementation shall not be unreasonably withheld for a change of use or works which are otherwise authorised under this Lease

(e) unless the Landlord shall otherwise direct to carry out before the termination of the Term any works stipulated to be carried out to the Demised Premises whether before or subsequent thereto as a condition of any planning permission which may have been granted during the Term

(f) not to enter into any agreement with any competent authority

regulating the development or use of the Demised Premises

As to repairs and decoration

(9) (a) At all times during the Term well and substantially to repair maintain cleanse and amend in every respect and to keep so repaired maintained cleansed and amended the Demised Premises and when requisite rebuild or renew the same

(b) Not less often than once in each Internal Decoration Year specified in the Particulars during the Term and in the last year of the Term (howsoever determined) to prepare and paint with two coats at least of the best quality paint or otherwise treat all internal parts of the Demised Premises usually or requiring to be painted or otherwise treated AND so that in the last year of the Term (howsoever determined) the tints colours and patterns of all such works of

<PAGE>

internal painting and decoration shall be such as shall be approved in writing by the Landlord

(c) Not less often than once in each External Decoration Year specified in the Particulars during the Term and in the last year of the Term (howsoever determined) to prepare and paint or otherwise treat all exterior parts of the Demised Premises usually or requiring to be painted or otherwise treated with two coats at least of best quality undercoat paint and one coat of best quality gloss paint or other suitable material (all such painting and treating to be carried out in accordance with a specification and colour scheme previously approved in writing by the Landlord) and also in like manner as often as in the opinion of the Landlord shall be reasonably necessary to clean the exterior of the Demised Premises by such method as shall be previously approved by the Landlord in writing

(d) To carry out all work hereunder with the best materials of their several kinds and in accordance with the best standards of workmanship

(e) To inform the Landlord immediately in writing of any defect in the Demised Premises which might give rise to a duty imposed by Common Law or Statute on the Landlord in favour of the Tenant or any other person

(f) To yield up the Demised Premises at the termination of the Term in good and substantial repair and condition in accordance with covenants on the Tenant's part herein contained and in case any of the Landlord's fixtures and fittings shall be missing broken damaged or destroyed forthwith to replace them with others of a similar character and quality and remove every moulding sign writing or painting of the name or business of the Tenant or other occupiers (if any) and to make good all damage caused by the removal thereof and of the Tenant's fixtures fittings furniture and

<PAGE>

effects

(g) Provided Always that the Tenant's liability hereunder shall not extend to damage caused by any of the Insured Risks save to the extent that the insurance moneys are rendered irrecoverable in consequence of any act or default or omission of the Tenant or other occupiers of the Demised Premises or their respective servants or agents or save by reason of some limitation or condition of the kind hereinafter mentioned

As to alterations
-----------------
(10) (a) Not to make any alteration or addition whatsoever to the Demised Premises Provided that the Tenant shall be entitled with the previous written consent of the Landlord which shall not be unreasonably withheld (but which may be subject to such reasonable conditions as the Landlord shall specify) to carry out internal non-structural alterations to the building comprised in the Demised Premises

(b) Without prejudice to the foregoing sub-clause by the termination of the Term (unless the Landlord otherwise requires) to remove all alterations and additions whatsoever (or such of them as the Landlord shall stipulate) and to reinstate the Demised Premises to their condition prior to the execution thereof all such work to be carried out in a good and workmanlike manner to the satisfaction of the Landlord

As to signs and advertisements
------------------------------

(11) Not to paint write place affix attach or exhibit any figure letter pole flag signboard advertisement inscription bill placard or sign whatsoever in onto or in front of any part of the Demised Premises other than a sign on the exterior of the building comprised in the Demised Premises in such position and being of such materials size design and colour as the Landlord or the Landlord's managing agents shall in the Landlord's

<PAGE>

absolute discretion direct

As to user
----------

(12) (a) Not to use the Demised Premises otherwise than for the Permitted Use specified in the Particulars

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 567 of 2711

(b) Not to use the Parking Spaces otherwise than for the parking of vehicles of the type specified in the Particulars belonging to the person for the time being entitled to beneficial occupation of the Demised Premises its employees or visitors

(c) Not to carry on upon the Demised Premises any noisy noisome or offensive trade business or occupation nor to do any act or thing which is or may be or become a nuisance annoyance disturbance or damage to the Landlord or the occupiers of any adjoining or neighbouring premises of the Landlord or which in the reasonable opinion of the Landlord shall prejudicially affect or depreciate any such adjoining or neighbouring premises and not to use the Demised Premises at any time for any illegal or immoral purpose nor for a sale by auction nor to permit any person to sleep therein

As to dealings
--------------

(13) (a) In this sub-clause the expression "sub-lease" means a sub-lease whether immediately or mediately derived out of this Lease and "sub-let" or "sub-letting" or "sub-lessor" or sub-lessee" shall be construed accordingly

(b) There shall not at any time be any assignment transfer sub-letting parting with or sharing of possession or occupation of the whole or of any part of the Demised Premises (whether by the Tenant or any person deriving title through or under the Tenant) PROVIDED THAT:

(i) if all the covenants and provisions hereinafter contained in this sub-clause are complied with the following transactions will be permitted with the previous consent in writing of the

<PAGE>

Landlord which shall not be unresonably withheld:

(I) an assignment of the whole of the Demised Premises

(II) a sub-lease of the whole of the Demised Premises or an assignment thereof

(ii) the Tenant or any permitted sub-lessee shall be entitled to share occupation of the Demised Premises with other companies within the same group (within the meaning assigned thereto by Section 42(1) of the Landlord and Tenant Act 1954) as the Tenant or the permitted sub-lessee PROVIDED THAT

(I) no tenancy is thereby created

(II) the Tenant shall give to the Landlord not less than one month's prior written notice of such proposed occupation and the cessation thereof and

(III) any such occupation of the Demised Premises or any part thereof shall cease upon the company in occupation ceasing to be a member of the same group of companies as the Tenant or the permitted sub-lessee as the case may be whereupon such company shall forthwith vacate the Demised Premises or such part thereof of which it is in occupation

(c) Prior to the assignment of the whole of the Demised Premises or the assignment of a sub-lease thereof the intended assignee shall covenant with the Landlord during the residue of the Term to observe and perform all the covenants on the part of the Tenant (except as to the Rent and sums payable hereunder in respect of insurance and services in the case of an assignment of a sub-lease of the Demised Premises) and the conditions contained in this Lease

(d) (i) If an intended assignee of the whole of the Demised Premises shall be a limited

<PAGE>

liability company then if the Landlord shall reasonably require there shall be provided a guarantor or guarantors sufficient in the reasonable opinion of the Landlord for such company and

(ii) such guarantor or guarantors shall prior to such assignment but with effect therefrom (jointly and severally if more than one) enter into covenants with the Landlord in the form set out in Part I of the Sixth Schedule hereto but subject as mentioned in Part 2 of that Schedule

(e) No sub-lease shall be granted otherwise than at the best rent reasonably obtainable in the open market (exclusive of all outgoings) with the most frequent rent reviews (but not at less frequent intervals than and in similar form to the rent reviews under this Lease) reasonably obtainable in the open market and without taking any fine or premium

(f) There shall not be any sub-lease unless:

(i) the intended sub-lessee shall have covenanted with the intended sub-lessor and the Landlord hereunder respectively as follows:

(I) not to assign transfer sub-let or part with or share possession or occupation of the Demised Premises in any manner which is inconsistent with the provisions of this sub-clause and then only with the previous consent in writing of the Landlord which shall not be unreasonably withheld

(II) to observe and perform the covenants on the part of the Tenant contained in this Lease (other than as to the Rent and sums payable hereunder in respect of insurance and services) so far as the same are not inconsistent with any other provision of this sub-clause

(ii) the form of the sub-lease shall have been previously approved in writing by the Landlord

<PAGE>

Which shall not be unreasonably withheld

(g) Not to be party or privy to any agreement or arrangement for the commutation in whole or in part of any annual rent to be reserved and made payable on any sub-letting and no rent reserved by a aub-lease shall be payable more than one quarter in advance

(h) To notify the Landlord not less than one month nor more than three months prior to any agreement by the Tenant with a sub-lessee for the continuation of the rent payable by such sub-lessee for a further period or for an alteration in such rent

(i) Not to make any variation to any sub-lease without the previous consent in writing of the Landlord which shall not be unreasonably withheld

(j) To observe and perform all the obligations imposed on the Tenant as

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 569 of 2711

sub-lessor under any sub-lease and to ensure the due performance by any sub-lessee of all the obligations under any sub-lease

(k) From time to time on demand during the Term to furnish the Landlord with particulars of any derivative interest of or in the Demised Premises including particulars of the rents payable in respect thereof and such copy documents as the Landlord may require in respect thereof

(l) Within twenty-eight days after any assignment transfer sub-lease charge or other devolution of the title to the Demised Premises to give notice in writing with particulars to the solicitor for the time being of the Landlord and to produce to him with such notice such assignment or transfer or the counterpart of such sub-lease or the Probate or Letters of Administration or other document effecting such devolution (together with a copy thereof for his retention) and to pay to him his reasonable fee (not being less than fifteen pounds (pounds 15)) for the registration of each such deed or document

16.

<PAGE>

New Guarantor
-------------

(14) With fourteen days of the death during the Term of any person who has or shall have guaranteed to the Landlord the payment of the Rent and the observance and performance of the covenants on the part of the Tenant herein contained or of such person becoming bankrupt or having a Receiving Order made against him or being a company passing a resolution to wind up or entering into liquidation or suffering a receiver of any of its assets to be appointed then to give notice thereof to the Landlord and without perjudice to any other right or remedy of the Landlord if so required by the Landlord at the expense of the Tenant within twenty-eight days to procure that some other person acceptable to the Landlord shall enter into covenants with the Landlord in the form set out in Part 1 of the Sixth Schedule hereto but subject as mentioned in Part 2 of that Schedule

To permit entry by the
Landlord and others
---------------------

(15) (a) To permit the Landlord and all persons authorised by the Landlord with all necessary appliances at all reasonable times (but after at least twenty-four hours prior written notice except in emergency) to enter the Demised Premises for the purpose of viewing the state and condition thereof or of inspecting any works in progress and in case there shall be found any defects disrepair removal of fixtures or unauthorised alterations or additions or work not conforming with any consent or licence given by the Landlord or any other breach of any of the covenants on the part of the Tenant herein contained to carry out after receipt notice in writing in that behalf and within such reasonable period as shall be specified in such notice such repairs works replacements or removals or take such other steps as may be necessary to remedy any such breach to the satisfaction of the Landlord and in case of default the

17.

<PAGE>

Landlord may itself execute such repairs works replacements and removals or take such other steps as aforesaid and the costs (including professional fees and other expenses) incurred by the Landlord in so doing shall on demand be paid by the Tenant to the Landlord together with interest at the Stipulated Rate (as well after as before judgment) calculated from the date of expenditure by the Landlord to the date of receipt by the Landlord

(b) To permit the Landlord and all persons authorised by the Landlord from time to time at all reasonable times (but after at least twenty-four hours prior written notice except in emergency) to enter and remain upon the Demised Premises with all necessary appliances

(i) to execute work to any adjoining or neighbouring property of the Landlord

(ii) to construct alter maintain repair renew or fix any thing serving or intended to serve the Demised Premises or any adjoining or neighbouring property and running through or intended to run through under on or over the Demised Premises

(iii) for the purpose of taking inventories of the Landlord's fixtures and things to be yielded up at the termination of the Term

(iv) to inspect the progress of any works undertaken by the Tenant pursuant to any obligation under this Lease or any licence or consent given pursuant to the terms hereof or otherwise and/or to prepare any Schedule of works specifications or estimates required by the Landlord prior to or in contemplation of the exercise by the Landlord of any rights of entry of the Landlord in case of the Tenant's default the persons entering causing as little disturbance to the Tenant as reasonably possible and forthwith making

<PAGE>

good any damage caused to the Demised Premises

(c) To permit the Landlord and all others authorised by the Landlord at all times to enter and remain upon or pass through the Demised premises for the purpose of carrying out or in connection with the Services and other matters mentioned in the Fifth Schedule hereto or for the purpose of complying with any covenant on the part of the Landlord herein contained

(d) (i) To permit the Landlord during the twelve months immediately preceding the termination of the Term to affix and retain without interference to any part of the exterior of the Demised Premises (but so as not unduly to obscure the windows thereof or interfere with the Tenant's use thereof) a notice for re-letting the same and during the said twelve months to permits persons with written authority from the Landlord or the Landlord's agents at reasonable times of the day to view the demised premises

(ii) At all convenient hours in the daytime to permit all prospective purchasers of or dealers in the Landlord's reversionary interest by order in writing of the Landlord or the Landlord's agents to view the Demised Premises without interruption subject to at least twenty-four hours written notice being given

As to the payment of certain costs and as to indemnities
---------------------------

(16) (a) To pay all costs fees expenses and commission (including bailiff's commission) incurred by the Landlord incidental to or in connection with any of the following:

(i) the preparation and service of any notice under Section 146 of the Law of Property Act 1925 or incurred in or in contemplation of proceedings under Section 146 or 147 of that Act notwithstanding in any such case that forfeiture may be avoided otherwise than by relief granted by the court

<PAGE>

(ii) the preparation and service of any notice or schedule relating to dilapidations whether the same is served before or after the termination of the Term

(iii) the enforcement of any of the Tenant's covenants and conditions herein contained whether during the currency of or after the termination of the Term

(iv) any application for a licence or consent required hereunder from the Landlord whether or not such licence or consent shall be forthcoming

(b) To pay and make good to the Landlord all and every loss and damage whatsoever incurred or sustained by the Landlord as a consequence of any breach or non-observance of the Tenant's covenants herein contained and to indemnify the Landlord from and against all actions claims liability costs and expenses thereby arising

(c) To indemnify and keep indemnified the Landlord from liability in respect of any injury to or the death of any person damage to any property movable or immovable the infringement disturbance or destruction of any right easement or privilege or otherwise by reason of or arising directly or indirectly out of the repair or state of repair (which is the Tenant's responsibility hereunder) of the Demised Premises and all claims and demands of whatsoever nature in respect of any such liability

(d) To be responsible for and to indemnify the Landlord against all damage occasioned to the Demised Premises or any part of the Estate caused by any act default or negligence of the Tenant or the servants agents licensees or invitees of the Tenant

(e) To indemnify the Landlord against any taxes charges or other assessments payable in respect of any change of use or works (as the case may be)

20.

<PAGE>

permitted by or by reason of this Lease or by reason of any licence granted to the Tenant or by reason of the obtaining of any consents required to be obtained under the terms of any such licence

(f) To pay the proper costs of the Landlord's Solicitor and necessary disbursements in connection with the grant of this Lease and the stamp duty on the counterpart thereof

To comply with further stipulations restrictions and requlations
----------------------------------------------------------------

(17) (a) To comply at all times with the stipulations and restrictions set out in the Fourth Schedule hereto

(b) To comply with such reasonable regulations as the Landlord or the Landlord's managing agents shall from time to time make for the general convenience of the tenants and occupiers of the Estate and the good management thereof.

To comply with the provisions of the Relevent Documents
-------------------------------------------------------

(18) To observe and perform the provisions of the Relevant Documents insofar as the same affect the Demised Premises and to indemnify the Landlord against all actions proceedings costs claims and demands in respect thereof

COVENANTS BY THE LANDLORD
- ------------------------

4. THE Landlord HEREBY COVENANTS with the Tenant as follows:

For quiet enjoyment
-------------------

(1) That the Tenant paying the Rent and observing and performing the several covenants and stipulations herein on the Tenant's part contained shall peaceably hold and enjoy the Demised Premises during the Term without any lawful

interruption by the Landlord or any person rightfully claiming under or in trust for the Landlord

21.

<PAGE>

To provide certain services
---------------------------

(2) Subject as hereinafter provided and subject always to the due payment of the Rent and all other moneys payable hereunder to keep in good repair cleansed and adequately lit the common roads and accessways and common Conduits on the Estate and the Parking spaces

To insure
---------

(3) Subject to the due payment of the Rent and all other moneys payable hereunder at all times to keep the Demised Premises insured (or procure that the same are kept insured) with reputable insurers in the full costs of reinstatement against loss or damage by the Iinsured Risks together with architects' surveyors' engineers' and other professional fees and also the loss of the Rent for the loss of Rent period and upon request to supply to the Tenant sufficient particulars of such insurance and evidence that the policy is on foot

To make good damage
caused by insured Risks
-----------------------

(4) In the event of the Demised Premises being destroyed or damaged by any of the Insured Risks and subject to the previous compliance by the Tenant with the covenants of the Tenant as to insurance hereinbefore contained and provided that the Landlord's insurance has not been vitiated or payment thereunder refused in whole or part as a result of any act default or omission on the part of the Tenant or other occupiers of the Demised Premises or their respective servants or agents with all due diligence to use the Landlord's best endeauovrs to procure that any necessary building licence and permits under any regulations or enactment for the time being in force are obtained to enable the Landlord to rebuild and reinstate the Demised Premises and as soon as such licences and permits have been obtained and provided the same remain unrevoked and subject to all necessary labour and materials being available to pay out (or

22.

<PAGE>

procure such payment out) of all moneys received in respect of such insurance (other than for architects' surveyors' and other professional fees and loss of rent) in rebuilding reinstating replacing and making good the Demised Premises And in case the insurance moneys shall be insufficient for that purpose the Landlord shall make up the deficiency out of the Landlord's own moneys

PROVISOS
- --------

5. PROVIDED ALWAYS AND IT IS HEREBY AGREED that
Re-entry
--------

(1) (a) if the Rent or the moneys secondly thirdly or fourthly hereby reserved or any part thereof or any other sum payable by the Tenant pursuant to any provision contained in this Lease or any part thereof shall at any time be in arrear and unpaid for twenty-one days after the same shall have become due (whether or not any formal or legal demand therefor shall have been made) or

(b) if the Tenant or the Guarantor shall at any time fail to perform or observe any of the covenants conditions or agreements herein contained and on the part of the Tenant or the Guarantor to be performed and observed or

(c) if the Tenant or the Guarantor (being a company) shall enter into liquidation whether compulsory or voluntary (not being a voluntary liquidation for the purposes of amalgamation or reconstruction) or permit or suffer a receiver of any of the assets of the Tenant or the Guarantor to be appointed or permit or suffer any execution to be levied on the Demised Premises or enter into any arrangement or composition for the benefit of the creditors of the Tenant or the Guarantor or

(d) if the Tenant or the Guarantor (not being a company) shall become bankrupt or have a receiving order made against the Tenant or the Guarantor

23.

<PAGE>

THEN it shall be lawful for the Landlord or any persons duly authorised by the Landlord to re-enter upon the Demised Premises or any part thereof in the name of the whole and peaceably to hold and enjoy the same thenceforth as it this Lease had not been made without prejudice to any right of action or remedy of the Landlord in respect of any antecedent breach of any of the Tenant's covenants

Cesser of Rent

(2) In the event of the Demised Premises or any part thereof at any time during the Term being damaged or destroyed by any of the Insured Risks so as to be rendered unfit for use then (unless the policy moneys become irrecoverable in whole or in part through any act default or omission of the Tenant or other occupiers of the Demised Premises or their respective servants or agents and subject as hereinafter provided in this Clause) the Rent or a fair proportion thereof according to the nature and extent of the damage sustained shall be suspended until the Demised Premises shall again be fit for use or the end of the Loss of Rent Period (whichever shall first occur) and any dispute concerning this sub-clause shall be determined by a single arbitrator in accordance with the Arbitration Acts 1950 and 1979 to be appointed (in the absence of agreement) upon the application of either the Landlord or the Tenant by the President for the time being of the Royal Institution of Chartered Surveyors

Demise not to confer rights to enforce convenants against others or to grant further rights

(3) Nothing herein contained shall confer on the Tenant any right to the benefit of or to enforce any covenant or agreement contained in any lease or any other instrument relating to any other part or parts of the Estate or to any other premises belonging to the

24.

<PAGE>

Landlord or limit or affect the right of the Landlord to deal with the same now or at any time hereafter in any manner which may be thought fit and the demise hereby made shall not be deemed to include and shall not operate to convey or demise any ways conduits lights liberties privileges easements rights or advantages whatsoever in through over or upon any land adjoining or near to the Demised Premises except as herein expressly provided

Limitation of Landlord's liability for provision of Services

(4) Notwithstanding anything in any provision contained in this Lease the Landlord shall not be liable to the Tenant nor shall the Tenant have any claim against the Landlord in respect of any interruption in any of the Services mentioned in the Fifth Schedule hereto which shall from time to time be supplied

by reason of any necessary repair or maintenance of any installations or apparatus or damage thereto or destruction thereof by fire water Act of God or by reason of electrical mechanical or other defect or breakdown or frost or other inclement conditions or shortage of fuel materials water or labour or whole or partial failure or stoppage of any mains supply or by reason of other circumstances of whatsoever nature beyond the control of the Landlord

No warranty as to the Permitted Use

(5) Nothing herein contained or implied nor any statement or representation made by or on behalf of the Landlord shall be taken to be a covenant warranty or representation that the Demised Premises can lawfully be used for the Permitted Use

<PAGE>

Limitation on the Landlord's obligation to insure

(6) The Landlord shall be deemed to comply with the LandLord's obligations as to insurance under this Lease notwithstanding that the insurance for the time being maintained by the Landlord is subject to conditions or limitations which the Landlord considers it reasonable to accept and without prejudice to the foregoing nothing in this Lease shall require the Landlord at any time to insure against loss or damage or destruction from any cause for which United Kingdom insurance offices of repute generally are not for the time being prepared to grant insurance

Service of notices

(7) Section 196 of the Law of Property Act 1925 as amended by the Recorded Delivery Service Act 1962 shall apply to all notices demands requests or other communications given or made pursuant to this Lease and in addition any such notice demand request or other communication may be delivered to any party hereunder which is for the time being a company or corporation at its registered office If the Tenant or the Guarantor shall comprise more than one person the service of any such notice demand request or other communication on any one of such persons shall constitute good service on all of them

Party walls

(8) Such of the walls of the Demised Premises as divide the Demised Premises from other premises of the Landlord shall be deemed to be party walls severed medially and shall be included in the Demised Premises as far only as the medial plane thereof

As to arbitration in certain events

(9) Where in this Lease provision is made for the appointment of some person to act as an expert or arbitrator to determine a matter of difference between

26.

<PAGE>

the Landlord and the Tenant and such provision proves ineffective to secure such appointment then the difference in question shall if the Landlord so requires be settled by a single arbitrator under the Arbitration Acts 1950 and 1979

Exclusion of compensation

(10) Except where any Act of Parliament prohibits or modifies the right to compensation being excluded or reduced by agreement neither the Tenant nor any sub-lessee (whether immediate or derivative) shall be entitled on quitting the Demised Premises or any part thereof to claim any compensation from the Landlord

Impossibility of performance of certain covenants

(11) Nothing herein shall render the Landlord or the Tenant liable in respect of any of the covenants conditions or provisions hereinbefore contained insofar only as the performance and observance of such covenants conditions or provisions or any one or more of them shall hereafter become impossible or illegal under or by virtue or the provisions of the Town and Country Planning Acts 1971 to 1974 but subject as aforesaid the Term and the Rent and other moneys payable to the Landlord hereunder shall not be determined or cease to be payable by reason only of any change modification or restriction of the use of the Demised Premises or obligations or requirements hereafter to be made or imposed under or by virtue of the said Acts

GUARANTEE

6. WHERE a person is named in the Particulars as the Guarantor in consideration of the Landlord at the request of the Guarantor entering into this Lease the Guarantor covenants with the Landlord in the manner set out in Part 1 of the Sixth Schedule hereto

IN WITNESS whereof the parties hereto have executed this Lease the day and year first before written

27.

<PAGE>

THE FIRST SCHEDULE above referred to

Rights granted

1. A right of way (in common with the Landlord and all others authorised by the Landlord from time to time or otherwise having the like right) for the Tenant and all others authorised by the Tenant to pass to and from the Demised Premises with or without vehicles over and along the service road or roads and accessways situate upon the Estate from time to time allocated by the Landlord for use by the Tenant

2. The right (in common as aforesaid) of passage of gas electricity water drainage air smoke or other effluvia from and to the Demised Premises through the Conduits now or hereafter during the Perpetuity Period running through under or over other parts of the Estate and serving the Demised Premises

3. Full and free right and liberty for the Tenant and all others authorised by the Tenant upon reasonable prior written notice to the Landlord and the relevant occupier to enter upon such part of the Estate as may be reasonably necessary for the purpose of repairing or maintaining the Demised Premises the Tenant in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 577 of 2711
the exercise of such right doing as little damage as possible to such part of the Estate and forthwith making good any such damage to the reasonable satisfaction of the Landlord

4. The right to park vehicles of the type specified in the particulars on the Parking Spaces

5. The right of support from any adjacent building on the Estate

THE SECOND SCHEDULE about referred to

Exceptions and Reservation

EXCEPT AND RESERVED unto the Landlord and all other persons at any time authorised by the Landlord or otherwise entitled thereto

<PAGE>

1. Full right and liberty at all times without obtaining any consent from or making any compensation to the Tenant to build upon any land now or hereafter during the Perpetuity Period belonging to the Landlord (adjoining or near to the Demised Premises) or otherwise deal with or use such land as the Landlord or such other persons may think fit notwithstanding that the access of light and air to the Demised Premises may be affected

2. Full and free right

(1) of running of water soil gas electricity the flow of air and the passage of smoke or other effluvia from and to any other parts of the Estate and the buildings which now are or may hereafter during the Perpetuity Period be erected thereon through the Conduits which now are or may hereafter at any time during the Perpetuity Period be upon in over or under the Demised Premises

(2) during the Perpetuity Period to build additional or relay any Conduits upon in over through or under the Demised Premises in connection with any adjoining or neighbouring property now or hereafter during the Perpetuity Period belonging to the Landlord and to enter upon the Demised Premises for that purpose subject to making good all damage to the Demised Premises caused thereby

(3) to make connections with any Conduits which now are or may hereafter during the Perpetuity Period be upon in over or under the Demised Premises and to enter upon the Demised Premises for that purpose and subject to making good damage to the Demised Premises as aforesaid

3. Full right and liberty to enter upon the Demised Premises at any time during the Term (but after at least twenty-four hours prior notice to the Tenant except in case of emergency) in order to build on or into any party or boundary wall of the Demised Premises the

<PAGE>

persons exercising such rights making good all damage to the Demised Premises caused thereby

4. The right to restrict temporarily the exercise of the rights mentioned in paragraphs 1, 2 and 4 of the First Schedule in connection with the provision or carrying out of any of the matters mentioned in the Fifth Schedule hereto but in such manner as to cause as little disturbance as practicable to the Tenant

5. Rights of support for any adjacent buildings on the Estate from the Demised Premises

THE THIRD SCHEDULE above referred to

Rent Review Provisions

1. In this Schedule the following expressions shall have the meanings hereinafter respectively assigned to them that is to say:

(1) "Relevant Review Date" means that one of the Review Dates specified in the Particulars in respect of which Rental Value (as hereinafter defined) falls to be agreed to determined hereunder

(2) "Rent Period" means the period from and including the commencement date of the Term or a Review Date (as the case may be) until the expiration of the day before the first Review Date thereafter or until the end of the Term (as the case may be)

(3) "Rental Value" means the best yearly rent at which the Demised Premises together with the rights granted by this Lease could reasonably be let in the open market at a Relevant Review Date by a willing landlord to a willing tenant and disregarding and making no allowance for the value of any rent free period or the amount of any reverse premium or concession or discount as to rent which such landlord and tenant might reasonably agree as a term of the grant and acceptance of a tenancy

(a) UPON the following assumptions at that date:

<PAGE>

(i) that the Demised Premises are fit for immediate occupation and use and that no work has been carried out thereon by the Tenant or the Tenant's prodecessors in title during or prior to the Term which has deminished the Rental Value of the Demised Premises and that in case the Demised Premises have been destroyed or damaged they have been fully restored

(ii) that the Demised Premises are available to let as a whole without a premium but with vacant possession and subject to the provisions of this Lease (other than the amount of the Rent but including the provisions for rent review herein contained) for a term equal to the length of the Term

(iii) that the covenants herein contained have been fully performed and observed

(iv) that all necessary permissions approvals licences and consents for the Permitted Use have been obtained and that any condition or provision contained in any planning permission (now or hereafter granted) restricting at any time the occupation of the Demised Premises to any person or class or type of person or precluding occupation by any person or class or type of persons did not exist

(b) BUT disregarding:

(i) any effect on Rental Value of the fact that the Tenant or the Tenant's predecessors in title have been in occupation of the Demised Premises

(ii) any effect on Rental Value of any goodwill attached to the Demised Premises by reason of the carrying on thereat of the business of the Tenant or the Tenant's predecessors in title in their respective business

<PAGE>

(iii) any increase in Rental Value of the Demised Premises attributable to any tenant's fixtures or fittings installed in the Demised Premises by the Tenant or the Tenant's predecessors in title or to the existence at a Relevant Review Date of any improvement or alteration to the Demised Premises carried out with the Landlord's consent otherwise than in pursuance of an obligation to the Landlord or the Landlord's predecessors in title by the Tenant or the Tenant's predecessors in title during the Term or during any period of occupation prior thereto arising out of any agreement to grant the Term AND the improvement or alteration was completed not more than twenty-one years before the Relevant Review Date

(iv) any effect on rent of any obligation to reinstate the Demised Premises to its condition prior to the execution of alterations or improvements whether under this Lease or any document supplemental thereto hereinafter entered into

2. Within three months before or as soon as may be after each Review Date the Rental Value at such date shall be agreed between the Landlord and the Tenant or (failing such agreement) determined as hereinafter provided and the yearly rent first reserved and payable commencing on such Review Date or the yearly rent (first reserved) last payable during the immediately preceding Rent Period whichever shall be the greater

3. For the purpose of calculating the amount of rent provided for under this Schedule Rental Value at a Relevant Review Date shall be the amount agreed between

<PAGE>

the Landlord and the Tenant and in case no such agreement shall be made by the Relevant Review Date (for any reason whatever and whether or not any steps shall have been taken to reach agreement) either the Landlord or the Tenant may at any time thereafter by written notice to the other require that the matter be referred to the determination of an independent surveyor such surveyor to be agreed upon between the Landlord and the Tenant or failing agreement to be chosen at the request of either the Landlord or the Tenant by the President or a Vice-President for the time being of the Royal Institution of Chartered Surveyors and the reference to the said surveyor shall subject as hereinafter provided be deemed to be a submission to arbitration and so subject to the provisions of the Arbitration Acts 1950 and 1979

PROVIDED that

(1) Within fourteen days of either the Landlord or the Tenant requiring such reference by service of notice as aforesaid the Landlord may require that the said surveyor shall act in the reference as an expert and not as an arbitrator and in such case the said surveyor shall consider any representations submitted to him but shall not thereby be precluded from determining the reference in accordance with his own judgment and

(2) if for any reason the said surveyor (acting as an expert) shall not have determined the Rental Value within three months next following his appointment then either the Landlord or the Tenant may apply to the said President or Vice-President for the appointment of a substitute expert and such procedure to secure the reference of the matter to an expert shall be repeated as many times as may be necessary to secure the determination of Rental Value hereunder and

(3) the fees of the said surveyor acting as an expert and the costs of his appointment shall be shared

<PAGE>

between the Landlord and the Tenant in such proportions as the said surveyor shall determine

4. As soon as the amount of rent payable from a Relevant Review Date has been agreed or determined a Memorandum in duplicate specifying the particulars of such agreement or determination shall be signed by or on behalf of the Landlord and the Tenant and one part shall be attached to this Lease and the other to the counterpart thereof

5. Pending the said agreement or determination of rent payable from a Relevant Review Date the Tenant shall pay rent at the yearly rate last payable immediately before the Relevant Review Date on every due date for payment until the amount of the said rent for the relevant Rent Period (hereinafter called "rent at the revised rate") shall have been so agreed or determined and within seven days after such agreement or determination the Tenant shall pay to the Landlord by way of rent such a sum as (with the rent already paid in respect of the period to which such agreement or determination relates down to the Quarter Day immediately following such agreement or determination) shall be equal to rent at the revised rate for such period down to such Quarter Day and in addition the Tenant shall pay to the Landlord interest on such sum at the rate of Two pounds per centum (pounds 2%) per annum below the Stipulated Rate calculated on a daily basis from the Relevant Review Date (but in relation to any part of such sum (relating to any period after the Quarter Day immediately following the Relevant Review Date) which had the rent at the revised rate been ascertained on the Relevant Review Date would have become payable to the Landlord on a Quarter Day subsequent to the Relevant Review Date then such interest shall be calculated only from such Quarter Day) down to the date of payment (as well after as before judgment)

34.

<PAGE>

6. If at a Relevant Review Date the Landlord shall be restricted or prevented by any legislation relative to the control of rents from obtaining the full amount of the rent which would otherwise be payable hereunder or from obtaining any increase in the rent hereunder or by reason of such legislation the provisions hereinbefore contained shall not operate than the foregoing provisions of this Schedule shall have effect so far as permitted by law but in addition the Landlord shall be entitled on giving to the Tenant not less than three months notice in writing at any time after the Relevant Review Date to introduce an intermediate review date (hereinafter called "the Intermediate Review Date") which shall be the date of the expiration of such notice and the rent payable hereunder from an Intermediate Review Date until the expiration of the then current Rent Period (or such later date as the rent should be reviewed hereunder as the case may be) shall be determined and the provisions of this Schedule shall apply (mutatis mutandis) as though the Intermediate Review Date was the date of commencement of a Rent Period and shall constitute a Relevant Review Date for the purposes of this Schedule

7. Time shall not be of the essence in the operation of this Schedule

THE FOURTH SCHEDULE above referred to
-------------------------------------
Stipulations and Restrictions

1. Not to obstruct the service roads and accessways situate upon the Estate or park any vehicles thereon

2. Not to permit any vehicle to remain for an unreasonable time nor any goods materials or other things to be loaded unloaded or deposited outside the Demised Premises in such manner as to cause obstruction or annoyance to the Landlord or to the tenants or occupiers of any other premises on the Estate

<PAGE>

3. Not to install any heating apparatus of any description in the Demised Premises unless the same shall first be approved by the Landlord

4. Not to do anything which may put any weight or impose strain on the Demised Premises in excess of that which the same are calculated to bear with due margin for safety

5. Not to allow to pass into the Conduits serving the Demised Premises any noxious or deleterious effluent or other substance which may cause an obstruction in or injure the same and in the event of any such obstruction or injury if required by the Landlord at the Tenant's cost forthwith to remove such obstruction and to make good all damage to the satisfaction of the Landlord and not to discharge any trade waste into the Conduits nor discharge anything but storm water and surface water into the surface water drains of the Demised Premises

6. Not to obstruct any of the windows lights or ventilators belonging to the Demised Premises nor to give to any third party any acknowledgement that the Tenant enjoys the access of light to any of the windows or openings in the Demised Premises by the consent of such third party nor to permit any new window light ventilator passage drainage or other encroachment or easement to be made in to or acquired against or over the Demised Premises or any part thereof and in case any encroachment or easement whatsoever shall be alleged or attempted to be made or acquired by any person or persons whomsoever to give notice thereof in writing to the Landlord immediately the same shall come to the notice of the Tenant and at the cost of the Tenant to do all such things as may be proper for preventing any encroachment or easement being made or acquired

7. To provide and to maintain or cause to be provided and maintained in good working order adequate fire fighting and prevention equipment within the Demised

<PAGE>

Premises

8. Not to use the Demised Premises for the storage deposit or display of goods materials or things of a dangerous inflammable or explosive nature or liable to spontaneous combustion or the keeping storage or possession of which may contravene any legislation or any requirement of the Landlord's insurers

9. Not to store any materials or goods outside the building or buildings comprised in the Demised Premises

10. Not to burn rubbish or waste materials paper wood and other combustible matter on the Demised Premises except within boilers or incinerators provided for the purpose and approved by the Landlord or the Landlord's managing agents

11. Not to emit any smoke fumes or smells from the Demised Premises so as to cause in the opinion of the Landlord or the Landlord's managing agents annoyance or interference with the proper enjoyment of other tenants of the Estate or premises adjoining or near thereto

12. To secure all buildings comprised in the Demised Premises by locking all windows and doors therein outside working hours

13. To provide facilities within the curtilage of the Demised Premises for the keeping of refuse in proper receptacles readily accessible for collection

14. To keep the interior and exterior of the windows of the Demised Premises clean and to effect such cleaning as often as shall be necessary

THE FIFTH SCHEDULE above referred to

Service Charge

Definitions

1. In this Schedule the following expressions shall have the meanings hereinafter respectively assigned thereto that is to say:

<PAGE>

(1) "Accounting Period" means a period of twelve months ending on the Service Charge Accounting Day specified in the Particulars (whether or not including a period falling before the commencement of the Term or subsequent to the termination of the Term) Provided that if there shall be an Estate Opening Date specified in the Particulars the period from that date until the Service Charge Accounting Day immediately following the Estate Opening Date shall be an Accounting Period hereunder

(2) "Initial Period" means the period from the Service Charge Commencement Date specified in the Particulars until the Service Charge Accounting Day immediately following the same

(3) "Final Period" means the period from the Service Charge Accounting Day immediately preceding the termination of the Term until the termination of the Term

(4) "Relevant Proportion" means in relation to the Initial Period or the Final Period the proportion which the number of days comprised in such period bears to the number of days comprised in the Accounting Period in which the Initial Period or the Final Period as the case may be falls

(5) "Services" means the following services matters or things:

(a) the amount (if any) from time to time assessed by the Landlord's insurers by way of premium as being payable by the Landlord for keeping the roads and accessways within the Estate and other areas or other parts of the Estate intended to be used in common and any building or structure occupied by the Landlord in connection with any of the services matters or things mentioned herein insured for an amount (estimated from time to time by the Landlord or the Landlord's managing agents) necessary to cover the full costs of rebuilding or reinstating the same against damage by the Insured

<PAGE>

Risks together with architects' surveyors' engineers' and other professional fees

(b) the amounts from time to time assessed by the Landlord's insurers by way of premium as being payable by the Landlord for providing insurance cover which may from time to time be effected by the Landlord in respect of the following matters or any of them:

(i) any liability to the public or third parties by virtue of the Landlord's ownership or occupation of the Estate or any part thereof

(ii) the loss or damage of or to any fixtures fittings plant equipment machinery chattel or any other things in use from time to time in connection with the provision or supply of services matters or things herein mentioned

(iii) such other damage loss liability or claim which may arise in relation to any of the services matters or things herein mentioned and the employment of staff in connection therewith

(c) the scavenging lighting cleansing repair renewal maintenance rebuilding replacement redecoration or repainting (as often as occasion shall require) of the service roads areas ramps accessways pedestrian ways passageways staircases embankments transformer chambers gatehouse management office parking areas car parks open spaces gardens (including suitable planting or replanting of such open spaces and gardens) Conduits boundary walls and gateways fences or other structures and all other conveniences works services and facilities of whatsoever nature now or at any time hereafter forming part of or serving the Estate and intended for common or public use or for the benefit of the tenants of the Estate (whether or not also serving other premises near to or adjoining the Estate) and not being the responsibility of the Tenant or any other tenant on the Estate

<PAGE>

(d) the collection compaction and disposal of refuse from the Estate (if the same shall be arranged by the Landlord)

(e) the maintaining of any security for the Estate (if the Landlord shall so require)

(f) the provision of signboards for general use on the Estate

(g) the employment or engagement and remuneration of staff servants contractors agents professional advisers and any other persons in connection with the provision of the services things or matters herein mentioned the general supervision management and administration of the Estate and the ascertainment and collection of the Service Charge (as hereinafter defined) and all incidental expenditure in relation to the employment of staff and others including the provision of clothing uniforms the payment of the statutory and such other insurance health pension welfare travelling expenses and allowances clothing allowances and other payments contributions and premiums as the Landlord may deem desirable or necessary

(h) the taking of any steps thought desirable or expedient by the Landlord for complying with making representations against or otherwise contesting the incidence of the provisions of any legislation concerning town planning public health highways streets drainage or other matters relating or alleged to relate to the Estate for which tenants of the Estate are not directly liable

(i) the provision maintenance and replacement of any plant equipment machinery tool chattel or thing used by the Landlord or others for any of the services matters or things herein mentioned

(j) all outgoings in connection with any accommodation building or area occupied by the Landlord in connection with the supply and provision of any of

<PAGE>

the services matters or things herein mentioned and in connection with all common parts of the Estate

(k) the supply or provison and maintenance of any other services or matters which the Landlord shall reasonably consider to be conductive to the proper and efficient management of the Estate

(l) the amount of any value added tax or any other similar tax or taxes payable in respect of any of the above matters

(6) "Service Charge" in relation to any Accounting Period means all costs
--------------

expenses and outgoings expended or incurred or which may become payable or which are provided for by the Landlord in the provision or supply of the Services in respect of the relevant Accounting Period (including (a) such provision for anticipated future expenditure (if any) or notional sums (if any) comprised within the Services and reasonably allocated by the Landlord to the relevant Accounting Period) and (b) if the Landlord shall itself undertake the general supervision and management of the Estate the Landlord may if it so desires include in the Service Charge for any relevant Accounting Period a sum equivalent to the amount which a firm of Chartered Surveyors would reasonably have charged for the time being in the open market for undertaking such a general supervision and management and such sum shall be deemed to be expenditure incurred by the Landlord for the relevant Accounting Period

(7) "Tenant's Proportion" means the Service Charge Proportion specified in the Particulars or if the Landlord shall hereafter so determine such other proportion as to the Landlord shall seem fair and equitable

Tenant's share of Service Charge

2. The share of the Service Charge for an Accounting Period payable by the Tenant shall be an amount equal to

41.

<PAGE>

the Tenant's Proportion of the Service Charge for that Accounting Period Provided that in relation to the Initial Period or the Final Period the share of the Service Charge for the Accounting Period in which the same Falls shall be the Tenant's Proportion multiplied by the Relevance Proportion of the Service Charge for that Accounting Period

The keeping of accounts

3. The Landlord or the Landlords managing agents shall at all times keep an account of the Service Charge for each Accounting Period and such account shall be open to inspection by the Tenant at all reasonable times and every entry in such account shall be sufficient evidence of the expenditure or provision recorded therein

Provision of estimates

4. As soon as may be before or after the beginning of every Accounting Period the Landlord or the Landlord's managing agents shall make an estimate of the anticipated amount of the Service Charge for such Accounting Period and shall notify the Tenant of such estimate

Payments on account

5. (1) For each Accounting Period during the Term in respect of which an estimate shall have been made the Tenant shall pay to the Landlord on account of the Tenant's liability hereunder an amount equal to the Tenant's Proportion of such estimate and one quarter thereof shall be paid in advance in respect of every Quarter of such Accounting Period comprised in the Term on the Quarter Day at the beginning of such Quarter Provided Always that pending the notification of any such estimate as aforesaid the Tenant shall pay to the Landlord in advance on each Quarter Day an amount equal to one quarter of the Tenant's Proportion of the estimate of the Service Charge for the preceding Accounting Period and within seven days of such

42.

<PAGE>

notification the Tenant shall make such payment to the Landlord or the Landlord

shall make to the Tenant such allowance against the future liability of the Tenant hereunder as shall ensure that the Tenant has paid the amount which would otherwise have become payable by the Tenant in respect of the period from the commencement of the relevant Accounting Period to the date of such notification had the Tenant been notified of such estimate prior to the commencement of the relevant Accounting Period

(2) During the Initial Period in respect of which an estimate shall have been made the Tenant shall pay to the Landlord in advance on account of the Tenant's liability hereunder on the Service Charge Commencement Date (in respect of the period therefrom until the next following Quarter Day) and on each of the Quarter Days thereafter (in respect of the period therefrom until the next following Quarter Day) a proportionate part (calculated on a daily basis) of an amount equal to the Tenant's Proportion of such estimate Provided Always that if the Tenant shall not be notified of such estimate as aforesaid until after the commencement of the Initial Period the Tenant shall within seven days of such notification pay to the Landlord such payments which would otherwise have become payable by the Tenant in respect of the period from the Service Charge Commencement Date to the date of such notification had the Tenant been notified of such estimate prior to the Service Charge Commencement Date

Issue of certificates
for Accounting Periods
- ---------------------

6. As soon as possible after the end of every Accounting Period the Landlord or the Landlord's managing agents shall issue to the Tenant a certificate certifying the total amount of the Service Charge for

<PAGE>

the preceding Accounting Period and such certificate shall save in the case of manifest error be conclusive and binding upon the Tenant and upon request by the Tenant the Tenant shall be entitled to receive a summary of the Service Charge for the relevant Accounting Period Adjustment at the end of each Accounting Period.

Payment following issue of certificate
- ----------------------------------------

7. Within fourteen days after the issue of the certificate as aforesaid such allowance or (in respect of the Final Period) payment shall be made to the Tenant or the Tenant shall make such payment to the Landlord on demand as shall be requisite for ensuring that the Tenant has paid the Tenant's Proportion of the Service Charge (or in respect of the Initial Period or the Final Period the Relevant Proportion thereof) in respect of the preceding Accounting Period Provided Always that the provisions of this paragraph shall continue to apply notwithstanding the termination of the Term but only in respect of any period prior thereto

THE SIXTH SCHEDULE above referred to
------------------------------------
Covenants by Guarantor or Guarantors

PART 1

(A) The Tenant will at all times during the Term and any statutory continuation thereof pay the Rent and all other moneys payable hereunder at the respective times and in manner herein appointed for payment thereof and will also duly observe and perform the several covenants and stipulations herein on the part of the Tenant herein contained

(B) The Guarantor (by way of indemnity and not only by way of guarantee) will pay and make good to the Landlord on demand all losses costs and damages and expenses occasioned to the Landlord by reason of any non-payment or breach specified in Paragraph (A) of this part of

                                    <PAGE>

this Schedule and (without prejudice to the generality thereof) in the event of any disclaimer by any trustee in bankruptcy or liquidator or after any forfeiture of this Lease the Guarantor will pending any reletting of the Demised Premises pay to the Landlord an amount equal to all Rent and other sums which but for such disclaimer or forfeiture would have been payable by the Tenant under this Lease

(C) If so required in writing by the Landlord within three months after any disclaimer of this Lease by any trustee in bankruptcy or liquidator or after any forfeiture (as the case may be) the Guarantor will accept a new lease of the Demised Premises for a term equal to the residue of the Term unexpired at the date of such disclaimer or forfeiture as the case may be and commencing on that date at a rent or rents equal to that or those payable at the date of the disclaimer or forfeiture as the case may be and containing the like covenants conditions and provisions as are reserved by and contained in this Lease (such new lease and the rights and liabilities thereunder to take effect from the date of such disclaimer or forfeiture The costs of the Landlord in the preparation and completion of such new lease to be paid by the Guarantor to the Landlord on demand

(D) Any neglect or forebearance of the Landlord in endeavouring to obtain payment of the Rent or other moneys payable under this Lease or any delay in taking any steps to enforce performance of the covenants contained in this Lease and any time which may be given by the Landlord to the Tenant or any variation of the terms of this Lease agreed between the Landlord and the Tenant or any other act omission matter or thing whatsoever whereby (but for this provision) the Guarantor would be exonerated either in whole or in part from the aforesaid covenants shall not release or in any

45.

<PAGE>

way lessen or affect the liability of the Guarantor

(E) For the avoidance of doubt and notwithstanding the definition of "Landlord" hereinbefore contained the covenants on the part of the Guarantor hereinbefore contained shall enure for the benefit of the person for the time being entitled to the reversion immediately expectant upon the determination of this Lease and without the need for any express assignment

PART 2

(i) In relation to a Guarantor (other than any Guarantor specified in the Particulars) the words "this Lease" shall be deemed to read "the Lease", and

(ii) In relation to a Guarantor for a successor in title to the Tenant specified in the Particulars the expression "Tenant" mentioned in Part 1 of this Schedule shall mean the person to whom an assignment of the Term is to be made and its successor in title, and

(iii) In relation to a new Guarantor required by the Landlord pursuant to this Lease (other than as mentioned in (ii) above) the expression "Tenant" mentioned in Part 1 of this Schedule shall mean the person who was the Tenant

immediately before the event which occasioned the Landlord's requirement for a new guarantor and the successors in title of such person

THE COMMON SEAL of ELECTRICITY )
SUPPLY NOMINEES LIMITED was )
hereunto affixed in the )
presence of :- )

Director

Secretary

46.

<PAGE>

THE COMMON SEAL of JOHN ADAMS )
ELECTRONICS LIMITED was )
hereunto affixed in the ) [SEAL APPEARS HERE]
presence of :- )

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

<PAGE>

DATED 22nd December 1989

ELECTRICITY SUPPLY NOMINEES LIMITED (1)

JOHN ADAMS ELECTRONICS LIMITED (2)

INTERNATIONAL AERADIO PLC (3)

LICENCE TO ASSIGN
----------------

Lease of

Unit No. 1 Block B The Fleming
Centre Fleming Way Crawley West Sussex

Jaques & Lewis,
2 South Square,
Gray's Inn,
London, WCIR 5HR.

(2494J)
<PAGE>

THIS LICENCE TO ASSIGN is made the Twenty-second day of December One thousand nine hundred and eighty-nine BETWEEN the PERSON whose name and address is set out in Part I of the First Schedule hereto (hereinafter called "the Landlord") of the first part the PERSON whose name and address is set out in Part II of the First Schedule hereto (hereinafter called "the Tenant") of the second part and the PERSON whose name and address is set out in Part III of the First Schedule hereto (hereinafter called "the Assignee") of the third part

WHEREAS:

(1) In these presents unless there be something in the subject or context inconsistent therewith:

(a) (i) where there are two or more persons included in any party hereto covenants contained in this Deed which are expressed to be made by such party shall be deemed to be made by such persons jointly and severally

(ii) words importing the singular number only shall include the plural number and vice versa and words importing any particular gender shall include masculine feminine and neuter genders

(b) the expressions "the Landlord" "the Tenant" and "the Assignee" shall include those deriving title under them respectively (including without prejudice to the generality of the foregoing their personal representatives assigns and successors in title and in the case of the Landlord the person for the time being entitle to the
<PAGE>

reversion immediately expectant on the determination of the term created by the Lease as hereinafter defined)

(c) the expressions following shall have the meanings hereinafter mentioned (that is to say)

(i) "the Lease" means the lease or underlease short particulars of which are set out in Part I of the Second Schedule hereto and the Supplemental Deeds (as hereinafter defined)

(ii) "the Premises" means the premises demised by the Lease short particulars of which are set out in Part II of the Second Schedule hereto

(iii) "the Supplemental Deeds" means the deeds or documents particulars of which are set out in the Third Schedule hereto

(2) This Deed is supplemental to the Lease

(3) The reversion immediately expectant upon the determination of the term created by the Lease is vested in the Landlord and the term of years thereby created is vested in the Tenant

NOW THIS DEED WITNESSETH as follows:

1. IN consideration of the covenants by the Assignee hereinafter contained the Landlord hereby grants unto the Tenant licence to assign all the estate and interest of the Tenant in the Premises to the Assignee

2. THE Assignee hereby covenants with the Landlord that as from the date when the estate and interest of the Tenant in the Premises shall be assigned to the Assignee pursuant to

(2494J)

2.

<PAGE>

this Licence and thenceforth during the residue of the term created by the Lease and any statutory extension or renewal thereof the Assignee will pay the rent and other payments thereby reserved and observe and perform the covenants conditions and agreements on the part of the lessee contained therein

3. THE Tenant shall forthwith upon demand by the Landlord pay to the Landlord all legal costs and surveyors' and management fees (including Value Added Tax) and disbursements incurred by the Landlord in connection with this Licence

4. THE assignment in its final form shall be produced to the Landlord for its approval and the Tenant HEREBY COVENANTS that completion of the assignment will not take place until such approval has been given

5. NOTHING herein contained shall authorise any further or other dealing with or assignment demise or underlease of the Premises except such as is hereby expressly authorised

6. THE condition for re-entry contained in the Lease shall be exercisable as well on breach of the covenants on the part of the Assignee hereinbefore contained as on the happening of any of the events mentioned in the said condition

7. THE assignment shall be produced to the solicitors for the Landlord for registration within two months of the date hereof (or such shorter period as may be specified in the Lease) and such registration fee as is specified in the Lease (or if none is specified such registration fee as may

(2494J)

3.

<PAGE>

be required by the Landlord's solicitors) shall be paid

In Witness whereof the parties hereto have executed this Deed the day and year first before written

THE FIRST SCHEDULE before referred to

Part I

Particulars of the Landlord

ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London SW1

Part II

Particulars of the Tenant

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 590 of 2711

JOHN ADAMS ELECTRONICS LIMITED whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ

Part III

Particulars of the Assignee

INTERNATIONAL AERADIO plc whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ

THE SECOND SCHEDULE before referred to

Part I

Particulars of the Lease

(2494J)

4.

<PAGE>

| Date | Document | Parties | Term |
|---|---|---|---|
| 4.7.1986 | Lease | the Landlord(1)<br>the Tenant (2) | 25 years from (and including) 25.3.1986 |

Part II

Particulars of the Premises

ALL THAT piece or parcel of land together with the building erected thereon or on some part thereof known as Unit Number B1 The Fleming Centre Fleming Way Crawley as the same is described in and demised by the Lease

THE THIRD SCHEDULE before referred to

Particulars of Supplemental Deeds

| Date | Document | Parties |
|---|---|---|
| 22.4.1987 | Licence for Alterations | the Landlord (1)<br>the Tenant (2) |

The COMMON SEAL of ELECTRICITY SUPPLY NOMINEES LIMITED was hereunto affixed in the presence of :- [SEAL APPEARS HERE]

/s/ [SIGNATURE ILLEGIBLE]
Director
/s/ [SIGNATURE ILLEGIBLE]
Secretary

(2494J)

                                    <PAGE>

[SEAL APPEARS HERE]

(The COMMON SEAL of JOHN ADAMS
(ELECTRONICS LIMITED was
(hereunto affixed in the
(presence of:-

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

[SEAL APPEARS HERE]

(The COMMON SEAL of
(INTERNATIONAL AERADIO PLC was
(hereunto affixed in the
(presence of:-

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

(2494J)

<PAGE>

TO

Electricity Supply Nominees Limited and to their Solicitors Messrs Jaques & Lewis of 2 South Square Grays Inn London WC1R 5HR

UNIT B1 FLEMING CENTRE FLEMING WAY GRAWLEY WEST SUSSEX

NOTICE IS HEREBY GIVEN that by a Transfer dated the 24th day of January 1990 made between John Adams Electronics Limited (1) and International Aerado plc (2) the above premises being the premises comprised in a Lease dated the 4th day of July 1986 and made between Electricity Supply Nominees Limited (1) and John Adams Electronics Limited (2) were assigned to International Aerado plc for the residue of the term of 25 years from (and including) the 25th day of March 1986 granted by the said Lease subject nevertheless to the payment of the rents and other payments thereby reserved and to the observance and performance of the covenants agreements stipulations and conditions contained or referred to in the said Lease and on the part of the Tenant to be observed and performed

DATED this 15th day of June 1990

[SIGNATURE ILLEGIBLE]
For the solicitor to
British Telecommunications plc
Property Law Department
10-18 Manor Gardens
London N7 6JR

Received this 19th day of June 1990 a Notice in duplicate of which the above is a copy together with a certified copy of the above Transfer and cheque for (POUNDS) 17.25 in respect of the fee payable for registration pursuant to Clause 3(23) (i) of the said Lease and Clause 7 of the Licence to Assign dated the 22nd day of December 1989

[SIGNATURE ILLEGIBLE]
- --------------------------------
Solicitors to the said
Electricity Supply Nominees Limited
<PAGE>

DATED 24th January 1990


                    JOHN ADAMS ELECTRONICS LIMITED

                              - and -

                    INTERNATIONAL AERADIO plc


                            TRANSFER

                               of

                    Leasehold property known as
                         Unit No 1 Block B
                    The Fleming Centre Fleming Way
                         Crawley West Sussex

                 (Comprised in a Lease dated 4th July 1986)


<PAGE>

                         H M LAND REGISTRY

                 LAND REGISTRATION ACTS 1925 TO 1986

                    TRANSFER OF WHOLE (LEASEHOLD)

COUNTY:          WEST SUSSEX CRAWLEY DISTRICT

TITLE NUMBER:    WSX105598

PROPERTY:        UNIT NO 1 BLOCK B THE FLEMING CENTRE
                 FLEMING WAY CRAWLEY WEST SUSSEX

DATE:            26TH JANUARY 1990


1.   In consideration of ONE POUND ((POUND 1) (the receipt whereof is hereby
     acknowledged) JOHN ADAMS ELECTRONICS LIMITED whose registered office is at
     Aeradio House Hayes Road Southall Middlesex UB2 5NJ (Company Registration
     Number 1538157) ("the Transferor") hereby transfers to INTERNATIONAL
     AERADIO plc whose registered office is at Aeradio House aforesaid (Company
     Registration Number 427272) ("the Transferee") the land comprised in the
     above title for the residue of the term granted by the Registered Lease


2.   THE Transferee hereby covenants with the Transferor that it the Transferee
     and those deriving title under it will at all times after the date hereof
     and thenceforth during the remainder of the term created by the Registered
     Lease pay all rents and other payments becoming due under and by virtue of
     the Registered Lease or any deed or document supplemental thereto and will
     duly observe and perform all

                               1
<PAGE>

     the covenants agreements restrictions stipulations and conditions contained
     or referred to therein and on the part of the Tenant to be observed and
     performed and will keep the Transferor and its effects fully and
     effectually indemnified against all actions proceedings costs claims
     demands expenses losses and liabilities whatsoever in respect of or arising
     on account of any breach or non-observance of any such matters occurring
     after the date hereof

3. IT is hereby certified that the transaction hereby effected does not form part of a larger transaction or series of transaction in respect of which the amount or value or aggregate of value of the consideration exceeds thirty thousand pounds ((Pounds) 30,000)

THE COMMON SEAL of JOHN ADAMS ELECTRONICS LIMITED was hereunto affixed in the presence of: [SEAL APPEARS HERE]

/s/ [SIGNATURE ILLEGIBLE] Director

/s/ [SIGNATURE ILLEGIBLE] Secretary

THE COMMON SEAL of INTERNATIONAL AERADIO plc was hereunto affixed in the presence of: [SEAL APPEARS HERE]

/s/ [SIGNATURE ILLEGIBLE] Director

/s/ [SIGNATURE ILLEGIBLE] Secretary

<PAGE>

[LETTERHEAD OF CLIVE LEWIS AND PARTNERS APPEARS HERE]

7th November 1991

Our Ref: LEB/CMT/4666

Your Ref:

R Brackenbury Esq ASVA
Messrs. Debenham Tewson and Chinnocks
75 Davies Street
LONDON W1A 1DZ

C D Fitzgerald Esq FRICS
Messrs. Johns
6 Spencers Road
CRAWLEY
WEST SUSSEX RH11 7DA

Dear Sirs,

UNIT B1 THE FLEMING CENTRE, FLEMING WAY, CRAWLEY, WEST SUSSEX

By an appointment dated 3rd May 1991 I, Leonard Ernest Baker, MA (Cantab) Dip. Est. Man., FRICS, was appointed by the President of the Royal Institution of Chartered Surveyors as the Arbitrator to determine the rent in respect of the above mentioned premises in accordance with the provisions of the Arbitration Acts of 1950 and 1979.

The reference to arbitration arose out of the terms of a lease dated 4th July 1986, between Electricity Supply Nominees Limited (the landlord) and John Adams Electronics Limited, now vested in International Aeradio Plc (the tenant). The lease was granted for a term of 25 years from 25th March 1986, at an initial rent of (Pounds) 65,000 per annum and contained provision for rent review at each fifth anniversary of the term.

The matter in dispute between the parties is the assessment of the rental value of the demised premises, in accordance with the provisions of the Third Schedule to the lease of 4th July 1986, as at 25th March 1991.

It was agreed that the matter should proceed by written submissions and these were duly received from Mr. R Brackenbury ASVA of Messrs. Debenham Tewson and Chinnocks of 75 Davies Street, London W1, on behalf of the landlords, and from Mr. C D Fitzgerald FRICS of Messrs. Johns of 6 Spencers Road, Crawley, West

initial submissions of the other side.

The parties submitted a Statement of Agreed Facts in which, amongst other things the floor areas were agreed, as also were details of tenant's fixtures and fittings.

Cont /...

<PAGE>

[LOGO OF CLIVE LEWIS AND PARTNERS APPEARS HERE]

... /2
R Brackenbury Esq ASVA and C D Fitzgerald Esq FRICS
7th November 1991

Mr. Brackenbury contended for a rent of (Pounds) 121,900 per annum, based upon a rental value of (Pounds) 10.25 per sq ft with 50% of this rate being applied to the area of the covered loading bay. Mr. Fitzgerald argued in support of a rent of (Pounds) 79,400 per annum by adopting a basic rate of (Pounds) 6.75 per sq ft and with one third, i.e. (Pounds) 2.25 per sq ft, applied to the area of the covered loading bay.

It was requested by each party that I should make an Interim Award, final save only as to the question of costs, on which the parties would have the opportunity of addressing me prior to making my final Award.

I have inspected the subject premises and either inspected or viewed externally the properties cited as comparables and have carefully considered the submissions and counter submissions which have been made.

In accordance with the foregoing, I find that the rental value, in accordance with the provisions of the Third Schedule of the lease dated 4th July 1986, as at 25th March 1991, is (Pounds) 94,000 (Ninety Four Thousand Pounds) per annum exclusive and I so Award.

This is my Interim Award, final save only as to the question of costs upon which submissions are to be made by a date to be agreed.

Yours truly,

/s/ L. E. Baker

L. E. BAKER
- -----------

Dated: 7th November 1991
<PAGE>

[LOGO]

CERTIFICATE OF INCORPORATION

ON RE-REGISTRATION OF A PUBLIC COMPANY

AS A PRIVATE COMPANY

No 427272

I hereby certify that

INTERNATIONAL AERADIO LIMITED

formerly registered as a public company has this day been re-registered under the Companies Act 1985 as a private company, and that the Company is limited.

Given under my hand at Cardiff the 14TH FEBRUARY 1992

/s/ M. B. May

M. B. MAY (MRS.)

An Authorised Officer

<PAGE>

LICENCE TO ASSIGN

DATED 29th January 1993

The Landlord: ELECTRICITY SUPPLY NOMINEES LIMITED

The Tenant: INTERNATIONAL AERADIO LIMITED

The Assignee: RAPISCAN SECURITY PRODUCTS LIMITED

The Guarantor: INTERNATIONAL AERADIO LIMITED

The Property: Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

Jaques & Lewis
2 South Square
Gray's Inn
London WC1R 5HR
Tel: 071 242 9755
Ref: MD/jb/10/8653

(8740I)

<PAGE>

LICENCE TO ASSIGN

PARTICULARS

Date :29th January 1993

the Landlord :ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 110 Buckingham Palace Road London SW1W 9SL

the Tenant :INTERNATIONAL AERADIO LIMITED
whose registered office is at Lincoln Way Sunbury on Thames Middlesex TW16 7HW

the Assignee :RAPISCAN SECURITY PRODUCTS LIMITED whose registered office is at Unit 1 Block B The Fleming Crawley

the Guarantor :INTERNATIONAL AERADIO LIMITED aforesaid

the Lease :

| Date | Parties | Premises | Term |
|---|---|---|---|
| 04.07.1986 | The Landlord (1) John Adams Electronics Ltd (2) | Unit No.1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex | 25 years from 25.03.1986 |

and includes the following deeds and documents:-

| Date | Documents | Parties |
|---|---|---|
| 24.04.1987 | Licence for Alterations | The Landlord (1) John Adams Electronics Ltd (2) |
| 22.12.1989 | Licence to Assign | The Landlord (1) John Adams Electronics Ltd (2) The Tenant (3) |
| 29.01.1990 | Licence for Alterations | The Landlord (1) The Tenant (2) |
| 1.12.1992 | Licence for Alterations | The Landlord (1) The Tenant (2) |

(8740I)

<PAGE>

INTERPRETATION

1.1 In this Deed unless the context otherwise requires:-

1.1.1 where more than one person is included in any of the expressions "the Tenant" "the Assignee" or "the Guarantor" covenants by such persons are joint and several

1.1.2 the expressions "the Landlord" "the Tenant" and "the Assignee" include those deriving title through or under them respectively and in the case of the Landlord include the person for the time being entitled to the reversion immediately expectant upon the Term

1.1.3 "the Lease" means the documents shortly so described in the Particulars and includes all documents supplemental thereto

1.1.4 "the Premises" means the premises demised by the Lease

1.1.5 "the Term" means the terms of years granted by the Lease and includes any statutory extension or continuation thereof

1.1.6 otherwise expressions have the meanings given to them in the Particulars

1.2 This Deed is made supplemental to the Lease.

TITLE

2. The Landlord is entitled to the Premises in reversion immediately expectant upon the determination of the Term and the Term is vested in the Tenant
<PAGE>

LICENCE

3. The Landlord HEREBY GRANTS unto the Tenant licence to assign the Tenant's interest in the Premises to the Assignee

ASSIGNEE'S COVENANTS

4. THE Assignee HEREBY COVENANTS with the Landlord:-

4.1 as from the date when the Premises are assigned to the Assignee and thenceforth during the residue of the Term to pay the rents reserved by and observe and perform the covenants conditions and agreements on the part of the lessee contained in the Lease

4.2 not to enter into occupation or possession of the whole or any part of the Premises until completion of the assignment to the Assignee

GUARANTOR'S COVENANTS

5. In consideration of the Landlord granting this Licence at the request of the Guarantor the Guarantor covenants with the Landlord:-

5.1 that the Assignee will at all times during the Term pay the rent reserved by the Lease and all other moneys payable thereunder at the respective times and in manner therein appointed for payment thereof and will also duly observe and perform the several covenants and stipulations on the part of the lessee therein contained

(8740I)

<PAGE>

5.2 the Guarantor (by way of indemnity and not only by way of guarantee) will pay and make good to the Landlord on demand all losses costs damages and expenses occasioned to the Landlord by reason of any non-payment or breach specified in sun-clause 5.1 hereof and (without prejudice to the generality thereof) in the event of any disclaimer by any trustee in bankruptcy or liquidator or after any forfeiture of the Lease the Guarantor will pending any reletting of the Premises pay to the Landlord an amount equal to all rent reserved by the Lease and other sums which but disclaimer or forfeiture would have been payable by the Tenant under the Lease

5.3  if so required in writing by the Landlord within three months after
any disclaimer of the Lease by any trustee in bankruptcy or liquidator or after
any forfeiture or after the Assignee (being a company) ceases to exist (as the
case may be) the Guarantor will accept a new lease of the Premises for a term
equal to the residue of the Term unexpired at the date of such disclaimer or
forfeiture or other event as the case may be and commencing on that date at a
rent or rents equal to that or those payable at the date of the disclaimer or
forfeiture or other event as the case may be and containing the like covenants
conditions and provisions as are contained in the Lease (such new lease and the
rights and liabilities thereunder to take effect from the date of such
disclaimer of forfeiture or other event but any rent

(8740I)

                                   3.

<PAGE>

review or other dates referred to in the new lease which are computed by
reference to a period or periods of time shall fall upon the same dates as would
have applied had the Lease still subsisted) and the cost of the Landlord in the
preparation and completion of such new lease shall be paid by the Guarantor to
the Landlord on demand

5.4  any neglect or forbearance of the Landlord in endeavoring to obtain
payment of the rent reserved by the Lease or other moneys payable thereunder or
any delay in taking any steps to enforce performance to the covenants contained
in the Lease and any time which may be given by the Landlord to the Assignee or
any other act omission matter or thing whatsoever whereby (but for this
provision) the Guarantor would be exonerated either in whole or in part from the
aforesaid covenants shall not release or in any way lessen or affect the
liability of the Guarantor

5.5  this guarantee shall enure to the benefit of all persons from time to
time constituting the Landlord without any express assignment of this guarantee
being required

5.6  where more than one person is named as the Guarantor no invalidity of
this guarantee in respect of any of them shall affect the liability of the
others

6.   In the event that (i) the Tenant (in this Clause 5 meaning International
Aeradio Limited only) is called

(8740I)

                                   4.

<PAGE>

upon by the Landlord (giving not less than fourteen days notice in writing) to
perform obligations or pay rent or other sums due under the lease as covenantor
pursuant to a Licence to Assign dated 22 December 1989 between the Landlord (1)
John Adams Electronics Limited (2) and the Tenant (3) or as Guarantor pursuant
to Clause 5 of this Licence and (ii) the Tenant has paid to the Landlord
pursuant to such notice all arrears then due under the Lease (being not less
than one quarter's rent plus any VAT thereon) then the Landlord will grant to
the Tenant (if so requested) within 14 days of the Landlord first calling upon
the Tenant to perform any such obligations or pay rent or other sums as
aforesaid an overriding lease with a reversion of 3 days in the same terms as
the Lease for the term then unexpired and also (if so requested) will assign to
the Tenant all rights of action accured against the defaulting party or parties
and the reasonable and proper costs of the Landlord in granting such overriding
lease and assigning such rights of action (together with any proper
disbursements) and any VAT thereon shall be paid by the Tenant to the Landlord
prior to the grant of the said overriding lease and assignment respectively

    DECLARATION
    -----------

7. It is hereby declared that the condition for re-entry contained in the Lease shall be exercisable as well on breach of the covenants on the part of the

<PAGE>

Assignee and the Guarantor herein contained as upon the happening of any of the events specified in the said condition

IN WITNESS whereof the Landlord the Assignee and the Guarantor have executed this Deed as a deed the day and year first above written

THE COMMON SEAL of INTERNATIONAL )
AERADIO LIMITED was hereunto )
affixed in the presence )
of:

[SEAL APPEARS HERE] [SEAL APPEARS HERE]

Director [SIGNATURE ILLEGIBLE]

Secretary/Director [SIGNATURE ILLEGIBLE]

THE COMMON SEAL of RAPISCAN )
SECURITY PRODUCTS LIMITED was )
hereunto affixed in the presence)
of: )

[SEAL APPEARS HERE] [SEAL APPEARS HERE]

Director [SIGNATURE ILLEGIBLE]

Secretary [SIGNATURE ILLEGIBLE]

(87401)

<PAGE>

TRANSFER OF WHOLE

H M Land Registry

Land Registration Acts of 1925 to 1986

County and district
(or London Borough): West Sussex, Crawley

Title Numbers: WSX105598

Property: Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley

Date: 1st February 1993

In consideration of the covenants hereinafter contained INTERNATIONAL AERADIO LIMITED of Aeradio House Hayes Road Southa11 Middlesex UB2 5NJ ("the Transferor") as beneficial owner transfers to RAPISCAN SECURITY PRODUCTS LIMITED of Unit B1 Fleming Way The Fleming Centre Crawley West Sussex RH10 2NN ("the Transferee") Company registration number 2755398 the land comprised in the title above referred to

1. The parties declare that the covenants for title implied by the Transfer transferring as Beneficial Owner shall not imply that the covenants in a Lease dated 4th July 1986 between Electricity Supply Nominees Limited (1) and John Adams Electronics Limited (2) ("the Lease") relating to the state and condition of the Property have been observed and performed to the date of this Transfer

2. The Transferee will from the date of this Transfer and thenceforth during the residue of the term of the Lease duly pay all rent becoming due under the Lease and will observe and perform and all the covenants agreements and

conditions therein contained and on the part of the lessee to be observed and performed and will also from such date keep the Transferor indemnified against all proceedings costs claims and

<PAGE>

set our in clause 10 of the Deed and when such evidence has been provided to the Transferor the Rent Deposit shall be released to the Transferee absolutely in accordance with clauses 8 and 10 of the Deed such clause 10.1 being read mutatis mutandis as if the words Rapiscan in the third and fifth lines of that clause were replaced by the name of the proposed assignee

The Common Seal of INTERNATIONAL AERADIO LIMITED was affixed in the presence of:- ) [SEAL]

Director [SIGNATURE ILLEGIBLE]

Director/Secretary [SIGNATURE ILLEGIBLE]

The Common Seal of RAPISCAN SECURITY PRODUCTS LIMITED was affixed in the presence of:- ) [SEAL]

Director [SIGNATURE ILLEGIBLE]

Secretary [SIGNATURE ILLEGIBLE]

<PAGE>

No.______________

TO JAQUES & LEWIS
2 SOUTH SQUARE, GRAY'S INN,
LONDON WC1R 5HP and all others whom it may concern.

========================

PURSUANT TO the covenant contained or implied in the Lease or Underlease of which Particulars appear below NOTICE IS HEREBY GIVEN that by a/Transfer/_______ dated 1st February 1993 the property known as Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

______________________________________________________________________________

was/transferred ________________ by INTERNATIONAL AERADIO LIMITED
to RAPISCAN SECURITY PRODUCTS LIMITED

______________________________________________________________________________

[for the residue of the term] ________________________________________________

______________________________________________________________________________

______________________________________________________________________________

| Date of Lease or Underlease | | Parties |
|---|---|---|
| 4 July 1986 | 1. | ELECTRICITY SUPPLY NOMINEES LIMITED |
| | 2. | JOHN ADAMS ELECTRONICS LIMITED |

The rent reserved by the above Lease or Underlease will [in future] be paid by +
Rapiscan Security Products Limited

Unit B1, Fleming Way, The Fleming Centre,

Crawley, West Sussex RH10 2NN

*In the case of a Mortgage it is requested that notice be given to the mortgagee of any default on the part of the lessee/underlessee in paying the rent or performing the tenant's covenants.
+In the case of an Assignment of Sublease please state the occupation or description of the assignee of subtenant.

DATED this 18 day of February 1993

BRECHER & CO. [SIGNATURE ILLEGIBLE]

78 BROOK STREET LONDON W1Y 2AD

Solicitors for the said Transferee

P.T.O for Receipt]
<PAGE>

[Letter Head of Oyez]

DATED 18 February 1993

Re property known as

Unit 1 Block B
The Fleming Centre
Fleming Way
Crawley
West Sussex

NOTICE
of
/Transfer/

RECEIVED this.........................day of............19.....a Notice, of which the within-written Notice is a duplicate.

......................................

......................................

......................................

Notice to lessor from Assignee, Chargee or Underlessee
of Leaseholds.

CONVEYANCING 4A

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11.1
<SEQUENCE>8
<DESCRIPTION>STATEMENT REGARDING COMPUTATION OF EARNINGS PER
<TEXT>

<PAGE>

OSI SYSTEMS, INC.
EXHIBIT 11.1
STATEMENT OF COMPUTATION OF EARNINGS PER SHARE

<TABLE>
<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1993 <C> | YEAR ENDED JUNE 30, 1994 <C> | YEAR ENDED JUNE 30, 1995 <C> | YEAR ENDED JUNE 30, 1996 <C> | YEAR ENDED JUNE 30, 1997 <C> |
|---|---|---|---|---|---|
| Weighted Average Common Shares Outstanding | 1,676,063 | 1,680,750 | 1,780,125 | 1,852,219 | 1,912,408 |
| Weighted Average Preferred Shares Outstanding | 1,738,125 | 1,738,125 | 1,778,125 | 1,938,125 | 2,098,125 |
| Effect of Subordinated Debt | 357,100 | 488,421 | 303,139 | 40,000 | |
| Effect of Preferred Shares Issued within 12 months of initial public offering, treasury stock method | 1,793,684 | 1,793,684 | 1,793,684 | 1,793,684 | 1,793,684 |
| Acquisition of Minority Interests | 206,610 | 206,610 | 206,610 | 206,610 | 206,610 |
| Effect of Stock Options: | | | | | |
| Granted within 12 months of initial public offering, treasury stock method | 207,460 | 207,460 | 207,460 | 207,460 | 207,460 |
| Remaining options, treasury stock method | 160,387 | 134,624 | 103,758 | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | 96,571 | 45,676 |
| Weighted Average Shares | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |
| Historic Net Income | $ 659,000 | $ 787,000 | $1,158,000 | $2,259,000 | $4,177,000 |
| Interest on Subordinated Debt, Net of Income Taxes | 161,000 | 246,000 | 216,000 | 166,000 | 92,000 |
| Minority Interest in Net Loss of Subsidiaries | (6,000) | (38,000) | (17,000) | (117,000) | - |
| Net Income Available to Common Shareholders | $ 814,000 | $ 995,000 | $1,357,000 | $2,308,000 | $4,269,000 |
| Net Income Per Share | $ 0.13 | $ 0.16 | $ 0.22 | $ 0.38 | $ 0.68 |

</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>9
<DESCRIPTION>CONSENT OF DELOITTE & TOUCHE LLP
<TEXT>

<PAGE>

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

We consent to the use in this Amendment No. 2 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated August 15, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

Deloitte & Touche llp

Los Angeles, California

August 15, 1997
</TEXT>

```
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>10
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>

<PAGE>

<ARTICLE> 5
<MULTIPLIER> 1,000

<S>                             <C>
<PERIOD-TYPE>                   YEAR
<FISCAL-YEAR-END>                          JUN-30-1997
<PERIOD-START>                             JUL-01-1996
<PERIOD-END>                               JUN-30-1997
<CASH>                                             553
<SECURITIES>                                         0
<RECEIVABLES>                                   15,556
<ALLOWANCES>                                         0
<INVENTORY>                                     18,517
<CURRENT-ASSETS>                                38,383
<PP&E>                                           5,841
<DEPRECIATION>                                       0
<TOTAL-ASSETS>                                  47,333
<CURRENT-LIABILITIES>                           27,583
<BONDS>                                          2,840
<PREFERRED-MANDATORY>                                0
<PREFERRED>                                          0
<COMMON>                                         7,367
<OTHER-SE>                                       9,442
<TOTAL-LIABILITY-AND-EQUITY>                    47,333
<SALES>                                         77,628
<TOTAL-REVENUES>                                77,628
<CGS>                                           56,174
<TOTAL-COSTS>                                   56,174
<OTHER-EXPENSES>                                14,664
<LOSS-PROVISION>                                     0
<INTEREST-EXPENSE>                               1,197
<INCOME-PRETAX>                                  5,593
<INCOME-TAX>                                     1,416
<INCOME-CONTINUING>                              4,177
<DISCONTINUED>                                       0
<EXTRAORDINARY>                                      0
<CHANGES>                                            0
<NET-INCOME>                                     4,177
<EPS-PRIMARY>                                     0.68
<EPS-DILUTED>                                        0

</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
OBUxNvpO5lstA0BAbj7zSFOh8Qn1X+4wBkyL5MbOVuvr2vxpm1ube10FD74MEY8e
+d502PP5TdnBQgd7U3Ql/w==

<SEC-DOCUMENT>0000944209-97-001288.txt : 19971002
<SEC-HEADER>0000944209-97-001288.hdr.sgml : 19971002
ACCESSION NUMBER: 0000944209-97-001288
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 3
FILED AS OF DATE: 19971001
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT:
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97689204

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMENDMENT NO. 3 TO THE FORM S-1
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON OCTOBER 1, 1997

REGISTRATION NO. 333-29179

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------

AMENDMENT NO. 3 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

----------------

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

| CALIFORNIA | 3674 | 33-0238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

----------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

----------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

----------------

COPIES TO:

| | |
|---|---|
| ISTVAN BENKO, ESQ. TROY & GOULD PROFESSIONAL CORPORATION 1801 CENTURY PARK EAST, SUITE 1600 LOS ANGELES, CALIFORNIA 90067 TEL. (310) 553-4441 FAX. (310) 201-4746 | BERTRAM R. ZWEIG, ESQ. JONES, DAY, REAVIS & POGUE 555 WEST 5TH STREET, SUITE 4600 LOS ANGELES, CALIFORNIA 90013-1025 TEL. (213) 489-3939 FAX. (213) 243-2539 |

----------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

----------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

----------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(A), MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

<PAGE>

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE.

SUBJECT TO COMPLETION, DATED SEPTEMBER 30, 1997

[LOGO OF OPTO-SENSORS, INC.]

------------------

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $12.50 and $14.50 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Common Stock has been approved for quotation on the Nasdaq National Market under the symbol "OSIS."

----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>

<CAPTION>

| | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING SHAREHOLDERS(2) |
|---|---|---|---|---|
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]

Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."
<PAGE>

[TWO PAGE GATEFOLD]

## OSI SYSTEMS, INC.

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]

Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]
Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL    , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

---------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |

Dilution........................................................ 17
Selected Consolidated Financial Data.................................... 18
Management's Discussion and Analysis of Financial Condition and Results of Operations............................................................ 19
Business................................................................ 28
Management.............................................................. 41
Certain Transactions.................................................... 49
Principal and Selling Shareholders...................................... 51
Description of Capital Stock............................................ 54
Shares Eligible for Future Sale......................................... 55
Underwriting............................................................ 56
Legal Matters........................................................... 58
Experts................................................................. 58
Additional Information.................................................. 58
Index to Consolidated Financial Statements.............................. F-1
</TABLE>

---------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or

approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In fiscal 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During fiscal 1997, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

<PAGE>

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the

market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its global presence, and selectively entering into new end-product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997 the Company marketed its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,563,778 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Nasdaq National Market Symbol....... | OSIS |

</TABLE>

- ---------------

(1) Based on the number of shares outstanding on September 30, 1997. Excludes 783,236 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.74 per share.

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>

<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues | $27,225 | $47,735 | $49,815 | $61,518 | $77,628 |
| Cost of goods sold | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | | | |
| Selling, general and administrative(1) | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2) | -- | -- | -- | -- | 856 |
| Total operating expenses | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest | 6 | 38 | 17 | 117 | -- |
| Net income | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4) | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5) | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5) | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(6) |
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash | $ 553 | $29,839 |
| Working capital | 10,800 | 49,961 |
| Total assets | 47,333 | 76,619 |
| Total debt | 13,180 | 1,258 |
| Total shareholders' equity | 16,809 | 58,017 |

</TABLE>

- -------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income

from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of $161,000, $246,000, $216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $6,000, $38,000, $17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to

predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics"), Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business--Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing

inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the Company's

<PAGE>

subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not

experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995, 1996 and 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 42.2%, respectively, of the Company's revenues. Of the revenues generated during fiscal 1997 from shipments made outside of the United States, 14.9% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial

condition and results of operations. While the Company has no current agreement or negotiations underway with

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the Company.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations.

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, the court could grant Lunar and UAB a permanent injunction in which case Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 621 of 2711

operations. For the year ended June 30, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $10.5 million or approximately 13.5% of the Company's revenues. Through June 30, 1997, the Company has incurred legal fees in the amount of approximately $368,000 in connection with this lawsuit. The Company intends to pursue vigorously its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights. Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability

insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13.0 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

<PAGE>

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 623 of 2711

storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.1% and 16.1%, respectively, of the Company's Common Stock (17.1% and 14.2%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 41.7% of the outstanding Common Stock (37.6% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. Although the Common Stock has been approved for quotation on the Nasdaq National Market, there can be no assurance that an active trading market for

the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,563,778 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,863,778 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,838,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for 180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,863,778 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of this Offering to be received by the Company, approximately $29.3 million or approximately 71.1% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

14

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $11.9 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT JUNE 30, 1997 | RATE BASIS PER ANNUM(1) | RATE AT JUNE 30, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $5,077,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,344,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,500,000 | Variable rate plus 0.25% | 8.75% | October 1997 |
| Revolving Credit | 963,000 | Variable rate plus 1.85% | 7.85% | December 1997 |
| Revolving Credit | 974,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 41,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 586,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 437,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- ---------------

(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

Borrowings under the foregoing bank facilities are generally used for

working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

<PAGE>

CAPITALIZATION

The following table sets forth as of June 30, 1997: (i) the actual short-term debt and capitalization of the Company; and (ii) the short-term debt and capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

<TABLE>
<CAPTION>

| | JUNE 30, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED |
| | (In thousands) | |
| <S> | <C> | <C> |
| Short-term debt........................................ | $10,340 | $ 465 |
| | ======= | ======= |
| Long-term debt, less current portion.................. | 2,840 | 793 |
| Shareholders' equity: | | |
| Preferred Stock, no par value; | | |
| 10,000,000 shares authorized; none issued and | | |
| outstanding......................................... | -- | -- |
| Common Stock, no par value(1)(2); | | |
| 40,000,000 shares authorized, actual and as | | |
| adjusted; | | |
| 6,156,528 shares issued and outstanding, actual; | | |
| 9,486,528 issued and outstanding, as adjusted....... | 7,367 | 48,575 |
| Retained earnings.................................. | 9,171 | 9,171 |
| Cumulative foreign currency translation adjustment... | 271 | 271 |
| | ------- | ------- |
| Total shareholders' equity........................ | 16,809 | 58,017 |
| | ------- | ------- |
| Total capitalization............................. | $19,649 | $58,810 |
| | ======= | ======= |

</TABLE>

- ---------------

(1) Excludes 860,486 shares of Common Stock issuable upon exercise of

outstanding stock options as of June 30, 1997. An additional [illegible]7,250 shares of Common Stock were issued in September 1997 for a total purchase price of $252,625 upon the exercise of outstanding stock options.

(2) Includes 27,654 shares of Common Stock that were issued after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

## DILUTION

The net tangible book value of the Company at June 30, 1997 , was $14,707,000 or $2.39 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding . After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of June 30, 1997 would have been $55,915,000, or $5.89 per share. This represents an immediate increase in the net tangible book value of $3.50 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.61 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed initial public offering price.......................... | | $13.50 |
| Net tangible book value before Offering...................... | $2.39 | |
| Increase in net tangible book value attributable to this Offering................................................. | 3.50 | |
| Pro forma net tangible book value after Offering.............. | | 5.89 |
| Dilution to new investors.................................... | | $ 7.61 |

The following table sets forth on a pro forma basis as of September 30, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| Existing shareholders.. | 6,233,778 | 65.2% | $ 7,620,000 | 14.5% | $ 1.22 |
| New public investors... | 3,330,000 | 34.8 | 44,955,000 | 85.5 | $13.50 |
| Total................. | 9,563,778 | 100.0% | $52,575,000 | 100.0% | |

As of September 30, 1997, there are outstanding options to purchase an aggregate of 783,236 of Common Stock at a weighted average exercise price of

approximately $2.79 per share. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1997, and the balance sheet data at June 30, 1996 and 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1993 and 1994 and the balance sheet data at June 30, 1993, 1994 and 1995 are derived from audited financial statements not otherwise contained herein.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues................ | $ 27,225 | $ 47,735 | $ 49,815 | $61,518 | $77,628 |
| Cost of goods sold...... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit............ | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | | | |
| Selling, general and administrative(1)..... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development........... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)....... | -- | -- | -- | -- | 856 |
| Total operating expenses.............. | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations.. | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense........ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest............... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.................. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest............... | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest....... | 6 | 38 | 17 | 117 | -- |
| Net income.............. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4)..... | $814 | $995 | $1,357 | $2,308 | $4,269 |

| | | | | | |
|---|---|---|---|---|---|
| Net income per share(3)(4)(5)......... | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)......... | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | |
| Cash.................................. | $941 | $625 | $1,405 | $581 | $553 |
| Working capital........................ | 3,852 | 2,280 | 12,117 | 6,044 | 10,800 |
| Total assets........................... | 15,739 | 25,807 | 30,780 | 35,309 | 47,333 |
| Total debt............................. | 6,882 | 11,140 | 14,113 | 15,462 | 13,180 |
| Total shareholders' equity............. | 2,256 | 3,128 | 4,951 | 7,194 | 16,809 |

</TABLE>

- -------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000, respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of 161, 000, 246,000, 216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of 6,000, 38,000, 17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

<PAGE>

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company

designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2% of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997, the Company markets its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 42.2% of revenues for the fiscal years 1995, 1996 and 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, 1996 and 1997 was 26.6%, 34.2% and 25.3%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | |
| <S> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...... | $34,729 | $37,977 | $45,007 | $51,554 |
| (Inter-company eliminations)............... | (1,257) | (1,529) | (6,392) | (8,675) |
| Unaffiliated optoelectronic devices and subsystems .............................. | 33,472 | 36,448 | 38,615 | 42,879 |
| Security and inspection products........... | 14,263 | 13,367 | 22,903 | 34,749 |
| Total revenues............................. | $47,735 | $49,815 | $61,518 | $77,628 |

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> |
| Revenues.................................. | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold........................ | 75.5 | 75.9 | 73.9 | 72.4 |
| Gross profit.............................. | 24.5 | 24.1 | 26.1 | 27.6 |
| Operating expenses: | | | | |
| Selling, general and administrative....... | 16.7 | 15.3 | 15.9 | 14.6 |
| Research and development.................. | 3.0 | 3.2 | 2.7 | 3.2 |
| Stock option compensation................. | -- | -- | -- | 1.1 |
| Total operating expenses................ | 19.7 | 18.5 | 18.6 | 18.9 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 632 of 2711

| | | | | |
|---|---|---|---|---|
| Income from operations........................ | 4.8 | 5.6 | 7.5 | 8.7 |
| Interest expense.......................... | 1.5 | 2.5 | 2.2 | 1.5 |
| Income before income taxes and minority interest................................. | 3.3 | 3.1 | 5.3 | 7.2 |
| Provision for income taxes................ | 1.7 | 0.8 | 1.8 | 1.8 |
| Income before minority interest........... | 1.6 | 2.3 | 3.5 | 5.4 |
| Minority interest......................... | -- | -- | 0.2 | -- |
| Net income................................ | 1.6% | 2.3% | 3.7% | 5.4% |

</TABLE>

<PAGE>

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1997 TO THE FISCAL YEAR ENDED JUNE 30, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all inter-company eliminations. Revenues for the fiscal year ended June 30, 1997 increased by $16.1 million, or 26.2%, to $77.6 million from $61.5 million for the fiscal year ended June 30, 1996. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $4.3 million, or 11.0%, to $42.9 million from $38.6 million for fiscal 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenues from the sale of security and inspection products increased by $11.8 million, or 51.7%, to $34.7 million from $22.9 million for fiscal 1996. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, the growth in sales of the Rapiscan 119 tabletop model and the introduction of large cargo inspection machines.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $5.4 million, or 33.8%, to $21.5 million from $16.0 million for fiscal 1996. As a percentage of revenues, gross profit increased to 27.6% in fiscal 1997 from 26.1% in fiscal 1996. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For fiscal 1997, such expenses increased by $1.5 million, or 15.9%, to $11.3 million from $9.8 million in fiscal 1996. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.9%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For fiscal 1997, such expenses increased by $841,000, or 50.6%, to $2.5 million from $1.7 million in fiscal 1996. As a percentage of revenues, research and development expenses increased to 3.2% from 2.7%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 633 of 2711

technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for fiscal 1997 increased by $2.2 million, or 47.2%, to $6.8 million from $4.6 million for fiscal 1996. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during fiscal 1997, income from operations increased by $3.0 million, or 65.8%, to $7.6 million from $4.6 million. As a percent of revenues, income from operations increased to 8.7% from 7.5%, and excluding the non-cash compensation expense referenced above, it would have increased to 9.8% from 7.5%.

Interest Expense. Interest expense for fiscal 1997 decreased by $162,000, or 11.9%, to $1.2 million from $1.4 million for fiscal 1996. As a percentage of revenues, interest expense decreased to 1.5% from 2.2%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during fiscal 1997, and to a decrease in the Company's borrowings outstanding under its lines of credit.

21

<PAGE>

Provision for Income Taxes. Provision for income taxes for fiscal 1997 increased by $305,000, or 27.5%, to $1.4 million from $1.1 million for fiscal 1996. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.3% from 34.2% in fiscal 1996. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for fiscal 1997, increased $1.9 million, or 84.9%, to $4.2 million from $2.3 million in fiscal 1996. The compensation charge described above, decreased net income by $514,000 in fiscal 1997.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 634 of 2711

expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling, general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest expense increased to 2.5% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eight consecutive quarters in the period ended June 30, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| | (In thousands) | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Revenues................ | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 | $21,655 |
| Cost of goods sold...... | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 | 15,794 |
| Gross profit............ | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 | 5,861 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 | 3,121 |
| Research and development........... | 419 | 408 | 453 | 383 | 517 | 636 | 584 | 767 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 856 | - |
| Total operating expenses............. | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 | 3,888 |
| Income from operations.. | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | 1,470 | 1,973 |
| Interest expense........ | 336 | 345 | 345 | 333 | 360 | 331 | 209 | 297 |
| Income before income taxes and minority interest............... | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 | 1,676 |
| Provision for income taxes.................. | 85 | 293 | 409 | 324 | 259 | 408 | 316 | 433 |
| Income before minority interest............... | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 | 1,243 |
| Minority interest....... | 19 | 17 | (8) | 89 | -- | -- | -- | -- |
| Net income.............. | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 | $ 1,243 |

</TABLE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of fiscal years 1996 and 1997.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold...... | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 | 72.9 |
| Gross profit............ | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 | 27.1 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 | 14.4 |
| Research and development........... | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 | 3.5 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 4.1 | -- |
| Total operating expenses............. | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 | 17.9 |
| Income from operations.. | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 | 9.2 |
| Interest expense........ | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 | 1.4 |
| Income before income taxes and minority interest............... | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 | 7.8 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 637 of 2711

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Provision for income taxes.................. | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 | 2.0 |
| Income before minority interest............... | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 | 5.8 |
| Minority interest....... | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- | -- |
| Net income.............. | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% | 5.8% |

</TABLE>

<PAGE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of June 30, 1997, the Company's principal sources of liquidity consisted of $553,000 in cash and several credit agreements described below.

The Company's operations provided net cash of $3.4 million during fiscal 1997. For fiscal 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accounts payable and accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in fiscal 1997. Net cash provided by operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $3.0 million and $2.2 million in fiscal 1997 and 1996, respectively, in each case due primarily to purchases of property and equipment in the amount of approximately $2.2 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for fiscal 1997 was $526,000 due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for

a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of June 30, 1997, there was outstanding approximately $5.1 million under the $10.0 million line of credit, $2.4 million under the term loan, and approximately $154,000 under the letter of credit facility. As of June 30, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11.0 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

<PAGE>

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of June 30, 1997, there was outstanding approximately $1.5 million under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $1.9 million was used as of June 30, 1997. The facility terminates on October 27, 1997. Borrowings under the agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.1 million at June 30, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus 2.00% per annum. At June 30, 1997, no amounts were outstanding under the overdraft facility. The second agreement provides for a 750,000 pound sterling (approximately $1.3 million as of June 30, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $832,000 as of June 30, 1997) facility for tender and performance bonds. These facilities are secured by certain assets of Rapiscan UK and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of June 30, 1997, there was outstanding approximately $963,000 under the line of credit and $452,000 was outstanding under the performance bond facility. The above facilities expire in December

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 639 of 2711

and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at June 30, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at June 30, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of June 30, 1997 there was approximately $974,000 outstanding under the line of credit and approximately $41,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $682,000 at June 30, 1997), of which $586,000 was outstanding as of June 30, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At June 30, 1997 outstanding term loan borrowings totalled approximately 3.2 million Norwegian krone (approximately $437,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

26

<PAGE>

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000) and $68,000 were included in income for fiscal 1994, 1995, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

27

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 640 of 2711

designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

28

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by

setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the year ended June 30, 1997, approximately 27.3% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through

research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take advantage of the

<PAGE>

growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of

both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in fiscal 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995, 1996, and 1997 approximately 28.7%, 33.1%, and 27.3% respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the

atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

<PAGE>

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

<TABLE>
<CAPTION>

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| <S> | <C> | <C> |
| Rapiscan 19 (single energy) | Inspection of incoming package | Embassies |
| Rapiscan 119 (single energy) | | Post offices |
| | | Courthouses |
| | | High risk office buildings |
| | | Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Airport hand carried and checked baggage<br>Pallet inspection<br>Customs inspections<br>Agriculture inspection | Airports<br>Cruise ships<br>Freight shippers<br>Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |

| | | |
|---|---|---|
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

</TABLE>

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During fiscal 1997, sales of the walk-through and hand-held metal detectors constituted 1.6% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the year ended June 30, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who purchased more than $100,000 of optoelectronic products; and (iv) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 23.3% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 12.3% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 10 |
| Medical Monitoring | 12.1% | Datascope<br>BioChem International<br>Criticare Systems | 8 |
| Analytical, Medical Diagnostics, and Particle Analyzers | 6.9% | Johnson & Johnson<br>Leica<br>Coulter Corporation | 10 |
| Office Automation and Computer Peripherals | 7.6% | Xerox | 8 |

| | | | |
|---|---|---|---|
| | | Eastman Kodak<br>Dr. Johannes Heidenhain | |
| Construction, Robotics and Industrial Automation | 6.2% | 3M<br>Spectra Physics<br>Baumer Electric | 7 |
| Military/Defense and Weapons Simulations | 5.1% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 7 |
| Bar Code Scanners | 3.6% | Symbol Technologies<br>Intermec<br>United Barcode Industries (Singapore) | 3 |
| Gaming Industry | 2.1% | Bally Gaming<br>Ardac, Inc. | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 647 of 2711

Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 23 independent sales representatives and distributors, as of June 30, 1997. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 19 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 72 independent sales representatives, as of June 30, 1997. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection

<PAGE>

products sales staff is supported by a service organization of approximately 23 persons, as of June 30, 1997, located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996 and 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.6%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom optoelectronic solutions for their specific needs when standard components or

subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of June 30, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 33 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $2.5 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities

<PAGE>

in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 649 of 2711

manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In

<PAGE>

certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations,

any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

<PAGE>

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At June 30, 1997, the Company's backlog products totalled approximately $52.7 million, compared to approximately $30.0 million at June 30, 1996. Substantially all of the Company's backlog as of June 30, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of June 30, 1997, the Company employed approximately 725 people, of whom 565 were employed in manufacturing, 33 in research and development, 62 in finance and administration, 42 in sales and marketing, and 23 in its service organization. Of the total employees, approximately 453 were employed in the United States, 109 were employed in Europe, 162 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |

| | | | |
|---|---|---|---|
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

38

<PAGE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future. The Company currently anticipates that it will be able to renew the leases that are scheduled to expire in the next few years on terms substantially the same as currently in effect. However, even if the Company were not able to renew one or more of the leases, the Company believes that suitable substitute space is available to relocate any of the facilities where the lease is not renewed. Accordingly, the Company does not believe that its failure to renew any of the leases that are scheduled to expire in the next few years will have a material adverse effect on the Company's operations.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement, contributory infringement and inducement thereof. Lunar and UAB seek damages in an unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California and has been consolidated with the lawsuit brought by Rapiscan U.S.A.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the

court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. No assurance can be given that the Company will be successful in this lawsuit. See "Risk Factors--Proprietary Technology; Pending Litigation." The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In

<PAGE>

the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

<PAGE>

## MANAGEMENT

### EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |
| Manoocher Mansouri | | |

| | | |
|---|---|---|
| Aliabadi.......... | 41 | Vice President -- Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 55 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 71 | Director |

</TABLE>
- ----------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

<PAGE>

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1997, each non-employee Director received, as additional director compensation, options to purchase 5,000 shares of Common Stock at an exercise price of $13.50 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1997, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension & Profit Sharing Plan, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension plan by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1997, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION SALARY | ANNUAL COMPENSATION BONUS | LONG TERM COMPENSATION SECURITIES UNDERLYING OPTIONS (#)(2) |
|---|---|---|---|
| Deepak Chopra(1) Chief Executive Officer | $370,843 | $175,000 | 137,500 |
| Ajay Mehra Chief Financial Officer | 172,216 | 58,040 | 73,750 |
| Andreas F. Kotowski President of U.S. Operation, Rapiscan U.S.A. | 124,452 | 10,000 | 57,029 |
| Manoocher Mansouri Aliabadi Vice President--Corporate Marketing, UDT Sensors | 110,019 | 28,000 | 15,000 |
| Thomas K. Hickman Managing Director, OSI Malaysia and OSI Singapore | 124,220 | 12,500 | 10,125 |

</TABLE>

(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.
(2) For additional information see "Option Grants."

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that

the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

44

<PAGE>

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years. Mr. Kotowski was not entitled to receive such additional incentive compensation for the 1997 fiscal year.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in May and June 1997 based on their performances during the fiscal year ended June 30, 1997.

OPTION GRANTS

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1997:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | MARKET PRICE ($/SHARE) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 0% ($) | 5% ($) | 10% ($) |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | |

<C>

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra.......... | 37,500 | 5.7% | $3.33 | $6.67 | 12/14/01 | $125,000 | $34,535 | $76,314 |
| | 100,000 | 15.3 | 13.50 | N/A | 5/31/02 | N/A | 372,980 | 824,189 |
| Ajay Mehra(2).......... | 30,000 | 4.6 | 3.33 | 6.67 | 12/14/01 | 100,000 | 27,601 | 60,990 |
| | 10,000 | 1.5 | 13.50 | N/A | 5/31/02 | N/A | 37,298 | 82,419 |
| | 30,000 | 4.6 | 11.50 | N/A | 5/31/02 | N/A | 95,317 | 210,626 |
| Andreas F. Kotowski(2).. | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 20,000 | 3.1 | 11.50 | N/A | 5/31/02 | N/A | 63,545 | 140,417 |
| Manoocher Mansouri Aliabadi(2)........... | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 7,500 | 1.1 | 11.50 | N/A | 5/31/02 | N/A | 23,829 | 52,656 |
| Thomas K. Hickman(2).... | 3,750 | 0.6 | 2.83 | 6.67 | 12/14/01 | 14,375 | 2,935 | 6,487 |
| | 6,000 | 0.9 | 11.50 | N/A | 5/31/02 | N/A | 19,063 | 42,125 |

</TABLE>

- ----------------
(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 0.0%, 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.
(2) Excludes options granted as consideration for the acquisition by the Company of the minority interests in Rapiscan U.S.A. See "Certain Transactions."

45

<PAGE>

OPTION EXERCISES AND FISCAL YEAR-END VALUES

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1997 and held by them on June 30, 1997:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) | |
|---|---|---|---|---|---|---|
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |

| | | | | | | |
|---|---|---|---|---|---|---|
| Deepak Chopra.......... | 0 | -- | 37,500 | 100,000 | $381,375 | $ 0 |
| Ajay Mehra.............. | 9,000 | $107,100 | 75,000 | 40,000 | 814,500 | 60,000 |
| Andreas F. Kotowski..... | 0 | -- | 7,500 | 20,000 | 80,025 | 40,000 |
| Manoocher Mansouri Aliabadi............... | 7,500 | 89,250 | 13,500 | 8,250 | 149,500 | 23,625 |
| Thomas K. Hickman....... | 9,750 | 109,925 | 15,187 | 14,813 | 174,648 | 109,600 |

</TABLE>

- ---------------

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of September 30, 1997, 466,500 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 348,750 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 234,750 shares remained available for grant. As of such date, stock options to purchase 316,501 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

<PAGE>

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common

Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant

to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a

47

<PAGE>

director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company has entered into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers. Each such Indemnity Agreement provides that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnity Agreements also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnity Agreement permits the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified

persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a total of 159,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) the issuance to the holders of the Option Shares of 27,654 additional shares of Common Stock which was based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ended June 30, 1997. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, 1996 and 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result,

certain Related Parties who were collectively owed $2,110,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

<PAGE>

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 and $111,000 for such services during fiscal 1996 and 1997, respectively. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 and $82,000 for such services during fiscal 1996 and 1997, respectively.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as of September 30, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.
<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | NUMBER OF SHARES BEING OFFERED(2) | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | | NUMBER | PERCENT |
| Scope Industries(4)(5) | 1,875,000 | 30.1% | 148,148 | 1,726,852 | 18.1% |
| Sally F. Chamberlain(6)(7) | 1,170,375 | 18.8 | 63,343 | 1,107,032 | 11.6 |
| Deepak Chopra(6)(8) | 1,539,484 | 24.7 | 0 | 1,539,484 | 16.1 |
| Ajay Mehra(9) | 195,693 | 3.1 | 0 | 195,693 | 2.0 |
| Andreas F. Kotowski(10) | 128,806 | 2.1 | 0 | 128,806 | 1.3 |
| Manoocher Mansouri Aliabadi(11) | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12) | 27,228 | * | 0 | 27,228 | * |
| Steven C. Good(13) | 40,313 | * | 21,896 | 18,417 | * |
| Madan G. Syal(14) | 243,938 | 3.9 | 25,926 | 218,012 | 2.3 |
| Meyer Luskin(15) | 23,438 | * | 0 | 23,438 | * |
| Good Swartz & Berns Pension & Profit Sharing Plan(16) | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birinder Mehra | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust | 77,679 | 1.2 | 9,259 | 68,420 | * |
| Mohinder Chopra | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman | 65,357 | 1.0 | 9,259 | 56,098 | * |
| Martha B. Holmes | 60,000 | * | 9,259 | 50,741 | * |
| Combined TR/DR Account Trust | 52,500 | * | 7,407 | 45,093 | * |
| Gary E. Fleischer | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Redinger | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust | 9,732 | * | 5,982 | 3,750 | * |
| Arnold G. and Hope Anisgarten | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra | 2,057 | * | 450 | 1,607 | * |
| Surendra V. and Kala Jain(17) | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons) | 2,286,136 | 36.3 | 47,822 | 2,238,314 | 23.2 |

</TABLE>

- ----------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of September 30, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (88,519); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333);

Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension & Profit Sharing Plan (3,309); Leila and Birinder Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Combined TR/DR Account Trust (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette J. Moore (7,407); Robert W. Kephart (5,556); Phillip M. Wascher (7,407); Charan J. Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Alan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Le (741); Mark and Penny Berns Trust (1,518); Arnold G. and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln A. Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette J. Moore, Robert W. Kephart, Phillip M. Wascher, Charan J. Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Alan J. Barnard, Christine Williams, Christopher Chin, Khai Le, Louis Peters and Lincoln A. Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,638,333, 17.1%); Sally F. Chamberlain 1,057,402, 11.1%); Deepak Chopra (1,354,299, 14.2%); Ajay Mehra (162,360, 1.7%); Andreas F. Kotowski 110,287, 1.2%); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,524) Steven C. Good (2,843); Madan G. Syal (199,493, 2.1%); Meyer Luskin (14,179); Good Swartz & Berns Pension & Profit Sharing Plan (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Combined TR/DR Account Trust (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); BetteJ. Moore (28,218); Robert W. Kephart (22,944); Phillip M. Wascher (23,241); Charan J. Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Alan J. and Pamela Barnard (9,704); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (12,148); Khai Le (8,956); Mark and Penny Berns Trust (2,232); Arnold G. and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln A. Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See

"Management."

(9) Includes 45,000 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

52

<PAGE>

(13) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 15,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See "Management."

(14) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Includes 217,500 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 8,438 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good, Mark and Penny Berns Trust, Arnold G. and Hope Anisgarten and Rajiv Mehra. Steven C. Good and Mark S. Berns are the trustees of the Good Swartz & Berns Pension & Profit Sharing Plan.

(17) Includes 6,429 shares held by Surendra V. Jain M.D. Inc.

53

<PAGE>

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

COMMON STOCK

As of September 30, 1997, 6,233,778 shares of Common Stock were outstanding, held of record by 79 shareholders. After completion of the Offering, there will be 9,563,778 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 668 of 2711

the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,563,778 shares of Common Stock outstanding (assuming no exercise of stock options after September 30, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,863,778 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,838,000 Restricted Shares (or approximately 5,283,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 669 of 2711

whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 95,638 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

55

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

<TABLE>
<CAPTION>

| Underwriter | Number of Shares |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC.................................... | |
| William Blair & Company, L.L.C....................................... | |
| Volpe Brown Whelan & Company, LLC.................................... | |
| Total.......................................................... | 3,700,000 |

</TABLE>

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in this Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,838,000 shares of the Company's Common Stock outstanding prior to this Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,838,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company has agreed that until the expiration of the

lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in this Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with this Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with this Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

57

<PAGE>

LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 672 of 2711

given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement onForm S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Report of Independent Auditors | F-2 |
| Consolidated Balance Sheets as of June 30, 1996 and 1997 | F-3 |
| Consolidated Statements of Operations for the Years Ended June 30, 1995, 1996 and 1997 | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1995, 1996 and 1997 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended June 30, 1995, 1996 and 1997 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

</TABLE>

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems, Inc. (the "Company") and its subsidiaries as of June 30, 1997 and 1996, and the related consolidated statements of operations, shareholders' equity, and cash flows for the years ended June 30, 1997, 1996 and 1995. These financial

statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of June 30, 1997 and 1996, and the results of their operations and their cash flows for the years ended June 30, 1997, 1996 and 1995 in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Los Angeles, California
August 15, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| ASSETS (NOTE 4) | | |
| Current Assets: | | |
| Cash and cash equivalents (Note 1) | $ 581 | $ 553 |
| Accounts receivable, net of allowance for doubtful accounts of $276 and $586 at June 30, 1996 and 1997, respectively (Note 1) | 13,295 | 15,556 |
| Other receivables (Note 2) | 783 | 2,346 |
| Inventory (Note 1) | 13,642 | 18,517 |
| Prepaid expenses | 633 | 537 |
| Deferred income taxes (Notes 1 and 7) | 700 | 874 |
| Total current assets | 29,634 | 38,383 |
| Property and Equipment, Net (Notes 1 and 4): | 4,454 | 5,841 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 1,221 | 3,109 |
| Total | $35,309 | $47,333 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Current Liabilities: | | |
| Bank lines of credit (Note 4) | $ 7,783 | $ 9,100 |
| Current portion of long-term debt (Notes 6 and 13) | 1,491 | 1,240 |
| Current portion of senior subordinated debt (Note 5) | 2,500 | |

| | 1996 | 1997 |
|---|---|---|
| Accounts payable (Note 1) | 6,522 | 7,712 |
| Accrued payroll and related expenses | 1,667 | 1,607 |
| Income taxes payable (Notes 1 and 7) | 799 | 1,804 |
| Advances from customers | 219 | 2,410 |
| Other accrued expenses and current liabilities | 2,609 | 3,710 |
| Total current liabilities | 23,590 | 27,583 |
| Senior Subordinated Debt (Notes 1 and 5) | 575 | |
| Long-Term Debt (Notes 1, 6 and 13) | 3,113 | 2,840 |
| Deferred Income Taxes (Notes 1 and 7) | 827 | 101 |
| Minority Interest (Note 1) | 10 | |
| Total liabilities | 28,115 | 30,524 |
| Commitments and Contingencies (Notes 8 and 13) | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1996 and 0 shares at June 30, 1997 (Note 10) | 1,514 | |
| Preferred stock, no par value; 10,000,000 shares authorized; none issued and outstanding at June 30, 1996 and 1997 | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding, 1,858,132 and 6,156,528 shares at June 30, 1996 and 1997, respectively | 560 | 7,367 |
| Retained earnings | 4,994 | 9,171 |
| Cumulative foreign currency translation adjustment (Note 1) | 126 | 271 |
| Total shareholders' equity | 7,194 | 16,809 |
| Total | $35,309 | $47,333 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Revenues (Note 1) | $ 49,815 | $ 61,518 | $ 77,628 |
| Cost of goods sold | 37,818 | 45,486 | 56,174 |
| Gross profit | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | |
| Selling, general and administrative expenses (Notes 11 and 12) | 7,601 | 9,757 | 11,304 |
| Research and development (Note 1) | 1,591 | 1,663 | 2,504 |
| Stock option compensation (Note 9) | -- | -- | 856 |
| Total operating expenses | 9,192 | 11,420 | 14,664 |
| Income from operations | 2,805 | 4,612 | 6,790 |
| Interest expense (Notes 4, 5, 6 and 11) | 1,251 | 1,359 | 1,197 |

| | | | |
|---|---|---|---|
| Income before provision for income taxes and minority interest | 1,554 | 3,253 | 5,593 |
| Provision for income taxes (Notes 1 and 7) | 413 | 1,111 | 1,416 |
| Income before minority interest in net loss of subsidiaries | 1,141 | 2,142 | 4,177 |
| Minority interest in net loss of subsidiaries (Note 1) | 17 | 117 | -- |
| Net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Historical net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Interest on subordinated debt, net of income taxes | 216 | 166 | 92 |
| Minority interest in net loss of subsidiaries | (17) | (117) | -- |
| Net income available to common shareholders | $ 1,357 | $ 2,308 | $ 4,269 |
| Net income per share (Note 1) | $ 0.22 | $ 0.38 | $ 0.68 |
| Weighted average shares outstanding | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1994 | 1,123,750 | $ 1,124 | 1,703,257 | $ 363 | $1,577 | $ 64 | $ 3,128 |
| Exercise of stock options | 35,000 | 70 | 60,000 | 75 | -- | -- | 145 |
| Conversion of debt | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment | -- | -- | -- | -- | -- | 95 | 95 |
| Net income | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995 | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment | -- | -- | -- | -- | -- | (33) | (33) |
| Net income | -- | -- | -- | -- | 2,259 | -- | 2,259 |
| BALANCE, JUNE 30, 1996 | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options | -- | -- | 118,125 | 146 | -- | -- | 146 |
| Conversion of debt | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions | -- | -- | 206,610 | 1,566 | -- | -- | 1,566 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Conversion of preferred stock...... | (2,568,750) | (4,014) | 3,853,125 | 4,014 | -- | -- | -- |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 145 | 145 |
| Net income............ | -- | -- | -- | -- | 4,177 | -- | 4,177 |
| BALANCE, JUNE 30, 1997.. | -- | $ -- | 6,156,528 | $7,367 | $9,171 | $271 | $16,809 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | |
| Net income........................................ | $ 1,158 | $ 2,259 | $ 4,177 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Minority interest in net loss of subsidiaries.... | (17) | (117) | |
| Provision for losses on accounts receivable...... | (70) | 404 | 389 |
| Depreciation and amortization................... | 1,551 | 2,014 | 2,302 |
| Stock option compensation....................... | | | 856 |
| Deferred income taxes........................... | 240 | (12) | (900) |
| Gain on sale of property and equipment........... | (11) | (13) | |
| Changes in operating assets and liabilities, net of business acquisition: | | | |
| Accounts receivable........................... | (1,239) | (858) | (1,980) |
| Other receivables............................. | 226 | (194) | (1,530) |
| Inventory..................................... | (2,599) | (4,068) | (4,573) |
| Prepaid expenses.............................. | (139) | (245) | 96 |
| Accounts payable.............................. | 221 | 120 | 1,026 |
| Accrued payroll and related expenses........... | 191 | 707 | (60) |
| Income taxes payable.......................... | (217) | 652 | 1,005 |
| Advances from customers....................... | 9 | 183 | 1,448 |
| Other accrued expenses and current liabilities................................ | (87) | (827) | 1,101 |
| Net cash provided by (used in) operating activities................................ | (783) | 5 | 3,357 |
| Cash flows from investing activities: | | | |
| Proceeds from sale of property and equipment...... | 142 | 120 | |
| Additions to property and equipment............... | (1,396) | (1,612) | (2,182) |
| Cash paid for business acquisition, net of cash acquired......................................... | | | (848) |
| Cash paid for minority interest.................. | (160) | | |
| Other assets..................................... | (662) | (688) | 23 |
| Net cash used in investing activities........ | (2,076) | (2,180) | (3,007) |

| | | | |
|---|---|---|---|
| Cash flows from financing activities: | | | |
| Net proceeds from (repayment of) bank lines of credit | 2,668 | 1,502 | 1,014 |
| Payments on senior subordinated debt | (700) | | (350) |
| Payments on junior subordinated debt | (280) | | |
| Payments on long-term debt | (1,095) | (1,250) | (3,983) |
| Proceeds from issuance of long-term debt | 2,806 | 1,097 | 2,647 |
| Proceeds from exercise of stock options and warrants | 145 | 17 | 146 |
| Proceeds from issuance of minority interest | | 21 | |
| Net cash provided by (used in) financing activities | 3,544 | 1,387 | (526) |
| Effect of exchange rate changes on cash | 95 | (36) | 148 |
| Net (decrease) increase in cash | 780 | (824) | (28) |
| Cash, beginning of period | 625 | 1,405 | 581 |
| Cash, end of period | $ 1,405 | $ 581 | $ 553 |
| Supplemental disclosures of cash flow information-- Cash paid during the period for: | | | |
| Interest | $ 1,229 | $ 1,346 | $ 1,197 |
| Income taxes | $ 82 | $ 377 | $ 1,511 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- ---------------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During October and December 1996, the Company acquired the minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock, at an estimated fair value of $6.67 per share. An additional 27,654 shares, at an estimated fair value of $13.50 per share, are issuable at June 30, 1997. The excess of the fair value of the common stock of $1,566 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (916) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In October and December 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares to be issued is based upon the pre-tax income of the subsidiary for the year ended June 30, 1997, and has been determined to be 27,654 shares and have been included in the number of shares issued for minority interest acquisitions in the accompanying 1997 consolidated statement of shareholders' equity.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| <S> | <C> | <C> |

| | | |
|---|---|---|
| Raw materials | $ 7,795 | $11,408 |
| Work-in-process | 3,114 | 4,224 |
| Finished goods | 2,733 | 2,885 |
| Total | $13,642 | $18,517 |

</TABLE>

F-8

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Equipment | $ 6,280 | $ 7,545 |
| Leasehold improvements | 1,601 | 2,093 |
| Tooling | 1,558 | 1,967 |
| Furniture and fixtures | 488 | 666 |
| Computer equipment | 1,283 | 1,699 |
| Vehicles | 93 | 176 |
| Total | 11,303 | 14,146 |
| Less accumulated depreciation and amortization | 6,849 | 8,305 |
| Property and equipment, net | $ 4,454 | $ 5,841 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Software development costs | $ 588 | $ 588 |
| Goodwill | -- | 2,142 |
| Deposits | 262 | 320 |
| Other | 524 | 444 |
| Total | 1,374 | 3,494 |
| Less accumulated amortization | 153 | 385 |
| Intangible and other assets, net | $ 1,221 | $ 3,109 |

</TABLE>

Goodwill in the amount of $1,554,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the year ended June 30, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

<PAGE>

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately $76,000, ($123,000), and $68,000 were included in income for the years ended June 30, 1995, 1996 and 1997, respectively.

Earnings Per Share -- Earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from preferred stock, convertible debt and stock

options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period. Net income and net income per share have been presented to reflect the effect of the conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

In June 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 130, "Reporting for Comprehensive Income" and No. 131, "Disclosure about Segments of an Enterprise and Related Information." These statements are effective for financial statements issued for periods beginning after December 15, 1997. The Company has not yet analyzed the impact of adopting these statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at June 30, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and 1997, the Company earned a technical fee from the joint venture in the amount of $200,000 and $115,000, respectively. At June 30, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 682 of 2711

Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The cash purchase price amounted to $916,000. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1994, pro forma consolidated sales for the years ended June 30, 1995, 1996 and 1997 would have been $53,338,000, $65,371,000, and $79,871,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1996 and 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| <S> | <C> | <C> |
| Line of credit -- U.S. | $6,361 | $6,577 |
| Line of credit -- Singapore | 1,422 | 974 |
| Line of credit -- Norway | | 586 |
| Line of credit -- Rapiscan U.K. | | 963 |
| Total bank lines of credit | $7,783 | $9,100 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. At June 30, 1997 approximately $5,077,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At June 30, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 683 of 2711

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. At June 30, 1997 $1,500,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $4,000,000. At June 30, 1997 approximately $1,917,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank, which provides for revolving line of credit borrowings up to 2,600,000 Singapore dollars (approximately $1,800,000 at June 30, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $682,000 at June 30, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at June 30, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,081,000 at June 30, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,248,000 at June 30, 1997) and a 500,000 pound sterling (approximately $832,000 at June 30, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at June 30, 1997) plus 2%. The overdraft facility expires in December 1997. At June 30, 1997 no amounts were outstanding under the overdraft facility. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly and the line expires in November 1997. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $452,000 was outstanding under performance bonds at June 30, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $990,000 at June 30, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at June 30, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 684 of 2711

debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the year ended June 30, 1997, all of the debt outstanding under the various agreements was repaid or converted in accordance with the conversion terms as summarized in the following table:

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (In thousands) | |
| <S> | <C> | <C> |
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | -- |
| Total senior subordinated debt | 3,075 | -- |
| Less current portion | 2,500 | -- |
| Total long-term portion | $ 575 | $-- |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

6. LONG-TERM DEBT

At June 30, 1996 and 1997, long-term debt consisted of the following:

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (In thousands) | |
| <S> | <C> | <C> |
| Term loan payable to a bank, interest due monthly at the bank's | | |

| | | |
|---|---|---|
| prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in January 1997 | $1,667 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001. Outstanding balances are collateralized by substantially all of the assets of the Company | -- | $2,344 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,129 until paid in full on June 1, 2001. Outstanding balances are collateralized by certain assets of the subsidiary | -- | 437 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 141 | 41 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.35% at June 30, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,000 | 700 |
| Other | 535 | 558 |
| | 4,604 | 4,080 |
| Less current portion of long-term debt | 1,491 | 1,240 |
| Long-term portion of debt | $3,113 | $2,840 |

</TABLE>

Fiscal year principal payments of long-term debt as of June 30, 1997 are as follows (in thousands):

<TABLE>

| <S> | <C> |
|---|---|
| 1998 | $1,240 |
| 1999 | 1,333 |
| 2000 | 896 |
| 2001 | 592 |
| 2002 | 19 |
| Total | $4,080 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

<TABLE>

<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1995 <C> | 1996 <C> | 1997 <C> |
|---|---|---|---|
| Pretax income: | | | |
| United States | $1,277 | $1,965 | $2,655 |
| Foreign | 277 | 1,288 | 2,938 |
| Total pretax income | $1,554 | $3,253 | $5,593 |

</TABLE>

The Company's provision for income taxes is comprised of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1995 <C> | 1996 <C> | 1997 <C> |
|---|---|---|---|
| Current: | | | |
| Federal | $ 43 | $ 510 | $1,256 |
| State | 3 | 21 | 24 |
| Foreign | 127 | 592 | 1,036 |
| | 173 | 1,123 | 2,316 |
| Deferred | 240 | (12) | (900) |
| Total provision | $413 | $1,111 | $1,416 |

</TABLE>

Deferred income tax assets (liabilities) at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | 1997 <C> |
|---|---|---|
| Expenses not currently deductible | $ 873 | $1,455 |
| State income taxes | -- | -- |
| Other | -- | 301 |
| Total deferred income tax assets | 873 | 1,756 |
| Depreciation | (145) | (43) |
| Capitalized software development costs | (214) | (219) |
| State income taxes | (173) | (329) |
| Revitalization zone deductions | (278) | (392) |
| Other | (190) | -- |
| Total deferred income tax liabilities | (1,000) | (983) |
| Net deferred income taxes | $ (127) | $ 773 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1995 <C> | 1996 <C> | 1997 <C> |
|---|---|---|---|
| Provision for income taxes at federal statutory rate... | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit... | (2.6) | 0.2 | (4.7) |
| Nontaxable earnings of FSC........................... | (7.1) | (5.7) | (4.9) |
| Research and development tax credits.................. | (2.8) | -- | (1.7) |
| Foreign income subject to tax at other than federal statutory rate....................................... | 0.7 | 1.1 | (1.0) |
| Other................................................ | 3.4 | 3.6 | 2.6 |
| Effective income tax rate............................ | 26.6 % | 34.2 % | 25.3 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At June 30, 1997 undistributed earnings of the foreign subsidiaries amounted to approximately $3,656,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of June 30, 1997 are as follows: $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $959,000, $901,000 and $921,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the

Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect on the Company's consolidated financial statements.

F-16

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the year ended June 30, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

F-17

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1995, 1996 and 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 689 of 2711

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Outstanding, July 1, 1994.................... | 307,875 | $1.43 | $ 440,000 |
| Granted...................................... | 69,000 | 2.00 | 138,000 |
| Exercised.................................... | (60,000) | 1.25 | (75,000) |
| Canceled..................................... | (19,500) | 1.77 | (34,000) |
| Outstanding, June 30, 1995................... | 297,375 | 1.57 | 469,000 |
| Granted...................................... | 51,000 | 2.17 | 111,000 |
| Exercised.................................... | (16,125) | 1.06 | (17,000) |
| Canceled..................................... | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996................... | 318,750 | 1.70 | 541,000 |
| Granted...................................... | 669,611 | 8.88 | 5,947,000 |
| Exercised.................................... | (118,125) | 1.24 | (146,000) |
| Canceled..................................... | (9,750) | 2.38 | (23,000) |
| Outstanding, June 30, 1997................... | 860,486 | $7.34 | $6,319,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of June 30, 1997:

<TABLE>
<CAPTION>

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING AT JUNE 30, 1997 | WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | EXERCISABLE AT JUNE 30, 1997 | WEIGHTED AVERAGE EXERCISE PRICE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| $0.17 to $0.67.......... | 13,500 | 1.0 years | $0.64 | 13,500 | $0.64 |
| 1.87 to 2.00.......... | 134,625 | 2.0 | 1.95 | 102,563 | 1.93 |
| 2.33 to 3.33.......... | 277,875 | 4.1 | 2.89 | 269,250 | 2.90 |
| 11.50 to 13.50......... | 434,486 | 5.0 | 12.08 | -- | -- |
| $0.17 to $13.50......... | 860,486 | 4.2 | $7.34 | 385,313 | $2.56 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and 1997 pursuant to SFAS 123 was approximately $19,000 and $1,054,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $4,058,000, and pro forma net income per share would have been $0.36 and $0.64 for 1996 and 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.33% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the common stock.

In June 1997, in order to simplify the capital structure of the Company, holders of the preferred stock converted each preferred share into 1.5 shares (post-split) of common stock.

In June 1997, the Company amended its articles of incorporation, which articles authorize 10,000,000 shares of new preferred stock. Such preferred stock has no par value, and no preferred shares are issued and outstanding at June 30, 1997.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11.  RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1995, 1996 and 1997 are approximately $77,000, $83,000, and $111,000 for messenger service and auto rental; $78,000, $63,000, and $82,000 for printing services; and $23,000, $7,000, and $11,000 for professional services, respectively. During the year ended June 30, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $315,000, $263,000, and $146,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

12.  GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and charged to operations in the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At June 30, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

13.  EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the years ended June 30, 1997, 1996 and 1995. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient to provide for benefits accruing

after that date. Pension expense for the years ended June 30, 1995, 1996 and 1997 was approximately $111,000, $91,000, and $89,000, respectively.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| YEAR ENDED JUNE 30, 1995 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues..................... | $33,158 | $11,341 | $ 5,316 | | $49,815 |
| Transfer between geographical areas...................... | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues................ | $34,856 | $12,129 | $ 9,147 | $ (6,317) | $49,815 |
| Operating income............ | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets.......... | $36,751 | $10,832 | $ 4,839 | $(21,642) | $30,780 |

<CAPTION>

| YEAR ENDED JUNE 30, 1996 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues..................... | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas...................... | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues................ | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income............ | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets.......... | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

<CAPTION>

| YEAR ENDED JUNE 30, 1997 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues..................... | $54,310 | $18,915 | $ 4,403 | | $77,628 |
| Transfer between geographical areas...................... | 8,655 | 5,156 | 12,191 | $(26,002) | -- |
| Net revenues................ | $62,965 | $24,071 | $16,594 | $(26,002) | $77,628 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 692 of 2711

| | | | | | |
|---|---|---|---|---|---|
| Operating income............ | $ 3,814 | $ 1,849 | $ 1,390 | $ (263) | $ 6,790 |
| | ======= | ======= | ======= | ======== | ======= |
| Identifiable assets.......... | $52,367 | $15,066 | $ 8,395 | $(28,495) | $47,333 |
| | ======= | ======= | ======= | ======== | ======= |

</TABLE>

F-20

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

<S> <C>

| | |
|---|---|
| Securities and Exchange Commission registration fee | $ 18,052 |
| NASD filing fee | 6,457 |
| Nasdaq National Market System listing fee | 42,000 |
| Printing and engraving expenses | 100,000 |
| Transfer agent and registrar fees | 2,000 |
| Legal fees and expenses | 175,000 |
| Accounting fees and expenses | 150,000 |
| "Blue sky" fees and expenses | 15,000 |
| Other expenses | 151,491 |
| Total | $660,000* |

</TABLE>

- ---------------------

* The Selling Shareholders participating in the Offering of the 370,000 shares to be sold by such Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000. The Selling Shareholders who are selling in the case that the underwriters over-allotment option is exercised will not pay any of the above expenses.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee, or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company has entered into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers. Each such Indemnity Agreement provides that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him

in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnity Agreement permits the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful.

<PAGE>

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

In September 1997, Deepak Chopra, Ajay Mehra, Anuj Wadhawan and Dennis Noble exercised options to purchase a total of 77,250 shares of Common Stock for a total purchase price of $252,625. The options had been granted pursuant to the Company's 1987 Plan. Each of Messrs. Chopra, Mehra, Wadhawan and Noble is an officer and/or employee of the Company.

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of

Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

<PAGE>

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share. As part of the same arrangement, the Company issued 27,654 additional shares of its Common Stock to such officers and key employees in August 1997. The number of shares of Common Stock issued was based on the combined net income before taxes of Rapiscan U.S.A. and Rapiscan UK for the fiscal year ended June 30, 1997.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Amended Form of Underwriting Agreement. |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.(4) |
| 5.1 | Opinion of Troy & Gould Professional Corporation.(4) |

| | |
|---|---|
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.(4) |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company.(4) |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |

</TABLE>

II-4

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| ------- | ------------------- |
| <C> | <S> |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).(4) |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1). |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule. |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2) |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy.(2) |

</TABLE>

- ---------------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(4) Previously filed with the Company's Amendment No. 2 to the Registration Statement filed August 15, 1997.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act

<PAGE>

and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be

deemed to be the initial bona fide offering thereof.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 699 of 2711

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on September 30, 1997.

OSI SYSTEMS, INC.

By: /s/ AJAY MEHRA

Ajay Mehra
Vice President, Chief Financial Officer,
Secretary and Director

Pursuant to the requirements of the Securities Act of 1933, this Amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| SIGNATURE | TITLE | DATE |
|---|---|---|
| * Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | September 30, 1997 |
| /s/ AJAY MEHRA Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | September 30, 1997 |
| * Steven C. Good | Director | September 30, 1997 |
| * Meyer Luskin | Director | September 30, 1997 |
| * Madan G. Syal | Director | September 30, 1997 |

*By: /s/ AJAY MEHRA
- ------------------------------------ September 30, 1997
Ajay Mehra
as Attorney-In-Fact

</TABLE>

II-7

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994 | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, 1995 | $203 | (70) | -- | 80 | $ 53 |
| Year Ended June 30, 1996 | $ 53 | $404 | -- | 181 | $276 |
| Year Ended June 30, 1997 | $276 | $389 | -- | 79 | $586 |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Amended Form of Underwriting Agreement. |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.(4) |
| 5.1 | Opinion of Troy & Gould Professional Corporation.(4) |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.(4) |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |

10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1)
10.10 Form of Indemnity Agreement for directors and executive officers of the Company.(4)
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2)
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1)
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).(4)
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1)
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1)
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1)
10.17 License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1)
10.18 Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1)
11.1 Statement regarding computation of earnings per share.(3)
21.1 Subsidiaries of the Company.(1)
23.1 Consent of Deloitte & Touche LLP.
23.2 Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).
24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2)
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.(2)
</TABLE>
- ---------------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(4) Previously filed with the Company's Amendment No. 2 to the Registration Statement filed August 15, 1997.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-1.1
<SEQUENCE>2
<DESCRIPTION>FORM OF UNDERWRITING AGREEMENT
<TEXT>

<PAGE>

3,700,000 Shares/1/

OSI SYSTEMS, INC.

Common Stock

UNDERWRITING AGREEMENT

________, 1997

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC
As Representatives of the several Underwriters
c/o Robertson, Stephens & Company LLC
555 California Street
Suite 2600
San Francisco, California 94104

Ladies and Gentlemen:

OSI SYSTEMS, INC., a California corporation (the "Company"), and certain shareholders of the Company named in Schedules B and C hereto (hereafter called the "Selling Shareholders") address you as the Representatives of each of the persons, firms and corporations listed in Schedule A hereto (herein collectively called the "Underwriters") and hereby confirm their respective agreements with the several Underwriters as follows:

1. Description of Shares. The Company proposes to issue and sell 3,330,000 shares of its authorized and unissued common stock, no par value, to the Underwriters. The Selling Shareholders, acting severally and not jointly, propose to sell an aggregate of 370,000 shares of the Company's issued and outstanding common stock, no par value, to the several Underwriters. The 3,330,000 shares of common stock, no par value, of the Company to be sold by the Company are hereinafter called the "Company Shares" and the 370,000 shares of common stock, no par value, to be sold by the Selling Shareholders are hereinafter called the "Selling Shareholder Shares." The

- --------------------
/1/ Plus an option to purchase up to 555,000 additional shares from certain shareholders of the Company to cover over-allotments.

<PAGE>

Company Shares and the Selling Shareholder Shares are hereinafter collectively referred to as the "Firm Shares." Certain Selling Shareholders also propose to grant, severally and not jointly, to the Underwriters, an option to purchase up to 555,000 additional shares of the Company's common stock, no par value (the "Option Shares"), as provided in Section 8 hereof. As used in this Agreement, the term "Shares" shall include the Firm Shares and the Option Shares. All shares of the Company's common stock, no par value, outstanding after giving effect to the sales contemplated hereby, including the Shares, are hereinafter referred to as "Common Stock."

2. Representations, Warranties and Agreements of the Company. The Company represents and warrants to and agrees with each Underwriter and each Selling Shareholder that:

(a) A registration statement on Form S-1 (File No. 333-29179) with respect to the offer and sale of the Shares, including a prospectus subject to completion, has been prepared by the Company in conformity with the requirements prescribed by the Securities Act of 1933, as amended (the "Act"), and the applicable rules and regulations (the "Rules and Regulations") prescribed by the Securities and Exchange Commission (the "Commission") pursuant to the Act and has been filed with the Commission; such amendments to such registration

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 703 of 2711

statement, such amended prospectuses subject to completion and such abbreviated registration statements pursuant to Rule 462(b) of the Rules and Regulations as may have been required prior to the date hereof have been similarly prepared and filed with the Commission; and the Company will file such additional amendments to such registration statement, such amended prospectuses subject to completion and such abbreviated registration statements as may hereafter be required. Copies of such registration statement and amendments, of each related prospectus subject to completion (the "Preliminary Prospectuses") and of any abbreviated registration statement filed pursuant to Rule 462(b) of the Rules and Regulations have been delivered to you.

If the registration statement relating to the Shares has been declared effective under the Act by the Commission, the Company will prepare and promptly file with the Commission the information omitted from the registration statement in reliance upon Rule 430A(a) or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations pursuant to subparagraph (1), (4) or (7) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to the registration statement (including a final form of prospectus). If the registration statement relating to the Shares has not been declared effective under the Act by the Commission, the Company will prepare and promptly file an amendment to the registration statement, including a final form of prospectus, or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations. The term "Registration Statement" as used in this Agreement shall mean such registration statement, including financial statements, schedules and exhibits, in the form in which it was or is, as the case may be, declared effective (including, if the Company omitted information from the registration statement in reliance upon Rule 430A(a) or files a term sheet pursuant to Rule 434 of the Rules and Regulations, the information deemed to be a part of the registration statement at the time it was declared effective pursuant to Rule 430A(b) or Rule 434(d) of the Rules and Regulations) and, in the event of any amendment thereto or the filing of any abbreviated registration statement pursuant to Rule 462(b)

-2-

<PAGE>

of the Rules and Regulations after the effective date of such registration statement, shall also mean (from and after the effectiveness of such amendment or the filing of such abbreviated registration statement) such registration statement as so amended, together with any such abbreviated registration statement. The term "Prospectus" as used in this Agreement shall mean the prospectus relating to the Shares as included in the Registration Statement at the time it is declared effective (including, if the Company omitted information from the Registration Statement in reliance upon Rule 430A(a) of the Rules and Regulations, the information deemed to be a part of the Registration Statement pursuant to Rule 430A(b) of the Rules and Regulations as of the time it was declared effective; *provided, however*, that if in reliance on Rule 434 of the Rules and Regulations and with the written consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the term "Prospectus" shall mean the "prospectus subject to completion" (as defined in Rule 434(g) of the Rules and Regulations) last provided to the Underwriters by the Company and circulated by the Underwriters to all prospective purchasers of the Shares (including the information deemed to be a part of the Registration Statement pursuant to Rule 434(d) of the Rules and Regulations) at the time the Registration Statement was declared effective. Notwithstanding the foregoing, if any revised prospectus shall be provided to the Underwriters by the Company for use in connection with the offering of the Shares that differs from the prospectus referred to in the immediately preceding

sentence (whether or not such revised prospectus is required to be filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations), the term "Prospectus" shall refer to such revised prospectus from and after the time it is first provided to the Underwriters for such use. If in reliance on Rule 434 of the Rules and Regulations and with the consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the Prospectus and the term sheet, together, will not be materially different from the prospectus in the Registration Statement.

(b) The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus or instituted proceedings for that purpose, and the Preliminary Prospectus last provided to the Underwriters by the Company and circulated by the Underwriters to certain prospective purchasers of the Shares has conformed in all material respects to the requirements of the Act and the Rules and Regulations and, as of its date, has not included any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and at the time the Registration Statement was or is, as the case may be, declared effective and at all times subsequent thereto up to and on the Closing Date (hereinafter defined) and on any later date on which Option Shares are to be purchased, (i) the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained and will contain all material information required to be included therein by the Act and the Rules and Regulations and will in all material respects conform to the requirements of the Act and the Rules and Regulations, (ii) the Registration Statement, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein not misleading, and (iii) the Prospectus, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under

-3-

<PAGE>

which they were made, not misleading; provided, however, that none of the representations and warranties contained in this subparagraph (b) shall apply to information contained in or omitted from the Registration Statement or Prospectus, or any amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter, furnished to the Company by such Underwriter specifically for use in the preparation thereof.

(c) Each of the Company and its subsidiaries has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation with full power and authority (corporate and other) to own, lease and operate its properties and conduct its business as described in the Prospectus; the Company owns all of the outstanding capital stock of its subsidiaries free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; each of the Company and its subsidiaries is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its business requires such qualification; no proceeding has been instituted in any such jurisdiction, revoking, limiting or curtailing, or seeking to revoke, limit or curtail, such power and authority or qualification; each of the Company and its subsidiaries is in possession of and operating in compliance with all authorizations, licenses, certificates, consents, orders and permits from state, federal and other regulatory authorities which are material to the conduct of the Company and its subsidiaries business, all of which are valid and in full force and effect as of the date hereof; neither the Company nor any of its subsidiaries is in violation of its respective incorporating charter or bylaws or in default in the

performance or observance of any material obligation, agreement, covenant or condition contained in any material bond, debenture, note or other evidence of indebtedness, or in any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound; and neither the Company nor any of its subsidiaries is in violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties of which it has knowledge and which would have a material adverse effect on the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise (a "Material Adverse Effect"). The Company does not own or control, directly or indirectly, any corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., a California corporation, Rapiscan Security Products Limited, a private company formed under the laws of the United Kingdom and registered in England, Ferson Optics, Inc., a California corporation, UDT Sensors, Inc., a California corporation, Advanced Micro Electronics AS ("AME"), a company incorporated under Norwegian law, Opto Sensors (Singapore) Pte Ltd, a private company limited by shares and incorporated in the Republic of Singapore, Opto Sensors (Malaysia) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia, OSI Electronics, a California corporation, and Rapiscan Consortium (M) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia (collectively, the "Material Subsidiaries"). In addition the Company owns a minority interest in ECIL Rapiscan Ltd., a limited liability joint stock corporation organized under the laws of India,

(d) The Company has full legal right, power and authority to enter into this Agreement and to perform the transactions contemplated hereby. This Agreement has been duly

<PAGE>

authorized, executed and delivered by the Company and is a valid and binding agreement on the part of the Company, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except to the extent that the enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a material breach or violation of any of the terms and provisions of, or constitute a default under, (i) any bond, debenture, note or other evidence of indebtedness, or under any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound, (ii) the charter or bylaws of the Company or any of its subsidiaries, or (iii) any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties. No consent, approval, authorization or order of or qualification with any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties is required for the execution and delivery of this Agreement and the consummation by the Company or any of its subsidiaries of the transactions herein contemplated, except such as may be required under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") (if applicable), or under state or other securities or Blue Sky laws, all of which requirements have been satisfied in all material respects.

(e) Except as disclosed in the Registration Statement, there is not any pending or, to the best of the Company's knowledge, threatened action,

suit, claim or proceeding against the Company, any of its subsidiaries or any of their respective officers (i.e., relating to or in connection with their duties as officers of the Company and any of its subsidiaries) or any of their respective properties, assets or rights before any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective officers or properties or otherwise which (i) may result in any material adverse change in the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise (a "Material Adverse Change") or may materially and adversely affect their properties, assets or rights, (ii) may prevent consummation of the transactions contemplated hereby or (iii) is required to be disclosed in the Registration Statement or Prospectus and is not so disclosed; and there are no agreements, contracts, leases or documents of the Company or any of its subsidiaries of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement by the Act or the Rules and Regulations which have not been accurately described in all material respects in the Registration Statement or Prospectus or filed as exhibits to the Registration Statement.

(f) All outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly authorized and validly issued and are fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and the authorized and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization" and conforms in all material respects to the statements relating thereto contained in the Registration Statement and the Prospectus (and such statements

-5-

<PAGE>

correctly state the substance of the instruments defining the capitalization of the Company); the Company Shares have been duly authorized for issuance and sale to the Underwriters pursuant to this Agreement and, when issued and delivered by the Company against payment therefor in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and nonassessable, and will be sold free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; and no preemptive right, co-sale right, registration right, right of first refusal or other similar right of shareholders exists with respect to any of the Company Shares or the sale thereof or the issuance of the Company Shares other than those that have been expressly waived prior to the date hereof and those that will automatically expire on the Closing Date; the Selling Shareholder Shares have been duly authorized for sale to the Underwriters pursuant to this Agreement and, when delivered by the Selling Shareholders against payment therefor in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and nonassessable, and will be sold free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; and no preemptive right, co-sale right, registration right, right of first refusal or other similar right of shareholders exists with respect to any of the Shareholder Shares or the sale thereof other than those that have been expressly waived prior to the date hereof and those that will automatically expire upon and will not apply to the consummation of the transactions contemplated on the Closing Date. No further approval or authorization of any shareholder, the Board of Directors of the Company or others is required for the issuance and sale or transfer of the Shares except as may be required under the Act, the Exchange Act or under state or other securities or Blue Sky laws. All issued and outstanding shares of capital stock of each subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and were not issued in violation of or subject to any preemptive right, or other rights to subscribe for or purchase shares and are owned by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest. Except as disclosed in the Prospectus and the financial statements of the

Company, and the related notes thereto, included in the Prospectus, neither the Company nor any subsidiary has outstanding any options to purchase, or any preemptive rights or other rights to subscribe for or to purchase, any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of its capital stock or any such options, rights, convertible securities or obligations. The description in the Prospectus of the Company's stock option, stock bonus and other stock plans or arrangements, and the options or other rights granted and exercised thereunder, accurately and fairly presents the information required to be shown with respect to such plans, arrangements, options and rights.

(g) Deloitte & Touche LLP, which has examined the consolidated financial statements of the Company, together with the related schedules and notes, for the fiscal year ended June 30, 1997 and for each of the years in the two (2) fiscal years ended June 30, 1996 filed with the Commission as a part of the Registration Statement, which are included in the Prospectus, are independent accountants within the meaning of the Act and the Rules and Regulations; the audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, forming part of the Registration Statement and Prospectus, fairly present the financial position and the results of operations of the Company and its subsidiaries at the respective dates and for the respective periods to which they apply; and all audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, filed with the Commission as part of the Registration Statement, have been prepared in accordance with generally

<PAGE>

accepted accounting principles consistently applied throughout the periods involved except as may be otherwise stated therein. The selected and summary financial and statistical data included in the Registration Statement present fairly the information shown therein and have been compiled on a basis consistent with the audited financial statements presented therein. No other financial statements or schedules are required to be included in the Registration Statement.

(h) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (i) any Material Adverse Change, (ii) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (iii) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (iv) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (v) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (vi) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a Material Adverse Effect.

(i) Except as set forth in the Registration Statement and Prospectus, (i) each of the Company and its subsidiaries has good and marketable title to all properties and assets described in the Registration Statement and Prospectus as owned by it, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest, other than such as would not have a Material Adverse Effect, (ii) the agreements to which the Company or any of its subsidiaries is a party described in the Registration Statement and Prospectus are valid agreements, enforceable by the Company and its subsidiaries (as applicable), except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws

relating to or affecting creditors' rights generally or by general equitable principles and, to the best of the Company's knowledge, the other contracting party or parties thereto are not in material breach or material default under any of such agreements, and (iii) the Company and each of its subsidiaries has valid and enforceable leases for all properties described in the Registration Statement and Prospectus as leased by it, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles. Except as set forth in the Registration Statement, the Company owns or leases all such properties as are necessary to its operations.

(j) The Company and its subsidiaries have timely filed all necessary federal, state and foreign income and franchise tax returns and have paid all taxes shown thereon as due, other than those contested in good faith or for which adequate reserves have been provided or those currently payable with out penalty or interest, and there is no tax deficiency that has been or, to the best of the Company's knowledge, might be asserted against the Company or any of its subsidiaries that would have a Material Adverse Effect; and all tax liabilities are adequately provided for on the books of the Company and its subsidiaries.

(k) The Company and its subsidiaries maintain insurance with insurers of recognized financial responsibility of the types and in the amounts generally deemed adequate for

<PAGE>

their respective businesses and consistent with insurance coverage maintained by similar companies in similar businesses, including, but not limited to, insurance covering real and personal property owned or leased by the Company or its subsidiaries, against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, all of which insurance is in full force and effect; neither the Company nor any such subsidiary has been refused any insurance coverage sought or applied for; and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(l) To the best of Company's knowledge, no labor disturbance by the employees of the Company or any of its subsidiaries exists or is imminent that would result in a Material Adverse Change. Except for with respect to the employees of AME, no collective bargaining agreement exists with any of the Company's or its subsidiaries' employees and, to the best of the Company's knowledge, no such agreement is imminent.

(m) Each of the Company and its subsidiaries owns or possesses adequate rights to use all patents, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names and copyrights which are necessary to conduct its businesses as described in the Registration Statement and Prospectus; the expiration of any patents, patent rights, trade secrets, trademarks, service marks, trade names or copyrights would not have a Material Adverse Effect; except as set forth in the Prospectus, the Company has not received any notice of, and has no knowledge of, any infringement of or conflict with asserted rights of the Company by others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights; and the Company has not received any notice of, and has no knowledge of, any infringement of or conflict with asserted rights of others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect.

(n) The Common Stock has been approved for quotation on The Nasdaq National Market, subject to official notice of issuance.

(o) The Company has been advised as to the provisions of the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations thereunder, and has in the past conducted, and intends in the future to conduct, its affairs in such a manner as to ensure that it will not become an "investment company" or a company "controlled" by an "investment company" within the meaning of the 1940 Act and such rules and regulations.

(p) The Company has not distributed and will not distribute prior to the later of (i) the Closing Date, or any date on which Option Shares are to be purchased, as the case may be, and (ii) completion of the distribution of the Shares, any offering material in connection with the offering and sale of the Shares other than any Preliminary Prospectuses, the Prospectus, the Registration Statement and other materials, if any, permitted by the Act.

-8-

<PAGE>

(q) Neither the Company nor any of its subsidiaries has at any time during the last five (5) years (i) made any unlawful contribution to any candidate for foreign office or failed to disclose fully any contribution in violation of law, or (ii) made any payment to any federal or state governmental officer or official, or other person charged with similar public or quasi-public duties, other than payments required or permitted by the laws of the United States or any jurisdiction thereof.

(r) The Company has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

(s) Each officer and director of the Company, each Selling Shareholder and each beneficial owner of more than 7,500 shares of Common Stock, has agreed in writing that such person will not, for a period of 180 days from the date that the Registration Statement is declared effective by the Commission (the "Lock-up Period"), offer to sell, contract to sell, or otherwise sell, dispose of, loan, pledge or grant any rights with respect to (collectively, a "Disposition") any shares of Common Stock, any options or warrants to purchase any shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock (collectively, "Securities") now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction has been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than such holder. Such prohibited hedging or other transactions would include, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person has also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction. The Company has provided to counsel for the Underwriters a complete and accurate list of all securityholders of the Company and the number and type of securities held by each securityholder. The Company has provided to counsel for the Underwriters true, accurate and complete copies of all of the agreements pursuant to which its officers, directors and

shareholders have agreed to such or similar restrictions (the "Lock-up Agreements") presently in effect or effected hereby. The Company hereby represents and warrants that it will not release any of its officers, directors or other shareholders from any Lock-up Agreements currently existing or hereafter effected without the prior written consent of Robertson, Stephens & Company LLC.

(t) Except as set forth in the Registration Statement and Prospectus, (i) the Company is in material compliance with all rules, laws and regulations relating to the use, treatment, storage and disposal of toxic substances and protection of health or the environment

-9-

<PAGE>

("Environmental Laws") which are applicable to its business, (ii) the Company has received no notice from any governmental authority or third party of an asserted claim under Environmental Laws, which claim is required to be disclosed in the Registration Statement and the Prospectus, (iii) the Company is not aware of any requirement that will require it to make future material capital expenditures to comply with Environmental Laws and (iv) no property which is owned, leased or occupied by the Company has been designated as a Superfund site pursuant to the Comprehensive Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. (S) 9601, et seq.), or otherwise designated as a contaminated site under applicable state or local law.

(u) The Company and each of its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(v) There are no outstanding loans, advances (except normal advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company to or for the benefit of any of the officers or directors of the Company or any of the members of the families of any of them, except as required to be, and as, disclosed in the Registration Statement and the Prospectus.

(w) The Company has complied with all provisions of Section 517.075, Florida Statutes relating to doing business with the Government of Cuba or with any person or affiliate located in Cuba.

3. Representations and Warranties of the Selling Shareholders. Each Selling Shareholder, severally and not jointly, represents and warrants to and agrees with each Underwriter and the Company that:

(a) Such Selling Shareholder now has and on the Closing Date, and on any later date on which Option Shares are purchased, will have, valid marketable title to the Shares to be sold by such Selling Shareholder, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than pursuant to this Agreement; and upon delivery of such Shares hereunder and payment of the purchase price as herein contemplated, each of the Underwriters will obtain valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest pertaining to such Selling Shareholder or such Selling Shareholder's property, encumbrance, claim or equitable interest, including any liability for estate or inheritance taxes, or any liability to or claims of any creditor, devisee, legatee or beneficiary of such Selling Shareholder.

(b) Such Selling Shareholder has duly authorized (if applicable) executed and delivered, in form heretofore furnished to the Representatives, an Irrevocable Custody Agreement and Power of Attorney (the "Power of Attorney and Custody Agreement") appointing

<PAGE>

Deepak Chopra as attorney-in-fact (the "Attorney") with Deepak Chopra as custodian (the "Custodian"); each Power of Attorney and Custody Agreement constitutes a valid and binding agreement on the part of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and each of such Selling Shareholders' Attorney, acting alone, is authorized to execute and deliver this Agreement and the certificate referred to in Section 7(h) hereof on behalf of such Selling Shareholder, to determine the purchase price to be paid by the several Underwriters to such Selling Shareholder as provided in Section 4 hereof, to authorize the delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement and to duly endorse (in blank or otherwise) the certificate or certificates representing such Shares or a stock power or powers with respect thereto, to accept payment therefor, and otherwise to act on behalf of such Selling Shareholder in connection with this Agreement.

(c) All consents, approvals, authorizations and orders required for the execution and delivery by such Selling Shareholder of the Power of Attorney and Custody Agreement, the execution and delivery by or on behalf of such Selling Shareholder of this Agreement and the sale and delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement (other than, at the time of the execution hereof (if the Registration Statement has not yet been declared effective by the Commission), the issuance of the order of the Commission declaring the Registration Statement effective and such consents, approvals, authorizations or orders as may be necessary under state or other securities or Blue Sky laws) have been obtained and are in full force and effect; such Selling Shareholder, if other than a natural person, has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be; and such Selling Shareholder has full legal right, power and authority to enter into and perform its obligations under this Agreement and such Power of Attorney and Custody Agreement, and to sell, assign, transfer and deliver the Shares to be sold by such Selling Shareholder under this Agreement.

(d) Such Selling Shareholder will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such Selling Shareholder or with respect to which such Selling Shareholder has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such Selling Shareholder, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction is expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the Selling Shareholder. Such prohibited hedging or other transactions would include, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or

derives any significant part of its value from Securities. Such Selling Shareholder also agrees and consents to the entry of stop transfer instructions with the Company's

<PAGE>

transfer agent against the transfer of the securities held by such Selling Shareholder except in compliance with this restriction.

(e) Certificates in negotiable form for all Shares to be sold by such Selling Shareholder under this Agreement, together with a stock power or powers duly endorsed in blank by such Selling Shareholder, have been placed in custody with the Custodian for the purpose of effecting delivery hereunder.

(f) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of such Selling Shareholder and is a valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a breach or violation of any of the terms and provisions of or constitute a default under any bond, debenture, note or other evidence of indebtedness, or under any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other material agreement or instrument to which such Selling Shareholder is a party or by which such Selling Shareholder, or any Selling Shareholder Shares or any Option Shares to be sold by such Selling Shareholder hereunder, may be bound or, to the best of such Selling shareholders' knowledge, result in any violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over such Selling Shareholder or over the properties of such Selling Shareholder, or, if such Selling Shareholder is other than a natural person, result in any violation of any provisions of the charter, bylaws or other organizational documents of such Selling Shareholder.

(g) Such Selling Shareholder has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

(h) Such Selling Shareholder has not distributed and will not distribute any prospectus or other offering material in connection with the offering and sale of the Shares.

(i) All information furnished by or on behalf of such Selling Shareholder relating to such Selling Shareholder and the Selling Shareholder Shares that is contained in the representations and warranties of such Selling Shareholder in such Selling Shareholder's Power of Attorney and Custody Agreement or set forth in the Registration Statement or the Prospectus is, and at the time the Registration Statement became or becomes, as the case may be, effective, and at all times subsequent thereto through the Closing Date, and on any later date on which Option Shares are to be purchased, was or will be, true, correct and complete, and does not, and at the time the Registration Statement became or becomes, as the case may be, effective and at all times subsequent thereto through the Closing Date (hereinafter defined), and on any later date on which Option Shares

<PAGE>

are to be purchased, will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make such information not misleading.

(j) Such Selling Shareholder will review the Prospectus and will comply with all agreements and satisfy all conditions on its part to be complied with or satisfied pursuant to this Agreement on or prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, and will advise its Attorney and Robertson, Stephens & Company LLC prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, if any statement to be made on behalf of such Selling Shareholder in the certificate contemplated by Section 7(h) would be inaccurate if made as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be.

(k) Such Selling Shareholder does not have, or has waived prior to the date hereof, any preemptive right, co-sale right or right of first refusal or other similar right, in order to purchase any of the Shares that are to be sold by the Company or any of the other Selling Shareholders to the Underwriters pursuant to this Agreement; such Selling Shareholder does not have, or has waived prior to the date hereof, any registration right or other similar right, in order to participate in the offering made by the Prospectus, other than such rights of participation as have been satisfied by the participation of such Selling Shareholder in the transactions to which this Agreement relates in accordance with the terms of this Agreement; and such Selling Shareholder does not own any warrants, options or similar rights to acquire, and does not have any right or arrangement to acquire, any capital stock, rights, warrants, options or other securities from the Company, other than those described in the Registration Statement and the Prospectus.

4. Purchase, Sale and Delivery of Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Company and the Selling Shareholders agree, severally and not jointly, to sell to the Underwriters, and each Underwriter agrees, severally and not jointly, to purchase from the Company and the Selling Shareholders, respectively, at a purchase price of $______ per share, the respective number of Company Shares as hereinafter set forth and Selling Shareholder Shares set forth opposite the names of the Selling Shareholders in Schedule B hereto. The obligation of each Underwriter to the Company and to each Selling Shareholder shall be to purchase from the Company and such Selling Shareholder that number of Company Shares or Selling Shareholder Shares, as the case may be, which (as nearly as practicable, as determined by you) is in the same proportion to the number of Company Shares or Selling Shareholder Shares, as the case may be, set forth opposite the name of the Company or such Selling Shareholder in Schedule B hereto as the number of Firm Shares which is set forth opposite the name of such Underwriter in Schedule A hereto (subject to adjustment as provided in Section 11) is to the total number of Firm Shares to be purchased by all the Underwriters under this Agreement.

(b) The certificates in negotiable form for the Selling Shareholder Shares have been placed in custody (for delivery under this Agreement) under the Custody Agreement. Each Selling Shareholder agrees, severally and not jointly, that the certificates for the Selling Shareholder Shares of such Selling Shareholder so held in custody are subject to the interests of the

<PAGE>

Underwriters hereunder, that the arrangements made by such Selling Shareholder

for such Custody, including the Power of Attorney, is to that extent irrevocable and that the obligations of such Selling Shareholder hereunder shall not be terminated by the act of such Selling Shareholder or by operation of law, whether by the death or incapacity of such Selling Shareholder or the occurrence of any other event, except as specifically provided herein or in the Custody Agreement. If any Selling Shareholder should die or be incapacitated, or if any other such event should occur before the delivery of the certificates for the Selling Shareholder Shares hereunder, the Selling Shareholder Shares to be sold by such Selling Shareholder shall, except as specifically provided herein or in the Custody Agreement, be delivered by the Custodian in accordance with the terms and conditions of this Agreement as if such death, incapacity or other event had not occurred, regardless of whether the Custodian shall have received notice of such death or other event.

(c) Delivery of definitive certificates for the Firm Shares to be purchased by the Underwriters pursuant to this Section 4 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Company with regard to the Shares being purchased from the Company, and to the order of the Custodian for the respective accounts of the Selling Shareholders with regard to the Shares being purchased from such Selling Shareholders (and the Company and such Selling Shareholders agree not to deposit and to cause the Custodian not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Company or the Custodian, as the case may be, and, in the event of any breach of the foregoing, the Company or the Selling Shareholders, as the case may be, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach), at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067 (or at such other place as may be agreed upon among the Representatives and the Company and the Attorneys), at 7:00 A.M., San Francisco time (a) on the third (3rd) full business day following the first day that Shares are traded, (b) if this Agreement is executed and delivered after 1:30 P.M., San Francisco time, the fourth (4th) full business day following the day that this Agreement is executed and delivered or (c) at such other time and date not later than seven (7) full business days following the first day that Shares are traded as the Representatives and the Company and the Attorneys may determine (or at such time and date to which payment and delivery shall have been postponed pursuant to Section 11 hereof), such time and date of payment and delivery being herein called the "Closing Date;" provided, however, that if the Company has not made available to the Representatives copies of the Prospectus within the time provided in Section 5(d) hereof, the Representatives may, in their sole discretion, postpone the Closing Date until no later than two (2) full business days following delivery of copies of the Prospectus to the Representatives. The certificates for the Firm Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request, at least one (1) full business day prior to the Closing Date and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to the Closing Date. If the Representatives so elect, delivery of the Firm Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

<PAGE>

(d) It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been received by you prior to the Closing Date for the Firm Shares to be purchased by such Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters

of any of its or their obligations hereunder.

(e) After the Registration Statement is declared effective, the several Underwriters intend to make an initial public offering (as such term is described in Section 12 hereof) of the Firm Shares at an initial public offering price of $_____ per share. After the initial public offering, the several Underwriters may, in their discretion, vary the public offering price.

(f) The information set forth in the last paragraph on the front cover page (insofar as such information relates to the Underwriters), on the inside front cover concerning stabilization and over-allotment by the Underwriters, and under the ____ and ____ paragraphs under the caption "Underwriting" in any Preliminary Prospectus and in the Prospectus constitutes the only information furnished by the Underwriters to the Company for inclusion in any Preliminary Prospectus, the Prospectus or the Registration Statement, and you, on behalf of the respective Underwriters, represent and warrant to the Company and the Selling Shareholders that the statements made therein do not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

5. Further Agreements of the Company. The Company agrees with the several Underwriters that:

(a) The Company will use its best efforts to cause the Registration Statement and any amendment thereof, if not effective at the time and date that this Agreement is executed and delivered by the parties hereto, to become effective as promptly as possible; the Company will use its best efforts to cause any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations as may be required subsequent to the date the Registration Statement is declared effective to become effective as promptly as possible; the Company will notify you, promptly after it shall receive notice thereof, of the time when the Registration Statement, any subsequent amendment to the Registration Statement or any abbreviated registration statement, has become effective or any supplement to the Prospectus has been filed; if the Company omitted information from the Registration Statement at the time it was originally declared effective in reliance upon Rule 430A(a) of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed, within the time period prescribed, with the Commission pursuant to subparagraph (1) or (4) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to such Registration Statement as originally declared effective which is declared effective by the Commission; if the Company files a term sheet pursuant to Rule 434 of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus and term sheet meeting the requirements of Rule 434(b) or (c) of the Rules and Regulations, as applicable, have been filed, within the time period prescribed, with the Commission pursuant to subparagraph (7) of Rule 424(b) of the Rules and Regulations; if for any reason the filing of the final form of Prospectus is required under Rule 424(b)(3) of the Rules

<PAGE>

and Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed with the Commission within the time period prescribed; the Company will notify you promptly of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; promptly upon your request, the Company will prepare and file with the Commission any amendments or supplements to the Registration Statement or Prospectus which, in the opinion of counsel for the several Underwriters ("Underwriters' Counsel"), may be necessary or advisable in connection with the distribution of the Shares by the Underwriters; the Company will promptly prepare and file with the Commission,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 716 of 2711

and promptly notify you of the filing of, any amendments or supplements to the Registration Statement or Prospectus which may be necessary to correct any statements or omissions, if, at any time when a prospectus relating to the Shares is required to be delivered under the Act, any event shall have occurred as a result of which the Prospectus or any other prospectus relating to the Shares as then in effect would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; in the event that any Underwriter is required to deliver a prospectus nine (9) months or more after the effective date of the Registration Statement in connection with the sale of the Shares, the Company will prepare promptly upon request, but at the expense of such Underwriter, such amendment or amendments to the Registration Statement and such prospectus or prospectuses as may be necessary to permit compliance with the requirements of Section 10(a)(3) of the Act; and the Company will file no amendment or supplement to the Registration Statement or Prospectus which shall not previously have been submitted to you a reasonable time prior to the proposed filing thereof or to which you shall reasonably object in writing, subject, however, to compliance with the Act and the Rules and Regulations (in the judgment of the Company and its counsel) and the provisions of this Agreement.

(b) The Company will advise you, promptly after it shall receive notice or obtain knowledge, of the issuance of any stop order by the Commission suspending the effectiveness of the Registration Statement or of the initiation or threat of any proceeding for that purpose; and it will promptly use its best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(c) The Company will use its best efforts to qualify the Shares for offering and sale under the securities laws of such jurisdictions as you may reasonably request and to continue the effectiveness of such qualifications for so long as may be required for purposes of the distribution of the Shares, except that the Company shall not be required in connection therewith, or as a condition thereof, to qualify as a foreign corporation or to execute a general consent to service of process in any jurisdiction in which it is not otherwise required to be so qualified or to so execute a general consent to service of process. In each jurisdiction in which the Shares shall have been qualified as above provided, the Company will make and file such statements and reports in each year as are or may be required by the laws of such jurisdiction.

(d) The Company will furnish to you (to the extent not previously furnished), as soon as available, and, in the case of the Prospectus and any term sheet or abbreviated term sheet under Rule 434, in no event later than the first (1st) full business day following the first day that Shares are traded, copies of the Registration Statement (three of which will be signed and which will include all exhibits), each Preliminary Prospectus, the Prospectus and any amendments

<PAGE>

or supplements to such documents, including any prospectus prepared to permit compliance with Section 10(a)(3) of the Act, all in such quantities as you may from time to time reasonably request. Notwithstanding the foregoing, if Robertson, Stephens & Company LLC, on behalf of the several Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the Company shall provide to you copies of a Preliminary Prospectus updated in all respects through the date specified by you, in such quantities as you may from time to time reasonably request.

(e) The Company will make generally available to its securityholders as soon as practicable, but in no event later than the forty-fifth (45th) day following the end of the fiscal quarter first occurring after the first anniversary of the effective date of the Registration Statement, an

earnings statement (which will be in reasonable detail but need not be audited) complying with the provisions of Section 11(a) of the Act and covering a twelve (12) month period beginning after the effective date of the Registration Statement.

(f) During a period of five (5) years after the date hereof, the Company will furnish to its shareholders as soon as practicable after the end of each respective period, annual reports (including financial statements audited by independent certified public accountants) and unaudited quarterly reports of operations for each of the first three quarters of the fiscal year, and will furnish to you and the other several Underwriters hereunder, upon request (i) concurrently with furnishing such reports to its shareholders, statements of operations of the Company for each of the first three (3) quarters in the form furnished to the Company's shareholders, (ii) concurrently with furnishing to its shareholders, a balance sheet of the Company as of the end of such fiscal year, together with statements of operations, of shareholders' equity, and of cash flows of the Company for such fiscal year, accompanied by a copy of the certificate or report thereon of independent certified public accountants, (iii) as soon as they are available, copies of all reports (financial or other) mailed to shareholders, (iv) as soon as they are available, copies of all reports and financial statements furnished to or filed with the Commission, any securities exchange or the National Association of Securities Dealers, Inc. ("NASD"), (v) every material press release and every material news item or article in respect of the Company or its affairs which was generally released to shareholders or prepared by the Company or any of its subsidiaries, and (vi) any additional information of a public nature concerning the Company or its subsidiaries, or its business which you may reasonably request. During such five (5) year period, if the Company shall have active subsidiaries, the foregoing financial statements shall be on a consolidated basis to the extent that the accounts of the Company and its subsidiaries are consolidated, and shall be accompanied by similar financial statements for any significant subsidiary which is not so consolidated.

(g) The Company will apply the net proceeds from the sale of the Shares being sold by it in the manner set forth under the caption "Use of Proceeds" in the Prospectus.

(h) The Company will maintain a transfer agent and, if necessary under the jurisdiction of incorporation of the Company, a registrar (which may be the same entity as the transfer agent) for its Common Stock.

(i) If the transactions contemplated hereby are not consummated by reason of any failure, refusal or inability on the part of the Company or any Selling Shareholder to perform any agreement on their respective parts to be performed hereunder, or to fulfill any condition

<PAGE>

of the Underwriters' obligations hereunder, or if the Company shall terminate this Agreement pursuant to Section 12(a) hereof, or if the Underwriters shall terminate this Agreement pursuant to Section 12(b)(i), the Company will reimburse the several Underwriters for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of Underwriters' Counsel) incurred by the Underwriters in investigating, or preparing to market, or marketing the Shares.

(j) If at any time during the ninety (90) day period after the Registration Statement becomes effective, any rumor, publication or event relating to or affecting the Company shall occur as a result of which in your opinion the market price of the Common Stock has been or is likely to be materially affected (regardless of whether such rumor, publication or event necessitates a supplement to, or amendment of, the Prospectus), the Company will, after written notice from you advising the Company to the effect set forth

above, forthwith prepare, consult with you concerning the substance of and disseminate a press release or other public statement, reasonably satisfactory to you, responding to or commenting on such rumor, publication or event.

(k) During the Lock-up Period, the Company will not, without the prior written consent of Robertson Stephens & Company LLC, effect the Disposition of, directly or indirectly, any Securities other than the sale of the Company Shares, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the Company's issuance of options or Common Stock under the Company's presently authorized 1997 Stock Option Plan (the "Option Plan").

(l) During a period of ninety (90) days from the effective date of the Registration Statement, the Company will not file a registration statement registering the offer and sale of shares under the Option Plan or any other employee benefit plan.

6. Expenses.
--------

(a) The Company and the Selling Shareholders agree with each Underwriter that:

(i) The Company and the Selling Shareholders will pay and bear all costs and expenses in connection with the preparation, printing and filing of the Registration Statement (including financial statements, schedules and exhibits), Preliminary Prospectuses and the Prospectus and any amendments or supplements thereto; the printing of this Agreement, the Agreement Among Underwriters, the Selected Dealer Agreement, the Preliminary Blue Sky Survey and any Supplemental Blue Sky Survey, the Underwriters' Questionnaire and Power of Attorney, and any instruments related to any of the foregoing; the issuance and delivery of the Shares hereunder to the several Underwriters, including transfer taxes, if any, the cost of all certificates representing the Shares and transfer agents' and registrars' fees; the fees and disbursements of counsel for the Company; all fees and other charges of the Company's independent public accountants; the cost of furnishing to the several Underwriters copies of the Registration Statement (including appropriate exhibits), Preliminary Prospectus and the Prospectus, and any amendments or supplements to any of the foregoing; NASD filing fees and the cost of qualifying the Shares under the laws of such jurisdictions as you may designate (including filing fees and fees and disbursements of

<PAGE>

Underwriters' Counsel in connection with such NASD filings and Blue Sky qualifications); and all other expenses directly incurred by the Company and the Selling Shareholders in connection with the performance of their obligations hereunder. Any additional expenses incurred as a result of the sale of the Shares by the Selling Shareholders will be borne collectively by the Company and the Selling Shareholders. The provisions of this Section 6(a)(i) are intended to relieve the Underwriters from the payment of the expenses and costs which the Selling Shareholders and the Company hereby agree to pay, but shall not affect any agreement which the Selling Shareholders and the Company may make, or may have made, for the sharing of any of such expenses and costs. Such agreements shall not impair the obligations of the Company and the Selling Shareholders hereunder to the several Underwriters.

(ii) In addition to its other obligations under Section 9(a) hereof, the Company agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(a) hereof, it will reimburse the Underwriters on a

monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Company's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Company together with interest, compounded daily, determined on the basis of the prime rate (or other commercial lending rate for borrowers of the highest credit standing) set forth from time to time in The Wall Street Journal which represents the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's thirty (30) largest banks (the "Prime Rate"). Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(iii) In addition to their other obligations under Section 9(b) hereof, each Selling Shareholder agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(b) hereof relating to such Selling Shareholder, it will reimburse the Underwriters on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of such Selling Shareholder's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Selling Shareholders, together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

<PAGE>

(b) In addition to their other obligations under Section 9(c) hereof, the Underwriters severally and not jointly agree that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(c) hereof, they will reimburse the Company and each Selling Shareholder on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Underwriters' obligation to reimburse the Company and each such Selling Shareholder for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Company and each such Selling Shareholder shall promptly return such payment to the Underwriters together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Company and each such Selling Shareholder within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(c) It is agreed that any controversy arising out of the operation of the interim reimbursement arrangements set forth in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof, including the amounts of any requested reimbursement payments, the method of determining such amounts and the basis on

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 720 of 2711

which such amounts shall be apportioned among the reimbursing parties, shall be settled by arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the NASD. Any such arbitration must be commenced by service of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the party demanding arbitration does not make such designation of an arbitration tribunal in such demand or notice, then the party responding to said demand or notice is authorized to do so. Any such arbitration will be limited to the operation of the interim reimbursement provisions contained in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof and will not resolve the ultimate propriety or enforceability of the obligation to indemnify for expenses which is created by the provisions of Sections 9(a), 9(b) and 9(c) hereof or the obligation to contribute to expenses which is created by the provisions of Section 9(e) hereof.

7. Conditions of Underwriters' Obligations. The obligations of the several Underwriters to purchase and pay for the Shares as provided herein shall be subject to the accuracy, as of the date hereof and the Closing Date and any later date on which Option Shares are to be purchased, as the case may be, of the representations and warranties of the Company and the Selling Shareholders herein, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and to the following additional conditions:

(a) The Registration Statement shall have become effective not later than 2:00 P.M., San Francisco time, on the date following the date of this Agreement, or such later date as shall be consented to in writing by you; and no stop order suspending the effectiveness thereof shall have been issued and no proceedings for that purpose shall have been initiated or, to the knowledge of the Company, any Selling Shareholder or any Underwriter, threatened by the Commission, and any request of the Commission for additional information (to be included in the

<PAGE>

Registration Statement or the Prospectus or otherwise) shall have been complied with to the satisfaction of Underwriters' Counsel.

(b) All corporate proceedings and other legal matters in connection with this Agreement, the form of Registration Statement and the Prospectus, and the registration, authorization, issue, sale and delivery of the Shares, shall have been reasonably satisfactory to Underwriters' Counsel, and such counsel shall have been furnished with such papers and information as they may reasonably have requested to enable them to pass upon the matters referred to in this Section.

(c) Subsequent to the execution and delivery of this Agreement and prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, there shall not have been any Material Adverse Change from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and that makes it, in your reasonable judgment, impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus.

(d) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, the following opinion of counsel for the Company and the Selling Shareholders, dated the Closing Date or such later date on which Option Shares are to be purchased addressed to the Underwriters and with reproduced copies or signed counterparts thereof for each of the Underwriters, to the effect that:

(i) The Company and each Material Subsidiary has been

duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation;

(ii) The Company and each Material Subsidiary has the corporate power and corporate authority to own, lease and operate its properties and to conduct its business as described in the Prospectus;

(iii) The Company and each Material Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction, if any, in which the ownership or leasing of its properties or the conduct of its business requires such qualification, except where the failure to be so qualified or be in good standing would not have a material adverse effect on the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise. To such counsel's knowledge, the Company does not own or control, directly or indirectly, any subsidiary corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., Rapiscan Security Products Limited, Ferson Optics, Inc., UDT Sensors, Inc., AME, Opto Sensors (Singapore) Pte Ltd, Opto Sensors (Malaysia) Sdn. Bhd., OSI Electronics and Rapiscan Consortium (M) Sdn. Bhd.;

(iv) The authorized, issued and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization"

-21-

<PAGE>

as of the dates stated therein, the issued and outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right;

(v) All issued and outstanding shares of capital stock of each Material Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right and, to such counsel's knowledge, are owned by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest;

(vi) The Firm Shares to be issued by the Company and the Firm Shares and Option Shares to be purchased from the Selling Shareholders pursuant to the terms of this Agreement have been duly authorized and, upon issuance and delivery against payment therefor in accordance with the terms hereof, the Firm Shares will be duly and validly issued and the Firm Shares as well as the Option Shares will be fully paid and nonassessable, and will not have been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right known to such counsel.

(vii) The Company has the corporate power and corporate authority to enter into this Agreement and to issue, sell and deliver to the Underwriters the Shares to be issued and sold by it hereunder;

(viii) This Agreement has been duly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by you, is a valid and binding

agreement of the Company, enforceable in accordance with its terms, except insofar as indemnification provisions may be limited by applicable law and except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(ix) The Registration Statement has become effective under the Act and, based on the oral advice of the staff of the Commission, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or before the Commission or under the Act;

(x) The Registration Statement and the Prospectus, and each amendment or supplement thereto (other than the financial statements (including supporting schedules) and other statistical and financial data included therein as to which such counsel need express no opinion), as of the effective date of

<PAGE>

the Registration Statement, complied as to form in all material respects with the requirements of the Act and the applicable Rules and Regulations;

(xi) The information in the Prospectus under the caption "Description of Capital Stock, " to the extent that it constitutes matters of law or legal conclusions, has been reviewed by such counsel and is a fair summary of such matters and conclusions; and the forms of certificates evidencing the Common Stock and filed as exhibits to the Registration Statement comply with California law;

(xii) The description in the Registration Statement and the Prospectus of the charter and bylaws of the Company and of statutes are accurate in all material respects and fairly present the information required to be presented by the Act and the applicable Rules and Regulations;

(xiii) There are no agreements, contracts, leases or documents to which the Company is a party, known to such counsel, of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement which are not described or referred to therein or filed as required;

(xiv) The performance of this Agreement and the consummation of the transactions herein contemplated (other than performance of the Company's indemnification obligations hereunder, concerning which no opinion need be expressed) will not (a) result in any violation of the Company's charter or bylaws or (b) to such counsel's knowledge, result in a breach or violation of any of the terms and provisions of, or constitute a default under, any bond, debenture, note or other evidence of indebtedness, or any lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument known to such counsel to which the Company is a party or by which its properties are bound, and which breach or violation would have a Material Adverse Effect, or any Applicable Law (as hereinafter defined). The term "Applicable Law" means those statutes, rules, regulations, orders, writs or decrees of any Governmental Authority (as defined below) by which the Company or any of its subsidiaries is bound, the existence of which is actually known to such counsel and which, in the experience of such counsel,

are typically applicable to public offerings of securities of the type contemplated by this Agreement. The "Governmental Authority" means any legislative, judicial, administrative or regulatory body of the States of California and Mississippi or the United States of America;

(xv) No consent, approval, authorization or order of or qualification with any court, government or governmental agency or body having jurisdiction over the Company or any of its subsidiaries, or over any of their properties or operations is necessary in connection with the consummation by the Company of the transactions herein contemplated, except such as have been obtained under the Act or such as may be required under state or other securities or Blue Sky laws in connection with the purchase and the distribution of the Shares by the

-23-

<PAGE>

Underwriters, *provided, however*, that the foregoing opinion may be limited to such consents, approvals, authorizations, and orders which are actually known to such counsel and which in such counsel's experience, are typically applicable to public offerings of securities of the type contemplated by this Agreement;

(xvi) There are no legal or governmental proceedings pending or threatened against the Company, or any of its subsidiaries, known to such counsel, of a character required to be disclosed in the Registration Statement or the Prospectus by the Act or the Rules and Regulations other than those described therein;

(xvii) To such counsel's knowledge, neither the Company nor any of its Material Subsidiaries is (a) in material violation of its respective charter or bylaws, or (b) in material breach of any Applicable Law;

(xviii) To such counsel's knowledge, except as set forth in the Registration Statement and Prospectus, no holders of Common Stock or other securities of the Company have registration rights with respect to the offer and sale of any securities of the Company and, except as set forth in the Registration Statement and Prospectus, all prior holders of such registration rights have waived such rights or such rights have expired by reason of lapse of time following notification of the Company's intent to file the Registration Statement or have included securities in the Registration Statement pursuant to the exercise, and in full satisfaction, of such rights;

(xix) Each Selling Shareholder which is not a natural person has full right, power and authority to enter into and to perform its obligations under the Power of Attorney and Custody Agreement to be executed and delivered by it in connection with the transactions contemplated herein; the Power of Attorney and Custody Agreement of each Selling Shareholder that is not a natural person has been duly authorized by all necessary action on the part of such Selling Shareholder; the Power of Attorney and Custody Agreement of each Selling Shareholder has been duly executed and delivered by or on behalf of such Selling Shareholder; and the Power of Attorney and Custody Agreement of each Selling Shareholder constitutes the valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(xx) Each of the Selling Shareholders has full right, power and authority to enter into and to perform its obligations under this Agreement and to sell, transfer, assign and deliver the Shares to be sold by such Selling Shareholder hereunder;

<PAGE>

(xxi) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of each Selling Shareholder; and

(xxii) Upon the delivery of, and payment for, the Shares as contemplated by this Agreement, each of the Underwriters will receive valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest known to such counsel. In rendering such opinion, such counsel may assume that the Underwriters are without notice of any defect in the title of the Shares being purchased from the Selling Shareholders.

In addition, such counsel shall state that such counsel has participated in conferences with officials and other representatives of the Company, the Representatives, Underwriters' Counsel and the independent certified public accountants of the Company, at which conferences the contents of the Registration Statement and Prospectus and related matters were discussed, and although they have are not passing upon and do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement or the Prospectus, and have not made any independent check or verification of the thereof, on the basis of the foregoing, nothing has come to the attention of such counsel which leads them to believe that, at the time the Registration Statement became effective and at the Closing Date and on any later date on which Option Shares are to be purchased, the Registration Statement and any amendment or supplement thereto contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or at the Closing Date or any later date on which the Option Shares are to be purchased, as the case may be, the Registration Statement, the Prospectus and any amendment or supplement thereto contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (other than the financial statements, including supporting schedules and other financial and statistical information included therein, as to which such counsel need express no comment).

Counsel rendering the foregoing opinion may rely as to questions of law not involving the laws of the United States or the State of California upon opinions of local counsel, and as to questions of fact upon representations or certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person), and of government officials, in which case their opinion is to state that they are so relying. Copies of any opinion, representation or certificate so relied upon shall be delivered to you, as Representatives of the Underwriters, and to Underwriters' Counsel.

(e) You shall have received on the Closing Date and on any later date on which Option Shares to be purchased, as the case may be, an opinion of Jones, Day, Reavis & Pogue, in form and substance reasonably satisfactory to you, with respect to the sufficiency of all such corporate proceedings and other legal matters relating to this Agreement and the transactions contemplated hereby as you may reasonably require, and the Company shall have furnished to such counsel such documents as they may have requested for the purpose of enabling them to pass upon such matters.

<PAGE>

(f) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a letter from Deloitte & Touche LLP addressed to the Underwriters, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, confirming that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations and based upon the procedures described in such letter delivered to you concurrently with the execution of this Agreement (herein called the "Original Letter"), but carried out to a date not more than five (5) business days prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, (i) confirming, to the extent true, that the statements and conclusions set forth in the Original Letter are accurate as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, and (ii) setting forth any revisions and additions to the statements and conclusions set forth in the Original Letter which are necessary to reflect any changes in the facts described in the Original Letter since the date of such letter, or to reflect the availability of more recent financial statements, data or information. The letter shall not disclose any change in the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and that makes it, in your reasonable judgment, impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus. The Original Letter from Deloitte & Touche LLP shall be addressed to or for the use of the Underwriters in form and substance reasonably satisfactory to the Underwriters and shall (i) represent, to the extent true, that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations, (ii) set forth their opinion with respect to their examination of the consolidated balance sheet of the Company at June 30, 1997, 1996 and 1995 and related consolidated statements of operations, shareholders' equity, and cash flows for the twelve (12) months ended June 30, 1997, 1996 and 1995, and (iii) address other matters agreed upon by Deloitte & Touche LLP and you. In addition, you shall have received from Deloitte & Touche LLP a letter addressed to the Company and made available to you for the use of the Underwriters stating that their review of the Company's system of internal accounting controls, to the extent they deemed necessary in establishing the scope of their examination of the Company's consolidated financial statements at June 30, 1997, 1996 and 1995, did not disclose any weaknesses in internal controls that they considered to be material weaknesses.

(g) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a certificate of the Company, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, signed by the Chief Executive Officer and Chief Financial Officer of the Company, to the effect that, and you shall be satisfied that:

(i) The representations and warranties of the Company in this Agreement are true and correct in all material respects, as if made on and as of the Closing Date or any later date on which Option Shares are to be purchased, as the case may be, and the Company has complied in all material respects with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be;

(ii) No stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or threatened under the Act;

(iii) When the Registration Statement became effective and at all times subsequent thereto up to the delivery of such certificate, the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained all material information required to be included therein by the Act and the Rules and Regulations and in all material respects conformed to the requirements of the Act and the Rules and Regulations, the Registration Statement, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, the Prospectus, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and, since the effective date of the Registration Statement, there has occurred no event required to be set forth in an amended or supplemented Prospectus which has not been so set forth; and

(iv) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (a) any Material Adverse Change, (b) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (c) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (d) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (e) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (f) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a Material Adverse Effect.

(h) You shall be satisfied that, and you shall have received a certificate, dated the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, from the Attorney for each Selling Shareholder to the effect that, as of the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, they have not been informed that:

(i) The representations and warranties made by such Selling Shareholder herein are not true or correct in any material respect on the Closing Date or on any later date on which Option Shares are to be purchased, as the case may be; or

(ii) Such Selling Shareholder has not complied in any material respects with any obligation or satisfied any condition which is required to be performed or satisfied on the part of such Selling Shareholder at or prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be.

            (i) The Company shall have obtained and delivered to you an agreement from each officer and director of the Company, each Selling Shareholder and each beneficial owner of shares of Common Stock as reflected on Exhibit A attached hereto in writing prior to the date hereof that such person will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction shall have been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the such holder. Such prohibited hedging or other transactions would including, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person will have also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction.

(j) The Company and the Selling Shareholders shall have furnished to you such further certificates and documents as you shall reasonably request (including certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person) as to the accuracy of the representations and warranties of the Company and the Selling Shareholders herein, as to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and as to the other conditions concurrent and precedent to the obligations of the Underwriters hereunder.

All such opinions, certificates, letters and documents will be in compliance with the provisions hereof only if they are reasonably satisfactory to Underwriters' Counsel. The Company and the Selling Shareholders will furnish you with such number of conformed copies of such opinions, certificates, letters and documents as you shall reasonably request.

8. Option Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Selling Shareholders set forth on Schedule C hereto hereby grant to the several Underwriters, severally and not jointly, for the

<PAGE>

purpose of covering over-allotments in connection with the distribution and sale of the Firm Shares only, a nontransferable option to purchase up to an aggregate of 555,000 Option Shares at the purchase price per share for the Firm Shares set forth in Section 4 hereof. The number of Option Shares to be purchased from each Selling Shareholder listed on Schedule C shall be in the same proportion that the number of shares listed across from each such Selling Shareholder's name bears to the total number of Shares listed on Schedule C. Such option may be exercised by the Representatives on behalf of the several Underwriters on one (1) or more occasions in whole or in part during the period of thirty (30) days after the date on which the Firm Shares are initially offered to the public, by

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 728 of 2711
giving written notice to the Company and the Custodian. The number of Option Shares to be purchased by each Underwriter from each of such Selling Shareholders set forth on Schedule C upon the exercise of such option shall be in the same proportion as the number of Firm Shares purchased by such Underwriter (set forth in Schedule A hereto) bears to the total number of Firm Shares purchased by the several Underwriters (set forth in Schedule A hereto), adjusted by the Representatives in such manner as to avoid fractional shares.

Delivery of definitive certificates for the Option Shares to be purchased by the several Underwriters pursuant to the exercise of the option granted by this Section 8 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Custodian (and the Custodian agrees not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Custodian). In the event of any breach of the foregoing, the Selling Shareholders set forth on Schedule C, severally and not jointly, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach. Such delivery and payment shall take place at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067, or at such other place as may be agreed upon among the Representatives, the Company and the Custodian (i) on the Closing Date, if written notice of the exercise of such option is received by the Company and the Custodian at least two (2) full business days prior to the Closing Date, or (ii) on a date which shall not be later than the third (3rd) full business day following the date the Company and Custodian receive written notice of the exercise of such option, if such notice is received by the Company and Custodian less than two (2) full business days prior to the Closing Date.

The certificates for the Option Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request at least one (1) full business day prior to the date of payment and delivery and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to such date of payment and delivery. If the Representatives so elect, delivery of the Option Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been received by you prior to the date of payment and delivery for the Option Shares to be purchased by such

<PAGE>

Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters of any of its or their obligations hereunder.

(b) Upon exercise of any option provided for in Section 8(a) hereof, the obligations of the several Underwriters to purchase such Option Shares will be subject (as of the date hereof and as of the date of payment and delivery for such Option Shares) to the accuracy of and compliance with the representations, warranties and agreements of the Company and the Selling Shareholders herein, to the accuracy of the statements of the Company, the Selling Shareholders and officers of the Company made pursuant to the provisions hereof, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder, to the conditions set forth in Section 7 hereof, and to the condition that all proceedings taken at or prior to the payment date in connection with the sale and transfer of such Option Shares shall be satisfactory in form and substance to you and to Underwriters' Counsel,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 729 of 2711

and you shall have been furnished with all such documents, certificates and opinions as you may request in order to evidence the accuracy and completeness of any of the representations, warranties or statements, the performance of any of the covenants or agreements of the Company and the Selling Shareholders or the satisfaction of any of the conditions herein contained.

9. Indemnification and Contribution.

(a) The Company agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject (including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E of the Bylaws of the NASD), under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of the Company herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement, such Preliminary Prospectus or the Prospectus, or any such amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter furnished to the Company by such Underwriter, directly or through you, specifically for use in the preparation thereof and, provided further, that the indemnity agreement provided in this Section 9(a) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of material fact or omission or alleged omission to state therein a material

<PAGE>

fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(a) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which the Company may otherwise have.

(b) Each Selling Shareholder, severally and not jointly, agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become

subject (including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E or the Bylaws of the NASD) under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Selling Shareholder herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(b) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company or such Underwriter by such Selling Shareholder, directly or through such Selling Shareholder's representatives, specifically for use in the preparation thereof, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement
-------- -------
provided in this Section 9(b) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state therein a material fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(b) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which such Selling Shareholder may otherwise have.

<PAGE>

(c) Each Underwriter, severally and not jointly, agrees to indemnify and hold harmless the Company and each Selling Shareholder against any losses, claims, damages or liabilities, joint or several, to which the Company or such Selling Shareholder may become subject under the Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Underwriter herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(c) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by such

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 731 of 2711

Underwriter, directly or through you, specifically for use in the preparation thereof, and agrees to reimburse the Company and each such Selling Shareholder for any legal or other expenses reasonably incurred by the Company and each such Selling Shareholder in connection with investigating or defending any such loss, claim, damage, liability or action.

The indemnity agreement in this Section 9(c) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each officer of the Company who signed the Registration Statement and each director of the Company, each Selling Shareholder and each person, if any, who controls the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which each Underwriter may otherwise have.

(d) Promptly after receipt by an indemnified party under this Section 9 of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against any indemnifying party under this Section 9, notify the indemnifying party in writing of the commencement thereof but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 9 (unless and only to the extent that such omission results in the loss or compromise of any material rights or defence by the indemnifying party). In case any such action is brought against any indemnified party, and it notified the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it shall elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; *provided, however*, that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded (based on the advice of counsel) that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such

<PAGE>

indemnified party of the indemnifying party's election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Section 9 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the reasonable expenses of more than one separate counsel (together with appropriate local counsel) approved by the indemnifying party representing all the indemnified parties under Section 9(a), 9(b) or 9(c) hereof who are parties to such action), (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized in writing the employment of counsel for the indemnified party at the expense of the indemnifying party. In no event shall any indemnifying party be liable in respect of any amounts paid in settlement of any action unless the indemnifying party shall have approved in writing the terms of such settlement; *provided* that such consent shall not be unreasonably withheld. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any

indemnified party is or could have been a party and indemnification could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on all claims that are the subject matter of such proceeding.

(e) In order to provide for just and equitable contribution in any action in which a claim for indemnification is made pursuant to this Section 9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 9 provides for indemnification in such case, all the parties hereto shall contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that, except as set forth in Section 9(f) hereof, the Underwriters severally and not jointly are responsible pro-rata for the portion represented by the percentage that the underwriting discount bears to the initial public offering price, and the Company and the Selling Shareholders are responsible for the remaining portion, provided, however, that (i) except as otherwise agreed among the Underwriters, no Underwriter shall be required to contribute any amount in excess of the amount by which the underwriting discount applicable to the Shares purchased by such Underwriter exceeds the amount of damages which such Underwriter has otherwise been required to pay and (ii) no person guilty of a fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who is not guilty of such fraudulent misrepresentation. The contribution agreement in this Section 9(e) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter, the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act and each officer of the Company who signed the Registration Statement and each director of the Company.

(f) Notwithstanding any other provision herein to the contrary, the liability of each Selling Shareholder under this Agreement, including under the representations, warranties and agreements contained herein and under the indemnity and contribution agreements contained in the provisions of this Section 9 shall be limited to an amount equal to the initial public offering

<PAGE>

price of the Selling Shareholder Shares sold by such Selling Shareholder to the Underwriters minus the amount of the underwriting discount paid thereon to the Underwriters by such Selling Shareholder. The Company and such Selling Shareholders may agree, as among themselves and without limiting the rights of the Underwriters under this Agreement, as to the respective amounts of such liability for which they each shall be responsible.

(g) The parties to this Agreement hereby acknowledge that they are sophisticated business persons who were represented by counsel during the negotiations regarding the provisions hereof including, without limitation, the provisions of this Section 9, and are fully informed regarding said provisions. They further acknowledge that the provisions of this Section 9 fairly allocate the risks in light of the ability of the parties to investigate the Company and its business in order to assure that adequate disclosure is made in the Registration Statement and Prospectus as required by the Act and the Exchange Act.

10. Representations, Warranties, Covenants and Agreements to Survive Delivery. All representations, warranties, covenants and agreements of the Company, the Selling Shareholders and the Underwriters herein or in certificates

delivered pursuant hereto, and the indemnity and contribution agreements contained in Section 9 hereof shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Underwriter or any person controlling any Underwriter within the meaning of the Act or the Exchange Act, or by or on behalf of the Company or any Selling Shareholder, or any of their officers, directors or controlling persons within the meaning of the Act, or the Exchange Act, and shall survive the delivery of the Shares to the several Underwriters hereunder or termination of this Agreement.

11. Substitution of Underwriters. If any Underwriter or Underwriters shall fail to take up and pay for the number of Firm Shares agreed by such Underwriter or Underwriters to be purchased hereunder upon tender of such Firm Shares in accordance with the terms hereof, and if the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters so agreed but failed to purchase does not exceed 10% of the Firm Shares, the remaining Underwriters shall be obligated, severally in proportion to their respective commitments hereunder, to take up and pay for the Firm Shares of such defaulting Underwriter or Underwriters.

If any Underwriter or Underwriters so defaults and the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters agreed but failed to take up and pay for exceeds 10% of the Firm Shares, the remaining Underwriters shall have the right, but shall not be obligated, to take up and pay for (in such proportions as may be agreed upon among them) the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase. If such remaining Underwriters do not, at the Closing Date, take up and pay for the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase, the Closing Date shall be postponed for twenty-four (24) hours to allow the several Underwriters the privilege of substituting within twenty-four (24) hours (including non-business hours) another underwriter or underwriters (which may include any nondefaulting Underwriter) satisfactory to the Company. If no such underwriter or underwriters shall have been substituted as aforesaid by such postponed Closing Date, the Closing Date may, at the option of the Company, be postponed for a further twenty-four (24) hours, if necessary, to allow the Company the privilege of finding another underwriter or underwriters, satisfactory to you, to purchase the Firm Shares which the defaulting

<PAGE>

Underwriter or Underwriters so agreed but failed to purchase. If it shall be arranged for the remaining Underwriters or substituted underwriter or underwriters to take up the Firm Shares of the defaulting Underwriter or Underwriters as provided in this Section 11, (i) the Company shall have the right to postpone the time of delivery for a period of not more than seven (7) full business days, in order to effect whatever changes may thereby be made necessary in the Registration Statement or the Prospectus, or in any other documents or arrangements, and the Company agrees promptly to file any amendments to the Registration Statement, supplements to the Prospectus or other such documents which may thereby be made necessary, and (ii) the respective number of Firm Shares to be purchased by the remaining Underwriters and substituted underwriter or underwriters shall be taken as the basis of their underwriting obligation. If the remaining Underwriters shall not take up and pay for all such Firm Shares so agreed to be purchased by the defaulting Underwriter or Underwriters or substitute another underwriter or underwriters as aforesaid and the Company shall not find or shall not elect to seek another underwriter or underwriters for such Firm Shares as aforesaid, then this Agreement shall terminate.

In the event of any termination of this Agreement pursuant to the preceding paragraph of this Section 11, neither the Company nor any Selling Shareholder shall be liable to any Underwriter (except as provided in Sections 6

and 9 hereof) nor shall any Underwriter (other than an Underwriter who shall have failed, otherwise than for some reason permitted under this Agreement, to purchase the number of Firm Shares agreed by such Underwriter to be purchased hereunder, which Underwriter shall remain liable to the Company, the Selling Shareholders and the other Underwriters for damages, if any, resulting from such default) be liable to the Company or any Selling Shareholder (except to the extent provided in Sections 6 and 9 hereof).

The term "Underwriter" in this Agreement shall include any person substituted for an Underwriter pursuant to the terms of this Section 11.

12. Effective Date of this Agreement and Termination.

(a) This Agreement shall become effective at the earlier of (i) 6:30 A.M., San Francisco time, on the first full business day following the effective date of the Registration Statement, or (ii) the time of the initial public offering of any of the Shares by the Underwriters after the Registration Statement becomes effective. The time of the initial public offering shall mean the time of the release by you, for publication, of the first newspaper advertisement relating to the Shares, or the time at which the Shares are first generally offered by the Underwriters to the public by letter, telephone, telegram or telecopy, whichever shall first occur. By giving notice as set forth in Section 13 before the time this Agreement becomes effective, you, as Representatives of the several Underwriters, or the Company, may prevent this Agreement from becoming effective without liability of any party to any other party, except as provided in Sections 5(i), 6 and 9 hereof.

(b) You, as Representatives of the several Underwriters, shall have the right to terminate this Agreement by giving notice as hereinafter specified at any time on or prior to the Closing Date or on or prior to any later date on which Option Shares are to be purchased, as the case may be, (i) if the Company or any Selling Shareholder shall have failed, refused or been unable to perform any agreement in any material respect on its part to be performed, or because any other condition of the Underwriters' obligations hereunder required to be fulfilled is not fulfilled in any

<PAGE>

material respect, including, without limitation, any change in the condition (financial or otherwise), earnings, operations, business of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and would, in your opinion, make it impractical to distribute the Shares, or (ii) if additional material governmental restrictions, not in force and effect on the date hereof, shall have been imposed upon trading in securities generally or minimum or maximum prices shall have been generally established on the New York Stock Exchange or on the American Stock Exchange or in the over the counter market by the NASD, or trading in securities generally shall have been suspended on either such exchange or in the over the counter market by the NASD, or if a banking moratorium shall have been declared by federal, New York or California authorities, or (iii) if the Company shall have sustained a loss by strike, fire, flood, earthquake, accident or other calamity of such character as to interfere materially with the conduct of the business and operations of the Company regardless of whether or not such loss shall have been insured and would, in your opinion, make it impractical to distribute the Shares, or (iv) if there shall have been a material adverse change in the general political or economic conditions or financial markets which would, in your opinion, make it impractical to distribute the Shares, or (v) if there shall have been an outbreak or escalation of hostilities or of any other insurrection or armed conflict or the declaration by the United States of a national emergency which, in the reasonable opinion of the Representatives, make it impractical to distribute the Shares. In the event of termination

pursuant to subparagraph (i) above, the Company shall remain obligated to pay costs and expenses pursuant to Sections 5(i), 6 and 9 hereof. Any termination pursuant to any of subparagraphs (ii) through (v) above shall be without liability of any party to any other party except as provided in Sections 6 and 9 hereof.

If you elect to prevent this Agreement from becoming effective or to terminate this Agreement as provided in this Section 12, you shall promptly notify the Company by telephone, telecopy or telegram, in each case confirmed by letter. If the Company shall elect to prevent this Agreement from becoming effective, the Company shall promptly notify you by telephone, telecopy or telegram, in each case, confirmed by letter.

13. Notices. All notices or communications hereunder, except as herein otherwise specifically provided, shall be in writing and if sent to you shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to you c/o Robertson, Stephens & Company LLC, 555 California Street, Suite 2600, San Francisco, California 94104, telecopier number (415) 781-0278, Attention: General Counsel, with copy to Jones, Day, Reavis & Pogue, 555 West Fifth Street, Suite 4600, Los Angeles, California 90013, Attention: Bert Zweig; if sent to the Company, such notice shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727, Attention: Deepak Chopra, President, with copy to Troy & Gould, 1801 Century Park East, Suite 1600, Los Angeles, California 90067, Attention: Istvan Benko; if sent to one or more of the Selling Shareholders, such notice shall be sent mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to Deepak Chopra, as Attorney-in-Fact for the Selling Shareholders, at 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727, with copy to Troy & Gould, 1801 Century Park East, Suite 1600, Los Angeles, California 90067, Attention: Istvan Benko.

-36-

<PAGE>

14. Parties. This Agreement shall inure to the benefit of and be binding upon the several Underwriters and the Company and the Selling Shareholders and their respective executors, administrators, successors and assigns. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto and their respective executors, administrators, successors and assigns, and the controlling persons within the meaning of the Act or the Exchange Act, officers and directors referred to in Section 9 hereof, any legal or equitable right, remedy or claim in respect of this Agreement or any provisions herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and their respective executors, administrators, successors and assigns and said controlling persons and said officers and directors, and for the benefit of no other person or entity. No purchaser of any of the Shares from any Underwriter shall be construed a successor or assign by reason merely of such purchase.

In all dealings with the Company and the Selling Shareholders under this Agreement, you shall act on behalf of each of the several Underwriters, and the Company and the Selling Shareholders shall be entitled to act and rely upon any statement, request, notice or agreement made or given by you jointly or by Robertson, Stephens & Company LLC on behalf of you.

15. Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to principles of conflict of law.

16. Counterparts. This Agreement may be signed in several counterparts, each of which will constitute an original.

-37-

<PAGE>

If the foregoing correctly sets forth the understanding among the Company, the Selling Shareholders and the several Underwriters, please so indicate in the space provided below for that purpose, whereupon this letter shall constitute a binding agreement among the Company, the Selling Shareholders and the several Underwriters.

Very truly yours,

OSI SYSTEMS, INC.

By:______________________________
Name:____________________________
Its:_____________________________

SELLING SHAREHOLDERS

By:______________________________
Attorney-in-Fact for the Selling Shareholders named in Schedules B and C hereto

Accepted as of the date first above written:

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC

On their behalf and on behalf of each of the several Underwriters named in Schedule A hereto.

By: ROBERTSON, STEPHENS & COMPANY LLC

By: ROBERTSON, STEPHENS & COMPANY GROUP, L.L.C.

By:_____________________________________________
Authorized Signatory

-38-

<PAGE>

SCHEDULE A

<TABLE>
<CAPTION>

Number of

| Underwriters | Firm Shares To Be Purchased |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC .... | __________ |
| William Blair & Company, L.L.C. ...... | __________ |
| Volpe Brown Whelan & Company LLC ..... | __________ |
| Total ............................... | 3,700,000 |

</TABLE>

<PAGE>

SCHEDULE B

Firm Shares

<TABLE>
<CAPTION>

| Company | Number of Company Shares To Be Sold |
|---|---|
| <S> | <C> |
| OSI Systems, Inc. | 3,300,000 |
| Total............... | 3,300,000 |

</TABLE>

<TABLE>
<CAPTION>

| Name of Selling Shareholder | Number of Selling Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Scope Industries | 148,148 |
| Sally F. Chamberlain Trustee, Edward P. and Sally F. Fleischer Family Trust | 63,343 |
| Gary E. Fleischer | 14,625 |
| Cathleen A. Redinger | 14,625 |
| Madan and Mohini Syal | 25,926 |
| Good Swartz Berns Pension & Profit Sharing Plan | 3,000 |
| Steve Cary Good and Bari Anne Good Trust | 13,831 |
| Steven C. Good | 8,065 |
| Mark and Penny Berns Trust | 5,982 |
| Arnold G. and Hope Anisgarten | 5,709 |
| Rajiv Mehra | 450 |
| Zev and Elaine Edelstein Trust | 9,259 |
| Glenn P. Sorenson | 9,259 |
| Mohinder and Ranjana Chopra | 9,259 |
| Charles and Kiran M. Kerpelman | 9,259 |
| Martha B. Holmes | 9,259 |
| Combined Tehari & Durya Rangawala Account Trust | 7,407 |
| Leila and Birendra Mehra | 3,704 |
| Surendra V. and Kala Jain | 5,186 |
| Renu Jivrajka | 1,852 |
| Amita Jivrajka | 1,852 |
| Total................................................... | 370,000 |

</TABLE> 

-2-

<PAGE>

SCHEDULE C

Option Shares

<TABLE>
<CAPTION>

| Name of Selling Shareholder | Number of Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Scope Industries | 88,519 |
| Sally F. Chamberlain Trustee, Edward P. and Sally F. Fleischer Trust | 49,630 |
| Deepak and Nandini Chopra | 185,185 |
| Madan and Mohini Syal | 18,519 |
| Ajay Mehra | 33,333 |
| Good Swartz & Berns Pension & Profit Sharing Plan | 3,309 |
| Steven C. Good | 15,604 |
| Mark and Penny Berns Trust | 1,518 |
| Arnold G. and Hope Anisgarten | 1,791 |
| Andreas F. Kotowski | 18,519 |
| Zev and Elaine Edelstein Trust | 9,259 |
| Glenn P. Sorenson | 11,111 |
| Mohinder Chopra | 11,111 |
| Manoocher Mansouri Aliabadi | 14,815 |
| Charles and Kiran Kerpelman | 9,259 |
| Combined Tehari & Durya Rangawala Account Trust | 7,407 |
| Susan Sutherland | 7,407 |
| Anuj Wadhawan | 7,407 |
| Bette J. Moore | 7,407 |
| Thomas K. Hickman | 3,704 |
| Robert Kephart | 5,556 |
| Phillip M. Wascher | 7,407 |
| Narayan Taneja | 1,481 |
| Leila and Birendra Mehra | 3,704 |
| Charan J. Dewan | 3,704 |
| Jack Kimbro | 1,111 |
| Surendra and Kala Jain | 5,926 |
| Meyer Luskin | 9,259 |
| Denis Noble | 741 |
| Anthony S. and Suzie B. Crane | 1,481 |
| Neil Jivrajka | 740 |
| Renu Jivrajka | 1,482 |
| Amita Jivrajka | 1,482 |
| Alan J. and Pamela Barnard | 1,481 |
| Peter Bui | 741 |
| Christine Williams | 741 |

</TABLE>

-3-

<PAGE>

<TABLE>
<CAPTION>

Number of

| Name of Selling Shareholder | Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Christopher Chin | 926 |
| Louis S. and Linda O. Peters | 741 |
| Khai Le | 741 |
| Lincoln Gladden | 741 |
| Total.................................................. | 555,000 |

</TABLE>

-4-

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>3
<DESCRIPTION>CONSENT OF DELOITTE & TOUCHE LLP
<TEXT>

<PAGE>

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

We consent to the use in this Amendment No. 3 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated August 15, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

Deloitte & Touche llp

Los Angeles, California

September 30, 1997
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# Exhibit 1A

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
RR6yEEvEnkwdibs8qMSz0fRluI2DoIFJ8jrBU3CzztgyfY2tbi2KV3QuW/0Juoqe
n3WV69Xtt1Nn2DAHB1pKbw==

<SEC-DOCUMENT>0001017062-97-001396.txt : 19970804
<SEC-HEADER>0001017062-97-001396.hdr.sgml : 19970804
ACCESSION NUMBER: 0001017062-97-001396
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 7
FILED AS OF DATE: 19970801
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97650287

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMEND #1 TO FORM S-1 REGISTRATION STATEMENT
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 1, 1997

REGISTRATION NO. 333-29179

- ------------------------------------------------------------------------------
- ------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

--------------

AMENDMENT NO. 1 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| CALIFORNIA | 3674 | 33-0238801 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

</TABLE>

--------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

--------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

--------------

COPIES TO:

ISTVAN BENKO, ESQ.
TROY & GOULD PROFESSIONAL CORPORATION
1801 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL. (310) 553-4441
FAX. (310) 201-4746

BERTRAM R. ZWEIG, ESQ.
JONES, DAY, REAVIS & POGUE
555 WEST 5TH STREET, SUITE 4600
LOS ANGELES, CALIFORNIA 90013-1025
TEL. (213) 489-3939
FAX. (213) 243-2539

--------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

--------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

--------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

+ INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE. +

SUBJECT TO COMPLETION, DATED AUGUST 1, 1997

[LOGO OF OPTO-SENSORS, INC.]

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $13.00 and $14.00 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Company has made application for inclusion of the Common Stock on the Nasdaq National Market under the symbol "OSIS."

----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>
<CAPTION>

| | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING SHAREHOLDERS(2) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 744 of 2711

Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]
Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

<PAGE>

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

2

<PAGE>

[TWO PAGE GATEFOLD]

OSI SYSTEMS, INC.
----------------

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman
sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]
Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]
Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

     NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO
GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS
OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE,
SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN
AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS
PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER

TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

----------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
| --- | --- |
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |
| Dilution | 17 |
| Selected Consolidated Financial Data | 18 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 28 |
| Management | 42 |
| Certain Transactions | 50 |
| Principal and Selling Shareholders | 52 |
| Description of Capital Stock | 55 |
| Shares Eligible for Future Sale | 56 |
| Underwriting | 57 |
| Legal Matters | 59 |
| Experts | 59 |
| Additional Information | 59 |
| Index to Consolidated Financial Statements | F-1 |

</TABLE>

----------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine-month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In the nine-month period ended March 31, 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During the nine-month period, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its global presence, and selectively entering into new end-product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of March 31, 1997 the Company marketed its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,458,874 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Proposed Nasdaq National Market Symbol............................ | OSIS |

</TABLE>

- --------------------

(1) Based on the number of shares outstanding on May 31, 1997. Excludes: (i) approximately 864,986 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.32 per share; and (ii) up to 45,486 shares of Common Stock that may be issued after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares of Rapiscan U.S.A. See "Certain

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | | | (unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues............... | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold..... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit........... | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1).... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development.......... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)...... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense....... | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income taxes and minority interest.............. | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest.............. | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest...... | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income............. | $ 331 | $ 659 | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Pro forma net income(3)(4).......... | | | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share(3)(4)(5).... | | | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Pro forma weighted average shares outstanding(5)....... | | | | | 6,308,126 | 6,304,158 | 6,327,234 |

<CAPTION>

| | MARCH 31, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(6) |
| <S> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash.................................................. | $ 1,612 | $33,027 |
| Working capital....................................... | 9,940 | 48,915 |
| Total assets.......................................... | 44,314 | 75,729 |
| Total debt............................................ | 11,387 | 1,594 |
| Total shareholders' equity............................ | 14,982 | 56,190 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 750 of 2711

connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and pro forma net income by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and for each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Supplementary pro forma net income for the year ended June 30, 1996 and for each of the nine month periods ended March 31, 1996 and 1997 is $2,913,000, $2,086,000 and $3,464,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary pro forma net income per share for the corresponding periods is $0.41, $0.29 and $0.49, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

## RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

### FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 751 of 2711

predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics") Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business-- Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the

<PAGE>

Company's subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995 and 1996 and in the nine-month period ended March 31, 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 39.3%, respectively, of the Company's revenues. Of the revenues generated during fiscal 1996 from shipments made outside of

the United States, 12.0% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign control legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial condition and results of operations. While the Company has no current agreement or negotiations underway with

9

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the Company.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection

purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations. Rapiscan U.S.A. is currently involved in a lawsuit against EG&G Inc. and a subsidiary of EG&G Inc. in a matter not related to the patent license agreement with EG&G Inc. See "Business--Legal Proceedings."

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of operations. For the nine-month period ended March 31, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $8.9 million or approximately 15.9% of the Company's revenues. Through March 31, 1997, the Company has incurred legal fees in the amount of approximately $148,000 in connection with this lawsuit. The Company intends to vigorously pursue its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights. Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could

enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

<PAGE>

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the

manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.3% and 16.2%, respectively, of the Company's Common Stock (17.4% and 14.3%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 40.9% of the outstanding Common Stock (36.9% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

12

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of

the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. The Company has filed an application to have the Common Stock approved for quotation on the Nasdaq National Market. However, there can be no assurance that an active trading market for the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,458,874 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,758,874 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,731,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for 180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,758,874 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless

disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of the Offering to be received by the Company, approximately $31.4 million or approximately 76.2% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $9.8 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT MARCH 31, 1997 | RATE BASIS PER ANNUM(1) | RATE AT MARCH 31, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $4,927,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,500,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,442,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 66,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 354,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 504,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- ---------------------

(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

    Borrowings under the foregoing bank facilities are generally used for working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

15

<PAGE>

CAPITALIZATION

The following table sets forth: (i) the actual short-term debt and capitalization of the Company as of March 31, 1997; (ii) the pro forma short-term debt and capitalization of the Company giving effect to the conversion of the Company's outstanding shares of preferred stock into 3,853,125 additional shares of Common Stock and the filing of the Amended and Restated Articles of Incorporation; and (iii) the pro forma capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

<TABLE>
<CAPTION>

| | MARCH 31, 1997 | | |
|---|---|---|---|
| | ACTUAL | PRO FORMA | PRO FORMA AS ADJUSTED |
| | (In thousands, except share information) | | |
| <S> | <C> | <C> | <C> |
| Short-term debt................................ | $ 8,324 | $ 8,324 | $ 764 |
| | ======= | ======= | ======= |
| Long-term debt, less current portion............ | 3,063 | 3,063 | 830 |
| Shareholders' equity: | | | |
| Preferred Stock, $1.00 liquidation value; 3,000,000 shares authorized; 2,568,750 shares issued and outstanding, actual; none issued and outstanding, pro forma and pro forma as adjusted | 4,014 | -- | -- |
| Preferred Stock, no par value; 10,000,000 shares authorized, pro forma and pro forma as adjusted; none issued and outstanding................................. | -- | -- | -- |
| Common Stock, no par value(1); 4,500,000 shares authorized; 40,000,000 shares authorized, pro forma and pro forma as adjusted; 2,207,124 shares issued and outstanding, actual; 6,060,249 issued and outstanding, pro forma; 9,390,249 issued and outstanding, pro forma as adjusted.................................... | 2,913 | 6,927 | 48,135 |
| Retained earnings............................. | 7,928 | 7,928 | 7,928 |
| Cumulative foreign currency translation adjustment.................................. | 127 | 127 | 127 |

| | | | |
|---|---|---|---|
| Total shareholders' equity.................. | 14,982 | 14,982 | 56,190 |
| Total capitalization...................... | $18,045 | $18,045 | $57,020 |

</TABLE>

(1) Excludes 499,125 shares of Common Stock issuable upon exercise of outstanding stock options as of March 31, 1997 and up to 45,486 shares of Common Stock that may be issuable as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

16

<PAGE>

DILUTION

The net tangible book value of the Company at March 31, 1997 (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock), was $13,230,000 or $2.18 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock). After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of March 31, 1997 would have been $54,438,000, or $5.80 per share. This represents an immediate increase in the net tangible book value of $3.62 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.70 per share to new investors. The following table illustrates this per share dilution:

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| Assumed initial public offering price......................... | | $13.50 |
| Net tangible book value before Offering..................... | $2.18 | |
| Increase in net tangible book value attributable to this Offering................................................. | 3.62 | |
| Pro forma net tangible book value after Offering.............. | | 5.80 |
| Dilution to new investors.................................... | | $ 7.70 |

</TABLE>

The following table sets forth on a pro forma basis as of March 31, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (giving effect to the conversion of preferred stock outstanding as of March 31, 1997 into 3,853,125 shares of Common Stock and assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

<TABLE>
<CAPTION>

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Existing shareholders.. | 6,060,249 | 64.5% | $ 6,927,000 | 13.4% | $ 1.14 |
| New public investors... | 3,330,000 | 35.5 | 44,955,000 | 86.6 | $13.50 |
| Total................. | 9,390,249 | 100.0% | $51,882,000 | 100.0% | |

</TABLE>

The foregoing table does not take into effect the exercise of outstanding

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 761 of 2711

options to purchase 68,625 shares of Common Stock for $66,750 subsequent to March 31, 1997. As of the date of this Prospectus, there are outstanding options to purchase an aggregate of 864,986 of Common Stock at a weighted average exercise price of approximately $7.32 per share. In addition, the Company may be obligated to issue up to an additional 45,486 shares of Common Stock after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shares in Rapiscan U.S.A. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

## SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1996 and for the nine months ended March 31, 1997, and the balance sheet data at June 30, 1995 and 1996 and March 31, 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1992 and 1993 and the balance sheet data at June 30, 1992, 1993, and 1994 are derived from audited financial statements not otherwise contained herein. The consolidated statement of operations data for the nine months ended March 31, 1996 are derived from unaudited financial statements of the Company included elsewhere herein. The unaudited financial statements have been prepared by the Company on a basis consistent with the Company's audited consolidated financial statements and, in the opinion of management, include all adjustments, consisting only of normal recurring accruals, necessary for a fair presentation of the Company's results of operations for the period. The results of operations for the nine months ended March 31, 1997 are not necessarily indicative of future results.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | | | |
| Revenues................ | $21,471 | $27,225 | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |
| Cost of goods sold...... | 16,581 | 20,591 | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit............ | 4,890 | 6,634 | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative(1)..... | 2,914 | 4,014 | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development........... | 847 | 1,034 | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation(2)....... | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses.............. | 3,761 | 5,048 | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations.. | 1,129 | 1,586 | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense........ | 650 | 471 | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before income taxes and minority interest............... | 479 | 1,115 | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes.................. | 148 | 462 | 814 | 413 | 1,111 | 787 | 983 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income before minority interest............... | 331 | 653 | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest....... | -- | 6 | 38 | 17 | 117 | 28 | -- |
| Net income.............. | $331 | $659 | $787 | $1,158 | $2,259 | $1,546 | $2,934 |
| Pro forma net income(3)(4)........... | | | | | $2,308 | $1,643 | $3,026 |
| Pro forma net income per share(3)(4)(5)......... | | | | | $0.37 | $0.26 | $0.48 |
| Pro forma weighted average shares outstanding(4)........ | | | | | 6,308,126 | 6,304,158 | 6,327,234 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | | MARCH 31, |
|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | | |
| Cash............................ | $546 | $941 | $625 | $1,405 | $581 | $1,612 |
| Working capital................. | 3,728 | 3,852 | 2,280 | 12,117 | 6,044 | 9,940 |
| Total assets.................... | 10,548 | 15,739 | 25,807 | 30,780 | 35,309 | 44,314 |
| Total debt...................... | 6,090 | 6,882 | 11,140 | 14,113 | 15,462 | 11,387 |
| Total shareholders' equity....... | 1,677 | 2,256 | 3,128 | 4,951 | 7,194 | 14,982 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in September and November 1996 as if such transactions occurred on July 1, 1995. Pro forma adjustments for the year ended June 30, 1996 and each of the nine-month periods ended March 31, 1996 and 1997 consist of: (i) the elimination of interest expenses related to converted subordinated debt of $166,000, $125,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $117,000, $28,000 and $0, respectively.

(4) Supplementary pro forma net income for the year ended June 30, 1996 and for each of the nine month periods ended March 31, 1996 and 1997 is $2,913,000, $2,086,000 and $3,464,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary pro forma net income per share for the corresponding periods is $0.41, $0.29 and $0.49, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1995.

18

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6% of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. The Company markets its products worldwide through approximately 44 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 39.3% of revenues for the fiscal years 1995 and 1996 and for the nine months ended March 31, 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997 was 26.6%, 34.2% and 25.1%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

19

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's

optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...................... | $34,729 | $37,977 | $45,007 | $33,493 | $36,228 |
| (Inter-company eliminations)...... | (1,257) | (1,529) | (6,392) | (5,424) | (4,551) |
| Unaffiliated optoelectronic devices and subsystems ......... | 33,472 | 36,448 | 38,615 | 28,069 | 31,677 |
| Security and inspection products.. | 14,263 | 13,367 | 22,903 | 16,925 | 24,296 |
| Total revenues................... | $47,735 | $49,815 | $61,518 | $44,994 | $55,973 |

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues.......................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold................ | 75.5 | 75.9 | 73.9 | 74.8 | 72.2 |
| Gross profit...................... | 24.5 | 24.1 | 26.1 | 25.2 | 27.8 |
| Operating expenses: | | | | | |
| Selling, general and administrative.................. | 16.7 | 15.3 | 15.9 | 15.0 | 14.6 |
| Research and development......... | 3.0 | 3.2 | 2.7 | 2.8 | 3.1 |
| Stock option compensation........ | -- | -- | -- | -- | 1.5 |
| Total operating expenses........ | 19.7 | 18.5 | 18.6 | 17.8 | 19.2 |
| Income from operations............ | 4.8 | 5.6 | 7.5 | 7.4 | 8.6 |
| Interest expense.................. | 1.5 | 2.5 | 2.2 | 2.3 | 1.6 |
| Income before income taxes and minority interest................ | 3.3 | 3.1 | 5.3 | 5.1 | 7.0 |
| Provision for income taxes........ | 1.7 | 0.8 | 1.8 | 1.7 | 1.8 |
| Income before minority interest... | 1.6 | 2.3 | 3.5 | 3.4 | 5.2 |

| | | | | | |
|---|---|---|---|---|---|
| Minority interest........................ | [illegible] | -- | 0.2 | -- | [illegible] |
| Net income........................ | 1.6% | 2.3% | 3.7% | 3.4% | 5.2% |

</TABLE>

<PAGE>

COMPARISON OF THE NINE-MONTH PERIOD ENDED MARCH 31, 1997 TO THE NINE-MONTH PERIOD ENDED MARCH 31, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all intercompany eliminations. For the nine-month period ended March 31, 1997, revenues increased by $11.0 million, or 24.4%, to $56.0 million from $45.0 million in the comparable period ended March 31, 1996. Revenue from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $3.6 million, or 12.9%, to $31.7 million from $28.1 million in the comparable period ended March 31, 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenue from the sale of security and inspection products increased by $7.4 million, or 43.6%, to $24.3 million from $16.9 million in the comparable 1996 period. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, and growth in sales of the Rapiscan 119 tabletop model.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. For the nine-month period ended March 31, 1997, gross profit increased by $4.2 million, or 37.3%, to $15.6 million from $11.4 in the comparable 1996 period. As a percentage of revenues, gross profit increased to 27.8% in the 1997 period from 25.2% in the comparable 1996 period. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the nine-month period ended March 31, 1997, such expenses increased by $1.5 million, or 21.3%, to $8.2 million from $6.7 million in the comparable 1996 period. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.0%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For the nine-month period ended March 31, 1997, such expenses increased by $457,000, or 35.7%, to $1.7 million from $1.3 million in the comparable 1996 period. As a percentage of revenues, research and development expenses increased to 3.1% from 2.8%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for the nine-month period ended March 31, 1997 increased by $1.5 million, or 44.6%, to $4.8 million from $3.3 million for the comparable 1996 period. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during the 1997 period, income from operations increased by $2.3 million, or 70.3%, to $5.7 million from $3.3 million. As a percent of revenues, income from operations increased to 8.6% from 7.4%, and excluding the non-cash compensation expense referenced above, it would have increased to 10.1% from 7.4%.

Interest Expense. Interest expense for the nine-month period ended March 31, 1997 decreased by $126,000, or 12.3%, to $900,000 from $1,026,000 during the comparable 1996 period. As a percentage of revenues, interest expense decreased to 1.6% from 2.3%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during the 1997 period, and to a decrease in the Company's borrowings outstanding under its lines of credit.

<PAGE>

Provision for Income Taxes. Provision for income taxes for the nine-month period ended March 31, 1997 increased by $196,000, or 24.9%, to $983,000 from $787,000 during the comparable 1996 period. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.1% from 34.2% in the comparable 1996 period. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for the nine-month period ended March 31, 1997, increased $1.4 million, or 89.8%, to $2.9 million from $1.5 million in the comparable 1996 period. The compensation charge described above, decreased net income by $514,000 in the 1997 period.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of intercompany eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling,

general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 768 of 2711

expense increased to 2.6% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eleven consecutive quarters in the period ended March 31, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
| | (In thousands) | | | | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues.......... | $10,981 | $12,584 | $13,164 | $13,086 | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 |
| Cost of goods sold............. | 8,500 | 9,537 | 10,104 | 9,677 | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 |
| Gross profit...... | 2,481 | 3,047 | 3,060 | 3,409 | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative.. | 1,598 | 1,984 | 1,875 | 2,144 | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 |
| Research and development..... | 494 | 308 | 370 | 419 | 419 | 408 | 453 | 383 | 517 | 636 | 584 |
| Stock option compensation.... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 856 |
| Total operating expenses....... | 2,092 | 2,292 | 2,245 | 2,563 | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 |
| Income from operations....... | 389 | 755 | 815 | 846 | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 1,470 |
| Interest expense.. | 244 | 268 | 353 | 386 | 336 | 345 | 345 | 333 | 360 | 331 | 209 |
| Income before income taxes and minority interest......... | 145 | 487 | 462 | 460 | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 |
| Provision for income taxes..... | 39 | 129 | 123 | 122 | 85 | 293 | 409 | 324 | 259 | 408 | 316 |
| Income before minority interest......... | 106 | 358 | 339 | 338 | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 |
| Minority interest. | 14 | 4 | 6 | (7) | 19 | 17 | (8) | 89 | -- | -- | -- |
| Net income........ | $ 120 | $ 362 | $ 345 | $ 331 | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 |

</TABLE>

24

<PAGE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of the years fiscal 1995 and 1996 and for the first three quarters of fiscal 1997.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1994 | DEC. 31, 1994 | MAR. 31, 1995 | JUNE 30, 1995 | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues......... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold............ | 77.4 | 75.8 | 76.8 | 73.9 | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 |
| Gross profit..... | 22.6 | 24.2 | 23.2 | 26.1 | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 |
| Operating expenses: | | | | | | | | | | | |
| Selling, general and administrative. | 14.6 | 15.8 | 14.2 | 16.4 | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 |
| Research and development.... | 4.5 | 2.4 | 2.8 | 3.2 | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 |
| Stock option compensation... | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 4.1 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total operating expenses....... | 19.1 | 18.2 | 17.0 | 19.6 | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 |
| Income from operations...... | 3.5 | 6.0 | 6.2 | 6.5 | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 |
| Interest expense. | 2.2 | 2.1 | 2.7 | 2.9 | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 |
| Income before income taxes and minority interest........ | 1.3 | 3.9 | 3.5 | 3.6 | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 |
| Provision for income taxes.... | .4 | 1.0 | .9 | 1.0 | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 |
| Income before minority interest........ | 1.0 | 2.9 | 2.6 | 2.6 | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 |
| Minority interest........ | 0.1 | -- | -- | (0.1) | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- |
| Net income....... | 1.1% | 2.9% | 2.6% | 2.5% | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% |

</TABLE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of March 31, 1997, the Company's principal sources of liquidity consisted of $1.6 million in cash and several credit agreements described below.

The Company's operations provided net cash of $5.1 million in the nine month period ended March 31, 1997. For the nine-month period ended March 31, 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in the nine-month period ended March 31, 1997. Net cash provided by operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $1.7 million and $2.2 million in the nine-month period ended March 31, 1997 and fiscal 1996, respectively, in each case due primarily to purchases of property and equipment in the amount

of approximately $1.5 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property

<PAGE>

and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for the nine-month period ended March 31, 1997 was $2.4 million due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of March 31, 1997, there was outstanding approximately $4.9 million under the $10.0 million line of credit, $2.5 million under the term loan, and approximately $154,000 under the letter of credit facility. As of March 31, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of March 31, 1997, no amounts were outstanding under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $2.0 million was used as of March 31, 1997. The facility terminates on October 27, 1997. Borrowings under the agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.0 million at March 31, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus

2.00% per annum. The second agreement provides for a 750,000 pound sterling (approximately $1.2 million as of March 31, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $820,000 as of March 31, 1997) facility for tender and performance bonds. These facilities are secured by certain assets of Rapiscan UK

<PAGE>

and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of March 31, 1997, no amounts were outstanding under the line of credit and $134,000 was outstanding under the performance bond facility. The above facilities expire in December and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at March 31, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at March 31, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of March 31, 1997 there was approximately $1.4 million outstanding under the line of credit and approximately $66,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $741,000 at March 31, 1997), of which $354,000 was outstanding as of March 31, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At March 31, 1997 outstanding term loan borrowings totalled approximately 3.4 million Norwegian krone (approximately $504,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for fiscal 1994, 1995 and 1996 and for the nine-month period ended March 31, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL 

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In the nine month period ended March 31, 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $31.7 million, or approximately 56.6%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $24.3 million, or approximately 43.4% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 774 of 2711

imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the nine-month period ended March 31, 1997, approximately 28.4% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take

<PAGE>

advantage of the growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 775 of 2711

locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in the nine-month period ended March 31, 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995 and 1996, approximately 28.7% and 33.1%, respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| Rapiscan 19 (single energy)<br>Rapiscan 119 (single energy) | Inspection of incoming package | Embassies<br>Post offices<br>Courthouses<br>High risk office buildings<br>Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Airport hand carried and checked baggage<br>Pallet inspection<br>Customs inspections<br>Agriculture inspection | Airports<br>Cruise ships<br>Freight shippers<br>Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During the nine-month period ended March 31, 1997, sales of the walk-through and hand-held metal detectors constituted 1.8% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

32

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the twelve-month period ended March 31, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who

purchased more than $100,000 of optoelectronic products; and (ii) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 22.7% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 12.0% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 9 |
| Medical Monitoring | 9.5% | Datascope<br>BioChem International<br>Criticare Systems | 11 |
| Analytical and Medical Diagnostics Equipment | 6.7% | Johnson & Johnson<br>Leica<br>Bausch & Lomb | 10 |
| Office Automation and Computer Peripherals | 6.3% | Xerox<br>Eastman Kodak<br>Hewlett-Packard | 6 |
| Construction, Robotics and Industrial Automation | 4.9% | 3M<br>Spectra Physics<br>Baumer Electric | 8 |
| Military/Defense and Weapons Simulations | 3.3% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 5 |
| Colorometry and Particle Analyzers | 1.2% | Coulter Electronics<br>CILAS<br>Accuracy Microsensors | 3 |
| Bar Code Scanners | 1.1% | Symbol Technologies<br>Intermec | 2 |
| Gaming Industry | 1.1% | Bally Gaming<br>Dixie Narco | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |

| | |
|---|---|
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

34

<PAGE>

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 25 independent sales representatives and distributors. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 21 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 70 independent sales representatives. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection products sales staff is supported by a service organization of approximately 25 persons located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996, and for the nine-month period ended March 31, 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.1%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom

optoelectronic solutions for their specific needs when standard components or subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the

<PAGE>

implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of March 31, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 32 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and nine-month period ended March 31, 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $1.7 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser

printers and bar code readers.

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

<PAGE>

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 782 of 2711

customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

37

<PAGE>

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At March 31, 1997, the Company's backlog products totalled approximately $57.7 million, compared to approximately $27.5 million at March 31, 1996. Substantially all of the Company's backlog as of March 31, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any

future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of March 31, 1997, the Company employed approximately 730 people, of whom 570 were employed in manufacturing, 32 in research and development, 62 in finance and administration, 44 in sales and marketing, and 25 in its service organization. Of the total employees, approximately 470 were employed in the United States, 100 were employed in Europe, 160 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

38

<PAGE>

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint

also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement, contributory infringement and inducement thereof. Lunar and UAB seek damages in an

<PAGE>

unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

Rapiscan U.S.A. is also involved in a dispute with Quantum Magnetics, Inc. ("Quantum"), EG&G Astrophysics, and EG&G Inc., which is EG&G Astrophysics' parent company. The dispute relates to Rapiscan U.S.A.'s July 5, 1996 agreement with Quantum to collaborate in the production and marketing of airport security and inspection scanners (the "July 5 Agreement"). On July 25, 1996, Quantum informed Rapiscan U.S.A. that Quantum was terminating the July 5 Agreement, although Rapiscan U.S.A. contends that this action constituted a breach of the July 5 Agreement.

On August 5, 1996, EG&G Astrophysics filed suit against Rapiscan U.S.A. in the Superior Court of the State of California, County of Los Angeles. EG&G Astrophysics claims that by entering into the July 5 Agreement, Rapiscan U.S.A. interfered with EG&G Astrophysics' own pre-existing contractual right to market scanners with Quantum. EG&G Astrophysics also asserts that Rapiscan U.S.A. falsely represented that Rapiscan U.S.A.'s security and inspection scanners were just as effective as EG&G Astrophysics' scanners, and that replacing EG&G Astrophysics' scanners with Rapiscan U.S.A.'s security and inspection scanners would be cost efficient. EG&G Astrophysics' First Amended Complaint contains six causes of action: intentional inducement of breach of contract, intentional interference with contract, intentional interference with economic relations, negligent interference with economic relations, slander per se, and trade libel. EG&G Astrophysics seeks compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. On December 14, 1996, the Court dismissed EG&G Astrophysics' slander per se and trade libel claims, without leave to amend. The Company believes that the remaining claims of EG&G Astrophysics are without merit and has received an opinion from its litigation counsel that the Company will be able to defend the lawsuit without any liability to Rapiscan U.S.A.

Rapiscan U.S.A. has filed a cross-complaint against Quantum, EG&G Astrophysics, and EG&G, Inc. Rapiscan U.S.A.'s First Amended Cross-Complaint asserts four causes of action against Quantum: breach of written contract, intentional misrepresentation, negligent misrepresentation and indemnity.

Rapiscan U.S.A. alleges that Quantum made a series of misrepresentations in connection with the July 5 Agreement and that it failed to honor that agreement.

With respect to EG&G Astrophysics and EG&G, Inc., Rapiscan U.S.A. seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. Rapiscan U.S.A. alleges that EG&G Astrophysics and EG&G, Inc. interfered with Rapiscan U.S.A.'s relationship with Quantum and made false representations concerning Rapiscan U.S.A.'s solvency and its ability to fulfill its obligations. In addition, Rapiscan U.S.A. asserts that EG&G, Inc. breached an agreement not to disclose information pertaining to the prior resolution of a patent dispute between Rapiscan U.S.A. and EG&G, Inc.

40

<PAGE>

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

41

<PAGE>

MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |
| Manoocher Mansouri Aliabadi............. | 41 | Vice President - Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 54 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 70 | Director |

</TABLE>

- ---------------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of

the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

42

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992,

provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the animal food and waste product business. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

<PAGE>

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1996, each non-employee Director received, as additional director compensation, options to purchase 11,250 shares of Common Stock at an exercise price of $2.00 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1996, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension Fund, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension fund by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1996, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION SALARY | ANNUAL COMPENSATION BONUS | LONG TERM COMPENSATION SECURITIES UNDERLYING OPTIONS (#) |
|---|---|---|---|
| Deepak Chopra(1) Chief Executive Officer | $317,107 | $25,000 | 0 |
| Ajay Mehra Chief Financial Officer | 150,342 | 8,000 | 0 |
| Andreas F. Kotowski President of U.S. Operation, Rapiscan U.S.A. | 113,357 | 0 | 0 |
| Manoocher Mansouri Aliabadi Vice President--Corporate Marketing, UDT Sensors | 95,075 | 5,000 | 0 |
| Thomas K. Hickman Managing Director, OSI Malaysia and OSI Singapore | 125,466 | 0 | 15,000 |

- ---------------------
(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr.

Chopra. The value of such benefit is not susceptible to precise determination.

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

<PAGE>

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in August 1996 based on their performances during the fiscal year ended June 30, 1996.

Option Grants. The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1996:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

POTENTIAL REALIZABLE
VALUE AT ASSUMED

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 790 of 2711

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | EXPIRATION DATE | ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Thomas K. Hickman(2).... | 15,000 | 87.0% | 2.50 | 6/3/01 | $ 10,361 | $ 22,894 |

- ---------------------
(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.
(2) This grant was made in June 1996. One half of the total number of options granted was exercisable on the first anniversary of the grant date; one quarter is exercisable on each of the second and third anniversary dates.

Option Exercises and Fiscal Year-End Values. The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1996 and held by them on June 30, 1996:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) EXERCISABLE | UNEXERCISABLE | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) EXERCISABLE | UNEXERCISABLE |
|---|---|---|---|---|---|---|
| Deepak Chopra........... | 0 | -- | 0 | 0 | 0 | 0 |
| Ajay Mehra.............. | 2,250 | $27,375 | 46,500 | 7,500 | 532,850 | 83,750 |
| Andreas F. Kotowski..... | 0 | -- | 0 | 0 | 0 | 0 |
| Manoocher Mansouri Aliabadi............... | 3,000 | $36,500 | 12,750 | 1,500 | 150,125 | 17,250 |
| Thomas K. Hickman....... | 0 | -- | 10,500 | 19,500 | 119,175 | 216,125 |

- ---------------------
(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

46

<PAGE>

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 791 of 2711

transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of May 31, 1997, 384,375 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 430,500 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 235,125 shares remained available for grant. As of such date, stock options to purchase 381,188 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and

<PAGE>

employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 792 of 2711

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows

<PAGE>

the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnification Agreements will also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified persons as directors and officers.

<PAGE>

## CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a total of 159,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) an agreement by the Company to issue to the holders of the Option Shares up to 45,486 additional shares of Common Stock based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ending June 30, 1997. The number of shares to be issued after June 30, 1997 cannot yet be accurately established. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants

and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, fiscal 1996 and the nine-month period ended March 31, 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result, certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin

<PAGE>

is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 for such services during fiscal 1996 and approximately $87,000 for such services during the nine-month period ended March 31, 1997. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 for such services during fiscal 1996 and approximately $64,000 for such services during the nine-month period ended March 31, 1997.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 795 of 2711

of May 31, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | NUMBER OF SHARES BEING OFFERED(2) | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | | NUMBER | PERCENT |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.6% | 148,148 | 1,726,852 | 18.3% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 19.1 | 47,593 | 1,122,782 | 11.9 |
| Deepak Chopra(6)(8)............. | 1,539,484 | 25.0 | 0 | 1,539,484 | 16.2 |
| Ajay Mehra(9)................... | 193,413 | 3.1 | 0 | 193,413 | 2.0 |
| Andreas F. Kotowski(10)......... | 110,852 | 1.8 | 0 | 110,852 | 1.2 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12)........... | 27,000 | * | 0 | 27,000 | * |
| Steven C. Good(13).............. | 40,500 | * | 21,896 | 18,604 | * |
| Madan G. Syal(14)............... | 241,125 | 3.9 | 25,926 | 215,199 | 2.3 |
| Meyer Luskin(15)................ | 20,625 | * | 0 | 20,625 | * |
| Good Swartz & Berns Pension Fund(16)....................... | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birender Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.3 | 9,259 | 68,420 | * |
| Mohinder and Ranjana Chopra..... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.1 | 9,259 | 56,098 | * |
| Martha B. Holmes................ | 60,000 | * | 9,259 | 50,741 | * |
| Taheri and Durriya Rangwala..... | 52,500 | * | 7,407 | 45,093 | * |
| Cynthia G. Fleischer............ | 15,750 | * | 15,750 | 0 | -- |
| Gary F. Fleischer............... | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Fleischer........... | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold and Hope Anisgarten...... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra..................... | 1,607 | * | 450 | 1,157 | * |
| Surendra and Kala Jain(17)...... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka................... | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka.................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons).................... | 2,259,106 | 35.9 | 47,822 | 2,211,284 | 23.0 |

</TABLE>

- ---------------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of May 31, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

52

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders

if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (79,260); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333); Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension Fund (3,309); Leila and Birender Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder and Ranjana Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Martha B. Holmes (9,259); Taheri and Durriya Rangwala (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette Moore (7,407); Robert Kephart (5,556); Phillip M. Wascher (7,407); Charan Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Allan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Li (741); Mark and Penny Berns Trust (1,518); Arnold and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette Moore, Robert Kephart, Phillip M. Wascher, Charan Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Allan J. Barnard, Christine Williams, Christopher Chin, Khai Li, Louis Peters and Lincoln Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,647,592, 17.4%); Sally F. Chamberlain (1,073,152, 11.3%); Deepak Chopra (1,354,299, 14.3%); Ajay Mehra (160,080, 1.7%); Andreas F. Kotowski (92,333); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,296); Steven C. Good (3,000); Madan G. Syal (196,680, 2.1%); Good Swartz & Berns Pension Fund (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder and Ranjana Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Martha B. Holmes (41,482); Taheri and Durriya Rangwala (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); Bette Moore (28,218); Robert Kephart (22,944); Phillip M. Wascher (19,593); Charan Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Allan J. and Pamela Barnard (8,382); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (11,019); Khai Li (8,409); Mark and Penny Berns Trust (2,232); Arnold and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. 37,500 shares of the 49,125 shares are issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See "Management."

(9) Includes 75,000 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mehra is the Vice President, Chief Financial

Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

53

<PAGE>

(13) Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 18,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See "Management."

(14) Includes 217,500 shares held jointly by Mr. Syal and his wife, Mohini Syal. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 5,625 shares issuable pursuant to options exercisable within 60 days of May 31, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good.

(17) Includes 6,429 shares held by Surendra Jain M.D. Inc.

54

<PAGE>

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

### COMMON STOCK

As of May 31, 1997, 6,128,874 shares of Common Stock were outstanding, held of record by 73 shareholders. After completion of the Offering, there will be 9,458,874 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

### PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including

economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

55

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,458,874 shares of Common Stock outstanding (assuming no exercise of stock options after May 31, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,758,874 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,731,000 Restricted Shares (or approximately 5,176,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 94,589 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 799 of 2711

under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

56

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

| UNDERWRITER | NUMBER OF SHARES |
|---|---|
| Robertson, Stephens & Company LLC | |
| William Blair & Company, L.L.C. | |
| Volpe Brown Whelan & Company, LLC | |
| Total | 3,700,000 |

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $   per share, of which $   may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in the Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,731,000 shares of the Company's Common Stock outstanding prior to the Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 800 of 2711

shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,731,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company has agreed that until the expiration of the lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in the Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with the Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with the Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

<PAGE>

## LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the

Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Report of Independent Auditors........................................... | F-2 |
| Consolidated Balance Sheets as of June 30, 1995, 1996, and March 31, 1997. | F-3 |
| Consolidated Statements of Operations for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997................................................................... | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1997......... | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended June 30, 1994, 1995 and 1996 and the Nine Months Ended March 31, 1996 (Unaudited) and 1997................................................................... | F-6 |
| Notes to Consolidated Financial Statements............................... | F-8 |

</TABLE>

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 802 of 2711

Inc. (the "Company") and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the related consolidated statements of operations, shareholders' equity, and cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of March 31, 1997 and June 30, 1996 and 1995, and the results of their operations and their cash flows for the nine months ended March 31, 1997 and the years ended June 30, 1996, 1995 and 1994 in conformity with generally accepted accounting principles.

Deloitte & Touche llp

Los Angeles, California
June 12, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| ASSETS (NOTE 4) | | | |
| Current Assets: | | | |
| Cash | $ 1,405 | $ 581 | $ 1,612 |
| Accounts receivable, net of allowance for doubtful accounts of $53, $276 and $294 at June 30, 1995, June 30, 1996 and March 31, 1997, respectively (Note 1) | 12,841 | 13,295 | 15,450 |
| Other receivables (Note 2) | 589 | 783 | 1,643 |
| Inventory (Note 1) | 10,069 | 13,642 | 15,472 |
| Prepaid expenses | 388 | 633 | 665 |
| Deferred income taxes (Notes 1 and 7) | 490 | 700 | 1,127 |
| Total current assets | 25,782 | 29,634 | 35,969 |
| Property and Equipment, Net (Notes 1 and 4): | 4,257 | 4,454 | 5,654 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 741 | 1,221 | 2,691 |
| Total | $30,780 | $35,309 | $44,314 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | |
| Current Liabilities: | | | |
| Bank lines of credit (Note 4) | $ 1,452 | $ 7,783 | $ 6,723 |
| Current portion of long-term debt (Note 6 and 13) | 1,232 | 1,491 | 1,601 |
| Current portion of senior subordinated debt (Note 5) | | 2,500 | |
| Accounts payable | 6,402 | 6,522 | 7,665 |
| Accrued payroll and related expenses | 960 | 1,667 | 1,587 |

| | | | |
|---|---|---|---|
| Income taxes payable.................................. | 347 | 799 | 1,759 |
| Advances from customers............................ | 36 | 219 | 2,733 |
| Other accrued expenses and current liabilities..... | 3,436 | 2,609 | 3,961 |
| Total current liabilities........................ | 13,665 | 23,590 | 26,029 |
| Bank Line of Credit (Note 4)......................... | 4,829 | | |
| Senior Subordinated Debt (Note 5).................... | 3,075 | 575 | |
| Long-Term Debt (Note 6 and 13)....................... | 3,525 | 3,113 | 3,063 |
| Deferred Income Taxes (Notes 1 and 7)................ | 629 | 827 | 240 |
| Minority Interest (Note 1)........................... | 106 | 10 | |
| Total liabilities................................ | 25,829 | 28,115 | 29,332 |
| Commitments and Contingencies (Notes 8 and 13) | | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1995 and 1996 and 2,568,750 shares at March 31, 1997 (Note 10)............................................. | 1,514 | 1,514 | 4,014 |
| Common stock, no par value; authorized, 4,500,000 shares; issued and outstanding, 1,842,007, 1,858,132 and 2,207,124 shares at June 30, 1995 and 1996 and March 31, 1997, respectively......... | 543 | 560 | 2,913 |
| Retained earnings................................. | 2,735 | 4,994 | 7,928 |
| Cumulative foreign currency translation adjustment (Note 1)......................................... | 159 | 126 | 127 |
| Total shareholders' equity....................... | 4,951 | 7,194 | 14,982 |
| Total............................................ | $30,780 | $35,309 | $44,314 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| | | | | (Unaudited) | |
| Revenues................. | $47,735 | $49,815 | $ 61,518 | $ 44,994 | $ 55,973 |
| Cost of goods sold....... | 36,037 | 37,818 | 45,486 | 33,638 | 40,380 |
| Gross profit............. | 11,698 | 11,997 | 16,032 | 11,356 | 15,593 |
| Operating expenses: | | | | | |
| Selling, general and administrative expenses (Note 11 and 12)....... | 7,974 | 7,601 | 9,757 | 6,745 | 8,183 |
| Research and development (Note 1)............... | 1,451 | 1,591 | 1,663 | 1,280 | 1,737 |
| Stock option compensation (Note 9).. | | | | | 856 |
| Total operating expenses. | 9,425 | 9,192 | 11,420 | 8,025 | 10,776 |
| Income from operations... | 2,273 | 2,805 | 4,612 | 3,331 | 4,817 |
| Interest expense (Notes 4, 5, 6 and 11)......... | 710 | 1,251 | 1,359 | 1,026 | 900 |
| Income before provision | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| for income taxes and minority interest....... | 1,563 | 1,554 | 3,253 | 2,305 | 3,917 |
| Provision for income taxes (Notes 1 and 7)... | 814 | 413 | 1,111 | 787 | 983 |
| Income before minority interest in net loss of subsidiaries........... | 749 | 1,141 | 2,142 | 1,518 | 2,934 |
| Minority interest in net loss of subsidiaries (Note 1)............... | 38 | 17 | 117 | 28 | -- |
| Net income.............. | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Historical net income.... | | | $ 2,259 | $ 1,546 | $ 2,934 |
| Interest on subordinated debt, net of income taxes................... | | | 166 | 125 | 92 |
| Minority interest in net loss of subsidiaries.... | | | (117) | (28) | -- |
| Pro forma net income..... | | | $ 2,308 | $ 1,643 | $ 3,026 |
| Pro forma net income per share (Note 1).......... | | | $ 0.37 | $ 0.26 | $ 0.48 |
| Weighted average common shares used in the calculation of pro forma net income per share.... | | | 6,308,126 | 6,304,158 | 6,327,234 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1993... | 1,123,750 | $1,124 | 1,628,257 | $ 335 | $ 790 | $ 6 | $ 2,255 |
| Exercise of stock options.............. | -- | -- | 75,000 | 28 | -- | -- | 28 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 58 | 58 |
| Net income............ | -- | -- | -- | -- | 787 | -- | 787 |
| BALANCE, JUNE 30, 1994.. | 1,123,750 | 1,124 | 1,703,257 | 363 | 1,577 | 64 | 3,128 |
| Exercise of stock options.............. | 35,000 | 70 | 60,000 | 75 | -- | -- | 145 |
| Conversion of debt.... | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 95 | 95 |
| Net income............ | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995.. | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options.............. | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment........... | -- | -- | -- | -- | -- | (33) | (33) |
| Net income............ | -- | -- | -- | -- | 2,259 | -- | 2,259 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 805 of 2711

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BALANCE, JUNE 30, 1996... | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options.............. | -- | -- | 49,500 | 79 | -- | -- | 79 |
| Conversion of debt.... | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions......... | -- | -- | 178,956 | 1,193 | -- | -- | 1,193 |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 1 | 1 |
| Net income............ | -- | -- | -- | -- | 2,934 | -- | 2,934 |
| BALANCE, MARCH 31, 1997. | 2,568,750 | $4,014 | 2,207,124 | $2,913 | $7,928 | $127 | $14,982 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 | 1997 |
| | | | | (Unaudited) | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | | | |
| Net income.................. | $ 787 | $ 1,158 | $ 2,259 | $ 1,546 | $ 2,934 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Minority interest in net loss of subsidiaries...... | (38) | (17) | (117) | (28) | |
| Provision for losses on accounts receivable....... | 150 | (70) | 404 | 346 | 97 |
| Depreciation and amortization............. | 1,074 | 1,551 | 2,014 | 1,426 | 1,686 |
| Stock option compensation.. | | | | | 856 |
| Deferred income taxes...... | (150) | 240 | (12) | -- | (1,014) |
| Gain on sale of property and equipment............ | (22) | (11) | (13) | -- | |
| Changes in operating assets and liabilities, net of business acquisition: | | | | | |
| Accounts receivable...... | (7,289) | (1,239) | (858) | (397) | (1,582) |
| Other receivables........ | (541) | 226 | (194) | (800) | (827) |
| Inventory................ | (2,059) | (2,599) | (4,068) | (4,113) | (1,444) |
| Prepaid expenses......... | 28 | (139) | (245) | (253) | (32) |
| Accounts payable......... | 2,973 | 221 | 120 | 1,657 | 980 |
| Accrued payroll and related expenses........ | (232) | 191 | 707 | 36 | (80) |
| Income taxes payable..... | 113 | (217) | 652 | 595 | 960 |
| Advances from customers.. | (22) | 9 | 183 | (3) | 1,771 |
| Other accrued expenses and current liabilities............ | 3,470 | (87) | (827) | (1,214) | 806 |
| Net cash provided by (used in) operating activities........... | (1,758) | (783) | 5 | (1,202) | 5,111 |

| | | | | | |
|---|---|---|---|---|---|
| Cash flows from investing activities: | | | | | |
| Proceeds from sale of property and equipment..... | 70 | 142 | 120 | | |
| Additions to property and equipment.................. | (1,459) | (1,396) | (1,612) | (1,287) | (1,530) |
| Cash paid for business acquisition, net of cash acquired................... | | | | | (302) |
| Cash paid for minority interest................... | | (160) | | | |
| Other assets................ | (14) | (662) | (688) | (273) | 135 |
| Net cash used in investing activities.. | (1,403) | (2,076) | (2,180) | (1,560) | (1,697) |
| Cash flows from financing activities: | | | | | |
| Net proceeds from (repayment of) bank lines of credit... | 2,227 | 2,668 | 1,502 | 2,382 | (1,363) |
| Payments on senior subordinated debt.......... | | (700) | | | (350) |
| Payments on junior subordinated debt.......... | | (280) | | | |
| Payments on long-term debt.. | (660) | (1,095) | (1,250) | (1,000) | (3,399) |
| Proceeds from issuance of long-term debt............ | 1,191 | 2,806 | 1,097 | 558 | 2,646 |
| Proceeds from exercise of stock options and warrants. | 28 | 145 | 17 | 17 | 79 |
| Proceeds from issuance of minority interest.......... | 1 | | 21 | 20 | |
| Net cash provided by (used in) financing activities........... | 2,787 | 3,544 | 1,387 | 1,977 | (2,387) |
| Effect of exchange rate changes on cash............. | 58 | 95 | (36) | -- | 4 |
| Net (decrease) increase in cash......................... | (316) | 780 | (824) | (785) | 1,031 |
| Cash, beginning of period..... | 941 | 625 | 1,405 | 1,405 | 581 |
| Cash, end of period.......... | $ 625 | $ 1,405 | $ 581 | $ 620 | $ 1,612 |
| Supplemental disclosures of cash flow information--Cash paid during the period for: | | | | | |
| Interest.................... | $ 691 | $ 1,229 | $ 1,346 | $ 992 | $ 902 |
| Income taxes................ | $ 620 | $ 82 | $ 377 | $ 368 | $ 1,261 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- --------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During the nine months ended March 31, 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During the nine months ended March 31, 1997, the Company acquired the

minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock. The excess of the fair value of the common stock of $1,193 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (370) |
| Liability incurred | (546) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In September and November 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares, if any, to be issued is based upon the net income of the subsidiary for the year ended June 30, 1997, not to exceed 45,486 shares.

Unaudited Interim Financial Information -- The accompanying consolidated statements of income and of cash flows for the nine months ended March 31, 1996 have been prepared in accordance with generally accepted accounting principles for interim periods and are unaudited; however, in management's opinion, they include all adjustments (consisting of only normal recurring adjustments) necessary for a fair presentation of results for such interim periods.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic

dispersion. 

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Raw materials | $ 5,004 | $ 7,795 | $ 9,122 |
| Work-in-process | 2,597 | 3,114 | 4,300 |
| Finished goods | 2,468 | 2,733 | 2,050 |
| Total | $10,069 | $13,642 | $15,472 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Equipment | $5,247 | $ 6,280 | $ 7,438 |
| Leasehold improvements | 1,426 | 1,601 | 1,963 |
| Tooling | 1,397 | 1,558 | 1,775 |
| Furniture and fixtures | 626 | 488 | 570 |
| Computer equipment | 1,025 | 1,283 | 1,639 |
| Vehicles | 122 | 93 | 152 |
| Total | 9,843 | 11,303 | 13,537 |
| Less accumulated depreciation and amortization | 5,586 | 6,849 | 7,883 |
| Property and equipment, net | $4,257 | $ 4,454 | $ 5,654 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Software development costs | $494 | $ 588 | $ 588 |
| Goodwill | -- | -- | 1,769 |
| Deposits | 168 | 262 | 227 |
| Other | 111 | 524 | 426 |

| | | | |
|---|---|---|---|
| Total | 773 | 1,374 | 3,010 |
| Less accumulated amortization | 32 | 153 | 319 |
| Intangible and other assets, net | $741 | $1,221 | $2,691 |

</TABLE>

Goodwill in the amount of $1,181,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the nine months ended March 31, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

F-9

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000), ($21,000), and $9,000 were included in income for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996, (unaudited) and 1997, respectively.

Earnings Per Share -- Historical net income per share is not presented because it is not indicative of the ongoing operations of the Company. Pro forma net income and net income per share has been presented to reflect the

effect of the conversion of certain subordinated debt into preferred stock and the subsequent conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Pro forma earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from convertible debt and stock options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the pro forma weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period for which pro forma earnings per share is presented.

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at March 31, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and the nine months ended March 31, 1997, the Company earned a technical fee from the joint venture in the amount of $200,000 and $115,000, respectively. At March 31, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The purchase price of $916,000 consisted of cash of $370,000 with the balance of $546,000 payable by June 15, 1997. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1993, pro forma consolidated sales for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 would have been $50,735,000, $53,338,000, $65,371,000, $47,827,000 and $58,557,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1995 and 1996 and March 31, 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Line of credit -- U.S. | $4,829 | $6,361 | $4,927 |
| Line of credit -- Singapore | 1,452 | 1,422 | 1,442 |
| Line of credit -- Norway | | | 354 |
| Total bank lines of credit | $6,281 | $7,783 | $6,723 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At March 31, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. No amounts were outstanding under this agreement at March 31, 1997. The agreement also provides a commitment for letters of credit up to $5,000,000. At March 31, 1997 approximately $1,997,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank,

which provides for revolving line of credit borrowings up to 2,800,000 Singapore dollars (approximately $1,800,000 at March 31, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at March 31, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $741,000 at March 31, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at March 31, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,050,000 at March 31, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,230,000 at March 31, 1997) and a 500,000 pound sterling (approximately $820,000 at March 31, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at March 31, 1997) plus 2%. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $134,000 was outstanding under performance bonds at March 31, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $1,000,000 at March 31, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at March 31, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the nine months ended March 31, 1997, all of the debt outstanding under the various agreements was repaid or converted as summarized in the following table (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996.................................... | $2,500 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996.................................. | 350 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, | | | |

| | | | |
|---|---|---|---|
| 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | 175 | -- |
| Total senior subordinated debt | 3,075 | 3,075 | -- |
| Less current portion | -- | 2,500 | -- |
| Total long-term portion | $3,075 | $ 575 | $-- |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

6. LONG-TERM DEBT

At June 30, 1995 and 1996 and March 31, 1997, long-term debt consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, 1995 | JUNE 30, 1996 | MARCH 31, 1997 |
|---|---|---|---|
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in January 1997 | $2,240 | $1,667 | -- |
| Term loan payable to a bank, interest due mothly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 950 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | -- | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001 | -- | -- | $2,500 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,148 until paid in full on June 1, 2001 | -- | -- | 504 |
| Term loan payable, interest accrued monthly at 8.00%, paid in full on April 2, 1997 | -- | -- | 296 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at March 31, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 242 | 141 | 62 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.66% at March 31, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,300 | 1,000 | 700 |
| Other | 25 | 535 | 602 |
| | 4,757 | 4,604 | 4,664 |
| Less current portion of long-term debt | 1,232 | 1,491 | 1,601 |
| Long-term portion of debt | $3,525 | $3,113 | $3,063 |

</TABLE>

Fiscal year principal payments of long-term debt as of March 31, 1997 are as follows (in thousands):

| | |
|---|---|
| 1997 (3 months) | $ 555 |
| 1998 | 1,278 |
| 1999 | 1,317 |
| 2000 | 896 |
| 2001 | 618 |
| Total | $4,664 |

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 (Unaudited) | 1997 |
| Pretax income: | | | | | |
| United States | $ 547 | $1,277 | $1,965 | $1,053 | $1,904 |
| Foreign | 1,016 | 277 | 1,288 | 1,252 | 2,013 |
| Total pretax income | $1,563 | $1,554 | $3,253 | $2,305 | $3,917 |

The Company's provision for income taxes is comprised of the following (in thousands):

| | YEAR ENDED JUNE 30, | | | NINE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1996 (Unaudited) | 1997 |
| Current: | | | | | |
| Federal | $ 487 | $ 43 | $ 510 | $364 | $ 1,286 |
| State | 139 | 3 | 21 | 16 | 54 |
| Foreign | 338 | 127 | 592 | 407 | 657 |
| | 964 | 173 | 1,123 | 787 | 1,997 |
| Deferred | (150) | 240 | (12) | -- | (1,014) |
| Total provision | $ 814 | $413 | $1,111 | $787 | $ 983 |

Deferred income tax assets (liabilities) at June 30, 1995 and 1996 and March 31, 1997 consisted of the following (in thousands):

<TABLE>

<CAPTION>

| <S> | JUNE 30, 1995 <C> | JUNE 30, 1996 <C> | MARCH 31, 1997 <C> |
|---|---|---|---|
| Expenses not currently deductible | $ 518 | $ 873 | $ 1,491 |
| State income taxes | 49 | -- | -- |
| Other | 143 | -- | 411 |
| Total deferred income tax assets | 710 | 873 | 1,902 |
| Depreciation | (309) | (145) | (82) |
| Capitalized software development costs | (158) | (214) | (154) |
| State income taxes | | (173) | (365) |
| Revitalization zone deductions | (182) | (278) | (354) |
| Other | (200) | (190) | (60) |
| Total deferred income tax liabilities | (849) | (1,000) | (1,015) |
| Net deferred income taxes | $(139) | $ (127) | $ 887 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1994 <C> | 1995 <C> | 1996 <C> | NINE MONTHS ENDED MARCH 31, 1996 (Unaudited) <C> | 1997 <C> |
|---|---|---|---|---|---|
| Provision for income taxes at federal statutory rate | 35.0 % | 35.0 % | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit | 1.3 | (2.6) | 0.2 | 0.2 | (5.2) |
| Nontaxable earnings of FSC | (3.8) | (7.1) | (5.7) | (5.7) | (5.8) |
| Research and development tax credits | -- | (2.8) | -- | -- | (2.3) |
| Foreign income subject to tax at other than federal statutory rate | 3.2 | 0.7 | 1.1 | 1.1 | 0.2 |
| Government settlement | 16.8 | -- | -- | -- | -- |
| Other | (0.4) | 3.4 | 3.6 | 3.6 | 3.2 |
| Effective income tax rate | 52.1 % | 26.6 % | 34.2 % | 34.2 % | 25.1 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At March 31, 1997 undistributed earnings of the foreign subsidiaries amounted to $3,022,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal

options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of March 31, 1997 are as follows: (3 months) 1997, $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $825,000, $959,000, $901,000, $725,000, and $670,000 for the years ended June 30, 1994, 1995, and 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

Additional litigation involves claims that the Company interfered with pre-existing contractual rights of the plaintiff, who is claiming breach of contract and interference with contract, and is seeking compensatory damages of an indeterminate amount, as well as punitive damages and attorneys' fees. The Company has filed

<PAGE>

a cross-complaint claiming breach of contract and misrepresentation and seeks recovery for intentional interference with contractual relations, intentional interference with prospective economic advantage, slander per se, trade libel, and breach of written agreement. The Company has been informed by its counsel that the Company will be able to defend the lawsuit without any liability to the Company.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect on the Company's consolidated financial statements.

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the nine months ended March 31, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1994, 1995 and 1996 and for the nine months ended March 31, 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|
| Outstanding, July 1, 1993 | 355,125 | $1.10 | $ 390,000 |
| Granted | 37,500 | 2.33 | 88,000 |
| Exercised | (75,000) | 0.37 | (28,000) |
| Canceled | (9,750) | 1.03 | (10,000) |
| Outstanding, July 1, 1994 | 307,875 | 1.43 | 440,000 |
| Granted | 69,000 | 2.00 | 138,000 |
| Exercised | (60,000) | 1.25 | (75,000) |
| Canceled | (19,500) | 1.77 | (34,000) |
| Outstanding, July 1, 1995 | 297,375 | 1.57 | 469,000 |
| Granted | 51,000 | 2.17 | 111,000 |
| Exercised | (16,125) | 1.06 | (17,000) |
| Canceled | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996 | 318,375 | 1.70 | 541,000 |
| Granted | 235,125 | 2.98 | 701,000 |
| Exercised | (49,500) | 1.60 | (79,000) |
| Canceled | (5,250) | 2.00 | (10,000) |
| Outstanding, March 31, 1997 | 499,125 | $2.31 | $1,153,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of March 31, 1997:

<TABLE>
<CAPTION>

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING: NUMBER OUTSTANDING AT MARCH 31, 1997 | OPTIONS OUTSTANDING: WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | OPTIONS OUTSTANDING: WEIGHTED AVERAGE EXERCISE PRICE | OPTIONS EXERCISABLE: EXERCISABLE AT MARCH 31, 1997 | OPTIONS EXERCISABLE: WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|---|
| $0.17 to 0.67 | 58,500 | 0.8 years | $0.45 | 58,500 | $0.45 |
| 1.87 to 2.00 | 150,750 | 2.3 | 1.95 | 118,688 | 1.94 |
| 2.33 to 3.33 | 289,875 | 4.1 | 2.87 | 272,625 | 2.89 |
| $0.17 to 3.33 | 499,125 | 3.2 | $2.31 | 449,813 | $2.32 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and for the nine months ended March 31, 1997 pursuant to SFAS 123 was approximately $19,000 and $1,045,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $2,913,000, and pro forma net income per share would have been $0.36 and $0.46 for 1996 and for the nine months ended March 31, 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.28% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

Preferred stock is entitled to the same one vote per share as common stock and has a liquidation preference of $1.00 per preferred share.

In June 1997 holders of the preferred stock converted each preferred share into 1.5 shares of common stock.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 are approximately $61,000, $77,000, $83,000, $65,000, and $87,000 for messenger service and auto rental; $68,000, $78,000, $63,000, $42,000 and $64,000 for printing services; and $10,000, $23,000, $7,000, $7,000 and $3,000 for professional services, respectively. During the nine months ended March 31, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $302,000, $315,000, $263,000, $197,000 and $146,000 for the years ended June 30, 1994, 1995, 1996 and the nine months ended March 31, 1996 (unaudited) and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and included in selling, general and administrative expense in the accompanying statement of operations for the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At March 31, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

   13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the nine months ended March 31, 1997 and 1996 (unaudited) or for the years ended June 30, 1996, 1995 and 1994. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient

<PAGE>

to provide for benefits accruing after that date. Pension expense for the years ended June 30, 1994, 1995, and 1996 and for the nine months ended March 31, 1996 (unaudited) and 1997 was approximately $89,000, $111,000, $91,000, $67,000 and $64,000, respectively.

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1994 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $29,788 | $13,624 | $4,323 | | $47,735 |
| Transfer between geographical areas........................ | 1,551 | 742 | 882 | $ (3,175) | -- |
| Net revenues.................. | $31,339 | $14,366 | $5,205 | $ (3,175) | $47,735 |
| Operating income.............. | $ 1,028 | $ 564 | $ 653 | $ 28 | $ 2,273 |
| Identifiable assets........... | $29,266 | $ 9,629 | $2,923 | $(16,011) | $25,807 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1995 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $33,158 | $11,341 | $5,316 | | $49,815 |
| Transfer between geographical areas........................ | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues.................. | $34,856 | $12,129 | $9,147 | $ (6,317) | $49,815 |
| Operating income.............. | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets........... | $36,751 | $10,832 | $4,839 | $(21,642) | $30,780 |

</TABLE> 

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1996 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

</TABLE>

<TABLE>
<CAPTION>

| | NINE MONTHS ENDED MARCH 31, 1997 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues | $41,241 | $12,388 | $ 2,344 | | $55,973 |
| Transfer between geographical areas | 5,691 | 3,461 | 9,091 | $(18,243) | -- |
| Net revenues | $46,932 | $15,849 | $11,435 | $(18,243) | $55,973 |
| Operating income | $ 2,691 | $ 1,040 | $ 1,190 | $ (104) | $ 4,817 |
| Identifiable assets | $47,836 | $13,362 | $ 8,262 | $(25,146) | $44,314 |

</TABLE>

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

    The Company's security and inspection products are used for security purposes at locations such as airports, courthouses, government buildings, nuclear facilities, mail rooms, schools and prisons. In addition, the security and inspections products are also increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

| <S> | <C> |
|---|---|
| Securities and Exchange Commission registration fee | $ 18,052 |
| NASD filing fee | 6,457 |
| Nasdaq National Market System listing fee | 26,275 |
| Printing and engraving expenses | 100,000 |
| Transfer agent and registrar fees | 2,000 |
| Legal fees and expenses | 175,000 |
| Accounting fees and expenses | 150,000 |
| "Blue sky" fees and expenses | 15,000 |
| Other expenses | 167,216 |
| Total | $660,000* |

</TABLE>

* The Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a

director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

<PAGE>

action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee, or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company intends to enter into indemnification agreements ("Indemnification Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnification Agreement will provide that the Company will indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer, other than an action instituted by the director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect

<PAGE>

to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnification Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnification Agreement and to recover the expenses of such a suit if he is successful.

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued

in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

<PAGE>

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.* |
| 5.1 | Opinion of Troy & Gould Professional Corporation.* |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |

10.5 Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.*
10.6 Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1)
10.7 Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.*
10.8 Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2)
10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1)
10.10 Form of Indemnification Agreement for directors and executive officers of the Company.*
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1)
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).*
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1)
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1)
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1)
</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(1) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).* |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule.(1) |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office. |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy. |

</TABLE>

- --------
* To be filed by amendment.

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Replaces the exhibit previously filed with the corresponding exhibit number.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements

and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on August 1, 1997.

OSI SYSTEMS, INC.

By: /s/ DEEPAK CHOPRA
Deepak Chopra
Chairman, Chief Executive Officer and President

Pursuant to the requirements of the Securities Act of 1933, this amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ DEEPAK CHOPRA<br>Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | August 1, 1997 |

| | | |
|---|---|---|
| /s/ AJAY MEHRA<br>Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | August 1, 1997 |
| *<br>Steven C. Good | Director | August 1, 1997 |
| *<br>Meyer Luskin | Director | August 1, 1997 |
| *<br>Madan G. Syal | Director | August 1, 1997 |

*By: /s/ DEEPAK CHOPRA August 1, 1997

Deepak Chopra

as Attorney-In-Fact

II-6

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994.................. | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, 1995.................. | $203 | (70) | -- | 80 | $ 53 |
| Year Ended June 30, 1996.................. | $ 53 | $404 | -- | 181 | $276 |
| Nine Months Ended March 31, 1997.............. | $276 | $ 97 | -- | 79 | $294 |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.* |

5.1 Opinion of Troy & Gould Professional Corporation.*
10.1 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1)
10.2 1997 Stock Option Plan and forms of Stock Option Agreements.(2)
10.3 Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1)
10.4 Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1)
10.5 Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.*
10.6 Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1)
10.7 Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.*
10.8 Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2)
10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1)
10.10 Form of Indemnification Agreement for directors and executive officers of the Company.*
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1)
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).*
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1)
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1)
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1)
10.17 License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1)
10.18 Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1)
11.1 Statement regarding computation of earnings per share.(1)
21.1 Subsidiaries of the Company.(1)
23.1 Consent of Deloitte & Touche LLP.
23.2 Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).*
24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.(1)
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.

</TABLE>

- --------

* To be filed by amendment.

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Replaces the exhibit previously filed with the corresponding exhibit number.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.2
<SEQUENCE>2
<DESCRIPTION>1997 STOCK OPTION PLAN & FORM OF STOCK OPTION AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.2

                               1997 STOCK OPTION PLAN
OF
OSI SYSTEMS, INC.

1. PURPOSES OF THE PLAN

The purposes of the 1997 Stock Option Plan (the "Plan") of OSI Systems, Inc., a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or its Affiliates; and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (the "Code"), or "nonqualified options" ("NQOs").

2. ELIGIBLE PERSONS

Every person who at the date of grant of an Option is an employee of the Company or of any Affiliate (as defined below) of the Company is eligible to receive NQOs or ISOs under this Plan. Every person who at the date of grant is a consultant to, or non-employee director of, the Company or any Affiliate (as defined below) of the Company is eligible to receive NQOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 424(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

3. STOCK SUBJECT TO THIS PLAN; MAXIMUM NUMBER OF GRANTS

Subject to the provisions of Section 6.1.1 of the Plan, the total number of shares of stock which may be issued under Options granted pursuant to this Plan shall not exceed 850,000 shares of Common Stock (which gives effect to a 1.5-for-1 stock split of the Common Stock (the "Stock Split") to be effected in June 1997). The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. No eligible person shall be granted Options during any twelve-month period covering more than 425,000 shares (which gives effect to the Stock Split to be effected in June 1997).
<PAGE>

4. ADMINISTRATION

(a) The Plan shall be administered by the Board of Directors of the Company (the "Board") or by a committee (the "Committee") to which administration of the Plan, or of part of the Plan, is delegated by the Board (in either case, the "Administrator"). The Board shall appoint and remove members of the Committee in its discretion in accordance with applicable laws. If necessary in order to comply with Rule 16b-3 under the Exchange Act and Section 162(m) of the Code, the Committee shall, in the Board's discretion, be comprised solely of "non-employee directors" within the meaning of said Rule 16b-3 and "outside directors" within the meaning of Section 162(m) of the Code. The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

(b) Subject to the other provisions of this Plan, the Administrator

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 830 of 2711

shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the optionee, to modify or amend any Option; (ix) to defer (with the consent of the optionee) the exercise date of any Option; (x) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(c) All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

<PAGE>

## 5. GRANTING OF OPTIONS; OPTION AGREEMENT

(a) No Options shall be granted under this Plan after 10 years from the date of adoption of this Plan by the Board.

(b) Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Administrator, executed by the Company and the person to whom such Option is granted.

(c) The stock option agreement shall specify whether each Option it evidences is an NQO or an ISO.

(d) Subject to Section 6.3.3 with respect to ISOs, the Administrator may approve the grant of Options under this Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultants at the date of approval, and the date of approval shall be deemed to be the date of grant unless otherwise specified by the Administrator.

## 6. TERMS AND CONDITIONS OF OPTIONS

Each Option granted under this Plan shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall be also subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 Terms and Conditions to Which All Options Are Subject. All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1 Changes in Capital Structure. Subject to Section 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board in its sole discretion.

6.1.2 Corporate Transactions. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator,

in the exercise of its sole discretion, may permit exercise of any Options prior to their termination, even if such Options were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in

3

<PAGE>

the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Options prior to consummation of such event, even if such Options were not otherwise exercisable.

6.1.3 Time of Option Exercise. Subject to Section 5 and Section 6.3.4, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) in accordance with a schedule as may be set by the Administrator (in any case, the "Vesting Base Date") and specified in the written stock option agreement relating to such Option. In any case, no Option shall be exercisable until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee. Notwithstanding the foregoing, to the extent required by applicable laws, rules and regulations, the right to exercise Options granted pursuant to this Plan shall vest at the rate of at least 20% per year from the date of grant.

6.1.4 Option Grant Date. The date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

6.1.5 Nontransferability of Option Rights. Except with the express written approval of the Administrator which approval the Administrator is authorized to give only with respect to NQOs, no Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution. During the life of the optionee, an Option shall be exercisable only by the optionee.

6.1.6 Payment. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. The Administrator, in the exercise of its absolute discretion after considering any tax, accounting and financial consequences, may authorize any one or more of the following additional methods of payment:

(a) Acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company);

4

<PAGE>

(b) Subject to the discretion of the Administrator and the terms of the stock option agreement granting the Option, delivery by the optionee of shares of Common Stock already owned by the optionee for all or part of the Option price, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock; and

(c) Subject to the discretion of the Administrator, through the surrender of shares of Common Stock then issuable upon exercise of the Option,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 832 of 2711

provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by surrender of such stock.

(d) By means of so-called cashless exercises as permitted under applicable rules and regulations of the Securities and Exchange Commission and the Federal Reserve Board.

6.1.7 Termination of Employment. If for any reason other than death or permanent and total disability, an optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), Options held at the date of Termination (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, or such other period of not less than 30 days after the date of such Termination as is specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date); provided, however, that if such exercise of the Option would result in liability for the optionee under Section 16(b) of the Exchange Act, then such three-month period automatically shall be extended until the tenth day following the last date upon which optionee has any liability under Section 16(b) (but in no event after the Expiration Date). If an optionee dies or becomes permanently and totally disabled (within the meaning of Section 22(e)(3) of the Code) while employed by the Company or an Affiliate or within the period that the Option remains exercisable after Termination, Options then held (to the extent then exercisable) may be exercised, in whole or in part, by the optionee, by the optionee's personal representative or by the person to whom the Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of the optionee or any longer period specified in the Option Agreement or by amendment thereof (but in no event after the Expiration Date). For purposes of this Section 6.1.7, "employment" includes service as a director or as a consultant. For purposes of this Section 6.1.7, an optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if the optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

<PAGE>

6.1.8 Withholding and Employment Taxes. At the time of exercise of an Option and as a condition thereto, or at such other time as the amount of such obligations becomes determinable (the "Tax Date"), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. Such obligation to remit may be satisfied, if authorized by the Administrator in its sole discretion, after considering any tax, accounting and financial consequences, by the optionee's (i) delivery of a promissory note in the required amount on such terms as the Administrator deems appropriate, (ii) tendering to the Company previously owned shares of Stock or other securities of the Company with a fair market value equal to the required amount, or (iii) agreeing to have shares of Common Stock (with a fair market value equal to the required amount) which are acquired upon exercise of the Option withheld by the Company.

6.1.9 Other Provisions. Each Option granted under this Plan may contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

6.1.10 Determination of Value. For purposes of the Plan, the fair market value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is regularly quoted by a recognized securities dealer, and selling prices are reported, its fair market value shall

be the closing price of such stock on the date the value is to be determined, but if selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for such stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

(b) In the absence of an established market for the stock, the fair market value thereof shall be determined in good faith by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry, the Company's management, and the values of stock of other corporations in the same or a similar line of business.

6.1.11 Option Term. Subject to Section 6.3.4, no Option shall be exercisable more than 10 years after the date of grant, or such lesser period of time as is set forth in the stock option agreement (the end of the maximum exercise period stated in the stock option agreement is referred to in this Plan as the "Expiration Date").

6

<PAGE>

6.2 Terms and Conditions to Which Only NQOs Are Subject. Options granted under this Plan which are designated as NQOs shall be subject to the following terms and conditions:

6.2.1 Exercise Price. (a) Except as set forth in Section 6.2.1(b), the exercise price of a NQO shall be not less than 85% of the fair market value (determined in accordance with Section 6.1.10) of the stock subject to the Option on the date of grant.

(b) To the extent required by applicable laws, rules and regulations, the exercise price of a NQO granted to any person who owns, directly or by attribution under the Code (currently Section 424(d)), stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder") shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3 Terms and Conditions to Which Only ISOs Are Subject. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 Exercise Price. (a) Except as set forth in Section 6.3.1(b), the exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

(b) The exercise price of an ISO granted to any Ten Percent Shareholder shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3.2 Disqualifying Dispositions. If stock acquired by exercise of an ISO granted pursuant to this Plan is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code (a disposition within two years from the date of grant of the Option or within one year after the transfer such stock on exercise of the Option), the holder of the stock immediately before the disposition shall promptly notify the Company in writing of the date and terms of the disposition and shall provide such other information regarding the Option as the Company may reasonably require.

6.3.3 Grant Date. If an ISO is granted in anticipation of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 834 of 2711

employment as provided in Section 5(d), the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

7

<PAGE>

6.3.4 Term. Notwithstanding Section 6.1.11, no ISO granted to any Ten Percent Shareholder shall be exercisable more than five years after the date of grant.

7. MANNER OF EXERCISE

(a) An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price and withholding taxes as provided in Sections 6.1.6 and 6.1.8. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price will be considered as the date such Option was exercised.

(b) Promptly after receipt of written notice of exercise of an Option and the payments called for by Section 7(a), the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of stock. An optionee or permitted transferee of the Option shall not have any privileges as a shareholder with respect to any shares of stock covered by the Option until the date of issuance (as evidenced by the appropriate entry on the books of the Company or a duly authorized transfer agent) of such shares.

8. EMPLOYMENT OR CONSULTING RELATIONSHIP

Nothing in this Plan or any Option granted hereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any optionee's employment or consulting at any time, nor confer upon any optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

9. CONDITIONS UPON ISSUANCE OF SHARES

Shares of Common Stock shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act").

10. NONEXCLUSIVITY OF THE PLAN

The adoption of the Plan shall not be construed as creating any limitations on the power of the Company to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options other than under the Plan.

8

<PAGE>

11. MARKET STANDOFF

Each optionee, if so requested by the Company or any representative of the underwriters in connection with any registration of the offering of any securities of the Company under the Securities Act, shall not sell or otherwise transfer any shares of Common Stock acquired upon exercise of Options during the 180-day period following the effective date of a registration statement of the Company filed under the Securities Act; provided, however, that such restriction shall apply only to the first registration statement of the Company to become

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 835 of 2711

effective under the Securities Act after the date of adoption of this Plan which includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restriction until the end of such 180-day period.

12. AMENDMENTS TO PLAN

The Board may at any time amend, alter, suspend or discontinue this Plan. Without the consent of an optionee, no amendment, alteration, suspension or discontinuance may adversely affect outstanding Options except to conform this Plan and ISOs granted under this Plan to the requirements of federal or other tax laws relating to incentive stock options. No amendment, alteration, suspension or discontinuance shall require shareholder approval unless (a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes or (b) the Board otherwise concludes that shareholder approval is advisable.

13. EFFECTIVE DATE OF PLAN; TERMINATION

This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within twelve months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect from and after expiration of such twelve-month period. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws. This Plan (but not Options previously granted under this Plan) shall terminate within ten years from the date of its adoption by the Board.

14. DELIVERY OF FINANCIAL STATEMENTS

To the extent required by applicable laws, rules and regulations, the Company shall deliver to each optionee financial statements of the Company at least annually while such optionee holds an outstanding Option.

9

<PAGE>

OSI SYSTEMS, INC.
INCENTIVE STOCK OPTION AGREEMENT

THIS INCENTIVE STOCK OPTION AGREEMENT (the "Agreement"), is made as of the ___ day of _________ 19__ by and between OSI Systems, Inc., a California corporation (the "Company"), and __________________________ ("Optionee").

R E C I T A L

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of an incentive stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, _______________ shares of Common Stock of the Company ("Shares") at the price of

$________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary (fifth anniversary if Optionee owns more than 10% of the voting stock of the Company or an Affiliate of the Company on the date of this Agreement) of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

10.

<PAGE>

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

(C) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. In the event that this Option shall lose its qualification as an incentive stock option, as a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this

Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. In the event this Option is treated as a nonqualified stock option, then and to that extent, "employment" would include service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. This Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor confer upon Optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.3 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that, upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon each exercise thereof he shall furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state or federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms

                                        <PAGE>

and provisions of the Plan, as it may be construed by the Administrator. It is intended that this Option shall qualify as an incentive stock option as defined by Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement shall be construed in a manner which will enable this Option to be so qualified. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. Optionee understands that, under current law, beneficial tax treatment resulting from the exercise of this Option will be available only if certain requirements of the Code are satisfied, including without limitation, the requirement that no disposition of Shares acquired pursuant to exercise of this Option be made within two years from the grant date or within one year after the transfer of Shares to him or her. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form of transfer) of any such Shares, he or she will first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition. In addition to the foregoing, Optionee hereby agrees that before Optionee disposes (whether by sale, exchange, gift, or otherwise) of any Shares acquired by exercise of this Option within two years of the grant date or within one year after the transfer of such Shares to Optionee upon exercise of this Option, Optionee shall promptly notify the Company in writing of the date and terms of the proposed disposition and shall provide such other information regarding the Option as the Company may reasonably require immediately before such disposition. Said written notice shall state the date of such proposed disposition, and the type and amount of the consideration to be received for such Share or Shares by Optionee in connection therewith. In the event of any such disposition, the Company shall have the right to require Optionee to immediately pay the Company the amount of taxes (if any) which the Company is required to withhold under federal and/or state law as a result of the granting or exercise of the Option and the disposition of the Shares.

13.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By ______________________

Name:

Title:

OPTIONEE

______________________

Name:

Address:

______________________

______________________

______________________

OSI SYSTEMS, INC.
NONQUALIFIED STOCK OPTION AGREEMENT

THIS NONQUALIFIED STOCK OPTION AGREEMENT (the "Agreement"), is made as of the _____ day of ______________, 19___ by and between OSI Systems, Inc., a California corporation (the "Company"), and ____________________ ("Optionee").

R E C I T A L

Pursuant to the 1997 Stock Option Plan (the "Plan") of the Company, the Board of Directors of the Company or a committee to which administration of the Plan is delegated by the Board of Directors (in either case, the "Administrator") has authorized the granting to Optionee of a nonqualified stock option to purchase the number of shares of Common Stock of the Company specified in Paragraph 1 hereof, at the price specified therein, such option to be for the term and upon the terms and conditions hereinafter stated.

A G R E E M E N T

NOW, THEREFORE, in consideration of the promises and of the undertakings of the parties hereto contained herein, it is hereby agreed:

1. Number of Shares; Option Price. Pursuant to said action of the Administrator, the Company hereby grants to Optionee the option ("Option") to purchase, upon and subject to the terms and conditions of the Plan, ________ shares of Common Stock of the Company ("Shares") at the price of $________ per share.

2. Term. This Option shall expire on the day before the ________ anniversary of the date hereof (the "Expiration Date") unless such Option shall have been terminated prior to that date in accordance with the provisions of the Plan or this Agreement. The term "Affiliate" as used herein shall have the meaning as set forth in the Plan.

3. Shares Subject to Exercise. Shares subject to exercise shall be 25% of such Shares on and after the first anniversary of the date hereof, 50% of such Shares on and after the second anniversary of the date hereof, 75% of such Shares on and after the third anniversary of the date hereof and 100% of such Shares on and after the fourth anniversary of the date hereof. All Shares shall thereafter remain subject to exercise for the term specified in Paragraph 2 hereof, provided that Optionee is then and has continuously been in the employ of or providing services to the Company, or its Affiliate, subject, however, to the provisions of Paragraph 6 hereof.

4. Method and Time of Exercise. The Option may be exercised by written notice delivered to the Company at its principal executive office stating the number of shares with respect to which the Option is being exercised, together with:

(A) a check or money order made payable to the Company in the amount of the exercise price and any withholding tax, as provided under Paragraph 5 hereof; or

(B) if expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender to the Company of shares of the Company's Common Stock owned by Optionee having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes; or

(C) if expressly authorized in writing by the Administrator, in its

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 840 of 2711

sole discretion, at the time of the Option exercise, the Optionee's full recourse promissory note in a form approved by the Company; or

(D) if any other method such as cashless exercise is expressly authorized in writing by the Administrator, in its sole discretion, at the time of the Option exercise, the tender of such consideration having a fair market value, as determined by the Administrator, not less than the exercise price, plus the amount of applicable federal, state and local withholding taxes.

Not less than 100 shares may be purchased at any one time unless the number purchased is the total number purchasable under such Option at the time. Only whole shares may be purchased.

5. Tax Withholding. As a condition to exercise of this Option, the Company may require Optionee to pay over to the Company all applicable federal, state and local taxes which the Company is required to withhold with respect to the exercise of this Option. At the discretion of the Administrator and upon the request of Optionee, the minimum statutory withholding tax requirements may be satisfied by the withholding of shares of Common Stock of the Company otherwise issuable to Optionee upon the exercise of this Option.

6. Exercise on Termination of Employment. If for any reason other than death or permanent and total disability, Optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), this Option (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, but in no event after the Expiration Date; provided, however, that if such exercise of this Option would result in liability for Optionee under Section 16(b) of the Securities Exchange Act of 1934, then such three-month period automatically shall be extended until the tenth day following the last date upon which Optionee has any liability under Section 16(b), but in no event after the Expiration Date. If Optionee dies or becomes permanently and totally disabled (as defined in the Plan) while employed by the Company or an Affiliate or within the period that this Option remains exercisable after Termination, this Option (to the extent then exercisable) may be exercised, in whole or in part, by Optionee, by Optionee's personal

16.

<PAGE>

representative or by the person to whom this Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of Optionee, but in no event after the Expiration Date. For purposes of this Paragraph 6, "employment" includes service as a director or as a consultant. For purposes of this Paragraph 6, Optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if Optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

7. Nontransferability. Except with the express written approval of the Administrator, this Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised only by Optionee during his lifetime and after his death, by his personal representative or by the person entitled thereto under his will or the laws of intestate succession.

8. Optionee Not a Shareholder. Optionee shall have no rights as a shareholder with respect to the Common Stock of the Company covered by this Option until the date of issuance of a stock certificate or stock certificates to him upon exercise of this Option. No adjustment will be made for dividends or other rights for which the record date is prior to the date such stock certificate or certificates are issued.

9. No Right to Employment. Nothing in the Option granted hereby shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate Optionee's employment or consulting at any time, nor confer upon Optionee any right to continue in the employ of, or consult with,

the Company or any of its Affiliates.

10. Modification and Termination. The rights of Optionee are subject to modification and termination in certain events as provided in Sections 6.1 and 6.2 of the Plan.

11. Restrictions on Sale of Shares. Optionee represents and agrees that upon his exercise of this Option, in whole or in part, unless there is in effect at that time under the Securities Act of 1933 a registration statement relating to the Shares issued to him, he will acquire the Shares issuable upon exercise of this Option for the purpose of investment and not with a view to their resale or further distribution, and that upon such exercise thereof he will furnish to the Company a written statement to such effect, satisfactory to the Company in form and substance. Optionee agrees that any certificates issued upon exercise of this Option may bear a legend indicating that their transferability is restricted in accordance with applicable state and federal securities law. Any person or persons entitled to exercise this Option under the provisions of Paragraphs 5 and 6 hereof shall, upon each exercise of this Option under circumstances in which Optionee would be required to furnish such a written statement, also furnish to the Company a written statement to the same effect, satisfactory to the Company in form and substance.

<PAGE>

12. Plan Governs. This Agreement and the Option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the express terms and provisions of the Plan, as it may be construed by the Administrator. Optionee hereby acknowledges receipt of a copy of the Plan.

13. Notices. All notices to the Company shall be addressed to the Chief Financial Officer at the principal executive office of the Company at 12525 Chadron Avenue, Hawthorne, California 90250, and all notices to Optionee shall be addressed to Optionee at the address of Optionee on file with the Company or its subsidiary, or to such other address as either may designate to the other in writing. A notice shall be deemed to be duly given if and when enclosed in a properly addressed sealed envelope deposited, postage prepaid, with the United States Postal Service. In lieu of giving notice by mail as aforesaid, written notices under this Agreement may be given by personal delivery to Optionee or to the Chief Financial Officer (as the case may be).

14. Sale or Other Disposition. If Optionee at any time contemplates the disposition (whether by sale, gift, exchange, or other form or transfer) of any Shares acquired by exercise of this Option, he or she shall first notify the Company in writing of such proposed disposition and cooperate with the Company in complying with all applicable requirements of law, which, in the judgment of the Company, must be satisfied prior to such disposition.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

OSI SYSTEMS, INC.

By___________________________
Name:
Title:

OPTIONEE

By___________________________
Name:

Address:

____________________________
____________________________
____________________________

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.8
<SEQUENCE>3
<DESCRIPTION>EXPATRIATE EMPLOYMENT AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.8

EXPATRIATE EMPLOYMENT AGREEMENT

This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Singapore, a Singapore corporation having offices at 996 Bandemeer Road, #04-01/02, Singapore 1233 ("OSS") a wholly-owned subsidiary of OSI, and Opto Sensors, Malaysia, a Malaysian corporation having offices at Tebrau Industrial Estate No. 1, #8 Jalam Firma 2/2, 81200 Johor Bahru, Johor, Malaysia, a wholly-owned subsidiary of OSI.

OSI desires to employ Hickman as Managing Director of OSS and OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six months notice to the other of intent to terminate this agreement.

OSI agrees to offer Hickman a comparable position in the corporation upon termination of this agreement.

OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Singapore and Malaysia will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

OSI agrees to pay Hickman, from the time of his arrival in Malaysia, a salary of One Hundred Twenty Five Thousand dollars ($125,000) per annum for the first year of this agreement in monthly installments of Ten Thousand Four Hundred Sixteen Dollars and Sixty Seven Cents ($10,416.67) to be deposited in accounts in the United States, Singapore and Malaysia as directed by Hickman. At the beginning of this agreement, such deposits will be:

a. Seven Thousand Seven Hundred Fifty Dollars ($7,750.00US)

b. One Thousand Three Hundred Thirty Three and 33/100 US dollars ($1333.33US) in Singapore at an initial Exchange rate of $1.00 US equals $1.40

<PAGE>

Singapore or One Thousand Eight Hundred Sixty Six and 67/100 Singapore Dollars ($1866.67S),

c. One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Malaysia at a initial Exchange rate of $1.00 US equals $2.45 Malaysian or Three Thousand Two Hundred Sixty Six and 66/100 Malaysian Ringgit ($3266.66M)

d. During the first month of residence in Malaysia, OSI will pay to Hickman the Malaysian Ringgit equivalent Five Thousand US Dollars, or Twelve Thousand two hundred fifty Ringgit ($12,250.00M) as a one time payment for initial

outfitting in Malaysia. Such payment will be deducted by OSI from that month's deposit to Hickman's US account.

e. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

OSI agrees to provide housing selected by Hickman and utilities, for which payment will be made by OSM, for which Hickman agrees to reimburse the company or, alternatively, agrees to have the company deduct from Hickman's salary prior to deposit in the US, Singapore or Malaysia.

OSI agrees to provide an automobile selected by Hickman through OSM to Hickman for which Hickman agrees to reimburse the company or, alternatively, agrees to have the company deduct from Hickman's salary prior to deposit in the US, Singapore or Malaysia. Automobile insurance will be provided by the company as a company car.

OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia. Hickman agrees to schedule movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accomodation and meal expenses. Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

OSI agrees to provide temporary living accomodations and meal expenses for a period of not more than two weeks for Hickman and his wife during the period Hickman's household goods are in transit.

<PAGE>

OSI agrees to award Hickman options for Five Thousand Shares of OSI stock effective upon the date of Hickman's employment at OSS and OSM at the then-current value for management incentive options and, further, agrees to award Hickman an additional 5000 options for OSI stock, at the then-current value for such options, if OSS/OSM achieve a pre-tax profit of $1,000,000US or more during OSI's 1995/96 fiscal year.

OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

OSI will continue Hickman's current AETNA PPO Health Insurance coverage with the same employee contribution as at present, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

OSI will pay for a Singapore American Club membership for business use of Hickman as Managing Director of OSI/OSM. Hickman will pay for, or reimburse the company for, personal use of the club facilities.

Portions of this agreement may be duplicated in separate agreements pertaining solely to that portion of Hickman's employment applicable to Singapore or Malaysia. This agreement shall take precedence over any such other agreement and, in respect of any errors, omissions or conflict in wording between this and any other such agreements, the wording or content of this agreement shall be deemed to be correct.

For OptoSensors, Inc.:

/s/ Ajay Mehra      date: 7/12/95    /s/ Thomas K. Hickman   date: 7/12/95
- ------------------       --------   ---------------------       --------
                                     Thomas K. Hickman

its: Chief Financial Officer

<PAGE>

AGREEMENT FOR EXPATRIATE EMPLOYMENT IN SINGAPORE

1. This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

2. OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Singapore, a Singapore corporation having offices at 996 Bendemeer Road, #04-01/02, Singapore 1233 ("OSS") a wholly-owned subsidiary of OSI.

3. OSI desires to employ Hickman as Managing Director of OSS and OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six month's notice to the other of intent to terminate this agreement.

4. OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Singapore will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

5. For service as Managing Director of OSS, OSI agrees to pay Hickman a monthly salary of One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Singapore at an initial Exchange rate of $1.00 US equals $1.40 Singapore or One Thousand Eight Hundred Sixty Six and 67/100 Singapore Dollars ($1866.67S),

6. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

7. OSI agrees to provide housing and utilities for Hickman and his wife in Johor Bahru, Malaysis, for which payment will be made by OSM.

8. OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia. Hickman agrees to schedule

<PAGE>

movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accommodation and meal expenses. Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

9. OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

10. OSI agrees to provide temporary living accommodations and meal expenses for Hickman and his wife during the period Hickman's household goods are in transit.

11. OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

12. OSI will continue Hickman's current AETNA PPO Health Insurance coverage, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

For OptoSensors, Inc.:

/s/ Ajay Mehra  date: 7/12/95  /s/ Thomas K. Hickman  date: 7/12/95
- ----------------  --------  ---------------------  ---------
Thomas K. Hickman
its: Chief Financial Officer

<PAGE>

AGREEMENT FOR EXPATRIATE EMPLOYMENT IN MALAYSIA

1. This Agreement is made and effective this 11th day of July, 1995, by and between Opto Sensors, Inc., a California corporation having offices at 12525 Chadron Ave., Hawthorne, CA 90250 ("OSI") and Thomas K. Hickman, an individual residing at 10 Miwok Way, Inverness, CA 94937 ("Hickman").

2. OSI, through various subsidiary corporations, designs and manufactures electronic assemblies, among which are Opto Sensors, Malaysia, a Malaysian corporation having offices at Tebrau Industrial Estate No. 1, #8 Jalam Firma 2/2, 81200 Johor Bahru, Johor, Malaysia, a wholly-owned subsidiary of OSI.

3. OSI desires to employ Hickman as Managing Director of OSM for a period of not less than two years and Hickman agrees to serve as Managing Director for such term. After the initial term of two years, both parties agree to give a minimum of six month's notice to the other of intent to terminate this agreement.

4. OSI will, with the full cooperation of Hickman but at the company's expense, assure that work permits or other authority to work in Malaysia will be obtained and that permanent resident visas are obtained for Malaysia for Hickman and his wife.

5. For service as Managing Director of OSM, OSI agrees to pay Hickman a monthly salary of One Thousand Three Hundred Thirty Three and 33/100 US Dollars ($1333.33US) in Malaysia at a initial Exchange rate of $1.00 US equals $2.45 Malaysian or Three Thousand Two Hundred Sixty Six and 66/100 Malaysian Ringgit ($3266.66M).

6. During the first month of residence in Malaysia, OSI will pay to Hickman the Malaysian Ringgit equivalent Five Thousand Dollars, or Twelve Thousand Two Hundred Fifty Ringgit ($12,250.00M) as a one time payment for initial outfitting in Malaysia.

7. The rates of exchange for deposits made in Singapore and Malaysia shall remain fixed for the first year of Hickman's employment at OSS/OSM and will be reexamined by the parties at the beginning of each successive year.

8. OSI agrees to provide housing and utilities for Hickman and his wife in Johor Bahru for which payment will be made by OSM.

9. OSI agrees to provide an automobile through OSM, of Malaysian registration, for business and personal use. Automobile insurance will be provided by the company as a company car.
<PAGE>

10. OSI agrees to pay for packing, freight and cartage of Hickman's household goods to the place of residence in Malaysia, or to pay packing, cartage and storage of household goods not taken to Malaysia. Hickman agrees to schedule movement of household goods by sea and air to provide for a lowest cost combination of household goods move and temporary living accommodation and meal expenses. Estimates for material, packing, storage and transport will be provided for OSI review and agreement prior to Hickman's move to Malaysia.

11. OSI agrees, upon termination of this agreement and Hickman's employment in Malaysia, to pay to return Hickman's household goods from Malaysia or from storage whether or not Hickman returns to the US as an employee of OSI or one of its subsidiaries.

12. OSI agrees to provide temporary living accommodations and meal expenses for Hickman and his wife during the period Hickman's household goods are in transit.

13. OSI will pay, or reimburse Hickman for, annual round-trip home-leave coach airfare for himself and his wife to and from his current place of residence at a time of Hickman's choosing provided such time is not inconsistent with the needs of the company.

14. OSI will continue Hickman's current AETNA PPO Health Insurance coverage, or, upon any change of carrier by OSI or such subsidiary as may provide for Hickman's insurance, provide for transfer to such new carrier.

For OptoSensors, Inc.:

/s/ Ajay Mehra date:7/12/95 /s/ Thomas K. Hickman date:7/12/95
- ----------------------- ---------------------
its: Chief Financial Officer Thomas K. Hickman

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.11
<SEQUENCE>4
<DESCRIPTION>JOINT VENTURE BY AND AMONG CO. & ELECT. CORP.
<TEXT>

<PAGE>

EXHIBIT 10.11

JOINT VENTURE AGREEMENT

by and among

OPTO-SENSORS, INC.

and

ELECTRONICS CORPORATION OF INDIA, LIMITED

Dated as of 4th January, 1994.

<PAGE>

JOINT VENTURE AGREEMENT
-----------------------

THIS JOINT VENTURE AGREEMENT (this "Agreement") is made as of the 4th day of January, 1994 by and among Opto-Sensors,Inc. ("OSI"), a corporation organized under the laws of the State of California, U.S.A., and having its principal executive office at 12525 Chadron Avenue, Hawthorne, California 90250, U.S.A.; Electronics Corporation of India, Limited ("ECIL"), a corporation organized under the laws of India and having its registered office at Hyderabad, India (OSI and ECIL are collectively referred to as the "Stockholders"); and the Company (as defined in the first recital hereinbelow)).

WHEREAS, OSI and ECIL desire to enter into this Agreement in order to, inter alia, organize a limited liability joint stock corporation under the laws of India (the "Company") to manufacture, assemble, test, market, sell and service the Products (as defined in Section 1.16 hereof) throughout India, and any other territories as are subsequently agreed upon in writing by both of the Stockholders (collectively, the "Territory"), on the terms and conditions set forth hereinafter; and

WHEREAS, the parties hereto desire to proceed with the establishment and operation of the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

ARTICLE 1
DEFINITIONS

As used in this Agreement, the following terms shall, unless the context otherwise requires, have the meanings respectively ascribed to them below:

1.1 "ACT" shall have the meaning ascribed to it in Section 2.1 hereof.

1.2 "AFFILIATE" shall mean any individual or entity which directly, or

indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the party specified by virtue of fifty-one percent (51%) or greater direct or indirect equity ownership (excluding holdings by the Government of India and by the other Directors of the Company.)

1.3 "ARTICLES" shall have the meaning ascribed to it in Section 2.5 hereof.

-1-

<PAGE>

1.4 "BUSINESS" shall have the meaning ascribed to it in Section 12.2 hereof.

1.5 "COMPANY" shall have the meaning ascribed to it in the first recital hereto.

1.6 "COMPONENTS" shall have the meaning ascribed to it in Section 6.1 hereof.

1.7 "DEFAULTING STOCKHOLDER" shall have the meaning ascribed to it in Section 3.5 hereof.

1.8 "DISCLOSED PROPRIETARY TECHNOLOGY" shall have the meaning ascribed to it in Section 12.3 hereof.

1.9 "ECIL" shall have the meaning ascribed to it in the preamble hereto.

1.10 "EFFECTIVE DATE" shall have the meaning ascribed to it in Section 11.1 hereof.

1.11 "FISCAL YEAR" shall have the meaning ascribed to it in Section 2.10 hereof.

1.12 "LICENSES" shall have the meaning ascribed to it in Section 5.1 (a) hereof.

1.13 "MEMORANDUM" shall have the meaning ascribed to it in Section 2.6 hereof.

1.14 "OSI" shall have the meaning ascribed to it in the preamble hereto.

1.15 "OWNERSHIP PERCENTAGES" shall have the meaning ascribed to it in Section 3.2 hereof.

1.16 "PRODUCTS" shall mean single and multi-energy X-ray baggage inspection systems, explosive detectors, walk-through metal detectors and related security products as itemized on Schedule A attached hereto.

1.17 "PROPRIETARY TECHNOLOGY" shall mean engineering and technical data and information, know-how, trademarks and trade secrets, patentable and unpatentable inventions and confidential information.

1.18 "RECIPIENT" shall have the meaning ascribed to it in Section 12.3 hereof.

1.19 "RSPI" shall mean and refer to Rapiscan Security Products, Inc., a California corporation.

-2-

<PAGE>

1.20 "STOCKHOLDERS" shall have the meaning ascribed to it in the preamble hereto.

1.21 "TERRITORY" shall have the meaning ascribed to it in the first recital hereto.

ARTICLE 2
FORMATION OF COMPANY

2.1 Formation: Within [fifteen (15)] days following the Effective Date,

or, if not reasonably practicable within the aforesaid period, as soon thereafter as is reasonably practicable, the Stockholders shall cause the Company to be organized and registered under the Indian Companies Act, 1956 (the "Act"), as a limited liability joint stock corporation.

2.2 Name: The name of the Company shall be "ECIL-RAPISCAN SECURITY PRODUCTS LIMITED".

2.3 Office: The registered office of the Company shall be located at Hyderabad, India.

2.4 Business Purposes: The general business purposes of the Company shall be to: (i) arrange for the manufacture, assembly and testing of the Products in India, (ii) market and sell the Products throughout the Territory, (iii) service the Products sold throughout the Territory, and (iv) engage in such other activities as may be incidental or necessary to the foregoing.

2.5 Articles of Association: The Articles of Association of the Company (the "Articles") shall conform with the terms and provisions of this Agreement and shall set forth such other provisions as are required under the laws of India or are generally included in articles of association of limited liability joint stock corporations organized under the Act.

2.6 Memorandum of Association: The Memorandum of Association of the Company (the "Memorandum") shall conform with the terms and provision of this Agreement and set forth such other provisions as are required under the laws of India or are generally included in memoranda of association of limited liability joint stock corporations organized under the Act.

2.7 Other Filings: The Stockholders shall at all times cause the Company to prepare and file all filings, reports, notices and other documents or instruments as may be necessary or appropriate to maintain the valid and legal existence of the Company under the laws of India.

<PAGE>

2.8 Organizational Expenses: All costs and expenses related to the organization and registration of the Company shall be borne and promptly paid by ECIL, provided that, the Company shall reimburse ECIL for the reasonable amounts of money actually spent by ECIL after January 1, 1994 in forming the Company and in obtaining the requisite approvals pursuant to Section 12.1 hereof. Such reimbursements shall exclude all costs and expenses incurred by ECIL (including legal and other professional fees) (i) in the drafting and finalizing of the Articles, the Memorandum and any other organizational document, and (ii) in their filing with the relevant authorities pursuant hereto.

2.9 Ratification: As soon as practicable following its organization, the Stockholders shall cause the Company to ratify and confirm this Agreement through the execution hereof by its President and Financial Controller. Upon such execution, the Company shall become a party to, and shall be bound by all of the provisions of this Agreement.

2.10 Fiscal Year: The fiscal year ("Fiscal Year") of the Company shall end on the 31st of March each calendar year.

## ARTICLE 3
## CAPITALIZATION

3.1 Capital Stock: The authorized capital stock of the Company shall consist of ten (10) lakh shares of a single class of equity shares having a par value of Ten Rupees (Rs.10) per share. Except as may be otherwise agreed upon in writing by the Stockholders, the Company shall have no other classes of

capital stock.

3.2 Initial Capital: The initial paid-up capital of the Company shall consist of the sum of Rs.50,00,000 (Rupees fifty lakhs). Within five (5) days after the Effective Date, each Stockholder shall subscribe for equity shares of the Company in the respective percentages (as may be modified in accordance with the terms hereof, from time to time, (the "Ownership Percentages") set forth opposite its name below:

<TABLE>
<CAPTION>

| Stockholder | No. of Shares | Subscription Price | Ownership Percentage |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| OSI | 2,55,000 | 25,50,000 | 51% |
| ECIL | 2,45,000 | 24,50,000 | 49% |
| TOTAL | 5,00,000 | 50,00,000 | 100% |

</TABLE>

3.3 Payment: All subscriptions by the Stockholders for the Company's shares pursuant to Section 3.2 hereof shall be at par value, and shall be payable by each Stockholder by wire transfer

<PAGE>

of available funds immediately to a bank account of the Company within three (3) days of the Effective Date. Notwithstanding the foregoing, any payment to be made by OSI under this Section 3.3 shall be subject to and conditioned upon any and all governmental approvals, permits, or consents required under any law, rule, regulation or administrative practice applicable to a funds transfer from a bank located in the United States to a bank located in India.

3.4 Additional Capital: Stockholders' Loans:

(a) The Stockholders shall contribute additional equity capital to the Company in proportion to their respective, then existing Ownership Percentages for purposes of the business and operating needs of the Company. In addition, the stockholders hereby agree to loan the following respective amounts to the company, on such terms and conditions as are mutually agreed to by the Stockholders, within ninety (90) days of the Effective Date:

| Stockholder | Amount |
|---|---|
| OSI | Rs. 16,32,000 |
| ECIL | Rs. 15,68,000 |

(b) The issuance price and number of shares of capital stock to be issued by the Company to the Stockholders in exchange for additional equity capital contributions and the time and manner of payment therefor shall be set forth in a written notice of capital call which shall be given by the Board of Directors of the Company to the Stockholders no less than twenty (20) days prior to the date specified in such notice for the contribution of additional capital. Except as may be otherwise mutually agreed upon in writing by the Stockholders, no Stockholder shall have any obligation to contribute additional capital to the Company other than as provided in this Section 3.4.

3.5 Defaults: Failure by a Stockholder (the "Defaulting Stockholder") to contribute its pro-rata share of additional equity capital pursuant to Section 3.4 in the time and manner specified in the notice provided therefor shall constitute a material breach of this Agreement for purposes of Section 11.3(10) hereof. Notwithstanding the foregoing, the other Stockholder shall have the option in its absolute discretion to waive the default by a Defaulting Stockholder for purposes of Section 11.3(10) by a written waiver signed by the other Stockholder, provided, however, that no such waiver shall be deemed a continuing waiver or a waiver of any subsequent default under this Section 3.5 or of any other right or obligation under this Agreement. In the event of a

waiver hereunder by the other Stockholder, the Ownership Percentage of each of the Stockholders shall be redetermined as of the date the additional equity

-5-

<PAGE>

capital contribution is made by the other Stockholder and shares of the Company's capital stock are exchanged therefor to equal each Stockholder's respective percentage ownership of the then total outstanding shares of the capital stock of the Company.

3.6 Preemptive Rights: Except as may be mutually agreed otherwise in writing by the Stockholders, each Stockholder shall have a pre-emptive right vis-a-vis third parties to subscribe for and to purchase a portion of any new issuance of shares of capital stock by the Company in such amount as would be necessary for such Stockholder to maintain its respective, then existing Ownership Percentage.

3.7 Financing: The Stockholders shall cause the Company to the maximum extent practicable to borrow funds upon commercially reasonable terms and conditions from such commercial banks or other financial institutions as may be consistent with reasonable and prudent business practices for purposes of financing the Company's business and operating needs. Except as may be expressly agreed to in writing by both of the Stockholders, neither Stockholder shall have any obligation or commitment, except as otherwise expressly provided in Section 3.4(a) hereof, to loan funds to or to guarantee the borrowings of the Company, or to extend such Stockholder's own credit on behalf of the Company.

3.8 Company Banks. The Stockholders shall cause the Company to establish [lines of credit, deposit accounts and CC A/c] with no less than two commercial banks of established reputation organized under the laws of India. The foregoing commercial banks of the Company shall be jointly selected in good faith consultation between the Stockholders.

ARTICLE 4
JOINT REPRESENTATIONS AND COVENANTS OF THE STOCKHOLDERS

4.1 Representations and Warranties: Each Stockholder represents and warrants to the other Stockholder that: (i) it is a corporation duly organized, validly existing and in good corporate standing under the laws of its jurisdiction of incorporation, (ii) it has full corporate power and authority to enter into and to perform this Agreement, and (iii) its execution and performance of this Agreement will not violate any provision of applicable law or regulation or its organizational instruments, and will not result in any material breach of any material contract or agreement by which it is bound.

4.2 Good Faith: Each Stockholder hereby agrees to exercise good faith at all times when dealing with the other Stockholder and with the Company, and to affirmatively promote and further the business and best interests of the Company.

-6-

<PAGE>

ARTICLE 5
UNDERTAKINGS OF OSI

5.1 Furnishing of Technology:

(a) OSI shall cause RSPI to grant a license to ECIL and the Company, for the term of this Agreement or such shorter period as the Company and ECIL duly perform and observe their obligations hereunder, of that portion of RSPI's Proprietary Technology necessary to enable ECIL and the Company to manufacture, assemble and test or to arrange for the manufacture, assembly and testing of the Products in the Territory (the "Operations"). OSI confirms that the Proprietary Technology of RSPI covered by the License shall be sufficient to permit the manufacture and assembly of the Products in complete form by the Company (or its

sub-contractors as contemplated hereunder. Notwithstanding Section 11.4 (b) hereof, and subject to terms and conditions that are agreed upon by the Stockholders prior to the termination of the Agreement, contemporaneously with the expiry of the natural term of this Agreement pursuant to Section 11.2 hereof, OSI shall cause RSPI to grant to the Company (i) a license to RSPI's Proprietary Technology required by the Company in its Operations, and (ii) any additional licenses granted pursuant to Section 5.1 (b) hereof (collectively the "Licenses").

(b) OSI shall cause RSPI to grant a license to ECIL and the Company, for the term of this Agreement or such shorter period as the Company and ECIL duly perform and observe their obligations hereunder, of any improvements developed by RSPI pertaining to the manufacture of the Products or their sale and distribution, and such improvements to the Products, as would be conducive to the furtherance of the business purposes described in Section 2.4 hereof. Nothing contained in this Section 5.1(b), however, shall be construed as requiring OSI to cause RSPI to furnish or disclose to the Company or to ECIL any information or data which RSPI or OSI is prohibited from transferring or disclosing by virtue of any restriction or obligation under any other agreements to which RSPI or OSI is a party or which RSPI is prohibited from transferring or disclosing under any applicable laws, rules or regulations.

(c) The board of directors of RSPI hereby agree to pass a resolution setting forth the terms necessary for the licensing of technology to the Company and by ECIL as more fully set forth in Section 5.1 (a) and 5.1 (b) hereof, and in the event RSPI is disassociated from OSI this Agreement shall remain in full force and shall be deemed to have the same effect as though executed by RSPI.

<PAGE>

(d) RSPI hereby agrees to indemnify the Company and ECIL against any disputes or suits filed for the infringement of RSPI patents or other RSPI patent rights relating to the Proprietary Technology used in the Product.

(e) ECIL hereby agrees to indemnify the Company and OSI for the infringement of any patent or patent rights in respect of the Trent I technology being provided by ECIL to the Company pursuant hereto.

5.2 <u>Inspection of Machinery and Supplies</u>: OSI shall inspect the machinery and other items to be purchased from RSPI and its Affiliates by or on behalf of the Company before they are dispatched to the Company.

5.3 <u>Training of Company's Personnel</u>: OSI shall train in India, with ECIL's assistance, such number of personnel as are reasonably required by the Company so as to fulfill the business purposes of the Company more fully set forth in Section 2.4 hereof.

## ARTICLE 6
## UNDERTAKINGS OF THE COMPANY

6.1 <u>Purchase Obligations</u>: The Company hereby agrees to purchase all the components initially required to manufacture the Products (the "Components") from OSI, or from other suppliers suggested by OSI, at a mutually agreeable price. However, if Components of similar quality and at similar or cheaper cost are manufactured and are available in a timely manner in India or abroad, the Company may at its discretion purchase such cheaper Components. All the Products manufactured by ECIL on behalf of the Company will be purchased by the Company on such terms, including price, as shall be negotiated by ECIL and the Company in good faith. However, if the Products manufactured by ECIL on behalf of the Company are available from any source whatsoever, at a cheaper price, after factoring into such price all applicable duties (payable abroad or in India), and are of the same quality as the Products manufactured by ECIL, the Company may at its discretion purchase such cheaper Products. The initial prices of the Components and the Products are set forth on Schedules "B" and "C" attached hereto and such Schedules are subject to revision from time to time depending on changes in the cost of inputs.

6.2 <u>Supply of Components and Technology</u>: The Company hereby agrees to

provide ECIL with the components necessary for ECIL to manufacture the Products on behalf of the Company.

<PAGE>

ARTICLE 7
UNDERTAKINGS OF ECIL

7.1 Manufacture of Products: ECIL hereby agrees to manufacture the Products for and on behalf of the Company. ECIL shall have the right to sub-contract various sub-assemblies of the Products (including the conveyor frame, PCB Blanks and other mechanical fabricated parts). However, all such subcontracts entered into by ECIL shall be at the risk of ECIL, and ECIL shall make good any loss caused to the Company due to defective parts, workmanship, delay in delivery or otherwise in connection with any such subcontract. ECIL agrees that without the prior written consent of OSI and the Company it will not sell the Products to any person or entity other than the Company.

7.2 Governmental Approvals: ECIL shall be responsible for obtaining, and shall use its best efforts to obtain, all the necessary governmental approvals for the formation of the Company, or for any of the other matters covered by this Agreement, including all necessary approvals of the Government of India and all other relevant Indian State Governments, but excluding all necessary approvals of any United States governmental entities.

7.3 Installation and Servicing of Products: ECIL shall use its marketing and servicing network to the extent necessary or desirable for the installation and servicing of the Products, if so requested by the Company, at a price and on such other terms to be mutually agreed upon by ECIL and the Company.

ARTICLE 8
DIVIDENDS

8.1 Dividend. The Company's Board of Directors shall determine the amount and the timing of the declaration and the payment of any dividend by the Company to the Stockholders. The dividend payable to OSI shall be paid by the Company in U.S. dollars net of taxes, and all such taxes shall be paid by the Company.

ARTICLE 9
MANAGEMENT AND OPERATIONS

9.1 Directors: The Board of Directors of the Company (the "Board") shall consist of six (6) or eight (8) members represented equally by OSI and ECIL. The Chairman of the Board of Directors shall be the Chairman of the Board of Directors of ECIL, who shall be included in the total number of directors nominated by ECIL pursuant hereto. The Stockholders shall vote their respective shares for the election of the directors so nominated and, in the event of a vacancy for any reason on the Board, shall vote their respective shares for the election of a

<PAGE>

replacement director nominated by the Stockholder which had nominated the director whose death, resignation or removal had resulted in such vacancy. The term of a director of the Company shall be for one year or until the general meeting of the Company's stockholders following his or her appointment, whichever is later.

Veto Powers of the Chairman of Board: The Chairman shall have no veto powers on any of the issues that come before the Board.

9.2 Initial Directors: The Stockholders shall appoint, within five (5) business days of the Effective Date, the following persons to be the initial directors of the Company:

| | |
|---|---|
| CHAIRMAN | Dr. C. RAO KASARABADA. |
| MANAGING DIRECTOR | L. SATYANARAYANA |
| DIRECTOR | K.S. MURTHY |
| DIRECTOR | DEEPAK CHOPRA<br>ALTERNATE: Y.K. MEHTA/TOM SCHORLING |
| DIRECTOR | AJAY MEHRA<br>ALTERNATE: ANTHONY CRANE/R.L. CHOPRA |
| DIRECTOR | BRIGADIER R.K. MEHTA |

9.3 Auditors: The Company shall have one (1) independent auditor to be jointly selected by the Stockholders, provided, however, that the Company's initial independent auditor shall be M/S. Bhaskar Rao & Co., Chartered Accountants.

9.4 Initial Officers: The Stockholders shall cause the Board nominated pursuant hereto to appoint, within [ten (10)] business days of the Effective Date, the following persons to the respective offices set forth opposite their names as the initial officers of the Company:

| | |
|---|---|
| PRESIDENT | L. SATYANARAYANA |
| FINANCIAL CONTROLLER | D.V. SARMA |
| COMMERCIAL MANAGER (DIRECTOR MARKETING) | BRIGADIER R.K. MEHTA |

The term of the foregoing initial officers shall be one year initially and two years thereafter.

9.5 Permanent Management:

(a) Board of Directors: The business of the Company shall be managed by or under the direction and supervision of the Board, which may exercise all such powers of the Company and do all such lawful acts and things as are not by statute, the Articles, the Memorandum or this Agreement specifically directed

<PAGE>

or required to be exercised or undertaken by the stockholders of the Company.

(b) Officers. The officers of the Company shall be appointed by the Board and shall consist of:

(1) a President
(2) a Financial Controller
(3) a Commercial Manager
(4) a Marketing Executive
(i.e., Director Marketing)

Any number of offices may be held by the same person, unless the Articles otherwise provide. The Board shall, on the first anniversary of the date of the formation of the Company, appoint each of the officers of the Company. The officers of the Company so appointed shall serve for terms which shall be set forth in the respective contracts of appointment.

9.6 Board Meetings:

(a) General: All matters pertaining to actions and meetings by and of the Board shall be governed by the Articles which shall incorporate all of the relevant terms hereof, provided that, the Articles shall include a provision that all Board of Directors meetings shall be held in New Delhi, Bombay or in any other place that may be mutually convenient.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 854 of 2711

(b) Quorum Requirement: 1/3rd of the total strength of Directors (any fraction contained in that 1/3rd being rounded off as one) or two Directors (whichever is higher) shall constitute the quorum for a Board of Directors meeting, provided that, at least one Director nominated by ECIL and one Director (or an alternate Director) nominated by OSI present at the meeting shall be required to constitute such quorum.

(c) Notice Requirement: Written notice of an extraordinary general meeting of the Company's Board of Directors stating the place, date and hour of the meeting shall be given to each Director not less than twenty one (21) nor more than sixty (60) days before the date of such meeting. Any documents to be reviewed or discussed at such meeting shall accompany such notice.

(d) Written Consent in Lieu of Meeting. Except as otherwise expressly provided in the Act, a resolution in writing, executed by all of the members of the Board of Directors or of a committee thereof entitled to receive notice of a meeting of the Board of Directors or of such committee, shall be valid and shall have the same effect as if passed at a meeting, of the Board or of such committee, duly convened and held.

<PAGE>

9.7 Stockholder Meetings:

(a) General and Extraordinary General Meetings: The time and place of all general and extraordinary general meetings of the Company's stockholders shall be as provided for in the Articles.

(b) Notice Requirement: Written notice of an extraordinary general meeting of the Company's stockholders stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than twenty one (21), nor more than sixty (60), days before the date of the meeting. Any documents to be reviewed or discussed at such meeting shall accompany such notice.

(c) Quorum Requirement: A minimum of two stock/shareholders holding in aggregate 50% of the Company's issued and paid-up share capital/stock and entitled to vote thereat, present in person, or represented by proxy, shall constitute a quorum at all meetings of the share/stockholders of the Company for the transaction of business, except as otherwise provided by a statute or the Articles. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(d) Proxy Rights: A stockholder of the Company shall be entitled to exercise its right to vote at general and extraordinary general meetings of stockholders by proxy, and the holder of any such proxy shall not be limited to a stockholder of the Company.

(e) Matters Reserved Exclusively for and Requiring Majority of Stockholders: The following actions of the Company shall be decided solely by the affirmative vote of the majority of the stockholders of the Company, and without any approval by the Board:

(1) the sale by the Company of its shares of stock in a public

affecting;

(2) the declaration by the Company of a dividend on its capital stock;

<PAGE>

(3) the acquisition by the Company of any interest in the legal or beneficial ownership of any other corporation or business association;

(4) the formation of a subsidiary corporation by the Company;

(5) adoption and amendment of the Articles;

(6) adoption and amendment of the Memorandum;

(7) issuance by the Company of any bonds or debentures;

(8) borrowing money in an amount which, together with the aggregate balance of all outstanding borrowings, exceeds 300% of the paid-in capital of the Company;

(9) voluntary winding up of the Company;

(10) transfer of all or a substantial portion of the Company's business or assets; and

_provided that_, Subsections (1),(5),(6) and (9) herein above require the affirmative vote of a 2/3rd majority of the stockholders of the Company.

9.8 _Financial Statements:_ The Company shall maintain true and accurate books of account and records in accordance with Indian generally accepted accounting principles consistently applied. The Company shall provide each of the Stockholders with (i) interim internal financial reports every one (1) month, consisting of an income statement, a balance sheet, and a cash flow statement, and (ii) an audited financial report (within ninety (90) days after the close of each Fiscal Year.

9.9 _Access to Books/Records:_ Access to the books and records of account of the Company shall be made available to the Stockholders or their authorized representatives at all reasonable times during normal business hours. Whenever reasonably so requested by a Stockholder, the Company shall make information regarding its business operations and financial condition available to such Stockholder.

<PAGE>

ARTICLE 10
SHARE TRANSFERS

10.1 _Stock Transfers:_

(a) Each of the Stockholders agrees not to sell, assign, pledge or in any manner transfer title or right to, or otherwise encumber, any of the Company shares held by it, without the prior approval of the Board. All stock certificates which the Company issues shall bear a legend as follows: "Any transfer of the shares of stock of the Company shall be subject to approval of the Board of Directors of the Company."

(b) If a Stockholder which desires to transfer its shares to a specified third party, other than an Affiliate of said Stockholder, has received the prior approval of the Board, said Stockholder (the "Transferor") may sell any or all of the Company shares owned by it to said third party which has made a bona fide offer to purchase any or all of the Company shares owned by it, provided that in such case the Transferor shall give prior written notice to the Company and first offer and give the other Stockholder an opportunity to

purchase the shares on the same terms and conditions as offered by the specified third party. if all the shares offered as aforesaid are purchased by the other Stockholder, the necessary transfer shall be effected forthwith.

(c) When such offered shares are not all purchased and paid for in full by the other Stockholder within sixty (60) days of the initial offer by the Transferor to the other Stockholder, the Transferor shall have the right to either itself retain the remaining unsold shares or sell the remaining unsold shares to the aforesaid third party on the identical terms and conditions described in the prior written notice to the Company.

(d) Any notice made pursuant to subsection (b) of this Section 10 shall be made in writing and shall identify the proposed transferee to whom the Transferor desires to sell shares, and shall contain the specific terms and conditions of the offer.

(e) The options open to the Transferor pursuant to subsection (c) above shall be exercised within sixty (60) days of it having been ascertained that the shares are not to be purchased and paid for in full by the other Stockholder within said period of sixty (60) days, failing which the Transferor shall be deemed to have elected to retain all the shares originally offered.

(f) In any transfer of Company shares from a Stockholder, the transferee shall submit to the Company and the non-transferring Stockholder an agreement by such transferee to

<PAGE>

take the place of the Transferor with respect to, and to be bound as a party to, this Agreement and to assume such of the rights and obligations of the Transferor hereunder as they relate to such transferee as the holder of the shares being transferred.

ARTICLE 11
EFFECTIVE DATE, TERM, TERMINATION AND EXPIRATION

11.1 Effective Date: This Agreement shall come into effect upon this Agreement getting the required approval from all the requisite Government agencies (the "Effective Date").

11.2 Term: This Agreement shall be valid and in force commencing on the Effective Date, and will continue until expiration on eight (8) calendar years from the Effective Date, unless earlier terminated as provided in this Agreement, or extended by written agreement of the parties hereto. Notwithstanding the aforesaid, in the event the Licenses to the Company are further granted pursuant to the provisions of Section 5.1(a) hereof, the material provisions of this Agreement enabling the Company to effectively make use of the Licenses shall remain in full force and effect.

11.3 Termination of the Agreement:

This Agreement shall terminate upon the occurrence of any of the following events:

(1) mutual written agreement of the Stockholders;

(2) the sale or other disposition of all of the Company's assets and the receipt by the Stockholders in cash of the proceeds thereof;

(3) the dissolution of the Company;

(4) a trustee, receiver or liquidator is appointed for all or a substantial part of the assets or property of either Stockholder;

(5) a voluntary petition in bankruptcy or a voluntary winding-up petition is filed with respect to either Stockholder, or an involuntary petition is filed and is not dismissed within ninety (90) days after filing;

          (6) the interests of either Stockholder are assigned for the benefit of creditors;

(7) either Stockholder ceases the active conduct of its business;

-15-

<PAGE>

(8) either Stockholder dissolves or liquidates; or

(9) either Stockholder is in material breach or default under this Agreement.

In the event of termination pursuant to the provisions of clauses (4), (5), (6), (7), (8), (9), (10) (a "Stockholder Termination"), the other Stockholder may, for thirty (30) days after the occurrence of the event referenced therein, purchase the shares of Company stock of the affected Stockholder at a price which shall be the higher of the book value or the fair market value of the shares as shall be determined by an independent valuer which shall be retained by mutual agreement of the Stockholders. In the event that ECIL purchases the Company's Stock pursuant hereto, any and all sums of money due to OSI thereby shall be paid to OSI in US dollars, net of Indian taxes. Any purchase of shares of Company stock by OSI shall be subject to and conditioned upon compliance with the legal requirements referred to in Section 3.3 hereof, and any payment to ECIL pursuant thereto shall be net of Indian taxes, if any.

11.4 Effect of Termination and Expiration:

(a) Termination or expiration of this Agreement shall not affect any obligations of either of the Stockholders hereunder which have accrued but are not discharged prior to such termination or expiration, nor affect the rights of either Stockholder to recover damages from the other Stockholder by reason of any breach of this Agreement which has accrued prior to or would by its nature accrue after such termination or expiration.

(b) Upon termination or expiration of this Agreement, and subject to Section 5.1(a) hereof, all of the Proprietary Technology which OSI caused RSPI to deliver or transmit to ECIL or the Company, including the Proprietary Technology more fully set forth on Schedule B hereto (the "Schedule B Technology"), shall be returned forthwith by ECIL and the Company to RSPI, or shall be destroyed under supervision of OSI. Immediately upon such termination or expiration, ECIL and the Company shall cease making use of such Proprietary Technology, except as otherwise provided for herein, in each of its (or any of its subcontractors') manufacturing or assembly operations.

(c) If the joint venture cannot be formed due to the acts of the Government of India or subsequent to the Company being formed, RSPI withdraws from this Agreement due to acts beyond its control, the joint venture goals shall be pursued by ECIL, and RSPI shall fulfill its obligations for the duration of the Agreement and shall abide by the non-competition clause set forth in Section 12.2 hereto. ECIL shall thereafter pay OSI a license fee on the sale of every x-ray system sold by ECIL or its

-16-

<PAGE>

Affiliates which fee shall be US $5000 per X-ray system if such system sells for between US $60,000 - $63,000; US $4,500 per system if such system sells for between US $55,000 - $59,999; US $4,000 per system is such system sells for between US $50,000 -$54,999. In the event the x-ray system sells for an amount in excess of US $ 63,000, the license fee shall be an amount greater than US $5,000 and shall be negotiated in good faith by ECIL and OSI. In addition, ECIL hereby agrees that it shall purchase a minimum of one hundred and fifty (150) multi-energy units, as more fully described in Schedule B hereto, from RSPI, over a period of five years from the date of termination or withdrawal hereof, for a sum of US $21,000 per unit.

ARTICLE 12
MISCELLANEOUS

12.1 Government Approvals: ECIL hereby agrees, from time to time as

required by applicable Indian law, rule, regulation or administrative practice, to make any and all required notifications or filings with the Indian government and to expeditiously obtain all required Indian government and Reserve Bank of India approvals, permits or consents required for this agreement to be effective and so that the Company and the joint venture contemplated hereby shall be in full compliance with the laws of India.

12.2 No Competition: Except to the extent otherwise provided herein, the Stockholders shall not, other than through the Company, have any interest in the manufacturing, assembling, testing, marketing, selling or servicing of the Products, or in the operating of any business identical or substantially similar to the business of the Company (the "Business"), within the Territory as long as each shall remain a Stockholder of the Company, and for a period of five (5) years thereafter. In the event of a Stockholder Termination, the affected Stockholder shall not purchase, sell or operate any business similar to the Business in the Territory, for its own account or otherwise, or hold shares of stock in any other company engaged in the business of operating a Business in the Territory, whether or not such other company is an Affiliate of the said Stockholder, for a period of seven (7) years from the date thereof. The applicability of this Section 12.2 to each Stockholder shall survive the termination or expiration of this Agreement.

12.3 Non-Disclosure: ECIL and the Company each acknowledges that the Proprietary Technology of RSPI disclosed to it (as such, a "Recipient") pursuant to the terms hereof (the "Disclosed Proprietary Technology") is considered to be a valuable proprietary asset of RSPI and hereby agrees that disclosure to a Recipient by RSPI of any of the Disclosed Proprietary Technology, whether written, oral, or in machine-readable form, is made in strictest confidence. In addition:

<PAGE>

(a) Each Recipient will ensure that the confidentiality and secrecy of the Disclosed Proprietary Technology is maintained. Each Recipient agrees to take all steps necessary to avoid any unauthorized disclosure, use, or publication of the Disclosed Proprietary Technology.

(b) Each Recipient may disclose the Disclosed Proprietary Technology to its own employees to whom it shall be reasonably necessary in order to further Recipient's business relationship with OSI as contemplated hereunder. Each Recipient agrees that it shall take appropriate action (by instructions, agreement, or otherwise) with such employees in order to satisfy Recipient's obligations under this Agreement with respect to use, copying, protection, and security of the Disclosed Proprietary Technology.

(c) Each Recipient agrees not to print or copy, in whole or in part, any documents or magnetic media containing any of the Disclosed Proprietary Technology without the prior written consent of OSI.

(d) Each Recipient agrees not to disclose any of the Disclosed Proprietary Technology to any entity outside of said Recipient without the prior written consent of OSI, and without first obtaining from each such entity an agreement substantially identical to the provisions of this Section 12.3 in form.

(e) Each Recipient agrees to use the Disclosed Proprietary Technology only in furtherance of its business relationship with OSI as contemplated hereunder.

(f) The Disclosed Proprietary Technology will not be used by ECIL or the Company to provoke an interference with any patent application which RSPI has filed with respect to the Disclosed Proprietary Technology, and will not be used to amend any claim in any pending patent application to expand the claim to read on, cover, or dominate any invention (whether or not patentable) disclosed in the Disclosed Proprietary Technology.

(g) Each Recipient agrees not to otherwise use or dispose of the Disclosed Proprietary Technology except with the prior written consent of OSI. OSI's consent may be withheld for any reason or no reason, and may be granted upon such terms as OSI may establish from time to time.

(h) The Disclosed Proprietary Technology shall remain the property of RSPI.

The provisions of this Section 12.3 are binding upon each Recipient and its directors, employees, agents and subcontractors as long as any part of the Disclosed Proprietary Technology disclosed or delivered to Recipient remains confidential, except

-18-

<PAGE>

that said Recipient has no such obligation with respect to any Disclosed Proprietary Technology which (a) is already known to Recipient; (b) is or becomes publicly known through no wrongful act of Recipient; (c) is disclosed to Recipient by a third person not in violation of any obligation of non-disclosure owed to OSI or RSPI; or (d) is approved for release by written authorization of OSI. Each Recipient has the burden of proving the applicability of any of the above exceptions. OSI has the right to inspect Recipient's records to determine the source of any Disclosed Proprietary Technology claimed to be within any of the above exceptions.

12.4 Improvements and Developments: As part consideration for OSI's causing RSPI to grant to ECIL and the Company the Licenses, any improvement to the Products or the Proprietary Technology made by ECIL or by the Company shall be the sole property of OSI. If any patents result from any such improvements, such patents shall be solely owned by OSI, and the Company shall be granted a no-cost transferable shop rights license for such patents for the life of the patents. ECIL and the Company agree to promptly disclose any and all such improvements (including inventions) to OSI, and to cooperate in securing and perfecting any protectable intellectual property rights to such improvements. Any inventions, developments, or patents relating to the Products and resulting from sole development by OSI, or by OSI in conjunction with other parties, shall be the sole property of OSI, and the Company shall be granted an option to include in the Licenses any such inventions, developments or patents.

12.5 Arbitration: Any and all disputes between the Stockholders arising from or in connection with this Agreement shall be amicably and promptly negotiated upon consultation in good faith between the Stockholders. Each of the Stockholders agrees that, if an amicable settlement is not reached within thirty (30) days after commencing consultation, the dispute shall be settled exclusively by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce conducted in the place where the principal office of the Stockholder not initiating the arbitration is located, and the arbitration award shall be final and binding upon the Stockholders for all purposes hereof and (nay thereafter be enforced by any court having jurisdiction. The arbitration shall be conducted in the English language. Any arbitration award shall include attorneys' fees for the prevailing party.

12.6 Governing Law: The construction, validity and performance of this Agreement shall be governed by the laws of India, provided, however, that the construction, validity and performance of Sections 3.3 and 12.5 hereof shall be governed by the laws of the State of California, U.S.A.

-19-

<PAGE>

12.7 Counterparts: This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.8 Assignment: Neither this Agreement nor any right or obligation provided for herein is assignable in whole or in part by any party hereto without the prior written consent of the other parties hereto.

12.9 Integration: This Agreement constitutes the entire understanding among the parties, and supersedes any previous understandings, written or oral,

which the parties may have reached, with respect to the subject matter hereof.

12.10 Modification: No modification or amendment hereof shall be valid or binding upon the parties unless agreed to in writing by each of the parties hereto.

12.11 Force Majeure: No failure or omission by any party to carry out or observe any of the terms or conditions of this Agreement shall, except as herein expressly provided to the contrary, give rise to any claim against the party in question or be deemed a breach of this Agreement by such party if such failure or omission arises from any extraneous cause entirely beyond the control of that party.

12.12 Notices: All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed by registered or certified mail to the addresses hereinafter set forth or at such other addresses as may be designated in writing by notice given hereunder to the other parties. The date of the giving of such notices, requests, demands, and other communications shall be deemed to be the date of the posting of the mail, if so mailed, or the date of delivery, if delivered other than by registered or certified mail.

TO OSI - M/S Opto-Sensors Inc.
12525 Chadron Avenue
Hawthorne, California 90250, USA.

TO ECIL - M/S Electronics Corporation of India Limited,
ECIL P.O., Hyderabad-500 762 A.P., India.

TO THE COMPANY - M/S Ecil-Rapiscan Security Products
[address to be determined]

12.13 Non-Waiver of Right: The failure of any party to enforce at any time any of the provisions hereof shall not be construed to be a waiver of any such provisions or a waiver of

-20-

<PAGE>

the right of such party thereafter to enforce any such provisions. No waiver by a party of any right hereunder shall be deemed a waiver of any other right.

12.14 Severability: The provisions of this Agreement shall be deemed severable, and in the event that any term or provision of this Agreement shall be held invalid, illegal or unenforceable, the remainder of the terms and provisions of this Agreement shall not be affected by such invalidity, illegality or unenforceability, and this Agreement shall be interpreted and construed as if such term or provision had never been contained to the extent that the same shall have been held to be invalid, illegal or unenforceable.]

12.15 Headings: The headings of Sections used in this Agreement are inserted for convenience of reference only and shall not affect the interpretation of the respective Sections of this Agreement.

-21-

<PAGE>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf on the day and year set forth across its signature below.

OPTO-SENSORS, INC.

WITNESS:

By: /s/ Deepak Chopra

1. Its: CEO Chairman

2. Name: Deepak Chopra

ELECTRONICS CORPORATION OF INDIA LIMITED

By: /s/

1. Its: ________________

2. Name: ________________

<PAGE>

SCHEDULE A

X-Ray System

Rapiscan current Multi-Energy Security X-Ray Inspection System including:

1. All mechanical drawings of the Rap 2, Rap 17, Rap 14

2. X-Ray generator manufacturing drawings including mechanical, electrical, and schematics, test procedures.

(The Trent I Image Processor PCB and the A to D Converter PCB manufacturing drawings will be licensed after 12 months of the Effective Date. Maintenance documentation will be provided immediately).

<PAGE>

SCHEDULE B

<TABLE>
<CAPTION>

RAPISCAN2 MULTI-ENERGY MACHINE (90 MC X 80 CM)

| <S> | <C> | <C> |
|---|---|---|
| 36 | EACH | LARGE DETECTORS |
| 36 | EACH | SMALL DETECTORS |
| 9 | EACH | PCB DIODE ARRAY |
| 9 | EACH | PCB DIODE ARRAY |
| 1 | EACH | PROCESSOR PCB TRENT I |
| 1 | EACH | X-RAY CONTROL PCB |
| 1 | EACH | CONTROL PANEL |
| 2 | EACH | PHOTOCELLS |
| 1 | EACH | ENCODER |
| 1 | EACH | X-RAY TUBE |
| 1 | LOT | INDICATOR LIGHTS, SWITCHES, COMPONENTS, CABLES, MISCELLANEOUS PARTS |

TOTAL KIT PRICE (F O B) U.S. $ 16,000

</TABLE>

<PAGE>

SCHEDULE C

MULTI ENERGY XBIS 9080 - ECIL'S SCOPE OF SUPPLY

1. Conveyor Frame and L.S Box

2. X-Ray Generator Housing and Collimator

3. Conveyor Belt

4. Conveyor Rollers

5. Control Desk

6. Lead Flaps

7. 14" Color Monitors

8. Drum Monitor

9. X-Ray Control PSU (Power Supply)

10. DC-DC Voltage Control PCB

11. IR Interface PCB

12. IR Supply PCB

13. Torroidal Transformer (Mains)

14. Miscellaneous hardware, final assembly, testing and packaging for delivery.

Transfer Price U.S. $13000 (inclusive of customs duty, but exclusive of local
- -------------------------
duties and taxes).

-25-

<PAGE>

SCHEDULE A

<TABLE>
<CAPTION>

RAPISCAN2 MULTI-ENERGY MACHINE [OR SIMILAR MODEL] (90 MC X 80 CM)

| <S> | <C> | <C> |
|---|---|---|
| 36 | EACH | LARGE DETECTORS |
| 36 | EACH | SMALL DETECTORS |
| 9 | EACH | PCB DIODE ARRAY |
| 9 | EACH | PCB DIODE ARRAY |
| 1 | EACH | PROCESSOR PCB TRENT I |
| 1 | EACH | X-RAY CONTROL PCB |
| 1 | EACH | CONTROL PANEL |
| 2 | EACH | PHOTOCELLS |
| 1 | EACH | ENCODER |
| 1 | EACH | X-RAY TUBE |
| 1 | LOT | INDICATOR LIGHTS, SWITCHES, COMPONENTS, CABLES, MISCELLANEOUS PARTS |

</TABLE>

-26-

<PAGE>

AGREEMENT
---------

THIS AGREEMENT is made and entered into this 3rd day of JANUARY, 1995, by and among OPTO SENSORS, INC. ("OSI"), a California corporation, DEEPAK CHOPRA ("Chopra") and AJAY MEHRA ("Mehra").

WHEREAS, OSI and Electronic Corporation of India Limited ("ECIL"), an

Indian corporation, are parties to a joint venture regarding the manufacturing and selling of diode kits ("Joint Venture");

WHEREAS, pursuant to the agreement between OSI and ECIL for the Joint Venture, OSI and ECIL agreed to contribute total capital up to the amount of $150,000.00 to be divided between OSI and ECIL on the basis of 51% and 49%, respectively;

WHEREAS, the profits, losses distributions of the Joint Venture are to be allocated 51% to OSI and 49% to ECIL;

WHEREAS, Chopra and Mehra have expressed an interest in participating as joint venturers in the Joint Venture; and

WHEREAS, it is deemed by OSI to be in the best interests of said corporation to assign to Chopra and Mehra a portion of OSI's interest in the Joint Venture.

<PAGE>

NOW, THEREFORE, in consideration of the usual promises contained herein, the parties hereto agree as follows:

1. OSI hereby sells, assigns, transfers and conveys to Chopra and Mehra a 15% interest (10 1/2% to Chopra and 4 1/2% to Mehra) in the Joint Venture, the result of which will be that (i) OSI shall own 36% of the Joint Venture and shall be allocated 36% of the profits, losses and distributions, (ii) Chopra shall own 10 1/2% of the Joint Venture and shall be allocated 10 1/2% of the profits, losses and distributions and (iii) Mehra shall own 4 1/2% of the Joint Venture and shall be allocated 4 1/2% of the profits, losses and distributions.

2. Chopra and Mehra hereby accept the aforesaid assignment and, subject to the terms and conditions of this Agreement, agree to be bound by the terms and conditions relating to the Joint Venture. Any and all contributions of capital, as well as any other payments required to be made by OSI regarding its present 51% ownership interest in the Joint Venture, shall be allocated among OSI, Chopra and Mehra on a pari passu basis in the same proportion as their ownership percentages (36%, 10 1/2% and 4 1/2%, respectively) in the Joint Venture.

3. In the event that Chopra and/or Mehra are required or requested to give their consent to any action regarding the Joint Venture or to vote their Joint Venture interests, they will do so in accordance with the instructions given to them by OSI. In

<PAGE>

other words, any and all voting and decision making rights of Chopra and/or Mehra regarding the Joint Venture shall be exercised in accordance with OSI's instructions and wishes.

4. This Agreement may not be amended or modified without the approval of the Board of Directors of OSI.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

OPTO SENSORS, INC.

By: /s/ Deepak Chopra
-------------------------------

/s/ Deepak Chopra
-----------------------------------
DEEPAK CHOPRA

/s/ Ajay Mehra
-----------------------------------
AJAY MEHRA

3

<PAGE>

AMENDMENT TO AGREEMENT
----------------------

THIS AMENDMENT TO AGREEMENT is made and entered into this 20th day of May, 1997, by and among OPTO SENSORS, INC. ("OSI"), a California corporation, DEEPAK CHOPRA ("Chopra") and AJAY MEHRA ("Mehra").

WHEREAS, on January 3, 1995, the parties hereto entered into a certain Agreement which provided for the sale by OSI to Chopra and Mehra of a 15% interest in a certain joint venture between OSI and Electronics Corporation of India, Limited ("Assignment Agreement"); and

WHEREAS, the parties hereto now wish to amend the Assignment Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. Paragraph 3 of the Assignment Agreement is hereby deleted in its entirety.

2. All of the other terms and conditions of the Assignment Agreement, except as specifically amended by Paragraph 1 above, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereby have executed this Amendment to Agreement the day and year first above written.

OPTO SENSORS, INC.

By:/s/ Deepak Chopra
__________________________________
Deepak Chopra, President

/s/ Deepak Chopra
--------------------------------------
DEEPAK CHOPRA

/s/ Ajay Mehra
--------------------------------------
AJAY MEHRA

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>5
<DESCRIPTION>INDEPENDENT AUDITOR'S CONSENT & REPORT ON SCHEDULE
<TEXT>

<PAGE> EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

    We consent to the use in this Amendment No. 1 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated June 12, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ DELOITTE & TOUCHE LLP

Los Angeles, California

July 31, 1997
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>6
<DESCRIPTION>CRIMINAL PLEA AND SENTENCING AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 99.1

# CRIMINAL PLEA AND SENTENCING AGREEMENT

## UNITED STATES v. UDT SENSORS. INC.

## I

## INTRODUCTION

This constitutes the criminal plea and sentencing agreement ("Agreement") between UDT Sensors, Inc. ("UDT") and the United States Attorney's Office for the Central District of California ("this Office"). This Agreement is entered into pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure.

This Agreement contemplates the resolution of all criminal charges against UDT with regard to allegations of false testing within the scope of the Information attached hereto as Exhibit 1 ("the Information").

This Office is the sole governmental entity entering into this Agreement, and this Agreement does not bind any other federal, state or local prosecuting, administrative or regulatory authorities.

## II

## OFFENSES AND PENALTIES

The Information charges UDT with three counts of making false statements regarding matters within the jurisdiction of the United States Department of Defense, in violation of 18 U.S.C. (S) 1001. The maximum sentence that may be imposed is a fine of $500,000 per count. 18 U.S.C. (S) 3571(c)(3).

The court may also order restitution under 18 U.S.C. (S) 3663(a)(1), and may impose a term of probation for up to five years under 18 U.S.C. (S) 3561(b)(1). In addition, the court is
<PAGE>

required by statute to impose a special assessment of $200 per count. 18 U.S.C. (S) 3013(a)(2)(B).

III

PLEA
----

This Office and UDT hereby agree, pursuant to Federal Rule of Criminal procedure 11(e)(1)(C), that the disposition of this matter shall include the following terms and conditions:

A. UDT agrees to waive indictment by grand jury and to plead guilty to the Information that charges UDT with three counts of violating 18 U.S.C. (S) 1001.

B. To be guilty of violating 18 U.S.C. (S) 1001, UDT must have made a material false statement within the jurisdiction of a department or agency of the United States, knowing that the statement was untrue. By signing this Agreement, UDT admits that it is guilty of the offenses charged in the Information and stipulates to the Statement of Facts set forth herein.

C. UDT agrees to waive the requirement for a presentence investigation and report, as set forth in Rule 32 of the Federal Rules of Criminal Procedure, and asks to be sentenced on the same date as the entry of its guilty plea to the offenses charged in the Information. If, however, the sentencing takes place on a day other than the day of the plea, that will not provide a basis for UDT to withdraw its guilty plea.

D. UDT agrees to pay a criminal fine of $250,000 for each count of the Information, for a total of $750,000. In addition, as to Count Three, UDT agrees that it shall be placed on

-2-

<PAGE>

probation for a period of five years. The sole conditions of probation shall be: (1) that UDT abide by all federal, state, and local laws during the period of probation, and (2) that UDT pay the $750,000 fine pursuant to the five-payment installment schedule set forth below:

<TABLE>
<CAPTION>

| Installment | Amount | Due Date for Payment |
|---|---|---|
| <S> | <C> | <C> |
| 1 | $100,000 | March 31, 1995 |
| 2 | $150,000 | March 31, 1996 |
| 3 | $150,000 | March 31, 1997 |
| 4 | $150,000 | March 31, 1998 |
| 5 | $200,000 | March 31, 1999 |

</TABLE>

E. UDT agrees that the five-year term of probation on Count Three shall commence to run upon UDT's first installment payment due March 31, 1995.

F. The installment schedule set forth in paragraph D for the payment of UDT's criminal fine may only be adjusted with the consent of the government and must be approved by the court. In the event that UDT is financially unable to make a payment, it may request the opportunity to renegotiate the terms of the payment schedule. In no event shall any payments due by UDT be extended beyond the five-year period of probation. Nor shall the total principal amount of the fine be reduced to less than $750,000. UDT may prepay the criminal fine, including all interest due up to and including the date of prepayment, without penalty.

-3-

<PAGE>

G. UDT agrees to pay interest in addition to its $750,000 principal fine amount. The interest payments shall be due on the date of each principal installment, as set forth in paragraph D. The rate of interest shall be equal to the six-month U.S. Treasury Bill rate computed as of fifteen days prior to the due date of each installment. Interest on the $750,000 principal fine amount

shall commence running as of the date of sentencing.

H. UDT also agrees to pay to the Clerk of the Court for the United States District Court for the Central District of California on the date of sentencing the mandatory assessment of $600 ($200 per count of the Information).

I. Restitution shall not be ordered as part of the criminal sentence. The issue of restitution is addressed in the civil Settlement Agreement attached hereto as Exhibit 2. This Office and UDT expressly acknowledge that this Plea Agreement is conditioned upon the district court's approval of this related civil settlement.

J. In exchange for UDT's quilty pleas and other commitments pursuant to this Agreement, this Office agrees not to prosecute UDT for any other criminal violations involving parts UDT manufactured and tested for U.S. military application as of the date that this agreement is executed.

K. This Agreement does not prevent the government from prosecuting any individual for any offense, including the offenses charged in the Information.

<PAGE>

L. UDT knowingly and intelligently waives any rights it may have to any direct appeal or collateral attack of the sentence agreed to herein.

M. Until the entry of UDT's quilty plea pursuant to the terms of this Agreement, or the expiration of one year from the date this Agreement is signed, whichever occurs first, UDT agrees to waive any defense based on the statute of limitations with respect to the criminal charges set forth in the Information or related to activities described in paragraph J.

IV

## STATEMENT OF FACTS

The parties agree to the statement of facts attached hereto as Exhibit 3. This statement of facts does not preclude this Office or UDT from stating any further facts, not inconsistent with those in the attached statement, deemed necessary by either party or the court to establish a factual basis for the quilty pleas, or necessary to respond to questions by the court.

V

## JOINT AND SEVERAL LIABILITY

As part of this Agreement, the President of UDT, Deepak Chopra, agrees personally to guarantee UDT's payment of the criminal fine as described herein. Accordingly, UDT and Mr. Chopra are jointly and severally liable for the payment of fines plus interest pursuant to the schedule set forth in Section III. This provision is intended solely to insure payment of the fine,

<PAGE>

and does not mean or imply that Mr. Chopra directed, approved of, or had knowledge of the unlawful acts alleged in the Information.

VI

## BREACH OF THE AGREEMENT

UDT understands that this Office has entered into this Agreement strictly relying on UDT's faithful performance of every material term and condition herein. If it is determined that UDT has violated the provisions of this Agreement by failing to make a required installment payment, the following consequences will result:

A. This Office will no longer be bound in any respect by this Agreement,

and shall be entirely released from its commitments, representations and obligations to UDT set forth herein, and UDT may be subject to prosecution for any federal criminal violation to which a guilty plea has not been entered into pursuant to Section III above. UDT agrees that such prosecution will be at the discretion of this Office, and shall not be barred by any applicable statute of limitations.

B. Alternatively, at the discretion of this Office, if UDT fails to make a timely installment payment plus interest pursuant to the schedule set forth in Section III above, the United States may, by written notice to UDT, declare any remaining balance and interest due and payable as of the tenth business day following UDT's receipt of such written notice. In the event UDT refuses or is unable to pay any balance and interest due, Mr. Chopra agrees to pay the entire remaining balance and interest within

-6-

<PAGE>

ten business days thereafter. In such event, however, the court will not impose an additional monetary fine on UDT. The total fine to be imposed on UDT with respect to Counts One through Three will be $750,000.

If the government elects to proced under paragraph "VI.B", it will forego its right to proceed under paragraph "VI.A".

VII

SUSPENSION AND DEBARMENT

By this Agreement this Office makes no representation or promise concerning suspension or debarment of UDT from contracting with the United States government or with any office, agency, or department thereof. Suspension and debarment are administrative actions solely within the authority of other government offices, agencies, and departments. This Agreement is not conditioned upon, and shall not be effected by, any suspension or debarment decision concerning UDT that may be made by any office, agency or department of the United States following UDT's entry of guilty pleas herein.

The government agrees to make known to the Department of Defense the extent of UDT's cooperation and remedial efforts.

VIII

WAIVER OF CONSTITUTIONAL RIGHTS

UDT understands that by pleading guilty to the attached Information, it will be giving up the following constitutional rights:

-7-

<PAGE>

UDT waives its right to indictment by a grand jury. UDT also waives the right to plead not guilty to the charges and the right to be tried by a jury, or if UDT wished and with the consent of the government, to be tried by a judge. At that trial, UDT would have the right to an attorney. During the trial, UDT would be presumed innocent and a jury would be instructed that the burden of proof is on the government to prove UDT guilty beyond a reasonable doubt. UDT would have the right to confront and cross-examine witnesses against it. If UDT wished, it could call witnesses on its behalf and subpoena those witnesses to testify. If UDT were found guilty after a trial, it would have the right to appeal that verdict to see if any errors had been committed during trial that would require either a new trial or a dismissal of the charges. By pleading guilty, UDT will be giving up all of these rights.

IX

NO ADDITIONAL AGREEMENTS

Except as expressly set forth herein and in the attached civil Settlement

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 869 of 2711

Agreement, there are no additional promises, understandings or agreements, express or implied, between this Office and UDT, or their respective counsel, concerning this case or any other pending or future federal, state, or local criminal prosecution, civil litigation or administrative proceeding relating to any other federal, state or local charges that may now be pending or hereafter be brought against UDT or any of its parent divisions, subsidiaries, or affiliates. Nor may any

-8-

<PAGE>

additional agreement, understanding or condition be entered into unless in writing and signed by all parties.

X

LIENS AND CLAIMS

All matters relating to obtaining a lien on UDT's property, and enforcing or subordinating such lien or claim, shall be handled by the United States in a manner consistent with the Stipulation for Consent Judgment, which is part of the attached civil settlement agreement.

Dated: October 21, 1994

NORA M. MANELLA
United States Attorney

/s/ Bryan D. Daly
--------------------------
BRYAN D. DALY

/s/ Robert T. Scott
--------------------------
ROBERT T. SCOTT
Assistant United States Attorneys
Public Corruption and Government
Fraud Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

-9-

<PAGE>

On behalf of UDT, I have read this Agreement and have carefully reviewed every part of it with counsel for UDT. I understand it, and, on behalf of UDT, I knowingly agree to it. Further, I have consulted with counsel for UDT and fully understand UDT's rights under the law. No promises or inducements have been made to UDT other than those contained in this Agreement. In addition, no one has threatened or forced UDT in any way to enter into this Agreement. Finally, I am satisfied with the representation of counsel for UDT in this matter.

Dated: October 6, 1994

UDT SENSORS, INC.

/s/ Deepak Chopra
------------------------------
DEEPAK CHOPRA
PRESIDENT

As counsel for UDT, I have carefully reviewed every part of this Agreement with my client. To my knowledge, UDT's decision to enter into this Agreement is an informed and voluntary one.

Dated: October 6, 1994

RICHMAN, LAWRENCE, MANN,
GREBNZ, ARBITER & CHIZEVER

/s/ Roel C. Campos
--------------------------------
ROEL C. CAMPOS

Counsel for Defendant
UDT SENSORS, INC.

-10-

<PAGE>

STATEMENT OF FACTS

A. Introduction

At all times pertinent to the charges in the Information, UDT Sensors, Inc. ("UDT") was a corporation located at 12525 Chadron Avenue, Hawthorne, California. UDT was formed in May 1987 and currently has approximately 300 employees.

UDT manufactures photosensors under contracts with both military and commercial buyers. Among the photosensors manufactured by UDT are high-reliability ("hi-rel") sensors that are sold primarily to military customers, including the U.S. Army for application in laser detector sets on various aircraft and attack helicopters, and the U.S. Navy for application in arc fault detector sets on submarines.

The military hi-rel purchase orders awarded to UDT specified various quality assurance tests that were required to be performed to assure the reliability of the hi-rel photosensors for critical military applications. Those tests included various electrical and optical tests designed to measure the operational effectiveness of each sensor. The results of the tests were recorded on computer data sheets that were furnished to hi-rel customers with each shipment of sensors, along with certificates of conformance, which certified that the sensors had been manufactured and quality tested in accordance with applicable military specifications.

B. Creation of False Test Data

Beginning on or about May 1991, UDT testing personnel began using a random number generator ("RNG") program to create false computer test data for hi-rel photosensors. Specifically, by using this RNG program, UDT testers would create false computer test data with specific measurements without testing the sensors as required by the applicable military specifications. From on or about May 1991 to approximately April 1994, UDT testers, at the direction of UDT's hi-rel test supervisor and former project engineer, skipped various required electrical and/or optical tests and used the RNG to create false computer test data on approximately $6,900,878 in shipments of various types of hi-rel sensors, as described below:

<TABLE>
<CAPTION>

| Date | Part Identification No. | Sales |
|---|---|---|
| <S> | <C> | <C> |
| 1. Powertronics | | |
| 7/1/92 to 6/30/93 | 1304-1 | $2,144,274 |
| 7/1/93 to 3/26/94 | 1304-1 | $1,519,995 |
| 2. Hughes Danbury | | |
| 7/1/92 to 6/30/93 | 8060 | $28,364 |

</TABLE>

<PAGE>

| | | |
|---|---|---|
| 7/1/93 to 3/26/94 | 8060 | $313,040 |
| | | |
| 7/1/92 to 6/30/93 | 6523-2 | $32,472 |
| 7/1/93 to 3/26/94 | 6523-2 | $102,762 |
| | | |
| 7/1/92 to 6/30/93 | 6523-1 | $680,720 |
| 7/1/93 to 3/26/94 | 6523-1 | $423,720 |
| | | |
| 3. General Dynamics | | |
| 7/1/91 to 6/30/93 | 1304-1 | $546,937 |
| 7/1/93 to 3/26/94 | 1304-1 | $211,464 |
| | | |
| 4. Litton Guidance | | |
| 7/1/91 to 6/30/92 | 4819-3 | $229,725 |
| 7/1/92 to 6/30/93 | 4819-3 | $64,845 |
| 7/1/93 to 3/26/94 | 4819-3 | $137,955 |
| | | |
| 7/1/93 to 3/26/94 | 8640-3 | $26,724 |
| | | |
| 7/1/93 to 3/26/94 | 6834-1 | $14,019 |
| | | |
| 5. Honeywell Avionic | | |
| 7/1/91 to 6/30/92 | 4959-4 | $43,475 |
| 7/1/92 to 6/30/93 | 4959-4 | $23,429 |
| 7/1/93 to 3/26/94 | 4959-4 | $59,875 |
| | | |
| 7/1/91 to 6/30/92 | 4959-3 | $23,985 |
| 7/1/92 to 6/30/93 | 4959-3 | $27,730 |
| 7/1/93 to 3/26/94 | 4959-3 | $44,680 |
| | | |
| 7/1/92 to 6/30/93 | 7032-1 | $18,620 |
| 7/1/93 to 3/26/94 | 7032-1 | $7,000 |
| | | |
| 7/1/92 to 6/30/93 | 7032-2 | $14,504 |
| 7/1/93 to 3/26/94 | 7032-2 | $14,000 |

6. Allied-Signal/Bendix

| | | |
|---|---|---|
| 7/1/90 to 4/23/94 | 8705-2 | $62,708 |
| 7/1/93 to 4/23/94 | 8705-2 | $63,205 |

7. Ametek

| | | |
|---|---|---|
| 7/1/93 to 4/23/94 | 8505-1 | $20,650 |

</TABLE>

By deducting an estimated value of approximately 10% from the purchase price for the above photosensors for skipped quality testing, the loss to the government from UDT's failure to contduct

<PAGE>

this testing is estimated at approximately $690,087. This loss figure does not include damages relating to untested defective diodes which may have been shipped to the hi-rel customers, or consequential damages that may be attributed to UDT's failure to perform the required testing.

C. The Hughes Shipments (Count One and Two)

On or about March 14, 1990, the U.S. Army awarded contract DAAB07-90-C-S001 to Hughes Danbury Optical Systems ("HDOS") for the production of AN/AVR-2 laser detecting sets ("LDS"). The LDS's are used on aircraft and attack helicopters to detect optical signals received from enemy targeting systems and to provide warnings of laser threats to the aircrew, thereby allowing time for possible evasive maneuvers away from those threats. The contract called for HDOS to produce and deliver 99 LDS's to the Army for a firm fixed price of $38,412,099.

On or about August 20, 1992, HDOS awarded purchase order no. 92205 to UDT for the production and delivery of 2,030 photosensors, a component of the LDS. The purchase order was in the amount of $869,256. The purchase order incorporated military specifications that required UDT to perform certain optical tests (rise time , responsivity, cross-talk and uniformity) on a 100% basis. It also required UDT to certify that the photosensors were manufactured and quality tested in accordance with applicable military specifications.

Count One: On or about July 21, 1993, UDT shipped 84 photosensors to HDOS under purchase order no. 92205, along with a certificate of conformance certifying that the photosensors had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that the required 100% optical tests had not been performed. UDT's tester skipped these required tests entirely and knowingly used the RNG program to create false test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

Count Two: On or about November 17, 1993, UDT shipped 98 photosensors to HDOS under purchase order no. 92205, along with a certificate of conformance certifying that the photosensors had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that the required 100% optical testing had not been performed. UDT's tester skipped the required tests and knowingly used the RNG program to create false computer test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

D. The Powertronics Shipment (Count Three)

<PAGE>

On or about April 24, 1991, the U.S. Navy awarded contract N0024-91-C-4017 to Powertronics Systems, Incorporation ("Powertronics") for the production of arc-fault detector systems ("AFD systems"). The AFD systems are used on submarines to detect electrical switchboard arc faults and to automatically open selected circuit breakers to extinguish the arc, thereby preventing fires in the

submarine power rooms. The contract called for Powertronics to produce and deliver 43 AFD systems to the Navy for a firm fixed price of $22,872,950.

On or about October 5, 1992, Powertronics awarded purchase order no. 3599R to UDT for the production and delivery of 102 photosensor assemblies, a component of the AFD system. The purchase order was in the amount of $167,076. The purchase order incorporated military specifications that required UDT to perform a series of pre- and post-burn-in electrical and optical tests (dark current, shunt resistance, series resistance, responsivity, and LED/detector output) on a 100% basis. It also required UDT to certify that the photosensor assemblies were manufactured and quality tested in accordance with the military specifications.

Count Three: On or about November 23, 1993, UDT shipped photosensor assemblies to Powertronics under purchase order no. 3599R, along with a certificate of conformance certifying that the photosensor assemblies had been manufactured and quality tested in accordance with applicable military specifications. In truth and in fact, as UDT well knew, this certification was false in that certain of the required 100% electrical and optical tests had not been performed or had been performed on a sample basis only. UDT's tester skipped the required tests and knowingly used the RNG program to create false computer test data. UDT's false certification was within the jurisdiction of the U.S. Department of Defense.

E. UDT's Remedial Efforts

Upon learning of the facts underlying the government's investigation, UDT immediately terminated the employment of the employees who had admittedly participated in the falsification of the hi-rel test data. UDT also timely notified its hi-rel customers about this falsification and the programs impacted. UDT also voluntarily undertook a retesting effort for all programs affected by the false testing. UDT estimates that this retesting effort will cost the company approximately $550,000. Finally, UDT has agreed to provide the U.S. Navy a complete shipset of photosensor assemblies (valued at approximately $250,000) to replace any that may have to be replaced in the fleet in the future.

<PAGE>

GUARANTEE

Due to the close business and financial relationships between UDT Sensors, Inc., ("UDT") and the undersigned ("Guarantor"), in consideration of the benefits which will accrue to Guarantor and as an inducement for and in consideration of the agreement by the United States to enter into the Plea Agreement and Stipulated Consent Judgement, Guarantor hereby agrees as follows:

1. Guarantee.

(a) Guarantor absolutely and unconditionally guarantees and agrees to be liable for the full and indefeasible payment and performance when due of the following (all of which are collectively referred to herein as the "Guaranteed Obligations"): (i) all obligations, liabilities and indebtedness of any kind, nature and description of UDT to the United States, including principal, interest, charges, fees, costs and expenses arising under the Plea Agreement and Consent Judgment, whether as principal, surety, endorser, guarantor or otherwise, (ii) all expenses (including, without limitation, attorneys' fees and legal expenses) incurred in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, enforcement and defense of UDT's obligations.

(b) This Guarantee is a guaranty of payment and not of collection. Guarantor agrees that the United States need not attempt to collect any Guaranteed Obligations from UDT, Guarantor or any other Obligor or to realize upon any collateral, but may require Guarantor to make immediate payment of all of the Guaranteed Obligations when due, whether by maturity, acceleration or otherwise, or at any time thereafter.

(c) Payment by Guarantor shall be made from time to time on demand as Guaranteed Obligations become due. Guarantor shall make all payments on the Guaranteed Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind. One or more successive or concurrent actions may be brought hereon against Guarantor either in the same action in which UDT is sued or in separate actions. In the event any claim or action, or action on any judgment, based on this Guarantee is brought against Guarantor, Guarantor agrees not to deduct, setoff, or seek any counterclaim for or recoup any amounts which are or may be owed by the United States to Guarantor.

2. Waivers and Consents.

(a) Notice of acceptance of this Guarantee, the making of loans and advances and providing other financial

<PAGE>

accommodations to UDT and presentment, demand, protest, notice of protest, notice of nonpayment or default and all other notices to which UDT or Guarantor is entitled are hereby waived by Guarantor. Guarantor also waives notice of and hereby consents to, (i) any amendment, modification, supplement, extension, renewal, or restatement of the Plea Agreement and Stipulated Consent Judgment, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Guaranteed Obligations or any collateral, and the guarantee made herein shall apply to the Plea Agreement and Stipulated Consent Judgment and the Guaranteed Obligations as so amended, modified, supplemented, renewed, restated or extended, increased or decreased, (ii) the taking, exchange, surrender and relating of collateral or guarantees now or at any time held by or available to the United States for the obligations of UDT. Guarantor agrees that the amount of the Guaranteed Obligations shall not be diminished and the liability of Guarantor hereunder shall not be otherwise impaired or affected by any of the foregoing.

(b) No invalidity, irregularity or unenforceability of all or any part of the Guaranteed Obligations shall affect, impair or be a defense to this Guarantee, nor shall any other circumstance which might otherwise constitute a defense available to or legal or equitable discharge of UDT in respect of any of the Guaranteed Obligations, or Guarantor in respect of this Guarantee, affect, impair or be a defense to this Guarantee. Without limitation of the foregoing, the liability of Guarantor hereunder shall not be discharged or impaired in any respect by reason of any failure by the United States to perfect or continue perfection of any lien or security interest in any collateral or any delay in perfecting any such lien or security interest.

3. Subordination. Payment of all amounts now or hereafter owed to Guarantor by UDT (except for salary, bonus and other cash compensation not to exceed a total of $275,000 annually and all non-cash benefits) is hereby subordinated in right of payment to the indefeasible payment in full to the United States of the Guaranteed obligations and all such amounts and any security and guarantees therefor and hereby assigned to the Unites States as security for the Guaranteed Obligations. Notwithstanding the foregoing, prior to a default by UDT, payments of amounts now or hereafter owed to Guarantor by UDT may be made as and when such amounts become due and payable.

4. Reinstatement. If after receipt of any payment of, or proceeds of collateral applied to the payment of, any of the Guaranteed Obligations, the United States is required to surrender or return such payment or proceeds to any Person for any reason, then the Guaranteed Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Guarantee shall continue in full force and

<PAGE>

effect as if such payment or proceeds had not been received by United States.

5. Amendments and Waivers. Neither this Guarantee nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement. The United States shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall in writing and signed by an authorized employer of the United States.

6. GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTEE WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

7. The United States shall not have any liability to Guarantor (whether in tort, contract, equity or otherwise) for losses suffered by Guarantor in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Guarantee, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order that the losses were the result of acts or omissions constituting gross negligence or willful misconduct. In any such litigation, the United States shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of the Guarantee.

8. Partial Invalidity. If any provision of this Guarantee is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Guarantee as a whole, but this Guarantee shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

9. Entire Agreement. This Guarantee represents the entire agreement and understanding of this parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.

10. Successors and Assigns. This Guarantee shall be binding upon Guarantor and his or her heirs, executors, administrators, successors and assigns and shall inure to the benefit of the United States.

3

<PAGE>

11. Construction. All references to the term "Guarantor" wherever used herein shall mean Guarantor and his or her heirs, executors, administrators, successors and assigns (including, without limitation, any receiver, trustee or custodian for Guarantor or any of his or her assets-or Guarantor in his or her capacity as debtor or debtor-in-possession under the United States Bankruptcy Code).

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guarantee as of the day and year first above written.

WITNESS: /s/ Deepak Chopra
_________________________

/s/
___________________________

Name: ___________________________

Address: __________________________

__________________________

<PAGE>

STATE OF CALIFORNIA )

) ss.
COUNTY OF )

On this 26th day of October, 1994 before me, a Notary Public in and for said County and State, personally appeared Deepak Chopra, personally known to me (or proved to me on the basis of satisfactory evidence) to be the individual whose name is subscribed to this instrument, and acknowledged that he executed it.

Witness my official seal.

[SEAL APPEARS HERE]

/s/ Peggy L. Bennett 10-26-94
--------------------------------
Notary Public in and for said
County and State

5

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.2
<SEQUENCE>7
<DESCRIPTION>AGREEMENT BETWEEN UDT SENSORS & DEPT. OF THE NAVY
<TEXT>

<PAGE>

EXHIBIT 99.2

AGREEMENT BETWEEN UDT SENSORS, INC.
AND THE DEPARTMENT OF THE NAVY

1. This Agreement is entered into between the Department of the Navy, on behalf of the Department of Defense, and UDT SENSORS, INC. ("UDT" or "Company"). The sole purpose of this agreement is to evince that UDT is presently responsible to contract with the Federal Government by insuring that UDT has and will continue a program of acceptable contracting practices and procedures, and by establishing and implementing a program of compliance review, audits, and reports. For purpose of this agreement, UDT shall mean UDT as a body corporate, its predecessors, successors, affiliates, subsidiaries, and/or divisions and all directors, officers, employees and/or consultants of any of the aforesaid entities.

2. This agreement is based upon the resolution by UDT and the Department of Justice of the criminal investigation pursuant to the criminal and civil settlements reached by UDT with the United States Attorney's Office, Central District of California on or about October 24, 1994, as reflected in the Information and Plea Agreement and Stipulation for Consent Judgement and Consent Judgement, attached as Annex I. This agreement shall not be used for any purpose related to UDT's defense against or in mitigation or appeal of any criminal, civil or administrative charge, claim, or action related to or arising out of any criminal or civil investigation conducted by any component of the Department of Justice or the Department of Defense.

3. By this agreement, UDT recognizes its corporate responsibility to ensure that UDT fully complies with all Federal procurement laws and regulations when contracting, directly or indirectly, with the United States Government. In this regard, all aspects of UDT's corporate and business operations shall be conducted according to the highest code of corporate ethics, generally prevailing lawful and honest behavior, and the guidelines set by the letter and the spirit of this agreement.

4. To fulfill its corporate responsibilities, UDT has implemented a program which establishes compliant contracting procedures and practices for UDT and by which UDT will monitor adherence to these procedures and practices. This program includes four major components:

A. CODE OF ETHICS: UDT has established a written Code of Ethics which provides notice to all employees that the highest standard of business

ethics is maintained:

(1) The written Code of Ethics is maintained, reviewed on an annual basis by its duly appointed legal counsel,

<PAGE>

and updated as required for compliance with statutory and/or regulatory changes.

B. All UDT directors, officers, employees, and consultants are required to sign a certificate stating that they have read the Code of Ethics and understand its provisions.

(1) An Ethics Committee and its Chairman, the Director of Quality Assurance, reports and is responsible directly to the directors of UDT, and has been appointed to assist UDT employees in recognizing and reporting violations of the Code of Ethics or Standards of Conduct.

(i) The Chairman of the Ethics Committee and the Ethics Committee members shall investigate all instances of suspected misconduct and shall report the findings to the Board of Directors, which shall thereafter provide for management response.

(ii) For the term of this agreement, the Ethics Committee and its Chairman, the Director of Quality Assurance, shall, within 10 working days after the end of each fiscal quarter, prepare and deliver to Counsel, Procurement Integrity Office, Department of the Navy a synopsis of each instance of suspected and/or confirmed misconduct which became known to the Ethics Committee during the fiscal quarter. This synopsis shall be made without regard to the degree to which the Ethics Committee has been able, as of the due date of the report, to investigate the misconduct. This synopsis shall include disclosure of any remedial action taken to date.

(2) A telephone "hot line" to the Ethics Committee has been established at UDT to facilitate employee reports of suspected misconduct.

C. WRITTEN CONTRACTING PROCEDURES: A manual containing the regulatory standards and acceptable practices for doing business with the Government and/or Government prime contractors has been developed for UDT. These practices and procedures shall be applied to all business dealings involving Government contracts or subcontracts.

D. AUDIT AND COMPLIANCE REVIEW: The Chairman of the UDT Ethics Committee shall have the responsibility of directing and monitoring all audit and compliance review to ensure that all ethical standards are being met and that UDT's compliance program is being implemented. The duties in this regard of the Chairman of the Ethics Committee shall include the following:

(1) Have final decision making authority with respect to matters over which the Committee does not achieve a consensus, subject to the review of the Board of Directors.

(2) Review and approve all policies relating to quality, testing and inspection as well as meet with supervisory

2

<PAGE>

personnel who work in quality assurance, inspection and testing, to determine that they are fully trained in these areas.

(3) Have final decision making authority with respect to quality, inspection and testing, subject to the review of the Board of Directors.

(4) Review, with UDT's President, no less than four times yearly, testing and inspection audits which shall be conducted by the Quality Assurance Manager, including the compliance program audits which will be conducted two times per year.

(5) Conduct with UDT's President no less than two testing and

inspection audits per year.

(6) Report both testing and inspection audit results to the Ethics Committee and recommend any corrective action which the Ethics Committee Chairman deems appropriate, with a full report directed to the Board of Directors.

(7) Meet no less than twelve times per year with quality control supervisors and other employees who work in the areas of quality, testing and inspection to discuss and evaluate conformance with the procedures which have been approved and adopted pursuant to this Agreement. Such meetings shall be documented in writing.

(8) Convene special meetings of the Ethics Committee if it is determined that one or more matters pertaining to any aspect of this Agreement require the immediate attention of the Committee.

(9) Cause a report to be issued immediately to the Navy should the Ethics Committee Chairman become unable to carry out the foregoing responsibilities or if he is or will be replaced. This report should contain the UDT's proposal for another qualified officer to carry out the foregoing duties.

E. TRAINING: A comprehensive, recurring-type training program has been established for UDT directors, officers, employees, and consultants regarding the Code of Ethics and acceptable contracting practices.

The schedule for completed and planned compliance actions for this program will be as previously submitted and approved by the Navy.

5. UDT further agrees to:

A. Complete any planned compliance actions as scheduled and coordinated and approved by the Navy.

3

<PAGE>

B. Within ten (10) working days after the end of each fiscal quarter, prepare and provide a report to the Navy Debarring and Suspending Official, or his designee, describing UDT's implementation of this agreement.

C. Within ten (10) working days after the end of each fiscal quarter, UDT shall report the status of: (1) All instances of disciplinary action for violations of the Standards of Conduct; (2) all known, ongoing criminal investigations; (3) all known qui tam suits; (4) all known or suspected defective pricing cases; (5) all hotline calls received by the Ethics Advisor (including a description of the complaint and any remedial action taken or planned); and (6) any other matter which might affect UDT's present responsibility status, including but not limited to actual or potential suspension and/or debarment actions by other Government and quasi-governmental agencies.

D. Allow designated representatives of the Department of Defense to interview UDT personnel and to examine UDT's financial books, records, and other company documents for the purpose of evaluating UDT's compliance with the terms of this agreement; such materials described above shall be made available by UDT after reasonable notice for inspection, audit and/or reproduction, provided, however, the Department of Defense shall not be entitled to examine documents properly subject to the attorney-client or attorney work product privileges, not to copy: (1) Documents containing technical data or computer software, except in accordance with government contract data rights provisions, or (2) Documents containing trade secrets.

E. Disclose to the Department of Defense and to the prime Government customer if such customer is not a DOD component, all instances in which there are reasonable grounds to believe that UDT, its directors, officers, employees, consultants, suppliers and/or Government personnel have violated Federal laws or regulations relating to U.S. Government procurements. Further, UDT shall take immediate corrective measures to remedy the matter disclosed, and to notify the Department of Defense, and the prime Government customer, if the matter relates to a non-DOD contract, of the corrective action taken and UDT's opinion

regarding any impact the matter may have on the Government.

F. Cooperate fully with any investigation by the Department of Justice or the Department of Defense of which UDT knows or learns in the future.

G. Upon conviction of UDT for violation of any Federal criminal statute, take appropriate disciplinary action against all responsible individuals.

H. Upon indictment of, or the entering a guilty plea or plea of nolo contendere by any director, officer, employee or consultant of UDT for violation of an Federal criminal statue, which violation occurred in connection with the individual's

4

<PAGE>

performance of duties for or on behalf of UDT, immediately remove the director, officers, employee or consultant from active status with the Company relating to any dealings with the U.S. Government.

I. Upon unappealed conviction of, or after an unsuccessful appeal by any director, officer, employee or consultant of UDT for violation of any Federal criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of UDT, take prompt action to terminate the employment of such officer, employee or consultant, or as appropriate to remove such director from the UDT Board of Directors in recognition of Title 10, U.S.C. (S) D2408.

J. Treat all costs associated with the termination, severance and/or removal of any director, officer, employee or consultant of UDT under paragraph I, above, as unallowable for Federal Government Contract purposes.

K. Continue for a period of three years following full and complete implementation, the actions and procedures described in Annex I and elsewhere in the body of this agreement.

6. During the term of this agreement, UDT shall not knowingly employ, engage or accept the services of an individual who is listed by a Federal Agency as debarred, suspended, or otherwise ineligible for Federal contracting. Reasonable inquiry shall be made into the suspension/debarment status of any potential employee or consultant prior to the offer of employment or engagement of services. Further, UDT shall promptly terminate the employment of or contract for services with any individual who was suspended or debarred as of the effective date of their association with UDT. Moreover, UDT shall immediately remove such individuals from responsibility for or involvement with Government contract matters until the resolution of any question there might be regarding their suspension or debarment status as of the time of their association with UDT.

7. During the term of this agreement, UDT shall not knowingly enter into any subcontract or other business relationship relating to Federal Government contracts with any individual or business entity listed as debarred, suspended, or otherwise ineligible for contracting by a Federal Agency (hereinafter "listed contractor") until it has prepared a notice in form and content as specified in FAR 9.405-2(b), and has submitted a copy thereof to the Counsel, Procurement Integrity Office. Further, UDT shall make reasonable inquiry into the listed contractor status of each prospective business associate prior to the execution of any subcontract or the commencement of any other type of business relationship. In addition, UDT shall give written notice of the prohibition effected by this paragraph to all parties to any potential transaction involving a subcontract or other business relationship relating to Federal Government contracting prior to

5

<PAGE>

the execution of such subcontract or the commencement of such business relationship.

8. In addition to these costs stated in paragraphs 5.J and 9, UDT agrees

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 880 of 2711

that the costs described below shall be unallowable for United States Government contract purposes and shall not be charged directly or indirectly to any such contract or subcontract.

A. All costs of performing the actions set forth in Annex I accomplished by UDT subsequent to its learning of the investigation that resulted in the Information and Plea Agreement and Stipulation for Consent Judgment and Consent Judgment set forth in Annex II.

B. All costs of legal services (whether performed by in-house or private counsel), administrative and clerical services, services of accountants and consultants, salaries and wages of employees, officers, and directors, travel, and any costs directly related to the aforesaid, incurred in the implementation of and/or continued compliance with the terms of this agreement.

9. Within thirty days of the effective date of this agreement, UDT Corporation will remit the sum of $10,000, made payable to the Treasury of the United State, and for final payment of these administrative costs incurred, or to be incurred, by the Government because of UDT's improper activity, which include but are not limited to the costs of investigating the charges, and of monitoring, reviewing, enforcing, and administering this Agreement.

10. Except as provided in paragraph 14, the execution of this agreement by the Navy in no way waives any criminal, civil, contractual, or administrative remedy or right that the Government may have for the acts described in Annex I or for any other conduct that would give rise to such remedies. In addition, this agreement does not alter or limit in any way the releases and waivers previously provided for by the agreements with the U.S. Department of Justice, set forth in Annex I.

11. Failure by UDT to meet any of its obligations under the terms and spirit of this agreement, or to timely perform any of the actions identified in Annex I, not cured to the reasonable satisfaction of the Navy Debarring Authority within 20 working days, or as otherwise agreed, after receipt of written notice of such failure, shall constitute a cause for institution of suspension or debarment proceedings subject to the procedures established by the Federal Acquisition Regulation and any other applicable statute or regulation.

6

<PAGE>

12. By execution of this agreement, UDT releases the United States, its employees, agents, and instrumentalities, in both official and personal capacities, of any and all liability arising out of or otherwise related to this agreement. Further, UDT agrees not to file any claim against the United States, its employees, agents, and instrumentalities, in both official and personal capacities, in any form or jurisdiction, with regard to any matter arising out of or otherwise related to this agreement.

13. By execution of this agreement, UDT avers that any adverse action taken or to be taken against any UDT director, officer, employee, consultant, or agent, with regard to any matter arising out of or related to the facts and circumstances set forth in Annex II are the result solely of UDT's initiatives and decisions, and are not the result of any action by or on behalf of the United States, its employees, agents or instrumentalities.

14. UDT agrees to indemnify the Government against, and hold the Government harmless from, any and all claims, liabilities, obligations, and causes of action of whatsoever kind or nature for injury to, or death of, any person, and for any injury or damage to or destruction of any property, arising out of or as a result of the facts which form the basis for this agreement, even if the Government's liability to any person arises out of the acts or omissions of the Government, its employees, agents, invitees, or representatives of any other description whatsoever.

15. In recognition of the actions by and covenants of UDT set forth herein, the Navy, on behalf of the Department of Defense, will not suspend or debar UDT based upon the facts set forth in Annex II.

16. This agreement is a public document and may be distributed by the Navy throughout the Executive Branch of the Government and to other interested parties.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 881 of 2711

17. Modifications to this agreement may be made but shall have no effect until their terms are expressly incorporated in a writing which has been executed by both parties. Neither party shall seek or accept the benefit of a judicial or quasi-judicial order directing the other to execute a writing which would, if executed, modify this agreement.

18. For purposes of interpretation of this agreement, or any part hereof, by a court of competent jurisdiction (or any other judicial or quasi-judicial body), this agreement shall be deemed to have been drafted equally by all parties hereto.

7

<PAGE>

19. This agreement shall become effective on the date of the last signature hereto and shall continue thereafter for a period of three years from that date or, should UDT for any reason cease to be in full compliance with the letter and spirit of this agreement, for a period of three years following reestablishment for full compliance as determined by the Navy Debarring and Suspending Official, whichever period is longest.

20. This agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, oral or written, with respect to the subject hereof. This agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

Date: 7/25/95 UDT SENSORS, INC.

By: /s/ Deepak Chopra
----------------------------------
Deepak Chopra
President and CEO

Date: November 9, 1995 DEPARTMENT OF THE NAVY

By: /s/
----------------------------------
Department and Suspension Officer
Office of Procurement Integrity

8

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# Exhibit 1B

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
QNDzb1tW7Pl1W3q0TS1N7h/RoSZpzYiqbgML0ff+TzDLJ9iAtlk8NhybwfuakVA3
22+PHV6Oicv6S+LX9XO9tw==

<SEC-DOCUMENT>0000944209-97-001116.txt : 19970819
<SEC-HEADER>0000944209-97-001116.hdr.sgml : 19970819
ACCESSION NUMBER: 0000944209-97-001116
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 10
FILED AS OF DATE: 19970815
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97665515

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMEND #2 TO FORM S-1 REGISTRATION STATEMENT
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 15, 1997

REGISTRATION NO. 333-29179

- ------------------------------------------------------------------------
- ------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------

AMENDMENT NO. 2 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

----------------

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

<TABLE>

| <S> | <C> | <C> |
|---|---|---|
| CALIFORNIA | 3674 | 33-0238801 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

</TABLE>

----------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER,
INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

----------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

----------------

COPIES TO:

ISTVAN BENKO, ESQ. TROY & GOULD PROFESSIONAL CORPORATION 1801 CENTURY PARK EAST, SUITE 1600 LOS ANGELES, CALIFORNIA 90067 TEL. (310) 553-4441 FAX. (310) 201-4746

BERTRAM R. ZWEIG, ESQ. JONES, DAY, REAVIS & POGUE 555 WEST 5TH STREET, SUITE 4600 LOS ANGELES, CALIFORNIA 90013-1025 TEL. (213) 489-3939 FAX. (213) 243-2539

----------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

----------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

    If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

----------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

<PAGE>

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE.

SUBJECT TO COMPLETION, DATED AUGUST 15, 1997

[LOGO OF OPTO-SENSORS, INC.]

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $13.00 and $14.00 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Company has made application for inclusion of the Common Stock on the Nasdaq National Market under the symbol "OSIS."

-----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

-----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>

- --------------------------------------------------------------------------------

<CAPTION>

| | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING SHAREHOLDERS(2) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

-----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]
Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."
<PAGE>

[TWO PAGE GATEFOLD]

OSI SYSTEMS, INC.

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]
Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]

Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

## TABLE OF CONTENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |
| Dilution | 17 |
| Selected Consolidated Financial Data | 18 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 28 |
| Management | 41 |
| Certain Transactions | 49 |
| Principal and Selling Shareholders | 51 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 889 of 2711
Description of Capital Stock.......................................... 54
Shares Eligible for Future Sale....................................... 55
Underwriting.......................................................... 56
Legal Matters......................................................... 58
Experts............................................................... 58
Additional Information................................................ 58
Index to Consolidated Financial Statements............................ F-1
</TABLE>

----------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

3

<PAGE>

PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 890 of 2711

devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In fiscal 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During fiscal 1997, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

<PAGE>

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its

global presence, and selectively entering into new end product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997 the Company marketed its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,486,528 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Proposed Nasdaq National Market Symbol............................ | OSIS |

</TABLE>

- -------------------

(1) Based on the number of shares outstanding on August 15, 1997. Excludes approximately 860,486 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.34 per share.

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues.................... | $27,225 | $47,735 | $49,815 | $61,518 | $77,628 |
| Cost of goods sold.......... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit................ | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |

| | | | | | |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| Selling, general and administrative(1)......... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)........... | -- | -- | -- | -- | 856 |
| Total operating expenses... | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations...... | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense............ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest...... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest.................. | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest........... | 6 | 38 | 17 | 117 | -- |
| Net income.................. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4).. | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5)............ | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)............ | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1997 ACTUAL <C> | AS ADJUSTED(6) <C> |
|---|---|---|
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash.................................................. | $ 553 | $29,839 |
| Working capital....................................... | 10,800 | 49,961 |
| Total assets.......................................... | 47,333 | 76,619 |
| Total debt............................................ | 13,180 | 1,258 |
| Total shareholders' equity............................ | 16,809 | 58,017 |

</TABLE>

- -----------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of $161,000, $246,000, $216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $6,000, $38,000, $17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

## RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

### FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

### COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics"), Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business--Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is

required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the Company's

<PAGE>

subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995, 1996 and 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 42.2%, respectively, of the Company's revenues. Of the revenues generated during

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 896 of 2711

fiscal 1997 from shipments made outside of the United States, 14.9% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial condition and results of operations. While the Company has no current agreement or negotiations underway with

9

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the

Company. 

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations.

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, the court could grant Lunar and UAB a permanent injunction in which case Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of operations. For the year ended June 30, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $10.5 million or approximately 13.5% of the Company's revenues. Through June 30, 1997, the Company has incurred legal fees in the amount of approximately $368,000 in connection with this lawsuit. The Company intends to pursue vigorously its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 898 of 2711

Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13.0 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.2% and 16.2%, respectively, of the Company's Common Stock (17.3% and 14.2%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 41.7% of the outstanding Common Stock (37.7% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the

Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. The Company has filed an application to have the Common Stock approved for quotation on the Nasdaq National Market. However, there can be no assurance that an active trading market for the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,486,528 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,786,528 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,761,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for

180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,786,528 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of this Offering to be received by the Company, approximately $29.3 million or approximately 71.1% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 902 of 2711
bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $11.9 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT JUNE 30, 1997 | RATE BASIS PER ANNUM(1) | RATE AT JUNE 30, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $5,077,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,344,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,500,000 | Variable rate plus 0.25% | 8.75% | October 1997 |
| Revolving Credit | 963,000 | Variable rate plus 1.85% | 7.85% | December 1997 |
| Revolving Credit | 974,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 41,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 586,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 437,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- --------------------

(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

Borrowings under the foregoing bank facilities are generally used for working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

## DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

<PAGE>

## CAPITALIZATION

The following table sets forth as of June 30, 1997: (i) the actual short-term debt and capitalization of the Company; and (ii) the short-term debt and

capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

| | JUNE 30, 1997 ACTUAL | JUNE 30, 1997 AS ADJUSTED |
|---|---|---|
| | (In thousands) | |
| Short-term debt | $10,340 | $ 465 |
| Long-term debt, less current portion | 2,840 | 793 |
| Shareholders' equity: | | |
| Preferred Stock, no par value; 10,000,000 shares authorized; none issued and outstanding | -- | -- |
| Common Stock, no par value(1)(2); 40,000,000 shares authorized, actual and as adjusted; 6,156,528 shares issued and outstanding, actual; 9,486,528 issued and outstanding, as adjusted | 7,367 | 48,575 |
| Retained earnings | 9,171 | 9,171 |
| Cumulative foreign currency translation adjustment | 271 | 271 |
| Total shareholders' equity | 16,809 | 58,017 |
| Total capitalization | $19,649 | $58,810 |

- --------------------

(1) Excludes 860,486 shares of Common Stock issuable upon exercise of outstanding stock options as of June 30, 1997.

(2) Includes 27,654 shares of Common Stock that are issuable as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

DILUTION

The net tangible book value of the Company at June 30, 1997 , was $14,707,000 or $2.39 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding . After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of June 30, 1997 would have been $55,915,000, or $5.89 per share. This represents an immediate increase in the net tangible book value of $3.50 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.61 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed initial public offering price | | $13.50 |
| Net tangible book value before Offering | $2.39 | |
| Increase in net tangible book value attributable to this Offering | 3.50 | |

| | |
|---|---|
| Pro forma net tangible book value after Offering.............. | 5.89 |
| Dilution to new investors.................................... | $ 7.61 |

</TABLE>

The following table sets forth on a pro forma basis as of June 30, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

<TABLE>
<CAPTION>

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Existing shareholders.. | 6,156,528 | 64.9% | $ 7,367,000 | 14.1% | $ 1.20 |
| New public investors... | 3,330,000 | 35.1 | 44,955,000 | 85.9 | $13.50 |
| Total................. | 9,486,528 | 100.0% | $52,322,000 | 100.0% | |

</TABLE>

As of the date of this Prospectus, there are outstanding options to purchase an aggregate of 860,486 of Common Stock at a weighted average exercise price of approximately $7.34 per share. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

## SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1997, and the balance sheet data at June 30, 1996 and 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1993 and 1994 and the balance sheet data at June 30, 1993, 1994 and 1995 are derived from audited financial statements not otherwise contained herein.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues................ | $ 27,225 | $ 47,735 | $ 49,815 | $61,518 | $77,628 |
| Cost of goods sold...... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit........... | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |

| | | | | | |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| Selling, general and administrative(1)..... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development........... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)....... | -- | -- | -- | -- | 856 |
| Total operating expenses............. | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations.. | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense........ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest............... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.................. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest............... | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest....... | 6 | 38 | 17 | 117 | -- |
| Net income.............. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4)..... | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5)......... | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)......... | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | |
| Cash.................................. | $941 | $625 | $1,405 | $581 | $553 |
| Working capital........................ | 3,852 | 2,280 | 12,117 | 6,044 | 10,800 |
| Total assets........................... | 15,739 | 25,807 | 30,780 | 35,309 | 47,333 |
| Total debt............................. | 6,882 | 11,140 | 14,113 | 15,462 | 13,180 |
| Total shareholders' equity............. | 2,256 | 3,128 | 4,951 | 7,194 | 16,809 |

</TABLE>

- ------------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000, respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 906 of 2711

certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of 161, 000, 246,000, 216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of 6,000, 38,000, 17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2% of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997, the Company markets its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 42.2% of revenues for the fiscal years 1995, 1996 and 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, 1996 and 1997 was 26.6%, 34.2% and 25.3%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | |
| <S> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...... | $34,729 | $37,977 | $45,007 | $51,554 |
| (Inter-company eliminations)............... | (1,257) | (1,529) | (6,392) | (8,675) |
| Unaffiliated optoelectronic devices and subsystems .............................. | 33,472 | 36,448 | 38,615 | 42,879 |
| Security and inspection products........... | 14,263 | 13,367 | 22,903 | 34,749 |
| Total revenues............................ | $47,735 | $49,815 | $61,518 | $77,628 |

</TABLE>

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues

and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> |
| Revenues.................................. | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold........................ | 75.5 | 75.9 | 73.9 | 72.4 |
| Gross profit.............................. | 24.5 | 24.1 | 26.1 | 27.6 |
| Operating expenses: | | | | |
| Selling, general and administrative....... | 16.7 | 15.3 | 15.9 | 14.6 |
| Research and development.................. | 3.0 | 3.2 | 2.7 | 3.2 |
| Stock option compensation................. | -- | -- | -- | 1.1 |
| Total operating expenses................. | 19.7 | 18.5 | 18.6 | 18.9 |
| Income from operations.................... | 4.8 | 5.6 | 7.5 | 8.7 |
| Interest expense.......................... | 1.5 | 2.5 | 2.2 | 1.5 |
| Income before income taxes and minority interest................................. | 3.3 | 3.1 | 5.3 | 7.2 |
| Provision for income taxes................ | 1.7 | 0.8 | 1.8 | 1.8 |
| Income before minority interest........... | 1.6 | 2.3 | 3.5 | 5.4 |
| Minority interest......................... | -- | -- | 0.2 | -- |
| Net income................................ | 1.6% | 2.3% | 3.7% | 5.4% |

</TABLE>

<PAGE>

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1997 TO THE FISCAL YEAR ENDED JUNE 30, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all inter-company eliminations. Revenues for the fiscal year ended June 30, 1997 increased by $16.1 million, or 26.2%, to $77.6 million from $61.5 million for the fiscal year ended June 30, 1996. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $4.3 million, or 11.0%, to $42.9 million from $38.6 million for fiscal 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenues from the sale of security and inspection products increased by $11.8 million, or 51.7%, to $34.7 million from $22.9 million for fiscal 1996. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, the growth in sales of the Rapiscan 119 tabletop model and the introduction of large cargo inspection machines.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $5.4 million, or 33.8%, to $21.5 million from $16.0 million for fiscal 1996. As a percentage of revenues, gross profit increased to 27.6% in fiscal 1997 from 26.1% in fiscal 1996. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For fiscal 1997, such expenses increased by $1.5 million, or 15.9%, to $11.3 million from $9.8 million in fiscal 1996. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.9%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For fiscal 1997, such expenses increased by $841,000, or 50.6%, to $2.5 million from $1.7 million in fiscal 1996. As a percentage of revenues, research and development expenses increased to 3.2% from 2.7%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for fiscal 1997 increased by $2.2 million, or 47.2%, to $6.8 million from $4.6 million for fiscal 1996. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during fiscal 1997, income from operations increased by $3.0 million, or 65.8%, to $7.6 million from $4.6 million. As a percent of revenues, income from operations increased to 8.7% from 7.5%, and excluding the non-cash compensation expense referenced above, it would have increased to 9.8% from 7.5%.

Interest Expense. Interest expense for fiscal 1997 decreased by $162,000, or 11.9%, to $1.2 million from $1.4 million for fiscal 1996. As a percentage of revenues, interest expense decreased to 1.5% from 2.2%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during fiscal 1997, and to a decrease in the Company's borrowings outstanding under its lines of credit.

<PAGE>

Provision for Income Taxes. Provision for income taxes for fiscal 1997 increased by $305,000, or 27.5%, to $1.4 million from $1.1 million for fiscal 1996. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.3% from 34.2% in fiscal 1996. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for fiscal 1997,

increased $1.9 million, or 84.9%, to $4.2 million from $2.3 million in fiscal 1996. The compensation charge described above, decreased net income by $514,000 in fiscal 1997.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling, general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest expense increased to 2.5% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eight consecutive quarters in the period ended June 30, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| | (In thousands) | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues................ | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 | $21,655 |
| Cost of goods sold...... | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 | 15,794 |
| Gross profit............ | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 | 5,861 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 | 3,121 |
| Research and development........... | 419 | 408 | 453 | 383 | 517 | 636 | 584 | 767 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 856 | - |
| Total operating expenses............ | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 | 3,888 |
| Income from operations.. | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | 1,470 | 1,973 |
| Interest expense........ | 336 | 345 | 345 | 333 | 360 | 331 | 209 | 297 |
| Income before income taxes and minority interest............... | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 | 1,676 |
| Provision for income taxes.................. | 85 | 293 | 409 | 324 | 259 | 408 | 316 | 433 |
| Income before minority interest............... | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 | 1,243 |
| Minority interest....... | 19 | 17 | (8) | 89 | -- | -- | -- | -- |
| Net income............. | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 | $ 1,243 |

</TABLE>

<PAGE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of fiscal years 1996 and 1997.

<TABLE>
<CAPTION>

QUARTER ENDED

| <S> | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
|---|---|---|---|---|---|---|---|---|
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 | 72.9 |
| Gross profit | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 | 27.1 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 | 14.4 |
| Research and development | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 | 3.5 |
| Stock option compensation | -- | -- | -- | -- | -- | -- | 4.1 | -- |
| Total operating expenses | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 | 17.9 |
| Income from operations | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 | 9.2 |
| Interest expense | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 | 1.4 |
| Income before income taxes and minority interest | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 | 7.8 |
| Provision for income taxes | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 | 2.0 |
| Income before minority interest | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 | 5.8 |
| Minority interest | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- | -- |
| Net income | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% | 5.8% |

</TABLE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of June 30, 1997, the Company's principal sources of liquidity consisted of $553,000 in cash and several credit agreements described below.

The Company's operations provided net cash of $3.4 million during fiscal 1997. For fiscal 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accounts payable and accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in fiscal 1997. Net cash provided by

operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $3.0 million and $2.2 million in fiscal 1997 and 1996, respectively, in each case due primarily to purchases of property and equipment in the amount of approximately $2.2 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property

<PAGE>

and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for fiscal 1997 was $526,000 due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of June 30, 1997, there was outstanding approximately $5.1 million under the $10.0 million line of credit, $2.4 million under the term loan, and approximately $154,000 under the letter of credit facility. As of June 30, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11.0 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of June 30, 1997, there was outstanding approximately $1.5 million under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $1.9 million was used as of June 30, 1997. The facility terminates on October 27, 1997. Borrowings under the

agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.1 million at June 30, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus 2.00% per annum. At June 30, 1997, no amounts were outstanding under the overdraft facility. The second agreement provides for a 750,000 pound sterling (approximately $1.3 million as of June 30, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $832,000 as of June 30, 1997) facility for tender and

<PAGE>

performance bonds. These facilities are secured by certain assets of Rapiscan UK and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of June 30, 1997, there was outstanding approximately $963,000 under the line of credit and $452,000 was outstanding under the performance bond facility. The above facilities expire in December and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at June 30, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at June 30, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of June 30, 1997 there was approximately $974,000 outstanding under the line of credit and approximately $41,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $682,000 at June 30, 1997), of which $586,000 was outstanding as of June 30, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At June 30, 1997 outstanding term loan borrowings totalled approximately 3.2 million Norwegian krone (approximately $437,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average

rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000) and $68,000 were included in income for fiscal 1994, 1995, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology,

and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 918 of 2711

optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the year ended June 30, 1997, approximately 27.3% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take advantage of the

29

<PAGE>

growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The

Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in fiscal 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995, 1996, and 1997 approximately 28.7%, 33.1%, and 27.3% respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all

other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

<PAGE>

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

<TABLE>
<CAPTION>

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| <S> | <C> | <C> |
| Rapiscan 19 (single energy) | Inspection of incoming package | Embassies |
| Rapiscan 119 (single energy) | | Post offices |
| | | Courthouses |
| | | High risk office buildings |
| | | Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports |
| | | Prisons |
| | | Government buildings |
| | | Nuclear facilities |
| Rapiscan 500 Series-Standard | Airport hand carried and checked baggage | Airports |
| | | Cruise ships |

| | | |
|---|---|---|
| Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Pallet inspection Customs inspections Agriculture inspection | Freight shippers Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection Customs inspections | Airports Freight shippers Border crossings High risk seaport locations |
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events Airports Customs inspections Border crossing |

</TABLE>

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During fiscal 1997, sales of the walk-through and hand-held metal detectors constituted 1.6% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the year ended June 30, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who purchased more than $100,000 of optoelectronic products; and (iv) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 21.4% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 11.3% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 10 |

| | | | |
|---|---|---|---|
| Medical Monitoring | 11.1% | Datascope<br>BioChem International<br>Criticare Systems | 8 |
| Analytical and Medical Diagnostics Equipment | 6.1% | Johnson & Johnson<br>Leica<br>Coulter Corporation | 10 |
| Office Automation and Computer Peripherals | 7.3% | Xerox<br>Eastman Kodak<br>Dr. Johannes Heidenhain | 8 |
| Construction, Robotics and Industrial Automation | 5.6% | 3M<br>Spectra Physics<br>Baumer Electric | 7 |
| Military/Defense and Weapons Simulations | 4.8% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 7 |
| Colorometry and Particle Analyzers | 0.9% | Coulter Electronics<br>Accuracy Microsensors | 2 |
| Bar Code Scanners | 2.4% | Symbol Technologies<br>Intermec | 2 |
| Gaming Industry | 1.9% | Bally Gaming<br>Ardac, Inc. | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 923 of 2711

| | |
|---|---|
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 23 independent sales representatives and distributors, as of June 30, 1997. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 19 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 72 independent sales representatives, as of June 30, 1997. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection

<PAGE>

products sales staff is supported by a service organization of approximately 23 persons, as of June 30, 1997, located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 924 of 2711

maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996 and 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.6%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom optoelectronic solutions for their specific needs when standard components or subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of June 30, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 33 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $2.5 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities

35

<PAGE>

in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In

<PAGE>

certain cases, the Company has received a Phase II environmental assessment
report consisting of further soil testing and other investigations deemed
appropriate by an independent environmental consultant. The Company believes
that it is currently in compliance with all material environmental regulations
in connection with its manufacturing operations, and that it has obtained all
environmental permits necessary to conduct its business. The amount of
hazardous substances and wastes produced and generated by the Company may
increase in the future depending on changes in the Company's operations. Any
failure by the Company to comply with present or future regulations could
subject the Company to the imposition of substantial fines, suspension of
production, alteration of manufacturing process or cessation of operations,
any of which could have a material adverse effect on the Company's business,
financial condition and results of operations. For a discussion of the risks
imposed upon the Company's business by environmental regulations, see "Risk
Factors--Environmental Regulation."

COMPETITION

    The markets in which the Company operates are highly competitive and are
characterized by evolving customers needs and rapid technological change. The
Company competes with a number of other manufacturers, many of which have
significantly greater financial, technical and marketing resources than the
Company. In addition, these competitors may have the ability to respond more
quickly to new or emerging technologies, may adapt more quickly to changes in
customer requirements, may have stronger customer relationships, may have
greater name recognition, and may devote greater resources to the development,
promotion and sale of their products than the Company. There can be no
assurance that the Company will be able to compete successfully against any
current or future competitors in either the optoelectronic devices and
subsystem markets or the security and inspection markets or that future
competitive pressures will not materially and adversely affect its business,
financial conditions and results of operations.

    In the optoelectronic device and subsystem market, competition is based
primarily on such factors as expertise in the design and development of
optoelectronic devices, product quality, timeliness of delivery, price,
customer technical support, and on the ability to provide fully integrated
services from application development and design through volume subsystem
production. The Company believes that its major competitors in the
optoelectronic device and subsystem market are EG&G Electro-Optics, a division
of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell
Optoelectronics, a division of Honeywell, Inc. Because the Company specializes
in custom subsystems requiring a high degree of engineering expertise, the
Company believes that it generally does not compete to any significant degree
with any other large United States, European or Far Eastern manufacturers of
standard optoelectronic components.

    In the security and inspection market, competition is based primarily on
such factors as product performance, functionality and quality, the over-all
cost effectiveness of the system, prior customer relationships, technological
capabilities of the products, price, local market presence, and breadth of
sales and service organization. The Company believes that its principal
competitors in the market for security and inspection products are EG&G
Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision
Technologies, Inc., Vivid Technologies, American Science and Engineering,
Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics
Detection, Inc. Competition could result in price reductions, reduced margins,
and loss of market share by the Company. In the airline and airport security
and inspection market, particularly in the upgrade and replacement market, the
Company also competes for potential customers based on existing relationships
between its competitors and the customers. Certain of the Company's
competitors have been manufacturing inspection systems since the 1980's and
have established strong relationships with airlines and airport authorities.
The Company believes that the image quality and resolution of certain of its

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 927 of 2711

security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

37

<PAGE>

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At June 30, 1997, the Company's backlog products totalled approximately $52.7 million, compared to approximately $30.0 million at June 30, 1996. Substantially all of the Company's backlog as of June 30, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of June 30, 1997, the Company employed approximately 725 people, of whom 565 were employed in manufacturing, 33 in research and development, 62 in finance and administration, 42 in sales and marketing, and 23 in its service organization. Of the total employees, approximately 453 were employed in the United States, 109 were employed in Europe, 162 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 928 of 2711

| | | | |
|---|---|---|---|
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

38

<PAGE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future. The Company currently anticipates that it will be able to renew the leases that are scheduled to expire in the next few years on terms substantially the same as currently in effect. However, even if the Company were not able to renew one or more of the leases, the Company believes that suitable substitute space is available to relocate any of the facilities where the lease is not renewed. Accordingly, the Company does not believe that its failure to renew any of the leases that are scheduled to expire in the next few years will have a material adverse effect on the Company's operations.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

39

<PAGE>

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement,

contributory infringement and inducement thereof. Lunar and UAB seek damages in an unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California and has been consolidated with the lawsuit brought by Rapiscan U.S.A.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

<PAGE>

## MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra............ | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |

| | | |
|---|---|---|
| Manoocher Mansouri Aliabadi............. | 41 | Vice President - Corporate Marketing, UDT Sensors |
| Anthony S. Crane...... | 43 | Managing Director, Rapiscan UK |
| Thomas K. Hickman..... | 55 | Managing Director, OSI Singapore and OSI Malaysia |
| Steven C. Good(1)..... | 55 | Director |
| Meyer Luskin(1)....... | 71 | Director |
| Madan G. Syal(1)...... | 71 | Director |

</TABLE>

- --------------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri-Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1997, each non-employee Director received, as additional director compensation, options to purchase 5,000 shares of Common Stock at an exercise price of $13.50 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1997, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension & Profit Sharing Plan, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension plan by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1997, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION | | LONG TERM COMPENSATION |
|---|---|---|---|
| | SALARY | BONUS | SECURITIES UNDERLYING OPTIONS (#)(2) |
| <S> | <C> | <C> | <C> |
| Deepak Chopra(1) Chief Executive Officer | $370,843 | $175,000 | 137,500 |
| Ajay Mehra Chief Financial Officer | 172,216 | 58,040 | 73,750 |
| Andreas F. Kotowski President of U.S. Operation, Rapiscan U.S.A. | 124,452 | 10,000 | 57,029 |
| Manoocher Mansouri Aliabadi Vice President--Corporate Marketing, UDT Sensors | 110,019 | 28,000 | 15,000 |
| Thomas K. Hickman Managing Director, OSI Malaysia and OSI Singapore | 124,220 | 12,500 | 10,125 |

</TABLE>

- --------------------

(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) For additional information see "Option Grants."

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years. Mr. Kotowski was not entitled to receive such additional incentive compensation for the 1997 fiscal year.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in May and June 1997 based on their performances during the fiscal year ended June 30, 1997.

OPTION GRANTS

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1997:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| | | | | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) | | |
|---|---|---|---|---|---|---|---|---|
| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | MARKET PRICE ($/SHARE) | EXPIRATION DATE | 0% ($) | 5% ($) | 10% ($) |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra.......... | 37,500 | 5.7% | $3.33 | $6.67 | 12/14/01 | $125,000 | $34,535 | $76,314 |
| | 100,000 | 15.3 | 13.50 | N/A | 5/31/02 | N/A | 372,980 | 824,189 |
| Ajay Mehra(2).......... | 30,000 | 4.6 | 3.33 | 6.67 | 12/14/01 | 100,000 | 27,601 | 60,990 |
| | 10,000 | 1.5 | 13.50 | N/A | 5/31/02 | N/A | 37,298 | 82,419 |
| | 30,000 | 4.6 | 11.50 | N/A | 5/31/02 | N/A | 95,317 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 210,626 |
| Andreas F. Kotowski(2).. | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 20,000 | 3.1 | 11.50 | N/A | 5/31/02 | N/A | 63,545 | 140,417 |
| Manoocher Mansouri Aliabadi(2)........... | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 7,500 | 1.1 | 11.50 | N/A | 5/31/02 | N/A | 23,829 | 52,656 |
| Thomas K. Hickman(2).... | 3,750 | 0.6 | 2.83 | 6.67 | 12/14/01 | 14,375 | 2,935 | 6,487 |
| | 6,000 | 0.9 | 11.50 | N/A | 5/31/02 | N/A | 19,063 | 42,125 |

</TABLE>

- --------------------

(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 0.0%, 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.

(2) Excludes options granted as consideration for the acquisition by the Company of the minority interests in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

OPTION EXERCISES AND FISCAL YEAR-END VALUES

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1997 and held by them on June 30, 1997:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) | |
|---|---|---|---|---|---|---|
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Deepak Chopra........... | 0 | -- | 37,500 | 100,000 | $381,375 | $ 0 |
| Ajay Mehra.............. | 9,000 | $107,100 | 75,000 | 40,000 | 814,500 | 60,000 |
| Andreas F. Kotowski..... | 0 | -- | 7,500 | 20,000 | 80,025 | 40,000 |
| Manoocher Mansouri Aliabadi.............. | 7,500 | 89,250 | 13,500 | 8,250 | 149,500 | 23,625 |
| Thomas K. Hickman....... | 9,750 | 109,925 | 15,187 | 14,813 | 174,648 | 109,600 |

</TABLE>

- --------------------

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of August 15, 1997, 384,375 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 426,000 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 239,625 shares remained available for grant. As of such date, stock options to purchase 385,313 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

<PAGE>

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997

Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a

<PAGE>

director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived

an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company intends to enter into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnity Agreement will provide that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnity Agreements will also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnity Agreement will permit the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a

total of 15[illegible],201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) the issuance to the holders of the Option Shares of 27,654 additional shares of Common Stock which was based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ended June 30, 1997. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, 1996 and 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result, certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

<PAGE>

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less

favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 and $111,000 for such services during fiscal 1996 and 1997, respectively. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 and $82,000 for such services during fiscal 1996 and 1997, respectively.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as of August 15, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) | | NUMBER OF SHARES BEING OFFERED(2) | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | | NUMBER | PERCENT |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.5% | 148,148 | 1,726,852 | 18.2% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 19.0 | 63,343 | 1,107,032 | 11.7 |
| Deepak Chopra(6)(8)............ | 1,539,484 | 24.9 | 0 | 1,539,484 | 16.2 |
| Ajay Mehra(9)................... | 195,693 | 3.1 | 0 | 195,693 | 2.0 |
| Andreas F. Kotowski(10)......... | 128,806 | 2.1 | 0 | 128,806 | 1.4 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12)........... | 27,228 | * | 0 | 27,228 | * |
| Steven C. Good(13).............. | 40,313 | * | 21,896 | 18,417 | * |
| Madan G. Syal(14)............... | 243,938 | 4.0 | 25,926 | 218,012 | 2.3 |
| Meyer Luskin(15)................ | 23,438 | * | 0 | 23,438 | * |
| Good Swartz & Berns Pension & Profit Sharing Plan(16)........ | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birinder Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.3 | 9,259 | 68,420 | * |

| | | | | | |
|---|---|---|---|---|---|
| Mohinder Chopra............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.1 | 9,259 | 56,098 | * |
| Martha B. Holmes................ | 60,000 | * | 9,259 | 50,741 | * |
| Combined TR/DR Account Trust.... | 52,500 | * | 7,407 | 45,093 | * |
| Gary E. Fleischer............... | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Redinger............ | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold G. and Hope Anisgarten... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra..................... | 2,057 | * | 450 | 1,607 | * |
| Surendra V. and Kala Jain(17)... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka................... | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka.................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons).................... | 2,286,136 | 36.4 | 47,822 | 2,238,314 | 23.3 |

</TABLE>

- ---------------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of August 15, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (88,519); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333); Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension & Profit Sharing Plan (3,309); Leila and Birender Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Combined TR/DR Account Trust (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette J. Moore (7,407); Robert W. Kephart (5,556); Phillip M. Wascher (7,407); Charan J. Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Alan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Le (741); Mark and Penny Berns Trust (1,518); Arnold G. and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln A. Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette J. Moore, Robert W. Kephart, Phillip M. Wascher, Charan J. Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Alan J. Barnard, Christine Williams, Christopher Chin, Khai Le, Louis Peters and Lincoln A. Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,638,333, 17.3%); Sally F. Chamberlain 1,057,402, 11.1%); Deepak Chopra

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 942 of 2711

(1,354,289, 14.2%); Ajay Mehra (162,360, 1.7%); Andreas F. Kotowski 110,287, 1.2%); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,524) Steven C. Good (2,843); Madan G. Syal (199,493, 2.1%); Meyer Luskin (14,179); Good Swartz & Berns Pension & Profit Sharing Plan (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Combined TR/DR Account Trust (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); BetteJ. Moore (28,218); Robert W. Kephart (22,944); Phillip M. Wascher (23,241); Charan J. Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Alan J. and Pamela Barnard (9,704); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (12,148); Khai Le (8,956); Mark and Penny Berns Trust (2,232); Arnold G. and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln A. Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. 37,500 shares of the 49,125 shares are issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See "Management."

(9) Includes 75,000 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

<PAGE>

(13) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 15,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See

"Management."

(14) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Includes 217,500 shares held jointly by Mr. Syal and his wife, Mohini Syal. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 8,438 shares issuable pursuant to options exercisable within 60 days of August 15, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good, Mark and Penny Berns Trust, Arnold G. and Hope Anisgarten and Rajiv Mehra. Steven C. Good and Mark S. Berns are the trustees of the Good Swartz & Berns Pension & Profit Sharing Plan.

(17) Includes 6,429 shares held by Surendra V. Jain M.D. Inc.

<PAGE>

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

COMMON STOCK

As of August 15, 1997, 6,156,528 shares of Common Stock were outstanding, held of record by 79 shareholders. After completion of the Offering, there will be 9,486,528 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 944 of 2711

Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,486,528 shares of Common Stock outstanding (assuming no exercise of stock options after August 15, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,786,528 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,761,000 Restricted Shares (or approximately 5,206,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 94,865 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 945 of 2711

compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

<PAGE>

UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

| Underwriter | Number of Shares |
|---|---|
| Robertson, Stephens & Company LLC | |
| William Blair & Company, L.L.C | |
| Volpe Brown Whelan & Company, LLC | |
| Total | 3,700,000 |

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in the Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the
Underwriters, the Company and the Selling Shareholders against certain civil
liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors
of the Company, the Selling Shareholders and certain other shareholders
holding collectively approximately 5,761,000 shares of the Company's Common
Stock outstanding prior to the Offering, have agreed with the Representatives
that except for the 3,700,000 shares being offered in this Offering, or the
shares sold pursuant to the over-allotment option, without the prior written
consent of Robertson, Stephens & Company LLC or as a gift or distribution to
one who agrees to be bound by these restrictions, until 180 days after the
effective date of this Prospectus (the "lock-up period"), they will not offer
to sell, contract to sell or otherwise dispose of any shares of Common Stock,
including shares issuable under options or warrants exercisable during the 180
days after the date of this Prospectus, any options or warrants to purchase
shares of Common Stock or any securities convertible into or exchangeable for
shares of Common Stock owned directly by such holders or with respect to which
they have the power of disposition. Approximately 5,761,000 shares of Common
Stock subject to the lock-up agreements will become eligible for immediate
public sale following expiration of the lock-up period, subject to the
provisions of the Securities Act and the Rules promulgated thereunder.
Robertson, Stephens & Company LLC may, in its sole discretion, and at any time
without notice, release all or a portion of the

                                       56

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future
Sale." In addition, the Company has agreed that until the expiration of the
lock-up period, the Company will not, without the prior written consent of
Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise
dispose of any shares of Common Stock, any options or warrants to purchase
Common Stock or any securities convertible into or exchangeable for shares of
Common Stock, other than the Company's sales of shares in this Offering, the
issuance of shares of Common Stock upon the exercise of outstanding stock
options, and the grant of options to purchase shares or the issuance of shares
of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M
under the Securities Act, certain persons participating in the Offering may
engage in transactions, including stabilizing bids, syndicate covering
transactions or the imposition of penalty bids which may have the effect of
stabilizing or maintaining the market price of the Common Stock at a level
above that which might otherwise prevail in the open market. A "stabilizing
bid" is a bid for or the purchase of the Common Stock on behalf of the
Underwriters for the purpose of fixing or maintaining the price of the Common
Stock. A "syndicate covering transaction" is the bid for or the purchase of
the Common Stock on behalf of the Underwriters in connection with the
Offering. The Underwriters may also cover all or a portion of such short
position, by exercising the Underwriters' over-allotment option referred to
above. A "penalty bid" is an arrangement permitting the Representatives to
reclaim the selling concession otherwise accruing to an Underwriter or
syndicate member in connection with the Offering if the Common Stock
originally sold by such Underwriter or syndicate member is purchased by the
Representatives in a syndicate covering transaction and has therefore not been
effectively placed by such Underwriter or syndicate member. The
Representatives have advised the Company that such transactions may be
effected on the Nasdaq National Market or otherwise and, if commenced, may be
discontinued at any time.

The Representatives have advised the Company that they do not intend to
confirm sales to any accounts over which they exercise discretionary
authority.

Prior to this Offering, there has been no public market for the Company's

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 947 of 2711

securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

<PAGE>

LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

PAGE
----

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 948 of 2711

<S> <C>
Report of Independent Auditors.......................................... F-2
Consolidated Balance Sheets as of June 30, 1996 and 1997................. F-3
Consolidated Statements of Operations for the Years Ended June 30, 1995, 1996 and 1997...................................................... F-4
Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1995, 1996 and 1997.............................................. F-5
Consolidated Statements of Cash Flows for the Years Ended June 30, 1995, 1996 and 1997...................................................... F-6
Notes to Consolidated Financial Statements............................... F-8
</TABLE>

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems, Inc. (the "Company") and its subsidiaries as of June 30, 1997 and 1996, and the related consolidated statements of operations, shareholders' equity, and cash flows for the years ended June 30, 1997, 1996 and 1995. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of June 30, 1997 and 1996, and the results of their operations and their cash flows for the years ended June 30, 1997, 1996 and 1995 in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Los Angeles, California

August 15, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| ASSETS (NOTE 4) | | |

| | 1996 | 1997 |
|---|---|---|
| Current Assets: | | |
| Cash and cash equivalents (Note 1) | $ 581 | $ 553 |
| Accounts receivable, net of allowance for doubtful accounts of $276 and $586 at June 30, 1996 and 1997, respectively (Note 1) | 13,295 | 15,556 |
| Other receivables (Note 2) | 783 | 2,346 |
| Inventory (Note 1) | 13,642 | 18,517 |
| Prepaid expenses | 633 | 537 |
| Deferred income taxes (Notes 1 and 7) | 700 | 874 |
| Total current assets | 29,634 | 38,383 |
| Property and Equipment, Net (Notes 1 and 4): | 4,454 | 5,841 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 1,221 | 3,109 |
| Total | $35,309 | $47,333 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Current Liabilities: | | |
| Bank lines of credit (Note 4) | $ 7,783 | $ 9,100 |
| Current portion of long-term debt (Notes 6 and 13) | 1,491 | 1,240 |
| Current portion of senior subordinated debt (Note 5) | 2,500 | |
| Accounts payable (Note 1) | 6,522 | 7,712 |
| Accrued payroll and related expenses | 1,667 | 1,607 |
| Income taxes payable (Notes 1 and 7) | 799 | 1,804 |
| Advances from customers | 219 | 2,410 |
| Other accrued expenses and current liabilities | 2,609 | 3,710 |
| Total current liabilities | 23,590 | 27,583 |
| Bank Line of Credit (Notes 1 and 4) | | |
| Senior Subordinated Debt (Notes 1 and 5) | 575 | |
| Long-Term Debt (Notes 1, 6 and 13) | 3,113 | 2,840 |
| Deferred Income Taxes (Notes 1 and 7) | 827 | 101 |
| Minority Interest (Note 1) | 10 | |
| Total liabilities | 28,115 | 30,524 |
| Commitments and Contingencies (Notes 8 and 13) | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1996 and 0 shares at June 30, 1997 (Note 10) | 1,514 | |
| Preferred stock, no par value; 10,000,000 shares authorized; none issued and outstanding at June 30, 1996 and 1997 | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding, 1,858,132 and 6,156,528 shares at June 30, 1996 and 1997, respectively | 560 | 7,367 |
| Retained earnings | 4,994 | 9,171 |
| Cumulative foreign currency translation adjustment (Note 1) | 126 | 271 |
| Total shareholders' equity | 7,194 | 16,809 |
| Total | $35,309 | $47,333 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>

<CAPTION> 

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Revenues (Note 1) | $ 49,815 | $ 61,518 | $ 77,628 |
| Cost of goods sold | 37,818 | 45,486 | 56,174 |
| Gross profit | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | |
| Selling, general and administrative expenses (Notes 11 and 12) | 7,601 | 9,757 | 11,304 |
| Research and development (Note 1) | 1,591 | 1,663 | 2,504 |
| Stock option compensation (Note 9) | -- | -- | 856 |
| Total operating expenses | 9,192 | 11,420 | 14,664 |
| Income from operations | 2,805 | 4,612 | 6,790 |
| Interest expense (Notes 4, 5, 6 and 11) | 1,251 | 1,359 | 1,197 |
| Income before provision for income taxes and minority interest | 1,554 | 3,253 | 5,593 |
| Provision for income taxes (Notes 1 and 7) | 413 | 1,111 | 1,416 |
| Income before minority interest in net loss of subsidiaries | 1,141 | 2,142 | 4,177 |
| Minority interest in net loss of subsidiaries (Note 1) | 17 | 117 | -- |
| Net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Historical net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Interest on subordinated debt, net of income taxes | 216 | 166 | 92 |
| Minority interest in net loss of subsidiaries | (17) | (117) | -- |
| Net income available to common shareholders | $ 1,357 | $ 2,308 | $ 4,269 |
| Net income per share (Note 1) | $ 0.22 | $ 0.38 | $ 0.68 |
| Weighted average shares outstanding | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-4

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE, JULY 1, 1994 | 1,123,750 | 1,124 | 1,703,257 | 363 | 1,577 | 64 | 3,128 |
| Exercise of stock | | | | | | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 951 of 2711

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| options.............. | 35,000 | 70 | 60,060 | 75 | -- | -- | 145 |
| Conversion of debt.... | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 95 | 95 |
| Net income............ | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995.. | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options.............. | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment........... | -- | -- | -- | -- | -- | (33) | (33) |
| Net income............ | -- | -- | -- | -- | 2,259 | -- | 2,259 |
| BALANCE, JUNE 30, 1996.. | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options.............. | -- | -- | 118,125 | 146 | -- | -- | 146 |
| Conversion of debt.... | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions......... | -- | -- | 206,610 | 1,566 | -- | -- | 1,566 |
| Conversion of preferred stock...... | (2,568,750) | (4,014) | 3,853,125 | 4,014 | -- | -- | -- |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 145 | 145 |
| Net income............ | -- | -- | -- | -- | 4,177 | -- | 4,177 |
| BALANCE, JUNE 30, 1997.. | -- | $ -- | 6,156,528 | $7,367 | $9,171 | $271 | $16,809 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | |
| Net income...................................... | $ 1,158 | $ 2,259 | $ 4,177 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Minority interest in net loss of subsidiaries.... | (17) | (117) | |
| Provision for losses on accounts receivable...... | (70) | 404 | 389 |
| Depreciation and amortization.................... | 1,551 | 2,014 | 2,302 |
| Stock option compensation........................ | | | 856 |
| Deferred income taxes............................ | 240 | (12) | (900) |
| Gain on sale of property and equipment........... | (11) | (13) | |
| Changes in operating assets and liabilities, net of business acquisition: | | | |
| Accounts receivable............................ | (1,239) | (858) | (1,980) |
| Other receivables.............................. | 226 | (194) | (1,530) |
| Inventory...................................... | (2,599) | (4,068) | (4,573) |
| Prepaid expenses............................... | (139) | (245) | 96 |
| Accounts payable............................... | 221 | 120 | 1,026 |
| Accrued payroll and related expenses........... | 191 | 707 | (60) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 952 of 2711

| | | | |
|---|---|---|---|
| Income taxes payable | (217) | 652 | 1,005 |
| Advances from customers | 9 | 183 | 1,448 |
| Other accrued expenses and current liabilities | (87) | (827) | 1,101 |
| Net cash provided by (used in) operating activities | (783) | 5 | 3,357 |
| Cash flows from investing activities: | | | |
| Proceeds from sale of property and equipment | 142 | 120 | |
| Additions to property and equipment | (1,396) | (1,612) | (2,182) |
| Cash paid for business acquisition, net of cash acquired | | | (848) |
| Cash paid for minority interest | (160) | | |
| Other assets | (662) | (688) | 23 |
| Net cash used in investing activities | (2,076) | (2,180) | (3,007) |
| Cash flows from financing activities: | | | |
| Net proceeds from (repayment of) bank lines of credit | 2,668 | 1,502 | 1,014 |
| Payments on senior subordinated debt | (700) | | (350) |
| Payments on junior subordinated debt | (280) | | |
| Payments on long-term debt | (1,095) | (1,250) | (3,983) |
| Proceeds from issuance of long-term debt | 2,806 | 1,097 | 2,647 |
| Proceeds from exercise of stock options and warrants | 145 | 17 | 146 |
| Proceeds from issuance of minority interest | | 21 | |
| Net cash provided by (used in) financing activities | 3,544 | 1,387 | (526) |
| Effect of exchange rate changes on cash | 95 | (36) | 148 |
| Net (decrease) increase in cash | 780 | (824) | (28) |
| Cash, beginning of period | 625 | 1,405 | 581 |
| Cash, end of period | $ 1,405 | $ 581 | $ 553 |
| Supplemental disclosures of cash flow information-- Cash paid during the period for: | | | |
| Interest | $ 1,229 | $ 1,346 | $ 1,197 |
| Income taxes | $ 82 | $ 377 | $ 1,511 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- --------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During October and December 1996, the Company acquired the minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock, at an estimated fair value of $6.67 per share. An additional

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 953 of 2711

27,654 shares, at an estimated fair value of $13.[illegible]0 per share, are issuable at June 30, 1997. The excess of the fair value of the common stock of $1,566 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (916) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In October and December 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares to be issued is based upon the pre-tax income of the subsidiary for the year ended June 30, 1997, and has been determined to be 27,654 shares and have been included in the number of shares issued for minority interest acquisitions in the accompanying 1997 consolidated statement of shareholders' equity.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Raw materials | $ 7,795 | $11,408 |
| Work-in-process | 3,114 | 4,224 |
| Finished goods | 2,733 | 2,885 |
| Total | $13,642 | $18,517 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Equipment | $ 6,280 | $ 7,545 |
| Leasehold improvements | 1,601 | 2,093 |
| Tooling | 1,558 | 1,967 |
| Furniture and fixtures | 488 | 666 |
| Computer equipment | 1,283 | 1,699 |
| Vehicles | 93 | 176 |
| Total | 11,303 | 14,146 |
| Less accumulated depreciation and amortization | 6,849 | 8,305 |
| Property and equipment, net | $ 4,454 | $ 5,841 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1996 and 1997 consisted of the following (in thousands):
<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|

| | | |
|---|---|---|
| Software development costs | $ 588 | $ 588 |
| Goodwill | -- | 2,142 |
| Deposits | 262 | 320 |
| Other | 524 | 444 |
| Total | 1,374 | 3,494 |
| Less accumulated amortization | 153 | 385 |
| Intangible and other assets, net | $1,221 | $3,109 |

</TABLE>

Goodwill in the amount of $1,554,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the year ended June 30, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

<PAGE>

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income,

while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately $76,000, ($123,000), and $68,000 were included in income for the years ended June 30, 1995, 1996 and 1997, respectively.

Earnings Per Share -- Earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from preferred stock, convertible debt and stock options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period. Net income and net income per share have been presented to reflect the effect of the conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

In June 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 130, "Reporting for Comprehensive Income" and No. 131, "Disclosure about Segments of an Enterprise and Related Information." These statements are effective for financial statements issued for periods beginning after December 15, 1997. The Company has not yet analyzed the impact of adopting these statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at June 30, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and 1997, the Company earned a technical

fee from the joint venture in the amount of $200,000 and $115,000, respectively. At June 30, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The cash purchase price amounted to $916,000. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1994, pro forma consolidated sales for the years ended June 30, 1995, 1996 and 1997 would have been $53,338,000, $65,371,000, and $79,871,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1996 and 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Line of credit -- U.S. | $6,361 | $6,577 |
| Line of credit -- Singapore | 1,422 | 974 |
| Line of credit -- Norway | | 586 |
| Line of credit -- Rapiscan U.K. | | 963 |
| Total bank lines of credit | $7,783 | $9,100 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. At June 30, 1997 approximately $5,077,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At June 30, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. At June 30, 1997 $1,500,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $4,000,000. At June 30, 1997 approximately $1,917,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank, which provides for revolving line of credit borrowings up to 2,600,000 Singapore dollars (approximately $1,800,000 at June 30, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $682,000 at June 30, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at June 30, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,081,000 at June 30, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,248,000 at June 30, 1997) and a 500,000 pound sterling (approximately $832,000 at June 30, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at June 30, 1997) plus 2%. The overdraft facility expires in December 1997. At June 30, 1997 no amounts were outstanding under the overdraft facility. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly and the line expires in November 1997. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $452,000 was outstanding under performance bonds at June 30, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $990,000 at June 30, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at June 30, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the year ended June 30, 1997, all of the debt outstanding under the various agreements was repaid or converted in accordance with the conversion terms as summarized in the following table:

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (in thousands) | |
| <S> | <C> | <C> |
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | -- |
| Total senior subordinated debt | 3,075 | -- |
| Less current portion | 2,500 | -- |
| Total long-term portion | $ 575 | $-- |

</TABLE>

<PAGE>

6. LONG-TERM DEBT

At June 30, 1996 and 1997, long-term debt consisted of the following:

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (in thousands) | |
| <S> | <C> | <C> |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 960 of 2711

| | | |
|---|---|---|
| January 1997 | $1,667 | -- |
| Term loan payable to a bank, interest due mothly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001. Outstanding balances are collateralized by substantially all of the assets of the Company | -- | $2,344 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,129 until paid in full on June 1, 2001. Outstanding balances are collateralized by certain assets of the subsidiary | -- | 437 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 141 | 41 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.35% at June 30, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,000 | 700 |
| Other | 535 | 558 |
| | 4,604 | 4,080 |
| Less current portion of long-term debt | 1,491 | 1,240 |
| Long-term portion of debt | $3,113 | $2,840 |

</TABLE>

Fiscal year principal payments of long-term debt as of June 30, 1997 are as follows (in thousands):

<TABLE>

| <S> | <C> |
|---|---|
| 1998 | $1,240 |
| 1999 | 1,333 |
| 2000 | 896 |
| 2001 | 592 |
| 2002 | 19 |
| Total | $4,080 |

</TABLE>

<PAGE>

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |

| | | | |
|---|---|---|---|
| Pretax income: | | | |
| United States | $1,277 | $1,965 | $2,655 |
| Foreign | 277 | 1,288 | 2,938 |
| Total pretax income | $1,554 | $3,253 | $5,593 |

The Company's provision for income taxes is comprised of the following (in thousands):

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Current: | | | |
| Federal | $ 43 | $ 510 | $1,256 |
| State | 3 | 21 | 24 |
| Foreign | 127 | 592 | 1,036 |
| | 173 | 1,123 | 2,316 |
| Deferred | 240 | (12) | (900) |
| Total provision | $413 | $1,111 | $1,416 |

Deferred income tax assets (liabilities) at June 30, 1996 and 1997 consisted of the following (in thousands):

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| Expenses not currently deductible | $ 873 | $1,455 |
| State income taxes | -- | -- |
| Other | -- | 301 |
| Total deferred income tax assets | 873 | 1,756 |
| Depreciation | (145) | (43) |
| Capitalized software development costs | (214) | (219) |
| State income taxes | (173) | (329) |
| Revitalization zone deductions | (278) | (392) |
| Other | (190) | -- |
| Total deferred income tax liabilities | (1,000) | (983) |
| Net deferred income taxes | $ (127) | $ 773 |

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Provision for income taxes at federal statutory rate... | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit... | (2.6) | 0.2 | (4.7) |
| Nontaxable earnings of FSC............................ | (7.1) | (5.7) | (4.9) |
| Research and development tax credits.................. | (2.8) | -- | (1.7) |
| Foreign income subject to tax at other than federal statutory rate.................................... | 0.7 | 1.1 | (1.0) |
| Other................................................. | 3.4 | 3.6 | 2.6 |
| Effective income tax rate............................. | 26.6 % | 34.2 % | 25.3 % |

</TABLE>

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At June 30, 1997 undistributed earnings of the foreign subsidiaries amounted to approximately $3,656,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of June 30, 1997 are as follows: $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $959,000, $901,000 and $921,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect

on the Company's consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the year ended June 30, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1995, 1996 and 1997:

<TABLE>
<CAPTION>

| | NUMBER OF OPTIONS | OPTION PRICE WEIGHTED AVERAGE | OPTION PRICE TOTAL |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Outstanding, July 1, 1994.................... | 307,875 | 1.43 | 440,000 |
| Granted...................................... | 69,000 | 2.00 | 138,000 |
| Exercised.................................... | (60,000) | 1.25 | (75,000) |
| Canceled..................................... | (19,500) | 1.77 | (34,000) |
| Outstanding, June 30, 1995................... | 297,375 | 1.57 | 469,000 |
| Granted...................................... | 51,000 | 2.17 | 111,000 |
| Exercised.................................... | (16,125) | 1.06 | (17,000) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 964 of 2711

| | | | |
|---|---|---|---|
| Canceled.................................... | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996.................... | 318,750 | 1.70 | 541,000 |
| Granted....................................... | 669,611 | 8.88 | 5,947,000 |
| Exercised..................................... | (118,125) | 1.24 | (146,000) |
| Canceled...................................... | (9,750) | 2.38 | (23,000) |
| Outstanding, June 30, 1997.................... | 860,486 | $7.34 | $6,319,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of June 30, 1997:

<TABLE>
<CAPTION>

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING: NUMBER OUTSTANDING AT JUNE 30, 1997 | OPTIONS OUTSTANDING: WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | OPTIONS OUTSTANDING: WEIGHTED AVERAGE EXERCISE PRICE | OPTIONS EXERCISABLE: EXERCISABLE AT JUNE 30, 1997 | OPTIONS EXERCISABLE: WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| $0.17 to 0.67........... | 13,500 | 1.0 years | $0.64 | 13,500 | $0.64 |
| 1.87 to 2.00........... | 134,625 | 2.0 | 1.95 | 102,563 | 1.93 |
| 2.33 to 3.33........... | 277,875 | 4.1 | 2.89 | 269,250 | 2.90 |
| 11.50 to 13.50.......... | 434,486 | 5.0 | 12.08 | -- | -- |
| $0.17 to 13.50.......... | 860,486 | 4.2 | $7.34 | 385,313 | $2.56 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and 1997 pursuant to SFAS 123 was approximately $19,000 and $1,054,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $4,058,000, and pro forma net income per share would have been $0.36 and $0.64 for 1996 and 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.33% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the common stock.

In June 1997, in order to simplify the capital structure of the Company, holders of the preferred stock converted each preferred share into 1.5 shares (post-split) of common stock.

In June 1997, the Company amended its articles of incorporation, which articles authorize 10,000,000 shares of new preferred stock. Such preferred

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 965 of 2711

stock has no par value, and no preferred shares are issued and outstanding at June 30, 1997.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1995, 1996 and 1997 are approximately $77,000, $83,000, and $111,000 for messenger service and auto rental; $78,000, $63,000, and $82,000 for printing services; and $23,000, $7,000, and $11,000 for professional services, respectively. During the year ended June 30, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $315,000, $263,000, and $146,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and charged to operations in the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At June 30, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the years ended June 30, 1997, 1996 and 1995. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient to provide for benefits accruing after that date. Pension expense for the years ended June 30, 1995, 1996 and 1997 was approximately $111,000, $91,000, and $89,000, respectively.

<PAGE>

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 966 of 2711

Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1995 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues...................... | $33,158 | $11,341 | $5,316 | | $49,815 |
| Transfer between geographical areas........................ | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues.................. | $34,856 | $12,129 | $9,147 | $ (6,317) | $49,815 |
| Operating income.............. | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets........... | $36,751 | $10,832 | $4,839 | $(21,642) | $30,780 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1996 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas....................... | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues................. | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income............. | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets.......... | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

</TABLE>

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1997 | | | | |
|---|---|---|---|---|---|
| | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues..................... | $54,310 | $18,915 | $ 4,403 | | $77,628 |
| Transfer between geographical areas....................... | 8,655 | 5,156 | 12,191 | $(26,002) | -- |
| Net revenues................. | $62,965 | $24,071 | $16,594 | $(26,002) | $77,628 |
| Operating income............. | $ 3,814 | $ 1,849 | $ 1,390 | $ (263) | $ 6,790 |
| Identifiable assets.......... | $52,367 | $15,066 | $ 8,395 | $(28,495) | $47,333 |

</TABLE>

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

The Company's security and inspection products are used for security purposes at locations such as airports, courthouses, government buildings, nuclear facilities, mail rooms, schools and prisons. In addition, the security and inspections products are also increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

| <S> | <C> |
|---|---|
| Securities and Exchange Commission registration fee............... | $ 18,052 |

| | |
|---|---|
| NASD filing fee | 6,457 |
| Nasdaq National Market System listing fee | 42,000 |
| Printing and engraving expenses | 100,000 |
| Transfer agent and registrar fees | 2,000 |
| Legal fees and expenses | 175,000 |
| Accounting fees and expenses | 150,000 |
| "Blue sky" fees and expenses | 15,000 |
| Other expenses | 151,491 |
| Total | $660,000* |

</TABLE>

- ---------------------

* The Selling Shareholders participating in the Offering of the 370,000 shares to be sold by such Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000. The Selling Shareholders who are selling in the case that the underwriters over-allotment option is exercised will not pay any of the above expenses.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

<PAGE>

action by or in the right of the corporation) by reason of the fact that he is

or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.

Section 317 also provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted under similar standards, except that no indemnification may be made in respect to any claim, issue or matter as to which such persons shall have been adjudged to be liable to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine that despite the adjudication of liability, such person is fairly and reasonably entitled to be indemnified for such expenses which the court shall deem proper.

Section 317 provides further that to the extent a director or officer of a California corporation has been successful in the defense of any action, suit or proceeding referred to in the previous paragraphs or in the defense of any claim, issue or matter therein, he shall be indemnified against expenses actually and reasonably incurred by him in connection therewith; that indemnification authorized by Section 317 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; and that the corporation may purchase and maintain insurance on behalf of a director or officer of the corporation against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such whether or not the corporation would have the power to indemnify him against such liabilities under Section 317.

In May 1994, the Company entered into indemnification agreements with Deepak Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal guarantees provided by them to a Singapore financial institution that provided a loan to OSI Singapore, a subsidiary of the Company. The indemnification agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and Hickman against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by them in connection with OSI Singapore's inability to fulfill its obligations under the loan and their respective guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors and/or executive officers of the Company.

In connection with certain settlements entered into pursuant to the Consent Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United States government a total of $1,500,000 in five annual installments ending on March 31, 1999. In order to ensure the full payment, Deepak Chopra personally guaranteed the payment of $750,000 of the foregoing amount. The Company entered into an indemnification agreement with Mr. Chopra pursuant to which the Company shall indemnify Mr. Chopra against all debts, liabilities, damages, claims, expenses and costs including attorneys' fees incurred by him in connection with his guarantee of the payment of $750,000.

In addition, the Company intends to enter into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers prior to the consummation of the Offering. Each such Indemnity Agreement will provide that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and,

with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnity Agreement will permit the director or officer that is party thereto to bring

<PAGE>

suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful.

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an

aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

<PAGE>

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share. As part of the same arrangement, the Company issued 27,654 additional shares of its Common Stock to such officers and key employees in August 1997. The number of shares of Common Stock issued was based on the combined net income before taxes of Rapiscan U.S.A. and Rapiscan UK for the fiscal year ended June 30, 1997.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate. |
| 5.1 | Opinion of Troy & Gould Professional Corporation. |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and |

Anthony S. Crane

| | |
|---|---|
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company. |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited). |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |

</TABLE>

II-4

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1). |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule. |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2) |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy.(2) |

</TABLE>

- --------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

II-5

<PAGE>

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-6

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on August 15, 1997.

OSI SYSTEMS, INC.

/s/ AJAY MEHRA
By: ___________________________________
Ajay Mehra
Vice President, Chief Financial Officer,
Secretary and Director

Pursuant to the requirements of the Securities Act of 1933, this Amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| SIGNATURE | TITLE | DATE |
|---|---|---|
| * <br> Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | August 15, 1997 |
| /s/ AJAY MEHRA <br> Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | August 15, 1997 |
| * <br> Steven C. Good | Director | August 15, 1997 |
| * <br> Meyer Luskin | Director | August 15, 1997 |
| * <br> Madan G. Syal | Director | August 15, 1997 |
| *By: /s/ AJAY MEHRA <br> Ajay Mehra as Attorney-In-Fact | | August 15, 1997 |

</TABLE>

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994.................. | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1995.................. | $203 | (70) | -- | 80 | $ 53 |
| | ==== | ==== | === | === | ==== |
| Year Ended June 30, 1996.................. | $ 53 | $404 | -- | 181 | $276 |
| | ==== | ==== | === | === | ==== |
| Year Ended June 30, 1997.................. | $276 | $389 | -- | 79 | $586 |
| | ==== | ==== | === | === | ==== |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Form of Underwriting Agreement.(1) |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate. |
| 5.1 | Opinion of Troy & Gould Professional Corporation. |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane. |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company. |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited). |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit |

5.1(3)

24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2)
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.(2)
</TABLE>
- --------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<DESCRIPTION>SPECIMEN COMMON STOCK CERTIFICATE
<TEXT>

<PAGE>

Exhibit 4.1

OSI SYSTEMS, INC. FACE TEXT

OSI SYSTEMS, INC.
NUMBER
SHARES
Incorporated under the laws of the state of California
COMMON STOCK
CUSIP 671044 10 5
SEE REVERSE FOR CERTAIN DEFINITIONS
This Certifies that
is the recorder holder of
FULLY PAID AND NONASSESSABLE SHARES OF COMMON STOCK, NO PAR VALUE, OF
OSI SYSTEMS, INC.
transferable on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this certificate properly endorsed. This certificate is not valid until countersigned by the Transfer Agent and Registrar.
WITNESS the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.
Dated:
Secretary
{image of Corporate Seal}
President
COUNTERSIGNED AND REGISTERED:
U.S. STOCK TRANSFER CORPORATION
TRANSFER AGENT
AND REGISTRAR
BY
AUTHORIZED SIGNATURE

Page 1

<PAGE>

OSI SYSTEMS, INC. BACK TEXT

The Corporation is authorized to issue two classes of stock, Common Stock and Preferred Stock. The Board of Directors of the Corporation has authority to fix the number of shares and the designation of any series of Preferred Stock and to determine or alter the rights, preferences, privileges and restrictions granted to or imposed upon any unissued series of Preferred Stock.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common
UNIF GIFT MIN ACT................Custodian................
(Cust) (Minor)
under Uniform Gifts to Minors
Act................
(State)
UNIF TRF MIN ACT................Custodian (until
age................)
(Cust)
.........................under Uniform Transfers
(Minor)
to Minors Act
(State)
Additional abbreviations may also be used though not in the above list.
PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE..............
FOR VALUE RECEIVED,.............................hereby sell, assign and transfer unto.......................................
.................................................................
(PLEASE TYPE OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)
........... Shares
of the common stock represented by the within Certificate, and do hereby irrevocably constitute and appoint Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.
Dated
THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.
Signature(s) Guaranteed

Page 2

<PAGE>

By
THE SIGNATURES(S) SHOULD BE AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17Ad-15

Page 3

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5.1
<SEQUENCE>3
<DESCRIPTION>OPINION OF TROY & GOULD PROFESSIONAL CORP.
<TEXT>

<PAGE>

EXHIBIT 5.1

August 15, 1997

OPT2-3

OSI Systems, Inc.
12525 Chadron Avenue
Hawthorne, California 90250

Re: Registration Statement on Form S-1
(Registration No. 333-29179)

Gentlemen:

We have acted as securities counsel to OSI Systems, Inc., a California corporation (the "Company"), in connection with the preparation and filing with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), of a Registration Statement on Form S-1, as amended, Registration No. 333-29179 (the "Registration Statement"). The Registration Statement relates to the public offering by the Company and certain selling shareholders named therein (the "Selling Shareholders") of up to 4,255,000 shares of Common Stock of the Company, of which 3,330,000 shares are to be issued and sold by the Company (the "New Shares") and 925,000 shares are to be sold by the Selling Shareholders (the "Outstanding Shares"), including 555,000 shares to cover over-allotments, if any.

The New Shares and the Outstanding Shares are to be sold by the Company and the Selling Shareholders pursuant to an Underwriting Agreement (the "Underwriting Agreement") by and among the Company, the Selling Shareholders and Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC, acting as representatives of the several underwriters named in the Underwriting Agreement. This opinion is being furnished in accordance with the requirements of Item 601(b)(5) of Regulation S-K under the Securities Act.

In connection with this opinion, we have examined and are familiar with originals or copies, certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary or appropriate as a basis for the opinions set forth herein, including (i) the Registration Statement of the Company filed
<PAGE>

OSI Systems, Inc.
August 15, 1997
Page 2

with the Securities and Exchange Commission; (ii) the Articles of Incorporation and the Amended and Restated Bylaws of the Company, as amended to date; (iii) the form of the Underwriting Agreement; (iv) the form of Common Stock Certificate; (v) copies of certain resolutions adopted by the Board of Directors of the Company relating to the issuance of the New Shares and the Outstanding Shares, the filing of the Registration Statement and any amendments or supplements thereto and related matters; and (vi) such other documents as we have deemed necessary or appropriate as a basis for the opinions set forth below.

In our examination, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies and the authenticity of the originals of such latter documents. In making our

examination of documents executed by parties other than the Company, we have assumed that such parties had the power, corporate or other, to enter into and perform all obligations thereunder and have also assumed the due authorization by all requisite action, corporate or other, and execution and delivery by such parties of such documents and the validity and binding effect thereof. As to any facts material to the opinions expressed herein which were not independently established or verified, we have relied upon oral or written statements and representations of officers and other representatives of the Company and others.

Members of our firm are admitted to the bar in the State of California, and we do not express any opinion as to the laws of any other jurisdiction, other than the laws of the United States of America to the extent referred to specifically herein.

Based on the foregoing, it is our opinion that, subject to effectiveness with the Securities and Exchange Commission of the Registration Statement and to registration or qualification under the securities laws of the states in which securities may be sold,

1. The New Shares are duly and validly authorized and, upon the sale and issuance thereof in the manner contemplated in the Registration Statement and the Underwriting Agreement, and upon payment therefor, will

<PAGE>

OSI Systems, Inc.
August 15, 1997
Page 3

constitute legally issued, fully paid and nonassessable shares of Common Stock of the Company; and

2. The Outstanding Shares are duly and validly authorized and constitute legally issued, fully paid and nonassessable shares of Common Stock of the Company.

We consent to the use of our name under the caption "Legal Matters" in the Registration Statement, and to the filing of this opinion as an exhibit to the Registration Statement. By giving you this opinion and consent, we do not admit that we are experts with respect to any part of the Registration Statement within the meaning of the term "expert" as used in Section 11 of the Securities Act, or the rules and regulations promulgated thereunder, nor do we admit that we are in the category of persons whose consent is required under Section 7 of the Securities Act.

Very truly yours,

/s/ TROY & GOULD

TROY & GOULD
Professional Corporation

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.5
<SEQUENCE>4
<DESCRIPTION>EMPLOYMENT AGREEMENT DATED MARCH 1, 1993
<TEXT>

<PAGE>

EXHIBIT 10.5

EMPLOYMENT AGREEMENT
--------------------

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 1st day of March, 1993, by and between Rapiscan Security Products (U.S.A.), Inc. ("Company"), a California corporation, and Andreas Kotowski ("Employee").

In consideration of the mutual promises contained herein, the parties hereto agree as follows:

1. SCOPE OF EMPLOYMENT. The Company hereby agrees to employ the Employee, subject to the terms and conditions herein set forth, to perform such duties as may be determined and assigned to him from time to time by the Company's Board of Directors ("Board") or by any other officer to whom the Board may have delegated such authority. The Employee hereby agrees to serve in such capacities on a full time basis until the end of the term of employment under this Agreement. During the term of employment, the Employee shall be the general manager of U.S. operations of the Company and shall also serve on the Board of Directors of the Company as well as the Company's subsidiary corporation.

2. TERM. The term of this Agreement shall commence as of the date of this Agreement and shall continue and remain in full force and effect for a period of one (1) year. If at the end of such one (1) year period the Employee continues to be an employee of the Company, this Agreement shall continue in effect until terminated by either party hereto. Such termination may be for any reason whatsoever, with or without cause, and shall be effective immediately upon the giving of such notice of termination. It is understood and acknowledged by each of the parties hereto, irrespective of either one's performance, that no promises or representations (implied or expressed) have been made to either party regarding any commitment to keep this Agreement in effect for any specific or minimum period of time after the first year. Notwithstanding the foregoing, either party may terminate this Agreement at any time for cause.

3. COMPENSATION. The Company agrees to pay the Employee, and the Employee agrees to accept, during the term of this Agreement, in full payment for all services to be rendered by the Employee hereunder, the following compensation:

(a) a salary at the rate of $85,000.00 per annum, payable in equal periodic installments, not less frequently than semi-monthly, less such sums as may be required by law to be deducted or withheld.

(b) If the Employee is a full time employee for the entire one (1) year term, then at the end of such year the Company shall pay to the Employee the sum of $15,000.00, less such sums as may be required by law to be deducted or withheld.

<PAGE>

4. BONUS POOL.

(a) Subject to Paragraph 4(b) below and provided that this Agreement has not been terminated, the Employee shall be entitled to receive a one-time bonus from the Company in accordance with this Paragraph 4. The Employee shall have no right to receive a bonus (i) if the event giving rise to the payment of the bonus occurs prior to February 20, 1994, the shareholder's equity of the Company is less than $750,000 at the time of such event and (ii) if the event giving rise to the payment of the bonus occurs after February 19, 1994, the shareholder's equity of the Company is less than $1,000,000 at the time of such event.

(b) Subject to the conditions of Paragraph 4(a) above having been satisfied, the Company shall pay the Employee a bonus within sixty (60) days of the first to occur of any of the following events: (i) the consummation of any of the following (each of which shall be a "Sale Event"): a) a firm commitment underwritten public offering for Opto Sensors, Inc. ("OSI"), UDT Sensors, Inc.

("UDT") or the Company (OSI, DDI and the Company are collectively referred to as the OSI Group) pursuant to an effective registration statement under the Securities Act of 1933 as amended, b) the sale of assets or merger of the OSI Group or other acquisition transaction pursuant to which the shareholders of the OSI Group receive securities of a buyer whose shares are publicly traded or c) the sale, transfer or other disposition of all or substantially all of the assets of the OSI Group (for purposes of this Paragraph 4, the date of consummation of a Sale Event shall be deemed the date of the event causing the Employee to be eligible to receive the bonus) or (ii) the delivery of written notice to the Company from the Employee given at any time between February 20, 1994 and February 20, 1996 that the Employee desires to receive payment of the bonus.

(c) At the election of the Employee, the bonus may be paid in cash or securities of OSI (pursuant to a valuation determined by the Board of Directors of OSI in good faith); provided, however, that if a Sale Event has not occurred, The Company may elect to defer any cash payment, in which event the Company shall deliver to the Employee a non-interest bearing promissory note in the amount of the cash payment and which shall be due and payable sixty (60) days after the consummation of a Sale Event.

(d) The amount of the bonus to be paid to the Employee shall be equal to twenty-five percent (25%) of the net after-tax profit of the Company from February 20, 1993 through the date of the event giving rise to the payment of the bonus; provided, however, that (i) if a Sale Event occurs prior to February 20, 1994, the amount of the bonus shall be not less than $100,000 and (ii) net after-tax profit shall be determined in accordance with generally accepted accounting principles except that such profit shall be determined only with respect to the Company's sales operations in North America, South America and the

<PAGE>

Far East (other than Indonesia, Malaysia, Thailand or Singapore). The Employee acknowledges and agrees that sales operations of the Company in other locations and operations of any subsidiary or affiliate of the Company shall not be included in the determination of such profit.

5. INVENTIONS, PATENTS, DISCOVERIES, TRADE SECRETS.

(a) Except for the inventions, improvements and technology previously disclosed to the Company and described or listed in Schedule 5A (to be supplied by the Employee within 30 days) to this Agreement, the Employee agrees to make a prompt and complete disclosure to the Company of any technique, plan, concept, program, innovation or other item of information relating to the Company's business and to make in writing a disclosure of every invention, improvement and technology which relates to the Company's business which he learns of, conceives or reduces to practice during the term of this Agreement.

(b) As to inventions, improvements and technology described or listed on Schedule 5A to this Agreement, the Employee agrees to offer a license to the Company to make, have made, use, sell and have sold, such inventions, improvements and technology, upon terms and conditions which shall include:

(1) a royalty payment by the Company of five percent (5%) of the net lease, rental or sales price of products which use such invention, improvements or technology or are within the claims of any patent issued on such inventions, improvements or technology where such "net" price is defined specifically as gross amounts collected, less bona fide sales commissions and bona fide returns. However, (A) if such product is a component of another product or system, the royalty shall be based on the fair market value of such product, (B) with respect to the first Five Million Dollars ($5,000,000) of net leases, rentals or sales of such products in the aggregate, the royalty payment shall be seven percent (7%), and (C) with respect to detectors or devices for measuring concentration of radon or other radioactive materials, the royalty

shall be 10%,

(2) a provision allowing the Employee to terminate, or to terminate the exclusivity of, the license if the Company does not exploit the licensed technology at a reasonable level; and

(3) such other terms and conditions as may be common in patent, trade secret or know-how licenses and are satisfactory to the Employee and the Company.

(c) As to inventions, improvements and technology developed by the Employee, either solely or jointly with another, and which are not described or listed on Schedule 5A to this Agreement, the Employee agrees to grant to the Company an exclusive license subject to the following conditions:

<PAGE>

(1) the Company will have the exclusive right to make, have made, use, sell, and have sold, such inventions, improvements and technology so long as the Employee is both employed by the Company and the Company does not exercise any right it may have, except solely as a result of conversion of the Employee's stock in OSI, to require him to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company.

(2) If the Employee's employment with the Company is terminated, for any reason or no reason, the Employee shall have the right to make, have made, use, sell and have sold, such inventions, improvements and technology, either by himself or in a business enterprise. In such case, the Company's rights will be nonexclusive and, except as described above, neither the Company nor the Employee shall have the right to license others with respect to such inventions, improvements or technology.

(3) If the Company exercises any right it may have to require the Employee to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company, the Company will lose any rights to make, have made, use, sell, or have sold, such inventions, improvements and technology (other than such rights it may have by virtue of being any employer of another joint inventor), and the Employee will have the exclusive rights to make, have made, use, sell and have sold, such inventions, improvements and technology (other than such rights of another joint venture).

(d) The Employee agrees that upon the Company's request, but without expense to himself, he will execute any and all applications, assignments and other legal instruments (consistent with any obligations to assign or license arising out of this Agreement) which the Company shall deem necessary or convenient for the protection of its information in the United States and/or foreign countries, and will render aid and assistance in all proceedings pertaining to said property.

(e) As to all documents, writings, illustrations, models, and other such materials coming into his possession by or through his employment with the Company which relate to inventions, improvements or technology which are not the subject of the license to the Company set forth in Paragraph 5(c) herein, the Employee agrees that, upon termination of his employment with the Company, he will surrender such materials to the Company, and agrees that such materials are at all times the Company's property. As to all such materials which relate to inventions, improvements or technology which are the subject of license to the Company set forth in Paragraph 5(c) herein, the Employee shall have the right to retain materials describing, summarizing, relating to, or evidencing conception or reduction to practice of, such inventions, improvements and technologies which are the subject of license to the Company set forth in Paragraph 5(c) herein, so long as the Employee provides copies of such materials to the Company upon termination of this employment with the Company.

<PAGE>

(f) The Employee and the Company agree that their respective business interests require a confidential relationship between them both with respect to the Company's trade secrets and confidential business information, and with respect to the Employee's inventions, improvements and technology listed in Schedule 5A hereto, and inventions, improvements and technology learned of, conceived, developed or reduced to practice during his employment with the Company. Accordingly, the Employee and the Company agree to keep secret and to maintain in confidence each other's inventions, improvements, technology, confidences, trade secrets and confidential business information. These obligations of confidence shall continue beyond the duration of the Employee's employment with the Company for a reasonable time. The Employee and the Company agree that a reasonable time shall be for the Employee's obligations, three (3) years after the termination of the Employee's employment with the Company, and for the Company's obligations, three (3) years after the later of such termination or, if the Company exercises any right it may have to require the Employee to give up, sell, transfer, or otherwise divest himself of, ownership of stock in the Company the date such right is exercised.

(g) The foregoing covenants of this Paragraph 5 may be specifically enforced in equity and, for that purpose, the parties consent to the jurisdiction of the Los Angeles Superior Court. In this connection, the parties acknowledge that monetary damages would be inadequate to measure the injury to the Company resulting from a breach by the Employee or the Company of the covenants contained in this Paragraph 5 and, for that reason, the Employee and the Company each consent to the equitable relief herein provided for. In addition, the Employee and the Company each waive the posting of bond or other security by the other and each consent to the award by the court of reasonable attorneys' fees to the other if such equitable relief should by granted.

(h) Except as described or listed on Schedule 5A hereto, the Employee hereby represents and warrants that he has no involvement in any invention, process, innovation or improvement which relates to the Company's business.

6. VACATIONS AND BENEFITS. The Company's vacation health and medical and benefit policies as they relate to the Employee shall be the same as those policies of UDT.

7. NON-COMPETITION COVENANTS. During the term of this Agreement, the Employee agrees that he will not, anywhere in any country in which the Company engages in business:

(a) On his own behalf or as a partner, officer, director, employee or consultant of any other person, firm or corporation, directly or indirectly engage in any business activity which is the same as or similar to the business of the Company or any division or subsidiary thereof.

<PAGE>

(b) Contract or enter into any business dealings with any of the Company's customers, suppliers and/or affiliates or divulge any confidential matter relating to the Company's business to anyone not connected with the Company.

(c) Solicit the employment of or otherwise interfere with the peaceful employment of the Company's servants, agents and employees.

(d) The foregoing covenants of this Paragraph 8 may be specifically enforced in equity and, for that purpose, the parties consent to the jurisdiction of the Los Angeles Superior Court. In this connection, the parties acknowledge that monetary damages would be inadequate to measure the injury to the Company resulting from a breach by the Employee of the covenants contained in this Paragraph 8 and, for that reason, the Employee consents to the equitable relief herein provided for. In addition, the Employee waives the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 984 of 2711

posting of bond or other security by the Company and consents to the award by the court of reasonable attorneys' fees to the Company if such equitable relief should be granted.

8. INDEMNIFICATION FOR PREVIOUS EMPLOYER. The Company hereby agrees to indemnify and hold harmless the Employee to the extent of $25,000.00 (over and above any obligations to an employee which it may have by law) for any and all actions, claims or threats, whether or not actually reduced to judgment and whether or not actually collected or enforced, brought against the Employee or the Employer by E.G. & G. (or any company owned or controlled by E.G. & G.), the former employer of the Employee, for violation of any non-competition and/or confidentiality provisions of the written agreements between the Employee and E.G. & G., copies of which have heretofore been given to the Company or any oral or written agreements with substantially the same terms, and oral or written continuations or renewals of the same, and shall include indemnification for acts taken by the Employee to become employed by the Company, including without limitation, negotiating with the Company and terminating his relationship with E.G. & G. This indemnification and hold harmless provision shall not apply (a) if there were any written agreements entered into between the Employee and E.G. & G., other than those written agreements heretofore furnished to the Company by the Employee, (b) with respect to claims arising solely from acts taken by the Employee which are not related to employment with the Company and (c) to any acts taken by the Employee in violation of any written agreement between the Employee and the Company or any policy of the Company disclosed in writing to the Employee.

If the Employee is enjoined by a court of competent jurisdiction from being employed by the Company, then this Agreement shall be terminated at such time.

9. ENTIRE AGREEMENT. This Agreement contains the entire understanding between the parties hereto and supersedes all

-6-

<PAGE>

other oral and written agreements or understandings between them. No modification or addition hereto or waiver or cancellation of any provision shall be valid except by a writing signed by the party to be charged therewith.

10. SUCCESSORS AND ASSIGNS, ETC. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of the Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets, or similar reorganization. In no event may the Employee assign any rights or duties under this Agreement.

11. CONTROLLING LAW; SEVERABILITY. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of California. Should any provision of this Agreement be invalid either due to the duration thereof or the scope of the prohibited activity, such provision shall be limited by the court to the extent necessary to make it enforceable and, if invalid for any other reason, such invalidity or unenforceability shall not affect or limit the validity and enforceability of the other provisions hereof.

12. HEADINGS. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 985 of 2711

13. NOTICES. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally received by the party to whom it is sent or delivered, or if sent by registered or certified mail, postage prepaid, to Employee's residence in the case of notice to the Employee, or to its principal residence if to the Company.

14. WAIVER OF BREACH. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

RAPISCAN SECURITY PRODUCTS (U.S.A.), INC.

By: /s/ Ajay Mehra
-------------------------------------
AJAY MEHRA

/s/ Andreas Kotowski
-------------------------------------
ANDREAS KOTOWSKI

<PAGE>

(S) 2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

-8-

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.7
<SEQUENCE>5
<DESCRIPTION>EMPLOYMENT AGREEMENT DATED OCTOBER 5, 1994
<TEXT>

<PAGE>

Exhibit 10.7

STRICTLY PRIVATE AND CONFIDENTIAL

NOTE: - This Agreement constitutes A PRINCIPAL STATEMENT OF MAIN PARTICULARS OF EMPLOYMENT, as required and in accordance with the Employment Protection (Consolidation) Act 1978 and the Trade Union Reform and Employment Rights Act

1993, governing an employer's obligation to inform employees of the conditions applicable to the contract of employment relationship.

An Agreement between Rapiscan Security Products Limited of Unit B1, The Fleming Centre, Fleming Way, Crawley, West Sussex, RH10 2NN (hereinafter termed "the Company"), and Mr Anthony Sigmund Crane c/o International Aeradio Emirates, PO Box 9197, Dubai, U A E (hereinafter termed "the Employee").

Within this Agreement "Parent Company" shall for the time being mean Opto Sensors Inc, 12525 Chadron Avenue, Hawthorne, California 90250 and "Associated Company" shall encompass the organisation known as Rapiscan Security Product Inc, 2830 Temple Avenue, Long Beach, California 90806.

It is agreed between the parties as follows:

1. Occupation and Location

   a. The Employee shall serve the Company as Regional Sales Director, Middle East, to be based in Dubai and operating throughout the Middle East as appropriate to serve the best interests of the Company.

   b. No normal place of work is defined and the Company's registered place of business is recorded as being the Company's address stated above.

   c. The Company shall have the right to employ the Employee through a parent, associated or subsidiary company.

   d. The Employee shall be required to work in any other capacity reasonably within the scope of his activities. The Employee may be required to carry out the training of local nationals or other staff as a fundamental component of the Employee's activities without giving rise to a change in the Employee's defined job description or entitling the Employee to additional salary.

2. Requirement to Work Outside the United Kingdom

   a. It is the intention of both parties that the Employee, based in and working from Dubai, United Arab Emirates, shall serve the Company for a period of at least five years with effect from 1st January 1994.

   b. Either party may, however, at any stage give to the other a minimum of six Gregorian calendar months notice in writing that the Employee shall return to be domiciled in the United Kingdom and continue employment with the Company. Under these circumstances terms and conditions of employment to be negotiated to the mutual satisfaction of both parties, but which terms and conditions of employment would be different from those contained within this Agreement.

Cont/....

<PAGE>

3. Commencement of Employment

   Initial employment with the company commenced on 30th November 1980, from when the period of continuous employment counts for reckonable purposes.

4. Level of Remuneration

   The Employee will be paid a salary of 151,998 Dhs per annum, revised from time to time, to be paid monthly in arrears. Entitlement to salary shall accrue from day to day. United Kingdom National Insurance contributions shall be deducted by the Employer at source.

5. Hours of Work

The Employee's normal working week will be a maximum of 48 hours, exclusive of travelling time, although, on occasions, it will be necessary to work additional hours as necessary to satisfactorily complete the work in hand and achieve agreed targets. No overtime is paid, although time off in lieu may be granted in respect of excessive hours worked.

6. Motor Vehicle
-------------
The Company will supply a fully financed car in Dubai, at up to a cost of 1,750 Dhs per month, for the Employee's personal and business use, including funding the costs involved with all reasonable mileage.

7. Accommodation
------------
a. Whilst based in Dubai, the Company shall supply such accommodation for the Employee, his spouse and dependant children up to a cost of 45,000 Dhs per annum.

b. The Employee agrees to treat the accommodation and furnishings provided in a proper manner and undertakes to meet the cost of any damage caused (fair wear and tear excepted).

c. The cost of electricity, gas and mains water will normally by met by the Company, although the Company reserves the right to charge the employee for the supply of these utilities.

d. The Employee shall be responsible for his own catering arrangements.

8. Travel and Expenses
-------------------
a. The Company will meet the costs of travel for the Employee, his spouse and immediate dependant children between Dubai and the United Kingdom at the termination of the Employee's stay in Dubai, howsoever caused. This entitlement will be forfeited if it is not exercised within one calendar month.

b. The Company will meet the costs of travel for the Employee, his spouse and immediate dependent children between Dubai and another location should the Employee be required to relocate to another country at the Company's request.

Cont/....

<PAGE>

c. The Company will not be responsible for any costs of travel, excepting business travel, or for any other costs incurred within the United Kingdom or Dubai, whether associated with engagement, leave or repatriation, other than as set out elsewhere within this Agreement.

9. Leave Entitlement
-----------------
The Employee shall be entitled to 56 days paid holiday per annum, inclusive of any local public holidays in the United Arab Emirates.

10. Leave Travel
------------
a. The Employee shall be supplied with airline tickets to facilitate leave travel to the United Kingdom on one occasion each twelve months for himself, his spouse and immediate dependant children.

b. There will be no entitlement to cash in lieu of any unused leave travel tickets.

   Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 988 of 2711

c. The travel class adopted will be Economy and the type of ticket issued will be at the Company's discretion on an airline nominated by the Company.

d. The Employee agrees to ensure that leave travel visits to the United Kingdom coincide with business travel visits to the United Kingdom wherever possible.

11. Baggage
-------

a. On the occasion of relocation to another country at the Company's request or on the occasion of final repatriation to the United Kingdom, the Company will meet the transportation costs of one consignment of unaccompanied freight sent by air (maximum weight/space 200 kg or 2 cubic metres) and one consignment of unaccompanied freight by sea (maximum 500 kg). These limits apply to personal belongings only and exclude any office equipment owned by the Company.

b. The Company will not accept any costs in respect of excess baggage.

12. Children's Education
--------------------

Upon supply to the Company of receipted invoices which meet with the Company's satisfaction and approval, 60.0% of the cost of school fees incurred by the Employee in respect of the education in Dubai of dependant children shall be reimbursed by the Company, subject to a maximum of 10,000 Dhs during the twelve months commencing 1st January 1994. These amounts shall be the subject of negotiation annually between the Company and the Employee in the light of the circumstances of the Employee's children's education and associated costs then prevailing.

13. Medical Examination
-------------------

The Employee agrees to undergo a medical examination with a Medical Officer nominated by the Company, if ever so requested.

14. Medical Expenses
----------------

a. Medical insurance cover shall be supplied by the Company in respect of the Employee, his spouse and immediate dependant children, utilising covered supplied by the Medicaire medical insurance company.

Cont/...

<PAGE>

b. Any essential medical treatment for the Employee will be paid for by the Company whilst he is resident in Dubai, but not during any period of leave (except for leave periods in the United Kingdom or Dubai). All costs of any dental treatment will be the Employee's responsibility.

c. In the event that any medical treatment is arranged outside of Dubai, any costs involved will be the Employee's responsibility.

d. The Employee is required to undergo such inoculations, vaccinations and preventive medical treatment as the Company, in consultation with its medical advisers, shall require.

e. In the event that the Employee is prevented from working on the Company's behalf due to medical incapacity payment of salary will be maintained by the Company for up to a maximum of six months full pay and thereafter at the Company's sole discretion.

15. Pension
-------

The Employee shall retain UK membership of the Company's Pension Scheme,

making personal contributions, currently at the level of 4.0% of gross earnings.

16. Normal Retirement Age

Normal Retirement Age is 63 years. In the absence of other formal written advice being issued it shall be deemed that notice of termination of employment under this heading has been issued to the Employee twelve weeks ahead of his 63rd birthday.

17. Termination of Employment

a. This Agreement may be terminated by three months notice in writing on either side. Such a communication issued to the Company should be sent by registered mail to the Company's registered office. Written notice issued by the Company shall be given to the Employee personally or sent by first class mail to his last known place of residence.

The Company reserves the right to make a payment in lieu of notice.

b. Notwithstanding point a. above, the Company may summarily dismiss or suspend the Employee from his duties without pay and allowances, including any terminal gratuity, if the Employee should:

i. Fail to obtain or have withdrawn any necessary visas or work permits as may be required, as a result of his own negligence or actions;

ii. Wilfully neglect the interests of the Company;

iii. Drink spirituous or intoxicating liquors or take or use drugs to such extent as the Company may deem excessive or as likely to incapacitate the Employee, or the prevent him from properly performing his duties;

iv. Be guilty of misconduct or any conduct which is likely to be prejudicial to the interests of the Company;

Cont/...

<PAGE>

v. Be absent from duty without leave or any other valid reason, or be absent through illness for an aggregate period exceeding six Gregorian calendar months in any consecutive period of twelve Gregorian calendar months;

vi. Become, through his own fault (which shall include refusal or failure to undergo preventive treatment advised by the Medical Officer nominated by the Company) sick or disabled or otherwise unable properly to perform his duties or to do so without being a nuisance or menace to his fellow employees (a certificate from a properly qualified medical practitioner approved by the Company being sufficient evidence);

vii. Engage in any black market activities;

viii. Seriously offend against the laws or social customs of the country in which the Employee is employed;

ix. Refuse to undergo vaccinations, inoculations or other medical treatment which has been specified at any time by the Company's medical adviser;

x. Seriously or persistently breach the Terms and Conditions of the Employee's employment.

c. The Employee undertakes at the time when his employment terminates to

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 990 of 2711

furnish the Company, prior to his return to the United Kingdom, with a list of all of his outstanding debts and the Company shall be entitled to recover from the Employee whether by deduction from amounts owed to the Employee or otherwise, any sums which the Company may at its discretion, pay in settlement of any outstanding debts the Employee has incurred in the employment location. The Employee will be required to enter into a separate written agreement covering this topic.

d. Should this contract be terminated for any reason the Employee shall deliver to the Company all books, documents, papers, materials and other property of the Company or any of its parent, associated or subsidiary companies in the Employee's possession or under his control.

18. Restrictive Covenants
---------------------

a. The Employee shall not at any time after the end of his employment:

i. Represent himself as being in any way connected with or interested in the business of the Company or its parent, associated or subsidiary companies;

ii. Either on his own account or for any other person, firm or company, solicit, interfere with or endeavour to entice away from the Company or any of its parent, associated or subsidiary companies any employee of the Company or its parent, associated or subsidiary companies.

b. The Employee shall not (without the previous consent in writing of a member of Executive Management of the Company) for the period of twelve months after the end of his employment with the Company, either on his own account or for any other person, firm or company, solicit or endeavour to entice away from the Company or any of its parent, associated or subsidiary companies, any person, firm or company who or which in the preceding two years shall have been a customer or in the habit of dealing with the Company or any of its parent, associated or subsidiary companies.

19. Exclusive Employment
--------------------

Employment with the Company excludes employment with any other organisation or person. The Employee may not accept additional employment from others, with or without remuneration, unless prior written permission has been obtained from the Company.

Cont/...

<PAGE>

Such permission will only be granted where the circumstances are totally acceptable to the Company and where there can be no possible adverse effects on either the Company or the Employee's employment with the Company.

20. Confidentiality
---------------

Except as authorised by the Company in writing or upon the order of a court of competent jurisdiction the Employee shall keep secret and shall not, at any time (both during the period of his employment and after its termination for any reason whatsoever) use for the Employee's or another's advantage, or reveal to any person, any of the trade secrets or confidential operations, processes or dealings or any secret or confidential information concerning the organisation, business or finance of the Company, or its customers or any of the Company's parent, associated or subsidiary companies to which the Employee is seconded or from whom he takes instructions, so far as they shall have come to his knowledge during his employment with the Company or any parent, associated or subsidiary companies or organisations to whom the Employee is seconded or from whom he takes instructions.

21. Jurisdiction

This contract shall be governed by English law and both parties accept that the English courts shall have exclusive jurisdiction (both during the period of the Employee's period of this employment and following its termination for any reason whatsoever) to hear claims arising out of this contract, the employment or its termination.

Signed: /s/ Illegible Date: 10-5-94

For and on behalf of Rapiscan Security Products Limited

Signed: /s/ A S Crane Date: 10-5-94

Mr A S Crane Employee.

-6-

<PAGE>

Undertaking by Mr A S Crane

I hereby undertake at the time when my employment with Rapiscan Security Products Limited terminates, to furnish to the Company, prior to my return to the United Kingdom, a list of all of the outstanding debts incurred by me associated with my employment by the Company.

I understand that the Company shall be entitled to recover from me any sums which the Company, at its discretion, pay in settlement of any outstanding debts that I may have incurred.

I hereby give permission for any such sum, or balance outstanding thereof, to be deducted by the Company from any monies due to me, including salary payments, in accordance with the terms of the Wage Act 1986.

Signed: /s/ A S Crane Date: 10-5-95

A S Crane

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.10
<SEQUENCE>6
<DESCRIPTION>FORM OF INDEMNITY AGREEMENT
<TEXT>

<PAGE>

EXHIBIT 10.10

INDEMNITY AGREEMENT

This Indemnity Agreement (the "Agreement) is made as of _________________, by and between OSI Systems, Inc., a California corporation (the "Corporation"), and ___________ ___________________________, an individual (the "Indemnitee"), a director and/or officer of the Corporation.

R E C I T A L S

A. The Corporation and the Indemnitee recognize that the interpretation of statutes, regulations, court opinions and the Corporation's Articles of Incorporation and bylaws is too uncertain to provide the Corporation's officers and directors with adequate guidance with respect to the legal risks and potential liabilities to which they may become personally exposed as a result of performing their duties in good faith for the Corporation.

B. The Corporation and the Indemnitee are aware of the substantial increase in the number of lawsuits filed against corporate officers and directors.

C. The Corporation and the Indemnitee recognize that the cost of defending against such lawsuits, whether or not meritorious, may impose substantial economic hardship upon the Corporation's officers and directors.

D. The Corporation and the Indemnitee recognize that the legal risks, potential liabilities and expenses of defense associated with litigation against officers and directors arising or alleged to arise from the conduct of the affairs of the Corporation are frequently excessive in view of the amount of compensation received by the Corporation's officers and directors, and thus may act as a significant deterrent to the ability of the Corporation to obtain experienced and capable officers and directors.

E. Section 317 of the California General Corporation Law, which sets forth certain provisions relating to the indemnification of officers and directors (among others) of a California corporation by such corporation, is specifically not exclusive of other rights to which those indemnified thereunder may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise.

F. In order to induce capable persons such as the Indemnitee to serve or continue to serve as officers or directors of the Corporation and to enable them to perform their duties to the Corporation secure in the knowledge that certain expenses and liabilities that may be incurred by them will be

<PAGE>

borne by the Corporation, the Board of Directors of the Corporation has determined, after due consideration and investigation of the terms and provisions of this Agreement and the various other options available to the Corporation and the Indemnitee in lieu of this Agreement, that the following Agreement is in the best interests of the Corporation and its shareholders.

G. The Corporation desires to have the Indemnitee serve or continue to serve as an officer and/or director of the Corporation, and the Indemnitee desires to serve or continue to serve as an officer and/or director of the Corporation provided, and on the express condition, that he is furnished with the indemnity set forth below.

A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the Corporation and the Indemnitee agree as follows:

1. Continued Service. The Indemnitee agrees to serve or continue to serve as a director and/or officer of the Corporation for so long as he is duly elected or appointed or until such time as he resigns in writing, subject to the terms of any applicable employment agreement.

2. Definitions.

(a) The term "Proceeding" shall include any threatened, pending or completed action, suit or proceeding, whether brought in the name of the Corporation or otherwise and whether of a civil, criminal or administrative or investigative nature, including, but not limited to, actions, suits or proceedings brought under or predicated upon the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, their respective state counterparts or any rule or regulation promulgated thereunder, in which the Indemnitee may be or may have been involved as a party or otherwise by reason of the fact that the Indemnitee is or was a director and/or officer of the Corporation, by reason of any action taken by him or of any inaction on his part while acting as such director and/or officer, or by reason of the fact that he is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, whether or not he is serving in such capacity at the time any indemnified liability or reimbursable expense is incurred.

(b) The term "Expenses" shall include, but shall not be limited to, damages, judgments, fines, settlements and charges, costs, expenses of investigation and expenses of defense of legal actions, suits, proceedings or claims and appeals therefrom, and expenses of appeal, attachment or simi-

<PAGE>

lar bonds. "Expenses" shall not include any judgments, fines or penalties actually levied against the Indemnitee which the Corporation is prohibited by applicable law from paying.

3. Indemnity in Third-Party Proceedings. Subject to Paragraph 8, the Corporation shall indemnify the Indemnitee in accordance with the provisions of this Paragraph 3 if the Indemnitee is a party to, threatened to be made a party to or otherwise involved in any Proceeding (other than a Proceeding by the Corporation itself to procure a judgment in its favor), by reason of the fact that the Indemnitee is or was a director and/or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all Expenses actually and reasonably incurred by the Indemnitee in connection with the defense or settlement of such Proceeding, provided it is determined, pursuant to Paragraph 7 or by the court before which such action was brought, that the Indemnitee acted in good faith and in a manner that he reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe that his conduct was unlawful. The termination of any such Proceeding by judgment, order of court, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee did not act in good faith or in a manner that he reasonably believed to be in the best interests of the Corporation, and with respect to any criminal proceeding, that such person had reasonable cause to believe that his conduct was unlawful.

4. Indemnity in Proceedings by or in the Name of the Corporation. Subject to Paragraph 8, the Corporation shall indemnify the Indemnitee against all Expenses actually and reasonably incurred by the Indemnitee in connection with the defense or settlement of any Proceeding by or in the name of the Corporation to procure a judgment in its favor by reason of the fact that the Indemnitee was or is a director and/or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, but only if he acted in good faith and in a manner that he reasonably believed to be in the best interests of the Corporation and its shareholders; provided, however, that no indemnification for Expenses shall be made under this Paragraph 4 with respect to any claim, issue or matter as to which the Indemnitee shall have been adjudged to be liable to the Corporation, unless and only to the extent that any court in which such Proceeding is brought

shall determine upon application that despite the adjudication of liability, but in view of all the circumstances of the case, the Indemnitee is fairly and reasonably entitled to indemnity for such expenses as such court shall deem proper.

3.

<PAGE>

5. Indemnification of Expenses of Successful Party. Notwithstanding any other provisions of this Agreement, to the extent that the Indemnitee has been successful on the merits or otherwise in defense of any Proceeding or in defense of any claim, issue or matter therein, including the dismissal of an action without prejudice, the Indemnitee shall be indemnified against all Expenses incurred in connection therewith.

6. Advances of Expenses. Expenses incurred by the Indemnitee pursuant to Paragraphs 3 and 4 in any Proceeding shall be paid by the Corporation in advance of the determination of such Proceeding at the written request of the Indemnitee, if the Indemnitee shall undertake to repay such amount to the extent that it is ultimately determined that the Indemnitee is not entitled to indemnification.

7. Right of Indemnitee to Indemnification Upon Application; Procedure Upon Application. Any indemnification or advance under Paragraph 3, 4 or 6 shall be made no later than 30 days after receipt of the written request of the Indemnitee therefor, unless a determination is made within said 30-day period by (a) the Board of Directors of the Corporation by a majority vote of a quorum thereof consisting of directors who were not parties to such Proceedings, or (b) independent legal counsel in a written opinion (which counsel shall be appointed if such a quorum is not obtainable) that the Indemnitee has not met the relevant standards for indemnification set forth in Paragraphs 3 and 4.

The right to indemnification or advances as provided by this Agreement shall be enforceable by the Indemnitee in any court of competent jurisdiction. The Corporation shall bear the burden of proving that indemnification or advances are not appropriate. The failure of the Corporation to have made a determination that indemnification or advances are proper in the circumstances shall not be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct. The Indemnitee's Expenses incurred in connection with successfully establishing his right to indemnification or advances, in whole or in part, in any such Proceeding shall also be indemnified by the Corporation.

8. Indemnification Hereunder Not Exclusive.

(a) Notwithstanding any other provision of this Agreement, the Company shall not indemnify Indemnitee for any act or omission or transactions for which indemnification is expressly prohibited by Section 204(a)(11) of the California General Corporation Law.

(b) The right to indemnification provided by this Agreement shall not be exclusive of any other rights to which the Indemnitee may be entitled under the Corporation's Articles of Incorporation, bylaws, any agreement, any vote of

4.

<PAGE>

shareholders or disinterested directors, the California General Corporation Law or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office. The indemnification under this Agreement shall continue as to the Indemnitee even though he may have ceased to be a director or officer, and shall inure to the benefit of the heirs and

personal representatives of the Indemnitee.

9. Partial Indemnification. If the Indemnitee is entitled under any provision of this Agreement to indemnification by the Corporation for a portion of his Expenses actually and reasonably incurred by him in any Proceeding but not, however, for the total amount thereof, the Corporation shall nevertheless indemnify the Indemnitee for the portion of such Expenses to which the Indemnitee is entitled.

10. Severability. If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, unenforceable or otherwise illegal, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected, and the provision so held to be invalid, unenforceable or otherwise illegal shall be revised to the extent (and only to the extent) necessary to make it enforceable, valid and legal.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the principles of conflict of laws thereof.

12. Notices. The Indemnitee shall, as a condition precedent to his right to be indemnified under this Agreement, give to the Corporation written notice as soon as practicable of any claim made against him for which indemnity will or could be sought under this Agreement. Notice to the Corporation shall be directed to OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250, Attention: President (or at such other address or to the attention of such other person as the Corporation shall designate in writing to the Indemnitee). Notices to the Indemnitee shall be sent to the Indemnitee at the address set forth after his name on the

<PAGE>

signature page of this Agreement (or at such other addresses the Indemnitee shall designate in writing to the Corporation).

OSI SYSTEMS, INC.

By:______________________________

Title:___________________________

INDEMNITEE

_________________________________

_________________________________
(Print Name)

Address:_________________________
_________________________

6.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.13
<SEQUENCE>7
<DESCRIPTION>LEASE AGREEMENT DATED JULY 4, 1986
<TEXT>

<PAGE>

EXHIBIT 10.13

DATED 4 July 1986

ELECTRICITY SUPPLY NOMINEES LIMITED

-and-

JOHN ADAMS ELECTRONICS LIMITED

L E A S E

of

Unit No. 1, Block B,
The Fleming Centre Fleming Way
Crawley West Sussex

(2528B)

<PAGE>

Property & Lease ID: LP1564003 COUNTERPART/

MEMORANDUM OF REVIEWED RENT

DATE OF LEASE .................. 4 July 1986

PREMISES DEMISED.......... Unit Number 1 Block B and 30 Car Park Spaces

........ The Fleming Centre Fleming Way Crawley West Sussex

PARTIES-LANDLORD:.......... Electricity Supply Nominees Ltd

TENANTS(S):.......... John Adams Electronics Ltd

..........

SUBSTITUTE(S)....................................................................

The Norwich Union Life Insurance Society

PRESENT LANDLORD.................................................................
(where Lease assigned)

Rapiscan Security Products Ltd
PRESENT TENANT(S)................................................................
(where Lease assigned)

.................................................................................

International Aeradio Ltd

SURETY(IES)......................................................................

THE RENT PAYABLE UNDER THE ABOVE MENTIONED LEASE HAS BEEN REVIEWED UNDER THE PROVISIONS THEREOF AND THE PRINCIPAL RENT REMAINS THE SAME AT (pounds) 94,000.00pa..........

(Ninety four thousand pounds per annum)
.................................................................................

UNTIL NEXT REVIEW, WITH EFFECT FROM 25 March 1996.............................................

.........................................
BY/FOR AND ON BEHALF OF THE TENANT
Rapiscan Security Products Ltd
.........................................

SIGNATURE ILLEGIBLE
....................................

HEAD-NUIM PROPERTY (DOCUMENTATION)
....................................
FOR AND ON BEHALF OF THE LANDLORD

/S/ A.S. CRANE
.........................................
BY/FOR AND ON BEHALF OF THE SURETY(IES)*
International Aeradio Ltd

Date August 16th 1996
....................................

/s/ D.L.H STEEDS
.........................................

<PAGE>

A RENT REVIEW MEMORANDUM TO BE ATTACHED TO A LEASE DATED THE 4TH DAY OF JULY 1986 AND MADE BETWEEN ELECTRICITY SUPPLY NOMINEES LIMITED (1) AND JOHN ADAMS ELECTRONICS LIMITED (2)

---

Premises know as Unit Number 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

---

IT IS HEREBY AGREED AND DECLARED BETWEEN ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London SW1P 4RD (being the party remaining entitled to the reversion immediately expectant upon the determination of the term granted by the within written lease) and INTERNATIONAL AERADIO LIMITED whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ (being the party now entitled to the benefit of the term granted by the within written lease) that pursuant to Clause 1 of and the Third Schedule to the within written lease the yearly rent reserved by the within written lease is from the 25th day of March 1991 payable at the rate of NINETY FOUR THOUSAND POUNDS ((pounds)94,000)) per annum subject to the provisions for further rent review contained in the within written lease

Dated this 26th day of March 1992

....................................
Signed for and on behalf of
ELECTRICITY SUPPLY NOMINEES LIMITED

[SIGNATURE ILLEGIBLE]
....................................
Signed for and behalf of
INTERNATIONAL AREADIO LTD

(5629I)

<PAGE>

Appendix

By a Licence for Alterations dated 1st December, 1992 made between Electricity Supply Nominees Limited (1) and International Aeradio Plc (2) consent was granted to certain alterations upon the terms and conditions set out therein

9.

(7732I)

<PAGE>

INDEX

| Clause | Subject |
| --- | --- |
| Particulars | Lease Details |

1. General
   - (1) Interpretation
   - (2) Definitions

2. Demise

3. Covenants by the Tenant
   - (1) To pay the Rent
   - (2) To pay interest
   - (3) To pay Value Added Tax
   - (4) To pay outgoings
   - (5) To pay Service Charge
   - (6) As to insurance
   - (7) To comply with statutes

(8) As to the Town and Country Planning Acts

(9) As to repairs and decoration

(10) As to alterations

(11) As to signs and advertisements

(12) As to user

(13) As to dealings

(14) New Guarantor

(15) To permit entry by Landlord and others

(16) As to the payment of certain costs and as to indemnities

(17) To comply with further stipulations restrictions and regulations

(18) To comply with the provisions of the Relevant Documents

<PAGE>

4. Covenants by the Landlord

(1) For quiet enjoyment

(2) To provide certain services

(3) To insure

(4) To make good damage caused by Insured Risks

5. Provisos

(1) Re-entry

(2) Cesser of rent

(3) Demise not to confer rights to enforce covenants against others or to grant further rights

(4) Limitation of Landlord's liability for provision of Services

(5) No warranty as to the Permitted Use

(6) Limitation on Landlord's obligation to insure

(7) Service of notices

(8) Party Walls

(9) As to arbitration in certain events

(10) Exclusion of compensation

(11) Impossibility of performance of certain covenants

6. Covenants by Guarantor

The First Schedule - Rights Granted

The Second Schedule - Exceptions and Reservations

The Third Schedule - Rent Review Provisions

The Fourth Schedule - Stipulations and Restrictions

The Fifth Schedule - Service Charge

The Sixth Schedule - Covenants by Guarantor

<PAGE>

PARTICULARS

| Column 1 | Column 2 |
| --- | --- |
| Date | the 4th day of July One thousand nine hundred and eighty-six |
| the Landlord | ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London S.W.1. |
| the Tenant | JOHN ADAMS ELECTRONICS LIMITED whose registered office is at Aeradio House, Hayes Road, Southall Middlesex |
| the Guarantor (if any) | Not Applicable |
| the Term | Twenty-five years from (and including) the Twenty-fifth day of March One thousand nine hundred and eighty-six |
| the Premises | ALL THAT piece or parcel of land together with the building erected thereon or on some part thereof situate on the Estate (as hereinafter mentioned) known as Unit Number B1 WHICH piece of land is for the purpose of identification only delineated upon the plan annexed hereto and thereon verged in red |
| The Estate | ALL THOSE premises known as The Fleming Centre situate at Fleming Way, Crawley, West Sussex and shown for the purpose of identification only upon the plan annexed hereto and thereon verged in blue |

<PAGE>

| | |
|---|---|
| the Initial Rent | the yearly rent of Sixty-five thousand pounds ((pounds) 65,000) the first payment in respect of the period from the First day of July One thousand nine hundred and eighty-six to the Twenty-ninth day of September One thousand nine hundred and eighty-six to be made on the date hereof |
| Review Dates | the fifth tenth fifteenth and twentieth anniversaries of the commencement date of the Term |
| Initial Loss of Rent Period | Three years |
| Number of Parking Spaces | 30 parking spaces for private cars |
| Internal Decoration Year | the fifth year of the Term and each subsequent fifth year thereafter |
| External Decoration Years | the third year of the Term and each subsequent third year thereafter |
| the Permitted Use | Light Industrial Use within the meaning of Use Class III of the Town and Country Planning (Use Classes) Order 1972 (as enacted at the date thereof) or warehousing use within Class X of such order (subject to all necessary planning permissions being obtained) |
| Service Charge Proportion | the proportion which the gross external floor area of the building comprised in the Premises bears to the total gross external floor are or all the premises on the Estate (other than those parts thereof ??? for the provision of services for the Estate) let or intended to be |

iv.

<PAGE>

| | |
|---|---|
| Service Charge Accounting Day | the 25th day of March in each year |
| Estate Opening Date (if any) | the 25th day of March One thousand nine hundred and eighty-six |
| Service Charge Commencement Date | the first day of July One thousand nine hundred and eighty-six |

| | |
|---|---|
| the Relevant Documents (if any) | the deeds and documents specified in the Property and Charges Register of Title Number WSX72441 |
| Quarter Days | the 25th day of March the 24th day of June the 29th day of September and the 25th day of December in each year |
| Stipulated Rate | the rate of Six per centum (6%) per annum above the base rate of National Westminster Bank plc for time being in force |

v.

<PAGE>

THIS LEASE is made on the date first shown in the [SEAL APPEARS HERE] Particulars hereto between the Landlord specified in the Particulars of the first part the Tenant specified in the Particulars of the second part and the Guarantor (if any) specified in the Particulars of the third part

NOW THIS DEED WITNESSETH as follows:

INTERPRETATION AND DEFINITIONS

1. (1) (a) WHERE there are at any time two or more persons included in the expression "Tenant" or the expression "Guarantor" covenants expressed to be made by the Tenant or the Guarantor as the case may be shall be deemed to be made by such persons jointly and severally

(b) Any reference to any Act or Acts of Parliament or legislation generally shall include any modification extension or re-enactment thereof for the time being in force and shall also include all instruments orders plans regulations bye-laws permissions licences consents notices and directions or other things for the time being made issued or given thereunder or deriving authority therefrom

(c) Any covenant or obligation by or of the Tenant not to do or omit to be done any act matter or thing shall be deemed to include an obligation not to permit or suffer such act matter or thing to be done or not to permit or suffer the omission of such act matter or thing as the case may be

(d) The Clause or Paragraph headings or marginal notes and the Index (if any) to this Lease shall not affect the construction thereof

(2) In this Deed the following expressions shall (where the context so admits) have the following meanings:

(a) "the Particulars" means the details and descriptions appearing in the foregoing pages which comprise part of this Lease and the words and

<PAGE>

expressions in Column 1 of the Particulars shall (subject as hereinafter provided) have the meanings respectively set against them in Column 2 or the Particulars

(b) "the Landlord" means the person named as the Landlord in the Particulars and includes any other person for the time being entitled to the reversion immediately expectant upon the determination of the Term

(c) "the Tenant" means the person named as the Tenant in the

Particulars and includes the successors in title of the Tenant and those deriving title under the Tenant

(d) "the Guarantor" means the person (if any) named as the Guarantor in the Particulars or (as the case may require) any other person who shall for the time being have covenanted for the due observance and performance of the tenants covenants contained in this Lease

(e) "the Term" means the Term specified in the Particulars and includes any statutory extension thereof

(f) "the Demised Premises" means the Premises described in the Particulars and each and every part thereof and all additions and alterations which may be carried out during the Term and all landlord's fixtures and fittings from time to time in or about the same

(g) "the Rent" means the Initial Rent specified in the Particulars or such greater yearly rent as shall be agreed or determined in accordance with the provisions of the Third Schedule hereto

(h) "the Insured Risks" means (subject as hereinafter provided in this Lease) the risks in respect of loss or damage by fire lightning storm tempest flood explosion impact from vehicles aircraft and articles dropped therefrom riot malicious damage civil commotion earthquake (fire and shock) bursting or overflowing of water tanks apparatus or pipes and such other risks as

<PAGE>

the Landlord may from time to time reasonably deem expedient

(i) "the Loss of Rent Period" means the Initial Loss of Rent Period specified in the Particulars or such other period as the Landlord may from time to time reasonably require (including in each case if applicable any period subsequent to the termination of the Term)

(j) "the Parking Spaces" means the number of Parking Spaces (if any) on the Estate as are specified in the Particulars as shall from time to time be allocated for use by the Tenant by notice in writing given by the Landlord or the Landlord's managing agents to the Tenant

(k) "Stipulated Rate" means the Stipulated Rate specified in the Particulars or if at any time no rate shall be ascertainable under the formula so specified the Stipulated Rate shall be such reasonably equivalent rate of interest as the Landlord and the Tenant shall agree upon or in the absence of agreement within a reasonable time of the occasion for such agreement arising the matter shall be referred for determination by a single arbitrator pursuant to the Arbitration Acts 1950 and 1979 to be appointed in the absence of agreement between the Landlord and Tenant on the application of either of them by the President for the time being of The Law Society

(k) "the Quarter Days" means the Quarter Days specified in the Particulars and the expression "Quarter" shall be construed by reference thereto

(l) "Conduits" means pipes wires ducts cables channels sewers drains watercourses gutters shafts flues or other conducting media under through along

over or by means of which any gas electricity or other power source or any air water soil telephonic signal and the like or other thing may pass

<PAGE>

(m) "Perpetuity Period" means the period of eighty years commencing on the date of this Lease which shall be the perpetuity period applicable hereto

(n) "the termination of the Term" means the determination of the Term whether by effluxion of time re-entry or otherwise howsoever

DEMISE

2. IN consideration of the Rent and of the covenants on the part of the Tenant hereinafter contained the Landlord HEREBY DEMISES unto the Tenant ALL THAT the Demised Premises TOGETHER WITH so far as the Landlord has power to grant the same the easements and rights specified in the First Schedule hereto BUT EXCEPTING AND RESERVING the easements and rights specified in the Second Schedule hereto TO HOLD the same SUBJECT to (a) all easements rights quasi-easements privileges covenants and restrictions to which the Demised Premises are or may be subject and (b) the provisions of the Relevant Documents specified in the Particulars unto the Tenant for the Term (subject to determination as hereinafter provided) YIELDING AND PAYING therefor during the Term FIRST yearly and proportionately for any part of a year the Rent which shall be payable by equal quarterly payments in advance on the Quarter Days the first of such payments or a proportionate part thereof to be due on the date specified in the Particulars and to be in respect of the period therein mentioned SECONDLY by way of additional rent all sums covenanted to be paid pursuant to Clause 3(5) hereof THIRDLY all sums covenanted to be paid pursuant to Clause 3(6) hereof and FOURTHLY interest payable pursuant to Clause 3(2) hereof on the Rent and additional rents hereby reserved

CONVENANTS BY THE TENANT

3. THE Tenant HEREBY CONVENANTS with the Landlord as follows:

<PAGE>

To pay the Rent

(1) To pay the Rent at the times and in the manner herein provided without any deduction or set off whatsoever

To pay interest

(2) Without prejudice to any other right remedy or power herein contained or otherwise available to the Landlord if the Rent or any additional rents hereby reserved or any part thereof or any other sums payable to the Landlord pursuant to this Lease or any part thereof shall have become due and shall remain unpaid as to the Rent or additional rents hereby reserved for seven days or as to the said other sums for fourteen days after in each case the due date for payment to pay to the Landlord on demand interest thereon at the Stipulated Rate (as well after as before judgment) for the period from the date when the same shall have become due (unless otherwise provided for herein) to the date of receipt by the Landlord

To pay Value Added Tax

(3) To pay to the Landlord such amount of Value Added Tax (or similar tax or taxes) at the rate for the time being in force as shall be payable in respect of all moneys covenanted to be paid by the Tenant hereunder and in every case where in this Lease the Tenant covenants to pay an amount of money such amount shall be regarded as exclusive of value Added Tax (or other tax or taxes) which may from time to time be payable thereon

To pay outgoings

(4) To pay all rates taxes duties levies charges assessments impositions and outgoings whatsoever whether parliamentary county municipal parochial local or of any other description which are now or hereafter during the Term may be taxed assessed charged or imposed in respect of the Demised Premises or the Parking Spaces or on the owner or occupier in respect thereof (other than taxes

5.

<PAGE>

payable in respect of any dealing with any reversion to this Lease) In the event of there being no separate assessment for the Demised Premises or the Parking Spaces the Tenant shall pay such proportion of such rates taxes duties levies charges assessments impositions and outgoings as the Landlord or the Landlord's managing agents shall determine as being reasonably attributable to the same

To pay service charge

(5) To pay to the Landlord by way of additional rent a charge in respect of services ascertained as provided in the Fifth Schedule hereto and payable at the times therein mentioned

As to insurance

(6) (a) To pay to the Landlord on demand by way of additional rent in respect of each year during the Term:

(i) a sum (or in the event that the Demised Premises shall be insured with other premises belonging to the Landlord a proportionate part of the total sum such proportion being conclusively determined by the Landlord or the Landlord's managing agents) equivalent to the amount from time to time assessed by the Landlord's insurers as being payable by the Landlord by way of premium for keeping the Demised Premises insured for an amount (estimated from time to time by the Landlord or the Landlord's managing agents) necessary to cover the full costs of rebuilding or reinstating the Demised Premises against loss or damage by the Insured Risks together with architects' surveyors' engineers' and other professional fees

(ii) a sum (or in the event that the loss of the Rent hereinafter mentioned is not separately insured a proportionate part of the total sum such proportion being conclusively determined by the Landlord or the Landlord's managing agents) equivalent to the amount from time to time assessed by the Landlord's

6.

<PAGE>

insurers as being payable by the Landlord by way of premium for insuring the loss of the Rent (including if applicable loss of rent subsequent to the termination of the Term) for the Loss of Rent Period including the Landlord's or the Landlord's managing agents' estimate thereof where a part of the period in respect of which loss of rent insurance is or is to be effected by the Landlord is subsequent to a date or dates when the Rent fails to be reviewed pursuant to the provisions of the Third Schedule hereto or subsequent to the termination of

the Term and

(iii) any sum or sums by which the amount from time to time payable by way of premium by the Landlord (or the lessees or tenants of the Landlord) in respect of the insurance of any other part of the Estate or of any adjoining or neighbouring premises is increased by reason of the user of the Demised Premises or by reason of any act default or omission on the part of the Tenant or other occupiers of the Demised Premises or their respective servants or agents

(b) To comply forthwith with all proper requirements of the Landlord's insurers for the better protection of the Demised Premises of which notice in writing shall be given to the Tenant whether the same relate to the Demised Premises or to the use thereof or to any fixtures fittings equipment chattel or thing whatsoever therein or thereon and to do or execute or cause to be done or executed all such works acts deeds matters or things required by such notice to the satisfaction of the Landlord and the Landlord's insurers

(c) Not to do or omit to be done any act matter or thing whatsoever the doing or omission of which would make void or voidable the insurance of the Demised Premises or any other premises on the Estate and any fixtures fittings plant machinery equipment and other installations in or about the same or whereby any

<PAGE>

payment thereunder may be refused in whole or in part or whereby the premium payable in respect of such policy may be increased

(d) In the event of the Demised Premises or any part thereof being destroyed or damaged by any of the Insured Risks to give notice thereof to the Landlord as soon as such destruction or damage shall come to the notice of the Tenant

(e) In the event of the Demised Premises or any other premises on the Estate being destroyed or damaged by any of the Insured Risks and the insurance money under any insurance against the same effected thereon by the Landlord being wholly or partly irrecoverable by reason solely or in part of any act or default of the Tenant or other occupiers of the Demised Premises or their respective servants or agents forthwith to pay to the Landlord the whole or (as the case may require) the irrecoverable portion of the cost (including professional and other fees) of completely rebuilding and reinstating the same

(f) Not to effect or maintain or contribute towards the maintenance of any insurance on or in respect of the Demised Premises in duplication of any insurance effected and maintained by the Landlord PROVIDED ALWAYS that without prejudice to the foregoing and any right of action or remedy in respect of any breach thereof if at any time the Tenant is entitled to the benefit of any such insurance on the Demised Premises to pay or procure to be paid to the Landlord

all moneys received by virtue of such insurance and to hold the benefit of such policy and moneys payable thereunder in trust to be applied towards rebuilding or reinstating the Demised Premises

To comply with statues
---------------------

7 (a) To comply with all obligations imposed by and do and execute or cause to be done and executed all

8.

<PAGE>

such works acts deeds matters and things as under or by virtue of any Act or Acts of Parliament or legislation are or shall be properly directed or necessary to be done or executed upon or in respect of the Demised Premises or any part thereof or the use thereof whether by the owner the landlord tenant or occupier and at all times to keep the Landlord indemnified against all costs claims demands and liability in respect thereof

(b) Upon receipt of any notice order proposal requisition direction or other thing from any competent authority affecting or likely to affect the Demised Premises or the user thereof at the Tenant's own expense forthwith to deliver to the Landlord a copy of such notice order requisition direction or other thing And at the request of the Landlord to make or join with the Landlord in making such representations in respect thereof as the Landlord shall deem expedient

As to the Town & Country
Planning Acts 1971-1974
----------------------

(8) In relation to the Town & Country Planning Acts 1971-1974

(a) not to do or omit to be done any act matter or thing on or in connection with the Demised Premises the doing or omission of which shall be a contravention of the said Acts and to indemnify the Landlord against all actions proceedings damages penalties costs charges claims and demands in respect of such acts and omissions or any of them and against the costs of any application for planning permission and the works and things done in pursuance thereof

(b) to give notice forthwith to the Landlord of any notice order or proposal for a notice or order served on the Tenant under the said Acts and if so required by the Landlord to produce the same and at the request of the Landlord to make or join in making such representations in respect thereof as the Landlord may

9.

<PAGE>

require

(c) to comply at the Tenant's own cost with any notice or order under the said Acts

(d) not to make any application for planning permission in respect of the Demised Premises or any part thereof and without prejudice to the foregoing not to implement any planning permission or approval until the same has been submitted to and approved by the Landlord Provided that approval to such application or implementation shall not be unreasonably withheld for a change of use or works which are otherwise authorised under this Lease

(e) unless the Landlord shall otherwise direct to carry out before the termination of the Term any works stipulated to be carried out to the Demised Premises whether before or subsequent thereto as a condition of any planning permission which may have been granted during the Term

(f) not to enter into any agreement with any competent authority

regulating the development or use of the Demised Premises

As to repairs and decoration

(9) (a) At all times during the Term well and substantially to repair maintain cleanse and amend in every respect and to keep so repaired maintained cleansed and amended the Demised Premises and when requisite rebuild or renew the same

(b) Not less often than once in each Internal Decoration Year specified in the Particulars during the Term and in the last year of the Term (howsoever determined) to prepare and paint with two coats at least of the best quality paint or otherwise treat all internal parts of the Demised Premises usually or requiring to be painted or otherwise treated AND so that in the last year of the Term (howsoever determined) the tints colours and patterns of all such works of

<PAGE>

internal painting and decoration shall be such as shall be approved in writing by the Landlord

(c) Not less often than once in each External Decoration Year specified in the Particulars during the Term and in the last year of the Term (howsoever determined) to prepare and paint or otherwise treat all exterior parts of the Demised Premises usually or requiring to be painted or otherwise treated with two coats at least of best quality undercoat paint and one coat of best quality gloss paint or other suitable material (all such painting and treating to be carried out in accordance with a specification and colour scheme previously approved in writing by the Landlord) and also in like manner as often as in the opinion of the Landlord shall be reasonably necessary to clean the exterior of the Demised Premises by such method as shall be previously approved by the Landlord in writing

(d) To carry out all work hereunder with the best materials of their several kinds and in accordance with the best standards of workmanship

(e) To inform the Landlord immediately in writing of any defect in the Demised Premises which might give rise to a duty imposed by Common Law or Statute on the Landlord in favour of the Tenant or any other person

(f) To yield up the Demised Premises at the termination of the Term in good and substantial repair and condition in accordance with covenants on the Tenant's part herein contained and in case any of the Landlord's fixtures and fittings shall be missing broken damaged or destroyed forthwith to replace them with others of a similar character and quality and remove every moulding sign writing or painting of the name or business of the Tenant or other occupiers (if any) and to make good all damage caused by the removal thereof and of the Tenant's fixtures fittings furniture and

<PAGE>

effects

(g) Provided Always that the Tenant's liability hereunder shall not extend to damage caused by any of the Insured Risks save to the extent that the insurance moneys are rendered irrecoverable in consequence of any act or default or omission of the Tenant or other occupiers of the Demised Premises or their respective servants or agents or save by reason of some limitation or condition of the kind hereinafter mentioned

As to alterations
-----------------

(10) (a) Not to make any alteration or addition whatsoever to the Demised Premises Provided that the Tenant shall be entitled with the previous written consent of the Landlord which shall not be unreasonably withheld (but which may be subject to such reasonable conditions as the Landlord shall specify) to carry out internal non-structural alterations to the building comprised in the Demised Premises

(b) Without prejudice to the foregoing sub-clause by the termination of the Term (unless the Landlord otherwise requires) to remove all alterations and additions whatsoever (or such of them as the Landlord shall stipulate) and to reinstate the Demised Premises to their condition prior to the execution thereof all such work to be carried out in a good and workmanlike manner to the satisfaction of the Landlord

As to signs and advertisements
------------------------------

(11) Not to paint write place affix attach or exhibit any figure letter pole flag signboard advertisement inscription bill placard or sign whatsoever in onto or in front of any part of the Demised Premises other than a sign on the exterior of the building comprised in the Demised Premises in such position and being of such materials size design and colour as the Landlord or the Landlord's managing agents shall in the Landlord's

12.

<PAGE>

absolute discretion direct

As to user
----------

(12) (a) Not to use the Demised Premises otherwise than for the Permitted Use specified in the Particulars

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1010 of 2711

(b) Not to use the Parking Spaces otherwise than for the parking of vehicles of the type specified in the Particulars belonging to the person for the time being entitled to beneficial occupation of the Demised Premises its employees or visitors

(c) Not to carry on upon the Demised Premises any noisy noisome or offensive trade business or occupation nor to do any act or thing which is or may be or become a nuisance annoyance disturbance or damage to the Landlord or the occupiers of any adjoining or neighbouring premises of the Landlord or which in the reasonable opinion of the Landlord shall prejudicially affect or depreciate any such adjoining or neighbouring premises and not to use the Demised Premises at any time for any illegal or immoral purpose nor for a sale by auction nor to permit any person to sleep therein

As to dealings
--------------

(13) (a) In this sub-clause the expression "sub-lease" means a sub-lease whether immediately or mediately derived out of this Lease and "sub-let" or "sub-letting" or "sub-lessor" or sub-lessee" shall be construed accordingly

(b) There shall not at any time be any assignment transfer sub-letting parting with or sharing of possession or occupation of the whole or of any part of the Demised Premises (whether by the Tenant or any person deriving title through or under the Tenant) PROVIDED THAT:

(i) if all the covenants and provisions hereinafter contained in this sub-clause are complied with the following transactions will be permitted with the previous consent in writing of the

<PAGE>

Landlord which shall not be unresonably withheld:

(I) an assignment of the whole of the Demised Premises

(II) a sub-lease of the whole of the Demised Premises or an assignment thereof

(ii) the Tenant or any permitted sub-lessee shall be entitled to share occupation of the Demised Premises with other companies within the same group (within the meaning assigned thereto by Section 42(1) of the Landlord and Tenant Act 1954) as the Tenant or the permitted sub-lessee PROVIDED THAT

(I) no tenancy is thereby created

(II) the Tenant shall give to the Landlord not less than one month's prior written notice of such proposed occupation and the cessation thereof and

(III) any such occupation of the Demised Premises or any part thereof shall cease upon the company in occupation ceasing to be a member of the same group of companies as the Tenant or the permitted sub-lessee as the case may be whereupon such company shall forthwith vacate the Demised Premises or such part thereof of which it is in occupation

(c) Prior to the assignment of the whole of the Demised Premises or the assignment of a sub-lease thereof the intended assignee shall covenant with the Landlord during the residue of the Term to observe and perform all the covenants on the part of the Tenant (except as to the Rent and sums payable hereunder in respect of insurance and services in the case of an assignment of a sub-lease of the Demised Premises) and the conditions contained in this Lease

(d) (i) If an intended assignee of the whole of the Demised Premises shall be a limited

<PAGE>

liability company then if the Landlord shall reasonably require there shall be provided a guarantor or guarantors sufficient in the reasonable opinion of the Landlord for such company and

(ii) such guarantor or guarantors shall prior to such assignment but with effect therefrom (jointly and severally if more than one) enter into covenants with the Landlord in the form set out in Part I of the Sixth Schedule hereto but subject as mentioned in Part 2 of that Schedule

(e) No sub-lease shall be granted otherwise than at the best rent reasonably obtainable in the open market (exclusive of all outgoings) with the most frequent rent reviews (but not at less frequent intervals than and in similar form to the rent reviews under this Lease) reasonably obtainable in the open market and without taking any fine or premium

(f) There shall not be any sub-lease unless:

(i) the intended sub-lessee shall have covenanted with the intended sub-lessor and the Landlord hereunder respectively as follows:

(I) not to assign transfer sub-let or part with or share possession or occupation of the Demised Premises in any manner which is inconsistent with the provisions of this sub-clause and then only with the previous consent in writing of the Landlord which shall not be unreasonably withheld

(II) to observe and perform the covenants on the part of the Tenant contained in this Lease (other than as to the Rent and sums payable hereunder in respect of insurance and services) so far as the same are not inconsistent with any other provision of this sub-clause

(ii) the form of the sub-lease shall have been previously approved in writing by the Landlord

<PAGE>

Which shall not be unreasonably withheld

(g) Not to be party or privy to any agreement or arrangement for the commutation in whole or in part of any annual rent to be reserved and made payable on any sub-letting and no rent reserved by a aub-lease shall be payable more than one quarter in advance

(h) To notify the Landlord not less than one month nor more than three months prior to any agreement by the Tenant with a sub-lessee for the continuation of the rent payable by such sub-lessee for a further period or for an alteration in such rent

(i) Not to make any variation to any sub-lease without the previous consent in writing of the Landlord which shall not be unreasonably withheld

(j) To observe and perform all the obligations imposed on the Tenant as

sub-lessor under any sub-lease and to ensure the due performance by any sub-lessee of all the obligations under any sub-lease

(k) From time to time on demand during the Term to furnish the Landlord with particulars of any derivative interest of or in the Demised Premises including particulars of the rents payable in respect thereof and such copy documents as the Landlord may require in respect thereof

(l) Within twenty-eight days after any assignment transfer sub-lease charge or other devolution of the title to the Demised Premises to give notice in writing with particulars to the solicitor for the time being of the Landlord and to produce to him with such notice such assignment or transfer or the counterpart of such sub-lease or the Probate or Letters of Administration or other document effecting such devolution (together with a copy thereof for his retention) and to pay to him his reasonable fee (not being less than fifteen pounds (pounds 15)) for the registration of each such deed or document

<PAGE>

New Guarantor

(14) With fourteen days of the death during the Term of any person who has or shall have guaranteed to the Landlord the payment of the Rent and the observance and performance of the covenants on the part of the Tenant herein contained or of such person becoming bankrupt or having a Receiving Order made against him or being a company passing a resolution to wind up or entering into liquidation or suffering a receiver of any of its assets to be appointed then to give notice thereof to the Landlord and without perjudice to any other right or remedy of the Landlord if so required by the Landlord at the expense of the Tenant within twenty-eight days to procure that some other person acceptable to the Landlord shall enter into covenants with the Landlord in the form set out in Part 1 of the Sixth Schedule hereto but subject as mentioned in Part 2 of that Schedule

To permit entry by the Landlord and others

(15) (a) To permit the Landlord and all persons authorised by the Landlord with all necessary appliances at all reasonable times (but after at least twenty-four hours prior written notice except in emergency) to enter the Demised Premises for the purpose of viewing the state and condition thereof or of inspecting any works in progress and in case there shall be found any defects disrepair removal of fixtures or unauthorised alterations or additions or work not conforming with any consent or licence given by the Landlord or any other breach of any of the covenants on the part of the Tenant herein contained to carry out after receipt notice in writing in that behalf and within such reasonable period as shall be specified in such notice such repairs works replacements or removals or take such other steps as may be necessary to remedy any such breach to the satisfaction of the Landlord and in case of default the

<PAGE>

Landlord may itself execute such repairs works replacements and removals or take such other steps as aforesaid and the costs (including professional fees and other expenses) incurred by the Landlord in so doing shall on demand be paid by the Tenant to the Landlord together with interest at the Stipulated Rate (as well after as before judgment) calculated from the date of expenditure by the Landlord to the date of receipt by the Landlord

(b) To permit the Landlord and all persons authorised by the Landlord from time to time at all reasonable times (but after at least twenty-four hours prior written notice except in emergency) to enter and remain upon the Demised Premises with all necessary appliances

(i) to execute work to any adjoining or neighbouring property of the Landlord

(ii) to construct alter maintain repair renew or fix any thing serving or intended to serve the Demised Premises or any adjoining or neighbouring property and running through or intended to run through under on or over the Demised Premises

(iii) for the purpose of taking inventories of the Landlord's fixtures and things to be yielded up at the termination of the Term

(iv) to inspect the progress of any works undertaken by the Tenant pursuant to any obligation under this Lease or any licence or consent given pursuant to the terms hereof or otherwise and/or to prepare any Schedule of works specifications or estimates required by the Landlord prior to or in contemplation of the exercise by the Landlord of any rights of entry of the Landlord in case of the Tenant's default the persons entering causing as little disturbance to the Tenant as reasonably possible and forthwith making

<PAGE>

good any damage caused to the Demised Premises

(c) To permit the Landlord and all others authorised by the Landlord at all times to enter and remain upon or pass through the Demised premises for the purpose of carrying out or in connection with the Services and other matters mentioned in the Fifth Schedule hereto or for the purpose of complying with any covenant on the part of the Landlord herein contained

(d) (i) To permit the Landlord during the twelve months immediately preceding the termination of the Term to affix and retain without interference to any part of the exterior of the Demised Premises (but so as not unduly to obscure the windows thereof or interfere with the Tenant's use thereof) a notice for re-letting the same and during the said twelve months to permits persons with written authority from the Landlord or the Landlord's agents at reasonable times of the day to view the demised premises

(ii) At all convenient hours in the daytime to permit all prospective purchasers of or dealers in the Landlord's reversionary interest by order in writing of the Landlord or the Landlord's agents to view the Demised Premises without interruption subject to at least twenty-four hours written notice being given

As to the payment of certain costs and as to indemnities

(16) (a) To pay all costs fees expenses and commission (including bailiff's commission) incurred by the Landlord incidental to or in connection with any of the following:

(i) the preparation and service of any notice under Section 146 of the Law of Property Act 1925 or incurred in or in contemplation of proceedings under Section 146 or 147 of that Act notwithstanding in any such case that forfeiture may be avoided otherwise than by relief granted by the court

<PAGE>

(ii) the preparation and service of any notice or schedule relating to dilapidations whether the same is served before or after the termination of the Term

(iii) the enforcement of any of the Tenant's covenants and conditions herein contained whether during the currency of or after the termination of the Term

(iv) any application for a licence or consent required hereunder from the Landlord whether or not such licence or consent shall be forthcoming

(b) To pay and make good to the Landlord all and every loss and damage whatsoever incurred or sustained by the Landlord as a consequence of any breach or non-observance of the Tenant's covenants herein contained and to indemnify the Landlord from and against all actions claims liability costs and expenses thereby arising

(c) To indemnify and keep indemnified the Landlord from liability in respect of any injury to or the death of any person damage to any property movable or immovable the infringement disturbance or destruction of any right easement or privilege or otherwise by reason of or arising directly or indirectly out of the repair or state of repair (which is the Tenant's responsibility hereunder) of the Demised Premises and all claims and demands of whatsoever nature in respect of any such liability

(d) To be responsible for and to indemnify the Landlord against all damage occasioned to the Demised Premises or any part of the Estate caused by any act default or negligence of the Tenant or the servants agents licensees or invitees of the Tenant

(e) To indemnify the Landlord against any taxes charges or other assessments payable in respect of any change of use or works (as the case may be)

<PAGE>

permitted by or by reason of this Lease or by reason of any licence granted to the Tenant or by reason of the obtaining of any consents required to be obtained under the terms of any such licence

(f) To pay the proper costs of the Landlord's Solicitor and necessary disbursements in connection with the grant of this Lease and the stamp duty on the counterpart thereof

To comply with further stipulations restrictions and requlations

(17) (a) To comply at all times with the stipulations and restrictions set out in the Fourth Schedule hereto

(b) To comply with such reasonable regulations as the Landlord or the Landlord's managing agents shall from time to time make for the general convenience of the tenants and occupiers of the Estate and the good management thereof.

To comply with the provisions of the Relevent Documents

(18) To observe and perform the provisions of the Relevant Documents insofar as the same affect the Demised Premises and to indemnify the Landlord against all actions proceedings costs claims and demands in respect thereof

COVENANTS BY THE LANDLORD

4. THE Landlord HEREBY COVENANTS with the Tenant as follows:

For quiet enjoyment

(1) That the Tenant paying the Rent and observing and performing the several covenants and stipulations herein on the Tenant's part contained shall peaceably hold and enjoy the Demised Premises during the Term without any lawful

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1016 of 2711

interruption by the Landlord or any person rightfully claiming under or in trust for the Landlord

21.

<PAGE>

To provide certain services
---------------------------

(2) Subject as hereinafter provided and subject always to the due payment of the Rent and all other moneys payable hereunder to keep in good repair cleansed and adequately lit the common roads and accessways and common Conduits on the Estate and the Parking spaces

To insure
---------

(3) Subject to the due payment of the Rent and all other moneys payable hereunder at all times to keep the Demised Premises insured (or procure that the same are kept insured) with reputable insurers in the full costs of reinstatement against loss or damage by the Iinsured Risks together with architects' surveyors' engineers' and other professional fees and also the loss of the Rent for the loss of Rent period and upon request to supply to the Tenant sufficient particulars of such insurance and evidence that the policy is on foot

To make good damage
caused by insured Risks
-----------------------

(4) In the event of the Demised Premises being destroyed or damaged by any of the Insured Risks and subject to the previous compliance by the Tenant with the covenants of the Tenant as to insurance hereinbefore contained and provided that the Landlord's insurance has not been vitiated or payment thereunder refused in whole or part as a result of any act default or omission on the part of the Tenant or other occupiers of the Demised Premises or their respective servants or agents with all due diligence to use the Landlord's best endeauovrs to procure that any necessary building licence and permits under any regulations or enactment for the time being in force are obtained to enable the Landlord to rebuild and reinstate the Demised Premises and as soon as such licences and permits have been obtained and provided the same remain unrevoked and subject to all necessary labour and materials being available to pay out (or

22.

<PAGE>

procure such payment out) of all moneys received in respect of such insurance (other than for architects' surveyors' and other professional fees and loss of rent) in rebuilding reinstating replacing and making good the Demised Premises And in case the insurance moneys shall be insufficient for that purpose the Landlord shall make up the deficiency out of the Landlord's own moneys

PROVISOS
- --------

5. PROVIDED ALWAYS AND IT IS HEREBY AGREED that

Re-entry
--------

(1) (a) if the Rent or the moneys secondly thirdly or fourthly hereby reserved or any part thereof or any other sum payable by the Tenant pursuant to any provision contained in this Lease or any part thereof shall at any time be in arrear and unpaid for twenty-one days after the same shall have become due (whether or not any formal or legal demand therefor shall have been made) or

(b) if the Tenant or the Guarantor shall at any time fail to perform or observe any of the covenants conditions or agreements herein contained and on the part of the Tenant or the Guarantor to be performed and observed or

(c) if the Tenant or the Guarantor (being a company) shall enter into liquidation whether compulsory or voluntary (not being a voluntary liquidation for the purposes of amalgamation or reconstruction) or permit or suffer a receiver of any of the assets of the Tenant or the Guarantor to be appointed or permit or suffer any execution to be levied on the Demised Premises or enter into any arrangement or composition for the benefit of the creditors of the Tenant or the Guarantor or

(d) if the Tenant or the Guarantor (not being a company) shall become bankrupt or have a receiving order made against the Tenant or the Guarantor

23.

<PAGE>

THEN it shall be lawful for the Landlord or any persons duly authorised by the Landlord to re-enter upon the Demised Premises or any part thereof in the name of the whole and peaceably to hold and enjoy the same thenceforth as it this Lease had not been made without prejudice to any right of action or remedy of the Landlord in respect of any antecedent breach of any of the Tenant's covenants

Cesser of Rent

(2) In the event of the Demised Premises or any part thereof at any time during the Term being damaged or destroyed by any of the Insured Risks so as to be rendered unfit for use then (unless the policy moneys become irrecoverable in whole or in part through any act default or omission of the Tenant or other occupiers of the Demised Premises or their respective servants or agents and subject as hereinafter provided in this Clause) the Rent or a fair proportion thereof according to the nature and extent of the damage sustained shall be suspended until the Demised Premises shall again be fit for use or the end of the Loss of Rent Period (whichever shall first occur) and any dispute concerning this sub-clause shall be determined by a single arbitrator in accordance with the Arbitration Acts 1950 and 1979 to be appointed (in the absence of agreement) upon the application of either the Landlord or the Tenant by the President for the time being of the Royal Institution of Chartered Surveyors

Demise not to confer rights to enforce convenants against others or to grant further rights

(3) Nothing herein contained shall confer on the Tenant any right to the benefit of or to enforce any covenant or agreement contained in any lease or any other instrument relating to any other part or parts of the Estate or to any other premises belonging to the

24.

<PAGE>

Landlord or limit or affect the right of the Landlord to deal with the same now or at any time hereafter in any manner which may be thought fit and the demise hereby made shall not be deemed to include and shall not operate to convey or demise any ways conduits lights liberties privileges easements rights or advantages whatsoever in through over or upon any land adjoining or near to the Demised Premises except as herein expressly provided

Limitation of Landlord's liability for provision of Services

(4) Notwithstanding anything in any provision contained in this Lease the Landlord shall not be liable to the Tenant nor shall the Tenant have any claim against the Landlord in respect of any interruption in any of the Services mentioned in the Fifth Schedule hereto which shall from time to time be supplied

by reason of any necessary repair or maintenance of any installations or apparatus or damage thereto or destruction thereof by fire water Act of God or by reason of electrical mechanical or other defect or breakdown or frost or other inclement conditions or shortage of fuel materials water or labour or whole or partial failure or stoppage of any mains supply or by reason of other circumstances of whatsoever nature beyond the control of the Landlord

No warranty as to the Permitted Use

(5) Nothing herein contained or implied nor any statement or representation made by or on behalf of the Landlord shall be taken to be a covenant warranty or representation that the Demised Premises can lawfully be used for the Permitted Use

<PAGE>

Limitation on the Landlord's obligation to insure

(6) The Landlord shall be deemed to comply with the LandLord's obligations as to insurance under this Lease notwithstanding that the insurance for the time being maintained by the Landlord is subject to conditions or limitations which the Landlord considers it reasonable to accept and without prejudice to the foregoing nothing in this Lease shall require the Landlord at any time to insure against loss or damage or destruction from any cause for which United Kingdom insurance offices of repute generally are not for the time being prepared to grant insurance

Service of notices

(7) Section 196 of the Law of Property Act 1925 as amended by the Recorded Delivery Service Act 1962 shall apply to all notices demands requests or other communications given or made pursuant to this Lease and in addition any such notice demand request or other communication may be delivered to any party hereunder which is for the time being a company or corporation at its registered office If the Tenant or the Guarantor shall comprise more than one person the service of any such notice demand request or other communication on any one of such persons shall constitute good service on all of them

Party walls

(8) Such of the walls of the Demised Premises as divide the Demised Premises from other premises of the Landlord shall be deemed to be party walls severed medially and shall be included in the Demised Premises as far only as the medial plane thereof

As to arbitration in certain events

(9) Where in this Lease provision is made for the appointment of some person to act as an expert or arbitrator to determine a matter of difference between

26.

<PAGE>

the Landlord and the Tenant and such provision proves ineffective to secure such appointment then the difference in question shall if the Landlord so requires be settled by a single arbitrator under the Arbitration Acts 1950 and 1979

Exclusion of compensation

(10) Except where any Act of Parliament prohibits or modifies the right to compensation being excluded or reduced by agreement neither the Tenant nor any sub-lessee (whether immediate or derivative) shall be entitled on quitting the Demised Premises or any part thereof to claim any compensation from the Landlord

Impossibility of performance of certain covenants

(11) Nothing herein shall render the Landlord or the Tenant liable in respect of any of the covenants conditions or provisions hereinbefore contained insofar only as the performance and observance of such covenants conditions or provisions or any one or more of them shall hereafter become impossible or illegal under or by virtue or the provisions of the Town and Country Planning Acts 1971 to 1974 but subject as aforesaid the Term and the Rent and other moneys payable to the Landlord hereunder shall not be determined or cease to be payable by reason only of any change modification or restriction of the use of the Demised Premises or obligations or requirements hereafter to be made or imposed under or by virtue of the said Acts

GUARANTEE

6. WHERE a person is named in the Particulars as the Guarantor in consideration of the Landlord at the request of the Guarantor entering into this Lease the Guarantor covenants with the Landlord in the manner set out in Part 1 of the Sixth Schedule hereto

IN WITNESS whereof the parties hereto have executed this Lease the day and year first before written

27.

<PAGE>

THE FIRST SCHEDULE above referred to

Rights granted

1. A right of way (in common with the Landlord and all others authorised by the Landlord from time to time or otherwise having the like right) for the Tenant and all others authorised by the Tenant to pass to and from the Demised Premises with or without vehicles over and along the service road or roads and accessways situate upon the Estate from time to time allocated by the Landlord for use by the Tenant

2. The right (in common as aforesaid) of passage of gas electricity water drainage air smoke or other effluvia from and to the Demised Premises through the Conduits now or hereafter during the Perpetuity Period running through under or over other parts of the Estate and serving the Demised Premises

3. Full and free right and liberty for the Tenant and all others authorised by the Tenant upon reasonable prior written notice to the Landlord and the relevant occupier to enter upon such part of the Estate as may be reasonably necessary for the purpose of repairing or maintaining the Demised Premises the Tenant in

the exercise of such right doing as little damage as possible to such part of the Estate and forthwith making good any such damage to the reasonable satisfaction of the Landlord

4. The right to park vehicles of the type specified in the particulars on the Parking Spaces

5. The right of support from any adjacent building on the Estate

THE SECOND SCHEDULE about referred to

Exceptions and Reservation

EXCEPT AND RESERVED unto the Landlord and all other persons at any time authorised by the Landlord or otherwise entitled thereto

<PAGE>

1. Full right and liberty at all times without obtaining any consent from or making any compensation to the Tenant to build upon any land now or hereafter during the Perpetuity Period belonging to the Landlord (adjoining or near to the Demised Premises) or otherwise deal with or use such land as the Landlord or such other persons may think fit notwithstanding that the access of light and air to the Demised Premises may be affected

2. Full and free right

(1) of running of water soil gas electricity the flow of air and the passage of smoke or other effluvia from and to any other parts of the Estate and the buildings which now are or may hereafter during the Perpetuity Period be erected thereon through the Conduits which now are or may hereafter at any time during the Perpetuity Period be upon in over or under the Demised Premises

(2) during the Perpetuity Period to build additional or relay any Conduits upon in over through or under the Demised Premises in connection with any adjoining or neighbouring property now or hereafter during the Perpetuity Period belonging to the Landlord and to enter upon the Demised Premises for that purpose subject to making good all damage to the Demised Premises caused thereby

(3) to make connections with any Conduits which now are or may hereafter during the Perpetuity Period be upon in over or under the Demised Premises and to enter upon the Demised Premises for that purpose and subject to making good damage to the Demised Premises as aforesaid

3. Full right and liberty to enter upon the Demised Premises at any time during the Term (but after at least twenty-four hours prior notice to the Tenant except in case of emergency) in order to build on or into any party or boundary wall of the Demised Premises the

<PAGE>

persons exercising such rights making good all damage to the Demised Premises caused thereby

4. The right to restrict temporarily the exercise of the rights mentioned in paragraphs 1, 2 and 4 of the First Schedule in connection with the provision or carrying out of any of the matters mentioned in the Fifth Schedule hereto but in such manner as to cause as little disturbance as practicable to the Tenant

5. Rights of support for any adjacent buildings on the Estate from the Demised Premises

THE THIRD SCHEDULE above referred to

Rent Review Provisions

1. In this Schedule the following expressions shall have the meanings hereinafter respectively assigned to them that is to say:

(1) "Relevant Review Date" means that one of the Review Dates specified in the Particulars in respect of which Rental Value (as hereinafter defined) falls to be agreed to determined hereunder

(2) "Rent Period" means the period from and including the commencement date of the Term or a Review Date (as the case may be) until the expiration of the day before the first Review Date thereafter or until the end of the Term (as the case may be)

(3) "Rental Value" means the best yearly rent at which the Demised Premises together with the rights granted by this Lease could reasonably be let in the open market at a Relevant Review Date by a willing landlord to a willing tenant and disregarding and making no allowance for the value of any rent free period or the amount of any reverse premium or concession or discount as to rent which such landlord and tenant might reasonably agree as a term of the grant and acceptance of a tenancy

(a) UPON the following assumptions at that date:

<PAGE>

(i) that the Demised Premises are fit for immediate occupation and use and that no work has been carried out thereon by the Tenant or the Tenant's prodecessors in title during or prior to the Term which has deminished the Rental Value of the Demised Premises and that in case the Demised Premises have been destroyed or damaged they have been fully restored

(ii) that the Demised Premises are available to let as a whole without a premium but with vacant possession and subject to the provisions of this Lease (other than the amount of the Rent but including the provisions for rent review herein contained) for a term equal to the length of the Term

(iii) that the covenants herein contained have been fully performed and observed

(iv) that all necessary permissions approvals licences and consents for the Permitted Use have been obtained and that any condition or provision contained in any planning permission (now or hereafter granted) restricting at any time the occupation of the Demised Premises to any person or class or type of person or precluding occupation by any person or class or type of persons did not exist

(b) BUT disregarding:

(i) any effect on Rental Value of the fact that the Tenant or the Tenant's predecessors in title have been in occupation of the Demised Premises

(ii) any effect on Rental Value of any goodwill attached to the Demised Premises by reason of the carrying on thereat of the business of the Tenant or the Tenant's predecessors in title in their respective business

<PAGE>

(iii) any increase in Rental Value of the Demised Premises attributable to any tenant's fixtures or fittings installed in the Demised Premises by the Tenant or the Tenant's predecessors in title or to the existence at a Relevant Review Date of any improvement or alteration to the Demised Premises carried out with the Landlord's consent otherwise than in pursuance of an obligation to the Landlord or the Landlord's predecessors in title by the Tenant or the Tenant's predecessors in title during the Term or during any period of occupation prior thereto arising out of any agreement to grant the Term AND the improvement or alteration was completed not more than twenty-one years before the Relevant Review Date

(iv) any effect on rent of any obligation to reinstate the Demised Premises to its condition prior to the execution of alterations or improvements whether under this Lease or any document supplemental thereto hereinafter entered into

2. Within three months before or as soon as may be after each Review Date the Rental Value at such date shall be agreed between the Landlord and the Tenant or (failing such agreement) determined as hereinafter provided and the yearly rent first reserved and payable commencing on such Review Date or the yearly rent (first reserved) last payable during the immediately preceding Rent Period whichever shall be the greater

3. For the purpose of calculating the amount of rent provided for under this Schedule Rental Value at a Relevant Review Date shall be the amount agreed between

32.

<PAGE>

the Landlord and the Tenant and in case no such agreement shall be made by the Relevant Review Date (for any reason whatever and whether or not any steps shall have been taken to reach agreement) either the Landlord or the Tenant may at any time thereafter by written notice to the other require that the matter be referred to the determination of an independent surveyor such surveyor to be agreed upon between the Landlord and the Tenant or failing agreement to be chosen at the request of either the Landlord or the Tenant by the President or a Vice-President for the time being of the Royal Institution of Chartered Surveyors and the reference to the said surveyor shall subject as hereinafter provided be deemed to be a submission to arbitration and so subject to the provisions of the Arbitration Acts 1950 and 1979

PROVIDED that

(1) Within fourteen days of either the Landlord or the Tenant requiring such reference by service of notice as aforesaid the Landlord may require that the said surveyor shall act in the reference as an expert and not as an arbitrator and in such case the said surveyor shall consider any representations submitted to him but shall not thereby be precluded from determining the reference in accordance with his own judgment and

(2) if for any reason the said surveyor (acting as an expert) shall not have determined the Rental Value within three months next following his appointment then either the Landlord or the Tenant may apply to the said President or Vice-President for the appointment of a substitute expert and such procedure to secure the reference of the matter to an expert shall be repeated as many times as may be necessary to secure the determination of Rental Value hereunder and

(3) the fees of the said surveyor acting as an expert and the costs of his appointment shall be shared

<PAGE>

between the Landlord and the Tenant in such proportions as the said surveyor shall determine

4. As soon as the amount of rent payable from a Relevant Review Date has been agreed or determined a Memorandum in duplicate specifying the particulars of such agreement or determination shall be signed by or on behalf of the Landlord and the Tenant and one part shall be attached to this Lease and the other to the counterpart thereof

5. Pending the said agreement or determination of rent payable from a Relevant Review Date the Tenant shall pay rent at the yearly rate last payable immediately before the Relevant Review Date on every due date for payment until the amount of the said rent for the relevant Rent Period (hereinafter called "rent at the revised rate") shall have been so agreed or determined and within seven days after such agreement or determination the Tenant shall pay to the Landlord by way of rent such a sum as (with the rent already paid in respect of the period to which such agreement or determination relates down to the Quarter Day immediately following such agreement or determination) shall be equal to rent at the revised rate for such period down to such Quarter Day and in addition the Tenant shall pay to the Landlord interest on such sum at the rate of Two pounds per centum (pounds 2%) per annum below the Stipulated Rate calculated on a daily basis from the Relevant Review Date (but in relation to any part of such sum (relating to any period after the Quarter Day immediately following the Relevant Review Date) which had the rent at the revised rate been ascertained on the Relevant Review Date would have become payable to the Landlord on a Quarter Day subsequent to the Relevant Review Date then such interest shall be calculated only from such Quarter Day) down to the date of payment (as well after as before judgment)

<PAGE>

6. If at a Relevant Review Date the Landlord shall be restricted or prevented by any legislation relative to the control of rents from obtaining the full amount of the rent which would otherwise be payable hereunder or from obtaining any increase in the rent hereunder or by reason of such legislation the provisions hereinbefore contained shall not operate than the foregoing provisions of this Schedule shall have effect so far as permitted by law but in addition the Landlord shall be entitled on giving to the Tenant not less than three months notice in writing at any time after the Relevant Review Date to introduce an intermediate review date (hereinafter called "the Intermediate Review Date") which shall be the date of the expiration of such notice and the rent payable hereunder from an Intermediate Review Date until the expiration of the then current Rent Period (or such later date as the rent should be reviewed hereunder as the case may be) shall be determined and the provisions of this Schedule shall apply (mutatis mutandis) as though the Intermediate Review Date was the date of commencement of a Rent Period and shall constitute a Relevant Review Date for the purposes of this Schedule

7. Time shall not be of the essence in the operation of this Schedule

THE FOURTH SCHEDULE above referred to

Stipulations and Restrictions

1. Not to obstruct the service roads and accessways situate upon the Estate or park any vehicles thereon

2. Not to permit any vehicle to remain for an unreasonable time nor any goods materials or other things to be loaded unloaded or deposited outside the Demised Premises in such manner as to cause obstruction or annoyance to the Landlord or to the tenants or occupiers of any other premises on the Estate

<PAGE>

3. Not to install any heating apparatus of any description in the Demised Premises unless the same shall first be approved by the Landlord

4. Not to do anything which may put any weight or impose strain on the Demised Premises in excess of that which the same are calculated to bear with due margin for safety

5. Not to allow to pass into the Conduits serving the Demised Premises any noxious or deleterious effluent or other substance which may cause an obstruction in or injure the same and in the event of any such obstruction or injury if required by the Landlord at the Tenant's cost forthwith to remove such obstruction and to make good all damage to the satisfaction of the Landlord and not to discharge any trade waste into the Conduits nor discharge anything but storm water and surface water into the surface water drains of the Demised Premises

6. Not to obstruct any of the windows lights or ventilators belonging to the Demised Premises nor to give to any third party any acknowledgement that the Tenant enjoys the access of light to any of the windows or openings in the Demised Premises by the consent of such third party nor to permit any new window light ventilator passage drainage or other encroachment or easement to be made in to or acquired against or over the Demised Premises or any part thereof and in case any encroachment or easement whatsoever shall be alleged or attempted to be made or acquired by any person or persons whomsoever to give notice thereof in writing to the Landlord immediately the same shall come to the notice of the Tenant and at the cost of the Tenant to do all such things as may be proper for preventing any encroachment or easement being made or acquired

7. To provide and to maintain or cause to be provided and maintained in good working order adequate fire fighting and prevention equipment within the Demised

<PAGE>

Premises

8. Not to use the Demised Premises for the storage deposit or display of goods materials or things of a dangerous inflammable or explosive nature or liable to spontaneous combustion or the keeping storage or possession of which may contravene any legislation or any requirement of the Landlord's insurers

9. Not to store any materials or goods outside the building or buildings comprised in the Demised Premises

10. Not to burn rubbish or waste materials paper wood and other combustible matter on the Demised Premises except within boilers or incinerators provided for the purpose and approved by the Landlord or the Landlord's managing agents

11. Not to emit any smoke fumes or smells from the Demised Premises so as to cause in the opinion of the Landlord or the Landlord's managing agents annoyance or interference with the proper enjoyment of other tenants of the Estate or premises adjoining or near thereto

12. To secure all buildings comprised in the Demised Premises by locking all windows and doors therein outside working hours

13. To provide facilities within the curtilage of the Demised Premises for the keeping of refuse in proper receptacles readily accessible for collection

14. To keep the interior and exterior of the windows of the Demised Premises clean and to effect such cleaning as often as shall be necessary

THE FIFTH SCHEDULE above referred to

Service Charge

Definitions

1. In this Schedule the following expressions shall have the meanings hereinafter respectively assigned thereto that is to say:

37.

<PAGE>

(1) "Accounting Period" means a period of twelve months ending on the Service Charge Accounting Day specified in the Particulars (whether or not including a period falling before the commencement of the Term or subsequent to the termination of the Term) Provided that if there shall be an Estate Opening Date specified in the Particulars the period from that date until the Service Charge Accounting Day immediately following the Estate Opening Date shall be an Accounting Period hereunder

(2) "Initial Period" means the period from the Service Charge Commencement Date specified in the Particulars until the Service Charge Accounting Day immediately following the same

(3) "Final Period" means the period from the Service Charge Accounting Day immediately preceding the termination of the Term until the termination of the Term

(4) "Relevant Proportion" means in relation to the Initial Period or the Final Period the proportion which the number of days comprised in such period bears to the number of days comprised in the Accounting Period in which the Initial Period or the Final Period as the case may be falls

(5) "Services" means the following services matters or things:

(a) the amount (if any) from time to time assessed by the Landlord's insurers by way of premium as being payable by the Landlord for keeping the roads and accessways within the Estate and other areas or other parts of the Estate intended to be used in common and any building or structure occupied by the Landlord in connection with any of the services matters or things mentioned herein insured for an amount (estimated from time to time by the Landlord or the Landlord's managing agents) necessary to cover the full costs of rebuilding or reinstating the same against damage by the Insured

38.

<PAGE>

Risks together with architects' surveyors' engineers' and other professional fees

(b) the amounts from time to time assessed by the Landlord's insurers by way of premium as being payable by the Landlord for providing insurance cover which may from time to time be effected by the Landlord in respect of the following matters or any of them:

(i) any liability to the public or third parties by virtue of the Landlord's ownership or occupation of the Estate or any part thereof

(ii) the loss or damage of or to any fixtures fittings plant equipment machinery chattel or any other things in use from time to time in connection with the provision or supply of services matters or things herein mentioned

(iii) such other damage loss liability or claim which may arise in relation to any of the services matters or things herein mentioned and the employment of staff in connection therewith

(c) the scavenging lighting cleansing repair renewal maintenance rebuilding replacement redecoration or repainting (as often as occasion shall require) of the service roads areas ramps accessways pedestrian ways passageways staircases embankments transformer chambers gatehouse management office parking areas car parks open spaces gardens (including suitable planting or replanting of such open spaces and gardens) Conduits boundary walls and gateways fences or other structures and all other conveniences works services and facilities of whatsoever nature now or at any time hereafter forming part of or serving the Estate and intended for common or public use or for the benefit of the tenants of the Estate (whether or not also serving other premises near to or adjoining the Estate) and not being the responsibility of the Tenant or any other tenant on the Estate

39.

<PAGE>

(d) the collection compaction and disposal of refuse from the Estate (if the same shall be arranged by the Landlord)

(e) the maintaining of any security for the Estate (if the Landlord shall so require)

(f) the provision of signboards for general use on the Estate

(g) the employment or engagement and remuneration of staff servants contractors agents professional advisers and any other persons in connection with the provision of the services things or matters herein mentioned the general supervision management and administration of the Estate and the ascertainment and collection of the Service Charge (as hereinafter defined) and all incidental expenditure in relation to the employment of staff and others including the provision of clothing uniforms the payment of the statutory and such other insurance health pension welfare travelling expenses and allowances clothing allowances and other payments contributions and premiums as the Landlord may deem desirable or necessary

(h) the taking of any steps thought desirable or expedient by the Landlord for complying with making representations against or otherwise contesting the incidence of the provisions of any legislation concerning town planning public health highways streets drainage or other matters relating or alleged to relate to the Estate for which tenants of the Estate are not directly liable

(i) the provision maintenance and replacement of any plant equipment machinery tool chattel or thing used by the Landlord or others for any of the services matters or things herein mentioned

(j) all outgoings in connection with any accommodation building or area occupied by the Landlord in connection with the supply and provision of any of

40.

<PAGE>

the services matters or things herein mentioned and in connection with all common parts of the Estate

(k) the supply or provison and maintenance of any other services or matters which the Landlord shall reasonably consider to be conductive to the proper and efficient management of the Estate

(l) the amount of any value added tax or any other similar tax or taxes payable in respect of any of the above matters

(6) "Service Charge" in relation to any Accounting Period means all costs

expenses and outgoings expended or incurred or which may become payable and which are provided for by the Landlord in the provision or supply of the Services in respect of the relevant Accounting Period (including (a) such provision for anticipated future expenditure (if any) or notional sums (if any) comprised within the Services and reasonably allocated by the Landlord to the relevant Accounting Period) and (b) if the Landlord shall itself undertake the general supervision and management of the Estate the Landlord may if it so desires include in the Service Charge for any relevant Accounting Period a sum equivalent to the amount which a firm of Chartered Surveyors would reasonably have charged for the time being in the open market for undertaking such a general supervision and management and such sum shall be deemed to be expenditure incurred by the Landlord for the relevant Accounting Period

(7) "Tenant's Proportion" means the Service Charge Proportion specified in the Particulars or if the Landlord shall hereafter so determine such other proportion as to the Landlord shall seem fair and equitable

Tenant's share of Service Charge

2. The share of the Service Charge for an Accounting Period payable by the Tenant shall be an amount equal to

<PAGE>

the Tenant's Proportion of the Service Charge for that Accounting Period Provided that in relation to the Initial Period or the Final Period the share of the Service Charge for the Accounting Period in which the same Falls shall be the Tenant's Proportion multiplied by the Relevance Proportion of the Service Charge for that Accounting Period

The keeping of accounts

3. The Landlord or the Landlords managing agents shall at all times keep an account of the Service Charge for each Accounting Period and such account shall be open to inspection by the Tenant at all reasonable times and every entry in such account shall be sufficient evidence of the expenditure or provision recorded therein

Provision of estimates

4. As soon as may be before or after the beginning of every Accounting Period the Landlord or the Landlord's managing agents shall make an estimate of the anticipated amount of the Service Charge for such Accounting Period and shall notify the Tenant of such estimate

Payments on account

5. (1) For each Accounting Period during the Term in respect of which an estimate shall have been made the Tenant shall pay to the Landlord on account of the Tenant's liability hereunder an amount equal to the Tenant's Proportion of such estimate and one quarter thereof shall be paid in advance in respect of every Quarter of such Accounting Period comprised in the Term on the Quarter Day at the beginning of such Quarter Provided Always that pending the notification of any such estimate as aforesaid the Tenant shall pay to the Landlord in advance on each Quarter Day an amount equal to one quarter of the Tenant's Proportion of the estimate of the Service Charge for the preceding Accounting Period and within seven days of such

<PAGE>

notification the Tenant shall make such payment to the Landlord or the Landlord

shall make to the Tenant such allowance against the future liability of the Tenant hereunder as shall ensure that the Tenant has paid the amount which would otherwise have become payable by the Tenant in respect of the period from the commencement of the relevant Accounting Period to the date of such notification had the Tenant been notified of such estimate prior to the commencement of the relevant Accounting Period

(2) During the Initial Period in respect of which an estimate shall have been made the Tenant shall pay to the Landlord in advance on account of the Tenant's liability hereunder on the Service Charge Commencement Date (in respect of the period therefrom until the next following Quarter Day) and on each of the Quarter Days thereafter (in respect of the period therefrom until the next following Quarter Day) a proportionate part (calculated on a daily basis) of an amount equal to the Tenant's Proportion of such estimate Provided Always that if the Tenant shall not be notified of such estimate as aforesaid until after the commencement of the Initial Period the Tenant shall within seven days of such notification pay to the Landlord such payments which would otherwise have become payable by the Tenant in respect of the period from the Service Charge Commencement Date to the date of such notification had the Tenant been notified of such estimate prior to the Service Charge Commencement Date

Issue of certificates
for Accounting Periods
- ---------------------

6. As soon as possible after the end of every Accounting Period the Landlord or the Landlord's managing agents shall issue to the Tenant a certificate certifying the total amount of the Service Charge for

<PAGE>

the preceding Accounting Period and such certificate shall save in the case of manifest error be conclusive and binding upon the Tenant and upon request by the Tenant the Tenant shall be entitled to receive a summary of the Service Charge for the relevant Accounting Period Adjustment at the end of each Accounting Period.

Payment following issue of certificate
- ----------------------------------------

7. Within fourteen days after the issue of the certificate as aforesaid such allowance or (in respect of the Final Period) payment shall be made to the Tenant or the Tenant shall make such payment to the Landlord on demand as shall be requisite for ensuring that the Tenant has paid the Tenant's Proportion of the Service Charge (or in respect of the Initial Period or the Final Period the Relevant Proportion thereof) in respect of the preceding Accounting Period Provided Always that the provisions of this paragraph shall continue to apply notwithstanding the termination of the Term but only in respect of any period prior thereto

THE SIXTH SCHEDULE above referred to

Covenants by Guarantor or Guarantors

PART 1

(A) The Tenant will at all times during the Term and any statutory continuation thereof pay the Rent and all other moneys payable hereunder at the respective times and in manner herein appointed for payment thereof and will also duly observe and perform the several covenants and stipulations herein on the part of the Tenant herein contained

(B) The Guarantor (by way of indemnity and not only by way of guarantee) will pay and make good to the Landlord on demand all losses costs and damages and expenses occasioned to the Landlord by reason of any non-payment or breach specified in Paragraph (A) of this part of

<PAGE>

this Schedule and (without prejudice to the generality thereof) in the event of any disclaimer by any trustee in bankruptcy or liquidator or after any forfeiture of this Lease the Guarantor will pending any reletting of the Demised Premises pay to the Landlord an amount equal to all Rent and other sums which but for such disclaimer or forfeiture would have been payable by the Tenant under this Lease

(C) If so required in writing by the Landlord within three months after any disclaimer of this Lease by any trustee in bankruptcy or liquidator or after any forfeiture (as the case may be) the Guarantor will accept a new lease of the Demised Premises for a term equal to the residue of the Term unexpired at the date of such disclaimer or forfeiture as the case may be and commencing on that date at a rent or rents equal to that or those payable at the date of the disclaimer or forfeiture as the case may be and containing the like covenants conditions and provisions as are reserved by and contained in this Lease (such new lease and the rights and liabilities thereunder to take effect from the date of such disclaimer or forfeiture The costs of the Landlord in the preparation and completion of such new lease to be paid by the Guarantor to the Landlord on demand

(D) Any neglect or forebearance of the Landlord in endeavouring to obtain payment of the Rent or other moneys payable under this Lease or any delay in taking any steps to enforce performance of the covenants contained in this Lease and any time which may be given by the Landlord to the Tenant or any variation of the terms of this Lease agreed between the Landlord and the Tenant or any other act omission matter or thing whatsoever whereby (but for this provision) the Guarantor would be exonerated either in whole or in part from the aforesaid covenants shall not release or in any

<PAGE>

way lessen or affect the liability of the Guarantor

(E) For the avoidance of doubt and notwithstanding the definition of "Landlord" hereinbefore contained the covenants on the part of the Guarantor hereinbefore contained shall enure for the benefit of the person for the time being entitled to the reversion immediately expectant upon the determination of this Lease and without the need for any express assignment

PART 2

(i) In relation to a Guarantor (other than any Guarantor specified in the Particulars) the words "this Lease" shall be deemed to read "the Lease", and

(ii) In relation to a Guarantor for a successor in title to the Tenant specified in the Particulars the expression "Tenant" mentioned in Part 1 of this Schedule shall mean the person to whom an assignment of the Term is to be made and its successor in title, and

(iii) In relation to a new Guarantor required by the Landlord pursuant to this Lease (other than as mentioned in (ii) above) the expression "Tenant" mentioned in Part 1 of this Schedule shall mean the person who was the Tenant

immediately before the event occurred which occasioned the Landlord's requirement for a new guarantor and the successors in title of such person

THE COMMON SEAL of ELECTRICITY )
SUPPLY NOMINEES LIMITED was )
hereunto affixed in the )
presence of :- )

Director

Secretary

46.

<PAGE>

THE COMMON SEAL of JOHN ADAMS )
ELECTRONICS LIMITED was )
hereunto affixed in the ) [SEAL APPEARS HERE]
presence of :- )

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

<PAGE>

DATED 22nd December 1989

ELECTRICITY SUPPLY NOMINEES LIMITED (1)

JOHN ADAMS ELECTRONICS LIMITED (2)

INTERNATIONAL AERADIO PLC (3)

LICENCE TO ASSIGN
----------------

Lease of

Unit No. 1 Block B The Fleming
Centre Fleming Way Crawley West Sussex

Jaques & Lewis,
2 South Square,
Gray's Inn,
London, WCIR 5HR.

(2494J)
<PAGE>

THIS LICENCE TO ASSIGN is made the Twenty-second day of December One thousand nine hundred and eighty-nine BETWEEN the PERSON whose name and address is set out in Part I of the First Schedule hereto (hereinafter called "the Landlord") of the first part the PERSON whose name and address is set out in Part II of the First Schedule hereto (hereinafter called "the Tenant") of the second part and the PERSON whose name and address is set out in Part III of the First Schedule hereto (hereinafter called "the Assignee") of the third part

WHEREAS:

(1) In these presents unless there be something in the subject or context inconsistent therewith:

(a) (i) where there are two or more persons included in any party hereto covenants contained in this Deed which are expressed to be made by such party shall be deemed to be made by such persons jointly and severally

(ii) words importing the singular number only shall include the plural number and vice versa and words importing any particular gender shall include masculine feminine and neuter genders

(b) the expressions "the Landlord" "the Tenant" and "the Assignee" shall include those deriving title under them respectively (including without prejudice to the generality of the foregoing their personal representatives assigns and successors in title and in the case of the Landlord the person for the time being entitle to the
<PAGE>

reversion immediately expectant on the determination of the term created by the Lease as hereinafter defined)

(c) the expressions following shall have the meanings hereinafter mentioned (that is to say)

(i) "the Lease" means the lease or underlease short particulars of which are set out in Part I of the Second Schedule hereto and the Supplemental Deeds (as hereinafter defined)

(ii) "the Premises" means the premises demised by the Lease short particulars of which are set out in Part II of the Second Schedule hereto

(iii) "the Supplemental Deeds" means the deeds or documents particulars of which are set out in the Third Schedule hereto

(2) This Deed is supplemental to the Lease

(3) The reversion immediately expectant upon the determination of the term created by the Lease is vested in the Landlord and the term of years thereby created is vested in the Tenant

NOW THIS DEED WITNESSETH as follows:

1. IN consideration of the covenants by the Assignee hereinafter contained the Landlord hereby grants unto the Tenant licence to assign all the estate and interest of the Tenant in the Premises to the Assignee

2. THE Assignee hereby covenants with the Landlord that as from the date when the estate and interest of the Tenant in the Premises shall be assigned to the Assignee pursuant to

(2494J)

2.

<PAGE>

this Licence and thenceforth during the residue of the term created by the Lease and any statutory extension or renewal thereof the Assignee will pay the rent and other payments thereby reserved and observe and perform the covenants conditions and agreements on the part of the lessee contained therein

3. THE Tenant shall forthwith upon demand by the Landlord pay to the Landlord all legal costs and surveyors' and management fees (including Value Added Tax) and disbursements incurred by the Landlord in connection with this Licence

4. THE assignment in its final form shall be produced to the Landlord for its approval and the Tenant HEREBY COVENANTS that completion of the assignment will not take place until such approval has been given

5. NOTHING herein contained shall authorise any further or other dealing with or assignment demise or underlease of the Premises except such as is hereby expressly authorised

6. THE condition for re-entry contained in the Lease shall be exercisable as well on breach of the covenants on the part of the Assignee hereinbefore contained as on the happening of any of the events mentioned in the said condition

7. THE assignment shall be produced to the solicitors for the Landlord for registration within two months of the date hereof (or such shorter period as may be specified in the Lease) and such registration fee as is specified in the Lease (or if none is specified such registration fee as may

(2494J)

3.

<PAGE>

be required by the Landlord's solicitors) shall be paid

In Witness whereof the parties hereto have executed this Deed the day and year first before written

THE FIRST SCHEDULE before referred to

Part I

Particulars of the Landlord

ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 30 Millbank London SW1

Part II

Particulars of the Tenant

JOHN ADAMS ELECTRONICS LIMITED whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ

Part III

Particulars of the Assignee

INTERNATIONAL AERADIO plc whose registered office is at Aeradio House Hayes Road Southall Middlesex UB2 5NJ

THE SECOND SCHEDULE before referred to

Part I

Particulars of the Lease

(2494J)

4.

<PAGE>

| Date | Document | Parties | Term |
|---|---|---|---|
| 4.7.1986 | Lease | the Landlord(1) the Tenant (2) | 25 years from (and including) 25.3.1986 |

Part II

Particulars of the Premises

ALL THAT piece or parcel of land together with the building erected thereon or on some part thereof known as Unit Number B1 The Fleming Centre Fleming Way Crawley as the same is described in and demised by the Lease

THE THIRD SCHEDULE before referred to

Particulars of Supplemental Deeds

| Date | Document | Parties |
|---|---|---|
| 22.4.1987 | Licence for Alterations | the Landlord (1) the Tenant (2) |

The COMMON SEAL of ELECTRICITY SUPPLY NOMINEES LIMITED was hereunto affixed in the presence of :-

[SEAL APPEARS HERE]

/s/ [SIGNATURE ILLEGIBLE]
Director
/s/ [SIGNATURE ILLEGIBLE]
Secretary

(2494J)

<PAGE>

[SEAL APPEARS HERE]

(The COMMON SEAL of JOHN ADAMS
(ELECTRONICS LIMITED was
(hereunto affixed in the
(presence of:-

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

[SEAL APPEARS HERE]

(The COMMON SEAL of
(INTERNATIONAL AERADIO PLC was
(hereunto affixed in the
(presence of:-

[SIGNATURE ILLEGIBLE] Director

[SIGNATURE ILLEGIBLE] Secretary

(2494J)

6.

<PAGE>

TO

Electricity Supply Nominees Limited and to their Solicitors Messrs Jaques & Lewis of 2 South Square Grays Inn London WC1R 5HR

UNIT B1 FLEMING CENTRE FLEMING WAY GRAWLEY WEST SUSSEX

NOTICE IS HEREBY GIVEN that by a Transfer dated the 24th day of January 1990 made between John Adams Electronics Limited (1) and International Aerado plc (2) the above premises being the premises comprised in a Lease dated the 4th day of July 1986 and made between Electricity Supply Nominees Limited (1) and John Adams Electronics Limited (2) were assigned to International Aerado plc for the residue of the term of 25 years from (and including) the 25th day of March 1986 granted by the said Lease subject nevertheless to the payment of the rents and other payments thereby reserved and to the observance and performance of the covenants agreements stipulations and conditions contained or referred to in the said Lease and on the part of the Tenant to be observed and performed

DATED this 15th day of June 1990

[SIGNATURE ILLEGIBLE]
For the solicitor to
British Telecommunications plc
Property Law Department
10-18 Manor Gardens
London N7 6JR

Received this 19th day of June 1990 a Notice in duplicate of which the above is a copy together with a certified copy of the above Transfer and cheque for (POUNDS) 17.25 in respect of the fee payable for registration pursuant to Clause 3(23) (i) of the said Lease and Clause 7 of the Licence to Assign dated the 22nd day of December 1989

[SIGNATURE ILLEGIBLE]
- --------------------------------
Solicitors to the said
Electricity Supply Nominees Limited
<PAGE>

DATED 24th January 1990


JOHN ADAMS ELECTRONICS LIMITED

- and -

INTERNATIONAL AERADIO plc


TRANSFER

of

Leasehold property known as
Unit No 1 Block B
The Fleming Centre Fleming Way
Crawley West Sussex

(Comprised in a Lease dated 4th July 1986)


<PAGE>

H M LAND REGISTRY

LAND REGISTRATION ACTS 1925 TO 1986

TRANSFER OF WHOLE (LEASEHOLD)

COUNTY:          WEST SUSSEX CRAWLEY DISTRICT

TITLE NUMBER:    WSX105598

PROPERTY:        UNIT NO 1 BLOCK B THE FLEMING CENTRE
                 FLEMING WAY CRAWLEY WEST SUSSEX

DATE:            26TH JANUARY 1990


1.   In consideration of ONE POUND ((POUND 1) (the receipt whereof is hereby
     acknowledged) JOHN ADAMS ELECTRONICS LIMITED whose registered office is at
     Aeradio House Hayes Road Southall Middlesex UB2 5NJ (Company Registration
     Number 1538157) ("the Transferor") hereby transfers to INTERNATIONAL
     AERADIO plc whose registered office is at Aeradio House aforesaid (Company
     Registration Number 427272) ("the Transferee") the land comprised in the
     above title for the residue of the term granted by the Registered Lease


2.   THE Transferee hereby covenants with the Transferor that it the Transferee
     and those deriving title under it will at all times after the date hereof
     and thenceforth during the remainder of the term created by the Registered
     Lease pay all rents and other payments becoming due under and by virtue of
     the Registered Lease or any deed or document supplemental thereto and will
     duly observe and perform all

                                         1
<PAGE>

     the covenants agreements restrictions stipulations and conditions contained
     or referred to therein and on the part of the Tenant to be observed and
     performed and will keep the Transferor and its effects fully and
     effectually indemnified against all actions proceedings costs claims
     demands expenses losses and liabilities whatsoever in respect of or arising
     on account of any breach or non-observance of any such matters occurring
     after the date hereof

3. IT is hereby certified that the transaction hereby effected does not form part of a larger transaction or series of transaction in respect of which the amount or value or aggregate of value of the consideration exceeds thirty thousand pounds ((Pounds) 30,000)

THE COMMON SEAL of )
JOHN ADAMS ELECTRONICS LIMITED ) [SEAL APPEARS HERE]
was hereunto affixed in the )
presence of: )

/s/ [SIGNATURE ILLEGIBLE] Director

/s/ [SIGNATURE ILLEGIBLE] Secretary

THE COMMON SEAL of )
INTERNATIONAL AERADIO plc ) [SEAL APPEARS HERE]
was hereunto affixed in the )
presence of: )

/s/ [SIGNATURE ILLEGIBLE] Director

/s/ [SIGNATURE ILLEGIBLE] Secretary

2

<PAGE>

[LETTERHEAD OF CLIVE LEWIS AND PARTNERS APPEARS HERE]

7th November 1991 Our Ref: LEB/CMT/4666

Your Ref:

R Brackenbury Esq ASVA
Messrs. Debenham Tewson and Chinnocks
75 Davies Street
LONDON W1A 1DZ

C D Fitzgerald Esq FRICS
Messrs. Johns
6 Spencers Road
CRAWLEY
WEST SUSSEX RH11 7DA

Dear Sirs,

UNIT B1 THE FLEMING CENTRE, FLEMING WAY, CRAWLEY, WEST SUSSEX
- -----------------------------------------------------------

By an appointment dated 3rd May 1991 I, Leonard Ernest Baker, MA (Cantab) Dip. Est. Man., FRICS, was appointed by the President of the Royal Institution of Chartered Surveyors as the Arbitrator to determine the rent in respect of the above mentioned premises in accordance with the provisions of the Arbitration Acts of 1950 and 1979.

The reference to arbitration arose out of the terms of a lease dated 4th July 1986, between Electricity Supply Nominees Limited (the landlord) and John Adams Electronics Limited, now vested in International Aeradio Plc (the tenant). The lease was granted for a term of 25 years from 25th March 1986, at an initial rent of (Pounds) 65,000 per annum and contained provision for rent review at each fifth anniversary of the term.

The matter in dispute between the parties is the assessment of the rental value of the demised premises, in accordance with the provisions of the Third Schedule to the lease of 4th July 1986, as at 25th March 1991.

It was agreed that the matter should proceed by written submissions and these were duly received from Mr. R Brackenbury ASVA of Messrs. Debenham Tewson and Chinnocks of 75 Davies Street, London W1, on behalf of the landlords, and from Mr. C D Fitzgerald FRICS of Messrs. Johns of 6 Spencers Road, Crawley, West

initial submissions of the other side.

The parties submitted a Statement of Agreed Facts in which, amongst other things the floor areas were agreed, as also were details of tenant's fixtures and fittings.

Cont /...

<PAGE>

[LOGO OF CLIVE LEWIS AND PARTNERS APPEARS HERE]

Mr. Brackenbury contended for a rent of (Pounds) 121,900 per annum, based upon a rental value of (Pounds) 10.25 per sq ft with 50% of this rate being applied to the area of the covered loading bay. Mr. Fitzgerald argued in support of a rent of (Pounds) 79,400 per annum by adopting a basic rate of (Pounds) 6.75 per sq ft and with one third, i.e. (Pounds) 2.25 per sq ft, applied to the area of the covered loading bay.

It was requested by each party that I should make an Interim Award, final save only as to the question of costs, on which the parties would have the opportunity of addressing me prior to making my final Award.

I have inspected the subject premises and either inspected or viewed externally the properties cited as comparables and have carefully considered the submissions and counter submissions which have been made.

In accordance with the foregoing, I find that the rental value, in accordance with the provisions of the Third Schedule of the lease dated 4th July 1986, as at 25th March 1991, is (Pounds) 94,000 (Ninety Four Thousand Pounds) per annum exclusive and I so Award.

This is my Interim Award, final save only as to the question of costs upon which submissions are to be made by a date to be agreed.

Yours truly,

/s/ L. E. Baker

L. E. BAKER
- -----------

Dated: 7th November 1991

<PAGE>

[LOGO]

CERTIFICATE OF INCORPORATION

ON RE-REGISTRATION OF A PUBLIC COMPANY

AS A PRIVATE COMPANY

No 427272

I hereby certify that

INTERNATIONAL AERADIO LIMITED

formerly registered as a public company has this day been re-registered under the Companies Act 1985 as a private company, and that the Company is limited.

Given under my hand at Cardiff the 14TH FEBRUARY 1992

/s/ M. B. May

M. B. MAY (MRS.)

An Authorised Officer

<PAGE>

LICENCE TO ASSIGN

DATED 29th January 1993

The Landlord: ELECTRICITY SUPPLY NOMINEES LIMITED

The Tenant: INTERNATIONAL AERADIO LIMITED

The Assignee: RAPISCAN SECURITY PRODUCTS LIMITED

The Guarantor: INTERNATIONAL AERADIO LIMITED

The Property: Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

Jaques & Lewis
2 South Square
Gray's Inn
London WC1R 5HR
Tel: 071 242 9755
Ref: MD/jb/10/8653

(8740I)

<PAGE>

LICENCE TO ASSIGN

PARTICULARS

Date :29th January 1993

the Landlord :ELECTRICITY SUPPLY NOMINEES LIMITED whose registered office is at 110 Buckingham Palace Road London SW1W 9SL

the Tenant :INTERNATIONAL AERADIO LIMITED

whose registered office is at Lincoln Way Sunbury on Thames Middlesex TW16 7HW

the Assignee :RAPISCAN SECURITY PRODUCTS LIMITED whose registered office is at Unit 1 Block B The Fleming Crawley

the Guarantor :INTERNATIONAL AERADIO LIMITED aforesaid

the Lease :

| Date | Parties | Premises | Term |
|---|---|---|---|
| 04.07.1986 | The Landlord (1) John Adams Electronics Ltd (2) | Unit No.1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex | 25 years from 25.03.1986 |

and includes the following deeds and documents:-

| Date | Documents | Parties |
|---|---|---|
| 24.04.1987 | Licence for Alterations | The Landlord (1) John Adams Electronics Ltd (2) |
| 22.12.1989 | Licence to Assign | The Landlord (1) John Adams Electronics Ltd (2) The Tenant (3) |
| 29.01.1990 | Licence for Alterations | The Landlord (1) The Tenant (2) |
| 1.12.1992 | Licence for Alterations | The Landlord (1) The Tenant (2) |

(8740I)

<PAGE>

INTERPRETATION

1.1 In this Deed unless the context otherwise requires:-

1.1.1 where more than one person is included in any of the expressions "the Tenant" "the Assignee" or "the Guarantor" covenants by such persons are joint and several

1.1.2 the expressions "the Landlord" "the Tenant" and "the Assignee" include those deriving title through or under them respectively and in the case of the Landlord include the person for the time being entitled to the reversion immediately expectant upon the Term

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1040 of 2711

1.1.3 "the Lease" means the documents shortly so described in the Particulars and includes all documents supplemental thereto

1.1.4 "the Premises" means the premises demised by the Lease

1.1.5 "the Term" means the terms of years granted by the Lease and includes any statutory extension or continuation thereof

1.1.6 otherwise expressions have the meanings given to them in the Particulars

1.2 This Deed is made supplemental to the Lease.

TITLE

2. The Landlord is entitled to the Premises in reversion immediately expectant upon the determination of the Term and the Term is vested in the Tenant
<PAGE>

LICENCE

3. The Landlord HEREBY GRANTS unto the Tenant licence to assign the Tenant's interest in the Premises to the Assignee

ASSIGNEE'S COVENANTS

4. THE Assignee HEREBY COVENANTS with the Landlord:-

4.1 as from the date when the Premises are assigned to the Assignee and thenceforth during the residue of the Term to pay the rents reserved by and observe and perform the covenants conditions and agreements on the part of the lessee contained in the Lease

4.2 not to enter into occupation or possession of the whole or any part of the Premises until completion of the assignment to the Assignee

GUARANTOR'S COVENANTS

5. In consideration of the Landlord granting this Licence at the request of the Guarantor the Guarantor covenants with the Landlord:-

5.1 that the Assignee will at all times during the Term pay the rent reserved by the Lease and all other moneys payable thereunder at the respective times and in manner therein appointed for payment thereof and will also duly observe and perform the several covenants and stipulations on the part of the lessee therein contained

(8740I)

<PAGE>

5.2 the Guarantor (by way of indemnity and not only by way of guarantee) will pay and make good to the Landlord on demand all losses costs damages and expenses occasioned to the Landlord by reason of any non-payment or breach specified in sun-clause 5.1 hereof and (without prejudice to the generality thereof) in the event of any disclaimer by any trustee in bankruptcy or liquidator or after any forfeiture of the Lease the Guarantor will pending any reletting of the Premises pay to the Landlord an amount equal to all rent reserved by the Lease and other sums which but disclaimer or forfeiture would have been payable by the Tenant under the Lease

    5.3  if so required in writing by the Landlord within three months after
any disclaimer of the Lease by any trustee in bankruptcy or liquidator or after
any forfeiture or after the Assignee (being a company) ceases to exist (as the
case may be) the Guarantor will accept a new lease of the Premises for a term
equal to the residue of the Term unexpired at the date of such disclaimer or
forfeiture or other event as the case may be and commencing on that date at a
rent or rents equal to that or those payable at the date of the disclaimer or
forfeiture or other event as the case may be and containing the like covenants
conditions and provisions as are contained in the Lease (such new lease and the
rights and liabilities thereunder to take effect from the date of such
disclaimer of forfeiture or other event but any rent

(8740I)

                                        3.

<PAGE>


review or other dates referred to in the new lease which are computed by
reference to a period or periods of time shall fall upon the same dates as would
have applied had the Lease still subsisted) and the cost of the Landlord in the
preparation and completion of such new lease shall be paid by the Guarantor to
the Landlord on demand

    5.4  any neglect or forbearance of the Landlord in endeavoring to obtain
payment of the rent reserved by the Lease or other moneys payable thereunder or
any delay in taking any steps to enforce performance to the covenants contained
in the Lease and any time which may be given by the Landlord to the Assignee or
any other act omission matter or thing whatsoever whereby (but for this
provision) the Guarantor would be exonerated either in whole or in part from the
aforesaid covenants shall not release or in any way lessen or affect the
liability of the Guarantor

    5.5  this guarantee shall enure to the benefit of all persons from time to
time constituting the Landlord without any express assignment of this guarantee
being required

    5.6  where more than one person is named as the Guarantor no invalidity of
this guarantee in respect of any of them shall affect the liability of the
others

6.   In the event that (i) the Tenant (in this Clause 5 meaning International
Aeradio Limited only) is called

(8740I)

                                        4.

<PAGE>


upon by the Landlord (giving not less than fourteen days notice in writing) to
perform obligations or pay rent or other sums due under the lease as covenantor
pursuant to a Licence to Assign dated 22 December 1989 between the Landlord (1)
John Adams Electronics Limited (2) and the Tenant (3) or as Guarantor pursuant
to Clause 5 of this Licence and (ii) the Tenant has paid to the Landlord
pursuant to such notice all arrears then due under the Lease (being not less
than one quarter's rent plus any VAT thereon) then the Landlord will grant to
the Tenant (if so requested) within 14 days of the Landlord first calling upon
the Tenant to perform any such obligations or pay rent or other sums as
aforesaid an overriding lease with a reversion of 3 days in the same terms as
the Lease for the term then unexpired and also (if so requested) will assign to
the Tenant all rights of action accured against the defaulting party or parties
and the reasonable and proper costs of the Landlord in granting such overriding
lease and assigning such rights of action (together with any proper
disbursements) and any VAT thereon shall be paid by the Tenant to the Landlord
prior to the grant of the said overriding lease and assignment respectively


    DECLARATION
    -----------

7. It is hereby declared that the condition for re-entry contained in the Lease shall be exercisable as well on breach of the covenants on the part of the

<PAGE>

Assignee and the Guarantor herein contained as upon the happening of any of the events specified in the said condition

IN WITNESS whereof the Landlord the Assignee and the Guarantor have executed this Deed as a deed the day and year first above written

THE COMMON SEAL of INTERNATIONAL )
AERADIO LIMITED was hereunto )
affixed in the presence )
of:

[SEAL APPEARS HERE] [SEAL APPEARS HERE]

Director [SIGNATURE ILLEGIBLE]

Secretary/Director [SIGNATURE ILLEGIBLE]

THE COMMON SEAL of RAPISCAN )
SECURITY PRODUCTS LIMITED was )
hereunto affixed in the presence)
of: )

[SEAL APPEARS HERE] [SEAL APPEARS HERE]

Director [SIGNATURE ILLEGIBLE]

Secretary [SIGNATURE ILLEGIBLE]

(87401)

<PAGE>

TRANSFER OF WHOLE

H M Land Registry

Land Registration Acts of 1925 to 1986

County and district
(or London Borough): West Sussex, Crawley

Title Numbers: WSX105598

Property: Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley

Date: 1st February 1993

In consideration of the covenants hereinafter contained INTERNATIONAL AERADIO LIMITED of Aeradio House Hayes Road Southa11 Middlesex UB2 5NJ ("the Transferor") as beneficial owner transfers to RAPISCAN SECURITY PRODUCTS LIMITED of Unit B1 Fleming Way The Fleming Centre Crawley West Sussex RH10 2NN ("the Transferee") Company registration number 2755398 the land comprised in the title above referred to

1. The parties declare that the covenants for title implied by the Transfer transferring as Beneficial Owner shall not imply that the covenants in a Lease dated 4th July 1986 between Electricity Supply Nominees Limited (1) and John Adams Electronics Limited (2) ("the Lease") relating to the state and condition of the Property have been observed and performed to the date of this Transfer

2. The Transferee will from the date of this Transfer and thenceforth during the residue of the term of the Lease duly pay all rent becoming due under the Lease and will observe and perform and all the covenants agreements and

conditions therein contained and thenceforth on the part of the lessee to be observed and performed and will also from such date keep the Transferor indemnified against all proceedings costs claims and

<PAGE>

set our in clause 10 of the Deed and when such evidence has been provided to the Transferor the Rent Deposit shall be released to the Transferee absolutely in accordance with clauses 8 and 10 of the Deed such clause 10.1 being read mutatis mutandis as if the words Rapiscan in the third and fifth lines of that clause were replaced by the name of the proposed assignee

The Common Seal of INTERNATIONAL ) [SEAL]
AERADIO LIMITED was affixed in the )
presence of:- )

Director [SIGNATURE ILLEGIBLE]

Director/Secretary [SIGNATURE ILLEGIBLE]

The Common Seal of RAPISCAN ) [SEAL]
SECURITY PRODUCTS LIMITED was )
affixed in the presence of:- )

Director [SIGNATURE ILLEGIBLE]

Secretary [SIGNATURE ILLEGIBLE]

<PAGE>

No.______________

TO JAQUES & LEWIS
2 SOUTH SQUARE, GRAY'S INN,
LONDON WC1R 5HP and all others whom it may concern.

========================

PURSUANT TO the covenant contained or implied in the Lease or Underlease of which Particulars appear below NOTICE IS HEREBY GIVEN that by a/Transfer/_______ dated 1st February 1993 the property known as Unit 1, Block B, The Fleming Centre, Fleming Way, Crawley, West Sussex

______________________________________________________________________

was/transferred ________________ by INTERNATIONAL AERADIO LIMITED
to RAPISCAN SECURITY PRODUCTS LIMITED

______________________________________________________________________

[for the residue of the term] _______________________________________

______________________________________________________________________

______________________________________________________________________

| Date of Lease or Underlease | Parties |
|---|---|
| 4 July 1986 | 1. ELECTRICITY SUPPLY NOMINEES LIMITED |
| | 2. JOHN ADAMS ELECTRONICS LIMITED |

The rent reserved by the above Lease or Underlease will [in future] be paid by +
Rapiscan Security Products Limited

Unit B1, Fleming Way, The Fleming Centre,

Crawley, West Sussex RH10 2NN

*In the case of a Mortgage it is requested that notice be given to the mortgagee of any default on the part of the lessee/underlessee in paying the rent or performing the tenant's covenants.
+In the case of an Assignment of Sublease please state the occupation or description of the assignee of subtenant.

DATED this 18 day of February 1993

BRECHER & CO. [SIGNATURE ILLEGIBLE]

78 BROOK STREET LONDON W1Y 2AD

Solicitors for the said Transferee

P.T.O for Receipt]
<PAGE>

[Letter Head of Oyez]

DATED 18 February 1993

Re property known as

Unit 1 Block B
The Fleming Centre
Fleming Way
Crawley
West Sussex

NOTICE
of
/Transfer/

RECEIVED this........................day of............19.....a Notice, of which the within-written Notice is a duplicate.

.....................................

.....................................

.....................................

Notice to lessor from Assignee, Chargee or Underlessee of Leaseholds.

CONVEYANCING 4A

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11.1
<SEQUENCE>8
<DESCRIPTION>STATEMENT REGARDING COMPUTATION OF EARNINGS PER
<TEXT>

<PAGE>

OSI SYSTEMS, INC.
EXHIBIT 11.1
STATEMENT OF COMPUTATION OF EARNINGS PER SHARE

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, 1993 | YEAR ENDED JUNE 30, 1994 | YEAR ENDED JUNE 30, 1995 | YEAR ENDED JUNE 30, 1996 | YEAR ENDED JUNE 30, 1997 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Weighted Average Common Shares Outstanding | 1,676,063 | 1,680,750 | 1,780,125 | 1,852,219 | 1,912,408 |
| Weighted Average Preferred Shares Outstanding | 1,738,125 | 1,738,125 | 1,778,125 | 1,938,125 | 2,098,125 |
| Effect of Subordinated Debt | 357,100 | 488,421 | 303,139 | 40,000 | |
| Effect of Preferred Shares Issued within 12 months of initial public offering, treasury stock method | 1,793,684 | 1,793,684 | 1,793,684 | 1,793,684 | 1,793,684 |
| Acquisition of Minority Interests | 206,610 | 206,610 | 206,610 | 206,610 | 206,610 |
| Effect of Stock Options: | | | | | |
| Granted within 12 months of initial public offering, treasury stock method | 207,460 | 207,460 | 207,460 | 207,460 | 207,460 |
| Remaining options, treasury stock method | 160,387 | 134,624 | 103,758 | | |

96,571 45,876

| | | | | | |
|---|---|---|---|---|---|
| Weighted Average Shares | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |
| Historic Net Income | $ 659,000 | $ 787,000 | $1,158,000 | $2,259,000 | $4,177,000 |
| Interest on Subordinated Debt, Net of Income Taxes | 161,000 | 246,000 | 216,000 | 166,000 | 92,000 |
| Minority Interest in Net Loss of Subsidiaries | (6,000) | (38,000) | (17,000) | (117,000) | - |
| Net Income Available to Common Shareholders | $ 814,000 | $ 995,000 | $1,357,000 | $2,308,000 | $4,269,000 |
| Net Income Per Share | $ 0.13 | $ 0.16 | $ 0.22 | $ 0.38 | $ 0.68 |

</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>9
<DESCRIPTION>CONSENT OF DELOITTE & TOUCHE LLP
<TEXT>

<PAGE>

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

We consent to the use in this Amendment No. 2 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated August 15, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

Deloitte & Touche llp

Los Angeles, California

August 15, 1997
</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>10
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>

<PAGE>

<ARTICLE> 5
<MULTIPLIER> 1,000

| <S> | <C> | |
|---|---|---|
| <PERIOD-TYPE> | YEAR | |
| <FISCAL-YEAR-END> | | JUN-30-1997 |
| <PERIOD-START> | | JUL-01-1996 |
| <PERIOD-END> | | JUN-30-1997 |
| <CASH> | | 553 |
| <SECURITIES> | | 0 |
| <RECEIVABLES> | | 15,556 |
| <ALLOWANCES> | | 0 |
| <INVENTORY> | | 18,517 |
| <CURRENT-ASSETS> | | 38,383 |
| <PP&E> | | 5,841 |
| <DEPRECIATION> | | 0 |
| <TOTAL-ASSETS> | | 47,333 |
| <CURRENT-LIABILITIES> | | 27,583 |
| <BONDS> | | 2,840 |
| <PREFERRED-MANDATORY> | | 0 |
| <PREFERRED> | | 0 |
| <COMMON> | | 7,367 |
| <OTHER-SE> | | 9,442 |
| <TOTAL-LIABILITY-AND-EQUITY> | | 47,333 |
| <SALES> | | 77,628 |
| <TOTAL-REVENUES> | | 77,628 |
| <CGS> | | 56,174 |
| <TOTAL-COSTS> | | 56,174 |
| <OTHER-EXPENSES> | | 14,664 |
| <LOSS-PROVISION> | | 0 |
| <INTEREST-EXPENSE> | | 1,197 |
| <INCOME-PRETAX> | | 5,593 |
| <INCOME-TAX> | | 1,416 |
| <INCOME-CONTINUING> | | 4,177 |
| <DISCONTINUED> | | 0 |
| <EXTRAORDINARY> | | 0 |
| <CHANGES> | | 0 |
| <NET-INCOME> | | 4,177 |
| <EPS-PRIMARY> | | 0.68 |
| <EPS-DILUTED> | | 0 |

</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# Exhibit 1C

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
OBUxNvpO5lstA0BAbj7zSFOh8Qn1X+4wBkyL5MbOVuvr2vxpm1ube10FD74MEY8e
+d502PP5TdnBQgd7U3Ql/w==

<SEC-DOCUMENT>0000944209-97-001288.txt : 19971002
<SEC-HEADER>0000944209-97-001288.hdr.sgml : 19971002
ACCESSION NUMBER: 0000944209-97-001288
CONFORMED SUBMISSION TYPE: S-1/A
PUBLIC DOCUMENT COUNT: 3
FILED AS OF DATE: 19971001
SROS: NASD

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: OSI SYSTEMS INC
CENTRAL INDEX KEY: 0001039065
STANDARD INDUSTRIAL CLASSIFICATION: SEMICONDUCTORS & RELATED DEVICES [3674]
IRS NUMBER: 330238801
STATE OF INCORPORATION: CA
FISCAL YEAR END: 0630

FILING VALUES:
FORM TYPE: S-1/A
SEC ACT:
SEC FILE NUMBER: 333-29179
FILM NUMBER: 97689204

BUSINESS ADDRESS:
STREET 1: 12525 CHADRON AVE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
BUSINESS PHONE: 3109780516

MAIL ADDRESS:
STREET 1: 12525 CHADRON AVENUE
CITY: HAWTHORNE
STATE: CA
ZIP: 90250
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-1/A
<SEQUENCE>1
<DESCRIPTION>AMENDMENT NO. 3 TO THE FORM S-1
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON OCTOBER 1, 1997

REGISTRATION NO. 333-29179

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------

AMENDMENT NO. 3 TO
FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

----------------

OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN CHARTER)

| CALIFORNIA | 3674 | 33-0238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

----------------

(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER,
INCLUDING AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

----------------

DEEPAK CHOPRA
PRESIDENT AND CHIEF EXECUTIVE OFFICER
OSI SYSTEMS, INC.
12525 CHADRON AVENUE
HAWTHORNE, CALIFORNIA 90250
TEL. (310) 978-0516
(NAME, ADDRESS AND TELEPHONE NUMBER OF AGENT FOR SERVICE)

----------------

COPIES TO:

ISTVAN BENKO, ESQ. TROY & GOULD PROFESSIONAL CORPORATION 1801 CENTURY PARK EAST, SUITE 1600 LOS ANGELES, CALIFORNIA 90067 TEL. (310) 553-4441 FAX. (310) 201-4746

BERTRAM R. ZWEIG, ESQ. JONES, DAY, REAVIS & POGUE 555 WEST 5TH STREET, SUITE 4600 LOS ANGELES, CALIFORNIA 90013-1025 TEL. (213) 489-3939 FAX. (213) 243-2539

----------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO PUBLIC:
AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT BECOMES EFFECTIVE.

----------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended ("Securities Act"), check the following box. [_]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement of the earlier effective registration statement for the same offering. [_]

If the delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. [_]

----------------

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(A), MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

<PAGE>

+INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE. +

SUBJECT TO COMPLETION, DATED SEPTEMBER 30, 1997

[LOGO OF OPTO-SENSORS, INC.]

------------------

3,700,000 SHARES

COMMON STOCK

Of the 3,700,000 shares of Common Stock offered hereby, 3,330,000 shares are being sold by OSI Systems, Inc. (the "Company") and 370,000 shares are being sold by the Selling Shareholders. See "Principal and Selling Shareholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Shareholders.

Prior to this Offering, there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price will be between $12.50 and $14.50 per share. See "Underwriting" for information relating to the method of determining the initial public offering price. The Common Stock has been approved for quotation on the Nasdaq National Market under the symbol "OSIS."

----------

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" BEGINNING ON PAGE 7.

----------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<TABLE>

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1053 of 2711

<CAPTION>

| <S> | PRICE TO PUBLIC <C> | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) <C> | PROCEEDS TO COMPANY(2) <C> | PROCEEDS TO SELLING SHAREHOLDERS(2) <C> |
|---|---|---|---|---|
| Per Share... | $ | $ | $ | $ |
| Total(3).... | $ | $ | $ | $ |

</TABLE>

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). See "Underwriting."
(2) Before deducting estimated offering expenses of $ payable by the Company and $ payable by the Selling Shareholders.
(3) Certain of the Selling Shareholders have granted to the Underwriters a 30-day option to purchase up to an additional 555,000 shares of Common Stock solely to cover over-allotments, if any. If such over-allotment option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, and Proceeds to Selling Shareholders will be $ , $ and $ , respectively. See "Underwriting."

----------

The Common Stock is offered by the Underwriters as stated herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that delivery of such shares will be made through the offices of Robertson, Stephens & Company LLC ("Robertson, Stephens & Company"), San Francisco, California, on or about , 1997.

ROBERTSON, STEPHENS & COMPANY
WILLIAM BLAIR & COMPANY
VOLPE BROWN WHELAN & COMPANY

The date of this Prospectus is , 1997.

<PAGE>

OSI Systems, Inc. is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

RAPISCAN

Security and Inspection Products

[Picture of a woman standing in front of a Rapiscan 119 Table Top System machine]
Rapiscan 119 Table Top System

[Picture of a woman walking through a Rapiscan AMD 750 Metal Arch machine]

Rapiscan AMD 750 Metal Arch

[Picture of Rapiscan 520 Carry On System machine]
Rapiscan 520 Carry On System

[Picture of Rapiscan 532 Cargo System machine with image of person next to the system]
Rapiscan 532 Cargo System

[Three images of baggage with various contents]
Conventional Dual Energy Image
Organic Material Image
Enhanced Picture X-Ray (EPX) Image

[Picture of a Rapiscan Series 500 X-Ray van with open side door]
Rapiscan Series 500 X-Ray Van

CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN, OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING BY OVER-ALLOTMENT, ENTERING STABILIZING BIDS, EFFECTING SYNDICATE COVERING TRANSACTIONS OR THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."
<PAGE>

[TWO PAGE GATEFOLD]

OSI SYSTEMS, INC.

Optoelectronic Devices and Subsystems

[Picture of man with Pulse Oximetry Probe attached to his finger and woman sitting next to him]
Pulse Oximetry Probe

[Picture of computer and medical imaging equipment]
Medical Imaging Sensor Electronics

[Picture of hand-held Barcode Readout Sensor]
Barcode Readout Sensor

[Picture of detector device]
High Energy Radiation Detector

[Picture of various cables and subassemblies]
Opto-Assembly/Medical

[Picture of various printed circuit boards]
Custom PC Boards

[Picture of various optical components and subassemblies]
Optics

[Picture of X-ray scanning machine]
Imaging Sensor Electronics

[Picture of military attack helicopter]

Laser Warning Detector

[Picture of sensor device]
Satellite Sun Sensors

[Picture of submarine]
Fire Detection Subassembly

[Picture of various molding parts and casings]
Tool & Die and Injection Molding

[Picture of various photodetectors]
Custom Photodetectors

[Picture of various chips and printed circuit boards]
Ceramic Substrates/Hybrids

[Picture of array chip]
Hybrid

[Picture of slot machine]
Hopper Optical Assembly

[Schematic Image of Ring Laser Gyro Detector]
Ring Laser Gyro (RLG) Detector

[Picture of Color Sensor Hybrid]
Color Sensor Hybrid

<PAGE>

NO DEALER, SALES REPRESENTATIVE OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, ANY SELLING SHAREHOLDER OR ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED OFFER AND SALE OF THE SECURITIES TO WHICH IT RELATES OR AN OFFER TO, OR A SOLICITATION OF, ANY PERSON IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

UNTIL , 1997 (25 DAYS FROM THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS DELIVERY REQUIREMENT IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

---------------

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| <S> | PAGE<br>----<br><C> |
|---|---|
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 15 |
| Dividend Policy | 15 |
| Capitalization | 16 |

| | |
|---|---|
| Dilution | 17 |
| Selected Consolidated Financial Data | 18 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 28 |
| Management | 41 |
| Certain Transactions | 49 |
| Principal and Selling Shareholders | 51 |
| Description of Capital Stock | 54 |
| Shares Eligible for Future Sale | 55 |
| Underwriting | 56 |
| Legal Matters | 58 |
| Experts | 58 |
| Additional Information | 58 |
| Index to Consolidated Financial Statements | F-1 |

</TABLE>

---------------

The Company intends to furnish its shareholders with annual reports containing consolidated audited financial statements and quarterly reports containing unaudited consolidated financial data for the first three quarters of each fiscal year.

Rapiscan(R) is a registered trademark of the Company. This Prospectus also contains trademarks and tradenames of other companies.

The Company is a California corporation organized in 1987. In June 1997, the Company changed its name from Opto Sensors, Inc. to OSI Systems, Inc. The Company's principal subsidiaries are: UDT Sensors, Inc., a California corporation ("UDT Sensors"); Rapiscan Security Products (U.S.A.), Inc., a California corporation ("Rapiscan U.S.A."); Ferson Optics, Inc. ("Ferson"), a California corporation; Rapiscan Security Products Limited, a United Kingdom corporation ("Rapiscan UK"); Opto Sensors (Singapore) Pte Ltd, a corporation organized under the laws of Singapore ("OSI Singapore"); Opto Sensors (Malaysia) Sdn. Bhd., a Malaysian corporation ("OSI Malaysia"); and Advanced Micro Electronics AS, a Norwegian company ("AME"). The principal executive offices of the Company are located at 12525 Chadron Avenue, Hawthorne, California 90250. The Company's telephone number is (310) 978-0516. Unless otherwise indicated by the context, all references in this Prospectus to the "Company" are to OSI Systems, Inc. and to one or more, but not necessarily all of its consolidated subsidiaries.

<PAGE>

## PROSPECTUS SUMMARY

The following summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus, including the information under "Risk Factors."

## THE COMPANY

OSI Systems, Inc. (the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or

approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8%, of the Company's revenues.

Optoelectronic Devices and Subsystems

The Company manufactures a wide range of optoelectronic devices which it integrates into complex subsystems vital to various end products, including x-ray and computer tomography ("CT") imaging systems, industrial robotics, medical monitoring and diagnostic products, optical drives for computer peripherals, bar code scanners, and aviation gyroscopes. These optoelectronic devices operate by sensing light of varying wave lengths and converting the light into electronic signals. In addition to manufacturing optoelectronic devices, the Company produces optoelectronic subsystems and offers a range of vertically integrated services to its subsystem customers. These services include component design and customization, subsystem concept design and application engineering, product prototyping and development, pre-production, and short-run and high volume manufacturing. In fiscal 1997, the Company manufactured subsystems for use in more than 100 different applications, including those of approximately 50 major OEM customers such as Picker International, Honeywell Avionics, Eastman Kodak, Xerox, Johnson & Johnson, Bausch & Lomb, Texas Instruments, Boeing Aircraft Co. and Hewlett-Packard. During fiscal 1997, no single OEM customer accounted for more than 10.0% of the Company's revenues and the top five customers collectively represented less than 20.0% of the Company's revenues.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEMs could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations, enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products

The Company manufactures a range of security and inspection products that are used for conventional security purposes including the detection of concealed weapons and contraband, as well as for a variety of non-security applications. The Company's security and inspection products utilize linear x-ray technology to create a two-dimensional image of the contents of the object being inspected. These products may function either as stand-alone systems or as components of an integrated security system. Locations where these products are currently used for security inspection purposes include airports, government offices, post offices,

<PAGE>

courthouses, jails, embassies, commercial buildings and mail sorting facilities. Non-security inspection uses of these products include the detection of illegal narcotics, inspection of agricultural products, examination of cargo to mitigate the avoidance of import duties, and non-destructive product testing. The Company currently manufactures 16 models of products with different sizes, price points and imaging capabilities in order to appeal to the breadth of security and non-security applications for its products. Since entering the security and inspection market in 1993, the Company has shipped more than 2,000 units of its security and inspection products to over 50 countries. The Company believes that the growth in the

market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace, and to leverage its expertise in the optoelectronic technology industry by integrating into new end-markets on a selective basis. Key elements of the Company's growth strategy include leveraging its expertise in optoelectronic design and manufacturing to address new applications, further penetrating existing security and inspections markets, capitalizing on its high-level of vertical integration and on its global presence, and selectively entering into new end-product markets. Since 1990, the Company has completed four acquisitions. The Company intends to continue to pursue additional acquisition opportunities that expand the Company's technological capabilities, increase the breadth of its product offerings, and increase its geographic presence. As with the security and inspection operations that the Company acquired in 1993, the Company seeks to make acquisitions in which: (i) the Company's core optoelectronic technology is a significant technology component; (ii) the market for the products offers favorable pricing dynamics; (iii) the competitive market dynamics provide for substantial growth in market share; and (iv) the Company's existing manufacturing, sales and service organization provide the acquired operations with a strategic and cost advantage.

The Company currently manufactures its optoelectronic devices and subsystems at facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are currently manufactured at facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997 the Company marketed its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives.

THE OFFERING

<TABLE>

| <S> | <C> |
|---|---|
| Common Stock Offered by the Company. | 3,330,000 shares |
| Common Stock Offered by the Selling Shareholders...................... | 370,000 shares |
| Common Stock Outstanding after the Offering.......................... | 9,563,778 shares(1) |
| Use of Proceeds.................... | To repay certain indebtedness, to increase funds available for research and development, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and for general corporate purposes, including working capital. See "Use of Proceeds." |
| Nasdaq National Market Symbol....... | OSIS |

</TABLE>

- ---------------

(1) Based on the number of shares outstanding on September 30, 1997. Excludes 783,236 shares of Common Stock issuable upon exercise of outstanding stock options at a weighted average exercise price of $7.74 per share.

<PAGE>

SUMMARY CONSOLIDATED FINANCIAL DATA
(In thousands, except share and per share data)

<TABLE>

<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues.................... | $27,225 | $47,735 | $49,815 | $61,518 | $77,628 |
| Cost of goods sold.......... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit................ | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | | | |
| Selling, general and administrative(1)......... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)........... | -- | -- | -- | -- | 856 |
| Total operating expenses... | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations...... | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense............ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest...... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest................... | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest........... | 6 | 38 | 17 | 117 | -- |
| Net income.................. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4).. | $814 | $995 | $1,357 | $2,308 | $4,269 |
| Net income per share(3)(4)(5)............. | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)............ | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(6) |
| <S> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | |
| Cash................................................ | $ 553 | $29,839 |
| Working capital..................................... | 10,800 | 49,961 |
| Total assets........................................ | 47,333 | 76,619 |
| Total debt.......................................... | 13,180 | 1,258 |
| Total shareholders' equity.......................... | 16,809 | 58,017 |

</TABLE>

- -------------

(1) Fiscal 1994 includes a one-time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income

from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000 respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of $161,000, $246,000, $216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of $6,000, $38,000, $17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

(6) Adjusted to give effect to the sale of 3,330,000 shares of Common Stock offered by the Company hereby, at an assumed initial public offering price of $13.50 per share and after deducting underwriting discounts, commissions and estimated Offering expenses, and the application of the net proceeds therefrom.

Unless otherwise indicated, all information in this Prospectus: (i) reflects a 1.5-for-1 stock split (the "Stock Split") of the Common Stock effected in June 1997; (ii) reflects the conversion of each outstanding share of the Company's preferred stock into 1.5 shares of the Common Stock concurrent with the Stock Split; and (iii) assumes the Underwriters' over-allotment is not exercised. All references to the Company's fiscal years refer to the periods ending June 30.

<PAGE>

## RISK FACTORS

In addition to the other information in this Prospectus, investors should carefully consider the following risk factors when evaluating an investment in the Common Stock offered hereby. This Prospectus contains forward-looking statements that involve risks and uncertainties, such as statements of the Company's plans, objectives, expectations and intentions. The cautionary statements made in this Prospectus should be read as being applicable to all forward-looking statements wherever they appear in this Prospectus. The Company's actual results could differ materially from those discussed herein. Factors that could cause or contribute to such differences include those discussed below, as well as those discussed elsewhere in this Prospectus.

### FLUCTUATIONS IN QUARTERLY RESULTS

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to

predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results. Due to the foregoing factors, it is possible that in future quarters the Company's operating results will not meet the expectations of public market analysts and investors. In such event, the price of the Company's Common Stock would be materially adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business -- Backlog."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customer needs and rapid technological change. The Company competes with a number of other manufacturers, many of whom have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than does the Company. In the optoelectronic device and subsystem market, competition is based primarily on factors such as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost of the system, prior customer relationships, technological capabilities of the product, price, certification by government authorities, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc. ("EG&G Astrophysics"), Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. In addition, the Company supplies optoelectronic devices and subsystems to certain OEMs which, in turn, manufacture end-products that compete with the Company's own products. There can be no assurance that these competing OEMs will continue to purchase

<PAGE>

optoelectronic products from the Company. Competition could result in price reductions, reduced margins, and a decrease in the Company's market share. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either market or that future competitive pressures will not materially and adversely affect its business, financial condition and results of operations. See "Business--Competition."

LARGE ORDERS; LENGTHY SALES CYCLES

Sales of the Company's security and inspection products have increasingly been characterized by large orders of multiple units or of products having higher average selling prices. The Company's inability to obtain such additional large orders could have a material adverse effect on the Company's business, financial condition and results of operations. Sales of security and inspection products depend in significant part upon the decision of governmental agencies to upgrade or expand existing airports, border crossing

inspection sites and other security installations. Accordingly, a portion of the Company's sales of security inspection and detection products is often subject to delays associated with the lengthy approval processes that often accompany such capital expenditures. During these approval periods, the Company expends significant financial and management resources in anticipation of future orders that may not occur. A failure by the Company to receive an order after expending such resources could have a material adverse effect on its business, financial condition and results of operations.

RAPID TECHNOLOGICAL CHANGE

The markets for all of the Company's products are subject to rapidly changing technology. As OEMs seek to develop and introduce new, technologically-advanced products and product enhancements, the Company is required to design, develop and manufacture optoelectronic devices and subsystems to meet these new and enhanced product requirements. Accordingly, the Company's performance as a designer and manufacturer of optoelectronic devices and subsystems is dependent upon its ability to keep pace with technological developments in both the optoelectronic market and in the numerous markets that its products serve. Any delay or failure in the Company's ability to design and manufacture the increasingly complex and technologically-advanced products that its customers demand will have a material adverse effect on the Company's business, financial condition and results of operations. In addition, technological changes and market forces continually affect the products sold by the Company's customers and thereby alter the demand for the Company's optoelectronic subsystems. The Company has in the past suddenly and unexpectedly lost orders for entire subsystem product lines due to technological changes that made the products sold by the Company's customers obsolete. The market for the Company's security and inspection products is also characterized by rapid technological change as the security industry seeks to develop new and more sophisticated products. New and enhanced security and inspection products are continuously being developed and introduced by the Company's competitors, including products that use advanced x-ray technologies, CT technology, or electro-magnetic and ultrasound technologies. The Company believes that its future success in the security and inspection industry will depend in large part upon its ability to enhance its existing product lines and to successfully develop new products that meet changing customer requirements. No assurance can be given that new industry standards or changing technology will not render the Company's existing security and inspection products obsolete. The failure of the Company's security and inspection product lines to meet new technological requirements or new industry standards will have a material adverse effect on the Company's business, financial condition and results of operations.

AVAILABILITY OF RAW MATERIALS AND COMPONENTS

The Company purchases certain raw materials and subcomponents from third parties pursuant to purchase orders placed from time to time. Purchase order terms range from three months to one year at fixed costs, but the Company has no guaranteed long-term supply arrangements with its suppliers. Any material interruption in the Company's ability to purchase necessary raw materials or subcomponents could have a material adverse effect on the Company's business, financial condition and results of operations. Silicon-based optoelectronic devices manufactured by the Company are critical components in most of the Company's

<PAGE>

subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronic devices from Wacker Siltronic Corp., a United States subsidiary of Wacker Siltronic AG, a German company. The Company's dependence on this single source of supply exposes the Company to several risks, including limited control over pricing, availability of material, and material delivery schedules. Although the Company has not

experienced any significant shortages or material delays in obtaining silicon wafers from Wacker Siltronic Corp., a major interruption in the delivery of silicon wafers from Wacker Siltronic Corp. would materially disrupt the Company's operations and could have a material adverse effect on the Company's business, financial condition and results of operations. The inability of the Company to develop alternative sources for single or sole source components, or to obtain sufficient quantities of these components, would adversely affect the Company's operations. See "Business--Manufacturing and Materials Management."

INTERNATIONAL BUSINESS; FLUCTUATION IN EXCHANGE RATES; RISKS OF CHANGES IN FOREIGN REGULATIONS

In fiscal 1995, 1996 and 1997, revenues from shipments made outside of the United States accounted for approximately 32.0%, 38.0% and 42.2%, respectively, of the Company's revenues. Of the revenues generated during fiscal 1997 from shipments made outside of the United States, 14.9% represented sales from the United States to foreign customers, and the balance represented sales generated by the Company's foreign subsidiaries. The Company anticipates that international sales will continue to account for a material portion of the Company's revenues and that, accordingly, a major portion of the Company's business will be exposed to the risks associated with conducting international business operations, including unexpected changes in regulatory requirements, changes in foreign legislation, possible foreign currency controls, currency exchange rate fluctuations or devaluations, tariffs, difficulties in staffing and managing foreign operations, difficulties in obtaining and managing vendors and distributors, potentially negative tax consequences, and difficulties in collecting accounts receivable. The Company is also subject to risks associated with laws regulating the import and export of high technology products. The Company cannot predict whether quotas, duties, taxes or other charges or restrictions upon the importation or exportation of the Company's products will be implemented by the United States or any other country in the future. There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANAGING GROWTH AND ACQUISITIONS

Since 1990, the Company has experienced significant growth through both internal expansion and through acquisitions. During this period, OSI Systems, Inc. established its Rapiscan U.S.A. operations and its Malaysian manufacturing facilities and acquired UDT Sensors, Rapiscan UK, Ferson and AME. This growth has placed, and may continue to place, significant demands on the Company's management, working capital and financial resources. Failure to continue to expand and enhance the Company's management and its financial control systems could adversely affect the Company's business, financial condition and results of operations. There can be no assurance that the Company's current management and systems will be adequate to address any future expansion of the Company's business. An element of the Company's strategy is to pursue acquisitions that would complement its existing range of products, augment its market coverage or enhance its technological capabilities or that may otherwise offer growth opportunities. Such future acquisitions by the Company could result in potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, and the amortization of expenses related to goodwill and other intangible assets, any of which could materially adversely affect the Company's business, financial condition and results of operations. Acquisitions entail numerous risks, including difficulties in the assimilation of acquired operations, technologies and products, diversion of management's attention to other business concerns, risks of entering markets in which the Company has no, or limited, prior experience and the potential loss of key employees of acquired organizations. No assurance can be given as to the ability of the Company to successfully integrate any acquired business, product, technology or personnel with the operations of the Company, and the failure of the Company to do so could have a material adverse effect on the Company's business, financial

condition and results of operations. While the Company has no current agreement or negotiations underway with

<PAGE>

respect to any such acquisition, the Company may make acquisitions of businesses, products or technologies in the future. See "Use of Proceeds."

PROPRIETARY TECHNOLOGY; PENDING LITIGATION

The Company believes that its principal competitive strength is its ability to design, develop and manufacture complex optoelectronic devices and subsystems for various industry segments. The Company does not rely upon any of its own patents or copyrights in the development or manufacture of its products. Accordingly, there are no legal barriers that prevent potential competitors from copying the Company's products, processes and technologies or from otherwise entering into operations in direct competition with the Company.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States. The license may be terminated by EG&G Inc. in the event of a breach of the license agreement by Rapiscan U.S.A. The termination of the EG&G Inc. license would have a material adverse effect upon the Company's sales of its security and inspection products in the United States and upon the Company's business, financial condition and results of operations.

In a lawsuit currently pending before the United States District Court for the Central District of California, Lunar Corporation ("Lunar") and the University of Alabama Research Foundation ("UAB") have alleged that OSI Systems, Inc., UDT Sensors and Rapiscan U.S.A. infringe United States Patent No. 4,626,688 (" '688 patent"). UAB owns the '688 patent and has granted an exclusive license to Lunar. The '688 patent is directed to a dual energy radiation detector. The lawsuit concerns those Rapiscan U.S.A.'s baggage scanner products which contain a dual energy detector, and detector components produced by UDT Sensors ("accused products"). Lunar and UAB are requesting that the court grant them damages in an unspecified amount and an injunction barring Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. from making, using, selling or offering for sale, the accused products in the United States. Rapiscan U.S.A., UDT Sensors and OSI Systems, Inc. have alleged that the accused products do not infringe the '688 patent, that the '688 patent is invalid and that in any event, Lunar had previously agreed that Rapiscan U.S.A. and UDT Sensors did not infringe the '688 patent, so that Lunar's claim is estopped, limited by laches or that an implied license has been granted by Lunar.

The Company believes it has meritorious defenses and claims in the lawsuit with Lunar and UAB and believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. However, no assurance can be given that the Company will be successful in this lawsuit. In the event that the court determines that the accused products infringe the '688 patent and that Rapiscan U.S.A. and UDT Sensors do not have the right to use technology covered by the '688 patent, the court could grant Lunar and UAB a permanent injunction in which case Rapiscan U.S.A. could be prevented from marketing most of its baggage scanner products in the United States and UDT Sensors could be prevented from marketing certain detector components. Rapiscan U.S.A. and UDT Sensors could also be required to pay a significant amount of damages. Any such outcome would have a material adverse effect upon the Company's business, financial condition and results of

operations. For the year ended June 30, 1997, sales of security and inspection products that are allegedly infringing upon Lunar and UAB's rights constituted $10.5 million or approximately 13.5% of the Company's revenues. Through June 30, 1997, the Company has incurred legal fees in the amount of approximately $368,000 in connection with this lawsuit. The Company intends to pursue vigorously its legal remedies in this lawsuit. As a result, the Company will continue to expend significant financial and other resources in connection with this lawsuit. See "Business--Legal Proceedings."

The Company may from time to time in the future receive communications from third parties alleging infringements by the Company of patents or other intellectual property rights owned by such third parties. If

<PAGE>

any of the Company's products are found to infringe a patent, a court may grant an injunction to prevent the Company from making, selling or using these products in the applicable country. Protracted litigation may be necessary to defend the Company against alleged infringement of others' rights. Irrespective of the validity or the success of such claims, the defense of such claims could result in significant costs to the Company and the diversion of time and effort by management, either of which by itself could have a material adverse effect on the business, financial condition and results of operations of the Company. Further, adverse determinations in such litigation could subject the Company to significant liabilities (including treble damages under certain circumstances), or prevent the Company from selling certain of its products. If infringement claims are asserted against the Company, the Company may be forced to seek to obtain a license of such third party's intellectual property rights. No assurance can be given that the Company could enter into such a license agreement on terms favorable to the Company, or at all. The failure to obtain such a license agreement on reasonable terms could have an adverse effect on the Company's business, financial condition and results of operations.

RISKS ASSOCIATED WITH MANUFACTURING

The Company's ability to manufacture optoelectronic subsystems as well as security and inspection products is dependent upon the optoelectronic devices manufactured at the Company's Hawthorne, California facility. In addition, the Company's success also depends on its ability to manufacture its products at its various other facilities. Accordingly, any material disruption in the operations of any of its manufacturing facilities, and especially at its Hawthorne, California facility, would have a material adverse effect on the Company's business, financial condition and results of operations. Such interruption or disruption could occur due to the unavailability of parts, labor or raw materials, to political unrest, or to natural disasters, such as earthquakes or fires. The Company also believes that its long-term competitive position depends in part on its ability to increase manufacturing capacity. No assurance can be given that the Company will be able to increase its manufacturing capabilities in the future. The failure of the Company to build or acquire sufficient additional manufacturing capacity if and when needed could adversely impact the Company's relationships with its customers and materially adversely affect the Company's business, financial condition and results of operations.

PRODUCT LIABILITY RISKS

The Company's business exposes it to potential product liability risks, particularly with respect to its security and inspection products. There are many factors beyond the control of the Company that could lead to liability claims, including the failure of the products in which the Company's subsystems are installed, the reliability of the customer's operators of the inspection equipment, and the maintenance of the inspection units by the customers. There can be no assurance that the amount of product liability

insurance that the Company carries will be sufficient to protect the Company from product liability claims. A product liability claim in excess of the amount of insurance carried by the Company could have a material adverse effect on the Company's business, financial condition and results of operations.

DEPENDENCE ON KEY PERSONNEL

The Company is highly dependent upon the continuing contributions of its key management, technical and product development personnel. In particular, the Company is dependent upon the services of Deepak Chopra, the Chairman of the Company's Board of Directors, its President and Chief Executive Officer. In addition, the loss of the services of any of the Company's other senior managerial, technical or product development personnel could materially adversely affect the Company's business, financial condition and results of operations. The Company has entered into a five-year employment agreement with Mr. Chopra and maintains a $13.0 million policy of key man life insurance on the life of Mr. Chopra. The Company has also entered into shorter-term employment agreements with certain of the Company's senior managerial and technical personnel but does not maintain key man insurance policies on any of its other employees. The

<PAGE>

Company's future success depends on its continuing ability to attract, retain and motivate highly qualified managerial and technical personnel. Competition for qualified technical personnel is intense. There can be no assurance that these individuals will continue employment with the Company. The loss of certain key personnel could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Employees" and "Management."

ENVIRONMENTAL REGULATION

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances or wastes that have been or are being disposed of offsite as wastes or that have been or are being released on or in its facilities. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances or wastes. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, that it has obtained all necessary material environmental permits to conduct its business and has no knowledge of any offsite disposal or releases on site that could have a material adverse affect on the Company. However, there can be no assurance that any environmental assessments undertaken by the Company with respect to its facilities have revealed all potential environmental liabilities, that any prior operator of the properties did not create any material environmental condition not known to the Company, or that an environmental condition that could result in penalties, expenses, or liability for the Company does not otherwise exist in any one or more of the facilities. In addition, the amount of hazardous substances or wastes produced or generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing processes or cessation of operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations. Compliance with such regulations could require the Company to acquire expensive remediation equipment or to incur substantial expenses. Any failure of the Company to control or properly manage the use, disposal, removal or

storage of, or to adequately restrict the discharge of, or assist in the cleanup of, hazardous or toxic substances, could subject the Company to significant liabilities, including joint and several and retroactive liability under certain statutes. Furthermore, the presence of hazardous substances on a property or at certain offsite locations could result in the Company incurring substantial liabilities as a result of a claim by a private third party for personal injury or a claim by an adjacent property owner for property damage. The imposition of any of the foregoing liabilities could materially adversely affect the Company's business, financial condition and results of operations. See "Business--Environmental Regulations."

CONCENTRATION OF OWNERSHIP; CONTROL BY MANAGEMENT

Upon successful completion of this Offering, the Company's principal shareholders, Scope Industries and Deepak Chopra, the President and Chief Executive Officer of the Company, will beneficially own approximately 18.1% and 16.1%, respectively, of the Company's Common Stock (17.1% and 14.2%, respectively, if the Underwriters' over-allotment option is exercised in full), and the present directors and executive officers of the Company (including Scope Industries, an affiliate of one of the directors) will, in the aggregate, beneficially own 41.7% of the outstanding Common Stock (37.6% if the Underwriters' over-allotment option is exercised in full). Meyer Luskin, the President, Chief Executive Officer, Chairman of the Board of Directors and principal shareholder of Scope Industries, is a director of the Company. Consequently, Scope Industries, together with the Company's directors and executive officers acting in concert, will have the ability to significantly affect the election of the Company's directors and have a significant effect on the outcome of corporate actions requiring shareholder approval. Such concentration may also have the effect of delaying or preventing a change of control of the Company. See "Principal and Selling Shareholders," and "Management."

<PAGE>

POSSIBLE ADVERSE EFFECTS OF AUTHORIZATION OF PREFERRED STOCK; POTENTIAL ANTI-TAKEOVER PROVISIONS

The Company's Articles of Incorporation authorize the Company's Board of Directors to issue up to 10,000,000 shares of preferred stock in one or more series, to fix the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued shares of preferred stock, to fix the number of shares constituting any such series, and to fix the designation of any such series, without further vote or action by its shareholders. The terms of any series of preferred stock, which may include priority claims to assets and dividends and special voting rights, could adversely affect the rights of the holders of Common Stock and thereby reduce the value of the Common Stock. The Company has no present plans to issue shares of preferred stock. The issuance of preferred stock, coupled with the concentration of ownership in the directors and executive officers, could discourage certain types of transactions involving an actual or potential change in control of the Company, including transactions in which the holders of Common Stock might otherwise receive a premium for their shares over then current prices, otherwise dilute the rights of holders of Common Stock, and may limit the ability of such shareholders to cause or approve transactions which they may deem to be in their best interests, all of which could have a material adverse effect on the market price of the Common Stock offered hereby. See "Description of Capital Stock--Preferred Stock."

ABSENCE OF PRIOR PUBLIC MARKET AND POSSIBLE VOLATILITY OF STOCK PRICE; DILUTION

Prior to this Offering there has been no public market for the Common Stock. Although the Common Stock has been approved for quotation on the Nasdaq National Market, there can be no assurance that an active trading market for

the Common Stock will develop or be sustained after the Offering. The initial public offering price will be determined through negotiations between the Company and the representatives of the Underwriters. See "Underwriting." Additionally, the market price of the Common Stock could be subject to significant fluctuations in response to variations in actual and anticipated quarterly operating results and other factors, including announcements of new products or technical innovations by the Company or its competitors. Further, investors participating in the Offering will incur immediate and substantial dilution in the net tangible book value of their shares. See "Dilution."

SHARES ELIGIBLE FOR FUTURE SALE

Sales of substantial amounts of Common Stock in the public market following this Offering could have an adverse effect on the market price of the Common Stock. Upon completion of this Offering, the Company will have outstanding approximately 9,563,778 shares of Common Stock, of which 3,700,000 shares offered hereby (4,255,000 shares if the Underwriters' over-allotment option is exercised in full), will be freely tradeable without restriction or further registration under the Securities Act. The remaining 5,863,778 shares of Common Stock outstanding upon completion of this Offering are "restricted securities" as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"). Pursuant to lock-up agreements between certain securityholders and representatives of the Underwriters, the securityholders have agreed not to sell approximately 5,838,000 shares of Common Stock (including any additional shares issued upon the exercise of any options) for 180 days following the date of this Prospectus. However, beginning 180 days after the date of this Prospectus, subject in certain cases to the volume restrictions of Rule 144, all 5,863,778 shares will become freely transferable and available for immediate sale in the public market. The existence of a large number of shares eligible for future sale could have an adverse impact on the Company's ability to raise additional equity capital or on the price at which such equity capital could by raised.

LIMITATION ON OFFICERS' AND DIRECTORS' LIABILITIES UNDER CALIFORNIA LAW

The Company's Articles of Incorporation provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision does not eliminate the directors' fiduciary duty and does not apply

<PAGE>

for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. See "Management--Limitation on Directors' Liability."

BROAD DISCRETION AS TO USE OF PROCEEDS

Of the net proceeds of this Offering to be received by the Company, approximately $29.3 million or approximately 71.1% of the total estimated net proceeds has been generally allocated to increasing the Company's research and development activities, to enhancing the Company's sales and marketing capabilities, to pursuing possible acquisitions, and for working capital purposes. The amount of net proceeds allocated to each of these specific purposes has not been established and will, therefore, be used for these purposes as management may determine in its sole discretion without the need for shareholder approval with respect to any such allocation.

<PAGE>

USE OF PROCEEDS

The net proceeds to the Company from its sale of 3,330,000 shares of Common Stock offered hereby at an assumed initial public offering price of $13.50 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by the Company, are estimated to be approximately $41.2 million. The Company will not receive any proceeds from the sale of shares of Common Stock by the Selling Shareholders. The Selling Shareholders who own the 370,000 shares to be sold in this Offering will bear their pro rata share of all expenses incurred in connection with this Offering.

The principal reasons for this Offering are to enable the Company to repay bank indebtedness, to increase the Company's research and development activities, to enhance its sales and marketing capabilities, to pursue possible acquisitions, and to increase the Company's funds available for general corporate purposes, including working capital purposes. Although a portion of the net proceeds may be used to pursue possible strategic acquisitions, the Company is not currently a party to any commitments or agreements, and is not currently involved in any negotiations with respect to any acquisitions. While the Company intends to use the net proceeds it receives from this Offering for the foregoing purposes, other than the repayment of indebtedness, the Company is currently unable to specifically allocate the net proceeds among the foregoing purposes. See "Risk Factors--Broad Discretion as to Use of Proceeds." The Company intends to repay a total of approximately $11.9 million outstanding under various bank facilities as described below.

<TABLE>
<CAPTION>

| FACILITY | APPROXIMATE PRINCIPAL AMOUNT AT JUNE 30, 1997 | RATE BASIS PER ANNUM(1) | RATE AT JUNE 30, 1997 | MATURITY |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revolving Credit | $5,077,000 | Variable rate plus 0.25% | 8.75% | November 1998 |
| Term Loan | 2,344,000 | Variable rate plus 0.50% | 9.00% | March 2001 |
| Revolving Credit | 1,500,000 | Variable rate plus 0.25% | 8.75% | October 1997 |
| Revolving Credit | 963,000 | Variable rate plus 1.85% | 7.85% | December 1997 |
| Revolving Credit | 974,000 | Variable rate plus 1.50% | 10.00% | On demand |
| Term Loan | 41,000 | Variable rate plus 2.25% | 10.75% | November 1997 |
| Revolving Credit | 586,000 | Variable rate | 6.65% | Evergreen |
| Term Loan | 437,000 | 5.75% | 5.75% | June 2001 |

</TABLE>

- ---------------

(1) The term "variable rate" means the bank's prime rate or other published reference rate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

Borrowings under the foregoing bank facilities are generally used for

working capital purposes. However, in connection with the acquisition of AME earlier this year, the Company borrowed approximately $900,000 under these facilities to pay the cash portion of the purchase price of that subsidiary.

The Company is also considering exercising its option to purchase its headquarters and its engineering and manufacturing facilities in Hawthorne, California. See "Business--Facilities." If the Company elects to purchase the facilities, it may use a portion of the proceeds of this Offering to pay part or all of the approximately $3.0 million purchase price.

Pending the foregoing uses, the Company intends to invest the net proceeds of this Offering in short-term, interest bearing, investment-grade securities.

## DIVIDEND POLICY

The Company currently anticipates that it will retain any available funds for use in the operation of its business, and does not currently intend to pay any cash dividends in the foreseeable future. Future cash dividends, if any, will be determined by the Board of Directors. The payment of cash dividends by the Company is restricted by certain of the Company's current bank credit facilities, and future borrowings may contain similar restrictions.

<PAGE>

## CAPITALIZATION

The following table sets forth as of June 30, 1997: (i) the actual short-term debt and capitalization of the Company; and (ii) the short-term debt and capitalization as adjusted to give effect to the sale of the 3,330,000 shares of Common Stock offered by the Company hereby at an assumed initial public offering price of $13.50 per share and the application of the estimated net proceeds from the Offering.

<TABLE>
<CAPTION>

| | JUNE 30, 1997 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED |
| | (In thousands) | |
| Short-term debt | $10,340 | $ 465 |
| Long-term debt, less current portion | 2,840 | 793 |
| Shareholders' equity: | | |
| Preferred Stock, no par value; 10,000,000 shares authorized; none issued and outstanding | -- | -- |
| Common Stock, no par value(1)(2); 40,000,000 shares authorized, actual and as adjusted; 6,156,528 shares issued and outstanding, actual; 9,486,528 issued and outstanding, as adjusted | 7,367 | 48,575 |
| Retained earnings | 9,171 | 9,171 |
| Cumulative foreign currency translation adjustment | 271 | 271 |
| Total shareholders' equity | 16,809 | 58,017 |
| Total capitalization | $19,649 | $58,810 |

</TABLE>

- ---------------

(1) Excludes 860,486 shares of Common Stock issuable upon exercise of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1071 of 2711

outstanding stock options as of June 30, 1997. An additional 72,250 shares of Common Stock were issued in September 1997 for a total purchase price of $252,625 upon the exercise of outstanding stock options.

(2) Includes 27,654 shares of Common Stock that were issued after June 30, 1997 as additional consideration for the Company's purchase in November 1996 of certain minority shareholdings in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

DILUTION

The net tangible book value of the Company at June 30, 1997 , was $14,707,000 or $2.39 per share. Net tangible book value per share is determined by dividing the net tangible book value of the Company (total assets net of goodwill less total liabilities of the Company) by the number of shares of Common Stock outstanding . After giving effect to the sale of 3,330,000 shares offered by the Company hereby at an assumed initial public offering price of $13.50 per share (after deduction of estimated underwriting discounts and commissions and estimated offering expenses), the pro forma net tangible book value of the Company as of June 30, 1997 would have been $55,915,000, or $5.89 per share. This represents an immediate increase in the net tangible book value of $3.50 per share to existing shareholders and an immediate dilution in pro forma net tangible book value of $7.61 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed initial public offering price | | $13.50 |
| Net tangible book value before Offering | $2.39 | |
| Increase in net tangible book value attributable to this Offering | 3.50 | |
| Pro forma net tangible book value after Offering | | 5.89 |
| Dilution to new investors | | $ 7.61 |

The following table sets forth on a pro forma basis as of September 30, 1997, the number of shares of Common Stock purchased from the Company, the total consideration paid, and the average price per share paid by the existing shareholders and by purchasers of the shares of Common Stock offered hereby (assuming the sale of 3,330,000 shares by the Company at an assumed initial public offering price of $13.50 per share, before deduction of underwriting discounts and commissions and offering expenses):

| | SHARES PURCHASED | | TOTAL CONSIDERATION | | AVERAGE PRICE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | PER SHARE |
| Existing shareholders | 6,233,778 | 65.2% | $ 7,620,000 | 14.5% | $ 1.22 |
| New public investors | 3,330,000 | 34.8 | 44,955,000 | 85.5 | $13.50 |
| Total | 9,563,778 | 100.0% | $52,575,000 | 100.0% | |

As of September 30, 1997, there are outstanding options to purchase an aggregate of 783,236 of Common Stock at a weighted average exercise price of

approximately $7.74 per share. To the extent that options are exercised or additional shares are issued, there will be further dilution to new investors. See "Management--Stock Option Plans" and "Certain Transactions."

<PAGE>

SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth for the periods and the dates indicated certain financial data which should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere herein. The statement of operations data for each of the three fiscal years in the period ended June 30, 1997, and the balance sheet data at June 30, 1996 and 1997 are derived from the consolidated financial statements of the Company which have been audited by Deloitte & Touche, LLP, independent accountants, and are included elsewhere in this Prospectus. The statements of operations data for the years ended June 30, 1993 and 1994 and the balance sheet data at June 30, 1993, 1994 and 1995 are derived from audited financial statements not otherwise contained herein.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands, except share and per share data) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | | |
| Revenues................ | $ 27,225 | $ 47,735 | $ 49,815 | $61,518 | $77,628 |
| Cost of goods sold...... | 20,591 | 36,037 | 37,818 | 45,486 | 56,174 |
| Gross profit............ | 6,634 | 11,698 | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | | | |
| Selling, general and administrative(1)..... | 4,014 | 7,974 | 7,601 | 9,757 | 11,304 |
| Research and development........... | 1,034 | 1,451 | 1,591 | 1,663 | 2,504 |
| Stock option compensation(2)....... | -- | -- | -- | -- | 856 |
| Total operating expenses.............. | 5,048 | 9,425 | 9,192 | 11,420 | 14,664 |
| Income from operations.. | 1,586 | 2,273 | 2,805 | 4,612 | 6,790 |
| Interest expense........ | 471 | 710 | 1,251 | 1,359 | 1,197 |
| Income before income taxes and minority interest............... | 1,115 | 1,563 | 1,554 | 3,253 | 5,593 |
| Provision for income taxes.................. | 462 | 814 | 413 | 1,111 | 1,416 |
| Income before minority interest............... | 653 | 749 | 1,141 | 2,142 | 4,177 |
| Minority interest....... | 6 | 38 | 17 | 117 | -- |
| Net income.............. | $659 | $787 | $1,158 | $2,259 | $4,177 |
| Net income available to common shareholders(3)(4)..... | $814 | $995 | $1,357 | $2,308 | $4,269 |

| | | | | | |
|---|---|---|---|---|---|
| Net income per share(3)(4)(5)......... | $0.13 | $0.16 | $0.22 | $0.38 | $0.68 |
| Weighted average shares outstanding(5)......... | 6,139,429 | 6,249,674 | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

<TABLE>
<CAPTION>

| | JUNE 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | |
| Cash.................................... | $941 | $625 | $1,405 | $581 | $553 |
| Working capital......................... | 3,852 | 2,280 | 12,117 | 6,044 | 10,800 |
| Total assets............................ | 15,739 | 25,807 | 30,780 | 35,309 | 47,333 |
| Total debt.............................. | 6,882 | 11,140 | 14,113 | 15,462 | 13,180 |
| Total shareholders' equity.............. | 2,256 | 3,128 | 4,951 | 7,194 | 16,809 |

</TABLE>

- -------------

(1) Fiscal 1994 includes a one time charge of $1.5 million incurred in connection with the settlement of a governmental proceeding. See "Business--Legal Proceedings."

(2) Represents a charge resulting from the acceleration of the vesting periods of outstanding stock options having exercise prices below the fair market value on the date of grant. The charge had the effect of decreasing income from operations, net income and net income available to common shareholders by $856,000, $514,000 and $514,000, respectively.

(3) Gives effect to the conversion of certain subordinated debt into preferred stock and Common Stock in October and November 1996, and the issuance of Common Stock for the purchase of the remaining minority interests in certain subsidiaries in October and December 1996 as if such transactions occurred on July 1, 1992. Adjustments in each of the five years ended June 30, 1997 consist of: (i) the elimination of interest expense related to converted subordinated debt of 161, 000, 246,000, 216,000, $166,000 and $92,000, net of income taxes, respectively; and (ii) the elimination of the minority interest in the net loss of subsidiaries of 6,000, 38,000, 17,000, $117,000 and $0, respectively.

(4) Supplementary net income for each of the five years ended June 30, 1997 is $936,000, $1,163,000, $1,939,000, $2,913,000 and $4,872,000, respectively, reflecting the reduction in interest expense, net of income taxes, from the effect of debt repayments discussed under "Use of Proceeds." Supplementary net income per share for the corresponding periods is $0.15, $0.18, $0.28, $0.42 and $0.68, respectively, and reflects only the additional shares issued to repay that debt.

(5) Assumes the conversion of 2,568,750 shares of preferred stock into 3,853,125 shares of Common Stock as of July 1, 1992. The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the Common Stock.

18

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company

designs and manufactures optoelectronic devices and value added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2% of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

The Company was organized in May 1987. The Company's initial products were optoelectronic devices and subsystems sold to customers for use in the manufacture of x-ray scanners for carry-on airline baggage. In December 1987, the Company formed OSI Singapore to manufacture optoelectronic devices and subsystems. In April 1990, the Company acquired United Detector Technology's subsystem business. In February 1993, the Company acquired the Rapiscan UK security and inspection operations and, through Rapiscan U.S.A., commenced its operations as a provider of security and inspection products in the United States. In April 1993, the Company acquired Ferson, a U.S. manufacturer of passive optic components. In July 1994, the Company established OSI Malaysia to manufacture optoelectronic subsystems as well as security and inspection products. In March 1997, the Company acquired AME for the purpose of broadening its optoelectronic subsystem business in Europe. The Company currently owns all of the outstanding shares of each of these companies.

In January 1994 the Company entered into a joint venture agreement with Electronics Corporation of India, Limited ("ECIL"), an unaffiliated Indian corporation, pursuant to which the Company and ECIL formed ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The joint venture was established for the purpose of manufacturing security and inspection products in India from kits sold to ECIL by the Company. The Company currently owns a 36.0% interest in ECIL Rapiscan.

The Company engages in significant international operations. The Company currently manufactures its optoelectronic devices and subsystems at its facilities in Hawthorne, California, in Ocean Springs, Mississippi, in Johor Bahru, Malaysia, and in Horten, Norway. Its security and inspection products are manufactured at its facilities in Crawley, England, in Long Beach, California, and in Johor Bahru, Malaysia. As of June 30, 1997, the Company markets its products worldwide through approximately 42 sales and marketing employees located in five countries, and through approximately 95 independent sales representatives. Revenues from shipments made outside of the United States accounted for 32.0%, 38.0%, and 42.2% of revenues for the fiscal years 1995, 1996 and 1997, respectively. Information regarding the Company's operating income or loss and identifiable assets attributable to each of the Company's geographic areas is set forth in Note 14 in the Company's Consolidated Financial Statements.

The effective income tax rate for the Company for fiscal 1995, 1996 and 1997 was 26.6%, 34.2% and 25.3%, respectively. Certain products manufactured in the United States and sold overseas are sold through a Foreign Sales Corporation ("FSC") organized by the Company in 1990. Export sales made through the FSC are subject to federal tax advantages. If the tax advantages derived from sales made through the FSC and certain existing state and federal tax credits remain in effect, and if certain future foreign tax benefits are received as anticipated, the Company believes that its effective income tax rate will be below 32.0% during the next three fiscal years.

<PAGE>

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users. Two principal customers of the Company's optoelectronic devices and subsystems are the Company's Rapiscan UK and Rapiscan U.S.A. subsidiaries. Revenues from the sale of the Company's optoelectronic devices and subsystems to these two subsidiaries are eliminated from the Company's reported revenues. Revenues from the Company's principal markets and intercompany eliminations are presented in the table below.

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| | (In thousands) | | | |
| <S> | <C> | <C> | <C> | <C> |
| Optoelectronic devices and subsystems...... | $34,729 | $37,977 | $45,007 | $51,554 |
| (Inter-company eliminations)............... | (1,257) | (1,529) | (6,392) | (8,675) |
| Unaffiliated optoelectronic devices and subsystems .............................. | 33,472 | 36,448 | 38,615 | 42,879 |
| Security and inspection products........... | 14,263 | 13,367 | 22,903 | 34,749 |
| Total revenues............................ | $47,735 | $49,815 | $61,518 | $77,628 |

In recent years, the Company has experienced increased revenues from its security and inspection products, both in absolute dollars and as a percentage of total Company revenues, a trend which the Company believes will continue. The Company has recently initiated a program to produce larger security and inspection products, including those for use in inspecting cargo, which products are likely to have significantly higher selling prices than most of the Company's products sold to date. Sales of products with higher average selling prices may increase fluctuations in the Company's quarterly revenues and earnings.

The Company recognizes revenues upon shipment. As the Company's product offerings change to include sales of significantly larger systems, such as cargo inspection products, the Company may adopt the percentage of completion method of revenue recognition for certain products.

RESULTS OF OPERATIONS

The following table sets forth certain income and expenditure items as a percentage of total revenues for the periods indicated:

<CAPTION>

| | YEAR ENDED JUNE 30, | | | |
|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> | <C> |
| Revenues.................................. | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold........................ | 75.5 | 75.9 | 73.9 | 72.4 |
| Gross profit.............................. | 24.5 | 24.1 | 26.1 | 27.6 |
| Operating expenses: | | | | |
| Selling, general and administrative....... | 16.7 | 15.3 | 15.9 | 14.6 |
| Research and development.................. | 3.0 | 3.2 | 2.7 | 3.2 |
| Stock option compensation................. | -- | -- | -- | 1.1 |
| Total operating expenses................ | 19.7 | 18.5 | 18.6 | 18.9 |

| | | | | |
|---|---|---|---|---|
| Income from operations........................ | 4.8 | 5.6 | 7.5 | 8.7 |
| Interest expense.............................. | 1.5 | 2.5 | 2.2 | 1.5 |
| Income before income taxes and minority interest.................................. | 3.3 | 3.1 | 5.3 | 7.2 |
| Provision for income taxes.................... | 1.7 | 0.8 | 1.8 | 1.8 |
| Income before minority interest............ | 1.6 | 2.3 | 3.5 | 5.4 |
| Minority interest............................. | -- | -- | 0.2 | -- |
| Net income.................................... | 1.6% | 2.3% | 3.7% | 5.4% |

</TABLE>

<PAGE>

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1997 TO THE FISCAL YEAR ENDED JUNE 30, 1996

Revenues. Revenues consist of sales of optoelectronic devices and subsystems as well as of security and inspection products. Revenues are recorded net of all inter-company eliminations. Revenues for the fiscal year ended June 30, 1997 increased by $16.1 million, or 26.2%, to $77.6 million from $61.5 million for the fiscal year ended June 30, 1996. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $4.3 million, or 11.0%, to $42.9 million from $38.6 million for fiscal 1996. The increase was the result of increased orders from existing customers, particularly in the medical diagnostics industry, and the expansion of the Company's product base. Revenues from the sale of security and inspection products increased by $11.8 million, or 51.7%, to $34.7 million from $22.9 million for fiscal 1996. The increase was due mainly to the continued acceptance of the Rapiscan Series 500 EPX System, which was introduced in 1995, the growth in sales of the Rapiscan 119 tabletop model and the introduction of large cargo inspection machines.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $5.4 million, or 33.8%, to $21.5 million from $16.0 million for fiscal 1996. As a percentage of revenues, gross profit increased to 27.6% in fiscal 1997 from 26.1% in fiscal 1996. Gross margin increased as a result of the fact that fixed costs did not increase proportionally with the increase in revenues. In addition, gross profit improved as a result of the Company continuing to increase the production of product manufactured at its offshore facilities, thereby capitalizing on lower labor and other manufacturing costs.

Selling, General and Administrative. Selling, general and administrative expenses consist primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For fiscal 1997, such expenses increased by $1.5 million, or 15.9%, to $11.3 million from $9.8 million in fiscal 1996. As a percentage of revenues, selling, general and administrative expenses decreased to 14.6% from 15.9%. The increase in expenses was due to increases in payroll expenses to support revenue growth as well as to increases in legal expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For fiscal 1997, such expenses increased by $841,000, or 50.6%, to $2.5 million from $1.7 million in fiscal 1996. As a percentage of revenues, research and development expenses increased to 3.2% from 2.7%. The increase was due primarily to continued enhancement of the Rapiscan Series 500 EPX System and efforts to develop products for cargo scanning. In addition, the Company expensed all research and development expenses in the 1997 period as incurred, whereas certain of such expenses related to software products, the

technological feasibility of which had been established, were capitalized in the 1996 period.

Income from Operations. Income from operations for fiscal 1997 increased by $2.2 million, or 47.2%, to $6.8 million from $4.6 million for fiscal 1996. Excluding the non-recurring non-cash incentive compensation expense of $856,000 incurred in connection with the acceleration of the vesting period of stock options granted to certain employees during fiscal 1997, income from operations increased by $3.0 million, or 65.8%, to $7.6 million from $4.6 million. As a percent of revenues, income from operations increased to 8.7% from 7.5%, and excluding the non-cash compensation expense referenced above, it would have increased to 9.8% from 7.5%.

Interest Expense. Interest expense for fiscal 1997 decreased by $162,000, or 11.9%, to $1.2 million from $1.4 million for fiscal 1996. As a percentage of revenues, interest expense decreased to 1.5% from 2.2%. The decrease was due to the conversion of the Company's subordinated debt to preferred and common stock during fiscal 1997, and to a decrease in the Company's borrowings outstanding under its lines of credit.

21

<PAGE>

Provision for Income Taxes. Provision for income taxes for fiscal 1997 increased by $305,000, or 27.5%, to $1.4 million from $1.1 million for fiscal 1996. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 25.3% from 34.2% in fiscal 1996. The decrease was a result of increases in the Company's export sales through its FSC, which has the effect of reducing the tax rate on revenues from foreign sales made from the United States, and the increased utilization of research and development and certain state tax credits. In addition, the Company has made the California Waters Edge election under California tax law, which has the effect of exempting its foreign subsidiaries from California taxes through fiscal 2003.

Net Income. For the reasons outlined above, net income for fiscal 1997, increased $1.9 million, or 84.9%, to $4.2 million from $2.3 million in fiscal 1996. The compensation charge described above, decreased net income by $514,000 in fiscal 1997.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1996 TO THE FISCAL YEAR ENDED JUNE 30, 1995

Revenues. Revenues for the fiscal year ended June 30, 1996 increased by $11.7 million, or 23.5%, to $61.5 million from $49.8 million for the fiscal year ended June 30, 1995. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.2 million, or 5.9%, to $38.6 million from $36.4 million for fiscal year 1995. The increase was the result of a 10.0% growth in sales of active optoelectronic devices and subsystems, offset in part by a decline in sales of lenses and other passive optic components. Revenues from the sale of security and inspection products increased by $9.5 million, or 71.3%, to $22.9 million from $13.4 million in the comparable 1995 period. The increase was due mainly to the increased penetration of the U.S. security and inspection market and to larger shipments made to two international customers.

Gross Profit. Gross profit increased by $4.0 million, or 33.6%, to $16.0 million from $12.0 million for fiscal 1995. As a percentage of revenues, gross profit increased to 26.1% from 24.1%. Gross margin increased as a result of the Company more fully realizing the benefits of having established a manufacturing facility in Malaysia in fiscal 1995, which had the effect of decreasing labor rates.

Selling, General and Administrative. Selling, general and administrative

expenses increased by $2.2 million, or 28.4%, to $9.8 million from $7.6 million for fiscal 1995. As a percentage of revenues, selling, general and administrative expenses increased to 15.9% from 15.3%. The increase in expenses was due to increases in sales and marketing activities to support the growth in sales of security and inspection products in the United States, as well as general increases in payroll and administration to support sales growth.

Research and Development. Research and development expenses increased by $72,000, or 4.5%, to $1.7 million from $1.6 million for fiscal 1995. As a percentage of revenues, research and development expenses decreased to 2.7% from 3.2%, as increased research and development expenses related to security and inspection products were offset in part by decreases in such expenses related to optoelectronic products.

Income from Operations. Income from operations increased by $1.8 million, or 64.4%, to $4.6 million from $2.8 million for fiscal 1995. As a percent of revenues, income from operations increased to 7.5% from 5.6%. The increase was due to the reasons outlined above, as both cost of goods sold and selling, general, and administrative expenses did not increase as much as revenues during the period.

Interest Expense. Interest expense increased by $108,000, or 8.6%, to $1.4 million from $1.3 million for fiscal 1995. The increase was due to an increase in borrowings outstanding under the Company's line of credit. As a percentage of revenues, interest expense decreased to 2.2% from 2.5%.

Provision for Income Taxes. Provision for income taxes increased by $698,000, or 169%, to $1.1 million from $413,000 in fiscal 1995. As a percentage of income before provision for income taxes and minority

<PAGE>

interest, provision for income taxes increased to 34.2% in fiscal 1996 from 26.6% for the prior fiscal year. The increase resulted primarily from a reduction in certain state income tax credits, the repeal of the federal research and development credits, and a lower tax benefit from the Company's FSC in fiscal 1996.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1996, increased $1.1 million, or 95.1%, to $2.3 million from $1.2 million for fiscal 1995.

COMPARISON OF THE FISCAL YEAR ENDED JUNE 30, 1995 TO THE FISCAL YEAR ENDED JUNE 30, 1994

Revenues. Revenues for the fiscal year ended June 30, 1995 increased by $2.1 million, or 4.4%, to $49.8 million from $47.7 million for the fiscal year ended June 30, 1994. Revenues from the sale of optoelectronic devices and subsystems, net of inter-company eliminations, increased by $2.9 million, or 8.9%, to $36.4 million from $33.5 million in fiscal 1994. The increase was the result of increased sales of subsystems in most of the product markets served by the Company. Revenues from the sale of security and inspection products decreased by $896,000, or 6.3%, to $13.4 million from $14.3 million in fiscal 1994. The decrease was due mainly to the shipment of large orders to customers in fiscal year 1994 that were not repeated in fiscal year 1995. Aside from the timing of these large order shipments, base business in security and inspection products in fiscal 1995 increased over the prior fiscal year.

Gross Profit. Gross profit increased by $299,000, or 2.6%, to $12.0 million from $11.7 million for fiscal 1994. As a percentage of revenues, gross profit decreased to 24.1% from 24.5%. Gross margin decreased because of the start-up expenses associated with the opening of the Company's Malaysian manufacturing facility during fiscal 1995.

Selling, General and Administrative. Selling, general and administrative expenses decreased by $373,000, or 4.7%, to $7.6 million from $8.0 million for fiscal 1994. As a percentage of revenues, selling, general and administrative expenses decreased to 15.3% from 16.7%. Excluding a $1.5 million settlement with the U.S. government which occurred in fiscal 1994, selling, general, and administrative expenses increased by $1.1 million, or 17.4%. See "Business--Legal Proceedings." Excluding this settlement, such expenses as a percentage of revenues would have increased during the year from 13.6% to 15.3%. The increase was due to increases in legal fees and other general increases associated with revenue growth.

Research and Development. Research and development expenses increased by $140,000, or 9.6%, to $1.6 million from $1.5 million for fiscal 1994. As a percentage of revenues, research and development expenses increased to 3.2% from 3.0%. The increase in research and development expenses occurred primarily due to increased expenses related to the development of security and inspection products.

Income from Operations. Income from operations increased by $532,000, or 23.4%, to $2.8 million from $2.3 million for fiscal 1994. As a percentage of revenues, income from operations increased to 5.6% from 4.8%. The increase was due to the decrease in selling, general, and administrative expenses in the context of modest revenue growth.

Interest Expense. Interest expense increased by $541,000, or 76.2%, to $1.3 million from $710,000 in fiscal 1994. As a percentage of revenues, interest expense increased to 2.5% from 1.5%. The increase was due to increased borrowings under the Company's line of credit and interest on outstanding amounts owed under the government settlement.

Provision for Income Taxes. Provision for income taxes decreased by $401,000, or 49.3%, to $413,000 from $814,000 in fiscal 1994. As a percentage of income before provision for income taxes and minority interest, provision for income taxes decreased to 26.6% from 52.1%. The decrease was principally the result of the non-deductible portion of the government settlement in fiscal 1994.

Net Income. For the reasons outlined above, net income for the fiscal year ended June 30, 1995 increased $371,000, or 47.1%, to $1.2 million from $787,000 for fiscal 1994.

<PAGE>

QUARTERLY RESULTS OF OPERATIONS

The following table sets forth certain statement of operations data for the eight consecutive quarters in the period ended June 30, 1997. This data is unaudited but, in the opinion of management, reflects all adjustments, consisting only of normal recurring adjustments, necessary for fair presentation of this information in accordance with generally accepted accounting principles. The operating results for any quarter are not necessarily indicative of results for any future period or for the entire fiscal year.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| | | | | (In thousands) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1080 of 2711

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Revenues............... | $12,539 | $15,119 | $17,336 | $16,524 | $16,530 | $18,563 | $20,880 | $21,655 |
| Cost of goods sold...... | 9,657 | 11,382 | 12,599 | 11,848 | 11,884 | 13,286 | 15,210 | 15,794 |
| Gross profit........... | 2,882 | 3,737 | 4,737 | 4,676 | 4,646 | 5,277 | 5,670 | 5,861 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 1,879 | 2,126 | 2,740 | 3,012 | 2,737 | 2,686 | 2,760 | 3,121 |
| Research and development........... | 419 | 408 | 453 | 383 | 517 | 636 | 584 | 767 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 856 | - |
| Total operating expenses............. | 2,298 | 2,534 | 3,193 | 3,395 | 3,254 | 3,322 | 4,200 | 3,888 |
| Income from operations.. | 584 | 1,203 | 1,544 | 1,281 | 1,392 | 1,955 | 1,470 | 1,973 |
| Interest expense........ | 336 | 345 | 345 | 333 | 360 | 331 | 209 | 297 |
| Income before income taxes and minority interest............... | 248 | 858 | 1,199 | 948 | 1,032 | 1,624 | 1,261 | 1,676 |
| Provision for income taxes.................. | 85 | 293 | 409 | 324 | 259 | 408 | 316 | 433 |
| Income before minority interest............... | 163 | 565 | 790 | 624 | 773 | 1,216 | 945 | 1,243 |
| Minority interest....... | 19 | 17 | (8) | 89 | -- | -- | -- | -- |
| Net income............. | $ 182 | $ 582 | $ 782 | $ 713 | $ 773 | $ 1,216 | $ 945 | $ 1,243 |

</TABLE>

The following table sets forth, as a percentage of revenues, certain consolidated statements of operations data for the four quarters in each of fiscal years 1996 and 1997.

<TABLE>
<CAPTION>

| | QUARTER ENDED | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SEPT. 30, 1995 | DEC. 31, 1995 | MAR. 31, 1996 | JUNE 30, 1996 | SEPT. 30, 1996 | DEC. 31, 1996 | MAR. 31, 1997 | JUNE 30, 1997 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Revenues............... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold...... | 77.0 | 75.3 | 72.7 | 71.7 | 71.9 | 71.6 | 72.8 | 72.9 |
| Gross profit........... | 23.0 | 24.7 | 27.3 | 28.3 | 28.1 | 28.4 | 27.2 | 27.1 |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative........ | 15.0 | 14.1 | 15.8 | 18.2 | 16.6 | 14.5 | 13.2 | 14.4 |
| Research and development........... | 3.3 | 2.7 | 2.6 | 2.3 | 3.1 | 3.4 | 2.8 | 3.5 |
| Stock option compensation.......... | -- | -- | -- | -- | -- | -- | 4.1 | -- |
| Total operating expenses............. | 18.3 | 16.8 | 18.4 | 20.5 | 19.7 | 17.9 | 20.1 | 17.9 |
| Income from operations.. | 4.7 | 7.9 | 8.9 | 7.8 | 8.4 | 10.5 | 7.1 | 9.2 |
| Interest expense........ | 2.7 | 2.3 | 2.0 | 2.0 | 2.2 | 1.8 | 1.0 | 1.4 |
| Income before income taxes and minority interest............... | 2.0 | 5.6 | 6.9 | 5.8 | 6.2 | 8.7 | 6.1 | 7.8 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Provision for income taxes | .7 | 1.9 | 2.3 | 2.0 | 1.6 | 2.2 | 1.5 | 2.0 |
| Income before minority interest | 1.3 | 3.7 | 4.6 | 3.8 | 4.6 | 6.5 | 4.6 | 5.8 |
| Minority interest | 0.2 | -- | (0.1) | 0.5 | -- | -- | -- | -- |
| Net income | 1.5% | 3.7% | 4.5% | 4.3% | 4.6% | 6.5% | 4.6% | 5.8% |

</TABLE>

24

<PAGE>

The Company's quarterly operating results have varied in the past and are likely to vary significantly in the future. These quarterly fluctuations are the result of a number of factors, including the volume and timing of orders received and shipments made during the period, variations in the Company's product mix, changes in demand for the Company's products, the timing and amount of expenditures made by the Company in anticipation of future sales, variability in selling price, and other competitive conditions. The Company's revenues, particularly from the sale of security and inspection products, are increasingly dependent upon larger orders of multiple units and upon the sale of products having higher average selling prices. The Company is unable to predict the timing of the receipt of such orders and, as a result, significant variations between forecasts and actual orders will often occur. Furthermore, the rescheduling of the shipment of any large order, or portion thereof, or any production difficulties or delays experienced by the Company, could have a material adverse effect on the Company's quarterly operating results.

LIQUIDITY AND CAPITAL RESOURCES

The Company has financed its operations primarily through cash provided by operations and through various term loans, discounting facilities, and revolving credit lines extended to its different subsidiaries worldwide. As of June 30, 1997, the Company's principal sources of liquidity consisted of $553,000 in cash and several credit agreements described below.

The Company's operations provided net cash of $3.4 million during fiscal 1997. For fiscal 1997, the amount of net cash provided by operations reflects adjustments for depreciation and amortization, the increase in accounts payable and accrued expenses and the increase in advances from customers, which is primarily attributable to advances received on a significant security and inspection product contract obtained in fiscal 1997. Net cash provided by operations was offset in part by increases in receivables and inventories.

Net cash used in investing activities was $3.0 million and $2.2 million in fiscal 1997 and 1996, respectively, in each case due primarily to purchases of property and equipment in the amount of approximately $2.2 million and $1.6 million, respectively. The Company expects to spend approximately $2.0 million for purchases of property and equipment in fiscal 1998. In addition, the Company may spend approximately $3.0 million if it exercises its option to purchase its Hawthorne, California, facilities. The Company has no significant capital spending or purchase commitments other than normal purchase commitments and commitments under leases.

Net cash used in financing activities for fiscal 1997 was $526,000 due primarily to the repayment of debt. Net cash provided by financing activities in fiscal 1996 was $1.4 million due to increases in borrowings under the Company's lines of credit. The Company intends to use a portion of the net proceeds of this Offering to repay the amounts outstanding under the Company's lines of credit.

In January 1997, OSI Systems, Inc. and its three U.S. subsidiaries entered into a credit agreement with Sanwa Bank California. The agreement provides for

a $10.0 million line of credit, which includes revolving, letter of credit, acceptance and foreign exchange facilities. In addition, the Company has a $1.0 million equipment line of credit for capital purchases. At the borrowers' election, advances under both lines of credit bear interest at a rate equal to a variable bank reference rate plus 0.25% per annum or, at the Company's option, at a fixed rate above LIBOR. At the borrowers' election, advances under the equipment purchase facility bear interest at a variable bank reference rate plus 0.25% per annum or a fixed rate quoted by the bank. The agreement also provides for a term loan in a maximum amount of $2.5 million to refinance existing indebtedness. At the borrowers' election, the term loan may bear interest at a fixed or variable rate, as quoted by the bank. As of June 30, 1997, there was outstanding approximately $5.1 million under the $10.0 million line of credit, $2.4 million under the term loan, and approximately $154,000 under the letter of credit facility. As of June 30, 1997, there were no outstanding borrowings under the equipment line. Borrowings under the agreement are secured by liens on substantially all of the Company's assets. The agreement restricts the four borrowers from incurring certain additional indebtedness and from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year. In addition, the credit agreement currently requires that the Company at all times maintain (on a consolidated basis) a current ratio of not less than 1.2 to 1, a tangible net worth of at least $11.0 million, a ratio of debt to tangible net worth of not more than 3.0 to 1, and a ratio of cash, cash equivalents and accounts receivable to current liabilities of not less than 0.6 to 1. The Company is currently in compliance with all of these financial conditions.

<PAGE>

In November 1996, OSI Systems, Inc. and its three U.S. subsidiaries entered into an agreement with Wells Fargo HSBC Trade Bank, N.A. Under the agreement Wells Fargo will provide the four borrowers with a revolving credit line of up to a maximum of $5.0 million to be used to pay obligations incurred in connection with export orders. The revolving credit lines bear interest at the bank's prime rate plus 0.25% per annum. Although the credit lines are scheduled to expire on October 27, 1997, the bank has informed the Company that, unless there is a material adverse change in the financial condition of the Company, the bank intends to extend the term of the credit lines for one additional year. As of June 30, 1997, there was outstanding approximately $1.5 million under the facility. The agreement also provides for a letter of credit sub-facility up to an aggregate maximum of $4.0 million to be used for standby letters of credit in support of bid and performance bonds associated with specific foreign contracts, of which $1.9 million was used as of June 30, 1997. The facility terminates on October 27, 1997. Borrowings under the agreement are secured by liens on certain of the Company's assets. The agreement prohibits the Company from paying any dividends and restricts OSI Systems, Inc. and these subsidiaries from making capital expenditures greater than $1.8 million in the U.S. in any fiscal year.

In December 1996, Midland Bank plc agreed to provide certain banking facilities to Rapiscan UK under two agreements. Under the first agreement, Midland agreed to provide Rapiscan UK with a pound sterling overdraft, maximum amount of 1.2 million pounds sterling (approximately $2.1 million at June 30, 1997) outstanding at any one time, which amounts are secured by certain assets of Rapiscan UK. Outstanding borrowings will bear interest at a base rate plus 2.00% per annum. At June 30, 1997, no amounts were outstanding under the overdraft facility. The second agreement provides for a 750,000 pound sterling (approximately $1.3 million as of June 30, 1997) facility for purchase of accounts receivable at 1.85% over a base rate and a 500,000 pound sterling (approximately $832,000 as of June 30, 1997) facility for tender and performance bonds. These facilities are secured by certain assets of Rapiscan UK and OSI Systems, Inc. has guarantied Rapiscan UK's obligations under the performance bond facility. As of June 30, 1997, there was outstanding approximately $963,000 under the line of credit and $452,000 was outstanding under the performance bond facility. The above facilities expire in December

    and November 1997, respectively.

OSI Singapore has a loan agreement with Indian Bank (Singapore), which provides for an accounts receivable discounting facility for borrowings of up to 2.6 million Singapore dollars (approximately $1.8 million at June 30, 1997). The agreement also provides for a term loan with borrowings of 434,000 Singapore dollars (approximately $300,000 at June 30, 1997). Borrowings under the line of credit bear interest at the bank's prime rate plus 1.50%. The line of credit is terminable at any time. As of June 30, 1997 there was approximately $974,000 outstanding under the line of credit and approximately $41,000 was outstanding under the term loan. Borrowings under the line of credit are collateralized by certain assets of OSI Singapore. The borrowings under this line are guarantied by Messrs. Chopra, Mehra and Hickman, officers of the Company. Borrowings secured by intercompany receivables are guarantied by OSI Systems, Inc.

AME has a loan agreement with Christiania Bank OG Kreditkasse which provides for a revolving line of credit for borrowings of up to 5.0 million Norwegian krone (approximately $682,000 at June 30, 1997), of which $586,000 was outstanding as of June 30, 1997. Borrowings under the line of credit bear interest at an annual variable rate of 6.65%. The agreement also provides for a term loan which matures in June 2001 and bears interest at an annual rate of 5.75%. At June 30, 1997 outstanding term loan borrowings totalled approximately 3.2 million Norwegian krone (approximately $437,000).

OSI Malaysia has a bank guarantee line of credit for 2.5 million Malaysian ringgits (approximately $1,000,000) with the Hong Kong Bank Malaysia Berhad for performance bonds and standby letters of credit. This line expires in October 1997.

The Company believes that the net proceeds from this offering together with cash from operations, existing cash and lines of credit will be sufficient to meet its cash requirements for the foreseeable future.

<PAGE>

FOREIGN CURRENCY TRANSLATION

The accounts of the Company's operations in Singapore, Malaysia, England and Norway are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling and Norwegian krone, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Transaction (losses) gains of approximately ($19,000), $76,000, ($123,000) and $68,000 were included in income for fiscal 1994, 1995, 1996 and 1997.

INFLATION

The Company does not believe that inflation has had a material impact on its results of operations.

<PAGE>

BUSINESS

GENERAL

The Company is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company

designs and manufactures optoelectronic devices and value-added subsystems for OEMs for use in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband. In fiscal 1997, revenues from the sale of optoelectronic devices and subsystems amounted to $42.9 million, or approximately 55.2%, of the Company's revenues, while revenues from sales of security and inspection products amounted to $34.7 million, or approximately 44.8% of the Company's revenues.

INDUSTRY OVERVIEW

The Company's products currently address two principal markets. The Company's optoelectronic devices and subsystems are designed and manufactured primarily for sale to OEMs, while the Company's security and inspection products are sold to end-users.

Optoelectronic Devices and Subsystems. Optoelectronic devices consist of both active components, such as silicon photodiodes, that sense light of varying wavelengths and convert the light detected into electronic signals, and passive components, such as lenses, prisms, filters and mirrors. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components for integration into an end-product. Optoelectronic devices and subsystems are used for a wide variety of applications ranging from simple functions, such as the detection of paper in the print path of a laser printer, to complex monitoring, measurement or positioning functions, such as in industrial robotics where the subsystem is used to detect the exact position, motion or size of another object. Because optoelectronic devices and subsystems can be used in a wide variety of measurement, control and monitoring applications, optoelectronics may be used in a broad array of industrial applications.

The Company believes that in recent years advances in technology and reductions in the cost of key components of optoelectronic systems, including computer processing power and memory, have broadened the market by enabling the use of optoelectronic devices in a greater number of applications. In addition, the Company believes that there is a trend among OEMs to increasingly outsource the design and manufacture of optoelectronic subsystems to fully integrated, independent manufacturers who may have greater specialization, broader expertise, and the ability and flexibility to respond in shorter time periods than the OEM could accomplish in-house. The Company believes that its high level of vertical integration, substantial engineering resources, expertise in the use and application of optoelectronic technology, and low-cost international manufacturing operations enable it to effectively compete in the market for optoelectronic devices and subsystems.

Security and Inspection Products. A variety of products are currently used worldwide in security and inspection applications. These products include single energy x-ray equipment, dual energy x-ray equipment, trace detection systems that detect particulate and chemical traces of explosive materials, and CT scanners. To date, most of these products have been deployed primarily at commercial airports worldwide. The Company believes that the growth in the market for security and inspection products will continue to be driven by the increased perception of threat fueled by recent terrorist incidents, increased government mandates and appropriations, and the emergence of a growing market for the non-security applications of its products.

<PAGE>

In the 1970s, principally in response to civilian airline hijackings, the U.S. Federal Aviation Administration ("FAA") established security standards by

setting guidelines for the screening of carry-on baggage for weapons such as guns and knives. These standards were later mandated by the United Nations for adoption by all of its member states. The Company believes that to date the imposition of these standards has resulted in the installation of over 10,000 x-ray inspection systems installed in airports worldwide. Additionally, the United Kingdom Department of Transport has required the United Kingdom's commercial airports to deploy systems for 100% screening of international checked baggage by the end of 1998, and the European Civil Aviation Conference, an organization of 33 member states, has agreed to implement 100% screening of international checked baggage by the year 2000. In the United States, largely in response to the explosion of Pan Am Flight 103 in December 1988, Congress enacted the Aviation Security Improvement Act of 1990 which, among other initiatives, directed the FAA to establish and implement strict security measures and to deploy advanced technology for the detection of various contraband, including explosives, drugs, and currency. In July 1996, President Clinton formed the White House Commission on Aviation Safety and Security (the "Gore Commission"), to review airline and airport security and to oversee aviation safety. In response to the initial report released by the Gore Commission, the United States enacted legislation that includes $144 million in appropriations for the initial deployment of advanced security and inspection technology at major U.S. airports.

X-ray inspection equipment, such as that sold by the Company, is also increasingly being used for a number of purposes not related to security. Newer versions of x-ray inspection equipment combine x-ray inspection with computer image enhancement capabilities and can be applied to various non-security purposes such as the detection of narcotics, gold and currency, the inspection of agricultural products, and the inspection of cargo by customs officers and international shippers. The Company believes that the market for cargo inspection systems will increase significantly in the future.

GROWTH STRATEGY

The Company's objectives are to be a leading provider of specialized optoelectronic products, to enhance its position in the international inspection and detection marketplace and to leverage its expertise in the optoelectronic technology industry by entering into new end-product markets on a selective basis. Key elements of this strategy include:

Leverage its Optoelectronic Design and Manufacturing Expertise to Address New Applications. The Company believes that one of its primary competitive strengths is its expertise in designing and manufacturing specialized optoelectronic subsystems for its OEM customers in a cost-effective manner. The Company currently designs and manufactures devices and subsystems for over 200 customers serving over 100 applications. The Company has developed this expertise in the past through internal research and development efforts and through selective acquisitions. In 1990, the Company acquired UDT Sensors to broaden its expertise and capabilities in developing and manufacturing optoelectronic devices and subsystems. Thereafter, in 1992, the Company acquired Ferson for its passive optic technologies, and AME in 1997 for AME's hybrid optoelectronic capabilities. The Company intends to continue to build this expertise in order to address a greater number of applications. By expanding the number of potential applications its products may serve, the Company intends to increase its business with existing customers and attract new customers.

Further Penetrate Existing Security and Inspection Markets and Expand into Other Markets. For the year ended June 30, 1997, approximately 27.3% of the Company's security and inspection products were sold to airports or airlines for security purposes, with the remainder of these products being sold to other facilities for both security and nonsecurity related purposes. The Company intends to continue to expand its sales and marketing efforts both domestically and internationally to capitalize on opportunities in its existing markets for new installations as well as on opportunities to replace, service and upgrade existing security installations. In addition, through

research and development and selective acquisitions, the Company intends to enhance and expand its current product offering to better address new applications including automatic bomb detection and cargo scanning. The Company believes that this strategy will enable it to take advantage of the

<PAGE>

growth its existing markets are experiencing and to benefit from additional growth that these new and enhanced products will provide. The Company believes that sales of its security and inspection products at locations other than at airports will constitute an increasingly larger portion of its sales in the future.

Capitalize on Vertical Integration. The Company believes it offers significant added value to its OEM customers by providing a full range of vertically integrated services including component design and customization, subsystem concept design and application engineering, product prototyping and development, and efficient pre-production, short-run and high volume manufacturing. The Company believes that its vertical integration differentiates it from many of its competitors and provides value to its OEM customers who can rely on the Company to be an integrated supplier of an optoelectronic subsystem. In addition, the Company's vertical integration provides several other advantages in both its optoelectronic devices and subsystems and security and detection product lines. These advantages include reduced manufacturing and delivery times, lower costs due to its access to competitive international labor markets and direct sourcing of raw materials, and superior quality control. The Company intends to continue to leverage its vertically integrated services to create greater value for its customers in the design and manufacturing of its products. The Company believes that this strategy better positions the Company for penetration into other end markets.

Capitalize on Global Presence. The Company operates in three locations in the United States, three in Europe and two in Asia. The Company views its international operations as providing an important strategic advantage over competitors in both the optoelectronic device and subsystem market and the security and inspection market for three primary reasons. First, international manufacturing facilities allow the Company to take advantage of competitive labor rates in order to be a low cost producer. Second, its international offices strengthen its sales and marketing efforts and its ability to maintain and repair its systems by providing direct access to growing foreign markets and to its existing international customer base. Third, multiple manufacturing locations allow the Company to reduce delivery times to its global customer base. In the future, the Company intends to develop new sources of manufacturing and sales capabilities to maintain and enhance the benefits of its international presence.

Selectively Enter New End Markets. The Company intends to selectively enter new end markets that complement its existing capabilities in designing, developing and manufacturing optoelectronic devices and subsystems. The Company believes that by manufacturing other end products which rely on the technological capabilities of the Company, it can leverage its existing integrated design and manufacturing infrastructure to capture greater margins and build a significant presence in new end markets which present attractive competitive market dynamics. The Company intends to achieve this strategy through internal growth or through selective acquisitions of end-product manufacturers.

PRODUCTS AND TECHNOLOGY

The Company designs, develops, manufactures and sells products based on its core optoelectronic technology. These products range from discrete devices to value-added subsystems to complete x-ray security and inspection products.

Discrete Devices and Subsystems. Optoelectronic devices generally consist of

both active and passive components. Active components sense light of varying wavelengths and convert the light detected into electronic signals, whereas passive components amplify, separate or reflect light. Active components manufactured by the Company consist of silicon photodiodes and hybrid photodetectors. Passive components include lenses, prisms, filters, mirrors and other precision optical products that are used by the Company in the manufacture of its optoelectronic products or are sold to others for use in telescopes, laser printers, copiers, microscopes and other detection and vision equipment. The devices manufactured by the Company are both standard products and products customized for specific applications. Most of the devices manufactured by the Company are incorporated by it into the subsystems that it manufactures. The Company

<PAGE>

does, however, also sell its discrete devices separately to OEMs. Direct sales of devices to third parties constituted less than 10.0% of the Company's revenues in fiscal 1997.

In addition to the manufacture of discrete devices, the Company also specializes in designing and manufacturing customized optoelectronic subsystems for use in a wide range of products and equipment. An optoelectronic subsystem typically consists of one or more optoelectronic devices that are combined with other electronic components and packaging for use in an end-product. The composition of a subsystem can range from a simple assembly of various optoelectronic devices that are incorporated into other subsystems (for example, a printed circuit board containing the Company's optoelectronic devices), to complete end-products (for example, medical pulse oximeter probes that are manufactured and packaged by the Company on behalf of the OEM customer and then shipped directly to the customer or the customer's distributors). Since the end of fiscal 1996, the Company has manufactured subsystems for a variety of applications, including the following: imaging electronics for medical CT scanners; disposable and reusable medical probes for use with medical pulse oximetry equipment; components and subsystems for laser gyroscopes used in military and commercial aviation; optoelectronic subsystems for slot machines; laser subsystems in military helicopter gun sighting equipment; positioning subassemblies for computer peripheral equipment; alignment subsystems for laser heads in optical disc players; and ultra-violet fire detection subsystems for submarines and surface ships.

Security and Inspection Equipment. The Company manufactures and sells a range of security and inspection equipment that it markets under the "Rapiscan" brand name. To date, the security and inspection equipment has principally been used at airports to inspect carry-on and checked baggage for guns and knives. However, inspection products are increasingly being used for both security purposes at a wide range of facilities other than airports and for other non-security purposes. For fiscal years 1995, 1996, and 1997 approximately 28.7%, 33.1%, and 27.3% respectively, of the Company's security and inspection revenues were derived from the sale of inspection products to airlines and airports, and the balance of such revenues were derived from all other sales. The Company believes that sales of its inspection products for use at non-airport locations will constitute an increasingly larger portion of future revenues.

The Company's inspection and detection products combine the use of x-ray technology with the Company's core optoelectronic capabilities. The base models of its product line use single energy x-ray technology and are used for identifying weapons with distinct shapes, such as guns and knives. The Company's enhanced models combine dual- or multi-energy x-ray technology with computer enhanced imaging technology to facilitate the detection of materials such as explosives, narcotics, currency or other contraband. While all x-ray systems produce a two-dimensional image of the contents of the inspected material, the dual-energy x-ray systems also measure the x-ray absorption of the inspected materials' contents at two x-ray energies to determine the

atomic number, mass and other characteristics of the object's contents. The different organic and non-organic substances in the inspected material are displayed in various colors. This information is then displayed to an operator of the inspection equipment who can identify and differentiate the objects in the inspected materials.

Currently, all of the Company's inspection products require an operator to monitor the images produced by the inspection equipment. Depending on the model, the Company's products permit the operator to inspect the contents of packages at varying image modes and magnifications. The images range from the monochrome and pseudo-color images produced by single x-ray imaging systems, to high resolution, multi-color images in the Company's computer enhanced dual-energy models. The Company believes that its Rapiscan 500 Series provides one of the highest quality images currently available in the x-ray security and inspection industry.

In order to monitor the performance of operators of the x-ray baggage screening systems that are used in the United States airports, the FAA has implemented a computer-based training and evaluation program known as the Screener Proficiency Evaluation And Reporting System ("SPEARS"). The Company's Rapiscan 500 Series EPX System is, to date, the only system that meets the FAA's SPEARS criteria. In order to test the proficiency and attentiveness of the operator, the Company's system is able to insert test threat images, such as weapons, into an actual parcel stream by use of computer images.

<PAGE>

The following table sets forth certain information related to the standard security and inspection products currently offered by the Company. The Company does, however, also customize its standard products to suit specific applications and customer requirements:

<TABLE>
<CAPTION>

| MODEL (TECHNOLOGY) | APPLICATIONS | SELECTED INSTALLATIONS |
|---|---|---|
| <S> | <C> | <C> |
| Rapiscan 19 (single energy) | Inspection of incoming package | Embassies |
| Rapiscan 119 (single energy) | | Post offices |
| | | Courthouses<br>High risk office buildings<br>Manufacturing companies |
| Rapiscan 300 Series (160 kV x-ray source, single energy and dual energy) | Inspection of hand carried baggage | Airports<br>Prisons<br>Government buildings<br>Nuclear facilities |
| Rapiscan 500 Series-Standard Tunnel (single view and dual view 160 kV x-ray source, single energy and dual energy) | Airport hand carried and checked baggage<br>Pallet inspection<br>Customs inspections<br>Agriculture inspection | Airports<br>Cruise ships<br>Freight shippers<br>Border crossings |
| Rapiscan 500 Series-Large Tunnel (single view and dual view 320-450 kV x-ray source) | Large pallet inspection<br>Customs inspections | Airports<br>Freight shippers<br>Border crossings<br>High risk seaport locations |

| | | |
|---|---|---|
| Rapiscan 500 Series-Mobile Systems (x-ray van or trailer) | Mobile x-ray inspection | Conventions and special events<br>Airports<br>Customs inspections<br>Border crossing |

</TABLE>

In addition to its x-ray security and inspection products, the Company also markets three models of an archway walk-through metal detector and two models of a hand-held metal detector. These products are used to detect metal weapons such as guns and knives and are installed at airports and other locations, including prisons and schools. During fiscal 1997, sales of the walk-through and hand-held metal detectors constituted 1.6% of the Company's revenues.

The Company's Rapiscan U.S.A. subsidiary has entered into a non-exclusive patent license agreement with EG&G Inc. Under the license, Rapiscan U.S.A. is permitted to make, use and sell or otherwise dispose of security and inspection products that use an x-ray line scan system for baggage inspection purposes covered by EG&G Inc.'s patent. The patent, which expires in 2000, does not affect sales of the Company's security and inspection products manufactured and sold outside of the United States.

<PAGE>

MARKETS, CUSTOMERS AND APPLICATIONS

Optoelectronic Devices and Subsystems. The Company's optoelectronic devices and subsystems are used in a broad range of products by a variety of customers. The following chart illustrates, for the year ended June 30, 1997: (i) the major product categories for which the Company provided optoelectronic products; (ii) the percentage of revenues from the sale of optoelectronic devices and subsystems related to such categories; (iii) certain customers ("Major Customers") in each such category who purchased more than $100,000 of optoelectronic products; and (iv) the total number of Major Customers in each such category. The Company expects that the list of product categories, the amount of business derived from each such product category, and the composition of its major customers will vary from period to period.

<TABLE>
<CAPTION>

| PRODUCT CATEGORY | PERCENTAGE OF OPTOELECTRONIC SALES | REPRESENTATIVE MAJOR CUSTOMERS | APPROXIMATE NUMBER OF MAJOR CUSTOMERS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed Tomography and X-Ray Imaging | 23.3% | Picker International<br>Hologic, Inc.<br>InVision Technologies | 7 |
| Aerospace and Avionics | 12.3% | Kearfott Guidance<br>Honeywell Avionics<br>Litton Systems | 10 |
| Medical Monitoring | 12.1% | Datascope<br>BioChem International<br>Criticare Systems | 8 |
| Analytical, Medical Diagnostics, and Particle Analyzers | 6.9% | Johnson & Johnson<br>Leica<br>Coulter Corporation | 10 |
| Office Automation and Computer Peripherals | 7.6% | Xerox | 8 |

| | | | |
|---|---|---|---|
| | | Eastman Kodak<br>Dr. Johannes Heidenhain | |
| Construction, Robotics and Industrial Automation | 6.2% | 3M<br>Spectra Physics<br>Baumer Electric | 7 |
| Military/Defense and Weapons Simulations | 5.1% | Lockheed Martin (Loral)<br>Hughes (HDOS)<br>Texas Instruments | 7 |
| Bar Code Scanners | 3.6% | Symbol Technologies<br>Intermec<br>United Barcode Industries (Singapore) | 3 |
| Gaming Industry | 2.1% | Bally Gaming<br>Ardac, Inc. | 2 |

</TABLE>

<PAGE>

Security and Inspection Products. Since entering the security and inspection products market in 1993, the Company has shipped over 2,000 units to over 50 countries. The Company has sold 10 or more of its security and inspection products, or more than $100,000 of such products, in at least 26 countries. The following is a list of certain customers and/or installations that have purchased at least 10 units, or more than $100,000, of the Company's security and inspection products since January 1993:

<TABLE>

| <S> | <C> |
|---|---|
| Nanjing Airport; People's Republic of China | Ukraine Airports; Ukraine |
| Prague Airport; Czech Republic | United Kingdom Prison System; United Kingdom |
| Gatwick Airport; England | American Airlines; U.S.A |
| Heathrow Airport; England | Continental Airlines; U.S.A |
| TNT Freight; England | Delta Airlines; U.S.A. |
| Finnish Customs; Finland | Federal Courthouses; U.S.A. |
| Malaysian Airport Board; Malaysia | Federal Reserve Bank; U.S.A. |
| New Zealand Customs; New Zealand | JFK International Terminal; U.S.A. |
| Pakistan Airports; Pakistan | Los Angeles County Courthouse; U.S.A. |
| Doha International Airport; Qatar | Miami Airport; U.S.A. |
| HAJ Terminal; Saudi Arabia | Orlando Airport; U.S.A. |
| Spanish Radio/Television; Spain | USAir; U.S.A. |
| Sri Lanka Government; Sri Lanka | Japanese Embassies; Worldwide |
| Dubai Airport; U.A.E. | |

</TABLE>

Because the market for most security and inspection products developed in response to civilian airline hijackings, historically a large portion of the

Company's security and inspection products were sold for use at airports. Recently, however, the Company's security and inspection products have been used for security purposes at locations other than airports, such as courthouses, government buildings, mail rooms, schools, prisons and at unique locations such as Buckingham Palace, England. In addition, the Company's security and inspections products are increasingly being used for non-security purposes, such as for cargo inspection to detect narcotics and contraband, prevention of pilferage at semiconductor manufacturing facilities, quality assurance for agricultural products, and the detection of gold and currency.

MARKETING, SALES AND SERVICE

The Company markets and sells its optoelectronic devices and subsystems worldwide through both a direct sales and marketing staff of 23 employees and indirectly through a network of approximately 23 independent sales representatives and distributors, as of June 30, 1997. Most of the in-house sales staff is based in the United States while most of the independent sales representatives and distributors are located abroad. Since the acquisition of AME in March 1997, the Company's marketing efforts in Europe have been conducted through AME's sales and marketing staff and through a network of approximately four independent sales representatives. The Company markets and sells its security and inspection products worldwide through a direct sales and marketing staff of approximately 19 employees located in the United States, the United Kingdom, Dubai, and Malaysia and through a network of over 72 independent sales representatives, as of June 30, 1997. Following this Offering, the Company intends to expand its direct sales force.

The Company's optoelectronic products sales staff located in the United States and Norway is supported by an applications engineering group whose members are available to provide technical support. This support includes designing applications, providing custom tooling and process integration, defining solutions for customers and developing products that meet customer defined specifications. The security and inspection

<PAGE>

products sales staff is supported by a service organization of approximately 23 persons, as of June 30, 1997, located primarily in the United States, the United Kingdom and Malaysia. The Company also supports these sales and customer relations efforts by providing operator training, computerized training and testing equipment, in-country service, software upgrades, service training for customer technicians and a newsletter on security issues.

The Company considers its maintenance service operations to be an important element of its business. After the expiration of the standard one-year product warranty period, the Company is often engaged by its customers to provide maintenance services for its security and inspection products through annual maintenance contracts. The Company believes that its international maintenance service capabilities give it a competitive advantage in selling its security and inspection products. Furthermore, the Company believes that as its installed base of security and inspection products increases, revenues generated from such annual maintenance service contracts and from the sale of replacement parts will increase. In fiscal 1996 and 1997, maintenance service revenues and replacement part sales collectively represented 3.3% and 3.6%, respectively, of the Company's revenues.

RESEARCH AND DEVELOPMENT

The Company's components and optoelectronic subsystems are designed and engineered at the Company's offices in either Hawthorne, California, or Horten, Norway. The subsystems that the Company manufactures are engineered by the Company to solve specific application needs of its OEM customers. The Company's customers typically request that the Company design custom optoelectronic solutions for their specific needs when standard components or

subsystems are not available from other manufacturers of optoelectronic devices. After an end-product has been conceptualized by the OEM, the Company normally will involve its engineers to design the application, to establish the mechanical specifications for the application, to create the appropriate subsystem architecture for the application, and to design the development, production, and assembly process for the manufacture of the ultimate subsystem. However, because the Company has the engineering, tooling and manufacturing capabilities to design and manufacture entire subsystems, and not just a specific component, the Company typically also designs, manufactures and assembles the entire subsystem for the customer. Because the Company's engineers are able to provide additional value and services to its customers through the entire production process from concept to completion, the Company considers its engineering personnel to be an important extension of its core sales and marketing effort.

In addition to close collaboration with the Company's customers in the design and development of optoelectronics-based products, the Company maintains an active program for the development and introduction of new products and enhancements and improvements to its existing products, including the implementation of new applications of its technology. The Company seeks to further develop its research and development program and considers such program to be an important element of its business and operations. As of June 30, 1997, in addition to the engineers that the Company employed in manufacturing, process design and applications development, the Company engaged approximately 33 full-time engineers and technicians in research and development. During the fiscal 1994, 1995, 1996 and 1997, the Company's research and development expenses were approximately $1.5 million, $1.6 million, $1.7 million and $2.5 million, respectively. In order to fulfill its strategy of increasing its security and inspection product lines and of enhancing the capabilities of its existing products, the Company intends to increase its research and development efforts in the future.

MANUFACTURING AND MATERIALS MANAGEMENT

The Company currently has manufacturing facilities in the United Kingdom, Malaysia and Norway in addition to its manufacturing facilities in Hawthorne, California, Long Beach, California, and Ocean Springs, Mississippi. The Company's principal manufacturing facility is in Hawthorne, California. However, most of the Company's high volume, labor intensive manufacturing and assembly is generally performed at its facilities

35

<PAGE>

in Malaysia. Since most of the Company's customers currently are located in Europe, Asia and the United States, the Company's ability to assemble its products in these markets and provide follow-on service from offices located in these regions is an important component of the Company's global strategy.

The Company seeks to focus its subsystem manufacturing resources on its core competencies that enable it to provide value-added enhancements and distinctive value. The Company believes that its manufacturing organization has expertise in optoelectronic, electrical and mechanical manufacturing and assembly of products for commercial applications and for high reliability applications. High reliability devices and subsystems are those which are designed, manufactured, screened and qualified to function under exceptionally severe levels of environmental stress. See "Legal Proceedings." The manufacturing techniques include silicon wafer processing and fabrication, manufacture and assembly of photodiodes, SMT (surface mounting) and manual thru-hole assembly, thick-film ceramic processing, wire bonding, molding, assembly of components, testing, and packaging. The Company also has the ability to manufacture plastic parts and certain other parts that are either not available from third party suppliers or that can be more efficiently or cost-effectively manufactured in-house. The Company outsources certain manufacturing operations including its sheet metal fabrication. The

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1093 of 2711

manufacturing process for components and subsystems consists of manual tasks performed by skilled and semi-skilled workers as well as automated tasks. The number of subsystems that the Company manufacturers depends on the customers' needs and may range from a few subsystems (such as an optoelectronic sun sensor for use in a satellite) to many thousands (sensors used in laser printers and bar code readers).

The principal raw materials and subcomponents used in producing the Company's optoelectronic devices and subsystems consist of silicon wafers, ceramics, electronic subcomponents, light emitting diodes, phototransistors, printed circuit boards, headers and caps, housings, cables, filters and packaging materials. For cost, quality control and efficiency reasons, the Company generally purchases raw materials and subcomponents only from single vendors with whom the Company has on-going relationships. The Company does, however, qualify second sources for all of its raw materials and subcomponents, or has identified alternate sources of supply. The Company purchases the materials pursuant to purchase orders placed from time to time in the ordinary course of business with procurement commitment terms ranging from three months to one year at fixed costs but has no guaranteed long-term supply arrangements with such suppliers. The silicon-based optoelectronic devices manufactured by the Company are critical components in most of its subsystems. Since 1987, the Company has purchased substantially all of the silicon wafers it uses to manufacture its optoelectronics devices from Wacker Siltronic Corp. Although to date the Company has not experienced any significant shortages or material delays in obtaining any of its raw materials or subcomponents, there can be no assurance that the Company will not face such shortages or delays in one or more of these materials in the future. See "Risk Factors--Availability of Raw Materials and Components."

Substantially all of the optoelectronic subsystems, circuit boards and x-ray generators used in the Company's inspection and detection systems are manufactured in-house. The metal shells of the x-ray inspection systems, and certain standard mechanical parts are purchased from various third-party unaffiliated providers.

ENVIRONMENTAL REGULATIONS

The Company is subject to various federal, state and local environmental laws, ordinances and regulations relating to the use, storage, handling, and disposal of certain hazardous substances and wastes used or generated in the manufacturing and assembly of the Company's products. Under such laws, the Company may become liable for the costs of removal or remediation of certain hazardous substances that have been or are being released on or in its facilities or that have been or are being disposed of off site as wastes. Such laws may impose liability without regard to whether the Company knew of, or caused, the release of such hazardous substances. In the past, the Company has conducted a Phase I environmental assessment report for each of the properties in the United States at which it currently manufactures products. The purpose of each such report was to identify, as of the date of that report, potential sources of contamination of the property. In

<PAGE>

certain cases, the Company has received a Phase II environmental assessment report consisting of further soil testing and other investigations deemed appropriate by an independent environmental consultant. The Company believes that it is currently in compliance with all material environmental regulations in connection with its manufacturing operations, and that it has obtained all environmental permits necessary to conduct its business. The amount of hazardous substances and wastes produced and generated by the Company may increase in the future depending on changes in the Company's operations. Any failure by the Company to comply with present or future regulations could subject the Company to the imposition of substantial fines, suspension of production, alteration of manufacturing process or cessation of operations,

any of which could have a material adverse effect on the Company's business, financial condition and results of operations. For a discussion of the risks imposed upon the Company's business by environmental regulations, see "Risk Factors--Environmental Regulation."

COMPETITION

The markets in which the Company operates are highly competitive and are characterized by evolving customers needs and rapid technological change. The Company competes with a number of other manufacturers, many of which have significantly greater financial, technical and marketing resources than the Company. In addition, these competitors may have the ability to respond more quickly to new or emerging technologies, may adapt more quickly to changes in customer requirements, may have stronger customer relationships, may have greater name recognition, and may devote greater resources to the development, promotion and sale of their products than the Company. There can be no assurance that the Company will be able to compete successfully against any current or future competitors in either the optoelectronic devices and subsystem markets or the security and inspection markets or that future competitive pressures will not materially and adversely affect its business, financial conditions and results of operations.

In the optoelectronic device and subsystem market, competition is based primarily on such factors as expertise in the design and development of optoelectronic devices, product quality, timeliness of delivery, price, customer technical support, and on the ability to provide fully integrated services from application development and design through volume subsystem production. The Company believes that its major competitors in the optoelectronic device and subsystem market are EG&G Electro-Optics, a division of EG&G, Inc., Optek Technology Inc., Hamamatsu Corporation, and Honeywell Optoelectronics, a division of Honeywell, Inc. Because the Company specializes in custom subsystems requiring a high degree of engineering expertise, the Company believes that it generally does not compete to any significant degree with any other large United States, European or Far Eastern manufacturers of standard optoelectronic components.

In the security and inspection market, competition is based primarily on such factors as product performance, functionality and quality, the over-all cost effectiveness of the system, prior customer relationships, technological capabilities of the products, price, local market presence, and breadth of sales and service organization. The Company believes that its principal competitors in the market for security and inspection products are EG&G Astrophysics, a division of EG&G, Inc., Heimann Systems GmbH, InVision Technologies, Inc., Vivid Technologies, American Science and Engineering, Inc., Barringer Technologies Inc., Control Screening L.L.C., and Thermedics Detection, Inc. Competition could result in price reductions, reduced margins, and loss of market share by the Company. In the airline and airport security and inspection market, particularly in the upgrade and replacement market, the Company also competes for potential customers based on existing relationships between its competitors and the customers. Certain of the Company's competitors have been manufacturing inspection systems since the 1980's and have established strong relationships with airlines and airport authorities. The Company believes that the image quality and resolution of certain of its security and inspection products is superior to the image quality offered by most of its competitors' x-ray based inspection products. Although the Company also has established relationships with a number of airport and airline customers, no assurance can be given that the Company will be able to successfully compete in the future with existing competitors or with new entrants.

<PAGE>

BACKLOG

The Company measures its backlog as orders for which purchase orders or contracts have been signed, but which have not yet been shipped and for which revenues have not yet been recognized. The Company typically ships its optoelectronics devices and subsystems as well as its security and inspection products within one to three months after receiving an order. However, such shipments may be delayed for a variety of reasons including any special design or engineering requirements of the customer. In addition, large orders (more than 10 machines) of security and inspection products typically require more lead time. Large cargo scanning machines require six to twelve months lead time.

At June 30, 1997, the Company's backlog products totalled approximately $52.7 million, compared to approximately $30.0 million at June 30, 1996. Substantially all of the Company's backlog as of June 30, 1997 is expected to be shipped during the fiscal year ending June 30, 1998. Any failure of the Company to meet an agreed upon schedule could lead to the cancellation of the related order. Variations in the size of the order, the product mix, and delivery requirements of the customer order may result in substantial fluctuations in backlog from period to period. Backlog as of any particular date should not be relied upon as indicative of the Company's revenues for any future period and cannot be considered a meaningful indicator of the Company's performance on an annual or quarterly basis.

EMPLOYEES

As of June 30, 1997, the Company employed approximately 725 people, of whom 565 were employed in manufacturing, 33 in research and development, 62 in finance and administration, 42 in sales and marketing, and 23 in its service organization. Of the total employees, approximately 453 were employed in the United States, 109 were employed in Europe, 162 were employed in Asia, and one employee was employed in the Middle East. Nine employees at AME are members of a union and have collective bargaining rights. Other than the employees of AME, none of the Company's other employees are unionized. There has never been a work stoppage or strike at the Company, and management believes that its relations with its employees are good.

FACILITIES

The Company currently leases all of its facilities with remaining lease terms ranging from one to 14 years as reflected in the following table:

<TABLE>
<CAPTION>

| LOCATION | DESCRIPTION OF FACILITY | APPROXIMATE SQUARE FOOTAGE | LEASE EXPIRATION |
|---|---|---|---|
| Hawthorne, California | Executive offices, manufacturing, engineering, sales and marketing | 61,700 | 2005 |
| Long Beach, California | Manufacturing, engineering, sales and marketing and service | 26,200 | 1998 |
| Ocean Springs, Mississippi | Manufacturing, engineering and sales and marketing | 41,800 | 2001 |
| Johor Bahru, Malaysia | Manufacturing and sales | 13,500 | 1997 |
| Johor Bahru, Malaysia | Manufacturing | 10,500 | 1998 |
| Horten, Norway | Manufacturing, engineering, marketing and sales | 18,200 | 1999 |

| | | | |
|---|---|---|---|
| Singapore, Republic of Singapore | Administrative and materials procurement | 3,000 | 2000 |
| Crawley, United Kingdom | Manufacturing, engineering, sales and marketing | 11,900 | 2011 |
| Hayes, United Kingdom | Service | 3,900 | 2003 |

</TABLE>

<PAGE>

The Company believes its facilities are in good condition and are adequate to support its operations for the foreseeable future. The Company currently anticipates that it will be able to renew the leases that are scheduled to expire in the next few years on terms substantially the same as currently in effect. However, even if the Company were not able to renew one or more of the leases, the Company believes that suitable substitute space is available to relocate any of the facilities where the lease is not renewed. Accordingly, the Company does not believe that its failure to renew any of the leases that are scheduled to expire in the next few years will have a material adverse effect on the Company's operations.

The Company has an option to purchase the Hawthorne, California, facility for a base price of approximately $3.0 million. The option is exercisable by the Company upon prior written notice of six months to the landlord at any time during the term of the lease. After October 1999, the option purchase price will be increased each year by the percentage increase in the Consumer Price Index as calculated by the United States Department of Labor for urban consumers in the Los Angeles area. In addition to the option to purchase, the Company also has a right of first refusal to purchase the Hawthorne facility in the event that the landlord entertains a third party offer to buy the facility.

LEGAL PROCEEDINGS

On January 21, 1997, Rapiscan U.S.A. filed a complaint in the U.S. District Court for the Central District of California against Lunar in response to claims by Lunar that certain security inspection products produced by Rapiscan U.S.A. infringe the '688 patent, which patent is owned by UAB and licensed exclusively to Lunar. The complaint seeks a declaratory judgment that the products produced by Rapiscan U.S.A. do not infringe the '688 patent, that the '688 patent is invalid, and that the patent may not be enforced against Rapiscan U.S.A. for a number of equitable and legal reasons. The complaint also asserts related nonpatent claims including fraud and the breach of an oral agreement whereby Lunar would compensate Rapiscan U.S.A. for assisting Lunar in its enforcement of the '688 patent and seeks compensatory and punitive damages for these claims.

On January 23, 1997, Lunar and UAB, filed suit against OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors in the U.S. District Court for the Western District of Wisconsin. Lunar and UAB asserted patent infringement, contributory infringement and inducement thereof. Lunar and UAB seek damages in an unspecified amount and an injunction preventing OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors from further making, using, selling and offering for sale products including the dual energy detector allegedly covered by the '688 patent. The Wisconsin lawsuit has been transferred to the U.S. District Court for the Central District of California and has been consolidated with the lawsuit brought by Rapiscan U.S.A.

OSI Systems, Inc., Rapiscan U.S.A. and UDT Sensors moved for partial summary judgment on the scope of claims 38 and 39 of the '688 patent, which are presently the only claims being asserted by Lunar and UAB. In July 1997, the

court granted the motion for partial summary judgment and ordered that (1) claim 38 is construed to require that the scintillator material of the first detector element is a different material than the scintillator material of the second element, (2) claim 38 is construed to require the use of an area beam, and (3) claim 39 is construed to require that the phosphor material and primary radiation absorber in the first detector element are different materials than the phosphor material and primary radiation absorber in the second detector element. The issue of whether claims 38 and 39, as now construed, can cover the Company's specific products was not before the court. However, because the Company's products use only the same scintillator materials and use only fan beams, the Company believes that the likelihood of Lunar and UAB prevailing in its patent infringement lawsuit against the Company is remote. No assurance can be given that the Company will be successful in this lawsuit. See "Risk Factors--Proprietary Technology; Pending Litigation." The Company intends to continue its defense against Lunar's and UAB's claims and to vigorously pursue its claims against Lunar.

In October 1994, UDT Sensors, one of the Company's subsidiaries, entered into a Consent Judgment and a Criminal Plea and Sentencing Agreement (collectively, the "Consent Agreements") with the United States of America. The charges contained in the Consent Agreements relate to high-reliability optoelectronic subsystems that UDT Sensors manufactured for use in military aircraft, attack helicopters and submarines. In

39

<PAGE>

the Consent Agreements, UDT Sensors agreed that it had not tested 100% of these products as required by the applicable military specifications. Under the terms of the Consent Agreements, UDT Sensors agreed to pay a total of $1.5 million, plus interest, in five annual installments ending on March 31, 1999. UDT Sensors was placed on probation for the five-year period ending March 31, 2000 with respect to sales of optoelectronic subsystems for use by the U.S. Department of Defense. Probation does not, however, prohibit UDT Sensors from selling optoelectronic products to the United States, and UDT Sensors has, since the date of the Consent Agreements, continued to manufacture and sell the same optoelectronic products for use in military aircraft, attack helicopters and submarines. In addition, in order to ensure that UDT Sensors complies with all Federal procurement laws, UDT Sensors agreed to implement programs and practices to establish and monitor complying contracting procedures, and agreed to file periodic reports evidencing such practices and programs.

40

<PAGE>

MANAGEMENT

EXECUTIVE OFFICERS AND DIRECTORS

The following sets forth certain information regarding the Company's executive officers and directors:

<TABLE>
<CAPTION>

| NAME | AGE | POSITION |
|---|---|---|
| Deepak Chopra......... | 46 | Chairman of the Board, Chief Executive Officer and President |
| Ajay Mehra........... | 34 | Vice President, Chief Financial Officer, Secretary and Director |
| Andreas F. Kotowski... | 42 | President of U.S. Operations, Rapiscan U.S.A. |
| Manoocher Mansouri | | |

Aliabadi........... 43 Vice President -- Corporate Marketing, UDT Sensors

Anthony S. Crane...... 43 Managing Director, Rapiscan UK

Thomas K. Hickman..... 55 Managing Director, OSI Singapore and OSI Malaysia

Steven C. Good(1)..... 55 Director

Meyer Luskin(1)....... 71 Director

Madan G. Syal(1)...... 71 Director
</TABLE>

- ----------------
(1) Member of Audit Committee and Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries, including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore and Ferson Optics, Inc. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology Division. In 1990, the Company acquired certain assets of ILC's United Detector Technology Division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a B.S. in Electronics and a M.S. in Semiconductor Electronics. Messrs. Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Mr. Chopra.

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries including UDT Sensors, Rapiscan U.S.A., Rapiscan UK, OSI Singapore, and Ferson Optics, Inc. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a B.A. from the School of Business of the University of Massachusetts, Amherst, and a M.B.A from Pepperdine University. Mr. Deepak Chopra is the first cousin of Mr. Mehra.

Andreas F. Kotowski has served as the President of U.S. Operations, General Manager and a director of the Company's subsidiary, Rapiscan U.S.A., since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan UK, the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National

<PAGE>

Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a B.S. in Electrical Engineering and a B.S. in Physics from California State Polytechnic University, Pomona, and a M.S. in Electrical Engineering from Stanford University.

Manoocher Mansouri-Aliabadi has served as Vice President of Corporate Marketing for the Company's UDT Sensors subsidiary since March 1994. From March 1992 to November 1993, Mr. Mansouri served as Director of Sales and Marketing for UDT Sensors, and from 1990 to 1992, as a Division Director of the Aerospace and Defense Division of UDT Sensors. Mr. Mansouri joined United Detector Technology, the predecessor of UDT Sensors in 1982 as an Engineer and holds a B.S. in Electrical Engineering from the University of California, Los Angeles.

Anthony S. Crane has served as Managing Director of the Company's subsidiary, Rapiscan UK, since March 1996. From March 1995 to March 1996, he served as Sales and Marketing Director for Rapiscan UK, and from February 1993 to March 1995, he served as Sales Director, Middle East, for Rapiscan UK. From November 1980 to January 1993, Mr. Crane held various positions at Rapiscan UK before it was acquired by the Company including Exports Business Manager, Sales Manager and Service Engineer. From May 1974 to November 1980, Mr. Crane served as Production Coordinator and Electrical and Electronic Inspector for Redifon Flight Simulation where he was responsible for production and customer relations.

Thomas K. Hickman has served as Managing Director of the Company's subsidiaries, OSI Singapore and OSI Malaysia, since July 1995 and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan UK, respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a B.A. from Stetson University and a M.B.A. from the University of San Francisco.

Steven C. Good has served as Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good holds a B.S. in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as Director of the Company since February 1990. Since 1961 Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange and engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as Director of Scope Industries since 1958 and currently serves as Director of Stamet, Inc., an industrial solid pump manufacturer. Mr. Luskin holds a B.A. from the University of California, Los Angeles, and a M.B.A. from Stanford University.

Madan G. Syal has served as Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a B.S. from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University. Mr. Deepak Chopra is the son-in-law of Mr. Syal.

<PAGE>

There are currently five members of the Board of Directors. After the completion of the Offering, the management of the Company intends to increase the number of independent directors of the Company by increasing the number of directors constituting the Board of Directors. No nominees for the additional Board seats have yet been identified. The Directors serve until the next annual meeting of shareholders or until successors are elected and qualified. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors of the Company.

The Board of Directors has established an Audit Committee and a Compensation Committee. The functions of the Audit Committee include recommending to the Board the selection and retention of independent auditors, reviewing the scope of the annual audit undertaken by the Company's independent auditors and the progress and results of their work, and reviewing the financial statements of the Company and its internal accounting and auditing procedures. The functions of the Compensation Committee include establishing the compensation of the Chief Executive Officer, reviewing and approving executive compensation policies and practices, reviewing salaries and bonuses for certain executive officers of the Company, administering the Company's employee stock option plans, and considering such other matters as may, from time to time, be delegated to the Compensation Committee by the Board of Directors.

Each non-employee Director currently receives a cash fee of $1,250 per Board meeting attended and an additional $1,250 per Board committee meeting attended if such committee meeting is held on a day different from that of the Board meeting. During the fiscal year ended June 30, 1997, each non-employee Director received, as additional director compensation, options to purchase 5,000 shares of Common Stock at an exercise price of $13.50 per share. The Directors are reimbursed for expenses incurred in connection with the performance of their services as Directors.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During the fiscal year ended June 30, 1997, all of the outside Directors, Steven C. Good, Meyer Luskin and Madan G. Syal, served on the Board's compensation committee. Certain transactions between the Company and the members of the compensation committee include the following: Mr. Good is a senior partner of Good Swartz & Berns, an accounting firm that provided services to the Company. The Good Swartz & Berns Pension & Profit Sharing Plan, in which Mr. Good participates, exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under certain promissory notes issued to the pension plan by the Company. Mr. Luskin is the President, Chief Executive Officer and Chairman of Scope Industries which provided consultation services to the Company for a fee in the amount of $100,000. Scope Industries also exercised certain warrants to purchase stock of the Company by applying the outstanding principal amount under a promissory note issued by the Company to Scope Industries. Mr. Syal owns Pro Printers, a printing service company that provides printing services to the Company. For additional information regarding these direct or indirect transactions between the outside Directors, see "Certain Transactions." Mr. Syal is the father-in-law of Deepak Chopra, the President, Chief Executive Officer and Chairman of the Company.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

EXECUTIVE COMPENSATION

The following table sets forth certain compensation earned during the fiscal year ended June 30, 1997, by the Company's Chief Executive Officer and the four other most highly compensated executive officers whose total salary and bonus during such year exceeded $100,000 (collectively, the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION SALARY | ANNUAL COMPENSATION BONUS | LONG TERM COMPENSATION SECURITIES UNDERLYING OPTIONS (#)(2) |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Deepak Chopra(1)................................ Chief Executive Officer | $370,843 | $175,000 | 137,500 |
| Ajay Mehra ..................................... Chief Financial Officer | 172,216 | 58,040 | 73,750 |
| Andreas F. Kotowski ............................ President of U.S. Operation, Rapiscan U.S.A. | 124,452 | 10,000 | 57,029 |
| Manoocher Mansouri Aliabadi..................... Vice President--Corporate Marketing, UDT Sensors | 110,019 | 28,000 | 15,000 |
| Thomas K. Hickman .............................. Managing Director, OSI Malaysia and OSI Singapore | 124,220 | 12,500 | 10,125 |

</TABLE>

- ----------------
(1) The Company paid aggregate insurance premiums of approximately $23,000 for two universal life insurance policies of Mr. Chopra. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.
(2) For additional information see "Option Grants."

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as President, Chief Executive Officer and Chairman of the Board of the Company. The employment agreement provides for a base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

The Company has also entered into a three-year employment agreement with Ajay Mehra and a two-year employment agreement with Manoocher Mansouri Aliabadi, each of which became effective on April 1, 1997. The employment agreements provide for base salaries of $200,000 and $120,000 per year, for Messrs. Mehra and Mansouri, respectively, with annual raises to be determined by the Company's Chief Executive Officer. Pursuant to these employment agreements, Messrs. Mehra and Mansouri are also eligible for certain bonus payments and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. Each of the employment agreements contains confidentiality provisions and provides that

the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's current annual salary is $140,000.

44

<PAGE>

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's annual salary is $125,000. In addition to the salary, the Company has agreed to pay certain relocation expenses related to Mr. Hickman's service in Singapore.

Anthony S. Crane is currently employed by the Company pursuant to an employment agreement with a term that ends in December 1998.

Pursuant to an incentive compensation agreement entered into in December 1996 by the Company and Andreas F. Kotowski, Mr. Kotowski is entitled to receive as additional incentive compensation, 10.0% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan UK in excess of certain pre-determined amounts. Such incentive compensation may not exceed $150,000 for any fiscal year and is based on earnings of Rapiscan U.S.A. and Rapiscan UK for the 1997, 1998 and 1999 fiscal years. Mr. Kotowski was not entitled to receive such additional incentive compensation for the 1997 fiscal year.

The management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year. Bonuses were distributed to over 100 officers and employees in May and June 1997 based on their performances during the fiscal year ended June 30, 1997.

OPTION GRANTS

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 1997:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) | MARKET PRICE ($/SHARE) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) 0% ($) | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | |

<C>

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra........... | 37,500 | 5.7% | $3.33 | $6.67 | 12/14/01 | $125,000 | $34,535 | $76,314 |
| | 100,000 | 15.3 | 13.50 | N/A | 5/31/02 | N/A | 372,980 | 824,189 |
| Ajay Mehra(2)........... | 30,000 | 4.6 | 3.33 | 6.67 | 12/14/01 | 100,000 | 27,601 | 60,990 |
| | 10,000 | 1.5 | 13.50 | N/A | 5/31/02 | N/A | 37,298 | 82,419 |
| | 30,000 | 4.6 | 11.50 | N/A | 5/31/02 | N/A | 95,317 | 210,626 |
| Andreas F. Kotowski(2).. | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 20,000 | 3.1 | 11.50 | N/A | 5/31/02 | N/A | 63,545 | 140,417 |
| Manoocher Mansouri Aliabadi(2)............ | 7,500 | 1.1 | 2.83 | 6.67 | 12/14/01 | 28,750 | 5,871 | 12,973 |
| | 7,500 | 1.1 | 11.50 | N/A | 5/31/02 | N/A | 23,829 | 52,656 |
| Thomas K. Hickman(2).... | 3,750 | 0.6 | 2.83 | 6.67 | 12/14/01 | 14,375 | 2,935 | 6,487 |
| | 6,000 | 0.9 | 11.50 | N/A | 5/31/02 | N/A | 19,063 | 42,125 |

</TABLE>

- ----------------
(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5.0% and 10.0% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 0.0%, 5.0% and 10.0% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission, and do not represent the Company's estimate or projection of future Common Stock prices.
(2) Excludes options granted as consideration for the acquisition by the Company of the minority interests in Rapiscan U.S.A. See "Certain Transactions."

<PAGE>

OPTION EXERCISES AND FISCAL YEAR-END VALUES

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 1997 and held by them on June 30, 1997:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END (#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END ($)(1) | |
|---|---|---|---|---|---|---|
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($) | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1104 of 2711

| | | | | | | |
|---|---|---|---|---|---|---|
| Deepak Chopra.......... | 0 | -- | 37,500 | 100,000 | $331,875 | $ 0 |
| Ajay Mehra.............. | 9,000 | $107,100 | 75,000 | 40,000 | 814,500 | 60,000 |
| Andreas F. Kotowski..... | 0 | -- | 7,500 | 20,000 | 80,025 | 40,000 |
| Manoocher Mansouri Aliabadi............... | 7,500 | 89,250 | 13,500 | 8,250 | 149,500 | 23,625 |
| Thomas K. Hickman....... | 9,750 | 109,925 | 15,187 | 14,813 | 174,648 | 109,600 |

</TABLE>

- ---------------

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on an estimated initial offering price of $13.50 per share).

STOCK OPTION PLANS

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are non-transferrable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of September 30, 1997, 466,500 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 348,750 shares were outstanding under the 1987 Plan at exercise prices ranging from $0.17 to $3.33 per share, and 234,750 shares remained available for grant. As of such date, stock options to purchase 316,501 shares of Common Stock were exercisable. No stock options may be granted under the 1987 Plan after December 31, 1998.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's shareholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is to be administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

<PAGE>

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common

Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85.0% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10.0% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

In May 1997, the Board of Directors of the Company authorized grants of options to purchase 434,486 shares of Common Stock available for issuance under the 1997 Plan to certain directors, officers and employees of the Company. Of these options, 125,000 are exercisable at a price of $13.50 per share and 309,486 are exercisable at $11.50 per share. The options generally will be subject to vesting and will become exercisable over a period of four years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan after the Offering, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

EMPLOYEE BENEFIT PLAN, PENSION PLANS

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($9,500 in 1997) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. To date, no such matching contributions have been made with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan UK and AME each have a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

LIMITATION ON DIRECTORS' LIABILITY

The Company's Articles of Incorporation ("Articles") provide that, pursuant

to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a

<PAGE>

director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Company believes that it is the position of the Commission that insofar as the foregoing provision may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

The Company has entered into indemnity agreements ("Indemnity Agreement(s)") with each of its directors and executive officers. Each such Indemnity Agreement provides that the Company shall indemnify the indemnitee against expenses, including reasonable attorneys' fees, judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by him in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. The Indemnity Agreements also require that the Company indemnify the director or executive officer in all cases to the fullest extent permitted by applicable law. Each Indemnity Agreement permits the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. The Company believes that its Articles and Bylaw provisions are necessary to attract and retain qualified

persons as directors and officers.

<PAGE>

CERTAIN TRANSACTIONS

In 1993, the Company formed Rapiscan U.S.A. for the purpose of acquiring most of the capital stock of Rapiscan UK. As of October 1996, the Company owned 85.5% of the outstanding capital stock of Rapiscan U.S.A., and 14.5% (the "Option Shares") was owned by executive officers or employees of the Company, including Ajay Mehra, Andreas F. Kotowski, Anthony S. Crane and Thomas K. Hickman. See "Management--Executive Officers and Directors." In connection with the formation of Rapiscan U.S.A., the Company was granted an option to purchase all of the Option Shares. In November 1996, the Company exercised its option to acquire the Option Shares. The aggregate consideration paid for the Option Shares consisted of the following: (i) the issuance of a total of 159,201 shares of Common Stock valued at $6.67 per share; (ii) the issuance of options to purchase a total of 45,486 shares of Common Stock at a purchase price of $11.50 per share; and (iii) the issuance to the holders of the Option Shares of 27,654 additional shares of Common Stock which was based on the net income before taxes of Rapiscan U.S.A. and Rapiscan UK combined for the fiscal year ended June 30, 1997. The consideration paid by each of Messrs. Kotowski, Crane, Hickman and Mehra for their minority interests in Rapiscan U.S.A. was $119,372, $6,610, $500 and $125, respectively.

Until September 1996, the Company owned approximately 95.9% of the outstanding capital stock of Ferson Optics, Inc., and certain employees and officers of the Company, including Ajay Mehra and Thomas K. Hickman, the Managing Director of OSI Malaysia, owned the remaining shares. Mr. Mehra and Mr. Hickman acquired their minority interests in Ferson for $250 and $3,000, respectively. In September 1996, the Company purchased all of the remaining shares of Ferson from the minority shareholders in exchange for a total of 19,755 shares of Common Stock. The Common Stock was valued at $6.67 per share. Ajay Mehra and Thomas K. Hickman received 12,500 and 750 shares of Common Stock, respectively, in connection with the foregoing exchange.

In June 1989, April 1990 and February 1993 the Company, as part of its plan of financing, issued subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes included certain of the Company's directors, executive officers, principal shareholders and members of their families (collectively, the "Related Parties"). The June 1989 promissory notes bore interest at a fixed rate of 11.00% per annum while the April 1990 and February 1993 promissory notes bore interest at a variable rate based on certain banks' prime rate plus 1.50% per annum. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share, whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share.

During fiscal 1995, 1996 and 1997, all amounts outstanding under the promissory notes were either paid in full by the Company to the note holders or applied towards the exercise of the related warrants or conversion rights at the election of the note holders. The Company paid in cash the outstanding principal amount of $530,000 and all interest due thereon to one principal shareholder, Sally F. Chamberlain, in satisfaction of the promissory notes held by her personally and as trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust. The other Related Parties elected to exercise their warrants and conversion rights by purchasing the Company's capital stock with the outstanding principal amounts of their promissory notes. As a result,

certain Related Parties who were collectively owed $2,710,000 under the promissory notes, were issued an aggregate of 2,030,358 shares of Common Stock in lieu of the repayment of the principal amount of their promissory notes. Other Related Parties included Scope Industries, Ajay Mehra, members of Mr. Mehra's family, members of Mr. Chopra's family, and the Good Swartz & Berns Pension Fund. Scope Industries is a principal shareholder of the Company, and Meyer Luskin is a director of the Company and is the President, director and a major shareholder of Scope Industries. Steve C. Good is a director of the Company and a participant in the Good Swartz & Berns Pension Fund.

<PAGE>

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL Rapiscan. Mr. Chopra is the Chairman, President and Chief Executive Officer of the Company. The remaining 49.0% interest in ECIL Rapiscan is owned by ECIL, an unaffiliated Indian company. The Company sells the security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

Pursuant to a Consulting Agreement entered into in July 1996, the Company hired Scope Industries to provide planning and financial consulting services to the Company including advice regarding the valuation of the Company and certain of its subsidiaries. Upon the completion of the consulting services in December 1996, the Company paid Scope Industries a fee in the amount of $100,000 as full payment for such services.

From time to time the Company contracts for automobile rental and messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $83,000 and $111,000 for such services during fiscal 1996 and 1997, respectively. The Company also contracts for printing services from a business owned by Madan G. Syal, a director of the Company. The Company paid the business approximately $63,000 and $82,000 for such services during fiscal 1996 and 1997, respectively.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

<PAGE>

PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth the beneficial ownership of Common Stock as of September 30, 1997, and as adjusted to reflect the sale of Common Stock offered hereby (assuming no exercise of the Underwriters' over-allotment option), by: (i) each person known by the Company to beneficially own 5.0% or more of the outstanding shares of Common Stock; (ii) each director of the Company; (iii) each Named Executive Officer of the Company; (iv) the Selling Shareholders; and (v) all directors and executive officers of the Company as a group. Footnotes (2) and (3) to the table also set forth certain information with respect to the beneficial ownership of the Selling Shareholders, assuming the Underwriters exercise their over-allotment option in full. The information set forth in the table and accompanying footnotes has been furnished by the named beneficial owners.

<TABLE>
<CAPTION>

| NAME AND BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED PRIOR TO OFFERING(1) NUMBER | PERCENT | NUMBER OF SHARES BEING OFFERED(2) | SHARES BENEFICIALLY OWNED AFTER OFFERING(1)(3) NUMBER | PERCENT |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Scope Industries(4)(5).......... | 1,875,000 | 30.1% | 148,148 | 1,726,852 | 18.1% |
| Sally F. Chamberlain(6)(7)...... | 1,170,375 | 18.8 | 63,343 | 1,107,032 | 11.6 |
| Deepak Chopra(6)(8)............. | 1,539,484 | 24.7 | 0 | 1,539,484 | 16.1 |
| Ajay Mehra(9)................... | 195,693 | 3.1 | 0 | 195,693 | 2.0 |
| Andreas F. Kotowski(10)......... | 128,806 | 2.1 | 0 | 128,806 | 1.3 |
| Manoocher Mansouri Aliabadi(11). | 73,607 | 1.2 | 0 | 73,607 | * |
| Thomas K. Hickman(12)........... | 27,228 | * | 0 | 27,228 | * |
| Steven C. Good(13).............. | 40,313 | * | 21,896 | 18,417 | * |
| Madan G. Syal(14)............... | 243,938 | 3.9 | 25,926 | 218,012 | 2.3 |
| Meyer Luskin(15)................ | 23,438 | * | 0 | 23,438 | * |
| Good Swartz & Berns Pension & Profit Sharing Plan(16)........ | 148,125 | 2.4 | 3,000 | 145,125 | 1.5 |
| Leila and Birinder Mehra........ | 25,500 | * | 3,704 | 21,796 | * |
| Zev and Elaine Edelstein Trust.. | 77,679 | 1.2 | 9,259 | 68,420 | * |
| Mohinder Chopra................. | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Glenn P. Sorenson............... | 75,000 | 1.2 | 9,259 | 65,741 | * |
| Charles and Kiran M. Kerpelman.. | 65,357 | 1.0 | 9,259 | 56,098 | * |
| Martha B. Holmes................ | 60,000 | * | 9,259 | 50,741 | * |
| Combined TR/DR Account Trust.... | 52,500 | * | 7,407 | 45,093 | * |
| Gary E. Fleischer............... | 14,625 | * | 14,625 | 0 | -- |
| Cathleen A. Redinger............ | 14,625 | * | 14,625 | 0 | -- |
| Mark and Penny Berns Trust...... | 9,732 | * | 5,982 | 3,750 | * |
| Arnold G. and Hope Anisgarten... | 9,287 | * | 5,709 | 3,578 | * |
| Rajiv Mehra..................... | 2,057 | * | 450 | 1,607 | * |
| Surendra V. and Kala Jain(17)... | 13,393 | * | 5,186 | 8,207 | * |
| Renu Jivrajka................... | 11,250 | * | 1,852 | 9,398 | * |
| Amita Jivrajka.................. | 7,500 | * | 1,852 | 5,648 | * |
| All executive officers and directors as a group (9 persons)................... | 2,286,136 | 36.3 | 47,822 | 2,238,314 | 23.2 |

</TABLE>

- ----------------

* Less than 1.0%.

(1) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options currently exercisable, or exercisable within 60 days of September 30, 1997, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

51

<PAGE>

(2) Excludes shares of Common Stock to be offered by the Selling Shareholders if the over-allotment option granted to the Underwriters is exercised. The following Selling Shareholders will sell the following number of additional shares of Common Stock if the Underwriters' over-allotment option is exercised in full: Scope Industries (88,519); Sally F. Chamberlain (49,630); Deepak Chopra (185,185); Ajay Mehra (33,333);

Andreas F. Kotowski (18,519); Manoocher Mansouri Aliabadi (14,815); Thomas K. Hickman (3,704); Steven C. Good (15,604); Madan G. Syal (18,519); Meyer Luskin (9,259); Good Swartz & Berns Pension & Profit Sharing Plan (3,309); Leila and Birinder Mehra (3,704); Zev and Elaine Edelstein Trust (9,259); Mohinder Chopra (11,111); Glenn P. Sorenson (11,111); Charles and Kiran M. Kerpelman (9,259); Combined TR/DR Account Trust (7,407); Susan Sutherland (7,407); Anuj Wadhawan (7,407); Bette J. Moore (7,407); Robert W. Kephart (5,556); Phillip M. Wascher (7,407); Charan J. Dewan (3,704); Jack Kimbro (1,111); Narayan Taneja (1,481); Dennis Noble (741); Peter Bui (741); Alan J. and Pamela Barnard (1,481); Christine Williams (741); Christopher Chin (926); Anthony S. and Suzie B. Crane (1,481); Khai Le (741); Mark and Penny Berns Trust (1,518); Arnold G. and Hope Anisgarten (1,791); Surendra and Kala Jain (5,926); Neil Jivrajka (740); Renu Jivrajka (1,482); Amita Jivrajka (1,482); Louis S. and Linda O. Peters (741); Lincoln A. Gladden (741). Susan Sutherland, Anuj Wadhawan, Bette J. Moore, Robert W. Kephart, Phillip M. Wascher, Charan J. Dewan, Jack Kimbro, Narayan Taneja, Dennis Noble, Peter Bui, Alan J. Barnard, Christine Williams, Christopher Chin, Khai Le, Louis Peters and Lincoln A. Gladden are employees of the Company or its affiliates. Anthony S. Crane is the Managing Director of Rapiscan UK. See "Management."

(3) Assuming the Underwriters' over-allotment option is exercised in full, the number and percent of the shares beneficially owned after the Offering by the Selling Shareholders will be as follows: Scope Industries (1,638,333, 17.1%); Sally F. Chamberlain 1,057,402, 11.1%); Deepak Chopra (1,354,299, 14.2%); Ajay Mehra (162,360, 1.7%); Andreas F. Kotowski 110,287, 1.2%); Manoocher Mansouri Aliabadi (58,792); Thomas K. Hickman (23,524) Steven C. Good (2,843); Madan G. Syal (199,493, 2.1%); Meyer Luskin (14,179); Good Swartz & Berns Pension & Profit Sharing Plan (141,816, 1.5%); Leila and Birender Mehra (18,092); Zev and Elaine Edelstein Trust (59,161); Mohinder Chopra (54,630); Glenn P. Sorenson (54,630); Charles and Kiran M. Kerpelman (46,839); Combined TR/DR Account Trust (37,686); Susan Sutherland (35,343); Anuj Wadhawan (29,835); BetteJ. Moore (28,218); Robert W. Kephart (22,944); Phillip M. Wascher (23,241); Charan J. Dewan (16,171); Jack Kimbro (15,389); Narayan Taneja (23,698); Dennis Noble (11,446); Peter Bui (7,884); Alan J. and Pamela Barnard (9,704); Christine Williams (6,384); Christopher Chin (6,199); Anthony S. and Suzie B. Crane (12,148); Khai Le (8,956); Mark and Penny Berns Trust (2,232); Arnold G. and Hope Anisgarten (1,787); Surendra and Kala Jain (2,281); Neil Jivrajka (10,510); Renu Jivrajka (7,916); Amita Jivrajka (4,166); Louis S. and Linda O. Peters (6,510); Lincoln A. Gladden (4,134). Except as otherwise indicated in this footnote the percentage of Common Stock beneficially owned by the Selling Shareholders after this Offering if the over-allotment option is exercised in full is less than 1.0% for each person listed in this footnote.

(4) The address of Scope Industries is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(5) Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(6) The address of such shareholder is c\\o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(7) Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991.

(8) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Also includes 10,179 shares and 10,179 shares owned by Deepika Chopra and Chandini Chopra, respectively, who are the daughters of Mr. Chopra. Of the balance of such shares, 960,099 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 49,125 shares are held individually by Mr. Chopra. Mr. Chopra is the President, Chief Executive Officer and Chairman of the Board of the Company. See

"Management."

(9) Includes 45,000 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and Director of the Company. See "Management."

(10) Includes 7,500 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A. See "Management."

(11) Includes 13,500 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Mansouri is the Vice President-Corporate Marketing of UDT Sensors. See "Management."

(12) Includes 15,187 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia. See "Management."

52

<PAGE>

(13) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Includes 22,500 shares held by the Steve Cary Good & Bari Anne Good Trust and 15,000 shares held individually by Mr. Good. Does not include shares beneficially owned by the Good Swartz & Berns Pension Fund. Mr. Good is a Director of the Company. See "Management."

(14) Includes 2,813 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Includes 217,500 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Mr. Syal is a Director of the Company. See "Management."

(15) Includes 15,000 shares held by the Meyer and Doreen Luskin Family Trust. Does not include shares beneficially owned by Scope Industries. Includes 8,438 shares issuable pursuant to options exercisable within 60 days of September 30, 1997. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal shareholder of Scope Industries.

(16) Does not include shares beneficially owned by Steven C. Good, Mark and Penny Berns Trust, Arnold G. and Hope Anisgarten and Rajiv Mehra. Steven C. Good and Mark S. Berns are the trustees of the Good Swartz & Berns Pension & Profit Sharing Plan.

(17) Includes 6,429 shares held by Surendra V. Jain M.D. Inc.

53

<PAGE>

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company currently consists of 40,000,000 shares of Common Stock and 10,000,000 shares of preferred stock.

### COMMON STOCK

As of September 30, 1997, 6,233,778 shares of Common Stock were outstanding, held of record by 79 shareholders. After completion of the Offering, there will be 9,563,778 shares of Common Stock outstanding.

The holders of Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of the shareholders. The holders of Common Stock are entitled to cumulative voting rights with respect to the election of directors so long as at least one shareholder has given notice at

the meeting of shareholders prior to the voting of that shareholder's desire to cumulate votes. Subject to preferences that may be applicable to any shares of preferred stock issued in the future, holders of Common Stock are entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore. See "Dividend Policy." In the event of a liquidation, dissolution or winding up of the Company, holders of the Common Stock are entitled to share ratably with the holders of any then outstanding preferred stock in all assets remaining after payment of liabilities and the liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive rights and no right to convert their Common Stock into any other securities. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are, and all shares of Common Stock to be outstanding upon completion of the Offering will be, fully paid and nonassessable.

PREFERRED STOCK

The Board of Directors has authority to issue up to 10,000,000 shares of preferred stock, no par value, and to fix the rights, preferences, privileges and restrictions, including voting rights, of those shares without any future vote or action by the shareholders. The rights of the holders of the Common Stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock could have the effect of making it more difficult for a third party to acquire a majority of the outstanding voting stock of the Company, thereby delaying, deferring or preventing a change in control of the Company. Furthermore, such preferred stock may have other rights, including economic rights senior to the Common Stock, and, as a result, the issuance thereof could have a material adverse effect on the market value of the Common Stock. The Company has no present plans to issue shares of preferred stock. No shares of preferred stock are currently outstanding.

STOCK TRANSFER AGENT AND REGISTRAR

The transfer agent and registrar for the Company's Common Stock is U.S. Stock Transfer Corporation.

<PAGE>

SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering, the Company will have 9,563,778 shares of Common Stock outstanding (assuming no exercise of stock options after September 30, 1997). Of these shares, the 3,700,000 shares sold in this Offering (4,255,000 shares if the Underwriters' over-allotment option is exercised in full) will be freely tradeable without restriction or registration under the Securities Act unless they are purchased by "affiliates" of the Company as that term is defined under Rule 144. The remaining 5,863,778 shares will be "restricted securities" as defined in Rule 144 ("Restricted Shares"). Of such Restricted Shares, approximately 5,838,000 Restricted Shares (or approximately 5,283,000 if the Underwriters' over-allotment option is exercised in full) are subject to lock-up agreements with the Underwriters. See "Underwriting."

Future sales of substantial amounts of Common Stock in the public market could adversely affect prevailing market prices and adversely affect the Company's ability to raise additional capital in the capital markets at a time and price favorable to the Company. As a result of the lock-up agreements and the provisions of Rule 144(k), Rule 144 and Rule 701, all currently outstanding shares will be available for sale in the public market upon expiration of the lock-up agreements 180 days after the date of this Prospectus, subject to the provisions of Rule 144 and Rule 701.

In general, under Rule 144 as currently in effect, any person (or persons

whose shares are aggregated) who has beneficially owned Restricted Shares for at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of 1.0% of the then outstanding shares of the Company's Common Stock (approximately 95,638 shares immediately after this Offering) or the average weekly trading volume during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and availability of current public information about the Company. A person who is not an affiliate, has not been an affiliate within three months prior to the sale and has beneficially owned the Restricted Shares for at least two years is entitled to sell such shares under Rule 144(k) without regard to any of the limitations described above.

Subject to certain limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from the Company by its employees, directors, officers, consultants or advisers between May 20, 1988, the effective date of Rule 701, and the date the issuer becomes subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the Securities and Exchange Commission (the "Commission") has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act (including options granted before May 20, 1988, if made in accordance with the Rule had it been in effect), along with the shares acquired upon exercise of such options beginning May 20, 1988 (including exercises after the date of this Prospectus). Securities issued in reliance on Rule 701 are restricted securities and, subject to the contractual restrictions described above, beginning 90 days after the date of this Prospectus, such securities may be sold: (i) by persons other than Affiliates, subject only to the manner of sale provisions of Rule 144; and (ii) by Affiliates under Rule 144 without compliance with its minimum holding period requirements.

The Company intends to file a registration statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance under the 1987 Plan and the 1997 Plan or previously issued upon the exercise of options, thus permitting the resale of shares issued under such plans by non-affiliates in the public market without restriction under the Securities Act. The registration statement is expected to be filed within 90 days after the date of this Prospectus and will automatically become effective upon filing.

Prior to this Offering, there has been no public market for the Common Stock of the Company, and any sale of substantial amounts of Common Stock in the open market may adversely affect the market price of Common Stock offered hereby.

<PAGE>

## UNDERWRITING

The Underwriters (the "Underwriters") named below, acting through their representatives, Robertson, Stephens & Company LLC, William Blair & Company, L.L.C. and Volpe Brown Whelan & Company, LLC (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement by and among the Company, the Selling Shareholders and the Underwriters, to purchase from the Company and the Selling Shareholders the number of shares of Common Stock set forth opposite their respective names below. The Underwriters are committed to purchase and pay for all of such shares if any are purchased.

<TABLE>
<CAPTION>

| Underwriter | Number of Shares |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC.................................... | |
| William Blair & Company, L.L.C....................................... | |
| Volpe Brown Whelan & Company, LLC.................................... | |
| Total................................................................ | 3,700,000 |

</TABLE>

The Representatives have advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock at the offering price set forth on the cover page of this Prospectus: (i) to the public; and (ii) to certain dealers who will be offered a concession of not more than $ per share, of which $ may be reallowed to other dealers. After the consummation of this Offering, the public offering price, concession and reallowance to dealers may be reduced by the Representatives. No such reduction shall change the amount of proceeds to be received by the Company or the Selling Shareholders as set forth on the cover page of this Prospectus.

The Underwriters have been granted an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 555,000 additional shares of Common Stock from certain Selling Shareholders at the same price per share as the Company and the Selling Shareholders will receive for the 3,700,000 shares that the Underwriters have agreed to purchase in this Offering. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment to purchase approximately the same percentage thereof that the number of shares of Common Stock to be purchased by it set forth in the above table bears to the total number of shares of Common Stock listed in such table. The Underwriters may exercise such option only to cover over-allotments made in connection with the sale of Common Stock offered hereby.

The Underwriting Agreement contains covenants of indemnity among the Underwriters, the Company and the Selling Shareholders against certain civil liabilities, including liabilities under the Securities Act.

Pursuant to the terms of certain lock-up agreements, officers and directors of the Company, the Selling Shareholders and certain other shareholders holding collectively approximately 5,838,000 shares of the Company's Common Stock outstanding prior to this Offering, have agreed with the Representatives that except for the 3,700,000 shares being offered in this Offering, or the shares sold pursuant to the over-allotment option, without the prior written consent of Robertson, Stephens & Company LLC or as a gift or distribution to one who agrees to be bound by these restrictions, until 180 days after the effective date of this Prospectus (the "lock-up period"), they will not offer to sell, contract to sell or otherwise dispose of any shares of Common Stock, including shares issuable under options or warrants exercisable during the 180 days after the date of this Prospectus, any options or warrants to purchase shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock owned directly by such holders or with respect to which they have the power of disposition. Approximately 5,838,000 shares of Common Stock subject to the lock-up agreements will become eligible for immediate public sale following expiration of the lock-up period, subject to the provisions of the Securities Act and the Rules promulgated thereunder. Robertson, Stephens & Company LLC may, in its sole discretion, and at any time without notice, release all or a portion of the

<PAGE>

securities subject to the lock-up agreements. See "Shares Eligible for Future Sale." In addition, the Company has agreed that until the expiration of the

lock-up period, the Company will not, without the prior written consent of Robertson, Stephens & Company LLC, offer, sell, contract to sell or otherwise dispose of any shares of Common Stock, any options or warrants to purchase Common Stock or any securities convertible into or exchangeable for shares of Common Stock, other than the Company's sales of shares in this Offering, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the grant of options to purchase shares or the issuance of shares of Common Stock under the Company's 1997 Plan.

The Representatives have advised the Company that, pursuant to Regulation M under the Securities Act, certain persons participating in this Offering may engage in transactions, including stabilizing bids, syndicate covering transactions or the imposition of penalty bids which may have the effect of stabilizing or maintaining the market price of the Common Stock at a level above that which might otherwise prevail in the open market. A "stabilizing bid" is a bid for or the purchase of the Common Stock on behalf of the Underwriters for the purpose of fixing or maintaining the price of the Common Stock. A "syndicate covering transaction" is the bid for or the purchase of the Common Stock on behalf of the Underwriters in connection with this Offering. The Underwriters may also cover all or a portion of such short position, by exercising the Underwriters' over-allotment option referred to above. A "penalty bid" is an arrangement permitting the Representatives to reclaim the selling concession otherwise accruing to an Underwriter or syndicate member in connection with this Offering if the Common Stock originally sold by such Underwriter or syndicate member is purchased by the Representatives in a syndicate covering transaction and has therefore not been effectively placed by such Underwriter or syndicate member. The Representatives have advised the Company that such transactions may be effected on the Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

The Representatives have advised the Company that they do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this Offering, there has been no public market for the Company's securities. The initial public offering price of the Common Stock was determined by negotiation among the Company, the Selling Shareholders and the Representatives. Among the factors considered in such negotiations were prevailing market conditions, the results of operations of the Company in recent periods, market valuations of publicly traded companies that the Company and the Representatives believe to be comparable to the Company, estimates of the business potential of the Company, the present state of the Company's development, the current state of the industry and the economy as a whole, and any other factors deemed relevant.

<PAGE>

## LEGAL MATTERS

The validity of the Common Stock offered hereby will be passed upon for the Company by Troy & Gould Professional Corporation, Los Angeles, California. Certain legal matters with respect to this Offering will be passed upon for the Underwriters by Jones, Day, Reavis & Pogue, Los Angeles, California. As of the date of this Prospectus, Troy & Gould Professional Corporation and certain of its members collectively own 52,500 shares of the Company's Common Stock.

## EXPERTS

The consolidated financial statements included in this Prospectus and the related financial statement schedule included elsewhere in the Registration Statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their reports appearing herein and elsewhere in the Registration Statement, and have been so included in reliance upon the reports of such firm

given upon their authority as experts in accounting and auditing.

ADDITIONAL INFORMATION

The Company has filed with the Commission in Washington, D.C., a Registration Statement onForm S-1 under the Securities Act with respect to the Common Stock being offered hereby. As permitted by the rules and regulations of the Commission, this Prospectus does not contain all the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company and the Common Stock offered hereby, reference is made to the Registration Statement, and such exhibits and schedules. A copy of the Registration Statement, and the exhibits and schedules thereto, may be inspected without charge at the public reference facilities maintained by the Commission in Room 1024, 450 Fifth Street N.W., Washington, D.C. 20549, and at the Commissions regional offices located at the Northwestern Atrium Center, 500 West Madison Street, Chicago, Illinois 60661 and Seven World Trade Center, 13th Floor, New York, New York 10048, and copies of all or any part of the Registration Statement may be obtained from such offices upon payment of the fees prescribed by the Commission. In addition, the Registration Statement may be accessed at the Commission's site on the World Wide Web located at http://www.sec.gov. Statements contained in this Prospectus as to the contents of any contract or other document are not necessarily complete and, in each instance, reference is made to the copy of such contract or document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference.

<PAGE>

OSI SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

| <S> | PAGE <C> |
|---|---|
| Report of Independent Auditors | F-2 |
| Consolidated Balance Sheets as of June 30, 1996 and 1997 | F-3 |
| Consolidated Statements of Operations for the Years Ended June 30, 1995, 1996 and 1997 | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended June 30, 1995, 1996 and 1997 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended June 30, 1995, 1996 and 1997 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

</TABLE>

<PAGE>

REPORT OF INDEPENDENT AUDITORS

OSI Systems, Inc.:

We have audited the accompanying consolidated balance sheets of OSI Systems, Inc. (the "Company") and its subsidiaries as of June 30, 1997 and 1996, and the related consolidated statements of operations, shareholders' equity, and cash flows for the years ended June 30, 1997, 1996 and 1995. These financial

statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of OSI Systems, Inc. and its subsidiaries as of June 30, 1997 and 1996, and the results of their operations and their cash flows for the years ended June 30, 1997, 1996 and 1995 in conformity with generally accepted accounting principles.

DELOITTE & TOUCHE LLP

Los Angeles, California
August 15, 1997

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| <S> | <C> | <C> |
| ASSETS (NOTE 4) | | |
| Current Assets: | | |
| Cash and cash equivalents (Note 1) | $ 581 | $ 553 |
| Accounts receivable, net of allowance for doubtful accounts of $276 and $586 at June 30, 1996 and 1997, respectively (Note 1) | 13,295 | 15,556 |
| Other receivables (Note 2) | 783 | 2,346 |
| Inventory (Note 1) | 13,642 | 18,517 |
| Prepaid expenses | 633 | 537 |
| Deferred income taxes (Notes 1 and 7) | 700 | 874 |
| Total current assets | 29,634 | 38,383 |
| Property and Equipment, Net (Notes 1 and 4): | 4,454 | 5,841 |
| Intangible and Other Assets, Net (Notes 1, 2 and 3) | 1,221 | 3,109 |
| Total | $35,309 | $47,333 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Current Liabilities: | | |
| Bank lines of credit (Note 4) | $ 7,783 | $ 9,100 |
| Current portion of long-term debt (Notes 6 and 13) | 1,491 | 1,240 |
| Current portion of senior subordinated debt (Note 5) | 2,500 | |

| | | |
|---|---|---|
| Accounts payable (Note 1) | 6,522 | [illegible] |
| Accrued payroll and related expenses | 1,667 | 1,607 |
| Income taxes payable (Notes 1 and 7) | 799 | 1,804 |
| Advances from customers | 219 | 2,410 |
| Other accrued expenses and current liabilities | 2,609 | 3,710 |
| Total current liabilities | 23,590 | 27,583 |
| Senior Subordinated Debt (Notes 1 and 5) | 575 | |
| Long-Term Debt (Notes 1, 6 and 13) | 3,113 | 2,840 |
| Deferred Income Taxes (Notes 1 and 7) | 827 | 101 |
| Minority Interest (Note 1) | 10 | |
| Total liabilities | 28,115 | 30,524 |
| Commitments and Contingencies (Notes 8 and 13) | | |
| Shareholders' Equity (Notes 4, 5, 9 and 10): | | |
| Preferred stock, voting shares, no par value; authorized, 3,000,000 shares; issued and outstanding, 1,318,750 shares at June 30, 1996 and 0 shares at June 30, 1997 (Note 10) | 1,514 | |
| Preferred stock, no par value; 10,000,000 shares authorized; none issued and outstanding at June 30, 1996 and 1997 | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding, 1,858,132 and 6,156,528 shares at June 30, 1996 and 1997, respectively | 560 | 7,367 |
| Retained earnings | 4,994 | 9,171 |
| Cumulative foreign currency translation adjustment (Note 1) | 126 | 271 |
| Total shareholders' equity | 7,194 | 16,809 |
| Total | $35,309 | $47,333 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-3

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| <S> | <C> | <C> | <C> |
| Revenues (Note 1) | $ 49,815 | $ 61,518 | $ 77,628 |
| Cost of goods sold | 37,818 | 45,486 | 56,174 |
| Gross profit | 11,997 | 16,032 | 21,454 |
| Operating expenses: | | | |
| Selling, general and administrative expenses (Notes 11 and 12) | 7,601 | 9,757 | 11,304 |
| Research and development (Note 1) | 1,591 | 1,663 | 2,504 |
| Stock option compensation (Note 9) | -- | -- | 856 |
| Total operating expenses | 9,192 | 11,420 | 14,664 |
| Income from operations | 2,805 | 4,612 | 6,790 |
| Interest expense (Notes 4, 5, 6 and 11) | 1,251 | 1,359 | 1,197 |

| | | | |
|---|---|---|---|
| Income before provision for income taxes and minority interest | 1,554 | 3,253 | 5,593 |
| Provision for income taxes (Notes 1 and 7) | 413 | 1,111 | 1,416 |
| Income before minority interest in net loss of subsidiaries | 1,141 | 2,142 | 4,177 |
| Minority interest in net loss of subsidiaries (Note 1) | 17 | 117 | -- |
| Net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Historical net income | $ 1,158 | $ 2,259 | $ 4,177 |
| Interest on subordinated debt, net of income taxes | 216 | 166 | 92 |
| Minority interest in net loss of subsidiaries | (17) | (117) | -- |
| Net income available to common shareholders | $ 1,357 | $ 2,308 | $ 4,269 |
| Net income per share (Note 1) | $ 0.22 | $ 0.38 | $ 0.68 |
| Weighted average shares outstanding | 6,172,901 | 6,134,669 | 6,263,963 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(In thousands, except share amounts)

<TABLE>
<CAPTION>

| | PREFERRED | | COMMON | | | CUMULATIVE FOREIGN CURRENCY | |
|---|---|---|---|---|---|---|---|
| | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | RETAINED EARNINGS | TRANSLATION ADJUSTMENT | TOTAL |
| BALANCE, JULY 1, 1994 | 1,123,750 | $ 1,124 | 1,703,257 | $ 363 | $1,577 | $ 64 | $ 3,128 |
| Exercise of stock options | 35,000 | 70 | 60,000 | 75 | -- | -- | 145 |
| Conversion of debt | 160,000 | 320 | 78,750 | 105 | -- | -- | 425 |
| Translation adjustment | -- | -- | -- | -- | -- | 95 | 95 |
| Net income | -- | -- | -- | -- | 1,158 | -- | 1,158 |
| BALANCE, JUNE 30, 1995 | 1,318,750 | 1,514 | 1,842,007 | 543 | 2,735 | 159 | 4,951 |
| Exercise of stock options | -- | -- | 16,125 | 17 | -- | -- | 17 |
| Translation adjustment | -- | -- | -- | -- | -- | (33) | (33) |
| Net income | -- | -- | -- | -- | 2,259 | -- | 2,259 |
| BALANCE, JUNE 30, 1996 | 1,318,750 | 1,514 | 1,858,132 | 560 | 4,994 | 126 | 7,194 |
| Exercise of stock options | -- | -- | 118,125 | 146 | -- | -- | 146 |
| Conversion of debt | 1,250,000 | 2,500 | 120,536 | 225 | -- | -- | 2,725 |
| Minority interest acquisitions | -- | -- | 206,610 | 1,566 | -- | -- | 1,566 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1120 of 2711

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Conversion of preferred stock...... | (2,568,750) | (4,014) | 3,853,125 | 4,014 | -- | -- | -- |
| Stock option compensation......... | -- | -- | -- | 856 | -- | -- | 856 |
| Translation adjustment........... | -- | -- | -- | -- | -- | 145 | 145 |
| Net income............ | -- | -- | -- | -- | 4,177 | -- | 4,177 |
| BALANCE, JUNE 30, 1997.. | -- | $ -- | 6,156,528 | $7,367 | $9,171 | $271 | $16,809 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

<TABLE>
<CAPTION>

| <S> | YEAR ENDED JUNE 30, 1995 <C> | 1996 <C> | 1997 <C> |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income........................................ | $ 1,158 | $ 2,259 | $ 4,177 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Minority interest in net loss of subsidiaries.... | (17) | (117) | |
| Provision for losses on accounts receivable...... | (70) | 404 | 389 |
| Depreciation and amortization.................... | 1,551 | 2,014 | 2,302 |
| Stock option compensation........................ | | | 856 |
| Deferred income taxes............................ | 240 | (12) | (900) |
| Gain on sale of property and equipment........... | (11) | (13) | |
| Changes in operating assets and liabilities, net of business acquisition: | | | |
| Accounts receivable............................ | (1,239) | (858) | (1,980) |
| Other receivables.............................. | 226 | (194) | (1,530) |
| Inventory...................................... | (2,599) | (4,068) | (4,573) |
| Prepaid expenses............................... | (139) | (245) | 96 |
| Accounts payable............................... | 221 | 120 | 1,026 |
| Accrued payroll and related expenses........... | 191 | 707 | (60) |
| Income taxes payable........................... | (217) | 652 | 1,005 |
| Advances from customers........................ | 9 | 183 | 1,448 |
| Other accrued expenses and current liabilities................................ | (87) | (827) | 1,101 |
| Net cash provided by (used in) operating activities................................ | (783) | 5 | 3,357 |
| Cash flows from investing activities: | | | |
| Proceeds from sale of property and equipment...... | 142 | 120 | |
| Additions to property and equipment............... | (1,396) | (1,612) | (2,182) |
| Cash paid for business acquisition, net of cash acquired.......................................... | | | (848) |
| Cash paid for minority interest................... | (160) | | |
| Other assets...................................... | (662) | (688) | 23 |
| Net cash used in investing activities........ | (2,076) | (2,180) | (3,007) |

| | | | |
|---|---|---|---|
| Cash flows from financing activities: | | | |
| Net proceeds from (repayment of) bank lines of credit | 2,668 | 1,502 | 1,014 |
| Payments on senior subordinated debt | (700) | | (350) |
| Payments on junior subordinated debt | (280) | | |
| Payments on long-term debt | (1,095) | (1,250) | (3,983) |
| Proceeds from issuance of long-term debt | 2,806 | 1,097 | 2,647 |
| Proceeds from exercise of stock options and warrants | 145 | 17 | 146 |
| Proceeds from issuance of minority interest | | 21 | |
| Net cash provided by (used in) financing activities | 3,544 | 1,387 | (526) |
| Effect of exchange rate changes on cash | 95 | (36) | 148 |
| Net (decrease) increase in cash | 780 | (824) | (28) |
| Cash, beginning of period | 625 | 1,405 | 581 |
| Cash, end of period | $ 1,405 | $ 581 | $ 553 |
| Supplemental disclosures of cash flow information-- Cash paid during the period for: | | | |
| Interest | $ 1,229 | $ 1,346 | $ 1,197 |
| Income taxes | $ 82 | $ 377 | $ 1,511 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

- ---------------

SUPPLEMENTAL DISCLOSURES OF NONCASH INVESTING AND FINANCING ACTIVITIES:

During 1995, certain related parties converted $105 and $320 of junior and senior subordinated debt into 78,750 and 160,000 shares of common and preferred stock, respectively.

During 1995, the Company refinanced $1,244 in long-term debt obligations through a new financing arrangement with a bank.

During 1997, certain related parties converted $225 and $2,500 of senior subordinated debt into 120,536 and 1,250,000 shares of common and preferred stock, respectively.

During October and December 1996, the Company acquired the minority interest of its two majority-owned subsidiaries through the issuance of 178,956 shares of common stock, at an estimated fair value of $6.67 per share. An additional 27,654 shares, at an estimated fair value of $13.50 per share, are issuable at June 30, 1997. The excess of the fair value of the common stock of $1,566 over the book value of the minority interests of $12 has been recorded as goodwill.

In 1997, the Company acquired all of the capital stock of Advanced Micro Electronics AS. In conjunction with the acquisition, liabilities were assumed as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| Fair value of assets acquired | $2,350 |
| Goodwill | 588 |
| Cash paid for the capital stock | (916) |
| Liabilities assumed | $2,022 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General -- OSI Systems, Inc. (formerly Opto Sensors, Inc.) and its subsidiaries (collectively, the "Company") is a vertically integrated, worldwide provider of devices, subsystems and end-products based on optoelectronic technology. The Company designs and manufactures optoelectronic devices and value-added subsystems for original equipment manufacturers ("OEMs") in a broad range of applications, including security, medical diagnostics, telecommunications, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan" brand name. These products are used to inspect baggage, cargo and other objects for weapons, explosives, drugs and other contraband.

Consolidation -- The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. In October and December 1996 the Company purchased the minority interests of its two majority-owned subsidiaries by exchanging 178,956 shares of common stock for the minority shares of the subsidiaries. The excess of the fair value of the common stock issued of $1,193,000 over the carrying value of the minority interest of $12,000 has been recorded as goodwill and is being amortized over a period of 20 years. The Company also agreed to issue additional shares of the Company's common stock to the selling shareholders of one of the subsidiaries. The number of shares to be issued is based upon the pre-tax income of the subsidiary for the year ended June 30, 1997, and has been determined to be 27,654 shares and have been included in the number of shares issued for minority interest acquisitions in the accompanying 1997 consolidated statement of shareholders' equity.

Concentrations of Credit Risk -- The Company's financial instruments that are exposed to credit risk consist primarily of accounts receivable. The Company performs ongoing credit evaluations of its customers' financial condition and provides an allowance for potential credit losses. The concentration of credit risk is generally diversified due to the large number of entities comprising the Company's customer base and their geographic dispersion.

Inventory -- Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method.

Inventory at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| <S> | <C> | <C> |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1123 of 2711

| | | |
|---|---|---|
| Raw materials | $ 7,795 | $11,408 |
| Work-in-process | 3,114 | 4,224 |
| Finished goods | 2,733 | 2,885 |
| Total | $13,642 | $18,517 |

</TABLE>

F-8

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Property and Equipment -- Property and equipment are stated at cost. Depreciation and amortization are computed using the straight-line and accelerated methods over lives ranging from three to ten years. Amortization of leasehold improvements is calculated on the straight-line basis over the shorter of the useful life of the asset or the lease term.

Property and equipment at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Equipment | $ 6,280 | $ 7,545 |
| Leasehold improvements | 1,601 | 2,093 |
| Tooling | 1,558 | 1,967 |
| Furniture and fixtures | 488 | 666 |
| Computer equipment | 1,283 | 1,699 |
| Vehicles | 93 | 176 |
| Total | 11,303 | 14,146 |
| Less accumulated depreciation and amortization | 6,849 | 8,305 |
| Property and equipment, net | $ 4,454 | $ 5,841 |

</TABLE>

Intangibles and Other Assets -- Intangible and other assets at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Software development costs | $ 588 | $ 588 |
| Goodwill | -- | 2,142 |
| Deposits | 262 | 320 |
| Other | 524 | 444 |
| Total | 1,374 | 3,494 |
| Less accumulated amortization | 153 | 385 |
| Intangible and other assets, net | $ 1,221 | $ 3,109 |

</TABLE>

Goodwill in the amount of $1,554,000 resulting from the acquisition of minority interests and $588,000 resulting from the acquisition of Advanced Micro Electronics AS (see Note 3) is being amortized, on a straight-line basis, over a period of twenty years.

Software development costs incurred in the research and development of software products are expensed as incurred until the technological feasibility of the product has been established. After technological feasibility is established, certain software development costs are capitalized. The software, once developed, is a component which is included in X-ray security machines when they are sold to customers. The Company amortizes these costs on a straight-line basis over a two-year period. No software development costs were capitalized during the year ended June 30, 1997.

Impairment of Long-Lived Assets -- The Company reviews long-lived assets, including goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable. If the sum of the expected future cash flows, undiscounted and without interest charges, is less than the carrying amount of the asset, the Company recognizes an impairment loss based on the estimated fair value of the asset.

<PAGE>

Income Taxes -- Deferred income taxes are provided for temporary differences between the financial statement and income tax bases of the Company's assets and liabilities, based on enacted tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred income tax assets will not be realized.

Fair Value of Financial Instruments -- The Company's financial instruments consist primarily of cash accounts receivable, accounts payable, and debt instruments. The carrying values of financial instruments other than debt instruments, are representative of their fair values due to their short-term maturities. The carrying values of the Company's long-term debt instruments are considered to approximate their fair values because the interest rates of these instruments are variable or comparable to current rates offered to the Company. The fair value of the Company's senior subordinated debt cannot be determined due to the related-party nature of the obligations.

Revenue Recognition-- The Company recognizes revenue upon shipment of its product.

Foreign Currency Translation -- The accounts of the Company's operations in Singapore, Malaysia, Norway and the United Kingdom are maintained in Singapore dollars, Malaysian ringgits, Norwegian Krone and U.K. pounds sterling, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Transaction (losses) gains of approximately $76,000, ($123,000), and $68,000 were included in income for the years ended June 30, 1995, 1996 and 1997, respectively.

Earnings Per Share -- Earnings per share information is computed using the weighted average number of shares of common stock outstanding and dilutive common equivalent shares from preferred stock, convertible debt and stock

options using the treasury stock method. Pursuant to Securities and Exchange Commission Staff Accounting Bulletin Topic 4D, common stock and stock options issued or granted during the twelve month period prior to the date of the initial filing of the Company's Form S-1 Registration Statement have been included in the calculation of the weighted average number of common and common equivalent shares using the treasury stock method as if they were outstanding for each period. Net income and net income per share have been presented to reflect the effect of the conversion of the preferred stock into shares of the Company's common stock (see Notes 5 and 10).

Recently Issued Accounting Pronouncements -- In February 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 128 "Earnings Per Share". The statement is effective for interim periods and fiscal years ending after December 15, 1997. The Company does not expect that the statement will have a material effect on the Company's consolidated financial statements.

In June 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 130, "Reporting for Comprehensive Income" and No. 131, "Disclosure about Segments of an Enterprise and Related Information." These statements are effective for financial statements issued for periods beginning after December 15, 1997. The Company has not yet analyzed the impact of adopting these statements.

Use of Estimates -- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<PAGE>

2. INVESTMENT IN JOINT VENTURE

In January 1995, the Company, together with an unrelated company, formed ECIL-Rapiscan Security Products Limited, a joint venture organized under the laws of India. The Company, the Company's chairman and the Company's chief financial officer have a 36.0%, 10.5% and 4.5% ownership interest, respectively, in the joint venture. The Company's investment of approximately $108,000 at June 30, 1997 is included in other assets in the accompanying financial statements and the Company's equity in the earnings of the joint venture, since its inception, have been insignificant.

The joint venture was formed for the purpose of the manufacture, assembly, service and testing of X-ray security and other products. One of the Company's subsidiaries is a supplier to the joint venture partner, who in turn manufactures and sells the resulting products to the joint venture utilizing technology received from the subsidiary. The agreement provides for technology transfer between the Company and the joint venture, subject to certain restrictions.

During the year ended June 30, 1995 and 1997, the Company earned a technical fee from the joint venture in the amount of $200,000 and $115,000, respectively. At June 30, 1997, $100,000 was unpaid and included in other receivables in the accompanying consolidated financial statements.

3. ACQUISITIONS

On March 3, 1997, the Company acquired the capital stock of Advanced Micro

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1126 of 2711

Electronics AS ("AME") headquartered in Horten, Norway, from Industriinvestor ASA. The cash purchase price amounted to $916,000. The acquisition has been accounted for by the purchase method of accounting, and accordingly, the purchase price has been allocated to the assets acquired of $2,350,000, and liabilities assumed of $2,022,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of net assets acquired is being amortized over a period of 20 years.

The results of operations of AME are included in the Company's consolidated financial statements from the date of acquisition. Had the acquisition occurred as of July 1, 1994, pro forma consolidated sales for the years ended June 30, 1995, 1996 and 1997 would have been $53,338,000, $65,371,000, and $79,871,000, respectively. Consolidated pro forma net income and net income per share would not have been materially different than the amounts reported for the respective periods.

4. BANK AGREEMENTS

At June 30, 1996 and 1997, line of credit borrowings consisted of the following (in thousands):

<TABLE>
<CAPTION>

| <S> | JUNE 30, 1996 <C> | JUNE 30, 1997 <C> |
|---|---|---|
| Line of credit -- U.S. | $6,361 | $6,577 |
| Line of credit -- Singapore | 1,422 | 974 |
| Line of credit -- Norway | | 586 |
| Line of credit -- Rapiscan U.K. | | 963 |
| Total bank lines of credit | $7,783 | $9,100 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company maintains a senior loan agreement with a U.S. bank, which provides for a $10,000,000 revolving line of credit, a $2,500,000 term loan, a $1,000,000 equipment line and a $1,500,000 stock purchase facility (see Note 6). Total borrowings under the agreement are not to exceed $15,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25% or, at the Company's option, at 2.25% above the LIBOR rate for specific advances and terms. Interest is payable monthly, and the line expires in November 1998. Borrowings under the senior loan agreement are collateralized by substantially all of the assets of the Company. At June 30, 1997 approximately $5,077,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $10,000,000 not to exceed the available balance under the line of credit. At June 30, 1997 approximately $154,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, rental expense and capital expenditures.

The Company has a credit agreement with a U.S. bank, which provides for a $5,000,000 revolving line of credit and a $4,000,000 letter of credit sub-facility. Total borrowings under the agreement may not exceed $5,000,000. Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus .25%. Interest is payable monthly, and the line expires in October 1997. Borrowings under the current agreement are secured by certain of the Company's assets. At June 30, 1997 $1,500,000 was issued and outstanding under the revolving line of credit. The agreement also provides a commitment for letters of credit up to $4,000,000. At June 30, 1997 approximately $1,917,000 was issued and outstanding under letters of credit.

Covenants in connection with the agreement impose restrictions and requirements related to, among other things, maintenance of certain financial ratios, limitations on outside indebtedness, profitability, and capital expenditures.

Opto Sensors Pte. Ltd. ("OSP") has a loan agreement with a Singapore bank, which provides for revolving line of credit borrowings up to 2,600,000 Singapore dollars (approximately $1,800,000 at June 30, 1997). The agreement also has a term note feature providing for borrowings up to approximately $300,000 (see Note 6). Borrowings under the line of credit bear interest at the bank's prime rate (8.5% at June 30, 1997) plus 1.5%. Interest is payable monthly, and borrowings are due on demand. Borrowings under the line of credit are collateralized by certain OSP assets and are guaranteed by the Company and certain officers of the Company.

AME has a loan agreement with a Norwegian bank, which provides for revolving line of credit borrowings up to 5,000,000 Norwegian Krone (approximately $682,000 at June 30, 1997). Borrowings under the line of credit bear interest at a variable rate, which was 6.65% at June 30, 1997. Interest is payable quarterly. The loan agreement has no expiration date. Borrowings under the line of credit are collateralized by certain AME assets.

A subsidiary has loan agreements with a U.K. bank, which provide for overdraft borrowings of up to 1,250,000 pound sterling (approximately $2,081,000 at June 30, 1997), line of credit borrowings up to 750,000 pound sterling (approximately $1,248,000 at June 30, 1997) and a 500,000 pound sterling (approximately $832,000 at June 30, 1997) borrowing facility for tender and performance bonds. Borrowings under the overdraft facility bear interest at a base rate (6.0% at June 30, 1997) plus 2%. The overdraft facility expires in December 1997. At June 30, 1997 no amounts were outstanding under the overdraft facility. Borrowings under the line of credit bear interest at the base rate plus 1.85%. Interest is payable monthly and the line expires in November 1997. Borrowings under this agreement are secured by certain assets of the subsidiary and are guaranteed by the Company. Approximately $452,000 was outstanding under performance bonds at June 30, 1997.

<PAGE>

A subsidiary has a loan agreement with a Malaysian bank, which provides for revolving line of credit borrowings up to 2,500,000 Malaysian ringgits (approximately $990,000 at June 30, 1997) for performance bonds and standby letter of credits. This line expires in October 1997. No amounts were outstanding under this agreement at June 30, 1997.

5. SENIOR SUBORDINATED DEBT

The Company has issued convertible notes payable to non affiliates and certain related parties. Under the terms of the various agreements, certain

debt contained nondetachable warrants to convert the related debt into shares of the Company's preferred stock at $2.00 per share. Certain other notes provided for the conversion of the debt into shares of the Company's preferred stock at $2.80 per share at the option of the holder. The remaining debt, at the option of the holder, provided for conversion of the debt into shares of the Company's common stock at $1.87 per share. During the year ended June 30, 1997, all of the debt outstanding under the various agreements was repaid or converted in accordance with the conversion terms as summarized in the following table:

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (In thousands) | |
| Convertible note payable to a related party, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on April 24, 1997 converted into 1,250,000 shares of preferred stock on November 27, 1996 | $2,500 | $-- |
| Convertible notes payable, (including $50,000 to a related party) interest due quarterly at a bank'sprime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, paid in full as of October 28, 1996 | 350 | -- |
| Convertible notes payable to directors, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998, converted into 26,786 shares of common stock on October 31, 1996 | 50 | -- |
| Convertible notes payable, interest due quarterly at a bank's prime rate (8.25% at June 30, 1996) plus 1.5%, principal due on February 19, 1998 converted into 93,750 shares of common stock on October 31, 1996 | 175 | -- |
| Total senior subordinated debt | 3,075 | -- |
| Less current portion | 2,500 | -- |
| Total long-term portion | $ 575 | $-- |

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

6. LONG-TERM DEBT

At June 30, 1996 and 1997, long-term debt consisted of the following:

| | JUNE 30, 1996 | JUNE 30, 1997 |
|---|---|---|
| | (In thousands) | |
| Term loan payable to a bank, interest due monthly at the bank's | | |

| | | |
|---|---|---|
| prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $52,083. The term loan was repaid in January 1997 | $1,667 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in equal monthly installments of $16,666. The term loan was repaid in January 1997 | 750 | -- |
| Equipment line note payable to a bank, interest due monthly at the bank's prime rate (8.25% at June 30, 1996) plus 0.25%, principal due in monthly installments of $11,623. The term loan was repaid in January 1997 | 511 | -- |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 0.50%, principal due in monthly installments of $52,083 until paid in full on March 31, 2001. Outstanding balances are collateralized by substantially all of the assets of the Company | -- | $2,344 |
| Term loan payable to a Norwegian bank, interest due quarterly at a rate of 5.75% principal due in monthly installments of $12,129 until paid in full on June 1, 2001. Outstanding balances are collateralized by certain assets of the subsidiary | -- | 437 |
| Term loan payable to a bank, interest due monthly at the bank's prime rate (8.5% at June 30, 1997) plus 2.25%, principal due in monthly installments of $8,333 until paid in full on November 30, 1997 | 141 | 41 |
| Liability under settlement agreements, interest computed at the 52 week treasury bill rate (5.35% at June 30, 1997), principal due $300,000 in 1998, and $400,000 in 1999 | 1,000 | 700 |
| Other | 535 | 558 |
| | 4,604 | 4,080 |
| Less current portion of long-term debt | 1,491 | 1,240 |
| Long-term portion of debt | $3,113 | $2,840 |

</TABLE>

Fiscal year principal payments of long-term debt as of June 30, 1997 are as follows (in thousands):

<TABLE>

| <S> | <C> |
|---|---|
| 1998 | $1,240 |
| 1999 | 1,333 |
| 2000 | 896 |
| 2001 | 592 |
| 2002 | 19 |
| Total | $4,080 |

</TABLE>

<PAGE>

7. INCOME TAXES

For financial reporting purposes, income before provision for income taxes and minority interest includes the following components (in thousands):

<TABLE>

<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Pretax income: | | | |
| United States | $1,277 | $1,965 | $2,655 |
| Foreign | 277 | 1,288 | 2,938 |
| Total pretax income | $1,554 | $3,253 | $5,593 |

</TABLE>

The Company's provision for income taxes is comprised of the following (in thousands):

<TABLE>
<CAPTION>

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Current: | | | |
| Federal | $ 43 | $ 510 | $1,256 |
| State | 3 | 21 | 24 |
| Foreign | 127 | 592 | 1,036 |
| | 173 | 1,123 | 2,316 |
| Deferred | 240 | (12) | (900) |
| Total provision | $413 | $1,111 | $1,416 |

</TABLE>

Deferred income tax assets (liabilities) at June 30, 1996 and 1997 consisted of the following (in thousands):

<TABLE>
<CAPTION>

| | JUNE 30, | |
|---|---|---|
| | 1996 | 1997 |
| Expenses not currently deductible | $ 873 | $1,455 |
| State income taxes | -- | -- |
| Other | -- | 301 |
| Total deferred income tax assets | 873 | 1,756 |
| Depreciation | (145) | (43) |
| Capitalized software development costs | (214) | (219) |
| State income taxes | (173) | (329) |
| Revitalization zone deductions | (278) | (392) |
| Other | (190) | -- |
| Total deferred income tax liabilities | (1,000) | (983) |
| Net deferred income taxes | $ (127) | $ 773 |

</TABLE>

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The consolidated effective income tax rate differs from the federal statutory income tax rate due primarily to the following:

| | YEAR ENDED JUNE 30, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Provision for income taxes at federal statutory rate... | 35.0 % | 35.0 % | 35.0 % |
| State income taxes (credits), net of federal benefit... | (2.6) | 0.2 | (4.7) |
| Nontaxable earnings of FSC............................ | (7.1) | (5.7) | (4.9) |
| Research and development tax credits.................. | (2.8) | -- | (1.7) |
| Foreign income subject to tax at other than federal statutory rate........................................ | 0.7 | 1.1 | (1.0) |
| Other............................................... | 3.4 | 3.6 | 2.6 |
| Effective income tax rate............................ | 26.6 % | 34.2 % | 25.3 % |

The Company does not provide for U.S. income taxes on the undistributed earnings of the foreign subsidiaries as it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time. At June 30, 1997 undistributed earnings of the foreign subsidiaries amounted to approximately $3,656,000. It is not practicable to determine the amount of income or withholding tax that would be payable upon the remittance of those earnings.

8. COMMITMENTS AND CONTINGENCIES

The Company leases its production and office facilities and certain equipment under various operating leases. Most of these leases provide for increases in rents based on the Consumer Price Index and include renewal options ranging from two to ten years. The lease for the production and office facilities in Hawthorne, California expires in 2005, and the Company is currently considering exercising its option to purchase the facilities for approximately $3,000,000. Future minimum lease payments under such leases as of June 30, 1997 are as follows: $280,000; 1998, $1,046,000; 1999, $826,000; 2000, $684,000; 2001, $658,000; 2002, $401,000; and thereafter, $2,561,000. Total rent expense included in the accompanying consolidated financial statements was $959,000, $901,000 and $921,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

The Company is involved in various claims and legal proceedings arising out of the conduct of its business, principally related to patent rights and related licensing issues. The principal litigation involves claims that certain technology used in the Company's scanners infringes on certain existing patents and seeks damages in an unspecified amount and an injunction barring the Company from making, using, selling or offering for sale certain of its security and inspection products in the United States. The Company has alleged that its security products do not infringe the patents, and that the plaintiffs in the suit had previously granted the Company the right to market its security and inspection products. In the event it is determined that the Company's products infringe upon the rights of the plaintiffs and that the Company does not have the right to use the technology in its products, the

Company could be prevented from marketing most of its security and inspection products in the United States and could be required to pay a significant amount of damages.

An estimate of loss or range of loss cannot be made at this time, however, management of the Company believes that the resolution of the above noted litigation and other legal proceedings will not have a material adverse effect on the Company's consolidated financial statements.

F-16

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

9. STOCK OPTIONS

The Company has two stock option plans. Under the 1987 plan, 1,050,000 shares of common stock have been reserved for the issuance of incentive stock options to key employees, directors and officers of the Company. The price, terms and conditions of each issuance are determined by the Board of Directors.

The 1997 plan was established in May 1997 and authorizes the grant of up to 850,000 shares of the Company's common stock in the form of incentive and nonqualified options. Employees, officers and directors are eligible under this plan, which is administered by the Board of Directors who determine the terms and conditions of each grant. The exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals that own greater than ten percent of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock at the date of grant.

Exercise periods for incentive and nonqualified options granted under this plan may not exceed ten years from the grant date.

In November and December 1996, the Company granted stock options for the purchase of 235,125 shares of the Company's common stock to certain employees at prices below the $6.67 estimated fair market value at the date grant. The options were accelerated to vest immediately and accordingly, the Company has recorded compensation expense for the year ended June 30, 1997, representing the excess of the fair value of the Company's common stock at the date of grant over the option exercise price.

F-17

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following summarizes stock option activity for the years ended June 30, 1995, 1996 and 1997:

<TABLE>
<CAPTION>

| NUMBER OF OPTIONS | OPTION PRICE | |
|---|---|---|
| | WEIGHTED AVERAGE | TOTAL |

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Outstanding, July 1, 1994 | 307,875 | $1.43 | $ 440,000 |
| Granted | 69,000 | 2.00 | 138,000 |
| Exercised | (60,000) | 1.25 | (75,000) |
| Canceled | (19,500) | 1.77 | (34,000) |
| Outstanding, June 30, 1995 | 297,375 | 1.57 | 469,000 |
| Granted | 51,000 | 2.17 | 111,000 |
| Exercised | (16,125) | 1.06 | (17,000) |
| Canceled | (13,500) | 1.60 | (22,000) |
| Outstanding, June 30, 1996 | 318,750 | 1.70 | 541,000 |
| Granted | 669,611 | 8.88 | 5,947,000 |
| Exercised | (118,125) | 1.24 | (146,000) |
| Canceled | (9,750) | 2.38 | (23,000) |
| Outstanding, June 30, 1997 | 860,486 | $7.34 | $6,319,000 |

</TABLE>

The following summarizes pricing and term information for options outstanding as of June 30, 1997:

<TABLE>
<CAPTION>

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING AT JUNE 30, 1997 | WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | EXERCISABLE AT JUNE 30, 1997 | WEIGHTED AVERAGE EXERCISE PRICE |
| <S> | <C> | <C> | <C> | <C> | <C> |
| $0.17 to $0.67 | 13,500 | 1.0 years | $0.64 | 13,500 | $0.64 |
| 1.87 to 2.00 | 134,625 | 2.0 | 1.95 | 102,563 | 1.93 |
| 2.33 to 3.33 | 277,875 | 4.1 | 2.89 | 269,250 | 2.90 |
| 11.50 to 13.50 | 434,486 | 5.0 | 12.08 | -- | -- |
| $0.17 to $13.50 | 860,486 | 4.2 | $7.34 | 385,313 | $2.56 |

</TABLE>

The Company has adopted the disclosure-only provisions of SFAS 123, "Accounting for Stock-Based Compensation." The estimated fair value of options granted during 1996 and 1997 pursuant to SFAS 123 was approximately $19,000 and $1,054,000, respectively. Had the Company adopted SFAS 123, pro forma net income would have been $2,297,000 and $4,058,000, and pro forma net income per share would have been $0.36 and $0.64 for 1996 and 1997, respectively. The fair value of each option grant was estimated using the Black-Scholes option-pricing model with the following weighted average assumptions: dividend yield and volatility of zero, a risk free interest rate of 6.33% and expected option lives of 5 years.

10. STOCKHOLDERS' EQUITY

In May 1997, the Company's Board of Directors authorized a 1.5 for 1 stock split of the outstanding common stock. All share and per share numbers have been adjusted to retroactively reflect the common stock split.

<PAGE>

The preferred stock had a liquidation preference of $1.00 per share, and was otherwise entitled to the same voting, dividend and all other rights as the common stock.

In June 1997, in order to simplify the capital structure of the Company, holders of the preferred stock converted each preferred share into 1.5 shares (post-split) of common stock.

In June 1997, the Company amended its articles of incorporation, which articles authorize 10,000,000 shares of new preferred stock. Such preferred stock has no par value, and no preferred shares are issued and outstanding at June 30, 1997.

In connection with the acquisition of the minority interest of a subsidiary in November 1996 (see Note 1), the Company granted the selling shareholders options to purchase 45,486 shares of the Company's common stock at $11.50 per share. The options vest over four years from the date of grant. If the Company does not successfully complete an underwritten public offering of its common stock by December 31, 1997, the options revert back to the Company.

11. RELATED PARTY TRANSACTIONS

The Company contracts with entities affiliated by common ownership to provide messenger service and auto rental and printing services. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's Board of Directors. Included in selling, general and administrative expenses for the years ended June 30, 1995, 1996 and 1997 are approximately $77,000, $83,000, and $111,000 for messenger service and auto rental; $78,000, $63,000, and $82,000 for printing services; and $23,000, $7,000, and $11,000 for professional services, respectively. During the year ended June 30, 1997, the Company paid a one time consulting fee amounting to $100,000 to an entity that is a shareholder of the Company.

Shareholders and other parties related to the Company have made loans to the Company under agreements subordinating such loans to the Company's bank borrowings (see Notes 4, 5 and 6). Interest expense related to such borrowings was approximately $315,000, $263,000, and $146,000 for the years ended June 30, 1995, 1996 and 1997, respectively.

12. GOVERNMENT SETTLEMENT

During 1994, a subsidiary of the Company was notified that the U.S. Department of Justice was conducting an investigation regarding the testing of certain products that were sold by a subsidiary under government contracts. A settlement of $1,500,000 was agreed to, and was accrued and charged to operations in the year ended June 30, 1994. The settlement is being paid in five increasing installments, with the unpaid principal balance bearing interest at the 52-week Treasury bill rate. At June 30, 1997, the unpaid balance of this settlement was $700,000 (see Note 6).

13. EMPLOYEE BENEFIT PLANS

OSI Systems, Inc. has a qualified employee retirement savings plan. The plan provides for a contribution by the Company, which is determined annually by the Board of Directors. In addition, the plan permits voluntary salary reduction contributions by employees. The Company made no contributions to the plan for the years ended June 30, 1997, 1996 and 1995. During 1995, a subsidiary in the U.K. ("Rapiscan") transferred its existing employees from their former owner's plan to a new plan, the Rapiscan defined benefit plan, which covers certain Rapiscan employees. The benefits under this plan are based on years of service and the employee's highest 12 months' compensation during the last five years of employment. Rapiscan's funding policy is to make the minimum annual contributions required by applicable regulations based on an independent actuarial valuation sufficient to provide for benefits accruing

after that date. Pension expense for the years ended June 30, 1995, 1996 and 1997 was approximately $111,000, $91,000, and $89,000, respectively.

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

14. SEGMENT INFORMATION

The Company's operating locations include the United States, Europe (United Kingdom and Norway) and Asia (Singapore and Malaysia). The Company's operations and identifiable assets by geographical area are as follows (in thousands):

<TABLE>
<CAPTION>

| YEAR ENDED JUNE 30, 1995 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues | $33,158 | $11,341 | $ 5,316 | | $49,815 |
| Transfer between geographical areas | 1,698 | 788 | 3,831 | $ (6,317) | -- |
| Net revenues | $34,856 | $12,129 | $ 9,147 | $ (6,317) | $49,815 |
| Operating income | $ 1,996 | $ 485 | $ 267 | $ 57 | $ 2,805 |
| Identifiable assets | $36,751 | $10,832 | $ 4,839 | $(21,642) | $30,780 |

<CAPTION>

| YEAR ENDED JUNE 30, 1996 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues | $42,403 | $15,346 | $ 3,769 | | $61,518 |
| Transfer between geographical areas | 6,304 | 3,092 | 10,974 | $(20,370) | -- |
| Net revenues | $48,707 | $18,438 | $14,743 | $(20,370) | $61,518 |
| Operating income | $ 2,641 | $ 1,278 | $ 890 | $ (197) | $ 4,612 |
| Identifiable assets | $42,932 | $10,179 | $ 5,986 | $(23,788) | $35,309 |

<CAPTION>

| YEAR ENDED JUNE 30, 1997 | UNITED STATES | EUROPE | ASIA | ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|
| Revenues | $54,310 | $18,915 | $ 4,403 | | $77,628 |
| Transfer between geographical areas | 8,655 | 5,156 | 12,191 | $(26,002) | -- |
| Net revenues | $62,965 | $24,071 | $16,594 | $(26,002) | $77,628 |

| | | | | | |
|---|---|---|---|---|---|
| Operating income........... | $ 3,814 | $ 1,849 | $ 1,390 | $ (263) | $ 6,790 |
| | ======= | ======= | ======= | ======== | ======= |
| Identifiable assets.......... | $52,367 | $15,066 | $ 8,395 | $(28,495) | $47,333 |
| | ======= | ======= | ======= | ======== | ======= |

</TABLE>

<PAGE>

[INSIDE BACK PAGE]

[Background names of various countries]

[Picture of inspection machine with image of gun and various items on monitor]

RAPISCAN
2000 Units Shipped Worldwide

[Picture of cruise ship terminal]
Cruise Ship Terminal

[Picture of correctional facility]
Correctional Facility

[Picture of freight forwarder facility]
International Freight Forwarder

[Picture of court house]
Municipal Court House

[Picture of Buckingham Palace]
Buckingham Palace

[Picture of airport terminal]
International Airport

<PAGE>

[LOGO OF OPTO-SENSORS, INC.]

<PAGE>

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

The following table sets forth an itemized statement of all expenses to be incurred in connection with the issuance and distribution of the securities that are the subject of this Registration Statement other than underwriting discounts and commissions. All expenses incurred with respect to the distribution will be paid by the Company, and such amounts, other than the Securities and Exchange Commission registration fee and the NASD filing fee, are estimates only.

<TABLE>

<S> <C>

| | |
|---|---|
| Securities and Exchange Commission registration fee | $ 18,052 |
| NASD filing fee | 6,457 |
| Nasdaq National Market System listing fee | 42,000 |
| Printing and engraving expenses | 100,000 |
| Transfer agent and registrar fees | 2,000 |
| Legal fees and expenses | 175,000 |
| Accounting fees and expenses | 150,000 |
| "Blue sky" fees and expenses | 15,000 |
| Other expenses | 151,491 |
| Total | $660,000* |

</TABLE>

- ---------------------

* The Selling Shareholders participating in the Offering of the 370,000 shares to be sold by such Selling Shareholders will pay their pro rata share of all expenses incurred with respect to the distribution of the Common Stock, which amount is currently estimated to be approximately $60,000. The Selling Shareholders who are selling in the case that the underwriters over-allotment option is exercised will not pay any of the above expenses.

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

The Company's Articles of Incorporation ("Articles") provide that, pursuant to the California Corporations Code, the liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent permissible under California law. This is intended to eliminate the personal liability of a director for monetary damages in an action brought by, or in the right of, the Company for breach of a director's duties to the Company or its shareholders. This provision in the Articles does not eliminate the directors' fiduciary duty and does not apply for certain liabilities: (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (ii) for acts or omissions that a director believes to be contrary to the best interest of the Company or its shareholders or that involve the absence of good faith on the part of the director; (iii) for any transaction from which a director derived an improper personal benefit; (iv) for acts or omissions that show a reckless disregard for the director's duty to the Company or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the Company or its shareholders; (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its shareholders; (vi) with respect to certain transactions or the approval of transactions in which a director has a material financial interest; and (vii) expressly imposed by statute for approval of certain improper distributions to shareholders or certain loans or guarantees. This provision also does not limit or eliminate the rights of the Company or any shareholder to seek non-monetary relief such as an injunction or rescission in the event of a breach of a director's duty of care. The Company's Amended and Restated Bylaws require the Company to indemnify its officers and directors under certain circumstances. Among other things, the Bylaws require the Company to indemnify directors and officers against certain liabilities that may arise by reason of their status or service as directors and officers and allows the Company to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Section 317 of the California Corporations Code ("Section 317") provides that a California corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative (other than

action by or in the right of the corporation) by reason of the fact that he is
or was a director, officer, employee, or agent of the corporation or is or was
serving at the request of the corporation as a director, officer, employee or
agent of another corporation or enterprise, against expenses, judgments, fines
and amounts paid in settlement actually and reasonably incurred by him in
connection with such action or proceeding if he acted in good faith and in a
manner he reasonably believed to be in or not opposed to the best interest of
the corporation, and, with respect to any criminal action or proceeding, had
no cause to believe his conduct was unlawful.

    Section 317 also provides that a California corporation may indemnify any
person who was or is a party or is threatened to be made a party to any
threatened, pending or completed action or suit by or in the right of the
corporation to procure a judgment in its favor by reason of the fact that such
person acted in any of the capacities set forth above, against expenses
actually and reasonably incurred by him in connection with the defense or
settlement of such action or suit if he acted under similar standards, except
that no indemnification may be made in respect to any claim, issue or matter
as to which such persons shall have been adjudged to be liable to the
corporation unless and only to the extent that the court in which such action
or suit was brought shall determine that despite the adjudication of
liability, such person is fairly and reasonably entitled to be indemnified for
such expenses which the court shall deem proper.

    Section 317 provides further that to the extent a director or officer of a
California corporation has been successful in the defense of any action, suit
or proceeding referred to in the previous paragraphs or in the defense of any
claim, issue or matter therein, he shall be indemnified against expenses
actually and reasonably incurred by him in connection therewith; that
indemnification authorized by Section 317 shall not be deemed exclusive of any
other rights to which the indemnified party may be entitled; and that the
corporation may purchase and maintain insurance on behalf of a director or
officer of the corporation against any liability asserted against him or
incurred by him in any such capacity or arising out of his status as such
whether or not the corporation would have the power to indemnify him against
such liabilities under Section 317.

    In May 1994, the Company entered into indemnification agreements with Deepak
Chopra, Ajay Mehra and Thomas K. Hickman in connection with certain personal
guarantees provided by them to a Singapore financial institution that provided
a loan to OSI Singapore, a subsidiary of the Company. The indemnification
agreements provide that the Company shall indemnify Messrs. Chopra, Mehra and
Hickman against all debts, liabilities, damages, claims, expenses and costs
including attorneys' fees incurred by them in connection with OSI Singapore's
inability to fulfill its obligations under the loan and their respective
guarantees of such loan. Messrs. Chopra, Mehra and Hickman are directors
and/or executive officers of the Company.

    In connection with certain settlements entered into pursuant to the Consent
Agreements, the Company's subsidiary, UDT Sensors, agreed to pay the United
States government a total of $1,500,000 in five annual installments ending on
March 31, 1999. In order to ensure the full payment, Deepak Chopra personally
guaranteed the payment of $750,000 of the foregoing amount. The Company
entered into an indemnification agreement with Mr. Chopra pursuant to which
the Company shall indemnify Mr. Chopra against all debts, liabilities,
damages, claims, expenses and costs including attorneys' fees incurred by him
in connection with his guarantee of the payment of $750,000.

    In addition, the Company has entered into indemnity agreements ("Indemnity
Agreement(s)") with each of its directors and executive officers. Each such
Indemnity Agreement provides that the Company shall indemnify the indemnitee
against expenses, including reasonable attorneys' fees, judgements, penalties,
fines and amounts paid in settlement actually and reasonably incurred by him

in connection with any civil or criminal action or administrative proceeding arising out of the performance of his duties as a director or officer. Such indemnification is available if the indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, had no reasonable cause to believe his conduct was unlawful. Each Indemnity Agreement permits the director or officer that is party thereto to bring suit to seek recovery of amounts due under the Indemnity Agreement and to recover the expenses of such a suit if he is successful.

II-2

<PAGE>

The Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification by the Underwriters of the Company and its officers and directors for certain liabilities arising under the Securities Act or otherwise.

The Company believes that it is the position of the Commission that insofar as the foregoing provisions may be invoked to disclaim liability for damages arising under the Securities Act, the provision is against public policy as expressed in the Securities Act and is therefore unenforceable. Such limitation of liability also does not affect the availability of equitable remedies such as injunctive relief or rescission.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

In September 1997, Deepak Chopra, Ajay Mehra, Anuj Wadhawan and Dennis Noble exercised options to purchase a total of 77,250 shares of Common Stock for a total purchase price of $252,625. The options had been granted pursuant to the Company's 1987 Plan. Each of Messrs. Chopra, Mehra, Wadhawan and Noble is an officer and/or employee of the Company.

As of May 31, 1997, the Company had outstanding 2,568,750 shares of Preferred stock which had the same rights, preferences, privileges and restrictions as the Common Stock except for a liquidation preference entitling each holder of Preferred Stock to receive $1.00 per share of Preferred Stock prior to any payment to holders of Common Stock upon any liquidation, dissolution or winding up of the Company. The then outstanding shares of Preferred Stock were held by 29 investors including certain directors, executive officers and principal shareholders of the Company. On June 12, 1997, in connection with the Stock Split, each outstanding share of Preferred Stock was converted into one and one-half shares of Common Stock (the "Preferred Stock Conversion"). As a result, all of the shares of Preferred Stock were converted into 3,853,125 shares of Common Stock. No Preferred Stock is currently outstanding.

In June 1989, April 1990 and February 1993 the Company issued and sold (without payment of any selling commission to any person) subordinated promissory notes in the aggregate principal amounts of approximately $385,000, $3,520,000 and $575,000, respectively, with related warrants or conversion rights to purchase capital stock of the Company. The purchasers of the subordinated notes consisted of a financial institution and certain of the Company's directors, executive officers, principal shareholders and their family members, friends and acquaintances. The promissory notes, warrants and conversion rights provided that the note holders were entitled to exercise the warrants or convert the notes into capital stock of the Company by cancelling the appropriate amounts of the outstanding principal amount and accrued interest of such promissory notes. The exercise price of the warrants issued in June 1989 and April 1990 was $1.33 per share (after giving effect to the Stock Split), whereas the exercise price of the warrants and convertible notes issued in February 1993 was $1.87 per share (after giving effect to the Stock Split). During the period from March 1995 to November 1996, an aggregate principal amount of $3,150,000 underlying the subordinated notes were converted into 132,858 shares of Common Stock and 1,410,000 shares of

Preferred Stock (before giving effect to the Preferred Stock Conversion and the Stock Split) as a result of the exercise of the warrants and conversion rights. As a result of the Preferred Stock Conversion and the Stock Split, the former note holders that exercised their warrants and conversion rights currently hold 2,314,287 shares of Common Stock.

In April 1990, the Company issued warrants to purchase 35,000 shares of Preferred Stock to Troy & Gould Professional Corporation ("Troy & Gould") in consideration for legal services rendered by Troy & Gould. In April 1995, Troy & Gould and certain principals thereof exercised such warrants by acquiring an aggregate of 35,000 shares of Preferred Stock for a total exercise price of $70,000. As a result of the Preferred Stock Conversion, Troy & Gould and certain of its principals currently hold 52,500 shares of Common Stock.

Since June 1, 1994, the Company sold an aggregate of 194,250 shares of Common Stock for an aggregate purchase price of $238,075 to various employees pursuant to the exercise of options granted under the Company's 1987 Incentive Stock Option Plan.

<PAGE>

Since June 1, 1994, the Company has issued options to purchase a total of 789,611 shares of its Common Stock to a total of 89 officers, directors and employees of the Company. The exercise price of the foregoing options granted by the Company ranged from $2.00 to $13.50 per share.

In November 1996, the Company issued 159,201 shares of its Common Stock to 10 officers and key employees of the Company in exchange for all of the shares of capital stock of Rapiscan U.S.A., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share. As part of the same arrangement, the Company issued 27,654 additional shares of its Common Stock to such officers and key employees in August 1997. The number of shares of Common Stock issued was based on the combined net income before taxes of Rapiscan U.S.A. and Rapiscan UK for the fiscal year ended June 30, 1997.

In September 1996, the Company issued 19,755 shares of its Common Stock to six officers and key employees of the Company in exchange for all of the shares of capital stock of Ferson Optics, Inc., one of the Company's subsidiaries, then owned by such officers and employees. The shares of Common Stock were valued at $6.67 per share.

The Company believes that the issuances of securities pursuant to the foregoing transactions were exempt from registration under the Securities Act of 1933, as amended, by virtue of Section 4(2) or Section 3(b).

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following exhibits, which are furnished with this Registration Statement or incorporated herein by reference, are filed as a part of this Registration Statement:

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 1.1 | Amended Form of Underwriting Agreement. |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.(4) |
| 5.1 | Opinion of Troy & Gould Professional Corporation.(4) |

| | |
|---|---|
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.(4) |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |
| 10.9 | Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1) |
| 10.10 | Form of Indemnity Agreement for directors and executive officers of the Company.(4) |
| 10.11 | Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2) |
| 10.12 | Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1) |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| <C> | <S> |
| 10.13 | Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).(4) |
| 10.14 | Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1) |
| 10.15 | Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1) |
| 10.16 | Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1) |
| 10.17 | License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1) |
| 10.18 | Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1) |
| 11.1 | Statement regarding computation of earnings per share.(3) |
| 21.1 | Subsidiaries of the Company.(1) |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1). |
| 24.1 | Power of Attorney.(1) |
| 27.1 | Financial Data Schedule. |
| 99.1 | Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2) |
| 99.2 | Agreement between UDT Sensors, Inc. and Department of Navy.(2) |

</TABLE>

- ---------------

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1142 of 2711

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(4) Previously filed with the Company's Amendment No. 2 to the Registration Statement filed August 15, 1997.

(b) The following schedules supporting the financial statements are included herein:

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted, since the required information is not present in amounts sufficient to require submission of schedules or because the information required is included in the Registrant's financial statements and notes thereto.

ITEM 17. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes to provide to the Underwriters at the closing specified in the Underwriting Agreement certificates in such denominations and registered in such names as required by the Underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act

<PAGE>

and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c) The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or Rule 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be

deemed to be the initial bona fide offering thereof.

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hawthorne, State of California, on September 30, 1997.

OSI SYSTEMS, INC.

By: /s/ AJAY MEHRA

Ajay Mehra
Vice President, Chief Financial Officer,
Secretary and Director

Pursuant to the requirements of the Securities Act of 1933, this Amendment to the Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| SIGNATURE | TITLE | DATE |
|---|---|---|
| * <br> Deepak Chopra | Chairman, Chief Executive Officer and President (Principal Executive Officer) | September 30, 1997 |
| /s/ AJAY MEHRA <br> Ajay Mehra | Vice President, Chief Financial Officer, Secretary and Director (Principal Financial and Accounting Officer) | September 30, 1997 |
| * <br> Steven C. Good | Director | September 30, 1997 |
| * <br> Meyer Luskin | Director | September 30, 1997 |
| * <br> Madan G. Syal | Director | September 30, 1997 |

*By: /s/ AJAY MEHRA September 30, 1997
Ajay Mehra
as Attorney-In-Fact

</TABLE>

II-7

<PAGE>

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS

<TABLE>
<CAPTION>

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS (1) CHARGED TO COSTS AND EXPENSES | ADDITIONS (2) CHARGED TO OTHER ACCOUNTS | DEDUCTIONS-- WRITE-OFFS (RECOVERIES) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | | |
| Year Ended June 30, 1994 | $ 38 | $150 | -- | (15) | $203 |
| Year Ended June 30, 1995 | $203 | (70) | -- | 80 | $ 53 |
| Year Ended June 30, 1996 | $ 53 | $404 | -- | 181 | $276 |
| Year Ended June 30, 1997 | $276 | $389 | -- | 79 | $586 |

</TABLE>
<PAGE>

<TABLE>
<CAPTION>

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| 1.1 | Amended Form of Underwriting Agreement. |
| 3.1 | Articles of Incorporation of the Company.(1) |
| 3.2 | Amended and Restated Bylaws of the Company.(1) |
| 4.1 | Specimen Common Stock Certificate.(4) |
| 5.1 | Opinion of Troy & Gould Professional Corporation.(4) |
| 10.1 | 1987 Incentive Stock Option Plan, as amended, and form of Stock Option Agreement.(1) |
| 10.2 | 1997 Stock Option Plan and forms of Stock Option Agreements.(2) |
| 10.3 | Employment Agreement dated April 1, 1997 between the Company and Deepak Chopra.(1) |
| 10.4 | Employment Agreement dated April 1, 1997 between the Company and Ajay Mehra.(1) |
| 10.5 | Employment Agreement dated March 1, 1993 between the Company and Andreas F. Kotowski.(3) |
| 10.6 | Employment Agreement dated April 1, 1997 between the Company and Manoocher Mansouri Aliabadi.(1) |
| 10.7 | Employment Agreement dated October 5, 1994 between the Company and Anthony S. Crane.(4) |
| 10.8 | Expatriate Employment Agreement dated July 11, 1995 between the Company and Thomas K. Hickman.(2) |

10.9 Incentive Compensation Agreement dated December 18, 1996 between the Company and Andreas F. Kotowski.(1)
10.10 Form of Indemnity Agreement for directors and executive officers of the Company.(4)
10.11 Joint Venture Agreement dated January 4, 1994 among the Company, Electronics Corporation of India, Limited and ECIL-Rapiscan Security Products Limited ("ECIL-Rapiscan") as amended.(2)
10.12 Amendment Number Two to Lease, dated October 24, 1995 to lease dated January 1, 1989 by and between KB Management Company, and UDT Sensors, Inc.(1)
10.13 Lease Agreement dated July 4, 1986 by and between Electricity Supply Nominees Limited and Rapiscan Security Products Limited (as assignee of International Aeradio Limited).(4)
10.14 Lease Agreement dated January 17, 1997 by and between Artloon Supplies Sdn. Bhd. and Opto Sensors (M) Sdn. Bhd.(1)
10.15 Credit Agreement entered into on January 24, 1997, by and between Sanwa Bank California and Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc.(1)
10.16 Credit Agreement entered into on November 1, 1996 by and between Opto Sensors, Inc., UDT Sensors, Inc., Rapiscan Security Products (U.S.A.), Inc. and Ferson Optics, Inc., and Wells Fargo HSBC Trade Bank.(1)
10.17 License Agreement made and entered into as of December 19, 1994, by and between EG&G Inc. and Rapiscan Security Products, Inc.(1)
10.18 Stock Purchase Agreement dated March 5, 1997 between Industriinvestor ASA and Opto Sensors, Inc.(1)
11.1 Statement regarding computation of earnings per share.(3)
21.1 Subsidiaries of the Company.(1)
23.1 Consent of Deloitte & Touche LLP.
23.2 Consent of Troy & Gould Professional Corporation (contained in Exhibit 5.1).
24.1 Power of Attorney.(1)
27.1 Financial Data Schedule.
99.1 Criminal Plea and Sentencing Agreement between UDT Sensors, Inc. and U.S. Attorney's Office.(2)
99.2 Agreement between UDT Sensors, Inc. and Department of Navy.(2)

</TABLE>

- ---------------

(1) Previously filed with the Company's Registration Statement filed June 13, 1997.

(2) Previously filed with the Company's Amendment No. 1 to the Registration Statement filed August 1, 1997.

(3) Replaces the exhibit previously filed with the corresponding exhibit number.

(4) Previously filed with the Company's Amendment No. 2 to the Registration Statement filed August 15, 1997.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-1.1
<SEQUENCE>2
<DESCRIPTION>FORM OF UNDERWRITING AGREEMENT
<TEXT>

<PAGE>

3,700,000 Shares/1/

OSI SYSTEMS, INC.

Common Stock

UNDERWRITING AGREEMENT

, 1997

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC
As Representatives of the several Underwriters
c/o Robertson, Stephens & Company LLC
555 California Street
Suite 2600
San Francisco, California 94104

Ladies and Gentlemen:

OSI SYSTEMS, INC., a California corporation (the "Company"), and certain shareholders of the Company named in Schedules B and C hereto (hereafter called the "Selling Shareholders") address you as the Representatives of each of the persons, firms and corporations listed in Schedule A hereto (herein collectively called the "Underwriters") and hereby confirm their respective agreements with the several Underwriters as follows:

1. Description of Shares. The Company proposes to issue and sell 3,330,000 shares of its authorized and unissued common stock, no par value, to the Underwriters. The Selling Shareholders, acting severally and not jointly, propose to sell an aggregate of 370,000 shares of the Company's issued and outstanding common stock, no par value, to the several Underwriters. The 3,330,000 shares of common stock, no par value, of the Company to be sold by the Company are hereinafter called the "Company Shares" and the 370,000 shares of common stock, no par value, to be sold by the Selling Shareholders are hereinafter called the "Selling Shareholder Shares." The

- --------------------
/1/ Plus an option to purchase up to 555,000 additional shares from certain shareholders of the Company to cover over-allotments.

<PAGE>

Company Shares and the Selling Shareholder Shares are hereinafter collectively referred to as the "Firm Shares." Certain Selling Shareholders also propose to grant, severally and not jointly, to the Underwriters, an option to purchase up to 555,000 additional shares of the Company's common stock, no par value (the "Option Shares"), as provided in Section 8 hereof. As used in this Agreement, the term "Shares" shall include the Firm Shares and the Option Shares. All shares of the Company's common stock, no par value, outstanding after giving effect to the sales contemplated hereby, including the Shares, are hereinafter referred to as "Common Stock."

2. Representations, Warranties and Agreements of the Company. The Company represents and warrants to and agrees with each Underwriter and each Selling Shareholder that:

(a) A registration statement on Form S-1 (File No. 333-29179) with respect to the offer and sale of the Shares, including a prospectus subject to completion, has been prepared by the Company in conformity with the requirements prescribed by the Securities Act of 1933, as amended (the "Act"), and the applicable rules and regulations (the "Rules and Regulations") prescribed by the Securities and Exchange Commission (the "Commission") pursuant to the Act and has been filed with the Commission; such amendments to such registration

statement, such amended prospectuses subject to completion and such abbreviated registration statements pursuant to Rule 462(b) of the Rules and Regulations as may have been required prior to the date hereof have been similarly prepared and filed with the Commission; and the Company will file such additional amendments to such registration statement, such amended prospectuses subject to completion and such abbreviated registration statements as may hereafter be required. Copies of such registration statement and amendments, of each related prospectus subject to completion (the "Preliminary Prospectuses") and of any abbreviated registration statement filed pursuant to Rule 462(b) of the Rules and Regulations have been delivered to you.

If the registration statement relating to the Shares has been declared effective under the Act by the Commission, the Company will prepare and promptly file with the Commission the information omitted from the registration statement in reliance upon Rule 430A(a) or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations pursuant to subparagraph (1), (4) or (7) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to the registration statement (including a final form of prospectus). If the registration statement relating to the Shares has not been declared effective under the Act by the Commission, the Company will prepare and promptly file an amendment to the registration statement, including a final form of prospectus, or, if Robertson, Stephens & Company LLC, on behalf of the Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the information required to be included in any term sheet filed pursuant to Rule 434(b) of the Rules and Regulations. The term "Registration Statement" as used in this Agreement shall mean such registration statement, including financial statements, schedules and exhibits, in the form in which it was or is, as the case may be, declared effective (including, if the Company omitted information from the registration statement in reliance upon Rule 430A(a) or files a term sheet pursuant to Rule 434 of the Rules and Regulations, the information deemed to be a part of the registration statement at the time it was declared effective pursuant to Rule 430A(b) or Rule 434(d) of the Rules and Regulations) and, in the event of any amendment thereto or the filing of any abbreviated registration statement pursuant to Rule 462(b)

<PAGE>

of the Rules and Regulations after the effective date of such registration statement, shall also mean (from and after the effectiveness of such amendment or the filing of such abbreviated registration statement) such registration statement as so amended, together with any such abbreviated registration statement. The term "Prospectus" as used in this Agreement shall mean the prospectus relating to the Shares as included in the Registration Statement at the time it is declared effective (including, if the Company omitted information from the Registration Statement in reliance upon Rule 430A(a) of the Rules and Regulations, the information deemed to be a part of the Registration Statement pursuant to Rule 430A(b) of the Rules and Regulations as of the time it was declared effective; provided, however, that if in reliance on Rule 434 of the Rules and Regulations and with the written consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the term "Prospectus" shall mean the "prospectus subject to completion" (as defined in Rule 434(g) of the Rules and Regulations) last provided to the Underwriters by the Company and circulated by the Underwriters to all prospective purchasers of the Shares (including the information deemed to be a part of the Registration Statement pursuant to Rule 434(d) of the Rules and Regulations) at the time the Registration Statement was declared effective. Notwithstanding the foregoing, if any revised prospectus shall be provided to the Underwriters by the Company for use in connection with the offering of the Shares that differs from the prospectus referred to in the immediately preceding

sentence (whether or not such revised prospectus is required to be filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations), the term "Prospectus" shall refer to such revised prospectus from and after the time it is first provided to the Underwriters for such use. If in reliance on Rule 434 of the Rules and Regulations and with the consent of Robertson, Stephens & Company LLC, acting on behalf of the Underwriters, the Company shall have provided to the Underwriters a term sheet pursuant to Rule 434(b) prior to the time that a confirmation is sent or given for purposes of Section 2(10)(a) of the Act, the Prospectus and the term sheet, together, will not be materially different from the prospectus in the Registration Statement.

(b) The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus or instituted proceedings for that purpose, and the Preliminary Prospectus last provided to the Underwriters by the Company and circulated by the Underwriters to certain prospective purchasers of the Shares has conformed in all material respects to the requirements of the Act and the Rules and Regulations and, as of its date, has not included any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and at the time the Registration Statement was or is, as the case may be, declared effective and at all times subsequent thereto up to and on the Closing Date (hereinafter defined) and on any later date on which Option Shares are to be purchased, (i) the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained and will contain all material information required to be included therein by the Act and the Rules and Regulations and will in all material respects conform to the requirements of the Act and the Rules and Regulations, (ii) the Registration Statement, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein not misleading, and (iii) the Prospectus, and any amendments or supplements thereto, did not and will not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under

<PAGE>

which they were made, not misleading; *provided, however*, that none of the representations and warranties contained in this subparagraph (b) shall apply to information contained in or omitted from the Registration Statement or Prospectus, or any amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter, furnished to the Company by such Underwriter specifically for use in the preparation thereof.

(c) Each of the Company and its subsidiaries has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation with full power and authority (corporate and other) to own, lease and operate its properties and conduct its business as described in the Prospectus; the Company owns all of the outstanding capital stock of its subsidiaries free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; each of the Company and its subsidiaries is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its business requires such qualification; no proceeding has been instituted in any such jurisdiction, revoking, limiting or curtailing, or seeking to revoke, limit or curtail, such power and authority or qualification; each of the Company and its subsidiaries is in possession of and operating in compliance with all authorizations, licenses, certificates, consents, orders and permits from state, federal and other regulatory authorities which are material to the conduct of the Company and its subsidiaries business, all of which are valid and in full force and effect as of the date hereof; neither the Company nor any of its subsidiaries is in violation of its respective incorporating charter or bylaws or in default in the

performance or observance of any material obligation, agreement, covenant or condition contained in any material bond, debenture, note or other evidence of indebtedness, or in any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound; and neither the Company nor any of its subsidiaries is in violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties of which it has knowledge and which would have a material adverse effect on the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise (a "Material Adverse Effect"). The Company does not own or control, directly or indirectly, any corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., a California corporation, Rapiscan Security Products Limited, a private company formed under the laws of the United Kingdom and registered in England, Ferson Optics, Inc., a California corporation, UDT Sensors, Inc., a California corporation, Advanced Micro Electronics AS ("AME"), a company incorporated under Norwegian law, Opto Sensors (Singapore) Pte Ltd, a private company limited by shares and incorporated in the Republic of Singapore, Opto Sensors (Malaysia) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia, OSI Electronics, a California corporation, and Rapiscan Consortium (M) Sdn. Bhd., a private company limited by shares and incorporated in Malaysia (collectively, the "Material Subsidiaries"). In addition the Company owns a minority interest in ECIL Rapiscan Ltd., a limited liability joint stock corporation organized under the laws of India,

(d) The Company has full legal right, power and authority to enter into this Agreement and to perform the transactions contemplated hereby. This Agreement has been duly

-4-

<PAGE>

authorized, executed and delivered by the Company and is a valid and binding agreement on the part of the Company, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except to the extent that the enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a material breach or violation of any of the terms and provisions of, or constitute a default under, (i) any bond, debenture, note or other evidence of indebtedness, or under any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries or their respective properties may be bound, (ii) the charter or bylaws of the Company or any of its subsidiaries, or (iii) any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties. No consent, approval, authorization or order of or qualification with any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective properties is required for the execution and delivery of this Agreement and the consummation by the Company or any of its subsidiaries of the transactions herein contemplated, except such as may be required under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") (if applicable), or under state or other securities or Blue Sky laws, all of which requirements have been satisfied in all material respects.

(e) Except as disclosed in the Registration Statement, there is not any pending or, to the best of the Company's knowledge, threatened action,

suit, claim or proceeding against the Company, any of its subsidiaries or any of their respective officers (i.e., relating to or in connection with their duties as officers of the Company and any of its subsidiaries) or any of their respective properties, assets or rights before any court, government or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or over their respective officers or properties or otherwise which (i) may result in any material adverse change in the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise (a "Material Adverse Change") or may materially and adversely affect their properties, assets or rights, (ii) may prevent consummation of the transactions contemplated hereby or (iii) is required to be disclosed in the Registration Statement or Prospectus and is not so disclosed; and there are no agreements, contracts, leases or documents of the Company or any of its subsidiaries of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement by the Act or the Rules and Regulations which have not been accurately described in all material respects in the Registration Statement or Prospectus or filed as exhibits to the Registration Statement.

(f) All outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly authorized and validly issued and are fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and the authorized and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization" and conforms in all material respects to the statements relating thereto contained in the Registration Statement and the Prospectus (and such statements

<PAGE>

correctly state the substance of the instruments defining the capitalization of the Company); the Company Shares have been duly authorized for issuance and sale to the Underwriters pursuant to this Agreement and, when issued and delivered by the Company against payment therefor in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and nonassessable, and will be sold free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; and no preemptive right, co-sale right, registration right, right of first refusal or other similar right of shareholders exists with respect to any of the Company Shares or the sale thereof or the issuance of the Company Shares other than those that have been expressly waived prior to the date hereof and those that will automatically expire on the Closing Date; the Selling Shareholder Shares have been duly authorized for sale to the Underwriters pursuant to this Agreement and, when delivered by the Selling Shareholders against payment therefor in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and nonassessable, and will be sold free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest; and no preemptive right, co-sale right, registration right, right of first refusal or other similar right of shareholders exists with respect to any of the Shareholder Shares or the sale thereof other than those that have been expressly waived prior to the date hereof and those that will automatically expire upon and will not apply to the consummation of the transactions contemplated on the Closing Date. No further approval or authorization of any shareholder, the Board of Directors of the Company or others is required for the issuance and sale or transfer of the Shares except as may be required under the Act, the Exchange Act or under state or other securities or Blue Sky laws. All issued and outstanding shares of capital stock of each subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and were not issued in violation of or subject to any preemptive right, or other rights to subscribe for or purchase shares and are owned by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest. Except as disclosed in the Prospectus and the financial statements of the

Company, and the related notes thereto, included in the Prospectus, neither the Company nor any subsidiary has outstanding any options to purchase, or any preemptive rights or other rights to subscribe for or to purchase, any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of its capital stock or any such options, rights, convertible securities or obligations. The description in the Prospectus of the Company's stock option, stock bonus and other stock plans or arrangements, and the options or other rights granted and exercised thereunder, accurately and fairly presents the information required to be shown with respect to such plans, arrangements, options and rights.

(g) Deloitte & Touche LLP, which has examined the consolidated financial statements of the Company, together with the related schedules and notes, for the fiscal year ended June 30, 1997 and for each of the years in the two (2) fiscal years ended June 30, 1996 filed with the Commission as a part of the Registration Statement, which are included in the Prospectus, are independent accountants within the meaning of the Act and the Rules and Regulations; the audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, forming part of the Registration Statement and Prospectus, fairly present the financial position and the results of operations of the Company and its subsidiaries at the respective dates and for the respective periods to which they apply; and all audited consolidated financial statements of the Company, together with the related schedules and notes, and the unaudited consolidated financial information, filed with the Commission as part of the Registration Statement, have been prepared in accordance with generally

<PAGE>

accepted accounting principles consistently applied throughout the periods involved except as may be otherwise stated therein. The selected and summary financial and statistical data included in the Registration Statement present fairly the information shown therein and have been compiled on a basis consistent with the audited financial statements presented therein. No other financial statements or schedules are required to be included in the Registration Statement.

(h) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (i) any Material Adverse Change, (ii) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (iii) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (iv) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (v) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (vi) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a Material Adverse Effect.

(i) Except as set forth in the Registration Statement and Prospectus, (i) each of the Company and its subsidiaries has good and marketable title to all properties and assets described in the Registration Statement and Prospectus as owned by it, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest, other than such as would not have a Material Adverse Effect, (ii) the agreements to which the Company or any of its subsidiaries is a party described in the Registration Statement and Prospectus are valid agreements, enforceable by the Company and its subsidiaries (as applicable), except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1152 of 2711

relating to or affecting creditors' rights generally or by general equitable principles and, to the best of the Company's knowledge, the other contracting party or parties thereto are not in material breach or material default under any of such agreements, and (iii) the Company and each of its subsidiaries has valid and enforceable leases for all properties described in the Registration Statement and Prospectus as leased by it, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles. Except as set forth in the Registration Statement, the Company owns or leases all such properties as are necessary to its operations.

(j) The Company and its subsidiaries have timely filed all necessary federal, state and foreign income and franchise tax returns and have paid all taxes shown thereon as due, other than those contested in good faith or for which adequate reserves have been provided or those currently payable with out penalty or interest, and there is no tax deficiency that has been or, to the best of the Company's knowledge, might be asserted against the Company or any of its subsidiaries that would have a Material Adverse Effect; and all tax liabilities are adequately provided for on the books of the Company and its subsidiaries.

(k) The Company and its subsidiaries maintain insurance with insurers of recognized financial responsibility of the types and in the amounts generally deemed adequate for

<PAGE>

their respective businesses and consistent with insurance coverage maintained by similar companies in similar businesses, including, but not limited to, insurance covering real and personal property owned or leased by the Company or its subsidiaries, against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, all of which insurance is in full force and effect; neither the Company nor any such subsidiary has been refused any insurance coverage sought or applied for; and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(l) To the best of Company's knowledge, no labor disturbance by the employees of the Company or any of its subsidiaries exists or is imminent that would result in a Material Adverse Change. Except for with respect to the employees of AME, no collective bargaining agreement exists with any of the Company's or its subsidiaries' employees and, to the best of the Company's knowledge, no such agreement is imminent.

(m) Each of the Company and its subsidiaries owns or possesses adequate rights to use all patents, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names and copyrights which are necessary to conduct its businesses as described in the Registration Statement and Prospectus; the expiration of any patents, patent rights, trade secrets, trademarks, service marks, trade names or copyrights would not have a Material Adverse Effect; except as set forth in the Prospectus, the Company has not received any notice of, and has no knowledge of, any infringement of or conflict with asserted rights of the Company by others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights; and the Company has not received any notice of, and has no knowledge of, any infringement of or conflict with asserted rights of others with respect to any patent, patent rights, inventions, trade secrets, know-how, trademarks, service marks, trade names or copyrights which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect.

(n) The Common Stock has been approved for quotation on The Nasdaq National Market, subject to official notice of issuance.

(o) The Company has been advised as to the provisions of the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations thereunder, and has in the past conducted, and intends in the future to conduct, its affairs in such a manner as to ensure that it will not become an "investment company" or a company "controlled" by an "investment company" within the meaning of the 1940 Act and such rules and regulations.

(p) The Company has not distributed and will not distribute prior to the later of (i) the Closing Date, or any date on which Option Shares are to be purchased, as the case may be, and (ii) completion of the distribution of the Shares, any offering material in connection with the offering and sale of the Shares other than any Preliminary Prospectuses, the Prospectus, the Registration Statement and other materials, if any, permitted by the Act.

<PAGE>

(q) Neither the Company nor any of its subsidiaries has at any time during the last five (5) years (i) made any unlawful contribution to any candidate for foreign office or failed to disclose fully any contribution in violation of law, or (ii) made any payment to any federal or state governmental officer or official, or other person charged with similar public or quasi-public duties, other than payments required or permitted by the laws of the United States or any jurisdiction thereof.

(r) The Company has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

(s) Each officer and director of the Company, each Selling Shareholder and each beneficial owner of more than 7,500 shares of Common Stock, has agreed in writing that such person will not, for a period of 180 days from the date that the Registration Statement is declared effective by the Commission (the "Lock-up Period"), offer to sell, contract to sell, or otherwise sell, dispose of, loan, pledge or grant any rights with respect to (collectively, a "Disposition") any shares of Common Stock, any options or warrants to purchase any shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock (collectively, "Securities") now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction has been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than such holder. Such prohibited hedging or other transactions would include, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person has also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction. The Company has provided to counsel for the Underwriters a complete and accurate list of all securityholders of the Company and the number and type of securities held by each securityholder. The Company has provided to counsel for the Underwriters true, accurate and complete copies of all of the agreements pursuant to which its officers, directors and

shareholders have agreed to such or similar restrictions (the "Lock-up Agreements") presently in effect or effected hereby. The Company hereby represents and warrants that it will not release any of its officers, directors or other shareholders from any Lock-up Agreements currently existing or hereafter effected without the prior written consent of Robertson, Stephens & Company LLC.

(t) Except as set forth in the Registration Statement and Prospectus, (i) the Company is in material compliance with all rules, laws and regulations relating to the use, treatment, storage and disposal of toxic substances and protection of health or the environment

-9-

<PAGE>

("Environmental Laws") which are applicable to its business, (ii) the Company has received no notice from any governmental authority or third party of an asserted claim under Environmental Laws, which claim is required to be disclosed in the Registration Statement and the Prospectus, (iii) the Company is not aware of any requirement that will require it to make future material capital expenditures to comply with Environmental Laws and (iv) no property which is owned, leased or occupied by the Company has been designated as a Superfund site pursuant to the Comprehensive Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. (S) 9601, *et seq.*), or otherwise designated as a contaminated site under applicable state or local law.

(u) The Company and each of its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(v) There are no outstanding loans, advances (except normal advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company to or for the benefit of any of the officers or directors of the Company or any of the members of the families of any of them, except as required to be, and as, disclosed in the Registration Statement and the Prospectus.

(w) The Company has complied with all provisions of Section 517.075, Florida Statutes relating to doing business with the Government of Cuba or with any person or affiliate located in Cuba.

3. *Representations and Warranties of the Selling Shareholders.* Each Selling Shareholder, severally and not jointly, represents and warrants to and agrees with each Underwriter and the Company that:

(a) Such Selling Shareholder now has and on the Closing Date, and on any later date on which Option Shares are purchased, will have, valid marketable title to the Shares to be sold by such Selling Shareholder, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than pursuant to this Agreement; and upon delivery of such Shares hereunder and payment of the purchase price as herein contemplated, each of the Underwriters will obtain valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest pertaining to such Selling Shareholder or such Selling Shareholder's property, encumbrance, claim or equitable interest, including any liability for estate or inheritance taxes, or any liability to or claims of any creditor, devisee, legatee or beneficiary of such Selling Shareholder.

(b) Such Selling Shareholder has duly authorized (if applicable) executed and delivered, in form heretofore furnished to the Representatives, an Irrevocable Custody Agreement and Power of Attorney (the "Power of Attorney and Custody Agreement") appointing

<PAGE>

Deepak Chopra as attorney-in-fact (the "Attorney") with Deepak Chopra as custodian (the "Custodian"); each Power of Attorney and Custody Agreement constitutes a valid and binding agreement on the part of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and each of such Selling Shareholders' Attorney, acting alone, is authorized to execute and deliver this Agreement and the certificate referred to in Section 7(h) hereof on behalf of such Selling Shareholder, to determine the purchase price to be paid by the several Underwriters to such Selling Shareholder as provided in Section 4 hereof, to authorize the delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement and to duly endorse (in blank or otherwise) the certificate or certificates representing such Shares or a stock power or powers with respect thereto, to accept payment therefor, and otherwise to act on behalf of such Selling Shareholder in connection with this Agreement.

(c) All consents, approvals, authorizations and orders required for the execution and delivery by such Selling Shareholder of the Power of Attorney and Custody Agreement, the execution and delivery by or on behalf of such Selling Shareholder of this Agreement and the sale and delivery of the Selling Shareholder Shares and the Option Shares to be sold by such Selling Shareholder under this Agreement (other than, at the time of the execution hereof (if the Registration Statement has not yet been declared effective by the Commission), the issuance of the order of the Commission declaring the Registration Statement effective and such consents, approvals, authorizations or orders as may be necessary under state or other securities or Blue Sky laws) have been obtained and are in full force and effect; such Selling Shareholder, if other than a natural person, has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be; and such Selling Shareholder has full legal right, power and authority to enter into and perform its obligations under this Agreement and such Power of Attorney and Custody Agreement, and to sell, assign, transfer and deliver the Shares to be sold by such Selling Shareholder under this Agreement.

(d) Such Selling Shareholder will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such Selling Shareholder or with respect to which such Selling Shareholder has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such Selling Shareholder, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction is expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the Selling Shareholder. Such prohibited hedging or other transactions would include, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or

derives any significant part of its value from Securities. Such Selling Shareholder also agrees and consents to the entry of stop transfer instructions with the Company's

<PAGE>

transfer agent against the transfer of the securities held by such Selling Shareholder except in compliance with this restriction.

(e) Certificates in negotiable form for all Shares to be sold by such Selling Shareholder under this Agreement, together with a stock power or powers duly endorsed in blank by such Selling Shareholder, have been placed in custody with the Custodian for the purpose of effecting delivery hereunder.

(f) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of such Selling Shareholder and is a valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as rights to indemnification hereunder may be limited by applicable law and except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles; and the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a breach or violation of any of the terms and provisions of or constitute a default under any bond, debenture, note or other evidence of indebtedness, or under any material lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other material agreement or instrument to which such Selling Shareholder is a party or by which such Selling Shareholder, or any Selling Shareholder Shares or any Option Shares to be sold by such Selling Shareholder hereunder, may be bound or, to the best of such Selling shareholders' knowledge, result in any violation of any law, order, rule, regulation, writ, injunction, judgment or decree of any court, government or governmental agency or body, domestic or foreign, having jurisdiction over such Selling Shareholder or over the properties of such Selling Shareholder, or, if such Selling Shareholder is other than a natural person, result in any violation of any provisions of the charter, bylaws or other organizational documents of such Selling Shareholder.

(g) Such Selling Shareholder has not taken and will not take, directly or indirectly, any action designed to or that might reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Shares.

(h) Such Selling Shareholder has not distributed and will not distribute any prospectus or other offering material in connection with the offering and sale of the Shares.

(i) All information furnished by or on behalf of such Selling Shareholder relating to such Selling Shareholder and the Selling Shareholder Shares that is contained in the representations and warranties of such Selling Shareholder in such Selling Shareholder's Power of Attorney and Custody Agreement or set forth in the Registration Statement or the Prospectus is, and at the time the Registration Statement became or becomes, as the case may be, effective, and at all times subsequent thereto through the Closing Date, and on any later date on which Option Shares are to be purchased, was or will be, true, correct and complete, and does not, and at the time the Registration Statement became or becomes, as the case may be, effective and at all times subsequent thereto through the Closing Date (hereinafter defined), and on any later date on which Option Shares

<PAGE>

are to be purchased, will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make such information not misleading.

(j) Such Selling Shareholder will review the Prospectus and will comply with all agreements and satisfy all conditions on its part to be complied with or satisfied pursuant to this Agreement on or prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, and will advise its Attorney and Robertson, Stephens & Company LLC prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, if any statement to be made on behalf of such Selling Shareholder in the certificate contemplated by Section 7(h) would be inaccurate if made as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be.

(k) Such Selling Shareholder does not have, or has waived prior to the date hereof, any preemptive right, co-sale right or right of first refusal or other similar right, in order to purchase any of the Shares that are to be sold by the Company or any of the other Selling Shareholders to the Underwriters pursuant to this Agreement; such Selling Shareholder does not have, or has waived prior to the date hereof, any registration right or other similar right, in order to participate in the offering made by the Prospectus, other than such rights of participation as have been satisfied by the participation of such Selling Shareholder in the transactions to which this Agreement relates in accordance with the terms of this Agreement; and such Selling Shareholder does not own any warrants, options or similar rights to acquire, and does not have any right or arrangement to acquire, any capital stock, rights, warrants, options or other securities from the Company, other than those described in the Registration Statement and the Prospectus.

4. Purchase, Sale and Delivery of Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Company and the Selling Shareholders agree, severally and not jointly, to sell to the Underwriters, and each Underwriter agrees, severally and not jointly, to purchase from the Company and the Selling Shareholders, respectively, at a purchase price of $______ per share, the respective number of Company Shares as hereinafter set forth and Selling Shareholder Shares set forth opposite the names of the Selling Shareholders in Schedule B hereto. The obligation of each Underwriter to the Company and to each Selling Shareholder shall be to purchase from the Company and such Selling Shareholder that number of Company Shares or Selling Shareholder Shares, as the case may be, which (as nearly as practicable, as determined by you) is in the same proportion to the number of Company Shares or Selling Shareholder Shares, as the case may be, set forth opposite the name of the Company or such Selling Shareholder in Schedule B hereto as the number of Firm Shares which is set forth opposite the name of such Underwriter in Schedule A hereto (subject to adjustment as provided in Section 11) is to the total number of Firm Shares to be purchased by all the Underwriters under this Agreement.

(b) The certificates in negotiable form for the Selling Shareholder Shares have been placed in custody (for delivery under this Agreement) under the Custody Agreement. Each Selling Shareholder agrees, severally and not jointly, that the certificates for the Selling Shareholder Shares of such Selling Shareholder so held in custody are subject to the interests of the

<PAGE>

Underwriters hereunder, that the arrangements made by such Selling Shareholder

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1158 of 2711

for such custody, including the Power of Attorney, is to that extent irrevocable and that the obligations of such Selling Shareholder hereunder shall not be terminated by the act of such Selling Shareholder or by operation of law, whether by the death or incapacity of such Selling Shareholder or the occurrence of any other event, except as specifically provided herein or in the Custody Agreement. If any Selling Shareholder should die or be incapacitated, or if any other such event should occur before the delivery of the certificates for the Selling Shareholder Shares hereunder, the Selling Shareholder Shares to be sold by such Selling Shareholder shall, except as specifically provided herein or in the Custody Agreement, be delivered by the Custodian in accordance with the terms and conditions of this Agreement as if such death, incapacity or other event had not occurred, regardless of whether the Custodian shall have received notice of such death or other event.

(c) Delivery of definitive certificates for the Firm Shares to be purchased by the Underwriters pursuant to this Section 4 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Company with regard to the Shares being purchased from the Company, and to the order of the Custodian for the respective accounts of the Selling Shareholders with regard to the Shares being purchased from such Selling Shareholders (and the Company and such Selling Shareholders agree not to deposit and to cause the Custodian not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Company or the Custodian, as the case may be, and, in the event of any breach of the foregoing, the Company or the Selling Shareholders, as the case may be, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach), at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067 (or at such other place as may be agreed upon among the Representatives and the Company and the Attorneys), at 7:00 A.M., San Francisco time (a) on the third (3rd) full business day following the first day that Shares are traded, (b) if this Agreement is executed and delivered after 1:30 P.M., San Francisco time, the fourth (4th) full business day following the day that this Agreement is executed and delivered or (c) at such other time and date not later than seven (7) full business days following the first day that Shares are traded as the Representatives and the Company and the Attorneys may determine (or at such time and date to which payment and delivery shall have been postponed pursuant to Section 11 hereof), such time and date of payment and delivery being herein called the "Closing Date;" provided, however, that if the Company has not made available to the Representatives copies of the Prospectus within the time provided in Section 5(d) hereof, the Representatives may, in their sole discretion, postpone the Closing Date until no later than two (2) full business days following delivery of copies of the Prospectus to the Representatives. The certificates for the Firm Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request, at least one (1) full business day prior to the Closing Date and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to the Closing Date. If the Representatives so elect, delivery of the Firm Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

-14-

<PAGE>

(d) It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been received by you prior to the Closing Date for the Firm Shares to be purchased by such Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters

of any of its or their obligations hereunder.

(e) After the Registration Statement is declared effective, the several Underwriters intend to make an initial public offering (as such term is described in Section 12 hereof) of the Firm Shares at an initial public offering price of $_____ per share. After the initial public offering, the several Underwriters may, in their discretion, vary the public offering price.

(f) The information set forth in the last paragraph on the front cover page (insofar as such information relates to the Underwriters), on the inside front cover concerning stabilization and over-allotment by the Underwriters, and under the ____ and ____ paragraphs under the caption "Underwriting" in any Preliminary Prospectus and in the Prospectus constitutes the only information furnished by the Underwriters to the Company for inclusion in any Preliminary Prospectus, the Prospectus or the Registration Statement, and you, on behalf of the respective Underwriters, represent and warrant to the Company and the Selling Shareholders that the statements made therein do not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

5. Further Agreements of the Company. The Company agrees with the several Underwriters that:

(a) The Company will use its best efforts to cause the Registration Statement and any amendment thereof, if not effective at the time and date that this Agreement is executed and delivered by the parties hereto, to become effective as promptly as possible; the Company will use its best efforts to cause any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations as may be required subsequent to the date the Registration Statement is declared effective to become effective as promptly as possible; the Company will notify you, promptly after it shall receive notice thereof, of the time when the Registration Statement, any subsequent amendment to the Registration Statement or any abbreviated registration statement, has become effective or any supplement to the Prospectus has been filed; if the Company omitted information from the Registration Statement at the time it was originally declared effective in reliance upon Rule 430A(a) of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed, within the time period prescribed, with the Commission pursuant to subparagraph (1) or (4) of Rule 424(b) of the Rules and Regulations or as part of a post-effective amendment to such Registration Statement as originally declared effective which is declared effective by the Commission; if the Company files a term sheet pursuant to Rule 434 of the Rules and Regulations, the Company will provide evidence satisfactory to you that the Prospectus and term sheet meeting the requirements of Rule 434(b) or (c) of the Rules and Regulations, as applicable, have been filed, within the time period prescribed, with the Commission pursuant to subparagraph (7) of Rule 424(b) of the Rules and Regulations; if for any reason the filing of the final form of Prospectus is required under Rule 424(b)(3) of the Rules

<PAGE>

and Regulations, the Company will provide evidence satisfactory to you that the Prospectus contains such information and has been filed with the Commission within the time period prescribed; the Company will notify you promptly of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; promptly upon your request, the Company will prepare and file with the Commission any amendments or supplements to the Registration Statement or Prospectus which, in the opinion of counsel for the several Underwriters ("Underwriters' Counsel"), may be necessary or advisable in connection with the distribution of the Shares by the Underwriters; the Company will promptly prepare and file with the Commission,

and promptly notify you of the filing of, any amendments or supplements to the Registration Statement or Prospectus which may be necessary to correct any statements or omissions, if, at any time when a prospectus relating to the Shares is required to be delivered under the Act, any event shall have occurred as a result of which the Prospectus or any other prospectus relating to the Shares as then in effect would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; in the event that any Underwriter is required to deliver a prospectus nine (9) months or more after the effective date of the Registration Statement in connection with the sale of the Shares, the Company will prepare promptly upon request, but at the expense of such Underwriter, such amendment or amendments to the Registration Statement and such prospectus or prospectuses as may be necessary to permit compliance with the requirements of Section 10(a)(3) of the Act; and the Company will file no amendment or supplement to the Registration Statement or Prospectus which shall not previously have been submitted to you a reasonable time prior to the proposed filing thereof or to which you shall reasonably object in writing, subject, however, to compliance with the Act and the Rules and Regulations (in the judgment of the Company and its counsel) and the provisions of this Agreement.

(b) The Company will advise you, promptly after it shall receive notice or obtain knowledge, of the issuance of any stop order by the Commission suspending the effectiveness of the Registration Statement or of the initiation or threat of any proceeding for that purpose; and it will promptly use its best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(c) The Company will use its best efforts to qualify the Shares for offering and sale under the securities laws of such jurisdictions as you may reasonably request and to continue the effectiveness of such qualifications for so long as may be required for purposes of the distribution of the Shares, except that the Company shall not be required in connection therewith, or as a condition thereof, to qualify as a foreign corporation or to execute a general consent to service of process in any jurisdiction in which it is not otherwise required to be so qualified or to so execute a general consent to service of process. In each jurisdiction in which the Shares shall have been qualified as above provided, the Company will make and file such statements and reports in each year as are or may be required by the laws of such jurisdiction.

(d) The Company will furnish to you (to the extent not previously furnished), as soon as available, and, in the case of the Prospectus and any term sheet or abbreviated term sheet under Rule 434, in no event later than the first (1st) full business day following the first day that Shares are traded, copies of the Registration Statement (three of which will be signed and which will include all exhibits), each Preliminary Prospectus, the Prospectus and any amendments

<PAGE>

or supplements to such documents, including any prospectus prepared to permit compliance with Section 10(a)(3) of the Act, all in such quantities as you may from time to time reasonably request. Notwithstanding the foregoing, if Robertson, Stephens & Company LLC, on behalf of the several Underwriters, shall agree to the utilization of Rule 434 of the Rules and Regulations, the Company shall provide to you copies of a Preliminary Prospectus updated in all respects through the date specified by you, in such quantities as you may from time to time reasonably request.

(e) The Company will make generally available to its securityholders as soon as practicable, but in no event later than the forty-fifth (45th) day following the end of the fiscal quarter first occurring after the first anniversary of the effective date of the Registration Statement, an

earnings statement (which will be in reasonable detail but need not be audited) complying with the provisions of Section 11(a) of the Act and covering a twelve (12) month period beginning after the effective date of the Registration Statement.

(f) During a period of five (5) years after the date hereof, the Company will furnish to its shareholders as soon as practicable after the end of each respective period, annual reports (including financial statements audited by independent certified public accountants) and unaudited quarterly reports of operations for each of the first three quarters of the fiscal year, and will furnish to you and the other several Underwriters hereunder, upon request (i) concurrently with furnishing such reports to its shareholders, statements of operations of the Company for each of the first three (3) quarters in the form furnished to the Company's shareholders, (ii) concurrently with furnishing to its shareholders, a balance sheet of the Company as of the end of such fiscal year, together with statements of operations, of shareholders' equity, and of cash flows of the Company for such fiscal year, accompanied by a copy of the certificate or report thereon of independent certified public accountants, (iii) as soon as they are available, copies of all reports (financial or other) mailed to shareholders, (iv) as soon as they are available, copies of all reports and financial statements furnished to or filed with the Commission, any securities exchange or the National Association of Securities Dealers, Inc. ("NASD"), (v) every material press release and every material news item or article in respect of the Company or its affairs which was generally released to shareholders or prepared by the Company or any of its subsidiaries, and (vi) any additional information of a public nature concerning the Company or its subsidiaries, or its business which you may reasonably request. During such five (5) year period, if the Company shall have active subsidiaries, the foregoing financial statements shall be on a consolidated basis to the extent that the accounts of the Company and its subsidiaries are consolidated, and shall be accompanied by similar financial statements for any significant subsidiary which is not so consolidated.

(g) The Company will apply the net proceeds from the sale of the Shares being sold by it in the manner set forth under the caption "Use of Proceeds" in the Prospectus.

(h) The Company will maintain a transfer agent and, if necessary under the jurisdiction of incorporation of the Company, a registrar (which may be the same entity as the transfer agent) for its Common Stock.

(i) If the transactions contemplated hereby are not consummated by reason of any failure, refusal or inability on the part of the Company or any Selling Shareholder to perform any agreement on their respective parts to be performed hereunder, or to fulfill any condition

<PAGE>

of the Underwriters' obligations hereunder, or if the Company shall terminate this Agreement pursuant to Section 12(a) hereof, or if the Underwriters shall terminate this Agreement pursuant to Section 12(b)(i), the Company will reimburse the several Underwriters for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of Underwriters' Counsel) incurred by the Underwriters in investigating, or preparing to market, or marketing the Shares.

(j) If at any time during the ninety (90) day period after the Registration Statement becomes effective, any rumor, publication or event relating to or affecting the Company shall occur as a result of which in your opinion the market price of the Common Stock has been or is likely to be materially affected (regardless of whether such rumor, publication or event necessitates a supplement to, or amendment of, the Prospectus), the Company will, after written notice from you advising the Company to the effect set forth

above, forthwith prepare, consult with you concerning the substance of and disseminate a press release or other public statement, reasonably satisfactory to you, responding to or commenting on such rumor, publication or event.

(k) During the Lock-up Period, the Company will not, without the prior written consent of Robertson Stephens & Company LLC, effect the Disposition of, directly or indirectly, any Securities other than the sale of the Company Shares, the issuance of shares of Common Stock upon the exercise of outstanding stock options, and the Company's issuance of options or Common Stock under the Company's presently authorized 1997 Stock Option Plan (the "Option Plan").

(l) During a period of ninety (90) days from the effective date of the Registration Statement, the Company will not file a registration statement registering the offer and sale of shares under the Option Plan or any other employee benefit plan.

6. Expenses.
--------

(a) The Company and the Selling Shareholders agree with each Underwriter that:

(i) The Company and the Selling Shareholders will pay and bear all costs and expenses in connection with the preparation, printing and filing of the Registration Statement (including financial statements, schedules and exhibits), Preliminary Prospectuses and the Prospectus and any amendments or supplements thereto; the printing of this Agreement, the Agreement Among Underwriters, the Selected Dealer Agreement, the Preliminary Blue Sky Survey and any Supplemental Blue Sky Survey, the Underwriters' Questionnaire and Power of Attorney, and any instruments related to any of the foregoing; the issuance and delivery of the Shares hereunder to the several Underwriters, including transfer taxes, if any, the cost of all certificates representing the Shares and transfer agents' and registrars' fees; the fees and disbursements of counsel for the Company; all fees and other charges of the Company's independent public accountants; the cost of furnishing to the several Underwriters copies of the Registration Statement (including appropriate exhibits), Preliminary Prospectus and the Prospectus, and any amendments or supplements to any of the foregoing; NASD filing fees and the cost of qualifying the Shares under the laws of such jurisdictions as you may designate (including filing fees and fees and disbursements of

<PAGE>

Underwriters' Counsel in connection with such NASD filings and Blue Sky qualifications); and all other expenses directly incurred by the Company and the Selling Shareholders in connection with the performance of their obligations hereunder. Any additional expenses incurred as a result of the sale of the Shares by the Selling Shareholders will be borne collectively by the Company and the Selling Shareholders. The provisions of this Section 6(a)(i) are intended to relieve the Underwriters from the payment of the expenses and costs which the Selling Shareholders and the Company hereby agree to pay, but shall not affect any agreement which the Selling Shareholders and the Company may make, or may have made, for the sharing of any of such expenses and costs. Such agreements shall not impair the obligations of the Company and the Selling Shareholders hereunder to the several Underwriters.

(ii) In addition to its other obligations under Section 9(a) hereof, the Company agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(a) hereof, it will reimburse the Underwriters on a

monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Company's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Company together with interest, compounded daily, determined on the basis of the prime rate (or other commercial lending rate for borrowers of the highest credit standing) set forth from time to time in The Wall Street Journal which represents the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's thirty (30) largest banks (the "Prime Rate"). Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(iii) In addition to their other obligations under Section 9(b) hereof, each Selling Shareholder agrees that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(b) hereof relating to such Selling Shareholder, it will reimburse the Underwriters on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of such Selling Shareholder's obligation to reimburse the Underwriters for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Underwriters shall promptly return such payment to the Selling Shareholders, together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Underwriters within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

<PAGE>

(b) In addition to their other obligations under Section 9(c) hereof, the Underwriters severally and not jointly agree that, as an interim measure during the pendency of any claim, action, investigation, inquiry or other proceeding described in Section 9(c) hereof, they will reimburse the Company and each Selling Shareholder on a monthly basis for all reasonable legal or other expenses incurred in connection with investigating or defending any such claim, action, investigation, inquiry or other proceeding, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the Underwriters' obligation to reimburse the Company and each such Selling Shareholder for such expenses and the possibility that such payments might later be held to have been improper by a court of competent jurisdiction. To the extent that any such interim reimbursement payment is so held to have been improper, the Company and each such Selling Shareholder shall promptly return such payment to the Underwriters together with interest, compounded daily, determined on the basis of the Prime Rate. Any such interim reimbursement payments which are not made to the Company and each such Selling Shareholder within thirty (30) days of a request for reimbursement shall bear interest at the Prime Rate from the date of such request.

(c) It is agreed that any controversy arising out of the operation of the interim reimbursement arrangements set forth in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof, including the amounts of any requested reimbursement payments, the method of determining such amounts and the basis on

which such amounts shall be apportioned among the reimbursing parties, shall be settled by arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the NASD. Any such arbitration must be commenced by service of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the party demanding arbitration does not make such designation of an arbitration tribunal in such demand or notice, then the party responding to said demand or notice is authorized to do so. Any such arbitration will be limited to the operation of the interim reimbursement provisions contained in Sections 6(a)(ii), 6(a)(iii) and 6(b) hereof and will not resolve the ultimate propriety or enforceability of the obligation to indemnify for expenses which is created by the provisions of Sections 9(a), 9(b) and 9(c) hereof or the obligation to contribute to expenses which is created by the provisions of Section 9(e) hereof.

7. Conditions of Underwriters' Obligations. The obligations of the several Underwriters to purchase and pay for the Shares as provided herein shall be subject to the accuracy, as of the date hereof and the Closing Date and any later date on which Option Shares are to be purchased, as the case may be, of the representations and warranties of the Company and the Selling Shareholders herein, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and to the following additional conditions:

(a) The Registration Statement shall have become effective not later than 2:00 P.M., San Francisco time, on the date following the date of this Agreement, or such later date as shall be consented to in writing by you; and no stop order suspending the effectiveness thereof shall have been issued and no proceedings for that purpose shall have been initiated or, to the knowledge of the Company, any Selling Shareholder or any Underwriter, threatened by the Commission, and any request of the Commission for additional information (to be included in the

<PAGE>

Registration Statement or the Prospectus or otherwise) shall have been complied with to the satisfaction of Underwriters' Counsel.

(b) All corporate proceedings and other legal matters in connection with this Agreement, the form of Registration Statement and the Prospectus, and the registration, authorization, issue, sale and delivery of the Shares, shall have been reasonably satisfactory to Underwriters' Counsel, and such counsel shall have been furnished with such papers and information as they may reasonably have requested to enable them to pass upon the matters referred to in this Section.

(c) Subsequent to the execution and delivery of this Agreement and prior to the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, there shall not have been any Material Adverse Change from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and that makes it, in your reasonable judgment, impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus.

(d) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, the following opinion of counsel for the Company and the Selling Shareholders, dated the Closing Date or such later date on which Option Shares are to be purchased addressed to the Underwriters and with reproduced copies or signed counterparts thereof for each of the Underwriters, to the effect that:

(i) The Company and each Material Subsidiary has been

duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation;

(ii) The Company and each Material Subsidiary has the corporate power and corporate authority to own, lease and operate its properties and to conduct its business as described in the Prospectus;

(iii) The Company and each Material Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction, if any, in which the ownership or leasing of its properties or the conduct of its business requires such qualification, except where the failure to be so qualified or be in good standing would not have a material adverse effect on the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise. To such counsel's knowledge, the Company does not own or control, directly or indirectly, any subsidiary corporation, association or other entity other than Rapiscan Security Products (U.S.A.), Inc., Rapiscan Security Products Limited, Ferson Optics, Inc., UDT Sensors, Inc., AME, Opto Sensors (Singapore) Pte Ltd, Opto Sensors (Malaysia) Sdn. Bhd., OSI Electronics and Rapiscan Consortium (M) Sdn. Bhd.;

(iv) The authorized, issued and outstanding capital stock of the Company is as set forth in the Prospectus under the caption "Capitalization"

<PAGE>

as of the dates stated therein, the issued and outstanding shares of capital stock of the Company (including the Selling Shareholder Shares) have been duly and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right;

(v) All issued and outstanding shares of capital stock of each Material Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and, to such counsel's knowledge, have not been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right and, to such counsel's knowledge, are owned by the Company free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest;

(vi) The Firm Shares to be issued by the Company and the Firm Shares and Option Shares to be purchased from the Selling Shareholders pursuant to the terms of this Agreement have been duly authorized and, upon issuance and delivery against payment therefor in accordance with the terms hereof, the Firm Shares will be duly and validly issued and the Firm Shares as well as the Option Shares will be fully paid and nonassessable, and will not have been issued in violation of or subject to any preemptive right, co-sale right, registration right, right of first refusal or other similar right known to such counsel.

(vii) The Company has the corporate power and corporate authority to enter into this Agreement and to issue, sell and deliver to the Underwriters the Shares to be issued and sold by it hereunder;

(viii) This Agreement has been duly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by you, is a valid and binding

agreement of the Company, enforceable in accordance with its terms, except insofar as indemnification provisions may be limited by applicable law and except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(ix) The Registration Statement has become effective under the Act and, based on the oral advice of the staff of the Commission, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or before the Commission or under the Act;

(x) The Registration Statement and the Prospectus, and each amendment or supplement thereto (other than the financial statements (including supporting schedules) and other statistical and financial data included therein as to which such counsel need express no opinion), as of the effective date of

<PAGE>

the Registration Statement, complied as to form in all material respects with the requirements of the Act and the applicable Rules and Regulations;

(xi) The information in the Prospectus under the caption "Description of Capital Stock, " to the extent that it constitutes matters of law or legal conclusions, has been reviewed by such counsel and is a fair summary of such matters and conclusions; and the forms of certificates evidencing the Common Stock and filed as exhibits to the Registration Statement comply with California law;

(xii) The description in the Registration Statement and the Prospectus of the charter and bylaws of the Company and of statutes are accurate in all material respects and fairly present the information required to be presented by the Act and the applicable Rules and Regulations;

(xiii) There are no agreements, contracts, leases or documents to which the Company is a party, known to such counsel, of a character required to be described or referred to in the Registration Statement or Prospectus or to be filed as an exhibit to the Registration Statement which are not described or referred to therein or filed as required;

(xiv) The performance of this Agreement and the consummation of the transactions herein contemplated (other than performance of the Company's indemnification obligations hereunder, concerning which no opinion need be expressed) will not (a) result in any violation of the Company's charter or bylaws or (b) to such counsel's knowledge, result in a breach or violation of any of the terms and provisions of, or constitute a default under, any bond, debenture, note or other evidence of indebtedness, or any lease, contract, indenture, mortgage, deed of trust, loan agreement, joint venture or other agreement or instrument known to such counsel to which the Company is a party or by which its properties are bound, and which breach or violation would have a Material Adverse Effect, or any Applicable Law (as hereinafter defined). The term "Applicable Law" means those statutes, rules, regulations, orders, writs or decrees of any Governmental Authority (as defined below) by which the Company or any of its subsidiaries is bound, the existence of which is actually known to such counsel and which, in the experience of such counsel,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1167 of 2711

are typically applicable to public offerings of securities of the type contemplated by this Agreement. The "Governmental Authority" means any legislative, judicial, administrative or regulatory body of the States of California and Mississippi or the United States of America;

(xv) No consent, approval, authorization or order of or qualification with any court, government or governmental agency or body having jurisdiction over the Company or any of its subsidiaries, or over any of their properties or operations is necessary in connection with the consummation by the Company of the transactions herein contemplated, except such as have been obtained under the Act or such as may be required under state or other securities or Blue Sky laws in connection with the purchase and the distribution of the Shares by the

<PAGE>

Underwriters, provided, however, that the foregoing opinion may be limited to such consents, approvals, authorizations, and orders which are actually known to such counsel and which in such counsel's experience, are typically applicable to public offerings of securities of the type contemplated by this Agreement;

(xvi) There are no legal or governmental proceedings pending or threatened against the Company, or any of its subsidiaries, known to such counsel, of a character required to be disclosed in the Registration Statement or the Prospectus by the Act or the Rules and Regulations other than those described therein;

(xvii) To such counsel's knowledge, neither the Company nor any of its Material Subsidiaries is (a) in material violation of its respective charter or bylaws, or (b) in material breach of any Applicable Law;

(xviii) To such counsel's knowledge, except as set forth in the Registration Statement and Prospectus, no holders of Common Stock or other securities of the Company have registration rights with respect to the offer and sale of any securities of the Company and, except as set forth in the Registration Statement and Prospectus, all prior holders of such registration rights have waived such rights or such rights have expired by reason of lapse of time following notification of the Company's intent to file the Registration Statement or have included securities in the Registration Statement pursuant to the exercise, and in full satisfaction, of such rights;

(xix) Each Selling Shareholder which is not a natural person has full right, power and authority to enter into and to perform its obligations under the Power of Attorney and Custody Agreement to be executed and delivered by it in connection with the transactions contemplated herein; the Power of Attorney and Custody Agreement of each Selling Shareholder that is not a natural person has been duly authorized by all necessary action on the part of such Selling Shareholder; the Power of Attorney and Custody Agreement of each Selling Shareholder has been duly executed and delivered by or on behalf of such Selling Shareholder; and the Power of Attorney and Custody Agreement of each Selling Shareholder constitutes the valid and binding agreement of such Selling Shareholder, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditors' rights generally or by general equitable principles;

(xx) Each of the Selling Shareholders has full right, power and authority to enter into and to perform its obligations under this Agreement and to sell, transfer, assign and deliver the Shares to be sold by such Selling Shareholder hereunder;

<PAGE>

(xxi) This Agreement has been duly authorized by each Selling Shareholder that is not a natural person and has been duly executed and delivered by or on behalf of each Selling Shareholder; and

(xxii) Upon the delivery of, and payment for, the Shares as contemplated by this Agreement, each of the Underwriters will receive valid marketable title to the Shares purchased by it from such Selling Shareholder, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest known to such counsel. In rendering such opinion, such counsel may assume that the Underwriters are without notice of any defect in the title of the Shares being purchased from the Selling Shareholders.

In addition, such counsel shall state that such counsel has participated in conferences with officials and other representatives of the Company, the Representatives, Underwriters' Counsel and the independent certified public accountants of the Company, at which conferences the contents of the Registration Statement and Prospectus and related matters were discussed, and although they have are not passing upon and do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement or the Prospectus, and have not made any independent check or verification of the thereof, on the basis of the foregoing, nothing has come to the attention of such counsel which leads them to believe that, at the time the Registration Statement became effective and at the Closing Date and on any later date on which Option Shares are to be purchased, the Registration Statement and any amendment or supplement thereto contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or at the Closing Date or any later date on which the Option Shares are to be purchased, as the case may be, the Registration Statement, the Prospectus and any amendment or supplement thereto contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (other than the financial statements, including supporting schedules and other financial and statistical information included therein, as to which such counsel need express no comment).

Counsel rendering the foregoing opinion may rely as to questions of law not involving the laws of the United States or the State of California upon opinions of local counsel, and as to questions of fact upon representations or certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person), and of government officials, in which case their opinion is to state that they are so relying. Copies of any opinion, representation or certificate so relied upon shall be delivered to you, as Representatives of the Underwriters, and to Underwriters' Counsel.

(e) You shall have received on the Closing Date and on any later date on which Option Shares to be purchased, as the case may be, an opinion of Jones, Day, Reavis & Pogue, in form and substance reasonably satisfactory to you, with respect to the sufficiency of all such corporate proceedings and other legal matters relating to this Agreement and the transactions contemplated hereby as you may reasonably require, and the Company shall have furnished to such counsel such documents as they may have requested for the purpose of enabling them to pass upon such matters.

<PAGE>

(f) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a letter from Deloitte & Touche LLP addressed to the Underwriters, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, confirming that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations and based upon the procedures described in such letter delivered to you concurrently with the execution of this Agreement (herein called the "Original Letter"), but carried out to a date not more than five (5) business days prior to the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, (i) confirming, to the extent true, that the statements and conclusions set forth in the Original Letter are accurate as of the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, and (ii) setting forth any revisions and additions to the statements and conclusions set forth in the Original Letter which are necessary to reflect any changes in the facts described in the Original Letter since the date of such letter, or to reflect the availability of more recent financial statements, data or information. The letter shall not disclose any change in the condition (financial or otherwise), earnings, operations or business of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and that makes it, in your reasonable judgment, impracticable or inadvisable to proceed with the public offering of the Shares as contemplated by the Prospectus. The Original Letter from Deloitte & Touche LLP shall be addressed to or for the use of the Underwriters in form and substance reasonably satisfactory to the Underwriters and shall (i) represent, to the extent true, that they are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable published Rules and Regulations, (ii) set forth their opinion with respect to their examination of the consolidated balance sheet of the Company at June 30, 1997, 1996 and 1995 and related consolidated statements of operations, shareholders' equity, and cash flows for the twelve (12) months ended June 30, 1997, 1996 and 1995, and (iii) address other matters agreed upon by Deloitte & Touche LLP and you. In addition, you shall have received from Deloitte & Touche LLP a letter addressed to the Company and made available to you for the use of the Underwriters stating that their review of the Company's system of internal accounting controls, to the extent they deemed necessary in establishing the scope of their examination of the Company's consolidated financial statements at June 30, 1997, 1996 and 1995, did not disclose any weaknesses in internal controls that they considered to be material weaknesses.

(g) You shall have received on the Closing Date and on any later date on which Option Shares are to be purchased, as the case may be, a certificate of the Company, dated the Closing Date or such later date on which Option Shares are to be purchased, as the case may be, signed by the Chief Executive Officer and Chief Financial Officer of the Company, to the effect that, and you shall be satisfied that:

(i) The representations and warranties of the Company in this Agreement are true and correct in all material respects, as if made on and as of the Closing Date or any later date on which Option Shares are to be purchased, as the case may be, and the Company has complied in all material respects with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be;

(ii) No stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or are pending or threatened under the Act;

(iii) When the Registration Statement became effective and at all times subsequent thereto up to the delivery of such certificate, the Registration Statement and the Prospectus, and any amendments or supplements thereto, contained all material information required to be included therein by the Act and the Rules and Regulations and in all material respects conformed to the requirements of the Act and the Rules and Regulations, the Registration Statement, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, the Prospectus, and any amendment or supplement thereto, did not and does not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and, since the effective date of the Registration Statement, there has occurred no event required to be set forth in an amended or supplemented Prospectus which has not been so set forth; and

(iv) Subsequent to the respective dates as of which information is given in the Registration Statement and Prospectus, there has not been (a) any Material Adverse Change, (b) any transaction that is material to the Company and its subsidiaries considered as one enterprise, except transactions entered into in the ordinary course of business, (c) any obligation, direct or contingent, that is material to the Company and its subsidiaries considered as one enterprise, incurred by the Company or its subsidiaries, except obligations incurred in the ordinary course of business, (d) any change in the capital stock or outstanding indebtedness of the Company or any of its subsidiaries that is material to the Company and its subsidiaries considered as one enterprise, (e) any dividend or distribution of any kind declared, paid or made on the capital stock of the Company or any of its subsidiaries, or (f) any loss or damage (whether or not insured) to the property of the Company or any of its subsidiaries which has been sustained or will have been sustained which has a Material Adverse Effect.

(h) You shall be satisfied that, and you shall have received a certificate, dated the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, from the Attorney for each Selling Shareholder to the effect that, as of the Closing Date, or any later date on which Option Shares are to be purchased, as the case may be, they have not been informed that:

(i) The representations and warranties made by such Selling Shareholder herein are not true or correct in any material respect on the Closing Date or on any later date on which Option Shares are to be purchased, as the case may be; or

<PAGE>

(ii) Such Selling Shareholder has not complied in any material respects with any obligation or satisfied any condition which is required to be performed or satisfied on the part of such Selling Shareholder at or prior to the Closing Date or any later date on which Option Shares are to be purchased, as the case may be.

(i) The Company shall have obtained and delivered to you an agreement from each officer and director of the Company, each Selling Shareholder and each beneficial owner of shares of Common Stock as reflected on Exhibit A attached hereto in writing prior to the date hereof that such person will not, during the Lock-up Period, effect the Disposition of any Securities now owned or hereafter acquired directly by such person or with respect to which such person has or hereafter acquires the power of disposition, otherwise than (i) as a bona fide gift or gifts, provided the donee or donees thereof agree in writing to be bound by this restriction, (ii) as a distribution to partners or shareholders of such person, provided that the distributees thereof agree in writing to be bound by the terms of this restriction, or (iii) with the prior written consent of Robertson, Stephens & Company LLC. The foregoing restriction shall have been expressly agreed to preclude the holder of the Securities from engaging in any hedging or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Securities during the Lock-up Period, even if such Securities would be disposed of by someone other than the such holder. Such prohibited hedging or other transactions would including, without limitation, any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any Securities or with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from Securities. Furthermore, such person will have also agreed and consented to the entry of stop transfer instructions with the Company's transfer agent against the transfer of the Securities held by such person except in compliance with this restriction.

(j) The Company and the Selling Shareholders shall have furnished to you such further certificates and documents as you shall reasonably request (including certificates of officers of the Company, the Selling Shareholders or officers of the Selling Shareholders (when the Selling Shareholder is not a natural person) as to the accuracy of the representations and warranties of the Company and the Selling Shareholders herein, as to the performance by the Company and the Selling Shareholders of their respective obligations hereunder and as to the other conditions concurrent and precedent to the obligations of the Underwriters hereunder.

All such opinions, certificates, letters and documents will be in compliance with the provisions hereof only if they are reasonably satisfactory to Underwriters' Counsel. The Company and the Selling Shareholders will furnish you with such number of conformed copies of such opinions, certificates, letters and documents as you shall reasonably request.

8. Option Shares.

(a) On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Selling Shareholders set forth on Schedule C hereto hereby grant to the several Underwriters, severally and not jointly, for the

<PAGE>

purpose of covering over-allotments in connection with the distribution and sale of the Firm Shares only, a nontransferable option to purchase up to an aggregate of 555,000 Option Shares at the purchase price per share for the Firm Shares set forth in Section 4 hereof. The number of Option Shares to be purchased from each Selling Shareholder listed on Schedule C shall be in the same proportion that the number of shares listed across from each such Selling Shareholder's name bears to the total number of Shares listed on Schedule C. Such option may be exercised by the Representatives on behalf of the several Underwriters on one (1) or more occasions in whole or in part during the period of thirty (30) days after the date on which the Firm Shares are initially offered to the public, by

giving written notice to the Company and the Custodian. The number of Option Shares to be purchased by each Underwriter from each of such Selling Shareholders set forth on Schedule C upon the exercise of such option shall be in the same proportion as the number of Firm Shares purchased by such Underwriter (set forth in Schedule A hereto) bears to the total number of Firm Shares purchased by the several Underwriters (set forth in Schedule A hereto), adjusted by the Representatives in such manner as to avoid fractional shares.

Delivery of definitive certificates for the Option Shares to be purchased by the several Underwriters pursuant to the exercise of the option granted by this Section 8 shall be made against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks drawn in next-day funds, payable to the order of the Custodian (and the Custodian agrees not to deposit any such check in the bank on which it is drawn, and not to take any other action with the purpose or effect of receiving immediately available funds, until the business day following the date of its delivery to the Custodian). In the event of any breach of the foregoing, the Selling Shareholders set forth on Schedule C, severally and not jointly, shall reimburse the Underwriters for the interest lost and any other expenses borne by them by reason of such breach. Such delivery and payment shall take place at the offices of Troy & Gould, 1801 Century Park East, 16th Floor, Los Angeles, California 90067, or at such other place as may be agreed upon among the Representatives, the Company and the Custodian (i) on the Closing Date, if written notice of the exercise of such option is received by the Company and the Custodian at least two (2) full business days prior to the Closing Date, or (ii) on a date which shall not be later than the third (3rd) full business day following the date the Company and Custodian receive written notice of the exercise of such option, if such notice is received by the Company and Custodian less than two (2) full business days prior to the Closing Date.

The certificates for the Option Shares to be so delivered will be made available to you for examination at such office or such other location including, without limitation, in Chicago, as you may reasonably request at least one (1) full business day prior to the date of payment and delivery and will be in such names and denominations as you may request, such request to be made at least two (2) full business days prior to such date of payment and delivery. If the Representatives so elect, delivery of the Option Shares may be made by credit through full fast transfer to the accounts at The Depository Trust Company designated by the Representatives.

It is understood that you, individually, and not as the Representatives of the several Underwriters, may (but shall not be obligated to) make payment of the purchase price on behalf of any Underwriter or Underwriters whose check or checks shall not have been received by you prior to the date of payment and delivery for the Option Shares to be purchased by such

<PAGE>

Underwriter or Underwriters. Any such payment by you shall not relieve any such Underwriter or Underwriters of any of its or their obligations hereunder.

(b) Upon exercise of any option provided for in Section 8(a) hereof, the obligations of the several Underwriters to purchase such Option Shares will be subject (as of the date hereof and as of the date of payment and delivery for such Option Shares) to the accuracy of and compliance with the representations, warranties and agreements of the Company and the Selling Shareholders herein, to the accuracy of the statements of the Company, the Selling Shareholders and officers of the Company made pursuant to the provisions hereof, to the performance by the Company and the Selling Shareholders of their respective obligations hereunder, to the conditions set forth in Section 7 hereof, and to the condition that all proceedings taken at or prior to the payment date in connection with the sale and transfer of such Option Shares shall be satisfactory in form and substance to you and to Underwriters' Counsel,

and you shall have been furnished with all such documents, certificates and opinions as you may request in order to evidence the accuracy and completeness of any of the representations, warranties or statements, the performance of any of the covenants or agreements of the Company and the Selling Shareholders or the satisfaction of any of the conditions herein contained.

9. *Indemnification and Contribution.*

(a) The Company agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject (including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E of the Bylaws of the NASD), under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of the Company herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; *provided, however*, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement, such Preliminary Prospectus or the Prospectus, or any such amendment or supplement thereto, in reliance upon, and in conformity with, written information relating to any Underwriter furnished to the Company by such Underwriter, directly or through you, specifically for use in the preparation thereof and, *provided further*, that the indemnity agreement provided in this Section 9(a) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of material fact or omission or alleged omission to state therein a material

<PAGE>

fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(a) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which the Company may otherwise have.

(b) Each Selling Shareholder, severally and not jointly, agrees to indemnify and hold harmless each Underwriter against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become

subject (including, without limitation, in its capacity as an Underwriter or as a "qualified independent underwriter" within the meaning of Schedule E or the Bylaws of the NASD) under the Act, the Exchange Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Selling Shareholder herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(b) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company or such Underwriter by such Selling Shareholder, directly or through such Selling Shareholder's representatives, specifically for use in the preparation thereof, and agrees to reimburse each Underwriter for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement provided in this Section 9(b) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any losses, claims, damages, liabilities or actions based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state therein a material fact purchased Shares, if a copy of the Prospectus in which such untrue statement or alleged untrue statement or omission or alleged omission was corrected had not been sent or given to such person within the time required by the Act and the Rules and Regulations, unless such failure is the result of noncompliance by the Company with Section 5(d) hereof.

The indemnity agreement in this Section 9(b) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which such Selling Shareholder may otherwise have.

<PAGE>

(c) Each Underwriter, severally and not jointly, agrees to indemnify and hold harmless the Company and each Selling Shareholder against any losses, claims, damages or liabilities, joint or several, to which the Company or such Selling Shareholder may become subject under the Act or otherwise, specifically including, but not limited to, losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon (i) any breach of any representation, warranty, agreement or covenant of such Underwriter herein contained, (ii) any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any Preliminary Prospectus or the Prospectus or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of subparagraphs (ii) and (iii) of this Section 9(c) to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by such

Underwriter, directly or through you, specifically for use in the preparation thereof, and agrees to reimburse the Company and each such Selling Shareholder for any legal or other expenses reasonably incurred by the Company and each such Selling Shareholder in connection with investigating or defending any such loss, claim, damage, liability or action.

The indemnity agreement in this Section 9(c) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each officer of the Company who signed the Registration Statement and each director of the Company, each Selling Shareholder and each person, if any, who controls the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act. This indemnity agreement shall be in addition to any liabilities which each Underwriter may otherwise have.

(d) Promptly after receipt by an indemnified party under this Section 9 of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against any indemnifying party under this Section 9, notify the indemnifying party in writing of the commencement thereof but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 9 (unless and only to the extent that such omission results in the loss or compromise of any material rights or defence by the indemnifying party). In case any such action is brought against any indemnified party, and it notified the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it shall elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; _provided, however_, that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded (based on the advice of counsel) that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such

<PAGE>

indemnified party of the indemnifying party's election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Section 9 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the reasonable expenses of more than one separate counsel (together with appropriate local counsel) approved by the indemnifying party representing all the indemnified parties under Section 9(a), 9(b) or 9(c) hereof who are parties to such action), (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized in writing the employment of counsel for the indemnified party at the expense of the indemnifying party. In no event shall any indemnifying party be liable in respect of any amounts paid in settlement of any action unless the indemnifying party shall have approved in writing the terms of such settlement; _provided_ that such consent shall not be unreasonably withheld. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any

indemnified party is or could have been a party and indemnification could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on all claims that are the subject matter of such proceeding.

(e) In order to provide for just and equitable contribution in any action in which a claim for indemnification is made pursuant to this Section 9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 9 provides for indemnification in such case, all the parties hereto shall contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that, except as set forth in Section 9(f) hereof, the Underwriters severally and not jointly are responsible pro-rata for the portion represented by the percentage that the underwriting discount bears to the initial public offering price, and the Company and the Selling Shareholders are responsible for the remaining portion, provided, however, that (i) except as otherwise agreed among the Underwriters, no Underwriter shall be required to contribute any amount in excess of the amount by which the underwriting discount applicable to the Shares purchased by such Underwriter exceeds the amount of damages which such Underwriter has otherwise been required to pay and (ii) no person guilty of a fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who is not guilty of such fraudulent misrepresentation. The contribution agreement in this Section 9(e) shall extend upon the same terms and conditions to, and shall inure to the benefit of, each person, if any, who controls any Underwriter, the Company or any Selling Shareholder within the meaning of the Act or the Exchange Act and each officer of the Company who signed the Registration Statement and each director of the Company.

(f) Notwithstanding any other provision herein to the contrary, the liability of each Selling Shareholder under this Agreement, including under the representations, warranties and agreements contained herein and under the indemnity and contribution agreements contained in the provisions of this Section 9 shall be limited to an amount equal to the initial public offering

<PAGE>

price of the Selling Shareholder Shares sold by such Selling Shareholder to the Underwriters minus the amount of the underwriting discount paid thereon to the Underwriters by such Selling Shareholder. The Company and such Selling Shareholders may agree, as among themselves and without limiting the rights of the Underwriters under this Agreement, as to the respective amounts of such liability for which they each shall be responsible.

(g) The parties to this Agreement hereby acknowledge that they are sophisticated business persons who were represented by counsel during the negotiations regarding the provisions hereof including, without limitation, the provisions of this Section 9, and are fully informed regarding said provisions. They further acknowledge that the provisions of this Section 9 fairly allocate the risks in light of the ability of the parties to investigate the Company and its business in order to assure that adequate disclosure is made in the Registration Statement and Prospectus as required by the Act and the Exchange Act.

10. Representations, Warranties, Covenants and Agreements to Survive Delivery. All representations, warranties, covenants and agreements of the Company, the Selling Shareholders and the Underwriters herein or in certificates

delivered pursuant hereto, and the indemnity and contribution agreements contained in Section 9 hereof shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Underwriter or any person controlling any Underwriter within the meaning of the Act or the Exchange Act, or by or on behalf of the Company or any Selling Shareholder, or any of their officers, directors or controlling persons within the meaning of the Act, or the Exchange Act, and shall survive the delivery of the Shares to the several Underwriters hereunder or termination of this Agreement.

11. Substitution of Underwriters. If any Underwriter or Underwriters shall fail to take up and pay for the number of Firm Shares agreed by such Underwriter or Underwriters to be purchased hereunder upon tender of such Firm Shares in accordance with the terms hereof, and if the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters so agreed but failed to purchase does not exceed 10% of the Firm Shares, the remaining Underwriters shall be obligated, severally in proportion to their respective commitments hereunder, to take up and pay for the Firm Shares of such defaulting Underwriter or Underwriters.

If any Underwriter or Underwriters so defaults and the aggregate number of Firm Shares which such defaulting Underwriter or Underwriters agreed but failed to take up and pay for exceeds 10% of the Firm Shares, the remaining Underwriters shall have the right, but shall not be obligated, to take up and pay for (in such proportions as may be agreed upon among them) the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase. If such remaining Underwriters do not, at the Closing Date, take up and pay for the Firm Shares which the defaulting Underwriter or Underwriters so agreed but failed to purchase, the Closing Date shall be postponed for twenty-four (24) hours to allow the several Underwriters the privilege of substituting within twenty-four (24) hours (including non-business hours) another underwriter or underwriters (which may include any nondefaulting Underwriter) satisfactory to the Company. If no such underwriter or underwriters shall have been substituted as aforesaid by such postponed Closing Date, the Closing Date may, at the option of the Company, be postponed for a further twenty-four (24) hours, if necessary, to allow the Company the privilege of finding another underwriter or underwriters, satisfactory to you, to purchase the Firm Shares which the defaulting

<PAGE>

Underwriter or Underwriters so agreed but failed to purchase. If it shall be arranged for the remaining Underwriters or substituted underwriter or underwriters to take up the Firm Shares of the defaulting Underwriter or Underwriters as provided in this Section 11, (i) the Company shall have the right to postpone the time of delivery for a period of not more than seven (7) full business days, in order to effect whatever changes may thereby be made necessary in the Registration Statement or the Prospectus, or in any other documents or arrangements, and the Company agrees promptly to file any amendments to the Registration Statement, supplements to the Prospectus or other such documents which may thereby be made necessary, and (ii) the respective number of Firm Shares to be purchased by the remaining Underwriters and substituted underwriter or underwriters shall be taken as the basis of their underwriting obligation. If the remaining Underwriters shall not take up and pay for all such Firm Shares so agreed to be purchased by the defaulting Underwriter or Underwriters or substitute another underwriter or underwriters as aforesaid and the Company shall not find or shall not elect to seek another underwriter or underwriters for such Firm Shares as aforesaid, then this Agreement shall terminate.

In the event of any termination of this Agreement pursuant to the preceding paragraph of this Section 11, neither the Company nor any Selling Shareholder shall be liable to any Underwriter (except as provided in Sections 6

and 9 hereof) nor shall any Underwriter (other than an Underwriter who shall have failed, otherwise than for some reason permitted under this Agreement, to purchase the number of Firm Shares agreed by such Underwriter to be purchased hereunder, which Underwriter shall remain liable to the Company, the Selling Shareholders and the other Underwriters for damages, if any, resulting from such default) be liable to the Company or any Selling Shareholder (except to the extent provided in Sections 6 and 9 hereof).

The term "Underwriter" in this Agreement shall include any person substituted for an Underwriter pursuant to the terms of this Section 11.

12. Effective Date of this Agreement and Termination.

(a) This Agreement shall become effective at the earlier of (i) 6:30 A.M., San Francisco time, on the first full business day following the effective date of the Registration Statement, or (ii) the time of the initial public offering of any of the Shares by the Underwriters after the Registration Statement becomes effective. The time of the initial public offering shall mean the time of the release by you, for publication, of the first newspaper advertisement relating to the Shares, or the time at which the Shares are first generally offered by the Underwriters to the public by letter, telephone, telegram or telecopy, whichever shall first occur. By giving notice as set forth in Section 13 before the time this Agreement becomes effective, you, as Representatives of the several Underwriters, or the Company, may prevent this Agreement from becoming effective without liability of any party to any other party, except as provided in Sections 5(i), 6 and 9 hereof.

(b) You, as Representatives of the several Underwriters, shall have the right to terminate this Agreement by giving notice as hereinafter specified at any time on or prior to the Closing Date or on or prior to any later date on which Option Shares are to be purchased, as the case may be, (i) if the Company or any Selling Shareholder shall have failed, refused or been unable to perform any agreement in any material respect on its part to be performed, or because any other condition of the Underwriters' obligations hereunder required to be fulfilled is not fulfilled in any

<PAGE>

material respect, including, without limitation, any change in the condition (financial or otherwise), earnings, operations, business of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in your reasonable judgment, is material and adverse and would, in your opinion, make it impractical to distribute the Shares, or (ii) if additional material governmental restrictions, not in force and effect on the date hereof, shall have been imposed upon trading in securities generally or minimum or maximum prices shall have been generally established on the New York Stock Exchange or on the American Stock Exchange or in the over the counter market by the NASD, or trading in securities generally shall have been suspended on either such exchange or in the over the counter market by the NASD, or if a banking moratorium shall have been declared by federal, New York or California authorities, or (iii) if the Company shall have sustained a loss by strike, fire, flood, earthquake, accident or other calamity of such character as to interfere materially with the conduct of the business and operations of the Company regardless of whether or not such loss shall have been insured and would, in your opinion, make it impractical to distribute the Shares, or (iv) if there shall have been a material adverse change in the general political or economic conditions or financial markets which would, in your opinion, make it impractical to distribute the Shares, or (v) if there shall have been an outbreak or escalation of hostilities or of any other insurrection or armed conflict or the declaration by the United States of a national emergency which, in the reasonable opinion of the Representatives, make it impractical to distribute the Shares. In the event of termination

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1179 of 2711

pursuant to subparagraph (i) above, the Company shall remain obligated to pay costs and expenses pursuant to Sections 5(i), 6 and 9 hereof. Any termination pursuant to any of subparagraphs (ii) through (v) above shall be without liability of any party to any other party except as provided in Sections 6 and 9 hereof.

If you elect to prevent this Agreement from becoming effective or to terminate this Agreement as provided in this Section 12, you shall promptly notify the Company by telephone, telecopy or telegram, in each case confirmed by letter. If the Company shall elect to prevent this Agreement from becoming effective, the Company shall promptly notify you by telephone, telecopy or telegram, in each case, confirmed by letter.

13. Notices. All notices or communications hereunder, except as herein otherwise specifically provided, shall be in writing and if sent to you shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to you c/o Robertson, Stephens & Company LLC, 555 California Street, Suite 2600, San Francisco, California 94104, telecopier number (415) 781-0278, Attention: General Counsel, with copy to Jones, Day, Reavis & Pogue, 555 West Fifth Street, Suite 4600, Los Angeles, California 90013, Attention: Bert Zweig; if sent to the Company, such notice shall be mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727, Attention: Deepak Chopra, President, with copy to Troy & Gould, 1801 Century Park East, Suite 1600, Los Angeles, California 90067, Attention: Istvan Benko; if sent to one or more of the Selling Shareholders, such notice shall be sent mailed, delivered, telegraphed (and confirmed by letter) or telecopied (and confirmed by letter) to Deepak Chopra, as Attorney-in-Fact for the Selling Shareholders, at 12525 Chadron Avenue, Hawthorne, California 90250, telecopier number (310) 644-1727, with copy to Troy & Gould, 1801 Century Park East, Suite 1600, Los Angeles, California 90067, Attention: Istvan Benko.

<PAGE>

14. Parties. This Agreement shall inure to the benefit of and be binding upon the several Underwriters and the Company and the Selling Shareholders and their respective executors, administrators, successors and assigns. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto and their respective executors, administrators, successors and assigns, and the controlling persons within the meaning of the Act or the Exchange Act, officers and directors referred to in Section 9 hereof, any legal or equitable right, remedy or claim in respect of this Agreement or any provisions herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and their respective executors, administrators, successors and assigns and said controlling persons and said officers and directors, and for the benefit of no other person or entity. No purchaser of any of the Shares from any Underwriter shall be construed a successor or assign by reason merely of such purchase.

In all dealings with the Company and the Selling Shareholders under this Agreement, you shall act on behalf of each of the several Underwriters, and the Company and the Selling Shareholders shall be entitled to act and rely upon any statement, request, notice or agreement made or given by you jointly or by Robertson, Stephens & Company LLC on behalf of you.

15. Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to principles of conflict of law.

    16. Counterparts. This Agreement may be signed in several counterparts, each of which will constitute an original.

-37-

<PAGE>

If the foregoing correctly sets forth the understanding among the Company, the Selling Shareholders and the several Underwriters, please so indicate in the space provided below for that purpose, whereupon this letter shall constitute a binding agreement among the Company, the Selling Shareholders and the several Underwriters.

Very truly yours,

OSI SYSTEMS, INC.

By:______________________________
Name:____________________________
Its:_____________________________

SELLING SHAREHOLDERS

By:______________________________
Attorney-in-Fact for the Selling Shareholders named in Schedules B and C hereto

Accepted as of the date first above written:

ROBERTSON, STEPHENS & COMPANY LLC
WILLIAM BLAIR & COMPANY, L.L.C.
VOLPE BROWN WHELAN & COMPANY LLC

On their behalf and on behalf of each of the several Underwriters named in Schedule A hereto.

By: ROBERTSON, STEPHENS & COMPANY LLC

By: ROBERTSON, STEPHENS & COMPANY GROUP, L.L.C.

By:_____________________________________________
Authorized Signatory

-38-

<PAGE>

SCHEDULE A

<TABLE>
<CAPTION>

Number of

| Underwriters | Firm Shares To Be Purchased |
|---|---|
| <S> | <C> |
| Robertson, Stephens & Company LLC .... | __________ |
| William Blair & Company, L.L.C. ...... | __________ |
| Volpe Brown Whelan & Company LLC ..... | __________ |
| Total ................................ | 3,700,000 |

</TABLE>

-1-

<PAGE>

SCHEDULE B

Firm Shares

<TABLE>
<CAPTION>

| Company | Number of Company Shares To Be Sold |
|---|---|
| <S> | <C> |
| OSI Systems, Inc. | 3,300,000 |
| Total............... | 3,300,000 |

</TABLE>

<TABLE>
<CAPTION>

| Name of Selling Shareholder | Number of Selling Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Scope Industries | 148,148 |
| Sally F. Chamberlain Trustee, Edward P. and Sally F. Fleischer Family Trust | 63,343 |
| Gary E. Fleischer | 14,625 |
| Cathleen A. Redinger | 14,625 |
| Madan and Mohini Syal | 25,926 |
| Good Swartz Berns Pension & Profit Sharing Plan | 3,000 |
| Steve Cary Good and Bari Anne Good Trust | 13,831 |
| Steven C. Good | 8,065 |
| Mark and Penny Berns Trust | 5,982 |
| Arnold G. and Hope Anisgarten | 5,709 |
| Rajiv Mehra | 450 |
| Zev and Elaine Edelstein Trust | 9,259 |
| Glenn P. Sorenson | 9,259 |
| Mohinder and Ranjana Chopra | 9,259 |
| Charles and Kiran M. Kerpelman | 9,259 |
| Martha B. Holmes | 9,259 |
| Combined Tehari & Durya Rangawala Account Trust | 7,407 |
| Leila and Birendra Mehra | 3,704 |
| Surendra V. and Kala Jain | 5,186 |
| Renu Jivrajka | 1,852 |
| Amita Jivrajka | 1,852 |
| Total...................................................... | 370,000 |

</TABLE> 

-2-

<PAGE>

SCHEDULE C

Option Shares

<TABLE>
<CAPTION>

| Name of Selling Shareholder | Number of Shareholder Shares To Be Sold |
|---|---|
| <S> | <C> |
| Scope Industries | 88,519 |
| Sally F. Chamberlain Trustee, Edward P. and Sally F. Fleischer Trust | 49,630 |
| Deepak and Nandini Chopra | 185,185 |
| Madan and Mohini Syal | 18,519 |
| Ajay Mehra | 33,333 |
| Good Swartz & Berns Pension & Profit Sharing Plan | 3,309 |
| Steven C. Good | 15,604 |
| Mark and Penny Berns Trust | 1,518 |
| Arnold G. and Hope Anisgarten | 1,791 |
| Andreas F. Kotowski | 18,519 |
| Zev and Elaine Edelstein Trust | 9,259 |
| Glenn P. Sorenson | 11,111 |
| Mohinder Chopra | 11,111 |
| Manoocher Mansouri Aliabadi | 14,815 |
| Charles and Kiran Kerpelman | 9,259 |
| Combined Tehari & Durya Rangawala Account Trust | 7,407 |
| Susan Sutherland | 7,407 |
| Anuj Wadhawan | 7,407 |
| Bette J. Moore | 7,407 |
| Thomas K. Hickman | 3,704 |
| Robert Kephart | 5,556 |
| Phillip M. Wascher | 7,407 |
| Narayan Taneja | 1,481 |
| Leila and Birendra Mehra | 3,704 |
| Charan J. Dewan | 3,704 |
| Jack Kimbro | 1,111 |
| Surendra and Kala Jain | 5,926 |
| Meyer Luskin | 9,259 |
| Denis Noble | 741 |
| Anthony S. and Suzie B. Crane | 1,481 |
| Neil Jivrajka | 740 |
| Renu Jivrajka | 1,482 |
| Amita Jivrajka | 1,482 |
| Alan J. and Pamela Barnard | 1,481 |
| Peter Bui | 741 |
| Christine Williams | 741 |

</TABLE>

-3-

<PAGE>

<TABLE>
<CAPTION>

Number of

| Name of Selling Shareholder | Shareholder Shares To Be Sold |
| --- | --- |
| <S> | <C> |
| Christopher Chin | 926 |
| Louis S. and Linda O. Peters | 741 |
| Khai Le | 741 |
| Lincoln Gladden | 741 |
| Total................................................. | 555,000 |

</TABLE>

-4-

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>3
<DESCRIPTION>CONSENT OF DELOITTE & TOUCHE LLP
<TEXT>

<PAGE>

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT AND REPORT ON SCHEDULE

To the Board of Directors and Shareholders of
OSI Systems, Inc.

We consent to the use in this Amendment No. 3 to Registration Statement No. 333-29179 of OSI Systems, Inc. of our report dated August 15, 1997, appearing in the Prospectus, which is a part of this Registration Statement, and to the references to us under the headings "Selected Consolidated Financial Data" and "Experts" in such Prospectus.

Our audits of financial statements referred to in our aforementioned report also included the financial statement schedule of OSI Systems, Inc., listed in Item 16. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

Deloitte & Touche llp

Los Angeles, California

September 30, 1997
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# Exhibits 2, 3, 24

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1185 of 2711

8-K12G3 1 d8k12g3.htm FORM 8-K12G3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

---

# FORM 8-K

---

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) MARCH 5, 2010**

---

# OSI SYSTEMS, INC.

**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

---

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT’S TELEPHONE NUMBER, INCLUDING AREA CODE)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01        Entry into a Material Definitive Agreement**

On March 5, 2010, OSI Systems, Inc. (the "Company") changed its state of incorporation from California to Delaware. This reincorporation was effectuated by merging the Company with and into a wholly owned Delaware subsidiary established for such purpose, following approval by the requisite vote of shareholders at the Company's Annual Meeting of Shareholders on March 5, 2010. OSI Systems, Inc., a Delaware corporation ("OSI Delaware"), is deemed to be the successor issuer of OSI Systems, Inc., a California corporation ("OSI California"), under Rule 12g-3 of the Securities Exchange Act of 1934, as amended. A copy of the merger agreement related to the reincorporation is attached hereto as Exhibit 2.1.

The reincorporation of the Company does not result in any change in the name, business, management, fiscal year, accounting, location of the principal executive offices, assets or liabilities of the Company. Furthermore, the Company's common stock will continue to trade on the NASDAQ Global Market under the ticker symbol "OSIS." Stockholders are not required to undertake any exchange of the Company's shares in connection with the reincorporation, as shares in the California company are deemed to represent an equal number of shares in the Delaware company.

As of March 5, 2010, the effective date of the reincorporation, the rights of the Company's stockholders began to be governed by the Delaware General Corporation Law and the Certificate of Incorporation and Bylaws attached hereto as Exhibits 3.1 and 3.2.

Additional information about the reincorporation and a comparison of the rights of stockholders of OSI California and OSI Delaware can be found in the Company's proxy statement, filed with the Securities and Exchange Commission on February 5, 2010.

**Item 1.02        Termination of a Material Agreement**

In connection with the change of the Company's domicile from California to Delaware, the Company's Board of Directors resolved to terminate the Rights Agreement originally dated July 31, 2000, by and between the Company and StockTrans, Inc., as amended (the "Rights Agreement"), effective upon the effectiveness of the reincorporation. On March 5, 2010, the Company entered into an amendment to the Rights Agreement, which is attached hereto as Exhibit 4.2, to accelerate the Final Expiration Date (as defined in the Rights Agreement) from July 31, 2018, to March 5, 2010. As a result of the amendment, the Rights (as defined in the Rights Agreement) expired and the Rights Agreement terminated on March 5, 2010.

**Item 3.03        Material Modification to Rights of Security Holders**

Please see the disclosures set forth under Items 1.01 and 1.02, which are incorporated by reference into this Item 3.03.

**Item 5.03        Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

Please see the disclosure set forth under Item 1.01, which is incorporated by reference into this Item 5.03. The Company's Certificate of Incorporation and Bylaws effective as of March 5, 2010 are attached hereto as Exhibits 3.1 and 3.2.

**Item 5.07 Submission of Matters to a Vote of Security Holders**

The Company held its Annual Meeting of Shareholders on March 5, 2010. The results of the proposals voted on by our shareholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 11,972,247 | 601,594 | 3,699,445 |
| Ajay Mehra | 12,114,506 | 495,335 | 3,699,445 |
| Steven C. Good | 12,071,866 | 501,975 | 3,699,445 |
| Meyer Luskin | 12,067,868 | 505,973 | 3,699,445 |
| Leslie E. Bider | 11,030,520 | 1,543,321 | 3,699,445 |
| David T. Feinberg | 12,474,926 | 98,915 | 3,699,445 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2010.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 16,149,572 | 50,878 | 72,836 | — |

The proposal was approved.

*3. Approval of the reincorporation of the Company from California to Delaware.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 12,245,431 | 276,826 | 51,583 | 3,699,446 |

The proposal was approved.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1188 of 2711

**Item 9.01. Financial Statements and Exhibits.**

***(d) Exhibits***

| | |
|---|---|
| Exhibit 2.1 | Agreement and Plan of Merger dated March 5, 2010 by and between OSI Systems, Inc., a Delaware corporation, and OSI Systems, Inc., a California corporation |
| Exhibit 3.1 | Certificate of Incorporation of OSI Systems, Inc. |
| Exhibit 3.2 | Bylaws of OSI Systems, Inc. |
| Exhibit 3.3 | Certificate of Merger of OSI Systems, Inc., a California corporation, with and into OSI Systems, Inc., a Delaware corporation |
| Exhibit 4.1 | Form of Common Stock Certificate |
| Exhibit 4.2 | Amendment No. 3 to Rights Agreement, dated as of March 5, 2010, by and between OSI Systems, Inc. and StockTrans, Inc. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: March 8, 2010

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| Exhibit 2.1 | Agreement and Plan of Merger dated March 5, 2010 by and between OSI Systems, Inc., a Delaware corporation, and OSI Systems, Inc., a California corporation |
| Exhibit 3.1 | Certificate of Incorporation of OSI Systems, Inc. |
| Exhibit 3.2 | Bylaws of OSI Systems, Inc. |
| Exhibit 3.3 | Certificate of Merger of OSI Systems, Inc., a California corporation, with and into OSI Systems, Inc., a Delaware corporation |
| Exhibit 4.1 | Form of Common Stock Certificate |
| Exhibit 4.2 | Amendment No. 3 to Rights Agreement, dated as of March 5, 2010, by and between OSI Systems, Inc. and StockTrans, Inc. |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1191 of 2711

EX-3.1 3 dex31.htm CERTIFICATION OF INCORPORATION OF OSI SYSTEMS, INC.

**EXHIBIT 3.1**

**CERTIFICATE OF INCORPORATION**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**I.**

The name of this corporation is "OSI Systems, Inc." (the "Corporation").

**II.**

The address of the Corporation's registered office in the 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**III.**

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

**IV.**

A. *Classes of Stock*. This Corporation is authorized to issue two classes of stock to be designated, respectively, as "Common Stock" and "Preferred Stock". The total number of shares which the Corporation is authorized to issue is one hundred ten million (110,000,000) shares, $0.001 par value. One hundred million (100,000,000) shares shall be Common Stock and ten million (10,000,000) shares shall be Preferred Stock.

B. *Rights, Preferences and Restrictions of Preferred Stock*. Shares of Preferred Stock may be issued from time to time in one or more series, with each such series to consist of such number of shares and to have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, as shall be stated in the resolution or resolutions providing for the issuance of such series adopted by the Board of Directors of the Corporation, and the Board of Directors is hereby expressly vested with authority, to the fullest extent now or hereafter provided by law, to adopt any such resolution or resolutions. The Board of Directors may increase or decrease the number of shares of any such series subsequent to the issuance of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any such series shall be so decreased, the shares constituting such decrease shall resume the status they had prior to the adoption of the resolution originally fixing the number of shares of such series.

**V.**

The number of directors that constitutes the entire Board of Directors shall be no less than five (5) nor more than nine (9), the exact number of directors to be fixed from time to time within such limit by a duly adopted resolution of the Board of Directors.

**VI.**

Stockholders shall not be permitted to cumulate votes at any election of directors.

**VII.**

Except as otherwise provided by law, vacancies in the Board of Directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, provided that a vacancy created by the removal of a director by stockholders may be filled only by the vote of a majority of the shares entitled to vote on the election of such director, present in person or represented by proxy at a duly called and convened meeting of stockholders, or by the written consent of holders of a majority of the outstanding shares entitled to vote on the election of such director.

**VIII.**

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

**IX.**

A. Except as otherwise provided in the Bylaws, the Bylaws may be amended or repealed or new Bylaws adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote generally in the election of directors. In furtherance and not in limitation of the powers conferred by law, the Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal Bylaws.

B. The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

C. Advance notice of stockholder nominations for the election of directors or of business to be brought by the stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

**X.**

Special meetings of the stockholders of the Corporation for any purpose or purposes may be called at any time by the Chief Executive Officer of the Corporation, the Chairman of the Board of Directors or a majority of the authorized number of directors or by stockholders of record who hold in the aggregate at least 10% percent of the voting power of the outstanding shares of the Corporation entitled to vote at the meeting in the manner provided in the Bylaws, but such special meetings may not be called by any other person or persons.

**XI.**

Any action required or permitted to be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1193 of 2711

consent or consents in writing, setting forth the action so taken, shall be signed by holders of record on the record date (established in the manner provided in the Bylaws) of outstanding shares of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; provided, however, that in the case of the election or removal of directors by written consent, such consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, further, however, that a director may be elected at any time to fill a vacancy on the Board of Directors that has not theretofor been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.

**XII.**

Meetings of stockholders may be held within or without the State of Delaware. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors.

**XIII.**

The Corporation shall have perpetual existence.

**XIV.**

A. To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the DGCL is hereafter amended to authorize further reductions in the liability of a corporation's directors for breach of fiduciary duty, then a director of the Corporation shall not be liable for any such breach to the fullest extent permitted by the DGCL as so amended.

B. Any repeal or modification of the foregoing provisions of this Article XIV shall not adversely affect any right or protection of a director of the Corporation with respect to any acts or omissions of such director occurring prior to such repeal or modification.

**XV.**

A. To the fullest extent permitted by applicable law, the Corporation is also authorized to provide indemnification of (and advancement of expenses to) directors, officers, employees and other agents of the Corporation (and any other persons to which Delaware law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of Delaware, subject only to limits created by applicable Delaware law (statutory or non-statutory), with respect to actions for breach of duty to a corporation.

B. Any repeal or modification of any of the foregoing provisions of this Article XV shall not adversely affect any right or protection of any such agent or other

person existing at the time of, or increase the liability of any such agent or other person with respect to any acts or omissions of such agent or other person occurring prior to such repeal or modification.

**XVI.**

Pursuant to Section 203(b)(1) of the DGCL, the Corporation shall not be governed by the provisions of Section 203 of the DGCL.

**XVII.**

The name and mailing address of the incorporator are as follows:

Victor S. Sze
c/o OSI Systems, Inc.
12525 Chadron Avenue
Hawthorne, CA 90250

IN WITNESS WHEREOF, the undersigned incorporator has executed this Certificate of Incorporation on this 3rd day of March, 2010.

/s/ Victor S. Sze
Victor S. Sze, Incorporator

EX-3.2 4 dex32.htm BYLAWS OF OSI SYSTEMS, INC.

**EXHIBIT 3.2**

**BYLAWS**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**ARTICLE I**
**OFFICES**

Section 1. *Registered Office.* The registered office of OSI Systems, Inc., a Delaware corporation (the "Corporation"), shall be fixed in the Certificate of Incorporation of the Corporation.

Section 2. *Other Offices.* The Corporation shall also have and maintain a principal executive office at 12525 Chadron Avenue, Hawthorne, CA 90250 and other offices at such place or places within and without the State of Delaware as the Board of Directors (the "Board") may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 1. *Place of Meetings.* Meetings of stockholders shall be held either at the principal executive office of the Corporation or at any other place within or without the State of Delaware which may be designated by the Board and provided in notice of the meeting.

Section 2. *Annual Meetings.* The annual meetings of the stockholders shall be held on such date and at such time as may be fixed by the Board. At such meetings, directors shall be elected and any other proper business may be transacted.

Section 3. *Special Meetings*.

(a) Special meetings of the stockholders for any purpose or purposes may be called only (i) by the Chairman of the Board of Directors, (ii) by the Board of Directors, pursuant to a resolution approved by a majority of the entire Board of Directors, (iii) the Chief Executive Officer or (v) by the Secretary of the Corporation, following his or her receipt of one or more written demands to call a special meeting of the stockholders in accordance with, and subject to, this Section 3 from stockholders of record as of the record date fixed in accordance with Section 3(d) who hold, in the aggregate, at least 10% percent of the voting power of the outstanding shares of the Corporation. The notice of a special meeting shall state the purpose or purposes of the special meeting, and the business to be conducted at the special meeting shall be limited to the purpose or purposes stated in the notice. Except in accordance with this Section 3, stockholders shall not be permitted to propose business to be brought before a special meeting of the stockholders. Stockholders who nominate persons for election to the board of directors at a special meeting must also comply with the requirements set forth in Section 14.

(b) No stockholder may demand that the Secretary of the Corporation call a special meeting of the stockholders pursuant to Section 3(a) unless a stockholder of record has first submitted a request in writing that the Board of Directors fix a record date for the purpose of determining the stockholders entitled to demand that the

Secretary of the Corporation call such special meeting (the "Request Record Date"), which request shall be in proper form and delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation.

(c) To be in proper form for purposes of this Section 3, a request by a stockholder for the Board of Directors to fix a Request Record Date shall set forth:

(i) As to each Requesting Person (as defined below), the Stockholder Information (as defined in Section 13(c)(i), except that for purposes of this Section 3 the term "Requesting Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(i));

(ii) As to each Requesting Person, any Disclosable Interests (as defined in Section 13(c)(ii), except that for purposes of this Section 3 the term "Requesting Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(ii) and the disclosure in clause (E) of Section 13(c)(ii) shall be made with respect to the business proposed to be conducted at the special meeting or the proposed election of directors at the special meeting, as the case may be); (iii) As to the purpose or purposes of the special meeting, (A) a reasonably brief description of the purpose or purposes of the special meeting and the business proposed to be conducted at the special meeting, the reasons for conducting such business at the special meeting and any material interest in such business of each Requesting Person, and (B) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Requesting Persons or (y) between or among any Requesting Person and any other record or beneficial holder of the shares of any class or series of the Corporation (including their names) in connection with the request for the special meeting or the business proposed to be conducted at the special meeting; and

(iv) If directors are proposed to be elected at the special meeting, the Nominee Information for each person whom a Requesting Person expects to nominate for election as a director at the special meeting.

For purposes of this Section 3(b), the term "Requesting Person" shall mean (i) the stockholder making the request to fix a record date for the purpose of determining the stockholders entitled to demand that the Secretary call a special meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf such request is made, and (iii) any affiliate or associate of such stockholder or beneficial owner.

(d) Within ten (10) days after receipt of a request to fix the Request Record Date in proper form and otherwise in compliance with this Section 3 from any stockholder of record, the Board of Directors may adopt a resolution fixing the Request Record Date, which date shall not precede the date upon which the resolution fixing the Request Record Date is adopted by the Board of Directors. If no resolution fixing a Request Record Date has been adopted by the Board of Directors within the ten (10) day period after the date on which such a request to fix a Request Record Date was received, the Request Record Date shall be deemed to be the twentieth (20th) day after the date on which the request therefor is received. Notwithstanding anything in this Section 3 to the contrary, no Request Record Date shall be fixed if the Board of Directors determines that the demand or demands that would otherwise be submitted following the Request Record Date could not comply with the requirements set forth in clauses (ii), (iv), (v) or (vi) of Section 3(f).

(e) Without qualification, a special meeting of the stockholders shall not be called pursuant to Section 3(a) unless stockholders of record as of the Request Record Date who hold, in the aggregate, more than 10 percent of the outstanding shares of common stock of the Corporation (the “Requisite Percentage”) timely provide one or more demands to call such special meeting in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation. Only stockholders of record on the Request Record Date shall be entitled to demand that the Secretary of the Corporation call a special meeting of the stockholders pursuant to Section 3(a). To be timely, a stockholder’s demand to call a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not later than the sixtieth (60th) day following the Request Record Date. To be in proper form for purposes of this Section 3, a demand to call a special meeting shall set forth (i) the business proposed to be conducted at the special meeting or the proposed election of directors at the special meeting, as the case may be, (ii) the text of the proposal or business (including the text of any resolutions proposed for consideration), if applicable, and (iii) with respect to any stockholder or stockholders submitting a demand to call a special meeting (except for any stockholder that has provided such demand in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Securities Exchange Act of 1934, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the “Exchange Act”), by way of a solicitation statement filed on Schedule 14A) (a “Solicited Stockholder”) the information required to be provided pursuant to this Section 3 by a Requesting Person. A stockholder may revoke a demand to call a special meeting by written revocation delivered to the Secretary at any time prior to the special meeting. If any such revocation(s) are received by the Secretary after the Secretary’s receipt of written demands from the holders of the Requisite Percentage of stockholders, and as a result of such revocation(s), there no longer are unrevoked demands from the Requisite Percentage of stockholders to call a special meeting, the Board of Directors shall have the discretion to determine whether or not to proceed with the special meeting.

(f) The Secretary shall not accept, and shall consider ineffective, a written demand from a stockholder to call a special meeting (i) that does not comply with this Section 3, (ii) that relates to an item of business to be transacted at such meeting that is not a proper subject for stockholder action under applicable law, (iii) that includes an item of business to be transacted at such meeting that did not appear on the written request that resulted in the determination of the Request Record Date, (iv) that relates to an item of business (other than the election of directors) that is identical or substantially similar to an item of business (a “Similar Item”) for which a record date (other than the Request Record Date) was previously fixed and such demand is delivered between the time beginning on the 61st day after such previous record date and ending on the one-year anniversary of such previous record date, (v) if a Similar Item will be submitted for stockholder approval at any stockholder meeting to be held on or before the 90th day after the Secretary receives such demand, or (vi) if a Similar Item has been presented at the most recent annual meeting or at any special meeting held within one year prior to receipt by the Secretary of such demand to call a special meeting.

(g) After receipt of demands in proper form and in accordance with this Section 3 from a stockholder or stockholders holding the Requisite Percentage, the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1198 of 2711

Board of Directors shall duly call, and determine the place, date and time of a special meeting of stockholders for the purpose or purposes and to conduct the business specified in the demands received by the Corporation. Notwithstanding anything in these Bylaws to the contrary, the Board of Directors may submit its own proposal or proposals for consideration at such a special meeting. The record date for such a special meeting shall be fixed in accordance with Section 8 of these Bylaws. The Board of Directors shall provide written notice of such special meeting to the stockholders in accordance with Section 4.

(h) In connection with a special meeting called in accordance with this Section 3, the stockholder or stockholders (except for any Solicited Stockholder) who requested that the Board of Directors fix a Request Record Date in accordance with this Section 3 or who delivered a demand to call a special meeting to the Secretary shall further update and supplement the information previously provided to the Corporation in connection with such request or demand, if necessary, so that the information provided or required to be provided in such request or demand pursuant to this Section 3 shall be true and correct as of the record date for the special meeting and as of the date that is ten (10) business days prior to the special meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the special meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the special meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the special meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the special meeting or any adjournment or postponement thereof).

(i) Notwithstanding anything in these Bylaws to the contrary, the Secretary shall not be required to call a special meeting pursuant to this Section 3 except in accordance with this Section 3. If the Board of Directors shall determine that any request to fix a record date or demand to call and hold a special meeting was not properly made in accordance with this Section 3, or shall determine that the stockholder or stockholders requesting that the Board of Directors fix such record date or submitting a demand to call the special meeting have not otherwise complied with this Section 3, then the Board of Directors shall not be required to fix a record date or to call and hold the special meeting. In addition to the requirements of this Section 3, each Requesting Person shall comply with all requirements of applicable law, including all requirements of the Exchange Act, with respect to any request to fix a record date or demand to call a special meeting.

Section 4. *Notice of Annual or Special Meeting.* Except as otherwise provided by law, written notice of each annual or special meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote thereat. Such notice shall state the place, date and hour of the meeting and (a) in the case of a special meeting, the purpose or purposes for which the meeting is called, and no other business may be transacted, or (b) in the case of the annual meeting, those matters which the Board, at the time of the mailing of the notice, intends to present for action by the stockholders, but, subject to the provisions of applicable law, the Certificate of Incorporation and these Bylaws, any proper matter may be presented at the meeting for such action. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by management for election.

Notice of a stockholders' meeting shall be given either personally or by mail or by other means of written or electronic communication, addressed to the stockholder at the address of such stockholder appearing on the books of the Corporation or given by the stockholder to the Corporation for the purpose of notice; or, if no such address appears or is given, at the place where the principal executive office of the Corporation is located or by publication at least once in a newspaper of general circulation in the county in which the principal executive office is located. Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is directed to the stockholder in the manner consented to by the stockholder. Any notice to stockholders may be given by electronic mail or other electronic transmission, in the manner provided by Section 232 of the Delaware General Corporation Law. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the giving of such notice. Notice of the time, place and purpose of any meeting of stockholders may be waived in writing, either before or after the meeting, and to the extent permitted by law, will be waived by any stockholder by attendance thereat, in person or by proxy, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Notwithstanding the foregoing provisions of this Section 4, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to matters set forth in this Section 4.

Section 5. *Quorum.* A majority of the issued and outstanding stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. If a quorum is not present or represented at any meeting of the stockholders, then either (a) the chairman of the meeting or (b) holders of a majority of the shares of stock entitled to vote who are present, in person or in proxy, at the place of the meeting shall have power to adjourn the meeting to another place, date or time in accordance with Section 6 of this Article.

Section 6. *Adjourned Meeting and Notice Thereof.* It shall not be necessary to give any notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by announcement at the meeting at which such adjournment is taken; provided, however, when any stockholders' meeting is adjourned for more than thirty (30) days or, if after adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given as in the case of an original meeting.

Section 7. *Voting.* Except as may be otherwise provided in the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder. All elections shall be determined by a plurality of the votes cast, and except as otherwise required by the Certificate of Incorporation, these bylaws, applicable law or any other rules and regulations applicable to the Corporation or shares of its capital stock (including the rules and regulations of any stock exchange on which shares of the Corporation's capital stock are traded), all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1200 of 2711

Section 8. *Record Date.* The Board may fix, in advance, a record date for the determination of the stockholders entitled to notice of any meeting to vote or entitled to receive payment of any dividend or other distribution, or any allotment of rights, or to exercise rights in respect of any other lawful action. The record date so fixed shall be not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting nor more than sixty (60) days prior to any other action. When a record date is so fixed, only stockholders of record on that date are entitled to notice of and to vote at the meeting or to receive the dividend, distribution, or allotment of rights, or to the exercise of the rights, as the case may be, notwithstanding any transfer of shares on the books of the Corporation after the record date. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the Board fixes a new record date for the adjourned meeting. The Board shall fix a new record date if the meeting is adjourned for more than thirty (30) days. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the next business day next preceding the day on which the meeting is held.

Section 9. *Consent of Absentees.* The transactions of any meeting of stockholders, however called and noticed, and wherever held, are as valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of the meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting. Neither the business to be transacted at nor the purpose of any regular or special meeting of stockholders need be specified in any written waiver of notice, except as provided in the Certificate of Incorporation or these Bylaws.

Section 10. *Action by Written Consent in Lieu of a Meeting.*

(a) Any action required or permitted to be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by holders of record on the record date (established as provided below) of outstanding shares of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; provided, however, that in the case of the election or removal of directors by written consent, such consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, further, however, that a director may be elected at any time to fill a vacancy on the Board of Directors that has not theretofor been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors. Any such consent shall be delivered to the Corporation at its registered office in the State of Delaware, at its principal place of business or to an officer or agent of the Corporation having custody of the minute books in which proceedings of meetings of stockholders are recorded. Delivery shall be made by hand or by certified or registered mail, return receipt requested. Every written consent shall bear the date of the signature of each stockholder who signs the consent, and no

written consent shall be effective to take corporate action unless, within sixty (60) days of the earliest dated valid consent delivered in the manner described in this Section 10, written consents signed by a sufficient number of holders to take such action are delivered to the Corporation in the manner described in this Section 10. Only stockholders of record on the record date shall be entitled to consent to corporate action in writing without a meeting.

(b) Without qualification, any stockholder of record seeking to have the stockholders authorize or take any action by written consent shall first request in writing that the Board of Directors fix a record date for the purpose of determining the stockholders entitled to take such action, which request shall be in proper form and delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation. Within ten (10) days after receipt of a request in proper form and otherwise in compliance with this Section 10(b) from any such stockholder, the Board of Directors may adopt a resolution fixing a record date for the purpose of determining the stockholders entitled to take such action, which date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no resolution fixing a record date has been adopted by the Board of Directors within such ten (10) day period after the date on which such a request is received, (i) the record date for determining stockholders entitled to consent to such action, when no prior action of the Board of Directors is required by applicable law, shall be the first date on which a valid signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner described in this Section 10, and (ii) the record date for determining stockholders entitled to consent to such action, when prior action by the Board of Directors is required by applicable law, shall be at the close of business on the date on which the Board of Directors adopts the resolution taking such prior action.

(c) Notwithstanding anything in these Bylaws to the contrary, no action may be taken by the stockholders by written consent except in accordance with this Section 10. If the Board of Directors shall determine that any request to fix a record date or to take stockholder action by written consent was not properly made in accordance with this Section 10, or the stockholder or stockholders seeking to take such action do not otherwise comply with this Section 10, then the Board of Directors shall not be required to fix a record date and any such purported action by written consent shall be null and void to the fullest extent permitted by applicable law. In addition to the requirements of this Section 10 with respect to stockholders seeking to take an action by written consent, each such stockholder shall comply with all requirements of applicable law, including all requirements of the Exchange Act, with respect to such action.

Section 11. *Proxies.* Every person entitled to vote shares has the right to do so either in person or by one or more persons authorized to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date.

Section 12. *Inspector of Election.* In advance of any meeting of stockholders, the Board may appoint any person to act as the inspector of election at such meeting and any adjournment thereof. If the inspector of election is not so appointed, or if any person so appointed fails to appear or refuses to act, the chairman of any such meeting may, and on the request of any stockholder or stockholder's proxy shall, make such appointment at the meeting. The duties of such inspector shall include: determining, and certifying as appropriate, the number of shares outstanding and the voting power of each; the shares represented at the meeting; the existence of a quorum; the authenticity, validity and effect of proxies; receiving votes, ballots or consents; hearing and determining all challenges and questions in any way arising in connection with the right to vote; counting and tabulating all votes or consents; determining when the polls shall close; determining the result; and doing such acts as may be proper to conduct the election or vote with fairness to all stockholders.

Section 13. *Notice of Business to be Brought Before a Meeting.*

(a) At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) brought before the meeting by the Corporation and specified in the notice of meeting given by or at the direction of the Board of Directors, (ii) brought before the meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the meeting by a stockholder who (A) was a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf such business is proposed, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 13 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 13 as to such business. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board of Directors, the foregoing clause (iii) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of the stockholders. Stockholders seeking to nominate persons for election to the Board must comply with Section 14 and this Section 13 shall not be applicable to nominations except as expressly provided in Section 14.

(b) Without qualification, for business to be properly brought before an annual meeting by a stockholder, the stockholder must (i) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 13. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made (such notice within such time periods, "Timely Notice"). In no event shall any adjournment of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(c) To be in proper form for purposes of this Section 13, a stockholder's notice to the Secretary shall set forth:

(i) As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); and (B) the class or series and number of shares of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Persons, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future (the disclosures to be made pursuant to the foregoing clauses (A) and (B) are referred to as "Stockholder Information");

(ii) As to each Proposing Person, (A) any derivative, swap or other transaction or series of transactions engaged in, directly or indirectly, by such Proposing Person, the purpose or effect of which is to give such Proposing Person economic risk similar to ownership of shares of any class or series of the Corporation, including due to the fact that the value of such derivative, swap or other transactions are determined by reference to the price, value or volatility of any shares of any class or series of the Corporation, or which derivative, swap or other transactions provide, directly or indirectly, the opportunity to profit from any increase in the price or value of shares of any class or series of the Corporation ("Synthetic Equity Interests"), which Synthetic Equity Interests shall be disclosed without regard to whether (x) the derivative, swap or other transactions convey any voting rights in such shares to such Proposing Person, (y) the derivative, swap or other transactions are required to be, or are capable of being, settled through delivery of such shares or (z) such Proposing Person may have entered into other transactions that hedge or mitigate the economic effect of such derivative, swap or other transactions (B) any proxy (other than a revocable proxy or consent given in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act by way of a solicitation statement filed on Schedule 14A), agreement, arrangement, understanding or relationship pursuant to which such Proposing Person has or shares a right to vote any shares of any class or series of the Corporation, (C) any agreement, arrangement, understanding or relationship, including any repurchase or similar so-called "stock borrowing" agreement or arrangement, engaged in, directly or indirectly, by such Proposing Person, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of shares of any class or series of the Corporation by, manage the risk of share price changes for, or increase or decrease the voting power of, such Proposing Person with respect to the shares of any class or series of the Corporation, or which provides, directly or indirectly, the opportunity to profit from any decrease in the price or value of the shares of any class or series of the Corporation ("Short Interests"), (D) any performance related fees (other than an asset based fee) that such Proposing Person is entitled to based on any increase or decrease in the price or value of shares of any class or series of the Corporation, or any Synthetic Equity Interests or Short Interests, if any, and (E) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (E) are referred to as "Disclosable Interests");

provided, however, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner; and

(iii) As to each item of business that the stockholder proposes to bring before the annual meeting, (A) a reasonably brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration), and (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other record or beneficial holder of the shares of any class or series of the Corporation (including their names) in connection with the proposal of such business by such stockholder.

For purposes of this Section 13, the term “Proposing Person” shall mean (i) the stockholder providing the notice of business proposed to be brought before an annual meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (iii) any affiliate or associate (each within the meaning of Rule 12b-2 under the Exchange Act for purposes of these Bylaws) of such stockholder or beneficial owner.

(d) A stockholder providing notice of business proposed to be brought before an annual meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 13 shall be true and correct as of the record date for the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).

(e) Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting except in accordance with this Section 13. The presiding officer of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 13, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(f) This Section 13 is expressly intended to apply to any business proposed to be brought before an annual meeting of stockholders other than any proposal made pursuant to Rule 14a-8 under the Exchange Act. In addition to the requirements of this Section 13 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the

Exchange Act with respect to any such business. Nothing in this Section 13 shall be deemed to affect the rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(g) For purposes of these Bylaws, "public disclosure" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

Section 14. *Notice of Nominations for Election to the Board of Directors*.

(a) Nominations of any person for election to the Board of Directors at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (i) by or at the direction of the Board of Directors, including by any committee or persons appointed by the Board of Directors, or (ii) by a stockholder who (A) was a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf such nomination is proposed to be made, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 14 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 14 as to such nomination. The foregoing clause (ii) shall be the exclusive means for a stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting or special meeting.

(b) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting, the stockholder must (i) provide Timely Notice (as defined in Section 13) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 14. Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting, then for a stockholder to make any nomination of a person or persons for election to the Board of Directors at a special meeting, the stockholder must (i) provide timely notice thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 14. To be timely, a stockholder's notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 13) of the date of such special meeting was first made. In no event shall any adjournment of an annual meeting or special meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above.

(c) To be in proper form for purposes of this Section 14, a stockholder's notice to the Secretary shall set forth:

(i) As to each Nominating Person (as defined below), the Stockholder Information (as defined in Section 13(c)(i), except that for purposes of this Section 14 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(i));

(ii) As to each Nominating Person, any Disclosable Interests (as defined in Section 13(c)(ii), except that for purposes of this Section 14 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(ii) and the disclosure in clause (E) of Section 13(c)(ii) shall be made with respect to the election of directors at the meeting);

(iii) As to each person whom a Nominating Person proposes to nominate for election as a director, (A) all information with respect to such proposed nominee that would be required to be set forth in a stockholder's notice pursuant to this Section 14 if such proposed nominee were a Nominating Person, (B) all information relating to such proposed nominee that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such proposed nominee's written consent to being named in the proxy statement as a nominee and to serving as a director if elected), (C) a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among any Nominating Person, on the one hand, and each proposed nominee, his or her respective affiliates and associates, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the proposed nominee were a director or executive officer of such registrant (the disclosures to be made pursuant to the foregoing clauses (A) through (C) are referred to as "Nominee Information"); and

(iv) The Corporation may require any proposed nominee to furnish such other information (A) as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation in accordance with the Corporation's Corporate Governance Guidelines or (B) that could be material to a reasonable stockholder's understanding of the independence or lack of independence of such proposed nominee.

For purposes of this Section 14, the term "Nominating Person" shall mean (i) the stockholder providing the notice of the nomination proposed to be made at the meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made, and (iii) any affiliate or associate of such stockholder or beneficial owner,

(d) A stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 14 shall be true and correct as of the record date for the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1207 of 2711
adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).

(e) Notwithstanding anything in these Bylaws to the contrary, no person shall be eligible for election as a director of the Corporation unless nominated in accordance with this Section 14. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with this Section 14, and if he or she should so determine, he or she shall so declare such determination to the meeting and the defective nomination shall be disregarded.

(f) In addition to the requirements of this Section 14 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.

## ARTICLE III
## DIRECTORS

Section 1. *Powers.* Subject to limitations of the Certificate of Incorporation, of these Bylaws and of the Delaware General Corporation Law relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board. The Board may delegate the management of the day-to-day operation of the business of the Corporation to a management company or other person provided that the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

Section 2. *Number of Directors.* The number of directors shall be determined from time to time by resolution of the Board, within the range set forth in the Certificate of Incorporation. No reduction of the authorized number of directors shall have the effect of shortening the term of any incumbent director.

Section 3. *Election and Term of Office.* The directors shall be elected at each annual meeting of the stockholders, but if any such annual meeting is not held or the directors are not elected thereat, the directors may be elected at any special meeting of stockholders held for that purpose. Each director shall hold office until the next annual meeting and until a successor has been elected and qualified.

Section 4. *Vacancies.* Any director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective.

Except as otherwise provided by law, vacancies in the Board may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, provided that a vacancy created by the removal of a director by the stockholders may be filled only by the vote of a majority of the shares entitled to vote for the election of such director in person or represented at a duly called and convened

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1208 of 2711

meeting of stockholders, or by the written consent of holders of a majority of the outstanding shares entitled to vote in the election of such director. Each director so elected shall hold office until the next annual meeting and until such director's successor has been elected and qualified.

Any person who has been declared of unsound mind by an order of court or convicted of a felony shall cease to be qualified as a director.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of the director's term of office.

Section 5. *Place of Meeting.* Regular or special meetings of the Board shall be held at any place within or without the State of Delaware which has been designated from time to time by the Board. In the absence of such designation, regular meetings shall be held at the principal executive office of the Corporation.

Section 6. *Regular Meetings.* Immediately following each annual meeting of stockholders, the Board shall hold a regular meeting for the purpose of organization, election of officers and the transaction of other business. Call and notice of all such regular meetings of the Board is hereby dispensed with. Other regular meetings of the Board shall be held without call on such dates and at such times as may be fixed by the Board, and shall be subject to the notice requirements set forth in Section 7 of this Article.

Section 7. *Special Meetings.* Special meetings of the Board for any purpose or purposes may be called at any time by the Chief Executive Officer, Chairman of the Board, or by any two (2) directors.

Special meetings of the Board shall be held upon three (3) days' written notice by mail or twenty-four (24) hours' notice given personally or by telephone, telecopier, e-mail or other similar means of communication. Any such notice shall be addressed or delivered to each director at such director's address as it is shown upon the records of the Corporation or as may have been given to the Corporation by the director for purposes of notice or, if such address is not shown on such records or is not readily ascertainable, at the place in which the meetings of the directors are regularly held.

Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient. Oral notice shall be deemed to have been given at the time it is communicated in person or by telephone or wireless, to the recipient or to a person at the office or residence of the recipient who the person giving the notice has reason to believe will promptly communicate it to the recipient.

Section 8. *Quorum.* A majority of the authorized number of directors, constitutes a quorum of the Board for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board, unless a greater number be required by law or by the Certificate of Incorporation.

Section 9. *Participation in Meetings by Conference Telephone.* Members of the Board or any committee thereof may participate in a meeting through use of conference telephone or similar communications equipment, so long as all members participating in such meeting can hear one another, and such participation shall constitute presence in person at such meeting.

Section 10. *Waiver of Notice.* The transactions of any meeting of the Board, however called and noticed or wherever held, are as valid as though had at a meeting duly held after regular call and notice if a quorum be present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice or delivers a waiver by electronic transmission. All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 11. *Adjournment.* A majority of the directors present, whether or not a quorum is present, may adjourn any directors' meeting to another time and place. Notice of the time and place of holding an adjourned meeting need not be given to absent directors if the time and place be fixed at the meeting adjourned. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

Section 12. *Fees and Compensation.* Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement for expenses, as may be fixed or determined by the Board.

Section 13. *Action Without Meeting.* Any action required or permitted to be taken by the Board, or any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, shall consent in writing or by electronic communication to such action, and such writing or writings (or communications) are duly filed with the minutes of proceedings of the Board or committee, as the case may be.

Section 14. *Rights and Inspection.* Every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Corporation and also of its subsidiary corporations, domestic or foreign. Such inspection by a director may be made in person or by agent or attorney and includes the right to copy and obtain extracts.

Section 15. *Committees.* The Board may appoint one or more committees, each consisting of one or more directors, and delegate to such committees any of the authority of the Board except with respect to:

(i) The approval of any action for which the Delaware General Corporation Law also requires stockholders' approval;

(ii) The filling of vacancies on the Board or in any committee;

(iii) The amendment or repeal of Bylaws or the adoption of new Bylaws;

(iv) The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable; or

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1210 of 2711
(v) The appointment of other committees of the Board or the members thereof.

Any such committee must be appointed by resolution adopted by a majority of the authorized number of directors and may be designated a name as the Board shall specify. The Board shall have the power to prescribe the manner in which proceedings of any such committee shall be conducted. In the absence of any such prescription, such committee shall have the power to prescribe the manner in which its proceedings shall be conducted. Unless the Board or such committee shall otherwise provide, the regular and special meetings and other actions of any such committee shall be governed by the provisions of this Article applicable to meetings and actions of the Board. Minutes shall be kept of each meeting of each committee.

Section 16. *Submission of Resignation Upon Material Change in Occupation or Business Association*. A director shall submit a letter of resignation to the Board upon such individual director's material change in principal occupation or business association. Such a letter of resignation shall become effective only if accepted by the Board.

## ARTICLE IV
## OFFICERS

Section 1. *Officers.* The officers of the Corporation shall be a Chief Executive Officer, a Secretary and a Chief Financial Officer. The Corporation may also have, at the discretion of the Board, a Chairman of the Board, a President, a Chief Operating Officer, one or more Vice Presidents (who may be designated as executive or senior vice presidents as the Board may, from time to time, deem necessary), one or more Assistant Secretaries, one or more Assistant Financial Officers and such other officers as may be elected or appointed in accordance with the provisions of Section 3 of this Article. Any number of offices may be held by the same person.

Section 2. *Election.* The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article, shall be chosen annually by, and shall serve at the pleasure of the Board, and shall hold their respective offices until their resignation, removal or other disqualification from service, or until their respective successors shall be elected.

Section 3. *Subordinate Officers.* The Board may appoint, and may empower the Chief Executive Officer or the President to appoint, such other officers as the business of the Corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in these Bylaws or as the Board may from time to time determine. Any officer appointed pursuant to this Section 3 may be removed, with or without cause, by the Board or any such officer upon whom the power of removal has been conferred by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Section 4. *Removal and Resignation.* Any officer not appointed in accordance with the provisions of Section 3 or 5 hereof may be removed, either with or without cause, by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Any officer may resign at any time by giving written notice to the Corporation, but without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5. *Vacancies.* A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular election or appointment to such office.

Section 6. *Chairman of the Board.* The Chairman of the Board, shall, if present, preside at all meetings of the Board and exercise and perform such other powers and duties as may be from time to time assigned by the Board.

Section 7. *Chief Executive Officer.* The Chief Executive Officer, shall be subject to the control of the Board and have general supervision, direction and control of the business and the officers of the corporation. The Chief Executive Officer shall preside at all meetings of the stockholders and shall act as Chairman of the Board unless the Board has appointed a different person as Chairman.

Section 8. *President; Chief Operating Officer.* The President or the Chief Operating Officer has the general powers and duties of management usually vested in the office of president, general manager and chief operating officer of a corporation and such other powers and duties as may be prescribed by the Board. In the absence of the Chief Executive Officer, the President shall perform the duties required of the Chief Executive Officer under these Bylaws.

Section 9. *Vice President.* In the absence or disability of the President, the Vice Presidents in order of their rank as fixed by the Board or, if not ranked, the Vice President designated by the Board, shall perform all the duties of the President and, when so acting, shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board.

Section 10. *Secretary.* The Secretary shall keep or cause to be kept, at the principal executive office and such other place as the Board may order, a book of minutes of all meetings of stockholders, the Board and its committees, with the time and place of holding, whether regular or special, and if special, how authorized, the notice thereof given, the names of those present at Board and committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings thereof. The Secretary shall keep, or cause to be kept, a copy of the Bylaws of the Corporation at the principal executive offices or business office.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Corporation's transfer agent or registrar, if one be appointed, a share register, or a duplicate share register, showing the names of the stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same and the number and date of cancellation of every certificate surrendered for cancellation.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1212 of 2711

The Secretary shall give, or cause to be given, notice of all meetings of the stockholders of the Board and of any committees thereof required by these Bylaws or by law to be given, shall keep the seal of the Corporation in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board.

Section 11. *Chief Financial Officer.* The Chief Financial Officer is the principal financial officer of the Corporation and shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, and shall send or cause to be sent to the stockholders of the Corporation such financial statements and reports as are by law or these Bylaws required to be sent to them. The books of account shall at all times be open to inspection by any director.

The Chief Financial Officer shall deposit all monies and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board. The Chief Financial Officer shall disburse the funds of the Corporation as may be ordered by the Board, shall render to the Chief Executive Officer or the President or directors, whenever they request it, an account of all transactions entered into as Chief Financial Officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board.

## ARTICLE V
## OTHER PROVISIONS

Section 1. *Inspection of Corporate Records.* The Corporation shall, either at its principal executive offices or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these Bylaws as amended to date, accounting books, and other records.

(a) Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation’s stock ledger, a list of its stockholders, and its other books and records permitted by the Delaware General Corporation Law and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person’s interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal place of business.

(b) In addition to the inspections rights set forth in Section 1(a) above and those available under the Delaware General Corporation Law, any stockholder or stockholders holding at least 5 percent in the aggregate of the outstanding voting shares of the Corporation or who hold at least 1 percent of those voting shares and have filed a Schedule 14A with the United States Securities and Exchange Commission shall have an absolute right to do either or both of the following: (1) inspect and copy the record of stockholder’s names and addresses and stockholdings during usual business hours upon five business days’ prior written demand upon the Corporation, or (2) obtain from

the transfer agent for the Corporation, upon written demand and upon the tender of its usual charges for such a list (the amount of which charges shall be stated to the stockholder by the transfer agent upon request), a list of the stockholders' names and addresses, who are entitled to vote for the election of directors, and their stockholdings, as of the most recent record date for which it has been compiled or as of a date specified by the stockholder subsequent to the date of demand. The list shall be made available on or before the later of five business days after the demand is received or the date specified therein as the date as of which the list is to be compiled. The Corporation shall have the responsibility to cause its transfer agent to comply with this subsection.

(c) A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order for each class of stock and showing the address of each such stockholder and the number of shares registered in each such stockholder's name, shall be open to the examination of any such stockholder for a period of at least ten (10) days prior to the meeting in the manner provided by law. The stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law. This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

Section 2. *Inspection of Bylaws.* The Corporation shall keep in its principal executive office the original or a copy of these Bylaws as amended to date, which shall be open to inspection by stockholders at all reasonable times, during office hours. If the principal executive office of the Corporation is located outside the State of Delaware and the Corporation has no principal business office in such state, it shall upon the written notice of any stockholder furnish to such stockholder a copy of these Bylaws as amended to date.

Section 3. *Endorsement of Documents; Contracts.* Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, share certificate, conveyance or other instrument in writing and any assignment or endorsements thereof executed or entered into between the Corporation and any other person, when signed by the Chief Executive Officer, the Chairman of the Board or the President, shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by another person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or amount.

Section 4. *Certificates of Stock.* The shares of stock of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and, upon request, every holder of uncertificated shares, shall be entitled to have a certificate signed in the name of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer or a Vice President and by the Chief Financial Officer or an Assistant Financial Officer or the Secretary or an Assistant Secretary, certifying the number of shares and the class or

series of shares owned by the stockholder. Any or all of the signatures on the certificate may be facsimile. If any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue.

Certificates for shares may be issued prior to full payment under such restrictions and for such purposes as the Board may provide; provided, however, that on any certificate issued to represent any partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated.

Except as provided in this section, no new certificate for shares shall be issued in lieu of an old one unless the latter is surrendered and cancelled at the same time. The Board may, however, if any certificate for shares is alleged to have been lost, stolen or destroyed, authorize the issuance of a new certificate in lieu thereof, and the Corporation may require that the Corporation be given a bond or other adequate security sufficient to indemnify it against any claim that may be made against it (including expense or liability) on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

Section 5. *Representation of Shares of other Corporations.* The President, the Chief Executive Officer, the Chief Financial Officer or any other officer or officers authorized by the Board, the Chief Executive Officer, the President or the Chief Financial Officer are each authorized to vote, represent and exercise on behalf of the Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of the Corporation. The authority herein granted may be exercised either by any such officer in person or by any other person authorized so to do by proxy or power of attorney duly executed by said officer.

Section 6. *Stock Purchase Plans.* The Corporation may adopt and carry out a stock purchase plan or agreement or stock option plan or agreement providing for the issue and sale for such consideration as may be fixed of its unissued shares, or of issued shares acquired or to be acquired, to one or more of the employees or directors of the Corporation or of a subsidiary or to a trustee on their behalf and for the payment for such shares in installments or at one time, and may provide for aiding any such persons in paying for such shares by compensation for services rendered, promissory notes or otherwise.

Any such stock purchase plan or agreement or stock option plan or agreement may include, among other features, the fixing of eligibility for participation therein, the class and price of shares to be issued or sold under the plan or agreement, the number of shares which may be subscribed for, the method of payment therefor, the reservation of title until full payment therefor, the effect of the termination of employment and option or obligation on the part of the Corporation to repurchase the shares upon termination of employment, restrictions upon transfer of the shares, the time limits of and termination of the plan, and any other matters, not in violation of applicable law, as may be included in the plan as approved or authorized by the Board or any committee of the Board.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1215 of 2711

Section 7. *Stockholder Rights Plans.*

(a) Except as provided in Section 7(b), the Board shall seek stockholder approval prior to its adoption of (a) any Stockholder Rights Plan with a term of more than 12 months or (b) any amendment which has the effect of extending the term of a Stockholder Rights Plan.

(b) The Board may adopt any Stockholders Right Plan or amendment which has the effect of extending the term of a Stockholder Rights Plan, provided that the Board, in the exercise of its fiduciary duties, determines that, under the circumstances existing at the time, it is in the best interests of the stockholders of the Corporation to adopt or extend a Stockholders Rights Plan without delay, and provided further that the Board submits any Stockholders Right Plan adopted or extended pursuant to this Section 7(b) to the stockholders for ratification at a meeting to be held within 12 months of such adoption or extension of the Stockholders Rights Plan by the Board. If the adoption or extension of the Stockholders Rights Plan is not approved by the majority of the outstanding shares entitled to vote at the meeting, then the Stockholders Rights Plan shall immediately terminate.

(c) "Stockholder Rights Plan" refers in this Section 7 to any stockholder rights plan, rights agreement or any other form of rights plan generally referred to as a "poison pill" which is designed to or has the effect of making an acquisition of significant holdings of the corporation's shares of stock more difficult or expensive.

Section 8. *Construction and Definitions.* Unless the context otherwise requires, the general provisions, rules of construction and definitions contained in the Delaware General Corporation Law shall govern the construction of these Bylaws.

## ARTICLE VI
## INDEMNIFICATION

Section 1. *Right to Indemnification*. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the corporation or, while a director or officer of the corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in Section 4, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the commencement of such proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board.

Section 2. *Insurance.* The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1216 of 2711

employee, trustee or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise, against any liability or expense asserted against or incurred by such person in or arising from that capacity, or arising out of his or her status as such, whether or not the Corporation would otherwise have the power or the obligation to indemnify the person against such liability or expense. The Corporation shall not be obligated under these Bylaws to make any payment in connection with any claim made against any person if and to the extent that such person has actually received payment therefor under any insurance policy or policies.

Section 3. *Expenses Payable in Advance.* Expenses (including attorneys' fees and expenses) incurred by a director or officer, or a former director or officer, in defending, investigating, preparing to defend, or being or preparing to be a witness in, a threatened or pending action, suit, proceeding or claim against him or her in his her capacity as an officer or director of the Corporation, whether civil or criminal, shall be paid by the Corporation in advance of the final disposition of such action, suit, proceeding or claim upon receipt by the Corporation of a request therefor and an undertaking by or on behalf of the director or officer, or former director or officer, to repay such amounts if it ultimately shall be determined by final judicial decision from which there is no further right of appeal that he or she is not entitled to be indemnified by the Corporation.

Section 4. *Claims*. If a claim for indemnification (following the final disposition of such proceeding) or advancement of expenses under this Article VI is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law. In any such action the corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Section 5. *Nonexclusivity of Rights*. The rights conferred on any Covered Person by this Article VI shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

Section 6. *Other Sources*. The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

Section 7. *Amendment or Repeal*. Any repeal or modification of the provisions of this Article VI shall not adversely affect any right or protection hereunder of any Covered Person in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to the time of such repeal or modification.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1217 of 2711

Section 8. *Other Indemnification and Advancement of Expenses*. This Article VI shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

## ARTICLE VII
## AMENDMENTS

These Bylaws may be repealed, altered or amended or new Bylaws adopted at any meeting of the stockholders, either annual or special, by the affirmative vote of at least a majority of the stock entitled to vote at such meeting, unless a larger vote is required by these Bylaws or the Certificate of Incorporation. The Board shall also have the authority to repeal, alter or amend these Bylaws or adopt new Bylaws by unanimous written consent or at any annual, regular, or special meeting of the Board by the affirmative vote of a majority of the whole number of directors.

# Exhibit 4

<DOCUMENT>
<TYPE>DEF 14A
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>DEFINITIVE PROXY STATEMENT 14A
<TEXT>

<PAGE>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

SCHEDULE 14A
(RULE 14A-101)

INFORMATION REQUIRED IN PROXY STATEMENT
SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934

Filed by the Registrant [X]

Filed by a Party other than the Registrant [_]

Check the appropriate box:

[_] Preliminary Proxy Statement

[_] Confidential, for use of the Commission only (as permitted by Rule 14a-6(e)(2))

[X] Definitive Proxy Statement

[_] Definitive Additional Materials

[_] Soliciting Material Pursuant to (S) 240.14a-11(c) or (S) 240.14a-12

OSI SYSTEMS, INC.
--------------------------------------------------------------------------------
(Name of Registrant as Specified In Its Charter)

--------------------------------------------------------------------------------
(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[_] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

(1) Title of each class of securities to which transaction applies:

------------------------------------------------------------------------

(2) Aggregate number of securities to which transaction applies:

------------------------------------------------------------------------

(3) Per unit price or other underlying value of transaction computed

pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[_] Fee paid previously with preliminary materials.

[_] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

<PAGE>

[LOGO OF OSI SYSTEMS, INC.]
12525 Chadron Avenue
Hawthorne, California 90250

October 16, 2000

To Our Stockholders:

You are cordially invited to attend the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc. (the "Company"), which will be held at 10:00 a.m., local time, on November 16, 2000, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of the Company's outstanding common stock as of the close of business on October 10, 2000, are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

/s/ Ajay Mehra

Ajay Mehra
Secretary

<PAGE>

[LOGO OF OSI SYSTEMS, INC.]
12525 Chadron Avenue
Hawthorne, California 90250

NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
To Be Held November 16, 2000

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 16, 2000, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect five (5) directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify an amendment to the OSI Systems, Inc. 1997 Stock Option Plan to increase the number of shares of the Company's common stock for which options may be granted under the plan from 850,000 shares to 1,850,000 shares.

3. To ratify the selection of Deloitte & Touche L.L.P. as the Company's independent accountants for the fiscal year ending June 30, 2001.

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on October 10, 2000, as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

/s/ Ajay Mehra

Ajay Mehra
Secretary

Dated: October 16, 2000

---

PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.

---

<PAGE>

OSI SYSTEMS, INC.
12525 Chadron Avenue
Hawthorne, California 90250

                                  PROXY STATEMENT


                                GENERAL INFORMATION

        This Proxy Statement is being furnished in connection with the solicitation
of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for
use at the Annual Meeting of Stockholders (the "Annual Meeting" or the
"Meeting"), to be held at 10:00 a.m., local time, on November 16, 2000, at the
executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California
90250, and at any adjournment thereof. When such proxy is properly executed and
returned, the shares it represents will be voted in accordance with any
directions noted thereon. Any stockholder giving a proxy has the power to revoke
it at any time before it is voted by written notice to the Secretary of the
Company or by issuance of a subsequent proxy. In addition, a stockholder
attending the Annual Meeting may revoke his or her proxy and vote in person if
he or she desires to do so, but attendance at the Annual Meeting will not of
itself revoke the proxy.

        At the close of business on October 10, 2000, the record date for
determining stockholders entitled to notice of and to vote at the Annual
Meeting, the Company had issued and outstanding 9,354,803 shares of common
stock, without par value ("Common Stock"). Each share of Common Stock entitles
the holder of record thereof to one vote on any matter coming before the Annual
Meeting. In voting for directors, however, if any stockholder gives notice at
the Annual Meeting prior to voting of an intention to cumulate votes, then each
stockholder has the right to cumulate votes and to give any one or more of the
nominees whose names have been placed in nomination prior to voting a number of
votes equal to the number of directors to be elected (i.e., five) multiplied by
the number of shares which the stockholder is entitled to vote. Unless the proxy
holders are otherwise instructed, stockholders, by means of the accompanying
proxy, will grant the proxy holders discretionary authority to cumulate votes.
Only stockholders of record at the close of business on October 10, 2000 are
entitled to notice of and to vote at the Annual Meeting or any adjournment
thereof.

        The enclosed Proxy, when properly signed, also confers discretionary
authority with respect to amendments or variations to the matters identified in
the Notice of Annual Meeting and with respect to other matters which may be
properly brought before the Annual Meeting. At the time of printing this Proxy
Statement, management of the Company was not aware of any other matters to be
presented for action at the Annual Meeting. If, however, other matters which are
not now known to management should properly come before the Annual Meeting, the
proxies hereby solicited will be exercised on such matters in accordance with
the best judgment of the proxy holders.

        Shares represented by executed and unrevoked proxies will be voted in
accordance with the instructions contained therein or in the absence of such
instructions, in accordance with the recommendations of the Board of Directors.
Neither abstentions nor broker non-votes will be counted for the purposes of
determining whether any of the proposals has been approved by the stockholders
of the Company, although they will be counted for purposes of determining the
presence of a quorum.

        The election of directors requires a plurality of the votes cast by the
holders of the Company's Common Stock. A "plurality" means that the individuals
who receive the largest number of affirmative votes cast are elected as
directors up to the maximum number of directors to be chosen at the Annual
Meeting. Approval of the other proposals will require the affirmative vote of a
majority of the shares of Common Stock present and voting at the Meeting.

        The Company will pay the expenses of soliciting proxies for the Annual
Meeting, including the cost of preparing, assembling and mailing the proxy
solicitation materials. Proxies may be solicited personally, by mail, by telex

or by telephone, by directors, officers and regular employees of the Company who will not be additionally
<PAGE>

compensated therefor. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 16, 2000 to all stockholders entitled to vote at the Annual Meeting.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

## ELECTION OF DIRECTORS
(Item 1 of the Proxy Card)

The Company has a Board of Directors consisting of five members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting dates.

Management's nominees for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Madan G. Syal. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Stockholders in 2001, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although management knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as management may designate.

If a quorum is present and voting, the five nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, i.e., broker non-votes, will be counted as present for purposes of determining if a quorum is present.

The following are Management's nominees for election as directors at this meeting.

<TABLE>
<CAPTION>

| Name | Age | Position | Director Since |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Deepak Chopra............................. | 49 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Ajay Mehra................................ | 38 | Vice President, Chief Financial Officer, Secretary and Director | 1996 |
| Steven C. Good (1)(2)..................... | 58 | Director | 1987 |
| Meyer Luskin (1)(2)....................... | 74 | Director | 1990 |
| Madan G. Syal (1)......................... | 74 | Director | 1987 |

</TABLE>

---

(1) Member of Audit Committee

(2) Member of Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

<PAGE>

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as Vice President and Chief Financial Officer of the Company's major subsidiaries. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst, and a Master of Business Administration degree from Pepperdine University.

Steven C. Good has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on Nasdaq. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, and Chromagen, Inc., a biotechnology company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

Madan G. Syal has served as a Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a Bachelor of Science degree from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University.

Executive Officers

Andreas F. Kotowski has served as the President of U.S. Operations, General

Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan U.S.A."), since January 1993. As General Manager of Rapiscan U.S.A., Mr. Kotowski is also responsible for the operations of Rapiscan U.K., the subsidiary of Rapiscan U.S.A. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

Thomas K. Hickman has served as Managing Director of Opto Sensors (Singapore) Pte Ltd. and Opto Sensors (Malaysia) Sdn. Bhd., subsidiaries of the Company, since July 1995, and as the Managing Director of Rapiscan Consortium (M) Sdn. Bhd. since its formation in October 1996. From July 1993 to July 1995, Mr. Hickman served as Vice President of Operations and Director of Operations for Rapiscan U.S.A. and Rapiscan U.K., respectively. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors, Inc. ("UDT Sensors"), a subsidiary of the Company, and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems

3

<PAGE>

Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a Bachelor of Arts degree from Stetson University and a Master of Business Administration degree from the University of San Francisco.

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Deepak Chopra. Other than these relationships, there are no family relationships among the directors and executive officers of the Company.

The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Madan G. Syal as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present and voting at the Meeting.

Board of Directors Meetings and Committees of the Board of Directors

There were five meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on three additional occasions during the fiscal year ended June 30, 2000. The Board of Directors has established an Audit Committee and a Compensation Committee. The members of each committee are appointed by the majority vote of the Board of Directors. There is no nominating committee.

Audit Committee

The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. The Audit Committee consists of Messrs. Good, Luskin and Syal. There was one meeting of the Audit Committee during the fiscal year ended June 30, 2000.

Compensation Committee

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee presently consists of Messrs. Good and Luskin. There was one meeting of the Compensation Committee during the fiscal year ended June 30, 2000. See Report of Compensation Committee on Executive Compensation.

Director Compensation

Each non-employee Director receives a fee of $7,500 per year, $1,500 for each Board or Committee meeting attended, and options to purchase 5,000 shares of Common Stock at an exercise price equal to 110% of fair market value as of the date of grant. The Directors also are reimbursed for expenses incurred in connection with the performance of their services as Directors.

<PAGE>

Compensation Committee Interlocks and Insider Participation

During the fiscal year ended June 30, 2000, Steven C. Good and Meyer Luskin served on the Compensation Committee.

The Company currently intends that any future transactions, if any, with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

Executive Compensation and Other Information

The following table sets forth the compensation for the Chief Executive Officer and each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2000 (the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

Annual Compensation Long-Term
Compensation
-------------------------------- --------------------
--------------------
Awards
Payouts
--------------------
------- ----------
All Other
Securities
Annual Restricted
Underlying
Name and Principal Compen- Stock

| Position | Year | Salary ($) | Bonus ($) | sation ($) | Awards (#) | Options/SARS (#) | LTIP Payouts ($) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra (1) | 2000 | 536,539 | 22,500 | -- | -- | 50,000 (3) | -- | -- |
| Chief Executive Officer | 1999 | 483,723 | 200,000 | -- | -- | 5,200 | -- | -- |
| | 1998 | 450,000 | 158,600 | -- | -- | -- | -- | 222,750 (2) |
| Ajay Mehra | 2000 | 250,251 | 17,500 | -- | -- | 25,000 (3) | -- | -- |
| Chief Financial Officer | 1999 | 221,137 | 55,000 | -- | -- | 12,400 | -- | -- |
| | 1998 | 200,000 | 65,300 | -- | -- | -- | -- | 178,200 (2) |
| Andreas F. Kotowski | 2000 | 178,904 | -- | -- | -- | 8,500 | -- | -- |
| President of U.S. Operations, | 1999 | 159,594 | 30,000 | -- | -- | 1,700 | -- | -- |
| Rapiscan U.S.A. | 1998 | 140,000 | | -- | -- | 5,000 | -- | -- |
| Thomas K. Hickman | 2000 | 185,275 | -- | -- | -- | 15,000 | -- | -- |
| Managing Director, | 1999 | 134,732 | 50,000 | -- | -- | 650 | -- | -- |
| OSI Malaysia and | 1998 | 124,936 | 50,000 | -- | -- | 2,500 | -- | -- |
| OSI Singapore | | | | | | | | |

</TABLE>

---

(1) The Company paid aggregate insurance premiums of approximately $38,000 for three universal life insurance policies of Mr. Chopra in each of 2000, 1999, and 1998. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) Consists of gain on exercise of non-qualified stock options.

(3) This table does not include options granted by OSI Medical, Inc., of which the Company is a majority stockholder. As compensation for services as a director of that company, on February 1, 1999, OSI Medical, Inc. granted to this person 7,500 10-year options to purchase common stock of OSI Medical, Inc. at a price of $1.35 per share, and on January 28, 2000, granted an additional 7,500 options at an exercise price of $1.50 per share. These options vest in five equal installments on the first through the fifth anniversaries of the grant date, conditioned upon continued service to the company. In the event of termination of such service, the options expire 90 days thereafter. 1,500 options vested on February 1, 2000. There presently exists no public market for the stock of OSI Medical, Inc.

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation

Committee. The Compensation Committee increased Mr.

<PAGE>

Chopra's annual base salary to $500,000 effective April 1, 1998 and to $600,000 effective April 15, 2000. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time. Mr. Chopra's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

The Company entered into a three-year employment agreement with Ajay Mehra, which became effective on April 1, 1997. The employment agreement provided for a base salary of $200,000 per year, with annual raises to be determined by management. The Compensation Committee increased Mr. Mehra's annual base salary to $230,000 effective April 1, 1998. Pursuant to this employment agreement, Mr. Mehra was also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contained confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment. On September 1, 2000, the Company entered into a new three-year employment agreement with Mr. Mehra. This agreement provides for a base salary of $260,000, and is otherwise similar to the prior agreement.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's annual salary initially was $140,000, which was increased to $165,000 effective April 16, 1998 and to $175,000 on September 1, 1999. Pursuant to an incentive compensation agreement entered into in December 1996, for the 1997, 1998 and 1999 fiscal years Mr. Kotowski was entitled to receive as additional incentive compensation amounts equal to 10% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan U.K. in excess of certain pre-determined amounts, up to maximum compensation of $150,000 for any fiscal year. This agreement expired at the end of fiscal year 1999.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's initial annual salary was $125,000. Effective July 1, 1998, his salary was increased to $137,500, and effective July 1, 2000 it was increased to $160,000. During fiscal 1999, Mr. Hickman received a bonus payment of $50,000, which amount was his bonus for fiscal 1998. In addition to his salary, the Company paid certain expenses related to his service in Singapore. Mr. Hickman has been temporarily transferred from Malaysia to the U.K. as of February 1, 2000. In connection with such transfer, he was allowed a relocation allowance of up to approximately $13,000. During his posting in the U.K., the Company is also paying him a cost-of-living allowance of approximately $45,000 per year and providing him with a leased automobile at a cost of approximately $9,200 per year. Mr. Hickman's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

As part of a cost savings program, Messrs. Chopra, Mehra and Kotowski took a voluntary 10% pay cut for the fourth quarter of fiscal 1999. Additionally, during fiscal 1999, Messrs. Chopra, Mehra, Kotowski and Hickman took voluntary pay cuts for which the Company granted to them options to purchase 5,200, 2,400,

1,700 and 550 shares, respectively, of the Company's Common Stock, at an exercise price of $7.00 per share.

Management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

6

<PAGE>

Certain Relationships and Related Transactions

On December 23, 1997, the Board of Directors authorized the Company to loan to Deepak Chopra and Ajay Mehra the sum of $90,000 and $70,000 respectively, at an interest rate of six percent per annum, to be repaid within 48 months of such date. Of these amounts, Mr. Chopra has repaid $22,500 and Mr. Mehra has repaid $35,000.

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The remaining 49.0% interest in ECIL Rapiscan is owned by Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

The Company contracts for a portion of its automobile rental and daily messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $90,000 for such services during fiscal 2000. The Company contracts for printing services from a business owned by Madan G. Syal, a Director of the Company. The Company paid the business approximately $46,000 for such services during fiscal 2000. The Company contracts for professional services from a firm of which Steven C. Good, a Director of the Company, is a part owner. The Company paid the firm approximately $9,000 for such services during fiscal 2000.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

Option Grants

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2000:

OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| Potential Realizable Value of Assumed Annual Rates of Stock Price | Number of Securities | % of Total Options Granted to |
|---|---|---|

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1230 of 2711

| Name | Underlying Options Granted(#) | Employees in Fiscal Year (%) | Exercise Price ($/Share) | Expiration Date | Appreciation for Option Term (1) 5%($) | 10%($) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra | 50,000 (2) | 13.7 | 7.70 | 4/23/05 | 106,368 | 235,046 |
| Ajay Mehra | 5,000 (2) | 1.4 | 7.00 | 8/2/04 | 9,670 | 21,368 |
| | 20,000 | 5.5 | 8.62 | 2/6/05 | 47,630 | 105,252 |
| Andreas F. Kotowski | 5,000 | 1.4 | 7.00 | 8/2/04 | 9,670 | 21,368 |
| | 3,500 | 1.0 | 8.62 | 2/6/05 | 8,335 | 18,419 |
| Thomas K. Hickman | 5,000 | 1.4 | 7.00 | 8/2/04 | 9,670 | 21,368 |
| | 10,000 | 2.7 | 8.62 | 2/6/05 | 23,815 | 52,626 |

</TABLE>

(1) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and

<PAGE>

10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission and do not represent the Company's estimate or projection of future Common Stock prices.

(2) This table does not include options granted by OSI Medical, Inc., of which the Company is a majority stockholder. As compensation for services as a director of that company, on February 1, 1999, OSI Medical, Inc. granted to this person 7,500 10-year options to purchase common stock of OSI Medical, Inc. at a price of $1.35 per share, and on January 28, 2000, granted an additional 7,500 options at an exercise price of $1.50 per share. These options vest in five equal installments on the first through the fifth anniversaries of the grant date, conditioned upon continued service to the company. In the event of termination of such service, the options expire 90 days thereafter. 1,500 options vested on February 1, 2000. There presently exists no public market for the stock of OSI Medical, Inc.

All of these options vest in three annual installments, beginning on the first anniversary of the date of grant, 25% each at the end of the first and second years , 25% at the end of the second year, and 50% at the end of the third year.

Option Exercises and Fiscal Year-End Values

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2000 and held

by them on June 30, 2000.

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

| Name | Shares Acquired On Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($) (1) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra (2) | 0 | -- | 53,800 | 71,400 | 1,261 | 3,782 |
| Ajay Mehra (2) | 0 | -- | 35,913 | 45,237 | 3,007 | 9,021 |
| Andreas F. Kotowski | 0 | -- | 47,572 | 24,657 | 38,937 | 1,231 |
| Thomas K. Hickman | 5,250 | 31,343 | 24,944 | 18,331 | 135,221 | 472 |

______________

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $7.97 per share).

(2) This table does not include options granted by OSI Medical, Inc., of which the Company is a majority stockholder. As compensation for services as a director of that company, on February 1, 1999, OSI Medical, Inc. granted to this person 7,500 10-year options to purchase common stock of OSI Medical, Inc. at a price of $1.35 per share, and on January 28, 2000, granted an additional 7,500 options at an exercise price of $1.50 per share. These options vest in five equal installments on the first through the fifth anniversaries of the grant date, conditioned upon continued service to the company. In the event of termination of such service, the options expire 90 days thereafter. 1,500 options vested on February 1, 2000. There presently exists no public market for the stock of OSI Medical, Inc.

Stock Option Plans

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's

Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are nontransferable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2000,

<PAGE>

726,735 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 291,451 shares were outstanding under the 1987 Plan at exercise prices ranging from $2.00 to $11.10 per share, and no shares remained available for grant, since the 1987 Plan expired on December 31, 1998. As of such date, stock options to purchase 172,613 shares of Common Stock were exercisable.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's stockholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. Proposal # 2 described in this Proxy Statement provides for an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2000, stock options to purchase 8,000 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 761,311 shares were outstanding under the 1997 Plan at exercise prices ranging from $6.56 to $13.50 per share, and stock options to purchase 80,689 shares remained available for grant. As of such date, stock options to purchase 272,827 shares were exercisable. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During fiscal 2000, the Board of Directors of the Company granted options

to purchase an aggregate of 365,750 shares of Common Stock available for issuance under the 1997 Plan to certain officers and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. The options generally will be subject to vesting and will become exercisable in equal installments over a period of four years from the first anniversary of the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

<PAGE>

Employee Stock Purchase Plan

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's stockholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase through regular payroll deductions up to an aggregate of 200,000 shares of Common Stock. The 1998 Plan is administered by the Board of Directors, or a committee of the Board. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

Employee Benefit Plan, Pension Plans

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to

the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($10,500 in calendar 1999) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. As of June 30, 2000, no matching contributions had been made, but subsequent to that date the Company is providing discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan U.K. and Advanced Micro Electronics AS, subsidiaries of the Company, each has a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

Report of Compensation Committee on Executive Compensation

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers.

<PAGE>

The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

Compensation Philosophy. The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its stockholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and stockholder value .

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers.  The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's stockholders.

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the statute exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

Compensation Program Components. The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

Base Salary. Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

<PAGE>

Annual Bonus. Management of the Company allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

Long-Term Incentive Compensation. The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

Chief Executive Officer's Compensation. The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra's annual base salary to $500,000 effective April 1, 1998 and to $600,000 effective April 15, 2000. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees.

Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

Summary. The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's stockholders, by attracting and retaining the best qualified people as senior management and enhancing corporate performance. Furthermore, the Compensation Committee believes that executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

Performance Graph

The graph below compares the Company's cumulative total stockholder return since the Company's Common Stock became publicly traded on October 2, 1997, with the Nasdaq Market Index and with a peer group comprised of companies with which the Company generally competes.

The peer group is comprised of the following companies: Barringer Technologies, Inc. (Nasdaq Symbol: BARR); PerkinElmer, Inc. (NYSE Symbol: PKI), which was previously known as "EG&G"; and InVision Technologies, Inc. (Nasdaq Symbol: INVN). The Company previously included Optek Technology, Inc. (Nasdaq Symbol: OPTT) and Vivid Technologies, Inc. (Nasdaq Symbol: VVID) in its peer group. Optek Technology, Inc. was acquired by a wholly-owned subsidiary of the Dyson-Kissner-Moran Corporation in June 1999, and Vivid Technologies, Inc. was acquired by PerkinElmer, Inc. in January 2000; accordingly, Optek Technology, Inc. and Vivid Technologies, Inc. are not included in the peer group.

The graph assumes that $100.00 was invested on October 2, 1997 in the Company's Common Stock, at the closing price of $15.13 per share (on which date the initial public offering price was $13.50 per share), and in each of the indexes mentioned above, and that all dividends were reinvested.

12

<PAGE>

COMPARISON OF CUMULATIVE TOTAL RETURN
AMONG OSI SYSTEMS, INC.,
NASDAQ MARKET INDEX AND PEER GROUP INDEX

[GRAPH APPEARS HERE]

ASSUMES $100 INVESTED ON OCT. 2, 1997
ASSUMES DIVIDEND REINVESTED
FISCAL YEAR ENDING JUNE 30, 2000

COMPARISON OF CUMULATIVE TOTAL RETURN AMONG
OSI SYSTEMS, INC., NASDAQ MARKET INDEX AND PEER GROUP INDEX

<TABLE>

| | 10/02/97 | 12/31/97 | 3/31/98 | 6/30/98 | 9/30/98 | 12/31/98 | 3/31/99 | 6/30/99 |
|---|---|---|---|---|---|---|---|---|
| OSI Systems, Inc.............. | 100.00 | 80.99 | 76.86 | 66.12 | 50.41 | 57.02 | 34.30 | 33.06 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nasdaq Market Index.......... | 100.00 | [illegible]3.70 | 1[illegible]9.[illegible]1 | 112.[illegible]5 | [illegible]01.53 | 131.98 | 147.45 | 160.45 |
| Peer Group.................... | 100.00 | 95.86 | 129.60 | 130.89 | 99.40 | 121.51 | 114.39 | 152.05 |

| | 9/30/99 | 12/31/99 | 3/31/00 | 6/30/00 |
|---|---|---|---|---|
| OSI Systems, Inc.............. | 24.79 | 36.36 | 97.52 | 52.69 |
| Nasdaq Market Index........... | 163.06 | 240.83 | 274.02 | 235.68 |
| Peer Group.................... | 167.09 | 176.63 | 280.16 | 277.31 |

</TABLE>

Security Ownership of Certain Beneficial Owners and Management

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2000 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

<TABLE>
<CAPTION>

| Name of Beneficial Owner (1) | Amount and Nature of Beneficial Ownership of Common Stock (2) | Percent of Class of Common Stock |
|---|---|---|
| <S> | <C> | <C> |
| Deepak Chopra (3)............ | 1,367,761 | 14.6% |
| Scope Industries (4)......... | 1,029,680 | 11.0% |
| Sally F. Chamberlain (5)..... | 965,853 | 10.3% |
| Brinson Partners, Inc. (6)... | 877,400 | 9.4% |
| Wellington Management Company, LLP (7)... | 633,000 | 6.8% |

</TABLE>

---

<PAGE>

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2000, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July

17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 792,434 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 53,800 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) The address of Scope Industries, Inc. is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal stockholder of Scope Industries.

(5) Based solely upon a review of filings made by such stockholder pursuant to Section 16(a) of the Exchange Act. Such shares are held by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991. The address of Mrs. Chamberlain is c/o Hecht, Solberg, Robinson & Goldberg, LLP, 600 West Broadway, 8th Floor, San Diego, California 92101.

(6) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Brinson Partners, Inc., whose address was reported as 209 LaSalle, Chicago, Illinois 60604.

(7) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Wellington Management Company, LLP, whose address was reported as 75 State Street, Boston, MA 02109.

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2000 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

<TABLE>
<CAPTION>

| Name of Beneficial Owner (1) | Amount and Nature of Beneficial Ownership of Common Stock (2) | Percent of Class of Common Stock |
|---|---|---|
| <S> | <C> | <C> |
| Deepak Chopra (3)........................................................................ | 1,367,761 | 14.6% |
| Ajay Mehra (4)........................................................................... | 173,127 | 1.8% |
| Andreas F. Kotowski (5).................................................................. | 138,611 | 1.5% |
| Thomas K. Hickman (6).................................................................... | 40,181 | * |
| Steven C. Good (7)....................................................................... | 11,875 | * |
| Meyer Luskin (8)......................................................................... | 68,072 | * |
| Madan G. Syal (9)........................................................................ | 91,929 | 1.0% |
| All directors and executive officers as a group (7 persons) (3)(4)(5)(6)(7)(8)(9).... | 1,891,556 | 19.8% |

</TABLE>

   * Less than 1.0%.

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2000, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 792,434 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 53,800 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

<PAGE>

(4) Includes 37,163 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and a Director of the Company.

(5) Includes 48,822 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Kotowski is the President of U.S. Operations of Rapiscan U.S.A.

(6) Includes 26,194 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Hickman is the Managing Director of OSI Singapore and OSI Malaysia.

(7) Includes 6,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Does not include 25,000 shares owned for Mr. Good's benefit by the Good Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, California 90025.

(8) Includes 6,742 shares held by the Meyer and Doreen Luskin Family Trust. Includes 17,500 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Does not include 1,029,680 shares beneficially owned by Scope Industries, Inc. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal stockholder of Scope Industries, Inc. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(9) Includes 85,679 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Includes 6,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2000. Mr. Syal is a Director of the Company.

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. Such officers, directors and stockholders are required by Securities and Exchange Commission regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2000, and written representations from certain reporting persons, the Company believes that all filing requirements applicable to the Company's executive officers, directors and more than 10% stockholders have been complied with, except that Mr. Good made one late filing with respect to two transactions.

RATIFICATION OF AMENDMENT OF 1997 STOCK OPTION PLAN
(Item 2 of the Proxy Card)

The Company's 1997 Stock Option Plan (the "1997 Plan") is described above in Stock Option Plans. The Board of Directors has voted to amend the 1997 Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 850,000 to 1,850,000. No other change in the plan is presently proposed. As of September 30, 2000, options to purchase 8,000 shares were exercised under the 1997 Plan and options to purchase 811,311 shares were outstanding under the 1997 Plan, leaving options to purchase only 30,689 shares of Common Stock authorized for issuance under the 1997 Plan. The Board of Directors believes that the proposed increase in the number of shares of Common Stock available for issuance as provided in the 1997 Plan will provide the Compensation Committee with greater flexibility in the administration of the Incentive Plan and is appropriate in light of the growth of the Company and the addition of new employees who will be subject to the Incentive Plan. The increase in the number of shares for which options may be issued under the 1997 Plan would represent approximately 10.7% of the issued and outstanding shares of Common Stock of the Company as of September 30, 2000.

The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the amendment of the Company's 1997 Stock Option Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 850,000 to 1,850,000. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.

15

<PAGE>

RATIFICATION OF SELECTION OF INDEPENDENT ACCOUNTANTS
(Item 3 of the Proxy Card)

The Board of Directors has selected Deloitte & Touche L.L.P. ("Deloitte & Touche") as the Company's independent accountants for the fiscal year ending June 30, 2000, and has further directed that management submit the selection of independent accountants for ratification by the stockholders at the Annual Meeting. Deloitte & Touche has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte & Touche is not expected to be present at the Annual Meeting.

In the event the stockholders fail to ratify the selection of Deloitte & Touche, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1241 of 2711

independent accounting firm at any time during the year if they determine that such a change would be in the best interests of the Company and its stockholders.

The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 3 on the Proxy) to ratify the selection of the independent accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.

OTHER BUSINESS

The Company does not know of any other business to be presented to the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

STOCKHOLDER PROPOSALS

Any proposals of security holders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 15, 2001, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the Securities and Exchange Commission is available upon written request and without charge to stockholders by writing to Ajay Mehra, Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

By Order of the Board of Directors

/s/ Ajay Mehra

Ajay Mehra
Secretary

Hawthorne, California
October 16, 2000

--------------------------------------------------------------------------------

PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.

--------------------------------------------------------------------------------

<PAGE>

PROXY OSI SYSTEMS, INC. PROXY

12525 Chadron Avenue, Hawthorne, CA 90250

This Proxy is Solicited on Behalf of the Board of Directors

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Stockholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as

of the close of business on October 10, 2000, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Stockholders of the Company to be held on November 16, 2000, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2001 Annual Meeting of Stockholders or until their respective successors are elected and qualified:

[_] FOR ALL [_] WITHHOLD AUTHORITY FOR ALL

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal

To withhold authority to vote for any individual nominee, write the nominee's name in the space provided below:

-----------------------------------------------------------------------------

2. To ratify an amendment to the OSI Systems, Inc. 1997 Stock Option Plan to increase the number of shares of the Company's common stock for which options may be granted under the plan from 850,000 shares to 1,850,000 shares

[_] FOR [_] AGAINST [_] ABSTAIN

3. To ratify the Board of Director's selection of Deloitte & Touche LLP to serve as the Company's independent accountants for the fiscal year ending June 30, 2001.

[_] FOR [_] AGAINST [_] ABSTAIN

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

(PLEASE DATE AND SIGN ON REVERSE SIDE)

<PAGE>

This Proxy, when properly executed, will be voted in the manner directed herein. This Proxy will be voted FOR the election of the directors listed and FOR the other proposals if no specification is made.

Please sign exactly as your name(s) is (are) shown on the stock certificate to which the Proxy applies. When shares are held by joint tenants, both should sign. When signing as an attorney, executor, administrator, trustee or guardian, please give full title, as such. If a corporation, please sign in full corporate name by the President or other authorized officer. If a partnership, please sign in the partnership's name by an authorized person.

Dated: _____, 2000

------------------
Signature

------------------
Signature if held jointly

Please mark, sign, date and return the proxy card promptly using the enclosed envelope.

</TEXT> 
</DOCUMENT>

# Exhibit 5

<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>FORM 10-Q
<TEXT>

<PAGE>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON DC 20549

---

FORM 10-Q

(Mark one)

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended December 31, 2000

OR

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from ____ to ____

Commission File Number 0-23125

---

OSI SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

| California | 33-0238801 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

12525 Chadron Avenue
Hawthorne, California 90250
(Address of principal executive offices)

Registrant's telephone number, including area code: (310) 978-0516

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past ninety days.

YES X No _____

As of February 10, 2001 there were 9,083,468 shares of common stock outstanding.

<PAGE>

OSI SYSTEMS, INC.

INDEX

PART I - FINANCIAL INFORMATION PAGE NUMBER

               Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1246 of 2711

Item 1 - Consolidated Financial Statements

Consolidated Balance Sheets at December 31, 2000 and June 30, 2000 — 3

Consolidated Statements of Operations for the three and six months ended December 31, 2000 and December 31, 1999 — 4

Consolidated Statements of Cash Flows for the six months ended December 31, 2000 and December 31, 1999 — 5

Notes to Consolidated Financial Statements (Unaudited) — 6

Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations — 11

PART II - OTHER INFORMATION

Item 4 - Submission of Matters to a Vote of Security Holders — 15

Item 6 - Exhibits and Reports on Form 8-K — 15

Signatures — 16

<PAGE>

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
(in thousands, except share amounts)

<TABLE>
<CAPTION>

| | December 31, 2000 | June 30, 2000 |
|---|---|---|
| ASSETS | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 8,329 | $ 10,892 |
| Accounts receivable, net of allowance for doubtful accounts of $881 and $855 at December 31, 2000 and June 30, 2000, respectively | 31,766 | 29,890 |
| Other receivables | 1,917 | 2,184 |
| Inventory | 35,025 | 30,920 |
| Prepaid expenses | 1,292 | 821 |
| Deferred income taxes | 1,941 | 1,807 |

| | | |
|---|---|---|
| Income taxes receivable | 206 | 193 |
| | ------------- | -------------- |
| Total current assets | 80,476 | 76,707 |
| Property and Equipment, Net | 14,348 | 14,248 |
| Intangible and Other Assets, Net | 9,676 | 9,052 |
| Deferred income taxes | 3,016 | 3,016 |
| | ------------- | -------------- |
| Total | $ 107,516 | $ 103,023 |
| | ============== | ============== |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | | |
|---|---|---|
| Current Liabilities: | | |
| Bank lines of credit | $ 9,548 | $ 6,079 |
| Current portion of long-term debt | 4,026 | 2,641 |
| Accounts payable | 13,146 | 12,728 |
| Accrued payroll and related expenses | 2,210 | 2,270 |
| Income taxes payable | 2,925 | 1,586 |
| Advances from customers | 1,241 | 558 |
| Accrued warranties | 1,672 | 1,805 |
| Other accrued expenses and current liabilities | 3,392 | 3,141 |
| | ------------- | -------------- |
| Total current liabilities | 38,160 | 30,808 |
| Long-Term Debt | 6,548 | 7,698 |
| Deferred Income Taxes | 162 | 164 |
| Minority interest | 146 | |
| | ------------- | -------------- |
| Total liabilities | 44,870 | 38,816 |
| Shareholders' Equity | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December 31, 2000 and June 30, 2000, respectively | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding 9,078,428 and 9,349,750 shares at December 31, 2000 and June 30, 2000, respectively | 46,046 | 47,357 |
| Retained earnings | 18,635 | 18,787 |

| | | |
|---|---|---|
| Accumulated other comprehensive loss | (2,035) | (1,937) |
| Total shareholders' equity | 62,646 | 64,207 |
| Total | $ 107,516 | $ 103,023 |

</TABLE>

See accompanying notes to consolidated financial statements

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> |
| Revenues | $ 27,996 | $ 26,507 | $ 52,880 | $ 51,462 |
| Cost of goods sold | 20,046 | 19,441 | 37,987 | 37,200 |
| Gross profit | 7,950 | 7,066 | 14,893 | 14,262 |
| Operating expenses: | | | | |
| Selling, general and administrative | 5,583 | 5,055 | 11,200 | 10,238 |
| Research and development | 1,502 | 1,872 | 3,217 | 3,509 |
| Goodwill amortization | 129 | 137 | 257 | 264 |
| Restrcuturing costs | | | | 1,898 |
| Total operating expenses | 7,214 | 7,064 | 14,674 | 15,909 |
| Income (loss) from operations | 736 | 2 | 219 | (1,647) |
| Interest expense, net | 285 | 176 | 589 | 299 |

```
Gain on sale of marketable securities
(309)                                (309)
                                                                          -----------    --------
--          ----------     ----------
Income (loss) before provision for income taxes and minority interest         451
135                (370)        (1,637)
Provision (benefit) for income taxes                                          100
78                 (70)          (313)
                                                                          -----------    --------
--          ----------     ----------
Income (loss) before minority interest in net loss of subsidiary              351
57                (300)        (1,324)
Minority interest in net loss of subsidiary
98                 146             98
                                                                          -----------    --------
--          ----------     ----------
Net income (loss)                                                         $       351    $
155               ($154)       ($1,226)
                                                                          ===========
==========          ==========     ==========
Earnings (loss) per common share                                          $      0.04    $
0.02              ($0.02)        ($0.13)
                                                                          ===========
==========          ==========     ==========
Earnings (loss) per common share,assuming dilution                        $      0.04    $
0.02              ($0.02)        ($0.13)
                                                                          ===========
==========          ==========     ==========
 Weighted average shares outstanding -assuming dilution                     9,311,229
9,393,548           9,310,199      9,421,195
                                                                          ===========
==========          ==========     ==========
</TABLE>
```

See accompanying notes to consolidated financial statements

-4-

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)

```
<TABLE>
<CAPTION>

Six months ended December 31,
                                                                                           -----
-------------------------------------

2000                        1999
                                                                                           -----
------------           -------------
<S>                                                                                        <C>
<C>
Cash flows from operating activities:
          Net loss
($154)                  ($1,226)
          Adjustments to reconcile net loss to net cash used in operating
           activities:
                   Depreciation and amortization
2,167                     2,057
                   Loss on sale of property and equipment
134
```

| | | |
|---|---|---|
| Deferred income taxes | (244) | (17) |
| Gain on sale of marketable securities available for sale | (309) | |
| Minority interest in net loss of subsidiary | (146) | (98) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,159) | (2,745) |
| Other receivables | 286 | (571) |
| Inventory | (4,636) | (2,928) |
| Prepaid expenses | (477) | (83) |
| Accounts payable | 617 | 1,298 |
| Accrued payroll and related expenses | (37) | (388) |
| Income taxes payable | 1,375 | 567 |
| Prepaid income taxes receivable | 17 | 238 |
| Advances from customers | 689 | (239) |
| Accrued warranty | (130) | (82) |
| Other accrued expenses and current liabilities | 335 | 617 |
| Net cash used in operating activities | (2,363) | (3,909) |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (1,714) | (1,628) |
| Proceeds from sale of property and equipment | 16 | |
| Proceeds from sale of marketable securities available for sale | 2,505 | |
| (Increase) decrease in equity investments | (117) | 95 |
| Cash paid for business acquisitions, net of cash acquired | (442) | (1,342) |
| Other assets | (361) | 12 |
| Net cash used in investing activities | (2,618) | (358) |
| Cash flows from financing activities: | | |
| Net proceeds (payment to) from bank lines of credits | 3,478 | (4,575) |
| Net proceeds on long-term debt | 239 | 11,410 |
| Proceeds from exercise of stock options and warrants | 36 | 26 |
| Purchase of treasury stock | (1,347) | (1,820) |

| | | |
|---|---|---|
| Net cash provided by financing activities | 2,406 | 5,041 |
| Effect of exchange rate changes on cash | 12 | 106 |
| Net (decrease) increase in cash and cash equivalents | (2,563) | 880 |
| Cash and cash equivalents, beginning of period | 10,892 | 7,241 |
| Cash and cash equivalents, end of period | $8,329 | $8,121 |
| Supplemental disclosures of cash flow information - Cash paid/(received) during the period for: | | |
| Interest | $472 | $255 |
| Income taxes | ($1,243) | ($989) |

</TABLE>

See accompanying notes to consolidated financial statements

-5-

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General. OSI Systems, Inc. and its subsidiaries (collectively, the "Company") is a vertically integrated worldwide provider of devices, subsystems and end-products based on optoelectronic and silicon pressure-sensor micro-structure technology. The Company designs and manufactures optoelectronic and silicon pressure-sensor devices and value-added subsystems for original equipment manufacturers in a broad range of applications, including security, medical diagnostics, telecommunications, gigabit ethernet and fiber optics, gaming, office automation, aerospace, computer peripherals and industrial automation. In addition, the Company utilizes its optoelectronic technology and design capabilities to manufacture security and inspection products that it markets worldwide to end users under the "Rapiscan", "Secure" and "Metor" brand names. These products are used to inspect people, baggage, cargo and other objects for weapons, explosives, drugs and other contraband. The Company also manufactures and sells bone densitomers, which are used to provide bone loss measurements in the diagnosis of osteoporosis.

Consolidation. The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The consolidated balance sheet as of December 31, 2000, the consolidated statements

of operations for the three month and six month periods ended December 31, 2000 and 1999 and the consolidated statements of cash flows for the six month periods ended December 31, 2000 and 1999 have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "Commission"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. However, in the opinion of management all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes for the fiscal year ended June 30, 2000 included in the Company's Annual Report on Form 10K as filed with the Commission on September 27, 2000. The results of operations for the six months ended December 31, 2000 are not necessarily indicative of the results to be expected for the fiscal year ending June 30, 2001.

-6-

<PAGE>

Recent Developments - In August 2000, the Company acquired substantially all the assets of Square One Technology for total consideration consisting of: $228,000 in cash, a $30,000 advance for future royalties, the return of the Square One stock held by the Company with a carrying value of $259,000, and an agreement to pay royalties equal to ten percent of net sales of the Square One products in the next five years, up to a maximum of one million dollars. The cash consideration of $228,000 approximates the fair value of the tangible assets acquired. Additional consideration, if any, will be recorded as intangible assets, and will be amortized over a period of twenty years.

In September 2000, the Company acquired an additional equity interest, representing approximately 10% of the ownership of OSI Medical Inc., for $183,000. This amount was recorded as goodwill based on the estimated fair value of the underlying net assets and is being amortized over a period of twenty years. With this additional equity investment, the Company increased its common stock ownership in OSI Medical Inc. to approximately 64%.

New Accounting Pronouncements - In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin 101, Revenue Recognition In Financial Statements ("SAB 101"). SAB 101 provides guidance on applying generally accepted accounting principles to revenue recognition in financial statements. The Company will adopt SAB 101 as required in the fourth quarter of fiscal 2001. The Company is currently evaluating the impact of adopting SAB 101, and does not expect it to have a material impact on the Company's financial position or result of operations.

Effective July 1, 2000, the Company adopted FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities ("FAS 133"). FAS 133 requires that all derivative financial instruments, such as foreign exchange contracts, be recognized in the financial statements and measured at fair value regardless of the purpose or intent for holding them. Changes in the fair value of derivative financial instruments are either recognized periodically in income or shareholders' equity (as a component of comprehensive income), depending on whether the derivative is being used to hedge changes in fair value or cash flows. The adoption of FAS 133 did not have a material effect on the Company's financial position or result of operations for the quarter and six months ended December 31, 2000.

Financial Instruments - The Company enters into forward foreign exchange contracts principally to hedge currency fluctuation in transactions denominated in foreign currencies, thereby limiting the Company's risk that would otherwise result from changes in exchange rates. The periods of the forward foreign exchange contracts correspond to the periods of the hedged transactions. The Company does not use the contracts for trading purposes. As of December 31,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1253 of 2711

2000, the total notional amount of all outstanding foreign currency contracts was $1.5 million. The estimated fair value of foreign currency contracts was not material.

-7-

<PAGE>

Inventory. Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method. Inventory at December 31, 2000 and June 30, 2000 consisted of the following (in thousands):

| | December 31, 2000 | June 30, 2000 |
|---|---|---|
| Raw Materials.................................. | $18,463 | $16,877 |
| Work-in-process................................ | 6,977 | 6,619 |
| Finished goods................................. | 9,585 | 7,424 |
| | ------- | ------- |
| Total.......................................... | $35,025 | $30,920 |
| | ======= | ======= |

Earnings Per Share. Earnings per common share is computed using the weighted average number of shares outstanding during the period. Earnings per common share-assuming dilution, is computed using the weighted average number of shares outstanding during the period and dilutive common stock equivalents from the Company's stock option plans.

The following table reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share-assuming dilution.

-8-

<PAGE>

<TABLE>
<CAPTION>

| | For the Quarter ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | | 1999 | | |
| | Income (Numerator) | Shares (Denominator) | Per-Share Amount | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Earnings per common share | | | | | | |
| Income available to common stockholders | $351,000 | 9,265,095 | $0.04 | $155,000 | 9,320,695 | $0.02 |
| | | | ===== | | | ===== |
| Effect of Dilutive Securities | | | | | | |
| Options, treasury stock method | | 46,134 | | | 72,853 | |
| | ---------------------- | | | ---------------------- | | |
| Earnings per common share assuming dilution | | | | | | |

Income available to common
stockholder, assuming dilution $351,000 9,311,229 $0.04
$155,000 9,393,548 $0.02
==================================
==================================

<CAPTION>
For the six months
ended December 31,
-------------------------------
-----------------------

2000
1999
-------------
-----------

Loss Shares Per-Share
Loss Shares Per-Share
(Numerator) (Denominator) Amount
(Numerator) (Denominator) Amount

<S> <C> <C> <C>
<C> <C> <C>
Earnings per common share
Loss to common stockholders ($154,000) 9,310,199 ($0.02)
($1,226,000) 9,421,195 ($0.13)
======
======

Effect of Dilutive Securities
Options, treasury stock method
---------------------- --
---------------------
Earnings per common share assuming dilution
Loss to common stockholders,
assuming dilution ($154,000) 9,310,199 ($0.02)
($1,226,000) 9,421,195 ($0.13)
===================================
==================================
</TABLE>

Comprehensive Income - Comprehensive income is computed as follows (in thousands):

<TABLE>
<CAPTION>
For the
quarter For the six months
ended
December 31, ended December 31,
2000
1999 2000 1999
-------------------
-------- ---------------------
<S> <C>
<C> <C> <C>
Net income (loss) $351
$155 ($154) ($1,226)
-------------------
------- --------------------
Other comprehensive income (loss), net of taxes:
Foreign currency translation adjustments 484
(431) (98) 63
Unrealized gains on marketable securities available for sale

427 486

| | | | | |
|---|---|---|---|---|
| Other comprehensive income (loss) | 484 | (4) | (98) | 549 |
| Comprehensive income (loss) | $835 | $151 | ($252) | ($677) |

</TABLE>

<PAGE>

Segment information. The company's operating locations include the North America (United States and Canada), Europe(United Kingdom, Denmark, Finland and Norway) and Asia(Singapore and Malaysia). The company's operations by geographical areas are as follows (in thousands);

<TABLE>
<CAPTION>

| Three months ended December 31, 2000 | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues | $ 21,000 | $ 5,869 | $ 1,127 | | $ 27,996 |
| Transfer between geographical areas | $ 2,254 | $ 1,152 | $ 7,760 | $ (11,166) | |
| Net revenues | $ 23,254 | $ 7,021 | $ 8,887 | $ (11,166) | $ 27,996 |
| Income (loss) from operations | $ (709) | $ 249 | $ 989 | $ 207 | $ 736 |

| Six months ended December 31, 2000 | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues | $ 36,606 | $ 13,138 | $ 3,136 | | $ 52,880 |
| Transfer between geographical areas | $ 4,535 | $ 2,591 | $ 13,544 | $ (20,670) | |

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ 41,141 | $ 15,729 | $ 16,680 | $ (20,670) | $ 52,880 |
| Income (loss) from operations | $ (2,333) | $ 882 | $ 1,525 | $ 145 | $ 219 |

Three months ended December 31, 1999

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues | $ 14,798 | $ 9,166 | $ 2,543 | | $ 26,507 |
| Transfer between geographical areas | $ 15,004 | $ 1,199 | $ 5,264 | $ (21,467) | |
| Net revenues | $ 29,802 | $ 10,365 | $ 7,807 | $ (21,467) | $ 26,507 |
| Income (loss) from operations | $ (1,041) | $ 298 | $ 1,382 | $ (637) | $ 2 |

Six months ended December 31, 1999

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues | $ 30,282 | $ 17,233 | $ 3,947 | | $ 51,462 |
| Transfer between geographical areas | $ 17,018 | $ 2,169 | $ 10,646 | $ (29,833) | |
| Net revenues | $ 47,300 | $ 19,402 | $ 14,593 | $ (29,833) | $ 51,462 |
| Income (loss) from operations | $ (2,142) | $ (1,431) | $ 29,708 | $ (782) | $ (1,647) |

</TABLE>

<PAGE>

Item 2. Management's Discussion and Analysis of Financial Condition and

Statements in this report that are forward-looking are based on current expectations, and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties that could cause actual results to differ materially, including, but not limited to, the possibilities that the demand for the Company's products may decline as a result of possible changes in general and industry specific economic conditions and the effects of competitive pricing and such other risks and uncertainties as are described in this report on Form 10-Q and other documents previously filed or hereafter filed by the Company from time to time with the Securities and Exchange Commission.

Results of Operations

Revenues. Revenues consist of sales of optoelectronic and pressure sensor devices, medical imaging systems and security and inspection products. Revenues are recorded net of all inter-company transactions. Revenues increased by 5.6% to $28.0 million for the three months ended December 31, 2000, compared to $26.5 million for the comparable prior year period. For the six months ended December 31, 2000, revenues increased by 2.8% to $52.9 million from $51.5 million for the comparable prior year period. Revenues for the three months ended December 31, 2000 from optoelectronic devices, value added subsystems and medical imaging systems were $15.7 million, or approximately 56.1% of the Company's revenues, and revenues from security and inspection products were $12.3 million, or approximately 43.9% of the Company's revenues. Revenues for the six months ended December 31, 2000 from optoelectronic devices, value added subsystems and medical imaging systems were $29.2 million, or approximately 55.2%, of the Company's revenues from security and inspection products were $23.7 million, or approximately 44.8% of the Company's revenues. The increase in revenues from sales of optoelectronic devices, value added subsystems and medical imaging systems for the quarter and six months ended December 31, 2000 was primarily due to increased sales of fiber optics and silicon pressure sensors and was offset in part by decreased sales of the discontinued product line of data/video projector systems. The increase in revenues from sale of security and inspection products for the quarter and six months ended December 31, 2000 was primarily due to the shipment of a large domestic order.

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by 12.5% to $8.0 million for the three months ended December 31, 2000, compared to $7.1 million for the comparable prior year period. For the six months ended December 31, 2000, gross profit increased by 4.4% to $14.9 million, compared to $14.3 million for the comparable prior year period. As a percentage of revenues, gross profit increased in the quarter and six months to 28.4% and 28.2% this year, from 26.7% and 27.7% last year, respectively. The increase in gross profit was due to improved

<PAGE>

product mix and discontinuation of the data/video projector systems product line, which had lower gross margin.

Selling, General and Administrative. Selling, general and administrative expenses consisted primarily of compensation paid to sales, marketing and administrative personnel, and professional service fees and marketing expenses. For the three months ended December 31, 2000, such expenses increased 10.4% to $5.6 million, compared to $5.1 million for the comparable prior year period. For the six months ended December 31, 2000, such expenses increased by 9.4% to $11.2 million, compared to $10.2 million for the comparable prior year period. As a percentage of revenues, selling, general and administrative expenses increased in the quarter and six months to 19.9% and 21.2% this year, from 19.1% and 19.9% last year, respectively. The increase in expenses for the quarter and six months was primarily due to the increased legal and professional fees and increased administrative expenses.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2000, such expenses decreased 19.8% to $1.5 million, compared to $1.9 million for the comparable prior year period. For the six months ended December 31, 2000, such expenses decreased 8.3% to $3.2 million, compared to $3.5 million for the comparable prior year period. As a percentage of revenues, research and development expenses decreased in the three month and six month periods to 5.4% and 6.1% this year from 7.1% and 6.8% last year, respectively. The decrease in expenses for the quarter and six months ended December 31, 2000 was primarily due to deploying certain research and development personnel to the manufacturing of products, offset in part by increased research spending for medical and fiber optic products.

Restructuring Costs. In August 1999, the Company decided to close the operations of Osteometer in Denmark, and relocate certain of these operations to the Company's U.S. facilities. For the six months ended December 31, 1999, the Company recorded restructuring costs of $1.9 million related to the closure of the Osteometer facility in Denmark. These costs were associated primarily with the termination of certain employees, commitments and other facility closure costs. The Company has completed the closure of the Osteometer facility in Denmark and does not anticipate any future expenses.

Income (Loss) from Operations. For the three months ended December 31, 2000, the Company had income from operations of $736,000 compared to $2,000 for the three months ended December 31, 1999. For the six months ended December 31, 2000, the Company had income from operations of $219,000 compared to loss from operations of $1.6 million for the comparable prior year period. Excluding the non-recurring restructuring costs of $1.9 million in the six months ended December 31, 1999, income from operations for six months ended December 31, 1999 was $251,000. Income from operations for the three months ended December 31, 2000 increased due to increased gross margin, reduced research and development expenses and was offset in part by

<PAGE>

increased selling, general and administrative expenses.

Interest Expense. For the three months ended December 31, 2000, the Company incurred net interest expense of $285,000, compared to net interest expense of $176,000 for the three months ended December 31, 1999. For the six months ended December 31, 2000, the Company incurred net interest expense of $589,000, compared to net interest expense of $299,000 for the six months ended December 31, 1999. The increase in net interest expense for the three and six months ended December 31, 2000 was due to increased borrowing on the Company's lines of credit and a reduction in short term investments which were used for working capital and acquisitions.

Provision (Benefit) for Income Taxes. Provision for income taxes increased to $100,000 for the three months ended December 31, 2000, compared to $78,000 for the three months ended December 31, 1999. For the six months ended December 31, 2000, the Company had an income tax benefit of $70,000 compared to a income tax benefit of $313,000 for the six months ended December 31, 1999. The change in income tax was due to a mix in income from U.S. and foreign operations.

Net Income (Loss). For the reasons outlined above, the Company had net income of $351,000 and a net loss of $154,000 for the three and six months ended December 31, 2000, compared to net income of $155,000 and a net loss of $1.2 million for the three and six months ended December 31, 1999, respectively. The six months ended December 31, 1999 included non-recurring restructuring costs of $1.9 million ($1.5 million net of income taxes).

Liquidity and Capital Resources

The Company's operations used net cash of $2.4 million during the six months

ended December 31, 2000, the amount of net cash used by operations reflects increases in accounts receivable, inventory and prepaid expenses. Net cash used in operations was offset in part by an increase in accounts payable, income taxes payable, advances from customers, and other accrued expenses and current liabilities and reduction in other receivables. The increase in accounts receivable is mainly due to the increased sales, and the timing of shipments of certain large contracts. The increase in inventory is due to a change in product mix and a longer intercompany in transit time due to certain manufacturing being moved to Malaysia from the United States and the United Kingdom.

Net cash used in investing activities was $2.6 million and $358,000 for the six months ended December 31, 2000 and 1999, respectively. In the six month period ended December 31, 2000, net cash used in investing activities reflects cash used in business acquisitions and the purchase of property and equipment. In the six months ended December 31, 1999, the net cash used in investing activities reflects primarily cash used in business acquisitions and the purchase of property and equipment and was offset in part by proceeds received from the sale of marketable securities.

<PAGE>

Net cash provided by financing activities was $2.4 million and $5.0 million for the six months ended December 31, 2000 and 1999, respectively. During the six months ended December 31, 2000, net cash provided by financing activities resulted primarily from borrowings under the Company's working capital lines of credit and was offset in part by the purchase of the Company's common stock pursuant to its stock repurchase program.

In March 1999, the Company announced a stock repurchase program of up to 2,000,000 shares of its common stock. Through February 10, 2001, the Company repurchased 770,500 shares at an average price $4.68 per share. The stock repurchase program did not have a material effect on the Company's liquidity and is not expected to have a material effect on liquidity in subsequent quarters. The Company retired the repurchased shares. The shares are included as a deduction from issued and outstanding common shares in the accompanying financial statements.

The Company anticipates that current cash balances, anticipated cash flows from operations and current borrowing arrangements will be sufficient to meet its working capital and capital expenditure needs for the foreseeable future. The Company was in violation of a covenant for the three months ended December 31, 2000. The covenant was waived by the bank for the three months ended December 31, 2000 only. The Company is currently negotiating the renewal of loan facilities with its existing lender. These loan facilities were to expire in November 2000; however these facilities have been extended through February 28, 2001.

Foreign Currency Translation. The accounts of the Company's operations in Singapore, Malaysia, England, Norway, Denmark, Finland and Canada are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling, Norwegian kroner, Danish kroner, Finnish markka and Canadian dollars, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of accumulated other comprehensive income. Net transaction gain (loss) of approximately $79,000 and ($67,000) were included in the Company's results for the six months ended December 31, 2000 and 1999, respectively.

Inflation. The Company does not believe that inflation has had a material impact on its results of operations for the six months ended December 31, 2000.

<PAGE>

Item 4. Submission of Matters to a Vote of Security Holders

At the annual meeting of shareholders on November 16, 2000, the following actions were taken:

1. Election of Directors

| Name | For | Withheld |
|---|---|---|
| Deepak Chopra | 7,829,654 | 560,865 |
| Ajay Mehra | 7,829,654 | 560,865 |
| Steven C. Good | 7,829,654 | 560,865 |
| Meyer Luskin | 7,829,654 | 560,865 |
| Madan G. Syal | 7,829,654 | 560,865 |

2. Ratification of Deloitte & Touche L.L.P. as independent auditors for the year ending June 30, 2001.

| | |
|---|---|
| For | 3,881,972 |
| Against | 830,423 |
| Abstain | 40,387 |

3. Ratification to an amendment to the OSI Systems, Inc. 1997 Stock Option Plan.

| | |
|---|---|
| For | 3,881,972 |
| Against | 830,423 |
| Abstain | 40,387 |
| Broker non votes | 3,637,737 |

Item 6. Exhibits and Reports of Form 8-K

a. Exhibits

None

b. Reports on Form 8-K

None

<PAGE>

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 14th day of February 2001.

OSI Systems, Inc.

By: /s/ Deepak Chopra

Deepak Chopra
President and

Chief Executive Officer

By: /s/ Ajay Mehra
-----------------------
Ajay Mehra
Vice President and
Chief Financial Officer

</TEXT>
</DOCUMENT>

# Exhibit 6

<DOCUMENT>
<TYPE>DEF 14A
<SEQUENCE>1
<FILENAME>ddef14a.txt
<DESCRIPTION>DEFINITIVE PROXY STATEMENT
<TEXT>
<PAGE>

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

SCHEDULE 14A

(RULE 14A-101)

INFORMATION REQUIRED IN PROXY STATEMENT

SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a)
of the Securities Exchange Act of 1934

Filed by the Registrant |X|
Filed by a Party other than the Registrant |_|

Check the appropriate box:
|_| Preliminary Proxy Statement.
|X| Definitive Proxy Statement.
|_| Definitive Additional Materials.
|_| Soliciting Material under Rule 14a-12.

|_| Confidential, for use of the Commission only (as permitted by Rule 14a-6(e)(2).

OSI SYSTEMS, INC.
(Name of Registrant as Specified In Its Charter)

--------------------------------------------------------------------------------
(Name of Person(s) Filing Proxy Statement if Other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

|X| No fee required.
|_| Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:
(2) Aggregate number of securities to which transaction applies:
(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
(4) Proposed maximum aggregate value of transaction:
(5) Total fee paid:

|_| Fee paid previously with preliminary materials:

|_| Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.
(1) Amount Previously Paid:
(2) Form, Schedule or Registration Statement No.:
(3) Filing Party:
(4) Date Filed:

OSI SYSTEMS, INC.
12525 Chadron Avenue
Hawthorne, California 90250

October 16, 2001

To Our Stockholders:

You are cordially invited to attend the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc. (the "Company"), which will be held at 10:00 a.m., local time, on November 16, 2001, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of the Company's outstanding common stock as of the close of business on October 5, 2001, are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

/s/ Ajay Mehra
Secretary

<PAGE>

OSI SYSTEMS, INC.
12525 Chadron Avenue
Hawthorne, California 90250

NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
To Be Held November 16, 2001

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 16, 2001, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify the selection of Deloitte & Touche L.L.P. as the Company's independent accountants for the fiscal year ending June 30, 2002.

3. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on October 5, 2001, as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

/s/ Ajay Mehra
Secretary

Dated: October 16, 2001

================================================================================
PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.
================================================================================

<PAGE>

OSI SYSTEMS, INC.
12525 Chadron Avenue
Hawthorne, California 90250

PROXY STATEMENT

GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at the Annual Meeting of Stockholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on November 16, 2001, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company or by issuance of a subsequent proxy. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 5, 2001, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 8,483,109 shares of common stock, without par value ("Common Stock"). Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any stockholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each stockholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (i.e., six) multiplied by the number of shares which the stockholder is entitled to vote. Unless the proxy holders are otherwise instructed, stockholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes. Only stockholders of record at the close of business on October 5, 2001 are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management of the Company was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Shares represented by executed and unrevoked proxies will be voted in accordance with the instructions contained therein or in the absence of such

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1266 of 2711

instructions, in accordance with the recommendations of the Board of Directors. Neither abstentions nor broker non-votes will be counted for the purposes of determining whether any of the proposals has been approved by the stockholders of the Company, although they will be counted for purposes of determining the presence of a quorum.

The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock. A "plurality" means that the individuals who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of the other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting at the Meeting.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by telex or by telephone, by directors, officers and regular employees of the Company who will not be additionally

<PAGE>

compensated therefor. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 16, 2001 to all stockholders entitled to vote at the Annual Meeting.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

ELECTION OF DIRECTORS
(Item 1 of the Proxy Card)

The Company has a Board of Directors consisting of six members, having been increased from five as of June 14, 2001, by vote of the Board of Directors. At the same time, the Board of Directors elected Chand R. Viswanathan to fill the vacancy created by the increase in the number of directors, to serve until this Annual Meeting and until his successor is elected and qualified. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

Management shall nominate six directors. Management's nominees for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Stockholders in 2002, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although management knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as management may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, i.e., broker non-votes, will be counted as present for purposes of determining if a quorum is present.

The following are Management's nominees for election as directors at this meeting.

<TABLE>
<CAPTION>

Director

| Name | Age | Position | Since |
|---|---|---|---|

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Deepak Chopra.................. | 50 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Ajay Mehra..................... | 39 | Vice President, Chief Financial Officer, Secretary and Director; President of OSI Security Group | 1996 |
| Steven C. Good (1)(2).......... | 59 | Director | 1987 |
| Meyer Luskin (1)(2)............ | 75 | Director | 1990 |
| Madan G. Syal.................. | 75 | Director | 1987 |
| Chand R. Viswanathan (1)....... | 72 | Director | 2001 |

</TABLE>

(1) Member of Audit Committee
(2) Member of Compensation Committee

Deepak Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

<PAGE>

Ajay Mehra joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as President of the Company's Security Group, and as Vice President and Chief Financial Officer of the Company's major subsidiaries. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst, and a Master of Business Administration degree from Pepperdine University.

Steven C. Good has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on Nasdaq. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles.

Meyer Luskin has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and

Chairman of the Board of Scope Industries, a publicly held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, and Chromagen, Inc., a biotechnology company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

Madan G. Syal has served as a Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a Bachelor of Science degree from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University.

Chand R. Viswanathan has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California at Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chairman of the department from 1979 to 1985.

Executive Officers

Andreas F. Kotowski has served as Chief Technology Officer of the Company since October, 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan U.S.A."). From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc., a company that filed for bankruptcy in July of that year. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

<PAGE>

Thomas K. Hackman presently serves as Vice President of Operations of the Rapiscan group and Managing Director of Opto Sensors (Singapore) Pte Ltd. and Opto Sensors (Malaysia) Sdn. Bhd., subsidiaries of the Company. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors, Inc. ("UDT Sensors"), a subsidiary of the Company, and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a Bachelor of Arts degree from Stetson University and a Master of Business Administration degree from the University of San Francisco.

There are no arrangements or understandings known to the Company between

any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Deepak Chopra. Other than these relationships, there are no family relationships among the directors and executive officers of the Company.

The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present and voting at the Meeting.

Board of Directors Meetings and Committees of the Board of Directors

There were four meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on six additional occasions during the fiscal year ended June 30, 2001. The Board of Directors has established an Audit Committee and a Compensation Committee. The members of each committee are appointed by the majority vote of the Board of Directors. There is no nominating committee.

Audit Committee

The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. The Audit Committee consists of Messrs. Good, Luskin and Viswanathan. There were eignt meetings of the Audit Committee during the fiscal year ended June 30, 2001.

Compensation Committee

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee presently consists of Messrs. Good and Luskin. There were two meeting of the Compensation Committee during the fiscal year ended June 30, 2001. See Report of Compensation Committee on Executive Compensation.

<PAGE>

Director Compensation

Each non-employee Director receives a fee of $7,500 per year, $1,500 for each Board or Committee meeting attended, and options to purchase 5,000 shares of Common Stock at an exercise price equal to 110% of fair market value as of the date of grant. The Directors also are reimbursed for expenses incurred in connection with the performance of their services as Directors. These options vest in three equal installments on the first through the third anniversaries of the grant date, conditioned upon continued service as a director of the Company. As additional compensation for services as directors of the Company, on April

18, 2001, OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company, granted to each outside director, Messrs. Good, Syal and Luskin, 25,000 five-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the Company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

Compensation Committee Interlocks and Insider Participation

During the fiscal year ended June 30, 2001, Steven C. Good and Meyer Luskin served on the Compensation Committee.

The Company currently intends that any future transactions, if any, with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

Executive Compensation and Other Information

The following table sets forth the compensation for the Chief Executive Officer and each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2001 (the "Named Executive Officers"):

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| | | Annual Compensation | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary($) | Bonus($) | All Other Annual Compen-sation($) | Restricted Stock Awards(#) | Securities Underlying Options/ SARS(#) | LTIP Payouts($) | All Other Compen-sation($) |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Deepak Chopra (1) ...... | 2001 | 600,000 | 22,500 | -- | -- | 40,000(2) | -- | -- |
| Chief Executive Officer | 2000 | 536,539 | 22,500 | -- | -- | 50,000(3) | -- | -- |
| | 1999 | 483,723 | 200,000 | -- | -- | 5,200(3) | -- | -- |
| Ajay Mehra ............ | 2001 | 257,172 | 57,500 | -- | -- | 25,000(4) | -- | -- |
| Chief Financial Officer | 2000 | 250,251 | 17,500 | -- | -- | 25,000(3) | -- | -- |
| | 1999 | 221,137 | 55,000 | -- | -- | 12,400(3) | -- | -- |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Andreas F. Kotowski .... | 2001 | 183,079 | -- | -- | -- | 10,000 | -- | -- |
| Chief Technology Officer | 2000 | 178,904 | -- | -- | -- | 8,500 | -- | -- |
| | 1999 | 159,594 | 30,000 | -- | -- | 1,700 | -- | -- |
| Thomas K. Hickman ...... | 2001 | 199,503 | -- | -- | -- | 3,000(5) | -- | -- |
| Managing Director, | 2000 | 185,275 | -- | -- | -- | 15,000 | -- | -- |
| OSI Malaysia and | 1999 | 134,732 | 50,000 | -- | -- | 650 | -- | -- |
| OSI Singapore | | | | | | | | |

</TABLE>

<PAGE>

----------

(1) The Company paid aggregate insurance premiums of approximately $38,000 for three universal life insurance policies of Mr. Chopra in each of 2001, 2000, and 1999. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Executive officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 300,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(3) This table does not include options granted by OSI Medical, Inc., of which the Company is a majority stockholder. As compensation for services as a director of that company, on February 1, 1999, OSI Medical, Inc. granted to this person 7,500 10-year options to purchase common stock of OSI Medical, Inc. at a price of $1.35 per share, and on January 28, 2000, granted an additional 7,500 options at an exercise price of $1.50 per share. These options vest in five equal installments on the first through the fifth anniversaries of the grant date, conditioned upon continued service to the company. In the event of termination of such service, the options expire 90 days thereafter. There presently exists no public market for the stock of OSI Medical, Inc.

(4) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Financial Officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 150,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(5) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services to OSI

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1272 of 2711

Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 20,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra's annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000, and to $650,000 as of April 1, 2001. Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase for an indefinite period, and as of the date of this Proxy Statement, the increase has not yet been implemented. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time. Mr. Chopra's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

The Company entered into a three-year employment agreement with Ajay Mehra, which became effective on April 1, 1997. The employment agreement provided for a base salary of $200,000 per year, with annual raises to be determined by management. The Compensation Committee increased Mr. Mehra's annual base salary to $230,000 effective April 1, 1998. Pursuant to this employment agreement, Mr. Mehra was also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contained confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment. On September 1, 2000, the Company entered into a new three-year employment agreement with Mr. Mehra. This agreement provides for a base salary of $260,000, and is otherwise similar to the prior agreement. The Compensation Committee increased Mr. Mehra's annual base salary to $280,000 as of April 1, 2001. Mr. Mehra volunteered to postpone the effectiveness of the April 1, 2001 salary increase for an indefinite period, and as of the date of this Proxy Statement, the increase has not yet been implemented.

<PAGE>

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's annual salary initially was $140,000, which was increased to $165,000 effective April 16, 1998, to $175,000 on September 1, 1999, and to $185,000 on September 1, 2000. His salary has not been increased since that time. Pursuant to an incentive compensation agreement entered into in December 1996, for the 1997, 1998 and 1999 fiscal years Mr. Kotowski was entitled to receive as additional incentive compensation amounts equal to 10% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan U.K. in excess of certain pre-determined amounts, up to maximum compensation of $150,000 for any fiscal year. This agreement expired at the end of fiscal year 1999.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's initial annual salary was $125,000. Effective July 1, 1998, his salary was increased to $137,500, and effective July 1, 2000 it was increased to $160,000. His salary has not been increased since that time. During fiscal 1999, Mr. Hickman received a bonus payment of $50,000, which amount was his bonus for fiscal 1998. In addition to his salary, the Company paid certain expenses related to his service in Singapore. Mr. Hickman was transferred from Malaysia to the U.K. as of February 1, 2000. In connection with such transfer, he was allowed a relocation allowance of up to approximately $13,000. During his posting in the U.K., the Company is also paying him a cost-of-living allowance of approximately $45,000 per year and providing him with a leased automobile at a cost of approximately $9,200 per year. Mr. Hickman's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

As part of a cost savings program, Messrs. Chopra, Mehra and Kotowski took a voluntary 10% pay cut for the fourth quarter of fiscal 1999. Additionally, during fiscal 1999, Messrs. Chopra, Mehra, Kotowski and Hickman took voluntary pay cuts for which the Company granted to them options to purchase 5,200, 2,400, 1,700 and 650 shares, respectively, of the Company's Common Stock, at an exercise price of $7.00 per share.

Management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

Certain Relationships and Related Transactions

On December 23, 1997, the Board of Directors authorized the Company to loan to Deepak Chopra and Ajay Mehra the sums of $90,000 and $70,000 respectively, at an interest rate of six percent per annum, to be repaid within 48 months of such date. Of these amounts, Mr. Chopra has repaid $45,000 and Mr. Mehra has repaid $52,500.

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The remaining 49.0% interest in ECIL Rapiscan is owned by Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

The Company contracts for a portion of its automobile rental and daily messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $103,000 for such services during fiscal 2001. The Company contracts for printing services from a business owned by Madan G. Syal, a Director of the Company. The Company paid the business approximately $178,000 for such services during fiscal 2001.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends

<PAGE>

that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

Option Grants

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2001:

OPTION GRANTS IN LAST FISCAL YEAR

| Name | Number of Securities Underlying Options (1) Granted(#) | % of Total Options Granted to Employees in Fiscal Year(%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Option Term(2) 5%($) | 10%($) |
|---|---|---|---|---|---|---|
| Deepak Chopra ....... | 40,000(3) | 13.7 | 3.44 | 4/18/06 | 38,016 | 84,006 |
| Ajay Mehra .......... | 25,000(4) | 8.6 | 3.13 | 4/18/06 | 21,619 | 47,772 |
| Andreas F. Kotowski.. | 10,000 | 3.4 | 3.13 | 4/18/06 | 8,648 | 19,109 |
| Thomas K. Hickman ... | 3,000(5) | 1.0 | 3.13 | 4/18/06 | 2,594 | 5,733 |

----------

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.

(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission and do not represent the Company's estimate or projection of future Common Stock prices.

(3) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Executive officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 300,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(4) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Financial Officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 150,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share.These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(5) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services to OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 20,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

8

<PAGE>

Option Exercises and Fiscal Year-End Values

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2001 and held by them on June 30, 2001:

AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| Name | Shares Acquired On Exercise(#) | Value Realized($) | Number of Securities Underlying Unexercised Options at Fiscal Year-End(#) Exercisable | Unexercisable | Value of Unexercised In-the-Money Options at Fiscal Year End ($)(1) Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| Deepak Copra (2) | 0 | -- | 85,100 | 80,100 | 0 | 11,200 |
| Ajay Mehra (3) | 0 | -- | 56,200 | 49,950 | 0 | 14,750 |
| Andreas F. Kotowski | 0 | -- | 65,004 | 17,225 | 6,653 | 5,900 |
| Thomas K. Hackman (4) | 15,000 | 18,300 | 16,700 | 14,575 | 3,326 | 1,770 |

</TABLE>

----------

(1) Amounts are shown as the positive spread between the exercise price and

fair market value (based on the fair market price at fiscal year end of $3.72 per share).

(2) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Executive officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 300,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(3) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Financial Officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 150,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share.These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(4) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services to OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 20,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

Stock Option Plans

1987 Incentive Stock Option Plan. In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are nontransferable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2001, 743,235 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 249,502 shares were outstanding under the 1987 Plan at exercise prices ranging from $2.00 to $11.10

<PAGE>

per share, and no shares remained available for grant, since the 1987 Plan

expired on December 31, 1998. As of such date, stock options to purchase 119,815 shares of Common Stock were exercisable.

1997 Stock Option Plan. In May 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's stockholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company's stockholders approved an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2001, stock options to purchase 8,625 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,002,454 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.13 to $13.50 per share, and stock options to purchase 838,921 shares remained available for grant. As of such date, stock options to purchase 396,052 shares were exercisable. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During fiscal 2001, the Board of Directors of the Company granted options to purchase an aggregate of 291,350 shares of Common Stock available for issuance under the 1997 Plan to certain officers and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. The options generally will be subject to vesting and will become exercisable in equal installments over a period of three years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan, the Company intends to issue such options with an exercise price of

not less than the market price of the Common Stock on the date of grant.

Employee Stock Purchase Plan

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's stockholders in November 1998, provides persons

<PAGE>

who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase through regular payroll deductions up to an aggregate of 200,000 shares of Common Stock. The 1998 Plan is administered by the Board of Directors, or a committee of the Board. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

Employee Benefit Plan, Pension Plans

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($10,500 in calendar 1999) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. As of June 30, 2001, the Company had provided $151,657 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be

deductible by the Company when made.

Rapiscan U.K. and Advanced Micro Electronics AS, subsidiaries of the Company, each has a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

Report of Compensation Committee on Executive Compensation

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers.

The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

<PAGE>

Compensation Philosophy. The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its stockholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and stockholder value.

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's stockholders.

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of

the most highly compensated executive officers as of the end of any fiscal year. However, the statute exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

Compensation Program Components. The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

Base Salary. Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

Annual Bonus. Management of the Company allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

<PAGE>

Long-Term Incentive Compensation. The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

Chief Executive Officer's Compensation. The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra's annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000, and to $650,000 as of April 1, 2001. Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase for an indefinite period, and as of the date of this Proxy Statement, the increase has not yet been implemented. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

Summary. The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1281 of 2711

the Company's stockholders, by attracting and retaining the best qualified people as senior management and enhancing corporate performance. Furthermore, the Compensation Committee believes that executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

Performance Graph

The graph below compares the Company's cumulative total stockholder return since the Company's Common Stock became publicly traded on October 2, 1997, with the Nasdaq Market Index and with a peer group comprised of companies with which the Company generally competes.

The peer group is comprised of the following companies: PerkinElmer, Inc. (NYSE Symbol: PKI), which was previously known as "EG&G"; and InVision Technologies, Inc. (Nasdaq Symbol: INVN). The Company previously included Optek Technology, Inc. (Nasdaq Symbol: OPTT), Vivid Technologies, Inc. (Nasdaq Symbol: VVID) and Barringer Technologies, Inc. (Nasdaq Symbol: BARR) in its peer group. However, Optek Technology, Inc. has been acquired by a wholly-owned subsidiary of the Dyson-Kissner-Moran Corporation, Vivid Technologies, Inc. been acquired by PerkinElmer, Inc., and Barringer Technologies, Inc. has been acquired by Smith Industries and thus they are no longer included in the peer group.

The graph assumes that $100.00 was invested on October 2, 1997 in the Company's Common Stock, at the closing price of $15.13 per share (on which date the initial public offering price was $13.50 per share), and in each of the indexes mentioned above, and that all dividends were reinvested.

<PAGE>

COMPARISON OF CUMULATIVE TOTAL RETURN
AMONG OSI SYSTEMS, INC.,
NASDAQ MARKET INDEX AND PEER GROUP INDEX

[PERFORMANCE GRAPH APPEARS HERE]

<TABLE>
<CAPTION>

| | 10/02/97 | 12/31/97 | 3/31/98 | 6/30/98 | 9/30/98 | 12/31/98 | 3/31/99 | 6/30/99 |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| OSI Systems, Inc........... | 100.00 | 80.99 | 76.86 | 66.12 | 50.41 | 57.02 | 34.30 | 33.06 |
| Nasdaq Market Index........ | 100.00 | 93.70 | 109.81 | 112.65 | 101.53 | 131.98 | 147.45 | 160.45 |
| Peer Group................. | 100.00 | 95.86 | 129.60 | 130.89 | 99.40 | 121.51 | 114.39 | 152.05 |

| | 9/30/99 | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 3/31/01 | 6/30/01 |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| OSI Systems, Inc........... | 24.79 | 36.36 | 97.52 | 52.69 | 69.42 | 40.50 | 21.08 | 24.60 |
| Nasdaq Market Index........ | 163.06 | 240.83 | 274.02 | 235.68 | 453.65 | 454.34 | 229.75 | 242.49 |
| Peer Group................. | 167.09 | 176.63 | 280.16 | 277.31 | 217.49 | 146.15 | 110.19 | 129.14 |

</TABLE>

Security Ownership of Certain Beneficial Owners and Management

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2001 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

<TABLE>
<CAPTION>

| Name of Beneficial Owner (1) | Amount and Nature of Beneficial Ownership of Common Stock (2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra (3).............................. | 1,399,061 | 16.4% |
| Sally F. Chamberlain (4)....................... | 1,062,767 | 12.6% |
| Scope Industries (5)........................... | 1,030,200 | 12.2% |
| Benson Associates, LLC (6)..................... | 625,400 | 7.4% |
| Dimensional Fund Advisors, Inc. (7)............ | 546,100 | 6.5% |

</TABLE>

<PAGE>

----------

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2001, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 792,434 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 85,100 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Sally F. Chamberlain as Trustee of the Edward P. Fleischer and Sally F. Fleischer Family Trust dated June 3, 1991, whose address was reported as 2404 Via Siena, La Jolla, CA 92037.

(5) Does not include 5,000 shares beneficially owned by Scope Industries, Inc. Retirement Savings Plan and 3,000 shares beneficially owned by Scope Products, Inc. Profit Sharing Plan. The address of Scope Industries, Inc. is 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.Does not include shares beneficially owned by Meyer Luskin. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal stockholder of Scope Industries.

(6) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Benson Associates, LLC, whose address was reported as 111 S. W. Fifth Avenue, Suite 2130, Portland, OR 97204

(7) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Dimensional Fund Advisors, Inc., whose address was reported as 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2001 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

<TABLE>
<CAPTION>

| Name of Beneficial Owner (1) | Amount and Nature of Beneficial Ownership of Common Stock (2) | Percent of Class of Common Stock |
|---|---|---|
| <S> | <C> | <C> |
| Deepak Chopra (3)............................ | 1,399,061 | 16.4% |
| Ajay Mehra (4)............................... | 193,414 | 2.3% |
| Andreas F. Kotowski (5)...................... | 156,043 | 1.8% |
| Thomas K. Hickman (6)........................ | 46,937 | 0.6% |
| Steven C. Good (7)........................... | 12,500 | 0.1% |
| Meyer Luskin (8)............................. | 69,772 | 0.8% |
| Madan G. Syal (9)............................ | 108,179 | 1.3% |
| Chand R. Viswanathan......................... | 0 | 0.0% |
| All directors and executive officers as a group (7 persons) (3)(4)(5)(6)(7)(8)(9)(10).................... | 1,985,906 | 22.8% |

----------
</TABLE>

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2001, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 254,951 shares and 254,951 shares owned by The Deepika Chopra

Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 792,434 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra.

<PAGE>

Includes 85,100 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) Includes 57,450 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and a Director of the Company and President of OSI Security Group.

(5) Includes 66,254 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Kotowski is the Chief Technology Officer of the Company.

(6) Includes 17,950 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Hickman is Vice President of Operations of Rapiscan Group and the Managing Director of OSI Singapore and OSI Malaysia.

(7) Includes 12,500 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Does not include 25,000 shares owned for Mr. Good's benefit by the Good Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, California 90025.

(8) Includes 6,742 shares held by the Meyer and Doreen Luskin Family Trust. Includes 12,500 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Does not include 1,030,200 shares beneficially owned by Scope Industries, Inc., 5,000 shares beneficially owned by Scope Industries, Inc. Retirement Savings Plan and 3,000 shares beneficially owned by Scope Products, Inc. Profit Sharing Plan, as to all of which Mr. Luskin disclaims beneficial ownership. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal stockholder of Scope Industries, Inc. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(9) Includes 95,679 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Includes 6,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2001. Mr. Syal is a Director of the Company.

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. Such officers, directors and stockholders are required by Securities and Exchange Commission regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1285 of 2711

furnished to the Company during the fiscal year ended June 30, 2001, and written representations from certain reporting persons, the Company believes that all filing requirements applicable to the Company's executive officers, directors and more than 10% stockholders have been complied with.

## RATIFICATION OF SELECTION OF INDEPENDENT ACCOUNTANTS
(Item 2 of the Proxy Card)

The Board of Directors has selected Deloitte & Touche L.L.P. ("Deloitte & Touche") as the Company's independent accountants for the fiscal year ending June 30, 2001, and has further directed that management submit the selection of independent accountants for ratification by the stockholders at the Annual Meeting. Deloitte & Touche has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte & Touche is not expected to be present at the Annual Meeting.

In the event the stockholders fail to ratify the selection of Deloitte & Touche, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the best interests of the Company and its stockholders.

The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the selection of the independent accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of

<PAGE>

this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.

## OTHER BUSINESS

The Company does not know of any other business to be presented to the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

## STOCKHOLDER PROPOSALS

Any proposals of security holders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 15, 2001, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the Securities and Exchange Commission is available upon written request and without charge to stockholders by writing to Ajay Mehra, Secretary, OSI Systems, Inc.,

                              12525 Chadron Avenue, Hawthorne, California 90250.

By Order of the Board of Directors

/s/ Ajay Mehra
Secretary

Hawthorne, California
October 16, 2001

PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.

17

<PAGE>

PROXY

OSI SYSTEMS, INC.

PROXY

12525 Chadron Avenue, Hawthorne, CA 90250

This Proxy is Solicited on Behalf of the Board of Directors

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Stockholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on October 5, 2001, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Stockholders of the Company to be held on November 16, 2001, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2002 Annual Meeting of Stockholders or until their respective successors are elected and qualified:

   [_] FOR ALL    [_] WITHHOLD AUTHORITY FOR ALL

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal, Chand R. Viswanathan

   To withhold authority to vote for any individual nominee, write the nominee's name in the space provided below:

--------------------------------------------------------------------------------

2. To ratify the Board of Director's selection of Deloitte & Touche LLP to serve as the Company's independent accountants for the fiscal year ending June 30, 2002

   [_] FOR   [_] AGAINST   [_] ABSTAIN

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

(PLEASE DATE AND SIGN ON REVERSE SIDE)

<PAGE>

This Proxy, when properly executed, will be voted in the manner directed herein. This Proxy will be voted FOR the election of the directors listed and

FOR the other proposals if no specification is made.

Please sign exactly as your name(s) is (are) shown on the stock certificate to which the Proxy applies. When shares are held by joint tenants, both should sign. When signing as an attorney, executor, administrator, trustee or guardian, please give full title, as such. If a corporation, please sign in full corporate name by the President or other authorized officer. If a partnership, please sign in the partnership's name by an authorized person.

Dated: __ , 2001

---------------------
Signature

---------------------
Signature if held jointly

Please mark, sign, date and return the proxy card promptly using the enclosed envelope.

</TEXT>
</DOCUMENT>

# Exhibit 7

<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>d10q.txt
<DESCRIPTION>OSI SYSTEMS - 10-Q - 12/31/2001
<TEXT>
<PAGE>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON DC 20549

---

FORM 10-Q

(Mark one)

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended December 31, 2001

OR

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from ____ to ____

Commission File Number 0-23125

---

OSI SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

| California | 33-0238801 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

12525 Chadron Avenue
Hawthorne, California 90250
(Address of principal executive offices)

Registrant's telephone number, including area code: (310) 978-0516

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past ninety days.

YES X NO__

As of February 5, 2002 there were 12,511,695 shares of common stock outstanding.

<PAGE>

OSI SYSTEMS, INC.

INDEX

<TABLE>

<CAPTION>

| PART I - FINANCIAL INFORMATION | PAGE NUMBER |
|---|---|
| <S> | <C> |
| Item 1 - Consolidated Financial Statements | |
| Consolidated Balance Sheets at December 31, 2001 and June 30, 2001 | 3 |
| Consolidated Statements of Operations for the three and six months ended December 31, 2001 and December 31, 2000 | 4 |
| Consolidated Statements of Cash Flows for the six months ended December 31, 2001 and 2000, respectively. | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| PART II - OTHER INFORMATION | |
| Item 2 - Changes in Securities and Use of Proceeds | 18 |
| Item 4 - Submission of Matters to a Vote of Security Holders | 18 |
| Item 6 - Exhibits and Reports on Form 8-K | 19 |
| Signatures | 19 |

</TABLE>

<PAGE>

PART I. FINANCIAL INFORMATION

Item 1. Consolidated Financial Statements

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
(in thousands, except share amounts)

<TABLE>
<CAPTION>

| | December 31, 2001 | June 30, 2001 |
|---|---|---|
| <S> | <C> | <C> |
| ASSETS | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 66,814 | $ 4,467 |
| Investments | 928 | 863 |
| Accounts receivable, net of allowance for doubtful accounts of $1,216 and $903 at December 31, 2001 and June 30, 2001, respectively | 30,038 | 28,437 |
| Current portion of note receivable | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1291 of 2711

| | | |
|---|---|---|
| | 400 | 452 |
| Other receivables | 1,696 | 1,552 |
| Inventory | 32,084 | 31,174 |
| Prepaids | 1,036 | 1,009 |
| Deferred income taxes | 693 | 832 |
| Income taxes receivable | 697 | 310 |
| | -------- | ------- |
| Total current assets | 134,386 | 69,094 |
| Property and Equipment, net | 12,828 | 13,405 |
| Intangible and other assets, net | 7,602 | 7,371 |
| Note receivable | 600 | 800 |
| Deferred income taxes | 1,726 | 1,726 |
| | -------- | ------- |
| Total | $157,142 | $92,396 |
| | ======== | ======= |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | | |
|---|---|---|
| Current Liabilities: | | |
| Bank lines of credit | $ 513 | $ 100 |
| Current portion of long-term debt | 2,625 | 2,625 |
| Accounts payable | 14,397 | 10,720 |
| Accrued payroll and related expenses | 2,610 | 2,614 |
| Income taxes payable | 1,446 | 1,525 |
| Advances from customers | 1,240 | 924 |
| Accrued warranties | 1,684 | 1,687 |
| Other accrued expenses and current liabilities | 3,202 | 2,585 |
| | -------- | ------- |
| Total current liabilities | 27,717 | 22,780 |
| Long-term debt | 5,734 | 7,003 |
| Deferred income taxes | 132 | 132 |
| | -------- | ------- |

| | December 31, 2001 | June 30, 2001 |
|---|---|---|
| Total liabilities | 33,583 | 29,915 |
| Shareholders' Equity | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December 31, 2001 and June 30, 2001, respectively | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding 12,494,368 and 8,462,968 shares at December 31, 2001 and June 30, 2001, respectively | 102,536 | 43,567 |
| Retained earnings | 23,986 | 22,291 |
| Accumulated other comprehensive loss | (2,963) | (3,377) |
| Total shareholders' equity | 123,559 | 62,481 |
| Total | $157,142 | $92,396 |

</TABLE>

See accompanying notes to consolidated financial statements

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share amounts)

<TABLE>
<CAPTION>

| | Three months ended December 31, 2001 | Three months ended December 31, 2000 | Six months ended December 31, 2001 | Six months ended December 31, 2000 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Revenues | $ 30,044 | $ 27,996 | $ 56,499 | $ 52,880 |
| Cost of goods sold | 21,172 | 20,046 | 40,621 | 37,987 |
| Gross profit | 8,872 | 7,950 | 15,878 | 14,893 |
| Operating expenses: | | | | |
| Selling, general and administrative | 5,308 | 5,583 | 9,892 | 11,200 |

```
     Research and development                                                    1,587
1,502           3,156         3,217
     Goodwill amortization                                                         101
129             202           257

                                                                           -----------    ------
-----     -----------   -----------
                  Total operating expenses                                       6,990
7,214          13,250        14,674
                                                                           -----------    ------
-----     -----------   -----------

Income from operations                                                           1,882
736           2,628           219
Interest expense, net                                                               72
285             231           589

                                                                           -----------    ------
-----     -----------   -----------
Income (loss) before provision (benefit) for income taxes
  and minority interest                                                          1,810
451           2,397          (370)
Provision (benefit) for income taxes                                               525
100             702           (70)

                                                                           -----------    ------
-----     -----------   -----------
Income (loss) before minority interest in net loss of subsidiary                 1,285
351           1,695          (300)
Minority interest in net loss of subsidiary
146

                                                                           -----------    ------
-----     -----------   -----------
Net income (loss)                                                          $     1,285    $
351     $     1,695         ($154)
                                                                           ===========
===========     ===========   ===========

Earnings (loss) per common share                                           $      0.12    $
0.04     $      0.17        ($0.02)
                                                                           ===========
===========     ===========   ===========

Earnings (loss) per common share,assuming dilution                         $      0.12    $
0.04     $      0.17        ($0.02)
                                                                           ===========
===========     ===========   ===========

 Weighted average shares outstanding -assuming dilution                     11,098,649
9,311,229       9,756,496     9,310,199
                                                                           ===========
===========     ===========   ===========
</TABLE>
```

See accompanying notes to consolidated financial statements

-4-

<PAGE>

OSI SYSTEMS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)

<TABLE>
<CAPTION>

| | Six months ended December 31, | |
|---|---|---|
| | 2001 | 2000 |
| <S> | <C> | <C> |
| Cash flows from operating activities: | | |
| Net income (loss) | $ 1,695 | ($154) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Provision for losses on accounts receivable | 313 | 32 |
| Depreciation and amortization | 2,123 | 2,167 |
| Loss on sale of property and equipment | 62 | 134 |
| Deferred income taxes | 112 | (244) |
| Minority interest in net loss of subsidiary | (146) | |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (1,701) | (2,191) |
| Other receivables | (245) | 286 |
| Inventory | (911) | (4,636) |
| Prepaids | (20) | (477) |
| Accounts payable | 3,431 | 617 |
| Accrued payroll and related expenses | 130 | (37) |
| Income taxes payable | (73) | 1,375 |
| Income taxes receivable | (377) | 17 |
| Advances from customers | 294 | 689 |
| Accrued warranty | (7) | (130) |
| Other accrued expenses and current liabilities | 482 | 335 |
| Net cash provided by (used in) operating activities | 5,308 | (2,363) |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (1,108) | (1,714) |
| Proceeds from sale of property and equipment | 73 | 16 |
| Cash paid for business acquisitions, net of cash acquired | | |

(442) 

Cash received on note receivable
250
Other assets
(248) (478)

---------

-- -----------

Net cash used in investing activities
(1,033) (2,618)

---------

-- -----------

Cash flows from financing activities:
Net proceeds from bank lines of credits
415 3,478
Net (payments) proceeds on long-term debt
(1,269) 239
Proceeds from exercise of options and warrants
2,175 36
Proceeds from issuance of stock
56,794
Purchase of treasury stock
(1,347)

---------

-- -----------

Net cash provided by financing activities
58,115 2,406

---------

-- -----------

Effect of exchange rate changes on cash
(43) 12

---------

-- -----------

Net increase (decrease) in cash and cash equivalents
62,347 (2,563)
Cash and cash equivalents, beginning of period
4,467 10,892

---------

-- -----------

Cash and cash equivalents, end of period $
66,814 $ 8,329

=========== ===========

Supplemental disclosures of cash flow information - Cash paid/(received) during the period for:
Interest $
168 $ 472
Income taxes $
1,066 ($1,243)
</TABLE>

See accompanying notes to consolidated financial statements

<PAGE>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General. OSI Systems, Inc. and its subsidiaries (collectively, the "Company") is
a vertically integrated worldwide provider of devices, subsystems and
end-products based on optoelectronic technology. The Company designs and
manufactures optoelectronic devices and value-added subsystems for original
equipment manufacturers in a broad range of applications, including security,
medical diagnostics, telecommunications, gigabit ethernet and fiber channel
supplies, gaming, office automation, aerospace, computer peripherals and
industrial automation. In addition, the Company utilizes its optoelectronic
technology and design capabilities to manufacture security and inspection
products that it markets worldwide to end users under the "Rapiscan", "Secure"
and "Metor" brand names. These products are used to inspect people, baggage,
cargo and other objects for weapons, explosives, drugs and other contraband. In
the medical field the Company manufactures and sell desitometers which are used
to provide bone loss measurements in the diagnosis of osteoporosis. The Company
also manufactures and sells saturation of arterial hemoglobin ("S\p\O\2\")
monitors and sensors under the trade names Digital Dolphin(TM) and Dolphin
2000(TM). Digital Dolphin(TM) model 2100 S\P\O\2\ monitors have received 510 (k)
approval for sale in the United States.

Consolidation. The consolidated financial statements include the accounts of OSI
Systems, Inc. and its majority-owned subsidiaries. All significant intercompany
accounts and transactions have been eliminated in consolidation. The
consolidated balance sheet as of December 31, 2001, the consolidated statements
of operations for the three-month and six-month periods ended December 31, 2001
and 2000 and the consolidated statements of cash flows for the six month periods
ended December 31, 2001 and 2000 have been prepared by the Company, without
audit, pursuant to the rules and regulations of the Securities and Exchange
Commission (the "Commission"). Certain information and footnote disclosures
normally included in financial statements prepared in accordance with generally
accepted accounting principles have been condensed or omitted pursuant to such
rules and regulations. However, in the opinion of management all adjustments,
consisting of only normal and recurring adjustments, necessary for a fair
presentation of the financial position and the results of operations for the
periods presented have been included. These consolidated financial statements
and the accompanying notes should be read in conjunction with the audited
consolidated financial statements and accompanying notes for the fiscal year
ended June 30, 2001 included in the Company's Annual Report on Form 10K as filed
with the Commission on September 28, 2001. The results of operations for the
quarter and six months ended December 31, 2001 are not necessarily indicative of
the results to be expected for the fiscal year ending June 30, 2002.

-6-

<PAGE>

Recent Developments - In November 2001, the Company entered into a letter of
intent with L-3 Communications (L-3) to purchase from L-3 certain detection
systems assets of PerkinElmer, Inc. Subject to the execution of a definitive
purchase agreement and other closing terms, the Company intends to acquire from
L-3, PerkinElmer's businesses pertaining to carry-on passenger baggage screening
including service, as well as all technologies and rights associated with
PerkinElmer's ARGUS explosive detection X-ray system. The closing is subject to
numerous conditions including the satisfactory closing of L-3's purchase from
PerkinElmer of the Dectection Systems business, government and regulatory
approval, as well as the execution of a definitive purchase agreement between
the Company and L-3. The Company believes that current cash balances,
anticipated cash flows from operations and current borrowing arrangements will
be sufficient to fund the purchase of PerkinElmer's assets from L-3.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1297 of 2711

Notwithstanding the fact that the Company has entered into a letter intent with L-3, there can be no assurances that the Company will enter into a definitive purchase agreement with L-3 on favorable terms, or at all. In addition, for the foregoing seasons there can be no assurances that the Company will acquire some or all of the intended assets of PerkinElmer.

In November 2001, the Company issued and sold an aggregate of 1,696,946 shares of its common stock in a private placement to institutional investors for an aggregate sales price of $19.9 million. After placements agents commission and expenses, net proceeds to the Company were $18.5 million. Roth Capital Partners and William Blair & Company acted as placement agents in the transaction. In connection with the transactions, Roth Capital Partners received warrants to purchase 84,847 shares of the Company at $15.00 per share, exercisable at any time in full or part after May 13, 2002 and no later than May 13, 2005. The Company filed a registration statement on Form S-3 with the Commission on November 19, 2001 for the purpose of registering these securities.

In December 2001, the Company issued and sold an aggregate of 2,070,000 shares of its common stock in a private placement to institution investors for an aggregate sales price of $40.4 million. After placement agent commission and expenses, net proceeds to the Company were $38.4 million. Roth Capital Partners acted as placement agent in the transaction. As part of the transaction, the Company issued to the investors warrants to purchase 517,500 additional shares of the Company at an exercise price of $23.47 per share exercisable at any time in full or part no later than December 10, 2008. In connection with the transaction, Roth Capital Partners received warrants to purchase 103,500 shares of the Company at an exercise price of $23.47 per share exercisable at any time in full or part no later than December 10, 2008. The Company filed a registration statement on Form S-3 with the Commission on December 14, 2001, for the purpose of registering these securities.

New Accounting Pronouncements - In July 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard ("SFAS") No. 141, "Business Combinations", which requires that all business combinations initiated after June 30, 2001 be accounted for under the purchase method and prohibits the use of the pooling-of-interests method. The Company does not believe that the adoption of SFAS No. 141 will have any effect on its financial position and results of operations.

<PAGE>

In July 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets", which becomes effective for the Company beginning July 1, 2002. This statement changes the method of accounting for goodwill to a test for impairment and requires among other things, the discontinuance of goodwill amortization. The Company is currently assessing the impact of the adoption of this statement on its financial position and result of operations.

SFAS No. 143 "Accounting for Asset Retirement Obligations", which becomes effective for the Company on July 1, 2002, addresses the obligations and asset retirement costs associated with the retirement of tangible long-lived assets. It requires that the fair value of the liability for an asset retirement obligation be recorded when incurred instead of over the life of the asset. The asset retirement costs must be capitalized as part of the carrying value of the long-lived asset. If the liability is settled for an amount other than the recorded balance, either a gain or loss will be recognized at settlement. The Company is currently assessing the impact of the adoption of this statement on its financial position and results of operations.

SFAS No. 144, "Impairment or Disposal of Long-Lived Assets", will become effective for the Company on July 1, 2002. SFAS No. 144 addresses financial accounting and reporting for the impairment or disposal of long-lived assets and provides guidance on implementation issues related to SFAS No. "121, Accounting

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1298 of 2711

for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of", and addresses the accounting for a component of an entity which has been disposed of has been classified as held for sale. The Company is currently assessing the impact of the adoption of this statement on its financial position and results of operations.

Credit Risk. The Company's financial instruments that are exposed to concentration of credit risk consist primarily of its cash, cash equivalents, available-for-sale investments, and accounts receivable. The Company restricts investments in cash equivalents and available-for-sale investments to financial institutions with high credit standing. At December 31, 2001, approximately 92% of the Company's cash equivalents were held at two financial institutions. Credit risk on accounts receivable is minimized as a result of the large and diverse nature of the Company's worldwide customer base. The Company performs ongoing credit evaluations of its customers' financial condition and maintains allowances for potential credit losses.

Derivative Instruments - The Company's use of derivatives consists of the purchase of foreign exchange contracts, in order to attempt to reduce foreign exchange transaction gains and losses, along with interest rate swaps on a variable interest rate term loan.

The Company purchases forward contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and does not use the contracts for trading purposes. As of December 31, 2001 and June 30, 2001, notional amounts were approximately $5.9 million and $1.5 million for outstanding foreign exchange contracts, respectively. The estimated fair value of these contracts, based on quoted market prices, approximated $0 and ($50,000) at December 31, 2001 and June 30, 2001 respectively. The foreign exchange contracts are effective foreign exchange hedges and the difference in the fair value from the prior reporting period has been recorded as other comprehensive income (loss).

The Company also has entered into interest rate swaps. The terms of the swaps are to convert a portion of the Company's variable interest rate debt into a fixed rate liability. At December 31, 2001, and June 30, 2001 the notional amount of the swaps were $7,973,200 and $5,042,000 respectively. The fair values of the swaps at December 31,

-8-

<PAGE>

2001 and June 30, 2001 were ($215,000) and ($50,000) respectively. The decrease in the period is recorded in other comprehensive income (loss), due to the swaps meeting the criteria of an effective cash flow hedge. No amounts were reclassified to earnings resulting from the ineffectiveness or discontinuation of cash flow hedges. As of December 31, 2001, the amount to be reclassified from other comprehensive income (loss) during the next twelve months is expected to be immaterial. The actual amounts that will be reclassified into earnings will vary as a result of changes in market conditions. All forward contracts, swaps, and underlying transaction exposures are carried at fair value in other accrued expenses and liabilities in the accompanying consolidated balance sheets.

Revenue Recognition - The Company generally recognizes revenue upon shipment of its products. Concurrent with the shipment of the product, the Company accrues estimated warranty expenses. The Company has undertaken projects which include the development and construction of large complex cargo inspection systems requiring installation and customization at the customer's site. Sales under such long-term contracts are recorded under the percentage of completion method. Costs and estimated revenues are recorded as work is performed based on the percentage that incurred costs bear to estimated total costs utilizing the most recent estimates of costs. If the current contract estimate indicates a loss, provision is made for the total anticipated loss in the current period.

Inventory - Inventory is stated at the lower of cost or market; cost is

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1299 of 2711

determined on the first-in, first-out method. Inventory at December 31, 2001 and June 30, 2001 consisted of the following (in thousands):

| | December 31, 2001 | June 30, 2001 |
|---|---|---|
| Raw Materials | $15,245 | $16,442 |
| Work-in-process | 7,651 | 6,595 |
| Finished goods | 9,188 | 8,137 |
| Total | $32,084 | $31,174 |

Accounts Receivable. Accounts receivable at December 31, 2001 and June 30, 2001 consisted of the following (in thousands):

| | December 31, 2001 | June 30, 2001 |
|---|---|---|
| Trade receivables net | $28,423 | $27,113 |
| Unbilled costs and accrued profit on progress completed | 1,615 | 1,324 |
| Total | $30,038 | $28,437 |

The unbilled costs and accrued profit at December 31, 2001 are expected to be entirely billed and collected during calendar 2002.

<PAGE>

Earnings Per Share. Earnings (loss) per common share is computed by dividing net income (loss) by the weighted average number of shares outstanding during each period presented. Earnings (loss) per common share assuming dilution is computed based on the weighted average number of shares plus the dilutive effect of potential common stock. As of December 31, 2000, the only type of potential common stock was stock options from the Company's stock option plans. As of December 31, 2001, the types of potential common stock were stock options and stock purchase rights. Stock options and stock purchase rights totaling 621,000 and 1,149,824 were outstanding for the quarter and six months ended December 31, 2001, but were not included in the earnings (loss) assuming dilution calculation because to do so would have been antidulitive. 988,729 stock options were outstanding for the quarter ended December 31, 2000, but were not included in the earnings (loss) assuming dilution calculation because to do so would have been antidilutive.

Because the inclusion of potential commons stock had an antidilutive effect on the earnings (loss) per share for the six months ended December 31, 2000, reported earnings (loss) per common share and earnings (loss) per share assuming dilution were the same for the six months ended December 31, 2000.

The following tables reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share-assuming dilution.

<TABLE>
<CAPTION>

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1300 of 2711

| | For the quarter ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | | | 2000 | | |
| | Income (Numerator) | Shares (Denominator) | Per-Share Amount | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
| Earnings per common share Income available to common stockholders | $1,285,000 | 10,435,677 | $0.12 | $351,000 | 9,265,095 | $0.04 |
| Effect of Dilutive Securities Options, treasury stock method | | 662,972 | | | 46,134 | |
| Earnings per common share assuming dilution Income available to common stockholder, assuming dilution | $1,285,000 | $11,098,649 | $0.12 | $351,000 | $9,311,229 | $0.04 |

</TABLE>

<TABLE>
<CAPTION>

| | For the six months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | | | 2000 | | |
| | Income (Numerator) | Shares (Denominator) | Per-Share Amount | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
| Earnings per common share Income (loss) available to common stockholders | $1,695,000 | 9,457,893 | $0.17 | ($154,000) | 9,310,199 | ($0.02) |
| Effect of Dilutive Securities Options, treasury stock method | | 298,603 | | | --- | |
| Earnings per common share assuming dilution Income (loss) available to common stockholder, assuming dilution | $1,695,000 | 9,756,496 | $0.17 | ($154,000) | 9,310,199 | ($0.02) |

</TABLE>

<PAGE>

Comprehensive Income - Comprehensive Income (loss) is computed as follows (in thousands):

| | For the quarter ended December 31, 2001 | 2000 |
| --- | --- | --- |
| Net income | $1,285 | $351 |
| Other Comprehensive income (loss), net of taxes: | | |
| Foreign currency translation adjustments | ($351) | $484 |
| Unrealized gains on marketable securities available for sale | $221 | |
| Change in fair value of derivative instruments | $31 | |
| Other Comprehensive income (loss) | ($99) | $484 |
| Comprehensive income (loss) | $1,186 | $835 |

| | For the six months ended December 31, 2001 | 2000 |
| --- | --- | --- |
| Net income (loss) | $1,695 | ($154) |
| Other Comprehensive income (loss), net of taxes: | | |

| | | |
|---|---|---|
| Foreign currency translation adjustments | $501 | ($98) |
| Unrealized gains on marketable securities available for sale | $28 | |
| Change in fair value of derivative instruments | ($115) | |
| Other Comprehensive income (loss) | $414 | ($98) |
| Comprehensive income (loss) | $2,109 | ($252) |

</TABLE>

Segment Information.

The Company has adopted SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information." The Company has reflected the provisions of SFAS No. 131 in the accompanying financial statements for all periods presented. The Company believes that it operates in two identifiable industry segments, a) optoelectronic devices and subsystems, medical imaging systems, and b) security and inspection products. For the quarter and six months ended December 31, 2001, external revenues from optoelectronics devices subsystems and medical imaging systems were $11,433 and $23,973, compared to $13,878 and $27,423 for the quarter and six months ended December 31, 2000. For the quarter and six months ended December 31, 2001, revenues from security and inspection products were $18,611 and $32,526, compared to $14,118 and $25,457 for the quarter and six months ended December 31, 2000.

Segment information is provided by geographic area. The Company is vertically integrated and is sharing common resources and facilities. Therefore, with the exception of external revenues, meaningful information is not available by industry or product segment.

<PAGE>

The company's operating locations include the North America (United States and Canada), Europe (United Kingdom, Denmark, Finland and Norway) and Asia (Singapore and Malaysia). The company's operations by geographical areas are as follows (in thousands):

<TABLE>
<CAPTION>

| | Three months ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| Revenues from external customers | $18,413 | $ 8,979 | $ 2,652 | | $30,044 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1303 of 2711

| | | | | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Transfer between geographical areas | $ 1,336 | $ 1,097 | $ 9,097 | ($11,530) | |
| Total revenues | $19,749 | $10,076 | $11,749 | ($11,530) | $30,044 |
| Income (loss) from operations | ($303) | $ 726 | $ 1,602 | ($143) | $ 1,882 |

<CAPTION>

Three months ended December 31, 2000

<S> <C> <C> <C> <C> <C>

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues from external customers | $ 21,000 | $ 5,869 | $ 1,127 | | $27,996 |
| Transfer between geographical areas | $ 2,254 | $ 1,152 | $ 7,760 | ($11,166) | |
| Total revenues | $ 23,254 | $ 7,021 | $ 8,887 | ($11,166) | $27,996 |
| Income (loss) from operations | $ (709) | $ 249 | $ 989 | $ 207 | $ 736 |

<CAPTION>

Six months ended December 31, 2001

<S> <C> <C> <C> <C> <C>

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Revenues from external customers | $36,094 | $15,259 | $ 5,146 | | $56,499 |
| Transfer between geographical areas | $ 2,632 | $2,373 | $16,495 | ($21,500) | |
| Total revenues | $38,726 | $17,632 | $21,641 | ($21,500) | $56,499 |

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Income (loss) from operations | ($1,437) | $ 1,244 | $ 2,957 | $ (136) | $ 2,628 |

<CAPTION>

| | Six months ended December 31, 2000 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Revenues from external customers | $ 36,606 | $ 13,138 | $ 3,136 | | $52,880 |
| Transfer between geographical areas | $ 4,535 | $ 2,591 | $ 13,544 | ($20,670) | |
| Total revenues | $ 41,141 | $ 15,729 | $ 16,680 | ($20,670) | $52,880 |
| Income (loss) from operations | $ (2,333) | $ 882 | $ 1,525 | $ 145 | $ 219 |

</TABLE>

<PAGE>

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

Statements in this report that are forward-looking are based on current expectations, and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties that could cause actual results to differ materially, including, but not limited to, the possibilities that the demand for the Company's products may decline as a result of possible changes in general and industry specific economic conditions and the effects of competitive pricing and such other risks and uncertainties as are described in this report on Form 10-Q and other documents previously filed or hereafter filed by the Company from time to time with the Securities and Exchange Commission.

### Results of Operations

Revenues. Revenues consist of sales of optoelectronic devices and value added subsystems, medical imaging systems and security and inspection products. Revenues are recorded net of all inter-company transactions. Revenues increased by 7.3% to $30.0 million for the three months ended December 31, 2001, compared to $28.0 million for the comparable prior year period. For the six months ended December 31, 2001, revenues increased by 6.8% to $56.5 million from $52.9 million for the comparable prior year period. Revenues for the three months ended December 31, 2001 from optoelectronic devices and value added subsystems,

and medical imaging systems net of intercompany eliminations decreased by $2.4 million or 17.6% to $11.4 million, compared to $13.9 million for comparable prior year period and revenues from security and inspection products increased by $4.5 million, or 31.8% to $18.6 million, compared to $14.1 million for the comparable prior year period. Revenues for the six months ended December 31, 2001 from optoelectronic devices, value added subsystems and medical imaging systems net of intercompany eliminations decreased by $3.5 million or 12.6% to $24.0 million, compared to $27.4 million for the comparable prior year period and revenues from security and inspection products increased by $7.1 million or 27.8%, to $32.5 million, compared to $25.5 million for the comparable prior year period. The decrease in revenues from sales of optoelectronic devices, value added subsystems and medical imaging systems for the quarter and six months ended December 31, 2001 was primarily due to a discontinued product line of portable data/video projectors systems and the exclusion of Silicon Microstructures, Inc. ("SMI") revenues and decrease in fiber optic sales. SMI was sold in March 2001. SMI `s revenues and revenues from the sale of data/video projector systems for the three and six months ended December 31, 2001 were $2.0 million and $4.4 million, respectively, compared to $0 revenues for the three and six months ended December 31, 2001.The increase in revenues from the sale of security and inspection was due to increased sales of X-ray screening machines in the United States and international markets in response to the attacks on the World Trade Center and Pentagon on September 11, 2001.

<PAGE>

Gross Profit. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by 11.6% to $8.9 million for the three months ended December 31, 2001, compared to $8.0 million for the comparable prior year period. For the six months ended December 31, 2001, gross profit increased by 6.6% to $15.9 million, compared to $14.9 million change for the comparable prior year period. As a percentage of revenues, gross profit increased in the quarter to 29.5% this year, from 28.4% last year. As a percentage of revenues, gross profit decreased in the six months to 28% this year, from 28.2% last year. The increase in gross profit for the quarter ended December 31, 2001, was due to increased security and inspection products shipments which have a higher gross margin.

Selling, General and Administrative. Selling, general and administrative expenses consisted primarily of compensation paid to sales, marketing and administrative personnel, and professional service fees and marketing expenses. For the three months ended December 31, 2001, such expenses decreased 5.1% to $5.3 million, compared to $5.6 million for the comparable prior year period. For the six months ended December 31, 2001, such expenses decreased by 11.7% to $9.9 million, compared to $11.2 million for the comparable prior year period. As a percentage of revenues, selling, general and administrative expenses decreased in the quarter and six months to 17.7% and 17.5% this year, from 19.9% and 21.2% last year, respectively. The decrease in expenses for the quarter and six months was primarily due to the absence of selling general and administrative expenses of the divested SMI subsidiary and decreased legal and professional fees and decreased administrative expenses. Selling, general and administrative expenses of SMI for the quarter and six months ended December 31, 2000 were $236,000 and $405,000 , respectively, compared to $0 for the three and six months periods ended December 31, 2001.

Research and Development. Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2001, such expenses increased 5.3% to $1.6 million, compared to $1.5 million for the comparable prior year period. For the six months ended December 31, 2001, such expenses remained relatively constant compared to the prior year period. As a percentage of revenues, research and development expenses decreased in the three month and six month periods to 5.3% and 5.6% this period from 5.4% and 6.1% for the comparable prior year period. The decrease in research and development expenses was primarily due to certain

research and development personnel who worked directly on specific shipments and the cost of their services were charged to manufacturing overhead and the absence of research and development expenses of SMI.

Income (Loss) from Operations. For the three months ended December 31, 2001, the Company had income from operations of $1.8 million compared to $736,000 for the three months ended December 31, 2000. For the six months ended December 31, 2001, the Company had income from operations of $2.6 million compared to $219,000 for the comparable prior year period. Income from operations for the three months ended December 31, 2001, increased due to increased revenues and increased gross margin and

<PAGE>

income from operations for the six months ended December 31, 2001 increased due to increased revenues, increased gross profits and lower selling, general and administrative expenses.

Interest Expense. For the three months ended December 31, 2001, the Company incurred net interest expense of $72,000, compared to net interest expense of $285,000 for the three months ended December 31, 2000. For the six months ended December 31, 2001, the Company incurred net interest expense of $231,000, compared to net interest expense of $589,000 for the six months ended December 31, 2000. The decrease in net interest expense for the three and six months ended December 31, 2001 was due to decreased borrowings under the Company's lines of credit and was further reduced by interest income on the proceeds from private placements in November and December 2001. These proceeds are invested in short term investments with an original maturity date of less than ninety days.

Provision (Benefit) for Income Taxes. Provision for income taxes increased to $525,000 for the three months ended December 31, 2001, compared to $100,000 for the three months ended December 31, 2000. For the six months ended December 31, 2001, the Company had provision for income taxes income of $702,000 compared to a income tax benefit of $70,000 for the six months ended December 31, 2000. The change in the effective income tax rate was due to a mix in income from U.S. and foreign operations.

Net Income (Loss). For the reasons outlined above, the Company had net income of $1.3 million and $1.7 million for the three and six months ended December 31, 2001, compared to net income of $351,000 and a net loss of $154,000 for the three and six months ended December 31, 2000, respectively.

Liquidity and Capital Resources

The Company's operations provided net cash of $5.3 million during the six months ended December 31, 2001. The amount of net cash provided by operations reflects increases in accounts payable, advances from customers and other accrued expenses and current liabilities, and was offset in part by an increase in accounts receivable, other receivables, inventory and income taxes receivable. The increase in accounts receivable is mainly due to the increased sales. The increase in inventory is due to an increased demand for security and inspection products.

Net cash used in investing activities was $1.0 million and $2.6 million for the six months ended December 31, 2001 and 2000, respectively. In the six month period ended December 31, 2001, net cash used in investing activities reflects cash used for the purchase of property and equipment. In the six months ended December 31, 2000, the net cash used in investing activities primarily reflects cash used in business acquisitions and the purchase of property and equipment.

Net cash provided by financing activities was $58.1 million and $2.4 million for the six

<PAGE>

months ended December 31, 2001 and 2000, respectively. During the six months ended December 31, 2001, net cash provided by financing activities was $58.1 million and $2.4 million for the six months ended December 31, 2001 and 2000, respectively. During the six months ended December 31, 2001, net cash provided by financing activities resulted primarily from the proceeds from the private placements totaling $56.9 million and was offset in part by repayment of long term debt. The Company anticipates utilizing the proceeds from these private placements for working capital requirements and other general corporate purposes including acquisitions.

In March 1999, the Company announced a stock repurchase program of up to 2,000,000 shares of its common stock. Through February 13, 2002, the Company repurchased 1,404,500 shares at an average price $4.37 per share. The stock repurchase program did not have a material effect on the Company's liquidity and is not expected to have a material effect on liquidity in subsequent quarters.

The Company anticipates that current cash balances, anticipated cash flows from operations and current borrowing arrangements will be sufficient to meet its working capital, stock repurchase program and capital expenditure needs for the foreseeable future.

Market Risk - The Company is exposed to certain market risks which are inherent in the Company's financial instruments and arise from transactions entered into in the normal course of business. The Company may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign currency-denominated transactions. The Company does not enter into derivative financial instrument transactions for speculative purposes.

Foreign Currency Translation. The accounts of the Company's operations in Singapore, Malaysia, England, Norway, Denmark, Finland and Canada are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling, Norwegian kroner, Danish kroner, Finnish markka and Canadian dollars, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of accumulated other comprehensive income. Net transaction losses of approximately $84,000 and $67,000 were included in the Company's results for the six months ended December 31, 2001 and 2000, respectively.

Importance of International Markets - International markets provide the Company with significant growth opportunities. However, the following events, among others, could adversely affect the Company's financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, and political instability.

For the quarter and six months ended December 31, 2001, overall foreign currency fluctuations relative to the U.S. dollar had an immaterial effect on the Company's

<PAGE>

consolidated revenues and results of operations. As a result of monetary policy in Malaysia, including the pegging of the Malaysian ringgit to the U.S. dollar, the Company believes that its foreign currency exposure in Malaysia will not be significant in the foreseeable future. The Company continues to perform ongoing

credit evaluations of its customers' financial condition and, if deemed necessary, the Company requires advance payments for sales. The Company is monitoring economic and currency conditions around the world to evaluate whether there may be any significant effect on its international sales in the future. Due to its overseas investments and the necessity of dealing with local currencies in its foreign business transactions, the Company is at risk with respect to foreign currency fluctuations.

Euro Conversion. On January 1, 1999, 11 of 15 member countries of the European Union introduced a new currency, the "Euro". The conversion rates between the Euro and the participating nations' existing legacy currencies were fixed irrevocably as of December 31, 1998. Prior to full implementation of the new currency on January 1, 2002, there will be a transition period during which parties may, at their discretion, use either the legacy currencies or the Euro for financial transactions. The Company is not aware of any material operational issues or costs associated with preparing internal systems for the Euro. While it is not possible to accurately predict the impact the Euro will have on the Company's business or on the economy in general, management does not anticipate that the Euro conversion will have a material adverse impact on the Company's market risk with respect to foreign exchange, its results of operations, or its financial condition.

Foreign Exchange Contracts. The Company purchases forward contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and does not use the contracts for trading purposes. As of December 31, 2001 and June 30, 2001, notional amounts were approximately $5.9 million and $1.5 million for outstanding foreign exchange contracts, respectively. The estimated fair value of these contracts, based on quoted market prices, approximated $0 and ($50,000) at December 31, 2001 and June 30, 2001 respectively. The foreign exchange contracts are effective foreign exchange hedges and the difference in the fair value from the prior reporting period has been recorded as other comprehensive income (loss).

Credit Risk. The Company's financial instruments that are exposed to concentration of credit risk consist primarily of its cash, cash equivalents, available-for-sale investments, and accounts receivable. The Company restricts investments in cash equivalents and available-for-sale investments to financial institutions with high credit standing. At December 31, 2001, approximately 92% of the Company's cash equivalents were held at two financial institutions. Credit risk on accounts receivable is minimized as a result of the large and diverse nature of the Company's worldwide customer base. The Company performs ongoing credit evaluations of its customers' financial condition and maintains allowances for potential credit losses.

<PAGE>

Interest Rate Risk. All highly-liquid investments with a maturity of three months or less are classified as cash equivalents and recorded in the balance sheet at fair value. Short-term investments are comprised of high quality marketable securities. The Company generally does not use derivatives to hedge its interest rate risk with the exception of interest rate swaps to convert a portion of the Company's variable-interest-rate debt to a fixed-rate liability. At December 31, 2001, the fair values of the swaps were ($215,000). The change in the fair values of the swaps from the previous reported period is recorded in other comprehensive income (loss) due to the swaps meeting the criteria of an effective cash flow hedge.

Inflation. The Company does not believe that inflation has had a material impact on its results of operations for the six months ended December 31, 2001.

Part II - OTHER INFORMATION

Item 2. Changes in Securities and Use of Proceeds

In December 2001, the Company offered and sold 2,070,000 shares of its common stock to certain accredited, institutional investors for an aggregate of $40.4 million. As part of the sale, the Company granted warrants to the investors to purchase 517,500 shares of common stock at an exercise price of $23.47 per share. The Company paid Roth Capital Partners a placement agent fee consisting of a cash commission of $2.0 million and warrants. The warrants issued to Roth Capital represented the right to purchase 103,500 shares of common stock at an exercise price of $23.47 per share. Both the investor and Roth Capital warrants were exercisable immediately and expire in December 2008. No general forms of advertising or solicitation were used in connection the issuance of shares and warrants. The offer and sale of the Company's common stock and warrants above was exempt from the registration provisions of the Securities Act of 1933, as amended (the "Act"), pursuant to Section 4(2) and Regulation D thereof.

In November 2001, the Company offered and sold 1,696,946 shares of its common stock to certain accredited, institutional investors for an aggregate of $19.9 million. The Company paid Roth Capital Partners and William Blair & Company a placement agent fee consisting of a cash commission of $977,000 and $419,000, respectively, and, with respect to Roth Capital, warrants. The warrants issued to Roth Capital represented the right to purchase 84,847 shares of common stock at an exercise price of $15 per share. The Roth Capital warrants are exercisable after May 13, 2002 and expire in May 2005. No general forms of advertising or solicitation were used in connection the issuance of shares and warrants. The offer and sale of the Company's common stock and warrants above was exempt from the registration provisions of the Act, pursuant to Section 4(2) and Regulation D thereof.

Item 4. Submission of Matters to a Vote of Security Holders

At the annual meeting of shareholders on November 16, 2001, the following actions were taken:

<PAGE>

1. Election of Directors

| Name | For | Withheld |
|---|---|---|
| Deepak Chopra | 6,955,380 | 53,362 |
| Ajay Mehra | 6,955,380 | 53,362 |
| Steven C. Good | 6,996,380 | 12,362 |
| Meyer Luskin | 6,996,380 | 12,362 |
| Madan G. Syal | 6,994,500 | 14,242 |

1. Ratification of Deloitte & Touche L.L.P. as independent auditors for the year ending June 30, 2001.

| | |
|---|---|
| For | 6,999,681 |
| Against | 4,857 |
| Abstain | 4,204 |

Item 6. Exhibits and Reports of Form 8-K

a. Exhibits

None

b. Reports on Form 8-K

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 14th day of February 2002.

OSI Systems, Inc.

By: /s/ Deepak Chopra

Deepak Chopra
President and
Chief Executive Officer

By: /s/ Ajay Mehra

Ajay Mehra
Vice President and
Chief Financial Officer

</TEXT>
</DOCUMENT>

# Exhibit 8

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1312 of 2711

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**SCHEDULE 14A**
**(RULE 14A-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**
**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant x

Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement.

¨ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

x Definitive Proxy Statement.

¨ Definitive Additional Materials.

¨ Soliciting Material under Rule 14a-12.

# OSI SYSTEMS, INC.

**(Name of Registrant as Specified In Its Charter)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

¨ Fee paid previously with preliminary materials:

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 10, 2002

To Our Stockholders:

You are cordially invited to attend the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc. (the "Company"), which will be held at 10:00 a.m., local time, on November 14, 2002, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of the Company's outstanding common stock as of the close of business on October 3, 2002, are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

Ajay Mehra
*Secretary*



**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**To Be Held November 14, 2002**

---

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 14, 2002, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify the Board of Directors' amendment to the 1997 Stock Option Plan.

3. To ratify the selection of Deloitte & Touche L.L.P. as the Company's independent accountants for the fiscal year ending June 30, 2003.

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on October 3, 2002, as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Ajay Mehra
*Secretary*

Dated: October 10, 2002

**PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1315 of 2711

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the “Company”) for use at the Annual Meeting of Stockholders (the “Annual Meeting” or the “Meeting”), to be held at 10:00 a.m., local time, on November 14, 2002, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company or by issuance of a subsequent proxy. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 3, 2002, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 12,831,793 shares of common stock, without par value (“Common Stock”). Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any stockholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each stockholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (i.e., six) multiplied by the number of shares which the stockholder is entitled to vote. Unless the proxy holders are otherwise instructed, stockholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes. Only stockholders of record at the close of business on October 3, 2002 are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management of the Company was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Shares represented by executed and unrevoked proxies will be voted in accordance with the instructions contained therein or in the absence of such instructions, in accordance with the recommendations of the Board of Directors. Neither abstentions nor broker non-votes will be counted for the purposes of determining whether any of the proposals has been approved by the stockholders of the Company, although they will be counted for purposes of determining the presence of a quorum.

The election of directors requires a plurality of the votes cast by the holders of the Company’s Common Stock. A “plurality” means that the individuals who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of the other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting at the Meeting.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by telex or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefor. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 15, 2002 to all stockholders entitled to vote at the Annual Meeting.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

## ELECTION OF DIRECTORS
***(Item 1 of the Proxy Card)***

The Company has a Board of Directors consisting of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

Management shall nominate six directors. Management's nominees for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Stockholders in 2003, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although management knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as management may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present for purposes of determining if a quorum is present.

The following are Management's nominees for election as directors at this meeting.

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 51 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 40 | Vice President, Chief Financial Officer, Secretary and Director; President of OSI Security Group | 1996 |
| Steven C. Good(1)(2) | 60 | Director | 1987 |
| Meyer Luskin(1)(2) | 76 | Director | 1990 |
| Madan G. Syal | 76 | Director | 1987 |
| Chand R. Viswanathan(1) | 73 | Director | 2001 |

(1) Member of Audit Committee
(2) Member of Compensation Committee

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of

the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989, has served as Vice President and Chief Financial Officer since November 1992, and became Secretary and a Director in March 1996. Mr. Mehra also serves as President of the Company's Security Group, and as Vice President and Chief Financial Officer of the Company's major subsidiaries. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst, and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on Nasdaq. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, and Chromagen, Inc., a biotechnology company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

***Madan G. Syal*** has served as a Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a Bachelor of Science degree from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California at Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chairman of the department from 1979 to 1985.

**Executive Officers**

***Andreas F. Kotowski*** has served as Chief Technology Officer of the Company since October, 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan U.S.A."). From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. In 1992, Mr. Kotowski was a director of Dextra Medical, Inc. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he

was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

***Thomas K. Hickman*** presently serves as Vice President of Operations of the Rapiscan group and Managing Director of Opto Sensors (Singapore) Pte Ltd. and Opto Sensors (Malaysia) Sdn. Bhd., subsidiaries of the Company. From November 1992 to July 1993, Mr. Hickman served as Director of Materials for UDT Sensors, Inc. ("UDT Sensors"), a subsidiary of the Company, and, from July through November 1992, provided service as an independent consultant to UDT Sensors. From 1985 through 1992, Mr. Hickman held various positions at Mouse Systems Corporation, a manufacturer of computer optical mouse systems, including that of Director of OEM Operations, Purchasing Manager and Representative Director of a joint venture. Prior to 1985, Mr. Hickman was the Director of Materials for Measurex Corporation, the Representative Director for Hitachi-Singer Corp. and a Product Line Manager for Singer Business Machines. Mr. Hickman holds a Bachelor of Arts degree from Stetson University and a Master of Business Administration degree from the University of San Francisco.

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra and Madan G. Syal are the first cousin and father-in-law, respectively, of Deepak Chopra. Other than these relationships, there are no family relationships among the directors and executive officers of the Company.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present and voting at the Meeting.***

**Board of Directors Meetings and Committees of the Board of Directors**

There were four meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2002. The Board of Directors has established an Audit Committee and a Compensation Committee. The members of each committee are appointed by the majority vote of the Board of Directors. There is no nominating committee.

*Audit Committee*

The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. The Audit Committee consists of Messrs. Good, Luskin and Viswanathan. There were four meetings of the Audit Committee during the fiscal year ended June 30, 2002.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1319 of 2711

to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee presently consists of Messrs. Good and Luskin. There were two meetings of the Compensation Committee during the fiscal year ended June 30, 2002. See *Report of Compensation Committee on Executive Compensation.*

**Director Compensation**

Each non-employee Director receives a fee of $7,500 per year, $1,500 for each Board or Committee meeting attended, and options to purchase 5,000 shares of Common Stock at an exercise price equal to 100% of fair market value as of the date of grant. In addition, options to purchase 5,000 shares of common stock at an exercise price equal to 100% of fair market value as of the date of grant, were granted to each member of the compensation committee. These options vest in three equal installments on the first through the third anniversaries of the grant date, conditioned upon continued service as a director of the Company. The Directors also are reimbursed for expenses incurred in connection with the performance of their services as Directors.

**Compensation Committee Interlocks and Insider Participation**

During the fiscal year ended June 30, 2002, Steven C. Good and Meyer Luskin served on the Compensation Committee.

The Company currently intends that any future transactions, if any, with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Executive Compensation and Other Information**

The following table sets forth the compensation for the Chief Executive Officer and each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2002 (the "Named Executive Officers")

**SUMMARY COMPENSATION TABLE**

| | | | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | Annual Compensation | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | All Other Annual Compen-sation ($) | Restricted Stock Awards (#) | Securities Underlying Options/ SARS (#) | LTIP Payouts($) | All Other Compen-sation ($) |
| Deepak Chopra(1) | 2002 | 606,770 | 216,000 | — | — | 150,000 | — | — |
| Chief Executive Officer | 2001 | 600,000 | 22,500 | — | — | 40,000(2) | — | — |
| | 2000 | 536,539 | 22,500 | | | 50,000(3) | | |
| Ajay Mehra | 2002 | 252,139 | 60,000 | — | — | 50,000 | — | — |
| Chief Financial Officer | 2001 | 257,172 | 57,500 | — | — | 25,000(4) | — | — |
| | 2000 | 250,251 | 17,500 | — | — | 25,000(3) | — | — |
| Andreas F. Kotowski | 2002 | 189,615 | 10,000 | — | — | 10,000 | — | 76,250(6) |
| Chief Technology Officer | 2001 | 183,079 | — | — | — | 10,000 | — | — |
| | 2000 | 178,904 | — | — | — | 8,500 | — | — |
| | | | | | | | | — |
| Thomas K. Hickman | 2002 | 168,285 | 10,000 | — | — | 1,500 | — | — |
| Managing Director, | 2001 | 199,503 | — | — | — | 3,000(5) | — | — |
| OSI Malaysia and | 2000 | 185,275 | — | — | — | 15,000 | — | — |
| OSI Singapore | | | | | | | | |

(1) The Company paid aggregate insurance premiums of approximately $38,000 for three universal life insurance policies of Mr. Chopra in each of 2002, 2001, and 2000. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by it on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Executive officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 300,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(3) As compensation for services as a director of that company, on February 1, 1999, OSI Medical, Inc. granted to this person 7,500 10-year options to purchase common stock of OSI Medical, Inc. at a price of $1.35 per share, and on January 28, 2000, granted an additional 7,500 options at an exercise price of $1.50 per share. These options terminated prior to exercise.

(4) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Financial Officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 150,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(5) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services to OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to this person 20,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to the company. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(6) Consists of gain on exercise of non-qualified stock options

The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra’s annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000, to $650,000 as of April 1, 2001. Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001 and the increase was implemented effective January 1,2002. On April 1, 2002, the Company entered into a new five-year employment agreement with Mr. Chopra. The new agreement provides for a base salary of $750,000, and is otherwise similar to the prior agreement. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time. Mr. Chopra’s employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

The Company entered into a three-year employment agreement with Ajay Mehra, which became effective on April 1, 1997. The employment agreement provided for a base salary of $200,000 per year, with annual raises to be determined by management. The Compensation Committee increased Mr. Mehra’s annual base salary to $230,000 effective April 1, 1998. Pursuant to this employment agreement, Mr. Mehra was also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1321 of 2711
time to time. The employment agreement contained confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment. On September 1, 2000, the Company entered into a new three-year employment agreement with Mr. Mehra. This agreement provides for a base salary of $260,000, and is otherwise similar to the prior agreement. The Compensation Committee increased Mr. Mehra's annual base salary to $280,000 as of April 1, 2001. Mr. Mehra volunteered to postpone the effectiveness of the April 1, 2001 salary increase until December 31, 2001, and the increase was implemented effective January 1, 2002. The Compensation Committee increased Mr. Mehra's annual base salary to $310,000 effective September 1, 2002.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's annual salary initially was $140,000, which was increased to $165,000 effective April 16, 1998, to $175,000 on September 1, 1999, to $185,000 on September 1, 2000 and to $200,000 effective March 4, 2002. His salary has not been increased since that time. Pursuant to an incentive compensation agreement entered into in December 1996, for the 1997, 1998 and 1999 fiscal years Mr. Kotowski was entitled to receive as additional incentive compensation amounts equal to 10% of the consolidated pre-tax earnings of Rapiscan U.S.A. and Rapiscan U.K. in excess of certain pre-determined amounts, up to maximum compensation of $150,000 for any fiscal year. This agreement expired at the end of fiscal year 1999.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's initial annual salary was $125,000, which was increased to $137,500 effective July 1, 1998, to $160,000 effective July 1, 2000 and to $175,000 effective July 1, 2002. His salary has not been increased since that time. During fiscal 1999, Mr. Hickman received a bonus payment of $50,000, which amount was his bonus for fiscal 1998. In addition to his salary, the Company paid certain expenses related to his service in Singapore. Mr. Hickman was transferred from Malaysia to the U.K. as of February 1, 2000. In connection with such transfer, he was allowed a relocation allowance of up to approximately $13,000. During his posting in the U.K., the Company is also paying him a cost-of-living allowance of approximately $45,000 per year and providing him with a leased automobile at a cost of approximately $9,200 per year. Mr. Hickman subsequently moved back to Malaysia in September 2001. Mr. Hickman's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

As part of a cost savings program, Messrs. Chopra, Mehra and Kotowski took a voluntary 10% pay cut for the fourth quarter of fiscal 1999. Additionally, during fiscal 1999, Messrs. Chopra, Mehra, Kotowski and Hickman took voluntary pay cuts for which the Company granted to them options to purchase 5,200, 2,400, 1,700 and 650 shares, respectively, of the Company's Common Stock, at an exercise price of $7.00 per share.

Management of the Company allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

**Certain Relationships and Related Transactions**

On December 23, 1997, the Board of Directors authorized the Company to loan to Deepak Chopra and Ajay Mehra the sums of $90,000 and $70,000 respectively, at an interest rate of six percent per annum, to be repaid within 48 months of such date. These amounts have been repaid in full.

The Company, Mr. Chopra and Mr. Mehra, each currently owns a 36.0%, 10.5% and 4.5% interest, respectively, in ECIL-Rapiscan Security Products Limited ("ECIL Rapiscan"). The remaining 49.0% interest in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1322 of 2711

ECIL Rapiscan is owned by Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan have been insignificant.

The Company contracts for a portion of its automobile rental and daily messenger services from a business that is owned by Deepak Chopra and his wife. The Company paid the business approximately $107,000 for such services during fiscal 2002. The Company contracts for printing services from a business owned by Madan G. Syal, a Director of the Company. The Company paid the business approximately $100,000 for such services during fiscal 2002. The Company also contracts for professional services from a firm that has a partner serving as a member of the Company's board of directors. The Company paid the firm approximately $14,000 for such services during fiscal 2002.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Option Grants**

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2002:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options(1) Granted(#) | % of Total Options Granted to Employees in Fiscal Year (%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Option Term(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5%($) | 10%($) |
| Deepak Chopra | 50,000 | 10.5 | 3.77 | 8/27/06 | 52,079 | 115,081 |
| | 100,000 | 21.0 | 19.95 | 1/29/07 | 551,182 | 1,217,967 |
| Ajay Mehra | 25,000 | 5.2 | 14.76 | 11/16/06 | 101,948 | 225,278 |
| | 25,000 | 5.2 | 19.95 | 1/29/07 | 137,795 | 304,492 |
| Andreas F. Kotowski | 1,500 | 0.3 | 8.06 | 10/2/06 | 3,340 | 7,381 |
| | 1,000 | 0.2 | 19.95 | 1/29/07 | 5,512 | 12,180 |
| | 7,500 | 1.6 | 19.57 | 6/7/07 | 40,551 | 89,608 |
| Thomas K. Hickman | 1,500 | 0.3 | 19.95 | 1/29/07 | 8,268 | 18,270 |

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.

(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission and do not represent the Company's estimate or projection of future Common Stock prices.

**Option Exercises and Fiscal Year-End Values**

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2002 and held by them on June 30, 2002:

**AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES**

| | | | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($) (1) | |
|---|---|---|---|---|---|---|
| Name | Shares Acquired On Exercise (#) | Value Realized ($) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra | 70,000 | 443,100 | 40,200 | 205,000 | 533,866 | 1,585,950 |
| Ajay Mehra | 43,750 | 334,437 | 31,150 | 81,250 | 407,592 | 531,100 |
| Andreas F. Kotowski | 57,029 | 540,052 | 13,450 | 21,750 | 164,395 | 31,830 |
| Thomas K. Hickman | 9,897 | 114,952 | 11,400 | 11,250 | 133,540 | 125,495 |

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $19.83 per share).

**Stock Option Plans**

***1987 Incentive Stock Option Plan.*** In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the “1987 Plan”). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors, which has discretion to select options and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are nontransferable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2002, 908,385 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 83,600 shares were outstanding under the 1987 Plan at exercise prices ranging from $2.0 to $11.10 per share, and no shares remained available for grant, since the 1987 Plan expired on December 31, 1998. As of such date, stock options to purchase 83,600 shares of Common Stock were exercisable.

***1997 Stock Option Plan.*** In May 1997, the Board of Directors adopted the Company’s 1997 Stock Option Plan (the “1997 Plan”). The 1997 Plan, which was approved by the Company’s stockholders in June 1997, provides for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company’s stockholders approved an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be “incentive stock options” as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the “Code”), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2002, stock options to purchase 397,989 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,063,010 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.13 to $19.95 per share, and stock options to purchase 389,001 shares remained available for grant. As of such date, stock options to purchase 193,150 shares were exercisable. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During fiscal 2002, the Board of Directors of the Company granted options to purchase an aggregate of 477,225 shares of Common Stock available for issuance under the 1997 Plan to certain officers and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. The options generally will be subject to vesting and will become exercisable in equal installments over a period of three years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1987 Plan and the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

**Employee Stock Purchase Plan**

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's stockholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase through regular payroll deductions up to an aggregate of 200,000 shares of Common Stock. The 1998 Plan is administered by the Board of Directors, or a committee of the Board. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1325 of 2711

determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

**Employee Benefit Plan, Pension Plans**

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($10,500 in calendar 2001) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. As of June 30, 2002, the Company had provided $93,000 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Rapiscan U.K. and Advanced Micro Electronics AS, subsidiaries of the Company, each has a pension plan in effect for certain of their employees. As of the date hereof, approximately 50 employees are covered by these plans.

**Report of Compensation Committee on Executive Compensation**

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers.

The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

***Compensation Philosophy.*** The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its stockholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and stockholder value.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1326 of 2711

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's stockholders.

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the statute exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

***Compensation Program Components.*** The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

*Base Salary.* Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Bonus.* Management of the Company allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

*Long-Term Incentive Compensation.* The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1327 of 2711
and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

***Chief Executive Officer's Compensation.*** The Company has entered into an employment agreement with Deepak Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he serves as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provides for an initial base salary of $450,000 per year, with annual raises to be determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra's annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000, and to $650,000 as of April 1, 2001. Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001 and the increase was implemented effective January 1, 2002. The Company entered into a new five-year employment agreement with Mr. Chopra. The new agreement provides for a base salary of $750,000, and in otherwise similar to the prior agreement. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time.

***Summary.*** The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's stockholders, by attracting and retaining the best qualified people as senior management and enhancing corporate performance. Furthermore, the Compensation Committee believes that executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

**Report of Audit Committee**

*The information contained in this report shall not be deemed to be "soliciting material" or "filed" or incorporated by reference in future filings with the SEC, or subject to the liabilities of Section 18 of the Securities Exchange Act of 1934, except to the extent that the Company specifically incorporates it by reference into a document filed under the Securities Act of 1933, as amended, or the Exchange Act.*

The Audit Committee has reviewed and discussed with the Company's management and Deloitte & Touche LLP the audited consolidated financial statements of the Company contained in the Company's Annual Report on Form 10-K for the Company's 2002 fiscal year. The Audit Committee has also discussed with Deloitte & Touche LLP the matters required to be discussed pursuant to SAS No. 61 (Codification of Statements on Auditing Standards, AU Section 380), which includes, among other items, matters related to the conduct of the audit of the Company's consolidated financial statements.

The Audit Committee has received and reviewed the written disclosures and the letter from Deloitte & Touche LLP required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), and has discussed with Deloitte & Touche LLP its independence from the Company.

Based on the review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for its 2002 fiscal year for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Chand R. Viswanathan

**Performance Graph**

The graph below compares the Company's cumulative total stockholder return since the Company's Common Stock became publicly traded on October 2, 1997, with the Nasdaq Market Index and with a peer group comprised of companies with which the Company generally competes.

The peer group is comprised of the following companies: PerkinElmer, Inc. (NYSE Symbol: PKI), which was previously known as "EG&G" (whose security detection group was sold to L-3 Communications in June 2002); and InVision Technologies, Inc. (Nasdaq Symbol: INVN). The Company previously included Optek Technology, Inc. (Nasdaq Symbol: OPTT), Vivid Technologies, Inc. (Nasdaq Symbol: VVID) and Barringer Technologies, Inc. (Nasdaq Symbol: BARR) in its peer group. However, Optek Technology, Inc. has been acquired by a wholly-owned subsidiary of the Dyson-Kissner-Moran Corporation, Vivid Technologies, Inc. been acquired by PerkinElmer, Inc., and Barringer Technologies, Inc. has been acquired by Smith Industries and thus they are no longer included in the peer group.

The graph assumes that $100.00 was invested on October 2, 1997 in the Company's Common Stock, at the closing price of $15.13 per share (on which date the initial public offering price was $13.50 per share), and in each of the indexes mentioned above, and that all dividends were reinvested.

**COMPARISON OF CUMULATIVE TOTAL RETURN AMONG OSI SYSTEMS, INC., NASDAQ MARKET INDEX AND PEER GROUP INDEX**

| | 10/02/97 | 12/31/97 | 3/31/98 | 6/30/98 | 9/30/98 | 12/31/98 | 3/31/99 | 6/30/99 |
|---|---|---|---|---|---|---|---|---|
| OSI Systems, Inc. | 100.00 | 80.99 | 76.86 | 66.12 | 50.41 | 57.02 | 34.30 | 33.06 |
| Nasdaq Market Index | 100.00 | 93.90 | 130.55 | 133.28 | 101.08 | 123.80 | 117.29 | 157.07 |
| Peer Group | 100.00 | 93.70 | 109.81 | 112.65 | 101.53 | 131.98 | 147.45 | 160.45 |

| | 9/30/99 | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 3/31/01 | 6/30/01 |
|---|---|---|---|---|---|---|---|---|
| OSI Systems, Inc. | 24.79 | 36.36 | 97.52 | 52.69 | 69.42 | 40.50 | 21.08 | 24.60 |
| Nasdaq Market Index | 173.62 | 183.15 | 292.21 | 288.91 | 453.65 | 454.34 | 229.75 | 242.49 |
| Peer Group | 163.06 | 240.83 | 274.02 | 235.68 | 217.49 | 146.15 | 110.19 | 129.14 |

| | 9/28/01 | 12/31/01 | 3/28/02 | 6/28/02 |
|---|---|---|---|---|
| OSI Systems, Inc. | 52.30 | 120.60 | 166.61 | 131.11 |
| Nasdaq Market Index | 238.91 | 337.33 | 204.84 | 123.02 |
| Peer Group | 89.68 | 116.89 | 110.80 | 88.86 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1329 of 2711

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2002 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,053,140 | 8.21% |
| Essex Investment Management Co. Inc.(4) | 1,508,005 | 11.8% |

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2002, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 52,700 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Essex Investment Management Co. Inc., whose address was reported as 125 High Street, South Boston, MA 02110.

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2002 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,053,140 | 8.2% |
| Ajay Mehra(4) | 123,364 | 1.0% |
| Andreas F. Kotowski(5) | 73,768 | 0.6% |
| Thomas K. Hickman(6) | 31,697 | 0.2% |
| Steven C. Good(7) | 11,875 | 0.1% |
| Meyer Luskin(8) | 44,035 | 0.2% |
| Madan G. Syal(9) | 55,250 | 0.4% |
| Chand R. Viswanathan | 1,250 | 0.0% |
| All directors and executive officers as a group (8 persons)(3)(4)(5)(6)(7)(8)(9)(10) | 1,394,379 | 10.8% |

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will

become exercisable no later than 60 days after June 30, 2002, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 52,700 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) Includes 33,650 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Mehra is the Vice President, Chief Financial Officer, Secretary and a Director of the Company and President of OSI Security Group.

(5) Includes 15,950 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Kotowski is the Chief Technology Officer of the Company.

(6) Includes 13,900 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Hickman is Vice President of Operations of Rapiscan Group and the Managing Director of OSI Singapore and OSI Malaysia.

(7) Includes 6,875 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Includes 5,000 shares owned for Mr. Good's benefit by the Good Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, California 90025.

(8) Includes 6,742 shares held by the Meyer and Doreen Luskin Family Trust. Includes 6,125 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Luskin is the President, Chief Executive Officer, Chairman of the Board and a principal stockholder of Scope Industries, Inc. Includes 25,000 shares owned by Scope Industries, Inc. as to which Mr. Luskin disclaims beneficial ownership. The address of Mr. Luskin is c/o Scope Industries, Inc., 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(9) Includes 44,000 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Includes 11,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Syal is a Director of the Company.

(10) Includes 1,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2002. Mr. Viswanathan is a Director of the Company.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. Such officers, directors and stockholders are required by Securities and Exchange Commission regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2002, and written representations from certain reporting persons, the Company believes that all filing requirements applicable to the Company's executive officers, directors and more than 10% stockholders have been complied with.

**RATIFICATION OF AMENDMENT OF 1997 STOCK OPTION PLAN**
***(Item 2 of the Proxy Card)***

The Company's 1997 Stock Option Plan (the "1997 Plan") is described above in Stock Option Plans. The Board of Directors has voted to amend the 1997 Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 1,850,000 to 2,350,000. No other change in the plan is

presently proposed. As of June 30, 2002, options to purchase 397,989 shares were exercised under the 1997 Plan and options to purchase 1,063,010 shares were outstanding under the 1997 Plan, leaving options to purchase only 389,001 shares of Common Stock authorized for issuance under the 1997 Plan. The Board of Directors believes that the proposed increase in the number of shares of Common Stock available for issuance as provided in the 1997 Plan will provide the Compensation Committee with greater flexibility in the administration of the Incentive Plan and is appropriate in light of the growth of the Company and the addition of new employees who will be subject to the Incentive Plan. The increase in the number of shares for which options may be issued under the 1997 Plan would represent approximately 3.9% of the issued and outstanding shares of Common Stock of the Company as of June 30, 2002.

As of the date hereof, the Company cannot estimate the benefits or amounts required by Item 10 of this Schedule 14A with respect to the persons and groups specified in such Item resulting from the approval of the amendment to this 1997 Plan.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the amendment of the Company's 1997 Stock Option Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 1,850,000 to 2,350,000. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

## RATIFICATION OF SELECTION OF INDEPENDENT ACCOUNTANTS
***(Item 3 of the Proxy Card)***

The Board of Directors has selected Deloitte & Touche L.L.P. ("Deloitte & Touche") as the Company's independent accountants for the fiscal year ending June 30, 2002, and has further directed that management submit the selection of independent accountants for ratification by the stockholders at the Annual Meeting. Deloitte & Touche has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte & Touche is not expected to be present at the Annual Meeting.

In the event the stockholders fail to ratify the selection of Deloitte & Touche, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the best interests of the Company and its stockholders.

**Fees for Independent Accountants**

Aggregate fees billed to the Company for the fiscal year ended June 30, 2002 by the Company's principal accounting firm, Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu, and their respective affiliates (collectively, "Deloitte & Touche"):

| | | |
|---|---|---|
| Audit Fees | $ | 298,000 |
| Financial Information Systems Design and Implementation Fees | $ | 0 |
| All Other Fees* | $ | 377,000 |
| Total Fees | $ | 675,000 |

* Other fees consisted of tax and audit-related services of $286,000 and $91,000, respectively. The tax services were primarily comprised of U.S. and international tax return compliance and advisory services. Audit-related services included audits of employee benefit plans, consents related to SEC and other registration statements, and fees for due diligence services.

In making its recommendation to ratify the appointment of Deloitte & Touche as the Company's independent accountants for the 2003 fiscal year, the Audit Committee has determined that the non-audit services provided by Deloitte & Touche are compatible with maintaining the independence of Deloitte & Touche.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the selection of the independent accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

## OTHER BUSINESS

The Company does not know of any other business to be presented to the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

## STOCKHOLDER PROPOSALS

Any proposals of security holders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 15, 2003, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the Securities and Exchange Commission is available upon written request and without charge to stockholders by writing to Ajay Mehra, Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

By Order of the Board of Directors

Ajay Mehra
*Secretary*

Hawthorne, California
October 10, 2002

**PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1333 of 2711

**PROXY**

**OSI SYSTEMS, INC.**

**PROXY**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Stockholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on October 3, 2002, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Stockholders of the Company to be held on November 14, 2002, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2003 Annual Meeting of Stockholders or until their respective successors are elected and qualified:

¨ **FOR ALL** ¨ **WITHHOLD AUTHORITY FOR ALL**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal, Chand R. Viswanathan

To withhold authority to vote for any individual nominee, write the nominee's name in the space provided below:

---

2. To ratify the Board of Director's amendment to the 1997 Stock Option Plan.

¨ **FOR** ¨ **AGAINST** ¨ **ABSTAIN**

3. To ratify the Board of Director's selection of Deloitte & Touche LLP to serve as the Company's independent accountants for the fiscal year ending June 30, 2003.

¨ **FOR** ¨ **AGAINST** ¨ **ABSTAIN**

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

This Proxy, when properly executed, will be voted in the manner directed herein. **This Proxy will be voted FOR the election of the directors listed and FOR the other proposals if no specification is made.**

Please sign exactly as your name(s) is (are) shown on the stock certificate to which the Proxy applies. When shares are held by joint tenants, both should sign. When signing as an attorney, executor, administrator, trustee or guardian, please give full title, as such. If a corporation, please sign in full corporate name by the President or other authorized officer. If a partnership, please sign in the partnership's name by an authorized person.

Dated: ________________ , 2002

______________________________

Signature

______________________________

Signature if held jointly

Please mark, sign, date and return the proxy card promptly using the enclosed envelope.

# Exhibit 9

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1336 of 2711
10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON DC 20549**

# FORM 10-Q

**(Mark one)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended December 31, 2002**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ____ to ____**

**Commission File Number 0-23125**

# OSI SYSTEMS, INC.
**(Exact name of Registrant as specified in its charter)**

| **California** | **33-0238801** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**Registrant's telephone number, including area code: (310) 978-0516**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past ninety days.

YES x NO o

Indicate by check mark the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act)

YES x NO o

As of February 5, 2003 there were 14,450,812 shares of common stock outstanding.

Table of Contents

**OSI SYSTEMS, INC.**

**INDEX**

| | | PAGE NUMBER |
|---|---|---|
| **PART I - FINANCIAL INFORMATION** | | |
| Item 1 – | Consolidated Financial Statements | |
| | Consolidated Balance Sheets at December 31, 2002 and June 30, 2002 | 3 |
| | Consolidated Statements of Operations for the three and six months ended December 31, 2002 and December 31, 2001 | 4 |
| | Consolidated Statements of Cash Flows for the six months ended December 31, 2002 and December 31, 2001 | 5 |
| | Notes to Consolidated Financial Statements | 6 |
| Item 2 – | Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Item 3 – | Quantitative and Qualitative Disclosures about Market Risk | 21 |
| Item 4 – | Controls and Procedures | 22 |
| **PART II - OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 23 |
| Item 2. | Changes in Securities and Use of Proceeds | 23 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 24 |
| Item 6. | Exhibits and Reports on Form 8-K | 24 |
| Signatures | | 25 |

Table of Contents

## PART I. FINANCIAL INFORMATION

### Item 1.Consolidated Financial Statements

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share amounts)**

| | December 31, 2002 | June 30, 2002 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 89,469 | $ 67,604 |
| Investments | 513 | 539 |
| Accounts receivable, net of allowance for doubtful accounts of $1,783 and $1,485 at December 31, 2002 and June 30, 2002, respectively | 35,468 | 38,812 |
| Current portion of note receivable | 350 | 350 |
| Other receivables | 4,187 | 3,103 |
| Inventory | 47,112 | 36,512 |
| Prepaid expenses | 1,430 | 1,008 |
| Deferred income taxes | 2,428 | 2,026 |
| Prepaid income taxes | 177 | 175 |
| Total current assets | 181,134 | 150,129 |
| Property and Equipment, net | 13,992 | 12,901 |
| Goodwill | 6,507 | 5,690 |
| Intangible assets, net | 13,469 | 823 |
| Other assets, net | 3,724 | 1,751 |
| Note receivable | 250 | 450 |
| Deferred income taxes | 5,356 | 3,614 |
| Total | $ 224,432 | $ 175,358 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 138 | |
| Current portion of long-term debt | 2,625 | $ 2,625 |
| Accounts payable | 15,360 | 13,379 |
| Accrued payroll and related expenses | 4,802 | 3,784 |
| Income taxes payable | 4,922 | 2,861 |
| Advances from customers | 9,487 | 4,484 |
| Accrued warranties | 2,720 | 2,164 |
| Other accrued expenses and current liabilities | 10,666 | 5,201 |
| Total current liabilities | 50,720 | 34,498 |
| Long-term debt | 3,143 | 4,463 |
| Other long term liabilities | 448 | 448 |
| Deferred income taxes | 136 | 136 |
| Minority interest | 122 | 79 |
| Total liabilities | 54,569 | 39,624 |

| | | |
|---|---|---|
| Shareholders' Equity | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December 31, 2002 and June 30, 2002, respectively | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding 14,443,295 and 12,806,896 shares at December 31, 2002 and June 30, 2002, respectively | 134,652 | 108,141 |
| Retained earnings | 36,174 | 29,212 |
| Accumulated other comprehensive loss | (963) | (1,619) |
| Total shareholders' equity | 169,863 | 135,734 |
| Total | $ 224,432 | $ 175,358 |

See accompanying notes to consolidated financial statements

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share amounts)**

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| Revenues | $ 43,673 | $ 30,044 | $ 80,774 | $ 56,499 |
| Cost of goods sold | 29,186 | 21,172 | 53,307 | 40,621 |
| Gross profit | 14,487 | 8,872 | 27,467 | 15,878 |
| Operating expenses: | | | | |
| Selling, general and administrative | 6,771 | 5,308 | 13,590 | 9,892 |
| Research and development | 2,215 | 1,581 | 3,761 | 3,156 |
| Goodwill amortization | | 101 | | 202 |
| Total operating expenses | 8,986 | 6,990 | 17,351 | 13,250 |
| Income from operations | 5,501 | 1,882 | 10,116 | 2,628 |
| Interest (income) expense, net | (207) | 72 | (381) | 231 |
| Write-off of deferred acquisition costs | 608 | | 608 | |
| Income before provision for income taxes and minority interest | 5,100 | 1,810 | 9,889 | 2,397 |
| Provision for income taxes | 1,302 | 525 | 2,885 | 702 |
| Income before minority interest | 3,798 | 1,285 | 7,004 | 1,695 |
| Minority interest | (38) | | (43) | |
| Net income | $ 3,760 | $ 1,285 | $ 6,961 | $ 1,695 |
| Earnings per common share | $ 0.26 | $ 0.12 | $ 0.51 | $ 0.18 |
| Diluted earnings per share | $ 0.25 | $ 0.12 | $ 0.49 | $ 0.18 |
| Weighted average shares outstanding -assuming dilution | 14,842,002 | 11,098,649 | 14,099,600 | 9,756,496 |

See accompanying notes to consolidated financial statements

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Six months ended December 31, | |
|---|---|---|
| | **2002** | **2001** |
| Cash flows from operating activities: | | |
| Net income | $ 6,961 | $ 1,695 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Provision for losses on accounts receivable | 265 | 313 |
| Depreciation and amortization | 1,629 | 2,123 |
| Write-off of deferred acquisition costs | 608 | |
| Deferred income taxes | (1,741) | 112 |
| Loss on sale of property and equipment | | 62 |
| Minority interest | 44 | |
| Changes in operating assets and liabilities net of business acquisitions: | | |
| Accounts receivable | 4,380 | (1,701) |
| Other receivables | (992) | (245) |
| Inventory | (9,158) | (911) |
| Prepaid expenses | (42) | (20) |
| Accounts payable | 869 | 3,431 |
| Accrued payroll and related expenses | 333 | 130 |
| Income taxes payable | 1,927 | (73) |
| Prepaid Income taxes | (2) | (377) |
| Advances from customers | 4,985 | 294 |
| Accrued warranties | 463 | (7) |
| Other accrued expenses and current liabilities | (488) | 482 |
| Net cash provided by operating activities | 10,041 | 5,308 |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (1,607) | (1,108) |
| Proceeds from sale of property and equipment | — | 73 |
| Cash paid for business acquisitions, net of cash acquired | (2,829) | |
| Cash received on note receivable | 200 | 250 |
| Purchase of equity investments included in other assets | (2,561) | |
| Other assets | (965) | (248) |
| Net cash used in investing activities | (7,762) | (1,033) |
| Cash flows from financing activities: | | |
| Net proceeds from bank lines of credits | 130 | 415 |
| Payments on long-term debt | (1,320) | (1,269) |
| Proceeds from exercise of stock options and warrants | 216 | 2,175 |
| Proceeds from issuance of stock | 20,545 | 56,794 |
| Net cash provided by financing activities | 19,571 | 58,115 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1342 of 2711

| | | | | |
|---|---|---|---|---|
| Effect of exchange rate changes on cash | | 15 | | (43) |
| Net increase in cash and cash equivalents | | 21,865 | | 62,347 |
| Cash and cash equivalents, beginning of period | | 67,604 | | 4,467 |
| Cash and cash equivalents, end of period | $ | 89,469 | $ | 66,814 |
| Supplemental disclosures of cash flow information - Cash paid/(received) during the period for: | | | | |
| Interest, net | $ | (416) | $ | 168 |
| Income taxes | $ | 2,770 | $ | 1,066 |

See accompanying notes to consolidated financial statements

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*General* - OSI Systems, Inc. (sometimes referred to as "OSI") and its subsidiaries is a vertically integrated, worldwide provider of security and inspection systems, medical and imaging systems, and optoelectronic devices and value-added subsystems.

We design, manufacture and market security and inspection systems worldwide to end users under the "Rapiscan Ò," "Secure," "Ancore," and "Metor" brand names. These products are used to inspect people, baggage, cargo, vehicles and other objects for weapons, explosives, hazardous chemical agents, drugs and other contraband. Such systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials.

In the medical field, we design, manufacture and market bone densitometers, which are used to provide bone density measurements in the diagnosis of osteoporosis, or to provide an early age indication of the potential for later development of osteoporosis. We also manufacture and sell saturation of arterial hemoglobin ("$SpO_2$") monitors and sensors, including hand-held monitoring tools under the trade names Dolphin ONE Ô, Aristo Ô and Dolphin 2000 Ô. Dolphin model 2100 $SpO_2$ monitors have received 510[k] approval for sale in the United States.

Our optoelectronic devices and subsystems are used in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical diagnostics, fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We design and manufacture optoelectronic devices and subsystems for others through OEM arrangements, as well as for our security and medical equipment businesses.

*Consolidation* - The consolidated financial statements include the accounts of OSI Systems, Inc. and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The consolidated balance sheet as of December 31, 2002 and consolidated statements of operations and cash flows for the three and six month period then ended have been prepared by us, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "Commission"). Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. However, in the opinion of management all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes for the fiscal year ended June 30, 2002 included in our Annual Report on Form 10-K as filed with the Commission on September 30, 2002. The results of operations for the three and six months ended December 31, 2002 are not necessarily indicative of the results to be expected for the fiscal year ending June 30, 2003.

Table of Contents

*Recent Developments* – In November 2002, we acquired all the outstanding capital stock of Ancore Corporation ("Ancore"), a Santa Clara, California based privately held high-technology developer and provider of advanced inspection systems for aviation security, port and border inspection and counter-terrorism. Consideration paid for the acquisition consists of a combination of OSI common stock and cash. At the close of the acquisition, we paid $2 million in cash, and issued 347,890 shares of OSI Common Stock valued at $5.8 million. Expenses associated with the acquisition were approximately $100,000, and have been included in the total purchase price. The acquisition agreement contains certain provisions for additional contingent purchase price.

In December 2002, an additional cash payment of $2 million became due and payable to former Ancore stockholders based on Ancore meeting certain performance criteria. The additional $2 million has been included in the allocated purchase price and has been accrued in other accrued expenses and current liabilities in the accompanying consolidated financial statements. This payment was made in January 2003. Based upon certain performance criteria, we may pay an additional $4.69 million, in either cash or stock at our election, on or before May 10, 2003. In addition, during the next five years, upon each commercial sale of Pulsed Fast Neutron Analysis (PFNA) inspection systems, we will pay former Ancore stockholders an earn-out of 6% of the price of the PFNA system, up to $750,000 per system, in either cash or stock, at our election. The PFNA earn-outs are capped at an aggregate of $34 million. PFNA Systems are currently in development under government funding, and there is no assurance that PFNA Systems will be successfully commercialized.

On December 9, 2002, we filed a registration statement on Form S-3 with the Securities and Exchange Commission to register the shares issued as part of the Ancore purchase consideration, as well as shares potentially issuable in satisfaction of contingent payments. The registration statement was declared effective as of December 16, 2002.

The acquisition was made through a newly formed, wholly owned subsidiary Ancore, Inc., and has been accounted for by the purchase method of accounting. The purchase price has been allocated to the assets acquired of $2.4 million and liabilities assumed of $5.3 million, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of the net assets acquired of $12.7 million was allocated to intangible assets including core technology, developed technology and goodwill, based on a preliminary independent valuation of those assets. We are in the process of assessing the purchase price allocation for the acquisition of Ancore based on the appraisals of tangible and identifiable intangible assets. The final determination may result in asset fair values and useful lives that are different from the preliminary estimates of these amounts. The following table shows the preliminary allocation of purchase price (in thousands):

| | | |
|---|---|---|
| Fair value of assets (net of cash) acquired | $ | 1,700 |
| Core technology | | 6,800 |
| Developed technology | | 5,700 |
| Goodwill | | 203 |
| Liabilities Assumed | | (5,275) |
| Total consideration | $ | 9,128 |
| Paid in cash | $ | 1,379 |
| Amounts not yet paid and stock consideration | $ | 7,749 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1345 of 2711

Table of Contents

Supplemental pro-forma disclosures of results of operations for the three and six months ended December 31, 2002 and 2001 respectively, as though the business combination had been completed as of July 1, 2001 are as follows (in thousands except per share amounts):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| Revenue | $ 44,826 | $ 31,243 | $ 83,452 | $ 58,917 |
| Net Income before taxes | 4,654 | 1,589 | 6,513 | 1,906 |
| Net Income | 3,335 | 1,134 | 4,657 | 1,359 |
| Diluted Earnings per Share | 0.22 | 0.10 | 0.33 | 0.14 |

In October 2002, we issued and sold an aggregate of 1,250,000 shares of our common stock in a private placement to institutional investors for an aggregate sales price of $21.6 million. After agent's commissions, and expenses, net proceeds to us were $20.6 million. Roth Capital Partners served as the placement agent for this transaction. As part of the transaction, we issued to the investors warrants to purchase 281,250 additional shares of OSI Common Stock at an exercise price of $21.217 per share, exercisable at any time in full or part no later than October 21, 2009. On October 28, 2002, we filed a registration statement on Form S-3 with the Securities and Exchange Commission for the purpose of registering these securities. The registration statement was declared effective as of November 4, 2002.

In July 2002, we acquired substantially all the assets and business of Thermo Centro Vision, Inc., an optoelectronic subsystems designer and manufacturer based in Ventura County, California, for a purchase price of $1.45 million. The acquisition was made through a newly formed, wholly-owned subsidiary, Centro Vision. The acquisition has been accounted for by the purchase method of accounting, and, accordingly, the purchase price has been allocated to the assets acquired of $1.5 million and liabilities assumed of $410,000, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of the net assets acquired of $399,000 was allocated to goodwill. Although our agreement to purchase the assets and business of Thermo Centro Vision, Inc. included a provision for a contingent additional payment based on the financial performance of the business measured as of December 31, 2002, the minimum threshold for the contingent additional payment was not met. We are therefore under no further obligation to make additional purchase price payments in this transaction. The following table shows the allocation of purchase price (in thousands):

| | |
|---|---|
| Fair value of assets acquired | $ 1,461 |
| Goodwill | 399 |
| Liabilities Assumed | (410) |
| Cash paid | $ 1,450 |

Supplemental pro-forma disclosures of results of operations for the three and six months ended December 31, 2002 and 2001, respectively, as though the business combination had been completed as of July 1, 2001 is not disclosed, as the business acquired is not considered to be material.

Table of Contents

In July 2002, we purchased from Imagis Technologies, Inc. ("Imagis") 1,166,667 shares of its common stock (approximately 6% of its then-outstanding stock), and 2-year warrants to purchase 291,667 additional shares of Imagis common stock (approximately 1.5% of its then-outstanding stock) at a price of $1.50 per share, and certain ancillary rights, for an aggregate purchase price of $1.75 million. Imagis develops facial recognition software for security applications. We account for the investment under the cost method of accounting and have designated the investment as available for sale. The investment, adjusted for changes in the market value of Imagis' equity securities, is included under "other assets" in the accompanying consolidated financial statements

In August 2002, we invested $775,000 to purchase a minority equity interest in a UK-based research and development venture focused on security technologies. We account for the investment under the equity method of accounting and the investment is included under "other assets" in the accompanying consolidated financial statements. Our equity share in the losses of the equity investment was not material for six months ended December 31, 2002.

In fiscal 2002, we entered into an agreement regarding a joint acquisition by us and L-3 Communications Corporation ("L-3") of certain detection and security businesses then owned by PerkinElmer, Inc. ("PerkinElmer"). The transaction as contemplated would result in our acquisition from L-3 of a certain portion of PerkinElmer's detection and security businesses. L-3 completed the purchase of the entirety of the businesses from PerkinElmer in June 2002. In November 2002, L-3 terminated the L-3/OSI transaction prior to consummation. Because of L-3's termination of the transaction, for the three months ended December 31, 2002, we recorded an expense of $608,000 consisting of previously deferred transaction-related expenses.

*New Accounting Pronouncements*

On July 1, 2002, we adopted SFAS No. 142, *Goodwill and Other Intangible Assets*, which eliminates the amortization of goodwill. SFAS 142 also establishes a new method of testing goodwill for impairment on an annual basis or on an interim basis if an event occurs or circumstances change that would reduce the fair value of a reporting unit below its carrying value. In accordance with the statement, amortization of goodwill, including goodwill recorded in past business combinations, ceased beginning July 1, 2002. SFAS 142 prescribes a two-phase process for impairment testing of goodwill. The first phase, required to be completed by December 31, 2002, screens for impairment; the second phase (if necessary), required to be completed by June 30, 2003, measures the impairment. We have completed the first phase, screening for impairment, and have concluded that there is no impairment of goodwill. SFAS 142 also requires that intangible assets that do not meet the criteria for recognition apart from goodwill be reclassified and that intangibles with indefinite lives cease to be amortized in favor of periodic impairment testing. We determined that as of July 1, 2002, no change was necessary to the classification and useful lives of identifiable intangible assets.

Table of Contents

Intangible assets consisted of the following (in thousands):

| | December 31, 2002 | | | | June 30, 2002 | | |
|---|---|---|---|---|---|---|---|
| | Range of Lifes | Gross Carrying Amount | Accumulated Amortization | Intangibles Net | Gross Carrying Amount | Accumulated Amortization | Intangibles Net |
| Purchased software | 5-7 years | $ 327 | $ 210 | $ 117 | $ 327 | $ 178 | $ 149 |
| Software development costs | 5 years | 1,182 | 632 | 550 | 895 | 594 | 301 |
| Patents | 20 years | 408 | 66 | 342 | 408 | 35 | 373 |
| Core technology | 30 years | 6,800 | 18 | 6,782 | | | |
| Developed technology | 20 years | 5,700 | 22 | 5,678 | | | |
| | | $ 14,417 | $ 948 | $ 13,469 | $ 1,630 | $ 807 | $ 823 |

Amortization expense for the three months and six months ended December 31, 2002 was approximately $129,000 and $185,000 respectively. At December 31, 2002, estimated future amortization expense is as follows (in thousands):

| Fiscal Year | Amortization Expense |
|---|---|
| Remaining 6 months of 2003 | $ 327 |
| 2004 | 764 |
| 2005 | 719 |
| 2006 | 699 |
| 2007 | 677 |
| 2008 | 530 |
| 2009 and thereafter | 9,753 |
| Total | $ 13,469 |

For the six months ended December 31, 2002 , the carrying amount of goodwill increased by $$817,000 to $6,507,000 from $5,690,000 as of June 30, 2002. This increase was a result of goodwill associated with the Centro Vision acquisition of $399,000, the acquisition of Ancore of $203,000 and foreign currency translation adjustments of $215,000.

As required by SFAS No. 142, the results for the prior year have not been restated. A reconciliation of net income as if SFAS No. 142 had been adopted and reported results is as follows:

Table of Contents

**Amortization Impact of Adoption of SFAS No. 142**

**"Goodwill and Other Intangible Assets"** ***(in thousands, except per share amounts)***

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | **2002** | **2001** | **2002** | **2001** |
| Operating income: | | | | |
| As reported | $ 5,501 | $ 1,882 | $ 10,116 | $ 2,628 |
| Add back amortization of goodwill | — | 101 | — | 202 |
| Adjusted operating income | $ 5,501 | $ 1,983 | $ 10,116 | $ 2,830 |
| Net income: | | | | |
| As reported | $ 3,760 | $ 1,285 | $ 6,961 | $ 1,695 |
| Add back amortization of goodwill, net of tax | — | 101 | — | 202 |
| Adjusted net income | $ 3,760 | $ 1,386 | $ 6,961 | $ 1,897 |
| Diluted earnings per share: | | | | |
| As reported | $ 0.25 | $ 0.12 | $ 0.49 | $ 0.17 |
| Add back amortization of goodwill, net of tax | — | 0.01 | — | 0.02 |
| Adjusted diluted earnings per share | $ 0.25 | $ 0.13 | $ 0.49 | $ 0.19 |

On July 1, 2002, we adopted SFAS No. 144, *Impairment or Disposal of Long-Lived Assets*, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets and provides guidance on implementation issues related to SFAS No. 121, *Accounting for the Impairment of Long-lived Assets and for Long-lived Assets to be Disposed Of*, and addresses the accounting for a component of an entity which has been disposed of and which has been classified as held for sale. The adoption of SFAS No. 144 did not have a significant effect on our financial position or result or operations.

In November 2002, the Emerging Issues Task Force (EITF) reached a consensus on Issue No. 00-21, *Revenue Arrangements with Multiple Deliverables*. EITF Issue No. 00-21 addresses certain aspects of the accounting by a vendor for arrangements under which it will perform multiple revenue-generating activities and how arrangement considerations should be measured and allocated to the separate units of accounting in the arrangement. The provisions of EITF Issue No. 00-21 will apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. We are currently assessing the effect of the adoption of EITF Issue No. 00-21 on our financial position and results of operations.

In November 2002, the FASB issued Interpretation Number 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45). FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of FIN 45 are applicable on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements in this interpretation are effective for financial statements of interim or annual periods ending after December 15, 2002.

We offer our customers warranties on product sales made to them. These warranties typically provide for repairs and maintenance of our products for a specified time period. Concurrent with

Table of Contents

the sale of products, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. This provision is adjusted periodically based on historical and anticipated experience. Actual expenses of repairs under warranty, including parts and labor are charged to this provision when incurred.

For the six months ended December 31, 2002, the changes in warranty provisions were as follows (in thousands):

| | | Provision for Warranties |
|---|---|---|
| Balance on June 30, 2002 | $ | 2,164 |
| Additions | | 647 |
| Reductions for warranty repair costs | | (385) |
| Balance on September 30, 2002 | $ | 2,426 |
| Additions | | 654 |
| Reductions for warranty repair costs | | (360) |
| Balance on December 31, 2002 | $ | 2,720 |

In December 2002, the FASB issued SFAS No. 148, *Accounting for Stock-Based Compensation – Transition and Disclosure – an amendment of FASB Statement No. 123.* SFAS No. 148 amends FASB Statement No. 123, Accounting for Stock-Based Compensation, to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. In addition, SFAS 148, amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The voluntary transition provisions of SFAS No. 148 are effective for financial statements for fiscal years ending after December 15, 2002. The disclosure requirements of SFAS No. 148 becomes effective for us on July 1, 2003. We are currently assessing the impact of the adoption of this statement on our financial position and results of operations.

In January 2003, the FASB issued FIN 46, *Consolidation of Variable Interest Entities*, an interpretation of Accounting Research Bulletin No. 51. FIN 46 requires that variable interest entities be consolidated by a company if that company absorbs a majority of the entity's expected losses, receives a majority of its expected residual returns, or both, as a result of holding variable interest, which are the ownership, contractual, or other pecuniary interest in the entity. The consolidation requirements of FIN 46 will apply immediately to variable interest in a variable interest entity created after January 31, 2003. The disclosure requirements of FIN 46 become effective for us on February 1, 2003 if it is reasonably possible that we will consolidate or disclose information about a variable interest entity when FIN 46 becomes effective for us on July 1, 2003. We are currently assessing the impact of the adoption of FIN 46 on our financial position and results of operations.

*Derivative Instruments* – Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risk, along with interest rate swaps on a variable interest rate term loan used to manage interest rate risk. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and do not use the contracts for trading purposes. Notional amounts of outstanding foreign exchange contracts were approximately $3.9 million as of December 31, 2002 and $4.2 million as of June 30, 2002. The

Table of Contents

estimated fair value of these contracts, based on quoted market prices, approximated before income taxes, were ($37,000) at December 31, 2002 and $0 at June 30, 2002. The foreign exchange contracts are effective foreign exchange hedges and the difference in the fair value from the prior reporting period has been recorded as other comprehensive income (loss).

In February and August 2001, we entered into interest rate swaps. The purpose of the swaps is to convert a portion of our variable interest rate debt into a fixed rate liability. The notional amounts of the swaps were $5.5 million at December 31, 2002, and $6.7 million at June 30, 2002. The fair values of the swaps before income taxes were ($166,000) at December 31, 2002 and ($189,000) at June 30, 2002. The decrease in the fair value from the previously reported period is recorded in other comprehensive income (loss), due to the swaps meeting the criteria of an effective cash flow hedge.

All forward contracts, swaps, and underlying transaction exposures are carried at fair value in other accrued expenses and current liabilities in the accompanying consolidated balance sheets.

*Revenue Recognition* – We generally recognize revenue upon shipment of our products and transfer of title. Concurrent with the shipment of a product, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. The provision is adjusted periodically based on historical and anticipated experience.

Some of our revenues derive from long-term projects such as the development and construction of large, complex cargo inspection systems requiring installation and customization at the customer's site. In addition, some of our revenues derive from United States government funded projects and grants. Revenues from such long-term cargo contracts and government grants and projects are recorded under the "percentage of completion" method. Costs and estimated revenues are recorded as work is performed based on the percentage that incurred costs bear to estimated total costs utilizing the most recent estimates. If the current contract estimate indicates a loss, provision is made for the total anticipated loss in the current period.

*Inventory* - Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method. Inventory and consisted of the following (in thousands):

| | December 31, 2002 | June 30, 2002 |
|---|---|---|
| Raw Materials | $ 24,008 | $ 19,998 |
| Work-in-process | 14,756 | 8,782 |
| Finished goods | 8,348 | 7,732 |
| Total | $ 47,112 | $ 36,512 |

*Accounts Receivable* - Accounts receivable consisted of the following (in thousands):

| | December 31, 2002 | June 30, 2002 |
|---|---|---|
| Trade receivables, net | $ 33,244 | $ 36,306 |
| Receivables related to long term contracts - unbilled costs and accrued profit on progress completed | 2,224 | 2,506 |
| Total | $ 35,468 | $ 38,812 |

Table of Contents

The unbilled costs and accrued profits at December 31, 2002 are expected to be entirely billed and collected during the calendar year 2003.

*Earnings Per Share* - We have reflected the provisions of SFAS No.128, *Earnings per Share*, in the accompanying consolidated financial statements for all periods presented. Earnings per common share are computed using the weighted-average number of shares outstanding during the period. Earnings per common share, assuming dilution, are computed using the weighted-average number of shares outstanding during the period plus the dilutive effect of potential common stock. Potential common stock types were stock options as of December 31, 2001 and stock options and purchase rights as of December 31, 2002.

As of December 31, 2002 1,426,462 outstanding stock options and purchase rights were not included in diluted earnings per common share because to do so would have been anti-dilutive. As of December 31, 2001 1,323,591 outstanding stock options were not included in diluted earnings per common share because to do so would have been anti-dilutive.

The following table reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share-assuming dilution.

| | For the three months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2001 | | |
| | Income (Numerator) | Shares (Denominator) | Per-Share Amount | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
| **Earnings per common share** | | | | | | |
| Income available to common stockholders | $ 3,760,000 | 14,320,469 | $ 0.26 | $ 1,285,000 | 10,435,677 | $ 0.12 |
| **Effect of Dilutive Securities** | | | | | | |
| Options and warrants, treasury stock method | | 521,533 | (0.01) | | 662,972 | |
| **Earnings per common share assuming dilution** | | | | | | |
| Income available to common Stockholder, assuming dilution | $ 3,760,000 | 14,842,002 | $ 0.25 | $ 1,285,000 | 11,098,649 | $ 0.12 |

| | For the six months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2001 | | |
| | Income (Numerator) | Shares (Denominator) | Per-Share Amount | Income (Numerator) | Shares (Denominator) | Per-Share Amount |
| **Earnings per common share** | | | | | | |
| Income available to common stockholders | $ 6,961,000 | 13,571,432 | $ 0.51 | $ 1,695,000 | 9,457,893 | $ 0.18 |
| **Effect of Dilutive Securities** | | | | | | |
| Options and warrants, treasury stock method | | 528,168 | (0.02) | | 298,603 | (0.01) |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Earnings per common share assuming dilution** | | | | | | |
| Income available to common Stockholder, assuming dilution | $ 6,961,000 | 14,099,600 | $ 0.49 | $ 1,695,000 | 9,756,496 | $ 0.17 |

Table of Contents

**C*omprehensive Income* - Comprehensive income is computed as follows (in thousands):**

| | For the three months ended December 31, | | For the six months ended December 31, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| Net income | $ 3,760 | $ 1,285 | $ 6,961 | $ 1,695 |
| Foreign currency translation adjustments | 744 | (351) | 1,058 | 501 |
| Unrealized loss on marketable securities available for sale | 132 | 221 | (394) | 28 |
| Change in fair value of derivative instruments | 28 | 31 | (8) | (115) |
| Comprehensive income | $ 4,664 | $ 1,186 | $ 7,617 | $ 2,109 |

**Segment Information**

We have adopted SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*. We have reflected the provisions of SFAS No. 131 in the accompanying financial statements for all periods presented. We operate in two identifiable industry segments, a) security and inspection products and b) optoelectronic devices and subsystems, medical imaging systems. For the three months ended December 31, 2002, revenues from security and inspection products were $27.7 million compared to $18.6 million for the three months ended December 31, 2001. For the three months ended December 31, 2002, external revenues from optoelectronic devices subsystems and medical and imaging systems were $16.0 million compared to $11.4 million for the three months ended December 31, 2001. For the six months ended December 31, 2002, revenues from security and inspection products were $51.8 million compared to $32.5 million for the six months ended December 31, 2001. For the six months ended December 31, 2002, external revenues from optoelectronic devices subsystems and medical and imaging systems were $29.0 million compared to $24.0 million for the six months ended December 31, 2001.

Segment information is provided by geographic area. We are vertically integrated and we share common resources and facilities. Therefore, with the exception of external revenues, meaningful information is not available by industry or product segment.

Our operating locations include the North America (United States and Canada), Europe (United Kingdom, Finland, and Norway) and Asia (Singapore and Malaysia). Revenue and income from operations generated in a particular geographic segment can be significantly affected by changes in prices or mix of inter company product sales. Our operations by geographical areas are as follows (in thousands):

| | Three months ended December 31, 2002 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| Product & System Revenues | $ 30,929 | $ 7,655 | $ 3,415 | | $ 41,999 |
| Service Revenues | 480 | 1,166 | 28 | | 1,674 |
| Transfer between geographical areas | 2,092 | 2,463 | 9,862 | (14,417) | |
| Total revenues | $ 33,501 | $ 11,284 | $ 13,305 | $ (14,417) | $ 43,673 |
| Income from operations | $ 3,606 | $ 867 | $ 337 | $ 691 | $ 5,501 |

Table of Contents

| | Three months ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| Product & System Revenues | $ 17,920 | $ 8,130 | $ 2,579 | | $ 28,629 |
| Service Revenues | 495 | 848 | 72 | | 1,415 |
| Transfer between geographical areas | 1,335 | 1,096 | 9,097 | (11,528) | |
| Total revenues | $ 19,750 | $ 10,074 | $ 11,748 | $ (11,528) | $ 30,044 |
| Income (loss) from operations | $ (303) | $ 726 | $ 1,602 | $ (143) | $ 1,882 |

| | Six months ended December 31, 2002 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| Product & System Revenues | $ 55,819 | $ 15,517 | $ 5,426 | | $ 76,762 |
| Service Revenues | 883 | 3,006 | 123 | | 4,012 |
| Transfer between geographical areas | 4,917 | 4,534 | 20,657 | (30,108) | |
| Total revenues | $ 61,619 | $ 23,057 | $ 26,206 | $ (30,108) | $ 80,774 |
| Income from operations | $ 6,327 | $ 1,800 | $ 1,853 | $ 136 | $ 10,116 |

| | Six months ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | North America | Europe | Asia | Eliminations | Consolidated |
| Product & System Revenues | $ 35,176 | $ 13,601 | $ 5,000 | | $ 53,777 |
| Service Revenues | 918 | 1,658 | 146 | | 2,722 |
| Transfer between geographical areas | 2,632 | 2,373 | 16,495 | (21,500) | |
| Total revenues | $ 38,726 | $ 17,632 | $ 21,641 | $ (21,500) | $ 56,499 |
| Income (loss) from operations | $ (1,437) | $ 1,244 | $ 2,957 | $ (136) | $ 2,628 |

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Cautionary Statement

***Statements in this report that are forward-looking are based on current expectations, and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties that could cause actual results to differ materially, including, but not limited to, the possibilities that the demand for our products may decline as a result of possible changes in general and industry specific economic conditions and the effects of competitive pricing and such other risks and uncertainties as are described in this report on***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1355 of 2711

*Form 10-Q, our annual report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission.*

Table of Contents

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based on our consolidated financial statements, which had been prepared in conformity with accounting principles generally accepted in the United States of America. Our preparation of these consolidated financial statements requires us to make judgments and estimates that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statement and the reported amount of revenues and expenses during the reporting period. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from such estimated under different assumptions or conditions. The following summarizes our critical accounting policies and significant estimates used in preparing our consolidated financial statements:

*Revenue Recognition.* We generally recognize revenue upon shipments of our products and transfer of title. Concurrent with the shipment of a product, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. The provision is adjusted periodically based on historical and anticipated experience.

Some of our revenues derive from long-term projects such as the development and construction of large, complex cargo inspection systems requiring installation and customization at the customer's site. In addition, some of our revenues derive from United States government funded projects and grants. Revenues from such long-term cargo contracts and government grants and projects are recorded under the "percentage of completion" method. Costs and estimated revenues are recorded as work is performed based on the percentage that incurred costs bear to estimated total costs utilizing the most recent estimates. If the current contract estimate indicates a loss, provision is made for the total anticipated loss in the current period. The percentage-of-completion method relies on estimates of total expected contract revenue and costs. Recognized revenues and profit are subject to revisions as the contract progresses to completion.

*Accounts Receivable.* We perform ongoing credit evaluations of our customers and adjust credit limits based upon each customer's payment history and current credit worthiness, as determined by credit information available at that time. We continuously monitor collections and payments from our customers and we maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. If the condition of our customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

*Inventory.* Inventory is stated at the lower of cost or market. Cost is determined on the first-in-first-out method. We write down inventory for slow-moving and obsolete inventory based on assessment of demand for the next 18 to 24 months, market conditions, and customers who may be experiencing financial difficulties. If these factors are less favorable than those projected, additional inventory write-downs may be required.

*Deferred Tax Asset Valuation Allowance.* We record a valuation allowance to reduce our deferred tax assets when it is more likely than not, based upon currently available evidence and other factors, that we will not realize some portion or all of our deferred tax assets. We base our determination of the need for a valuation allowance on an on-going evaluation of current

Table of Contents

evidence including, among other things, estimates of future earnings, the backlog of customer orders and the expected timing of deferred tax assets reversals. We charge or credit adjustments to the valuation allowance to income tax expense in the period in which these determinations are made. If we determine that we would be able to realize our deferred tax assets in the future in excess of its net recorded amount, an adjustment to the deferred tax asset would increase net income in the period this determination was made. Likewise, if we determine that we would not be able to realize all or part of our net deferred tax assets in the future, we would reduce net income and would establish a valuation allowance for the deferred tax asset in the period this determination is made.

**Results of Operations**

*Revenues.* Revenues consist of sales of security and inspection products as well as optoelectronic devices, subsystems and medical and imaging systems. Revenues for the three months ended December 31, 2002, increased by $13.6 million, or 45.4%, to $43.7 million from $30.0 million for the comparable prior year period. For the six months ended December 31, 2002, revenues increased by $24.3 million, or 43.0%, to $80.8 million from $56.5 million for the comparable prior year period. Revenues for the three months ended December 31, 2002 from the sale of security and inspection products increased by $9.1 million, or 48.8%, to $27.7 million from $18.6 million for the comparable prior year period and revenues from the sale of optoelectronic devices, subsystems and medical and imaging systems increased by $4.5 million or 39.7%, to $16.0 million from $11.4 million for the comparable prior year period. For the six months ended December 31, 2002 revenues from the sale of security and inspection products increased by $19.3 million, or 59.3%, to $51.8 million from $32.5 million for the comparable prior year period and revenues from the sale of optoelectronic devices, subsystems and medical imaging systems increased by $5.0 million or 20.8%, to $29.0 million from $24.0 million for the comparable prior year period. The increase in revenues for the three and six months from the sale of security and inspection products was due to increased sales of x-ray screening machines in the United States and international markets and inclusion of $683,000 in revenues from Ancore, which was acquired in November 2002. The increase in revenues from the sale of optoelectronic devices, subsystems and medical imaging systems was primarily due to increased sales to defense and medical industries of $2.9 million and $2.3 million for the three and six months ended December 31, 2002 and inclusion of revenues from Centro Vision, which was acquired in July 2002. Centro Vision's revenues were $901,000 for the three months ended December 31, 2002 and $1.7 million for the six months ended December 31, 2002.

*Gross Profit*. Gross profit consists of revenues less cost of goods sold. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $5.6 million, or 63.3%, to $14.5 million for the three months ended December 31, 2002 from $8.9 million for the comparable prior year period. For the six months ended December 31, 2002, gross profit increased by $11.6 million, or 73%, to $27.5 million from $15.9 million for the comparable prior year period. As a percentage of revenues, gross profit increased in the three and six months to 33.2% and 34.0% this year, from 29.5% and 28.1% last year, respectively. The change in gross profit was primarily due to increased security and inspection products shipments, which have a relatively higher gross margin.

*Selling, General and Administrative*. Selling, general and administrative expenses consisted primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the three months ended December 31, 2002, such

Table of Contents

expenses increased by $1.5 million, or 27.6%, to $6.8 million from $5.3 million for the comparable prior year period. For the six months ended December 31, 2002, such expenses increased by $3.7 million, or 37.4%, to $13.6 million from $9.9 million for the comparable prior year period. As a percentage of revenues, selling, general and administrative expenses decreased in the three months ended December 31 to 15.5% this year, from 17.7% last year and decreased in the six months ended December 31 to 16.8% this year, from 17.5% last year. The increase in expenses for the three and six months was primarily due to increased sales and marketing expenses for security and inspection products and medical imaging devices. The increase in administrative expenses for the three and six months ended December 31, 2002 was due to an increase in headcount, compensation and exchange rate fluctuation losses. Increased exchange rate fluctuation losses were $129,000 for the three months ended December 31, 2002 and $248,000 for the six months ended December 31, 2002. In addition, the acquisitions of Centro Vision and Ancore resulted in an increase in expenses of $259,000 for the three months ended December 31, 2002, and $417,000 for the six months ended December 31, 2002.

*Research and Development*. Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2002, such expenses increased by $634,000, or 40.1%, to $2.2 million from $1.6 million for the comparable prior year period. For the six months ended December 31, 2002, such expenses increased by $605,000, or 19.2%, to $3.8 million from $3.2 million for the comparable prior year period. As a percentage of revenues, research and development expenses decreased in the three months ended December 31 to 5.1% this year from 5.3% last year, and in the six months ended December 31 to 4.7% this year, from 5.6% last year. The increase in research and development expenses was primarily due to increased research and development spending for security and inspection products.

*Goodwill Amortization.* For the three and six months ended December 31, 2002, there was no amortization of goodwill. On July 1, 2002, we adopted SFAS No. 142, *Goodwill and Other Intangible Assets,* which changes the method of accounting for goodwill to a test for impairment and requires, among other things, the discontinuance of goodwill amortization. The amortization of goodwill was $101,000 for the three months ended December 31, 2001, and $202,000 for the six months ended December 31, 2001.

*Income from Operations*. For the three months ended December 31, 2002, income from operations was $5.5 million compared to $1.9 million for the comparable prior year period. For the six months ended December 31, 2002, income from operations was $10.1 million compared to $2.6 million for the comparable prior year period. Income from operations increased primarily due to an increase in revenues, and in gross margin, and was offset in part by increased selling, general and administrative expenses and research and development expenses.

*Interest (Income) Expense*. For the three months ended December 31, 2002, we earned net interest income of $207,000 compared to net interest expense of $72,000 for the comparable prior year period. For the six months ended December 31, 2002, we earned net interest income of $381,000 compared to net interest expense of $231,000 for the comparable prior year period. The net interest income for the quarter and six months ended December 31, 2002 was due to interest income on the proceeds from private placements in November and December 2001 and October 2002 and decreased borrowings under the our lines of credit.

Table of Contents

*Write-off of deferred acquisition costs.* In fiscal 2002, we entered into an agreement regarding a joint acquisition by us and L-3 Communications Corporation ("L-3") of certain detection and security businesses then owned by PerkinElmer, Inc. ("PerkinElmer"). The transaction as contemplated would result in our acquisition from L-3 of a certain portion of PerkinElmer's detection and security businesses. L-3 completed the purchase of the entirety of the businesses from PerkinElmer in June 2002. In November 2002, L-3 terminated the L-3/OSI transaction prior to consummation. Because of L-3's termination of the transaction, for the three months ended December 31, 2002, we recorded an expense of $608,000 consisting of transaction-related expenses, primarily professional fees.

*Provision for Income Taxes*. Provisions for income taxes for the three months ended December 31, 2002 increased to $1.3 million this year from $525,000 last year. Provisions for income taxes for the six months ended December 31, 2002 increased $2.9 million this year from $702,000 last year. As a percentage of income before provision for income taxes and minority interest, provision for income taxes were 25.5% for the three months ended December 31 this year, compared to 29.0% last year, and 29.2% for the six months ended December 31 this year, compared to 29.3% last year. The tax rate for the three months ended December 31, 2002 was lower due to expected utilization of certain tax credits as a result of improved financial conditions. Also the change in the effective income tax rate was due to changes in the mix of income from U.S. and foreign operations.

*Net Income.* For the reasons outlined above, we had net income of $3.8 million for the three months ended December 31, 2002, and $7.0 million for the six months ended December 31, 2002, compared to $1.3 million for the three months ended December 31, 2001 and $1.7 million for the six months ended December 31, 2001. Excluding write-off of deferred acquisition costs of $608,000 (after tax $432,000), net income was $4.2 million for the three months ended December 31, 2002 and $7.4 million for the six months ended December 31, 2002.

**Liquidity and Capital Resources**

Cash and equivalents as of December 31, 2002 were $89.5 million, an increase of $21.9 million from $67.6 million as of June 30, 2002.

Our operations provided net cash of $10.0 million during the six months ended December 31, 2002. The amount of net cash provided by operations reflects our net income of $7.0 million, a reduction in accounts receivables, increase in accounts payable, accrued payroll and related expenses, income taxes payable and advances from customers. Net cash provided by operations was offset by increase in inventory and other receivables. Inventories increased due to the higher volume of business in the security and inspection products.

Net cash used in investing activities was $(7.8) million for the six months ended December 31, 2002. This reflects our capital expenditures for property and equipment, cash used for the acquisition of Ancore and Centro Vision and our equity investments in Imagis and a United Kingdom based technology venture specializing in security and inspection technologies.

Net cash provided by financing activities was $19.6 million for the six months ended December 31, 2002. In October 2002, we issued and sold an aggregate of 1,250,000 shares of our common stock in a private placement to institutional investors for an aggregate sales price of $21.6

Table of Contents

million. After agent's commissions, and expenses, net proceeds to us were $20.6 million. This financing was partially offset by the repayment of our long-term debt obligations.

In March 1999, we announced a stock repurchase program of up to 2,000,000 shares of our common stock. Through February 5, 2003, we repurchased 1,404,500 shares at an average price $4.37 per share. The stock repurchase program did not have a material effect on our liquidity and is not expected to have a material effect on liquidity in subsequent quarters.

We anticipate that current cash balances, anticipated cash flows from operations and current borrowing arrangements will be sufficient to meet our working capital, stock repurchase program and capital expenditure needs for the foreseeable future.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

*Market Risk.* We are exposed to certain market risks that are inherent in our financial instruments and arise from transactions entered into in the normal course of business. We may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign currency-denominated transactions. We do not enter into derivative financial instrument transactions for speculative purposes.

*Foreign Currency Translation*.The accounts of our operations in Singapore, Malaysia, England, Finland, Norway and Canada are maintained in Singapore dollars, Malaysian ringgits, U.K. pounds sterling, euros, Norwegian kroners and Canadian dollars, respectively. Foreign currency financial statements are translated into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Net foreign currency transaction losses of approximately $136,000 and $7,000 were included in income for the three months ended December 31, 2002 and 2001, respectively, and $332,000 and $84,000 for the six months ended December 31, 2002 and 2001, respectively.

Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risks, along with interest rate swaps on a variable interest rate term loan used to manage interest rate risks. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and do not use the contracts for trading purposes. Notional amounts for outstanding foreign exchange contracts were approximately $3.9 million as of December 31, 2002 and $4.2 million as of June 30, 2002. The estimated fair value of these contracts, based on quoted market prices, approximated before income taxes, were ($37,000) at December 31, 2002 and $0 at June 30, 2002. The foreign exchange contracts are effective foreign exchange hedges and the difference in the fair value from the prior reporting period has been recorded as other comprehensive income (loss).

*Importance of International Markets.* International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, and political instability.

Table of Contents

For the three months ended December 31, 2002, overall foreign currency fluctuations relative to the U.S. dollar had an immaterial effect on our consolidated revenues and results of operations. As a result of monetary policy in Malaysia, including the pegging of the Malaysian ringgit to the U.S. dollar, we believe that our foreign currency exposure in Malaysia will not be significant in the foreseeable future. We perform ongoing credit evaluations of our customers' financial condition and, if deemed necessary, we require advance payments for sales. We monitor economic and currency conditions around the world to evaluate whether there may be any significant effect on our international sales in the future. Due to our overseas investments and the necessity of dealing with local currencies in our foreign business transactions, we are at risk with respect to foreign currency fluctuations.

*Interest Rate Risk*. All highly-liquid investments with purchased maturity of three months or less are classified as cash equivalents and recorded in the balance sheet at cost which approximates fair value. Short-term investments are comprised of high quality marketable securities. We generally do not use derivatives to hedge our interest rate risk with the exception of interest rate swaps to convert a portion of our variable-interest-rate debt to a fixed-rate liability.

The notional amount of the swaps was $5.5 million at December 31, 2002, and $6.7 million at June 30, 2002. The fair value of the swaps before income taxes were ($166,000) at December 31, 2002 and ($189,000) at June 30, 2002. The change in the fair value from the previously reported period is recorded in other comprehensive income (loss), due to the swaps meeting the criteria of an effective cash flow hedge.

*Inflation*. We do not believe that inflation has had a material impact on our December 31, 2002 results of operations.

**Item 4. Controls and Procedures**

Our management, including the Chief Executive Officer and Chief Financial Officer, have conducted an evaluation of the effectiveness of disclosure controls and procedures pursuant to Exchange Act Rule 13a-14 within 90 days prior to the filing date of this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures are effective in ensuring that all material information required to be filed in this quarterly report has been made known to them in a timely fashion. There have been no significant changes in internal controls, or in factors that could significantly affect internal controls subsequent to the date of the evaluation referred to herein.

Table of Contents

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

In November 2002 we were served with an action for declaratory relief filed by L-3 Communications Corp. (“L-3”). In its action, L-3 seeks a declaratory judgment stating primarily that L-3 has no liabilities to us arising from L-3’s termination of a joint acquisition by L-3 and us of assets that were auctioned by PerkinElmer, Inc. In December 2002 we filed an action against L-3 alleging, among other causes of action, that L-3 defrauded and breached fiduciary duties to OSI with respect to that transaction. Both actions are pending.

We are also involved in routine litigation from time to time in the course of conducting our business.

### Item 2. Changes in Securities and Use of Proceeds

In October 2002, we issued and sold an aggregate of 1,250,000 shares of our common stock in a private placement to institutional investors for an aggregate sales price of $21.6 million. After agent’s commissions, and expenses, net proceeds to us were $20.6 million. Roth Capital Partners served as the placement agent for this transaction. As part of the transaction, we issued to the investors warrants to purchase 281,250 additional shares of OSI Common Stock at an exercise price of $21.217 per share, exercisable at any time in full or part no later than October 21, 2009. The issuance of stock and warrants was exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof. On October 28, 2002, we filed a registration statement on Form S-3 with the Securities and Exchange Commission for the purpose of registering these securities. The registration statement was declared effective as of November 4, 2002.

In November 2002, we acquired all the outstanding capital stock of Ancore Corporation (“Ancore”), a Santa Clara, California based privately held high-technology developer and provider of advanced inspection systems for aviation security, port and border inspection and counter-terrorism. Consideration paid for the acquisition consists of a combination of OSI common stock and cash. At the close of the acquisition, we paid $2 million in cash, and issued 347,890 shares of OSI Common Stock valued at $5.8 million. The issuance of stock was exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof. In December 2002, an additional cash payment of $2 million became due and payable to former Ancore stockholders based on Ancore meeting certain performance criteria. This payment was made in January 2003

On December 9, 2002, we filed a registration statement on Form S-3 with the Securities and Exchange Commission to register the shares issued as part of the Ancore purchase consideration, as well as shares potentially issuable in satisfaction of contingent payments. The registration statement was declared effective as of December 16, 2002.

Table of Contents

**Item 4. Submission of Matters to a Vote of Security Holders**

At the annual meeting of shareholders on November 14, 2002, the following actions were taken:

1. Election of Directors

| Name | For | Withheld |
|---|---|---|
| Deepak Chopra | 6,167,446 | 4,381,223 |
| Ajay Mehra | 6,170,998 | 4,377,681 |
| Steven C. Good | 9,803,098 | 745,581 |
| Meyer Luskin | 9,800,927 | 747,752 |
| Madan G. Syal | 9,816,622 | 732,057 |
| Chand R. Viswanathan | 9,799,143 | 749,536 |

2. Ratification of Board of Director's amendment to the 1997 Stock Option Plan

| | |
|---|---|
| For | 9,641,557 |
| Against | 872,923 |
| Abstain | 34,199 |

3. Ratification of Deloitte & Touche L.L.P. as independent auditors for the year ending June 30, 2001.

| | |
|---|---|
| For | 10,287,490 |
| Against | 253,169 |
| Abstain | 8,020 |

**Item 6. Exhibits and Reports on Form 8-K**

a. Exhibits

99.1 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

b. We filed a Report on Form 8-K with the Commission on November 13, 2002, announcing our acquisition of Ancore Corporation, a developer of high-technology advanced inspection systems for aviation security, port and border inspection and counter-terrorism neutron and gamma-ray based inspection systems.

Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 11th day of February 2003.

OSI SYSTEMS, INC.

By: /s/ DEEPAK CHOPRA

**Deepak Chopra**
**President and Chief Executive Officer**

By: /s/ ANUJ WADHAWAN

**Anuj Wadhawan**
**Chief Financial Officer**

Table of Contents

## CERTIFICATIONS

I, Deepak Chopra, Chief Executive Officer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of OSI Systems, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this quarterly report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Company and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the Company's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluations, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and have identified for the Company's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in Company's internal controls; and

6. The Company's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 11, 2003

/s/ DEEPAK CHOPRA

**Deepak Chopra, Chief Executive Officer**

Table of Contents

**CERTIFICATIONS**

I, Anuj Wadhawan, Chief Financial Officer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of OSI Systems, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this quarterly report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Company and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the Company's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluations, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and have identified for the Company's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in Company's internal controls; and

6. The Company's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 11, 2003

/s/ ANUJ WADHAWAN

**Anuj Wadhawan, Chief Financial Officer**

# Exhibit 10

DEF 14A 1 ddef14a.htm DEFINITIVE NOTICE & PROXY STATEMENT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**
**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a)**
**of the Securities Exchange Act of 1934**

Filed by the Registrant x

Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement

☐ **Confidential, for use of the Commission only (as permitted by Rule 14a-6(e)(2))**

x Definitive Proxy Statement

¨ Definitive Additional Materials

¨ Soliciting Material Pursuant to §240.14a-11(c) or §240.14a-12

# OSI SYSTEMS, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement if Other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 1, 2003

To Stockholders:

You are cordially invited to attend the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc. (the "Company"), which will be held at 10:00 a.m., local time, on November 5, 2003, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of the Company's outstanding common stock as of the close of business on September 25, 2003, are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1370 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**To Be Held November 5, 2003**

---

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 5, 2003, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.
2. To ratify the selection of Deloitte & Touche LLP as the Company's independent auditors for the fiscal year ending June 30, 2004.
3. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2003, containing consolidated financial statements, is included with this mailing.

The Board of Directors has fixed the close of business on September 25, 2003, as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 1, 2003

**PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at the Annual Meeting of Stockholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on November 5, 2003, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company or by issuance of a subsequent proxy. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on September 25, 2003, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 14,545,952 shares of common stock, without par value ("Common Stock"). Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any stockholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each stockholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (i.e., six) multiplied by the number of shares which the stockholder is entitled to vote. Unless the proxy holders are otherwise instructed, stockholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes. Only stockholders of record at the close of business on September 25, 2003 are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Shares represented by executed and unrevoked proxies will be voted in accordance with the instructions contained therein or in the absence of such instructions, in accordance with the recommendations of the Board of Directors. Neither abstentions nor broker non-votes will be counted for the purposes of determining whether any of the proposals has been approved by the stockholders of the Company, although they will be counted for purposes of determining the presence of a quorum.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of the other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting at the Meeting.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by e-mail, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 3, 2003 to all stockholders entitled to vote at the Annual Meeting.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1372 of 2711

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

## ELECTION OF DIRECTORS
***(Item 1 of the Proxy Card)***

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

Management has nominated six directors. Management's nominees for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Stockholders in 2004, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although management knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as management may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The following are Management's nominees for election as directors at this meeting.

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 52 | Chairman of the Board, Chief Executive Officer, and President | 1987 |
| Ajay Mehra | 41 | Director, Executive Vice President, and President of Security Group | 1996 |
| Steven C. Good(1)(2) | 61 | Director | 1987 |
| Meyer Luskin(1)(2) | 77 | Director | 1990 |
| Madan G. Syal | 77 | Director | 1987 |
| Chand R. Viswanathan(1) | 74 | Director | 2001 |

(1) Member of Audit Committee
(2) Member of Compensation Committee

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice

President. Mr Mehra became a Director in March 1996 served as Secretary between March 1996 and November 2002. Mr. Mehra also serves as President of the Company's Security Group. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz & Berns, which he founded in 1974, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good is the founder and has served as Chairman of California United Bancorp, and was elected in 1997 as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on NASDAQ. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the Board of Scope Industries, a publicly-held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal food. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, and Chromagen, Inc., a biotechnology company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

***Madan G. Syal*** has served as a Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal is the sole proprietor of Pro Printers, a printing service business he founded in October 1984. Prior to 1984, Mr. Syal held various positions with Shell Oil Company, Exxon Corporation, Burmah Oil Company, C.F. Braun and Bechtel Group, Incorporated. Mr. Syal holds a Bachelor of Science degree from the American College in Lahore (now Pakistan) and a B.S.E. in Electrical and Mechanical Engineering from London University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California at Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chairman of the department from 1979 to 1985.

**Executive Officers**

***Anuj Wadhawan*** was named Chief Financial Officer and Treasurer of the Company in November 2002. From March 1991 to March 2000, Mr. Wadhawan held various accounting and finance-related positions with the Company and its subsidiaries, including Corporate Controller. In March 2000, Mr. Wadhawan became the Company's Vice President of Finance. Mr. Wadhawan holds a Batchelor of Science in Accounting from Punjab University in India, is a chartered accountant from India, and has passed the certified public accounting examinations in the United States.

***Andreas F. Kotowski*** has served as Chief Technology Officer of the Company since October 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. From September 1989 to January 1993, Mr. Kotowski was self-employed as an Engineering Consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and

Chief Engineer, in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

***Victor S. Sze*** was named General Counsel, Vice President of Corporate Affairs and Secretary of the Company in March 2002. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp. a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a bachelors' degree in economics from UCLA and a juris doctorate from Loyola Law School.

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin and Madan G. Syal is the father-in-law of Deepak Chopra. Other than these relationships, there are no family relationships among the directors and executive officers of the Company.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal and Chand R. Viswanathan as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present and voting at the Meeting.***

**Board of Directors Meetings and Committees of the Board of Directors**

There were seven meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on six additional occasions during the fiscal year ended June 30, 2003. The Board of Directors has established an Audit Committee and a Compensation Committee. The members of each committee are appointed by the majority vote of the Board of Directors. There is no nominating committee. No Director attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

*Audit Committee*

The Audit Committee makes recommendations for selection of the Company's independent public auditors, reviews with the independent public auditors the plans and results of the audit engagement, approves professional services provided by the independent public auditors, reviews the independence of the independent public auditors, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. The Audit Committee consists of Messrs. Good, Luskin and Viswanathan. The Board of Directors has determined that the members of the Audit Committee are independent pursuant to NASDAQ Rules. There were four meetings of the Audit Committee during the fiscal year ended June 30, 2003. See *Report of the Audit Committee.*

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input

to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee presently consists of Messrs. Good and Luskin. There were two meetings of the Compensation Committee during the fiscal year ended June 30, 2003. See *Report of the Compensation Committee on Executive Compensation.*

### Director Compensation

Each non-employee Director receives a fee of $7,500 per year, $1,500 for each Board or Committee meeting attended, and options to purchase 5,000 shares of Common Stock at an exercise price equal to 100% of fair market value as of the date of grant. In addition, options to purchase 5000 shares of common stock at an exercise price equal to 100% of fair market value as of the date of grant, are granted to each member of the Compensation Committee. These options vest in three equal installments on the first through the third anniversaries of the grant date, conditioned upon continued service as a Director of the Company. The Directors also are reimbursed for expenses incurred in connection with the performance of their services as Directors.

### Compensation Committee Interlocks and Insider Participation

No member of the Compensation Committee is a former or current officer or employee of the Company or any of its subsidiaries. No executive officer of the Company has served during the fiscal year ended June 30, 2003, or subsequently, as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or Compensation Committee.

### Executive Compensation and Other Information

The following table sets forth the compensation for the Chief Executive Officer, each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2003, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers"):

**SUMMARY COMPENSATION TABLE**

| | | | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | Annual Compensation | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | All Other Annual Compen-sation ($) | Restricted Stock Award(s) (#) | Securities Underlying Options/ SARs (#) | LTIP Payouts($) | All Other Compen-sation ($) |
| Deepak Chopra(1) | 2003 | 750,000 | 325,000 | — | — | 100,000 | — | 638,437(2) |
| Chief Executive Officer | 2002 | 606,770 | 216,000 | — | — | 150,000 | — | — |
| | 2001 | 600,000 | 22,500 | — | — | 40,000(3) | — | — |
| Ajay Mehra(4) | 2003 | 315,767 | 125,000 | — | — | 25,000 | — | 448,833(2) |
| Executive V.P. President of | 2002 | 252,139 | 60,000 | — | — | 50,000 | — | — |
| Security Group | 2001 | 257,172 | 57,500 | — | — | 25,000(5) | | — |
| Anuj Wadhawan | 2003 | 161,450 | 37,500 | — | — | 15,000 | | 140,802(2) |
| Chief Financial Officer | | | | | | | | |
| Andreas F. Kotowski | 2003 | 204,847 | 42,000 | — | — | 2,000 | — | — |
| Chief Technology Officer | 2002 | 189,615 | 10,000 | — | — | 10,000 | — | 76,250(6) |
| | 2001 | 183,079 | — | — | — | 10,000 | — | — |
| Victor S. Sze | 2003 | 145,192 | 5,000 | — | — | 5,000 | | — |
| General Counsel, V.P. Corporate Affairs | | | | | | | | |
| Thomas K. Hickman | 2003 | 175,000 | 42,500 | — | — | 4,500 | — | — |
| V.P. Operations of Security | 2002 | 168,285 | 10,000 | — | — | 1,500 | — | — |
| Group | 2001 | 199,503 | — | — | — | 3,000(7) | — | — |

(1) The Company paid aggregate insurance premiums of approximately $38,000 for three universal life insurance policies of Mr. Chopra in each of 2003, 2002, and 2001. The Company also paid an insurance premium of approximately $4,700 for a twenty-year term life insurance policy of Mr. Chopra in 2003. Mr. Chopra or his estate is obligated to repay to the Company all amounts paid by the Company on behalf of Mr. Chopra upon the death or termination of employment of Mr. Chopra. The value of such benefit is not susceptible to precise determination.

(2) Compensation resulting from a disqualified disposition of incentive stock options.

(3) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Executive officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to Mr. Chopra 300,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.22 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to OSI Fibercomm, Inc. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(4) The Company paid aggregate insurance premiums of approximately $2,700 for three universal life insurance policies of Mr. Mehra in each of 2003, 2002, and 2001. The Company also paid an insurance premium of approximately $2,800 for a thirty-year term life insurance policy of Mr. Mehra in 2003. Mr. Mehra or his estate is obligated to repay to the Company all amounts paid by the Company on behalf of Mr. Mehra upon the death or termination of employment of Mr. Mehra. The value of such benefit is not susceptible to precise determination.

(5) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services as Chief Financial Officer of OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to Mr. Mehra 150,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to OSI Fibercomm, Inc. There presently exists no public market for the stock of OSI Fibercomm, Inc.

(6) Consists of gain on exercise of non-qualified stock options.

(7) This does not include options granted by OSI Fibercomm, Inc., a wholly-owned subsidiary of the Company. As compensation for services to OSI Fibercomm, Inc., on April 18, 2001, OSI Fibercomm, Inc. granted to Mr. Hickman 20,000 5-year options to purchase common stock of OSI Fibercomm, Inc. at a price of $0.20 per share. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service to OSI Fibercomm, Inc. There presently exists no public market for the stock of OSI Fibercomm, Inc.

The Company entered into an employment agreement with Mr. Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he served as Chairman of the Board, Chief Executive Officer and President of the Company. The employment agreement provided for an initial base salary of $450,000 per year, with annual raises to have been determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra’s annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000, to $650,000 as of April 1, 2001 Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001 and the increase was implemented effective January 1, 2002. On April 1, 2002, the Company entered into a new five-year employment agreement with Mr. Chopra. The new agreement provides for a base salary of $750,000, and is otherwise similar to the prior agreement. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time. Mr. Chopra’s employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

The Company entered into a three-year employment agreement with Ajay Mehra, which became effective on September 1, 1997. The employment agreement provides for a base salary of $260,000 per year, with annual raises to be determined by management. Pursuant to his employment agreement, Mr. Mehra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that Mr. Mehra shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by Mr. Mehra under certain circumstances during his employment. The Compensation Committee increased Mr. Mehra's annual base salary to $280,000 as of April 1, 2001. Mr. Mehra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001, and the increase was implemented effective January 1, 2002. The Compensation Committee increased Mr. Mehra's annual base salary to $310,000 effective September 1, 2002. In February 2003, Mr. Mehra's employment agreement was amended to extend the term of the agreement until August 31, 2006. All other provisions of the agreement are the same.

The Company entered into a two-year employment agreement with Anuj Wadhawan, which became effective June 1, 2003. The employment agreement provides for a base salary of $165,000 per year, with annual raises to be determined by the Board of Directors. Pursuant to his employment agreement, Mr. Wadhawan is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's annual salary initially was $140,000, which was increased to $165,000 effective April 16, 1998, to $175,000 on September 1, 1999, to $185,000 on September 1, 2000, to $200,000 on March 4, 2002, and to 210,000 effective September 1, 2002. His salary has not been increased since that time.

The Company entered into a one-year employment agreement with Victor S. Sze, which became effective June 1, 2003. The employment agreement provides for a base salary of $155,000 per year, with annual raises to be determined by the Board of Directors. Pursuant to his employment agreement, Mr. Sze is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Thomas K. Hickman is currently employed by the Company pursuant to an employment agreement that may be terminated by either the Company or by Mr. Hickman upon six months prior notice. Under the employment agreement, Mr. Hickman's initial annual salary was $125,000, which was increased to $137,500 effective July 1, 1998, to $160,000 effective July 1, 2000 and to $175,000 effective July 1, 2002. His salary has not been increased since that time. In addition to his salary, the Company paid certain expenses related to his service in Singapore. Mr. Hickman was transferred from Malaysia to the U.K. as of February 1, 2000. In connection with such transfer, he was allowed a relocation allowance of up to approximately $13,000. During his posting in the U.K., the Company paid him a cost-of-living allowance of approximately $45,000 per year and provided him with a leased automobile at a cost of approximately $9,200 per year. In June 2003, Mr. Hickman returned to the U.S. and was named V.P. of Operations of the Security Products Group. Mr. Hickman's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

Management allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1378 of 2711

comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division, as determined before the start of the fiscal year.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra, owns a 4.5% interest. The remaining 49.0% interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been insignificant.

The Company contracts for a portion of its automobile rental and daily messenger services from a business that was owned during fiscal year 2003 by Mr. Chopra and his wife. The Company paid the business approximately $101,000 for such services during fiscal year 2003. The Company contracts for printing services from a business owned by Madan G. Syal, a Director of the Company. The Company paid the business approximately $104,000 for such services during fiscal year 2003.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Option Grants**

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2003:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options/ SARs (1) Granted(#) | Percent of Total Options/SARs Granted to Employees in Fiscal Year Year (%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Options Term(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5%($) | 10%($) |
| Deepak Chopra | 100,000 | 23.7 | 16.31 | 1/8/08 | 450,615 | 995,742 |
| Ajay Mehra | 25,000 | 5.93 | 16.31 | 1/8/08 | 112,654 | 248,935 |
| Anuj Wadhawan | 15,000 | 3.56 | 16.31 | 1/8/08 | 67,592 | 149,361 |
| Andreas F. Kotowski | 2,000 | 0.47 | 16.04 | 11/8/07 | 8,863 | 19,585 |
| Victor S. Sze | 5,000 | 1.19 | 16.22 | 8/15/07 | 22,406 | 49,512 |
| Thomas K. Hickman | 3,000 | 0.71 | 16.22 | 8/15/07 | 13,444 | 29,707 |
| | 1,500 | 0.36 | 16.04 | 11/8/07 | 6,647 | 14,689 |

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.

(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the Securities and Exchange Commission and do not represent the Company's estimate or projection of future Common Stock prices.

**Option Exercises and Fiscal Year-End Values**

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2003 and held by them on June 30, 2003:

**AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES**

| | | | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($) (1) | |
|---|---|---|---|---|---|---|
| Name | Shares Acquired On Exercise (#) | Value Realized ($) (1) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra | — | — | 112,700 | 232,500 | 839,565 | 692,575 |
| Ajay Mehra | — | — | 62,400 | 75,000 | 455,880 | 174,750 |
| Anuj Wadhawan | — | — | 18,952 | 31,858 | 152,867 | 96,290 |
| Andreas F. Kotowski | 5,000 | 28,500 | 17,700 | 14,500 | 148,768 | 71,445 |
| Victor S. Sze | — | — | — | 5,000 | — | — |
| Thomas K. Hickman | 2,500 | 14,250 | 17,525 | 7,125 | 138,760 | 18,855 |

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $15.70 per share).

**Stock Option Plans**

***1987 Incentive Stock Option Plan.*** In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors, which has discretion to select options and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are nontransferable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, the number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2003, 949,310 shares had been issued upon the exercise of stock options under the 1987 Plan, stock options to purchase an aggregate of 28,800 shares were outstanding under the 1987 Plan all at exercise price of $7.0 per share, and no shares remained available for grant, since the 1987 Plan expired on December 31, 1998. As of such date, stock options to purchase 28,800 shares of Common Stock were exercisable.

***1997 Stock Option Plan.*** In May 1997, the Board of Directors adopted the 1997 Stock Option Plan (the "1997 Plan"). The 1997 Plan, which was approved by the Company's stockholders in June 1997, provided for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company's stockholders approved an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. In November 2002, the Company's stockholders approved an increase of the number of shares of Common Stock for which options may be granted to 2,350,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives that will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board, which has

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1380 of 2711
discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances in the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2003, stock options to purchase 455,708 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,350,741 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.13 to $19.95 per share, and stock options to purchase 543,551 shares remained available for grant. As of such date, stock options to purchase 455,450 shares were exercisable. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During fiscal 2003, the Board of Directors of the Company granted options to purchase an aggregate of 419,748 shares of Common Stock available for issuance under the 1997 Plan to certain officers and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. The options generally will be subject to vesting and will become exercisable in installments over a period of three years from the date of grant, subject to the optionee's continuing employment with the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

**Employee Stock Purchase Plan**

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's stockholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase shares of Common Stock through regular payroll deductions. The total number of shares of Common Stock subject to the 1998 Plan is 200,000. The 1998 Plan is administered by the Board of Directors, or a committee of the Board. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1381 of 2711
participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

**Employee Benefit Plan, Pension Plans**

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($12,000 in calendar 2003) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. For the year ended June 30, 2003, the Company had provided $123,000 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Advanced Micro Electronics AS, Metorex Security Products, Oy, and Rapiscan Security Products, Ltd., all subsidiaries of the Company, have pension plans in effect for certain of their employees. As of the date hereof, approximately 140 employees are covered by these plans.

**Report of Compensation Committee on Executive Compensation**

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers. The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

***Compensation Philosophy.*** The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its stockholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and stockholder value.

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's stockholders.

Section 162(m) of the Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the Code exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

***Compensation Program Components.*** The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

*Base Salary.* Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Bonus.* Management allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

*Long-Term Incentive Compensation.* The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1383 of 2711

discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

*Chief Executive Officer's Compensation*. The Company has entered into an employment agreement with Mr. Chopra as more fully described above. (See *Executive Compensation and Other Information*.) In setting Mr. Chopra's base salary and other compensation under his employment agreement, in granting bonuses, and when considering other forms of compensation, the Compensation Committee has looked to the same components it applies when establishing compensation for the other executive officers of the Company.

***Summary.*** The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's stockholders, by attracting and retaining the best qualified people as senior managers and enhancing corporate performance. Furthermore, the Compensation Committee believes that the executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1384 of 2711

**Report of the Audit Committee**

*The information contained in this Audit Committee Report shall not be deemed to be "soliciting material" or to be "filed" or incorporated by reference in future filings with the Securities and Exchange Commission, or subject to the liabilities of Section 18 of the Securities Exchange Act of 1934, except to the extent that the Company specifically incorporates it by reference into a document filed under the Securities Act of 1933 or the Securities Exchange Act of 1934.*

The Board of Directors has adopted a Charter of the Audit Committee, a copy of which is attached as Appendix A to this Proxy Statement.

The Audit Committee has reviewed and discussed with the Company's management and Deloitte & Touche LLP the audited consolidated financial statements of the company contained in the Company's Annual Report on Form 10-K for the Company's 2003 fiscal year. The Audit Committee has also discussed with Deloitte & Touche LLP the matters required to be discussed pursuant to SAS No. 61 (Codification of Statements on Auditing Standards, AU Section 380), which includes, among other items, matters related to the conduct of the audit of the Company's consolidated financial statements.

The Audit Committee has received and reviewed the written disclosures and the letter from Deloitte & Touche LLP required by Independence Standards Board Standard No.1 (Independence Discussions with Audit Committees), and has discussed with Deloitte & Touche LLP its independence from the Company.

Based on the review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Companys Annual Report on Form 10-K for its 2003 fiscal year for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Chand R. Viswanathan

**Performance Graph**

The graph below compares the Company's cumulative total stockholder return for the period beginning on the market close on the last trading day before the beginning of the Company's fifth preceding fiscal year through and including the end of the Company's last completed fiscal year, with the NASDAQ Market Index and with a peer group composed of companies with which the Company generally competes.

The peer group is composed of the following companies: American Science & Engineering (AMEX Symbol: ASE), InVision Technologies, Inc. (NASDAQ Symbol: INVN) and PerkinElmer, Inc. (NYSE Symbol: PKI). The Company previously included only InVision Technologies and PerkinElmer within its peer group, but has added American Science & Engineering as part of the Company's annual review of other companies with similar operations.

The graph assumes that $100.00 was invested on June 30, 1998 in the Company's Common Stock, at the closing price of $10.00 per share, and in each of the indexes mentioned above, and that all dividends were reinvested.

**Comparison of 5 Year Cumulative Total Return**
**Assumes Initial Investment of $100**
**June 1998 Through June 2003**

**COMPARISON OF CUMULATIVE TOTAL RETURN AMONG OSI SYSTEMS, INC., NASDAQ MARKET INDEX AND PEER GROUP INDEXES**

| | OSI Systems | New Peer Group | Old Peer Group | NASDAQ Market |
|---|---|---|---|---|
| **6/30/1998** | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| **9/30/1998** | $ 76.25 | $ 76.09 | $ 75.88 | $ 90.23 |
| **12/31/1998** | $ 86.25 | $ 91.96 | $ 92.82 | $ 117.25 |
| **3/31/1999** | $ 51.88 | $ 85.86 | $ 87.89 | $ 131.50 |
| **6/30/1999** | $ 50.00 | $ 114.72 | $ 117.57 | $ 143.83 |
| **9/30/1999** | $ 37.50 | $ 125.46 | $ 129.89 | $ 147.42 |
| **12/31/1999** | $ 55.00 | $ 132.59 | $ 137.01 | $ 217.90 |
| **3/31/2000** | $ 147.50 | $ 210.72 | $ 219.19 | $ 244.61 |
| **6/30/2000** | $ 79.69 | $ 207.82 | $ 216.71 | $ 212.69 |
| **9/30/2000** | $ 105.00 | $ 325.86 | $ 340.35 | $ 195.72 |
| **12/31/2000** | $ 61.25 | $ 325.50 | $ 340.74 | $ 131.05 |
| **3/31/2001** | $ 31.88 | $ 165.81 | $ 172.32 | $ 97.83 |
| **6/30/2001** | $ 37.20 | $ 174.84 | $ 181.85 | $ 115.30 |
| **9/30/2001** | $ 79.10 | $ 174.78 | $ 178.97 | $ 80.00 |
| **12/31/2001** | $ 182.40 | $ 247.28 | $ 253.43 | $ 104.00 |
| **3/31/2002** | $ 252.00 | $ 148.99 | $ 151.83 | $ 98.43 |
| **6/30/2002** | $ 198.30 | $ 91.37 | $ 91.20 | $ 78.12 |
| **9/30/2002** | $ 173.05 | $ 62.14 | $ 62.43 | $ 62.57 |
| **12/31/2002** | $ 169.80 | $ 76.17 | $ 76.05 | $ 71.37 |
| **3/31/2003** | $ 158.10 | $ 75.66 | $ 77.30 | $ 66.49 |
| **6/30/2003** | $ 157.00 | $ 108.72 | $ 111.63 | $ 80.45 |

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2003 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,125,640 | 7.7% |
| Essex Investment Management Co., LLC(4) | 1,302,312 | 8.97% |
| Kern Capital Management, LLC(5) | 1,807,600 | 12.45% |

(1) Except as otherwise noted, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2003, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his

wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 125,200 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Essex Investment Management Co. Inc., whose address was reported as 125 High Street, South Boston, MA 02110.

(5) As reported in a Schedule 13G filed with the Securities and Exchange Commission by Kern Capital Management, LLC, whose address was reported as 114 West 47th Street, Suite 1926, New York, NY 10036.

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2003 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,125,640 | 7.7% |
| Ajay Mehra(4) | 152,114 | 1.0% |
| Anuj Wadhawan(5) | 20,842 | 0.1% |
| Andreas F. Kotowski(6) | 73,518 | 0.5% |
| Victor S. Sze(7) | 1,250 | 0.0% |
| Thomas K. Hickman(8) | 38,572 | 0.3% |
| Steven C. Good(9) | 21,250 | 0.1% |
| Meyer Luskin(10) | 32,660 | 0.2% |
| Madan G. Syal(11) | 62,750 | 0.4% |
| Chand R. Viswanathan(12) | 3,750 | 0.0% |
| All directors and executive officers as a group (10 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11)(12) | 1,532,346 | 10.3% |

(1) Except as noted otherwise, the address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250.

(2) Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2003, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT dated July 17, 1987 and The Chandini Chopra Trust UDT dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 11,625 shares are held individually by Mr. Chopra. Includes 125,200 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Chopra is the Chairman of the Board, Chief Executive Officer and President of the Company.

(4) Includes 62,400 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Mehra is the Executive Vice President and a Director of the Company and President of the OSI Security Group.

(5) Includes 19,592 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Wadhawan is the Chief Financial Officer of the Company.

(6) Includes 17,700 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Kotowski is the Chief Technology Officer of the Company.

(7) Includes 1,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Sze is the General Counsel, Vice President of Corporate Affairs, and Secretary of the Company.

(8) Includes 18,275 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Hickman is the V.P. of Operations of the OSI Security Group.

(9) Includes 16,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, California 90025.

(10) Includes 19,750 shares held by the Meyer and Doreen Luskin Family Trust. Includes 6,125 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Lusken is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, California 90401.

(11) Includes 44,000 shares held by Mr. Syal and his wife, Mohini Syal as trustees for the Syal Trust. Includes 13,750 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Syal is a Director of the Company.

(12) Includes 3,750 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2003. Mr. Viswanathan is a Director of the Company.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the of the Securities Exchange Act of 1934 requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. Such officers, directors and stockholders are required by Securities and Exchange Commission regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2003, and written representations from certain reporting persons, the Company believes that the Company's executive officers, directors and more than 10% stockholders have been complied with all such filing requirements, except that Mr. Chopra, Mr. Mehra, Mr. Good, Mr. Luskin, Mr. Syal, Mr. Viswanathan, and Mr. Wadhawan each filed one late report relating to one transaction and Mr. Kotowski filed two late reports each relating to one transaction.

**INDEPENDENT AUDITORS**

***(Item 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Deloitte & Touche LLP ("Deloitte & Touche") as the Company's independent auditors for the fiscal year ending June 30, 2004, and has further directed that management submit the selection of independent auditors for ratification by the stockholders at the Annual Meeting. Deloitte & Touche has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte & Touche is not expected to be present at the Annual Meeting.

In the event the stockholders fail to ratify the selection of Deloitte & Touche, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent auditing firm at any time during the year if they determine that such a change would be in the best interests of the Company and its stockholders.

**Audit Fees**

The aggregate fees billed for the audit of the Company's annual financial statements for the fiscal years ended June 30, 2003 and 2002 and for the reviews of the financial statements included in the Company's Quarterly Reports on Form 10-Q were $398,000 and $332,000, respectively.

**Audit-Related Fees**

The aggregate fees billed for audit-related services for the fiscal years ended June 30, 2003 and 2002 were $182,000 and $84,000, respectively. For the fiscal years ended June 30, 2003 and 2002, these fees related to due diligence/consultation services in connection with potential and completed acquisitions and to consents related to Securities and Exchange Commission registration statements.

**Tax Fees**

The aggregate fees billed for tax services for the fiscal years ended June 30, 2003 and 2002 were $225,000 and $286,000, respectively. For the fiscal years ended June 30, 2003 and 2002, these fees related to U.S. and international tax return compliance and advisory services.

**All Other Fees**

During the fiscal years ended June 30, 2003 and 2002, there were no fees for services not included in the above categories.

**Independence**

The Audit Committee has considered whether Deloitte & Touche's provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such auditor's independence and has determined that it is compatible.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the selection of the independent accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

**STOCKHOLDER PROPOSALS**

Any proposals of stockholders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 15, 2004, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

**AVAILABILITY OF ANNUAL REPORT ON FORM 10-K**

A copy of the Company's Annual Report on Form 10-K as filed with the Securities and Exchange Commission is available upon written request and without charge to stockholders by writing to Victor Sze, Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, California 90250 or by calling telephone number (310) 978-0516.

Only one Annual Report and Proxy Statement may be delivered to multiple security holders sharing an address unless the Company has received contrary instructions from one or more of the security holders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report or Proxy Statement, as applicable, to a security holder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Victor Sze, Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, security holders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 1, 2003

**PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1391 of 2711

**APPENDIX A**

**Charter of the Audit Committee**

**1. Statement of Policy**

This Charter specifies the scope of the responsibilities of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") and the manner in which those responsibilities shall be performed, including its structure, processes and membership requirements.

The primary purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities by reviewing and reporting to the Board on the integrity of the financial reports and other financial information provided by the Company to any governmental body or to the public, and on the Company's compliance with legal and regulatory requirements. The Committee shall also review the qualifications, independence and performance, and approve the terms of engagement of the Company's independent auditor and prepare any reports required of the Committee under rules of the Securities and Exchange Commission ("SEC").

The Company shall provide appropriate funding, as determined by the Committee, to permit the Committee to perform its duties under this Charter, to compensate its advisors and to compensate any registered public accounting firm engaged for the purpose of rendering or issuing an audit report or related work or performing other audit, review or attest services for the Company. The Committee, at its discretion, has the authority to initiate special investigations, and, hire special legal, accounting or other outside advisors or experts to assist the Committee, as it deems necessary to fulfill its duties under this Charter. The Committee may also perform such other activities consistent with this Charter, the Company's Bylaws and governing law, as the Committee or the Board deems necessary or appropriate.

**2. Organization and Membership Requirements**

The Committee shall be composed of three or more directors selected by the Board, each of whom shall satisfy the independence and experience requirements of The NASDAQ Stock Market. In addition, the Committee shall not include any member who:

(a) accepts any consulting, advisory, or other compensatory fee, directly or indirectly, from the Company, other than in his or her capacity as a member of the Committee, the Board, or any other committee of the Board; or

(b) is an executive officer of the Company, or beneficially owns or controls, directly or indirectly, more than 10% of the Company's outstanding common stock or is otherwise an affiliate of the Company or any subsidiary of the Company, other than a director who meets the independence requirements of The NASDAQ Stock Market.

Each member of the Committee must be able to read and understand fundamental financial statements, including a balance sheet, income statement and cash flow statement. In addition, at least one member shall have past employment experience in finance or accounting, professional certification in accounting, or other comparable experience or background resulting in the individual being financially sophisticated, which may include being or having been a chief executive, chief financial or other senior officer with financial oversight responsibilities. At least one member shall be an audit committee financial expert as determined by the Board in accordance with the rules of the SEC. No Committee member shall simultaneously serve on the audit committee of more than three public companies without prior disclosure to the Committee and the Board and an affirmative determination by the Board that such service does not impair the ability of such member to serve effectively on the Committee, which determination shall be disclosed in the annual proxy statement.

The members of the Committee shall be appointed by the Board and shall serve until their successors are duly elected and qualified or their earlier resignation or removal. Any member of the Committee may be replaced

by the Board. Unless a chairman for the Committee is elected by the full Board, the members of the Committee may designate a chairman of the Committee by majority vote of the full Committee membership.

**3. Meetings**

The Committee shall meet as often as it determines, but not less frequently than quarterly. The Committee may form and delegate authority to subcommittees, or to one or more members of the Committee, when appropriate. The Committee shall meet with management and the independent auditor in separate executive sessions as appropriate. The Committee shall meet with the independent auditor and management on a quarterly basis to review the Company's financial statements and financial reports. The Committee shall maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board. The Committee will also record summaries of its recommendations to the Board in written form, which will be incorporated as part of the minutes of the Board meeting at which those recommendations are presented.

**4. Committee Authority and Responsibilities**

To fulfill its responsibilities and duties, the Committee shall:

(a) *Oversight of the Company's Independent Auditor*

i. Be directly and solely responsible for the appointment, compensation, retention and oversight of any independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) engaged by the Company for the purpose of preparing or issuing an audit report or related work, with each such auditor reporting directly to the Committee.

ii. Periodically review and discuss with the independent auditor (i) the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, and (ii) any formal written statements received from the independent auditor consistent with and in satisfaction of Independence Standards Board Standard No. 1, as amended, including without limitation, descriptions of (x) all relationships between the auditor and the Company, (y) any disclosed relationships or services that may impact the independent auditor's objectivity and independence and (z) whether any of the Company's senior finance personnel were recently employed by the independent auditor.

iii. Obtain and review annually a report from the independent auditor describing (i) the auditor's internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review or peer reviews or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues, and (iii) all relationships between the independent auditor and the Company.

iv. Evaluate annually the qualifications, performance and independence of the independent auditor, including a review of whether the independent auditor's quality-control procedures are adequate and a review and evaluation of the lead partner of the independent auditor, taking into account the opinions of management and the Company's internal auditors, and report to the Board on its conclusions, together with any recommendations for additional action.

v. Consult with the independent auditor to assure the rotation of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit every five years, consider issues related to the timing of such rotation and the transition to new lead and reviewing partners, and consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm, and report to the Board on its conclusions.

vi. Approve in advance the engagement of the independent auditor for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approve the fees

and other terms of any such engagement; provided, however, that (i) the Committee may establish pre-approval policies and procedures for any engagement to render such services, provided that such polices and procedures (x) are detailed as to particular services, (y) do not involve delegation to management of the Committee's responsibilities hereunder and (z) provide that, at its next scheduled meeting, the Committee is informed as to each such service for which the independent auditor is engaged pursuant to such policies and procedures, and (ii) the Committee may delegate to one or more members of the Committee the authority to grant pre-approvals for such services, provided that (a) the decisions of such member(s) to grant any such pre-approval shall be presented to the Committee at its next scheduled meeting and (b) the Committee has established policies and procedures for such pre-approval of services consistent with the requirements of clauses (i)(x) and (y) above.

vii. Meet with the independent auditor prior to the audit to discuss the planning and staffing of the audit.

viii. Approve as necessary the termination of the engagement of the independent auditor.

ix. Establish policies for the hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company, taking into account the impact of such policies on auditor independence.

x. Regularly review with the independent auditor any significant difficulties encountered during the course of the audit, any restrictions on the scope of work or access to required information and any significant disagreement among management and the independent auditor in connection with the preparation of the financial statements. Review with the independent auditor any accounting adjustments that were noted or proposed by the auditor but that were "passed" (as immaterial or otherwise), any communications between the audit team and the auditor's national office respecting auditing or accounting issues presented by the engagement, any "management" or "internal control" letter or schedule of unadjusted differences issued, or proposed to be issued, by the auditor to the Company, or any other material written communication provided by the auditor to the Company's management.

xi. Review with the independent auditor the critical accounting policies and practices used by the Company, all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that the independent auditor has discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

(b) *Review of Financial Reporting, Policies and Processes*

i. Review and discuss with management and the independent auditor the Company's annual audited financial statements and any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

ii. Review and discuss with management and the independent auditor the Company's quarterly financial statements.

iii. Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports.

iv. Review and discuss earnings press releases and other information provided to securities analysts and rating agencies, including any "pro forma" or adjusted financial information.

v. Periodically meet separately with management and with the independent auditor.

vi. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments.

vii. Review with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ("Internal Controls"), review annually with the independent auditor the attestation to and report on the assessment made by management, and consider with management and the independent auditor whether any changes to the Internal Controls are appropriate in light of management's assessment or the independent auditor's attestation.

viii. Review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in its periodic public reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

ix. Review and discuss with management and the independent auditor any off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings.

x. Review with management and the independent auditor the effect of regulatory and accounting initiatives on the financial statements. Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in selection of an application of accounting principles. Consider and approve, if appropriate, changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor or management.

xi. Review any analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effects of alternative GAAP methods on the financial statements.

xii. Review any special audit steps adopted in light of material control deficiencies.

(c) *Risk Management, Related Party Transactions, Legal Compliance and Ethics*

i. Review with the chief executive and chief financial officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's Internal Controls.

ii. Review and approve any related-party transactions, after reviewing each such transaction for potential conflicts of interests and other improprieties.

iii. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

iv. Consider and present to the Board for adoption a Code of Ethics for the Company's principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions, which meets the requirements of Item 406 of the SEC's Regulation S-K, and provide for and review prompt disclosure to the public of any change in, or waiver of, such Code of Ethics. Review such Code of Ethics periodically and recommend such changes to such Code of Ethics as the Committee shall deem appropriate, and adopt procedures for the Company to monitor and enforce compliance with such Code of Ethics.

v. Consult with the Board regarding its adoption of a Code of Business Conduct and Ethics applicable to all employees and directors and required by the rules of The NASDAQ Stock Market, and adopt procedures for the Company to monitor and enforce compliance with such Code of Business Conduct.

vi. As requested by the Board, review and investigate conduct alleged by the Board to be in violation of the Company's Code of Ethics or the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct.

vii. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

viii. Discuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

ix. Review with the Company's general counsel and report to the Board on litigation, material government investigations and compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics.

x. Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

xi. Develop and implement an annual performance evaluation of the Committee.

xii. Regularly report to the Board on the Committee's activities, recommendations and conclusions.

xiii. Review and reassess the Charter's adequacy as appropriate.

**PROXY**

**OSI SYSTEMS, INC.**

**PROXY**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Stockholders and the Proxy Statement and appoints Deepak Chopra and Anuj Wadhawan and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on September 25, 2003, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Stockholders of the Company to be held on November 5, 2003, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2004 Annual Meeting of Stockholders or until their respective successors are elected and qualified:

¨ **FOR ALL** ☐ **WITHHOLD AUTHORITY FOR ALL**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Madan G. Syal, Chand R. Viswanathan

To withhold authority to vote for any individual nominee, write the nominee's name in the space provided below:

2. To ratify the Board of Director's selection of Deloitte & Touche LLP to serve as the Company's independent accountants for the fiscal year ending June 30, 2004.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

3. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2003 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ______________________________ Dated:

Signature: ______________________________ Dated:

# Exhibit 11

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1399 of 2711

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON DC 20549**

# FORM 10-Q

(Mark one)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2003

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ______ to ______

Commission File Number 0-23125

# OSI SYSTEMS, INC.
**(Exact name of registrant as specified in its charter)**

| **California** | **33-0238801** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**(310) 978-0516**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past ninety days.

**YES ☒ NO ☐**

Indicate by check mark the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

**YES ☒ NO ☐**

As of February 9, 2004 there were 14,607,586 shares of the registrant's common stock outstanding.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1400 of 2711

Table of Contents

**OSI SYSTEMS, INC.**

**INDEX**

| | PAGE NUMBER |
|---|---|
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Consolidated Financial Statements | |
| Consolidated Balance Sheets at December 31, 2003 and June 30, 2003 | 3 |
| Consolidated Statements of Operations for the three and six months ended December 31, 2003 and December 31, 2002 | 4 |
| Consolidated Statements of Cash Flows for the six months ended December 31, 2003 and December 31, 2002 | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 22 |
| Item 4 – Controls and Procedures | 24 |
| **PART II - OTHER INFORMATION** | |
| Item 1 – Legal Proceedings | 25 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 25 |
| Item 6 – Exhibits and Reports on Form 8-K | 26 |
| Signatures | 27 |

Table of Contents

## PART I. FINANCIAL INFORMATION

**Item 1. Consolidated Financial Statements**

### OSI SYSTEMS, INC. AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
### (in thousands, except share amounts)

| | December 31, 2003 | June 30, 2003 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 85,356 | $ 94,246 |
| Marketable securities, available-for sale | 3,497 | 3,973 |
| Accounts receivable, net of allowance for doubtful accounts of $1,197 and $1,098 at December 31, 2003 and June 30, 2003, respectively | 38,988 | 36,901 |
| Other receivables | 2,873 | 2,549 |
| Inventory | 49,440 | 42,415 |
| Prepaid expenses | 3,042 | 1,264 |
| Deferred income taxes | 5,797 | 5,473 |
| Prepaid income taxes | 361 | 191 |
| Total current assets | 189,354 | 187,012 |
| Property and equipment, net | 14,524 | 14,115 |
| Goodwill | 14,917 | 11,436 |
| Intangible assets, net | 14,762 | 14,055 |
| Other assets | 440 | 665 |
| Investments | 2,542 | 1,697 |
| Deferred income taxes | 606 | 558 |
| Total | $ 237,145 | $ 229,538 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 151 | $ — |
| Current portion of long-term debt | 2,625 | 2,625 |
| Accounts payable | 19,395 | 14,524 |
| Accrued payroll and related expenses | 4,900 | 5,122 |
| Income taxes payable | 3,627 | 3,192 |
| Advances from customers | 4,917 | 6,648 |
| Accrued warranties | 2,410 | 2,782 |
| Provision for losses on long-term contract | 2,445 | 4,644 |
| Other accrued expenses and current liabilities | 4,705 | 5,559 |
| Total current liabilities | 45,175 | 45,096 |
| Long-term debt | 524 | 1,838 |
| Accrued pension | 1,478 | 1,340 |
| Deferred income taxes | 630 | 630 |
| Minority interest | 1,484 | 235 |
| Total liabilities | 49,291 | 49,139 |
| Shareholders' Equity | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December 31, 2003 and June 30, 2003, respectively | | |
| Common stock, no par value; authorized, 40,000,000 shares; issued and outstanding 14,607,586 | 136,531 | 135,884 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1402 of 2711

| | | |
|---|---|---|
| and 14,519,913 shares at December 31, 2003 and June 30, 2003, respectively | | |
| Retained earnings | 49,334 | 45,005 |
| Accumulated other comprehensive income (loss) | 1,989 | (490) |
| Total shareholders' equity | 187,854 | 180,399 |
| Total | $ 237,145 | $229,538 |

See accompanying notes to consolidated financial statements

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share amounts)**

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | **2003** | **2002** | **2003** | **2002** |
| Revenues | $ 51,095 | $ 43,673 | $ 89,740 | $ 80,774 |
| Cost of goods sold | 36,498 | 29,186 | 62,577 | 53,307 |
| Gross profit | 14,597 | 14,487 | 27,163 | 27,467 |
| Operating expenses: | | | | |
| Selling, general and administrative | 8,189 | 6,771 | 15,710 | 13,590 |
| Research and development | 2,373 | 2,215 | 4,410 | 3,761 |
| Restructuring charges | | | 1,061 | |
| Total operating expenses | 10,562 | 8,986 | 21,181 | 17,351 |
| Income from operations | 4,035 | 5,501 | 5,982 | 10,116 |
| Interest income | (301) | (290) | (611) | (603) |
| Interest expense | 80 | 83 | 167 | 222 |
| Write-off of deferred acquisition costs | | 608 | | 608 |
| Impairment of equity investment | | | 247 | |
| Income before provision for income taxes and minority interest | 4,256 | 5,100 | 6,179 | 9,889 |
| Provision for income taxes | 1,221 | 1,302 | 1,804 | 2,885 |
| Income before minority interest | 3,035 | 3,798 | 4,375 | 7,004 |
| Minority interest | 9 | (38) | (48) | (43) |
| Net income | $ 3,044 | $ 3,760 | $ 4,327 | $ 6,961 |
| Earnings per share | $ 0.21 | $ 0.26 | $ 0.30 | $ 0.51 |
| Diluted earnings per share | $ 0.20 | $ 0.25 | $ 0.29 | $ 0.49 |
| Weighted average shares outstanding | 14,587,369 | 14,320,469 | 14,563,052 | 13,571,432 |
| Weighted average shares outstanding - assuming dilution | 15,077,424 | 14,842,002 | 14,981,827 | 14,099,600 |

See accompanying notes to consolidated financial statements

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Six months ended December 31, | |
|---|---|---|
| | **2003** | **2002** |
| Cash flows from operating activities: | | |
| Net income | $ 4,327 | $ 6,961 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Provision for losses on accounts receivable | 86 | 265 |
| Depreciation and amortization | 2,418 | 1,629 |
| Write-off of deferred acquisition costs | — | 608 |
| Impairment of equity Investment | 247 | — |
| Gain on sale of marketable securities | (90) | — |
| Deferred income taxes | — | (1,741) |
| Restructuring charges | 1,061 | — |
| Minority interest | 48 | 44 |
| Changes in operating assets and liabilities net of business acquisitions: | | |
| Accounts receivable | 1,163 | 4,380 |
| Other receivables | (429) | (992) |
| Inventory | (4,599) | (9,158) |
| Prepaid expenses | (1,604) | (42) |
| Accounts payable | 4,727 | 869 |
| Accrued payroll and related expenses | (283) | 333 |
| Income taxes payable | 363 | 1,927 |
| Advances from customers | (3,702) | 4,985 |
| Accrued warranties | (391) | 463 |
| Other accrued expenses and current liabilities | (3,106) | (490) |
| Net cash provided by operating activities | 236 | 10,041 |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (1,065) | (1,607) |
| Cash paid for business acquisitions, net of cash acquired | (10,106) | (2,829) |
| Cash received on note receivable | — | 200 |
| Purchase of equity investment included in other assets | (1,113) | (2,561) |
| Other assets | (63) | (965) |
| Cash proceeds from sale of marketable securities | 1,658 | — |
| Cash proceeds from the sale of minority interest and distribution rights for Dolphin Medical | 2,000 | — |
| Net cash used in investing activities | (8,689) | (7,762) |
| Cash flows from financing activities: | | |
| Net proceeds from bank lines of credit | 141 | 130 |
| Payments on long-term debt | (1,317) | (1,320) |
| Proceeds from exercise of stock options and warrants | 647 | 216 |
| Proceeds from issuance of stock | — | 20,545 |
| Net cash (used in) provided by financing activities | (529) | 19,571 |
| Effect of exchange rate changes on cash | 92 | 15 |
| Net (decrease) increase in cash and cash equivalents | (8,890) | 21,865 |
| Cash and cash equivalents, beginning of period | 94,246 | 67,604 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1405 of 2711

| | | |
|---|---|---|
| Cash and cash equivalents, end of period | $ 85,856 | $89,469 |
| Supplemental disclosures of cash flow information - Cash paid/(received) during the period for: | | |
| Interest, net | $ (479) | $ (416) |
| Income taxes | $ 1,785 | $ 2,770 |

See accompanying notes to consolidated financial statements

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1406 of 2711
Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*General* – OSI Systems, Inc. and its subsidiaries is a vertically integrated, worldwide provider of security and inspection systems, medical monitoring and imaging systems, and opto-electronic devices and value-added subsystems.

We design, manufacture and market security and inspection systems worldwide to end users under the "Ancore," "Eagle," "Metor," "Rapiscan," and "Secure," brand names. These products are used to inspect people, baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband. These systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials.

In the medical field, we design, manufacture and market arterial hemoglobin saturation monitors and sensors, including hand-held and wireless monitoring tools under the trade names "Dolphin," "NuCat," "Dolphin ONE," "Aristo," and "Dolphin 2000". We also design, manufacture and market peripheral bone densitometers, which are used to provide bone density measurements in the diagnosis of osteoporosis, and to assess the risk of developing osteoporosis.

Our opto-electronic devices and subsystems are used in a broad range of applications, including printed circuit board assembly and surface mounting technologies, aerospace and defense electronics, security and inspection systems, medical diagnostics, fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We design and manufacture opto-electronic devices and subsystems for others through OEM arrangements, as well as for our security and medical equipment businesses.

*Consolidation* – The consolidated financial statements include the accounts of OSI Systems, Inc. and its subsidiaries. All significant inter-company accounts and transactions have been eliminated in consolidation. The consolidated balance sheet as of December 31, 2003, consolidated statements of operations for the three and six months ended December 31, 2003 and December 31, 2002 and cash flows for the six-month periods ended December 31, 2003, and December 31, 2002 have been prepared by us, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles in the United States of America have been condensed or omitted pursuant to such rules and regulations. However, in the opinion of management, all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes for the fiscal year ended June 30, 2003 included in our Annual Report on Form 10-K as filed with the Securities and Exchange Commission on September 29, 2003. The results of operations for the three and six months ended December 31, 2003 are not necessarily indicative of the results to be expected for the fiscal year ending June 30, 2004.

**Recent Developments**

In December 2003, we negotiated an Amended and Restated Credit Agreement with Bank of the West. The Agreement provides for a $50 million line of credit, which includes revolving line, letter of credit, acceptance, and foreign exchange facilities. In addition, we have a $3.3 million balance on an existing term loan with the same bank. Advances under the lines of credit

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1407 of 2711

Table of Contents

bear interest at a rate equal to a variable bank reference rate plus a margin, or at our option at a fixed rate as quoted by the bank upon request for specific advances. The new credit facilities expire in November 2005. Borrowings under the agreement are secured by liens on substantially all of our assets and the assets of our U.S. subsidiaries.

The Amended and Restated Credit Agreement contains certain covenants. Among these, we are at all times required to maintain (on a consolidated basis) a tangible net worth of at least $120 million; effective tangible net worth for any fiscal year to increase by a minimum of 75% of our net income for that year; a ratio of debt to earnings before interest, tax, depreciation and amortization of not more than 2.5 to 1; a ratio of current assets to current liabilities of not less than 1.25 to 1; a debt coverage ratio of 1.5 to 1; and a minimum balance of cash and cash equivalents and marketable securities of $20 million. In addition, the Amended and Restated Credit Agreement includes certain other covenants concerning pre-approval by the bank of mergers and acquisitions, the payment of dividends on our stock, the purchase or retirement of our stock, the sale of assets outside the ordinary course of business, and capital expenditures in excess of $10 million, among others. As of December 31, 2003, we were in compliance with all the covenants under the Amended and Restated Credit Agreement. As of December 31, 2003, we had utilized $4.7 million under the letter of credit facility.

In December 2003, we entered into a Stock Purchase and Option Agreement with Conmed Corporation, whereby Conmed Corporation purchased a 10% interest in our subsidiary, Dolphin Medical, Inc. and an option to purchase all of the remaining assets and the business of Dolphin Medical, Inc. In addition, Conmed Corporation and Dolphin Medical, Inc. entered into a Distribution Agreement, which provides Conmed Corporation with distribution rights for certain Dolphin Medical, Inc. products within certain defined territories. Conmed Corporation's option to purchase the assets and business of Dolphin Medical, Inc. expires upon the earlier of December 31, 2008 or the termination of the Distribution Agreement. Pursuant to the terms of the Stock Purchase and Option Agreement Conmed Corporation paid us $2 million, of which $1.2 million has been recorded as minority interest, based on an independent valuation of Dolphin Medical, Inc., and $0.8 million has been recorded as deferred income. The deferred income will be amortized over the life of the distribution agreement.

In December 2003, we acquired substantially all of the assets of J.D. Engineering (UK) Limited, a company registered in England and Wales. We paid approximately 367,000 pounds sterling (or approximately $649,000) including acquisition costs. A further 90,000 pounds sterling (or approximately $150,000) is payable March 22, 2004. The acquired assets comprise a business for the design, sale and manufacturing of, among other products, metal frames for x-ray scanners.

The acquisition was made through our wholly owned subsidiary, Rapiscan Security Products Limited. The following table shows the preliminary allocation of the purchase price (in thousands):

| | |
|---|---|
| Fair value of assets (net of cash) acquired | $435 |
| Goodwill | 214 |
| Total consideration paid in cash | $649 |

Table of Contents

In November 2003, we acquired substantially all of the remaining assets of Schwartz Electro-Optics, Inc. in a bankruptcy-court supervised auction. We paid approximately $1.6 million, including acquisition costs. The acquired assets comprise a business for the design, sale and manufacturing of laser-based systems used in traffic and toll management, precision agricultural management, and precision mapping and surveying. The business, located in Orlando, Florida now operates under the name OSI Laserscan. The acquisition was made through our wholly owned subsidiary, OSI Defense Systems, LLC. We have not yet completed the allocation of the purchase price between goodwill and identifiable intangible assets. The final determination may result in asset fair values and useful lives that are different from the preliminary estimates of these amounts. The following table shows the preliminary allocation of the purchase price (in thousands):

| | |
|---|---|
| Fair value of assets (net of cash) acquired | $ 676 |
| Goodwill | 414 |
| Developed technology | 300 |
| Customer relationships | 250 |
| Liabilities assumed | (37) |
| Total consideration paid in cash | $1,603 |

In October 2003, we acquired the assets of a manufacturing services company specializing in surface mount technology lines and PC board assembly operations for approximately $4.4 million including acquisition costs. The acquisition was made through a wholly owned subsidiary, OSI Electronics, Inc. The purchase price has been allocated to the assets acquired of $5.3 million and liabilities assumed of $1.0 million, based on the estimated fair values of the assets and liabilities at the date of acquisition. The excess of the purchase price over the fair value of the net assets acquired of $157,000 was allocated to intangible assets consisting of the value of customer relationships, based on a preliminary independent valuation of those assets. We have not yet completed the allocation of the purchase price between goodwill and identifiable intangible assets. The final determination may result in asset fair values and useful lives that are different from the preliminary estimates of these amounts. The following table shows the preliminary allocation of purchase price (in thousands):

| | |
|---|---|
| Fair value of assets (net of cash) acquired | $ 5,335 |
| Customer relationships | 158 |
| Liabilities assumed | (1,050) |
| Total consideration paid in cash | $ 4,443 |

In August 2003, we acquired certain assets representing the military laser-based training business of Schwartz Electro-Optics, Inc. The acquisition was made through a newly formed, wholly owned subsidiary, OSI Defense Systems, LLC. The acquired business now develops and manufactures tactical engagement simulation systems, man worn laser detectors, small arms transmitters, controller guns and a variety of targeting systems for the defense industry. The excess of the purchase price over the fair value of the net assets acquired of $3.6 million was allocated between tangible assets, goodwill and identifiable intangible assets, based on an independent valuation of those assets. The following table shows the purchase price allocation (in thousands).

| | |
|---|---|
| Fair value of assets (net of cash) acquired | $ 102 |
| Goodwill | 3,157 |
| Customer relationships | 445 |
| Liabilities assumed | (43) |
| Total consideration paid in cash | $3,661 |

Table of Contents

Supplemental pro-forma disclosures of results of operations for the three and six months ended December 31, 2002 and 2001, as though the above business combinations had been completed as of July 1, 2002, are as follows (in thousands except per share amounts):

| | Three months ended December 31 | | Six months ended December 31 | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Revenue | $51,474 | $53,194 | $97,074 | $102,749 |
| Net income before tax and minority interest | 4,169 | 5,980 | 5,857 | 7,103 |
| Net income | 2,982 | 4,416 | 4,102 | 5,162 |
| Diluted earnings per share | 0.20 | 0.30 | 0.27 | 0.37 |

**Subsequent Events**

In January 2004, we announced a definitive agreement to purchase Issaquah, Washington based Spacelabs Medical from GE Medical Systems for approximately $57 million in cash. The final purchase price is subject to closing adjustments. Spacelabs Medical is a leading global manufacturer and distributor of patient monitoring products, an area in which we have considerable interest as it represents a natural extension of our engineering, product and manufacturing expertise. Their installed base of patient monitoring systems consists of approximately 100,000 units worldwide, with 60,000 in the United States, 30,000 in Europe and 10,000 in Asia. Spacelabs' trailing 12 months unaudited revenues were over $150 million. This agreement is subject to regulatory approvals in Europe and South America and there is no assurance that it will be consummated.

In January 2004, we completed the acquisition of Advanced Research & Applications Corporation ("ARACOR"), a privately held company located in Sunnyvale, California. Consideration for the acquisition consisted of an initial cash payment of approximately $17.3 million (net of cash acquired), including acquisition costs. Furthermore, during the seven years after the close, contingent consideration is payable based on ARACOR's net revenues, provided certain requirements are met. The contingent consideration is capped at $30 million. ARACOR broadens our security product portfolio through its mobile x-ray inspection system, the Eagle, which is designed for container scanning at busy ports.

**New Accounting Pronouncements**

In November 2002, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 00-21, Revenue Arrangements with Multiple Deliverables. EITF Issue No. 00-21 addresses certain aspects of the accounting by a vendor for arrangements under which it will perform multiple revenue-generating activities and how arrangement considerations should be measured and allocated to the separate units of accounting in the arrangement. The provisions of EITF Issue No. 00-21 apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. The adoption of EITF Issue No. 00-21 did not have a material effect on our financial position or result of operations.

In January 2003, the FASB issued Interpretation Number 46, Consolidation of Variable Interest Entities ("FIN 46"), an interpretation of Accounting Research Bulletin No. 51. FIN 46 requires that variable interest entities be consolidated by a company if that company absorbs a majority of the entity's expected losses, receives a majority of its expected residual returns, or both, as a result of holding a variable interest. In December 2003, the FASB issued FIN 46R, which made certain amendments to FIN 46. The provisions of FIN 46R are effective for the first interim or annual period ending after March 15, 2004 when certain conditions are met by a variable interest entity. We anticipate that our adoption of FIN 46R will require that we consolidate our investment in an overseas-based research and development venture focused on security technologies, which are currently accounted for under the equity method.

Table of Contents

**Derivative Instruments**

Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risk, together with interest rate swaps on a variable interest rate term loan used to manage interest rate risk. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and accounts receivable and do not use the contracts for trading purposes. There were no foreign exchange contracts outstanding as of December 31, 2003.

In February 2001 and August 2001, we entered into interest rate swaps. The purpose of the swaps is to convert a portion of our variable interest rate debt into a fixed rate liability. The notional amount of the swaps was $2.9 million at December 31, 2003, and $4.2 million at June 30, 2003. The fair value of the swaps before income taxes was ($18,000) at December 31, 2003 and ($90,000) at June 30, 2003. The change in the fair value from the previously reported period is recorded in other comprehensive income (loss), due to the swaps meeting the criteria of an effective cash flow hedge. The swaps expire in June 2004.

**Inventory**

Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method. Inventory consisted of the following (in thousands):

| | December 31, 2003 | June 30, 2003 |
|---|---|---|
| Raw materials | $ 24,817 | $19,327 |
| Work-in-process | 16,675 | 13,097 |
| Finished goods | 7,948 | 9,991 |
| Total | $ 49,440 | $42,415 |

**Accounts Receivable**

Accounts receivable consisted of the following (in thousands):

| | December 31, 2003 | June 30, 2003 |
|---|---|---|
| Trade receivables, net | $ 38,870 | $36,855 |
| Receivables related to long term contracts – unbilled costs and accrued profit on progress completed | 118 | 46 |
| Total | $ 38,988 | $36,901 |

We expect to bill and collect the unbilled costs and accrued profits at December 31, 2003 during the next twelve months.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1411 of 2711

Table of Contents

**Goodwill and Other Intangible Assets:**

The changes in carrying value of goodwill for the six months ended December 31, 2003 is as follows (in thousands):

| | North America | Europe | Asia | Consolidated |
|---|---|---|---|---|
| Balance as of June 2003 | $ 8,086 | $3,350 | | $ 11,436 |
| Reduction related to net operating losses acquired on purchase of Ancore Corporation | (631) | | | (631) |
| Goodwill acquired during the period | 3,570 | 214 | | 3,784 |
| Foreign currency translation adjustments | 5 | 323 | | 328 |
| Balance as of December 31, 2003 | $11,030 | $3,887 | $ — | $ 14,917 |

Other intangible assets consisted of the following (in thousands):

| | | Dec 31, 2003 | | | June 30, 2003 | | |
|---|---|---|---|---|---|---|---|
| | Range of Life | Gross Carrying Amount | Accumulated Amortization | Intangibles net | Gross Carrying Amount | Accumulated Amortization | Intangibles net |
| Purchased software | 5-7 yrs | $ 327 | $ 278 | $ 49 | $ 327 | $ 243 | $ 84 |
| Software development costs | 5 yrs | 2,222 | 909 | 1,313 | 2,144 | 752 | 1,392 |
| Patents | 20 yrs | 408 | 116 | 292 | 408 | 96 | 312 |
| Core technology | 30 yrs | 6,800 | 245 | 6,555 | 6,800 | 132 | 6,668 |
| Developed technology | 5-20yrs | 6,150 | 408 | 5,742 | 5,850 | 251 | 5,599 |
| Customer relationships/backlog | 5yrs | 853 | 42 | 811 | | | |
| | | $16,760 | $ 1,998 | $ 14,762 | $15,529 | $ 1,474 | $ 14,055 |

Amortization expense for the six months ended December 31, 2003 was approximately $524,000. At December 31, 2003, estimated future amortization expense is as follows (in thousands):

| Fiscal years | Future amortization |
|---|---|
| Remaining 6 months of 2004 | $ 578 |
| 2005 | 1,104 |
| 2006 | 1,132 |
| 2007 | 1,083 |
| 2008 | 867 |
| 2009 | 622 |
| 2010 and thereafter | 9,376 |
| | $ 14,762 |

**Stock Based Compensation**

We apply the intrinsic value-based method of accounting prescribed by APBO No. 25, Accounting for Stock Issued to Employees, and related interpretations to account for our stock options. Under this method, compensation expense is generally recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price. We have adopted the disclosure-only provisions of SFAS No. 123, “Accounting for Stock-Based Compensation”, and SFAS No. 148, “Accounting for Stock-Based Compensation-Transition and Disclosure”, which was released in December of 2002 as an amendment to SFAS No. 123. These statements establish accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As allowed by SFAS No. 123 and SFAS No. 148, we elected to continue to apply the intrinsic value-based method of accounting described above.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1413 of 2711

Table of Contents

We account for option grants to non-employees using the guidance of SFAS No. 123, as amended by SFAS No. 148, and EITF No. 96-18, whereby the fair value of such options is determined using the Black-Scholes option pricing model at the earlier of the date at which the non-employee's performance is complete or a performance commitment is reached.

In accordance with the intrinsic value method, no compensation cost has been recognized for our stock option grants in the accompanying financial statements. If the fair value-based method had been applied in measuring stock compensation expense under SFAS No. 123, as amended by SFAS No. 148, the pro forma effect on net earnings and net earnings per share would have been as follows (in thousands, except share and per share amounts):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **Net earnings as reported** | $3,044 | $3,760 | $ 4,327 | $ 6,961 |
| **Add:** Stock based compensation expense included in reported net earnings, net of related tax benefits | | | | |
| **Deduct:** Stock based employee compensation expense determined under the fair value-based method for all awards, net of related tax effects | (683) | (561) | (1,356) | (1,068) |
| **Pro forma net earnings** | $2,361 | $3,199 | $ 2,971 | $ 5,893 |
| **Earnings per common share** | | | | |
| As reported | $ 0.21 | $ 0.26 | $ 0.30 | $ 0.51 |
| Pro forma | 0.16 | 0.22 | 0.20 | 0.43 |
| **Diluted earnings per share** | | | | |
| As reported | $ 0.20 | $ 0.25 | $ 0.29 | $ 0.49 |
| Pro forma | 0.16 | 0.22 | 0.20 | 0.42 |

**Earnings per Share**

We have reflected the provisions of SFAS No.128, "Earnings per Share", in the accompanying consolidated financial statements for all periods presented. Earnings per common share are computed using the weighted-average number of shares outstanding during the period. Earnings per common share, assuming dilution, are computed using the weighted-average number of shares outstanding during the period plus the dilutive effect of potential common stock. Potential common stock types are stock options and purchase rights.

Stock options and rights to purchase a total of 1,170,250 and 1,191,048 shares were outstanding for the three and six months ended December 31, 2003, but were not included in diluted earnings per common share because to do so would have been anti-dilutive. Stock options and rights to purchase rights totaling 1,426,462 shares were outstanding for the three and six months ended December 31, 2002, but were not included in diluted earnings per common share because to do so would have been anti-dilutive. The following table reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share-assuming dilution.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1414 of 2711
Table of Contents

| | For the three months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | | 2002 | | |
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Earnings per common share** | | | | | | |
| Income available to common stockholders | $3,044,000 | 14,587,369 | $ 0.21 | $3,760,000 | 14,320,469 | $ 0.26 |
| **Effect of dilutive securities** | | | | | | |
| Options and warrants, treasury stock method | | 490,055 | (0.01) | | 521,533 | (0.01) |
| **Diluted earnings per common share** | | | | | | |
| Income available to common stockholders, assuming dilution | $3,044,000 | 15,077,424 | $ 0.20 | $3,760,000 | 14,842,002 | $ 0.25 |

| | For the six months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | | 2002 | | |
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Earnings per common share** | | | | | | |
| Income available to common stockholders | $4,327,000 | 14,563,052 | $ 0.30 | $6,961,000 | 13,571,432 | $ 0.51 |
| **Effect of dilutive securities** | | | | | | |
| Options and warrants, treasury stock method | | 418,775 | (0.01) | | 528,168 | (0.02) |
| **Diluted earnings per common share** | | | | | | |
| Income available to common stockholders, assuming dilution | $4,327,000 | 14,981,827 | $ 0.29 | $6,961,000 | 14,099,600 | $ 0.49 |

### Comprehensive Income

Comprehensive income is computed as follows (in thousands):

| | For the three months ended December 31, | | For the six months ended December 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net Income | $3,044 | $3,760 | $4,327 | $6,961 |
| Foreign currency translation adjustments | 1,209 | 744 | 1,666 | 1,058 |
| Unrealised gain/(loss) on marketable securities available for sale | 271 | 132 | 761 | (394) |
| Change in the fair value of derivative instruments | 26 | 27 | 52 | (8) |
| Comprehensive Income | $4,550 | $4,663 | $6,806 | $7,617 |

### Contingencies

We are involved in various claims and legal proceedings arising out of the conduct of our business. In the opinion of our management after consultation with outside legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations or cash flows.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1415 of 2711

*Provision for Warranties* – We offer our customers warranties on products sold to them. These warranties typically provide for repairs and maintenance of our products for a specified time period. Concurrent with the sale of products, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. This provision is adjusted periodically based on historical and anticipated experience. Actual expenses of repairs under warranty, including parts and labor, are charged to this provision when incurred.

Table of Contents

For the six months ended December 31, 2003, the changes in warranty provisions were as follows (in thousands):

| | Provision for Warranties |
|---|---|
| Balance as of June 30, 2003 | $ 2,782 |
| Additions | 481 |
| Reductions for warranty repair costs | (431) |
| Balance on September 30, 2003 | 2,832 |
| Additions | 458 |
| Reductions for warranty repair costs | (880) |
| Balance on December 31, 2003 | $ 2,410 |

**Segment Information**

We have adopted SFAS No. 131, “Disclosures about Segments of an Enterprise and Related Information” (“SFAS No. 131”). We have reflected the provisions of SFAS No. 131 in the accompanying financial statements for all periods presented. We operate in two identifiable industry segments, (a) security and inspection products and (b) opto-electronic devices and subsystems and medical monitoring and imaging systems. Revenues for the three months ended December 31, 2003 from the sale of security and inspection products were $29.0 million compared to $27.7 million for the comparable prior year period and revenues from the sale of opto-electronic devices and subsystems and medical monitoring and imaging systems for the three months ended December 31, 2003, were $22.1 million compared to $16.0 million for the comparable prior year period. For the six months ended December 31, 2003 revenues from the sale of security and inspection products were $52.7 million compared to $51.8 million for the comparable prior year period and revenues from the sale of optoelectronic devices and subsystems and medical monitoring and imaging systems were $37.0 million compared to $29.0 million for the comparable prior year period.

Segment information is provided by geographic area. We are vertically integrated and we share common resources and facilities. Therefore, with the exception of external revenues, meaningful information by industry or product segment is not available.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1417 of 2711

Table of Contents

Our operating locations include North America (Canada and the United States), Europe (Finland, Norway, and the United Kingdom) and Asia (India, Malaysia, and Singapore). Revenue and income from operations generated in a particular geographic segment can be significantly affected by changes in prices or mix of inter-company product sales. Our operations by geographical areas are as follows (in thousands):

**Three months ended December 31, 2003**

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Product revenues | $ 35,826 | $10,487 | $ 2,292 | | $ 48,605 |
| Service revenue | 973 | 1,433 | 84 | | 2,490 |
| Transfer between geographic | 2,419 | 1,792 | 10,765 | (14,976) | 0 |
| Net revenue | $ 39,218 | $13,712 | $13,141 | $ (14,976) | $ 51,095 |
| Income (loss) from operations | $ 672 | $ 1,372 | $ 2,473 | $ (482) | $ 4,035 |
| Identifiable assets | $399,855 | $37,256 | $44,258 | $ (244,224) | $ 237,145 |
| Capital expenditure | $ 577 | $ 57 | $ 71 | $ — | $ 705 |
| Depreciation | $ 556 | $ 185 | $ 184 | $ — | $ 924 |

**Six months ended December 31, 2003**

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Product revenues | $ 60,036 | $18,540 | $ 6,228 | | $ 84,804 |
| Service revenue | 2,116 | 2,731 | 89 | | 4,936 |
| Transfer between geographic | 3,501 | 2,727 | 19,873 | (26,101) | 0 |
| Net revenue | $ 65,653 | $23,998 | $26,190 | $ (26,101) | $ 89,740 |
| Income (loss) from operations | $ (479) | $ 1,936 | $ 4,659 | $ (134) | $ 5,982 |
| Identifiable assets | $399,855 | $37,256 | $44,258 | $ (244,224) | $ 237,145 |
| Capital expenditure | $ 850 | $ 122 | $ 93 | $ — | $ 1,065 |
| Depreciation | $ 1,177 | $ 355 | $ 362 | $ — | $ 1,894 |

For the six months ended December 31, 2003, the North America geographic segment includes a pre-tax restructuring charge of $1,061,000 consisting primarily of write-off of equipment and leasehold improvements of $993,000 that were abandoned during the period and charges related to the clean up of a vacated facility of $60,000.

Table of Contents

**Three months ended December 31, 2002**

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Product revenues | $ 30,929 | $ 7,655 | $ 3,415 | | $ 41,999 |
| Service revenue | 480 | 1,166 | 28 | | 1,674 |
| Transfer between geographic | 2,092 | 2,463 | 9,862 | (14,417) | 0 |
| Net revenue | $ 33,501 | $11,284 | $13,305 | $ (14,417) | $ 43,673 |
| Income (loss) from operations | $ 3,606 | $ 867 | $ 337 | $ 691 | $ 5,501 |
| Identifiable assets | $378,384 | $30,364 | $38,588 | $ (222,904) | $ 224,432 |
| Capital expenditure | $ 329 | $ 51 | $ 351 | $ — | $ 731 |
| Depreciation | $ 499 | $ 140 | $ 158 | $ — | $ 797 |

**Six months ended December 31, 2002**

| | North America | Europe | Asia | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Product Revenues | $ 55,819 | $15,517 | $ 5,426 | | $ 76,762 |
| Service Revenue | 883 | 3,006 | 123 | | 4,012 |
| Transfer between Geographic | 4,917 | 4,534 | 20,657 | (30,108) | 0 |
| Net Revenue | $ 61,619 | $23,057 | $26,206 | $ (30,108) | $ 80,774 |
| Income (loss) from operations | $ 6,327 | $ 1,800 | $ 1,853 | $ 136 | $ 10,116 |
| Identifiable assets | $378,384 | $30,364 | $38,588 | $ (222,904) | $ 224,432 |
| Capital expenditure | $ 851 | $ 208 | $ 548 | $ — | $ 1,607 |
| Depreciation | $ 762 | $ 365 | $ 324 | $ — | $ 1,451 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1419 of 2711
Table of Contents

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Cautionary Statement

***Statements in this report on Form 10-Q that are forward-looking are based on current expectations, and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties that could cause actual results to differ materially, including, but not limited to, the possibilities that the demand for our products may decline as a result of possible changes in general and industry specific economic conditions, the effects of competitive pricing and such other risks and uncertainties as are described in this report on Form 10-Q, our Annual Report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission. All forward-looking statements speak only as of the date made, and we undertake no obligation to update these forward-looking statements.***

### Critical Accounting Policies and Estimates

The discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in conformity with accounting principles generally accepted in the United States of America. Our preparation of these consolidated financial statements requires us to make judgments and estimates that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statement and the reported amount of revenues and expenses during the reporting period. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from such estimates under different assumptions or conditions.

Our critical accounting policies are described in our Annual Report on Form 10-K, previously filed by us with the Securities and Exchange Commission.

### Executive Summary

Our security and inspection systems business continues to grow. This growth occurred despite the completion during the first quarter of our contract to manufacture pre-scanners and related electronics for Invision Technologies, Inc.'s CTX products. The Invision Technologies, Inc. contract contributed approximately $22 million to our sales last year (including approximately $11 million in the first six months of fiscal 2003) compared to approximately $300,000 through the first six months this fiscal year. Our security and inspection systems business growth has occurred in both domestic and international markets and stems from both our conventional parcel security and our cargo businesses.

We recently completed the acquisition of Advanced Research & Applications Corp. ("ARACOR"). This acquisition has strengthened our position in the cargo security sector. ARACOR's Eagle product is a large, x-ray based scanning system for containers and cargo. The Eagle was designed in partnership with U.S. Customs and has gained the acceptance of U.S. Customs, as evidenced by its blanket purchase order of up to $40 million over the next 5 years. Including options exercised by U.S. Customs, ARACOR has to date received orders totaling approximately $14 million for the Eagle product. Our security and inspection systems business believes it now offers the broadest product line in the conventional and cargo security business, including x-ray, gamma-ray and neutron technologies and hybrid products built on these technologies.

Our security and inspection systems group's research and development activities have most recently focused on conventional parcel, large cargo and automated baggage inspection, both for carry-on and checked baggage. In this regard, we are pleased that our XRD 1000 product has been selected by the U.S. Department of Homeland Security to participate in a laboratory evaluation for explosives detection

Table of Contents

devices. While this in no way assures that this product will pass the test, we are happy to be considered by the government together with other suppliers.

Our opto-electronic devices and subsystems product sales have weakened along with the overall U.S. manufacturing sector. Revenues in this area continue to be flat to lower than last year. In the first half of this fiscal year, however, our opto-electronic devices and subsystems group acquired several new promising companies. In August, we purchased the military, laser-based training business of Schwartz Electro-Optics, Inc. We believe the products lines we acquired from this company – now sold by our new OSI Defense Systems, LLC subsidiary – complement the defense product lines of our existing RapiTec, Inc. subsidiary. Both OSI Defense Systems, LLC and RapiTec, Inc. develop and manufacture tactical engagement simulation systems, man worn laser detectors, small arms transmitters, controller guns and a variety of targeting systems for the defense industry.

During the past fiscal quarter we also acquired from Schwartz Electro-Optics, Inc., a business for the design, sale and manufacturing of laser-based systems used in traffic and toll management, precision agricultural management, and precision mapping and surveying. This business now operates under the name OSI Laserscan and offers, among other products, a unique, patented laser range finder technology, which is rapidly gaining acceptance by traffic and toll management authorities, as well as precision agricultural management and mapping and survey technologies.

In addition, our opto-electronic devices and subsystems group also purchased the assets of a manufacturing services company specializing in surface mount technology lines and PC board assembly operations. The company – now operating as OSI Electronics, Inc. – has begun to provide our opto-electronic devices and subsystems group with increased manufacturing capacity and technologies to support internal needs as well as to offer a broader manufacturing platform to our existing customers.

Following these acquisitions, our total opto-electronic devices and subsystems product revenues grew by 38% in the quarter ended December 31, 2003 compared to the same quarter last year.

Our medical monitoring and imaging products are experiencing strong sales growth, especially our pulse oximetry products, which compete directly with the products of Nellcor. These products are receiving considerable interest as we have begun to introduce them in the United States and other countries worldwide where key Nellcor patents have recently expired. In addition, in this quarter we sold a 10% interest in and an option to purchase our Dolphin Medical, Inc. subsidiary to Conmed Corporation. We also granted Conmed Corporation exclusive marketing and distribution rights to certain Dolphin Medical, Inc. products in the United States and other territories.

We announced in January 2004, that we have signed a definitive agreement with GE Medical Systems for the purchase of Spacelabs Medical. Spacelabs Medical is a leading global manufacturer and distributor of patient monitoring products, an area in which we have considerable interest as it represents a natural extension of our engineering, product and manufacturing expertise. The Spacelabs Medical installed base of patient monitoring systems consists of approximately 100,000 units worldwide, with 60,000 in the United States, 30,000 in Europe and 10,000 in Asia. Spacelabs Medical's trailing 12 months unaudited revenues were over $150 million. This agreement is subject to regulatory approvals in Europe and South America and there is no assurance that it will be consummated.

As a company, we continue to move towards the overall consolidation of our various businesses. We do so in order to generate manufacturing, sales force, and administrative related efficiencies and to increase productivity. We also continue to invest in critical areas such as sales, marketing, and research and development. Our gross margins in respective product areas continue to hold, however, with the inclusion of OSI Electronics, Inc., our consolidated gross margin as a percentage of revenues has declined. OSI Electronics, Inc. is a manufacturing services company, an industry where gross margins are traditionally low.

Table of Contents

The following table is intended to illustrate a tabular analysis of certain consolidated statement of income data as a percentage of revenue for the periods presented.

| | Three months ended December 31 | | Six months ended December 31 | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 71.4% | 66.8% | 69.7% | 66.0% |
| Gross profit | 28.6% | 33.2% | 30.3% | 34.0% |
| Selling, general and administrative | 16.0% | 15.5% | 17.5% | 16.8% |
| Research and development | 4.6% | 5.1% | 4.9% | 4.7% |
| Restructuring charge | | | 1.2% | |
| Operating Income | 7.9% | 12.6% | 6.7% | 12.5% |

We had $88.8 million in cash and cash equivalents and marketable securities as of December 31, 2003. In addition, we recently re-negotiated our credit agreement with Bank of the West in order to increase our line of credit from $26 million to $50 million.

**Results of Operations**

*Revenues* – Revenues consist of sales of security and inspection products as well as opto-electronic devices and subsystems and medical monitoring and imaging systems. Revenues for the three months ended December 31, 2003, increased by $7.4 million, or 17%, to $51.1 million from $43.7 million for the comparable prior year period. For the six months ended December 31, 2003, revenues increased by $8.9 million, or 11%, to $89.7 million from $80.8 million for the comparable prior year period. Revenues for the three months ended December 31, 2003 from the sale of security and inspection products increased by $1.3 million, or 5%, to $29.0 million from $27.7 million for the comparable prior year period and revenues from the sale of opto-electronic devices and subsystems and medical monitoring and imaging systems for the three months ended December 31, 2003, increased by $6.1 million, or 38%, to $22.1 million from $16.0 million for the comparable prior year period. For the six months ended December 31, 2003, revenues from the sale of security and inspection products increased by $0.9 million, or 2%, to $52.7 million from $51.8 million for the comparable prior year period and revenues from the sale of optoelectronic devices and subsystems and medical monitoring and imaging systems increased by $8.0 million or 28%, to $37.0 million from $29.0 million for the comparable prior year period.

The increase in revenues from the sale of security and inspection products was due to increased sales of x-ray screening machines in the United States and international markets offset by a decrease in sales to Invision Technologies, Inc. of $4.5 million in the three months ended December 31, 2003 and $10.6 million for the six months ended December 31, 2003. The increase in revenues from the sale of optoelectronic devices and subsystems and medical monitoring and imaging systems resulted from the inclusion of revenues from the acquisitions of OSI Defense Systems, LLC, OSI Laserscan and OSI Electronics, Inc. of approximately $8.0 million for the three months and $8.2 million for the six months ended December 31, 2003 and growth in sales of our medical products, offset by lower sales from our existing opto-electronics and defense businesses.

*Gross Profit* – Gross profit consists of revenues less cost of goods sold. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $110,000 or 1%, to $14.6 million for the three months ended December 31, 2003 from $14.5 million for the comparable prior year period. As a percentage of revenues, gross profit decreased in the three months ended December 31, 2003 to 28.6% from 33.2% in the comparable prior year period. For the six months ended December 31, 2003, gross profit decreased by $0.3 million to $27.2 million from $27.5 million in the comparable prior year period. As a percentage of revenues, gross profit decreased in the six months ended December 31, 2003 to 30.3% from 34.0% in the comparable prior year period. The decrease in gross profit as a percentage of

Table of Contents

revenues or gross margin is driven by two primary factors. First, the mix of security and inspection products shifted towards lower margin sales. Second, the gross margin derived from the products of OSI Electronics, Inc. is significantly lower than that derived from the products of our other businesses, as is consistent with the characteristics of the manufacturing outsourcing industry in which OSI Electronics, Inc. operates. The inclusion of OSI Electronics, Inc.'s revenues at lower gross margins reduced our overall gross margin. The decrease in gross margin from the above factors was partially offset by an increase resulting from additional funding of $775,000 received for a United States government-funded project, for which Ancore Corporation had established a provision for loss prior to our acquisition of that company.

*Selling, General and Administrative* – Selling, general and administrative expenses consisted primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the three months ended December 31, 2003, such expenses increased by $1.4 million, or 20.9%, to $8.2 million from $6.8 million for the comparable prior year period. For the six months ended December 31, 2003, such expenses increased by $2.1 million, or 15.5%, to $15.7 million from $13.6 million for the comparable prior year period. As a percentage of revenues, selling, general and administrative expenses increased in the three months ended December 31, 2003 to 16.0%, from 15.5% in the comparable period last year and increased in the six months ended December 31, 2003 to 17.5%, from 16.8% in the comparable period last year. The increase in expenses for the three and six months was primarily due to increased sales and marketing expenses for security and inspection products and medical monitoring and imaging systems. The increase in administrative expenses for the three months ended December 31, 2003 was due to an increase in headcount and compensation partially offset by a decrease in exchange rate fluctuation losses and lower legal costs. For the six months ended December 31, 2003, administrative expenses increased from last year due to increases in headcount, compensation and legal costs, partially offset by lower exchange rate fluctuation losses. Exchange rate fluctuation losses amounted to $33,000 in the three months ended December 31, 2003 compared to losses of $136,000 in the comparable period last year. For the six months ended December 31, 2003, exchange rate fluctuation gains amounted to $4,000 compared to losses of $332,000 in the comparable period last year. In addition, the acquisitions of OSI Defense Systems, LLC, OSI Laserscan and OSI Electronics, Inc. added selling, general and administrative expenses of $710,000 for the three months ended December 31, 2003, and $737,000 for the six months ended December 31, 2003.

*Research and Development* – Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2003, such expenses increased by $158,000, or 7%, to $2.4 million from $2.2 million for the comparable prior year period. For the six months ended December 31, 2003, such expenses increased by $649,000, or 17%, to $4.4 million from $3.8 million for the comparable prior year period. As a percentage of revenues, research and development expenses were 4.6% in the three months ended December 31, 2003, compared to 5.1% in the comparable period last year. For the six months ended December 31, 2003, expenses were 4.9% of revenues compared to 4.7% last year. The increase in research and development expenses for the three and six month periods ending December 31, 2003 from the comparable periods last year was primarily due to increased research and development spending for security and inspection products and medical monitoring imaging systems.

*Restructuring Charges* – In the six months ended December 31, 2003, we consolidated manufacturing processes and facilities of certain opto-electronics and medical businesses. These consolidations resulted in a pre-tax charge of $1.1 million, consisting primarily of write-off of equipment and leasehold improvements of $993,000 that were retired during the period and charges related to the clean up of a vacated facility of $60,000. We do not expect to incur further costs in relation to these consolidations. These charges were recorded as restructuring charges in our consolidated financial statements for the three months ended September 30, 2003. These charges were calculated in accordance with SFAS No. 144, "Impairment or Disposal of Long-Lived Assets" and SFAS No. 146, "Accounting for Exit or Disposal Activities".

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1423 of 2711

Table of Contents

*Income from Operations* – For the three months ended December 31, 2003, income from operations was $4.0 million compared to $5.5 million for the comparable prior year period. For the six months ended December 31, 2003, income from operations was $6.0 million compared to $10.1 million for the comparable prior year period. Income from operations decreased due to lower gross profit margin, increased selling, general and administrative expenses, research and development expenses and restructuring charges.

*Interest (Income) Expense* – For the three months ended December 31, 2003, we earned interest income of $301,000 compared to $290,000 for the comparable prior year period. For the six months ended December 31, 2003, we earned interest income of $611,000 compared to $603,000 for the comparable prior year period. The increase in interest income for the three and six months ended December 31, 2003 was due to the increase in interest earning deposits in the current year compared to the same periods in the prior year. For the three months ended December 31, 2003, our interest expense was $80,000 compared to $83,000 for the comparable prior year period. For the six months ended December 31, 2003, our interest expense was $167,000 compared to $222,000 for the comparable prior year period. The decrease in expense stems primarily from a decrease in borrowings.

*Impairment of Equity Investment* – In July 2002, we purchased from Imagis Technologies, Inc. 1,166,667 shares of its common stock (approximately 6% of its then-outstanding stock), and 2-year warrants to purchase 291,667 additional shares of its common stock (approximately 1.5% of its then-outstanding stock) at a price of $1.50 per share, and certain ancillary rights, for an aggregate purchase price of $1.75 million. Imagis Technologies, Inc. develops facial recognition software for security applications. We have designated the investment as available for sale. The investment is included under other assets in the accompanying consolidated financial statements. In September 2003, based on the continued trading of Imagis Technologies, Inc. common stock below the original purchase price for a prolonged period of time, we recognized an other than temporary impairment in the market value of this investment and recognized a pre-tax charge of $247,000 in our income statement. Through December 31, 2003, we have written down the value of this investment by a cumulative total of $1.7 million.

*Provision for Income Taxes* – Provision for income taxes for the three months ended December 31, 2003 decreased to $1.2 million from $1.3 million last year. For the six months ended December 31, 2003, provision for income taxes decreased to $1.8 million from $2.9 million last year. As a percentage of income before provision for income taxes and minority interest, provision for income taxes was 28.7% for the three months ended December 31, 2003, compared to 25.5% for the comparable period last year, and 29.2% for the six months ended December 31, 2003 unchanged from last year. The increase in the effective income tax rate for the three months ended December 31, 2003 as compared to the same period last year was due primarily to changes in the mix of income from U.S. and foreign operations.

*Net Income* – For the reasons outlined above, we had net income of $3.0 million for the three months ended December 31, 2003, compared to $3.8 million for the three months ended December 31, 2002, and $4.3 million for the six months ended December 31, 2003 compared to $ 7.0 million for the comparable period last year.

**Liquidity and Capital Resources**

Cash and equivalents as of December 31, 2003 were $85.4 million, a decrease of $8.9 million from $94.3 million as of June 30, 2003.

Our operations provided net cash of $236,000 during the six months ended December 31, 2003. The amount of net cash provided by operations reflects our net income of $4.3 million adjusted for non-cash expenses relating to depreciation and amortization, restructuring charges and impairment of equity investment, and changes in operating assets and liabilities net of the effect of business acquisitions. A decrease in accounts receivable through better collections, coupled with an increase in accounts payable further contributed to the generation of cash. This was partially offset by increases in inventory and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1424 of 2711
Table of Contents

prepaid expenses and a decrease in accrued payroll and related expenses, advances from customers, accounts payable and other accrued expenses and current liabilities.

Net cash used in investing activities was $8.7 million for the six months ended December 31, 2003. This amount reflects the cash paid for the acquisition of the assets representing the military laser-based training business of Schwartz Electro-Optics, Inc. of $3.3 million (in addition to $250,000 paid as a deposit in the three months ended June 30, 2003), the acquisition of a manufacturing services company specializing in surface mount technology lines and PC board assembly operations for $4.4 million, the acquisition of the remaining assets of Schwartz Electro-Optics, Inc., of $1.6 million, the acquisition of J.D. Engineering (UK) Limited of $649,000, an investment of $1.1 million in an overseas-based research and development venture focused on security technologies, and the purchase of $1.1 million of property and equipment. These investments were partially offset by a receipt of $2.0 million from Conmed Corporation. Under the terms of a Stock Purchase and Sale Agreement Conmed Corporation purchased a 10% interest in our subsidiary, Dolphin Medical, Inc. and an option to purchase all of the remaining assets and the business of Dolphin Medical, Inc. In addition, under the terms of a distribution agreement, Conmed acquired rights to sell certain Dolphin Medical, Inc. products in the United States and other territories.

Net cash used by financing activities was $529,000 for the six months ended December 31, 2003. This reflects payments on long term debt of $1.3 million partially offset by proceeds from the exercise of employee stock options.

In December 2003, we negotiated an Amended and Restated Credit Agreement with Bank of the West. The agreement provides for a $50 million line of credit, which includes revolving line, letter of credit, acceptance, and foreign exchange facilities. In addition, we have a $3.1 million balance on an existing term loan with the same bank. As of December 31, 2003, we had utilized $4.7 million under the letter of credit facility.

In March 1999, we announced a program under which we would repurchase up to 2,000,000 shares of our common stock. Through December 31, 2003, we had repurchased 1,404,500 shares at an average price of $4.37 per share. The stock repurchase program did not have a material effect on our liquidity and is not expected to have a material effect on liquidity in subsequent quarters.

We anticipate that current cash balances, anticipated cash flows from operations and current borrowing arrangements will be sufficient to meet our working capital, stock repurchase program and capital expenditure needs for the foreseeable future including, if consummated, the acquisition of Spacelabs Medical.

*Contractual obligations* – We have continued to repay our long-term debt and our outstanding balance has decreased to $3.1 million from $4.5 million as of June 30, 2003. Our contractual obligations relating to operating leases of office premises have increased due to the of a manufacturing services company specializing in surface mount technology lines and PC board assembly operations and the defense and commercial businesses of Schwartz Electro-optics, Inc., partially offset by lowered lease obligations driven by the consolidation and relocation of certain of our existing businesses. Contractual lease obligations have increased from the June 30, 2003 level by approximately $4.4 million over the life of the leases, with estimated increases of $0.5 million occurring in the remaining six months of this fiscal year.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

*Market Risk* – We are exposed to certain market risks that are inherent in our financial instruments and arise from transactions entered into in the normal course of business. We may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign currency-denominated transactions. We do not enter into derivative financial instrument transactions for speculative purposes. In addition, our investments in equity securities are highly concentrated and unhedged, and are therefore subject to potentially significant fluctuations in market

Case 2:19-cv-02288-JAM-AC    Document 32-12    Filed 09/28/21    Page 1425 of 2711

Table of Contents

value resulting from factors such as the financial performance of the issuing companies, changes in the market for the companies' products, and extrinsic fluctuations in the overall market for equity securities.

*Foreign Currency Translation* – The accounts of our operations in each of the following countries are maintained in the following currencies: Canada (Canadian dollars), England (U.K. pounds sterling), Finland (euros), India (Indian rupees), Malaysia (Malaysian ringgits), Norway (Norwegian kroners), and Singapore (Singapore dollars). We translate foreign currency financial statements into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Net foreign currency transaction gains of approximately $4,000 were included in income for the six months ended December 31, 2003 and losses of approximately $332,000 were included in the comparable prior year period.

Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risks, along with interest rate swaps on a variable interest rate term loan used to manage interest rate risks. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and do not use the contracts for trading purposes. No foreign exchange contracts were outstanding as of December 31, 2003.

*Importance of International Markets* – International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, wars and political instability. In addition, the outbreak of infectious diseases such as the recent outbreak of the SARS virus represent a potential risk to our ability to complete projects on schedule and to gain new project awards, due to travel constraints to and from the affected areas.

For the six months ended December 31, 2003, overall foreign currency fluctuations relative to the U.S. dollar had an immaterial effect on our consolidated revenues and results of operations. As a result of monetary policies in Malaysia, including the pegging of the Malaysian ringgit to the U.S. dollar, we believe that our foreign currency exposure in Malaysia will not be significant in the foreseeable future. We perform ongoing credit evaluations of our customers' financial condition and, if deemed necessary, we require advance payments for sales. We monitor economic and currency conditions around the world to evaluate whether there may be any significant effect on our international sales in the future. Due to our overseas investments and the necessity of dealing with local currencies in our foreign business transactions, we are at risk with respect to foreign currency fluctuations.

*Interest Rate Risk* – We classify all highly liquid investments with purchased maturity of three months or less as cash equivalents and record them in the balance sheet at cost, which approximates fair value. Short-term investments are comprised of high quality marketable securities. We generally do not use derivatives to hedge our interest rate risk with the exception of interest rate swaps to convert a portion of our variable-interest-rate debt to a fixed-rate liability.

In February 2001 and August 2001, we entered into interest rate swaps. The purpose of the swaps was to convert a portion of our variable interest rate debt into a fixed rate liability. The notional amount of the swaps was $2.9 million at December 31, 2003, and $4.2 million at June 30, 2003. The fair value of the swaps before income taxes was ($18,000) at December 31, 2003 and ($90,000) at June 30, 2003. The change in the fair value from the previously reported period is recorded in other comprehensive income (loss), due to the swaps meeting the criteria of an effective cash flow hedge. The swaps expire in June 2004.

*Inflation* – We do not believe that inflation has had a material impact on our December 31, 2003 results of operations.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1426 of 2711
Table of Contents

## Item 4. Controls and Procedures

### Disclosure Controls and Procedures

As of December 31, 2003, the end of the period covered by this report, our Chief Executive Officer and our Chief Financial Officer reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) and 15d-15(e)). Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized, and filed or submitted on a timely basis. They have concluded, based on their evaluation, that as of such date, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to them as appropriate to allow timely decisions regarding required disclosure.

### Internal Control Over Financial Reporting

There have been no significant changes in our internal control over financial reporting (as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

Table of Contents

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

In November 2002, L-3 Communications Corporation ("L-3") brought suit against us for a declaratory judgment that L-3 had not breached its obligations under an amended letter of intent concerning the parties' joint acquisition of Perkin Elmer, Inc.'s Securities Detection System Business. In February 2003, we answered and asserted counterclaims against L-3 for, among other things, fraud, breach of fiduciary duty, breach of contract and failure to negotiate in good faith. In March 2003, L-3 amended its complaint and asserted claims against us for breach of contract, failure to negotiate in good faith, and tortious interference. In its amended complaint, L-3 requested both a declaratory judgment that it had fulfilled its obligations under the amended letter of intent and an award of damages for an unspecified amount. Subsequently, L-3 moved to dismiss all of our counterclaims. On January 6, 2004, L-3's motion to dismiss our counterclaims was granted in part and denied in part. In its ruling, the court upheld the adequacy of our allegations against L-3 for fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, imposition of constructive trust, and breach of contract for failure to negotiate in good faith. Discovery in the case is proceeding. These actions are pending in the District Court for the Southern District of New York.

We are also involved in various other claims and legal proceedings arising out of the conduct of our business. In our opinion after consultation with outside legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations, or cash flows.

### Item 4. Submission of Matters to a Vote of Security Holders

We held our Annual Meeting on November 5, 2003. During the Annual Meeting, the following actions were taken:

1. Election of Directors

| Name | For | Withheld |
|---|---|---|
| Deepak Chopra | 10,153,684 | 2,777,646 |
| Ajay Mehra | 10,157,802 | 2,773,528 |
| Steven C. Good | 12,811,614 | 119,716 |
| Meyer Luskin | 12,807,927 | 123,403 |
| Madan G. Syal | 10,179,243 | 2,752,087 |
| Chand R. Viswanathan | 12,804,849 | 126,481 |

2. Ratification of Deloitte & Touche LLP as independent auditors for the year ending June 30, 2004.

| | |
|---|---|
| For | 12,620,338 |
| Against | 303,587 |
| Abstain | 7,405 |

Table of Contents

**Item 6. Exhibits and Reports on Form 8-K**

(a) Exhibits

| | |
|---|---|
| 10.20 | Amended and Restated Credit Agreement dated as of December 1, 2003, by and between Bank of the West and OSI Systems, Inc. |
| 31.1 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

(b) Reports on Form 8-K.

We filed a current report on Form 8-K on January 7, 2004 announcing the signing of a definitive agreement to purchase Spacelabs Medical, a manufacturer and distributor of patient monitoring systems.

We filed a current report on Form 8-K on January 22, 2004 announcing the acquisition of Advance Research & Applications Corp., a developer and manufacturer of x-ray test and inspection systems.

We filed a current report on Form 8-K on February 3, 2004 in connection with the dissemination of an earnings release.

Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 13th day of February 2004.

**OSI SYSTEMS, INC.**

By: /s/ DEEPAK CHOPRA

**Deepak Chopra**
**President and Chief Executive Officer**

By: /s/ ANUJ WADHAWAN

**Anuj Wadhawan**
**Chief Financial Officer**

# Exhibit 12

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1431 of 2711

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**
**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a)
of the Securities Exchange Act of 1934**

Filed by the Registrant x

Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement

☐ **Confidential, for use of the Commission only (as permitted by Rule 14a-6(e)(2))**

x Definitive Proxy Statement

¨ Definitive Additional Materials

¨ Soliciting Material Pursuant to §240.14a-11(c) or §240.14a-12

# OSI SYSTEMS, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement if Other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1432 of 2711

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

September 30, 2004

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc. (the "Company"), which will be held at 10:00 a.m., local time, on November 8, 2004, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of the Company's outstanding common stock as of the close of business on September 24, 2004, are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1433 of 2711
Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held November 8, 2004**

---

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 8, 2004, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect five directors to hold office for a one-year term and until their respective successors are elected and qualified.
2. To ratify the selection of Deloitte & Touche LLP as the Company's independent public accountants for the fiscal year ending June 30, 2005.
3. To amend the Company's Articles of Incorporation to increase the number of shares of common stock which the Company is authorized to issue, from 40,000,000 shares to 100,000,000 shares.
4. To ratify the Board of Directors' amendment to the 1997 Stock Option Plan.
5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, containing consolidated financial statements, is included with this mailing.

The Board of Directors has fixed the close of business on September 24, 2004, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: September 30, 2004

**PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 2 |
| Proposal No. 2 Ratification of Independent Public Accountants | 7 |
| Proposal No. 3 Approval of Amendment to Articles of Incorporation | 9 |
| Proposal No. 4 Ratification of Amendment of 1997 Stock Option Plan | 11 |
| Information Concerning Management, Compensation and Stock Ownership | 13 |
| Report of the Compensation Committee | 22 |
| Report of the Audit Committee | 24 |
| Company Stock Price Performance | 26 |
| Shareholder Proposals | 27 |
| Availability of Annual Report on Form 10-K | 27 |
| Other Business | 28 |
| Appendix A (Audit Committee Charter) | A-1 |
| Appendix B (Nominating Committee Charter) | B-1 |

Table of Contents

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at the Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on November 8, 2004, at the executive offices at the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any shareholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company or by issuance of a subsequent proxy. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on September 24, 2004, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 16,245,310 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date will constitute a quorum for the transaction of business. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (i.e., five) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes. Only shareholders of record at the close of business on September 24, 2004 are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Shares represented by executed and unrevoked proxies will be voted in accordance with the instructions contained therein or in the absence of such instructions, in accordance with the recommendations of the Board of Directors. Neither abstentions nor broker non-votes will be counted for the purposes of determining whether any of the proposals has been approved by the shareholders of the Company, although they will be counted for purposes of determining the presence of a quorum.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of the other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting at the Meeting.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by e-mail, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 8, 2004 to all shareholders entitled to vote at the Annual Meeting. A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, containing consolidated financial statements, is included in this mailing.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1436 of 2711

Table of Contents

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

## ELECTION OF DIRECTORS
***(Item 1 of the Proxy Card)***

**Nominees**

The Board of Directors consists of five members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The five candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2005, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the five nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 53 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 42 | Director, Executive Vice President, and President of Security Group | 1996 |
| Steven C. Good(1)(2)(3) | 62 | Director | 1987 |
| Meyer Luskin(1)(2)(3) | 78 | Director | 1990 |
| Chand R. Viswanathan(1) | 75 | Director | 2001 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating Committee

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

Table of Contents

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996 and served as Secretary between March 1996 and November 2002. Mr. Mehra also serves as President of the Company's Security Group. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. In 1997, Mr. Good was elected as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on NASDAQ. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the board of directors of Scope Industries, a publicly-held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal feed. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, Chromagen, Inc., a biotechnology company, Alerion Biomedical, Inc. a biotechnology company, and Myricom, Inc. a computer and network infrastructure company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chairman of the department from 1979 to 1985.

**Retirement from the Board of Directors**

Madan G. Syal retired as a Director of the Company on June 30, 2004. He had been a Director of the Company since the Company's inception in May 1987. From May 1987 until February 1992, he served as Secretary of the Company. Mr. Syal has accepted an invitation by the Company to continue his involvement with the Company as a member of OSI Systems' Healthcare Group's Advisory Committee, which is currently being formed.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Information Concerning Management, Compensation and Stock Ownership – Executive Compensation").

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1438 of 2711
Table of Contents

**Board of Directors Meetings and Committees of the Board of Directors**

There were six meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2004. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee, and Nominating Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No director attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the Securities and Exchange Commission ("SEC") and the Nasdaq Stock Market, Inc. ("NASDAQ") director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices.

The Audit Committee consists of Messrs. Good, Luskin and Viswanathan. The Board of Directors has determined that, based upon his prior work experience and his tenure and experience on the Company's Audit Committee, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts. There were seven meetings of the Audit Committee during the fiscal year ended June 30, 2004. See *Report of the Audit Committee.*

The charter of the Audit Committee is attached to this Proxy Statement as Appendix A.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Good and Luskin. There were two meetings of the Compensation Committee during the fiscal year ended June 30, 2004. See *Report of the Compensation Committee.*

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances between the Company and third parties. The Executive Committee consists of Messrs. Good and Luskin.

*Nominating Committee*

In June 2004, the Board of Directors formed a Nominating Committee for the purpose of evaluating nominations for new members of the Board of Directors. The Nominating Committee consists of Messrs. Good and Luskin. There were no meetings of the Nominating Committee during the fiscal year ended June 30, 2004.

Table of Contents

The Nominating Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating Committee deems necessary to ascertain the candidates ability to serve on the Board of Directors. The Charter of the Nominating Committee is attached to this Proxy Statement as Appendix B.

**Director Nomination Process**

The Nominating Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating Committee (and prior to its formation, the Board of Directors) did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify us of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

Table of Contents

**Annual Meeting Attendance**

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended the 2003 annual meeting of shareholders in person.

**Shareholder Communications**

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

**Director Compensation**

Each non-employee director receives a fee of $7,500 per year, $1,500 for each Board of Directors or committee meeting attended, and options to purchase 5,000 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant. Each member of the Executive Committee also receives a fee of $10,000 per year. In addition, options to purchase 5,000 shares of Common Stock at an exercise price equal to 100% of fair market value as of the date of grant, are granted to each member of the Executive Committee and each member of the Compensation Committee. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

**Code of Ethics**

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct may be obtained, without charge, upon written request addressed to the following address, c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present and voting at the Meeting.***

Table of Contents

## RATIFICATION OF INDEPENDENT PUBLIC ACCOUNTANTS
*(Item 2 of the Proxy Card)*

The Audit Committee of the Board of Directors has selected Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu, and their respective affiliates (collectively, the “Deloitte Entities” or “Deloitte”) as the Company’s independent public accountant for the fiscal year ending June 30, 2005, and has further directed that management submit the selection of independent public accountants for ratification by the stockholders at the Annual Meeting. Deloitte has no financial interest in the Company and neither it nor any employee of Deloitte has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte is expected to be present at the Annual Meeting.

In the event the stockholders fail to ratify the selection of Deloitte, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent public accounting firm at any time during the year if they determine that such a change would be in the best interests of the Company and its shareholders.

### Audit Fees

The aggregate fees billed for the audit of the Company’s annual financial statements for the fiscal years ended June 30, 2004 and 2003 for the reviews of the financial statements included in the Company’s Quarterly Reports on Form 10-Q were $1,138,000 and $405,000, respectively. For the fiscal year ended June 30, 2004, these fees included $529,000 related to the audit of the opening balance sheet of a completed acquisition.

### Audit-Related Fees

The aggregate fees billed for audit-related services for the fiscal years ended June 30, 2004 and 2003 were $40,000 and $188,000, respectively. For the fiscal year ended June 30, 2004, these fees related to due diligence/consultation services in connection with completed acquisitions of $24,000, Sarbanes-Oxley 404 advisory fees of $9,000, and pension plan audits of $7,000. For the fiscal year ended June 30, 2003, these fees related to due diligence/consultation services in connection with potential and completed acquisitions of $164,000, consents related to SEC registration statements of $18,000 and employee benefit plans of $6,000.

### Tax Fees

The aggregate fees billed for tax services for the fiscal years ended June 30, 2004 and 2003 were $428,000 and $225,000, respectively. For the fiscal years ended June 30, 2004 and 2003, these fees related to U.S. and international tax return compliance and advisory services.

### All Other Fees

During the fiscal years ended June 30, 2004 and 2003, there were no fees for services not included in the above categories.

### Audit Committee’s Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1442 of 2711

Table of Contents

**Independence**

The Audit Committee has considered whether Deloitte's provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the selection of the independent public accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1443 of 2711
Table of Contents

**APPROVAL OF AMENDMENT TO ARTICLES OF INCORPORATION**
***(Item 3 of the Proxy Card)***

The Board of Directors has adopted a resolution proposing an amendment of the Company's Amended and Restated Articles of Incorporation to increase the number of authorized shares of Common Stock of Company from 40,000,000 shares to 100,000,000 shares. As of June 30, 2004, the Company had 16,213,428 shares of Common Stock issued and outstanding. Following the end of fiscal year 2004, the Company repurchased 107,500 shares of Common Stock and now holds such shares in treasury. An additional 1,745,673 authorized and unissued shares were reserved for future issuance under the Company's stock plans, of which 1,652,887 authorized and unissued shares were covered by outstanding options and 92,786 authorized and unissued shares were available for future grant.

The Board of Directors believes that the authorized Common Stock available for issue is not sufficient to enable the Company to respond to potential business opportunities and to pursue important objectives designed to enhance shareholder value. The additional authorized shares will provide the Company with greater flexibility to use its capital stock, without further shareholder approval, for various purposes including, without limitation, expanding the Company's businesses and product lines through the acquisition of other businesses or products, stock dividends (including stock splits in the form of stock dividends), raising capital, providing equity incentives to employees, officers and directors and establishing strategic relationships with other companies. The Company currently does not have specific agreements or plans that would involve the issuance of the proposed additional authorized shares, although it intends to continue to consider transactions from time to time that may result in such issuances. The Company cannot assure the shareholders that any such transactions will be consummated on favorable terms or at all or, if consummated, that any such transaction will enhance shareholder value. The issuance of additional shares of Common Stock may have a dilutive effect on earnings per share and, for a shareholder who does not purchase additional shares to maintain his or her pro rata interest, on a shareholder's percentage voting power.

The authorized shares of Common Stock in excess of those issued or reserved will be available for issuance at such times and for such corporate purposes as the Board of Directors may deem advisable without further action by the Company's shareholders, except as may be required by applicable laws or the rules of any stock exchange or national securities association trading system on which the Common Stock may be listed or traded. Upon issuance, such shares will have the same rights as the outstanding shares of Common Stock. Holders of Common Stock do not have preemptive rights.

The additional shares of Common Stock that would become available for issuance if the proposal were adopted could also be used by the Company to oppose a hostile takeover attempt or delay or prevent changes in control or management of the Company. For example, without further shareholder approval, the Board of Directors could strategically sell shares of Common Stock in a private transaction to purchasers who would oppose a takeover or favor the current Board of Directors. Although this proposal to increase the authorized Common Stock has been prompted by business and financial considerations and not by the threat of any hostile takeover attempt (nor is the Board of Directors currently aware of any such attempts directed at the Company), nevertheless, shareholders should be aware that approval of the proposal could facilitate future efforts by the Company to deter or prevent changes in control of the Company, including transactions in which the shareholders might otherwise receive a premium for their shares over then current market prices.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1444 of 2711

Table of Contents

If the amendment is approved, then Article III(A) of the Company's Amended and Restated Articles would be amended to read as provided below. The only proposed change from the current Amended and Restated Articles of Incorporation is the number of shares of Common Stock that would be authorized for issuance:

Article III(A)

The total number of shares of stock which this corporation shall have authority to issue is 110,000,000, consisting of 100,000,000 shares of Common Stock and 10,000,000 shares of Preferred Stock.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 3 on the Proxy) to amend the Company's Articles of Incorporation to increase the number of shares of Common Stock from 40,000,000 shares to 100,000,000 shares. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

## RATIFICATION OF AMENDMENT OF 1997 STOCK OPTION PLAN
### *(Item 4 of the Proxy Card)*

**Summary and Purpose of the Amended Stock Option Plan**

The Company's 1997 Stock Option Plan (the "1997 Plan") is described below in "Information Concerning Management, Compensation and Stock Ownership - Stock Option Plans." The Board of Directors has voted to amend the 1997 Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 2,350,000 to 3,350,000. No other change in the plan is presently proposed. As of June 30, 2004, options to purchase 604,327 shares were exercised under the 1997 Plan and options to purchase 1,652,887 shares were outstanding under the 1997 Plan, leaving options to purchase only 92,786 shares of Common Stock authorized for issuance under the 1997 Plan. The Board of Directors believes that the proposed increase in the number of shares of Common Stock available for issuance as provided in the 1997 Plan will provide the Compensation Committee with greater flexibility in the administration of its incentive plan and is appropriate in light of the growth of the Company. The increase in the number of shares for which options may be issued under the 1997 Plan would represent approximately 6.2% of the issued and outstanding shares of Common Stock of the Company as of June 30, 2004.

**Awards to be Granted to Certain Individuals and Groups**

As of the date hereof, the Company cannot estimate the benefits or amounts required by Item 10 of this Schedule 14A with respect to the persons and groups specified in such Item resulting from the approval of the amendment to this 1997 Plan. The following table sets forth (a) the aggregate number of shares subject to option grants to certain individuals and groups under the 1997 Plan during the last fiscal year, which ended June 30, 2004, and (b) the average per share exercise price of such options.

| Name of Group | Number of Options Granted | Average Per Share Exercise Price |
|---|---|---|
| Named Executive Officers(1) | 170,000 | $ 19.88 |
| All executive officers, as a group | 170,000 | $ 19.88 |
| All directors who are not executive offices, as a group(2) | 40,000 | $ 19.86 |
| All employees, including all current officers who are not executive officers, as a group | 245,765 | $ 18.83 |

(1) The Named Executive Officers are set forth under "Information Concerning Management, Compensation and Stock Ownership – Executive Compensation."

(2) The directors group includes Mr. Madan Syal who retired from the Board of Directors on June 30, 2004.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1446 of 2711

Table of Contents

**Equity Compensation Plan Information**

The following table summarizes information, as of June 30, 2004, with respect to shares of the Company's Common Stock that may be issued under the Company's existing equity compensation plans.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (A)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,652,887 | $ 14.57 | 92,786 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,652,887 | $ 14.57 | 92,786 |

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 4 on the Proxy) to ratify the amendment of the Company's 1997 Stock Option Plan to increase the number of shares of Common Stock for which options may be issued under the plan from 2,350,000 to 3,350,000. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

## INFORMATION CONCERNING MANAGEMENT, COMPENSATION AND STOCK OWNERSHIP

### Executive Officers

***Anuj Wadhawan*** was named Chief Financial Officer and Treasurer of the Company in November 2002. From March 1991 to March 2000, Mr. Wadhawan held various accounting and finance-related positions with the Company and its subsidiaries, including Corporate Controller. In March 2000, Mr. Wadhawan became the Company's Vice President of Finance. Prior to joining the Company, Mr. Wadhawan held various finance positions with the Lighting Division of Phillips Electronics in India. Mr. Wadhawan holds a Bachelor of Science in Accounting from Punjab University in India, is a chartered accountant in India, and has passed the certified public accounting examinations in the United States.

***Andreas F. Kotowski*** has served as Chief Technology Officer for Company's security and inspection systems subsidiaries since October 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. From September 1989 to January 1993, Mr. Kotowski was self-employed as an engineering consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

***Victor S. Sze*** was named General Counsel, Vice President of Corporate Affairs of the Company in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a bachelors' degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

### Security Ownership of Certain Beneficial Owners and Management

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2004 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,220,640 | 7.4% |
| Essex Investment Management Co., LLC(4) | 1,302,312 | 8.0% |
| Wellington Management Company, LLP(5) | 1,638,342 | 10.1% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2004, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

Table of Contents

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and The Chandini Chopra Trust UDT, dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 16,825 shares are held individually by Mr. Chopra. Includes 215,000 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the SEC by Essex Investment Management Co. Inc., whose address was reported as 125 High Street, South Boston, MA 02110.

(5) As reported in a Schedule 13G filed with the SEC by Wellington Management Company, LLP, whose address was reported as 75 State St., Boston, MA 02109.

The following table sets forth the amount of shares of the Company beneficially owned as of June 30, 2004 by each director of the Company, each Named Executive Officer (see "Information Concerning Management, Compensation and Stock Ownership – Executive Compensation"), and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,220,640 | 7.4% |
| Ajay Mehra(4) | 170,964 | 1.0% |
| Anuj Wadhawan(5) | 34,185 | 0.2% |
| Andreas F. Kotowski(6) | 81,518 | 0.5% |
| Victor S. Sze(7) | 3,000 | 0.0% |
| Steven C. Good(8) | 20,000 | 0.1% |
| Meyer Luskin(9) | 72,410 | 0.4% |
| Madan Syal(10) | 67,750 | 0.4% |
| Chand R. Viswanathan(11) | 8,750 | 0.1% |
| All directors and executive officers as a group (9 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11) | 1,654,217 | 9.9% |

* Less than 1%.

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after June 30, 2004, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and The Chandini Chopra Trust UDT, dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 16,825 shares are held individually by Mr. Chopra. Includes 215,000 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Includes 81,250 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Mehra is the Executive Vice President and a Director of the Company and President of the OSI Security Group.

(5) Includes 27,935 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Wadhawan is the Chief Financial Officer of the Company.

Table of Contents

(6) Includes 24,000 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Kotowski is the Chief Technology Officer of the Company.
(7) Includes 2,500 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Sze is the General Counsel, Vice President of Corporate Affairs and Secretary of the Company.
(8) Includes 15,000 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.
(9) Includes 12,910 shares held by the Meyer and Doreen Luskin Family Trust. Includes 25,000 shares owned by Scope Industries. Mr. Luskin is the Chairman of the Board, President and Chief Executive Officer of Scope Industries. Includes 34,500 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, CA 90401.
(10) Includes 18,750 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. On June 30, 2004, Mr. Syal retired as a Director of the Company.
(11) Includes 8,750 shares issuable pursuant to options which become exercisable no later than 60 days after June 30, 2004. Mr. Viswanathan is a Director of the Company.

### Executive Compensation

The following table sets forth the compensation for the Chief Executive Officer, each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2004, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers"):

**SUMMARY COMPENSATION TABLE**

| | | Annual Compensation | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | All Other Annual Compen-sation ($) | Restricted Stock Award(s) (#) | Securities Underlying Options/ SARs (#) | LTIP Payouts ($) | All Other Compen-sation ($) |
| Deepak Chopra | 2004 | 793,269 | 435,000 | — | — | 100,000 | — | $334,793(1) |
| Chief Executive Officer | 2003 | 750,000 | 325,000 | — | — | 100,000 | — | 638,437(3) |
| | 2002 | 606,770 | 216,000 | — | — | 150,000 | — | — |
| Ajay Mehra(2) | 2004 | 310,000 | 170,000 | — | — | 25,000 | — | — |
| Executive V.P. President of | 2003 | 315,767 | 125,000 | — | — | 25,000 | — | 448,833(3) |
| Security Group | 2002 | 252,139 | 60,000 | — | — | 50,000 | — | — |
| Anuj Wadhawan | 2004 | 174,941 | 72,500 | — | — | 20,000 | — | — |
| Chief Financial Officer | 2003 | 161,450 | 37,500 | — | — | 15,000 | — | 140,802(3) |
| Andreas F. Kotowski | 2004 | 210,675 | 72,500 | — | — | 7,500 | — | — |
| Chief Technology Officer | 2003 | 204,847 | 42,000 | — | — | 2,000 | — | — |
| | 2002 | 189,615 | 10,000 | — | — | 10,000 | — | 76,250(4) |
| Victor S. Sze | 2004 | 169,945 | 40,000 | — | — | 17,500 | — | — |
| General Counsel, V.P. Corporate Affairs | 2003 | 145,192 | 5,000 | — | — | 5,000 | — | — |

Table of Contents

(1) The Company paid aggregate insurance premiums of approximately $38,000 for three universal life insurance policies of Mr. Chopra in each of 2004, 2003 and 2002. The Company also paid an insurance premium of approximately $4,700 for a twenty-year term life insurance policy of Mr. Chopra in 2004. In 2004, the Company assigned the twenty-year term life insurance policy to Mr. Chopra. The value of the assigned policy is reflected in “All Other Compensation” for 2004.
(2) The Company paid aggregate insurance premiums of approximately $2,700 for three universal life insurance policies of Mr. Mehra in each of 2004, 2003 and 2002. The Company also paid an insurance premium of approximately $2,800 for a thirty-year term life insurance policy of Mr. Mehra in 2004. Mr. Mehra or his estate is obligated to repay to the Company all amounts paid by the Company on behalf of Mr. Mehra upon the death or termination of employment of Mr. Mehra.
(3) Compensation resulting from a disqualified disposition of incentive stock options.
(4) Consists of gain on exercise of non-qualified stock options.

**Option Grants**

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2004:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options/ SARs Granted(#) (1) | Percent of Total Options/SARs Granted to Employees in Fiscal Year Year (%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Options Term(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5%($) | 10%($) |
| Deepak Chopra | 100,000 | 21.94 | 19.86 | 02/13/09 | 548,695 | 1,212,473 |
| Ajay Mehra | 25,000 | 5.48 | 19.86 | 02/13/09 | 137,174 | 303,118 |
| Anuj Wadhawan | 20,000 | 4.38 | 19.86 | 02/13/09 | 109,739 | 242,495 |
| Andreas F. Kotowski | 7,500 | 1.64 | 20.25 | 04/01/09 | 41,960 | 92,721 |
| Victor S. Sze | 17,500 | 3.83 | 19.86 | 02/13/09 | 96,022 | 212,183 |

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.
(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the SEC and do not represent the Company’s estimate or projection of future Common Stock prices.

Table of Contents

**Option Exercises and Fiscal Year-End Values**

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2004 and held by them on June 30, 2004:

**AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES**

| Name | Shares Acquired On Exercise (#) | Value Realized ($) (1) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($) (1) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra | 5,200 | 67,236 | 190,000 | 250,000 | 1,765,600 | 682,500 |
| Ajay Mehra | 12,400 | 160,332 | 81,250 | 68,750 | 798,000 | 134,250 |
| Anuj Wadhawan | 5,000 | 84,000 | 26,655 | 39,155 | 251,214 | 74,589 |
| Andreas F. Kotowski | 1,700 | 21,981 | 24,000 | 14,000 | 284,415 | 16,088 |
| Victor S. Sze | — | — | 1,250 | 21,250 | 4,638 | 15,138 |

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $19.93 per share).

**Stock Option Plans**

***1987 Incentive Stock Option Plan.*** In May 1987, the Board of Directors adopted the Incentive Stock Option Plan (the "1987 Plan"). The 1987 Plan provides for the grant of options to directors, officers and other key employees of the Company to purchase up to an aggregate of 1,050,000 shares of Common Stock. The purpose of the 1987 Plan is to provide participants with incentives which will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1987 Plan is administered by the Board of Directors, which has discretion to select options and to establish the terms and conditions of each option, subject to the provisions of the 1987 Plan. Pursuant to the 1987 Plan, the Company has from time to time granted its directors, officers and employees options to purchase shares of the Company's Common Stock at exercise prices determined by the Board of Directors. The stock options generally expire either on the fifth or tenth anniversary of the date of grant of the option. All stock options are nontransferable by the grantee and may be exercised only by the optionee during his service to the Company as a director, officer or employee. The aggregate number of options issuable under the 1987 Plan, the number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2004, 977,185 shares had been issued upon the exercise of stock options under the 1987 Plan. No shares are available for grant or are outstanding. The 1987 Plan expired on December 31, 1998.

***1997 Stock Option Plan.*** In May 1997, the Board of Directors adopted the 1997 Plan. The 1997 Plan, which was approved by the Company's shareholders in June 1997, provided for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company's shareholders approved an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. In November 2002, the Company's shareholders approved an increase of the number of shares of Common Stock for which options may be granted to 2,350,000 of which 92,786 remain available for grant. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives that will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board of Directors, which has discretion to select optionees and to establish the terms and conditions of each

option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances at the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2004, stock options to purchase 604,327 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,652,887 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.13 to $20.25 per share, and stock options to purchase 92,786 shares remained available for grant. As of such date, stock options to purchase 653,474 shares were exercisable. The 1997 Plan is effective for ten years, unless sooner terminated or suspended. The Company's Board of Directors have recommended, in Proposal 4 of this Proxy Statement (see *Ratification of Amendment of 1997 Stock Option Plan*), that the Company's shareholders approve an increase in the number of shares available under the 1997 Plan by 1,000,000, such that 1,092,786 shares would be available for grant under the 1997 Plan.

During the fiscal year ended June 30, 2004, the Board of Directors of the Company granted options to purchase an aggregate of 455,765 shares of Common Stock available for issuance under the 1997 Plan to certain of its executive officers, directors and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. Options granted to such officers, directors and employees of the Company generally are subject to vesting. Such options will become exercisable in installments over a period of three years from the date of grant, subject to the optionee's continuing employment or service as a director of the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

**Employee Stock Purchase Plan**

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's shareholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase shares of Common Stock through regular payroll deductions. The total number of shares of Common Stock subject to the 1998 Plan is 200,000. The 1998 Plan is administered by the Board of Directors, or a committee of the Board of Directors. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

Table of Contents

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

**Employee Benefit Plan, Pension Plans**

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($13,000 in calendar 2004) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. For the fiscal year ended June 30, 2004, the Company had provided $239,000 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn, and so that the contributions by employees will be deductible by the Company when made.

Advanced Micro Electronics AS, Metorex Security Products, Oy, OSI Medical Germany GmbH, Rapiscan Security Products, Ltd., Spacelabs Medical (Canada) Inc., Spacelabs Medical Finland Oy, Spacelabs Medical SAS, and Spacelabs Medical UK Limited, all subsidiaries of the Company, have pension plans in effect for certain of their employees. As of the date hereof, approximately 170 employees are covered by these plans.

**Employment Agreements**

The Company entered into an employment agreement with Mr. Chopra, with a term of five years commencing on April 1, 1997, pursuant to which he served as Chairman of the Board of Directors, Chief Executive Officer and President of the Company. The employment agreement provided for an initial base salary of $450,000 per year, with annual raises to have been determined by the Compensation Committee. The Compensation Committee increased Mr. Chopra's annual base salary to $500,000 effective April 1, 1998, to $600,000 effective April 15, 2000 and to $650,000 as of April 1, 2001. Mr. Chopra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001 and the increase was implemented effective January 1, 2002. On April 1, 2002, the Company entered into a new five-year employment agreement with Mr. Chopra. The new agreement provided for an initial base salary of $750,000, and is otherwise similar to the prior agreement. The Compensation Committee increased Mr. Chopra's salary to $925,000 effective April 1,

Table of Contents

2004. Pursuant to the employment agreement, Mr. Chopra is also entitled to receive at least one-third of the amount of the aggregate bonus pool established by the Company for its officers and employees. Mr. Chopra is eligible to participate in certain incentive compensation and other employee benefit plans established by the Company from time to time. Mr. Chopra's employment agreement contains confidentiality provisions and provides that he shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by him under certain circumstances during his employment.

The Company entered into a three-year employment agreement with Ajay Mehra, which became effective on September 1, 1997. The employment agreement provides for a base salary of $260,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to his employment agreement, Mr. Mehra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that Mr. Mehra shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by Mr. Mehra under certain circumstances during his employment. The Compensation Committee increased Mr. Mehra's annual base salary to $280,000 as of April 1, 2001. Mr. Mehra volunteered to postpone the effectiveness of the April 1, 2001 salary increase through December 31, 2001, and the increase was implemented effective January 1, 2002. The Compensation Committee increased Mr. Mehra's annual base salary to $310,000 effective April 1, 2002. In February 2003, Mr. Mehra's employment agreement was amended to extend the term of the agreement until August 31, 2006. All other provisions of the agreement remain the same.

The Company entered into a two-year employment agreement with Anuj Wadhawan, which became effective June 1, 2003. The employment agreement provided for a base salary of $165,000 per year, with annual raises to be determined by the Compensation Committee. On January 1, 2004, Mr Wadhawan's annual base salary was increased to $185,000 and on June 1, 2004 it was increased to $200,000. Pursuant to his employment agreement, Mr. Wadhawan is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment.

Andreas F. Kotowski is currently employed by the Company pursuant to an employment agreement that is terminable by either party thereto at any time for any reason. Mr. Kotowski's annual salary initially was $140,000, which was increased to $165,000 effective April 16, 1998, to $175,000 on September 1, 1999, to $185,000 on September 1, 2000, to $200,000 on March 4, 2002, and to 210,000 effective September 1, 2002. On December 1, 2003, Mr. Kotowski's annual base salary was increased to $216,300.

The Company entered into a one-year employment agreement with Victor S. Sze, which became effective July 1, 2003. The employment agreement provided for an initial base salary of $155,000 per year, with annual raises to be determined by the Compensation Committee. Pursuant to his employment agreement, Mr. Sze is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The employment agreement contains confidentiality provisions and provides that the employee shall assign and the Company shall be entitled to any inventions or other proprietary rights developed by the employee under certain circumstances during his employment. On September 1, 2003, Mr. Sze's annual base salary was increased to $165,000 and on January 1, 2004, it was increased to $185,000

Management allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division, as determined before the start of the fiscal year.

Table of Contents

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining 49.0% interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during fiscal year 2004 by Mr. Chopra and his wife. The Company paid the business approximately $70,000 for such services during fiscal year 2004. The Company contracts for printing services from a business owned by Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $73,000 for such printing services during fiscal year 2004. In addition, in consideration of Mr. Syal's past services to the Company as a Director, the Board of Directors approved yearly payments of $25,000 each to Mr. Syal during each of fiscal years 2004, 2005, 2006, and 2007.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than ten percent of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and shareholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2004, and written representations from certain reporting persons, the Company believes that the Company's executive officers, directors and more than 10% shareholders have complied with all such filing requirements.

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Good and Luskin. No executive officer of the Company has served during the fiscal year ended June 30, 2004 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2004, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 402(j) of Regulation S-K under the Exchange Act.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1456 of 2711

Table of Contents

## REPORT OF THE COMPENSATION COMMITTEE

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers. The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

***Compensation Philosophy.*** The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its shareholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and shareholder value.

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

Section 162(m) of the Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the Code exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

Table of Contents

***Compensation Program Components.*** The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

*Base Salary.* Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Bonus.* Management allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

*Long-Term Incentive Compensation.* The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

*Chief Executive Officer's Compensation.* The Company has entered into an employment agreement with Mr. Chopra as more fully described above. See "Information Concerning Management, Compensation and Stock Ownership – Employment Agreements." In setting Mr. Chopra's base salary and other compensation under his employment agreement, in granting bonuses, and when considering other forms of compensation, the Compensation Committee has looked to the same components it applies when establishing compensation for the other executive officers of the Company.

***Summary.*** The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's shareholders, by attracting and retaining the best qualified people as senior managers and enhancing corporate performance. Furthermore, the Compensation Committee believes that the executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

Table of Contents

**REPORT OF THE AUDIT COMMITTEE**

The Audit Committee is composed of three non-employee directors, Steven C. Good, Meyer Luskin, and Chand R. Viswanathan, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met seven times during the fiscal year ended June 30, 2004.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's chairman and the Company's chief financial officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Deloitte & Touche LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address, and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61 ("Communication with Audit Committees"). The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 ("Independence Discussions

Table of Contents

with Audit Committees"), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2004 was compatible with the independent public accountants' independence.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements to generally accepted accounting principles.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee has recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2004, for filing with the SEC.

AUDIT COMMITTEE

Meyer Luskin
Steven C. Good
Chand R. Viswanathan

Table of Contents

**COMPANY STOCK PRICE PERFORMANCE**

The graph below compares the Company's cumulative total shareholder return for the period beginning on the market close on the last trading day before the beginning of the Company's fifth preceding fiscal year through and including the end of the Company's last completed fiscal year, with the NASDAQ Market Index and with a peer group composed of companies with which the Company generally competes.

The peer group is composed of the following companies: American Science & Engineering (AMEX Symbol: ASE), InVision Technologies, Inc. (NASDAQ Symbol: INVN) and PerkinElmer, Inc. (NYSE Symbol: PKI).

The graph assumes that $100.00 was invested on June 30, 1999 in the Company's Common Stock, and in each of the indexes mentioned above, and that all dividends were reinvested. Historical stock price performance is not necessarily indicative of future stock price performance.

**Comparison of 5 Year Cumulative Total Return**
**Assumes Initial Investment of $100**
**June 1999 Through June 2004**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1461 of 2711

Table of Contents

**COMPARISON OF CUMULATIVE TOTAL RETURN AMONG OSI SYSTEMS, INC., NASDAQ MARKET INDEX AND PEER GROUP INDEX**

| | 6/30/99 | 9/30/99 | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 3/31/01 |
|---|---|---|---|---|---|---|---|---|
| OSI Systems | $100.00 | $ 75.00 | $110.00 | $295.00 | $159.37 | $210.00 | $122.50 | $ 63.75 |
| Nasdaq Market Index | $100.00 | $102.49 | $151.49 | $170.06 | $147.87 | $136.07 | $ 91.11 | $ 68.02 |
| Peer Group | $100.00 | $109.36 | $115.58 | $183.67 | $181.15 | $284.04 | $283.72 | $144.53 |

| | 6/30/01 | 9/30/01 | 12/31/01 | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 | 3/31/03 |
|---|---|---|---|---|---|---|---|---|
| OSI Systems | $ 74.40 | $158.20 | $364.80 | $504.00 | $396.60 | $346.10 | $339.60 | $316.20 |
| Nasdaq Market Index | $ 80.16 | $ 55.62 | $ 72.30 | $ 68.43 | $ 54.31 | $ 43.50 | $ 49.62 | $ 46.23 |
| Peer Group | $152.40 | $152.35 | $215.54 | $129.87 | $ 79.65 | $ 54.16 | $ 66.40 | $ 65.95 |

| | 6/30/03 | 9/30/03 | 12/31/03 | 3/31/04 | 6/30/04 |
|---|---|---|---|---|---|
| OSI Systems | $314.00 | $345.99 | $384.19 | $399.98 | $398.58 |
| Nasdaq Market Index | $ 55.99 | $ 61.71 | $ 69.29 | $ 69.05 | $ 70.98 |
| Peer Group | $ 94.77 | $100.57 | $119.60 | $153.81 | $151.84 |

**SHAREHOLDER PROPOSALS**

Any proposals of shareholders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 2, 2005, and must satisfy the conditions established by the SEC and the Company's bylaws, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

**AVAILABILITY OF ANNUAL REPORT ON FORM 10-K**

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

Only one Annual Report and Proxy Statement may be delivered to multiple security holders sharing an address unless the Company has received contrary instructions from one or more of the security holders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report or Proxy Statement, as applicable, to a security holder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Victor Sze, Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, security holders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1462 of 2711

Table of Contents

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
September 30, 2004

**PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.**

Table of Contents

**APPENDIX A**
**Charter of the Audit Committee**

**OSI SYSTEMS, INC.**

**AUDIT COMMITTEE CHARTER**

The Audit Committee ("the Committee") of the Board of Directors ("the Board") of OSI Systems, Inc., a California corporation ("the Company"), will have the oversight responsibility, authority and specific duties as described below.

**COMPOSITION**

The Committee will be comprised of three (3) or more directors as determined by the Board. The members of the Committee must fulfill the independence and experience requirements of the rules and regulations of Nasdaq and the Securities and Exchange Commission (the "SEC"). The Members of the Committee will be elected annually at the organizational meeting of the Board and will be listed in the annual report to the Company's shareholders. One of the members of the Committee will be elected Committee Chairman by the Board.

**RESPONSIBILITY**

The Committee will assist the Board in fulfilling its oversight responsibilities with respect to (i) the annual financial information to be provided to shareholders and the SEC; (ii) the system of internal controls that management has established; and (iii) the internal and external audit process. In addition, the Committee provides an avenue for communication between internal auditors, the independent public accountants, financial management and the Board. The Committee should have a clear understanding with the independent public accountants that they must maintain an open and transparent relationship with the Committee, and that the ultimate accountability of the independent public accountants is to the Board and the Committee. The Committee will make regular reports to the Board concerning its activities.

While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate or are in accordance with generally accepted accounting principles. It is not the duty of the Committee to conduct investigations, to resolve disagreements, if any, between management and the independent public accountants or to assure compliance with laws and regulations and the Company's business conduct guidelines.

**AUTHORITY**

The Committee is directly responsible for the appointment, compensation, retention, oversight and termination of engagement of any independent public accountant employed by the Company. Each independent public accountant shall report directly to the Committee. The Committee is granted the authority to investigate any matter or activity involving financial accounting and financial reporting, as well as the internal control of the Company. In that regard, the Committee will have the authority to approve the retention of external professionals to render advice and counsel in such matters. The cost of the independent public accountants and such professionals, as well as the Committee's ordinary administrative expenses incurred in carrying out its duties, shall be borne by the Company. All employees will be directed to cooperate with respect thereto as requested by members of the Committee.

**MEETINGS**

The Committee is to meet at least four (4) times annually and as many additional times as the Committee deems necessary. Content of the agenda for each meeting should be cleared by the Committee Chairman. The Committee is to meet in separate executive sessions with the Company's chief financial officer, independent public accountants and internal auditors at least once each year and at other times when considered appropriate.

Table of Contents

**ATTENDANCE**

Committee members will strive to be present at all meetings. As necessary or desirable, the Committee Chairman may request that members of management and representatives of the independent public accountants and internal auditors be present at Committee meetings.

**SPECIFIC DUTIES**

In carrying out its oversight responsibilities, the Committee will:

1. Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. This should be done in compliance with applicable Nasdaq Audit Committee Requirements.

2. Review with the Company's management, internal auditors and independent public accountants the Company's accounting and financial reporting controls. Obtain annually in writing from the independent public accountants their letter as to the adequacy of such controls.

3. Review with the Company's management, internal auditors and independent public accountants significant accounting and reporting principles, practices and procedures applied by the Company and management's judgments and estimates in preparing its financial statements. Discuss with the independent public accountants their judgments about the quality, not just the acceptability, of the Company's accounting principles used in financial reporting.

4. Review the scope of internal auditors' work plan for the year and receive a summary report of major findings by internal auditors and how management is addressing the conditions reported.

5. Review the scope and general extent of the independent public accountants' annual audit. The Committee's review should include an explanation from the independent public accountants of the factors considered by the accountants in determining the audit scope, including the major risk factors. The independent public accountants should confirm to the Committee that no limitations have been placed on the scope or nature of their audit procedures. The Committee will review annually with management the fee arrangement with the independent public accountants.

6. Inquire as to the independence of the independent public accountants and obtain from the independent public accountants, at least annually, a formal written statement delineating all relationships between the independent public accountants and the Company as contemplated by Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees.

7. Have a predetermined arrangement with the independent public accountants that they will advise the Committee, through its Chairman, and management of the Company of any matters identified through procedures followed for interim quarterly financial statements, and that such notification is to be made prior to the related press release or, if not practicable, prior to filing the Company's Form 10-Q. The Committee shall also receive a confirmation provided by the independent public accountants at the end of each of the first three quarters of the year that they have nothing to report to the Committee, if that is the case, or the written enumeration of required reporting issues.

8. At the completion of the annual audit, review with management, internal auditors and the independent public accountants the following:

   - The annual financial statements and related footnotes and financial information to be included in the Company's annual report to shareholders and on Form 10-K.
   - Results of the audit of the financial statements and the related report thereon and, if applicable, a report on changes during the year in accounting principles and their application.
   - Significant changes to the audit plan, if any, and any serious disputes or difficulties with management encountered during the audit. Inquire about the cooperation received by the independent public accountants during their audit, including access to all requested records, data

Table of Contents

and information. Inquire of the independent public accountants whether there have been any disagreements with management which, if not satisfactorily resolved, would have caused them to issue a nonstandard report on the Company's financial statements.

- Other communications as required to be communicated by the independent public accountants by Statement of Auditing Standards (SAS) 61 as amended by SAS 90 relating to the conduct of the audit. Further, receive a communication provided by the independent public accountants concerning their judgment about the quality of the Company's accounting principles, as outlined in SAS 61 as amended by SAS 90, and that they concur with management's representation concerning audit adjustments.

If deemed appropriate after such review and discussion, recommend to the Board that the financial statements be included in the Company's annual report on Form 10-K.

9. After preparation by management and review by internal auditors and independent public accountants, approve the report required under SEC rules to be included in the Company's annual proxy statement. The Charter is to be published as an appendix to the proxy statement at least every three (3) years.
10. Discuss with the independent public accountants the quality of the Company's financial and accounting personnel. Also, elicit the comments of management regarding the responsiveness of the independent public accountants to the Company's needs.
11. Meet with management, internal auditors and the independent public accountants to discuss any relevant significant recommendations that the independent public accountants may have, particularly those characterized as "material" or "serious." Typically, such recommendations will be presented by the independent auditors in the form of a Letter of Comments and Recommendations to the Committee. The Committee should review responses of management to the Letter of Comments and Recommendations from the independent auditors and receive follow-up reports on action taken concerning the aforementioned recommendations.
12. Approve in advance the engagement of the independent public accountants for all audit services and non-audit services and approve the fees and terms of any such engagement.
13. Review the appointment and replacement of the senior internal audit executive.
14. Review with management, internal auditors and the independent public accountants the methods used to establish and monitor the Company's policies with respect to unethical or illegal activities by Company employees that may have a material impact on the financial statements.
15. Generally as part of the review of the annual financial statements, receive an oral report(s), at least annually, from the Company's general counsel concerning legal and regulatory matters that may have a material impact on the financial statements.
16. As the Committee may deem appropriate, obtain, weigh and consider expert advice as to Audit Committee related rules of Nasdaq, Statements on Auditing Standards and other accounting, legal and regulatory provisions.
17. Review and approve all related-party transactions after reviewing each such transaction for potential conflicts of interest and improprieties.
18. Adopt and monitor a code of ethics for senior financial and other officers and provide for and review prompt disclosure to the public of any change in, or waiver of such code of ethics.
19. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

Table of Contents

**APPENDIX B**
**Charter of the Nominating Committee**

**OSI SYSTEMS, INC.**

**NOMINATING COMMITTEE CHARTER**

**Purpose**

The purpose of the Nominating Committee (the "Committee") shall be:

- The identification of individuals qualified to become directors and nominate directors for election and candidates for all vacant directorships to be filled by the Board of Directors or by the shareholders;
- Making recommendations to the Board of Directors of nominees for the committees of the Board of Directors; and
- The review and evaluation of the Board of Directors' performance and each committee thereof.

The Committee shall undertake those specific duties and responsibilities set forth in this charter and such other duties as the Board of Directors may from time to time prescribe.

**Membership**

The Committee shall be comprised of two or more members of the Board of Directors, each of whom the Board of Directors determines to be "independent" under applicable rules and regulations of The Nasdaq Stock Market ("Nasdaq") and the Securities and Exchange Commission ("SEC"). The Board of Directors shall appoint the members and designate one Committee member to be the chairman of the Committee.

**Responsibilities and Duties**

*Board Selection, Composition and Evaluation*

1. Establish criteria for the selection of new directors to serve on the Board of Directors.
2. Identify individuals believed to be qualified as candidates to serve on the Board of Directors and recommend to the Board of Directors, the candidates for all directorships to be filled by the Board of Directors or by the shareholders at an annual or special meeting. In identifying candidates for membership on the Board of Directors, the Committee shall take into account all factors it considers appropriate, which may include strength of character, mature judgment, career specialization, relevant skills, diversity and the extent to which the candidate would fill a present need on the Board of Directors.
3. Review and make recommendations to the full Board of Directors whether members of the Board of Directors should stand for re-election. Consider matters relating to the retirement of members of the Board of Directors, including term limits or retirement ages.
4. Conduct all necessary and appropriate inquiries into the backgrounds and qualifications of possible candidates. The Committee shall have authority to retain and to terminate any search firm to be used to assist it in identifying candidates to serve as directors of the corporation, including authority to approve the fees payable to such search firm and any other terms of retention.
5. Consider questions of independence and possible conflicts of interest of members of the Board of Directors and executive officers.

6. Review and make recommendations, as the Committee deems appropriate, regarding the composition and size of the Board of Directors to ensure the Board has the requisite expertise and its membership consists of persons with sufficiently diverse and independent backgrounds.
7. Oversee the evaluation of, at least annually, and more frequently as the Committee deems appropriate, the Board of Directors.
8. Recommend members of the Board of Directors to serve on the committees of the Board, giving consideration to the criteria for service on each committee as set forth in the charter for such committee, the rules of the SEC and Nasdaq and any other factors the Committee deems relevant, and where appropriate, make recommendations to the Board of Directors regarding the removal of any member of any committee.
9. Establish, monitor and recommend the purpose, structure and operations of the various committees of the Board of Directors, the qualifications and criteria for membership on each committee of the Board and, as circumstances dictate, make any recommendations regarding periodic rotation of directors among the committees and impose any term limitations of service on any Board committee.
10. Periodically lead the Board of Directors in a review of the charter, composition and performance of each committee of the Board of Directors and make recommendations to the Board of Directors for the creation of additional committees or the elimination of committees.
11. Report regularly to the Board of Directors, including with respect to:
    - i. such matters as the Committee deems to be relevant to the Committee's discharge of its responsibilities; and
    - ii. such recommendations as the Committee may deem appropriate.
12. Maintain minutes or other records of meetings and activities of the Committee.
13. Review annually the charter, structure and membership of the Committee.

Table of Contents

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on September 24, 2004, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on November 8, 2004, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2005 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

☐ **FOR ALL** ☐ **WITHHOLD AUTHORITY FOR ALL**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan

To withhold authority to vote for any individual nominee, check the box marked "For All" above and write the nominee's name in the space provided here:

2. To ratify the Board of Director's selection of Deloitte & Touche LLP to serve as the Company's independent accountants for the fiscal year ending June 30, 2005.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

3. To amend the Articles of Incorporation of the Company to increase the authorized number of shares of Common Stock from 40,000,000 shares to 100,000,000 shares.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

4. To ratify and approve the Board of Directors' amendment to the 1997 Stock Option Plan.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

5. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2004 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 13

10-Q 1 d10q.htm FORM 10-Q (12/31/2004)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-Q

**(Mark one)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended December 31, 2004**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number 0-23125**

# OSI SYSTEMS, INC.
**(Exact name of registrant as specified in its charter)**

| **California** | **33-0238801** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**(310) 978-0516**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES x NO ¨

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). YES x NO ¨

As of February 7, 2005 there were 16,223,490 shares of the registrant's common stock outstanding.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1471 of 2711

Table of Contents

**OSI SYSTEMS, INC.**

**INDEX**

| | PAGE NUMBER |
|---|---|
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Consolidated Financial Statements | |
| Consolidated Balance Sheets at December 31, 2004 and June 30, 2004 | 3 |
| Consolidated Statements of Operations for the three and six months ended December 31, 2004 and December 31, 2003 | 4 |
| Consolidated Statements of Cash Flows for the six months ended December 31, 2004 and December 31, 2003 | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Item 2 – Management’s Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 24 |
| Item 4 – Controls and Procedures | 26 |
| **PART II - OTHER INFORMATION** | |
| Item 1 – Legal Proceedings | 27 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 27 |
| Item 6 – Exhibits | 28 |
| Signatures | 29 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1472 of 2711

Table of Contents

## PART I. FINANCIAL INFORMATION

### Item 1. Consolidated Financial Statements

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share amounts)**

| | December 31, 2004 | June 30, 2004 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 29,116 | $ 39,879 |
| Accounts receivable, net of allowance for doubtful accounts of $954 and $774 at December 31, 2004 and June 30, 2004, respectively | 90,726 | 85,774 |
| Other receivables | 5,698 | 7,480 |
| Inventory | 99,032 | 97,174 |
| Prepaid expenses | 3,441 | 3,580 |
| Prepaid income taxes | 838 | 391 |
| Deferred income taxes | 6,714 | 6,611 |
| Total current assets | 235,565 | 240,889 |
| Property and Equipment, net | 22,680 | 18,775 |
| Goodwill | 24,780 | 23,925 |
| Intangible assets, net | 43,564 | 44,914 |
| Investments | 1,580 | 1,475 |
| Other assets, net | 6,332 | 1,035 |
| Deferred income taxes | 1,001 | 788 |
| Total | $ 335,502 | $ 331,801 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 141 | $ 723 |
| Current portion of long-term debt | 751 | 1,798 |
| Current portion of capital lease obligation | 188 | — |
| Accounts payable | 37,546 | 33,171 |
| Accrued payroll and related expenses | 11,497 | 13,006 |
| Income taxes payable | 3,099 | 3,075 |
| Advances from customers | 6,405 | 14,331 |
| Accrued warranties | 8,680 | 9,190 |
| Provision for losses on long-term contracts | 43 | 858 |
| Other accrued expenses and current liabilities | 21,732 | 21,339 |
| Total current liabilities | 90,082 | 97,491 |
| Long-term debt | 5,066 | 32 |
| Long-term capital lease obligation | 311 | — |
| Accrued pension | 1,670 | 1,529 |
| Deferred income taxes | 5,211 | 5,198 |
| Minority interest | — | 69 |
| Total liabilities | 102,340 | 104,319 |
| Contingencies | | |
| Shareholders' Equity: | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1473 of 2711

31, 2004 and June 30, 2004, respectively

| | | |
|---|---|---|
| Common stock, no par value; authorized, 100,000,000 shares; issued and outstanding 16,208,491 and 16,213,428 shares at December 31, 2004 and June 30, 2004, respectively | 169,382 | 170,129 |
| Retained earnings | 58,729 | 54,961 |
| Accumulated other comprehensive income | 5,051 | 2,392 |
| Total shareholders' equity | 233,162 | 227,482 |
| Total | $ 335,502 | $331,801 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1474 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share amounts)**

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Revenues | $ 102,531 | $ 51,095 | $ 190,175 | $ 89,740 |
| Cost of goods sold | 66,079 | 36,498 | 119,933 | 62,577 |
| Gross profit | $ 36,452 | 14,597 | $ 70,242 | 27,163 |
| Operating expenses: | | | | |
| Selling, general and administrative | 25,595 | 8,189 | 50,388 | 15,710 |
| Research and development | 7,066 | 2,373 | 13,736 | 4,410 |
| Restructuring charges | — | — | — | 1,061 |
| Management retention bonus | 549 | — | 1,098 | — |
| Total operating expenses | 33,210 | 10,562 | 65,222 | 21,181 |
| Income from operations | 3,242 | 4,035 | 5,020 | 5,982 |
| Interest income | 103 | 301 | 191 | 611 |
| Interest expense | (98) | (80) | (154) | (167) |
| Write down of equity investment | — | — | — | (247) |
| Income before provision for income taxes and minority interest | 3,247 | 4,256 | 5,057 | 6,179 |
| Provision for income taxes | 789 | 1,221 | 1,358 | 1,804 |
| Minority interest | — | 9 | 68 | (48) |
| Net income | $ 2,458 | $ 3,044 | $ 3,767 | $ 4,327 |
| Earnings per share | $ 0.15 | $ 0.21 | $ 0.23 | $ 0.30 |
| Diluted earnings per share | $ 0.15 | $ 0.20 | $ 0.23 | $ 0.29 |
| Weighted average shares outstanding | 16,168,778 | 14,587,369 | 16,185,269 | 14,563,052 |
| Weighted average diluted shares outstanding | 16,592,724 | 15,077,424 | 16,577,752 | 14,981,827 |

See accompanying notes to consolidated financial statements.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1475 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Six months ended December 31, | |
|---|---|---|
| | **2004** | **2003** |
| Cash flows from operating activities: | | |
| Net income | $ 3,767 | $ 4,327 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Provision for losses on accounts receivable | 342 | 86 |
| Depreciation and amortization | 4,485 | 2,418 |
| Write-off of equity investment | — | 247 |
| Minority interest in net income (loss) of subsidiary | (68) | 48 |
| Equity earnings of unconsolidated affiliates | (105) | — |
| Deferred income taxes | 16 | — |
| Gain on sale of marketable securities | — | (90) |
| Restructuring charges | — | 1,061 |
| Write-off of property and equipment | 272 | — |
| Changes in operating assets and liabilities—net of business acquisitions | | |
| Accounts receivable | (4,298) | 1,163 |
| Other receivables | 1,899 | (429) |
| Inventory | (1,764) | (4,599) |
| Prepaid expenses | 163 | (1,604) |
| Accounts payable | 3,810 | 4,727 |
| Accrued payroll and related expenses | (1,367) | (283) |
| Income taxes payable | 46 | 363 |
| Prepaid Income taxes | (501) | — |
| Advances from customers | (8,756) | (3,702) |
| Accrued warranties | (548) | (391) |
| Other accrued expenses and current liabilities | (1,249) | (3,106) |
| Net cash (used in) provided by operating activities | (3,856) | 236 |
| Cash flows from investing activities: | | |
| Purchases of investments and marketable securities | — | (1,113) |
| Additions to property and equipment | (5,805) | (1,065) |
| Cash paid for business acquisitions, net of cash acquired | (1,359) | (10,106) |
| Increase in other assets | (5,396) | 6 |
| (Increase) / decrease in intangible assets | 168 | (69) |
| Cash proceeds from sale of marketable securities | — | 1,658 |
| Cash proceeds from sale of minority interest and distribution rights for Dolphin Medical | — | 2,000 |
| Net cash used in investing activities | (12,392) | (8,689) |
| Cash flows from financing activities: | | |
| Net (payments on) / proceeds from bank lines of credits | (665) | 141 |
| Proceeds from lessor in consideration for extension of lease contract | 2,000 | — |
| Term debt for the purchase of land and building | 5,078 | — |
| Payments under capital lease obligation | (74) | — |
| Payments on long-term debt | (1,312) | (1,317) |
| Proceeds from exercise of stock options and warrants | 836 | 647 |
| Purchase of Treasury Stock | (1,583) | — |
| Net cash (used in) provided by financing activities | 4,280 | (529) |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1476 of 2711

| | | | | |
|---|---|---|---|---|
| Effect of exchange rate changes on cash | | 1,205 | | 92 |
| Net decrease in cash and cash equivalents | | (10,763) | | (8,890) |
| Cash and cash equivalents, beginning of period | | 39,879 | | 94,246 |
| Cash and cash equivalents, end of period | $ | 29,116 | $ | 85,356 |
| Supplemental disclosures of cash flow information—Cash paid/(received) during the period for: | | | | |
| Interest, net | $ | (46) | $ | (479) |
| Income taxes | $ | 2,149 | $ | 1,785 |
| Supplemental disclosure of non-cash activities: | | | | |
| Property and equipment purchased through capital lease | $ | 542 | $ | — |

See accompanying notes to consolidated financial statements.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1477 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Summary of Significant Accounting Policies**

*General* **–** OSI Systems, Inc. and its subsidiaries is a vertically integrated, worldwide provider of security and inspection systems, medical monitoring and imaging systems, and optoelectronic devices and value-added subsystems. Our company was incorporated in 1987 in California. Our principal office is located at 12525 Chadron Avenue, Hawthorne, California 90250.

We design, manufacture and market security and inspection systems worldwide to end users under trade names including: "Rapiscan," "Ancore," "PFNA," "Eagle," "Metor," and "Secure." These systems are used to inspect baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband and to screen people. These systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials.

In March 2004, we significantly enhanced our medical monitoring and imaging systems activities through the acquisition of Spacelabs Medical, Inc. ("Spacelabs Medical"), a global manufacturer and distributor of patient monitoring and clinical information systems for use primarily in hospitals. Spacelabs Medical's principal products encompass patient monitoring systems, network and connectivity solutions, ambulatory blood pressure monitors and medical data services. As a result, in the medical field, we now design, develop, manufacture, and market patient monitoring products, network connectivity solutions, ambulatory blood pressure monitors, and related services under trade names including "Spacelabs," "Ultracare," and "Ultraview." We also continue to design, develop, manufacture and market arterial hemoglobin saturation monitors and sensors, including hand-held and wireless monitoring tools under trade names including "Dolphin" and "NuCat," and peripheral bone densitometers under trade names including "DTX-200" and "DTU-One."

Our optoelectronic devices and value-added subsystems are used in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical diagnostics, fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We design and manufacture optoelectronic devices and value-added subsystems for others through original equipment manufacturer arrangements, as well as for our own security and medical equipment businesses.

*Consolidation* – The consolidated financial statements include the accounts of OSI Systems, Inc. and its subsidiaries. All significant inter-company accounts and transactions have been eliminated in consolidation. The consolidated balance sheet as of December 31, 2004, consolidated statements of operations for the three and six months ended December 31, 2004 and December 31, 2003, and cash flows for the six-month periods ended December 31, 2004 and December 31, 2003 have been prepared by us, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with generally accepted accounting principles in the United States of America have been condensed or omitted pursuant to such rules and regulations. However, in the opinion of management, all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes for the fiscal year ended June 30, 2004, included in our Annual Report on Form 10-K as filed with the Securities and Exchange Commission on September 13, 2004. The results of operations for the three and six months ended December 31, 2004, are not necessarily indicative of the results to be expected for the fiscal year ending June 30, 2005.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1478 of 2711

Table of Contents

**Subsequent Events**

In January 2005, through our Rapiscan Security Products, Ltd. subsidiary ("Rapiscan UK"), we acquired a manufacturing and office facility of approximately 59,000 square feet located in Horley, England, for approximately $6.9 million. We acquired this property for the purpose of co-locating certain of our Rapiscan UK and Spacelabs Medical UK Limited ("Spacelabs Medical UK") operations in a single facility.

On February 8, 2005, we completed the acquisition of Blease Medical Holdings Limited ("Blease"), a privately-held business located in Chesham, England that specializes in the design and manufacture of anesthesia systems. Consideration for the acquisition consisted of approximately £4.5 million ($8.4 million). Furthermore, during the three years following the close, contingent consideration is payable based on Blease's net revenues, provided certain requirements are met. The contingent consideration is capped at approximately £6.25 million ($11.6 million). The acquisition of Blease expands the portfolio of products offered by our Healthcare Group, enabling Blease and Spacelabs Medical jointly to develop and market products for the perioperative market.

**New Accounting Pronouncements**

In March 2004, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 03-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments" ("EITF 03-1"). EITF 03-1 provides guidance for determining when an investment is other-than-temporarily impaired to be applied in reporting periods beginning after June 15, 2004 and contains disclosure requirements effective in annual financial statements for fiscal years ending after December 15, 2003 for investments. In September 2004, the Financial Accounting Standards Board ("FASB") delayed the accounting provisions of EITF 03-1; however the disclosure requirements remain effective. The adoption of EITF 03-1 is not expected to have a material effect on our financial position or result of operations.

In November 2004, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 151, "Inventory Costs" ("SFAS 151"), an amendment of Accounting Research Bulletin No. 43, Chapter 4. SFAS 151 clarifies the accounting for abnormal amounts of idle facility expense, freight, handling costs and wasted material. SFAS 151 is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. As such, we are currently evaluating the impact of SFAS 151 on our consolidated financial statements and related disclosures.

In December 2004, the FASB issued SFAS No. 123R, "Share-Based Payment" ("SFAS 123R"), which is effective for the interim or annual periods beginning after June 15, 2005. SFAS 123R therefore becomes effective for us in the first quarter of fiscal 2006. Statement 123R requires all share-based payments to employees, including grants of employee stock options and purchases under employee stock purchase plans, to be recognized as an operating expense in the income statement. The cost is recognized over the requisite service period based on fair values measured on grant dates, and the new standard may be adopted using either the modified prospective transition method or the modified retrospective transition method. We expect the adoption of this statement will have an adverse impact on our consolidated financial position and results of operations.

Table of Contents

**Derivative Instruments**

Effective July 1, 2000, we adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended ("SFAS 133"). SFAS 133 establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. Under SFAS 133, certain contracts that were not formerly considered derivatives may now meet the definition of a derivative. SFAS 133 requires that all derivatives be recorded on the balance sheet at their fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether a derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction.

Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risk. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and accounts receivable and do not use the contracts for trading purposes. There were no foreign exchange contracts outstanding as of December 31, 2004 or as of June 30, 2004.

**Inventory**

Inventory is stated at the lower of cost or market; cost is determined on the first-in, first-out method. Inventory consisted of the following (in thousands):

| | December 31, 2004 | June 30, 2004 |
|---|---|---|
| Raw Materials | $ 51,244 | $ 41,064 |
| Work-in-process | 25,341 | 25,283 |
| Finished Goods | 22,447 | 30,827 |
| Total | $ 99,032 | $ 97,174 |

**Accounts Receivable**

Accounts receivable consisted of the following (in thousands):

| | December 31, 2004 | June 30, 2004 |
|---|---|---|
| Trade receivables, net | $ 83,612 | $ 81,601 |
| Receivables related to long term contracts - unbilled costs and accrued profit on progress completed | 7,114 | 4,173 |
| Total | $ 90,726 | $ 85,774 |

We expect to bill and collect the unbilled costs and accrued profits at December 31, 2004 during the next twelve months.

**Spacelabs Medical Acquisition**

In March 2004, we completed the acquisition of Spacelabs Medical from Instrumentarium Corporation for approximately $47.9 million in cash (net of cash acquired), including acquisition costs. The final purchase price is subject to certain working capital adjustments. In June 2004, we notified

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1480 of 2711
Table of Contents

Instrumentarium Corporation's parent, GE Medical Systems, of a working capital and retention bonus adjustment resulting in what we believe to be a downward adjustment of the purchase price in the amount of $25.9 million. In September 2004, GE Medical Systems responded that it believes the amount of the downward adjustment to be approximately $7.8 million. As of December 31, 2004, no amounts have been recorded in the financial statements in relation to the expected reduction in the purchase price. We are in negotiation with GE Medical Systems to resolve this working capital adjustment through a process established in the purchase agreement. Therefore, the final purchase price and the purchase price allocation may differ significantly from the preliminary estimates of these amounts.

As a result of the acquisition of Spacelabs Medical, we acquired a 19.95% investment in a privately held company called Tempus Software, Inc. In June 2004, Quadramed Corp., a public company, trading since August 2004 on the American Stock Exchange, purchased Tempus Software from its shareholders for cash and unregistered shares. We received $902,000 in cash plus unregistered shares in Quadramed. In addition, $115,000 in cash and additional unregistered shares in Quadramed were placed in escrow pending the resolution of final purchase adjustments.

As of December 31, 2004, the book value of our investment in Quadramed unregistered shares was $322,000; however, we are in the process of determining the market value of these shares as of June 30, 2004, which will serve as the basis of our purchase price allocation to the Tempus Software shares as of the date of the Spacelabs Medical acquisition. In addition, we have not yet assigned a value to the cash and Quadramed shares that were placed in escrow as there are significant uncertainties as to the ultimate amount to which we will be entitled.

**Goodwill and Other Intangible Assets**

The changes in carrying value of goodwill for the six months ended December 31, 2004 are as follows (in thousands):

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Consolidated OSI Systems, Inc. |
|---|---|---|---|---|
| Balance as of June 30, 2004 | $16,590 | $ 1,269 | $ 6,066 | $ 23,925 |
| Goodwill acquired during the period | — | 391 | — | 391 |
| Foreign currency translation adjustments | 464 | — | — | 464 |
| Balance as of December 31, 2004 | $17,054 | $ 1,660 | $ 6,066 | $ 24,780 |

SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), requires that intangible assets that meet the criteria for recognition apart from goodwill be reclassified and that intangibles with indefinite lives cease to be amortized in favor of periodic impairment testing. SFAS 142 requires testing goodwill for impairment on an annual basis and on an interim basis if an event occurs or circumstance change that may reduce the fair value of a reporting unit below its carrying value. We performed our annual impairment test during the three months ended December 31, 2004, and concluded that there were no impairment losses related to goodwill.

Intangible assets which have indefinite lives, and are therefore not subject to amortization, consisted of the following (in thousands):

| | December 31, 2004 Gross Carrying Value | June 30, 2004 Gross Carrying Value |
|---|---|---|
| Tradename | $ 6,041 | $ 6,041 |

Table of Contents

Other intangible assets consisted of the following (in thousands):

| | | December 31, 2004 | | | June 30, 2004 | | |
|---|---|---|---|---|---|---|---|
| | Weighted Average Lives | Gross Carrying Value | Accumulated Amortization | Intangibles Net | Gross Carrying Value | Accumulated Amortization | Intangibles Net |
| Purchased Software | 5 years | $ 327 | $ 327 | $ — | $ 327 | $ 310 | $ 17 |
| Software development costs | 5 years | 3,724 | 1,222 | 2,502 | 3,558 | 1,063 | 2,495 |
| Patents | 10 years | 438 | 172 | 266 | 438 | 139 | 299 |
| Core technology | 30 years | 6,800 | 472 | 6,328 | 6,800 | 359 | 6,441 |
| Developed technology | 18 years | 26,221 | 1,833 | 24,388 | 26,221 | 1,116 | 25,105 |
| Customer relationships / backlog | 5 years | 4,779 | 740 | 4,039 | 4,779 | 263 | 4,516 |
| | | $42,289 | $ 4,766 | $ 37,523 | $42,123 | $ 3,250 | $ 38,873 |

Amortization expense for the six months ended December 31, 2004, was approximately $1.5 million. At December 31, 2004, estimated future amortization expense is as follows (in thousands):

| Fiscal Year | Amortization expense |
|---|---|
| Remaining 6 months of 2005 | $ 1,510 |
| 2006 | 3,008 |
| 2007 | 2,977 |
| 2008 | 2,816 |
| 2009 | 2,500 |
| 2010 | 2,391 |
| 2011 and thereafter | 22,321 |
| Total | $ 37,523 |

**Stock Based Compensation**

We apply the intrinsic value-based method of accounting prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations to account for our stock options. Under this method, compensation expense is generally recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price. We have adopted the disclosure-only provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"), and SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure" ("SFAS 148"), which was released in December of 2002 as an amendment to SFAS 123. These statements establish accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS 123 and SFAS 148, we elected to continue to apply the intrinsic value-based method of accounting described above.

We account for option grants to non-employees using the guidance of SFAS 123, as amended by SFAS 148, and EITF No. 96-18, whereby the fair value of such options is determined using the Black-Scholes option pricing model at the earlier of the date at which the non-employee's performance is complete or a performance commitment is reached.

Table of Contents

In accordance with the intrinsic value method, no compensation cost has been recognized for our stock option grants in the accompanying financial statements. If the fair value-based method had been applied in measuring stock compensation expense under SFAS 123, as amended by SFAS 148, the pro forma effect on net earnings and net earnings per share would have been as follows (in thousands, except share and per share amounts):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| **Net income—as reported** | $ 2,458 | $ 3,044 | $ 3,767 | $ 4,327 |
| **Add:** Stock-based employee compensation expense included in reported net income—net of related tax effects | — | — | — | — |
| **Deduct:** Total stock-based employee compensation expense determined under fair value based method for all awards—net | (1,084) | (683) | (1,740) | (1,356) |
| **Pro forma net income** | $ 1,374 | $ 2,361 | $ 2,027 | $ 2,971 |
| Ear**nings per share:** | | | | |
| Basic - as reported | $ 0.15 | $ 0.21 | $ 0.23 | $ 0.30 |
| Basic - pro forma | $ 0.08 | $ 0.16 | $ 0.13 | $ 0.20 |
| Diluted - as reported | $ 0.15 | $ 0.20 | $ 0.23 | $ 0.29 |
| Diluted - pro forma | $ 0.08 | $ 0.16 | $ 0.12 | $ 0.20 |

As noted previously, SFAS 123R is effective beginning in fiscal 2006. SFAS 123R applies to new awards and to awards modified, repurchased, or cancelled after the effective date, as well as to the unvested portion of awards outstanding as of the effective date. Upon adoption, prior periods may be, but are not required to be, restated. We expect that the adoption of SFAS 123R will have an adverse impact on our net earnings and net earnings per share. Though we have not completed an evaluation of the effect that SFAS 123R will have on our financial statements, we currently expect the impact of the adoption of SFAS 123R to be consistent with the pro forma effect on net earnings and net earnings per share as represented above.

**Earnings per Share**

We have reflected the provisions of SFAS No. 128, "Earnings per Share," in the accompanying consolidated financial statements for all periods presented. Earnings per common share are computed using the weighted-average number of shares outstanding during the period. Diluted earnings per common share are computed using the weighted-average number of shares outstanding during the period plus the dilutive effect of potential common stock. Potential common stock types are stock options and purchase rights.

Stock options and rights to purchase a total of 2,091,990 shares of our common stock that were outstanding for the three and six months ended December 31, 2004, were not included in diluted earnings per common share because to do so would have been anti-dilutive. Stock options and purchase rights totaling 1,170,250 and 1,191,048 shares were outstanding for the three and six months ended December 31, 2003, but were not included in diluted earnings per common share because to do so would have been anti-dilutive. The following table reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share assuming dilution.

Table of Contents

| | Three months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | | 2003 | | |
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Earnings per common share** Income available to common shareholders | $2,458,000 | 16,168,778 | $ 0.15 | $3,044,000 | 14,587,369 | $ 0.21 |
| **Effect of dilutive securities** (Treasury stock method) | | 423,946 | | | 490,055 | (0.01) |
| **Earnings per common share assuming dilution** Income available to common shareholders, assuming dilution | $2,458,000 | 16,592,724 | $ 0.15 | $3,044,000 | 15,077,424 | $ 0.20 |

| | Six months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | | 2003 | | |
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Earnings per common share** Income available to common shareholders | $3,767,000 | 16,185,269 | $ 0.23 | $4,327,000 | 14,563,052 | $ 0.30 |
| **Effect of dilutive securities** (Treasury stock method) | | 392,483 | | | 418,775 | (0.01) |
| **Earnings per common share assuming dilution** Income available to common shareholders, assuming dilution | $3,767,000 | 16,577,752 | $ 0.23 | $4,327,000 | 14,981,827 | $ 0.29 |

**Comprehensive Income**

Comprehensive income is computed as follows (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net income | $ 2,458 | $ 3,044 | $ 3,767 | $ 4,327 |
| Foreign currency translation adjustments | 2,343 | 1,209 | 2,659 | 1,666 |
| Unrealized gain on marketable securities available for sale | — | 271 | — | 761 |
| Change in the fair value of derivative instruments | — | 26 | — | 52 |
| Comprehensive Income | $ 4,801 | $ 4,550 | $ 6,426 | $ 6,806 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1484 of 2711
Table of Contents

**Contingencies**

In March 2000, certain individuals filed a class action suit in Los Angeles Superior Court naming our Rapiscan Security Products (U.S.A.), Inc. ("Rapiscan") subsidiary and others as defendants. The named plaintiffs are the wives of men incarcerated in California prisons. The plaintiffs allege that while attempting to visit their husbands in prison, as a condition to such visits, prison personnel have subjected them, and other members of the putative class, to scans by Rapiscan's Secure 1000 product, as well as strip searches, and body cavity searches, all of which plaintiffs allege to have been illegal searches and have caused them emotional injuries. The other defendants in the action include the State of California, the California Department of Corrections, its Director and other Department of Corrections personnel. The complaint asserts, among other things, that these types of searches are illegal and intrusive and have caused emotional injury to the plaintiffs. In addition to alleging that we are responsible for illegal searches conducted by prison personnel, the complaint alleges that we were negligent, that the Secure 1000 product is defective in design and manufacture, that we have failed to properly train the prison personnel in using the Secure 1000 product, that we have failed to warn subjects that they might be subjected to illegal searches using the Secure 1000 product, and that the scans are more intrusive than manual searches. Plaintiffs seek general, special and punitive damages in unspecified amounts and declaratory relief against illegal searches. We believe that these claims against us have no merit and we intend to vigorously defend this suit.

In November 2002, L-3 Communications Corporation ("L-3") brought suit against us for a declaratory judgment that L-3 had not breached its obligations to us concerning the acquisition of PerkinElmer's, Security Detection Systems Business. In February 2003, we answered and asserted counterclaims against L-3 for, among other things, fraud, breach of fiduciary duty, breach of contract and failure to negotiate in good faith. In March 2003, L-3 amended its complaint and asserted claims against us for breach of contract, failure to negotiate in good faith, and tortious interference. In its amended complaint, L-3 requested both a declaratory judgment that it had fulfilled its obligations and an award of damages for an unspecified amount. These actions are pending in the District Court for the Southern District of New York.

During 2003 and 2004, we were informed that Science Applications International Corporation ("SAIC") had made statements to prospective buyers of our gamma ray mobile detection system product ("GaRDS") that GaRDS infringed upon unspecified SAIC patents. In April 2004, we received a letter from SAIC specifying a patent upon which SAIC claimed the GaRDS infringed. Contrary to SAIC's claim, the patent cited by SAIC actually distinguished the technology used in GaRDS as a different, pre-existing technology. We therefore filed a lawsuit in the U.S. District Court, Central District of California seeking declaratory judgment. SAIC has since counter-claimed for patent infringement, citing the same patent, and unfair competition.

In March 2004, certain individuals named us and our subsidiary, Spacelabs Medical, as well as a hospital located in Bexar County, Texas, in a petition claiming that the individuals suffered injuries in March 2003 caused, in part, by a defective monitoring system manufactured by Spacelabs Medical. The amount of the claim has not yet been specified. The petition was filed in the 285th Judicial District Court in Bexar County, Texas.

In April 2004, certain individuals named our subsidiary, Spacelabs Medical, as well as several other defendants, in a petition that alleges, among other things, that a product possibly manufactured by Spacelabs Medical failed to properly monitor a hospital patient thereby contributing to the patient's death in November 2001. The amount of the claim has not yet been specified. The petition was filed in the 21st Judicial District Court, Parish of Tangipahoa, Louisiana.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1485 of 2711

Table of Contents

In August 2004, the former president of our subsidiary, Spacelabs Medical, submitted an arbitration claim alleging breach of a retention and severance agreement seeking approximately $1.5 million and punitive damages. The claim is currently pending before the CPR Institute for Dispute Resolution in Chicago, Illinois.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business. In our opinion after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations, or cash flows.

*Provision for Warranties* - We offer our customers warranties on products we sell to them. These warranties typically provide for repairs and maintenance of our products for a specified time period. Concurrent with the sale of products, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. This provision is adjusted periodically based on historical and anticipated experience. Actual expenses of repairs under warranty, including parts and labor, are charged to this provision when incurred.

The changes in warranty provisions were as follows (in thousands):

| | Three months ended, December 31, | | Six months ended, December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Balance as of beginning of period | $ 8,757 | $ 2,832 | $ 9,190 | $ 2,782 |
| Additions | 1,844 | 458 | 2,809 | 939 |
| Reductions for warranty repair costs | (1,921) | (880) | (3,319) | (1,311) |
| Balance as of end of period | $ 8,680 | $ 2,410 | $ 8,680 | $ 2,410 |

**Retirement Benefit Plans**

We operate a defined benefit plan for certain employees located in the U.K. The benefits under this plan are based on years of service and the employees' highest 12 months' compensation during the last five years of employment. The net periodic expense for this defined benefits plan consists of (in thousands):

| | Three months ended, December 31, | | Six months ended, December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Service cost | $ 17 | $ 15 | $ 32 | $ 28 |
| Interest cost | 50 | 40 | 95 | 76 |
| Expected return on plan assets | (28) | (21) | (53) | (40) |
| Settlement cost | — | 50 | — | 96 |
| Amortization of net loss | 31 | 50 | 58 | 81 |
| Net periodic pension expense | $ 70 | $ 134 | $ 132 | $ 241 |

For the three months and six months ended December 31, 2004, we made a contribution of $81,600 and $112,100 to this pension plan. We presently anticipate contributing an additional $118,300 to fund this pension plan during the six-month period ending June 30, 2005, for a fiscal year total of $230,400.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1486 of 2711

Table of Contents

**Segment Information**

We have adopted SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information" ("SFAS 131"). We have reflected the provisions of SFAS 131 in the accompanying financial statements for all periods presented. We operate in three identifiable product segments: (a) security and inspection systems ("Security Group"), (b) medical monitoring and imaging systems ("Healthcare Group"), and (c) optoelectronic devices and value-added subsystems ("Optoelectronics and Manufacturing Group"). We also have a corporate segment ("Corporate") that includes executive compensation and certain other general and administrative expenses, expenses related to stock issuances and legal, audit and other professional service fees not allocated to product segments. Both the Security Group and the Healthcare Group comprise primarily end-product businesses whereas the businesses of the Optoelectronics and Manufacturing Group primarily supply components and subsystems to original equipment manufacturers including to members of the Security Group and Healthcare Group through inter-company sales. All inter-company sales are eliminated in consolidation. We have restated our segment information for the three months and six months ended December 31, 2003, to conform to the product segment presentation. We have made certain allocations of prior period costs of goods sold and operating expenses in order to restate prior-year information.

The following tables present the operations and identifiable assets by product segment (in thousands):

**Three months ended December 31, 2004**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue (1) | $ 32,037 | $ 54,000 | $ 16,494 | $ — | $ — | $102,531 |
| Revenue between product segments | — | — | 5,652 | — | (5,652) | — |
| Total revenue | $ 32,037 | $ 54,000 | $ 22,146 | $ — | $ (5,652) | $102,531 |
| Income (loss) from operations (2) | $ (1,283) | $ 4,863 | $ 2,004 | $ (2,062) | $ (280)(3) | $ 3,242 |
| Identifiable assets | $146,597 | $115,114 | $ 50,574 | $ 25,946 | $ (2,729)(4) | $335,502 |

**Three months ended December 31, 2003**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $28,977 | $ 3,292 | $ 18,826 | $ — | $ — | $ 51,095 |
| Revenue between product segments | — | — | 4,519 | — | (4,519) | — |
| Total revenue | $28,977 | $ 3,292 | $ 23,345 | $ — | $ (4,519) | $ 51,095 |
| Income (loss) from operations | $ 3,275 | $ (456) | $ 2,734 | $ (1,139) | $ (379)(3) | $ 4,035 |
| Identifiable assets | $90,983 | $ 11,514 | $ 43,507 | $ 92,760 | $ (1,619)(4) | $237,145 |

(1) The increase in external customer revenue for the Healthcare Group for the three months ended December 31, 2004 as compared to the three months ended December 31, 2003, was primarily attributable to the inclusion of Spacelabs Medical, a business which we acquired in March 2004.

Table of Contents

(2) The increase in income from operations for the Healthcare Group for the three months ended December 31, 2004, as compared to an operating loss for the three months ended December 31, 2003, was primarily attributable to the inclusion of Spacelabs Medical. The Healthcare Group income from operations for the three months ended December 31, 2004 includes $549 of retention bonuses for key Spacelabs Medical personnel that were funded by GE Medical Systems at the time of our acquisition of Spacelabs Medical and $354 of amortization of intangible and depreciation of other fixed assets recorded in connection with the Spacelabs Medical acquisition. Final resolution of the purchase price for Spacelabs Medical could significantly reduce these intangible and fixed assets with a corresponding reduction of the related amortization.

(3) This adjustment represents the change in the elimination entry for profit in ending inventory.

(4) Eliminations of the identifiable assets primarily reflect the elimination of inter-company inventory profit not yet realized. These profits will be realized when inventory is shipped to the eventual Security Group and Healthcare Group external customers.

**Six months ended December 31, 2004**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue (1) | $ 61,980 | $ 96,804 | $ 31,391 | $ — | $ — | $190,175 |
| Revenue between product segments | — | — | 9,917 | — | (9,917) | — |
| Total revenue | $ 61,980 | $ 96,804 | $ 41,308 | $ — | $ (9,917) | $190,175 |
| Income (loss) from operations (2) | $ 1,076 | $ 5,098 | $ 3,689 | $ (4,426) | $ (417)(4) | $ 5,020 |
| Identifiable assets | $146,597 | $115,114 | $ 50,574 | $ 25,946 | $ (2,729)(5) | $335,502 |

**Six months ended December 31, 2003**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $52,734 | $ 6,623 | $ 30,383 | $ — | $ — | $ 89,740 |
| Revenue between product segments | — | — | 7,176 | — | (7,176) | — |
| Total revenue | $52,734 | $ 6,623 | $ 37,559 | $ — | $ (7,176) | $ 89,740 |
| Income (loss) from operations (3) | $ 5,505 | $ (794) | $ 4,077 | $ (2,648) | $ (158)(4) | $ 5,982 |
| Identifiable assets | $90,983 | $ 11,514 | $ 43,507 | $ 92,760 | $ (1,619)(5) | $237,145 |

(1) The increase in external customer revenue for the Healthcare Group for the six months ended December 31, 2004 as compared to the six months ended December 31, 2003, was primarily attributable to the inclusion of Spacelabs Medical, a business we acquired in March 2004.

Table of Contents

(2) The increase in income from operations for the Healthcare Group for the six months ended December 31, 2004, as compared to an operating loss for the six months ended December 31, 2003, was primarily attributable to the inclusion of Spacelabs Medical. The Healthcare Group for the six months ended December 31, 2004 includes $1,098 of retention bonuses for key Spacelabs Medical personnel that were funded by GE Medical Systems at the time of our acquisition of Spacelabs Medical, $708 of amortization of intangible and depreciation of other fixed assets recorded in connection with the Spacelabs Medical acquisition and a recovery of previously written off accounts receivable of $942. Final resolution of the purchase price for Spacelabs Medical could significantly reduce these intangible and fixed assets with a corresponding reduction of the related amortization.

(3) For the six months ended December 31, 2003, total restructuring charges of $1,061 have been recorded for the Healthcare Group and the Optoelectronics and Manufacturing Group. They consist primarily of a $993 write-off of equipment and leasehold improvements that were abandoned during the three-month period ended September 30, 2003, and charges related to the cleanup of a vacated facility of $60. The total amount charged to the Healthcare Group was $102. The total amount charged to the Optoelectronics and Manufacturing Group was $959.

(4) This adjustment represents the change in the elimination entry for profit in ending inventory.

(5) Eliminations of the identifiable assets primarily reflect the elimination of inter-company inventory profit not yet realized. These profits will be realized when inventory is shipped to the eventual Security Group and Healthcare Group external customers.

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Cautionary Statement**

***Statements in this report that are forward-looking are based on current expectations, and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties that could cause actual results to differ materially, including, but not limited to, the possibilities that the demand for our products may decline as a result of possible changes in general and industry specific economic conditions, the effects of competitive pricing and such other risks and uncertainties as are described in this report on Form 10-Q, our Annual Report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission. All forward-looking statements speak only as of the date made, and we undertake no obligation to update these forward-looking statements.***

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in conformity with accounting principles generally accepted in the United States of America. Our preparation of these consolidated financial statements requires us to make judgments and estimates that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statement and the reported amount of revenues and expenses during the reporting period. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from such estimates under different assumptions or conditions.

Our critical accounting policies are described in our Annual Report on Form 10-K, previously filed by us with the Securities and Exchange Commission.

**Executive Summary**

Our revenues for the three months ended December 31, 2004, were $102.5 million, compared to $51.1 million for the three months ended December 31, 2003, an increase of 101%. This increase was primarily attributable to the inclusion of Spacelabs Medical, a business we acquired in March 2004. Revenues for the Security Group were $32.0 million, or 31% of total revenues. Revenues for the Healthcare Group were $54 million, or 53% of total revenues. Revenues for the Optoelectronics and Manufacturing Group were $16.5 million, or 16% of total revenues. In addition, the Optoelectronics and Manufacturing Group had inter-company sales of $5.7 million sold to the Security and Healthcare Groups which were eliminated in consolidation. Net income for the three months ended December 31, 2004 was $2.5 million, compared to $3.0 million in the comparable prior-year period. Earnings per diluted share were $0.15 for the three months ended December 31, 2004, compared to $0.20 for the three months ended December 31, 2003. Earnings per diluted share were $0.23 for the six months ended December 31, 2004, compared to $0.29 for the six months ended December 31, 2003.

While the revenues of the Security Group increased, the results were negatively affected by the lower operating margins of the Group's cargo and vehicle inspection (CVI) products. Of the Security Group's $32.0 million revenues for the three months ended December 31, 2004, $23.6 million were attributable to the sale of baggage and parcel inspection (BPI) systems (also referred to as conventional X-ray inspection systems) and to the sale of people screening (PS) systems. The remaining $8.4 million in revenues was attributable to the cargo and vehicle inspection systems portion of the Security Group's operations. The baggage and parcel inspection and the people screening businesses continue to grow and remain profitable. However, until the time that cargo and vehicle inspection technologies and products become repeat production orders, they are not likely to contribute positively to the operating margin of the Security Group. In January 2005, the Security Group embarked on a cost-cutting program that we expect will result in an annualized saving of approximately $2.0 million, beginning in the fourth quarter of fiscal 2005.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1490 of 2711

Table of Contents

Revenues for the Healthcare Group increased substantially in the quarter ended December 31, 2004, as compared to the comparable prior-year period. This was primarily due to the acquisition of Spacelabs Medical. Revenues for Spacelabs Medical were $49.0 million while the balance of the Healthcare Group companies had revenues of $5.0 million. The revenues for the Healthcare Group in the quarter ended December 31, 2003 were $3.3 million. In addition, the results of Spacelabs Medical also improved as compared to the quarter ended September 30, 2004 as Spacelabs Medical was able to take advantage of the capital equipment spending cycle for U.S. hospitals that typically is higher in the three months ending in December as compared to the other three quarters. The pulse oximetry business of our Dolphin Medical, Inc. subsidiary, which was also robust, contributed significantly to the growth in Healthcare Group revenues as well.

External sales by our Optoelectronics and Manufacturing Group weakened during the quarter ended December 31, 2004, as compared to the quarter ended December 31, 2003, due to lower sales of printed circuit boards and defense optoelectronics. In addition, the Optoelectronics and Manufacturing Group supplies components and sub-assemblies to our Healthcare and Security Groups. The inter-company sales for the quarter and six months ended December 31, 2004, from our Optoelectronic and Manufacturing Group increased as compared to the prior year periods due to an increase in sales to the Healthcare Group.

The following financial ratios table reflects certain consolidated statement of operations data as a percentage of revenue for the periods presented.

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | **2004** | **2003** | **2004** | **2003** |
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 64.4% | 71.4% | 63.1% | 69.7% |
| Gross profit | 35.6% | 28.6% | 36.9% | 30.3% |
| Selling, general and administrative | 25.0% | 16.0% | 26.5% | 17.5% |
| Research and development | 6.9% | 4.6% | 7.2% | 4.9% |
| Restructuring charge | 0.0% | 0.0% | 0.0% | 1.2% |
| Management retention bonuses | 0.5% | 0.0% | 0.6% | 0.0% |
| Operating Income | 3.2% | 7.9% | 2.6% | 6.7% |

**Results of Operations**

*Revenues* – Total revenues for the three months ended December 31, 2004, increased by $51.4 million, or 101%, to $102.5 million from $51.1 million for the comparable prior-year period. Total revenues for the six months ended December 31, 2004, increased by $100.4 million, or 112%, to $190.2 million, from $89.7 million for the comparable prior six month period.

Revenues for the Security Group for the three months ended December 31, 2004, increased by $3.0 million, or 11%, to $32.0 million, from $29.0 million for the comparable prior-year period. Revenues for the Security Group for the six months ended December 31, 2004, increased by $9.3 million, or 18%, to $62.0 million, from $52.7 million for the comparable prior-year period. The increase was attributable primarily to increases in domestic and international sales of cargo and vehicle inspection systems as well as the inclusion of Advanced Research & Applications Corp. ("ARACOR") revenues and was partially offset by lower sales to the U. S. Transportation Security Authority ("TSA"). We completed our acquisition of ARACOR in January 2004.

Table of Contents

Revenues for the Healthcare Group for three months ended December 31, 2004, increased by $50.7 million to $54.0 million, from $3.3 million for the comparable prior-year period. Revenues for the Healthcare Group for the six months ended December 31, 2004, increased by $90.2 million to $96.8 million, from $6.6 million for the comparable prior-year period. The increase was primarily attributable to the inclusion of the revenues of Spacelabs Medical, a company we acquired in March 2004. In addition, we experienced growth in the pulse oximetry business.

Revenues for the Optoelectronics and Manufacturing Group for the three months ended December 31, 2004, decreased by $2.3 million, or by 12%, to $16.5 million, from $18.8 million for the comparable prior-year period. This decrease was primarily attributable to lower sales of defense optoelectronics and printed circuit boards. Revenues for the Optoelectronics and Manufacturing Group for the six months ended December 31, 2004, increased by $1.0 million, or 3%, to $31.4 million, from $30.4 million for the comparable prior-year period. The increase was primarily attributable to the inclusion of the revenues of OSI Electronics, Inc. (a subsidiary operating manufacturing services assets that we acquired in October 2003) ("OSI Electronics") and the revenues of OSI Laserscan (a business we began to operate in November 2003 after acquiring substantially all of the toll and traffic management assets of Schwartz Electro-Optics, Inc.). This increase was partially offset by lower sales of defense optoelectronics.

The Optoelectronics and Manufacturing Group reported inter-company revenues for the three-month period ended December 31, 2004, of $5.7 million, an increase of 25% from $4.5 million for the comparable prior-year period. Inter-company revenues for the Optoelectronics and Manufacturing group for the six months ended December 31, 2004, increased by $2.7 million, or 38%, to $9.9 million, from $7.2 million for the comparable prior-year period. This increase was primarily attributable to inter-company sales to the Healthcare Group.

*Gross Profit* – Gross profit consists of revenues less cost of goods sold. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $21.9 million, or 150%, to $36.5 million for the three months ended December 31, 2004, from $14.6 million for the comparable prior-year period. As a percentage of revenues, gross profit increased in the three months ended December 31, 2004, to 35.6%, from 28.6% for the comparable prior-year period. The increase in gross profit as a percentage of revenues, or gross margin, in the three months ended December 31, 2004, over the prior-year period, was primarily attributable to the inclusion of sales of Spacelabs Medical products, which have a higher gross margin and also have higher sales, general and administrative expenses and research and development expenses as a percentage of revenues compared to our other products. This increase was partially offset by a change in the mix of products sold by the Security Group, as cargo and vehicle inspection systems typically carry lower gross margins. For the six months ended December 31, 2004, gross profit increased by $43.0 million, or 159%, to $70.2 million, from $27.2 million in the comparable prior-year period. As a percentage of revenues, gross profit increased in the six months ended December 31, 2004, to 36.9%, from 30.3% in the comparable prior-year period. The increase in gross profit as a percentage of revenues, or gross margin, was primarily attributable to the inclusion of sales of Spacelabs Medical products, which have a higher gross margin and also have higher sales, general and administrative expenses and research and development expenses as a percentage of revenues compared to our other products. This increase was partially offset by a change in the mix of products sold by the Security Group, as cargo and vehicle inspection systems typically carry lower gross margins, as well as by lower sales of defense optoelectronics.

*Selling, General and Administrative* – Selling, general and administrative ("SG&A") expenses consisted primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses. For the three months ended December 31, 2004, such expenses increased by $17.4 million, or 213%, to $25.6 million, from $8.2 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses increased in the three months ended December 31, 2004, to 25.0%, from 16.0% for the comparable prior-year period. The increase in SG&A expenses for the three months ended December 31, 2004 over the prior-year period was primarily attributable to the inclusion of Spacelabs Medical SG&A expenses, which were $14.5 million, and increased headcount in sales and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1492 of 2711
Table of Contents

marketing in the Security Group and was offset in part by exchange rate fluctuation gains. For the six months ended December 31, 2004, SG&A expenses increased by $34.7 million, or 221%, to $50.4 million, from $15.7 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses increased in the six months ended December 31, 2004, to 26.5%, from 17.5% in the comparable period last year. The increase in SG&A expenses for the six months ended December 31, 2004 over the prior-year period was primarily attributable to the inclusion of Spacelabs Medical SG&A expenses which were $28.2 million, the inclusion of SG&A expenses from other acquisitions that occurred in fiscal year 2004, such as ARACOR, OSI Electronics and OSI Laserscan, and increased headcount in sales and marketing in the Security Group and was offset in part by a recovery of previously written off accounts receivable of $942,000 and exchange rate fluctuation gains. Exchange rate fluctuation gains amounted to $1.1 million in the three months ended December 31, 2004, compared to losses of $33,000 in the comparable prior-year period. For the six months ended December 31, 2004, exchange rate fluctuation gains amounted to $1.2 million, compared to a gain of $4,000 in the comparable prior-year period.

*Research and Development* – Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2004, such expenses increased by $4.7 million, or 196%, to $7.1 million, from $2.4 million for the comparable prior-year period. For the six months ended December 31, 2004, such expenses increased by $9.3 million, or 211%, to $13.7 million, from $4.4 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 6.9% for the three months ended December 31, 2004, compared to 4.6% in the comparable prior-year period. For the six months ended December 31, 2004, such expenses were 7.2% of revenues, compared to 4.9% for the comparable prior-year period. The increase in research and development expenses for the three- and six-month periods ending December 31, 2004 versus comparable prior-year periods was primarily due to increased research and development spending related to the development of cargo and vehicle inspection systems and explosives detection products and due to the inclusion of the research and development spending of Spacelabs Medical. Spacelabs Medical incurred research and development spending of $3.2 million for the three months ended December 31, 2004, and $6.8 million for the six months ended December 2004.

*Restructuring Charges* – In the six months ended December 31, 2003, we consolidated manufacturing processes and facilities of certain businesses of our Healthcare and Optoelectronics and Manufacturing Groups. These consolidations resulted in a pre-tax charge of $1.1 million. The consolidations consisted primarily of write-offs of equipment and leasehold improvements of $993,000 that were retired during the period and charges related to the clean up of a vacated facility of $60,000. We do not expect to incur further costs in relation to these consolidations. These charges were recorded as restructuring charges in our consolidated financial statements for the three months ended September 30, 2003. These charges were calculated in accordance with SFAS No. 144, “Impairment or Disposal of Long-Lived Assets” and SFAS No. 146, “Accounting for Exit or Disposal Activities”.

*Management retention bonus* – In March 2004, we completed the acquisition of Spacelabs Medical from Instrumentarium Corporation. As a result of our acquisition of Spacelabs Medical from Instrumentarium Corporation, we assumed a management retention bonus agreement for key personnel of Spacelabs Medical, which could amount to $5.9 million. These retention bonuses vest over a two year period beginning October 2003. We have accrued $549,000 in the three months ended December 31, 2004 and $1.1 million in the six months ended December 31, 2004 for these bonuses, bringing the total accrued to $4.1 million as of December 31, 2004, of which $2.0 million relates to the period prior to the acquisition of Spacelabs Medical. In the three months ended December 31, 2004 there was a payment made of $2.0 million to key Spacelabs Medical personnel bringing the total payments to $2.5 million. As of December 31, 2004, a balance of $1.6 million management retention bonus payable was included in our accrued expenses and current liabilities.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1493 of 2711

Table of Contents

*Income from Operations* – For the three months ended December 31, 2004, income from operations was $3.2 million, compared to $4.0 million for the comparable prior-year period. For the six months ended December 31, 2004, income from operations was $5.0 million, compared to $6.0 million for the comparable prior-year period.

Operating loss for the Security Group was $1.3 million for the three months ended December 31, 2004, compared to operating income of $3.3 million for the comparable prior-year period. The decrease in operating income for the Security Group was primarily attributable to the change in the mix of products sold by the Security group, as cargo and vehicle inspection shipments had lower or no gross margins. It was also attributable to increased investment in sales and marketing headcount, and to increased investment in research and development spending for the development of cargo and vehicle inspection systems and explosives detection products. Operating income was $1.1 million for the six months ended December 31, 2004, compared to $5.5 million for the comparable prior-year period. The decrease in operating income for the Security Group was primarily attributable to the change in the mix of products sold by the Security Group, increased investment in sales and marketing headcount, and research and development spending for the development of cargo and vehicle inspection systems and explosives detection products.

Operating income for the Healthcare Group was $4.9 million for the three months ended September 30, 2004, compared to a loss of $456,000 for the comparable prior-year period. Operating income was $5.1 million for the six months ended December 31, 2004, compared to a loss of $794,000 for the comparable prior-year period. The increase in Healthcare Group operating income was mainly due to the inclusion of Spacelabs Medical, a business we acquired in March 2004

Operating income for the Optoelectronics and Manufacturing Group was $2.0 million for the three months ended December 31, 2004, compared to $2.7 million for the prior-year period. This decrease in operating income was partially due to lower sales of defense optoelectronics. Operating income for the Optoelectronic and Manufacturing Group was $3.7 million for the six months ended December 31, 2004, compared to $4.1 million for the prior-year period. This decrease in operating income was primarily due to lower sales of defense optoelectronics, partially offset by the impact of restructuring charges that occurred during the six months ended December 31, 2003.

*Interest (Income) Expense* – For the three months ended December 31, 2004, we earned interest income of $103,000, compared to $301,000 for the comparable prior-year period. For the six months ended December 31, 2004, we earned interest income of $191,000, compared to $611,000 for the comparable prior-year period. The decrease in interest income for the three and six months ended December 31, 2004, was attributable to the decrease in interest earning deposits in the current year compared to the same periods in the prior-year. For the three months ended December 31, 2004, our interest expense was $98,000, compared to $80,000 for the comparable prior-year period. For the six months ended December 31, 2004, our interest expense was $154,000 compared to $167,000 for the comparable prior-year period.

*Impairment of equity investment* – In the six months ended December 31, 2003, we recognized an other-than-temporary impairment in the market value of Imagis Technologies ("Imagis") common stock that we own and recognized a pre-tax charge of $247,000 in our statements of operations. In July 2002, we purchased from Imagis 1,166,667 shares of its common stock (approximately 6% of its then-outstanding stock), and 2-year warrants to purchase 291,667 additional shares of Imagis common stock (approximately 1.5% of its then-outstanding stock) at a price of $1.50 per share, and certain ancillary rights, for an aggregate purchase price of $1.75 million. Imagis develops facial recognition software for security applications. We have designated the investment as available-for-sale. For the six months ended December 31, 2003, based on the continued trading of Imagis common stock below our original purchase price for a prolonged period of time, we recognized an other-than-temporary impairment in the market value of this investment in our income statement. The investment continues to be included under "Other Assets" in the accompanying consolidated financial statements. Through December 31, 2004, we have written down the value of this investment by a cumulative total of $1.7 million.

Table of Contents

*Provision for Income Taxes* – Provision for income taxes for the three months ended December 31, 2004, decreased to $789,000, compared to $1.2 million for the comparable prior-year period. For the six months ended December 31, 2004, provisions for income taxes decreased to $1.4 million from $1.8 million for the comparable prior-year period. As a percentage of income before provision for income taxes and minority interest, provision for income taxes was 24.3% for the three months ended December 31, 2004, compared to 28.7% for the comparable prior-year period. As a percentage of income before provisions for income taxes and minority interest, provision for income taxes was 26.9% for the six months ended December 31, 2004, compared to 29.2% for the comparable prior-year period. Our tax rate for the fiscal second quarter and six months ending December 31, 2004, was favorably impacted by the recognition of certain research and development tax credits in the second quarter of fiscal 2005, which had a 2.5% decrease on the effective tax rate, made available by the Working Families Relief Act 2004, effective in October 2004. Our tax rate is also dependent on the mix of income from U.S. and foreign locations due to tax rate differences between countries.

*Net Income* – For the reasons outlined above, we had net income of $2.5 million for the three months ended December 31, 2004, compared to $3.0 million for the three months ended December 31, 2003, and we had net income of $3.8 million for the six months ended December 31, 2004 compared to $4.3 million for the six months ended December 31, 2003.

**Liquidity and Capital Resources**

Cash and equivalents as of December 31, 2004, were $29.1 million, a decrease of $10.8 million from $39.9 million as of June 30, 2004.

Net cash used by operations was $3.9 million during the six months ended December 31, 2004. The amount of net cash used by operations was primarily attributable to an increase in accounts receivable and inventory and a reduction in accrued payroll and related expenses, other accrued expenses and current liabilities and advances from customers. Cash used in operating activities was offset in part by an increase in accounts payable as well as a decrease in other receivables.

Net cash used in investing activities was $12.4 million for the six months ended December 31, 2004. The amount was primarily used to purchase property and equipment of $5.8 million and an increase in other assets. The increase in other assets was primarily attributable to a $5.3 million transfer of cash to a third party in connection with our purchase of a manufacturing and office facility of approximately 59,000 square feet located in Horley, England which we acquired January 2005. We acquired this property for the purpose of co-locating certain of our Rapiscan UK and Spacelabs Medical UK operations in a single location. Net cash used in investing activities was also a result of the payment in July 2004 related to the increase in our investment in CXR Limited by $1.4 million.

Net cash generated in financing activities was $4.3 million for the six months ended December 31, 2004. This primarily reflects the $5.1 million cash proceeds from the term debt to support the purchase of a manufacturing and office facility of approximately 59,000 square feet located in Horley, England, which we acquired in January 2005 and $2.0 million we received when Spacelabs Medical amended their two building leases located in Issaquah, Washington. The amendments extended the lease terms by approximately 2 years until December 2014 and eliminated our option to terminate these leases early. The net cash generated was partially offset by the purchase of treasury stock of $1.6 million and payments on our long term debt of $1.3 million.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1495 of 2711

Table of Contents

In March 1999, we announced a stock repurchase program of up to 2,000,000 shares of our common stock. Through November 5, 2002, we repurchased 1,404,500 shares at an average price of $4.37 per share. In September 2004, we repurchased 107,500 shares of our common stock at an average purchase price of $14.73 per share and our Board of Directors authorized an increase in the number of shares available for repurchase under the stock program by 1,000,000 shares. As a result, 1,488,000 shares may be repurchased under the program as of December 31, 2004. Through December 31, 2004, we made no additional repurchases of our common stock. The stock repurchase program did not have a material effect on our liquidity and is not expected to have a material effect on liquidity in subsequent quarters. We retire the treasury shares as they are repurchased, and they are disclosed as a reduction in the number of shares of common stock issued and outstanding in the accompanying consolidated financial statements.

We anticipate that current cash balances, anticipated cash flows from operations, and current borrowing arrangements will be sufficient to meet our working capital, stock repurchase program, and capital expenditure needs for at least the next twelve months.

*Contractual obligations* – We have continued to repay our term loan and our outstanding balance as of December 31, 2004, has decreased to $500,000 from $1.8 million as of June 30, 2004. In addition, we have entered into a bank loan of $5.3 million to fund the acquisition of land and buildings in Horley, England that we intend to use in order to co-locate certain of our Security and Healthcare Group operations in the UK. The loan is repayable over a twenty-year term and has a variable interest rate that is set at 1.20% over the three-month London Interbank Offered Rate (LIBOR).

In March 2004, we completed the acquisition of Spacelabs Medical from Instrumentarium Corporation. As a result of this acquisition, we assumed a management retention bonus agreement for key personnel of Spacelabs Medical which could amount to $5.9 million. These retention bonuses vest over a two-year period beginning October 2003. In the three months ending December 31, 2004, there were payments made of $2.0 million to key Spacelabs Medical personnel. As of December 31, 2004, a balance of $1.6 million management retention bonus payable was included in our accrued expenses and current liabilities.

In October 2004, Spacelabs Medical amended two real property leases covering office and manufacturing facilities in Issaquah, Washington. Under the amendments, Spacelabs Medical extended the term of such leases by approximately two years and relinquished certain options it held to terminate portions of such leases early. As a result, the leases now expire in December 2014. In consideration, the landlord paid us $2.0 million in cash which has been recorded as deferred rent to be amortized over the remaining term of the lease. The leases are accounted for as operating leases.

In the quarter ended December 2004, we entered into a master lease agreement with Dell Financial Services to lease computer equipment over a period of 36 months. Such lease agreements have been recorded as capital leases. This agreement permits us to lease up to $1.0 million in equipment. As of December 31, 2004, we had committed to approximately $500,000 of equipment under this agreement. We expect to commit to approximately $200,000 of additional lease agreements in the three months ended March 31, 2005.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

*Market Risk* – We are exposed to certain market risks that are inherent in our financial instruments and arise from transactions entered into in the normal course of business. We may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign currency-denominated transactions. We do not enter into derivative financial instrument transactions for speculative purposes. In addition, our investments in equity securities are highly concentrated and unhedged, and are therefore subject to potentially significant fluctuations in market value resulting from factors such as the financial performance of the issuing companies, changes in the market for the companies' products, and extrinsic fluctuations in the overall market for equity securities.

Table of Contents

*Foreign Currency Translation* – The accounts of our operations in each of the following countries are maintained in the following currencies: Singapore (Singapore dollars), Malaysia (Malaysian ringgits), England (U.K. pounds sterling), Austria, Finland, France, Germany, Greece and Italy (euros), Norway (Norwegian kroners), India (Indian rupees) and Canada (Canadian dollars). We translate foreign currency financial statements into U.S. dollars at current rates, with the exception of revenues, costs, and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholder's equity. Net foreign currency transaction gains of approximately $1.2 million were included in income for the six months ended December 31, 2004, and gains of approximately $4,000 were included in the comparable prior-year period.

Our use of derivatives consists of foreign exchange contracts used to manage foreign exchange risks, along with interest rate swaps on a variable interest rate term loan used to manage interest rate risks. We purchase foreign exchange contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and do not use the contracts for trading purposes. No foreign exchange contracts were outstanding as of December 31, 2004.

*Importance of International Markets* – International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, wars and political instability. In addition, the outbreak of infectious diseases such as the outbreak of the SARS virus that occurred in late 2002 and early 2003 represent a potential risk to our ability to complete projects on schedule and to gain new project awards, due to travel constraints to and from the affected areas.

As a result of monetary policies in Malaysia, including the pegging of the Malaysian ringgit to the U.S. dollar, we believe that our foreign currency exposure in Malaysia will not be significant in the foreseeable future. We perform ongoing credit evaluations of our customers' financial condition and, if deemed necessary, we require advance payments for sales. We monitor economic and currency conditions around the world to evaluate whether there may be any significant effect on our international sales in the future. Due to our overseas investments and the necessity of dealing with local currencies in our foreign business transactions, we are at risk with respect to foreign currency fluctuations.

*Interest Rate Risk* – We classify all highly liquid investments with purchased maturity of three months or less as cash equivalents and record them in the balance sheet at cost, which approximates fair value. Short-term investments are comprised of high quality marketable securities. We generally do not use derivatives to hedge our interest rate risk with the exception of interest rate swaps to convert a portion of our variable-interest-rate debt to a fixed-rate liability.

In February 2001 and August 2001, we entered into interest rate swaps. The purpose of the swaps was to convert a portion of our variable interest rate debt into a fixed rate liability. As of December 31, 2004, all of our interest rate swaps had expired

*Inflation* – We do not believe that inflation has had a material impact on our December 31, 2004, results of operations.

Table of Contents

**Item 4. Controls and Procedures**

*(a) Evaluation of Disclosure Controls and Procedures*

As of December 31, 2004, the end of the period covered by this report, our Chief Executive Officer and our Chief Financial Officer reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Securities Exchange Act of 1934 ("Exchange Act") Rules 13a-15(e) and 15d-15(e)). Such disclosure controls and procedures are designed to ensure that material information required to be disclosed in this report is recorded, processed, summarized, and filed or submitted on a timely basis. They have concluded, based on their evaluation, that as of such date, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to them as appropriate to allow timely decisions regarding required disclosure.

*(b) Changes in Internal Control Over Financial Reporting*

During the quarter ended December 31, 2004, we completed the implementation of enterprise resource planning software at our Rapiscan U.K. subsidiary. As a result of the system implementation, certain difficulties arose which prevented the accurate generation of an inventory detail listing and certain other reports. In addition, certain account reconciliations were not completed as of December 31, 2004. Subsequent to quarter end, we undertook procedures to verify the accuracy of inventory and certain other account balances in the general ledger as of December 31, 2004, including a detail rollforward of inventory activity from a date prior to the system implementation through December 31, 2004, and the subsequent performance of a physical inventory count. Based on the results of our procedures, we believe that the internal control weaknesses described above did not affect the accuracy of the financial statements included in this Report.

Except as described in the previous paragraph, there have been no significant changes in our internal control over financial reporting (as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) during the fiscal quarter to which this Report relates that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1498 of 2711

Table of Contents

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

We are involved in various claims and legal proceedings which have been previously disclosed in our quarterly and annual reports in accordance with Item 103 of Regulation S-K. The results of such legal proceedings cannot be predicted with certainty. Should we fail to prevail in any of these legal matters or should several of these legal matters be resolved against us in the same reporting period, the operating results of a particular reporting period could be materially adversely affected.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in our quarterly and annual reports. In our opinion after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations, or cash flows.

### Item 4. Submission of Matters to a Vote of Security Holders

We held our Annual Meeting on November 8, 2004. At the meeting, shareholders voted upon the following actions:

1. Election of Directors.

| Name | For | Against | Abstain |
|---|---|---|---|
| Deepak Chopra | 12,553,221 | 0 | 839,363 |
| Ajay Mehra | 12,507,287 | 0 | 867,297 |
| Steven C. Good | 12,199,447 | 0 | 1,175,137 |
| Meyer Luskin | 12,187,650 | 0 | 1,186,934 |
| Chand R. Viswanathan | 12,582,113 | 0 | 792,471 |

The five nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

2. Ratification of Deloitte & Touche LLP as independent auditors for the year ending June 30, 2005.

| | |
|---|---|
| For | 13,284,700 |
| Against | 79,807 |
| Abstain | 10,077 |

The appointment was ratified.

3. Amendment of our Articles of Incorporation to increase the number of shares of common stock that we are authorized to issue from 40,000,000 shares to 100,000,000 shares.

| | |
|---|---|
| For | 11,449,5320 |
| Against | 1,908,048 |
| Abstain | 17,004 |

The amendment was approved.

4. Amendment to our 1997 Stock Option Plan to increase the number of shares of common stock for which options may be issued under the plan from 2,350,000 to 3,350,000.

| | |
|---|---|
| For | 4,867,872 |
| Against | 3,475,992 |
| Abstain | 26,483 |

The amendment was approved.

**Item 6. Exhibits**

| | |
|---|---|
| 31.1 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 9th day of February 2005.

**OSI SYSTEMS, INC.**

By: /s/ Deepak Chopra

Deepak Chopra
President and Chief Executive Officer

By: /s/ Anuj Wadhawan

Anuj Wadhawan
Chief Financial Officer

# Exhibit 14

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**
**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a)**
**of the Securities Exchange Act of 1934**

Filed by the Registrant x

Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement

¨ **Confidential, for use of the Commission only (as permitted by Rule 14a-6(e)(2))**

x Definitive Proxy Statement

¨ Definitive Additional Materials

¨ Soliciting Material Pursuant to §240.14a-11(c) or §240.14a-12

# OSI SYSTEMS, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement if Other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 12, 2005

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on November 11, 2005, at our executive offices, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of OSI Systems, Inc. common stock as of the close of business on September 26, 2005 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy.

We hope you will be able to attend the Annual Meeting. Whether or not you expect to attend, it is important that you complete, sign, date and return the Proxy in the enclosed envelope in order to make certain that your shares will be represented at the Annual Meeting.

Sincerely,

Victor S. Sze
*Secretary*

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held November 11, 2005**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on November 11, 2005, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect five directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify the selection of Deloitte & Touche LLP as the Company's independent public accountants for the fiscal year ending June 30, 2006.

3. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, containing consolidated financial statements, is included with this mailing.

The Board of Directors has fixed the close of business on September 26, 2005, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 12, 2005

**PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE RETURN ENVELOPE FURNISHED FOR THAT PURPOSE AS PROMPTLY AS POSSIBLE, WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1505 of 2711

Table of Contents

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Independent Public Accountants | 8 |
| Information Concerning Management, Compensation and Stock Ownership | 10 |
| Report of the Compensation Committee | 19 |
| Report of the Audit Committee | 21 |
| Company Stock Price Performance | 23 |
| Shareholder Proposals | 24 |
| Availability of Annual Report on Form 10-K | 24 |
| Other Business | 25 |

Table of Contents

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at the Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on November 11, 2005, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. If you sign your proxy card with no further instructions, your shares will be voted "FOR" each of the nominees for the Board of Directors, "FOR" the ratification of Deloitte & Touche LLP ("Deloitte & Touche") as the Company's independent public accountants for the fiscal year ending June 30, 2006, and, in the discretion of the proxy holders, with respect to any other matters that properly come before the Annual Meeting.

Any shareholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company or by issuance of a subsequent proxy. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on September 26, 2005, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 16,245,224 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR", "AGAINST", "ABSTAIN" or "WITHHELD" from a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (*i.e.*, five) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

The total number of votes that could be cast at the Meeting is the number of votes actually cast, plus the number of abstentions and broker non-votes, described below. Abstentions are counted as shares present at the Meeting for purposes of determining whether a quorum exists; however, abstentions will not be counted as votes for or against a proposal. Proxies submitted by brokers that do not indicate a vote for some or all of the proposals because they do not have discretionary voting authority and have not received instructions as to how to vote on those proposals (so-called "broker non-votes") are counted as present and entitled to vote and are, therefore,

Table of Contents

included for purposes of determining whether a quorum is present at the Meeting; however, broker non-votes are not deemed to be votes cast. As a result, broker non-votes are not included in the tabulation of the voting results on the election of directors or issues requiring approval of a majority of the votes cast and, therefore, do not have the effect of votes for or against a proposal.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of the other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting in person at the Meeting or represented by proxy and entitled to vote on the subject matter of the proposal.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by e-mail, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 12, 2005 to all shareholders entitled to vote at the Annual Meeting. A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, containing consolidated financial statements, is included in this mailing.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1508 of 2711

Table of Contents

## ELECTION OF DIRECTORS
*(Item 1 of the Proxy Card)*

**Nominees**

The Board of Directors consists of five members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The five candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2006, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the five nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 54 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 43 | Director, Executive Vice President, and President of Security Group | 1996 |
| Steven C. Good(1)(2)(3)(4) | 63 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 79 | Director | 1990 |
| Chand R. Viswanathan(1) | 76 | Director | 2001 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating Committee
(4) Member of Executive Committee

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996 and served as Secretary between March 1996 and

Table of Contents

November 2002. Mr. Mehra also serves as President of the Company's Security and Inspection Systems Group. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. In 1997, Mr. Good was elected as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Since October 1997, Mr. Good has also served as a Director of Big Dogs, Inc., a publicly held corporation listed on NASDAQ. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1961, Mr. Luskin has served as the President, Chief Executive Officer and Chairman of the board of directors of Scope Industries, a publicly-held company listed on the American Stock Exchange, which is engaged in the business of recycling and processing food waste products into animal feed. Mr. Luskin has also served as a Director of Scope Industries since 1958 and currently serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, Chromagen, Inc., a biotechnology company, Alerion Biomedical, Inc. a biotechnology company, and Myricom, Inc. a computer and network infrastructure company. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles, and a Master of Business Administration degree from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chairman of the department from 1979 to 1985.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Information Concerning Management, Compensation and Stock Ownership – Executive Compensation").

**Board of Directors Meetings and Committees of the Board of Directors**

There were four meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on four additional occasions during the fiscal year ended June 30, 2005. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee, and Nominating Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No director attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the Securities and Exchange Commission

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1510 of 2711

Table of Contents

("SEC") and the Nasdaq Stock Market, Inc. ("NASDAQ") director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices.

The Audit Committee consists of Messrs. Good, Luskin and Viswanathan. The Board of Directors has determined that, based upon his prior work experience and his tenure and experience on the Company's Audit Committee, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts. There were 11 meetings of the Audit Committee during the fiscal year ended June 30, 2005. See *Report of the Audit Committee.*

The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com.*

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Good and Luskin. There was one meeting of the Compensation Committee during the fiscal year ended June 30, 2005. See *Report of the Compensation Committee.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances between the Company and third parties. The Executive Committee consists of Messrs. Good and Luskin. There was one meeting of the Executive Committee during the fiscal year ended June 30, 2005.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Nominating Committee*

In June 2004, the Board of Directors formed a Nominating Committee for the purpose of evaluating nominations for new members of the Board of Directors. The Nominating Committee consists of Messrs. Good, and Luskin. There were no meetings of the Nominating Committee during the fiscal year ended June 30, 2005.

Table of Contents

The Nominating Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating Committee did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify us of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

Table of Contents

### Annual Meeting Attendance

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended the 2005 annual meeting of shareholders in person.

### Shareholder Communications

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

### Director Compensation

Each non-employee director receives a fee of $15,000 per year, $1,500 for each Board of Directors or committee meeting attended, and options to purchase 5,000 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant. Each member of the Executive Committee also receives a fee of $10,000 per year. In addition, options to purchase 5,000 shares of Common Stock at an exercise price equal to 100% of fair market value as of the date of grant are granted to each member of the Executive Committee and each member of the Compensation Committee. These options vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

### Code of Ethics

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, upon written request addressed to the following address, c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Table of Contents

## RATIFICATION OF INDEPENDENT PUBLIC ACCOUNTANTS
*(Item 2 of the Proxy Card)*

The Audit Committee of the Board of Directors has selected Deloitte & Touche as the Company's independent public accountants for the fiscal year ending June 30, 2006, and has further directed that management submit the selection of independent public accountants for ratification by the shareholders at the Annual Meeting. Deloitte & Touche has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee. A representative of Deloitte & Touche is expected to be present at the Annual Meeting.

In the event the shareholders fail to ratify the selection of Deloitte & Touche, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent public accounting firm at any time during the year if they determine that such a change would be in the best interests of the Company and its shareholders.

### Audit Fees

The aggregate fees billed for the audit of the Company's annual financial statements for the fiscal years ended June 30, 2005 and 2004 and for the reviews of the financial statements included in the Company's Quarterly Reports on Form 10-Q were approximately $2,872,000 and $1,138,000, respectively. For the fiscal year ended June 30, 2005, these fees included approximately $1,674,000 related to the audit of the Company's internal control over financial reporting.

### Audit-Related Fees

The aggregate fees billed for audit-related services for the fiscal years ended June 30, 2005 and 2004 were approximately $1,105,000 and $40,000, respectively. For the fiscal year ended June 30, 2005, these fees include approximately $990,000 for a potential equity offering for the Spacelabs Healthcare Inc., fees in connection with stand alone audit scope for the Security and Inspection Systems Group of $65,000, a pension plan audit of $7,000 and fees for services in connection with SEC registration statement of $44,000. For the fiscal year ended June 30, 2004, these fees related to due diligence/consultation services in connection with potential and completed acquisitions of $24,000, Sarbanes-Oxley 404 advisory fees of $9,000 and pension plan audits of $7,000.

### Tax Fees

The aggregate fees billed for tax services for the fiscal years ended June 30, 2005 and 2004 were approximately $178,000 and $428,000, respectively. For the fiscal years ended June 30, 2005 and 2004, these fees related to U.S. and international tax return compliance and advisory services.

### All Other Fees

During the fiscal years ended June 30, 2005 and 2004, there were no fees for services not included in the above categories.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

Table of Contents

**Independence**

The Audit Committee has considered whether Deloitte's provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the selection of the independent public accountants. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Table of Contents

**INFORMATION CONCERNING
MANAGEMENT, COMPENSATION AND STOCK OWNERSHIP**

**Executive Officers**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996 and served as Secretary between March 1996 and November 2002. Mr. Mehra also serves as President of the Company's Security and Inspection Systems Group. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Anuj Wadhawan*** was named Chief Financial Officer and Treasurer of the Company in November 2002. From March 1991 to March 2000, Mr. Wadhawan held various accounting and finance-related positions with the Company and its subsidiaries, including Corporate Controller. In March 2000, Mr. Wadhawan became the Company's Vice President of Finance. Prior to joining the Company, Mr. Wadhawan held various finance positions with the Lighting Division of Phillips Electronics in India. Mr. Wadhawan holds a Bachelor of Science in Accounting from Punjab University in India, is a chartered accountant in India, and has passed the certified public accounting examinations in the United States.

***Andreas F. Kotowski*** has served as Chief Technology Officer for Company's security and inspection systems subsidiaries since October 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. From September 1989 to January 1993, Mr. Kotowski was self-employed as an engineering consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he was responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

***Victor S. Sze*** was named General Counsel, Vice President of Corporate Affairs of the Company in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President of Corporate Affairs. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a bachelors' degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

Table of Contents

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2005 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,340,640 | 8.1% |
| Dimensional Fund Advisors Inc.(4) | 1,152,684 | 7.1% |
| Royce & Associates, LLC(5) | 900,000 | 5.5% |
| Strong Capital Management, Inc.(6) | 1,046,810 | 6.4% |
| Wellington Management Company, LLP(7) | 1,949,242 | 12.0% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2005, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and The Chandini Chopra Trust UDT, dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 66,825 shares are held individually by Mr. Chopra. Includes 285,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the SEC by Dimensional Fund Advisors Inc., whose address was reported as 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(5) As reported in a Schedule 13G filed with the SEC by Royce & Associates, LLC, whose address was reported as 1414 Avenue of the Americas, New York, NY 10019.

(6) As reported in a Schedule 13G filed with the SEC by Strong Capital Management, Inc., whose address was reported as 100 Heritage Reserve, Menomonee Falls, WI 53051.

(7) As reported in a Schedule 13G filed with the SEC by Wellington Management Company, LLP, whose address was reported as 75 State St., Boston, MA 02109.

Table of Contents

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2005 by each director of the Company, each Named Executive Officer (see "Information Concerning Management, Compensation and Stock Ownership – Executive Compensation"), and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,340,640 | 8.1% |
| Ajay Mehra(4) | 214,714 | 1.3% |
| Anuj Wadhawan(5) | 54,560 | 0.3% |
| Andreas F. Kotowski(6) | 29,143 | 0.2% |
| Victor S. Sze(7) | 15,000 | 0.1% |
| Steven C. Good(8) | 35,000 | 0.2% |
| Meyer Luskin(9) | 157,510 | 1.0% |
| Chand R. Viswanathan(10) | 15,000 | 0.1% |
| All directors and executive officers as a group (8 persons)(3)(4)(5)(6)(7)(8)(9)(10) | 1,861,567 | 11.1% |

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2005, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 200,000 shares and 200,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and The Chandini Chopra Trust UDT, dated July 17, 1987, respectively. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 588,815 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 66,825 shares are held individually by Mr. Chopra. Includes 285,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Includes 100,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Mehra is the Executive Vice President and a Director of the Company and President of the OSI Security Group.

(5) Includes 38,310 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Wadhawan is the Chief Financial Officer of the Company.

(6) Includes 13,625 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Kotowski is the Chief Technology Officer of the Company.

(7) Includes 13,750 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Sze is the General Counsel, Vice President of Corporate Affairs and Secretary of the Company.

(8) Includes 30,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

Table of Contents

(9) Includes 5,710 shares held by the Meyer and Doreen Luskin Family Trust. Includes 110,700 shares owned by Scope Industries. Mr. Luskin is the Chairman of the Board, President and Chief Executive Officers of Scope Industries. Includes 41,100 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, CA 90401.
(10) Includes 15,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 30, 2005. Mr. Viswanathan is a Director of the Company.

### Executive Compensation

The following table sets forth the compensation for the Chief Executive Officer, each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 during the fiscal year ended June 30, 2005, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the “Named Executive Officers”):

**SUMMARY COMPENSATION TABLE**

| | | | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | Annual Compensation | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | All Other Annual Compen-sation ($) | Restricted Stock Award(s) (#) | Securities Underlying Options/ SARs (#) | LTIP Payouts ($) | All Other Compen-sation ($) |
| Deepak Chopra | 2005 | 925,000 | 300,000 | — | — | 80,000 | — | $ 47,600(1) |
| Chief Executive Officer | 2004 | 793,269 | 435,000 | — | — | 100,000 | — | 377,493(1)(2) |
| | 2003 | 750,000 | 325,000 | — | — | 100,000 | — | 676,437(1)(7) |
| Ajay Mehra | 2005 | 338,048 | 120,000 | — | — | 25,000 | — | 11,875(3) |
| Executive V.P. President of Security Group | 2004 | 310,000 | 170,000 | — | — | 25,000 | — | 8,600(3) |
| | 2003 | 315,767 | 125,000 | — | — | 25,000 | — | 454,333(3)(7) |
| Anuj Wadhawan | 2005 | 228,382 | 90,000 | — | — | 20,000 | — | 2,400(4) |
| Chief Financial Officer | 2004 | 174,941 | 72,500 | — | — | 20,000 | — | 2,400(4) |
| | 2003 | 161,450 | 37,500 | — | — | 15,000 | — | 143,202(4)(7) |
| Andreas F. Kotowski | 2005 | 223,260 | 40,000 | — | — | 5,000 | — | 2,400(5) |
| Chief Technology Officer | 2004 | 210,675 | 72,500 | — | — | 7,500 | — | 2,400(5) |
| | 2003 | 204,847 | 42,000 | — | — | 2,000 | — | 2,400(5) |
| Victor S. Sze | 2005 | 209,160 | 75,000 | — | — | 17,500 | — | 3,700(6) |
| General Counsel, | 2004 | 169,945 | 40,000 | — | — | 17,500 | — | — |
| Executive V.P. | 2003 | 145,192 | 5,000 | — | — | 5,000 | — | — |

(1) The Company paid aggregate insurance premiums of approximately $47,600, $42,700 and $38,000 on behalf of Mr. Chopra in 2005, 2004 and 2003, respectively.
(2) In 2004, the Company assigned a 20-year term life insurance policy to Mr. Chopra. The value of the assigned policy is $334,793 and is reflected in “All Other Compensation” for 2004.
(3) The Company paid aggregate insurance premiums of approximately $11,875, $8,600 and $5,500 on behalf of Mr. Mehra in 2005, 2004 and 2003, respectively.
(4) The Company paid aggregate insurance premiums of approximately $2,400 on behalf of Mr. Wadhawan in each of 2005, 2004 and 2003.
(5) The Company paid aggregate insurance premiums of approximately $2,400 on behalf of Mr. Kotowski in each of 2005, 2004 and 2003.
(6) The Company paid aggregate insurance premiums of approximately $3,700 on behalf of Mr. Sze 2005.
(7) Includes compensation resulting from a disqualified disposition of incentive stock options.

Table of Contents

**Option Grants**

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2005:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options/ SARs Granted(#)(1) | Percent of Total Options/SARs Granted to Employees in Fiscal Year Year (%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Options Term(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5%($) | 10%($) |
| Deepak Chopra | 80,000 | 21.22 | 20.91 | 11/26/09 | 462,164 | 1,021,261 |
| Ajay Mehra | 25,000 | 6.63 | 20.91 | 11/26/09 | 144,426 | 319,144 |
| Anuj Wadhawan | 20,000 | 5.31 | 20.91 | 11/26/09 | 115,541 | 255,315 |
| Andreas F. Kotowski | 5,000 | 1.33 | 20.91 | 11/26/09 | 28,885 | 63,829 |
| Victor S. Sze | 17,500 | 4.64 | 20.91 | 11/26/09 | 101,098 | 223,401 |

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.

(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the SEC and do not represent the Company's estimate or projection of future Common Stock prices.

**Option Exercises and Fiscal Year-End Values**

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2005 and held by them on June 30, 2005:

**AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES**

| Name | Shares Acquired On Exercise (#) | Value Realized ($)(1) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($)(1) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra | 50,000 | 404,500 | 265,000 | 205,000 | 1,095,000 | — |
| Ajay Mehra | 25,000 | 187,250 | 93,750 | 56,250 | 342,250 | — |
| Anuj Wadhawan | 10,000 | 79,775 | 33,310 | 42,500 | 108,315 | — |
| Andreas F. Kotowski | 15,000 | 163,273 | 11,375 | 11,625 | — | — |
| Victor S. Sze | — | — | 6,875 | 33,125 | — | — |

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $15.79 per share).

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1520 of 2711
Table of Contents

**1997 Stock Option Plan**

In May 1997, the Board of Directors adopted the 1997 Plan. The 1997 Plan, which was approved by the Company's shareholders in June 1997, provided for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company's shareholders approved an increase of the number of shares of Common Stock for which options may be granted to 1,850,000. In November 2002, the Company's shareholders approved an increase of the number of shares of Common Stock for which options may be granted to 2,350,000. In November 2004, the Company's shareholders approved an increase in the number of shares of Common Stock for which options may be granted to 3,350,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives that will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board of Directors, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances at the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2005, stock options to purchase 796,726 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,775,148 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.13 to $20.91 per share, and stock options to purchase 790,801 shares remained available for future grant. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During the fiscal year ended June 30, 2005, the Board of Directors of the Company granted options to purchase an aggregate of 377,000 shares of Common Stock under the 1997 Plan to certain executive officers, directors and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. Options granted to such officers, directors and employees of the Company generally are subject to vesting. Such options will become exercisable in installments over a period of three years from the date of grant, subject to the optionee's continuing employment or service as a director of the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

To the extent nonqualified options are granted under the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

Table of Contents

**Employee Stock Purchase Plan**

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's shareholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase shares of Common Stock through regular payroll deductions. The total number of shares of Common Stock subject to the 1998 Plan is 200,000. The 1998 Plan is administered by the Board of Directors, or a committee of the Board of Directors. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

**Employee Benefit Plan, Pension Plans**

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($14,000 in calendar 2005) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. For the fiscal year ended June 30, 2005, the Company had provided $1,057,000 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn and so that the contributions by employees will be deductible by the Company when made.

Certain employees in the following of the Company's operations are covered by pension plans: Advanced Micro Electronics AS, Rapiscan Systems Oy, Rapiscan Systems Limited, Spacelabs Medical Austria GmbH, Spacelabs Medical (Canada) Inc., Spacelabs Medical Finland Oy, Spacelabs Medical Germany GmbH, Spacelabs Medical SAS, Spacelabs Medical UK Limited, and divisions of Spacelabs Medical operating in Australia and Italy. As of the date hereof, approximately 205 employees are covered by these plans.

Table of Contents

**Employment Arrangements**

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with its President and Chief Executive Officer, Deepak Chopra. Unless the employment agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (i) the fifth anniversary of the date of the agreement or (ii) the close of business three years following the date that either party notifies the other in writing that the notifying party elects to end the term of the agreement. Pursuant to the terms of the employment agreement, Mr. Chopra is to receive an annual base salary of $950,000 and will be eligible to participate in a year-end bonus pool for management, if such bonus pool is established. In addition, the employment agreement provides that the Compensation Committee may grant options to purchase shares of the Company's Common Stock to Mr. Chopra in each of the fiscal years he is employed by the Company. The agreement may be terminated for "cause" or due to Mr. Chopra's death or disability. In addition, Mr. Chopra may resign from the Company for "good reason" as defined in the employment agreement. If Mr. Chopra is terminated by the Company other than for "cause" or death or disability, or resigns from the Company for "good reason," he will receive continued payment of base salary for three years from the date of such termination of resignation from the Company, bonus and certain accelerated vesting of options. The agreement also contains certain restrictive covenants and other prohibitions that preclude Mr. Chopra from competing with the Company or soliciting its employees or customers following termination.

The Company entered into a three-year employment agreement with Ajay Mehra, the Company Executive Vice President and President of Rapiscan Systems, which became effective on September 1, 1997. The employment agreement provided for a base salary to be determined each year by the Compensation Committee. In February 2003, the Company amended Mr. Mehra's employment agreement to extend the term of the agreement until August 31, 2006. The Compensation Committee increased Mr. Mehra's annual base salary to $340,000 effective April 1, 2004 and to $345,000 effective September 1, 2004. Mr. Mehra is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

The Company and Anuj Wadhawan, the Company's Chief Financial Officer, were parties to an employment agreement dated June 1, 2003. On July 18, 2005, the parties amended the employment agreement to extend the term of the agreement until June 1, 2007. As of June 1, 2004, Mr. Wadhawan's annual base salary was $200,000. Effective September 1, 2004, the Compensation Committee increased Mr. Wadhawan's annual base salary to $225,000. Mr. Wadhawan is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

Andreas F. Kotowski, the Company's Chief Technology Officer, is currently employed by the Company pursuant to an employment arrangement that is terminable by either party at any time for any reason. As of December 1, 2003, Mr. Kotowski's annual base salary was $216,300. The Compensation Committee increased Mr. Kotowski's annual base salary to $225,000 effective September 1, 2004. Mr. Kotowski is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

The Company and Victor Sze, the Company's General Counsel and Executive Vice President, were parties to an employment agreement dated July 1, 2003. On July 18, 2005, the parties amended the employment agreement to extend the term of the agreement until July 1, 2007. As of January 1, 2004, Mr. Sze's annual base salary was $185,000. Effective September 1, 2004, the Compensation Committee increased Mr. Sze's annual base salary to $215,000. Mr. Sze is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1523 of 2711
Table of Contents

Management allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division, as determined before the start of the fiscal year.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining 49.0% interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during fiscal year 2005 by Mr. Chopra and his wife. The Company paid the business approximately $60,000 for such services during fiscal year 2005. The Company contracts for printing services from a business owned by Mr. Chopra's father-in-law, Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $67,000 for such printing services during fiscal year 2005. In addition, in consideration of Mr. Syal's past services to the Company as a Director, the Board of Directors approved yearly payments of $25,000 each to Mr. Syal during each of fiscal years 2004, 2005, 2006 and 2007.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and shareholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2005, and written representations from certain reporting persons, the Company believes that all but one of the Company's executive officers and all of the Company's directors and more than 10% shareholders have complied with all such filing requirements. Mr. Kotowski, an executive officer, neglected to timely make one such filing.

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Good and Luskin. No executive officer of the Company has served during the fiscal year ended June 30, 2005 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2005, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 402(j) of Regulation S-K under the Exchange Act.

Table of Contents

**REPORT OF THE COMPENSATION COMMITTEE**

This Compensation Committee Report discusses the components of the Company’s executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers. The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors.

***Compensation Philosophy.*** The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its shareholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and shareholder value.

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company’s annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer’s efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company’s shareholders.

Section 162(m) of the Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation’s chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the Code exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

Table of Contents

***Compensation Program Components.*** The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

*Base Salary.* Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Bonus.* Management allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

*Long-Term Incentive Compensation.* The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

***Chief Executive Officer's Compensation.*** The Company has entered into an employment agreement with Mr. Chopra as more fully described above. See "Information Concerning Management, Compensation and Stock Ownership – Employment Agreements." In setting Mr. Chopra's base salary and other compensation under his employment agreement, in granting bonuses, and when considering other forms of compensation, the Compensation Committee has looked to the same components it applies when establishing compensation for the other executive officers of the Company.

***Summary.*** The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's shareholders, by attracting and retaining the best qualified people as senior managers and enhancing corporate performance. Furthermore, the Compensation Committee believes that the executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1526 of 2711
Table of Contents

**REPORT OF THE AUDIT COMMITTEE**

The Audit Committee is composed of three non-employee directors, Steven C. Good , Meyer Luskin, and Chand R. Viswanathan, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met six times during the fiscal year ended June 30, 2005.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's chairman and the Company's chief financial officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Deloitte & Touche LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address, and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61, as amended, ("Communication with Audit Committees"). The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and

Table of Contents

its management, which is made under Independence Standards Board Standard No. 1 ("Independence Discussions with Audit Committees"), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2005 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee has recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2005, for filing with the SEC.

AUDIT COMMITTEE

Meyer Luskin
Steven C. Good
Chand R. Viswanathan

Table of Contents

**COMPANY STOCK PRICE PERFORMANCE**

The graph below compares the Company's cumulative total shareholder return for the period beginning on the market close on the last trading day before the beginning of the Company's fifth preceding fiscal year through and including the end of the Company's last completed fiscal year, with the NASDAQ Market Index and with peer groups composed of companies with which the Company has generally competed.

The Company's peer group for the fiscal year ended June 30, 2004 ("Old Peer Group") included the following companies: American Science & Engineering (AMEX Symbol: ASE), InVision Technologies, Inc. (NASDAQ Symbol: INVN) and PerkinElmer, Inc. (NYSE Symbol: PKI). The Company's peer group for the fiscal year ended June 30, 2005 ("New Peer Group") includes the following companies: American Science & Engineering (AMEX Symbol: ASE), Analogic Corporation (NASDAQ Symbol: ALOG), Criticare Systems, Inc. (AMEX Symbol: CMD) and Datascope Corporation (NASDAQ Symbol: DSCP). The Company has updated the composition of its peer group because it believes that the New Peer Group better reflects the nature of the Company's current operations.

The graph assumes that $100.00 was invested on June 30, 2000 in the Company's Common Stock, and in each of the indexes mentioned above, and that all dividends were reinvested. Historical stock price performance is not necessarily indicative of future stock price performance.

**Comparison of 5 Year Cumulative Total Return**
**Assumes Initial Investment of $100**
**June 2000 Through June 2005**

Table of Contents

**COMPARISON OF CUMULATIVE TOTAL RETURN AMONG OSI SYSTEMS, INC., NASDAQ MARKET INDEX, THE OLD PEER GROUP INDEX AND THE NEW PEER GROUP INDEX**

| Date | OSI Systems | NASDAQ Market Index | Old Peer Group | New Peer Group |
|---|---|---|---|---|
| **6/30/2000** | $100.00 | $100.00 | $100.00 | $100.00 |
| **9/30/2000** | $131.76 | $ 92.02 | $156.80 | $ 95.75 |
| **12/31/2000** | $ 76.86 | $ 61.62 | $156.63 | $104.11 |
| **3/31/2001** | $ 40.00 | $ 46.00 | $ 79.79 | $108.37 |
| **6/30/2001** | $ 46.68 | $ 54.21 | $ 84.13 | $124.46 |
| **9/30/2001** | $ 99.26 | $ 37.61 | $ 84.11 | $119.03 |
| **12/31/2001** | $228.89 | $ 48.90 | $118.99 | $113.98 |
| **3/31/2002** | $316.24 | $ 46.28 | $ 71.69 | $110.57 |
| **6/30/2002** | $248.85 | $ 36.73 | $ 43.97 | $119.33 |
| **9/30/2002** | $217.16 | $ 29.42 | $ 29.90 | $104.98 |
| **12/31/2002** | $213.08 | $ 33.56 | $ 36.65 | $118.63 |
| **3/31/2003** | $198.40 | $ 31.26 | $ 36.41 | $113.55 |
| **6/30/2003** | $197.02 | $ 37.86 | $ 52.32 | $123.74 |
| **9/30/2003** | $217.10 | $ 41.73 | $ 55.52 | $127.01 |
| **12/31/2003** | $241.06 | $ 46.86 | $ 66.03 | $129.97 |
| **3/31/2004** | $250.97 | $ 46.70 | $ 84.91 | $139.90 |
| **6/30/2004** | $250.09 | $ 48.00 | $ 83.82 | $147.59 |
| **9/30/2004** | $202.03 | $ 44.53 | $ 74.68 | $160.84 |
| **12/31/2004** | $284.98 | $ 51.15 | $ 97.69 | $182.61 |
| **3/31/2005** | $219.72 | $ 47.08 | $ 90.58 | $170.44 |
| **6/30/2005** | $198.14 | $ 48.53 | $ 83.68 | $191.21 |

## SHAREHOLDER PROPOSALS

Any proposals of shareholders which are intended to be presented at next year’s annual meeting must be received by the Company at its principal executive offices on or before July 14, 2006, and must satisfy the conditions established by the SEC and the Company’s bylaws, in order to be considered for inclusion in the Company’s proxy materials relating to that meeting.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company’s Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

Only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

Table of Contents

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 12, 2005

**PLEASE COMPLETE, DATE, AND SIGN THE ENCLOSED PROXY AND RETURN IT PROMPTLY IN THE ENCLOSED REPLY ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.**

Table of Contents

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the “Company”) held of record by the undersigned as of the close of business on September 26, 2005, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on November 11, 2005, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2006 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

☐ **FOR ALL** ☐ **WITHHOLD AUTHORITY FOR ALL**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin and Chand R. Viswanathan

To withhold authority to vote for any individual nominee, check the box marked “For All” above and write the nominee’s name in the space provided here:

2. To ratify the Board of Director’s selection of Deloitte & Touche LLP to serve as the Company’s independent accountants for the fiscal year ending June 30, 2006.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

3. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2005 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 15

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1533 of 2711

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

---

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-Q

(Mark one)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __________ to __________

Commission File Number 0-23125

# OSI SYSTEMS, INC.

**(Exact name of registrant as specified in its charter)**

| **California** | **33-0238801** |
| --- | --- |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**(310) 978-0516**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. **Yes** ☒ **No** ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ¨ Accelerated filer x Non-accelerated filer ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). **Yes** ☐ **No** ☒

As of February 15, 2006 there were 16,385,747 shares of the registrant's common stock outstanding.

---

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1534 of 2711

Table of Contents

**OSI SYSTEMS, INC.**

**INDEX**

| | PAGE NUMBER |
|---|---|
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Financial Statements | |
| Consolidated Balance Sheets at December 31, 2005 and June 30, 2005 | 2 |
| Consolidated Statements of Operations for the three and six months ended December 31, 2005 and December 31, 2004 | 3 |
| Consolidated Statements of Cash Flows for the six months ended December 31, 2005 and December 31, 2004 | 4 |
| Notes to Consolidated Financial Statements | 5 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 39 |
| Item 4 – Controls and Procedures | 40 |
| **PART II - OTHER INFORMATION** | |
| Item 1 – Legal Proceedings | 43 |
| Item 1A – Risk Factors | 43 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 43 |
| Item 6 – Exhibits | 44 |
| Signatures | 45 |

Table of Contents

## PART I. FINANCIAL INFORMATION

**Item 1. Condensed Consolidated Financial Statements**

### OSI SYSTEMS, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS
### (in thousands, except share amounts)

| | December 31, 2005 (Unaudited) | June 30, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 17,127 | $ 14,623 |
| Marketable securities, available-for-sale | 74 | 816 |
| Accounts receivable, net of allowance for doubtful accounts of $2,581 and $4,682 at December 31, 2005 and June 30, 2005, respectively | 101,392 | 89,227 |
| Other receivables | 7,637 | 5,345 |
| Inventory | 110,235 | 107,441 |
| Prepaid expenses | 4,340 | 4,165 |
| Deferred income taxes | 12,388 | 10,537 |
| Income taxes receivable | 4,853 | 5,519 |
| Total current assets | 258,046 | 237,673 |
| Property and Equipment, net | 34,337 | 30,974 |
| Goodwill | 28,415 | 28,697 |
| Intangible assets, net | 45,412 | 47,287 |
| Investments | 2,075 | 1,366 |
| Other assets | 881 | 1,014 |
| Deferred income taxes | 287 | 109 |
| Total | $ 369,453 | $ 347,120 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 2,050 | $ 15,752 |
| Current portion of long-term debt | 785 | 247 |
| Current portion of capital lease obligation | 252 | 252 |
| Accounts payable | 41,748 | 41,123 |
| Deferred income taxes | 2,199 | 2,191 |
| Accrued payroll and related expenses | 14,259 | 13,381 |
| Income taxes payable | 823 | 1,608 |
| Advances from customers | 6,466 | 2,565 |
| Accrued warranties | 6,761 | 6,641 |
| Sales return allowance | 3,123 | 1,248 |
| Deferred revenue | 7,498 | 6,016 |
| Other accrued expenses and current liabilities | 15,252 | 16,274 |
| Total current liabilities | 101,216 | 107,298 |
| Long-term debt | 5,449 | 4,597 |
| Long-term capital lease obligation | 119 | 255 |
| Deferred rent | 5,448 | 5,468 |
| Accrued pension | 2,448 | 1,819 |
| Deferred income taxes | 8,958 | 3,547 |
| Other long-term liabilities | 514 | 509 |
| Total liabilities | 124,152 | 123,493 |
| Minority interest | 8,718 | — |
| Commitments and Contingencies | | |
| Shareholders' Equity: | | |
| Preferred stock, no par value; authorized, 10,000,000 shares; none issued and outstanding at December 31, 2005 and June 30, 2005, respectively | | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1536 of 2711

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Common stock, no par value, authorized, 100,000,000 shares; issued and outstanding 16,371,998 and 16,193,239 shares at December 31, 2005 and June 30, 2005, respectively | 187,559 | 169,406 |
| Retained earnings | 48,462 | 52,566 |
| Accumulated other comprehensive income | 562 | 1,655 |
| Total shareholders' equity | 236,583 | 223,627 |
| Total | $ 369,453 | $347,120 |

See accompanying notes to condensed consolidated financial statements.

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share amounts)**

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 (Unaudited) | 2004 (Unaudited) | 2005 (Unaudited) | 2004 (Unaudited) |
| Revenues | $ 117,138 | $ 102,531 | $ 219,008 | $ 190,175 |
| Cost of goods sold - (Includes non-cash stock-based compensation expense of $53 and $108 for three and six months ended December 31, 2005) | 71,999 | 66,079 | 136,917 | 119,933 |
| Gross profit | 45,139 | 36,452 | 82,091 | 70,242 |
| Operating expenses: | | | | |
| Selling, general and administrative - (Includes non-cash stock-based compensation expense of $1,144 and $2,218 for three and six months ended December 31, 2005) | 33,515 | 25,595 | 66,929 | 50,388 |
| Research and development - (Includes non-cash stock-based compensation expense of $103 and $215 for three and six months ended December 31, 2005) | 8,700 | 7,066 | 17,431 | 13,736 |
| Restructuring charges | — | — | 800 | — |
| Management retention bonus | 51 | 549 | 572 | 1,098 |
| Total operating expenses | 42,266 | 33,210 | 85,732 | 65,222 |
| Income (Loss) from operations | 2,873 | 3,242 | (3,641) | 5,020 |
| Interest income | 69 | 103 | 89 | 191 |
| Interest expense | (399) | (98) | (950) | (154) |
| Gain on sale of marketable securities | 349 | — | 349 | — |
| Income (Loss) before provision for income taxes and minority interest | 2,892 | 3,247 | (4,153) | 5,057 |
| Provision (Benefit) for income taxes | 1,861 | 789 | (996) | 1,358 |
| Minority interest | (946) | — | (946) | 68 |
| Net income (loss) | $ 85 | $ 2,458 | ($4,103) | $ 3,767 |
| Basic earnings (loss) per share | $ 0.01 | $ 0.15 | ($0.25) | $ 0.23 |
| Diluted earnings (loss) per share | $ 0.00 | $ 0.15 | ($0.26) | $ 0.23 |
| Weighted average shares outstanding | 16,299,337 | 16,168,778 | 16,270,205 | 16,185,269 |
| Weighted average diluted shares outstanding | 16,490,714 | 16,592,724 | 16,270,205 | 16,577,752 |

See accompanying notes to condensed consolidated financial statements.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1538 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Six months ended December 31, | |
|---|---|---|
| | (Unaudited) 2005 | (Unaudited) 2004 |
| | | Restated |
| Cash flows from operating activities: | | |
| Net (loss) income | ($4,103) | $ 3,767 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | |
| Depreciation and amortization | 5,837 | 4,485 |
| Stock-based compensation expense - non cash | 2,541 | — |
| Minority interest in net income (loss) of subsidiary | 946 | (68) |
| Equity in earnings of unconsolidated affiliates | (128) | (105) |
| Deferred income taxes | (1,847) | 16 |
| Gain on sale of marketable securities | (349) | — |
| Loss on sale of property and equipment | 62 | — |
| Restructuring charges | 742 | — |
| Write-off of property and equipment | — | 272 |
| Changes in operating assets and liabilities-net of business acquisitions | | |
| Accounts receivable | (12,503) | (3,956) |
| Other receivables | (1,839) | 1,899 |
| Inventory | (3,548) | (1,764) |
| Prepaid expenses | (265) | 163 |
| Accounts payable | (1,156) | 4,001 |
| Accrued payroll and related expenses | 966 | (1,367) |
| Income taxes receivable | 737 | (501) |
| Income taxes payable | (784) | 46 |
| Advances from customers | 3,967 | (8,756) |
| Accrued warranties | 166 | (548) |
| Sales return allowance | 1,875 | (1,495) |
| Deferred Rent | (20) | 2,040 |
| Deferred Revenue | 1,522 | 1,930 |
| Other accrued expenses and current liabilities | (1,264) | (1,724) |
| Net cash used in operating activities | (8,445) | (1,665) |
| Cash flows from investing activities: | | |
| Proceeds from sale of marketable securities | 921 | — |
| Purchase of investments and marketable securities | (581) | — |
| Proceeds from the sale of property and equipment | 40 | — |
| Additions to property and equipment | (5,990) | (5,996) |
| Cash paid for business acquisitions, net of cash acquired | (311) | (1,359) |
| Deposit on escrow and other | 19 | (5,228) |
| Net cash used in investing activities | (5,902) | (12,583) |
| Cash flows from financing activities: | | |
| Payments on bank lines of credits | (13,823) | (665) |
| Proceeds from long-term debt | 1,700 | 5,078 |
| Payments on capital lease obligation | (136) | (74) |
| Payments on long-term debt | (10) | (1,312) |
| Proceeds from exercise of stock options, warrants and employee stock purchase plan | 2,207 | 836 |
| Proceeds from issuance of subsidiary stock | 26,280 | — |
| Purchase of Treasury Stock | — | (1,583) |
| Net cash provided by financing activities | 16,218 | 2,280 |
| Effect of exchange rate changes on cash and cash equivalents | 633 | 1,205 |
| Net increase (decrease) in cash and cash equivalents | 2,504 | (10,763) |
| Cash and cash equivalents, beginning of period | 14,623 | 39,879 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1539 of 2711

| | | |
|---|---|---|
| Cash and cash equivalents, end of period | $ 17,127 | $ 29,116 |
| Supplemental disclosures of cash flow information: | | |
| Interest paid | $ 920 | $ 144 |
| Income taxes paid | $ 1,330 | $ 2,149 |
| Non-cash investing and financing activities: | | |
| Property and equipment purchased through capital lease | — | $ 542 |
| Capital expenditures in accounts payable | $ 539 | $ 421 |

See accompanying notes to condensed consolidated financial statements.

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Summary of Significant Accounting Policies**

*General* – OSI Systems, Inc. and its subsidiaries is a vertically integrated, worldwide provider of security and inspection systems, medical monitoring and anesthesia systems, and optoelectronic devices and value-added subsystems. Our company was incorporated in 1987 in California. Our principal office is located at 12525 Chadron Avenue, Hawthorne, California 90250.

We design, manufacture and market security and inspection systems worldwide to end users under the “Rapiscan Systems” trade name. These systems are used to inspect baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband and to screen people. These systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials. Rapiscan Systems products fall into four categories: baggage and parcel inspection, cargo and vehicle inspection, hold baggage screening and people screening.

Our medical monitoring and anesthesia systems businesses design, manufacture and market products worldwide to end users under several brand names. Our medical monitoring systems, network and connectivity solutions, ambulatory blood pressure monitors and related services are sold under the “Spacelabs Medical” brand name. Our anesthesia systems and components are sold under the “Blease” brand name. Our arterial hemoglobin saturation monitors and sensors, including hand-held and wireless monitoring tools, are sold under the “Dolphin” brand name and our peripheral bone densitometers and ultrasound bone densitometer are sold under the “Osteometer” brand name.

Our optoelectronic devices and value-added subsystems are used in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical diagnostics, fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We design and manufacture optoelectronic devices and value-added subsystems for others through original equipment manufacturer arrangements, as well as for our own security and medical equipment businesses.

*Consolidation* – The condensed consolidated financial statements include the accounts of OSI Systems, Inc. and its subsidiaries. All significant inter-company accounts and transactions have been eliminated in consolidation. The consolidated balance sheet as of December 31, 2005, consolidated statements of operations for the three and six months ended December 31, 2005 and December 31, 2004, and cash flows for the six-month periods ended December 31, 2005 and December 31, 2004 have been prepared by us, without audit, pursuant to Accounting Principles Board Opinion No. 28, “Interim Financial Reporting” and the rules and regulations of the Securities and Exchange Commission with respect to interim financial information. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. However, in the opinion of management, all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2005, as filed with the Securities and Exchange Commission on September 29, 2005. The results of operations for the three and six months ended December 31, 2005 are not necessarily indicative of the results to be expected for the fiscal year ending June 30, 2006.

Table of Contents

*Sales of Stock by a Subsidiary* – We account for sales of stock by a subsidiary as capital transactions, pursuant to Securities and Exchange Commission Staff Accounting Bulletin No. 51, "Accounting for Sales of Stock by a Subsidiary" ("SAB 51").

**Restatement**

*Condensed Consolidated Statements of Cash Flows* – Subsequent to the issuance of our condensed consolidated financial statements for the interim period ended March 31, 2005, our management determined that in accordance with FASB Technical Bulletin No. 88-1, "Issues Relating to Accounting for Leases," cash lease incentives in the amount of $2 million received by us relating to the extension of two operating leases should have been presented as cash flows from operating activities and that accounts payable in the amount of approximately $191,000 incurred in connection with capital expenditures during the six months ended December 31, 2004 should have presented as a non-cash investing activity and not reflected in our condensed consolidated statement of cash flows until payment of the liability is made. In our previously issued condensed consolidated statements of cash flows for the interim periods ended December 31, 2004 and March 31, 2005, the amount associated with the extension of the operating leases had been reported as cash flows from financing activities. As a result of these items, the accompanying condensed consolidated statement of cash flows for the six months ended December 31, 2004 has been restated from the amounts previously reported.

A summary of the significant effects of the restatement is as follows (in thousands):

| | As previously reported Six months ended December 31, 2004 | As restated Six months ended December 31, 2004 |
|---|---|---|
| Net Cash Used in Operating Activities | $ (3,856) | $ (1,665) |
| Net Cash Used in Investing Activities | (12,392) | (12,583) |
| Net Cash Provided by Financing Activities | 4,280 | 2,280 |

We intend to correct the classification of cash lease incentives and accounts payable in connection with capital expenditures in our condensed consolidated statement of cash flows for the nine months ended March 31, 2005 in connection with the filing of our Form 10-Q for the quarterly period ending March 31, 2006.

A summary of the significant effects of the restatement is as follows (in thousands):

| | As previously reported Nine months ended March 31, 2005 | As restated Nine months ended March 31, 2005 |
|---|---|---|
| Net Cash Used in Operating Activities | $ (13,628) | $ (11,592) |
| Net Cash Used in Investing Activities | (27,115) | (27,151) |
| Net Cash Provided by Financing Activities | 12,006 | 10,006 |

*Condensed Consolidated Balance Sheets* – Our management also determined that we incorrectly classified approximately $6.0 million of deferred rent-related liabilities, including the cash lease incentive discussed above, and a portion of deferred revenues, as current liabilities in our condensed consolidated balance sheet as of June 30, 2005. Although we do not believe that these classification errors are material, we have corrected the classification of these items in our condensed consolidated balance sheet as of December 31, 2005 and have restated the accompanying condensed consolidated balance sheet as of June 30, 2005 for comparative purposes.

*Pro Forma Stock Compensation Expense* – Subsequent to the issuance of our fiscal year 2004 consolidated financial statements, our management determined that total stock-based employee compensation expense determined under the fair value based method, net of related tax effects, and the per-share weighted-average fair value of stock options granted, for fiscal years 2003 and 2004, had been calculated incorrectly. For a further discussion regarding the impact of the restatement associated with the correction of this error see Stock-Based Compensation (As Restated).

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1542 of 2711

Table of Contents

**Recent Accounting Pronouncements**

In November 2004, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 151, "Inventory Costs" ("SFAS 151"), an amendment to Accounting Research Bulletin No. 43, Chapter 4. SFAS 151 clarifies the accounting for abnormal amounts of idle facility expense, freight, handling costs and wasted material. SFAS 151 is effective for inventory costs incurred during fiscal years beginning after June 15, 2005 and was adopted as of July 1, 2005. The adoption of SFAS 151 did not have a material impact on our financial statements.

In December 2004, the FASB issued SFAS 123R, "Share-Based Payment" ("SFAS 123R"), which is effective for the annual periods beginning after June 15, 2005. SFAS 123R became effective for us beginning July 1, 2005. SFAS 123R requires that all share-based payments to employees, including grants of employee stock options and purchases under employee stock purchase plans be recognized as an operating expense in the income statement. The cost is recognized over the requisite service period based on fair values measured on grant dates. For additional information regarding SFAS 123R, see information contained in "Stock-Based Compensation Statements" below.

In December 2004, the FASB issued two FASB Staff Positions ("FSP"), namely, FSP SFAS 109-1, "Application of FASB Statement No. 109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004" ("SFAS 109-1") and FSP SFAS 109-2, "Accounting and Disclosure Guidance for the Foreign Earnings Repatriation Provision Within the American Jobs Creation Act of 2004" ("SFAS 109-2"), which were both effective upon issuance. FSP SFAS 109-1 clarifies that the tax deduction for domestic manufacturers under the American Jobs Creation Act of 2004 should be accounted for as a special deduction in accordance with FSP SFAS No. 109, "Accounting for Income Taxes" ("SFAS 109"). FSP SFAS 109-2 grants additional time to evaluate the act's impact on a company's plan for reinvestment or repatriation of foreign earnings for purposes of applying SFAS 109.

The adoption of SFAS 109-1 had no effect on our condensed consolidated financial statements. We are currently evaluating the effect of SFAS 109-2 on our condensed consolidated financial statements and we expect that our evaluation will be completed by June 30, 2006.

In June 2005, the Emerging Issues Task Force modified its consensus on Issue No. 04-10, "Determining Whether to Aggregate Operating Segments That Do Not Meet the Quantitative Thresholds." This guidance creates stricter standards for aggregating operating segments that do not meet the quantitative thresholds provided within SFAS 131, "Disclosures about Segments of an Enterprise and Related Information." The guidance is effective for fiscal years ending after September 15, 2005. Adoption of this guidance did not impact the presentation of our reportable segments.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1543 of 2711

Table of Contents

**Derivative Instruments**

We apply provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended ("SFAS 133"). SFAS 133 establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. SFAS 133 requires that all derivatives be recorded on the balance sheet at their fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether a derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction.

Our use of derivatives has in the past consisted of foreign exchange contracts used to manage foreign exchange risk. In the past, we purchased foreign exchange contracts to hedge foreign exchange exposures related to commitments to acquire inventory for sale and accounts receivable and did not use the contracts for trading purposes. There were no foreign exchange contracts outstanding as of December 31, 2005 or as of June 30, 2005.

**Accounts Receivable**

Accounts receivable consisted of the following (in thousands):

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Trade receivables, net | $ 99,408 | $ 86,744 |
| Receivables related to long term contracts - unbilled costs and accrued profit on progress completed | 1,984 | 2,483 |
| Total | $ 101,392 | $ 89,227 |

We expect to bill and collect the unbilled costs and accrued profits at December 31, 2005 during the next twelve months.

**Inventory**

Inventory is stated at the lower of cost or market. We determine cost based on the first-in, first-out method. Inventory consisted of the following (in thousands):

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Raw Materials | $ 55,621 | $ 56,584 |
| Work-in-process | 27,513 | 22,132 |
| Finished Goods | 27,101 | 28,725 |
| Total | $ 110,235 | $ 107,441 |

Table of Contents

**Property and Equipment**

Property and equipment consisted of the following (in thousands):

| | | December 31, 2005 | June 30, 2005 |
|---|---|---|---|
| Land | | $ 5,762 | $ 5,564 |
| Buildings | 20 years | 6,459 | 6,322 |
| Equipment | 5-8 years | 25,208 | 23,058 |
| Leasehold improvements | 3-10 years | 6,620 | 6,513 |
| Tooling | 3-5 years | 3,758 | 2,911 |
| Furniture and fixtures | 8-10 years | 3,413 | 3,328 |
| Computer | 3-4 years | 13,116 | 12,252 |
| Demo equipment | 2-5 years | 3,106 | 832 |
| ERP System | 10 years | 2,290 | 1,848 |
| Vehicles | 3-5 years | 274 | 262 |
| Total | | 70,006 | 62,890 |
| Less Accumulated depreciation and amortization | | (35,669) | (31,916) |
| Property and equipment — net | | $ 34,337 | $ 30,974 |

**Spacelabs Medical Acquisition**

In March 2004, we completed the acquisition of Spacelabs Medical from Instrumentarium Corporation, now a subsidiary of General Electric Company. The acquisition price was approximately $47.9 million in cash (net of cash acquired), including acquisition costs. The final purchase price is subject to certain working capital adjustments. In June 2004, we notified General Electric Company of a working capital and retention bonus adjustment resulting in what we believe to be a downward adjustment of the purchase price in the amount of $25.9 million. In September 2004, General Electric Company responded that it believes the amount of the downward adjustment to be approximately $7.8 million. As of December 31, 2005, no amounts have been recorded in our financial statements in relation to the expected reduction in the purchase price. In June 2005, we filed suit in Delaware seeking specific performance of our agreement with respect to an independent determination of the amount of the purchase price adjustment. The action is currently pending. As a result of the prospective price adjustment, the final purchase price and the purchase price allocation may differ significantly from the preliminary estimates of these amounts.

In connection with the acquisition of Spacelabs Medical, we acquired 19.95% of the issued and outstanding shares of Tempus Software, Inc., a privately-held company. In June 2004, QuadraMed Corp., a public company, traded over-the-counter at that time, purchased all of the issued and outstanding shares of Tempus Software, Inc. In exchange for our Tempus Software, Inc. shares, we received $902,000 in cash plus restricted shares in QuadraMed Corp. Such restricted shares were provisionally valued by us at $322,000 until a more complete valuation of such shares could be finalized. In February 2005, we finalized our valuation and determined that the QuadraMed Corp. shares should in fact be valued at $827,000 as of the acquisition date.

As of March 31, 2005, the fair value of our QuadraMed Corp. shares had decreased based on the market price of QuadraMed Corp.'s shares that were publicly traded. In accordance with SFAS No. 115, “Accounting for Certain Investments in Debt and Equity Securities,” we concluded that an other-than-temporary decline in the value of our QuadraMed Corp. shares had occurred and recorded a write down of $182,000 in our consolidated statements of operations.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1545 of 2711

Table of Contents

As of June 30, 2005, we had held our restricted QuadraMed Corp. shares for a sufficient period such that under federal and state securities laws the shares became unrestricted. Therefore, we deemed the value of our QuadraMed Corp. shares to be equal to the quoted market price of QuadraMed Corp. shares. As of June 30, 2005, our QuadraMed shares were accordingly re-classified from investments to Marketable Securities, available-for-sale in the accompanying consolidated balance sheet.

We sold these shares in October 2005. Net proceeds from the sale were $806,000 and the gain on the sale was $160,000. The gain of $160,000, before tax, included the realization of $134,000 of previously unrealized gain in accumulated other comprehensive income.

In connection with the sale of Tempus Software, Inc., we also received $115,000 in cash and approximately 51,000 additional unregistered shares in QuadraMed Corp. which were both placed into escrow pending the resolution of certain purchase price adjustments. In December 2005, the cash and shares held in such escrow were released to us, resulting in recognition of an additional gain of $189,000.

**Spacelabs Healthcare Public Offering**

In September 2005, we announced our intention to pursue a listing in the U.K. of common stock in Spacelabs Healthcare, Inc., a newly formed subsidiary composed of the business operations of our medical monitoring and anesthesia systems businesses, and the initial public offering of a minority interest. On October 25, 2005, Spacelabs Healthcare completed the placing of 13.5 million previously unissued shares of its common stock, representing approximately 20 percent of its total issued and outstanding shares. The newly issued shares began trading on the AIM, a market administered by the London Stock Exchange, on October 31, 2005 under the ticker symbol “SLAB.” The shares in Spacelabs Healthcare that are now trading on AIM were not offered in the United States. Under rules and regulations promulgated by the Securities and Exchange Commission, U.S. Persons (as such term is defined in Regulation S promulgated under the Securities Act of 1933, as amended) were prohibited from participating in this offering.

As a result of the placing, we recorded minority interest in Spacelabs Healthcare of $7.6 million, representing approximately 20% of the issued and outstanding shares in Spacelabs Healthcare. We treated the placing as a capital transaction in accordance with SAB 51. The placing resulted in $26.3 million in proceeds, net of expenses. We have reported the associated gain of $13.4 million, net of tax, as an adjustment to our shareholders’ equity on the accompanying consolidated balance sheet.

**Goodwill and Other Intangible Assets**

The changes in carrying value of goodwill for the six months ended December 31, 2005 are as follows (in thousands):

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Consolidated OSI Systems, Inc. |
|---|---|---|---|---|
| Balance as of June 30, 2005 | $16,492 | $ 5,861 | $ 6,344 | $ 28,697 |
| Foreign currency translation adjustments | (117) | (165) | — | (282) |
| Balance as of December 31, 2005 | $16,375 | $ 5,696 | $ 6,344 | $ 28,415 |

SFAS No. 142, “Goodwill and Other Intangible Assets” (“SFAS 142”), requires that intangible assets that meet the criteria for recognition apart from goodwill be reclassified and that intangibles with indefinite lives cease to be amortized in favor of periodic impairment testing. SFAS 142 requires testing goodwill for impairment on an annual basis and on an interim basis if an event occurs or circumstance change that may reduce the fair value of a reporting unit below its carrying value. We performed our annual impairment test during the three months ended December 31, 2005 and concluded that there were no impairment losses related to goodwill.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1546 of 2711

Table of Contents

Intangible assets which have indefinite lives, and are therefore not subject to amortization, consisted of the following (in thousands):

| | December 31, 2005 Gross Carrying Value | June 30, 2005 Gross Carrying Value |
|---|---|---|
| Tradename | $ 7,036 | $ 7,083 |

Intangible assets subject to amortization consisted of the following (in thousands):

| | | December 31, 2005 | | | June 30, 2005 | | |
|---|---|---|---|---|---|---|---|
| | Weighted Average Lives | Gross Carrying Value | Accumulated Amortization | Intangibles Net | Gross Carrying Value | Accumulated Amortization | Intangibles Net |
| Software development costs | 3-4 years | 3,182 | 1,109 | 2,073 | 3,635 | 1,382 | 2,253 |
| Patents | 10 years | 418 | 193 | 225 | 439 | 193 | 246 |
| Core technology | 25 years | 9,115 | 939 | 8,176 | 9,213 | 681 | 8,532 |
| Developed technology | 17 years | 27,471 | 3,734 | 23,737 | 27,816 | 3,159 | 24,657 |
| Customer relationships / backlog | 8 years | 5,410 | 1,245 | 4,165 | 5,439 | 923 | 4,516 |
| | | $45,596 | $ 7,220 | $ 38,376 | $46,542 | $ 6,338 | $ 40,204 |

Amortization expense for the six months ended December 31, 2005 was approximately $1.8 million. At December 31, 2005, estimated future amortization expense is as follows (in thousands):

| Fiscal Year | Amortization expense |
|---|---|
| Remaining 6 months of 2006 | $ 1,734 |
| 2007 | 3,398 |
| 2008 | 3,238 |
| 2009 | 2,999 |
| 2010 | 2,844 |
| 2011 | 2,677 |
| 2012 and thereafter | 21,486 |
| Total | $ 38,376 |

**Research and Development**

Research and development costs are those costs related to the development of a new product, process or service, or significant improvement to an existing product, process or service. Such costs are charged to operations as incurred unless the costs are related to a contractual arrangement with the U.S. Government.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1547 of 2711

Table of Contents

Costs incurred pursuant to such contractual arrangements are evaluated in accordance with the criteria established by the American Institute of Certified Public Accountants Audit and Accounting Guide, Federal Government Contractors. In accordance with the terms of the contractual arrangement and the criteria established by such guide, reimbursement of costs associated with these contracts is recorded as revenue or as a reduction of research and development expense. Revenues related to research and development arrangements totaled $1.9 million for the three months ended December 31, 2005 and $4.3 million for the six months ended December 31, 2005. We did not record any reimbursement of costs associated with such contracts as an offset against research and development expense.

**Stock Option Plans**

For the six months ended December 31, 2005, equity-based compensation awards were granted under one of three stock option plans: (a) the 1997 Stock Option Plan, (b) the 2004 Spacelabs Medical Stock Option Plan and (c) the 2005 Spacelabs Healthcare Plan. We also maintain an employee stock purchase plan known as the 1998 Employee Stock Purchase Plan.

*The 1997 Stock Option Plan* – We established the 1997 Stock Option Plan in May 1997 under which we authorized the grant of up to 850,000 shares of our common stock in the form of incentive and nonqualified options. We increased the number of shares authorized under the 1997 Stock Option Plan to 3,350,000 in November 2004. Under the 1997 Stock Option Plan, we may grant to our employees, including those of our subsidiaries, and directors incentive and nonqualified options to purchase shares of our common stock. Our Board of Directors administers the 1997 Stock Option Plan, and determines the terms and conditions of each grant, with the advice of and input from the Compensation Committee of our Board of Directors. Under the plan, the exercise price of nonqualified options may not be less than 85% of the fair market value of our common stock on the date of grant. The exercise price of incentive stock options may not be less than the fair market value of our common stock at the date of grant. The exercise price of incentive stock options granted to individuals who own more than 10% of our voting stock may not be less than 110% of the fair market value of our common stock on the date of grant. Stock options granted under this plan may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is of an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of our capital stock).

Under the 1997 Stock Option Plan, the fair value of each option award is estimated on the date of grant using a Black-Scholes options pricing model that uses assumptions detailed in the table below. We base expected volatilities on a blend of historical volatilities of our common stock and implied volatilities of our publicly traded options, as more fully explained below. The expected life represents the weighted average period of time that options granted are expected to be outstanding giving consideration to vesting periods and historical exercise patterns. The risk free rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding to the expected life of the option.

In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 107 (“SAB 107”), which provides the views of the Securities and Exchange Commission regarding valuation of share-based payments pursuant to SFAS 123R. With respect to volatility, SAB 107 clarifies that no single method of estimating volatility is proper under all circumstances and that to the extent a company can derive the implied volatility based on the trading of its financial instruments on a public market, it may be appropriate to use both implied and historical volatility in its assumptions. We have certain financial instruments that are publicly traded from which we can derive the implied volatility. Therefore, beginning in July 2005, we used implied and historical volatility for valuing our stock options, whereas we had previously used historical volatility exclusively as the measure. We believe that implied and historical volatility is a better indicator of expected volatility because it is generally reflective of both historical volatility and expectations of how future volatility will differ from historical volatility.

Table of Contents

We determined the fair value of options issued during the three and six months ended December 31, 2005 and 2004 as of the date of the grant, using the Black-Scholes option pricing model with the following weighted average assumptions:

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Expected dividend | 0% | 0% | 0% | 0% |
| Risk free interest rate | 4.5% | 3.3% | 4.5% | 3.3% |
| Expected volatility | 43.4% | 58.3% | 43.5% | 58.3% |
| Expected life (in years) | 3.7 | 3.7 | 3.7 | 3.7 |

The following summarizes stock option activity for the six months ended December 31, 2005:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding at June 30, 2005 | 1,775,148 | $ 16.41 | | |
| Granted | 241,500 | 18.49 | | |
| Exercised | (61,356) | 7.30 | | |
| Expired or canceled | (19,538) | 17.30 | | |
| Outstanding at December 31, 2005 | 1,935,754 | $ 16.95 | 2.67 | $ 4,340 |
| Exercisable at December 31, 2005 | 937,595 | $ 15.11 | 1.65 | $ 3,738 |

The per-share weighted-average grant-date fair value of stock options granted under the 1997 Stock Option Plan was $7.04 for the three months ended December 31, 2005 and $7.03 for six months ended December 31, 2005. It was $9.61 for the three months ended December 31, 2004 and $9.23 for the six months ended December 31, 2004. The total intrinsic value of options exercised during the three months ended December 31, 2005 was $440,000 and $611,000 for the six months ended December 31, 2005. It was $1.1 million for the three months ended December 31, 2004 and $1.4 million for the six months ended December 31, 2004. The total fair value of options vested for the six months ended December 31, 2005 was $1.4 million and the total fair value of options vested for the six months ended December 31, 2004 was $1.9 million.

Table of Contents

The following table summarizes the 1997 Stock Option Plan's non-vested stock option activities for the six month period ended December 31, 2005:

| | Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Non-vested options, June 30, 2005 | 913,052 | $ 10.14 |
| Granted | 241,500 | 7.04 |
| Vested | (144,396) | 9.94 |
| Forfeited | (11,997) | 9.95 |
| Non-vested options, December 31, 2005 | 998,159 | 9.42 |

Additional information relating to the 1997 Stock Option Plan at December 31, 2005 and June 30, 2005 is as follows:

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Options exercisable | 937,595 | 862,096 |
| Options available for grant | 568,839 | 790,801 |
| Total reserved common stock shares for stock option plan | 3,350,000 | 3,350,000 |

*The 2004 Spacelabs Medical Stock Option Plan* – We established the 2004 Spacelabs Medical Stock Option Plan in April 2004 under which we authorized the grant of up to 12,500,000 shares of Spacelabs Medical common stock in the form of nonqualified options. Under the 2004 Spacelabs Medical Stock Option Plan, we may grant to our employees, including those of our subsidiaries, consultants and to the non-employee directors of Spacelabs Medical, nonqualified options to purchase shares of the Spacelabs Medical common stock. The Board of Directors of Spacelabs Medical administers the 2004 Spacelabs Medical Stock Option Plan and determines the terms and conditions of each grant, with the advice of and input from the Compensation Committee of the Board of Directors of Spacelabs Medical. Stock options granted under this plan may not be exercised more than ten years after the date of grant.

We estimate the fair value of each stock option award on the date of grant, using a Black-Scholes option pricing model that uses assumptions detailed in the table below. We based expected volatilities on the historical volatilities of the publicly traded common stock of a select peer group of companies that are similar to Spacelabs Medical. We have determined the 2006 expected term assumption under the "Simplified Method" as defined in SAB 107, as we lack historical data and are unable to make reasonable expectations regarding future exercise patterns. The risk free rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding with the expected life of the option.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1550 of 2711

Table of Contents

We have determined the fair value of options issued during the three and six months ended December 31, 2005 and December 31, 2004 on the date of the grant using the Black-Scholes option pricing model with the following weighted average assumptions:

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Expected dividend | — | 0% | 0% | 0% |
| Risk free interest rate | — | 3.0% | 3.3% | 3.0% |
| Expected volatility | — | 51.5% | 51.0% | 51.5% |
| Expected life (in years) | — | 3.6 | 3.6 | 3.6 |

The following summarizes stock option activity for the six months ended December 31, 2005:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding at June 30, 2005 | 7,923,500 | $ 0.70 | | |
| Granted | 739,000 | 1.10 | | |
| Exercised | — | — | | |
| Expired or cancel | (144,375) | 0.73 | | |
| Outstanding at December 31, 2005 | 8,518,125 | $ 0.73 | 3.73 | $ 7,149 |
| Exercisable at December 31, 2005 | 1,402,500 | $ 0.60 | 3.45 | $ 1,361 |

The per-share weighted-average grant-date fair value of stock options issued under the 2004 Spacelabs Medical Stock Option Plan was $0.45 for the six months ended December 31, 2005. There were no grants during the three months ended December 31, 2005. The per-share weighted-average grant-date fair value of stock options granted under the 2004 Spacelabs Medical Stock Option Plan was $0.26 for the three and six months ended December 31, 2004. No option-holders under the 2004 Spacelabs Medical Stock Option Plan exercised their options during the three and six months ended December 31, 2005. The total fair value of options vested for the six months ended December 31, 2005 was $123,000. There were no vested options in the six months ended December 31, 2004.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1551 of 2711

Table of Contents

The following table summarizes the non-vested 2004 Spacelab Medical Stock Option Plan's stock option activities for the period ended December 31, 2005:

| | Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Non-vested options, June 30, 2005 | 6,979,750 | $ 0.29 |
| Granted | 739,000 | 0.45 |
| Vested | (468,750) | 0.26 |
| Forfeited | (134,375) | 0.30 |
| Non-vested options, December 31, 2005 | 7,115,625 | 0.31 |

Additional information relating to the 2004 Spacelabs Medical Stock Option Plan as of December 31, 2005 and June 30, 2005 is as follows:

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Options exercisable | 1,402,500 | 943,750 |
| Options available for grant | 3,981,875 | 4,576,500 |
| Total reserved common stock shares for stock option plan | 12,500,000 | 12,500,000 |

*2005 Spacelabs Healthcare Plan* - We established the 2005 Spacelabs Healthcare Plan in October 2005 under which we authorized the grant of up to 10,000,000 shares of Spacelabs Healthcare common stock. Under the 2005 Spacelabs Healthcare Plan, we may grant to our employees, including those of our subsidiaries, consultants and to the non-employee directors of Spacelabs Healthcare, incentive or nonqualified options to purchase shares of the Spacelabs Healthcare common stock. The Board of Directors of Spacelabs Healthcare administers the 2005 Spacelabs Healthcare Plan and determines the terms and conditions of each grant, with the advice of and input from the Compensation Committee of the Board of Directors of Spacelabs Healthcare. Stock options granted under this plan may not be exercised more than ten years after the date of grant.

We estimate the fair value of each option award on the date of grant using a Black-Scholes option pricing model that uses assumptions detailed in the table below. We based expected volatilities on the historical volatilities of the publicly traded common stock of a select peer group of companies that are similar to Spacelabs Healthcare. We have determined the 2006 expected term assumption under the "Simplified Method" as defined in SAB 107, as we lack historical data and are unable to make reasonable expectations regarding future exercise patterns. The risk free rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding with the expected life of the option.

Table of Contents

We determined the fair value of the options issued during the three and six months ended December 31, 2005 and 2004 on the date of the grant using the Black-Scholes option pricing model with the following weighted average assumptions:

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Expected dividend | 0% | — | 0% | — |
| Risk free interest rate | 4.4% | — | 4.4% | — |
| Expected volatility | 49.5% | — | 49.5% | — |
| Expected life (in years) | 3.6 | — | 3.6 | — |

The following table summarizes the 2005 Spacelabs Healthcare Plan's stock option activities for the six months ended December 31, 2005:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding at June 30, 2005 | | | | |
| Granted | 190,000 | $ 2.08 | | |
| Exercised | — | — | | |
| Expired or cancel | — | — | | |
| Outstanding at December 31, 2005 | 190,000 | $ 2.08 | 4.90 | $ 88 |
| Exercisable at December 31, 2005 | — | — | — | — |

The per-share weighted-average grant-date fair value of stock options granted under the 2005 Spacelabs Healthcare Plan was $1.12 for the three months ended December 31, 2005. We made no grants under this plan during prior periods. No option holders under the 2005 Spacelabs Healthcare Plan exercised their options during the three months ended December 31, 2005. There were no vested options under the 2005 Spacelabs Healthcare Plan in the six months ended December 31, 2005.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1553 of 2711

Table of Contents

The following table summarizes the non-vested 2005 Spacelabs Healthcare Plan's stock option activities for the period ended December 31, 2005:

| | Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Non-vested options, June 30, 2005 | — | |
| Granted | 190,000 | $ 1.12 |
| Vested | — | |
| Forfeited | — | |
| Non-vested options, December 31, 2005 | 190,000 | $ 1.12 |

Additional information relating to the 2005 Spacelabs Healthcare Plan's stock options at December 31, 2005 as follows:

| | December 31, 2005 |
|---|---|
| Options exercisable | — |
| Options available for grant | 9,810,000 |
| Total reserved common stock shares for stock option plan | 10,000,000 |

*1998 Employee Stock Purchase Plan* – Historically, we have offered eligible employees the option to purchase our common stock at 85% of the lesser of the fair market value of our common stock determined either as of (i) the first day of each offering period or (ii) the last day of each offering period. Offering periods commence on January 1 and end on June 30 of each year and a second offering period commences on July 1 and ends on December 31 of each year. Participating employees purchase such common stock through payroll deductions. Under the 1998 Employee Stock Purchase Plan, we are authorized to issue up to 200,000 shares of common stock. The compensation expense associated with the 1998 Employee Stock Purchase Plan included in the statement of operations for the six month period ended December 31, 2005 was not material.

**Stock-Based Compensation *(As Restated)***

Effective July 1, 2005, we adopted the fair value measurement provisions of SFAS 123R and accordingly have adopted the modified prospective application method. Under the provisions of SFAS 123R, the compensation cost relating to share-based payment transactions is to be recognized in the financial statements. Under SFAS 123R, the fair value of each option award is estimated on the date of grant using a Black-Scholes option-pricing model and amortized to expense straight-line over the option's vesting period.

During the six months ended December 31, 2005, each of the 1997 Stock Option Plan, 2004 Spacelabs Medical Stock Option Plan, 2005 Spacelabs Healthcare Plan and the 1998 Employee Stock Purchase Plan were in effect. The compensation cost in connection with these plans that has been charged against income for the three and six months ended December 31, 2005 was approximately $974,000 and $2.0 million, respectively, net of tax. The total income tax benefit recognized in the statement of operations

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1554 of 2711
Table of Contents

for share-based compensation arrangements for three and six months ended December 31, 2005 was approximately $326,000 and $582,000, respectively.

The compensation cost that has been charged against income for these plans for the three and six months ending December 31, 2005 is as follows (in thousands):

| | Three months ended December 31, 2005 | Six months ended December 31, 2005 |
|---|---|---|
| Cost of goods sold | $ 53 | $ 108 |
| Selling, general and administrative | 1,144 | 2,218 |
| Research and Development | 103 | 215 |
| | $ 1,300 | $ 2,541 |

As of December 31, 2005, total unrecognized compensation cost related to non-vested share-based compensation arrangements granted under the 1997 Stock Option Plan amounted to $4.9 million. Under the 2004 Spacelabs Medical Stock Option Plan it amounted to $1.4 million. Under the 2005 Spacelabs Healthcare Plan it amounted to $172,000. We expect to recognize these costs over a weighted-average period of 1.4 years with respect to the 1997 Stock Option Plan, 1.7 years with respect to the 2004 Spacelabs Medical Stock Option Plan, and 2.9 years with respect to the 2005 Spacelabs Healthcare Plan.

Cash received from option exercises under all share-based payment arrangements amounted to $776,000 for the six months ended December 31, 2005 and $836,000 for the six months ended December 31, 2004. The actual tax benefit realized for the tax deductions associated with option exercises under all share-based payment arrangements totaled $195,800 for the six months ended December 31, 2005 and $416,500 for the six months ended December 31, 2004.

Prior to July 1, 2005 and the adoption of SFAS 123R, we accounted for our employee stock option plans by applying the intrinsic value-based method of accounting prescribed by Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations ("APB Opinion 25"). Among these interpretations, FASB Interpretation No. 44, "Accounting for Certain Transactions involving Stock Compensation, an interpretation of APB Opinion No. 25," issued in March 2000, directs that compensation expense should generally be determined on the date of grant, but only if the fair value of the underlying stock exceeded the exercise price on such date. We adopted the disclosure-only requirements of SFAS 123, "Accounting for Stock-Based Compensation," ("SFAS 123") and SFAS No. 148, "Accounting for Stock-Based Compensation – Transition and Disclosure," ("SFAS 148"), an amendment to SFAS 123. These statements establish accounting and disclosure requirements using a fair-value based method of accounting for stock-based employee compensation plans. As permitted by SFAS 123 and SFAS 148, we elected to continue to apply the intrinsic-value based method described above.

We accounted for stock-based awards to non-employees in accordance with SFAS 123, as amended by SFAS 148, and Emerging Issues Task Force No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," whereby the fair value of such options is determined using the Black-Scholes option pricing model at the earlier of the date at which the non-employee's performance is complete or a performance commitment is reached.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1555 of 2711
Table of Contents

As such, prior to July 1, 2005, we applied APB Opinion 25 in accounting for substantially all of our stock-based awards and, accordingly, except for certain options issued to non-employees, as discussed above, we recognized no compensation cost using the intrinsic value method for our stock-based compensation in the accompanying financial statements.

Subsequent to the issuance of our fiscal year 2004 consolidated financial statements, our management determined that total stock-based employee compensation expense determined under the fair value based method, net of related tax effects, and the per-share weighted-average fair value of stock options granted, for fiscal years 2003 and 2004, had been calculated incorrectly. As a result, the amounts presented below for the three and six months ended December 31, 2004 have been restated from the amounts previously reported. For the three month ended December 31, 2004, pro forma net income decreased by $66,000 and pro forma basic and diluted earnings did not change. For the six months ended December 31, 2004, pro forma net income decreased by $509,000, pro forma basic earnings per share decreased by $0.04 and pro forma diluted earnings per share decreased by $0.03.

The restated per share weighted-average fair value of stock options granted under the 1997 Stock Option Plan was $9.23 for the six months ended December 31, 2004. This restatement did not impact our consolidated financial position, results of operations or cash flows for any of the periods presented.

If the fair value based method had been applied in measuring stock-based compensation expense under SFAS 123, as amended by SFAS 148, the pro forma effect on net earnings and net earnings per share would have been as follows (in thousands, except per share amounts):

| | Three months ended December 31, 2004 (Restated) | Six months ended December 31, 2004 (Restated) |
|---|---|---|
| **Net income as reported** | $ 2,458 | $ 3,767 |
| **Add:** Stock-based employee compensation expense included in reported net income-net of related tax effects | — | — |
| **Deduct:** Stock-based employee compensation expense determined under the fair value-based method for all awards-net of related tax effects | (1,150) | (2,249) |
| **Pro forma net income** | $ 1,308 | $ 1,518 |
| **Earnings per share:** | | |
| Basic-as reported | $ 0.15 | $ 0.23 |
| Basic-pro forma | $ 0.08 | $ 0.09 |
| Diluted-as reported | $ 0.15 | $ 0.23 |
| Diluted-pro forma | $ 0.08 | $ 0.09 |

**Earnings per Share**

We have reflected the provisions of SFAS No. 128, “Earnings per Share,” in the accompanying condensed consolidated financial statements for all periods presented. Earnings per common share are computed using the weighted-average number of shares outstanding during the period. Diluted earnings

Table of Contents

per common share are computed using the weighted-average number of shares outstanding during the period plus the dilutive effect of potential common stock. Potential common stock types are stock options and purchase rights.

Stock options and rights to purchase a total of 2,295,648 and 2,229,819 shares of our common stock, computed on a weighted-average basis, that were outstanding for the three and six months ended December 31, 2005 were not included in diluted earnings per common share because to do so would have been anti-dilutive. Stock options and purchase rights totaling 2,091,990 shares were outstanding for the three and six months ended December 31, 2004, but were not included in diluted earnings per common share because to do so would have been anti-dilutive. The following table reconciles the numerator and denominator used in calculating earnings per common share and earnings per common share assuming dilution.

| | Three months ended December 31, 2005 | | |
|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Income per common share** | | | |
| Net Income | $ 85,000 | 16,299,337 | $ 0.01 |
| Effect of dilutive interest in subsidiary stock | (92,000) | | |
| (Loss) available to common shareholders | (7,000) | | |
| **Effect of dilutive securities** | | | |
| (Treasury stock method) | | 191,377 | |
| **(Loss) per common share assuming dilution** | | | |
| (Loss) available to common shareholders, assuming dilution | $ (7,000) | 16,490,714 | $ (0.00) |

| | Three months ended December 31, 2004 | | |
|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Income per common share** | | | |
| Net Income | $2,458,000 | 16,168,778 | $ 0.15 |
| Effect of dilutive interest in subsidiary stock | — | | |
| Income available to common shareholders | 2,458,000 | | |
| **Effect of dilutive securities** | | | |
| (Treasury stock method) | | 423,946 | |
| **Income per common share assuming dilution** | | | |
| Income available to common shareholders, assuming dilution | $2,458,000 | 16,592,724 | $ 0.15 |

Table of Contents

| | Six months ended December 31, 2005 | | |
|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **(Loss) per common share** | | | |
| Net Loss | $(4,103,000) | 16,270,205 | $ (0.25) |
| Effect of dilutive interest in subsidiary stock | (175,000) | | |
| (Loss) available to common shareholders | (4,278,000) | | |
| **Effect of dilutive securities** | | | |
| (Treasury stock method) | | — | |
| **(Loss) per common share assuming dilution** | | | |
| (Loss) available to common shareholders, assuming dilution | $(4,278,000) | 16,270,205 | $ (0.26) |

| | Six months ended December 31, 2004 | | |
|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Earnings per common share** | | | |
| Net Income | $3,767,000 | 16,185,269 | $ 0.23 |
| Effect of dilutive interest in subsidiary stock | | | |
| Income available to common shareholders | 3,767,000 | | |
| **Effect of dilutive securities** | | | |
| (Treasury stock method) | | 392,483 | |
| **Earnings per common share assuming dilution** | | | |
| Income available to common shareholders, assuming dilution | $3,767,000 | 16,577,752 | $ 0.23 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1558 of 2711

Table of Contents

**Comprehensive Income**

Comprehensive income is computed as follows (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Net income (Loss) | $ 85 | $ 2,458 | $ (4,103) | $ 3,767 |
| Foreign currency translation adjustments | (1,150) | 2,343 | (985) | 2,659 |
| Less: reclassification adjustment to net income (net of income tax provision of $58 and $46, respectively) | (134) | — | (108) | — |
| Comprehensive Income (Loss) | $ (1,199) | $ 4,801 | $ (5,196) | $ 6,426 |

**Line of Credit Borrowings and Long-Term Debt**

In May 2005, we entered into a second amended and restated credit agreement with Bank of the West. The agreement provides for a $50 million senior revolving line of credit, including a letter-of-credit, foreign exchange facility and an acquisition credit facility, which are secured by substantially all of the assets of our U.S. subsidiaries and our stock ownership in two significant foreign subsidiaries. On October 13, 2005, we entered into a first amendment to the credit agreement. As amended, the credit agreement includes an asset–based credit facility of up to $50 million with revised financial covenants. Some of the covenants include maintaining a specified tangible net worth, ratio of total liabilities to effective tangible net worth, and capital expenditure limitations, among others. As of December 31, 2005, we were in compliance with the covenants. As of December 31, 2005, our borrowing capacity as calculated under the credit agreement was $46 million of which $2.1 million was outstanding under the revolving line of credit and $9.2 million issued and outstanding under the letter of credit facility.

Table of Contents

Long-Term debt consisted of the following (in thousands):

| | December 31, 2005 | June 30, 2005 |
|---|---|---|
| Twenty-year term loan payable in quarterly installments of £34 (approximately $59 at December 31, 2005) until paid in full on December 1, 2024. Interest is due quarterly at a rate of three-months LIBOR plus 1.2% (5.84% at December 31,2005) | $ 4,509 | $ 4,817 |
| Four-year loan payable in monthly installments of $34 until paid in full at October 23, 2009. Interest is due monthly at the rate of 7.85% | 1,375 | — |
| Capital lease obligation due through fiscal year 2008 | 371 | 507 |
| Fifteen-year term loan payable in monthly installments of $0.8 until paid in full at July 27, 2020. The interest rate is 0.0%. | 150 | — |
| One year demand loan payable (principal and interest) at the end of the one year term on July 27, 2006. Interest rate is at NY prime rate (6.25% at December 31, 2005) | 175 | — |
| Other | 25 | 27 |
| | 6,605 | 5,351 |
| Less current portion of long-term debt and capital lease obligation | 1,037 | 499 |
| Long -term portion of debt | $ 5,568 | $ 4,852 |

**Commitments and Contingencies**

In November 2002, L-3 Communications Corporation brought suit against us for a declaratory judgment that L-3 Communications Corporation had not breached its obligations to us concerning the acquisition of PerkinElmer's, Security Detection Systems Business. In February 2003, we answered and asserted counterclaims against L-3 for, among other things, fraud, breach of fiduciary duty, breach of contract and failure to negotiate in good faith. In March 2003, L-3 Communications Corporation amended its complaint and asserted claims against us for breach of contract, failure to negotiate in good faith, and tortious interference. In its amended complaint, L-3 Communications Corporation requested both a declaratory judgment that it had fulfilled its obligations and an award of damages for an unspecified amount. In March 2005, the court in this action ruled that as a matter of law, L-3 Communications Corporation owed us a fiduciary duty. These actions are pending in the District Court for the Southern District of New York.

During 2003 and 2004, we were informed that Science Applications International Corporation ("SAIC") had made statements to prospective buyers of our gamma ray mobile detection product infringed upon unspecified SAIC patents. In April 2004, we received a letter from SAIC specifying a patent upon which SAIC claimed the GaRDS infringed. Contrary to SAIC's claim, the patent cited by SAIC actually distinguished the technology used in GaRDS as a different, pre-existing technology. We therefore filed a lawsuit in the U.S. District Court, Central District of California seeking declaratory judgment. SAIC has since counter-claimed for patent infringement, citing the same patent, and unfair competition.

In March 2004, certain individuals named us and our subsidiary, Spacelabs Medical, as well as a hospital located in Bexar County, Texas, in a petition claiming that the individuals suffered injuries in March 2003 caused, in part, by a defective monitoring system manufactured by Spacelabs Medical. The amount of the claim has not yet been specified. The petition was filed in the 285th Judicial District Court in Bexar County, Texas.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1560 of 2711

Table of Contents

In April 2004, certain individuals named our subsidiary, Spacelabs Medical, as well as several other defendants, in a petition that alleges, among other things, that a product possibly manufactured by Spacelabs Medical failed to properly monitor a hospital patient thereby contributing to the patient's death in November 2001. The amount of the claim has not yet been specified. The petition was filed in the 21st Judicial District Court, Parish of Tangipahoa, Louisiana.

In February 2005, Electromedical, a Greek distribution company, filed an action in the courts of Greece claiming that Spacelabs Medical orally agreed to appoint Electromedical as Spacelabs Medical's exclusive Greek distributor, but failed to do so. Electromedical claims that it incurred significant expenses as a result of Spacelabs Medical's actions, and demands Euro 872,414 (approximately $1,029,449 as of December 31, 2005) compensation.

In October 2005, Security Detection Systems, Inc. filed a complaint alleging that certain "Metorex" brand people screening systems sold by our security and inspection systems group infringe a specified patent held by Security Detection Systems, Inc. This action is currently pending in the U.S. District Court for the Western District of Texas, El Paso Division. In November 2005, we filed a motion to remove this action to the U.S. District court for the Central District of California.

In accordance with SFAS No. 5, "Accounting for Contingencies," we have not accrued for loss contingencies relating to the above matters because we believe that, although unfavorable outcomes in the proceedings may be possible, they are not considered by management to be probable or reasonably estimable. If one or more of these matters are resolved in a manner adverse to us, their impact on our results of operations, liquidity and financial position could be material.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in our quarterly and annual reports. In our opinion after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, results of operations, or cash flows.

*Provision for Warranties* - We offer our customers warranties on products we sell to them. These warranties typically provide for repairs and maintenance of our products for a specified time period. Concurrent with the sale of products, a provision for estimated warranty expenses is recorded with a corresponding increase in cost of goods sold. This provision is adjusted periodically based on historical and anticipated experience. Actual expenses of repairs under warranty, including parts and labor, are charged to this provision when incurred.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1561 of 2711

Table of Contents

The changes in warranty provisions were as follows (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Balance as of beginning of period | $ 6,291 | $ 8,757 | $ 6,641 | $ 9,190 |
| Additions | 1,957 | 1,844 | 2,767 | 2,809 |
| Reductions for warranty repair costs | (1,487) | (1,921) | (2,647) | (3,319) |
| Balance as of end of period | $ 6,761 | $ 8,680 | $ 6,761 | $ 8,680 |

**Retirement Benefit Plans**

We operate a defined benefit plan for certain employees located in the United Kingdom. The benefits under this plan are based on years of service and the employees' highest 12 months' compensation during the last five years of employment. The net periodic expense for this defined benefit plan consists of (in thousands):

| | Three months ended, December 31, | | Six months ended, December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Service cost | $ 9 | $ 17 | $ 21 | $ 32 |
| Interest cost | 41 | 50 | 88 | 95 |
| Expected return on plan assets | (29) | (28) | (60) | (53) |
| Amortization of net loss | 26 | 31 | 60 | 58 |
| Net periodic pension expense | $ 47 | $ 70 | $ 109 | $ 132 |

For the three months ended December 31, 2005, we made a contribution to this pension plan of $32,300 and for the six months ended December 31, 2005 we made a contribution of $90,300. We presently anticipate contributing an additional $129,200 to fund this pension plan during the six-month period ending June 30, 2006, for a fiscal year total of $219,500.

**Segment Information**

We have adopted SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information" ("SFAS 131"). We have reflected the provisions of SFAS 131 in the accompanying condensed consolidated financial statements for all periods presented. We operate in three identifiable industry segments, (a) security and inspection systems ("Security Group"), (b) medical monitoring and anesthesia systems ("Healthcare Group") and (c) optoelectronic devices and value-added subsystems ("Optoelectronics and Manufacturing Group"). We also have a corporate segment ("Corporate") that includes executive compensation and certain other general and administrative expenses, expenses related to stock issuances and legal, audit and other professional service fees not allocated to product segments.

Table of Contents

Both the Security Group and the Healthcare Group comprise primarily end-product businesses whereas the businesses of the Optoelectronics and Manufacturing Group primarily supplies components and subsystems to original equipment manufacturers, including to the businesses of the Security and Healthcare Groups. All inter-company sales are eliminated in consolidation.

The following tables present the operations by product segment (in thousands):

**Three months ended December 31, 2005**

| | Security Group | Healthcare Group (1) | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $30,378 | $ 60,999 | $ 25,761 | $ — | $ — | $117,138 |
| Revenue between product segments | — | — | 5,367 | — | (5,367) | — |
| Total revenue | $30,378 | $ 60,999 | $ 31,128 | $ — | $ (5,367) | $117,138 |
| (Loss) Income from operations (2) | $ (651) | $ 5,319 | $ 2,581 | $ (4,293) | $ (83)(3) | $ 2,873 |

**Three months ended December 31, 2004**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $32,037 | $ 54,000 | $ 16,494 | $ — | $ — | $102,531 |
| Revenue between product segments | — | — | 5,652 | — | (5,652) | — |
| Total revenue | $32,037 | $ 54,000 | $ 22,146 | $ — | $ (5,652) | $102,531 |
| (Loss) Income from operations | $ (1,283) | $ 4,863 | $ 2,004 | $ (2,062) | $ (280)(3) | $ 3,242 |

(1) On October 24, 2005, we completed the placing of approximately 20% of the equity in Spacelabs Healthcare with institutional investors. The placing raised approximately $26.3 million, net of expenses. These shares of common stock of Spacelabs Healthcare began trading on the AIM, a market administered by the London Stock Exchange on October 31, 2005 under the ticker symbol "SLAB."

(2) The income/(loss) from operations for the three months ended December 31, 2005, includes stock based compensation expense of $1.3 million, resulting from the adoption of SFAS 123R, as described above. SFAS 123R compensation expense incurred by each of the operating segments was $206,000 for the Security Group, $290,000 for the Healthcare Group, $126,000 for the Optoelectronics and Manufacturing Group and $678,000 for the Corporate segment.

(3) Adjustment represents elimination of inter-company profit recognized during the period on amounts in ending inventory as of December 31, 2005.

Table of Contents

**Six months ended December 31, 2005**

| | Security Group | Healthcare Group (1) | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $57,341 | $112,370 | $ 49,297 | $ — | $ — | $219,008 |
| Revenue between product segments | — | — | 9,607 | — | (9,607) | — |
| Total revenue | $57,341 | $112,370 | $ 58,904 | $ — | $ (9,607) | $219,008 |
| (Loss) income from operations (2) | $ (3,844) | $ 6,502 | $ 3,783 | $(10,115) | $ 33(3) | $ (3,641) |

**Six months ended December 31, 2004**

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations | Total |
|---|---|---|---|---|---|---|
| External customer revenue | $61,980 | $ 96,804 | $ 31,391 | $ — | $ — | $190,175 |
| Revenue between product segments | — | — | 9,917 | — | (9,917) | — |
| Total revenue | $61,980 | $ 96,804 | $ 41,308 | $ — | $ (9,917) | $190,175 |
| Income (loss) from operations | $ 1,076 | $ 5,098 | $ 3,689 | $ (4,426) | $ (417)(3) | $ 5,020 |

(1) On October 24, 2005, we completed the placing of approximately 20% of the equity in Spacelabs Healthcare with institutional investors. The placing raised approximately $26.3 million, net of expenses. These shares of common stock of Spacelabs Healthcare began trading on the AIM, a market administered by the London Stock Exchange on October 31, 2005 under the ticker symbol "SLAB."

(2) The (loss) income from operations for the six months ended December 31, 2005, includes stock based compensation expense of $2.5 million, resulting from the adoption of SFAS 123R, as described above. SFAS 123R compensation expense incurred by each of the operating segments was $447,000 for the Security Group, $457,000 for the Healthcare Group, $277,000 for the Optoelectronics and Manufacturing Group and $1.4 million for Corporate segment. The income (loss) from operations for the six months ended December 31, 2005 included a restructuring charge of $800,000. The Security Group incurred restructuring charges of $511,000 and the Optoelectronics and Manufacturing Group incurred restructuring charges of $289,000, both amounts stemming from costs incurred during the consolidation by such groups of certain of their facilities. In addition, for the six months ended December 31, 2005, we reached a final settlement relating to an international receivable for which the Security Group had, in the three months ended March 31, 2005, recorded a $2.5 million charge. Under the terms of the settlement, the Security Group recovered the majority of the equipment from the customer and incurred an additional $657,000 pre-tax bad-debt expense in the six months ended December 31, 2005.

(3) Adjustment represents elimination of inter-company profit recognized during the period on amounts in ending inventory as of December 31, 2005.

Table of Contents

The reconciliation of segment information to our consolidated net income is as follows (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Total segment income (loss) from operations | $ 2,873 | $ 3,242 | $(3,641) | $5,020 |
| Interest income | 69 | 103 | 89 | 191 |
| Interest expense | (399) | (98) | (950) | (154) |
| Gain on sale of marketable securities | 349 | — | 349 | — |
| Income (Loss) before provision for income taxes and minority interest | 2,892 | 3,247 | (4,153) | 5,057 |
| Provision (Benefit) for income taxes | 1,861 | 789 | (996) | 1,358 |
| Minority interest | (946) | — | (946) | 68 |
| Net income (loss) | $ 85 | $ 2,458 | $(4,103) | $3,767 |

The following table presents assets by product segment (in thousands):

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Corporate | Eliminations(1) | Total |
|---|---|---|---|---|---|---|
| As of December 31, 2005 | $147,276 | $138,173 | $ 66,274 | $ 21,108 | $ (3,378) | $369,453 |
| As of June 30, 2005 | $143,168 | $127,906 | $ 57,446 | $ 21,603 | $ (3,003) | $347,120 |

(1) Eliminations primarily reflect the elimination of inter-company profit in ending inventory. These profits will be realized when inventory is shipped to external customers.

Table of Contents

The following tables present revenues by geographical area (in thousands):

**Three months ended December 31, 2005**

| | North America | Europe | Asia | Eliminations | Total |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| External customer revenue | $ 85,793 | $23,945 | $ 7,400 | $ — | $117,138 |
| Revenue between product segments | 2,465 | — | 2,902 | (5,367) | — |
| Total revenue | $ 88,258 | $23,945 | $10,302 | $ (5,367) | $117,138 |

**Three months ended December 31, 2004**

| | North America | Europe | Asia | Eliminations | Total |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| External customer revenue | $ 79,506 | $17,533 | $ 5,492 | $ — | $102,531 |
| Revenue between product segments | 2,656 | — | 2,996 | (5,652) | — |
| Total revenue | $ 82,162 | $17,533 | $ 8,488 | $ (5,652) | $102,531 |

**Six months ended December 31, 2005**

| | North America | Europe | Asia | Eliminations | Total |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| External customer revenue | $160,085 | $45,478 | $13,445 | $ — | $219,008 |
| Revenue between product segments | 4,113 | — | 5,494 | (9,607) | — |
| Total revenue | $164,198 | $45,478 | $18,939 | $ (9,607) | $219,008 |

**Six months ended December 31, 2004**

| | North America | Europe | Asia | Eliminations | Total |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| External customer revenue | $149,181 | $31,266 | $ 9,728 | $ — | $190,175 |
| Revenue between product segments | 4,609 | — | 5,308 | (9,917) | — |
| Total revenue | $153,790 | $31,266 | $15,036 | $ (9,917) | $190,175 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1566 of 2711

Table of Contents

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Cautionary Statement

***Certain statements contained in this report on Form 10-Q that are not related to historical results, including, without limitation, statements regarding our business strategy, objectives and future financial position, are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Exchange Act of 1934, as amended, and involve risks and uncertainties. These forward-looking statements may be identified by the use of forward-looking terms such as "anticipate," "believe," "expect," "may," "could," "likely to," "should," or "will," or by discussions of strategy that involve predictions which are based upon a number of future conditions that ultimately may prove to be inaccurate. Statements in this report that are forward-looking are based on current expectations and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties including, but not limited to, the possibility that the demand for our products may decline or not materialize and such other risks and uncertainties as are described in this report on Form 10-Q, our Annual Report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission. Such factors, of course, do not include all factors that might affect our business and financial condition. Although we believe that the assumptions upon which our forward-looking statements are based are reasonable, such assumptions could prove to be inaccurate and actual results could differ materially from those expressed in or implied by the forward-looking statements. All forward-looking statements contained in this Quarterly Report on Form 10-Q are qualified in their entirety by this statement. We undertake no obligation other than as may be required under securities laws to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.***

### Critical Accounting Policies and Estimates

We base our discussion and analysis of our financial condition and results of operations on our condensed consolidated financial statements, which have been prepared in conformity with accounting principles generally accepted in the United States of America. Our preparation of these consolidated financial statements requires us to make judgments and estimates that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statement and the reported amount of revenues and expenses during the reporting period. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from such estimates under different assumptions or conditions.

We have described our critical accounting policies in our Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 29, 2005.

### Recent Accounting Pronouncements

In December 2004, the FASB issued SFAS 123R, which is effective for the annual periods beginning after June 15, 2005. SFAS 123R was effective for us beginning July 1, 2005. SFAS 123R requires all share-based payments to employees, including grants of employee stock options and purchases under employee stock purchase plans, to be recognized as an operating expense in the income statement.

Effective July 1, 2005, we adopted the fair value measurement provisions of the SFAS 123R and accordingly have adopted the modified prospective application method. Under the provisions of SFAS 123R, the compensation cost relating to share-based payment transactions is to be recognized in the financial statements. Under SFAS 123R, the fair value of each option award is estimated on the date of grant using a Black-Scholes option-pricing model and amortized to expense straight-line over the options' vesting period of three years.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1567 of 2711
Table of Contents

During the six months ending December 31, 2005, each of the 1997 Stock Option Plan, 2004 Spacelabs Medical Stock Option Plan, 2005 Spacelabs Healthcare Plan and the 1998 Employee Stock Purchase Plan were in effect. The compensation cost in connection with these plans that has been charged against income for the three and six months ended December 31, 2005 was approximately $974,000 and $2 million, respectively, net of tax. The total income tax benefit recognized in the statement of operations for share-based compensation arrangements for three and six months ended December 31, 2005 was approximately $326,000 and $582,000, respectively.

As of December 31, 2005, total unrecognized compensation cost related to non-vested share-based compensation arrangements granted under the 1997 Stock Option Plan amounted to $4.9 million. Under the 2004 Spacelabs Medical Stock Option Plan it amounted to $1.4 million. Under the 2005 Spacelabs Healthcare Plan it amounted to $172,000. We expect to recognize these costs over a weighted-average period of 1.4 years with respect to the 1997 Stock Option Plan, 1.7 years with respect to the 2004 Spacelabs Medical Stock Option Plan, and 2.9 years with respect to the 2005 Spacelabs Healthcare Plan.

Prior to July 1, 2005 and the adoption of SFAS 123R, we accounted for our employee stock option plans by applying the intrinsic value-based method of accounting prescribed by Accounting Principles Board (“APB”) Opinion No. 25, “Accounting for Stock Issued to Employees,” and related interpretations (“APB Opinion 25”). Among these interpretations, FASB Interpretation No. 44, “Accounting for Certain Transactions involving Stock Compensation, an interpretation of APB Opinion No. 25,” issued in March 2000, directs that compensation expense should generally be determined on the date of grant, but only if the fair value of the underlying stock exceeded the exercise price on such date. We adopted the disclosure-only requirements of SFAS 123, “Accounting for Stock-Based Compensation,” (“SFAS 123”) and SFAS No. 148, “Accounting for Stock-Based Compensation – Transition and Disclosure,” (“SFAS 148”), an amendment to SFAS 123. These statements establish accounting and disclosure requirements using a fair-value based method of accounting for stock-based employee compensation plans. As permitted by SFAS 123 and SFAS 148, we elected to continue to apply the intrinsic-value based method described above.

We accounted for stock-based awards to non-employees in accordance with SFAS 123, as amended by SFAS 148, and Emerging Issues Task Force No. 96-18, “Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services,” whereby the fair value of such options is determined using the Black-Scholes option pricing model at the earlier of the date at which the non-employee’s performance is complete or a performance commitment is reached.

As such, prior to July 1, 2005, we applied APB Opinion 25 in accounting for substantially all of our stock-based awards and, accordingly, except for certain options issued to non-employees, as discussed above, we recognized no compensation cost using the intrinsic value method for our stock-based compensation in the accompanying financial statements.

Other recent accounting pronouncements are described in Item 1 – “Condensed Consolidated Financial Statements – Notes to Condensed Consolidated Financial Statements.”

**Executive Summary**

Our revenues for the three months ended December 31, 2005 were $117.1 million, compared to $102.5 million for the three months ended December 31, 2004, an increase of 14%. Revenues for the security and inspection systems group were $30.4 million, or 26% of total revenues. Revenues for the medical monitoring and anesthesia systems group were $61.0 million, or 52% of total revenues. Revenues for the optoelectronic devices and value-added manufacturing group were $25.8 million, or 22% of total revenues. In addition, the optoelectronic devices and value-added subsystems group realized inter-company sales of $5.4 million from products and services sold to the security and inspection systems and medical monitoring and anesthesia systems groups.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1568 of 2711
Table of Contents

In the second quarter of fiscal year 2006, our total revenues increased by 14%, while operating income fell 11% compared to the prior year period. Overall growth in sales of patient monitoring systems, both in U.S. and international markets, and the inclusion of sales of anesthesia systems sold by Blease, a company we acquired in February 2005, drove overall revenue growth. The optoelectronics and value-added manufacturing group also contributed to such growth, both as a result of increased sales of commercial optoelectronics and increased levels of contract manufacturing. However, the revenues of the security and inspection systems group decreased in the second quarter of fiscal year 2006 when compared to the same prior-year period. This decrease is primarily attributable to lower cargo and vehicle inspection sales, partially offset by growth in sales of baggage and parcel inspection systems.

Revenue growth in patient monitoring systems, which products historically have maintained a higher gross margin than many of our other products, positively impacted our operating income, as did sales of baggage and parcel inspection, cargo and vehicle inspection, and people screening systems, which achieved higher gross margins as compared to prior periods. These security and inspection systems achieved higher gross margins due to product mix as well as the impact of a restructuring program undertaken by the security and inspection systems group beginning in January 2005.

Operating income was adversely impacted by higher selling, general and administrative expenses due to currency exchange, high professional fees and services, and the impact of stock compensation expenses as required by SFAS 123R.

**Results of Operations**

The following financial ratios table reflects certain consolidated statement of operations data as a percentage of revenue for the periods presented.

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 61.5% | 64.4% | 62.5% | 63.1% |
| Gross profit | 38.5% | 35.6% | 37.5% | 36.9% |
| Selling, general and administrative | 28.6% | 25.0% | 30.6% | 26.5% |
| Research and development | 7.4% | 6.9% | 8.0% | 7.2% |
| Restructuring charge | 0.0% | 0.0% | 0.4% | 0.0% |
| Management retention bonuses | 0.0% | 0.5% | 0.3% | 0.6% |
| Operating Income | 2.5% | 3.2% | (1.7)% | 2.6% |

*Revenues* – Total revenues for the three months ended December 31, 2005 increased by $14.6 million, or 14%, to $117.1 million from $102.5 million for the comparable prior-year period. Total revenues for the six months ended December 31, 2005 increased by $28.8 million, or 15%, to $219.0 million, from $190.2 million for the comparable prior six month period.

Revenues for the security and inspection systems group for the three months ended December 31, 2005, decreased by $1.6 million, or 5%, to $30.4 million, from $32.0 million for the comparable prior-year period. The revenues of the security and inspection systems group were lower in the three months ended December 31, 2005 due to lower sales of cargo and vehicle inspection products. Of the security and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1569 of 2711

Table of Contents

inspection systems group's $30.4 million in revenues for the three months ended December 31, 2005, $25.7 million were attributable to sales of baggage and parcel inspection and people screening systems and $4.7 million were attributable to sales of cargo and vehicle inspection systems. The baggage and parcel inspection and the people screening systems business grew by $2.1 million due to increased x-ray systems and service revenue. Revenues for the security and inspection systems group for the six months ended December 31, 2005, decreased by $4.7 million, or 8%, to $57.3 million, from $62.0 million for the comparable prior-year period. The decrease was attributable primarily to decreases in domestic and international sales of cargo and vehicle inspection systems and was partially offset by higher sales of baggage and parcel inspection and people screening systems as well as higher service revenues.

Revenues for the medical monitoring and anesthesia systems group for three months ended December 31, 2005 increased by $7.0 million, or 13%, to $61.0 million, from $54.0 million for the comparable prior-year period. Revenues for the medical monitoring and anesthesia systems group for the six months ended December 31, 2005, increased by $15.6 million, or 16%, to $112.4 million, from $96.8 million for the comparable prior-year period. The increase was primarily attributable to increased sales of patient monitoring systems and the inclusion of the revenues of Blease, a company we acquired in February 2005. Revenues for Blease were $3.7 million for the three months ended December 31, 2005 and $7.5 million for the six months ended December 31, 2005.

Revenues for the optoelectronics devices and value-added subsystems group for the three months ended December 31, 2005 increased by $9.3 million, or by 56%, to $25.8 million, from $16.5 million for the comparable prior-year period. Revenues for the Optoelectronics and Manufacturing Group for the six months ended December 31, 2005, increased by $17.9 million, or 57%, to $49.3 million, from $31.4 million for the comparable prior-year period. This increase was primarily attributable to increases in contract manufacturing as well as growth in both domestic and international commercial optoelectronics sales.

The optoelectronics devices and value-added subsystems group reported inter-company revenues for the three-month period ended December 31, 2005 of $5.4 million, a decrease of 5%, from $5.7 million for the comparable prior-year period. Inter-company revenues for the Optoelectronics and Manufacturing Group for the six months ended December 31, 2005 were $9.6 million, a decrease of 3% from $9.9 million for the comparable prior-year period.

*Gross Profit* – Gross profit consists of revenues less cost of goods sold. Cost of goods sold consists of material, labor and manufacturing overhead. Gross profit increased by $8.6 million, or 24%, to $45.1 million for the three months ended December 31, 2005, from $36.5 million for the comparable prior-year period. As a percentage of revenues, gross profit increased in the three months ended December 31, 2005 to 38.5%, from 35.6% for the comparable prior-year period. This increase in gross profit as a percentage of revenues, or gross margin, over the prior-year period, was primarily attributable to higher patient monitoring systems revenue and improved patient monitoring gross margin as well as to higher commercial optoelectronics revenue. In addition, the increase was attributable to an improvement in the margins on products sold by the security and inspection systems group due to the favorable impact of restructuring completed previously. For the six months ended December 31, 2005, gross profit increased by $11.9 million, or 17%, to $82.1 million, from $70.2 million in the comparable prior-year period. As a percentage of revenues, gross profit increased in the six months ended December 31, 2005 to 37.5%, from 36.9% in the comparable prior-year period. The increase in gross profit as a percentage of revenues, or gross margin, was primarily attributable to higher commercial optoelectronics revenue, as well as higher patient monitoring revenue and was offset in part by a decrease in cargo and vehicle inspection systems revenues.

*Selling, General and Administrative* – Selling, general and administrative ("SG&A") expenses consisted primarily of compensation paid to sales, marketing, and administrative personnel, professional service fees, and marketing expenses.

For the three months ended December 31, 2005, such expenses increased

Table of Contents

by $7.9 million, or 31%, to $33.5 million, from $25.6 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses increased in the three months ended December 31, 2005 to 28.6%, from 25.0% for the comparable prior-year period. The increase in SG&A expenses for the three months ended December 31, 2005 over the prior-year period was primarily attributable to increased spending on legal and professional fees of $1.3 million as well as higher administrative costs of $900,000, the inclusion of $1.1 million in stock compensation expenses as required by SFAS 123R and $1.6 million in foreign currency exchange losses. The increase in SG&A expenses for the three months ended December 31, 2005 over the prior year period was also attributable to $1.5 million in support of higher sales by the patient monitoring and anesthesia system groups as well as to $700,000 in spending by the security and inspection systems group for higher U.S. government sales support, sales and marketing spending in connection with hold baggage screening systems, as well as support and other administrative costs. In addition, the increased spending was also attributable to $600,000 in increased commercial optoelectronics and contract manufacturing SG&A spending in support of increased sales.

For the six months ended December 31, 2005, SG&A expenses increased by $16.5 million, or 33%, to $66.9 million, from $50.4 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses increased in the six months ended December 31, 2005 to 30.6%, from 26.5% in the comparable period last year. The increase in SG&A expenses for the six months ended December 31, 2005 over the prior-year period was primarily attributable to increased spending on legal and professional fees of $3.9 million as well as higher administrative costs of $1.3 million, the inclusion of $2.2 million in stock compensation expenses as required by SFAS 123R and $1.9 million in foreign currency exchange losses. The increase in SG&A expenses for the six months ended December 31, 2005 over the prior year period was also attributable to $4.2 million in support of higher sales by the medical monitoring and anesthesia system group as well as to $1.3 million in spending by the security and inspection system group for higher U.S. government sales support, sales and marketing spending in connection with hold baggage screening systems, as well as support and other administrative costs. In addition, the increased SG&A spending was attributable to $1.0 million in increased commercial optoelectronics and contract manufacturing SG&A spending in support of increased sales.

In October 2005 we reached a final settlement over a previously disclosed international receivable for our cargo and vehicle inspection product. Under the terms of the settlement, we recovered most of the equipment we had shipped and recorded an additional bad debt expense of $657,000. All recovered equipment is available for resale.

*Research and Development* – Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2005, such expenses increased by $1.6 million, or 23%, to $8.7 million, from $7.1 million for the comparable prior-year period. For the six months ended December 31, 2005, such expenses increased by $3.7 million, or 27%, to $17.4 million, from $13.7 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 7.4% for the three months ended December 31, 2005, compared to 6.9% in the comparable prior-year period. For the six months ended December 31, 2005, such expenses were 8.0% of revenues, compared to 7.2% for the comparable prior-year period. The increase in research and development expenses for the three- and six-month periods ending December 31, 2005, as compared to comparable prior-year periods, was primarily due to increased research and development spending by our medical monitoring and anesthesia systems group in connection with developing the localization of products into foreign languages, the development of next generation medical monitoring products, the inclusion of the research and development spending of Blease, a company we acquired in February 2005, and the development of new cargo and vehicle inspection and hold baggage screening systems by our security and inspection systems group.

*Restructuring Charges* – We incurred no restructuring charges during the three months ended December 31, 2005. In the six months ended December 31, 2005, we consolidated manufacturing processes and facilities of certain businesses within each of our Security and Optoelectronics and Manufacturing Groups. These consolidations resulted in a pre-tax charge of $800,000, consisting primarily of lease obligation charges of $445,000, restoration of leased facilities of $118,000, fixed asset and leasehold improvement write-off of $105,000, and $132,000 for severance and other expenses. These charges were

calculated in accordance with SFAS No. 144, "Impairment or Disposal of Long-Lived Assets" and SFAS No. 146, "Accounting for Exit or Disposal Activities" There were no restructuring charges for the three months and six months ended December 31, 2004.

*Management retention bonus* – In March 2004, we completed the acquisition of Spacelabs Medical from Instrumentarium Corporation. As a result of this acquisition, we assumed management retention bonus agreements for key personnel of Spacelabs Medical, which could result in bonus payments of up to $5.9 million when fully paid. The retention bonuses associated with these agreements vest over a two-year period beginning in either October 2003 or March 2004. We accrued $51,000 during the three months ended December 31, 2005 for these bonuses, bringing the total accrual to $5.4 million, of which $1.9 million relates to a reporting period prior to our acquisition of Spacelabs Medical. The current estimate of total retention bonuses paid and to be paid under these agreements is approximately $5.5 million. In the three months ended December 31, 2005 we made retention bonus payments of $1.9 million. Total retention bonus payments made to date amounts to $5.2 million. As of December 31, 2005, we included a balance of $165,000 in management retention bonuses payable in our accrued payroll and related expenses.

*Income from Operations* – For the three months ended December 31, 2005, income from operations was $2.9 million, compared to $3.2 million for the comparable prior-year period. For the six months ended December 31, 2005, loss from operations was $3.6 million, compared to income from operations of $5.0 million for the comparable prior-year period.

*Interest Income* – For the three months ended December 31, 2005, we earned interest income of $69,000, compared to $103,000 for the comparable prior-year period. For the six months ended December 31, 2005, we earned interest income of $89,000, compared to $191,000 for the comparable prior-year period. The decrease in interest income for the three and six months ended December 31, 2005, was attributable to a decrease in interest earning deposits in the current year compared to the same periods in the prior-year.

*Interest Expense* – For the three months ended December 31, 2005, we incurred interest expense of $399,000, compared to $98,000 for the comparable prior-year period. For the six months ended December 31, 2005, we incurred interest expense of $950,000, compared to $154,000 for the comparable prior-year period. The increase in interest expense for the three months and six months ended December 31, 2005, was attributable to increases in our short-term borrowing. As of the end of December 2005, these levels of short term borrowing have been reduced.

*Provision (Benefit) for Income Taxes* – For the three months ended December 31, 2005, we had an income tax provision of $1.9 million, compared to an income tax provision of $789,000 for the comparable prior-year period. For the six months ended December 31, 2005, we had an income tax benefit of $996,000, compared to an income tax provision of $1.4 million for the comparable prior-year period. As a percentage of income before provision for income taxes and minority interest, provision for income taxes was 64.4% for the three months ended December 31, 2005, compared to 24.3% for the comparable prior-year period. As a percentage of income or loss before provisions or benefit for income taxes and minority interest, benefit for income taxes for the six months ended December 31, 2005 was 24.0%, compared to provision for income taxes of 26.9% for the comparable prior-year period. The change in the income tax rate was primarily attributable to the inclusion of incentive stock options expense in total stock compensation expense, which does not qualify for a tax deduction and not receiving tax benefit for losses incurred in certain non U.S. subsidiaries. Our tax rate is also dependent on the mix of income from U.S. and foreign locations due to tax rate differences between countries.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1572 of 2711
Table of Contents

*Net Income* – We had net income of $85,000 for the three months ended December 31, 2005, compared to $2.5 million for the three months ended December 31, 2004, and we had net loss of $4.1 million for the six months ended December 31, 2005 compared to net income of $3.8 million for the six months ended December 31, 2004.

**Liquidity and Capital Resources**

Cash and equivalents as of December 31, 2005, were $17.1 million, an increase of $2.5 million from $14.6 million as of June 30, 2005.

Net cash used in operations was $8.4 million during the six months ended December 31, 2005. The amount of net cash used in operations was primarily attributable to an increase in accounts receivable of $12.5 million, inventory and other receivables. Net cash used in operations was offset in part by an increase in advances from customers, deferred revenue and sales return and allowance. The increase in accounts receivable was primarily due to higher shipments.

Net cash used in investing activities was $5.9 million for the six months ended December 31, 2005. The amount was primarily used to purchase property and equipment of $6.0 million. Net cash used in investing activities was partially offset by proceeds from the sale marketable securities and investments due to the recent sale of our stock in QuadraMed Corp.

Net cash provided by financing activities was $16.2 million for the six months ended December 31, 2005. This amount is primarily attributable to the $26.3 million in proceeds, net of offering expenses, that we received from the placing of 13.5 million shares of previously unissued Spacelabs Healthcare common stock, which represents an approximately 20% interest in Spacelabs Healthcare, with outside investors and the listing of Spacelabs Healthcare common stock on the AIM, a market administered by the London Stock Exchange, $2.2 million we received from the exercise of stock option, warrants and employee stock purchase plan. The net cash provided was partially offset by a $13.8 million reduction in our short term borrowings.

In May 2005, we entered into a second amended and restated credit agreement with Bank of the West. The agreement provides for a $50 million senior revolving line of credit, including a letter-of-credit, foreign exchange facility and an acquisition credit facility, which are secured by substantially all of the

Table of Contents

assets of our U.S. subsidiaries and our stock ownership in two significant foreign subsidiaries. On October 13, 2005, we entered into a first amendment to the credit agreement. As amended, the credit agreement includes an asset–based credit facility of up to $50 million with revised financial covenants. Some of the covenants include maintaining specified amount of tangible net worth, ratio of total liabilities to effective tangible net worth, capital expenditure not to exceed specified amount during the fiscal year, and pre-tax loss in aggregate for the first two fiscal quarters of fiscal year 2006. As of December 31, 2005, our borrowing capacity as calculated under the credit agreement was $46 million of which $2.1 million was outstanding under the revolving line of credit and $9.2 million issued and outstanding under the letter of credit facility.

In March 1999, we announced a stock repurchase program under which we could repurchase up to 2,000,000 shares of our common stock. Through June 30, 2004 we had repurchased 1,404,500 shares at an average price of $4.37 per share. In September 2004, we repurchased 107,500 shares at an average purchase price of $14.73 per share. In addition, our Board of Directors authorized an increase by 1,000,000 in the number of shares available for repurchase under the program. In May 2005, we repurchased 157,027 shares at an average price of $14.25 per share. Since May 2005, we have made no additional repurchases. As of December 31, 2005, 1,330,973 shares were available for additional repurchase under the program. The stock repurchase program did not have a material effect on our liquidity and is not expected to have a material effect on liquidity in subsequent quarters. We retire the treasury shares as they are repurchased. They are disclosed as a reduction in the number of shares of common stock issued and outstanding in the accompanying consolidated financial statements.

We anticipate that current cash balances, including the proceeds from the sale of approximately 20% of the equity of Spacelabs Healthcare, anticipated cash flows from operations and current borrowing arrangements will be sufficient to meet our working capital, stock repurchase program and capital expenditure needs for at least the next twelve months.

*Contractual obligations* – In December 2004, we entered into a bank loan of $5.3 million to fund the acquisition of land and buildings in Horley, England for the purpose of co-locating certain of our security and inspection systems and medical monitoring and anesthesia systems group operations in the United Kingdom. The loan is repayable over a twenty-year period, with a quarterly payment of £34,500 (approximately $59,300 at December 31, 2005). Outstanding borrowings bear interest at 3 months LIBOR plus 1.2% (at December 31, 2005 5.84%) and are payable on a quarterly basis. Of our outstanding balance, $237,400 is due over the next twelve months and the balance of $4.3 million is due over the remaining term of the loan.

In fiscal year 2005, we committed to enter into new leases for computer equipment associated with a master lease agreement previously entered into with Dell Financial Services. The master lease agreement provided for the leasing of computer equipment over a period of 36 months. The new leases that are associated with the master lease agreement have been recorded as capital leases. The master lease agreement permits us to lease up to $1.0 million in equipment. During fiscal year 2005, we committed to a total of approximately $730,000 of equipment under this agreement. We do not currently expect to commit to any additional leases of equipment. As of December 31, 2005, $371,000 was outstanding under these capital lease obligations.

In November 2004, we entered into an agreement with a third party for the design and manufacture of a patient monitor for our Spacelabs Medical subsidiary. Under the agreement, we are required to buy a minimum number of monitors from the manufacturer during each year of the term of the agreement at a fixed price. We may provide one year's notice to terminate the agreement without cause at any time following the completion of the second year of the term of the agreement. Given this termination right, our minimum commitment under this agreement amounts to three years of purchases, which totals approximately $8.9 million. We expect to take delivery on the first units under this agreement in fiscal year 2006.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1574 of 2711

Table of Contents

Under the terms and conditions of the purchase agreements associated with the following four acquisitions, we may be obligated to make additional payments:

In August 2002, we purchased a minority equity interest in CXR Limited, a United Kingdom based research and development company that develops real time tomography systems. In June 2004, we increased our equity interest in CXR to approximately 75% and in December 2004 we acquired the remaining 25%. As compensation to the selling shareholders for this remaining interest, we have agreed to make certain royalty payments based on sales of CXR's products. As of December 31, 2005, no royalty payments had been made.

In November 2002, we acquired all of the outstanding capital stock of Ancore Corporation (since renamed Rapiscan Systems Neutronics and Advanced Technologies Corporation), a Santa Clara, California based company. During the five years following the close, contingent consideration is payable based on the sale of certain products. The contingent consideration is capped at $34.0 million. As of December 31, 2005, no earn-out payments had been made.

In January 2004, we completed the acquisition of Advanced Research & Applications Corp. (since renamed Rapiscan Systems High Energy Inspection Corporation), a privately held company located in Sunnyvale, California. During the seven years following the close, contingent consideration is payable based on net revenues, provided certain requirements are met. The contingent consideration is capped at $30.0 million. As of December 31, 2005, approximately $8,000 had been earned and paid as part of this contingent consideration.

In February 2005, we completed the acquisition of Blease. During the three years following the close, contingent consideration is payable based on Blease's net revenues, provided certain requirements are met. The contingent consideration is capped at £6.25 million (approximately $10.8 million as of December 31, 2005). As of December 31, 2005, no earn out payments had been made.

**Factors That May Affect Operations Results**

Information concerning factors that may affect our operating results is contained in our Annual Report on Form 10-K, filed with the Securities and Exchange Commission on September 29, 2005.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

For the six months ended December 31, 2005, no material changes have occurred with respect to market risk as disclosed in our Annual Report on Form 10-K for the year ended June 30, 2005.

*Foreign Currency Translation* – We maintain the accounts of our operations in each of the following countries in the following currencies: Singapore (Singapore dollars), Malaysia (Malaysian ringgits), England (U.K. pounds sterling), Austria, Finland, France, Germany, Greece and Italy (euros), Norway (Norwegian kroners), India (Indian rupees) and Canada (Canadian dollars). We translate foreign currency financial statements into U.S. dollars at current rates, with the exception of revenues, costs, and expenses, which are translated at average rates during the reporting period. Gains and losses resulting from foreign currency transactions are included in income, while those resulting from translation of financial statements are excluded from income and accumulated as a component of shareholders' equity. Net foreign currency transaction loss of approximately $708,000 million was included in net loss for the six months ended December 31, 2005, and gains of approximately $1.2 million was included in the net income for six months ended December 31, 2004.

For the quarter and six months ended December 31, 2005, there have been no material changes in the market risk disclosure presented in our Annual Report on Form 10-K for the year ended June 30, 2005, other than as described above.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1575 of 2711

Table of Contents

*Importance of International Markets* – International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, wars and political instability.

**Item 4. Controls and Procedures**

(a) *Evaluation of Disclosure Controls and Procedures*

As of December 31, 2005, the end of the period covered by this report, our management, including our Chief Executive Officer and our Chief Financial Officer, reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) and 15d-15(e)). Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized, and filed or submitted on a timely basis. Based upon this evaluation, they concluded that as of December 31, 2005, our disclosure controls and procedures were ineffective.

As reported in Item 9A of our Form 10-K our management reported that material weaknesses existed in our internal controls as of June 30, 2005. Due to the fact that management's remediation steps had not been completed as of December 31, 2005, and as a result of the identification of additional material weaknesses in our internal controls during the three months ended December 31, 2005, we performed additional analysis and post-closing procedures in order to prepare the consolidated financial statements in accordance with generally accepted accounting principles in the United States of America.

(b) *Changes in Internal Control over Financial Reporting*

As reported in Item 9A of our Form 10-K for fiscal year 2005, we determined that the following material weaknesses in internal control over financial reporting existed as of June 30, 2005:

1) We had identified certain computational errors in our annual income tax provision and related income tax receivable and payable and deferred tax assets and deferred tax liabilities for fiscal year 2005. These errors resulted from a deficiency in the operation of controls requiring the reconciliation of the components of our income tax provision to appropriate supporting documentation; and

2) We had identified certain transactions recorded as revenue by one of our Canadian subsidiaries in the period ended June 30, 2005 that did not meet the criteria for revenue recognition in such period. These errors resulted from a deficiency in the operation of controls requiring the supervisory review of year-end revenue transactions related to ensure proper cutoff at year end. The errors associated with these transactions totaled approximately $1.4 million in product sales revenue.

During the six months ended December 31, 2005, we took the actions described immediately below to address the previously identified material weaknesses. Given that our remediation efforts continue, these actions also serve as additional procedures and analyses to ensure that our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America.

Income Taxes:

- We formalized tax account reconciliation and review procedures and improved documentation standards. These procedures include obtaining and reviewing on a quarterly basis, additional tax account analysis from each operating subsidiary;

Table of Contents

- We added an additional tax accounting staff member. This additional employee participates in the preparation of tax account analysis permitting our Tax Director to be the primary reviewer of most documentation, which in turn allows for an overriding level of review by our Chief Financial Officer;
- We engaged the services of an outside consulting firm to assist in the preparation of our quarterly and annual income tax calculations, including assistance at selected international subsidiaries; and
- We determined that the software that we installed for purposes of calculating the fiscal year end tax provision was not reliable. We have and will continue to calculate the tax provision using manual controls until such time that replacement software can be fully evaluated, implemented and tested. We expect to have identified, implemented and tested a software replacement package by June 30, 2006.

Revenue Recognition:

- We refined pre-existing controls including specific examination of customer purchase orders and delivery documents related to shipments near period end and performed management level reviews of revenue cutoff procedures including an inspection of selected delivery documents; and
- We supplemented training regarding our pre-existing revenue recognition policies and revenue cutoff control procedures at the Canadian subsidiary and selected other international subsidiaries. In addition, we reinforced the use of a checklist control document designed to address period end cutoff procedures including revenue recognition cutoff procedures.

Through these actions we have begun our remediation efforts and we believe that these actions have strengthened our internal control over financial reporting. Although initiated, our testing of the operating effectiveness of the controls associated with these remediation efforts is not complete. Accordingly, we cannot assert that the material weaknesses identified above have been remediated. Additionally, during the three months ended December 31, 2005, we identified additional internal control deficiencies which we have determined represent material weaknesses as follows:

1) Income Taxes – During the calculation of our tax provision, we did not correctly apply FASB Interpretation No. 18 “Accounting for Income Taxes in Interim Periods,” which resulted in a material error in the tax provision for the three and six month periods ending December 31, 2005. Additionally, we did not correctly apply FASB Statement No. 109, “Accounting for Income Taxes,” with respect to the three month period ending December 31, 2005. Specifically, we did not provide for deferred tax liabilities in connection with the sale of newly issued subsidiary stock.

2) Financial Reporting and Disclosure – Subsequent to the issuance of our unaudited consolidated financial statements for the six months ended December 31, 2004, we determined that our consolidated statement of cash flows for the six months ended December 31, 2004 incorrectly reflected cash lease incentives as a financing activity. The cash lease incentives should have been classified as an operating activity. We corrected this presentation in the financial statements filed on Form 10-K for the year ended June 30, 2005. Our proposed statement of cash flows for the six months ended December 31, 2005, included a comparative statement of cash flows for the six months ended December 31, 2004. In that proposed statement of cash flows for the comparable prior-year period we failed to make a correction to the classification of the cash lease incentives. This presentation was corrected prior to finalization of this Form 10-Q. As presented in this Form 10-Q, the comparative statement of cash flows for the six months ended December 31, 2004 properly classifies the cash lease incentives as operating activity. Additionally, our financial reporting and disclosure controls failed to detect that we had incorrectly classified $6.0 million of deferred rent, including the liability recorded in conjunction with the cash lease incentive detailed above, and a portion of deferred revenues as current liabilities in the proposed December 31, 2005 consolidated balance sheet. This presentation was corrected prior to the finalization of this Form 10-Q. As presented in this Form 10-Q, deferred rent and a portion of deferred revenues are presented as non-current liabilities.

Our Chief Executive Officer and Chief Financial Officer have determined that the two weaknesses identified above as of December 31, 2005, occurred in part because we do not have adequate personnel with adequate technical training concerning relevant accounting principles and associated financial reporting implications in place to effectively assess and disclose the proper accounting and reporting principles of significant transactions concerning lease accounting and accounting for income taxes.

To address the material weaknesses identified above, as of December 31, 2005 our management intends to take the following steps:

- Hire additional qualified and experienced personnel into the financial close and reporting process;
- Provide additional training and supervision of existing personnel in the financial close and reporting process;
- Refine our review processes over significant and unusual transactions for proper accounting treatment; including providing an additional layer of management review;
- Invest in a software upgrade that will provide improved accuracy and timeliness of our financial consolidation and tax provision preparation processes; and
- Supplement the services of an outside accounting firm we engaged to assist with the preparation of our tax provision, in order to provide stronger technical tax accounting support.

While we have made certain progress with respect to remediating the material weaknesses described above, it will take some time to put in place the rigorous disclosure controls and procedures desired by our management and our Board of Directors. We cannot at this time estimate how long it will take to complete the steps identified above. Our management will continue to evaluate the effectiveness of the control environment and will continue to refine existing controls.

Other than the changes discussed above, there have been no changes in our internal control over financial reporting that occurred since the beginning of the second quarter of fiscal year 2006 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting. Our management has discussed these issues and remediation efforts in detail with our Audit Committee.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1578 of 2711

Table of Contents

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

On October 17, 2005, Security Detection Systems, Inc. filed a complaint in the U.S. District Court for the Western District of Texas, El Paso Division, alleging that certain "Metorex" brand people screening systems sold by our security and inspection systems group infringe a specified patent held by Security Detection Systems, Inc. In November 2005, we filed a motion to remove this action to the U.S. District Court for the Central District of California.

We are involved in various other claims and legal proceedings which have been previously disclosed in our quarterly and annual reports in accordance with Item 103 of Regulation S-K. The results of such legal proceedings cannot be predicted with certainty. Should we fail to prevail in any of these legal matters or should several of these legal matters be resolved against us in the same reporting period, the operating results of a particular reporting period could be materially adversely affected.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in our quarterly and annual reports. In our opinion after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations, or cash flows.

### Item 1A. Risk Factors

The discussion of our business and operations should be read together with the risk factors contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2005 filed with the Securities and Exchange Commission and those set forth below, which describe various risks and uncertainties to which we are or may become subject. These risks and uncertainties have the potential to affect our business, financial condition, results of operations, cash flows, strategies or prospects in a material and adverse manner.

*Our operations are subject to certain risks and uncertainties associated with the listing in the United Kingdom of common stock of Spacelabs Healthcare.*

In September 2005, we announced our intention to pursue a listing in the U.K. of common stock in Spacelabs Healthcare, a newly formed subsidiary composed of the business operations of our medical monitoring and anesthesia systems businesses, and the initial public offering of a minority interest. On October 25, 2005, Spacelabs Healthcare completed the placing of 13.5 million previously unissued shares of its common stock, representing approximately 20 percent of its total issued and outstanding shares. The newly issued shares began trading on the AIM, a market administered by the London Stock Exchange on October 31, 2005 under the ticker symbol "SLAB." The value of these shares, and consequently the value of the shares in Spacelabs Healthcare that we retained following the placing, is subject to stock price fluctuations as well as fluctuations in the British pound, the currency in which the shares trade. A downturn in the performance of equity markets in the U.K. generally, or on the AIM specifically, could depress the value of the Spacelabs Healthcare shares that we own.

### Item 4. Submission of Matters to a Vote of Security Holders

We held our Annual Meeting on November 11, 2005. At the meeting, shareholders voted upon the following actions:

1. Election of Directors.

| Name | For | Withheld |
|---|---|---|
| Deepak Chopra | 13,927,666 | 255,213 |
| Ajay Mehra | 13,912,330 | 270,549 |
| Steven C. Good | 13,744,771 | 438,108 |
| Meyer Luskin | 13,757,229 | 425,650 |
| Chand R. Viswanathan | 14,079,131 | 103,748 |

Table of Contents

The five nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

2. Ratification of Deloitte & Touche LLP as independent auditors for the year ending June 30, 2006.

| | |
|---|---|
| For | 14,142,988 |
| Against | 24,946 |
| Abstain | 14,949 |

The appointment was ratified.

**Item 6. Exhibits**

31.1 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 16th day of February 2006.

**OSI SYSTEMS, INC.**

By: /s/ Deepak Chopra
Deepak Chopra
President and Chief Executive Officer

By: /s/ Anuj Wadhawan
Anuj Wadhawan
Chief Financial Officer

# Exhibit 16

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1582 of 2711
8-K 1 d8k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): SEPTEMBER 27, 2006

# OSI SYSTEMS, INC.

**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

| **CALIFORNIA** | **000-23125** | **330238801** |
|---|---|---|
| **(STATE OR OTHER JURISDICTION OF INCORPORATION)** | **(COMMISSION FILE NUMBER)** | **(IRS EMPLOYER IDENTIFICATION NO.)** |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02   Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

On September 27, 2006, our Board of Directors elected Mr. Leslie E. Bider to the Board of Directors and to the Audit and Nominating Committees of the Board of Directors.

Mr. Bider currently serves as Executive-in-Residence at Elevation Partners, a Menlo Park and New York based private equity firm. Between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Masters degree from the Wharton School at the University of Pennsylvania.

There is no arrangement or understanding between Mr. Bider and any of our executive officers or directors. There are no family relationships among Mr. Bider and any of our executive officers or directors and there are no transactions involving Mr. Bider and our company which would be reportable pursuant to Item 404(a) of Regulation S-K promulgated under the Securities Act of 1933, as amended.

A copy of the press release, dated September 27, 2006, announcing Mr. Bider's election to the Board of Directors, is filed with this Current Report on Form 8-K as Exhibit 99.1.


**Item 5.03.   Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On September 27, 2006, the Board of Directors amended the Bylaws to increase the authorized number of directors of the company from five to six in connection with the appointment of Mr. Bider to the Board of Directors.


**Item 9.01.   Financial Statements and Exhibits.**

*(d) Exhibits*

Exhibit 99.1  :  Press Release of OSI Systems, Inc., dated September 27, 2006.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: September 27, 2006                     By:  /s/ Victor Sze
                                                  Victor Sze
                                                  General Counsel

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| Exhibit 99.1: | Press Release of OSI Systems, Inc., dated September 27, 2006. |

# Exhibit 17

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1587 of 2711

DEF 14A 1 a06-20424_1def14a.htm DEFINITIVE PROXY STATEMENT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant x
Filed by a Party other than the Registrant o
Check the appropriate box:
o Preliminary Proxy Statement
o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
x Definitive Proxy Statement
o Definitive Additional Materials
o Soliciting Material Pursuant to §240.14a-12

# OSI SYSTEMS, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
x No fee required.
o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:
(2) Aggregate number of securities to which transaction applies:
(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
(4) Proposed maximum aggregate value of transaction:
(5) Total fee paid:

o Fee paid previously with preliminary materials.
o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:
(2) Form, Schedule or Registration Statement No.:
(3) Filing Party:
(4) Date Filed:

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1588 of 2711

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 10, 2006

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:30 a.m., local time, on November 30, 2006, at our executive offices, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of OSI Systems, Inc. common stock as of the close of business on October 2, 2006 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy Card.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. In order to facilitate your voting, you may vote in person at the meeting, by sending in your written proxy. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person. Please review the instructions on the Proxy Card regarding each of these voting options.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*

---

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held November 30, 2006**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the “Annual Meeting”) of OSI Systems, Inc., a California corporation (the “Company”), will be held at 10:30 a.m., local time, on November 30, 2006, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.
2. To ratify the Amended and Restated 1997 Stock Option Plan to add the authority to issue and grant restricted stock.
3. To amend the Amended and Restated 1997 Stock Option Plan to change the name of the plan and extend the term of the plan.
4. To approve the reincorporation of the Company from California to Delaware.
5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company’s Annual Report on Form 10-K for the fiscal year ended June 30, 2006, containing consolidated financial statements, is included with this mailing.

The Board of Directors has fixed the close of business on October 2, 2006, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1589 of 2711

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 10, 2006

**WHETHER OR NOT YOU EXPECT TO ATTEND THE ANNUAL MEETING, PLEASE COMPLETE, DATE AND SIGN THE ENCLOSED PROXY AND MAIL IT PROMPTLY IN THE ENCLOSED ENVELOPE. ANY ONE OF THESE METHODS WILL ENSURE REPRESENTATION OF YOUR SHARES AT THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

---

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Amended and Restated 1997 Stock Option Plan | 9 |
| Proposal No. 3 Approval of Amendment to Amended and Restated 1997 Stock Option Plan | 11 |
| Proposal No. 4 Approval of the Reincorporation from California to Delaware | 12 |
| Independent Public Accountants | 27 |
| Information Concerning Management, Compensation and Stock Ownership | 32 |
| Report of the Compensation Committee | 43 |
| Report of the Audit Committee | 45 |
| Company Stock Price Performance | 47 |
| Shareholder Proposals | 48 |
| Availability of Annual Report on Form 10-K | 48 |
| Other Business | 48 |

---

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the “Company”) for use at the Annual Meeting of Shareholders (the “Annual Meeting” or the “Meeting”), to be held at 10:30 a.m., local time, on November 30, 2006, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. You may direct your vote without attending the Annual Meeting by completing and mailing your proxy card or voting instruction card in the enclosed, postage pre-paid envelope. Please refer to the proxy card for instructions.

When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your proxy card. In addition, a shareholder attending the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1590 of 2711

Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 2, 2006, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 16,708,250 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD" from a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or more of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (*i.e.*, six) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

The enclosed Proxy, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

The total number of votes that could be cast at the Meeting is the number of votes actually cast, plus the number of abstentions and broker non-votes, described below. Abstentions are counted as shares present at the Meeting for purposes of determining whether a quorum exists; however, abstentions will not be counted as votes for or against a proposal. Proxies submitted by brokers that do not indicate a vote for some or all of the proposals because they do not have discretionary voting authority and have not received

---

instructions as to how to vote on those proposals (so-called "broker non-votes") are counted as present and entitled to vote and are, therefore, included for purposes of determining whether a quorum is present at the Meeting; however, broker non-votes are not deemed to be votes cast. As a result, broker non-votes are not included in the tabulation of the voting results on the election of directors or issues requiring approval of a majority of the votes cast and, therefore, do not have the effect of votes for or against a proposal.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting in person at the Meeting or represented by proxy and entitled to vote on the subject matter of the proposal.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by e-mail, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 20, 2006 to all shareholders entitled to vote at the Annual Meeting. A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, containing consolidated financial statements, is included in this mailing.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

---

## ELECTION OF DIRECTORS
***(Item 1 of the Proxy Card)***

**Nominees**

On September 27, 2006, the size of the Board of Directors was increased from five to six members. In accordance with the terms of the Company's Bylaws, the newly created directorship resulting from the increase in the authorized number of directors was filled by

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1591 of 2711
the Board of Directors. Consequently, Leslie E. Bider was appointed as a director to hold office until the Annual Meeting where he will stand for election.

At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date. The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2007, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 55 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 44 | Director, Executive Vice President, and President of Security Group | 1996 |
| Steven C. Good(1)(2)(3)(4) | 64 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 80 | Director | 1990 |
| Chand R. Viswanathan | 77 | Director | 2001 |
| Leslie E. Bider(1)(3) | 56 | Director | 2006 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating Committee
(4) Member of Executive Committee

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various

positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996 and served as Secretary between March 1996 and November 2002. Mr. Mehra also serves as President of the Company's Security division. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Big Dogs, Inc., California Pizza Kitchen, Inc., Kayne Anderson MLP Investment Company

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1592 of 2711

and Youbet.com, Inc., each of which is a publicly held corporation listed on The Nasdaq Stock Market. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed. Since 1961, Mr. Luskin has also served as the President, Chief Executive Officer and Chairman of Scope Industries Inc. Mr. Luskin currently also serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, Alerion Biomedical, Inc., a biotechnology company, Myricom, Inc., a computer and network infrastructure company and Santa Monica - UCLA Medical Center, an acute-care medical center. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chair of the department from 1979 to 1985. During his tenure at University of California, Los Angeles, Dr. Viswanathan also served in various additional capacities, including Chair of the Academic Senate of the University of California, Los Angeles and Vice-Chair and later Chair of the University of California-wide Academic Senate. As Chair of the Academic Senate, he was also a member of the University of California Board of Regents as a faculty representative.

***Leslie E. Bider*** was appointed as a Director of the Company on September 27, 2006. Mr. Bider is currently Executive-in-Residence at Elevation Partners, a private equity firm that makes large-scale investments in market-leading media, entertainment and consumer-related businesses. Between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Masters degree from the Wharton School at the University of Pennsylvania.

---

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See “Information Concerning Management, Compensation and Stock Ownership—Executive Compensation”).

**Board of Directors Meetings and Committees of the Board of Directors**

There were five meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on five additional occasions during the fiscal year ended June 30, 2006. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee, and Nominating Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No person serving as a director during the fiscal year ended June 30, 2006, attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the Securities and Exchange Commission (“SEC”) and The Nasdaq Stock Market (“NASDAQ”) director independence standards (“Listing Standards”), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is “independent” within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the “Exchange Act”). The Audit Committee makes recommendations for selection of the Company’s independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company’s internal accounting controls and financial management practices.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1593 of 2711

The Audit Committee currently consists of Messrs. Bider, Good and Luskin. Mr. Bider was appointed to the Audit Committee on September 27, 2006. Mr. Viswanathan, who was previously a member of the Audit Committee, resigned from the Audit Committee on September 27, 2006. The Board of Directors has determined that, based upon his prior work experience and his tenure and experience on the Company's Audit Committee, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts. There were five meetings of the Audit Committee during the fiscal year ended June 30, 2006. See *Report of the Audit Committee.*

The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website—*http://www.osi-systems.com.*

---

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's stock option plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Good and Luskin. There were four meetings of the Compensation Committee during the fiscal year ended June 30, 2006. See *Report of the Compensation Committee.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website—*http://www.osi-systems.com*.

*Nominating Committee*

The Nominating Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating Committee currently consists of Messrs. Bider, Good, and Luskin. Mr. Bider was appointed to the Nominating Committee on September 27, 2006. There was one meeting of the Nominating Committee during the fiscal year ended June 30, 2006.

The Nominating Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website—*http://www.osi-systems.com*.

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances between the Company and third parties. The Executive Committee consists of Messrs. Good and Luskin. There was one meeting of the Executive Committee during the fiscal year ended June 30, 2006.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website—*http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating Committee;
- The name and contact information for the candidate;

· A statement of the candidate's occupation and background, including education and business experience;

· Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;

· A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and

· A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating Committee did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify us of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

**Annual Meeting Attendance**

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended last year's annual meeting of shareholders in person.

**Shareholder Communications**

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

**Director Compensation**

Each non-employee director receives a fee of $15,000 per year, $1,500 for each Board of Directors meeting attended, and options to purchase 7,500 shares of the Company's Common Stock per year, at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Audit Committee receives a fee of $1,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Compensation Committee receives a fee of $1,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Nominating Committee receives a fee of $1,500 for each Nominating Committee meeting attended. In addition, the Chairman of the Nominating Committee also receives a fee of $5,000 per year.

Each member of the Executive Committee receives a fee of $10,000 per year and options to purchase 5,000 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

All options granted to members of the Board of Directors and it committees vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

**Code of Ethics**

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, upon written request addressed to the following address, c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

---

**RATIFICATION OF AMENDED AND RESTATED**
**1997 STOCK OPTION PLAN**
***(Item 2 of the Proxy Card)***

**Summary and Purpose of Amended and Restated Stock Option Plan**

The Company believes that its success depends in large part on its ability to attract, retain, and motivate its executive officers and other key personnel and that grants of restricted stock may be a significant element of compensation for such persons. Grants of restricted stock benefit the Company in a number of ways. Because restricted stock has an immediate value upon vesting, restricted stock awards are generally smaller, by a significant factor, than stock options which, upon vesting, may not ultimately have a value to the recipient. As a result, grants of restricted stock generally have a less dilutive effect on current shareholders than grants of stock options. Grants of restricted stock also allow the Company to tie compensation to the Company's performance, conserving cash and reducing fixed costs. Competition for executive officers and other key personnel is intense and the Company believes an attractive restricted stock package could serve as a material inducement to attract and retain such persons.

The Board of Directors has voted to amend and restate the 1997 Plan to grant authority to the administrator to issue and grant restricted stock. The Company's 1997 Stock Option Plan (the "1997 Plan") is described below in "Information Concerning Management, Compensation and Stock Ownership—1997 Stock Option Plan."

Restricted stock may be issued at such price, if any, and may be made subject to such restrictions (including time vesting or satisfaction of performance milestones), as may be determined by the administrator. Restricted stock, typically, may be repurchased and/or cancelled by the Company, if the conditions or restrictions are not met. In general, restricted stock may not be sold, or otherwise hypothecated or transferred, until the vesting restrictions applicable to such shares are removed or expire. Recipients of restricted stock, unlike recipients of options, generally will have voting rights and will receive dividends prior to the time when the restrictions lapse.

In general, a participant will not be taxed upon the grant or purchase of restricted stock that is subject to a "substantial risk of forfeiture," within the meaning of Section 83 of the Internal Revenue Code of 1986, as amended (the "Code"). However, at the time the restricted stock is no longer subject to the substantial risk of forfeiture, the participant will be taxed on the difference, if any, between the fair market value of the Common Stock on the date the restrictions lapsed and the amount the participant paid, if any, for such restricted stock. Recipients of restricted stock under the 1997 Plan may, however, make an election under Section 83(b) of the Code to be taxed at the time of the grant or purchase on an amount equal to the difference, if any, between the fair market value of the Common Stock on the date of transfer and the amount the participant paid, if any, for such restricted stock. If the Section 83(b) election is made, the participant will not recognize any additional income as and when the restrictions applicable to the restricted stock lapses.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1596 of 2711

The total aggregate number of shares of Common Stock which may be granted as restricted stock and/or issued upon the exercise of options granted pursuant to the 1997 Plan will remain unchanged. The Board of Directors simply believes that the proposed amendment will provide the Compensation Committee with greater flexibility in the administration of its incentive plan by allowing for grants of restricted stock. The 1997 Plan as amended and restated is included as Appendix "A" to this Proxy Statement.

**Awards to be Granted to Certain Individuals and Groups**

As of the date hereof, the Company cannot estimate the benefits or amounts required by Item 10 of this Schedule 14A with respect to the persons and groups specified in such Item resulting from the ratification of the amended and restated 1997 Plan. The following table sets forth (a) the aggregate number of shares subject to option grants to certain individuals and groups under the 1997 Plan during the last fiscal year, which ended June 30, 2006, and (b) the average per share exercise price of such options.

| Name of Group | Number of Options Granted | Average Per Share Exercise Price |
|---|---|---|
| Named Executive Officers(1) | 190,000 | $ 18.36 |
| All executive officers, as a group | 192,500 | $ 18.38 |
| All directors who are not executive offices, as a group | 57,500 | $ 18.42 |
| All employees, including all current officers who are not executive officers, as a group | 354,000 | $ 18.54 |

(1) The Named Executive Officers are set forth under "Information Concerning Management, Compensation and Stock Ownership—Executive Compensation."

**Equity Compensation Plan Information**

The following table summarizes information, as of June 30, 2006, with respect to shares of the Company's Common Stock that may be issued under the Company's existing equity compensation plans.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (A)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,778,678 | $ 17.93 | 517,571 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,778,678 | $ 17.93 | 517,571 |

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 2 on the Proxy) to ratify the Company's Amended and Restated 1997 Stock Option Plan to add the authority to issue and grant restricted stock. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

**APPROVAL OF AMENDMENT TO 1997 STOCK OPTION PLAN**
***(Item 3 of the Proxy Card)***

The Company's success depends in large part on its ability to attract, retain, and motivate its executive officers and other key personnel. Stock options are a significant element of compensation for such persons. Stock options benefit the Company in a number of ways, including by tying compensation to the Company's performance, conserving cash and reducing fixed costs. Competition for

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1597 of 2711
executive officers and other key personnel is intense and the Company believes an attractive option package is a material inducement to attract and retain such persons.

The shareholders are asked to approve an amendment to the 1997 Plan to (i) change the name of the plan to the "2006 Equity Participation Plan" and (ii) extend the term of the plan to September 6, 2016. No other changes to the 1997 Plan are presently proposed, other than as described in Item 2 of this Proxy Statement.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 3 on the Proxy) to approve the amendment to the Company's 1997 Stock Option Plan to (i) change the name of the plan to the 2006 Equity Participation Plan, and (ii) extend the term of the plan to September 6, 2016. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

---

## APPROVAL OF THE REINCORPORATION FROM CALIFORNIA TO DELAWARE
***(Item 4 of the Proxy Card)***

For the reasons set forth below, the Board of Directors believes that the best interests of the Company and its shareholders will be served by changing the state of incorporation of the Company from California to Delaware (the "Reincorporation Proposal"). In proposing the reincorporation, the Board of Directors has purposefully drafted the proposed Certificate of Incorporation and Bylaws so that they retain certain features of the existing Articles of Incorporation and Bylaws of the Company. Attention has also been given to the inclusion of provisions commonly maintained by companies incorporated in Delaware and friendly to shareholders in order to maximize management efficiency, maximize value for the Company and to preserve shareholder rights.

Shareholders are urged to read carefully the following sections of this Proxy Statement, including the related appendices, before voting on the Reincorporation Proposal. Throughout Item 4 of this Proxy Statement, the term "OSI California" refers to the existing California corporation and the term "OSI Delaware" refers to a newly-created, wholly—owned Delaware subsidiary of OSI California and the proposed successor to OSI California. The principal executive offices of both OSI California and OSI Delaware are located at 12525 Chadron Avenue, Hawthorne, California 90250.

Approval of the Reincorporation Proposal by the Company's shareholders will implicitly constitute such shareholders' approval of each of the following: (i) the Agreement and Plan of Merger (the "Merger Agreement") pursuant to which OSI California will be merged with and into OSI Delaware; (ii) the Certificate of Incorporation of OSI Delaware; (iii) the Bylaws of OSI Delaware; and (iv) the form of Indemnification Agreement of OSI Delaware, each in form and substance as attached hereto as Appendices B, C, D and E, respectively.

### Principal Reasons for Reincorporation

As the Board of Directors and management of the Company considers its future, the importance of their ability to look to well-established principles of corporate governance and legal decisions is highlighted. Further, the responsiveness of the Delaware courts and legislature to the evolving legal and business requirements of corporations incorporated in the state make it a favorable environment for the conduct of the Company's business. The Company believes that any direct benefit that Delaware law provides to a corporation indirectly benefits the shareholders, who are the owners of the corporation. The Board and management believe that there are several reasons why a reincorporation to Delaware is in the best interests of the Company which are summarized briefly as follows:

- greater predictability, flexibility and responsiveness of Delaware law to corporate needs;
- enhanced ability to protect shareholder interests in the event of a takeover attempt (including any attempt to seize control without acquiring all outstanding shares, or without paying a fair value for the Company); and
- more certainty regarding indemnification and limitation of liability for directors and therefore increased ability of Delaware corporations to attract and retain qualified independent directors.

### *Predictability, Flexibility and Responsiveness of Delaware Law*

The Company's decision to reincorporate in the state of Delaware is due in large part to Delaware's reputation for the comprehensiveness and flexibility of its corporate laws and its tradition of promoting progressive principles of corporate governance. The Company carefully compared the corporate laws of Delaware and California and observed favorably that Delaware offers laws that are responsive to the ever-changing legal and business needs of corporations. Furthermore, the Company's Board of Directors believes that Delaware's corporate legal regime provides greater protection to shareholders and their

interests in the event of an unsolicited takeover attempt (including any attempt to seize control without acquiring all outstanding shares, or without paying a fair value for the Company). The Company is currently unaware of any hostile attempts to acquire control of the Company, to obtain representation on the Company's Board of Directors or of any actions by any person or entity to impact materially, and potentially adversely, the governance of the Company or its business.

The following benefits of Delaware's corporate legal framework were carefully considered by management in deciding to propose reincorporating in Delaware:

- the Delaware General Corporation Law (the "DGCL"), which is generally acknowledged to be the most advanced and flexible corporate statute in the country;
- the Delaware General Assembly, which annually considers and adopts statutory amendments that the Corporation Law Section of the Delaware State Bar Association proposes in an effort to ensure that the corporate statute continues to be responsive to the changing needs of businesses;
- the Delaware Court of Chancery, which handles complex corporate issues with a level of experience and a degree of sophistication and understanding unmatched by any other court in the country, and the highly regarded Delaware Supreme Court;
- the well—established body of case law construing Delaware law, which has developed over the last century and which provides businesses with a greater predictability than most, if not all, other jurisdictions provide; and
- the responsiveness and efficiency of the Division of Corporations of the Secretary of State of Delaware.

***Enhanced Ability to Attract and Retain Directors***

The current emphasis on issues of corporate governance brought about by the requirements of the Sarbanes-Oxley Act of 2002, SEC rules and recent market regulation reforms, among other things, has increased the overall demand for highly qualified independent directors. The Board of Directors and the management believe that the resulting corporate environment has engendered increased competition for qualified and experienced independent directors. The Board of Directors and management further believe that this increased competitiveness coupled with the increased scrutiny of director actions and the perception of increased liability of independent directors has served to decrease the number of qualified persons willing to serve as independent directors and to cause qualified directors to opt to serve on fewer boards.

The Company has not, to date, experienced notable difficulty in attracting and retaining experienced, qualified directors. The Board of Directors and management do, however, believe that the favorability of the corporate environment offered by Delaware to the interests of prospective directors will figure more prominently in their choice of directorships.

Because of its flexibility and familiarity to prospective directors, Delaware law provides, as noted above, a more favorable environment for directors to serve the bests interests of the Company. Additionally, the enhanced certainty regarding the indemnification and limitation of liability of directors under Delaware law enables corporations organized in Delaware to compete more effectively with other public companies, most of whom are already incorporated in Delaware, and to increase the Company's ability to retain its current directors and attract and retain new directors.

***Enhanced Certainty Regarding Indemnification and Limitation of Liability for Directors***

California and Delaware law both permit a corporation to include a provision in its charter which reduces or limits the monetary liability of directors for breaches of fiduciary duties with certain exceptions.

The increasing frequency of claims against directors and officers and the amount of time and money required to respond to such claims and related litigation can be a substantial risk for directors and officers. The Board of Directors and management of the Company believe that, in general, Delaware law provides greater protection to directors than California law, and that Delaware case law regarding a corporation's ability to limit director liability is more developed and provides more guidance than California law. Shareholders of the Company should be aware of and consider that such protection and limitation of liability inure to the benefit of the directors, and the interest of the Board of Directors in recommending the reincorporation may therefore be in conflict with the interests of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1599 of 2711
shareholders. See “Significant Differences between the Corporation Laws of California and Delaware—Indemnification and Limitation of Liability.”

***Dissenters’ Rights Not Available***

Although in some circumstances California law provides shareholders with the right to dissent from certain corporate reorganizations and receive cash for their shares, California law does not permit dissenter’s rights in connection with the proposed reincorporation. See “Appraisal/Dissenters’ Rights.”

***Anti-takeover Implications***

Under Delaware law, a corporation may adopt certain measures to mitigate a corporation’s vulnerability to unsolicited takeover attempts through amendment of the corporate charter documents or otherwise. Unsolicited takeovers can involve attempts to seize control without acquiring all outstanding shares, or without paying a fair value for the Company. In the discharge of its fiduciary obligations to its shareholders, the Board of Directors has evaluated the Company’s vulnerability to potential unsolicited bidders and in doing so has carefully considered and may consider in the future certain defensive strategies designed to enhance the Board’s ability to negotiate with an unsolicited bidder. These strategies include, but are not limited to, the elimination of the right to remove a director other than for cause, the elimination of shareholder action by written consent, and the authorization of preferred shares, the rights and preferences of which may be determined by the Board of Directors. Although the Board of Directors is not aware of any present attempt to acquire control of it, or to obtain representation on its Board, the Board of Directors believes that Delaware law would permit it to adopt certain measures that could prevent adverse effects of an unsolicited takeover bid on the business of the Company (including any attempt to seize control without acquiring all outstanding shares, or without paying a fair value for the Company).

Certain aspects of the Reincorporation Proposal may be considered to have anti-takeover implications. In particular, Section 203 of the DGCL, which OSI Delaware does not intend to opt out of, restricts certain “business combinations” with “interested shareholders” for three years following the date that a person becomes an interested shareholder, unless the Board of Directors approves the business combination. For a detailed discussion of Section 203 of the DGCL and other differences between California and Delaware corporate law that may affect the shareholders, see “Significant Differences Between the Corporation Laws of California and Delaware—Shareholder Approval of Certain Business Combinations.”

Despite the belief of the Board of Directors as to the benefits of the Reincorporation Proposal to shareholders of the Company, the effect of certain aspects of the Reincorporation Proposal may be disadvantageous to the extent that it has the effect of discouraging a future takeover attempt which is not approved by OSI Delaware’s Board, but which a majority of the shareholders may deem to be in their best interests or in which shareholders may receive a substantial premium for their shares over the then-current market value or over their cost basis in such shares. As a result of such effects of the Reincorporation Proposal, shareholders who might wish to participate in an unsolicited tender offer may not have an opportunity to do so. In addition, to the extent that provisions of Delaware law enable the Board of

---

Directors to resist a takeover or a change in control of OSI Delaware, such provisions could make it more difficult to dislodge the existing Board of Directors and management.

***Mechanics of Reincorporation***

The discussion contained herein is qualified in its entirety by reference to the Merger Agreement, the Certificate of Incorporation of OSI Delaware, the Bylaws of OSI Delaware, and the form of Indemnification Agreement of OSI Delaware, copies of which are attached hereto as Appendices B, C, D and E, respectively. OSI California’s capital stock consists of 100,000,000 authorized shares of Common Stock, of which 16,708,450 shares were issued and outstanding as of October 5, 2006, and 10,000,000 authorized shares of preferred stock, without par value (“Preferred Stock”), none of which were outstanding as of October 5, 2006. On the effective date of the reincorporation, OSI Delaware will have the same number of outstanding shares of Common Stock that OSI California had outstanding immediately prior to the effective date of the reincorporation.

OSI Delaware’s capital stock will consist of 100,000,000 authorized shares of Common Stock and 10,000,000 shares of Preferred Stock, which will be consistent with maintaining adequate capitalization for the current needs of the Company. OSI Delaware’s authorized but unissued shares of Common Stock and Preferred Stock will both be available for future issuance.

The Reincorporation Proposal will be affected by merging OSI California into OSI Delaware (the “Merger”). Upon completion of the Merger, OSI California will cease to exist and OSI Delaware will continue the business of the Company under the name “OSI Systems, Inc.” Pursuant to the Merger Agreement, a form of which is attached hereto as Appendix B, upon the effective date of the Merger, (1) each outstanding share of OSI California Common Stock will automatically be converted into one share of OSI Delaware

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1600 of 2711
Common Stock, and (2) each outstanding option to purchase OSI California Common Stock will automatically be assumed by OSI Delaware and will represent an option to acquire shares of OSI Delaware Common Stock on the basis of one share of OSI Delaware Common Stock for each one share of OSI California Common Stock and at an exercise price equal to the exercise price of the OSI California option. Each certificate representing issued and outstanding shares of OSI California Common Stock will represent the same number of shares of Common Stock of OSI Delaware, respectively, into which such shares are converted by virtue of the Merger.

IT WILL NOT BE NECESSARY FOR SHAREHOLDERS OF OSI CALIFORNIA TO EXCHANGE THEIR EXISTING STOCK CERTIFICATES FOR STOCK CERTIFICATES OF OSI DELAWARE. HOWEVER, SHAREHOLDERS MAY EXCHANGE THEIR CERTIFICATE IF THEY SO CHOOSE.

The Common Stock of OSI California is listed for trading on NASDAQ, and after the Merger, OSI Delaware's Common Stock will continue to be traded on NASDAQ without interruption, under the same symbol used by OSI California prior to the Merger.

Under California law, the affirmative vote of holders of a majority of the outstanding shares of the Company's Common Stock is required for approval of the terms of the Reincorporation Proposal. The Reincorporation Proposal has been approved by OSI California's Board of Directors, which unanimously recommends a vote in favor of such proposal. If approved by the shareholders, it is anticipated that the Reincorporation Proposal will become effective as soon as practicable. However, pursuant to the Merger Agreement, the Merger may be abandoned or the Merger Agreement may be amended (except that the principal terms may not be amended without shareholder approval) either before or after shareholder approval has been obtained and prior to the effective date if, in the opinion of the Board of Directors of either OSI California or OSI Delaware, circumstances arise which make it inadvisable to proceed.

---

***Company***

The Reincorporation Proposal will effect only a change in the legal domicile of OSI California and other changes of a legal nature, certain of which are described in this Proxy Statement. The reincorporation will not result in any significant change in the name, business, management, fiscal year, accounting, location of the principal executive offices, assets or liabilities of OSI California. The current directors of OSI California will continue as directors of OSI Delaware. All employee benefits and stock options of OSI California will be assumed and continued by OSI Delaware, and each option or right to purchase shares of OSI California Common Stock will automatically be converted into an option or right to purchase the same number of shares of OSI Delaware Common Stock at the same price per share, upon the same terms, and subject to the same conditions.

Shareholders should note that approval of the Reincorporation Proposal will also constitute approval of the assumption by OSI Delaware of the Company's options and other rights to purchase OSI California capital stock. OSI California's other employee benefit arrangements will also be continued by OSI Delaware upon the terms and subject to the conditions in effect prior to the Merger. Prior to the effective date of the Merger of OSI California with and into OSI Delaware, OSI California will seek to obtain any requisite consents to the reincorporation merger from parties with whom it may have material contractual arrangements. Assuming such consents are obtained, OSI California's rights and obligations under such material contractual arrangements will continue and be assumed by OSI Delaware. In addition, immediately prior to the Merger, the Company and U.S. Stock Transfer will enter into an amendment to the Rights Agreement, dated July 31, 2000, to preserve the continued effectiveness of the Rights Agreement for the benefit of the Company and its shareholders.

**Comparison of the Charters and Bylaws of OSI California and OSI Delaware**

The rights of the Company's shareholders are currently governed by OSI California's Amended and Restated Articles of Incorporation, its Bylaws and the California General Corporation Law (the "CGCL"). As a result of the Merger , OSI California's shareholders will become shareholders of OSI Delaware.

With certain exceptions, the provisions of the OSI Delaware Certificate of Incorporation and Bylaws are similar to those of the OSI California Articles of Incorporation and Bylaws. The Board has purposefully prepared the proposed OSI Delaware Certificate of Incorporation and Bylaw provisions to include terms that are customarily and commonly maintained by companies incorporated in Delaware. However, the Reincorporation Proposal includes the implementation of certain provisions in the OSI Delaware Certificate of Incorporation and Bylaws which may alter the rights of shareholders and the powers of management and reduce shareholder participation in certain important corporate decisions. These provisions may have anti-takeover implications (including protections against attempts to seize control without acquiring all outstanding shares, or without paying a fair value for the Company) and are described in detail below.

Approval by OSI California's shareholders of the Reincorporation Proposal will constitute an approval of the inclusion in the OSI Delaware Certificate of Incorporation and Bylaws of each of the provisions described below. In addition, certain other changes altering

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1601 of 2711
the rights of shareholders and powers of management could be implemented in the future by amendment of the Certificate of Incorporation following shareholder approval and certain such changes could be implemented by amendment of the Bylaws of OSI Delaware without shareholder approval. For a discussion of such changes, see "Significant Differences Between the Corporation Laws of California and Delaware." This discussion of the Certificate of Incorporation and Bylaws of OSI Delaware is qualified by reference to Appendices C and D attached to this Proxy Statement, respectively.

---

***Change in Number of Directors***

Delaware law permits corporations to provide in their certificate of incorporation that their boards of directors are empowered to change the authorized number of directors by amendment to the bylaws or in the manner provided in the bylaws, unless the number of directors is fixed in the certificate of incorporation, in which case a change in the number of directors may be made only by amendment to the certificate of incorporation.

The Bylaws of OSI California and OSI Delaware establish a range of five (5) to nine (9) for the number of directors. The Bylaws of OSI California and OSI Delaware further provide that the number of directors may be fixed within this range from time to time by resolution of the Board of Directors. However, unlike the OSI California Bylaws, changes in the size of the Board outside of the abovementioned limits can be adopted by an amendment approved by a majority of the Board of Directors then in office, absent shareholder approval.

NASDAQ corporate governance rules require that the majority of the Board of Directors be independent. If the Reincorporation Proposal is approved, all of the directors of OSI California will continue to serve as directors of OSI Delaware following the Merger.

***Cumulative Voting***

Under a cumulative voting regime, a shareholder is permitted to cast as many votes as there are directors to be elected multiplied by the number of shares registered in such shareholder's name. Such votes may be cast for a single nominee or may be distributed among any two or more nominees. California law permits any shareholder to cumulate his or her votes in the election of directors upon proper notice of his, her or its intention to do so. California corporations that are listed on the American or New York Stock Exchanges or with securities qualified for trading on NASDAQ may opt to eliminate cumulative voting with the approval of their shareholders. Under Delaware law, cumulative voting is not permitted unless it is expressly authorized in the certificate of incorporation. The Bylaws of OSI California give shareholders the right to cumulate votes, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes. The Certificate of Incorporation of OSI Delaware will not provide for cumulative voting. The shareholders rights with respect to cumulative voting will, therefore, change if the Reincorporation Proposal is approved.

***Filling Vacancies on the Board of Directors***

Under California law, any vacancy on the board of directors other than one created by removal of a director may be filled by the board. If the number of directors is less than a quorum, a vacancy may be filled by the unanimous written consent of the directors then in office, by the affirmative vote of a majority of the directors at a meeting held pursuant to notice or waivers of notice or by a sole remaining director. A vacancy created by removal of a director may be filled only if authorized by a corporation's articles of incorporation or by a bylaw approved by the corporation's shareholders. OSI California's Articles of Incorporation and Bylaws do not authorize directors to fill vacancies created by removal of a director by the shareholders.

Under Delaware law, vacancies and newly created directorships may be filled by a majority of directors then in office, even if less than a quorum, or by a sole remaining director, unless otherwise provided in a corporation's certificate of incorporation or bylaws. The Bylaws of OSI Delaware provide that any vacancy, including any vacancy created by the removal of a director by the shareholders of OSI Delaware, may be filled by a majority of the directors then in office, even if less than a quorum, or by a sole remaining director.

---

***Shareholder Power to Call Special Shareholders' Meeting***

Under California law and the Bylaws of OSI California, a special meeting of shareholders may be called by the board of directors, the Chairman of the Board, the President, or the holders of shares entitled to cast not less than ten percent (10%) of the votes at such

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1602 of 2711

meeting. California law authorizes charter or bylaw provisions identifying additional persons who may call special meetings, though no such additional persons are identified in the Articles of Incorporation or Bylaws of OSI California.

Under Delaware law, a special meeting of shareholders may be called by the board of directors or by any other person authorized to do so in the certificate of incorporation or the bylaws. The Bylaws of OSI Delaware effectively eliminate the right of shareholders to call a special meeting. Rather, the right to call a special meeting is limited in the Bylaws of OSI Delaware to the Board, the Chairman of the Board, the President, or the Chief Executive Officer.

The Board has specifically opted to eliminate the right of shareholders to call a special meeting in order to avoid the unnecessary expense of a shareholders meeting and the distraction to management that might be occasioned by such a meeting where the matter or matters at issue are of minimal interest to the vast majority of the Company's shareholders.

**Comparison of the Corporation Laws of California and Delaware**

The following provides a general summary of the principal differences between the General Corporation Laws of California and Delaware. It is not an exhaustive description of the differences between the two states' laws as it is impractical to summarize all of such differences in this Proxy Statement. Certain principal differences beyond those discussed in "Significant Differences in the Charters and Bylaws of OSI California and OSI Delaware" that could materially affect the rights of shareholders include the following:

***Dividends and Repurchase of Shares***

California law does not utilize concepts of par value for shares or statutory definitions of capital, surplus and similar concepts. Delaware law permits a corporation, unless otherwise restricted by its certificate of incorporation, to declare and pay dividends out of surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or for the preceding fiscal year as long as the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets. In addition, Delaware law generally provides that a corporation may redeem or repurchase its shares only if such redemption or repurchase would not impair the capital of the corporation. In determining the amount of surplus of a Delaware corporation, the assets of the corporation, including stock of subsidiaries owned by the corporation, must, under certain circumstances, and may, under certain other circumstances, be valued at their fair market value as determined by the board of directors, regardless of their historical book value.

Under California law, a corporation may not make any distribution (including dividends, whether in cash or other property, and including repurchases of its shares) unless either (1) the corporation's retained earnings immediately prior to the proposed distribution equal or exceed the amount of the proposed distribution or, (2) immediately after giving effect to such distribution, the corporation's assets (exclusive of goodwill, capitalized research and development expenses and deferred charges) would be at least equal to 125% of its liabilities (not including deferred taxes, deferred income and other deferred credits), and the corporation's current assets, as defined, would be at least equal to its current liabilities (or 125% of its current liabilities if the average pre-tax and pre-interest earnings for the preceding two fiscal years were less than the average interest expenses for such years). Such tests are applied to California corporations on a consolidated basis. Under California law, there are certain exceptions to the foregoing rules for

repurchases of shares in connection with certain rescission actions and certain repurchases pursuant to employee stock plans.

OSI California currently maintains a share repurchase program. Under California law, repurchase programs are subject to certain restrictions that are not present in Delaware law. Delaware law, however, provides that a corporation may redeem or repurchase its shares only if the capital of the corporation is not impaired and such redemption or repurchase would not impair the capital of the corporation. If the Company were to reincorporate in Delaware, this share repurchase program might be operated with fewer restrictions than is the case under California law enabling the Company to extend the program and to thereby return value to its shareholders.

***Classified Board of Directors***

A classified board is a board on which a certain number, but not all, of the directors are elected on a rotating basis each year. California law requires, with an exception applicable to certain publicly-traded companies, that directors be elected annually and, therefore, does not permit the creation of a classified board. Under the exception, a corporation that is listed on the American or New York Stock Exchanges or that have securities qualified for trading on NASDAQ may create and elect a classified board. By contrast, Delaware law permits, but does not require, the adoption of a classified board of directors, pursuant to which the directors can be divided into as many as three classes with staggered terms of office and with only one class of directors coming up for election each year. The Company is not proposing to implement a classified board in connection with the implementation of the Reincorporation Proposal.

***Removal of Directors***

Under California law, any director or the entire board of directors may be removed, with or without cause, with the approval of a majority of the outstanding shares entitled to vote. No individual director, however, may be removed (unless the entire board is removed) if the number of votes cast against the removal would be sufficient to elect the director under cumulative voting.

Under Delaware law, any director or the entire board of directors of a corporation that does not have a classified board of directors or cumulative voting may be removed, with or without cause, by the holders of a majority of the outstanding shares entitled to vote at an election of directors. In the case of a Delaware corporation having cumulative voting, however, if less than the entire board is to be removed, a director may not be removed if the shares voted against such removal would be sufficient to elect the director under cumulative voting. A director of a Delaware corporation with a classified board of directors can be removed only for cause unless the charter documents otherwise provide.

***Interested Director Transactions***

Under both California and Delaware law, certain contracts or transactions in which one or more of a corporation's directors has an interest are not void or voidable simply because of such interest provided that certain conditions are met, such as obtaining the required approval and fulfilling the requirements of good faith and full disclosure. With certain exceptions, the conditions are similar under California and Delaware law. Under California and Delaware law, (1) after full disclosure of the material facts, either the shareholders or the board of directors must approve any such contract or transaction and, in the case of board approval, the contract or transaction must also be "just and reasonable" (in California) or "fair" (in Delaware), or (2) if there was no disclosure, the contract or transaction must have been "just and reasonable" (in California) or "fair" in Delaware, as the case may be, as to the corporation at the time it was approved. In the latter case, California law explicitly places the burden of proof on the interested director.

---

Under California law, to shift the burden of proof on the validity of the contract by shareholder approval, the interested director would not be entitled to vote his or her shares at a shareholder meeting with respect to any action regarding such contract or transaction. To shift the burden of proof on the validity of the contract by board approval, the contract or transaction must be approved by a majority vote of a quorum of the directors, without counting the vote of any interested directors (except that interested directors may be counted for purposes of establishing a quorum).

Under Delaware law, if board approval is sought to shift the burden of proof on the validity of the contract, the contract or transaction must be approved by a majority of the disinterested directors (even though less than a majority of a quorum). Therefore, certain transactions that the Board of Directors of OSI California might not be able to approve, because of the number of interested directors, could be approved by a majority of the disinterested directors of OSI Delaware, although less than a majority of a quorum. Neither OSI California nor OSI Delaware is aware of any plans to propose any transaction involving directors that could not be approved under California law, but could be approved under Delaware law.

***Shareholder Approval of Certain Business Combinations***

Under Section 203 of the Delaware General Corporation Law ("Section 203"), certain "business combinations" with "interested shareholders" of Delaware corporations are prohibited for a period of three years following the date that such person or entity becomes an interested shareholder unless specified conditions are met.

Section 203 prohibits a Delaware corporation from engaging in a "business combination" with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. With certain exceptions, an interested shareholder is a person or entity who or which owns, individually or with or through certain other persons or entities, 15% or more of the corporation's outstanding voting stock (including any rights to acquire stock pursuant to an option, warrant, agreement, arrangement or understanding, or upon the exercise of conversion or exchange rights, and stock with respect to which the person has voting rights only), or is an affiliate or associate of the corporation and was the owner of 15% or more of such voting stock at any time within the previous three years.

For purposes of Section 203, the term "business combination" is defined broadly to include (1) any mergers or consolidations by the corporation or any of its subsidiaries with or caused by the interested shareholder, (2) sales, transfers or other dispositions to or with the interested shareholder (except proportionately with the corporation's other shareholders) of assets of the corporation or a subsidiary equal to ten percent (10%) or more of the aggregate market value of the corporation's consolidated assets or its outstanding stock, (3) the issuance or transfer by the corporation or a subsidiary of stock of the corporation or such subsidiary to the interested shareholder (except for transfers in a conversion or exchange or a pro rata distribution or certain other transactions, none of which increase the interested shareholder's proportionate ownership of any class or series of the corporation's or such subsidiary's stock), or (4) receipt by

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1604 of 2711

the interested shareholder (except proportionately as a shareholder), directly or indirectly, of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation or a subsidiary.

The three-year moratorium imposed on business combinations by Section 203 does not apply if (1) prior to the date on which such shareholder becomes an interested shareholder the board of directors of the subject corporation approves either the business combination or the transaction which resulted in the person or entity becoming an interested shareholder, (2) the interested shareholder owns 85% of the corporation's voting stock upon consummation of the transaction which made him or her a 15% shareholder (excluding from the 85% calculation shares owned by directors who are also officers of the subject corporation and shares held by employee stock plans, which do not permit employees to decide

confidentially whether to accept a tender or exchange offer), or (3) on or after the date such person becomes an interested shareholder, the board approves the business combination and it is also approved at a shareholder meeting by 66 2/3% of the voting stock not owned by the interested shareholder.

Opting out of Section 203 of the Delaware General Corporation Law would minimize the ability of the Board of Directors and the management to negotiate takeover bids to achieve maximum value for the corporation and all of its shareholders. The Board believes that an unsolicited takeover attempt may have a negative effect on the Company and its shareholders. Section 203 may further have the effect of preventing a potential acquiror from making a two-tiered bid for the Company in which shareholders might be treated disparately. Transactions approved by the Board of Directors can, however, be carefully planned and undertaken at an opportune time to obtain maximum value for the corporation and its shareholders.

The application of Section 203 to OSI Delaware will confer upon the Board of Directors the power to reject a proposed business combination in certain circumstances, even though a potential acquiror may be offering a substantial premium for OSI Delaware's shares over the then-current market price. Section 203 should, however, have the added benefit of discouraging certain potential acquirors unwilling to comply with its provisions.

***Indemnification and Limitation of Liability***

California and Delaware have similar laws permitting a corporation to indemnify, with certain exceptions, its officers, directors, employees and other agents. The laws of both states also permit corporations to adopt charter and bylaw provisions that effectively eliminate the liability of a director to the corporation or its shareholders for monetary damages for breach of the director's fiduciary duty of care. Delaware law does, however, differ to some extent from California law insofar as it takes a somewhat more lenient approach in allowing corporations to indemnify and limit the liability of corporate agents. Certain of the differences between the limitation of liability and indemnification permitted under California and Delaware law are summarized below.

***Comparison of Limitation of Liability***

The Certificate of Incorporation of OSI Delaware eliminates the liability of directors to the corporation or its shareholders for monetary damages for breach of fiduciary duty as directors to the fullest extent permitted by Delaware law, as that law exists currently and as it may be amended in the future. Under Delaware law, a director's monetary liability may not be eliminated or limited by a corporation for: (1) breaches of the director's duty of loyalty to the corporation or its shareholders; (2) acts or omissions not in good faith or which involve intentional misconduct or knowing violations of law; (3) the unlawful payment of dividends or unlawful stock repurchases or redemptions under Section 174 of the DGCL; or (4) transactions in which the director received an improper personal benefit. Under Delaware law, a provision in the charter documents that limits a director's liability for the violation of, or otherwise relieves the corporation or its directors from complying with federal or state securities laws is prohibited. Such provisions may also not attempt to limit the availability of non-monetary remedies such as injunctive relief or rescission for a violation of federal or state securities laws.

California law does not permit the elimination of monetary liability where such liability is based on: (1) acts or omissions that involve intentional misconduct or a knowing and culpable violation of law, (2) acts or omissions that a director believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith on the part of the director, (3) any transaction from which a director derived an improper personal benefit, (4) acts or omissions that show a reckless disregard for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of

serious injury to the corporation or its shareholders, (5) acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation or its shareholders, (6) interested transactions between the corporation and a director in which a director has a material financial interest, and (7) liability for improper distributions, loans or guarantees. Therefore, under California law, monetary liability may exist in circumstances where it would be eliminated under Delaware law.

Both the Articles of Incorporation of OSI California and the Certificate of Incorporation of OSI Delaware provide for the elimination of the liability of the directors to the fullest extent permissible under California and Delaware law respectively. Because of its general belief that Delaware law provides greater protection to directors than California law and that Delaware case law regarding a corporation's ability to limit director liability is more developed and provides more guidance than California law, the Company believes that the Reincorporation Proposal and the attendant adoption of the OSI Delaware Certificate of Incorporation will give the Company greater leverage in attracting and retaining qualified directors and officers. The Company further believes that the Reincorporation Proposal would benefit the Company by enabling its directors to make decisions that are in the best interest of the Company and its shareholders in a corporate environment in which the likelihood of frivolous shareholder suits against them is decreased.

***Indemnification***

Indemnification is permitted by both California and Delaware law, provided the requisite standard of conduct is met. California law requires indemnification when the individual has successfully defended the action on the merits, as opposed to Delaware law, which requires indemnification relating to a successful defense on the merits or otherwise.

Delaware law generally permits indemnification of expenses, including attorneys' fees, judgments, fines and amounts actually and reasonably incurred in the defense or settlement of a direct, derivative or third-party action, provided there is a determination by (1) a majority vote of disinterested directors (even though less than a quorum), (2) a committee comprised of and established by a majority vote of such disinterested directors (even though less than a quorum), (3) independent legal counsel in a written opinion if there are no such directors or such directors so direct, or (4) the shareholders that the person seeking indemnification has satisfied the applicable standard of conduct. Without requisite court approval, however, no indemnification may be made in the defense of any derivative action in which the person is found to be liable in the performance of his or her duty to the corporation.

California law generally permits a corporation to indemnify any director, officer, employee or agent of the corporation for expenses, monetary damages, fines, and settlement amounts to the extent actually and reasonably incurred in the defense or settlement of a derivative or third-party action, provided there is a determination by (1) majority vote of a quorum of disinterested directors, (2) independent legal counsel in a written opinion if such a quorum of directors is not obtainable, (3) shareholders, with the shares owned by the person to be indemnified, if any, not being entitled to vote thereon, or (4) the court in which the proceeding is or was pending upon application made by the corporation, agent or other person rendering services in connection with the defense, whether or not the application by such person is opposed by the corporation, that the person seeking indemnification has satisfied the applicable standard of conduct.

With respect to derivative actions, however, no indemnification may be provided under California law for amounts paid in settling or otherwise disposing of a pending action or expenses incurred in defending a pending action that is settled or otherwise disposed of, or with respect to the defense of any person adjudged to be liable to the corporation in the performance of his or her duty to the corporation and its shareholders without court approval. In addition, by contrast to Delaware law, California law requires indemnification only when the individual being indemnified was successful on the merits in defending any action, claim, issue or matter.

---

Expenses incurred by an officer or director in defending an action may be paid in advance, under Delaware law and California law, if such director or officer undertakes to repay such amounts if it is ultimately determined that he or she is not entitled to indemnification. In addition, the laws of both states authorize a corporation's purchase of indemnity insurance for the benefit of its officers, directors, employees and agents whether or not the corporation would have the power to indemnify against the liability covered by the policy. California law permits a California corporation to provide rights to indemnification beyond those provided therein to the extent such additional indemnification is authorized in the corporation's Articles of Incorporation. Thus, if so authorized, rights to indemnification may be provided pursuant to agreements or bylaw provisions which make mandatory the permissive indemnification provided by California law.

OSI California's Articles of Incorporation permit indemnification beyond that expressly mandated by California law and limit director monetary liability to the extent permitted by California law. OSI California's Bylaws make indemnification of directors mandatory in cases where OSI California is permitted by applicable law to indemnify its directors. Similar to OSI California's Articles

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1606 of 2711
of Incorporation and Bylaws, the Bylaws and Certificate of Incorporation of OSI Delaware require indemnification to the maximum extent permissible under applicable law.

If the Reincorporation Proposal is approved, in connection with the reincorporation OSI directors and officers would enter into a new form of indemnification agreement with OSI Delaware that provides indemnification to the fullest extent permitted by current Delaware law and any future Delaware law that expands the permissible scope of indemnification. Such form of Indemnification Agreement is attached as Appendix E hereto.

California and Delaware corporate law, the OSI California Articles of Incorporation and Bylaws and the OSI Delaware Certificate of Incorporation and Bylaws may permit indemnification for liabilities under the Securities Act of 1933, as amended (the "Act") or the Exchange Act. The Board of Directors has been advised that, in the opinion of the SEC, indemnification for liabilities arising under the Act and the Exchange Act may be contrary to public policy and, therefore, may be unenforceable, absent a decision to the contrary by a court of appropriate jurisdiction.

***Inspection of Shareholders' List and Books and Records***

Both California and Delaware law allow any shareholder to inspect the shareholder list of a corporation for a purpose reasonably related to such person's interest as a shareholder. This right is unqualified and absolute and includes a right to inspect and copy the list under California law by persons who hold an aggregate of five percent or more of a corporation's voting shares or who hold one percent or more of such shares and have filed a Schedule 14A with the SEC. California law also permits a shareholder upon such shareholder's written demand to the corporation to inspect the accounting books and records and the minutes of board and shareholder proceedings of the corporation for any purpose reasonably related to the shareholder's interest

Delaware law also permits any shareholder of record, upon compliance with certain procedures, to inspect a list of shareholders and the corporation's other books and records for any proper purpose reasonably related to such person's interest as a shareholder, upon written demand under oath stating the purpose of such inspection. Delaware law, however, contains no provision comparable to the absolute right of inspection provided by California law to certain shareholders

***Approval of Certain Corporate Transactions***

Under both California and Delaware law, with certain exceptions, any merger, consolidation or sale of all or substantially all the assets must be approved by the board of directors and by a majority of the

outstanding shares entitled to vote. Under California law, similar board and shareholder approval is also required in connection with certain additional acquisition transactions. See "Appraisal/Dissenters' Rights."

***Class Voting in Certain Corporate Transactions***

California law generally differs from corporate law with respect to shareholder approval of any merger, certain sales of all or substantially all the assets of a corporation and certain other transactions. Under California law, such transactions must be approved by a majority of the outstanding shares of each class of stock (without regard to limitations on voting rights). By contrast, Delaware law does not generally require class voting, except in connection with certain amendments to the certificate of incorporation that, among other things, adversely affect a class of stock.

***Appraisal/Dissenters' Rights***

Under both California and Delaware law, a shareholder of a corporation participating in certain major corporate transactions may, under varying circumstances, be entitled to appraisal rights, pursuant to which such shareholder may receive cash in the amount of the fair market value of the shares held by such shareholder (as determined by agreement of the corporation and the shareholder or by a court) in lieu of the consideration such shareholder would otherwise receive in the transaction.

Under Delaware law, such appraisal rights are not available to (1) shareholders if the merger or consolidation is of a corporation the shares of which are listed on a national securities exchange, (2) shareholders if the merger or consolidation is of a corporation the shares of stock of which are held of record by more than 2,000 holders if such shareholders receive only shares of the surviving corporation or shares of any other corporation, or (3) the shareholders of the corporation surviving a merger if no vote of the shareholders of the surviving corporation is required to approve the merger in accordance with Section 251(f) of the DGCL.

California law differs from Delaware law with respect to appraisal rights (which are referred to as "dissenters' rights" under California law) insofar as California law does not provide for such rights for shares listed on a national securities exchange immediately prior to the transaction unless the holders of at least five percent of the outstanding shares claim the rights or transfer of the shares is

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1607 of 2711
restricted by the corporation or any law or regulation. Such rights are also generally not available where the shareholders of the corporation or the corporation itself, or both, immediately prior to the reorganization will own immediately after the reorganization, equity securities constituting more than 83.3% of the voting power of the surviving or acquiring corporation or its parent entity (as will be the case in the Merger). Thus, appraisal rights are not available to shareholders of OSI California under California law with respect to the Reincorporation Proposal.

***Dissolution***

Under California law, shareholders holding 50% or more of the total voting power may elect to require a corporation's dissolution, with or without the approval of the corporation's board of directors, and this right may not be modified by the articles of incorporation. Shareholders who have not voted in favor of a dissolution may prevent the dissolution by purchasing for cash at fair market value the shares of the parties attempting to initiate the dissolution.

By contrast, under Delaware law, shareholders holding 100% of the total voting power of the corporation must approve a dissolution unless the board of directors approves the proposal to dissolve. If the dissolution is initiated by the board of directors, it may be approved by the holders of a simple majority of the corporation's shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions to enable a corporation to prevent a board initiated dissolution scenario. OSI Delaware's Certificate of Incorporation contains no

---

such supermajority voting requirement, however, and the vote of the holders of a majority of the outstanding shares would be sufficient to approve a dissolution of OSI Delaware which had previously been approved by its Board of Directors.

***Shareholder Derivative Suits***

California law provides that a shareholder bringing a derivative action on behalf of a corporation need not have been a shareholder at the time of the transaction in question, provided that certain tests are met. California law also provides that the corporation or the defendant in a derivative suit may make a motion to the court for an order requiring the plaintiff shareholder to furnish a security bond. Delaware law differs from California law insofar as it does not have such a bond requirement. Additionally, under Delaware law, a shareholder may bring a derivative action on behalf of the corporation only if the shareholder was a shareholder of the corporation at the time of the transaction in question or if his or her stock thereafter came to be owned by him or her by operation of law.

**Application of the CGCL to Delaware Corporations**

Under Section 2115 of the CGCL, certain foreign corporations (*i.e.*, corporations not organized under California law) are subject to a number of key provisions of the CGCL. Such corporations are included in a special category (referred to in this discussion as "quasi-California" corporations) if they have characteristics of ownership and operation which indicate that they have significant contacts with California. These characteristics include the following: (1) more than half of the corporation's outstanding voting securities being held of record by persons or entities domiciled in California; and (2) the average of a "property factor, sales factor and payroll factor" (as defined under California law) exceeds a 50% threshold. Key provisions of the CGCL to which a Delaware corporation would be subject are those relating to the election and removal of directors, cumulative voting, prohibition of classified boards of directors unless certain requirements are met, standard of liability and indemnification of directors, distributions, dividends and repurchases of shares, shareholder meetings, approval of certain corporate transactions, dissenters' appraisal rights and inspection of corporate records. See "Significant Differences between the Corporation Laws of California and Delaware."

However, an exemption from Section 2115 is provided for corporations whose shares are listed on the New York Stock Exchange or the American Stock Exchange or whose shares are traded on NASDAQ are be exempt from the provisions of Section 2115. Because the securities of the Company will continue to be designated as NASDAQ securities after the Merger, OSI Delaware will be exempt from the provisions of Section 2115 after the reincorporation.

**Federal Income Tax Considerations**

The following is a discussion of certain federal income tax considerations with respect to the Merger that are generally applicable to holders of OSI California capital stock who receive OSI Delaware capital stock in exchange for their OSI California capital stock in the Merger. This summary is for general information purposes only and does not purport to address all the federal income tax considerations that may be relevant to particular shareholders of OSI California in light of their particular circumstances or who are subject to special treatment under the federal income tax laws (such as shareholders that are dealers in securities, foreign persons or shareholders that acquired their shares in connection with a stock option plan or other compensatory transaction). Furthermore, no foreign, state or local tax considerations are addressed herein. This summary is based on current federal income tax law, which is

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1608 of 2711

subject to change at any time, possibly with retroactive effect. ALL SHAREHOLDERS OF OSI CALIFORNIA ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE SPECIFIC FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

---

Subject to the limitations, qualifications and exceptions described herein, and assuming the Merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, the following tax consequences generally should result:

(a) No gain or loss should be recognized by a shareholder of OSI California who exchanges all of such shareholder's OSI California capital stock for OSI Delaware capital stock in the Merger;

(b) The aggregate tax basis of the OSI Delaware capital stock received by a shareholder of OSI California in the Merger should be equal to the aggregate tax basis of OSI California capital stock surrendered in exchange therefor; and

(c) The holding period of the OSI Delaware capital stock received in the Merger should include the period for which the OSI California capital stock surrendered in exchange therefor was held, provided that the OSI California capital stock is held as a capital asset at the time of the Merger.

The Company has not requested a ruling from the Internal Revenue Service, nor an opinion from its outside legal counsel, with respect to the federal income tax consequences of the Reincorporation Proposal under the Internal Revenue Code. In any case, such an opinion would neither bind the Internal Revenue Service nor preclude it from asserting a contrary position.

State, local or foreign income tax consequences to shareholders may vary from the federal tax consequences described above.

The Company should not recognize gain or loss for federal income tax purposes as a result of the Reincorporation Proposal, and OSI Delaware should succeed, without adjustment, to the federal income tax attributes of OSI California.

**General**

The Board of Directors believes that reincorporating the Company from California to Delaware will enable the Company to benefit from Delaware's predictable and responsive legal and institutional regimes. One such benefit will be the Company's increased ability to attract and retain qualified independent directors and ensure sound corporate governance. In proposing the reincorporation, the Board of Directors has carefully evaluated the Company's anti-takeover profile and balanced the relative rights of its shareholders and management in order to maximize management efficiency and maximize value for the Company and its shareholders. For the reasons set forth above, the Board of Directors believes that it is in the best interests of the Company and its shareholders for the Company to reincorporate in the state of Delaware.

***The Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 4 on the Proxy) to approve the reincorporation of the Company from California to Delaware. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. Approval of the Reincorporation Proposal, will constitute approval of (1) the Merger Agreement, the Certificate of Incorporation of OSI Delaware, the Bylaws of OSI Delaware, and the form of Indemnification Agreement of OSI Delaware, in substantially the form attached as Appendices B, C, D and E, respectively and (2) the assumption of OSI California's stock option plans and outstanding stock options by OSI Delaware. In order to be adopted, this proposal must be approved by the affirmative vote of holders of a majority of the outstanding Common Stock of OSI California present and voting at the Meeting.***

---

## INDEPENDENT PUBLIC ACCOUNTANTS

On March 23, 2006, Deloitte & Touche LLP ("Deloitte & Touche") resigned as the Company's independent public accountants. The resignation was accepted by the Audit Committee of the Board of Directors.

The reports of Deloitte & Touche on the financial statements of the Company for the years ended June 30, 2005 and 2004 contained no adverse opinion or disclaimer of opinion, and such reports were not qualified or modified as to uncertainty, audit scope or accounting principle, except as discussed in the following sentence. Deloitte & Touche's report on the Company's June 30, 2005 consolidated financial statements included an explanatory paragraph related to the restatement of the June 30, 2003 and 2004 pro forma stock compensation fair value disclosures. In connection with its audit of the effectiveness of the Company's internal control over

financial reporting as of June 30, 2005, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, Deloitte & Touche expressed an unqualified opinion on the Company's assessment of the effectiveness of its internal control over financial reporting, and an adverse opinion in its report dated September 28, 2005 on the effectiveness of the Company's internal control over financial reporting due to two material weaknesses as more fully described below. The Audit Committee of the Board of Directors discussed the subject matter of the adverse opinion with Deloitte & Touche prior to the September 28, 2005 report. The Company authorized Deloitte & Touche to respond fully to any inquiries of its successor concerning the subject matter of the September 28, 2005 report and any other matters.

During the years ended June 30, 2005 and 2004 and through March 23, 2006, there were no disagreements with Deloitte & Touche on any accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Deloitte & Touche, would have caused it to make reference thereto in connection with its reports on the Company's financial statements for such years, other than as discussed in this paragraph. In connection with Deloitte & Touche's review of the Company's interim financial statements for the quarter ended September 30, 2004, the Company had a disagreement with Deloitte & Touche, which was resolved to Deloitte & Touche's satisfaction prior to the filing of the Quarterly Report on Form 10-Q for that period. The disagreement related to the application of accounting principles used to recognize revenue upon shipment of x-ray scanning equipment to a third-party warehouse on September 28, 2004. The Company recorded adjustments to its financial statements for the three-month period ended September 30, 2004, in order to decrease revenue and cost of sales by $1.4 million and $1 million, respectively. The Audit Committee of the Board of Directors discussed such disagreement with Deloitte & Touche. The Company authorized Deloitte & Touche to respond fully to the inquiries of any successor accountant concerning the subject matter of this disagreement.

In connection with its audit for the fiscal year 2005, Deloitte & Touche advised the Company that it believed the following matters constituted material weaknesses. These material weaknesses were reported in Item 9A of the Company's Form 10-K for that fiscal year.

1) The Company identified certain computational errors in its annual income tax provision and related income tax receivable and payable and deferred tax assets and deferred tax liabilities for fiscal year 2005. These errors resulted from a deficiency in the operation of controls requiring the reconciliation of the components of the Company's income tax provision to appropriate supporting documentation. Given the significance of the tax account balances and the absence of sufficient mitigating controls, these deficiencies represent a material weakness in internal control over financial reporting.

2) The Company identified certain transactions recorded as revenue by one of its Canadian subsidiaries in the period ended June 30, 2005 that did not meet the criteria for revenue recognition in such period. These errors resulted from a deficiency in the operation of controls

requiring the supervisory review of year-end revenue transactions to ensure proper cutoff at year end. The errors associated with these transactions totaled approximately $1.4 million.

During the three months ended December 31, 2005, two additional material weaknesses were identified as follows:

1) Income Taxes—During the calculation of the Company's tax provision, it did not correctly apply FASB Interpretation No. 18 "Accounting for Income Taxes in Interim Periods," which resulted in a material error in the tax provision for the three and six month periods ended December 31, 2005. Additionally, the Company did not correctly apply FASB Statement No. 109, "Accounting for Income Taxes," with respect to the three month period ended December 31, 2005. Specifically, the Company did not provide for deferred tax liabilities in connection with the sale of newly issued subsidiary stock.

2) Financial Reporting and Disclosure—Subsequent to the issuance of the Company's unaudited consolidated financial statements for the six months ended December 31, 2004, the Company determined that its consolidated statement of cash flows for the six months ended December 31, 2004 incorrectly reflected cash lease incentives as a financing activity. The cash lease incentives should have been classified as an operating activity. The Company corrected this presentation in the financial statements filed on Form 10-K for the year ended June 30, 2005. The Company's proposed statement of cash flows for the six months ended December 31, 2005, included a comparative statement of cash flows for the six months ended December 31, 2004. In that proposed statement of cash flows for the comparable prior-year period, the Company failed to make a correction to the classification of the cash lease incentives. This presentation was corrected prior to finalization of the Company's Form 10-Q for the quarter ended December 31, 2005. As presented in the Company's Form 10-Q for the quarter ended December 31, 2005, the comparative statement of cash flows for the six months ended December 31, 2004 properly classified the cash lease incentives as an operating activity. Additionally, the Company's financial reporting and disclosure controls failed to detect that the Company had incorrectly classified $6.0 million of deferred rent, including the liability recorded in conjunction with the cash lease incentive detailed above, and a portion of deferred revenues as current liabilities in the proposed December 31, 2005 consolidated balance sheet. This presentation was corrected prior to the finalization of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1610 of 2711

Company's Form 10-Q for the quarter ended December 31, 2005. As presented in the Company's Form 10-Q for the quarter ended December 31, 2005, deferred rent and a portion of deferred revenues are presented as non-current liabilities.

The Company has undertaken measures to address each of the material weaknesses described above. However, Deloitte & Touche has not reviewed such measures.

In performing their audit of the Company's financial statements for the fiscal years ended June 30, 2004 and 2005 and in their reviews of interim financial statements, Deloitte & Touche also advised the Company of the following significant deficiencies in its internal control over financial reporting, which are described here as further disclosure. These significant deficiencies, taken individually or in combination, do not rise to the level of material weakness.

With the exception of the items identified with respect to the three months ended December 31, 2005, the Company has undertaken measures to address the items described below. However, Deloitte & Touche has not reviewed such measures.

Significant Deficiencies identified for the fiscal year ended June 30, 2005:

1) Review of Obsolete and Slow Moving Inventory—At one subsidiary location, the Company's process for identifying and reviewing excess inventory was based on a system-generated computer

report that did not accurately calculate potential excess inventory and lacked supervisory review for the "formulaic" reasonableness of the report.

2) Review of Detail Job Cost Reports and Supporting Documentation—The Company's designed controls include the review of project job cost reports and supporting detail. Deloitte & Touche noted a lack of documented evidence of certain of these controls at two subsidiary locations.

3) Goodwill Impairment Analysis—Deloitte & Touche noted that although the Company appropriately concluded that further impairment tests were not required, the Company's reporting unit carrying value computation did not properly take into consideration certain inter-company loan balances which were long-term in nature, and an allocation of the net assets at one subsidiary location.

4) Asset Impairment Analysis—An assessment of certain impairment indicators, along with the related conclusions, were not formally documented.

5) Pro Forma Stock-Based Compensation Calculations—The methodology the Company employed to calculate pro forma stock-based compensation did not conform to generally accepted accounting principles with regard to the requirement that the recognition of compensation over the service period equal to amounts that, on a cumulative basis, are no less than the portion of service provided during the vesting period.

6) Performance of Reconciliations—At certain international subsidiaries, account reconciliations and review of account balances had not been properly documented.

7) Application of U.S. Generally Accepted Accounting Principles—Miscellaneous accounting errors were noted at certain international subsidiaries.

8) Revenue Recognition—At one subsidiary location, the methodology the Company employed for revenue recognition with regard to multiple-element transactions did not conform to generally accepted accounting principles.

9) Inventory and Cost of Sales; Accounts Payable and Expenses—Deloitte & Touche noted that in the aggregate, the Company had inventory related controls which were not operating effectively, and, in the aggregate, the Company had several accounts payable related controls which were not operating effectively.

Significant Deficiencies for the three months ended September 30, 2005:

1) Financial Reporting and Disclosure—In connection with the adoption of Statement Financial Accounting Standards No. 123R, "Share-Based Payments," the Company excluded certain disclosures required by Securities and Exchange Commission Staff Accounting Bulletin Topic 14H. In addition, changes subsequent to the balance sheet date in the Company's debt structure were not disclosed.

2) Financial Closing Process and Journal Entry Review—An entry related to deferred taxes in the amount of $651,000 was not reviewed in accordance with the Company's stated policy subsequent to posting to the general ledger, and the entry was mis-posted.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1611 of 2711

3) Accounts Payable and Expenses—There was an improper cut-off related to certain expenses for which a liability should have been recorded in the amount of approximately $65,000. Deloitte & Touche noted and previously communicated similar errors as of June 30, 2005 and deemed such errors to represent a significant deficiency in the aggregate at the corporate consolidated level. As such, Deloitte & Touche indicated its belief that the potential misstatement associated with this deficiency was more than inconsequential.

---

4) Revenue Cut-off—There was an improper cut-off related to revenue associated with a sale of demo inventory prior to the balance sheet date. Revenue in the amount of approximately $68,000 was not recorded. Deloitte & Touche noted and previously communicated similar errors as of June 30, 2005 and deemed such errors to represent a significant deficiency in the aggregate. As such, Deloitte & Touche indicated its belief that the potential misstatement associated with this deficiency was more than inconsequential.

Significant Deficiencies for the three months ended December 31, 2005:

1) Goodwill Impairment Analysis—The Company did not have sufficient documentation evidencing the basis for the Company's decision to perform the impairment test at the segment level.

2) Revenue Recognition—There was an improper cut-off related to revenue associated with a sale of maintenance services. Revenue in the amount of approximately $22,000 in the three month period ended September 30, 2005 and $15,000 in the three month period ended December 31, 2005 was not recorded. Deloitte & Touche had noted and had previously communicated similar errors as of June 30, 2005 and September 30, 2005 and deemed such errors to represent a significant deficiency in the aggregate. As such, Deloitte & Touche believed the potential misstatement associated with this deficiency was more than inconsequential.

Except as described above, no reportable events as described in paragraph (a)(1)(v) of Item 304 of Regulation S-K occurred during the years ended June 30, 2005 and 2004 and through March 23, 2006. The Company requested that Deloitte & Touche furnish it with a letter addressed to the SEC stating whether or not it agrees with the above statements. A copy of such letter, dated March 29, 2006, was filed as Exhibit 16.1 to the Company's Form 8-K filed on March 30, 2006.

On April 20, 2006, the Audit Committee of the Board of Directors of the Company appointed Moss Adams LLP ("Moss Adams") as its independent registered public accounting firm for fiscal 2006. The Company did not consult with Moss Adams during the years ended June 30, 2005 and 2004, and through April 20, 2006, on any matter which was the subject of any disagreement or any reportable event as defined in Regulation S-K Item 304(a)(1)(iv) and Regulation S-K Item 304(a)(1)(v), respectively, or on the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements. Moss Adams has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

The California General Corporation Law does not require the ratification of the selection of independent registered public accounting firm by the Company's shareholders. As a result, no accounting firm has been recommended to be ratified by the Company's shareholders as the independent registered public accounting firm for the fiscal year ending June 30, 2007. The Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent registered public accounting firm at any time during the year, if they determine that such a change would be in the best interests of the Company and its shareholders.

A representative of Moss Adams will be present at this year's Annual Meeting of Shareholders. The representative may have an opportunity to make a statement if he or she desire to do so, and may be available to respond to appropriate questions.

---

**Independent Registered Public Accounting Firm Fees**

The following table represents fees charged for professional audit services rendered by Deloitte & Touche and Moss Adams for the audit of the Company's financial statements for the years ended June 30, 2006 and 2005, and fees billed by Deloitte & Touche and Moss Adams for other services during those years.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1612 of 2711

| | 2006 | 2005 |
|---|---|---|
| Audit Fees | $ 4,504,000 | $ 2,872,000 |
| Audit-Related Fees | 90,000 | 1,105,000 |
| Tax Fees | 30,000 | 178,000 |
| All Other Fees | — | — |
| Total | $ 4,624,000 | $ 4,155,000 |

Audit Fees consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams and Deloitte & Touche in connection with statutory and regulatory filings or engagements. For the fiscal year ended June 30, 2006, these fees included approximately $1,697,000 related to the audit of the Company's internal control over financial reporting.

Audit-Related Fees consist of fees billed for assurance and related services, primarily related to equity offerings, transfer pricing and pension plan related support and are not reported under "Audit Fees."

Tax Fees consist of fees billed for professional services rendered for tax advice, planning and compliance (domestic and international).

All Other Fees consist of fees for products and services other than for the services described above. In fiscal 2006 and 2005, there were no fees for services not included in the above categories.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

---

## INFORMATION CONCERNING
## MANAGEMENT, COMPENSATION AND STOCK OWNERSHIP

**Executive Officers**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Ajay Mehra*** joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996 and served as Secretary between March 1996 and November 2002. Mr. Mehra also serves as President of the Company's Security and Inspection Systems Group. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Anuj Wadhawan*** was named Chief Financial Officer and Treasurer of the Company in November 2002. From March 1991 to March 2000, Mr. Wadhawan held various accounting and finance-related positions with the Company and its subsidiaries, including Corporate Controller. In March 2000, Mr. Wadhawan became the Company's Vice President of Finance. Prior to joining the Company,

Mr. Wadhawan held various finance positions with the Lighting Division of Phillips Electronics in India. Mr. Wadhawan holds a Bachelor of Science in Accounting from Punjab University in India, is a chartered accountant in India, and has passed the certified public accounting examinations in the United States. As previously disclosed in a Current Report on Form 8-K, filed with the SEC on July 31, 2006, Mr. Wadhawan assumed the position of Executive Vice President and Chief Financial Offer of the Company's Security division on September 25, 2006. As of such date, Mr. Wadhawan no longer served as the Company's Chief Financial Officer or Treasurer.

***Victor S. Sze*** was named General Counsel, Vice President of Corporate Affairs of the Company in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President of Corporate Affairs. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a bachelors' degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Andreas F. Kotowski*** has served as Chief Technology Officer for Company's security and inspection systems subsidiaries since October 2000. Previously, since January 1993, he served as the President of U.S. Operations, General Manager and a Director of the Company's subsidiary, Rapiscan Security Products (U.S.A.), Inc. From September 1989 to January 1993, Mr. Kotowski was self-employed as an engineering consultant, providing technical and management consulting services to businesses in the explosive detection and medical imaging industries. From 1979 to 1989, Mr. Kotowski held various positions with EG&G Astrophysics, including Vice President of Engineering and Chief Engineer, in which he was

responsible for product planning, design, development and management. Prior to 1979, he worked as an Engineer at National Semiconductor Corporation and the Jet Propulsion Laboratory. Mr. Kotowski holds a Bachelor of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics from California State Polytechnic University, Pomona, and a Master of Science degree in Electrical Engineering from Stanford University.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the amount of shares of the Company beneficially owned as of September 21, 2006 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,325,440 | 7.8% |
| Dimensional Fund Advisors, Inc.(4) | 1,382,644 | 8.3% |
| NWQ Investment Management Company, LLC(5) | 1,135,162 | 6.8% |
| Royce & Associates, LLC(6) | 904,200 | 5.4% |
| Wellington Management Company, LLP(7) | 1,982,942 | 11.9% |
| Wells Fargo & Company(8) | 2,256,283 | 13.5% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 21, 2006, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 160,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 160,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 553,615 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 156,825 shares are held individually by Mr. Chopra. Includes 25,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the SEC, the address of Dimensional Fund Advisors, Inc. is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(5) As reported in a Schedule 13G filed with the SEC, the address of NWQ Investment Management, LLC is 2049 Century Park East, 16th Floor, Los Angeles, CA 90067.

(6) As reported in a Schedule 13G filed with the SEC, the address of Royce & Associates, LLC is 1414 Avenue of the Americas, New York, NY 10019.

(7) As reported in a Schedule 13G filed with the SEC, the address of Wellington Management Company, LLP is 75 State St., Boston, MA 02109.

(8) As reported in a Schedule 13G filed with the SEC, the address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94104.

The following table sets forth the amount of shares of the Company beneficially owned as of September 21, 2006 by each director of the Company, each Named Executive Officer (see “Information Concerning Management, Compensation and Stock Ownership—Executive Compensation”), and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,325,440 | 7.8% |
| Ajay Mehra(4) | 233,464 | 1.4% |
| Anuj Wadhawan(5) | 65,510 | 0.4% |
| Victor S. Sze(6) | 24,625 | 0.1% |
| Andreas F. Kotowski(7) | 31,018 | 0.2% |
| Steven C. Good(8) | 48,750 | 0.3% |
| Meyer Luskin(9) | 56,550 | 0.3% |
| Chand R. Viswanathan(10) | 15,625 | 0.1% |
| All directors and executive officers as a group (8 persons) (3)(4)(5)(6)(7)(8)(9)(10) | 1,800,782 | 10.4% |

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 21, 2006, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 160,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 160,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 553,615 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 156,825 shares are held individually by Mr. Chopra. Includes 25,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Includes no shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company’s Security Group.

(5) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Wadhawan is the Chief Financial Officer of the Company.

(6) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Sze is the General Counsel, Vice President of Corporate Affairs and Secretary of the Company.

(7) Includes no shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Kotowski is the Chief Technology Officer of the Company.

(8) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

(9) Includes 1,500 shares held by The Meyer and Doreen Luskin Family Trust. Includes 18,800 shares owned by Scope Industries. Mr. Luskin is the Chairman of the Board, President and Chief Executive Officers of Scope Industries. Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, CA 90401.

(10) Includes 1,875 shares issuable pursuant to options which become exercisable no later than 60 days after September 21, 2006. Mr. Viswanathan is a Director of the Company.

**Executive Compensation**

The following table sets forth the compensation for the Chief Executive Officer, each of the four most highly compensated executive officers whose individual remuneration exceeded $100,000 during the fiscal year ended June 30, 2006, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers"):

**SUMMARY COMPENSATION TABLE**

| | | Annual Compensation | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | All Other Annual Compensation ($) | Restricted Stock Award(s)(#) | Securities Underlying Options/ SARs (#) | LTIP Payouts ($) | All Other Compensation ($) |
| Deepak Chopra | 2006 | 985,197 | 150,000 | — | — | 150,000 | — | $ 62,577(1) |
| Chief Executive | 2005 | 925,000 | 300,000 | — | — | 80,000 | — | 47,600(1) |
| Officer | 2004 | 793,269 | 435,000 | — | — | 100,000 | — | 377,493(1)(2) |
| Ajay Mehra | 2006 | 364,587 | — | — | — | — | — | 11,952(3) |
| Executive V.P. | 2005 | 338,048 | 120,000 | — | — | 25,000 | — | 11,875(3) |
| President of Security Group | 2004 | 310,000 | 170,000 | — | — | 25,000 | — | 8,600(3) |
| Anuj Wadhawan | 2006 | 232,074 | 90,000 | — | — | 20,000 | — | 12,403(4) |
| Chief Financial | 2005 | 228,382 | 90,000 | — | — | 20,000 | — | 2,400(4) |
| Officer | 2004 | 174,941 | 72,500 | — | — | 20,000 | — | 2,400(4) |
| Victor S. Sze | 2006 | 253,122 | 75,000 | — | — | 20,000 | — | 3,700(5) |
| General Counsel, | 2005 | 209,160 | 75,000 | — | — | 17,500 | — | 3,700(5) |
| Executive V.P. | 2004 | 169,945 | 40,000 | — | — | 17,500 | — | — |
| Andreas F. Kotowski | 2006 | 229,800 | — | — | — | — | — | 2,400(6) |
| Chief Technology | 2005 | 223,260 | 40,000 | — | — | 5,000 | — | 2,400(6) |
| Officer | 2004 | 210,675 | 72,500 | — | — | 7,500 | — | 2,400(6) |

(1) The Company paid aggregate insurance premiums of approximately $62,577, $47,600 and $42,700 on behalf of Mr. Chopra in 2006, 2005 and 2004, respectively.

(2) In 2004, the Company assigned a 20-year term life insurance policy to Mr. Chopra. The value of the assigned policy is $334,793 and is included in "All Other Compensation" for 2004.

(3) The Company paid aggregate insurance premiums of approximately $11,952, $11,875 and $8,600 on behalf of Mr. Mehra in 2006, 2005 and 2004, respectively.

(4) The Company paid aggregate insurance premiums of approximately $12,403, $2,400 and $2,400 on behalf of Mr. Wadhawan in 2006, 2005 and 2004, respectively.

(5) The Company paid aggregate insurance premiums of approximately $3,700 and $3,700 on behalf of Mr. Sze in 2006 and 2005.

(6) The Company paid aggregate insurance premiums of approximately $2,400, $2,400 and $2,400 on behalf of Mr. Kotowski in 2006, 2005 and 2004, respectively.

**Option Grants**

The following table sets forth certain information concerning grants of options to the Named Executive Officers during the year ended June 30, 2006:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options/ SARs Granted(#)(1) | Percent of Total Options/SARs Granted to Employees in Fiscal Year Year (%) | Exercise Price ($/Share) | Expiration Date | Potential Realizable Value of Assumed Annual Rates of Stock Price Appreciation for Options Term(2) | |
|---|---|---|---|---|---|---|
| | | | | | 5%($) | 10%($) |
| Deepak Chopra | 150,000 | 42.37 | 18.32 | 6/23/2011 | 759,222 | 1,677,681 |
| Ajay Mehra | — | — | — | — | — | — |
| Anuj Wadhawan | 20,000 | 5.65 | 18.53 | 11/11/2010 | 102,390 | 226,255 |
| Victor S. Sze | 20,000 | 5.65 | 18.53 | 11/11/2010 | 102,390 | 226,255 |
| Andreas F. Kotowski | — | — | — | — | — | — |

(1) All of the listed options vest in three annual installments, 25% on the first anniversary of the date of grant, 25% on the second anniversary, and 50% on the third anniversary.

(2) Sets forth potential option gains based on assumed annualized rates of stock price appreciation from the exercise price at the date of grant of 5% and 10% (compounded annually) over the full term of the grant with appreciation determined as of the expiration date. The 5% and 10% assumed rates of appreciation are mandated by the rules of the SEC and do not represent the Company's estimate or projection of future Common Stock prices.

**Option Exercises and Fiscal Year-End Values**

The following table sets forth certain information regarding option exercises by the Named Executive Officers during the fiscal year 2006 and held by them on June 30, 2006:

**AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES**

| Name | Shares Acquired On Exercise (#) | Value Realized ($)(1) | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year End ($)(1) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Deepak Chopra | 40,000 | 573,200 | 270,000 | 260,000 | 846,000 | — |
| Ajay Mehra | 25,000 | 366,000 | 93,750 | 31,250 | 111,750 | — |
| Anuj Wadhawan | 5,000 | 73,200 | 43,250 | 45,000 | 76,439 | — |
| Victor S. Sze | — | — | 18,125 | 61,875 | 7,750 | — |
| Andreas F. Kotowski | — | — | 15,500 | 7,500 | 3,460 | — |

(1) Amounts are shown as the positive spread between the exercise price and fair market value (based on the fair market price at fiscal year end of $17.77 per share).

**1997 Stock Option Plan**

In May 1997, the Board of Directors adopted the 1997 Plan. The 1997 Plan, which was approved by the Company's shareholders in June 1997, provided for the grant of options to directors, officers, other employees and consultants of the Company to purchase up to an aggregate of 850,000 shares of Common Stock. In November 2000, the Company's shareholders approved an increase of the number

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1617 of 2711

of shares of Common Stock for which options may be granted to 1,850,000. In November 2002, the Company's shareholders approved an increase of the number of shares of Common Stock for which options may be granted to 2,350,000. In November 2004, the Company's shareholders approved an increase in the number of shares of Common Stock for which options may be granted to 3,350,000. No eligible person may be granted options during any 12-month period covering more than 425,000 shares of Common Stock. The purpose of the 1997 Plan is to provide participants with incentives that will encourage them to acquire a proprietary interest in, and continue to provide services to, the Company. The 1997 Plan is administered by the Board of Directors, or a committee of the Board of Directors, which has discretion to select optionees and to establish the terms and conditions of each option, subject to the provisions of the 1997 Plan. Options granted under the 1997 Plan may be "incentive stock options" as defined in Section 422 of the Code or nonqualified options.

The exercise price of incentive stock options may not be less than 100% of the fair market value of Common Stock as of the date of grant (110% of the fair market value if the grant is to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). The Code currently limits to $100,000 the aggregate value of Common Stock that may be acquired in any one year pursuant to incentive stock options under the 1997 Plan or any other option plan adopted by the Company. Nonqualified options may be granted under the 1997 Plan at an exercise price of not less than 85% of the fair market value of the Common Stock on the date of grant. Nonqualified options may be granted without regard to any restriction on the amount of Common Stock that may be acquired pursuant to such options in any one year. Options may not be exercised more than ten years after the date of grant (five years after the date of grant if the grant is an incentive stock option to an employee who owns more than 10% of the total combined voting power of all classes of capital stock of the Company). Options granted under the 1997 Plan generally are nontransferable, but transfers may be permitted under certain circumstances at the discretion of the administrator. Shares subject to options that expire unexercised under the 1997 Plan will once again become available for future grant under the 1997 Plan. The number of options outstanding and the exercise price thereof are subject to adjustment in the case of certain transactions such as mergers, recapitalizations, stock splits or stock dividends. As of June 30, 2006, stock options to purchase 1,042,751 shares were exercised under the 1997 Plan, stock options to purchase an aggregate of 1,778,678 shares were outstanding under the 1997 Plan at exercise prices ranging from $3.77 to $20.91per share, and stock options to purchase 517,571 shares remained available for future grant. The 1997 Plan is effective for ten years, unless sooner terminated or suspended.

During the fiscal year ended June 30, 2006, the Board of Directors of the Company granted options to purchase an aggregate of 354,000 shares of Common Stock under the 1997 Plan to certain executive officers, directors and employees of the Company. These options are exercisable at a price equal to the fair market value of the Common Stock on the date of grant. Options granted to such officers, directors and employees of the Company generally are subject to vesting. Such options will become exercisable in installments over a period of three years from the date of grant, subject to the optionee's continuing employment or service as a director of the Company.

In general, upon termination of employment of an optionee, all options granted to such person which were not exercisable on the date of such termination will immediately terminate, and any options that are exercisable will terminate not more than three months (six months in the case of termination by reason of death or disability) following termination of employment.

---

To the extent nonqualified options are granted under the 1997 Plan, the Company intends to issue such options with an exercise price of not less than the market price of the Common Stock on the date of grant.

**Employee Stock Purchase Plan**

In August 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan, which was approved by the Company's shareholders in November 1998, provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase shares of Common Stock through regular payroll deductions. The total number of shares of Common Stock subject to the 1998 Plan is 200,000. The 1998 Plan is administered by the Board of Directors, or a committee of the Board of Directors. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section 423 of the Code.

To participate in the 1998 Plan, eligible employees submit a form to the Company's payroll office authorizing payroll deductions in an amount between 1% and 10% of the employee's regular annual pay. At the end of each offering period, initially set at six months duration, the aggregate amount deducted from each participating employee's paycheck is applied to the purchase of a whole number of shares of Common Stock, with any sums remaining being returned to the employee. No interest accrues on payroll deductions. The purchase price of the Common Stock is 85% of the lesser of the fair market value of the Common Stock (as determined by the Board of Directors) on the first day or the last day of the offering period. If the aggregate number of shares of Common Stock which all participants elect to purchase during any offering period is greater than the number of shares remaining available for issuance under the 1998 Plan, the remaining shares will be allocated pro-rata among participants. Notwithstanding any of the foregoing, no employee may

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1618 of 2711

purchase Common Stock under the 1998 Plan if (i) after any such purchase, the employee would own 5% or more of the total combined voting power or value of all classes of the Company's stock on a consolidated basis, or (ii) the rights to purchase Common Stock under the 1998 Plan and all other qualified employee stock purchase plans of the Company or any of its subsidiaries granted to that employee would exceed $25,000 per calendar year.

A participant may elect to withdraw from the 1998 Plan at any time up to the last day of an offering period by filing a form to such effect. Upon withdrawal, the amount contributed to the employee will be refunded in cash, without interest. Any person withdrawing may not participate again in the 1998 Plan until the end of one complete offering period. Termination of a participant's employment for any reason shall be treated as a withdrawal.

**Employee Benefit Plan, Pension Plans**

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") covering all of its employees. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($15,000 in calendar 2006) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. For the fiscal year ended June 30, 2006, the Company had provided $1,162,000 in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn and so that the contributions by employees will be deductible by the Company when made.

---

During the fiscal year ended June 30, 2006, certain employees in the following of the Company's operations were covered by pension plans: OSI Optoelectronics AS, Rapiscan Systems Limited, Spacelabs Medical Finland Oy, Spacelabs Medical Germany GmbH, Spacelabs Medical SAS and Spacelabs Medical UK Limited,. As of the date hereof, approximately 283 employees are covered by these plans.

**Employment Arrangements**

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with its President and Chief Executive Officer, Deepak Chopra. Unless the employment agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (i) the fifth anniversary of the date of the agreement or (ii) the close of business three years following the date that either party notifies the other in writing that the notifying party elects to end the term of the agreement. Pursuant to the terms of the employment agreement, Mr. Chopra initially was to receive an annual base salary of $950,000. Mr. Chopra is eligible to participate in a year end bonus pool for management, if such bonus pool is established. The Compensation Committee increased Mr. Chopra's annual base salary to $1,000,000, effective June 23, 2006. In addition, the employment agreement provides that the Compensation Committee may grant options to purchase shares of the Company's Common Stock to Mr. Chopra in each of the fiscal years he is employed by the Company. The agreement may be terminated for "cause" or due to Mr. Chopra's death or disability. In addition, Mr. Chopra may resign from the Company for "good reason" as defined in the employment agreement. If Mr. Chopra is terminated by the Company other than for "cause" or death or disability, or resigns from the Company for "good reason," he will receive continued payment of base salary for three years from the date of such termination of resignation from the Company, bonus and certain accelerated vesting of options. The agreement also contains certain restrictive covenants and other prohibitions that preclude Mr. Chopra from competing with the Company or soliciting its employees or customers following termination.

The Company entered into a three-year employment agreement with Ajay Mehra, the Company Executive Vice President and President of Rapiscan Systems, which became effective on September 1, 1997. The employment agreement provided for a base salary to be determined each year by the Compensation Committee. In February 2003, the Company amended Mr. Mehra's employment agreement to extend the term of the agreement until August 31, 2006. The agreement has expired, but the Company expects to renew it on similar terms in the near future. The Compensation Committee increased Mr. Mehra's annual base salary to $340,000 effective April 1, 2004, to $345,000 effective September 1, 2004. Mr. Mehra is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

The Company and Anuj Wadhawan, the Company's Chief Financial Officer until September 22, 2006, were parties to an employment agreement dated June 1, 2003. On July 18, 2005, the parties amended the employment agreement to extend the term of the agreement until June 1, 2007. As of June 1, 2004, Mr. Wadhawan's annual base salary was $200,000. The Compensation Committee increased Mr. Wadhawan's annual base salary to $225,000 effective September 1, 2004, then to $250,000 effective July 1, 2006. Mr. Wadhawan is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1619 of 2711
employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

The Company and Victor Sze, the Company's General Counsel and Executive Vice President, were parties to an employment agreement dated July 1, 2003. On July 18, 2005, the parties amended the employment agreement to extend the term of the agreement until July 1, 2007. As of January 1, 2004, Mr. Sze's annual base salary was $185,000. The Compensation Committee increased Mr. Sze's annual base salary to $215,000 effective September 1, 2004 and to $260,000 effective January 1, 2006. Mr. Sze is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers

and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

Andreas F. Kotowski, the Company's Chief Technology Officer, is currently employed by the Company pursuant to an employment arrangement that is terminable by either party at any time for any reason. As of December 1, 2003, Mr. Kotowski's annual base salary was $216,300. The Compensation Committee increased Mr. Kotowski's annual base salary to $225,000 effective September 1, 2004 and to $247,500, effective July 3, 2006. Mr. Kotowski is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company from time to time.

Management allocates bonuses to officers and employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer or employee is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division, as determined before the start of the fiscal year.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining 49.0% interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during fiscal year 2006 by Mr. Chopra and his wife. The Company paid the business approximately $60,000 for such services during fiscal year 2006. The Company contracts for printing services from a business owned by Mr. Chopra's father-in-law, Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $79,000 for such printing services during fiscal year 2006. In addition, in consideration of Mr. Syal's past services to the Company as a Director, the Board of Directors approved yearly payments of $25,000 each to Mr. Syal during each of fiscal years 2004, 2005, 2006 and 2007.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the of the Exchange Act requires the Company's executive officers and directors and persons who beneficially own more than 10% of a registered class of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and shareholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2006, and written representations from certain reporting persons, the Company believes that all of the Company's executive officers and all of the Company's directors and more than 10% shareholders have complied with all such filing requirements, except for Mr. Viswanathan who failed to timely file one such report during the Company's 2006 fiscal year.

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Good and Luskin. No executive officer of the Company has served during the fiscal year ended June 30, 2006 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2006, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 402(j) of Regulation S-K under the Exchange Act.

---

**REPORT OF THE COMPENSATION COMMITTEE**

This Compensation Committee Report discusses the components of the Company's executive officer compensation policies and programs and describes the bases upon which compensation is determined by the Compensation Committee with respect to the executive officers of the Company, including the Named Executive Officers. The Compensation Committee reviews and approves salaries, benefits and other compensation for executive officers and reviews bonus pool allocations for key employees of the Company. The Compensation Committee is composed of two non-employee directors. There were four meetings of the Compensation Committee during fiscal 2006.

***Compensation Philosophy.*** The Compensation Committee endeavors to ensure that the compensation programs for the executive officers of the Company and its subsidiaries are effective in attracting and retaining key executives responsible for the success of the Company and are administered with the long-term interests of the Company and its shareholders in mind. The Compensation Committee seeks to align total compensation for senior management with corporate performance by linking directly executive compensation to individual and team contributions, continuous improvements in corporate performance and shareholder value.

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation for the executive officers. The primary quantitative factors reviewed by the Compensation Committee include such financial measures as net income, cash flow and earnings-per-share, and market capitalization of the Company and may vary its quantitative measurements from employee to employee and from year to year. The Compensation Committee also appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability, overall contributions to the Company and the national and global business and economic environment.

In order to attract and retain highly qualified executives in the areas in which the Company does business and in recognition of the overall competitiveness of the market for highly qualified executive talent, the Compensation Committee also evaluates the total compensation of the executive officers in light of information regarding the compensation practices and corporate financial performance of other companies in its industry.

In implementing its compensation program for executive officers, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

Section 162(m) of the Code generally disallows a tax deduction to public corporations for compensation over $1,000,000 paid for any fiscal year to the corporation's chief executive officer and certain other of the most highly compensated executive officers as of the end of any fiscal year. However, the Code exempts qualifying performance-based compensation from the deduction limit if certain requirements are met. Although, at the present time, the Company is not paying any compensation to any of its executive officers or any other employee that would be disallowed by Section 162(m), the Compensation Committee currently intends to structure performance-based compensation, including stock option grants and annual bonuses, to executive officers who may be subject to Section 162(m) in a manner that satisfies those requirements if, in the future, the need arises. The Board of Directors and the Compensation Committee, however, reserve the authority to award non-deductible compensation in other circumstances as they deem appropriate.

---

***Compensation Program Components.*** The Compensation Committee regularly reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. The particular elements of the compensation program for executive officers consist of the following:

*Base Salary.* Base salaries for executive officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Bonus.* Management allocates bonuses to officers and key employees of the Company under a bonus plan that has been in effect since the Company's inception. The amount of bonus for each officer is determined by comparing the profits of the subsidiary or division in which such person performed services against the budget profit goals for such subsidiary or division as determined before the start of the fiscal year.

*Long-Term Incentive Compensation.* The Company's long-term incentive program consists of periodic grants of stock options, which are made at the discretion of the Board of Directors with the advice and input of the Compensation Committee. Decisions made regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

***Chief Executive Officer's Compensation.*** The Company has entered into an employment agreement with Mr. Chopra as more fully described above. See "Information Concerning Management, Compensation and Stock Ownership—Employment Agreements." In setting Mr. Chopra's base salary and other compensation under his employment agreement, in granting bonuses, and when considering other forms of compensation, the Compensation Committee has looked to the same components it applies when establishing compensation for the other executive officers of the Company.

***Summary.*** The Compensation Committee believes that the total compensation program for executive officers of the Company is focused on increasing value for the Company's shareholders, by attracting and retaining the best qualified people as senior managers and enhancing corporate performance. Furthermore, the Compensation Committee believes that the executive compensation levels of the Company are competitive with the compensation programs provided by other corporations with which the Company is competitive. The foregoing report has been approved by all the members of the Compensation Committee.

COMPENSATION COMMITTEE

Steven C. Good
Meyer Luskin

---

## REPORT OF THE AUDIT COMMITTEE

During the fiscal year ended June 30, 2006, the Audit Committee was composed of three non-employee directors, Steven C. Good , Meyer Luskin, and Chand R. Viswanathan, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. Mr. Bider was appointed to the Audit Committee on September 27, 2006. Mr. Viswanathan ceased serving on, the Audit Committee on September 27, 2006. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met five times during the fiscal year ended June 30, 2006.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's chairman and the Company's chief financial officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the

Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

· Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?

· Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?

· Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on

---

Auditing Standards No. 61, as amended, ("Communication with Audit Committees"). The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 ("Independence Discussions with Audit Committees"), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2006 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee has recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, for filing with the SEC.

AUDIT COMMITTEE

Meyer Luskin
Steven C. Good
Leslie E. Bider

---

**COMPANY STOCK PRICE PERFORMANCE**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1623 of 2711

The graph below compares the Company's cumulative total shareholder return for the period beginning on the market close on the last trading day before the beginning of the Company's fifth preceding fiscal year through and including the end of the Company's last completed fiscal year, with The NASDAQ Stock Market Index and with peer groups composed of companies with which the Company has generally competed.

The Company's peer group for the fiscal year ended June 30, 2006 includes the following companies: American Science & Engineering (AMEX Symbol: ASE), Analogic Corporation (NASDAQ Symbol: ALOG), Criticare Systems, Inc. (AMEX Symbol: CMD) and Datascope Corporation (NASDAQ Symbol: DSCP).

The graph assumes that $100.00 was invested on June 30, 2001 in the Company's Common Stock, and in each of the indexes mentioned above, and that all dividends were reinvested. Historical stock price performance is not necessarily indicative of future stock price performance.

**Comparison of 5 Year Cumulative Total Return**
**Assumes Initial Investment of $100**
**June 2001 Through June 2006**

**COMPARISON OF CUMULATIVE TOTAL RETURN AMONG OSI SYSTEMS, INC., THE NASDAQ STOCK MARKET INDEX, AND THE PEER GROUP INDEX**

| On June 30, | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| OSI Systems, Inc. | 100.00 | 533.06 | 421.51 | 535.75 | 424.46 | 477.69 |
| The NASDAQ Stock Market Index | 100.00 | 70.34 | 78.10 | 98.58 | 99.24 | 105.85 |
| Peer Group | 100.00 | 87.12 | 85.61 | 97.00 | 115.57 | 118.24 |

**SHAREHOLDER PROPOSALS**

Any proposals of shareholders which are intended to be presented at next year's annual meeting must be received by the Company at its principal executive offices on or before June 22, 2007, and must satisfy the conditions established by the SEC and the Company's Bylaws, in order to be considered for inclusion in the Company's proxy materials relating to that meeting.

**AVAILABILITY OF ANNUAL REPORT ON FORM 10-K**

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases, only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 10, 2006

---

**Appendix A**

**AMENDED AND RESTATED**
**1997 STOCK OPTION PLAN**
**OF**
**OSI SYSTEMS, INC.**

1. *PURPOSES OF THE PLAN*

The purposes of this Amended and Restated 1997 Stock Option Plan (the "Plan") of OSI Systems, Inc., a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or its Affiliates (as such term is defined in Section 2); and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the Company's common stock, no par value per share (the "Common Stock"), through (i) the grant of stock options under this Plan ("Options") and/or (ii) the issuance of shares of restricted Common Stock ("Restricted Stock") under this Plan.

Options granted under this Plan may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (the "Code"), or "nonqualified options" ("NQOs").

2. *ELIGIBLE PERSONS*

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1625 of 2711

Every person who, at the date of grant of an Option and/or Restricted Stock, is an employee of the Company or of any Affiliate of the Company is eligible to receive NQOs, ISOs and/or Restricted Stock under this Plan. Every person who, at the date of grant, is a consultant to, or non-employee director of, the Company or any Affiliate of the Company is eligible to receive NQOs and/or Restricted Stock under this Plan. The term “Affiliate” as used in this Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 424(e) and (f), respectively) of the Code. The term “employee” includes an officer or director who is an employee of the Company. The term “consultant” includes persons employed by, or otherwise affiliated with, a consultant.

3. *STOCK SUBJECT TO THIS PLAN; MAXIMUM NUMBER OF GRANTS*

Subject to the provisions of Section 6.1.1 and Section 8(e)(i) of this Plan, the total number of shares of Common Stock which may be granted as Restricted Stock and/or issued upon the exercise of Options granted pursuant to this Plan shall not exceed 3,350,000 shares of Common Stock in the aggregate. The shares of Common Stock covered by the portion of any Option grant under this Plan which expires or remains unexercised shall become available again for grant under this Plan. If any shares of Restricted Common Stock expire or are otherwise terminated, cancelled, surrendered or forfeited, then such shares of Common Stock shall also be available again for grant under this Plan. No eligible person shall be granted Options during any twelve-month period covering more than 425,000 shares.

4. *ADMINISTRATION*

(a) The Plan shall be administered by the Board of Directors of the Company (the “Board”) or by a committee (the “Committee”) to which administration of this Plan, or of part of this Plan, is delegated by the Board (in either case, the “Administrator”). The Board shall appoint and remove members of the Committee in its discretion in accordance with applicable laws. If necessary in order to comply with Rule 16b-3 under the Securities Exchange Act of 1934, as amended (the “Exchange Act”) and Section 162(m) of the Code, the Committee shall, in the Board’s discretion, be comprised solely of “non-employee directors” within the meaning of said Rule 16b-3 and “outside directors” within the meaning of

---

Section 162(m) of the Code. The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under this Plan.

(b) Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options and/or Restricted Stock shall be granted, and the number of shares subject to each Option and/or the number of shares of Restricted Stock; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including but not limited to, the time or times at which Options shall be exercisable; (viii) to determine the form of a grant of Restricted Stock under this Plan (a “Restricted Stock Grant”); (ix) to determine the terms and provisions of each Restricted Stock Grant (which need not be identical); (x) with the consent of the optionee, to modify or amend any Option; (xi) with the consent of the participant, to modify or amend any Restricted Stock Grant; (xii) to defer (with the consent of the optionee) the exercise date of any Option; (xiii) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option and/or the grant of Restricted Stock; and (xiv) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(c) All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

5. *GRANTING OF OPTIONS; OPTION AGREEMENT*

(a) No Options shall be granted under this Plan after 10 years from the date of adoption of this Plan by the Board.

(b) Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Administrator, executed by the Company and the person to whom such Option is granted.

(c) The stock option agreement shall specify whether each Option it evidences is an NQO or an ISO.

(d) Subject to Section 6.3.3 with respect to ISOs, the Administrator may approve the grant of Options under this Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultants at the date of approval, and the date of approval shall be deemed to be the date of grant unless otherwise specified by the Administrator.

6. *TERMS AND CONDITIONS OF OPTIONS*

Each Option granted under this Plan shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall be also subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 *Terms and Conditions to Which All Options Are Subject*. All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1 *Changes in Capital Structure*. Subject to Section 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or

recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board in its sole discretion.

6.1.2 *Corporate Transactions*. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator, in the exercise of its sole discretion, may permit exercise of any Options prior to their termination, even if such Options were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Options prior to consummation of such event, even if such Options were not otherwise exercisable.

6.1.3 *Time of Option Exercise*. Subject to Section 5 and Section 6.3.4, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) in accordance with a schedule as may be set by the Administrator (in any case, the "Vesting Base Date") and specified in the written stock option agreement relating to such Option. In any case, no Option shall be exercisable until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee. Notwithstanding the foregoing, to the extent required by applicable laws, rules and regulations, the right to exercise Options granted pursuant to this Plan shall vest at the rate of at least 20% per year from the date of grant.

6.1.4 *Option Grant Date*. The date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

6.1.5 *Nontransferability of Option Rights*. Except with the express written approval of the Administrator which approval the Administrator is authorized to give only with respect to NQOs, no Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution. During the life of the optionee, an Option shall be exercisable only by the optionee.

6.1.6 *Payment*. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. The Administrator, in the exercise of its absolute discretion after considering any tax, accounting and financial consequences, may authorize any one or more of the following additional methods of payment:

(a) Acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest would be imputed), which promissory note may be either secured or unsecured in such manner as the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1627 of 2711

Administrator shall approve (including, without limitation, by a security interest in the shares of the Company);

(b) Subject to the discretion of the Administrator and the terms of the stock option agreement granting the Option, delivery by the optionee of shares of Common Stock already owned by the optionee for all or part of the Option price, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock;

(c) Subject to the discretion of the Administrator, through the surrender of shares of Common Stock then issuable upon exercise of the Option, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by surrender of such stock; and

(d) By means of so-called cashless exercises as permitted under applicable rules and regulations of the Securities and Exchange Commission and the Federal Reserve Board.

6.1.7 *Termination of Employment*. If for any reason other than death or permanent and total disability, an optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), Options held at the date of Termination (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, or such other period of not less than 30 days after the date of such Termination as is specified in the stock option agreement or by amendment thereof (but in no event after the Expiration Date, as such term is defined in Section 6.1.11); provided, however, that if such exercise of the Option would result in liability for the optionee under Section 16(b) of the Exchange Act, then such three-month period automatically shall be extended until the tenth day following the last date upon which optionee has any liability under Section 16(b) (but in no event after the Expiration Date). If an optionee dies or becomes permanently and totally disabled (within the meaning of Section 22(e)(3) of the Code) while employed by the Company or an Affiliate or within the period that the Option remains exercisable after Termination, Options then held (to the extent then exercisable) may be exercised, in whole or in part, by the optionee, by the optionee's personal representative or by the person to whom the Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of the optionee or any longer period specified in the stock option agreement or by amendment thereof (but in no event after the Expiration Date). For purposes of this Section 6.1.7, "employment" includes service as a director or as a consultant. For purposes of this Section 6.1.7, an optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if the optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

6.1.8 *Withholding and Employment Taxes*. At the time of exercise of an Option and as a condition thereto, or at such other time as the amount of such obligations becomes determinable (the "Tax Date"), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. Such obligation to remit may be satisfied, if authorized by the Administrator in its sole discretion, after considering any tax, accounting and financial consequences, by the optionee's (i) delivery of a promissory note in the required amount on such terms as the Administrator deems appropriate, (ii) tendering to the Company previously owned shares of Common Stock or other securities of the Company with a fair market value

equal to the required amount, or (iii) agreeing to have shares of Common Stock (with a fair market value equal to the required amount) which are acquired upon exercise of the Option withheld by the Company.

6.1.9 *Other Provisions*. Each Option granted under this Plan may contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

6.1.10 *Determination of Value*. For purposes of this Plan, the fair market value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is regularly quoted by a recognized securities dealer, and selling prices are reported, its fair market value shall be the closing price of such stock on the date the value is to be determined, but if selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for such stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1628 of 2711

(b) In the absence of an established market for the stock, the fair market value thereof shall be determined in good faith by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry, the Company's management, and the values of stock of other corporations in the same or a similar line of business.

6.1.11 *Option Term*. Subject to Section 6.3.4, no Option shall be exercisable more than 10 years after the date of grant, or such lesser period of time as is set forth in the stock option agreement (the end of the maximum exercise period stated in the stock option agreement is referred to in this Plan as the "Expiration Date").

6.2 *Terms and Conditions to Which Only NQOs Are Subject*. Options granted under this Plan which are designated as NQOs shall be subject to the following terms and conditions:

6.2.1 *Exercise Price*.

(a) Except as set forth in Section 6.2.1(b), the exercise price of a NQO shall be not less than 85% of the fair market value (as determined in accordance with Section 6.1.10) of the stock subject to the Option on the date of grant.

(b) To the extent required by applicable laws, rules and regulations, the exercise price of a NQO granted to any person who owns, directly or by attribution under the Code (currently Section 424(d)), stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder") shall in no event be less than 110% of the fair market value (as determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3 *Terms and Conditions to Which Only ISOs Are Subject*. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 *Exercise Price*.

(a) Except as set forth in Section 6.3.1(b), the exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the fair market value (as determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

(b) The exercise price of an ISO granted to any Ten Percent Shareholder shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3.2 *Disqualifying Dispositions*. If stock acquired by exercise of an ISO granted pursuant to this Plan is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code (a disposition within two years from the date of grant of the Option or within one year after the transfer such stock on exercise of the Option), the holder of the stock immediately before the disposition shall promptly notify the Company in writing of the date and terms of the disposition and shall provide such other information regarding the Option as the Company may reasonably require.

6.3.3 *Grant Date*. If an ISO is granted in anticipation of employment as provided in Section 5(d), the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

6.3.4 *Term*. Notwithstanding Section 6.1.11, no ISO granted to any Ten Percent Shareholder shall be exercisable more than five years after the date of grant.

7. *MANNER OF EXERCISE*

(a) An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price and withholding taxes as provided in Sections 6.1.6 and 6.1.8. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price will be considered as the date such Option was exercised.

(b) Promptly after receipt of written notice of exercise of an Option and the payments called for by Section 7(a), the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of stock. An optionee or permitted transferee

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1629 of 2711
of the Option shall not have any privileges as a shareholder with respect to any shares of stock covered by the Option until the date of issuance (as evidenced by the appropriate entry on the books of the Company or a duly authorized transfer agent) of such shares.

8. *RESTRICTED STOCK*

(a) *Terms of Grant*. The Administrator may grant Restricted Stock Grants to such employees, consultants and non-employee directors, in such amounts, and subject to such terms and conditions as the Administrator may determine in its sole discretion, including such restrictions on transferability and other restrictions as the Administrator may impose, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as

---

the Administrator shall determine. No Restricted Stock Grants shall be granted under this Plan after 10 years from the date of adoption of this Plan by the Board.

(b) *Purchase Price*. The Administrator shall, in its sole discretion, determine the purchase price, if any, and form of payment for Restricted Stock.

(c) *Restricted Stock Grant Agreement*. Restricted Stock shall be granted pursuant to a written agreement, in form satisfactory to the Administrator, which shall set forth the terms of the Restricted Stock Grant. Restricted Stock granted under a restricted stock grant Agreement shall be evidenced by certificates registered in the name of the participant, which certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock. The Company may retain physical possession of any such certificates, and the Company may require a participant awarded Restricted Stock to deliver a stock power to the Company, endorsed in blank, relating to the Restricted Stock for so long as the Restricted Stock is subject to a risk of forfeiture.

(d) *Rights as Shareholder*. Unless otherwise determined by the Administrator at the time of a grant, the holder of Restricted Stock shall have the right to vote the Restricted Stock and to receive dividends thereon, unless and until such shares are forfeited.

(e) *Adjustments*.

(i) *Changes in Capital Structure*. If the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in the number and class of shares of stock subject to this Plan and each Restricted Stock Grant outstanding under this Plan; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustment. Each such adjustment shall be subject to approval by the Board in its sole discretion.

(ii) *Corporate Transactions*. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each participant at least 30 days prior to such proposed action. The Restricted Stock Grants will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator, in the exercise of its sole discretion, may permit exercise of any Restricted Stock Grant prior to its termination, even if such Restricted Stock Grant were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Restricted Stock Grants shall be assumed or equivalent awards shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Restricted Stock Grants or to substitute equivalent awards therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Restricted Stock Grants prior to consummation of such event, even if such Restricted Stock Grants were not otherwise exercisable.

---

9. *EMPLOYMENT OR CONSULTING RELATIONSHIP*

Nothing in this Plan, nor any Restricted Stock Grant, nor or any Option grant, shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any participant's or optionee's employment or consulting at any time, nor confer upon any participant or optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1630 of 2711

10. *CONDITIONS UPON ISSUANCE OF SHARES*

Neither shares of Restricted Stock nor shares of Common Stock underlying Options shall be issued to the participant or the optionee unless the issuance and delivery of such shares of Restricted Stock, the exercise of such Option and the issuance and delivery of such shares of Common Stock underlying such Option shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act").

11. *NONEXCLUSIVITY OF THE PLAN*

The adoption of this Plan shall not be construed as creating any limitations on the power of the Company to adopt such other incentive or equity participation arrangements as it may deem desirable, including, without limitation, the granting of stock options or the issuance of shares of Common Stock other than under this Plan.

12. *MARKET STANDOFF*

Each participant and optionee, if so requested by the Company or any representative of the underwriters in connection with any registration of the offering of any securities of the Company under the Securities Act, shall not sell or otherwise transfer any shares of Common Stock acquired upon exercise of Options and/or any shares of Restricted Stock during the 180-day period following the effective date of a registration statement of the Company filed under the Securities Act; provided, however, that such restriction shall apply only to the first registration statement of the Company to become effective under the Securities Act after the date of adoption of this Plan which includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restriction until the end of such 180-day period.

13. *AMENDMENTS TO PLAN*

The Board may at any time amend, alter, suspend or discontinue this Plan. Without the consent of an optionee and/or a participant, no amendment, alteration, suspension or discontinuance may adversely affect (a) outstanding Options except to conform this Plan and ISOs granted under this Plan to the requirements of federal or other tax laws relating to incentive stock options and/or (b) Restricted Stock Grants. No amendment, alteration, suspension or discontinuance shall require shareholder approval unless (a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes or (b) the Board otherwise concludes that shareholder approval is advisable.

14. *EFFECTIVE DATE OF PLAN; TERMINATION*

This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within twelve months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect, and any Restricted Stock Grants or exercises that have already occurred shall be rescinded, from and after expiration of such twelve-month

---

period. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws. This Plan (but not the Options and/or the Restricted Stock Grants previously granted under this Plan) shall terminate within ten years from the date of its adoption by the Board.

15. *DELIVERY OF FINANCIAL STATEMENTS*

To the extent required by applicable laws, rules and regulations, the Company shall deliver to each optionee financial statements of the Company at least annually while such optionee holds an outstanding Option.

---

**Appendix B**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1631 of 2711

**AGREEMENT AND PLAN OF MERGER**
**OF**
**OSI SYSTEMS, INC.,**
**A DELAWARE CORPORATION**
**AND**
**OSI SYSTEMS, INC.,**
**A CALIFORNIA CORPORATION**

This Agreement and Plan of Merger dated as of , 2006 (the "Agreement") is between OSI Systems, Inc., a California corporation ("OSI California") and OSI Systems, Inc., a Delaware corporation ("OSI Delaware"). OSI Delaware and OSI California are sometimes referred to in this Agreement as the "Constituent Corporations."

**R E C I T A L S**

A. OSI Delaware is a corporation duly organized and existing under the laws of the State of Delaware and has an authorized capital of 110,000,000 shares, 100,000,000 of which are designated "Common Stock," no par value, and 10,000,000 of which are designated "Preferred Stock," no par value. As of the date of this Agreement, 100 shares of OSI Delaware Common Stock were issued and outstanding, all of which are held by OSI California, and no shares of Preferred Stock were issued and outstanding.

B. OSI California is a corporation duly organized and existing under the laws of the State of California and has an authorized capital of 110,000,000 shares, 100,000,000 of which are designated "Common Stock," no par value and 10,000,000 of which are designated "Preferred Stock," no par value. As of , 2006, shares of OSI California Common Stock were issued and outstanding and no shares of Preferred Stock were issued and outstanding.

C. The Board of Directors of OSI California has determined that, for the purpose of effecting the reincorporation of OSI California in the State of Delaware, it is advisable and in the best interests of OSI California that OSI California merge with and into OSI Delaware upon the terms and conditions provided in this Agreement.

D. The respective Boards of Directors of OSI Delaware and OSI California have approved this Agreement and have directed that this Agreement be submitted to a vote of their respective stockholders and, if approved by such stockholders, executed by officers of their respective corporations.

**A G R E E M E N T**

In consideration of the mutual agreements and covenants set forth herein, OSI Delaware and OSI California hereby agree, subject to the terms and conditions hereinafter set forth, as follows:

Section 1 *Merger.* In accordance with the provisions of this Agreement, the Delaware General Corporation Law and the California General Corporation Law, OSI California shall be merged with and into OSI Delaware (the "Merger"), the separate existence of OSI California shall cease and OSI Delaware shall be, and is sometimes referred to below as, the "Surviving Corporation," and the name of the Surviving Corporation shall be "OSI Systems, Inc."

Section 2. *Closing.* The closing of this Agreement shall take place at 12525 Chadron Avenue, Hawthorne, California, as soon as practicable following the satisfaction of all conditions to closing set forth in Section 3 of this Agreement (the "Closing").

---

Section 3. *Conditions to Closing.* The obligations hereunder of both parties to enter into this Agreement are subject to their satisfaction, at or before the Closing, of each of the conditions set forth below:

3.1 *Adoption and Approval by Stockholders.* Adoption and approval of this Agreement and the Merger by the stockholders of each Constituent Corporation in accordance with the applicable requirements of the Delaware General Corporation Law and the California General Corporation Law; and

3.2 *Satisfaction of Conditions Precedent.* The satisfaction or waiver of all of the conditions precedent to the consummation of the Merger as specified in this Agreement; and

Section 4 *Filing and Effectiveness.* Upon the satisfaction of all Conditions to Closing set forth in Section 3 above, the parties shall file, and the Merger shall become effective upon completion of the filing, with the Secretary of State of Delaware of an executed Certificate of Merger or an executed counterpart of this Agreement meeting the requirements of the Delaware General Corporation Law. The date and time when the Merger becomes effective is referred to in this Agreement as the "Effective Date of the Merger."

Section 5 *Effect of the Merger.* Upon the Effective Date of the Merger, the separate existence of OSI California shall cease and OSI Delaware, as the Surviving Corporation, (a) shall continue to possess all of its assets, rights, powers and property as constituted immediately prior to the Effective Date of the Merger, (b) shall be subject to all actions previously taken by its and OSI

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1632 of 2711

California's Board of Directors, (c) shall succeed, without other transfer, to all of the assets, rights, powers and property of OSI California in the manner more fully set forth in Section 259 of the Delaware General Corporation Law, (d) shall continue to be subject to all of the debts, liabilities and obligations of OSI Delaware as constituted immediately prior to the Effective Date of the Merger, and (e) shall succeed, without other transfer, to all of the debts, liabilities and obligations of OSI California in the same manner as if OSI Delaware had itself incurred them, all as more fully provided under the applicable provisions of the Delaware General Corporation Law and the California General Corporation Law.

Section 6. *Charter Documents, Directors and Officers*

6.1 *Certificate of Incorporation.* The Certificate of Incorporation of OSI Delaware as in effect immediately prior to the Effective Date of the Merger shall continue in full force and effect as the Certificate of Incorporation of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

6.2 *Bylaws*. The Bylaws of OSI Delaware as in effect immediately prior to the Effective Date of the Merger shall continue in full force and effect as the Bylaws of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

6.3 *Directors and Officers*. The directors and officers of OSI Delaware immediately prior to the Effective Date of the Merger shall be the directors and officers of the Surviving Corporation until their successors shall have been duly elected and qualified or as otherwise provided by law, the Certificate of Incorporation of the Surviving Corporation or the Bylaws of the Surviving Corporation.

Section 7. *Manner of Conversion of Stock*

7.1 *OSI California Common Stock*. Upon the Effective Date of the Merger, each one share of OSI California Common Stock issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by the Constituent Corporations, the holder of such share or any other person, be converted into and exchanged for one fully paid and nonassessable share of Common Stock, no par value, of the Surviving Corporation. No fractional share interests of the Surviving Corporation shall be issued. In lieu thereof, each holder of shares of OSI California shall receive from OSI Delaware an amount of cash equal to the average closing prices of OSI California Common Stock as quoted on The NASDAQ Stock Market for five (5) consecutive trading days ending three (3) business days

---

prior to the closing date of the Merger. Any fractional share interests to which a holder would otherwise be entitled shall be aggregated so that no OSI California shareholder shall receive cash in an amount greater than the value of one (1) full share of OSI Delaware Common Stock.

7.2 *OSI California Options, Stock Purchase Rights and Convertible Securities*.

(a) Upon the Effective Date of the Merger, the Surviving Corporation shall assume and continue any and all stock option, stock incentive, employee benefit and other equity-based award plans heretofore adopted by OSI California (the "Plans"). Each outstanding and unexercised option, other right to purchase, or security convertible into, OSI California Common Stock (a "Right") shall become, subject to the provisions in paragraph (c) hereof, an option, right to purchase, or a security convertible into the Surviving Corporation's Common Stock, respectively, on the basis of one share of the Surviving Corporation's Common Stock, as the case may be, for each one share of OSI California Common Stock, issuable pursuant to any such Right, on the same terms and conditions and at an exercise price equal to the exercise price applicable to any such OSI California Right at the Effective Date of the Merger. This paragraph 3.2(a) shall not apply to OSI California Common Stock. Such Common Stock is subject to paragraph 3.1 hereof.

(b) A number of shares of the Surviving Corporation's Common Stock shall be reserved for issuance upon the exercise or conversion of Rights equal to the number of shares OSI California Common Stock so reserved immediately prior to the Effective Date of the Merger.

(c) The assumed Rights shall not entitle any holder thereof to a fractional share upon exercise or conversion. In lieu thereof, any fractional share interests to which a holder of an assumed Right (other than an option issued pursuant to OSI Delaware's Plans) would otherwise be entitled upon exercise or conversion shall be aggregated (but only with other similar Rights which have the same per share terms). To the extent that after such aggregation, the holder would still be entitled to a fractional share with respect thereto upon exercise or conversion, the holder shall be entitled upon the exercise or conversion of all such assumed Rights pursuant to their terms (as modified herein), to one full share of Common Stock in lieu of such fractional share. With respect to each class of such similar Rights, no holder will be entitled to more than one full share in lieu of a fractional share upon exercise or conversion.

Notwithstanding the foregoing, with respect to options issued under OSI California's Plans that are assumed in the Merger, the number of shares of Common Stock to which the holder would be otherwise entitled upon exercise of each such assumed option

following the Merger shall be rounded down to the nearest whole number and the exercise price shall be rounded up to the nearest whole cent. In addition, no "additional benefits" (within the meaning of Section 424(a)(2) of the Internal Revenue Code of 1986, as amended) shall be accorded to the optionees pursuant to the assumption of their options.

7.3 *OSI Delaware Common Stock.* Upon the Effective Date of the Merger, each share of Common Stock, no par value, of OSI Delaware issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by OSI Delaware, the holder of such shares or any other person, be canceled and returned to the status of authorized but unissued shares.

7.4 *Exchange of Certificates.* After the Effective Date of the Merger, each holder of an outstanding certificate representing OSI California Common Stock may, at such holder's option, surrender the same for cancellation to U.S. Stock Transfer as exchange agent (the "Exchange Agent"), and each such holder shall be entitled to receive in exchange therefor a certificate or certificates representing the number of shares of the Surviving Corporation's Common Stock into which the surrendered shares were converted as provided herein. Until so surrendered, each outstanding certificate theretofore representing shares of OSI California capital stock shall be deemed for all purposes to represent the number of whole shares of

---

the appropriate class and series of the Surviving Corporation's capital stock into which such shares of OSI California capital stock were converted in the Merger.

The registered owner on the books and records of the Surviving Corporation or the Exchange Agent of any such outstanding certificate shall, until such certificate shall have been surrendered for transfer or conversion or otherwise accounted for to the Surviving Corporation or the Exchange Agent, have and be entitled to exercise any voting and other rights with respect to and to receive dividends and other distributions upon the shares of capital stock of the Surviving Corporation represented by such outstanding certificate as provided above.

Each certificate representing capital stock of the Surviving Corporation so issued in the Merger shall bear the same legends, if any, with respect to the restrictions on transferability as the certificates of OSI California so converted and given in exchange therefor, unless otherwise determined by the Board of Directors of the Surviving Corporation in compliance with applicable laws.

If any certificate for shares of Surviving Corporation's stock is to be issued in a name other than that in which the certificate surrendered in exchange therefor is registered, it shall be a condition of issuance thereof that the certificate so surrendered shall be properly endorsed and otherwise in proper form for transfer, that such transfer otherwise be proper and comply with applicable securities laws and that the person requesting such transfer pay to the Exchange Agent any transfer or other taxes payable by reason of the issuance of such new certificate in a name other than that of the registered holder of the certificate surrendered or establish to the satisfaction of the Surviving Corporation that such tax has been paid or is not payable.

Section 8. *General*

8.1 *Covenants of OSI Delaware.* OSI Delaware covenants and agrees that it will, on or before the Effective Date of the Merger:

(a) Qualify to do business as a foreign corporation in the State of California and irrevocably appoint an agent for service of process as required under the provisions of Section 2105 of the California General Corporation Law.

(b) File any and all documents with the California Franchise Tax Board necessary for the assumption by OSI Delaware of all of the franchise tax liabilities of OSI California; and

(c) Take such other actions as may be required by the California General Corporation Law.

8.2 *Further Assurances*. From time to time, as and when required by OSI Delaware or by its successors or assigns, there shall be executed and delivered on behalf of OSI California such deeds and other instruments, and there shall be taken or caused to be taken by it such further and other actions, as shall be appropriate or necessary in order to vest or perfect in or conform of record or otherwise by OSI Delaware the title to and possession of all the property, interests, assets, rights, privileges, immunities, powers, franchises and authority of OSI California and otherwise to carry out the purposes of this Agreement, and the officers and directors of OSI Delaware are fully authorized in the name and on behalf of OSI California or otherwise to take any and all such action and to execute and deliver any and all such deeds and other instruments.

8.3 *Abandonment*. At any time before the Effective Date of the Merger, this Agreement may be terminated and the Merger may be abandoned for any reason whatsoever by the Board of Directors of either OSI California or OSI Delaware, or both, notwithstanding the approval of this Agreement by the shareholders of OSI California or by the sole stockholder of OSI Delaware, or by both.

8.4 *Amendment*. The Boards of Directors of the Constituent Corporations may amend this Agreement at any time prior to the filing of this Agreement (or certificate in lieu thereof) with the Secretary of State of the State of Delaware, provided that an amendment made subsequent to the adoption

of this Agreement by the stockholders of either Constituent Corporation shall not: (a) alter or change the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares of any class or series thereof of such Constituent Corporation, (b) alter or change any term of the Certificate of Incorporation of the Surviving Corporation to be effected by the Merger, or (c) alter or change any of the terms and conditions of this Agreement if such alteration or change would adversely affect the holders of any class of shares or series of capital stock of such Constituent Corporation.

8.5 *Registered Office*. The registered office of the Surviving Corporation in the State of Delaware is located at 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

8.6 *Agreement*. Executed copies of this Agreement will be on file at the principal place of business of the Surviving Corporation at 12525 Chadron Avenue, Hawthorne, CA 90250 and copies thereof will be furnished to any stockholder of either Constituent Corporation, upon request and without cost.

8.7 *Governing Law*. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

8.8 *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

---

The undersigned authorized representatives of the Constituent Corporation have executed and acknowledged this Agreement as of the date first set forth above.

**OSI CALIFORNIA:**

OSI, Systems, Inc., a California corporation

By: ______________________
Name: ______________________
Title: ______________________

**OSI DELAWARE:**

OSI Systems, Inc., a Delaware corporation

By: ______________________
Name: ______________________
Title: ______________________

---

**Appendix C**

**FORM OF**
**CERTIFICATE OF INCORPORATION**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**I.**

The name of this corporation is “OSI Systems, Inc.” (the “Corporation”).

**II.**

The address of the Corporation's registered office in the 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**III.**

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware.

**IV.**

A. *Classes of Stock*. This Corporation is authorized to issue two classes of stock to be designated, respectively, as "Common Stock" and "Preferred Stock". The total number of shares which the Corporation is authorized to issue is one hundred ten million (110,000,000) shares, no par value. One hundred million (100,000,000) shares shall be Common Stock and ten million (10,000,000) shares shall be Preferred Stock.

B. *Rights, Preferences and Restrictions of Preferred Stock*. The Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby authorized, by filing a certificate pursuant to the applicable law of the State of Delaware and within the limitations and restrictions set forth in this Certificate of Incorporation, to fix or alter the dividend rights, dividend rate, conversion rights, voting rights, rights and terms of redemption (including sinking fund provisions), redemption price or prices, and the liquidation preferences of any wholly unissued series of Preferred Stock, and the number of shares constituting any such series and the designation thereof, or any of them; and to increase or decrease the number of shares of any series subsequent to the issuance of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status they had prior to the adoption of the resolution originally fixing the number of shares of such series.

**V.**

The number of directors of the Corporation shall be fixed from time to time by the Bylaws of the Corporation or amendment thereof duly adopted by the Board of Directors.

**VI.**

In the election of directors of any class or series of capital stock of the Corporation shall be entitled to vote for each share held. No stockholder will be permitted to cumulate votes at any election of directors.

---

**VII.**

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

**VIII.**

A. Except as otherwise provided in the Bylaws, the Bylaws may be amended or repealed or new Bylaws adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote generally in the election of directors. The Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal Bylaws.

B. The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

C. Advance notice of stockholder nominations for the election of directors or of business to be brought by the stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

**IX.**

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**X.**

The Corporation shall have perpetual existence.

**XI.**

A. To the fullest extent permitted by the General Corporation Law of Delaware, but not limited to Section 102(b)(7) thereof, as the same may be amended from time to time, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law of Delaware is hereafter amended to authorize, with the approval of a corporation's stockholders, further reductions in the liability of a corporation's directors for breach of fiduciary duty, then a director of the Corporation shall not be liable for any such breach to the fullest extent permitted by the General Corporation Law of Delaware as so amended.

B. Any repeal or modification of the foregoing provisions of this Article XI shall not adversely affect any right or protection of a director of the Corporation with respect to any acts or omissions of such director occurring prior to such repeal or modification.

**XII.**

A. To the fullest extent permitted by applicable law, the Corporation is also authorized to provide indemnification of (and advancement of expenses to) directors, officers, employees and other agents of the Corporation (and any other persons to which Delaware law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of Delaware, subject only to limits created by applicable Delaware law (statutory or non-statutory), with respect to actions for breach of duty to a corporation.

---

B. Any repeal or modification of any of the foregoing provisions of this Article XII shall not adversely affect any right or protection of any such agent or other person existing at the time of, or increase the liability of any such agent or other person with respect to any acts or omissions of such agent or other person occurring prior to such repeal or modification.

**XIII.**

The name and mailing address of the incorporator are as follows:

Victor S. Sze
c/o OSI Systems, Inc.
12525 Chadron Avenue
Hawthorne, CA 90250

Executed this day of , 2006.

Victor S. Sze, Incorporator

---

**Appendix D**

**FORM OF**
**BYLAWS**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**ARTICLE I**
**OFFICES**

Section 1. *Registered Office.* The registered office of OSI Systems, Inc., a Delaware corporation (the "Corporation"), shall be fixed in the Certificate of Incorporation of the Corporation.

Section 2. *Other Offices.* The Corporation shall also have and maintain a principal executive office at 12525 Chadron Avenue, Hawthorne, CA 90250 and may also have offices at such other places both within and without the State of Delaware as the Board of Directors (the "Board") may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 1. *Place of Meetings.* Meetings of stockholders shall be held either at the principal executive office of the Corporation or at any other place within or without the State of Delaware which may be designated either by the Board or by the written consent of all persons entitled to vote thereat, given either before or after the meeting and filed with the Secretary.

Section 2. *Annual Meetings.* The annual meetings of the stockholders shall be held on such date and at such time as may be fixed by the Board. At such meetings, directors shall be elected and any other proper business may be transacted.

Section 3. *Special Meetings.* Special meetings of the stockholders may be called at any time by the Board, the Chairman of the Board, or the Chief Executive Officer and may not be called by any other person or persons. Business transacted at any special meeting shall be limited to the purposes stated in the notice of the meeting.

Section 4. *Notice of Annual or Special Meeting.* Written notice of each annual or special meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote thereat. Such notice shall state the place, date and hour of the meeting and (a) in the case of a special meeting, the general nature of the business to be transacted, and no other business may be transacted, or (b) in the case of the annual meeting, those matters which the Board, at the time of the mailing of the notice, intends to present for action by the stockholders, but, subject to the provisions of applicable law, any proper matter may be presented at the meeting for such action. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by management for election.

Notice of a stockholders' meeting shall be given either personally or by mail or by other means of written communication, addressed to the stockholder at the address of such stockholder appearing on the books of the Corporation or given by the stockholder to the Corporation for the purpose of notice; or, if no such address appears or is given, at the place where the principal executive office of the Corporation is located or by publication at least once in a newspaper of general circulation in the county in which the principal executive office is located. Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission to the recipient. Any notice to stockholders may be given by electronic mail or other electronic transmission, in the manner provided by Section 232 of the Delaware General Corporation Law. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the of

---

the giving of such notice. Notice of the time, place and purpose of any meeting of stockholders may be waived in writing, either before or after the meeting, and to the extent permitted by law, will be waived by any stockholder by attendance thereat, in person or by proxy, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Notwithstanding the foregoing provisions of this Section 4, a stockholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations thereunder with respect to matters set forth in this Section 4.

Section 5. *Quorum.* A majority of the issued and outstanding stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. The stockholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough stockholders to have less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum. If, however, such quorum is not present or represented at any meeting of the stockholders, then either (a) the chairman of the meeting or (b) holders of a majority of the shares of stock entitled to vote who are present, in person or in proxy, shall have power to adjourn the meeting to another place (if any), date or time in accordance with Section 6 of this Article.

Section 6. *Adjourned Meeting and Notice Thereof.* Any stockholders' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of a majority of the shares, the holders of which are either present in person or represented by proxy thereat, but in the absence of a quorum (except as provided in Section 5 of this Article) no other business may be transacted at such meeting.

It shall not be necessary to give any notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by announcement at the meeting at which such adjournment is taken; provided, however, when any stockholders' meeting is adjourned for more than thirty (30) days or, if after adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given as in the case of an original meeting.

Section 7. *Voting.* The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 8 of this Article, subject to the provisions of Sections 217 and 218 of the General Corporation Law of Delaware (relating to voting rights of fiduciaries, pledgors and joint owners of stock and to voting trusts and other voting agreements). Except as may be otherwise provided in the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1638 of 2711

capital stock held by such stockholder. All elections shall be determined by a plurality of the votes cast, and except as otherwise required by law, all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

Section 8. *Record Date.* The Board may fix, in advance, a record date for the determination of the stockholders entitled to notice of any meeting to vote or entitled to receive payment of any dividend or other distribution, or any allotment of rights, or to exercise rights in respect of any other lawful action. The record date so fixed shall be not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting nor more than sixty (60) days prior to any other action. When a record date is so fixed, only stockholders of record on that date are entitled to notice of and to vote at the meeting or to receive the dividend, distribution, or allotment of rights, or to the exercise of the rights, as the case may be, notwithstanding any transfer of shares on the books of the Corporation after the record date. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the Board fixes a new record date for the adjourned meeting. The Board shall fix a new record date if the meeting is adjourned for more than thirty (30) days. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the next business day next preceding the day on which the meeting is held.

Section 9. *Consent of Absentees.* The transactions of any meeting of stockholders, however called and noticed, and wherever held, are as valid as though had at a meeting duly held after regular call

---

and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of the meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting. Neither the business to be transacted at nor the purpose of any regular or special meeting of stockholders need be specified in any written waiver of notice, except as provided in the Certificate of Incorporation or these Bylaws.

Section 10. *Action Without Meeting.* Subject to Section 228 of the Delaware General Corporation Law, any action which, under any provision of the Delaware General Corporation Law, may be taken at any annual or special meeting of stockholders, may be taken without a meeting and without prior notice if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Unless a record date for voting purposes be fixed as provided in Section 8 of this Article, the record date for determining stockholders entitled to give consent shall be the day on which the first written consent is given.

Section 11. *Proxies.* Every person entitled to vote shares has the right to do so either in person or by one or more persons authorized by a written proxy executed by such stockholder and filed with the Secretary. Every proxy duly executed shall continue in full force and effect until revoked by the person executing it prior to the vote pursuant thereto effected by a writing delivered to the Corporation stating that the proxy is revoked or by a subsequent proxy executed by the person executing the prior proxy and presented to the meeting, or by attendance at the meeting and voting in person by the person executing the proxy; provided, however, that no proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise provided in the proxy. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212(a) of the Delaware General Corporation Law.

Section 12. *Inspector of Election.* In advance of any meeting of stockholders, the Board may appoint any person to act as the inspector of election at such meeting and any adjournment thereof. If the inspector of election is not so appointed, or if any person so appointed fails to appear or refuses to act, the chairman of any such meeting may, and on the request of any stockholder or stockholder's proxy shall, make such appointment at the meeting. The duties of such inspector shall include: determining, and certifying as appropriate, the number of shares outstanding and the voting power of each; the shares represented at the meeting; the existence of a quorum; the authenticity, validity and effect of proxies; receiving votes, ballots or consents; hearing and determining all challenges and questions in any way arising in connection with the right to vote; counting and tabulating all votes or consents; determining when the polls shall close; determining the result; and doing such acts as may be proper to conduct the election or vote with fairness to all stockholders.

**ARTICLE III**
**DIRECTORS**

Section 1. *Powers.* Subject to limitations of the Certificate of Incorporation, of these Bylaws and of the Delaware General Corporation Law relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board. The Board may delegate the management of the day-to-day operation of the business of the Corporation to a management company or other person provided that the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1639 of 2711

Section 2. *Number of Directors.* The authorized number of directors shall be, until changed by amendment of the Bylaws or by a Bylaw duly adopted by the holders of a majority of the outstanding capital stock entitled to vote thereon or a majority of the Board, such number as may from time to time be

---

authorized by resolution of the Board or the stockholders, provided that such number shall not be less than five (5) nor more than nine (9).

Section 3. *Election and Term of Office.* The directors shall be elected at each annual meeting of the stockholders, but if any such annual meeting is not held or the directors are not elected thereat, the directors may be elected at any special meeting of stockholders held for that purpose. Each director shall hold office until the next annual meeting and until a successor has been elected and qualified.

Section 4. *Vacancies.* Any director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective.

Vacancies in the Board may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, and each director so elected shall hold office until the next annual meeting and until such director's successor has been elected and qualified.

A vacancy or vacancies in the Board shall be deemed to exist in the case of the death, resignation or removal of any director, or if the authorized number of directors be increased, or if the stockholders fail, at any annual or special meeting of stockholders at which any director or directors are elected, to elect the full authorized number of directors to be voted for at that meeting.

The Board may declare vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony.

The stockholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors. Any such election by written consent requires the consent of a majority of the outstanding shares entitled to vote. If the Board accepts the resignation of a director tendered to take effect at a future time, the Board or the stockholders shall have power to elect a successor to take office when the resignation is to become effective.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of the director's term of office.

Section 5. *Place of Meeting.* Regular or special meetings of the Board shall be held at any place within or without the State of Delaware which has been designated from time to time by the Board. In the absence of such designation, regular meetings shall be held at the principal executive office of the Corporation.

Section 6. *Regular Meetings.* Immediately following each annual meeting of stockholders, the Board shall hold a regular meeting for the purpose of organization, election of officers and the transaction of other business. Call and notice of all such regular meetings of the Board is hereby dispensed with. Other regular meetings of the Board shall be held without call on such dates and at such times as may be fixed by the Board, and shall be subject to the notice requirements set forth in Section 7 of this Article.

Section 7. *Special Meetings.* Special meetings of the Board for any purpose or purposes may be called at any time by the Chief Executive Officer, Chairman of the Board, or by any two (2) directors.

Special meetings of the Board shall be held upon three (3) days' written notice by mail or twenty-four (24) hours' notice given personally or by telephone, telecopier, e-mail or other similar means of communication. Any such notice shall be addressed or delivered to each director at such director's address as it is shown upon the records of the Corporation or as may have been given to the Corporation by the director for purposes of notice or, if such address is not shown on such records or is not readily ascertainable, at the place in which the meetings of the directors are regularly held.

Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient. Oral notice shall

---

be deemed to have been given at the time it is communicated in person or by telephone or wireless, to the recipient or to a person at the office or residence of the recipient who the person giving the notice has reason to believe will promptly communicate it to the recipient.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1640 of 2711

Section 8. *Quorum.* A majority of the authorized number of directors constitutes a quorum of the Board for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board, unless a greater number be required by law or by the Certificate of Incorporation. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for such meeting.

Section 9. *Participation in Meetings by Conference Telephone.* Members of the Board may participate in a meeting through use of conference telephone or similar communications equipment, so long as all members participating in such meeting can hear one another.

Section 10. *Waiver of Notice.* The transactions of any meeting of the Board, however called and noticed or wherever held, are as valid as though had at a meeting duly held after regular call and notice if a quorum be present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding such a meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 11. *Adjournment.* A majority of the directors present, whether or not a quorum is present, may adjourn any directors' meeting to another time and place. Notice of the time and place of holding an adjourned meeting need not be given to absent directors if the time and place be fixed at the meeting adjourned. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

Section 12. *Fees and Compensation.* Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement for expenses, as may be fixed or determined by the Board.

Section 13. *Action Without Meeting.* Any action required or permitted to be taken by the Board may be taken without a meeting if all members of the Board shall individually or collectively consent in writing to such action. Such consent or consents shall have the same effect as a unanimous vote of the Board and shall be filed with minutes of the proceedings of the Board.

Section 14. *Rights and Inspection.* Every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Corporation and also of its subsidiary corporations, domestic or foreign. Such inspection by a director may be made in person or by agent or attorney and includes the right to copy and obtain extracts.

Section 15. *Committees.* The Board may appoint one or more committees, each consisting of one or more directors, and delegate to such committees any of the authority of the Board except with respect to:

(i) The approval of any action for which the Delaware General Corporation Law also requires stockholders' approval;

(ii) The filling of vacancies on the Board or in any committee;

(iii) The amendment or repeal of Bylaws or the adoption of new Bylaws;

(iv) The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable; or

---

(v) The appointment of other committees of the Board or the members thereof.

Any such committee must be appointed by resolution adopted by a majority of the authorized number of directors and may be designated a name as the Board shall specify. The Board shall have the power to prescribe the manner in which proceedings of any such committee shall be conducted. In the absence of any such prescription, such committee shall have the power to prescribe the manner in which its proceedings shall be conducted. Unless the Board or such committee shall otherwise provide, the regular and special meetings and other actions of any such committee shall be governed by the provisions of this Article applicable to meetings and actions of the Board. Minutes shall be kept of each meeting of each committee.

**ARTICLE IV**
**OFFICERS**

Section 1. *Officers.* The officers of the Corporation shall be a Chief Executive Officer, a Secretary and a Chief Financial Officer. The Corporation may also have, at the discretion of the Board, a Chairman of the Board, a President, a Chief Operating Officer, one or more Vice Presidents (who may be designated as executive or senior vice presidents as the Board may, from time to time, deem necessary), one or more Assistant Secretaries, one or more Assistant Financial Officers and such other officers as may be elected or appointed in accordance with the provisions of Section 3 of this Article. Any number of offices may be held by the same person.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1641 of 2711

Section 2. *Election.* The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article, shall be chosen annually by, and shall serve at the pleasure of the Board, and shall hold their respective offices until their resignation, removal or other disqualification from service, or until their respective successors shall be elected.

Section 3. *Subordinate Officers.* The Board may appoint, and may empower the Chief Executive Officer or the President to appoint, such other officers as the business of the Corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in these Bylaws or as the Board may from time to time determine. Any officer appointed pursuant to this Section 3 may be removed, with or without cause, by the Board or any such officer upon whom the power of removal has been conferred by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Section 4. *Removal and Resignation.* Any officer not appointed in accordance with the provisions of Section 3 or 5 hereof may be removed, either with or without cause, by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Any officer may resign at any time by giving written notice to the Corporation, but without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5. *Vacancies.* A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular election or appointment to such office.

Section 6. *Chairman of the Board.* The Chairman of the Board, shall, if present, preside at all meetings of the Board and exercise and perform such other powers and duties as may be from time to time assigned by the Board.

Section 7. *Chief Executive Officer.* The Chief Executive Officer, shall be subject to the control of the Board and have general supervision, direction and control of the business and the officers of the

---

corporation. The Chief Executive Officer shall preside at all meetings of the stockholders and shall act as Chairman of the Board unless the Board has appointed a different person as Chairman.

Section 8. *President; Chief Operating Officer.* The President or the Chief Operating Officer has the general powers and duties of management usually vested in the office of president, general manager and chief operating officer of a corporation and such other powers and duties as may be prescribed by the Board. In the absence of the Chief Executive Officer, the President shall perform the duties required of the Chief Executive Officer under these Bylaws.

Section 9. *Vice President.* In the absence or disability of the President, the Vice Presidents in order of their rank as fixed by the Board or, if not ranked, the Vice President designated by the Board, shall perform all the duties of the President and, when so acting, shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board.

Section 10. *Secretary.* The Secretary shall keep or cause to be kept, at the principal executive office and such other place as the Board may order, a book of minutes of all meetings of stockholders, the Board and its committees, with the time and place of holding, whether regular or special, and if special, how authorized, the notice thereof given, the names of those present at Board and committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings thereof. The Secretary shall keep, or cause to be kept, a copy of the Bylaws of the Corporation at the principal executive offices or business office.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Corporation's transfer agent or registrar, if one be appointed, a share register, or a duplicate share register, showing the names of the stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the stockholders of the Board and of any committees thereof required by these Bylaws or by law to be given, shall keep the seal of the Corporation in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board.

Section 11. *Chief Financial Officer.* The Chief Financial Officer is the principal financial officer of the Corporation and shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, and shall send or cause to be sent to the stockholders of the Corporation such financial statements and reports as are by law or these Bylaws required to be sent to them. The books of account shall at all times be open to inspection by any director.

The Chief Financial Officer shall deposit all monies and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board. The Chief Financial Officer shall disburse the funds of the Corporation as may be ordered by the Board, shall render to the Chief Executive Officer or the President or directors, whenever they request it, an account of all transactions entered into as Chief Financial Officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board.

**ARTICLE V**
**OTHER PROVISIONS**

Section 1. *Inspection of Corporate Records.* The Corporation shall, either at its principal executive offices or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these Bylaws as amended to date, accounting books, and other records.

---

(a) Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records permitted by the Delaware General Corporation Law and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal place of business.

(b) A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order for each class of stock and showing the address of each such stockholder and the number of shares registered in each such stockholder's name, shall be open to the examination of any such stockholder for a period of at least ten (10) days prior to the meeting in the manner provided by law. The stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law. This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

Section 2. *Inspection of Bylaws.* The Corporation shall keep in its principal executive office the original or a copy of these Bylaws as amended to date, which shall be open to inspection by stockholders at all reasonable times, during office hours. If the principal executive office of the Corporation is located outside the State of Delaware and the Corporation has no principal business office in such state, it shall upon the written notice of any stockholder furnish to such stockholder a copy of these Bylaws as amended to date.

Section 3. *Endorsement of Documents; Contracts.* Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, share certificate, conveyance or other instrument in writing and any assignment or endorsements thereof executed or entered into between the Corporation and any other person, when signed by the Chief Executive Officer, the Chairman of the Board or the President, shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by another person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or amount.

Section 4. *Certificates of Stock.* Every holder of shares of the Corporation shall be entitled to have a certificate signed in the name of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer or a Vice President and by the Chief Financial Officer or an Assistant Financial Officer or the Secretary or an Assistant Secretary, certifying the number of shares and the class or series of shares owned by the stockholder. Any or all of the signatures on the certificate may be facsimile. If any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue.

Certificates for shares may be issued prior to full payment under such restrictions and for such purposes as the Board may provide; provided, however, that on any certificate issued to represent any partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated.

Except as provided in this section, no new certificate for shares shall be issued in lieu of an old one unless the latter is surrendered and cancelled at the same time. The Board may, however, if any certificate for shares is alleged to have been lost, stolen or destroyed, authorize the issuance of a new certificate in lieu thereof, and the Corporation may require that the Corporation be given a bond or other

---

adequate security sufficient to indemnify it against any claim that may be made against it (including expense or liability) on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

Section 5. *Representation of Shares of other Corporations.* The President, the Chief Executive Officer, the Chief Financial Officer or any other officer or officers authorized by the Board, the Chief Executive Officer, the President or the Chief Financial Officer are each authorized to vote, represent and exercise on behalf of the Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of the Corporation. The authority herein granted may be exercised either by any such officer in person or by any other person authorized so to do by proxy or power of attorney duly executed by said officer.

Section 6. *Stock Purchase Plans.* The Corporation may adopt and carry out a stock purchase plan or agreement or stock option plan or agreement providing for the issue and sale for such consideration as may be fixed of its unissued shares, or of issued shares acquired or to be acquired, to one or more of the employees or directors of the Corporation or of a subsidiary or to a trustee on their behalf and for the payment for such shares in installments or at one time, and may provide for aiding any such persons in paying for such shares by compensation for services rendered, promissory notes or otherwise.

Any such stock purchase plan or agreement or stock option plan or agreement may include, among other features, the fixing of eligibility for participation therein, the class and price of shares to be issued or sold under the plan or agreement, the number of shares which may be subscribed for, the method of payment therefor, the reservation of title until full payment therefor, the effect of the termination of employment and option or obligation on the part of the Corporation to repurchase the shares upon termination of employment, restrictions upon transfer of the shares, the time limits of and termination of the plan, and any other matters, not in violation of applicable law, as may be included in the plan as approved or authorized by the Board or any committee of the Board.

Section 7. *Construction and Definitions.* Unless the context otherwise requires, the general provisions, rules of construction and definitions contained in the Delaware General Corporation Law shall govern the construction of these Bylaws.

**ARTICLE VI**
**INDEMNIFICATION**

Section 1. *Indemnification.* The Corporation shall indemnify its officers and directors, and former officers and directors, for such expenses and liabilities, in such manner, under such circumstances, and to such extent, as required or permitted by the Delaware General Corporation Law, as amended from time to time.

Section 2. *Insurance.* The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, trustee or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise, against any liability or expense asserted against or incurred by such person in or arising from that capacity, or arising out of his or her status as such, whether or not the Corporation would otherwise have the power or the obligation to indemnify the person against such liability or expense. The Corporation shall not be obligated under these Bylaws to make any payment in connection with any claim made against any person if and to the extent that such person has actually received payment therefor under any insurance policy or policies.

Section 3. *Expenses Payable in Advance.* Expenses (including attorneys' fees and expenses) incurred by a director or officer, or a former director or officer, in defending, investigating, preparing to defend, or being or preparing to be a witness in, a threatened or pending action, suit, proceeding or claim against him or her, whether civil or criminal, shall be paid by the Corporation in advance of the final disposition of such action, suit, proceeding or claim upon receipt by the Corporation of a request therefor

---

and an undertaking by or on behalf of the director or officer, or former director or officer, to repay such amounts if it ultimately shall be determined that he or she is not entitled to be indemnified by the Corporation.

**ARTICLE VII**
**AMENDMENTS**

These Bylaws may be repealed, altered or amended or new Bylaws adopted at any meeting of the stockholders, either annual or special, by the affirmative vote of at least a majority of the stock entitled to vote at such meeting, unless a larger vote is required by these Bylaws or the Certificate of Incorporation. The Board shall also have the authority to repeal, alter or amend these Bylaws or adopt new Bylaws (including, without limitation, the amendment of any Bylaws setting forth the number of directors who shall constitute the whole Board) by unanimous written consent or at any annual, regular, or special meeting of the Board by the affirmative vote of a majority of the whole number of directors.

---

**Appendix E**

**FORM OF**
**INDEMNIFICATION AGREEMENT**

This Indemnification Agreement (the "*Agreement*") is made as of , 2006, by and between OSI Systems, Inc., a Delaware corporation (the "*Company*") and (the "*Indemnitee*").

**RECITALS**

A. The Company and Indemnitee recognize the increasing difficulty in obtaining liability insurance for directors, officers and key employees, the significant increases in the cost of such insurance and the general reductions in the coverage of such insurance.

B. The Company and Indemnitee further recognize the substantial increase in corporate litigation in general, subjecting directors, officers and key employees to expensive litigation risks at the same time as the availability and coverage of liability insurance has been severely limited.

C. Indemnitee does not regard the current protection available as adequate under the present circumstances, and Indemnitee and agents of the Company may not be willing to continue to serve as agents of the Company without additional protection.

D. The Company desires to attract and retain the services of highly qualified individuals, such as Indemnitee, and to indemnify its directors, officers and key employees so as to provide them with the maximum protection permitted by law.

**AGREEMENT**

In consideration of the mutual promises made in this Agreement, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Company and Indemnitee hereby agree as follows:

1. *Indemnification*.

(a) *Third Party Proceedings*. The Company shall indemnify Indemnitee if Indemnitee is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding, or investigation whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that Indemnitee is or was a director, officer, employee or agent of the Company, or any subsidiary of the Company, by reason of any action or inaction on the part of Indemnitee while an officer or director or by reason of the fact that Indemnitee is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) actually and reasonably incurred by Indemnitee in connection with such action, suit or proceeding if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal action or proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

(b) *Proceedings By or in the Right of the Company*. The Company shall indemnify Indemnitee if Indemnitee was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding by or in the right of the Company or any subsidiary of the Company to procure a judgment in its favor by reason of the fact that Indemnitee is or was a director, officer, employee

---

or agent of the Company, or any subsidiary of the Company, by reason of any action or inaction on the part of Indemnitee while an officer or director or by reason of the fact that Indemnitee is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) and, to the fullest extent permitted by law, amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld), in each case to the extent actually and reasonably incurred by Indemnitee in connection with the defense or settlement of such action or suit if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company and its stockholders, except that no indemnification shall be made in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudicated by court order or judgment to be liable to the Company in the performance of Indemnitee's duty to the Company and its stockholders unless and only to the extent that the court in which such action or proceeding is or was pending shall determine upon application that, in view of all the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1645 of 2711
circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c) *Mandatory Payment of Expenses*. To the extent that Indemnitee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 1(a) or Section 1(b) or the defense of any claim, issue or matter therein, Indemnitee shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by Indemnitee in connection therewith.

(d) *Exceptions*. Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement:

(i) *Claims Initiated by Indemnitee*. To indemnify or advance expenses to Indemnitee with respect to proceedings or claims initiated or brought voluntarily by Indemnitee and not by way of defense, except with respect to proceedings brought to establish or enforce a right to indemnification under this Agreement or any other statute or law or otherwise as required under Section 145 of the Delaware General Corporation Law, but such indemnification or advancement of expenses may be provided by the Company in specific cases if the Board finds it to be appropriate; or

(ii) *Claims under Section 16(b)*. To indemnify Indemnitee for expenses or the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the Securities and Exchange Act of 1934, as amended, or any similar successor statute.

2. *No Employment Rights*. Nothing contained in this Agreement is intended to create in Indemnitee any right to continued employment.

3. *Expenses; Indemnification Procedure*.

(a) *Advancement of Expenses*. The Company shall advance all expenses incurred by Indemnitee in connection with the investigation, defense, settlement or appeal of any civil or criminal action, suit or proceeding referred to in Section 1(a) or Section 1(b) hereof (including amounts actually paid in settlement of any such action, suit or proceeding). Indemnitee hereby undertakes to repay such amounts advanced only if, and to the extent that, it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company as authorized hereby.

(b) *Notice/Cooperation by Indemnitee*. Indemnitee shall, as a condition precedent to his or her right to be indemnified under this Agreement, give the Company notice in writing as soon as practicable of any claim made against Indemnitee for which indemnification will or could be sought under this Agreement. Notice to the Company shall be directed to the President or the Chief Executive Officer of the Company and shall be given in accordance with the provisions of Section 11(d) below. In addition, Indemnitee shall give the Company such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

---

(c) *Procedure*. Any indemnification and advances provided for in Section 1 and this Section 3 shall be made no later than thirty (30) days after receipt of the written request of Indemnitee. If a claim under this Agreement, under any statute, or under any provision of the Company's Certificate of Incorporation or Bylaws providing for indemnification, is not paid in full by the Company within thirty (30) days after a written request for payment thereof has first been received by the Company, Indemnitee may, but need not, at any time thereafter bring an action against the Company to recover the unpaid amount of the claim and, subject to Section 10 of this Agreement, Indemnitee shall also be entitled to be paid for the expenses (including attorneys' fees) of bringing such action. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in connection with any action, suit or proceeding in advance of its final disposition) that Indemnitee has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed, but the burden of proving such defense shall be on the Company and Indemnitee shall be entitled to receive interim payments of expenses pursuant to Section 3(a) unless and until such defense may be finally adjudicated by court order or judgment from which no further right of appeal exists. It is the parties' intention that if the Company contests Indemnitee's right to indemnification, the question of Indemnitee's right to indemnification shall be for the court to decide, and neither the failure of the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct required by applicable law, nor an actual determination by the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) that Indemnitee has not met such applicable standard of conduct, shall create a presumption that Indemnitee has or has not met the applicable standard of conduct.

(d) *Notice to Insurers*. If, at the time of the receipt of a notice of a claim pursuant to Section 3(b) hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1646 of 2711

(e) *Selection of Counsel*. In the event the Company shall be obligated under Section 3(a) hereof to pay the expenses of any proceeding against Indemnitee, the Company, if appropriate, shall be entitled to assume the defense of such proceeding, with counsel approved by Indemnitee, upon the delivery to Indemnitee of written notice of its election so to do. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same proceeding, provided that (i) Indemnitee shall have the right to employ counsel in any such proceeding at Indemnitee's expense; and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense or (C) the Company shall not, in fact, have employed counsel to assume the defense of such proceeding, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Company.

4. *Additional Indemnification Rights; Nonexclusivity*.

(a) *Scope*. Notwithstanding any other provision of this Agreement, the Company hereby agrees to indemnify the Indemnitee to the fullest extent permitted by law, notwithstanding that such indemnification is not specifically authorized by the other provisions of this Agreement, the Company's Certificate of Incorporation, the Company's Bylaws or by statute. In the event of any change, after the date of this Agreement, in any applicable law, statute, or rule which expands the right of a Delaware corporation to indemnify a member of its board of directors or an officer, such changes shall be deemed to be within the purview of Indemnitee's rights and the Company's obligations under this Agreement. In the event of any change in any applicable law, statute or rule which narrows the right of a Delaware corporation to indemnify a member of its board of directors or an officer, such changes, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement shall have no effect on this Agreement or the parties' rights and obligations hereunder.

(b) *Nonexclusivity*. The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which Indemnitee may be entitled under the Company's Certificate of Incorporation, its Bylaws, any agreement, any vote of stockholders or disinterested members of the Company's Board of Directors, the General Corporation Law of the State of Delaware, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office. The indemnification provided under this Agreement shall continue as to Indemnitee for any action taken or not taken while serving in an indemnified capacity even though he or she may have ceased to serve in any such capacity at the time of any action, suit or other covered proceeding.

5. *Partial Indemnification*. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the expenses, judgments, fines or penalties actually or reasonably incurred in the investigation, defense, appeal or settlement of any civil or criminal action, suit or proceeding, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such expenses, judgments, fines or penalties to which Indemnitee is entitled.

6. *Mutual Acknowledgment*. Both the Company and Indemnitee acknowledge that in certain instances, Federal law or public policy may override applicable state law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise. For example, the Company and Indemnitee acknowledge that the Securities and Exchange Commission (the "*SEC*") has taken the position that indemnification is not permissible for liabilities arising under certain federal securities laws, and federal legislation prohibits indemnification for certain ERISA violations.

7. *Officer and Director Liability Insurance*. The Board shall, from time to time, make the good faith determination whether or not it is practicable for the Company to obtain and maintain a policy or policies of insurance with reputable insurance companies providing the officers and directors of the Company with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. Among other considerations, the Board will weigh the costs of obtaining such insurance coverage against the protection afforded by such coverage. In all policies of director and officer liability insurance, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's directors, if Indemnitee is a director; or of the Company's officers, if Indemnitee is not a director of the Company but is an officer; or of the Company's key employees, if Indemnitee is not an officer or director but is a key employee. Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Board determines in good faith that such insurance is not reasonably available, if the premium costs for such insurance are disproportionate to the amount of coverage provided, if the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or if Indemnitee is covered by similar insurance maintained by a parent or subsidiary of the Company.

8. *Severability*. Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. The provisions of this Agreement shall be severable as provided in this Section 8. If this Agreement or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify Indemnitee to the full extent permitted by any applicable portion of this Agreement that shall not have been invalidated, and the balance of this Agreement not so invalidated shall be enforceable in accordance with its terms.

9. *Construction of Certain Phrases*.

(a) For purposes of this Agreement, references to the "Company" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that if Indemnitee is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving corporation as Indemnitee would have with respect to such constituent corporation if its separate existence had continued.

(b) For purposes of this Agreement, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants, or beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

10. *Attorneys' Fees*. In the event that any action is instituted by Indemnitee under this Agreement to enforce or interpret any of the terms hereof, Indemnitee shall be entitled to be paid all court costs and expenses, including reasonable attorneys' fees, incurred by Indemnitee with respect to such action, unless as a part of such action, the court of competent jurisdiction determines that each of the material assertions made by Indemnitee as a basis for such action were not made in good faith or were frivolous. In the event of an action instituted by or in the name of the Company under this Agreement or to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all court costs and expenses, including attorneys' fees, incurred by Indemnitee in defense of such action (including with respect to Indemnitee's counterclaims and cross-claims made in such action), unless as a part of such action the court determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

11. *Miscellaneous*.

(a) *Governing Law*. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(b) *Entire Agreement; Enforcement of Rights*. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) *Construction*. This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(d) *Notices*. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by fax or 48 hours after being sent by nationally-recognized courier or deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address or fax number as set forth below or as subsequently modified by written notice.

(e) *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f) *Successors and Assigns*. This Agreement shall be binding upon the Company and its successors and assigns, and inure to the benefit of Indemnitee and Indemnitee's heirs, legal representatives and assigns.

(g) *Subrogation*. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that may be necessary to secure such rights and to enable the Company to effectively bring suit to enforce such rights.

---

The parties hereto have executed this Agreement as of the day and year set forth on the first page of this Agreement.

OSI Systems, Inc.,
a Delaware corporation

By: ______________________
Name: ______________________

Title: ____________________________

Address:
12525 Chadron Avenue
Hawthorne, CA 90250

Facsimile:

AGREED TO AND ACCEPTED:

By: ____________________________
Name: ____________________________
Title: ____________________________

Address:

Facsimile:

---

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the “Company”) held of record by the undersigned as of the close of business on October 2, 2006, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on November 30, 2006, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2007 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

☐ **FOR ALL** ☐ **WITHHOLD AUTHORITY FOR ALL**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider

To withhold authority to vote for any individual nominee, check the box marked “For All” above and write the nominee’s name in the space provided here:

2. To ratify the Amended and Restated 1997 Stock Option Plan to add the authority to issue and grant restricted stock.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

3. To amend the Amended and Restated 1997 Stock Option Plan to change the name of the plan and extend the term of the plan.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

4. To approve the reincorporation of the Company from California to Delaware.

☐ **FOR** ☐ **AGAINST** ☐ **ABSTAIN**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1649 of 2711

5. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2006 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

☐ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ______________________ Dated:

Signature: ______________________ Dated:

# Exhibit 18

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1651 of 2711
10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-Q

**(Mark one)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended December 31, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number 0-23125**

# OSI SYSTEMS, INC.
**(Exact name of registrant as specified in its charter)**

| **California** | **33-0238801** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**(310) 978-0516**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period as the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ¨ Accelerated filer x Non-accelerated filer ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ¨ No x

As of February 6, 2007, there were 16,859,279 shares of the registrant's common stock outstanding.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1652 of 2711

Table of Contents

**OSI SYSTEMS, INC.**

**INDEX**

| | | PAGE |
|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | |
| Item 1 – | Consolidated Financial Statements | |
| | Consolidated Balance Sheets at June 30, 2006 and December 31, 2006 | 3 |
| | Consolidated Statements of Operations for the three and six months ended December 31, 2005 and 2006 | 4 |
| | Consolidated Statements of Cash Flows for the six months ended December 31, 2005 and 2006 | 5 |
| | Notes to Consolidated Financial Statements | 6 |
| Item 2 – | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 3 – | Quantitative and Qualitative Disclosures about Market Risk | 29 |
| Item 4 – | Controls and Procedures | 30 |
| **PART II – OTHER INFORMATION** | | |
| Item 1 – | Legal Proceedings | 32 |
| Item 1A – | Risk Factors | 32 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 32 |
| Item 6 – | Exhibits | 33 |
| Signatures | | 34 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1653 of 2711

Table of Contents

## PART I. FINANCIAL INFORMATION

**Item 1. Consolidated Financial Statements**

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share amounts)**
**(Unaudited)**

| | June 30, 2006 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 13,799 | $ 12,153 |
| Marketable securities, available-for-sale | 100 | — |
| Accounts receivable, net | 119,419 | 131,946 |
| Other receivables | 4,495 | 5,484 |
| Inventories | 120,604 | 121,104 |
| Income taxes receivable | 2,119 | 3,346 |
| Deferred income taxes | 13,752 | 29,813 |
| Prepaid expenses and other current assets | 9,011 | 7,069 |
| Total current assets | 283,299 | 310,915 |
| Property and equipment, net | 42,521 | 48,721 |
| Goodwill | 29,066 | 42,606 |
| Intangible assets, net | 44,046 | 29,527 |
| Investments | 1,789 | 1,859 |
| Deferred income taxes | 331 | 645 |
| Other assets | 2,021 | 2,594 |
| Total assets | $403,073 | $ 436,867 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 10,857 | $ 27,146 |
| Current portion of long-term debt | 1,251 | 5,747 |
| Accounts payable | 54,282 | 60,538 |
| Accrued payroll and related expenses | 14,244 | 14,911 |
| Deferred income taxes | 2,186 | 2,671 |
| Advances from customers | 2,961 | 3,968 |
| Accrued warranties | 7,224 | 7,380 |
| Deferred revenue | 9,314 | 7,795 |
| Other accrued expenses and current liabilities | 18,824 | 20,804 |
| Total current liabilities | 121,143 | 150,960 |
| Long-term debt | 5,483 | 28,222 |
| Deferred rent | 5,379 | 5,303 |
| Accrued pension | 2,280 | 2,825 |
| Deferred income taxes | 7,504 | 8,237 |
| Other long-term liabilities | 2,606 | 3,169 |
| Total liabilities | 144,395 | 198,716 |
| Minority interest | 9,731 | 8,739 |
| Commitment and Contingencies (Note 10) | | |
| Shareholders' Equity: | | |
| Preferred stock, no par value – authorized, 10,000,000 shares; no shares issued or outstanding | — | — |
| Common stock, no par value – authorized, 100,000,000 shares; issued and outstanding, 16,598,361 and 16,782,078 shares at June 30, 2006 and December 31, 2006, respectively | 193,698 | 198,767 |
| Retained earnings | 50,208 | 23,554 |
| Accumulated other comprehensive income | 5,041 | 7,091 |
| Total shareholders' equity | 248,947 | 229,412 |
| Total liabilities and shareholders' equity | $403,073 | $ 436,867 |

See accompanying notes to consolidated financial statements.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1655 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Revenues | $117,138 | $137,458 | $219,008 | $252,987 |
| Cost of goods sold | 71,999 | 98,177 | 136,917 | 175,209 |
| Gross profit | 45,139 | 39,281 | 82,091 | 77,778 |
| Operating expenses: | | | | |
| Selling, general and administrative | 33,515 | 37,961 | 66,929 | 74,331 |
| Research and development | 8,700 | 11,215 | 17,431 | 21,473 |
| Impairment, restructuring, and other charges | — | 21,543 | 800 | 21,543 |
| Other operating expenses | 51 | 329 | 572 | 1,109 |
| Total operating expenses | 42,266 | 71,048 | 85,732 | 118,456 |
| Income (loss) from operations | 2,873 | (31,767) | (3,641) | (40,678) |
| Other income (expense): | | | | |
| Interest expense | (399) | (1,267) | (950) | (2,281) |
| Interest income | 69 | 95 | 89 | 236 |
| Other | 349 | 74 | 349 | — |
| Income (loss) before provision for income taxes and minority interest | 2,892 | (32,865) | (4,153) | (42,723) |
| Provision (benefit) for income taxes | 1,861 | (12,106) | (996) | (15,285) |
| Income (loss) before minority interest | 1,031 | (20,759) | (3,157) | (27,438) |
| Minority interest | (946) | 146 | (946) | 784 |
| Net income (loss) | $ 85 | $ (20,613) | $ (4,103) | $ (26,654) |
| Earnings (loss) per share: | | | | |
| Basic | $ 0.01 | $ (1.23) | $ (0.25) | $ (1.60) |
| Diluted | $ 0.00 | $ (1.23) | $ (0.26) | $ (1.60) |
| Shares used in per share calculation: | | | | |
| Basic | 16,299 | 16,747 | 16,270 | 16,708 |
| Diluted | 16,491 | 16,747 | 16,270 | 16,708 |

See accompanying notes to consolidated financial statements.

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**
**(Unaudited)**

| | Six Months Ended December 31, 2005 | Six Months Ended December 31, 2006 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (4,103) | $ (26,654) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 5,837 | 9,907 |
| Stock based compensation expense | 2,541 | 2,825 |
| Minority interest in net income (loss) of subsidiary | 946 | (992) |
| Equity in undistributed earnings of unconsolidated affiliates | (128) | (70) |
| Deferred income taxes | (1,847) | (15,128) |
| Impairment, restructuring, and other charges | 742 | 21,543 |
| In-process research and development | — | 561 |
| Gain on sale of marketable securities | (349) | (75) |
| Loss on sale of property and equipment | 62 | 141 |
| Changes in operating assets and liabilities – net of business acquisitions: | | |
| Accounts receivable | (12,503) | (6,319) |
| Other receivables | (1,839) | 1,588 |
| Inventories | (3,548) | 3,484 |
| Income taxes receivable | (47) | (1,988) |
| Prepaid expenses | (265) | 51 |
| Accounts payable | (1,156) | 3,783 |
| Accrued payroll and related expenses | 966 | 541 |
| Advances from customers | 3,967 | 946 |
| Accrued warranties | 166 | (869) |
| Deferred revenue | 1,522 | (3,299) |
| Other accrued expenses and current liabilities | 591 | (2,607) |
| Net cash used in operating activities | (8,445) | (12,631) |
| Cash flows from investing activities: | | |
| Proceeds from sale of property and equipment | 40 | 68 |
| Acquisition of property and equipment | (5,990) | (7,746) |
| Proceeds from sale of marketable securities | 921 | 147 |
| Purchase of investments and marketable securities | (581) | — |
| Cash paid for business acquisitions, net of cash acquired | (311) | (23,950) |
| Intangible and other assets | 19 | (1,273) |
| Net cash used in investing activities | (5,902) | (32,754) |
| Cash flows from financing activities: | | |
| Net proceeds (payments) from bank lines of credit | (13,823) | 16,320 |
| Proceeds from long-term debt | 1,700 | 26,019 |
| Payments on capital lease obligations | (136) | (317) |
| Payments on long-term debt | (10) | (342) |
| Proceeds from exercise of stock options, warrants and employee stock purchase plan | 2,207 | 2,211 |
| Proceeds from issuance of subsidiary stock | 26,280 | — |
| Net cash provided by financing activities | 16,218 | 43,891 |
| Effect of exchange rate changes on cash | 633 | (152) |
| Net increase (decrease) in cash and cash equivalents | 2,504 | (1,646) |
| Cash and cash equivalents-beginning of year | 14,623 | 13,799 |
| Cash and cash equivalents-end of year | $ 17,127 | $ 12,153 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ 920 | $ 2,342 |
| Cash paid for income taxes | $ 1,330 | $ 2,352 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1657 of 2711

| Supplemental disclosure of non-cash investing activities— | | |
| --- | --- | --- |
| Capital expenditures in accounts payable | $ 539 | $ 1,040 |

See accompanying notes to consolidated financial statements.

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**1. Basis of Presentation**

*Description of Business*

OSI Systems, Inc. (the "Company") is a vertically integrated designer and manufacturer of specialized electronic systems and components for critical applications. The Company sells its products in diversified markets, including homeland security, healthcare, defense and aerospace.

The Company has three operating divisions: (a) Security, providing security inspection systems; (b) Healthcare, providing medical monitoring and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for external clients in the defense and aerospace markets, among others.

The Company's Security division designs, manufactures and markets security and inspection systems worldwide to end users under the "Rapiscan Systems" trade name. Rapiscan Systems products are used for the non-intrusive inspection of baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband and to screen people. These systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials. Rapiscan Systems products fall into four categories: baggage and parcel inspection, cargo and vehicle inspection, hold (checked) baggage screening and people screening.

The Company's Healthcare division designs, manufactures and markets medical monitoring and anesthesia systems worldwide to end users, primarily under the "Spacelabs Healthcare" trade name. The products and services of this division include network and connectivity solutions, ambulatory blood pressure monitors and related services as well as cardiac monitoring and diagnostic services.

The Company's Optoelectronics and Manufacturing division designs, manufactures and markets optoelectronic devices and value-added manufacturing services worldwide for use in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical imaging and diagnostics, computed tomography (CT), toll and traffic management systems, fiber optics, telecommunications, weapons simulation systems, gaming, office automation, computer peripherals and industrial automation. The Company sells optoelectronic devices under the "OSI Optoelectronics" trade name and performs value-added manufacturing services under the "OSI Electronics" trade name. This division provides products and services to original equipment manufacturers, as well as to the Company's own Security and Healthcare divisions.

*Basis of Presentation*

The consolidated financial statements include the accounts of OSI Systems, Inc. and its subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The consolidated financial statements have been prepared by the Company, without audit, pursuant to Financial Accounting Principles Board ("FASB") Opinion No. 28, "Interim Financial Reporting" and the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. In the opinion of the Company's management, all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These consolidated financial statements and the accompanying notes should be read in conjunction with the audited consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2006, filed with the Securities and Exchange Commission on September 22, 2006. The results of operations for the three and six months ended December 31, 2006 are not necessarily indicative of the operating results to be expected for the full fiscal year or any future periods.

*Reclassifications*

Certain reclassifications have been made to prior period amounts to conform to the current year's presentation.

*Spacelabs Healthcare Public Offering*

In October 2005, Spacelabs Healthcare, Inc., a subsidiary comprising the business operations of the Company's Healthcare division, completed an initial public offering of approximately 20% of its total issued and outstanding common stock. The newly issued Spacelabs Healthcare shares trade under the ticker symbol "SLAB" on the AIM (formerly known as the Alternative Investment

Table of Contents

Market), a stock market administered by the London Stock Exchange. As a result of the initial public offering, the Company recorded minority interest in Spacelabs Healthcare of $7.6 million, representing approximately 20% of Spacelabs Healthcare's issued and outstanding shares. The Company treated the initial public offering as a capital transaction in accordance with Securities and Exchange Commission Staff Accounting Bulletin ("SAB") No. 51 "Accounting for Sales of Stock of a Subsidiary." The offering resulted in $26.3 million in proceeds, net of expenses.

*Impairment of Long-Lived Assets*

The Company tests goodwill for impairment in accordance with SFAS 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). SFAS 142 requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events. For purposes of SFAS 142, the Company has determined that it has five reporting units, consisting of the Security division, Optoelectronics and Manufacturing division and three reporting units within the Healthcare division. The Company tests goodwill for impairment annually in its second fiscal quarter using a two-step process. First, the Company determines if the carrying amount of any of the reporting units within each of its divisions exceeds its fair value. It uses a discounted cash flows method to make this determination for its Security and Optoelectronics and Manufacturing divisions and it uses a market value method for the reporting units within its Healthcare division (based on the market price of Spacelabs Healthcare common stock on the AIM). If these methods indicate a potential impairment of goodwill associated with any reporting unit, the Company then compares the implied fair value of the goodwill associated with the respective reporting unit to its carrying amount to determine if there is an impairment loss. The Company performed its annual impairment test for goodwill during the second quarter of fiscal year 2007 and found no impairment of goodwill.

In accordance with SFAS No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS 144"), the Company evaluates long-lived assets, including intangible assets other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. An impairment is considered to exist if the total estimated future cash flows on an undiscounted basis are less than the carrying amount of the assets. If an impairment does exist, the Company measures the impairment loss and records it based on the discounted estimate of future cash flows. In estimating future cash flows, the Company groups assets at the lowest level for which there are identifiable cash flows that are largely independent of cash flows from other asset groups. The Company's estimate of future cash flows is based upon, among other things, certain assumptions about expected future operating performance, growth rates and other factors.

During the second quarter ended December 31, 2006, the Company recognized non-cash impairment charges totaling $21.5 million relating to software development costs, core technology, developed technology, customer relationships/backlog and fixed assets. Of the $21.5 million impairment charge, $21.3 million was recognized within the Security division and $0.2 million was recognized within the Optoelectronics and Manufacturing division. See Note 5 for additional information about these impairment charges.

*Derivative Instruments*

The Company may, from time to time, purchase foreign exchange contracts in order to attempt to reduce foreign exchange transaction gains and losses, or enter into interest rate swaps. As of June 30, 2006, the Company had a $25.4 million foreign currency forward contract outstanding to buy British pounds in anticipation of the acquisition by Spacelabs Healthcare of the Del Mar Reynolds cardiac division of Ferraris Group PLC. Transaction gains during the year ended June 30, 2006, included a $0.5 million gain related to this contract. In July 2006, the Company completed the Del Mar Reynolds acquisition and the foreign currency forward contract settled, resulting in a loss related to this contract of $24,000 for the six months ended December 31, 2006.

*Per Share Computations*

The Company computes basic earnings per share by dividing net income available to common shareholders by the weighted average number of common shares outstanding during the period. The Company computes diluted earnings per share by dividing net income available to common shareholders by the sum of the weighted average number of common and dilutive potential common shares outstanding. Potential common shares consist of the shares issuable upon the exercise of stock options or warrants under the treasury stock method. The Company excludes from the calculation of diluted earnings per share stock options and warrants with exercise prices greater than the average market price of the Company's common stock because their effect would otherwise be anti-dilutive. Stock options and warrants to purchase a total of 1,725,650 and 2,022,650 shares of our common stock for the three and six months ended December 31, 2006 were not included in diluted earnings per share calculations because to do so would have been antidilutive. Stock options and warrants to purchase a total of 2,295,648 and 2,229,819 shares of our common stock for the three and six months ended December 31, 2005, were not included in diluted earnings per share calculations because to do so would have been antidilutive. The following table sets forth the computation of basic and diluted earnings per share (in thousands, except per share amounts):

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1661 of 2711

Table of Contents

| | Three months Ended December 31, | | Six months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Net income (loss) | $ 85 | $(20,613) | $ (4,103) | $(26,654) |
| Effect of dilutive interest in subsidiary stock | (92) | — | (175) | — |
| Loss available to common shareholders | $ (7) | $(20,613) | $ (4,278) | $(26,654) |
| Weighted average shares outstanding – basic | 16,299 | 16,747 | 16,270 | 16,708 |
| Dilutive effect of stock options and warrants | 192 | — | — | — |
| Weighted average of shares outstanding – diluted | 16,491 | 16,747 | 16,270 | 16,708 |
| Basic income (loss) per share | $ 0.01 | $ (1.23) | $ (0.25) | $ (1.60) |
| Diluted loss per share | $ 0.00 | $ (1.23) | $ (0.26) | $ (1.60) |

*Comprehensive Loss*

Comprehensive loss is computed as follows (in thousands):

| | Three months Ended December 31, | | Six months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Net income (loss) | $ 85 | $(20,613) | $(4,103) | $(26,654) |
| Foreign currency translation adjustments | (1,150) | 2,251 | (985) | 2,131 |
| Minimum pension liability adjustment | — | (44) | — | (55) |
| Other | (134) | (39) | (108) | (26) |
| Comprehensive loss | $(1,199) | $(18,445) | $(5,196) | $(24,604) |

*Recent Accounting Pronouncements*

In July 2006, the FASB issued FASB Interpretation No. 48, “Accounting for Uncertainty in Income Taxes.” This interpretation clarifies how companies should account for uncertainty in income taxes that they recognize in accordance with FASB Statement No. 109, “Accounting for Income Taxes.” This Interpretation is effective for fiscal years beginning after December 15, 2006. The Company has not yet determined the impact that this interpretation will have on its consolidated financial statements.

In September 2006, FASB issued SFAS No. 157, “Fair Value Measurements.” This statement defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. It is effective for fiscal years beginning after November 15, 2007. The Company has not yet determined the impact that this statement will have on its consolidated financial statements.

In September 2006, FASB issued SFAS No. 158, “Employers’ Accounting for Defined Benefit Pension and Other Postretirement Plans – an amendment of FASB Statements No. 87, 88, 106, and 132(R).” This statement requires that an employer recognize the over-funded or under-funded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability, as applicable, in its statement of financial position and that it recognize, in comprehensive income of a business entity, any changes in such status in the year in which the changes occur. This statement also requires that an employer measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. This statement is effective for fiscal years ending after December 15, 2006. The Company has not yet determined the impact that this statement will have on its consolidated financial statements.

**2. Business Acquisitions**

*Spacelabs Medical*

In March 2004, the Company completed the acquisition from Instrumentarium Corporation, now a subsidiary of General Electric Company (“GE”), of certain capital stock and assets constituting substantially all of the business operations of Spacelabs Medical.

Table of Contents

The acquisition price was approximately $47.9 million in cash (net of cash acquired), including acquisition costs. Spacelabs Medical is a leading global manufacturer and distributor of patient monitoring systems for critical care and anesthesia, wired and wireless networks, clinical information connectivity solutions, ambulatory blood pressure monitors and medical data services. In June 2004, the Company notified GE of a working capital and retention bonus adjustment resulting in what the Company believes to be a downward adjustment of the purchase price in the amount of approximately $26 million. In September 2004, GE responded that it believes the amount of the downward adjustment to be $7.8 million. No amounts have been recorded in the financial statements in relation to the expected reduction in purchase price.

*Del Mar Reynolds*

In July 2006, the Company's majority-owned subsidiary, Spacelabs Healthcare, completed the acquisition of the Del Mar Reynolds Cardiac division of Ferraris Group PLC. Pursuant to the terms of the acquisition agreement, Spacelabs Healthcare made an initial cash payment of $25.9 million, subject to a working capital adjustment and to an adjustment of plus or minus $1.9 million based upon revenue and earnings results for Del Mar Reynolds for the 13-month period ending September 30, 2006. In September 2006, Ferraris Group PLC paid $1.7 million in connection with the working capital adjustment and in November 2006 it paid an additional $1.9 million as a result of the failure of Del Mar Reynolds to meet certain revenue and earnings results for the 13-month period ending September 30, 2006.

Contingent consideration of up to £5 million ($9.8 million at December 31, 2006) will be payable if Del Mar Reynolds achieves certain revenue targets during fiscal year 2007. The additional earn-out, if any, may be satisfied, at Spacelabs Healthcare's discretion, either in cash or by the issuance of Spacelabs Healthcare common stock. This acquisition expands the portfolio of products that the Company's Healthcare division offers to the hospital market with the addition of cardiac monitoring systems. Del Mar Reynolds also offers a core laboratory business that provides clinical trial services to pharmaceutical companies and to clinical research organizations.

The results of operations for Del Mar Reynolds have been included in the accompanying condensed consolidated financial statements as of the date of acquisition. The total cost of the acquisition, excluding the potential earn-out, was as follows (in thousands):

| | |
|---|---|
| Cash paid for common stock | $25,879 |
| Less refund pursuant to working capital adjustment | (1,694) |
| Less receivable pursuant to 13-month revenue and earnings adjustment | (1,872) |
| Direct costs | 814 |
| Total purchase price | $23,127 |

The Company has based the preliminary allocation of the purchase price on an estimate of fair values of the assets acquired and the liabilities assumed. The final determination of the allocation of the purchase price is pending the final assessment of a third party's valuation of the assets acquired and liabilities assumed. The finalization of the purchase price allocation may result in asset fair values and liabilities assumed that differ from the preliminary estimates of these amounts. As of December 31, 2006, the preliminary purchase price allocation was as follows (in thousands):

| | |
|---|---|
| Net tangible assets acquired | $ 2,150 |
| In-process research and development costs acquired | 561 |
| Identifiable intangible assets acquired | 7,567 |
| Goodwill | 12,849 |
| | $23,127 |

A history of operating margins and profitability, a strong scientific employee base and operations in an attractive market niche were among the factors that contributed to a purchase price resulting in the recognition of goodwill. In-process research and development costs acquired were expensed during the six months ended December 31, 2006, and are included in other operating expenses. Projects that qualify as in-process research and development represent those that have not yet reached technological feasibility and which have no alternative future use.

As part of the integration of these business operations, the Company established the following reserve for the termination and relocation of certain employees to other sites, and legal and accounting fees (in thousands):

Table of Contents

| | |
|---|---|
| Employee severance | $ 692 |
| Relocation costs | 212 |
| Legal and accounting fees | 63 |
| Rent and lease obligations | 571 |
| | $1,538 |

During the six months ended December 31, 2006, the Company paid $0.2 million in connection with severance charges, relocation costs and rent obligations. At December 31, 2006, the remaining reserve amounted to $1.3 million and is included in accrued expenses and other current liabilities in the Consolidated Balance Sheets.

Table of Contents

### 3. Balance Sheet Details

The following tables provide details of selected balance sheet accounts (in thousands):

| | June 30, 2006 | December 31, 2006 |
|---|---|---|
| **Accounts receivable** | | |
| Trade receivables | $118,129 | $ 133,236 |
| Receivables related to long term contracts – unbilled costs and accrued profit on progress completed | 4,286 | 1,840 |
| **Total** | 122,415 | 135,076 |
| Less: allowance for doubtful accounts | (2,996) | (3,130) |
| **Accounts receivable, net** | $119,419 | $ 131,946 |
| **Inventories, net** | | |
| Raw materials | $ 63,785 | $ 71,352 |
| Work-in-process | 29,961 | 34,633 |
| Finished goods | 26,858 | 15,119 |
| **Total** | $120,604 | $ 121,104 |
| **Property and equipment, net** | | |
| Land | $ 5,899 | $ 6,162 |
| Buildings | 7,370 | 7,751 |
| Leasehold improvements | 7,066 | 7,741 |
| Equipment | 30,902 | 35,506 |
| Tooling | 4,288 | 4,333 |
| Furniture and fixtures | 4,140 | 4,834 |
| Computer equipment | 15,619 | 21,165 |
| ERP software | 2,455 | 2,268 |
| Demo equipment | 4,888 | 4,385 |
| Vehicles | 359 | 509 |
| **Total** | 82,986 | 94,654 |
| Less: accumulated depreciation and amortization | (40,465) | (45,933) |
| **Property and equipment, net** | $ 42,521 | $ 48,721 |

The Company expects to bill and collect the receivables for unbilled costs and accrued profits at December 31, 2006 during the next twelve months.

### 4. Goodwill and Intangible Assets

The changes in the carrying value of goodwill for the six month period ended December 31, 2006 are as follows (in thousands):

| | Security Group | Healthcare Group | Optoelectronics and Manufacturing Group | Consolidated |
|---|---|---|---|---|
| Balance as of June 30, 2006 | $16,732 | $ 5,990 | $ 6,344 | $ 29,066 |
| Goodwill acquired during the period | — | 13,070 | 72 | 13,142 |
| Foreign currency translation adjustment | 147 | 251 | — | 398 |
| Balance as of December 31, 2006 | $16,879 | $ 19,311 | $ 6,416 | $ 42,606 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1665 of 2711

Intangible assets consisted of the following (in thousands):

| | Weighted Average Lives | June 30, 2006 Gross Carrying Value | June 30, 2006 Accumulated Amortization | June 30, 2006 Intangibles Net | December 31, 2006 Gross Carrying Value | December 31, 2006 Accumulated Amortization | December 31, 2006 Intangibles Net |
|---|---|---|---|---|---|---|---|
| Amortizable assets: | | | | | | | |
| Software development costs | 3 years | $ 3,271 | $ 1,480 | $ 1,791 | $ 3,440 | $ 1,598 | $ 1,842 |
| Patents | 10 years | 420 | 215 | 205 | 422 | 237 | 185 |
| Core technology | 10 years | 9,289 | 1,159 | 8,130 | 2,637 | 500 | 2,137 |
| Developed technology | 12 years | 27,573 | 4,589 | 22,984 | 14,851 | 2,967 | 11, 884 |
| Customer relationships/backlog | 5 years | 5,462 | 1,646 | 3,816 | 8,127 | 1,839 | 6,288 |
| Total amortizable assets | | 46,015 | 9,089 | 36,926 | 29,477 | 7,141 | 22,336 |
| Non-amortizable assets: | | | | | | | |
| Trademarks | | 7,120 | — | 7,120 | 7,191 | — | 7,191 |
| Total intangible assets | | $53,135 | $ 9,089 | $ 44,046 | $36,668 | $ 7,141 | $ 29,527 |

Amortization expense related to intangibles assets was $1.8 million and $2.4 million for the six months ended December 31, 2005 and 2006 respectively. During the three months ended December 31, 2006, the Company recorded an impairment charge for core technology of $5.9 million, developed technology of $14.5 million and customer relationships/backlog of $0.3 million. See Note 5 for additional information about these impairment charges. At December 31, 2006, the estimated future amortization expense was as follows (in thousands):

| | |
|---|---|
| 2007 (remaining 6 months) | $ 1,768 |
| 2008 | 3,265 |
| 2009 | 2,893 |
| 2010 | 2,541 |
| 2011 | 2,508 |
| 2012 | 2,431 |
| 2013 and thereafter | 6,930 |
| Total | $22,336 |

**5. Impairment, Restructuring and Other Charges**

During the second quarter ended December 31, 2006, as part of a global review of its operations, the Company assessed the value of certain technologies and product lines. As a result of this assessment, the Company recorded total charges of $31.8 million. These charges consist of $21.5 million of asset impairment of certain identifiable intangible and fixed assets, and $10.3 of inventory charges, primarily related to finished goods inventory. Of the $21.5 million of impairment charges, $21.3 million was recorded within the Company's Security division and $0.2 million was recorded within the Optoelectronics and Manufacturing division. Of the $10.3 million of inventory charges, $9.9 million was recorded within the Company's Security division and $0.4 million was recorded within the Optoelectronics and Manufacturing division. Such inventory charges are reflected in cost of goods sold in the consolidated financial statements. Asset impairments were calculated in accordance with SFAS No. 144 as discussed in Note 1.

During the first quarter of fiscal 2006, the Company consolidated manufacturing processes and facilities of certain businesses. These consolidations resulted in a pre-tax restructuring charge of $0.8 million.

The following table summarizes the aforementioned impairment, restructuring and other charges (in thousands):

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1666 of 2711

Table of Contents

| | Three months Ended December 31, | | Six months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Impairment of intangible assets: | | | | |
| Software development costs | $ — | $ 169 | $— | $ 169 |
| Core technology | — | 5,874 | — | 5,874 |
| Developed technology | — | 14,463 | — | 14,463 |
| Customer relationships/backlog | — | 280 | — | 280 |
| Impairment of fixed assets | — | 757 | — | 757 |
| Restructuring charges | — | — | 800 | — |
| Total impairment and restructuring charges | — | 21,543 | 800 | 21,543 |
| Inventory charges | — | 10,301 | — | 10,301 |
| Total charges | $ — | $ 31,844 | $800 | $ 31,844 |

### 6. Lines of Credit

In May 2005, the Company entered into a second amended and restated credit agreement with Bank of the West. The agreement provided for a $50 million senior revolving line-of-credit, including a letter-of-credit, foreign exchange facility and an acquisition credit facility, each of which were secured by substantially all of the assets of the Company's U.S. subsidiaries and its stock ownership in two significant foreign subsidiaries. In October 2005, the Company entered into a first amendment to the second amended and restated credit agreement. As amended, the agreement included an asset–based credit facility of up to $50 million with revised financial covenants. In July 2006, in order to provide the Company's Spacelabs Healthcare subsidiary with a separate line of credit, the Company bifurcated its arrangement with Bank of the West. In doing so, the Company entered into a third amended and restated credit agreement with Bank of the West. As amended, the agreement provides the Company a $35 million senior revolving line-of-credit, including a letter-of-credit and foreign exchange facility, each of which are secured by substantially all of the Company's U.S. assets, including its ownership interest in Spacelabs Healthcare. Interest on the revolving loans is based, at the Company's option, on either the bank's prime rate plus up to 0.5%, or on the British Bankers Association Interest Settlement Rate for deposits in U.S. dollars, plus up to 2.5%. The agreement contains various representations, warranties, affirmative, negative and financial covenants, and conditions of default customary for financing of this type. The agreement expires in July 2009. As of December 31, 2006, $19.0 million was outstanding under the revolving line-of-credit and $10.3 million was issued and outstanding under the letter-of-credit facility.

In connection with bifurcating the Company's line-of-credit, Spacelabs Healthcare also entered into a credit agreement with Bank of the West. The agreement provides for a $10 million senior revolving line-of-credit, including a letter-of-credit and foreign exchange facility, and a $27.4 million term loan to fund the purchase of the Del Mar Reynolds cardiology division of Ferraris Group PLC. The agreement is secured by substantially all of the assets of the U.S. subsidiaries of the Company's Healthcare division. Interest on the revolving loans is based, at Spacelabs Healthcare's option, on either the bank's prime rate, plus up to 0.5%, or on the British Bankers Association Interest Settlement Rate for deposits in U.S. dollars plus up to 2.5%. The agreement contains various representations, warranties, affirmative, negative and financial covenants, and conditions of default customary for financing of this type. As of December 31, 2006, the Company was not in compliance with certain financial covenants; however, the bank waived this noncompliance. The agreement expires in July 2009. As of December 31, 2006, $7.8 million was outstanding under the revolving line-of-credit and $23.6 million was outstanding under the term loan.

At December 31, 2006, several of the Company's foreign subsidiaries maintained bank lines-of-credit, denominated in local currencies, to meet short-term working capital requirements. These credit facilities bear interest at fixed rates at the bank's prime rate, the United Kingdom LIBOR rate, the Norwegian NIBOR rate and the Japan TIBOR rate resulting in a weighted average rate of 6.1% at December 31, 2006. The U.S. dollar equivalent of these facilities totaled $11.8 million at December 31, 2006, of which $0.3 million was outstanding at December 31, 2006. The Company has guaranteed these credit facilities up to approximately $4.9 million.

### 7. Long-Term Debt

Long-term debt consisted of the following (in thousands):

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1667 of 2711

Table of Contents

| | June 30, 2006 | December 31, 2006 |
|---|---|---|
| Five-year term loan payable in quarterly installments of $908,000 until paid in full on July 18, 2011. Interest is variable based on either one to three-month LIBOR plus 2.5% (7.88% at December 31, 2006) or prime rate | $ — | $ 23,600 |
| Twenty-year term loan payable in quarterly installments of £34,500 (approximately $68,000 at December 31, 2006) until paid in full on December 1, 2024. Interest is due quarterly at a rate of three-month LIBOR plus 1.2% (6.52% at December 31, 2006) | 4,721 | 4,865 |
| Capital leases | 248 | 3,812 |
| Other | 1,765 | 1,692 |
| | 6,734 | 33,969 |
| Less current portion of long-term debt | 1,251 | 5,747 |
| Long-term portion of debt | $5,483 | $ 28,222 |

**8. Stock-based Compensation**

As of December 31, 2006, the Company maintained the following three significant stock option plans: (a) the 2006 Equity Participation Plan of OSI Systems, Inc. (the "OSI Plan"), (b) the 2005 Equity Participation Plan of Spacelabs Healthcare (the "Spacelabs Healthcare Plan") and (c) the 2006 Equity Participation Plan of Rapiscan Systems Holdings, Inc. (the "Rapiscan Systems Plan").

The Company recorded stock-based-compensation expense in accordance with SFAS No. 123(R) "Share-Based Payment" ("SFAS 123(R)") for the three months ended December 31, 2005 and 2006 of approximately $1.0 million and $1.1 million, respectively, net of tax and for the six months ended December 31, 2005 and 2006 of approximately $2.0 million and $2.1 million, respectively, net of tax. The income tax benefit related to such compensation for the three months ended December 31, 2005 and 2006 was approximately $0.3 million and $0.4 million, respectively and for the six months ended December 31, 2005 and 2006 was approximately $0.5 million and $0.7 million respectively. The Company recorded stock-based compensation expense in the consolidated statement of operations as follows (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Cost of goods sold | $ 53 | $ 89 | $ 108 | $ 182 |
| Selling, general and administrative | 1,144 | 1,271 | 2,218 | 2,466 |
| Research and development | 103 | 90 | 215 | 177 |
| | $ 1,300 | $ 1,450 | $2,541 | $2,825 |

As of December 31, 2006, total unrecognized compensation cost related to non-vested share-based compensation arrangements granted amounted to: $3.9 million under the OSI Plan, $1.6 million under the Spacelabs Healthcare Plan and $2.1 million under the Rapiscan Systems Plan. The Company expects to recognize these costs over a weighted-average period of 1.7 years with respect to the OSI Plan, 2.0 years with respect to the Spacelabs Healthcare Plan and 2.4 years with respect to the Rapiscan Systems Plan.

*Employee Stock Purchase Plan*

The Company maintains and administers an employee stock purchase plan under which it has reserved for issuance 500,000 shares of its common stock. Eligible employees may purchase a limited number of shares of common stock at a discount of up to 15% of the market value of such stock at pre-determined, plan-defined dates. The compensation expense associated with the this plan, included in the consolidated statement of operations for the six month period ended December 31, 2006, was not material.

*Stock Option Plans*

*OSI Plan* – Under the OSI Plan the Company is authorized to grant of up to 3,350,000 shares of common stock in the form of incentive and nonqualified options or restricted stock to its directors and employees, including those of its subsidiaries. Under the plan, the exercise price of nonqualified options may not be less than 85% of the fair market value of the Company's common stock on the date of grant. The exercise price of incentive stock options may not be less than the fair market value of the Company's common stock at the date of grant. The exercise price of incentive stock options granted to individuals who own more than 10% of the Company's voting stock may not be less than 110% of the fair market value of the Company's common stock on the date of grant.

Table of Contents

Restricted stock may be issued at such price, if any, and may be made subject to such restrictions (including time vesting or satisfaction of performance milestones), as may be determined by the administrator of the OSI Plan. Restricted stock, typically, may be repurchased and/or cancelled by the Company, if the conditions or restrictions are not met. In general, restricted stock may not be sold, or otherwise hypothecated or transferred, until the vesting restrictions applicable to such shares are removed or expire.

As of December 31, 2006, the Company had not made any grants of restricted Stock under the OSI Plan. The Company estimates the fair value of each option award under the OSI Plan as of the date of grant using the Black-Scholes options pricing model utilizing assumptions detailed in the table below. The Company bases expected volatilities on a blend of historical volatilities of the Company's common stock and implied volatilities of its publicly traded options, as more fully explained below. The expected life utilized represents the weighted-average period of time that options granted are expected to be outstanding, giving consideration to vesting periods and historical exercise patterns. The risk-free rate utilized is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding to the expected life of the option.

The Company determined the fair value of options issued under the OSI Plan as of the date of the grant, using the Black-Scholes option pricing model, with the following weighted average assumptions:

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Expected dividend | 0% | 0% | 0% | 0% |
| Risk-free interest rate | 4.5% | 4.4% | 4.5% | 4.8% |
| Expected volatility | 43.4% | 39.3% | 43.5% | 42.3% |
| Expected life (in years) | 3.7 | 3.9 | 3.7 | 3.9 |

The following table summarizes stock option activity under the OSI Plan during the six months ended December 31, 2006:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding at June 30, 2006 | 1,778,678 | $ 17.93 | | |
| Granted | 149,500 | 18.28 | | |
| Exercised | (145,948) | 10.58 | | |
| Expired or cancelled | (10,038) | 13.49 | | |
| Outstanding at December 31, 2006 | 1,772,192 | $ 18.61 | 2.4 | $ 4,119 |
| Exercisable at December 31, 2006 | 979,108 | $ 18.37 | 1.5 | $ 2,511 |

The per-share weighted-average grant-date fair value of stock options granted under the OSI Plan was $6.92 for the three months ended December 31, 2006, and $7.13 for the six months ended December 31, 2006. It was $7.04 for the three months ended December 31, 2005 and $7.03 for the six months ended December 31, 2005. The total intrinsic value of options exercised during the three months ended December 31, 2006 was $267,000 and $1.3 million for the six months ended December 31, 2006. The total intrinsic value of options exercised during the three months ended December 31, 2005 was $440,000 and $611,000 for the six months ended December 31, 2005.

Additional information relating to the OSI Plan at December 31, 2006 is as follows:

| | |
|---|---|
| Options exercisable | 979,108 |
| Options and restricted stock available for grant | 369,896 |
| Total shares reserved for stock option plan | 3,350,000 |

*Spacelabs Healthcare Plan* – The Company established the Spacelabs Healthcare Plan in October 2005 under which the Company authorized the grant of options to purchase up to 10,000,000 shares of Spacelabs Healthcare common stock. Under the Spacelabs Healthcare Plan, Spacelabs Healthcare may grant to employees, including those of its subsidiaries, consultants and to the non-employee directors of Spacelabs Healthcare, nonqualified options to purchase shares of the Spacelabs Healthcare common stock.

The Company estimates the fair value of each option award under the Spacelabs Healthcare Plan as of the date of grant using a Black-Scholes option pricing model utilizing assumptions detailed in the table below. The Company bases expected volatilities on the

Table of Contents

historical volatilities of the publicly traded common stock of a select peer group of companies that are similar to Spacelabs Healthcare. The Company has determined the expected term assumption under the "Simplified Method" as defined in SAB 107, as it lacks historical data and is unable to make reasonable estimates regarding future exercise patterns. The risk-free rate utilized is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding with the expected life of the option.

The Company has determined the fair value of options issued under the Spacelabs Healthcare Plan as of the date of the grant using the Black-Scholes option pricing model with the following weighted average assumptions:

| | Three Months Ended December 31, | | Six Months Ended December 31, |
|---|---|---|---|
| | 2005 | 2006 | 2006 |
| Expected dividend | 0% | 0% | 0% |
| Risk-free interest rate | 4.4% | 4.4% | 4.5% |
| Expected volatility | 49.5% | 37.7% | 37.8% |
| Expected life (in years) | 3.6 | 3.6 | 3.6 |

The following table summarizes stock option activity under the Spacelabs Healthcare Plan during the six months ended December 31, 2006:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding—June 30, 2006 | 5,474,119 | $ 1.37 | | |
| Granted | 997,200 | 2.11 | | |
| Exercised | (186,667) | 1.12 | | |
| Canceled | (172,782) | 1.33 | | |
| Outstanding at December 31, 2006 | 6,111,870 | $ 1.50 | 3.1 | $ 2,515 |
| Exercisable at December 31, 2006 | 2,015,228 | $ 1.24 | 2.6 | $ 1,211 |

The per-share weighted-average grant-date fair value of stock options granted under the 2005 Spacelabs Healthcare Plan was $0.70 for the three months ended December 31, 2006 and $0.72 for six months ended December 31, 2006. It was $1.12 for the three months ended December 31, 2005. We made no grants under this plan prior to such periods. The total intrinsic value of options exercised during the three months ended December 31, 2006 was $211,000 and $241,000 for the six months ended December 31, 2006. No option holders under the 2005 Spacelabs Healthcare Plan exercised their options during the three months ended December 31, 2005.

Additional information relating to the Spacelabs Healthcare Plan at December 31, 2006 is as follows:

| | |
|---|---|
| Options exercisable | 2,015,228 |
| Options available for grant | 3,933,998 |
| Total shares reserved for stock option plan | 10,000,000 |

*Rapiscan Systems Plan* – The Company established the Rapiscan Systems Plan in January 2006 under which the Company authorized the grant of options to purchase up to 10,000,000 shares of Rapiscan Systems Holdings common stock. Under the Rapiscan Systems Plan, Rapiscan Systems Holdings may grant to employees, including those of its subsidiaries, consultants and to the non-employee directors of Rapiscan Systems Holdings, incentive or nonqualified options to purchase shares of the Rapiscan Systems Holdings common stock.

The Company estimates the fair value of each option award under the Rapiscan Systems Plan as of the date of grant using a Black-Scholes option pricing model utilizing assumptions detailed in the table below. The Company bases expected volatilities on the historical volatilities of the publicly traded common stock of a select peer group of companies that are similar to Rapiscan Systems Holdings. The Company has determined the expected term assumption under the "Simplified Method" as defined in SAB 107, as it lacks historical data and is unable to make reasonable estimates regarding future exercise patterns. The risk-free rate utilized is based on the U.S. Treasury yield curve in effect at the time of grant for periods corresponding with the expected life of the option.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1670 of 2711

Table of Contents

The Company has determined the fair value of the options issued under the Rapiscan Systems Plan as of the date of the grant using the Black-Scholes option pricing model with the following weighted average assumptions:

| | Three Months Ended December 31, 2006 | Six Months Ended December 31, 2006 |
|---|---|---|
| Expected dividend | 0% | 0% |
| Risk-free interest rate | 4.5% | 4.6% |
| Expected volatility | 37.3% | 37.3% |
| Expected life (in years) | 3.6 | 3.6 |

The following table summarizes stock option activity under the Rapiscan Systems Plan during the six months ended December 31, 2006:

| | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|
| Outstanding at June 30, 2006 | 5,048,000 | $ 1.42 | — | — |
| Granted | 1,842,500 | 1.50 | — | — |
| Exercised | — | — | — | — |
| Expired or cancelled | — | — | — | — |
| Outstanding at December 31, 2006 | 6,890,500 | $ 1.44 | 4.4 | $ 405 |
| Exercisable at December 31, 2006 | — | — | — | — |

The per-share weighted-average grant-date fair value of stock options granted under the 2006 Rapiscan Systems Plan was $0.52 for the three months ended December 31, 2006 and $0.51 for the six months ended December 31, 2006. We made no grants under this plan prior to such periods. There were no options exercises under the 2006 Rapiscan Systems Plan during the three months ended December 31, 2006.

Additional information relating to the Rapiscan Systems Plan at December 31, 2006 is as follows:

| | |
|---|---|
| Options exercisable | — |
| Options available for grant | 3,109,500 |
| Total reserved common stock shares for stock option plan | 10,000,000 |

**9. Retirement Benefit Plans**

The Company has a defined benefit plan for certain employees located in the United Kingdom. The benefits under this plan are based on years of service and an employee's highest twelve months' compensation during the last five years of employment. The components of net periodic pension expense are as follows (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Service cost | $ 9 | $ 9 | $ 21 | $ 17 |
| Interest cost | 41 | 54 | 88 | 107 |
| Expected return on plan assets | (29) | (46) | (60) | (92) |
| Amortization of net loss | 26 | 26 | 60 | 52 |
| Net periodic pension expense | $ 47 | $ 43 | $ 109 | $ 84 |

For the three and six months ended December 31, 2006, the Company made contributions of $69,000 and $136,000 to this pension plan.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1671 of 2711

Table of Contents

**10. Commitments and Contingencies**

*Legal Proceedings*

In November 2002, L-3 Communications Corporation brought suit against the Company seeking a declaratory judgment that L-3 Communications Corporation had not breached its obligations to the Company concerning the acquisition of PerkinElmer's Security Detection Systems Business. The Company asserted counterclaims against L-3 Communications Corporation for, among other things, fraud and breach of fiduciary duty. On May 24, 2006, the jury in the case returned a verdict in the Company's favor and awarded $125 million in damages. The jury found that L-3 Communications Corporation had breached its fiduciary duty to the Company and had committed fraud. In addition, the jury also found that the Company had breached a confidentiality agreement and awarded L-3 Communications Corporation nominal damages of one dollar. L-3 Communications Corporation is seeking to have the verdict reduced or set aside.

During 2003 and 2004, we were informed that SAIC, Inc. had made statements to prospective buyers of our gamma-ray mobile detection system that our system infringed an SAIC patent. We contended that SAIC's infringement allegations were not only without merit, but wrongfully made for improper purposes and we therefore filed a lawsuit in the U.S. District Court, Central District of California for declaratory judgment. SAIC counter-claimed for patent infringement and unfair competition. In January 2007, we entered into an agreement settling our litigation with SAIC. Under the terms of the settlement, SAIC agreed that, going forward, it would not make such infringement allegations again and both parties agreed not to allege that each others' current and future gamma-ray based inspection systems infringe any existing or pending patents. The settlement included a general release of claims.

In February 2005, Electromedical, a Greek distribution company, filed an action in the courts of Greece claiming that Spacelabs Medical orally agreed to appoint Electromedical as Spacelabs' exclusive Greek distributor, but failed to do so. Electromedical claims that it incurred significant expenses as a result of Spacelabs' actions and demands Euro 872,414 (approximately $1.2 million as of December 31, 2006) in compensation.

The Company is also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in its quarterly and annual reports. In the opinion of the Company's management, after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on the Company's financial statements.

In accordance with SFAS No. 5, "Accounting for Contingencies," the Company has not accrued for loss contingencies relating to the above matters because it believes that, although unfavorable outcomes in the proceedings may be possible, they are not considered by management to be probable or reasonably estimable. If one or more of these matters are resolved in a manner adverse to the Company, the impact on the Company's results of operations, financial position and/or liquidity could be material.

*Contingent Acquisition Obligations*

Under the terms and conditions of the purchase agreements associated with the following acquisitions, the Company may be obligated to make additional payments.

In August 2002, the Company purchased a minority equity interest in CXR Limited, a United Kingdom-based research and development company that develops real time tomography systems. In June 2004, the Company increased its equity interest in CXR to approximately 75% and in December 2004 the Company acquired the remaining 25%. As compensation to the selling shareholders for this remaining interest, the Company has agreed to make certain royalty payments based on sales of CXR's products. As of December 31, 2006, no royalty payments have been earned.

In November 2002, the Company acquired all the outstanding capital stock of Ancore Corporation (since renamed Rapiscan Systems Neutronics and Advanced Technologies Corporation), a Santa Clara, California based company, for its advanced inspection systems for aviation security, port and border inspection and counter-terrorism. Consideration paid for the acquisition consisted of a combination of the Company's common stock and cash of approximately $10.4 million, including professional fees associated with the acquisition. In addition, during the five years following the close, contingent consideration is payable based on the sales of certain of its products. The contingent consideration is capped at $34.0 million. As of December 31, 2006, no contingent consideration has been earned.

In January 2004, the Company acquired Advanced Research & Applications Corp. (since renamed Rapiscan Systems High Energy Inspection Corporation), a privately-held company located in Sunnyvale, California. Consideration for the acquisition consisted of an initial cash payment of approximately $17.6 million (net of cash acquired), including acquisition costs. Furthermore, during the seven years following the close, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at $30.0 million. As of December 31, 2006, no contingent consideration has been earned.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1672 of 2711
Table of Contents

In February 2005, the Company acquired Blease Medical Holdings Limited and certain affiliated companies for approximately $9.3 million in cash (net of cash acquired), including acquisition costs. Furthermore, during the three years following the close, contingent consideration is payable based on Blease's net revenues, provided certain requirements are met. The contingent consideration is capped at £6.25 million (approximately $12.1 million as of December 31, 2006). As of December 31, 2006, no contingent consideration has been earned.

*Environmental Contingencies*

The Company is subject to various environmental laws. The Company's practice is to ensure that Phase I environmental site assessments are conducted for each of its properties in the United States at which the Company manufactures products in order to identify, as of the date of such report, potential sources of contamination of the property. In certain cases, the Company has conducted further environmental assessments consisting of soil and groundwater testing and other investigations deemed appropriate by independent environmental consultants.

During one investigation, the Company discovered soil and groundwater contamination at its Hawthorne, California facility. The Company filed reports concerning this problem with the appropriate environmental authorities in fiscal year 2001. The Company has not yet received any response to such reports, and no agency action or litigation is presently pending or threatened. The Company's site was previously used for semiconductor manufacturing similar to that presently conducted on the site by the Company, and it is not presently known who is responsible for the contamination and the remediation. The groundwater contamination is a known regional problem, not limited to the Company's premises or its immediate surroundings.

The Company has also been informed of soil and groundwater remediation efforts at a facility that its Ferson Technologies, Inc. subsidiary previously leased in Ocean Springs, Mississippi. Ferson Technologies occupied the facility until October 2003. The Company believes that the owner and previous occupants of the facility have primary responsibility for such remediation and have an agreement with the facility's owner under which the owner is responsible for remediation of pre-existing conditions. However, the Company is unable at this time to ascertain whether Ferson Technologies bears any exposure for remediation costs under applicable environmental regulations.

In accordance with SFAS No. 5, "Accounting for Contingencies," the Company has not accrued for loss contingencies relating to the above environmental matters because it believes that, although unfavorable outcomes may be possible, they are not considered by the Company's management to be probable or reasonably estimable. If one or more of these matters are resolved in a manner adverse to the Company, the impact on the Company's results of operations, financial position and/or liquidity could be material.

*Product Warranties*

The Company offers its customers warranties on many of the products that it sells. These warranties typically provide for repairs and maintenance of the products if problems arise during a specified time period after original shipment. Concurrent with the sale of products, the Company records a provision for estimated warranty expenses with a corresponding increase in cost of goods sold. The Company periodically adjusts this provision based on historical and anticipated experience. The Company charges actual expenses of repairs under warranty, including parts and labor, to this provision when incurred.

The following table presents changes in warranty provisions (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Balance at beginning of period | $ 6,291 | $ 7,318 | $ 6,641 | $ 7,224 |
| Additions | 1,957 | 1,097 | 2,767 | 1,933 |
| Increase as a result of acquisitions | — | — | — | 439 |
| Reductions for warranty repair costs | (1,487) | (1,035) | (2,647) | (2,216) |
| Balance at end of period | $ 6,761 | $ 7,380 | $ 6,761 | $ 7,380 |

Table of Contents

**11. Segment Information**

The Company operates in three identifiable industry segments: (a) Security, providing security and inspection systems; (b) Healthcare, providing medical monitoring and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for applications in the defense and aerospace markets, among others. The Company also has a corporate segment ("Corporate") that includes executive compensation and certain other general and administrative expenses, interest expense, expenses related to stock issuances and legal, audit and other professional service fees not allocated to industry segments. Both the Security and Healthcare divisions comprise primarily end-product businesses whereas the Optoelectronics and Manufacturing division comprises businesses that primarily supply components and subsystems to original equipment manufacturers, including to the businesses of the Security and Healthcare divisions. All intersegment sales are eliminated in consolidation.

The following table presents segment information (in thousands):

| | Three months ended December 31, | | Six months ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| **Revenues - by Segment:** | | | | |
| Security division | $ 30,378 | $ 44,388 | $ 57,341 | $ 85,435 |
| Healthcare division | 60,999 | 62,737 | 112,370 | 110,968 |
| Optoelectronics and Manufacturing division including intersegment revenues | 31,128 | 39,590 | 58,904 | 73,868 |
| Intersegment revenues elimination | (5,367) | (9,257) | (9,607) | (17,284) |
| Total | $117,138 | $137,458 | $219,008 | $252,987 |
| **Revenues - by Geography:** | | | | |
| North America | $ 88,258 | $ 88,434 | $164,198 | $163,527 |
| Europe | 23,945 | 40,265 | 45,478 | 77,299 |
| Asia | 10,302 | 18,016 | 18,939 | 29,445 |
| Intersegment revenues elimination | (5,367) | (9,257) | (9,607) | (17,284) |
| **Total** | $117,138 | $137,458 | $219,008 | $252,987 |
| **Operating income (loss) - by Segment:** | | | | |
| Security division (1) | $ (651) | $ (30,023) | $ (3,844) | $ (31,811) |
| Healthcare division | 5,319 | (1,350) | 6,502 | (5,613) |
| Optoelectronics and Manufacturing division (2) | 2,581 | 2,923 | 3,783 | 6,734 |
| Corporate | (4,293) | (3,826) | (10,115) | (10,145) |
| Eliminations | (83) | 509 | 33 | 157 |
| **Total** | $ 2,873 | $ (31,767) | $ (3,641) | $ (40,678) |

| | June 30, 2006 | December 31, 2006 |
|---|---|---|
| **Assets - by Segment:** | | |
| Security division | $168,987 | $ 148,837 |
| Healthcare division | 148,858 | 176,175 |
| Optoelectronics and Manufacturing division | 73,793 | 84,862 |
| Corporate | 15,124 | 30,530 |
| Eliminations (3) | (3,689) | (3,537) |
| **Total** | $403,073 | $ 436,867 |

(1) Operating losses for the three months and six months ended December 31, 2006, include $21.3 million of impairment charges and $9.9 million of inventory charges related to the Company's global review of its operations and the value of certain product lines.

(2) Operating income for the three months and six months ended December 31, 2006, include $0.2 million of impairment charges and $0.4 million of inventory charges related to the Company's global review of its operations and the value of certain product lines.

Table of Contents

(3) Eliminations primarily reflect the elimination of intercompany inventory profit not-yet-realized. This profit will be realized when inventory is shipped to the Security and Healthcare divisions' external customers.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Cautionary Statement**

*Certain statements contained in this quarterly report on Form 10-Q that are not related to historical results, including, without limitation, statements regarding our business strategy, objectives and future financial position, are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and involve risks and uncertainties. These forward-looking statements may be identified by the use of forward-looking terms such as "anticipate," "believe," "expect," "may," "could," "likely to," "should," or "will," or by discussions of strategy that involve predictions which are based upon a number of future conditions that ultimately may prove to be inaccurate. Statements in this quarterly report on Form 10-Q that are forward-looking are based on current expectations and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties described in this quarterly report on Form 10-Q, our Annual Report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission. Such factors, of course, do not include all factors that might affect our business and financial condition. Although we believe that the assumptions upon which our forward-looking statements are based are reasonable, such assumptions could prove to be inaccurate and actual results could differ materially from those expressed in or implied by the forward-looking statements. All forward-looking statements contained in this quarterly report on Form 10-Q are qualified in their entirety by this statement. We undertake no obligation other than as may be required under securities laws to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions and select accounting policies that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Our critical accounting policies are detailed in our Annual Report on Form 10-K for the year ended June 30, 2006. As of December 31, 2006, our critical accounting policies had not changed from those at June 30, 2006, other than the addition of Impairment of Long-Lives Assets as described below.

*Impairment of Long-Lived Assets.* We test goodwill for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events. For purposes of testing for goodwill impairment, we have determined that we have five reporting units, consisting of the Security division, Optoelectronics and Manufacturing division and three reporting units within the Healthcare division. We test goodwill for impairment annually during the second fiscal quarter using a two-step process. First, we determine if the carrying amount of any of the reporting units exceeds its fair value. We use a discounted cash flows method to make this determination for our Security and Optoelectronics and Manufacturing divisions and we use a market value method for our Healthcare division (based on the market price of the Healthcare division's publicly traded stock). If these methods indicate a potential impairment of goodwill associated with that the respective reporting unit, we then compare the implied fair value of the goodwill associated with the respective reporting unit to its carrying amount to determine if there is an impairment loss. We performed this annual impairment test for goodwill during the second quarter of fiscal year 2007 and concluded that there was no impairment of goodwill.

We evaluate long-lived assets, including intangible assets other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. An impairment is considered to exist if the total estimated future cash flows on an undiscounted basis are less than the carrying amount of the assets. If an impairment does exist, we measure the impairment loss and record it based on discounted estimated future cash flows. In estimating future cash flows, we group assets at the lowest level for which there are identifiable cash flows that are largely independent of cash flows from other asset groups. Our estimate of future cash flows is based upon, among other things, certain assumptions about expected future operating performance, growth rates and other factors.

During the second quarter ended December 31, 2006, we recognized non-cash impairment charges totaling $21.5 million relating to software development costs, core technology, developed technology, customer relationships/backlog and fixed assets. Of the $21.5 million impairment charge, $21.3 million was recognized within the Security division and $0.2 million was recognized within the Optoelectronics and Manufacturing division. See Note 5 to the consolidated financial statements for additional information about these impairment charges.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1675 of 2711

Table of Contents

**Recent Accounting Pronouncements**

We describe recent accounting pronouncements in Item 1 – "Condensed Consolidated Financial Statements – Notes to Consolidated Financial Statements."

**Executive Summary**

We are a vertically integrated designer and manufacturer of specialized electronic systems and components for critical applications. We sell our products in diversified markets, including homeland security, healthcare, defense and aerospace. We have three operating divisions: (a) Security, providing security and inspection systems; (b) Healthcare, providing medical monitoring and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for applications in the defense and aerospace markets, among others.

*Security Division.* Through our Security division, we design, manufacture and market security and inspection systems worldwide for sale primarily to U.S. federal, state and local government agencies as well as foreign governments. These products are used to inspect baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband as well as to screen people. Revenues from our Security division accounted for 34% of our total consolidated revenues for the six months ended December 31, 2006 and 26% for the six months ended December 31, 2005.

Following the September 11, 2001 terrorist attacks, U.S. Government spending for the development and acquisition of security and inspection systems increased in response to the attacks and has continued at high levels during its global war on terrorism. This spending has had a favorable impact on our business. However, future levels of such spending could decrease as a result of changing budgetary priorities or could shift to products that we do not provide. Additionally, competition for contracts with the U.S. Government has become more intense in recent years as new competitors and technologies have entered this market.

*Healthcare Division.* Through our Healthcare division, we design, manufacture and market medical monitoring and anesthesia systems for sale primarily to hospitals and medical centers. Our products monitor patients in critical, emergency and perioperative care areas of the hospital and provide such information, through wired and wireless networks, to physicians and nurses who may be at the patient's bedside, in another area of the hospital or even outside the hospital. Revenues from our Healthcare division accounted for 44% our total consolidated revenues for the six months ended December 31, 2006 and 51% for the six months ended December 31, 2005.

The healthcare markets in which we operate are highly competitive. We believe that our customers choose among competing medical monitoring and anesthesia products on the basis of product performance, functionality, value and service. We also believe that price has become an important factor in hospital purchasing decisions because of pressures they are facing to cut costs.

*Optoelectronics and Contract Manufacturing Division.* Through our Optoelectronics and Manufacturing division, we design, manufacture and market optoelectronic devices and value-added manufacturing services worldwide for use in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical imaging and diagnostics, computed tomography (CT), fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We also provide our optoelectronic devices and value-added manufacturing services to our own Security and Healthcare divisions. Revenues from our Optoelectronics and Manufacturing division accounted for 29% of our total consolidated revenues for the six months ended December 31, 2006 and 27% of our total consolidated revenues for the six months ended December 31, 2005.

Despite the overall growth in revenues that we experienced, our operating losses for the six months ended December 31, 2006, grew in comparison to the prior year period, primarily as a result of: (i) lower sales of patient monitors in North America by our Healthcare division (such monitors generally carry a higher gross margin than many of our other products), (ii) a $21.5 million charge associated with the impairment of certain intangible and fixed assets, (iii) the recordation of $10.3 million of inventory charges following a review of our product portfolio, (iv) a $0.6 million charge for in-process research and development related to our acquisition of Del Mar Reynolds and (v) increased research and development expenses within our Security and Healthcare divisions.

During the second quarter of fiscal year 2007, we undertook a review of our global operations as part of our on-going efforts to integrate recent acquisitions and rationalize our overall cost structure. The review resulted in plans to achieve approximately $15-$17 million of pre-tax annualized cost savings, including a reduction of approximately 8% of the global workforce and the consolidation of multiple facilities. We have initiated these cost cutting measures, with the goal of implementing them by the end of the current fiscal year.

Table of Contents

**Results of Operations**

*Three Months Ended December 31, 2006 Compared to Three Months Ended December 31, 2005.*

**Net Revenues**

The table below and the discussion that follows are based upon the way we analyze our business. See Note 11 to the Consolidated Financial Statements for additional information about our business segments.

| (in millions) | Q2 2006 | % of Net Sales | Q2 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Security division | $ 30.4 | 26% | $ 44.4 | 32% | $ 14.0 | 46% |
| Healthcare division | 61.0 | 52% | 62.7 | 46% | 1.7 | 3% |
| Optoelectronics and Manufacturing division | 31.1 | 27% | 39.6 | 29% | 8.5 | 27% |
| Intersegment revenues | (5.4) | (5)% | (9.2) | (7)% | (3.8) | 70% |
| Total revenues | $117.1 | | $137.5 | | $ 20.4 | 17% |

Net revenues for the three months ended December 31, 2006, increased $20.4 million, or 17%, to $137.5 million from $117.1 million for the comparable prior-year period.

Revenues for the Security division for the three months ended December 31, 2006, increased $14.0 million, or 46%, to $44.4 million, from $30.4 million for the comparable prior-year period. The increase was primarily attributable to an $11.3 million, or 44%, increase in sales of baggage and parcel inspection and people screening systems, and a $2.7 million, or 58%, increase in sales of cargo and vehicle inspection systems.

Revenues for the Healthcare division for the three months ended December 31, 2006, increased $1.7 million, or 3%, to $62.7 million, from $61.0 million for the comparable prior-year period. The increase was primarily attributable to the inclusion of revenues from Del Mar Reynolds totaling $8.0 million, a business that we acquired in July 2006, partially offset by lower patient monitoring sales of $6.2 million, primarily in North America.

Revenues for the Optoelectronics and Manufacturing division for the three months ended December 31, 2006, increased $8.5 million, or 27%, to $39.6 million, from $31.1 million for the comparable prior-year period. The increase was primarily attributable to higher commercial optoelectronic sales, as well as to growth in contract manufacturing sales. In addition, for the three months ended December 31, 2006, the division recorded intersegment sales of $9.2 million, compared to $5.4 million in the comparable prior-year period. Such sales are eliminated in consolidation.

**Gross Profit**

| (in millions) | Q2 2006 | % of Net Sales | Q2 2007 | % of Net Sales |
|---|---|---|---|---|
| Gross profit | $45.1 | 38.5% | $39.3 | 28.6% |

Gross profit decreased $5.8 million, or 13%, to $39.3 million for the three months ended December 31, 2006, from $45.1 million for the comparable prior-year period. The gross profit margin decreased to 28.6%, from 38.5% over the same period. This decrease was primarily attributable to the recording of $10.3 million of inventory charges following a global review of operations during which we determined that certain inventory values primarily associated with cargo and vehicle inspection products developed by our Security division were impaired. These inventory charges reduced our gross margin by 7.5%. The remainder of the decline in gross margin was attributable to: (i) lower gross margins within our Security division resulting from sales of new types of cargo and vehicle inspection products that were sold at low gross margins, but which we expect to sell at higher gross margins when future repeat sales result in greater operating efficiencies; (ii) reduced patient monitoring systems sales by our Healthcare division (such monitors generally carry higher gross margins than many of our other products); and (iii) growth in sales of commercial optoelectronic products and contract manufacturing services by our Optoelectronic and Manufacturing division (such products and services generally carry lower gross margins than the products and services of the other divisions).

Table of Contents

**Operating Expenses**

| (in millions) | Q2 2006 | % of Net Sales | Q2 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $33.5 | 28.6% | $38.0 | 27.6% | $ 4.5 | 13% |
| Research and development | 8.7 | 7.4% | 11.2 | 8.1% | 2.5 | 29% |
| Impairment, restructuring, and other charges | — | — % | 21.5 | 15.7% | 21.5 | NM |
| Other | — | — % | 0.4 | 0.3% | 0.4 | NM |
| Total operating expenses | $42.2 | 36.0% | $71.1 | 51.7% | $ 28.9 | 68% |

**Selling, general and administrative expenses**. Selling, general and administrative ("SG&A") expenses consist primarily of compensation paid to sales, marketing and administrative personnel, professional service fees and marketing expenses. For the three months ended December 31, 2006, SG&A expenses increased by $4.5 million, or 13%, to $38.0 million, from $33.5 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses for the three months ended December 31, 2006 decreased to 27.6%, from 28.6% for the comparable prior-year period. The increase in SG&A expenses in the three months ended December 31, 2006 was primarily attributable to: (i) approximately $3.7 million in support of Del Mar Reynolds, a business that we acquired in July 2006 and (ii) an increase of $1.2 million in general sales and administrative support costs to support the growth in the Optoelectronic and Manufacturing divisions.

**Research and development**. Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2006, such expenses increased $2.5 million, or 29%, to $11.2 million, from $8.7 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 8.1% for the three months ended December 31, 2006, compared to 7.4% for the comparable prior-year period. The increase in research and development expenses for the three month period ended December 31, 2006 was primarily attributable to: (i) $1.0 million in support of the Del Mar Reynolds business which was acquired on July 31, 2006 and (ii) increased investment by our Security division of $1.6 million primarily to support new hold baggage screening products.

**Impairment, restructuring, and other charges**. During the second quarter ended December 31, 2006, as part of a global review of our operations, we assessed the value of certain technologies and product lines. As a result of this assessment, we recorded total charges of $31.8 million. These charges consist of $21.5 million of asset impairment of certain identifiable intangible and fixed assets, and $10.3 of inventory charges, primarily related to finished goods inventory. Of the $21.5 million of impairment charges of intangible and fixed assets, $21.3 million was recorded within our Security division and $0.2 million was recorded within our Optoelectronics and Manufacturing division. Of the $10.3 million of inventory charges, $9.9 million was recorded within our Security division and $0.4 million was recorded within our Optoelectronics and Manufacturing division. Such inventory charges are reflected in cost of goods sold in our consolidated financial statements.

**Non-Operating Income and Expenses**

| (in millions) | Q2 2006 | % of Net Sales | Q2 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Interest expense | $ 0.4 | 0.3% | $ 1.3 | 1.0% | $ 0.9 | 225% |
| Interest (income) | (0.1) | (0.1)% | (0.1) | (0.1)% | — | — % |
| Other (income) / expense | (0.3) | (0.2)% | (0.1) | (0.1)% | 0.2 | 67% |
| Total non-operating income and expense | $— | — % | $ 1.1 | 0.8% | $ 1.1 | NM |

**Interest expense**. For the three months ended December 31, 2006, we incurred interest expense of $1.3 million compared to $0.4 million for the comparable prior-year period. The increase in interest expense was attributable to increased borrowings associated with the acquisition of Del Mar Reynolds in July 2006 and working capital requirements, as well as to rising interest rates.

Table of Contents

**Income tax benefit**. For the three months ended December 31, 2006, our effective tax rate was 36.8%, compared to 64.4% for the comparable prior-year period. Our provision for income taxes is dependent on the mix of income from U.S. and foreign locations due to tax rate differences among such countries as well as due to the impact of permanent taxable differences.

*Six Months Ended December 31, 2006 Compared to Six Months Ended December 31, 2005.*

**Net Revenues**

| (in millions) | Q2 YTD 2006 | % of Net Sales | Q2 YTD 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Security | $ 57.3 | 26% | $ 85.4 | 34% | $ 28.1 | 49% |
| Healthcare | 112.4 | 51% | 111.0 | 44% | (1.4) | (1)% |
| Optoelectronics / Manufacturing | 58.9 | 27% | 73.9 | 29% | 15.0 | 25% |
| Intersegment Revenues | (9.6) | (4)% | (17.3) | (7)% | (7.7) | 80% |
| Total Revenues | $219.0 | | $253.0 | | $ 34.0 | 16% |

Net revenues for the six months ended December 31, 2006, increased $34.0 million, or 16%, to $253.0 million from $219.0 million for the comparable prior-year period.

Revenues for the Security division for the six months ended December 31, 2006, increased $28.1 million, or 49%, to $85.4 million, from $57.3 million for the comparable prior-year period. The increase was primarily attributable to a $17.4 million, or 35%, increase in sales of baggage and parcel inspection and people screening systems, and a $10.7 million, or 129%, increase in sales of cargo and vehicle inspection systems.

Revenues for the Healthcare division for the six months ended December 31, 2006, decreased $1.4 million, or 1%, to $111.0 million, from $112.4 million for the comparable prior-year period. The decrease was attributable to lower patient monitoring sales of $15.0 million, primarily in North America, partially offset by the inclusion of $13.1 million of revenues from Del Mar Reynolds, a business that we acquired in July 2006.

Revenues for the Optoelectronics and Manufacturing division for the six months ended December 31, 2006 increased $15.0 million, or 25%, to $73.9 million, from $58.9 million for the comparable prior-year period. The increase was primarily attributable to higher commercial optoelectronic sales, as well as to higher levels of contract manufacturing sales. In addition, for the six months ended December 31, 2006, the division recorded intersegment sales of $17.3 million, compared to $9.6 million in the comparable prior-year period. Such sales are eliminated in consolidation.

**Gross Profit**

| (in millions) | Q2 YTD 2006 | % of Net Sales | Q2 YTD 2007 | % of Net Sales |
|---|---|---|---|---|
| Gross profit | $ 82.1 | 37.5% | $ 77.8 | 30.8% |

Gross profit decreased $4.3 million, or 5%, to $77.8 million for the six months ended December 31, 2006, from $82.1 million for the comparable prior-year period. The gross profit margin decreased to 30.8%, from 37.5% over the same periods. This decrease was primarily attributable to the recording of $10.3 million of inventory charges following a global review of operations during which we determined that certain finished goods inventory values primarily associated with cargo and vehicle inspection products developed by our Security division were impaired. These inventory charges reduced our gross margin by 4.1%. The remainder of the decline in gross margin was primarily attributable to: (i) lower gross margins within in our Security division resulting from sales of new types of cargo and vehicle inspection products that were sold at low gross margins, but which we expect to sell at higher gross margins when future repeat sales result in greater operating efficiencies; (ii) reduced patient monitoring systems sales by our Healthcare division (such monitors generally carry higher gross margins than many of our other products); and (iii) growth in sales of commercial optoelectronic products and contract manufacturing services by our Optoelectronic and Manufacturing division (such products and services generally carry lower gross margins than the products and services of the other divisions).

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1679 of 2711

Table of Contents

**Operating Expenses**

| (in millions) | Q2 YTD 2006 | % of Net Sales | Q2 YTD 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 66.9 | 30.5% | $ 74.4 | 29.4% | $ 7.5 | 11% |
| Research and development | 17.4 | 7.9% | 21.5 | 8.5% | 4.1 | 24% |
| Impairment, restructuring, and other charges | 0.8 | 0.4% | 21.5 | 8.5% | 20.7 | NM |
| Other | 0.6 | 0.3% | 1.1 | 0.4% | 0.5 | 83% |
| Total operating expenses | $ 85.7 | 39.1% | $118.5 | 46.8% | $ 32.8 | 38% |

**Selling, general and administrative expenses**. For the six months ended December 31, 2006, SG&A expenses increased by $7.5 million, or 11%, to $74.4 million from $66.9 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses for the six months ended December 31, 2006 decreased to 29.4%, from 30.5% in the comparable prior-year period. The increase in SG&A expenses in the six months ended December 31, 2006, over the comparable prior-year period was primarily attributable to: (i) approximately $6.6 million utilized by Del Mar Reynolds, a business that we acquired in July 2006 and (ii) an increase of $2.2 million to support growth in the Optoelectronic and Manufacturing division. This increase in SG&A expenses was partially offset by a $1.0 million net reduction due to favorable foreign exchange gains of $0.3 in the six months ended December 31, 2006, as compared to a foreign exchange loss of $0.7 in the comparable prior year period.

**Research and development**. Research and development expenses include research related to new product development and product enhancement expenditures. For the six months ended December 31, 2006, such expenses increased $4.1 million, or 24%, to $21.5 million, from $17.4 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 8.5% for the six months ended December 31, 2006, compared to 7.9% for the comparable prior-year period. The increase in research and development expenses for the three month period ended December 31, 2006 was primarily attributable to: (i) $2.2 million in support of Del Mar Reynolds and (ii) increased investment by our Security division of $2.2 million, primarily to support new hold baggage screening products.

**Impairment, restructuring, and other charges.** During the six months ended December 31, 2006, as part of a global review of our operations, we assessed the value of certain technologies and product lines. As a result of this assessment, we recorded total charges of $31.8 million. These charges consist of $21.5 million of asset impairment of certain identifiable intangible and fixed assets, and $10.3 of inventory charges, primarily related to finished goods inventory. Of the $21.5 million of impairment charges of intangible and fixed assets, $21.3 million was recorded within our Security division and $0.2 million was recorded within our Optoelectronics and Manufacturing division. Of the $10.3 million of inventory charges, $9.9 million was recorded within our Security division and $0.4 million was recorded within our Optoelectronics and Manufacturing division. Such inventory charges are reflected in cost of goods sold in our consolidated financial statements.

During the six months ended December 31, 2005, we consolidated manufacturing processes and facilities of certain businesses. These consolidations resulted in a pre-tax restructuring charge of $0.8 million.

**Non-Operating Income and Expenses**

| (in millions) | Q2 YTD 2006 | % of Net Sales | Q2 YTD 2007 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Interest expense | $ 1.0 | 0.4% | $ 2.2 | 0.9% | $ 1.2 | 120% |
| Interest (income) | (0.1) | — % | (0.2) | (0.1)% | (0.1) | 100% |
| Other (income) / expense | (0.3) | (0.1)% | — | — % | 0.3 | NM |
| Total non-operating income and expense | $ 0.6 | 0.3% | $ 2.0 | 0.8% | $ 1.4 | 133% |

**Interest expense.** For the six months ended December 31, 2006, we incurred interest expense of $2.3 million compared to $1.0 million for the comparable prior-year period. The increase in interest expense was primarily attributable to increases in our borrowings used to support our acquisition in July 2006 of Del Mar Reynolds and working capital requirements, and due to rising interest rates.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1680 of 2711
Table of Contents

**Income Tax Benefit**. For the six months ended December 31, 2006, our effective tax rate was 38.8%, compared to 24.0% for the comparable prior-year period. Our provision for income taxes is dependent on the mix of income from U.S. and foreign locations due to tax rate differences among such countries as well as due to the impact of permanent taxable differences.

**Liquidity and Capital Resources**

To date, we have financed our operations primarily through cash flow from operations, proceeds from equity issuances and our credit facilities. Cash and cash equivalents totaled $12.2 million at December 31, 2006, a decrease of $1.6 million from $13.8 million at June 30, 2006.

*Cash Used in Operating Activities.* Net cash used in operating activities was $12.6 million for the six months ended December 31, 2006, compared to $8.4 million for the six months ended December 31, 2005. Although our net loss for the six months ended December 31, 2006 was $26.6 million, included within this loss were non-cash charges resulting from an impairment of intangible and fixed assets of $21.5 million and inventory charges of $10.3 million. These charges were recorded in the second quarter of fiscal year 2007 and resulted from a global review of operations and an assessment of the value of certain technologies and product lines. We recognized a non-cash tax benefit for the six months ended December 31, 2006 of $15.3 million.

*Cash Used in Investing Activities.* Net cash used in investing activities was $32.8 million for the six months ended December 31, 2006. Of this amount, $24.2 million was used to fund the acquisition of Del Mar Reynolds and $7.7 million was used for capital expenditures. We used $6.0 million for capital expenditures during the comparable prior-year period.

*Cash Provided by Financing Activities.* Cash provided by financing activities of $43.9 million primarily consisted of $26.0 million from increases in long-term debt used to fund the acquisition of Del Mar Reynolds and $16.3 million from our revolving lines-of-credit to fund operations and capital expenditures. In the comparable prior-year period, cash provided by financing activities of $16.2 million primarily consisted of $26.3 million from an initial public offering of approximately 20% of the total issued and outstanding common stock of our Spacelabs Healthcare, Inc. subsidiary on the AIM (formerly known as the Alternative Investment Market), a stock market administered by the London Stock Exchange. We used approximately $13.8 million of these proceeds to pay down our credit line with a U.S. bank.

**Borrowings**

Outstanding lines of credit and long-term debt totaled $61.1 million at December 31, 2006, an increase of $43.5 million from $17.6 million at June 30, 2006.

We maintain two revolving credit lines with a U.S. bank totaling $45 million, including letter-of-credit and foreign exchange facilities. Loans under these credit lines bear interest at either LIBOR plus up to 2.5% or at the bank's prime rate plus up to 0.5%. The credit lines are collateralized by substantially all of our U.S. assets. As of December 31, 2006, $26.8 million was outstanding under these credit lines and $10.3 million was outstanding under the letter-of-credit facilities.

Our credit lines contain covenants limiting our ability to, among other things, incur additional debt, pay cash dividends, make investments or repurchase the Company's stock, enter into transactions with affiliates, merge or consolidate with others and dispose of assets or create liens on assets. In addition, they contain certain financial covenants. As of December 31, 2006, we were not in compliance with certain financial covenants; however, the bank waived this noncompliance.

In addition, in July 2006 we secured a $27.4 million term loan with the same U.S. bank to fund the acquisition of Del Mar Reynolds. As of December 31, 2006, $23.6 million was outstanding under this term loan.

As of December 31, 2006, several of our foreign subsidiaries had available bank lines of credit denominated in local currency to meet short term working capital requirements. The U.S. dollar equivalent of these facilities totaled $ 11.8 million, of which $0.3 million was outstanding at December 31, 2006. These credit facilities bear interest at fixed rates, the bank's prime rate, the London LIBOR rate, the Norwegian NIBOR rate and the Japan TIBOR rate (a weighted average rate of 6.1% at September 30, 2006).

Table of Contents

Our long-term debt consisted of the following:

| (in thousands) | June 30, 2006 | December 31, 2006 |
|---|---|---|
| Five-year term loan payable in quarterly installments of $908,000 until paid in full on July 18, 2011. Interest is variable based on either one to three-month LIBOR plus 2.5% | $ — | $ 23,600 |
| Twenty-year term loan payable in quarterly installments of £34,500 (approximately $68,000 at December 31, 2006) until paid in full on December 1, 2024. Interest is due quarterly at a rate of three-month LIBOR plus 1.2% | 4,721 | 4,865 |
| Capital lease obligations | 248 | 3,812 |
| Other | 1,765 | 1,692 |
| | 6,734 | 33,969 |
| Less current portion of long-term debt | 1,251 | 5,747 |
| Long-term portion of debt | $5,483 | $ 28,222 |

We anticipate that existing cash, current borrowing arrangements and future access to capital markets should be sufficient to meet our cash requirements for the foreseeable future. However, our future capital requirements and the adequacy of available funds will depend on many factors, including future business acquisitions, litigation, stock repurchases and levels of research and development expenditures.

### Stock Repurchase Program

Our Board of Directors has authorized a stock repurchase program under which we can repurchase up to 3,000,000 shares of our common stock. During the first half of fiscal year 2007, we did not repurchase any shares under this program. As of December 31, 2006, 1,330,973 shares were available for additional repurchase under the program. We retire the treasury shares as they are repurchased and record them as a reduction in the number of shares of common stock issued and outstanding in our consolidated financial statements.

### Dividend Policy

We have never paid cash dividends on our common stock and have no plans to do so in the foreseeable future.

### Contractual Obligations

On July 31, 2006, Spacelabs Healthcare completed the acquisition of Del Mar Reynolds Cardiac division of Ferraris Group PLC. As a result of this acquisition, Spacelabs Healthcare created retention bonus agreements for key personnel of the acquired operations that could result in up to $0.7 million in retention bonus payments. These retention bonuses vest at the end of a six month period, beginning on the date of acquisition. During the six months ended December 31, 2006, we paid $0.2 million in connection with severance charges, relocation costs and rent obligations. At December 31, 2006, the reserve amounted to $1.3 million and is included in accrued expenses and other current liabilities in the consolidated financial statements.

Under the terms and conditions of the purchase agreements associated with the following acquisitions, we may be obligated to make additional payments:

In August 2002, we purchased a minority equity interest in CXR Limited, a United Kingdom based research and development company that develops real time tomography systems. In June 2004, we increased our equity interest in CXR to approximately 75% and in December 2004 we acquired the remaining 25%. As compensation to the selling shareholders for this remaining interest, we have agreed to make certain royalty payments based on sales of CXR’s products. As of December 31, 2006, no royalty payments had been earned.

In November 2002, we acquired all of the outstanding capital stock of Ancore Corporation (since renamed Rapiscan Systems Neutronics and Advanced Technologies Corporation), a Santa Clara, California based company. During the five years following the close, contingent consideration is payable based on the sales of certain of its products. The contingent consideration is capped at $34.0 million. As of December 31, 2006, no earn-out payments had been earned.

In January 2004, we acquired Advanced Research & Applications Corp. (since renamed Rapiscan Systems High Energy Inspection Corporation), a privately-held company located in Sunnyvale, California. During the seven years following the close, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at $30.0 million. As of December 31, 2006, no earn out payments had been earned.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1682 of 2711
Table of Contents

In February 2005, we acquired Blease Medical Holdings Limited and certain affiliated companies. During the three years following the close, contingent consideration is payable based on Blease's net revenues, provided certain requirements are met. The contingent consideration is capped at £6.25 million (approximately $11.6 million as of December 31, 2006). As of December 31, 2006, no earn-out payments had been earned.

In July 2006, we acquired Del Mar Reynolds. If Del Mar Reynolds achieves certain revenue targets during fiscal year 2007, contingent consideration of up to £5 million ($9.4 million at December 31, 2006) will be payable. The additional earn-out, if any, may be satisfied, at Spacelabs Healthcare's discretion, either in cash or by the issuance of Spacelabs Healthcare common stock. As of December 31, 2006 no earn-out payments had been earned.

**Off Balance Sheet Arrangements**

As of December 31, 2006, we did not have any significant off balance sheet arrangements as defined in Item 303(a)(4) of Regulation S-K.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

For the three months ended December 31, 2006, no material changes have occurred with respect to market risk as disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2006.

**Market Risk**

We are exposed to certain market risks, which are inherent in our financial instruments and arise from transactions entered into in the normal course of business. We may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign-currency-denominated transactions. We do not enter into derivative financial instrument transactions for speculative purposes.

We are subject to interest rate risk on our short-term borrowings under our bank lines of credit. Borrowings under these lines of credit do not give rise to significant interest rate risk because these borrowings have short maturities and are borrowed at variable interest rates. Historically, we have not experienced material gains or losses due to interest rate changes.

**Foreign Currency**

We maintain the accounts of our operations in each of the following countries in the following currencies: Singapore (Singapore dollars), Malaysia (Malaysian ringgits), United Kingdom (U.K. pounds sterling), Norway (Norwegian kroners), India (Indian rupees), Indonesia (Indonesian rupiah), Hong Kong (Hong Kong dollars), China (Chinese yuan renminbi), Canada (Canadian dollars) and Cyprus (Cypriot pounds). We maintain the accounts of our operations in each of the following countries in euros: Finland, France, Germany, Greece and Italy. We translate foreign currency financial statements into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which we translate at average rates during the reporting period. We include gains and losses resulting from foreign currency transactions in income, and exclude those resulting from translation of financial statements from income and accumulate them as a component of shareholders' equity. A hypothetical 10% change in the relevant currency rates at December 31, 2006 would not have a material impact on our financial position or results of operations.

**Use of Derivatives**

Our use of derivatives consists primarily of foreign exchange contracts and interest rate swaps. We purchase forward contracts to hedge foreign exchange exposure related to commitments to acquire inventory for sale and to reduce our exposure associated with acquisitions. We do not use the contracts for trading purposes. As of June 30, 2006, we had a $25.4 million foreign currency forward contract outstanding to buy U.K. pounds sterling in anticipation of the Del Mar Reynolds acquisition. In July 2006, we completed the Del Mar Reynolds acquisition and the foreign currency forward contract settled, resulting in a fiscal year 2007 loss of approximately $24,000 related to this contract. There were no foreign exchange contracts or interest rate swaps outstanding as of December 31, 2006.

**Importance of International Markets**

International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, wars and other forms of political instability. For the three and six months ended December 31, 2006, overall foreign currency fluctuations relative to the U.S. dollar had an immaterial effect on our consolidated revenues and results of operations.

Table of Contents

Despite changes in monetary policy in Malaysia, including the de-pegging of the Malaysian ringgit to the U.S. dollar, we believe that our foreign currency exposure in Malaysia will not be significant in the foreseeable future. We continue to perform ongoing credit evaluations of our customers' financial condition and, if deemed necessary, we require advance payments for sales. We monitor economic and currency conditions around the world to evaluate whether there may be any significant effect on our international sales in the future. Due to our overseas investments and the necessity of dealing in local currencies in many foreign business transactions, we are at risk with respect to foreign currency fluctuations.

**Inflation**

We do not believe that inflation had a material impact on our results of operations during the first half of fiscal year 2007.

**Interest Rate Risk**

We classify all highly liquid investments with maturity of three months or less as cash equivalents and record them in the balance sheet at fair value. Short-term investments comprise high-quality marketable securities.

**Item 4.       Controls and Procedures**

(a)    *Evaluation of Disclosure Controls and Procedures*

As of December 31, 2006, the end of the period covered by this Quarterly Report on Form 10-Q, our management, including our Chief Executive Officer and our Chief Financial Officer, reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Securities Exchange Act of 1934, Rule 13a-15(e) and 15d-15(e)). Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized, and filed or submitted on a timely basis. Based upon this evaluation and due to material weaknesses existing in our internal controls as of June 30, 2006 (described below), which have not been fully remediated as of December 31, 2006, we have concluded that, as of December 31, 2006, our disclosure controls and procedures were ineffective.

(b)    *Changes in Internal Control over Financial Reporting*

As reported in Item 9A of our Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 22, 2006, we determined that the following material weaknesses in internal control over financial reporting existed as of June 30, 2006:

1) In our testing of information technology controls we determined that controls over systems change management, program development, end-user computing, and systems access and related monitoring were inadequately designed and implemented. In assessing these control deficiencies, we determined that there was an incomplete adoption of recognized industry standards resulting in the lack of a comprehensive internal control framework over information technology; we determined that there was a lack of adequate oversight by experienced managers knowledgeable and fully engaged with the design and implementation of effective information technology controls; we determined there was a lack of a comprehensive training program related to information technology controls supporting our internal controls over financial reporting; and we determined that the evaluation and testing of information technology controls was insufficient and was conducted by personnel who lacked the competency needed to fully evaluate this area; and

2) In our overall testing of internal controls, we determined that there was a weakness in the monitoring and oversight component of our control environment. We found that there was insufficient and inappropriate verification of the performance of certain review controls and inadequacies in the documentation supporting those controls. Although we did not identify an error in financial reporting as a result of these observations, we determined that a material weakness in our monitoring and oversight controls was evident. Therefore, we determined that the design and operation of our control environment did not sufficiently promote effective internal control over financial reporting.

During the six months ended December 31, 2006, we took the actions described below to address such material weaknesses. Given that our remediation efforts are still ongoing, these actions also serve as additional procedures and analyses to ensure that our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States. We are currently in the process of:

- developing and implementing a global information technology strategic plan;

- evaluating the adequacy of our personnel overseeing information technology controls and the testing of those controls;

- developing a training program for our personnel overseeing information technology controls and the testing of those controls;

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1684 of 2711
Table of Contents

- adopting a widely-recognized standard for information technology controls to supplement our existing internal control framework and evaluating and enhancing our existing processes and controls in adopting that standard; and
- evaluating and improving our information technology policies and procedures, specifically with regard to systems change management, program development, end-user computing, and access controls and related monitoring.

While we have made progress with respect to remediating the material weaknesses described above, it will take time to put in place the rigorous controls and procedures desired by our management and our Board of Directors. We cannot, at this time, estimate how long it will take to complete the steps identified above. Our management will continue to evaluate the effectiveness of our overall control environment and will continue to refine existing controls as they, in conjunction with the Audit Committee of our Board of Directors, Chief Executive Officer and Chief Financial Officer, consider necessary.

Other than the changes discussed above, there have been no changes in our internal control over financial reporting that occurred that have materially affected or are reasonably likely to materially affect our internal control over financial reporting. Our management has discussed these issues and remediation efforts in detail with the Audit Committee of our Board of Directors.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1685 of 2711

Table of Contents

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

During 2003 and 2004, we were informed that SAIC, Inc. had made statements to prospective buyers of our gamma-ray mobile detection system that our system infringed an SAIC patent. We contended that SAIC's infringement allegations were not only without merit, but wrongfully made for improper purposes and we therefore filed a lawsuit in the U.S. District Court, Central District of California for declaratory judgment. SAIC counter-claimed for patent infringement and unfair competition. In January 2007, we entered into an agreement settling our litigation with SAIC. Under the terms of the settlement, SAIC agreed that, going forward, it would not make such infringement allegations again and both parties agreed not to allege that each others' current and future gamma-ray based inspection systems infringe any existing or pending patents. The settlement included a general release of claims.

We are also involved in various claims and legal proceedings which have been previously disclosed in our quarterly and annual reports in accordance with Item 103 of Regulation S-K. The results of such legal proceedings cannot be predicted with certainty. Should we fail to prevail in any of these legal matters or should several of these legal matters be resolved against us in the same reporting period, the operating results of a particular reporting period could be materially adversely affected.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in our quarterly and annual reports. In our opinion, after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations or cash flows.

### Item 1A. Risk Factors

The discussion of our business and operations in this Quarterly Report on form 10-Q should be read together with the risk factors contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2006, filed with the Securities and Exchange Commission, which describe various risks and uncertainties to which we are or may become subject. These risks and uncertainties have the potential to affect our business, financial condition, results of operations, cash flows, strategies or prospects in a material and adverse manner.

### Item 4. Submission of Matters to a Vote of Security Holders

We held our Annual Meeting on November 30, 2006. At the meeting, shareholders voted on the following actions:

1. Election of Directors.

| Name | For | Against | Abstain |
|---|---|---|---|
| Deepak Chopra | 12,630,352 | 0 | 1,662,641 |
| Ajay Mehra | 12,625,486 | 0 | 1,667,507 |
| Steven C. Good | 12,212,741 | 0 | 2,080,252 |
| Meyer Luskin | 12,408,002 | 0 | 1,884,991 |
| Chand R. Viswanathan | 12,661,894 | 0 | 1,631,099 |
| Leslie E. Bider | 12,827,708 | | 1,465,285 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

2. To ratify the Amended and Restated 1997 Stock Option Plan to add the authority to issue and grant restricted stock.

| | |
|---|---|
| For | 7,960,396 |
| Against | 2,424,237 |
| Abstain | 25,959 |

The proposal was approved.

Table of Contents

3. To amend the Amended and Restated 1997 Stock Option Plan to change the name of the plan and extend the term of the plan.

| | |
|---|---|
| For | 9,383,954 |
| Against | 929,943 |
| Abstain | 96,695 |

The proposal was approved.

4. To approve the reincorporation of the Company from California to Delaware.

| | |
|---|---|
| For | 3,889,362 |
| Against | 6,494,460 |
| Abstain | 26,770 |

The proposal was not approved.

**Item 6. Exhibits**

31.1 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002
31.2 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002
32.1 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
32.2 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1687 of 2711
Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 7th day of February 2007.

**OSI SYSTEMS, INC.**

By: /s/ Deepak Chopra
Deepak Chopra
President and Chief Executive Officer

By: /s/ Alan Edrick
Alan Edrick
Executive Vice President and
Chief Financial Officer

# Exhibit 19

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1689 of 2711

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

**(Rule 14a-101)**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**
**(Amendment No. __)**

Filed by the Registrant x Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement
¨ Confidential, for Use of the Commission Only (as Permitted by Rule 14a-6(e)(2))
x Definitive Proxy Statement
¨ Definitive Additional Materials
¨ Soliciting Material Pursuant to §240.14a-11(c) or §240.14a-12

**OSI Systems, Inc.**

**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 29, 2007

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 5, 2007, at our executive offices, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of OSI Systems, Inc. common stock as of the close of business on October 15, 2007 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy Card.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. In order to facilitate your voting, you may vote in person at the meeting, by sending in your written Proxy Card, or, if indicated on your Proxy Card, by telephone or internet voting. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person. Please review the instructions on the Proxy Card regarding these voting options.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held December 5, 2007**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on December 5, 2007, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2008.

3. To amend the Company's 2006 Equity Participation Plan to: (i) increase the number of shares of Common Stock authorized for issuance under the plan by 2,000,000 shares; (ii) limit the number of shares of restricted stock available for issuance under the plan to 1,000,000 shares; and (iii) raise from 85% of market value to 100% of market value, the lowest exercise price at which stock options may be granted under the plan.

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007, containing consolidated financial statements, is included with this mailing.

The Board of Directors has fixed the close of business on October 15, 2007, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 29, 2007

**WHETHER OR NOT YOU EXPECT TO ATTEND THE ANNUAL MEETING, PLEASE COMPLETE, DATE AND SIGN THE ENCLOSED PROXY CARD AND MAIL IT PROMPTLY IN THE ENCLOSED ENVELOPE OR, IF GIVEN THE OPTION ON YOUR PROXY CARD, YOU MAY ALSO VOTE OVER THE TELEPHONE OR THE INTERNET. ANY ONE OF THESE METHODS WILL ENSURE REPRESENTATION OF YOUR SHARES AT THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1692 of 2711

Table of Contents

TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Independent Registered Public Accounting Firm | 8 |
| Proposal No. 3 Ratification of Amendment to 2006 Equity Participation Plan | 9 |
| Compensation of Executive Officers and Directors | 11 |
| Security Ownership of Certain Beneficial Owners and Management | 41 |
| Independent Registered Public Accounting Firm | 44 |
| Report of Audit Committee | 45 |
| Code of Ethics and Conduct | 47 |
| Annual Meeting Attendance | 47 |
| Shareholder Communications | 47 |
| Availability of Annual Report on Form 10-K | 47 |
| Shareholder Proposals | 47 |
| Incorporation by Reference | 48 |
| Other Business | 48 |
| Appendix A (Nominating and Governance Committee Charter) | A-1 |
| Appendix B (Amended and Restated 2006 Equity Participation Plan) | B-1 |

Table of Contents

# OSI SYSTEMS, INC.
**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at the Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on December 5, 2007, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof. You may direct your vote without attending the Annual Meeting by completing and mailing your Proxy Card or voting instruction card in the enclosed, postage pre-paid envelope or, if indicated on your Proxy Card, by telephone or internet voting. Please refer to the Proxy Card for instructions.

When such proxy is properly executed and returned, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 15, 2007, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 17,139,425 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD" for a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or to allocate among any of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (*i.e.*, six) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

The enclosed Proxy Card, when properly signed, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

The total number of votes that could be cast at the Meeting is the number of votes actually cast, plus the number of abstentions and broker non-votes, described below. Abstentions are counted as shares present at the Meeting for purposes of determining whether a quorum exists; however, abstentions will not be counted as votes for or against a proposal. Proxies submitted by brokers that do not indicate a vote for some or all of the proposals because they do not have discretionary voting authority and have not received instructions as to how to vote on those proposals (so-called "broker non-votes") are counted as present and entitled to vote and are, therefore, included for purposes of determining whether a quorum is present at the Meeting, however, broker non-votes are

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1694 of 2711

Table of Contents

not deemed to be votes cast. As a result, broker non-votes are not included in the tabulation of the voting results on the election of directors or issues requiring approval of a majority of the votes cast and, therefore, do not have the effect of votes for or against a proposal.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting in person at the Meeting or represented by proxy and entitled to vote on the subject matter of the proposal.

The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the proxy solicitation materials. Proxies may be solicited personally, by mail, by e-mail, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. It is anticipated that this Proxy Statement and accompanying Proxy will be mailed on or about October 26, 2007 to all shareholders entitled to vote at the Annual Meeting. A copy of the Company’s Annual Report on Form 10-K for the fiscal year ended June 30, 2007, containing consolidated financial statements, is included in this mailing.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

Table of Contents

**ELECTION OF DIRECTORS**
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

The Board of Directors consists of six members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2008, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 56 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 45 | Director, Executive Vice President, and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 65 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 81 | Director | 1990 |
| Chand R. Viswanathan | 78 | Director | 2001 |
| Leslie E. Bider(1)(3) | 57 | Director | 2006 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating and Governance Committee
(4) Member of Executive Committee

**Business Experience**

***Deepak Chopra*** is Chairman of the Board of Directors. Mr. Chopra is also President and Chief Executive Officer of the Company. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

Table of Contents

***Ajay Mehra*** has served as a Director of the Company since March 1996. Mr. Mehra is also Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Big Dogs, Inc., California Pizza Kitchen, Inc., Kayne Anderson MLP Investment Company and Youbet.com, Inc., each of which is a publicly held corporation listed on The Nasdaq Stock Market. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Stamet, Inc., an industrial solid pump manufacturer, Myricom, Inc., a computer and network infrastructure company and as Chairman of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee of the Orthopedic Hospital. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He served as the Chair of the department from 1979 to 1985. During his tenure at University of California, Los Angeles, Dr. Viswanathan also served in various additional capacities, including Chair of the Academic Senate of the University of California, Los Angeles and Vice-Chair and later Chair of the University of California-wide Academic Senate. As Chair of the Academic Senate, he was also a member of the University of California Board of Regents as a faculty representative.

***Leslie E. Bider*** has served as a Director of the Company since September 2006. Mr. Bider is currently Chief Strategist of ITU Ventures, a private equity firm. Between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of Douglas Emmett, Inc., a real estate investment trust that trades on the New York Stock Exchange, and on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Masters degree from the Wharton School at the University of Pennsylvania.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Compensation of Executive Officers and Directors – Summary Compensation Table").

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1697 of 2711
Table of Contents

**Board of Directors Meetings and Committees of the Board of Directors**

There were eight meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2007. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee and Nominating and Governance Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No person serving as a director during the fiscal year ended June 30, 2007, attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the Securities and Exchange Commission ("SEC") and The Nasdaq Stock Market ("NASDAQ") director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices.

The Audit Committee currently consists of Messrs. Bider, Good and Luskin. The Board of Directors has determined that, based upon his prior work experience and his tenure and experience on the Company's Audit Committee, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2007. See Report of Audit Committee. The charter of the Audit Committee is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Good and Luskin. There was one meeting of the Compensation Committee during the fiscal year ended June 30, 2007. See *Compensation Committee Report.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Bider, Good and Luskin. There were no meetings of the Nominating and Governance Committee during the fiscal year ended June 30, 2007.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1698 of 2711

Table of Contents

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors. The charter of the Nominating and Governance Committee is attached as Appendix A to the Proxy Statement and is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were no meetings of the Executive Committee during the fiscal year ended June 30, 2007.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (1) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (2) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating and Governance Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating and Governance Committee did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify us of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Good and Luskin. No executive officer of the Company has served during the fiscal year ended June 30, 2007 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2007, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K under the Exchange Act.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1700 of 2711

Table of Contents

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2008, and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's shareholders at the Annual Meeting. Moss Adams has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's shareholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its shareholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***Our Board of Directors unanimously recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2008. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

**RATIFICATION OF AMENDMENT TO 2006 EQUITY PARTICIPATION PLAN**
***(Proposal No. 3 of the Proxy Card)***

**Summary and Purpose of the Amended Equity Participation Plan**

The Company's 2006 Equity Participation Plan (the "2006 Plan") is described below in "Compensation of Executive Officers and Directors – Company Plans."

The Board of Directors has voted to amend the 2006 Plan to (i) increase the number of shares of Common Stock authorized for issuance under the plan by 2,000,000 shares; (ii) limit the number of shares of restricted stock available for issuance under the 2006 Plan to 1,000,000 shares; and (iii) raise from 85% of market value to 100% of market value, the lowest exercise price at which stock options may be granted under the plan. No other changes to the 2006 Plan are presently proposed.

*Increase in Number of Authorized Shares*

The 2006 Plan, originally named the 1997 Stock Option Plan, has been in place since 1997. As of September 26, 2007, options to purchase 1,470,908 shares had been exercised since the inception of the 2006 Plan. As of September 26, 2007, options to purchase 1,490,566 shares were outstanding under the 2006 Plan. As of such date, the Company had issued 60,825 shares of restricted stock under the 2006 Plan. As a result, the Company presently has only 316,706 shares authorized for issuance under the 2006 Plan.

The Board of Directors believes that the proposed increase in the number of shares of Common Stock available for issuance as provided in the 2006 Plan will provide the Compensation Committee with greater flexibility in the administration of its incentive plan and is appropriate in light of the growth of the Company. The increase in the number of shares for which options may be granted under the 2006 Plan would represent approximately 12% of the issued and outstanding shares of Common Stock of the Company as of September 26, 2007.

*Limitation on Number of Shares Authorized for Issuance in the Form of Restricted Stock*

The Board of Directors believes that the Company's success depends in large part on its ability to attract, retain, and motivate its executive officers and other key personnel and that grants of restricted stock may be a significant element of compensation for such persons. However, because restricted stock has an immediate value upon vesting, restricted stock awards are generally smaller, by a significant factor, than stock options which, upon vesting, may not ultimately have a value to the recipient. As a result, although the Board of Directors has authorized the issuance of grants of restricted stock and plans to continue to do so in the future, it does not presently anticipate that it will require more than 1,000,000 shares for such purposes. The Board of Directors believes that by amending the 2006 Plan to limit the number of shares of restricted stock available for issuance, it will eliminate confusion about the Company's present plans with respect to the issuance of restricted stock.

*Exercise Price of Stock Options*

All stock options currently outstanding under the 2006 Plan specify an exercise price of 100% of the market value of the Company Common Stock on the date such stock options were granted. The Board of Directors presently anticipates that all future stock option granted will also specify an exercise price of at least the market value of the Company's Common Stock on the date of grant. The Board of Directors believes that by amending the 2006 Plan to require that future grants specify an exercise price of at least the market value of the Company's Common Stock on the date of grant, it will eliminate confusion about the Company's present plans with respect to the issuance of stock options.

The 2006 Plan, as amended and restated, is attached as Appendix B to this Proxy Statement.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1702 of 2711
Table of Contents

**Awards to be Granted to Certain Individuals and Groups**

As of the date hereof, the Company cannot determine the benefits or amounts that will be received by or allocated to any individual or group resulting from the approval of the amendment to the 2006 Plan. The following table sets forth (a) the aggregate number of shares subject to option grants to certain individuals and groups under the 2006 Plan during the last fiscal year, which ended June 30, 2007, and (b) the average per share exercise price of such options.

| Name of Group | Number of Options Granted | Average Per Share Exercise Price |
|---|---|---|
| Named Executive Officers(1) | 70,000 | $ 18.04 |
| All executive officers, as a group | 70,000 | $ 18.04 |
| All directors who are not executive officers, as a group | 70,000 | $ 18.43 |
| All employees, including all current officers who are not executive officers, as a group | 149,500 | $ 18.28 |

(1) The number of shares subject to option granted to each Named Executive Officer and the average per share exercise price of such options are set forth under "Compensation of Executive Officers and Directors – Grants of Plan-Based Awards."

**Equity Compensation Plan Information**

The following table summarizes information, as of June 30, 2007, with respect to shares of the Company's Common Stock that may be issued under the Company's existing equity compensation plans.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,332,129 | $ 18.63 | 552,968 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,332,129 | $ 18.63 | 552,968 |

***The Board of Directors unanimously recommends that you vote "FOR" the ratification of the amendment of the 2006 Plan to amend the 2006 Plan to: (i) increase the number of shares of Common Stock authorized for issuance under the plan by 2,000,000 shares; (ii) limit the number of shares of restricted stock available for issuance under the plan to 1,000,000 shares; and (iii) raise from 85% of market value to 100% of market value, the lowest exercise price at which stock options may be granted under the plan. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1703 of 2711
Table of Contents

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

**Compensation Discussion & Analysis**

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the "Named Executive Officers," as defined under the section entitled "Compensation of Executive Officers and Directors – Summary Compensation Table." Please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Overview of Compensation Philosophy and Guiding Principles*

The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with its business strategy, objectives and stockholder interests, and is designed to attract, motivate and retain highly qualified and key executives. Executive compensation elements generally consist of a base salary, an annual cash bonus, long-term equity compensation and certain benefits and perquisites more fully described below.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee to assist in recommending and reviewing executive compensation for the Named Executive Officers. The Compensation Committee reviews and approves salaries, annual bonuses, long-term incentive compensation, benefits, and other compensation in order to ensure that the Company's executive compensation strategy and principles are aligned with its business strategy, objectives and stockholder interests. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Nasdaq Listing Standards, as currently in effect.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. The Compensation Committee appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability and overall management contributions to the Company.

In general, the process by which the Compensation Committee makes decisions relating to executive compensation includes, but is not limited to, consideration of the following factors:

- The Company's executive compensation philosophy and practices
- The Company's performance relative to peers and industry standards
- Success in attaining annual and long-term goals and objectives
- Alignment of executive interests with shareholder interests through equity-based awards and performance-based compensation
- Individual and team contributions, performance and experience
- Total compensation and the mix of compensation elements for each Named Executive Officer

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies in the industries in which the Company operates. The Compensation Committee assesses competitive market

Table of Contents

compensation using a number of data sources reflecting industry practices of other organizations similar in size. The Compensation Committee reviews each component of the executive's compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2007, the Compensation Committee engaged Watson Wyatt to prepare such surveys and provide expert advice. The surveys used for comparison reflect compensation levels and practices for executives holding comparable positions at targeted peer-group companies. These surveys collect compensation data from peer-group companies based on revenues. The survey data utilized by the Compensation Committee generally includes:

- base salary,
- annual bonus,
- total cash compensation,
- pay adjustment trends,
- long-term incentives,
- retirement and capital accumulation,
- benefits and perquisites, and
- equity ownership.

In implementing the Company's compensation program, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

*Executive Compensation Program Elements*

The Compensation Committee reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. In addition, the Compensation Committee reviews components of the Named Executive Officer's compensation against executive compensation surveys of a peer group prepared by outside compensation consultants with the intent to establish targeted levels of base salary, annual incentive bonus and long-term incentive compensation. The particular elements of the compensation program for the Named Executive Officers consist of the following:

*Base Salary.* Base salary is set to attract and retain executive talent and it serves as the only form of fixed income paid to Named Executive Officers for executing their duties. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Incentive Bonus.* Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement. Named Executive Officers are eligible for a target annual incentive bonus. The Company pays annual incentive bonuses to its Named Executive Officers based upon the achievement of targets that are indicative of the Company's performance, as well as individual performance. The annual incentive bonus for fiscal year 2007 paid to each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Compensation/Equity Based Awards.* The Company's long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the interests of the Company's stockholders. The Company's long-term incentive program consists of periodic grants of stock options which are made at the discretion of the Compensation

Table of Contents

Committee under the 2006 Plan. Beginning in fiscal year 2008, the Company's long-term incentive program will also consist of periodic grants of restricted stock. Decisions made by the Compensation Committee regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, contributions to the Company's development, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

The Compensation Committee typically grants awards to the Named Executive Officers under the 2006 Plan on a yearly basis. Except in limited circumstances, the Compensation Committee does not grant equity awards to Named Executive Officers at other times during the year. All equity awards are made at fair market value on the date of grant, which is the date on which the Compensation Committee authorizes the grant. Under the 2006 Plan, fair market value is determined by the closing price of the Company's Common Stock on the date of grant.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees including the Company's 401(k) Plan and the 2006 Plan. Other benefits and perquisites are limited and are provided at the discretion of the Compensation Committee. These benefits include medical and dental health insurance plans and life and long-term disability insurance plan benefits. The 401(k) Plan and the medical and dental plans require each participant to pay a contributory amount. The Company provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service.

*Total Compensation Mix*

The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based compensation, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy to pay median pay for median performance and above-market pay for superior performance.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick and Mehra and change-of-control agreements with Messrs. Mehra, Wadhawan, Sze and Mansouri. The terms of each of such agreements are summarized below under the heading "Employment Agreements, Termination of Employment and Change in Control Arrangements."

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax, securities laws and accounting regulation in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of the Statement of Financial Accounting Standard No. 123, "Share-Based Payment" ("SFAS 123R"), which the Company adopted in fiscal year 2006, on the Company's use of equity-based awards. This consideration factored heavily in the Company's decision with respect to stock options grants

Table of Contents

made in fiscal year 2007. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code (the "Code") with respect to annual compensation exceeding $1.0 million and Section 280(b) of the Code with respect to change in control payments exceeding specified limits.

**Executive Officers**

***Deepak Chopra*** is President and Chief Executive Officer of the Company. He also serves as Chairman of the Board of Directors. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics.

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick was named the Company's Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than 18 years of financial management and public accounting experience, including mergers and acquisitions, financial planning and analysis and regulatory compliance. Between 2004 and 2006, he served as Executive Vice President and Chief Financial Officer of BioSource International, Inc, a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra is also a member of the Company's Board of Directors. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor or Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Between May 2000 and June 2006, Mr. Mansouri served as President of the Company's UDT Sensors, Inc. subsidiary

Table of Contents

(since renamed OSI Optoelectronics, Inc.). Between 1982 and May 2000, Mr. Mansouri held various positions within UDT Sensors, Inc., including Vice President, Sales and Marketing, Director of its Aerospace-Defense group, and Director of Applications. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in Management certificate from the Anderson School at the University of California, Los Angeles.

***Anuj Wadhawan*** is no longer a Named Executive Officer. Between November 2002 and September 2006, Mr. Wadhawan served as Chief Financial Officer and Treasurer of the Company. However, in September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division. From March 1991 to March 2002, Mr. Wadhawan held various accounting and finance-related positions with the Company and its subsidiaries, including Corporate Controller and Vice President of Finance. Prior to joining the Company, Mr. Wadhawan held various finance positions with the Lighting Division of Phillips Electronics in India. Mr. Wadhawan holds a Bachelor of Science in Accounting from Punjab University in India, is a chartered accountant in India, and has passed the certified public accounting examination in the United States.

Table of Contents

**SUMMARY COMPENSATION TABLE**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, the three highest paid executive officers of the Company serving as executive officers on June 30, 2007 whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2007, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers"):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards (1)($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation (2)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 2007 | 998,077 | 250,000 | — | 1,167,801 | — | — | 83,203 | 2,499,081 |
| Alan Edrick<br>Executive V.P.,<br>Chief Financial Officer(3) | 2007 | 262,277 | 150,000 | — | 154,895 | — | — | 16,804 | 583,976 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 2007 | 351,928 | 80,000 | — | 260,285 | — | — | 45,845 | 738,058 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 2007 | 285,865 | 160,000 | — | 247,056 | — | — | 29,768 | 722,689 |
| Manoocher Mansouri<br>President of Optoelectronics and Manufacturing division | 2007 | 184,622 | 43,000 | — | 20,560 | — | — | 22,985 | 271,167 |
| Anuj Wadhawan<br>Executive V.P.,<br>Chief Financial Officer of Security division(4) | 2007 | 249,038 | 35,000 | — | 194,868 | — | — | 47,783 | 526,689 |

(1) The amounts in the "Option Awards" column are calculated using the provisions of SFAS 123R.

(2) Individual breakdowns of amounts set forth in "All Other Compensation" are as follows (in thousands):

| Name | Matching 401(k) Contributions ($) | Car Benefit ($) | Membership Dues ($)(5) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra(6) | 2,139 | 2,030 | 3,763 | 12,574 | 62,697 | 83,203 |
| Alan Edrick | 963 | 11,000 | — | 4,841 | — | 16,804 |
| Ajay Mehra(6) | 2,765 | 4,745 | — | 18,977 | 19,358 | 45,845 |
| Victor S. Sze | 690 | 12,000 | — | 10,722 | 6,356 | 29,768 |
| Manoocher Mansouri | 3,182 | 5,850 | — | 11,665 | 2,288 | 22,985 |
| Anuj Wadhawan(6) | 3,185 | 3,753 | — | 24,893 | 14,952 | 47,783 |

(3) Mr. Edrick became an employee of the Company on July 25, 2006. Prior to such date, Mr. Edrick provided consulting services to the Company. Fees paid to Mr. Edrick in connection with such consulting services are not included in this table.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1709 of 2711

(4) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

(5) Membership Dues consists of payments made to a golf club.

(6) The Company permits Messrs. Chopra, Mehra and Wadhawan to purchase credit card reward points from the Company.

**Company Plans**

*2006 Equity Participation Plan*

The Company's officers, directors and employees are eligible to receive restricted stock and options to purchase shares of the Company's Common Stock under the 2006 Plan. Stock options have an exercise price equal to 100% of the fair market value of the Company's Common Stock on the date of grant. Stock options typically expire five years after the date of grant and vest over a period of approximately three years from the date of grant. Restricted stock typically vests over a period of four years from the date of grant.

The total number of shares of Common Stock which may be granted as restricted stock and/or issued upon the exercise of options pursuant to the 2006 Plan is 3,350,000. During the fiscal year ended June 30, 2007, options to purchase 149,500 shares of the Company's Common Stock were granted under the 2006 Plan. During the Company's last fiscal year, no shares of restricted stock were granted under the 2006 Plan. Options to purchase 1,332,129 shares of Common Stock were outstanding at June 30, 2007 and were held by 172 officers, directors and employees of the Company. As of June 30, 2007, the weighted-average exercise price of the outstanding options and stock grants was $18.63.

*Employee Stock Purchase Plan*

In 1998, the Board of Directors adopted the Company's Employee Stock Purchase Plan (the "1998 Plan"). The 1998 Plan provides persons who have been regular employees of the Company or its U.S. subsidiaries for at least six months, and who meet certain other criteria, the opportunity to purchase shares of Common Stock through regular payroll deductions. The total number of shares of Common Stock subject to the 1998 Plan is 500,000. The 1998 Plan is administered by the Board of Directors, or a committee of the Board of Directors. The 1998 Plan qualifies as an "employee stock purchase plan" as defined in Section the Code.

*Employee Benefit Plan, Pension Plans*

In 1991, the Company established a tax-qualified employee savings and retirement plan (the "401(k) Plan") for its employees and the employees of its U.S. subsidiaries. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to the annual limit prescribed by statute ($15,500 in calendar 2007 for individuals under 50 years of age, $20,500 for individuals over 50 years of age) and contribute the amount of such reduction to the 401(k) Plan. The 401(k) Plan allows for matching contributions to the 401(k) Plan by the Company, such matching and the amount of such matching to be determined at the sole discretion of the Board of Directors. For the fiscal year ended June 30, 2007, the Company provided approximately $1.3 million in discretionary matching contributions with respect to the 401(k) Plan. The trustee under the 401(k) Plan, at the direction of each participant, invests the assets of the 401(k) Plan in numerous investment options. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees to the 401(k) Plan, and income earned on plan contributions, are not taxable until withdrawn and so that the contributions by employees will be deductible by the Company when made.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1710 of 2711
Table of Contents

**2006 Equity Participation Plan of Rapiscan Systems Holdings, Inc.**

In 2006, the Company established the 2006 Equity Participation Plan of Rapiscan Systems Holdings, Inc. Under this plan, the Company may grant to employees, including those of its subsidiaries, consultants and to non-employee directors, options to purchase shares of the Rapiscan Systems Holdings, Inc. common stock. This plan is more particularly described in the Company's Annual Report on Form 10-K filed with the SEC on September 13, 2007.

**2005 Equity Participation Plan of Spacelabs Healthcare, Inc.**

In 2005, the Company established the 2005 Equity Participation Plan of Spacelabs Healthcare, Inc. Under this plan, the Company may grant to employees, including those of its subsidiaries, consultants and to non-employee directors, options to purchase shares of the Spacelabs Healthcare, Inc. common stock. This plan is more particularly described in the Company's Annual Report on Form 10-K filed with the SEC on September 13, 2007.

Table of Contents

**GRANTS OF PLAN-BASED AWARDS TABLE**

The following table sets forth the plan-based grants made during the fiscal year ended June 30, 2007, to each of our Named Executive Officers with respect to the Company's 2006 Plan.

| Name and Principal Position | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1)($) Threshold | Target | Maximum | Estimated Future Payouts Under Equity Incentive Plan Awards(1)(#) Threshold | Target | Maximum | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (2)(#) | Exercise or Base Price of Option Awards (3) ($/Sh) | Grant Date Fair Value of Options and Awards (4)($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | — | — | — | — | — | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | July 31, 2006 | — | — | — | — | — | — | — | 50,000 | $ 17.99 | $ 354,392 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | — | — | — | — | — | — | — | — | — | — | — |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | July 7, 2006 | — | — | — | — | — | — | — | 20,000 | $ 18.16 | $ 144,556 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing Division | — | — | — | — | — | — | — | — | — | — | — |
| Anuj Wadhawan<br>Executive V.P., Chief Financial Officer of Security division(5) | — | — | — | — | — | — | — | — | — | — | — |

(1) The Company does not maintain a non-equity or equity plan that provides for payments based upon achievement of threshold, target and/or maximum goals.

(2) The option grants expire after five years and vest over three years from the date of grant.

(3) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(4) The grant date fair value of the stock options shown in the table above was computed in accordance with SFAS 123R and represents the total projected expense to the Company of grants made during the past fiscal year.

(5) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

Table of Contents

The following table sets forth the plan-based grants made during the fiscal year ended June 30, 2007, to each of our Named Executive Officers with respect to the 2006 Equity Participation Plan of Rapiscan Systems Holdings, Inc.

| Name and Principal Position | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1)($) | | | Estimated Future Payouts Under Equity Incentive Plan Awards(1)(#) | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options(2) (#) | Exercise or Base Price of Option Awards(3) ($/Sh) | Grant Date Fair Value of Options and Awards(4) ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | Threshold | Target | Maximum | | | | |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | — | — | — | — | — | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | July 25, 2006 | — | — | — | — | — | — | — | 200,000 | $ 1.50 | $ 103,797 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | February 6, 2007 | — | — | — | — | — | — | — | 500,000 | $ 1.60 | $ 174,422 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | July 7, 2006 | — | — | — | — | — | — | — | 150,000 | $ 1.50 | $ 78,086 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing Division | — | — | — | — | — | — | — | — | — | — | — |
| Anuj Wadhawan<br>Executive V.P., Chief Financial Officer of Security division(5) | February 6, 2007 | — | — | — | — | — | — | — | 260,000 | $ 1.60 | $ 90,699 |

(1) Rapiscan Systems Holdings, Inc. does not maintain a non-equity or equity plan that provides for payments based upon achievement of threshold, target and/or maximum goals.

(2) The option grants expire after five years and vest over three years from the date of grant.

(3) The exercise price for grants of stock options is determined by estimating the fair value of each stock option award as of the date of grant.

(4) The grant date fair value of the stock options shown in the table above was computed in accordance with SFAS 123R and represents the total projected expense to the Company of grants made during the past fiscal year.

(5) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

Table of Contents

The following table sets forth the plan-based grants made during the fiscal year ended June 30, 2007, to each of our Named Executive Officers with respect to the 2005 Equity Participation Plan of Spacelabs Healthcare, Inc.

| | | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1)($) | | | Estimated Future Payouts Under Equity Incentive Plan Awards(1)(#) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Grant Date** | **Threshold** | **Target** | **Maximum** | **Threshold** | **Target** | **Maximum** | **All Other Stock Awards: Number of Shares of Stock or Units (#)** | **All Other Option Awards: Number of Securities Underlying Options (2)(#)** | **Exercise or Base Price of Option Awards (3) ($/Sh)** | **Grant Date Fair Value of Options and Awards (4)($)** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | November 22, 2006 | — | — | — | — | — | — | — | 125,200 | $ 2.07 | $ 87,775 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | November 22, 2006 | — | — | — | — | — | — | — | 100,000 | $ 2.07 | $ 70,108 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | — | — | — | — | — | — | — | — | — | — | — |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | November 22, 2006 | — | — | — | — | — | — | — | 20,000 | $ 2.07 | $ 14,022 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing Division | — | — | — | — | — | — | — | — | — | — | — |
| Anuj Wadhawan<br>Executive V.P., Chief Financial Officer of Security division(5) | — | — | — | — | — | — | — | — | — | — | — |

(1) Spacelabs Healthcare, Inc. does not maintain a non-equity or equity plan that provides for payments based upon achievement of threshold, target and/or maximum goals.

(2) The option grants expire after five years and vest over three years from the date of grant.

(3) The exercise price for grants of stock options is determined on the date of grant using the closing price of the most recent trade of the common stock of Spacelabs Healthcare, Inc. on the Alternative Investment Market ("AIM"), a market administered by the London Stock Exchange.

(4) The grant date fair value of the stock options shown in the table above was computed in accordance with SFAS 123R and represents the total projected expense to the Company of grants made during the past fiscal year.

(5) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

Table of Contents

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards under the Company's 2006 Plan as of June 30, 2007.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Number of Securities Underlying Unexercised Options Exercisable (#)** | **Number of Securities Underlying Unexercised Options Unexercisable(1) (#)** | **Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#)** | **Option Exercise Price (2)($)** | **Option Expiration Date** | **Number of Shares or Units of Stock That Have Not Vested (#)** | **Market Value of Shares or Units of Stock That Have Not Vested ($)** | **Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested** | **Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 100,000 | — | — | $ 16.31 | January 7, 2008 | — | — | — | — |
| | 100,000 | — | | $ 19.86 | February 12, 2009 | — | — | — | — |
| | 40,000 | 40,000 | — | $ 20.91 | November 25, 2009 | — | — | — | — |
| | 25,000 | 75,000 | — | $ 18.53 | January 10, 2010 | — | — | — | — |
| | 12,500 | 37,500 | — | $ 17.90 | June 22, 2011 | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | 50,000 | | $ 17.99 | July 30, 2011 | — | — | — | — |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,000 | — | — | $ 16.31 | January 7, 2008 | — | — | — | — |
| | 25,000 | — | — | $ 19.86 | February 12, 2009 | — | — | — | — |
| | 12,500 | 12,500 | — | $ 20.91 | November 25, 2009 | | | | |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 17,500 | — | — | $ 19.86 | February 12, 2009 | — | — | — | — |
| | 8,750 | 8,750 | | $ 20.91 | November 25, 2009 | — | — | — | — |
| | 5,000 | 15,000 | | $ 18.53 | November 10, 2010 | — | — | — | — |
| | — | 20,000 | | $ 18.16 | July 6, 2011 | — | — | — | — |

Table of Contents

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Number of Securities Underlying Unexercised Options Exercisable (#)** | **Number of Securities Underlying Unexercised Options Unexercisable(1) (#)** | **Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#)** | **Option Exercise Price(2) ($)** | **Option Expiration Date** | **Number of Shares or Units of Stock That Have Not Vested (#)** | **Market Value of Shares or Units of Stock That Have Not Vested ($)** | **Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested** | **Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested** |
| Manoocher Mansouri | 2,250 | — | — | $16.31 | January 7, 2008 | — | — | — | — |
| President, Optoelectronics | 1,500 | — | — | $16.10 | August 13, 2008 | — | | | |
| and Manufacturing | 1,500 | — | — | $19.88 | March 1, 2009 | — | — | — | — |
| division | 1,250 | 1,250 | — | $17.19 | March 9, 2010 | — | — | — | — |
| | 625 | 1,875 | — | $19.58 | January 10, 2011 | — | — | — | — |
| Anuj Wadhawan | 15,000 | — | — | $16.31 | January 7, 2008 | — | — | — | — |
| Executive V.P., | 20,000 | — | — | $19.86 | February 12, 2009 | — | — | — | — |
| Chief Financial Officer of | 10,000 | 10,000 | | $20.91 | November 25, 2009 | | | | |
| Security division(3) | 5,000 | 15,000 | | $18.53 | November 10, 2010 | | | | |

(1) Each option grant has a five-year term and vests over a three year period from the date of grant.

(2) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(3) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

Table of Contents

The following table sets forth the outstanding equity awards under the 2006 Equity Participation Plan of Rapiscan Systems, Inc. as of June 30, 2007.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Number of Securities Underlying Unexercised Options Exercisable (#)** | **Number of Securities Underlying Unexercised Options Unexercisable(1) (#)** | **Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#)** | **Option Exercise Price(2) ($)** | **Option Expiration Date** | **Number of Shares or Units of Stock That Have Not Vested (#)** | **Market Value of Shares or Units of Stock That Have Not Vested ($)** | **Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested** | **Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 250,000 | 750,000 | — | $ 1.50 | June 22, 2011 | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | 200,000 | — | $ 1.50 | July 24, 2011 | — | — | — | — |
| Ajay Mehra | 175,000 | 525,000 | — | $ 1.40 | February 7, 2011 | — | — | — | — |
| Executive V.P. of the Company, President of Security division | — | 500,000 | — | $ 1.60 | February 5, 2012 | — | — | — | — |
| Victor S. Sze | 16,000 | 48,000 | — | $ 1.40 | February 7, 2011 | — | — | — | — |
| Executive V.P., General Counsel and Secretary | — | 150,000 | — | $ 1.50 | July 6, 2011 | — | — | — | — |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 5,000 | 15,000 | — | $ 1.40 | April 17, 2011 | — | — | — | — |
| Anuj Wadhawan | 16,000 | 48,000 | — | $ 1.40 | February 7, 2011 | — | — | — | — |
| Executive V.P., Chief Financial Officer of Security division(3) | — | 260,000 | — | $ 1.60 | February 5, 2012 | — | — | — | — |

(1) Each option grant has a five-year term and vests over a three year period from the date of grant.

(2) The exercise price for grants of stock options is determined by estimating the fair value of each stock option award as of the date of grant.

(3) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

The following table sets forth the outstanding equity awards under the 2005 Equity Participation Plan of Spacelabs Healthcare, Inc. as of June 30, 2007.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name and Principal Position** | **Number of Securities Underlying Unexercised Options Exercisable (#)** | **Number of Securities Underlying Unexercised Options Unexercisable(1) (#)** | **Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#)** | **Option Exercise Price(2) ($)** | **Option Expiration Date** | **Number of Shares or Units of Stock That Have Not Vested (#)** | **Market Value of Shares or Units of Stock That Have Not Vested ($)** | **Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested** | **Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 137,450<br>68,725<br>— | 137,450<br>206,175<br>125,200 | —<br>—<br>— | $1.12<br>$2.00<br>$2.07 | October 25, 2009<br>July 11, 2010<br>November 22, 2011 | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— |
| Alan Edrick<br>Executive V.P.,<br>Chief Financial Officer | — | 100,000 | — | $2.07 | November 22, 2011 | — | — | — | — |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 20,618<br>13,745 | 20,617<br>— | —<br>— | $1.12<br>$1.05 | October 25, 2009<br>March 31, 2009 | —<br>— | —<br>— | —<br>— | —<br>— |
| Victor S. Sze<br>Executive V.P.,<br>General Counsel and Secretary | 54,980<br>27,490<br>— | —<br>27,490<br>20,000 | | $1.05<br>$1.72<br>$2.07 | March, 31, 2009<br>April 3, 2010<br>November 22, 2011 | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 2,749 | — | — | $1.05 | March 31, 2009 | — | — | — | — |
| Anuj Wadhawan<br>Executive V.P., Chief Financial Officer of Security division(3) | 13,745<br>54,980<br>13,745 | 13,745<br>—<br>13,745 | —<br>—<br>— | $1.12<br>$1.05<br>$1.72 | October 25, 2009<br>March 31, 2009<br>April 3, 2010 | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— | —<br>—<br>— |

(1) Each option grant has a five-year term and vests over a three year period from the date of grant.

(2) The exercise price for grants of stock options is determined on the date of grant using the closing price of the most recent trade of the common stock of Spacelabs Healthcare, Inc. on the AIM.

(3) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

**Option Exercises and Stock Vested Table**

During the fiscal year ended June 30, 2007, none of the Named Executive Officers exercised any options under either of the 2006 Equity Participation Plan of Rapiscan Systems Holdings, Inc. or the 2005 Equity Participation Plan of Spacelabs Healthcare, Inc. The following table sets forth certain information with respect to exercised options under the Company's 2006 Plan for the fiscal year ended June 30, 2007.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1) ($) | Number of Shares Acquired on Vesting | Value Realized on Vesting ($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 50,000 | $ 784,500 | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | — | — | — |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,200 | $ 124,500 | — | — |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 5,000 | $ 58,450 | — | — |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 2,655 | $ 38,498 | — | — |
| Anuj Wadhawan<br>Executive V.P., Chief Financial Officer of Security division(2) | 11,810 | $ 75,839 | — | — |

(1) Represents the difference between the closing price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

**Pension Benefits**

The Company does not sponsor any qualified or non-qualified defined benefit plans for any Named Executive Officer.

**Nonqualified Deferred Compensation**

The Company does not maintain any non-qualified defined contribution or deferred compensation plans.

**Employment Agreements, Termination of Employment and Change in Control Arrangements**

*Employment Agreements*

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with its Chairman, President and Chief Executive Officer, Deepak Chopra. Unless the employment agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (1) the fifth anniversary of the date of the agreement or (2) the close of business three years following the date that either party notifies the other in writing of its election to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. Most recently, the Compensation Committee set Mr. Chopra's annual base salary at $1,000,000 effective July 1, 2006 Mr. Chopra is entitled to receive one-third of the Company's year-end bonus pool for management, if a bonus pool is established, and to participate in

incentive compensation and other employee benefit plans established by the Company from time to time. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Chopra from soliciting its employees or customers after the expiration of the term of his employment with the Company. The agreement also contains certain provisions regarding potential payments upon termination of employment or a change in control of the Company, which are described in "Potential Payments upon Termination or Change in Control" below.

On July 25, 2006, the Company entered into an employment agreement with Alan Edrick, its Chief Financial Officer. The initial term of Mr. Edrick's employment agreement was one year. The agreement automatically renewed until July 24, 2008. The agreement provides for a base salary to be determined each year by the Company. During the term of his employment, Mr. Edrick's base salary cannot be reduced. Most recently, the Compensation Committee set Mr. Edrick's annual base salary at $335,000, effective September 1, 2007. Under the terms of the agreement, Mr. Edrick initially received options to purchase 50,000 shares of Common Stock of the Company; 100,000 shares of common stock of the Company's subsidiary, Spacelabs Healthcare, Inc.; and 200,000 shares of common stock of the Company's subsidiary, Rapiscan Systems Holdings, Inc. Each of these options was priced as of the date of grant, vests over a three-year period and expires five years from the date of grant. In addition, Mr. Edrick is entitled to participate in the Company's bonus pool, and is entitled to benefits under any plan made available to any other similarly situated executives. In addition, the Company pays Mr. Edrick a car allowance in the amount of $1,000 per month. Furthermore, in the event of the relocation of the Company's principal office more than 50 miles from its present location, the Company will offer Mr. Edrick a reasonable relocation package. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Edrick from soliciting its employees or customers after the expiration of the term of his employment with the Company. The agreement also contains certain provisions regarding potential payments upon termination of employment or a change in control of the Company, which are described in "Potential Payments upon Termination or Change in Control" below.

On September 1, 2000, the Company entered into an employment agreement with Ajay Mehra, its Executive Vice President and the President of its Security division. In November 2006, the Company amended Mr. Mehra's employment agreement to extend the term of the agreement until August 31, 2009. The agreement provides for a base salary to be determined each year by the Company. Most recently, the Compensation Committee set Mr. Mehra's annual base salary at $375,000 effective September 1, 2007. Mr. Mehra is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Mehra from soliciting its employees or customers after the expiration of the term of his employment with the Company. Mr. Mehra has also entered into a Letter Agreement for Payments upon a Change in Control with the Company's Rapiscan Systems Holdings, Inc. subsidiary, which contains provisions regarding potential payments upon termination of employment or a change in control of such subsidiary, which are described in "Potential Payments upon Termination or Change in Control" below.

*Potential Payments upon Termination or Change in Control*

Messrs. Chopra and Edrick have each entered into employment agreements with the Company which provide for potential payments upon termination or change in control. Mr. Mehra has entered into a change in control agreement with the Company's Rapiscan Systems, Inc. subsidiary. Mr. Sze has entered into a change in control agreement with the Company. Mr. Mansouri has entered into a change in control agreement with the Company's OSI Optoelectronics, Inc. subsidiary. Mr. Wadhawan has entered into a change in control agreement with the Company's Rapiscan Systems, Inc. subsidiary.

Table of Contents

The following tables show the potential payments upon termination or a change in control. The tables assume each such Named Executive Officer's employment was terminated on June 30, 2007, and assume that the change in control occurred at June 30, 2007. These disclosed amounts are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which would only be known at the time that they become eligible for such payments.

**Deepak Chopra: Specific Circumstances Triggering Payment upon Termination or Change in Control**

*Termination for "Cause"*

The Company may terminate Mr. Chopra's employment at any time for "Cause" by delivering written notice to Mr. Chopra. "Cause" is defined as any of the following events: (1) Mr. Chopra is convicted, or pleads guilty or *nolo contendre* to, a felony or a crime involving moral turpitude; (2) Mr. Chopra engages in gross negligence or gross or willful misconduct in connection with the performance of his responsibilities under the employment agreement; (3) after written notice to Mr. Chopra, Mr. Chopra repeatedly fails to comply materially with any material Company policy; or (4) Mr. Chopra materially breaches any material term or provision of the employment agreement and fails to cure such breach within 30 days after he receives written notice from Company. In the event that Mr. Chopra is terminated for "Cause," then he will be entitled to unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of termination.

The table below reflects the breakdown of payments and benefits that Mr. Chopra would receive assuming that his employment was terminated for "Cause" on June 30, 2007:

| Name | Base Salary | Bonus(1) | Vacation Payout | Expenses | Employee Benefits | Total |
|---|---|---|---|---|---|---|
| Deepak Chopra | $ 38,462 | $ 250,000 | $ 113,923 | — | — | $ 402,385 |

(1)     For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

*Termination with "Good Reason" or without "Cause"*

In the event that Mr. Chopra resigns from his employment with the Company with "Good Reason" (as defined below), or the Company terminates Mr. Chopra without "Cause," then: (1) Mr. Chopra will be entitled to all of his unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses, and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of his resignation with "Good Reason" or termination without "Cause;" (2) Mr. Chopra will continue to be entitled to receive all of his salary, unpaid expenses, unpaid vacation days, bonuses and other benefits made available to the Company's senior members of management, or to its employees generally, for a period of 3 years from the date of resignation with "Good Reason" or termination without "Cause," without any deduction or offset for any compensation earned or received by Mr. Chopra from any other sources and without any further obligation by Mr. Chopra to render services to the Company; and (3) at Mr. Chopra's election upon written notice to the Company within 10 days after his resignation with "Good Reason" or termination without "Cause," all of his unvested stock options in the Company will fully vest upon the date of his resignation with "Good Reason" or termination without "Cause."

Table of Contents

"Good Reason" means the following events:

(1) Withdrawal by the Company from Mr. Chopra of any substantial part of his duties then being performed, or responsibility or authority then being carried by him, or a material change in Mr. Chopra's reporting lines;

(2) Assignment by the Company to Mr. Chopra of substantial additional duties or responsibilities which are inconsistent with the duties or responsibilities then being carried out by him;

(3) Material reduction in the level of Mr. Chopra's responsibility, authority, autonomy, title, compensation, executive perquisites or other employee benefits;

(4) Failure to keep Mr. Chopra in office as President and Chief Executive Officer of Company;

(5) The Company materially breaches any material term or provision of the employment agreement and fails to cure such breach within 30 days after it receives written notice from Mr. Chopra;

(6) Fraud on the part of the Company; or

(7) Discontinuance of the active operation of business of the Company.

The table below reflects the breakdown of payments and benefits that Mr. Chopra would receive assuming that his employment agreement was terminated by the Company without "Cause" or by Mr. Chopra for "Good Reason" on June 30, 2007:

| Name | Base Salary | Bonus(1) | Vacation Payout | Expenses | Employee Benefits(2) | Accelerated Vesting(3) | Total |
|---|---|---|---|---|---|---|---|
| Deepak Chopra | $ 3,000,000 | $ 750,000 | $ 113,923 | — | $ 249,609 | $ 1,467,393 | $ 5,580,925 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

(2) Consists of benefits under any plan made available to the Company's senior members of management or its employees generally during the course of Mr. Chopra's employment, including any pension, profit sharing, savings or other retirement plans or programs, accidental death and dismemberment protection, flex plans, or any other pension or retirement plans or programs and any other employee welfare benefit plans or programs that may be sponsored by the Company from time to time, along with automobile, life or other insurance benefits that Mr. Chopra is entitled to receive.

(3) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007. Spacelabs Healthcare, Inc. common stock trades on the AIM, a market administered by the London Stock Exchange. The stock option value of options to purchase shares of Spacelabs Healthcare, Inc. common stock is calculated by multiplying the number of unvested, in-the-money options to purchase shares by the difference between the grant price and the closing stock price of Spacelabs Healthcare, Inc. common stock on June 29, 2007(£0.72 or $1.44).

*Termination with "Good Reason" or without "Cause" in Connection with a "Change in Control"*

In the event Mr. Chopra resigns from the Company with "Good Reason" or the Company terminates him without "Cause" at any time upon or after the occurrence of a "Change in Control" (as defined below), then Mr. Chopra, at his option and in lieu of receiving the amounts set forth under "Termination for 'Good Reason" or

Table of Contents

without 'Cause'" above, may elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Code Section 280G(b)(3)) (the "Alternative Payment").

In order to elect the Alternative Payment, Mr. Chopra must give written notice to the Company of his election: (1) concurrently with his resignation with "Good Reason" following a Change in Control; or (2) within 10 days after he is terminated by the Company without "Cause" following a Change in Control. The Company will pay the Alternative Payment to Mr. Chopra within 5 days after its receipt of the notice. Further, in connection with the Alternative Payment, Mr. Chopra, in his sole discretion, has the right to have all or any portion of his unvested stock options accelerate as of the date of such resignation or termination.

For purposes of the employment agreement, "Change in Control" means the occurrence of any of the following events: (1) any sale, lease, license, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all, of the business and/or assets of the Company or assets that account for over 50% of the operating revenue of the Company; (2) a merger or consolidation of the Company and the Company is not the surviving entity; (3) a reorganization or liquidation of the Company; and (4) a merger, consolidation, tender offer or any other transaction involving the Company if the equity holders of the Company immediately before such merger, consolidation, tender offer or other transaction do not own, directly or indirectly, immediately following such merger, consolidation, tender offer or other transaction, more than 50% of the combined voting power of the outstanding voting securities of the entity resulting from such merger, consolidation, tender offer or other transaction.

The table below reflects the breakdown of payments and benefits that Mr. Chopra would receive, following a Change in Control, assuming that his employment agreement was terminated by the Company without "Cause" or by Mr. Chopra for "Good Reason," and had Mr. Chopra elected to receive the Alternative Payment:

| Name | Alternative Payment | Vacation Payout | Expenses | Employee Benefits | Accelerated Vesting(1) | Total |
|---|---|---|---|---|---|---|
| Deepak Chopra | 3,238,777 | $ 113,923 | — | — | $ 1,467,393 | $ 4,820,093 |

(1) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007. Spacelabs Healthcare, Inc. common stock trades on the AIM, a market administered by the London Stock Exchange. The stock option value of options to purchase shares of Spacelabs Healthcare, Inc. common stock is calculated by multiplying the number of unvested, in-the-money options to purchase shares by the difference between the grant price and the closing stock price of Spacelabs Healthcare, Inc. common stock on June 29, 2007(£0.72 or $1.44).

*Death or Permanent Disability*

In the event of Mr. Chopra's death during the term of his employment, Mr. Chopra's employment with the Company will cease. In addition, in the event Mr. Chopra becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, the Company may, at its sole discretion, terminate his employment with the Company. Upon the date of his death or upon the Company's termination of his employment due to a disability, (1) Mr. Chopra will be entitled to all unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of Mr. Chopra's death or termination for disability, and (2) all of Mr. Chopra's unvested stock options in the Company will fully vest on such date.

Table of Contents

The table below reflects the breakdown of payments and benefits that Mr. Chopra would receive assuming that his employment was terminated due to death or disability on June 30, 2007:

| Name | Base Salary | Bonus(1) | Vacation Payout | Expenses | Employee Benefits | Accelerated Vesting(2) | Total |
|---|---|---|---|---|---|---|---|
| Deepak Chopra | $ 38,462 | $ 250,000 | $ 113,923 | — | — | $ 1,467,393 | $ 1,869,778 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

(2) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007. Spacelabs Healthcare, Inc. common stock trades on the AIM, a market administered by the London Stock Exchange. The stock option value of options to purchase shares of Spacelabs Healthcare, Inc. common stock is calculated by multiplying the number of unvested, in-the-money options to purchase shares by the difference between the grant price and the closing stock price of Spacelabs Healthcare, Inc. common stock on June 29, 2007(£0.72 or $1.44).

**Alan Edrick: Specific Circumstances Triggering Payment upon Termination or Change in Control**

*General Termination or Expiration of the Employment Agreement*

The Company may terminate Alan Edrick's employment for "Cause" at any time upon notice to Mr. Edrick. "Cause" is defined as: (1) Mr. Edrick's admission or conviction of, or entering of a plea of *nolo contendere* as to any felony, or any lesser crime involving fraud, embezzlement or theft; (2) Mr. Edrick's failure to substantially perform his duties, which failure cannot be cured or is not cured within 10 business days after written notice from the Company, as long as Mr. Edrick is not prevented from performing or curing by actions outside his control; or (3) Mr. Edrick's material breach of any provision of his employment agreement, which breach cannot be cured or is not cured within 10 business days after written notice from the Company, as long as Mr. Edrick is not prevented from performing or curing by actions outside his control.

The Company may also terminate Mr. Edrick's employment at any time other than for "Cause," for the following additional reasons: (1) in the event of Mr. Edrick's death, in which case his employment agreement will automatically terminate; (2) if Mr. Edrick, because of physical or mental incapacity or disability, fails to perform the essential functions of his position required of him for an aggregate period of 60 days within any six month period; or (3) upon 60 days' written notice.

Mr. Edrick may terminate his employment agreement for "Good Reason" or for no "Good Reason" upon 60 days' notice to the Company. If Mr. Edrick provides notice of termination during the Company's fourth fiscal quarter, then his employment will conclude on the first business day after the filing of the Company's Form 10-K for that fiscal year. "Good Reason" means the occurrence of any of the following events unless Mr. Edrick specifically agrees in writing that such event is not "Good Reason": (1) any change in Mr. Edrick's title as Executive Vice President and Chief Financial Officer; (2) any change in Mr. Edrick's reporting relationship, such that he no longer reports to the Company's Chief Executive Officer; (3) in the event that, for whatever reason, the Company is no longer the parent entity in its organizational framework, such that Mr. Edrick is no longer the Executive Vice President and Chief Financial Officer of the parent; (4) upon removal of any of the essential functions of a Chief Financial Officer; (5) following a "Change of Control" (as defined below), the relocation of Mr. Edrick's principal office location more than 50 miles from its location as of July 25, 2006; (6) Mr. Edrick's Base Salary is reduced from any prior year; or (7) any material breach of the employment agreement by the Company that is not cured within 10 business days after written notice from Mr. Edrick.

Table of Contents

Upon expiration by non-renewal or termination of the employment agreement for any reason by either party, Mr. Edrick will be entitled to receive payment of (1) base salary through the "Completion Date" (as defined below); (2) any unused vacation and paid time off accrued through the "Completion Date;" and (3) any employee benefits that Mr. Edrick is entitled to upon the cessation of his employment with the Company, in accordance with the terms of plans or programs then in effect. "Completion Date" means the earliest of (1) the second anniversary of July 25, 2006; (2) if Mr. Edrick's employment is terminated because of his death, the date of death; (3) if Mr. Edrick's employment is terminated for "Cause" or due to disability, the effective date notice provided by the Company; (4) if Mr. Edrick's employment is terminated without "Cause," the 60th day following written notice provided by the Company; or (5) if Mr. Edrick's employment is terminated for "Good Reason" or for no "Good Reason," the 60th day following written notice provided by Mr. Edrick.

The table below reflects the breakdown of payments and benefits that Mr. Edrick would receive assuming that his employment was terminated on June 30, 2007, upon termination of the employment agreement for any reason by either party:

| Name | Base Salary | Vacation Payout | Employee Benefits(1) | Total |
|---|---|---|---|---|
| Alan Edrick | $ 323,077 | $ 10,223 | $ 16,804 | $ 350,104 |

(1) Consists of benefits under any plan made available to any other similarly situated executive during the course of Mr. Edrick's employment, including any life insurance, disability insurance, medical/dental/vision insurance and other retirement benefits.

*Termination without "Cause" or with "Good Reason"*

Absent or prior to a "Change of Control" (as defined below), in the event of termination of Mr. Edrick's employment by the Company without "Cause" or by Mr. Edrick for "Good Reason," Mr. Edrick will also be entitled to (1) an amount equal to 12 months' salary at his then-current base salary; and (2) an amount equal to 50% of the bonus paid to Mr. Edrick in the prior year; provided, however, that if termination occurs prior to the payment of any bonus to Mr. Edrick, he will be entitled to an amount equal to 50% of the bonus to which he would be entitled under the current year's bonus program; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Edrick, to the extent that such options and awards would have vested within 90 days after the "Completion Date" but for termination of employment by Company, will become fully vested as of the "Completion Date."

The table below reflects the breakdown of payments and benefits that Mr. Edrick would receive assuming that, absent or prior to a "Change of Control," his employment agreement was terminated by the Company without "Cause" or by Mr. Edrick for "Good Reason" on June 30, 2007:

| Name | Base Salary | Bonus(1) | Vacation Payout | Employee Benefits(2) | Accelerated Vesting(3) | Total |
|---|---|---|---|---|---|---|
| Alan Edrick | $ 300,000 | $ 75,000 | $ 10,223 | $ 16,804 | $ 508,000 | $ 910,027 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Edrick following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

(2) Consists of benefits under any plan made available to any other similarly situated executive during the course of Mr. Edrick's employment, including any life insurance, disability insurance, medical/dental/vision insurance and other retirement benefits.

(3) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007.

Table of Contents

*Termination without "Cause" or with "Good Reason" in Connection with a "Change in Control"*

In the event of either (1) termination of the employment agreement by the Company without "Cause" within 180 days prior to or 12 months following a "Change of Control" (as defined below), or (2) termination of the employment agreement by Mr. Edrick for "Good Reason" within 12 months after a "Change of Control," Mr. Edrick will be entitled to those payments and benefits described above under "General Termination or Expiration of the Employment Agreement," along with (1) an amount equal to 24 months' base salary at Mr. Edrick's then-current level; (2) an amount equal to 50% of the bonus to which Mr. Edrick would be entitled under the current year's bonus program; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Edrick will become fully vested as of the "Completion Date."

"Change in Control" means the occurrence of any of the following events during the term of his employment agreement: (1) any sale, lease, license, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all, of the business and/or assets of the Company; (2) a merger or consolidation of the Company and the Company is not the surviving entity; (3) a reorganization or liquidation of the Company; (4) a merger, consolidation, tender offer or any other transaction involving the Company if the equity holders of the Company immediately before such merger, consolidation, tender offer or other transaction do not own, directly or indirectly, immediately following such merger, consolidation, tender offer or other transaction, more than 30% of the combined voting power of the outstanding voting securities of the entity resulting from such merger, consolidation, tender offer or other transaction; (5) Deepak Chopra ceases to be Chief Executive Officer of the Company, unless his termination from employment with the Company is by reason of a voluntary termination; or (6) a change in the composition of the Board of the Company as a result of which fewer than a majority of the directors are incumbent directors.

The table below reflects the breakdown of payments and benefits that Mr. Edrick would receive assuming that Mr. Edrick had been terminated on June 30, 2007 without "Cause" or Mr. Edrick resigned with "Good Reason" on June 30, 2007, in connection with a "Change in Control":

| Name | Base Salary | Bonus(1) | Vacation Payout | Employee Benefits(2) | Accelerated Vesting(3) | Total |
|---|---|---|---|---|---|---|
| Alan Edrick | $ 600,000 | $ 75,000 | $ 10,223 | $ 16,804 | $ 508,000 | $ 1,210,027 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Edrick following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

(2) Consists of benefits under any plan made available to any other similarly situated executive during the course of Mr. Edrick's employment, including any life insurance, disability insurance, medical/dental/vision insurance and other retirement benefits.

(3) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007.

**Ajay Mehra: Specific Circumstances Triggering Payment upon Termination or Change in Control**

*Termination without "Cause"*

Mr. Mehra's employment agreement will expire on August 31, 2009. Prior to such date, if the Company terminates Mr. Mehra's employment any time without "Cause" (defined below), then, in addition to all compensation accrued and outstanding as of such termination date, Mr. Mehra will be entitled to receive the salary, bonus and other benefits that he would have received had he remained employed during the remainder of

the term of the agreement, without deduction or offset for any compensation earned or received by Mr. Mehra from any other sources. In addition, in accordance with the Company's policies, Mr. Mehra would also receive payment for accrued, but unpaid vacation days.

"Cause" is defined as any of the following events: (1) any willful breach of duty by Mr. Mehra in the course of his employment; (2) the breach of any provision of his employment agreement or any misrepresentation by Mr. Mehra thereunder; (3) misconduct, neglect or negligence in the performance of his duties and obligations; (4) disloyal, dishonest, willful misconduct, illegal, immoral or unethical conduct by Mr. Mehra; (5) such carelessness or inefficiency in the performance of Mr. Mehra's duties that he is unfit to continue in the service of Company; (6) failure by Mr. Mehra to comply with the policies or directives of Company and/or failure to take direction from Company's Board of Directors; or (7) such other conduct which is substantially detrimental to the best interests of Company.

The table below reflects the breakdown of payments and benefits that Mr. Mehra would receive assuming that Mr. Mehra had been terminated without "Cause" on June 30, 2007:

| Name | Base Salary(1) | Bonus(2) | Vacation Payout | Employee Benefits(3) | Total |
|---|---|---|---|---|---|
| Ajay Mehra | $ 810,000 | $ 160,000 | $ 40,112 | $ 99,331 | $ 1,109,443 |

(1) For the purposes of this table, the "Base Salary" amount is calculated on the amount actually paid to Mr. Mehra during July and August of 2007, plus a period of 24 months at his current base salary.

(2) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Mehra following the completion of the fiscal year ended June 30, 2007, for performance in the fiscal year ended June 30, 2007.

(3) Consists of benefits under any plan made available to any other similarly situated executive during the course of Mr. Mehra's employment, including any life insurance, disability insurance, medical/dental/vision insurance and other retirement benefits that would have been provided during the remainder of the term of his agreement.

*Termination in Connection with a Change in Control*

Rapiscan Systems Holdings, Inc., a subsidiary of the Company, has entered into a Letter Agreement for Payment upon a Change in Control with Mr. Mehra. The letter agreement provides for the payment to Mr. Mehra of certain sums if (1) Mr. Mehra's employment by Rapiscan Systems Holdings, Inc. or one of its subsidiaries (collectively, "Rapiscan") is terminated by Rapiscan without cause within 12 months after a "Change in Control," (defined below) or (2) Mr. Mehra terminates such employment for "Good Reason" (defined below) within 12 months after a "Change in Control."

"Change in Control" means the acquisition, by a single party or a "group" (as defined in Section 13(d)(3) of the Exchange Act), other than the Company or its subsidiaries, of equity in Rapiscan Systems Holdings, Inc. representing a majority of the voting power in Rapiscan Systems Holdings, Inc.

"Good Reason," means the occurrence of any of the following events unless Mr. Mehra specifically agrees in writing that such event is not "Good Reason": (1) any substantial reduction in duties; (2) following a "Change in Control," the relocation of Mr. Mehra's principal office location more than 75 miles from its present location; (3) Mr. Mehra's base salary is reduced from any prior year, except for a reduction: (a) of 10% or less, (b) for a period of one year or less, and (c) which is compensated with substantially equivalent value through a grant of stock options, restricted stock or some other form of compensation; or (4) any material breach of any written employment agreement by Rapiscan that is not cured within 10 business days after written notice from Mr. Mehra. Changes in lines of reporting, of itself, will not constitute "Good Reason."

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1727 of 2711
Table of Contents

If Mr. Mehra's employment with Rapiscan is terminated by Rapiscan within 12 months after a "Change in Control" or Mr. Mehra terminates such employment for "Good Reason" within 12 months after a "Change in Control," Mr. Mehra will be entitled to receive: (1) an amount equal to 12 months' base salary at Mr. Mehra's then-current rate; (2) an amount equal to 50% of Mr. Mehra's bonus for the prior year; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Mehra shall become fully vested and (where applicable) exercisable. Payment of (1) and (2) shall be made in a single lump-sum cash payment, less appropriate deductions and withholding, on the last day of Mr. Mehra's employment. In addition, in accordance with the Company's policies, Mr. Mehra would also receive payment for accrued, but unpaid vacation days.

Unless Rapiscan provides Mr. Mehra with notice of renewal of Mr. Mehra's letter agreement prior to its expiration, Mr. Mehra's letter agreement shall expire on (1) September 11, 2008, if no "Change in Control" occurs earlier, or (2) if any "Change in Control" should occur during the term of Mr. Mehra's letter agreement, the day after the first anniversary of the "Change in Control."

The table below reflects the breakdown of payments and benefits that Mr. Mehra would receive assuming that on June 30, 2007, Mr. Mehra's employment had been terminated without cause within 12 months after a "Change in Control," or (2) Mr. Mehra had terminated such employment for "Good Reason" within 12 months after a "Change in Control."

| Name | Base Salary | Bonus | Vacation Payout | Accelerated Vesting(1) | Total |
|---|---|---|---|---|---|
| Ajay Mehra | $ 360,000 | $ 12,500 | $ 40,112 | $ 294,588 | $ 707,200 |

(1) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007. Spacelabs Healthcare, Inc. common stock trades on the AIM, a market administered by the London Stock Exchange. The stock option value of options to purchase shares of Spacelabs Healthcare, Inc. common stock is calculated by multiplying the number of unvested, in-the-money options to purchase shares by the difference between the grant price and the closing stock price of Spacelabs Healthcare, Inc. common stock on June 29, 2007(£0.72 or $1.44).

**Victor Sze: Specific Circumstances Triggering Payment upon Termination in Connection with a Change in Control**

The Company has entered into a Letter Agreement for Payment upon a Change in Control with Mr. Sze. The letter agreement provides for the payment to Mr. Sze of certain sums if (1) Mr. Sze's employment by the Company or one of its subsidiaries is terminated by the Company without cause within 12 months after a "Change in Control," (defined below) or (2) Mr. Sze terminates such employment for "Good Reason" (defined below) within 12 months after a "Change in Control."

"Change in Control" means the acquisition, by a single party or a "group" (as defined in Section 13(d)(3) of the Exchange Act), of equity in the Company representing a majority of the voting power in the Company.

"Good Reason," means the occurrence of any of the following events unless Mr. Sze specifically agrees in writing that such event is not "Good Reason": (1) any substantial reduction in duties; (2) following a "Change in Control," the relocation of Mr. Sze's principal office location more than 75 miles from its present location; (3) Mr. Sze's base salary is reduced from any prior year, except for a reduction: (a) of 10% or less, (b) for a

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1728 of 2711

Table of Contents

period of one year or less, and (c) which is compensated with substantially equivalent value through a grant of stock options, restricted stock or some other form of compensation; or (4) any material breach of any written employment agreement by the Company that is not cured within 10 business days after written notice from Mr. Sze. Changes in lines of reporting, of itself, will not constitute "Good Reason."

If Mr. Sze's employment is terminated by the Company within 12 months after a "Change in Control" or Mr. Sze terminates such employment for "Good Reason" within 12 months after a "Change in Control," Mr. Sze will be entitled to receive: (1) an amount equal to 12 months' base salary at Mr. Sze's then-current rate, (2) an amount equal to 50% of Mr. Sze's bonus for the prior year; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Sze shall become fully vested and (where applicable) exercisable. Payment of (1) and (2) shall be made in a single lump-sum cash payment, less appropriate deductions and withholding, on the last day of Mr. Sze's employment. In addition, in accordance with the Company's policies, Mr. Sze would also receive payment for accrued, but unpaid vacation days.

Unless the Company provides Mr. Sze with notice of renewal of Mr. Sze's letter agreement prior to its expiration, Mr. Sze's letter agreement shall expire on (1) September 11, 2008, if no "Change in Control" occurs earlier; or (2) if any "Change in Control" should occur during the term of Mr. Sze's letter agreement, the day after the first anniversary of the "Change in Control."

The table below reflects the breakdown of payments and benefits that Mr. Sze would receive assuming that on June 30, 2007, Mr. Sze's employment had been terminated without cause within 12 months after a "Change in Control," or (2) Mr. Sze had terminated such employment for "Good Reason" within 12 months after a "Change in Control."

| Name | Base Salary | Bonus | Vacation Payout | Accelerated Vesting(1) | Total |
|---|---|---|---|---|---|
| Victor Sze | $ 300,000 | $ 72,500 | $ 26,913 | $ 416,850 | $ 816,263 |

(1) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007.

**Manoocher Mansouri: Specific Circumstances Triggering Payment upon Termination in Connection with a Change in Control**

OSI Optoelectronics, Inc., a subsidiary of the Company, has entered into a Letter Agreement for Payment upon a Change in Control with Mr. Mansouri. The letter agreement provides for the payment to Mr. Mansouri of certain sums if (1) Mr. Mansouri's employment by OSI Optoelectronics, Inc. or one of its subsidiaries (collectively, "OSI Optoelectronics") is terminated by OSI Optoelectronics without cause within 12 months after a "Change in Control," (defined below) or (2) Mr. Mansouri terminates such employment for "Good Reason" (defined below) within 12 months after a "Change in Control."

"Change in Control" means the acquisition, by a single party or a "group" (as defined in Section 13(d)(3) of the Exchange Act), other than the Company or its subsidiaries, of equity in OSI Optoelectronics, Inc. representing a majority of the voting power in OSI Optoelectronics, Inc.

"Good Reason," means the occurrence of any of the following events unless Mr. Mansouri specifically agrees in writing that such event is not "Good Reason": (1) any substantial reduction in duties; (2) following a "Change in Control," the relocation of Mr. Mansouri's principal office location more than 75 miles from its

Table of Contents

present location; (3) Mr. Mansouri's base salary is reduced from any prior year, except for a reduction: (a) of 10% or less, (b) for a period of one year or less, and (c) which is compensated with substantially equivalent value through a grant of stock options, restricted stock or some other form of compensation; or (4) any material breach of any written employment agreement by OSI Optoelectronics that is not cured within 10 business days after written notice from Mr. Mansouri. Changes in lines of reporting, of itself, will not constitute "Good Reason."

If Mr. Mansouri's employment with OSI Optoelectronics is terminated by OSI Optoelectronics within 12 months after a "Change in Control" or Mr. Mansouri terminates such employment for "Good Reason" within 12 months after a "Change in Control," Mr. Mansouri will be entitled to receive: (1) an amount equal to 12 months' base salary at Mr. Mansouri's then-current rate; (2) an amount equal to 50% of Mr. Mansouri's bonus for the prior year; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Mansouri shall become fully vested and (where applicable) exercisable. Payment of (1) and (2) shall be made in a single lump-sum cash payment, less appropriate deductions and withholding, on the last day of Mr. Mansouri's employment. In addition, in accordance with the Company's policies, Mr. Mansouri would also receive payment for accrued, but unpaid vacation days.

Unless OSI Optoelectronics provides Mr. Mansouri with notice of renewal of Mr. Mansouri's letter agreement prior to its expiration, Mr. Mansouri's letter agreement shall expire on (1) September 11, 2008, if no "Change in Control" occurs earlier, or (2) if any "Change in Control" should occur during the term of Mr. Mansouri's letter agreement, the day after the first anniversary of the "Change in Control."

The table below reflects the breakdown of payments and benefits that Mr. Mansouri would receive assuming that on June 30, 2007, Mr. Mansouri's employment had been terminated without cause within 12 months after a "Change in Control," or (2) Mr. Mansouri had terminated such employment for "Good Reason" within 12 months after a "Change in Control."

| Name | Base Salary | Bonus | Vacation Payout | Accelerated Vesting(1) | Total |
|---|---|---|---|---|---|
| Manoocher Mansouri | $ 225,000 | $ 21,500 | $ 34,615 | $ 31,769 | $ 312,884 |

(1) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007.

**Anuj Wadhawan: Specific Circumstances Triggering Payment upon Termination in Connection with a Change in Control**

Rapiscan Systems Holdings, Inc., a subsidiary of the Company has entered into a Letter Agreement for Payment upon a Change in Control with Mr. Wadhawan. The letter agreement provides for the payment to Mr. Wadhawan of certain sums if (1) Mr. Wadhawan's employment by Rapiscan Systems Holdings, Inc. or one of its subsidiaries (collectively, "Rapiscan") is terminated by Rapiscan without cause within 12 months after a "Change in Control," (defined below) or (2) Mr. Wadhawan terminates such employment for "Good Reason" (defined below) within 12 months after a "Change in Control."

"Change in Control" means the acquisition, by a single party or a "group" (as defined in Section 13(d)(3) of the Exchange Act), other than the Company or its subsidiaries, of equity in Rapiscan Systems Holdings, Inc. representing a majority of the voting power in Rapiscan Systems Holdings, Inc.

Table of Contents

"Good Reason," means the occurrence of any of the following events unless Mr. Wadhawan specifically agrees in writing that such event is not "Good Reason": (1) any substantial reduction in duties; (2) following a "Change in Control," the relocation of Mr. Wadhawan's principal office location more than 75 miles from its present location; (3) Mr. Wadhawan's base salary is reduced from any prior year, except for a reduction: (a) of 10% or less, (b) for a period of one year or less, and (c) which is compensated with substantially equivalent value through a grant of stock options, restricted stock or some other form of compensation; or (4) any material breach of any written employment agreement by Rapiscan that is not cured within 10 business days after written notice from Mr. Wadhawan. Changes in lines of reporting, of itself, will not constitute "Good Reason."

If Mr. Wadhawan's employment with Rapiscan is terminated by Rapiscan within 12 months after a "Change in Control" or Mr. Wadhawan terminates such employment for "Good Reason" within 12 months after a "Change in Control," Mr. Wadhawan will be entitled to receive: (1) an amount equal to 12 months' base salary at Mr. Wadhawan's then-current rate; (2) an amount equal to 50% of Mr. Wadhawan's bonus for the prior year; and (3) any unvested stock options and other equity awards subject to a vesting schedule and previously granted to Mr. Wadhawan shall become fully vested and (where applicable) exercisable. Payment of (1) and (2) shall be made in a single lump-sum cash payment, less appropriate deductions and withholding, on the last day of Mr. Wadhawan's employment. In addition, in accordance with the Company's policies, Mr. Wadhawan would also receive payment for accrued, but unpaid vacation days.

Unless Rapiscan provides Mr. Wadhawan with notice of renewal of Mr. Wadhawan's letter agreement prior to its expiration, Mr. Wadhawan letter agreement shall expire on (1) June 11, 2008, if no "Change in Control" occurs earlier, or (2) if any "Change in Control" should occur during the term of Mr. Wadhawan's letter agreement, the day after the first anniversary of the "Change in Control."

The table below reflects the breakdown of payments and benefits that Mr. Wadhawan would receive assuming that on June 30, 2007, Mr. Wadhawan's employment had been terminated without cause within 12 months after a "Change in Control," or (2) Mr. Wadhawan had terminated such employment for "Good Reason" within 12 months after a "Change in Control."

| Name | Base Salary | Bonus(1) | Vacation Payout | Accelerated Vesting(1) | Total |
|---|---|---|---|---|---|
| Anuj Wadhawan | $ 250,000 | $ 20,000 | $ 34,142 | $ 241,492 | $ 545,634 |

(1) The stock option value of options to purchase shares of Company Common Stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the closing stock price of the Company's Common Stock on June 29, 2007 ($27.35). The stock option value of options to purchase shares of Rapiscan Systems Holdings, Inc. common stock is calculated by multiplying the number of unvested options to purchase shares by the difference between the grant price and the most recent valuation of such stock by the Company's management. Management last performed such valuation on May 7, 2007. Spacelabs Healthcare, Inc. common stock trades on the AIM, a market administered by the London Stock Exchange. The stock option value of options to purchase shares of Spacelabs Healthcare, Inc. common stock is calculated by multiplying the number of unvested, in-the-money options to purchase shares by the difference between the grant price and the closing stock price of Spacelabs Healthcare, Inc. common stock on June 29, 2007(£0.72 or $1.44).

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

Each non-employee director receives a fee of $15,000 per year, $1,500 for each Board of Directors meeting attended, and options to purchase 7,500 shares of the Company's Common Stock per year, at an exercise price equal to 100% of fair market value as of the date of grant.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1731 of 2711
Table of Contents

Each member of the Audit Committee receives a fee of $1,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Compensation Committee receives a fee of $1,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Nominating and Governance Committee receives a fee of $1,500 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also receives a fee of $5,000 per year.

Each member of the Executive Committee receives a fee of $10,000 per year and options to purchase 5,000 shares of the Company's Common Stock at an exercise price equal to 100% of fair market value as of the date of grant.

All options granted to members of the Board of Directors and it committees vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2007 for each member of the Company's Board of Directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards (1)($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Steven C. Good | 60,000 | — | 227,524 | — | — | — | 287,524 |
| Meyer Luskin | 58,500 | — | 227,524 | — | — | — | 286,024 |
| Chand R. Viswanathan | 38,000(2) | — | 87,161 | — | — | — | 125,161 |
| Leslie E. Bider | 35,000 | — | 19,989 | — | — | — | 54,989 |

(1) Amounts calculated utilizing the provisions of SFAS 123R.

(2) Amount includes $5,000 received by Mr. Viswanathan for serving on an advisory technology committee of the Company.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during fiscal year 2007 by Mr. Chopra and his wife. The Company paid the business approximately $50,000 for such services during fiscal year 2007. The Company contracts for printing services from a business

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1732 of 2711

Table of Contents

owned by Mr. Chopra's father-in-law, Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $50,000 for such printing services during fiscal year 2007. In addition, in consideration of Mr. Syal's past services to the Company as a Director, the Board of Directors approved yearly payments of $25,000 each to Mr. Syal during each of fiscal years 2004, 2005, 2006 and 2007.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

**Compensation Committee Report**

We have reviewed and discussed with management certain Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, we recommend to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1733 of 2711
Table of Contents

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of September 26, 2007 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,367,940 | 7.8% |
| Wells Fargo & Company(4) | 2,230,721 | 13.0% |
| Dimensional Fund Advisors, Inc.(5) | 1,422,969 | 8.3% |
| Wellington Management Company, LLP(6) | 1,233,442 | 7.7% |
| Turner Investment Partners, Inc.(7) | 889,163 | 5.2% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 26, 2007, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 215,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 225,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 610,440 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 15,000 shares of restricted stock granted on September 17, 2007 are held individually by Mr. Chopra. Includes 25,000 shares issuable pursuant to options that become exercisable no later than 60 days after September 26, 2007. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13G filed with the SEC, the address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94104.

(5) As reported in a Schedule 13G filed with the SEC, the address of Dimensional Fund Advisors, Inc. is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(6) As reported in a Schedule 13G filed with the SEC, the address of Wellington Management Company, LLP is 75 State St., Boston, MA 02109.

(7) As reported in a Form 13-F filed with the SEC, the address of Turner Investment Partners, Inc. is 1205 Westlakes Drive, Suite 100, Berwyn, PA 19312.

Table of Contents

The following table sets forth the amount of shares of the Company beneficially owned as of September 26, 2007 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,367,940 | 7.8% |
| Ajay Mehra(4) | 204,214 | 1.2% |
| Alan Edrick(5) | 18,000 | 0.1% |
| Victor S. Sze(6) | 45,000 | 0.2% |
| Manoocher Mansouri(7) | 36,137 | 0.2% |
| Steven C. Good(8) | 57,500 | 0.3% |
| Meyer Luskin(9) | 64,700 | 0.3% |
| Chand R. Viswanathan(10) | 21,875 | 0.1% |
| Leslie E. Bider(11) | 3,625 | 0.0% |
| Anuj Wadhawan(12) | 65,554 | 0.4% |
| All directors and executive officers as a group (10 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11)(12) | 1,884,545 | 10.6% |

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 26, 2007, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 215,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 225,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 610,440 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 15,000 shares of restricted stock granted on September 17, 2007 are held individually by Mr. Chopra. Includes 25,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division.

(5) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007.

(7) Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division.

(8) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

(9) Includes 3,400 shares held by The Meyer and Doreen Luskin Family Trust. Includes 18,800 shares owned by Scope Industries. Mr. Luskin is the Chairman of the Board, President and Chief Executive Officers of Scope Industries. Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 233 Wilshire Boulevard, Suite 310, Santa Monica, CA 90401.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1735 of 2711

Table of Contents

(10) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Mr. Viswanathan is a Director of the Company.

(11) Includes 1,875 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Mr. Bider is a Director of the Company.

(12) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after September 26, 2007. Mr. Wadhawan is no longer a Named Executive Officer. In September 2006, Mr. Wadhawan resigned as the Company's Chief Financial Officer and Treasurer and was named Executive Vice President and Chief Financial Officer of the Company's Security division.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2007, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except for Mr. Good who neglected to timely file one Form 4 report during the year ended June 30, 2007, relating to the sale of 7,500 shares on March 22, 2007.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1736 of 2711
Table of Contents

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

On March 23, 2006, Deloitte & Touche LLP ("Deloitte & Touche") resigned as the Company's independent registered public accounting firm. The resignation was accepted by the Audit Committee of the Board of Directors. On April 20, 2006, the Audit Committee of the Board of Directors of the Company appointed Moss Adams LLP ("Moss Adams") as its independent registered public accounting firm. Moss Adams has served as the Company's independent registered public accounting firm since that time.

### Independent Registered Public Accounting Firm Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's financial statements for the year ended June 30, 2007 and fees billed by Moss Adams for other services during such year. The following table also represents fees charged for professional audit services rendered by Deloitte & Touche and Moss Adams for the audit of the Company's financial statements for the year ended June 30, 2006, and fees billed by Deloitte & Touche and Moss Adams for other services during such year.

| | 2007 | 2006 |
|---|---|---|
| Audit Fees | $ 2,585,000 | $ 3,668,000 |
| Audit-Related Fees | 116,000 | 62,000 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 2,701,000 | $ 3,730,000 |

Audit Fees consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams and Deloitte & Touche in connection with statutory and regulatory filings or engagements. For the fiscal year ended June 30, 2007, these fees included approximately $954,000 related to the audit of the Company's internal control over financial reporting.

Audit-Related Fees consist of fees billed for assurance and related services, primarily related to equity offerings, transfer pricing and pension plan related support and are not reported under "Audit Fees."

Tax Fees consist of fees billed for professional services rendered for tax advice, planning and compliance (domestic and international).

All Other Fees consist of fees for products and services other than for the services described above. In fiscal 2007 and 2006, there were no fees for services not included in the above categories.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Table of Contents

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2007, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and Leslie E. Bider, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. Mr. Bider was appointed to the Audit Committee on September 27, 2006. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met times during the fiscal year ended June 30, 2007.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61, as amended, AICPA, Professional Standards, Vol. 1, AU section 380, as adopted by the Public Company Accounting Oversight Board in Rule 3200T. The Audit Committee received and discussed with the independent

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1738 of 2711

Table of Contents

public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as adopted by the Public Company Accounting Oversight Board in Rule 3600T, and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2007 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Leslie E. Bider

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1739 of 2711
Table of Contents

**CODE OF ETHICS AND CONDUCT**

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, upon written request addressed to the following address, c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**ANNUAL MEETING ATTENDANCE**

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended last year's annual meeting of shareholders in person.

**SHAREHOLDER COMMUNICATIONS**

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

**AVAILABILITY OF ANNUAL REPORT ON FORM 10-K**

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases, only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

**SHAREHOLDER PROPOSALS**

In the event that a shareholder desires to have a proposal considered for presentation at the 2008 Annual Meeting of Shareholders, and inclusion in the proxy statement and form of proxy used in connection with such meeting, the proposal must be forwarded in writing to the Secretary of the Company so that it is received no later than June 28, 2008. Any such proposal must comply with the requirements of Rule 14a-8 promulgated under the Exchange Act.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1740 of 2711

The Company's Bylaws provide that if a shareholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the 2008 Annual Meeting of Shareholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the Company must receive notice of such proposal not less than 90 days prior to December 5, 2008. The notice must comply with the Company's Bylaws. Notices should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of the Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 29, 2007

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1741 of 2711

**APPENDIX A**
**Charter of the Nominating and Governance Committee**

**OSI SYSTEMS, INC.**
**NOMINATING AND GOVERANCE COMMITTEE CHARTER**

**I. Purpose**

The purposes of the Nominating and Governance Committee (the "Committee") are:

- To assist the Board of Directors (the "Board") in making the Board as effective as possible through recommendations and periodic evaluations. The Committee may develop and/or recommend to the Board a set of corporate governance principles applicable to OSI Systems, Inc. (the "Company").
- The review and evaluation of the Board of Directors' performance and each committee thereof.
- The identification of individuals qualified to become directors and nominate directors for election and candidates for all vacant directorships to be filled by the Board of Directors or by the shareholders.

**II. Membership**

The Committee shall be composed of at least three directors appointed by the Board. Each Committee member shall be "independent" under applicable rules and regulations of The Nasdaq Stock Market, Inc. ("Nasdaq") and the Securities and Exchange Commission ("SEC"). The members of the Committee, including the Chair, may be removed by the Board with or without cause. Any action duly taken by the Committee shall be valid and effective, whether or not the members of the Committee at the time of such action are later determined not to have satisfied the requirements for membership provided herein.

**III. Meetings and Procedures**

The Chair (or in his absence, a member designated by the Chair) shall preside at each meeting of the Committee and set the agendas for Committee meetings. The Committee shall have the authority to establish its own rules and procedures for notice and conduct of its meetings consistent with the Company's Bylaws. The Committee shall meet at least one time per year and more frequently as the Committee deems necessary or desirable. The Chair shall regularly report to the Board and as otherwise requested by the Board. All non-management directors who are not members of the Committee may attend and observe meetings of the Committee, but shall not participate in any discussion or deliberation unless invited to do so by the Committee, and in any event shall not be entitled to vote. The Committee may, at its discretion, include in its meetings members of the Company's management, representatives of the independent auditors, or any other financial personnel employed or retained by the Company or any other person whose presence the Committee believes to be necessary or appropriate.

The Committee shall have the sole authority, as it deems appropriate, to retain and/or replace, as needed, any independent counsel, governance consultants and other outside experts or advisors as the Committee believes to be necessary or appropriate and to utilize the services of the Company's regular legal counsel or other advisors to the Company. The Company shall provide for appropriate funding, as determined by the Committee in its sole discretion, for payment of compensation to any such persons retained by the Committee.

**IV. Duties and Responsibilities**

1. The Committee may develop and/or recommend to the Board a set of corporate governance principles and keep abreast of developments with regard to corporate governance to enable the Committee to make recommendations to the Board in light of such developments as may be appropriate.
2. The Committee shall, at least annually (i) review the governance philosophy of the Company to assure that they are appropriate for the Company and comply with the requirements of the SEC and Nasdaq

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1742 of 2711

regulations and policies; (ii) review and approve corporate governance goals and objectives; and (iii) review the effectiveness of the Board.

3. The Committee shall periodically review (i) the Certificate of Incorporation of the Company, (ii) the Bylaws of the Company and (ii) officer and director indemnification and insurance matters.

4. The Committee may consider, develop and/or recommend to the Board policies, procedures guidelines and studies with respect to independence of directors, director qualifications, and corporate governance principles.

5. The Committee shall monitor the orientation of new directors in order to promote an understanding of Board policies and the Company's business, and oversee continuing education programs for all directors.

6. The Committee shall identify individuals believed to be qualified as candidates to serve on the Board of Directors and recommend to the Board of Directors, the candidates for all directorships to be filled by the Board of Directors or by the shareholders at an annual or special meeting. In identifying candidates for membership on the Board of Directors, the Committee shall take into account all factors it considers appropriate, which may include strength of character, mature judgment, career specialization, relevant skills, diversity and the extent to which the candidate would fill a present need on the Board of Directors.

7. The Committee shall review and make recommendations to the full Board of Directors whether members of the Board of Directors should stand for re-election. Consider matters relating to the retirement of members of the Board of Directors, including term limits or retirement ages.

8. The Committee shall consider questions of independence and possible conflicts of interest of members of the Board of Directors and executive officers.

9. The Committee shall recommend members of the Board of Directors to serve on the committees of the Board, giving consideration to the criteria for service on each committee as set forth in the charter for such committee, the rules of the SEC and Nasdaq and any other factors the Committee deems relevant, and where appropriate, make recommendations to the Board of Directors regarding the removal of any member of any committee.

10. The Committee shall establish, monitor and recommend the purpose, structure and operations of the various committees of the Board of Directors, the qualifications and criteria for membership on each committee of the Board, the charter of each committee and, as circumstances dictate, make any recommendations regarding periodic rotation of directors among the committees and impose any term limitations of service on any Board committee.

11. The Committee shall perform other duties or responsibilities delegated by the Board from time to time, or as required by the rules, regulations or interpretations of the SEC or Nasdaq.

12. The Committee shall report regularly to the Board of Directors, including with respect to:

    i. such matters as the Committee deems to be relevant to the Committee's discharge of its responsibilities; and

    ii. such recommendations as the Committee may deem appropriate.

13. The Committee shall maintain minutes or other records of meetings and activities of the Committee.

The Committee shall be entitled to delegate any or all of its responsibilities to a subcommittee of the Committee comprised of members of the Committee or the Board or executive officers.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1743 of 2711

Table of Contents

**APPENDIX B**
**Amended and Restated 2006 Equity Participation Plan**

**AMENDED AND RESTATED**
**2006 EQUITY PARTICIPATION PLAN**
**OF**
**OSI SYSTEMS, INC.**

**1. PURPOSES OF THE PLAN**

The purposes of this Amended and Restated 1997 Stock Option Plan (the "Plan") of OSI Systems, Inc., a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or its Affiliates (as such term is defined in Section 2); and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the Company's common stock, no par value per share (the "Common Stock"), through (i) the grant of stock options under this Plan ("Options") and/or (ii) the issuance of shares of restricted Common Stock ("Restricted Stock") under this Plan.

Options granted under this Plan may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (the "Code"), or "nonqualified options" ("NQOs").

**2. ELIGIBLE PERSONS**

Every person who, at the date of grant of an Option and/or Restricted Stock, is an employee of the Company or of any Affiliate of the Company is eligible to receive NQOs, ISOs and/or Restricted Stock under this Plan. Every person who, at the date of grant, is a consultant to, or non-employee director of, the Company or any Affiliate of the Company is eligible to receive NQOs and/or Restricted Stock under this Plan. The term "Affiliate" as used in this Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 424(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

**3. STOCK SUBJECT TO THIS PLAN; MAXIMUM NUMBER OF GRANTS**

Subject to the provisions of Section 6.1.1 and Section 8(e)(i) of this Plan, the total number of shares of Common Stock which (a) may be granted as Restricted Stock and/or (b) issued upon the exercise of Options granted pursuant to this Plan, shall not exceed 5,500,000 shares of Common Stock in the aggregate. Subject to the forgoing limitation, in no event shall the total number of shares of Common Stock which may be granted as Restricted Stock pursuant to this Plan be permitted to exceed 1,000,000 shares of Common Stock in the aggregate. The shares of Common Stock covered by the portion of any Option grant under this Plan which expires or remains unexercised shall become available again for grant under this Plan. If any shares of Restricted Common Stock expire or are otherwise terminated, cancelled, surrendered or forfeited, then such shares of Common Stock shall also be available again for grant under this Plan. No eligible person shall be granted Options during any twelve-month period covering more than 425,000 shares.

**4. ADMINISTRATION**

(a) The Plan shall be administered by the Board of Directors of the Company (the "Board") or by a committee (the "Committee") to which administration of this Plan, or of part of this Plan, is delegated by the Board (in either case, the "Administrator"). The Board shall appoint and remove members of the Committee in

its discretion in accordance with applicable laws. If necessary in order to comply with Rule 16b-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Section 162(m) of the Code, the Committee shall, in the Board's discretion, be comprised solely of "non-employee directors" within the meaning of said Rule 16b-3 and "outside directors" within the meaning of Section 162(m) of the Code. The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under this Plan.

(b) Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options and/or Restricted Stock shall be granted, and the number of shares subject to each Option and/or the number of shares of Restricted Stock; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including but not limited to, the time or times at which Options shall be exercisable; (viii) to determine the form of a grant of Restricted Stock under this Plan (a "Restricted Stock Grant"); (ix) to determine the terms and provisions of each Restricted Stock Grant (which need not be identical); (x) with the consent of the optionee, to modify or amend any Option; (xi) with the consent of the participant, to modify or amend any Restricted Stock Grant; (xii) to defer (with the consent of the optionee) the exercise date of any Option; (xiii) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option and/or the grant of Restricted Stock; and (xiv) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(c) All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

**5. GRANTING OF OPTIONS; OPTION AGREEMENT**

(a) No Options shall be granted under this Plan after September 6, 2016.

(b) Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Administrator, executed by the Company and the person to whom such Option is granted.

(c) The stock option agreement shall specify whether each Option it evidences is an NQO or an ISO.

(d) Subject to Section 6.3.3 with respect to ISOs, the Administrator may approve the grant of Options under this Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultants at the date of approval, and the date of approval shall be deemed to be the date of grant unless otherwise specified by the Administrator.

**6. TERMS AND CONDITIONS OF OPTIONS**

Each Option granted under this Plan shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall be also subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 *Terms and Conditions to Which All Options Are Subject*. All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1 *Changes in Capital Structure*. Subject to Section 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or recapitalization, combination or

Table of Contents

reclassification, appropriate adjustments shall be made by the Board in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board in its sole discretion.

6.1.2 *Corporate Transactions*. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator, in the exercise of its sole discretion, may permit exercise of any Options prior to their termination, even if such Options were not otherwise exercisable. In the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Options prior to consummation of such event, even if such Options were not otherwise exercisable.

6.1.3 *Time of Option Exercise*. Subject to Section 5 and Section 6.3.4, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) in accordance with a schedule as may be set by the Administrator (in any case, the "Vesting Base Date") and specified in the written stock option agreement relating to such Option. In any case, no Option shall be exercisable until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee. Notwithstanding the foregoing, to the extent required by applicable laws, rules and regulations, the right to exercise Options granted pursuant to this Plan shall vest at the rate of at least 20% per year from the date of grant.

6.1.4 *Option Grant Date*. The date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

6.1.5 *Nontransferability of Option Rights*. Except with the express written approval of the Administrator which approval the Administrator is authorized to give only with respect to NQOs, no Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution. During the life of the optionee, an Option shall be exercisable only by the optionee.

6.1.6 *Payment*. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. The Administrator, in the exercise of its absolute discretion after considering any tax, accounting and financial consequences, may authorize any one or more of the following additional methods of payment:

(a) Acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company);

(b) Subject to the discretion of the Administrator and the terms of the stock option agreement granting the Option, delivery by the optionee of shares of Common Stock already owned by the optionee for all or part of the Option price, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock;

Table of Contents

(c) Subject to the discretion of the Administrator, through the surrender of shares of Common Stock then issuable upon exercise of the Option, provided the fair market value (determined as set forth in Section 6.1.10) of such shares of Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by surrender of such stock; and

(d) By means of so-called cashless exercises as permitted under applicable rules and regulations of the Securities and Exchange Commission and the Federal Reserve Board.

6.1.7 *Termination of Employment*. If for any reason other than death or permanent and total disability, an optionee ceases to be employed by the Company or any of its Affiliates (such event being called a "Termination"), Options held at the date of Termination (to the extent then exercisable) may be exercised in whole or in part at any time within three months of the date of such Termination, or such other period of not less than 30 days after the date of such Termination as is specified in the stock option agreement or by amendment thereof (but in no event after the Expiration Date, as such term is defined in Section 6.1.11); provided, however, that if such exercise of the Option would result in liability for the optionee under Section 16(b) of the Exchange Act, then such three-month period automatically shall be extended until the tenth day following the last date upon which optionee has any liability under Section 16(b) (but in no event after the Expiration Date). If an optionee dies or becomes permanently and totally disabled (within the meaning of Section 22(e)(3) of the Code) while employed by the Company or an Affiliate or within the period that the Option remains exercisable after Termination, Options then held (to the extent then exercisable) may be exercised, in whole or in part, by the optionee, by the optionee's personal representative or by the person to whom the Option is transferred by devise or the laws of descent and distribution, at any time within six months after the death or six months after the permanent and total disability of the optionee or any longer period specified in the stock option agreement or by amendment thereof (but in no event after the Expiration Date). For purposes of this Section 6.1.7, "employment" includes service as a director or as a consultant. For purposes of this Section 6.1.7, an optionee's employment shall not be deemed to terminate by reason of sick leave, military leave or other leave of absence approved by the Administrator, if the period of any such leave does not exceed 90 days or, if longer, if the optionee's right to reemployment by the Company or any Affiliate is guaranteed either contractually or by statute.

6.1.8 *Withholding and Employment Taxes*. At the time of exercise of an Option and as a condition thereto, or at such other time as the amount of such obligations becomes determinable (the "Tax Date"), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. Such obligation to remit may be satisfied, if authorized by the Administrator in its sole discretion, after considering any tax, accounting and financial consequences, by the optionee's (i) delivery of a promissory note in the required amount on such terms as the Administrator deems appropriate, (ii) tendering to the Company previously owned shares of Common Stock or other securities of the Company with a fair market value equal to the required amount, or (iii) agreeing to have shares of Common Stock (with a fair market value equal to the required amount) which are acquired upon exercise of the Option withheld by the Company.

6.1.9 *Other Provisions*. Each Option granted under this Plan may contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

6.1.10 *Determination of Value*. For purposes of this Plan, the fair market value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is regularly quoted by a recognized securities dealer, and selling prices are reported, its fair market value shall be the closing price of such stock on the date the value is to be determined, but if selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for such stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

Table of Contents

(b) In the absence of an established market for the stock, the fair market value thereof shall be determined in good faith by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry, the Company's management, and the values of stock of other corporations in the same or a similar line of business.

6.1.11 *Option Term*. Subject to Section 6.3.4, no Option shall be exercisable more than 10 years after the date of grant, or such lesser period of time as is set forth in the stock option agreement (the end of the maximum exercise period stated in the stock option agreement is referred to in this Plan as the "Expiration Date").

6.2 *Terms and Conditions to Which Only NQOs Are Subject*. Options granted under this Plan which are designated as NQOs shall be subject to the following terms and conditions:

6.2.1 *Exercise Price*.

(a) Except as set forth in Section 6.2.1(b), the exercise price of a NQO shall in no event be less than the fair market value (as determined in accordance with Section 6.1.10) of the stock subject to the Option on the date of grant.

(b) To the extent required by applicable laws, rules and regulations, the exercise price of a NQO granted to any person who owns, directly or by attribution under the Code (currently Section 424(d)), stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder") shall in no event be less than 110% of the fair market value (as determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3 *Terms and Conditions to Which Only ISOs Are Subject*. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 *Exercise Price*.

(a) Except as set forth in Section 6.3.1(b), the exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the fair market value (as determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

(b) The exercise price of an ISO granted to any Ten Percent Shareholder shall in no event be less than 110% of the fair market value (determined in accordance with Section 6.1.10) of the stock covered by the Option at the time the Option is granted.

6.3.2 *Disqualifying Dispositions*. If stock acquired by exercise of an ISO granted pursuant to this Plan is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code (a disposition within two years from the date of grant of the Option or within one year after the transfer such stock on exercise of the Option), the holder of the stock immediately before the disposition shall promptly notify the Company in writing of the date and terms of the disposition and shall provide such other information regarding the Option as the Company may reasonably require.

6.3.3 *Grant Date*. If an ISO is granted in anticipation of employment as provided in Section 5(d), the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

6.3.4 *Term*. Notwithstanding Section 6.1.11, no ISO granted to any Ten Percent Shareholder shall be exercisable more than five years after the date of grant.

Table of Contents

**7. MANNER OF EXERCISE**

(a) An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price and withholding taxes as provided in Sections 6.1.6 and 6.1.8. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price will be considered as the date such Option was exercised.

(b) Promptly after receipt of written notice of exercise of an Option and the payments called for by Section 7(a), the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of stock. An optionee or permitted transferee of the Option shall not have any privileges as a shareholder with respect to any shares of stock covered by the Option until the date of issuance (as evidenced by the appropriate entry on the books of the Company or a duly authorized transfer agent) of such shares.

**8. RESTRICTED STOCK**

(a) *Terms of Grant*. The Administrator may grant Restricted Stock Grants to such employees, consultants and non-employee directors, in such amounts, and subject to such terms and conditions as the Administrator may determine in its sole discretion, including such restrictions on transferability and other restrictions as the Administrator may impose, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Administrator shall determine. No Restricted Stock Grants shall be granted under this Plan after September 6, 2016.

(b) *Purchase Price*. The Administrator shall, in its sole discretion, determine the purchase price, if any, and form of payment for Restricted Stock.

(c) *Restricted Stock Grant Agreement*. Restricted Stock shall be granted pursuant to a written agreement, in form satisfactory to the Administrator, which shall set forth the terms of the Restricted Stock Grant. Restricted Stock granted under a restricted stock grant Agreement shall be evidenced by certificates registered in the name of the participant, which certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock. The Company may retain physical possession of any such certificates, and the Company may require a participant awarded Restricted Stock to deliver a stock power to the Company, endorsed in blank, relating to the Restricted Stock for so long as the Restricted Stock is subject to a risk of forfeiture.

(d) *Rights as Shareholder*. Unless otherwise determined by the Administrator at the time of a grant, the holder of Restricted Stock shall have the right to vote the Restricted Stock and to receive dividends thereon, unless and until such shares are forfeited.

(e) *Adjustments*.

(i) *Changes in Capital Structure*. If the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification, appropriate adjustments shall be made by the Board in the number and class of shares of stock subject to this Plan and each Restricted Stock Grant outstanding under this Plan; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustment. Each such adjustment shall be subject to approval by the Board in its sole discretion.

(ii) *Corporate Transactions*. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each participant at least 30 days prior to such proposed action. The Restricted Stock Grants will terminate immediately prior to the consummation of such proposed action; provided, however, that the Administrator, in the exercise of its sole discretion, may permit exercise of any Restricted Stock Grant prior to its termination, even if such Restricted Stock Grant were not otherwise exercisable. In

the event of a merger or consolidation of the Company with or into another corporation or entity in which the Company does not survive, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Restricted Stock Grants shall be assumed or equivalent awards shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Restricted Stock Grants or to substitute equivalent awards therefor, the Administrator, in the exercise of its sole discretion, may permit the exercise of any of the Restricted Stock Grants prior to consummation of such event, even if such Restricted Stock Grants were not otherwise exercisable.

**9. EMPLOYMENT OR CONSULTING RELATIONSHIP**

Nothing in this Plan, nor any Restricted Stock Grant, nor or any Option grant, shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any participant's or optionee's employment or consulting at any time, nor confer upon any participant or optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

**10. CONDITIONS UPON ISSUANCE OF SHARES**

Neither shares of Restricted Stock nor shares of Common Stock underlying Options shall be issued to the participant or the optionee unless the issuance and delivery of such shares of Restricted Stock, the exercise of such Option and the issuance and delivery of such shares of Common Stock underlying such Option shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act").

**11. NONEXCLUSIVITY OF THE PLAN**

The adoption of this Plan shall not be construed as creating any limitations on the power of the Company to adopt such other incentive or equity participation arrangements as it may deem desirable, including, without limitation, the granting of stock options or the issuance of shares of Common Stock other than under this Plan.

**12. MARKET STANDOFF**

Each participant and optionee, if so requested by the Company or any representative of the underwriters in connection with any registration of the offering of any securities of the Company under the Securities Act, shall not sell or otherwise transfer any shares of Common Stock acquired upon exercise of Options and/or any shares of Restricted Stock during the 180-day period following the effective date of a registration statement of the Company filed under the Securities Act; provided, however, that such restriction shall apply only to the first registration statement of the Company to become effective under the Securities Act after the date of adoption of this Plan which includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restriction until the end of such 180-day period.

**13. AMENDMENTS TO PLAN**

The Board may at any time amend, alter, suspend or discontinue this Plan. Without the consent of an optionee and/or a participant, no amendment, alteration, suspension or discontinuance may adversely affect (a) outstanding Options except to conform this Plan and ISOs granted under this Plan to the requirements of federal or other tax laws relating to incentive stock options and/or (b) Restricted Stock Grants. No amendment, alteration, suspension or discontinuance shall require shareholder approval unless (a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes or (b) the Board otherwise concludes that shareholder approval is advisable.

Table of Contents

**14. EFFECTIVE DATE OF PLAN; TERMINATION**

This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within twelve months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect, and any Restricted Stock Grants or exercises that have already occurred shall be rescinded, from and after expiration of such twelve-month period. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws. This Plan (but not the Options and/or the Restricted Stock Grants previously granted under this Plan) shall terminate on September 6, 2016.

**15. DELIVERY OF FINANCIAL STATEMENTS**

To the extent required by applicable laws, rules and regulations, the Company shall deliver to each optionee financial statements of the Company at least annually while such optionee holds an outstanding Option.

Table of Contents

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on October 15, 2007, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on December 5, 2007, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2008 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

**FOR ALL ______ WITHHOLD AUTHORITY FOR ALL ______**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider

To withhold authority to vote for any individual nominee, check the box marked "For All" above and write the nominee's name in the space provided here:

2. To ratify the appointment of Moss Adams LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2008.

**FOR ______ AGAINST ______ ABSTAIN ______**

3. To amend the Company's 2006 Equity Participation Plan to: (i) increase the number of shares of Common Stock authorized for issuance under the plan by 2,000,000 shares; (ii) limit the number of shares of restricted stock available for issuance under the plan to 1,000,000; and (iii) raise from 85% of market value to 100% of market value, the lowest exercise price at which stock options may be granted under the plan.

**FOR ______ AGAINST ______ ABSTAIN ______**

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1752 of 2711

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2007 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 20

10-Q 1 a37492e10vq.htm FORM 10-Q

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-Q

**(Mark one)**

þ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended December 31, 2007**

**OR**

o **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _________to _________**

**Commission File Number 0-23125**

# OSI SYSTEMS, INC.

**(Exact name of registrant as specified in its charter)**

| **California**<br>**(State or other jurisdiction of incorporation or organization)** | **33-0238801**<br>**(I.R.S. Employer Identification Number)** |
|---|---|

**12525 Chadron Avenue**
**Hawthorne, California 90250**
**(Address of principal executive offices)**

**(310) 978-0516**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes þ No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer o | Accelerated filer þ | Non-accelerated filer o<br>(Do not check if a smaller reporting company) | Smaller reporting company o |
|---|---|---|---|

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1756 of 2711

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes o No þ

As of February 1, 2008, there were 17,663,781 shares of the registrant's common stock outstanding.

**OSI SYSTEMS, INC.**

**INDEX**

| | | PAGE |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | 3 |
| Item 1 — | Condensed Consolidated Financial Statements | 3 |
| | Condensed Consolidated Balance Sheets at June 30, 2007 and December 31, 2007 | 3 |
| | Condensed Consolidated Statements of Operations for the three and six months ended December 31, 2006 and 2007 | 4 |
| | Condensed Consolidated Statements of Cash Flows for the six months ended December 31, 2006 and 2007 | 5 |
| | Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2 — | Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Item 3 — | Quantitative and Qualitative Disclosures about Market Risk | 24 |
| Item 4 — | Controls and Procedures | 25 |
| **PART II — OTHER INFORMATION** | | 26 |
| Item 1 — | Legal Proceedings | 26 |
| Item 1A — | Risk Factors | 26 |
| Item 4 — | Submission of Matter to a Vote of Security Shareholders | 26 |
| Item 6 — | Exhibits | 27 |
| Signatures | | 28 |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |

Table of Contents

## PART I. FINANCIAL INFORMATION

### Item 1. Condensed Consolidated Financial Statements

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share amounts)**

| | June 30, 2007 | December 31, 2007 (Unaudited) |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 15,980 | $ 14,128 |
| Accounts receivable | 140,483 | 150,754 |
| Other receivables | 5,770 | 4,670 |
| Inventories | 120,174 | 148,608 |
| Deferred income taxes | 20,265 | 18,365 |
| Prepaid expenses and other current assets | 11,967 | 16,307 |
| Total current assets | 314,639 | 352,832 |
| Property and equipment, net | 48,051 | 47,014 |
| Goodwill | 50,286 | 64,730 |
| Intangible assets, net | 28,476 | 27,606 |
| Other assets | 10,031 | 9,653 |
| Total assets | $451,483 | $ 501,835 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Bank lines of credit | $ 16,775 | $ 13,509 |
| Current portion of long-term debt | 5,744 | 5,042 |
| Accounts payable | 60,524 | 100,449 |
| Accrued payroll and employee benefits | 17,905 | 19,975 |
| Advances from customers | 16,734 | 6,501 |
| Accrued warranties | 7,443 | 9,158 |
| Deferred revenue | 7,548 | 7,734 |
| Other accrued expenses and current liabilities | 23,225 | 16,432 |
| Total current liabilities | 155,898 | 178,800 |
| Long-term debt | 25,709 | 47,902 |
| Deferred rent | 5,174 | 5,243 |
| Other long-term liabilities | 8,675 | 11,534 |
| Total liabilities | 195,456 | 243,479 |
| Minority interest | 8,815 | 1,049 |
| Commitment and contingencies (Note 8) | | |
| Shareholders' Equity: | | |
| Preferred stock, no par value—authorized, 10,000,000 shares; no shares issued or outstanding | — | — |
| Common stock, no par value—authorized, 100,000,000 shares; issued and outstanding, 17,086,989 and 17,488,924 shares at June 30,2007 and December 31, 2007, respectively | 207,260 | 217,278 |
| Retained earnings | 31,450 | 29,525 |
| Accumulated other comprehensive income | 8,502 | 10,504 |
| Total shareholders' equity | 247,212 | 257,307 |
| Total liabilities and shareholders' equity | $451,483 | $ 501,835 |

See accompanying notes to condensed consolidated financial statements.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1759 of 2711

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share amount data)**
**(Unaudited)**

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Revenues | $ 137,458 | $ 164,194 | $ 252,987 | $ 295,207 |
| Cost of goods sold | 98,177 | 105,193 | 175,209 | 192,096 |
| Gross profit | 39,281 | 59,001 | 77,778 | 103,111 |
| Operating expenses: | | | | |
| Selling, general and administrative expenses | 38,290 | 39,105 | 74,879 | 75,316 |
| Research and development | 11,215 | 11,725 | 22,034 | 21,454 |
| Impairment, restructuring, and other charges | 21,543 | 2,114 | 21,543 | 2,199 |
| Total operating expenses | 71,048 | 52,944 | 118,456 | 98,969 |
| Income (loss) from operations | (31,767) | 6,057 | (40,678) | 4,142 |
| Other income (expense): | | | | |
| Other income | 74 | — | — | — |
| Interest income | 95 | 113 | 236 | 232 |
| Interest expense | (1,267) | (1,281) | (2,281) | (2,489) |
| Income (loss) before provision for income taxes and minority interest | (32,865) | 4,889 | (42,723) | 1,885 |
| Provision (benefit) for income taxes | (12,106) | 1,721 | (15,285) | 666 |
| Minority interest benefit | 146 | 312 | 784 | 194 |
| Net income (loss) | $ (20,613) | $ 3,480 | $ (26,654) | $ 1,413 |
| Earnings (loss) per share: | | | | |
| Basic | $ (1.23) | $ 0.20 | $ (1.60) | $ 0.08 |
| Diluted | $ (1.23) | $ 0.20 | $ (1.60) | $ 0.08 |
| Shares used in per share calculation: | | | | |
| Basic | 16,747 | 17,302 | 16,708 | 17,237 |
| Diluted | 16,747 | 17,675 | 16,708 | 17,597 |

See accompanying notes to condensed consolidated financial statements.

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**
**(Unaudited)**

| | Six Months Ended December 31, | |
|---|---|---|
| | 2006 | 2007 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ (26,654) | $ 1,413 |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 9,907 | 9,506 |
| Stock based compensation expense | 2,825 | 2,301 |
| Provision for losses on accounts receivable | 265 | 285 |
| Minority interest in net loss of subsidiary | (992) | (194) |
| Equity in earnings of unconsolidated affiliates | (70) | (236) |
| Deferred income taxes | (15,128) | (2,450) |
| Non-cash impairment charges | 21,543 | — |
| In-process research and development | 561 | — |
| Other | 66 | (11) |
| Changes in operating assets and liabilities—net of business acquisitions: | | |
| Accounts receivable | (6,584) | (9,763) |
| Other receivables | 1,588 | 1,249 |
| Inventories | 3,484 | (28,384) |
| Prepaid expenses and other current assets | (1,937) | (5,286) |
| Accounts payable | 3,783 | 24,017 |
| Accrued payroll and related expenses | 541 | 2,640 |
| Advances from customers | 946 | (10,378) |
| Accrued warranties | (869) | 1,691 |
| Deferred revenue | (3,299) | (8) |
| Other accrued expenses and current liabilities | (2,607) | (966) |
| Net cash used in operating activities | (12,631) | (14,574) |
| Cash flows from investing activities: | | |
| Proceeds from the sale of marketable securities | 68 | — |
| Purchases of marketable securities | (7,746) | — |
| Proceeds from the sale of property and equipment | 147 | 95 |
| Acquisition of property and equipment | — | (4,995) |
| Acquisition of businesses—net of cash acquired | (23,950) | — |
| Buyback of subsidiary stock | — | (659) |
| Acquisition of intangible and other assets | (1,273) | (812) |
| Net cash used in investing activities | (32,754) | (6,371) |
| Cash flows from financing activities: | | |
| Net proceeds from (payments on) bank lines of credit | 16,320 | (3,306) |
| Proceeds from long-term debt | 26,019 | 44,891 |
| Payments on long-term debt | (317) | (23,197) |
| Payments on capital lease obligations | (342) | (578) |
| Proceeds from exercise of stock options, warrants and employee stock purchase plan | 2,211 | 1,862 |
| Net cash provided by financing activities | 43,891 | 19,672 |
| Effect of exchange rate changes on cash | (152) | (579) |
| Net decrease in cash and cash equivalents | (1,649) | (1,852) |
| Cash and cash equivalents-beginning of period | 13,799 | 15,980 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1762 of 2711

| | | |
|---|---|---|
| Cash and cash equivalents-end of period | $ 12,150 | $ 14,128 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ 2,342 | $ 2,342 |
| Cash paid for income taxes | $ 2,352 | $ 1,751 |
| Supplemental disclosure of non-cash investing activities: | | |
| Equipment purchased under capital lease obligations | $ 2,493 | — |
| Buyback of subsidiary stock with common stock | — | $ 5,898 |
| Buyback of subsidiary stock in accounts payable | — | $ 15,146 |

See accompanying notes to condensed consolidated financial statements.

Table of Contents

**OSI SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**1. Basis of Presentation**

*Description of Business*

OSI Systems, Inc. (the Company) is a vertically integrated designer and manufacturer of specialized electronic systems and components for critical applications. The Company sells its products in diversified markets, including homeland security, healthcare, defense and aerospace.

The Company has three operating divisions: (a) Security, providing security inspection systems; (b) Healthcare, providing medical monitoring and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for external clients in the defense and aerospace markets, among others.

The Company's Security division designs, manufactures and markets security and inspection systems worldwide to end users primarily under the "Rapiscan Systems" trade name. Rapiscan Systems products are used for the non-intrusive inspection of baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband and to screen people. These systems are also used for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials. Rapiscan Systems products fall into four categories: baggage and parcel inspection, cargo and vehicle inspection, hold (checked) baggage screening and people screening.

The Company's Healthcare division designs, manufactures and markets patient monitoring, diagnostic cardiology and anesthesia systems worldwide to end users, primarily under the "Spacelabs" trade name. These products are used by care providers in critical care, emergency and perioperative areas within hospitals as well as physicians offices, medical clinics and ambulatory surgery centers. The Company's Healthcare division also offers centralized cardiac safety core laboratory services in connection with clinical trials by or on behalf of pharmaceutical companies and clinical research organizations.

The Company's Optoelectronics and Manufacturing division designs, manufactures and markets optoelectronic devices and value-added manufacturing services worldwide for use in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical imaging and diagnostics, computed tomography, toll and traffic management systems, fiber optics, telecommunications, weapons simulation systems, gaming, office automation, computer peripherals and industrial automation. The Company sells optoelectronic devices primarily under the "OSI Optoelectronics" trade name and performs value-added manufacturing services primarily under the "OSI Electronics" trade name. This division provides products and services to original equipment manufacturers, as well as to the Company's own Security and Healthcare divisions.

*Basis of Presentation*

The condensed consolidated financial statements include the accounts of OSI Systems, Inc. and its subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The condensed consolidated financial statements have been prepared by the Company, without audit, pursuant to Accounting Principles Board Opinion No. 28, "Interim Financial Reporting" and the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. In the opinion of the Company's management, all adjustments, consisting of only normal and recurring adjustments, necessary for a fair presentation of the financial position and the results of operations for the periods presented have been included. These condensed consolidated financial statements and the accompanying notes should be read in conjunction with the audited condensed consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007, filed with the Securities and Exchange Commission on September 13, 2007. The results of operations for the three and six months ended December 31, 2007 are not necessarily indicative of the operating results to be expected for the full fiscal year or any future periods.

*Spacelabs Healthcare Public Offering and Repurchase*

In October 2005, Spacelabs Healthcare, Inc., a subsidiary comprising the business operations of the Company's Healthcare division, completed an initial public offering of approximately 20% of its total issued and outstanding common stock. The Spacelabs Healthcare shares traded under the ticker symbol "SLAB" on the AIM (formerly known as the Alternative Investment Market), a stock market administered by the London Stock Exchange. In the second quarter of fiscal 2007, the Company began repurchasing publicly-traded shares of Spacelabs Healthcare, increasing the Company's ownership to 84% as of June 30, 2007. By December 31, 2007, the Company increased its ownership in Spacelabs Healthcare to 100% repurchasing all remaining shares of Spacelabs Healthcare. During the six months ended December 31, 2007, the Company spent approximately $15.8 million in cash and issued 240,000 shares of the Company's common stock in exchange for the remaining outstanding Spacelabs Healthcare shares. At the time of issuance, the 240,000 shares of the Company's common stock had a fair value of $5.9 million. As of December 31, 2007, $15.1 million of the cash portion of the repurchase remained outstanding and is included in accounts payable in the condensed consolidated financial statements. Effective January 24, 2008, Spacelabs Healthcare shares no longer trade on the AIM.

*Impairment of Long-Lived Assets*

The Company tests goodwill for impairment in accordance with Statement of Financial Accounting Standards (SFAS) 142, "Goodwill and Other Intangible Assets" (SFAS 142). SFAS 142 requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events. For purposes of SFAS 142, the Company has determined that it has five reporting units, consisting of the Security division, Optoelectronics and Manufacturing division and two reporting units within the Healthcare division. The Company tests goodwill for impairment annually in its second fiscal quarter using a two-step process. First, the Company determines if the carrying amount of any of the reporting units within each of its divisions exceeds its fair value. It uses a discounted cash flows method to make this determination for its Security and Optoelectronics and Manufacturing divisions and it uses a market value method for the reporting units within its Healthcare division (based on the market price of Spacelabs Healthcare common stock on the AIM). If these methods indicate a potential impairment of goodwill associated with any reporting unit, the Company then compares the implied fair value of the goodwill associated with the respective reporting unit to its carrying amount to determine if there is an impairment loss.

In accordance with SFAS No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets," the Company evaluates long-lived assets, including intangible assets other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. An impairment is considered to exist if the total estimated future cash flows on an undiscounted basis are less than the carrying amount of the assets. If an impairment does exist, the Company measures the impairment loss and records it based on the discounted estimate of future cash flows. In estimating future cash flows, the Company groups assets at the lowest level for which there are identifiable cash flows that are largely independent of cash flows from other asset groups. The Company's estimate of future cash flows is based upon, among other things, certain assumptions about expected future operating performance, growth rates and other factors.

*Per Share Computations*

The Company computes basic earnings per share by dividing net income available to common shareholders by the weighted average number of common shares outstanding during the period. The Company computes diluted earnings per share by dividing net income available to common shareholders by the sum of the weighted average number of common and dilutive potential common shares outstanding. Potential common shares consist of the shares issuable upon the exercise of stock options or warrants under the treasury stock method. Stock options and warrants to purchase a total of 0.3 million shares of common stock for the three months and six months ended December 31, 2007, were not included in diluted earnings per share calculations because to do so would have been antidilutive. Stock options and warrants to purchase a total of 1.7 million and 2.0 million shares of common stock for the three months and six months ended December 31, 2006, respectively, were not included in diluted earnings per share calculations because to do so would have been antidilutive. The following table sets forth the computation of basic and diluted earnings per share (in thousands, except per share amounts):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Net income (loss) available to common shareholders | $(20,613) | $ 3,480 | $(26,654) | $ 1,413 |
| Weighted average shares outstanding — basic | 16,747 | 17,302 | 16,708 | 17,237 |
| Dilutive effect of stock options and warrants | — | 373 | — | 360 |
| Weighted average of shares outstanding — diluted | 16,747 | 17,675 | 16,708 | 17,597 |
| Basic earnings (loss) per share | $ (1.23) | $ 0.20 | $ (1.60) | $ 0.08 |
| Diluted earnings (loss) per share | $ (1.23) | $ 0.20 | $ (1.60) | $ 0.08 |

*Comprehensive Income*

Comprehensive income/ (loss) is computed as follows (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Net income / (loss) | $(20,613) | $ 3,480 | $(26,654) | $ 1,413 |
| Foreign currency translation adjustments | 2,251 | 530 | 2,131 | 2,030 |
| Minimum pension liability adjustment | (44) | 1 | (55) | (85) |
| Other | (39) | — | (26) | 57 |
| Comprehensive income / (loss) | $(18,445) | $ 4,011 | $(24,604) | $ 3,415 |

*Recent Accounting Pronouncements*

In September 2006, the Financial Accounting Standards Board (FASB) issued SFAS No. 157, "Fair Value Measurements." This statement defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. It is effective for fiscal years beginning after November 15, 2007. The Company has not yet determined the impact that this statement will have on its condensed consolidated financial statements.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities- including an amendment of SFAS No. 115," (SFAS 159). SFAS 159 allows companies to elect to measure many financial assets and financial liabilities at fair value. Unrealized gains and losses on items for which the fair value option has been chosen are reported in earnings. SFAS 159 is effective for fiscal years beginning after November 15, 2007. The Company has not yet determined the impact that this statement will have on its condensed consolidated financial statements.

In December 2007, the FASB issued SFAS No. 141 (revised 2007), "Business Combinations," (SFAS 141(R)). SFAS 141(R) retains the fundamental requirements of the original pronouncement requiring that the purchase method be used for all business combinations. SFAS 141(R) defines the acquirer as the entity that obtains control of one or more businesses in the business combination, establishes the acquisition date as the date that the acquirer achieves control and requires the acquirer to recognize the assets acquired, liabilities assumed and any noncontrolling interest at their fair values as of the acquisition date. In addition, SFAS 141(R) requires expensing of acquisition-related and restructure-related costs, remeasurement of earn out provisions at fair value, measurement of equity securities issued for purchase at the date of close of the transaction and non-expensing of in-process research and development related intangibles. SFAS 141(R) is effective for the Company's business combinations for which the acquisition date is on or after July 1, 2009. The Company has not yet determined the impact that this statement will have on its condensed consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160, “Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51,” (SFAS 160). SFAS 160 amends ARB 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. It requires consolidated net income to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest. This Statement establishes a single method of accounting for changes in a parent’s ownership interest in a subsidiary that do not result in deconsolidation. SFAS No. 160 is effective for the Company’s fiscal year beginning July 1, 2009. The Company has not yet determined the impact that this statement will have on its condensed consolidated financial statements.

**2. Balance Sheet Details**

The following tables provide details of selected balance sheet accounts (in thousands):

| | June 30, 2007 | December 31, 2007 |
|---|---|---|
| **Accounts receivable** | | |
| Trade receivables | $138,960 | $ 150,867 |
| Receivables related to long term contracts — unbilled costs and accrued profit on progress completed | 3,525 | 2,558 |
| **Total** | 142,485 | 153,425 |
| Less: allowance for doubtful accounts | (2,002) | (2,671) |
| **Accounts receivable, net** | $140,483 | $ 150,754 |
| **Inventories, net** | | |
| Raw materials | $ 64,652 | $ 71,119 |
| Work-in-process | 25,304 | 39,011 |
| Finished goods | 30,218 | 38,478 |
| **Total** | $120,174 | $ 148,608 |
| **Property and equipment** | | |
| Land | $ 6,277 | $ 6,244 |
| Buildings and leasehold improvements | 16,596 | 17,570 |
| Equipment and tooling | 44,224 | 48,683 |
| Furniture and fixtures | 5,202 | 5,348 |
| Computer equipment | 17,240 | 15,522 |
| Software | 8,754 | 10,385 |
| **Total** | 98,293 | $ 103,752 |
| Less: accumulated depreciation and amortization | (50,242) | (56,738) |
| **Property and equipment, net** | $ 48,051 | $ 47,014 |

**3. Goodwill and Intangible Assets**

The changes in the carrying value of goodwill for the six month period ended December 31, 2007, are as follows (in thousands):

| | Security | Healthcare | Optoelectronics and Manufacturing | Consolidated |
|---|---|---|---|---|
| Balance as of June 30, 2007 | $16,985 | $ 26,443 | $ 6,858 | $ 50,286 |
| Goodwill acquired during the period | — | 14,130 | — | 14,130 |
| Foreign currency translation adjustment | 352 | (31) | (7) | 314 |
| Balance as of December 31, 2007 | $17,337 | $ 40,542 | $ 6,851 | $ 64,730 |

Goodwill acquired during the six months ended December 31, 2007, resulted from the repurchase of all outstanding shares of Spacelabs Healthcare stock previously owned by minority shareholders, whereby the entire purchase price in excess of the book value of the minority interest was recorded as goodwill. This is a preliminary purchase price allocation and may be subject to change when final valuations are completed.

Intangible assets consisted of the following (in thousands):

| | | June 30, 2007 | | | December 31, 2007 | | |
|---|---|---|---|---|---|---|---|
| | Weighted Average Lives | Gross Carrying Value | Accumulated Amortization | Intangibles Net | Gross Carrying Value | Accumulated Amortization | Intangibles Net |
| Amortizable assets: | | | | | | | |
| Software development costs | 3 years | $ 4,177 | $ 2,115 | $ 2,062 | $ 5,070 | $ 2,401 | $ 2,669 |
| Patents | 10 years | 423 | 259 | 164 | 451 | 280 | 171 |
| Core technology | 10 years | 2,701 | 648 | 2,053 | 2,683 | 778 | 1,905 |
| Developed technology | 14 years | 15,068 | 3,809 | 11,259 | 15,061 | 4,543 | 10,518 |
| Customer relationships/ backlog | 8 years | 8,146 | 2,429 | 5,717 | 8,140 | 3,010 | 5,130 |
| Total amortizable assets | | 30,515 | 9,260 | 21,255 | 31,405 | 11,012 | 20,393 |
| Non-amortizable assets: | | | | | | | |
| Trademarks | | 7,221 | — | 7,221 | 7,213 | — | 7,213 |
| Total intangible assets | | $37,736 | $ 9,260 | $ 28,476 | $38,618 | $ 11,012 | $ 27,606 |

Amortization expense related to intangibles assets was $2.4 million and $1.8 million for the six months ended December 31, 2006 and 2007, respectively. At December 31, 2007, the estimated future amortization expense was as follows (in thousands):

| | |
|---|---|
| 2008 (remaining 6 months) | $ 2,034 |
| 2009 | 3,288 |
| 2010 | 3,076 |
| 2011 | 2,940 |
| 2012 | 2,593 |
| 2013 | 2,011 |
| 2014 and thereafter | 4,451 |
| Total | $20,393 |

**4. Impairment, Restructuring and Other Charges**

During the quarter ended December 31, 2006, as part of a global review of its operations, the Company assessed the value of certain technologies and product lines. As a result of this assessment, the Company recorded total charges of $31.8 million. These charges consisted of $21.5 million of asset impairment of certain identifiable intangible and fixed assets, and $10.3 of inventory charges, primarily related to finished goods inventory. Of the $21.5 million of impairment charges, $21.3 million was recorded within the Company's Security division and $0.2 million was recorded within the Optoelectronics and Manufacturing division. Of the $10.3 million of inventory charges, $9.9 million was recorded within the Company's Security division and $0.4 million was recorded within the Optoelectronics and Manufacturing division. Such inventory charges are reflected in cost of goods sold in the condensed consolidated financial statements. Asset impairments were calculated in accordance with SFAS No. 144 as discussed in Note 1.

During the first half of fiscal 2008, the Company incurred various restructuring and other charges related to consolidating manufacturing processes and facilities of certain businesses, headcount reductions, as well other non-recurring charges. These charges included $1.9 million in the Security division, $0.2 million in the Healthcare division and $0.1 million in the Optoelectronics and manufacturing division. As of December 31, 2007, $1.5 million of restructuring and other charges remained unpaid and is included in accrued expenses and other current liabilities in the condensed consolidated financial statements.

The following table summarizes the aforementioned impairment, restructuring and other charges (in thousands):

| | Three months Ended December 31, 2006 | Three months Ended December 31, 2007 | Six months Ended December 31, 2006 | Six months Ended December 31, 2007 |
|---|---|---|---|---|
| Impairment of intangible assets: | | | | |
| Software development costs | $ 169 | $ — | $ 169 | $ — |
| Core technology | 5,874 | — | 5,874 | — |
| Developed technology | 14,463 | — | 14,463 | — |
| Customer relationships/backlog | 280 | — | 280 | — |
| Impairment of fixed assets | 757 | — | 757 | — |
| Restructuring and other charges | — | 2,114 | — | 2,199 |
| Total impairment, restructuring and other charges | 21,543 | 2,114 | 21,543 | 2,199 |
| Inventory charges | 10,301 | — | 10,301 | — |
| Total charges | $31,844 | $ 2,114 | $31,844 | $ 2,199 |

**5. Borrowings**

On July 27, 2007, the Company entered into a credit agreement with Wachovia Bank allowing for borrowings of up to $89.5 million. The new credit agreement replaced pre-existing agreements with Bank of the West, which were repaid and terminated simultaneously with the close of the agreement with Wachovia Bank. The credit agreement with Wachovia Bank consists of a $44.75 million five-year revolving credit facility, including a $35 million sub-limit for letters-of-credit, and a $44.75 million five-year term loan. Borrowings under this facility bear interest at either (a) the London Interbank Offered Rate plus between 2.00% and 2.50% or (b) the bank's prime rate plus between 1.00% and 1.50%. The rates are determined based on the Company's consolidated leverage ratio. As of December 31, 2007, the effective weighted average interest rate under the credit agreement was 7.8%. The Company's borrowings under the credit agreement are guaranteed by substantially all of the Company's direct and indirect wholly-owned subsidiaries and are secured by substantially all of the Company's assets and by the assets of such subsidiaries. The agreement contains various representations, warranties, affirmative, negative and financial covenants, and conditions of default customary for financing agreements of this type. As of December 31, 2007, $43.6 million was outstanding under the term loan, $12.0 million was outstanding under the Company's revolving credit facility, and $5.5 million was outstanding under the letter-of-credit facility.

Several of the Company's foreign subsidiaries maintain bank lines-of-credit, denominated in local currencies, to meet short-term working capital requirements and for the issuance of letters-of-credit. As of December 31, 2007, the total amount available under these various credit facilities was $34.4 million with a total cash borrowing sub-limit of $8.6 million, of which $1.5 million was outstanding at December 31, 2007. The weighted average interest rate of these facilities was 6.8% at December 31, 2007.

In December 2004, the Company entered into a bank loan of $5.3 million to fund the acquisition of land and buildings in England. The loan is payable over a 20-year period, with quarterly installments of £34,500 (approximately $69,000 as of December 31, 2007). The loan bears interest at LIBOR plus 1.2%, payable on a quarterly basis. As of December 31, 2007, $4.7 million remained outstanding under this loan.

Long-term debt consisted of the following (in thousands):

| | June 30, 2007 | December 31, 2007 |
|---|---|---|
| Five-year term loan due in fiscal 2012 | $21,782 | $ — |
| Five-year term loan due in fiscal 2013 | — | 43,631 |
| Twenty-year term loan due in fiscal 2025 | 4,846 | 4,675 |
| Capital leases | 3,334 | 2,754 |
| Other | 1,491 | 1,884 |
| | 31,453 | 52,944 |
| Less current portion of long-term debt | 5,744 | 5,042 |
| Long-term portion of debt | $25,709 | $ 47,902 |

### 6. Stock-based Compensation

As of December 31, 2007, the Company maintained two significant stock equity participation plans: (a) the 2006 Equity Participation Plan of OSI Systems (OSI Plan), and (b) the 2006 Equity Participation Plan of Rapiscan Systems Holdings. In addition, the Company maintains and administers an employee stock purchase plan.

The Company recorded stock-based-compensation expense in accordance with SFAS No. 123(R) "Share-Based Payment" in the condensed consolidated statement of operations as follows (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Cost of goods sold | $ 89 | $ 42 | $ 182 | $ 83 |
| Selling, general and administrative | 1,271 | 1,115 | 2,466 | 2,114 |
| Research and development | 90 | 49 | 177 | 104 |
| | $ 1,450 | $ 1,206 | $ 2,825 | $ 2,301 |

As of December 31, 2007, total unrecognized compensation cost related to non-vested share-based compensation arrangements granted was approximately $5.4 million. The Company expects to recognize these costs over a weighted-average period of 2.0 years.

### 7. Retirement Benefit Plans

The Company sponsors a number of qualified and nonqualified defined benefit pension plans for its employees. The benefits under these plans are based on years of service and an employee's highest twelve months' compensation during the last five years of employment. The components of net periodic pension expense are as follows (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Service cost | $ 9 | $ 76 | $ 17 | $ 147 |
| Interest cost | 54 | 124 | 107 | 244 |
| Expected return on plan assets | (46) | (95) | (92) | (187) |
| Amortization of net loss | 26 | 39 | 52 | 77 |
| Net periodic pension expense | $ 43 | $ 144 | $ 84 | $ 281 |

For the three and six months ended December 31, 2007 and 2006, the Company made contributions of $0.3 million, $0.6 million, $0.4 million and $0.7 million, respectively, to these defined benefit plans.

In addition, the Company sponsors several defined contribution pension plans. For the three and six months ended December 31, 2007 and 2006, the Company made contributions of $0.2 million, $0.7 million, $0.3 million and $0.6 million, respectively, to these defined contribution plans.

### 8. Commitments and Contingencies

*Legal Proceedings*

In November 2002, L-3 Communications Corporation (L-3) brought suit against the Company seeking a declaratory judgment that L-3 had not breached its obligations to the Company concerning the acquisition of PerkinElmer's Security Detection Systems Business. The Company asserted counterclaims against L-3 for, among other things, fraud and breach of fiduciary duty. On May 24, 2006, the jury in the case returned a verdict in the Company's favor and awarded $125 million in damages. The jury found that L-3 had breached its fiduciary duty to the Company and had committed fraud. L-3 has appealed the judgment.

The Company is also involved in various other claims and legal proceedings. In the opinion of the Company's management, after consultation with legal counsel, the ultimate disposition of such proceedings is unlikely to have a material adverse effect on the Company's financial statements.

In accordance with SFAS No. 5, "Accounting for Contingencies," the Company has not accrued for loss contingencies relating to legal proceedings because it believes that, although unfavorable outcomes in the proceedings may be possible, they are not considered by management to be probable or reasonably estimable. If one or more of these matters are resolved in a manner adverse to the Company, the impact on the Company's results of operations, financial position and/or liquidity could be material.

*Contingent Acquisition Obligations*

Under the terms and conditions of the purchase agreements associated with the following acquisitions, the Company may be obligated to make additional payments.

In August 2002, the Company purchased a minority equity interest in CXR Limited. In June 2004, the Company increased its equity interest to approximately 75% and in December 2004, the Company acquired the remaining 25%. As compensation to the selling shareholders for this remaining interest, the Company agreed to make certain royalty payments based on sales of its products through December, 2022. As of December 31, 2007, no royalty payments have been earned.

In January 2004, the Company acquired Advanced Research & Applications Corp. During the seven years following the acquisition, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at $30.0 million. As of December 31, 2007, no contingent consideration has been earned.

In February 2005, the Company completed the acquisition of Blease Medical. During the three years following the acquisition, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at £6.25 million (approximately $12.5 million as of December 31, 2007). As of December 31, 2007, no contingent consideration has been earned.

In July 2005, the Company completed another acquisition that was not material to its overall condensed consolidated financial statements. During the seven years following the acquisition, contingent consideration is payable based on its profits before interest and taxes, provided certain requirements are met. The contingent consideration is capped at $6.0 million. As of December 31, 2007, no contingent consideration has been earned.

In July 2006, the Company completed another acquisition that was not material to its overall condensed consolidated financial statements. During the two years following the acquisition, contingent compensation is payable based upon profitability. Total contingent consideration is capped at $0.6 million. As of December 31, 2007, $0.3 million of contingent consideration has been earned.

*Environmental Contingencies*

The Company is subject to various environmental laws. The Company's practice is to ensure that Phase I environmental site assessments are conducted for each of its properties in the United States at which the Company manufactures products in order to identify, as of the date of such report, potential sources of contamination of the property. In certain cases, the Company has conducted further environmental assessments consisting of soil and groundwater testing and other investigations deemed appropriate by independent environmental consultants.

During one investigation, the Company discovered soil and groundwater contamination at its Hawthorne, California facility. The Company filed reports concerning this problem with the appropriate environmental authorities in fiscal 2001. The Company has not yet received any response to such reports, and no agency action or litigation is presently pending or threatened. The Company's site was previously used for semiconductor manufacturing, and it is not presently known who is responsible for the contamination and the remediation. The groundwater contamination is a known regional problem, not limited to the Company's premises or its immediate surroundings.

The Company has also been informed of soil and groundwater remediation efforts at a facility that its Ferson Technologies, Inc. subsidiary previously leased in Ocean Springs, Mississippi. Ferson Technologies occupied the facility until October 2003. The Company believes that the owner and previous occupants of the facility have primary responsibility for such remediation and have an agreement with the facility's owner under which the owner is responsible for remediation of pre-existing conditions. However, the Company is unable at this time to ascertain whether Ferson Technologies bears any exposure for remediation costs under applicable environmental regulations.

The Company has not accrued for loss contingencies relating to the above environmental matters because it believes that, although unfavorable outcomes may be possible, they are not considered by the Company's management to be probable and reasonably estimable. If one or more of these matters are resolved in a manner adverse to the Company, the impact on the Company's results of operations, financial position and/or liquidity could be material.

*Product Warranties*

The Company offers its customers warranties on many of the products that it sells. These warranties typically provide for repairs and maintenance of the products if problems arise during a specified time period after original shipment. Concurrent with the sale of products, the Company records a provision for estimated warranty expenses with a corresponding increase in cost of goods sold. The Company periodically adjusts this provision based on historical and anticipated experience. The Company charges actual expenses of repairs under warranty, including parts and labor, to this provision when incurred.

The following table presents changes in warranty provisions (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Balance at beginning of period | $ 7,318 | $ 7,998 | $ 7,224 | $ 7,443 |
| Additions | 1,097 | 2,334 | 2,372 | 3,666 |
| Reductions for warranty repair costs | (1,035) | (1,174) | (2,216) | (1,951) |
| Balance at end of period | $ 7,380 | $ 9,158 | $ 7,380 | $ 9,158 |

**9. Income Taxes**

On July 1, 2007, the Company adopted FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (FIN 48). FIN 48 prescribes a two-step process for the financial statement measurement and recognition of a tax position taken or expected to be taken in a tax return. The first step involves the determination of whether it is more likely than not (greater than 50 percent likelihood) that a tax position will be sustained upon examination, based on the technical merits of the position. The second step requires that any tax position that meets the more-likely-than-not recognition threshold be measured and recognized in the financial statements at the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. FIN 48 also provides guidance on the accounting for related interest and penalties, financial statement classification and disclosure. The cumulative effect of applying FIN 48 is to be reported as an adjustment to the opening balance of retained earnings in the period of adoption. The cumulative effect of applying FIN 48 to the Company has been recorded as a decrease of $3.3 million to retained earnings, an increase of $2.5 million to deferred tax asset and an increase of $5.8 million to tax liability. In addition, $0.4 million of current tax liability was reclassified to a long-term liability.

As of the July 1, and December 31, 2007, the total amount of gross unrecognized tax benefits was $6.2 million and $6.3 million, respectively. Of this total, $3.7 million represents the amount of unrecognized tax benefits that, if recognized, would affect the effective tax rate. The Company recognizes potential interest and penalties related to income tax matters in income tax expense. As of July 1, and December 31, 2007, the Company has $1.4 million and $1.5 million accrued for the payment of interest and penalties, respectively.

The Company conducts business globally and, as a result, one or more of the Company's subsidiaries file income tax returns in the U.S. federal jurisdiction and multiple state, local and foreign jurisdictions. The Company is no longer subject to U.S. federal IRS audit for years prior to 2004. With limited exception, the Company's operations in state and foreign tax jurisdictions are no longer subject to audit by the respective tax authorities for tax years prior to 1998.

**10. Segment Information**

The Company operates in three identifiable industry segments: (a) Security, providing security and inspection systems; (b) Healthcare, providing medical monitoring and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for applications in the defense and aerospace markets, among others. The Company also has a Corporate segment that includes executive compensation and certain other general and administrative expenses. Interest expense, and certain expenses related to legal, audit and other professional service fees are not allocated to the industry segments. Both the Security and Healthcare divisions comprise primarily end-product businesses whereas the Optoelectronics and Manufacturing division comprises businesses that primarily supply components and subsystems to original equipment manufacturers, including to the businesses of the Security and Healthcare divisions. All intersegment sales are eliminated in consolidation.

The following table presents segment information (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| **Revenues — by Segment:** | | | | |
| Security division | $ 44,388 | $ 63,874 | $ 85,435 | $112,680 |
| Healthcare division | 62,737 | 67,862 | 110,968 | 124,461 |
| Optoelectronics and Manufacturing division, including intersegment revenues | 39,590 | 44,695 | 73,868 | 81,065 |
| Intersegment revenues elimination | (9,257) | (12,237) | (17,284) | (22,999) |
| Total | $137,458 | $164,194 | $252,987 | $295,207 |
| **Revenues — by Geography:** | | | | |
| North America | $ 88,434 | $105,390 | $163,527 | $196,476 |
| Europe | 40,265 | 55,043 | 77,299 | 93,642 |
| Asia | 18,016 | 16,008 | 29,445 | 28,088 |
| Intersegment revenues elimination | (9,257) | (12,247) | (17,284) | (22,999) |
| **Total** | $137,458 | $164,194 | $252,987 | $295,207 |
| **Operating income (loss) — by Segment:** | | | | |
| Security division | $ (30,023) | $ 871 | $ (31,811) | $ 174 |
| Healthcare division | (1,350) | 6,242 | (5,613) | 7,293 |
| Optoelectronics and Manufacturing division | 2,923 | 3,114 | 6,734 | 4,453 |
| Corporate | (3,826) | (3,986) | (10,145) | (7,465) |
| Eliminations (1) | 509 | (184) | 157 | (313) |
| **Total** | $ (31,767) | $ 6,057 | $ (40,678) | $ 4,142 |

| | June 30, 2007 | December 31, 2007 |
|---|---|---|
| **Assets — by Segment:** | | |
| Security division | $170,881 | $ 179,624 |
| Healthcare division | 172,340 | 180,259 |
| Optoelectronics and Manufacturing division | 87,483 | 104,231 |
| Corporate | 23,738 | 40,994 |
| Eliminations (1) | (2,959) | (3,273) |
| **Total** | $451,483 | $ 501,835 |

(1) Eliminations primarily reflect the elimination of intercompany inventory profit not-yet-realized. This profit will be realized when inventory is shipped to the Security and Healthcare divisions' external customers.

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Cautionary Statement

*Certain statements contained in this quarterly report on Form 10-Q that are not related to historical results, including, without limitation, statements regarding our business strategy, objectives and future financial position, are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and involve risks and uncertainties. These forward-looking statements may be identified by the use of forward-looking terms such as "anticipate," "believe," "expect," "may," "could," "likely to," "should," or "will," or by discussions of strategy that involve predictions which are based upon a number of future conditions that ultimately may prove to be inaccurate. Statements in this quarterly report on Form 10-Q that are forward-looking are based on current expectations and actual results may differ materially. Forward-looking statements involve numerous risks and uncertainties described in this quarterly report on Form 10-Q, our Annual Report on Form 10-K and other documents previously filed or hereafter filed by us from time to time with the Securities and Exchange Commission. Such factors, of course, do not include all factors that might affect our business and financial condition. Although we believe that the assumptions upon which our forward-looking statements are based are reasonable, such assumptions could prove to be inaccurate and actual results could differ materially from those expressed in or implied by the forward-looking statements. All forward-looking statements contained in this quarterly report on Form 10-Q are qualified in their entirety by this statement. We undertake no obligation other than as may be required under securities laws to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

### Critical Accounting Policies and Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions and select accounting policies that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Our critical accounting policies are detailed in our Annual Report on Form 10-K for the year ended June 30, 2007.

### Recent Accounting Pronouncements

We describe recent accounting pronouncements in Item 1 — "Condensed Consolidated Financial Statements — Notes to Condensed Consolidated Financial Statements."

### Executive Summary

We are a vertically integrated designer and manufacturer of specialized electronic systems and components for critical applications. We sell our products in diversified markets, including homeland security, healthcare, defense and aerospace. We have three operating divisions: (a) Security, providing security and inspection systems; (b) Healthcare, providing patient monitoring, diagnostic cardiology and anesthesia systems; and (c) Optoelectronics and Manufacturing, providing specialized electronic components for affiliated end-products divisions, as well as for applications in the defense and aerospace markets, among others.

*Security Division.* Through our Security division, we design, manufacture and market security and inspection systems worldwide for sale primarily to U.S. federal, state and local government agencies as well as to foreign governments. These products are used to inspect baggage, cargo, vehicles and other objects for weapons, explosives, drugs and other contraband as well as to screen people. Revenues from our Security division accounted for 38% and 34% of our total consolidated revenues for the six months ended December 31, 2007 and 2006, respectively.

Following the September 11, 2001 terrorist attacks, U.S. Government spending for the development and acquisition of security and inspection systems increased in response to the attacks and has continued at high levels during its global war on terrorism. This spending has had a favorable impact on our business. However, future levels of such spending could decrease as a result of changing budgetary priorities or could shift to products that we do not provide. Additionally, competition for contracts with the U.S. Government has become more intense in recent years as new competitors and technologies have entered this market.

*Healthcare Division.* Through our Healthcare division, we design, manufacture and market patient monitoring, diagnostic cardiology and anesthesia systems for sale primarily to hospitals and medical centers. Our products monitor patients in critical, emergency and perioperative care areas of the hospital and provide such information, through wired and wireless networks, to physicians and nurses who may be at the patient's bedside, in another area of the hospital or even outside the hospital. Revenues from our Healthcare division accounted for 42% and 44% of our total consolidated revenues for the six months ended December 31, 2007 and 2006, respectively.

The healthcare markets in which we operate are highly competitive. We believe that our customers choose among competing products on the basis of product performance, functionality, value and service. We also believe that price has become an important factor in hospital purchasing decisions because of pressures they are facing to cut costs.

In October 2005, Spacelabs Healthcare, Inc., a subsidiary comprising the business operations of our Healthcare division, completed an initial public offering of approximately 20% of its total issued and outstanding common stock. The Spacelabs Healthcare shares traded under the ticker symbol "SLAB" on the AIM (formerly known as the Alternative Investment Market), a stock market administered by the London Stock Exchange. In the second quarter of fiscal 2007, we began repurchasing publicly-traded shares of Spacelabs Healthcare, increasing our ownership to 84% as of June 30, 2007. By December 31, 2007, we increased our ownership in Spacelabs Healthcare to 100% repurchasing all remaining outstanding shares. During the six months ended December 31, 2007, we spent approximately $15.8 million in cash and issued 240,000 shares of our common stock in exchange for the remaining Spacelabs Healthcare shares. At the time of issuance, the 240,000 shares of our common stock had a fair value of $5.9 million. As of December 31, 2007, $15.1 million of the cash portion of the repurchase remained outstanding and is included in accounts payable in the condensed consolidated financial statements. Effective January 24, 2008, Spacelabs Healthcare shares no longer trade on the AIM.

*Optoelectronics and Manufacturing Division.* Through our Optoelectronics and Manufacturing division, we design, manufacture and market optoelectronic devices and value-added manufacturing services worldwide for use in a broad range of applications, including aerospace and defense electronics, security and inspection systems, medical imaging and diagnostics, computed tomography, fiber optics, telecommunications, gaming, office automation, computer peripherals and industrial automation. We also provide our optoelectronic devices and value-added manufacturing services to our own Security and Healthcare divisions. Revenues from our Optoelectronics and Manufacturing division accounted for 20% and 22% of our total consolidated revenues for the six months ended December 31, 2007 and 2006, respectively.

*Consolidated Results*. We reported a consolidated operating profit of $6.1 million for the three months ended December 31, 2007, an improvement from the $31.8 million operating loss reported for the three months ended December 31, 2006. This $37.9 million improvement was largely due to three factors: (i) a $26.7 million, or 19%, growth in revenue; (ii) our recognition, during the second quarter of fiscal 2007, of $31.8 of nonrecurring impairment charges related to various long-lived assets and inventory; and (iii) cost-cutting and facility consolidation initiatives that we began in the second half of fiscal 2007 and that have since resulted in more efficient manufacturing activities and nearly flat operating expenses, even during a period of significant revenue growth. These factors were partially offset by $2.1 million of nonrecurring restructuring costs recognized during the three months ended December 31, 2007, primarily related to further headcount reductions and facility consolidations.

During fiscal 2007, we undertook a review of our global operations as part of our ongoing efforts to integrate recent acquisitions and rationalize our overall cost structure. The review resulted in a plan that led to annualized cost savings of approximately $17 million, including a reduction of approximately 8% of our global workforce and the consolidation of multiple facilities. During the first half of fiscal 2008, we identified additional cost savings opportunities that have been initiated and are expected to benefit future periods.

**Results of Operations**

*Three Months Ended December 31, 2007 Compared to Three Months Ended December 31, 2006.*

Table of Contents

**Net Revenues**

The table below and the discussion that follows are based upon the way in which we analyze our business. See Note 10 to the condensed consolidated financial statements for additional information about our business segments.

| (in millions) | Q2 2007 | % of Net Sales | Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Security division | $ 44.4 | 32% | $ 63.9 | 39% | $ 19.5 | 44% |
| Healthcare division | 62.7 | 46% | 67.9 | 41% | 5.2 | 8% |
| Optoelectronics and Manufacturing division | 39.6 | 29% | 44.6 | 27% | 5.0 | 13% |
| Intersegment revenues | (9.2) | (7)% | (12.2) | (7)% | (3.0) | 33% |
| Total revenues | $ 137.5 | | $ 164.2 | | $ 26.7 | 19% |

Net revenues for the three months ended December 31, 2007, increased $26.7 million, or 19%, to $164.2 million from $137.5 million for the comparable prior-year period.

Revenues for the Security division for the three months ended December 31, 2007, increased $19.5 million, or 44%, to $63.9 million, from $44.4 million for the comparable prior-year period. The increase was attributable to a $20.1 million, or 271%, increase in sales of cargo and vehicle inspection systems. We believe that this increase in cargo and vehicle inspection system sales reflects greater market acceptance of these products in the early stages of their life cycle.

Revenues for the Healthcare division for the three months ended December 31, 2007, increased $5.2 million, or 8%, to $67.9 million, from $62.7 million for the comparable prior-year period. The increase was primarily attributable to increased patient monitoring equipment sales of $6.0 million, primarily in North America, partially offset by lower anesthesia equipment sales of $0.4 million and lower clinical trial services revenue of $0.4 million.

Revenues for the Optoelectronics and Manufacturing division for the three months ended December 31, 2007, increased $5.0 million, or 13%, to $44.6 million, from $39.6 million for the comparable prior-year period. The change in revenues was attributable to an increase in contract manufacturing sales of $10.4 million, partially offset by a decrease in commercial optoelectronic sales and weapons simulation sales of $3.2 million and $2.7 million, respectively. The increased contract manufacturing business is primarily due to the fulfillment of a significant defense-industry related contract that is expected to continue through the end of the fiscal year and into the first quarter of fiscal 2009. In addition, for the three months ended December 31, 2007, the division recorded intersegment sales of $12.2 million, compared to $9.2 million in the comparable prior-year period. Such sales are eliminated in consolidation.

**Gross Profit**

| (in millions) | Q2 2007 | % of Net Sales | Q2 2008 | % of Net Sales |
|---|---|---|---|---|
| Gross profit | $39.3 | 28.6% | $59.0 | 35.9% |

Gross profit increased $19.7 million, or 50%, to $59.0 million for the three months ended December 31, 2007, from $39.3 million for the comparable prior-year period, as a result of both the 19% increase in total revenues as well as the recording of a $10.3 million inventory impairment charge that reduced gross profit in the second quarter of fiscal 2007. The gross margin increased to 35.9%, from 28.6% over the comparable prior-year period. Excluding the impact of the aforementioned inventory charges, our gross margin in the three months ended December 31, 2007 was essentially flat versus the comparable prior year period. Although we experienced gross margin improvement in our Healthcare division, a change in our overall product mix lead to comparable year over year gross margins. The improvements in gross margins resulted from: (i) growth in the revenues for our Healthcare division, primarily in patient monitoring systems, which generally carry higher gross margins than many of our other products; (ii) cost savings in our Healthcare division from restructuring activities initiated in fiscal 2007; and (iii) gross margin improvement in cargo and vehicle inspection products in our Security division associated with manufacturing efficiencies. Factors that reduced our consolidated gross margins included: (i) lower sales volumes in our commercial optoelectronic products line; (ii) increased contract manufacturing revenues, which tend to carry lower gross margins than our other businesses; and (iii) lower gross margins in our baggage and parcel inspection and people screening systems in our Security division, primarily as a result of changes in product mix.

**Operating Expenses**

| (in millions) | Q2 2007 | % of Net Sales | Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 38.4 | 27.9% | $ 39.1 | 23.8% | $ 0.7 | 2% |
| Research and development | 11.2 | 8.2% | 11.7 | 7.1% | 0.5 | 4% |
| Impairment, restructuring, and other charges | 21.5 | 15.6% | 2.1 | 1.3% | (19.4) | (90)% |
| Total operating expenses | $ 71.1 | 51.7% | $ 52.9 | 32.2% | $ (18.2) | (26)% |

**Selling, general and administrative expenses**. Selling, general and administrative (SG&A) expenses consist primarily of compensation paid to sales, marketing and administrative personnel, professional service fees and marketing expenses. For the three months ended December 31, 2007, SG&A expenses increased by $0.7 million, or 2%, to $39.1 million, from $38.4 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses for the three months ended December 31, 2007 decreased to 23.8%, from 27.9% for the comparable prior-year period as we leveraged our fixed cost structure and benefited from cost cutting activities that began in fiscal 2007.

**Research and development**. Research and development expenses include research related to new product development and product enhancement expenditures. For the three months ended December 31, 2007, such expenses increased $0.5 million, or 4%, to $11.7 million, from $11.2 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 7.1% for the three months ended December 31, 2007, compared to 8.2% for the comparable prior-year period. The increase in research and development expenses for the three month period ended December 31, 2007 was primarily attributable to increased spending in support of next generation products in our Healthcare division.

**Impairment, restructuring, and other charges.** Beginning in fiscal 2007, we initiated a series of restructuring activities, which were intended to align our global capacity and infrastructure with demand by our customers and thereby improve our operating efficiencies. During the second quarter ended December 31, 2007, we continued this initiative and realigned our operations to further increase our operating efficiency. As a result, we recorded total impairment, restructuring and other charges of $2.1 million. These charges included $1.8 million in the Security division, $0.2 million charges in our Healthcare division and $0.1 million in our Optoelectronics and Manufacturing division, primarily relating to severance and manufacturing relocation costs.

During the second quarter ended December 31, 2006, as part of a global review of our operations, we assessed the value of certain technologies and product lines. As a result of this assessment, we recorded nonrecurring impairment charges in both operating expenses and cost of goods sold in our condensed consolidated financial statements. In operating expenses, these charges consist of $21.5 million for asset impairment of certain identifiable intangible and fixed assets. Of the $21.5 million of impairment charges of intangible and fixed assets, $21.3 million was recorded within our Security division and $0.2 million was recorded within our Optoelectronics and Manufacturing division. In cost of goods sold, we recorded $10.3 of inventory charges, primarily related to finished goods inventory. Of the $10.3 million of inventory charges, $9.9 million was recorded within our Security division and $0.4 million was recorded within our Optoelectronics and Manufacturing division.

**Other Income and Expenses**

| (in millions) | Q2 2007 | % of Net Sales | Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Interest expense | $ 1.3 | 1.0% | $ 1.3 | 0.8% | — | 0% |
| Interest (income) | (0.1) | (0.1)% | (0.1) | (0.1)% | — | 0% |
| Other (income) / expense | (0.1) | (0.1)% | — | — | 0.1 | NM |
| Total other income and expense | $ 1.1 | 0.8% | $ 1.2 | 0.7% | $ 0.1 | 9% |

**Interest expense**. For the three months ended December 31, 2007, we incurred interest expense of $1.3 million, which was consistent with the comparable prior-year period. The interest expense was primarily attributable to ongoing working capital requirements of our operations as well to finance the acquisition of Del Mar Reynolds, a business that we purchased in July 2006. Effective weighted average interest rates during the comparable periods were substantially the same.

**Income taxes**. For the three months ended December 31, 2007, our income tax expense was $1.7 million, compared to a benefit of $12.1 million for the comparable prior-year period. Our effective tax rate for the three months ended December 31, 2007 was 35.2%, compared to 38.8% in the comparable prior-year period. Our provision for income taxes is dependent on the mix of income from U.S. and foreign locations due to tax rate differences among such countries as well as due to the impact of permanent taxable differences.

Table of Contents

*Six Months Ended December 31, 2007 Compared to Six Months Ended December 31, 2006.*

**Net Revenues**

The table below and the discussion that follows are based upon the way in which we analyze our business. See Note 9 to the Condensed Consolidated Financial Statements for additional information about our business segments.

| (in millions) | YTD Q2 2007 | % of Net Sales | YTD Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Security division | $ 85.4 | 34% | $ 112.7 | 38% | $ 27.3 | 32% |
| Healthcare division | 111.0 | 44% | 124.5 | 42% | 13.5 | 12% |
| Optoelectronics and Manufacturing division | 73.9 | 29% | 81.0 | 27% | 7.1 | 10% |
| Intersegment revenues | (17.3) | (7)% | (23.0) | (7)% | (5.7) | 33% |
| Total revenues | $ 253.0 | | $ 295.2 | | $ 42.2 | 17% |

Net revenues for the six months ended December 31, 2007, increased $42.2 million, or 17%, to $295.2 million from $253.0 million for the comparable prior-year period.

Revenues for the Security division for the six months ended December 31, 2007, increased $27.3 million, or 32%, to $112.7 million, from $85.4 million for the comparable prior-year period. The increase was attributable to a $28.0 million, or 147%, increase in sales of cargo and vehicle inspection systems. We believe that this increase in cargo and vehicle inspection system sales reflects greater market acceptance of these products in the early stages of their life cycle.

Revenues for the Healthcare division for the six months ended December 31, 2007, increased $13.5 million, or 12%, to $124.5 million, from $111.0 million for the comparable prior-year period. The increase was primarily attributable to: (i) increased patient monitoring equipment sales of $13.3 million, primarily in North America, (ii) increased anesthesia equipment sales of approximately $0.7 million. These increases were partially offset by a reduction in clinical trial services revenue of $1.0 million.

Revenues for the Optoelectronics and Manufacturing division for the six months ended December 31, 2007, increased $7.1 million, or 10%, to $81.0 million, from $73.9 million for the comparable prior-year period. The change in revenues was attributable to an increase in contract manufacturing sales of $12.4 million, partially offset by decreases in commercial optoelectronics sales and weapons simulation sales of $2.9 million and $2.3 million, respectively. The increase in contract manufacturing revenues is primarily due to the fulfillment of a significant defense-industry related contract that is expected to continue through the end of fiscal 2008 and into the first quarter of fiscal 2009. In addition, for the three months ended December 31, 2007, the Optoelectronics and Manufacturing division recorded intersegment sales of $23.0 million, compared to $17.3 million in the comparable prior-year period. Such sales are eliminated in consolidation.

**Gross Profit**

| (in millions) | YTD Q2 2007 | % of Net Sales | YTD Q2 2008 | % of Net Sales |
|---|---|---|---|---|
| Gross profit | $77.8 | 30.8% | $103.1 | 34.9% |

Gross profit increased $25.3 million, or 33%, to $103.1 million for the six months ended December 31, 2007, from $77.8 million for the comparable prior-year period. The increase in gross profit is the result of both the 17% increase in total revenues as well as the recording of $10.3 million inventory impairment charge that reduced gross profit in the first half of fiscal 2007. The gross profit margin increased to 34.9%, from 30.8% over the comparable prior-year period. This increase was attributable to the prior period impact of the inventory charges, which had the effect of reducing our gross margin by 4.1%. Excluding the impact of the aforementioned inventory charges, our gross margin in the six months ended December 31, 2007, was essentially flat versus the comparable prior year period. Although we experienced gross margin improvement in our Healthcare division, a change in our overall product mix lead to comparable year over year gross margins. The factors that generally increased gross margins included: (i) growth in the revenues for our Healthcare division, primarily in patient monitoring systems, which generally carry higher gross margins than many of our other products; (ii) cost savings in our Healthcare division from the restructuring activities initiated in fiscal 2007; and (iii) gross margin improvement in cargo and vehicle inspection products in our Security division associated with manufacturing efficiencies. Factors that reduced our consolidated gross margins included: (i) lower sales volumes in our commercial optoelectronic products line; (ii) increased contract manufacturing revenues, which tend to carry lower gross margins than our other businesses; and (iii) lower gross margins in our baggage and parcel inspection and people screening systems in our Security division primarily as a result of changes in product mix.

### Operating Expenses

| (in millions) | YTD Q2 2007 | % of Net Sales | YTD Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 74.9 | 29.6% | $ 75.3 | 25.5% | $ 0.4 | 1% |
| Research and development | 22.1 | 8.7% | 21.5 | 7.3% | (0.6) | (3)% |
| Impairment, restructuring, and other charges | 21.5 | 8.5% | 2.2 | 0.7% | (19.3) | (90)% |
| Total operating expenses | $ 118.5 | 46.8% | $ 99.0 | 33.5% | $ (19.5) | (16)% |

**Selling, general and administrative expenses**. For the six months ended December 31, 2007, SG&A expenses increased by $0.4 million, or 1%, to $75.3 million, from $74.9 million for the comparable prior-year period. As a percentage of revenues, SG&A expenses for the six months ended December 31, 2007 decreased to 25.5%, from 29.6% for the comparable prior-year period as we leveraged our fixed cost structure and benefited from the cost cutting activities that began in fiscal 2007.

**Research and development**. Research and development expenses include research related to new product development and product enhancement expenditures. For the six months ended December 31, 2007, such expenses decreased $0.6 million, or 3%, to $21.5 million, from $22.1 million for the comparable prior-year period. As a percentage of revenues, research and development expenses were 7.3% for the six months ended December 31, 2007, compared to 8.7% for the comparable prior-year period. The decrease in research and development expenses for the six month period ended December 31, 2007, was primarily attributable to: (i) a decrease in research and development spending within our Security division of $0.9 million and (ii) $0.6 million of costs booked in the six months ended December 31, 2006, for in-process research and development costs incurred by Del Mar Reynolds, a business that we acquired in July of 2006. This decrease was partially offset by an increase of $1.0 million in the six months ended December 31, 2007 in our Healthcare division attributable to increased spending in support of next generation products.

**Impairment, restructuring, and other charges**. In fiscal 2007, we initiated a series of restructuring activities that were intended to align our global capacity and infrastructure with demand by our customers and thereby improve our operating efficiencies. During the six months ended December 31, 2007, we continued this initiative to further increase our operating efficiency. As a result, we recorded total impairment, restructuring and other charges of $2.2 million. These charges included $1.9 million in the Security division, $0.2 million charges in our Healthcare division and $0.1 million in out Optoelectronics and Manufacturing division, primarily relating to severance and manufacturing relocation costs.

During the six months ended December 31, 2006, as part of a global review of our operations, we assessed the value of certain technologies and product lines. As a result of this assessment, we recorded impairment charges to both operating expenses and to cost of goods sold in our condensed consolidated financial statements. In operating expenses, these charges consist of $21.5 million for asset impairment of certain identifiable intangible and fixed assets. Of the $21.5 million of impairment charges of intangible and fixed assets, $21.3 million was recorded within our Security division and $0.2 million was recorded within our Optoelectronics and Manufacturing division. In cost of goods sold, we recorded $10.3 of inventory charges, primarily related to finished goods inventory. Of the $10.3 million of inventory charges, $9.9 million was recorded within our Security division and $0.4 million was recorded within our Optoelectronics and Manufacturing division.

### Other Income and Expenses

| (in millions) | YTD Q2 2007 | % of Net Sales | YTD Q2 2008 | % of Net Sales | $ Change | % Change |
|---|---|---|---|---|---|---|
| Interest expense | $ 2.2 | 0.9% | $ 2.4 | 0.9% | $ (0.2) | 9% |
| Interest (income) | (0.2) | (0.1)% | (0.2) | (0.1)% | — | — |
| Other (income) / expense | — | — | — | — | — | — |
| Total other income and expense | $ 2.0 | 0.8% | $ 2.2 | 0.8% | $ (0.2) | 10% |

**Interest expense**. For the six months ended December 31, 2007, we incurred interest expense of $2.4 million, compared to $2.2 million for the comparable prior-year period. The increase in interest expense was primarily attributable to slightly higher than average debt levels in the current year to fund working capital requirements and the timing of the financing related to the July 2006 acquisition of Del Mar Reynolds. Effective weighted-average interest rates during the comparable periods were substantially the same.

**Income taxes**. For the six months ended December 31, 2007, our income tax expense was $0.7 million, compared to a benefit of $15.3 million for the comparable prior-year period. Our effective tax rate for the six months ended December 31, 2007 was 35.3%, compared to 35.8% in the comparable prior-year period. Our provision for income taxes is dependent on the mix of income from U.S. and foreign locations due to tax rate differences among such countries as well as due to the impact of permanent taxable differences.

### Liquidity and Capital Resources

To date, we have financed our operations primarily through cash flow from operations, proceeds from equity issuances and our credit facilities. Cash and cash equivalents totaled $14.1 million at December 31, 2007, a decrease of $1.9 million from $16.0 million at June 30, 2007. The changes in our working capital and cash and cash equivalent balances during the six months ended are described below.

| (in millions) | June 30, 2007 | December 31, 2007 | % Change |
|---|---|---|---|
| Working capital | $158.7 | $173.9 | 10% |
| Cash and cash equivalents | 16.0 | 14.1 | (12)% |

*Working Capital.* The increase in working capital is primarily due to increases in inventory of $28.4 million and accounts receivables of $10.3 million and a decrease in advances from customers of $10.2 million. These increases in working capital were partially offset by an increase in accounts payable of $39.9 million. Of this increase in accounts payable, $15.0 million relates to the repurchase of Spacelabs Healthcare stock. The remainder of the increase primarily relates to the increased inventory level.

| (in millions) | YTD Q2 2007 | YTD Q2 2008 | % Change |
|---|---|---|---|
| Cash used in operating activities | $(12.6) | $(14.6) | (16)% |
| Cash used in investing activities | (32.8) | (6.4) | 81% |
| Cash provided by financing activities | 43.9 | 19.7 | 55% |

*Cash Used in Operating Activities.* Cash flows from operating activities can fluctuate significantly from period to period, as net income (loss), tax timing differences, and other items can significantly impact cash flows. Net cash used in operations for the six months ended December 31, 2007 was $14.6 million, an increase of $2.0 million from the $12.6 million used in the comparable prior-year period. There were several competing factors that contributed to this overall increase in the cash utilized by our operations. Net income, after giving consideration to non-cash operating items including depreciation and amortization, stock-based compensation, deferred taxes, impairment charges, and provision for losses on accounts receivable, among others, generated $10.6 million of cash during the six months ended December 31, 2007 compared to utilizing $7.7 million of cash during the same period of the prior year. This $18.3 million improvement, however, was entirely offset by the significant investments we made in inventory totaling $31.9 million for two principle business purposes: (i) to meet the demands of a large defense-related contract within our Optoelectronic and Manufacturing division expected to ship throughout the second half of fiscal 2008 and the first half of fiscal 2009 and (ii) to meet the demands of the growing security division. Part of this inventory investment was offset with a corresponding increase in accounts payable of $20.2 million. A further use of cash in operations was $11.3 million of customer advances that were recognized as revenue during the six months ended December 31, 2007. These uses of cash were partially offset by improved working capital management year-over-year, amounting to a net positive change in operating assets and liabilities of $2.7 million.

*Cash Used in Investing Activities.* Net cash used in investing activities was $6.4 million for the six months ended December 31, 2007, compared to $32.8 million for the six months ended December 31, 2006. During the current year period, the primary investing activity involved $5.0 million of capital expenditures. We used $7.7 million for capital expenditures during the comparable prior-year period. During the six months ended December 31, 2006, we acquired Del Mar Reynolds for approximately $24.2 million, net of certain payments.

*Cash Provided by Financing Activities.* Net cash provided by financing activities was $19.7 million for the six months ended December 31, 2007, compared to $43.9 million for the six months ended December 31, 2006. In the current year period, we received $44.8 million when we entered into a new credit agreement, which was partially offset by the simultaneous repayment of two preexisting credit facilities totaling $38.6 million. In the comparable prior-year period, net cash provided by financing activities of $43.9 million primarily consisted of proceeds of $25.4 million from a term loan to fund the acquisition of Del Mar Reynolds and $16.3 million drawn down from our revolving lines of credit mainly used to fund operations.

**Borrowings**

On July 27, 2007, we entered into a credit agreement with Wachovia Bank allowing for borrowings of up to $89.5 million. The new credit agreement replaced pre-existing agreements with Bank of the West, which were repaid and terminated simultaneously with the close of the agreement with Wachovia Bank. The credit agreement with Wachovia Bank consists of a $44.75 million five-year revolving credit facility, including a $35 million sub-limit for letters-of-credit, and a $44.75 million five-year term loan. Borrowings under this facility bear interest at either (a) the London Interbank Offered Rate plus between 2.00% and 2.50% or (b) the bank's prime rate plus between 1.00% and 1.50%. The rates are determined based on our consolidated leverage ratio. As of December 31, 2007, the effective weighted average interest rate under the credit agreement was 7.8%. Our borrowings under the credit agreement are guaranteed by substantially all of our direct and indirect wholly-owned subsidiaries and are secured by substantially all of our assets and by our assets of such subsidiaries. The agreement contains various representations, warranties, affirmative, negative and financial covenants, and conditions of default customary for financing agreements of this type. As of December 31, 2007, $43.6 million was outstanding under the term loan, $12.0 million was outstanding under our revolving credit facility, and $5.5 million was outstanding under the letter-of-credit facility.

Several of our foreign subsidiaries maintain bank lines-of-credit, denominated in local currencies, to meet short-term working capital requirements and for the issuance of letters-of-credit. As of December 31, 2007, the total amount available under these various credit facilities was $34.4 million with a total cash borrowing sub-limit of $8.6 million, of which $1.5 million was outstanding at December 31, 2007. The weighted average interest rate of these facilities was 6.8% at December 31, 2007.

In December 2004, we entered into a bank loan of $5.3 million to fund the acquisition of land and buildings in England. The loan is payable over a 20-year period, with quarterly installments of £34,500 (approximately $69,000 as of December 31, 2007). The loan bears interest at LIBOR plus 1.2%, payable on a quarterly basis. As of December 31, 2007, $4.7 million remained outstanding under this loan.

Our long-term debt consisted of the following:

| (in thousands) | June 30, 2007 | December 31, 2007 |
|---|---|---|
| Five-year term loan due in fiscal 2012 | $21,782 | $ — |
| Five-year term loan due in fiscal 2013 | — | 43,631 |
| Twenty-year term loan due in fiscal 2025 | 4,846 | 4,675 |
| Capital leases | 3,334 | 2,754 |
| Other | 1,491 | 1,884 |
| | 31,453 | 52,944 |
| Less current portion of long-term debt | 5,744 | 5,042 |
| Long-term portion of debt | $25,709 | $ 47,902 |

We anticipate that existing cash borrowing arrangements and future access to capital markets should be sufficient to meet our cash requirements for the foreseeable future. However, our future capital requirements and the adequacy of available funds will depend on many factors, including future business acquisitions, litigation, stock repurchases and levels of research and development spending.

**Stock Repurchase Program**

Our Board of Directors has authorized a stock repurchase program under which we can repurchase up to 3,000,000 shares of our common stock. During the six months ended December 31, 2007, we did not repurchase any shares under this program and 1,330,973 shares were available for additional repurchase under the program as of December 31, 2007. We retire the treasury shares as they are repurchased and record them as a reduction in the number of shares of common stock issued and outstanding in our condensed consolidated financial statements.

**Dividend Policy**

We have never paid cash dividends on our common stock and have no plans to do so in the foreseeable future.

**Contractual Obligations**

Under the terms and conditions of the purchase agreements associated with the following acquisitions, we may be obligated to make additional payments:

In August 2002, we purchased a minority equity interest in CXR Limited. In June 2004, we increased our equity interest to approximately 75% and in December 2004, we acquired the remaining 25%. As compensation to the selling shareholders for this remaining interest, we agreed to make certain royalty payments through December 2022 based on sales of its products. As of December 31, 2007, no royalty payments have been earned.

In January 2004, we acquired Advanced Research & Applications Corp. During the seven years following the acquisition, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at $30.0 million. As of December 31, 2007, no contingent consideration has been earned.

In February 2005, we completed the acquisition of Blease Medical. During the three years following the acquisition, contingent consideration is payable based on its net revenues, provided certain requirements are met. The contingent consideration is capped at £6.25 million (approximately $12.5 million as of December 31, 2007). As of December 31, 2007, no contingent consideration has been earned.

In July 2005, we completed another acquisition that was not material to our overall condensed consolidated financial statements. During the seven years following the acquisition, contingent consideration is payable based on its profits before interest and taxes, provided certain requirements are met. The contingent consideration is capped at $6.0 million. As of December 31, 2007, no contingent consideration has been earned.

In July 2006, we completed another acquisition that was not material to our overall condensed consolidated financial statements. During the two years following the acquisition, contingent compensation is payable based upon profitability. Total contingent consideration is capped at $0.6 million. As of December 31, 2007, $0.3 million of contingent consideration has been earned.

**Off Balance Sheet Arrangements**

As of December 31, 2007, we did not have any significant off balance sheet arrangements as defined in Item 303(a)(4) of Regulation S-K.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

For the six months ended December 31, 2007, no material changes occurred with respect to market risk as disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2007.

**Market Risk**

We are exposed to certain market risks, which are inherent in our financial instruments and arise from transactions entered into in the normal course of business. We may enter into derivative financial instrument transactions in order to manage or reduce market risk in connection with specific foreign-currency-denominated transactions. We do not enter into derivative financial instrument transactions for speculative purposes.

We are subject to interest rate risk on our short-term borrowings under our bank lines of credit. Borrowings under these lines of credit do not give rise to significant interest rate risk because these borrowings have short maturities and are borrowed at variable interest rates. Historically, we have not experienced material gains or losses due to interest rate changes.

**Foreign Currency**

We maintain the accounts of our operations in each of the following countries in the following currencies: Singapore (Singapore dollars), Malaysia (Malaysian ringgits), United Kingdom (U.K. pounds sterling), Norway (Norwegian kroners), India (Indian rupees), Indonesia (Indonesian rupiah), Hong Kong (Hong Kong dollars), China (Chinese yuan), Canada (Canadian dollars) and Cyprus (Cypriot pounds). We maintain the accounts of our operations in each of the following countries in euros: Finland, France, Germany, Greece and Italy. We translate foreign currency financial statements into U.S. dollars at current rates, with the exception of revenues, costs and expenses, which we translate at average rates during the reporting period. We include gains and losses resulting from foreign currency transactions in income, and exclude those resulting from translation of financial statements from income and accumulate them as a component of shareholders' equity. A hypothetical 10% change in the relevant currency rates at December 31, 2007 would not have a material impact on our financial position or results of operations.

**Use of Derivatives**

In the past, our use of derivatives consisted primarily of foreign exchange contracts and interest rate swaps. There were no foreign exchange contracts or interest rate swaps outstanding as of December 31, 2007.

**Importance of International Markets**

International markets provide us with significant growth opportunities. However, the following events, among others, could adversely affect our financial results in subsequent periods: periodic economic downturns in different regions of the world, changes in trade policies or tariffs, wars and other forms of political instability. For the three and six months ended December 31, 2007, overall foreign currency fluctuations relative to the U.S. dollar had an immaterial effect on our consolidated revenues and results of operations. We continue to perform ongoing credit evaluations of our customers' financial condition and, if deemed necessary, we require advance payments for sales. We monitor economic and currency conditions around the world to evaluate whether there may be any significant effect on our international sales in the future. Due to our overseas investments and the necessity of dealing in local currencies in many foreign business transactions, we are at risk with respect to foreign currency fluctuations.

**Inflation**

We do not believe that inflation had a material impact on our results of operations during the three and six months ended December 31, 2007.

**Interest Rate Risk**

We classify all highly liquid investments with maturity of three months or less as cash equivalents and record them in the balance sheet at fair value. Short-term investments comprise high-quality marketable securities.

**Item 4. Controls and Procedures**

(a) *Evaluation of Disclosure Controls and Procedures*

As of December 31, 2007, the end of the period covered by this report, our management, including our Chief Executive Officer and our Chief Financial Officer, reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized and filed or submitted on a timely basis. Based upon that evaluation our management, Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of December 31, 2007.

(b) *Changes in Internal Control over Financial Reporting*

During the second quarter of fiscal 2008, the Company implemented Hyperion Financial Manager (HFM) to enhance the Company's worldwide consolidation function. This software implementation is part of an ongoing effort to improve the efficiency and effectiveness of the financial reporting process. In connection with the HFM implementation completed during the second quarter, the Company has modified the design, operation and documentation of its internal control processes impacted by the new software.

There were no other changes in the Company's internal control over financial reporting during the second quarter of fiscal 2008 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

We are involved in various claims and legal proceedings which have been previously disclosed in our quarterly and annual reports. The results of such legal proceedings cannot be predicted with certainty. Should we fail to prevail in any of these legal matters or should several of these legal matters be resolved against us in the same reporting period, the operating results of a particular reporting period could be materially adversely affected.

We are also involved in various other claims and legal proceedings arising out of the ordinary course of business which have not been previously disclosed in our quarterly and annual reports. In our opinion, after consultation with legal counsel, the ultimate disposition of such proceedings will not have a material adverse effect on our financial position, future results of operations or cash flows.

### Item 1A. Risk Factors

The discussion of our business and operations in this Quarterly Report on form 10-Q should be read together with the risk factors contained in our Annual Report on Form 10-K for the fiscal year ended June 30, 2007, filed with the Securities and Exchange Commission, which describe various risks and uncertainties to which we are or may become subject. These risks and uncertainties have the potential to affect our business, financial condition, results of operations, cash flows, strategies or prospects in a material and adverse manner.

### Item 4. Submission of Matters to a Vote of Security Holders

We held our Annual Meeting on December 5, 2007. At the meeting, shareholders voted on the following actions:

1. Election of Directors.

| Name | For | Against | Withheld |
|---|---|---|---|
| Deepak Chopra | 14,305,854 | 0 | 183,645 |
| Ajay Mehra | 14,301,990 | 0 | 187,509 |
| Steven C. Good | 13,755,844 | 0 | 733,655 |
| Meyer Luskin | 14,119,226 | 0 | 370,273 |
| Chand R. Viswanathan | 14,375,878 | 0 | 113,621 |
| Leslie E. Bider | 14,379,712 | 0 | 109,787 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

Table of Contents

2. Ratification of the appointment of Moss Adams LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2008.

| | |
|---|---|
| **For** | 14,443,682 |
| **Against** | 20,552 |
| **Abstain** | 25,265 |
| **Non-Votes** | 0 |

The proposal was approved.

3. Ratification of an amendment to our 2006 Equity Participation Plan in order to: (i) increase the number of shares of Common Stock authorized for issuance under the plan by 2,000,000 shares; (ii) limit the number of shares of restricted stock available for issuance under the plan to 1,000,000 shares; and (iii) raise from 85% of market value to 100% of market value, the lowest exercise price at which stock options may be granted under the plan.

| | |
|---|---|
| **For** | 10,601,531 |
| **Against** | 940,413 |
| **Abstain** | 33,329 |
| **Non-Votes** | 2,914,226 |

The proposal was approved.

**Item 6. Exhibits**

31.1 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2 Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, in the City of Hawthorne, State of California on the 5th day of February 2008.

**OSI SYSTEMS, INC.**

By: /s/ Deepak Chopra
Deepak Chopra
President and Chief Executive Officer

By: /s/ Alan Edrick
Alan Edrick
Executive Vice President and
Chief Financial Officer

# Exhibit 21

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A
**(Rule 14a-101)**

## Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No. __)

Filed by the Registrant x Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement
¨ Confidential, for Use of the Commission Only (as Permitted by Rule 14a-6(e)(2))
x Definitive Proxy Statement
¨ Definitive Additional Materials
¨ Soliciting Material Pursuant to §240.14a-12

## OSI Systems, Inc.

**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 13, 2008

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 8, 2008, at our executive offices, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of OSI Systems, Inc. common stock as of the close of business on October 10, 2008 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy Card.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

The Securities and Exchange Commission recently adopted rules that permit proxy materials to be furnished over the Internet rather than in paper form. Accordingly, this year, some of our shareholders will receive printed copies of these proxy materials in the mail, while others will receive a notice regarding the availability of this Proxy Statement, our Annual Report on Form 10-K for the fiscal year ended June 30, 2008 and other proxy-related materials *via* the Internet (the "Notice of Internet Availability of Proxy Materials").

If you receive a printed copy of the proxy materials by mail, you may vote by sending in your Proxy Card or, if indicated on your Proxy Card, by telephone or Internet voting.

If, on the other hand, you are a shareholder that receives a Notice of Internet Availability of Proxy Materials, please review the instructions contained therein regarding how to vote your shares over the Internet. You may also request a paper copy of the proxy materials, including the Proxy Card to submit your vote, if you prefer.

All shareholders may also choose to vote in person at the meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1792 of 2711

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held December 8, 2008**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on December 8, 2008, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.
2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2009.
3. To approve the adoption of the OSI Systems, Inc. 2008 Employee Stock Purchase Plan, including the reservation of 1,500,000 shares of the Company's Common Stock for issuance thereunder.
4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, containing consolidated financial statements, is included with this Proxy Statement.

The Board of Directors has fixed the close of business on October 10, 2008, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 13, 2008

**WHETHER OR NOT YOU EXPECT TO ATTEND THE ANNUAL MEETING, PLEASE VOTE PROMPTLY.**

**IF YOU HAVE RECEIVED THIS PROXY STATEMENT BY MAIL, PLEASE COMPLETE, DATE AND SIGN THE ENCLOSED PROXY CARD AND MAIL IT IN THE ENCLOSED ENVELOPE OR, IF GIVEN THE OPTION, YOU MAY ALSO VOTE BY TELEPHONE OR INTERNET VOTING.**

**IF, ON THE OTHER HAND, YOU HAVE RECEIVED A NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIALS, PLEASE VOTE IN ACCORDANCE WITH THE VOTING INSTRUCTIONS CONTAINED THEREIN.**

**EITHER ONE OF THESE METHODS WILL ENSURE REPRESENTATION OF YOUR SHARES AT THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1793 of 2711

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 8 |
| Proposal No. 3 Approval of 2008 Employee Stock Purchase Plan. | 9 |
| Compensation of Executive Officers and Directors | 13 |
| Security Ownership of Certain Beneficial Owners and Management | 29 |
| Independent Registered Public Accounting Firm | 32 |
| Report of Audit Committee | 33 |
| Code of Ethics and Conduct | 35 |
| Annual Meeting Attendance | 35 |
| Shareholder Communications | 35 |
| Availability of Annual Report on Form 10-K | 35 |
| Shareholder Proposals | 35 |
| Incorporation by Reference | 36 |
| Other Business | 36 |
| Appendix A (2008 Employee Stock Purchase Plan) | A-1 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1794 of 2711

Table of Contents

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on December 8, 2008, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

As permitted by rules recently adopted by the Securities and Exchange Commission ("SEC"), the Company is making its proxy materials, which include the Notice of Annual Meeting of Shareholders, Proxy Statement Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to most of its shareholders over the Internet. Others will receive printed copies of the Proxy Materials in the mail. The Company believes that by providing access over the Internet, it will expedite the receipt of Proxy Materials by its shareholders, at a lower cost.

In accordance with these new rules, most shareholders of record as of the close of business on October 10, 2008 will receive a Notice of Internet Availability of Proxy Materials.

The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote your shares over the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials, but would instead prefer to receive a printed copy of the Proxy Materials instead of downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a shareholder that receives a printed copy of the Proxy Materials by mail, you may also view the Proxy Materials on the Internet at *http://materials.proxyvote.com/osis*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed, postage pre-paid envelope or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any shareholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 10, 2008, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 17,839,522 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD" for a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or to allocate among any of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1795 of 2711
Table of Contents

directors to be elected (*i.e.*, six) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

A Proxy Card, when properly submitted by Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Shareholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

The total number of votes that could be cast at the Meeting is the number of votes actually cast, plus the number of abstentions and broker non-votes, described below. Abstentions are counted as shares present at the Meeting for purposes of determining whether a quorum exists; however, abstentions will not be counted as votes for or against a proposal. Proxies submitted by brokers that do not indicate a vote for some or all of the proposals because they do not have discretionary voting authority and have not received instructions as to how to vote on those proposals (so-called “broker non-votes”) are counted as present and entitled to vote and are, therefore, included for purposes of determining whether a quorum is present at the Meeting. However, broker non-votes are not deemed to be votes cast. As a result, broker non-votes are not included in the tabulation of the voting results on the election of directors or issues requiring approval of a majority of the votes cast and, therefore, do not have the effect of votes for or against a proposal.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting in person at the Meeting or represented by proxy and entitled to vote on the subject matter of the proposal.

It is anticipated that the Notice of Internet Availability of Proxy Materials and the Proxy Materials will be mailed on or about October 17, 2008. All shareholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1796 of 2711

Table of Contents

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

### Nominees

The Board of Directors consists of six members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2009, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 57 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 46 | Director, Executive Vice President, and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 66 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 82 | Director | 1990 |
| Chand R. Viswanathan | 79 | Director | 2001 |
| Leslie E. Bider(1)(3) | 58 | Director | 2006 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating and Governance Committee
(4) Member of Executive Committee

### Business Experience

***Deepak Chopra*** is Chairman of the Board of Directors. Mr. Chopra is also President and Chief Executive Officer of the Company. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

Table of Contents

***Ajay Mehra*** has served as a Director of the Company since March 1996. Mr. Mehra is also Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of the Walking Company Holdings, Inc. and Kayne Anderson MLP Investment Company, each of which is a publicly held corporation listed on the The NASDAQ Stock Market. He formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008 and as a Director of Youbet.com from 2006 to 2008. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Myricom, Inc., a computer and network infrastructure company and as Chairman of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee of the Orthopedic Hospital. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He is currently a Distinguished Professor Emeritus in the department and served as the Chair of the department from 1979 to 1985. During his tenure at University of California, Los Angeles, Dr. Viswanathan also served in various additional capacities, including Chair of the Academic Senate of the University of California, Los Angeles and Vice-Chair and later Chair of the University of California-wide Academic Senate. As Chair of the Academic Senate, he was also a member of the University of California Board of Regents as a faculty representative.

***Leslie E. Bider*** has served as a Director of the Company since September 2006. Mr. Bider is currently Chief Executive Officer of Pinnacle Care, Inc., a health advisory company. Between 2007 and 2008, Mr. Bider served as Chief Strategist of ITU Ventures, a private equity firm and between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of Douglas Emmett, Inc., a real estate investment trust that trades on the New York Stock Exchange, California Pizza Kitchen, Inc., which trades on The NASDAQ Stock Market and 1st Century Bank which trades on the OTC Bulletin Board. He also serves on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Master of Science degree from the Wharton School at the University of Pennsylvania.

Table of Contents

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board of Directors Meetings and Committees of the Board of Directors**

There were seven meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on four additional occasions during the fiscal year ended June 30, 2008. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee and Nominating and Governance Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No person serving as a director during the fiscal year ended June 30, 2008, attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the SEC and The NASDAQ Stock Market ("NASDAQ") director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices.

The Audit Committee currently consists of Messrs. Good, Luskin and Bider. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC and is independent, as independence for audit committee members is defined in the listing standards applicable to the Company. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2008. See Report of Audit Committee. The charter of the Audit Committee is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1799 of 2711
Table of Contents

to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Luskin and Good. There were nine meetings of the Compensation Committee during the fiscal year ended June 30, 2008. See *Compensation Committee Report.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com.*

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Bider, Good and Luskin. There were no meetings of the Nominating and Governance Committee during the fiscal year ended June 30, 2008.(1)

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors. The charter of the Nominating and Governance Committee is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were two meetings of the Executive Committee during the fiscal year ended June 30, 2008.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;

(1) The Nominating and Governance Committee's meeting was held subsequent to the fiscal year end.

- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (1) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (2) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating and Governance Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating and Governance Committee did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify the Company of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Luskin and Good. No executive officer of the Company has served during the fiscal year ended June 30, 2008 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2008, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K under the Exchange Act.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Table of Contents

**RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2009, and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's shareholders at the Annual Meeting. Moss Adams has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's shareholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its shareholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors unanimously recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2009. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

**ADOPTION OF 2008 EMPLOYEE STOCK PURCHASE PLAN**
***(Proposal No. 3 of the Proxy Card)***

**Introduction**

The Board of Directors recommends that the Company's shareholders approve the OSI Systems, Inc. 2008 Employee Stock Purchase Plan (the "New ESPP"), including the reservation of 1,500,000 shares of Common Stock for issuance thereunder. The New ESPP was adopted by the Company's Board of Directors on August 26, 2008, and, following approval by the shareholders, will replace the Company's existing Employee Stock Purchase Plan (the "Old ESPP") adopted in 1998. The New ESPP is intended to qualify as an "employee stock purchase plan" under Section 423 of the U.S. Internal Revenue Code (the "Code"). As of October 10, 2008, no shares had been issued pursuant to the New ESPP. The Company anticipates that the first Offering Period (as defined below) under the New ESPP will begin on January 1, 2009.

**Summary and Purpose of the 2008 Employee Stock Purchase Plan**

The purpose of the New ESPP is to encourage and enable eligible employees to acquire a financial stake in the Company through the ownership of Common Stock. The New ESPP offers eligible employees the opportunity to acquire Common Stock through periodic payroll deductions at a discount from the current market price in accordance with applicable Internal Revenue Service regulations. The Board of Directors believes that the New ESPP is in the best interest of the shareholders, as it helps increase the number of the Company's employees who own Common Stock and helps align employee and shareholder interests. The Board of Directors believes that the New ESPP will also help the Company to attract, retain and motivate its employees.

The Company's Old ESPP expires on December 31, 2008. If the shareholders approve the New ESPP, it will replace the Company's Old ESPP with respect to future offerings to employees. As of October 10, 2008, an aggregate of 133,067 shares remain available for future issuance under the Old ESPP. The Company anticipates that approximately 100,000 shares will remain unissued under the Old ESPP when it expires. Any shares which remain unissued under the Old ESPP when it expires will not be available for future issuance under the New ESPP.

The following is a summary of the principal provisions of the New ESPP. This summary does not purport to be a complete description of all of the provisions of the New ESPP. It is qualified in its entirety by reference to the full text of the New ESPP, which is included as Appendix A to this Proxy Statement.

*Number of Authorized Shares*

The maximum aggregate number of shares of the Company's Common Stock that may be issued under the New ESPP shall be 1,500,000 shares.

*Administration*

The New ESPP is administered by the Board of Directors or a committee appointed by the Board (the "Committee"). Unless otherwise specified by the Board of Directors, the Committee shall consist of the members of the Company's Compensation Committee. Every finding, decision and determination by the Board of Directors or the Committee shall, to the full extent permitted by law, be final and binding upon all parties.

*Eligibility*

All U.S. persons who are regular employees of the Company whose date of hire was at least ninety (90) days prior to the commencement of an Offering Period and who are customarily employed by the Company for at least twenty (20) hours per week and more than five (5) months per calendar year are eligible to participate

in the New ESPP. Participation in the New ESPP ends automatically on termination of employment with the Company. An eligible employee may become a participant by completing an enrollment form authorizing payroll deductions and delivering it to the Company's human resources office prior to the applicable enrollment date.

*Offering and Exercise Periods*

The New ESPP is implemented by overlapping offering periods of twenty-four (24) months each ("Offering Periods"). Offering Periods commence every six months, beginning on January 1 and July 1 of each year and consist of four exercise periods of six months each ("Exercise Periods"). The Board of Directors or the Committee may change the duration of the Exercise Periods or the length or date of commencement of an Offering Period.

*Grant of Option; Purchase Price; Limitations*

On the first day of each Offering Period (the "Offering Date"), each eligible employee participating in the New ESPP will be granted an option to purchase on the last day of each Exercise Period in such Offering Period (the "Exercise Date") a number of shares of Common Stock of the Company determined by dividing such employee's accumulated payroll deductions by the lower of: (i) 85% of the fair market value of one share of the Company's Common Stock on the Offering Date or (ii) 85% of the fair market value of one share of the Company's Common Stock on the applicable Exercise Date. Unless a participating employee withdraws from the New ESPP, his or her option will be automatically exercised on each Exercise Date of the Offering Period; provided that in no event will an employee be permitted to purchase during an Exercise Period a number of shares in excess of the number determined by dividing $12,500 by the fair market value of a share of the Company's Common Stock on the Offering Date. The fair market value of the Common Stock on a given date is the closing sale price of the Common Stock for such date as quoted on the Nasdaq Global Market.

In addition, no employee will be granted an option under the New ESPP if, immediately after grant, the employee would own 5% or more of the voting power or value of all classes of stock of the Company or of any of its subsidiaries (including stock which may be purchased under the New ESPP or pursuant to any other options), nor will any employee be permitted to participate to the extent such employee could buy under all employee stock purchase plans of the Company more than $25,000 worth of stock (determined at the fair market value of the shares at the time the option is granted) in any calendar year.

*Payroll Deductions*

The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation, which is defined in the plan to mean the annual base rate of pay of an eligible employee during an Offering Period, determined in accordance with nondiscriminatory rules adopted by the Board of Directors, plus commissions and cash bonuses, but excluding income with respect to stock options, restricted stock awards or other stock purchases and expense reimbursements. A participant may discontinue his or her participation in the New ESPP at any time during the Offering Period. Payroll deductions commence on the first payday following the Offering Date, and continue at the same rate with automatic enrollment in subsequent Offering Periods, unless sooner terminated by the participant.

*Automatic Transfer to Low Price Offering Period*

In the event that the fair market value of the Company's Common Stock is lower on an Exercise Date than it was on the first day of the Offering Period, all employees participating in the New ESPP on the Exercise Date will be deemed to have withdrawn from the Offering Period immediately after exercise of their option and to have enrolled as participants in the newly commencing Offering Period.

Table of Contents

*Withdrawal; Termination of Employment*

Employees may end their participation in an offering at any time during the Offering Period, and participation ends automatically on termination of employment with the Company or failure of the participant to remain in the continuous scheduled employment of the Company for at least twenty (20) hours per week. Once a participant withdraws from a particular offering, that participant may not participate again in the same offering. A participant may withdraw all, but not less than all, of the payroll deductions credited to such participant's account by giving written notice to the Company.

*Transferability*

No rights or accumulated payroll deductions of a participant under the New ESPP may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will or the laws of descent and distribution), and any such attempt may be treated by the Company as an election to withdraw from the New ESPP.

*Adjustments Upon Changes in Capitalization, Dissolution, Merger, Asset Sale or Change of Control*

The shares reserved under the New ESPP, as well as the price per share of Common Stock covered by each option under the New ESPP which has not yet been exercised, will be proportionately adjusted for any stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company. In the event of the proposed dissolution or liquidation of the Company, the pending Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board of Directors. In the event of a proposed sale of all or substantially all the assets of the Company or a merger of the Company with or into another corporation, the New ESPP provides that each option under the New ESPP will be assumed or an equivalent option will be substituted by the successor or purchaser corporation, unless the Board of Directors determines, in its sole discretion, to terminate the pending Offering Period prior to the consummation of such event, in which case the option will be exercisable for a period of thirty days thereafter.

*Amendment and Termination*

The Board of Directors of the Company may at any time and for any reason terminate or amend the New ESPP. Except as provided in the New ESPP, no termination can affect options previously granted, nor may any amendment make any change in any option already granted which adversely affects the rights of any participant. Shareholder approval is required under the New ESPP for any amendment which would:

- Increase the aggregate number of shares of Common Stock to be issued under the New ESPP;
- Materially modify the requirements for eligibility to participate in the New ESPP;
- Increase the maximum number of shares of Common Stock which a participant may purchase in any Offering Period;
- Extend the term of the New ESPP;
- Alter the option price per share formula so as to reduce the price for shares of Common Stock to be purchased under the New ESPP;
- Otherwise materially increase the benefits accruing to participants under the New ESPP; or
- Cause the New ESPP to fail to meet the requirements of an "employee stock purchase plan" under Section 423 of the Code.

Unless terminated sooner, the New ESPP will terminate 10 years from its date of adoption.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1805 of 2711

Table of Contents

**Federal Tax Information**

The following information is a general summary of the federal income tax consequences of the New ESPP to participants and to the Company. Tax laws may change, and actual tax consequences will depend on the participant's individual circumstances as well as state and local tax laws. The Company encourages all employees to seek tax advice when they participate in the ESPP. The ESPP is intended to qualify as an "employee stock purchase plan" under Code Section 423.

*Tax Treatment of Participants*

Participants will not recognize income when they enroll in the New ESPP or when they purchase shares. If the participant holds the shares acquired under the New ESPP for one year or more after the Exercise Date and two years or more after the Offering Date, or if the participant dies while owning the shares, the participant will generally recognize ordinary income when disposing of the shares equal to the difference between the purchase price and the fair market value of the shares on the date of disposition, or 15% of the fair market value of the shares on the Offering Date, whichever is less. Any additional gain will be taxed as long-term capital gain. If the shares are sold for less than the purchase price, there is no ordinary income, but the participant will have a long-term capital loss for the difference between the purchase price and the sale price. If a participant sells or gifts the shares less than one year after the Exercise Date or less than two years after the Offering Date, the participant will generally have ordinary income equal to the difference between the purchase price and the fair market value on the Exercise Date. The difference between the sale price and the fair market value on the Exercise Date will be a capital gain or loss.

*Tax Treatment of Company*

When a participant recognizes ordinary income by disposing of shares before the one-year or two-year holding period ends, the Company will generally be entitled to a tax deduction in the amount of the ordinary income.

**New Plan Benefits**

Eligible employees participate in the New ESPP voluntarily and each such employee determines his or her level of payroll deductions within the guidelines fixed by the New ESPP. Accordingly, future purchases under the New ESPP are not determinable at this time.

***The Board of Directors unanimously recommends that you vote "FOR" the adoption of the New ESPP, including the reservation of 1,500,000 shares of Common Stock for issuance thereunder. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Compensation Discussion & Analysis

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the "Named Executive Officers," as defined under the section entitled "Compensation of Executive Officers and Directors – Summary Compensation Table." Please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Overview of Compensation Philosophy and Guiding Principles*

The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with its business strategy, objectives and stockholder interests, and is designed to attract, motivate and retain highly qualified and key executives. Executive compensation elements generally consist of a base salary, an annual cash bonus, long-term equity compensation and certain benefits and perquisites more fully described below.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee to assist in recommending and reviewing executive compensation for the Named Executive Officers. The Compensation Committee reviews and approves salaries, annual bonuses, long-term incentive compensation, benefits, and other compensation in order to ensure that the Company's executive compensation strategy and principles are aligned with its business strategy, objectives and stockholder interests. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Nasdaq Listing Standards, as currently in effect.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. The Compensation Committee appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability and overall management contributions to the Company.

In general, the process by which the Compensation Committee makes decisions relating to executive compensation includes, but is not limited to, consideration of the following factors:

- The Company's executive compensation philosophy and practices;
- The Company's performance relative to peers and industry standards;
- Success in attaining annual and long-term goals and objectives;
- Alignment of executive interests with shareholder interests through equity-based awards and performance-based compensation;
- Individual and team contributions, performance and experience; and
- Total compensation and the mix of compensation elements for each Named Executive Officer.

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies in the industries in which the Company operates. The Compensation Committee assesses competitive market compensation using a number of data sources reflecting industry practices of other organizations similar in size.

Table of Contents

The Compensation Committee reviews each component of the executive's compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2008, the Compensation Committee engaged Watson Wyatt to prepare such surveys and provide expert advice. The surveys used for comparison reflect compensation levels and practices for executives holding comparable positions at targeted peer-group companies. These surveys collect compensation data from peer-group companies based on revenues. The survey data utilized by the Compensation Committee generally includes:

- base salary;
- annual bonus;
- total cash compensation;
- pay adjustment trends;
- long-term incentives;
- retirement and capital accumulation;
- benefits and perquisites; and
- equity ownership.

In implementing the Company's compensation program, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

*Executive Compensation Program Elements*

The Compensation Committee reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. In addition, the Compensation Committee reviews components of the Named Executive Officer's compensation against executive compensation surveys of a peer group prepared by outside compensation consultants with the intent to establish targeted levels of base salary, annual incentive bonus and long-term incentive compensation. The particular elements of the compensation program for the Named Executive Officers consist of the following:

*Base Salary.* Base salary is set to attract and retain executive talent. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Incentive Bonus.* Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement. Named Executive Officers are eligible for a target annual incentive bonus. The Company pays annual incentive bonuses to its Named Executive Officers based upon the achievement of targets that are indicative of the Company's performance, as well as individual performance. The annual incentive bonus for fiscal year 2008 paid to each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Compensation/Equity Based Awards.* The Company's long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the interests of the Company's stockholders. The Company's long-term incentive program consists of periodic grants of restricted stock and stock options which are made at the discretion of the Compensation Committee under the Company's Amended and Restated 2006 Equity Participation Plan

(the "Equity Plan"). Decisions made by the Compensation Committee regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, contributions to the Company's development, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

The Compensation Committee grants awards to the Named Executive Officers under the Equity Plan. All equity awards are made at fair market value on the date of grant with respect to stock options (which is the date on which the Compensation Committee authorizes the grant). Under the Equity Plan, fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees including the Company's 401(k) Plan, Equity Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, vision and dental plans require each participant to pay a contributory amount. In certain instances, the Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service.

The Company also maintains a Nonqualified Deferred Compensation Plan that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death. Currently, Mr. Chopra is the only employee that participates in this plan.

*Total Compensation Mix*

The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based compensation, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy to pay median pay for median performance and above-market pay for superior performance.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze. The terms of each of such agreements are summarized below under the heading "Employment Agreements."

Table of Contents

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax, securities laws and accounting regulation in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of the Statement of Financial Accounting Standard No. 123, “Share-Based Payment” (“SFAS 123R”), which the Company adopted in fiscal 2006, on the Company’s use of equity-based awards. This consideration factored heavily in the Company’s decision with respect to stock options grants made in fiscal year 2008. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Code with respect to annual compensation exceeding $1.0 million and Section 280(b) of the Code with respect to change in control payments exceeding specified limits.

**Executive Officers**

***Deepak Chopra*** is President and Chief Executive Officer of the Company. He also serves as Chairman of the Board of Directors. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company’s inception in May 1987. He has served as the Company’s Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company’s major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC’s United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick was named the Company’s Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than 18 years of financial management and public accounting experience, including mergers and acquisitions, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc, a biotechnology company, until its sale to Invitrogen Corporation. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick currently serves as a Director of Vertical Branding, Inc., a publicly held consumer products company that is quoted on the OTC Bulletin Board. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company’s Security division. Mr. Mehra is also a member of the Company’s Board of Directors. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company’s Executive Vice President. Mr. Mehra became a Director in March 1996. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is Executive Vice President, General Counsel and Secretary of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of

Table of Contents

Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor or Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in Management certificate from the Anderson School at the University of California, Los Angeles.

Table of Contents

### Summary Compensation Table

The following table sets forth the compensation for the principal executive officer, the principal financial officer, the three highest paid executive officers of the Company serving as executive officers on June 30, 2008 whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2008, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards (2)($) | All Other Compensation (3)(4)(5)($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 2008 | 1,000,000 | 700,000 | 113,671 | 881,154 | 116,171 | 2,810,996 |
| | 2007 | 998,077 | 250,000 | — | 1,167,801 | 83,203 | 2,499,081 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 2008 | 327,596 | 220,000 | 22,961 | 285,429 | 35,631 | 891,617 |
| | 2007 | 262,277 | 150,000 | — | 154,895 | 16,804 | 583,976 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 2008 | 371,827 | 200,000 | 17,956 | 261,306 | 49,747 | 900,836 |
| | 2007 | 351,928 | 80,000 | — | 260,285 | 45,845 | 738,058 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 2008 | 311,827 | 135,000 | 13,183 | 224,765 | 36,776 | 721,551 |
| | 2007 | 285,865 | 205,000 | — | 247,056 | 29,768 | 767,689 |
| Manoocher Mansouri<br>President of Optoelectronics and Manufacturing division | 2008 | 225,000 | 40,000 | 23,668 | 22,072 | 21,628 | 332,368 |
| | 2007 | 184,622 | 43,000 | — | 20,560 | 22,985 | 271,167 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation" and "Change in Pension Value and Nonqualified Deferred Compensation Earnings" because no amounts would have been included in such columns.

(2) The amounts in the "Stock Awards" and "Option Awards" column are calculated using the provisions of SFAS 123R.

(3) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Equity Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan and the medical, vision and dental plans require each participant to pay a contributory amount. In certain instances, the Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. Certain of the Named Executive Officers also participate in life and long-term disability insurance plans that are not made available to all employees. In certain circumstances, the Company leases a car on behalf of a Named Executive Officer or provides a Named Executive Officers with a car allowance.

(4) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2008 are as follows (in thousands):

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions ($) | Car Benefit ($) | Membership Dues (*)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,600 | 1,780 | 5,348 | 16,720 | 87,723 | 116,1714 |
| Alan Edrick | 8,716 | 12,000 | — | 5,616 | 9,299 | 35,631 |
| Ajay Mehra | 8,296 | 6,675 | — | 16,949 | 17,827 | 49,747 |
| Victor S. Sze | 7,527 | 12,000 | — | 8,892 | 8,357 | 36,776 |
| Manoocher Mansouri | 4,963 | 7,200 | — | 7,177 | 2,288 | 21,628 |

(*) Membership Dues consists of payments made to a golf club.

Table of Contents

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2007 are as follows (in thousands):

| Name | Matching 401(k) Contributions ($) | Car Benefit ($) | Membership Dues (*)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 2,139 | 2,030 | 3,763 | 12,574 | 62,697 | 83,203 |
| Alan Edrick | 963 | 11,000 | — | 4,841 | — | 16,804 |
| Ajay Mehra | 2,765 | 4,745 | — | 18,977 | 19,358 | 45,845 |
| Victor S. Sze | 690 | 12,000 | — | 10,722 | 6,356 | 29,768 |
| Manoocher Mansouri | 3,182 | 5,850 | — | 11,665 | 2,288 | 22,985 |

(*) Membership Dues consists of payments made to a golf club.

Table of Contents

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2008, to each of our Named Executive Officers(1):

| Name Position | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(2)(#) | All Other Option Awards: Number of Securities Underlying Options (3)(#) | Exercise or Base Price of Option Awards (4)($/Sh) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|
| Deepak Chopra | 9/17/2007 | — | 60,000 | $ 20.02 | $447,663 |
| Chairman, President and Chief Executive | 9/17/2007 | 15,000 | — | — | $300,300 |
| Officer | 2/08/2008 | 17,000 | — | — | $394,060 |
| Alan Edrick | 9/17/2007 | — | 48,000 | $ 20.02 | $358,130 |
| Executive V.P., Chief Financial Officer | 9/17/2007 | 3,000 | — | — | $ 60,060 |
| | 2/08/2008 | — | 14,000 | $ 23.18 | $117,500 |
| | 2/08/2008 | 3,500 | — | — | $ 81,130 |
| Ajay Mehra | 9/17/2007 | — | 32,000 | $ 20.02 | $238,754 |
| Executive V.P. of the Company, President of | 9/17/2007 | 2,000 | — | — | $ 40,040 |
| Security division | 2/08/2008 | — | 14,000 | $ 23.18 | $117,500 |
| | 2/08/2008 | 3,500 | — | — | $ 81,130 |
| Victor S. Sze | 9/17/2007 | — | 24,000 | $ 20.02 | $179,065 |
| Executive V.P., General Counsel and Secretary | 9/17/2007 | 1,500 | — | — | $ 30,030 |
| | 2/08/2008 | — | 10,000 | $ 23.18 | $ 83,929 |
| | 2/08/2008 | 2,500 | — | — | $ 57,950 |
| Manoocher Mansouri | 7/24/2007 | 2,500 | — | — | $ 64,475 |
| President, Optoelectronics and Manufacturing | 2/08/2008 | — | 7,500 | $ 23.18 | $ 62,947 |
| Division | 2/08/2008 | 1,875 | — | — | $ 43,463 |

(1) The Company has eliminated from this table the columns titled "Estimated Future Payouts Under Non-Equity Incentive Plan Awards" and "Estimated Future Payouts Under Equity Incentive Plan Award" because no amounts would have been included in such columns.
(2) The grants of restricted stock vest over a period of between three and four years from the date of grant.
(3) The option grants expire after five or ten years from the date of grant and vest over three years from the date of grant.
(4) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.
(5) The grant date fair value of the stock options and restricted stock shown in the table above was computed in accordance with SFAS 123R and represents the total projected expense to the Company of grants made during the past fiscal year.

Table of Contents

### Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2008(1):

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(3)(#) | Option Exercise Price (4)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (5) (#) | Market Value of Shares or Units of Stock That Have Not Vested(6) ($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 100,000 | — | $ 19.86 | 2/12/2009 | — | — |
| | 21,202 | — | $ 14.50 | 10/25/2009 | — | — |
| | 80,000 | — | $ 20.91 | 11/25/2009 | — | — |
| | 50,000 | 50,000 | $ 18.53 | 11/10/2010 | — | — |
| | 10,573 | 10,574 | $ 25.91 | 7/10/2010 | — | — |
| | 25,000 | 25,000 | $ 17.90 | 6/22/2011 | — | — |
| | 43,084 | 43,085 | $ 17.37 | 6/22/2011 | — | — |
| | 2,439 | 7,317 | $ 26.81 | 11/21/2011 | — | — |
| | 20,400 | 39,600 | $ 20.02 | 9/16/2017 | — | — |
| | — | — | — | — | 28,250 | $ 605,115 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 4,308 | 12,927 | $ 17.37 | 7/24/2011 | — | — |
| | 12,500 | 37,500 | $ 17.99 | 7/30/2011 | — | — |
| | 1,948 | 5,845 | $ 26.81 | 11/21/2011 | — | — |
| | 16,320 | 31,680 | $ 20.02 | 9/16/2017 | — | — |
| | — | 14,000 | $ 23.18 | 2/ 7/2018 | — | — |
| | — | — | — | — | 5,750 | $ 123,165 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,000 | — | $ 19.86 | 2/12/2009 | — | — |
| | 1,061 | — | $ 13.60 | 3/31/2009 | — | — |
| | 3,181 | — | $ 14.50 | 10/25/2009 | — | — |
| | 25,000 | — | $ 20.91 | 11/25/2009 | — | — |
| | 30,162 | 30,163 | $ 16.21 | 2/7/2011 | — | — |
| | 10,769 | 32,308 | $ 18.53 | 2/5/2012 | — | — |
| | 10,880 | 21,120 | $ 20.02 | 9/16/2017 | — | — |
| | — | 14,000 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 5,000 | $ 107,100 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 17,500 | — | $ 19.86 | 2/12/2009 | — | — |
| | 4243 | — | $ 13.60 | 3/31/2009 | — | — |
| | 17,500 | — | $ 20.91 | 11/25/2009 | — | — |
| | 4241 | — | $ 22.28 | 4/4/2010 | — | — |
| | 10,000 | 10,000 | $ 18.53 | 11/10/2010 | — | — |
| | 2,758 | 2,758 | $ 16.21 | 2/7/2011 | — | — |
| | 5,000 | 15,000 | $ 18.16 | 7/6/2011 | — | — |
| | 3,231 | 9,695 | $ 17.37 | 7/6/2011 | — | — |
| | 389 | 1,170 | $ 26.81 | 11/21/2011 | — | — |
| | 8,160 | 15,840 | $ 20.02 | 9/16/2017 | — | — |
| | — | 10,000 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 3,625 | $ 77,648 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 1,500 | — | $ 16.10 | 8/13/2008 | — | — |
| | 1,500 | — | $ 19.88 | 3/1/2009 | — | — |
| | 213 | — | $ 13.60 | 3/31/2009 | — | — |
| | 2,500 | — | $ 17.19 | 3/9/2010 | — | — |
| | 1,250 | 1,250 | $ 19.58 | 1/10/2011 | — | — |
| | 862 | 862 | $ 16.21 | 4/17/2011 | — | — |
| | — | 7,500 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 3,750 | $ 80,325 |

(1) The Company has eliminated from this table the columns titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options," "Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested" and "Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested" because no amounts would have been included in such columns.

Table of Contents

(2) Each option grant vests over a three year period from the date of grant.
(3) During the year ended June 30, 2008, the Company converted all stock options outstanding under stock option plans offered by each of its Spacelabs Healthcare, Inc. and Rapiscan Systems Holdings, Inc. subsidiaries to stock options under the Company's Equity Plan. The stock options outstanding under the Spacelabs Healthcare, Inc. plan were converted to stock options under the Company's Equity Plan on December 19, 2007, and the stock options outstanding under the Rapiscan Systems Holdings, Inc. plan were converted to stock options under the Company's Equity Plan on March 17, 2008. The methodology used for such conversions provided equivalent fair values under the Equity Plan.
(4) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.
(5) Includes restricted stock awards granted between July 2007 and June 2008. These restricted stock awards vest over a period of between three and four years from the date of grant.
(6) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2008, multiplied by the closing price of the Company's Common Stock on June 30, 2008 ($21.42 per share).

## Option Exercises and Stock Vested Table

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2008:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| **Name and Principal Position** | **Number of Shares Acquired on Exercise** | **Value Realized on Exercise(1) ($)** | **Number of Shares Acquired on Vesting** | **Value Realized on Vesting(2) ($)** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 100,000 | $ 879,000 | 3,750 | $ 80,325 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | — | 750 | $ 16,065 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,000 | $ 219,750 | 500 | $ 10,710 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | — | — | 375 | $ 8,033 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 7,250 | $ 63,443 | 625 | $ 14,838 |

(1) Represents the difference between the closing price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.
(2) Represents the number of restricted stock awards that vested multiplied by the closing price of the Company's Common Stock on the date of vesting.

## Pension Benefits

During the year ended June 30, 2008, the Company did not sponsor any qualified or non-qualified defined benefit plan for any Named Executive Officer. On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan. Mr. Chopra is currently its only participant.

## Nonqualified Deferred Compensation

The Company adopted a nonqualified deferred compensation plan in May 2008 (the "Deferred Compensation Plan"). Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of

Table of Contents

these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants.

Participants receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Company's 401(k) Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2008 ranged from -10.2% to 0%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the Named Executive Officers during fiscal year ended June 30, 2008(1):

| Name and Principal Position | Executive Contributions ($) | Company Contributions ($) | Aggregate Earnings (2)($) | Aggregate Balance ($) |
|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 5,354 | 5,354 | ($653) | $ 10,054 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 5,769 | 5,769 | ($709) | $ 10,830 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 5,046 | 5,046 | ($616) | $ 9,477 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 6,670 | 2,507 | ($70) | $ 9,108 |

(1) The Company has eliminated from this table the column titled "Aggregate Withdrawals/Distributions" because no amounts would have been included in such column.
(2) Represents earnings (losses) during the year ended June 30, 2008.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze.

*Deepak Chopra's Employment Agreement*

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with Mr. Chopra. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (i) the fifth anniversary of the date of the agreement or (ii) the close of business three years following the date that either party elects to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. Mr. Chopra is entitled to receive one-third of the Company's year-end bonus pool for management, if a bonus pool is established, and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Chopra from soliciting its employees or customers after the expiration of the term of his employment with the Company.

Under the terms of the agreement with Mr. Chopra, the Company may terminate Mr. Chopra's employment at any time for "cause," as defined in the agreement.

In the event that Mr. Chopra resigns from his employment with the Company with "good reason" (as defined in the agreement), or the Company terminates Mr. Chopra without cause, then: (i) Mr. Chopra is entitled to his unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses, and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of his resignation with good reason or termination without cause; (ii) Mr. Chopra would continue to be entitled to receive all of his salary, unpaid expenses, unpaid vacation days, bonuses and other benefits made available to the Company's senior members of management, or to its employees generally, for a period of three years from the date of resignation with good reason or termination without cause, without any deduction or offset for any compensation earned or received by Mr. Chopra from any other sources and without any further obligation by Mr. Chopra to render services to the Company; and (iii) at Mr. Chopra's election, all of his unvested stock options in the Company would fully vest upon the date of his resignation with good reason or termination without cause.

In the event Mr. Chopra resigns from the Company with good reason or the Company terminates him without cause at any time upon or after the occurrence of a "change in control" (as defined in the agreement), then Mr. Chopra, at his option and in lieu of receiving the amounts set forth above may elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Code Section 280G(b)(3)). In connection with such alternative payment, Mr. Chopra, in his sole discretion, has the right to have all or any portion of his unvested stock options accelerate as of the date of such resignation or termination.

In the event that Mr. Chopra dies or becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, then, upon the date of his death or upon the Company's termination of his employment due to a disability, (i) Mr. Chopra would be entitled to all unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of Mr. Chopra's death or termination for disability and (ii) all of Mr. Chopra's unvested stock options in the Company would fully vest on such date.

On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death or disability. Currently, Mr. Chopra is the only employee that participates in this plan. Under the terms of his participation, commencing on the first day of the month following the date that Mr. Chopra turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For every year that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333. However, in no event will his total yearly benefit exceed $600,000. If Mr. Chopra terminates his employment with the Company within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If Mr. Chopra remains in the service of the Company for more than two years following a change in control, his benefit will continue as scheduled. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Nonqualified Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions. Mr. Chopra's benefits under the Nonqualified Defined Benefit Plan will vest equally over the remaining seven years of his service to the Company (assuming retirement at the age of 65).

*Alan Edrick's and Victor Sze's Employment Agreements*

On September 22, 2008, the Company entered into an employment agreement with each of Messrs. Edrick and Sze (each, the "Executive"). The terms of such agreements are nearly identical. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ the Executive until the later of (i) the third anniversary of the date of the agreement or (ii) one year following the date that the Company notifies the Executive

of its election to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. The Executive is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees, to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude the Executive from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 60 days within any six-month period; or (iii) on 30 days' written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement).

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 18 months' salary at the Executive's then-current base salary; (ii) an amount equal to 1.5 times the average bonus paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and an extension of time to exercise such stock options such that the Executive's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) an amount equal to 24 months' salary at the Executive's then-current base salary; (ii) an amount equal to twice the average of bonuses paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and such stock options shall remain exercisable by the Executive for no less than 12 months after the date of such termination. Under such circumstances, the Executive may, at his option, and in lieu of receive the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Code Section 280G(b)(3)); provided, however, that in such case, the amount of such alternative payment shall be reduced by the value of acceleration (as determined under Code Section 280G and the regulations thereunder) of any equity or stock options accelerated under the terms of the agreement.

*Ajay Mehra's Employment Agreement*

On September 1, 2000, the Company entered into an employment agreement with Mr. Mehra. In November 2006, the Company amended Mr. Mehra's employment agreement to extend the term of the agreement until August 31, 2009. The agreement provides for a base salary to be determined each year by the Company. Mr. Mehra is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Mehra from soliciting its employees or customers after the expiration of the term of his employment with the Company.

The Company may terminate the employment agreement on 30 days' written notice, subject to the obligation described in the paragraph below. In addition, in the event that Mr. Mehra dies or becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, then, upon the date of his death or upon the Company's termination of his employment due to a disability, the Company may terminate the agreement.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1819 of 2711

Table of Contents

If the Company terminates Mr. Mehra's employment without "cause" (as defined in the agreement), then, in addition to all compensation accrued and outstanding as of such termination date, Mr. Mehra will be entitled to receive the salary, bonus and other benefits that he would have received had he remained employed during the remainder of the term of the agreement, without deduction or offset for any compensation earned or received by Mr. Mehra from any other sources.

### Potential Payment upon Termination of Employment or Change in Control

The following table reflects the breakdown of potential payments and benefits upon termination or a change in control. The table assumes that the terms of employment to which each Named Executive Officer is currently subject had been effect on June 30, 2008 and that employment terminated on such date. The table also assumes that the price of the Company's stock, on which certain calculations in the following table are made, was the closing price of the Company's Common stock on that date ($21.42).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included the following table, include: (i) regular salary accrued as of the final date of employment; (ii) vacation and paid time off accrued as of the final date of employment; (iii) travel expense reimbursements not yet paid as of the final date of employment; and (iv) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following table are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

| Name and Principal Position | Reason for Termination | Base Salary | Bonus(1) | Accelerated Vesting | Total |
|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | Cause | — | $ 700,000 | — | $ 700,000 |
| | Good Reason or Without Cause | $3,000,000(2) | $2,800,000 (2) | $ 462,434 | $ 6,262,434 |
| | Good Reason or Without Cause in Connection with a Change in Control Alternative Payment(3) | $ 2,990,000 | — | $ 462,434 | $3,452,434 |
| | Death or Permanent Disability | — | $ 700,000 | $ 462,434 | $1,162,434 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | Good Reason or Without Cause | $ 502,500 | $ 225,000 | $ 348,496 | $1,075,996 |
| | Good Reason or Without Cause in Connection with a Change in Control | $ 670,000 | $ 300,000 | $ 348,496 | $1,318,496 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(3) | $ 1,001,650 | — | — | $1,001,650 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | Termination without Cause | $ 442,500(4) | $ 400,000 | — | $ 861,530 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | Good Reason or Without Cause | $ 450,000 | $ 140,000 | $ 231,257 | $ 821,257 |
| | Good Reason or Without Cause in Connection with a Change in Control | $ 600,000 | $ 186,667 | $ 231,257 | $1,017,924 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(3) | $ 897,000 | — | — | $ 897,000 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2008, for performance in the fiscal year ended June 30, 2008.

(2) These amounts assume that Mr. Chopra would be entitled to the same salary and bonuses during the three years following the date of resignation for Good Reason or termination without cause as he earned during the year ended June 30, 2008.

Table of Contents

(3) This reflects the compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for Good Reason or the Company terminates his employment without Cause following a Change in Control and the Named Executive Officer elects to receive the alternate payment method described in his employment agreement.
(4) For the purposes of this table, the "Base Salary" amount is calculated on the amount actually paid to Mr. Mehra during July and August of 2008, plus a period of 12 months at his current base salary.

## Director Compensation

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

Each non-employee director receives a fee of $30,000 per year, $1,500 for each Board of Directors meeting attended, and options to purchase 7,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) per year, at an exercise price equal to 100% of fair market value as of the date of grant. Each non-employee director may also, from time to time, become eligible to receive additional shares of restricted Common Stock.

Each member of the Audit Committee receives a fee of $1,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Compensation Committee receives a fee of $1,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Nominating and Governance Committee receives a fee of $1,500 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also receives a fee of $5,000 per year.

Each member of the Executive Committee receives a fee of $15,000 per year and options to purchase 10,000 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

All options granted to members of the Board of Directors and it committees vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2008 for each member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 60,000 | 18,769 | 182,616 | 261,385 |
| Meyer Luskin | 58,500 | 18,769 | 182,616 | 259,885 |
| Chand R. Viswanathan | 38,000(3) | 12,513 | 98,817 | 149,330 |
| Leslie E. Bider | 35,000 | 8,759 | 38,780 | 82,539 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.
(2) Amounts calculated utilizing the provisions of SFAS 123R.
(3) Amount includes $5,000 received by Mr. Viswanathan for serving on an advisory technology committee of the Company.

Table of Contents

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2008 by Mr. Chopra and his wife. The Company paid the business approximately $54,000 for such services during the year ended June 30, 2008. The Company contracts for printing services from a business owned by Mr. Chopra's father-in-law, Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $42,000 for such printing services during the year ended June 30, 2008.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

The Audit Committee of Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

We have reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, we recommend to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the amount of shares of the Company beneficially owned as of October 10, 2008 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,166,151 | 6.3% |
| Wells Fargo & Company(4) | 2,738,260 | 15.2% |
| Dimensional Fund Advisors, Inc.(5) | 1,338,727 | 7.4% |
| Wellington Management Company, LLP(6) | 1,190,042 | 6.6% |

(1)  Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2)  Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 10, 2008, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3)  Includes 90,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 55,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 564,190 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 41,250 shares of unvested restricted stock granted between September 17, 2007 and July 28, 2008 are held individually by Mr. Chopra. Includes 52,439 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4)  As reported in a Schedule 13F-HR filed on August 12, 2008 with the SEC, the address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94104.

(5)  As reported in a Schedule 13F-HR filed on August 1, 2008 with the SEC, the address of Dimensional Fund Advisors, Inc. is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(6)  As reported in a Schedule 13F-HR filed on August 14, 2008 with the SEC, the address of Wellington Management Company, LLP is 75 State St., Boston, MA 02109.

Table of Contents

The following table sets forth the amount of shares of the Company beneficially owned as of October 10, 2008 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,166,151 | 6.3% |
| Ajay Mehra(4) | 254,017 | 1.4% |
| Alan Edrick(5) | 65,833 | 0.3% |
| Victor S. Sze(6) | 99,644 | 0.5% |
| Manoocher Mansouri(7) | 42,967 | 0.2% |
| Steven C. Good(8) | 88,247 | 0.5% |
| Meyer Luskin(9) | 96,547 | 0.5% |
| Chand R. Viswanathan(10) | 42,729 | 0.2% |
| Leslie E. Bider(11) | 11,888 | 0.0% |
| All directors and executive officers as a group (10 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11) | 1,868,023 | 9.9% |

(1)   Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2)   Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 10, 2008, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3)   Includes 90,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 55,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 564,190 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 41,250 shares of unvested restricted stock granted between September 17, 2007 and July 28, 2008 are held individually by Mr. Chopra. Includes 52,439 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4)   Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division.

(5)   Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 1,948 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008.

(6)   Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 10,390 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008.

(7)   Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division.

(8)   Includes 10,877 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

(9)   Includes 29,237 shares held by The Meyer and Doreen Luskin Family Trust. Includes 10,877 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 2811 Wilshire Boulevard, Suite 410, Santa Monica, CA 90403.

(10)  Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Viswanathan is a Director of the Company.

(11)  Includes 1,250 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Bider is a Director of the Company.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1824 of 2711

Table of Contents

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2008, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that Messrs. Chopra, Edrick, Mehra, Sze, Good, Viswanathan and Bider each untimely filed one Form 4 report during the year ended June 30, 2008, Mr Luskin untimely filed two Form 4 reports during the year ended June 30, 2008, and Mr. Mansouri untimely filed five Form 4 reports during the year ended June 30, 2008.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1825 of 2711
Table of Contents

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements and for the years ended June 30, 2008 and 2007 and fees billed by Moss Adams for other services during those years:

| | FY 2008 | FY 2007 |
|---|---|---|
| Audit Fees | $2,150,939 | $2,701,000 |
| Audit-Related Fees | — | — |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $2,150,939 | $2,701,000 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services related to projects other than statutory and regulatory filings. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Table of Contents

## REPORT OF AUDIT COMMITTEE

During the fiscal year ended June 30, 2008, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and Leslie E. Bider, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2008.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board in Rule 3200T. The Audit Committee received and discussed with the

Table of Contents

independent public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as adopted by the Public Company Accounting Oversight Board in Rule 3600T, and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2008 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Leslie E. Bider

Table of Contents

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended last year's annual meeting of shareholders in person.

## SHAREHOLDER COMMUNICATIONS

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

With respect to shareholders that receive copies of the Proxy Materials in the mail, in certain cases only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report and/or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

## SHAREHOLDER PROPOSALS

In the event that a shareholder desires to have a proposal considered for presentation at the 2009 Annual Meeting of Shareholders, and inclusion in the proxy statement and form of proxy used in connection with such meeting, the proposal must be forwarded in writing to the Secretary of the Company so that it is received no later than June 19, 2009. Any such proposal must comply with the requirements of Rule 14a-8 promulgated under the Exchange Act.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1829 of 2711
Table of Contents

The Company's Bylaws provide that if a shareholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the 2009 Annual Meeting of Shareholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the Company must receive notice of such proposal not less than 90 days prior to December 8, 2009. The notice must comply with the Company's Bylaws. Notices should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of the Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 13, 2008

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1830 of 2711

Table of Contents

**APPENDIX A**
**2008 Employee Stock Purchase Plan**

**OSI SYSTEMS, INC.**
**2008 EMPLOYEE STOCK PURCHASE PLAN**

The following constitute the provisions of the 2008 Employee Stock Purchase Plan (herein called the "Plan") of OSI Systems, Inc., a California corporation ("OSI Systems, Inc."). The Plan was adopted by the Board of Directors of OSI Systems, Inc. on August 26, 2008.

1. *Purpose*. The purpose of the Plan is to provide employees of the Company with an opportunity to purchase Common Stock of the Company through accumulated payroll deductions. The Plan is intended to qualify as an "Employee Stock Purchase Plan" under Section 423 of the Internal Revenue Code of 1986. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of that section of the Code.

2. *Definitions*.

(a) "*Board*" shall mean the Board of Directors of the Company.

(b) "*Code*" shall mean the Internal Revenue Code of 1986, as amended.

(c) "*Committee*" shall mean the committee appointed by the Board of Directors of OSI Systems, Inc. to administer the Plan in accordance with Section 13 below, if one is appointed.

(d) "*Common Stock*" shall mean the Common Stock, no par value per share, of OSI Systems, Inc.

(e) "*Company*" shall mean (i) OSI Systems, Inc., (ii) each of the existing Subsidiaries, as defined in Section 425 of the Code, of OSI Systems, Inc. that are incorporated in the United States, and (iii) any such other or future Subsidiaries as the Board of Directors of OSI Systems, Inc. shall from time to time designate. Until the Board of Directors of OSI System, Inc. determines otherwise, the term "Company" shall not refer to or include any Subsidiary incorporated outside of the United States.

(f) "*Compensation*" shall mean the annual base rate of pay of an eligible Employee during an Offering Period, determined in accordance with nondiscriminatory rules adopted by the Board of Directors, including commissions and cash bonuses, but excluding income with respect to stock options, restricted stock awards or other stock purchases and moving expense reimbursements.

(g) "*Continuous Status as an Employee*" shall mean the absence of any interruption or termination of service as an Employee. Continuous Status as an Employee shall not be considered interrupted in the case of a leave of absence agreed to in writing by the Company, provided that such leave is for a period of not more than 90 days or reemployment upon the expiration of such leave is guaranteed by contract or statute.

(h) "*Employee*" shall mean any regular employee of the Company whose date of hire was at least ninety (90) days prior to the commencement of an Offering Period, who is customarily employed for at least twenty (20) hours per week and more than five (5) months in a calendar year.

(i) "*Exercise Date*" shall mean the date one day prior to the date six (6) months, twelve (12) months, eighteen (18) months or twenty-four (24) months after the Offering Date of each Offering Period. In the absence of a specific determination to the contrary by the Board of Directors or the Committee, (i) for an Offering Period that commences on January 1 the following June 30, December 31, June 30 and December 31 shall each be an Exercise Date; and (ii) for an Offering Period that commences on July 1, the following December 31, June 30, December 31 and June 30 shall each be an Exercise Date.

(j) "*Exercise Period*" shall mean a period commencing on an Offering Date or on the day after an Exercise Date and terminating one day prior to the date six (6) months later.

(k) "*Offering Period*" shall mean, in the absence of a specific determination to the contrary by the Board of Directors or the Committee, a period of twenty-four (24) months beginning on January 1 and July 1 of each year consisting of four (4) six-month Exercise Periods during which options granted pursuant to the Plan may be exercised.

(l) "*Offering Date*" shall mean the first day of each Offering Period of the Plan.

(m) "*Plan*" shall mean this Employee Stock Purchase Plan.

(n) "*Plan Account*" means the account established for each participant pursuant to the Plan.

(n) "*Subsidiary*" shall mean a corporation, domestic or foreign, of which not less than 50% of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3. *Eligibility*.

(a) Any Employee as defined in Section 2(h) who shall be employed by the Company on the Offering Date shall be eligible to participate in the Plan, subject to limitations imposed by Section 423(b) of the Code.

(b) Any provisions of the Plan to the contrary notwithstanding, no Employee shall be granted an option under the Plan (i) if, immediately after the grant, such Employee (or any other person whose stock would be attributed to such Employee pursuant to Section 424(d) of the Code) would own stock and/or hold outstanding options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company, or (ii) which permits such Employee's rights to purchase stock under all employee stock purchase plans of the Company and its subsidiaries to accrue at a rate which exceeds Twenty-Five Thousand Dollars ($25,000) of fair market value of such stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time.

(c) In the event that the aggregate number of shares which all participants elect to purchase during an Offering Period shall exceed the number of shares remaining available for issuance under the Plan, the number of shares to which each participant shall become entitled shall be determined by multiplying the number of shares available for issuance, by a fraction, the numerator of which is the sum of the number of shares the participant has elected to purchase and the denominator of which is the sum of the number of shares which all participants have elected to purchase.

4. *Offering Periods*. The Plan shall be implemented by twenty-four (24) month Offering Periods beginning every six (6) months, until terminated in accordance with Section 19 hereof. The Board of Directors of the Company shall have the power to change the duration of offering periods with respect to future offerings without stockholder approval if such change is announced at least fifteen (15) days prior to the scheduled beginning of the first offering period to be affected. In no event shall an Offering Period exceed twenty-four (24) months.

5. *Participation*.

(a) An eligible Employee may become a participant in the Plan by delivering to the Company's human resources office an enrollment form provided by the Company authorizing payroll deductions not less than ten (10) business days prior to the applicable Offering Date, unless a later or earlier time for filing the form is set by the Board or Committee for all eligible Employees with respect to a given offering.

(b) Payroll deductions for a participant shall continue at the rate specified in the enrollment form throughout the Offering Period with automatic re-enrollment for the Offering Period which commences the day

Table of Contents

after the Exercise Date at the same rate specified in the original enrollment form, subject to any change in payroll deduction rate made pursuant to Section 6(c), unless sooner terminated by the participant as provided in Section 11. A participant is not required to file any additional enrollment forms for subsequent Offering Periods in order to continue participation in the Plan. A participant may not participate in more than one Offering Period at any given time.

6. *Payroll Deductions*.

(a) A participant shall designate on the enrollment form the percentage of Compensation which he or she elects to have withheld for the purchase of Common Stock, which may be any whole percentage from 1% to 10% of the participant's Compensation.

(b) All payroll deductions made by a participant shall be credited to his or her account under the Plan. A participant may not make any additional payments into such account.

(c) A participant may discontinue his or her participation in the Plan as provided in Section 11, or may reduce (but not increase) the rate of payroll withholding during an Offering Period by filing an amended enrollment form with the Company's human resources office at any time prior to the last day of any Offering Period (for which such change is to be effective), but not more than four (4) changes may be made in any Offering Period (or such other number of changes as may be approved by the Board or the Committee). A Participant may increase or decrease the rate of payroll deduction for any subsequent Offering Period by filing with the Company's human resources office a new authorization for payroll deductions not less than ten (10) business days prior to the Offering Date for such subsequent Offering Period.

7. *Grant of Option*.

(a) On the Offering Date of each Offering Period, each eligible Employee participating in the Plan shall be granted an option to purchase on each Exercise Date during such Offering Period (at the per share option price) up to a number of shares of the Company's Common Stock determined by dividing such Employee's payroll deductions to be accumulated prior to such Exercise Date by the lower of (i) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Offering Date or (ii) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Exercise Date; provided that in no event shall an Employee be permitted to purchase during an Exercise Period a number of shares in excess of a number determined by dividing $12,500 by the fair market value of a share of the Company's Common Stock on the Offering Date, subject to the limitations set forth in Sections 3(b) and 12 hereof. Fair market value of a share of the Company's Common Stock shall be determined as provided in Section 7(b) herein.

(b) The option price per share of the shares offered in a given Exercise Period shall be the lower of: (i) 85% of the fair market value of a share of the Common Stock of the Company on the Offering Date; or (ii) 85% of the fair market value of a share of the Common Stock of the Company on the Exercise Date. The fair market value of the Company's Common Stock on a given date shall be the closing price as quoted on the Nasdaq Stock Market, Inc.'s Global Market or, if traded on an alternative securities exchange, the closing price on such exchange.

8. *Exercise of Option*. Unless a participant withdraws from the Plan as provided in Section 11, his or her option for the purchase of shares will be exercised automatically on each Exercise Date of the Offering Period, and the maximum number of full shares subject to option will be purchased for him or her at the applicable option price with the accumulated payroll deductions in his or her account. During his or her lifetime, a participant's option to purchase shares hereunder is exercisable only by him or her.

9. *Purchase of Common Stock*. The Company will maintain a Plan Account on its books in the name of each participant. On each payday the amount deducted from the participant's Compensation will be credited to the participant's Plan Account. No interest shall accrue on any such payroll deductions. As promptly as

practicable after the Exercise Date of each offering, the Company shall arrange, for each participant as appropriate, for the issuance of the shares purchased upon exercise of his or her option in street name and for the delivery of such shares to the participant's account at the Company's designated broker-dealer. Any cash remaining which is insufficient to purchase a full share of Common Stock at the termination of each Exercise Period shall be credited to the participant's account for the next Exercise Period.

10. *Automatic Transfer to Low Price Offering Period*. In the event that the fair market value of the Company's Common Stock is lower on an Exercise Date than it was on the first Offering Date for that Offering Period, all Employees participating in the Plan on the Exercise Date shall be deemed to have withdrawn from the Offering Period immediately after the exercise of their option on such Exercise Date and to have enrolled as participants in a new Offering Period which begins on or about the day following such Exercise Date.

11. *Withdrawal; Termination of Employment*.

(a) A participant may withdraw all but not less than all the payroll deductions credited to his or her account under the Plan at any time prior to the Exercise Date of the Offering Period by giving written notice to the Company. All of the participant's payroll deductions credited to his or her account will be paid to him or her at the next pay date which follows the tenth business day after the receipt of his or her notice of withdrawal and his or her option for the current period will be automatically terminated, and no further payroll deductions for the purchase of shares will be made during the Offering Period.

(b) Upon termination of the participant's Continuous Status as an Employee prior to the Exercise Date for any reason, including retirement or death, the payroll deductions credited to his or her account will be returned to the participant or, in the case the of participant's death, to the representative of the participant's estate.

(c) A participant's withdrawal from an offering will not have any effect upon his or her eligibility to participate in a succeeding offering or in any similar plan which may hereafter be adopted by the Company.

12. *Number of Shares to be Offered*. The maximum aggregate number of shares of the Company's Common Stock that may be issued under the Plan shall be 1,500,000 shares, subject to adjustment upon changes in capitalization of the Company as provided in Section 15 hereof. In the event that any option granted under the Plan expires or is terminated for any reason, such shares allocable to the unexercised portion of such option shall again be subject to an option under the Plan.

13. *Administration*. The Plan shall be administered by the Board of Directors and/or by a duly appointed Committee consisting of not less than two persons, at least one of which shall be a member of the Board of Directors, and having such powers as shall be specified by the Board. The Board of Directors may from time to time remove members from, or add members to, the Committee. Vacancies on the Committee shall be filled by the Board of Directors. The Committee shall hold meetings at such times and places as it may determine. Unless otherwise specified by the Board of Directors, the Committee shall consist of the members of the Company's Compensation Committee. The interpretation and construction by the Board of Directors or the Committee of any provision of the Plan or of any right to purchase Common Stock shall be conclusive and binding on all persons.

14. *Transferability*. Neither payroll deductions credited to a participant's account nor any rights with regard to the exercise of an option or to receive shares under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, or the laws of descent and distribution) by the participant. Any such attempt at assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 11.

15. *Adjustments Upon Changes in Capitalization*. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each option under the Plan which has not yet been

exercised and the number of shares of Common Stock which have been authorized for issuance under the Plan but have not yet been placed under option (collectively, the "Reserves"), as well as the price per share of Common Stock covered by each option under the Plan which has not yet been exercised, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split or the payment of a stock dividend (but only on the Common Stock) or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an option.

In the event of the proposed dissolution or liquidation of the Company, the offering period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each option under the Plan shall be assumed or an equivalent option shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, unless the Board determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, that the participant shall have the right to exercise the option as to all of the optioned stock, including shares as to which the option would not otherwise be exercisable. If the Board makes an option fully exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Board shall notify the participant that the option shall be fully exercisable for a period of thirty (30) days from the date of such notice, and the option will terminate upon the expiration of such period.

The Board may, if it so determines in the exercise of its sole discretion, also make provision for adjusting the Reserves, as well as the price per share of Common Stock covered by each outstanding option, in the event that the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or reductions of shares of its outstanding Common Stock, and in the event of the Company being consolidated with or merged into any other corporation.

16. *Rights as a Shareholder*. A participant shall have no rights as a shareholder with respect to any shares of Common Stock he or she may have a right to purchase under the Plan until the date of issuance of a stock certificate to such participant for shares issued pursuant to the Plan.

17. *Rights as an Employee*. Nothing in the Plan shall be construed to give any participant the right to remain in the employ of the Company or a Subsidiary or to affect the right of the Company and its Subsidiaries or the participant to terminate such employment at any time with or without cause.

18. *Use of Funds*. All payroll deductions received or held by the Company under the Plan may be used by the Company for any corporate purpose, and the Company shall not be obligated to segregate such payroll deductions.

19. *Amendment or Termination*. The Board of Directors shall have the right to amend, modify or terminate the Plan at any time without notice, provided that no Participant's existing rights are adversely affected thereby, and provided further that no amendment to the Plan shall be effective until such amendment is approved by a vote of the holders of at least a majority of the outstanding shares of Common Stock of the Company within twelve month before or after the date upon which such action is taken by the Board of Directors, if such amendment would:

(a) Increase the aggregate number of shares of Common Stock to be issued under the Plan (except as provided in Section 15 hereof);

(b) Materially modify the requirements for eligibility to participate in the Plan;

(c) Increase the maximum number of shares of Common Stock which a Participant may purchase in any Offering Period;

(d) Extend the term of the Plan;

(e) Alter the option price per share formula so as to reduce the price for shares of Common Stock to be purchased under the Plan;

(f) Otherwise materially increase the benefits accruing to participants under the Plan; or

(g) Cause the Plan to fail to meet the requirements of an "employee stock purchase plan" under Section 423 of the Code.

The Plan shall terminate on the date prior to the tenth anniversary of its adoption, if it has not been earlier terminated pursuant to this Section 19, but the Plan shall remain in full force and effect until the end of the Offering Period then in effect.

20. *Notices*. All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

21. *Stockholder Approval*. Continuance of the Plan and the effectiveness of any option granted hereunder shall be subject to approval of the Plan by the affirmative vote or written consent of the holders of a majority of the outstanding shares of Common Stock of the Company present or represented and entitled to vote thereon, within 12 months after the date of adoption of this Plan by the Board of Directors.

22. *Conditions Upon Issuance of Shares*. Shares shall not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the shares are being purchased only for investment and without any present intention to sell or distribute such shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

23. *Governing Law*. To the extent not governed by federal law, all legal questions pertaining to the Plan shall be determined in accordance with the laws of the State of California.

Table of Contents

**Important Notice Regarding Internet Availability of Proxy Materials for the Annual Meeting:**
The Annual Report and Proxy Statement are available at http://materials.proxyvote.com/osis.

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on October 10, 2008, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on December 8, 2008, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2009 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

**FOR ALL ______ WITHHOLD AUTHORITY FOR ALL ______**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider

To withhold authority to vote for any individual nominee, check the box marked "For All" above and write the nominee's name in the space provided here:

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2009.

**FOR ______ AGAINST ______ ABSTAIN ______**

3. To approve the adoption of the OSI Systems, Inc. 2008 Employee Stock Purchase Plan, including the reservation of 1,500,000 shares of the Company's Common Stock for issuance thereunder.

**FOR ______ AGAINST ______ ABSTAIN ______**

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

Table of Contents

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2008 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 22

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A
**(Rule 14a-101)**

## Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No. __)

Filed by the Registrant x Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement
¨ Confidential, for Use of the Commission Only (as Permitted by Rule 14a-6(e)(2))
x Definitive Proxy Statement
¨ Definitive Additional Materials
¨ Soliciting Material Pursuant to §240.14a-12

## OSI Systems, Inc.

**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 13, 2008

To Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 8, 2008, at our executive offices, 12525 Chadron Avenue, Hawthorne, California 90250. All holders of OSI Systems, Inc. common stock as of the close of business on October 10, 2008 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy Card.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

The Securities and Exchange Commission recently adopted rules that permit proxy materials to be furnished over the Internet rather than in paper form. Accordingly, this year, some of our shareholders will receive printed copies of these proxy materials in the mail, while others will receive a notice regarding the availability of this Proxy Statement, our Annual Report on Form 10-K for the fiscal year ended June 30, 2008 and other proxy-related materials *via* the Internet (the “Notice of Internet Availability of Proxy Materials”).

If you receive a printed copy of the proxy materials by mail, you may vote by sending in your Proxy Card or, if indicated on your Proxy Card, by telephone or Internet voting.

If, on the other hand, you are a shareholder that receives a Notice of Internet Availability of Proxy Materials, please review the instructions contained therein regarding how to vote your shares over the Internet. You may also request a paper copy of the proxy materials, including the Proxy Card to submit your vote, if you prefer.

All shareholders may also choose to vote in person at the meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held December 8, 2008**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on December 8, 2008, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified.

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2009.

3. To approve the adoption of the OSI Systems, Inc. 2008 Employee Stock Purchase Plan, including the reservation of 1,500,000 shares of the Company's Common Stock for issuance thereunder.

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, containing consolidated financial statements, is included with this Proxy Statement.

The Board of Directors has fixed the close of business on October 10, 2008, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: October 13, 2008

**WHETHER OR NOT YOU EXPECT TO ATTEND THE ANNUAL MEETING, PLEASE VOTE PROMPTLY.**

**IF YOU HAVE RECEIVED THIS PROXY STATEMENT BY MAIL, PLEASE COMPLETE, DATE AND SIGN THE ENCLOSED PROXY CARD AND MAIL IT IN THE ENCLOSED ENVELOPE OR, IF GIVEN THE OPTION, YOU MAY ALSO VOTE BY TELEPHONE OR INTERNET VOTING.**

**IF, ON THE OTHER HAND, YOU HAVE RECEIVED A NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIALS, PLEASE VOTE IN ACCORDANCE WITH THE VOTING INSTRUCTIONS CONTAINED THEREIN.**

**EITHER ONE OF THESE METHODS WILL ENSURE REPRESENTATION OF YOUR SHARES AT THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1842 of 2711

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 8 |
| Proposal No. 3 Approval of 2008 Employee Stock Purchase Plan. | 9 |
| Compensation of Executive Officers and Directors | 13 |
| Security Ownership of Certain Beneficial Owners and Management | 29 |
| Independent Registered Public Accounting Firm | 32 |
| Report of Audit Committee | 33 |
| Code of Ethics and Conduct | 35 |
| Annual Meeting Attendance | 35 |
| Shareholder Communications | 35 |
| Availability of Annual Report on Form 10-K | 35 |
| Shareholder Proposals | 35 |
| Incorporation by Reference | 36 |
| Other Business | 36 |
| Appendix A (2008 Employee Stock Purchase Plan) | A-1 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1843 of 2711
Table of Contents

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on December 8, 2008, at the executive offices of the Company, 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

As permitted by rules recently adopted by the Securities and Exchange Commission ("SEC"), the Company is making its proxy materials, which include the Notice of Annual Meeting of Shareholders, Proxy Statement Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to most of its shareholders over the Internet. Others will receive printed copies of the Proxy Materials in the mail. The Company believes that by providing access over the Internet, it will expedite the receipt of Proxy Materials by its shareholders, at a lower cost.

In accordance with these new rules, most shareholders of record as of the close of business on October 10, 2008 will receive a Notice of Internet Availability of Proxy Materials.

The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote your shares over the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials, but would instead prefer to receive a printed copy of the Proxy Materials instead of downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a shareholder that receives a printed copy of the Proxy Materials by mail, you may also view the Proxy Materials on the Internet at *http://materials.proxyvote.com/osis*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed, postage pre-paid envelope or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any shareholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 10, 2008, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 17,839,522 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD" for a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or to allocate among any of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1844 of 2711
Table of Contents

directors to be elected (*i.e.*, six) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

A Proxy Card, when properly submitted by Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Shareholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

The total number of votes that could be cast at the Meeting is the number of votes actually cast, plus the number of abstentions and broker non-votes, described below. Abstentions are counted as shares present at the Meeting for purposes of determining whether a quorum exists; however, abstentions will not be counted as votes for or against a proposal. Proxies submitted by brokers that do not indicate a vote for some or all of the proposals because they do not have discretionary voting authority and have not received instructions as to how to vote on those proposals (so-called “broker non-votes”) are counted as present and entitled to vote and are, therefore, included for purposes of determining whether a quorum is present at the Meeting. However, broker non-votes are not deemed to be votes cast. As a result, broker non-votes are not included in the tabulation of the voting results on the election of directors or issues requiring approval of a majority of the votes cast and, therefore, do not have the effect of votes for or against a proposal.

In the election of directors, the candidates who receive the largest number of affirmative votes cast are elected as directors up to the maximum number of directors to be chosen at the Annual Meeting. Approval of other proposals will require the affirmative vote of a majority of the shares of Common Stock present and voting in person at the Meeting or represented by proxy and entitled to vote on the subject matter of the proposal.

It is anticipated that the Notice of Internet Availability of Proxy Materials and the Proxy Materials will be mailed on or about October 17, 2008. All shareholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

Table of Contents

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

### Nominees

The Board of Directors consists of six members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2009, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 57 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 46 | Director, Executive Vice President, and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 66 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 82 | Director | 1990 |
| Chand R. Viswanathan | 79 | Director | 2001 |
| Leslie E. Bider(1)(3) | 58 | Director | 2006 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating and Governance Committee
(4) Member of Executive Committee

### Business Experience

***Deepak Chopra*** is Chairman of the Board of Directors. Mr. Chopra is also President and Chief Executive Officer of the Company. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC Technology, Inc. ("ILC"), a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

Table of Contents

***Ajay Mehra*** has served as a Director of the Company since March 1996. Mr. Mehra is also Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, which he founded in 1976, and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of the Walking Company Holdings, Inc. and Kayne Anderson MLP Investment Company, each of which is a publicly held corporation listed on the The NASDAQ Stock Market. He formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008 and as a Director of Youbet.com from 2006 to 2008. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Myricom, Inc., a computer and network infrastructure company and as Chairman of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee of the Orthopedic Hospital. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***Chand R. Viswanathan*** has served as a Director of the Company since June 2001. Dr. Viswanathan has been a Professor of Electrical Engineering on the faculty of the University of California, Los Angeles since 1974 and a member of the faculty of that department since 1962. He is currently a Distinguished Professor Emeritus in the department and served as the Chair of the department from 1979 to 1985. During his tenure at University of California, Los Angeles, Dr. Viswanathan also served in various additional capacities, including Chair of the Academic Senate of the University of California, Los Angeles and Vice-Chair and later Chair of the University of California-wide Academic Senate. As Chair of the Academic Senate, he was also a member of the University of California Board of Regents as a faculty representative.

***Leslie E. Bider*** has served as a Director of the Company since September 2006. Mr. Bider is currently Chief Executive Officer of Pinnacle Care, Inc., a health advisory company. Between 2007 and 2008, Mr. Bider served as Chief Strategist of ITU Ventures, a private equity firm and between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of Douglas Emmett, Inc., a real estate investment trust that trades on the New York Stock Exchange, California Pizza Kitchen, Inc., which trades on The NASDAQ Stock Market and 1st Century Bank which trades on the OTC Bulletin Board. He also serves on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Master of Science degree from the Wharton School at the University of Pennsylvania.

Table of Contents

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board of Directors Meetings and Committees of the Board of Directors**

There were seven meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on four additional occasions during the fiscal year ended June 30, 2008. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee and Nominating and Governance Committee. The members of each committee are appointed by the majority vote of the Board of Directors. No person serving as a director during the fiscal year ended June 30, 2008, attended fewer than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the SEC and The NASDAQ Stock Market ("NASDAQ") director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices.

The Audit Committee currently consists of Messrs. Good, Luskin and Bider. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC and is independent, as independence for audit committee members is defined in the listing standards applicable to the Company. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2008. See Report of Audit Committee. The charter of the Audit Committee is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input

Table of Contents

to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee consists of Messrs. Luskin and Good. There were nine meetings of the Compensation Committee during the fiscal year ended June 30, 2008. See *Compensation Committee Report.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com.*

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Bider, Good and Luskin. There were no meetings of the Nominating and Governance Committee during the fiscal year ended June 30, 2008.(1)

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors. The charter of the Nominating and Governance Committee is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

In January 2004, the Board of Directors formed an Executive Committee whose members convene for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were two meetings of the Executive Committee during the fiscal year ended June 30, 2008.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;

(1) The Nominating and Governance Committee's meeting was held subsequent to the fiscal year end.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1849 of 2711

Table of Contents

- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (1) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (2) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

To date, the Nominating and Governance Committee has not retained or paid any third party to identify or evaluate, or assist in identifying or evaluating, potential director nominees, although it may do so in the future. The Nominating and Governance Committee did not receive any shareholder recommendations for nomination to the Board of Directors in connection with this year's Annual Meeting, and this year's nominees for director are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify the Company of their intent to do so on or before the date on which shareholder proposals to be included in the proxy statement for the shareholder meeting must be received by the Company. For details see "Shareholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Luskin and Good. No executive officer of the Company has served during the fiscal year ended June 30, 2008 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2008, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K under the Exchange Act.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Table of Contents

**RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2009, and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's shareholders at the Annual Meeting. Moss Adams has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's shareholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its shareholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors unanimously recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2009. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

## ADOPTION OF 2008 EMPLOYEE STOCK PURCHASE PLAN
*(Proposal No. 3 of the Proxy Card)*

**Introduction**

The Board of Directors recommends that the Company's shareholders approve the OSI Systems, Inc. 2008 Employee Stock Purchase Plan (the "New ESPP"), including the reservation of 1,500,000 shares of Common Stock for issuance thereunder. The New ESPP was adopted by the Company's Board of Directors on August 26, 2008, and, following approval by the shareholders, will replace the Company's existing Employee Stock Purchase Plan (the "Old ESPP") adopted in 1998. The New ESPP is intended to qualify as an "employee stock purchase plan" under Section 423 of the U.S. Internal Revenue Code (the "Code"). As of October 10, 2008, no shares had been issued pursuant to the New ESPP. The Company anticipates that the first Offering Period (as defined below) under the New ESPP will begin on January 1, 2009.

**Summary and Purpose of the 2008 Employee Stock Purchase Plan**

The purpose of the New ESPP is to encourage and enable eligible employees to acquire a financial stake in the Company through the ownership of Common Stock. The New ESPP offers eligible employees the opportunity to acquire Common Stock through periodic payroll deductions at a discount from the current market price in accordance with applicable Internal Revenue Service regulations. The Board of Directors believes that the New ESPP is in the best interest of the shareholders, as it helps increase the number of the Company's employees who own Common Stock and helps align employee and shareholder interests. The Board of Directors believes that the New ESPP will also help the Company to attract, retain and motivate its employees.

The Company's Old ESPP expires on December 31, 2008. If the shareholders approve the New ESPP, it will replace the Company's Old ESPP with respect to future offerings to employees. As of October 10, 2008, an aggregate of 133,067 shares remain available for future issuance under the Old ESPP. The Company anticipates that approximately 100,000 shares will remain unissued under the Old ESPP when it expires. Any shares which remain unissued under the Old ESPP when it expires will not be available for future issuance under the New ESPP.

The following is a summary of the principal provisions of the New ESPP. This summary does not purport to be a complete description of all of the provisions of the New ESPP. It is qualified in its entirety by reference to the full text of the New ESPP, which is included as Appendix A to this Proxy Statement.

*Number of Authorized Shares*

The maximum aggregate number of shares of the Company's Common Stock that may be issued under the New ESPP shall be 1,500,000 shares.

*Administration*

The New ESPP is administered by the Board of Directors or a committee appointed by the Board (the "Committee"). Unless otherwise specified by the Board of Directors, the Committee shall consist of the members of the Company's Compensation Committee. Every finding, decision and determination by the Board of Directors or the Committee shall, to the full extent permitted by law, be final and binding upon all parties.

*Eligibility*

All U.S. persons who are regular employees of the Company whose date of hire was at least ninety (90) days prior to the commencement of an Offering Period and who are customarily employed by the Company for at least twenty (20) hours per week and more than five (5) months per calendar year are eligible to participate

in the New ESPP. Participation in the New ESPP ends automatically on termination of employment with the Company. An eligible employee may become a participant by completing an enrollment form authorizing payroll deductions and delivering it to the Company's human resources office prior to the applicable enrollment date.

*Offering and Exercise Periods*

The New ESPP is implemented by overlapping offering periods of twenty-four (24) months each ("Offering Periods"). Offering Periods commence every six months, beginning on January 1 and July 1 of each year and consist of four exercise periods of six months each ("Exercise Periods"). The Board of Directors or the Committee may change the duration of the Exercise Periods or the length or date of commencement of an Offering Period.

*Grant of Option; Purchase Price; Limitations*

On the first day of each Offering Period (the "Offering Date"), each eligible employee participating in the New ESPP will be granted an option to purchase on the last day of each Exercise Period in such Offering Period (the "Exercise Date") a number of shares of Common Stock of the Company determined by dividing such employee's accumulated payroll deductions by the lower of: (i) 85% of the fair market value of one share of the Company's Common Stock on the Offering Date or (ii) 85% of the fair market value of one share of the Company's Common Stock on the applicable Exercise Date. Unless a participating employee withdraws from the New ESPP, his or her option will be automatically exercised on each Exercise Date of the Offering Period; provided that in no event will an employee be permitted to purchase during an Exercise Period a number of shares in excess of the number determined by dividing $12,500 by the fair market value of a share of the Company's Common Stock on the Offering Date. The fair market value of the Common Stock on a given date is the closing sale price of the Common Stock for such date as quoted on the Nasdaq Global Market.

In addition, no employee will be granted an option under the New ESPP if, immediately after grant, the employee would own 5% or more of the voting power or value of all classes of stock of the Company or of any of its subsidiaries (including stock which may be purchased under the New ESPP or pursuant to any other options), nor will any employee be permitted to participate to the extent such employee could buy under all employee stock purchase plans of the Company more than $25,000 worth of stock (determined at the fair market value of the shares at the time the option is granted) in any calendar year.

*Payroll Deductions*

The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation, which is defined in the plan to mean the annual base rate of pay of an eligible employee during an Offering Period, determined in accordance with nondiscriminatory rules adopted by the Board of Directors, plus commissions and cash bonuses, but excluding income with respect to stock options, restricted stock awards or other stock purchases and expense reimbursements. A participant may discontinue his or her participation in the New ESPP at any time during the Offering Period. Payroll deductions commence on the first payday following the Offering Date, and continue at the same rate with automatic enrollment in subsequent Offering Periods, unless sooner terminated by the participant.

*Automatic Transfer to Low Price Offering Period*

In the event that the fair market value of the Company's Common Stock is lower on an Exercise Date than it was on the first day of the Offering Period, all employees participating in the New ESPP on the Exercise Date will be deemed to have withdrawn from the Offering Period immediately after exercise of their option and to have enrolled as participants in the newly commencing Offering Period.

Table of Contents

*Withdrawal; Termination of Employment*

Employees may end their participation in an offering at any time during the Offering Period, and participation ends automatically on termination of employment with the Company or failure of the participant to remain in the continuous scheduled employment of the Company for at least twenty (20) hours per week. Once a participant withdraws from a particular offering, that participant may not participate again in the same offering. A participant may withdraw all, but not less than all, of the payroll deductions credited to such participant's account by giving written notice to the Company.

*Transferability*

No rights or accumulated payroll deductions of a participant under the New ESPP may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will or the laws of descent and distribution), and any such attempt may be treated by the Company as an election to withdraw from the New ESPP.

*Adjustments Upon Changes in Capitalization, Dissolution, Merger, Asset Sale or Change of Control*

The shares reserved under the New ESPP, as well as the price per share of Common Stock covered by each option under the New ESPP which has not yet been exercised, will be proportionately adjusted for any stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company. In the event of the proposed dissolution or liquidation of the Company, the pending Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board of Directors. In the event of a proposed sale of all or substantially all the assets of the Company or a merger of the Company with or into another corporation, the New ESPP provides that each option under the New ESPP will be assumed or an equivalent option will be substituted by the successor or purchaser corporation, unless the Board of Directors determines, in its sole discretion, to terminate the pending Offering Period prior to the consummation of such event, in which case the option will be exercisable for a period of thirty days thereafter.

*Amendment and Termination*

The Board of Directors of the Company may at any time and for any reason terminate or amend the New ESPP. Except as provided in the New ESPP, no termination can affect options previously granted, nor may any amendment make any change in any option already granted which adversely affects the rights of any participant. Shareholder approval is required under the New ESPP for any amendment which would:

- Increase the aggregate number of shares of Common Stock to be issued under the New ESPP;
- Materially modify the requirements for eligibility to participate in the New ESPP;
- Increase the maximum number of shares of Common Stock which a participant may purchase in any Offering Period;
- Extend the term of the New ESPP;
- Alter the option price per share formula so as to reduce the price for shares of Common Stock to be purchased under the New ESPP;
- Otherwise materially increase the benefits accruing to participants under the New ESPP; or
- Cause the New ESPP to fail to meet the requirements of an "employee stock purchase plan" under Section 423 of the Code.

Unless terminated sooner, the New ESPP will terminate 10 years from its date of adoption.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1854 of 2711

Table of Contents

**Federal Tax Information**

The following information is a general summary of the federal income tax consequences of the New ESPP to participants and to the Company. Tax laws may change, and actual tax consequences will depend on the participant's individual circumstances as well as state and local tax laws. The Company encourages all employees to seek tax advice when they participate in the ESPP. The ESPP is intended to qualify as an "employee stock purchase plan" under Code Section 423.

*Tax Treatment of Participants*

Participants will not recognize income when they enroll in the New ESPP or when they purchase shares. If the participant holds the shares acquired under the New ESPP for one year or more after the Exercise Date and two years or more after the Offering Date, or if the participant dies while owning the shares, the participant will generally recognize ordinary income when disposing of the shares equal to the difference between the purchase price and the fair market value of the shares on the date of disposition, or 15% of the fair market value of the shares on the Offering Date, whichever is less. Any additional gain will be taxed as long-term capital gain. If the shares are sold for less than the purchase price, there is no ordinary income, but the participant will have a long-term capital loss for the difference between the purchase price and the sale price. If a participant sells or gifts the shares less than one year after the Exercise Date or less than two years after the Offering Date, the participant will generally have ordinary income equal to the difference between the purchase price and the fair market value on the Exercise Date. The difference between the sale price and the fair market value on the Exercise Date will be a capital gain or loss.

*Tax Treatment of Company*

When a participant recognizes ordinary income by disposing of shares before the one-year or two-year holding period ends, the Company will generally be entitled to a tax deduction in the amount of the ordinary income.

**New Plan Benefits**

Eligible employees participate in the New ESPP voluntarily and each such employee determines his or her level of payroll deductions within the guidelines fixed by the New ESPP. Accordingly, future purchases under the New ESPP are not determinable at this time.

***The Board of Directors unanimously recommends that you vote "FOR" the adoption of the New ESPP, including the reservation of 1,500,000 shares of Common Stock for issuance thereunder. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

**Compensation Discussion & Analysis**

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the "Named Executive Officers," as defined under the section entitled "Compensation of Executive Officers and Directors – Summary Compensation Table." Please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Overview of Compensation Philosophy and Guiding Principles*

The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with its business strategy, objectives and stockholder interests, and is designed to attract, motivate and retain highly qualified and key executives. Executive compensation elements generally consist of a base salary, an annual cash bonus, long-term equity compensation and certain benefits and perquisites more fully described below.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee to assist in recommending and reviewing executive compensation for the Named Executive Officers. The Compensation Committee reviews and approves salaries, annual bonuses, long-term incentive compensation, benefits, and other compensation in order to ensure that the Company's executive compensation strategy and principles are aligned with its business strategy, objectives and stockholder interests. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Nasdaq Listing Standards, as currently in effect.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. The Compensation Committee appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability and overall management contributions to the Company.

In general, the process by which the Compensation Committee makes decisions relating to executive compensation includes, but is not limited to, consideration of the following factors:

- The Company's executive compensation philosophy and practices;
- The Company's performance relative to peers and industry standards;
- Success in attaining annual and long-term goals and objectives;
- Alignment of executive interests with shareholder interests through equity-based awards and performance-based compensation;
- Individual and team contributions, performance and experience; and
- Total compensation and the mix of compensation elements for each Named Executive Officer.

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies in the industries in which the Company operates. The Compensation Committee assesses competitive market compensation using a number of data sources reflecting industry practices of other organizations similar in size.

Table of Contents

The Compensation Committee reviews each component of the executive's compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2008, the Compensation Committee engaged Watson Wyatt to prepare such surveys and provide expert advice. The surveys used for comparison reflect compensation levels and practices for executives holding comparable positions at targeted peer-group companies. These surveys collect compensation data from peer-group companies based on revenues. The survey data utilized by the Compensation Committee generally includes:

- base salary;
- annual bonus;
- total cash compensation;
- pay adjustment trends;
- long-term incentives;
- retirement and capital accumulation;
- benefits and perquisites; and
- equity ownership.

In implementing the Company's compensation program, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

*Executive Compensation Program Elements*

The Compensation Committee reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. In addition, the Compensation Committee reviews components of the Named Executive Officer's compensation against executive compensation surveys of a peer group prepared by outside compensation consultants with the intent to establish targeted levels of base salary, annual incentive bonus and long-term incentive compensation. The particular elements of the compensation program for the Named Executive Officers consist of the following:

*Base Salary.* Base salary is set to attract and retain executive talent. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Incentive Bonus.* Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement. Named Executive Officers are eligible for a target annual incentive bonus. The Company pays annual incentive bonuses to its Named Executive Officers based upon the achievement of targets that are indicative of the Company's performance, as well as individual performance. The annual incentive bonus for fiscal year 2008 paid to each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Compensation/Equity Based Awards.* The Company's long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the interests of the Company's stockholders. The Company's long-term incentive program consists of periodic grants of restricted stock and stock options which are made at the discretion of the Compensation Committee under the Company's Amended and Restated 2006 Equity Participation Plan

(the "Equity Plan"). Decisions made by the Compensation Committee regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, contributions to the Company's development, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

The Compensation Committee grants awards to the Named Executive Officers under the Equity Plan. All equity awards are made at fair market value on the date of grant with respect to stock options (which is the date on which the Compensation Committee authorizes the grant). Under the Equity Plan, fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees including the Company's 401(k) Plan, Equity Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, vision and dental plans require each participant to pay a contributory amount. In certain instances, the Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service.

The Company also maintains a Nonqualified Deferred Compensation Plan that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death. Currently, Mr. Chopra is the only employee that participates in this plan.

*Total Compensation Mix*

The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based compensation, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy to pay median pay for median performance and above-market pay for superior performance.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze. The terms of each of such agreements are summarized below under the heading "Employment Agreements."

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1858 of 2711

Table of Contents

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax, securities laws and accounting regulation in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of the Statement of Financial Accounting Standard No. 123, "Share-Based Payment" ("SFAS 123R"), which the Company adopted in fiscal 2006, on the Company's use of equity-based awards. This consideration factored heavily in the Company's decision with respect to stock options grants made in fiscal year 2008. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Code with respect to annual compensation exceeding $1.0 million and Section 280(b) of the Code with respect to change in control payments exceeding specified limits.

**Executive Officers**

***Deepak Chopra*** is President and Chief Executive Officer of the Company. He also serves as Chairman of the Board of Directors. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick was named the Company's Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than 18 years of financial management and public accounting experience, including mergers and acquisitions, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc, a biotechnology company, until its sale to Invitrogen Corporation. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick currently serves as a Director of Vertical Branding, Inc., a publicly held consumer products company that is quoted on the OTC Bulletin Board. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra is also a member of the Company's Board of Directors. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is Executive Vice President, General Counsel and Secretary of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of

Table of Contents

Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor or Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in Management certificate from the Anderson School at the University of California, Los Angeles.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1860 of 2711
Table of Contents

### Summary Compensation Table

The following table sets forth the compensation for the principal executive officer, the principal financial officer, the three highest paid executive officers of the Company serving as executive officers on June 30, 2008 whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2008, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards (2)($) | All Other Compensation (3)(4)(5)($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2008 | 1,000,000 | 700,000 | 113,671 | 881,154 | 116,171 | 2,810,996 |
| Chairman, President and Chief Executive Officer | 2007 | 998,077 | 250,000 | — | 1,167,801 | 83,203 | 2,499,081 |
| Alan Edrick | 2008 | 327,596 | 220,000 | 22,961 | 285,429 | 35,631 | 891,617 |
| Executive V.P., Chief Financial Officer | 2007 | 262,277 | 150,000 | — | 154,895 | 16,804 | 583,976 |
| Ajay Mehra | 2008 | 371,827 | 200,000 | 17,956 | 261,306 | 49,747 | 900,836 |
| Executive V.P. of the Company, President of Security division | 2007 | 351,928 | 80,000 | — | 260,285 | 45,845 | 738,058 |
| Victor S. Sze | 2008 | 311,827 | 135,000 | 13,183 | 224,765 | 36,776 | 721,551 |
| Executive V.P., General Counsel and Secretary | 2007 | 285,865 | 205,000 | — | 247,056 | 29,768 | 767,689 |
| Manoocher Mansouri | 2008 | 225,000 | 40,000 | 23,668 | 22,072 | 21,628 | 332,368 |
| President of Optoelectronics and Manufacturing division | 2007 | 184,622 | 43,000 | — | 20,560 | 22,985 | 271,167 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation" and "Change in Pension Value and Nonqualified Deferred Compensation Earnings" because no amounts would have been included in such columns.

(2) The amounts in the "Stock Awards" and "Option Awards" column are calculated using the provisions of SFAS 123R.

(3) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Equity Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan and the medical, vision and dental plans require each participant to pay a contributory amount. In certain instances, the Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. Certain of the Named Executive Officers also participate in life and long-term disability insurance plans that are not made available to all employees. In certain circumstances, the Company leases a car on behalf of a Named Executive Officer or provides a Named Executive Officers with a car allowance.

(4) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2008 are as follows (in thousands):

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions ($) | Car Benefit ($) | Membership Dues (*)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,600 | 1,780 | 5,348 | 16,720 | 87,723 | 116,1714 |
| Alan Edrick | 8,716 | 12,000 | — | 5,616 | 9,299 | 35,631 |
| Ajay Mehra | 8,296 | 6,675 | — | 16,949 | 17,827 | 49,747 |
| Victor S. Sze | 7,527 | 12,000 | — | 8,892 | 8,357 | 36,776 |
| Manoocher Mansouri | 4,963 | 7,200 | — | 7,177 | 2,288 | 21,628 |

(*) Membership Dues consists of payments made to a golf club.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1861 of 2711

Table of Contents

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2007 are as follows (in thousands):

| Name | Matching 401(k) Contributions ($) | Car Benefit ($) | Membership Dues (*)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 2,139 | 2,030 | 3,763 | 12,574 | 62,697 | 83,203 |
| Alan Edrick | 963 | 11,000 | — | 4,841 | — | 16,804 |
| Ajay Mehra | 2,765 | 4,745 | — | 18,977 | 19,358 | 45,845 |
| Victor S. Sze | 690 | 12,000 | — | 10,722 | 6,356 | 29,768 |
| Manoocher Mansouri | 3,182 | 5,850 | — | 11,665 | 2,288 | 22,985 |

(*) Membership Dues consists of payments made to a golf club.

Table of Contents

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2008, to each of our Named Executive Officers(1):

| Name Position | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(2)(#) | All Other Option Awards: Number of Securities Underlying Options (3)(#) | Exercise or Base Price of Option Awards (4)($/Sh) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|
| Deepak Chopra | 9/17/2007 | — | 60,000 | $ 20.02 | $447,663 |
| Chairman, President and Chief Executive | 9/17/2007 | 15,000 | — | — | $300,300 |
| Officer | 2/08/2008 | 17,000 | — | — | $394,060 |
| Alan Edrick | 9/17/2007 | — | 48,000 | $ 20.02 | $358,130 |
| Executive V.P., Chief Financial Officer | 9/17/2007 | 3,000 | — | — | $ 60,060 |
| | 2/08/2008 | — | 14,000 | $ 23.18 | $117,500 |
| | 2/08/2008 | 3,500 | — | — | $ 81,130 |
| Ajay Mehra | 9/17/2007 | — | 32,000 | $ 20.02 | $238,754 |
| Executive V.P. of the Company, President of | 9/17/2007 | 2,000 | — | — | $ 40,040 |
| Security division | 2/08/2008 | — | 14,000 | $ 23.18 | $117,500 |
| | 2/08/2008 | 3,500 | — | — | $ 81,130 |
| Victor S. Sze | 9/17/2007 | — | 24,000 | $ 20.02 | $179,065 |
| Executive V.P., General Counsel and Secretary | 9/17/2007 | 1,500 | — | — | $ 30,030 |
| | 2/08/2008 | — | 10,000 | $ 23.18 | $ 83,929 |
| | 2/08/2008 | 2,500 | — | — | $ 57,950 |
| Manoocher Mansouri | 7/24/2007 | 2,500 | — | — | $ 64,475 |
| President, Optoelectronics and Manufacturing | 2/08/2008 | — | 7,500 | $ 23.18 | $ 62,947 |
| Division | 2/08/2008 | 1,875 | — | — | $ 43,463 |

(1) The Company has eliminated from this table the columns titled “Estimated Future Payouts Under Non-Equity Incentive Plan Awards” and “Estimated Future Payouts Under Equity Incentive Plan Award” because no amounts would have been included in such columns.

(2) The grants of restricted stock vest over a period of between three and four years from the date of grant.

(3) The option grants expire after five or ten years from the date of grant and vest over three years from the date of grant.

(4) The exercise price for grants of stock options is determined using the closing price of the Company’s Common Stock on the date of grant.

(5) The grant date fair value of the stock options and restricted stock shown in the table above was computed in accordance with SFAS 123R and represents the total projected expense to the Company of grants made during the past fiscal year.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1863 of 2711

Table of Contents

## Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2008(1):

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(3)(#) | Option Exercise Price (4)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (5) (#) | Market Value of Shares or Units of Stock That Have Not Vested(6) ($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 100,000 | — | $ 19.86 | 2/12/2009 | — | — |
| | 21,202 | — | $ 14.50 | 10/25/2009 | — | — |
| | 80,000 | — | $ 20.91 | 11/25/2009 | — | — |
| | 50,000 | 50,000 | $ 18.53 | 11/10/2010 | — | — |
| | 10,573 | 10,574 | $ 25.91 | 7/10/2010 | — | — |
| | 25,000 | 25,000 | $ 17.90 | 6/22/2011 | — | — |
| | 43,084 | 43,085 | $ 17.37 | 6/22/2011 | — | — |
| | 2,439 | 7,317 | $ 26.81 | 11/21/2011 | — | — |
| | 20,400 | 39,600 | $ 20.02 | 9/16/2017 | — | — |
| | — | — | — | — | 28,250 | $ 605,115 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 4,308 | 12,927 | $ 17.37 | 7/24/2011 | — | — |
| | 12,500 | 37,500 | $ 17.99 | 7/30/2011 | — | — |
| | 1,948 | 5,845 | $ 26.81 | 11/21/2011 | — | — |
| | 16,320 | 31,680 | $ 20.02 | 9/16/2017 | — | — |
| | — | 14,000 | $ 23.18 | 2/ 7/2018 | — | — |
| | — | — | — | — | 5,750 | $ 123,165 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,000 | — | $ 19.86 | 2/12/2009 | — | — |
| | 1,061 | — | $ 13.60 | 3/31/2009 | — | — |
| | 3,181 | — | $ 14.50 | 10/25/2009 | — | — |
| | 25,000 | — | $ 20.91 | 11/25/2009 | — | — |
| | 30,162 | 30,163 | $ 16.21 | 2/7/2011 | — | — |
| | 10,769 | 32,308 | $ 18.53 | 2/5/2012 | — | — |
| | 10,880 | 21,120 | $ 20.02 | 9/16/2017 | — | — |
| | — | 14,000 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 5,000 | $ 107,100 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 17,500 | — | $ 19.86 | 2/12/2009 | — | — |
| | 4243 | — | $ 13.60 | 3/31/2009 | — | — |
| | 17,500 | — | $ 20.91 | 11/25/2009 | — | — |
| | 4241 | — | $ 22.28 | 4/4/2010 | — | — |
| | 10,000 | 10,000 | $ 18.53 | 11/10/2010 | — | — |
| | 2,758 | 2,758 | $ 16.21 | 2/7/2011 | — | — |
| | 5,000 | 15,000 | $ 18.16 | 7/6/2011 | — | — |
| | 3,231 | 9,695 | $ 17.37 | 7/6/2011 | — | — |
| | 389 | 1,170 | $ 26.81 | 11/21/2011 | — | — |
| | 8,160 | 15,840 | $ 20.02 | 9/16/2017 | — | — |
| | — | 10,000 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 3,625 | $ 77,648 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 1,500 | — | $ 16.10 | 8/13/2008 | — | — |
| | 1,500 | — | $ 19.88 | 3/1/2009 | — | — |
| | 213 | — | $ 13.60 | 3/31/2009 | — | — |
| | 2,500 | — | $ 17.19 | 3/9/2010 | — | — |
| | 1,250 | 1,250 | $ 19.58 | 1/10/2011 | — | — |
| | 862 | 862 | $ 16.21 | 4/17/2011 | — | — |
| | — | 7,500 | $ 23.18 | 2/7/2018 | — | — |
| | — | — | — | — | 3,750 | $ 80,325 |

(1) The Company has eliminated from this table the columns titled “Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options,” “Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested” and “Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested” because no amounts would have been included in such columns.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1864 of 2711

Table of Contents

(2) Each option grant vests over a three year period from the date of grant.

(3) During the year ended June 30, 2008, the Company converted all stock options outstanding under stock option plans offered by each of its Spacelabs Healthcare, Inc. and Rapiscan Systems Holdings, Inc. subsidiaries to stock options under the Company's Equity Plan. The stock options outstanding under the Spacelabs Healthcare, Inc. plan were converted to stock options under the Company's Equity Plan on December 19, 2007, and the stock options outstanding under the Rapiscan Systems Holdings, Inc. plan were converted to stock options under the Company's Equity Plan on March 17, 2008. The methodology used for such conversions provided equivalent fair values under the Equity Plan.

(4) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(5) Includes restricted stock awards granted between July 2007 and June 2008. These restricted stock awards vest over a period of between three and four years from the date of grant.

(6) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2008, multiplied by the closing price of the Company's Common Stock on June 30, 2008 ($21.42 per share).

### Option Exercises and Stock Vested Table

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2008:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| **Name and Principal Position** | **Number of Shares Acquired on Exercise** | **Value Realized on Exercise(1) ($)** | **Number of Shares Acquired on Vesting** | **Value Realized on Vesting(2) ($)** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 100,000 | $ 879,000 | 3,750 | $ 80,325 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | — | 750 | $ 16,065 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 25,000 | $ 219,750 | 500 | $ 10,710 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | — | — | 375 | $ 8,033 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 7,250 | $ 63,443 | 625 | $ 14,838 |

(1) Represents the difference between the closing price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Represents the number of restricted stock awards that vested multiplied by the closing price of the Company's Common Stock on the date of vesting.

### Pension Benefits

During the year ended June 30, 2008, the Company did not sponsor any qualified or non-qualified defined benefit plan for any Named Executive Officer. On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan. Mr. Chopra is currently its only participant.

### Nonqualified Deferred Compensation

The Company adopted a nonqualified deferred compensation plan in May 2008 (the "Deferred Compensation Plan"). Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of

these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants.

Participants receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Company's 401(k) Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2008 ranged from -10.2% to 0%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the Named Executive Officers during fiscal year ended June 30, 2008(1):

| Name and Principal Position | Executive Contributions ($) | Company Contributions ($) | Aggregate Earnings (2)($) | Aggregate Balance ($) |
|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | — | — |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 5,354 | 5,354 | ($653) | $10,054 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 5,769 | 5,769 | ($709) | $10,830 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 5,046 | 5,046 | ($616) | $ 9,477 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 6,670 | 2,507 | ($70) | $ 9,108 |

(1) The Company has eliminated from this table the column titled "Aggregate Withdrawals/Distributions" because no amounts would have been included in such column.
(2) Represents earnings (losses) during the year ended June 30, 2008.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze.

*Deepak Chopra's Employment Agreement*

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with Mr. Chopra. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (i) the fifth anniversary of the date of the agreement or (ii) the close of business three years following the date that either party elects to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. Mr. Chopra is entitled to receive one-third of the Company's year-end bonus pool for management, if a bonus pool is established, and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Chopra from soliciting its employees or customers after the expiration of the term of his employment with the Company.

Table of Contents

Under the terms of the agreement with Mr. Chopra, the Company may terminate Mr. Chopra's employment at any time for "cause," as defined in the agreement.

In the event that Mr. Chopra resigns from his employment with the Company with "good reason" (as defined in the agreement), or the Company terminates Mr. Chopra without cause, then: (i) Mr. Chopra is entitled to his unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses, and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of his resignation with good reason or termination without cause; (ii) Mr. Chopra would continue to be entitled to receive all of his salary, unpaid expenses, unpaid vacation days, bonuses and other benefits made available to the Company's senior members of management, or to its employees generally, for a period of three years from the date of resignation with good reason or termination without cause, without any deduction or offset for any compensation earned or received by Mr. Chopra from any other sources and without any further obligation by Mr. Chopra to render services to the Company; and (iii) at Mr. Chopra's election, all of his unvested stock options in the Company would fully vest upon the date of his resignation with good reason or termination without cause.

In the event Mr. Chopra resigns from the Company with good reason or the Company terminates him without cause at any time upon or after the occurrence of a "change in control" (as defined in the agreement), then Mr. Chopra, at his option and in lieu of receiving the amounts set forth above may elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Code Section 280G(b)(3)). In connection with such alternative payment, Mr. Chopra, in his sole discretion, has the right to have all or any portion of his unvested stock options accelerate as of the date of such resignation or termination.

In the event that Mr. Chopra dies or becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, then, upon the date of his death or upon the Company's termination of his employment due to a disability, (i) Mr. Chopra would be entitled to all unpaid salary, prorated bonuses, unpaid vacation days, unpaid expenses and other benefits made available to the Company's senior members of management, or to its employees generally, through the date of Mr. Chopra's death or termination for disability and (ii) all of Mr. Chopra's unvested stock options in the Company would fully vest on such date.

On October 10, 2008, the Company adopted a Nonqualified Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death or disability. Currently, Mr. Chopra is the only employee that participates in this plan. Under the terms of his participation, commencing on the first day of the month following the date that Mr. Chopra turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For every year that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333. However, in no event will his total yearly benefit exceed $600,000. If Mr. Chopra terminates his employment with the Company within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If Mr. Chopra remains in the service of the Company for more than two years following a change in control, his benefit will continue as scheduled. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Nonqualified Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions. Mr. Chopra's benefits under the Nonqualified Defined Benefit Plan will vest equally over the remaining seven years of his service to the Company (assuming retirement at the age of 65).

*Alan Edrick's and Victor Sze's Employment Agreements*

On September 22, 2008, the Company entered into an employment agreement with each of Messrs. Edrick and Sze (each, the "Executive"). The terms of such agreements are nearly identical. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ the Executive until the later of (i) the third anniversary of the date of the agreement or (ii) one year following the date that the Company notifies the Executive

of its election to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. The Executive is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees, to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude the Executive from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 60 days within any six-month period; or (iii) on 30 days' written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement).

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 18 months' salary at the Executive's then-current base salary; (ii) an amount equal to 1.5 times the average bonus paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and an extension of time to exercise such stock options such that the Executive's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) an amount equal to 24 months' salary at the Executive's then-current base salary; (ii) an amount equal to twice the average of bonuses paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and such stock options shall remain exercisable by the Executive for no less than 12 months after the date of such termination. Under such circumstances, the Executive may, at his option, and in lieu of receive the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Code Section 280G(b)(3)); provided, however, that in such case, the amount of such alternative payment shall be reduced by the value of acceleration (as determined under Code Section 280G and the regulations thereunder) of any equity or stock options accelerated under the terms of the agreement.

*Ajay Mehra's Employment Agreement*

On September 1, 2000, the Company entered into an employment agreement with Mr. Mehra. In November 2006, the Company amended Mr. Mehra's employment agreement to extend the term of the agreement until August 31, 2009. The agreement provides for a base salary to be determined each year by the Company. Mr. Mehra is eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude Mr. Mehra from soliciting its employees or customers after the expiration of the term of his employment with the Company.

The Company may terminate the employment agreement on 30 days' written notice, subject to the obligation described in the paragraph below. In addition, in the event that Mr. Mehra dies or becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, then, upon the date of his death or upon the Company's termination of his employment due to a disability, the Company may terminate the agreement.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1868 of 2711

Table of Contents

If the Company terminates Mr. Mehra's employment without "cause" (as defined in the agreement), then, in addition to all compensation accrued and outstanding as of such termination date, Mr. Mehra will be entitled to receive the salary, bonus and other benefits that he would have received had he remained employed during the remainder of the term of the agreement, without deduction or offset for any compensation earned or received by Mr. Mehra from any other sources.

### Potential Payment upon Termination of Employment or Change in Control

The following table reflects the breakdown of potential payments and benefits upon termination or a change in control. The table assumes that the terms of employment to which each Named Executive Officer is currently subject had been effect on June 30, 2008 and that employment terminated on such date. The table also assumes that the price of the Company's stock, on which certain calculations in the following table are made, was the closing price of the Company's Common stock on that date ($21.42).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included the following table, include: (i) regular salary accrued as of the final date of employment; (ii) vacation and paid time off accrued as of the final date of employment; (iii) travel expense reimbursements not yet paid as of the final date of employment; and (iv) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following table are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

| Name and Principal Position | Reason for Termination | Base Salary | Bonus(1) | Accelerated Vesting | Total |
|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | Cause | — | $ 700,000 | — | $ 700,000 |
| | Good Reason or Without Cause | $3,000,000(2) | $2,800,000 (2) | $ 462,434 | $ 6,262,434 |
| | Good Reason or Without Cause in Connection with a Change in Control Alternative Payment(3) | $ 2,990,000 | — | $ 462,434 | $3,452,434 |
| | Death or Permanent Disability | — | $ 700,000 | $ 462,434 | $1,162,434 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | Good Reason or Without Cause | $ 502,500 | $ 225,000 | $ 348,496 | $1,075,996 |
| | Good Reason or Without Cause in Connection with a Change in Control | $ 670,000 | $ 300,000 | $ 348,496 | $1,318,496 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(3) | $ 1,001,650 | — | — | $1,001,650 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | Termination without Cause | $ 442,500(4) | $ 400,000 | — | $ 861,530 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | Good Reason or Without Cause | $ 450,000 | $ 140,000 | $ 231,257 | $ 821,257 |
| | Good Reason or Without Cause in Connection with a Change in Control | $ 600,000 | $ 186,667 | $ 231,257 | $1,017,924 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(3) | $ 897,000 | — | — | $ 897,000 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2008, for performance in the fiscal year ended June 30, 2008.
(2) These amounts assume that Mr. Chopra would be entitled to the same salary and bonuses during the three years following the date of resignation for Good Reason or termination without cause as he earned during the year ended June 30, 2008.

Table of Contents

(3) This reflects the compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for Good Reason or the Company terminates his employment without Cause following a Change in Control and the Named Executive Officer elects to receive the alternate payment method described in his employment agreement.
(4) For the purposes of this table, the "Base Salary" amount is calculated on the amount actually paid to Mr. Mehra during July and August of 2008, plus a period of 12 months at his current base salary.

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

Each non-employee director receives a fee of $30,000 per year, $1,500 for each Board of Directors meeting attended, and options to purchase 7,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) per year, at an exercise price equal to 100% of fair market value as of the date of grant. Each non-employee director may also, from time to time, become eligible to receive additional shares of restricted Common Stock.

Each member of the Audit Committee receives a fee of $1,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Compensation Committee receives a fee of $1,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Nominating and Governance Committee receives a fee of $1,500 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also receives a fee of $5,000 per year.

Each member of the Executive Committee receives a fee of $15,000 per year and options to purchase 10,000 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

All options granted to members of the Board of Directors and it committees vest in three installments: 25% on the first anniversary of the grant date, 25% on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2008 for each member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 60,000 | 18,769 | 182,616 | 261,385 |
| Meyer Luskin | 58,500 | 18,769 | 182,616 | 259,885 |
| Chand R. Viswanathan | 38,000(3) | 12,513 | 98,817 | 149,330 |
| Leslie E. Bider | 35,000 | 8,759 | 38,780 | 82,539 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.
(2) Amounts calculated utilizing the provisions of SFAS 123R.
(3) Amount includes $5,000 received by Mr. Viswanathan for serving on an advisory technology committee of the Company.

Table of Contents

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2008 by Mr. Chopra and his wife. The Company paid the business approximately $54,000 for such services during the year ended June 30, 2008. The Company contracts for printing services from a business owned by Mr. Chopra's father-in-law, Madan G. Syal. Mr. Syal retired as a Director of the Company on June 30, 2004. The Company paid Mr. Syal approximately $42,000 for such printing services during the year ended June 30, 2008.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

The Audit Committee of Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

We have reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, we recommend to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1871 of 2711
Table of Contents

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 10, 2008 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,166,151 | 6.3% |
| Wells Fargo & Company(4) | 2,738,260 | 15.2% |
| Dimensional Fund Advisors, Inc.(5) | 1,338,727 | 7.4% |
| Wellington Management Company, LLP(6) | 1,190,042 | 6.6% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 10, 2008, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 90,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 55,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 564,190 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 41,250 shares of unvested restricted stock granted between September 17, 2007 and July 28, 2008 are held individually by Mr. Chopra. Includes 52,439 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13F-HR filed on August 12, 2008 with the SEC, the address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94104.

(5) As reported in a Schedule 13F-HR filed on August 1, 2008 with the SEC, the address of Dimensional Fund Advisors, Inc. is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(6) As reported in a Schedule 13F-HR filed on August 14, 2008 with the SEC, the address of Wellington Management Company, LLP is 75 State St., Boston, MA 02109.

Table of Contents

The following table sets forth the amount of shares of the Company beneficially owned as of October 10, 2008 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,166,151 | 6.3% |
| Ajay Mehra(4) | 254,017 | 1.4% |
| Alan Edrick(5) | 65,833 | 0.3% |
| Victor S. Sze(6) | 99,644 | 0.5% |
| Manoocher Mansouri(7) | 42,967 | 0.2% |
| Steven C. Good(8) | 88,247 | 0.5% |
| Meyer Luskin(9) | 96,547 | 0.5% |
| Chand R. Viswanathan(10) | 42,729 | 0.2% |
| Leslie E. Bider(11) | 11,888 | 0.0% |
| All directors and executive officers as a group (10 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11) | 1,868,023 | 9.9% |

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 10, 2008, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 90,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 55,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 564,190 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 41,250 shares of unvested restricted stock granted between September 17, 2007 and July 28, 2008 are held individually by Mr. Chopra. Includes 52,439 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division.

(5) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 1,948 shares issuable pursuant to options that become exercisable no later than 60 days after October 10, 2008.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 10,390 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008.

(7) Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division.

(8) Includes 10,877 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Includes 5,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

(9) Includes 29,237 shares held by The Meyer and Doreen Luskin Family Trust. Includes 10,877 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 2811 Wilshire Boulevard, Suite 410, Santa Monica, CA 90403.

(10) Includes 5,000 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Viswanathan is a Director of the Company.

(11) Includes 1,250 shares issuable pursuant to options which become exercisable no later than 60 days after October 10, 2008. Mr. Bider is a Director of the Company.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1873 of 2711

Table of Contents

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2008, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that Messrs. Chopra, Edrick, Mehra, Sze, Good, Viswanathan and Bider each untimely filed one Form 4 report during the year ended June 30, 2008, Mr Luskin untimely filed two Form 4 reports during the year ended June 30, 2008, and Mr. Mansouri untimely filed five Form 4 reports during the year ended June 30, 2008.

Table of Contents

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements and for the years ended June 30, 2008 and 2007 and fees billed by Moss Adams for other services during those years:

| | FY 2008 | FY 2007 |
|---|---|---|
| Audit Fees | $2,150,939 | $2,701,000 |
| Audit-Related Fees | — | — |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $2,150,939 | $2,701,000 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services related to projects other than statutory and regulatory filings. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Table of Contents

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2008, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and Leslie E. Bider, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2008.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board in Rule 3200T. The Audit Committee received and discussed with the

independent public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as adopted by the Public Company Accounting Oversight Board in Rule 3600T, and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2008 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Leslie E. Bider

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1877 of 2711
Table of Contents

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended last year's annual meeting of shareholders in person.

## SHAREHOLDER COMMUNICATIONS

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available upon written request and without charge to shareholders by writing to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

With respect to shareholders that receive copies of the Proxy Materials in the mail, in certain cases only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report and/or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

## SHAREHOLDER PROPOSALS

In the event that a shareholder desires to have a proposal considered for presentation at the 2009 Annual Meeting of Shareholders, and inclusion in the proxy statement and form of proxy used in connection with such meeting, the proposal must be forwarded in writing to the Secretary of the Company so that it is received no later than June 19, 2009. Any such proposal must comply with the requirements of Rule 14a-8 promulgated under the Exchange Act.

Table of Contents

The Company's Bylaws provide that if a shareholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the 2009 Annual Meeting of Shareholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the Company must receive notice of such proposal not less than 90 days prior to December 8, 2009. The notice must comply with the Company's Bylaws. Notices should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of the Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
October 13, 2008

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1879 of 2711
Table of Contents

**APPENDIX A**
**2008 Employee Stock Purchase Plan**

**OSI SYSTEMS, INC.**
**2008 EMPLOYEE STOCK PURCHASE PLAN**

The following constitute the provisions of the 2008 Employee Stock Purchase Plan (herein called the "Plan") of OSI Systems, Inc., a California corporation ("OSI Systems, Inc."). The Plan was adopted by the Board of Directors of OSI Systems, Inc. on August 26, 2008.

1. *Purpose*. The purpose of the Plan is to provide employees of the Company with an opportunity to purchase Common Stock of the Company through accumulated payroll deductions. The Plan is intended to qualify as an "Employee Stock Purchase Plan" under Section 423 of the Internal Revenue Code of 1986. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of that section of the Code.

2. *Definitions*.

(a) "*Board*" shall mean the Board of Directors of the Company.

(b) "*Code*" shall mean the Internal Revenue Code of 1986, as amended.

(c) "*Committee*" shall mean the committee appointed by the Board of Directors of OSI Systems, Inc. to administer the Plan in accordance with Section 13 below, if one is appointed.

(d) "*Common Stock*" shall mean the Common Stock, no par value per share, of OSI Systems, Inc.

(e) "*Company*" shall mean (i) OSI Systems, Inc., (ii) each of the existing Subsidiaries, as defined in Section 425 of the Code, of OSI Systems, Inc. that are incorporated in the United States, and (iii) any such other or future Subsidiaries as the Board of Directors of OSI Systems, Inc. shall from time to time designate. Until the Board of Directors of OSI System, Inc. determines otherwise, the term "Company" shall not refer to or include any Subsidiary incorporated outside of the United States.

(f) "*Compensation*" shall mean the annual base rate of pay of an eligible Employee during an Offering Period, determined in accordance with nondiscriminatory rules adopted by the Board of Directors, including commissions and cash bonuses, but excluding income with respect to stock options, restricted stock awards or other stock purchases and moving expense reimbursements.

(g) "*Continuous Status as an Employee*" shall mean the absence of any interruption or termination of service as an Employee. Continuous Status as an Employee shall not be considered interrupted in the case of a leave of absence agreed to in writing by the Company, provided that such leave is for a period of not more than 90 days or reemployment upon the expiration of such leave is guaranteed by contract or statute.

(h) "*Employee*" shall mean any regular employee of the Company whose date of hire was at least ninety (90) days prior to the commencement of an Offering Period, who is customarily employed for at least twenty (20) hours per week and more than five (5) months in a calendar year.

(i) "*Exercise Date*" shall mean the date one day prior to the date six (6) months, twelve (12) months, eighteen (18) months or twenty-four (24) months after the Offering Date of each Offering Period. In the absence of a specific determination to the contrary by the Board of Directors or the Committee, (i) for an Offering Period that commences on January 1 the following June 30, December 31, June 30 and December 31 shall each be an Exercise Date; and (ii) for an Offering Period that commences on July 1, the following December 31, June 30, December 31 and June 30 shall each be an Exercise Date.

(j) "*Exercise Period*" shall mean a period commencing on an Offering Date or on the day after an Exercise Date and terminating one day prior to the date six (6) months later.

(k) "*Offering Period*" shall mean, in the absence of a specific determination to the contrary by the Board of Directors or the Committee, a period of twenty-four (24) months beginning on January 1 and July 1 of each year consisting of four (4) six-month Exercise Periods during which options granted pursuant to the Plan may be exercised.

(l) "*Offering Date*" shall mean the first day of each Offering Period of the Plan.

(m) "*Plan*" shall mean this Employee Stock Purchase Plan.

(n) "*Plan Account*" means the account established for each participant pursuant to the Plan.

(n) "*Subsidiary*" shall mean a corporation, domestic or foreign, of which not less than 50% of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3. *Eligibility*.

(a) Any Employee as defined in Section 2(h) who shall be employed by the Company on the Offering Date shall be eligible to participate in the Plan, subject to limitations imposed by Section 423(b) of the Code.

(b) Any provisions of the Plan to the contrary notwithstanding, no Employee shall be granted an option under the Plan (i) if, immediately after the grant, such Employee (or any other person whose stock would be attributed to such Employee pursuant to Section 424(d) of the Code) would own stock and/or hold outstanding options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or of any subsidiary of the Company, or (ii) which permits such Employee's rights to purchase stock under all employee stock purchase plans of the Company and its subsidiaries to accrue at a rate which exceeds Twenty-Five Thousand Dollars ($25,000) of fair market value of such stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time.

(c) In the event that the aggregate number of shares which all participants elect to purchase during an Offering Period shall exceed the number of shares remaining available for issuance under the Plan, the number of shares to which each participant shall become entitled shall be determined by multiplying the number of shares available for issuance, by a fraction, the numerator of which is the sum of the number of shares the participant has elected to purchase and the denominator of which is the sum of the number of shares which all participants have elected to purchase.

4. *Offering Periods*. The Plan shall be implemented by twenty-four (24) month Offering Periods beginning every six (6) months, until terminated in accordance with Section 19 hereof. The Board of Directors of the Company shall have the power to change the duration of offering periods with respect to future offerings without stockholder approval if such change is announced at least fifteen (15) days prior to the scheduled beginning of the first offering period to be affected. In no event shall an Offering Period exceed twenty-four (24) months.

5. *Participation*.

(a) An eligible Employee may become a participant in the Plan by delivering to the Company's human resources office an enrollment form provided by the Company authorizing payroll deductions not less than ten (10) business days prior to the applicable Offering Date, unless a later or earlier time for filing the form is set by the Board or Committee for all eligible Employees with respect to a given offering.

(b) Payroll deductions for a participant shall continue at the rate specified in the enrollment form throughout the Offering Period with automatic re-enrollment for the Offering Period which commences the day

Table of Contents

after the Exercise Date at the same rate specified in the original enrollment form, subject to any change in payroll deduction rate made pursuant to Section 6(c), unless sooner terminated by the participant as provided in Section 11. A participant is not required to file any additional enrollment forms for subsequent Offering Periods in order to continue participation in the Plan. A participant may not participate in more than one Offering Period at any given time.

6. *Payroll Deductions*.

(a) A participant shall designate on the enrollment form the percentage of Compensation which he or she elects to have withheld for the purchase of Common Stock, which may be any whole percentage from 1% to 10% of the participant's Compensation.

(b) All payroll deductions made by a participant shall be credited to his or her account under the Plan. A participant may not make any additional payments into such account.

(c) A participant may discontinue his or her participation in the Plan as provided in Section 11, or may reduce (but not increase) the rate of payroll withholding during an Offering Period by filing an amended enrollment form with the Company's human resources office at any time prior to the last day of any Offering Period (for which such change is to be effective), but not more than four (4) changes may be made in any Offering Period (or such other number of changes as may be approved by the Board or the Committee). A Participant may increase or decrease the rate of payroll deduction for any subsequent Offering Period by filing with the Company's human resources office a new authorization for payroll deductions not less than ten (10) business days prior to the Offering Date for such subsequent Offering Period.

7. *Grant of Option*.

(a) On the Offering Date of each Offering Period, each eligible Employee participating in the Plan shall be granted an option to purchase on each Exercise Date during such Offering Period (at the per share option price) up to a number of shares of the Company's Common Stock determined by dividing such Employee's payroll deductions to be accumulated prior to such Exercise Date by the lower of (i) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Offering Date or (ii) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Exercise Date; provided that in no event shall an Employee be permitted to purchase during an Exercise Period a number of shares in excess of a number determined by dividing $12,500 by the fair market value of a share of the Company's Common Stock on the Offering Date, subject to the limitations set forth in Sections 3(b) and 12 hereof. Fair market value of a share of the Company's Common Stock shall be determined as provided in Section 7(b) herein.

(b) The option price per share of the shares offered in a given Exercise Period shall be the lower of: (i) 85% of the fair market value of a share of the Common Stock of the Company on the Offering Date; or (ii) 85% of the fair market value of a share of the Common Stock of the Company on the Exercise Date. The fair market value of the Company's Common Stock on a given date shall be the closing price as quoted on the Nasdaq Stock Market, Inc.'s Global Market or, if traded on an alternative securities exchange, the closing price on such exchange.

8. *Exercise of Option*. Unless a participant withdraws from the Plan as provided in Section 11, his or her option for the purchase of shares will be exercised automatically on each Exercise Date of the Offering Period, and the maximum number of full shares subject to option will be purchased for him or her at the applicable option price with the accumulated payroll deductions in his or her account. During his or her lifetime, a participant's option to purchase shares hereunder is exercisable only by him or her.

9. *Purchase of Common Stock*. The Company will maintain a Plan Account on its books in the name of each participant. On each payday the amount deducted from the participant's Compensation will be credited to the participant's Plan Account. No interest shall accrue on any such payroll deductions. As promptly as

practicable after the Exercise Date of each offering, the Company shall arrange, for each participant as appropriate, for the issuance of the shares purchased upon exercise of his or her option in street name and for the delivery of such shares to the participant's account at the Company's designated broker-dealer. Any cash remaining which is insufficient to purchase a full share of Common Stock at the termination of each Exercise Period shall be credited to the participant's account for the next Exercise Period.

10. *Automatic Transfer to Low Price Offering Period*. In the event that the fair market value of the Company's Common Stock is lower on an Exercise Date than it was on the first Offering Date for that Offering Period, all Employees participating in the Plan on the Exercise Date shall be deemed to have withdrawn from the Offering Period immediately after the exercise of their option on such Exercise Date and to have enrolled as participants in a new Offering Period which begins on or about the day following such Exercise Date.

11. *Withdrawal; Termination of Employment*.

(a) A participant may withdraw all but not less than all the payroll deductions credited to his or her account under the Plan at any time prior to the Exercise Date of the Offering Period by giving written notice to the Company. All of the participant's payroll deductions credited to his or her account will be paid to him or her at the next pay date which follows the tenth business day after the receipt of his or her notice of withdrawal and his or her option for the current period will be automatically terminated, and no further payroll deductions for the purchase of shares will be made during the Offering Period.

(b) Upon termination of the participant's Continuous Status as an Employee prior to the Exercise Date for any reason, including retirement or death, the payroll deductions credited to his or her account will be returned to the participant or, in the case the of participant's death, to the representative of the participant's estate.

(c) A participant's withdrawal from an offering will not have any effect upon his or her eligibility to participate in a succeeding offering or in any similar plan which may hereafter be adopted by the Company.

12. *Number of Shares to be Offered*. The maximum aggregate number of shares of the Company's Common Stock that may be issued under the Plan shall be 1,500,000 shares, subject to adjustment upon changes in capitalization of the Company as provided in Section 15 hereof. In the event that any option granted under the Plan expires or is terminated for any reason, such shares allocable to the unexercised portion of such option shall again be subject to an option under the Plan.

13. *Administration*. The Plan shall be administered by the Board of Directors and/or by a duly appointed Committee consisting of not less than two persons, at least one of which shall be a member of the Board of Directors, and having such powers as shall be specified by the Board. The Board of Directors may from time to time remove members from, or add members to, the Committee. Vacancies on the Committee shall be filled by the Board of Directors. The Committee shall hold meetings at such times and places as it may determine. Unless otherwise specified by the Board of Directors, the Committee shall consist of the members of the Company's Compensation Committee. The interpretation and construction by the Board of Directors or the Committee of any provision of the Plan or of any right to purchase Common Stock shall be conclusive and binding on all persons.

14. *Transferability*. Neither payroll deductions credited to a participant's account nor any rights with regard to the exercise of an option or to receive shares under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, or the laws of descent and distribution) by the participant. Any such attempt at assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 11.

15. *Adjustments Upon Changes in Capitalization*. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each option under the Plan which has not yet been

Table of Contents

exercised and the number of shares of Common Stock which have been authorized for issuance under the Plan but have not yet been placed under option (collectively, the "Reserves"), as well as the price per share of Common Stock covered by each option under the Plan which has not yet been exercised, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split or the payment of a stock dividend (but only on the Common Stock) or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an option.

In the event of the proposed dissolution or liquidation of the Company, the offering period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each option under the Plan shall be assumed or an equivalent option shall be substituted by such successor corporation or a parent or subsidiary of such successor corporation, unless the Board determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, that the participant shall have the right to exercise the option as to all of the optioned stock, including shares as to which the option would not otherwise be exercisable. If the Board makes an option fully exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Board shall notify the participant that the option shall be fully exercisable for a period of thirty (30) days from the date of such notice, and the option will terminate upon the expiration of such period.

The Board may, if it so determines in the exercise of its sole discretion, also make provision for adjusting the Reserves, as well as the price per share of Common Stock covered by each outstanding option, in the event that the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or reductions of shares of its outstanding Common Stock, and in the event of the Company being consolidated with or merged into any other corporation.

16. *Rights as a Shareholder*. A participant shall have no rights as a shareholder with respect to any shares of Common Stock he or she may have a right to purchase under the Plan until the date of issuance of a stock certificate to such participant for shares issued pursuant to the Plan.

17. *Rights as an Employee*. Nothing in the Plan shall be construed to give any participant the right to remain in the employ of the Company or a Subsidiary or to affect the right of the Company and its Subsidiaries or the participant to terminate such employment at any time with or without cause.

18. *Use of Funds*. All payroll deductions received or held by the Company under the Plan may be used by the Company for any corporate purpose, and the Company shall not be obligated to segregate such payroll deductions.

19. *Amendment or Termination*. The Board of Directors shall have the right to amend, modify or terminate the Plan at any time without notice, provided that no Participant's existing rights are adversely affected thereby, and provided further that no amendment to the Plan shall be effective until such amendment is approved by a vote of the holders of at least a majority of the outstanding shares of Common Stock of the Company within twelve month before or after the date upon which such action is taken by the Board of Directors, if such amendment would:

(a) Increase the aggregate number of shares of Common Stock to be issued under the Plan (except as provided in Section 15 hereof);

(b) Materially modify the requirements for eligibility to participate in the Plan;

Table of Contents

(c) Increase the maximum number of shares of Common Stock which a Participant may purchase in any Offering Period;

(d) Extend the term of the Plan;

(e) Alter the option price per share formula so as to reduce the price for shares of Common Stock to be purchased under the Plan;

(f) Otherwise materially increase the benefits accruing to participants under the Plan; or

(g) Cause the Plan to fail to meet the requirements of an "employee stock purchase plan" under Section 423 of the Code.

The Plan shall terminate on the date prior to the tenth anniversary of its adoption, if it has not been earlier terminated pursuant to this Section 19, but the Plan shall remain in full force and effect until the end of the Offering Period then in effect.

20. *Notices*. All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

21. *Stockholder Approval*. Continuance of the Plan and the effectiveness of any option granted hereunder shall be subject to approval of the Plan by the affirmative vote or written consent of the holders of a majority of the outstanding shares of Common Stock of the Company present or represented and entitled to vote thereon, within 12 months after the date of adoption of this Plan by the Board of Directors.

22. *Conditions Upon Issuance of Shares*. Shares shall not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the shares are being purchased only for investment and without any present intention to sell or distribute such shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

23. *Governing Law*. To the extent not governed by federal law, all legal questions pertaining to the Plan shall be determined in accordance with the laws of the State of California.

Table of Contents

**Important Notice Regarding Internet Availability of Proxy Materials for the Annual Meeting:**
The Annual Report and Proxy Statement are available at http://materials.proxyvote.com/osis.

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the "Company") held of record by the undersigned as of the close of business on October 10, 2008, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on December 8, 2008, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the 2009 Annual Meeting of Shareholders or until their respective successors are elected and qualified:

**FOR ALL ______ WITHHOLD AUTHORITY FOR ALL ______**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Chand R. Viswanathan and Leslie E. Bider

To withhold authority to vote for any individual nominee, check the box marked "For All" above and write the nominee's name in the space provided here:

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2009.

**FOR ______ AGAINST ______ ABSTAIN ______**

3. To approve the adoption of the OSI Systems, Inc. 2008 Employee Stock Purchase Plan, including the reservation of 1,500,000 shares of the Company's Common Stock for issuance thereunder.

**FOR ______ AGAINST ______ ABSTAIN ______**

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

Table of Contents

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE 2008 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 23

DEFR14A 1 ddefr14a.htm REVISED DEFINITIVE PROXY STATEMENT

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A
**(Rule 14a-101)**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No. 1)**

Filed by the Registrant x Filed by a Party other than the Registrant ¨

Check the appropriate box:

¨ Preliminary Proxy Statement
¨ Confidential, for Use of the Commission Only (as Permitted by Rule 14a-6(e)(2))
x Definitive Proxy Statement
¨ Definitive Additional Materials
¨ Soliciting Material Pursuant to §240.14a-12

**OSI Systems, Inc.**

**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

x No fee required.

¨ Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

¨ Fee paid previously with preliminary materials.

¨ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

**EXPLANATORY NOTE**

On January 5, 2010, OSI Systems, Inc. (the "Company") filed with the Securities and Exchange Commission a definitive proxy statement (the "Proxy Statement") relating to the Company's Annual Meeting of Shareholders (the "Annual Meeting"). After filing the Proxy Statement, but prior to mailing the Proxy Statement to our shareholders, the Board of Directors of the Company (the "Board") resolved to amend the record date for the Annual Meeting and the meeting date for the Annual Meeting. The new record date for the Annual Meeting is February 5, 2010 and the new date/time for the Annual Meeting is March 5, 2010 at 10 a.m., local time.

The Board initially established the record date as December 22, 2009 and the meeting date as February 19, 2010. However, after December 22, 2009, the Company experienced a significant increase in the volume of trading in Company shares. Due to this increase in trading volume, certain holders of Company shares who purchased shares after December 22, 2009 would not have been deemed record holders at the Annual Meeting with regard to such shares and, accordingly, would not have had the right to vote such shares at the Annual Meeting. Conversely, certain record owners of Company shares as of December 22, 2009 who sold shares after December 22, 2009 would have, nevertheless, had the right to vote such shares at the Annual Meeting. Desiring to allow beneficial owners of Company shares bought after December 22, 2009 to vote such shares at the Annual Meeting and recognizing the potential for "empty voting", the Board resolved to reset the record date for the Annual Meeting to February 5, 2010 and reschedule the Annual Meeting to 10 a.m., local time, on March 5, 2010.

The Company is hereby amending and restating the Proxy Statement to reflect the new meeting date/time and record date, and corresponding updates to the number of shares outstanding on the record date as well as to the deadlines for submission of shareholder proposals and director nominees for next year's annual meeting. There are no other changes to the information contained in the Proxy Statement. The proposals contained in this amended and restated Proxy Statement remain the same as those set forth in the original Proxy Statement. The Company intends to mail this amended and restated Proxy Statement on or about February 8, 2010 to our shareholders of record as of the close of business on February 5, 2010.

**Table of Contents**



**12525 Chadron Avenue**
**Hawthorne, California 90250**

February 5, 2010

Dear Shareholders:

You are cordially invited to attend the Annual Meeting of Shareholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on March 5, 2010, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on February 5, 2010 are entitled to vote at the Annual Meeting. Enclosed is a copy of the Notice of Annual Meeting of Shareholders, Proxy Statement and Proxy Card.

The expected actions to be taken at the Annual Meeting are described in the enclosed Notice of Annual Meeting of Shareholders and Proxy Statement. We have also included a copy of our Annual Report on Form 10-K for the fiscal year ended June 30, 2009, which I encourage you to read. It includes our financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by sending in your Proxy Card or, if indicated on your Proxy Card, by telephone or Internet voting.

All shareholders may also choose to vote in person at the meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*

Table of Contents

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To Be Held March 5, 2010**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Annual Meeting") of OSI Systems, Inc., a California corporation (the "Company"), will be held at 10:00 a.m., local time, on March 5, 2010, at the Company's principal offices, 12525 Chadron Avenue, Hawthorne, California, 90250, for the following purposes:

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2010;

3. To approve the reincorporation of the Company from California to Delaware; and

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

A copy of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2009, containing consolidated financial statements, is included with this Proxy Statement.

The Board of Directors has fixed the close of business on February 5, 2010, as the record date for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Dated: February 5, 2010

**WHETHER OR NOT YOU EXPECT TO ATTEND THE ANNUAL MEETING, PLEASE VOTE PROMPTLY.**

**PLEASE COMPLETE, DATE AND SIGN THE ENCLOSED PROXY CARD AND MAIL IT IN THE ENCLOSED ENVELOPE OR, IF GIVEN THE OPTION, YOU MAY ALSO VOTE BY TELEPHONE OR INTERNET VOTING.**

**ANY OF THESE METHODS WILL ENSURE REPRESENTATION OF YOUR SHARES AT THE ANNUAL MEETING. IF YOU LATER DESIRE TO REVOKE YOUR PROXY FOR ANY REASON, YOU MAY DO SO IN THE MANNER DESCRIBED IN THE ATTACHED PROXY STATEMENT.**

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 8 |
| Proposal No. 3 Approval of Reincorporation from California to Delaware | 9 |
| Compensation of Executive Officers and Directors | 24 |
| Security Ownership of Certain Beneficial Owners and Management | 42 |
| Independent Registered Public Accounting Firm | 44 |
| Report of Audit Committee | 45 |
| Code of Ethics and Conduct | 47 |
| Annual Meeting Attendance | 47 |
| Shareholder Communications | 47 |
| Availability of Annual Report on Form 10-K | 47 |
| Shareholder Proposals | 47 |
| Incorporation by Reference | 48 |
| Other Business | 48 |
| Appendix A (Form of Agreement and Plan of Merger) | A-1 |
| Appendix B (Form of Certificate of Incorporation) | B-1 |
| Appendix C (Form of Bylaws) | C-1 |

Table of Contents

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Shareholders (the "Annual Meeting" or the "Meeting"), to be held at 10:00 a.m., local time, on March 5, 2010, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Shareholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to all shareholders of record on February 5, 2010.

In order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed, postage pre-paid envelope or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any shareholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a shareholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on February 5, 2010, the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 17,916,174 shares of common stock, without par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Meeting or represented at the Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD" for a proposal are treated as being present at the Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting. In voting for directors, however, if any shareholder gives notice at the Annual Meeting prior to voting of an intention to cumulate votes, then each shareholder has the right to cumulate votes and to give any one or to allocate among any of the nominees whose names have been placed in nomination prior to voting a number of votes equal to the number of directors to be elected (*i.e.*, six) multiplied by the number of shares which the shareholder is entitled to vote. Unless the proxy holders are otherwise instructed, shareholders, by means of the accompanying proxy, will grant the proxy holders discretionary authority to cumulate votes.

A Proxy Card, when properly submitted by Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Shareholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Meeting for the purposes of determining a quorum. "Broker non-votes"

Table of Contents

means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One.* Directors are elected by a plurality and the nominees who receive the most votes will be elected. Beginning with shareholder meetings held on or after January 1, 2010, Proposal One will be considered a "non routine" matter under NASDAQ Stock Market ("NASDAQ") rules and, accordingly, brokerage firms and nominees will not have the authority to vote their customers' unvoted shares on Proposal One or to vote their customers' shares if the customers have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will decrease the number of votes cast in director elections.

*Proposal Two.* To be approved, the ratification of Moss Adams LLP, as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy at the Annual Meeting and entitled to vote. Proposal Two is considered a "routine" matter under NASDAQ rules and, accordingly, brokerage firms and nominees have the authority to vote their customers' unvoted shares on Proposal Two as well as to vote their customers' shares where the customers have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not affect the outcome of the vote on Proposal Two.

*Proposal Three.* To be approved, the re-incorporation of the Company from the State of California to the State of Delaware must receive the affirmative vote of the majority of the outstanding shares of Common Stock. Proposal Three is considered a "non routine" matter under NASDAQ rules and, accordingly, brokerage firms and nominees do not have the authority to vote their customers' unvoted shares on Proposal Three or to vote the customers' shares if the customers have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will have the same effect as a vote against Proposal Three.

It is anticipated that the Proxy Materials will be mailed on or about February 8, 2010. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling and mailing the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore. We have also engaged MacKenzie Partners, Inc., to assist in our solicitation efforts and provide related advice and informational support. The total of all fees for such services, including for the reimbursement of expenses, is not expected to exceed $40,000 in the aggregate.

The matters to be considered and acted upon at the Annual Meeting are referred to in the preceding notice and are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting to be held on March 5, 2010:** This Proxy Statement and the Company's most recent Annual Report on Form 10-K are available at http://investors.osi-systems.com

Table of Contents

## ELECTION OF DIRECTORS
*(Proposal No. 1 of the Proxy Card)*

### Nominees

The Board of Directors consists of six members. At each annual meeting of shareholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Leslie E. Bider and David T. Feinberg. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's Annual Meeting of Shareholders in 2010, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 59 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 47 | Director, Executive Vice President, and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 67 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 84 | Director | 1990 |
| Leslie E. Bider(1)(3) | 59 | Director | 2006 |
| David T. Feinberg | 47 | Director | — |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating and Governance Committee
(4) Member of Executive Committee

### Business Experience

***Deepak Chopra*** is President and Chief Executive Officer of the Company. He also serves as Chairman of the Board of Directors. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra is also a member of the Company's Board of Directors. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a Senior Partner in the accounting firm of Good, Swartz, Brown & Berns, a division of JH Cohn LLP. He founded Good, Swartz, Brown & Berns in 1976, and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, Inc., each of which is listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Myricom, Inc., a computer and network infrastructure company, and as a Director of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee of the Orthopedic Hospital. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***Leslie E. Bider*** has served as a Director of the Company since September 2006. Mr. Bider is currently Chief Executive Officer of Pinnacle Care, Inc. a Health Advisory Company. Between 2007 and 2008, Mr. Bider served as Chief Strategist of ITU Ventures, a venture capital firm, and between 1987 and 2005, Mr. Bider served as Chairman and Chief Executive Officer of Warner Chappell Music, Inc. Prior to that, Mr. Bider was Chief Financial Officer and Chief Operating Officer of Warner Bros. Music. Mr. Bider currently serves on the board of directors of Douglas Emmett, Inc., a real estate investment trust that trades on the New York Stock Exchange and California Pizza Kitchens, Inc., which trades on the NASDAQ. He also serves on the board of directors of several charitable and educational institutions. He holds a Bachelors of Science degree in Accounting from the University of Southern California and a Masters degree from the Wharton School at the University of Pennsylvania.

***David T. Feinberg*** has served as the chief executive officer of the UCLA Hospital System and associate vice chancellor since July 2007. Prior to assuming this position, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA. Dr. Feinberg graduated *cum laude* in economics from the University of California, Berkeley in 1984, and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his master of business administration from Pepperdine University in 2002.

Table of Contents

**Retirement from the Board of Directors**

Chand R. Viswanathan, who has served as a Director of the Company since 2001, notified the Company on December 21, 2009, that he would retire as a Director, effective upon the date of the Annual Meeting of Shareholders and the election of a successor Director.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers of the Company (for a list of Named Executive Officers, See "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board of Directors Meetings and Committees of the Board of Directors**

There were six meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2009. The Board of Directors has established an Audit Committee, Compensation Committee, Executive Committee and Nominating and Governance Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2009, attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served, except Mr. Bider who attended 73% of the aggregate number of meetings held by the Board of Directors and all committees on which he served.

The Board of Directors has determined that each of the directors, except Deepak Chopra and Ajay Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and NASDAQ director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is "independent" within the meaning of the rules and regulations of the SEC and the NASDAQ Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in the listing standards applicable to the Company

The Audit Committee currently consists of Messrs. Good, Luskin and Bider. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

Table of Contents

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2009. See Report of Audit Committee. The charter of the Audit Committee is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of Messrs. Luskin and Good. There were eleven meetings of the Compensation Committee during the fiscal year ended June 30, 2009. See *Compensation Committee Report.*

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com.*

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Bider, Good and Luskin. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2009.

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors. The charter of the Nominating and Governance Committee is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were seven meetings of the Executive Committee during the fiscal year ended June 30, 2009.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by shareholders. Shareholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a shareholder and is proposing a candidate for consideration by the Nominating and Governance Committee;

- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the committee to evaluate the candidate;
- A statement detailing (1) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (2) any relationship or understanding between the candidate and the shareholder proposing the candidate for consideration, or any affiliate of such shareholder; and
- A statement that the candidate is willing to be considered for nomination by the committee and willing to serve as a director if nominated and elected.

Shareholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the committee generally does not differentiate between candidates proposed by shareholders and other proposed nominees, except that the committee may consider, as one of the factors in its evaluation of shareholder recommended candidates, the size and duration of the interest of the recommending shareholder or shareholder group in the equity of the Company.

There are no shareholder nominations for election to our Board to be voted on at this year's Annual Meeting. The Nominating and Governance Committee has retained Korn/Ferry International to assist it in identifying potential future director nominees. All of this year's nominees for director, other than Dr. Feinberg, are all currently directors of the Company. Shareholders wishing to submit nominations for next year's annual meeting of shareholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Shareholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Luskin and Good. No executive officer of the Company has served during the fiscal year ended June 30, 2009 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2009, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K under the Exchange Act.

***The Board of Directors unanimously recommends that you vote FOR the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Leslie E. Bider and David T. Feinberg as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

Table of Contents

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2010, and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's shareholders at the Annual Meeting. Moss Adams has no financial interest in the Company and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's shareholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its shareholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors unanimously recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2010. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

Table of Contents

## APPROVAL OF REINCORPORATION FROM CALIFORNIA TO DELAWARE
***(Proposal 3 of the Proxy Card)***

Our Board of Directors (the "Board") has undertaken a program of corporate governance enhancement. As a part of that program, the Board believes that it is in the best interests of our shareholders to change our state of incorporation from California to Delaware in a specific manner that, among other things: (a) provides shareholders with expanded rights against potential dilution; (b) enhances shareholder control over our company's Bylaws; (c) improves the ability for the majority of shareholders to exercise control of the company, and decreases the power of dissident minority shareholders to impede or frustrate the will of the majority; (d) enhances shareholder rights with respect to any prospective sale or merger of our company; and (e) provides shareholders access to the comparatively more established jurisprudence and the judicial expertise in Delaware. The Board considers the reincorporation in Delaware, under the terms specified, to be an important step in the enhancement of corporate governance and shareholder value.

Our Board reached this decision following a comprehensive review of corporate governance-related matters. As a result of the review, the Board concluded that changes in corporate governance, including changes to corporate structure, if properly designed and implemented, could significantly bolster on-going efforts by the Board and our management to generate sustainable, long-term value for shareholders.

Our Board believes, particularly in light of the on-going, worldwide economic crisis and the related re-examination of corporate risk tolerance, that continuing to ensure that we strive to seek sustainable, long-term value over pressures to pursue more short-lived returns, is one of its most important responsibilities to shareholders.

Following its review, the Board undertook several significant actions. Among them, it adopted the OSI Systems, Inc. Corporate Governance Guidelines, which are now available for public viewing on our Internet website – *www.osi-systems.com*.

As part of its review, our Board also undertook an extensive review of the advantages and disadvantages of changing our corporate structure, including reincorporating from California to Delaware. As discussed in "Principal Reasons for Reincorporation," the Board concluded that reincorporation in Delaware on the terms specified in this Proposal, would significantly enhance our overall corporate governance profile. We also believe that reincorporation in Delaware, on the terms specified in this Proposal, will improve the Company's Corporate Governance Quotient (CGQ) score, which is a measure of corporate governance structure and practices maintained by RiskMetrics Group, a leading proxy advisory firm.

Additionally, our Board believes that, as a Delaware corporation, our company would be better able to attract and retain qualified directors and officers than it can as a California corporation.

In this Proposal, we refer to the current OSI Systems, Inc., a California corporation, as "OSI California" and a new OSI Systems, Inc., a Delaware corporation, as "OSI Delaware."

We urge shareholders to read carefully the following sections of this Proposal, including the related appendices, before voting on this Proposal.

Approval of this Proposal by a shareholder will constitute such shareholder's approval of each of the following: (i) the Agreement and Plan of Merger (the "Merger Agreement") pursuant to which OSI California will be merged with and into OSI Delaware; (ii) the Certificate of Incorporation of OSI Delaware and (iii) the Bylaws of OSI Delaware, each in substantially the form attached hereto as Appendices A, B and C, respectively.

***IN ORDER FOR THE PROPOSED REINCORPORATION TO PROCEED, A VOTE OF THE MAJORITY OF ALL OUTSTANDING SHARES OF OUR COMMON STOCK MUST APPROVE THIS PROPOSAL.***

**Mechanics of Reincorporation**

This discussion is qualified in its entirety by reference to the Merger Agreement, the Certificate of Incorporation of OSI Delaware and the Bylaws of OSI Delaware, copies of which are attached hereto as Appendices A, B and C, respectively.

OSI California's capital stock consists of 100,000,000 authorized shares of Common Stock, of which 17,673,749 shares were issued and outstanding as of December 17, 2009, and 10,000,000 authorized shares of preferred stock, without par value ("Preferred Stock"), none of which were outstanding as of December 17, 2009. On the effective date of the reincorporation, OSI Delaware would have the same number of outstanding shares of Common Stock that OSI California had outstanding immediately prior to the effective date of the reincorporation.

OSI Delaware's capital stock would consist of 100,000,000 authorized shares of Common Stock and 10,000,000 shares of Preferred Stock, which will be consistent with maintaining adequate capitalization for the current needs of our company. OSI Delaware's authorized but unissued shares of Common Stock and Preferred Stock would both be available for future issuance.

This Proposal would be effectuated by merging OSI California into OSI Delaware (the "Merger"). Upon completion of the Merger, OSI California would cease to exist and OSI Delaware would continue the business of our company under the name "OSI Systems, Inc." Pursuant to the Merger Agreement, a form of which is attached hereto as Appendix A, upon the effective date of the Merger, (1) each outstanding share of OSI California Common Stock would automatically be converted into one share of OSI Delaware Common Stock and (2) each outstanding option to purchase OSI California Common Stock would automatically be assumed by OSI Delaware and would represent an option to acquire shares of OSI Delaware Common Stock on the basis of one share of OSI Delaware Common Stock for each one share of OSI California Common Stock and at an exercise price equal to the exercise price of the OSI California option. Each outstanding warrant to purchase OSI California Common Stock would similarly automatically be assumed and converted into a warrant to purchase shares of OSI Delaware Common Stock. Each certificate representing issued and outstanding shares of OSI California Common Stock would represent the same number of shares of Common Stock of OSI Delaware into which such shares are converted by virtue of the Merger.

IT WILL NOT BE NECESSARY FOR SHAREHOLDERS OF OSI CALIFORNIA TO EXCHANGE THEIR EXISTING SHARE CERTIFICATES FOR STOCK CERTIFICATES OF OSI DELAWARE. HOWEVER, SHAREHOLDERS MAY EXCHANGE THEIR CERTIFICATES IF THEY SO CHOOSE.

The Common Stock of OSI California is listed for trading on the Nasdaq under the ticker symbol "OSIS." After the Merger, OSI Delaware's Common Stock would continue to be traded on Nasdaq without interruption, under the same symbol.

Under California law, the affirmative vote of the holders of a majority of the outstanding shares of our Common Stock is required for approval of the terms of this Proposal. This Proposal has been approved by OSI California's Board of Directors, which unanimously recommends a vote in favor of such proposal. If approved by the shareholders, it is anticipated that the reincorporation would become effective as soon as practicable. However, pursuant to the Merger Agreement, the Merger may be abandoned or the Merger Agreement may be amended (except that the principal terms may not be amended without shareholder approval) either before or after shareholder approval has been obtained and prior to the effective date if, in the opinion of the Board of Directors of either OSI California or OSI Delaware, circumstances arise which make it inadvisable to proceed.

*Company*

This Proposal would effect only a change in the legal domicile of OSI California and other changes of a legal nature, many of which are described in this Proposal. The reincorporation would not result in any change in the name, business, management, fiscal year, accounting, location of the principal executive offices, assets or

liabilities of our company. The Directors of OSI California at the time of the Merger would continue as the Directors of OSI Delaware. All employee benefits and stock options of OSI California would be assumed and continued by OSI Delaware, and each option or right to purchase shares of OSI California Common Stock would automatically be converted into an option or right to purchase the same number of shares of OSI Delaware Common Stock at the same price per share, upon the same terms, and subject to the same conditions.

Shareholders should note that approval of this Proposal would also constitute approval of the assumption by OSI Delaware of OSI California's options and other rights to purchase OSI California capital stock. Shareholder approval of this Proposal would also constitute approval of the assumption by OSI Delaware of OSI California's 2006 Amended and Restated Equity Participation Plan and 2008 Employee Stock Purchase Plan. OSI California's other employee benefit arrangements would also be continued by OSI Delaware upon the terms and subject to the conditions in effect prior to the Merger. Prior to the effective date of the Merger, OSI California would seek to obtain any required consents to the Merger from parties with whom it may have material contractual arrangements. Assuming such consents are obtained, OSI California's rights and obligations under such material contractual arrangements would be assumed by OSI Delaware.

OSI California does not, and OSI Delaware therefore would not, have any collective bargaining agreements with employees or employ anyone that resides in Delaware. As a result, reincorporating in Delaware should have no effect on any labor contracts covering persons employed in Delaware.

**Principal Reasons for Reincorporation**

The State of Delaware has been a leader in adopting a comprehensive and coherent set of corporate laws that are responsive to the evolving legal and business needs of corporations organized under Delaware law. Our company's decision to reincorporate in the state of Delaware is due in large part to Delaware's history of comprehensiveness and flexibility of its corporate laws and its tradition of promoting progressive principles of corporate governance.

*Enhanced Ability to Attract and Retain Directors*

The current emphasis on issues of corporate governance brought about by the recent worldwide economic crisis has increased the overall demand for highly qualified independent directors. Because of its flexibility and familiarity to prospective directors, Delaware law provides, as noted above, a more favorable environment for directors to serve the bests interests of our company and its shareholders. According to a recent survey, a majority of U.S. publicly-traded companies are incorporated in Delaware. Additionally, the enhanced certainty regarding the indemnification of officers and directors and limitation of liability of directors under Delaware law enables corporations organized in Delaware to compete more effectively to seek out and retain qualified directors than their peer companies that are not organized in Delaware.

*Enhanced Ability of the Majority of Shareholders to Exercise Control*

The majority of shareholders of a Delaware corporation would have greater ability to exercise control because Delaware law does not require cumulative voting. Cumulative voting is often used when a minority shareholder (or shareholder group) is otherwise unable to persuade the majority to elect one or more nominees for the election of directors. Under cumulative voting, a shareholder may cast as many votes as shall equal the number of votes that such holder would be entitled to cast for the election of directors multiplied by the number of directors to be elected. The holder may cast all such votes for a single director or distribute the votes among two or more directors. Thus, minority shareholders are often able to use cumulative voting to elect one or more directors to the corporation's board of directors. The Board believes that directors so elected by a minority shareholder who was unable or unwilling to persuade the majority of shareholders would then act to advance courses of action with respect to which the majority of shareholders was not persuaded. Oftentimes, such situations lead to impediment and frustration of the intentions of the majority of shareholders.

*Predictability, Flexibility and Responsiveness of Delaware Law*

Delaware courts have, over many years, established a jurisprudence that is far more thorough and broadly applied on questions regarding the principles of corporate governance than any other state's courts. As a result, corporations that are organized under Delaware law are often at an advantage over their peers that are organized under the laws of other states in that Delaware corporations can draw upon these well-established and consistently interpreted principles when making business and legal decisions. Consequently, Delaware is the preferred state of incorporation for most publicly traded companies in the U.S.

Additionally, because so many companies are incorporated in Delaware, Delaware courts are often the first in the country to issue rulings on rights and obligations in important new issues relating to corporate governance. Because Delaware courts were among the first and most influential to address these issues, many California corporations have looked to Delaware law for guidance on these issues. We believe that the clarity provided on these issues is ultimately beneficial to both our company and our shareholders because it provides a more reliable foundation upon which corporate governance decisions can be made.

Delaware's court system also provides swift and efficient resolutions in corporate litigation. Delaware has a specialized Court of Chancery that hears corporate law cases. Furthermore, appeals to the Supreme Court of Delaware in important corporate cases can be made and decided very quickly. The fact that issues of corporate governance are frequently addressed first in Delaware contribute to an efficient and expert court system and bar. In contrast, disputes regarding California corporate law are heard by the Superior Court, the general trial court in California that hears all types of cases, from criminal to civil, which has been known in the past experience lengthy delays in resolving cases, and to produce outcomes that are inconsistent from court to court. The highly specialized nature of the Delaware court system is therefore widely believed to result in more consistent and timely rulings.

Our Board of Directors has therefore identified the following overall benefits of Delaware's corporate legal framework in reaching its decision to propose reincorporating in Delaware:

- The Delaware General Corporate Law ("DGCL") is generally acknowledged to be the most advanced and flexible state corporate statute in the United States;
- The Delaware General Assembly each year considers and adopts statutory amendments, many proposed by the Corporation Law Section of the Delaware State Bar, in an effort to ensure that the Delaware corporate statute continues to be responsive to the changing needs of businesses;
- The Delaware Court of Chancery routinely handles cases involving complex corporate issues with a level of experience and a degree of sophistication and understanding unmatched by any other court in the country;
- The Delaware Supreme Court is also well regarded and is timely and highly responsive in cases involving complex corporate issues; and
- The well-established body of case law construing Delaware law has developed over the last century and provides businesses with a greater predictability than the case law in most, if not all, other jurisdictions.

*Treatment of Sales and Mergers*

In this Proposal to reincorporate in Delaware, the Board has sought to achieve parity of statutory treatment of any prospective sales and mergers of our company whether under OSI California or OSI Delaware. Therefore, the Board has chosen to "opt out" of Delaware's "freeze-out" statute. Moreover, as a part of this Proposal, above and beyond statutory parity, upon effectiveness of the Merger, our current Shareholder Rights Plan would expire. The Board also recognizes that Delaware law would provide shareholders with enhanced rights of appraisal in the event of any sale or merger. These points are discussed in more detail below.

*Delaware Law.* Under Delaware law, a corporation may adopt certain measures to mitigate its vulnerability to unsolicited takeover attempts through amendment of the corporate charter documents, adoption

of shareholder rights plans or otherwise. Moreover, DGCL 203 imposes certain restrictions on parties attempting to seize control of Delaware corporations. Unsolicited takeovers can involve attempts to seize control without acquiring all outstanding shares, and without paying a fair value to the shareholders of a company.

However, in light of prevailing commentary on this subject, and considering the position taken by leading proxy advisory firms, the Board has elected in this Proposal to "opt-out" of DGCL 203. Moreover, upon effectiveness of the Merger, our current Shareholder Rights Plan would expire.

In the discharge of its fiduciary duty to the shareholders, our Board may consider, at some point in the future, implementing certain defensive strategies allowed under Delaware law that are designed to enhance the Board's ability to negotiate with an unsolicited bidder; such defensive strategies and negotiations may result in the offer of a price-per-share premium above the then-current trading price of our company's stock that may not be available to shareholders in the absence of such defensive strategies and negotiations. Such strategies could include, but are not limited to, the adoption of a new shareholder rights plan that would become effective upon certain pre-determined circumstances. With respect to implementing such defensive strategies, our Board believes that Delaware law is preferable to California law because of the substantial judicial precedent that exists in Delaware regarding the legal principles that govern the implementation and use of such defensive strategies. As either a California corporation or a Delaware corporation, our company could implement some of these same defensive measures, but as a Delaware corporation, our Board and our shareholders would benefit from the greater guidance and predictability in such matters afforded by Delaware law, as well as the greater number of precedents of Delaware corporations using such strategies to increase the amounts of any offers that may be made for control or ownership of our company.

*Shareholder Rights Agreement*. Since July 31, 2000, our company has maintained with its stock transfer agent a shareholder rights plan, in the form of a Shareholder Rights Agreement, as amended ("Rights Agreement"). The Rights Agreement expires on January 30, 2018. If this Proposal is approved by shareholders, the Bylaws of OSI Delaware would include a provision that would restrict the adoption of such shareholders rights agreements unless such agreements met certain criteria, more fully described below under "Termination of Shareholder Rights Plan". In conjunction with the adoption of OSI Delaware's bylaws, upon the effectiveness of the Merger, the Rights Agreement would be terminated. The termination of the Rights Agreement would be effectuated by the adoption of an amendment accelerating the expiration of the Rights Agreement.

*Section 203 of the DGCL*. The Board also recognizes that certain aspects of Delaware law could be considered to have anti-takeover implications that could be construed as unfavorable to shareholder interests. The most significant of these provisions is Section 203, which restricts certain "business combinations" with "interested stockholders" (generally, a person who acquires 15% or more of the outstanding voting stock of the corporation without prior board approval) for three years following the date that a person becomes an interested shareholder, unless the Board of Directors approves the business combination.

As stated above, our Board does not intend, as a part of its proposed reincorporation, to ask shareholders to adopt any new anti-takeover defenses, even in those areas where Delaware law may provide greater freedom to do so. Consequently, the Certificate of Incorporation of OSI Delaware, attached hereto as Appendix B, contains a provision opting out of Section 203. As a result, OSI Delaware would not be subject to Section 203.

Please take note that, although our Board has designed the reincorporation for purpose of protecting shareholder interests, certain aspects of the reincorporation, including the elimination of the Rights Agreement and the decision to opt out of Section 203, could ultimately be disadvantageous to individual shareholders or groups of shareholders. For example, DGCL 203 has been used successfully to extract a price premium from unsolicited bidders for control or ownership of Delaware Corporations, where such premiums may not otherwise have been available. For a detailed discussion of the DGCL and other differences between California and Delaware corporate law that may affect your rights as a shareholder, see "Comparison of the Corporation Laws of California and Delaware."

*Comparison of the Charter Documents of OSI California and OSI Delaware*

The rights of our shareholders are currently governed by OSI California's Amended and Restated Articles of Incorporation, its Bylaws and the California General Corporation Law (the "CGCL"). As a result of the Merger, OSI California's shareholders would become shareholders of OSI Delaware.

With certain exceptions, the provisions of the OSI Delaware Certificate of Incorporation and Bylaws are similar to those of the OSI California Articles of Incorporation and Bylaws. The descriptions below are a summary and they are qualified in their entirety by reference to the respective corporation laws of California and Delaware and to the full text of the Amended and Restated Articles of Incorporation and the Bylaws of OSI California and the Certificate of Incorporation and the Bylaws OSI Delaware.

*Size of the Board of Directors*

California law provides that the number of directors of a corporation may be fixed in the corporation's articles of incorporation or bylaws, or a range may be established for the number of directors, with the board of directors itself given authority to fix the exact number of directors within such range. The Bylaws of OSI California specify a range of five to nine for the number of directors and authorize the Board to fix the exact number of directors within that range. The number of directors of OSI California is currently set at six. Changes in the size of the Board outside these limits can be made only with the approval of the holders of a majority of the outstanding voting stock of OSI California.

Delaware law provides that, unless a corporation's certificate of incorporation fixes the number of directors, the number shall be fixed by, or in the manner provided in, the corporation's bylaws. The Certificate of Incorporation of OSI Delaware establishes a range of five to nine for the number of directors and authorizes the board of directors to fix the exact number of directors within this range. Changes outside of these limits may be made only by amendment to the certificate of incorporation, which must be approved by at least a majority of the outstanding voting stock of OSI Delaware.

Nasdaq corporate governance rules require that a majority of the Board of Directors be independent. If this Proposal is approved, all of the directors of OSI California would continue to serve as directors of OSI Delaware following the Merger and, as a result, OSI Delaware would satisfy this Nasdaq requirement.

*Cumulative Voting*

Under a cumulative voting regime, a shareholder is permitted to cast as many votes as there are directors to be elected multiplied by the number of shares registered in such shareholder's name. Such votes may be cast for a single nominee or may be distributed among any two or more nominees. California law permits any shareholder to cumulate his or her votes in the election of directors upon proper notice of the intention to do so. Under Delaware law, cumulative voting is not permitted unless it is expressly authorized in the certificate of incorporation. In keeping with this general rule and the practices of most companies incorporated in Delaware, the Certificate of Incorporation of OSI Delaware would not provide for cumulative voting. The shareholders rights with respect to cumulative voting would, therefore, change if this Proposal is approved.

The Board believes that it is the general practice of companies incorporated in Delaware not to provide for cumulative voting because cumulative voting has the effect of giving disproportionate power to minority shareholders over and at the expense of the interests of the majority of shareholders. Cumulative voting tends to be used specifically in instances in which minority shareholders hold views not held by the majority. By cumulating votes, a minority shareholder can leverage its minority position in order to elect a nominee to a board of directors. By design, such nominee, once on the board of directors, then serves the interests of the minority investor that elected him over the interests of the majority of shareholders, and will tend to act to frustrate the will of the majority of shareholders. After careful review, the Board believes that cumulative voting is typically used to advantage a minority investor who is unable to persuade the majority to vote for his interests. By

Table of Contents

eliminating cumulative voting, therefore, our Board believes that an enhanced environment is created whereby the Board and our management can give greater consideration to the desires of the majority of our shareholders.

*Filling Vacancies on the Board of Directors*

Under California law, any vacancy on a corporation's board of directors, other than one created by the removal of a director by shareholders, may be filled by the board of directors. If the number of directors is less than a quorum, a vacancy may be filled by the unanimous written consent of the directors then in office, by the affirmative vote of a majority of the directors at a meeting held pursuant to notice or waivers of notice or by a sole remaining director. A vacancy created by the removal of a director by shareholders may be filled only if authorized by a corporation's articles of incorporation or by a bylaw approved by the corporation's shareholders. OSI California's Articles of Incorporation and Bylaws do not authorize directors to fill vacancies created by the removal of a director by shareholders.

The Certificate of Incorporation and Bylaws of OSI Delaware would also permit the majority of directors then in office to fill Board vacancies and newly created directorships, and, like California law, would prohibit Directors from filling any vacancy created by the removal of a director by shareholders. Pursuant to the Certificate of Incorporation and Bylaws of OSI Delaware, such a vacancy could be filled only by a majority of the shareholders. Delaware law permits all vacancies and newly created directorships to be filled by a majority of directors then in office, even if less than a quorum, or by a sole remaining director, unless otherwise provided in the certificate of incorporation or the bylaws, but the Board has elected to set further limits on its powers to fill such vacancies created by the removal of a director by shareholders, as described above.

*Shareholder Power to Call Special Shareholders' Meeting*

Under California law and the Bylaws of OSI California, a special meeting of shareholders may be called by the Board, the Chairman of the Board, the President of OSI California, or the holders of shares entitled to cast not less than ten percent (10%) of the votes at such meeting. California law authorizes charter or bylaw provisions identifying additional persons who may call special meetings, although no such additional persons are identified in the Articles of Incorporation or Bylaws of OSI California.

The proposed Certificate of Incorporation and Bylaws of OSI Delaware provide, just as in the Bylaws of OSI California, that a special meeting of shareholders may be called by the Board, the Chairman of the Board, the Chief Executive Officer of OSI Delaware, or the holders of shares entitled to cast not less than ten percent (10%) of the votes at such meeting. No additional persons are identified in the Certificate of Incorporation or Bylaws of OSI Delaware to call special meetings. Delaware law provides that a special meeting of shareholders may be called by the board of directors or by any other person authorized to do so in the certificate of incorporation or the bylaws.

*Shareholder Power To Act by Written Consent*

Under California law and the Bylaws of OSI California, shareholders may act by written consent with regard to any action required or permitted to be taken at an annual or special meeting, if written consents signed by the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, provided, however, that in the case of the election of directors by written consent, such consent would be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors. The proposed Certificate of Incorporation and Bylaws of OSI Delaware would provide stockholders the same rights to act by written consent as are provided under the Bylaws of OSI California.

*Termination of Shareholder Rights Plan*

As indicated in "Principle Reasons for Reincorporation" above, since July 31, 2000, our company has maintained a shareholder rights plan in the form of the Rights Agreement. Under the Rights Agreement, our

Table of Contents

Board is authorized to issue additional shares as a defensive strategy in the event of a hostile takeover attempt. If this Proposal is approved by shareholders, then our existing Rights Agreement would terminate upon the consummation of the Merger. Additionally, if this Proposal is approved by shareholders, the Bylaws of OSI Delaware would require our Board to seek shareholder approval prior to the adoption of any future shareholder rights plan with a term of more than 12 months or any amendment which has the effect of extending the term of a shareholders rights plan, except when the Board determines that the adoption or extension of a shareholders rights plan is required in the exercise of the Board's fiduciary duties. Additionally, if a shareholder rights plan or renewal thereof is adopted by the Board without prior shareholder approval in the exercise of the Board's fiduciary duties, then the Bylaws of OSI Delaware would require the Board to submit the shareholders rights plan or renewal thereof to the shareholders for ratification at a shareholders meeting within 12 months of the Board's adoption of the shareholders right plan or renewal. If such shareholders rights plan or renewal was not approved by a majority of the outstanding shares entitled to vote at the meeting, then the shareholders right plan would automatically terminate. The Bylaws and Articles of OSI California contain no such provisions and under the Bylaws and Certificate of OSI California the Board is able to adopt or renew a shareholders rights plan without shareholder approval or ratification.

In conjunction with the adoption of the OSI Delaware bylaws, upon the effectiveness of the Merger, the current Rights Agreement would be terminated. The termination of the Rights Agreement would be effectuated by the adoption of an amendment accelerating the expiration of the Rights Agreement.

*Director Submission of Resignation Upon Material Change In Principal Occupation*

The Bylaws of OSI Delaware would contain a clause that requires a director to submit a letter of resignation to the Board upon such director's material change in principal occupation or business association. Such a letter of resignation would become effective only if accepted by the Board. If this Proposal is approved by our shareholders, we would also amend our Corporate Governance Guidelines so that the guidelines are consistent with this Bylaw provision.

In contrast, the Bylaws of OSI California do not contain any such requirement. Rather, under our current Corporate Governance Guidelines a director should offer to tender his or her resignation upon a material change in principal occupation only if that change would likely interfere with the director's duties as a director. Under the OSI Delaware approach, the director would be required to tender his or her resignation regardless of whether the material change in principal occupation or business association would likely interfere with the director's duties as a director.

**Comparison of the Corporation Laws of California and Delaware**

The following provides a general summary of the principal differences between the General Corporation Laws of California and Delaware. It is not an exhaustive description of the differences between the two states' laws as it is impractical to summarize all of such differences in this Proposal. Certain principal differences beyond those discussed in "Comparison of the Charter Documents of OSI California and OSI Delaware" that could materially affect the rights of shareholders include the following:

*Classified Board of Directors*

A classified board is a board in which directors are divided into multiple classes with staggered terms. California law requires, with an exception applicable to certain publicly-traded companies, that directors be elected annually and, therefore, does not permit the creation of a classified board. Under the exception, a corporation that is listed on the New York Stock Exchange or Nasdaq may create and elect a classified board. By contrast, Delaware law permits, but does not require, the adoption of a classified board of directors, pursuant to which the directors can be divided into as many as three classes with three-year staggered terms of office and with only one class of directors coming up for election each year.

Our Board is not proposing to implement a classified board in connection with the implementation of the reincorporation.

*Removal of Directors*

Under California law, any director or the entire board of directors may be removed, with or without cause, with the approval of a majority of the outstanding shares entitled to vote. No individual director, however, may be removed (unless the entire board is removed) if the number of votes cast against the removal would be sufficient to elect the director under cumulative voting.

Under Delaware law, any director or the entire board of directors of a corporation that does not have a classified board of directors or cumulative voting may be removed, with or without cause, by the holders of a majority of the outstanding shares entitled to vote at an election of directors. As indicated in "Comparison of the Charter Documents of OSI California and OSI Delaware," the OSI Delaware Certificate of Incorporation and Bylaws do not provide for a classified board or cumulative voting.

*Interested Director Transactions*

Under both California and Delaware law, certain contracts or transactions in which one or more of a corporation's directors has an interest are not void or voidable simply because of such interest provided that certain conditions are met, such as obtaining the required approval and fulfilling the requirements of good faith and full disclosure. With certain exceptions, the conditions are similar under California and Delaware law. Under California law, after full disclosure of the material facts, either the shareholders or the board of directors must approve any such contract or transaction and, in the case of board approval, the contract or transaction must also be "just and reasonable" or, if there was no disclosure, the contract or transaction must have been "just and reasonable" as to the corporation at the time it was approved. In the latter case, California law explicitly places the burden of proof on the interested director. Under Delaware law, a contract or transaction will not be void or voidable if it is approved, after full disclosure, by a majority of the disinterested directors a majority of shareholders or it if is fair to the corporation at the time it is authorized, approved or ratified.

Under California law, to shift the burden of proof on the validity of the contract by shareholder approval, the interested director would not be entitled to vote his or her shares at a shareholder meeting with respect to any action regarding such contract or transaction. To shift the burden of proof on the validity of the contract by board approval, the contract or transaction must be approved by a majority vote of a quorum of the directors, without counting the vote of any interested directors (except that interested directors may be counted for purposes of establishing a quorum).

Under Delaware law, if board approval is sought to shift the burden of proof on the validity of the contract, the contract or transaction must be approved by a majority of the disinterested directors (even if less than a majority of a quorum). Therefore, certain transactions that a California corporation might not be able to approve, because of the number of interested directors, could be approved by a majority of the disinterested directors of a Delaware corporation, although less than a majority of a quorum.

Our Board is not aware of any plans to propose any transaction involving directors that could not be approved under California law, but could be approved under Delaware law.

*Indemnification and Limitation of Liability*

California and Delaware have similar laws permitting a corporation to indemnify, with certain exceptions, its officers, directors, employees and other agents. The laws of both states also permit corporations to adopt charter and bylaw provisions that effectively eliminate the liability of a director to the corporation or its shareholders for monetary damages for breach of the director's fiduciary duty of care. Delaware law does, however, differ to some extent from California law insofar as it takes a somewhat more lenient approach in allowing corporations to

indemnify and limit the liability of corporate agents. Certain of the differences between the limitation of liability and indemnification permitted under California and Delaware law are summarized below.

*Indemnification.* Indemnification is permitted by both California and Delaware law, provided the requisite standard of conduct is met. California law requires indemnification when the individual has successfully defended the action on the merits, as opposed to Delaware law, which requires indemnification relating to a successful defense on the merits or otherwise.

Delaware law generally permits indemnification of expenses, including attorneys' fees, judgments, fines and amounts actually and reasonably incurred by an officer, director employee or agent (a "covered person") in the defense or settlement of a direct or third-party action, and it permits indemnification of expenses actually and reasonably incurred by a covered person in an action by or in the right of the corporation, in either case upon a determination that the covered person has met the applicable standard of conduct. For a person who is an officer or director at the time the determination is made, the determination must be made by (1) a majority vote of disinterested directors (even though less than a quorum), (2) a committee comprised of and established by a majority vote of such disinterested directors (even if less than a quorum), (3) independent legal counsel in a written opinion if there are no such directors or such directors so direct or (4) the shareholders that the person seeking indemnification has satisfied the applicable standard of conduct. Without requisite court approval, however, no indemnification may be made in the defense of any derivative action in which the person is found to be liable in the performance of his or her duty to the corporation.

California law generally permits a corporation to indemnify any director, officer, employee or agent of the corporation for expenses, monetary damages, fines, and settlement amounts to the extent actually and reasonably incurred in the defense or settlement of a derivative or third-party action, provided there is a determination by (1) majority vote of a quorum of disinterested directors, (2) independent legal counsel in a written opinion if such a quorum of directors is not obtainable, (3) shareholders, with the shares owned by the person to be indemnified, if any, not being entitled to vote thereon or (4) the court in which the proceeding is or was pending upon application made by the corporation, agent or other person rendering services in connection with the defense, whether or not the application by such person is opposed by the corporation, that the person seeking indemnification has satisfied the applicable standard of conduct.

With respect to derivative actions, however, California law prohibits indemnification, unless with court approval, for any person judged to be liable to the corporation in the performance of his or her duty to the corporation and its shareholders. In addition, by contrast to Delaware law, California law requires indemnification only when the individual being indemnified was successful on the merits in defending the action.

Expenses incurred by an officer or director in defending an action may be paid in advance, under Delaware law and California law, if such director or officer undertakes to repay such amounts if it is ultimately determined that he or she is not entitled to indemnification. Such expenses may be paid in advance of former officers and directors and employees and agents of a Delaware corporation upon such terms and conditions as the corporation deems appropriate. In addition, the laws of both states authorize a corporation's purchase of indemnity insurance for the benefit of its officers, directors, employees and agents whether or not the corporation would have the power to indemnify against the liability covered by the policy. California law permits a California corporation to provide rights to indemnification beyond those provided therein to the extent such additional indemnification is authorized in the corporation's articles of incorporation. Thus, if so authorized, rights to indemnification may be provided pursuant to agreements or bylaw provisions which make mandatory the permissive indemnification provided by California law.

OSI California's Articles of Incorporation permit indemnification beyond that expressly mandated by California law and limit director monetary liability to the extent permitted by California law. OSI California's Bylaws make indemnification of directors mandatory in cases where OSI California is permitted by applicable law to indemnify its directors. In a similar way, the Bylaws and Certificate of Incorporation of OSI Delaware require indemnification to the maximum extent permissible under applicable law.

If this Proposal is approved, in connection with Merger, OSI Delaware would assume the indemnification agreements that OSI California has previously entered into with each of the Directors and executive officers of our company and all references in the agreements to California law and the Articles and Bylaws of OSI California would be changed to reference Delaware law and the Certificate of Incorporation and Bylaws of OSI Delaware. A vote in favor of this Proposal also constitutes approval of the assumption of such indemnification agreements by OSI Delaware.

California and Delaware corporate law, the OSI California Articles of Incorporation and Bylaws and the OSI Delaware Certificate of Incorporation and Bylaws may permit indemnification for liabilities under the Securities Act of 1933, as amended ("Securities Act") or the Securities Exchange Act of 1934, as amended ("Exchange Act"). The Board of Directors has been advised that, in the opinion of the U.S. Securities and Exchange Commission, indemnification for liabilities arising under the Securities Act and the Exchange Act may be contrary to public policy and, therefore, may be unenforceable, absent a decision to the contrary by a court of appropriate jurisdiction.

*Limitation of Liability*. The Certificate of Incorporation of OSI Delaware eliminates the liability of directors to the corporation or its shareholders for monetary damages for breach of fiduciary duty as directors to the fullest extent permitted by Delaware law, as that law exists currently and as it may be amended in the future. Under Delaware law, a director's monetary liability may not be eliminated or limited by a corporation for: (1) breaches of the director's duty of loyalty to the corporation or its shareholders; (2) acts or omissions not in good faith or which involve intentional misconduct or knowing violations of law; (3) the unlawful payment of dividends or unlawful stock repurchases or redemptions under Section 174 of the DGCL or (4) transactions in which the director received an improper personal benefit. Under Delaware law, a provision in the charter documents that limits a director's liability for the violation of, or otherwise relieves the corporation or its directors from complying with federal or state securities laws is prohibited. Such provisions also may not attempt to limit the availability of non-monetary remedies such as injunctive relief or rescission for a violation of federal or state securities laws.

California law does not permit the elimination of monetary liability where such liability is based on: (1) acts or omissions that involve intentional misconduct or a knowing and culpable violation of law; (2) acts or omissions that a director believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith on the part of the director; (3) any transaction from which a director derived an improper personal benefit; (4) acts or omissions that show a reckless disregard for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the corporation or its shareholders; (5) acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation or its shareholders; (6) interested transactions between the corporation and a director in which a director has a material financial interest and (7) liability for improper distributions, loans or guarantees. Therefore, under California law, monetary liability may exist in circumstances where it would be eliminated under Delaware law.

Both the Articles of Incorporation of OSI California and the Certificate of Incorporation of OSI Delaware provide for the elimination of the liability of the directors to the fullest extent permissible under California and Delaware law respectively. Because of its general belief that Delaware law provides greater protection to directors than California law and that Delaware case law regarding a corporation's ability to limit director liability is more developed and provides more guidance than California law, our Board believes that the proposed reincorporation and the attendant adoption of the OSI Delaware Certificate of Incorporation will give our company greater ability to attract and retain qualified directors and officers. Our Board further believes that the reincorporation will enable our Directors to make decisions that are in the best interest of our company and its shareholders in a corporate environment in which the likelihood of frivolous shareholder suits against them is decreased.

Table of Contents

*Inspection of Shareholders' List and Books and Records*

California law allows any shareholder to inspect the shareholder list, the accounting books and records, and the minutes of board and shareholder proceedings for a purpose reasonably related to such person's interest as a shareholder. In addition, California law provides for an absolute right to inspect and copy the corporation's shareholder list by persons who hold an aggregate of five percent or more of a corporation's voting shares or who hold one percent or more of such shares and have filed a Schedule 14A with the SEC.

Like California law, Delaware law permits any shareholder of record to inspect a list of shareholders and the corporation's other books and records for any proper purpose reasonably related to such person's interest as a shareholder, upon written demand under oath stating the purpose of such inspection and completion of certain other procedures. Delaware law, however, contains no provision comparable to the absolute right of inspection of the corporation's shareholder list provided by California law to certain shareholders, as described above. However, we have included a clause in the Bylaws of OSI Delaware in order to provide that OSI Delaware would continue to practice the approach taken by California law, namely that certain shareholders, as described above, would have an absolute right of inspection of the corporation's shareholder list.

*Approval of Certain Corporate Transactions*

Under both California and Delaware law, with certain exceptions, any merger, consolidation or sale of all or substantially all the assets must be approved by the board of directors and by a majority of the outstanding shares entitled to vote. Under California law, similar board and shareholder approval is also required in connection with certain additional acquisition transactions. See "Appraisal/Dissenters' Rights."

*Class Voting in Certain Corporate Transactions*

California law generally differs from Delaware law with respect to shareholder approval of any merger, certain sales of all or substantially all the assets of a corporation and certain other transactions. Under California law, such transactions must be approved by a majority of the outstanding shares of each class of stock (without regard to limitations on voting rights). By contrast, Delaware law does not generally require class voting, except in connection with certain amendments to the certificate of incorporation that, among other things, adversely affect the rights, powers or preferences of a class of stock.

*Appraisal/Dissenters' Rights*

Under both California and Delaware law, a shareholder of a corporation participating in certain major corporate transactions may, under varying circumstances, be entitled to appraisal rights, pursuant to which such shareholder may receive cash in the amount of the fair market value of the shares held by such shareholder (as determined by agreement of the corporation and the shareholder or by a court) in lieu of the consideration such shareholder would otherwise receive in the transaction.

Under Delaware law, appraisal rights are only available in connection with a merger or consolidation. Appraisal rights generally are not available for the shares of any class or series of stock that were either (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders, provided that such rights are available for such shares if the holders thereof are required by the terms of the agreement of merger or consolidation to accept for such stock anything except (a) shares of stock of the surviving or resulting corporation (b) shares of stock of any other corporation that, at the effective date of the merger or consolidation, will be either listed on a national securities exchange or held of record by more than 2,000 holders, (c) cash in lieu of fractional shares, or (d) any combination of the shares of stock and cash in lieu of fractional shares. In addition, appraisal rights are not available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in Section 251(f) of DGCL.

California law differs from Delaware law with respect to appraisal rights (which are referred to as "dissenters' rights" under California law) insofar as California law does not provide for such rights for shares listed on a national securities exchange immediately prior to the transaction unless the holders of at least five percent of the outstanding shares claim the rights or transfer of the shares is restricted by the corporation or any law or regulation. Such rights are also generally not available where the shareholders of the corporation or the corporation itself, or both, immediately prior to the reorganization will own immediately after the reorganization, equity securities constituting more than 83.3% of the voting power of the surviving or acquiring corporation or its parent entity (as will be the case in the Merger). Thus, appraisal rights are not available to shareholders of OSI California under California law with respect to the reincorporation described in this Proposal.

*Dividends and Repurchase of Shares*

California law does not utilize concepts of par value for shares or statutory definitions of capital, surplus and similar concepts. Delaware law permits a corporation, unless otherwise restricted by its certificate of incorporation, to declare and pay dividends out of surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or for the preceding fiscal year as long as the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets. In addition, Delaware law generally provides that a corporation may redeem or repurchase its shares only if such redemption or repurchase would not impair the capital of the corporation. Surplus is defined as the excess of a corporation's net assets (*i.e.*, its total assets minus its total liabilities) over the capital. In determining the amount of surplus of a Delaware corporation, the assets of the corporation, including stock of subsidiaries owned by the corporation, may be valued at their fair market value as determined by the board of directors, regardless of their historical book value.

Under California law, a corporation may not make any distribution (including dividends, whether in cash or other property, and including repurchases of its shares) unless either (1) the corporation's retained earnings immediately prior to the proposed distribution equal or exceed the amount of the proposed distribution or (2) immediately after giving effect to such distribution, the corporation's assets (exclusive of goodwill, capitalized research and development expenses and deferred charges) would be at least equal to 125% of its liabilities (not including deferred taxes, deferred income and other deferred credits), and the corporation's current assets, as defined, would be at least equal to its current liabilities (or 125% of its current liabilities if the average pre-tax and pre-interest earnings for the preceding two fiscal years were less than the average interest expenses for such years). Such tests are applied to California corporations on a consolidated basis. Under California law, there are certain exceptions to the foregoing rules for repurchases of shares in connection with certain rescission actions and certain repurchases pursuant to employee stock plans.

OSI California currently maintains a share repurchase program. Under California law, repurchase programs are subject to certain restrictions that are not present in Delaware law. Delaware law, however, provides that a corporation may redeem or repurchase its shares only if the capital of the corporation is not impaired and such redemption or repurchase would not impair the capital of the corporation. If we were to reincorporate in Delaware, this share repurchase program might be operated with fewer restrictions than is the case under California law enabling our Board to extend the program and to thereby return value to our shareholders.

*Dissolution*

Under California law, shareholders holding 50% or more of the total voting power may elect to require a corporation's dissolution, with or without the approval of the corporation's board of directors, and this right may not be modified by the articles of incorporation. Shareholders who have not voted in favor of dissolution may prevent the dissolution by purchasing for cash at fair market value the shares of the parties attempting to initiate the dissolution.

By contrast, under Delaware law, shareholders holding 100% of the total voting power of the corporation must approve dissolution unless the board of directors approves the proposal to dissolve. If the dissolution is

initiated by the board of directors, it may be approved by the holders of a simple majority of the corporation's outstanding shares entitled to vote. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions to enable a corporation to prevent a board-initiated dissolution scenario. OSI Delaware's Certificate of Incorporation contains no such supermajority voting requirement, however, and the vote of the holders of a majority of the outstanding shares would be sufficient to approve a dissolution of OSI Delaware which had previously been approved by its Board of Directors.

*Shareholder Derivative Suits*

California law provides that a shareholder bringing a derivative action on behalf of a corporation need not have been a shareholder at the time of the transaction in question, provided that certain tests are met. California law also provides that the corporation or the defendant in a derivative suit may make a motion to the court for an order requiring the plaintiff shareholder to furnish a security bond. Delaware law differs from California law insofar as it does not have such a bond requirement. However, under Delaware law, a shareholder may bring a derivative action on behalf of the corporation only if the shareholder was a shareholder of the corporation at the time of the transaction in question or if his stock thereafter came to be owned by him by operation of law.

**Application of the CGCL to Delaware Corporations**

Under Section 2115 of the CGCL, certain foreign corporations (*i.e.*, corporations not organized under California law) are subject to a number of key provisions of the CGCL. Such corporations are included in a special category (referred to in this discussion as "quasi-California" corporations) if they have characteristics of ownership and operation which indicate that they have significant contacts with California. These characteristics include the following: (1) more than half of the corporation's outstanding voting securities being held of record by persons or entities domiciled in California and (2) the average of a "property factor, sales factor and payroll factor" (as defined under California law) exceeds a 50% threshold. Key provisions of the CGCL to which a Delaware corporation would be subject are those relating to the election and removal of directors, cumulative voting, prohibition of classified boards of directors unless certain requirements are met, standard of liability and indemnification of directors, distributions, dividends and repurchases of shares, shareholder meetings, approval of certain corporate transactions, dissenters' appraisal rights and inspection of corporate records. See "Comparison of the Corporation Laws of California and Delaware."

However, an exemption from Section 2115 is provided for corporations whose shares are listed on the New York Stock Exchange or Nasdaq. Because the securities of OSI Delaware would continue to be designated as Nasdaq securities after the Merger, OSI Delaware would be exempt from the provisions of Section 2115 after the reincorporation.

**Federal Income Tax Considerations**

The following is a discussion of certain federal income tax considerations with respect to the Merger that are generally applicable to holders of OSI California capital stock who receive OSI Delaware capital stock in exchange for their OSI California capital stock in the Merger. This summary is for general information purposes only and does not purport to address all the federal income tax considerations that may be relevant to particular shareholders of OSI California in light of their particular circumstances or who are subject to special treatment under the federal income tax laws (such as shareholders that are dealers in securities, foreign persons or shareholders that acquired their shares in connection with a stock option plan or other compensatory transaction). Furthermore, no foreign, state or local tax considerations are addressed herein. This summary is based on current federal income tax law, which is subject to change at any time, possibly with retroactive effect. ALL SHAREHOLDERS OF OSI CALIFORNIA ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE SPECIFIC FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF THE MERGER.

Table of Contents

Subject to the limitations, qualifications and exceptions described herein, and assuming the Merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, the following tax consequences generally should result:

(a) No gain or loss should be recognized by a shareholder of OSI California who exchanges all of such shareholder's OSI California capital stock for OSI Delaware capital stock in the Merger;

(b) The aggregate tax basis of the OSI Delaware capital stock received by a shareholder of OSI California in the Merger should be equal to the aggregate tax basis of OSI California capital stock surrendered in exchange therefor; and

(c) The holding period of the OSI Delaware capital stock received in the Merger should include the period for which the OSI California capital stock surrendered in exchange therefor was held, provided that the OSI California capital stock is held as a capital asset at the time of the Merger.

We have not requested a ruling from the Internal Revenue Service, nor an opinion from our outside legal counsel, with respect to the federal income tax consequences of the recincorporation under the Internal Revenue Code. In any case, such an opinion would neither bind the Internal Revenue Service nor preclude it from asserting a contrary position.

State, local or foreign income tax consequences to shareholders may vary from the federal tax consequences described above.

Our company would not recognize gain or loss for federal income tax purposes as a result of the reincorporation, and OSI Delaware would succeed, without adjustment, to the federal income tax attributes of OSI California.

**Accounting Consequences**

We believe that there will be no material accounting consequences for us resulting from the reincorporation.

**Regulatory Approval**

To our knowledge, the only required regulatory or governmental approval or filings necessary in connection with the consummation of the reincorporation would be the filings with the Secretary of State of California and the Secretary of State of Delaware.

***For the reasons set forth above, our Board of Directors unanimously recommends that you vote FOR this proposal (Proposal 3 on the Proxy Card).***

Table of Contents

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

**Compensation Discussion & Analysis**

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the "Named Executive Officers," as defined under the section entitled "Compensation of Executive Officers and Directors – Summary Compensation Table." Please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Overview of Compensation Philosophy and Guiding Principles*

The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with its business strategy, objectives and stockholder interests, and is designed to attract, motivate and retain highly qualified executives. Executive compensation elements generally consist of a base salary, an annual cash bonus, long-term equity compensation and certain benefits and perquisites more fully described below.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee to assist in recommending and reviewing executive compensation for the Named Executive Officers. The Compensation Committee reviews and approves salaries, annual bonuses, long-term incentive compensation, benefits, and other compensation in order to ensure that the Company's executive compensation strategy and principles are aligned with its business strategy, objectives and stockholder interests. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Nasdaq Listing Standards, as currently in effect.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. The Compensation Committee appreciates the importance of achievements that may be difficult to quantify, and accordingly recognizes qualitative factors, such as superior individual performance, new responsibilities or positions within the Company, leadership ability and overall management contributions to the Company.

In general, the process by which the Compensation Committee makes decisions relating to executive compensation includes, but is not limited to, consideration of the following factors:

- The Company's executive compensation philosophy and practices;
- The Company's performance relative to peers and industry standards;
- Success in attaining annual and long-term goals and objectives;
- Alignment of executive interests with shareholder interests through equity-based awards and performance-based compensation;
- Individual and team contributions, performance and experience; and
- Total compensation and the mix of compensation elements for each Named Executive Officer.

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies in the industries in which the Company operates. The Compensation Committee assesses competitive market

compensation using a number of data sources reflecting industry practices of other organizations similar in size. The Compensation Committee reviews each component of the executive's compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2009, the Compensation Committee engaged Watson Wyatt to prepare such surveys and provide expert advice. The surveys used for comparison reflect compensation levels and practices for executives holding comparable positions at targeted peer-group companies. These surveys collect compensation data from peer-group companies based on revenues. The survey data utilized by the Compensation Committee generally includes:

- base salary;
- annual bonus;
- total cash compensation;
- pay adjustment trends;
- long-term incentives;
- retirement and capital accumulation;
- benefits and perquisites; and
- equity ownership.

In implementing the Company's compensation program, the Compensation Committee seeks to achieve a balance between compensation and the Company's annual and long-term budgets and business objectives, encourage executive performance in furtherance of stated Company goals, provide variable compensation based on the performance of the Company, create a stake in the executive officer's efforts by encouraging stock ownership in the Company, and align executive remuneration with the interests of the Company's shareholders.

*Executive Compensation Program Elements*

The Compensation Committee reviews the Company's compensation program to ensure that pay levels and incentive opportunities are competitive with the market and reflect the performance of the Company. In addition, the Compensation Committee reviews components of the Named Executive Officer's compensation against executive compensation surveys of a peer group prepared by outside compensation consultants with the intent to establish targeted levels of base salary, annual incentive bonus and long-term incentive compensation. The particular elements of the compensation program for the Named Executive Officers consist of the following:

*Base Salary.* Base salary is set to attract and retain executive talent. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position, and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted as warranted to reflect sustained individual performance. Base salaries are kept within a competitive range for each position, reflecting both job performance and market forces.

*Annual Incentive Bonus.* Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement. Named Executive Officers are eligible for a target annual incentive bonus. The Company pays annual incentive bonuses to its Named Executive Officers based upon the achievement of targets that are indicative of the Company's performance, as well as individual performance. The annual incentive bonus for fiscal year 2009 paid to each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Compensation/Equity Based Awards.* The Company's long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the interests of the Company's stockholders. The Company's long-term incentive

program consists of periodic grants of restricted stock and stock options which are made at the discretion of the Compensation Committee under the Company's Amended and Restated 2006 Equity Participation Plan (the "Equity Plan"). Decisions made by the Compensation Committee regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, individual performance and experience, contributions to the Company's development, competitive forces to attract and retain senior management, and the nature and terms of grants made in prior years.

The Compensation Committee grants awards to the Named Executive Officers under the Equity Plan. All equity awards are made at fair market value on the date of grant with respect to stock options (which is the date on which the Compensation Committee authorizes the grant). Under the Equity Plan, fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees including the Company's 401(k) Plan, Equity Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, vision and dental plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officer receives reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*

The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based compensation, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance.

The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and company performance, and the market for the executive's services.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze. The terms of each of such agreements are summarized below under the heading "Employment Agreements."

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax, securities laws and accounting regulation in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of Generally Accepted Accounting Standards on the Company's use of equity-based awards. This consideration factored heavily in the Company's decision with respect to stock options grants made in fiscal year 2009. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Code with respect to annual compensation exceeding $1.0 million and Section 280(b) of the Code with respect to change in control payments exceeding specified limits.

**Business Experience of Executive Officers**

The following table sets forth the names, ages and positions of each of the Company's executive officers (the "Named Executive Officers"):

| Name | Age | Position |
|---|---|---|
| Deepak Chopra | 59 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Ajay Mehra | 47 | Director, Executive Vice President, and President of Security division |
| Alan Edrick | 42 | Executive Vice President and Chief Financial Officer |
| Victor Sze | 42 | Executive Vice President and General Counsel |
| Manoocher Mansouri | 53 | President of Optoelectronics and Manufacturing division |

***Deepak Chopra*** is President and Chief Executive Officer of the Company. He also serves as Chairman of the Board of Directors. Mr. Chopra is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the President and Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics and a Master of Science degree in Semiconductor Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than 20 years of financial management and public accounting experience, including mergers and acquisitions, financial planning and analysis and regulatory compliance. Between 2004 and 2006, he served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior

Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra is also a member of the Company's Board of Directors. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Mr. Mehra became a Director in March 1996. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor or Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

Table of Contents

### Summary Compensation Table

The following table sets forth the compensation for the principal executive officer, the principal financial officer, the three highest paid executive officers of the Company serving as executive officers on June 30, 2009 whose individual remuneration exceeded $100,000 for the fiscal year ended June 30, 2009, and up to two additional individuals for whom disclosure would have been provided but for the fact that the individual was not serving as an executive officer of the Company at the end of the fiscal year (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards (2)($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation (3)(4)(5)(6)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2009 | 1,000,000 | 900,000 | 286,694 | 617,841 | 291,058 | 84,650 | 3,180,243 |
| Chairman, President and Chief Executive Officer | 2008 | 1,000,000 | 700,000 | 113,671 | 881,154 | — | 116,171 | 2,810,996 |
| | 2007 | 998,077 | 250,000 | — | 1,167,801 | — | 83,203 | 2,499,081 |
| Alan Edrick | 2009 | 355,000 | 285,000 | 66,019 | 384,681 | — | 53,334 | 1,144,034 |
| Executive V.P. and Chief Financial Officer | 2008 | 327,596 | 220,000 | 22,961 | 285,429 | — | 35,631 | 891,617 |
| | 2007 | 262,277 | 150,000 | — | 154,895 | — | 16,804 | 583,976 |
| Ajay Mehra | 2009 | 380,000 | 285,000 | 61,014 | 281,732 | — | 69,850 | 1,077,596 |
| Executive V.P. of the Company, President of Security division | 2008 | 371,827 | 200,000 | 17,956 | 261,306 | — | 49,747 | 900,836 |
| | 2007 | 351,928 | 80,000 | — | 260,285 | — | 45,845 | 738,058 |
| Victor S. Sze | 2009 | 330,000 | 240,000 | 41,000 | 220,086 | — | 62,706 | 893,792 |
| Executive V.P., General Counsel and Secretary | 2008 | 311,827 | 135,000 | 13,183 | 224,765 | — | 36,776 | 721,551 |
| | 2007 | 285,865 | 205,000 | — | 247,056 | — | 29,768 | 767,689 |
| Manoocher Mansouri | 2009 | 250,000 | 60,000 | 51,200 | 26,809 | — | 34,694 | 422,703 |
| President of Optoelectronics and Manufacturing division | 2008 | 225,000 | 40,000 | 23,668 | 22,072 | — | 21,628 | 332,368 |
| | 2007 | 184,622 | 43,000 | — | 20,560 | — | 22,985 | 271,167 |

(1) The Company has eliminated from this table the column titled "Non-Equity Incentive Plan Compensation" because no amounts would have been included in such column.

(2) The amounts in the "Stock Awards" and "Option Awards" column are calculated in accordance with Generally Accepted Accounting Standards.

(3) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Equity Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan and the medical, vision and dental plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental, and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officer. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officer receives reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(4) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2009 are as follows (in thousands):

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions (*)($) | Car Benefit ($) | Membership Dues (**)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,600 | 1,780 | 4,963 | 7,015 | 66,292 | 84,650 |
| Alan Edrick | 37,326 | 2,850 | — | 2,525 | 10,633 | 53,334 |
| Ajay Mehra | 42,494 | 6,675 | — | 7,964 | 12,717 | 69,850 |
| Victor S. Sze | 37,632 | 12,000 | — | 4,064 | 9,010 | 62,706 |
| Manoocher Mansouri | 20,869 | 6,000 | — | 5,537 | 2,288 | 34,694 |

(*) Company matching amounts for the 401(k) and Nonqualified Deferred Compensation plans are subject to vesting schedules specified in plan documents.

(**) Membership Dues consists of payments made to a golf club.

Table of Contents

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2008 are as follows (in thousands):

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions (*)($) | Car Benefit ($) | Membership Dues (**)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,600 | 1,780 | 5,348 | 16,720 | 87,723 | 116,171 |
| Alan Edrick | 8,716 | 12,000 | — | 5,616 | 9,299 | 35,631 |
| Ajay Mehra | 8,296 | 6,675 | — | 16,949 | 17,827 | 49,747 |
| Victor S. Sze | 7,527 | 12,000 | — | 8,892 | 8,357 | 36,776 |
| Manoocher Mansouri | 4,963 | 7,200 | — | 7,177 | 2,288 | 21,628 |

(*) Company matching amounts for the 401(k) and Nonqualified Deferred Compensation plans are subject to vesting schedules specified in plan documents.

(**) Membership Dues consists of payments made to a golf club.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2007 are as follows (in thousands):

| Name | Matching 401(k) Contributions (*)($) | Car Benefit ($) | Membership Dues (**)($) | Medical/Dental/ Vision Health Insurance Payments ($) | Life and L-T Disability Insurance Payments ($) | Total All Other Compensation ($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 2,139 | 2,030 | 3,763 | 12,574 | 62,697 | 83,203 |
| Alan Edrick | 963 | 11,000 | — | 4,841 | — | 16,804 |
| Ajay Mehra | 2,765 | 4,745 | — | 18,977 | 19,358 | 45,845 |
| Victor S. Sze | 690 | 12,000 | — | 10,722 | 6,356 | 29,768 |
| Manoocher Mansouri | 3,182 | 5,850 | — | 11,665 | 2,288 | 22,985 |

(*) Company matching amounts for the 401(k) plan is subject to vesting schedules specified in plan documents.

(**) Membership Dues consists of payments made to a golf club.

Table of Contents

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2009, to each of our Named Executive Officers(1):

| Name<br>Position | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(2)(#) | All Other Option Awards: Number of Securities Underlying Options (3)(#) | Exercise or Base Price of Option Awards (4) ($/Sh) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|
| Deepak Chopra | 7/28/2008 | 13,000 | — | — | 271,960 |
| Chairman, President and Chief Executive | 1/12/2009 | — | 80,000 | 12.52 | 332,661 |
| Officer | 1/12/2009 | 20,000 | — | — | 250,400 |
| Alan Edrick | 7/28/2008 | — | 10,000 | 20.92 | 77,740 |
| Executive V.P. and Chief Financial Officer | 7/28/2008 | 2,500 | — | — | 52,300 |
| | 1/12/2009 | — | 40,000 | 12.52 | 166,305 |
| | 1/12/2009 | 10,000 | — | — | 125,200 |
| Ajay Mehra | 7/28/2008 | — | 10,000 | 20.92 | 77,740 |
| Executive V.P. of the Company, President of Security division | 7/28/2008 | 2,500 | — | — | 52,300 |
| | 1/12/2009 | — | 40,000 | 12.52 | 166,305 |
| | 1/12/2009 | 10,000 | — | — | 125,200 |
| Victor S. Sze | 7/28/2008 | — | 5,000 | 20.92 | 38,870 |
| Executive V.P., General Counsel and Secretary | 7/28/2008 | 1,250 | — | — | 26,150 |
| | 1/12/2009 | — | 30,000 | 12.52 | 124,729 |
| | 1/12/2009 | 7,500 | — | — | 93,900 |
| Manoocher Mansouri | 7/28/2008 | 3,750 | — | — | 78,450 |
| President, Optoelectronics and Manufacturing Division | | | | | |

(1) The Company has eliminated from this table the columns titled "Estimated Future Payouts Under Non-Equity Incentive Plan Awards" and "Estimated Future Payouts Under Equity Incentive Plan Award" because no amounts would have been included in such columns.

(2) The grants of restricted stock vest over a period of between four years from the date of grant.

(3) The option grants expire after five or ten years from the date of grant and vest over three years from the date of grant.

(4) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(5) The grant date fair value of the stock options and restricted stock shown in the table above was computed in accordance with Generally Accepted Accounting Standards and represents the total projected expense to the Company of grants made during the past fiscal year.

Table of Contents

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2009(1):

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (4)(#) | Market Value of Shares or Units of Stock That Have Not Vested(5)($) |
| Deepak Chopra | 21,202 | — | 14.50 | 10/25/2009 | — | |
| Chairman, President and Chief | 80,000 | — | 20.91 | 11/25/2009 | — | |
| Executive Officer | 100,000 | — | 18.53 | 11/10/2010 | — | |
| | 21,147 | — | 25.91 | 7/10/2010 | — | |
| | 50,000 | — | 17.90 | 6/22/2011 | — | |
| | 86,169 | — | 17.37 | 6/22/2011 | — | |
| | 4,878 | 4,878 | 26.81 | 11/21/2011 | — | |
| | 40,200 | 19,800 | 20.02 | 9/16/2017 | — | |
| | — | 80,000 | 12.52 | 1/11/2019 | — | |
| | — | — | — | — | 57,000 | 1,188,450 |
| Alan Edrick | 8,617 | 8,618 | 17.37 | 7/24/2011 | — | |
| Executive V.P., Chief Financial Officer | 25,000 | 25,000 | 17.99 | 7/30/2011 | — | |
| | 3,896 | 3,897 | 26.81 | 11/21/2011 | — | |
| | 32,160 | 15,840 | 20.02 | 9/16/2017 | — | |
| | 4,667 | 9,333 | 23.18 | 2/7/2018 | — | |
| | — | 10,000 | 20.92 | 7/28/2018 | — | |
| | — | 40,000 | 12.52 | 1/11/2019 | — | |
| | — | — | — | — | 17,375 | 362,269 |
| Ajay Mehra | 3,181 | — | 14.50 | 10/25/2009 | — | |
| Executive V.P. of the Company, President of Security | 25,000 | — | 20.91 | 11/25/2009 | — | |
| division | 60,325 | — | 16.21 | 2/7/2011 | — | |
| | 21,538 | 21,539 | 18.53 | 2/5/2012 | — | |
| | 21,440 | 10,560 | 20.02 | 9/16/2017 | — | |
| | 4,667 | 9,333 | 23.18 | 2/7/2018 | — | |
| | — | 10,000 | 20.92 | 7/28/2018 | — | |
| | — | 40,000 | 12.52 | 1/11/2019 | — | |
| | — | — | — | — | 16,625 | 346,631 |
| Victor S. Sze | 17,500 | — | 20.91 | 11/25/2009 | — | |
| Executive V.P., General | 4,241 | — | 22.28 | 4/4/2010 | — | |
| Counsel and Secretary | 20,000 | — | 18.53 | 11/10/2010 | — | |
| | 5,516 | — | 16.21 | 2/7/2011 | — | |
| | 10,000 | 10,000 | 18.16 | 7/6/2011 | — | |
| | 6,463 | 6,463 | 17.37 | 7/6/2011 | — | |
| | 779 | 780 | 26.81 | 11/21/2011 | — | |
| | 16,080 | 7,920 | 20.02 | 9/16/2017 | — | |
| | 3,334 | 6,666 | 23.18 | 2/7/2018 | — | |
| | — | 5,000 | 20.92 | 7/28/2018 | — | |
| | — | 30,000 | 12.52 | 1/11/2019 | — | |
| | — | — | — | — | 11,750 | 244,988 |
| Manoocher Mansouri | 2,500 | — | 17.19 | 3/9/2010 | — | |
| President, Optoelectronics and | 2,500 | — | 19.58 | 1/10/2011 | — | |
| Manufacturing division | 1,724 | — | 16.21 | 4/17/2011 | — | |
| | 2,500 | 5,000 | 23.18 | 2/7/2018 | — | |

6,401 133,586

(1) The Company has eliminated from this table the columns titled “Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options,” “Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other

Rights That Have Not Vested" and "Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested" because no amounts would have been included in such columns.

(2) Each option grant vests over a three year period from the date of grant.
(3) The exercise price for grants of stock options is determined using the closing price of the Company's Common Stock on the date of grant.
(4) Includes restricted stock awards granted between July 2007 and June 2008. These restricted stock awards vest over a period of between three and four years from the date of grant.
(5) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2009, multiplied by the closing price of the Company's Common Stock on June 30, 2009 ($20.85 per share).

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2009:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| **Name and Principal Position** | **Number of Shares Acquired on Exercise** | **Value Realized on Exercise(1) ($)** | **Number of Shares Acquired on Vesting** | **Value Realized on Vesting(2) ($)** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 4,250 | 76,118 |
| Alan Edrick<br>Executive V.P., Chief Financial Officer | — | — | 875 | 15,671 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 1,061 | 2,016 | 875 | 15,671 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 4,243 | 7,968 | 625 | 11,194 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 1,713 | 12,627 | 1,093 | 20,107 |

(1) Represents the difference between the closing price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.
(2) Represents the number of restricted stock awards that vested multiplied by the closing price of the Company's Common Stock on the date of vesting.

**Pension Benefits**

The Company maintains a Nonqualified Defined Benefit Plan ("Defined Benefit Plan"). The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting.

Vesting of benefits under the Defined Benefit Plan occurs in accordance with a vesting scheduled that is established for individual participants by a committee of the Board of Directors. Vesting occurs when a participant reaches the retirement age specified in the vesting schedule. In addition, participants are also deemed vested upon the occurrence of the earlier of (i) the death of the participant while actively employed by the Company, (ii) the disability of the participant and (iii) a "change of control" of the Company (as defined in the plan). Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, commencing on the first day of the month following the date that he turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For every year that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333. However, in no event will his total yearly benefit exceed $600,000. If Mr. Chopra terminates his employment with the Company

Table of Contents

within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If Mr. Chopra remains in the service of the Company for more than two years following a change in control, his benefit will continue as scheduled. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Nonqualified Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions. Mr. Chopra's benefits under the Nonqualified Defined Benefit Plan will vest equally over the remaining seven years of his service to the Company (assuming retirement at the age of 65).

The following table sets forth information regarding contributions into the Defined Benefit Plan made by or for the participating Named Executive Officer during fiscal year ended June 30, 2009(1):

| Name and Principal Position | Number of Years of Credited Service (#) | Present Value of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 1 | 291,058 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted a nonqualified deferred compensation plan in May 2008 (the "Deferred Compensation Plan"). Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants.

Participants receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Company's 401(k) Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2009 ranged from (8.9%) to 5.0%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date, or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during fiscal year ended June 30, 2009(1)(2):

| Name and Principal Position | Executive Contributions ($) | Company Contributions ($) | Aggregate Earnings (3)($) | Aggregate Balance ($) |
|---|---|---|---|---|
| Alan Edrick<br>Executive V.P., Chief Financial Officer | 35,077 | 35,077 | (854) | 79,354 |
| Ajay Mehra<br>Executive V.P. of the Company, President of Security division | 37,894 | 37,894 | (5,833) | 98,115 |
| Victor S. Sze<br>Executive V.P., General Counsel and Secretary | 33,883 | 33,883 | (1,453) | 78,351 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 36,965 | 17,250 | 2,423 | 79,493 |

(1) The amounts reported in the Company Contributions column are (and in past years were) reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not (and in past years were not) reported as compensation in the Summary Compensation Table above.
(2) The Company has eliminated from this table the column titled “Aggregate Withdrawals/Distributions” because no amounts would have been included in such column.
(3) Represents earnings (losses) during the year ended June 30, 2009.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze.

*Deepak Chopra’s Employment Agreement*

On July 18, 2005, the Company entered into an Amended and Restated Employment Agreement with Mr. Chopra. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ Mr. Chopra until the later of (i) the fifth anniversary of the date of the agreement or (ii) the close of business three years following the date that either party elects to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. Mr. Chopra is entitled to receive one-third of the Company’s year-end bonus pool for management, if a bonus pool is established, and to participate in incentive compensation and other employee benefit plans established by the Company from time to time. The agreement contains certain restrictive covenants and other prohibitions that protect the Company’s proprietary and confidential information following termination, and preclude Mr. Chopra from soliciting its employees or customers after the expiration of the term of his employment with the Company.

Under the terms of the agreement with Mr. Chopra, the Company may terminate Mr. Chopra’s employment at any time for “cause,” as defined in the agreement.

In the event that Mr. Chopra resigns from his employment with the Company with “good reason” (as defined in the agreement), or the Company terminates Mr. Chopra without cause, then: (i) Mr. Chopra is entitled to prorated bonuses through the date of his resignation with good reason or termination without cause; (ii) Mr. Chopra would continue to be entitled to receive all of his salary, unpaid expenses, unpaid vacation days, bonuses and other benefits made available to the Company’s senior members of management, or to its employees generally, for a period of three years from the date of resignation with good reason or termination without cause, without any deduction or offset for any compensation earned or received by Mr. Chopra from any other sources

and without any further obligation by Mr. Chopra to render services to the Company; and (iii) at Mr. Chopra's election, all of his unvested stock options in the Company would fully vest upon the date of his resignation with good reason or termination without cause.

In the event Mr. Chopra resigns from the Company with good reason or the Company terminates him without cause at any time upon or after the occurrence of a "change in control" (as defined in the agreement), then Mr. Chopra, at his option and in lieu of receiving the amounts set forth above may elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Code Section 280G(b)(3)). In connection with such alternative payment, Mr. Chopra, in his sole discretion, has the right to have all or any portion of his unvested stock options accelerate as of the date of such resignation or termination.

In the event that Mr. Chopra dies or becomes physically or mentally disabled so as to become unable for more than 180 days in the aggregate in any 12 month period to perform his duties on a full-time basis with reasonable accommodations, then, upon the date of his death or upon the Company's termination of his employment due to a disability all of Mr. Chopra's unvested stock options in the Company would fully vest on such date.

The Company maintains a Nonqualified Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death or disability. Currently, Mr. Chopra is the only employee that participates in this plan. Under the terms of his participation, commencing on the first day of the month following the date that he turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For every year that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333. However, in no event will his total yearly benefit exceed $600,000. If Mr. Chopra terminates his employment with the Company within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If Mr. Chopra remains in the service of the Company for more than two years following a change in control, his benefit will continue as scheduled. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Nonqualified Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions. Mr. Chopra's benefits under the Nonqualified Defined Benefit Plan will vest equally over the remaining seven years of his service to the Company (assuming retirement at the age of 65).

*Alan Edrick's, Ajay Mehra and Victor Sze's Employment Agreements*

On September 22, 2008, the Company entered into an employment agreement with each of Messrs. Edrick and Sze. On September 14, 2009, the Company entered into an employment agreement with Mr. Mehra. (For purposes of this section, each of Messrs. Edrick, Mehra and Sze are each individually referred to as the "Executive"). The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ the Executive until the later of (i) the third anniversary of the date of the agreement or (ii) one year following the date that the Company notifies the Executive of its election to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. The Executive is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees, to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination, and preclude the Executive from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his

position for an aggregate period of 60 days within any six-month period; or (iii) on 30 days' written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement).

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 18 months' salary at the Executive's then-current base salary; (ii) an amount equal to 1.5 times the average bonus paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and an extension of time to exercise such stock options such that the Executive's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) an amount equal to 24 months' salary at the Executive's then-current base salary; (ii) an amount equal to twice the average of bonuses paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and such stock options shall remain exercisable by the Executive for no less than 12 months after the date of such termination. Under such circumstances, the Executive may, at his option, and in lieu of receive the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Code Section 280G(b)(3)); provided, however, that in such case, the amount of such alternative payment shall be reduced by the value of acceleration (as determined under Code Section 280G and the regulations thereunder) of any equity or stock options accelerated under the terms of the agreement.

**Potential Payment upon Termination of Employment or Change in Control**

The following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officer's current employment agreement. The table therefore assumes that the terms of the employment agreement to which each Named Executive Officer is currently subject had been effect on June 30, 2009, and that employment terminated on such date. The table also assumes that the price of the Company's stock, on which certain calculations in the following table are made, was the closing price of the Company's Common stock on that date ($20.85).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included the following table, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

Table of Contents

All disclosed amounts in the following table are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($)(1) | Accelerated Vesting($) | Total($) |
|---|---|---|---|---|---|
| Deepak Chopra(2) Chairman, President and Chief Executive Officer | Good Reason or Without Cause(3) | 3,000,000 | 2,700,000 | 682,834 | 6,382,834 |
| | Good Reason or Without Cause in Connection with a Change in Control Alternative Payment(4) | 2,990,000 | — | 682,834 | 3,672,834 |
| | Death or Permanent Disability | — | — | 682,834 | 682,834 |
| Alan Edrick Executive V.P. and Chief Financial Officer | Good Reason or Without Cause | 532,500 | 327,500 | 810,107 | 1,670,107 |
| | Good Reason or Without Cause in Connection with a Change in Control | 710,000 | 436,667 | 810,107 | 1,956,774 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(4) | 251,343 | — | 810,107 | 1,061,450 |
| Ajay Mehra Executive V.P. of the Company, President of Security division | Good Reason or Without Cause | 570,000 | 282,500 | 738,567 | 1,591,067 |
| | Good Reason or Without Cause in Connection with a Change in Control | 760,000 | 376,667 | 738,567 | 1,875,234 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(4) | 397,633 | — | 738,567 | 1,136,200 |
| Victor S. Sze Executive V.P., General Counsel and Secretary | Good Reason or Without Cause | 495,000 | 290,000 | 550,852 | 1,335,852 |
| | Good Reason or Without Cause in Connection with a Change in Control | 660,000 | 386,667 | 550,852 | 1,597,519 |
| | Termination for Good Reason or Without Cause in Connection With a Change in Control Alternative Payment(4) | 435,848 | — | 550,852 | 986,700 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2009, for performance in the fiscal year ended June 30, 2009.

(2) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 65, to certain payments under the Company's Nonqualified Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(3) These amounts assume that Mr. Chopra would be entitled to the same salary and bonuses during the three years following the date of resignation for Good Reason or termination without cause as he earned during the year ended June 30, 2009.

(4) This reflects the compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for Good Reason or the Company terminates his employment without Cause following a Change in Control and the Named Executive Officer elects to receive the alternate payment method described in his employment agreement.

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2009, each non-employee director received a fee of $30,000 for their year of service, $1,500 for each Board of Directors meeting attended, and options to purchase 7,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) per year, at an exercise price equal to 100% of fair market value as of the date of grant. Each non-employee director may also, from time to time, become eligible to receive additional shares of restricted Common Stock.

Each member of the Audit Committee receives a fee of $1,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Compensation Committee receives a fee of $1,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also receives a fee of $5,000 per year and options to purchase 12,500 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Nominating and Governance Committee receives a fee of $1,500 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also receives a fee of $5,000 per year and options to purchase 10,000 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

Each member of the Executive Committee receives a fee of $15,000 per year and options to purchase 10,000 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant.

All options granted to members of the Board of Directors and its committees vest in three installments: one-third on the first anniversary of the grant date, one-third on the second anniversary, and the balance on the third anniversary, conditioned upon continued service as a director of the Company. All restricted stock granted to members of the Board of Directors and its committees vests in either three installments (one-third on the first anniversary of the grant date, one-third on the second anniversary, and the balance on the third anniversary) or four installments (one-fourth on the first anniversary of the grant date, one-fourth on the second anniversary, one fourth on the third anniversary, and the balance on the fourth anniversary), conditioned upon continued service as a director of the Company. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

Table of Contents

The following table provides compensation information for the fiscal year ended June 30, 2009 for each member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 83,000 | 49,216 | 157,482 | 289,698 |
| Meyer Luskin | 83,000 | 49,216 | 157,482 | 289,698 |
| Chand R. Viswanathan(3) | 47,000 | 30,702 | 88,295 | 165,997 |
| Leslie E. Bider | 47,000 | 25,928 | 63,423 | 136,351 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States.

(3) Amounts include (i) $5,000 and (ii) 10,000 shares of the Company's Common Stock (or its equivalent in the form of shares of restricted Common Stock) at an exercise price equal to 100% of fair market value as of the date of grant, received by Mr. Viswanathan for serving on an advisory technology committee of the Company. Mr. Viswanathan notified the Company on December 21, 2009 that he would retire from his position as a Director effective upon the Annual Meeting of Shareholders and the election of a successor Director.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India. The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2009 by Mr. Chopra and his wife. The Company paid the business approximately $54,000 for such services during the year ended June 30, 2009. The Company contracts for printing services from a business owned by Mr. Chopra's father-in-law, Madan G. Syal. The Company paid Mr. Syal approximately $45,000 for such printing services during the year ended June 30, 2009.

The Company believes that each of the foregoing transactions was on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company will be on terms at least as favorable to the Company as those that can be obtained from nonaffiliated third parties.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from nonaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

Table of Contents

**Compensation Committee Report**

We have reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, we recommend to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the amount of shares of the Company beneficially owned as of December 17, 2009, by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,052,746 | 5.6% |
| Wells Fargo & Company(4) | 2,359,474 | 12.9% |
| Wellington Management Company, LLP(5) | 1,076,226 | 5.9% |

(1) Except as otherwise noted, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after December 17, 2009, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 80,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 40,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 489,891 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 108,916 shares of unvested restricted stock granted between September 17, 2007 and September 1, 2009, are held individually by Mr. Chopra. Includes 26,667 shares issuable pursuant to options that become exercisable no later than 60 days after December 17, 2009. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) As reported in a Schedule 13F-HR filed on November 17, 2009, with the SEC, the address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94104.

(5) As reported in a Schedule 13F-HR filed on November 16, 2009, with the SEC, the address of Wellington Management Company, LLP is 75 State St., Boston, MA 02109.

The following table sets forth the amount of shares of the Company beneficially owned as of December 17, 2009, by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 1,052,746 | 5.6% |
| Ajay Mehra(4) | 303,108 | 1.6% |
| Alan Edrick(5) | 171,309 | 0.9% |
| Victor S. Sze(6) | 125,476 | 0.6% |
| Manoocher Mansouri(7) | 56,079 | 0.3% |
| Steven C. Good(8) | 82,674 | 0.4% |
| Meyer Luskin(9) | 112,340 | 0.6% |
| Chand R. Viswanathan(10) | 45,630 | 0.2% |
| Leslie E. Bider(11) | 25,705 | 0.1% |
| All directors and executive officers as a group (9 persons)(3)(4)(5)(6)(7)(8)(9)(10)(11) | 1,975,067 | 10.3% |

(1) Except as noted otherwise, the address of each shareholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after December 17, 2009,, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Includes 80,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 40,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 489,891 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, and 108,916 shares of unvested restricted stock granted between September 17, 2007 and September 1, 2009 are held individually by Mr. Chopra. Includes 26,667 shares issuable pursuant to options that become exercisable no later than 60 days after December 17, 2009. Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(4) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division. Includes 39,539 shares issuable pursuant to options that become exercisable no later than 60 days after December 17, 2009.

(5) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 18,000 shares issuable pursuant to options that become exercisable no later than 60 days after December 17, 2009.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 13,333 shares issuable pursuant to options which become exercisable no later than 60 days after December 17, 2009.

(7) Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division. Includes 2,500 shares issuable pursuant to options which become exercisable no later than 60 days after December 17, 2009.

(8) Includes 6,000 shares owned for Mr. Good's benefit by the Good, Swartz & Berns Pension & Profit Sharing Plan, of which Mr. Good is a co-trustee and in which he participates. Mr. Good is a Director of the Company. The address of Mr. Good is 11755 Wilshire Boulevard, 17th Floor, Los Angeles, CA 90025.

(9) Includes 35,666 shares held by The Meyer and Doreen Luskin Family Trust. Mr. Luskin is a Director of the Company. The address of Mr. Luskin is c/o Scope Industries, 2811 Wilshire Boulevard, Suite 410, Santa Monica, CA 90403.

(10) Includes 5,000 shares held by C. R. Viswanathan Trust Fund. Mr. Viswanathan, a Director of the Company, notified the Company on December 21, 2009 that he would retire as a Director, effective upon the Annual Meeting of Shareholders and the election of a successor Director.

(11) Mr. Bider is a Director of the Company.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2009, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that during the year ended June 30, 2009, Mr. Good untimely filed one Form 4 report, Messrs. Edrick, Mehra and Sze each untimely filed two Form 4 reports, and Messrs. Chopra and Mansouri each untimely filed three Form 4 reports.

Table of Contents

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements and for the years ended June 30, 2008 and 2009 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2008 | FY 2009 |
|---|---|---|
| Audit Fees | $2,090 | $1,453 |
| Audit-Related Fees | — | — |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $2,090 | $1,453 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services related to projects other than statutory and regulatory filings. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Table of Contents

## REPORT OF AUDIT COMMITTEE

During the fiscal year ended June 30, 2009, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and Leslie E. Bider, all of whom meet the independence and experience requirements of the SEC and NASDAQ Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2009.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams LLP as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal controls, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the committee asks them to address and discusses their responses to several questions that the committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?
- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?
- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal controls and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board in Rule 3200T. The Audit Committee received and discussed with the

Table of Contents

independent public accountants their annual written report on their independence from the Company and its management, which is made under Independence Standards Board Standard No. 1 (Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees), as adopted by the Public Company Accounting Oversight Board in Rule 3600T, and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2009 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal controls and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal controls over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (1) management's assessment of the effectiveness of internal control over financial reporting, and (2) the effectiveness of internal controls over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2009, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
Leslie E. Bider

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1941 of 2711

Table of Contents

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of shareholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of shareholders. All of the Company's directors attended last year's annual meeting of shareholders in person.

## SHAREHOLDER COMMUNICATIONS

Shareholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal controls or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – http://www.osi-systems.com – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement may be delivered to multiple shareholders sharing an address unless the Company has received contrary instructions from one or more of the shareholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report and/or Proxy Statement, as applicable, to a shareholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to Secretary, OSI Systems, Inc., at the address or telephone number indicated in the previous paragraph. In addition, shareholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

## SHAREHOLDER PROPOSALS

In the event that a shareholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next Annual Meeting of Shareholders, the proposal must

be delivered in writing to the Secretary of the Company and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to the Company would be October 11, 2010.

The Company's Bylaws provide that if a shareholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next Annual Meeting of Shareholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the shareholder must deliver a notice of such proposal to the Company at least 90 days prior to March 5, 2011. The notice must comply with the Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of the Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors

Victor S. Sze
*Secretary*

Hawthorne, California
February 5, 2010

Table of Contents

**Appendix A**
**AGREEMENT AND PLAN OF MERGER**
**OF**
**OSI SYSTEMS, INC.,**
**A DELAWARE CORPORATION**
**AND**
**OSI SYSTEMS, INC.,**
**A CALIFORNIA CORPORATION**

This Agreement and Plan of Merger dated as of , 2010 (the "Agreement") is entered into by and between OSI Systems, Inc., a California corporation ("OSI California") and OSI Systems, Inc., a Delaware corporation ("OSI Delaware"). OSI Delaware and OSI California are sometimes referred to in this Agreement as the "Constituent Corporations."

RECITALS

A. OSI Delaware is a corporation duly organized and existing under the laws of the State of Delaware and has an authorized capital of 110,000,000 shares, 100,000,000 of which are designated "Common Stock," $0.001 par value, and 10,000,000 of which are designated "Preferred Stock," $0.001 par value. As of the date of this Agreement, 100 shares of OSI Delaware Common Stock were issued and outstanding, all of which are held by OSI California, and no shares of Preferred Stock were issued and outstanding.

B. OSI California is a corporation duly organized and existing under the laws of the State of California and has an authorized capital of 110,000,000 shares, 100,000,000 of which are designated "Common Stock," no par value and 10,000,000 of which are designated "Preferred Stock," no par value. As of , 2010, shares of OSI California Common Stock were issued and outstanding and no shares of Preferred Stock were issued and outstanding.

C. The Board of Directors of OSI California has determined that, for the purpose of effecting the reincorporation of OSI California in the State of Delaware, it is advisable and in the best interests of OSI California that OSI California merge with and into OSI Delaware upon the terms and conditions provided in this Agreement.

D. The respective Boards of Directors of OSI Delaware and OSI California have approved this Agreement and have directed that this Agreement be submitted to a vote of their respective stockholders and, if approved by such stockholders, executed by officers of their respective corporations.

AGREEMENT

In consideration of the mutual agreements and covenants set forth herein, OSI Delaware and OSI California hereby agree, subject to the terms and conditions hereinafter set forth, as follows:

Section 1 *Merger*. In accordance with the provisions of this Agreement, the Delaware General Corporation Law and the California General Corporation Law, OSI California shall be merged with and into OSI Delaware (the "Merger"), the separate existence of OSI California shall cease and OSI Delaware shall be, and is sometimes referred to below as, the "Surviving Corporation," and the name of the Surviving Corporation shall be "OSI Systems, Inc."

Section 2. *Closing*. The closing of this Agreement shall take place at 12525 Chadron Avenue, Hawthorne, California, as soon as practicable following the satisfaction of all conditions to closing set forth in Section 3 of this Agreement (the "Closing").

Section 3 *Conditions to Closing*. The obligations hereunder of both parties to enter into this Agreement are subject to their satisfaction, at or before the Closing, of each of the conditions set forth below:

3.1 *Adoption and Approval by Stockholders*. Adoption and approval of this Agreement and the Merger by the stockholders of each Constituent Corporation in accordance with the applicable requirements of the Delaware General Corporation Law and the California General Corporation Law; and

3.2 *Satisfaction of Conditions Precedent*. The satisfaction or waiver of all of the conditions precedent to the consummation of the Merger as specified in this Agreement.

Section 4 *Filing and Effectiveness*. Upon the satisfaction of all Conditions to Closing set forth in Section 3 above, the parties shall file, and the Merger shall become effective upon completion of the filing, with the Secretary of State of Delaware of an executed Certificate of Merger or an executed counterpart of this Agreement meeting the requirements of the Delaware General Corporation Law. The date and time when the Merger becomes effective is referred to in this Agreement as the "Effective Time of the Merger."

Section 5 *Effect of the Merger*. Upon the Effective Time of the Merger, the separate existence of OSI California shall cease and OSI Delaware, as the Surviving Corporation, (a) shall continue to possess all of its assets, rights, powers and property as constituted immediately prior to the Effective Time of the Merger, (b) shall be subject to all actions previously taken by its and OSI California's Board of Directors, (c) shall succeed, without other transfer, to all of the assets, rights, powers and property of OSI California in the manner more fully set forth in Section 259 of the Delaware General Corporation Law, (d) shall continue to be subject to all of the debts, liabilities and obligations of OSI Delaware as constituted immediately prior to the Effective Time of the Merger and (e) shall succeed, without other transfer, to all of the debts, liabilities and obligations of OSI California in the same manner as if OSI Delaware had itself incurred them, all as more fully provided under the applicable provisions of the Delaware General Corporation Law and the California General Corporation Law.

Section 6. *Charter Documents, Directors and Officers*.

6.1 *Certificate of Incorporation*. The Certificate of Incorporation of OSI Delaware as in effect immediately prior to the Effective Time of the Merger shall continue in full force and effect as the Certificate of Incorporation of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

6.2 *Bylaws*. The Bylaws of OSI Delaware as in effect immediately prior to the Effective Time of the Merger shall continue in full force and effect as the Bylaws of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

6.3 *Directors and Officers*. The directors and officers of OSI Delaware immediately prior to the Effective Time of the Merger shall be the directors and officers of the Surviving Corporation until their successors shall have been duly elected and qualified or as otherwise provided by law, the Certificate of Incorporation of the Surviving Corporation or the Bylaws of the Surviving Corporation.

Section 7. *Manner of Conversion of Stock*.

7.1 *OSI California Common Stock*. Upon the Effective Time of the Merger, each one share of OSI California Common Stock issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by the Constituent Corporations, the holder of such share or any other person, be converted into and exchanged for one fully paid and nonassessable share of Common Stock, $0.001 par value, of the Surviving Corporation. No fractional share interests of the Surviving Corporation shall be issued. In lieu thereof, each holder of shares of OSI California shall receive from OSI Delaware an amount of cash equal to the average closing prices of OSI California Common Stock as quoted on The Nasdaq Stock Market for five (5) consecutive trading days ending three (3) business days prior to the closing date of the Merger. Any fractional share interests to which a holder would otherwise be entitled shall be aggregated so that no OSI California shareholder shall receive cash in an amount greater than the value of one (1) full share of OSI Delaware Common Stock.

7.2 *OSI California Options, Stock Purchase Rights and Convertible Securities*.

(a) Upon the Effective Time of the Merger, the Surviving Corporation shall assume and continue any and all stock option, stock incentive, employee benefit and other equity-based award plans heretofore adopted by OSI California (the “Plans”). Each outstanding and unexercised option, other right to purchase, or security convertible into, OSI California Common Stock (a “Right”) shall become, subject to the provisions in paragraph (c) hereof, an option, right to purchase, or a security convertible into the Surviving Corporation’s Common Stock, respectively, on the basis of one share of the Surviving Corporation’s Common Stock, as the case may be, for each one share of OSI California Common Stock, issuable pursuant to any such Right, on the same terms and conditions and at an exercise price equal to the exercise price applicable to any such OSI California Right at the Effective Time of the Merger. This paragraph 7.2(a) shall not apply to OSI California Common Stock. Such Common Stock is subject to paragraph 7.1 hereof.

(b) A number of shares of the Surviving Corporation’s Common Stock shall be reserved for issuance upon the exercise or conversion of Rights equal to the number of shares OSI California Common Stock so reserved immediately prior to the Effective Time of the Merger.

(c) The assumed Rights shall not entitle any holder thereof to a fractional share upon exercise or conversion. In lieu thereof, any fractional share interests to which a holder of an assumed Right (other than an option issued pursuant to OSI Delaware’s Plans) would otherwise be entitled upon exercise or conversion shall be aggregated (but only with other similar Rights which have the same per share terms). To the extent that after such aggregation, the holder would still be entitled to a fractional share with respect thereto upon exercise or conversion, the holder shall be entitled upon the exercise or conversion of all such assumed Rights pursuant to their terms (as modified herein), to one full share of Common Stock in lieu of such fractional share. With respect to each class of such similar Rights, no holder will be entitled to more than one full share in lieu of a fractional share upon exercise or conversion.

Notwithstanding the foregoing, with respect to options issued under OSI California’s Plans that are assumed in the Merger, the number of shares of Common Stock to which the holder would be otherwise entitled upon exercise of each such assumed option following the Merger shall be rounded down to the nearest whole number and the exercise price shall be rounded up to the nearest whole cent. In addition, no “additional benefits” (within the meaning of Section 424(a)(2) of the Internal Revenue Code of 1986, as amended) shall be accorded to the optionees pursuant to the assumption of their options.

7.3 *OSI Delaware Common Stock*. Upon the Effective Time of the Merger, each share of Common Stock, $0.001 par value, of OSI Delaware issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by OSI Delaware, the holder of such shares or any other person, be canceled and returned to the status of authorized but unissued shares.

7.4 *Exchange of Certificates*. After the Effective Time of the Merger, each holder of an outstanding certificate representing OSI California Common Stock may, at such holder’s option, surrender the same for cancellation to StockTrans, Inc. as exchange agent (the “Exchange Agent”), and each such holder shall be entitled to receive in exchange therefor a certificate or certificates representing the number of shares of the Surviving Corporation’s Common Stock into which the surrendered shares were converted as provided herein. Until so surrendered, each outstanding certificate theretofore representing shares of OSI California capital stock shall be deemed for all purposes to represent the number of whole shares of the appropriate class and series of the Surviving Corporation’s capital stock into which such shares of OSI California capital stock were converted in the Merger.

The registered owner on the books and records of the Surviving Corporation or the Exchange Agent of any such outstanding certificate shall, until such certificate shall have been surrendered for transfer or conversion or otherwise accounted for to the Surviving Corporation or the Exchange Agent, have and be entitled to exercise

any voting and other rights with respect to and to receive dividends and other distributions upon the shares of capital stock of the Surviving Corporation represented by such outstanding certificate as provided above.

Each certificate representing capital stock of the Surviving Corporation so issued in the Merger shall bear the same legends, if any, with respect to the restrictions on transferability as the certificates of OSI California so converted and given in exchange therefor, unless otherwise determined by the Board of Directors of the Surviving Corporation in compliance with applicable laws.

If any certificate for shares of Surviving Corporation's stock is to be issued in a name other than that in which the certificate surrendered in exchange therefor is registered, it shall be a condition of issuance thereof that the certificate so surrendered shall be properly endorsed and otherwise in proper form for transfer, that such transfer otherwise be proper and comply with applicable securities laws and that the person requesting such transfer pay to the Exchange Agent any transfer or other taxes payable by reason of the issuance of such new certificate in a name other than that of the registered holder of the certificate surrendered or establish to the satisfaction of the Surviving Corporation that such tax has been paid or is not payable.

Section 8. *General*.

8.1 *Covenants of OSI Delaware*. OSI Delaware covenants and agrees that it will, on or before the Effective Time of the Merger:

(a) Qualify to do business as a foreign corporation in the State of California and irrevocably appoint an agent for service of process as required under the provisions of Section 2105 of the California General Corporation Law.

(b) File any and all documents with the California Franchise Tax Board necessary for the assumption by OSI Delaware of all of the franchise tax liabilities of OSI California; and

(c) Take such other actions as may be required by the California General Corporation Law.

8.2 *Further Assurances*. From time to time, as and when required by OSI Delaware or by its successors or assigns, there shall be executed and delivered on behalf of OSI California such deeds and other instruments, and there shall be taken or caused to be taken by it such further and other actions, as shall be appropriate or necessary in order to vest or perfect in or conform of record or otherwise by OSI Delaware the title to and possession of all the property, interests, assets, rights, privileges, immunities, powers, franchises and authority of OSI California and otherwise to carry out the purposes of this Agreement, and the officers and directors of OSI Delaware are fully authorized in the name and on behalf of OSI California or otherwise to take any and all such action and to execute and deliver any and all such deeds and other instruments.

8.3 *Abandonment*. At any time before the Effective Time of the Merger, this Agreement may be terminated and the Merger may be abandoned for any reason whatsoever by the Board of Directors of either OSI California or OSI Delaware, or both, notwithstanding the approval of this Agreement by the shareholders of OSI California or by the sole stockholder of OSI Delaware, or by both.

8.4 *Amendment*. The Boards of Directors of the Constituent Corporations may amend this Agreement at any time prior to the filing of this Agreement (or certificate in lieu thereof) with the Secretary of State of the State of Delaware, provided that an amendment made subsequent to the adoption of this Agreement by the stockholders of either Constituent Corporation shall not: (a) alter or change the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares of any class or series thereof of such Constituent Corporation, (b) alter or change any term of the Certificate of Incorporation of the Surviving Corporation to be effected by the Merger, or (c) alter or change any of the terms and conditions of this Agreement if such alteration or change would adversely affect the holders of any class of shares or series of capital stock of such Constituent Corporation.

8.5 *Registered Office*. The registered office of the Surviving Corporation in the State of Delaware is located at 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

8.6 *Agreement*. Executed copies of this Agreement will be on file at the principal place of business of the Surviving Corporation at 12525 Chadron Avenue, Hawthorne, CA 90250 and copies thereof will be furnished to any stockholder of either Constituent Corporation, upon request and without cost.

8.7 *Governing Law*. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

8.8 *Counterparts*. This Agreement may be executed in counterparts, each of which shall be deemed an original and both of which together shall constitute one instrument.

**Appendix B**
**FORM OF**
**CERTIFICATE OF INCORPORATION**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**I.**

The name of this corporation is "OSI Systems, Inc." (the "Corporation").

**II.**

The address of the Corporation's registered office in the 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**III.**

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

**IV.**

A. *Classes of Stock*. This Corporation is authorized to issue two classes of stock to be designated, respectively, as "Common Stock" and "Preferred Stock". The total number of shares which the Corporation is authorized to issue is one hundred ten million (110,000,000) shares, $0.001 par value. One hundred million (100,000,000) shares shall be Common Stock and ten million (10,000,000) shares shall be Preferred Stock.

B. *Rights, Preferences and Restrictions of Preferred Stock*. Shares of Preferred Stock may be issued from time to time in one or more series, with each such series to consist of such number of shares and to have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, as shall be stated in the resolution or resolutions providing for the issuance of such series adopted by the Board of Directors of the Corporation, and the Board of Directors is hereby expressly vested with authority, to the fullest extent now or hereafter provided by law, to adopt any such resolution or resolutions. The Board of Directors may increase or decrease the number of shares of any such series subsequent to the issuance of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any such series shall be so decreased, the shares constituting such decrease shall resume the status they had prior to the adoption of the resolution originally fixing the number of shares of such series.

**V.**

The number of directors that constitutes the entire Board of Directors shall be no less than five (5) nor more than nine (9), the exact number of directors to be fixed from time to time within such limit by a duly adopted resolution of the Board of Directors.

**VI.**

Stockholders shall not be permitted to cumulate votes at any election of directors.

**VII.**

Except as otherwise provided by law, vacancies in the Board of Directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, provided that a vacancy created by the removal of a director by stockholders may be filled only by the vote of a majority of the shares entitled to vote on the election of such director, present in person or represented by proxy at a duly called and convened meeting of stockholders, or by the written consent of holders of a majority of the outstanding shares entitled to vote on the election of such director.

**VIII.**

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

**IX.**

A. Except as otherwise provided in the Bylaws, the Bylaws may be amended or repealed or new Bylaws adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote generally in the election of directors. In furtherance and not in limitation of the powers conferred by law, the Board of Directors of the Corporation is expressly authorized to adopt, amend or repeal Bylaws.

B. The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

C. Advance notice of stockholder nominations for the election of directors or of business to be brought by the stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws.

**X.**

Special meetings of the stockholders of the Corporation for any purpose or purposes may be called at any time by the Chief Executive Officer of the Corporation, the Chairman of the Board of Directors or a majority of the authorized number of directors or by stockholders of record who hold in the aggregate at least 10% percent of the voting power of the outstanding shares of the Corporation entitled to vote at the meeting in the manner provided in the Bylaws, but such special meetings may not be called by any other person or persons.

**XI.**

Any action required or permitted to be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by holders of record on the record date (established in the manner provided in the Bylaws) of outstanding shares of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; provided, however, that in the case of the election or removal of directors by written consent, such consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, further, however, that a director may be elected at any time to fill a vacancy on the Board of Directors that has not theretofor been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.

**XII**

Meetings of stockholders may be held within or without the State of Delaware. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors.

Table of Contents

**XIII.**

The Corporation shall have perpetual existence.

**XIV.**

A. To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the DGCL is hereafter amended to authorize further reductions in the liability of a corporation's directors for breach of fiduciary duty, then a director of the Corporation shall not be liable for any such breach to the fullest extent permitted by the DGCL as so amended.

B. Any repeal or modification of the foregoing provisions of this Article XIV shall not adversely affect any right or protection of a director of the Corporation with respect to any acts or omissions of such director occurring prior to such repeal or modification.

**XV.**

A. To the fullest extent permitted by applicable law, the Corporation is also authorized to provide indemnification of (and advancement of expenses to) directors, officers, employees and other agents of the Corporation (and any other persons to which Delaware law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of Delaware, subject only to limits created by applicable Delaware law (statutory or non-statutory), with respect to actions for breach of duty to a corporation.

B. Any repeal or modification of any of the foregoing provisions of this Article XV shall not adversely affect any right or protection of any such agent or other person existing at the time of, or increase the liability of any such agent or other person with respect to any acts or omissions of such agent or other person occurring prior to such repeal or modification.

**XVI.**

Pursuant to Section 203(b)(1) of the DGCL, the Corporation shall not be governed by the provisions of Section 203 of the DGCL.

**XVII.**

The name and mailing address of the incorporator are as follows:

Victor S. Sze
c/o OSI Systems, Inc.
12525 Chadron Avenue
Hawthorne, CA 90250

IN WITNESS WHEREOF, the undersigned incorporator has executed this Certificate of Incorporation on this day of , 2010.

______________________________

Victor S. Sze, Incorporator

Table of Contents

**Appendix C**
**FORM OF BYLAWS**
**OF**
**OSI SYSTEMS, INC.**
**(a Delaware corporation)**

**ARTICLE I**
**OFFICES**

Section 1. *Registered Office.* The registered office of OSI Systems, Inc., a Delaware corporation (the "Corporation"), shall be fixed in the Certificate of Incorporation of the Corporation.

Section 2. *Other Offices.* The Corporation shall also have and maintain a principal executive office at 12525 Chadron Avenue, Hawthorne, CA 90250 and other offices at such place or places within and without the State of Delaware as the Board of Directors (the "Board") may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

Section 1. *Place of Meetings.* Meetings of stockholders shall be held either at the principal executive office of the Corporation or at any other place within or without the State of Delaware which may be designated by the Board and provided in notice of the meeting.

Section 2. *Annual Meetings.* The annual meetings of the stockholders shall be held on such date and at such time as may be fixed by the Board. At such meetings, directors shall be elected and any other proper business may be transacted.

Section 3. *Special Meetings*.

(a) Special meetings of the stockholders for any purpose or purposes may be called only (i) by the Chairman of the Board of Directors, (ii) by the Board of Directors, pursuant to a resolution approved by a majority of the entire Board of Directors, (iii) the Chief Executive Officer or (v) by the Secretary of the Corporation, following his or her receipt of one or more written demands to call a special meeting of the stockholders in accordance with, and subject to, this Section 3 from stockholders of record as of the record date fixed in accordance with Section 3(d) who hold, in the aggregate, at least 10% percent of the voting power of the outstanding shares of the Corporation. The notice of a special meeting shall state the purpose or purposes of the special meeting, and the business to be conducted at the special meeting shall be limited to the purpose or purposes stated in the notice. Except in accordance with this Section 3, stockholders shall not be permitted to propose business to be brought before a special meeting of the stockholders. Stockholders who nominate persons for election to the board of directors at a special meeting must also comply with the requirements set forth in Section 14.

(b) No stockholder may demand that the Secretary of the Corporation call a special meeting of the stockholders pursuant to Section 3(a) unless a stockholder of record has first submitted a request in writing that the Board of Directors fix a record date for the purpose of determining the stockholders entitled to demand that the Secretary of the Corporation call such special meeting (the "Request Record Date"), which request shall be in proper form and delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation.

(c) To be in proper form for purposes of this Section 3, a request by a stockholder for the Board of Directors to fix a Request Record Date shall set forth:

(i) As to each Requesting Person (as defined below), the Stockholder Information (as defined in Section 13(c)(i), except that for purposes of this Section 3 the term "Requesting Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(i));

(ii) As to each Requesting Person, any Disclosable Interests (as defined in Section 13(c)(ii), except that for purposes of this Section 3 the term "Requesting Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 13(c)(ii) and the disclosure in clause (E) of Section 13(c)(ii) shall be made with respect to the business proposed to be conducted at the special meeting or the proposed election of directors at the special meeting, as the case may be);

(iii) As to the purpose or purposes of the special meeting, (A) a reasonably brief description of the purpose or purposes of the special meeting and the business proposed to be conducted at the special meeting, the reasons for conducting such business at the special meeting and any material interest in such business of each Requesting Person, and (B) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Requesting Persons or (y) between or among any Requesting Person and any other record or beneficial holder of the shares of any class or series of the Corporation (including their names) in connection with the request for the special meeting or the business proposed to be conducted at the special meeting; and

(iv) If directors are proposed to be elected at the special meeting, the Nominee Information for each person whom a Requesting Person expects to nominate for election as a director at the special meeting.

For purposes of this Section 3(b), the term "Requesting Person" shall mean (i) the stockholder making the request to fix a record date for the purpose of determining the stockholders entitled to demand that the Secretary call a special meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf such request is made, and (iii) any affiliate or associate of such stockholder or beneficial owner.

(d) Within ten (10) days after receipt of a request to fix the Request Record Date in proper form and otherwise in compliance with this Section 3 from any stockholder of record, the Board of Directors may adopt a resolution fixing the Request Record Date, which date shall not precede the date upon which the resolution fixing the Request Record Date is adopted by the Board of Directors. If no resolution fixing a Request Record Date has been adopted by the Board of Directors within the ten (10) day period after the date on which such a request to fix a Request Record Date was received, the Request Record Date shall be deemed to be the twentieth (20th) day after the date on which the request therefor is received. Notwithstanding anything in this Section 3 to the contrary, no Request Record Date shall be fixed if the Board of Directors determines that the demand or demands that would otherwise be submitted following the Request Record Date could not comply with the requirements set forth in clauses (ii), (iv), (v) or (vi) of Section 3(f).

(e) Without qualification, a special meeting of the stockholders shall not be called pursuant to Section 3(a) unless stockholders of record as of the Request Record Date who hold, in the aggregate, more than 10 percent of the outstanding shares of common stock of the Corporation (the "Requisite Percentage") timely provide one or more demands to call such special meeting in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation. Only stockholders of record on the Request Record Date shall be entitled to demand that the Secretary of the Corporation call a special meeting of the stockholders pursuant to Section 3(a). To be timely, a stockholder's demand to call a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not later than the sixtieth (60th) day following the Request Record Date. To be in proper form for purposes of this Section 3, a demand to call a special meeting shall set forth (i) the business proposed to be conducted at the special meeting or the proposed election of directors at the special meeting, as the case may be, (ii) the text of the proposal or business (including the text of any resolutions proposed for consideration), if applicable, and (iii) with respect to any stockholder or stockholders submitting a demand to call a special meeting (except for any stockholder that has provided such demand in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Securities Exchange Act of 1934, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "Exchange Act"), by way of a solicitation statement filed on Schedule 14A) (a "Solicited Stockholder") the information required to be provided pursuant to this Section 3 by a Requesting Person. A stockholder may revoke a demand to call a special meeting by written revocation delivered to the

Table of Contents

Secretary at any time prior to the special meeting. If any such revocation(s) are received by the Secretary after the Secretary's receipt of written demands from the holders of the Requisite Percentage of stockholders, and as a result of such revocation(s), there no longer are unrevoked demands from the Requisite Percentage of stockholders to call a special meeting, the Board of Directors shall have the discretion to determine whether or not to proceed with the special meeting.

(f) The Secretary shall not accept, and shall consider ineffective, a written demand from a stockholder to call a special meeting (i) that does not comply with this Section 3, (ii) that relates to an item of business to be transacted at such meeting that is not a proper subject for stockholder action under applicable law, (iii) that includes an item of business to be transacted at such meeting that did not appear on the written request that resulted in the determination of the Request Record Date, (iv) that relates to an item of business (other than the election of directors) that is identical or substantially similar to an item of business (a "Similar Item") for which a record date (other than the Request Record Date) was previously fixed and such demand is delivered between the time beginning on the 61st day after such previous record date and ending on the one-year anniversary of such previous record date, (v) if a Similar Item will be submitted for stockholder approval at any stockholder meeting to be held on or before the 90th day after the Secretary receives such demand, or (vi) if a Similar Item has been presented at the most recent annual meeting or at any special meeting held within one year prior to receipt by the Secretary of such demand to call a special meeting.

(g) After receipt of demands in proper form and in accordance with this Section 3 from a stockholder or stockholders holding the Requisite Percentage, the Board of Directors shall duly call, and determine the place, date and time of a special meeting of stockholders for the purpose or purposes and to conduct the business specified in the demands received by the Corporation. Notwithstanding anything in these Bylaws to the contrary, the Board of Directors may submit its own proposal or proposals for consideration at such a special meeting. The record date for such a special meeting shall be fixed in accordance with Section 8 of these Bylaws. The Board of Directors shall provide written notice of such special meeting to the stockholders in accordance with Section 4.

(h) In connection with a special meeting called in accordance with this Section 3, the stockholder or stockholders (except for any Solicited Stockholder) who requested that the Board of Directors fix a Request Record Date in accordance with this Section 3 or who delivered a demand to call a special meeting to the Secretary shall further update and supplement the information previously provided to the Corporation in connection with such request or demand, if necessary, so that the information provided or required to be provided in such request or demand pursuant to this Section 3 shall be true and correct as of the record date for the special meeting and as of the date that is ten (10) business days prior to the special meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the special meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the special meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the special meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the special meeting or any adjournment or postponement thereof).

(i) Notwithstanding anything in these Bylaws to the contrary, the Secretary shall not be required to call a special meeting pursuant to this Section 3 except in accordance with this Section 3. If the Board of Directors shall determine that any request to fix a record date or demand to call and hold a special meeting was not properly made in accordance with this Section 3, or shall determine that the stockholder or stockholders requesting that the Board of Directors fix such record date or submitting a demand to call the special meeting have not otherwise complied with this Section 3, then the Board of Directors shall not be required to fix a record date or to call and hold the special meeting. In addition to the requirements of this Section 3, each Requesting Person shall comply with all requirements of applicable law, including all requirements of the Exchange Act, with respect to any request to fix a record date or demand to call a special meeting.

Table of Contents

Section 4. *Notice of Annual or Special Meeting.* Except as otherwise provided by law, written notice of each annual or special meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote thereat. Such notice shall state the place, date and hour of the meeting and (a) in the case of a special meeting, the purpose or purposes for which the meeting is called, and no other business may be transacted, or (b) in the case of the annual meeting, those matters which the Board, at the time of the mailing of the notice, intends to present for action by the stockholders, but, subject to the provisions of applicable law, the Certificate of Incorporation and these Bylaws, any proper matter may be presented at the meeting for such action. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by management for election.

Notice of a stockholders' meeting shall be given either personally or by mail or by other means of written or electronic communication, addressed to the stockholder at the address of such stockholder appearing on the books of the Corporation or given by the stockholder to the Corporation for the purpose of notice; or, if no such address appears or is given, at the place where the principal executive office of the Corporation is located or by publication at least once in a newspaper of general circulation in the county in which the principal executive office is located. Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is directed to the stockholder in the manner consented to by the stockholder. Any notice to stockholders may be given by electronic mail or other electronic transmission, in the manner provided by Section 232 of the Delaware General Corporation Law. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the giving of such notice. Notice of the time, place and purpose of any meeting of stockholders may be waived in writing, either before or after the meeting, and to the extent permitted by law, will be waived by any stockholder by attendance thereat, in person or by proxy, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Notwithstanding the foregoing provisions of this Section 4, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to matters set forth in this Section 4.

Section 5. *Quorum.* A majority of the issued and outstanding stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. If a quorum is not present or represented at any meeting of the stockholders, then either (a) the chairman of the meeting or (b) holders of a majority of the shares of stock entitled to vote who are present, in person or in proxy, at the place of the meeting shall have power to adjourn the meeting to another place, date or time in accordance with Section 6 of this Article.

Section 6. *Adjourned Meeting and Notice Thereof.* It shall not be necessary to give any notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by announcement at the meeting at which such adjournment is taken; provided, however, when any stockholders' meeting is adjourned for more than thirty (30) days or, if after adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given as in the case of an original meeting.

Section 7. *Voting.* Except as may be otherwise provided in the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder. All elections shall be determined by a plurality of the votes cast, and except as otherwise required by the Certificate of Incorporation, these bylaws, applicable law or any other rules and regulations applicable to the Corporation or shares of its capital stock (including the rules and regulations of any stock exchange on which shares of the Corporation's capital stock are traded), all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

Section 8. *Record Date.* The Board may fix, in advance, a record date for the determination of the stockholders entitled to notice of any meeting to vote or entitled to receive payment of any dividend or other distribution, or any allotment of rights, or to exercise rights in respect of any other lawful action. The record date so fixed shall be not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting nor

more than sixty (60) days prior to any other action. When a record date is so fixed, only stockholders of record on that date are entitled to notice of and to vote at the meeting or to receive the dividend, distribution, or allotment of rights, or to the exercise of the rights, as the case may be, notwithstanding any transfer of shares on the books of the Corporation after the record date. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the Board fixes a new record date for the adjourned meeting. The Board shall fix a new record date if the meeting is adjourned for more than thirty (30) days. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the next business day next preceding the day on which the meeting is held.

Section 9. *Consent of Absentees.* The transactions of any meeting of stockholders, however called and noticed, and wherever held, are as valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of the meeting or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting. Neither the business to be transacted at nor the purpose of any regular or special meeting of stockholders need be specified in any written waiver of notice, except as provided in the Certificate of Incorporation or these Bylaws.

Section 10. *Action by Written Consent in Lieu of a Meeting.*

(a) Any action required or permitted to be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by holders of record on the record date (established as provided below) of outstanding shares of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; provided, however, that in the case of the election or removal of directors by written consent, such consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, further, however, that a director may be elected at any time to fill a vacancy on the Board of Directors that has not theretofor been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors. Any such consent shall be delivered to the Corporation at its registered office in the State of Delaware, at its principal place of business or to an officer or agent of the Corporation having custody of the minute books in which proceedings of meetings of stockholders are recorded. Delivery shall be made by hand or by certified or registered mail, return receipt requested. Every written consent shall bear the date of the signature of each stockholder who signs the consent, and no written consent shall be effective to take corporate action unless, within sixty (60) days of the earliest dated valid consent delivered in the manner described in this Section 10, written consents signed by a sufficient number of holders to take such action are delivered to the Corporation in the manner described in this Section 10. Only stockholders of record on the record date shall be entitled to consent to corporate action in writing without a meeting.

(b) Without qualification, any stockholder of record seeking to have the stockholders authorize or take any action by written consent shall first request in writing that the Board of Directors fix a record date for the purpose of determining the stockholders entitled to take such action, which request shall be in proper form and delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation. Within ten (10) days after receipt of a request in proper form and otherwise in compliance with this Section 10(b) from any such stockholder, the Board of Directors may adopt a resolution fixing a record date for the purpose of determining the stockholders entitled to take such action, which date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no resolution fixing a record date has been adopted by the Board of Directors within such ten (10) day period after the date on which such a request is received, (i) the record date for determining stockholders

entitled to consent to such action, when no prior action of the Board of Directors is required by applicable law, shall be the first date on which a valid signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner described in this Section 10, and (ii) the record date for determining stockholders entitled to consent to such action, when prior action by the Board of Directors is required by applicable law, shall be at the close of business on the date on which the Board of Directors adopts the resolution taking such prior action.

(c) Notwithstanding anything in these Bylaws to the contrary, no action may be taken by the stockholders by written consent except in accordance with this Section 10. If the Board of Directors shall determine that any request to fix a record date or to take stockholder action by written consent was not properly made in accordance with this Section 10, or the stockholder or stockholders seeking to take such action do not otherwise comply with this Section 10, then the Board of Directors shall not be required to fix a record date and any such purported action by written consent shall be null and void to the fullest extent permitted by applicable law. In addition to the requirements of this Section 10 with respect to stockholders seeking to take an action by written consent, each such stockholder shall comply with all requirements of applicable law, including all requirements of the Exchange Act, with respect to such action.

Section 11. *Proxies.* Every person entitled to vote shares has the right to do so either in person or by one or more persons authorized to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date.

Section 12. *Inspector of Election.* In advance of any meeting of stockholders, the Board may appoint any person to act as the inspector of election at such meeting and any adjournment thereof. If the inspector of election is not so appointed, or if any person so appointed fails to appear or refuses to act, the chairman of any such meeting may, and on the request of any stockholder or stockholder's proxy shall, make such appointment at the meeting. The duties of such inspector shall include: determining, and certifying as appropriate, the number of shares outstanding and the voting power of each; the shares represented at the meeting; the existence of a quorum; the authenticity, validity and effect of proxies; receiving votes, ballots or consents; hearing and determining all challenges and questions in any way arising in connection with the right to vote; counting and tabulating all votes or consents; determining when the polls shall close; determining the result; and doing such acts as may be proper to conduct the election or vote with fairness to all stockholders.

Section 13. *Notice of Business to be Brought Before a Meeting.*

(a) At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) brought before the meeting by the Corporation and specified in the notice of meeting given by or at the direction of the Board of Directors, (ii) brought before the meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the meeting by a stockholder who (A) was a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf such business is proposed, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 13 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 13 as to such business. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board of Directors, the foregoing clause (iii) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of the stockholders. Stockholders seeking to nominate persons for election to the Board must comply with Section 14 and this Section 13 shall not be applicable to nominations except as expressly provided in Section 14.

(b) Without qualification, for business to be properly brought before an annual meeting by a stockholder, the stockholder must (i) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 13. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made (such notice within such time periods, "Timely Notice"). In no event shall any adjournment of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(c) To be in proper form for purposes of this Section 13, a stockholder's notice to the Secretary shall set forth:

(i) As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); and (B) the class or series and number of shares of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Persons, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future (the disclosures to be made pursuant to the foregoing clauses (A) and (B) are referred to as "Stockholder Information");

(ii) As to each Proposing Person, (A) any derivative, swap or other transaction or series of transactions engaged in, directly or indirectly, by such Proposing Person, the purpose or effect of which is to give such Proposing Person economic risk similar to ownership of shares of any class or series of the Corporation, including due to the fact that the value of such derivative, swap or other transactions are determined by reference to the price, value or volatility of any shares of any class or series of the Corporation, or which derivative, swap or other transactions provide, directly or indirectly, the opportunity to profit from any increase in the price or value of shares of any class or series of the Corporation ("Synthetic Equity Interests"), which Synthetic Equity Interests shall be disclosed without regard to whether (x) the derivative, swap or other transactions convey any voting rights in such shares to such Proposing Person, (y) the derivative, swap or other transactions are required to be, or are capable of being, settled through delivery of such shares or (z) such Proposing Person may have entered into other transactions that hedge or mitigate the economic effect of such derivative, swap or other transactions (B) any proxy (other than a revocable proxy or consent given in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act by way of a solicitation statement filed on Schedule 14A), agreement, arrangement, understanding or relationship pursuant to which such Proposing Person has or shares a right to vote any shares of any class or series of the Corporation, (C) any agreement, arrangement, understanding or relationship, including any repurchase or similar so-called "stock borrowing" agreement or arrangement, engaged in, directly or indirectly, by such Proposing Person, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of shares of any class or series of the Corporation by, manage the risk of share price changes for, or increase or decrease the voting power of, such Proposing Person with respect to the shares of any class or series of the Corporation, or which provides, directly or indirectly, the opportunity to profit from any decrease in the price or value of the shares of any class or series of the Corporation ("Short Interests"), (D) any performance related fees (other than an asset based fee) that such Proposing Person is entitled to based on any increase or decrease in the price or value of shares of any class or series of the Corporation, or any Synthetic Equity Interests or Short Interests, if any, and (E) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (E) are referred to as "Disclosable

Interests"); provided, however, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner; and

(iii) As to each item of business that the stockholder proposes to bring before the annual meeting, (A) a reasonably brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration), and (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other record or beneficial holder of the shares of any class or series of the Corporation (including their names) in connection with the proposal of such business by such stockholder.

For purposes of this Section 13, the term "Proposing Person" shall mean (i) the stockholder providing the notice of business proposed to be brought before an annual meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (iii) any affiliate or associate (each within the meaning of Rule 12b-2 under the Exchange Act for purposes of these Bylaws) of such stockholder or beneficial owner.

(d) A stockholder providing notice of business proposed to be brought before an annual meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 13 shall be true and correct as of the record date for the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).

(e) Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting except in accordance with this Section 13. The presiding officer of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 13, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(f) This Section 13 is expressly intended to apply to any business proposed to be brought before an annual meeting of stockholders other than any proposal made pursuant to Rule 14a-8 under the Exchange Act. In addition to the requirements of this Section 13 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business. Nothing in this Section 13 shall be deemed to affect the rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(g) For purposes of these Bylaws, "public disclosure" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

Section 14. *Notice of Nominations for Election to the Board of Directors*.

(a) Nominations of any person for election to the Board of Directors at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at

the direction of the person calling such special meeting) may be made at such meeting only (i) by or at the direction of the Board of Directors, including by any committee or persons appointed by the Board of Directors, or (ii) by a stockholder who (A) was a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf such nomination is proposed to be made, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 14 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 14 as to such nomination. The foregoing clause (ii) shall be the exclusive means for a stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting or special meeting.

(b) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting, the stockholder must (i) provide Timely Notice (as defined in Section 13) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 14. Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting, then for a stockholder to make any nomination of a person or persons for election to the Board of Directors at a special meeting, the stockholder must (i) provide timely notice thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 14. To be timely, a stockholder’s notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 13) of the date of such special meeting was first made. In no event shall any adjournment of an annual meeting or special meeting or the announcement thereof commence a new time period for the giving of a stockholder’s notice as described above.

(c) To be in proper form for purposes of this Section 14, a stockholder’s notice to the Secretary shall set forth:

(i) As to each Nominating Person (as defined below), the Stockholder Information (as defined in Section 13(c)(i), except that for purposes of this Section 14 the term “Nominating Person” shall be substituted for the term “Proposing Person” in all places it appears in Section 13(c)(i));

(ii) As to each Nominating Person, any Disclosable Interests (as defined in Section 13(c)(ii), except that for purposes of this Section 14 the term “Nominating Person” shall be substituted for the term “Proposing Person” in all places it appears in Section 13(c)(ii) and the disclosure in clause (E) of Section 13(c)(ii) shall be made with respect to the election of directors at the meeting);

(iii) As to each person whom a Nominating Person proposes to nominate for election as a director, (A) all information with respect to such proposed nominee that would be required to be set forth in a stockholder’s notice pursuant to this Section 14 if such proposed nominee were a Nominating Person, (B) all information relating to such proposed nominee that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such proposed nominee’s written consent to being named in the proxy statement as a nominee and to serving as a director if elected), (C) a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among any Nominating Person, on the one hand, and each proposed nominee, his or her respective affiliates and associates, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the “registrant” for purposes of such rule and the proposed nominee were a director or executive officer of such registrant (the disclosures to be made pursuant to the foregoing clauses (A) through (C) are referred to as “Nominee Information”); and

(iv) The Corporation may require any proposed nominee to furnish such other information (A) as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation in accordance with the Corporation's Corporate Governance Guidelines or (B) that could be material to a reasonable stockholder's understanding of the independence or lack of independence of such proposed nominee.

For purposes of this Section 14, the term "Nominating Person" shall mean (i) the stockholder providing the notice of the nomination proposed to be made at the meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made, and (iii) any affiliate or associate of such stockholder or beneficial owner,

(d) A stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 14 shall be true and correct as of the record date for the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for the meeting (in the case of the update and supplement required to be made as of the record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).

(e) Notwithstanding anything in these Bylaws to the contrary, no person shall be eligible for election as a director of the Corporation unless nominated in accordance with this Section 14. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with this Section 14, and if he or she should so determine, he or she shall so declare such determination to the meeting and the defective nomination shall be disregarded.

(f) In addition to the requirements of this Section 14 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.

## ARTICLE III
## DIRECTORS

Section 1. *Powers.* Subject to limitations of the Certificate of Incorporation, of these Bylaws and of the Delaware General Corporation Law relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board. The Board may delegate the management of the day-to-day operation of the business of the Corporation to a management company or other person provided that the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

Section 2. *Number of Directors.* The number of directors shall be determined from time to time by resolution of the Board, within the range set forth in the Certificate of Incorporation. No reduction of the authorized number of directors shall have the effect of shortening the term of any incumbent director.

Section 3. *Election and Term of Office.* The directors shall be elected at each annual meeting of the stockholders, but if any such annual meeting is not held or the directors are not elected thereat, the directors may be elected at any special meeting of stockholders held for that purpose. Each director shall hold office until the next annual meeting and until a successor has been elected and qualified.

Table of Contents

Section 4. *Vacancies.* Any director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective.

Except as otherwise provided by law, vacancies in the Board may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, provided that a vacancy created by the removal of a director by the stockholders may be filled only by the vote of a majority of the shares entitled to vote for the election of such director in person or represented at a duly called and convened meeting of stockholders, or by the written consent of holders of a majority of the outstanding shares entitled to vote in the election of such director. Each director so elected shall hold office until the next annual meeting and until such director's successor has been elected and qualified.

Any person who has been declared of unsound mind by an order of court or convicted of a felony shall cease to be qualified as a director.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of the director's term of office.

Section 5. *Place of Meeting.* Regular or special meetings of the Board shall be held at any place within or without the State of Delaware which has been designated from time to time by the Board. In the absence of such designation, regular meetings shall be held at the principal executive office of the Corporation.

Section 6. *Regular Meetings.* Immediately following each annual meeting of stockholders, the Board shall hold a regular meeting for the purpose of organization, election of officers and the transaction of other business. Call and notice of all such regular meetings of the Board is hereby dispensed with. Other regular meetings of the Board shall be held without call on such dates and at such times as may be fixed by the Board, and shall be subject to the notice requirements set forth in Section 7 of this Article.

Section 7. *Special Meetings.* Special meetings of the Board for any purpose or purposes may be called at any time by the Chief Executive Officer, Chairman of the Board, or by any two (2) directors.

Special meetings of the Board shall be held upon three (3) days' written notice by mail or twenty-four (24) hours' notice given personally or by telephone, telecopier, e-mail or other similar means of communication. Any such notice shall be addressed or delivered to each director at such director's address as it is shown upon the records of the Corporation or as may have been given to the Corporation by the director for purposes of notice or, if such address is not shown on such records or is not readily ascertainable, at the place in which the meetings of the directors are regularly held.

Notice by mail shall be deemed to have been given at the time a written notice is deposited in the United States mails, postage prepaid. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or is delivered to a common carrier for transmission, or actually transmitted by the person giving the notice by electronic means, to the recipient. Oral notice shall be deemed to have been given at the time it is communicated in person or by telephone or wireless, to the recipient or to a person at the office or residence of the recipient who the person giving the notice has reason to believe will promptly communicate it to the recipient.

Section 8. *Quorum.* A majority of the authorized number of directors, constitutes a quorum of the Board for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board, unless a greater number be required by law or by the Certificate of Incorporation.

Section 9. *Participation in Meetings by Conference Telephone.* Members of the Board or any committee thereof may participate in a meeting through use of conference telephone or similar communications equipment, so long as all members participating in such meeting can hear one another, and such participation shall constitute presence in person at such meeting.

Section 10. *Waiver of Notice.* The transactions of any meeting of the Board, however called and noticed or wherever held, are as valid as though had at a meeting duly held after regular call and notice if a quorum be present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice or delivers a waiver by electronic transmission. All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 11. *Adjournment.* A majority of the directors present, whether or not a quorum is present, may adjourn any directors' meeting to another time and place. Notice of the time and place of holding an adjourned meeting need not be given to absent directors if the time and place be fixed at the meeting adjourned. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

Section 12. *Fees and Compensation.* Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement for expenses, as may be fixed or determined by the Board.

Section 13. *Action Without Meeting.* Any action required or permitted to be taken by the Board, or any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, shall consent in writing or by electronic communication to such action, and such writing or writings (or communications) are duly filed with the minutes of proceedings of the Board or committee, as the case may be.

Section 14. *Rights and Inspection.* Every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Corporation and also of its subsidiary corporations, domestic or foreign. Such inspection by a director may be made in person or by agent or attorney and includes the right to copy and obtain extracts.

Section 15. *Committees.* The Board may appoint one or more committees, each consisting of one or more directors, and delegate to such committees any of the authority of the Board except with respect to:

(i) The approval of any action for which the Delaware General Corporation Law also requires stockholders' approval;

(ii) The filling of vacancies on the Board or in any committee;

(iii) The amendment or repeal of Bylaws or the adoption of new Bylaws;

(iv) The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable; or

(v) The appointment of other committees of the Board or the members thereof.

Any such committee must be appointed by resolution adopted by a majority of the authorized number of directors and may be designated a name as the Board shall specify. The Board shall have the power to prescribe the manner in which proceedings of any such committee shall be conducted. In the absence of any such prescription, such committee shall have the power to prescribe the manner in which its proceedings shall be conducted. Unless the Board or such committee shall otherwise provide, the regular and special meetings and other actions of any such committee shall be governed by the provisions of this Article applicable to meetings and actions of the Board. Minutes shall be kept of each meeting of each committee.

Section 16. *Submission of Resignation Upon Material Change in Occupation or Business Association*. A director shall submit a letter of resignation to the Board upon such individual director's material change in principal occupation or business association. Such a letter of resignation shall become effective only if accepted by the Board.

**ARTICLE IV**
**OFFICERS**

Section 1. *Officers.* The officers of the Corporation shall be a Chief Executive Officer, a Secretary and a Chief Financial Officer. The Corporation may also have, at the discretion of the Board, a Chairman of the Board, a President, a Chief Operating Officer, one or more Vice Presidents (who may be designated as executive or senior vice presidents as the Board may, from time to time, deem necessary), one or more Assistant Secretaries, one or more Assistant Financial Officers and such other officers as may be elected or appointed in accordance with the provisions of Section 3 of this Article. Any number of offices may be held by the same person.

Section 2. *Election.* The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article, shall be chosen annually by, and shall serve at the pleasure of the Board, and shall hold their respective offices until their resignation, removal or other disqualification from service, or until their respective successors shall be elected.

Section 3. *Subordinate Officers.* The Board may appoint, and may empower the Chief Executive Officer or the President to appoint, such other officers as the business of the Corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in these Bylaws or as the Board may from time to time determine. Any officer appointed pursuant to this Section 3 may be removed, with or without cause, by the Board or any such officer upon whom the power of removal has been conferred by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Section 4. *Removal and Resignation.* Any officer not appointed in accordance with the provisions of Section 3 or 5 hereof may be removed, either with or without cause, by the Board at any time. Any such removal shall be without prejudice to the rights, if any, of the officer under any contract of employment.

Any officer may resign at any time by giving written notice to the Corporation, but without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5. *Vacancies.* A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular election or appointment to such office.

Section 6. *Chairman of the Board.* The Chairman of the Board, shall, if present, preside at all meetings of the Board and exercise and perform such other powers and duties as may be from time to time assigned by the Board.

Section 7. *Chief Executive Officer.* The Chief Executive Officer, shall be subject to the control of the Board and have general supervision, direction and control of the business and the officers of the corporation. The Chief Executive Officer shall preside at all meetings of the stockholders and shall act as Chairman of the Board unless the Board has appointed a different person as Chairman.

Section 8. *President; Chief Operating Officer.* The President or the Chief Operating Officer has the general powers and duties of management usually vested in the office of president, general manager and chief operating officer of a corporation and such other powers and duties as may be prescribed by the Board. In the

absence of the Chief Executive Officer, the President shall perform the duties required of the Chief Executive Officer under these Bylaws.

Section 9. *Vice President.* In the absence or disability of the President, the Vice Presidents in order of their rank as fixed by the Board or, if not ranked, the Vice President designated by the Board, shall perform all the duties of the President and, when so acting, shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board.

Section 10. *Secretary.* The Secretary shall keep or cause to be kept, at the principal executive office and such other place as the Board may order, a book of minutes of all meetings of stockholders, the Board and its committees, with the time and place of holding, whether regular or special, and if special, how authorized, the notice thereof given, the names of those present at Board and committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings thereof. The Secretary shall keep, or cause to be kept, a copy of the Bylaws of the Corporation at the principal executive offices or business office.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Corporation's transfer agent or registrar, if one be appointed, a share register, or a duplicate share register, showing the names of the stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the stockholders of the Board and of any committees thereof required by these Bylaws or by law to be given, shall keep the seal of the Corporation in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board.

Section 11. *Chief Financial Officer.* The Chief Financial Officer is the principal financial officer of the Corporation and shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, and shall send or cause to be sent to the stockholders of the Corporation such financial statements and reports as are by law or these Bylaws required to be sent to them. The books of account shall at all times be open to inspection by any director.

The Chief Financial Officer shall deposit all monies and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board. The Chief Financial Officer shall disburse the funds of the Corporation as may be ordered by the Board, shall render to the Chief Executive Officer or the President or directors, whenever they request it, an account of all transactions entered into as Chief Financial Officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board.

**ARTICLE V**
**OTHER PROVISIONS**

Section 1. *Inspection of Corporate Records.* The Corporation shall, either at its principal executive offices or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these Bylaws as amended to date, accounting books, and other records.

(a) Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records permitted by the Delaware General Corporation Law and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other

agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal place of business.

(b) In addition to the inspections rights set forth in Section 1(a) above and those available under the Delaware General Corporation Law, any stockholder or stockholders holding at least 5 percent in the aggregate of the outstanding voting shares of the Corporation or who hold at least 1 percent of those voting shares and have filed a Schedule 14A with the United States Securities and Exchange Commission shall have an absolute right to do either or both of the following: (1) inspect and copy the record of stockholder's names and addresses and stockholdings during usual business hours upon five business days' prior written demand upon the Corporation, or (2) obtain from the transfer agent for the Corporation, upon written demand and upon the tender of its usual charges for such a list (the amount of which charges shall be stated to the stockholder by the transfer agent upon request), a list of the stockholders' names and addresses, who are entitled to vote for the election of directors, and their stockholdings, as of the most recent record date for which it has been compiled or as of a date specified by the stockholder subsequent to the date of demand. The list shall be made available on or before the later of five business days after the demand is received or the date specified therein as the date as of which the list is to be compiled. The Corporation shall have the responsibility to cause its transfer agent to comply with this subsection.

(c) A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order for each class of stock and showing the address of each such stockholder and the number of shares registered in each such stockholder's name, shall be open to the examination of any such stockholder for a period of at least ten (10) days prior to the meeting in the manner provided by law. The stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law. This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

Section 2. *Inspection of Bylaws.* The Corporation shall keep in its principal executive office the original or a copy of these Bylaws as amended to date, which shall be open to inspection by stockholders at all reasonable times, during office hours. If the principal executive office of the Corporation is located outside the State of Delaware and the Corporation has no principal business office in such state, it shall upon the written notice of any stockholder furnish to such stockholder a copy of these Bylaws as amended to date.

Section 3. *Endorsement of Documents; Contracts.* Subject to the provisions of applicable law, any note, mortgage, evidence of indebtedness, contract, share certificate, conveyance or other instrument in writing and any assignment or endorsements thereof executed or entered into between the Corporation and any other person, when signed by the Chief Executive Officer, the Chairman of the Board or the President, shall be valid and binding on the Corporation in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same. Any such instruments may be signed by another person or persons and in such manner as from time to time shall be determined by the Board, and, unless so authorized by the Board, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or amount.

Section 4. *Certificates of Stock.* The shares of stock of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and, upon request, every holder of uncertificated shares, shall be entitled to have a certificate signed in the name of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer or a Vice President and by the Chief Financial Officer or an Assistant Financial Officer or the Secretary or an Assistant Secretary, certifying the number of shares and the class or series of shares owned by the stockholder. Any or all

of the signatures on the certificate may be facsimile. If any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue.

Certificates for shares may be issued prior to full payment under such restrictions and for such purposes as the Board may provide; provided, however, that on any certificate issued to represent any partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated.

Except as provided in this section, no new certificate for shares shall be issued in lieu of an old one unless the latter is surrendered and cancelled at the same time. The Board may, however, if any certificate for shares is alleged to have been lost, stolen or destroyed, authorize the issuance of a new certificate in lieu thereof, and the Corporation may require that the Corporation be given a bond or other adequate security sufficient to indemnify it against any claim that may be made against it (including expense or liability) on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

Section 5. *Representation of Shares of other Corporations.* The President, the Chief Executive Officer, the Chief Financial Officer or any other officer or officers authorized by the Board, the Chief Executive Officer, the President or the Chief Financial Officer are each authorized to vote, represent and exercise on behalf of the Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of the Corporation. The authority herein granted may be exercised either by any such officer in person or by any other person authorized so to do by proxy or power of attorney duly executed by said officer.

Section 6. *Stock Purchase Plans.* The Corporation may adopt and carry out a stock purchase plan or agreement or stock option plan or agreement providing for the issue and sale for such consideration as may be fixed of its unissued shares, or of issued shares acquired or to be acquired, to one or more of the employees or directors of the Corporation or of a subsidiary or to a trustee on their behalf and for the payment for such shares in installments or at one time, and may provide for aiding any such persons in paying for such shares by compensation for services rendered, promissory notes or otherwise.

Any such stock purchase plan or agreement or stock option plan or agreement may include, among other features, the fixing of eligibility for participation therein, the class and price of shares to be issued or sold under the plan or agreement, the number of shares which may be subscribed for, the method of payment therefor, the reservation of title until full payment therefor, the effect of the termination of employment and option or obligation on the part of the Corporation to repurchase the shares upon termination of employment, restrictions upon transfer of the shares, the time limits of and termination of the plan, and any other matters, not in violation of applicable law, as may be included in the plan as approved or authorized by the Board or any committee of the Board.

Section 7. *Stockholder Rights Plans.*

(a) Except as provided in Section 7(b), the Board shall seek stockholder approval prior to its adoption of (a) any Stockholder Rights Plan with a term of more than 12 months or (b) any amendment which has the effect of extending the term of a Stockholder Rights Plan.

(b) The Board may adopt any Stockholders Right Plan or amendment which has the effect of extending the term of a Stockholder Rights Plan, provided that the Board, in the exercise of its fiduciary duties, determines that, under the circumstances existing at the time, it is in the best interests of the stockholders of the Corporation to adopt or extend a Stockholders Rights Plan without delay, and provided further that the Board submits any Stockholders Right Plan adopted or extended pursuant to this Section 7(b) to the stockholders for ratification at a meeting to be held within 12 months of such adoption or extension of the Stockholders Rights Plan by the Board. If the adoption or extension of the Stockholders Rights Plan is not approved by the majority of the outstanding shares entitled to vote at the meeting, then the Stockholders Rights Plan shall immediately terminate.

(c) "Stockholder Rights Plan" refers in this Section 7 to any stockholder rights plan, rights agreement or any other form of rights plan generally referred to as a "poison pill" which is designed to or has the effect of making an acquisition of significant holdings of the corporation's shares of stock more difficult or expensive.

Section 8. *Construction and Definitions.* Unless the context otherwise requires, the general provisions, rules of construction and definitions contained in the Delaware General Corporation Law shall govern the construction of these Bylaws.

**ARTICLE VI**
**INDEMNIFICATION**

Section 1. *Right to Indemnification*. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the corporation or, while a director or officer of the corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in Section 4, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the commencement of such proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board.

Section 2. *Insurance.* The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, trustee or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise, against any liability or expense asserted against or incurred by such person in or arising from that capacity, or arising out of his or her status as such, whether or not the Corporation would otherwise have the power or the obligation to indemnify the person against such liability or expense. The Corporation shall not be obligated under these Bylaws to make any payment in connection with any claim made against any person if and to the extent that such person has actually received payment therefor under any insurance policy or policies.

Section 3. *Expenses Payable in Advance.* Expenses (including attorneys' fees and expenses) incurred by a director or officer, or a former director or officer, in defending, investigating, preparing to defend, or being or preparing to be a witness in, a threatened or pending action, suit, proceeding or claim against him or her in his her capacity as an officer or director of the Corporation, whether civil or criminal, shall be paid by the Corporation in advance of the final disposition of such action, suit, proceeding or claim upon receipt by the Corporation of a request therefor and an undertaking by or on behalf of the director or officer, or former director or officer, to repay such amounts if it ultimately shall be determined by final judicial decision from which there is no further right of appeal that he or she is not entitled to be indemnified by the Corporation.

Section 4. *Claims*. If a claim for indemnification (following the final disposition of such proceeding) or advancement of expenses under this Article VI is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law. In any such action the corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Table of Contents

Section 5. *Nonexclusivity of Rights*. The rights conferred on any Covered Person by this Article VI shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

Section 6. *Other Sources*. The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

Section 7. *Amendment or Repeal*. Any repeal or modification of the provisions of this Article VI shall not adversely affect any right or protection hereunder of any Covered Person in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to the time of such repeal or modification.

Section 8. *Other Indemnification and Advancement of Expenses*. This Article VI shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

**ARTICLE VII**
**AMENDMENTS**

These Bylaws may be repealed, altered or amended or new Bylaws adopted at any meeting of the stockholders, either annual or special, by the affirmative vote of at least a majority of the stock entitled to vote at such meeting, unless a larger vote is required by these Bylaws or the Certificate of Incorporation. The Board shall also have the authority to repeal, alter or amend these Bylaws or adopt new Bylaws by unanimous written consent or at any annual, regular, or special meeting of the Board by the affirmative vote of a majority of the whole number of directors.

Table of Contents

**PROXY** **PROXY**

**OSI SYSTEMS, INC.**

**12525 Chadron Avenue, Hawthorne, CA 90250**
**This Proxy is Solicited on Behalf of the Board of Directors**

The undersigned revokes all previous proxies, acknowledges receipt of the Notice of the Annual Meeting of Shareholders and the Proxy Statement and appoints Deepak Chopra and Ajay Mehra and each of them, the Proxy of the undersigned, with full power of substitution, to vote all shares of Common Stock of OSI Systems, Inc. (the “Company”) held of record by the undersigned as of the close of business on February 5, 2010, either on his or her own behalf or on behalf of any entity or entities, at the Annual Meeting of Shareholders of the Company to be held on March 5, 2010, and at any adjournment or postponement thereof, with the same force and effect as the undersigned might or could do if personally present thereat. The shares represented by this Proxy shall be voted in the manner set forth below.

1. To elect the following directors to serve until the next Annual Meeting of Shareholders or until their respective successors are elected and qualified:

**FOR ALL ______ WITHHOLD AUTHORITY FOR ALL ______**

Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, Leslie E. Bider and David T. Feinberg

To withhold authority to vote for any individual nominee, check the box marked “For All” above and write the nominee’s name in the space provided here:

2. To ratify the appointment of Moss Adams LLP as the Company’s independent registered public accounting firm for the fiscal year ending June 30, 2010.

**FOR ______ AGAINST ______ ABSTAIN ______**

3. To approve the reincorporation of the Company from California to Delaware.

**FOR ______ AGAINST ______ ABSTAIN ______**

4. To transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

**(PLEASE DATE AND SIGN ON REVERSE SIDE)**

Table of Contents

THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THE NOTICE OF ANNUAL MEETING AND PROXY STATEMENT FOR THE MARCH 5, 2010 ANNUAL MEETING.

PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.

MARK HERE FOR ADDRESS CHANGE AND INDICATE NEW ADDRESS IN SPACE PROVIDED.

¨ NEW ADDRESS:

NOTE: Please sign exactly as name(s) appear(s). When signing as executor, administrator, attorney, trustee or guardian, please give your full title as such. If a corporation, please sign in full corporation name by president or other authorized officer. If a partnership, please sign in partnership name by authorized person. If a joint tenancy, please have both tenants sign.

Signature: ____________________ Dated:

Signature: ____________________ Dated:

# Exhibit 25

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

---

# FORM 8-K

---

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) MAY 5, 2010**

---

# OSI SYSTEMS, INC.

**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

---

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE
HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(b) On May 5, 2010, Leslie E. Bider resigned from our Board of Directors and its committees. At the time of his resignation, Mr. Bider was a member of the Nominating and Governance Committee and the Audit Committee. Mr. Bider's decision to resign was due to a desire to devote more time to his other obligations.

(d) Also on May 5, 2010, our Board of Directors, upon recommendation of the Company's Nominating and Governance Committee, appointed William F. Ballhaus, Jr. as a member of the Board, to hold office until our next annual meeting of shareholders and until his successor is elected and qualified. Mr. Ballhaus was also named to serve on the Audit Committee.

The Company announced the appointment of Mr. Ballhaus to the Board in a press release, a copy of which is attached as Exhibit 99.1 to this Current Report on Form 8-K.

As a non-employee director of the Company, Mr. Ballhaus will be entitled to receipt of the same cash and equity compensation paid by the Company to each of its non-employee directors. In addition, the Company will enter into an indemnification agreement with Mr. Ballhaus in the Company's standard form for directors and officers.

There are no arrangements or understandings between the Company and any other person pursuant to which Mr. Ballhaus was elected as a director, nor are there any transactions between Mr. Ballhaus and the Company that would require disclosure under Item 404(a) of Regulation S-K of the Securities and Exchange Commission.

**Item 9.01. Financial Statements and Exhibits.**

**(d) Exhibits.**

99.1 Press Release of OSI Systems, Inc. dated May 10, 2010.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: May 10, 2010

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release of OSI Systems, Inc. dated May 10, 2010. |

EXHIBIT 99.1



**OSI Systems Announces Appointment of New Board Member**

HAWTHORNE, CA. – May 10, 2010 – OSI Systems, Inc. (NASDAQ:OSIS-E), a vertically integrated provider of solutions in Security, Healthcare, and specialized electronics, today announced the appointment of Dr. William F. Ballhaus, Jr. to its Board of Directors.

Deepak Chopra, CEO and Chairman of OSI Systems, stated: "We are delighted to welcome Dr. Ballhaus to our Board of Directors. Dr. Ballhaus brings a wealth of insight and experience in managing technology-based organizations and complex government projects, and we're very pleased that he has elected to join us."

Dr. Ballhaus is the former President and Chief Executive Officer of The Aerospace Corporation, an independent, nonprofit organization dedicated to the development of critical applications and solutions for our nation's space program. At his time of retirement in December 2007, The Aerospace Corporation employed approximately 4,000 people with annual revenues of more than $800 million. Prior to joining the Aerospace Corporation, Dr. Ballhaus spent 11 years with the Lockheed Martin Corporation where he served as a Corporate Officer and Vice President of Engineering and Technology. Previous to Lockheed Martin he served as President of two Martin Marietta companies, Aero and Naval Systems and Civil Space and Communications. Previously, Dr. Ballhaus served as director of NASA's Ames Research Center. Dr. Ballhaus is a graduate of the University of California at Berkeley where he earned a Ph.D. in engineering.

Dr. Ballhaus stated, "I am delighted to be joining OSI Systems, an exciting organization that over the years has brought to market a number of innovative technologies and products that have positively benefited the lives of millions of people globally. Over the past three years, the Company has done an exceptional job in improving its overall operating efficiency and cost structure and now as global economic conditions improve finds itself ideally positioned to experience significant global expansion in all three of its operating businesses. I look forward to drawing upon the experiences and knowledge acquired throughout my career to contribute to the future success of the business."

**About OSI Systems, Inc.**

OSI Systems, Inc. is a vertically integrated designer and manufacturer of specialized electronic systems and components for critical applications. The Company sells its products in diversified markets, including homeland security, healthcare, defense and aerospace. The Company has more than 30 years of experience in electronics engineering and manufacturing and maintains offices and production facilities located in more than a dozen countries. It implements a strategy of expansion by leveraging its electronics and contract manufacturing capabilities into selective end product markets through organic growth and acquisitions. For more information on OSI Systems Inc. or any of its subsidiary companies, visit www.osi-systems.com. News Filter: OSIS-G

**For Further Information**

**OSI Systems, Inc**.
Jeremy Norton
Vice President, Investor Relations
12525 Chadron Ave
Hawthorne CA 90250
Tel: (310) 349 2372
Email: jnorton@osi-systems.com

# Exhibit 26

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1978 of 2711
8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) NOVEMBER 30, 2010**

# OSI SYSTEMS, INC.
**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

On November 30, 2010, OSI Systems, Inc. (the "Company") amended and restated the Company's Amended and Restated 2006 Equity Participation Plan (the "2006 Plan") following stockholder approval at the Company's Annual Meeting of Stockholders. The 2006 Plan was amended to increase the number of shares authorized for issuance under the 2006 Plan by 1,350,000 shares and to increase the limit on the number of shares that may be granted as restricted stock by 675,000 shares. Additional information about the amendments can be found in the Company's proxy statement, filed with the Securities and Exchange Commission on October 12, 2010. The foregoing description of the amendment and restatement of the 2006 Plan is qualified entirety by reference to the full text of the 2006 Plan, as amended and restated, a copy of which is attached hereto as Exhibit 10.1 to this Current Report.

**Item 5.07 Submission of Matters to a Vote of Security Holders**

The Company held its Annual Meeting of Stockholders on November 30, 2010. The results of the proposals voted on by our stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 14,236,949 | 768,652 | 2,286,128 |
| Ajay Mehra | 14,373,642 | 631,959 | 2,286,128 |
| Steven C. Good | 13,691,702 | 1,313,899 | 2,286,128 |
| Meyer Luskin | 12,421,892 | 2,583,709 | 2,286,128 |
| David T. Feinberg | 14,618,039 | 387,572 | 2,286,128 |
| William F. Ballhaus | 14,695,499 | 310,102 | 2,286,128 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2011.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 17,225,945 | 22,424 | 43,360 | — |

The proposal was approved.

*3. Approval of the amendment and restatement of the Company's Amended and Restated 2006 Equity Participation Plan.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 13,348,101 | 1,591,707 | 65,793 | 2,286,128 |

The proposal was approved.

**Item 9.01. Financial Statements and Exhibits.**

**(d) Exhibits**

Exhibit 10.1 Amended and Restated 2006 Equity Participation Plan of OSI Systems, Inc.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 1, 2010

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1981 of 2711

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| Exhibit 10.1 | Amended and Restated 2006 Equity Participation Plan of OSI Systems, Inc. |

# Exhibit 27

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) NOVEMBER 30, 2010**

# OSI SYSTEMS, INC.
**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

On November 30, 2010, OSI Systems, Inc. (the "Company") amended and restated the Company's Amended and Restated 2006 Equity Participation Plan (the "2006 Plan") following stockholder approval at the Company's Annual Meeting of Stockholders. The 2006 Plan was amended to increase the number of shares authorized for issuance under the 2006 Plan by 1,350,000 shares and to increase the limit on the number of shares that may be granted as restricted stock by 675,000 shares. Additional information about the amendments can be found in the Company's proxy statement, filed with the Securities and Exchange Commission on October 12, 2010. The foregoing description of the amendment and restatement of the 2006 Plan is qualified entirety by reference to the full text of the 2006 Plan, as amended and restated, a copy of which is attached hereto as Exhibit 10.1 to this Current Report.

**Item 5.07 Submission of Matters to a Vote of Security Holders**

The Company held its Annual Meeting of Stockholders on November 30, 2010. The results of the proposals voted on by our stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 14,236,949 | 768,652 | 2,286,128 |
| Ajay Mehra | 14,373,642 | 631,959 | 2,286,128 |
| Steven C. Good | 13,691,702 | 1,313,899 | 2,286,128 |
| Meyer Luskin | 12,421,892 | 2,583,709 | 2,286,128 |
| David T. Feinberg | 14,618,039 | 387,572 | 2,286,128 |
| William F. Ballhaus | 14,695,499 | 310,102 | 2,286,128 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until our next annual meeting and until their successor is elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2011.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 17,225,945 | 22,424 | 43,360 | — |

The proposal was approved.

*3. Approval of the amendment and restatement of the Company's Amended and Restated 2006 Equity Participation Plan.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 13,348,101 | 1,591,707 | 65,793 | 2,286,128 |

The proposal was approved.

**Item 9.01. Financial Statements and Exhibits.**

**(d) Exhibits**

Exhibit 10.1 Amended and Restated 2006 Equity Participation Plan of OSI Systems, Inc.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 1, 2010

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| Exhibit 10.1 | Amended and Restated 2006 Equity Participation Plan of OSI Systems, Inc. |

# Exhibit 28

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1988 of 2711
DEF 14A 1 a2205782zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1989 of 2711

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1990 of 2711

OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 7, 2011

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 1, 2011, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 3, 2011 are entitled to vote at the Annual Meeting.

We have enclosed herewith a Notice of Annual Meeting of Stockholders, a Proxy Statement and a Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and named executive officers. We have also enclosed a copy of our Annual Report on Form 10-K for the fiscal year ended June 30, 2011, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 1991 of 2711

OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

---

**Date and Time:** 10:00 a.m., local time, on Thursday, December 1, 2011

**Location:** The Company's principal offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2012;

3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2011, as described in the accompanying Proxy Statement;

4. To conduct an advisory vote on the determination of the frequency of future advisory votes on the Company's executive compensation; and

5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 3, 2011, as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 1, 2011:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2011 are available *http://www.proxyvote.com*.

---

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2011 | 11 |
| Proposal No. 4 Advisory Vote on the Determination of the Frequency of the Advisory Vote on the Company's Executive Compensation | 13 |
| Compensation of Executive Officers and Directors | 14 |
| Security Ownership of Certain Beneficial Owners and Management | 32 |
| Independent Registered Public Accounting Firm | 34 |
| Report of Audit Committee | 35 |
| Code of Ethics and Conduct | 37 |
| Annual Meeting Attendance | 37 |
| Stockholder Communications | 37 |
| Availability of Annual Report on Form 10-K | 37 |
| Stockholder Proposals | 38 |
| Incorporation by Reference | 38 |
| Other Business | 38 |

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 1, 2011, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to its stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail.

Stockholders of record as of the close of business on October 3, 2011 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company, by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 3, 2011, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 19,645,145 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST," "ABSTAIN," "1 YEAR," "2 YEARS" or "3 YEARS" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, the Company's management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. Directors are elected by a plurality, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter under NASDAQ Stock Market ("NASDAQ") rules, and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One.

*Proposal Two*. To be approved, the ratification of Moss Adams LLP, as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter under NASDAQ rules, and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares where the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. To be approved, the proposal regarding the Company's executive compensation for the fiscal year ended June 30, 2011 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter under NASDAQ rules, and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that the stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about the Company's executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

*Proposal Four.* The proposal regarding the determination of the frequency of the advisory vote on the Company's executive compensation must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Stockholders are not voting to approve or disapprove the recommendation of the Board of Directors. Instead, stockholders are selecting one of the frequency alternatives (every year, every two years or every three years or abstaining). Proposal Four is considered a "non-routine" matter under NASDAQ rules, and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Four or to

vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Four. With respect to this item, if none of the frequency alternatives (every year, every two years or every three years) receives a majority of the votes cast, the Company will consider the frequency that receives the highest number of votes by stockholders to be the frequency that has been selected by the stockholders. This vote is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although the vote is non-binding, the Board of Directors values the opinions that the stockholders express in their votes and will take into account the outcome of the vote when considering how frequently the Company should conduct a vote on its executive compensation going forward. However, because this vote is advisory and not binding on the Company or the Board of Directors, the Board of Directors may decide that it is in the Company's and the stockholders' best interests to hold a vote on the Company's executive compensation more or less frequently than the option that receives the most votes from the stockholders.

The Company anticipates that the Notice of Internet Availability of Proxy Materials and the Proxy Materials will be mailed on or about October 11, 2011. All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 1, 2011:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2011, are available at *http://www.proxyvote.com*.

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority, *i.e.*, broker non-votes, will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 60 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 49 | Director, Executive Vice President and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 69 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 86 | Director | 1990 |
| David T. Feinberg(3) | 49 | Director | 2010 |
| William F. Ballhaus(1) | 66 | Director | 2010 |

(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of Nominating and Governance Committee
(4) Member of Executive Committee

**Business Experience**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director

because of his expertise in the field of electrical engineering as well as his long-standing experience managing the Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and experience managing the Company's Security division.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a consultant for the accounting firm of JH Cohn LLP. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of JH Cohn LLP) in 1976 and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, Inc., each of which is listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Myricom, Inc., a computer and network infrastructure company, and as a Director of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee and Director of the Orthopedic Hospital and is a Director of the Alliance for College-Ready Public Schools. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***David T. Feinberg*** has served as a Director of the Company since March 2010. Dr. Feinberg has served as the Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming this position, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA. Dr. Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Dr. Feinberg graduated *cum laude* in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his master of business administration from Pepperdine University in 2002. Dr. Feinberg was selected to serve as a director because of his knowledge of the healthcare industry and his experience managing a large, internationally-renown hospital system.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then as Chief Executive Officer of Aerospace Corporation, a nonprofit organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political and other risks. Risks are reported to the Board of Directors through the Company's executive officers, who are responsible for the identification, assessment and management of the Company's risks. The Board of Directors regularly discusses the risks reported by the Company's executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of risks related to accounting, auditing and financial reporting and maintaining effective internal controls for financial reporting. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions.

**Board Leadership Structure**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. The Company believes that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances the Company's ability to communicate its message

and strategy clearly and consistently to its stockholders, employees, and other companies with which it does business. Although the Company believes that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, it will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve the Company's best interests and the best interests of its stockholders. The Company does not have a lead independent director.

**Board of Directors Meetings and Committees of the Board of Directors**

There were five meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on three additional occasions during the fiscal year ended June 30, 2011. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee and Executive Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2011 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and NASDAQ director independence standards ("Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of Messrs. Good, Luskin and Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2011. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation

plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of Messrs. Luskin and Good. There were four meetings of the Compensation Committee and the Compensation Committee acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2011. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Good, Luskin and Feinberg. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2011.

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were four meetings of the Executive Committee during the fiscal year ended June 30, 2011.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn,

forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from the Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to the Company's Board of Directors to be voted on at this year's Annual Meeting. All of this year's nominees for director are currently directors of the Company. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of two non-employee directors, Messrs. Luskin and Good. No executive officer of the Company has served during the fiscal year ended June 30, 2011 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2011, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus, Jr. as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast by the holders of the Company's Common Stock present in person at the Annual Meeting or represented by proxy, and entitled to vote on the subject matter of the proposal.***

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2012 and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2012. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Annual Meeting.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2011**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") enables the Company's stockholders to vote to approve, on an advisory, non-binding basis, the Company's executive compensation for the fiscal year ended June 30, 2011 as disclosed in the Proxy Statement in accordance with the SEC's rules ("Say-on-Pay").

**Summary**

The Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. The Company is asking its stockholders to provide advisory approval of the Company's executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives. The Company believes that its compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the long-term interests of the stockholders. The Company urges the stockholders to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

The Company believes that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. In fiscal year 2011, the Company experienced growth in revenue, net income and earnings per share. The Company generated strong sales growth and ended fiscal year 2011 with a record backlog. In recent years, the Company has continued to outperformed the equity markets in general as well as outperform its industry peers. The Company believes that its continued success is closely tied to the performance of its executive officers and has designed its compensation practices in order to reward the executives for their contributions to the overall success of the Company.

**Alignment with Stockholders' Interests**

The Company grants equity awards as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of the stockholders. The Company has generally used restricted stock and stock options as its equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have a vesting period, which creates a strong retention incentive and helps ensure the continuity of the Company's operations.

**Recommendation**

The Board of Directors believes that the information provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that the Company's

executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2011. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting.***

**ADVISORY VOTE ON THE DETERMINATION OF THE FREQUENCY OF THE ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION**
***(Proposal No. 4 of the Proxy Card)***

The Dodd-Frank Act enables stockholders to indicate how frequently they believe the Company should seek future Say-on-Pay advisory votes (the "Say-on-Frequency"). Accordingly, the Company is seeking an advisory, non-binding determination from the stockholders as to the frequency with which the Company should present future Say-on-Pay advisory votes to the stockholders. The Company is providing stockholders the option of selecting a frequency of every one, two or three years, or abstaining. For the reasons described below, the Company recommends that the stockholders select a frequency of one year, or an annual vote.

The Board of Directors values constructive dialogue on executive compensation and other important governance topics with the Company's stockholders. The Board of Directors believes an advisory vote every year is appropriate because it will enable the stockholders to vote on the most recent executive compensation information that is presented in the Company's Proxy Statement, leading to more meaningful and timely communication between the Company and its stockholders on executive compensation matters. An annual advisory vote on executive compensation is consistent with the Company's policy of seeking input from, and engaging in discussions with, its stockholders on corporate governance matters and its executive compensation philosophy, policies and practices. Additionally, the Board of Director's determination was further based on the premise that this recommendation could be modified in future years if it becomes apparent that an annual frequency vote is not meaningful, burdensome or more frequent than dictated by best corporate governance practices.

As a stockholder, you have the choice to vote for one of the following choices, as indicated on the Proxy Card: to hold the Say-on-Frequency advisory vote on executive compensation every year, every two years or every three years, or you may abstain from voting.

While the Say-on-Frequency vote is advisory in nature and will not bind the Company to adopt any particular frequency, the Board of Directors intends to carefully consider the stockholder vote resulting from the proposal in determining how frequently the Company will hold future Say-on-Pay advisory votes.

***The Board of Directors recommends that you vote for "1 YEAR" as the determination on frequency for an advisory vote on the Company's executive compensation. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of an annual frequency. In order to be approved on an advisory basis, the frequency must be approved by the affirmative vote of the holders of a majority of the shares of Common Stock present and voting at the Meeting. If none of the frequency alternatives receives a majority of the votes cast, the Company will consider the frequency that receives the highest number of votes by stockholders to be the frequency that has been selected by the stockholders.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Compensation Discussion and Analysis

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the Named Executive Officers. Please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Overview of Compensation Philosophy and Guiding Principles*

The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee. The Compensation Committee is responsible for establishing and approving all compensation for the Named Executive Officers, including base salaries, annual incentive bonuses, long-term equity incentive compensation, benefits and perquisites, and other compensation.

Compensation for each of the Named Executive Officers (other than the Chief Executive Officer) is recommended to the Compensation Committee by the Chief Executive Officer. Compensation for the Chief Executive Officer is established by the Compensation Committee on its own.

Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. In general, the process by which the Compensation Committee makes decisions relating to executive compensation includes, but is not limited to, consideration of the factors set forth in the following table:

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of Long-term Goals | • Compensation Paid in Prior Years |
| • Individual Performance and Experience | • Financial Performance of Company / Division |
| • Demonstration of Leadership Skills and Ability | • Performance Relative to Benchmarks |
| • Achievement of Strategic Targets | |

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. The Compensation Committee assesses competitive market compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2011, the Compensation Committee engaged Veritas

Executive Compensation Consultants, LLC ("Veritas") for such purposes and reviewed certain proprietary Veritas analyses as well as the following published survey data:

- Mercer Human Resource Consulting – Executive Compensation Survey;
- Towers Watson Data Services – Top Management Compensation Survey; and
- World at Work – Salary Planning Survey.

The surveys reflect compensation levels and practices for executives holding comparable positions at the companies covered by the surveys. The survey data included: (i) base salary; (ii) annual bonus; (iii) total cash compensation; (iv) long-term incentives and (v) total compensation.

The Compensation Committee reviewed these surveys to obtain information regarding current compensation practices and to analyze how executive compensation for the Named Executive Officers compares to prevailing practices.

In implementing the Company's compensation program, the Compensation Committee seeks to achieve balance among the following factors, among others:

| Compensation Factors | Relative Weight |
|---|---|
| Alignment with Stockholder Interests | Primary Importance (overriding principle for all compensation decisions) |
| Accomplishment of Long-Term Strategic Goals and Objectives | Highly Important |
| Attracting and Retaining Executive Talent | Highly Important |
| Meeting Financial Targets | Important |
| Accomplishment of Near-Term Strategic Goals and Objectives | Important |

All compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving the Company's long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Executive Compensation Program Elements*

The particular elements of the compensation program for the Named Executive Officers consist of the following:

*Fixed Compensation*. Fixed compensation for Named Executive Officers consists principally of base salary. Base salary is set to attract and retain executive talent. It provides a fixed rate of pay and is generally not at risk of upward or downward adjustment until the following year. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted, typically on an annual basis, to reflect sustained individual performance. In determining whether base salary increases for fiscal year 2011 were appropriate, the Compensation Committee considered the Company's general financial performance, the minimum base salary amount provided for in the Named Executive Officer's

employment agreement (for those Named Executive Officers that have entered into employment agreements with the Company), as well as a subjective determination of each Named Executive Officer's responsibilities, past performance and expected future contributions.

Fixed base salary is intended to compensate the Named Executive Officers for their ongoing responsibilities. The Compensation Committee believes that annual incentive bonuses and long-term compensation/equity awards, on the other hand, provide executives with the opportunity for substantial rewards for achieving successful performance and has tended to rely more on those elements than on year-to-year base salary adjustments to reward executives for individual or Company performance.

*Variable Compensation.* Variable compensation for Named Executive Officers consists principally of annual incentive bonuses and long-term incentive compensation in the form of equity based awards. In determining variable compensation, the Compensation Committee considers both qualitative and quantitative factors, including the following:

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Quality of the Management of Units or Functions Managed by the Named Executive Officer | • Financial Performance (including earnings per share and internal metrics) |
| • Leadership of Personnel Under the Named Executive Officer's Management | • Financial Performance Metrics for Business Units Managed by the Named Executive Officer |
| • Execution of Strategically Important Projects | • Compensation Surveys Provided by External Advisors |
| • Overall Effectiveness of Units or Functions Managed by the Named Executive Officer | |
| • Contributions to the Formulation of Company Strategy and Tactics | |
| • Contributions to Stockholder Value | |
| • Management of Risk | |

Named Executive Officers are eligible for an annual incentive bonus. Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement and near-term success.

The particular performance achievements for each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed by the Compensation Committee. The Compensation Committee also reviews and approves the amounts to be paid to each of the Named Executive Officers, based on the Chief Executive Officer's recommendation. The performance achievements for the Chief Executive Officer are established by the Compensation Committee. The Compensation Committee also reviews and approves the amounts to be paid to the Chief Executive Officer.

Having agreed on the performance achievements, the Compensation Committee also assesses the value that each of the Named Executive Officers provided through the generation of new sources of revenue, achievement of operational efficiencies, management of risk and completion of strategic initiatives. The annual incentive bonus earned for fiscal year 2011 by each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

The Company's long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the long-term interests of the

Company's stockholders, namely the achievement of sustainable, long-term stock price appreciation. The Company's long-term incentive program consists of periodic grants of restricted stock and stock options which are made at the discretion of the Compensation Committee under the Company's Amended and Restated 2006 Equity Participation Plan (the "Equity Plan").

The size and timing of grants for each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed and approved by the Compensation Committee. The size and timing of grants for the Chief Executive Officer are established by the Compensation Committee.

Decisions regarding the amount of the grant and other discretionary aspects of the grant take into consideration Company performance, the Named Executive Officer's level of responsibility, the ability of the individual to affect overall financial performance and the nature and terms of grants made in prior years. However, the Compensation Committee also considers a number of factors that are not directly tied to the performance of the Named Executive Officer, including the number and value of equity grants previously made under the Equity Plan, dilution effects on the Company's stockholders and prevailing practices in the market.

All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under the Equity Plan, fair market value is determined by the closing price of the Company's Common Stock on such dates. Equity awards typically vest in a series of installments over a three or four-year vesting period. The Compensation Committee believes that this vesting period provides an incentive for the Named Executive Officers to remain with the Company and also focuses the Named Executive Officers on the long-term performance and business objectives of the Company for the benefit of stockholders.

During fiscal year 2011, the fair market value of awards given to each of the Named Executive Officers increased as compared to the awards given in fiscal year 2010, primarily because of the Company's improved financial and operational performance. The Compensation Committee believes that the amount of each Named Executive Officer's equity awards is consistent with the Company's compensation objectives of aligning incentives with the desired individual performance of the Named Executive Officer, the Company's long-term financial goals and factors that create long-term stockholder value.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Equity Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the

Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*

The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and Company performance.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze. The terms of each of such agreements are summarized below under the heading "Employment Agreements."

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on the Company's use of equity-based awards. This consideration factored heavily in the Company's decision with respect to stock options grants made in fiscal year 2011. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

**Business Experience of Executive Officers**

The following table sets forth the names, ages and positions of each of the Company's Named Executive Officers:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra | 60 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick | 43 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra | 49 | Director, Executive Vice President and President of Security division |
| Victor Sze | 44 | Executive Vice President and General Counsel |
| Manoocher Mansouri | 55 | President of Optoelectronics and Manufacturing division |

***Deepak Chopra*** is President and Chief Executive Officer of the Company. Biographical information regarding Mr. Chopra is set forth under "Election of Directors."

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Biographical information regarding Mr. Mehra is set forth under "Election of Directors."

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

**Summary Compensation Table**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, and the three highest paid executive officers of the Company serving as executive officers on June 30, 2011 for the fiscal year ended June 30, 2011 (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (2)($) | Option Awards ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3) ($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2011 | 1,000,000 | 1,300,000 | 1,966,200 | — | 418,357 | 104,526 | 4,789,083 |
| Chairman, President and | 2010 | 1,000,000 | 1,000,000 | 982,200 | — | 1,033,041 | 85,894 | 4,101,135 |
| Chief Executive Officer | 2009 | 1,000,000 | 900,000 | 522,360 | 332,611 | 2,037,409 | 86,864 | 4,879,244 |
| Alan Edrick | 2011 | 388,500 | 360,000 | 813,600 | 368,000 | — | 100,910 | 2,031,010 |
| Executive Vice President and | 2010 | 363,923 | 300,000 | 245,550 | 478,550 | — | 55,177 | 1,443,200 |
| Chief Financial Officer | 2009 | 350,769 | 285,000 | 177,500 | 244,045 | — | 58,514 | 1,115,828 |
| Ajay Mehra | 2011 | 396,000 | 360,000 | 1,084,800 | — | — | 120,705 | 1,961,505 |
| Executive Vice President | 2010 | 384,461 | 300,000 | 245,550 | 478,550 | — | 84,796 | 1,493,357 |
| of the Company and President of Security division | 2009 | 378,942 | 285,000 | 177,500 | 244,045 | — | 83,465 | 1,168,952 |
| Victor S. Sze | 2011 | 345,000 | 300,000 | 549,180 | 248,400 | — | 104,291 | 1,546,871 |
| Executive Vice President, | 2010 | 334,349 | 272,000 | 163,700 | 309,650 | — | 65,256 | 1,144,955 |
| General Counsel and Secretary | 2009 | 326,826 | 240,000 | 120,050 | 163,599 | — | 63,118 | 913,593 |
| Manoocher Mansouri | 2011 | 266,500 | 100,000 | 488,160 | — | — | 73,867 | 928,527 |
| President of Optoelectronics | 2010 | 265,085 | 45,000 | 122,775 | 168,900 | — | 38,204 | 639,964 |
| and Manufacturing division | 2009 | 237,500 | 60,000 | 78,450 | — | — | 34,694 | 410,644 |

(1) The Company has eliminated from this table the column titled "Non-Equity Incentive Plan Compensation" because no amounts would have been included in such column.

(2) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year.

(3) The Company adopted the Defined Benefit Plan during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2011 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Equity Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2011 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,900 | 1,780 | 4,857 | 9,553 | 83,436 | 104,526 |
| Alan Edrick | 81,314 | 2,851 | — | 6,477 | 10,268 | 100,910 |
| Ajay Mehra | 83,712 | 6,675 | — | 17,757 | 12,561 | 120,705 |
| Victor S. Sze | 74,592 | 12,000 | — | 7,731 | 9,968 | 104,291 |
| Manoocher Mansouri | 55,009 | 7,200 | — | 6,576 | 5,082 | 73,867 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2010 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contribution(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 5,260 | 1,780 | 6,866 | 8,645 | 63,343 | 85,894 |
| Alan Edrick | 39,929 | 2,850 | — | 4,226 | 8,172 | 55,177 |
| Ajay Mehra | 42,962 | 5,563 | — | 25,278 | 10,993 | 84,796 |
| Victor S. Sze | 39,377 | 12,000 | — | 6,649 | 7,230 | 65,256 |
| Manoocher Mansouri | 22,855 | 7,200 | — | 5,861 | 2,288 | 38,204 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2009 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,600 | 1,780 | 4,963 | 9,229 | 66,292 | 86,864 |
| Alan Edrick | 37,326 | 2,850 | — | 7,705 | 10,633 | 58,514 |
| Ajay Mehra | 42,494 | 6,675 | — | 21,579 | 12,717 | 83,465 |
| Victor S. Sze | 37,632 | 12,000 | — | 4,476 | 9,010 | 63,118 |
| Manoocher Mansouri | 20,869 | 6,000 | — | 5,537 | 2,288 | 34,694 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2014 of 2711

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2011 to each of our Named Executive Officers(1):

| Name<br>Position | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(2)(#) | All Other Option Awards: Number of Securities Underlying Options (3)(#) | Exercise or Base Price of Option Awards (4)($/Sh) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 8/11/2010 | 72,500 | — | — | 1,966,200 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 8/11/2010<br>8/11/2010 | 30,000<br>— | —<br>40,000 | —<br>27.12 | 813,600<br>368,000 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 8/11/2010 | 40,000 | — | — | 1,084,800 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 8/11/2010<br>8/11/2010 | 20,250<br>— | —<br>27,000 | —<br>27.12 | 549,180<br>248,400 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 8/11/2010 | 18,000 | — | — | 488,160 |

(1) The Company has eliminated from this table the columns titled "Estimated Future Payouts Under Non-Equity Incentive Plan Awards" and "Estimated Future Payouts Under Equity Incentive Plan Award" because no amounts would have been included in such columns.

(2) Restricted stock awards vest over a period of four years from the date of grant.

(3) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(4) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(5) The grant date fair value of the stock options and restricted stock was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2011(1):

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable(#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price(3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested(4)(#) | Market Value of Shares or Units of Stock That Have Not Vested(5)($) |
| Deepak Chopra | 9,756 | — | 26.81 | 11/21/2011 | — | — |
| Chairman, President and | 60,000 | — | 20.02 | 9/16/2017 | — | — |
| Chief Executive Officer | 53,333 | 26,667 | 12.52 | 1/11/2019 | — | — |
| | — | — | — | — | 139,833 | 6,012,819 |
| Alan Edrick | 4,429 | — | 17.99 | 7/30/2011 | — | — |
| Executive Vice President | 6,163 | — | 26.81 | 11/21/2011 | — | — |
| and Chief Financial Officer | 48,000 | — | 20.02 | 9/16/2017 | — | — |
| | 14,000 | — | 23.18 | 2/7/2018 | — | — |
| | 6,667 | 3,333 | 20.92 | 7/28/2018 | — | — |
| | 26,667 | 13,333 | 12.52 | 1/11/2019 | — | — |
| | 28,334 | 56,666 | 16.37 | 8/31/2019 | — | — |
| | — | 40,000 | 27.12 | 8/10/2020 | | |
| | — | — | — | — | 48,708 | 2,094,444 |
| Ajay Mehra | 20,077 | — | 18.53 | 2/5/2012 | — | — |
| Executive Vice President | 32,000 | — | 20.02 | 9/16/2017 | — | — |
| of the Company and President of Security division | 14,000 | — | 23.18 | 2/7/2018 | — | — |
| | 6,667 | 3,333 | 20.92 | 7/28/2018 | — | — |
| | 13,333 | 13,333 | 12.52 | 1/11/2019 | — | — |
| | 28,334 | 56,666 | 16.37 | 8/31/2019 | — | — |
| | — | — | — | — | 58,458 | 2,513,694 |
| Victor S. Sze | 1,559 | — | 26.81 | 11/21/2011 | — | — |
| Executive Vice President, | 24,000 | — | 20.02 | 9/16/2017 | — | — |
| General Counsel and Secretary | 10,000 | — | 23.18 | 2/7/2018 | — | — |
| | 3,333 | 1,667 | 20.92 | 7/28/2018 | — | — |
| | 20,000 | 10,000 | 12.52 | 1/11/2019 | — | — |
| | 18,334 | 36,666 | 16.37 | 8/31/2019 | — | — |
| | — | 27,000 | 27.12 | 8/10/2020 | | |
| | — | — | — | — | 32,917 | 1,415,431 |
| Manoocher Mansouri | 7,500 | — | 23.18 | 2/7/2018 | — | — |
| President, | 5,657 | 20,000 | 16.37 | 8/31/2019 | — | — |
| Optoelectronics and Manufacturing division | — | — | — | — | 25,344 | 1,089,792 |

(1) The Company has eliminated from this table the columns titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options," "Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested" and "Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested" because no amounts would have been included in such columns.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2016 of 2711

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.
(4) Restricted stock awards vest over periods ranging between three and four years from the date of grant.
(5) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2011, multiplied by the closing price of the Company's Common Stock on June 30, 2011 ($43.00 per share).

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2011:

| | **Option Awards** | | **Stock Awards** | |
|---|---|---|---|---|
| **Name and Principal Position** | **Number of Shares Acquired on Exercise** | **Value Realized on Exercise(1)($)** | **Number of Shares Acquired on Vesting** | **Value Realized on Vesting(2)($)** |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 236,169 | 4,609,922 | 32,333 | 1,053,595 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 39,436 | 828,933 | 8,708 | 289,727 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 46,659 | 904,192 | 8,458 | 281,797 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 38,442 | 838,110 | 5,791 | 194,278 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 8,567 | 169,808 | 4,219 | 137,102 |

(1) Represents the difference between the fair market price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.
(2) Represents the number of restricted stock awards that vested multiplied by the fair market price of the Company's Common Stock on the date of vesting.

**Pension Benefits**

The Company maintains the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, commencing on the first day of the month following the date that he turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For each full year of service that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333 up to a maximum annual benefit of $600,000. If Mr. Chopra terminates his employment with the Company within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2018 of 2711

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2011(1):

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 4 | 3,488,807 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted the Deferred Compensation Plan in May 2008. Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants.

Participants receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Company's 401(k) Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2011 ranged from 0.1% to 28.8%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2011:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 46,771 | 76,194(3) | 65,782 | — | 343,426 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 47,931 | 78,531(4) | 74,140 | — | 379,885 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 43,205 | 69,642(5) | 63,063 | — | 326,247 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 40,986 | 52,740(6) | 16,008 | 37,960 | 219,164 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.
(2) Represents earnings during the fiscal year ended June 30, 2011.
(3) Includes $38,694 matching contribution and $37,500 discretionary contribution.
(4) Includes $39,531 matching contribution and $39,000 discretionary contribution.
(5) Includes $35,642 matching contribution and $34,000 discretionary contribution.
(6) Includes $30,740 matching contribution and $22,000 discretionary contribution.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra and Sze.

*Deepak Chopra's Employment Agreement*

On January 6, 2010, the Company entered into its current employment agreement with Mr. Chopra. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement. The agreement provides for a base salary to be determined each year by the Company. Mr. Chopra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for two years thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may

also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonus and incentive compensation; (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options and equity grants from the Company to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)).

The Company maintains the Defined Benefit Plan, the purpose of which is to provide specified payments to participants following retirement, termination in connection with a change in control of the Company, or the participant's death or disability. Currently, Mr. Chopra is the only employee that participates in this plan. Under the terms of his participation, commencing on the first day of the month following the date that he turns 65, Mr. Chopra will be paid $500,000 per year for 10 years. For every year that Mr. Chopra continues his employment with the Company past the age 65, Mr. Chopra's benefit will increase by $33,333. However, in no event will his total yearly benefit exceed $600,000. If Mr. Chopra terminates his employment with the Company within two years of a "change in control" (as defined in the plan), he will be entitled to receive, in a single lump-sum payment, the net present value of his accrued benefit. If Mr. Chopra remains in the service of the Company for more than two years following a change in control, his benefit will continue as scheduled. If a change in control occurs after Mr. Chopra's retirement and prior to or during his distributions under the Defined Benefit Plan, he will receive an accelerated payment of the net present value of all remaining distributions.

*Alan Edrick's, Ajay Mehra's and Victor Sze's Employment Agreements*

On September 22, 2008, the Company entered into its current employment agreement with each of Messrs. Edrick and Sze. On September 14, 2009, the Company entered into its current employment agreement with Mr. Mehra. For purposes of this section, Messrs. Edrick, Mehra and Sze are each individually referred to as the "Executive." The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the Company will employ the Executive until the later of (i) the third anniversary of the date of the agreement or (ii) one year following the date that the Company notifies the Executive of its election to end the term of the agreement. The agreement provides for a base salary to be determined each year by the Company. The Executive is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for two years thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 60 days within any six-month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 18 months salary at the Executive's then-current base salary; (ii) an amount equal to 1.5 times the average bonus paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive and an extension of time to exercise such stock options such that the Executive's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) an amount equal to 24 months salary at the Executive's then-current base salary; (ii) an amount equal to twice the average of bonuses paid by the Company to the Executive in the three years preceding such termination; and (iii) the acceleration of vesting of all stock options and equity grants from the Company to the Executive, and such stock options shall remain exercisable by the Executive for no less than 12 months after the date of such termination. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)).

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2011, and that employment terminated on such date. The tables also assume that the price of the Company's Common Stock, on which certain calculations in the following tables are made, was the closing price of the Company's Common Stock on that date ($43.00).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Equity Grants($) | Accelerated Vesting($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(2) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 3,300,000 | 4,231,757 | 6,825,629 | 287,085 | 17,644,471 |
| | Good Reason or Without Cause in Connection with a Change in Control(3) | 3,000,000 | 3,300,000 | 4,231,757 | 6,825,629 | 287,085 | 17,644,471 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2011, for performance in the fiscal year ended June 30, 2011.

(2) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 65, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(3) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra and Sze.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Accelerated Vesting($) | Total($) |
|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 603,000 | 472,500 | 4,718,642 | 5,794,142 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 630,000 | 4,718,642 | 6,152,642 |
| Ajay Mehra Executive Vice President of the Company and President of Security division | Good Reason or Without Cause | 603,000 | 472,500 | 4,502,692 | 5,578,192 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 630,000 | 4,502,692 | 5,936,692 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 525,000 | 406,000 | 3,162,214 | 4,093,214 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 700,000 | 541,333 | 3,162,214 | 4,403,547 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2011, for performance in the fiscal year ended June 30, 2011.

(2) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2011, each non-employee director that served as a director for the full fiscal year, received a fee of $45,000 for his year of service, 3,500 shares of restricted Common Stock, and $2,000 for each Board of Directors meeting attended.

Each member of the Audit Committee received a fee of $2,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received a fee of $10,000 per year.

Each member of the Compensation Committee received a fee of $2,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received a fee of $10,000 per year.

Each member of the Nominating and Governance Committee received a fee of $2,000 for each Nominating and Governance Committee meeting attended.

Each member of the Executive Committee received a fee of $15,000 per year and 3,000 shares of restricted Common Stock.

All restricted stock awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2011 for each non-employee member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 98,000 | 176,280 | — | 274,280 |
| Meyer Luskin | 98,000 | 176,280 | — | 274,280 |
| David T. Feinberg | 57,000 | 94,920 | — | 151,920 |
| William F. Ballhaus | 63,000 | 94,920 | — | 157,920 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2011 by Mr. Chopra and his wife. The Company paid the business approximately $60,000 for such services during the year ended June 30, 2011. Additionally, the Company contracts for a portion of its printing services from a business that was owned during the year ended June 30, 2011 by Mr. Chopra's father-in-law. The Company paid the business approximately $31,000 for such services during the year ended June 30, 2011. Further, a subsidiary of the Company is leasing warehouse space on a month-to-month basis for approximately $3,000 per month from an entity controlled by Mr. Chopra.

The Company believes that the foregoing transactions were on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company would be on terms at least as favorable to the Company as those that can be obtained from unaffiliated third parties.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

We have reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, we recommend to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2011 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| Wells Fargo & Company(2) | 1,497,087 | 7.4% |
| BlackRock, Inc.(3) | 1,390,879 | 6.9% |
| Waddell & Reed Financial, Inc.(4) | 1,205,345 | 5.9% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2011, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) As reported in a Schedule 13F-HR filed on August 12, 2011 with the SEC. The address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94163.

(3) As reported in a Schedule 13F-HR filed on July 27, 2011 with the SEC by three subsidiaries of BlackRock, Inc. The address of BlackRock, Inc. is 40 East 52nd St., New York, NY 10022.

(4) As reported in a Schedule 13F-HR filed on August 12, 2011 with the SEC. The address of Waddell & Reed Financial, Inc. is 6300 Lamar Avenue, Overland Park, KS 66202.

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2011 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 756,043 | 3.7% |
| Ajay Mehra(4) | 328,592 | 1.6% |
| Alan Edrick(5) | 283,463 | 1.4% |
| Victor S. Sze(6) | 193,483 | 0.9% |
| Manoocher Mansouri(7) | 90,699 | 0.4% |
| Steven C. Good(8) | 41,475 | 0.2% |
| Meyer Luskin(9) | 98,985 | 0.4% |
| David Feinberg(10) | 7,010 | 0.0% |
| William F. Ballhaus(11) | 7,000 | 0.0% |
| All directors and executive officers as a group (9 persons) | 1,806,750 | 8.6% |

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2011, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other

person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company. Includes 65,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 25,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 260,165 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, 118,164 are held directly by Mr. Chopra and 164,625 shares of unvested restricted stock granted between September 17, 2007 and September 9, 2011 are held individually by Mr. Chopra.

(4) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division.

(5) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company.

(7) Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division.

(8) Mr. Good is a Director of the Company.

(9) Mr. Luskin is a Director of the Company. Includes 79,360 shares held by The Meyer and Doreen Luskin Family Trust, and 14,625 shares of unvested restricted stock granted between September 17, 2007 and September 9, 2011 are held individually by Mr. Luskin.

(10) Dr. Feinberg is a Director of the Company.

(11) Dr. Ballhaus is a Director of the Company.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2011, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that during the year ended June 30, 2011, Mr. Edrick untimely filed two Form 4 reports, and Messrs. Mehra and Sze each untimely filed one Form 4 report.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements and for the years ended June 30, 2010 and 2011 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2010 | FY 2011 |
|---|---|---|
| Audit Fees | $ 995 | $ 995 |
| Audit-Related Fees | 14 | 2 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 1,009 | $ 997 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services related to projects other than statutory and regulatory filings. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2011, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2011.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the Audit Committee asks them to address and discusses their responses to several questions that the Audit Committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?

- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?

- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal control and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2011 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2011, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which code applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's 2005 Annual Report on Form 10-K filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of the Company's directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement may be delivered to multiple stockholders sharing an address unless the Company has received contrary instructions from one or more of the stockholders at that address. The Company will undertake to deliver promptly upon written or oral request a separate copy of the Annual Report and/or Proxy Statement, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to the Secretary of the Company at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports or Proxy Statements if they are receiving multiple copies of Annual Reports or Proxy Statements by directing such request to the same mailing address.

**STOCKHOLDER PROPOSALS**

In the event that a stockholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next annual meeting of stockholders, the proposal must be delivered in writing to the Secretary of the Company and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to the Company would be June 13, 2012, which is 120 days prior to the one-year anniversary of the mailing date of this Proxy Statement.

The Company's Bylaws provide that if a stockholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to the Company no more than 120 days and no less than 90 days prior to December 1, 2012, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 1, 2012, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 7, 2011

Broadridge Corporate Issuer Solutions
1717 Arch St., Ste. 1300
Philadelphia, PA 19103

Investor Address Line 1
Investor Address Line 2
Investor Address Line 3
Investor Address Line 4
Investor Address Line 5
John Sample
1234 ANYWHERE STREET
ANY CITY, ON A1A 1A1

1 1 OF 2

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

CONTROL # → 000000000000

| NAME | SHARES |
|---|---|
| THE COMPANY NAME INC. - COMMON | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS A | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS B | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS C | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS D | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS E | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - CLASS F | 123,456,789,012.12345 |
| THE COMPANY NAME INC. - 401 K | 123,456,789,012.12345 |

PAGE 1 OF 2

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS: ☒

KEEP THIS PORTION FOR YOUR RECORDS

THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.

DETACH AND RETURN THIS PORTION ONLY

The Board of Directors recommends you vote FOR the following:

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 David T. Feinberg
06 William F. Ballhaus

02 0000000000

The Board of Directors recommends you vote FOR proposals 2 and 3.

| | For | Against | Abstain |
|---|---|---|---|
| 2 Ratification of the appointment of Moss Adams LLP as the company's independent registered public accounting firm for the fiscal year ending June 30, 2012. | ☐ | ☐ | ☐ |
| 3 Advisory vote on the company's executive compensation for the fiscal year ended June 30, 2011. | ☐ | ☐ | ☐ |

The Board of Directors recommends you vote 1 YEAR on the following proposal:

| | 1 year | 2 years | 3 years | Abstain |
|---|---|---|---|---|
| 4 Advisory vote on the determination of the frequency of the advisory vote on the company's executive compensation. | ☐ | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Investor Address Line 1
Investor Address Line 2
Investor Address Line 3
Investor Address Line 4
Investor Address Line 5
John Sample
1234 ANYWHERE STREET
ANY CITY, ON A1A 1A1

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

0000115680_1 R1.0.0.11699

Signature [PLEASE SIGN WITHIN BOX] Date

JOB #

Signature (Joint Owners) Date

SHARES
CUSIP #
SEQUENCE #

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com .

OSI SYSTEMS, INC.
Annual Meeting of Stockholders
December 1, 2011 10:00 A.M.
This proxy is solicited by the Board of Directors

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 1, 2011 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2 and 3 and "1 YEAR" for proposal 4 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000115680_2 R1.0.0.11699

**Continued and to be signed on reverse side**

# Exhibit 29

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2035 of 2711
8-K 1 a11-30953_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 1, 2011**

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 1, 2011. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 14,902,060 | 1,163,218 | 2,113,749 |
| Ajay Mehra | 15,521,142 | 544,136 | 2,113,749 |
| Steven C. Good | 15,365,421 | 699,857 | 2,113,749 |
| Meyer Luskin | 13,516,085 | 2,549,193 | 2,113,749 |
| David T. Feinberg | 15,741,114 | 324,164 | 2,113,749 |
| William F. Ballhaus | 15,740,922 | 324,356 | 2,113,749 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2012.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 18,148,043 | 27,097 | 3,887 | 0 |

The proposal was approved.

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2011.*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 15,488,392 | 550,213 | 26,673 | 2,113,749 |

The proposal was approved.

*4. Advisory vote on the determination of the frequency of the advisory vote on the Company's executive compensation.*

| 1 Year | 2 Years | 3 Years | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| 14,677,154 | 21,449 | 1,349,734 | 16,941 | 2,113,749 |

In light of the voting results with respect to the frequency of stockholder votes on executive compensation, the Company's Board of Directors has decided that the Company will hold an annual advisory vote on the compensation of named executive officers.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 1, 2011

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

# Exhibit 30

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2039 of 2711

DEF 14A 1 a2211409zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 23, 2012

Dear Stockholder:

    You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 12, 2012, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 15, 2012 are entitled to vote at the Annual Meeting.

    We have enclosed herewith a Notice of Annual Meeting of Stockholders, a Proxy Statement and a Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and named executive officers. We have also enclosed a copy of our Annual Report on Form 10-K for the fiscal year ended June 30, 2012, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

    Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

    You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

    Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

---

**Date and Time:** 10:00 a.m., local time, on Wednesday, December 12, 2012

**Location:** The Company's principal offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To approve the OSI Systems, Inc. 2012 Incentive Award Plan;

3. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2013;

4. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2012, as described in the accompanying Proxy Statement; and

5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 15, 2012 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2012:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2012 are available *http://www.proxyvote.com*.

---

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Approval of OSI Systems, Inc. 2012 Incentive Award Plan | 11 |
| Proposal No. 3 Ratification of Selection of Independent Registered Public Accounting Firm | 17 |
| Proposal No. 4 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2012 | 18 |
| Compensation of Executive Officers and Directors | 20 |
| Security Ownership of Certain Beneficial Owners and Management | 46 |
| Independent Registered Public Accounting Firm | 49 |
| Report of Audit Committee | 50 |
| Code of Ethics and Conduct | 52 |
| Annual Meeting Attendance | 52 |
| Stockholder Communications | 52 |
| Availability of Annual Report on Form 10-K | 52 |
| Stockholder Proposals | 52 |
| Incorporation by Reference | 53 |
| Other Business | 53 |

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

---

# PROXY STATEMENT

---

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 12, 2012, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to its stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. The Company anticipates that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 26, 2012.

Stockholders of record as of the close of business on October 15, 2012 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 15, 2012, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 19,990,702 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST" or "ABSTAIN" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual

Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, the Company's management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. Directors are elected by a plurality, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One.

*Proposal Two*. To be approved, the proposal to ratify the OSI Systems, Inc. 2012 Incentive Award Plan must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy at the Annual Meeting and cast at the Annual Meeting. Proposal Two is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Two or to vote the clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. To be approved, the ratification of Moss Adams LLP as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Three as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three.

*Proposal Four.* To be approved, the proposal regarding the Company's executive compensation for the fiscal year ended June 30, 2012 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Four is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Four or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Four. The vote on Proposal Four is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that the stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about the Company's executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the

expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2012:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2012 are available at *http://www.proxyvote.com*.

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 61 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 50 | Director, Executive Vice President and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 70 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 87 | Director | 1990 |
| David T. Feinberg(3)(5) | 50 | Director | 2010 |
| William F. Ballhaus(1)(2)(5) | 67 | Director | 2010 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Executive Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor

Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing the Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and experience managing the Company's Security division.

***Steven C. Good*** has served as a Director of the Company since September 1987. He is a consultant for the accounting firm of JH Cohn LLP. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of JH Cohn LLP) in 1976 and has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, Inc., each of which is listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. Mr. Luskin currently also serves as a Director of Myricom, Inc., a computer and network infrastructure company, and as a Director of the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. Mr. Luskin also serves as a trustee and Chairman of the Board of the Orthopedic Hospital. Mr. Luskin is also a Director of the advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***David T. Feinberg*** has served as a Director of the Company since March 2010. Dr. Feinberg has served as the Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming this position, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA. Dr. Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Dr. Feinberg graduated *cum laude* in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his master of business administration from Pepperdine University in 2002. Dr. Feinberg was

selected to serve as a director because of his knowledge of the healthcare industry and his experience managing a large, internationally-renown hospital system.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political and other risks. Risks are reported to the Board of Directors through the Company's executive officers, who are responsible for the identification, assessment and management of the Company's risks. The Board of Directors regularly discusses the risks reported by the Company's executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of risks related to accounting, auditing and financial reporting and maintaining effective internal control over financial reporting. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. The Company believes that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In

addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances the Company's ability to communicate its message and strategy clearly and consistently to its stockholders, employees, and other companies with which it does business. Although the Company believes that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, it will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve the Company's best interests and the best interests of its stockholders. The Company does not have a lead independent director.

**Board of Directors Meetings, Independence and Committees of the Board of Directors**

There were five meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2012. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2012 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of Messrs. Good and Luskin and Dr. Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2012. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of Messrs. Luskin and Good and Dr. Ballhaus. There were ten meetings of the Compensation Committee and the Compensation Committee acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2012. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Good and Luskin and Dr. Feinberg. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2012.

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were twelve meetings of the Executive Committee during the fiscal year ended June 30, 2012.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board of Directors regarding all technology-based matters. The Technology Committee consists of Drs. Ballhaus and Feinberg. There were three meetings of the Technology Committee during the fiscal year ended June 30, 2012.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from the Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to the Company's Board of Directors to be voted on at this year's Annual Meeting. All of this year's nominees for director are currently directors of the Company. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors, Messrs. Luskin and Good and Dr. Ballhaus. No executive officer of the Company has served during the fiscal year ended June 30, 2012 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2012, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus, Jr. as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

**APPROVAL OF OSI SYSTEMS, INC.**
**2012 INCENTIVE AWARD PLAN**
***(Proposal No. 2 of the Proxy Card)***

**Introduction**

The Company is interested in establishing and maintaining strong corporate governance practices, including with respect to equity awards granted to the Company's executive officers. For this reason, the Board of Directors adopted on September 25, 2012 (the "Effective Date"), subject to stockholder approval, the 2012 Incentive Award Plan (the "2012 Plan"). Awards under the 2012 Plan provide employees, consultants and directors an opportunity to acquire or increase their ownership stake in the Company, and the Board of Directors believes this aligns their interests with those of the Company's stockholders, creating strong incentives to achieve goals that result in consistent stockholder returns. The Company believes that adopting the 2012 Plan is in the best interests of the Company in light of its growth and the continuing need to provide equity-based incentives to attract and retain the most qualified personnel. A copy of the 2012 Plan is included as Appendix A to this Proxy Statement.

Upon stockholder approval of the 2012 Plan, the Company will freeze its existing Amended and Restated 2006 Equity Participation Plan (the "2006 Plan"), and no further grants will be made under the 2006 Plan. As of October 8, 2012, in aggregate, 959,517 stock options were outstanding with a weighted average exercise price of $24.39 and a weighted average remaining term of 7.1 years, and 666,747 full value awards were outstanding. Other than the 2006 Plan, the Company has no other incentive award plans. Any awards granted under the 2006 Plan between October 8, 2012 and the date of stockholder approval of the 2012 Plan will be depleted from the 2012 Plan share pool.

The Company is asking stockholders to approve the 2012 Plan in order to satisfy the requirements of the Listing Standards of The NASDAQ Stock Market ("NASDAQ") and to satisfy the requirement that stockholders approve "performance-based" compensation under Section 162(m) of the Internal Revenue Code of 1986, as amended ("Section 162(m)"). If the stockholders do not approve this proposal, the 2006 Plan will continue in full force and effect and the Company may continue to grant awards under the 2006 Plan.

Stockholder approval of the 2012 Plan is only one of several requirements under Section 162(m) that must be satisfied for grants under the 2012 Plan to qualify for the "performance-based" compensation exemption under Section 162(m), and submission of the material terms of the 2012 Plan's performance goals for stockholder approval should not be viewed as a guarantee that the Company will be able to deduct all compensation under the 2012 Plan. Nothing in this proposal precludes the Company or the Compensation Committee from making any payment or granting awards that do not qualify for tax deductibility under Section 162(m).

The material terms of the 2012 Plan are summarized below and qualified in their entirety by reference to the 2012 Plan attached as Appendix A to this Proxy Statement.

**Material Terms of the 2012 Plan**

*Eligibility and Administration.* The Company's employees, consultants and directors are eligible to receive awards under the 2012 Plan. As of October 1, 2012, there were approximately 4,052 employees, including five named executive officers, and four non-employee directors eligible to receive awards under the 2012 Plan. The 2012 Plan is administered by the Board of Directors with respect to awards to non-employee directors and by the Compensation Committee with respect to other participants, each of which may delegate its duties and responsibilities to committees of the Company's directors and/or officers (all such bodies and delegates referred to collectively as the plan administrator), subject to certain limitations that may be imposed under Section 162(m), Section 16 of the Exchange Act and/or stock exchange rules, as applicable. The plan administrator has the authority to make all determinations and

interpretations under, prescribe all forms for use with, and adopt rules for the administration of, the 2012 Plan, subject to its express terms and conditions. The plan administrator also sets the terms and conditions of all awards under the 2012 Plan, including any vesting and vesting acceleration conditions.

*Limitation on Awards and Shares Available.* No awards may be granted under the 2012 Plan prior to the date on which the Company's stockholders approve the 2012 Plan. The aggregate number of shares of the Company's Common Stock that are available for issuance under awards granted pursuant to the 2012 Plan equals the sum of (i) 3,850,000 shares minus (ii) any shares of the Company's Common Stock delivered in settlement of awards granted pursuant to the 2006 Plan during the period beginning on the effective date of the 2012 Plan and ending immediately prior to the time the Company's stockholders approve the 2012 Plan, plus (iii) any shares of the Company's Common Stock subject to awards outstanding under the 2006 Plan that terminate, expire or lapse for any reason on or after stockholder approval of the 2012 Plan (up to a maximum of 2,220,000 shares). Any shares delivered in settlement of awards of options, stock appreciation rights ("SARs") or similar awards which do not deliver the full share value at grant of the underlying shares will be counted against this limit as one share for every one share granted. Any shares that are delivered in settlement of restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award (other than options, SARs or similar awards for which the recipient must pay the grant-date intrinsic value) will be counted against this limit as 1.87 shares for every one share granted. Shares subject to awards under the 2012 Plan that are forfeited, expire or are settled for cash may be used again for new grants under the 2012 Plan, and will be added back to the 2012 Plan's share limit in the same number of shares as were debited from the share limit in respect of the grant of such awards. (1) Shares subject to a SAR or stock option that are not issued in connection with the stock settlement of the SAR or stock option on its exercise, (2) shares purchased on the open market with the cash proceeds from the exercise of options, and (3) shares tendered or withheld to satisfy exercise price or tax withholding obligations associated with an award, in any case, may not be used again for new grants of awards. Shares granted under the 2012 Plan may be treasury shares, authorized but unissued shares, or shares purchased in the open market. The Company will cease granting any awards under the 2006 Plan upon approval by the stockholders of the 2012 Plan.

Awards granted under the 2012 Plan upon the assumption of, or in substitution for, awards authorized or outstanding under a qualifying equity plan maintained by an entity with which the Company enters into a merger or similar corporate transaction will not reduce the shares available for grant under the 2012 Plan. The maximum number of shares of the Company's Common Stock that may be subject to one or more awards granted to any one participant pursuant to the 2012 Plan during any calendar year will be 250,000 and the maximum amount that may be paid in cash pursuant to the 2012 Plan to any one participant during any calendar year period will be $15,000,000.

*Awards.* The 2012 Plan provides for the grant of stock options, including incentive stock options and nonqualified stock options, restricted stock, dividend equivalents, restricted stock units ("RSUs"), other incentive awards and SARs and cash awards. Certain awards under the 2012 Plan may constitute or provide for a deferral of compensation, subject to Section 409A of the Internal Revenue Code, which may impose additional requirements on the terms and conditions of such awards. All awards under the 2012 Plan are or will be set forth in award agreements, which detail the terms and conditions of the awards, including any applicable vesting and payment terms and post-termination exercise limitations. Awards other than cash awards are generally settled in shares of the Company's Common Stock, but the plan administrator may provide for cash settlement of any award. A brief description of each award type follows.

- *Stock Options.* Stock options provide for the purchase of shares of the Company's Common Stock in the future at an exercise price set on the grant date. Incentive stock options, by contrast to nonqualified stock options, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Internal Revenue Code are satisfied. The exercise price of a stock option may not be less than 100% of the fair

market value of the underlying share on the date of grant (or 110% in the case of incentive stock options granted to certain significant stockholders), except with respect to certain substitute options granted in connection with a corporate transaction. The term of a stock option may not be longer than ten years (or five years in the case of incentive stock options granted to certain significant stockholders). Vesting conditions determined by the plan administrator may apply to stock options and may include continued service, performance and/or other conditions.

- *Stock Appreciation Rights*. SARs entitle their holder, upon exercise, to receive from the Company an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The exercise price of a SAR may not be less than 100% of the fair market value of the underlying share on the date of grant (except with respect to certain substitute SARs granted in connection with a corporate transaction) and the term of a SAR may not be longer than ten years. Vesting conditions determined by the plan administrator may apply to SARs and may include continued service, performance and/or other conditions.

- *Restricted Stock and Restricted Stock Units*. Restricted stock is an award of nontransferable shares of the Company's Common Stock that remain forfeitable unless and until specified conditions are met. RSUs are contractual promises to deliver shares of the Company's Common Stock in the future, which may also remain forfeitable unless and until specified conditions are met. Delivery of the shares underlying RSUs may be deferred under the terms of the award or at the election of the participant if the plan administrator permits such a deferral. Vesting conditions determined by the plan administrator may apply to restricted stock and RSUs and may include continued service, performance and/or other conditions.

- *Other Incentive Awards and Cash Awards*. Other incentive awards are awards other than those enumerated in this summary that are denominated in, linked to or derived from shares of the Company's Common Stock or value metrics related to the Company's shares, and may remain forfeitable unless and until specified conditions are met. Cash awards are cash incentive bonuses subject to performance goals.

- *Dividend Equivalents*. Dividend equivalents represent the right to receive the equivalent value of dividends paid on shares of the Company's Common Stock and may be granted alone or in tandem with awards. Dividend equivalents are credited as of dividend payment dates during the period between the date an award is granted and the date such award vests, is exercised, is distributed or expires, as determined by the plan administrator. Dividend equivalents on performance awards shall not be paid unless and until performance metrics are met. Dividend equivalents may not be granted on options or SARS.

*Performance Awards*. Performance awards include any of the foregoing awards that are granted subject to vesting and/or payment based on the attainment of specified performance goals. The plan administrator will determine whether performance awards are intended to qualify as "performance-based" compensation ("QPBC") within the meaning of Section 162(m), in which case the applicable performance criteria will be selected from the list below in accordance with the requirements of Section 162(m).

In order to constitute QPBC under Section 162(m), in addition to certain other requirements, the relevant amounts must be payable only upon the attainment of pre-established, objective performance goals set by the Compensation Committee and linked to stockholder-approved performance criteria. For purposes of the 2012 Plan, one or more of the following performance criteria will be used in setting performance goals applicable to QPBC, and may be used in setting performance goals applicable to other performance awards: (i) net earnings (either before or after one or more of the following: (a) interest, (b) taxes, (c) depreciation, (d) amortization and (e) non-cash equity-based compensation); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder

return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for the Company or any operating unit of the Company or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices. The 2012 Plan also permits the plan administrator to provide for objectively determinable adjustments to the applicable performance criteria in setting performance goals for QPBC awards.

*Certain Transactions.* The plan administrator has broad discretion to equitably adjust the provisions of the 2012 Plan, as well as the terms and conditions of existing and future awards, to prevent the dilution or enlargement of intended benefits and facilitate necessary or desirable changes in the event of certain transactions and events affecting the Company's Common Stock, such as stock dividends, stock splits, mergers, acquisitions, consolidations and other corporate transactions. In addition, in the event of certain non-reciprocal transactions with the Company's stockholders known as "equity restructurings," the plan administrator will make equitable adjustments to the 2012 Plan and outstanding awards. In the event of a change in control of the Company (as defined in the 2012 Plan), the surviving entity must assume outstanding awards or substitute economically equivalent awards for such outstanding awards; however, if the surviving entity declines to assume or substitute for some or all outstanding awards, then all such awards will vest in full and be deemed exercised (as applicable) upon the transaction. Individual award agreements may provide for additional accelerated vesting and payment provisions.

*Foreign Participants, Transferability, Repricing and Participant Payments.* The plan administrator may modify award terms, establish subplans and/or adjust other terms and conditions of awards, subject to the share limits described above, in order to facilitate grants of awards subject to the laws and/or stock exchange rules of countries outside of the United States. With limited exceptions for estate planning, domestic relations orders, certain beneficiary designations and the laws of descent and distribution, awards under the 2012 Plan are generally non-transferable prior to vesting and exercisable only by the participant. Except in connection with certain corporate transactions, the 2012 Plan does not permit the repricing or cancelation of options or SARS in exchange for cash or other awards without stockholder approval when the option or SAR price per share exceeds the fair market value of the underlying shares. With regard to tax withholding, exercise price and purchase price obligations arising in connection with awards under the 2012 Plan, the plan administrator may, in its discretion, accept cash or check, shares of the Company's Common Stock that meet specified conditions, a "market sell order" or such other consideration as it deems suitable.

*Plan Amendment and Termination.* The Board of Directors may amend or terminate the 2012 Plan at any time; however, except in connection with certain changes in the Company's capital structure, stockholder approval will be required for (i) any amendment that increases the number of shares available under the 2012 Plan, and (ii) any amendment that reduces the price per share of any outstanding option or SAR granted under the 2012 Plan or that cancels any stock option or SAR in exchange for cash or another award when the option or SAR price per share exceeds the fair market value of the underlying shares. After the tenth anniversary of the Effective Date of the 2012 Plan, no incentive stock options may be granted; however, the 2012 Plan does not have a specified expiration and will otherwise continue in effect until terminated by the Company.

*Programs.* The 2012 Plan provides that the plan administrator may establish programs under the 2012 Plan which contain the terms and conditions intended to govern a specified type of award granted under the 2012 Plan. Programs may be established to govern awards tied to specific performance goals and business criteria under the umbrella of the 2012 Plan. In all cases, these programs will be consistent with the terms of the 2012 Plan.

**Summary of Federal Income Tax Consequences of the 2012 Plan**

Following is a brief description of the principal United States federal income tax consequences related to grants made under the 2012 Plan and certain other United States federal income tax issues. Some kinds of taxes, such as state, local and foreign income taxes and federal employment taxes, are not discussed. Tax laws are complex and subject to change and may vary depending on individual circumstances and from locality to locality. **The summary does not discuss all aspects of federal income taxation that may be relevant in light of a holder's personal circumstances. It is not intended as tax advice for award recipients, who should consult their own tax advisors.**

- *Nonqualified Stock Options*. An award recipient will not be subject to tax at the time a nonqualified stock option is granted, and no tax deduction will then be available to the Company. Upon the exercise of a nonqualified stock option, an amount equal to the difference between the exercise price and the fair market value of the shares acquired on the date of exercise will be included in the recipient's ordinary income and the Company will generally be entitled to deduct the same amount. Upon disposition of shares acquired upon exercise, any appreciation or depreciation after the date of exercise will generally constitute a capital gain or capital loss for the holder of the shares.

- *Incentive Stock Options (ISOs)*. An award recipient will not be subject to regular income tax at the time an ISO is granted or exercised, and no tax deduction will then be available to the Company; however, the recipient may be subject to the alternative minimum tax on the excess of the fair market value of the shares received upon exercise of the ISO over the exercise price. Upon disposition of the shares acquired upon exercise of an ISO, capital gain or capital loss will generally be recognized by the recipient in an amount equal to the difference between the sale price and the exercise price, as long as the recipient has not disposed of the shares within two years after the date of grant or within one year after the date of exercise and has been employed by the Company at all times from the grant date until the date three months before the date of exercise (one year in the case of permanent disability). If the recipient disposes of the shares without satisfying both the holding period and employment requirements, the recipient will recognize ordinary income at the time of the disposition equal to the excess of the amount realized over the exercise price but, in the case of a failure to satisfy the holding period requirement, not more than the excess of the fair market value of the shares on the date the ISO is exercised over the exercise price, with any remaining gain or loss being treated as capital gain or capital loss. The Company is not entitled to a tax deduction upon either the exercise of an ISO or upon disposition of the shares acquired pursuant to such exercise, except to the extent that the participant recognizes ordinary income on a disqualifying disposition of the shares.

- *Other Awards*. The current federal income tax consequences of other awards authorized under the 2012 Plan generally follow certain basic patterns: SARs are taxed and deductible in substantially the same manner as nonqualified stock options; nontransferable restricted stock subject to a substantial risk of forfeiture results in income recognition equal to the excess of the fair market value over the price paid, if any, only at the time the restrictions lapse (unless the recipient elects to accelerate recognition as of the date of grant); RSUs, dividend equivalents, and performance awards are generally subject to tax at the time of payment. Compensation otherwise effectively deferred is taxed when paid (other than employment taxes which are generally paid at the time such compensation is deferred or, if later, vested). In each of the foregoing cases, the Company will generally have a corresponding deduction at the time the participant recognizes income, subject to Section 162(m) with respect to covered employees.

**Interest of Certain Persons in Matters to Be Acted Upon; New Plan Benefits**

The Company's directors and executive officers have an interest in the proposal to approve the 2012 Plan, as each would be eligible to receive awards under the 2012 Plan.

As of the date hereof, the Company cannot determine the benefits or amounts that will be received by or allocated to any individual or group resulting from the approval of the 2012 Plan. In order to determine the aggregate number of shares subject to awards which would have been granted to certain individuals and groups under the 2012 Plan had the 2012 Plan been in effect during the Company's last fiscal year, which ended June 30, 2012, see the summary compensation table, grants of plan-based awards table and director compensation table included in this Proxy Statement.

**Equity Compensation Plans**

The following table provides information concerning the Company's equity compensation plans as of June 30, 2012.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 1,059,397(1) | $ 23.01 | 1,090,876(2) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 1,059,397 | $ 23.01 | 1,090,876 |

(1) Consists of shares of the Company's Common Stock issuable upon exercise of options under the 2006 Plan.

(2) Of the 1,090,876 securities remaining available for future issuance under the 2006 Plan, 604,167 shares are available to be issued as restricted stock.

***The Board of Directors recommends that you vote "FOR" the approval of OSI Systems, Inc. 2012 Incentive Award Plan. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2060 of 2711
Table of Contents

**RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 3 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2013 and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2013. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2012**
***(Proposal No.4 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") enables the Company's stockholders to vote to approve, on an advisory, non-binding basis, the Company's executive compensation for the fiscal year ended June 30, 2012 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act ("Say-on-Pay"). The Company currently conducts this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at the Company's next annual meeting of stockholders following the 2012 Annual Meeting.

**Summary**

The Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. The Company is asking its stockholders to provide advisory approval of the Company's executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives. The Company believes that its compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the long-term interests of the stockholders.

The Company urges the stockholders to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

The Company believes that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. In fiscal year 2012, the Company experienced growth in revenue, net income and earnings per share. The Company generated strong sales growth and ended fiscal year 2012 with a record backlog. In recent years, the Company has continued to outperform the equity markets in general as well as outperform its industry peers. The Company believes that its continued success is closely tied to the performance of its executive officers and has designed its compensation practices in order to reward the executives for their contributions to the overall success of the Company.

**Alignment with Stockholders' Interests**

The Company grants annual incentive bonuses based in part on each executive's contribution to enhancing long-term stockholder value. The Company also grants long-term incentives in the form of equity awards as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of the stockholders. The Company has generally used restricted stock and stock options as its equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have a vesting period, which creates a strong retention incentive and helps ensure the continuity of the Company's operations. For fiscal year

2012, long-term equity incentives consisted of three components: stock options subject to time vesting, restricted stock subject to time vesting, and restricted stock subject to performance vesting based on growth of EBITDA. For fiscal year 2013, long-term equity incentives will be 100% performance vesting.

**Long-Term Performance**

In order to promote the Company's philosophy of pay-for-performance and furthering its objective of aligning the interests of management with those of the stockholders, the Company established a performance program for certain of its executive officers. The program focuses on the achievement of the Company's long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, the Company is incentivizing its officers to achieve the Company's long-term corporate objectives and ultimately increase stockholder value.

**Recommendation**

The Board of Directors believes that the information provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that the Company's executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2012. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Compensation Discussion and Analysis

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the Named Executive Officers.

The following table sets forth the names, ages and positions of each of the Company's Named Executive Officers:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra | 61 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick | 44 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra | 50 | Director, Executive Vice President and President of Security division |
| Victor Sze | 45 | Executive Vice President and General Counsel |
| Manoocher Mansouri | 56 | President of Optoelectronics and Manufacturing division |

For additional information, please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Executive Compensation Summary*

*Fiscal 2012 Performance*

Fiscal 2012 was an excellent year for the Company. During fiscal 2012, the Company (a) substantially increased its revenues and, in addition, further improved sustainability of revenues by growing the Company's addressable markets; (b) actively leveraged its business infrastructure to support new products and revenue sources while maintaining intelligent cost management; and (c) continued building a foundation for future growth by making targeted investments in new product development and acquisitions, all of which resulted in the third consecutive year of record earnings.

*Growth in Revenues and Markets*. In fiscal 2012, in addition to growing revenues by 21% over the prior year, the Company continued to expand its addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and the Company believes it will continue to serve, to sustain growth even through periods such as the past year, when many sectors of the global economy, including much of the rest of the security inspection industry, experienced significant headwinds. Examples include:

- Significantly expanding the Company's turnkey security screening services business by way of a groundbreaking six-year screening services program in Mexico. The screening services business is an integrated technology-and-services model that is strongly differentiated from any other offering in the security inspection market.

- Entering new, previously-unaddressed markets such as the computed tomography (CT) hold baggage screening market with the revolutionary Rapiscan RTT®, and the trace detection market by completing development of the HE50™, a generational leap forward in user-friendly, cost effective trace detection.

- Continuing the development and launch of an entire new generation of healthcare products, each of which will embody significant innovations in form and function. This ambitious program began in fiscal 2011 with the introduction of the Company's Xprezzon® monitoring platform, and continued in this past year with products such as the qube™ compact monitor, the Arkon™ anesthesia machine, and the AriaTele™ telemetry transmitter, all of which are indications of the exciting, highly differentiated products yet to come.

*Leverage Business Infrastructure*. Even as the Company launched new products, entered new markets, and invested substantial amounts in R&D and the pre-revenue start-up of the Mexico screening services program, the Company actively leveraged its business infrastructure and maintained intelligent cost management, resulting in a significantly improved operating income margin of 8.3% as compared to 7.3% in the prior year.

*Building a Foundation for the Future*. While improving the Company's operating and net income margins during fiscal 2012, the Company continued to make significant targeted investments in R&D and acquisitions. Such investments in the past have led to the Company's introduction of the aforementioned RTT and HE50, as well as the ongoing end-to-end renewal of its healthcare product line. The Company believes that these investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

The results of the assertive and dynamic management of the Company are seen in the Company's financial outcomes, particularly considering the state of the overall global economy in the period since the economic downturn that began in late 2008. During this period of economic uncertainty, the Company's stockholders have witnessed strong growth in revenues, earnings per share, and stock price.

This strong and consistent growth is reflected in an increase in the Company's stock price of more than 200% over the three years ending in fiscal 2012. Moreover, the Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business that will position the Company to sustain growth into the coming years.

As a result of the particularly strong performance in fiscal 2012, which represented a significant enhancement over and above a highly successful fiscal 2011, it is the view of the Compensation Committee that fiscal 2012 variable compensation for the Named Executive Officers should be commensurately increased as compared to variable compensation for fiscal 2011.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee. The Compensation Committee is responsible for establishing and approving all compensation for the Named Executive Officers, including base salaries, annual incentive bonuses, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of the Named Executive Officers (other than the Chief Executive Officer) is recommended to the Compensation Committee by the Chief Executive Officer. Compensation for the Chief Executive Officer is established by the Compensation Committee on its own.

Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape.

*Executive Compensation Methodology*

The Compensation Committee takes into account various qualitative and quantitative indicators of corporate and individual performance in determining the level and composition of compensation to be paid to the Named Executive Officers. In general, the process by which the Compensation Committee

makes decisions relating to executive compensation includes, but is not limited to, consideration of the factors set forth in the following table:

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of Long-term Goals | • Compensation Paid in Prior Years |
| • Individual Performance and Experience | • Financial Performance of Company / Division |
| • Demonstration of Leadership Skills and Ability | • Performance Relative to Benchmarks |
| • Achievement of Strategic Targets | |

The Compensation Committee also evaluates the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. The Compensation Committee assesses competitive market compensation against executive compensation surveys prepared by outside compensation consultants engaged by the Compensation Committee. During the year ended June 30, 2012, the Compensation Committee engaged Veritas Executive Compensation Consultants, LLC ("Veritas") for such purposes and reviewed certain proprietary Veritas analyses as well as the following published survey data:

- Mercer Human Resource Consulting – Executive Compensation Survey;
- Towers Watson Data Services – Top Management Compensation Survey; and
- World at Work – Salary Planning Survey.

The surveys reflect compensation levels and practices for executives holding comparable positions at the companies covered by the surveys. The survey data included: (i) base salary; (ii) annual bonus; (iii) total cash compensation; (iv) long-term incentives and (v) total compensation.

The Compensation Committee reviewed such data to obtain information regarding current compensation practices and to analyze how executive compensation for the Named Executive Officers compares to prevailing practices.

For the fiscal year ending June 30, 2013, the Compensation Committee engaged Frederic W. Cook & Co., Inc. to provide consulting services and advice regarding executive compensation matters.

All compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving the Company's long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Executive Compensation Program Elements*

The particular elements of the compensation program for the Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with the Company's pay-for-performance philosophy, the Company structures its compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation, in the form of annual cash incentives and both time-vesting and performance-based equity grants, comprises a significant percentage of total compensation.

The following is an overview of the elements of the Company's compensation and benefits programs for fiscal 2012:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Cash Annual Incentives | Cash-based annual incentives that are determined based on Company and individual performance, subject to achievement of a pre-determined threshold rate of return on book value of the Company. |
| Long-Term Incentives | The fiscal 2012 program with respect to the Named Executive Officers consists of a mix of stock options, time-vested restricted stock, and performance-vested restricted stock.<br>• Stock options vest 33% per year over three years and expire 10 years from the date of grant.<br>• Time-vested restricted stock vests 25% per year over four years.<br>• Performance-vested restricted stock is earned based on EBITDA-based metrics for each of the three years following grant, as well as an aggregate three-year metric.<br>The fiscal 2013 program will consist of 100% performance-vested restricted stock. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2012, perquisites included car allowances and membership dues. Membership dues were discontinued during fiscal 2013. |
| Retirement | 401(k) retirement plan, which includes a Company match.<br>Nonqualified deferred compensation plan that permits the deferral of salary and cash bonuses at executive officers' election and permits a Company match.<br>Nonqualified defined benefit plan, of which the CEO is the only participant. |

In fiscal 2012, fixed compensation comprised approximately 16% to 36% and variable compensation comprised approximately 64% to 84% of each Named Executive Officer's total compensation.

*Fixed Compensation.* Fixed compensation is intended to compensate the Named Executive Officers for their ongoing responsibilities and consists principally of base salary. Base salary is set to attract and retain executive talent. It provides a fixed rate of pay and is generally not at risk of upward or downward adjustment until the following year. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted, typically on an annual basis, to reflect sustained individual performance. In determining whether base salary increases for fiscal year 2012 were appropriate, the Compensation Committee considered the Company's general financial performance, the minimum base salary amount provided for in the Named Executive Officer's employment agreement (for those Named Executive Officers that had employment agreements with the Company at such time), as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions.

*Variable Compensation.* Variable compensation provides the Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive bonuses and long-term incentive compensation in the form of equity based awards.

*Annual Incentive Bonuses.* All Named Executive Officers are eligible for an annual incentive bonus pursuant to the Company's annual performance bonus program. Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement and near-term success. In determining annual incentive bonuses for the Named Executive Officers, the Compensation Committee considers the rate of return on the book value of the Company. If a pre-established threshold rate of return is exceeded for a particular fiscal year, cash bonuses may be allocated among the participating executives. Such rate of return excludes the effect of specifically identified operations and product development programs. With respect to grants awarded for fiscal 2012 and beyond, all such grants are contingent on stockholder approval of the 2012 Plan, and no such bonus may exceed maximum amounts of 300% of base salary for the Chief Executive Officer and 200% of base salary for the other participating executives. Moreover, no such grants may be awarded unless the Company achieves a minimum of $10 million in pre-tax net income. The Compensation

Committee retains negative discretion to reduce any awards under the annual performance bonus program to a lesser award or no award to any participant.

In determining the amounts of annual incentive bonuses, the Compensation Committee also considers individual performance, which may include the following quantitative and qualitative factors:

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Quality of the Management of Units or Functions Managed by the Named Executive Officer | • Financial Performance (including earnings per share and internal metrics) |
| • Leadership of Personnel Under the Named Executive Officer's Management | • Financial Performance Metrics for Business Units Managed by the Named Executive Officer |
| • Execution of Strategically Important Projects | • Compensation Surveys Provided by External Advisors |
| • Overall Effectiveness of Units or Functions Managed by the Named Executive Officer | |
| • Contributions to the Formulation of Company Strategy and Tactics | |
| • Contributions to Stockholder Value | |
| • Management of Risk | |

The particular performance achievements for each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed by the Compensation Committee. The performance achievements for the Chief Executive Officer are established by the Compensation Committee. The Compensation Committee also reviews and approves the amounts to be paid to the Chief Executive Officer.

The Compensation Committee also assesses the value that each of the Named Executive Officers provided through the generation of new sources of revenue, achievement of operational efficiencies, management of risk and completion of strategic initiatives. The annual incentive bonus earned for fiscal year 2012 by each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Program.* In order to further promote the Company's philosophy of pay-for-performance and furthering its objective of aligning its executive compensation with the Company's long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of the Named Executive Officer, the Company has a long-term incentive program. For fiscal year 2012, this program consisted of three elements: stock options subject to time vesting, restricted stock subject to time vesting, and restricted stock subject to performance vesting based on growth of EBITDA. For fiscal year 2013, the long-term program is 100% performance vesting restricted stock based on growth of EBITDA.

For fiscal year 2012, the Compensation Committee determined the amount of the stock option grants and time vesting restricted stock grants for each of the Named Executive Officers (other than the Chief Executive Officer) based upon the recommendation of the Chief Executive Officer. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the quantitative and qualitative factors set forth in "Annual Incentive Bonuses" above, as well as overall corporate performance. In determining the allocation of such grants between stock options and restricted stock, the Compensation Committee considers each executive's risk tolerance and stated

preference for equity vehicle. Awards of time vesting restricted stock under the long-term incentive program are subject to achievement of a pre-determined threshold return on book value of the Company consistent with the threshold for the award of annual incentive bonuses.

Time vesting restricted stock grants awarded after fiscal 2012, if any, are subject to individual caps of 300% of base salary for the Chief Executive Officer and 200% of base salary for the other participating executives, and are granted on condition of exceeding a threshold adjusted rate of return on book value, as well as a minimum requirement of $10 million of Company pre-tax net income, in the preceding fiscal year. The Compensation Committee retains negative discretion to reduce any such awards under the long-term incentive program to a lesser award or no award to any participant.

*Six-year Performance Program.* With respect to performance-based awards, the Compensation Committee has established a six-year program for long-term performance-based incentive grants for the Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each grant will have a performance-based component, which vests based on the achievement of certain one-, two- and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. Such metrics will exclude the effect of particular designated operations for which specific incentive programs are established; at this time, the only such designated operation is the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill. The performance-based component will vest if three-year baseline metrics are achieved. For each grant, additional shares may be earned if annual baselines are exceeded as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 105% to 110% | Vested shares equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares equaling 50% of initial grant would be awarded |

However, if actual three-year performance falls below baseline, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 95% to 99.9% | 10% of shares would be forfeited |
| 90% to 94.9% | 25% of shares would be forfeited |
| 85% to 89.9% | 65% of shares would be forfeited |
| Below 85% | 100% of shares would be forfeited |

For actual performance in fiscal 2012, each of the Named Executive Officers earned additional shares, as follows: Mr. Chopra, 13,500 shares; Mr. Edrick, 7,500 shares; Mr. Mehra, 7,500 shares; Mr. Sze, 5,000 shares; and Mr. Mansouri, 600 shares.

In the event of a change of control, the initial grant of the performance-based component would vest upon the change of control; to the extent actual performance has exceeded baseline for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed baseline by the same percentage for the purposes of awarding additional incentive shares in connection with the change of control.

The grants to the Named Executive Officers during fiscal 2013 were performance-based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for the Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving performance and business objectives of the Company for the benefit of its stockholders. Grants are contingent upon stockholder approval of the 2012 Plan.

The Compensation Committee will determine, after consultation with the Chief Executive Officer, the number of equity awards to grant to the Named Executive Officers. For performance share calculation purposes, the Chief Executive Officer, Chief Financial Officer and General Counsel will be measured against consolidated Company performance, and division Presidents will have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance with the exception of the President of Rapiscan whose performance will be weighted 70% based on consolidated Company performance and 30% based on division performance in order to effectively compensate him for his role in overall corporate performance.

The Company's overall long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the long-term interests of the Company's stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under the Company's equity incentive plan as in effect on the date of grant (the "Equity Plan"), fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Mexico SAT Incentive Program.* For the fiscal years 2013 through 2017, the Company has established an incentive program tied to the performance of the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive Program"). The Mexico SAT Incentive Program was adopted in July 2013, and is contingent on stockholder approval of the 2012 Plan. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of certain metrics based on the operating income of the services for the Mexico Servicio de Administración Tributaria. The metrics require such operating income, as a percentage of revenue, to significantly exceed operating income margin for the Company as a whole before any incentives are awarded, and are thus believed to be challenging, but achievable. The Mexico SAT Incentive Program consists of three components that may be awarded to certain Named Executive Officers upon achievement of performance criteria: a short-term component, a long-term component, and a "contract award bonus".

If the threshold operating income amount is exceeded for a particular fiscal year, and dependent on the amount by which such threshold operating income is exceeded, a bonus pool would be established for certain Named Executive Officers. The bonus pool, if any, would be allocated among participating executives. For each such executive, 70% of the annual bonus allocation would comprise the short-term component. Half of the short-term component would be paid to that executive within 75 days of the end of the fiscal year in which it is earned, and the other half would be paid to that executive within 75 days of the end of the following year, provided that the executive has not resigned prior to the date of such payments. The long-term component would constitute the remaining 30% of the executive's annual bonus allocation, and would not be paid until 2018, if the executive has not previously resigned. The amount of the long-term component would be divided by $50.17, representing the baseline value of the Company's stock prior to public disclosure of the Company's contract with the Servicio de Administración Tributaria. The resulting figure would then be multiplied by the per-share price of the Company's stock as of December 31, 2017, and the product would constitute the final value of the long-term component.

The contract award bonus would be based on five-and-a-half year cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. If the threshold cumulative operating income is exceeded, and dependent on the amount by which such operating income is exceeded, a "CAB" bonus pool would be established. The CAB bonus pool, if any, would be allocated among participating executives. The CAB bonuses, if any, for each executive would be paid in January 2018, provided that the executive has not resigned prior to the payment.

In the event of a change of control: (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the change of control; (b) a pro-rata CAB bonus would be paid based on the operating income for the two quarters preceding the change of control; (c) the remaining value of the Mexico SAT Incentive Program would be calculated by imputing the operating income for the 12 months preceding the change of control to the period that is the shorter of (i) the 24 months after the change of control or (ii) the remainder of the term of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria (or, in the case of the CAB bonus, until December 31, 2017), and establishing bonus pools based on such data.

In the event that a participating executive's participation in the Mexico SAT Incentive Program is terminated, for reasons other than by the executive's voluntary resignation or the termination of that executive's employment for cause, then (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the termination; (b) a further annual bonus and CAB amount calculated by imputing performance for the 12 months preceding the termination to the period equal to the remainder of the then-current fiscal year plus an additional 12 months, provided that such period does not extend beyond the end of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria for the calculation of the annual bonus amount, and December 31, 2017 for calculation of the CAB amount. Such amounts would be paid within 45 days of the termination.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. For matching contribution amounts, see summary compensation table and related footnotes. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan)

upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix.* The Compensation Committee believes that the elements described above provide a well proportioned mix of equity-based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity-based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and Company performance.

*Minimum Equity Ownership Guidelines*

The Company believes that its Named Executive Officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of the Company's stockholders. Accordingly, the Company has established requirements that Named Executive Officers own equity of the Company valued at three times their respective annual base salaries. The Company believes that this multiple constitutes significant amounts for its Named Executive Officers and provides a substantial link between the interests of its Named Executive Officers and those of the Company's stockholders. The Company periodically reviews its minimum equity ownership guidelines. Based on the Company's review from leading stockholder advisory groups, the Company increased the minimum equity ownership guideline for its Named Executive Officers from a multiple of two times annual base salary to three times annual base salary. As of June 30, 2012, each of the Named Executive Officers met or exceeded the Company's minimum equity ownership guidelines.

*Employment Agreements*

During fiscal 2012, the Company entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri. The terms of each of such agreements are summarized below under the heading "Employment Agreements." Employment agreements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on the Company's use of equity-based awards. This consideration factored heavily in the Company's decision with respect to stock options grants made in fiscal year 2012. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with

respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

*Additional Information Regarding the Named Executive Officers*

***Deepak Chopra*** is President and Chief Executive Officer of the Company. Biographical information regarding Mr. Chopra is set forth under "Election of Directors."

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Biographical information regarding Mr. Mehra is set forth under "Election of Directors."

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

**Summary Compensation Table**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, and the three highest paid executive officers of the Company serving as executive officers on June 30, 2012 for the fiscal years ended June 30, 2012, 2011 and 2010 (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (2)($) | Option Awards ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3) ($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2012 | 1,000,000 | 1,750,000 | 2,218,920 | 606,600 | 1,287,536 | 171,010 | 7,034,066 |
| Chairman, President and | 2011 | 1,000,000 | 1,300,000 | 1,966,200 | — | 418,357 | 104,526 | 4,789,083 |
| Chief Executive Officer | 2010 | 1,000,000 | 1,000,000 | 982,200 | — | 1,033,041 | 85,894 | 4,101,135 |
| Alan Edrick | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | 111,736 | 2,628,936 |
| Executive Vice President and | 2011 | 388,500 | 360,000 | 813,600 | 368,000 | — | 100,910 | 2,031,010 |
| Chief Financial Officer | 2010 | 363,923 | 300,000 | 245,550 | 478,550 | — | 55,177 | 1,443,200 |
| Ajay Mehra | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | 131,373 | 2,648,573 |
| Executive Vice President | 2011 | 396,000 | 360,000 | 1,084,800 | — | — | 120,705 | 1,961,505 |
| of the Company and | 2010 | 384,461 | 300,000 | 245,550 | 478,550 | — | 84,796 | 1,493,357 |
| President of Security division | | | | | | | | |
| Victor S. Sze | 2012 | 350,000 | 350,000 | 672,400 | 404,400 | — | 115,373 | 1,892,173 |
| Executive Vice President, | 2011 | 345,000 | 300,000 | 549,180 | 248,400 | — | 104,291 | 1,546,871 |
| General Counsel and | 2010 | 334,349 | 272,000 | 163,700 | 309,650 | — | 65,256 | 1,144,955 |
| Secretary | | | | | | | | |
| Manoocher Mansouri | 2012 | 270,500 | 70,000 | 403,440 | — | — | 78,586 | 822,526 |
| President of Optoelectronics | 2011 | 266,500 | 100,000 | 488,160 | — | — | 73,867 | 928,527 |
| and Manufacturing division | 2010 | 265,085 | 45,000 | 122,775 | 168,900 | — | 38,204 | 639,964 |

(1) The Company has eliminated from this table the column titled "Non-Equity Incentive Plan Compensation" because no amounts would have been included in such column.

(2) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the fiscal year ended June 30, 2012 for a discussion of the assumptions used in valuation of stock options and stock awards.

(3) The Company initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2011 to June 30, 2012 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2012 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan, and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. Further, the Named Executive Officers are eligible to participate in the Deferred Compensation Plan, and the Company may provide matching and discretionary contributions under such plan. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2012 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 5,199 | 1,780 | 5,652 | 10,675 | 147,704 | 171,010 |
| Alan Edrick | 89,000 | 2,850 | — | 8,417 | 11,469 | 111,736 |
| Ajay Mehra | 89,016 | 6,675 | — | 17,382 | 18,300 | 131,373 |
| Victor S. Sze | 77,726 | 12,000 | — | 15,016 | 10,631 | 115,373 |
| Manoocher Mansouri | 58,209 | 7,200 | — | 7,006 | 6,171 | 78,586 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2011 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,900 | 1,780 | 4,857 | 9,553 | 83,436 | 104,526 |
| Alan Edrick | 81,314 | 2,851 | — | 6,477 | 10,268 | 100,910 |
| Ajay Mehra | 83,712 | 6,675 | — | 17,757 | 12,561 | 120,705 |
| Victor S. Sze | 74,592 | 12,000 | — | 7,731 | 9,968 | 104,291 |
| Manoocher Mansouri | 55,009 | 7,200 | — | 6,576 | 5,082 | 73,867 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2010 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contribution(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 5,260 | 1,780 | 6,866 | 8,645 | 63,343 | 85,894 |
| Alan Edrick | 39,929 | 2,850 | — | 4,226 | 8,172 | 55,177 |
| Ajay Mehra | 42,962 | 5,563 | — | 25,278 | 10,993 | 84,796 |
| Victor S. Sze | 39,377 | 12,000 | — | 6,649 | 7,230 | 65,256 |
| Manoocher Mansouri | 22,855 | 7,200 | — | 5,861 | 2,288 | 38,204 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

## Grants of Plan-Based Awards Table

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2012 to each of the Named Executive Officers(1):

| Name Position | Grant Date | Estimated Future Payouts under Equity Incentive Plan Awards(9) Threshold (#)(6) | Target (#)(7) | Maximum (#)(8) | All Other Stock Awards: Number of Shares of Stock or Units (2)(#) | All Other Option Awards: Number of Securities Underlying Options (3)(#) | Exercise or Base Price of Option Awards (4)($/Sh) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 9/9/2011 | — | 27,000 | 67,500 | — | — | — | 907,740 |
| Chairman, President and | 9/9/2011 | — | — | — | 39,000 | — | — | 1,311,180 |
| Chief Executive Officer | 9/9/2011 | — | — | — | — | 60,000 | 33.62 | 606,600 |
| Alan Edrick | 9/9/2011 | — | 15,000 | 37,500 | — | — | — | 504,300 |
| Executive Vice President and | 9/9/2011 | — | — | — | 15,000 | — | — | 504,300 |
| Chief Financial Officer | 9/9/2011 | — | — | — | — | 60,000 | 33.62 | 606,600 |
| Ajay Mehra | 9/9/2011 | — | 15,000 | 37,500 | — | — | — | 504,300 |
| Executive Vice President of the | 9/9/2011 | — | — | — | 15,000 | — | — | 504,300 |
| Company and President of Security division | 9/9/2011 | — | — | — | — | 60,000 | 33.62 | 606,600 |
| Victor S. Sze | 9/9/2011 | — | 10,000 | 25,000 | — | — | — | 336,200 |
| Executive Vice President, | 9/9/2011 | — | — | — | 10,000 | — | — | 336,200 |
| General Counsel and Secretary | 9/9/2011 | — | — | — | — | 40,000 | 33.62 | 404,400 |
| Manoocher Mansouri | 9/9/2011 | — | 4,000 | 10,000 | — | — | — | 134,480 |
| President, Optoelectronics and Manufacturing division | 9/9/2011 | — | — | — | 8,000 | — | — | 268,960 |

(1) The Company has eliminated from this table the column titled "Estimated Future Payouts Under Non-Equity Incentive Plan Awards" because no amounts would have been included in such column.

(2) Restricted stock awards vest over a period of four years from the date of grant.

(3) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(4) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(5) The grant date fair value of the stock options and restricted stock was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are show in this column as the Company's long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(7) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(8) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program; Quantitative Objectives.*"

(9) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

### Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2012(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (4)(#) | Market Value of Shares or Units of Stock That Have Not Vested (5)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(6) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(5) |
| Deepak Chopra | 60,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 80,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| Chief Executive Officer | — | 60,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 128,375(14) | 8,131,273 | 40,500 | 2,565,270 |
| Alan Edrick | 48,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/28/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 56,667 | 28,333(8) | 16.37 | 8/31/2019 | — | — | — | — |
| | 13,334 | 26,666(9) | 27.12 | 8/10/2020 | — | — | — | — |
| | — | 60,000(7) | 33.62 | 9/08/2021 | | | | |
| | — | — | — | — | 47,500(15) | 3,008,650 | 22,500 | 1,425,150 |
| Ajay Mehra | 32,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| of the Company and | 10,000 | — | 20.92 | 7/28/2018 | — | — | — | — |
| President of | 56,667 | 28,333(8) | 16.37 | 8/31/2019 | — | — | — | — |
| Security division | — | 60,000(7) | 33.62 | 9/08/2021 | — | — | — | — |
| | — | — | — | — | 55,000(16) | 3,483,700 | 22,500 | 1,425,150 |
| Victor S. Sze | 24,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice | 10,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, General | 5,000 | — | 20.92 | 7/28/2018 | — | — | — | — |
| Counsel and Secretary | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 36,667 | 18,333(10) | 16.37 | 8/31/2019 | — | — | — | — |
| | 9,000 | 18,000(11) | 27.12 | 8/10/2020 | — | — | — | — |
| | — | 40,000(12) | 33.62 | 9/8/2021 | | | | |
| | — | — | — | — | 32,063(17) | 2,030,870 | 15,000 | 950,100 |
| Manoocher Mansouri | 7,500 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, | 15,657 | 10,000(13) | 16.37 | 8/31/2019 | — | — | — | — |
| Optoelectronics and Manufacturing division | — | — | — | — | 25,250(18) | 1,599,335 | 4,360 | 276,162 |

(1) The Company has eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(4) Restricted stock awards vest over periods ranging between three and four years from the date of grant.

(5) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 29, 2012, multiplied by the closing price of the Company's Common Stock on June 29, 2012 ($63.34 per share).

(6) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) These 60,000 unexercisable option awards are subject to the following vesting schedule: 20,000 vested on September 9, 2012, 20,000 are expected to vest on September 9, 2013 and 20,000 are expected to vest on September 9, 2014.

(8) These 28,333 unexercisable option awards vested on September 1, 2012.

(9) These 26,666 unexercisable option awards are subject to the following vesting schedule: 13,333 vested on August 11, 2012 and 13,333 will vest on August 11, 2013.

(10) These 18,333 unexercisable option awards vested on September 1, 2012.

(11) These 18,000 unexercisable option awards are subject to the following vesting schedule: 9,000 vested on August 11, 2012 and 9,000 will vest on August 11, 2013.

(12) These 40,000 unexercisable option awards are subject to the following vesting schedule: 13,334 vested on September 9, 2012, 13,333 will vest on September 9, 2013 and 13,333 will vest on September 9, 2014.

(13) These 10,000 unexercisable option awards vested on September 1, 2012.

(14) These 128,375 unvested stock awards are subject to the following vesting schedule: 18,125 shares vested on August 11, 2012, 15,000 shares vested on September 1, 2012, 9,750 shares vested on September 9, 2012, 5,000 shares will vest on February 5, 2013, 18,125 shares will vest on August 11, 2013, 15,000 shares will vest on September 1, 2013, 9,750 shares will vest on September 9, 2013, 18,125 shares will vest on August 11, 2014, 9,750 shares will vest on September 9, 2014 and 9,750 shares will vest on September 9, 2015.

(15) These 47,500 unvested stock awards are subject to the following vesting schedule: 7,500 shares vested on August 11, 2012, 3,750 shares vested on September 1, 2012, 3,750 shares vested on September 9, 2012, 2,500 shares will vest on February 5, 2013, 7,500 shares will vest on August 11, 2013, 3,750 shares will vest on September 1, 2013, 3,750 shares will vest on September 9, 2013, 7,500 shares will vest on August 11, 2014, 3,750 shares will vest on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(16) These 55,000 unvested stock awards are subject to the following vesting schedule: 10,000 shares vested on August 11, 2012, 3,750 shares vested on September 1, 2012, 3,750 shares vested on September 9, 2012, 2,500 shares will vest on February 5, 2013, 10,000 shares will vest on August 11, 2013, 3,750 shares will vest on September 1, 2013, 3,750 shares will vest on September 9, 2013, 10,000 shares will vest on August 11, 2014, 3,750 shares will vest on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(17) These 32,063 unvested stock awards are subject to the following vesting schedule: 5,063 shares vested on August 11, 2012, 2,500 shares vested on September 1, 2012, 2,500 shares vested on September 9, 2012, 1,875 shares will vest on February 5, 2013, 5,062 shares will vest on August 11, 2013, 2,500 shares will vest on September 1, 2013, 2,500 shares on September 9, 2013, 5,063 shares on August 11, 2014, 2,500 shares on September 9, 2014 and 2,500 shares will vest on September 9, 2015.

(18) These 25,250 unvested stock awards are subject to the following vesting schedule: 4,500 shares vested on August 11, 2012, 1,875 shares vested on September 1, 2012, 2,000 shares vested on September 9, 2012, 4,500 shares will vest on August 11, 2013, 1,875 shares will vest on September 1, 2013, 2,000 shares will vest on September 9, 2013, 4,500 shares will vest on August 11, 2014, 2,000 shares will vest on September 9, 2014 and 2,000 shares will vest on September 9, 2015.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2082 of 2711

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2012:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting | Value Realized on Vesting(2)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 9,756 | 190,925 | 50,458 | 2,006,957 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 10,592 | 225,577 | 16,208 | 648,405 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 46,743 | 1,947,500 | 18,458 | 724,925 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 1,559 | 30,510 | 10,854 | 439,091 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | — | — | 8,094 | 296,892 |

(1) Represents the difference between the fair market price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Represents the number of restricted stock awards that vested multiplied by the fair market price of the Company's Common Stock on the date of vesting.

**Pension Benefits**

The Company maintains the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2012(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 12 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2012.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 5 | 4,776,343 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted the Deferred Compensation Plan in May 2008. Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Eligible participants are fully vested in Company contributions.

Participants receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Company's 401(k) Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2012 ranged from -0.5% to 5.0%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2012:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | 77,746 | 83,746(3) | 1,984 | — | 506,902 |
| Ajay Mehra Executive Vice President of the Company and President of Security division | 41,746 | 83,746(4) | (2,144) | — | 503,233 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | 37,546 | 72,546(5) | (1,795) | — | 434,543 |
| Manoocher Mansouri President, Optoelectronics and Manufacturing division | 43,216 | 55,860(6) | 12,780 | 39,303 | 291,717 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2012.

(3) Includes $41,746 matching contribution and $42,000 discretionary contribution.

(4) Includes $41,746 matching contribution and $42,000 discretionary contribution.

(5) Includes $37,546 matching contribution and $35,000 discretionary contribution.

(6) Includes $28,810 matching contribution and $27,050 discretionary contribution.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri.

*Deepak Chopra's Employment Agreement*

On April 4, 2012, the Company entered into its current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an annual base salary of $1,000,000. Mr. Chopra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect the

Company's proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from the Company to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date, he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's, Ajay Mehra's, Victor Sze's and Manoocher Mansouri's Employment Agreements*

On April 4, 2012, the Company entered into its current employment agreement with each of Messrs. Edrick, Mehra, Sze and Mansouri, which were effective as of January 1, 2012. For purposes of this section, Messrs. Edrick, Mehra, Sze and Mansouri are each individually referred to as the "Executive." The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for

successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68 (the "Executive Scheduled Retirement Date"). The agreements provide for an annual base salary of $402,000 for Mr. Edrick, $402,000 for Mr. Mehra, $350,000 for Mr. Sze and $270,500 for Mr. Mansouri. The Executive is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Edrick's, Mr. Mehra's and Mr. Sze's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mansouri's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 12 months salary at the Executive's then-current base salary plus an amount equal to the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall

continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by the Company to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Edrick's, Mr. Mehra's, Mr. Sze's and Mr. Mansouri's continued employment until the Executive Scheduled Retirement Date, he shall be entitled a lump sum stay bonus equal to his highest year out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Executive Scheduled Retirement Date.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2012, and that employment terminated on such date. The tables also assume that the price of the Company's Common Stock, on which certain calculations in the following tables are made, was the closing price of the Company's Common Stock on June 29, 2012, the last business day of the fiscal year ($63.34).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2088 of 2711

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Equity Grants($) | Accelerated Vesting($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(2) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,575,000 | 7,187,580 | 11,624,653 | 434,942 | 26,822,175 |
| | Good Reason or Without Cause in Connection with a Change in Control(3) | 3,000,000 | 4,575,000 | 7,187,580 | 11,624,653 | 434,942 | 26,822,175 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2012, for performance in the fiscal year ended June 30, 2012.

(2) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(3) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Mansouri.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Accelerated Vesting($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 804,000 | 773,333 | 8,038,594 | $ 6,000 | $ 6,000 | 9,627,927 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 773,333 | 8,038,594 | $ 6,000 | $ 6,000 | 9,627,927 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | Good Reason or Without Cause | 804,000 | 773,333 | 7,547,801 | $ 6,000 | $ 6,000 | 9,137,134 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 773,333 | 7,547,801 | $ 6,000 | $ 6,000 | 9,137,134 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 700,000 | 614,667 | 5,366,131 | $ 6,000 | $ 6,000 | 6,692,798 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 700,000 | 614,667 | 5,366,131 | $ 6,000 | $ 6,000 | 6,692,798 |
| Manoocher Mansouri<br>President of Optoelectronics and Manufacturing division | Good Reason or Without Cause | 270,500 | 76,667 | 2,322,395 | $ 6,000 | $ 6,000 | 2,681,562 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 270,500 | 76,667 | 2,322,395 | $ 6,000 | $ 6,000 | 2,681,562 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2012, for performance in the fiscal year ended June 30, 2012.

(2) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

### Director Compensation

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2012, each non-employee director that served as a director for the full fiscal year, received $50,000 for his year of service, 3,000 shares of restricted Common Stock, and $2,500 for each Board of Directors meeting attended.

Each member of the Audit Committee received $2,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $10,000.

Each member of the Compensation Committee received $2,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $10,000.

Each member of the Nominating and Governance Committee received $2,500 for each Nominating and Governance Committee meeting attended.

Each member of the Executive Committee received $20,000 and 3,500 shares of restricted Common Stock.

Each member of the Technology Committee received 500 shares of restricted Common Stock.

All restricted stock awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2012 for each non-employee member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 130,000 | 218,530 | — | 348,530 |
| Meyer Luskin | 127,500 | 218,530 | — | 346,030 |
| David T. Feinberg | 65,000 | 117,670 | — | 182,670 |
| William F. Ballhaus | 77,500 | 117,670 | — | 195,170 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2012 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2012 a total of 6,500 stock awards were granted to Mr. Good and Mr. Luskin and 3,500 stock awards were granted to Mr. Ballhaus and Mr. Feinberg, all with a fair value of $33.62. As of June 30, 2012, Mr. Good had 14,625 unvested stock awards outstanding, Mr. Luskin had 14,625 unvested stock awards and 5,000 exercisable option awards outstanding, Mr. Feinberg had 6,125 unvested stock awards outstanding and Mr. Ballhaus had 6,125 unvested stock awards outstanding.

The Company believes that its directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of its stockholders. Accordingly, the Company has established requirements that directors own equity of the Company valued at three times their annual retainers. The Company believes that this multiple constitutes significant amounts for its directors and provides a substantial link between the interests of its directors and those of its stockholders. The Company periodically reviews its minimum equity ownership guidelines. Based on the Company's review from leading stockholder advisory groups, the Company increased the minimum equity ownership guideline for its directors from a multiple of two times annual retainer to three times annual retainer. As of June 30, 2012, each of the Company's directors met or exceeded the Company's minimum equity ownership guidelines.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracts for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2012 by Mr. Chopra and his wife. The Company paid the business approximately $65,000 for such services during the year ended June 30, 2012. Additionally, the Company contracts for a portion of its printing services from a business that was owned during the year ended June 30, 2012 by Mr. Chopra's father-in-law. The Company paid the business approximately $14,000 for such services during the year ended June 30, 2012. Further, a subsidiary of the Company is leasing warehouse space on a month-to-month basis for approximately $3,000 per month from an entity controlled by Mr. Chopra.

The Company believes that the foregoing transactions were on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company would be on terms at least as favorable to the Company as those that can be obtained from unaffiliated third parties.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of the Company's voting securities, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2012 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| Wells Fargo & Company(2) | 1,463,784 | 7.1% |
| BlackRock, Inc.(3) | 1,423,724 | 6.9% |
| The Vanguard Group, Inc.(4) | 1,147,714 | 5.6% |
| Waddell & Reed Financial, Inc.(5) | 1,092,705 | 5.3% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2012, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) As reported in a Schedule 13F-HR filed on August 10, 2012 with the SEC. The address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94163.

(3) As reported in a Schedule 13F-HR filed on August 13, 2012 with the SEC by five subsidiaries of BlackRock, Inc. The address of BlackRock, Inc. is 40 East 52nd St., New York, NY 10022.

(4) As reported in a Schedule 13F-HR filed on August 13, 2012 with the SEC. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(5) As reported in a Schedule 13F-HR filed on August 14, 2012 with the SEC. The address of Waddell & Reed Financial, Inc. is 6300 Lamar Avenue, Overland Park, KS 66202.

The following table sets forth the amount of shares of the Company beneficially owned as of September 30, 2012 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 718,328 | 3.4% |
| Alan Edrick (4) | 353,485 | 1.7% |
| Ajay Mehra(5) | 302,569 | 1.4% |
| Victor S. Sze(6) | 260,271 | 1.2% |
| Manoocher Mansouri(7) | 100,505 | 0.5% |
| Meyer Luskin (8) | 104,485 | 0.5% |
| Steven C. Good(9) | 25,125 | 0.1% |
| David Feinberg(10) | 10,010 | 0.0% |
| William F. Ballhaus(11) | 10,000 | 0.0% |
| All directors and executive officers as a group (9 persons) | 1,884,778 | 8.8% |

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after September 30, 2012, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(3) Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company. Includes 65,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 25,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 260,165 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, 109,663 are held directly by Mr. Chopra and 178,500 shares of unvested restricted stock granted between January 12, 2009 and July 23, 2012 are held individually by Mr. Chopra. Includes 80,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011 that were vested as of September 30, 2012.

(4) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 81,500 shares of unvested restricted stock granted between January 12, 2009 and July 23, 2012. Includes 243,667 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011 that were vested as of September 30, 2012.

(5) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division. Includes 86,500 shares of unvested restricted stock granted between January 12, 2009 and July 23, 2012. Includes 136,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011 that were vested as of September 30, 2012.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 54,500 shares of unvested restricted stock granted between January 12, 2009 and July 23, 2012. Includes 155,334 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011 that were vested as of September 30, 2012.

(7) Mr. Mansouri is the President of the Company's Optoelectronics and Manufacturing division. Includes 26,875 shares of unvested restricted stock granted between September 1, 2009 and July 23, 2012. Includes 33,157 shares issuable pursuant to options which were granted between February 8, 2008 and September 1, 2009 that were vested as of September 30, 2012.

(8) Mr. Luskin is a Director of the Company. Includes 84,235 shares held by The Meyer and Doreen Luskin Family Trust, and 15,250 shares of unvested restricted stock granted between September 8, 2009 and July 23 2012 that are held individually by Mr. Luskin. Includes 5,000 shares issuable pursuant to options which were granted on August 4, 2008.

(9) Mr. Good is a Director of the Company. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan. Includes 15,250 shares of unvested restricted stock granted between September 8, 2009 and July 23, 2012.

(10) Dr. Feinberg is a Director of the Company. Includes 7,375 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012.

(11) Dr. Ballhaus is a Director of the Company. Includes 7,375 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2094 of 2711

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2012, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements for the years ended June 30, 2011 and 2012 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2011 | FY 2012 |
|---|---|---|
| Audit Fees | $ 1,027 | $ 844 |
| Audit-Related Fees | 2 | 25 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 1,029 | $ 869 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements other than audit fees. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

## REPORT OF AUDIT COMMITTEE

During the fiscal year ended June 30, 2012, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2012.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which candid discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

In its meetings with representatives of the independent public accountants, the Audit Committee asks them to address, and discusses their responses to, several questions that the Audit Committee believes are particularly relevant to its oversight. These questions include:

- Are there any significant accounting judgments made by management in preparing the financial statements that would have been made differently had the independent public accountants themselves prepared and been responsible for the financial statements?

- Based on the independent public accountants' experience and their knowledge of the Company, do the Company's financial statements fairly present to investors, with clarity and completeness, the Company's financial position and performance for the reporting period in accordance with generally accepted accounting principles and SEC disclosure requirements?

- Based on the independent public accountants' experience and their knowledge of the Company, has the Company implemented internal control and internal audit procedures that are appropriate for the Company?

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T.

The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2012 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2012, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2098 of 2711

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2011 filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of the Company's directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless the Company has received contrary instructions from one or more of the stockholders at that address. The Company undertakes to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to the Secretary of the Company at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next annual meeting of stockholders, the proposal must be delivered in writing to the Secretary of the Company and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such

proposal to the Company would be June 25, 2013, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

The Company's Bylaws provide that if a stockholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to the Company no more than 120 days and no less than 90 days prior to December 12, 2013, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 12, 2013, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 23, 2012

**Appendix A**

# OSI SYSTEMS, INC.

# 2012 INCENTIVE AWARD PLAN

## ARTICLE 1.

## PURPOSE

The purpose of the OSI Systems, Inc. 2012 Incentive Award Plan (the "*Plan*") is to promote the success and enhance the value of OSI Systems, Inc. (the "*Company*") by linking the individual interests of the members of the Board, Employees and Consultants to those of the Company's stockholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to the Company's stockholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract and retain the services of members of the Board, Employees and Consultants upon whose judgment, interest and special effort the successful conduct of the Company's operation is largely dependent.

## ARTICLE 2.

## DEFINITIONS AND CONSTRUCTION

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1 "*Administrator*" shall mean the governing body that conducts the general administration of the Plan as provided in Article 12 hereof. With reference to the duties of the Committee under the Plan which have been delegated to one or more persons pursuant to Section 12.6 hereof, or which the Board has assumed, the term "Administrator" shall refer to such person(s) unless the Committee or the Board has revoked such delegation or the Board has terminated the assumption of such duties.

2.2 "*Affiliate*" shall mean any Parent or Subsidiary.

2.3 "*Applicable Accounting Standards*" shall mean Generally Accepted Accounting Principles in the United States, International Financial Reporting Standards or such other accounting principles or standards as may apply to the Company's financial statements under United States federal securities laws from time to time.

2.4 "*Award*" shall mean an Option, a Restricted Stock Award, a Restricted Stock Unit Award, a Performance Award, a Dividend Equivalent Award, a Stock Appreciation Right or an Other Incentive Award, which may be awarded or granted under the Plan.

2.5 "*Award Agreement*" shall mean any written notice, agreement, contract or other instrument or document evidencing an Award, including through electronic medium, which shall contain such terms and conditions with respect to an Award as the Administrator shall determine, consistent with the Plan.

2.6 "*Board*" shall mean the Board of Directors of the Company.

2.7 "*Cause*" shall mean, with respect to any Participant, "Cause" as defined in such Participant's employment agreement with the Company if such an agreement exists and contains a definition of Cause or, if no such agreement exists or such agreement does not contain a definition of Cause, then Cause shall mean (i) the Participant's unauthorized use or disclosure of confidential information or trade secrets of the Company or any Subsidiary or any other material breach of a written agreement between the Participant and the Company, including without limitation a material breach of any employment or confidentiality

agreement; (ii) the Participant's indictment for, or the entry of a plea of guilty or nolo contendere by the Participant to, a felony under the laws of the United States or any state thereof or other foreign jurisdiction or any crime involving dishonesty or moral turpitude; (iii) the Participant's gross negligence or willful misconduct or the Participant's willful or repeated failure or refusal to substantially perform assigned duties; (iv) any act of fraud, embezzlement, material misappropriation or dishonesty committed by the Participant against the Company or any Subsidiary; or (v) any acts, omissions or statements by a Participant which the Company reasonably determines to be materially detrimental or damaging to the reputation, operations, prospects or business relations of the Company or any Subsidiary.

2.8 "*Change in Control*" shall mean the occurrence of any of the following events:

(a) The consummation of a transaction or series of transactions (other than an offering of Shares to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Parents or Subsidiaries, an employee benefit plan maintained by the Company or any of its Parents or Subsidiaries or a "person" that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities outstanding immediately after such acquisition; or

(b) During any period of two consecutive years, individuals who, at the beginning of such period, constitute the Board together with any new director(s) (other than a director designated by a person who shall have entered into an agreement with the Company to effect a transaction described in Section 2.8(a) or Section 2.8(c)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the two-year period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof; or

(c) The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case, other than a transaction:

(i) Which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "*Successor Entity*")), directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(ii) After which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; *provided, however,* that no person or group shall be treated for purposes of this Section 2.8(c)(ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction; or

(d) The Company's stockholders approve a liquidation or dissolution of the Company.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award which provides for the deferral of compensation that is subject to Section 409A of the Code, to the extent required to avoid the imposition of additional taxes under Section 409A of the Code, the transaction or event described in subsection (a), (b), (c) or (d) with respect to such Award shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation §1.409A-3(i)(5).

Consistent with the terms of this Section 2.8, the Administrator shall have full and final authority to determine conclusively whether a Change in Control of the Company has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto.

2.9 "*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, together with the regulations and official guidance promulgated thereunder, whether issued prior or subsequent to the grant of any Award.

2.10 "*Committee*" shall mean the Compensation Committee of the Board, or another committee or subcommittee of the Board described in Article 12 hereof.

2.11 "*Common Stock*" shall mean the common stock of the Company, par value $0.001 per share.

2.12 "*Company*" shall mean OSI Systems, Inc., a Delaware corporation.

2.13 "*Consultant*" shall mean any consultant or adviser engaged to provide services to the Company or any Affiliate that qualifies as a consultant under the applicable rules of the Securities and Exchange Commission for registration of shares on a Form S-8 Registration Statement or any successor Form thereto.

2.14 "*Covered Employee*" shall mean any Employee who is, or could become, a "covered employee" within the meaning of Section 162(m) of the Code.

2.15 "*Director*" shall mean a member of the Board, as constituted from time to time.

2.16 "*Dividend Equivalent*" shall mean a right to receive the equivalent value (in cash or Shares) of dividends paid on Shares, awarded under Section 9.2 hereof.

2.17 "*DRO*" shall mean a "domestic relations order" as defined by the Code or Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time, or the rules thereunder.

2.18 "*Effective Date*" shall mean the date on which the Plan is approved by the Board, subject to approval of the Plan by the Company's stockholders.

2.19 "*Eligible Individual*" shall mean any person who is an Employee, a Consultant or a Non-Employee Director, as determined by the Administrator.

2.20 "*Employee*" shall mean any officer or other employee (as determined in accordance with Section 3401(c) of the Code) of the Company or of any Affiliate.

2.21 "*Equity Restructuring*" shall mean a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off, rights offering or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of shares of Common Stock (or other securities of the Company) or the share price of Common Stock (or other securities) and causes a change in the per share value of the Common Stock underlying outstanding Awards.

2.22 "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended from time to time.

2.23 "*Fair Market Value*" shall mean, as of any given date, the value of a Share determined as follows:

(a) If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange, the NASDAQ Global Market and the NASDAQ Global Select Market), (ii) listed on any national market system or (iii) listed, quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a share of Common Stock as quoted on such exchange or system for such date or, if there is no closing sales price for a share of Common Stock on the date in question, the closing sales price for a share of Common Stock on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(b) If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a share of Common Stock on such date, the high bid and low asked prices for a share of Common Stock on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c) If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in good faith.

2.24 "*Full Value Award*" shall mean any Award that is settled in Shares other than: (a) an Option, (b) a Stock Appreciation Right or (c) any other Award for which the Participant pays the intrinsic value existing as of the date of grant (whether directly or by forgoing a right to receive a payment from the Company or any Subsidiary), including any Restricted Stock Award, Performance Award, Dividend Equivalents Award, Restricted Stock Unit Award or Other Incentive Award, in each case, to the extent settled in Stock.

2.25 "*Greater Than 10% Stockholder*" shall mean an individual then-owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any "parent corporation" or "subsidiary corporation" (as defined in Sections 424(e) and 424(f) of the Code, respectively).

2.26 "*Incentive Stock Option*" shall mean an Option that is intended to qualify as an incentive stock option and conforms to the applicable provisions of Section 422 of the Code.

2.27 "*Individual Award Limit*" shall mean the cash and share limits applicable to Awards granted under the Plan, as set forth in Section 3.3 hereof.

2.28 "*Non-Employee Director*" shall mean a Director of the Company who is not an Employee.

2.29 "*Non-Qualified Stock Option*" shall mean an Option that is not an Incentive Stock Option or which is designated as an Incentive Stock Option but does not meet the applicable requirements of Section 422 of the Code.

2.30 "*Option*" shall mean a right to purchase Shares at a specified exercise price, granted under Article 6 hereof. An Option shall be either a Non-Qualified Stock Option or an Incentive Stock Option; *provided*, *however*, that Options granted to Non-Employee Directors and Consultants shall only be Non-Qualified Stock Options.

2.31 "*Original Plan*" shall mean the 2006 Equity Participation Plan of OSI Systems, Inc., as may be amended.

2.32 "*Other Incentive Award*" shall mean an Award denominated in, linked to or derived from Shares or value metrics related to Shares, granted pursuant to Section 9.4 hereof.

2.33 "*Parent*" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities ending with the Company if each of the entities other than the Company beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.34 "*Participant*" shall mean a person who has been granted an Award.

2.35 "*Performance Award*" shall mean an Award that is granted under Section 9.1 hereof.

2.36 "*Performance-Based Compensation*" shall mean any compensation that is intended to qualify as "performance-based compensation" as described in Section 162(m)(4)(C) of the Code.

2.37 "*Performance Criteria*" shall mean the criteria (and adjustments) that the Committee selects for an Award for purposes of establishing the Performance Goal or Performance Goals for a Performance Period, determined as follows:

(a) The Performance Criteria that shall be used to establish Performance Goals are limited to the following: (i) net earnings (either before or after one or more of the following: (A) interest, (B) taxes, (C) depreciation, (D) amortization and (E) non-cash equity-based compensation expense); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for the Company or any operating unit of the Company or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices.

(b) The Administrator may, in its sole discretion, provide that one or more objectively determinable adjustments shall be made to one or more of the Performance Goals. Such adjustments may include, but are not limited to, one or more of the following: (i) items related to a change in accounting principle; (ii) items relating to financing activities; (iii) expenses for restructuring or productivity initiatives; (iv) other non-operating items; (v) items related to acquisitions; (vi) items attributable to the business operations of any entity acquired by the Company during the Performance Period; (vii) items related to the disposal of a business or segment of a business; (viii) items related to discontinued operations that do not qualify as a segment of a business under Applicable Accounting Standards; (ix) items attributable to any stock dividend, stock split, combination or exchange of stock occurring during the Performance Period; (x) any other items of significant income or expense which are determined to be appropriate adjustments; (xi) items relating to unusual or extraordinary corporate transactions, events or developments, (xii) items related to amortization of acquired intangible assets; (xiii) items that are outside the scope of the Company's core, on-going business activities; (xiv) items related to acquired in-process research and development; (xv) items relating to changes in tax laws; (xvi) items relating to major licensing or partnership arrangements; (xvii) items relating to asset impairment charges; (xviii) items relating to gains or losses for litigation, arbitration and contractual settlements; or (xix) items relating to any other unusual or nonrecurring events or changes in applicable laws, accounting principles or business conditions. For all Awards intended to qualify as Performance-Based Compensation, such determinations shall be made within the time prescribed by, and otherwise in compliance with, Section 162(m) of the Code.

2.38 "*Performance Goals*" shall mean, for a Performance Period, one or more goals established in writing by the Administrator for the Performance Period based upon one or more Performance Criteria. Depending on the Performance Criteria used to establish such Performance Goals, the Performance Goals may be expressed in terms of overall Company performance or the performance of an Affiliate, division, business unit or an individual. The achievement of each Performance Goal shall be determined in accordance with Applicable Accounting Standards.

2.39 "*Performance Period*" shall mean one or more periods of time, which may be of varying and overlapping durations, as the Administrator may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Award.

2.40 "*Permitted Transferee*" shall mean, with respect to a Participant, any "family member" of the Participant, as defined under the instructions to use of the Form S-8 Registration Statement under the Securities Act, or any other transferee specifically approved by the Administrator after taking into account any state, federal, local or foreign tax and securities laws applicable to transferable Awards. In addition, the Administrator, in its sole discretion, may determine to permit a Participant to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and applicable state law, the Participant is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

2.41 "*Plan*" shall mean this OSI Systems, Inc. 2012 Incentive Award Plan, as it may be amended from time to time.

2.42 "*Program*" shall mean any program adopted by the Administrator pursuant to the Plan containing the terms and conditions intended to govern a specified type of Award granted under the Plan and pursuant to which such type of Award may be granted under the Plan.

2.43 "*Restricted Stock*" shall mean Common Stock awarded under Article 8 hereof that is subject to certain restrictions and may be subject to risk of forfeiture or repurchase.

2.44 "*Restricted Stock Unit*" shall mean a contractual right awarded under Section 9.3 hereof to receive in the future a Share.

2.45 "*Securities Act*" shall mean the Securities Act of 1933, as amended.

2.46 "*Share Limit*" shall have the meaning provided in Section 3.1(a) hereof.

2.47 "*Shares*" shall mean shares of Common Stock.

2.48 "*Stock Appreciation Right*" shall mean a stock appreciation right granted under Article 10 hereof.

2.49 "*Stockholder Approval Date*" shall mean the date on which the Company's stockholders approve the Plan.

2.50 "*Subsidiary*" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.51 "*Substitute Award*" shall mean an Award granted under the Plan in connection with a corporate transaction, such as a merger, combination, consolidation or acquisition of property or stock, in any case, upon the assumption of, or in substitution for, an outstanding equity award previously granted by a company or other entity; *provided*, *however*, that in no event shall the term "Substitute Award" be construed to refer to an award made in connection with the cancellation and repricing of an Option or Stock Appreciation Right.

2.52 "*Termination of Service*" shall mean:

(a) As to a Consultant, the time when the engagement of a Participant as a Consultant to the Company and its Affiliates is terminated for any reason, with or without Cause, including, without limitation, by resignation, discharge, death or retirement, but excluding terminations where the Consultant simultaneously commences or remains in employment and/or service as a Director with the Company or any Affiliate.

(b) As to a Non-Employee Director, the time when a Participant who is a Non-Employee Director ceases to be a Director for any reason, including, without limitation, a termination by resignation, failure to be elected, death or retirement, but excluding terminations where the Participant simultaneously commences or remains in employment or service as a Consultant with the Company or any Affiliate.

(c) As to an Employee, the time when the employee-employer relationship between a Participant and the Company and its Affiliates is terminated for any reason, including, without limitation, a termination by resignation, discharge, death, disability or retirement; but excluding terminations where the Participant simultaneously commences or remains in a capacity providing substantial services to the Company or any Affiliate, whether as a Consultant and/or Director.

The definition of Termination of Service shall be interpreted consistently with the meaning of "separation from service" as such term is defined under Code Section 409A, and the Administrator, in its sole discretion, shall determine the effect of all matters and questions relating to Terminations of Service, including, without limitation, the question of whether a Termination of Service has occurred, whether any Termination of Service resulted from a discharge for Cause and all questions of whether particular leaves of absence constitute a Termination of Service; *provided*, *however*, that, with respect to Incentive Stock Options, unless the Administrator otherwise provides in the terms of any Program, Award Agreement or otherwise, a leave of absence, change in status from an employee to an independent contractor or other change in the employee-employer relationship shall constitute a Termination of Service only if, and to the extent that, such leave of absence, change in status or other change interrupts employment for the purposes of Section 422(a)(2) of the Code. For purposes of the Plan, a Participant's employee-employer relationship or consultancy relationship shall be deemed to be terminated in the event that the Affiliate employing or contracting with such Participant ceases to remain an Affiliate following any merger, sale of stock or other corporate transaction or event (including, without limitation, a spin-off).

## ARTICLE 3.

## SHARES SUBJECT TO THE PLAN

3.1 *Number of Shares*.

(a) No Awards shall be granted under the Plan prior to the Stockholder Approval Date. Subject to Sections 3.1(b), 13.1 and 13.2 hereof, the aggregate number of Shares which may be issued or transferred pursuant to Awards under the Plan shall be equal to the sum of (i) 3,850,000 Shares *minus* (ii) any Shares delivered in settlement of awards granted pursuant to the Original Plan during the period beginning on the Effective Date and ending immediately prior to the time the Company's stockholders approve the Plan *plus* (iii) any Shares underlying awards outstanding under the Original Plan as of the Stockholder Approval Date, up to a maximum of 2,220,000 such Shares, which on or after the Stockholder Approval Date, terminate, expire or lapse for any reason without the delivery of Shares to the holder (the "*Share Limit*"), *provided*, *however*, that such aggregate number of Shares available for issuance under the Plan (including the determination of the number of Shares that reduce the Share Limit pursuant to 3.1(a)(ii) above) shall be reduced by 1.87 Shares for each Share delivered in settlement of any Full Value Award (including, with respect to 3.1(a)(ii), Full Value Awards granted pursuant to the Original Plan). All Shares authorized under the Plan may be issued as

Incentive Stock Options; *provided*, *however*, that notwithstanding the foregoing, Shares added to the Share Limit pursuant to Section 3.1(a)(ii) shall be available for issuance as Incentive Stock Options only to the extent that making such Shares available for issuance as Incentive Stock Options would not cause any Incentive Stock Option to cease to qualify as such. Notwithstanding the foregoing, to the extent permitted under applicable law and applicable stock exchange rules, Awards that provide for the delivery of Shares subsequent to the applicable grant date may be granted in excess of the Share Limit if such Awards provide for the forfeiture or cash settlement of such Awards to the extent that insufficient Shares remain under the Share Limit at the time that Shares would otherwise be issued in respect of such Award. As of the Stockholder Approval Date, no further awards may be granted under the Original Plan, however, any awards under the Original Plan that are outstanding as of the Stockholder Approval Date shall continue to be subject to the terms and conditions of the Original Plan.

(b) If any Shares subject to an Award that is not a Full Value Award are forfeited or expire or such Award is settled for cash (in whole or in part), the Shares subject to such Award shall, to the extent of such forfeiture, expiration or cash settlement, again be available for future grants of Awards under the Plan and shall be added back to the Share Limit in the same number of Shares as were debited from the Share Limit in respect of the grant of such Award (as may be adjusted in accordance with Section 13.2 hereof). To the extent that a Full Value Award is forfeited or expires or such Full Value Award is settled for cash (in whole or in part), the Shares available under the Plan shall be increased by 1.87 Shares subject to such Full Value Award that is forfeited, expired or settled in cash. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added back to the Share Limit and will not be available for future grants of Awards: (i) Shares not issued or delivered as a result of the net settlement of an outstanding Stock Appreciation Right or Option, (ii) Shares tendered by the Participant or withheld by the Company to pay the exercise price or satisfy any tax withholding obligations related to an outstanding Award, or (iii) Shares repurchased on the open market with the cash proceeds of the Option exercise price. Any Shares repurchased by the Company under Section 8.4 hereof at the same price paid by the Participant so that such shares are returned to the Company will again be available for Awards. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards shall not be counted against the shares available for issuance under the Plan. Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Stock Option to fail to qualify as an incentive stock option under Section 422 of the Code.

(c) Substitute Awards shall not reduce the Shares authorized for grant under the Plan. Additionally, in the event that a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan in the Board's discretion at the time of such acquisition or combination and shall not reduce the Shares authorized for grant under the Plan; *provided*, *however*, that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employed by or providing services to the Company or its Affiliates immediately prior to such acquisition or combination.

3.2 *Stock Distributed*. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Common Stock, treasury Common Stock or Common Stock purchased on the open market.

3.3 *Limitation on Number of Shares Subject to Awards*. Notwithstanding any provision in the Plan to the contrary, and subject to Section 13.2 hereof, the maximum aggregate number of Shares with respect to one or more Awards that may be granted to any one person during any calendar year (measured from the date of any grant) shall be 250,000 shares and the maximum aggregate amount of cash that may be paid in cash during any calendar year (measured from the date of any payment) with respect to one or more Awards payable in cash shall be $15,000,000 (together, the "*Individual Award Limits*").

**ARTICLE 4.**

**GRANTING OF AWARDS**

4.1 *Participation*. The Administrator may, from time to time, select from among all Eligible Individuals, those to whom one or more Awards shall be granted and shall determine the nature and amount of each Award, which shall not be inconsistent with the requirements of the Plan. No Eligible Individual shall have any right to be granted an Award pursuant to the Plan.

4.2 *Award Agreement*. Each Award shall be evidenced by an Award Agreement stating the terms and conditions applicable to such Award, consistent with the requirements of the Plan and any applicable Program.

4.3 *Limitations Applicable to Section 16 Persons*. Notwithstanding anything contained herein to the contrary, with respect to any Award granted or awarded to any individual who is then subject to Section 16 of the Exchange Act, the Plan, any applicable Program and the applicable Award Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3 of the Exchange Act and any amendments thereto) that are requirements for the application of such exemptive rule, and such additional limitations shall be deemed to be incorporated by reference into such Award to the extent permitted by applicable law.

4.4 *At-Will Service*. Nothing in the Plan or in any Program or Award Agreement hereunder shall confer upon any Participant any right to continue as an Employee, Director or Consultant of the Company or any Affiliate, or shall interfere with or restrict in any way the rights of the Company and any Affiliate, which rights are hereby expressly reserved, to discharge any Participant at any time for any reason whatsoever, with or without Cause, and with or without notice, or to terminate or change all other terms and conditions of employment or engagement, except to the extent expressly provided otherwise in a written agreement between the Participant and the Company or any Affiliate.

4.5 *Foreign Participants*. Notwithstanding any provision of the Plan to the contrary, in order to comply with the laws in other countries in which the Company and its Affiliates operate or have Employees, Non-Employee Directors or Consultants, or in order to comply with the requirements of any foreign securities exchange, the Administrator, in its sole discretion, shall have the power and authority to: (a) determine which Affiliates shall be covered by the Plan; (b) determine which Eligible Individuals outside the United States are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Eligible Individuals outside the United States to comply with applicable foreign laws or listing requirements of any such foreign securities exchange; (d) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable (and any such subplans and/or modifications shall be attached to the Plan as appendices); *provided*, *however*, that no such subplans and/or modifications shall increase the Share Limit or Individual Award Limits contained in Sections 3.1 and 3.3 hereof, respectively; and (e) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local governmental regulatory exemptions or approvals or listing requirements of any such foreign securities exchange. Notwithstanding the foregoing, the Administrator may not take any actions hereunder, and no Awards shall be granted, that would violate the Code, the Exchange Act, the Securities Act, the rules of the securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law.

4.6 *Stand-Alone and Tandem Awards*. Awards granted pursuant to the Plan may, in the sole discretion of the Administrator, be granted either alone, in addition to, or in tandem with, any other Award granted pursuant to the Plan. Awards granted in addition to or in tandem with other Awards may be granted either at the same time as or at a different time from the grant of such other Awards.

**ARTICLE 5.**

**PROVISIONS APPLICABLE TO AWARDS INTENDED TO QUALIFY AS PERFORMANCE-BASED COMPENSATION**

5.1 *Purpose*. The Committee, in its sole discretion, may determine whether any Award is intended to qualify as Performance-Based Compensation. If the Committee, in its sole discretion, decides to grant an Award to an Eligible Individual that is intended to qualify as Performance-Based Compensation, then the provisions of this Article 5 shall control over any contrary provision contained in the Plan. The Administrator may in its sole discretion grant Awards to Eligible Individuals that are based on Performance Criteria or Performance Goals but that do not satisfy the requirements of this Article 5 and that are not intended to qualify as Performance-Based Compensation. Unless otherwise specified by the Administrator at the time of grant, the Performance Criteria with respect to an Award intended to be Performance-Based Compensation payable to a Covered Employee shall be determined on the basis of Applicable Accounting Standards.

5.2 *Applicability*. The grant of an Award to an Eligible Individual for a particular Performance Period shall not require the grant of an Award to such Eligible Individual in any subsequent Performance Period and the grant of an Award to any one Eligible Individual shall not require the grant of an Award to any other Eligible Individual in such period or in any other period.

5.3 *Procedures with Respect to Performance-Based Awards*. To the extent necessary to comply with the requirements of Section 162(m)(4)(C) of the Code, with respect to any Award which is intended to qualify as Performance-Based Compensation, no later than ninety (90) days following the commencement of any Performance Period or any designated fiscal period or period of service (or such earlier time as may be required under Section 162(m) of the Code), the Committee shall, in writing, (a) designate one or more Eligible Individuals, (b) select the Performance Criteria applicable to the Performance Period, (c) establish the Performance Goals and amounts of such Awards, as applicable, which may be earned for such Performance Period based on the Performance Criteria, and (d) specify the relationship between Performance Criteria and the Performance Goals and the amounts of such Awards, as applicable, to be earned by each Covered Employee for such Performance Period. Following the completion of each Performance Period, the Committee shall certify in writing whether and the extent to which the applicable Performance Goals have been achieved for such Performance Period.

5.4 *Payment of Performance-Based Awards*. Unless otherwise provided in the applicable Program or Award Agreement (and only to the extent otherwise permitted by Section 162(m)(4)(C) of the Code), the holder of an Award that is intended to qualify as Performance-Based Compensation must be employed by the Company or an Affiliate throughout the applicable Performance Period. Unless otherwise provided in the applicable Performance Goals, Program or Award Agreement, a Participant shall be eligible to receive payment pursuant to such Awards for a Performance Period only if and to the extent the Committee determines that the applicable Performance Goals for such period have been achieved.

5.5 *Additional Limitations*. Notwithstanding any other provision of the Plan and except as otherwise determined by the Administrator, any Award which is granted to an Eligible Individual and is intended to qualify as Performance-Based Compensation shall be subject to any additional limitations imposed under Section 162(m) of the Code that are requirements for qualification as Performance-Based Compensation, and the Plan, the Program and the Award Agreement shall be deemed amended to the extent necessary to conform to such requirements.

## ARTICLE 6.

## GRANTING OF OPTIONS

6.1 *Granting of Options to Eligible Individuals*. The Administrator is authorized to grant Options to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine which shall not be inconsistent with the Plan.

6.2 *Qualification of Incentive Stock Options*. No Incentive Stock Option shall be granted to any person who is not an Employee of the Company or any "parent corporation" or "subsidiary corporation" of the Company (as defined in Sections 424(e) and 424(f) of the Code, respectively). No person who qualifies as a Greater Than 10% Stockholder may be granted an Incentive Stock Option unless such Incentive Stock Option conforms to the applicable provisions of Section 422 of the Code. Any Incentive Stock Option granted under the Plan may be modified by the Administrator, with the consent of the Participant, to disqualify such Option from treatment as an "incentive stock option" under Section 422 of the Code. To the extent that the aggregate fair market value of stock with respect to which "incentive stock options" (within the meaning of Section 422 of the Code, but without regard to Section 422(d) of the Code) are exercisable for the first time by a Participant during any calendar year under the Plan and all other plans of the Company and any Affiliate corporation thereof exceeds $100,000, the Options shall be treated as Non-Qualified Stock Options to the extent required by Section 422 of the Code. The rule set forth in the preceding sentence shall be applied by taking Options and other "incentive stock options" into account in the order in which they were granted and the Fair Market Value of stock shall be determined as of the time the respective options were granted. In addition, to the extent that any Options otherwise fail to qualify as Incentive Stock Options, such Options shall be treated as Nonqualified Stock Options.

6.3 *Option Exercise Price*. Except as provided in Section 6.6 hereof, the exercise price per Share subject to each Option shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value of a Share on the date the Option is granted (or on the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable). In addition, in the case of Incentive Stock Options granted to a Greater Than 10% Stockholder, such price shall not be less than 110% of the Fair Market Value of a Share on the date the Option is granted (or the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable).

6.4 *Option Term*. The term of each Option shall be set by the Administrator in its sole discretion; *provided*, *however*, that the term shall not be more than ten (10) years from the date the Option is granted, or five (5) years from the date an Incentive Stock Option is granted to a Greater Than 10% Stockholder. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise the vested Options, which time period may not extend beyond the stated term of the Option. Except as limited by the requirements of Section 409A or Section 422 of the Code, the Administrator may extend the term of any outstanding Option, and may extend the time period during which vested Options may be exercised, in connection with any Termination of Service of the Participant, and, subject to Section 13.1 hereof, may amend any other term or condition of such Option relating to such a Termination of Service.

*6.5 Option Vesting*.

(a) The terms and conditions pursuant to which an Option vests in the Participant and becomes exercisable shall be determined by the Administrator and set forth in the applicable Award Agreement. Such vesting may be based on service with the Company or any Affiliate, any of the Performance Criteria, or any other criteria selected by the Administrator. At any time after grant of an Option, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the vesting of the Option.

(b) No portion of an Option which is unexercisable at a Participant's Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either

in a Program, the applicable Award Agreement or by action of the Administrator following the grant of the Option.

6.6 *Substitute Awards*. Notwithstanding the foregoing provisions of this Article 6 to the contrary, in the case of an Option that is a Substitute Award, the price per share of the shares subject to such Option may be less than the Fair Market Value per share on the date of grant, *provided*, *however,* that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

6.7 *Substitution of Stock Appreciation Rights*. The Administrator may provide in an applicable Program or the applicable Award Agreement evidencing the grant of an Option that the Administrator, in its sole discretion, shall have the right to substitute a Stock Appreciation Right for such Option at any time prior to or upon exercise of such Option; *provided*, *however,* that such Stock Appreciation Right shall be exercisable with respect to the same number of Shares for which such substituted Option would have been exercisable, and shall also have the same exercise price and remaining term as the substituted Option.

**ARTICLE 7.**

**EXERCISE OF OPTIONS**

7.1 *Partial Exercise*. An exercisable Option may be exercised in whole or in part. However, an Option shall not be exercisable with respect to fractional shares and the Administrator may require that, by the terms of the Option, a partial exercise must be with respect to a minimum number of shares.

7.2 *Manner of Exercise*. All or a portion of an exercisable Option shall be deemed exercised upon delivery of all of the following to the Secretary of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Option, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then entitled to exercise the Option or such portion of the Option;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act, the Exchange Act, any other federal, state or foreign securities laws or regulations, the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance including, without limitation, placing legends on share certificates and issuing stop-transfer notices to agents and registrars;

(c) In the event that the Option shall be exercised pursuant to Section 11.3 hereof by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Option, as determined in the sole discretion of the Administrator; and

(d) Full payment of the exercise price and applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Option, or portion thereof, is exercised, in a manner permitted by Sections 11.1 and 11.2 hereof.

7.3 *Notification Regarding Disposition*. The Participant shall give the Company prompt written or electronic notice of any disposition of shares of Common Stock acquired by exercise of an Incentive Stock Option which occurs within (a) two years from the date of granting (including the date the Option is modified, extended or renewed for purposes of Section 424(h) of the Code) such Option to such Participant, or (b) one year after the transfer of such shares to such Participant.

**ARTICLE 8.**

**RESTRICTED STOCK**

8.1 *Award of Restricted Stock.*

(a) The Administrator is authorized to grant Restricted Stock to Eligible Individuals, and shall determine the terms and conditions, including the restrictions applicable to each award of Restricted Stock, which terms and conditions shall not be inconsistent with the Plan, and the Administrator may impose such conditions on the issuance of such Restricted Stock as it deems appropriate.

(b) The Administrator shall establish the purchase price, if any, and form of payment for Restricted Stock; *provided*, *however*, that if a purchase price is charged, such purchase price shall be no less than the par value of the Shares to be purchased, unless otherwise permitted by applicable law. In all cases, legal consideration shall be required for each issuance of Restricted Stock to the extent required by applicable law.

8.2 *Rights as Stockholders.* Subject to Section 8.4 hereof, upon issuance of Restricted Stock, the Participant shall have, unless otherwise provided by the Administrator, all the rights of a stockholder with respect to said shares, subject to the restrictions in an applicable Program or in the applicable Award Agreement, including the right to receive dividends and other distributions paid or made with respect to the shares; *provided*, *however*, that, in the sole discretion of the Administrator, any extraordinary distributions with respect to the Shares shall be subject to the restrictions set forth in Section 8.3 hereof.

8.3 *Restrictions.* All shares of Restricted Stock (including any shares received by Participants thereof with respect to shares of Restricted Stock as a result of stock dividends, stock splits or any other form of recapitalization) shall, in the terms of an applicable Program or in the applicable Award Agreement, be subject to such restrictions and vesting requirements as the Administrator shall provide. Such restrictions may include, without limitation, restrictions concerning voting rights and transferability and such restrictions may lapse separately or in combination at such times and pursuant to such circumstances or based on such criteria as selected by the Administrator, including, without limitation, criteria based on the Participant's duration of employment, directorship or consultancy with the Company, the Performance Criteria, Company or Affiliate performance, individual performance or other criteria selected by the Administrator. Restricted Stock may not be sold or encumbered until all restrictions are terminated or expire.

8.4 *Repurchase or Forfeiture of Restricted Stock.* If no price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Participant's rights in unvested Restricted Stock then subject to restrictions shall lapse, and such Restricted Stock shall be surrendered to the Company and cancelled without consideration. If a price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Company shall have the right to repurchase from the Participant the unvested Restricted Stock then-subject to restrictions at a cash price per share equal to the price paid by the Participant for such Restricted Stock or such other amount as may be specified in an applicable Program or the applicable Award Agreement. The Administrator in its sole discretion may provide that, upon certain events, including without limitation a Change in Control, the Participant's death, retirement or disability, any other specified Termination of Service or any other event, the Participant's rights in unvested Restricted Stock shall not lapse, such Restricted Stock shall vest and cease to be forfeitable and, if applicable, the Company cease to have a right of repurchase.

8.5 *Certificates for Restricted Stock.* Restricted Stock granted pursuant to the Plan may be evidenced in such manner as the Administrator shall determine. Certificates or book entries evidencing shares of Restricted Stock must include an appropriate legend referring to the terms, conditions and restrictions applicable to such Restricted Stock, and the Company may, in its sole discretion, retain physical possession of any stock certificate until such time as all applicable restrictions lapse.

8.6 *Section 83(b) Election*. If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which the Participant would otherwise be taxable under Section 83(a) of the Code, the Participant shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service.

**ARTICLE 9.**

**PERFORMANCE AWARDS, DIVIDEND EQUIVALENTS, RESTRICTED STOCK UNITS; OTHER INCENTIVE AWARDS**

9.1 *Performance Awards*.

(a) The Administrator is authorized to grant Performance Awards to any Eligible Individual and to determine whether such Performance Awards shall be Performance-Based Compensation. The value of Performance Awards may be linked to any one or more of the Performance Criteria or other specific criteria determined by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. Performance Awards may be paid in cash, Shares or a combination of both, as determined by the Administrator.

(b) Without limiting Section 9.1(a) hereof, the Administrator may grant Performance Awards to any Eligible Individual in the form of a cash bonus payable upon the attainment of objective Performance Goals, or such other criteria, whether or not objective, which are established by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. Any such bonuses paid to a Participant which are intended to be Performance-Based Compensation shall be based upon objectively determinable bonus formulas established in accordance with the provisions of Article 5 hereof.

9.2 *Dividend Equivalents*.

(a) Subject to Section 9.2(b) hereof, Dividend Equivalents may be granted by the Administrator, either alone or in tandem with another Award, based on dividends declared on the Common Stock, to be credited as of dividend payment dates during the period between the date the Dividend Equivalents are granted to a Participant and the date such Dividend Equivalents terminate or expire, as determined by the Administrator. Such Dividend Equivalents shall be converted to cash or additional shares of Common Stock by such formula and at such time and subject to such limitations as may be determined by the Administrator. In addition, the Administrator may provide that Dividend Equivalents with respect to Shares covered by an Award shall only be paid out to the Participant at the same time or times and to the same extent that the vesting conditions, if any, are subsequently satisfied and the Award vests with respect to such Shares. Any dividends or Dividend Equivalents granted on Performance Awards will not be paid unless and until performance metrics are met.

(b) Notwithstanding the foregoing, no Dividend Equivalents shall be payable with respect to Options or Stock Appreciation Rights.

9.3 *Restricted Stock Units*. The Administrator is authorized to grant Restricted Stock Units to any Eligible Individual. The number and terms and conditions of Restricted Stock Units shall be determined by the Administrator. The Administrator shall specify the date or dates on which the Restricted Stock Units shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate, including conditions based on one or more Performance Criteria or other specific criteria, including service to the Company or any Affiliate, in each case on a specified date or dates or over any period or periods, as determined by the Administrator. The Administrator shall specify, or permit the Participant to elect, the conditions and dates upon which the Shares underlying the Restricted Stock Units which shall be issued, which dates shall not be earlier than the date as of which the Restricted Stock Units vest and become nonforfeitable and which conditions and dates shall be subject to compliance with

Section 409A of the Code or an exemption therefrom. On the distribution dates, the Company shall issue to the Participant one unrestricted, fully transferable Share (or the Fair Market Value of one such Share in cash) for each vested and nonforfeitable Restricted Stock Unit.

9.4 *Other Incentive Awards*. The Administrator is authorized to grant Other Incentive Awards to any Eligible Individual, which Awards may cover Shares or the right to purchase Shares or have a value derived from the value of, or an exercise or conversion privilege at a price related to, or that are otherwise payable in or based on, Shares, stockholder value or stockholder return, in each case on a specified date or dates or over any period or periods determined by the Administrator. Other Incentive Awards may be linked to any one or more of the Performance Criteria or other specific performance criteria determined appropriate by the Administrator.

9.5 *Other Terms and Conditions*. All applicable terms and conditions of each Award described in this Article 9, including without limitation, as applicable, the term, vesting and exercise/purchase price applicable to the Award, shall be set by the Administrator in its sole discretion, *provided*, *however*, that the value of the consideration paid by a Participant for an Award shall not be less than the par value of a Share, unless otherwise permitted by applicable law.

9.6 *Exercise upon Termination of Service*. Awards described in this Article 9 are generally exercisable or distributable, as applicable, only while the Participant is an Employee, Director or Consultant, as applicable. The Administrator, however, in its sole discretion, may provide that a vested Award may be exercised or distributed subsequent to Termination of Service as provided under an applicable Program, Award Agreement, payment deferral election and/or in certain events, including a Change in Control, the Participant's death, retirement or disability or any other specified Termination of Service, subject to compliance with Code Section 409A and other applicable laws.

**ARTICLE 10.**

**STOCK APPRECIATION RIGHTS**

10.1 *Grant of Stock Appreciation Rights*.

(a) The Administrator is authorized to grant Stock Appreciation Rights to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine consistent with the Plan.

(b) A Stock Appreciation Right shall entitle the Participant (or other person entitled to exercise the Stock Appreciation Right pursuant to the Plan) to exercise all or a specified portion of the Stock Appreciation Right (to the extent then exercisable pursuant to its terms) and to receive from the Company an amount determined by multiplying the difference obtained by subtracting the exercise price per share of the Stock Appreciation Right from the Fair Market Value on the date of exercise of the Stock Appreciation Right by the number of Shares with respect to which the Stock Appreciation Right shall have been exercised, subject to any limitations the Administrator may impose. Except as described in Section 10.1(c) hereof, the exercise price per Share subject to each Stock Appreciation Right shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value on the date the Stock Appreciation Right is granted.

(c) Notwithstanding the foregoing provisions of Section 10.1(b) hereof to the contrary, in the case of a Stock Appreciation Right that is a Substitute Award, the price per share of the shares subject to such Stock Appreciation Right may be less than the Fair Market Value per share on the date of grant; *provided*, *however*, that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the

predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

10.2 *Stock Appreciation Right Vesting*.

(a) The Administrator shall determine the period during which a Participant shall vest in a Stock Appreciation Right and have the right to exercise such Stock Appreciation Right in whole or in part. Such vesting may be based on service with the Company or any Affiliate, or any other criteria selected by the Administrator. At any time after grant of a Stock Appreciation Right, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the period during which a Stock Appreciation Right vests.

(b) No portion of a Stock Appreciation Right which is unexercisable at Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either in an applicable Program or Award Agreement or by action of the Administrator following the grant of the Stock Appreciation Right.

10.3 *Manner of Exercise*. All or a portion of an exercisable Stock Appreciation Right shall be deemed exercised upon delivery of all of the following to the stock administrator of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Stock Appreciation Right, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then-entitled to exercise the Stock Appreciation Right or such portion of the Stock Appreciation Right;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act and any other federal, state or foreign securities laws or regulations. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance;

(c) In the event that the Stock Appreciation Right shall be exercised pursuant to this Section 10.3 by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Stock Appreciation Right; and

(d) Full payment of the applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Stock Appreciation Right, or portion thereof, is exercised, in a manner permitted by Sections 11.1 and 11.2 hereof.

10.4 *Stock Appreciation Right Term*. The term of each Stock Appreciation Right shall be set by the Administrator in its sole discretion; *provided*, *however*, that the term shall not be more than ten (10) years from the date the Stock Appreciation Right is granted. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise any vested Stock Appreciation Rights, which time period may not extend beyond the expiration date of the Stock Appreciation Right term. Except as limited by the requirements of Section 409A of the Code, the Administrator may extend the term of any outstanding Stock Appreciation Right, and may extend the time period during which vested Stock Appreciation Rights may be exercised in connection with any Termination of Service of the Participant, and, subject to Section 13.1 hereof, may amend any other term or condition of such Stock Appreciation Right relating to such a Termination of Service.

## ARTICLE 11.

## ADDITIONAL TERMS OF AWARDS

11.1 *Payment*. The Administrator shall determine the methods by which payments by any Participant with respect to any Awards granted under the Plan shall be made, including, without limitation:

(a) cash or check, (b) Shares (including, in the case of payment of the exercise price of an Award, Shares issuable pursuant to the exercise of the Award) held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences, in each case, having a Fair Market Value on the date of delivery equal to the aggregate payments required, (c) delivery of a written or electronic notice that the Participant has placed a market sell order with a broker with respect to Shares then-issuable upon exercise or vesting of an Award, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the aggregate payments required; *provided*, *however*, that payment of such proceeds is then made to the Company upon settlement of such sale, or (d) other form of legal consideration acceptable to the Administrator. The Administrator shall also determine the methods by which Shares shall be delivered or deemed to be delivered to Participants. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

11.2 *Tax Withholding*. The Company and its Affiliates shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company or an Affiliate, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's social security, Medicare and any other employment tax obligation) required by law to be withheld with respect to any taxable event concerning a Participant arising as a result of the Plan. The Administrator may in its sole discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company or an Affiliate withhold Shares otherwise issuable under an Award (or allow the surrender of Shares). Unless determined otherwise by the Administrator, the number of Shares which may be so withheld or surrendered shall be limited to the number of shares which have a Fair Market Value on the date of withholding or repurchase no greater than the aggregate amount of such liabilities based on the minimum statutory withholding rates or federal, state, local and foreign income tax and payroll tax purposes that are applicable to such supplemental taxable income. The Administrator shall determine the fair market value of the Shares, consistent with applicable provisions of the Code, for tax withholding obligations due in connection with a broker-assisted cashless Option or Stock Appreciation Right exercise involving the sale of shares to pay the Option or Stock Appreciation Right exercise price or any tax withholding obligation.

11.3 *Transferability of Awards*.

(a) Except as otherwise provided in Section 11.3(b) or (c) hereof:

(i) No Award under the Plan may be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO, unless and until such Award has been exercised, or the shares underlying such Award have been issued, and all restrictions applicable to such shares have lapsed;

(ii) No Award or interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, hypothecation, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy) unless and until such Award has been exercised, or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed, and any attempted disposition of an Award prior to the satisfaction of these conditions shall be null and void and of no effect, except to the extent that such disposition is permitted by clause (i) of this provision; and

(iii) During the lifetime of the Participant, only the Participant may exercise an Award (or any portion thereof) granted to him under the Plan, unless it has been disposed of pursuant to a

DRO; after the death of the Participant, any exercisable portion of an Award may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Program or Award Agreement, be exercised by his personal representative or by any person empowered to do so under the deceased Participant's will or under the then applicable laws of descent and distribution.

(b) Notwithstanding Section 11.3(a) hereof, the Administrator, in its sole discretion, may determine to permit a Participant or a Permitted Transferee of such Participant to transfer an Award other than an Incentive Stock Option to any one or more Permitted Transferees of such Participant, subject to the following terms and conditions: (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee (other than to another Permitted Transferee of the applicable Participant) other than by will or the laws of descent and distribution; (ii) an Award transferred to a Permitted Transferee shall continue to be subject to all the terms and conditions of the Award as applicable to the original Participant (other than the ability to further transfer the Award); and (iii) the Participant (or transferring Permitted Transferee) and the Permitted Transferee shall execute any and all documents requested by the Administrator, including without limitation, documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under applicable federal, state and foreign securities laws and (C) evidence the transfer.

(c) Notwithstanding Section 11.3(a) hereof, a Participant may, in the manner determined by the Administrator, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Program or Award Agreement applicable to the Participant, except to the extent the Plan, the Program and the Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Administrator. If the Participant is married or a domestic partner in a domestic partnership qualified under applicable law and resides in a "community property" state, a designation of a person other than the Participant's spouse or domestic partner, as applicable, as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written or electronic consent of the Participant's spouse or domestic partner. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Administrator prior to the Participant's death.

11.4 *Conditions to Issuance of Shares*.

(a) Notwithstanding anything herein to the contrary, neither the Company nor its Affiliates shall be required to issue or deliver any certificates or make any book entries evidencing Shares pursuant to the exercise of any Award, unless and until the Administrator has determined, with advice of counsel, that the issuance of such Shares is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded, and the Shares are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Administrator may require that a Participant make such reasonable covenants, agreements and representations as the Administrator, in its discretion, deems advisable in order to comply with any such laws, regulations or requirements.

(b) All Share certificates delivered pursuant to the Plan and all shares issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to comply with federal, state or foreign securities or other laws, rules

and regulations and the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. The Administrator may place legends on any Share certificate or book entry to reference restrictions applicable to the Shares.

(c) The Administrator shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Award, including a window-period limitation, as may be imposed in the sole discretion of the Administrator.

(d) No fractional Shares shall be issued and the Administrator shall determine, in its sole discretion, whether cash shall be given in lieu of fractional shares or whether such fractional shares shall be eliminated by rounding down.

(e) Notwithstanding any other provision of the Plan, unless otherwise determined by the Administrator or required by any applicable law, rule or regulation, the Company and/or its Affiliates may, in lieu of delivering to any Participant certificates evidencing Shares issued in connection with any Award, record the issuance of Shares in the books of the Company (or, as applicable, its transfer agent or stock plan administrator).

11.5 *Forfeiture Provisions*. Pursuant to its general authority to determine the terms and conditions applicable to Awards under the Plan, the Administrator shall have the right to provide, in the terms of Awards made under the Plan, or to require a Participant to agree by separate written or electronic instrument, that: (a)(i) any proceeds, gains or other economic benefit actually or constructively received by the Participant upon any receipt or exercise of the Award, or upon the receipt or resale of any Shares underlying the Award, must be paid to the Company, and (ii) the Award shall terminate and any unexercised portion of the Award (whether or not vested) shall be forfeited, if (b)(i) a Termination of Service occurs prior to a specified date, or within a specified time period following receipt or exercise of the Award, or (ii) the Participant at any time, or during a specified time period, engages in any activity in competition with the Company, or which is inimical, contrary or harmful to the interests of the Company, as further defined by the Administrator or (iii) the Participant incurs a Termination of Service for Cause.

11.6 *Prohibition on Repricing*. Except in connection with a corporate transaction involving the Company (including, without limitation, any stock dividend, stock split, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, or exchange of shares), the terms of outstanding Awards may not be amended, without stockholder approval, to reduce the exercise price of outstanding Options or Stock Appreciation Rights or cancel outstanding Options or Stock Appreciation Rights in exchange for cash, other Awards or Options or Stock Appreciation Rights with an exercise price that is less than the exercise price of the original Options or Stock Appreciation Rights.

11.7 *Cash Settlement*. Without limiting the generality of any other provision of the Plan, the Administrator may provide, in an Award Agreement or subsequent to the grant of an Award, in its discretion, that any Award may be settled in cash, Shares or a combination thereof.

11.8 *Terms May Vary Between Awards*. The terms and conditions of each Award shall be determined by the Administrator in its sole discretion and the Administrator shall have complete flexibility to provide for varied terms and conditions as between any Awards, whether of the same or different Award type and/or whether granted to the same or different Participants (in all cases, subject to the terms and conditions of the Plan).

**ARTICLE 12.**

**ADMINISTRATION**

12.1 *Administrator.* The Committee (or another committee or a subcommittee of the Board assuming the functions of the Committee under the Plan) shall administer the Plan (except as otherwise permitted herein). and, unless otherwise determined by the Board, shall consist solely of two or more Non-Employee Directors appointed by and holding office at the pleasure of the Board, each of whom is intended to qualify as a "non-employee director" as defined by Rule 16b-3 of the Exchange Act, an "outside director" for purposes of Section 162(m) of the Code and an "independent director" under the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, in each case, to the extent required under such provision; *provided*, *however*, that any action taken by the Committee shall be valid and effective, whether or not members of the Committee at the time of such action are later determined not to have satisfied the requirements for membership set forth in this Section 12.l or otherwise provided in any charter of the Committee. Except as may otherwise be provided in any charter of the Committee, appointment of Committee members shall be effective upon acceptance of appointment. Committee members may resign at any time by delivering written or electronic notice to the Board. Vacancies in the Committee may only be filled by the Board. Notwithstanding the foregoing, (a) the full Board, acting by a majority of its members in office, shall conduct the general administration of the Plan with respect to Awards granted to Non-Employee Directors and (b) the Board or Committee may delegate its authority hereunder to the extent permitted by Section 12.6 hereof.

12.2 *Duties and Powers of Administrator.* It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and all Programs and Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan and any Program as are not inconsistent with the Plan, to interpret, amend or revoke any such rules and to amend any Program or Award Agreement provided that the rights or obligations of the holder of the Award that is the subject of any such Program or Award Agreement are not affected adversely by such amendment, unless the consent of the Participant is obtained or such amendment is otherwise permitted under Section 13.10 hereof. Any such grant or award under the Plan need not be the same with respect to each Participant. Any such interpretations and rules with respect to Incentive Stock Options shall be consistent with the provisions of Section 422 of the Code. In its sole discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan except with respect to matters which under Rule 16b-3 under the Exchange Act, Section 162(m) of the Code or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded are required to be determined in the sole discretion of the Committee.

12.3 *Action by the Committee.* A majority of the Committee shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by all members of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Affiliate, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

12.4 *Authority of Administrator.* Subject to any specific designation in the Plan, the Administrator has the exclusive power, authority and sole discretion to:

(a) Designate Eligible Individuals to receive Awards;

(b) Determine the type or types of Awards to be granted to each Eligible Individual;

(c) Determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d) Determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price or purchase price, any performance criteria, any restrictions or limitations on the Award, any schedule for vesting, lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, and any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Administrator in its sole discretion determines;

(e) Determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in cash, Shares, other Awards or other property, or an Award may be canceled, forfeited or surrendered;

(f) Prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) Decide all other matters that must be determined in connection with an Award;

(h) Establish, adopt or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) Interpret the terms of, and any matter arising pursuant to, the Plan, any Program or any Award Agreement; and

(j) Make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan.

12.5 *Decisions Binding*. The Administrator's interpretation of the Plan, any Awards granted pursuant to the Plan, any Program, any Award Agreement and all decisions and determinations by the Administrator with respect to the Plan are final, binding and conclusive on all parties.

12.6 *Delegation of Authority.* To the extent permitted by applicable law or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, the Board or Committee may from time to time delegate to a committee of one or more members of the Board or one or more officers of the Company the authority to grant or amend Awards or to take other administrative actions pursuant to this Article 12; *provided*, *however*, that in no event shall an officer of the Company be delegated the authority to grant awards to, or amend awards held by, the following individuals: (a) individuals who are subject to Section 16 of the Exchange Act, (b) Covered Employees with respect to Awards intended to constitute Performance-Based Compensation or (c) officers of the Company (or Directors) to whom authority to grant or amend Awards has been delegated hereunder; *provided further,* that any delegation of administrative authority shall only be permitted to the extent it is permissible under Section 162(m) of the Code and applicable securities laws or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. Any delegation hereunder shall be subject to the restrictions and limits that the Board or Committee specifies at the time of such delegation, and the Board may at any time rescind the authority so delegated or appoint a new delegatee.

## ARTICLE 13.

## MISCELLANEOUS PROVISIONS

13.1 *Amendment, Suspension or Termination of the Plan*. Except as otherwise provided in this Section 13.1, the Plan may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Board. However, without approval of the Company's stockholders given within twelve (12) months before or after the action by the Administrator, no action of the Administrator may, except as provided in Section 13.2 hereof, (a) increase the Share Limit or increase the Individual Award Limits, (b) reduce the price per share of any outstanding Option or Stock Appreciation Right granted under the Plan or (c) cancel any Option or Stock Appreciation Right in exchange for cash or another Award when the Option or Stock Appreciation Right price per share exceeds the Fair Market

Value of the underlying Shares. Except as provided in Section 13.10 hereof, no amendment, suspension or termination of the Plan shall, without the consent of the Participant, impair any rights or obligations under any Award theretofore granted or awarded, unless the Award itself otherwise expressly so provides. No Awards may be granted or awarded during any period of suspension or after termination of the Plan. Notwithstanding anything herein to the contrary, no Incentive Stock Option shall be granted under the Plan after the tenth (10th) anniversary of the Effective Date.

13.2 *Changes in Common Stock or Assets of the Company, Acquisition or Liquidation of the Company and Other Corporate Events.*

(a) In the event of any stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of the Company's stock or the share price of the Company's stock other than an Equity Restructuring, the Administrator shall make equitable adjustments, if any, to reflect such change with respect to (i) the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments of the Share Limit and Individual Award Limits, and adjustments of the manner in which shares subject to Full Value Awards will be counted); (ii) the number and kind of shares of Common Stock (or other securities or property) subject to outstanding Awards; (iii) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and/or (iv) the grant or exercise price per share for any outstanding Awards under the Plan. Any adjustment affecting an Award intended as Performance-Based Compensation shall be made consistent with the requirements of Section 162(m) of the Code unless otherwise determined by the Administrator.

(b) In the event of any transaction or event described in Section 13.2(a) hereof or any unusual or nonrecurring transactions or events affecting the Company, any Affiliate of the Company, or the financial statements of the Company or any Affiliate, or of changes in applicable laws, regulations or accounting principles, the Administrator, in its sole discretion, and on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event and either automatically or upon the Participant's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any Award under the Plan, to facilitate such transactions or events or to give effect to such changes in laws, regulations or principles:

(i) To provide for either (A) termination of any such Award in exchange for an amount of cash, if any, equal to the amount that would have been attained upon the exercise of such Award or realization of the Participant's rights (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction or event described in this Section 13.2, the Administrator determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment) or (B) the replacement of such Award with other rights or property selected by the Administrator in its sole discretion having an aggregate value not exceeding the amount that could have been attained upon the exercise of such Award or realization of the Participant's rights had such Award been currently exercisable or payable or fully vested;

(ii) To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar options, rights or awards covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and prices;

(iii) To make adjustments in the number and type of securities subject to outstanding Awards and Awards which may be granted in the future and/or in the terms, conditions and criteria included in such Awards (including the grant or exercise price, as applicable);

(iv) To provide that such Award shall be exercisable or payable or fully vested with respect to all securities covered thereby, notwithstanding anything to the contrary in the Plan or an applicable Program or Award Agreement; and

(v) To provide that the Award cannot vest, be exercised or become payable after such event.

(c) In connection with the occurrence of any Equity Restructuring, and notwithstanding anything to the contrary in Sections 13.2(a) and 13.2(b) hereof:

(i) The number and type of securities subject to each outstanding Award and/or the exercise price or grant price thereof, if applicable, shall be equitably adjusted. The adjustment provided under this Section 13.2(c)(i) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(ii) The Administrator shall make such equitable adjustments, if any, as the Administrator in its discretion may deem appropriate to reflect such Equity Restructuring with respect to the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments to the Share Limit and the Individual Award Limits). The adjustments provided under this Section 13.2(c) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(d) Change in Control.

(i) Notwithstanding any other provision of the Plan, in the event of a Change in Control, each outstanding Award shall be assumed or an equivalent Award substituted by the successor corporation or a parent or subsidiary of the successor corporation. For the purposes of this Section 13.2(d)(i), an Award shall be considered assumed or substituted if, following the Change in Control, the assumed or substituted Award confers the right to purchase or receive, for each share of Common Stock subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) received in the Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); *provided*, *however*, that if such consideration received in the Change in Control was not solely common stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the assumed or substituted Award, for each share of Common Stock subject to such Award, to be solely common stock of the successor corporation or its parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change in Control.

(ii) In the event that the successor corporation in a Change in Control and its parents and subsidiaries refuse to assume or substitute for any Award in accordance with Section 13.2(d)(i) hereof, each such non-assumed/substituted Award shall become fully vested and, as applicable, exercisable and shall be deemed exercised, immediately prior to the consummation of such transaction, and all forfeiture restrictions on any or all such Awards shall lapse at such time. If an Award vests and, as applicable, is exercised in lieu of assumption or substitution in connection with a Change in Control, the Administrator shall notify the Participant of such vesting and any applicable exercise, and the Award shall terminate upon the Change in Control. For the avoidance of doubt, if the value of an Award that is terminated in connection with this Section 13.2(d)(ii) is zero or negative at the time of such Change in Control, such Award shall be terminated upon the Change in Control without payment of consideration therefor.

(e) The Administrator may, in its sole discretion, include such further provisions and limitations in any Award, agreement or certificate, as it may deem equitable and in the best interests of the Company that are not inconsistent with the provisions of the Plan.

(f) With respect to Awards which are granted to Covered Employees and are intended to qualify as Performance-Based Compensation, no adjustment or action described in this Section 13.2 or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause such Award to fail to so qualify as Performance-Based Compensation, unless the Administrator determines that the Award should not so qualify. No adjustment or action described in this Section 13.2 or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause the Plan to violate Section 422(b)(1) of the Code. Furthermore, no such adjustment or action shall be authorized with respect to any Award to the extent such adjustment or action would result in short-swing profits liability under Section 16 or violate the exemptive conditions of Rule 16b-3 unless the Administrator determines that the Award is not to comply with such exemptive conditions.

(g) The existence of the Plan, any Program(s), any Award Agreement(s) and/or any Awards granted hereunder shall not affect or restrict in any way the right or power of the Company or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants or rights to purchase stock or of bonds, debentures, preferred or prior preference stocks whose rights are superior to or affect the Common Stock or the rights thereof or which are convertible into or exchangeable for Common Stock, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(h) No action shall be taken under this Section 13.2 which shall cause an Award to fail to comply with Section 409A of the Code or an exemption therefrom, in either case, to the extent applicable to such Award, unless the Administrator determines any such adjustments to be appropriate.

(i) In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of Common Stock or the share price of the Common Stock including any Equity Restructuring, for reasons of administrative convenience, the Company in its sole discretion may refuse to permit the exercise of any Award during a period of thirty (30) days prior to the consummation of any such transaction.

13.3 *Approval of Plan by Stockholders*. The Plan will be submitted for the approval of the Company's stockholders within twelve (12) months after the date of the Board's initial adoption of the Plan. If the Plan is not approved by stockholders within twelve (12) months after its adoption by the Board, then the Original Plan shall continue on its existing terms and conditions and the Plan shall be of no force or effect.

13.4 *No Stockholders Rights*. Except as otherwise provided herein or in an Award Agreement, a Participant shall have none of the rights of a stockholder with respect to shares of Common Stock covered by any Award until the Participant becomes the record owner of such shares of Common Stock.

13.5 *Paperless Administration*. In the event that the Company establishes, for itself or using the services of a third party, an automated system for the documentation, granting or exercise of Awards, such as a system using an internet website or interactive voice response, then the paperless documentation, granting or exercise of Awards by a Participant may be permitted through the use of such an automated system.

13.6 *Effect of Plan upon Other Compensation Plans*. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for the Company or any Affiliate. Nothing in the Plan shall

be construed to limit the right of the Company or any Affiliate: (a) to establish any other forms of incentives or compensation for Employees, Directors or Consultants of the Company or any Affiliate, or (b) to grant or assume options or other rights or awards otherwise than under the Plan in connection with any proper corporate purpose including without limitation, the grant or assumption of options in connection with the acquisition by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, partnership, limited liability company, firm or association.

13.7 *Compliance with Laws*. The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of Shares and the payment of money under the Plan or under Awards granted or awarded hereunder are subject to compliance with all applicable federal, state, local and foreign laws, rules and regulations (including but not limited to state, federal and foreign securities law and margin requirements), the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, and to such approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all applicable legal requirements. To the extent permitted by applicable law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

13.8 *Titles and Headings, References to Sections of the Code or Exchange Act*. The titles and headings of the sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. References to sections of the Code or the Exchange Act shall include any amendment or successor thereto.

13.9 *Governing Law.* The Plan and any agreements hereunder shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of laws thereof.

13.10 *Section 409A*. To the extent that the Administrator determines that any Award granted under the Plan is subject to Section 409A of the Code, the Plan, any applicable Program and the Award Agreement covering such Award shall be interpreted in accordance with Section 409A of the Code. Notwithstanding any provision of the Plan to the contrary, in the event that, following the Effective Date, the Administrator determines that any Award may be subject to Section 409A of the Code, the Administrator may adopt such amendments to the Plan, any applicable Program and the Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to avoid the imposition of taxes on the Award under Section 409A of the Code, either through compliance with the requirements of Section 409A of the Code or with an available exemption therefrom.

13.11 *No Rights to Awards*. No Eligible Individual or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Administrator is obligated to treat Eligible Individuals, Participants or any other persons uniformly.

13.12 *Unfunded Status of Awards*. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Program or Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Affiliate.

13.13 *Indemnification*. To the extent allowable pursuant to applicable law, each member of the Board and any officer or other employee to whom authority to administer any component of the Plan is delegated shall be indemnified and held harmless by the Company from any loss, cost, liability or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit or proceeding to which he or she may be a party or in which he or she may be

involved by reason of any action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit or proceeding against him or her; *provided*, *however*, that he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Certificate of Incorporation or Bylaws, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

13.14 *Relationship to other Benefits*. No payment pursuant to the Plan shall be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

13.15 *Expenses*. The expenses of administering the Plan shall be borne by the Company and its Affiliates.

13.16 *Arbitration*. With the exception of any claims for workers compensation, unemployment insurance, claims before any governmental administrative agencies as required by applicable law, or claims related to the National Labor Relations Act, any controversy relating to this Plan shall be settled via binding arbitration according to the applicable employment dispute resolution rules of the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures (available at http://www.adr.org). Such arbitration shall be presided over by a single arbitrator in California. Such binding arbitration is applicable to any and all claims under state and federal employment related statutes including without limitation the Fair Employment and Housing Act, the Title VII of the Civil Rights Act, as well as any claims related to a claimed right under this Plan. The Company shall bear all costs uniquely associated with the arbitration process, including the arbitrator's fees, if required by applicable law. The arbitrator shall have the authority to award any damages authorized by law. The prevailing party shall be entitled to his/its attorneys' fees, unless otherwise prohibited by applicable law. This requirement to arbitrate shall apply to both the Company and Employee. The parties understand that they are giving up their right to a trial in a court of law.

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*1717 Arch St., Ste. 1300*
*Philadelphia, PA 19103*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 David T. Feinberg
06 William F. Ballhaus

**The Board of Directors recommends you vote FOR proposals 2, 3 and 4.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Approval of OSI Systems, Inc. 2012 Incentive Award Plan. | ☐ | ☐ | ☐ |
| 3 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2013. | ☐ | ☐ | ☐ |
| 4 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2012. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date Signature (Joint Owners) Date

0000150125_1 R1.0.0.11699

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com .

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 12, 2012 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 12, 2012 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, 3 and 4 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000150125_2 R1.0.0.11699

**Continued and to be signed on reverse side**

# Exhibit 31

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 12, 2012**

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07. Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 12, 2012. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 15,508,215 | 1,343,332 | 1,939,540 |

| | | | |
|---|---|---|---|
| Ajay Mehra | 15,805,948 | 1,045,599 | 1,939,540 |
| Steven C. Good | 15,281,634 | 1,569,913 | 1,939,540 |
| Meyer Luskin | 13,938,228 | 2,913,319 | 1,939,540 |
| David T. Feinberg | 16,510,380 | 341,167 | 1,939,540 |
| William F. Ballhaus | 16,262,808 | 588,739 | 1,939,540 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Approval of the OSI Systems, Inc. 2012 Incentive Award Plan*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 11,556,859 | 5,275,488 | 19,200 | 1,939,540 |

The proposal was approved.

*3. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2013*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 18,757,864 | 19,844 | 13,379 | 0 |

The proposal was approved.

*4. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2012*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 16,178,409 | 649,388 | 23,750 | 1,939,540 |

The proposal was approved.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 12, 2012

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

# Exhibit 32

DEF 14A 1 a2216924zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 15, 2013

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 3, 2013, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 8, 2013 are entitled to vote at the Annual Meeting.

We have enclosed herewith a Notice of Annual Meeting of Stockholders, a Proxy Statement and a Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and named executive officers. We have also enclosed a copy of our Annual Report on Form 10-K for the fiscal year ended June 30, 2013, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., local time, on Tuesday, December 3, 2013

**Location:** The Company's principal offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2014;

3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2013, as described in the accompanying Proxy Statement; and

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 8, 2013 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 3, 2013:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2013 are available at *http://www.proxyvote.com*.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2013 | 11 |
| Compensation of Executive Officers and Directors | 13 |
| Security Ownership of Certain Beneficial Owners and Management | 43 |
| Equity Compensation Plan Information | 46 |
| Independent Registered Public Accounting Firm | 47 |
| Report of Audit Committee | 48 |
| Code of Ethics and Conduct | 50 |
| Annual Meeting Attendance | 50 |
| Stockholder Communications | 50 |
| Availability of Annual Report on Form 10-K | 50 |
| Stockholder Proposals | 50 |
| Incorporation by Reference | 51 |
| Other Business | 51 |

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 3, 2013, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to its stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. The Company anticipates that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 21, 2013.

Stockholders of record as of the close of business on October 8, 2013 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on your Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 8, 2013, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 20,053,538 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST" or "ABSTAIN" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual

Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, the Company's management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. Directors are elected by a plurality, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One.

*Proposal Two*. To be approved, the ratification of Moss Adams LLP as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. To be approved, the proposal regarding the Company's executive compensation for the fiscal year ended June 30, 2013 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that the stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about the Company's executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 3, 2013:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2013 are available at *http://www.proxyvote.com*.

## ELECTION OF DIRECTORS
*(Proposal No. 1 of the Proxy Card)*

**Nominees**

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 62 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 51 | Director, Executive Vice President and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 71 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 88 | Director | 1990 |
| David T. Feinberg(3)(5) | 51 | Director | 2010 |
| William F. Ballhaus(1)(2)(5) | 68 | Director | 2010 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Executive Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor

Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing the Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and experience managing the Company's Security division.

***Steven C. Good*** has served as a Director of the Company since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good also currently serves as a Director of Rexford Industrial Realty, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman. Mr. Luskin is also a Director of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital) and was formerly the Chairman. Mr. Luskin is also a Director on the Advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***David T. Feinberg*** has served as a Director of the Company since March 2010. Dr. Feinberg has served as the President of the UCLA Health System since July 2011 and as Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming these positions, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine

at UCLA. Dr. Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Dr. Feinberg graduated cum laude in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his master of business administration from Pepperdine University in 2002. Dr. Feinberg was selected to serve as a director because of his knowledge of the healthcare industry and his experience managing a large, internationally-renown hospital system.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political and other risks. Risks are reported to the Board of Directors through the Company's executive officers, who are responsible for the identification, assessment and management of the Company's risks. The Board of Directors regularly discusses the risks reported by the Company's executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of risks related to accounting, auditing and financial reporting and maintaining effective internal control over financial reporting. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. The Company believes that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances the Company's ability to communicate its message and strategy clearly and consistently to its stockholders, employees, and other companies with which it does business. Although the Company believes that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, it will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve the Company's best interests and the best interests of its stockholders. The Company does not have a lead independent director.

**Board of Directors Meetings, Independence and Committees of the Board of Directors**

There were nine meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2013. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2013 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of Messrs. Good and Luskin and Dr. Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To

date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee and the Audit Committee acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2013. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of Messrs. Luskin and Good and Dr. Ballhaus. There were two meetings of the Compensation Committee and the Compensation Committee acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2013. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Good and Luskin and Dr. Feinberg. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2013.

The Nominating and Governance Committee will consider candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were two meetings of the Executive Committee during the fiscal year ended June 30, 2013.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board of Directors regarding all technology-based matters. The Technology Committee consists of Drs. Ballhaus and Feinberg. There were four meetings of the Technology Committee during the fiscal year ended June 30, 2013.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from the Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to the Company's Board of Directors to be voted on at this year's Annual Meeting. All of this year's nominees for director are currently directors of the Company. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors, Messrs. Luskin and Good and Dr. Ballhaus. No executive officer of the Company has served during the fiscal year ended June 30, 2013 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2013, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus, Jr. as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2146 of 2711

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2014 and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2014. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2147 of 2711

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2013**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") enables the Company's stockholders to vote to approve, on an advisory, non-binding basis, the Company's executive compensation for the fiscal year ended June 30, 2013 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act ("Say-on-Pay"). The Company currently conducts this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at the Company's next annual meeting of stockholders following the 2013 Annual Meeting.

**Summary**

The Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. The Company is asking its stockholders to provide advisory approval of the Company's executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives. The Company believes that its compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the long-term interests of the stockholders.

The Company urges the stockholders to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

The Company believes that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. In fiscal year 2013, the Company experienced growth in operating margin, non-GAAP net income, non-GAAP earnings per share, and revenue. The Company ended fiscal year 2013 with a very strong backlog. In recent years, the Company has continued to outperform the equity markets in general as well as outperform its industry peers. The Company believes that its continued success is closely tied to the performance of its executive officers and has designed its compensation practices in order to reward the executives for their contributions to the overall success of the Company.

**Alignment with Stockholders' Interests**

The Company grants annual incentive bonuses based in part on each executive's contribution to enhancing long-term stockholder value. The Company also grants long-term incentives in the form of equity awards as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of the stockholders. The Company has also established the Mexico SAT Incentive Program which includes a long term component. The Company has generally used restricted stock, stock options and restricted stock units as its equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In

addition to linking compensation value to stockholder value, these awards generally have a vesting period, which creates a strong retention incentive and helps ensure the continuity of the Company's operations. For fiscal year 2013, long-term equity incentives consisted of restricted stock subject to performance vesting based on growth of EBITDA per share. For fiscal year 2014, long-term equity incentives will continue to be 100% performance vesting.

**Long-Term Performance**

In order to promote the Company's philosophy of pay-for-performance and furthering its objective of aligning the interests of management with those of the stockholders, the Company established a performance program for certain of its executive officers. The program focuses on the achievement of the Company's long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, the Company is incentivizing its officers to achieve the Company's long-term corporate objectives and ultimately increase stockholder value.

**Advisory Vote on Named Executive Officer Compensation**

At our 2012 annual meeting, 96.1% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Considering the strong stockholder support of the compensation of the Named Executive Officers for fiscal 2012, the Compensation Committee determined to continue to apply the same general approach with respect to compensation policies and decisions for fiscal 2013.

**Recommendation**

The Board of Directors believes that the information provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that the Company's executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2013. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Compensation Discussion and Analysis

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the Named Executive Officers.

The following table sets forth the names, ages and positions of each of the Company's Named Executive Officers:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra | 62 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick | 45 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra | 51 | Director, Executive Vice President and President of Security division |
| Victor Sze | 46 | Executive Vice President and General Counsel |
| Manoocher Mansouri | 57 | President of Optoelectronics and Manufacturing division |

For additional information, please also refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Executive Compensation Summary*

*Fiscal 2013 Performance*

Fiscal 2013 was a strong year for the Company. During fiscal 2013, the Company (a) increased its operating margin, (b) actively leveraged its business infrastructure to support new products and revenue sources while maintaining intelligent cost management, (c) continued building a foundation for future growth by making targeted investments in new product development and acquisitions, (d) increased revenues over our prior year despite the fact that revenues for fiscal 2012 were unusually high due to a large U.S. Army program which was substantially completed during that fiscal year and (e) further improved sustainability of revenues by growing the Company's addressable markets; all of which resulted in the fifth consecutive year of record non-GAAP earnings.

*Leverage Business Infrastructure and Growth in Operating Income Margin.* Even as the Company launched new products, entered new markets, and invested substantial amounts in R&D and in connection with the implementation of the Mexico screening services program, the Company actively leveraged its business infrastructure and maintained intelligent cost management, resulting in a significantly improved operating margin of 9.3% as compared to 8.3% in the prior year.

*Growth in Markets and Opportunities.* In fiscal 2013, in addition to growing revenues over the prior year, the Company continued to expand its addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and the Company believes it will continue to serve, to sustain growth even through periods such as the past year, when many sectors of the global economy, including much of the rest of the security inspection industry, experienced significant headwinds. Examples include:

- Continuing to expand and strengthen the Company's turnkey security screening services business by way of the implementation of our Security Division's multi-year screening services program with the tax and customs authority of Mexico including the completion of construction of numerous screening sites throughout Mexico, together with obtaining permits and regulatory approvals, and the commencement of the screening services operations on a large scale.

- Continuing the development and launch of an entire new generation of healthcare products, each of which will embody significant innovations in form and function. This ambitious program began in fiscal 2011 with the introduction of the Company's Xprezzon® monitoring platform and in fiscal

2012 with the introduction of the qube™ compact monitor, and continued in fiscal 2013 with introduction of the Arkon™ anesthesia machine and the AriaTele™ telemetry transmitter.

- Expanding our Optoelectronics and Manufacturing division's electronics manufacturing services, market segments, customer base and capabilities.

*Building a Foundation for the Future*. While improving the Company's operating margin during fiscal 2013, the Company continued to make significant targeted investments in R&D and acquisitions. Such investments in the past have led to the Company's introduction of the Rapiscan RTT® computed tomography (CT) based hold baggage inspection system and new generation of healthcare products. The Company believes that these investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

The results of the assertive and dynamic management of the Company are seen in the Company's financial outcomes, particularly considering the state of the overall global economy in the period since the economic downturn that began in late 2008. During this period of economic uncertainty, the Company's stockholders have witnessed solid growth in revenues, earnings per share, and stock price.

This growth is reflected in an increase in the Company's stock price of more than 132% over the three years ending in fiscal 2013. Moreover, the Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business that will position the Company to sustain growth into the coming years.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee. The Compensation Committee is responsible for establishing and approving all compensation for the Named Executive Officers, including base salaries, annual incentive bonuses, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of the Named Executive Officers (other than the Chief Executive Officer) is recommended to the Compensation Committee by the Chief Executive Officer. Compensation for the Chief Executive Officer is established by the Compensation Committee on its own.

Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape.

*Executive Compensation Program Elements*

The particular elements of the compensation program for the Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with the Company's pay-for-performance philosophy, the Company structures its compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation, in the form of annual cash incentives and performance-based equity grants and compensation under the Mexico SAT Incentive Program, comprises a significant percentage of total compensation.

The following is an overview of the elements of the Company's compensation and benefits programs for fiscal 2013:

| Pay Element | Description |
| --- | --- |
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Cash Annual Incentives | Cash-based annual incentives that are determined based on Company and individual performance, subject to achievement of a pre-determined threshold rate of return on book value of the Company. |
| | The Mexico SAT Incentive Program also includes a short-term cash incentive component in the form of annual cash bonuses for participating Named Executive Officers. |
| Long-Term Incentives | The fiscal 2013 program with respect to the Named Executive Officers consisted of performance-based restricted stock. The fiscal 2014 program will consist of performance-based restricted stock units. |
| | Performance-based restricted stock is earned based on EBITDA-based metrics for each of the three years following grant, as well as an aggregate three-year metric. |
| | The Mexico SAT Incentive Program also includes cash long-term incentives in the form of a long-term component bonus and a contract award bonus ("CAB Bonus") for participating Named Executive Officers. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2013, perquisites included car allowances and membership dues. Membership dues were discontinued during fiscal 2013. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash bonuses at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which the CEO is the only participant. |

In fiscal 2013, fixed compensation comprised approximately 11% to 37% and variable compensation comprised approximately 63% to 89% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 86% of total compensation.

*Fixed Compensation*. Fixed compensation is intended to compensate the Named Executive Officers for their ongoing responsibilities and consists principally of base salary. Base salary is set to attract and retain executive talent. It provides a fixed rate of pay and is generally not at risk of upward or downward adjustment until the following year. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted, typically on an annual basis, to reflect sustained individual performance. In determining whether base salary levels for fiscal year 2013 were appropriate, the Compensation Committee considered the Company's general financial performance, the minimum base salary amount provided for in the Named Executive Officer's employment agreement (for those Named Executive Officers that had employment agreements with the Company at such time), as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions. Based on the challenging business environment during the second quarter of fiscal 2013, all of the Named Executive Officers voluntarily agreed to a pay cut of 10% of their base salary rates through June 30, 2013.

*Variable Compensation*. Variable compensation provides the Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive bonuses and long-term incentive compensation in the form of equity based awards, as well as compensation under the Mexico SAT Incentive Program.

*Annual Incentive Bonuses*. All Named Executive Officers are eligible for an annual incentive bonus pursuant to the Company's annual performance bonus program. Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement and near-term success. In determining annual incentive bonuses for the Named Executive Officers, the Compensation Committee considers the rate of return on the book value of the Company. If a pre-established threshold rate of return before taxes is exceeded for a particular fiscal year, cash bonuses may be awarded to the participating executives. The Company needed to exceed a threshold rate of return before taxes on book value of 7% for fiscal year 2013. Such threshold rate of return was calculated based on the pre-tax income of the Company for fiscal year 2013, excluding the impact of

bonuses, restructuring charges and pre-tax income from the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria, relative to the Company's total stockholders' equity as of the prior fiscal year end. The threshold was designed to be challenging yet achievable with significant effort and management skill. Moreover, no such bonuses may be awarded unless the Company achieves a minimum of $10 million in pre-tax income. If the Company exceeds these thresholds, then the Compensation Committee evaluates the various quantitative and qualitative factors as described below in a non-formulaic manner to determine the amount of bonus compensation for each named executive officer. Achievement of these thresholds is not linked to any specific payouts as these metrics are not target performance objectives, but rather are minimum performance thresholds for the Company below which the Named Executive Officers would not be entitled to any such annual incentive bonus compensation. Both of these thresholds were exceeded by the Company in fiscal year 2013. Additionally, no such bonus may exceed maximum amounts of 300% of base salary for the Chief Executive Officer and 200% of base salary for the other participating executives.

After satisfaction of the threshold performance criteria, the bonus amounts were determined by the Compensation Committee based on its evaluation of the overall and relative performance of the Company as well as its evaluation of the compensation practices of the Company's peer group. Each bonus was established at its respective value in order to provide the executive sufficient incentive to create long-term shareholder value while at the same time ensuring that such executive's total bonus compensation would be appropriate as compared to compensation of similarly situated executives. The Compensation Committee retains negative discretion to reduce any awards under the annual performance bonus program to a lesser award or no award to any participant.

In determining the amounts of annual incentive bonuses, the Compensation Committee also considers individual performance, which may include the following quantitative and qualitative factors:

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Quality of the Management of Units or Functions Managed by the Named Executive Officer | • Financial Performance (including earnings per share and internal metrics) |
| • Leadership of Personnel Under the Named Executive Officer's Management | • Financial Performance Metrics for Business Units Managed by the Named Executive Officer |
| • Execution of Strategically Important Projects | • Compensation Surveys Provided by External Advisors |
| • Overall Effectiveness of Units or Functions Managed by the Named Executive Officer | |
| • Contributions to the Formulation of Company Strategy and Tactics | |
| • Contributions to Stockholder Value | |
| • Management of Risk | |

The particular performance achievements for each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed by the Compensation Committee. The performance achievements for the Chief Executive Officer are established by the Compensation Committee. The Compensation Committee also reviews and approves the amounts to be paid to the Chief Executive Officer.

The Compensation Committee also assesses the value that each of the Named Executive Officers provided through the generation of new sources of revenue, achievement of operational efficiencies, management of risk and completion of strategic initiatives. The annual incentive bonus earned for

fiscal year 2013 by each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Program*. In order to further promote the Company's philosophy of pay-for-performance and furthering its objective of aligning its executive compensation with the Company's long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of the Named Executive Officer, the Company has a long-term incentive program. For fiscal year 2013, this program consisted of restricted stock subject to performance vesting based on growth of adjusted EBITDA per share in connection with the Six-year Performance Program described below. For fiscal year 2014, the long-term program is comprised of performance based restricted stock units based on growth of adjusted EBITDA per share.

*Six-year Performance Program*. With respect to performance based awards, the Compensation Committee has established a six-year program for long-term performance based incentive grants for the Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each grant has a performance based component, which vests based on the achievement of certain one-, two-and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. Such metrics exclude the effect of particular designated operations for which specific incentive programs are established; at this time, the only such designated operation is the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill. The performance based component will vest if three-year baseline metrics are achieved. For each grant, additional shares may be earned if annual baselines are exceeded as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

However, if actual three-year performance falls below baseline, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 65% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

For actual performance in fiscal 2013, each of the Named Executive Officers earned additional shares, as follows: Mr. Chopra, 46,500 shares; Mr. Edrick, 24,500 shares; Mr. Mehra, 24,500 shares; Mr. Sze, 16,250 shares; and Mr. Mansouri, 1,500 shares.

In the event of a change of control, the initial grant of the performance based component would vest upon the change of control; to the extent actual performance has exceeded baseline for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed baseline by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The grants to the Named Executive Officers during fiscal 2013 were performance based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for the Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving performance and business objectives of the Company for the benefit of its stockholders. The grants to the Named Executive Officers during fiscal 2014 were also performance based in their entirety.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the number of equity awards to grant to the Named Executive Officers. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the quantitative and qualitative factors set forth in "Annual Incentive Bonuses" above, as well as overall corporate performance. For fiscal year 2013 performance share calculation purposes, the Chief Executive Officer, Chief Financial Officer and General Counsel are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance with the exception of the President of Rapiscan whose performance is weighted 70% based on consolidated Company performance and 30% based on division performance in order to effectively compensate him for his role in overall corporate performance. The Compensation Committee retains negative discretion to reduce any awards under the long-term incentive program to a lesser award or no award to any participant.

The Company's overall long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the long-term interests of the Company's stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under the Company's equity incentive plan as in effect on the date of grant (the "Equity Plan"), fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Mexico SAT Incentive Program.* For the fiscal years 2013 through 2017, the Company has established an incentive program tied to the performance of the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive Program"). The Mexico SAT Incentive Program was adopted in July 2012. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of certain metrics based on the operating income of the services for the Mexico Servicio de Administración Tributaria. The metrics require such operating income, as a percentage of revenue, to significantly exceed operating margin for the Company as a whole before any incentives are awarded, and are thus believed to be challenging, but achievable. The Mexico SAT Incentive Program consists of three components that may be awarded to certain Named Executive Officers upon achievement of performance criteria: a short-term component, a long-term component, and a "contract award bonus".

If the threshold operating income amount is exceeded for a particular fiscal year, and dependent on the amount by which such threshold operating income is exceeded, a bonus pool is established for certain Named Executive Officers. The bonus pool, if any, is allocated among participating executives. For each such executive, 70% of the annual bonus allocation comprises the short term component. Half of the short-term component is paid to that executive within 75 days of the end of the fiscal year

in which it is earned, and the other half would be paid to that executive within 75 days of the end of the following year, provided that the executive has not resigned prior to the date of such payments. The long-term component constitutes the remaining 30% of the executive's annual bonus allocation, and would not be paid until 2018, if the executive has not previously resigned. The amount of the long-term component would be divided by $50.17, representing the baseline value of the Company's stock prior to public disclosure of the Company's contract with the Servicio de Administración Tributaria. The resulting figure would then be multiplied by the per-share price of the Company's stock as of December 31, 2017, and the product would constitute the final value of the long-term component.

The contract award bonus is based on five-and-a-half year cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. If the threshold cumulative operating income is exceeded, and dependent on the amount by which such operating income is exceeded, a "CAB" bonus pool would be established in an amount equal to 1%-5% of the cumulative operating income. The CAB bonus pool, if any, would be allocated among participating executives. The CAB bonuses, if any, for each executive would be paid in January 2018, provided that the executive has not resigned prior to the payment.

In the event of a change of control: (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the change of control; (b) a pro-rata CAB bonus would be paid based on the operating income for the two quarters preceding the change of control; (c) the remaining value of the Mexico SAT Incentive Program would be calculated by imputing the operating income for the 12 months preceding the change of control to the period that is the shorter of (i) the 24 months after the change of control or (ii) the remainder of the term of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria (or, in the case of the CAB bonus, until December 31, 2017), and establishing bonus pools based on such data.

In the event that a participating executive's participation in the Mexico SAT Incentive Program is terminated, for reasons other than by the executive's voluntary resignation or the termination of that executive's employment for cause, then (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the termination; (b) a further annual bonus and CAB amount calculated by imputing performance for the 12 months preceding the termination to the period equal to the remainder of the then-current fiscal year plus an additional 12 months, provided that such period does not extend beyond the end of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria for the calculation of the annual bonus amount, and December 31, 2017 for calculation of the CAB amount. Such amounts would be paid within 45 days of the termination.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the amount of awards to grant to the Named Executive Officers under the Mexico SAT Incentive Program. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers each Named Executive Officer's position with the Company and involvement in the management of the screening services operation in making its determinations. The Compensation Committee retains discretion to amend the Mexico SAT Incentive Program.

All of the Named Executive Officers, with the exception of Mr. Mansouri, were participants in the Mexico SAT Incentive Program during fiscal 2013. The short-term and long-term components of the Mexico SAT Incentive Program compensation earned for fiscal year 2013 by each of such Named Executive Officers is shown in the "Non-equity Incentive Plan Compensation" column of the

"Summary Compensation Table." Each of such Named Executive Officers will receive a CAB bonus provided that the five-and-a-half year cumulative operating income threshold is achieved. Information concerning the potential CAB bonus amounts is shown in the "Grant of Plan Based Awards Table."

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. For matching contribution amounts, see the Summary Compensation Table and related footnotes. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix.* While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to the Named Executive Officers for fiscal 2013, the Compensation Committee performed a global review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was thoroughly evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of Long-term Goals | • Compensation Paid in Prior Years |
| • Individual Performance and Experience | • Financial Performance of Company / Division |
| • Demonstration of Leadership Skills and Ability | • Peer Group Compensation and Performance Data |
| • Achievement of Strategic Targets | • Compensation Surveys Provided by External Advisors |
| • Management of Unplanned Events and Issues Emerging During the Fiscal Year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2013 peer group were developed based on similarity in size and operations within the industries in which the Company operates as follows:

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| • Analogic Corporation | • CONMED Corporation | • FEI Company | • JDS Uniphase Corporation | • Newport Corporation | • Sirona Dental Systems, Inc. |
| • ARRIS Group, Inc. | • CTS Corporation | • Finisar Corporation | • Masimo Corporation | • NuVasive, Inc. | • Teleflex Incorporated |
| • Checkpoint Systems, Inc. | • Edwards Lifesciences Corporation | • FLIR Systems, Inc. | • MTS Systems Corporation | • ResMed Inc. | • TTM Technologies, Inc. |
| • Coherent, Inc. | • Fabrinet | • Harmonic Inc. | • Multi-Fineline Electronix, Inc. | • Rofin-Sinar Technologies Inc. | |

In connection with executive compensation for fiscal 2013, the Compensation Committee engaged Frederic W. Cook & Co., Inc., to provide consulting services and advice regarding executive compensation matters. The Company's management also provided the Compensation Committee with information gathered from Pearl Meyer & Partners for consideration.

The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that each Named Executive Officer was located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed the Company's actual performance taken as a whole as

well as its performance relative to its peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to the Company's comparative performance.

For fiscal 2013, the Compensation Committee determined that it was appropriate to maintain fixed compensation levels relatively stable for all Named Executive Officers as compared to fiscal 2012. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position, which did not change materially in fiscal 2013. However, based on the challenging business environment during the second quarter of fiscal 2013, all of the Named Executive Officers voluntarily agreed to a pay cut of 10% of their base salary rates through June 30, 2013. The following table sets forth the changes to base salaries paid to the Named Executive Officers for fiscal 2013 as compared to fiscal 2012:

| Named Executive Officer | Changes in Base Salary |
|---|---|
| Deepak Chopra | Decreased from $1,000,000 to $961,538 |
| Alan Edrick | Decreased from $402,000 to $386,538 |
| Ajay Mehra | Decreased from $402,000 to $386,538 |
| Victor Sze | Decreased from $350,000 to $336,538 |
| Manoocher Mansouri | Decreased from $270,500 to $260,096 |

Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual cash incentives and performance-based equity grants, as well as compensation under the MSAT Incentive Program, comprised a significant portion of total compensation.

In making variable compensation determinations, the Compensation Committee noted significant corporate and management achievements during fiscal year 2013 in the categories "furtherance of long-term goals", "demonstration of leadership skills and ability" and "achievement of strategic targets". With respect to Messrs. Chopra, Mehra, Edrick and Sze these included implementation of the screening services operation with the tax and customs authority of Mexico. With respect to Messrs. Chopra, Edrick, and Sze these also included the continuation of the development and launch of an entire new generation of healthcare products and, with respect to those executives and also with respect to Mr. Mansouri, also the expansion of the Optoelectronics and Manufacturing division's electronics manufacturing services, market segments, customer base and capabilities. The Compensation Committee factored these achievements against instances where the Company did not achieve desired results, including the delayed launch of certain products and delays in realizing certain sales.

The Compensation Committee determined that the achievements of each Named Executive Officer for the fiscal year contributed significantly to the long-term goals of the Company, and substantially improved the Company's competitive standing in important markets, while the goals that were not achieved during the fiscal year did not represent significant set backs to the Company as a whole.

The Compensation Committee also took into consideration the Company's strong financial performance overall as well as relative to certain of its peer companies, which was attributable to the commendable performance of the Named Executive Officers. In making compensation decisions among the executives, the Compensation Committee further considered the relative performance of the Company's divisions, particularly the strong performance of the Security division headed by Mr. Mehra, as compared to the Optoelectronics and Manufacturing division headed by Mr. Mansouri and the Company as a whole.

For fiscal 2013, the Compensation Committee also considered each Named Executive Officer's position with the Company and involvement in the management of the screening services program with the tax and customs authority of Mexico when determining awards under the Mexico SAT Incentive Program to participating Named Executive Officers. As a result of such review, each Named Executive Officer received an award under the Mexico SAT Incentive Program except for Mr. Mansouri.

For the variable component of compensation, there was no mathematical formula for tying the fiscal year's events and performance to each individual executive's variable compensation, but rather that compensation element was determined in consideration of the executive's involvement in the Company's performance for that year, the Company's overall performance for the year, as well as the compensation for comparable-company executives.

In light of this global evaluation, the Compensation Committee determined that certain Named Executive Officers should receive increased variable compensation for fiscal year 2013 as compared to fiscal year 2012. The following table provides a summary of decisions of the Compensation Committee with respect to each person's eligibility for variable compensation for fiscal year 2013:

| Named Executive Officer | Changes in Variable Compensation |
| --- | --- |
| Deepak Chopra | Increase variable compensation overall including an increase of target equity awards, a decrease in bonus, a grant of awards under the Mexico SAT Incentive Program, and a decrease in other types of compensation. |
| Alan Edrick | Increase variable compensation overall including an increase of target equity awards, a decrease in bonus, a grant of awards under the Mexico SAT Incentive Program, and a decrease in other types of compensation. |
| Ajay Mehra | Increase variable compensation overall including an increase of target equity awards, a decrease in bonus, a grant of awards under the Mexico SAT Incentive Program, and a decrease in other types of compensation. |
| Victor Sze | Increase variable compensation overall including an increase of target equity awards, a decrease in bonus, a grant of awards under the Mexico SAT Incentive Program, and a decrease in other types of compensation. |
| Manoocher Mansouri | Slight decrease in variable compensation overall including target equity awards, bonus, and other types of compensation. |

All compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving the Company's long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Advisory Vote on Named Executive Officer Compensation*

At our 2012 annual meeting, 96.1% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Considering the strong stockholder support of the compensation of the Named Executive Officers for fiscal 2012, the Compensation Committee determined to continue to apply the same general approach with respect to compensation policies and decisions for fiscal 2013.

*Minimum Equity Ownership and Retention Guidelines*

The Company believes that its Named Executive Officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of the Company's stockholders. Accordingly, the Company has established requirements that Named Executive Officers own equity of the Company valued at five times their respective annual base salaries. The Company believes that this multiple constitutes significant amounts for its Named Executive Officers and provides a substantial link between the interests of its Named Executive Officers and those of the Company's stockholders. During such time that a Named Executive Officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. The Company periodically reviews its minimum equity ownership guidelines. Based on the Company's review from leading stockholder advisory groups, the Company increased the minimum equity ownership guideline for its Named Executive Officers from a multiple of three times annual base salary to five times annual base salary and adopted the foregoing retention policy. Any shares pledged by a Named Executive Officer are not counted towards such Named Executive Officer's satisfaction of the Company's minimum equity ownership guidelines. As of June 30, 2013, each of the Named Executive Officers met or exceeded the Company's minimum equity ownership guidelines.

*Adoption of Clawback Policy*

The Company has adopted a clawback policy. The policy provides that if an accounting restatement is required due to the Company's material non-compliance with any accounting requirements, then the Company will seek to recover any excess in the incentive compensation earned by all of the Company's Named Executive Officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements.

*Adoption of a Policy Prohibiting the Hedging or Pledging of Company Stock*

The Company has adopted a policy that prohibits our Named Executive Officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of the Company's common stock or other equity securities. The Company has also adopted a policy that prohibits on a prospective basis our Named Executive Officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan.

*Employment Agreements*

The Company has employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri which were entered into during fiscal 2012. The terms of each of such agreements are summarized below under the heading "Employment Agreements." Employment agreements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on the Company's use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

*Additional Information Regarding the Named Executive Officers*

***Deepak Chopra*** is President and Chief Executive Officer of the Company. Biographical information regarding Mr. Chopra is set forth under "Election of Directors."

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Biographical information regarding Mr. Mehra is set forth under "Election of Directors."

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

**Summary Compensation Table**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, and the three highest paid executive officers of the Company serving as executive officers on June 30, 2013 for the fiscal years ended June 30, 2013, 2012 and 2011 (the "Named Executive Officers")(1):

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($)(1) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2013 | 961,538 | 1,323,000 | 4,091,340 | — | 1,077,000 | 579,138 | 258,254 | 8,290,270 |
| Chairman, President and | 2012 | 1,000,000 | 1,750,000 | 2,218,920 | 606,600 | — | 1,287,536 | 171,010 | 7,034,066 |
| Chief Executive Officer | 2011 | 1,000,000 | 1,300,000 | 1,966,200 | — | — | 418,357 | 104,526 | 4,789,083 |
| Alan Edrick | 2013 | 386,538 | 340,000 | 2,107,660 | — | 348,000 | — | 58,653 | 3,240,851 |
| Executive Vice President and | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | — | 111,736 | 2,628,936 |
| Chief Financial Officer | 2011 | 388,500 | 360,000 | 813,600 | 368,000 | — | — | 100,910 | 2,031,010 |
| Ajay Mehra | 2013 | 386,538 | 325,000 | 2,107,660 | — | 546,000 | — | 81,226 | 3,446,424 |
| Executive Vice President | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | — | 131,373 | 2,648,573 |
| of the Company and President of Security division | 2011 | 396,000 | 360,000 | 1,084,800 | — | — | — | 120,705 | 1,961,505 |
| Victor S. Sze | 2013 | 336,538 | 345,000 | 1,394,775 | — | 273,000 | — | 71,549 | 2,420,862 |
| Executive Vice President, | 2012 | 350,000 | 350,000 | 672,400 | 404,400 | — | — | 115,373 | 1,892,173 |
| General Counsel and Secretary | 2011 | 345,000 | 300,000 | 549,180 | 248,400 | — | — | 104,291 | 1,546,871 |
| Manoocher Mansouri | 2013 | 260,096 | 65,000 | 371,940 | — | — | — | 55,507 | 752,543 |
| President of Optoelectronics | 2012 | 270,500 | 70,000 | 403,440 | — | — | — | 78,586 | 822,526 |
| and Manufacturing division | 2011 | 266,500 | 100,000 | 488,160 | — | — | — | 73,867 | 928,527 |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the fiscal year ended June 30, 2013 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represents annual bonus amounts earned for Fiscal Year 2013 under the Mexico SAT Incentive Program in the amounts of $682,000, $243,600, $382,000, and $191,100 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, as the short-term component of the program, and amounts earned for Fiscal Year 2013 of $395,000, $104,400, $164,000, and $81,900 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, credited to the long-term component of the program.

(3) The Company initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2012 to June 30, 2013 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2013 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan, and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Service. Further, the Named Executive Officers are eligible to participate in the Deferred Compensation Plan, and the Company may provide matching and discretionary contributions under such plan. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2013 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 6,614 | 1,780 | 1,782 | 10,167 | 237,911 | 258,254 |
| Alan Edrick | 46,703 | 2,850 | — | 6,519 | 2,580 | 58,653 |
| Ajay Mehra | 44,504 | 6,675 | — | 18,861 | 11,185 | 81,226 |
| Victor S. Sze | 39,580 | 12,000 | — | 8,814 | 11,156 | 71,549 |
| Manoocher Mansouri | 29,526 | 7,200 | — | 7,135 | 11,647 | 55,507 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club. Membership dues were discontinued during fiscal year 2013.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2012 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 5,199 | 1,780 | 5,652 | 10,675 | 147,704 | 171,010 |
| Alan Edrick | 89,000 | 2,850 | — | 8,417 | 11,469 | 111,736 |
| Ajay Mehra | 89,016 | 6,675 | — | 17,382 | 18,300 | 131,373 |
| Victor S. Sze | 77,726 | 12,000 | — | 15,016 | 10,631 | 115,373 |
| Manoocher Mansouri | 58,209 | 7,200 | — | 7,006 | 6,171 | 78,586 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2011 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contribution(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 4,900 | 1,780 | 4,857 | 9,553 | 83,436 | 104,526 |
| Alan Edrick | 81,314 | 2,851 | — | 6,477 | 10,268 | 100,910 |
| Ajay Mehra | 83,712 | 6,675 | — | 17,757 | 12,561 | 120,705 |
| Victor S. Sze | 74,592 | 12,000 | — | 7,731 | 9,968 | 104,291 |
| Manoocher Mansouri | 55,009 | 7,200 | — | 6,576 | 5,082 | 73,867 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

### Grants of Plan-Based Awards Table

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2013 to each of the Named Executive Officers:

| | | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(6) | | | Grant Date Fair Value of Options and Awards |
|---|---|---|---|---|---|---|---|---|---|
| Name Position | Type of Award(1) | Grant Date | Threshold ($)(2) | Target ($) | Maximum ($)(2) | Threshold (#)(3) | Target (#)(4) | Maximum (#)(5) | (7)($) |
| Deepak Chopra Chairman, | RSA | 7/23/2012 | — | — | — | — | 66,000 | 165,000 | 4,091,340 |
| President and Chief Executive | STI(8) | — | — | 682,000 | — | — | — | — | — |
| Officer | LTI(9) | — | — | 395,000 | — | — | — | — | — |
| | CAB(10) | — | — | 582,151 | — | — | — | — | — |
| Alan Edrick Executive Vice | RSA | 7/23/2012 | — | — | — | — | 34,000 | 85,000 | 2,107,660 |
| President and Chief Financial | STI(8) | — | — | 243,600 | — | — | — | — | — |
| Officer | LTI(9) | — | — | 104,400 | — | — | — | — | — |
| | CAB(10) | — | — | 116,430 | — | — | — | — | — |
| Ajay Mehra Executive Vice | RSA | 7/23/2012 | — | — | — | — | 34,000 | 85,000 | 2,107,660 |
| President of the Company and | STI(8) | — | — | 382,000 | — | — | — | — | — |
| President of | LTI(9) | — | — | 164,000 | — | — | — | — | — |
| Security division | CAB(10) | — | — | 211,691 | — | — | — | — | — |
| Victor S. Sze Executive Vice | RSA | 7/23/2012 | — | — | — | — | 22,500 | 56,250 | 1,394,775 |
| President, General Counsel | STI (8) | — | — | 191,100 | — | — | — | — | — |
| and Secretary | LTI(9) | — | — | 81,900 | — | — | — | — | — |
| | CAB(10) | — | — | 148,184 | — | — | — | — | — |
| Manoocher Mansouri President, Optoelectronics and Manufacturing division | RSA | 7/23/2012 | — | — | — | — | 6,000 | 15,000 | 371,940 |

(1) Type of Award:

| | |
|---|---|
| RSA | Restricted Stock Award |
| STI | Short Term Component of Mexico Bonus Plan |
| LTI | Long Term Component of Mexico Bonus Plan |
| CAB | Contract Award Bonus under Mexico Bonus Plan |

(2) No amounts are shown in these columns because awards under the applicable programs do not provide for threshold or maximum payment amounts.

(3) No amounts are shown in this column as the Company's long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(5) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program; Quantitative Objectives.*"

(6) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) The grant date fair value of the restricted stock was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2166 of 2711

(8) Represents the short-term component of annual bonus awards under the Mexico SAT Incentive Program, as more fully explained above under "*Mexico SAT Incentive Program*."

(9) Represents the long-term component of annual bonus awards under the Mexico SAT Incentive Program. The amount reported is the dollar amount credited to the individual, which is payable in 2018 (provided the individual has not voluntarily resigned prior to payment) and may vary from the amount reported based on the future performance of our stock price, as more fully explained above under "*Mexico SAT Incentive Program*."

(10) Represents an award made during the fiscal year as a Contract Award Bonus under the Mexico SAT Incentive Program. The amount reported is not the actual amount earned by or credited to the individual, but rather a representative amount based on the Company's performance during fiscal year ending June 30, 2013. As more fully explained above under "*Mexico SAT Incentive Program*", the Contract Award Bonus is payable in 2018, if at all, based on cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. The amount reported assumes that 2013 operating income from these operations continues each year during the measuring period. However, the actual amount of our operating income through 2017 may vary substantially from the amount assumed for purposes of this table.

(11) The Company has eliminated from this table the columns titled "All Other Stock Awards: Number of Shares of Stock or Units", "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

## Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2013(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (4)(#) | Market Value of Shares or Units of Stock That Have Not Vested (5)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(6) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(5) |
| Deepak Chopra | 60,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 20,000 | 40,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| Chief Executive Officer | — | — | — | — | 80,500(11) | 5,185,810 | 134,100 | 8,638,722 |
| Alan Edrick | 48,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 26,667 | 13,333(8) | 27.12 | 8/10/2020 | — | — | — | — |
| | 20,000 | 40,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 30,000(12) | 1,932,600 | 70,500 | 4,541,610 |
| Ajay Mehra | 7,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| of the Company and | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| President of | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Security division | 20,000 | 40,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 35,000(13) | 2,254,700 | 70,950 | 4,570,599 |
| Victor S. Sze | 24,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice | 10,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, General | 5,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Counsel and Secretary | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 18,000 | 9,000(9) | 27.12 | 8/10/2020 | — | — | — | — |
| | 13,334 | 26,666(10) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 20,125(14) | 1,296,453 | 46,750 | 3,011,635 |
| Manoocher Mansouri | 7,500 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, | 25,657 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Optoelectronics and | — | — | — | — | 16,875(15) | 1,087,088 | 2,660 | 171,357 |
| Manufacturing division | | | | | | | | |

(1) The Company has eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(4) Restricted stock awards vest over periods ranging between three and four years from the date of grant.

(5) The market value of restricted stock awards that have not yet vested is based on the number of unvested shares of stock on June 28, 2013, multiplied by the closing price of the Company's Common Stock on June 28, 2013 ($64.42 per share).

(6) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7)

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2169 of 2711

These 40,000 unexercisable option awards are subject to the following vesting schedule: 20,000 vested on September 9, 2013 and 20,000 are expected to vest on September 9, 2014.

(8) These 13,333 unexercisable option awards vested on August 11, 2013.

(9) These 9,000 unexercisable option awards vested on August 11, 2013

(10) These 26,666 unexercisable option awards are subject to the following vesting schedule: 13,333 will vest on September 9, 2013 and 13,333 will vest on September 9, 2014.

(11) These 80,500 unvested stock awards are subject to the following vesting schedule: 18,125 shares vested on August 11, 2013, 15,000 shares vested on September 1, 2013, 9,750 shares vested on September 9, 2013, 18,125 shares will vest on August 11, 2014, 9,750 shares will vest on September 9, 2014 and 9,750 shares will vest on September 9, 2015.

(12) These 30,000 unvested stock awards are subject to the following vesting schedule: 7,500 shares vested on August 11, 2013, 3,750 shares vested on September 1, 2013, 3,750 shares vested on September 9, 2013, 7,500 shares will vest on August 11, 2014, 3,750 shares will vest on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(13) These 35,000 unvested stock awards are subject to the following vesting schedule: 10,000 shares vested on August 11, 2013, 3,750 shares vested on September 1, 2013, 3,750 shares vested on September 9, 2013, 10,000 shares will vest on August 11, 2014, 3,750 shares will vest on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(14) These 20,125 unvested stock awards are subject to the following vesting schedule: 5,062 shares vested on August 11, 2013, 2,500 shares vested on September 1, 2013, 2,500 shares vested on September 9, 2013, 5,063 shares on August 11, 2014, 2,500 shares on September 9, 2014 and 2,500 shares will vest on September 9, 2015.

(15) These 16,875 unvested stock awards are subject to the following vesting schedule: 4,500 shares vested on August 11, 2013, 1,875 shares vested on September 1, 2013, 2,000 shares vested on September 9, 2013, 4,500 shares will vest on August 11, 2014, 2,000 shares will vest on September 9, 2014 and 2,000 shares will vest on September 9, 2015.

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2013:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting | Value Realized on Vesting(2)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 80,000 | 4,883,200 | 61,375 | 4,414,763 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | — | — | 25,000 | 1,788,875 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 25,000 | 1,342,250 | 27,500 | 1,967,625 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | — | — | 16,938 | 1,208,536 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | — | — | 8,975 | 655,348 |

(1) Represents the difference between the fair market price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Represents the number of restricted stock awards that vested multiplied by the fair market price of the Company's Common Stock on the date of vesting.

**Pension Benefits**

The Company maintains the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2013(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 12 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2013.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 6 | 5,355,481 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted the Deferred Compensation Plan in May 2008. Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Eligible participants are fully vested in Company contributions.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the Named Executive Officers for deferred amounts in the Deferred Compensation Plan in fiscal 2013 ranged from 0.0% to 20.2%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2013:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 88,654 | 40,200(3) | 108,345 | — | 744,101 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | 38,654 | 40,200(3) | 109,072 | — | 691,159 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 33,995 | 35,200(3) | 94,324 | — | 598,062 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | 39,195 | 27,170(3) | 7,142 | — | 365,224 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2013.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri.

*Deepak Chopra's Employment Agreement*

On April 4, 2012, the Company entered into its current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from the Company to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date, he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's, Ajay Mehra's, Victor Sze's and Manoocher Mansouri's Employment Agreements*

On April 4, 2012, the Company entered into its current employment agreement with each of Messrs. Edrick, Mehra, Sze and Mansouri, which were effective as of January 1, 2012. For purposes of this section, Messrs. Edrick, Mehra, Sze and Mansouri are each individually referred to as the "Executive." The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68 (the "Executive Scheduled Retirement Date"). The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick, $402,000 for Mr. Mehra, $350,000 for Mr. Sze and $270,500 for Mr. Mansouri. The Executive

is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Edrick's, Mr. Mehra's and Mr. Sze's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mansouri's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 12 months salary at the Executive's then-current base salary plus an amount equal to the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the

applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by the Company to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Edrick's, Mr. Mehra's, Mr. Sze's and Mr. Mansouri's continued employment until the Executive Scheduled Retirement Date, he shall be entitled a lump sum stay bonus equal to his highest year out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Executive Scheduled Retirement Date.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2013, and that employment terminated on such date. The tables also assume that the price of the Company's Common Stock, on which certain calculations in the following tables are made, was the closing price of the Company's Common Stock on June 28, 2013, the last business day of the fiscal year ($64.42).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | Mexico SAT Incentive Program ($)(4) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra(2) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,609,500 | 10,375,290 | 12,408,870 | 4,231,581 | 643,896 | 35,269,137 |
| | Good Reason or Without Cause in Connection with a Change in Control(3) | 3,000,000 | 4,609,500 | 10,375,290 | 17,530,260 | 4,231,581 | 643,896 | 40,390,527 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2013, for performance in the fiscal year ended June 30, 2013.

(2) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(3) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(4) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program.*"

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Mansouri.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1)($) | Accelerated Vesting of Stock Awards ($) | Mexico SAT Incentive Program ($)(3) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 773,077 | 800,000 | 6,818,501 | 1,236,160 | 6,000 | 6,000 | 9,639,738 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 773,077 | 800,000 | 9,491,931 | 1,236,160 | 6,000 | 6,000 | 12,313,168 |
| Ajay Mehra Executive Vice President of the Company and President of Security division | Good Reason or Without Cause | 773,077 | 790,000 | 6,643,280 | 1,995,836 | 6,000 | 6,000 | 10,214,193 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 773,077 | 790,000 | 9,316,710 | 1,995,836 | 6,000 | 6,000 | 12,887,623 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 673,077 | 663,333 | 4,547,115 | 1,079,601 | 6,000 | 6,000 | 6,975,126 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 673,077 | 663,333 | 6,318,665 | 1,079,601 | 6,000 | 6,000 | 8,746,676 |
| Manoocher Mansouri President of Optoelectronics and Manufacturing division | Good Reason or Without Cause | 260,096 | 78,333 | 1,731,288 | — | 6,000 | 6,000 | 2,081,717 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 260,096 | 78,333 | 1,885,896 | — | 6,000 | 6,000 | 2,236,325 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2013, for performance in the fiscal year ended June 30, 2013.

(2) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(3) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program*."

## Director Compensation

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2013, each non-employee director that served as a director for the full fiscal year, received $65,000 for his year of service, 2,500 shares of restricted Common Stock, and $2,500 for each Board of Directors meeting attended.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2179 of 2711

Each member of the Audit Committee received $2,500 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $15,000.

Each member of the Compensation Committee received $2,500 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $15,000.

Each member of the Nominating and Governance Committee received $2,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $5,000 and 500 shares of restricted Common Stock.

Each member of the Executive Committee received $25,000 and 3,000 shares of restricted Common Stock.

Each member of the Technology Committee received $2,500 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $5,000 and 500 shares of restricted Common Stock.

All restricted stock awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2013 for each non-employee member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 139,500 | 340,945 | — | 480,445 |
| Meyer Luskin | 139,500 | 340,945 | — | 480,445 |
| David T. Feinberg | 97,000 | 185,970 | — | 282,970 |
| William F. Ballhaus | 112,500 | 185,970 | — | 298,470 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2013 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2013 a total of 5,500 stock awards were granted to Mr. Good and Mr. Luskin and 3,000 stock awards were granted to Mr. Ballhaus and Mr. Feinberg, all with a fair value of $61.99. As of June 30, 2013, Mr. Good had 15,250 unvested stock awards outstanding, Mr. Luskin had 15,250 unvested stock awards outstanding, Mr. Feinberg had 7,375 unvested stock awards outstanding and Mr. Ballhaus had 7,375 unvested stock awards outstanding.

The Company believes that its directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of its stockholders. Accordingly, the Company has established requirements that directors own equity of the Company valued at five times their annual retainers. The Company believes that this multiple constitutes significant amounts for its directors and provides a substantial link between the interests of its directors and those of its stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. The Company periodically reviews its minimum equity ownership guidelines. Based on the Company's review from leading stockholder advisory groups, the Company increased the minimum equity ownership guideline for its directors from a multiple of three times annual retainer to five times annual retainer and adopted the foregoing retention policy. Any shares pledged by a director are not counted towards such director's satisfaction of the Company's minimum equity ownership guidelines. As of June 30, 2013, each of the Company's directors met or exceeded the Company's minimum equity ownership guidelines.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracted for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2013 by Mr. Chopra and his wife. The Company paid the business approximately $62,000 for such services during the year ended June 30, 2013. Additionally, the Company contracted for a portion of its printing services from a business that was owned during the year ended June 30, 2013 by Mr. Chopra's father-in-law. The Company paid the business approximately $14,000 for such services during the year ended June 30, 2013. Further, a subsidiary of the Company leased warehouse space on a month-to-month basis for approximately $2,200 per month from an entity controlled by Mr. Chopra. The foregoing automobile rental, messenger, and printing services and warehouse lease were all discontinued by the end of September of 2013.

The Company believes that the foregoing transactions were on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company would be on terms at least as favorable to the Company as those that can be obtained from unaffiliated third parties.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of the Company's voting securities, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 1, 2013 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| Tremblant Capital Group.(2) | 1,963,853 | 9.5% |
| Wells Fargo & Company(3) | 1,746,777 | 8.4% |
| BlackRock, Inc.(4) | 1,572,415 | 7.6% |
| The Vanguard Group, Inc.(5) | 1,157,412 | 5.6% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 1, 2013, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) As reported in a Schedule 13F-HR filed on August 14, 2013 with the SEC. The address of Tremblant Capital Group is 767 Fifth Avenue, New York, NY 10153. Beneficial ownership is made up of 1,602,253 shares and 361,600 call options.

(3) As reported in a Schedule 13F-HR filed on August 13, 2013 with the SEC. The address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94163.

(4) As reported in a Schedule 13F-HR filed on August 13, 2013 with the SEC by five subsidiaries of BlackRock, Inc. The address of BlackRock, Inc. is 40 East 52nd St., New York, NY 10022.

(5) As reported in a Schedule 13F-HR filed on August 13, 2013 with the SEC. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

The following table sets forth the amount of shares of the Company beneficially owned as of October 1, 2013 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 736,212 | 3.6% |
| Alan Edrick(4) | 391,958 | 1.9% |
| Ajay Mehra(5) | 326,399 | 1.6% |
| Victor S. Sze(6) | 286,667 | 1.3% |
| Manoocher Mansouri(7) | 94,131 | 0.4% |
| Meyer Luskin(8) | 54,485 | 0.2% |
| Steven C. Good(9) | 25,125 | 0.1% |
| David Feinberg(10) | 10,010 | 0.0% |
| William F. Ballhaus(11) | 10,000 | 0.0% |
| All directors and executive officers as a group (9 persons) | 1,934,987 | 9.1% |

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 1, 2013, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. Except as indicated by footnote, no shares are pledged as security.

(3) Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company. Includes 65,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 25,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. Of the balance of such shares, 260,165 shares are held jointly by Mr. Chopra and his wife, Nandini Chopra, 155,422 are held directly by Mr. Chopra and 130,625 shares of unvested restricted stock granted between August 10, 2010 and July 23, 2012 are held individually by Mr. Chopra. Includes 100,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011. The total amount of shares beneficially owned by Mr. Chopra includes 137,982 shares that are pledged by Mr. Chopra as security for a line of credit. Mr. Chopra's stock holdings exceed the Company's equity ownership and retention guidelines without taking into account these pledged shares.

(4) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 64,000 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012. Includes 277,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(5) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division. Includes 66,500 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012. Includes 156,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 42,563 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012. Includes 177,667 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(7) Mr. Mansouri is the President of the Optoelectronics and Manufacturing division. Includes 18,500 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012. Includes 33,157 shares issuable pursuant to options which were granted between February 8, 2008 and September 1, 2009.

(8) Mr. Luskin is a Director of the Company. Includes 39,235 shares held by The Meyer and Doreen Luskin Family Trust, and 9,000 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012 that are held individually by Mr. Luskin.

(9) Mr. Good is a Director of the Company. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan. Includes 9,000 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012.

(10) Dr. Feinberg is a Director of the Company. Includes 4,875 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012.

(11) Dr. Ballhaus is a Director of the Company. Includes 4,875 shares of unvested restricted stock granted between August 11, 2010 and July 23, 2012.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2013, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act.

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the Company's equity compensation plans as of June 30, 2013.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders(1) | 1,019,733 | 26.33 | (2) (3) 3,705,988(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 1,019,733 | 26.33 | 3,705,988 |

(1) Includes shares of our Common Stock issuable upon exercise of options under our 2006 Equity Participation Plan and our 2012 Incentive Award Plan.

(2) These shares are available for future issuance under our 2012 Incentive Award Plan, which was approved by our shareholders on December 12, 2012. Upon shareholder approval of the 2012 Incentive Award Plan, we froze the 2006 Equity Participation Plan, and no further awards can be granted thereunder.

(3) Shares awarded as restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one share granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason (up to a maximum of 2,220,000 shares) also become available for future issuance under our 2012 Incentive Award Plan.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements for the years ended June 30, 2012 and 2013 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2012 | FY 2013 |
|---|---|---|
| Audit Fees | $ 844 | $ 896 |
| Audit-Related Fees | $ 25 | $ 15 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 869 | $ 911 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements other than audit fees. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2013, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2013.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2013 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the

Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2013, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2011 filed with the SEC. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of the Company's directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless the Company has received contrary instructions from one or more of the stockholders at that address. The Company undertakes to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to the Secretary of the Company at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next annual meeting of stockholders, the proposal must be delivered in writing to the Secretary of the Company and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such

proposal to the Company would be June 17, 2014, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

The Company's Bylaws provide that if a stockholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to the Company no more than 120 days and no less than 90 days prior to December 3, 2014, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 3, 2014, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 15, 2013

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

The Board of Directors recommends you vote FOR the following:

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 David T. Feinberg
06 William F. Ballhaus

**The Board of Directors recommends you vote FOR proposals 2 and 3.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2014. | ☐ | ☐ | ☐ |
| 3 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2013. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

0000185135_1 R1.0.0.51160

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com .

OSI SYSTEMS, INC.
Annual Meeting of Stockholders
December 3, 2013 10:00 A.M.
This proxy is solicited by the Board of Directors

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 3, 2013 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, and 3 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000185135_2 R1.0.0.51160

**Continued and to be signed on reverse side**

# Exhibit 33

8-K 1 a13-25637_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 3, 2013**

# OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07. Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 3, 2013. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 15,527,369 | 1,201,765 | 1,637,707 |

| | | | |
|---|---|---|---|
| Ajay Mehra | 16,009,018 | 720,116 | 1,637,707 |
| Steven C. Good | 15,132,290 | 1,596,844 | 1,637,707 |
| Meyer Luskin | 15,704,263 | 1,024,871 | 1,637,707 |
| David T. Feinberg | 16,472,423 | 256,711 | 1,637,707 |
| William F. Ballhaus | 16,354,933 | 374,201 | 1,637,707 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2014*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 18,322,780 | 6,523 | 37,538 | 0 |

The proposal was approved.

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2013*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 13,658,889 | 3,003,705 | 66,540 | 1,637,707 |

The proposal was approved.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 3, 2013

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

# Exhibit 34

DEF 14A 1 a2221825zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 17, 2014

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 12, 2014, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 14, 2014 are entitled to vote at the Annual Meeting.

Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and named executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2014, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



**12525 Chadron Avenue**
**Hawthorne, California 90250**

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

**Date and Time:** 10:00 a.m., local time, on Friday, December 12, 2014

**Location:** The Company's principal offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2015;

3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2014, as described in the accompanying Proxy Statement; and

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 14, 2014 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2014:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2014 are available at *http://www.proxyvote.com*.

## TABLE OF CONTENTS

| | Page |
| --- | --- |
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2014 | 11 |
| Compensation of Executive Officers and Directors | 17 |
| Security Ownership of Certain Beneficial Owners and Management | 45 |
| Equity Compensation Plan Information | 48 |
| Independent Registered Public Accounting Firm | 49 |
| Report of Audit Committee | 50 |
| Code of Ethics and Conduct | 52 |
| Annual Meeting Attendance | 52 |
| Stockholder Communications | 52 |
| Availability of Annual Report on Form 10-K | 52 |
| Stockholder Proposals | 52 |
| Incorporation by Reference | 53 |
| Other Business | 53 |

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 12, 2014, at the Company's principal offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to its stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. The Company anticipates that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 24, 2014.

Stockholders of record as of the close of business on October 14, 2014 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 14, 2014, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 19,829,016 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST" or "ABSTAIN" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual

Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, the Company's management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One.* Directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One.

*Proposal Two.* To be approved, the ratification of Moss Adams LLP as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three.* To be approved, the proposal regarding the Company's executive compensation for the fiscal year ended June 30, 2014 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that the stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about the Company's executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2014:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2014 are available at *http://www.proxyvote.com*.

## ELECTION OF DIRECTORS
*(Proposal No. 1 of the Proxy Card)*

**Nominees**

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus. The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 63 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 52 | Director, Executive Vice President and President of Security division | 1996 |
| Steven C. Good(1)(2)(3)(4) | 72 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 89 | Director | 1990 |
| David T. Feinberg(3)(5) | 52 | Director | 2010 |
| William F. Ballhaus(1)(2)(5) | 69 | Director | 2010 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Executive Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor

Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing the Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of the Company's Security division. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and experience managing the Company's Security division.

***Steven C. Good*** has served as a Director of the Company since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good also currently serves as a Director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman. Mr. Luskin is also a Director of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital) and was formerly the Chairman. Mr. Luskin is also a Director on the Advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***David T. Feinberg*** has served as a Director of the Company since March 2010. Dr. Feinberg has served as the President of the UCLA Health System since July 2011 and as Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming these positions, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine at

UCLA. Dr. Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Dr. Feinberg graduated cum laude in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his Master of Business Administration from Pepperdine University in 2002. Dr. Feinberg was selected to serve as a director because of his knowledge of the healthcare industry and his experience managing a large, internationally-renown hospital system.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political and other risks. Risks are reported to the Board of Directors through the Company's executive officers, who are responsible for the identification, assessment and management of the Company's risks. The Board of Directors regularly discusses the risks reported by the Company's executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of risks related to accounting, auditing and financial reporting and maintaining effective internal control over financial reporting. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. The Company believes that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances the Company's ability to communicate its message and strategy clearly and consistently to its stockholders, employees, and other companies with which it does business. Although the Company believes that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, it will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve the Company's best interests and the best interests of its stockholders. The Company does not have a lead independent director.

**Board of Directors Meetings, Independence and Committees of the Board of Directors**

There were eight meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2014. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2014 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the directors, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of Messrs. Good and Luskin and Dr. Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To

date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2014. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of Messrs. Luskin and Good and Dr. Ballhaus. There were two meetings of the Compensation Committee during the fiscal year ended June 30, 2014. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of Messrs. Good and Luskin and Dr. Feinberg. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2014.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of Messrs. Good and Luskin. There were two meetings of the Executive Committee during the fiscal year ended June 30, 2014.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board of Directors regarding all technology-based matters. The Technology Committee consists of Drs. Ballhaus and Feinberg. There were two meetings of the Technology Committee during the fiscal year ended June 30, 2014.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from the Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to the Company's Board of Directors to be voted on at this year's Annual Meeting. All of this year's nominees for director are currently directors of the Company. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2210 of 2711

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors, Messrs. Luskin and Good and Dr. Ballhaus. No executive officer of the Company has served during the fiscal year ended June 30, 2014 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2014, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, David T. Feinberg and William F. Ballhaus, Jr. as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

**RATIFICATION OF SELECTION OF
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2015 and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2015. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2014**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") enables the Company's stockholders to vote to approve, on an advisory, non-binding basis, the Company's executive compensation for the fiscal year ended June 30, 2014 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act. The Company currently conducts this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at the Company's next annual meeting of stockholders following the 2014 Annual Meeting.

**Summary**

The Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. The Company is asking its stockholders to provide advisory approval of the Company's executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives. The Company believes that its compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the long-term interests of the stockholders.

The Company urges the stockholders to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

The Company believes that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. In fiscal year 2014, the Company experienced growth in revenues, operating income, net income, earnings per share and operating cash flow. The Company ended fiscal year 2014 with a very strong backlog. The Company believes that its continued success is closely tied to the performance of its executive officers and has designed its compensation practices in order to reward the executives for their contributions to the overall success of the Company.

**Alignment with Stockholders' Interests**

The Company grants annual incentive bonuses based in part on each executive's contribution to enhancing long-term stockholder value. The Company also grants long-term incentives in the form of equity awards as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of the stockholders. In 2012, the Company established the Mexico SAT Incentive Program which includes a long-term component. The Company has generally used restricted stock, stock options and restricted stock units as its equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have a vesting period, which creates a strong retention incentive and helps ensure the continuity of the Company's operations. For fiscal year 2014, long-term equity incentives consisted of restricted stock units subject to performance

vesting based on growth of adjusted EBITDA per share. For fiscal year 2015, long-term equity incentives will continue to be 100% performance vesting.

**Long-Term Performance**

In order to promote the Company's philosophy of pay-for-performance and furthering its objective of aligning the interests of management with those of the stockholders, the Company established a performance program for certain of its executive officers. The program focuses on the achievement of the Company's long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, the Company is incentivizing its officers to achieve the Company's long-term corporate objectives and ultimately increase stockholder value.

**Advisory Vote on Named Executive Officer Compensation**

At the Company's 2013 annual meeting, 82% of the votes cast on the advisory vote on the compensation of the Named Executive Officers were in favor of our executive compensation policies. Considering the strong stockholder support of the compensation of the Named Executive Officers for fiscal 2013, the Compensation Committee determined to continue to apply the same general approach with respect to compensation policies and decisions for fiscal 2014.

**Recommendation**

The Board of Directors believes that a vote in favor of the proposal is warranted for these reasons: (1) the Company delivered strong operating performance during fiscal 2014; (2) under the CEO's leadership, the Company's stock price has increased approximately 55% and 220% over the past three- and five- year periods ending in fiscal 2014; (3) the CEO's pay over the past five-years has been closely aligned with the Company's total stockholder return (TSR) performance; (4) 100% of the executives' equity awards for fiscal 2014 were performance-based and tied to measurable pre-established targets; (5) the annual incentive bonus program included consideration of quantitative factors; and (6) the Company is committed to having strong governance standards and has taken multiple steps to further this commitment.

1. **Operating Performance: The Company delivered strong operating performance during fiscal 2014:**

- Our revenues increased 13% over the prior year, once again setting a new record for the Company.
- We achieved non-GAAP diluted earnings per share (EPS) of $3.13 which represented a 13% increase over the prior year; our sixth consecutive year of record non-GAAP earnings.
- We achieved record adjusted EBITDA representing growth of 30%.
- We generated record free cash flow of $74 million.
- We grew our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served to sustain growth even through periods such as the past year, when many sectors of the global economy, including much of the rest of the security inspection industry, experienced significant headwinds.

- We made targeted investments in new product development (R&D) and acquisitions. Such investments in the past have led to our introduction of the Rapiscan RTT® computed tomography (CT) based hold baggage inspection system and a new generation of healthcare products.

**2. Stock Price Appreciation: Under the CEO's leadership, the Company's stock price has increased 55% and 220% over the past three- and five-year periods, respectively, ending in fiscal 2014. The Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business. The CEO's pay over the past five-years ending in fiscal year 2014 has been closely aligned with the Company's TSR performance.**

The Company believes that its long-term TSR performance has been exceptional and that the structure of its executive compensation program contributed to the Company's achievements by incentivizing the executives to grow the Company in a way that creates long-term value for the Company's

stockholders. The chart below shows the close alignment of CEO pay as compared to the Company's TSR performance over the past five years ending in fiscal year 2014.

| | 2010 Chopra, Deepak | 2011 Chopra, Deepak | 2012 Chopra, Deepak | 2013 Chopra, Deepak | 2014 Chopra, Deepak |
|---|---|---|---|---|---|
| CEO Pay ($000) | $4,101 | $4,789 | $7,034 | $8,209 | $8,188 |
| Indexed TSR | 133.19 | 206.24 | 303.79 | 308.97 | 320.14 |

**3. Six-Year Performance Program: The Company's executives' equity awards are 100% performance-based and tied to measurable pre-established adjusted EBITDA per share goals. Under the Six-Year Performance Program, the Company's Mexico operations were specifically excluded so that executives would not receive two payments for the same performance.**

The Company's Named Executive Officers were not granted any time-vesting equity awards during fiscal 2014. The equity grants made to the executives during fiscal 2014 were 100% performance-based and tied to pre-established adjusted EBITDA per share targets which require significant compound annual growth. Forty percent (40%) of the maximum number of shares underlying each Named Executive Officer's 2014 award has a three-year performance component which vests or is forfeited following the end of the three-year performance cycle, subject to the achievement of the adjusted EBITDA per share growth target for fiscal 2016. If 85% of this three-year adjusted EBITDA per share target is not attained, then 100% of these shares tied to that target are forfeited. Up to twenty percent (20%) of the maximum number of shares under each award may vest annually over the three-year period if annual adjusted EBITDA per share growth targets are exceeded for fiscal years 2014, 2015 and 2016, respectively. These grants were made pursuant to our Long Term Incentive Program, which was established in 2012.

The adjusted EBITDA per share targets exclude the effect of the Company's security scanning program for the Mexico Servicio de Administración Tributaria for which the Compensation Committee has established a separate program, discussed in further detail below. The Compensation Committee specifically excluded the Mexico operations from the long-term equity incentive program so that the

executives would not benefit multiple times under two programs for the same accomplishments. The Company believes that the performance metrics underlying its long-term equity incentive program are rigorous and the Company has not disclosed these metrics because their disclosure would allow the Company's competitors to determine the EBITDA and pricing related to the Mexico turnkey operations, which would be competitively harmful to the Company. These targets will be stated, on a retrospective basis, following completion of each 3-year performance cycle beginning with the performance cycle ending in fiscal 2015.

For fiscal 2014, we achieved 105% of the fiscal 2014 adjusted EBITDA per share target, and as a result the 27,000 shares granted to our CEO in fiscal 2012 were vested. In addition, our CEO earned 30,600 shares, consisting of 12,000 vested shares earned pursuant to the fiscal 2014 grant, 13,200 vested shares earned pursuant to the fiscal 2013 grant and 5,400 vested shares earned pursuant to the fiscal 2012 grant.

**4. Mexico SAT Incentive Program: In 2012, the Compensation Committee established a separate incentive program tied to the Company's Mexico turnkey operations in order to underscore its importance to the Company and to focus management's attention on developing the opportunity in Mexico.**

The Compensation Committee established a separate incentive program in 2012 tied to the performance of the Company's security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive Program") in order to underscore its importance to the Company and to focus management's attention on this important opportunity. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of operating income targets that the Company believes are rigorous which relate to the services for the Mexico Servicio de Administración Tributaria. These targets require that such operating income, as a percentage of revenue, significantly exceed the Company-wide operating margin before any incentives are awarded. The Company has not disclosed these operating income targets because such disclosure would be competitively harmful to the Company. These operating income targets will be stated, on a retrospective basis, following the completion of the security scanning program for the Mexico Servicio de Administración Tributaria.

Under the Mexico SAT Incentive Program, for fiscal 2014, based on operating income achieved, the CEO was awarded $1,185,474 consisting of the short term component of the program. The long-term components of the program are described more fully below in the Compensation Discussion and Analysis section under "Mexico Sat Incentive Program."

**5. Annual Incentives: Although the Company's annual incentive bonus program allows for the Compensation Committee to exercise discretion once financial thresholds are achieved, qualitative and quantitative factors are then considered in determining bonus amounts.**

The Compensation Committee considered both qualitative and quantitative factors when determining the annual bonus amounts for fiscal 2014. With respect to the annual incentive bonuses granted to the CEO and other executive officers, once the Compensation Committee determined that the Company's financial thresholds were achieved, the Compensation Committee then considered quantitative factors including that in fiscal 2014: (1) our revenues increased 13% over the prior year, again setting a new record for the Company; (2) our non-GAAP diluted earnings per share (EPS) increased by 13% over the prior year; (3) we achieved record adjusted EBITDA representing growth of 30%; and (4) we generated record free cash flow of $74 million. The Compensation Committee also considered qualitative factors as described in further detail below. After an assessment of all factors, the Compensation Committee determined that cash bonuses would be reduced by more than 50% from the prior year's awards due to certain operational shortcomings, including the cancellation of a Transportation Security Administration (TSA) delivery order.

**6. Corporate Governance and Best Practices: The Company is committed to having strong governance standards with respect to its compensation programs, procedures and practices.**

The Company has done the following:

- Prohibited all hedging and prospective pledging of Company stock by Named Executive Officers and directors.
- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then the Company will seek to recover any excess in the incentive compensation earned by all of the Named Executive Officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements.
- Increased the rigor of the Company stock ownership guidelines by increasing the required ownership level for Named Executive Officers from three to five times their respective annual base salaries. These guidelines align the executives' long-term interests with those of the Company's stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price.

The Board of Directors believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that the Company's executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2014. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Compensation Discussion and Analysis

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the Named Executive Officers.

The following table sets forth the names, ages and positions of each of the Company's Named Executive Officers:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra | 63 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick | 46 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra | 52 | Director, Executive Vice President and President of Security division |
| Victor Sze | 47 | Executive Vice President and General Counsel |
| Manoocher Mansouri | 58 | President of Optoelectronics and Manufacturing division |

For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Executive Compensation Summary*

*Fiscal 2014 Performance*

Fiscal 2014 was a strong year for the Company. During fiscal 2014, the Company (a) increased its operating margin, (b) actively leveraged its business infrastructure to support new products and revenue sources while maintaining intelligent cost management, (c) continued building a foundation for future growth by making targeted investments in new product development and acquisitions, (d) had record revenues and (e) further improved sustainability of revenues by growing the Company's addressable markets; all of which resulted in the sixth consecutive year of record non-GAAP earnings.

*Leverage Business Infrastructure and Growth in Operating Income Margin*. Even as the Company launched new products, entered new markets, and invested substantial amounts in R&D and in connection with the implementation of the Mexico screening services program, the Company actively leveraged its business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities*. In fiscal 2014, in addition to growing revenues over the prior year, the Company continued to expand its addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and the Company believes it will continue to serve, to sustain growth over the long term. Examples include:

- Expanding presence with international customers for air cargo scanning solutions, related services and support.
- Developing new sensor technologies for radiation monitoring and trace detection solutions.
- Increasing participation with healthcare group purchasing organizations or GPOs that facilitate sales of healthcare equipment to large hospital networks.
- Growing customer base in the Company's Optoelectronics and Manufacturing division through new relationships with consumer health, automotive and personal self-monitoring device OEMs.
- Acquiring product lines and companies that not only leverage the Company's existing operating infrastructure but also provide immediate entry into growing market segments.

*Building a Foundation for the Future*. While improving the Company's operating margin during fiscal 2014, the Company continued to make significant targeted investments in R&D and acquisitions. Such investments in the past have led to the Company's introduction of the Rapiscan RTT® computed tomography (CT) based hold baggage inspection system and new generation of healthcare products. The Company believes that these investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

The results of the assertive and dynamic management of the Company are seen in the Company's financial outcomes, particularly considering the state of the overall global economy in the period since the economic downturn that began in late 2008. During this period of economic uncertainty, the Company's stockholders have witnessed solid growth in revenues, earnings per share, and stock price.

This growth is reflected in an increase since fiscal year 2008 in the Company's revenue by 46%, net income by 245%, and a tripling of the stock price. Moreover, the Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business that will position the Company to sustain growth into the coming years.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee. The Compensation Committee is responsible for establishing and approving all compensation for the Named Executive Officers, including base salaries, annual incentive bonuses, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of the Named Executive Officers (other than the Chief Executive Officer) is recommended to the Compensation Committee by the Chief Executive Officer. Compensation for the Chief Executive Officer is established by the Compensation Committee on its own.

Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape.

*Executive Compensation Program Elements*

The particular elements of the compensation program for the Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with the Company's pay-for-performance philosophy, the Company structures its compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation, in the form of annual cash incentives and performance-based equity grants and compensation under the Mexico SAT Incentive Program, comprises a significant percentage of total compensation.

The following is an overview of the elements of the Company's compensation and benefits programs for fiscal 2014:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Cash Annual Incentives | Cash-based annual incentives that are determined based on Company and individual performance, subject to achievement of a pre-determined threshold rate of return on book value of the Company (excluding the Mexico SAT results). |
| | The Mexico SAT Incentive Program also includes a short-term cash incentive component in the form of annual cash bonuses for participating Named Executive Officers. |
| Long-Term Incentives | The fiscal 2014 program with respect to the Named Executive Officers consisted of performance-based restricted stock units. The Six-Year Performance Program includes performance-based restricted stock units, which are earned based on EBITDA-based metrics (excluding Mexico SAT earnings) for each of the three years following grant, as well as an aggregate three-year metric. |
| | The Mexico SAT Incentive Program also includes cash long-term incentives in the form of a long-term component bonus and a contract award bonus ("CAB Bonus") for participating Named Executive Officers. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2014, perquisites included car allowances. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash bonuses at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which the CEO is the only participant. |

In fiscal 2014, fixed compensation comprised approximately 13% to 41% and variable compensation comprised approximately 59% to 87% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 86% of total compensation.

*Fixed Compensation.* Fixed compensation is intended to compensate the Named Executive Officers for their ongoing responsibilities and consists principally of base salary. Base salary is set to attract and retain executive talent. It provides a fixed rate of pay and is generally not at risk of upward or downward adjustment until the following year. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted, typically on an annual basis, to reflect sustained individual performance. In determining whether base salary levels for fiscal year 2014 were appropriate, the Compensation Committee considered the Company's general financial performance, the minimum base salary amount provided for in the Named Executive Officer's employment agreement (for those Named Executive Officers that had employment agreements with the Company at such time), as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions.

*Variable Compensation.* Variable compensation provides the Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive bonuses and long-term incentive compensation in the form of equity based awards, as well as compensation under the Mexico SAT Incentive Program.

*Annual Incentive Bonuses.* All Named Executive Officers are eligible for an annual incentive bonus pursuant to the Company's annual performance bonus program. Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement and near-term success. In determining annual incentive bonuses for the Named Executive Officers, the Compensation Committee considers the rate of return on the book value of the Company. If a pre-established threshold rate of return before taxes is exceeded for a particular fiscal year, cash bonuses may be awarded to the participating executives. The Company needed to exceed a threshold rate of return before taxes on book value of 7% for fiscal year 2014, below which no bonuses would have been paid. Such threshold rate of return was calculated based on the pre-tax income of the Company for fiscal year 2014, excluding the impact of bonuses, restructuring charges and pre-tax income from the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria, relative to the Company's total stockholders' equity as of the prior fiscal

year end. The threshold was designed to be challenging yet achievable with significant effort and management skill. If the Company exceeds this threshold, then the Compensation Committee evaluates the various quantitative and qualitative factors as described below in a non-formulaic manner to determine the amount of bonus compensation for each Named Executive Officer. Achievement of this threshold is not linked to any specific payouts as this metric is not a target performance objective, but rather a minimum performance threshold for the Company below which the Named Executive Officers would not be entitled to any such annual incentive bonus compensation. This threshold was exceeded by the Company in fiscal year 2014. Additionally, no such bonus may exceed maximum amounts of 300% of base salary for the Chief Executive Officer and 200% of base salary for the other participating executives.

After satisfaction of the threshold performance criterion, the bonus amounts were determined by the Compensation Committee based on its evaluation of the overall and relative performance of the Company as well as its evaluation of the compensation practices of the Company's peer group. Each bonus was established at its respective value in order to provide the executive sufficient incentive to create long-term shareholder value while at the same time ensuring that such executive's total bonus compensation would be appropriate as compared to compensation of similarly situated executives. The Compensation Committee retains negative discretion to reduce any awards under the annual performance bonus program to a lesser award or no award to any participant.

In determining the amounts of annual incentive bonuses, the Compensation Committee also considers individual performance, which may include the following quantitative and qualitative factors:

**Qualitative Factors**

- Quality of the management of units or functions managed by the Named Executive Officer
- Leadership of personnel under the Named Executive Officer's management
- Execution of strategically important projects
- Overall effectiveness of units or functions managed by the Named Executive Officer
- Contributions to the formulation of Company strategy and tactics
- Contributions to stockholder value
- Management of risk

**Quantitative Factors**

- Financial performance (including earnings per share and internal metrics)
- Financial performance metrics for business units managed by the Named Executive Officer
- Compensation surveys provided by external advisors

The particular performance achievements for, and amounts paid to, each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed by the Compensation Committee. The performance achievements for, and amounts to be paid to, the Chief Executive Officer are established by the Compensation Committee.

The Compensation Committee also assesses the value that each of the Named Executive Officers provided through the generation of new sources of revenue, achievement of operational efficiencies, management of risk and completion of strategic initiatives. The annual incentive bonus earned for fiscal year 2014 by each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Long-Term Incentive Program.* In order to further promote the Company's philosophy of pay-for-performance and furthering its objective of aligning its executive compensation with the

Company's long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of the Named Executive Officer, the Company has a long-term incentive program. For fiscal year 2014, this program consisted of restricted stock units subject to performance vesting based on growth of adjusted EBITDA per share in connection with the Six-year Performance Program described below.

*Six-year Performance Program.* With respect to performance based awards, the Compensation Committee has established a six-year program for long-term performance based incentive grants for the Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each grant has a performance based component, which vests based on the achievement of certain one-, two-and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. Such metrics exclude the effect of particular designated operations for which specific incentive programs are established; at this time, the only such designated operation is the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill. The performance based component will vest if three-year baseline metrics are achieved. For each grant, additional shares may be earned if annual baselines are exceeded as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

However, if actual three-year performance falls below baseline, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Baseline | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 55% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

For actual performance in fiscal 2014, each of the Named Executive Officers earned additional shares, as follows: Mr. Chopra, 30,600 shares; Mr. Edrick, 15,781 shares; Mr. Mehra, 15,781 shares; Mr. Sze, 10,757 shares; and Mr. Mansouri, 917 shares.

In the event of a change of control, the initial grant of the performance based component would vest upon the change of control; to the extent actual performance has exceeded baseline for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed baseline by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The grants to the Named Executive Officers during fiscal 2014 were performance based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for the Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving performance and business objectives of the Company for the benefit of its stockholders. The grants to the Named Executive Officers during fiscal 2015 were also performance based in their entirety.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the number of equity awards to grant to the Named Executive Officers. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the quantitative and qualitative factors set forth in "Annual Incentive Bonuses" above, as well as overall corporate performance. For fiscal year 2014 performance share calculation purposes, the Chief Executive Officer, Chief Financial Officer and General Counsel are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance. The Compensation Committee retains negative discretion to reduce any awards under the long-term incentive program to a lesser award or no award to any participant.

The Company's overall long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the long-term interests of the Company's stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under the Company's equity incentive plan as in effect on the date of grant (the "Equity Plan"), fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Mexico SAT Incentive Program.* For the fiscal years 2013 through 2017, the Company has established an incentive program tied to the performance of the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive Program"). The Mexico SAT Incentive Program was adopted in July 2012. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of certain metrics based on the operating income of the services for the Mexico Servicio de Administración Tributaria. The metrics require such operating income, as a percentage of revenue, to significantly exceed operating margin for the Company as a whole before any incentives are awarded, and are thus believed to be challenging, but achievable with significant management effort. The Mexico SAT Incentive Program consists of three components that may be awarded to certain Named Executive Officers upon achievement of performance criteria: a short-term component, a long-term component, and a "contract award bonus".

If the threshold operating income amount is exceeded for a particular fiscal year, and dependent on the amount by which such threshold operating income is exceeded, a bonus pool is established for certain Named Executive Officers. The bonus pool, if any, is allocated among participating executives. For each such executive, 70% of the annual bonus allocation comprises the short-term component. Half of the short-term component is paid to that executive within 75 days of the end of the fiscal year in which it is earned, and the other half would be paid to that executive within 75 days of the end of the following year, provided that the executive has not voluntarily resigned or is not terminated for cause prior to the date of such payments. The long-term component constitutes the remaining 30% of the executive's annual bonus allocation, and would not be paid until 2018, provided that the executive has not previously resigned or is not terminated for cause prior to the payment. The amount of the long-term component would be divided by $50.17, representing the baseline value of the Company's stock prior to public disclosure of the Company's contract with the Servicio de Administración Tributaria. The resulting figure would then be multiplied by the per-share price of the Company's

stock as of December 31, 2017, and the product would constitute the final value of the long-term component.

The contract award bonus is based on five-and-a-half year cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. If the threshold cumulative operating income is exceeded, and dependent on the amount by which such operating income is exceeded, a "CAB" bonus pool would be established in an amount equal to 1%-5% of the cumulative operating income. The CAB bonus pool, if any, would be allocated among participating executives. The CAB bonuses, if any, for each executive would be paid in January 2018, provided that the executive has not voluntarily resigned or is not terminated for cause prior to the payment.

In the event of a change of control: (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the change of control; (b) a pro-rata CAB bonus would be paid based on the operating income for the two quarters preceding the change of control; (c) the remaining value of the Mexico SAT Incentive Program would be calculated by imputing the operating income for the 12 months preceding the change of control to the period that is the shorter of (i) the 24 months after the change of control or (ii) the remainder of the term of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria (or, in the case of the CAB bonus, until December 31, 2017), and establishing bonus pools based on such data.

In the event that a participating executive's participation in the Mexico SAT Incentive Program is terminated, for reasons other than by the executive's voluntary resignation or the termination of that executive's employment for cause, then (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the termination; (b) a further annual bonus and CAB amount calculated by imputing performance for the 12 months preceding the termination to the period equal to the remainder of the then-current fiscal year plus an additional 12 months, provided that such period does not extend beyond the end of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria for the calculation of the annual bonus amount, and December 31, 2017 for calculation of the CAB amount. Such amounts would be paid within 45 days of the termination.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the amount of awards to grant to the Named Executive Officers under the Mexico SAT Incentive Program. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers each Named Executive Officer's position with the Company and involvement in the management of the screening services operation in making its determinations. The Compensation Committee retains discretion to amend the Mexico SAT Incentive Program.

All of the Named Executive Officers, with the exception of Mr. Mansouri, were participants in the Mexico SAT Incentive Program during fiscal 2014. The short-term and long-term components of the Mexico SAT Incentive Program compensation earned for fiscal year 2014 by each of such Named Executive Officers is shown in the "Non-equity Incentive Plan Compensation" column of the "Summary Compensation Table." Each of such Named Executive Officers will receive a CAB bonus provided that the five-and-a-half year cumulative operating income threshold is achieved. Information concerning the potential CAB bonus amounts is shown in the "Grant of Plan Based Awards Table."

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee

Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. For matching contribution amounts, see the Summary Compensation Table and related footnotes. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix.* While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and Company performance.

*Bases for the Company's Compensation Policies and Decisions*

In determining compensation awarded to the Named Executive Officers for fiscal 2014, the Compensation Committee performed a global review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was thoroughly evaluated and taken into consideration in the Compensation Committee's

overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2014 peer group were developed based on similarity in size and operations within the industries in which the Company operates as follows:

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| • Analogic Corporation | • CONMED Corporation | • FEI Company | • JDS Uniphase Corporation | • Newport Corporation | • Sirona Dental Systems, Inc. |
| • Itron, Inc. | • CTS Corporation | • Finisar Corporation | • Masimo Corporation | • NuVasive, Inc. | • Teleflex Incorporated |
| • Checkpoint Systems, Inc. | • Edwards Lifesciences Corporation | • FLIR Systems, Inc. | • MTS Systems Corporation | • ResMed Inc. | • TTM Technologies, Inc. |
| • Coherent, Inc. | • Daktronics, Inc | • Harmonic Inc. | • Multi-Fineline Electronix, Inc. | • Rofin-Sinar Technologies Inc. | • Zebra Technologies Corp. |

In connection with executive compensation for fiscal 2014, the Company's management provided the Compensation Committee with information gathered from Pearl Meyer & Partners for consideration.

The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that each Named Executive Officer was located in the high cost of living area in the geographic location of the Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed the Company's actual performance taken as a whole as well as its performance relative to its peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to the Company's comparative performance.

For fiscal 2014, the Compensation Committee determined that it was appropriate to maintain fixed compensation levels relatively stable for all Named Executive Officers. Based on the challenging business environment during the second quarter of fiscal 2013, all of the Named Executive Officers voluntarily agreed to a pay cut of 10% of their base salary rates through June 30, 2013. Following June 30, 2013, the temporary pay cuts terminated, and fixed compensation levels returned automatically to the fiscal 2012 levels, which the Compensation Committee determined to leave unchanged for the remainder of fiscal 2014. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position

and the experience he brings to the position, which did not change materially in fiscal 2014. The following table sets forth the changes to base salaries paid to the Named Executive Officers for fiscal 2014:

| Named Executive Officer | Changes in Base Salary |
| --- | --- |
| Deepak Chopra | No change – maintain 2012 base salary of $1,000,000 |
| Alan Edrick | No change – maintain 2012 base salary of $402,000 |
| Ajay Mehra | No change – maintain 2012 base salary of $402,000 |
| Victor Sze | No change – maintain 2012 base salary of $350,000 |
| Manoocher Mansouri | No change – maintain 2012 base salary of $270,500 |

Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual cash incentives and performance-based equity grants, as well as compensation under the MSAT Incentive Program, comprised a significant portion of total compensation.

In making variable compensation determinations, the Compensation Committee noted significant corporate and management achievements during fiscal year 2014 in the categories "furtherance of long-term goals", "demonstration of leadership skills and ability" and "achievement of strategic targets". With respect to Messrs. Chopra, Mehra, Edrick and Sze these included achievement of record revenues and earnings. With respect to Messrs. Chopra, Edrick, and Sze these also included the continuation of the development and launch of an entire new generation of healthcare products and, with respect to those executives and also with respect to Mr. Mansouri, also the expansion of the Optoelectronics and Manufacturing division's electronics manufacturing services, market segments, customer base and capabilities. The Compensation Committee factored these achievements against instances where the Company did not achieve desired results, including the delayed launch of certain products and delays in realizing certain sales.

The Compensation Committee determined that the achievements of each Named Executive Officer for the fiscal year contributed significantly to the Company's strong overall financial performance for the year and success in achieving certain of its long- term goals, and substantially improved the Company's competitive standing in important markets, while the goals that were not achieved during the fiscal year did not represent significant setbacks to the Company as a whole.

In determining variable compensation, the Compensation Committee did not use a mathematical formula for tying the fiscal year's events and performance to each individual executive's variable compensation, but rather took into consideration the executive's involvement in and contribution to the Company's performance for the year, the Company's overall financial performance for the year, certain operational setbacks and failure to achieve certain goals for the year, and approximate compensation levels for comparable-company executives.

In light of this global evaluation, the Compensation Committee determined to reduce the cash component of variable compensation for the Named Executive Officers but maintain equity compensation in the form of stock-based awards relatively stable for fiscal year 2014 as compared to fiscal year 2013. These compensation decisions are reflected in the Summary Compensation Table below under the columns

"Bonus" and "Stock Awards". The following table provides a summary of decisions of the Compensation Committee with respect to each person's eligibility for variable compensation for fiscal year 2014:

| Named Executive Officer | Changes in Variable Compensation |
|---|---|
| Deepak Chopra | Decrease cash bonus as set forth in the Summary Compensation Table due to operational shortcomings including cancellation of a TSA delivery order. |
| Alan Edrick | Decrease cash bonus as set forth in the Summary Compensation Table due to operational shortcomings including cancellation of a TSA delivery order. |
| Ajay Mehra | Decrease cash bonus as set forth in the Summary Compensation Table due to operational shortcomings including cancellation of a TSA delivery order. |
| Victor Sze | Decrease cash bonus as set forth in the Summary Compensation Table due to operational shortcomings including cancellation of a TSA delivery order. |
| Manoocher Mansouri | Decrease cash bonus as set forth in the Summary Compensation Table due to operational shortcomings. |

With respect to the Mexico SAT Incentive Program, for fiscal 2014, the Compensation Committee also considered each Named Executive Officer's position with the Company and involvement in the management of the screening services program with the tax and customs authority of Mexico when determining awards under the Mexico SAT Incentive Program to participating Named Executive Officers. As a result of such review, each Named Executive Officer received an award under the Mexico SAT Incentive Program except for Mr. Mansouri.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving the Company's long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Advisory Vote on Named Executive Officer Compensation*

At the Company's 2013 annual meeting, 82% of the votes cast on the advisory vote on the compensation of the Named Executive Officers were in favor of our executive compensation policies. Considering the strong stockholder support of the compensation of the Named Executive Officers for fiscal 2013, the Compensation Committee determined to continue to apply the same general approach with respect to compensation policies and decisions for fiscal 2014.

*Minimum Equity Ownership and Retention Guidelines*

The Company believes that its Named Executive Officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of the Company's stockholders. Accordingly, the Company has established requirements that Named Executive Officers own equity of the Company valued at five times their respective annual base salaries. The Company believes that this multiple constitutes significant amounts for its Named Executive Officers and provides a substantial link between the interests of its Named Executive Officers and those of the Company's stockholders. During such time that a Named Executive Officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. The Company

periodically reviews its minimum equity ownership guidelines. Any shares pledged by a Named Executive Officer are not counted towards such Named Executive Officer's satisfaction of the Company's minimum equity ownership guidelines. As of June 30, 2014, each of the Named Executive Officers met or exceeded the Company's minimum equity ownership guidelines.

*Clawback Policy*

The Company has adopted a clawback policy. The policy provides that if an accounting restatement is required due to the Company's material non-compliance with any accounting requirements, then the Company will seek to recover any excess in the incentive compensation earned by all of the Company's Named Executive Officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

The Company has adopted a policy that prohibits our Named Executive Officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of the Company's common stock or other equity securities. The Company has also adopted a policy that prohibits on a prospective basis our Named Executive Officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. The Company's anti-pledging policy does not prohibit pledges existing at the time of the adoption of the policy.

*Employment Agreements*

The Company has employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri which were entered into during fiscal 2012. The terms of each of such agreements are summarized below under the heading "Employment Agreements." Employment agreements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on the Company's use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

*Additional Information Regarding the Named Executive Officers*

***Deepak Chopra*** is President and Chief Executive Officer of the Company. Biographical information regarding Mr. Chopra is set forth under "Election of Directors."

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is Executive Vice President of the Company and President of the Company's Security division. Biographical information regarding Mr. Mehra is set forth under "Election of Directors."

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 25 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2232 of 2711

**Summary Compensation Table**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, and the three highest paid executive officers of the Company serving as executive officers on June 30, 2014 (the "Named Executive Officers") for the fiscal years ended June 30, 2014, 2013 and 2012:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($)(1) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2014 | 1,000,000 | 353,000 | 4,192,800 | — | 1,933,535 | 513,000 | 195,735 | 8,188,070 |
| Chairman, President and | 2013 | 961,538 | 1,323,000 | 4,091,340 | — | 1,077,000 | 579,138 | 177,440 | 8,209,456 |
| Chief Executive Officer | 2012 | 1,000,000 | 1,750,000 | 2,218,920 | 606,600 | — | 1,287,536 | 171,010 | 7,034,066 |
| Alan Edrick | 2014 | 402,000 | 160,000 | 2,089,692 | — | 447,349 | — | 58,718 | 3,157,759 |
| Executive Vice President and | 2013 | 386,538 | 340,000 | 2,107,660 | — | 348,000 | — | 58,653 | 3,240,851 |
| Chief Financial Officer | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | — | 111,736 | 2,628,936 |
| Ajay Mehra | 2014 | 402,000 | — | 2,089,692 | — | 702,977 | — | 84,716 | 3,279,385 |
| Executive Vice President | 2013 | 386,538 | 325,000 | 2,107,660 | — | 546,000 | — | 81,226 | 3,446,424 |
| of the Company and | 2012 | 402,000 | 500,000 | 1,008,600 | 606,600 | — | — | 131,373 | 2,648,573 |
| President of Security division | | | | | | | | | |
| Victor S. Sze | 2014 | 350,000 | 160,000 | 1,487,256 | — | 351,488 | — | 77,449 | 2,426,193 |
| Executive Vice President, | 2013 | 336,538 | 345,000 | 1,394,775 | — | 273,000 | — | 71,549 | 2,420,862 |
| General Counsel and | 2012 | 350,000 | 350,000 | 672,400 | 404,400 | — | — | 115,373 | 1,892,173 |
| Secretary | | | | | | | | | |
| Manoocher Mansouri | 2014 | 270,500 | 20,000 | 368,757 | — | — | — | 56,249 | 715,506 |
| President of Optoelectronics | 2013 | 260,096 | 65,000 | 371,940 | — | — | — | 55,507 | 752,543 |
| and Manufacturing division | 2012 | 270,500 | 70,000 | 403,440 | — | — | — | 78,586 | 822,526 |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance- based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the fiscal year ended June 30, 2014 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represents annual bonus amounts earned for fiscal year 2014 under the Mexico SAT Incentive Program in the amounts of $1,425,474, $313,144, $492,084, and $246,042 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, as the short-term component of the program, and amounts earned for fiscal year 2014 of $508,060, $134,205, $210,893, and $105,446 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, credited to the long-term component of the program.

(3) The Company initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2013 to June 30, 2014 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2014 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan, and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of- pocket expenses not covered by their health insurance plans. The Company also provides a discretionary matching contribution to its 401(k) Plan for participating employees, including the Named Executive Officers. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. Further, the Named Executive Officers are eligible to participate in the Deferred Compensation Plan, and the Company may provide matching and discretionary contributions under such plan. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2014 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,369 | 1,780 | 11,285 | 177,301 | 195,735 |
| Alan Edrick | 45,490 | 2,850 | 7,798 | 2,580 | 58,718 |
| Ajay Mehra | 45,313 | 6,675 | 21,543 | 11,185 | 84,716 |
| Victor S. Sze | 40,119 | 12,000 | 16,704 | 8,626 | 77,449 |
| Manoocher Mansouri | 29,506 | 7,200 | 7,897 | 11,646 | 56,249 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2013 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 6,614 | 1,780 | 1,782 | 10,167 | 157,097 | 177,440 |
| Alan Edrick | 46,703 | 2,850 | — | 6,519 | 2,580 | 58,653 |
| Ajay Mehra | 44,504 | 6,675 | — | 18,861 | 11,185 | 81,226 |
| Victor S. Sze | 39,580 | 12,000 | — | 8,814 | 11,156 | 71,549 |
| Manoocher Mansouri | 29,526 | 7,200 | — | 7,135 | 11,647 | 55,507 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club. Membership dues were discontinued during fiscal year 2013.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2012 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 5,199 | 1,780 | 5,652 | 10,675 | 147,704 | 171,010 |
| Alan Edrick | 89,000 | 2,850 | — | 8,417 | 11,469 | 111,736 |
| Ajay Mehra | 89,016 | 6,675 | — | 17,382 | 18,300 | 131,373 |
| Victor S. Sze | 77,726 | 12,000 | — | 15,016 | 10,631 | 115,373 |
| Manoocher Mansouri | 58,209 | 7,200 | — | 7,006 | 6,171 | 78,586 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club.

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2014 to each of the Named Executive Officers(11):

| | | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(6) | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Type of Award(1)** | **Grant Date** | **Threshold ($)(2)** | **Target ($)** | **Maximum ($)(2)** | **Threshold (#)(3)** | **Target (#)(4)** | **Maximum (#)(5)** | **Grant Date Fair Value of Options and Awards (7)($)** |
| Deepak Chopra | RSU | 8/15/2013 | — | — | — | — | 60,000 | 150,000 | 4,192,800 |
| Chairman, President and | STI(8) | — | — | 1,185,474 | — | — | — | — | — |
| Chief Executive Officer | LTI(9) | — | — | 508,060 | — | — | — | — | — |
| | CAB(10) | — | — | 675,962 | — | — | — | — | — |
| Alan Edrick | RSU | 8/15/2013 | — | — | — | — | 29,904 | 74,760 | 2,089,692 |
| Executive Vice President and | STI(8) | — | — | 313,144 | — | — | — | — | — |
| Chief Financial Officer | LTI(9) | — | — | 134.205 | — | — | — | — | — |
| | CAB(10) | — | — | 178,556 | — | — | — | — | — |
| Ajay Mehra | RSU | 8/15/2013 | — | — | — | — | 29,904 | 74,760 | 2,089,692 |
| Executive Vice President of the | STI(8) | — | — | 492,084 | — | — | — | — | — |
| Company and President of | LTI(9) | — | — | 210,893 | — | — | — | — | — |
| Security division | CAB(10) | — | — | 280,588 | — | — | — | — | — |
| Victor S. Sze | RSU | 8/15/2013 | — | — | — | — | 21,283 | 53,208 | 1,487,256 |
| Executive Vice President, | STI (8) | — | — | 246,042 | — | — | — | — | — |
| General Counsel and Secretary | LTI(9) | — | — | 105,446 | — | — | — | — | — |
| | CAB(10) | — | — | 140,292 | — | — | — | — | — |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | RSU | 8/15/2013 | — | — | — | — | 5,277 | 13,193 | 368,757 |

(1) Type of Award:

RSU Restricted Stock Unit

STI Short Term Component of Mexico SAT Incentive Program

LTI Long Term Component of Mexico SAT Incentive Program

CAB Contract Award Bonus under Mexico SAT Incentive Program

(2) No amounts are shown in these columns because awards under the applicable programs do not provide for threshold or maximum payment amounts.

(3) No amounts are shown in this column as the Company's long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(5) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(6) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) The grant date fair value of the restricted stock units was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(8) Represents the short-term component of annual bonus awards under the Mexico SAT Incentive Program, as more fully explained above under "*Mexico SAT Incentive Program*."

(9) Represents the long-term component of annual bonus awards under the Mexico SAT Incentive Program. The amount reported is the dollar amount credited to the individual, which is payable in 2018 (provided the individual has not voluntarily resigned or is not terminated for cause prior to payment) and may vary from the amount reported based on the future performance of our stock price, as more fully explained above under "*Mexico SAT Incentive Program*."

(10)

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2235 of 2711

Represents an award made during the fiscal year as a Contract Award Bonus under the Mexico SAT Incentive Program. The amount reported is not the actual amount earned by or credited to the individual, but rather a representative amount based on the Company's performance during fiscal year ending June 30, 2014. As more fully explained above under "*Mexico SAT Incentive Program*", the Contract Award Bonus is payable in 2018, if at all, based on cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. The amount reported assumes that 2014 operating income from these operations continues each year during the measuring period. However, the actual amount of our operating income through 2017 may vary substantially from the amount assumed for purposes of this table.

(11) The Company has eliminated from this table the columns titled "All Other Stock Awards: Number of Shares of Stock or Units", "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

## Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2014(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (4)(#) | Market Value of Shares or Units of Stock That Have Not Vested (5)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(6) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(5) |
| Deepak Chopra | 60,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 40,000 | 20,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| Chief Executive Officer | — | — | — | — | 37,625(9) | 2,511,469 | 113,400 | 7,569,450 |
| Alan Edrick | 48,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 40,000 | 20,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 15,000(10) | 1,001,250 | 57,514 | 3,839,060 |
| Ajay Mehra | 7,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| of the Company and | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| President of | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Security division | 40,000 | 20,000(7) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 17,500(11) | 1,168,125 | 60,940 | 4,067,745 |
| Victor S. Sze | 24,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice | 10,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, General | 5,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Counsel and Secretary | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 26,667 | 13,333(8) | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 10,063(12) | 671,705 | 39,405 | 2,630,284 |
| Manoocher Mansouri | 7,500 | — | 23.18 | 2/7/2018 | — | — | — | — |
| President, | 25,657 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Optoelectronics and Manufacturing division | — | — | — | — | 8,500(13) | 567,375 | 3,225 | 215,269 |

(1) The Company has eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(4) Restricted stock and RSU awards vest over periods ranging between three and four years from the date of grant.

(5) The market value of restricted stock and RSU awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2014, multiplied by the closing price of the Company's Common Stock on June 30, 2014 ($66.75 per share).

(6) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) These 20,000 unexercisable option awards vested on September 9, 2014.

(8) These 13,333 unexercisable option awards vested on September 9, 2014.

(9) These 37,625 unvested stock awards are subject to the following vesting schedule: 18,125 shares vested on August 11, 2014, 9,750 shares vested on September 9, 2014 and 9,750 shares will vest on September 9, 2015.

(10) These 15,000 unvested stock awards are subject to the following vesting schedule: 7,500 shares vested on August 11, 2014, 3,750 shares vested on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(11) These 17,500 unvested stock awards are subject to the following vesting schedule: 10,000 shares vested on August 11, 2014, 3,750 shares vested on September 9, 2014 and 3,750 shares will vest on September 9, 2015.

(12) These 10,063 unvested stock awards are subject to the following vesting schedule: 5,063 shares vested on August 11, 2014, 2,500 shares vested on September 9, 2014 and 2,500 shares will vest on September 9, 2015.

(13) These 8,500 unvested stock awards are subject to the following vesting schedule: 4,500 shares vested on August 11, 2014, 2,000 shares vested on September 9, 2014 and 2,000 shares will vest on September 9, 2015.

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2014:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting | Value Realized on Vesting(2)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 89,375 | 6,556,896 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | — | — | 39,500 | 2,901,798 |
| Ajay Mehra<br>Executive Vice President of the Company and President of Security division | — | — | 42,000 | 3,085,973 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | — | — | 26,312 | 1,932,955 |
| Manoocher Mansouri<br>President, Optoelectronics and Manufacturing division | — | — | 9,875 | 722,563 |

(1) Represents the difference between the fair market price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Represents the number of restricted stock awards that vested multiplied by the fair market price of the Company's Common Stock on the date of vesting.

**Pension Benefits**

The Company maintains the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's

death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2014(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 12 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2014.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 7 | 5,868,232 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants. Eligible participants are fully vested in Company contributions.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2014 ranged from 0.0% to 22.9%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2014:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | 74,123 | 40,200(3) | 170,009 | — | 1,028,433 |
| Ajay Mehra Executive Vice President of the Company and President of Security division | 40,123 | 40,200(3) | 164,691 | — | 936,173 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | 34,933 | 35,000(3) | 142,543 | — | 810,538 |
| Manoocher Mansouri President, Optoelectronics and Manufacturing division | 40,497 | 27,050(3) | 26,904 | — | 459,675 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2014.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Mansouri.

*Deepak Chopra's Employment Agreement*

On April 4, 2012, the Company entered into its current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from the Company to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date, he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's, Ajay Mehra's, Victor Sze's and Manoocher Mansouri's Employment Agreements*

On April 4, 2012, the Company entered into its current employment agreement with each of Messrs. Edrick, Mehra, Sze and Mansouri, which were effective as of January 1, 2012. For purposes of this section, Messrs. Edrick, Mehra, Sze and Mansouri are each individually referred to as the "Executive." The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68 (the "Executive Scheduled Retirement Date"). The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick, $402,000 for Mr. Mehra, $350,000 for Mr. Sze and $270,500 for Mr. Mansouri. The Executive

is also eligible to receive discretionary bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Edrick's, Mr. Mehra's and Mr. Sze's employment by the Company without cause, the Company's non- renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months salary at the Executive's then- current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mansouri's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 12 months salary at the Executive's then-current base salary plus an amount equal to the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change of control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the

applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by the Company to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Edrick's, Mr. Mehra's, Mr. Sze's and Mr. Mansouri's continued employment until the Executive Scheduled Retirement Date, he shall be entitled a lump sum stay bonus equal to his highest year out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Executive Scheduled Retirement Date.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2014, and that employment terminated on such date. The tables also assume that the price of the Company's Common Stock, on which certain calculations in the following tables are made, was the closing price of the Company's Common Stock on June 30, 2014, the last business day of the fiscal year ($66.75).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2244 of 2711

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1) ($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | Mexico SAT Incentive Program ($)(4) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra(2) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,609,500 | 12,426,210 | 13,386,819 | 7,562,511 | 559,763 | 41,544,803 |
| | Good Reason or Without Cause in Connection with a Change in Control(3) | 3,000,000 | 4,609,500 | 12,426,210 | 15,869,919 | 7,562,511 | 559,763 | 44,027,903 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to Mr. Chopra following the completion of the fiscal year ended June 30, 2014, for performance in the fiscal year ended June 30, 2014.

(2) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(3) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(4) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program.*"

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Mansouri.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus(1) ($) | Accelerated Vesting of Stock Awards ($) | Mexico SAT Incentive Program ($)(3) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 804,000 | 800,000 | 6,930,692 | 1,862,316 | 6,000 | 6,000 | 10,409,008 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 800,000 | 8,183,029 | 1,862,316 | 6,000 | 6,000 | 11,661,345 |
| Ajay Mehra Executive Vice President of the Company and President of Security division | Good Reason or Without Cause | 804,000 | 790,000 | 7,097,567 | 3,030,224 | 6,000 | 6,000 | 11,773,791 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 804,000 | 790,000 | 8,349,904 | 3,030,224 | 6,000 | 6,000 | 12,986,128 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 700,000 | 663,333 | 4,703,443 | 1,668,612 | 6,000 | 6,000 | 7,747,388 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 700,000 | 663,333 | 5,572,074 | 1,668,612 | 6,000 | 6,000 | 8,616,019 |
| Manoocher Mansouri President of Optoelectronics and Manufacturing division | Good Reason or Without Cause | 270,500 | 78,333 | 1,587,115 | — | 6,000 | 6,000 | 1,947,948 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 270,500 | 78,333 | 1,653,414 | — | 6,000 | 6,000 | 2,014,247 |

(1) For the purposes of this table, the bonus amount is based on the bonus amount granted by the Compensation Committee to each of the Named Executive Officers following the completion of the fiscal year ended June 30, 2014, for performance in the fiscal year ended June 30, 2014.

(2) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(3) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program*."

## Director Compensation

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2014, each non-employee director that served as a director for the full fiscal year, received $65,000 for his year of service, 2,200 RSUs, and $3,000 for each Board of Directors meeting attended.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2246 of 2711

Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $15,000.

Each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $15,000.

Each member of the Nominating and Governance Committee received $2,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $7,500 and 500 RSUs.

Each member of the Executive Committee received $25,000 and 2,600 RSUs.

Each member of the Technology Committee received $3,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $7,500 and 500 RSUs.

All restricted stock awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2014 for each non-employee member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 140,500 | 335,424 | — | 475,924 |
| Meyer Luskin | 143,500 | 335,424 | — | 478,924 |
| David T. Feinberg | 87,500 | 188,676 | — | 276,176 |
| William F. Ballhaus | 117,000 | 188,676 | — | 305,676 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2014 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2014 a total of 4,800 RSUs were granted to Mr. Good and Mr. Luskin and 2,700 RSUs were granted to Mr. Ballhaus and Mr. Feinberg, all with a fair value of $69.88. As of June 30, 2014, Mr. Good had 13,800 unvested stock awards outstanding, Mr. Luskin had 13,800 unvested stock awards outstanding, Mr. Feinberg had 7,575 unvested stock awards outstanding and Mr. Ballhaus had 7,575 unvested stock awards outstanding.

The Company believes that its directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of its stockholders. Accordingly, the Company has established requirements that directors own equity of the Company valued at five times their annual retainers. The Company believes that this multiple constitutes significant amounts for its directors and provides a substantial link between the interests of its directors and those of its stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. The Company periodically reviews its minimum equity ownership guidelines. Any shares pledged by a director are not counted towards such director's satisfaction of the Company's minimum equity ownership guidelines. As of June 30, 2014, each of the Company's directors met or exceeded the Company's minimum equity ownership guidelines.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company contracted for a portion of its automobile rental and messenger services from a business that was owned during the year ended June 30, 2014 by Mr. Chopra and his wife. The Company paid the business approximately $18,000 for such services during the year ended June 30, 2014. Additionally, the Company contracted for a portion of its printing services from a business that was owned during the year ended June 30, 2014 by Mr. Chopra's father-in-law. The Company paid the business approximately $13,000 for such services during the year ended June 30, 2014. The foregoing automobile rental, messenger, and printing services were all discontinued by the end of September 2013.

The Company believes that the foregoing transactions were on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company would be on terms at least as favorable to the Company as those that can be obtained from unaffiliated third parties.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of the Company's voting securities, or any immediate family member of any of the foregoing would have a direct or material interest in the transaction and the amount of the transaction is not negligible. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the amount of shares of the Company beneficially owned as of October 16, 2014 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,262,781 | 11.3% |
| Tremblant Capital Group(3) | 1,646,611 | 8.2% |
| Wells Fargo & Company(4) | 1,606,412 | 8.0% |
| The Vanguard Group, Inc.(5) | 1,274,085 | 6.3% |
| Janus Capital Management LLC(6) | 1,199,895 | 6.0% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 16, 2014, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) As reported in a Schedules 13F-HR filed on August 6, 2014 with the SEC by BlackRock, Inc. and six of its affiliated entities. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) As reported in a Schedule 13F-HR filed on August 14, 2014 with the SEC. The address of Tremblant Capital Group is 767 Fifth Avenue, Floor 12a, New York, NY 10153. Beneficial ownership is made up of 626,111 shares and 1,020,500 call options.

(4) As reported in a Schedule 13F-HR/A filed on August 29, 2014 with the SEC. The address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94163.

(5) As reported in a Schedule 13F-HR filed on August 11, 2014 with the SEC. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(6) As reported in a Schedule 13F-HR filed on August 14, 2014 with the SEC. The address of Janus Capital Management LLC is 151 Detroit Street, Denver, CO 80206.

The following table sets forth the amount of shares of the Company beneficially owned as of October 16, 2014 by each director of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 720,383 | 3.6% |
| Alan Edrick(4) | 408,188 | 2.0% |
| Ajay Mehra(5) | 341,304 | 1.7% |
| Victor S. Sze(6) | 298,396 | 1.4% |
| Manoocher Mansouri(7) | 89,808 | 0.4% |
| Meyer Luskin(8) | 55,685 | 0.2% |
| Steven C. Good(9) | 22,325 | 0.1% |
| David Feinberg(10) | 10,685 | 0.0% |
| William F. Ballhaus(11) | 9,800 | 0.0% |
| All directors and executive officers as a group (9 persons) | 1,956,574 | 9.4% |

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 16, 2014, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. Except as indicated by footnote, no shares are pledged as security.

(3) Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company. Includes 65,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 25,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. In addition, includes 417,193 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, 17,000 shares held in the Nandini SLAT Trust and 75,750 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012 held individually by Mr. Chopra. Includes 120,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011. The total amount of shares beneficially owned by Mr. Chopra includes 50,000 shares that are pledged by Mr. Chopra as security for a line of credit, which reflects a decrease from the prior year in the number of shares pledged. Mr. Chopra's stock holdings exceed the Company's equity ownership and retention guidelines without taking into account these pledged shares.

(4) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 37,750 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012. Includes 297,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(5) Mr. Mehra is the Executive Vice President and a Director of the Company and President of the Company's Security division. Includes 37,750 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012. Includes 176,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(6) Mr. Sze is the General Counsel, Executive Vice President and Secretary of the Company. Includes 25,000 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012. Includes 191,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(7) Mr. Mansouri is the President of the Optoelectronics and Manufacturing division. Includes 8,000 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012. Includes 33,157 shares issuable pursuant to options which were granted between February 8, 2008 and September 1, 2009.

(8) Mr. Luskin is a Director of the Company. Includes 51,310 shares held by The Meyer and Doreen Luskin Family Trust, and 4,375 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012 that are held individually by Mr. Luskin.

(9) Mr. Good is a Director of the Company. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan. Includes 4,375 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012.

(10) Dr. Feinberg is a Director of the Company. Includes 2,375 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012.

(11) Dr. Ballhaus is a Director of the Company. Includes 2,375 shares of unvested restricted stock granted between September 9, 2011 and July 23, 2012.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2014, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that during the year ended June 30, 2014, Dr. Feinberg untimely filed one Form 4 report.

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the Company's equity compensation plans as of June 30, 2014.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 1,022,991 | 26.60 | (2)(3) 3,330,177(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 1,022,991 | 26.60 | 3,330,177 |

(1) Includes shares of our Common Stock issuable upon exercise of options under our 2006 Equity Participation Plan and our 2012 Incentive Award Plan.

(2) These shares are available for future issuance under our 2012 Incentive Award Plan, which was approved by our shareholders on December 12, 2012. Upon shareholder approval of the 2012 Incentive Award Plan, we froze the 2006 Equity Participation Plan, and no further awards can be granted thereunder.

(3) Shares awarded as restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one share granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason (up to a maximum of 2,220,000 shares) also become available for future issuance under our 2012 Incentive Award Plan.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements for the years ended June 30, 2013 and 2014 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2013 | FY 2014 |
|---|---|---|
| Audit Fees | $ 925 | $ 915 |
| Audit-Related Fees | $ 15 | $ 15 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 940 | $ 930 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements other than audit fees. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2014, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2014.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2014 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the

Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2014, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's Current Report on Form 8-K filed with the SEC on May 13, 2014. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of the Company's directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – *http://www.osi- systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless the Company has received contrary instructions from one or more of the stockholders at that address. The Company undertakes to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to the Secretary of the Company at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next annual meeting of stockholders, the proposal must be delivered in writing to the Secretary of the Company and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such

proposal to the Company would be June 19, 2015, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

The Company's Bylaws provide that if a stockholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to the Company no more than 120 days and no less than 90 days prior to December 12, 2015, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 12, 2015, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 17, 2014

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

________________________

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 David T. Feinberg
06 William F. Ballhaus

**The Board of Directors recommends you vote FOR proposals 2 and 3.**

| | For | Against | Abstain |
|---|---|---|---|
| 2 Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2015. | ☐ | ☐ | ☐ |
| 3 Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2014. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

0000221012_1 R1.0.0.51160

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com .

OSI SYSTEMS, INC.
Annual Meeting of Stockholders
December 12, 2014 10:00 A.M.
This proxy is solicited by the Board of Directors

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 12, 2014 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, and 3 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000221012_2 R1.0.0.51160

**Continued and to be signed on reverse side**

# Exhibit 35

8-K 1 a14-26126_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): DECEMBER 12, 2014**

# OSI SYSTEMS, INC.
**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 12, 2014. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 15,431,385 | 451,399 | 1,687,958 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2262 of 2711

| | | | |
|---|---|---|---|
| Ajay Mehra | 15,782,436 | 100,348 | 1,687,958 |
| Steven C. Good | 14,828,183 | 1,054,601 | 1,687,958 |
| Meyer Luskin | 14,826,908 | 1,055,876 | 1,687,958 |
| David T. Feinberg | 14,723,921 | 1,158,863 | 1,687,958 |
| William F. Ballhaus | 14,877,308 | 1,005,476 | 1,687,958 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2015*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 17,405,003 | 68,111 | 97,628 | 0 |

The proposal was approved.

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2014*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 11,804,596 | 3,962,992 | 115,196 | 1,687,958 |

The proposal was approved.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 12, 2014

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**Secretary, and General Counsel**

# Exhibit 36

DEF 14A 1 a2226260zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 19, 2015

Dear Stockholder:

    You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 8, 2015, at the Company's offices at 2805 Columbia Street, Torrance, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 13, 2015 are entitled to vote at the Annual Meeting.

    Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2015, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

    Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

    You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

    Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., local time, on Tuesday, December 8, 2015

**Location:** The Company's offices, 2805 Columbia Street, Torrance, California 90503

**Proposals:**

1. To elect six directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2016;

3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2015, as described in the accompanying Proxy Statement; and

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 13, 2015 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 8, 2015:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2015 are available at *http://www.proxyvote.com*.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2015 | 11 |
| Compensation of Executive Officers and Directors | 18 |
| Security Ownership of Certain Beneficial Owners and Management | 48 |
| Equity Compensation Plan Information | 51 |
| Independent Registered Public Accounting Firm | 52 |
| Report of Audit Committee | 53 |
| Code of Ethics and Conduct | 55 |
| Annual Meeting Attendance | 55 |
| Stockholder Communications | 55 |
| Availability of Annual Report on Form 10-K | 55 |
| Stockholder Proposals | 55 |
| Incorporation by Reference | 56 |
| Other Business | 56 |

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at its Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 8, 2015, at the Company's offices at 2805 Columbia Street, Torrance, California 90503, and at any adjournment thereof.

The Company is making its proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and its most recent Annual Report on Form 10-K ("Proxy Materials"), available to its stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. The Company anticipates that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 26, 2015.

Stockholders of record as of the close of business on October 13, 2015 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 13, 2015, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, the Company had issued and outstanding 19,722,098 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST" or "ABSTAIN" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual

Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, the Company's management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. Directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One.

*Proposal Two*. To be approved, the ratification of Moss Adams LLP as the Company's independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. To be approved, the proposal regarding the Company's executive compensation for the fiscal year ended June 30, 2015 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that the stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about the Company's executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. The Company will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 8, 2015:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2015 are available at *http://www.proxyvote.com*.

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

### Nominees

The Board of Directors consists of six members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The six candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus and James B. Hawkins. Other than Mr. Hawkins, all of our director nominees are currently directors of the Company and were previously elected to serve on the Board of Directors by our stockholders.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until the Company's next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although the Company knows of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the six nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The current directors and nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 64 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 53 | Director, Executive Vice President and President of OSI Solutions Business | 1996 |
| Steven C. Good(1)(2)(3)(4)(5) | 73 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4)(5) | 90 | Director | 1990 |
| David T. Feinberg(6) | 53 | Director | 2010 |
| William F. Ballhaus(1)(2)(3)(5) | 70 | Director | 2010 |
| James B. Hawkins | 59 | Director Nominee | — |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Executive Committee

(5) Member of the Technology Committee

(6) Dr. Feinberg's term as a director will end at the upcoming Annual Meeting.

### Business Experience

***Deepak Chopra*** is the founder of the Company and has served as President, Chief Executive Officer and a Director since the Company's inception in May 1987. He has served as the Company's Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of the Company's major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various

positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, the Company acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing the Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of OSI Solutions Business. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named the Company's Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and management experience within the Company.

***Steven C. Good*** has served as a Director of the Company since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good also currently serves as a Director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman. Mr. Luskin is also a Director of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital) and was formerly the Chairman. Mr. Luskin is also a Director on the Advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***David T. Feinberg*** has served as a Director of the Company since March 2010. Dr. Feinberg has served as the President and Chief Executive Officer of Geisinger Health System since May 2015. Prior to that, Dr. Feinberg served as President of the UCLA Health System since July 2011 and as Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming these positions, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry and was a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA. Dr. Feinberg previously served on the Board of Directors of Douglas Emmett, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Dr. Feinberg graduated cum laude in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his Master of Business Administration from Pepperdine University in 2002.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory and on the Board of Trustees of the University Space Research Association. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** is the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Mr. Hawkins has held this position since 2004. In addition, he currently serves as a director of IRADIMED Corporation and El Dorado Resorts Inc. Mr. Hawkins has notified the Company that he will not stand for re-election as director on one of the outside public company boards on which he serves as an independent director, thereafter serving on two public company boards in addition to the Natus board. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a Director of Invivo Corporation, a provider of MRI-safe patient monitoring. He earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins has been nominated as a director because of his direct management experience in the medical device area.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and other risks. Risks are reported to the Board of Directors through the Company's executive officers, who are responsible for the identification, assessment and management of the Company's risks. The Board of Directors regularly discusses the risks reported by the Company's executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of risks related to accounting, auditing and financial reporting and maintaining effective internal control over financial reporting. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. The Company believes that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances the Company's ability to communicate its message and strategy clearly and consistently to its stockholders, employees, and other companies with which it does business. Although the Company believes that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, it will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve the Company's best interests and the best interests of its stockholders. The Company does not have a lead independent director.

**Board of Directors Meetings, Independence and Committees of the Board of Directors**

There were five meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2015. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2015 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the nominees for director, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board of Directors has determined that each

of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect.

*Audit Committee*

The Company has a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of the Company's independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews the financial statements of the Company and the adequacy of the Company's internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of Messrs. Good and Luskin and Dr. Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee and the Audit Committee acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2015. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for the Company's executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of the Company's equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Good and Dr. Ballhaus. There were six meetings of the Compensation Committee and the Compensation Committee acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2015. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of three independent directors – Dr. Ballhaus and Messrs. Good and Luskin. During fiscal year 2015, the Nominating and Governance Committee consisted of Messrs. Good and Luskin and Dr. Feinberg. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2015.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members.

The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with the Company's management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of two independent directors – Messrs. Good and Luskin. There were six meetings of the Executive Committee during the fiscal year ended June 30, 2015.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board of Directors regarding all technology-based matters. The Technology Committee currently consists of three independent directors – Dr. Ballhaus and Messrs. Good and Luskin. During fiscal year 2015, the Technology Committee consisted of Drs. Ballhaus and Feinberg. There were no meetings of the Technology Committee during the fiscal year ended June 30, 2015.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Company's Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;

- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and

- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of the Company's Bylaws, a copy of which is available from the Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. The Company may also require any proposed nominee to furnish such other information as the Company or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to the Company's Board of Directors to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify the Company of their intent to do so on or before the date on which nominations must be received by the Company in accordance with its Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Good and Dr. Ballhaus. No executive officer of the Company has served during the fiscal year ended June 30, 2015 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on the Company's Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2015, no member of the Company's Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr. and James B. Hawkins as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as the Company's independent registered public accountants for the year ending June 30, 2016 and has further directed that management submit the selection of independent registered public accountants for ratification by the Company's stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that the Company's stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in the Company's and its stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2016. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2015**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 enables the Company's stockholders to vote to approve, on an advisory, non-binding basis, the Company's executive compensation for the fiscal year ended June 30, 2015 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act. The Company currently conducts this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at the Company's 2016 Annual Meeting of Stockholders.

**Summary**

The Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. The Company is asking its stockholders to provide advisory approval of the Company's executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. The Company recognizes and values the critical role that executive leadership plays in its performance. The Company's executive compensation philosophy is intended to ensure that executive compensation is aligned with the Company's long-term business strategy, objectives and stockholder interests. The Company's executive compensation is designed to attract, motivate and retain highly qualified executives. The Company believes that its compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the long-term interests of the stockholders.

The Company urges the stockholders to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

The Company believes that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. In fiscal year 2015, the Company experienced growth in revenues, operating income, net income, earnings per share and operating cash flow. The Company ended fiscal year 2015 with a strong backlog. The Company believes that its continued success is closely tied to the performance of its executive officers and has designed its compensation practices in order to reward the executives for their contributions to the overall success of the Company.

**Alignment with Stockholders' Interests**

The Company grants annual incentives based in part on each executive's contribution to enhancing long-term stockholder value. The Company also grants long-term incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of the stockholders. The Company has generally used restricted stock, restricted stock units and stock options as its equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of the Company's operations. For fiscal year 2015, 100% of the long-term equity incentives granted to the Company's Named Executive Officers

consisted of restricted stock units subject to performance vesting based on growth of adjusted EBITDA per share. For fiscal year 2016, long-term equity incentives will continue to be 100% performance vesting.

**Long-Term Performance**

In order to promote the Company's philosophy of pay-for-performance and furthering its objective of aligning the interests of management with those of the stockholders, the Company has established performance programs for certain of its executive officers. These programs focus on the achievement of the Company's long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, the Company is incentivizing its officers to achieve the Company's long-term corporate objectives and ultimately increase stockholder value.

**Recommendation**

The Board of Directors believes that a vote in favor of the proposal is warranted for these reasons: (1) the Company delivered strong operating performance during fiscal 2015; (2) under the CEO's leadership, the Company's stock price has increased approximately 155% over the five-year period ended June 30, 2015; (3) the CEO's pay over the past five-years has been closely aligned with the Company's total stockholder return (TSR) performance; (4) 100% of Named Executive Officer equity awards for fiscal 2015 were performance-based and tied to measurable pre-established targets; (5) the annual incentives were awarded only after a robust consideration of both qualitative and quantitative factors; and (6) the Company is committed to having strong governance standards and continues to take steps to further this commitment.

1. **Operating Performance: The Company delivered strong operating performance during fiscal 2015:**

- The Company's revenues increased 6% over the prior year, once again setting a new record for the Company.
- The Company achieved non-GAAP diluted earnings per share (EPS) of $3.53, which represented a 13% increase over the prior year; the Company's seventh consecutive year of record non-GAAP earnings.
- The Company achieved record adjusted EBITDA representing growth of 11%.
- The Company generated record free cash flow of approximately $90 million.
- The Company grew its addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. In the past, this dynamic approach has served to sustain growth even through periods of adverse macroeconomic conditions.
- The Company made targeted investments in new product development (R&D) and acquisitions. Such investments in the past have led to the Company's introduction of the Rapiscan RTT®

computed tomography (CT) based hold baggage inspection system and a new generation of healthcare products.

**2. Total Shareholder Return (TSR): The Company's 5-year, 7-year and 10-year TSR numbers have been exceptional.**

Under the CEO's leadership, the Company's 5-year, 7-year and 10-year TSR numbers have been exceptional with the Company's stock price out-performing approximately 96% of its peer group over the last 10 years. This illustrates management's commitment to long-term shareholder value creation. The Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business. The CEO's pay over the five-years ended June 30, 2015 has been closely aligned with the Company's TSR performance.

**3. Stock Price Appreciation and Linkage to Executive Compensation: Under the CEO's leadership, the Company's stock price has increased approximately 155% over the five-year period ended June 30, 2015. The CEO's pay over the past five fiscal years has been closely aligned with the Company's TSR performance.**

The Company believes that its long-term TSR performance has been very strong and that the structure of its executive compensation program contributed to the Company's achievements by incentivizing the executives to grow the Company in a way that creates long-term value for the Company's stockholders. The Company's 3-year relative TSR number was not strong, but the Company believes this to be reflective of certain Company and industry-specific challenges that the Company faced during that period. Additionally, the Company has had continued operational success over the same period and has significantly outperformed its peers in the security detection industry, thus providing further support for the Company's belief that the 3-year TSR metric is not a meaningful indication of the Company's long-term performance. In fiscal year 2015, the Company had record revenues, record non-GAAP earnings per share and record free cash flow. Also noteworthy is that between June 30, 2015 and September 30, 2015, the Company's stock price increased nearly 9%. The chart below shows the close alignment of CEO pay as compared to the Company's TSR performance over the past five fiscal years.

| | 2011 Chopra, Deepak | 2012 Chopra, Deepak | 2013 Chopra, Deepak | 2014 Chopra, Deepak | 2015 Chopra, Deepak |
|---|---|---|---|---|---|
| CEO Pay ($000) | $4,789 | $7,034 | $8,250 | $8,229 | $8,478 |
| Indexed TSR | 154.84 | 228.09 | 231.98 | 240.37 | 254.92 |

**4. Six-Year Performance Program: Equity awards granted to the Company's Named Executive Officers are 100% performance-based and tied to measurable pre-established adjusted EBITDA per share goals. Under the Six-Year Performance Program, the Company's Mexico security scanning program was specifically excluded so that executives would not receive two payments for the same performance.**

The Company's Named Executive Officers were not granted any time-based vesting equity awards during fiscal 2015. The equity grants made to the executives during fiscal 2015 were 100% performance-

based and tied to pre-established adjusted EBITDA per share targets which require significant annual growth. Forty percent (40%) of the maximum number of shares that can be earned under each Named Executive Officer's 2015 award has a three-year performance component which vests or is forfeited following the end of the three-year performance cycle, subject to the achievement of the adjusted EBITDA per share growth target for fiscal 2017. If 85% of this three-year adjusted EBITDA per share target is not attained, then these shares are forfeited. The remaining sixty percent (60%) of the maximum number of shares that can be earned under each executive's 2015 award may vest up to twenty percent (20%) per year over the three-year period if annual adjusted EBITDA per share growth targets are exceeded for fiscal years 2015, 2016 and 2017, respectively. These grants were made pursuant to our Six-Year Performance Program, which was established in 2012.

The adjusted EBITDA per share targets exclude the effect of the Company's security scanning program for the Mexico Servicio de Administración Tributaria for which the Compensation Committee has established a separate program, discussed in further detail below. The Compensation Committee specifically excluded the Mexico security scanning program from the long-term equity incentive program so that the executives would not benefit multiple times under two programs for the same accomplishments. The Company believes that the performance metrics underlying its long-term equity incentive program are rigorous and the Company has not disclosed current metrics because their disclosure would allow the Company's competitors to determine the EBITDA and pricing related to the Mexico turnkey operations, which would be competitively harmful to the Company. The adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2015 was $5.07.

For fiscal 2015, the Company achieved 116% of the fiscal 2015 adjusted EBITDA per share target, and as a result the 66,000 shares granted to the CEO in fiscal 2013 were vested. In addition, the CEO earned 74,400 shares, consisting of 24,000 vested shares earned pursuant to the fiscal 2015 grant, 24,000 vested shares earned pursuant to the fiscal 2014 grant and 26,400 vested shares earned pursuant to the fiscal 2013 grant.

**5. Mexico SAT Incentive Program: The Compensation Committee established a separate incentive program tied to the Company's Mexico turnkey operations in order to underscore its importance to the Company and to focus management's attention on developing the opportunity in Mexico.**

The Compensation Committee established a separate incentive program in 2012 tied to the performance of the Company's security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive Program") in order to underscore its importance to the Company and to focus management's attention on this important opportunity. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of operating income targets that the Company believes are rigorous which relate to the services for the Mexico Servicio de Administración Tributaria. These targets require that such operating income, as a percentage of revenue, significantly exceed the Company-wide operating margin before any incentives are awarded. The Company has not disclosed these operating income targets because such disclosure would be competitively harmful to the Company. These operating income targets will be stated, on a retrospective basis, following the completion of the security scanning program for the Mexico Servicio de Administración Tributaria.

Under the Mexico SAT Incentive Program, for fiscal 2015, based on operating income achieved, the CEO was awarded $1,141,327 consisting of the short-term component of the program. The long-term components of the program are described more fully below in the Compensation Discussion and Analysis section under "Mexico SAT Incentive Program."

**6. Annual Incentives: Although the Company's annual incentive bonus program allows for the Compensation Committee to exercise discretion once financial thresholds are achieved, both qualitative and quantitative factors are robustly considered in determining bonus amounts.**

The Compensation Committee considered both qualitative and quantitative factors when determining the annual bonus amounts for fiscal 2015. With respect to the annual incentive bonuses granted to the CEO and certain executive officers, once the Compensation Committee determined that the Company's financial thresholds were achieved, the Compensation Committee then considered quantitative factors including that in fiscal 2015: (1) the Company's revenues increased 6% over the prior year, again setting a new record for the Company; (2) the Company's non-GAAP diluted earnings per share (EPS) increased by 13% over the prior year; (3) the Company achieved record adjusted EBITDA representing growth of 11%; and (4) the Company generated record free cash flow of approximately $90 million. The Compensation Committee also considered qualitative factors as described in further detail below.

**7. Turnkey Solutions Incentive Program: The Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey solutions business in order to underscore its importance and to focus Mr. Mehra's attention on developing these opportunities.**

The Compensation Committee established a separate incentive program in 2015 tied to the annual performance of the Company's turnkey solutions business, of which Mr. Mehra is the President. The purpose of the program is to focus Mr. Mehra's attention on developing the Company's turnkey solutions business. The Company's Mexico security scanning program and certain other existing operations were specifically excluded from this program so that Mr. Mehra would not receive multiple payments for the same performance. Incentives under this program are conditioned on the achievement of operating income targets that the Company believes are rigorous which relate to the Company's turnkey solutions business. The Company has not disclosed these operating income targets because such disclosure would be competitively harmful to the Company. These operating income targets will be stated, on a retrospective basis, following the completion of each applicable performance period. Awards under this program may be granted in shares of Company stock or, at the discretion of the Company, in cash.

**8. Corporate Governance and Best Practices: The Company is committed to having strong governance standards with respect to its compensation programs, procedures and practices.**

The Company has done the following:

- Prohibited all hedging and pledging of Company stock by executive officers and directors. As of the date of the Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then the Company will seek to recover any excess in the incentive compensation earned by all of the executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements.

- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives' long-term interests with those of the Company's stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price.

The Board of Directors believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement

demonstrates that the Company's executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2015. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Executive Officers

The Company's executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 64 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 47 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 53 | Director, Executive Vice President and President of OSI Solutions Business |
| Victor Sze* | 48 | Executive Vice President and General Counsel |
| Nicholas Ong* | 50 | President of Healthcare division |
| Pak Chin | 43 | President of Security division |
| Manoocher Mansouri | 59 | President of Optoelectronics and Manufacturing division |
| Paul Morben | 54 | President of OSI Electronics, Inc. |
| Rick Merritt | 53 | Senior Vice President and Chief Human Resources Officer |

* Denotes the Company's Named Executive Officers for fiscal 2015.

The following section sets forth certain background information regarding those persons currently serving as executive officers of the Company, excluding Deepak Chopra and Ajay Mehra, who are described above under "Election of Directors":

***Alan Edrick*** is Executive Vice President and Chief Financial Officer of the Company. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Victor S. Sze*** is Executive Vice President and General Counsel of the Company. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary of the Company. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in economics from the University of California, Los Angeles and a juris doctorate from Loyola Law School.

***Nicholas Ong*** is President of the Company's Spacelabs Healthcare division and has held various senior leadership positions at Spacelabs Healthcare before his current appointment. Mr. Ong has more than two decades of experience in the diagnostic and medical equipment industry. He led the integration effort in the Asia Pacific region for the acquisition of Instrumentarium by GE Healthcare prior to joining Spacelabs. He joined Ohmeda as Regional Director for Asia Pacific in 1995 and between 1997 and 2003, he served as the President for the Asia Pacific and Australia/New Zealand region of Datex-Ohmeda. Mr. Ong started his career with Beckman Instruments in Sales and Marketing in 1989. He holds a Bachelor of Arts degree from the University of California at Berkeley

and a Master of Business Administration from the Henley Management College in the United Kingdom.

***Pak Chin*** is President of the Company's Security division. Mr. Chin joined the Company in May 2015 from Honeywell Inc. where he held a variety of leadership positions over 17 years including Vice President of the Boeing KC-46 Pegasus Aerial Refueling Tanker program, Vice President of the Lockheed Martin, Northrop Grumman, General Atomics and Huntington Ingalls Defense & Space business segment, Vice President of commercial aerospace and airlines business segment in Asia Pacific and Chairman of the Board for the Honeywell Aerospace and TAECO Aerospace joint venture. Mr. Chin holds a Bachelors in electrical engineering from the University of Oklahoma and a Masters in international business from the Rensselaer Polytechnic Institute.

***Manoocher Mansouri*** is President of the Company's Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of its Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of the Company's OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in electrical engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Paul Morben*** is President of the Company's OSI Electronics, Inc. subsidiary. Mr. Morben first joined the Company in 1983 and was named President of OSI Electronics in June 2012. Mr. Morben has over 30 years of experience in the optoelectronics and manufacturing services industry, including approximately 10 years in Asia where he established and led the Company's manufacturing operations in Singapore, Indonesia, and Malaysia. Mr. Morben holds a Bachelor of Science degree in management science from California State University, Northridge and a Master of Business Administration degree from Concordia University, Irvine.

***Rick Merritt*** is Senior Vice President and Chief Human Resources Officer of the Company. Prior to joining the Company in October 2013, Mr. Merritt held the positions of Global Vice President of Human Resources for Power-One, Inc., a power conversion solution provider, from April 2011 to October 2013 and Global Vice President at International Rectifier Corporation, a publicly-traded power management technology company, from May 2004 to April 2011. Mr. Merritt received a Bachelor of Science degree from Indiana University and a Master of Science degree from California State University, Hayward.

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes the Company's compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for the Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Governance Highlights*

The Company is committed to having strong governance practices with respect to its compensation programs, practices and procedures. The Company believes that these practices reinforce the Company's

emphasis on tying executive compensation to performance. The following chart highlights some of the Company's governance practices with respect to executive compensation:

| What The Company Does | What The Company Does Not Do |
|---|---|
| Uses 100% performance-based vesting with respect to executive equity awards | No excise tax gross-ups upon a change in control |
| Maintains a robust clawback policy | No hedging, pledging, or speculative transactions by executives and directors |
| Maintains share ownership and retention guidelines for executives and directors | No re-pricing of underwater options |
| Conducts an annual say on pay vote | No stock option grants with an exercise price less than fair market value |
| Maintains open lines of communication with stockholders | No "single trigger" severance payments owing solely on account of the occurrence of a change in control event |

*Executive Compensation Summary*

*Fiscal 2015 Performance*

Fiscal 2015 was a strong year for the Company. During fiscal 2015, the Company (a) had record revenues, record non-GAAP earnings per share and record free cash flow, (b) increased its adjusted EBITDA margin, (c) actively leveraged its business infrastructure to support new products and revenue sources while maintaining intelligent cost management, (d) continued building a foundation for future growth by making targeted investments in new product development and acquisitions, and (e) further improved sustainability of revenues by growing the Company's addressable markets, all while increasing R&D spending by more than twice the rate of sales growth.

*Leverage Business Infrastructure*. Even as the Company launched new products, entered new markets, and invested substantial amounts in R&D, the Company actively leveraged its business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities*. In fiscal 2015, in addition to growing revenues over the prior year, the Company continued to expand its addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and the Company believes it will continue to serve, to sustain growth over the long term. Examples include:

- Expanding presence with international customers for checked baggage scanning solutions, related services and support.
- Significant growth in U.S. patient monitoring business and new product launches in the Company's Healthcare division.
- Acquiring an international automated external defibrillator (AED) company further strengthening the Company's cardiology business.
- Increasing participation with healthcare group purchasing organizations or GPOs that facilitate sales of healthcare equipment to large hospital networks.
- Acquiring product lines and companies that not only leverage the Company's existing operating infrastructure but also provide immediate entry into growing market segments.

*Building a Foundation for the Future.* While improving the Company's earnings per share during fiscal 2015, the Company continued to make significant targeted investments in R&D and acquisitions. Such investments in the past have led to the Company's introduction of the Rapiscan RTT® computed tomography (CT) based hold baggage inspection system and new generation of healthcare products. The Company believes that these investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

The results of the assertive and dynamic management of the Company are seen in the Company's financial outcomes, particularly considering the state of the overall global economy in the period since the economic downturn that began in late 2008. During this period of economic uncertainty, the Company's stockholders have witnessed solid growth in revenues, earnings per share, and stock price.

This growth is reflected in an increase since fiscal year 2009 in the Company's revenue by 62%, net income by 484%, and a more than a tripling of the stock price. Moreover, the Company achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business that will position the Company to sustain growth into the coming years.

*Role of the Compensation Committee*

The Company's Board of Directors appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for the Named Executive Officers, including base salaries, annual incentive bonuses, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of the Named Executive Officers (other than the Chief Executive Officer) is recommended to the Compensation Committee by the Chief Executive Officer. Compensation for the Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

*Executive Compensation Program Elements*

The particular elements of the compensation program for the Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with the Company's pay-for-performance philosophy, the Company structures its compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

The following is an overview of the elements of the Company's compensation and benefits programs for fiscal 2015:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined based on Company and individual performance, subject to achievement of a pre-determined threshold rate of return on book value of the Company (excluding the Mexico SAT results), with the exception of Mr. Mehra whose cash-based annual incentives are determined based on Company and individual performance, but are not subject to the achievement of any pre-established criteria. |
| | The Mexico SAT Incentive Program also includes a short-term cash incentive component in the form of annual cash bonuses for participating Named Executive Officers. |
| | The Turnkey Solutions Incentive Program allows for annual incentives in the form of shares of Company stock or, at the discretion of the Company, cash to be granted to Mr. Mehra based on the achievement of certain pre-established performance metrics. |
| Long-Term Incentives | The fiscal 2015 program with respect to the Named Executive Officers consisted of performance-based restricted stock units under the Six-Year Performance Program, which are earned based on the achievement of pre-established EBITDA-based metrics (excluding Mexico SAT earnings) for each of the three years following grant, as well as an aggregate three-year metric. |
| | The Mexico SAT Incentive Program also includes cash long-term incentives in the form of a long-term component bonus and a contract award bonus ("CAB Bonus") for participating Named Executive Officers. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2015, perquisites included car allowances. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash bonuses at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which the CEO is the only participant. |

In fiscal 2015, fixed compensation comprised approximately 13% to 34% and variable compensation comprised approximately 66% to 87% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 84% of total compensation.

*Fixed Compensation.* Fixed compensation is intended to compensate the Named Executive Officers for their ongoing responsibilities and consists principally of base salary. Base salary is set to attract and retain executive talent. Base salaries for the Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically and adjusted, typically on an annual basis, to reflect sustained individual performance.

The Compensation Committee takes a conservative approach with respect to base salary increases. For example, CEO base salary has not been increased since 2008. In addition, in certain challenging years base salaries have been reduced, such as in fiscal 2013 when executives agreed to temporary base salary reductions of 10%.

In determining whether base salary levels for fiscal year 2015 were appropriate, the Compensation Committee considered the Company's general financial performance, the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions. In fiscal 2015, the Compensation Committee maintained base salary levels consistent with fiscal 2014 levels, with the exception of Mr. Mehra whose base salary was reduced approximately 12%. This determination was made in light of Mr. Mehra's new role within the Company and, in conjunction with the Turnkey Solutions Incentive Program (described in further detail below), was designed to create greater alignment between executive pay and performance.

*Variable Compensation.* Variable compensation provides the Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive bonuses and long-term incentive compensation in the form of equity based awards, as well as compensation under the Mexico SAT Incentive Program and the Turnkey Solutions Incentive Program.

*Annual Incentive Bonuses*. All Named Executive Officers are eligible for an annual incentive bonus pursuant to the Company's annual performance bonus program. Annual incentive bonuses are designed to focus the Company's Named Executive Officers on annual operating achievement and near-term success. In determining annual incentive bonuses for the Named Executive Officers (with the exception of Mr. Mehra whose annual incentive bonus is determined solely based on a review of quantitative and qualitative factors discussed below), the Compensation Committee considers the rate of return on the book value of the Company. If a pre-established threshold rate of return before taxes is exceeded for a particular fiscal year, cash bonuses may be awarded to the participating executives. The Company needed to exceed a threshold rate of return before taxes on book value of 7% for fiscal year 2015, below which no bonuses would have been paid. Such threshold rate of return was calculated based on the pre-tax income of the Company for fiscal year 2015, excluding the impact of bonuses, restructuring charges and pre-tax income from the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria, relative to the Company's total stockholders' equity as of the prior fiscal year end. The threshold was designed to be challenging yet achievable with significant effort and management skill. If the Company exceeds this threshold, then the Compensation Committee evaluates the various quantitative and qualitative factors as described below in a non-formulaic manner to determine the amount of bonus compensation for each Named Executive Officer. Achievement of this threshold is not linked to any specific payouts as this metric is not a target performance objective, but rather a minimum performance threshold for the Company below which the Named Executive Officers would not be entitled to any such annual incentive bonus compensation. This threshold was exceeded by the Company in fiscal year 2015. Additionally, no such bonus may exceed maximum amounts of 300% of base salary for the Chief Executive Officer and 200% of base salary for Mr. Edrick, Mr. Sze and Mr. Ong and the greater of $300,000 or 80% of base salary for Mr. Mehra.

After satisfaction of the threshold performance criterion (where applicable), the bonus amounts were determined by the Compensation Committee based on its evaluation of the overall and relative performance of the Company as well as its evaluation of the compensation practices of the Company's peer group. Each bonus was established at its respective value in order to provide the executive sufficient incentive to create long-term stockholder value while at the same time ensuring that such executive's total bonus compensation would be appropriate as compared to compensation of similarly situated executives. The Compensation Committee retains negative discretion to reduce any awards under the annual performance bonus program to a lesser award or no award to any participant.

In determining the amounts of annual incentive bonuses, the Compensation Committee also considers individual performance, which may include the following quantitative and qualitative factors:

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Quality of the management of units or functions managed by the Named Executive Officer | • Financial performance (including earnings per share and internal metrics) |
| • Leadership of personnel under the Named Executive Officer's management | • Financial performance metrics for business units managed by the Named Executive Officer |
| • Execution of strategically important projects | • Compensation surveys provided by external advisors |
| • Overall effectiveness of units or functions managed by the Named Executive Officer | |
| • Contributions to the formulation of Company strategy and tactics | |
| • Contributions to stockholder value | |
| • Management of risk | |

The particular performance achievements for, and amounts paid to, each of the Named Executive Officers (other than the Chief Executive Officer) are recommended by the Chief Executive Officer and reviewed by the Compensation Committee. The performance achievements for, and amounts to be paid to, the Chief Executive Officer are established by the Compensation Committee.

The Compensation Committee also assesses the value that each of the Named Executive Officers provided through the generation of new sources of revenue, achievement of operational efficiencies, management of risk and completion of strategic initiatives. The annual incentive bonus earned for fiscal year 2015 by each of the Named Executive Officers is shown in the "Bonus" column of the "Summary Compensation Table."

*Turnkey Solutions Incentive Program.* In 2015, the Company established an incentive program tied to the performance of the Company's turnkey solutions business (the "Turnkey Solutions Incentive Program"). Mr. Mehra is the only Named Executive Officer who participates in this program. Incentives under the Turnkey Solutions Incentive Program are conditioned on the achievement of certain metrics based on the operating income of the Company's solutions business (excluding certain operations already existing at the time of the adoption of the program). The operating income targets are believed to be challenging, but achievable with significant management effort.

*Long-Term Incentive Program.* In order to further promote the Company's philosophy of pay-for-performance and furthering its objective of aligning its executive compensation with the Company's long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of the Named Executive Officer, the Company has a long-term incentive program.

The grants to the Named Executive Officers during fiscal 2015 were performance based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for the Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving performance and business objectives of the Company for the benefit of its stockholders. The grants to the Named Executive Officers during fiscal 2016 were also performance based in their entirety.

The Company's overall long-term incentive program is designed to retain the Named Executive Officers and to align the interests of the Named Executive Officers with the long-term interests of the Company's stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under the Company's equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of the Company's Common Stock on such dates.

*Six-year Performance Program.* With respect to performance based awards, the Compensation Committee has established a six-year program for long-term performance based incentive grants for the Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each award is 100% performance based and vests based on the achievement of certain one-, two- and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. Such metrics exclude the effect of particular designated operations for which specific incentive programs are established; at this time, the only such designated operation is the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill.

Each fiscal year, the Named Executive Officers are awarded an initial grant, which vests if a three-year EBITDA per share target is achieved. However, if actual three-year performance falls below target, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 55% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

Additional shares may be earned annually for each initial grant within the three-year performance period if annual targets are exceeded as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

The Company's adjusted EBITDA per share for fiscal year 2015 was 116% of the fiscal 2015 adjusted EBITDA per share target of $5.07. Therefore, each of the Named Executive Officers earned additional shares as follows: Mr. Chopra, 74,400 shares; Mr. Edrick, 36,762 shares; Mr. Mehra, 10,428 shares; Mr. Sze, 25,913 shares; and Mr. Ong, 3,786 shares.

In the event of a change of control, the initial grant would vest upon the change of control; to the extent actual performance has exceeded target for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed target by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the number of equity awards to grant to the Named Executive Officers. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the quantitative and qualitative factors set forth in "Annual Incentive Bonuses" above, as well as overall corporate performance. For fiscal year 2015 performance share calculation purposes, the Chief Executive Officer, Chief Financial Officer and General Counsel are measured against consolidated Company performance, and division/business unit Presidents have their performance results weighted 70% based on their respective division/business unit performance and 30% based on consolidated Company performance. The Compensation Committee retains negative discretion to reduce any awards under the long-term incentive program to a lesser award or no award to any participant.

*Mexico SAT Incentive Program*. For the fiscal years 2013 through 2017, the Company has established an incentive program tied to the performance of the Company's turnkey security scanning program for the Mexico Servicio de Administración Tributaria (the "Mexico SAT Incentive

Program"). The Mexico SAT Incentive Program was adopted in 2012. Incentives under the Mexico SAT Incentive Program are conditioned on the achievement of certain metrics based on the operating income of the services for the Mexico Servicio de Administración Tributaria. The metrics require such operating income, as a percentage of revenue, to significantly exceed operating margin for the Company as a whole before any incentives are awarded, and are thus believed to be challenging, but achievable with significant management effort. The Mexico SAT Incentive Program consists of three components that may be awarded to participating Named Executive Officers upon achievement of performance criteria: a short-term component, a long-term component, and a "contract award bonus".

If the threshold operating income amount is exceeded for a particular fiscal year, and dependent on the amount by which such threshold operating income is exceeded, a bonus pool is established formulaically for and allocated among participating Named Executive Officers. For each such executive, 70% of the annual bonus allocation comprises the short-term component. Half of the short-term component is paid to that executive within 75 days of the end of the fiscal year in which it is earned, and the other half would be paid to that executive within 75 days of the end of the following year, provided that the executive has not voluntarily resigned or is not terminated for cause prior to the date of such payments. The long-term component constitutes the remaining 30% of the executive's annual bonus allocation, and would not be paid until 2018, provided that the executive has not previously resigned or is not terminated for cause prior to the payment. The amount of the long-term component would be divided by $50.17, representing the baseline value of the Company's stock prior to public disclosure of the Company's contract with the Servicio de Administración Tributaria. The resulting figure would then be multiplied by the per-share price of the Company's stock as of December 31, 2017, and the product would constitute the final value of the long-term component.

The contract award bonus is based on five-and-a-half year cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. If the threshold cumulative operating income is exceeded, and dependent on the amount by which such operating income is exceeded, a "CAB" bonus pool would be established formulaically in an amount equal to 1%-5% of the cumulative operating income. The CAB bonus pool, if any, would be allocated among participating executives. The CAB bonuses, if any, for each executive would be paid in January 2018, provided that the executive has not voluntarily resigned or is not terminated for cause prior to the payment.

In the event of a change of control: (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the change of control; (b) a pro-rata CAB bonus would be paid based on the operating income for the two quarters preceding the change of control; (c) the remaining value of the Mexico SAT Incentive Program would be calculated by imputing the operating income for the 12 months preceding the change of control to the period that is the shorter of (i) the 24 months after the change of control or (ii) the remainder of the term of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria (or, in the case of the CAB bonus, until December 31, 2017), and establishing bonus pools based on such data.

In the event that a participating executive's participation in the Mexico SAT Incentive Program is terminated, for reasons other than by the executive's voluntary resignation or the termination of that executive's employment for cause, then (a) any earned but unpaid short and long-term components of the Mexico SAT Incentive Program would be accelerated, with the long-term component calculated using the value of the Company's stock on the date of the termination; (b) a further annual bonus and CAB amount calculated by imputing performance for the 12 months preceding the termination to the period equal to the remainder of the then-current fiscal year plus an additional 12 months, provided

that such period does not extend beyond the end of the Company's contracts to operate security screening services for the Mexico Servicio de Administración Tributaria for the calculation of the annual bonus amount, and December 31, 2017 for calculation of the CAB amount. Such amounts would be paid within 45 days of the termination.

The Compensation Committee determines, after consultation with the Chief Executive Officer, the amount of awards to grant to the Named Executive Officers under the Mexico SAT Incentive Program. The grant amounts for the Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers each Named Executive Officer's position with the Company and involvement in the management of the screening services operation in making its determinations. The Compensation Committee retains discretion to amend the Mexico SAT Incentive Program.

All of the Named Executive Officers, with the exception of Mr. Ong, were participants in the Mexico SAT Incentive Program during fiscal 2015. The short-term and long-term components of the Mexico SAT Incentive Program compensation earned for fiscal year 2015 by each of such Named Executive Officers is shown in the "Non-equity Incentive Plan Compensation" column of the "Summary Compensation Table." Each of such Named Executive Officers will receive a CAB bonus provided that the five-and-a-half year cumulative operating income threshold is achieved. Information concerning the potential CAB bonus amounts is shown in the "Grant of Plan Based Awards Table."

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, the Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. The Company also leases automobiles for or provides an auto allowance to each of the Named Executive Officers.

The Company maintains a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows the Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

The Company also maintains a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among the Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix.* While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation

Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. The Company believes this compensation mix provides the Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of performance for the Company, as well as reducing the risk of recruitment of highly qualified executive talent by the Company's competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. The Company believes that its compensation mix results in a pay-for-performance orientation that is aligned with its compensation philosophy, which takes into account individual, group and Company performance.

*Bases for the Company's Compensation Policies and Decisions*

In determining compensation awarded to the Named Executive Officers for fiscal 2015, the Compensation Committee performed a global review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was thoroughly evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2015 peer group were developed based on similarity in size and operations within the industries in which the Company operates as follows:

| | | | | | |
|---|---|---|---|---|---|
| • Analogic Corporation | • CONMED Corporation | • FEI Company | • JDS Uniphase Corporation | • Newport Corporation | • Sirona Dental Systems, Inc. |
| • Itron, Inc. | • CTS Corporation | • Finisar Corporation | • Masimo Corporation | • NuVasive, Inc. | • Teleflex Incorporated |
| • Checkpoint Systems, Inc. | • Edwards Lifesciences Corporation | • FLIR Systems, Inc. | • MTS Systems Corporation | • ResMed Inc. | • TTM Technologies, Inc. |
| • Coherent, Inc. | • Daktronics, Inc | • Harmonic Inc. | • Multi-Fineline Electronix, Inc. | • Rofin-Sinar Technologies Inc. | • Zebra Technologies Corp. |

In connection with executive compensation for fiscal 2015, the Company's management provided the Compensation Committee with information gathered from Pearl Meyer for consideration. The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of the Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed the Company's actual performance taken as a whole as well as its performance relative to its peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to the Company's comparative performance.

For fiscal 2015, the Compensation Committee determined that it was appropriate to maintain fixed compensation levels relatively stable for all Named Executive Officers with the exception of Mr. Mehra whose base salary was reduced approximately 12% as described above. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position, which did not change materially in fiscal 2015 other than with respect to Mr. Mehra. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual cash incentives and performance-based equity grants, as well as compensation under the MSAT Incentive Program, comprised a significant portion of total compensation.

In making variable compensation determinations, the Compensation Committee noted significant corporate and management achievements during fiscal year 2015 in the categories "furtherance of long-term goals", "demonstration of leadership skills and ability" and "achievement of strategic targets". These included achievement of the following:

**Significant Achievements**

- Record revenues as revenues increased 6% over the prior year
- Record earnings as non-GAAP diluted EPS increased 13% over the prior year
- Record free cash flow of approximately $90 million
- Record sales and operating profit in the Security division
- Strong growth in sales and operating income in the Healthcare division
- Operating margin expansion in the Optoelectronics and Manufacturing division
- Successful completion of a strategic acquisition in the Healthcare division
- Bookings of several significant orders for the Security division's Real Time Tomography (RTT®) high-speed hold baggage screening system

The Compensation Committee determined that the achievements of each Named Executive Officer for the fiscal year contributed significantly to the Company's strong overall financial performance for the year and success in achieving certain of its long-term goals, and substantially improved the Company's competitive standing in important markets, while the goals that were not achieved during the fiscal year did not represent significant setbacks to the Company as a whole.

In determining variable compensation, the Compensation Committee did not use a mathematical formula for tying the fiscal year's events and performance to each individual executive's variable

compensation, but rather took into consideration the executive's involvement in and contribution to the Company's performance for the year, the Company's overall financial performance for the year, and approximate compensation levels for comparable-company executives.

In light of this global evaluation, the Compensation Committee determined to increase the cash component of variable compensation for the Named Executive Officers but maintain equity compensation in the form of stock-based awards relatively stable for fiscal year 2015 as compared to fiscal year 2014. Although the cash bonus increased as compared to fiscal 2014, it should be noted that the CEO cash bonus for fiscal 2015 is significantly lower than his bonuses for fiscal years 2012 and 2013, reflecting the Compensation Committee's continued commitment to structuring the compensation program with an emphasis on pay for performance. These compensation decisions are reflected in the Summary Compensation Table below under the columns "Bonus" and "Stock Awards". With respect to the Mexico SAT Incentive Program, for fiscal 2015, the Compensation Committee also considered each Named Executive Officer's position with the Company and involvement in the management of the screening services program with the tax and customs authority of Mexico when determining awards under the Mexico SAT Incentive Program to participating Named Executive Officers. As a result of such review, each Named Executive Officer received an award under the Mexico SAT Incentive Program except for Mr. Ong.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving the Company's long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Advisory Vote on Named Executive Officer Compensation*

The Company maintains open lines of communication with the stockholders, and senior management routinely interacts with the stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. At the Company's 2014 annual meeting, 75% of the votes cast on the advisory vote on the compensation of the Named Executive Officers were in favor of the Company's executive compensation policies. Considering the vote results for fiscal 2014, the Compensation Committee determined to continue to apply the same general approach with respect to compensation policies and decisions for fiscal 2015.

At the upcoming 2015 annual meeting, the Company will again hold an annual advisory vote to approve executive compensation. The Company will continue to engage with its stockholders throughout the year, and the Compensation Committee will consider the results from this year's and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Minimum Equity Ownership and Retention Guidelines*

The Company believes that its executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of the Company's stockholders. Accordingly, the Company has established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. The Company believes that this multiple constitutes significant amounts for its executive officers and provides a substantial link between the interests of its executive officers and those of the Company's stockholders. During such time that an executive officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. The Company periodically reviews its minimum equity ownership guidelines. As of June 30, 2015, each of the Named Executive Officers met or exceeded the Company's minimum equity ownership guidelines.

*Clawback Policy*

The Company has adopted a clawback policy. The policy provides that if an accounting restatement is required due to the Company's material non-compliance with any accounting requirements, then the Company will seek to recover any excess in the incentive compensation earned by all of the Company's executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

The Company has adopted a policy that prohibits its executive officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of the Company's common stock or other equity securities. The Company has also adopted a policy that prohibits its executive officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Ong. The terms of each of such agreements are summarized below under the heading "Employment Agreements." Employment agreements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on the Company's use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2301 of 2711
Table of Contents

**Summary Compensation Table**

The following table sets forth the compensation for the principal executive officer, the principal financial officer, and the three highest paid executive officers of the Company serving as executive officers on June 30, 2015 (the "Named Executive Officers") for the fiscal years ended June 30, 2015, 2014 and 2013:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($)(1) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2015 | 1,000,000 | 700,000 | 3,970,800 | — | 1,630,467 | 982,853 | 193,801 | 8,477,921 |
| Chairman, President and | 2014 | 1,000,000 | 353,000 | 4,192,800 | — | 1,933,535 | 513,000 | 236,426 | 8,228,761 |
| Chief Executive Officer | 2013 | 961,538 | 1,323,000 | 4,091,340 | — | 1,077,000 | 579,138 | 218,064 | 8,250,080 |
| Alan Edrick | 2015 | 402,000 | 300,000 | 1,853,040 | — | 430,690 | — | 61,725 | 3,047,455 |
| Executive Vice President and | 2014 | 402,000 | 160,000 | 2,089,692 | — | 447,349 | — | 61,099 | 3,160,140 |
| Chief Financial Officer | 2013 | 386,538 | 340,000 | 2,107,660 | — | 348,000 | — | 61,026 | 3,243,224 |
| Ajay Mehra | 2015 | 352,000 | 125,000 | 1,522,140 | — | 676,797 | — | 80,590 | 2,756,527 |
| Executive Vice President | 2014 | 402,000 | — | 2,089,692 | — | 702,977 | — | 87,048 | 3,281,717 |
| of the Company and President of OSI Solutions Business | 2013 | 386,538 | 325,000 | 2,107,660 | — | 546,000 | — | 83,550 | 3,448,748 |
| Victor S. Sze | 2015 | 350,000 | 285,000 | 1,389,780 | — | 338,399 | — | 75,606 | 2,438,785 |
| Executive Vice President, | 2014 | 350,000 | 160,000 | 1,487,256 | — | 351,488 | — | 79,830 | 2,428,574 |
| General Counsel and Secretary | 2013 | 336,538 | 345,000 | 1,394,775 | — | 273,000 | — | 73,924 | 2,423,237 |
| Nicholas Ong President of Healthcare division | 2015 | 345,000 | 70,000 | 595,620 | — | — | — | 65,320 | 1,075,940 |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the fiscal year ended June 30, 2015 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represents annual bonus amounts earned for fiscal year 2015 under the Mexico SAT Incentive Program in the amounts of $1,141,327, $301,483, $473,758, and $236,879 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, as the short-term component of the program, and amounts earned for fiscal year 2015 of $489,140, $129,207, $203,039, and $101,520 for Messrs. Chopra, Edrick, Mehra and Sze, respectively, credited to the long-term component of the program.

(3) The Company initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2014 to June 30, 2015 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2015 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) The Named Executive Officers are eligible to participate in benefit plans available to all employees, including the Company's 401(k) Plan, Employee Stock Purchase Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan, and the medical, dental and vision plans require each participant to pay a contributory amount. The Company has elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of the Named Executive Officers. In addition, the Company maintains an executive medical reimbursement plan under which the Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. Further, the Named Executive Officers are eligible to participate in the Deferred Compensation Plan. The Company also leases automobiles or provides an auto allowance to each of the Named Executive Officers.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2015 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,673 | 2,667 | 9,717 | 175,744 | 193,801 |
| Alan Edrick | 46,396 | 2,850 | 7,536 | 4,943 | 61,725 |
| Ajay Mehra | 41,082 | 6,675 | 19,334 | 13,499 | 80,590 |
| Victor S. Sze | 41,070 | 12,000 | 11,547 | 10,989 | 75,606 |
| Nicholas Ong | 39,965 | 5,134 | 15,019 | 5,202 | 65,320 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2014 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,369 | 1,780 | 11,285 | 217,992 | 236,426 |
| Alan Edrick | 45,490 | 2,850 | 7,798 | 4,961 | 61,099 |
| Ajay Mehra | 45,313 | 6,675 | 21,543 | 13,517 | 87,048 |
| Victor S. Sze | 40,119 | 12,000 | 16,704 | 11,007 | 79,830 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2013 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Membership Dues(**)($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|---|
| Deepak Chopra | 6,614 | 1,780 | 1,782 | 10,167 | 197,721 | 218,064 |
| Alan Edrick | 46,703 | 2,850 | — | 6,519 | 4,954 | 61,026 |
| Ajay Mehra | 44,504 | 6,675 | — | 18,861 | 13,510 | 83,550 |
| Victor S. Sze | 39,580 | 12,000 | — | 8,814 | 13,530 | 73,924 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(**) Membership dues consist of payments made to a golf club. Membership dues were discontinued during fiscal year 2013.

## Grants of Plan-Based Awards Table

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2015 to each of the Named Executive Officers(11):

| | | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(6) | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Type of Award(1)** | **Grant Date** | **Threshold ($)(2)** | **Target ($)** | **Maximum ($)(2)** | **Threshold (#)(3)** | **Target (#)(4)** | **Maximum (#)(5)** | **Grant Date Fair Value of Options and Awards (7)($)** |
| Deepak Chopra | RSU | 7/24/2014 | — | — | — | — | 60,000 | 150,000 | 3,970,800 |
| Chairman, President and | STI(8) | — | — | 1,141,327 | — | — | — | — | — |
| Chief Executive Officer | LTI(9) | — | — | 489,140 | — | — | — | — | — |
| | CAB(10) | — | — | 690,179 | — | — | — | — | — |
| Alan Edrick | RSU | 7/24/2014 | — | — | — | — | 28,000 | 70,000 | 1,853,040 |
| Executive Vice President and | STI(8) | — | — | 301,483 | — | — | — | — | — |
| Chief Financial Officer | LTI(9) | — | — | 129,207 | — | — | — | — | — |
| | CAB(10) | — | — | 182,311 | — | — | — | — | — |
| Ajay Mehra | RSU | 7/24/2014 | — | — | — | — | 23,000 | 57,500 | 1,522,140 |
| Executive Vice President of the | STI(8) | — | — | 473,758 | — | — | — | — | — |
| Company and President of | LTI(9) | — | — | 203,039 | — | — | — | — | — |
| OSI Solutions Business | CAB(10) | — | — | 286,489 | — | — | — | — | — |
| Victor S. Sze | RSU | 7/24/2014 | — | — | — | — | 21,000 | 52,500 | 1,389,780 |
| Executive Vice President, | STI(8) | — | — | 236,879 | — | — | — | — | — |
| General Counsel and Secretary | LTI(9) | — | — | 101,520 | — | — | — | — | — |
| | CAB(10) | — | — | 143,245 | — | — | — | — | — |
| Nicholas Ong | RSU | 7/24/2014 | — | — | — | — | 9,000 | 22,500 | 595,620 |
| President, Healthcare division | | | | | | | | | |

(1) Type of Award:

RSU Restricted Stock Unit

STI Short Term Component of Mexico SAT Incentive Program

LTI Long Term Component of Mexico SAT Incentive Program

CAB Contract Award Bonus under Mexico SAT Incentive Program

(2) No amounts are shown in these columns because awards under the applicable programs do not provide for threshold or maximum payment amounts.

(3) No amounts are shown in this column as the Company's long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Six-year Performance Program.*"

(4) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Six-year Performance Program.*"

(5) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Six-year Performance Program.*"

(6) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) The grant date fair value of the restricted stock units was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(8) Represents the short-term component of annual bonus awards under the Mexico SAT Incentive Program, as more fully explained above under "*Mexico SAT Incentive Program*."

(9) Represents the long-term component of annual bonus awards under the Mexico SAT Incentive Program. The amount reported is the dollar amount credited to the individual, which is payable in 2018 (provided the individual has not voluntarily resigned or is not terminated for cause prior to payment) and may vary from the amount reported based on the future performance of the Company's stock price, as more fully explained above under "*Mexico SAT Incentive Program*."

(10) Represents a Contract Award Bonus under the Mexico SAT Incentive Program. The amount reported is not the actual amount earned by or credited to the individual, but rather a representative amount based on the Company's performance during fiscal year ending June 30, 2015. As more fully explained above under "*Mexico SAT Incentive*

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2304 of 2711

*Program*", the Contract Award Bonus is payable in 2018, if at all, based on cumulative operating income for the Servicio de Administración Tributaria operations through December 31, 2017. The amount reported assumes that 2015 operating income from these operations continues each year during the measuring period.

However, the actual amount of the Company's operating income through 2017 may vary substantially from the amount assumed for purposes of this table.

(11) The Company has eliminated from this table the columns titled "All Other Stock Awards: Number of Shares of Stock or Units", "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

## Outstanding Equity Awards at Fiscal Year-End

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2015(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (4)(#) | Market Value of Shares or Units of Stock That Have Not Vested (5)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(6) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(5) |
| Deepak Chopra | 60,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chief Executive Officer | — | — | — | — | 9,750(7) | 690,203 | 144,000 | 10,193,760 |
| Alan Edrick | 48,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 3,750(7) | 265,463 | 69,485 | 4,918,843 |
| Ajay Mehra | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| Executive Vice President | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| of the Company and | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| President of OSI Solutions | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Business | — | — | — | — | 3,750(7) | 265,463 | 19,045 | 1,348,196 |
| Victor S. Sze | 24,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President, | 10,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| General Counsel and | 5,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Secretary | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | 2,500(7) | 176,975 | 50,740 | 3,591,855 |
| Nicholas Ong | 8,000(9) | — | 10.96 | 11/13/2018 | — | — | — | — |
| President, Healthcare | 14,000(9) | — | 16.72 | 2/7/2018 | — | — | — | — |
| division | 2,963 | — | 36.45 | 12/21/2020 | — | — | — | — |
| | 16,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | 4,000 | — | 52.64 | 2/9/2022 | — | — | — | — |
| | — | — | — | — | 1,250(8) | 88,488 | 10,364 | 733,668 |

(1) The Company has eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of the Company's Common Stock on the date of grant.

(4) Restricted stock and RSU awards vest over periods ranging between three and four years from the date of grant.

(5) The market value of restricted stock and RSU awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2015, multiplied by the closing price of the Company's Common Stock on June 30, 2015 ($70.79 per share).

(6) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(7) These shares vested on September 9, 2015.

(8) 1,000 of these shares vested on September 9, 2015; and 250 of these shares will vest on February 10, 2016.

(9) These options were exercised on September 17, 2015.

### Option Exercises and Stock Vested Table

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of the Named Executive Officers during fiscal year ended June 30, 2015:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting | Value Realized on Vesting(2)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 85,475 | 5,547,315 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | — | — | 42,031 | 2,717,097 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 7,000 | 362,670 | 44,531 | 2,884,997 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | — | — | 28,320 | 1,830,641 |
| Nicholas Ong<br>President, Healthcare division | — | — | 4,475 | 294,940 |

(1) Represents the difference between the fair market price of the Company's Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Represents the number of restricted stock awards that vested multiplied by the fair market price of the Company's Common Stock on the date of vesting.

### Pension Benefits

The Company maintains the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service

and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2015(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 12 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2015.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 8 | 6,851,085 | — |

(1) The Company has eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

The Company adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of the Company's management or highly compensated employees (as designated by the Compensation Committee), including the Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to eighty percent (80%) of their base salary and up to one hundred percent (100%) of other types of eligible compensation. The Deferred Compensation Plan also allows the Company to make discretionary contributions and matching contributions on behalf of eligible participants.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2015 ranged from –4.4% to 11.8%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2015:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | 72,200 | 40,200(3) | 33,277 | — | 1,174,109 |
| Ajay Mehra Executive Vice President of the Company and President of OSI Solutions Business | 35,585 | 35,585(3) | 31,567 | — | 1,038,909 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | 35,000 | 35,000(3) | 27,560 | — | 908,098 |
| Nicholas Ong President, Healthcare division | 288,445 | 34,500(3) | 21,709 | — | 1,023,927 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2015.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

The Company has entered into employment agreements with Messrs. Chopra, Edrick, Mehra, Sze and Ong.

*Deepak Chopra's Employment Agreement*

In April 2012, the Company entered into its current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from the Company to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date, he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's, Victor Sze's and Nicholas Ong's Employment Agreements*

For purposes of this section, Messrs. Edrick, Sze and Ong are each individually referred to as the "Executive." In April 2012, the Company entered into its current employment agreement with each Executive, which were effective as of January 1, 2012. The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68 (the "Executive Scheduled Retirement Date"). The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick, $350,000 for Mr. Sze and $345,000 for Mr. Ong. The Executive is also eligible to receive bonus payments from the bonus pool established by the Company for

its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with the Company.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from the Company to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by the Company to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of the Executive's continued employment until the Executive Scheduled Retirement Date, he shall be entitled a lump sum stay bonus equal to his highest year out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or

not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Executive Scheduled Retirement Date.

*Ajay Mehra's Employment Agreement*

In April 2012, the Company entered into its current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of May 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000, which shall increase to $402,000 per year upon achievement of certain pre-established operating income metrics for the OSI Solutions Business. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by the Company for its officers and employees and to participate in incentive compensation and other employee benefit plans established by the Company. The agreement contains certain restrictive covenants and other prohibitions that protect the Company's proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with the Company. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of the Company's financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, the Company may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment on or prior to December 31, 2016 by the Company without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to 24 months salary at his then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by the Company to Mr. Mehra in the five years preceding such termination; (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from the Company to Mr.Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment after December 31, 2016 by the Company without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times

his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12 calendar months immediately preceding termination plus the cash equivalent of any awards under the Turnkey Solutions Incentive Program earned during the six calendar months immediately preceding a termination occurring in 2017, annualized, or during the 12 calendar months immediately preceding a termination occurring in 2018 or thereafter), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from the Company to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment by the Company without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by the Company to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances (i) if the change in control occurs on or before December 31, 2016, Mr. Mehra may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G (the "Alternative Payment"); and (ii) if the change in control occurs after December 31, 2016, Mr. Mehra shall receive the lesser of the Change in Control Payment or the Alternative Payment.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2015, and that employment terminated on such date. The tables also assume that the price of the Company's Common Stock, on which certain calculations in the following tables are made, was the closing price of the Company's Common Stock on June 30, 2015, the last business day of the fiscal year ($70.79).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under the Company's qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | Mexico SAT Incentive Program ($)(3) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,609,500 | 12,426,210 | 13,857,143 | 7,626,532 | 681,735 | 42,201,120 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 4,609,500 | 12,426,210 | 18,954,023 | 7,626,532 | 681,735 | 47,298,000 |

(1) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(3) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program.*"

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Ong.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards ($) | Mexico SAT Incentive Program ($)(2) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 804,000 | 800,000 | 6,771,347 | 1,879,201 | 6,000 | 6,000 | 10,266,548 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 804,000 | 800,000 | 9,203,804 | 1,879,201 | 6,000 | 6,000 | 12,699,005 |
| Ajay Mehra Executive Vice President of the Company and President of OSI Solutions Business | Good Reason or Without Cause | 704,000 | 790,000 | 3,795,845 | 3,057,157 | 6,000 | 6,000 | 8,359,002 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 704,000 | 790,000 | 4,440,634 | 3,057,157 | 6,000 | 6,000 | 9,003,791 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 700,000 | 663,333 | 4,762,964 | 1,682,029 | 6,000 | 6,000 | 7,820,326 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 700,000 | 663,333 | 6,554,885 | 1,682,029 | 6,000 | 6,000 | 9,612,247 |
| Nicholas Ong President of Healthcare division | Good Reason or Without Cause | 690,000 | 426,667 | 2,322,195 | — | 6,000 | 6,000 | 3,450,862 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 690,000 | 426,667 | 2,564,756 | — | 6,000 | 6,000 | 3,693,423 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(2) Represents amounts to which the executive would be entitled to under the Mexico SAT Incentive Program. Additional information about the program is summarized in the section entitled "*Mexico SAT Incentive Program*."

## Director Compensation

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company. Mr. Hawkins did not serve on the Board of Directors in fiscal year 2015 and therefore received no compensation from the Company in fiscal 2015.

During the fiscal year ended June 30, 2015, each non-employee director that served as a director for the full fiscal year, received $65,000 for his year of service, 2,200 RSUs, and $3,000 for each Board of Directors meeting attended.

Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $15,000.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2315 of 2711

Each member of the Compensation Committee received $[illegible],000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $15,000.

Each member of the Nominating and Governance Committee received $2,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and

Governance Committee also received $7,500 and 500 RSUs. For fiscal year 2016, each member of the Nominating and Governance Committee will receive $3,000 for each meeting attended.

Each member of the Executive Committee received $25,000 and 2,600 RSUs.

Each member of the Technology Committee received $3,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $7,500 and 500 RSUs.

All RSU awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2015 for each non-employee member of the Company's Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 152,000 | 317,664 | — | 469,664 |
| Meyer Luskin | 152,000 | 317,664 | — | 469,664 |
| David T. Feinberg | 89,500 | 178,686 | — | 268,186 |
| William F. Ballhaus | 114,500 | 178,686 | — | 293,186 |

(1) The Company has eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 7 to the Consolidated Financial Statements included in the Company's Form 10-K for the year ended June 30, 2015 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2015, 4,800 RSUs were granted to Mr. Good and Mr. Luskin and 2,700 RSUs were granted to Dr. Ballhaus and Dr. Feinberg, all with a fair value of $66.18. As of June 30, 2015, Mr. Good had 12,775 unvested stock awards outstanding, Mr. Luskin had 12,775 unvested stock awards outstanding, Dr. Feinberg had 7,100 unvested stock awards outstanding and Dr. Ballhaus had 7,100 unvested stock awards outstanding.

*Director Share Ownership Requirements*

The Company believes that its directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of its stockholders. Accordingly, the Company has established requirements that directors own at minimum equity of the Company valued at five times their annual retainers. The Company believes that this multiple constitutes significant amounts for its directors and provides a substantial link between the interests of its directors and those of its stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. The Company periodically reviews its minimum equity ownership guidelines. As of June 30, 2015, each of the Company's directors met or exceeded the Company's minimum equity ownership guidelines.

**Certain Relationships and Related Transactions**

In 1994, the Company, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). The Company owns a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. The Company sells security and inspection kits to ECIL at a price no less favorable to the Company than the price the Company charges unaffiliated third parties for such products. To date, the Company's portion of the earnings of ECIL Rapiscan has been immaterial to the Company's financial results and results of operations.

The Company has contracted with entities owned by Mr. Chopra and/or his family members to provide messenger service, auto rental and printing services. Such expenses for fiscal 2013 and 2014 were approximately $76,000 and $31,000, respectively; while there were no expenses during fiscal 2015.

The Company believes that the foregoing transactions were on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. The Company currently intends that any future transactions with affiliates of the Company would be on terms at least as favorable to the Company as those that can be obtained from unaffiliated third parties.

Additionally, Mohinder Chopra, who is the brother of Deepak Chopra, the Company's Chief Executive Officer, is the Company's Chief Information Officer. His total compensation for fiscal year 2015, which is comprised of base salary, and cash and equity bonus components, was valued at approximately $340,000.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of the Company's voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to the Company as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 13, 2015 by each person known by the Company to own beneficially more than 5% of the outstanding shares of the Company's outstanding Common Stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,301,577 | 11.7% |
| Janus Capital Management LLC(3) | 1,551,855 | 7.9% |
| The Vanguard Group, Inc.(4) | 1,372,986 | 7.0% |
| Wells Fargo & Company(5) | 1,274,150 | 6.5% |
| EARNEST Partners, LLC(6) | 1,203,869 | 6.1% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 13, 2015, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) As reported in a Schedules 13F-HR filed on August 7, 2015 with the SEC by BlackRock, Inc. and six of its affiliated entities. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) As reported in a Schedule 13F-HR filed on August 17, 2015 with the SEC. The address of Janus Capital Management LLC is 151 Detroit Street, Denver, CO 80206.

(4) As reported in a Schedule 13F-HR filed on August 13, 2015 with the SEC. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(5) As reported in a Schedule 13F-HR filed on August 14, 2015 with the SEC. The address of Wells Fargo & Company is 420 Montgomery Street, San Francisco, CA 94163.

(6) As reported in a Schedule 13F-HR filed on August 14, 2015 with the SEC. The address of EARNEST Partners, LLC is 1180 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309.

The following table sets forth the amount of shares of the Company beneficially owned as of October 13, 2015 by each director and director nominee of the Company, each Named Executive Officer, and all directors and executive officers as a group:

| **Name of Beneficial Owner(1)** | **Amount and Nature of Beneficial Ownership of Common Stock(2)** | **Percent of Class of Common Stock** |
|---|---|---|
| Deepak Chopra(3) | 534,786 | 2.7% |
| Alan Edrick(4) | 374,824 | 1.9% |
| Ajay Mehra(5) | 242,478 | 1.2% |
| Victor S. Sze(6) | 280,016 | 1.4% |
| Nicholas Ong(7) | 60,402 | * |
| Meyer Luskin(8) | 58,085 | * |
| Steven C. Good(9) | 15,325 | * |
| David Feinberg(10) | 12,035 | * |
| William F. Ballhaus(11) | 11,150 | * |
| James B. Hawkins(12) | — | — |
| All directors and executive officers as a group (14 persons) | 1,589,101 | 7.7% |

* Represents less than 1.0% of the outstanding shares of the Company's Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 13, 2015, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. Except as otherwise indicated by footnote, no shares are pledged as security.

(3) Mr. Chopra is the Chairman of the Board of Directors, Chief Executive Officer and President of the Company. Includes 45,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 20,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. In addition, includes 337,786 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 12,000 shares held in the Nandini SLAT Trust. Includes 120,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(4) Mr. Edrick is Executive Vice President and Chief Financial Officer of the Company. Includes 297,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(5) Mr. Mehra is the Executive Vice President of the Company and President of OSI Solutions Business and a Director. Includes 160,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(6) Mr. Sze is the Executive Vice President, General Counsel and Secretary of the Company. Includes 191,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(7) Mr. Ong is the President of the Healthcare division. Includes 250 shares of unvested restricted stock granted on February 10, 2012. Includes 22,963 shares issuable pursuant to options which were granted between December 22, 2010 and February 10, 2012.

(8) Mr. Luskin is a Director of the Company. Includes 56,710 shares held by The Meyer and Doreen Luskin Family Trust, and 1,375 shares of unvested restricted stock granted on July 23, 2012 that are held individually by Mr. Luskin.

(9) Mr. Good is a Director of the Company. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan. Includes 1,375 shares of unvested restricted stock granted on July 23, 2012.

(10) Dr. Feinberg is a Director of the Company. Includes 750 shares of unvested restricted stock granted on July 23, 2012.

(11) Dr. Ballhaus is a Director of the Company. Includes 750 shares of unvested restricted stock granted on July 23, 2012.

(12) Mr. Hawkins is a nominee for Director of the Company.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish the Company with copies of all such reports that they file. None of the Company's directors or executive officers owns more than 10% of the Company's securities. Based solely upon the Company's review of such forms furnished to the Company during the fiscal year ended June 30, 2015, and written representations from certain reporting persons, the Company believes that its executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act except that during the year ended June 30, 2015, Mr. Ong untimely filed three Form 4s. In addition, Mr. Ong has untimely filed two Form 4s during the current fiscal year. Mr. Ong had certain transactions that were matchable under Section 16(b) of the Exchange Act and has disgorged to the Company his profits of $12,713 related to those transactions.

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the Company's equity compensation plans as of June 30, 2015.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 1,012,650 | 27.30 | (2) (3) 3,020,206(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 1,012,650 | 27.30 | 3,020,206 |

(1) Includes shares of the Company's Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under the 2012 Incentive Award Plan, which was approved by the Company's shareholders on December 12, 2012. Upon shareholder approval of the 2012 Incentive Award Plan, the Company froze the 2006 Equity Participation Plan, and no further awards can be granted thereunder.

(3) Shares awarded as restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one share granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason (up to a maximum of 2,220,000 shares) also become available for future issuance under the 2012 Incentive Award Plan.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2322 of 2711

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Audit Fees

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of the Company's annual financial statements for the years ended June 30, 2014 and 2015 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2014 | FY 2015 |
|---|---|---|
| Audit Fees | $ 915 | $ 1,007 |
| Audit-Related Fees | $ 15 | $ 16 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 930 | $ 1,023 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of the Company's consolidated financial statements and the review of the Company's interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements other than audit fees. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

### Audit Committee's Pre-Approval Policy

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

### Independence

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2015, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times and acted by unanimous written consent one time during the fiscal year ended June 30, 2015.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2015 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2324 of 2711

Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2015, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

## CODE OF ETHICS AND CONDUCT

The Company has adopted a Code of Ethics and Conduct, which applies to all of its directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to the Company's Current Report on Form 8-K filed with the SEC on May 13, 2014. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of the Company's website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

The Company has adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of the Board of Directors of the Company are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of the Company's directors attended last year's annual meeting of stockholders in person with the exception of Mr. Mehra who was unable to attend.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing the Secretary of the Company at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. The Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of the Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of the Company's Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of the Company's website – *http://www.osi- systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless the Company has received contrary instructions from one or more of the stockholders at that address. The Company undertakes to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to the Secretary of the Company at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in the Company's proxy statement and form of proxy used in connection with the Company's next annual meeting of stockholders, the proposal must be delivered in writing to the Secretary of the Company and comply with the requirements

of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to the Company would be June 21, 2016, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

The Company's Bylaws provide that if a stockholder, rather than including a proposal in the Company's proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to the Company no more than 120 days and no less than 90 days prior to December 8, 2016, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 8, 2016, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in Company's Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by the Company under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by the Company under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by the Company under those statutes, except to the extent the Company specifically incorporates such report by reference therein. In addition, information on the Company's website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

The Company does not know of any other business to be presented at the Annual Meeting and does not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 19, 2015

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

________________________

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 William F. Ballhaus
06 James B. Hawkins

**The Board of Directors recommends you vote FOR proposals 2 and 3.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2016. | ☐ | ☐ | ☐ |
| 3 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2015. | ☐ | ☐ | ☐ |

**NOTE**: Such other business as may properly come before the meeting or any adjournment thereof.

0000257535_1 R1.0.0.51160

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com .

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 8, 2015 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Torrance, California on December 8, 2015 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, and 3 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000257535_2 R1.0.0.51160

**Continued and to be signed on reverse side**

# Exhibit 37

8-K 1 a15-24710_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): DECEMBER 8, 2015**

# OSI SYSTEMS, INC.
**(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)**

| DELAWARE | 000-23125 | 330238801 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 8, 2015. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 16,472,839 | 803,815 | 1,363,268 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2331 of 2711

| | | | |
|---|---|---|---|
| Ajay Mehra | 16,683,683 | 592,971 | 1,363,268 |
| Steven C. Good | 14,271,563 | 3,005,091 | 1,363,268 |
| Meyer Luskin | 14,419,034 | 2,857,620 | 1,363,268 |
| William F. Ballhaus | 15,191,614 | 2,085,040 | 1,363,268 |
| James B. Hawkins | 16,570,668 | 705,986 | 1,363,268 |

The six nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2016*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 18,023,364 | 611,290 | 5,268 | 0 |

The proposal was approved.

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2015*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 8,580,191 | 8,573,797 | 122,666 | 1,363,268 |

The proposal was approved.

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 8, 2015

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**General Counsel, and Secretary**

---

# Exhibit 38

8-K 1 a16-19781_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **OCTOBER 10, 2016**

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(d) On October 10, 2016, the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") expanded the size of the Board to seven members and appointed Gerald Chizever as a member of the Board to fill the vacancy created, effective immediately. Mr. Chizever was appointed to serve on the Board until the Company's next annual meeting of stockholders and until his successor is duly elected and qualified, or until his earlier death, resignation or removal.

Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in various matters, including business transactions, corporate governance and compliance with governmental regulations. The Board appointed Mr. Chizever as a director, in part, because of his extensive corporate governance and compliance background, including his successful experience in highly-regulated industries.

The Board has determined that Mr. Chizever is independent within the meaning of the director independence standards of The NASDAQ Stock Market, as currently in effect. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining independence.

As a non-employee director of the Company, Mr. Chizever will be entitled to receipt of the same cash and equity compensation paid by the Company to each of its non-employee directors. In addition, the Company will enter into an indemnification agreement with Mr. Chizever in the Company's standard form for directors and officers.

There are no arrangements or understandings between Mr. Chizever and any other person pursuant to which Mr. Chizever was elected as a director, and there are no transactions in which Mr. Chizever has an interest that would be reportable under Item 404(a) of Regulation S-K.

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: October 14, 2016

By: /S/ VICTOR SZE
**Victor Sze**
**Executive Vice President,**
**General Counsel, and Secretary**

# Exhibit 39

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2336 of 2711

DEF 14A 1 a2230040zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 21, 2016

Dear Stockholder:

     You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 6, 2016, at the Company's offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 12, 2016 are entitled to vote at the Annual Meeting.

     Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2016, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

     Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

     You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

     Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2338 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., local time, on Tuesday, December 6, 2016

**Location:** The Company's offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect seven directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2017;

3. To approve the First Amendment to the Amended and Restated OSI Systems, Inc. 2008 Employee Stock Purchase Plan ("ESPP");

4. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2016, as described in the accompanying Proxy Statement; and

5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 12, 2016 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 6, 2016:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2016 are available at *http://www.proxyvote.com*.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 11 |
| Proposal No. 3 Approval of First Amendment to ESPP | 12 |
| Proposal No. 4 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2016 | 17 |
| Compensation of Executive Officers and Directors | 20 |
| Security Ownership of Certain Beneficial Owners and Management | 48 |
| Equity Compensation Plan Information | 51 |
| Independent Registered Public Accounting Firm | 52 |
| Report of Audit Committee | 53 |
| Code of Ethics and Conduct | 55 |
| Annual Meeting Attendance | 55 |
| Stockholder Communications | 55 |
| Availability of Annual Report on Form 10-K | 55 |
| Stockholder Proposals | 56 |
| Incorporation by Reference | 56 |
| Other Business | 56 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2340 of 2711

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors of OSI Systems, Inc. (the "Company") for use at our Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 6, 2016, at our offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

We are making our proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and our most recent Annual Report on Form 10-K ("Proxy Materials"), available to our stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. We anticipate that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 27, 2016.

Stockholders of record as of the close of business on October 12, 2016 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 12, 2016, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, we had issued and outstanding 18,926,290 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted "FOR ALL," "FOR," "FOR ALL EXCEPT," "WITHHOLD ALL," "AGAINST" or "ABSTAIN" (as applicable) for a proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2341 of 2711

Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, our management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. In accordance with our Bylaws, directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One. Votes marked "withhold" will not affect the outcome of the election of directors.

*Proposal Two*. In accordance with our Bylaws, to be approved, the ratification of Moss Adams LLP as our independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. To be approved, the proposal regarding the first amendment to our ESPP must receive the affirmative vote of the majority of the shares of Common Stock outstanding as of the record date. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will have the same effect as a vote "against" Proposal Three.

*Proposal Four.* In accordance with our Bylaws, to be approved, the proposal regarding our executive compensation for the fiscal year ended June 30, 2016 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Four is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Four or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Four. The vote on Proposal Four is advisory and therefore not binding on the Company, the Compensation Committee or the Board of Directors. Although non-binding, the Board of Directors values the opinions that our stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. We will pay the expenses of

soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 6, 2016:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2016 are available at *http://www.proxyvote.com*.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2343 of 2711

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

The Board of Directors consists of seven members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The seven candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, James B. Hawkins and Gerald Chizever. All of our director nominees are currently directors of the Company and, with the exception of Mr. Chizever who was appointed in October 2016, were previously elected to serve on the Board of Directors by our stockholders.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until our next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although we know of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board of Directors may designate.

If a quorum is present and voting, the seven nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The current directors and nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 65 | Chairman of the Board of Directors, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 54 | Director, Executive Vice President and President of OSI Solutions Business | 1996 |
| Steven C. Good(1)(2)(3)(4) | 74 | Director | 1987 |
| Meyer Luskin(1)(2)(3)(4) | 91 | Director | 1990 |
| William F. Ballhaus(1)(2)(3)(5) | 71 | Director | 2010 |
| James B. Hawkins(1)(3)(5) | 60 | Director | 2015 |
| Gerald Chizever | 72 | Director | 2016 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Executive Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is the founder of our Company and has served as President, Chief Executive Officer and a Director since our inception in May 1987. He has served as our Chairman of the Board of Directors since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of our major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief

Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, we acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing our Company.

***Ajay Mehra*** has served as a Director since March 1996. Mr. Mehra is Executive Vice President of the Company and President of OSI Solutions Business. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named our Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and management experience within our Company.

***Steven C. Good*** has served as a Director of the Company since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good also currently serves as a Director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman. Mr. Luskin was formerly Chairman of the Board of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital). Mr. Luskin is also a Director on the Advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***William F. Ballhaus, Jr.*** has served as a Director of the Company since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory and on the Board of Trustees of the University Space Research Association. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** has served as a Director of the Company since December 2015. Mr. Hawkins is the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Mr. Hawkins has held this position since 2004. In addition, he currently serves as a director of El Dorado Resorts Inc. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a Director of Invivo Corporation, a provider of MRI-safe patient monitoring. Mr. Hawkins has extensive risk management experience gained through the various executive and board positions that he has held. He earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins was selected to serve as a director because of his direct management experience in the medical device area.

***Gerald Chizever*** has served as a Director of the Company since October 2016. Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever's practice includes mergers and acquisitions, corporate finance, public and private securities offerings, general corporate representation and strategic alliances. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in all matters, including business transactions, corporate governance and compliance with governmental regulations. He holds a B.B.A. degree in Accounting and a Juris Doctorate from George Washington University. Mr. Chizever was selected to serve as a director because of his corporate governance and compliance experience, including his experience in highly-regulated industries.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to the Company between any of the directors or nominees for director of the Company and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among the directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table") of the Company.

**Board Role in Risk Oversight**

The Board of Directors is responsible for risk oversight of the Company. Risks facing the Company include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and other risks. Risks are reported to the Board of Directors through our executive officers, who are responsible for the identification, assessment and management of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2346 of 2711

the Company's risks. The Board of Directors regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major financial and enterprise risks, including risks related to accounting, auditing, financial reporting, maintaining effective internal control over financial reporting, legal and compliance. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board of Directors. The Compensation Committee oversees risks related to the Company's executive compensation policies and practices. The Executive Committee oversees risks related to the Company's strategic transactions. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure and Lead Independent Director**

The Chairman of the Board of Directors is the Company's Chief Executive Officer. We believe that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board of Directors' role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges the Company faces and is thus well positioned to develop agendas and highlight issues that ensure that the Board of Directors' time and attention are focused on the most critical matters. In addition, the Board of Directors has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances our ability to communicate our message and strategy clearly and consistently to our stockholders, employees, and other companies with which we do business. Although we believe that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, we will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve our best interests and the best interests of our stockholders.

The combined Chairman of the Board and Chief Executive Officer position is balanced by the number of independent directors serving on our Board of Directors, our independent committees and our lead independent director. Mr. Luskin is currently our lead independent director and brings to this role considerable skills and experience as described above in "Election of Directors." The role of lead independent director is designed to further promote the independence of our Board of Directors and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

**Board of Directors Meetings, Independence and Committees of the Board of Directors**

There were eight meetings of the Board of Directors and the Board of Directors acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2016. The Board of Directors has established an Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. The members of each committee are appointed by the majority vote of the Board of Directors. All persons serving as a director during the fiscal year ended June 30, 2016 attended more than 75% of the aggregate number of meetings held by the Board of Directors and all committees on which such director served.

The Board of Directors has determined that each of the nominees for director, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board of

Directors has determined that each of the members of each of the committees of the Board of Directors is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and the Listing Standards, as currently in effect.

*Audit Committee*

We have a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of our independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews our financial statements and the adequacy of our internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to the Company.

The Audit Committee currently consists of four independent directors – Messrs. Good, Luskin and Hawkins and Dr. Ballhaus. The Board of Directors has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2016. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation for our executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board of Directors in the administration of our equity compensation plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Good and Dr. Ballhaus. There were ten meetings of the Compensation Committee during the fiscal year ended June 30, 2016. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board of Directors. The Nominating and Governance Committee currently consists of four independent directors – Dr. Ballhaus and Messrs. Good, Luskin and Hawkins. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2016.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board of Directors members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board of Directors,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2348 of 2711

willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board of Directors.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board of Directors members. The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Executive Committee*

The Executive Committee convenes for the purpose of advising and consulting with our management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consists of two independent directors – Messrs. Good and Luskin. There were ten meetings of the Executive Committee during the fiscal year ended June 30, 2016.

The Executive Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board of Directors regarding all technology-based matters. The Technology Committee currently consists of two independent directors – Dr. Ballhaus and Mr. Hawkins. There were two meetings of the Technology Committee during the fiscal year ended June 30, 2016.

The Technology Committee acts pursuant to a written charter adopted by the Board of Directors, a copy of which is available under the Investor Relations section of the Company's website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board of Directors must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and the Company, or any customer, supplier, competitor, or affiliate of the Company, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and

- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of our Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board of Directors. We may also require any proposed nominee to furnish such other information as we or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to our Board of Directors to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify us of their intent to do so on or before the date on which nominations must be received by us in accordance with our Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Good and Dr. Ballhaus. None of our executive officers has served during the fiscal year ended June 30, 2016 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on our Board of Directors or the Compensation Committee. During the fiscal year ended June 30, 2016, no member of our Compensation Committee had any relationship or transaction with the Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board of Directors recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr., James B. Hawkins and Gerald Chizever as directors of the Company. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2350 of 2711

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee of the Board of Directors has selected Moss Adams LLP ("Moss Adams") as our independent registered public accountants for the year ending June 30, 2017 and has further directed that management submit the selection of independent registered public accountants for ratification by our stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that our stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board of Directors in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in our and our stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board of Directors recommends a vote "FOR" the ratification of Moss Adams as the Company's independent registered public accountants for the fiscal year ending June 30, 2017. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2351 of 2711

**APPROVAL OF FIRST AMENDMENT TO THE AMENDED AND RESTATED OSI SYSTEMS, INC. 2008 EMPLOYEE STOCK PURCHASE PLAN**
***(Proposal No. 3 of the Proxy Card)***

**Introduction**

We are asking stockholders to approve the First Amendment (the "Amendment") to the Amended and Restated OSI Systems, Inc. 2008 Employee Stock Purchase Plan (the "ESPP") to (i) provide that the Board of Directors may amend, modify or terminate the ESPP, subject to such stockholder approval as the Board of Directors determines to be necessary or advisable to comply with applicable law or rule, and (ii) remove the ESPP's automatic termination provision which would otherwise cause the ESPP to expire on August 25, 2018. The Board of Directors approved the Amendment on October 20, 2016, subject to stockholder approval. The Amendment will become effective immediately upon stockholder approval at the Annual Meeting. If the Amendment is not approved by our stockholders, the Amendment will not become effective, the ESPP will continue in full force and effect, and shares of the Common Stock may continue to be issued under the ESPP, subject to its existing terms, conditions and limitations.

The purpose of the ESPP is to provide employees of the Company and certain of our subsidiaries with an opportunity to purchase shares of Common Stock at a discount through accumulated payroll deductions at levels elected by the employees. The terms of the ESPP provide that no amendment to the ESPP will be effective until such amendment is approved by a vote of a majority of our stockholders if such amendment would:

- increase the aggregate number of shares of Common Stock to be issued under the ESPP (other than due to adjustments upon changes in capitalization);
- materially modify the eligibility requirements to participate in the ESPP;
- increase the maximum number of shares of Common Stock which a participant may purchase in any Offering Period (as defined below);
- extend the term of the ESPP;
- alter the option price per share formula to reduce the price for shares of Common Stock to be purchased under the ESPP;
- otherwise materially increase the benefits accruing to participants under the ESPP; or
- cause the ESPP to fail to meet the "employee stock purchase plan" requirements under Section 423 of the Internal Revenue Code of 1986, as amended (the "Code").

The terms of the ESPP further state that it will automatically terminate on the date prior to the tenth anniversary of the date on which the ESPP was adopted, or August 25, 2018. We propose that stockholders approve the Amendment to (i) provide that the Board of Directors may amend, modify or terminate the ESPP, subject to such stockholder approval as the Board of Directors determines to be necessary or advisable to comply with applicable law or rule, and (ii) remove the ESPP's automatic termination provision such that there will no longer be a fixed termination date for the ESPP. The Amendment will allow us to continue to offer to our employees the benefits of the ESPP beyond August 25, 2018, unless and until the ESPP is otherwise terminated or the shares of Common Stock reserved for issuance thereunder are exhausted.

The Amendment is consistent with our desire to continue to afford eligible employees an opportunity to obtain a proprietary interest in the continued growth and prosperity of the Company through purchases of Common Stock, which we believe is beneficial to both the Company and our employees.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2352 of 2711

We are not asking stockholders to approve any increase to the number of shares reserved for issuance under the ESPP. When originally approved, an aggregate of 1.5 million shares were reserved for issuance under the ESPP. As of the end of the purchase period ending June 30, 2016, there were 893,119 shares remaining for issuance.

**Description of the ESPP**

The following is a summary of the principal provisions of the ESPP, as amended. This summary does not purport to be a complete description of all of the provisions of the ESPP. It is qualified in its entirety by reference to the full text of the ESPP, as amended. The Amendment is included as Appendix A to this Proxy Statement.

*Number of Authorized Shares*

The maximum aggregate number of shares of Common Stock that may be issued under the ESPP is 1,500,000 shares. As of the end of the purchase period ending June 30, 2016, of this 1,500,000 shares of Common Stock, a total of 893,119 shares remained available for issuance.

*Administration*

The ESPP is administered by the Board of Directors or a committee appointed by the Board of Directors (the "Committee"). All determinations by the Committee are, to the full extent permitted by law, final and binding upon all parties.

*Offering and Exercise Periods*

The ESPP has been implemented as a series of overlapping 24 month offering periods (each, an "Offering Period"). That is, a new Offering Period commences every six months, beginning on January 1 and July 1 of each year and consists of four exercise periods of six months each ("Exercise Periods"). The Board of Directors or the Committee may change the number and/or duration of the Exercise Periods or the length or date of commencement of an Offering Period at any time.

*Eligibility*

Each employee of the Company, our U.S. subsidiaries or any other designated subsidiaries whose date of hire was at least ninety days prior to the commencement of an Offering Period and who is customarily employed by the Company for at least twenty hours per week and more than five months per calendar year are eligible to participate in the ESPP. An eligible employee may become a participant by completing an enrollment form authorizing payroll deductions and delivering it to our human resources office no later than ten days prior to the applicable enrollment date. An enrollment form will automatically enroll a participant in the ESPP for each successive Offering Period until such participant timely submits a new payroll deduction authorization, withdraws from participation under the ESPP or becomes ineligible to participate in the ESPP. As of June 30, 2016, approximately 1,363 employees were eligible to participate in the ESPP, of which eight were executive officers of the Company.

*Grant of Option; Purchase Price; Limitations*

On the first day of each Offering Period (the "Offering Date"), each eligible employee participating in such Offering Period will be granted an option to purchase, on the last day of each Exercise Period in such Offering Period (the "Exercise Date"), a number of shares of Common Stock determined by dividing such employee's accumulated payroll deductions by the lower of: (i) 85% of the fair market value of one share of Common Stock on the Offering Date or (ii) 85% of the fair market value of one share of Common Stock on the applicable Exercise Date. However, if any Exercise Date of an Offering Period occurs following the 27 month anniversary of the applicable Offering Date for any reason, the per share purchase

price for Common Stock for such Exercise Period will equal 85% of the fair market value of a share of Common Stock on the applicable Exercise Date.

Unless a participating employee withdraws from the ESPP, his or her option will be automatically exercised on each Exercise Date of the Offering Period and will automatically expire upon the termination of each Offering Period; *provided, however*, that in no event will an employee be permitted to purchase during an Exercise Period a number of shares of Common Stock in excess of the number determined by dividing $12,500 by the fair market value of a share of Common Stock on the Offering Date.

In addition, no employee will be granted an option under the ESPP if, immediately after grant, the employee would own stock possessing 5% or more of the voting power or value of all classes of stock of the Company or of any of our subsidiaries (including stock which may be purchased under the ESPP or pursuant to any other options), nor will any employee be permitted to participate to the extent such employee could purchase more than $25,000 worth of Common Stock (determined at the fair market value of the shares at the time the option is granted) under all employee stock purchase plans of the Company in any calendar year.

Participants must notify us of any disposition or other transfer of any shares of Common Stock acquired under the ESPP if such disposition or transfer is made within two years after the applicable Offering Date or within one year after the applicable Exercise Date.

*Payroll Deductions*

Payroll deductions commence on the first payday following the Offering Date. The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation, which is defined in the plan to mean the participant's base rate of pay, including commissions and cash bonuses, but excluding income with respect to stock options, restricted stock awards or other stock purchases and expense reimbursements. A participant may decrease (but not increase) payroll deductions up to four times during an Offering Period. A participant may also discontinue his or her participation in the ESPP at any time during the Offering Period, in which case such participant's payroll deductions credited to his or her account will be paid to such employee. Upon termination of an Offering Period, a participant will automatically participate in the subsequent Offering Period at the same payroll deduction percentage unless the participant delivers a different authorization or the participant becomes ineligible for participation in the ESPP.

*Automatic Transfer to Lower-Price Offering Period*

In the event that the fair market value of a share of Common Stock is lower on an Exercise Date than it was on such Offering Period's Offering Date, the Offering Period will automatically be terminated following such Exercise Date. A new Offering Period will begin on the day following such Exercise Date, and participants in the terminated Offering Period will be automatically enrolled at the same levels in the Offering Period beginning on the day following the terminated Offering Period. As noted above, the duration, timing and terms of Offering Periods may be changed by the Committee at any time.

*Withdrawal; Termination of Employment*

Participants may withdraw from participation in the ESPP at any time, in which case such participant's payroll deductions credited to his or her account will be paid to such participant. Once a participant withdraws from the ESPP, that participant may elect to participate again for any subsequent Offering Period (so long as the participant is then eligible to participate in the ESPP and elects to participate). If a participant experiences a termination of employment, we will pay to such participant any amounts in his or her account. A participant may withdraw all, but not less than all, of the payroll deductions credited to such participant's account by giving us written notice.

*Transferability*

No rights or accumulated payroll deductions of a participant under the ESPP may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will or the laws of descent and distribution), and any such attempt may be treated by us as an election to withdraw from the ESPP.

*Adjustments Upon Changes in Capitalization, Dissolution, Merger, Asset Sale or Change of Control*

The number of shares of Common Stock reserved under the ESPP, the number of shares of Common Stock subject to outstanding options under the ESPP which have not yet been exercised, and the price per share of Common Stock covered by each option under the ESPP which has not yet been exercised will be proportionately adjusted for any stock split, reverse stock split, stock dividend or any other increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company. In the event of the proposed dissolution or liquidation of the Company, the Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board of Directors. In the event of a proposed sale of all or substantially all the assets of the Company or a merger of the Company with or into another corporation, each option under an ongoing Offering Period will be assumed or an equivalent option will be substituted by the successor or purchaser corporation, unless the Board of Directors determines, in its sole discretion, to provide the participant with the right to exercise his or her option as to all of the option shares of Common Stock.

*Amendment and Termination*

Our Board of Directors may amend, modify or terminate the ESPP at any time without notice as long as no participant's existing rights are adversely affected by such amendment, modification or termination. Stockholder approval is required under the ESPP for any amendment which would:

- increase the aggregate number of shares of Common Stock to be issued under the ESPP;
- materially modify the requirements for eligibility to participate in the ESPP;
- increase the maximum number of shares of Common Stock which a participant may purchase in any Offering Period;
- extend the term of the ESPP;
- reduce the price for shares of Common Stock to be purchased under the ESPP;
- otherwise materially increase the benefits accruing to participants under the ESPP; or
- cause the ESPP to fail to meet the requirements of an "employee stock purchase plan" under Section 423 of the Code.

If the stockholders approve the Amendment, the Board of Directors may amend, modify or terminate the ESPP, subject to such stockholder approval as the Board of Directors determines to be necessary or advisable to comply with applicable law or rule.

Unless terminated earlier, the ESPP will automatically terminate on the date prior to the tenth anniversary of the date on which the ESPP was originally adopted, but will remain in full force until the end of the Offering Period then in effect. If the stockholders approve the Amendment, this automatic termination provision will be eliminated and will no longer apply.

**Federal Tax Information**

The following information is a general summary of the federal income tax consequences of the ESPP to participants and to the Company. Tax laws may change, and actual tax consequences will depend on the participant's individual circumstances as well as state and local tax laws. We encourage all employees to

seek tax advice when they participate in the ESPP. The ESPP is intended to qualify as an "employee stock purchase plan" under Code Section 423.

*Tax Treatment of Participants*

Participants will not recognize income as a result of enrollment in the ESPP or when they purchase shares of Common Stock under the ESPP. If the participant holds the shares acquired under the ESPP until the later of one year after the Exercise Date or two years after the Offering Date, or if the participant dies while owning the shares, the participant will generally recognize ordinary income when disposing of the shares equal to the lesser of (i) the difference between the purchase price and the fair market value of the shares on the date of disposition or (ii) 15% of the fair market value of the shares on the Offering Date. Any additional gain will generally be taxed as long-term capital gain. If the shares of Common Stock are sold for less than the purchase price, then there is no ordinary income, but the participant will have a long-term capital loss equal to the difference between the purchase price and the sale price. If a participant sells or gifts the shares less than one year after the Exercise Date or less than two years after the Offering Date, the participant will generally have ordinary income equal to the difference between the purchase price and the fair market value on the Exercise Date. The difference between the sale price and the fair market value on the Exercise Date will be a capital gain or loss.

*Tax Treatment of Company*

When a participant recognizes ordinary income by disposing of shares before the one-year or two-year holding period ends, the Company will generally be entitled to a tax deduction in the amount of the ordinary income.

**New Plan Benefits**

Participation in the ESPP is voluntary, so awards granted under the ESPP are subject to the elections of the participants. We are not requesting that additional unissued shares be authorized for use under the ESPP. As of June 30, 2016, the ESPP had approximately 893,119 shares reserved for issuance thereunder, and in fiscal year 2016, approximately 60,375 shares were issued under the ESPP. The benefits that will be awarded or paid under the amended ESPP are not currently determinable, and will vary depending on the level of participation by each individual participant (subject to the limitations described above). As of June 30, 2016, the closing price of a share of Common Stock was $58.13.

The table below shows, for the listed individuals and specified groups, the number of shares of Common Stock purchased under the ESPP during fiscal year 2016.

| Name | Number of Shares of Common Stock Purchased under the ESPP |
|---|---|
| Named Executive Officers | |
| Deepak Chopra | 402 |
| Alan Edrick | 402 |
| Ajay Mehra | 402 |
| Victor S. Sze | 402 |
| Pak Chin | 0 |
| Executive Group | 1,959 |
| Non-Executive Director Group | 0 |
| Non-Executive Officer Employee Group | 58,416 |

***The Board of Directors unanimously recommends that you vote "FOR" the First Amendment to the ESPP. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock outstanding as of the record date.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2016**
***(Proposal No. 4 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 enables our stockholders to vote to approve, on an advisory, non-binding basis, our executive compensation for the fiscal year ended June 30, 2016 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act. We currently conduct this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at our 2017 Annual Meeting of Stockholders.

**Summary**

Our Board of Directors is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. We are asking our stockholders to provide advisory approval of our executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. We recognize and value the critical role that executive leadership plays in our performance. Our executive compensation philosophy is intended to ensure that executive compensation is aligned with our short- and long-term business strategy, objectives and stockholder interests. Our executive compensation is designed to attract, motivate and retain highly qualified executives. We believe that our compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the short- and long-term interests of our stockholders.

We urge you to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

We believe that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis. We believe that our continued success is closely tied to the performance of our executive officers and have designed our compensation practices in order to reward the executives for their contributions to our overall success.

**Alignment with Stockholders' Interests**

We grant annual incentives based in part on each executive's contribution to enhancing short- and long-term profitable growth of the Company. We also grant long-term equity-based incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of our stockholders. We have historically used restricted stock, restricted stock units and stock options as our equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in the Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead the Company to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of our operations. For fiscal year 2016, 100% of the long-term equity incentives granted to our Named Executive Officers consisted of restricted stock units subject to performance vesting based on growth of adjusted EBITDA per share.

**Long-Term Performance**

In order to promote our philosophy of pay-for-performance and furthering our objective of aligning the interests of management with those of our stockholders, we have established performance programs for certain of our executive officers. These programs focus on the achievement of our long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, we are incentivizing our officers to achieve our long-term corporate objectives and ultimately increase stockholder value.

**Highlights of 2016 Exeuctive Compensation Program**

The Board of Directors believes our executive compensation program is designed appropriately and that a vote in favor of the proposal is warranted, including for these reasons: (1) 100% of Named Executive Officer equity awards for fiscal 2016 were performance-based and tied to measurable pre-established targets; (2) we conducted a robust stockholder outreach and, in response to stockholder feedback, revised our annual incentive program to be performance-based and tied to measurable targets; and (3) we are committed to having strong governance standards and continue to take steps to further this commitment.

**1. 100% Performance-Based Equity Awards: Equity awards granted to our Named Executive Officers are 100% performance-based and tied to measurable pre-established adjusted EBITDA per share goals.**

100% of the equity grants made to our Named Executive Officers during fiscal 2016 were performance-based and tied to pre-established adjusted EBITDA per share targets which require significant annual growth. 40% of the maximum number of shares that can be earned under each Named Executive Officer's 2016 award has a three-year performance component which vests or is forfeited following the end of the three-year performance cycle, subject to the achievement of the adjusted EBITDA per share growth target for fiscal 2018. If 85% of this three-year adjusted EBITDA per share target is not attained, then these shares are forfeited. The remaining 60% of the maximum number of shares that can be earned under each executive's 2016 award may vest up to 20% per year over the three-year period if annual adjusted EBITDA per share growth targets are exceeded for fiscal years 2016, 2017 and 2018, respectively. These grants were made pursuant to our Six-Year Performance Program, which was established in 2012.

We believe that the performance metrics underlying our long-term equity incentive program are rigorous and we have not disclosed current metrics because their disclosure would allow our competitors to determine the EBITDA and pricing related to key programs, which would be competitively harmful to us. The adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2016 was $5.38.

For fiscal 2016, we achieved 118% of the fiscal 2016 adjusted EBITDA per share target, and as a result the 60,000 shares granted to our CEO in fiscal 2014 were vested. In addition, our CEO earned 72,000 shares, consisting of 24,000 vested shares earned pursuant to the fiscal 2016 grant, 24,000 vested shares earned pursuant to the fiscal 2015 grant and 24,000 vested shares earned pursuant to the fiscal 2014 grant.

**2. Stockholder Outreach and Annual Cash Incentives: We conducted a robust stockholder outreach and revised our annual cash incentive program to directly address the feedback we received from our stockholders.**

The Compensation Committee takes very seriously stockholder feedback with respect to executive compensation. We conducted a robust stockholder outreach, contacting and requesting meetings with over 75% of our top 25 stockholders, so that we could better understand stockholder sentiments and concerns about our program. In response to the specific stockholder feedback we received, the Compensation Committee revised the annual cash executive officer incentive program for fiscal 2016 to be performance-

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2358 of 2711

based and formulaicly tied to measurable thresholds, targets, and maximums. The annual incentives under this program are now calculated based on the Company's pretax adjusted return on equity (AROE). Depending on the level of AROE achieved, each participating corporate Named Executive Officer will be awarded a cash incentive calculated based upon a formula up to a maximum award. We believe that the AROE metrics underlying our annual incentive program are rigorous yet achievable with significant management effort. The Compensation Committee will have the discretion to reduce each calculated award under this program by up to 20%.

Our stockholders also indicated that our programs should be simplified and reflect overall corporate performance. In response to this, our Compensation Committee eliminated the separate Mexico SAT Incentive Program effective July 1, 2015. Accrued amounts as of the date of termination of this program were paid out to participating executives.

**3. Corporate Governance and Best Practices: We are committed to having strong governance standards with respect to our compensation programs, procedures and practices.**

We have taken the following actions to enhance our corporate governance and executive compensation policies:

- Conducted a robust stockholder outreach and revised our fiscal 2016 executive compensation to address specific stockholder feedback;
- Prohibited all hedging and pledging of Company stock by executive officers and directors. As of the date of the Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.
- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements. We have also included clawback provisions in each Named Executive Officer's employment agreement.
- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives' long-term interests with those of our stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price.

The Board of Directors believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that our executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K of the SEC, including in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board of Directors recommends that you vote "FOR" the approval of the Company's executive compensation for the fiscal year ended June 30, 2016. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the votes cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Executive Officers

Our executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 65 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 48 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 54 | Director, Executive Vice President and President of OSI Solutions Business |
| Victor Sze* | 49 | Executive Vice President and General Counsel |
| Pak Chin* | 44 | President of Security Division |
| Sujit Kumar | 46 | President of Healthcare Division |
| Manoocher Mansouri | 60 | President of Optoelectronics and Manufacturing Division |
| Paul Morben | 55 | President of OSI Electronics, Inc. |
| Rick Merritt | 54 | Senior Vice President and Chief Human Resources Officer |

* Denotes our Named Executive Officers for fiscal 2016.

The following section sets forth certain background information regarding those persons currently serving as our executive officers, excluding Deepak Chopra and Ajay Mehra, who are described above under "Election of Directors":

***Alan Edrick*** is our Executive Vice President and Chief Financial Officer. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Victor S. Sze*** is our Executive Vice President and General Counsel. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Juris Doctorate from Loyola Law School.

***Pak Chin*** is President of our Security division. Mr. Chin joined the Company in May 2015 from Honeywell Inc. where he held a variety of leadership positions over 17 years including Vice President of the Boeing KC-46 Pegasus Aerial Refueling Tanker program, Vice President of the Lockheed Martin, Northrop Grumman, General Atomics and Huntington Ingalls Defense & Space business segment, Vice President of commercial aerospace and airlines business segment in Asia Pacific and Chairman of the Board for the Honeywell Aerospace and TAECO Aerospace joint venture. Mr. Chin holds a Bachelors in Electrical Engineering from the University of Oklahoma and a Masters in International Business from the Rensselaer Polytechnic Institute.

***Sujit Kumar*** is President of our Healthcare division. Mr. Kumar brings over two decades of global experience with majority in the medical device and HCIT space. Mr. Kumar joined the Company in April 2016 from Verathon Medical (part of Roper Technologies) where he most recently served as Vice President/General Manager. He has also held global leadership positions at Philips Healthcare, GE Healthcare, GM and Amazon.com. Early in his career, Mr. Kumar worked in investment banking advising clients on M&A and buy-side analysis. Mr. Kumar holds a Bachelor of Science degree in Mechanical Engineering from Osmania University, India, a Master of Science degree in Mechanical Engineering from University of Mississippi, and a Master of Business Administration degree from Ross School of Business at University of Michigan.

***Manoocher Mansouri*** is President of our Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of our Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of our OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in Electrical Engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Paul Morben*** is President of our OSI Electronics, Inc. subsidiary. Mr. Morben first joined the Company in 1983 and was named President of OSI Electronics in June 2012. Mr. Morben has over 30 years of experience in the optoelectronics and manufacturing services industry, including approximately 10 years in Asia where he established and led our manufacturing operations in Singapore, Indonesia, and Malaysia. Mr. Morben holds a Bachelor of Science degree in Management Science from California State University, Northridge and a Master of Business Administration degree from Concordia University, Irvine.

***Rick Merritt*** is our Senior Vice President and Chief Human Resources Officer. Prior to joining the Company in October 2013, Mr. Merritt held the positions of Global Vice President of Human Resources for Power-One, Inc., a power conversion solution provider, from April 2011 to October 2013 and Global Vice President at International Rectifier Corporation, a publicly-traded power management technology company, from May 2004 to April 2011. Mr. Merritt received a Bachelor of Science degree from Indiana University and a Master of Science degree from California State University, Hayward.

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes our compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for our Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Advisory Vote on Named Executive Officer Compensation; Stockholder Outreach*

We maintain open lines of communication with our stockholders, and senior management routinely interacts with our stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. Further, the Compensation Committee considers the outcome of our annual say on pay vote when making decisions regarding our executive compensation program. At our 2015 annual meeting, more than 50% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Although this proposal passed, the Compensation Committee deliberated extensively about the results of this vote and considered this result when engaging in its ongoing review of our executive compensation program.

We conducted targeted stockholder outreach efforts to gather input on the compensation program from some of our largest stockholders. We requested meetings with over 75% of our top 25 stockholders, and we spoke with each stockholder that expressed an interest in speaking with us. Our Chief Financial Officer, General Counsel, and/or a member of our Compensation Committee generally participated in these meetings. The primary goals in soliciting feedback from our stockholders were to (a) better understand their views on our executive compensation program, (b) identify specific concerns and issues reflected in their 2015 vote, and (c) initiate discussions about proposed changes to the program. The general feedback was that our executive compensation program should be simplified, reflect overall corporate performance, and be more formulaic.

In response to the 2015 say on pay vote and stockholder discussions, the Compensation Committee took the following actions with respect to our executive compensation program:

| Stockholder Concern Expressed | Company Response/Action Taken |
|---|---|
| Annual bonus is discretionary | Eliminated the discretionary annual bonus for corporate Named Executive Officers.<br><br>Established the annual incentive program. This program is formulaic based on a pretax adjusted return on equity metric (AROE).<br><br>In order for corporate Named Executive Officers to earn awards under the annual incentive program, the Company must exceed certain AROE thresholds. Awards can range from 0% to 200% of base salary depending on level of AROE achieved. |
| Corporate Named Executive Officer compensation should not be based on any one individual program but rather based on overall corporate performance. | Eliminated the separate Mexico SAT Incentive Program and included Mexico SAT results in our Six Year Performance Program so that the corporate Named Executive Officers compensation is based on overall Company performance. |

At the upcoming 2016 annual meeting, we will again hold an annual advisory vote to approve executive compensation. We will continue to engage with our stockholders throughout the year, and the Compensation Committee will consider the results from this year's and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Governance Highlights*

We are committed to having strong governance practices with respect to our compensation programs, practices and procedures. We believe that these practices reinforce our emphasis on tying executive

compensation to performance. The following chart highlights some of our governance practices with respect to executive compensation:

| What We Do | What We Do Not Do |
|---|---|
| Use 100% performance-based vesting with respect to executive equity awards | No excise tax gross-ups upon a change in control |
| Have formulaic performance-based annual incentives | No hedging, pledging, or speculative transactions are permitted by executives and directors |
| Maintain a robust clawback policy | No re-pricing of underwater stock options |
| Maintain share ownership and retention guidelines for executives and directors | No stock option grants with an exercise price less than fair market value |
| Conduct an annual say on pay vote | No "single trigger" severance payments owing solely on account of the occurrence of a change in control event |
| Maintain open lines of communication with stockholders and conducted a robust stockholder outreach | |

*Executive Compensation Summary*

*Fiscal 2016 Performance*

During fiscal 2016, we (a) achieved a significant 15-year booking and successful rollout of our turnkey screening solutions program in Albania, (b) had a strong win rate for our Security division's Real Time Tomography (RTT) checked baggage screening product in the EMEA region, (c) strengthened our leadership team, (d) announced the signing of a significant strategic acquisition in our Security division, and (e) completed two acquisitions and expanded our operating margins in our Optoelectronics and Manufacturing division. We were, however, adversely impacted by certain global economic factors, including lower oil prices, sluggishness in emerging markets, and volatility in the Middle East.

*Leverage Business Infrastructure.* Even as we launched new products, entered new markets, and invested substantial amounts in R&D, we actively leveraged our business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities.* In fiscal 2016, we continued to expand our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and we believe it will continue to serve, to sustain growth over the long term. Some of our key achievements during fiscal 2016 include the following:

- Expanding presence with international customers for checked baggage scanning solutions, related services and support.
- Significant 15-year booking and successful rollout of our turnkey screening solutions program in Albania.
- Acquiring two companies in our Optoelectronics and Manufacturing division.
- Acquiring product lines and companies that not only leverage the Company's existing operating infrastructure but also provide immediate entry into growing market segments.

*Building a Foundation for the Future.* We continue to make significant targeted investments in R&D and acquisitions. In 2016, we entered into an agreement for a significant strategic acquisition in our

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2363 of 2711

Security division as well as completed two acquisitions in our Optoelectronics and Manufacturing division. We believe that these acquisitions and investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

*Role of the Compensation Committee*

Our Board of Directors appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for our Named Executive Officers, including base salaries, annual incentives, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of our Named Executive Officers (other than our Chief Executive Officer) is recommended to the Compensation Committee by our Chief Executive Officer. Compensation for our Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

*Executive Compensation Program Elements*

The particular elements of the compensation program for our Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with our pay-for-performance philosophy, we structure our compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

The following is an overview of the elements of our compensation and benefits programs for fiscal 2016:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined formulaically based on AROE metrics, including a negative discretion feature whereby calculated awards may be reduced up to 20%. |
| | The Turnkey Solutions Incentive Program allows for annual incentives in the form of shares of stock or, at our discretion, cash to be granted to Mr. Mehra based on the achievement of certain pre-established performance metrics. |
| Long-Term Incentives | The fiscal 2016 program with respect to the Named Executive Officers consisted of performance-based restricted stock units under the Six-Year Performance Program, which are earned based on the achievement of pre-established EBITDA-based metrics for each of the three years following grant, as well as an aggregate three-year metric. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2016, perquisites included car allowances. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash incentives at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which our CEO is the only participant. |

In fiscal 2016, fixed compensation comprised approximately 16% to 35% and variable compensation comprised approximately 65% to 84% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 80% of total compensation.




*Fixed Compensation*. Fixed compensation is intended to compensate our Named Executive Officers for their ongoing responsibilities and consists of base salary. Base salary is set to attract and retain executive talent. Base salaries for our Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically, typically on an annual basis.

The Compensation Committee takes a conservative approach with respect to base salary increases. For example, our CEO's base salary has not been increased since 2008. In determining whether base salary levels for fiscal year 2016 were appropriate, the Compensation Committee considered the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions. In fiscal 2016, the Compensation Committee determined not to adjust any base salary levels for any of the Named Executive Officers.

*Variable Compensation*. Variable compensation provides our Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive awards and long-term incentive compensation.

*Annual Incentive Awards*. All corporate Named Executive Officers are eligible for an annual incentive pursuant to our annual incentive program. Annual incentives under this program are designed to focus our participating Named Executive Officers on annual operating achievement and near-term success. Annual incentives are calculated based on a formula tied to AROE metrics and provide for a threshold below which no incentive will be paid and a maximum award level.

Depending on the level of AROE achieved, corporate executives can earn from 0% to 200% of base salary as follows:

| AROE | % of Base Salary Earned |
|---|---|
| Less than 10% | 0% |
| 10% | 25% |
| 11% | 50% |
| 12% | 75% |
| 13% | 100% |
| 14% | 125% |
| 15% | 150% |
| 16% | 175% |
| 17% or more | 200% |

The Compensation Committee considers AROE to be an effective annual performance measure for assessing the Company's efficient use of capital and return to stockholders. The AROE targets were designed to be challenging yet achievable with significant effort and management skill and were established in order to provide the executives sufficient incentive to create long-term stockholder value while at the same time ensuring appropriate risk management. The Compensation Committee retains negative discretion to reduce any awards under the annual incentive program up to 20% of the calculated value.

*Turnkey Solutions Incentive Program.* In 2015, we established an incentive program tied to the performance of our turnkey solutions business (the "Turnkey Solutions Incentive Program"). Mr. Mehra, President of the OSI Solutions Business, is the only Named Executive Officer who participates in this program. Incentives under the Turnkey Solutions Incentive Program are conditioned on the achievement of certain metrics based on the operating income and bookings of our solutions business (excluding certain operations already existing at the time of the adoption of the program). The operating income and bookings targets are believed to be challenging, but achievable with significant management effort. For fiscal year 2016, we did not achieve the operating income threshold of $10 million generated by new business. Therefore, Mr. Mehra did not earn anything under this component of the program. Mr. Mehra vested in 23,800 RSUs for achieving a bookings target of $225 million of new business in fiscal 2016.

*Long-Term Incentive Program.* In order to further promote our philosophy of pay-for-performance and furthering our objective of aligning our executive compensation with our long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of our Named Executive Officer, we have a long-term incentive program. For fiscal 2016, our long-term incentive program was comprised of the Six-year Performance Program described in more detail below.

The grants to our Named Executive Officers during fiscal 2016 were performance based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for our Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving corporate performance and business objectives for the benefit of our stockholders.

Our overall long-term incentive program is designed to retain our Named Executive Officers and to align the interests of our Named Executive Officers with the long-term interests of our stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under our equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of our Common Stock on such dates.

With respect to performance based awards, the Compensation Committee has established a six-year program for long-term performance based incentive grants for our Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each award is 100% performance based and vests based on the achievement of certain one-, two- and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. Upon the termination of the Mexico SAT Incentive Program, the Compensation Committee incorporated the EBITDA from the Mexico SAT project into this program. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill.

Each fiscal year, our Named Executive Officers are awarded an initial grant, which vests if a three-year adjusted EBITDA per share target is achieved. However, if actual three-year performance falls below target, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 55% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

Additional shares may be earned annually for each initial grant within the three-year performance period if annual targets are exceeded as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

Our adjusted EBITDA per share for fiscal year 2016 was 118% of the fiscal 2016 adjusted EBITDA per share target of $5.38. Therefore, our executive officers earned additional shares as follows: Mr. Chopra, 72,000 shares; Mr. Edrick, 33,562 shares; Mr. Mehra, 9,468 shares; and Mr. Sze, 25,913 shares.

In the event of a change of control, the initial grant would vest upon the change of control; to the extent actual performance has exceeded target for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed target by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The Compensation Committee determines, after consultation with our Chief Executive Officer, the number of equity awards to grant to our Named Executive Officers. The grant amounts for our Chief Executive Officer are determined solely by the Compensation Committee. The Compensation

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2368 of 2711

Committee considers individual performance, including the following quantitative and qualitative factors, as well as overall corporate performance.

**Qualitative Factors**

- Quality of the management of units or functions managed by the Named Executive Officer
- Leadership of personnel under the Named Executive Officer's management
- Execution of strategically important projects
- Overall effectiveness of units or functions managed by the Named Executive Officer
- Contributions to the formulation of Company strategy and tactics
- Contributions to stockholder value
- Management of risk

**Quantitative Factors**

- Financial performance (including earnings per share and internal metrics)
- Financial performance metrics for business units managed by the Named Executive Officer
- Compensation surveys provided by external advisors

For fiscal year 2016 performance share calculation purposes, our Chief Executive Officer, Chief Financial Officer, General Counsel, and President of our solutions business are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance. The Compensation Committee retains negative discretion to reduce any awards under the long-term incentive program to a lesser award or no award to any participant.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. We also lease automobiles for or provide an auto allowance to each of our Named Executive Officers.

We maintain a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows our Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

We also maintain a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board of Directors may select participants from among our Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2369 of 2711

participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*. While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. We believe this compensation mix provides our Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of corporate performance, as well as reducing the risk of recruitment of highly qualified executive talent by our competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. We believe that this compensation mix results in a pay-for-performance orientation that is aligned with our compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to our Named Executive Officers for fiscal 2016, the Compensation Committee performed a review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2370 of 2711

compensation surveys. The companies in the fiscal 2016 peer group were developed based on similarity in size and operations within the industries in which we operate as follows:

| | | | | | |
|---|---|---|---|---|---|
| • Badger Meter, Inc. | • FEI Company | • National Instruments Corporation | • Masimo Corporation | • Calix, Inc. | • Ixia |
| • Cognex Corporation | • FLIR Systems, Inc. | • Novanta Inc. | • NuVasive, Inc. | • Palo Alto Netrworks, Inc. | • Cubic Corporation |
| • Coherent, Inc. | • Itron, Inc. | • Rofin-Sinar Technologies Inc. | • Invacare Corporation | • Harmonic Inc. | • DigitalGlobe, Inc. |
| • Daktronics, Inc. | • MTS Systems Corporation | • VeriFone Systems, Inc. | • ADTRAN, Inc. | • Viavi Solutions Inc. | • Esterline Technologies Corporation |

In connection with executive compensation decisions for fiscal 2016, the Compensation Committee engaged independent compensation consultant firm, Pearl Meyer. The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed our actual performance taken as a whole as well as our performance relative to our peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to our comparative performance.

For fiscal 2016, the Compensation Committee determined that it was appropriate to maintain salary levels constant for all Named Executive Officers. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position, which did not change materially in fiscal 2016. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual incentives and performance-based equity grants comprised a significant portion of total compensation.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving our long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Minimum Equity Ownership and Retention Guidelines*

We believe that our executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. We believe that this multiple constitutes significant amounts for our executive officers and provides a substantial link between the interests of our executive officers and those of our stockholders. During such time that an executive officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2016, each of our Named Executive Officers met or exceeded our minimum equity ownership guidelines, with the exception of Pak Chin who was appointed as an executive officer in May 2015.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2371 of 2711

*Clawback Policy*

We have adopted a clawback policy. The policy provides that if an accounting restatement is required due to our material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements. Each Named Executive Officer's employment agreement also contains a clawback provision.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

We have adopted a policy that prohibits our executive officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of our Common Stock or other equity securities. We have also adopted a policy that prohibits our executive officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Chin. The terms of each of such agreements or arrangements are summarized below under the heading "Employment Agreements." These types of arrangements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on our use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

**Summary Compensation Table**

The following table sets forth the compensation for our principal executive officer, principal financial officer, and our three highest paid executive officers serving as executive officers on June 30, 2016 (the "Named Executive Officers") for the fiscal years ended June 30, 2016, 2015 and 2014:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (4)(5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2016 | 1,000,000 | — | 4,264,200 | — | 500,000 | 897,351 | 227,148 | 6,888,699 |
| Chairman, President and | 2015 | 1,000,000 | 700,000 | 3,970,800 | — | 1,630,467 | 982,853 | 193,801 | 8,477,921 |
| Chief Executive Officer | 2014 | 1,000,000 | 353,000 | 4,192,800 | — | 1,933,535 | 513,000 | 236,426 | 8,228,761 |
| Alan Edrick | 2016 | 402,000 | — | 1,847,820 | — | 201,000 | — | 57,812 | 2,508,632 |
| Executive Vice President and | 2015 | 402,000 | 300,000 | 1,853,040 | — | 430,690 | — | 61,725 | 3,047,455 |
| Chief Financial Officer | 2014 | 402,000 | 160,000 | 2,089,692 | — | 447,349 | — | 61,099 | 3,160,140 |
| Ajay Mehra | 2016 | 352,000 | — | 554,346 | — | 176,000 | — | 82,460 | 1,164,806 |
| Executive Vice President of the | 2015 | 352,000 | 125,000 | 1,522,140 | — | 676,797 | — | 80,590 | 2,756,527 |
| Company and President | 2014 | 402,000 | — | 2,089,692 | — | 702,977 | — | 87,048 | 3,281,717 |
| of OSI Solutions Business | | | | | | | | | |
| Victor S. Sze | 2016 | 350,000 | — | 1,599,075 | — | 175,000 | — | 69,834 | 2,193,909 |
| Executive Vice President, | 2015 | 350,000 | 285,000 | 1,389,780 | — | 338,399 | — | 75,606 | 2,438,785 |
| General Counsel and Secretary | 2014 | 350,000 | 160,000 | 1,487,256 | — | 351,488 | — | 79,830 | 2,428,574 |
| Pak Chin | 2016 | 335,000 | 120,000 | 497,490 | — | — | — | 48,761 | 1,001,251 |
| President of Security Division | | | | | | | | | |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 7 to the Consolidated Financial Statements included in our Form 10-K for the fiscal year ended June 30, 2016 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) 2016 figures represent amounts earned under the annual incentive program. 2015 and 2014 figures represent amounts earned under the Mexico SAT Incentive Program, which was terminated effective at the end of fiscal year 2015.

(3) We initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2015 to June 30, 2016 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2016 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) Our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan, and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. Further, our Named Executive Officers are eligible to participate in the Deferred Compensation Plan. We also lease automobiles or provide an auto allowance to each of our Named Executive Officers.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2373 of 2711

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2016 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,111 | 3,300 | 11,889 | 206,848 | 227,148 |
| Alan Edrick | 44,713 | 2,850 | 6,250 | 3,999 | 57,812 |
| Ajay Mehra | 39,912 | 6,675 | 24,646 | 11,227 | 82,460 |
| Victor S. Sze | 39,599 | 12,000 | 12,031 | 6,204 | 69,834 |
| Pak Chin | 39,727 | — | 7,615 | 1,419 | 48,761 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2015 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,673 | 2,667 | 9,717 | 175,744 | 193,801 |
| Alan Edrick | 46,396 | 2,850 | 7,536 | 4,943 | 61,725 |
| Ajay Mehra | 41,082 | 6,675 | 19,334 | 13,499 | 80,590 |
| Victor S. Sze | 41,070 | 12,000 | 11,547 | 10,989 | 75,606 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2014 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,369 | 1,780 | 11,285 | 217,992 | 236,426 |
| Alan Edrick | 45,490 | 2,850 | 7,798 | 4,961 | 61,099 |
| Ajay Mehra | 45,313 | 6,675 | 21,543 | 13,517 | 87,048 |
| Victor S. Sze | 40,119 | 12,000 | 16,704 | 11,007 | 79,830 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2016 to each of our Named Executive Officers(7):

| | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(4) | | | |
|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Grant Date** | **Threshold ($)(6)** | **Target ($)** | **Maximum ($)** | **Threshold (#)(1)** | **Target (#)(2)** | **Maximum (#)(3)** | **Grant Date Fair Value of Options and Awards (5)($)** |
| Deepak Chopra | 7/6/2015 | — | — | — | — | 60,000 | 150,000 | 4,264,200 |
| Chairman, President and Chief Executive Officer | — | — | $ 1,000,000 | $ 2,000,000 | — | — | — | — |
| Alan Edrick | 7/6/2015 | — | — | — | — | 26,000 | 65,000 | 1,847,820 |
| Executive Vice President and Chief Financial Officer | — | — | $ 402,000 | $ 804,000 | — | — | — | — |
| Ajay Mehra | 7/6/2015 | — | — | — | — | 7,800 | 19,500 | 554,346 |
| Executive Vice President of the Company and President of OSI Solutions Business | — | — | $ 352,000 | $ 704,000 | — | — | — | — |
| Victor S. Sze | 7/6/2015 | — | — | — | — | 22,500 | 56,250 | 1,599,075 |
| Executive Vice President, General Counsel and Secretary | — | — | $ 350,000 | $ 700,000 | — | — | — | — |
| Pak Chin<br>President, Security Division | 7/6/2015 | — | — | — | — | 7,000 | 17,500 | 497,490 |

(1) No amounts are shown in this column as our long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(2) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(3) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(5) The grant date fair value of the restricted stock units was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are shown in this column as our annual incentive program provides for no award under certain circumstances.

(7) We have eliminated from this table the columns titled "All Other Stock Awards: Number of Shares of Stock or Units", "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2375 of 2711

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2016(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date(2) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested (4)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Deepak Chopra | 60,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chief Executive Officer | — | — | — | — | — | — | 168,000 | 9,765,840 |
| Alan Edrick | 48,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 75,400 | 4,383,002 |
| Ajay Mehra | | | | | — | — | — | — |
| Executive Vice President | | | | | — | — | — | — |
| of the Company and | 65,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| President of OSI Solutions | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Business | — | — | — | — | — | — | 20,670 | 1,201,547 |
| Victor S. Sze | 24,000 | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President, | 10,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| General Counsel and | 5,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Secretary | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 58,800 | 3,418,044 |
| Pak Chin President, Security Division | — | — | — | — | — | — | — | — |

(1) We have eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of our Common Stock on the date of grant.

(4) The market value of RSU awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2016, multiplied by the closing price of our Common Stock on June 30, 2016 ($58.13 per share).

(5) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of our Named Executive Officers during fiscal year ended June 30, 2016:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting(2) | Value Realized on Vesting(3)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 150,150 | 11,256,531 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | — | — | 74,512 | 5,586,417 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 44,000 | 3,191,382 | 48,178 | 3,636,859 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | — | — | 50,913 | 3,817,141 |
| Pak Chin<br>President, Security Division | — | — | — | — |

(1) Represents the difference between the fair market price of our Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Includes shares acquired from the vesting of time-based restricted stock awards and vesting of performance-based restricted stock awards based upon performance in fiscal years 2013, 2014 and 2015.

(3) Represents the number of restricted stock awards that vested multiplied by the fair market price of our Common Stock on the date of vesting.

**Pension Benefits**

We maintain the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2377 of 2711

during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2016(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 12 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2016.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
| --- | --- | --- | --- |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 9 | 7,748,436 | — |

(1) We have eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

We adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of our management or highly compensated employees (as designated by the Compensation Committee), including our Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to 80% of their base salary and up to 100% of other types of eligible compensation. The Deferred Compensation Plan also allows us to make discretionary contributions and matching contributions on behalf of eligible participants.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2016 ranged from –9.96% to 5.25%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2378 of 2711

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2016:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 120,300 | 40,200(3) | (242) | — | 1,334,367 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 35,200 | 35,200(3) | (7,657) | — | 1,101,652 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 35,000 | 35,000(3) | (6,469) | — | 971,628 |
| Pak Chin<br>President, Security Division | 33,500 | 33,500(3) | 1,836 | — | 73,898 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2016.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Chin.

*Deepak Chopra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Mr. Chopra's employment agreement was amended, effective as of July 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with us. The agreement also contains a clawback provision whereby Mr. Chopra's incentive or performance based compensation shall be subject to reduction or

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2379 of 2711

repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by us without cause, our non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from us to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by us without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date (including if Mr. Chopra becomes disabled or continues performing services for the Company in a different capacity prior to the Scheduled Retirement Date and such disability or other form of services continues through the Scheduled Retirement Date), he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's and Victor Sze's Employment Agreements*

For purposes of this section, Messrs. Edrick and Sze are each individually referred to as the "Executive." In April 2012, we entered into its current employment agreement with each Executive, which were effective as of January 1, 2012. Each Executive's employment agreement was amended, effective as of July 1, 2015. The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other

party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68. The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick and $350,000 for Mr. Sze. The Executive is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with us. Each Executive's agreement also contains a clawback provision whereby the Executive's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by us without cause, our non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from us to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by us without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by us to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by

Table of Contents Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2381 of 2711

reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Ajay Mehra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of May 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000, which shall increase to $402,000 per year upon achievement of certain pre-established operating income metrics for the OSI Solutions Business. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with us. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment on or prior to December 31, 2016 by us without cause, our non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to 24 months salary at his then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to Mr. Mehra in the five years preceding such termination; (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment after December 31, 2016 by us without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2382 of 2711

calendar months immediately preceding termination plus the cash equivalent of any awards under the Turnkey Solutions Incentive Program earned during the six calendar months immediately preceding a termination occurring in 2017, annualized, or during the 12 calendar months immediately preceding a termination occurring in 2018 or thereafter), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment by us without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by us to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances (i) if the change in control occurs on or before December 31, 2016, Mr. Mehra may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G (the "Alternative Payment"); and (ii) if the change in control occurs after December 31, 2016, Mr. Mehra shall receive the lesser of the Change in Control Payment or the Alternative Payment.

*Pak Chin's Offer Letter*

In April 2015, we entered into an offer letter with Pak Chin. The letter provides for an initial annual base salary of $335,000. Mr. Chin is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us.

In the event of the termination of Mr. Chin's employment other than for "cause" (as defined in the offer letter) or Mr. Chin's voluntary resignation, Mr. Chin shall be entitled to: (i) an amount equal to one year of base salary, (ii) an amount equal to 50% of Mr. Chin's prior year bonus award, and (iii) acceleration of vesting of Mr. Chin's initial performance-based restricted stock unit award on a pro rata basis based on the number of months worked to the extent that our Security division has met its financial targets for the preceding year.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2383 of 2711

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2016, and that employment terminated on such date. The tables also assume that the price of our Common Stock, on which certain calculations in the following tables are made, was the closing price of our Common Stock on June 30, 2016, the last business day of the fiscal year ($58.13).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under our qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,609,500 | 12,685,500 | 10,463,400 | 695,361 | 31,453,761 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 4,609,500 | 12,685,500 | 14,648,760 | 695,361 | 35,639,121 |

(1) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Chin.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick | Good Reason or Without Cause | 804,000 | 760,000 | 4,877,340 | 6,000 | 6,000 | 6,453,340 |
| Executive Vice President and Chief Financial Officer | Good Reason or Without Cause in Connection with a Change in Control(1) | 804,000 | 760,000 | 6,737,500 | 6,000 | 6,000 | 8,313,500 |
| Ajay Mehra | Good Reason or Without Cause | 704,000 | 667,333 | 1,376,007 | 6,000 | 6,000 | 2,759,340 |
| Executive Vice President of the Company and President of OSI Solutions Business | Good Reason or Without Cause in Connection with a Change in Control(1) | 704,000 | 667,333 | 1,899,177 | 6,000 | 6,000 | 3,282,510 |
| Victor S. Sze | Good Reason or Without Cause | 700,000 | 653,333 | 3,765,836 | 6,000 | 6,000 | 5,131,169 |
| Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause in Connection with a Change in Control(1) | 700,000 | 653,333 | 5,300,468 | 6,000 | 6,000 | 6,665,801 |
| Pak Chin<br>President of Security Division | Without Cause | 335,000 | — | — | — | — | 335,000 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company. Mr. Chizever did not serve on the Board of Directors in fiscal year 2016 and therefore received no compensation from the Company in fiscal 2016.

During the fiscal year ended June 30, 2016, each non-employee director that served as a director for the full fiscal year received $65,000 for his year of service, 2,200 RSUs, and $3,000 for each Board of Directors meeting attended (not including telephonic meetings).

Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $15,000.

Each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $15,000.

Each member of the Nominating and Governance Committee received $3,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $7,500 and 500 RSUs.

Each member of the Executive Committee received $25,000 and 2,600 RSUs.

Each member of the Technology Committee received $3,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $7,500 and 500 RSUs.

All RSU awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2016 for each non-employee member of our Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 168,000 | 341,136 | — | 509,136 |
| Meyer Luskin | 174,000 | 341,136 | — | 515,136 |
| William F. Ballhaus | 149,000 | 227,424 | — | 376,424 |
| James B. Hawkins | 52,917 | 88,073 | — | 140,990 |
| David T. Feinberg(3) | 38,500 | — | — | 38,500 |

(1) We have eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 7 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2016 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2016, 4,800 RSUs were granted to Mr. Good and Mr. Luskin; and 3,200 RSUs were granted to Dr. Ballhaus, all with a fair value of $71.07; and 980 RSUs were granted to Mr. Hawkins with a fair value of $89.87. As of June 30, 2016, Mr. Good had 12,175 unvested stock awards outstanding, Mr. Luskin had 12,175 unvested stock awards outstanding, Dr. Ballhaus had 7,325 unvested stock awards outstanding and Mr. Hawkins had 980 unvested stock awards outstanding.

(3) Dr. Feinberg's term as a director ended on December 8, 2015.

*Director Share Ownership Requirements*

We believe that our directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that our directors own at minimum equity of the Company valued at five times their annual retainers. We believe that this multiple constitutes significant amounts for our directors and provides a substantial link between the interests of our directors and those of our stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2016, each of our directors met or exceeded our minimum equity ownership guidelines, with the exception of Mr. Hawkins who was elected as a director in December 2015.

**Certain Relationships and Related Transactions**

In 1994, we, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). We own a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. We sell security and inspection kits to ECIL at a price no less favorable to us than the price we charge unaffiliated third parties for such products. To date, our portion of the earnings of ECIL Rapiscan has been immaterial to our financial results and results of operations.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2386 of 2711

Mohinder Chopra, who is the brother of Deepak Chopra, our Chief Executive Officer, is our Senior Vice President/General Manager India. His total compensation for fiscal year 2016, which is comprised of base salary and bonus, was valued at approximately $260,000.

Gerald Chizever, a member of our Board of Directors, is a partner at Loeb & Loeb LLP. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining director independence. Our Board of Directors carefully reviewed the nature of our engagement of Loeb & Loeb and the services rendered, including the expertise and relevant experience of the firm, the firm's and specific partners' knowledge of our Company and our business and past legal engagements, and the fees paid in such engagements, and determined that Mr. Chizever is independent under the standards of The NASDAQ Stock Market.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of our voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to us as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 12, 2016, unless otherwise indicated, by each person known by us to own beneficially more than 5% of the outstanding shares of our outstanding Common Stock. As of October 12, 2016, 18,926,290 shares of our Common Stock were issued and outstanding.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,157,235 | 11.4% |
| Janus Capital Management LLC(3) | 1,506,769 | 8.0% |
| The Vanguard Group, Inc.(4) | 1,401,231 | 7.4% |
| EARNEST Partners, LLC(5) | 1,130,973 | 6.0% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 12, 2016, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) Represents the number of shares of Common Stock beneficially owned as of December 31, 2015, as reported on Schedule 13G/A filed on January 8, 2016 with the SEC by BlackRock, Inc. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) Represents the number of shares of Common Stock beneficially owned as of December 31, 2015, as reported on Schedule 13G/A filed on February 16, 2016 with the SEC. The address of Janus Capital Management LLC is 151 Detroit Street, Denver, CO 80206.

(4) Represents the number of shares of Common Stock beneficially owned as of December 31, 2015, as reported on Schedule 13G/A filed on February 11, 2016 with the SEC. Such report indicates sole voting power over 29,056 shares, shared voting power over 1,400 shares, sole dispositive power over 1,371,875 shares, and shared dispositive power over 29,356 shares. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(5) Represents the number of shares of Common Stock beneficially owned as of December 31, 2015, as reported on Schedule 13G filed on February 11, 2016 with the SEC. Such report indicates sole voting power over 260,118 shares, shared voting power over 139,465 shares, and sole dispositive power over 1,130,973 shares. The address of EARNEST Partners, LLC is 1180 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2388 of 2711

The following table sets forth the amount of shares of the Company beneficially owned as of October 12, 2016 by each of our directors, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 488,244 | 2.6% |
| Alan Edrick(4) | 340,226 | 1.8% |
| Ajay Mehra(5) | 202,828 | 1.1% |
| Victor S. Sze(6) | 270,418 | 1.4% |
| Pak Chin(7) | — | — |
| Meyer Luskin(8) | 56,265 | * |
| Steven C. Good(9) | 15,925 | * |
| William F. Ballhaus(10) | 13,050 | * |
| James B. Hawkins(11) | — | — |
| Gerald Chizever(12) | 5,000 | * |
| All directors and executive officers as a group (14 persons) | 1,471,180 | 7.5% |

* Represents less than 1.0% of the outstanding shares of our Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 12, 2016, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. No shares are pledged as security.

(3) Mr. Chopra is our Chairman of the Board of Directors, Chief Executive Officer and President. Includes 40,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 17,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. In addition, includes 301,244 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 10,000 shares held in the Nandini SLAT Trust. Includes 120,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(4) Mr. Edrick is our Executive Vice President and Chief Financial Officer. Includes 297,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(5) Mr. Mehra is our Executive Vice President and President of OSI Solutions Business and a Director. Includes 125,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(6) Mr. Sze is our Executive Vice President, General Counsel and Secretary. Includes 191,000 shares issuable pursuant to options which were granted between September 17, 2007 and September 9, 2011.

(7) Mr. Chin is the President of our Security division.

(8) Mr. Luskin is a Director. Includes 56,265 shares held by The Meyer and Doreen Luskin Family Trust.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2389 of 2711

(9) Mr. Good is a Director. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan.

(10) Dr. Ballhaus is a Director.

(11) Mr. Hawkins is a Director.

(12) Mr. Chizever is a Director. Includes 5,000 shares held by The G & C Chizever Family Trust.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish us with copies of all such reports that they file. None of our directors or executive officers owns more than 10% of the our securities. Based solely upon our review of such forms furnished to us during the fiscal year ended June 30, 2016, and written representations from certain reporting persons, we believe that our executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2390 of 2711

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the our equity compensation plans as of June 30, 2016.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders(1) | 934,112 | 28.67 | 2,000,226(4) (2)(3) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 934,112 | 28.67 | 2,000,226 |

(1) Includes shares of our Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under the 2012 Incentive Award Plan, which was approved by our stockholders on December 12, 2012. Upon stockholder approval of the 2012 Incentive Award Plan, we froze the 2006 Equity Participation Plan, and no further awards can be granted thereunder.

(3) Shares awarded as restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one share granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason (up to a maximum of 2,220,000 shares) also become available for future issuance under the 2012 Incentive Award Plan.

Table of Contents

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**Audit Fees**

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of our annual financial statements for the years ended June 30, 2015 and 2016 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2015 | FY 2016 |
|---|---|---|
| Audit Fees | $ 892 | $ 1,004 |
| Audit-Related Fees | $ 16 | $ 16 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 908 | $ 1,020 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of our consolidated financial statements and the review of our interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements other than audit fees. The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international). The term "All Other Fees" means fees for products and services other than for the services described above.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2392 of 2711

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2016, the Audit Committee was composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin and William F. Ballhaus. Mr. Hawkins was appointed to the Audit Committee in September 2016. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. The Board of Directors has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2016.

At each of its meetings, the Audit Committee met with the senior members of the Company's financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and the Company's Chief Financial Officer. During the year, the Audit Committee had private sessions with the Company's independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board of Directors the engagement of Moss Adams as the Company's independent public accountants. The Audit Committee reviewed with the Company's financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of the Company's internal control, and the quality of the Company's financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that the audited consolidated financial statements of the Company have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from the Company and its management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to the Company during the fiscal year ended June 30, 2016 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of the Company's internal control and the audit of management's report on the effectiveness of the Company's internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews the Company's SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2393 of 2711

Company's management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of the Company's annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus
James Hawkins

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2394 of 2711

## CODE OF ETHICS AND CONDUCT

We have adopted a Code of Ethics and Conduct, which applies to all of our directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to our Current Report on Form 8-K filed with the SEC on May 23, 2016. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

We have adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of our Board of Directors are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of our directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing our Secretary at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of our Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of our Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders at that address. We undertake to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to our Secretary at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in our proxy statement and form of proxy used in connection with our next annual meeting of stockholders, the proposal must be delivered in writing to our Secretary and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to us would be June 23, 2017, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

Our Bylaws provide that if a stockholder, rather than including a proposal in our proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to us no more than 120 days and no less than 90 days prior to December 6, 2017, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 6, 2017, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in our Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by us under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by us under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by us under those statutes, except to the extent we specifically incorporate such report by reference therein. In addition, information on our website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

We do not know of any other business to be presented at the Annual Meeting and do not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 21, 2016

**Appendix A**

**FIRST AMENDMENT TO**

**AMENDED AND RESTATED OSI SYSTEMS, INC.**

**2008 EMPLOYEE STOCK PURCHASE PLAN**

The following constitutes an amendment (the "Amendment") to the Amended and Restated 2008 Employee Stock Purchase Plan (the "Plan") of OSI Systems, Inc., a Delaware corporation ("OSI Systems, Inc."). Except as expressly set forth herein, this Amendment is not intended to otherwise modify or change the Plan, and all other terms and conditions of the Plan shall remain in full force and effect. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

The Plan is hereby amended as follows:

Section 19 of the Plan is amended and restated to read in its entirety as follows:

"*Amendment or Termination*. The Board of Directors shall have the right to amend, modify or terminate the Plan at any time without notice, subject to such stockholder approval as the Board of Directors determines to be necessary or advisable to comply with applicable law or rule, provided that no Participant's existing rights are adversely affected thereby."

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| For All | Withhold All | For All Except |
|---|---|---|
| ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

______________________________

**1.** Election of Directors

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 William F. Ballhaus
06 James B. Hawkins 07 Gerald Chizever

**The Board of Directors recommends you vote FOR proposals 2, 3 and 4.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2017. | ☐ | ☐ | ☐ |
| 3 | Approval of the First Amendment to the Amended and Restated OSI Systems, Inc. 2006 Employee Stock Purchase Plan. | ☐ | ☐ | ☐ |
| 4 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2016. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date Signature (Joint Owners) Date

0000301472_1 R1.0.1.29

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap are available at www.proxyvote.com

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 6, 2016 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 6, 2016 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, 3, and 4 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000301472_2 R1.0.1.29

**Continued and to be signed on reverse side**

# Exhibit 40

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 6, 2016**

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 6, 2016. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 15,999,126 | 597,972 | 1,219,462 |
| Ajay Mehra | 15,965,941 | 631,157 | 1,219,462 |
| Steven C. Good | 15,548,733 | 1,048,365 | 1,219,462 |
| Meyer Luskin | 15,149,689 | 1,447,409 | 1,219,462 |
| William F. Ballhaus | 15,899,049 | 698,049 | 1,219,462 |
| James B. Hawkins | 16,212,632 | 384,466 | 1,219,462 |
| Gerald Chizever | 15,910,218 | 686,880 | 1,219,462 |

The seven nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2017*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 17,236,190 | 529,646 | 50,724 | 0 |

The proposal was approved.

*3. Approval of the First Amendment to the Amended and Restated OSI Systems, Inc. 2008 Employee Stock Purchase Plan*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 16,571,542 | 17,037 | 8,519 | 1,219,462 |

The proposal was approved.

*4. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2016*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 15,991,544 | 376,083 | 229,471 | 1,219,462 |

The proposal was approved.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 6, 2016

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**General Counsel, and Secretary**

# Exhibit 41

DEF 14A 1 a2233565zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2405 of 2711

**12525 Chadron Avenue
Hawthorne, California 90250**

October 23, 2017

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., local time, on December 11, 2017, at the Company's offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 17, 2017 are entitled to vote at the Annual Meeting.

Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2017, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2406 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., local time, on Monday, December 11, 2017

**Location:** The Company's offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect seven directors to hold office for a one-year term and until their respective successors are elected and qualified;
2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2018;
3. To approve the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan;
4. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2017, as described in the accompanying Proxy Statement;
5. To conduct an advisory vote on the determination of the frequency of future advisory votes on the Company's executive compensation; and
6. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 17, 2017 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 11, 2017:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2017 are available at *http://www.proxyvote.com*.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 11 |
| Proposal No. 3 Approval of Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan | 12 |
| Proposal No. 4 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2017 | 20 |
| Proposal No. 5 Advisory Vote on the Determination of the Frequency of the Advisory Vote on the Company's Executive Compensation | 23 |
| Compensation of Executive Officers and Directors | 24 |
| Security Ownership of Certain Beneficial Owners and Management | 50 |
| Equity Compensation Plan Information | 53 |
| Independent Registered Public Accounting Firm | 54 |
| Report of Audit Committee | 55 |
| Code of Ethics and Conduct | 57 |
| Annual Meeting Attendance | 57 |
| Stockholder Communications | 57 |
| Availability of Annual Report on Form 10-K | 57 |
| Stockholder Proposals | 58 |
| Incorporation by Reference | 58 |
| Other Business | 58 |
| Appendix A | A-1 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2408 of 2711

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

## PROXY STATEMENT

### GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") for use at our Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., local time on December 11, 2017, at our offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

We are making our proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and our most recent Annual Report on Form 10-K ("Proxy Materials"), available to our stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. We anticipate that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 27, 2017.

Stockholders of record as of the close of business on October 17, 2017 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 17, 2017, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, we had issued and outstanding 18,967,963 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted with respect to any proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Stockholders and with respect to other matters which may be properly brought before the

Annual Meeting. At the time of printing this Proxy Statement, our management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. In accordance with our Bylaws, directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One. Votes marked "withhold" will not affect the outcome of the election of directors.

*Proposal Two*. In accordance with our Bylaws, to be approved, the ratification of Moss Adams LLP as our independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. In accordance with our Bylaws, to be approved, the proposal regarding our Amended and Restated 2012 Incentive Award Plan must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three.

*Proposal Four.* In accordance with our Bylaws, to be approved, the proposal regarding our executive compensation for the fiscal year ended June 30, 2017 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Four is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Four or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Four. The vote on Proposal Four is advisory and therefore not binding on the Company, the Compensation and Benefits Committee (the "Compensation Committee") or the Board. Although non-binding, the Board values the opinions that our stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

*Proposal Five*. The frequency of the advisory vote on executive compensation receiving the greatest number of votes will be considered the frequency recommended by our stockholders. Proposal Five is

considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Five or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Five. The vote on Proposal Five is advisory and therefore not binding on the Company, the Compensation Committee or the Board. Although non-binding, the Board values the opinions that our stockholders express in their votes and will take into account the outcome of the vote when considering how frequently we should conduct a vote on our executive compensation going forward. However, because this vote is advisory and not binding on the Company or the Board, the Board may decide that it is in our and our stockholders' best interests to hold a vote on our executive compensation more or less frequently than the option that receives the most votes from the stockholders.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. We will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 11, 2017:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2017 are available at *http://www.proxyvote.com*.

**ELECTION OF DIRECTORS**
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

Our Board consists of seven members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The seven candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, James B. Hawkins and Gerald Chizever. All of our director nominees are currently directors of the Company and were previously elected to serve on the Board by our stockholders.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until our next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although we know of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board may designate.

If a quorum is present and voting, the seven nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The current directors and nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 66 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 55 | Director, Executive Vice President and President of OSI Solutions Business | 1996 |
| Steven C. Good(1)(2)(4) | 75 | Director | 1987 |
| Meyer Luskin(1)(2)(4) | 92 | Director | 1990 |
| William F. Ballhaus(1)(2)(3)(4)(5) | 72 | Director | 2010 |
| James B. Hawkins(1)(3)(5) | 61 | Director | 2015 |
| Gerald Chizever(4)(5) | 73 | Director | 2016 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Risk Management Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is our founder and has served as President, Chief Executive Officer and has been a member of our Board since our inception in May 1987. He has served as our Chairman of the Board since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of our major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, we acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held

various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing our Company.

***Ajay Mehra*** has been a member of our Board since March 1996. Mr. Mehra is Executive Vice President of the Company and President of OSI Solutions Business. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named our Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and management experience within our Company.

***Steven C. Good*** has been a member of our Board since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good currently serves as a director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good also currently serves as a director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has been a member of our Board since February 1990. Since 1958, Mr. Luskin has served as a director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman. Mr. Luskin was formerly Chairman of the Board of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital). Mr. Luskin is also a director on the Advisory Board of the UCLA Luskin School of Public Affairs, a director of the UCLA Foundation, and a director of the Alliance for College-Ready Public Schools. Mr. Luskin also served as a director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***William F. Ballhaus, Jr.*** has been a member of our Board since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2413 of 2711

critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus serves on the Board of Directors of Draper Laboratory and is Chairman of the Board of Trustees of the University Space Research Association. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** has been a member of our Board since December 2015. Mr. Hawkins is the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Mr. Hawkins has held this position since 2004. In addition, he currently serves as a director of El Dorado Resorts Inc. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a director of Invivo Corporation, a provider of MRI-safe patient monitoring. Mr. Hawkins has extensive risk management experience gained through the various executive and board positions that he has held. He earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins was selected to serve as a director because of his direct management experience in the medical device area.

***Gerald Chizever*** has been a member of our Board since October 2016. Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever's practice includes mergers and acquisitions, corporate finance, public and private securities offerings, general corporate representation and strategic alliances. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in all matters, including business transactions, corporate governance and compliance with governmental regulations. He holds a B.B.A. degree in Accounting and a Juris Doctorate from George Washington University. Mr. Chizever was selected to serve as a director because of his corporate governance and compliance experience, including his experience in highly-regulated industries.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to us between any of the directors or nominees for director and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among our directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board Role in Risk Oversight**

Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and other risks. Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment and management of our risks. Our Board regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk. For example, the Audit Committee

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2414 of 2711

oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting. The Risk Management Committee, which was formed in August 2017, oversees management of key enterprise risks, including strategic, operational, legal, regulatory, and compliance. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board. The Compensation Committee oversees risks related to our executive compensation policies and practices. The Technology Committee oversees risks related to technology matters. During fiscal 2017, the Board also had an Executive Committee that oversaw risks related to strategic transactions.

**Board Leadership Structure and Lead Independent Director**

Our Chairman of the Board is our Chief Executive Officer. We believe that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board's role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges we face and is thus well positioned to develop agendas and highlight issues that ensure that the Board's time and attention are focused on the most critical matters. In addition, our Board has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances our ability to communicate our message and strategy clearly and consistently to our stockholders, employees, and other companies with which we do business. Although we believe that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, we will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve our best interests and the best interests of our stockholders.

The combined Chairman of the Board and Chief Executive Officer position is balanced by the number of independent directors serving on our Board, our independent committees and our lead independent director. Mr. Good is currently our lead independent director and brings to this role considerable skills and experience as described above in "Election of Directors." The role of lead independent director is designed to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

**Board Meetings, Independence and Committees of the Board**

There were eight meetings of the Board and the Board acted pursuant to unanimous written consent on four additional occasions during the fiscal year ended June 30, 2017. During fiscal 2017, the Board had a standing Audit Committee, Compensation Committee, Nominating and Governance Committee, Executive Committee and Technology Committee. In August 2017, the Board dissolved the Executive Committee and formed a Risk Management Committee. The members of each committee are appointed by the majority vote of the Board. All persons serving as a director during the fiscal year ended June 30, 2017 attended more than 75% of the aggregate number of meetings held by the Board and all committees on which such director served.

The Board has determined that each of the nominees for director, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board has determined that each of the members of each of the committees of the Board is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and the Listing Standards, as applicable and currently in effect.

*Audit Committee*

We have a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of our independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews our financial statements and the adequacy of our internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to our Company.

The Audit Committee currently consists of four independent directors – Messrs. Good, Luskin and Hawkins and Dr. Ballhaus. The Board has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2017. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Risk Management Committee*

The Risk Management Committee was formed in August 2017 and is responsible for overseeing and monitoring our key enterprise risks, including strategic, operational, legal, regulatory, compliance, security and reputational risks. The Risk Management Committee has responsibility for reviewing our compliance program and our major legal compliance risk exposures, monitoring our code of ethics, reviewing our risk management reviews and assessments, and regularly assessing the continuing appropriateness of a succession plan for our Chief Executive Officer and other executive officers. The Risk Management Committee currently consists of four independent directors – Messrs. Chizever, Good, and Luskin and Dr. Ballhaus.

The Risk Management Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation and benefits for our executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board in the administration of our equity compensation and benefits plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Good and Dr. Ballhaus. There were nine meetings of the Compensation Committee during the fiscal year ended June 30, 2017. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2416 of 2711

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board. During fiscal 2017, the Nominating and Governance Committee consisted of four independent directors – Dr. Ballhaus and Messrs. Good, Luskin and Hawkins. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2017. The Nominating and Governance Committee currently consists of two independent directors – Dr. Ballhaus and Mr. Hawkins.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board members. The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Executive Committee*

During fiscal 2017, the Executive Committee convened for the purpose of advising and consulting with our management regarding potential acquisitions, mergers and strategic alliances. The Executive Committee consisted of two independent directors – Messrs. Good and Luskin. There were nine meetings of the Executive Committee during the fiscal year ended June 30, 2017. The Executive Committee was dissolved in August 2017.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board regarding all technology-based matters. The Technology Committee currently consists of three independent directors – Dr. Ballhaus and Messrs. Hawkins and Chizever. There were two meetings of the Technology Committee during the fiscal year ended June 30, 2017.

The Technology Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;

- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and our Company, or any customer, supplier, competitor, or affiliate of ours, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of our Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board. We may also require any proposed nominee to furnish such other information as we or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to our Board to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify us of their intent to do so on or before the date on which nominations must be received by us in accordance with our Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Good and Dr. Ballhaus. None of our executive officers has served during the fiscal year ended June 30, 2017 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on our Board or the Compensation Committee. During the fiscal year ended June 30, 2017, no member of our Compensation Committee had any relationship or transaction with our Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr., James B. Hawkins and Gerald Chizever as our directors. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2418 of 2711

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee has selected Moss Adams LLP ("Moss Adams") as our independent registered public accountants for the year ending June 30, 2018 and has further directed that management submit the selection of independent registered public accountants for ratification by our stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that our stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in our and our stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board recommends a vote "FOR" the ratification of Moss Adams as our independent registered public accountants for the fiscal year ending June 30, 2018. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2419 of 2711

**APPROVAL OF AMENDED AND RESTATED**
**OSI SYSTEMS, INC. 2012 INCENTIVE AWARD PLAN**
***(Proposal No. 3 of the Proxy Card)***

**Introduction**

We are interested in maintaining strong corporate governance practices, including with respect to equity awards granted to our executive officers. For this reason, our Board adopted on October 13, 2017 (the "Effective Date"), subject to stockholder approval, the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "Amended Plan"). Awards under the Amended Plan provide employees, consultants and directors an opportunity to acquire or increase their ownership stake in our Company, and our Board believes this aligns their interests with those of our stockholders, creating strong incentives to achieve goals that result in consistent stockholder returns. We believe that adopting the Amended Plan is in our best interest in light of our growth and the continuing need to provide equity-based incentives to attract and retain the most qualified personnel. A copy of the Amended Plan is included as Appendix A to this Proxy Statement.

The Amended Plan amends and restates in its entirety our 2012 Incentive Award Plan (the "Existing Plan"). In particular, the Amended Plan makes the following material changes to the Existing Plan:

- Increases the maximum number of shares of Common Stock which may be issued under the Existing Plan by 1,600,000 shares to a total of 5,450,000 shares.

- Prohibits the payment of dividends or dividend equivalents with respect to awards granted under the Amended Plan until the applicable vesting conditions applicable to the underlying award are satisfied and the award vests.

- Permits net share tax withholding with respect to awards granted pursuant to the Amended Plan up to the maximum statutory withholding rates in the applicable jurisdiction.

- Requires participants in the Amended Plan to consent to the collection, use and transfer of personal data by us and our subsidiaries for the purpose of implementing, administering and managing participation in the Amended Plan.

- Limits the sum of the grant date fair value of equity-based awards and the amount of any cash-based awards granted to our non-employee directors during any calendar year to $750,000.

In determining the number of shares of Common Stock to request for approval under the Amended Plan, our management team worked with the Compensation Committee to evaluate a number of factors, including our recent share usage, anticipated share usage, and criteria expected to be utilized by institutional proxy advisory firms in evaluating our proposal for the Amended Plan.

If the Amended Plan is approved, we intend to utilize the shares of Common Stock authorized under the Amended Plan to continue our practice of incentivizing our employees, consultants and directors through the use of equity incentive grants. We anticipate that the shares of Common Stock requested in connection with the approval of the Amended Plan, combined with the shares of Common Stock currently available for future awards under the Existing Plan, will last for approximately three to four years, based on our historic grant rates and the approximate current stock price. However, these shares could last for a shorter period of time if actual practice does not match historic rates and/or our stock price changes materially.

We believe that grants of equity incentive awards are necessary to enable us to continue to attract and retain top talent. We also recognize that equity compensation awards dilute shareholder equity. Accordingly, we have balanced these concerns by carefully managing our equity incentive compensation usage in a manner intended to be competitive and consistent with market practice while also

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2420 of 2711

demonstrating a commitment to sound equity compensation practices. If the Amended Plan is not approved, we believe our recruitment and retention capabilities will be adversely affected.

As of June 30, 2017, awards covering 1,392,358 shares of our Common Stock were outstanding under the Existing Plan, and 1,312,813 shares remained available for future issuance or the grant of awards under the Existing Plan. The weighted average price of options outstanding as of June 30, 2017 was $30.00 and the weighted average remaining term was 3.3 years.

As of October 17, 2017, outstanding grants under our existing equity compensation plans, including shares remaining available for grant thereunder, are provided in the table below:

| | |
|---|---|
| Stock Options Outstanding | 706,312 |
| Stock Awards Outstanding* | 534,575 |
| Common Stock Outstanding | 18,967,963 |
| Weighted Average Exercise Price of Stock Options Outstanding | $31.34 |
| Weighted-Average Remaining Duration (Years) of Stock Options Outstanding | 3.3 years |
| Total Shares Available for Grant under Existing Plan* | 724,772 |

* Figures have decreased since June 30, 2017 primarily due to the vesting of certain awards as well as certain grants of fully vested shares pursuant to our Six-Year Performance Program.

In addition to the above, we are asking stockholders to approve the Amended Plan to satisfy the stockholder approval requirements of Section 162(m) of the Code ("Section 162(m)"), and to ensure we have the ability to grant "incentive stock options" under the Amended Plan.

In general, Section 162(m) places a limit on the deductibility for federal income tax purposes of the compensation paid to our Chief Executive Officer and our next three most highly compensated executive officers (other than our Chief Financial Officer). Under Section 162(m), compensation paid to such persons in excess of $1 million in a taxable year generally is not deductible. However, compensation that qualifies as "performance-based" under Section 162(m) does not count against the $1 million deduction limitation. One of the requirements of "performance-based" compensation for purposes of Section 162(m) is that the material terms of the plan under which compensation may be paid be disclosed to and approved by our stockholders. For purposes of Section 162(m), the material terms include (a) the employees eligible to receive compensation, (b) a description of the business criteria on which the performance goals may be based and (c) the maximum amount of compensation that can be paid to an employee under the performance goals. Each of these aspects of the Amended Plan is discussed below, and stockholder approval of this Proposal 3 will be deemed to constitute approval of the material terms of the Amended Plan for purposes of the stockholder approval requirements of Section 162(m).

Stockholder approval of the material terms of the performance goals of the Amended Plan is only one of several requirements under Section 162(m) that must be satisfied for amounts realized under the Amended Plan to qualify for the "performance-based" compensation exemption under Section 162(m), and submission of the Amended Plan for stockholder approval of the material terms of its performance goals should not be viewed as a guarantee that we will be able to deduct all compensation under the Amended Plan. Nothing in this proposal precludes us or the Compensation Committee from making any payment or granting awards that are not intended to qualify (or otherwise do not qualify) for tax deductibility under Section 162(m).

**Stockholder Approval**

If stockholders do not approve the proposal in this Proposal 3, the Existing Plan (not as amended and restated) will, however, remain in effect with respect to eligible individuals, including covered employees, and we may continue to grant awards under the Existing Plan (and not the Amended Plan) to such

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2421 of 2711

individuals, subject to the terms and conditions of the Existing Plan. In addition, all previously granted awards will continue to be subject to the terms of the Existing Plan.

**Material Terms of the Amended Plan**

*Eligibility and Administration*. Our employees, consultants and directors are eligible to receive awards under the Amended Plan. As of September 30, 2017, there were approximately 5,981 employees, including five Named Executive Officers, and five non-employee directors eligible to receive awards under the Amended Plan. The Amended Plan is administered by the Board with respect to awards to non-employee directors and by the Compensation Committee with respect to other participants, each of which may delegate its duties and responsibilities to committees of our directors and/or officers (all such bodies and delegates referred to collectively as the plan administrator), subject to certain limitations that may be imposed under Section 162(m), Section 16 of the Exchange Act and/or stock exchange rules, as applicable. The plan administrator has the authority to make all determinations and interpretations under, prescribe all forms for use with, and adopt rules for the administration of, the Amended Plan, subject to its express terms and conditions. The plan administrator also sets the terms and conditions of all awards under the Amended Plan, including any vesting and vesting acceleration conditions.

*Limitation on Awards and Shares Available*. The aggregate number of shares of our Common Stock that are available for issuance under awards granted pursuant to the Existing Plan equals the sum of (i) 3,850,000 shares minus (ii) any shares of our Common Stock delivered in settlement of awards granted pursuant to our 2006 Equity Participation Plan (the "2006 Plan") during the period beginning on September 25, 2012 and ending immediately prior to December 12, 2012, plus (iii) any shares of our Common Stock subject to awards outstanding under the 2006 Plan that terminate, expire or lapse for any reason on or after December 12, 2012 (up to a maximum of 2,220,000 shares). If this Proposal 3 is approved by our stockholders, then the aggregate number of shares of our Common Stock that will be available for issuance under awards granted pursuant to the Amended Plan will equal the sum of (i) 5,450,000 shares, plus (ii) any shares of our Common Stock subject to awards outstanding under the 2006 Plan that terminate, expire or lapse for any reason on or after stockholder approval of the Amended Plan. Any shares delivered in settlement of awards of options, stock appreciation rights ("SARs") or similar awards which do not deliver the full share value at grant of the underlying shares will be counted against this limit as one share for every one share granted. Any shares that are delivered in settlement of restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award (other than options, SARs or similar awards for which the recipient must pay the grant-date intrinsic value) will be counted against this limit as 1.87 shares for every one share granted. Shares subject to awards under the Amended Plan that are forfeited, expire or are settled for cash may be used again for new grants under the Amended Plan, and will be added back to the Amended Plan's share limit in the same number of shares as were debited from the share limit in respect of the grant of such awards. (1) Shares subject to a SAR or stock option that are not issued in connection with the stock settlement of the SAR or stock option on its exercise, (2) shares purchased on the open market with the cash proceeds from the exercise of options, and (3) shares tendered or withheld to satisfy exercise price or tax withholding obligations associated with an award, in any case, may not be used again for new grants of awards. Shares granted under the Amended Plan may be treasury shares, authorized but unissued shares, or shares purchased in the open market.

Subject to limited exception, awards granted under the Amended Plan upon the assumption of, or in substitution for, awards authorized or outstanding under a qualifying equity plan maintained by an entity with which we enter into a merger or similar corporate transaction will not reduce the shares available for grant under the Amended Plan. The maximum number of shares of our Common Stock that may be subject to one or more awards granted to any one participant pursuant to the Amended Plan during any calendar year will be 250,000 and the maximum amount that may be paid in cash pursuant to the Amended Plan to any one participant during any calendar year period will be $15,000,000. In addition, the sum of the

grant date fair value of equity-based awards and the amount of any cash-based awards that may be granted to any non-employee director pursuant to the Amended Plan during any calendar year will not exceed $750,000.

*Awards*. The Amended Plan provides for the grant of stock options, including incentive stock options and nonqualified stock options, restricted stock, dividend equivalents, restricted stock units ("RSUs"), other incentive awards and SARs and cash awards. Certain awards under the Amended Plan may constitute or provide for a deferral of compensation, subject to Section 409A of the Internal Revenue Code, which may impose additional requirements on the terms and conditions of such awards. All awards under the Amended Plan are or will be set forth in award agreements, which detail the terms and conditions of the awards, including any applicable vesting and payment terms and post-termination exercise limitations. Awards other than cash awards are generally settled in shares of our Common Stock, but the plan administrator may provide for cash settlement of any award. A brief description of each award type follows.

- *Stock Options*. Stock options provide for the purchase of shares of our Common Stock in the future at an exercise price set on the grant date. Incentive stock options, by contrast to nonqualified stock options, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Internal Revenue Code are satisfied. The exercise price of a stock option may not be less than 100% of the fair market value of the underlying share on the date of grant (or 110% in the case of incentive stock options granted to certain significant stockholders), except with respect to certain substitute options granted in connection with a corporate transaction. The term of a stock option may not be longer than ten years (or five years in the case of incentive stock options granted to certain significant stockholders). Vesting conditions determined by the plan administrator may apply to stock options and may include continued service, performance and/or other conditions.

- *Stock Appreciation Rights*. SARs entitle their holder, upon exercise, to receive from us an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The exercise price of a SAR may not be less than 100% of the fair market value of the underlying share on the date of grant (except with respect to certain substitute SARs granted in connection with a corporate transaction) and the term of a SAR may not be longer than ten years. Vesting conditions determined by the plan administrator may apply to SARs and may include continued service, performance and/or other conditions.

- *Restricted Stock and Restricted Stock Units*. Restricted stock is an award of nontransferable shares of our Common Stock that remain forfeitable unless and until specified conditions are met. RSUs are contractual promises to deliver shares of our Common Stock in the future, which may also remain forfeitable unless and until specified conditions are met. Delivery of the shares underlying RSUs may be deferred under the terms of the award or at the election of the participant if the plan administrator permits such a deferral. Vesting conditions determined by the plan administrator may apply to restricted stock and RSUs and may include continued service, performance and/or other conditions. Under the Amended Plan, dividends payable with respect to restricted stock prior to the vesting of such restricted stock instead will be paid out to the participant only to the extent that the applicable vesting conditions of the underlying award are subsequently satisfied and the restricted stock vests. Dividends payable with respect to the portion of an award that fails to vest will be forfeited.

- *Other Incentive Awards and Cash Awards*. Other incentive awards are awards other than those enumerated in this summary that are denominated in, linked to or derived from shares of our Common Stock or value metrics related to our shares, and may remain forfeitable unless and until specified conditions are met. Cash awards are cash incentive bonuses subject to performance goals.

- *Dividend Equivalents*. Dividend equivalents represent the right to receive the equivalent value of dividends paid on shares of our Common Stock and may be granted alone or in tandem with awards. Dividend equivalents are credited as of dividend payment dates during the period between the date an award is granted and the date such award vests, is exercised, is distributed or expires, as determined by the plan administrator. Dividend equivalents may not be granted on options or SARS. Under the Amended Plan, dividend equivalents payable with respect to an award prior to the vesting of such award instead will be paid out to the participant only to the extent that the applicable vesting conditions of the underlying award are subsequently satisfied and the award vests. Dividend equivalents payable with respect to the portion of an award that fails to vest will be forfeited.

*Performance Awards*. Performance awards include any of the foregoing awards that are granted subject to vesting and/or payment based on the attainment of specified performance goals. The plan administrator will determine whether performance awards are intended to qualify as "performance-based" compensation ("QPBC") within the meaning of Section 162(m), in which case the applicable performance criteria will be selected from the list below in accordance with the requirements of Section 162(m).

In order to constitute QPBC under Section 162(m), in addition to certain other requirements, the relevant amounts must be payable only upon the attainment of pre-established, objective performance goals set by the Compensation Committee and linked to stockholder-approved performance criteria. For purposes of the Amended Plan, one or more of the following performance criteria will be used in setting performance goals applicable to QPBC, and may be used in setting performance goals applicable to other performance awards: (i) net earnings (either before or after one or more of the following: (a) interest, (b) taxes, (c) depreciation, (d) amortization and (e) non-cash equity-based compensation); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for our Company or any of our operating units or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices. The Amended Plan also permits the plan administrator to provide for objectively determinable adjustments to the applicable performance criteria in setting performance goals for QPBC awards.

*Certain Transactions*. The plan administrator has broad discretion to equitably adjust the provisions of the Amended Plan, as well as the terms and conditions of existing and future awards, to prevent the dilution or enlargement of intended benefits and facilitate necessary or desirable changes in the event of certain transactions and events affecting our Common Stock, such as stock dividends, stock splits, mergers, acquisitions, consolidations and other corporate transactions. In addition, in the event of certain non-reciprocal transactions with our stockholders known as "equity restructurings," the plan administrator will make equitable adjustments to the Amended Plan and outstanding awards. In the event of a change in control of our Company (as defined in the Amended Plan), the surviving entity must assume outstanding awards or substitute economically equivalent awards for such outstanding awards; however, if the surviving entity declines to assume or substitute for some or all outstanding awards, then all such awards will vest in full and be deemed exercised (as applicable) upon the transaction. Individual award agreements may provide for additional accelerated vesting and payment provisions.

*Foreign Participants, Transferability, Repricing and Participant Payments*. The plan administrator may modify award terms, establish subplans and/or adjust other terms and conditions of awards, subject to the

share limits described above, in order to facilitate grants of awards subject to the laws and/or stock exchange rules of countries outside of the United States. With limited exceptions for estate planning, domestic relations orders, certain beneficiary designations and the laws of descent and distribution, awards under the Amended Plan are generally non-transferable prior to vesting and exercisable only by the participant. Except in connection with certain corporate transactions, the Amended Plan does not permit the repricing or cancelation of options or SARS in exchange for cash or other awards without stockholder approval when the option or SAR price per share exceeds the fair market value of the underlying shares. With regard to tax withholding, exercise price and purchase price obligations arising in connection with awards under the Amended Plan, the plan administrator may, in its discretion, accept cash or check, shares of our Common Stock that meet specified conditions, a "market sell order" or such other consideration as it deems suitable.

*Plan Amendment and Termination*. Our Board may amend or terminate the Amended Plan at any time; however, except in connection with certain changes in our capital structure, stockholder approval will be required for (i) any amendment that increases the number of shares available under the Amended Plan, and (ii) any amendment that reduces the price per share of any outstanding option or SAR granted under the Amended Plan or that cancels any stock option or SAR in exchange for cash or another award when the option or SAR price per share exceeds the fair market value of the underlying shares. After the tenth anniversary of the Effective Date of the Amended Plan, no incentive stock options may be granted; however, the Amended Plan does not have a specified expiration and will otherwise continue in effect until terminated by us.

*Programs*. The Amended Plan provides that the plan administrator may establish programs under the Amended Plan which contain the terms and conditions intended to govern a specified type of award granted under the Amended Plan. Programs may be established to govern awards tied to specific performance goals and business criteria under the umbrella of the Amended Plan. In all cases, these programs will be consistent with the terms of the Amended Plan.

*Tax Withholding*. We have the authority and the right to deduct or withhold, or require a participant to remit to us, an amount sufficient to satisfy federal, state, local and foreign taxes required by law to be withheld with respect to any taxable event concerning a participant arising as a result of the Amended Plan. The plan administrator may in its sole discretion and in satisfaction of the foregoing requirement allow a participant to elect to have us withhold shares otherwise issuable under an award. Unless determined otherwise by the plan administrator, the number of shares which may be so withheld or surrendered will be limited to the number of shares which have a fair market value no greater than the aggregate amount of such liabilities based on the maximum individual statutory withholding rates for federal, state, local and foreign income tax and payroll tax purposes for the applicable jurisdiction.

*Data Privacy*. Under the Amended Plan, as a condition of receipt of any award, each participant must explicitly consent to the collection, use and transfer of personal data as described in the Amended Plan by and among us and our subsidiaries for the exclusive purpose of implementing, administering and managing the participant's participation in the Amended Plan.

**Summary of Federal Income Tax Consequences of the Amended Plan**

Following is a brief description of the principal United States federal income tax consequences related to grants made under the Amended Plan and certain other United States federal income tax issues. Some kinds of taxes, such as state, local and foreign income taxes and federal employment taxes, are not discussed. Tax laws are complex and subject to change and may vary depending on individual circumstances and from locality to locality. **The summary does not discuss all aspects of federal income taxation that may be relevant in light of a holder's personal circumstances. It is not intended as tax advice for award recipients, who should consult their own tax advisors.**

- *Nonqualified Stock Options*. An award recipient will not be subject to tax at the time a nonqualified stock option is granted, and no tax deduction will then be available to us. Upon the exercise of a nonqualified stock option, an amount equal to the difference between the exercise price and the fair market value of the shares acquired on the date of exercise will be included in the recipient's ordinary income and we will generally be entitled to deduct the same amount. Upon disposition of shares acquired upon exercise, any appreciation or depreciation after the date of exercise will generally constitute a capital gain or capital loss for the holder of the shares.

- *Incentive Stock Options (ISOs)*. An award recipient will not be subject to regular income tax at the time an ISO is granted or exercised, and no tax deduction will then be available to us; however, the recipient may be subject to the alternative minimum tax on the excess of the fair market value of the shares received upon exercise of the ISO over the exercise price. Upon disposition of the shares acquired upon exercise of an ISO, capital gain or capital loss will generally be recognized by the recipient in an amount equal to the difference between the sale price and the exercise price, as long as the recipient has not disposed of the shares within two years after the date of grant or within one year after the date of exercise and has been employed by us at all times from the grant date until the date three months before the date of exercise (one year in the case of permanent disability). If the recipient disposes of the shares without satisfying both the holding period and employment requirements, the recipient will recognize ordinary income at the time of the disposition equal to the excess of the amount realized over the exercise price but, in the case of a failure to satisfy the holding period requirement, not more than the excess of the fair market value of the shares on the date the ISO is exercised over the exercise price, with any remaining gain or loss being treated as capital gain or capital loss. We are not entitled to a tax deduction upon either the exercise of an ISO or upon disposition of the shares acquired pursuant to such exercise, except to the extent that the participant recognizes ordinary income on a disqualifying disposition of the shares.

- *Other Awards*. The current federal income tax consequences of other awards authorized under the Amended Plan generally follow certain basic patterns: SARs are taxed and deductible in substantially the same manner as nonqualified stock options; nontransferable restricted stock subject to a substantial risk of forfeiture results in income recognition equal to the excess of the fair market value over the price paid, if any, only at the time the restrictions lapse (unless the recipient elects to accelerate recognition as of the date of grant); RSUs, dividend equivalents, and performance awards are generally subject to tax at the time of payment. Compensation otherwise effectively deferred is taxed when paid (other than employment taxes which are generally paid at the time such compensation is deferred or, if later, vested). In each of the foregoing cases, we will generally have a corresponding deduction at the time the participant recognizes income, subject to Section 162(m) with respect to covered employees.

- *Section 162(m) of the Internal Revenue Code*. Section 162(m) denies a deduction to any publicly-held corporation for compensation paid to "covered employees" in a taxable year to the extent that compensation paid to such covered employee exceeds $1,000,000. It is possible that compensation attributable to awards under the Amended Plan, when combined with all other types of compensation received by a covered employee from us, may cause this limitation to be exceeded in any particular year.

  The Section 162(m) deduction limitation does not apply to "qualified performance-based compensation." In order to qualify for the exemption for qualified performance-based compensation, Section 162(m) requires, among other things, that: (i) the compensation be paid solely upon account of the attainment of one or more pre-established objective performance goals, (ii) the performance goals must be established by a compensation committee comprised of two or more "outside directors," (iii) the material terms of the performance goals under which the compensation is to be paid must be disclosed to and approved by the shareholders and (iv) the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2426 of 2711

compensation committee of "outside directors" must certify that the performance goals have indeed been met prior to payment.

Section 162(m) contains a special rule for stock options and stock appreciation rights which provides that stock options and stock appreciation rights will satisfy the "qualified performance-based compensation" exemption if (i) the awards are made by a compensation committee comprised of "outside directors", (ii) the plan sets the maximum number of shares that can be granted to any person within a specified period, and (iii) the compensation is based solely on an increase in the stock price after the grant date.

The Amended Plan has been designed to permit our Compensation Committee to grant stock options, stock appreciation rights and other awards which will qualify as "qualified performance-based compensation."

If the Amended Plan is approved by our stockholders, our Compensation Committee may, but is not obligated to, grant awards under the Amended Plan intended to constitute "qualified performance-based compensation" under Section 162(m).

- *Section 409A of the Internal Revenue Code*. Certain types of awards under the Amended Plan may constitute, or provide for, a deferral of compensation subject to Section 409A of the Internal Revenue Code ("Section 409A"). Unless certain requirements set forth in Section 409A are complied with, holders of such awards may be taxed earlier than would otherwise be the case (e.g., at the time of vesting instead of the time of payment) and may be subject to an additional 20% penalty tax (and, potentially, certain interest penalties and additional state taxes). To the extent applicable, the Amended Plan and awards granted under the Amended Plan are intended to be structured and interpreted in a manner intended to either comply with or be exempt from Section 409A and the Department of Treasury regulations and other interpretive guidance that may be issued under Section 409A. To the extent determined necessary or appropriate by the plan administrator, the Amended Plan and applicable award agreements may be amended to further comply with Section 409A or to exempt the applicable awards from Section 409A.

**Interest of Certain Persons in Matters to Be Acted Upon; New Plan Benefits**

Our directors and executive officers have an interest in the proposal to approve the Amended Plan, as each would be eligible to receive awards under the Amended Plan.

The number of awards that our Named Executive Officers, directors, other executive officers and other employees may receive under the Amended Plan will be determined in the discretion of our Board or Compensation Committee, as applicable, in the future, and our Board and Compensation Committee have not made any determination to make future grants to any persons under the Amended Plan as of the date of this Proxy Statement. Therefore, it is not possible to determine the future benefits that will be received by these participants under the Amended Plan, or the benefits that would have been received by such participants if the Amended Plan, as proposed to be amended, had been in effect in the year ended June 30, 2017.

***The Board unanimously recommends that you vote "FOR" the approval of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2427 of 2711

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION**
**FOR THE FISCAL YEAR ENDED JUNE 30, 2017**
***(Proposal No. 4 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd Frank Act") enables our stockholders to vote to approve, on an advisory, non-binding basis, our executive compensation for the fiscal year ended June 30, 2017 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act ("Say-on-Pay"). We currently conduct this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at our 2018 Annual Meeting of Stockholders.

**Summary**

Our Board is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. We are asking our stockholders to provide advisory approval of our executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation and the accompanying narrative disclosure set forth in the Proxy Statement. We recognize and value the critical role that executive leadership plays in our performance. Our executive compensation philosophy is intended to ensure that executive compensation is aligned with our short- and long-term business strategy, objectives and stockholder interests. Our executive compensation is designed to attract, motivate and retain highly qualified executives. We believe that our compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the short- and long-term interests of our stockholders.

We urge you to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

We believe that executive compensation should be tied to our performance on both a short-term and long-term basis. We believe that our continued success is closely tied to the performance of our executive officers and have designed our compensation practices in order to reward the executives for their contributions to our overall success.

**Alignment with Stockholders' Interests**

We grant annual incentives based in part on each executive's contribution to enhancing our short- and long-term profitable growth. We also grant long-term equity-based incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of our stockholders. We have historically used restricted stock, restricted stock units and stock options as our equity incentive vehicles because these awards enable the executives to establish a meaningful equity stake in our Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead us to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of our operations. For fiscal year 2017, 100% of the long-term equity incentives granted to our corporate Named Executive Officers (our CEO, CFO, and General Counsel) and a significant portion of our equity incentives granted to our divisional Named Executive Officers consisted of restricted stock units subject to performance vesting based on growth of adjusted EBITDA per share.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2428 of 2711

**Long-Term Performance**

In order to promote our philosophy of pay-for-performance and furthering our objective of aligning the interests of management with those of our stockholders, we have established performance programs for certain of our executive officers. These programs focus on the achievement of our long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, we are incentivizing our officers to achieve our long-term corporate objectives and ultimately increase stockholder value.

**Highlights of 2017 Executive Compensation Program**

The Board believes our executive compensation program is designed appropriately and that a vote in favor of the proposal is warranted, including for these reasons: (1) 100% of corporate Named Executive Officer equity awards for fiscal 2017 were performance-based and tied to measurable pre-established targets; (2) we are committed to having strong governance standards and continue to take steps to further this commitment; and (3) we value the opinions and feedback we receive from, and we continue to engage with, our stockholders, and our executive compensation program directly reflects our stockholders' input.

**1. 100% Performance-Based Equity Awards for Corporate Named Executive Officers: Equity awards granted to our CEO, CFO, and General Counsel are 100% performance-based and tied to measurable pre-established adjusted EBITDA per share goals.**

100% of the equity grants made to our corporate Named Executive Officers and a significant portion of the equity grants made to our divisional Named Executive Officers during fiscal 2017 were performance-based and tied to pre-established adjusted EBITDA per share targets which require significant annual growth. 40% of the maximum number of shares that can be earned under each Named Executive Officer's 2017 award has a three-year performance component which vests or is forfeited following the end of the three-year performance cycle, subject to the achievement of the adjusted EBITDA per share growth target for fiscal 2019. If 85% of this three-year adjusted EBITDA per share target is not attained, then these shares are forfeited. The remaining 60% of the maximum number of shares that can be earned under each executive's 2017 award may vest up to 20% per year over the three-year period if annual adjusted EBITDA per share growth targets are exceeded for fiscal years 2017, 2018 and 2019, respectively. These grants were made pursuant to our Six-Year Performance Program, which was established in 2012.

We believe that the performance metrics underlying our long-term equity incentive program are rigorous and we have not disclosed current metrics because their disclosure would allow our competitors to determine the EBITDA and pricing related to key programs, which would be competitively harmful to us. The adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2017 was $5.69.

For fiscal 2017, we achieved 161% of the fiscal 2017 adjusted EBITDA per share target, and as a result the 60,000 shares granted to our CEO in fiscal 2015 were vested. In addition, our CEO earned 95,280 shares, consisting of 35,440 vested shares earned pursuant to the fiscal 2017 grant, 29,920 vested shares earned pursuant to the fiscal 2016 grant and 29,920 vested shares earned pursuant to the fiscal 2015 grant.

**2. Corporate Governance and Best Practices: We are committed to having strong governance standards with respect to our compensation programs, procedures and practices.**

We have taken the following actions to enhance our corporate governance and executive compensation policies:

- Appointed a lead independent director to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2429 of 2711

- Prohibited all hedging and pledging of our stock by executive officers and directors. As of the date of the Proxy Statement, no shares of our stock are pledged by any Named Executive Officer or director.

- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements. We have also included clawback provisions in each Named Executive Officer's employment agreement.

- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives' long-term interests with those of our stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price.

**3. Communications with Stockholders: Last year, we conducted a robust stockholder outreach and revised our annual cash incentive program to directly address the feedback we received from our stockholders. During the current year, we continued to have open lines of communication with our stockholders.**

Our Compensation Committee takes very seriously stockholder feedback with respect to executive compensation. Last year, we conducted a robust stockholder outreach, contacting and requesting meetings with over 75% of our top 25 stockholders, so that we could better understand stockholder sentiments and concerns about our program. This year, we continued to have open lines of communications with our stockholders, and our senior management routinely interacted with our stockholders on a variety of matters, including our executive compensation programs and practices.

In response to the specific stockholder feedback we received, our Compensation Committee revised our annual cash executive officer incentive program for fiscal 2016 to be performance-based and formulaically tied to measurable thresholds, targets, and maximums; and at our 2016 annual meeting, approximately 98% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor our executive compensation. Considering this overwhelming majority in favor, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2017.

Our Board believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that our executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K of the SEC, including in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board recommends that you vote "FOR" the approval of our executive compensation for the fiscal year ended June 30, 2017. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

**ADVISORY VOTE ON THE DETERMINATION OF THE FREQUENCY OF THE ADVISORY VOTE ON EXECUTIVE COMPENSATION**
***(Proposal No. 5 of the Proxy Card)***

The Dodd-Frank Act enables stockholders to indicate how frequently they believe we should seek future Say-on-Pay advisory votes (the "Say-on-Frequency"). Accordingly, we are seeking an advisory, non-binding determination from our stockholders as to the frequency with which we should present future Say-on-Pay advisory votes to our stockholders. We are providing stockholders the option of selecting a frequency of every one, two or three years, or abstaining. For the reasons described below, we recommend that the stockholders select a frequency of one year, or an annual vote.

Our Board values constructive dialogue on executive compensation and other important governance topics with our stockholders. Our Board believes an advisory vote every year is appropriate because it will enable our stockholders to vote on the most recent executive compensation information that is presented in our Proxy Statement, leading to more meaningful and timely communication between us and our stockholders on executive compensation matters. An annual advisory vote on executive compensation is consistent with our policy of seeking input from, and engaging in discussions with, our stockholders on corporate governance matters and our executive compensation philosophy, policies and practices. Additionally, our Board's determination was further based on the premise that this recommendation could be modified in future years if it becomes apparent that an annual frequency vote is not meaningful, burdensome or more frequent than dictated by best corporate governance practices.

As a stockholder, you have the choice to vote for one of the following choices, as indicated on the Proxy Card: to hold the Say-on-Frequency advisory vote on executive compensation every year, every two years or every three years, or you may abstain from voting. While the Say-on-Frequency vote is advisory in nature and will not bind us to adopt any particular frequency, our Board intends to carefully consider the stockholder vote resulting from the proposal in determining how frequently we will hold future Say-on-Pay advisory votes.

***The Board recommends that you vote for "1 YEAR" as the determination on frequency for an advisory vote on our executive compensation. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of an annual frequency. The frequency of the advisory vote on executive compensation receiving the greatest number of votes will be considered the frequency recommended by our stockholders.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Executive Officers

Our executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 66 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 49 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 55 | Director, Executive Vice President and President of OSI Solutions Business |
| Victor Sze* | 50 | Executive Vice President and General Counsel |
| Pak Chin(1)* | 45 | Former President of Security Division |
| Mal Maginnis | 58 | President of Rapiscan Systems, Inc. |
| Sujit Kumar | 47 | President of Healthcare Division |
| Manoocher Mansouri | 61 | President of Optoelectronics and Manufacturing Division |
| Shawn Thompson | 54 | President of OSI Electronics, Inc. |
| Rick Merritt | 55 | Senior Vice President and Chief Human Resources Officer |

* Denotes our Named Executive Officers for fiscal 2017.

(1) Mr. Chin resigned from the Company effective July 28, 2017.

The following section sets forth certain background information regarding those persons currently serving as our executive officers, excluding Deepak Chopra and Ajay Mehra, who are described above under "Election of Directors":

***Alan Edrick*** is our Executive Vice President and Chief Financial Officer. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Victor S. Sze*** is our Executive Vice President and General Counsel. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Juris Doctorate from Loyola Law School.

***Pak Chin*** is the former President of our Security division and held this role during fiscal 2017. Mr. Chin joined the Company in May 2015 from Honeywell Inc. where he held a variety of leadership positions over 17 years including Vice President of the Boeing KC-46 Pegasus Aerial Refueling Tanker program, Vice President of the Lockheed Martin, Northrop Grumman, General Atomics and Huntington Ingalls Defense & Space business segment, Vice President of commercial aerospace and airlines business segment in Asia Pacific and Chairman of the Board for the Honeywell Aerospace and TAECO Aerospace joint venture. Mr. Chin holds a Bachelors in Electrical Engineering from the

University of Oklahoma and a Masters in International Business from the Rensselaer Polytechnic Institute. Mr. Chin resigned from the Company effective July 28, 2017.

***Mal Maginnis*** is President of our Rapiscan Systems, Inc. subsidiary. Mr. Maginnis joined the Company in July 2017. He has more than 35 years in the defense, security, safety and technology industries, and is an experienced senior executive of technology-based businesses. Prior to joining the Company, Mr. Maginnis was the head of a technology development company based in Singapore and one of the owners of an Australian detection company based in Sydney. In addition, he was President of Smiths Detection from 2011-2014 based in London. He held a series of senior positions including President, Head of Technology, Programs and Products and was the head of the largest business unit managing the global military and emergency responder business. Mr. Maginnis holds Bachelor of Arts (Hons) degree in history and government from the Faculty of Military Studies University of New South Wales, and Graduate, UK Command Staff College.

***Sujit Kumar*** is President of our Healthcare division. Mr. Kumar brings over two decades of global experience with majority in the medical device and HCIT space. Mr. Kumar joined the Company in April 2016 from Verathon Medical (part of Roper Technologies) where he most recently served as Vice President/General Manager. He has also held global leadership positions at Philips Healthcare, GE Healthcare, GM and Amazon.com. Early in his career, Mr. Kumar worked in investment banking advising clients on M&A and buy-side analysis. Mr. Kumar holds a Bachelor of Science degree in Mechanical Engineering from Osmania University, India, a Master of Science degree in Mechanical Engineering from University of Mississippi, and a Master of Business Administration degree from Ross School of Business at University of Michigan.

***Manoocher Mansouri*** is President of our Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of our Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of our OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in Electrical Engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Shawn Thompson*** is President of our OSI Electronics, Inc. subsidiary. Mr. Thompson brings 30 years of global experience in leading companies in the design and manufacturing of equipment that connects, protects and controls critical applications in the defense, medical, wireless and industrial markets. Mr. Thompson joined the Company in 2017 from MC Electronics where he served as President and CEO. Between 1998 and 2013, Mr. Thompson held several global leadership roles for Smiths Group PLC within in their Interconnect division as a group president and board member. Early in his career he was a principal in Transtector Systems, a leader in power and signal integrity solutions that was acquired by Smiths in 1998. Mr. Thompson attended Northwest Nazarene University and participated in Stanford's Graduate School of Business Executive Management Program.

***Rick Merritt*** is our Senior Vice President and Chief Human Resources Officer. Prior to joining the Company in October 2013, Mr. Merritt held the positions of Global Vice President of Human Resources for Power-One, Inc., a power conversion solution provider, from April 2011 to October 2013 and Global Vice President at International Rectifier Corporation, a publicly-traded power management technology company, from May 2004 to April 2011. Mr. Merritt received a Bachelor of Science degree from Indiana University and a Master of Science degree from California State University, Hayward.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2433 of 2711

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes our compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for our Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Advisory Vote on Named Executive Officer Compensation*

We maintain open lines of communication with our stockholders, and senior management routinely interacts with our stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. Further, the Compensation Committee considers the outcome of our annual say on pay vote when making decisions regarding our executive compensation program. At our 2016 annual meeting, approximately 98% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Considering the level of support of our stockholders of our compensation program, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2017.

At the upcoming Annual Meeting, we will again hold an annual advisory vote to approve executive compensation. We will continue to engage with our stockholders throughout the year, and the Compensation Committee will consider the results from this year's and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Governance Highlights*

We are committed to having strong governance practices with respect to our compensation programs, practices and procedures. We believe that these practices reinforce our emphasis on tying executive compensation to performance. The following chart highlights some of our governance practices with respect to executive compensation:

| What We Do | What We Do Not Do |
|---|---|
| Use 100% performance-based vesting with respect to corporate Named Executive Officer equity awards | No excise tax gross-ups upon a change in control |
| Have formulaic performance-based annual incentives | No hedging, pledging, or speculative transactions are permitted by executives and directors |
| Maintain a robust clawback policy | No re-pricing of underwater stock options |
| Maintain share ownership and retention guidelines for executives and directors | No stock option grants with an exercise price less than fair market value |
| Conduct an annual say on pay vote | No "single trigger" severance payments owing solely on account of the occurrence of a change in control event |
| Maintain open lines of communication with stockholders | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2434 of 2711

*Executive Compensation Summary*

*Fiscal 2017 Performance*

During fiscal 2017, we (a) achieved record revenue of $961 million; (b) delivered 35% non-GAAP earnings per share growth; (c) had a strong win rate for our Security division's Real Time Tomography (RTT®) checked baggage screening product in the EMEA region; (d) strengthened our leadership team; (e) completed two significant strategic acquisitions in our Security division and signed a definitive agreement for a third strategic acquisition (which was completed in the first quarter of fiscal 2018); (f) divested a non-core business in our Healthcare division; and (g) made significant capital structural enhancements with the expansion of our revolving credit facility and issuance of convertible notes.

*Leverage Business Infrastructure.* Even as we launched new products, entered new markets, and invested substantial amounts in R&D, we actively leveraged our business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities.* In fiscal 2017, we continued to expand our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and we believe it will continue to serve, to sustain growth over the long term. Some of our key achievements during fiscal 2017 include the following:

- Expanding presence with international customers for checked baggage scanning solutions, related services and support.
- Acquiring two companies and entering into a definitive agreement for a third acquisition in our Security division.
- Acquiring product lines and companies that not only leverage our existing operating infrastructure but also provide immediate entry into growing market segments.

*Building a Foundation for the Future.* We continue to make significant targeted investments in R&D and acquisitions. In 2017, we completed two significant strategic acquisitions and entered into a definitive agreement for a third strategic acquisition in our Security division. We believe that these acquisitions and investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

*Role of the Compensation Committee*

Our Board appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for our Named Executive Officers, including base salaries, annual incentives, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of our Named Executive Officers (other than our Chief Executive Officer) is recommended to the Compensation Committee by our Chief Executive Officer. Compensation for our Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2435 of 2711

*Executive Compensation Program Elements*

The particular elements of the compensation program for our Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with our pay-for-performance philosophy, we structure our compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

The following is an overview of the elements of our compensation and benefits programs for fiscal 2017:

| Pay Element | Description |
| --- | --- |
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined formulaically based on adjusted return on equity ("AROE") metrics, including a negative discretion feature whereby calculated awards may be reduced up to 20%. |
| | The Turnkey Solutions Incentive Program allows for annual incentives in the form of shares of stock or, at our discretion, cash to be granted to Mr. Mehra based on the achievement of certain pre-established performance metrics. |
| Long-Term Incentives | The fiscal 2017 program with respect to the Named Executive Officers consisted of performance-based restricted stock units under the Six-Year Performance Program, which are earned based on the achievement of pre-established EBITDA-based metrics for each of the three years following grant, as well as an aggregate three-year metric. In addition, division executives Mr. Mehra and Mr. Chin received some time-based restricted stock units. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2017, perquisites included car allowances. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash incentives at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which our CEO is the only participant. |

In fiscal 2017, fixed compensation comprised approximately 14% to 57% and variable compensation comprised approximately 43% to 86% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 83% of total compensation.

*Fixed Compensation*. Fixed compensation is intended to compensate our Named Executive Officers for their ongoing responsibilities and consists of base salary. Base salary is set to attract and retain executive talent. Base salaries for our Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically, typically on an annual basis.

The Compensation Committee takes a conservative approach with respect to base salary increases. In determining whether base salary levels for fiscal year 2017 were appropriate, the Compensation Committee considered the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance and expected future contributions. In fiscal 2017, the Compensation Committee determined not to adjust any base salary levels for any of the Named Executive Officers with the exception of Mr. Mehra whose salary was increased by approximately 14% to $400,000 to compensate him for taking on significantly greater responsibility for the oversight and management of the cargo and vehicle inspection and turnkey business lines within our Security division.

*Variable Compensation*. Variable compensation provides our Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive awards and long-term incentive compensation.

*Annual Incentive Awards*. All corporate Named Executive Officers are eligible for an annual incentive pursuant to our annual incentive program. Annual incentives under this program are designed to focus our participating Named Executive Officers on annual operating achievement and near-term success. Annual incentives are calculated based on a formula tied to AROE metrics and provide for a threshold below which no incentive will be paid and a maximum award level.

Depending on the level of AROE achieved, corporate executives can earn from 0% to 200% of base salary as follows:

| AROE | % of Base Salary Earned |
|---|---|
| Less than 10% | 0% |
| 10% | 25% |
| 11% | 50% |
| 12% | 75% |
| 13% | 100% |
| 14% | 125% |
| 15% | 150% |
| 16% | 175% |
| 17% or more | 200% |

The Compensation Committee considers AROE to be an effective annual performance measure for assessing the Company's efficient use of capital and return to stockholders. The AROE targets were designed to be challenging yet achievable with significant effort and management skill and were established in order to provide the executives sufficient incentive to create long-term stockholder value while at the same time ensuring appropriate risk management. The Compensation Committee retains negative discretion to reduce any awards under the annual incentive program up to 20% of the calculated value. For fiscal year 2017, we achieved 14% AROE; therefore, participating Named Executive Officers earned annual incentives equal to 125% of base salary. See the "Non-equity Incentive Plan Compensation" column of the Summary Compensation Table.

*Turnkey Solutions Incentive Program.* In 2015, we established an incentive program tied to the performance of our turnkey solutions business (the "Turnkey Solutions Incentive Program"). Mr. Mehra, President of the OSI Solutions Business, is the only Named Executive Officer who participates in this program. Incentives under the Turnkey Solutions Incentive Program are conditioned on the achievement of certain metrics based on the operating income and bookings of our solutions business (excluding certain operations already existing at the time of the adoption of the program). The operating income and bookings targets are believed to be challenging, but achievable with significant management effort. For fiscal year 2017, we did not achieve the bookings target. Therefore, Mr. Mehra did not earn anything under this component of the program. Mr. Mehra was paid $705,000 for exceeding the operating income target of $10 million generated by new business.

*Long-Term Incentive Program.* In order to further promote our philosophy of pay-for-performance and furthering our objective of aligning our executive compensation with our long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of our Named Executive Officer, we have a long-term incentive program. For fiscal 2017, our long-term incentive program was comprised of the Six-year Performance Program described in more detail below.

The grants to our corporate Named Executive Officers during fiscal 2017 were performance based in their entirety, and a significant portion of the grants made to our divisional Named Executive Officers were performance based. The Compensation Committee believes that this vesting structure provides an incentive for our Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving corporate performance and business objectives for the benefit of our stockholders.

Our overall long-term incentive program is designed to retain our Named Executive Officers and to align the interests of our Named Executive Officers with the long-term interests of our stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under our equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of our Common Stock on such dates.

With respect to performance based awards, the Compensation Committee has established a six-year program for long-term performance based incentive grants for our Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each award is 100% performance based and vests based on the achievement of certain one-, two- and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill.

Each fiscal year, our Named Executive Officers are awarded an initial grant, which vests if a three-year adjusted EBITDA per share target is achieved. However, if actual three-year performance falls below target, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 55% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

Additional shares may be earned annually for each initial grant within the three-year performance period if annual targets are exceeded as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

Our adjusted EBITDA per share for fiscal year 2017 was 161% of the fiscal 2017 adjusted EBITDA per share target of $5.69. After consultation, the Compensation Committee and management mutually agreed to voluntary downward adjustments and determined that our executive officers would earn additional shares as follows: Mr. Chopra, 95,280 shares; Mr. Edrick, 34,691 shares; Mr. Mehra, 11,528 shares; and Mr. Sze, 29,818 shares.

In the event of a change of control, the initial grant would vest upon the change of control; to the extent actual performance has exceeded target for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed target by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The Compensation Committee determines, after consultation with our Chief Executive Officer, the number of equity awards to grant to our Named Executive Officers. The grant amounts for our Chief Executive Officer are determined solely by the Compensation Committee. The Compensation

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2439 of 2711

Committee considers individual performance, including the following quantitative and qualitative factors, as well as overall corporate performance.

**Qualitative Factors**

- Quality of the management of units or functions managed by the Named Executive Officer
- Leadership of personnel under the Named Executive Officer's management
- Execution of strategically important projects
- Overall effectiveness of units or functions managed by the Named Executive Officer
- Contributions to the formulation of Company strategy and tactics
- Contributions to stockholder value
- Management of risk

**Quantitative Factors**

- Financial performance (including earnings per share and internal metrics)
- Financial performance metrics for business units managed by the Named Executive Officer
- Compensation surveys provided by external advisors

For fiscal year 2017 performance share calculation purposes, our Chief Executive Officer, Chief Financial Officer, General Counsel, and President of our solutions business are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance. The Compensation Committee retains negative discretion to reduce any awards under the long-term incentive program to a lesser award or no award to any participant.

*Benefits and Perquisites*. Benefits and perquisites are designed to attract and retain key employees. Currently, our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. We also lease automobiles for or provide an auto allowance to certain of our Named Executive Officers.

We maintain a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows our Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

We also maintain a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board may select participants from among our Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*. While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. We believe this compensation mix provides our Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of corporate performance, as well as reducing the risk of recruitment of highly qualified executive talent by our competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. We believe that this compensation mix results in a pay-for-performance orientation that is aligned with our compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to our Named Executive Officers for fiscal 2017, the Compensation Committee performed a review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
| --- | --- |
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2017 peer group were developed based on similarity in size and operations within the industries in which we operate as follows:

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| • AAR Corp. | • Calix, Inc. | • Daktronics, Inc. | • Harmonic Inc. | • Masimo Corporation | • NuVasive, Inc. |
| • ADTRAN, Inc. | • COGNEX CORPORATION | • DigitalGlobe, Inc. | • Integer Holdings Corporation | • MTS Systems Corporation. | • Palo Alto Networks, Inc. |
| • Analogic Corporation | • Coherent, Inc. | • Esterline Technologies Corporation | • Invacare Corporation | • National Instruments Corporation | • VeriFone Systems, Inc. |
| • Astronics Corporation | • Cubic Corporation | • FLIR Systems, Inc. | • Itron, Inc. | • Novanta Inc. | • Viavi Solutions Inc. |

In connection with executive compensation decisions for fiscal 2017, the Compensation Committee engaged independent compensation consultant firm, Pearl Meyer. The Compensation Committee also

considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed our actual performance taken as a whole as well as our performance relative to our peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to our comparative performance.

For fiscal 2017, the Compensation Committee determined that it was appropriate to maintain salary levels constant for all Named Executive Officers with the exception of Mr. Mehra whose salary was increased as discussed above. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual incentives and performance-based equity grants comprised a significant portion of total compensation.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving our long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Minimum Equity Ownership and Retention Guidelines*

We believe that our executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. We believe that this multiple constitutes significant amounts for our executive officers and provides a substantial link between the interests of our executive officers and those of our stockholders. During such time that an executive officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2017, each of our Named Executive Officers met or exceeded our minimum equity ownership guidelines.

*Clawback Policy*

We have adopted a clawback policy. The policy provides that if an accounting restatement is required due to our material non-compliance with any accounting requirements, then we will seek to recover any excess in the cash and equity incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements. Each Named Executive Officer's employment agreement also contains a clawback provision.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

We have adopted a policy that prohibits our executive officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of our Common Stock or other equity securities. We have also adopted a policy that prohibits our executive officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Chin. The terms of each of such agreements or arrangements are summarized below under the heading "Employment Agreements." These types of arrangements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on our use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

**Summary Compensation Table**

The following table sets forth the compensation for our principal executive officer, principal financial officer, and our three highest paid executive officers serving as executive officers on June 30, 2017 (the "Named Executive Officers") for the fiscal years ended June 30, 2017, 2016 and 2015:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (4)(5)(6)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2017 | 1,000,000 | — | 4,316,792 | — | 1,250,000 | 302,189 | 209,498 | 7,078,479 |
| Chairman, President and | 2016 | 1,000,000 | — | 4,264,200 | — | 500,000 | 897,351 | 227,148 | 6,888,699 |
| Chief Executive Officer | 2015 | 1,000,000 | 700,000 | 3,970,800 | — | 1,630,467 | 982,853 | 193,801 | 8,477,921 |
| Alan Edrick | 2017 | 402,000 | — | 1,870,610 | — | 502,500 | — | 57,805 | 2,832,915 |
| Executive Vice President and | 2016 | 402,000 | — | 1,847,820 | — | 201,000 | — | 57,812 | 2,508,632 |
| Chief Financial Officer | 2015 | 402,000 | 300,000 | 1,853,040 | — | 430,690 | — | 61,725 | 3,047,455 |
| Ajay Mehra | 2017 | 400,000 | 245,000 | 1,433,149 | — | 705,000 | — | 75,569 | 2,858,718 |
| Executive Vice President of the | 2016 | 352,000 | — | 554,346 | — | 176,000 | — | 82,460 | 1,164,806 |
| Company and President | 2015 | 352,000 | 125,000 | 1,522,140 | — | 676,797 | — | 80,590 | 2,756,527 |
| of OSI Solutions Business | | | | | | | | | |
| Victor S. Sze | 2017 | 350,000 | — | 1,618,842 | — | 437,500 | — | 73,898 | 2,480,240 |
| Executive Vice President, | 2016 | 350,000 | — | 1,599,075 | — | 175,000 | — | 69,834 | 2,193,909 |
| General Counsel and Secretary | 2015 | 350,000 | 285,000 | 1,389,780 | — | 338,399 | — | 75,606 | 2,438,785 |
| Pak Chin | 2017 | 335,000 | — | 249,495 | — | — | — | 53,863 | 638,358 |
| President of Security Division | 2016 | 335,000 | 120,000 | 497,490 | — | — | — | 48,761 | 1,001,251 |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2443 of 2711

Awards Table below. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the fiscal year ended June 30, 2017 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) 2016 and 2017 figures represent amounts earned under the annual incentive program or the Turnkey Solutions Incentive Program, as applicable. 2015 figures represent amounts earned under the Mexico SAT Incentive Program, which was terminated effective at the end of fiscal year 2015.

(3) We initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2016 to June 30, 2017 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2017 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2017 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,200 | 3,300 | 5,761 | 195,237 | 209,498 |
| Alan Edrick | 46,405 | 2,850 | 4,421 | 4,129 | 57,805 |
| Ajay Mehra | 45,019 | 6,675 | 12,518 | 11,357 | 75,569 |
| Victor S. Sze | 41,075 | 12,000 | 10,648 | 10,175 | 73,898 |
| Pak Chin | 39,794 | — | 12,860 | 1,209 | 53,863 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2016 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,111 | 3,300 | 11,889 | 206,848 | 227,148 |
| Alan Edrick | 44,713 | 2,850 | 6,250 | 3,999 | 57,812 |
| Ajay Mehra | 39,912 | 6,675 | 24,646 | 11,227 | 82,460 |
| Victor S. Sze | 39,599 | 12,000 | 12,031 | 6,204 | 69,834 |
| Pak Chin | 39,727 | — | 7,615 | 1,419 | 48,761 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2015 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,673 | 2,667 | 9,717 | 175,744 | 193,801 |
| Alan Edrick | 46,396 | 2,850 | 7,536 | 4,943 | 61,725 |
| Ajay Mehra | 41,082 | 6,675 | 19,334 | 13,499 | 80,590 |
| Victor S. Sze | 41,070 | 12,000 | 11,547 | 10,989 | 75,606 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2444 of 2711

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2017 to each of our Named Executive Officers(8):

| | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(4) | | | All Other Stock Awards: Number of Shares of Stock or Units(#) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Grant Date** | **Threshold ($)(6)** | **Target ($)** | **Maximum ($)** | **Threshold (#)(1)** | **Target (#)(2)** | **Maximum (#)(3)** | | |
| Deepak Chopra | 8/1/2016 | — | — | — | — | 71,070 | 177,675 | — | 4,316,792 |
| Chairman, President and | — | — | $ 1,000,000 | $ 2,000,000 | — | — | — | — | — |
| Chief Executive Officer | | | | | | | | — | |
| Alan Edrick | 8/1/2016 | — | — | — | — | 30,797 | 76,992 | — | 1,870,610 |
| Executive Vice President and | — | — | $ 402,000 | $ 804,000 | — | — | — | — | — |
| Chief Financial Officer | | | | | | | | | |
| Ajay Mehra | 8/1/2016 | — | — | — | — | 9,239 | 23,097 | — | 561,177 |
| Executive Vice President of the | — | — | $ 705,000 | — | — | — | — | — | — |
| Company and President of | 8/18/2016 | — | — | — | — | — | — | 12,825(7) | 871,972 |
| OSI Solutions Business | | | | | | | | | |
| Victor S. Sze | 8/1/2016 | — | — | — | — | 26,652 | 66,630 | — | 1,618,842 |
| Executive Vice President, | — | — | $ 350,000 | $ 700,000 | — | — | — | — | — |
| General Counsel and Secretary | | | | | | | | | |
| Pak Chin | 8/1/2016 | — | — | — | — | 3,334 | 8,335 | — | 202,507 |
| President, Security Division | 9/8/2016 | | | | | | | 703(7) | 46,988 |

(1) No amounts are shown in this column as our long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(2) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(3) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(5) The grant date fair value of the restricted stock units was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are shown in this column as our annual incentive program provides for no award under certain circumstances.

(7) This RSU award vests over a period of three years from the date of grant.

(8) We have eliminated from this table the columns titled "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2445 of 2711

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2017(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date(2) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested (4)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Deepak Chopra | 60,000(6) | — | 20.02 | 9/16/2017 | — | — | — | — |
| Chairman, President and | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chief Executive Officer | — | — | — | — | — | — | 232,140 | 17,445,321 |
| Alan Edrick | 13,000(6) | — | 20.02 | 9/16/2017 | — | — | — | — |
| Executive Vice President | 14,000 | — | 23.18 | 2/7/2018 | — | — | — | — |
| and Chief Financial | 10,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Officer | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 100,594 | 7,559,639 |
| Ajay Mehra | 15,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Executive Vice President of the Company and | | | | | | | | |
| President of OSI Solutions | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Business | — | — | — | — | 12,825 | 963,799 | 30,178 | 2,267,877 |
| Victor S. Sze | 5,000 | — | 20.92 | 7/27/2018 | — | — | — | — |
| Executive Vice President, | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| General Counsel and | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Secretary | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 84,804 | 6,373,021 |
| Pak Chin President, Security Division | — | — | — | — | 703 | 52,830 | — | — |

(1) We have eliminated from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of our Common Stock on the date of grant.

(4) The market value of RSU awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2017, multiplied by the closing price of our Common Stock on June 30, 2017 ($75.15 per share).

(5) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(6) These options were exercised on September 13, 2017.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2446 of 2711

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of our Named Executive Officers during fiscal year ended June 30, 2017:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting(2) | Value Realized on Vesting(3)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 132,000 | 8,741,040 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 35,000 | 1,859,300 | 63,466 | 4,202,719 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 50,000 | 2,996,120 | 18,439 | 1,221,031 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 34,000 | 1,854,886 | 47,196 | 3,125,319 |
| Pak Chin<br>President, Security Division | — | — | — | — |

(1) Represents the difference between the fair market price of our Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Includes shares acquired from the vesting of time-based restricted stock awards and vesting of performance-based restricted stock awards based upon performance in fiscal years 2014, 2015 and 2016.

(3) Represents the number of restricted stock awards that vested multiplied by the fair market price of our Common Stock on the date of vesting.

**Pension Benefits**

We maintain the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 10-year period commencing January 1, 2019 in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2447 of 2711

during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2017(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 13 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2017.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 10 | 8,050,625 | — |

(1) We have eliminated from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

We adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of our management or highly compensated employees (as designated by the Compensation Committee), including our Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to 80% of their base salary and up to 100% of other types of eligible compensation. The Deferred Compensation Plan also allows us to make discretionary contributions and matching contributions on behalf of eligible participants.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2017 ranged from –1.01% to 27.19%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2017:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 201,001 | 40,200(3) | 252,631 | — | 1,828,199 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 38,338 | 38,338(3) | 213,873 | — | 1,392,202 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 35,000 | 35,000(3) | 189,013 | — | 1,230,641 |
| Pak Chin<br>President, Security Division | 33,500 | 33,500(3) | 20,586 | — | 161,484 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2017.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Chin.

*Deepak Chopra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Mr. Chopra's employment agreement was amended, effective as of July 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 68 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with us. The agreement also contains a clawback provision whereby Mr. Chopra's incentive or performance based compensation shall be subject to reduction or

repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months' notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by us without cause, our non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from us to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by us without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date (including if Mr. Chopra becomes disabled or continues performing services for the Company in a different capacity prior to the Scheduled Retirement Date and such disability or other form of services continues through the Scheduled Retirement Date), he shall be entitled to the greater of (i) $12,500,000 or (ii) a lump sum stay bonus equal to two times the average of his highest two years out of the prior five years of total annual compensation, including (a) base salary, (b) bonuses and incentive compensation (excluding any special bonus programs), (c) the fair value of any stock, options or other equity grants whether vested or not, and (d) the annualized value of all benefits and perquisites, payable in a single lump sum cash payment within 45 days of the Chopra Scheduled Retirement Date.

*Alan Edrick's and Victor Sze's Employment Agreements*

For purposes of this section, Messrs. Edrick and Sze are each individually referred to as the "Executive." In April 2012, we entered into its current employment agreement with each Executive, which were effective as of January 1, 2012. Each Executive's employment agreement was amended, effective as of July 1, 2015. The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other

party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68. The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick and $350,000 for Mr. Sze. The Executive is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with us. Each Executive's agreement also contains a clawback provision whereby the Executive's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by us without cause, our non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months' salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from us to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by us without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by us to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by

reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Ajay Mehra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of May 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000, which shall increase to $402,000 per year upon achievement of certain pre-established operating income metrics for the OSI Solutions Business. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with us. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment by us without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12 calendar months immediately preceding termination plus the cash equivalent of any awards under the Turnkey Solutions Incentive Program earned during the six calendar months immediately preceding a termination occurring in 2017, annualized, or during the 12 calendar months immediately preceding a termination occurring in 2018 or thereafter), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2452 of 2711

In the event of the termination of Mr. Mehra's employment by us without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by us to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances (i) if the change in control occurs on or before December 31, 2016, Mr. Mehra may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G (the "Alternative Payment"); and (ii) if the change in control occurs after December 31, 2016, Mr. Mehra shall receive the lesser of the Change in Control Payment or the Alternative Payment.

*Pak Chin's Offer Letter*

In April 2015, we entered into an offer letter with Pak Chin. The letter provided for an initial annual base salary of $335,000. Mr. Chin was also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us.

In the event of the termination of Mr. Chin's employment other than for "cause" (as defined in the offer letter) or Mr. Chin's voluntary resignation, Mr. Chin was entitled to: (i) an amount equal to one year of base salary, (ii) an amount equal to 50% of Mr. Chin's prior year bonus award, and (iii) acceleration of vesting of Mr. Chin's initial performance-based restricted stock unit award on a pro rata basis based on the number of months worked to the extent that our Security division has met its financial targets for the preceding year.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements. The tables therefore assume that the terms of the employment agreement to which each Named Executive Officer is currently subject had been in effect on June 30, 2017, and that employment terminated on such date. The tables also assume that the price of our Common Stock, on which certain calculations in the following tables are made, was the closing price of our Common Stock on June 30, 2017, the last business day of the fiscal year ($75.15).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under our qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 3,859,500 | 12,871,488 | 14,358,911 | 695,361 | 34,785,260 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 3,859,500 | 12,871,488 | 21,954,321 | 695,361 | 42,380,670 |

(1) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled, beginning at age 68, to certain payments under the Defined Benefit Plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements of Messrs. Edrick, Mehra, Sze and Chin.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick Executive Vice President and Chief Financial Officer | Good Reason or Without Cause | 804,000 | 761,667 | 6,372,495 | 6,000 | 6,000 | 7,950,162 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 804,000 | 761,667 | 9,663,839 | 6,000 | 6,000 | 11,241,506 |
| Ajay Mehra Executive Vice President of the Company and President of OSI Solutions Business | Good Reason or Without Cause | 800,000 | 967,333 | 2,762,815 | 6,000 | 6,000 | 4,542,148 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 800,000 | 967,333 | 3,750,210 | 6,000 | 6,000 | 5,529,543 |
| Victor S. Sze Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause | 700,000 | 711,667 | 5,271,923 | 6,000 | 6,000 | 6,695,590 |
| | Good Reason or Without Cause in Connection with a Change in Control(1) | 700,000 | 711,667 | 8,120,258 | 6,000 | 6,000 | 9,543,925 |
| Pak Chin President of Security Division | Without Cause | 335,000 | — | — | — | — | 335,000 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2454 of 2711

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2017, each non-employee director that served as a director for the full fiscal year received $65,000 for his year of service, 2,600 RSUs, and $3,000 for each Board of Directors meeting attended (not including telephonic meetings). For the fiscal year ending June 30, 2018, each non-employee director that serves as a director for the full fiscal year will receive $60,000 and an RSU grant that will be valued at $150,000, and the lead independent director will receive an additional retainer of $20,000 and an additional RSU grant valued at $30,000.

During the fiscal year ended June 30, 2017, each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $15,000. For the fiscal year ending June 30, 2018, the Chairman of the Audit Committee will receive $30,000 and an RSU grant valued at $35,000.

During the fiscal year ended June 30, 2017, each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $15,000. For the fiscal year ending June 30, 2018, the Chairman of the Compensation Committee will receive $30,000 and an RSU grant valued at $35,000.

During the fiscal year ended June 30, 2017, each member of the Nominating and Governance Committee received $3,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $7,500 and 500 RSUs. For the fiscal year ending June 30, 2018, the Chairman of the Nominating and Governance Committee will receive $15,000 and an RSU grant valued at $25,000.

During the fiscal year ended June 30, 2017, each member of the Executive Committee received $25,000 and 3,000 RSUs. The Executive Committee was dissolved in August 2017.

During the fiscal year ended June 30, 2017, each member of the Technology Committee received $3,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $10,000 and 1,000 RSUs. For the fiscal year ending June 30, 2018, each member of the Technology Committee will receive $5,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee will also receive $15,000 and an RSU grant valued at $30,000.

In August 2017, the Board formed a Risk Management Committee. For the fiscal year ending June 30, 2018, each member of the Risk Management Committee will receive $15,000 and an RSU grant valued at $25,000.

All RSU awards granted to members of the Board of Directors and its committees vest over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2017 for each non-employee member of our Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 159,000 | 340,144 | — | 499,144 |
| Meyer Luskin | 159,000 | 340,144 | — | 499,144 |
| William F. Ballhaus | 142,500 | 249,034 | — | 391,534 |
| James B. Hawkins | 95,000 | 157,924 | — | 252,924 |
| Gerald Chizever | 63,750 | 129,851 | — | 193,601 |

(1) We have eliminated from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2017 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2017, 5,600 RSUs were granted to Mr. Good and Mr. Luskin; 4,100 RSUs were granted to Dr. Ballhaus, and 2,600 RSUs were granted to Mr. Hawkins, all with a fair value of $60.74; and 1,950 RSUs were granted to Mr. Chizever with a fair value of $66.59. As of June 30, 2017, Mr. Good had 12,800 unvested stock awards outstanding, Mr. Luskin had 12,800 unvested stock awards outstanding, Dr. Ballhaus had 8,525 unvested stock awards outstanding, and Mr. Hawkins had 3,335 unvested stock awards outstanding, and Mr. Chizever had 1,950 unvested stock awards outstanding.

*Director Share Ownership Requirements*

We believe that our directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that our directors own at minimum equity of the Company valued at five times their annual retainers. We believe that this multiple constitutes significant amounts for our directors and provides a substantial link between the interests of our directors and those of our stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2017, each of our directors met or exceeded our minimum equity ownership guidelines, with the exception of Mr. Hawkins who was elected as a director in December 2015.

**Certain Relationships and Related Transactions**

In 1994, we, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). We own a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. We sell security and inspection kits to ECIL at a price no less favorable to us than the price we charge unaffiliated third parties for such products. To date, our portion of the earnings of ECIL Rapiscan has been immaterial to our financial results and results of operations.

Mohinder Chopra, who is the brother of Deepak Chopra, our Chief Executive Officer, is our Senior Vice President/General Manager India. His total compensation for fiscal year 2017 was valued at approximately $309,000.

Gerald Chizever, a member of our Board of Directors, is a partner at Loeb & Loeb LLP. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining director independence. Our Board of Directors carefully reviewed the nature of our engagement of Loeb & Loeb and the services rendered, including the expertise and relevant experience of the firm, the firm's and specific partners' knowledge of our Company and our business and past legal engagements, and the fees paid in such engagements, and determined that Mr. Chizever is independent under the standards of The NASDAQ Stock Market.

The Audit Committee of the Board of Directors reviews proposed transactions in which the Company and any person who is a member of the Board of Directors, a nominee to become a member of the Board of Directors, an executive officer of the Company, a holder of more than five percent of our voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to us as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board of Directors.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board of Directors that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2017, unless otherwise indicated, by each person known by us to own beneficially more than 5% of the outstanding shares of our outstanding Common Stock. As of October 17, 2017, 18,967,963 shares of our Common Stock were issued and outstanding.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,076,799 | 10.9% |
| Janus Capital Management LLC(3) | 1,609,592 | 8.5% |
| The Vanguard Group, Inc.(4) | 1,530,071 | 8.1% |
| Dimensional Fund Advisors LP(5) | 1,032,259 | 5.4% |
| EARNEST Partners, LLC(6) | 951,292 | 5.0% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2017, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) Represents the number of shares of Common Stock beneficially owned as of December 31, 2016, as reported on Schedule 13G/A filed on January 17, 2017 with the SEC by BlackRock, Inc. Such report indicates sole voting power over 2,038,136 shares and sole dispositive power over 2,076,799 shares. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) Represents the number of shares of Common Stock beneficially owned as of December 31, 2016, as reported on Schedule 13G/A filed on February 13, 2017 with the SEC. The address of Janus Capital Management LLC is 151 Detroit Street, Denver, CO 80206.

(4) Represents the number of shares of Common Stock beneficially owned as of December 31, 2016, as reported on Schedule 13G/A filed on February 10, 2017 with the SEC. Such report indicates sole voting power over 21,115 shares, shared voting power over 2,660 shares, sole dispositive power over 1,507,236 shares, and shared dispositive power over 22,835 shares. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(5) Represents the number of shares of Common Stock beneficially owned as of December 31, 2016, as reported on Schedule 13G filed on February 9, 2017 with the SEC. Such report indicates sole voting power over 982,664 shares and sole dispositive power over 1,032,259 shares. The address of Dimensional Fund Advisors LP is 6300 Bee Cave Board, Building One, Austin, TX 78746.

(6) Represents the number of shares of Common Stock beneficially owned as of April 30, 2017, as reported on Schedule 13G/A filed on May 9, 2017 with the SEC. Such report indicates sole voting power over 222,820 shares, shared voting power over 67,173 shares, and sole dispositive power over 951,292 shares. The address of EARNEST Partners, LLC is 1180 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2458 of 2711

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2017, unless otherwise indicated, by each of our directors, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 534,980 | 2.8% |
| Alan Edrick(4) | 359,890 | 1.9% |
| Ajay Mehra(5) | 164,735 | * |
| Victor S. Sze(6) | 286,870 | 1.5% |
| Pak Chin(7) | 2,587 | * |
| Meyer Luskin(8) | 18,446 | * |
| Steven C. Good(9) | 16,925 | * |
| William F. Ballhaus(10) | 15,350 | * |
| James B. Hawkins(11) | 895 | * |
| Gerald Chizever(12) | 5,000 | * |
| All directors and executive officers as a group (15 persons) | 1,492,683 | 7.6% |

* Represents less than 1.0% of the outstanding shares of our Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2017, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. No shares are pledged as security.

(3) Mr. Chopra is our Chairman of the Board of Directors, Chief Executive Officer and President. Includes 35,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 17,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. In addition, includes 301,244 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 10,000 shares held in the Nandini SLAT Trust. Includes 60,000 shares issuable pursuant to options which were granted on September 9, 2011.

(4) Mr. Edrick is our Executive Vice President and Chief Financial Officer. Includes 249,000 shares issuable pursuant to options which were granted between February 8, 2008 and September 9, 2011.

(5) Mr. Mehra is our Executive Vice President and President of OSI Solutions Business and a Director. Includes 75,000 shares issuable pursuant to options which were granted between September 1, 2009 and September 9, 2011.

(6) Mr. Sze is our Executive Vice President, General Counsel and Secretary. Includes 157,000 shares issuable pursuant to options which were granted between July 28, 2008 and September 9, 2011.

(7) Mr. Chin is the former President of our Security division. Represents the number of shares of Common Stock beneficially owned as of August 2, 2017.

(8) Mr. Luskin is a Director. Includes 18,446 shares held by The Meyer and Doreen Luskin Family Trust.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2459 of 2711

(9) Mr. Good is a Director. Includes 5,000 shares held in the Good, Swartz & Berns Pension and Profit Sharing Plan.

(10) Dr. Ballhaus is a Director. Includes 15,350 shares held in the Ballhaus Trust U/A 01/25/02 Dr. William Ballhaus Jr. and Jane K. Ballhaus Trustees.

(11) Mr. Hawkins is a Director.

(12) Mr. Chizever is a Director. Includes 5,000 shares held by The G & C Chizever Family Trust.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish us with copies of all such reports that they file. None of our directors or executive officers owns more than 10% of the our securities. Based solely upon our review of such forms furnished to us during the fiscal year ended June 30, 2017, and written representations from certain reporting persons, we believe that our executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act, with the exception of one untimely Form 4 filing by Dr. Ballhaus.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2460 of 2711

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the our equity compensation plans as of June 30, 2017.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 780,671 | $ 30.00 | 1,312,813(2)(3)(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 780,671 | $ 30.00 | 1,312,813 |

(1) Includes shares of our Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under the 2012 Incentive Award Plan, which was approved by our stockholders on December 12, 2012. Upon stockholder approval of the 2012 Incentive Award Plan, we froze the 2006 Equity Participation Plan, and no further awards can be granted thereunder.

(3) Shares awarded as restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one share granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason (up to a maximum of 2,220,000 shares) also become available for future issuance under the 2012 Incentive Award Plan.

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**Audit Fees**

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of our annual financial statements for the years ended June 30, 2016 and 2017 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2016 | FY 2017 |
|---|---|---|
| Audit Fees | $ 1,000 | $ 1,404 |
| Audit-Related Fees | $ 20 | $ 160 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 1,020 | $ 1,564 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of our consolidated financial statements and the review of our interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements other than audit fees. This includes research and analysis on accounting matters performed in conjunction with the audit and professional services for the audit of the financial statements of our 401(k) plan.

The term "Tax Fees" means fees for professional services rendered for tax advice, planning and compliance (domestic and international).

The term "All Other Fees" means fees for products and services other than for the services described above.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2017, the Audit Committee was composed of four non-employee directors, namely, Steven C. Good, Meyer Luskin, William F. Ballhaus, and James B. Hawkins. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. Our Board has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2017.

At each of its meetings, the Audit Committee met with the senior members of our financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and our Chief Financial Officer. During the year, the Audit Committee had private sessions with our independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board the engagement of Moss Adams as our independent public accountants. The Audit Committee reviewed with our financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of our internal control, and the quality of our financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that our audited consolidated financial statements have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from our Company and our management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to our Company during the fiscal year ended June 30, 2017 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of our internal control and the audit of management's report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews our SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of our management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2463 of 2711

disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of our annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board, and the Board approved, that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2017, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus
James Hawkins

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2464 of 2711

## CODE OF ETHICS AND CONDUCT

We have adopted a Code of Ethics and Conduct, which applies to all of our directors, officers and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to our Current Report on Form 8-K filed with the SEC on May 23, 2016. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## ANNUAL MEETING ATTENDANCE

We have adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of our Board are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of our directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board of Directors, or specified individual directors, may do so by writing our Secretary at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will review all such correspondence and will regularly forward to the Board of Directors copies of all such correspondence that, in the opinion of our Secretary, deals with the functions of the Board of Directors or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board of Directors and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of our Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders at that address. We undertake to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to our Secretary at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

## STOCKHOLDER PROPOSALS

In the event that a stockholder desires to have a proposal included in our proxy statement and form of proxy used in connection with our next annual meeting of stockholders, the proposal must be delivered in writing to our Secretary and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to us would be June 25, 2018, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

Our Bylaws provide that if a stockholder, rather than including a proposal in our proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to us no more than 120 days and no less than 90 days prior to December 11, 2018, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 11, 2018, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in our Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

## INCORPORATION BY REFERENCE

Notwithstanding anything to the contrary set forth in any of the previous filings made by us under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by us under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by us under those statutes, except to the extent we specifically incorporate such report by reference therein. In addition, information on our website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

## OTHER BUSINESS

We do not know of any other business to be presented at the Annual Meeting and do not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 23, 2017

**Appendix A**

**AMENDED AND RESTATED**

**OSI SYSTEMS, INC. 2012 INCENTIVE AWARD PLAN**

**ARTICLE 1.**

**PURPOSE**

The purpose of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "*Plan*") is to promote the success and enhance the value of OSI Systems, Inc. (the "*Company*") by linking the individual interests of the members of the Board, Employees and Consultants to those of the Company's stockholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to the Company's stockholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract and retain the services of members of the Board, Employees and Consultants upon whose judgment, interest and special effort the successful conduct of the Company's operation is largely dependent. The Plan amends and restates in its entirety the OSI Systems, Inc. 2012 Incentive Award Plan, which was initially adopted by the Board on September 25, 2012 and approved by the Company's stockholders as of December 12, 2012.

**ARTICLE 2.**

**DEFINITIONS AND CONSTRUCTION**

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1. "*Administrator*" shall mean the governing body that conducts the general administration of the Plan as provided in Article 12 hereof. With reference to the duties of the Committee under the Plan which have been delegated to one or more persons pursuant to Section 12.6 hereof, or which the Board has assumed, the term "Administrator" shall refer to such person(s) unless the Committee or the Board has revoked such delegation or the Board has terminated the assumption of such duties.

2.2. "*Affiliate*" shall mean any Parent or Subsidiary.

2.3. "*Applicable Accounting Standards*" shall mean Generally Accepted Accounting Principles in the United States, International Financial Reporting Standards or such other accounting principles or standards as may apply to the Company's financial statements under United States federal securities laws from time to time.

2.4. "*Award*" shall mean an Option, a Restricted Stock Award, a Restricted Stock Unit Award, a Performance Award, a Dividend Equivalent Award, a Stock Appreciation Right or an Other Incentive Award, which may be awarded or granted under the Plan.

2.5. "*Award Agreement*" shall mean any written notice, agreement, contract or other instrument or document evidencing an Award, including through electronic medium, which shall contain such terms and conditions with respect to an Award as the Administrator shall determine, consistent with the Plan.

2.6. "*Board*" shall mean the Board of Directors of the Company.

2.7. "*Cause*" shall mean, with respect to any Participant, "Cause" as defined in such Participant's employment agreement with the Company if such an agreement exists and contains a definition of Cause or, if no such agreement exists or such agreement does not contain a definition of Cause, then Cause shall mean (i) the Participant's unauthorized use or disclosure of confidential information or trade secrets of the Company or any Subsidiary or any other material breach of a written agreement between the Participant and the Company, including without limitation a material breach of any employment or confidentiality

agreement; (ii) the Participant's indictment for, or the entry of a plea of guilty or nolo contendere by the Participant to, a felony under the laws of the United States or any state thereof or other foreign jurisdiction or any crime involving dishonesty or moral turpitude; (iii) the Participant's gross negligence or willful misconduct or the Participant's willful or repeated failure or refusal to substantially perform assigned duties; (iv) any act of fraud, embezzlement, material misappropriation or dishonesty committed by the Participant against the Company or any Subsidiary; or (v) any acts, omissions or statements by a Participant which the Company reasonably determines to be materially detrimental or damaging to the reputation, operations, prospects or business relations of the Company or any Subsidiary.

2.8. "*Change in Control*" shall mean the occurrence of any of the following events:

(a) The consummation of a transaction or series of transactions (other than an offering of Shares to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Parents or Subsidiaries, an employee benefit plan maintained by the Company or any of its Parents or Subsidiaries or a "person" that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities outstanding immediately after such acquisition; or

(b) During any period of two consecutive years, individuals who, at the beginning of such period, constitute the Board together with any new director(s) (other than a director designated by a person who shall have entered into an agreement with the Company to effect a transaction described in Section 2.8(a) or Section 2.8(c)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the two-year period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof; or

(c) The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case, other than a transaction:

(i) Which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "*Successor Entity*")), directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(ii) After which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; *provided, however,* that no person or group shall be treated for purposes of this Section 2.8(c)(ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction; or

(d) The Company's stockholders approve a liquidation or dissolution of the Company.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award which provides for the deferral of compensation that is subject to Section 409A of the Code, to the extent required to avoid the imposition of additional taxes under Section 409A of the Code, the transaction or event described in subsection (a), (b), (c) or (d) with respect to such Award shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation §1.409A-3(i)(5).

Consistent with the terms of this Section 2.8, the Administrator shall have full and final authority to determine conclusively whether a Change in Control of the Company has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto.

2.9. "*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, together with the regulations and official guidance promulgated thereunder, whether issued prior or subsequent to the grant of any Award.

2.10. "*Committee*" shall mean the Compensation Committee of the Board, or another committee or subcommittee of the Board or the Compensation Committee of the Board described in Article 12 hereof.

2.11. "*Common Stock*" shall mean the common stock of the Company, par value $0.001 per share.

2.12. "*Company*" shall mean OSI Systems, Inc., a Delaware corporation.

2.13. "*Consultant*" shall mean any consultant or adviser engaged to provide services to the Company or any Affiliate that qualifies as a consultant under the applicable rules of the Securities and Exchange Commission for registration of shares on a Form S-8 Registration Statement or any successor Form thereto.

2.14. "*Covered Employee*" shall mean any Employee who is, or could become, a "covered employee" within the meaning of Section 162(m) of the Code.

2.15. "*Director*" shall mean a member of the Board, as constituted from time to time.

2.16. "*Director Limit*" shall have the meaning set forth in Section 4.7.

2.17. "*Dividend Equivalent*" shall mean a right to receive the equivalent value (in cash or Shares) of dividends paid on Shares, awarded under Section 9.2 hereof.

2.18. "*DRO*" shall mean a "domestic relations order" as defined by the Code or Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time, or the rules thereunder.

2.19. "*Effective Date*" shall mean the date on which the Plan is approved by the Board, subject to approval of the Plan by the Company's stockholders.

2.20. "*Eligible Individual*" shall mean any person who is an Employee, a Consultant or a Non-Employee Director, as determined by the Administrator.

2.21. "*Employee*" shall mean any officer or other employee (as determined in accordance with Section 3401(c) of the Code) of the Company or of any Affiliate.

2.22. "*Equity Restructuring*" shall mean a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off, rights offering or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of shares of Common Stock (or other securities of the Company) or the share price of Common Stock (or other securities) and causes a change in the per share value of the Common Stock underlying outstanding Awards.

2.23. "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended from time to time.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2469 of 2711

2.24. "*Fair Market Value*" shall mean, as of any given date, the value of a Share determined as follows:

(a) If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange, the NASDAQ Global Market and the NASDAQ Global Select Market), (ii) listed on any national market system or (iii) listed, quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a share of Common Stock as quoted on such exchange or system for such date or, if there is no closing sales price for a share of Common Stock on the date in question, the closing sales price for a share of Common Stock on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(b) If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a share of Common Stock on such date, the high bid and low asked prices for a share of Common Stock on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c) If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in good faith.

2.25. "*Full Value Award*" shall mean any Award that is settled in Shares other than: (a) an Option, (b) a Stock Appreciation Right or (c) any other Award for which the Participant pays the intrinsic value existing as of the date of grant (whether directly or by forgoing a right to receive a payment from the Company or any Subsidiary), including any Restricted Stock Award, Performance Award, Dividend Equivalents Award, Restricted Stock Unit Award or Other Incentive Award, in each case, to the extent settled in Stock.

2.26. "*Greater Than 10% Stockholder*" shall mean an individual then-owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any "parent corporation" or "subsidiary corporation" (as defined in Sections 424(e) and 424(f) of the Code, respectively).

2.27. "*Incentive Stock Option*" shall mean an Option that is intended to qualify as an incentive stock option and conforms to the applicable provisions of Section 422 of the Code.

2.28. "*Individual Award Limit*" shall mean the cash and share limits applicable to Awards granted under the Plan, as set forth in Section 3.3 hereof.

2.29. "*Non-Employee Director*" shall mean a Director of the Company who is not an Employee.

2.30. "*Non-Qualified Stock Option*" shall mean an Option that is not an Incentive Stock Option or which is designated as an Incentive Stock Option but does not meet the applicable requirements of Section 422 of the Code.

2.31. "*Option*" shall mean a right to purchase Shares at a specified exercise price, granted under Article 6 hereof. An Option shall be either a Non-Qualified Stock Option or an Incentive Stock Option; *provided*, *however*, that Options granted to Non-Employee Directors and Consultants shall only be Non-Qualified Stock Options.

2.32. "*Original Plan*" shall mean the 2006 Equity Participation Plan of OSI Systems, Inc., as may be amended.

2.33. "*Other Incentive Award*" shall mean an Award denominated in, linked to or derived from Shares or value metrics related to Shares, granted pursuant to Section 9.5 hereof.

2.34. "*Parent*" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities ending with the Company if each of the entities other than the Company beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.35. "*Participant*" shall mean a person who has been granted an Award.

2.36. "*Performance Award*" shall mean an Award that is granted under Section 9.1 hereof.

2.37 "*Performance-Based Compensation*" shall mean any compensation that is intended to qualify as "performance-based compensation" as described in Section 162(m)(4)(C) of the Code.

2.38. "*Performance Criteria*" shall mean the criteria (and adjustments) that the Committee selects for an Award for purposes of establishing the Performance Goal or Performance Goals for a Performance Period, determined as follows:

(a) The Performance Criteria that shall be used to establish Performance Goals are limited to the following: (i) net earnings (either before or after one or more of the following: (A) interest, (B) taxes, (C) depreciation, (D) amortization and (E) non-cash equity-based compensation expense); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for the Company or any operating unit of the Company or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices.

(b) The Administrator may, in its sole discretion, provide that one or more objectively determinable adjustments shall be made to one or more of the Performance Goals. Such adjustments may include, but are not limited to, one or more of the following: (i) items related to a change in accounting principle; (ii) items relating to financing activities; (iii) expenses for restructuring or productivity initiatives; (iv) other non-operating items; (v) items related to acquisitions; (vi) items attributable to the business operations of any entity acquired by the Company during the Performance Period; (vii) items related to the disposal of a business or segment of a business; (viii) items related to discontinued operations that do not qualify as a segment of a business under Applicable Accounting Standards; (ix) items attributable to any stock dividend, stock split, combination or exchange of stock occurring during the Performance Period; (x) any other items of significant income or expense which are determined to be appropriate adjustments; (xi) items relating to unusual or extraordinary corporate transactions, events or developments, (xii) items related to amortization of acquired intangible assets; (xiii) items that are outside the scope of the Company's core, on-going business activities; (xiv) items related to acquired in-process research and development; (xv) items relating to changes in tax laws; (xvi) items relating to major licensing or partnership arrangements; (xvii) items relating to asset impairment charges; (xviii) items relating to gains or losses for litigation, arbitration and contractual settlements; or (xix) items relating to any other unusual or nonrecurring events or changes in applicable laws, accounting principles or business conditions. For all Awards intended to qualify as Performance-Based Compensation, such determinations shall be made within the time prescribed by, and otherwise in compliance with, Section 162(m) of the Code.

2.39. "*Performance Goals*" shall mean, for a Performance Period, one or more goals established in writing by the Administrator for the Performance Period based upon one or more Performance Criteria. Depending on the Performance Criteria used to establish such Performance Goals, the Performance Goals may be expressed in terms of overall Company performance or the performance of an Affiliate, division, business unit or an individual. The achievement of each Performance Goal shall be determined in accordance with Applicable Accounting Standards.

2.40 "*Performance Period*" shall mean one or more periods of time, which may be of varying and overlapping durations, as the Administrator may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Award.

2.41. "*Permitted Transferee*" shall mean, with respect to a Participant, any "family member" of the Participant, as defined under the instructions to use of the Form S-8 Registration Statement under the Securities Act, or any other transferee specifically approved by the Administrator after taking into account any state, federal, local or foreign tax and securities laws applicable to transferable Awards. In addition, the Administrator, in its sole discretion, may determine to permit a Participant to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and applicable state law, the Participant is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

2.42. "*Plan*" shall mean this Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan, as it may be amended from time to time.

2.43. "*Program*" shall mean any program adopted by the Administrator pursuant to the Plan containing the terms and conditions intended to govern a specified type of Award granted under the Plan and pursuant to which such type of Award may be granted under the Plan.

2.44. "*Restricted Stock*" shall mean Common Stock awarded under Article 8 hereof that is subject to certain restrictions and may be subject to risk of forfeiture or repurchase.

2.45. "*Restricted Stock Unit*" shall mean a contractual right awarded under Section 9.4 hereof to receive in the future a Share.

2.46. "*Securities Act*" shall mean the Securities Act of 1933, as amended.

2.47. "*Share Limit*" shall have the meaning provided in Section 3.1(a) hereof.

2.48. "*Shares*" shall mean shares of Common Stock.

2.49. "*Stock Appreciation Right*" shall mean a stock appreciation right granted under Article 10 hereof.

2.50. "*Stockholder Approval Date*" shall mean the date on which the Company's stockholders approve the Plan.

2.51. "*Subsidiary*" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.52. "*Substitute Award*" shall mean an Award granted under the Plan in connection with a corporate transaction, such as a merger, combination, consolidation or acquisition of property or stock, in any case, upon the assumption of, or in substitution for, an outstanding equity award previously granted by a company or other entity; *provided*, *however*, that in no event shall the term "Substitute Award" be

construed to refer to an award made in connection with the cancellation and repricing of an Option or Stock Appreciation Right.

2.53. "*Termination of Service*" shall mean:

(a) As to a Consultant, the time when the engagement of a Participant as a Consultant to the Company and its Affiliates is terminated for any reason, with or without Cause, including, without limitation, by resignation, discharge, death or retirement, but excluding terminations where the Consultant simultaneously commences or remains in employment and/or service as a Director with the Company or any Affiliate.

(b) As to a Non-Employee Director, the time when a Participant who is a Non-Employee Director ceases to be a Director for any reason, including, without limitation, a termination by resignation, failure to be elected, death or retirement, but excluding terminations where the Participant simultaneously commences or remains in employment or service as a Consultant with the Company or any Affiliate.

(c) As to an Employee, the time when the employee-employer relationship between a Participant and the Company and its Affiliates is terminated for any reason, including, without limitation, a termination by resignation, discharge, death, disability or retirement; but excluding terminations where the Participant simultaneously commences or remains in a capacity providing substantial services to the Company or any Affiliate, whether as a Consultant and/or Director.

The definition of Termination of Service shall be interpreted consistently with the meaning of "separation from service" as such term is defined under Code Section 409A, and the Administrator, in its sole discretion, shall determine the effect of all matters and questions relating to Terminations of Service, including, without limitation, the question of whether a Termination of Service has occurred, whether any Termination of Service resulted from a discharge for Cause and all questions of whether particular leaves of absence constitute a Termination of Service; *provided*, *however*, that, with respect to Incentive Stock Options, unless the Administrator otherwise provides in the terms of any Program, Award Agreement or otherwise, a leave of absence, change in status from an employee to an independent contractor or other change in the employee-employer relationship shall constitute a Termination of Service only if, and to the extent that, such leave of absence, change in status or other change interrupts employment for the purposes of Section 422(a)(2) of the Code. For purposes of the Plan, a Participant's employee-employer relationship or consultancy relationship shall be deemed to be terminated in the event that the Affiliate employing or contracting with such Participant ceases to remain an Affiliate following any merger, sale of stock or other corporate transaction or event (including, without limitation, a spin-off).

## ARTICLE 3.

## SHARES SUBJECT TO THE PLAN

3.1. *Number of Shares*.

(a) Subject to Sections 3.1(b), 13.1 and 13.2 hereof, the aggregate number of Shares which may be issued or transferred pursuant to Awards under the Plan shall be equal to the sum of (i) 5,450,000 Shares *plus* (ii) any Shares underlying awards outstanding under the Original Plan as of the Stockholder Approval Date which on or after the Stockholder Approval Date, terminate, expire or lapse for any reason without the delivery of Shares to the holder (the "*Share Limit*"), *provided*, *however*, that such aggregate number of Shares available for issuance under the Plan (including the determination of the number of Shares that reduce the Share Limit pursuant to 3.1(a)(ii) above) shall be reduced by 1.87 Shares for each Share delivered in settlement of any Full Value Award (including, with respect to 3.1(a)(ii), Full Value Awards granted pursuant to the Original Plan). All Shares authorized under the Plan may be issued as Incentive Stock Options. Notwithstanding the foregoing, to the extent permitted under applicable law and applicable stock exchange rules, Awards that provide

for the delivery of Shares subsequent to the applicable grant date may be granted in excess of the Share Limit if such Awards provide for the forfeiture or cash settlement of such Awards to the extent that insufficient Shares remain under the Share Limit at the time that Shares would otherwise be issued in respect of such Award.

(b) If any Shares subject to an Award that is not a Full Value Award are forfeited or expire or such Award is settled for cash (in whole or in part), the Shares subject to such Award shall, to the extent of such forfeiture, expiration or cash settlement, again be available for future grants of Awards under the Plan and shall be added back to the Share Limit in the same number of Shares as were debited from the Share Limit in respect of the grant of such Award (as may be adjusted in accordance with Section 13.2 hereof). To the extent that a Full Value Award is forfeited or expires or such Full Value Award is settled for cash (in whole or in part), the Shares available under the Plan shall be increased by 1.87 Shares subject to such Full Value Award that is forfeited, expired or settled in cash. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added back to the Share Limit and will not be available for future grants of Awards: (i) Shares not issued or delivered as a result of the net settlement of an outstanding Stock Appreciation Right or Option, (ii) Shares tendered by the Participant or withheld by the Company to pay the exercise price or satisfy any tax withholding obligations related to an outstanding Award, or (iii) Shares repurchased on the open market with the cash proceeds of the Option exercise price. Any Shares repurchased by the Company under Section 8.4 hereof at the same price paid by the Participant so that such shares are returned to the Company will again be available for Awards. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards shall not be counted against the shares available for issuance under the Plan. Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Stock Option to fail to qualify as an incentive stock option under Section 422 of the Code.

(c) Substitute Awards shall not reduce the Shares authorized for grant under the Plan, except as may be required by reason of Section 422 of the Code to avoid the disqualification of any Option intended to be an Incentive Stock Option. Additionally, in the event that a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan in the Board's discretion at the time of such acquisition or combination and shall not reduce the Shares authorized for grant under the Plan; *provided*, *however*, that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employed by or providing services to the Company or its Affiliates immediately prior to such acquisition or combination.

3.2. *Stock Distributed*. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Common Stock, treasury Common Stock or Common Stock purchased on the open market.

3.3. *Limitation on Number of Shares Subject to Awards*. Notwithstanding any provision in the Plan to the contrary, and subject to Section 13.2 hereof, the maximum aggregate number of Shares with respect to one or more Awards that may be granted to any one person during any calendar year (measured from the date of any grant) shall be 250,000 shares and the maximum aggregate amount of cash that may be paid in cash during any calendar year (measured from the date of any payment) with respect to one or more Awards payable in cash shall be $15,000,000 (together, the "*Individual Award Limits*").

**ARTICLE 4.**

**GRANTING OF AWARDS**

4.1. *Participation*. The Administrator may, from time to time, select from among all Eligible Individuals, those to whom one or more Awards shall be granted and shall determine the nature and amount of each Award, which shall not be inconsistent with the requirements of the Plan. No Eligible Individual shall have any right to be granted an Award pursuant to the Plan.

4.2. *Award Agreement*. Each Award shall be evidenced by an Award Agreement stating the terms and conditions applicable to such Award, consistent with the requirements of the Plan and any applicable Program.

4.3. *Limitations Applicable to Section 16 Persons*. Notwithstanding anything contained herein to the contrary, with respect to any Award granted or awarded to any individual who is then subject to Section 16 of the Exchange Act, the Plan, any applicable Program and the applicable Award Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3 of the Exchange Act and any amendments thereto) that are requirements for the application of such exemptive rule, and such additional limitations shall be deemed to be incorporated by reference into such Award to the extent permitted by applicable law.

4.4. *At-Will Service*. Nothing in the Plan or in any Program or Award Agreement hereunder shall confer upon any Participant any right to continue as an Employee, Director or Consultant of the Company or any Affiliate, or shall interfere with or restrict in any way the rights of the Company and any Affiliate, which rights are hereby expressly reserved, to discharge any Participant at any time for any reason whatsoever, with or without Cause, and with or without notice, or to terminate or change all other terms and conditions of employment or engagement, except to the extent expressly provided otherwise in a written agreement between the Participant and the Company or any Affiliate.

4.5. *Foreign Participants*. Notwithstanding any provision of the Plan to the contrary, in order to comply with the laws in other countries in which the Company and its Affiliates operate or have Employees, Non-Employee Directors or Consultants, or in order to comply with the requirements of any foreign securities exchange, the Administrator, in its sole discretion, shall have the power and authority to: (a) determine which Affiliates shall be covered by the Plan; (b) determine which Eligible Individuals outside the United States are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Eligible Individuals outside the United States to comply with applicable foreign laws or listing requirements of any such foreign securities exchange; (d) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable (and any such subplans and/or modifications shall be attached to the Plan as appendices); *provided*, *however*, that no such subplans and/or modifications shall increase the Share Limit or Individual Award Limits contained in Sections 3.1 and 3.3 hereof, respectively, or the Director Limit contained in Section 4.7 hereof; and (e) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local governmental regulatory exemptions or approvals or listing requirements of any such foreign securities exchange. Notwithstanding the foregoing, the Administrator may not take any actions hereunder, and no Awards shall be granted, that would violate the Code, the Exchange Act, the Securities Act, the rules of the securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law.

4.6. *Stand-Alone and Tandem Awards*. Awards granted pursuant to the Plan may, in the sole discretion of the Administrator, be granted either alone, in addition to, or in tandem with, any other Award granted pursuant to the Plan. Awards granted in addition to or in tandem with other Awards may be granted either at the same time as or at a different time from the grant of such other Awards.

4.7. *Non-Employee Director Awards*. Notwithstanding any provision to the contrary in the Plan, the sum of the grant date fair value of equity-based Awards and the amount of any cash-based Awards granted to a Non-Employee Director during any calendar year shall not exceed $750,000 (the "*Director Limit*").

**ARTICLE 5.**

**PROVISIONS APPLICABLE TO AWARDS INTENDED TO QUALIFY AS PERFORMANCE-BASED COMPENSATION**

5.1. *Purpose*. The Committee, in its sole discretion, may determine whether any Award is intended to qualify as Performance-Based Compensation. If the Committee, in its sole discretion, decides to grant an Award to an Eligible Individual that is intended to qualify as Performance-Based Compensation, then the provisions of this Article 5 shall control over any contrary provision contained in the Plan. The Administrator may in its sole discretion grant Awards to Eligible Individuals that are based on Performance Criteria or Performance Goals but that do not satisfy the requirements of this Article 5 and that are not intended to qualify as Performance-Based Compensation. Unless otherwise specified by the Administrator at the time of grant, the Performance Criteria with respect to an Award intended to be Performance-Based Compensation payable to a Covered Employee shall be determined on the basis of Applicable Accounting Standards.

5.2. *Applicability*. The grant of an Award to an Eligible Individual for a particular Performance Period shall not require the grant of an Award to such Eligible Individual in any subsequent Performance Period and the grant of an Award to any one Eligible Individual shall not require the grant of an Award to any other Eligible Individual in such period or in any other period.

5.3. *Procedures with Respect to Performance-Based Awards*. To the extent necessary to comply with the requirements of Section 162(m)(4)(C) of the Code, with respect to any Award which is intended to qualify as Performance-Based Compensation, no later than ninety (90) days following the commencement of any Performance Period or any designated fiscal period or period of service (or such earlier time as may be required under Section 162(m) of the Code), the Committee shall, in writing, (a) designate one or more Eligible Individuals, (b) select the Performance Criteria applicable to the Performance Period, (c) establish the Performance Goals and amounts of such Awards, as applicable, which may be earned for such Performance Period based on the Performance Criteria, and (d) specify the relationship between Performance Criteria and the Performance Goals and the amounts of such Awards, as applicable, to be earned by each Covered Employee for such Performance Period. Following the completion of each Performance Period, the Committee shall certify in writing whether and the extent to which the applicable Performance Goals have been achieved for such Performance Period.

5.4. *Payment of Performance-Based Awards*. Unless otherwise provided in the applicable Program or Award Agreement (and only to the extent otherwise permitted by Section 162(m)(4)(C) of the Code), the holder of an Award that is intended to qualify as Performance-Based Compensation must be employed by the Company or an Affiliate throughout the applicable Performance Period. Unless otherwise provided in the applicable Performance Goals, Program or Award Agreement, a Participant shall be eligible to receive payment pursuant to such Awards for a Performance Period only if and to the extent the Committee determines that the applicable Performance Goals for such period have been achieved.

5.5. *Additional Limitations*. Notwithstanding any other provision of the Plan and except as otherwise determined by the Administrator, any Award which is granted to an Eligible Individual and is intended to qualify as Performance-Based Compensation shall be subject to any additional limitations imposed under Section 162(m) of the Code that are requirements for qualification as Performance-Based Compensation, and the Plan, the Program and the Award Agreement shall be deemed amended to the extent necessary to conform to such requirements.

**ARTICLE 6.**

**GRANTING OF OPTIONS**

6.1. *Granting of Options to Eligible Individuals*. The Administrator is authorized to grant Options to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine which shall not be inconsistent with the Plan.

6.2. *Qualification of Incentive Stock Options*. No Incentive Stock Option shall be granted to any person who is not an Employee of the Company or any "parent corporation" or "subsidiary corporation" of the Company (as defined in Sections 424(e) and 424(f) of the Code, respectively). No person who qualifies as a Greater Than 10% Stockholder may be granted an Incentive Stock Option unless such Incentive Stock Option conforms to the applicable provisions of Section 422 of the Code. Any Incentive Stock Option granted under the Plan may be modified by the Administrator, with the consent of the Participant, to disqualify such Option from treatment as an "incentive stock option" under Section 422 of the Code. To the extent that the aggregate fair market value of stock with respect to which "incentive stock options" (within the meaning of Section 422 of the Code, but without regard to Section 422(d) of the Code) are exercisable for the first time by a Participant during any calendar year under the Plan and all other plans of the Company and any Affiliate corporation thereof exceeds $100,000, the Options shall be treated as Non-Qualified Stock Options to the extent required by Section 422 of the Code. The rule set forth in the preceding sentence shall be applied by taking Options and other "incentive stock options" into account in the order in which they were granted and the Fair Market Value of stock shall be determined as of the time the respective options were granted. In addition, to the extent that any Options otherwise fail to qualify as Incentive Stock Options, such Options shall be treated as Nonqualified Stock Options. Neither the Company nor the Administrator shall have any liability to a Holder, or any other Person, (a) if an Option (or any part thereof) which is intended to qualify as an Incentive Stock Option fails to qualify as an Incentive Stock Option or (b) for any action or omission by the Company or the Administrator that causes an Option not to qualify as an Incentive Stock Option, including without limitation, the conversion of an Incentive Stock Option to a Non-Qualified Stock Option or the grant of an Option intended as an Incentive Stock Option that fails to satisfy the requirements under the Code applicable to an Incentive Stock Option.

6.3. *Option Exercise Price*. Except as provided in Section 6.6 hereof, the exercise price per Share subject to each Option shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value of a Share on the date the Option is granted (or on the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable). In addition, in the case of Incentive Stock Options granted to a Greater Than 10% Stockholder, such price shall not be less than 110% of the Fair Market Value of a Share on the date the Option is granted (or the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable).

6.4. *Option Term*. The term of each Option shall be set by the Administrator in its sole discretion; *provided*, *however*, that the term shall not be more than ten (10) years from the date the Option is granted, or five (5) years from the date an Incentive Stock Option is granted to a Greater Than 10% Stockholder. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise the vested Options, which time period may not extend beyond the stated term of the Option. Except as limited by the requirements of Section 409A or Section 422 of the Code, the Administrator may extend the term of any outstanding Option, and may extend the time period during which vested Options may be exercised, in connection with any Termination of Service of the Participant, and, subject to Section 13.1 hereof, may amend any other term or condition of such Option relating to such a Termination of Service.

6.5. *Option Vesting*.

(a) The terms and conditions pursuant to which an Option vests in the Participant and becomes exercisable shall be determined by the Administrator and set forth in the applicable Award Agreement. Such vesting may be based on service with the Company or any Affiliate, any of the Performance Criteria, or any other criteria selected by the Administrator. At any time after grant of an Option, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the vesting of the Option.

(b) No portion of an Option which is unexercisable at a Participant's Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either in a Program, the applicable Award Agreement or by action of the Administrator following the grant of the Option.

6.6. *Substitute Awards*. Notwithstanding the foregoing provisions of this Article 6 to the contrary, in the case of an Option that is a Substitute Award, the price per share of the shares subject to such Option may be less than the Fair Market Value per share on the date of grant, *provided*, *however,* that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

6.7. *Substitution of Stock Appreciation Rights*. The Administrator may provide in an applicable Program or the applicable Award Agreement evidencing the grant of an Option that the Administrator, in its sole discretion, shall have the right to substitute a Stock Appreciation Right for such Option at any time prior to or upon exercise of such Option; *provided*, *however,* that such Stock Appreciation Right shall be exercisable with respect to the same number of Shares for which such substituted Option would have been exercisable, and shall also have the same exercise price and remaining term as the substituted Option.

## ARTICLE 7.

## EXERCISE OF OPTIONS

7.1. *Partial Exercise*. An exercisable Option may be exercised in whole or in part. However, an Option shall not be exercisable with respect to fractional shares and the Administrator may require that, by the terms of the Option, a partial exercise must be with respect to a minimum number of shares.

7.2. *Manner of Exercise*. All or a portion of an exercisable Option shall be deemed exercised upon delivery of all of the following to the Secretary of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Option, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then entitled to exercise the Option or such portion of the Option;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act, the Exchange Act, any other federal, state or foreign securities laws or regulations, the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance including, without limitation, placing legends on share certificates and issuing stop-transfer notices to agents and registrars;

(c) In the event that the Option shall be exercised pursuant to Section 11.3 hereof by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Option, as determined in the sole discretion of the Administrator; and

(d) Full payment of the exercise price and applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Option, or portion thereof, is exercised, in a manner permitted by Sections 11.1 and 11.2 hereof.

7.3. *Notification Regarding Disposition*. The Participant shall give the Company prompt written or electronic notice of any disposition of shares of Common Stock acquired by exercise of an Incentive Stock Option which occurs within (a) two years from the date of granting (including the date the Option is modified, extended or renewed for purposes of Section 424(h) of the Code) such Option to such Participant, or (b) one year after the transfer of such shares to such Participant.

**ARTICLE 8.**

**RESTRICTED STOCK**

8.1. *Award of Restricted Stock*.

(a) The Administrator is authorized to grant Restricted Stock to Eligible Individuals, and shall determine the terms and conditions, including the restrictions applicable to each award of Restricted Stock, which terms and conditions shall not be inconsistent with the Plan, and the Administrator may impose such conditions on the issuance of such Restricted Stock as it deems appropriate.

(b) The Administrator shall establish the purchase price, if any, and form of payment for Restricted Stock; *provided*, *however*, that if a purchase price is charged, such purchase price shall be no less than the par value of the Shares to be purchased, unless otherwise permitted by applicable law. In all cases, legal consideration shall be required for each issuance of Restricted Stock to the extent required by applicable law.

8.2. *Rights as Stockholders*. Subject to Section 8.4 hereof, upon issuance of Restricted Stock, the Participant shall have, unless otherwise provided by the Administrator, all the rights of a stockholder with respect to said shares, subject to the restrictions in an applicable Program or in the applicable Award Agreement; *provided*, *however*, that any dividends or distributions with payment dates that occur prior to the vesting of the Restricted Stock shall only be paid out to the Holder if and when the underlying share of Restricted Stock vests.

8.3. *Restrictions*. All shares of Restricted Stock (including any shares received by Participants thereof with respect to shares of Restricted Stock as a result of stock dividends, stock splits or any other form of recapitalization) shall, in the terms of an applicable Program or in the applicable Award Agreement, be subject to such restrictions and vesting requirements as the Administrator shall provide. Such restrictions may include, without limitation, restrictions concerning voting rights and transferability and such restrictions may lapse separately or in combination at such times and pursuant to such circumstances or based on such criteria as selected by the Administrator, including, without limitation, criteria based on the Participant's duration of employment, directorship or consultancy with the Company, the Performance Criteria, Company or Affiliate performance, individual performance or other criteria selected by the Administrator. Restricted Stock may not be sold or encumbered until all restrictions are terminated or expire.

8.4. *Repurchase or Forfeiture of Restricted Stock*. If no price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Participant's rights in unvested Restricted Stock then subject to restrictions shall lapse, and such Restricted Stock shall be surrendered to the Company and cancelled without consideration. If a price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Company shall have the right to repurchase from the Participant the unvested

Restricted Stock then-subject to restrictions at a cash price per share equal to the price paid by the Participant for such Restricted Stock or such other amount as may be specified in an applicable Program or the applicable Award Agreement. The Administrator in its sole discretion may provide that, upon certain events, including without limitation a Change in Control, the Participant's death, retirement or disability, any other specified Termination of Service or any other event, the Participant's rights in unvested Restricted Stock shall not lapse, such Restricted Stock shall vest and cease to be forfeitable and, if applicable, the Company cease to have a right of repurchase.

8.5. *Certificates for Restricted Stock*. Restricted Stock granted pursuant to the Plan may be evidenced in such manner as the Administrator shall determine. Certificates or book entries evidencing shares of Restricted Stock must include an appropriate legend referring to the terms, conditions and restrictions applicable to such Restricted Stock, and the Company may, in its sole discretion, retain physical possession of any stock certificate until such time as all applicable restrictions lapse.

8.6. *Section 83(b) Election*. If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which the Participant would otherwise be taxable under Section 83(a) of the Code, the Participant shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service.

## ARTICLE 9.

## PERFORMANCE AWARDS, DIVIDEND EQUIVALENTS, RESTRICTED STOCK UNITS; OTHER INCENTIVE AWARDS

9.1. *Performance Awards*.

(a) The Administrator is authorized to grant Performance Awards to any Eligible Individual and to determine whether such Performance Awards shall be Performance-Based Compensation. The value of Performance Awards may be linked to any one or more of the Performance Criteria or other specific criteria determined by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. Performance Awards may be paid in cash, Shares or a combination of both, as determined by the Administrator.

(b) Without limiting Section 9.1(a) hereof, the Administrator may grant Performance Awards to any Eligible Individual in the form of a cash bonus payable upon the attainment of objective Performance Goals, or such other criteria, whether or not objective, which are established by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. Any such bonuses paid to a Participant which are intended to be Performance-Based Compensation shall be based upon objectively determinable bonus formulas established in accordance with the provisions of Article 5 hereof.

9.2. *Dividend Equivalents*.

(a) Subject to Section 9.2(b) hereof, Dividend Equivalents may be granted by the Administrator, either alone or in tandem with another Award, based on dividends declared on the Common Stock, to be credited as of dividend payment dates during the period between the date the Dividend Equivalents are granted to a Participant and the date such Dividend Equivalents terminate or expire, as determined by the Administrator. Such Dividend Equivalents shall be converted to cash or additional shares of Common Stock by such formula and at such time and subject to such limitations as may be determined by the Administrator; *provided*, *however*, that Dividend Equivalents with respect to Shares covered by an Award shall only be paid out to the Participant at the same time or times and to the same extent that the vesting conditions, if any, are subsequently satisfied and the Award vests with respect to such Shares.

(b) Notwithstanding the foregoing, no Dividend Equivalents shall be payable with respect to Options or Stock Appreciation Rights.

9.3. *Restricted Stock Units*. The Administrator is authorized to grant Restricted Stock Units to any Eligible Individual. The number and terms and conditions of Restricted Stock Units shall be determined by the Administrator. The Administrator shall specify the date or dates on which the Restricted Stock Units shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate, including conditions based on one or more Performance Criteria or other specific criteria, including service to the Company or any Affiliate, in each case on a specified date or dates or over any period or periods, as determined by the Administrator. The Administrator shall specify, or permit the Participant to elect, the conditions and dates upon which the Shares underlying the Restricted Stock Units which shall be issued, which dates shall not be earlier than the date as of which the Restricted Stock Units vest and become nonforfeitable and which conditions and dates shall be subject to compliance with Section 409A of the Code or an exemption therefrom. On the distribution dates, the Company shall issue to the Participant one unrestricted, fully transferable Share (or the Fair Market Value of one such Share in cash) for each vested and nonforfeitable Restricted Stock Unit.

9.4. *Other Incentive Awards*. The Administrator is authorized to grant Other Incentive Awards to any Eligible Individual, which Awards may cover Shares or the right to purchase Shares or have a value derived from the value of, or an exercise or conversion privilege at a price related to, or that are otherwise payable in or based on, Shares, stockholder value or stockholder return, in each case on a specified date or dates or over any period or periods determined by the Administrator. Other Incentive Awards may be linked to any one or more of the Performance Criteria or other specific performance criteria determined appropriate by the Administrator.

9.5. *Other Terms and Conditions*. All applicable terms and conditions of each Award described in this Article 9, including without limitation, as applicable, the term, vesting and exercise/purchase price applicable to the Award, shall be set by the Administrator in its sole discretion, *provided*, *however*, that the value of the consideration paid by a Participant for an Award shall not be less than the par value of a Share, unless otherwise permitted by applicable law.

9.6. *Termination of Service*. Awards described in this Article 9 are generally exercisable or distributable, as applicable, only while the Participant is an Employee, Director or Consultant, as applicable. The Administrator, however, in its sole discretion, may provide that a vested Award may be exercised or distributed subsequent to Termination of Service as provided under an applicable Program, Award Agreement, payment deferral election and/or in certain events, including a Change in Control, the Participant's death, retirement or disability or any other specified Termination of Service, subject to compliance with Code Section 409A and other applicable laws.

## ARTICLE 10.

## STOCK APPRECIATION RIGHTS

10.1. *Grant of Stock Appreciation Rights*.

(a) The Administrator is authorized to grant Stock Appreciation Rights to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine consistent with the Plan.

(b) A Stock Appreciation Right shall entitle the Participant (or other person entitled to exercise the Stock Appreciation Right pursuant to the Plan) to exercise all or a specified portion of the Stock Appreciation Right (to the extent then exercisable pursuant to its terms) and to receive from the Company an amount determined by multiplying the difference obtained by subtracting the exercise price per share of the Stock Appreciation Right from the Fair Market Value on the date of exercise of the Stock Appreciation Right by the number of Shares with respect to which the Stock Appreciation

Right shall have been exercised, subject to any limitations the Administrator may impose. Except as described in Section 10.1(c) hereof, the exercise price per Share subject to each Stock Appreciation Right shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value on the date the Stock Appreciation Right is granted.

(c) Notwithstanding the foregoing provisions of Section 10.1(b) hereof to the contrary, in the case of a Stock Appreciation Right that is a Substitute Award, the price per share of the shares subject to such Stock Appreciation Right may be less than the Fair Market Value per share on the date of grant; *provided*, *however*, that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

10.2. *Stock Appreciation Right Vesting*.

(a) The Administrator shall determine the period during which a Participant shall vest in a Stock Appreciation Right and have the right to exercise such Stock Appreciation Right in whole or in part. Such vesting may be based on service with the Company or any Affiliate, or any other criteria selected by the Administrator. At any time after grant of a Stock Appreciation Right, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the period during which a Stock Appreciation Right vests.

(b) No portion of a Stock Appreciation Right which is unexercisable at Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either in an applicable Program or Award Agreement or by action of the Administrator following the grant of the Stock Appreciation Right.

10.3. *Manner of Exercise*. All or a portion of an exercisable Stock Appreciation Right shall be deemed exercised upon delivery of all of the following to the stock administrator of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Stock Appreciation Right, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then-entitled to exercise the Stock Appreciation Right or such portion of the Stock Appreciation Right;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act and any other federal, state or foreign securities laws or regulations. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance;

(c) In the event that the Stock Appreciation Right shall be exercised pursuant to this Section 10.3 by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Stock Appreciation Right; and

(d) Full payment of the applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Stock Appreciation Right, or portion thereof, is exercised, in a manner permitted by Sections 11.1 and 11.2 hereof.

10.4. *Stock Appreciation Right Term*. The term of each Stock Appreciation Right shall be set by the Administrator in its sole discretion; *provided*, *however*, that the term shall not be more than ten (10) years from the date the Stock Appreciation Right is granted. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise any vested Stock Appreciation Rights, which time period may not extend beyond the expiration

date of the Stock Appreciation Right term. Except as limited by the requirements of Section 409A of the Code, the Administrator may extend the term of any outstanding Stock Appreciation Right, and may extend the time period during which vested Stock Appreciation Rights may be exercised in connection with any Termination of Service of the Participant, and, subject to Section 13.1 hereof, may amend any other term or condition of such Stock Appreciation Right relating to such a Termination of Service.

**ARTICLE 11.**

**ADDITIONAL TERMS OF AWARDS**

11.1. *Payment*. The Administrator shall determine the methods by which payments by any Participant with respect to any Awards granted under the Plan shall be made, including, without limitation: (a) cash or check, (b) Shares (including, in the case of payment of the exercise price of an Award, Shares issuable pursuant to the exercise of the Award) held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences, in each case, having a Fair Market Value on the date of delivery equal to the aggregate payments required, (c) delivery of a written or electronic notice that the Participant has placed a market sell order with a broker with respect to Shares then-issuable upon exercise or vesting of an Award, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the aggregate payments required; *provided*, *however*, that payment of such proceeds is then made to the Company upon settlement of such sale, or (d) other form of legal consideration acceptable to the Administrator. The Administrator shall also determine the methods by which Shares shall be delivered or deemed to be delivered to Participants. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

11.2. *Tax Withholding*. The Company and its Affiliates shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company or an Affiliate, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's social security, Medicare and any other employment tax obligation) required by law to be withheld with respect to any taxable event concerning a Participant arising as a result of the Plan. The Administrator may in its sole discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company or an Affiliate withhold Shares otherwise issuable under an Award (or allow the surrender of Shares). Unless determined otherwise by the Administrator, the number of Shares which may be so withheld or surrendered shall be limited to the number of shares which have a Fair Market Value on the date of withholding or repurchase no greater than the aggregate amount of such liabilities based on the maximum individual statutory withholding rates for federal, state, local and foreign income tax and payroll tax purposes for the applicable jurisdiction. The Administrator shall determine the fair market value of the Shares, consistent with applicable provisions of the Code, for tax withholding obligations due in connection with a broker-assisted cashless Option or Stock Appreciation Right exercise involving the sale of shares to pay the Option or Stock Appreciation Right exercise price or any tax withholding obligation.

11.3. *Transferability of Awards*.

(a) Except as otherwise provided in Section 11.3(b) or (c) hereof:

(i) No Award under the Plan may be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO, unless and until such Award has been exercised, or the shares underlying such Award have been issued, and all restrictions applicable to such shares have lapsed;

(ii) No Award or interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, hypothecation, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy) unless and until such Award has been exercised, or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed, and any attempted disposition of an Award prior to the satisfaction of these conditions shall be null and void and of no effect, except to the extent that such disposition is permitted by clause (i) of this provision; and

(iii) During the lifetime of the Participant, only the Participant may exercise an Award (or any portion thereof) granted to him under the Plan, unless it has been disposed of pursuant to a DRO; after the death of the Participant, any exercisable portion of an Award may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Program or Award Agreement, be exercised by his personal representative or by any person empowered to do so under the deceased Participant's will or under the then applicable laws of descent and distribution.

(b) Notwithstanding Section 11.3(a) hereof, the Administrator, in its sole discretion, may determine to permit a Participant or a Permitted Transferee of such Participant to transfer an Award other than an Incentive Stock Option to any one or more Permitted Transferees of such Participant, subject to the following terms and conditions: (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee (other than to another Permitted Transferee of the applicable Participant) other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO; (ii) an Award transferred to a Permitted Transferee shall continue to be subject to all the terms and conditions of the Award as applicable to the original Participant (other than the ability to further transfer the Award); and (iii) the Participant (or transferring Permitted Transferee) and the Permitted Transferee shall execute any and all documents requested by the Administrator, including without limitation, documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under applicable federal, state and foreign securities laws and (C) evidence the transfer. In addition, and further notwithstanding Section 11.3(a), hereof, the Administrator, in its sole discretion, may determine to permit a Holder to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and other Applicable Law, the Holder is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

(c) Notwithstanding Section 11.3(a) hereof, a Participant may, in the manner determined by the Administrator, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Program or Award Agreement applicable to the Participant, except to the extent the Plan, the Program and the Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Administrator. If the Participant is married or a domestic partner in a domestic partnership qualified under applicable law and resides in a "community property" state, a designation of a person other than the Participant's spouse or domestic partner, as applicable, as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written or electronic consent of the Participant's spouse or domestic partner. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Administrator prior to the Participant's death.

11.4. *Conditions to Issuance of Shares*.

(a) Notwithstanding anything herein to the contrary, neither the Company nor its Affiliates shall be required to issue or deliver any certificates or make any book entries evidencing Shares pursuant to the exercise of any Award, unless and until the Administrator has determined, with advice of counsel, that the issuance of such Shares is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded, and the Shares are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Administrator may require that a Participant make such reasonable covenants, agreements and representations as the Administrator, in its discretion, deems advisable in order to comply with any such laws, regulations or requirements.

(b) All Share certificates delivered pursuant to the Plan and all shares issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to comply with federal, state or foreign securities or other laws, rules and regulations and the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. The Administrator may place legends on any Share certificate or book entry to reference restrictions applicable to the Shares.

(c) The Administrator shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Award, including a window-period limitation, as may be imposed in the sole discretion of the Administrator.

(d) No fractional Shares shall be issued and the Administrator shall determine, in its sole discretion, whether cash shall be given in lieu of fractional shares or whether such fractional shares shall be eliminated by rounding down.

(e) Notwithstanding any other provision of the Plan, unless otherwise determined by the Administrator or required by any applicable law, rule or regulation, the Company and/or its Affiliates may, in lieu of delivering to any Participant certificates evidencing Shares issued in connection with any Award, record the issuance of Shares in the books of the Company (or, as applicable, its transfer agent or stock plan administrator).

11.5. *Forfeiture Provisions*. Pursuant to its general authority to determine the terms and conditions applicable to Awards under the Plan, the Administrator shall have the right to provide, in the terms of Awards made under the Plan, or to require a Participant to agree by separate written or electronic instrument, that: (a)(i) any proceeds, gains or other economic benefit actually or constructively received by the Participant upon any receipt or exercise of the Award, or upon the receipt or resale of any Shares underlying the Award, must be paid to the Company, and (ii) the Award shall terminate and any unexercised portion of the Award (whether or not vested) shall be forfeited, if (b)(i) a Termination of Service occurs prior to a specified date, or within a specified time period following receipt or exercise of the Award, or (ii) the Participant at any time, or during a specified time period, engages in any activity in competition with the Company, or which is inimical, contrary or harmful to the interests of the Company, as further defined by the Administrator or (iii) the Participant incurs a Termination of Service for Cause.

11.6. *Prohibition on Repricing*. Except in connection with a corporate transaction involving the Company (including, without limitation, any stock dividend, stock split, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, or exchange of shares), the terms of outstanding Awards may not be amended, without stockholder approval, to reduce the exercise price of outstanding Options or Stock Appreciation Rights or cancel outstanding Options or Stock Appreciation Rights in exchange for cash, other Awards or Options or Stock Appreciation Rights with an exercise price that is less than the exercise price of the original Options or Stock Appreciation Rights.

11.7. *Cash Settlement*. Without limiting the generality of any other provision of the Plan, the Administrator may provide, in an Award Agreement or subsequent to the grant of an Award, in its discretion, that any Award may be settled in cash, Shares or a combination thereof.

11.8. *Terms May Vary Between Awards*. The terms and conditions of each Award shall be determined by the Administrator in its sole discretion and the Administrator shall have complete flexibility to provide for varied terms and conditions as between any Awards, whether of the same or different Award type and/or whether granted to the same or different Participants (in all cases, subject to the terms and conditions of the Plan).

11.9. *Data Privacy*. As a condition of receipt of any Award, each Holder explicitly consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Section 11.9 by and among, as applicable, the Company and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Holder's participation in the Plan. The Company and its Subsidiaries may hold certain personal information about a Holder, including but not limited to, the Holder's name, home address and telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), any shares of stock held in the Company or any of its Subsidiaries, details of all Awards, in each case, for the purpose of implementing, managing and administering the Plan and Awards (the "*Data*"). The Company and its Subsidiaries may transfer the Data amongst themselves as necessary for the purpose of implementation, administration and management of a Holder's participation in the Plan, and the Company and its Subsidiaries may each further transfer the Data to any third parties assisting the Company and its Subsidiaries in the implementation, administration and management of the Plan. These recipients may be located in the Holder's country, or elsewhere, and the Holder's country may have different data privacy laws and protections than the recipients' country. Through acceptance of an Award, each Holder authorizes such recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Holder's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or any of its Subsidiaries or the Holder may elect to deposit any Shares. The Data related to a Holder will be held only as long as is necessary to implement, administer, and manage the Holder's participation in the Plan. A Holder may, at any time, view the Data held by the Company with respect to such Holder, request additional information about the storage and processing of the Data with respect to such Holder, recommend any necessary corrections to the Data with respect to the Holder or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel Holder's ability to participate in the Plan and, in the Administrator's discretion, the Holder may forfeit any outstanding Awards if the Holder refuses or withdraws his or her consents as described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Holders may contact their local human resources representative.

**ARTICLE 12.**

**ADMINISTRATION**

12.1. *Administrator.* The Committee (or another committee or a subcommittee of the Board assuming the functions of the Committee under the Plan) shall administer the Plan (except as otherwise permitted herein). and, unless otherwise determined by the Board, shall consist solely of two or more Non-Employee Directors appointed by and holding office at the pleasure of the Board, each of whom is intended to qualify as a "non-employee director" as defined by Rule 16b-3 of the Exchange Act, an "outside director" for purposes of Section 162(m) of the Code and an "independent director" under the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, in each case, to the extent required under such provision; *provided*, *however*, that any action taken by the Committee shall be valid and effective, whether or not members of the Committee at the time of such action are later determined not to have satisfied the requirements for membership set forth in this

Section 12.l or otherwise provided in any charter of the Committee. Except as may otherwise be provided in any charter of the Committee, appointment of Committee members shall be effective upon acceptance of appointment. Committee members may resign at any time by delivering written or electronic notice to the Board. Vacancies in the Committee may only be filled by the Board. Notwithstanding the foregoing, (a) the full Board, acting by a majority of its members in office, shall conduct the general administration of the Plan with respect to Awards granted to Non-Employee Directors and (b) the Board or Committee may delegate its authority hereunder to the extent permitted by Section 12.6 hereof.

12.2. *Duties and Powers of Administrator.* It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and all Programs and Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan and any Program as are not inconsistent with the Plan, to interpret, amend or revoke any such rules and to amend any Program or Award Agreement provided that the rights or obligations of the holder of the Award that is the subject of any such Program or Award Agreement are not affected adversely by such amendment, unless the consent of the Participant is obtained or such amendment is otherwise permitted under Section 13.10 hereof. Any such grant or award under the Plan need not be the same with respect to each Participant. Any such interpretations and rules with respect to Incentive Stock Options shall be consistent with the provisions of Section 422 of the Code. In its sole discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan except with respect to matters which under Rule 16b-3 under the Exchange Act, Section 162(m) of the Code or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded are required to be determined in the sole discretion of the Committee.

12.3. *Action by the Committee*. A majority of the Committee shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by all members of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Affiliate, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

12.4. *Authority of Administrator.* Subject to any specific designation in the Plan, the Administrator has the exclusive power, authority and sole discretion to:

(a) Designate Eligible Individuals to receive Awards;

(b) Determine the type or types of Awards to be granted to each Eligible Individual;

(c) Determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d) Determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price or purchase price, any performance criteria, any restrictions or limitations on the Award, any schedule for vesting, lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, and any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Administrator in its sole discretion determines;

(e) Determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in cash, Shares, other Awards or other property, or an Award may be canceled, forfeited or surrendered;

(f) Prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) Decide all other matters that must be determined in connection with an Award;

(h) Establish, adopt or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) Interpret the terms of, and any matter arising pursuant to, the Plan, any Program or any Award Agreement; and

(j) Make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan.

12.5. *Decisions Binding*. The Administrator's interpretation of the Plan, any Awards granted pursuant to the Plan, any Program, any Award Agreement and all decisions and determinations by the Administrator with respect to the Plan are final, binding and conclusive on all parties.

12.6. *Delegation of Authority.* To the extent permitted by applicable law or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, the Board or Committee may from time to time delegate to a committee of one or more members of the Board or one or more officers of the Company the authority to grant or amend Awards or to take other administrative actions pursuant to this Article 12; *provided*, *however*, that in no event shall an officer of the Company be delegated the authority to grant awards to, or amend awards held by, the following individuals: (a) individuals who are subject to Section 16 of the Exchange Act, (b) Covered Employees with respect to Awards intended to constitute Performance-Based Compensation or (c) officers of the Company (or Directors) to whom authority to grant or amend Awards has been delegated hereunder; *provided further,* that any delegation of administrative authority shall only be permitted to the extent it is permissible under Section 162(m) of the Code and applicable securities laws or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. Any delegation hereunder shall be subject to the restrictions and limits that the Board or Committee specifies at the time of such delegation, and the Board or Committee, as applicable, may at any time rescind the authority so delegated or appoint a new delegatee.

**ARTICLE 13.**

**MISCELLANEOUS PROVISIONS**

13.1. *Amendment, Suspension or Termination of the Plan*. Except as otherwise provided in this Section 13.1, the Plan may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Board. However, without approval of the Company's stockholders given within twelve (12) months before or after the action by the Administrator, no action of the Administrator may, except as provided in Section 13.2 hereof, (a) increase the Share Limit or increase the Individual Award Limits, (b) reduce the price per share of any outstanding Option or Stock Appreciation Right granted under the Plan or (c) cancel any Option or Stock Appreciation Right in exchange for cash or another Award when the Option or Stock Appreciation Right price per share exceeds the Fair Market Value of the underlying Shares. Except as provided in Section 13.10 hereof, no amendment, suspension or termination of the Plan shall, without the consent of the Participant, impair any rights or obligations under any Award theretofore granted or awarded, unless the Award itself otherwise expressly so provides. No Awards may be granted or awarded during any period of suspension or after termination of the Plan. Notwithstanding anything herein to the contrary, no Incentive Stock Option shall be granted under the Plan after the tenth (10th) anniversary of the Effective Date.

13.2. *Changes in Common Stock or Assets of the Company, Acquisition or Liquidation of the Company and Other Corporate Events*.

(a) In the event of any stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to

stockholders, or any other change affecting the shares of the Company's stock or the share price of the Company's stock other than an Equity Restructuring, the Administrator shall make equitable adjustments, if any, to reflect such change with respect to (i) the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments of the Share Limit and Individual Award Limits, and adjustments of the manner in which shares subject to Full Value Awards will be counted); (ii) the number and kind of shares of Common Stock (or other securities or property) subject to outstanding Awards; (iii) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and/or (iv) the grant or exercise price per share for any outstanding Awards under the Plan. Any adjustment affecting an Award intended as Performance-Based Compensation shall be made consistent with the requirements of Section 162(m) of the Code unless otherwise determined by the Administrator.

(b) In the event of any transaction or event described in Section 13.2(a) hereof or any unusual or nonrecurring transactions or events affecting the Company, any Affiliate of the Company, or the financial statements of the Company or any Affiliate, or of changes in applicable laws, regulations or accounting principles, the Administrator, in its sole discretion, and on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event and either automatically or upon the Participant's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any Award under the Plan, to facilitate such transactions or events or to give effect to such changes in laws, regulations or principles:

(i) To provide for either (A) termination of any such Award in exchange for an amount of cash, if any, equal to the amount that would have been attained upon the exercise of such Award or realization of the Participant's rights (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction or event described in this Section 13.2, the Administrator determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment) or (B) the replacement of such Award with other rights or property selected by the Administrator in its sole discretion having an aggregate value not exceeding the amount that could have been attained upon the exercise of such Award or realization of the Participant's rights had such Award been currently exercisable or payable or fully vested;

(ii) To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar options, rights or awards covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and prices;

(iii) To make adjustments in the number and type of securities subject to outstanding Awards and Awards which may be granted in the future and/or in the terms, conditions and criteria included in such Awards (including the grant or exercise price, as applicable);

(iv) To provide that such Award shall be exercisable or payable or fully vested with respect to all securities covered thereby, notwithstanding anything to the contrary in the Plan or an applicable Program or Award Agreement; and

(v) To provide that the Award cannot vest, be exercised or become payable after such event.

(c) In connection with the occurrence of any Equity Restructuring, and notwithstanding anything to the contrary in Sections 13.2(a) and 13.2(b) hereof:

(i) The number and type of securities subject to each outstanding Award and/or the exercise price or grant price thereof, if applicable, shall be equitably adjusted. The adjustment

provided under this Section 13.2(c)(i) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(ii) The Administrator shall make such equitable adjustments, if any, as the Administrator in its discretion may deem appropriate to reflect such Equity Restructuring with respect to the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments to the Share Limit and the Individual Award Limits). The adjustments provided under this Section 13.2(c) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(d) Change in Control.

(i) Notwithstanding any other provision of the Plan, in the event of a Change in Control, each outstanding Award shall be assumed or an equivalent Award substituted by the successor corporation or a parent or subsidiary of the successor corporation. For the purposes of this Section 13.2(d)(i), an Award shall be considered assumed or substituted if, following the Change in Control, the assumed or substituted Award confers the right to purchase or receive, for each share of Common Stock subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) received in the Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); *provided*, *however*, that if such consideration received in the Change in Control was not solely common stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the assumed or substituted Award, for each share of Common Stock subject to such Award, to be solely common stock of the successor corporation or its parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change in Control.

(ii) In the event that the successor corporation in a Change in Control and its parents and subsidiaries refuse to assume or substitute for any Award in accordance with Section 13.2(d)(i) hereof, each such non-assumed/substituted Award shall become fully vested and, as applicable, exercisable and shall be deemed exercised, immediately prior to the consummation of such transaction, and all forfeiture restrictions on any or all such Awards shall lapse at such time. If an Award vests and, as applicable, is exercised in lieu of assumption or substitution in connection with a Change in Control, the Administrator shall notify the Participant of such vesting and any applicable exercise, and the Award shall terminate upon the Change in Control. For the avoidance of doubt, if the value of an Award that is terminated in connection with this Section 13.2(d)(ii) is zero or negative at the time of such Change in Control, such Award shall be terminated upon the Change in Control without payment of consideration therefor.

(e) The Administrator may, in its sole discretion, include such further provisions and limitations in any Award, agreement or certificate, as it may deem equitable and in the best interests of the Company that are not inconsistent with the provisions of the Plan.

(f) With respect to Awards which are granted to Covered Employees and are intended to qualify as Performance-Based Compensation, no adjustment or action described in this Section 13.2 or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause such Award to fail to so qualify as Performance-Based Compensation, unless the Administrator determines that the Award should not so qualify. No adjustment or action described in this Section 13.2 or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause the Plan to violate Section 422(b)(1) of the Code. Furthermore, no such adjustment or action shall be authorized with respect to any Award to the extent such adjustment or action would result in short-swing profits liability under Section 16 or violate the exemptive

conditions of Rule 16b-3 unless the Administrator determines that the Award is not to comply with such exemptive conditions.

(g) The existence of the Plan, any Program(s), any Award Agreement(s) and/or any Awards granted hereunder shall not affect or restrict in any way the right or power of the Company or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants or rights to purchase stock or of bonds, debentures, preferred or prior preference stocks whose rights are superior to or affect the Common Stock or the rights thereof or which are convertible into or exchangeable for Common Stock, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(h) No action shall be taken under this Section 13.2 which shall cause an Award to fail to comply with Section 409A of the Code or an exemption therefrom, in either case, to the extent applicable to such Award, unless the Administrator determines any such adjustments to be appropriate.

(i) In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of Common Stock or the share price of the Common Stock including any Equity Restructuring, for reasons of administrative convenience, the Company in its sole discretion may refuse to permit the exercise of any Award during a period of thirty (30) days prior to the consummation of any such transaction.

13.3. *Approval of Plan by Stockholders*. The Plan will be submitted for the approval of the Company's stockholders within twelve (12) months after the date of the Board's initial adoption of the Plan. If the Plan is not approved by stockholders within twelve (12) months after its adoption by the Board, then the Original Plan shall continue on its existing terms and conditions and the Plan shall be of no force or effect.

13.4. *No Stockholders Rights*. Except as otherwise provided herein or in an Award Agreement, a Participant shall have none of the rights of a stockholder with respect to shares of Common Stock covered by any Award until the Participant becomes the record owner of such shares of Common Stock.

13.5. *Paperless Administration*. In the event that the Company establishes, for itself or using the services of a third party, an automated system for the documentation, granting or exercise of Awards, such as a system using an internet website or interactive voice response, then the paperless documentation, granting or exercise of Awards by a Participant may be permitted through the use of such an automated system.

13.6. *Effect of Plan upon Other Compensation Plans*. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for the Company or any Affiliate. Nothing in the Plan shall be construed to limit the right of the Company or any Affiliate: (a) to establish any other forms of incentives or compensation for Employees, Directors or Consultants of the Company or any Affiliate, or (b) to grant or assume options or other rights or awards otherwise than under the Plan in connection with any proper corporate purpose including without limitation, the grant or assumption of options in connection with the acquisition by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, partnership, limited liability company, firm or association.

13.7. *Compliance with Laws*. The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of Shares and the payment of money under the Plan or under Awards granted or awarded hereunder are subject to compliance with all applicable federal, state, local and foreign laws, rules and regulations (including but not limited to state, federal and foreign securities law and margin requirements), the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, and to such approvals by any listing, regulatory or governmental authority as may,

in the opinion of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all applicable legal requirements. To the extent permitted by applicable law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

13.8. *Titles and Headings, References to Sections of the Code or Exchange Act*. The titles and headings of the sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. References to sections of the Code or the Exchange Act shall include any amendment or successor thereto.

13.9. *Governing Law.* The Plan and any agreements hereunder shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of laws thereof.

13.10. *Section 409A*. To the extent that the Administrator determines that any Award granted under the Plan is subject to Section 409A of the Code, the Plan, any applicable Program and the Award Agreement covering such Award shall be interpreted in accordance with Section 409A of the Code. In that regard, to the extent any Award under the Plan or any other compensatory plan or arrangement of the Company or any of its Subsidiaries is subject to Section 409A, and such Award or other amount is payable on account of a Participant's Termination of Service (or any similarly defined term), then (a) such Award or amount shall only be paid to the extent such Termination of Service qualifies as a "separation from service" as defined in Section 409A, and (b) if such Award or amount is payable to a "specified employee" as defined in Section 409A then to the extent required in order to avoid a prohibited distribution under Section 409A, such Award or other compensatory payment shall not be payable prior to the earlier of (i) the expiration of the six-month period measured from the date of the Participant's Termination of Service, or (ii) the date of the Participant's death. Notwithstanding any provision of the Plan to the contrary, in the event that, following the Effective Date, the Administrator determines that any Award may be subject to Section 409A of the Code, the Administrator may adopt such amendments to the Plan, any applicable Program and the Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to avoid the imposition of taxes on the Award under Section 409A of the Code, either through compliance with the requirements of Section 409A of the Code or with an available exemption therefrom. The Company makes no representations or warranties as to the tax treatment of any Award under Section 409A or otherwise. The Company shall have no obligation under this Section 13.10 or otherwise to take any action (whether or not described herein) to avoid the imposition of taxes, penalties or interest under Section 409A with respect to any Award and shall have no liability to any Holder or any other person if any Award, compensation or other benefits under the Plan are determined to constitute non-compliant, "nonqualified deferred compensation" subject to the imposition of taxes, penalties and/or interest under Section 409A.

13.11. *No Rights to Awards*. No Eligible Individual or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Administrator is obligated to treat Eligible Individuals, Participants or any other persons uniformly.

13.12. *Unfunded Status of Awards*. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Program or Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Affiliate.

13.13. *Indemnification*. To the extent allowable pursuant to applicable law, each member of the Board and any officer or other employee to whom authority to administer any component of the Plan is delegated shall be indemnified and held harmless by the Company from any loss, cost, liability or expense

that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit or proceeding against him or her; *provided*, *however*, that he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Certificate of Incorporation or Bylaws, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

13.14. *Relationship to other Benefits*. No payment pursuant to the Plan shall be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

13.15. *Expenses*. The expenses of administering the Plan shall be borne by the Company and its Affiliates.

13.16. *Arbitration*. With the exception of any claims for workers compensation, unemployment insurance, claims before any governmental administrative agencies as required by applicable law, or claims related to the National Labor Relations Act, any controversy relating to this Plan shall be settled via binding arbitration according to the applicable employment dispute resolution rules of the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures (available at http://www.adr.org). Such arbitration shall be presided over by a single arbitrator in California. Such binding arbitration is applicable to any and all claims under state and federal employment related statutes including without limitation the Fair Employment and Housing Act, the Title VII of the Civil Rights Act, as well as any claims related to a claimed right under this Plan. The Company shall bear all costs uniquely associated with the arbitration process, including the arbitrator's fees, if required by applicable law. The arbitrator shall have the authority to award any damages authorized by law. The prevailing party shall be entitled to his/its attorneys' fees, unless otherwise prohibited by applicable law. This requirement to arbitrate shall apply to both the Company and Employee. The parties understand that they are giving up their right to a trial in a court of law.

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

**Nominees**

01 Deepak Chopra 02 Ajay Mehra 03 Steven C. Good 04 Meyer Luskin 05 William F. Ballhaus
06 James B. Hawkins 07 Gerald Chizever

**The Board of Directors recommends you vote FOR proposals 2, 3 and 4.**

| | For | Against | Abstain |
|---|---|---|---|
| 2 Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2018. | ☐ | ☐ | ☐ |
| 3 Approval of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan. | ☐ | ☐ | ☐ |
| 4 Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2017. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

**The Board of Directors recommends you vote 1 YEAR on the following proposal:**

| | 1 year | 2 years | 3 years | Abstain |
|---|---|---|---|---|
| 5 Advisory vote on the determination of the frequency of the advisory vote on the Company's executive compensation. | ☐ | ☐ | ☐ | ☐ |

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name, by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

0000346450_1 R1.0.1.17

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap are available at www.proxyvote.com

---

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 11, 2017 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 11, 2017 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, 3, and 4 and "1 YEAR" for proposal 5 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000346450_2 R1.0.1.17

**Continued and to be signed on reverse side**

# Exhibit 42

8-K 1 a17-28287_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 11, 2017**

---

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

---

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company o

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 11, 2017. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 15,625,377 | 540,005 | 1,535,061 |
| Ajay Mehra | 15,392,906 | 772,476 | 1,535,061 |
| Steven C. Good | 15,236,008 | 929,374 | 1,535,061 |
| Meyer Luskin | 14,683,090 | 1,482,292 | 1,535,061 |
| William F. Ballhaus | 15,849,871 | 315,511 | 1,535,061 |
| James B. Hawkins | 13,258,170 | 2,907,212 | 1,535,061 |
| Gerald Chizever | 15,599,514 | 565,868 | 1,535,061 |

The seven nominees who received the highest number of votes (all of the above individuals) were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2018*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 17,147,952 | 501,931 | 50,560 | 0 |

The proposal was approved.

*3. Approval of Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 14,706,751 | 1,412,685 | 45,946 | 1,535,061 |

The proposal was approved.

*4. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2017*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 15,603,065 | 282,279 | 280,038 | 1,535,061 |

The proposal was approved.

*5. Advisory vote on the determination of the frequency of the advisory vote on the Company's executive compensation.*

| 1 Year | 2 Years | 3 Years | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| 13,202,539 | 4,616 | 2,915,351 | 42,876 | 1,535,061 |

In light of the voting results with respect to the frequency of stockholder votes on executive compensation, the Company's Board of Directors has decided that the Company will hold an annual advisory vote on the compensation of named executive officers.

**SIGNATURES**

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2499 of 2711

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 11, 2017

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**General Counsel, and Secretary**

3

# Exhibit 43

DEF 14A 1 a2236940zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2502 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 19, 2018

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., Pacific Time, on December 10, 2018, at the Company's offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 17, 2018 are entitled to vote at the Annual Meeting.

Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2018, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*

---



**12525 Chadron Avenue**
**Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., Pacific Time, on Monday, December 10, 2018

**Location:** The Company's offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect seven directors to hold office for a one-year term and until their respective successors are elected and qualified;
2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2019;
3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2018, as described in the accompanying Proxy Statement; and
4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 17, 2018 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 10, 2018:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2018 are available at *http://www.proxyvote.com*.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 3 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2018 | 11 |
| Compensation of Executive Officers and Directors | 14 |
| Security Ownership of Certain Beneficial Owners and Management | 40 |
| Equity Compensation Plan Information | 43 |
| Independent Registered Public Accounting Firm | 44 |
| Report of Audit Committee | 45 |
| Code of Ethics and Conduct | 47 |
| Annual Meeting Attendance | 47 |
| Stockholder Communications | 47 |
| Availability of Annual Report on Form 10-K | 47 |
| Stockholder Proposals | 48 |
| Incorporation by Reference | 48 |
| Other Business | 48 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2505 of 2711

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") for use at our Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., Pacific Time on December 10, 2018, at our offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

We are making our proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and our most recent Annual Report on Form 10-K ("Proxy Materials"), available to our stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. We anticipate that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 25, 2018.

Stockholders of record as of the close of business on October 17, 2018 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 17, 2018, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, we had issued and outstanding 18,153,122 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted with respect to any proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Stockholders and with respect to other matters which may be properly brought before the

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2506 of 2711

Annual Meeting. At the time of printing this Proxy Statement, our management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. In accordance with our Bylaws, directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One. Votes marked "withhold" will not affect the outcome of the election of directors.

*Proposal Two*. In accordance with our Bylaws, to be approved, the ratification of Moss Adams LLP as our independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. In accordance with our Bylaws, to be approved, the proposal regarding our executive compensation for the fiscal year ended June 30, 2018 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation and Benefits Committee (the "Compensation Committee") or the Board. Although non-binding, the Board values the opinions that our stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. We will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 10, 2018:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2018 are available at *http://www.proxyvote.com*.

**ELECTION OF DIRECTORS**
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

Our Board consists of seven members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The seven candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, James B. Hawkins, and Gerald Chizever. All of our director nominees are currently directors of the Company and were previously elected to serve on the Board by our stockholders.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until our next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although we know of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board may designate.

If a quorum is present and voting, the seven nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The current directors and nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 67 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Ajay Mehra | 56 | Director, Executive Vice President and President of OSI Solutions Business | 1996 |
| Steven C. Good(1)(2)(4) | 76 | Director | 1987 |
| Meyer Luskin(1)(2)(4) | 93 | Director | 1990 |
| William F. Ballhaus(1)(2)(3)(4)(5) | 73 | Director | 2010 |
| James B. Hawkins(1)(3)(5) | 62 | Director | 2015 |
| Gerald Chizever(4)(5) | 74 | Director | 2016 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Risk Management Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is our founder and has served as President, Chief Executive Officer and has been a member of our Board since our inception in May 1987. He has served as our Chairman of the Board since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of our major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, we acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2508 of 2711

various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing our Company.

***Ajay Mehra*** has been a member of our Board since March 1996. Mr. Mehra is Executive Vice President of the Company and President of OSI Solutions Business. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named our Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University. Mr. Mehra was selected to serve as a director because of his financial management experience and management experience within our Company.

***Steven C. Good*** has been a member of our Board since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good formerly served as a director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good currently serves as a director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves as a Director on the Advisory Board of the UCLA Luskin School of Public Affairs. Mr. Luskin was formerly Chairman of the Board of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital, Chairman of the Board of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital), a Director of the UCLA Foundation, and a Director of the Alliance for College-Ready Public Schools. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.

***William F. Ballhaus, Jr.*** has been a member of our Board since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology

for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus currently is Chairman of the Board of Trustees of the University Space Research Association. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** has been a member of our Board since December 2015. From 2004 through July 2018, Mr. Hawkins was the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a director of Invivo Corporation, a provider of MRI-safe patient monitoring. Mr. Hawkins currently serves as a director of El Dorado Resorts Inc. Mr. Hawkins has extensive risk management experience gained through the various executive and board positions that he has held. He earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins was selected to serve as a director because of his direct management experience in the medical device area.

***Gerald Chizever*** has been a member of our Board since October 2016. Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever's practice includes mergers and acquisitions, corporate finance, public and private securities offerings, general corporate representation and strategic alliances. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in all matters, including business transactions, corporate governance and compliance with governmental regulations. He holds a B.B.A. degree in Accounting and a Juris Doctorate from George Washington University. Mr. Chizever was selected to serve as a director because of his corporate governance and compliance experience, including his experience in highly-regulated industries.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to us between any of the directors or nominees for director and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among our directors or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board Role in Risk Oversight**

Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and other risks. Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment, and management of our risks. Our Board regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting. The Risk Management Committee oversees management of key enterprise risks, including strategic, operational, legal, regulatory,

and compliance. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board. The Compensation Committee oversees risks related to our executive compensation policies and practices. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure and Lead Independent Director**

Our Chairman of the Board is our Chief Executive Officer. We believe that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board's role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges we face and is thus well positioned to develop agendas and highlight issues that ensure that the Board's time and attention are focused on the most critical matters. In addition, our Board has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances our ability to communicate our message and strategy clearly and consistently to our stockholders, employees, and other companies with which we do business. Although we believe that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, we will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve our best interests and the best interests of our stockholders.

The combined Chairman of the Board and Chief Executive Officer position is balanced by the number of independent directors serving on our Board, our independent committees and our lead independent director. Meyer Luskin is currently our lead independent director and brings to this role considerable skills and experience as described above in "Election of Directors." The role of lead independent director is designed to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

**Board Meetings, Independence and Committees of the Board**

There were 12 meetings of the Board and the Board acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2018. During fiscal 2018, the Board had a standing Audit Committee, Compensation Committee, Nominating and Governance Committee, Risk Management Committee, and Technology Committee. The members of each committee are appointed by the majority vote of the Board. All persons serving as a director during the fiscal year ended June 30, 2018 attended more than 75% of the aggregate number of meetings held by the Board and all committees on which such director served.

The Board has determined that each of the nominees for director, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board has determined that each of the members of each of the committees of the Board is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and the Listing Standards, as applicable and currently in effect.

*Audit Committee*

We have a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of our independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews our financial

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2511 of 2711

statements and the adequacy of our internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to our Company.

The Audit Committee currently consists of four independent directors – Messrs. Good, Luskin and Hawkins and Dr. Ballhaus. The Board has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2018. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Risk Management Committee*

The Risk Management Committee is responsible for overseeing and monitoring our key enterprise risks, including strategic, operational, legal, regulatory, compliance, security, and reputational risks. The Risk Management Committee has responsibility for reviewing our compliance program and our major legal compliance risk exposures, monitoring our code of ethics, reviewing our risk management reviews and assessments, and regularly assessing the continuing appropriateness of a succession plan for our Chief Executive Officer and other executive officers. The Risk Management Committee currently consists of four independent directors – Messrs. Chizever, Good, and Luskin and Dr. Ballhaus. There were three meetings of the Risk Management Committee during the fiscal year ended June 30, 2018.

The Risk Management Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation and benefits for our executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board in the administration of our equity compensation and benefits plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Good and Dr. Ballhaus. There were 13 meetings of the Compensation Committee during the fiscal year ended June 30, 2018. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board. The Nominating and Governance Committee currently consists of two independent directors – Dr. Ballhaus and Mr. Hawkins. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2018.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board members, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board, willingness to objectively appraise

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2512 of 2711

management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board members. The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board regarding all technology-based matters. The Technology Committee currently consists of three independent directors – Dr. Ballhaus and Messrs. Hawkins and Chizever. There was one meeting of the Technology Committee during the fiscal year ended June 30, 2018.

The Technology Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and our Company, or any customer, supplier, competitor, or affiliate of ours, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of our Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board. We may also require any proposed nominee to furnish such other information as we or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2513 of 2711

There are no stockholder nominations for election to our Board to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify us of their intent to do so on or before the date on which nominations must be received by us in accordance with our Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Good and Dr. Ballhaus. None of our executive officers has served during the fiscal year ended June 30, 2018 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on our Board or the Compensation Committee. During the fiscal year ended June 30, 2018, no member of our Compensation Committee had any relationship or transaction with our Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board recommends that you vote "FOR" the election of each of Deepak Chopra, Ajay Mehra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr., James B. Hawkins, and Gerald Chizever as our directors. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Table of Contents Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2514 of 2711

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee has selected Moss Adams LLP ("Moss Adams") as our independent registered public accountants for the year ending June 30, 2019 and has further directed that management submit the selection of independent registered public accountants for ratification by our stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that our stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in our and our stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board recommends a vote "FOR" the ratification of Moss Adams as our independent registered public accountants for the fiscal year ending June 30, 2019. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2515 of 2711

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION**
**FOR THE FISCAL YEAR ENDED JUNE 30, 2018**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd Frank Act") enables our stockholders to vote to approve, on an advisory, non-binding basis, our executive compensation for the fiscal year ended June 30, 2018 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act ("Say-on-Pay"). We currently conduct this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at our 2019 Annual Meeting of Stockholders.

**Summary**

Our Board is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. We are asking our stockholders to provide advisory approval of our executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation, and the accompanying narrative disclosure set forth in the Proxy Statement. We recognize and value the critical role that executive leadership plays in our performance. Our executive compensation philosophy is intended to ensure that executive compensation is aligned with our short- and long-term business strategy, objectives, and stockholder interests. Our executive compensation is designed to attract, motivate, and retain highly qualified executives. We believe that our compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the short- and long-term interests of our stockholders.

We urge you to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

We believe that executive compensation should be tied to our performance on both a short-term and long-term basis. We believe that our continued success is closely tied to the performance of our executive officers and have designed our compensation practices in order to reward the executives for their contributions to our overall success.

**Alignment with Stockholders' Interests**

We grant annual incentives based in part on each executive's contribution to enhancing our short- and long-term profitable growth. We also grant long-term equity-based incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of our stockholders. In recent years, we have generally used restricted stock units as our equity incentive vehicle as these awards enable the executives to establish a meaningful equity stake in our Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead us to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of our operations. For fiscal year 2018, 100% of the long-term equity incentives granted to our corporate Named Executive Officers (our CEO, CFO, and General Counsel) and a significant portion of our equity incentives granted to our divisional Named Executive Officers consisted of restricted stock units subject to performance vesting based on growth of adjusted EBITDA per share.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2516 of 2711

**Long-Term Performance**

In order to promote our philosophy of pay-for-performance and furthering our objective of aligning the interests of management with those of our stockholders, we have established performance programs for certain of our executive officers. These programs focus on the achievement of our long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, we are incentivizing our officers to achieve our long-term corporate objectives and ultimately increase stockholder value.

**Highlights of 2018 Executive Compensation Program**

The Board believes our executive compensation program is designed appropriately and that a vote in favor of the proposal is warranted, including for these reasons: (1) 100% of corporate Named Executive Officer equity awards for fiscal 2018 were performance-based and tied to measurable pre-established targets; (2) we are committed to having strong governance standards and continue to take steps to further this commitment; and (3) we value the opinions and feedback we receive from, and we continue to engage with, our stockholders, and our executive compensation program directly reflects our stockholders' input.

**1. 100% Performance-Based Equity Awards for Corporate Named Executive Officers: Equity awards granted to our CEO, CFO, and General Counsel are 100% performance-based and tied to measurable pre-established adjusted EBITDA per share goals.**

100% of the equity grants made to our corporate Named Executive Officers and a significant portion of the equity grants made to our divisional Named Executive Officers during fiscal 2018 were performance-based and tied to pre-established adjusted EBITDA per share targets which require significant annual growth. 40% of the maximum number of shares that can be earned under each Named Executive Officer's 2018 award has a three-year performance component which vests or is forfeited following the end of the three-year performance cycle, subject to the achievement of the adjusted EBITDA per share growth target for fiscal 2020. If at least 85% of this three-year adjusted EBITDA per share target is not attained, then these shares are forfeited. The remaining 60% of the maximum number of shares that can be earned under each executive's 2018 award may vest up to 20% per year over the three-year period if annual adjusted EBITDA per share growth targets are exceeded for fiscal years 2018, 2019 and 2020, respectively.

We believe that the performance targets underlying our long-term equity incentive program are rigorous, and we have not disclosed current targets because their disclosure would allow our competitors to determine the EBITDA and pricing related to key programs, which would be competitively harmful to us.

The adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2018 was $6.00 and was achieved at 171% of target. As a result the 60,000 shares granted to our CEO in fiscal 2016 were vested. In addition, our CEO earned 92,015 shares, consisting of 26,480 vested shares earned pursuant to the fiscal 2018 grant, 35,535 vested shares earned pursuant to the fiscal 2017 grant and 30,000 vested shares earned pursuant to the fiscal 2016 grant.

**2. Corporate Governance and Best Practices: We are committed to having strong governance standards with respect to our compensation programs, procedures, and practices.**

We have taken the following actions to enhance our corporate governance and executive compensation policies:

- Appointed a lead independent director to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

- Prohibited all hedging and pledging of our stock by executive officers and directors. As of the date of the Proxy Statement, no shares of our stock are pledged by any Named Executive Officer or director.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2517 of 2711

- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements. We have also included clawback provisions in each Named Executive Officer's employment agreement.

- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives' long-term interests with those of our stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price.

**3. Communications with Stockholders: We maintain open lines of communication with our stockholders. Based on feedback we received from stockholders about our compensation programs, we revised our annual cash incentive program to directly address stockholder input.**

Our Compensation Committee takes very seriously stockholder feedback with respect to executive compensation. We previously conducted a robust stockholder outreach and continue to have open lines of communications with our stockholders, and our senior management routinely interacts with our stockholders on a variety of matters, including our executive compensation programs and practices.

In response to the specific stockholder feedback we received, our Compensation Committee revised our annual cash executive officer incentive program to be performance-based and formulaically tied to measurable thresholds, targets, and maximums. At our 2017 annual meeting, approximately 98% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation. Considering this overwhelming majority in favor, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2018.

Our Board believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that our executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K of the SEC, including in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board recommends that you vote "FOR" the approval of our executive compensation for the fiscal year ended June 30, 2018. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

**Executive Officers**

Our executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 67 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 50 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 56 | Director, Executive Vice President and President of OSI Solutions Business |
| Victor Sze* | 51 | Executive Vice President and General Counsel |
| Mal Maginnis* | 59 | President of Rapiscan Systems, Inc. |
| James Green | 60 | President of Healthcare Division |
| Manoocher Mansouri | 62 | President of Optoelectronics and Manufacturing Division |
| Shawn Thompson | 55 | President of OSI Electronics, Inc. |

* Denotes our Named Executive Officers for fiscal 2018.

The following section sets forth certain background information regarding those persons currently serving as our executive officers, excluding Deepak Chopra and Ajay Mehra, who are described above under "Election of Directors":

***Alan Edrick*** is our Executive Vice President and Chief Financial Officer. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Victor S. Sze*** is our Executive Vice President and General Counsel. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Juris Doctorate from Loyola Law School.

***Mal Maginnis*** is President of our Rapiscan Systems, Inc. subsidiary. Mr. Maginnis joined the Company in July 2017. He has more than 35 years in the defense, security, safety and technology industries, and is an experienced senior executive of technology-based businesses. Prior to joining the Company, Mr. Maginnis was the head of a technology development company based in Singapore and one of the owners of an Australian detection company based in Sydney. In addition, he was President of Smiths Detection from 2011-2014 based in London. He held a series of senior positions at Smiths Detection including President, Head of Technology, Programs and Products and was the head of the largest business unit managing the global military and emergency responder business. Mr. Maginnis holds a Bachelor of Arts (Hons) degree in history and government from the Faculty of Military Studies University of New South Wales, and Graduate, UK Command Staff College.

***James Green*** is President of our Healthcare division. Mr. Green joined the Company in April 2018. He is a seasoned senior executive with over 30 years of experience in healthcare, most recently serving as President and Chief Executive Officer of Analogic Corporation, an advanced medical and security imaging company, from 2007 to 2016. Mr. Green has also held senior leadership positions at Quest Diagnostics Corporation, Koninklijke Philips Electronics NV, St. Jude Medical Inc., and Beckman Instruments. Mr. Green currently serves as Chairman of the Board of Harvard Bioscience, Inc. He holds a Bachelor of Science from the University of Missouri at Columbia, a Master of Science from the University of Southern California, and is a graduate of the Stanford University Executive Program.

***Manoocher Mansouri*** is President of our Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of our Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of our OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in Electrical Engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Shawn Thompson*** is President of our OSI Electronics, Inc. subsidiary. Mr. Thompson brings 30 years of global experience in leading companies in the design and manufacturing of equipment that connects, protects and controls critical applications in the defense, medical, wireless and industrial markets. Mr. Thompson joined the Company in 2017 from MC Electronics where he served as President and CEO. Between 1998 and 2013, Mr. Thompson held several global leadership roles for Smiths Group PLC within in their Interconnect division as a group president and board member. Early in his career he was a principal in Transtector Systems, a leader in power and signal integrity solutions that was acquired by Smiths in 1998. Mr. Thompson attended Northwest Nazarene University and participated in Stanford's Graduate School of Business Executive Management Program.

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes our compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for our Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Advisory Vote on Named Executive Officer Compensation*

We maintain open lines of communication with our stockholders, and senior management routinely interacts with our stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. Further, the Compensation Committee considers the outcome of our annual say on pay vote when making decisions regarding our executive compensation program. At our 2017 annual meeting, approximately 98% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Considering the level of support of our stockholders of our compensation program, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2018.

At the upcoming Annual Meeting, we will again hold an annual advisory vote to approve executive compensation. We will continue to engage with our stockholders throughout the year, and the Compensation Committee will consider the results from this year's and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Governance Highlights*

We are committed to having strong governance practices with respect to our compensation programs, practices and procedures. We believe that these practices reinforce our emphasis on tying executive compensation to performance. The following chart highlights some of our governance practices with respect to executive compensation:

| What We Do | What We Do Not Do |
|---|---|
| Use 100% performance-based vesting with respect to corporate Named Executive Officer equity awards | No excise tax gross-ups upon a change in control |
| Have formulaic performance-based annual incentives | No hedging, pledging, or speculative transactions are permitted by executives and directors |
| Maintain a robust clawback policy | No re-pricing of underwater stock options |
| Maintain share ownership and retention guidelines for executives and directors | No stock option grants with an exercise price less than fair market value |
| Conduct an annual say on pay vote | No "single trigger" severance payments owing solely on account of the occurrence of a change in control event |
| Maintain open lines of communication with stockholders | |

*Executive Compensation Summary*

*Fiscal 2018 Performance*

During fiscal 2018, we (a) achieved record revenue of $1.089 billion representing 13% growth as compared to fiscal 2017; (b) delivered 21% non-GAAP earnings per share growth compared to the prior fiscal year; (c) achieved outstanding operating cash flow of $133 miilion representing 112% growth as compared to fiscal 2017; (d) had outstanding bookings resulting in a backlog of $976 million, which represents a 32% year-over-year increase; (e) strengthened our leadership team with the appointment of new presidents in our Healthcare and Security divisions; and (f) completed two strategic acquisitions in our Security division and one strategic acquisition in our Optoelectronics and Manufacturing division and signed a letter of intent for a second strategic acquisition in our Optoelectronics and Manufacturing division (which was completed in the first quarter of fiscal 2019).

*Leverage Business Infrastructure*. Even as we launched new products, entered new markets, and invested substantial amounts in R&D, we actively leveraged our business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities*. In fiscal 2018, we continued to expand our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and we believe it will continue to serve, to sustain growth over the long term. Some of our key achievements during fiscal 2018 include the following:

- Expanding presence with international customers with the launch of a checkpoint CT solution by our Security division.
- Acquiring three companies and signing a letter of intent for a fourth acquisition.
- Acquiring product lines and companies that not only leverage our existing operating infrastructure but also provide immediate entry into growing market segments.
- Entering the sporting event security space to provide screening as a service.

*Building a Foundation for the Future*. We continue to make significant targeted investments in R&D and acquisitions. In fiscal 2018, we completed three strategic acquisitions and signed a letter of intent for a fourth strategic acquisition. We believe that these acquisitions and investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

*Role of the Compensation Committee*

Our Board appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for our Named Executive Officers, including base salaries, annual incentives, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of our Named Executive Officers (other than our Chief Executive Officer) is recommended to the Compensation Committee by our Chief Executive Officer. Compensation for our Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

*Executive Compensation Program Elements*

The particular elements of the compensation program for our Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with our pay-for-performance philosophy, we structure our compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2522 of 2711

The following is an overview of the elements of our compensation and benefits programs for fiscal 2018:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined formulaically based on adjusted return on equity ("AROE") metrics. |
| | The Solutions Incentive Program allows for annual incentives in the form of shares of stock or, at our discretion, cash to be granted to Mr. Mehra based on the achievement of certain pre-established performance metrics. |
| | Mr. Maginnis received a bonus based upon the parameters set forth in his offer letter. |
| Long-Term Incentives | The fiscal 2018 program with respect to the Named Executive Officers consisted of performance-based restricted stock units, which are earned based on the achievement of pre-established EBITDA-based metrics for each of the three years following grant, as well as an aggregate three-year metric. In addition, division executive Mr. Mehra received some time-based restricted stock units. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2018, perquisites included car allowances for each Named Executive Officer and a housing allowance for Mr. Maginnis. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash incentives at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, of which our CEO is the only participant. |

In fiscal 2018, fixed compensation comprised approximately 14% to 43% and variable compensation comprised approximately 57% to 86% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 85% of total compensation.





*Fixed Compensation*. Fixed compensation is intended to compensate our Named Executive Officers for their ongoing responsibilities and consists of base salary. Base salary is set to attract and retain executive talent. Base salaries for our Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically, typically on an annual basis.

The Compensation Committee takes a conservative approach with respect to base salary increases. In determining whether base salary levels for fiscal year 2018 were appropriate, the Compensation Committee considered the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance, and expected future contributions. During fiscal 2018, in order to better align their respective salaries with their overall leadership responsibilities, the Compensation Committee increased to $446,000 and $385,000, respectively, the base salaries of Mr. Edrick and Mr. Sze, each of whose base salary had not been increased since 2012, as well as increased to $424,000 the base salary of Mr. Mehra.

*Variable Compensation*. Variable compensation provides our Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive awards and long-term incentive compensation.

*Annual Incentive Awards*. All corporate Named Executive Officers are eligible for an annual incentive pursuant to our annual incentive program. Annual incentives under this program are designed to focus our participating Named Executive Officers on annual operating achievement and near-term success. Annual incentives are calculated based on a formula tied to AROE metrics and provide for a threshold below which no incentive will be paid and a maximum award level.

Depending on the level of AROE achieved, corporate executives can earn from 0% to 200% of base salary as follows:

| AROE | % of Base Salary Earned |
|---|---|
| Less than 10% | 0% |
| 10% | 25% |
| 11% | 50% |
| 12% | 75% |
| 13% | 100% |
| 14% | 125% |
| 15% | 150% |
| 16% | 175% |
| 17% or more | 200% |

The Compensation Committee considers AROE to be an effective annual performance measure for assessing the Company's efficient use of capital and return to stockholders. The AROE targets were designed to be challenging yet achievable with significant effort and management skill and were established in order to provide the executives sufficient incentive to create long-term stockholder value while at the same time ensuring appropriate risk management. For fiscal year 2018, we achieved 16% AROE; therefore, participating Named Executive Officers earned annual incentives equal to 175% of base salary. See the "Non-equity Incentive Plan Compensation" column of the Summary Compensation Table.

Mr. Maginnis's fiscal 2018 bonus was based upon the parameters set forth in his offer letter.

*Solutions Incentive Program.* In 2015, we established an incentive program tied to the performance of our solutions business (the "Solutions Incentive Program"). Mr. Mehra, President of the OSI Solutions Business, is the only Named Executive Officer who participates in this program. Incentives under the Solutions Incentive Program are conditioned on the achievement of certain metrics based on the operating income and bookings of our solutions business (excluding certain operations already existing at the time of the adoption of the program). The operating income and bookings metrics are believed to be challenging, but achievable with significant management effort. For fiscal year 2018, we did not achieve the bookings metric. Therefore, Mr. Mehra did not earn anything under this component of the program. Mr. Mehra was paid $1,150,000 based on the operating income performance of the solutions business.

*Long-Term Incentive Program.* In order to further promote our philosophy of pay-for-performance and furthering our objective of aligning our executive compensation with our long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of each Named Executive Officer, we have a long-term incentive program.

The grants to our corporate Named Executive Officers during fiscal 2018 were performance based in their entirety, and a significant portion of the grants made to our divisional Named Executive Officers were performance based. The Compensation Committee believes that this vesting structure provides an incentive for our Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving corporate performance and business objectives for the benefit of our stockholders.

Our overall long-term incentive program is designed to retain our Named Executive Officers and to align the interests of our Named Executive Officers with the long-term interests of our stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under our equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of our Common Stock on such dates.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2525 of 2711

With respect to performance based awards, the Compensation Committee has established a program for long-term performance based incentive grants for our Named Executive Officers. The program provides for yearly grants of equity or equity-tied incentives. Each award is 100% performance based and vests based on the achievement of certain one-, two- and three-year performance targets as well as a three-year performance target tied to objective adjusted EBITDA per share metrics. The metrics incentivize consistent, long-term growth, and were designed to be challenging, but achievable with significant effort and management skill.

Each fiscal year, our Named Executive Officers are awarded an initial grant, which vests if a three-year adjusted EBITDA per share target is achieved. However, if actual three-year performance falls below target, shares in the initial grant would be forfeited as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 95% to 99.9% | 10% of shares or units would be forfeited |
| 90% to 94.9% | 25% of shares or units would be forfeited |
| 85% to 89.9% | 55% of shares or units would be forfeited |
| Below 85% | 100% of shares or units would be forfeited |

Additional shares may be earned annually for each initial grant within the three-year performance period if annual targets are exceeded as follows:

| Actual Performance as a Percentage of Target | Result |
|---|---|
| 105% to 110% | Vested shares or units equaling 20% of initial grant would be awarded |
| 110% to 115% | Vested shares or units equaling 30% of initial grant would be awarded |
| 115% to 120% | Vested shares or units equaling 40% of initial grant would be awarded |
| Above 120% | Vested shares or units equaling 50% of initial grant would be awarded |

Our adjusted EBITDA per share for fiscal year 2018 was 171% of the fiscal 2018 adjusted EBITDA per share target of $6.00. Therefore, our executive officers earned additional shares as follows: Mr. Chopra, 92,015 shares; Mr. Edrick, 39,875 shares; Mr. Mehra, 11,963 shares; Mr. Sze, 34,507 shares; and Mr. Maginnis, 552 shares.

In the event of a change of control, the initial grant would vest upon the change of control; to the extent actual performance has exceeded target for a full fiscal year at the time of the change of control, performance for any annual periods remaining in association with a particular grant will be assumed to exceed target by the same percentage for the purposes of awarding additional incentive shares or units in connection with the change of control.

The Compensation Committee determines, after consultation with our Chief Executive Officer, the number of equity awards to grant to our Named Executive Officers. The grant amounts for our Chief Executive Officer are determined solely by the Compensation Committee. The Compensation

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2526 of 2711

Committee considers individual performance, including the following quantitative and qualitative factors, as well as overall corporate performance.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Quality of the management of units or functions managed by the Named Executive Officer | • Financial performance (including earnings per share and internal metrics) |
| • Leadership of personnel under the Named Executive Officer's management | • Financial performance metrics for business units managed by the Named Executive Officer |
| • Execution of strategically important projects | • Compensation surveys provided by external advisors |
| • Overall effectiveness of units or functions managed by the Named Executive Officer | |
| • Contributions to the formulation of Company strategy and tactics | |
| • Contributions to stockholder value | |
| • Management of risk | |

For fiscal year 2018 performance share calculation purposes, our Chief Executive Officer, Chief Financial Officer, General Counsel, and President of our solutions business are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance.

*Benefits and Perquisites*. Benefits and perquisites are designed to attract and retain key employees. Currently, our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. We lease automobiles for or provide an auto allowance to certain of our Named Executive Officers. We also provide a housing allowance to Mr. Maginnis.

We maintain a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows certain of our Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

We also maintain a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board may select participants from among our Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2527 of 2711

in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*. While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. We believe this compensation mix provides our Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of corporate performance, as well as reducing the risk of recruitment of highly qualified executive talent by our competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. We believe that this compensation mix results in a pay-for-performance orientation that is aligned with our compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to our Named Executive Officers for fiscal 2018, the Compensation Committee performed a review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2018 peer group were developed based on similarity in size and operations within the industries in which we operate as follows:

| | | | | | |
|---|---|---|---|---|---|
| • AAR Corp. | • Coherent, Inc. | • Esterline Technologies Corporation | • Integer Holdings Corporation | • MTS Systems Corporation | • Palo Alto Networks, Inc. |
| • ADTRAN, Inc. | • Comtech Telecommunications Corp. | • Fitbit, Inc. | • Invacare Corporation | • National Instruments Corporation | • VeriFone Systems, Inc. |
| • Astronics Corporation | • Cubic Corporation | • FLIR Systems, Inc. | • Itron, Inc. | • Natus Medical Incorporated | • VIASAT, INC. |
| • Calix, Inc. | • Daktronics, Inc. | • Infinera Corporation | • Masimo Corporation | • Novanta Inc. | • Viavi Solutions Inc. |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2528 of 2711

In connection with executive compensation decisions for fiscal 2018, the Compensation Committee engaged independent compensation consulting firm, Pearl Meyer. The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed our actual performance taken as a whole as well as our performance relative to our peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to our comparative performance.

For fiscal 2018, the Compensation Committee decided to increase the base salaries of Mr. Edrick, Mr. Mehra, and Mr. Sze in order to better align their respective salaries with their overall leadership responsibilities. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual incentives and performance-based equity grants comprised a significant portion of total compensation.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving our long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Minimum Equity Ownership and Retention Guidelines*

We believe that our executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. We believe that this multiple constitutes significant amounts for our executive officers and provides a substantial link between the interests of our executive officers and those of our stockholders. During such time that an executive officer has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2018, each of our Named Executive Officers met or exceeded our minimum equity ownership guidelines with the exception of Mr. Maginnis who joined the Company in July 2017.

*Clawback Policy*

We have adopted a clawback policy. The policy provides that if an accounting restatement is required due to our material non-compliance with any accounting requirements, then we will seek to recover any excess in the cash and equity incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements. Each Named Executive Officer's employment agreement also contains a clawback provision.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2529 of 2711

*Policy Prohibiting the Hedging or Pledging of Company Stock*

We have adopted a policy that prohibits our executive officers and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of our Common Stock or other equity securities. We have also adopted a policy that prohibits our executive officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis. The terms of each of such agreements or arrangements are summarized below under the heading "Employment Agreements." These types of arrangements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on our use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

The tax reform legislation passed in December 2017, generally referred to as The Tax Cuts and Jobs Act ("Tax Act"), substantially modifies Section 162(m) and, among other things, eliminates the "performance based" exception to the $1 million deduction limit with respect to taxable years beginning after December 31, 2017. Effective for the fiscal year beginning July 1, 2018, compensation paid to our Named Executive Officers, including our Chief Financial Officer, will be subject to the limitations on deductibility under Section 162(m), and, subject to certain statutory exceptions for equity compensation granted prior to the enactment of the Tax Act, we will not be able to deduct performance based compensation to our Named Executive Officers, including our Chief Financial Officer, who receive annual compensation in excess of $1 million.

**Summary Compensation Table**

The following table sets forth the compensation for our principal executive officer, principal financial officer, and our three highest paid executive officers serving as executive officers on June 30, 2018 (the "Named Executive Officers") for the fiscal years ended June 30, 2018, 2017 and 2016:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (5)(6)(7)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2018 | 1,000,000 | — | 4,348,546 | — | 1,750,000 | 14,750 | 196,944 | 7,310,240 |
| Chairman, President and | 2017 | 1,000,000 | — | 4,316,792 | — | 1,250,000 | 302,189 | 209,498 | 7,078,479 |
| Chief Executive Officer | 2016 | 1,000,000 | — | 4,264,200 | — | 500,000 | 897,351 | 227,148 | 6,888,699 |
| Alan Edrick | 2018 | 435,846 | — | 1,884,671 | — | 780,500 | — | 66,288 | 3,167,305 |
| Executive Vice President and | 2017 | 402,000 | — | 1,870,610 | — | 502,500 | — | 57,805 | 2,832,915 |
| Chief Financial Officer | 2016 | 402,000 | — | 1,847,820 | — | 201,000 | — | 57,812 | 2,508,632 |
| Ajay Mehra | 2018 | 418,462 | — | 1,477,671 | — | 1,150,000 | — | 81,005 | 3,127,138 |
| Executive Vice President of the | 2017 | 400,000 | 245,000 | 1,433,149 | — | 705,000 | — | 75,569 | 2,858,718 |
| Company and President | 2016 | 352,000 | — | 554,346 | — | 176,000 | — | 82,460 | 1,164,806 |
| of OSI Solutions Business | | | | | | | | | |
| Victor S. Sze | 2018 | 379,923 | — | 1,630,869 | — | 673,750 | — | 79,779 | 2,764,321 |
| Executive Vice President, | 2017 | 350,000 | — | 1,618,842 | — | 437,500 | — | 73,898 | 2,480,240 |
| General Counsel and Secretary | 2016 | 350,000 | — | 1,599,075 | — | 175,000 | — | 69,834 | 2,193,909 |
| Mal Maginnis | 2018 | 343,727(4) | 145,000 | 302,165 | — | — | — | 101,238(4) | 892,130(4) |
| President of Rapiscan Systems, Inc. | | | | | | | | | |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the fiscal year ended June 30, 2018 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represent amounts earned under the annual incentive program or the Solutions Incentive Program, as applicable.

(3) We initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2017 to June 30, 2018 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2018 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) Certain figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.3679 SGD, the June 28, 2018 exchange rate as published by Oanda.com.

(5) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2018 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit and Housing Allowance($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 8,100 | 3,300 | 11,263 | 174,281 | 196,944 |
| Alan Edrick | 52,065 | 2,850 | 7,002 | 4,371 | 66,288 |
| Ajay Mehra | 50,154 | 6,675 | 12,577 | 11,599 | 81,005 |
| Victor S. Sze | 46,095 | 12,000 | 11,267 | 10,417 | 79,779 |
| Mal Maginnis | — | 92,730 | 1,095(4) | 7,413(4) | 101,238 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2531 of 2711

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2017 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,200 | 3,300 | 5,761 | 195,237 | 209,498 |
| Alan Edrick | 46,405 | 2,850 | 4,421 | 4,129 | 57,805 |
| Ajay Mehra | 45,019 | 6,675 | 12,518 | 11,357 | 75,569 |
| Victor S. Sze | 41,075 | 12,000 | 10,648 | 10,175 | 73,898 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2016 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,111 | 3,300 | 11,889 | 206,848 | 227,148 |
| Alan Edrick | 44,713 | 2,850 | 6,250 | 3,999 | 57,812 |
| Ajay Mehra | 39,912 | 6,675 | 24,646 | 11,227 | 82,460 |
| Victor S. Sze | 39,599 | 12,000 | 12,031 | 6,204 | 69,834 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

### Grants of Plan-Based Awards Table

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2018 to each of our Named Executive Officers(8):

| | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(4) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name Position | Grant Date | Threshold ($)(6) | Target ($) | Maximum ($) | Threshold (#)(1) | Target (#)(2) | Maximum (#)(3) | All Other Stock Awards: Number of Shares of Stock or Units(#) | Grant Date Fair Value of Options and Awards (5)($) |
| Deepak Chopra | 8/14/2017 | — | — | — | — | 52,960 | 132,400 | — | 4,348,546 |
| Chairman, President and Chief Executive Officer | — | — | $ 1,000,000 | $ 2,000,000 | — | — | — | — | — |
| Alan Edrick | 8/14/2017 | — | — | — | — | 22,953 | 57,383 | — | 1,884,671 |
| Executive Vice President and Chief Financial Officer | — | — | $ 402,000 | $ 804,000 | — | — | — | — | — |
| Ajay Mehra | 8/14/2017 | — | — | — | — | 6,886 | 17,215 | — | 565,409 |
| Executive Vice President of the | — | — | $ 1,150,000 | — | — | — | — | — | — |
| Company and President of OSI Solutions Business | 9/19/2017 | — | — | — | — | — | — | 10,588(7) | 912,262 |
| Victor S. Sze | 8/14/2017 | — | — | — | — | 19,862 | 49,655 | — | 1,630,869 |
| Executive Vice President, General Counsel and Secretary | — | — | $ 350,000 | $ 700,000 | — | — | — | — | — |
| Mal Maginnis | 8/14/2017 | — | — | — | — | 3,680 | 9,200 | — | 302,165 |
| President, Rapiscan Systems, Inc. | | | | | | | | | |

(1) No amounts are shown in this column as our long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(2) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(3) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(5) The grant date fair value of the restricted stock units was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are shown in this column as our annual incentive program provides for no award under certain circumstances.

(7) This RSU award vests over a period of three years from the date of grant.

(8) We have omitted from this table the columns titled "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2018(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date(2) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested (4)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Deepak Chopra | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chairman, President and Chief Executive Officer | — | — | — | — | — | — | 212,525 | 16,434,558 |
| Alan Edrick | 40,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| Executive Vice President | 85,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| and Chief Financial | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| Officer | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 92,102 | 7,122,248 |
| Ajay Mehra | 15,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Executive Vice President | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| of the Company and President of OSI Solutions Business | — | — | — | — | 19,138 | 1,479,942 | 27,631 | 2,136,705 |
| Victor S. Sze | 5,000(6) | — | 20.92 | 7/27/2018 | — | — | — | — |
| Executive Vice President, | 30,000 | — | 12.52 | 1/11/2019 | — | — | — | — |
| General Counsel and | 55,000 | — | 16.37 | 8/31/2019 | — | — | — | — |
| Secretary | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| | — | — | — | — | — | — | 79,702 | 6,163,356 |
| Mal Maginnis President, Rapiscan Systems, Inc. | — | — | — | — | — | — | 4,784 | 369,947 |

(1) We have omitted from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of our Common Stock on the date of grant.

(4) The market value of RSU awards that have not yet vested is based on the number of unvested shares of stock on June 30, 2018, multiplied by the closing price of our Common Stock on June 29, 2018 ($77.33 per share).

(5) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(6) These options were exercised on July 13, 2018.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2533 of 2711

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of restricted stock held by each of our Named Executive Officers during fiscal year ended June 30, 2018:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting(2) | Value Realized on Vesting(3)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 60,000 | 3,750,600 | 155,280 | 13,378,925 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 37,000 | 1,669,790 | 62,691 | 5,401,457 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | — | — | 22,703 | 1,924,840 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | — | — | 50,818 | 4,378,479 |
| Mal Maginnis<br>President, Rapiscan Systems, Inc. | — | — | — | — |

(1) Represents the difference between the fair market price of our Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Includes shares acquired from the vesting of time-based restricted stock awards and vesting of performance-based restricted stock awards based upon performance in fiscal years 2016, 2017 and 2018.

(3) Represents the number of restricted stock awards that vested multiplied by the fair market price of our Common Stock on the date of vesting.

**Pay Ratio**

Pursuant to the Dodd Frank Act, the SEC adopted a rule requiring annual disclosure of the ratio of the median employee's annual total compensation to the annual total compensation of our Chief Executive Officer. The compensation for our Chief Executive Officer in fiscal year 2018 was approximately 562 times the median pay of our employees.

Median employee total annual compensation: $13,001 (figure converted to United States dollars (USD) from Indian rupees at 1 USD to 68.96859 Indian rupees, the June 28, 2018 exchange rate as published by Oanda.com)

CEO total annual compensation: $7,310,240

Ratio of CEO to median employee compensation: 562 to 1

With respect to the annual total compensation of our Chief Executive Officer, we used the amount reported in the "Total" column of the Summary Compensation Table above. We identified the median employee by reviewing the fiscal year 2018 annual base pay for all individuals, excluding our Chief Executive Officer, who were employed by us on June 30, 2018. We included all employees globally without regard to location, whether employed on a full-time, part-time, or seasonal basis. We did not make any

assumptions, adjustments, or estimates with respect to compensation other than annualizing the compensation for any full-time employees that were not employed by us for all of fiscal 2018. Using this methodology, we determined that the median employee was a full-time salaried employee located in India. Approximately 60% of our employees are located in countries where the cost of living and wages are substantially lower than in the United States. Compensation rates are set to be market-competitive in the country in which the jobs are performed. Accordingly, the resulting CEO to median employee pay ratio is substantially higher than it would have been if the cost of living and wages in those countries were comparable to the United States.

This pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules based on our payroll and employment records and the methodology described above. The SEC rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their compensation practices. Therefore, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies may have different employment and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

**Pension Benefits**

We maintain the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 5-year period commencing January 1, 2024. The initial payment will be $5.25 million and the remaining payments will be in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability prior to December 31, 2018, he or his dependents shall be entitled to $10 million payable over 10 years commencing within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's death or disability on or after December 31, 2018, he or his dependents shall receive the present value of the remaining retirement benefits payable within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2018(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2535 of 2711

benefit, please see Note 13 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2018.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 11 | 8,065,375 | — |

(1) We have omitted from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

We adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of our management or highly compensated employees (as designated by the Compensation Committee), including certain of our Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to 80% of their base salary and up to 100% of other types of eligible compensation. The Deferred Compensation Plan also allows us to make discretionary contributions and matching contributions on behalf of eligible participants.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2018 ranged from –0.05% to 27.23%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2018:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 388,331 | 43,415(3) | 203,872 | — | 2,463,817 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Solutions Business | 41,754 | 41,754(3) | 157,416 | — | 1,633,126 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 37,558 | 37,558(3) | 139,137 | — | 1,444,893 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2018.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis.

*Deepak Chopra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Mr. Chopra's employment agreement was amended effective as of July 1, 2015 and December 31, 2017. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 73 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with us. The agreement also contains a clawback provision whereby Mr. Chopra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months' notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by us without cause, our non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from us to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by us without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date (including if Mr. Chopra becomes disabled or continues performing services for the Company in a different capacity prior to the Scheduled Retirement Date and such disability or other form of services continues through the Scheduled Retirement Date), he shall be entitled to $13,500,000 payable on or within 45 days of the Chopra Scheduled Retirement Date; provided that in the event of Mr. Chopra's death or disability after January 1, 2019, such amount shall be paid within 45 days of such event.

*Alan Edrick's and Victor Sze's Employment Agreements*

For purposes of this section, Messrs. Edrick and Sze are each individually referred to as the "Executive." In April 2012, we entered into our current employment agreement with each Executive, which were effective as of January 1, 2012. Each Executive's employment agreement was amended, effective as of July 1, 2015. The terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68. The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick and $350,000 for Mr. Sze. The Executive is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other

prohibitions that protect our proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with us. Each Executive's agreement also contains a clawback provision whereby the Executive's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by us without cause, our non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months' salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from us to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by us without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by us to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Ajay Mehra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of

May 1, 2015. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000, which shall increase to $402,000 per year upon achievement of certain pre-established operating income metrics for the OSI Solutions Business. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with us. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment by us without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12 calendar months immediately preceding termination plus the cash equivalent of any awards under the Solutions Incentive Program earned during the six calendar months immediately preceding a termination occurring in 2017, annualized, or during the 12 calendar months immediately preceding a termination occurring in 2018 or thereafter), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment by us without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by us to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances (i) if the change in control occurs on or before

December 31, 2016, Mr. Mehra may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G (the "Alternative Payment"); and (ii) if the change in control occurs after December 31, 2016, Mr. Mehra shall receive the lesser of the Change in Control Payment or the Alternative Payment.

*Mal Maginnis's Offer Letter*

On July 3, 2017, we entered into an offer letter with Mal Maginnis. The letter provides for an initial annual base salary of SGD 470,184. Mr. Maginnis is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us.

In the event of the termination of Mr. Maginnis's employment other than for "cause" (as defined in the offer letter) or Mr. Maginnis's voluntary resignation, Mr. Maginnis is entitled to: (i) an amount equal to six months of base salary, (ii) an amount equal to 50% of Mr. Maginnis's prior year bonus award, and (iii) acceleration of vesting of Mr. Maginnis's initial performance-based restricted stock unit award on a pro rata basis based on the number of months worked to the extent that our Security division has met its financial targets for the preceding year.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements or offer letter, as applicable. The tables therefore assume that the terms of the employment agreement or offer letter to which each Named Executive Officer is currently subject had been in effect on June 30, 2018, and that employment terminated on such date. The tables also assume that the price of our Common Stock, on which certain calculations in the following tables are made, was the closing price of our Common Stock on June 29, 2018, the last business day of the fiscal year ($77.33).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under our qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 4,500,000 | 12,998,006 | 14,231,040 | 695,361 | 35,424,407 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 4,500,000 | 12,998,006 | 21,074,358 | 695,361 | 42,267,725 |

(1) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled to certain payments under the Defined Benefit Plan in accordance with the terms of such plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements or offer letter, as applicable, of Messrs. Edrick, Mehra, Sze and Maginnis.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick | Good Reason or Without Cause | 892,000 | 1,055,333 | 6,167,068 | 6,000 | 6,000 | 8,126,401 |
| Executive Vice President and Chief Financial Officer | Good Reason or Without Cause in Connection with a Change in Control(1) | 892,000 | 1,055,333 | 9,132,789 | 6,000 | 6,000 | 11,092,122 |
| Ajay Mehra | Good Reason or Without Cause | 848,000 | 1,517,333 | 3,314,596 | 6,000 | 6,000 | 5,691,929 |
| Executive Vice President of the Company and President of OSI Solutions Business | Good Reason or Without Cause in Connection with a Change in Control(1) | 848,000 | 1,517,333 | 4,204,316 | 6,000 | 6,000 | 6,581,649 |
| Victor S. Sze | Good Reason or Without Cause | 770,000 | 930,833 | 5,336,853 | 6,000 | 6,000 | 7,049,686 |
| Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause in Connection with a Change in Control(1) | 770,000 | 930,833 | 7,903,281 | 6,000 | 6,000 | 9,616,114 |
| Mal Maginnis President of Rapiscan Systems, Inc. | Without Cause | 343,727 | 72,500 | — | — | — | 416,227 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2542 of 2711

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2018, each non-employee director that served as a director for the full fiscal year received $60,000 and an RSU grant that valued at $150,000, and the lead independent director received an additional retainer of $20,000 and an additional RSU grant valued at $30,000. Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $30,000 and an RSU grant valued at $35,000. Each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $30,000 and an RSU grant valued at $35,000. Each member of the Nominating and Governance Committee received $3,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $15,000 and an RSU grant valued at $25,000. Each member of the Technology Committee received $5,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $15,000 and an RSU grant valued at $30,000. Each member of the Risk Management Committee received $15,000 and an RSU grant valued at $25,000. All RSU awards granted to members of the Board of Directors and its committees vest annually over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2018 for each non-employee member of our Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 212,000 | 232,458 | — | 444,458 |
| Meyer Luskin | 192,000 | 203,401 | — | 395,401 |
| William F. Ballhaus | 185,000 | 198,584 | — | 383,584 |
| James B. Hawkins | 131,000 | 169,527 | — | 300,527 |
| Gerald Chizever | 116,000 | 169,527 | — | 285,527 |

(1) We have omitted from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2018 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2018, 2,944 RSUs were granted to Mr. Good; 2,576 RSUs were granted to Mr. Luskin; 2,515 RSUs were granted to Dr. Ballhaus; 2,147 RSUs were granted to Mr. Hawkins; and 2,147 RSUs were granted to Mr. Chizever, all with a fair value of $78.96. As of June 30, 2018, Mr. Good had 10,744 unvested stock awards outstanding; Mr. Luskin had 10,376 unvested stock awards outstanding; Dr. Ballhaus had 7,865 unvested stock awards outstanding; Mr. Hawkins had 4,387 unvested stock awards outstanding; and Mr. Chizever had 3,610 unvested stock awards outstanding.

*Director Share Ownership Requirements*

We believe that our directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that our directors own at minimum equity of the Company valued at five times their annual retainers. We believe that this multiple constitutes significant amounts for our directors and provides a

substantial link between the interests of our directors and those of our stockholders. During such time that a director has not attained the share ownership guideline, he is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2018, each of our directors met or exceeded our minimum equity ownership guidelines, with the exception of Mr. Hawkins who was elected as a director in December 2015.

**Certain Relationships and Related Transactions**

In 1994, we, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). We own a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. We sell security and inspection kits to ECIL at a price no less favorable to us than the price we charge unaffiliated third parties for such products. To date, our portion of the earnings of ECIL Rapiscan has been immaterial to our financial results and results of operations.

Mohinder Chopra, who is the brother of Deepak Chopra, our Chief Executive Officer, is our Senior Vice President/General Manager India. His total compensation for fiscal year 2018 was valued at approximately $337,000.

Gerald Chizever, a member of our Board, is a partner at Loeb & Loeb LLP. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining director independence. Our Board carefully reviewed the nature of our engagement of Loeb & Loeb and the services rendered, including the expertise and relevant experience of the firm, the firm's and specific partners' knowledge of our Company and our business and past legal engagements, and the fees paid in such engagements, and determined that Mr. Chizever is independent under the standards of The NASDAQ Stock Market.

The Audit Committee of the Board reviews proposed transactions in which the Company and any person who is a member of the Board, a nominee to become a member of the Board, an executive officer of the Company, a holder of more than five percent of our voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to us as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2018, unless otherwise indicated, by each person known by us to own beneficially more than 5% of the outstanding shares of our outstanding Common Stock. As of October 17, 2018, 18,153,122 shares of our Common Stock were issued and outstanding.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,241,995 | 12.4% |
| The Vanguard Group, Inc.(3) | 1,838,601 | 10.1% |
| EARNEST Partners, LLC(4) | 1,140,704 | 6.3% |
| Janus Henderson Group Plc(5) | 1,103,015 | 6.1% |
| Dimensional Fund Advisors LP(6) | 1,079,164 | 5.9% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2018, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) Represents the number of shares of Common Stock beneficially owned as of December 31, 2017, as reported on Schedule 13G/A filed on February 8, 2018 with the SEC by BlackRock, Inc. Such report indicates sole voting power over 2,202,839 shares and sole dispositive power over 2,241,995 shares. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) Represents the number of shares of Common Stock beneficially owned as of May 31, 2018, as reported on Schedule 13G/A filed on June 11, 2018 with the SEC. Such report indicates sole voting power over 33,666 shares, shared voting power over 2,660 shares, sole dispositive power over 1,803,715 shares, and shared dispositive power over 34,886 shares. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(4) Represents the number of shares of Common Stock beneficially owned as of December 31, 2017, as reported on Schedule 13G/A filed on February 14, 2018 with the SEC. Such report indicates sole voting power over 223,148 shares, shared voting power over 70,596 shares, and sole dispositive power over 1,140,704 shares. The address of EARNEST Partners, LLC is 1180 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309.

(5) Represents the number of shares of Common Stock beneficially owned as of December 31, 2017, as reported on Schedule 13G filed on February 13, 2018 with the SEC. Such report indicates shared voting power and shared dispositive power over 1,103,015 shares. The address of Janus Henderson Group Plc is 201 Bishopsgate, London X0 EC2M 3AE.

(6) Represents the number of shares of Common Stock beneficially owned as of December 31, 2017, as reported on Schedule 13G/A filed on February 9, 2018 with the SEC. Such report indicates sole voting power over 1,025,624 shares and sole dispositive power over 1,079,164 shares. The address of Dimensional Fund Advisors LP is 6300 Bee Cave Road, Building One, Austin, TX 78746.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2545 of 2711

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2018, unless otherwise indicated, by each of our directors, each Named Executive Officer, and all directors and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 584,974 | 3.2% |
| Alan Edrick(4) | 383,442 | 2.1% |
| Ajay Mehra(5) | 165,739 | * |
| Victor S. Sze(6) | 313,178 | 1.7% |
| Mal Maginnis(7) | 552 | * |
| Meyer Luskin(8) | 32,890 | * |
| Steven C. Good(9) | 16,961 | * |
| William F. Ballhaus(10) | 18,448 | * |
| James B. Hawkins(11) | 2,326 | * |
| Gerald Chizever(12) | 6,023 | * |
| All directors and executive officers as a group (13 persons) | 1,604,721 | 8.6% |

* Represents less than 1.0% of the outstanding shares of our Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2018, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. No shares are pledged as security.

(3) Mr. Chopra is our Chairman of the Board of Directors, Chief Executive Officer and President. Includes 35,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987, and 17,000 shares owned by The Chandini Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of both irrevocable trusts. In addition, includes 460,874 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 10,000 shares held in the Nandini SLAT Trust. Includes 60,000 shares issuable pursuant to options which were granted on September 9, 2011.

(4) Mr. Edrick is our Executive Vice President and Chief Financial Officer. Includes 225,000 shares issuable pursuant to options which were granted between January 12, 2009 and September 9, 2011.

(5) Mr. Mehra is our Executive Vice President and President of OSI Solutions Business and a Director. Includes 75,000 shares issuable pursuant to options which were granted between September 1, 2009 and September 9, 2011.

(6) Mr. Sze is our Executive Vice President, General Counsel and Secretary. Includes 45,136 shares held by the Victor So-Mein Sze & Angela Hsin-Chi Hsu Co-ttee Sze Trust U/T/A DTD 11/25/2014. Includes 152,000 shares issuable pursuant to options which were granted between January 12, 2009 and September 9, 2011.

(7) Mr. Maginnis is the President of our Rapiscan Systems, Inc. subsidiary.

(8) Mr. Luskin is a Director. Includes 32,890 shares held by The Meyer and Doreen Luskin Family Trust.

(9) Mr. Good is a Director. Includes 3,500 shares held in the Steve Good IRA account.

(10) Dr. Ballhaus is a Director. Includes 18,448 shares held in the Ballhaus Trust U/A 01/25/02 Dr. William Ballhaus Jr. and Jane K. Ballhaus Trustees.

(11) Mr. Hawkins is a Director.

(12) Mr. Chizever is a Director. Includes 6,023 shares held by The G & C Chizever Family Trust.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish us with copies of all such reports that they file. None of our directors or executive officers owns more than 10% of our securities. Based solely upon our review of such forms furnished to us during the fiscal year ended June 30, 2018, and written representations from certain reporting persons, we believe that our executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act, with the exception of one untimely Form 4 filing by Mr. Mehra related to a transaction in 2012 that was inadvertently not previously reported.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2547 of 2711

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the our equity compensation plans as of June 30, 2018.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 677,525 | $ 32.80 | 2,278,658(2)(3)(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 677,525 | $ 32.80 | 2,278,658 |

(1) Includes shares of our Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under our Amended and Restated 2012 Incentive Award Plan, which was approved by our shareholders on December 11, 2017.

(3) Awards of restricted stock, restricted stock units or other awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one award granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason also become available for future issuance under our Amended and Restated 2012 Incentive Award Plan.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2548 of 2711

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**Audit Fees**

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of our annual financial statements for the years ended June 30, 2017 and 2018 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2017 | FY 2018 |
|---|---|---|
| Audit Fees | $ 1,404 | $ 1,503 |
| Audit-Related Fees | $ 160 | $ 36 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 1,564 | $ 1,539 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of our consolidated financial statements and the review of our interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees billed for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements other than audit fees. This includes research and analysis on accounting matters performed in conjunction with the audit and professional services for the audit of the financial statements of our 401(k) plan.

The term "Tax Fees" means fees billed for professional services rendered for tax advice, planning and compliance (domestic and international).

The term "All Other Fees" means fees billed for products and services other than for the services described above.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2549 of 2711

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2018, the Audit Committee was composed of four non-employee directors, namely, Steven C. Good, Meyer Luskin, William F. Ballhaus, and James B. Hawkins. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. Our Board has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2018.

At each of its meetings, the Audit Committee met with the senior members of our financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and our Chief Financial Officer. During the year, the Audit Committee had private sessions with our independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board the engagement of Moss Adams as our independent public accountants. The Audit Committee reviewed with our financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of our internal control, and the quality of our financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that our audited consolidated financial statements have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from our Company and our management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to our Company during the fiscal year ended June 30, 2018 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of our internal control and the audit of management's report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews our SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of our management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of

disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of our annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board, and the Board approved, that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2018, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus
James Hawkins

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2551 of 2711

## CODE OF ETHICS AND CONDUCT

We have adopted a Code of Ethics and Conduct, which applies to all of our directors, officers (including our principal executive officer, principal financial officer, and principal accounting officer), and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to our Current Report on Form 8-K filed with the SEC on May 23, 2016. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. We intend to disclose any changes in or waivers from this Code of Ethics and Conduct on the same website or by filing with the SEC a Current Report on Form 8-K, in each case if such disclosure is required by the rules of the SEC or Nasdaq.

## ANNUAL MEETING ATTENDANCE

We have adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of our Board are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of our directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board, or specified individual directors, may do so by writing our Secretary at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will review all such correspondence and will regularly forward to the Board copies of all such correspondence that, in the opinion of our Secretary, deals with the functions of the Board or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of our Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders at that address. We undertake to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to our Secretary at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2552 of 2711

**STOCKHOLDER PROPOSALS**

In the event that a stockholder desires to have a proposal included in our proxy statement and form of proxy used in connection with our next annual meeting of stockholders, the proposal must be delivered in writing to our Secretary and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to us would be June 21, 2019, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

Our Bylaws provide that if a stockholder, rather than including a proposal in our proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to us no more than 120 days and no less than 90 days prior to December 10, 2019, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 10, 2019, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in our Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by us under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by us under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by us under those statutes, except to the extent we specifically incorporate such report by reference therein. In addition, information on our website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

We do not know of any other business to be presented at the Annual Meeting and do not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 19, 2018

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| For All | Withhold All | For All Except |
|---|---|---|
| ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

______________________

1. Election of Directors

**Nominees**

01 Deepak Chopra   02 Ajay Mehra   03 Steven C. Good   04 Meyer Luskin   05 William F. Ballhaus
06 James B. Hawkins   07 Gerald Chizever

**The Board of Directors recommends you vote FOR proposals 2 and 3.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2019. | ☐ | ☐ | ☐ |
| 3 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2018. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

Signature [PLEASE SIGN WITHIN BOX]   Date   Signature (Joint Owners)   Date

0000390048_1 R1.0.1.17

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap are available at www.proxyvote.com

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 10, 2018 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra and Ajay Mehra with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 10, 2018 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2 and 3 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000390048_2 R1.0.1.17

**Continued and to be signed on reverse side**

# Exhibit 44

8-K 1 a18-41338_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): **DECEMBER 10, 2018**

# OSI SYSTEMS, INC.
(EXACT NAME OF REGISTRANT SPECIFIED IN CHARTER)

| **DELAWARE** | **000-23125** | **330238801** |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)

**(310) 978-0516**
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company o

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 10, 2018. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 13,915,913 | 971,885 | 1,495,460 |
| Ajay Mehra | 13,793,842 | 1,093,956 | 1,495,460 |
| Steven C. Good | 13,210,662 | 1,677,136 | 1,495,460 |
| Meyer Luskin | 12,824,120 | 2,063,678 | 1,495,460 |
| William F. Ballhaus | 12,048,748 | 2,839,050 | 1,495,460 |
| James B. Hawkins | 11,213,893 | 3,673,905 | 1,495,460 |
| Gerald Chizever | 13,904,150 | 983,648 | 1,495,460 |

The seven nominees identified above were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2019*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 15,688,088 | 659,516 | 35,654 | 0 |

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2018*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 5,569,585 | 9,120,369 | 197,844 | 1,495,460 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 11, 2018

By: /S/ VICTOR SZE

**Victor Sze**
**Executive Vice President,**
**General Counsel, and Secretary**

# Exhibit 45

DEF 14A 1 a2239723zdef14a.htm DEF 14A

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ý

Filed by a Party other than the Registrant o

Check the appropriate box:

o Preliminary Proxy Statement

o **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

ý Definitive Proxy Statement

o Definitive Additional Materials

o Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

ý No fee required.

o Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

o Fee paid previously with preliminary materials.

o Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 22, 2019

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., Pacific Time, on December 12, 2019, at the Company's offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 17, 2019 are entitled to vote at the Annual Meeting.

Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2019, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Table of Contents Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2563 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

**Date and Time:** 10:00 a.m., Pacific Time, on Thursday, December 12, 2019

**Location:** The Company's offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect seven directors to hold office for a one-year term and until their respective successors are elected and qualified;

2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2020;

3. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2019, as described in the accompanying Proxy Statement; and

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 17, 2019 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2019:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2019 are available at *http://www.proxyvote.com*.

**Electronic Delivery of Proxy Materials:** We encourage our stockholders to voluntarily elect to receive future proxy and annual meeting materials electronically. Electronic delivery is faster, convenient, economical, and environmentally cleaner. If you are a registered stockholder, you can opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions. If you hold shares through a bank, broker, or other nominee, you can also opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions or by contacting your nominee.

Case 2:19-cv-02288-JAM-AC   Document 32-12   Filed 09/28/21   Page 2564 of 2711

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 11 |
| Proposal No. 3 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2019 | 12 |
| Compensation of Executive Officers and Directors | 15 |
| Security Ownership of Certain Beneficial Owners and Management | 43 |
| Equity Compensation Plan Information | 46 |
| Independent Registered Public Accounting Firm | 47 |
| Report of Audit Committee | 48 |
| Code of Ethics and Conduct | 50 |
| Annual Meeting Attendance | 50 |
| Stockholder Communications | 50 |
| Availability of Annual Report on Form 10-K | 50 |
| Stockholder Proposals | 51 |
| Incorporation by Reference | 51 |
| Other Business | 51 |

**OSI SYSTEMS, INC.**
**12525 Chadron Avenue**
**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") for use at our Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., Pacific Time on December 12, 2019, at our offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

We are making our proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and our most recent Annual Report on Form 10-K ("Proxy Materials"), available to our stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. We anticipate that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 24, 2019.

Stockholders of record as of the close of business on October 17, 2019 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 17, 2019, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, we had issued and outstanding 18,357,463 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted with respect to any proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Stockholders and with respect to other matters which may be properly brought before the

Annual Meeting. At the time of printing this Proxy Statement, our management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One*. In accordance with our Bylaws, directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One. Votes marked "withhold" will not affect the outcome of the election of directors.

*Proposal Two*. In accordance with our Bylaws, to be approved, the ratification of Moss Adams LLP as our independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three*. In accordance with our Bylaws, to be approved, the proposal regarding our executive compensation for the fiscal year ended June 30, 2019 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three. The vote on Proposal Three is advisory and therefore not binding on the Company, the Compensation and Benefits Committee (the "Compensation Committee") or the Board. Although non-binding, the Board values the opinions that our stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. We will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 12, 2019:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2019 are available at *http://www.proxyvote.com*.

**Electronic Delivery of Proxy Materials:** We encourage our stockholders to voluntarily elect to receive future proxy and annual meeting materials electronically. Electronic delivery is faster, convenient, economical, and environmentally cleaner. If you are a registered stockholder, you can opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions. If you hold shares through a bank, broker, or other nominee, you can also opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions or by contacting your nominee.

## ELECTION OF DIRECTORS
***(Proposal No. 1 of the Proxy Card)***

**Nominees**

Our Board consists of seven members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The seven candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Steven C. Good, Meyer Luskin, William F. Ballhaus, James B. Hawkins, Gerald Chizever, and Kelli Bernard. With the exception of Ms. Bernard, all of our director nominees are currently directors of the Company and were previously elected to serve on the Board by our stockholders. Ajay Mehra, President of our Cargo Scanning and Solutions business, has decided not to continue on our Board in order to concentrate his time on the Cargo Scanning and Solutions business, which is likely to be a key growth driver for the Company in the long term, and the Board has agreed that the Company would be best served through his focus on that business. Ms. Bernard has been nominated to the board seat currently held by Mr. Mehra.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until our next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although we know of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board may designate.

If a quorum is present and voting, the seven nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 68 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Steven C. Good(1)(2)(4) | 77 | Director | 1987 |
| Meyer Luskin(1)(2)(4) | 94 | Director | 1990 |
| William F. Ballhaus(1)(2)(3)(4)(5) | 74 | Director | 2010 |
| James B. Hawkins(1)(3)(5) | 63 | Director | 2015 |
| Gerald Chizever(4)(5) | 75 | Director | 2016 |
| Kelli Bernard | 50 | Director Nominee | — |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Risk Management Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is our founder and has served as President, Chief Executive Officer and has been a member of our Board since our inception in May 1987. He has served as our Chairman of the Board since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of our major subsidiaries.

From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, we acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst. Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing our Company.

***Steven C. Good*** has been a member of our Board since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good formerly served as a director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good currently serves as a director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves as a Director on the Advisory Board of the UCLA Luskin School of Public Affairs. Mr. Luskin was formerly Chairman of the Board of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital, Chairman of the Board of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital), a Director of the UCLA Foundation, and a Director of the Alliance for College-Ready Public Schools. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***William F. Ballhaus, Jr.*** has been a member of our Board since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus currently is Chairman of the Board of Trustees of the University Space Research Association.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2570 of 2711

Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** has been a member of our Board since December 2015. From 2004 through July 2018, Mr. Hawkins was the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a director of Invivo Corporation, a provider of MRI-safe patient monitoring. Mr. Hawkins currently serves as a director of El Dorado Resorts Inc. and Iradimed Corporation. Mr. Hawkins has extensive risk management experience gained through the various executive and board positions that he has held. He earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins was selected to serve as a director because of his direct management experience in the medical device area.

***Gerald Chizever*** has been a member of our Board since October 2016. Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever's practice includes mergers and acquisitions, corporate finance, public and private securities offerings, general corporate representation and strategic alliances. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in all matters, including business transactions, corporate governance and compliance with governmental regulations. He holds a B.B.A. degree in Accounting and a Juris Doctorate from George Washington University. Mr. Chizever was selected to serve as a director because of his corporate governance and compliance experience, including his experience in highly-regulated industries.

***Kelli Bernard*** is a nominee to serve as director of the Company. Since June 2016, Ms. Bernard has served as an Executive Vice President and National Cities Leader for AECOM, a fully-integrated global infrastructure firm. Prior to joining AECOM, from July 2013 through June 2016, Ms. Bernard was Deputy Mayor of Economic Development for Los Angeles Mayor Eric Garcetti. Ms. Bernard is the current chair of the Los Angeles Homeless Services Authority ("LAHSA") and the co-chair of LAHSA's Ad-Hoc Committee on Black People Experiencing Homelessness. Ms. Bernard also serves on the Boards for the Greater Los Angeles African American Chamber of Commerce and the Los Angeles Area Chamber of Commerce. She holds a BA in Sociology from University of California, Berkeley and a Master's degree in Urban Planning from University of California, Los Angeles. Ms. Bernard was selected as a director nominee because of her business and economic development and international trade experience.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to us between any of the directors or nominees for director and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among our directors or director nominees or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board Role in Risk Oversight**

Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, cybersecurity, and other risks. Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment, and management of our risks. Our Board regularly discusses

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2571 of 2711

the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting. The Risk Management Committee oversees management of key enterprise risks, including strategic, operational, legal, regulatory, and compliance. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board. The Compensation Committee oversees risks related to our executive compensation policies and practices. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure and Lead Independent Director**

Our Chairman of the Board is our Chief Executive Officer. We believe that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board's role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges we face and is thus well positioned to develop agendas and highlight issues that ensure that the Board's time and attention are focused on the most critical matters. In addition, our Board has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances our ability to communicate our message and strategy clearly and consistently to our stockholders, employees, and other companies with which we do business. Although we believe that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, we will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve our best interests and the best interests of our stockholders.

The combined Chairman of the Board and Chief Executive Officer position is balanced by the number of independent directors serving on our Board, our independent committees and our Lead Independent Director. William Ballhaus is currently our Lead Independent Director and brings to this role considerable skills and experience as described above in "Election of Directors." The role of Lead Independent Director is designed to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

**Commitment to Diversity at the Company and on the Board**

We are focused on creating a diverse and inclusive workforce. We strive to attract and retain top talent, foster an inclusive culture, and embrace diversity. We are also committed to diversity at the Board level. Our Board considers diversity, including gender, racial, and ethnic diversity, when considering nominations to the Board. The Board's objective is to have a Board comprised of individuals who by occupation, background, and experience are in a position to make a strong, positive contribution to our Company and our stockholders.

**Board Meetings, Independence and Committees of the Board**

There were eight meetings of the Board and the Board acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2019. During fiscal 2019, the Board had a standing Audit Committee, Compensation Committee, Nominating and Governance Committee, Risk Management Committee, and Technology Committee. The members of each committee are appointed by the majority vote of the Board. All persons serving as a director during the fiscal year ended June 30, 2019

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2572 of 2711

attended more than 75% of the aggregate number of meetings held by the Board and all committees on which such director served.

The Board has determined that each of the current directors and nominees for director, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board has determined that each of the members of each of the committees of the Board is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and the Listing Standards, as applicable and currently in effect.

*Audit Committee*

We have a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of our independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews our financial statements and the adequacy of our internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to our Company.

The Audit Committee currently consists of four independent directors – Messrs. Good, Luskin and Hawkins and Dr. Ballhaus. The Board has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2019. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Risk Management Committee*

The Risk Management Committee is responsible for overseeing and monitoring our key enterprise risks, including strategic, operational, legal, regulatory, compliance, security, and reputational risks. The Risk Management Committee has responsibility for reviewing our compliance program and our major legal compliance risk exposures, monitoring our code of ethics, reviewing our risk management reviews and assessments, and regularly assessing the continuing appropriateness of a succession plan for our Chief Executive Officer and other executive officers. The Risk Management Committee currently consists of four independent directors – Messrs. Chizever, Good, and Luskin and Dr. Ballhaus. There were three meetings of the Risk Management Committee during the fiscal year ended June 30, 2019.

The Risk Management Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation and benefits for our executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board in the administration of our equity compensation and benefits plans. The

Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Good and Dr. Ballhaus. There were four meetings of the Compensation Committee and the Compensation Committee acted pursuant to unanimous written consent on two additional occasions during the fiscal year ended June 30, 2019. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board. The Nominating and Governance Committee currently consists of two independent directors – Dr. Ballhaus and Mr. Hawkins. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2019.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board members, diversity, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board members. The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board regarding technology-based matters. The Technology Committee currently consists of three independent directors – Dr. Ballhaus and Messrs. Hawkins and Chizever. There were two meetings of the Technology Committee during the fiscal year ended June 30, 2019.

The Technology Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;

- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and our Company, or any customer, supplier, competitor, or affiliate of ours, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of our Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board. We may also require any proposed nominee to furnish such other information as we or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to our Board to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify us of their intent to do so on or before the date on which nominations must be received by us in accordance with our Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Good and Dr. Ballhaus. None of our executive officers has served during the fiscal year ended June 30, 2019 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on our Board or the Compensation Committee. During the fiscal year ended June 30, 2019, no member of our Compensation Committee had any relationship or transaction with our Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board recommends that you vote "FOR" the election of each of Deepak Chopra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr., James B. Hawkins, Gerald Chizever, and Kelli Bernard as our directors. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2575 of 2711

**RATIFICATION OF SELECTION OF**
**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee has selected Moss Adams LLP ("Moss Adams") as our independent registered public accountants for the year ending June 30, 2020 and has further directed that management submit the selection of independent registered public accountants for ratification by our stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that our stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in our and our stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board recommends a vote "FOR" the ratification of Moss Adams as our independent registered public accountants for the fiscal year ending June 30, 2020. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION**
**FOR THE FISCAL YEAR ENDED JUNE 30, 2019**
***(Proposal No. 3 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd Frank Act") enables our stockholders to vote to approve, on an advisory, non-binding basis, our executive compensation for the fiscal year ended June 30, 2019 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act. We currently conduct this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at our 2020 Annual Meeting of Stockholders.

**Summary**

Our Board is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. We are asking our stockholders to provide advisory approval of our executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation, and the accompanying narrative disclosure set forth in the Proxy Statement. We recognize and value the critical role that executive leadership plays in our performance. Our executive compensation philosophy is intended to ensure that executive compensation is aligned with our short- and long-term business strategy, objectives, and stockholder interests. Our executive compensation is designed to attract, motivate, and retain highly qualified executives. We believe that our compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the short- and long-term interests of our stockholders.

We urge you to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

We believe that executive compensation should be tied to our performance on both a short-term and long-term basis. We believe that our continued success is closely tied to the performance of our executive officers and have designed our compensation practices in order to reward the executives for their contributions to our overall success.

**Alignment with Stockholders' Interests**

We grant annual incentives based in part on each executive's contribution to enhancing our short- and long-term profitable growth. We also grant long-term equity-based incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of our stockholders. In recent years, we have generally used restricted stock units ("RSUs") as our equity incentive vehicle as these awards enable the executives to establish a meaningful equity stake in our Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead us to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of our operations. For fiscal year 2019, 100% of the long-term equity incentives granted to our corporate Named Executive Officers (our CEO, CFO, and General Counsel) and a significant portion of our equity incentives granted to our divisional Named Executive Officers consisted of RSUs subject to performance vesting based on the compound annual growth rate of revenue and operating income.

**Long-Term Performance**

In order to promote our philosophy of pay-for-performance and furthering our objective of aligning the interests of management with those of our stockholders, we have established performance programs for certain of our executive officers. These programs focus on the achievement of our long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate financial metrics, we are incentivizing our officers to achieve our long-term corporate objectives and ultimately increase stockholder value.

**Highlights of 2019 Executive Compensation Program**

The Board believes our executive compensation program is designed appropriately and that a vote in favor of the proposal is warranted, including for these reasons: (1) 100% of corporate Named Executive Officer equity awards for fiscal 2019 were performance-based and tied to measurable pre-established targets; (2) we are committed to having strong governance standards and continue to take steps to further this commitment; and (3) we value the opinions and feedback we receive from, and we continue to engage with, our stockholders, and our executive compensation program directly reflects our stockholders' input.

**1. 100% Performance-Based Equity Awards for Corporate Named Executive Officers: Equity awards granted to our CEO, CFO, and General Counsel are 100% performance-based.**

100% of the equity grants made to our corporate Named Executive Officers and a significant portion of the equity grants made to our divisional Named Executive Officers during fiscal 2019 were performance-based and tied to pre-established targets. Our 2019 performance-based program established revenue and operating income targets which require significant annual growth as compared to baseline measurement levels. The revenue metric is weighted at 20%, and the operating income metric is weighted at 80%.

For the annual performance period ended June 30, 2019, compound annual revenue growth as compared to the baseline measurement level was 10.9%, and compound annual operating income growth as compared to the baseline measurement level was 34.0%. As a result, our CEO earned 25,931 shares in accordance with the program.

In addition, our participating executive officers received shares under our previous EBITDA-based program. Discussion of our previous program is available in our Proxy Statement on Schedule 14A as filed with the SEC on October 19, 2018. Under our prior program, the adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2019 was $6.31 and was achieved at 168% of target. As a result the 71,070 shares granted to our CEO in fiscal 2017 were vested. In addition, our CEO earned 62,015 shares, consisting of 26,480 vested shares earned pursuant to the fiscal 2018 grant and 35,535 vested shares earned pursuant to the fiscal 2017 grant.

**2. Corporate Governance and Best Practices: We are committed to having strong governance standards with respect to our compensation programs, procedures, and practices.**

We have taken the following actions to enhance our corporate governance and executive compensation policies:

- Engaged with stockholders and revised our fiscal 2019 executive compensation to address specific stockholder feedback.
- Appointed a Lead Independent Director to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.
- Prohibited all hedging and pledging of our stock by executive officers and directors. As of the date of the Proxy Statement, no shares of our stock are pledged by any Named Executive Officer or director.

- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements. We have also included clawback provisions in each Named Executive Officer's employment agreement.

- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives' long-term interests with those of our stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or RSU awards, net of amounts required to pay taxes and exercise price.

**3. Communications with Stockholders: We maintain open lines of communication with our stockholders. In response to a failed say on pay vote with respect to our fiscal year 2018 program, we engaged with our stockholders to solicit feedback on our program. We revised our annual cash incentive and long-term incentive programs and believe the implemented changes reflect the stockholder input we received.**

Our Compensation Committee takes very seriously stockholder feedback with respect to executive compensation. At our 2018 annual meeting, approximately 38% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation. Considering this result, we engaged with our stockholders so that we could better understand stockholder sentiments and concerns about our program. The Compensation Committee revised the annual cash executive officer incentive program as well as the long-term incentive program for fiscal 2019 to address stockholder concerns. Targets for our annual incentive program were increased to make achievement more difficult. Additionally, metrics were changed for our long-term incentive program to include two performance metrics, revenue and operating income, and our disclosure was enhanced and clarified to provide greater transparency.

Our Board believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that our executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K of the SEC, including in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board recommends that you vote "FOR" the approval of our executive compensation for the fiscal year ended June 30, 2019. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Executive Officers

Our executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 68 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 51 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 57 | Director, Executive Vice President and President of OSI Cargo Scanning and Solutions Business |
| Victor Sze* | 52 | Executive Vice President and General Counsel |
| Mal Maginnis* | 60 | President of Rapiscan Detection |
| Shalabh Chandra | 54 | President of Healthcare Division |
| Manoocher Mansouri | 63 | President of Optoelectronics and Manufacturing Division |
| Paul Morben | 58 | President of OSI Electronics |
| Deborah Cegielski | 49 | Senior Vice President and Chief Human Resources Officer |

* Denotes our Named Executive Officers for fiscal 2019.

The following section sets forth certain background information regarding those persons currently serving as our executive officers, excluding Deepak Chopra, who is described above under "Election of Directors":

***Alan Edrick*** is our Executive Vice President and Chief Financial Officer. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between 2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is our Executive Vice President and President of OSI Cargo Scanning and Solutions Business. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named our Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is our Executive Vice President and General Counsel. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Juris Doctorate from Loyola Law School.

***Mal Maginnis*** is President of our Rapiscan Detection business. Mr. Maginnis joined the Company in July 2017. He has more than 35 years in the defense, security, safety and technology industries, and is an experienced senior executive of technology-based businesses. Prior to joining the Company, Mr. Maginnis was the head of a technology development company based in Singapore and one of the owners of an Australian detection company based in Sydney. In addition, he was President of Smiths Detection from 2011-2014 based in London. He held a series of senior positions at Smiths Detection including President, Head of Technology, Programs and Products and was the head of the largest business unit managing the global military and emergency responder business. Mr. Maginnis holds a Bachelor of Arts (Hons) degree in history and government from the Faculty of Military Studies University of New South Wales, and Graduate, UK Command Staff College.

***Shalabh Chandra*** is President of our Healthcare division. Mr. Chandra joined the Company in September 2019. He has more than 20 years in the medical devices and medical diagnostics industries. From May 2018 to August 2019, he served as the VP & GM of the Neurology division for Quest Diagnostics. Prior to that, from May 2017 to April 2018, Mr. Chandra served as an industry consultant, and from August 2010 through April 2017, Mr. Chandra held several positions at Analogic, including President of Analogic Asia and SVP for the Global Ultrasound Business. Mr. Chandra also spent approximately 14 years at Philips as GM of Global MRI Patient Monitoring. Mr. Chandra received his BS in electrical engineering from IIT Kanpur, India, a MS in Biomedical Engineering from Ohio State, and an MBA from the Wharton School of the University of Pennsylvania.

***Manoocher Mansouri*** is President of our Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of our Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of our OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in Electrical Engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Paul Morben*** is President of our OSI Electronics business. Having first joined the Company in 1983, Mr. Morben has over 35 years of experience in the optoelectronics and manufacturing services industries, including 10 years in Asia where he established and led the Company's manufacturing operations in Singapore, Indonesia, and Malaysia. Mr. Morben was named President of OSI Electronics in October 2019 after having spent the past three years as President and CEO of Masterwork Electronics, Inc. Mr. Morben holds a Bachelor of Science degree from California State University, Northridge and a Master of Business Administration degree from Concordia University, Irvine.

***Deborah Cegielski*** is our Senior Vice President and Chief Human Resources Officer. Mrs. Cegielski joined the Company in this role in November 2018. Mrs. Cegielski has over 25 years of human resources experience. Between 2015 and 2018, Mrs. Cegielski served as the Head of Human Resources for Landing Systems, a division of United Technologies Aerospace Systems. Prior to this, Mrs. Cegielski held several senior positions, including senior leadership roles at XLA Corporation and AMETEK. Mrs. Cegielski holds a Bachelor of Arts in Business Administration from Excelsior College, a Master of Business Administration from Northeastern University, and a Master in Human Relations from the University of Oklahoma.

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes our compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for our Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the "Summary Compensation Table" contained in this Proxy Statement.

*Advisory Vote on Named Executive Officer Compensation; Stockholder Communications*

We maintain open lines of communication with our stockholders, and senior management routinely interacts with our stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. Further, the Compensation Committee considers the outcome of our annual say on pay vote when making decisions regarding our executive compensation program. At our 2018 annual meeting, 38% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. The Compensation Committee deliberated extensively about the results of this vote and considered this result when engaging in its ongoing review of our executive compensation program. Given the vote results, we engaged with our stockholders. The primary goals in soliciting feedback from our stockholders were to (a) better understand their views on our executive compensation program, (b) identify specific concerns and issues reflected in their 2018 vote, and (c) initiate discussions about proposed changes to the program. The general feedback was that our executive compensation program metrics should be more rigorous and that our disclosure should be clarified to provide greater transparency.

In response to the 2018 say on pay vote and stockholder discussions, the Compensation Committee took the following actions with respect to our executive compensation program:

| Company Response/Action Taken |
| --- |
| Made our annual incentive program more rigorous by increasing the targets |
| Changed the metrics and increased the rigor of our long-term incentive program such that awards are now tied to achievement of both revenue and operating income as compared to the single EBITDA per share metric under the prior program |
| Reduced base salary of our Chief Executive Officer |

At the upcoming Annual Meeting, we will again hold an annual advisory vote to approve executive compensation. We will continue to engage with our stockholders throughout the year, and the Compensation Committee will consider the results from this year's and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Governance Highlights*

We are committed to having strong governance practices with respect to our compensation programs, practices and procedures. We believe that these practices reinforce our emphasis on tying executive

compensation to performance. The following chart highlights some of our governance practices with respect to executive compensation:

| What We Do | What We Do Not Do |
|---|---|
| Use 100% performance-based vesting with respect to corporate Named Executive Officer equity awards | No excise tax gross-ups upon a change in control |
| Have formulaic performance-based annual incentives | No hedging, pledging, or speculative transactions are permitted by executives and directors |
| Maintain a robust clawback policy | No re-pricing of underwater stock options |
| Maintain share ownership and retention guidelines for executives and directors | No stock option grants with an exercise price less than fair market value |
| Conduct an annual say on pay vote | No "single trigger" severance payments owing solely on account of the occurrence of a change in control event |
| Maintain open lines of communication with stockholders | |

*Executive Compensation Summary*

*Fiscal 2019 Performance*

During fiscal 2019, we (a) achieved record revenue of $1.182 billion, representing 9% growth as compared to fiscal 2018; (b) delivered record non-GAAP earnings per share of $4.32, representing 20% growth compared to the prior fiscal year; (c) achieved outstanding operating cash flow of $119 million; (d) expanded our operating margin; and (e) completed three strategic acquisitions.

*Leverage Business Infrastructure*. Even as we launched new products, entered new markets, and invested substantial amounts in R&D, we actively leveraged our business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities*. In fiscal 2019, we continued to expand our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and we believe it will continue to serve, to sustain growth over the long term. Some of our key achievements during fiscal 2019 include the following:

- Expanding presence with international customers with the commercialization of a checkpoint CT solution by our Security division.
- Acquiring product lines and companies that not only leverage our existing operating infrastructure but also provide immediate entry into growing market segments.
- Expanding our presence in the sporting event security space to provide screening as a service.

*Building a Foundation for the Future*. We continue to make significant targeted investments in R&D and acquisitions. In fiscal 2019, we completed three strategic acquisitions, two in our Security division and one in our Optoelectronics and Manufacturing division. We believe that these acquisitions and investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

*Role of the Compensation Committee*

Our Board appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing

Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for our Named Executive Officers, including base salaries, annual incentives, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of our Named Executive Officers (other than our Chief Executive Officer) is recommended to the Compensation Committee by our Chief Executive Officer. Compensation for our Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

*Executive Compensation Program Elements*

The particular elements of the compensation program for our Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with our pay-for-performance philosophy, we structure our compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

The following is an overview of the elements of our compensation and benefits programs for fiscal 2019:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined formulaically based on adjusted return on equity ("AROE") metrics for our corporate Named Executive Officers. |
| | The Solutions Incentive Program allows for annual incentives in the form of shares of stock or, at our discretion, cash to be granted to Mr. Mehra based on the achievement of certain performance metrics. |
| | Mr. Maginnis received a bonus based upon performance. |
| Long-Term Incentives | The fiscal 2019 program with respect to the Named Executive Officers consisted of performance-based RSUs, which are earned based on the achievement of pre-established revenue and operating income metrics for each of the three years following grant, as well as an aggregate three-year metric. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2019, perquisites included a Company car for each Named Executive Officer and a housing allowance for Mr. Maginnis. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash incentives at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, in which our CEO is the only participant. |

In fiscal 2019, fixed compensation comprised approximately 10% to 45% and variable compensation comprised approximately 55% to 90% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 84% of total compensation.





*Fixed Compensation*. Fixed compensation is intended to compensate our Named Executive Officers for their ongoing responsibilities and consists of base salary. Base salary is set to attract and retain executive talent. Base salaries for our Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically, typically on an annual basis.

The Compensation Committee takes a conservative approach with respect to base salary increases. In determining whether base salary levels for fiscal year 2019 were appropriate, the Compensation Committee considered the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance, and expected future contributions. In fiscal 2019, in order to better align salaries with overall leadership responsibilities, the Compensation Committee increased base salary levels for each of the Named Executive Officers, with the exception of Mr. Chopra who voluntarily agreed to a salary reduction of 2.5% from $1,000,000 to $975,000 based on stockholder feedback.

*Variable Compensation*. Variable compensation provides our Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive awards and long-term incentive compensation.

*Annual Incentive Awards*. All corporate Named Executive Officers are eligible for an annual incentive pursuant to our annual incentive program with a target incentive opportunity equal to 100% of salary and a maximum incentive opportunity equal to 200% of salary. Annual incentives under this program are designed to focus our participating Named Executive Officers on annual operating achievement and near-term success. Annual incentives are calculated based on a formula tied to AROE metrics as follows:

| AROE | % of Base Salary Earned |
|---|---|
| Less than 12% | 0% |
| 12% | 25% |
| 14% | 50% |
| 15% | 75% |
| 16% | 100% |
| 16.5% | 125% |
| 17% | 150% |
| 17.5% | 175% |
| 18% or more | 200% |

The Compensation Committee considers AROE to be an effective annual performance measure for assessing the Company's efficient use of capital and return to stockholders. The AROE targets were designed to be challenging yet achievable with significant effort and management skill and were established in order to provide the executives sufficient incentive to create long-term stockholder value while at the same time ensuring appropriate risk management. For fiscal year 2019, threshold, target, and maximum performance goals were increased from fiscal year 2018. For fiscal 2019, we achieved 18.2% AROE; therefore, participating Named Executive Officers earned annual incentives equal to 200% of base salary. See the "Non-equity Incentive Plan Compensation" column of the Summary Compensation Table.

Mr. Maginnis's fiscal 2019 bonus was based upon performance.

*Solutions Annual Incentive Program*. In 2015, we established an annual incentive program tied to the performance of our solutions business (the "Solutions Incentive Program"). Mr. Mehra, President of the OSI Cargo Scanning and Solutions Business, is the only Named Executive Officer who participates in this program. Incentives under the Solutions Incentive Program are awarded based on the operating income of our solutions business (excluding certain operations already existing at the time of the adoption of the program). For fiscal year 2019 performance, Mr. Mehra was awarded incentives valued at $2,216,800 under this program. The fiscal 2019 award was paid fully in cash and is included in the "Non-equity Incentive Plan Compensation" column of the Summary Compensation Table as compared to the fiscal 2018 award which was paid partially in cash and partially in the form of time-based RSUs.

*Long-Term Incentive Program*. In order to further promote our philosophy of pay-for-performance and furthering our objective of aligning our executive compensation with our long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of each Named Executive Officer, we have a long-term incentive program.

The grants to our corporate Named Executive Officers during fiscal 2019 were performance based in their entirety, and a significant portion of the grants made to our divisional Named Executive Officers were performance based. The Compensation Committee believes that this vesting structure provides an incentive for our Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving corporate performance and business objectives for the benefit of our stockholders.

Our overall long-term incentive program is designed to retain our Named Executive Officers and to align the interests of our Named Executive Officers with the long-term interests of our stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under our equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of our Common Stock on such dates.

The Compensation Committee has established a three-year program for long-term performance-based incentive grants to our Named Executive Officers. The program provides for yearly initial grants of equity. Each award is 100% performance based and vests based on the level of performance achieved for the following metrics: compound annual revenue growth and compound annual operating income growth. The Compensation Committee considers compound annual growth revenue and operating income metrics to be effective long-term performance measures for assessing the Company's performance over multiple years. The Compensation Committee set the targets at the below-levels after taking into consideration various factors, including the significantly reduced revenue expected from the current contract with the Servicio de Administración Tributaria in Mexico. The targets are designed to be challenging yet achievable with significant effort and management skill, incentivizing management to create long-term stockholder value while at the same time ensuring appropriate risk management. Revenue and operating income figures are as reported in accordance with GAAP in our annual report on Form 10-K. Growth is measured as compared to our fiscal year 2017 as-reported figures. As described below, the majority of the shares that

can be earned under this program is based upon three-year performance, while additional shares can be earned based upon year one and year two performance.

Each initial grant would vest based upon the performance levels achieved for a three-year performance period for each metric based on the charts set forth below, which show the applicable metrics, weightings, and potential vesting percentage based upon performance level achieved.

**Revenue Metric (20%)**

| CAGR Revenue Growth | Vesting Percentage |
|---|---|
| <1.0% | 0% |
| 1.0% | 25% |
| 2.0% | 50% |
| 3.0% | 75% |
| 4.0% | 100% |

**Operating Income Metric (80%)**

| CAGR EBIT Growth | Vesting Percentage |
|---|---|
| <2.0% | 0% |
| 2.0% | 10% |
| 2.5% | 30% |
| 3.0% | 50% |
| 4.0% | 70% |
| 5.0% | 85% |
| 6.0% | 100% |

Our Named Executive Officers also have the opportunity to earn additional shares for each annual performance period within the three-year performance period if certain performance levels are achieved based on the charts set forth below.

**Revenue Metric (20%)**

| CAGR Revenue Growth | Potential Additional Shares as a % of Initial Grant |
|---|---|
| 4.5% | 10% |
| 5.0% | 20% |
| 5.5% | 30% |
| 6.0% | 40% |
| 6.5% | 50% |
| 7.0% | 60% |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2588 of 2711

**Operating Income Metric (80%)**

| CAGR EBIT Growth | Potential Additional Shares as a % of Initial Grant |
|---|---|
| 6.5% | 10% |
| 7.0% | 20% |
| 7.5% | 30% |
| 8.0% | 40% |
| 8.5% | 50% |
| 9.0% | 60% |

In the event of a change of control, the initial grant would vest upon the change of control; performance for any annual periods remaining in association with a particular grant will be assumed to be achieved at the maximum payout levels for the purposes of awarding additional incentive shares or units in connection with the change of control.

Our compound annual revenue growth for fiscal year 2019 was 10.9%, and our compound annual operating income growth for fiscal year 2019 was 34.0%. In addition, our adjusted EBITDA per share for fiscal year 2019 was 168% of the fiscal 2019 adjusted EBITDA per share target of $6.31 under our prior program. Therefore, our executive officers earned additional shares under our prior and current program as follows: Mr. Chopra: 87,946 shares; Mr. Edrick, 38,103 shares; Mr. Mehra, 11,431 shares; Mr. Sze, 32,981 shares; and Mr. Maginnis, 2,589 shares.

The Compensation Committee determines, after consultation with our Chief Executive Officer, the target number of equity awards to grant to our Named Executive Officers. The grant amounts for our Chief Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the following quantitative and qualitative factors, as well as overall corporate performance.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Quality of the management of units or functions managed by the Named Executive Officer | • Financial performance (including earnings per share and internal metrics) |
| • Leadership of personnel under the Named Executive Officer's management | • Financial performance metrics for business units managed by the Named Executive Officer |
| • Execution of strategically important projects | • Compensation surveys provided by external advisors |
| • Overall effectiveness of units or functions managed by the Named Executive Officer | |
| • Contributions to the formulation of Company strategy and tactics | |
| • Contributions to stockholder value | |
| • Management of risk | |

For fiscal year 2019 performance share calculation purposes, our Chief Executive Officer, Chief Financial Officer, General Counsel, and President of our Cargo Scanning and Solutions Business are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance.

*Benefits and Perquisites*. Benefits and perquisites are designed to attract and retain key employees. Currently, our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health

insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. We lease automobiles for or provide an auto allowance to certain of our Named Executive Officers. We also provide a housing allowance to Mr. Maginnis.

We maintain a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows certain of our Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

We also maintain a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board may select participants from among our Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix*. While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. We believe this compensation mix provides our Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of corporate performance, as well as reducing the risk of recruitment of highly qualified executive talent by our competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. We believe that this compensation mix results in a pay-for-performance orientation that is aligned with our compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to our Named Executive Officers for fiscal 2019, the Compensation Committee performed a review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was evaluated and taken into consideration in the Compensation Committee's overall determination of

each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2019 peer group were developed based on similarity in size and operations within the industries in which we operate as follows:

- AAR Corp.
- ADTRAN, Inc.
- Aerojet Rocketdyne Holdings, Inc.
- Astronics Corporation
- Calix, Inc.
- Coherent, Inc.
- Comtech Telecommunications Corp.
- Cubic Corporation
- Daktronics, Inc.
- Fitbit, Inc.
- FLIR Systems, Inc.
- Finisar Corporation
- Infinera Corporation
- Integer Holdings Corporation
- Integra LifeSciences Holdings Corporation
- Itron, Inc.
- Lumentum Holdings Inc.
- Masimo Corporation
- MTS Systems Corporation
- National Instruments Corporation
- Natus Medical Incorporated
- Novanta Inc.
- VIASAT, INC.
- Viavi Solutions Inc.

In connection with executive compensation decisions for fiscal 2019, the Compensation Committee engaged independent compensation consulting firm, Pearl Meyer. The Compensation Committee also considered broad-based surveys that reflected compensation levels and practices for executives holding comparable positions at the companies covered by the surveys and adjustments based on the cost of living in certain geographic areas. The review of the surveys further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed our actual performance taken as a whole as well as our performance relative to our peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to our comparative performance.

For fiscal 2019, in order to better align salaries with overall leadership responsibilities, the Compensation Committee increased the base salaries of each Named Executive Officer with the exception of Mr. Chopra who voluntarily agreed to a salary reduction to $975,000. The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual incentives and performance-based equity grants comprised a significant portion of total compensation.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving our long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Minimum Equity Ownership and Retention Guidelines*

We believe that our executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. We believe that this multiple constitutes significant amounts for our executive officers and provides a substantial link between the interests of our executive officers and those of our stockholders. Executive officers have five years from the date of appointment to attain such ownership levels. During such time that an executive officer has not attained the share ownership guideline, such officer is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2019, each of our Named Executive Officers met or exceeded our minimum equity ownership guidelines with the exception of Mr. Maginnis who joined the Company in July 2017.

*Clawback Policy*

We have adopted a clawback policy. The policy provides that if an accounting restatement is required due to our material non-compliance with any accounting requirements, then we will seek to recover any excess in the cash and equity incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements. Each Named Executive Officer's employment agreement also contains a clawback provision.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

We have adopted a policy that prohibits our employees and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of our Common Stock or other equity securities. We have also adopted a policy that prohibits our executive officers and directors from holding Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis. The terms of each of such agreements or arrangements are summarized below under the heading "Employment Agreements." These types of arrangements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on our use of equity based awards. The Compensation Committee also considers the limits on deductibility of

compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

The tax reform legislation passed in December 2017, generally referred to as The Tax Cuts and Jobs Act ("Tax Act"), substantially modified Section 162(m) and, among other things, eliminated the "performance based" exception to the $1 million deduction limit with respect to taxable years beginning after December 31, 2017. As a result of the implementation of the Tax Act, compensation paid to our Named Executive Officers, including our Chief Financial Officer, is subject to the limitations on deductibility under Section 162(m), and, subject to certain statutory exceptions for equity compensation granted prior to the enactment of the Tax Act, performance-based compensation in excess of $1 million awarded to our Named Executive Officers, including our Chief Financial Officer, is not deductible.

**Summary Compensation Table**

The following table sets forth the compensation for our principal executive officer, principal financial officer, and our three highest paid executive officers serving as executive officers on June 30, 2019 (the "Named Executive Officers") for the fiscal years ended June 30, 2019, 2018 and 2017:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (1)($) | Option Awards ($) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (6)(7)(8)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2019 | 975,000 | — | 3,400,039 | — | 1,950,000 | 302,451 | 190,605 | 6,818,095 |
| Chairman, President and | 2018 | 1,000,000 | — | 4,348,546 | — | 1,750,000 | 14,750 | 196,944 | 7,310,240 |
| Chief Executive Officer | 2017 | 1,000,000 | — | 4,316,792 | — | 1,250,000 | 302,189 | 209,498 | 7,078,479 |
| Alan Edrick | 2019 | 475,000 | — | 1,472,230 | — | 950,000 | — | 70,984 | 2,968,214 |
| Executive Vice President and | 2018 | 435,846 | — | 1,884,671 | — | 780,500 | — | 66,288 | 3,167,305 |
| Chief Financial Officer | 2017 | 402,000 | — | 1,870,610 | — | 502,500 | — | 57,805 | 2,832,915 |
| Ajay Mehra | 2019 | 450,000 | — | 1,846,632(4) | — | 2,216,800 | — | 83,646 | 4,597,078 |
| Executive Vice President of the | 2018 | 418,462 | — | 1,477,671 | — | 1,150,000 | — | 81,005 | 3,127,138 |
| Company and President of OSI Cargo Scanning and Solutions Business | 2017 | 400,000 | 245,000 | 1,433,149 | — | 705,000 | — | 75,569 | 2,858,718 |
| Victor S. Sze | 2019 | 410,000 | — | 1,275,005 | — | 820,000 | — | 72,143 | 2,577,148 |
| Executive Vice President, | 2018 | 379,923 | — | 1,630,869 | — | 673,750 | — | 79,779 | 2,764,321 |
| General Counsel and Secretary | 2017 | 350,000 | — | 1,618,842 | — | 437,500 | — | 73,898 | 2,480,240 |
| Mal Maginnis | 2019 | 375,181(5) | 165,000 | 300,047 | — | — | — | 118,330(5) | 958,558(5) |
| President of Rapiscan Detection | 2018 | 343,727(5) | 145,000 | 302,165 | — | — | — | 101,238(5) | 892,130(5) |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the fiscal year ended June 30, 2019 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represent amounts earned under the annual incentive program or the Solutions Incentive Program, as applicable.

(3) We initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2018 to June 30, 2019 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2019 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) Includes time-based RSUs valued at $1,404,979, which were granted in fiscal 2019 factoring in previous performance.

(5) Certain 2019 figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.3540 SGD, the June 27, 2019 exchange rate as published by Oanda.com. Certain 2018 figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.3679 SGD, the June 28, 2018 exchange rate as published by Oanda.com.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2019 are as follows:

| Name | Matching 401(k), Nonqualified Deferred Compensation, and Central Provident Fund Contributions(*)($) | Car Benefit and Housing Allowance($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 6,872 | 3,300 | 6,186 | 174,247 | 190,605 |
| Alan Edrick | 56,040 | 4,160 | 6,456 | 4,328 | 70,984 |
| Ajay Mehra | 53,558 | 6,675 | 11,858 | 11,555 | 83,646 |
| Victor S. Sze | 49,466 | 4,300 | 8,003 | 10,374 | 72,143 |
| Mal Maginnis | 9,793(5) | 106,959 | 1,578(5) | — | 118,330(5) |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2018 are as follows:

| Name | Matching 401(k), Nonqualified Deferred Compensation, and Central Provident Fund Contributions(*)($) | Car Benefit and Housing Allowance($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 8,100 | 3,300 | 11,263 | 174,281 | 196,944 |
| Alan Edrick | 52,065 | 2,850 | 7,002 | 4,371 | 66,288 |
| Ajay Mehra | 50,154 | 6,675 | 12,577 | 11,599 | 81,005 |
| Victor S. Sze | 46,095 | 12,000 | 11,267 | 10,417 | 79,779 |
| Mal Maginnis | 7,413(5) | 92,730 | 1,095(5) | — | 101,238(5) |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(8) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2017 are as follows:

| Name | Matching 401(k) and Nonqualified Deferred Compensation Contributions(*)($) | Car Benefit($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 5,200 | 3,300 | 5,761 | 195,237 | 209,498 |
| Alan Edrick | 46,405 | 2,850 | 4,421 | 4,129 | 57,805 |
| Ajay Mehra | 45,019 | 6,675 | 12,518 | 11,357 | 75,569 |
| Victor S. Sze | 41,075 | 12,000 | 10,648 | 10,175 | 73,898 |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2594 of 2711

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2019 to each of our Named Executive Officers(8):

| | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(4) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Grant Date** | **Threshold ($)(6)** | **Target ($)** | **Maximum ($)** | **Threshold (#)(1)** | **Target (#)(2)** | **Maximum (#)(3)** | **All Other Stock Awards: Number of Shares of Stock or Units(#)** | **Grant Date Fair Value of Options and Awards (5)($)** |
| Deepak Chopra | 7/5/2018 | — | — | — | — | 43,219 | 121,013 | — | 3,400,039 |
| Chairman, President and Chief Executive Officer | — | — | $ 975,000 | $ 1,950,000 | — | — | — | — | — |
| Alan Edrick | 7/5/2018 | — | — | — | — | 18,714 | 52,399 | — | 1,472,230 |
| Executive Vice President and Chief Financial Officer | — | — | $ 475,000 | $ 950,000 | — | — | — | — | — |
| Ajay Mehra | 7/5/2018 | — | — | — | — | 5,614 | 15,719 | — | 441,653 |
| Executive Vice President of the | — | — | $ 2,216,800 | — | — | — | — | — | — |
| Company and President of OSI Cargo Scanning and Solutions Business | 9/25/2018 | — | — | — | — | — | — | 18,211(7) | 1,404,979 |
| Victor S. Sze | 7/5/2018 | — | — | — | — | 16,207 | 45,380 | — | 1,275,005 |
| Executive Vice President, General Counsel and Secretary | — | — | $ 410,000 | $ 820,000 | — | — | — | — | — |
| Mal Maginnis | 7/5/2018 | — | — | — | — | 3,814 | 10,679 | — | 300,047 |
| President, Rapiscan Detection | | | | | | | | | |

(1) No amounts are shown in this column as our long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(2) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(3) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(5) The grant date fair value of the RSUs was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are shown in this column as our annual incentive program provides for no award under certain circumstances.

(7) This RSU award vests over a period of three years from the date of grant.

(8) We have omitted from this table the columns titled "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2019(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date(2) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested (4)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Deepak Chopra | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chairman, President and Chief Executive Officer | — | — | — | — | — | — | 174,522 | 19,658,413 |
| Alan Edrick | 85,000(6) | — | 16.37 | 8/31/2019 | — | — | — | — |
| Executive Vice President | 40,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| and Chief Financial | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Officer | — | — | — | — | — | — | 75,600 | 8,514828 |
| Ajay Mehra | 30,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Executive Vice President of the Company and President of OSI Cargo Scanning and Solutions Business | — | — | — | — | 29,544 | 3,327,541 | 22,680 | 2,554,448 |
| Victor S. Sze | 55,000(6) | — | 16.37 | 8/31/2019 | — | — | — | — |
| Executive Vice President, | 27,000 | — | 27.12 | 8/10/2020 | — | — | — | — |
| General Counsel and | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Secretary | — | — | — | — | — | — | 65,448 | 7,371,408 |
| Mal Maginnis President, Rapiscan Detection | — | — | — | — | — | — | 9,934 | 1,118,866 |

(1) We have omitted from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of our Common Stock on the date of grant.

(4) The market value of RSU awards that have not yet vested is based on the number of unvested RSUs on June 30, 2019 multiplied by the closing price of our Common Stock on June 28, 2019 ($112.63 per share).

(5) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(6) These options were exercised in August 2019.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2596 of 2711

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of RSUs held by each of our Named Executive Officers during fiscal year ended June 30, 2019:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting(2) | Value Realized on Vesting(3)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 152,015 | 11,840,448 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 40,000 | 2,382,164 | 65,875 | 5,131,004 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Cargo Scanning and Solutions Business | 45,000 | 3,073,107 | 27,568 | 2,139,557 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 35,000 | 2,047,800 | 57,007 | 4,440,275 |
| Mal Maginnis<br>President, Rapiscan Detection | — | — | 552 | 42,995 |

(1) Represents the difference between the fair market price of our Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Includes shares acquired from the vesting of time-based RSU awards and vesting of performance-based RSU awards based upon performance in fiscal years 2017, 2018 and 2019.

(3) Represents the number of RSU awards that vested multiplied by the fair market price of our Common Stock on the date of vesting.

**Pay Ratio**

Pursuant to the Dodd Frank Act, the SEC adopted a rule requiring annual disclosure of the ratio of the median employee's annual total compensation to the annual total compensation of our Chief Executive Officer. The compensation for our Chief Executive Officer in fiscal year 2019 was approximately 471 times the median pay of our employees.

Median employee total annual compensation: $14,473 (figure converted to United States dollars (USD) from Indian rupees at 1 USD to 69.0802 Indian rupees, the June 27, 2019 exchange rate as published by Oanda.com)

CEO total annual compensation: $6,818,095

Ratio of CEO to median employee compensation: 471 to 1

With respect to the annual total compensation of our Chief Executive Officer, we used the amount reported in the "Total" column of the Summary Compensation Table above. We identified the median employee by reviewing the fiscal year 2018 annual base pay for all individuals, excluding our Chief Executive Officer, who were employed by us on June 30, 2018. The identified employee remained employed by us on June 30, 2019. We included all employees globally without regard to location, whether

employed on a full-time, part-time, or seasonal basis. We did not make any assumptions, adjustments, or estimates with respect to compensation other than annualizing the compensation for any full-time employees that were not employed by us for all of fiscal 2018. Using this methodology, we determined that the median employee was a full-time salaried employee located in India. Approximately 60% of our employees are located in countries where the cost of living and wages are substantially lower than in the United States. Compensation rates are set to be market-competitive in the country in which the jobs are performed. Accordingly, the resulting CEO to median employee pay ratio is substantially higher than it would have been if the cost of living and wages in those countries were comparable to the United States.

This pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules based on our payroll and employment records and the methodology described above. The SEC rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their compensation practices. Therefore, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies may have different employment and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

**Pension Benefits**

We maintain the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $10 million payable over a 5-year period commencing January 1, 2024. The initial payment will be $5.25 million and the remaining payments will be in quarterly installments of $250,000. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall receive the present value of the remaining retirement benefits payable within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2019(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 13 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2019.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 12 | 8,367,826 | — |

(1) We have omitted from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2598 of 2711

**Nonqualified Deferred Compensation**

We adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of our management or highly compensated employees (as designated by the Compensation Committee), including certain of our Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to 80% of their base salary and up to 100% of other types of eligible compensation. The Deferred Compensation Plan also allows us to make discretionary contributions and matching contributions on behalf of eligible participants.

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2019 ranged from –7.77% to 17.02%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2019:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 551,202 | 47,388(3) | 186,414 | — | 3,248,821 |
| Ajay Mehra<br>Executive Vice President of the Company and President of OSI Cargo Scanning and Solutions Business | 44,900 | 44,900(3) | 108,558 | — | 1,831,489 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 40,904 | 40,904(3) | 85,314 | 119,155 | 1,492,859 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2019.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis.

*Deepak Chopra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Mr. Chopra's employment agreement was amended effective as of July 1, 2015 and December 31, 2017. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 73 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with us. The agreement also contains a clawback provision whereby Mr. Chopra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months' notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from us to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in

Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date (including if Mr. Chopra becomes disabled or continues performing services for the Company in a different capacity prior to the Scheduled Retirement Date and such disability or other form of services continues through the Scheduled Retirement Date), he shall be entitled to $13,500,000 payable on or within 45 days of the Chopra Scheduled Retirement Date; provided that in the event of Mr. Chopra's death or disability, such amount shall be paid within 45 days of such event.

*Alan Edrick's and Victor Sze's Employment Agreements*

For purposes of this section, Messrs. Edrick and Sze are each individually referred to as the "Executive." In April 2012, we entered into our current employment agreement with each Executive, which were effective as of January 1, 2012. Each Executive's employment agreement was amended, effective as of July 1, 2015. Mr. Sze's employment agreement was further amended on April 29, 2019 to provide for certain additional death and disability benefits. Excluding those additional benefits, the terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68. The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick and $350,000 for Mr. Sze. The Executive is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with us. Each Executive's agreement also contains a clawback provision whereby the Executive's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months' salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not

complete as of the Executive's last date of employment and any special bonus programs) from us to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by us to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Ajay Mehra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of May 1, 2015. Mr. Mehra's employment agreement was amended again on April 29, 2019 to provide for certain additional death and disability benefits. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with us. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, the Company may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment by the Company without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12 calendar months immediately preceding a termination), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment by the Company without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by us to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances, Mr. Mehra shall receive the lesser of (i) the Change in Control Payment or (ii) an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Mal Maginnis's Offer Letter*

On July 3, 2017, we entered into an offer letter with Mr. Maginnis. The letter provides for an initial annual base salary of SGD 470,184. Mr. Maginnis is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us.

In the event of the termination of Mr. Maginnis's employment other than for "cause" (as defined in the offer letter) or Mr. Maginnis's voluntary resignation, Mr. Maginnis is entitled to: (i) an amount equal to six months of base salary, (ii) an amount equal to 50% of Mr. Maginnis's prior year bonus award, and (iii) acceleration of vesting of Mr. Maginnis's initial performance-based RSU award on a pro rata basis based on the number of months worked to the extent that our Security division has met its financial targets for the preceding year.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements or offer letter, as applicable. The tables therefore assume that the terms of the employment agreement or offer letter to which each Named Executive Officer is currently subject had been in effect on June 30, 2019, and that employment terminated on such date. The tables also assume that the price of our Common Stock, on which certain calculations in the following tables are made, was the closing price of our Common Stock on June 28, 2019, the last business day of the fiscal year ($112.63).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under our qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 5,550,000 | 12,998,006 | 18,837,255 | 654,969 | 41,040,230 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 5,550,000 | 12,998,006 | 37,566,385 | 654,969 | 59,769,360 |

(1)	In addition to the amounts indicated in this table, Mr. Chopra would also become entitled to certain payments under the Defined Benefit Plan in accordance with the terms of such plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2)	Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements or offer letter, as applicable, of Messrs. Edrick, Mehra, Sze and Maginnis.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick | Good Reason or Without Cause | 950,000 | 1,488,667 | 8,161,620 | 6,000 | 6,000 | 10,612,287 |
| Executive Vice President and Chief Financial Officer | Good Reason or Without Cause in Connection with a Change in Control(1) | 950,000 | 1,488,667 | 16,275,148 | 6,000 | 6,000 | 18,725,815 |
| Ajay Mehra | Good Reason or Without Cause | 900,000 | 4,423,040(2) | 2,929,957 | 6,000 | 6,000 | 8,264,997 |
| Executive Vice President of the Company and President of OSI Cargo Scanning and Solutions Business | Good Reason or Without Cause in Connection with a Change in Control | 900,000 | 4,423,040(2) | 5,364,004 | 6,000 | 6,000 | 10,699,044(3) |
| Victor S. Sze | Good Reason or Without Cause | 820,000 | 1,287,500 | 7,064,266 | 6,000 | 6,000 | 9,183,766 |
| Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause in Connection with a Change in Control(1) | 820,000 | 1,287,500 | 14,087,986 | 6,000 | 6,000 | 16,207,486 |
| Mal Maginnis | Without Cause | 189,090 | 82,500 | 419,509 | — | — | 691,099 |
| President of Rapiscan Detection | Without Cause in Connection with a Change in Control | 189,090 | 82,500 | 770,577 | — | — | 1,042,167 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(2) Includes cash and time-based RSUs granted under the Solutions Incentive Program.

(3) Under the terms of Mr. Mehra's employment agreement, in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Mehra would receive the lesser of this amount and the amount of an alternate payment based on a calculation method described in his employment agreement.

**Director Compensation**

Messrs. Chopra and Mehra receive no compensation for their service as directors of the Company.

During the fiscal year ended June 30, 2019, each non-employee director that served as a director for the full fiscal year received $60,000 and an RSU grant that valued at $150,000, and the Lead Independent Director received an additional retainer of $20,000 and an additional RSU grant valued at $30,000. Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee also received $30,000 and an RSU grant valued at $35,000. Each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee also received $30,000 and an RSU grant valued at $35,000. Each member of the Nominating and Governance Committee received $3,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee also received $15,000 and an RSU grant valued at $25,000. Each member of the Technology Committee received $5,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee also received $15,000 and an RSU grant valued at $30,000. Each member of the Risk Management Committee received $15,000 and an RSU grant valued at $25,000. All RSU awards granted to members of the Board of Directors and its committees vest annually

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2605 of 2711

over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

The following table provides compensation information for the fiscal year ended June 30, 2019 for each non-employee member of our Board of Directors(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 153,000 | 209,835 | — | 362,835 |
| Meyer Luskin | 173,000 | 239,778 | — | 412,778 |
| William F. Ballhaus | 166,000 | 204,805 | — | 370,805 |
| James B. Hawkins | 124,000 | 174,863 | — | 298,863 |
| Gerald Chizever | 109,000 | 174,863 | — | 283,863 |

(1) We have omitted from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 8 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2019 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2019, 2,670 RSUs were granted to Mr. Good; 3,051 RSUs were granted to Mr. Luskin; 2,606 RSUs were granted to Dr. Ballhaus; 2,225 RSUs were granted to Mr. Hawkins; and 2,225 RSUs were granted to Mr. Chizever, all with a fair value of $78.59. As of June 30, 2019, Mr. Good had 8,878 unvested stock awards outstanding; Mr. Luskin had 8,983 unvested stock awards outstanding; Dr. Ballhaus had 7,343 unvested stock awards outstanding; Mr. Hawkins had 5,381 unvested stock awards outstanding; and Mr. Chizever had 4,811 unvested stock awards outstanding.

*Director Share Ownership Requirements*

We believe that our directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that our directors own at minimum equity of the Company valued at five times their annual retainers. We believe that this multiple constitutes significant amounts for our directors and provides a substantial link between the interests of our directors and those of our stockholders. During such time that a director has not attained the share ownership guideline, such director is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2019, each of our directors met or exceeded our minimum equity ownership guidelines.

**Certain Relationships and Related Transactions**

In 1994, we, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). We own a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. We sell security and inspection kits to ECIL at a price no less favorable to us than the price we charge unaffiliated third parties for such products. To date, our portion of the earnings of ECIL Rapiscan has been immaterial to our financial results and results of operations.

Mohinder Chopra, who is the brother of Deepak Chopra, our Chief Executive Officer, is our Senior Vice President/General Manager India. His total compensation for fiscal year 2019 was valued at approximately $324,000.

Gerald Chizever, a member of our Board, is a partner at Loeb & Loeb LLP. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining director independence. For fiscal year 2019, the Company paid $622,845 in fees to Loeb & Loeb. Our Board carefully reviewed the nature of our engagement of Loeb & Loeb and the services rendered, including nominal fees relative to Loeb & Loeb's annual revenues, the expertise and relevant experience of the firm, the firm's and specific partners' knowledge of our Company and our business and past legal engagements, and the fees paid in such engagements, and determined that Mr. Chizever is independent under the standards of The NASDAQ Stock Market.

The Audit Committee of the Board reviews proposed transactions in which the Company and any person who is a member of the Board, a nominee to become a member of the Board, an executive officer of the Company, a holder of more than five percent of our voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to us as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
Steven C. Good
William F. Ballhaus

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2019, unless otherwise indicated, by each person known by us to own beneficially more than 5% of the outstanding shares of our outstanding Common Stock. As of October 17, 2019, 18,357,463 shares of our Common Stock were issued and outstanding.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 2,775,294 | 15.1% |
| The Vanguard Group, Inc.(3) | 1,818,660 | 9.9% |
| Janus Henderson Group Plc(4) | 1,706,544 | 9.3% |
| Dimensional Fund Advisors LP(5) | 1,083,252 | 5.9% |
| Credit Suisse AG/(6) | 978,587 | 5.3% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2019, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) Represents the number of shares of Common Stock beneficially owned as of December 31, 2018, as reported on Schedule 13G/A filed on February 11, 2019 with the SEC by BlackRock, Inc. Such report indicates sole voting power over 20,863,785 shares and sole dispositive power over 2,775,294 shares. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) Represents the number of shares of Common Stock beneficially owned as of March 29, 2019, as reported on Schedule 13G/A filed on April 8, 2019 with the SEC. Such report indicates sole voting power over 23,226 shares, shared voting power over 2,660 shares, sole dispositive power over 1,794,214 shares, and shared dispositive power over 24,446 shares. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(4) Represents the number of shares of Common Stock beneficially owned as of December 31, 2018, as reported on Schedule 13G/A filed on February 12, 2019 with the SEC. Such report indicates shared voting power and shared dispositive power over 1,706,544 shares. The address of Janus Henderson Group Plc is 201 Bishopsgate, London X0 EC2M 3AE.

(5) Represents the number of shares of Common Stock beneficially owned as of December 31, 2018, as reported on Schedule 13G/A filed on February 8, 2019 with the SEC. Such report indicates sole voting power over 1,030,467 shares and sole dispositive power over 1,083,252 shares. The address of Dimensional Fund Advisors LP is 6300 Bee Cave Road, Building One, Austin, TX 78746.

(6) Represents the number of shares of Common Stock beneficially owned as of December 31, 2018, as reported on Schedule 13G filed on February 13, 2019 with the SEC. Such report indicates shared voting power and shared dispositive power over 978,587 shares. The address of Credit Suisse AG/ is Uetlibergstrasse 231, PO Box 900, CH 8070, Zurich, Switzerland.

The following table sets forth the amount of shares of the Company beneficially owned as of October 17, 2019, unless otherwise indicated, by each of our directors and director nominees, each Named Executive Officer, and all directors, director nominees, and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 499,411 | 2.7% |
| Alan Edrick(4) | 299,049 | 1.6% |
| Ajay Mehra(5) | 98,334 | * |
| Victor S. Sze(6) | 218,056 | 1.2% |
| Mal Maginnis(7) | 2,589 | * |
| Meyer Luskin(8) | 29,896 | * |
| Steven C. Good(9) | 12,964 | * |
| William F. Ballhaus(10) | 20,108 | * |
| James B. Hawkins(11) | 4,314 | * |
| Gerald Chizever(12) | 7,604 | * |
| Kelli Bernard(13) | — | — |
| All directors and executive officers as a group (14 persons) | 1,260,149 | 6.8% |

* Represents less than 1.0% of the outstanding shares of our Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 17, 2019, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. No shares are pledged as security.

(3) Mr. Chopra is our Chairman of the Board of Directors, Chief Executive Officer and President. Includes 30,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of this irrevocable trust. In addition, includes 399,411 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 10,000 shares held in the Nandini SLAT Trust. Includes 60,000 shares issuable pursuant to options which were granted on September 9, 2011.

(4) Mr. Edrick is our Executive Vice President and Chief Financial Officer. Includes 100,000 shares issuable pursuant to options which were granted between August 11, 2010 and September 9, 2011.

(5) Mr. Mehra is our Executive Vice President and President of OSI Cargo Scanning and Solutions Business and a Director. Includes 30,000 shares issuable pursuant to options which were granted on September 9, 2011.

(6) Mr. Sze is our Executive Vice President, General Counsel and Secretary. Includes 30,136 shares held by the Victor So-Mein Sze & Angela Hsin-Chi Hsu Co-ttee Sze Trust U/T/A DTD 11/25/2014. Includes 67,000 shares issuable pursuant to options which were granted between August 11, 20010 and September 9, 2011.

(7) Mr. Maginnis is the President of our Rapiscan Detection business.

(8) Mr. Luskin is a Director. Includes 29,896 shares held by The Meyer and Doreen Luskin Family Trust.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2609 of 2711

(9) Mr. Good is a Director. Includes 2,000 shares held in the Steve Good IRA account.

(10) Dr. Ballhaus is a Director. Includes 20,108 shares held in the Ballhaus Trust U/A 01/25/02 Dr. William Ballhaus Jr. and Jane K. Ballhaus Trustees.

(11) Mr. Hawkins is a Director.

(12) Mr. Chizever is a Director. Includes 6,511 shares held by The G & C Chizever Family Trust.

(13) Ms. Bernard is a Director nominee.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish us with copies of all such reports that they file. None of our directors or executive officers owns more than 10% of our securities. Based solely upon our review of such forms furnished to us during the fiscal year ended June 30, 2019, and written representations from certain reporting persons, we believe that our executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act, with the exception of one untimely Form 4 filing by Mr. Mehra related to a transaction from 2012 that was inadvertently not previously reported.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2610 of 2711

**EQUITY COMPENSATION PLAN INFORMATION**

The following table provides information concerning the our equity compensation plans as of June 30, 2019.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 515,884 | $ 33.74 | 1,598,560(2)(3)(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 515,884 | $ 33.74 | 1,598,560 |

(1) Includes shares of our Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under our Amended and Restated 2012 Incentive Award Plan, which was approved by our shareholders on December 11, 2017.

(3) Awards of RSUs or other awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one award granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason also become available for future issuance under our Amended and Restated 2012 Incentive Award Plan.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**Audit Fees**

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of our annual financial statements for the years ended June 30, 2018 and 2019 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2018 | FY 2019 |
|---|---|---|
| Audit Fees | $ 1,683 | $ 1,516 |
| Audit-Related Fees | 53 | 17 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $ 1,736 | $ 1,533 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of our consolidated financial statements and the review of our interim consolidated financial statements included in quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees billed for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements other than audit fees. This includes research and analysis on accounting matters performed in conjunction with the audit and professional services for the audit of the financial statements of our 401(k) plan.

The term "Tax Fees" means fees billed for professional services rendered for tax advice, planning and compliance (domestic and international).

The term "All Other Fees" means fees billed for products and services other than for the services described above.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2019, the Audit Committee was composed of four non-employee directors, namely, Steven C. Good, Meyer Luskin, William F. Ballhaus, and James B. Hawkins. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. Our Board has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2019.

At each of its meetings, the Audit Committee met with the senior members of our financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and our Chief Financial Officer. During the year, the Audit Committee had private sessions with our independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board the engagement of Moss Adams as our independent public accountants. The Audit Committee reviewed with our financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of our internal control, and the quality of our financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that our audited consolidated financial statements have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T. The Audit Committee received and discussed with the independent public accountants their annual written report on their independence from our Company and our management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to our Company during the fiscal year ended June 30, 2019 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of our internal control and the audit of management's report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews our SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of our management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of

disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of our annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board, and the Board approved, that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2019, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus
James Hawkins

## CODE OF ETHICS AND CONDUCT

We have adopted a Code of Ethics and Conduct, which applies to all of our directors, officers (including our principal executive officer, principal financial officer, and principal accounting officer), and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to our Current Report on Form 8-K filed with the SEC on May 23, 2016. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. We intend to disclose any changes in or waivers from this Code of Ethics and Conduct on the same website or by filing with the SEC a Current Report on Form 8-K, in each case if such disclosure is required by the rules of the SEC or Nasdaq.

## ANNUAL MEETING ATTENDANCE

We have adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of our Board are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of our directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board, or specified individual directors, may do so by writing our Secretary at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will review all such correspondence and will regularly forward to the Board copies of all such correspondence that, in the opinion of our Secretary, deals with the functions of the Board or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of our Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders at that address. We undertake to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to our Secretary at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

**STOCKHOLDER PROPOSALS**

In the event that a stockholder desires to have a proposal included in our proxy statement and form of proxy used in connection with our next annual meeting of stockholders, the proposal must be delivered in writing to our Secretary and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to us would be June 24, 2020, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

Our Bylaws provide that if a stockholder, rather than including a proposal in our proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to us no more than 120 days and no less than 90 days prior to December 12, 2020, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 12, 2020, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in our Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by us under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by us under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by us under those statutes, except to the extent we specifically incorporate such report by reference therein. In addition, information on our website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

We do not know of any other business to be presented at the Annual Meeting and do not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 22, 2019

*OSI Systems, Inc.*
*c/o Broadridge Corporate Issuer Solutions*
*P O Box 1342*
*Brentwood, NY 11717*

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 P.M. ET on 12/11/2019. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 P.M. ET on 12/11/2019. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

**The Board of Directors recommends you vote FOR the following:**

| For All | Withhold All | For All Except |
|---|---|---|
| ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

______________________________

**1.** Election of Directors

**Nominees**

01 Deepak Chopra 02 Steven C. Good 03 Meyer Luskin 04 William F. Ballhaus 05 James B. Hawkins
06 Gerald Chizever 07 Kelli Bernard

**The Board of Directors recommends you vote FOR proposals 2 and 3.**

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2 | Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2020. | ☐ | ☐ | ☐ |
| 3 | Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2019. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

0000430814_1 R1.0.1.18

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 12, 2019 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra, Alan Edrick, and Victor Sze with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 12, 2019 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2 and 3 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000430814_2 R1.0.1.18

**Continued and to be signed on reverse side**

# Exhibit 46

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): December 12, 2019

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| **DELAWARE** | **000-23125** | **33-0238801** |
|---|---|---|
| **(STATE OR OTHER JURISDICTION OF INCORPORATION)** | **(COMMISSION FILE NUMBER)** | **(IRS EMPLOYER IDENTIFICATION NO.)** |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310**) 978-0516
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

N/A
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which |
|---|---|---|

| | | registered |
|---|---|---|
| Common Stock, $0.001 par value | OSIS | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 12, 2019. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 14,934,187 | 385,760 | 1,448,965 |
| Steven C. Good | 13,700,528 | 1,619,419 | 1,448,965 |
| Meyer Luskin | 13,606,886 | 1,713,061 | 1,448,965 |
| William F. Ballhaus | 14,433,825 | 886,122 | 1,448,965 |
| James B. Hawkins | 14,691,982 | 627,965 | 1,448,965 |
| Gerald Chizever | 14,428,874 | 891,073 | 1,448,965 |
| Kelli Bernard | 15,225,248 | 94,699 | 1,448,965 |

The seven nominees identified above were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2020*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 16,566,910 | 151,759 | 50,243 | 0 |

The proposal was approved.

*3. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2019*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 12,741,118 | 2,454,400 | 124,429 | 1,448,965 |

The proposal was approved.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 13, 2019

By: /s/ Alan Edrick
    Alan Edrick
    Chief Financial Officer

# Exhibit 47

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2625 of 2711

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240.14a-12

**OSI Systems, Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2626 of 2711

**12525 Chadron Avenue**
**Hawthorne, California 90250**

October 21, 2020

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of OSI Systems, Inc., which will be held at 10:00 a.m., Pacific Time, on December 10, 2020, at the Company's offices at 12525 Chadron Avenue, Hawthorne, California. All holders of OSI Systems, Inc. common stock as of the close of business on October 15, 2020 are entitled to vote at the Annual Meeting.

Please refer to our Notice of Annual Meeting of Stockholders, Proxy Statement and Proxy Card. Each describes the actions expected to be taken at the Annual Meeting. The Proxy Statement describes the items in detail and also provides information about our Board of Directors and executive officers. Please also refer to our Annual Report on Form 10-K for the fiscal year ended June 30, 2020, which I encourage you to read. It includes our audited, consolidated financial statements and information about our operations, markets and products.

Your vote is very important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. Your vote will ensure your representation at the Annual Meeting if you cannot attend in person.

You may vote by Internet, telephone or by sending in your Proxy Card. In addition, you may also choose to vote in person at the Annual Meeting.

Thank you for your ongoing support and continued interest in OSI Systems, Inc.

Sincerely,

Victor S. Sze
*Secretary*



Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2627 of 2711

**12525 Chadron Avenue
Hawthorne, California 90250**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

**Date and Time:** 10:00 a.m., Pacific Time, on Thursday, December 10, 2020

**Location:** The Company's offices, 12525 Chadron Avenue, Hawthorne, California 90250

**Proposals:**

1. To elect seven directors to hold office for a one-year term and until their respective successors are elected and qualified;
2. To ratify the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2021;
3. To approve the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan;
4. To conduct an advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2020, as described in the accompanying Proxy Statement; and
5. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

**Record Date:** The Board of Directors has fixed the close of business on October 15, 2020 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and all adjourned meetings thereof.

**Voting:** Whether or not you plan to attend the Annual Meeting, it is important that you vote your shares. You may vote by signing and returning the enclosed Proxy Card, via the Internet, by telephone or by written ballot at the Annual Meeting, as more fully described in the Proxy Statement. Any of these methods will ensure representation of your shares at the Annual Meeting. If you later desire to revoke your proxy for any reason, you may do so in the manner described in the attached Proxy Statement.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 10, 2020:** This Proxy Notice, the accompanying Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2020 are available at *http://www.proxyvote.com*.

**Electronic Delivery of Proxy Materials:** We encourage our stockholders to voluntarily elect to receive future proxy and annual meeting materials electronically. Electronic delivery is faster, convenient, economical, and environmentally cleaner. If you are a registered stockholder, you can opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions. If you hold shares through a bank, broker, or other nominee, you can also opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions or by contacting your nominee.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2628 of 2711

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Proxy Statement | 1 |
| Proposal No. 1 Election of Directors | 4 |
| Proposal No. 2 Ratification of Selection of Independent Registered Public Accounting Firm | 10 |
| Proposal No. 3 Approval of Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan | 11 |
| Proposal No. 4 Advisory Vote on the Company's Executive Compensation for the Fiscal Year Ended June 30, 2020 | 18 |
| Compensation of Executive Officers and Directors | 20 |
| Security Ownership of Certain Beneficial Owners and Management | 45 |
| Equity Compensation Plan Information | 47 |
| Independent Registered Public Accounting Firm | 47 |
| Report of Audit Committee | 49 |
| Code of Ethics and Conduct | 51 |
| Annual Meeting Attendance | 51 |
| Stockholder Communications | 51 |
| Availability of Annual Report on Form 10-K | 51 |
| Stockholder Proposals | 52 |
| Incorporation by Reference | 52 |
| Other Business | 52 |
| Appendix A | A-1 |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2629 of 2711

# OSI SYSTEMS, INC.

**12525 Chadron Avenue**

**Hawthorne, California 90250**

# PROXY STATEMENT

## GENERAL INFORMATION

This Proxy Statement is being furnished in connection with the solicitation of proxies by the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") for use at our Annual Meeting of Stockholders ("Annual Meeting"), to be held at 10:00 a.m., Pacific Time on December 10, 2020, at our offices at 12525 Chadron Avenue, Hawthorne, California 90250, and at any adjournment thereof.

We are making our proxy materials, which include the Notice of Annual Meeting of Stockholders, Proxy Statement, Proxy Card and our most recent Annual Report on Form 10-K ("Proxy Materials"), available to our stockholders via the Internet, although registered stockholders and those stockholders who have previously requested to receive printed copies instead will receive their Proxy Materials in the mail. We anticipate that the Notice of Internet Availability of Proxy Materials will be mailed on or about October 21, 2020.

Stockholders of record as of the close of business on October 15, 2020 will receive a Notice of Internet Availability of Proxy Materials. The Notice of Internet Availability of Proxy Materials contains instructions about how to access the Proxy Materials and vote via the Internet without attending the Annual Meeting. If you receive a Notice of Internet Availability of Proxy Materials but would instead prefer to receive a printed copy of the Proxy Materials rather than downloading them from the Internet, you may do so by following the instructions for requesting such materials included in the Notice of Internet Availability of Proxy Materials.

If you are a stockholder that receives a printed copy of the Proxy Materials by mail, you may view the Proxy Materials on the Internet at *http://www.proxyvote.com*. However, in order to direct your vote without attending the Annual Meeting you must complete and mail the Proxy Card or voting instruction card enclosed (postage pre-paid return envelope also enclosed) or, if indicated on the Proxy Card that you receive, by telephone or Internet voting. Please refer to the Proxy Card that you receive for instructions.

When a proxy is properly submitted, the shares it represents will be voted in accordance with any directions noted thereon. Any stockholder giving a proxy has the power to revoke it at any time before it is voted by written notice to the Secretary of the Company by issuance of a subsequent proxy as more fully described on the Proxy Card. In addition, a stockholder attending the Annual Meeting may revoke his or her proxy and vote in person if he or she desires to do so, but attendance at the Annual Meeting will not of itself revoke the proxy.

At the close of business on October 15, 2020, the record date for determining stockholders entitled to notice of and to vote at the Annual Meeting, we had issued and outstanding 17,919,229 shares of common stock, $0.001 par value ("Common Stock"). A majority of the shares issued and outstanding on the record date, present in person at the Annual Meeting or represented at the Annual Meeting by proxy, will constitute a quorum for the transaction of business. Shares that are voted with respect to any proposal are treated as being present at the Annual Meeting for purposes of establishing a quorum. Each share of Common Stock entitles the holder of record thereof to one vote on any matter coming before the Annual Meeting.

A Proxy Card, when properly submitted via the Internet, telephone or mail, also confers discretionary authority with respect to amendments or variations to the matters identified in the Notice of Annual Meeting of Stockholders and with respect to other matters which may be properly brought before the Annual Meeting. At the time of printing this Proxy Statement, our management was not aware of any other matters to be presented for action at the Annual Meeting. If, however, other matters which are not now known to management should properly come before the Annual Meeting, the proxies hereby solicited will be exercised on such matters in accordance with the best judgment of the proxy holders.

Abstentions and broker non-votes represented by submitted proxies will be included in the calculation of the number of the shares present at the Annual Meeting for the purposes of determining a quorum. "Broker non-votes" means shares held of record by a broker that are not voted because the broker has not received voting instructions from the beneficial owner of the shares and either lacks or declines to exercise the authority to vote the shares in its discretion.

*Proposal One.* In accordance with our Bylaws, directors are elected by a plurality of the votes cast, and the nominees who receive the most votes will be elected. Proposal One is considered a "non routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal One or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal One. Votes marked "withhold" will not affect the outcome of the election of directors.

*Proposal Two.* In accordance with our Bylaws, to be approved, the ratification of Moss Adams LLP as our independent registered accounting firm must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Two is considered a "routine" matter and, accordingly, brokerage firms and nominees have the authority to vote their clients' unvoted shares on Proposal Two as well as to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Two.

*Proposal Three.* In accordance with our Bylaws, to be approved, the proposal regarding our Amended and Restated 2012 Incentive Award Plan must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Three is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Three or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Three.

*Proposal Four.* In accordance with our Bylaws, to be approved, the proposal regarding our executive compensation for the fiscal year ended June 30, 2020 must receive the affirmative vote of the majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting. Proposal Four is considered a "non-routine" matter and, accordingly, brokerage firms and nominees do not have the authority to vote their clients' unvoted shares on Proposal Four or to vote their clients' shares if the clients have not furnished voting instructions within a specified period of time prior to the Annual Meeting. Abstentions and broker non-votes will not be counted as votes cast and will have no effect on the outcome of the vote on Proposal Four. The vote on Proposal Four is advisory and therefore not binding on the Company, the Compensation and Benefits Committee (the "Compensation Committee") or the Board. Although non-binding, the Board values the opinions that our stockholders express in their votes, and the votes will provide information to the Compensation Committee regarding investor sentiment about our executive compensation philosophy, policies and practices, which the Compensation Committee will be able to consider when determining executive compensation in the future.

All stockholders entitled to vote at the Annual Meeting will receive either the Notice of Internet Availability of Proxy Materials or a printed copy of the Proxy Materials. We will pay the expenses of soliciting proxies for the Annual Meeting, including the cost of preparing, assembling, posting on the Internet and mailing the Notice of Internet Availability of Proxy Materials and the Proxy Materials. Proxies may be solicited personally, by mail, by e-mail, over the Internet, or by telephone, by directors, officers and regular employees of the Company who will not be additionally compensated therefore.

The matters to be considered and acted upon at the Annual Meeting are more fully discussed below.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be held on December 10, 2020:** The Proxy Notice, this Proxy Statement and Annual Report on Form 10-K for the fiscal year ended June 30, 2020 are available at *http://www.proxyvote.com*.

**Electronic Delivery of Proxy Materials:** We encourage our stockholders to voluntarily elect to receive future proxy and annual meeting materials electronically. Electronic delivery is faster, convenient, economical, and

environmentally cleaner. If you are a registered stockholder, you can opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions. If you hold shares through a bank, broker, or other nominee, you can also opt for e-delivery by visiting *http://www.proxyvote.com* and following the instructions or by contacting your nominee.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2632 of 2711

## ELECTION OF DIRECTORS

***(Proposal No. 1 of the Proxy Card)***

**Nominees**

Our Board consists of seven members. At each annual meeting of stockholders, directors are elected for a term of one year to succeed those directors whose terms expire on the annual meeting date.

The seven candidates nominated for election as directors at the Annual Meeting are Deepak Chopra, Steven C. Good, Meyer Luskin, William F. Ballhaus, James B. Hawkins, Gerald Chizever, and Kelli Bernard. All of our director nominees are currently directors of the Company and were previously elected to serve on the Board by our stockholders.

The enclosed Proxy will be voted in favor of these individuals unless other instructions are given. If elected, the nominees will serve as directors until our next annual meeting of stockholders, and until their successors are elected and qualified. If any nominee declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election (although we know of no reason to anticipate that this will occur), the proxies may be voted for such substitute nominees as the Board may designate.

If a quorum is present and voting, the seven nominees for directors receiving the highest number of votes will be elected as directors. Abstentions and shares held by brokers that are present, but not voted because the brokers were prohibited from exercising discretionary authority (broker non-votes) will be counted as present only for purposes of determining if a quorum is present.

The nominees for election as directors at this meeting are as follows:

| Name | Age | Position | Director Since |
|---|---|---|---|
| Deepak Chopra | 69 | Chairman of the Board, Chief Executive Officer and President | 1987 |
| Steven C. Good(1)(3)(4) | 78 | Director | 1987 |
| Meyer Luskin(1)(2)(4) | 95 | Director | 1990 |
| William F. Ballhaus(1)(2)(5) | 75 | Director | 2010 |
| James B. Hawkins(2)(3)(5) | 64 | Director | 2015 |
| Gerald Chizever(4)(5) | 76 | Director | 2016 |
| Kelli Bernard(4) | 51 | Director | 2019 |

(1) Member of Audit Committee

(2) Member of Compensation Committee

(3) Member of Nominating and Governance Committee

(4) Member of Risk Management Committee

(5) Member of the Technology Committee

**Business Experience**

***Deepak Chopra*** is our founder and has served as President, Chief Executive Officer and has been a member of our Board since our inception in May 1987. He has served as our Chairman of the Board since February 1992. Mr. Chopra also serves as the Chief Executive Officer of several of our major subsidiaries. From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held various positions with ILC, a publicly-held manufacturer of lighting products, including serving as Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer of its United Detector Technology division. In 1990, we acquired certain assets of ILC's United Detector Technology division. Mr. Chopra has also held various positions with Intel Corporation, TRW Semiconductors and RCA Semiconductors. Mr. Chopra holds a Bachelor of Science degree in Electronics from Punjab Engineering College in Chandigarh, Punjab, India and a Master of Science degree in Semiconductor Electronics from the University of Massachusetts, Amherst.

Mr. Chopra was selected to serve as a director because of his expertise in the field of electrical engineering as well as his long-standing experience in successfully managing our Company.

***Steven C. Good*** has been a member of our Board since September 1987. He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010. Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010. He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries. Mr. Good founded California United Bancorp in 1982 and served as its Chairman through 1993. From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. Mr. Good formerly served as a director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange. Mr. Good currently serves as a director of Rexford Industrial Realty, Inc., a publicly-held real estate investment trust listed on the New York Stock Exchange. He also formerly served as a director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business. Mr. Good was selected to serve as a director because of his audit, finance and accounting expertise.

***Meyer Luskin*** has served as a Director of the Company since February 1990. Since 1958, Mr. Luskin has served as a Director of Scope Industries, which is engaged principally in the business of recycling and processing food waste products into animal feed and has also served as its President, Chief Executive Officer and Chairman since 1961. He currently serves as a Director on the Advisory Board of the UCLA Luskin School of Public Affairs. Mr. Luskin was formerly Chairman of the Board of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital, Chairman of the Board of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital), a Director of the UCLA Foundation, and a Director of the Alliance for College-Ready Public Schools. Mr. Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company. Mr. Luskin has extensive risk management experience gained through the various executive and board positions that he has held. Mr. Luskin holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University. Mr. Luskin was selected to serve as a director because of his long-standing experience managing complex business operations.

***William F. Ballhaus, Jr.*** has been a member of our Board since May 2010. From 2000 to 2007, Dr. Ballhaus, now retired, served as President and then also as Chief Executive Officer of Aerospace Corporation, an organization dedicated to the application of science and technology to the solution of critical issues in the nation's space program. Between 1990 and 2000, Dr. Ballhaus' career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Dr. Ballhaus worked for the National Aeronautics and Space Administration (NASA), including as Director of its Ames Research Center. Dr. Ballhaus currently is Chairman of the Board of Trustees of the University Space Research Association. Dr. Ballhaus has extensive risk management experience gained through the various executive and board positions that he has held. Dr. Ballhaus, who has published more than 40 papers on computational aerodynamics, obtained a Ph.D. in Engineering in 1971 and a BS and MS in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley. Dr. Ballhaus was selected to serve as a director because of his experience in managing providers of technology and technical services to government agencies.

***James B. Hawkins*** has been a member of our Board since December 2015. From 2004 through July 2018, Mr. Hawkins was the President, Chief Executive Officer and member of the Board of Directors of Natus Medical Incorporated, a leading manufacturer of medical devices and software and a service provider for the newborn care, neurology, sleep, hearing and balance markets. Prior to joining Natus, Mr. Hawkins was President, Chief Executive Officer, and a director of Invivo Corporation, a provider of MRI-safe patient monitoring. Mr. Hawkins currently serves as a director of Iradimed Corporation. Mr. Hawkins has extensive risk management experience gained through the various executive and board positions that he has held. He

earned his undergraduate degree in Business Commerce from Santa Clara University and holds a Masters of Business Administration degree from San Francisco State University. Mr. Hawkins was selected to serve as a director because of his direct management experience in the medical device area.

***Gerald Chizever*** has been a member of our Board since October 2016. Mr. Chizever has been a partner at the law firm of Loeb & Loeb LLP since 2004. Mr. Chizever's practice includes mergers and acquisitions, corporate finance, public and private securities offerings, general corporate representation and strategic alliances. Mr. Chizever serves as general corporate counsel for public and private companies, advising them in all matters, including business transactions, corporate governance and compliance with governmental regulations. He holds a B.B.A. degree in Accounting and a Juris Doctorate from George Washington University. Mr. Chizever was selected to serve as a director because of his corporate governance and compliance experience, including his experience in highly-regulated industries.

***Kelli Bernard*** has been a member of our Board since December 2019. Since June 2016, Ms. Bernard has served as an Executive Vice President and National Cities Leader for AECOM, a fully-integrated global infrastructure firm. Prior to joining AECOM, from July 2013 through June 2016, Ms. Bernard was Deputy Mayor of Economic Development for Los Angeles Mayor Eric Garcetti. Ms. Bernard is the current chair of the Los Angeles Homeless Services Authority ("LAHSA") and the co-chair of LAHSA's Ad-Hoc Committee on Black People Experiencing Homelessness. Ms. Bernard also serves on the Boards for the Greater Los Angeles African American Chamber of Commerce and the Los Angeles Area Chamber of Commerce. She holds a BA in Sociology from University of California, Berkeley and a Master's degree in Urban Planning from University of California, Los Angeles. Ms. Bernard was selected to serve as a director because of her business and economic development and international trade experience.

**Relationships Among Directors or Executive Officers**

There are no arrangements or understandings known to us between any of the directors or nominees for director and any other person pursuant to which any such person was or is to be elected a director.

Ajay Mehra is the first cousin of Deepak Chopra. Other than this relationship, there are no family relationships among our directors or director nominees or Named Executive Officers (as defined in "Compensation of Executive Officers and Directors – Summary Compensation Table").

**Board Role in Risk Oversight**

Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, cybersecurity, and other risks. Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment, and management of our risks. Our Board regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting. The Risk Management Committee oversees management of key enterprise risks, including strategic, operational, legal, regulatory, and compliance. The Nominating and Governance Committee oversees risks related to the effectiveness of the Board. The Compensation Committee oversees risks related to our executive compensation policies and practices. The Technology Committee oversees risks related to technology matters.

**Board Leadership Structure and Lead Independent Director**

Our Chairman of the Board is our Chief Executive Officer. We believe that currently combining the positions of Chief Executive Officer and Chairman serves as an effective link between management's role of identifying, assessing and managing risks and the Board's role of risk oversight. Mr. Chopra possesses in-depth knowledge of the issues, opportunities and challenges we face and is thus well positioned to develop agendas and highlight issues that ensure that the Board's time and attention are focused on the most critical

matters. In addition, our Board has determined that this leadership structure is optimal because it believes that having one leader serving as both the Chairman and Chief Executive Officer provides decisive, consistent and effective leadership, as well as clear accountability. Having one person serve as Chairman and Chief Executive Officer also enhances our ability to communicate our message and strategy clearly and consistently to our stockholders, employees, and other companies with which we do business. Although we believe that the combination of the Chairman and Chief Executive Officer roles is appropriate under current circumstances, we will continue to review this issue periodically to determine whether, based on the relevant facts and circumstances, separation of these offices would serve our best interests and the best interests of our stockholders.

The combined Chairman of the Board and Chief Executive Officer position is balanced by the number of independent directors serving on our Board, our independent committees and our Lead Independent Director. William Ballhaus is currently our Lead Independent Director and brings to this role considerable skills and experience as described above in "Election of Directors." The role of Lead Independent Director is designed to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.

**Commitment to Diversity at the Company and on the Board**

We are focused on creating a diverse and inclusive workforce. We strive to attract and retain top talent, foster an inclusive culture, and embrace diversity. We are also committed to diversity at the Board level. Our Board considers diversity, including gender, racial, and ethnic diversity, when considering nominations to the Board. The Board's objective is to have a Board comprised of individuals who by occupation, background, and experience are in a position to make a strong, positive contribution to our Company and our stockholders.

**Board Meetings, Independence and Committees of the Board**

There were five meetings of the Board and the Board acted pursuant to unanimous written consent on one additional occasion during the fiscal year ended June 30, 2020. During fiscal 2020, the Board had a standing Audit Committee, Compensation Committee, Nominating and Governance Committee, Risk Management Committee, and Technology Committee. The members of each committee are appointed by the majority vote of the Board. All persons serving as a director during the fiscal year ended June 30, 2020 attended more than 75% of the aggregate number of meetings held by the Board and all committees on which such director served.

The Board has determined that each of the current directors, except Mr. Chopra, is independent within the meaning of the director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect. Furthermore, the Board has determined that each of the members of each of the committees of the Board is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and the Listing Standards, as applicable and currently in effect.

*Audit Committee*

We have a separately designated, standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee makes recommendations for selection of our independent public accountants, reviews with the independent public accountants the plans and results of the audit engagement, approves professional services provided by the independent public accountants, reviews the independence of the independent public accountants, considers the range of audit and any non-audit fees, and reviews our financial statements and the adequacy of our internal accounting controls and financial management practices. All members of the Audit Committee are independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) under the Exchange Act and the Listing Standards applicable to our Company.

The Audit Committee currently consists of three independent directors – Messrs. Good and Luskin and Dr. Ballhaus. The Board has determined that, based upon his work experience, Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. Information regarding Mr. Good's work experience is set forth above under "Election of Directors." To

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2636 of 2711

date, no determination has been made as to whether the other members of the Audit Committee also qualify as Audit Committee Financial Experts.

There were four meetings of the Audit Committee during the fiscal year ended June 30, 2020. See "Report of Audit Committee." The Audit Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Risk Management Committee*

The Risk Management Committee is responsible for overseeing and monitoring our key enterprise risks, including strategic, operational, legal, regulatory, compliance, security, and reputational risks. The Risk Management Committee has responsibility for reviewing our compliance program and our major legal compliance risk exposures, monitoring our code of ethics, reviewing our risk management reviews and assessments, and regularly assessing the continuing appropriateness of a succession plan for our Chief Executive Officer and other executive officers. The Risk Management Committee currently consists of four independent directors – Messrs. Chizever, Good, and Luskin and Ms. Bernard. There were four meetings of the Risk Management Committee during the fiscal year ended June 30, 2020.

The Risk Management Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Compensation Committee*

The Compensation Committee is responsible for determining compensation and benefits for our executive officers, reviewing and approving executive compensation policies and practices, and providing advice and input to the Board in the administration of our equity compensation and benefits plans. The Compensation Committee engages and consults with independent compensation consultants in the performance of its duties. The Compensation Committee currently consists of three independent directors – Messrs. Luskin and Hawkins and Dr. Ballhaus. There were three meetings of the Compensation Committee during the fiscal year ended June 30, 2020. See "Compensation Committee Report."

The Compensation Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com.*

*Nominating and Governance Committee*

The Nominating and Governance Committee is responsible for evaluating nominations for new members of the Board. The Nominating and Governance Committee currently consists of two independent directors – Messrs. Good and Hawkins. There was one meeting of the Nominating and Governance Committee during the fiscal year ended June 30, 2020.

The Nominating and Governance Committee will consider director candidates based upon their business and financial experience, personal characteristics, expertise that is complementary to the background and experience of other Board members, diversity, willingness to devote the required amount of time to carrying out the duties and responsibilities of membership on the Board, willingness to objectively appraise management performance, and any such other qualifications the Nominating and Governance Committee deems necessary to ascertain the candidate's ability to serve on the Board.

The Nominating and Governance Committee has sought to identify director nominees that have diverse professional and educational backgrounds that are believed to complement the skills offered by existing Board members. The Nominating and Governance Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com*.

*Technology Committee*

The Technology Committee is responsible for evaluating and making recommendations to the Board regarding technology-based matters. The Technology Committee currently consists of three independent

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2637 of 2711

directors – Dr. Ballhaus and Messrs. Hawkins and Chizever. There was one meeting of the Technology Committee during the fiscal year ended June 30, 2020.

The Technology Committee acts pursuant to a written charter adopted by the Board, a copy of which is available under the Investor Relations section of our website – *http://www.osi-systems.com.*

**Director Nomination Process**

The Nominating and Governance Committee will consider director candidates recommended by stockholders. Stockholders who wish to submit names of candidates for election to the Board must do so in writing. The recommendation should be sent to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will, in turn, forward the recommendation to the Nominating and Governance Committee. The recommendation should include the following information:

- A statement that the writer is a stockholder and is proposing a candidate for consideration by the Nominating and Governance Committee;
- The name and contact information for the candidate;
- A statement of the candidate's occupation and background, including education and business experience;
- Information regarding each of the factors listed above, sufficient to enable the Nominating and Governance Committee to evaluate the candidate;
- A statement detailing (i) any relationship or understanding between the candidate and our Company, or any customer, supplier, competitor, or affiliate of ours, and (ii) any relationship or understanding between the candidate and the stockholder proposing the candidate for consideration, or any affiliate of such stockholder; and
- A statement that the candidate is willing to be considered for nomination by the Nominating and Governance Committee and willing to serve as a director if nominated and elected.

Stockholders must also comply with all requirements of our Bylaws, a copy of which is available from our Secretary upon written request, with respect to nomination of persons for election to the Board. We may also require any proposed nominee to furnish such other information as we or the Nominating and Governance Committee may reasonably require to determine the eligibility of the nominee to serve as a director. In performing its evaluation and review, the Nominating and Governance Committee generally does not differentiate between candidates proposed by stockholders and other proposed nominees, except that the Nominating and Governance Committee may consider, as one of the factors in its evaluation of stockholder recommended candidates, the size and duration of the interest of the recommending stockholder or stockholder group in the equity of the Company.

There are no stockholder nominations for election to our Board to be voted on at this year's Annual Meeting. Stockholders wishing to submit nominations for next year's annual meeting of stockholders must notify us of their intent to do so on or before the date on which nominations must be received by us in accordance with our Bylaws and the rules and regulations of the SEC. For details see "Stockholder Proposals."

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is currently composed of three non-employee directors – Messrs. Luskin and Hawkins and Dr. Ballhaus. None of our executive officers has served during the fiscal year ended June 30, 2020 or subsequently as a member of the board of directors or compensation committee of any entity which has one or more executive officers who serve on our Board or the Compensation Committee. During the fiscal year ended June 30, 2020, no member of our Compensation Committee had any relationship or transaction with our Company required to be disclosed pursuant to Item 404 of Regulation S-K.

***The Board unanimously recommends that you vote "FOR" the election of each of Deepak Chopra, Steven C. Good, Meyer Luskin, William F. Ballhaus, Jr., James B. Hawkins, Gerald Chizever, and Kelli Bernard as our directors. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, for each of the above-named nominees. The election of directors requires a plurality of the votes cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2638 of 2711

**RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
***(Proposal No. 2 of the Proxy Card)***

The Audit Committee has selected Moss Adams LLP ("Moss Adams") as our independent registered public accountants for the year ending June 30, 2021 and has further directed that management submit the selection of independent registered public accountants for ratification by our stockholders at the Annual Meeting. Moss Adams has no financial interest in the Company, and neither it nor any member or employee of the firm has had any connection with the Company in the capacity of promoter, underwriter, voting trustee, director, officer or employee.

In the event that our stockholders fail to ratify the selection of Moss Adams, the Audit Committee will reconsider whether or not to retain the firm. Even if the selection is ratified, the Audit Committee and the Board in their discretion may direct the appointment of a different independent accounting firm at any time during the year if they determine that such a change would be in our and our stockholders' best interests.

Representatives of Moss Adams are expected to be present at the Annual Meeting, and they will have an opportunity to make a statement if they so desire and are expected to be available to respond to appropriate questions.

***The Board unanimously recommends a vote "FOR" the ratification of Moss Adams as our independent registered public accountants for the fiscal year ending June 30, 2021. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be adopted, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2639 of 2711

**APPROVAL OF THE AMENDED AND RESTATED OSI SYSTEMS, INC. 2012 INCENTIVE AWARD PLAN**
***(Proposal No. 3 of the Proxy Card)***

**Introduction**

We are interested in maintaining strong corporate governance practices, including with respect to equity awards granted to our executive officers. For this reason, our Board adopted on August 19, 2020, subject to stockholder approval, the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "Amended Plan"). Awards under the Amended Plan provide employees, consultants and directors an opportunity to acquire or increase an ownership stake in our Company, and our Board believes this aligns their interests with those of our stockholders, creating strong incentives to achieve goals that result in consistent stockholder returns. We believe that adopting the Amended Plan is in our best interest in light of our growth and the continuing need to provide equity-based incentives to attract and retain the most qualified personnel. A copy of the Amended Plan is included as Appendix A to this Proxy Statement.

The Amended Plan amends and restates in its entirety our Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "Existing Plan"). Under the Amended Plan, we propose to increase the number of shares reserved for issuance from the amount reserved under the Existing Plan by 1,650,000 shares to a total authorized limit of 7,100,000 shares. We believe such increase is necessary to help ensure that the Company has a sufficient reserve of shares available to attract and retain the services of key individuals essential to the Company's long-term growth and success. In addition, we are interested in reinforcing our strong corporate governance practices, including with respect to equity awards. For this reason, the Amended Plan implements the following additional updates to the Existing Plan to bring it further in line with compensation and governance best practices:

- Removes certain provisions which were previously included in order for awards to be eligible to qualify as "performance-based compensation" under Section 162(m) of the Internal Revenue Code (the "Code") prior to its repeal under the Tax Cuts and Jobs Act of 2017;
- Extends the right to grant incentive stock options under the Amended Plan through the tenth anniversary of the date the Amended Plan was adopted by our Board; and
- Provides other clarifying and administrative changes.

If the Amended Plan is approved, it will become effective on the date of this Annual Meeting.

**Stockholder Approval**

Approval of the Amended Plan is necessary in order for us to meet the stockholder approval requirements of the principal securities market on which shares of our Common Stock are traded, and to grant stock options that qualify as incentive stock options, as defined under Section 422 of the Code.

If stockholders do not approve this Proposal No. 3, then the proposed additional shares will not become available for issuance and the Existing Plan (not as amended and restated) will continue in full force and effect, and we may continue to grant awards under the Existing Plan (and not the Amended Plan) to eligible individuals, subject to the terms and conditions of the Existing Plan. In addition, all previously granted awards will continue to be subject to the terms of the Existing Plan.

**Reasonable Equity Dilution and Key Historical Equity Metrics**

In determining the number of shares of Common Stock to request for approval under the Amended Plan, our management team worked with our Board to evaluate a number of factors, including our recent share usage, anticipated share usage, and criteria expected to be utilized by proxy advisory firms in evaluating our proposal for the Amended Plan. Specifically, our Board considered the following:

- The share reserve under the Amended Plan represents an aggregate increase of 1,650,000 shares from the aggregate number of shares reserved for issuance under the Existing Plan, and such increase represents 9.2% of our outstanding Common Stock on October 15, 2020.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2640 of 2711

- In fiscal years 2018, 2019 and 2020, equity awards representing a total of approximately 376,413 shares, 393,960 shares and 321,694 shares, respectively, were granted under the Existing Plan, for an annual equity burn rate of 2.1%, 2.2% and 1.8%, respectively. This represents a three-year average burn rate of 2.0%. Equity burn rate is calculated by dividing (i) the number of shares subject to equity awards granted during the fiscal year by (ii) the number of shares outstanding at the end of the fiscal year. If each Full Value Award is multiplied by 1.87 (consistent with the methodology employed pursuant to the fungible share ratio in the Amended Plan), the "adjusted" annual burn rate under the Existing Plan would be 3.8%, 4.0% and 3.3%, for fiscal years 2018, 2019 and 2020, respectively.
- We expect the proposed aggregate share reserve under the Amended Plan to provide us with enough shares for awards for approximately three to four years, assuming we continue to grant awards consistent with our current practices and historical usage, and further dependent on the price of our shares and hiring activity during the next few years, forfeitures of outstanding awards, and noting that future circumstances may require us to change our current equity grant practices.

Additionally, as of June 30, 2020, outstanding grants under our Existing Plan, including shares remaining available for grant thereunder, are provided in the table below:

| | |
|---|---|
| Stock Options Outstanding | 326,304 |
| Stock Awards Outstanding | 423,590 |
| Common Stock Outstanding | 18,011,982 |
| Weighted Average Exercise Price of Stock Options Outstanding | $ 44.41 |
| Weighted-Average Remaining Duration (Years) of Stock Options Outstanding | 2.4 years |
| Total Shares Available for Grant under Existing Plan | 1,038,962 |

In light of the factors described above, and the fact that the ability to continue to grant equity compensation is vital in our view to our ability to continue to attract and retain employees in the extremely competitive labor markets in which we compete, our Board has determined that the size of the share reserve under the Amended Plan is reasonable and appropriate at this time.

**Material Terms of the Amended Plan**

*Eligibility and Administration.* Our employees, consultants and directors are eligible to receive awards under the Amended Plan. As of September 30, 2020, there were approximately 6,728 employees, six non-employee directors and zero consultants eligible to receive awards under the Amended Plan. The Amended Plan is administered by the Board with respect to awards to non-employee directors and by the Compensation Committee with respect to other participants, each of which may delegate its duties and responsibilities to committees of our directors and/or officers (all such bodies and delegates referred to collectively as the plan administrator), subject to certain limitations that may be imposed under Section 16 of the Exchange Act, and/or other applicable law or stock exchange rules, as applicable. The plan administrator has the authority to make all determinations and interpretations under, prescribe all forms for use with, and adopt rules for the administration of, the Amended Plan, subject to its express terms and conditions. The plan administrator also sets the terms and conditions of all awards under the Amended Plan, including any vesting and vesting acceleration conditions.

*Limitation on Awards and Shares Available.* The aggregate number of shares of our Common Stock that are authorized for issuance under awards granted pursuant to the Existing Plan equals the sum of (i) 5,450,000 shares minus (ii) any shares of our Common Stock delivered in settlement of awards granted pursuant to the 2006 Plan during the period beginning on September 25, 2012 and ending immediately prior to December 12, 2012, plus (iii) any shares of our Common Stock subject to awards outstanding under the 2006 Plan that terminate, expire or lapse for any reason on or after December 12, 2012 (up to a maximum of 2,220,000 shares). If the Amended Plan is approved by our stockholders, then the aggregate number of shares of our Common Stock that will be authorized for issuance under awards granted pursuant to the Amended Plan will equal the sum of (i) 7,100,000 shares, plus (ii) any shares of our Common Stock subject to awards outstanding under the 2006 Plan that terminate, expire or lapse for any reason on or after stockholder approval of the Amended Plan. Additionally, the number of shares which may be granted as incentive stock options under the

Existing Plan is 5,450,000 shares. If the Amended Plan is approved by our stockholders, the number of shares which may be granted as incentive stock options will be increased by 1,650,000 shares to a total of 7,100,000 shares. If all awards were to be granted as Full Value Awards (as defined below), this represents an increase of 882,352 shares.

The Amended Plan continues the Existing Plan's fungible stock plan feature under which "Full Value Awards" (***i.e.***, each award other than stock options, stock appreciation rights ("SARs"), or any other award for which the participant pays the grant-date intrinsic value) will be counted as 1.87 shares against the share reserve. Therefore, any shares delivered in settlement of awards of options, SARs or similar awards which do not deliver the full share value at grant of the underlying shares (i.e., which are not Full Value Awards) will be counted against the Amended Plan share reserve limit as one share for every one share granted. Any shares that are delivered in settlement of Full Value Awards (i.e., restricted stock, restricted stock units or similar awards that convey the full value of the shares subject to the award) will be counted against this limit as 1.87 shares for every one share granted. Shares subject to awards under the Amended Plan that are forfeited, expire or are settled for cash may be used again for new grants under the Amended Plan, and will be added back to the Amended Plan's share limit in the same number of shares as were debited from the share limit in respect of the grant of such awards. Shares that are (i) subject to a SAR or stock option that are not issued in connection with the stock settlement of the SAR or stock option on its exercise, (ii) purchased on the open market with the cash proceeds from the exercise of options, or (iii) tendered or withheld to satisfy exercise price or tax withholding obligations associated with an award, in any case, may not be used again for new grants of awards. Shares granted under the Amended Plan may be treasury shares, authorized but unissued shares, or shares purchased in the open market.

Subject to limited exception, awards granted under the Amended Plan upon the assumption of, or in substitution for, awards authorized or outstanding under a qualifying equity plan maintained by an entity with which we enter into a merger or similar corporate transaction will not reduce the shares available for grant under the Amended Plan. The maximum number of shares of our Common Stock that may be subject to one or more awards granted to any one participant pursuant to the Amended Plan during any calendar year will be 250,000 and the maximum amount that may be paid in cash pursuant to the Amended Plan to any one participant during any calendar year period will be $15,000,000. In addition, the sum of the grant date fair value of equity-based awards and the amount of any cash-based awards that may be granted to any non-employee director pursuant to the Amended Plan during any calendar year will not exceed $750,000.

*Awards.* The Amended Plan provides for the grant of stock options, including incentive stock options and nonqualified stock options, restricted stock, restricted stock units ("RSUs"), dividend equivalents, other incentive awards and SARs and cash awards. Certain awards under the Amended Plan may constitute or provide for a deferral of compensation, subject to Section 409A of the Internal Revenue Code, which may impose additional requirements on the terms and conditions of such awards. All awards under the Amended Plan are or will be set forth in award agreements which detail the terms and conditions of the awards, including any applicable vesting and payment terms and post-termination exercise limitations. Awards other than cash awards are generally settled in shares of our Common Stock, but the plan administrator may provide for cash settlement of any award. A brief description of each award type follows.

- *Stock Options.* Stock options provide for the purchase of shares of our Common Stock in the future at an exercise price set on the grant date. Incentive stock options, by contrast to nonqualified stock options, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Internal Revenue Code are satisfied. The exercise price of a stock option may not be less than 100% of the fair market value of the underlying share on the date of grant (or 110% in the case of incentive stock options granted to certain significant stockholders), except with respect to certain substitute options granted in connection with a corporate transaction. The term of a stock option may not be longer than ten years (or five years in the case of incentive stock options granted to certain significant stockholders). Vesting conditions determined by the plan administrator may apply to stock options and may include continued service, performance and/or other conditions.
- *Stock Appreciation Rights.* SARs entitle their holder, upon exercise, to receive from us an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The exercise price of a SAR may not be less than 100% of the fair market value of the underlying

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2642 of 2711

share on the date of grant (except with respect to certain substitute SARs granted in connection with a corporate transaction) and the term of a SAR may not be longer than ten years. Vesting conditions determined by the plan administrator may apply to SARs and may include continued service, performance and/or other conditions.

- *Restricted Stock and Restricted Stock Units.* Restricted stock is an award of nontransferable shares of our Common Stock which shares remain forfeitable unless and until specified conditions are met. RSUs are contractual promises to deliver shares of our Common Stock in the future, which may also remain forfeitable unless and until specified conditions are met. Delivery of the shares underlying RSUs may be deferred under the terms of the award or at the election of the participant if the plan administrator permits such a deferral. Vesting conditions determined by the plan administrator may apply to restricted stock and RSUs and may include continued service, performance and/or other conditions. Under the Amended Plan, dividends payable with respect to restricted stock prior to the vesting of such restricted stock instead will be paid out to the participant only as and to the extent that the applicable vesting conditions of the underlying award are subsequently satisfied and the restricted stock vests. Dividends payable with respect to the portion of an award that fails to vest will be forfeited.

- *Other Incentive Awards and Cash Awards.* Other incentive awards are awards other than those enumerated in this summary that are denominated in, linked to or derived from shares of our Common Stock or value metrics related to our shares, and may remain forfeitable unless and until specified conditions are met. Cash awards are cash incentive bonuses subject to performance goals.

- *Dividend Equivalents.* Dividend equivalents represent the right to receive the equivalent value of dividends paid on shares of our Common Stock and may be granted alone or in tandem with awards. Dividend equivalents are credited as of dividend payment dates during the period between the date an award is granted and the date such award vests, is exercised, is distributed or expires, as determined by the plan administrator. Dividend equivalents may not be granted on options or SARs. Under the Amended Plan, dividend equivalents payable with respect to an award prior to the vesting of such award instead will be paid out to the participant only to the extent that the applicable vesting conditions of the underlying award are subsequently satisfied and the award vests. Dividend equivalents payable with respect to the portion of an award that fails to vest will be forfeited.

*Certain Transactions.* The plan administrator has broad discretion to equitably adjust the provisions of the Amended Plan, as well as the terms and conditions of existing and future awards, to prevent the dilution or enlargement of intended benefits and facilitate necessary or desirable changes in the event of certain transactions and events affecting our Common Stock, such as stock dividends, stock splits, mergers, acquisitions, consolidations and other corporate transactions. In addition, in the event of certain non-reciprocal transactions with our stockholders known as “equity restructurings,” the plan administrator will make equitable adjustments to the Amended Plan and outstanding awards. In the event of a change in control of our Company (as defined in the Amended Plan), the surviving entity must assume outstanding awards or substitute economically equivalent awards for such outstanding awards; however, if the surviving entity declines to assume or substitute for some or all outstanding awards, then all such awards will vest in full and be deemed exercised (as applicable) upon the transaction. Individual award agreements may provide for additional accelerated vesting and payment provisions.

*Foreign Participants, Transferability, Repricing and Participant Payments.* The plan administrator may modify award terms, establish subplans and/or adjust other terms and conditions of awards, subject to the share limits described above, in order to facilitate grants of awards subject to the laws and/or stock exchange rules of countries outside of the United States. With limited exceptions for estate planning, domestic relations orders, certain beneficiary designations and the laws of descent and distribution, awards under the Amended Plan are generally non-transferable prior to vesting and exercisable only by the participant. Any transfer of an award to a permitted transferee (as defined in the Amended Plan) shall be without consideration except as required by applicable law. Except in connection with certain corporate transactions, the Amended Plan does not permit the repricing or cancelation of options or SARs in exchange for cash or other awards without stockholder approval when the option or SAR price per share exceeds the fair market value of the underlying shares. With regard to tax withholding, exercise price and purchase price obligations arising in connection with awards under the Amended Plan, the plan administrator may, in its discretion, accept cash or check, shares of our Common Stock that meet specified conditions, a “market sell order” or such other consideration as it deems suitable.

*Plan Amendment and Termination.* Our Board may amend or terminate the Amended Plan at any time; however, except in connection with certain changes in our capital structure, stockholder approval will be required for (i) any amendment that increases the number of shares available under the Amended Plan, and (ii) any amendment that reduces the price per share of any outstanding option or SAR granted under the Amended Plan or that cancels any stock option or SAR in exchange for cash or another award when the option or SAR price per share exceeds the fair market value of the underlying shares. After the tenth anniversary of the date the Amended Plan was adopted by our Board, no incentive stock options may be granted; however, the Amended Plan does not have a specified expiration and will otherwise continue in effect until terminated by us.

*Programs.* The Amended Plan provides that the plan administrator may establish programs under the Amended Plan which contain the terms and conditions intended to govern a specified type of award granted under the Amended Plan. Programs may be established to govern awards tied to specific performance goals and business criteria under the umbrella of the Amended Plan. In all cases, these programs will be consistent with the terms of the Amended Plan.

*Tax Withholding.* We have the authority and the right to deduct or withhold, or require a participant to remit to us, an amount sufficient to satisfy federal, state, local and foreign taxes required by law to be withheld with respect to any taxable event concerning a participant arising as a result of the Amended Plan. The plan administrator may in its sole discretion and in satisfaction of the foregoing requirement allow a participant to elect to have us withhold shares otherwise issuable under an award. Unless determined otherwise by the plan administrator, the number of shares which may be so withheld or surrendered will be limited to the number of shares which have a fair market value no greater than the aggregate amount of such liabilities based on the maximum individual statutory withholding rates for federal, state, local and foreign income tax and payroll tax purposes for the applicable jurisdiction.

*Data Privacy.* Under the Amended Plan, as a condition of receipt of any award, each participant must explicitly consent to the collection, use and transfer of personal data as described in the Amended Plan by and among us and our subsidiaries for the exclusive purpose of implementing, administering and managing the participant's participation in the Amended Plan.

**Federal Income Tax Consequences of the Amended Plan**

The U.S. federal income tax consequences of the Amended Plan under current federal law, which is subject to change, are summarized in the following discussion of the general tax principles applicable to the Amended Plan. This summary is not intended to be exhaustive and, among other considerations, does not describe state, local, or foreign tax consequences. Tax considerations may vary from locality to locality and depending on individual circumstances.

*Non-Qualified Stock Options*. If a participant is granted a nonqualified stock option under the Amended Plan, the participant should not have taxable income on the grant of the option. Generally, the participant should recognize ordinary income at the time of exercise in an amount equal to the fair market value of the shares acquired on the date of exercise, less the exercise price paid for the shares. The participant's basis in the Common Stock for purposes of determining gain or loss on a subsequent sale or disposition of such shares generally will be the fair market value of our Common Stock on the date the participant exercises such option. Any subsequent gain or loss should be taxable as a long-term or short-term capital gain or loss. We generally should be entitled to a federal income tax deduction at the time and for the same amount as the participant recognizes ordinary income.

*Incentive Stock Options*. A participant receiving incentive stock options should not recognize taxable income upon grant. Additionally, if applicable holding period requirements are met, the participant should not recognize taxable income at the time of exercise. However, the excess of the fair market value of the shares of our Common Stock received over the option exercise price is an item of tax preference income potentially subject to the alternative minimum tax. If stock acquired upon exercise of an incentive stock option is held for a minimum of two years from the date of grant and one year from the date of exercise and otherwise satisfies the incentive stock option requirements, the gain or loss (in an amount equal to the difference between the fair market value on the date of disposition and the exercise price) upon disposition of the stock should be treated as a long-term capital gain or loss, and we should not be entitled to any deduction. If the holding period

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2644 of 2711

requirements are not met, the incentive stock option should be treated as one that does not meet the requirements of the Code for incentive stock options and the participant should recognize ordinary income at the time of the disposition equal to the excess of the amount realized over the exercise price, but not more than the excess of the fair market value of the shares on the date the incentive stock option is exercised over the exercise price, with any remaining gain or loss being treated as capital gain or capital loss. We are not entitled to a tax deduction upon either the exercise of an incentive stock option or upon disposition of the shares acquired pursuant to such exercise, except to the extent that the participant recognizes ordinary income on disposition of the shares.

*Other Awards*. The current federal income tax consequences of other awards authorized under the Amended Plan generally follow certain basic patterns: SARs are taxed and deductible in substantially the same manner as nonqualified stock options; nontransferable restricted stock subject to a substantial risk of forfeiture results in income recognition equal to the excess of the fair market value over the price paid, if any, only at the time the restrictions lapse (unless the recipient elects to accelerate recognition as of the date of grant through a Section 83(b) election); restricted stock units, dividend equivalents, cash awards and other stock awards are generally subject to tax at the time of payment.

*Application of Section 409A of the Code*. Section 409A of the Code imposes an additional 20% tax and interest on an individual receiving non-qualified deferred compensation under a plan that fails to satisfy certain requirements. For purposes of Section 409A, "non-qualified deferred compensation" includes certain equity-based incentive programs, including some stock options, stock appreciation rights and restricted stock unit programs. Generally speaking, Section 409A does not apply to incentive stock options, non-discounted non-qualified stock options and appreciation rights if no deferral is provided beyond exercise, nor does Section 409A apply to restricted stock. The awards made pursuant to the Amended Plan are expected to be designed in a manner intended to comply with the requirements of Section 409A of the Code to the extent the awards granted under the Amended Plan are not exempt from coverage. However, if the Amended Plan fails to comply with Section 409A in operation, a participant could be subject to the additional taxes and interest.

**Share Price**

On October 14, 2020, the last trading day prior to the record date, the closing price of our Common Stock on the Nasdaq Stock Market was $79.70 per share.

**New Plan Benefits**

The number of awards that our Named Executive Officers, directors, other executive officers and other employees may receive under the Amended Plan will be determined in the discretion of our Board or Compensation Committee, as applicable, in the future, and our Board and Compensation Committee have not made any determination to make future grants to any persons under the Amended Plan as of the date of this Proxy Statement. Therefore, it is not possible to determine the future benefits that will be received by these participants under the Amended Plan, or the benefits that would have been received by such participants if the Amended Plan, as proposed to be amended, had been in effect in the fiscal year ended June 30, 2020.

**Plan Benefits**

The table below sets forth summary information concerning the number of shares of our Common Stock subject to equity awards granted to certain persons under the Existing Plan through June 30, 2020.

Certain awards set forth in this table for the Named Executive Officers were granted in fiscal year 2020 and therefore also are included in the Summary Compensation Table and in the Grants of Plan-Based Awards Table set forth in this Proxy Statement and are not additional awards. Certain awards set forth in this table for the non-employee directors were granted in fiscal year 2020 and therefore also are included in the Non-Employee Director Compensation Table set forth in this Proxy Statement and are not additional awards.

| Name and Position | Stock Option Grants (#) | Restricted Stock Units (#)(1) | Restricted Stock Awards (#) |
|---|---|---|---|
| **Named Executive Officers:** | | | |
| Deepak Chopra | — | 388,668 | — |
| Alan Edrick | — | 169,935 | — |
| Ajay Mehra | — | 128,481 | — |
| Victor Sze | — | 139,153 | — |
| Mal Maginnis | — | 10,514 | — |
| **All current executive officers, as a group** | — | 869,835 | — |
| **All current non-employee directors, as a group** | — | 93,119 | — |
| **Current director nominees:** | | | |
| Steve Good | — | 27,426 | — |
| Meyer Luskin | — | 27,439 | — |
| William Ballhaus | — | 19,762 | — |
| James Hawkins | — | 9,635 | — |
| Gerald Chizever | — | 7,981 | — |
| Kelli Bernard | | 876 | |
| **Each associate of any such directors, executive officers or nominees** | — | — | — |
| **Each other person who received or is to receive 5% of such options or rights** | — | — | — |
| **All employees, including all current officers who are not executive officers, as a group** | 247,682 | 413,749 | — |

(1) Performance-based restricted stock units are reflected at “target” levels.

***The Board unanimously recommends that you vote “FOR” the approval of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2646 of 2711

**ADVISORY VOTE ON THE COMPANY'S EXECUTIVE COMPENSATION FOR THE FISCAL YEAR ENDED JUNE 30, 2020**
***(Proposal No. 4 of the Proxy Card)***

**Background**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd Frank Act") enables our stockholders to vote to approve, on an advisory, non-binding basis, our executive compensation for the fiscal year ended June 30, 2020 as disclosed in the Proxy Statement in accordance with the SEC's rules, including Section 14A of the Exchange Act. We currently conduct this advisory vote on an annual basis, and the next advisory vote is expected to be conducted at our 2021 Annual Meeting of Stockholders.

**Summary**

Our Board is committed to excellence in governance and is aware of the significant interest in executive compensation matters by investors and the general public. We are asking our stockholders to provide advisory approval of our executive compensation as such compensation is described in the "Compensation Discussion and Analysis" section, the tabular disclosure regarding such compensation, and the accompanying narrative disclosure set forth in the Proxy Statement. We recognize and value the critical role that executive leadership plays in our performance. Our executive compensation philosophy is intended to ensure that executive compensation is aligned with our short- and long-term business strategy, objectives, and stockholder interests. Our executive compensation is designed to attract, motivate, and retain highly qualified executives. We believe that our compensation policies and procedures are centered on pay-for-performance principles and are strongly aligned with the short- and long-term interests of our stockholders.

We urge you to review the "Compensation Discussion and Analysis" section of the Proxy Statement and executive-related compensation tables for more information.

**Emphasis on Pay-For-Performance Principles**

We believe that executive compensation should be tied to our performance on both a short-term and long-term basis. We believe that our continued success is closely tied to the performance of our executive officers and have designed our compensation practices in order to reward the executives for their contributions to our overall success.

**Alignment with Stockholders' Interests**

We grant annual incentives based in part on each executive's contribution to enhancing our short- and long-term profitable growth. We also grant long-term equity-based incentives as a substantial component of the compensation program to reward long-term performance and further align the interests of management with those of our stockholders. In recent years, we have generally used restricted stock units ("RSUs") as our equity incentive vehicle as these awards enable the executives to establish a meaningful equity stake in our Company while allowing them to participate in future value creation through appreciation of the shares. These awards tie the executives' interests to those of long-term stockholders and serve to motivate the executives to lead us to achieve long-term financial goals that are expected to lead to increased stockholder value. In addition to linking compensation value to stockholder value, these awards generally have vesting conditions, which creates a strong retention incentive and helps ensure the continuity of our operations. For fiscal year 2020, 100% of the long-term equity incentives granted to our Named Executive Officers consisted of RSUs subject to performance vesting based on the compound annual growth rate of revenue and operating income.

**Long-Term Performance**

In order to promote our philosophy of pay-for-performance and furthering our objective of aligning the interests of management with those of our stockholders, we have established performance programs for certain of our executive officers. These programs focus on the achievement of our long-term financial goals and factors that create long-term stockholder value. By establishing performance targets tied to key corporate

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2647 of 2711

financial metrics, we are incentivizing our officers to achieve our long-term corporate objectives and ultimately increase stockholder value.

**Highlights of 2020 Executive Compensation Program**

The Board believes our executive compensation program is designed appropriately and that a vote in favor of the proposal is warranted, including for these reasons: (1) 100% of Named Executive Officer equity awards for fiscal 2020 were performance-based and tied to measurable pre-established targets; (2) in light of recent strong performance, we amended our annual incentive program to adjust the annual targets upwards; (3) we are committed to having strong governance standards and continue to take steps to further this commitment; and (4) we value the opinions and feedback we receive from, and we continue to engage with, our stockholders, and our executive compensation program directly reflects our stockholders' input.

**1. 100% Performance-Based Equity Awards for Named Executive Officers.**

100% of the equity grants made to our Named Executive Officers during fiscal 2020 were performance-based and tied to pre-established targets. Our 2020 performance-based program established revenue and operating income targets which require significant annual growth as compared to baseline measurement levels. The revenue metric is weighted at 20%, and the operating income metric is weighted at 80%.

For the annual performance period ended June 30, 2020, compound annual revenue growth as compared to the baseline measurement level was 6.7%, and compound annual operating income growth as compared to the baseline measurement level was 20.5%. As a result, our CEO earned 49,090 shares in accordance with the program.

In addition, our participating executive officers received shares under our previous EBITDA-based program. Discussion of our previous program is available in our Proxy Statement on Schedule 14A as filed with the SEC on October 19, 2018. Under our prior program, the adjusted EBITDA per share target for the three-year performance cycle ended in fiscal 2020 was $6.62 and was achieved at 152% of target. As a result the 52,960 shares granted to our CEO in fiscal 2018 were vested. In addition, our CEO earned 26,480 vested shares pursuant to the fiscal 2018 grant.

**2. Increased Targets for Annual Incentive Program.**

For fiscal year 2020, in light of recent strong performance, we amended our annual incentive program to adjust the annual targets upwards as set forth in the section titled "*Annual Incentive Awards*".

**3. Corporate Governance and Best Practices: We are committed to having strong governance standards with respect to our compensation programs, procedures, and practices.**

We have taken the following actions to enhance our corporate governance and executive compensation policies:

- Engaged with stockholders and incorporated stockholder feedback when establishing our executive compensation programs to address specific stockholder feedback.
- Appointed a Lead Independent Director to further promote the independence of our Board and appropriate oversight of management and to facilitate free and open discussion and communication among our independent directors.
- Prohibited all hedging and pledging of our stock by executive officers and directors. As of the date of the Proxy Statement, no shares of our stock are pledged by any Named Executive Officer or director.
- Adopted a robust clawback policy that provides that if an accounting restatement is required due to material non-compliance with any accounting requirements, then we will seek to recover any excess in the incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material restatement of the financial statements. We have also included clawback provisions in each Named Executive Officer's employment agreement.
- Established rigorous Company stock ownership guidelines requiring each executive officer to own Company stock valued at least at five times his annual base salary. These guidelines align the executives'

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2648 of 2711

long-term interests with those of our stockholders. In addition, prior to attaining the 5X share ownership guideline, each executive is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or RSU awards, net of amounts required to pay taxes and exercise price.

**4. Communications with Stockholders: We maintain open lines of communication with our stockholders, and our annual cash incentive and long-term incentive programs reflect the stockholder input we received.**

Our Compensation Committee takes very seriously stockholder feedback with respect to executive compensation. At our 2019 annual meeting, approximately 84% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation. Considering the level of support of our stockholders of our compensation program, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2020.

Our Board believes that the information above as well as that provided in the section entitled "Compensation of Executive Officers and Directors" contained in the Proxy Statement demonstrates that our executive compensation program was designed appropriately and is working to ensure that management's interests are aligned with the stockholders' interests and support long-term value creation. The following resolution will be submitted for a stockholder vote at the Annual Meeting:

"RESOLVED, that the stockholders of OSI Systems, Inc. approve, on an advisory basis, the compensation of the Company's Named Executive Officers, as disclosed pursuant to Item 402 of Regulation S-K of the SEC, including in the section entitled "Compensation Discussion and Analysis," the accompanying compensation tables, and the related narrative disclosure contained in the Proxy Statement."

***The Board unanimously recommends that you vote "FOR" the approval of our executive compensation for the fiscal year ended June 30, 2020. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the Proxy or, if no direction is made, in favor of this proposal. In order to be approved on an advisory basis, this proposal must be approved by the affirmative vote of a majority of the shares of Common Stock present in person or by proxy and cast at the Annual Meeting.***

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS

### Executive Officers

Our executive officers are as follows:

| Name | Age | Position |
|---|---|---|
| Deepak Chopra* | 69 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Alan Edrick* | 52 | Executive Vice President and Chief Financial Officer |
| Ajay Mehra* | 58 | Director, Executive Vice President and President, Cargo Scanning and Solutions |
| Victor Sze* | 53 | Executive Vice President and General Counsel |
| Mal Maginnis* | 61 | President of Rapiscan Detection |
| Shalabh Chandra | 55 | President of Healthcare Division |
| Manoocher Mansouri | 64 | President of Optoelectronics and Manufacturing Division |
| Paul Morben | 59 | President of OSI Electronics |
| Glenn Grindstaff | 58 | Senior Vice President and Chief Human Resources Officer |

* Denotes our Named Executive Officers for fiscal 2020.

The following section sets forth certain background information regarding those persons currently serving as our executive officers, excluding Deepak Chopra, who is described above under "Election of Directors":

***Alan Edrick*** is our Executive Vice President and Chief Financial Officer. Mr. Edrick joined the Company as Executive Vice President and Chief Financial Officer in September 2006. Mr. Edrick has more than two decades of financial management and public accounting experience, including mergers and acquisitions, capital markets, financial planning and analysis and regulatory compliance. Between

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2649 of 2711

2004 and 2006, Mr. Edrick served as Executive Vice President and Chief Financial Officer of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation. Between 1998 and 2004, Mr. Edrick served as Senior Vice President and Chief Financial Officer of North American Scientific, Inc., a medical device and specialty pharmaceutical company. Between 1989 and 1998, Mr. Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets. Mr. Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business Administration degree from the Anderson School at the University of California, Los Angeles.

***Ajay Mehra*** is our Executive Vice President and President, Cargo Scanning and Solutions. Mr. Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer from November 1992 until November 2002, when he was named our Executive Vice President. Prior to joining the Company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology. Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

***Victor S. Sze*** is our Executive Vice President and General Counsel. Mr. Sze joined the Company as Vice President of Corporate Affairs and General Counsel in March 2002. In November 2002, Mr. Sze was appointed Secretary. In September 2004, Mr. Sze was appointed Executive Vice President. From 1999 through November 2001, Mr. Sze served as in-house counsel to Interplay Entertainment Corp., a developer and worldwide publisher of interactive entertainment software, holding the title of Director of Corporate Affairs. Prior to joining Interplay Entertainment Corp., Mr. Sze practiced law with the firm of Wolf, Rifkin & Shapiro in Los Angeles. Mr. Sze holds a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Juris Doctorate from Loyola Law School.

***Mal Maginnis*** is President of our Rapiscan Detection business. Mr. Maginnis joined the Company in July 2017. He has more than 35 years in the defense, security, safety and technology industries, and is an experienced senior executive of technology-based businesses. Prior to joining the Company, Mr. Maginnis was the head of a technology development company based in Singapore and one of the owners of an Australian detection company based in Sydney. In addition, he was President of Smiths Detection from 2011-2014 based in London. He held a series of senior positions at Smiths Detection including President, Head of Technology, Programs and Products and was the head of the largest business unit managing the global military and emergency responder business. Mr. Maginnis holds a Bachelor of Arts (Hons) degree in history and government from the Faculty of Military Studies University of New South Wales, and Graduate, UK Command Staff College.

***Shalabh Chandra*** is President of our Healthcare division. Mr. Chandra joined the Company in September 2019. He has more than 20 years in the medical devices and medical diagnostics industries. From May 2018 to August 2019, he served as the VP & GM of the Neurology division for Quest Diagnostics. Prior to that, from May 2017 to April 2018, Mr. Chandra served as an industry consultant, and from August 2010 through April 2017, Mr. Chandra held several positions at Analogic, including President of Analogic Asia and SVP for the Global Ultrasound Business. Mr. Chandra also spent approximately 14 years at Philips as GM of Global MRI Patient Monitoring. Mr. Chandra received his BS in electrical engineering from IIT Kanpur, India, a MS in Biomedical Engineering from Ohio State, and an MBA from the Wharton School of the University of Pennsylvania.

***Manoocher Mansouri*** is President of our Optoelectronics and Manufacturing division. Mr. Mansouri joined the Company in 1982 and was named President of our Optoelectronics and Manufacturing division in June 2006. Mr. Mansouri has over 30 years of experience in the optoelectronics industry. Mr. Mansouri has served as President of our OSI Optoelectronics, Inc. subsidiary since May 2000. Mr. Mansouri holds a Bachelor of Science degree in Electrical Engineering from the University of California, Los Angeles as well as an Executive Program in management certificate from the Anderson School at the University of California, Los Angeles.

***Paul Morben*** is President of our OSI Electronics business. Having first joined the Company in 1983, Mr. Morben has over 35 years of experience in the optoelectronics and manufacturing services industries, including 10 years in Asia where he established and led the Company's manufacturing operations in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2650 of 2711

Singapore, Indonesia, and Malaysia. Mr. Morben was named President of OSI Electronics in October 2019 after having spent the past three years as President and CEO of Masterwork Electronics, Inc. Mr. Morben holds a Bachelor of Science degree from California State University, Northridge and a Master of Business Administration degree from Concordia University, Irvine.

***Glenn Grindstaff*** is our Chief Human Resources Officer. Mr. Grindstaff joined the Company in this role in February 2020. Mr. Grindstaff has over 25 years of progressive human resources leadership experience. Between 2010 and 2019, Mr. Grindstaff served as Vice President, Human Resources and Administration for L3Harris Technologies. Prior to that, Mr. Grindstaff held several senior positions, including Vice President, Human Resources and Administration at Honda Aircraft, and Senior Vice President, Human Resources at Spirent Communications. Mr. Grindstaff holds a Bachelor of Arts degree from California State University, Northridge.

**Compensation Discussion and Analysis**

This Compensation Discussion and Analysis describes our compensation philosophy, objectives, and processes, including the methodology for determining executive compensation for our Named Executive Officers. For additional information, please refer to the more detailed compensation disclosures beginning with and following the “Summary Compensation Table” contained in this Proxy Statement.

*Advisory Vote on Named Executive Officer Compensation; Stockholder Communications*

We maintain open lines of communication with our stockholders, and senior management routinely interacts with our stockholders on a number of matters, including executive compensation, in order to better understand their opinions and to obtain their feedback. Further, the Compensation Committee considers the outcome of our annual say on pay vote when making decisions regarding our executive compensation program. At our 2019 annual meeting, 84% of the votes cast on the advisory vote on the compensation of our Named Executive Officers were in favor of our executive compensation policies. Considering the level of support of our stockholders of our compensation program, our Compensation Committee determined to continue to apply the same approach with respect to compensation policies and decisions for fiscal 2020. At the upcoming Annual Meeting, we will again hold an annual advisory vote to approve executive compensation. We will continue to engage with our stockholders throughout the year, and the Compensation Committee will consider the results from this year’s and future advisory votes on executive compensation, as well as any feedback received from stockholders.

*Governance Highlights*

We are committed to having strong governance practices with respect to our compensation programs, practices and procedures. We believe that these practices reinforce our emphasis on tying executive compensation to performance. The following chart highlights some of our governance practices with respect to executive compensation:

| What We Do | What We Do Not Do |
| --- | --- |
| Use 100% performance-based vesting for Named Executive Officer equity awards | No excise tax gross-ups upon a change in control |
| Have formulaic performance-based annual incentives | No hedging, pledging, or speculative transactions are permitted by executives and directors |
| Maintain a robust clawback policy | No re-pricing of underwater stock options |
| Maintain share ownership and retention guidelines for executives and directors | No stock option grants with an exercise price less than fair market value |
| Conduct an annual say on pay vote | No “single trigger” severance payments owing solely on account of the occurrence of a change in control event |
| Maintain open lines of communication with stockholders | |

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2651 of 2711

*Executive Compensation Summary*

*Fiscal 2020 Performance*

During fiscal 2020, despite the adverse impacts stemming from the COVID-19 pandemic, we (a) delivered strong non-GAAP earnings per share of $4.60, representing 6% growth compared to the prior fiscal year; (b) achieved outstanding operating cash flow of $129 million; (c) expanded our operating margin; (d) completed four strategic acquisitions; and (e) achieved adjusted return on equity ("AROE") of 19.7%.

*Leverage Business Infrastructure.* Even as we launched new products, entered new markets, and invested substantial amounts in R&D, we actively leveraged our business infrastructure and maintained intelligent cost management.

*Growth in Markets and Opportunities.* In fiscal 2020, we continued to expand our addressable markets through new product introductions and targeting of markets that did not previously represent a significant source of revenues. This dynamic approach has served, and we believe it will continue to serve, to sustain growth over the long term. Some of our key achievements during fiscal 2020 include the following:

- Expanding global presence, most significantly in Australia.
- Commercialization of a body scanner by our Security division.
- Acquiring product lines and companies that not only leverage our existing operating infrastructure but also provide immediate entry into growing market segments.
- Making significant progress in our R&D programs for the development of new products and technologies.

*Building a Foundation for the Future.* We continue to make significant targeted investments in R&D and acquisitions. In fiscal 2020, we completed four strategic acquisitions, three in our Security division and one in our Optoelectronics and Manufacturing division. We believe that these acquisitions and investments, as well as other product development programs that are currently underway, will result in enhanced business outcomes for years to come.

*Role of the Compensation Committee*

Our Board appoints members to the Compensation Committee. Each member of the Compensation Committee is independent within the meaning of the rules and regulations of the SEC and the Listing Standards, as currently in effect. The Compensation Committee is responsible for establishing and approving all compensation for our Named Executive Officers, including base salaries, annual incentives, long-term equity incentive compensation, benefits and perquisites, and other compensation. The Compensation Committee may delegate certain of its responsibilities to a subcommittee, to individuals or to others.

Compensation for each of our Named Executive Officers (other than our Chief Executive Officer) is recommended to the Compensation Committee by our Chief Executive Officer. Compensation for our Chief Executive Officer is established by the Compensation Committee on its own.

The Compensation Committee has designed an executive compensation program that is focused on the attainment of consistent, long-term stockholder returns through (a) aligning executives' incentives with both single-year and multi-year performance, and (b) attracting and retaining executives with capabilities to lead the Company to excel in a competitive landscape. This structure is designed to emphasize pay for performance while simultaneously mitigating risk exposure.

*Executive Compensation Program Elements*

The particular elements of the compensation program for our Named Executive Officers consist of both fixed compensation and variable compensation. Consistent with our pay-for-performance philosophy, we structure our compensation program such that fixed compensation is a relatively small percentage of total compensation whereas variable compensation comprises a significant percentage of total compensation. The Compensation Committee takes risk into account when establishing the compensation program and believes

that the current structure appropriately balances risk and the desire to focus executives on specific annual and long-term goals while not encouraging unnecessary or excessive risk taking.

The following is an overview of the elements of our compensation and benefits programs for fiscal 2020:

| Pay Element | Description |
|---|---|
| Base Salary | Fixed cash compensation set based on the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. |
| Annual Incentives | Cash-based annual incentives that are determined formulaically based on AROE metrics for our corporate Named Executive Officers. |
| | The Cargo Incentive Program allows for annual incentives to Mr. Mehra based on the achievement of certain performance metrics. |
| | Mr. Maginnis received a bonus based upon performance. |
| Long-Term Incentives | The fiscal 2020 program with respect to the Named Executive Officers consisted of performance-based RSUs, which are earned based on the achievement of pre-established revenue and operating income metrics for each of the three years following grant, as well as an aggregate three-year metric. |
| Benefits | Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance. |
| Perquisites | For fiscal 2020, perquisites included a Company car for each Named Executive Officer and reimbursement of certain housing expenses for Mr. Maginnis. |
| Retirement | 401(k) retirement plan, which includes a Company match. |
| | Nonqualified deferred compensation plan that permits the deferral of salary and cash incentives at executive officers' election and permits a Company match. |
| | Nonqualified defined benefit plan, in which our CEO is the only participant. |

In fiscal 2020, fixed compensation comprised approximately 11% to 45% and variable compensation comprised approximately 55% to 89% of each Named Executive Officer's total compensation. Average variable compensation for the Named Executive Officers represented 85% of total compensation.




*Fixed Compensation.* Fixed compensation is intended to compensate our Named Executive Officers for their ongoing responsibilities and consists of base salary. Base salary is set to attract and retain executive talent. Base salaries for our Named Executive Officers are established at levels considered appropriate in light of the duties and scope of responsibilities of each executive officer's position and the experience the individual brings to the position. Salaries are reviewed periodically, typically on an annual basis.

The Compensation Committee takes a conservative approach with respect to base salary increases. In determining whether base salary levels for fiscal year 2020 were appropriate, the Compensation Committee considered the minimum base salary amount provided for in the Named Executive Officer's employment agreement, as well as a determination of each Named Executive Officer's responsibilities, past performance, and expected future contributions. In the beginning of fiscal 2020, base salary levels for the Named Executive Officers remained at their pre-existing levels. In the fourth quarter of fiscal year 2020, given the uncertainties in the marketplace associated with the coronavirus pandemic, our Named Executive Officers each took a voluntary 15% salary reduction that is expected to remain in place through December 31, 2020.

*Variable Compensation.* Variable compensation provides our Named Executive Officers with the opportunity for substantial rewards for achieving successful performance and contributing toward sustainable and consistent stockholder returns, and consists principally of annual incentive awards and long-term incentive compensation.

*Annual Incentive Awards.* For fiscal year 2020, all corporate Named Executive Officers (CEO, CFO, and General Counsel) are eligible for an annual incentive pursuant to our annual incentive program with a target incentive opportunity equal to 100% of the salary established at the beginning of the year and a maximum incentive opportunity equal to 200% of salary for our CEO and 150% of salary for our CFO and General Counsel. Annual incentives under this program are designed to focus our participating Named Executive Officers on annual operating achievement and near-term success. Annual incentives are calculated based on a formula tied to AROE metrics, whose goals were increased from the prior fiscal year, as follows:

| AROE | % of Base Salary Earned |
|---|---|
| Less than 13% | 0% |
| 13% | 25% |
| 15% | 50% |
| 16.5% | 75% |
| 18.5% | 100% |
| 18.75% | 125% |
| 19% | 150% |
| 19.25% | 175% |
| 19.5% or more | 200% |

The Compensation Committee considers AROE to be an effective annual performance measure for assessing the Company's efficient use of capital and return to stockholders. The AROE targets were designed to be challenging yet achievable with significant effort and management skill and were established in order to provide the executives sufficient incentive to create long-term stockholder value while at the same time ensuring appropriate risk management. For fiscal 2020, we achieved 19.7% AROE. See the "Non-equity Incentive Plan Compensation" column of the Summary Compensation Table.

Mr. Maginnis, President, Rapiscan Detection, is eligible to receive a bonus based upon operational and financial objectives specific to the performance of Rapiscan as well as the Company's overall performance.

Mr. Mehra, President, Cargo Scanning and Solutions, participates in an incentive program tied to the performance of our cargo scanning and solutions business (the "Cargo Incentive Program"). Incentives under the Cargo Incentive Program are, in part, awarded based on the operating income of our cargo scanning and solutions business. For fiscal year 2020 performance, Mr. Mehra was awarded a cash bonus of $3,000,000 under the operating income component of this program. The fiscal 2020 award is included in the "Non-equity

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2654 of 2711

Incentive Plan Compensation" column of the Summary Compensation Table. In addition, Mr. Mehra shall be entitled to receive an additional cash bonus under the Cargo Incentive Program if we book certain new turnkey scanning contracts or contracts for the standalone sales of software prior to December 31, 2020. As of June 30, 2020, nothing has been earned under this component of the program.

*Long-Term Incentive Program.* In order to further promote our philosophy of pay-for-performance and furthering our objective of aligning our executive compensation with our long-term financial goals and factors that create long-term stockholder value as well as incentivizing the desired individual performance of each Named Executive Officer, we have a long-term incentive program.

The grants to our Named Executive Officers during fiscal 2020 were performance based in their entirety. The Compensation Committee believes that this vesting structure provides an incentive for our Named Executive Officers to remain with the Company and also focus the Named Executive Officers on consistently achieving corporate performance and business objectives for the benefit of our stockholders.

Our overall long-term incentive program is designed to retain our Named Executive Officers and to align the interests of our Named Executive Officers with the long-term interests of our stockholders, namely the achievement of sustainable, long-term stock price appreciation. All equity awards are made at fair market value on the date of grant (which is the date on which the Compensation Committee authorizes the grant). Under our equity incentive plan as in effect on the date of grant, fair market value is determined by the closing price of our Common Stock on such dates.

The Compensation Committee has established a three-year program for long-term performance-based incentive grants to our Named Executive Officers. The program provides for yearly initial grants of equity. Each award is 100% performance based and vests based on the level of performance achieved for the following metrics: compound annual revenue growth and compound annual operating income growth. The Compensation Committee considers compound annual growth revenue and operating income metrics to be effective long-term performance measures for assessing the Company's performance over multiple years. The targets are designed to be challenging yet achievable with significant effort and management skill, incentivizing management to create long-term stockholder value while at the same time ensuring appropriate risk management. Revenue and operating income figures are as reported in accordance with GAAP in our annual report on Form 10-K. Compound annual growth rate is measured as compared to our fiscal year 2017 as-reported figures. As described below, the majority of the shares that can be earned under this program is based upon three-year performance, while additional shares can be earned based upon year one and year two performance.

Each initial grant would vest based upon the performance levels achieved for a three-year performance period for each metric based on the charts set forth below, which show the applicable metrics, weightings, and potential vesting percentage based upon performance level achieved.

**Revenue Metric (20%)**

| CAGR Revenue Growth | Vesting Percentage |
|---|---|
| <1.0% | 0% |
| 1.0% | 25% |
| 2.0% | 50% |
| 3.0% | 75% |
| 4.0% | 100% |

**Operating Income Metric (80%)**

| CAGR EBIT Growth | Vesting Percentage |
|---|---|
| <2.0% | 0% |
| 2.0% | 10% |
| 2.5% | 30% |
| 3.0% | 50% |
| 4.0% | 70% |
| 5.0% | 85% |
| 6.0% | 100% |

Our Named Executive Officers also have the opportunity to earn additional shares for each annual performance period within the three-year performance period if certain performance levels are achieved based on the charts set forth below.

**Revenue Metric (20%)**

| CAGR Revenue Growth | Potential Additional Shares as a % of Initial Grant |
|---|---|
| 4.5% | 10% |
| 5.0% | 20% |
| 5.5% | 30% |
| 6.0% | 40% |
| 6.5% | 50% |
| 7.0% | 60% |

**Operating Income Metric (80%)**

| CAGR EBIT Growth | Potential Additional Shares as a % of Initial Grant |
|---|---|
| 6.5% | 10% |
| 7.0% | 20% |
| 7.5% | 30% |
| 8.0% | 40% |
| 8.5% | 50% |
| 9.0% | 60% |

In the event of a change of control, the initial grant would vest upon the change of control; performance for any annual periods remaining in association with a particular grant will be assumed to be achieved at the maximum payout levels for the purposes of awarding additional incentive shares or units in connection with the change of control.

Our compound annual revenue growth for fiscal year 2020 was 6.7%, and our compound annual operating income growth for fiscal year 2020 was 20.5%. In addition, our adjusted EBITDA per share for fiscal year 2020 was 152% of the fiscal 2020 adjusted EBITDA per share target of $6.62 under our prior program. Therefore, our executive officers earned additional shares under our prior and current program as follows: Mr. Chopra: 75,570 shares; Mr. Edrick, 30,200 shares; Mr. Mehra, 9,259 shares; Mr. Sze, 26,087 shares; and Mr. Maginnis, 1,741 shares.

The Compensation Committee determines, after consultation with our Chief Executive Officer, the target number of equity awards to grant to our Named Executive Officers. The grant amounts for our Chief

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2656 of 2711

Executive Officer are determined solely by the Compensation Committee. The Compensation Committee considers individual performance, including the following quantitative and qualitative factors, as well as overall corporate performance.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Quality of the management of units or functions managed by the Named Executive Officer<br>• Leadership of personnel under the Named Executive Officer's management<br>• Execution of strategically important projects<br>• Overall effectiveness of units or functions managed by the Named Executive Officer<br>• Contributions to the formulation of Company strategy and tactics<br>• Contributions to stockholder value<br>• Management of risk | • Financial performance (including earnings per share and internal metrics)<br>• Financial performance metrics for business units managed by the Named Executive Officer<br>• Compensation surveys provided by external advisors |

For fiscal year 2020 performance share calculation purposes, our Chief Executive Officer, Chief Financial Officer, General Counsel, and President of our Cargo Scanning and Solutions Business are measured against consolidated Company performance, and division Presidents have their performance results weighted 70% based on their respective division performance and 30% based on consolidated Company performance.

*Benefits and Perquisites.* Benefits and perquisites are designed to attract and retain key employees. Currently, our Named Executive Officers are eligible to participate in benefit plans available to all employees, including our 401(k) Plan, Employee Stock Purchase Plan, medical, dental, and vision health insurance plans and life and long-term disability insurance plans. The 401(k) Plan, Employee Stock Purchase Plan and the medical, dental and vision plans require each participant to pay a contributory amount. We have elected to pay amounts contributed to medical, dental and vision health insurance plans and life and long-term disability insurance plans on behalf of our Named Executive Officers. In addition, we maintain an executive medical reimbursement plan under which our Named Executive Officers receive reimbursement for out-of-pocket expenses not covered by their health insurance plans. Employee individual plan contributions are subject to the maximum contribution allowed by the Internal Revenue Code. We lease automobiles for or provide an auto allowance to certain of our Named Executive Officers. During fiscal year 2020, we reimbursed Mr. Maginnis for certain housing expenses. This housing reimbursement benefit has been discontinued for fiscal year 2021.

We maintain a Nonqualified Deferred Compensation Plan (the "Deferred Compensation Plan") that is unfunded for federal tax purposes and allows certain of our Named Executive Officers and a select group of other managers or highly compensated employees (as designated by the Compensation Committee) to defer a specified percentage of certain compensation, including salary, bonuses and commissions. Distributions may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death. Additional information about this plan is summarized below under the heading "Nonqualified Deferred Compensation."

We also maintain a Nonqualified Defined Benefit Plan (the "Defined Benefit Plan") that is unfunded for federal tax purposes and that constitutes an unsecured promise by the Company to make payments to participants in the future following their retirement, termination in connection with a change in control of the Company, or their death or disability. Under the terms of the Defined Benefit Plan, a committee designated by the Board may select participants from among our Named Executive Officers and a select group of managers or other highly compensated employees. Currently, Mr. Chopra is the only participant in this plan. Additional information about this plan is summarized below under the heading "Pension Benefits."

*Total Compensation Mix.* While the Compensation Committee does not apply a predetermined or mathematical weighting to determine the fixed and variable elements of compensation, the Compensation Committee believes that the elements described above provide a well-proportioned mix of equity based, at risk or performance based compensation, and retention based compensation that produces short-term and long-term incentives and rewards. We believe this compensation mix provides our Named Executive Officers a measure of security as to the minimum levels of compensation that they are eligible to receive, while motivating the Named Executive Officers to focus on the business measures that will produce a high level of corporate performance, as well as reducing the risk of recruitment of highly qualified executive talent by our competitors. The mix of annual incentives and the equity based awards likewise provides an appropriate balance between short-term financial performance and long-term financial and stock performance. We believe that this compensation mix results in a pay-for-performance orientation that is aligned with our compensation philosophy, which takes into account individual, group and Company performance.

*Bases for Our Compensation Policies and Decisions*

In determining compensation awarded to our Named Executive Officers for fiscal 2020, the Compensation Committee performed a review of both overall and relative individual Named Executive Officer and corporate performance based on the qualitative and quantitative factors described in the table below. The factors considered did not have any predetermined or mathematical weighting; rather, the Compensation Committee considered the overall performance of each executive, considering the factors, and including consideration of unplanned events and issues emerging during the fiscal year. Each factor was evaluated and taken into consideration in the Compensation Committee's overall determination of each Named Executive Officer's total compensation package, including both the amount of compensation as well as allocation of such compensation between short-term and long-term components.

| Qualitative Factors | Quantitative Factors |
|---|---|
| • Furtherance of long-term goals | • Compensation paid in prior years |
| • Individual performance and experience | • Financial performance of Company/division/ business unit |
| • Demonstration of leadership skills and ability | • Peer group compensation and performance data |
| • Achievement of strategic targets | • Compensation surveys provided by external advisors |
| • Management of unplanned events and issues emerging during the fiscal year | |

The Compensation Committee's review included evaluating the compensation of the Named Executive Officers in light of information regarding the compensation practices and corporate financial performance of other companies. In making its determinations, the Compensation Committee reviewed information summarizing the compensation paid at peer group companies and more broad-based compensation surveys. The companies in the fiscal 2020 peer group were developed based on similarity in size and operations within the industries in which we operate as follows:

| | | | | | |
|---|---|---|---|---|---|
| • AAR Corp. | • Coherent, Inc. | • FLIR Systems, Inc. | • Integra LifeSciences Holdings Corporation | • Masimo Corporation | • NetScout Systems, Inc. |
| • ADTRAN, Inc. | • Cubic Corporation | • Hexcel Corporation | • Itron, Inc. | • MTS Systems Corporation | • Novanta Inc. |
| • Aerojet Rocketdyne Holdings, Inc. | • Extreme Networks, Inc. | • Infinera Corporation | • LivaNova, PLC | • National Instruments Corporation | • VIASAT, INC. |
| • Cognex Corporation | • Fitbit, Inc. | • Integer Holdings Corporation | • Lumentum Holdings Inc. | • Natus Medical Incorporated | • Viavi Solutions Inc. |

The peer companies were selected based on a set of established criteria intended to select companies that are similar in size, operate in similar end markets, proportional to our principal lines of business, and compete with us for executive talent. Companies were selected from the aerospace and defense, communications

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2658 of 2711

equipment, electronic equipment instruments, and components, and healthcare equipment and supplies industries, and chosen based on a range of comparable financial metrics.

In connection with executive compensation decisions for fiscal 2020, the Compensation Committee engaged independent compensation consulting firm, Pearl Meyer. The Compensation Committee also considered compensation levels and practices for executives holding comparable positions and adjustments based on the cost of living in certain geographic areas. This review further assisted the Compensation Committee in determining the appropriate level and mix of compensation for each Named Executive Officer. In connection with its review, the Compensation Committee also considered that certain Named Executive Officers were located in the high cost of living area in the geographic location of our Company headquarters.

While the Compensation Committee did not engage in formal benchmarking with pre-established targets, the Compensation Committee reviewed our actual performance taken as a whole as well as our performance relative to our peer group and established compensation levels at the competitive level that it believed most appropriately corresponded to our comparative performance.

The Compensation Committee believes that the fixed component of compensation is designed to compensate each Named Executive Officer based on the duties and scope of responsibilities of his position and the experience he brings to the position. Consistent with the Company's pay-for-performance philosophy, the variable component of compensation, in the form of annual incentives and performance-based equity grants comprised a significant portion of total compensation.

The Compensation Committee's compensation decisions are designed to encourage performance that enhances long-term stockholder value. The Compensation Committee believes that attracting and retaining executive talent capable of achieving our long-term, strategic objectives is the best way to align executive compensation decisions with the interests of stockholders. The Compensation Committee also believes that meeting financial targets as well as near-term strategic goals demonstrates whether an executive is on track to accomplish longer-term objectives.

*Minimum Equity Ownership and Retention Guidelines*

We believe that our executive officers should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that executive officers own at minimum equity of the Company valued at five times their respective annual base salaries. We believe that this multiple constitutes significant amounts for our executive officers and provides a substantial link between the interests of our executive officers and those of our stockholders. Executive officers have five years from the date of appointment to attain such ownership levels. During such time that an executive officer has not attained the share ownership guideline, such officer is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock awards or units, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2020, each of our Named Executive Officers met or exceeded our minimum equity ownership guidelines with the exception of Mr. Maginnis who joined the Company in July 2017.

*Clawback Policy*

We have adopted a clawback policy. The policy provides that if an accounting restatement is required due to our material non-compliance with any accounting requirements, then we will seek to recover any excess in the cash and equity incentive compensation earned by all of our executive officers, regardless of whether they were at fault or not in the circumstances leading to the restatement, over the prior three years over what they would have earned if there had not been a material non-compliance in the financial statements. Each Named Executive Officer's employment agreement also contains a clawback provision.

*Policy Prohibiting the Hedging or Pledging of Company Stock*

We have adopted a policy that prohibits our employees and directors from entering into any transaction that is designed to hedge or offset any decrease in the market value of our Common Stock or other equity securities. We have also adopted a policy that prohibits our executive officers and directors from holding

Company stock or other equity securities in margin accounts or pledging Company stock or other equity securities as collateral for a loan. As of the date of this Proxy Statement, no shares of Company stock are pledged by any Named Executive Officer or director.

*Employment Agreements*

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis. The terms of each of such agreements or arrangements are summarized below under the heading "Employment Agreements." These types of arrangements are used to retain executives and formalize the terms of the executives' employment.

*Impact of Accounting and Tax on the Form of Compensation*

The Compensation Committee considers applicable tax laws, securities laws and accounting regulations in structuring and modifying its compensation arrangements and employee benefit plans. The Compensation Committee has considered the impact of generally accepted accounting principles on our use of equity based awards. The Compensation Committee also considers the limits on deductibility of compensation imposed by Section 162(m) of the Internal Revenue Code with respect to annual compensation exceeding $1.0 million and Section 280G of the Internal Revenue Code with respect to change in control payments exceeding specified limits.

**Summary Compensation Table**

The following table sets forth the compensation for our principal executive officer, principal financial officer, and our three highest paid executive officers serving as executive officers on June 30, 2020 (the "Named Executive Officers") for the fiscal years ended June 30, 2020, 2019, and 2018:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards(1) ($) | Option Awards ($) | Non-equity Incentive Plan Compensation ($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(3)($) | All Other Compensation (6)(7)(8)($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Deepak Chopra | 2020 | 952,500 | — | 4,833,183 | — | 1,950,000 | 1,769,718 | 131,054 | 9,636,455 |
| Chairman, President and Chief Executive Officer | 2019 | 975,000 | — | 3,400,039 | — | 1,950,000 | 302,451 | 190,605 | 6,818,095 |
| | 2018 | 1,000,000 | — | 4,348,546 | — | 1,750,000 | 14,750 | 196,944 | 7,310,240 |
| Alan Edrick | 2020 | 464,221 | | 1,583,133 | — | 712,500 | — | 76,449 | 2,836,303 |
| Executive Vice President and Chief Financial Officer | 2019 | 475,000 | — | 1,472,230 | — | 950,000 | — | 70,984 | 2,968,214 |
| | 2018 | 435,846 | — | 1,884,671 | — | 780,500 | — | 66,288 | 3,167,305 |
| Ajay Mehra | 2020 | 439,788 | — | 474,939 | — | 3,000,000 | — | 82,721 | 3,997,448 |
| Executive Vice President of the Company and President, Cargo Scanning and Solutions | 2019 | 450,000 | — | 1,846,632(4) | — | 2,216,800 | — | 83,646 | 4,597,078 |
| | 2018 | 418,462 | — | 1,477,671 | — | 1,150,000 | — | 81,005 | 3,127,138 |
| Victor S. Sze | 2020 | 400,696 | — | 1,359,322 | — | 615,000 | — | 71,865 | 2,446,883 |
| Executive Vice President, General Counsel and Secretary | 2019 | 410,000 | — | 1,275,005 | — | 820,000 | — | 72,143 | 2,577,148 |
| | 2018 | 379,923 | — | 1,630,869 | — | 673,750 | — | 79,779 | 2,764,321 |
| Mal Maginnis | 2020 | 364,620(5) | 85,000 | 352,404 | — | — | — | 24,967(5) | 826,991(5) |
| President of Rapiscan Detection | 2019 | 375,181(5) | 165,000 | 300,047 | — | — | — | 118,330(5) | 958,558(5) |
| | 2018 | 343,727(5) | 145,000 | 302,165 | — | — | — | 101,238(5) | 892,130(5) |

(1) Represents the aggregate grant date fair value computed in accordance with generally accepted accounting principles of awards granted during the applicable fiscal year. Stock Awards column includes performance-based awards granted at target values. For additional information on the maximum amounts that could be earned if all metrics are achieved at the highest levels, see the Grants of Plan-Based Awards Table below. See Note 9 to the Consolidated Financial Statements included in our Form 10-K for the fiscal year ended June 30, 2020 for a discussion of the assumptions used in valuation of stock options and stock awards.

(2) Represent amounts earned under the annual incentive program or the Cargo Incentive Program, as applicable.

(3) We initially adopted the Defined Benefit Plan, as amended, during fiscal year 2008. Mr. Chopra is currently the only participant in the Defined Benefit Plan. The amounts included in this column represent the aggregate change in the present value of the accumulated benefit from June 30, 2019 to June 30, 2020 based on actuarial assumptions and therefore do not reflect the Company's liability as of June 30, 2020 under the plan or the plan's effect on the Company's earnings in the stated period.

(4) Includes time-based RSUs valued at $1,404,979, which were granted in fiscal 2019 factoring in previous performance.

(5) Certain 2020 figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.39322 SGD, the June 30, 2020 exchange rate as published by Oanda.com. Certain 2019 figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.3540 SGD, the June 27, 2019 exchange rate as published by Oanda.com. Certain 2018 figures were converted to United States dollars (USD) from Singapore dollars (SGD) at 1 USD to 1.3679 SGD, the June 28, 2018 exchange rate as published by Oanda.com.

(6) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2020 are as follows:

| Name | Matching 401(k), Nonqualified Deferred Compensation, and Central Provident Fund Contributions(*)($) | Car Benefit and Housing Reimbursement($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 8,166 | 3,300 | 9,113 | 110,475 | 131,054 |
| Alan Edrick | 54,845 | 3,135 | 14,357 | 4,112 | 76,449 |
| Ajay Mehra | 52,272 | 6,675 | 13,635 | 10,139 | 82,721 |
| Victor S. Sze | 48,523 | 2,292 | 10,892 | 10,158 | 71,865 |
| Mal Maginnis | 6,934(5) | 16,500 | 1,533(5) | — | 24,967(5) |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(7) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2019 are as follows:

| Name | Matching 401(k), Nonqualified Deferred Compensation, and Central Provident Fund Contributions(*)($) | Car Benefit and Housing Reimbursement($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 6,872 | 3,300 | 6,186 | 174,247 | 190,605 |
| Alan Edrick | 56,040 | 4,160 | 6,456 | 4,328 | 70,984 |
| Ajay Mehra | 53,558 | 6,675 | 11,858 | 11,555 | 83,646 |
| Victor S. Sze | 49,466 | 4,300 | 8,003 | 10,374 | 72,143 |
| Mal Maginnis | 9,793(5) | 106,959 | 1,578(5) | — | 118,330(5) |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

(8) Individual breakdowns of amounts set forth in "All Other Compensation" with respect to the fiscal year ended June 30, 2018 are as follows:

| Name | Matching 401(k), Nonqualified Deferred Compensation, and Central Provident Fund Contributions(*)($) | Car Benefit and Housing Reimbursement($) | Health Insurance and Medical Reimbursement Payments($) | Life and L-T Disability Insurance Payments($) | Total All Other Compensation($) |
|---|---|---|---|---|---|
| Deepak Chopra | 8,100 | 3,300 | 11,263 | 174,281 | 196,944 |
| Alan Edrick | 52,065 | 2,850 | 7,002 | 4,371 | 66,288 |
| Ajay Mehra | 50,154 | 6,675 | 12,577 | 11,599 | 81,005 |
| Victor S. Sze | 46,095 | 12,000 | 11,267 | 10,417 | 79,779 |
| Mal Maginnis | 7,413(5) | 92,730 | 1,095(5) | — | 101,238(5) |

(*) Company matching amounts for the 401(k) Plan and Deferred Compensation Plan are subject to vesting schedules as specified in the applicable plan documents.

**Grants of Plan-Based Awards Table**

The following table sets forth the plan-based awards made during the fiscal year ended June 30, 2020 to each of our Named Executive Officers(7):

| | | Estimated Future Payouts under Non-equity Incentive Plan Awards | | | Estimated Future Payouts under Equity Incentive Plan Awards(4) | | | All Other Stock Awards: Number of Shares of Stock or Units(#) | Grant Date Fair Value of Options and Awards (5)($) |
|---|---|---|---|---|---|---|---|---|---|
| **Name Position** | **Grant Date** | **Threshold ($)(6)** | **Target ($)** | **Maximum ($)** | **Threshold (#)(1)** | **Target (#)(2)** | **Maximum (#)(3)** | | |
| Deepak Chopra | 7/3/2019 | — | — | — | — | 41,419 | 115,973 | — | 4,833,183 |
| Chairman, President and Chief Executive Officer | — | — | $ 975,000 | $1,950,000 | — | — | — | — | — |
| Alan Edrick | 7/3/2019 | — | — | — | — | 13,567 | 37,988 | — | 1,583,133 |
| Executive Vice President and Chief Financial Officer | — | — | $ 475,000 | $ 712,500 | — | — | — | — | — |
| Ajay Mehra | 9/9/2019 | — | — | — | — | 4,414 | 12,359 | — | 474,939 |
| Executive Vice President of the Company and President, Cargo Scanning and Solutions | — | — | $3,000,000 | — | — | — | — | — | — |
| Victor S. Sze | 7/3/2019 | — | — | — | — | 11,649 | 32,617 | — | 1,359,322 |
| Executive Vice President, General Counsel and Secretary | — | — | $ 410,000 | $ 615,000 | — | — | — | — | — |
| Mal Maginnis President, Rapiscan Detection | 7/3/2019 | — | — | — | — | 3,020 | 8,456 | — | 352,404 |

(1) No amounts are shown in this column as our long-term performance program provides for the forfeiture of all shares under certain circumstances of significant underperformance, as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(2) Represents the baseline awards granted to the executives as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(3) Represents the maximum that each executive could receive if all performance metrics are achieved at the highest levels as more fully explained above in the section entitled "*Long-Term Incentive Program.*"

(4) Performance-based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(5) The grant date fair value of the RSUs was computed in accordance with generally accepted accounting principles and represents the total projected expense to the Company of grants made during the past fiscal year.

(6) No amounts are shown in this column as our annual incentive program provides for no award under certain circumstances.

(7) We have omitted from this table the columns titled "All Other Option Awards: Number of Securities Underlying Options", and "Exercise or Base Price of Option Awards" because no amounts would have been included in such columns.

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth the outstanding equity awards for each Named Executive Officer as of June 30, 2020(1):

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name and Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (2)(#) | Option Exercise Price (3)($) | Option Expiration Date(2) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested (4)($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(4) |
| Deepak Chopra | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Chairman, President and Chief Executive Officer | — | — | — | — | — | — | 145,145 | 10,833,623 |
| Alan Edrick | 40,000(6) | — | 27.12 | 8/10/2020 | — | — | — | — |
| Executive Vice President and Chief Financial | 60,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Officer | — | — | — | — | — | — | 54,288 | 4,052,056 |
| Ajay Mehra Executive Vice President of the Company and President, Cargo Scanning and Solutions | — | — | — | — | 15,669 | 1,169,534 | 16,960 | 1,265,894 |
| Victor S. Sze | 27,000(6) | — | 27.12 | 8/10/2020 | — | — | — | — |
| Executive Vice President, General Counsel and | 40,000 | — | 33.62 | 9/8/2021 | — | — | — | — |
| Secretary | — | — | — | — | — | — | 46,818 | 3,494,496 |
| Mal Maginnis President, Rapiscan Detection | — | — | — | — | — | — | 8,253 | 616,004 |

(1) We have omitted from this table the column titled "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" because no amounts would have been included in such column.

(2) Stock options vest over a period of three years from the date of grant and expire 10 years from the date of grant.

(3) The exercise price for stock options is determined using the closing price of our Common Stock on the date of grant.

(4) The market value of RSU awards that have not yet vested is based on the number of unvested RSUs on June 30, 2020 multiplied by the closing price of our Common Stock on June 30, 2020 ($74.64 per share).

(5) Performance based awards vest upon the attainment of certain one-, two- and three-year performance targets.

(6) These options were exercised in August 2020.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2663 of 2711

**Option Exercises and Stock Vested Table**

The following table sets forth information regarding the exercise of options by and the vesting of RSUs held by each of our Named Executive Officers during fiscal year ended June 30, 2020:

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name and Principal Position | Number of Shares Acquired on Exercise | Value Realized on Exercise(1)($) | Number of Shares Acquired on Vesting(2) | Value Realized on Vesting(3)($) |
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | — | — | 159,016 | 16,680,778 |
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 85,000 | 7,564,350 | 68,901 | 7,227,715 |
| Ajay Mehra<br>Executive Vice President of the Company and President,Cargo Scanning and Solutions | 30,000 | 1,873,110 | 34,545 | 3,622,721 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 55,000 | 4,950,550 | 59,633 | 6,255,502 |
| Mal Maginnis<br>President, Rapiscan Detection | — | — | 2,589 | 269,851 |

(1) Represents the difference between the fair market price of our Common Stock on the date of exercise and the exercise price, multiplied by the number of shares covered by the options.

(2) Includes shares acquired from the vesting of time-based RSU awards and vesting of performance-based RSU awards based upon performance in fiscal years 2018, 2019 and 2020.

(3) Represents the number of RSU awards that vested multiplied by the fair market price of our Common Stock on the date of vesting.

**Pay Ratio**

Pursuant to the Dodd Frank Act, the SEC adopted a rule requiring annual disclosure of the ratio of the median employee's annual total compensation to the annual total compensation of our Chief Executive Officer. The compensation for our Chief Executive Officer in fiscal year 2020 was approximately 325 times the median pay of our employees.

Median employee total annual compensation: $29,669 (figure converted to United States dollars (USD) from Malaysian ringgit at 1 USD to 4.28048 Malaysian ringgit, the June 30, 2020 exchange rate as published by Oanda.com)

CEO total annual compensation: $9,636,455

Ratio of CEO to median employee compensation: 325 to 1

With respect to the annual total compensation of our Chief Executive Officer, we used the amount reported in the "Total" column of the Summary Compensation Table above. We identified the median employee by reviewing the fiscal year 2020 annual base pay for all individuals, excluding our Chief Executive Officer, who were employed by us on June 30, 2020. We included all employees globally without regard to location, whether employed on a full-time, part-time, or seasonal basis. We did not make any assumptions, adjustments, or estimates with respect to compensation other than annualizing the compensation for any full-time employees that were not employed by us for all of fiscal 2020. Using this methodology, we determined that the median employee was a full-time salaried employee located in Malaysia. Approximately 60% of our employees are located in countries where the cost of living and wages are substantially lower than in the United States. Compensation rates are set to be market-competitive in the country in which the jobs are performed. Accordingly, the resulting CEO to median employee pay ratio is substantially higher than it would have been if the cost of living and wages in those countries were comparable to the United States.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2664 of 2711

This pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules based on our payroll and employment records and the methodology described above. The SEC rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their compensation practices. Therefore, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies may have different employment and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

**Pension Benefits**

We maintain the Defined Benefit Plan. The Defined Benefit Plan constitutes an unsecured promise by the Company to make payments to participants upon vesting. Mr. Chopra is currently the only participant in the Defined Benefit Plan.

Under the terms of his participation, Mr. Chopra will be entitled to a total benefit of $13 million payable over a multi-year period commencing January 1, 2024 with a final payment on April 1, 2030. The initial payment will be $5.25 million and the remaining payments will be in quarterly installments. Mr. Chopra is fully vested in all benefits under the Defined Benefit Plan. In the event of Mr. Chopra's death or disability, he or his dependents shall receive the present value of the remaining retirement benefits payable within 60 days following his death or disability, as applicable. In the event of Mr. Chopra's Separation from Service (as defined in the Defined Benefit Plan) within 24 months following a Change in Control (as defined in the Defined Benefit Plan), Mr. Chopra shall be entitled to (i) the net present value of $6 million of his retirement benefit payable in a single lump sum within 90 days following his Separation from Service and (ii) the net present value of $4 million of his retirement benefit payable in the form of a single lump sum 90 days following the first anniversary of his Separation from Service, each subject to Section 409A of the Internal Revenue Code. In the event a Change in Control occurs after his Separation from Service during the payout of Mr. Chopra's benefits, the present value of all remaining payments shall be paid in the form of a single lump sum within 90 days following the Change in Control. In the event of a Change in Control, whether before or after Mr. Chopra's Separation from Service, the net present value of all remaining payments with respect to $3 million of his retirement benefit shall be paid in the form of a single lump sum within 90 days following the Change in Control.

The following table sets forth information regarding the Defined Benefit Plan for the participating Named Executive Officer during fiscal year ended June 30, 2020(1). For a discussion of the valuation method and all material assumptions applied in quantifying the present value of the current accrued benefit, please see Note 14 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2020.

| Name and Principal Position | Number of Years of Credited Service(#) | Present Value of Accumulated Benefit($) | Payments During Last Fiscal Year($) |
|---|---|---|---|
| Deepak Chopra<br>Chairman, President and Chief Executive Officer | 13 | 10,137,544 | — |

(1) We have omitted from this table the column titled "Plan Name" because only the Defined Benefit Plan is covered by this table.

**Nonqualified Deferred Compensation**

We adopted the Deferred Compensation Plan in May 2008, as amended and restated in April 2014. Under the Deferred Compensation Plan, a select group of our management or highly compensated employees (as designated by the Compensation Committee), including certain of our Named Executive Officers, may defer a specified percentage of their salary, bonuses and commissions and thereby defer taxation of these deferred amounts until actual payment of the deferred amounts in future years. The Named Executive Officers may elect to defer up to 80% of their base salary and up to 100% of other types of eligible compensation. The Deferred Compensation Plan also allows us to make discretionary contributions and matching contributions on behalf of eligible participants.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2665 of 2711

Participating Named Executive Officers receive market-based returns on their deferred compensation amounts based on the performance of a variety of mutual fund-type investment vehicles chosen by them and which are similar to the investment vehicles made available to all employees participating in the Deferred Compensation Plan. Participants may at any time change their investment allocations among the investment vehicles made available under the Deferred Compensation Plan. The rates of return for the various investment vehicles for deferred amounts in the Deferred Compensation Plan in fiscal 2020 ranged from −19.24% to 23.28%.

Distributions to participants may be made in a lump sum (or in installments if elected in accordance with the terms of the Deferred Compensation Plan) upon termination of employment, disability, a specified withdrawal date or death.

The following table sets forth information regarding contributions into the Deferred Compensation Plan made by or for each of the participating Named Executive Officers during the fiscal year ended June 30, 2020:

| Name and Principal Position | Executive Contributions($) | Company Contributions(1)($) | Aggregate Earnings (1)(2)($) | Aggregate Withdrawals/ Distributions($) | Aggregate Balance($) |
|---|---|---|---|---|---|
| Alan Edrick<br>Executive Vice President and Chief Financial Officer | 545,030 | 46,687(3) | 92,371 | — | 3,932,939 |
| Ajay Mehra<br>Executive Vice President of the Company and President,Cargo Scanning and Solutions | 44,230 | 44,230(3) | 66,086 | 716,008 | 1,270,021 |
| Victor S. Sze<br>Executive Vice President, General Counsel and Secretary | 40,298 | 40,298(3) | 28,036 | 103,270 | 1,498,222 |

(1) The amounts reported in the Company Contributions column are reported as compensation in the Summary Compensation Table above. The amounts reported in the Aggregate Earnings column are not reported as compensation in the Summary Compensation Table above.

(2) Represents earnings during the fiscal year ended June 30, 2020.

(3) Represents matching contribution. No discretionary contributions were made.

**Employment Agreements**

We have entered into employment agreements with Messrs. Chopra, Edrick, Mehra, and Sze and an offer letter with Mr. Maginnis.

*Deepak Chopra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Chopra, which was effective as of January 1, 2012. Mr. Chopra's employment agreement was amended effective as of July 1, 2015 and December 31, 2017. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a three-year term that automatically renews on each anniversary of the effective date of the agreement for a new three year term. The employment agreement terminates on January 1 following the year in which Mr. Chopra turns 73 (the "Chopra Scheduled Retirement Date"). The agreement provides for an initial annual base salary of $1,000,000. Mr. Chopra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. Mr. Chopra is also entitled to receive the benefit award specified for him under the Defined Benefit Plan. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Chopra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Chopra's last date of employment with us. The agreement also contains a clawback provision whereby Mr. Chopra's incentive or performance based compensation shall be subject to reduction or repayment by

reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, we may terminate Mr. Chopra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Chopra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 12 months written notice, each as further detailed in the agreement. Mr. Chopra may also terminate his employment agreement at any time upon 12 months written notice to the Company or upon three months' notice if such termination is for "good reason" (as defined in the agreement).

In the event of the termination of Mr. Chopra's employment by the Company without cause, the Company's non-renewal of Mr. Chopra's employment agreement, or termination of such employment by Mr. Chopra for good reason, Mr. Chopra shall be entitled to a single lump-sum payment equal to three times the average of Mr. Chopra's highest two years out of the prior five years of total annual compensation, including: (i) base salary; (ii) bonuses and incentive compensation excluding "special bonus programs" (as defined in the agreement); (iii) the fair value of any stock, options or other equity grants whether vested or not and (iv) the annualized value of all benefits and perquisites. Mr. Chopra would also receive the acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Chopra's last date of employment and any special bonus programs) from us to Mr. Chopra and an extension of time to exercise such stock options such that Mr. Chopra's right to exercise such stock options shall continue until the first anniversary of the last day of his employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Chopra's employment by the Company without cause or by Mr. Chopra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Chopra shall be entitled to the same lump sum payment described in the previous paragraph, which shall be subject to mitigation as provided in applicable Treasury Regulations. Mr. Chopra may, at his option, and in lieu of receiving the forgoing, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by Mr. Chopra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3)); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

In the event of Mr. Chopra's continued employment until the Chopra Scheduled Retirement Date (including if Mr. Chopra becomes disabled or continues performing services for the Company in a different capacity prior to the Scheduled Retirement Date and such disability or other form of services continues through the Scheduled Retirement Date), he shall be entitled to $13,500,000 payable on or within 45 days of the Chopra Scheduled Retirement Date; provided that in the event of Mr. Chopra's death or disability, such amount shall be paid within 45 days of such event.

*Alan Edrick's and Victor Sze's Employment Agreements*

For purposes of this section, Messrs. Edrick and Sze are each individually referred to as the "Executive." In April 2012, we entered into our current employment agreement with each Executive, which were effective as of January 1, 2012. Each Executive's employment agreement was amended, effective as of July 1, 2015. Mr. Sze's employment agreement was further amended on April 29, 2019 to provide for certain additional death and disability benefits. Excluding those additional benefits, the terms of such agreements are substantially identical. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which the Executive turns 68. The agreements provide for an initial annual base salary of $402,000 for Mr. Edrick and $350,000 for Mr. Sze. The Executive is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude

the Executive during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, the Executive's last date of employment with us. Each Executive's agreement also contains a clawback provision whereby the Executive's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, the Company may terminate the Executive's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of the Executive's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. The Executive may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of the Executive's employment by the Company without cause, the Company's non-renewal of the Executive's employment agreement or the termination of such employment by the Executive for good reason, the Executive shall be entitled to: (i) an amount equal to 24 months' salary at the Executive's then-current base salary plus an amount equal to two times the average of the highest three annual bonuses (excluding any special bonus programs) paid by us to the Executive in the five years preceding such termination; (ii) continuation of the Executive's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) from us to Executive as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Executive's right to exercise such stock options shall continue until the first anniversary of the Executive's last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of the Executive's employment by the Company without cause or by the Executive for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then the Executive shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of the Executive's last date of employment and any special bonus programs) granted by us to Executive, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Executive for no less than 12 months after the date of such separation from service. Under such circumstances, the Executive may, at his option, and in lieu of receiving the forgoing amounts, elect to receive a lump sum payment in an amount equal to the product of 2.99 multiplied by the Executive's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Ajay Mehra's Employment Agreement*

In April 2012, we entered into our current employment agreement with Mr. Mehra, which was effective as of January 1, 2012. Mr. Mehra's employment agreement was amended, effective as of May 1, 2015. Mr. Mehra's employment agreement was amended again on April 29, 2019 to provide for certain additional death and disability benefits. Unless the agreement is terminated earlier in accordance with its terms, the agreement has a one year term that shall automatically be extended for successive one year periods, unless either party delivers notice of non-renewal to the other party at least 30 days prior to the end of the initial term or any renewal period then in effect. The employment agreement terminates on January 1 following the year in which Mr. Mehra turns 68. The agreement provides for an initial annual base salary of $352,000. Mr. Mehra is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2668 of 2711

and to participate in incentive compensation and other employee benefit plans established by us. The agreement contains certain restrictive covenants and other prohibitions that protect our proprietary and confidential information following termination and preclude Mr. Mehra during the term of the agreement and for 18 months thereafter from soliciting for hire any individual that was an executive, supervisor or manager of the Company on, or within 90 days prior to, Mr. Mehra's last date of employment with us. Mr. Mehra's agreement also contains a clawback provision whereby Mr. Mehra's incentive or performance based compensation shall be subject to reduction or repayment by reason of a correction or restatement of our financial information if and to the extent such reduction or repayment is required by any applicable law.

Under the terms of the agreement, the Company may terminate Mr. Mehra's employment at any time for "cause" (as defined in the agreement), or for the following additional reasons: (i) in the event of Mr. Mehra's death; (ii) because of physical or mental incapacity or disability, failure to perform the essential functions of his position for an aggregate period of 180 days within any 12 month period; or (iii) without cause on 30 days written notice, each as further detailed in the agreement. Mr. Mehra may also terminate his employment agreement for "good reason" (as defined in the agreement) or at any time on 30 days written notice.

In the event of the termination of Mr. Mehra's employment by the Company without cause, the Company's non-renewal of Mr. Mehra's employment agreement or the termination of such employment by Mr. Mehra for good reason, he shall be entitled to: (i) an amount equal to two times his total cash compensation (defined as base salary and annual discretionary bonus earned during the 12 calendar months immediately preceding a termination), (ii) continuation of Mr. Mehra's car usage or allowance payments for a period of six months after separation from service; (iii) an allowance of $6,000 for outplacement services; and (iv) acceleration of vesting of all stock options, equity grants and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) from us to Mr. Mehra as follows: (a) grants vesting over time shall be fully vested on separation from service, (b) grants vesting based on performance shall be accelerated and fully vested on separation from service without regard to whether the performance targets are met for such performance period, and (c) the time to exercise nonqualified stock options shall be extended such that Mr. Mehra's right to exercise such stock options shall continue until the first anniversary of his last date of employment, but in no event later than the expiration date of the options.

In the event of the termination of Mr. Mehra's employment by the Company without cause or by Mr. Mehra for good reason, within 90 days prior to or 12 months after a "change in control" (as defined in the agreement), then Mr. Mehra shall be entitled to (i) the severance payment described in the applicable paragraph above and (ii) equity, stock options and other incentive compensation awards (excluding any cash bonus attributable to performance in fiscal years that are not complete as of Mr. Mehra's last date of employment and any special bonus programs) granted by us to Mr. Mehra, whether time vested or performance vested, shall, to the extent unvested, immediately vest, and such stock options shall remain exercisable by Mr. Mehra for no less than 12 months after the date of such separation from service (the "Change in Control Payment"). Under such circumstances, Mr. Mehra shall receive the lesser of (i) the Change in Control Payment or (ii) an amount equal to the product of 2.99 multiplied by Mr. Mehra's "base amount" (as defined in Internal Revenue Code Section 280G(b)(3) excluding payments under any special bonus programs); provided that the amount of this alternative payment shall be reduced by the value of acceleration of any equity, stock options, incentive compensation or deferred compensation accelerated by reason of termination to the extent required to be included in the "base amount" pursuant to Internal Revenue Code Section 280G.

*Mal Maginnis's Offer Letter*

On July 3, 2017, we entered into an offer letter with Mr. Maginnis. The letter provides for an initial annual base salary of SGD 470,184. Mr. Maginnis is also eligible to receive bonus payments from the bonus pool established by us for our officers and employees and to participate in incentive compensation and other employee benefit plans established by us.

In the event of the termination of Mr. Maginnis's employment other than for "cause" (as defined in the offer letter) or Mr. Maginnis's voluntary resignation, Mr. Maginnis is entitled to: (i) an amount equal to six months of base salary, (ii) an amount equal to 50% of Mr. Maginnis's prior year bonus award, and

(iii) acceleration of vesting of Mr. Maginnis's initial performance-based RSU award on a pro rata basis based on the number of months worked to the extent that our Security division has met its financial targets for the preceding year.

**Potential Payment upon Termination of Employment or Change in Control**

The following tables reflect the breakdown of potential payments and benefits upon termination or a change in control required under the Named Executive Officers' current employment agreements or offer letter, as applicable. The tables therefore assume that the terms of the employment agreement or offer letter to which each Named Executive Officer is currently subject had been in effect on June 30, 2020, and that employment terminated on such date. The tables also assume that the price of our Common Stock, on which certain calculations in the following tables are made, was the closing price of our Common Stock on June 30, 2020, the last business day of the fiscal year ($74.64).

Please also note that regardless of the manner in which a Named Executive Officer's employment terminates, the officer is entitled to receive amounts earned during the term of employment. These amounts, which are not included in the following tables, include: (i) regular salary accrued as of the final date of employment; (ii) bonuses accrued as of the final date of employment; (iii) vacation and paid time off accrued as of the final date of employment; (iv) business expense reimbursements not yet paid as of the final date of employment; and (v) amounts contributed under our qualified and nonqualified deferred compensation plans.

All disclosed amounts in the following tables are estimates only and do not necessarily reflect the actual amounts that would be paid to the Named Executive Officers, which amounts would only be known at the time that they become eligible for such payments.

Subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under Mr. Chopra's current employment agreement.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Equity Grants($) | Accelerated Vesting of Stock Awards($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|
| Deepak Chopra(1) Chairman, President and Chief Executive Officer | Good Reason or Without Cause | 3,000,000 | 5,850,000 | 13,772,593 | 10,270,315 | 654,969 | 33,547,877 |
| | Good Reason or Without Cause in Connection with a Change in Control(2) | 3,000,000 | 5,850,000 | 13,772,593 | 21,682,547 | 654,969 | 44,960,109 |

(1) In addition to the amounts indicated in this table, Mr. Chopra would also become entitled to certain payments under the Defined Benefit Plan in accordance with the terms of such plan. Additional information about this plan is summarized above under the heading "Pension Benefits."

(2) Under the terms of his employment agreement, in lieu of the total compensation to which Mr. Chopra would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Chopra may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

Also subject to the foregoing, the following table reflects the breakdown of potential payments and benefits upon termination or a change in control required under the respective current employment agreements or offer letter, as applicable, of Messrs. Edrick, Mehra, Sze and Maginnis.

| Name and Principal Position | Reason for Termination | Salary($) | Bonus($) | Accelerated Vesting of Stock Awards($) | Car Allowance | Outplacement Services | Total($) |
|---|---|---|---|---|---|---|---|
| Alan Edrick | Good Reason or Without Cause | 928,442 | 1,628,667 | 4,122,666 | 6,000 | 6,000 | 6,691,775 |
| Executive Vice President and Chief Financial Officer | Good Reason or Without Cause in Connection with a Change in Control(1) | 928,442 | 1,628,667 | 8,478,283 | 6,000 | 6,000 | 11,047,392 |
| Ajay Mehra | Good Reason or Without Cause | 879,576 | 4,244,533(2) | 2,431,995 | 6,000 | 6,000 | 7,568,104 |
| Executive Vice President of the Company and President, Cargo Scanning and Solutions | Good Reason or Without Cause in Connection with a Change in Control | 879,576 | 4,244,533(2) | 3,784,845 | 6,000 | 6,000 | 8,920,954(3) |
| Victor S. Sze | Good Reason or Without Cause | 801,392 | 1,405,833 | 3,561,672 | 6,000 | 6,000 | 5,780,897 |
| Executive Vice President, General Counsel and Secretary | Good Reason or Without Cause in Connection with a Change in Control(1) | 801,392 | 1,405,833 | 7,319,572 | 6,000 | 6,000 | 9,538,797 |
| Mal Maginnis | Without Cause | 182,310 | 42,500 | 539,597 | — | — | 764,407 |
| President of Rapiscan Detection | Without Cause in Connection with a Change in Control | 182,310 | 42,500 | 719,082 | — | — | 943,892 |

(1) Under the terms of their employment agreements, in lieu of the total compensation to which the Named Executive Officer would be entitled in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, the Named Executive Officer may instead elect to receive an alternate payment amount based on a calculation method described in his employment agreement.

(2) Includes cash and time-based RSUs granted under the Cargo Incentive Program.

(3) Under the terms of Mr. Mehra's employment agreement, in the event that he terminates his employment for good reason or the Company terminates his employment without cause following a change in control, Mr. Mehra would receive the lesser of this amount and the amount of an alternate payment based on a calculation method described in his employment agreement.

**Director Compensation**

Mr. Chopra receives no compensation for his service as director of the Company.

During the fiscal year ended June 30, 2020, each non-employee director that served as a director for the full fiscal year received $60,000 and an RSU grant valued at $150,000, and the Lead Independent Director received an additional retainer of $20,000 and an additional RSU grant valued at $30,000. Each member of the Audit Committee received $3,000 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee received $30,000 and an RSU grant valued at $35,000. Each member of the Compensation Committee received $3,000 for each Compensation Committee meeting attended. In addition, the Chairman of the Compensation Committee received $30,000 and an RSU grant valued at $35,000. Each member of the Nominating and Governance Committee received $3,000 for each Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee received $15,000 and an RSU grant valued at $25,000. Each member of the Technology Committee received $5,000 for each Technology Committee meeting attended. In addition, the Chairman of the Technology Committee received $15,000 and an RSU grant valued at $30,000. Each member of the Risk Management Committee received $15,000 and an RSU grant valued at $25,000. All RSU awards granted to members of the Board and its committees vest annually over a period of four years from the date of grant. The directors also are reimbursed for expenses incurred in connection with the performance of their services as directors.

For the fiscal year ending June 30, 2021, each non-employee director that serves as a director for the full fiscal year will receive $48,000 and an RSU grant valued at $150,000, and the Lead Independent Director will receive an additional retainer of $28,000 and an additional RSU grant valued at $30,000. Each non-employee director will receive $4,000 for each Board meeting attended. Each member of the Audit Committee will receive $2,400 for each Audit Committee meeting attended. In addition, the Chairman of the Audit Committee will receive $26,000 and an RSU grant valued at $35,000. Each member of the Compensation Committee will receive $2,400 for each Compensation Committee meeting attended and an RSU grant valued at $10,000. In addition, the Chairman of the Compensation Committee will receive $26,000 and an RSU grant valued at $25,000. Each member of the Nominating and Governance Committee will receive $3,000 for each

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2671 of 2711

Nominating and Governance Committee meeting attended. In addition, the Chairman of the Nominating and Governance Committee will receive $10,000. Each member of the Technology Committee will receive $2,500 for each Technology Committee meeting attended and an RSU grant valued at $15,000. In addition, the Co-Chairmen of the Technology Committee will receive $15,000 and an RSU grant valued at $20,000. Each member of the Risk Management Committee will receive $2,500 for each Risk Management Committee meeting attended and an RSU grant valued at $25,000. In addition, the Chairman of the Risk Management Committee will receive $12,000.

The following table provides compensation information for the fiscal year ended June 30, 2020 for each non-employee member of our Board(1):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards (2)($) | Option Awards (2)($) | Total ($) |
|---|---|---|---|---|
| Steven C. Good | 138,000 | 211,442 | — | 349,442 |
| Meyer Luskin | 144,000 | 211,442 | — | 355,442 |
| William F. Ballhaus | 162,000 | 226,495 | — | 388,495 |
| James B. Hawkins | 130,000 | 196,389 | — | 326,389 |
| Gerald Chizever | 110,000 | 191,226 | — | 301,226 |
| Kelli Bernard | 41,000 | 87,530 | — | 128,530 |

(1) We have omitted from this table the columns titled "Non-Equity Incentive Plan Compensation," "Change in Pension Value and Nonqualified Deferred Compensation Earnings" and "All Other Compensation" because no amounts would have been included in such columns.

(2) Amounts are calculated utilizing the accounting guidance related to stock-based compensation under accounting principles generally accepted in the United States. See Note 9 to the Consolidated Financial Statements included in our Form 10-K for the year ended June 30, 2020 for a discussion of the assumptions used in valuation of stock awards. For the fiscal year ended June 30, 2020, 1,812 RSUs were granted to Mr. Good; 1,812 RSUs were granted to Mr. Luskin; 1,941 RSUs were granted to Dr. Ballhaus; 1,683 RSUs were granted to Mr. Hawkins; and 1,510 RSUs were granted to Mr. Chizever, all with a fair value of $116.69. In addition, 149 RSUs were granted to Mr. Chizever with a fair value of $100.83, and 876 RSUs were granted to Ms. Bernard with a fair value of $99.92. As of June 30, 2020, Mr. Good had 6,687 unvested stock awards outstanding; Mr. Luskin had 6,789 unvested stock awards outstanding; Dr. Ballhaus had 6,179 unvested stock awards outstanding; Mr. Hawkins had 5,076 unvested stock awards outstanding; Mr. Chizever had 4,890 unvested stock awards outstanding; and Ms. Bernard had 876 unvested stock awards outstanding.

*Director Share Ownership Requirements*

We believe that our directors should hold a significant amount of Company equity to link their long-term economic interests directly to those of our stockholders. Accordingly, we have established requirements that our directors own at minimum equity of the Company valued at five times their annual retainers. We believe that this multiple constitutes significant amounts for our directors and provides a substantial link between the interests of our directors and those of our stockholders. During such time that a director has not attained the share ownership guideline, such director is required to retain at least 50% of the shares acquired upon exercise of options or vesting of restricted stock or unit awards, net of amounts required to pay taxes and exercise price. We periodically review our minimum equity ownership guidelines. As of June 30, 2020, each of our directors met or exceeded our minimum equity ownership guidelines with the exception of Kelli Bernard who was appointed to our Board in December 2019.

**Certain Relationships and Related Transactions**

In 1994, we, together with Electronics Corporation of India Limited ("ECIL"), an unaffiliated Indian company, formed ECIL-Rapiscan Security Products Limited, a joint venture under the laws of India ("ECIL Rapiscan"). We own a 36% interest in the joint venture, Mr. Chopra owns a 10.5% interest and Mr. Mehra owns a 4.5% interest. The remaining interest in the joint venture is owned by ECIL. We sell security and

inspection kits to ECIL at a price no less favorable to us than the price we charge unaffiliated third parties for such products. To date, our portion of the earnings of ECIL Rapiscan has been immaterial to our financial results and results of operations.

Mohinder Chopra, who is the brother of Deepak Chopra, our Chief Executive Officer, is our Senior Vice President/General Manager India. His total compensation for fiscal year 2020 was valued at approximately $348,000.

Gerald Chizever, a member of our Board, is a partner at Loeb & Loeb LLP. Loeb & Loeb advises the Company in various matters from time to time. The fees paid by the Company to Loeb & Loeb in each of the past three fiscal years were significantly below the applicable threshold outlined in The NASDAQ Stock Market guidelines for determining director independence. For fiscal year 2020, the Company paid $667,324 in fees to Loeb & Loeb. Our Board carefully reviewed the nature of our engagement of Loeb & Loeb and the services rendered, including nominal fees relative to Loeb & Loeb's annual revenues, the expertise and relevant experience of the firm, the firm's and specific partners' knowledge of our Company and our business and past legal engagements, and the fees paid in such engagements, and determined that Mr. Chizever is independent under the standards of The NASDAQ Stock Market.

The Audit Committee of the Board reviews proposed transactions in which the Company and any person who is a member of the Board, a nominee to become a member of the Board, an executive officer of the Company, a holder of more than five percent of our voting securities, or any immediate family member of any of the foregoing would have a direct or indirect material interest in the transaction and the amount involved, when added together with the amounts of all other transactions with that related person for that fiscal year, exceeds $75,000. The review involves an evaluation, without participation by any member of the Audit Committee with a direct or indirect material interest in the transaction, of whether the transaction would be on terms at least as favorable to us as those that could have been obtained from unaffiliated third parties. This policy is supported by the Charter of the Audit Committee of the Board.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed with management the Compensation Discussion and Analysis provisions to be included in this Proxy Statement. Based on the reviews and discussions referred to above, the Compensation Committee recommends to the Board that the Compensation Discussion and Analysis referred to above be included in this Proxy Statement.

COMPENSATION COMMITTEE

Meyer Luskin
William F. Ballhaus
James Hawkins

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2673 of 2711

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the amount of shares of the Company beneficially owned as of October 15, 2020, unless otherwise indicated, by each person known by us to own beneficially more than 5% of the outstanding shares of our outstanding Common Stock. As of October 15, 2020, 17,919,229 shares of our Common Stock were issued and outstanding.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership of Common Stock(1) | Percent of Class of Common Stock |
|---|---|---|
| BlackRock, Inc.(2) | 3,023,339 | 16.9% |
| The Vanguard Group, Inc.(3) | 1,915,153 | 10.7% |
| Janus Henderson Group Plc(4) | 1,834,466 | 10.2% |
| Dimensional Fund Advisors LP(5) | 1,020,878 | 5.7% |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 15, 2020, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them.

(2) Represents the number of shares of Common Stock beneficially owned as of December 31, 2019, as reported on Schedule 13G/A filed on February 10, 2020 with the SEC by BlackRock, Inc. Such report indicates sole voting power over 2,915,321 shares and sole dispositive power over 3,023,339 shares. The address of BlackRock, Inc. is 55 East 52nd St., New York, NY 10055.

(3) Represents the number of shares of Common Stock beneficially owned as of December 31, 2019, as reported on Schedule 13G/A filed on February 12, 2020 with the SEC. Such report indicates sole voting power over 35,825 shares, shared voting power over 2,660 shares, sole dispositive power over 1,879,146 shares, and shared dispositive power over 36,007 shares. The address of The Vanguard Group, Inc. is PO Box 2600 V26, Valley Forge, PA 19482.

(4) Represents the number of shares of Common Stock beneficially owned as of March 31, 2020, as reported on Schedule 13G/A filed on April 9, 2020 with the SEC. Such report indicates shared voting power and shared dispositive power over 1,834,466 shares. The address of Janus Henderson Group Plc is 201 Bishopsgate, London X0 EC2M 3AE.

(5) Represents the number of shares of Common Stock beneficially owned as of December 31, 2019, as reported on Schedule 13G/A filed on February 12, 2020 with the SEC. Such report indicates sole voting power over 972,663 shares and sole dispositive power over 1,020,878 shares. The address of Dimensional Fund Advisors LP is 6300 Bee Cave Road, Building One, Austin, TX 78746.

The following table sets forth the amount of shares of the Company beneficially owned as of October 15, 2020, unless otherwise indicated, by each of our directors and director nominees, each Named Executive Officer, and all directors, director nominees, and executive officers as a group:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership of Common Stock(2) | Percent of Class of Common Stock |
|---|---|---|
| Deepak Chopra(3) | 466,010 | 2.6% |
| Alan Edrick(4) | 301,309 | 1.7% |
| Ajay Mehra(5) | 47,788 | * |
| Victor S. Sze(6) | 225,226 | 1.3% |
| Mal Maginnis(7) | 6,392 | * |
| Meyer Luskin(8) | 20,193 | * |
| Steven C. Good(9) | 12,104 | * |
| William F. Ballhaus(10) | 22,248 | * |
| James B. Hawkins(11) | 6,722 | * |
| Gerald Chizever(12) | 9,449 | * |
| Kelli Bernard(13) | — | — |
| All directors and executive officers as a group (15 persons) | 1,188,332 | 6.6% |

* Represents less than 1.0% of the outstanding shares of our Common Stock.

(1) The address of each stockholder is c/o OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

(2) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of Common Stock which are purchasable under options which are currently exercisable, or which will become exercisable no later than 60 days after October 15, 2020, are deemed outstanding for computing the percentage of the person holding such options but are not deemed outstanding for computing the percentage of any other person. Except as indicated by footnote and subject to community property laws where applicable, the persons named in the table have sole voting and investment power with respect to all shares of Common Stock shown as beneficially owned by them. No shares are pledged as security.

(3) Mr. Chopra is our Chairman of the Board of Directors, Chief Executive Officer and President. Includes 25,000 shares owned by The Deepika Chopra Trust UDT, dated July 17, 1987. Deepak Chopra is the co-trustee of this irrevocable trust. In addition, includes 371,010 shares held jointly by Mr. Chopra and his wife, Nandini Chopra, and 10,000 shares held in the Nandini SLAT Trust. Includes 60,000 shares issuable pursuant to options which were granted on September 9, 2011.

(4) Mr. Edrick is our Executive Vice President and Chief Financial Officer. Includes 60,000 shares issuable pursuant to options which were granted on September 9, 2011.

(5) Mr. Mehra is our Executive Vice President and President, Cargo Scanning and Solutions. Includes 22,065 shares owned by the Mehra Family Trust dated July 12, 2008.

(6) Mr. Sze is our Executive Vice President, General Counsel and Secretary. Includes 30,136 shares held by the Victor So-Mein Sze & Angela Hsin-Chi Hsu Co-ttee Sze Trust U/T/A DTD 11/25/2014. Includes 40,000 shares issuable pursuant to options which were granted on September 9, 2011.

(7) Mr. Maginnis is the President of our Rapiscan Detection business.

(8) Mr. Luskin is a Director. Includes 20,193 shares held by The Meyer and Doreen Luskin Family Trust.

(9) Mr. Good is a Director. Includes 2,000 shares held in the Steve Good IRA account.

(10) Dr. Ballhaus is a Director. Includes 22,248 shares held in the Ballhaus Trust U/A 01/25/02 Dr. William Ballhaus Jr. and Jane K. Ballhaus Trustees.

(11) Mr. Hawkins is a Director.

(12) Mr. Chizever is a Director. Includes 9,449 shares held by The G & C Chizever Family Trust.

(13) Ms. Bernard is a Director.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the executive officers and directors and persons who beneficially own more than 10% of a class of securities registered under Section 12(b) the Exchange Act to file initial reports of ownership and reports of changes in ownership with the SEC. Such officers, directors and stockholders are required by SEC regulations to furnish us with copies of all such reports that they file. None of our directors or executive officers owns more than 10% of our securities. Based solely upon our review of such forms furnished to us during the fiscal year ended June 30, 2020, and written representations from certain reporting persons, we believe that our executive officers and directors have complied with the requirements imposed on them by Section 16(a) of the Exchange Act, with the exception of one untimely Form 4 filing by Mr. Chizever.

## EQUITY COMPENSATION PLAN INFORMATION

The following table provides information concerning the our equity compensation plans as of June 30, 2020.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders(1) | 326,304 | $44.41 | 1,038,962(2)(3)(4) |
| Equity compensation plans not approved by security holders | — | N/A | — |
| Total | 326,304 | $44.41 | 1,038,962 |

(1) Includes shares of our Common Stock issuable upon exercise of options under the 2006 Equity Participation Plan and 2012 Incentive Award Plan.

(2) These shares are available for future issuance under our Amended and Restated 2012 Incentive Award Plan, which was approved by our shareholders on December 11, 2017.

(3) Awards of RSUs or other awards that convey the full value of the shares subject to the award are counted as 1.87 shares for every one award granted.

(4) Shares subject to awards outstanding under the 2006 Equity Participation Plan that terminate, expire or lapse for any reason also become available for future issuance under our Amended and Restated 2012 Incentive Award Plan.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**Audit Fees**

The following table represents fees charged for professional audit services rendered by Moss Adams for the audit of our annual financial statements for the years ended June 30, 2019 and 2020 and fees billed by Moss Adams for other services during those years (in thousands):

| | FY 2019 | FY 2020 |
|---|---|---|
| Audit Fees | $1,815 | $1,767 |
| Audit-Related Fees | 17 | 17 |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total | $1,832 | $1,784 |

"Audit Fees" consist of fees billed for professional services rendered for the integrated audit of our consolidated financial statements and the review of our interim consolidated financial statements included in

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2676 of 2711

quarterly reports and services that are normally provided by Moss Adams in connection with statutory and regulatory filings or engagements.

The term "Audit-Related Fees" means fees billed for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements other than audit fees. This includes professional services for the audit of the financial statements of our 401(k) plan.

The term "Tax Fees" means fees billed for professional services rendered for tax advice, planning and compliance (domestic and international).

The term "All Other Fees" means fees billed for products and services other than for the services described above.

**Audit Committee's Pre-Approval Policy**

The Audit Committee pre-approves all audit, audit-related and tax services (other than prohibited non-audit services) to be provided by the independent public accountants. The Audit Committee has delegated to its Chairman the authority to pre-approve all other services to be provided by the independent public accountants, up to an aggregate of $50,000 each fiscal year. The Chairman reports each such pre-approval decision to the full Audit Committee at its next scheduled meeting.

**Independence**

The Audit Committee has considered whether Moss Adams' provision of services other than its audit of the Company's annual financial statement and its review of the Company's quarterly financial statements is compatible with maintaining such independent public accountant's independence and has determined that it is compatible.

**REPORT OF AUDIT COMMITTEE**

During the fiscal year ended June 30, 2020, the Audit Committee was composed of four non-employee directors, namely, Steven C. Good, Meyer Luskin, William F. Ballhaus, and James B. Hawkins. Currently, the Audit Committee is composed of three non-employee directors, namely, Steven C. Good, Meyer Luskin, and William F. Ballhaus. All members of the Audit Committee meet the independence and experience requirements of the SEC and Listing Standards. Our Board has determined that Mr. Good qualifies as an "Audit Committee Financial Expert" as this term has been defined under the rules and regulations of the SEC. To date, no determination has been made as to whether the other members of the Audit Committee qualify as Audit Committee Financial Experts. The Audit Committee met four times during the fiscal year ended June 30, 2020.

At each of its meetings, the Audit Committee met with the senior members of our financial management team and the independent public accountants. The Audit Committee's agenda is established by the Audit Committee's Chairman and our Chief Financial Officer. During the year, the Audit Committee had private sessions with our independent public accountants at which open discussions of financial management, accounting and internal control issues took place.

The Audit Committee recommended to the Board the engagement of Moss Adams as our independent public accountants. The Audit Committee reviewed with our financial managers and the independent public accountants overall audit scopes and plans, the results of internal and external audit examinations, evaluations by the auditors of our internal control, and the quality of our financial reporting.

The Audit Committee has reviewed with management the audited financial statements in the Annual Report, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements. In addressing the quality of management's accounting judgments, members of the Audit Committee asked for management's representations that our audited consolidated financial statements have been prepared in conformity with generally accepted accounting principles and have expressed to both management and the independent public accountants their general preference for conservative policies when a range of accounting options is available.

The Audit Committee believes that by thus focusing its discussions with the independent public accountants, it can promote a meaningful dialogue that provides a basis for its oversight judgments.

The Audit Committee also discussed with the independent public accountants all other matters required to be discussed by the independent public accountants with the Audit Committee under AS 1301 (Communications with Audit Committees, formerly Auditing Standard No. 16), as amended and as adopted by the PCAOB in Rule 3200. The Audit Committee received and discussed with the independent public accountants their annual written communication on their independence from our Company and our management, which is made under PCAOB Ethics and Independence Rule 3526 (Communicating with Audit Committee Concerning Independence), and considered with the independent public accountants whether the provision of services provided by them to our Company during the fiscal year ended June 30, 2020 was compatible with the independent public accountants' independence.

Finally, the Audit Committee reviewed and discussed with management and the independent public accountants the evaluation of our internal control and the audit of management's report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes Oxley Act of 2002.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. The Audit Committee reviews our SEC reports prior to filing and all quarterly earnings announcements in advance of their issuance with management and representatives of the independent public accountants. In its oversight role, the Audit Committee relies on the work and assurances of our management, which has the primary responsibility for financial statements and reports, including evaluating the effectiveness of disclosure controls and procedures, and evaluating the effectiveness of internal control over financial reporting, and of the independent public accountants, who, in their report, express an opinion on the conformity of our annual financial statements with accounting principles generally accepted in the United States of America, as well as expressing an opinion on (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2678 of 2711

In reliance on these reviews and discussions, and the report of the independent public accountants, the Audit Committee recommended to the Board, and the Board approved, that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended June 30, 2020, for filing with the SEC.

AUDIT COMMITTEE

Steven C. Good
Meyer Luskin
William F. Ballhaus

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2679 of 2711

## CODE OF ETHICS AND CONDUCT

We have adopted a Code of Ethics and Conduct, which applies to all of our directors, officers (including our principal executive officer, principal financial officer, and principal accounting officer), and employees. A copy of the Code of Ethics and Conduct is attached as an exhibit to our Current Report on Form 8-K filed with the SEC on May 23, 2016. A copy of the Code of Ethics and Conduct may also be obtained, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. We intend to disclose any changes in or waivers from this Code of Ethics and Conduct on the same website or by filing with the SEC a Current Report on Form 8-K, in each case if such disclosure is required by the rules of the SEC or Nasdaq.

## ANNUAL MEETING ATTENDANCE

We have adopted a formal policy with regard to directors' attendance at annual meetings of stockholders. All members of our Board are strongly encouraged to prepare for, attend and participate in all annual meetings of stockholders. All of our directors attended last year's annual meeting of stockholders in person.

## STOCKHOLDER COMMUNICATIONS

Stockholders interested in communicating directly with the Board, or specified individual directors, may do so by writing our Secretary at the following address: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250. Our Secretary will review all such correspondence and will regularly forward to the Board copies of all such correspondence that, in the opinion of our Secretary, deals with the functions of the Board or committees thereof or that he otherwise determines requires their attention. Directors may at any time review a log of all correspondence received that is addressed to members of the Board and request copies of such correspondence. Concerns relating to accounting, internal control or auditing matters will immediately be brought to the attention of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## AVAILABILITY OF ANNUAL REPORT ON FORM 10-K

A copy of our Annual Report on Form 10-K as filed with the SEC is available, without charge, under the Investor Relations section of our website – *http://www.osi-systems.com* – or by written request addressed to: c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250 or by calling telephone number (310) 978-0516.

In certain cases only one Annual Report and Proxy Statement or Notice of Internet Availability of Proxy Materials may be delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders at that address. We undertake to deliver promptly upon written or oral request a separate copy of the Annual Report, Proxy Statement and/or Notice of Internet Availability of Proxy Materials, as applicable, to a stockholder at a shared address to which a single copy of such documents was delivered. Such request should also be directed to our Secretary at the address or telephone number indicated in the previous paragraph. In addition, stockholders sharing an address can request delivery of a single copy of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials if they are receiving multiple copies of Annual Reports, Proxy Statements or Notices of Internet Availability of Proxy Materials by directing such request to the same mailing address.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2680 of 2711

**STOCKHOLDER PROPOSALS**

In the event that a stockholder desires to have a proposal included in our proxy statement and form of proxy used in connection with our next annual meeting of stockholders, the proposal must be delivered in writing to our Secretary and comply with the requirements of Rule 14a-8 promulgated under the Exchange Act. Under such rule, the deadline for delivering any such proposal to us would be June 23, 2021, which is 120 days prior to the one-year anniversary of the date of this Proxy Statement.

Our Bylaws provide that if a stockholder, rather than including a proposal in our proxy statement as discussed above, commences his or her own proxy solicitation for the next annual meeting of stockholders or seeks to nominate a candidate for election or propose business for consideration at such meeting, the stockholder must deliver a notice of such proposal to us no more than 120 days and no less than 90 days prior to December 10, 2021, provided, however, that if the date of the next annual meeting of stockholders is more than 30 days before or more than 60 days after December 10, 2021, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the 90th day prior to the date of such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made. The notice must comply with the requirements set forth in our Bylaws and should be directed to the Company c/o Secretary, OSI Systems, Inc., 12525 Chadron Avenue, Hawthorne, CA 90250.

**INCORPORATION BY REFERENCE**

Notwithstanding anything to the contrary set forth in any of the previous filings made by us under the Securities Act of 1933, as amended, or the Exchange Act, which might incorporate future filings made by us under those statutes, the Compensation Committee Report and the Report of Audit Committee will not be incorporated by reference into any of those prior filings, nor will any such report be incorporated by reference into any future filings made by us under those statutes, except to the extent we specifically incorporate such report by reference therein. In addition, information on our website, other than this Proxy Statement and the enclosed Proxy, is not part of the proxy soliciting material and is not incorporated herein by reference.

**OTHER BUSINESS**

We do not know of any other business to be presented at the Annual Meeting and do not intend to bring any other matters before such meeting. If any other matters properly do come before the Annual Meeting, however, the persons named in the accompanying Proxy are empowered, in the absence of contrary instructions, to vote according to their best judgment.

By Order of the Board of Directors,

Victor S. Sze
*Secretary*

Hawthorne, California
October 21, 2020

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2681 of 2711

**Appendix A**

**AMENDED AND RESTATED**

**OSI SYSTEMS, INC. 2012 INCENTIVE AWARD PLAN**

**ARTICLE 1.**

**PURPOSE**

The purpose of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "Plan") is to promote the success and enhance the value of OSI Systems, Inc. (the "Company") by linking the individual interests of the members of the Board, Employees and Consultants to those of the Company's stockholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to the Company's stockholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract and retain the services of members of the Board, Employees and Consultants upon whose judgment, interest and special effort the successful conduct of the Company's operation is largely dependent. The Plan amends and restates in its entirety the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan (the "Prior Plan"), which was adopted by the Board on October 13, 2017 and approved by the Company's stockholders as of December 11, 2017.

**ARTICLE 2.**

**DEFINITIONS AND CONSTRUCTION**

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1. "162(m) Award" shall mean any Award made under the Plan prior to November 2, 2017 that is intended to continue to qualify as "performance-based compensation" within the meaning of Section 162(m)(4)(C) of the Code prior to its repeal pursuant to the transition relief rules in the TCJA.

2.2. "Administrator" shall mean the governing body that conducts the general administration of the Plan as provided in Article 11 hereof. With reference to the duties of the Committee under the Plan which have been delegated to one or more persons pursuant to Section 11.6 hereof, or which the Board has assumed, the term "Administrator" shall refer to such person(s) unless the Committee or the Board has revoked such delegation or the Board has terminated the assumption of such duties.

2.3. "Affiliate" shall mean any Parent or Subsidiary.

2.4. "Applicable Accounting Standards" shall mean Generally Accepted Accounting Principles in the United States, International Financial Reporting Standards or such other accounting principles or standards as may apply to the Company's financial statements under United States federal securities laws from time to time.

2.5. "Award" shall mean an Option, a Restricted Stock Award, a Restricted Stock Unit Award, a Performance Award, a Dividend Equivalent Award, a Stock Appreciation Right or an Other Incentive Award, which may be awarded or granted under the Plan.

2.6. "Award Agreement" shall mean any written notice, agreement, contract or other instrument or document evidencing an Award, including through electronic medium, which shall contain such terms and conditions with respect to an Award as the Administrator shall determine, consistent with the Plan.

2.7. "Board" shall mean the Board of Directors of the Company.

2.8. "Cause" shall mean, with respect to any Participant, "Cause" as defined in such Participant's employment agreement with the Company if such an agreement exists and contains a definition of Cause or, if no such agreement exists or such agreement does not contain a definition of Cause, then Cause shall mean (i) the Participant's unauthorized use or disclosure of confidential information or trade secrets of the Company

or any Subsidiary or any other material breach of a written agreement between the Participant and the Company, including without limitation a material breach of any employment or confidentiality agreement; (ii) the Participant's indictment for, or the entry of a plea of guilty or nolo contendere by the Participant to, a felony under the laws of the United States or any state thereof or other foreign jurisdiction or any crime involving dishonesty or moral turpitude; (iii) the Participant's gross negligence or willful misconduct or the Participant's willful or repeated failure or refusal to substantially perform assigned duties; (iv) any act of fraud, embezzlement, material misappropriation or dishonesty committed by the Participant against the Company or any Subsidiary; or (v) any acts, omissions or statements by a Participant which the Company reasonably determines to be materially detrimental or damaging to the reputation, operations, prospects or business relations of the Company or any Subsidiary.

2.9. "Change in Control" shall mean the occurrence of any of the following events:

(a) The consummation of a transaction or series of transactions (other than an offering of Shares to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Parents or Subsidiaries, an employee benefit plan maintained by the Company or any of its Parents or Subsidiaries or a "person" that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities outstanding immediately after such acquisition; or

(b) During any period of two consecutive years, individuals who, at the beginning of such period, constitute the Board together with any new director(s) (other than a director designated by a person who shall have entered into an agreement with the Company to effect a transaction described in Section 2.9(a) or Section 2.9(c)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the two-year period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof; or

(c) The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case, other than a transaction:

(i) Which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "Successor Entity")), directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(ii) After which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; provided, however, that no person or group shall be treated for purposes of this Section 2.9(c)(ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction; or

(d) The Company's stockholders approve a liquidation or dissolution of the Company.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award which provides for the deferral of compensation that is subject to Section 409A of the Code, to the extent required to avoid the imposition of additional taxes under Section 409A of the Code, the transaction or event described in subsection (a), (b), (c) or (d) with respect to such Award shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation §1.409A-3(i)(5).

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2683 of 2711

Consistent with the terms of this Section 2.9, the Administrator shall have full and final authority to determine conclusively whether a Change in Control of the Company has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto.

2.10. "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, together with the regulations and official guidance promulgated thereunder, whether issued prior or subsequent to the grant of any Award.

2.11. "Committee" shall mean the Compensation and Benefits Committee of the Board, or another committee or subcommittee of the Board or the Compensation Committee of the Board described in Article 11 hereof.

2.12. "Common Stock" shall mean the common stock of the Company, par value $0.001 per share.

2.13. "Company" shall mean OSI Systems, Inc., a Delaware corporation.

2.14. "Consultant" shall mean any consultant or adviser engaged to provide services to the Company or any Affiliate that qualifies as a consultant under the applicable rules of the Securities and Exchange Commission for registration of shares on a Form S-8 Registration Statement or any successor Form thereto.

2.15. "Director" shall mean a member of the Board, as constituted from time to time.

2.16. "Director Limit" shall have the meaning set forth in Section 4.7.

2.17. "Dividend Equivalent" shall mean a right to receive the equivalent value (in cash or Shares) of dividends paid on Shares, awarded under Section 8.2 hereof.

2.18. "DRO" shall mean a "domestic relations order" as defined by the Code or Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time, or the rules thereunder.

2.19. "Effective Date" shall mean the date on which the Plan (as amended and restated) is approved by the Company's stockholders; provided, however, that solely for purposes of the last sentence of Section 12.1 hereof, the Effective Date shall be the date on which the Plan (as amended and restated) is adopted by the Board, subject to approval of the Plan (as amended and restated) by the Company's stockholders. Notwithstanding the foregoing, the Prior Plan shall remain in effect on its existing terms unless and until the Plan (as amended and restated) is approved by the Company's stockholders.

2.20. "Eligible Individual" shall mean any person who is an Employee, a Consultant or a Non-Employee Director, as determined by the Administrator.

2.21. "Employee" shall mean any officer or other employee (as determined in accordance with Section 3401(c) of the Code) of the Company or of any Affiliate.

2.22. "Equity Restructuring" shall mean a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off, rights offering or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of shares of Common Stock (or other securities of the Company) or the share price of Common Stock (or other securities) and causes a change in the per share value of the Common Stock underlying outstanding Awards.

2.23. "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

2.24. "Fair Market Value" shall mean, as of any given date, the value of a Share determined as follows:

(a) If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange, the NASDAQ Global Market and the NASDAQ Global Select Market), (ii) listed on any national market system or (iii) listed, quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a share of Common Stock as quoted on such exchange or system for such date or, if there is no closing sales price for a share of Common Stock on the date in question, the closing sales price for a share of Common Stock on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(b) If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a share of Common Stock on such date, the high bid and low asked prices for a share of Common Stock on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c) If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in good faith.

2.25. "Full Value Award" shall mean any Award that is settled in Shares other than: (a) an Option, (b) a Stock Appreciation Right or (c) any other Award for which the Participant pays the intrinsic value existing as of the date of grant (whether directly or by forgoing a right to receive a payment from the Company or any Subsidiary), including any Restricted Stock Award, Performance Award, Dividend Equivalents Award, Restricted Stock Unit Award or Other Incentive Award, in each case, to the extent settled in Stock.

2.26. "Greater Than 10% Stockholder" shall mean an individual then-owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any "parent corporation" or "subsidiary corporation" (as defined in Sections 424(e) and 424(f) of the Code, respectively).

2.27. "Incentive Stock Option" shall mean an Option that is intended to qualify as an incentive stock option and conforms to the applicable provisions of Section 422 of the Code.

2.28. "Individual Award Limit" shall mean the cash and share limits applicable to Awards granted under the Plan, as set forth in Section 3.3 hereof.

2.29. "Non-Employee Director" shall mean a Director of the Company who is not an Employee.

2.30. "Non-Qualified Stock Option" shall mean an Option that is not an Incentive Stock Option or which is designated as an Incentive Stock Option but does not meet the applicable requirements of Section 422 of the Code.

2.31. "Option" shall mean a right to purchase Shares at a specified exercise price, granted under Article 5 hereof. An Option shall be either a Non-Qualified Stock Option or an Incentive Stock Option; provided, however, that Options granted to Non-Employee Directors and Consultants shall only be Non-Qualified Stock Options.

2.32. "Original Plan" shall mean the 2006 Equity Participation Plan of OSI Systems, Inc., as may be amended.

2.33. "Other Incentive Award" shall mean an Award denominated in, linked to or derived from Shares or value metrics related to Shares, granted pursuant to Section 8.4 hereof.

2.34. "Parent" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities ending with the Company if each of the entities other than the Company beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.35. "Participant" shall mean a person who has been granted an Award.

2.36. "Performance Award" shall mean an Award that is granted under Section 8.1 hereof.

2.37. "Performance Criteria" shall mean the criteria (and adjustments) that the Committee selects for an Award for purposes of establishing the Performance Goal or Performance Goals for a Performance Period. Such criteria (and adjustments) may include, but are not limited to, the following: (i) net earnings (either before or after one or more of the following: (A) interest, (B) taxes, (C) depreciation, (D) amortization and (E) non-cash equity-based compensation expense); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but

not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for the Company or any operating unit of the Company or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices.

The Administrator may, in its sole discretion, provide that one or more objectively determinable adjustments shall be made to one or more of the Performance Goals. Such adjustments may include, but are not limited to, one or more of the following: (i) items related to a change in accounting principle; (ii) items relating to financing activities; (iii) expenses for restructuring or productivity initiatives; (iv) other non-operating items; (v) items related to acquisitions; (vi) items attributable to the business operations of any entity acquired by the Company during the Performance Period; (vii) items related to the disposal of a business or segment of a business; (viii) items related to discontinued operations that do not qualify as a segment of a business under Applicable Accounting Standards; (ix) items attributable to any stock dividend, stock split, combination or exchange of stock occurring during the Performance Period; (x) any other items of significant income or expense which are determined to be appropriate adjustments; (xi) items relating to unusual or extraordinary corporate transactions, events or developments, (xii) items related to amortization of acquired intangible assets; (xiii) items that are outside the scope of the Company's core, on-going business activities; (xiv) items related to acquired in-process research and development; (xv) items relating to changes in tax laws; (xvi) items relating to major licensing or partnership arrangements; (xvii) items relating to asset impairment charges; (xviii) items relating to gains or losses for litigation, arbitration and contractual settlements; or (xix) items relating to any other unusual or nonrecurring events or changes in applicable laws, accounting principles or business conditions.

2.38. "Performance Goals" shall mean, for a Performance Period, one or more goals established in writing by the Administrator for the Performance Period based upon one or more Performance Criteria. Depending on the Performance Criteria used to establish such Performance Goals, the Performance Goals may be expressed in terms of overall Company performance or the performance of an Affiliate, division, business unit or an individual. The achievement of each Performance Goal shall be determined in accordance with Applicable Accounting Standards.

2.39. "Performance Period" shall mean one or more periods of time, which may be of varying and overlapping durations, as the Administrator may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Award.

2.40. "Permitted Transferee" shall mean, with respect to a Participant, any "family member" of the Participant, as defined under the instructions to use of the Form S-8 Registration Statement under the Securities Act, or any other transferee specifically approved by the Administrator after taking into account any state, federal, local or foreign tax and securities laws applicable to transferable Awards. In addition, the Administrator, in its sole discretion, may determine to permit a Participant to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and applicable state law, the Participant is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

2.41. "Plan" shall mean this Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan, as it may be amended from time to time.

2.42. "Prior Plan" shall mean the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan, which was adopted by the Board on October 13, 2017 and approved by the Company's stockholders as of December 11, 2017.

2.43. "Program" shall mean any program adopted by the Administrator pursuant to the Plan containing the terms and conditions intended to govern a specified type of Award granted under the Plan and pursuant to which such type of Award may be granted under the Plan.

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2686 of 2711

2.44. "Restricted Stock" shall mean Common Stock awarded under Article 7 hereof that is subject to certain restrictions and may be subject to risk of forfeiture or repurchase.

2.45. "Restricted Stock Unit" shall mean a contractual right awarded under Section 8.3 hereof to receive in the future a Share.

2.46. "Securities Act" shall mean the Securities Act of 1933, as amended.

2.47. "Share Limit" shall have the meaning provided in Section 3.1(a) hereof.

2.48. "Shares" shall mean shares of Common Stock.

2.49. "Stock Appreciation Right" shall mean a stock appreciation right granted under Article 9 hereof.

2.50. "Stockholder Approval Date" shall mean the date on which the Company's stockholders approve the Plan.

2.51. "Subsidiary" shall mean any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing more than fifty percent (50%) of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.52. "Substitute Award" shall mean an Award granted under the Plan in connection with a corporate transaction, such as a merger, combination, consolidation or acquisition of property or stock, in any case, upon the assumption of, or in substitution for, an outstanding equity award previously granted by a company or other entity; provided, however, that in no event shall the term "Substitute Award" be construed to refer to an award made in connection with the cancellation and repricing of an Option or Stock Appreciation Right.

2.53. "TCJA" shall mean the Tax Cuts and Jobs Act of 2017.

2.54. "Termination of Service" shall mean:

(a) As to a Consultant, the time when the engagement of a Participant as a Consultant to the Company and its Affiliates is terminated for any reason, with or without Cause, including, without limitation, by resignation, discharge, death or retirement, but excluding terminations where the Consultant simultaneously commences or remains in employment and/or service as a Director with the Company or any Affiliate.

(b) As to a Non-Employee Director, the time when a Participant who is a Non-Employee Director ceases to be a Director for any reason, including, without limitation, a termination by resignation, failure to be elected, death or retirement, but excluding terminations where the Participant simultaneously commences or remains in employment or service as a Consultant with the Company or any Affiliate.

(c) As to an Employee, the time when the employee-employer relationship between a Participant and the Company and its Affiliates is terminated for any reason, including, without limitation, a termination by resignation, discharge, death, disability or retirement; but excluding terminations where the Participant simultaneously commences or remains in a capacity providing substantial services to the Company or any Affiliate, whether as a Consultant and/or Director.

The definition of Termination of Service shall be interpreted consistently with the meaning of "separation from service" as such term is defined under Code Section 409A, and the Administrator, in its sole discretion, shall determine the effect of all matters and questions relating to Terminations of Service, including, without limitation, the question of whether a Termination of Service has occurred, whether any Termination of Service resulted from a discharge for Cause and all questions of whether particular leaves of absence constitute a Termination of Service; provided, however, that, with respect to Incentive Stock Options, unless the Administrator otherwise provides in the terms of any Program, Award Agreement or otherwise, a leave of absence, change in status from an employee to an independent contractor or other change in the employee-employer relationship shall constitute a Termination of Service only if, and to the extent that, such leave of absence, change in status or other change interrupts employment for the purposes of Section 422(a)(2) of the Code. For purposes of the Plan, a Participant's employee-employer relationship or consultancy relationship

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2687 of 2711

shall be deemed to be terminated in the event that the Affiliate employing or contracting with such Participant ceases to remain an Affiliate following any merger, sale of stock or other corporate transaction or event (including, without limitation, a spin-off).

**ARTICLE 3.**

**SHARES SUBJECT TO THE PLAN**

3.1. Number of Shares.

(a) Subject to Sections 3.1(b), 12.1 and 12.2 hereof, the aggregate number of Shares which may be issued or transferred pursuant to Awards under the Plan shall be equal to the sum of (i) 7,100,000 Shares plus (ii) any Shares underlying awards outstanding under the Original Plan as of the Stockholder Approval Date which on or after the Stockholder Approval Date, terminate, expire or lapse for any reason without the delivery of Shares to the holder (the "Share Limit"), provided, however, that such aggregate number of Shares available for issuance under the Plan (including the determination of the number of Shares that reduce the Share Limit pursuant to 3.1(a)(ii) above) shall be reduced by 1.87 Shares for each Share delivered in settlement of any Full Value Award (including, with respect to 3.1(a)(ii), Full Value Awards granted pursuant to the Original Plan). All Shares authorized under the Plan may be issued as Incentive Stock Options. Notwithstanding the foregoing, to the extent permitted under applicable law and applicable stock exchange rules, Awards that provide for the delivery of Shares subsequent to the applicable grant date may be granted in excess of the Share Limit if such Awards provide for the forfeiture or cash settlement of such Awards to the extent that insufficient Shares remain under the Share Limit at the time that Shares would otherwise be issued in respect of such Award.

(b) If any Shares subject to an Award that is not a Full Value Award are forfeited or expire or such Award is settled for cash (in whole or in part), the Shares subject to such Award shall, to the extent of such forfeiture, expiration or cash settlement, again be available for future grants of Awards under the Plan and shall be added back to the Share Limit in the same number of Shares as were debited from the Share Limit in respect of the grant of such Award (as may be adjusted in accordance with Section 12.2 hereof). To the extent that a Full Value Award is forfeited or expires or such Full Value Award is settled for cash (in whole or in part), the Shares available under the Plan shall be increased by 1.87 Shares subject to such Full Value Award that is forfeited, expired or settled in cash. Notwithstanding anything to the contrary contained herein, the following Shares shall not be added back to the Share Limit and will not be available for future grants of Awards: (i) Shares not issued or delivered as a result of the net settlement of an outstanding Stock Appreciation Right or Option, (ii) Shares tendered by the Participant or withheld by the Company to pay the exercise price or satisfy any tax withholding obligations related to an outstanding Award, or (iii) Shares repurchased on the open market with the cash proceeds of the Option exercise price. Any Shares repurchased by the Company under Section 7.4 hereof at the same price paid by the Participant so that such shares are returned to the Company will again be available for Awards. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards shall not be counted against the shares available for issuance under the Plan. Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Stock Option to fail to qualify as an incentive stock option under Section 422 of the Code.

(c) Substitute Awards shall not reduce the Shares authorized for grant under the Plan, except as may be required by reason of Section 422 of the Code to avoid the disqualification of any Option intended to be an Incentive Stock Option. Additionally, in the event that a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan in the Board's discretion at the time of such acquisition or combination and shall not reduce the Shares authorized for grant under the Plan; provided, however, that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan,

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2688 of 2711

absent the acquisition or combination, and shall only be made to individuals who were not employed by or providing services to the Company or its Affiliates immediately prior to such acquisition or combination.

3.2. Stock Distributed. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Common Stock, treasury Common Stock or Common Stock purchased on the open market.

3.3. Limitation on Number of Shares Subject to Awards. Notwithstanding any provision in the Plan to the contrary, and subject to Section 12.2 hereof, the maximum aggregate number of Shares with respect to one or more Awards that may be granted to any one person during any calendar year (measured from the date of any grant) shall be 250,000 shares and the maximum aggregate amount of cash that may be paid in cash during any calendar year (measured from the date of any payment) with respect to one or more Awards payable in cash shall be $15,000,000 (together, the "Individual Award Limits").

**ARTICLE 4.**

**GRANTING OF AWARDS**

4.1. Participation. The Administrator may, from time to time, select from among all Eligible Individuals, those to whom one or more Awards shall be granted and shall determine the nature and amount of each Award, which shall not be inconsistent with the requirements of the Plan. No Eligible Individual shall have any right to be granted an Award pursuant to the Plan.

4.2. Award Agreement. Each Award shall be evidenced by an Award Agreement stating the terms and conditions applicable to such Award, consistent with the requirements of the Plan and any applicable Program.

4.3. Limitations Applicable to Section 16 Persons. Notwithstanding anything contained herein to the contrary, with respect to any Award granted or awarded to any individual who is then subject to Section 16 of the Exchange Act, the Plan, any applicable Program and the applicable Award Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3 of the Exchange Act and any amendments thereto) that are requirements for the application of such exemptive rule, and such additional limitations shall be deemed to be incorporated by reference into such Award to the extent permitted by applicable law.

4.4. At-Will Service. Nothing in the Plan or in any Program or Award Agreement hereunder shall confer upon any Participant any right to continue as an Employee, Director or Consultant of the Company or any Affiliate, or shall interfere with or restrict in any way the rights of the Company and any Affiliate, which rights are hereby expressly reserved, to discharge any Participant at any time for any reason whatsoever, with or without Cause, and with or without notice, or to terminate or change all other terms and conditions of employment or engagement, except to the extent expressly provided otherwise in a written agreement between the Participant and the Company or any Affiliate.

4.5. Foreign Participants. Notwithstanding any provision of the Plan to the contrary, in order to comply with the laws in other countries in which the Company and its Affiliates operate or have Employees, Non-Employee Directors or Consultants, or in order to comply with the requirements of any foreign securities exchange, the Administrator, in its sole discretion, shall have the power and authority to: (a) determine which Affiliates shall be covered by the Plan; (b) determine which Eligible Individuals outside the United States are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Eligible Individuals outside the United States to comply with applicable foreign laws or listing requirements of any such foreign securities exchange; (d) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable (and any such subplans and/or modifications shall be attached to the Plan as appendices); provided, however, that no such subplans and/or modifications shall increase the Share Limit or Individual Award Limits contained in Sections 3.1 and 3.3 hereof, respectively, or the Director Limit contained in Section 4.7 hereof; and (e) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local governmental regulatory exemptions or approvals or listing requirements of any such foreign securities exchange. Notwithstanding the foregoing, the Administrator may not take any actions hereunder, and no

Awards shall be granted, that would violate the Code, the Exchange Act, the Securities Act, the rules of the securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law.

4.6. Stand-Alone and Tandem Awards. Awards granted pursuant to the Plan may, in the sole discretion of the Administrator, be granted either alone, in addition to, or in tandem with, any other Award granted pursuant to the Plan. Awards granted in addition to or in tandem with other Awards may be granted either at the same time as or at a different time from the grant of such other Awards.

4.7. Non-Employee Director Awards. Notwithstanding any provision to the contrary in the Plan, the sum of the grant date fair value of equity-based Awards and the amount of any cash-based Awards granted to a Non-Employee Director during any calendar year shall not exceed $750,000 (the "Director Limit").

**ARTICLE 5.**

**GRANTING OF OPTIONS**

5.1. Granting of Options to Eligible Individuals. The Administrator is authorized to grant Options to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine which shall not be inconsistent with the Plan.

5.2. Qualification of Incentive Stock Options. No Incentive Stock Option shall be granted to any person who is not an Employee of the Company or any "parent corporation" or "subsidiary corporation" of the Company (as defined in Sections 424(e) and 424(f) of the Code, respectively). No person who qualifies as a Greater Than 10% Stockholder may be granted an Incentive Stock Option unless such Incentive Stock Option conforms to the applicable provisions of Section 422 of the Code. Any Incentive Stock Option granted under the Plan may be modified by the Administrator, with the consent of the Participant, to disqualify such Option from treatment as an "incentive stock option" under Section 422 of the Code. To the extent that the aggregate fair market value of stock with respect to which "incentive stock options" (within the meaning of Section 422 of the Code, but without regard to Section 422(d) of the Code) are exercisable for the first time by a Participant during any calendar year under the Plan and all other plans of the Company and any Affiliate corporation thereof exceeds $100,000, the Options shall be treated as Non-Qualified Stock Options to the extent required by Section 422 of the Code. The rule set forth in the preceding sentence shall be applied by taking Options and other "incentive stock options" into account in the order in which they were granted and the Fair Market Value of stock shall be determined as of the time the respective options were granted. In addition, to the extent that any Options otherwise fail to qualify as Incentive Stock Options, such Options shall be treated as Nonqualified Stock Options. Neither the Company nor the Administrator shall have any liability to a holder, or any other Person, (a) if an Option (or any part thereof) which is intended to qualify as an Incentive Stock Option fails to qualify as an Incentive Stock Option or (b) for any action or omission by the Company or the Administrator that causes an Option not to qualify as an Incentive Stock Option, including without limitation, the conversion of an Incentive Stock Option to a Non-Qualified Stock Option or the grant of an Option intended as an Incentive Stock Option that fails to satisfy the requirements under the Code applicable to an Incentive Stock Option.

5.3. Option Exercise Price. Except as provided in Section 5.6 hereof, the exercise price per Share subject to each Option shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value of a Share on the date the Option is granted (or on the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable). In addition, in the case of Incentive Stock Options granted to a Greater Than 10% Stockholder, such price shall not be less than 110% of the Fair Market Value of a Share on the date the Option is granted (or the date the Option is modified, extended or renewed for purposes of Sections 424(h) or 409A of the Code, as applicable).

5.4. Option Term. The term of each Option shall be set by the Administrator in its sole discretion; provided, however, that the term shall not be more than ten (10) years from the date the Option is granted, or five (5) years from the date an Incentive Stock Option is granted to a Greater Than 10% Stockholder. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise the vested Options, which time period may not extend beyond the stated term of the Option. Except as limited by the requirements of Section 409A or Section 422

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2690 of 2711

of the Code, the Administrator may extend the term of any outstanding Option, and may extend the time period during which vested Options may be exercised, in connection with any Termination of Service of the Participant, and, subject to Section 12.1 hereof, may amend any other term or condition of such Option relating to such a Termination of Service.

5.5. Option Vesting.

(a) The terms and conditions pursuant to which an Option vests in the Participant and becomes exercisable shall be determined by the Administrator and set forth in the applicable Award Agreement. Such vesting may be based on service with the Company or any Affiliate, any of the Performance Criteria, or any other criteria selected by the Administrator. At any time after grant of an Option, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the vesting of the Option.

(b) No portion of an Option which is unexercisable at a Participant's Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either in a Program, the applicable Award Agreement or by action of the Administrator following the grant of the Option.

5.6. Substitute Awards. Notwithstanding the foregoing provisions of this Article 5 to the contrary, in the case of an Option that is a Substitute Award, the price per share of the shares subject to such Option may be less than the Fair Market Value per share on the date of grant, provided, however, that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

5.7. Substitution of Stock Appreciation Rights. The Administrator may provide in an applicable Program or the applicable Award Agreement evidencing the grant of an Option that the Administrator, in its sole discretion, shall have the right to substitute a Stock Appreciation Right for such Option at any time prior to or upon exercise of such Option; provided, however, that such Stock Appreciation Right shall be exercisable with respect to the same number of Shares for which such substituted Option would have been exercisable, and shall also have the same exercise price and remaining term as the substituted Option.

**ARTICLE 6.**

**EXERCISE OF OPTIONS**

6.1. Partial Exercise. An exercisable Option may be exercised in whole or in part. However, an Option shall not be exercisable with respect to fractional shares and the Administrator may require that, by the terms of the Option, a partial exercise must be with respect to a minimum number of shares.

6.2. Manner of Exercise. All or a portion of an exercisable Option shall be deemed exercised upon delivery of all of the following to the Secretary of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Option, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then entitled to exercise the Option or such portion of the Option;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act, the Exchange Act, any other federal, state or foreign securities laws or regulations, the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded or any other applicable law. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance including, without limitation, placing legends on share certificates and issuing stop-transfer notices to agents and registrars;

(c) In the event that the Option shall be exercised pursuant to Section 10.3 hereof by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Option, as determined in the sole discretion of the Administrator; and

(d) Full payment of the exercise price and applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Option, or portion thereof, is exercised, in a manner permitted by Sections 10.1 and 10.2 hereof.

6.3. Notification Regarding Disposition. The Participant shall give the Company prompt written or electronic notice of any disposition of shares of Common Stock acquired by exercise of an Incentive Stock Option which occurs within (a) two years from the date of granting (including the date the Option is modified, extended or renewed for purposes of Section 424(h) of the Code) such Option to such Participant, or (b) one year after the transfer of such shares to such Participant.

**ARTICLE 7.**

**RESTRICTED STOCK**

7.1. Award of Restricted Stock.

(a) The Administrator is authorized to grant Restricted Stock to Eligible Individuals, and shall determine the terms and conditions, including the restrictions applicable to each award of Restricted Stock, which terms and conditions shall not be inconsistent with the Plan, and the Administrator may impose such conditions on the issuance of such Restricted Stock as it deems appropriate.

(b) The Administrator shall establish the purchase price, if any, and form of payment for Restricted Stock; provided, however, that if a purchase price is charged, such purchase price shall be no less than the par value of the Shares to be purchased, unless otherwise permitted by applicable law. In all cases, legal consideration shall be required for each issuance of Restricted Stock to the extent required by applicable law.

7.2. Rights as Stockholders. Subject to Section 7.4 hereof, upon issuance of Restricted Stock, the Participant shall have, unless otherwise provided by the Administrator, all the rights of a stockholder with respect to said shares, subject to the restrictions in an applicable Program or in the applicable Award Agreement; provided, however, that any dividends or distributions with payment dates that occur prior to the vesting of the Restricted Stock shall only be paid out to the holder if and when the underlying share of Restricted Stock vests.

7.3. Restrictions. All shares of Restricted Stock (including any shares received by Participants thereof with respect to shares of Restricted Stock as a result of stock dividends, stock splits or any other form of recapitalization) shall, in the terms of an applicable Program or in the applicable Award Agreement, be subject to such restrictions and vesting requirements as the Administrator shall provide. Such restrictions may include, without limitation, restrictions concerning voting rights and transferability and such restrictions may lapse separately or in combination at such times and pursuant to such circumstances or based on such criteria as selected by the Administrator, including, without limitation, criteria based on the Participant's duration of employment, directorship or consultancy with the Company, the Performance Criteria, Company or Affiliate performance, individual performance or other criteria selected by the Administrator. Restricted Stock may not be sold or encumbered until all restrictions are terminated or expire.

7.4. Repurchase or Forfeiture of Restricted Stock. If no price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Participant's rights in unvested Restricted Stock then subject to restrictions shall lapse, and such Restricted Stock shall be surrendered to the Company and cancelled without consideration. If a price was paid by the Participant for the Restricted Stock, upon a Termination of Service, the Company shall have the right to repurchase from the Participant the unvested Restricted Stock then-subject to restrictions at a cash price per share equal to the price paid by the Participant for such Restricted Stock or such other amount as may be specified in an applicable Program or the applicable Award Agreement. The Administrator in its sole discretion may provide that, upon certain events, including without limitation a Change in Control, the Participant's death, retirement or disability, any other specified

Termination of Service or any other event, the Participant's rights in unvested Restricted Stock shall not lapse, such Restricted Stock shall vest and cease to be forfeitable and, if applicable, the Company cease to have a right of repurchase.

7.5. Certificates for Restricted Stock. Restricted Stock granted pursuant to the Plan may be evidenced in such manner as the Administrator shall determine. Certificates or book entries evidencing shares of Restricted Stock must include an appropriate legend referring to the terms, conditions and restrictions applicable to such Restricted Stock, and the Company may, in its sole discretion, retain physical possession of any stock certificate until such time as all applicable restrictions lapse.

7.6. Section 83(b) Election. If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which the Participant would otherwise be taxable under Section 83(a) of the Code, the Participant shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service.

**ARTICLE 8.**

**PERFORMANCE AWARDS, DIVIDEND EQUIVALENTS, RESTRICTED STOCK UNITS; OTHER INCENTIVE AWARDS**

8.1. Performance Awards.

(a) The Administrator is authorized to grant Performance Awards to any Eligible Individual. The value of Performance Awards may be linked to any one or more of the Performance Criteria or other specific criteria determined by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. Performance Awards may be paid in cash, Shares or a combination of both, as determined by the Administrator.

(b) Without limiting Section 8.1(a) hereof, the Administrator may grant Performance Awards to any Eligible Individual in the form of a cash bonus payable upon the attainment of objective Performance Goals, or such other criteria, whether or not objective, which are established by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator.

8.2. Dividend Equivalents.

(a) Subject to Section 8.2(b) hereof, Dividend Equivalents may be granted by the Administrator, either alone or in tandem with another Award, based on dividends declared on the Common Stock, to be credited as of dividend payment dates during the period between the date the Dividend Equivalents are granted to a Participant and the date such Dividend Equivalents terminate or expire, as determined by the Administrator. Such Dividend Equivalents shall be converted to cash or additional shares of Common Stock by such formula and at such time and subject to such limitations as may be determined by the Administrator; provided, however, that Dividend Equivalents with respect to Shares covered by an Award shall only be paid out to the Participant at the same time or times and to the same extent that the vesting conditions, if any, are subsequently satisfied and the Award vests with respect to such Shares.

(b) Notwithstanding the foregoing, no Dividend Equivalents shall be payable with respect to Options or Stock Appreciation Rights.

8.3. Restricted Stock Units. The Administrator is authorized to grant Restricted Stock Units to any Eligible Individual. The number and terms and conditions of Restricted Stock Units shall be determined by the Administrator. The Administrator shall specify the date or dates on which the Restricted Stock Units shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate, including conditions based on one or more Performance Criteria or other specific criteria, including service to the Company or any Affiliate, in each case on a specified date or dates or over any period or periods, as determined by the Administrator. The Administrator shall specify, or permit the Participant to elect, the conditions and dates upon which the Shares underlying the Restricted Stock Units which shall be issued, which dates shall not be earlier than the date as of which the Restricted Stock Units vest and become nonforfeitable and which conditions and dates shall be subject to compliance with Section 409A of the Code

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2693 of 2711

or an exemption therefrom. On the distribution dates, the Company shall issue to the Participant one unrestricted, fully transferable Share (or the Fair Market Value of one such Share in cash) for each vested and nonforfeitable Restricted Stock Unit.

8.4. Other Incentive Awards. The Administrator is authorized to grant Other Incentive Awards to any Eligible Individual, which Awards may cover Shares or the right to purchase Shares or have a value derived from the value of, or an exercise or conversion privilege at a price related to, or that are otherwise payable in or based on, Shares, stockholder value or stockholder return, in each case on a specified date or dates or over any period or periods determined by the Administrator. Other Incentive Awards may be linked to any one or more of the Performance Criteria or other specific performance criteria determined appropriate by the Administrator.

8.5. Other Terms and Conditions. All applicable terms and conditions of each Award described in this Article 8, including without limitation, as applicable, the term, vesting and exercise/purchase price applicable to the Award, shall be set by the Administrator in its sole discretion, provided, however, that the value of the consideration paid by a Participant for an Award shall not be less than the par value of a Share, unless otherwise permitted by applicable law.

8.6. Termination of Service. Awards described in this Article 8 are generally exercisable or distributable, as applicable, only while the Participant is an Employee, Director or Consultant, as applicable. The Administrator, however, in its sole discretion, may provide that a vested Award may be exercised or distributed subsequent to Termination of Service as provided under an applicable Program, Award Agreement, payment deferral election and/or in certain events, including a Change in Control, the Participant's death, retirement or disability or any other specified Termination of Service, subject to compliance with Code Section 409A and other applicable laws.

**ARTICLE 9.**

**STOCK APPRECIATION RIGHTS**

9.1. Grant of Stock Appreciation Rights.

(a) The Administrator is authorized to grant Stock Appreciation Rights to Eligible Individuals from time to time, in its sole discretion, on such terms and conditions as it may determine consistent with the Plan.

(b) A Stock Appreciation Right shall entitle the Participant (or other person entitled to exercise the Stock Appreciation Right pursuant to the Plan) to exercise all or a specified portion of the Stock Appreciation Right (to the extent then exercisable pursuant to its terms) and to receive from the Company an amount determined by multiplying the difference obtained by subtracting the exercise price per share of the Stock Appreciation Right from the Fair Market Value on the date of exercise of the Stock Appreciation Right by the number of Shares with respect to which the Stock Appreciation Right shall have been exercised, subject to any limitations the Administrator may impose. Except as described in Section 9.1(c) hereof, the exercise price per Share subject to each Stock Appreciation Right shall be set by the Administrator, but shall not be less than 100% of the Fair Market Value on the date the Stock Appreciation Right is granted.

(c) Notwithstanding the foregoing provisions of Section 9.1(b) hereof to the contrary, in the case of a Stock Appreciation Right that is a Substitute Award, the price per share of the shares subject to such Stock Appreciation Right may be less than the Fair Market Value per share on the date of grant; provided, however, that the excess of: (a) the aggregate Fair Market Value (as of the date such Substitute Award is granted) of the Shares subject to the Substitute Award, over (b) the aggregate exercise price thereof does not exceed the excess of: (x) the aggregate Fair Market Value (as of the time immediately preceding the transaction giving rise to the Substitute Award) of the shares of the predecessor entity that were subject to the grant assumed or substituted for by the Company, over (y) the aggregate exercise price of such shares.

9.2. Stock Appreciation Right Vesting.

(a) The Administrator shall determine the period during which a Participant shall vest in a Stock Appreciation Right and have the right to exercise such Stock Appreciation Right in whole or in part. Such vesting may be based on service with the Company or any Affiliate, or any other criteria selected by the Administrator. At any time after grant of a Stock Appreciation Right, the Administrator may, in its sole discretion and subject to whatever terms and conditions it selects, accelerate the period during which a Stock Appreciation Right vests.

(b) No portion of a Stock Appreciation Right which is unexercisable at Termination of Service shall thereafter become exercisable, except as may be otherwise provided by the Administrator either in an applicable Program or Award Agreement or by action of the Administrator following the grant of the Stock Appreciation Right.

9.3. Manner of Exercise. All or a portion of an exercisable Stock Appreciation Right shall be deemed exercised upon delivery of all of the following to the stock administrator of the Company, or such other person or entity designated by the Administrator, or his, her or its office, as applicable:

(a) A written or electronic notice complying with the applicable rules established by the Administrator stating that the Stock Appreciation Right, or a portion thereof, is exercised. The notice shall be signed by the Participant or other person then-entitled to exercise the Stock Appreciation Right or such portion of the Stock Appreciation Right;

(b) Such representations and documents as the Administrator, in its sole discretion, deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act and any other federal, state or foreign securities laws or regulations. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance;

(c) In the event that the Stock Appreciation Right shall be exercised pursuant to this Section 9.3 by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Stock Appreciation Right; and

(d) Full payment of the applicable withholding taxes to the stock administrator of the Company for the Shares with respect to which the Stock Appreciation Right, or portion thereof, is exercised, in a manner permitted by Sections 10.1 and 10.2 hereof.

9.4. Stock Appreciation Right Term. The term of each Stock Appreciation Right shall be set by the Administrator in its sole discretion; provided, however, that the term shall not be more than ten (10) years from the date the Stock Appreciation Right is granted. The Administrator shall determine the time period, including the time period following a Termination of Service, during which the Participant has the right to exercise any vested Stock Appreciation Rights, which time period may not extend beyond the expiration date of the Stock Appreciation Right term. Except as limited by the requirements of Section 409A of the Code, the Administrator may extend the term of any outstanding Stock Appreciation Right, and may extend the time period during which vested Stock Appreciation Rights may be exercised in connection with any Termination of Service of the Participant, and, subject to Section 12.1 hereof, may amend any other term or condition of such Stock Appreciation Right relating to such a Termination of Service.

**ARTICLE 10.**

**ADDITIONAL TERMS OF AWARDS**

10.1. Payment. The Administrator shall determine the methods by which payments by any Participant with respect to any Awards granted under the Plan shall be made, including, without limitation: (a) cash or check, (b) Shares (including, in the case of payment of the exercise price of an Award, Shares issuable pursuant to the exercise of the Award) held for such period of time as may be required by the Administrator in order to avoid adverse accounting consequences, in each case, having a Fair Market Value on the date of delivery equal to the aggregate payments required, (c) delivery of a written or electronic notice that the Participant has placed a market sell order with a broker with respect to Shares then-issuable upon exercise or vesting of an Award, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the

Company in satisfaction of the aggregate payments required; provided, however, that payment of such proceeds is then made to the Company upon settlement of such sale, or (d) other form of legal consideration acceptable to the Administrator. The Administrator shall also determine the methods by which Shares shall be delivered or deemed to be delivered to Participants. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

10.2. Tax Withholding. The Company and its Affiliates shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company or an Affiliate, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's social security, Medicare and any other employment tax obligation) required by law to be withheld with respect to any taxable event concerning a Participant arising as a result of the Plan. The Administrator may in its sole discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company or an Affiliate withhold Shares otherwise issuable under an Award (or allow the surrender of Shares). Unless determined otherwise by the Administrator, the number of Shares which may be so withheld or surrendered shall be limited to the number of shares which have a Fair Market Value on the date of withholding or repurchase no greater than the aggregate amount of such liabilities based on the maximum individual statutory withholding rates for federal, state, local and foreign income tax and payroll tax purposes for the applicable jurisdiction. The Administrator shall determine the fair market value of the Shares, consistent with applicable provisions of the Code, for tax withholding obligations due in connection with a broker-assisted cashless Option or Stock Appreciation Right exercise involving the sale of shares to pay the Option or Stock Appreciation Right exercise price or any tax withholding obligation.

10.3. Transferability of Awards.

(a) Except as otherwise provided in Section 10.3(b) or (c) hereof:

(i) No Award under the Plan may be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO, unless and until such Award has been exercised, or the shares underlying such Award have been issued, and all restrictions applicable to such shares have lapsed;

(ii) No Award or interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, hypothecation, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy) unless and until such Award has been exercised, or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed, and any attempted disposition of an Award prior to the satisfaction of these conditions shall be null and void and of no effect, except to the extent that such disposition is permitted by clause (i) of this provision; and

(iii) During the lifetime of the Participant, only the Participant may exercise an Award (or any portion thereof) granted to him under the Plan, unless it has been disposed of pursuant to a DRO; after the death of the Participant, any exercisable portion of an Award may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Program or Award Agreement, be exercised by his personal representative or by any person empowered to do so under the deceased Participant's will or under the then applicable laws of descent and distribution.

(b) Notwithstanding Section 10.3(a) hereof, the Administrator, in its sole discretion, may determine to permit a Participant or a Permitted Transferee of such Participant to transfer an Award other than an Incentive Stock Option to any one or more Permitted Transferees of such Participant, subject to the following terms and conditions: (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee (other than to another Permitted Transferee of the applicable Participant) other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO; (ii) an Award transferred to a Permitted Transferee shall continue to

be subject to all the terms and conditions of the Award as applicable to the original Participant (other than the ability to further transfer the Award); (iii) any transfer of an Award to a Permitted Transferee shall be without consideration, except as required by applicable law; and (iv) the Participant (or transferring Permitted Transferee) and the Permitted Transferee shall execute any and all documents requested by the Administrator, including without limitation, documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under applicable federal, state and foreign securities laws and (C) evidence the transfer. In addition, and further notwithstanding Section 10.3(a), hereof, the Administrator, in its sole discretion, may determine to permit a Participant to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and other applicable law, the Participant is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

(c) Notwithstanding Section 10.3(a) hereof, a Participant may, in the manner determined by the Administrator, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Program or Award Agreement applicable to the Participant, except to the extent the Plan, the Program and the Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Administrator. If the Participant is married or a domestic partner in a domestic partnership qualified under applicable law and resides in a "community property" state, a designation of a person other than the Participant's spouse or domestic partner, as applicable, as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written or electronic consent of the Participant's spouse or domestic partner. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Administrator prior to the Participant's death.

10.4. <u>Conditions to Issuance of Shares</u>.

(a) Notwithstanding anything herein to the contrary, neither the Company nor its Affiliates shall be required to issue or deliver any certificates or make any book entries evidencing Shares pursuant to the exercise of any Award, unless and until the Administrator has determined, with advice of counsel, that the issuance of such Shares is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded, and the Shares are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Administrator may require that a Participant make such reasonable covenants, agreements and representations as the Administrator, in its discretion, deems advisable in order to comply with any such laws, regulations or requirements.

(b) All Share certificates delivered pursuant to the Plan and all shares issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to comply with federal, state or foreign securities or other laws, rules and regulations and the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. The Administrator may place legends on any Share certificate or book entry to reference restrictions applicable to the Shares.

(c) The Administrator shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Award, including a window-period limitation, as may be imposed in the sole discretion of the Administrator.

(d) No fractional Shares shall be issued and the Administrator shall determine, in its sole discretion, whether cash shall be given in lieu of fractional shares or whether such fractional shares shall be eliminated by rounding down.

(e) Notwithstanding any other provision of the Plan, unless otherwise determined by the Administrator or required by any applicable law, rule or regulation, the Company and/or its Affiliates

may, in lieu of delivering to any Participant certificates evidencing Shares issued in connection with any Award, record the issuance of Shares in the books of the Company (or, as applicable, its transfer agent or stock plan administrator).

10.5. Forfeiture Provisions. Pursuant to its general authority to determine the terms and conditions applicable to Awards under the Plan, the Administrator shall have the right to provide, in the terms of Awards made under the Plan, or to require a Participant to agree by separate written or electronic instrument, that: (a)(i) any proceeds, gains or other economic benefit actually or constructively received by the Participant upon any receipt or exercise of the Award, or upon the receipt or resale of any Shares underlying the Award, must be paid to the Company, and (ii) the Award shall terminate and any unexercised portion of the Award (whether or not vested) shall be forfeited, if (b)(i) a Termination of Service occurs prior to a specified date, or within a specified time period following receipt or exercise of the Award, or (ii) the Participant at any time, or during a specified time period, engages in any activity in competition with the Company, or which is inimical, contrary or harmful to the interests of the Company, as further defined by the Administrator or (iii) the Participant incurs a Termination of Service for Cause.

10.6. Prohibition on Repricing. Except in connection with a corporate transaction involving the Company (including, without limitation, any stock dividend, stock split, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, or exchange of shares), the terms of outstanding Awards may not be amended, without stockholder approval, to reduce the exercise price of outstanding Options or Stock Appreciation Rights or cancel outstanding Options or Stock Appreciation Rights in exchange for cash, other Awards or Options or Stock Appreciation Rights with an exercise price that is less than the exercise price of the original Options or Stock Appreciation Rights.

10.7. Cash Settlement. Without limiting the generality of any other provision of the Plan, the Administrator may provide, in an Award Agreement or subsequent to the grant of an Award, in its discretion, that any Award may be settled in cash, Shares or a combination thereof.

10.8. Terms May Vary Between Awards. The terms and conditions of each Award shall be determined by the Administrator in its sole discretion and the Administrator shall have complete flexibility to provide for varied terms and conditions as between any Awards, whether of the same or different Award type and/or whether granted to the same or different Participants (in all cases, subject to the terms and conditions of the Plan).

10.9. Data Privacy. As a condition of receipt of any Award, each Participant explicitly consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Section 10.9 by and among, as applicable, the Company and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan. The Company and its Subsidiaries may hold certain personal information about a Participant, including but not limited to, the Participant's name, home address and telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), any shares of stock held in the Company or any of its Subsidiaries, details of all Awards, in each case, for the purpose of implementing, managing and administering the Plan and Awards (the "Data"). The Company and its Subsidiaries may transfer the Data amongst themselves as necessary for the purpose of implementation, administration and management of a Participant's participation in the Plan, and the Company and its Subsidiaries may each further transfer the Data to any third parties assisting the Company and its Subsidiaries in the implementation, administration and management of the Plan. These recipients may be located in the Participant's country, or elsewhere, and the Participant's country may have different data privacy laws and protections than the recipients' country. Through acceptance of an Award, each Participant authorizes such recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or any of its Subsidiaries or the Participant may elect to deposit any Shares. The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage the Participant's participation in the Plan. A Participant may, at any time, view the Data held by the Company with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel

Participant's ability to participate in the Plan and, in the Administrator's discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws his or her consents as described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

**ARTICLE 11.**

**ADMINISTRATION**

11.1. Administrator. The Committee (or another committee or a subcommittee of the Board assuming the functions of the Committee under the Plan) shall administer the Plan (except as otherwise permitted herein). and, unless otherwise determined by the Board, shall consist solely of two or more Non-Employee Directors appointed by and holding office at the pleasure of the Board, each of whom is intended to qualify as a "non-employee director" as defined by Rule 16b-3 of the Exchange Act and an "independent director" under the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, in each case, to the extent required under such provision; provided, however, that any action taken by the Committee shall be valid and effective, whether or not members of the Committee at the time of such action are later determined not to have satisfied the requirements for membership set forth in this Section 11.l or otherwise provided in any charter of the Committee. Except as may otherwise be provided in any charter of the Committee, appointment of Committee members shall be effective upon acceptance of appointment. Committee members may resign at any time by delivering written or electronic notice to the Board. Vacancies in the Committee may only be filled by the Board. Notwithstanding the foregoing, (a) the full Board, acting by a majority of its members in office, shall conduct the general administration of the Plan with respect to Awards granted to Non-Employee Directors and (b) the Board or Committee may delegate its authority hereunder to the extent permitted by Section 11.6 hereof. Notwithstanding the foregoing, all such determinations regarding 162(m) Awards will be made solely by a Committee comprised solely of two of more "outside directors" within the meaning of Section 162(m) of the Code.

11.2. Duties and Powers of Administrator. It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and all Programs and Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan and any Program as are not inconsistent with the Plan, to interpret, amend or revoke any such rules and to amend any Program or Award Agreement provided that the rights or obligations of the holder of the Award that is the subject of any such Program or Award Agreement are not affected adversely by such amendment, unless the consent of the Participant is obtained or such amendment is otherwise permitted under Section 12.10 hereof. Any such grant or award under the Plan need not be the same with respect to each Participant. Any such interpretations and rules with respect to Incentive Stock Options shall be consistent with the provisions of Section 422 of the Code. In its sole discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan except with respect to matters which under Rule 16b-3 under the Exchange Act or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded are required to be determined in the sole discretion of the Committee.

11.3. Action by the Committee. A majority of the Committee shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by all members of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Affiliate, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

11.4. Authority of Administrator. Subject to any specific designation in the Plan, the Administrator has the exclusive power, authority and sole discretion to:

(a) Designate Eligible Individuals to receive Awards;

(b) Determine the type or types of Awards to be granted to each Eligible Individual;

Case 2:19-cv-02288-JAM-AC Document 32-12 Filed 09/28/21 Page 2699 of 2711

(c) Determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d) Determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price or purchase price, any performance criteria, any restrictions or limitations on the Award, any schedule for vesting, lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, and any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Administrator in its sole discretion determines;

(e) Determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in cash, Shares, other Awards or other property, or an Award may be canceled, forfeited or surrendered;

(f) Prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) Decide all other matters that must be determined in connection with an Award;

(h) Establish, adopt or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) Interpret the terms of, and any matter arising pursuant to, the Plan, any Program or any Award Agreement; and

(j) Make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan.

11.5. Decisions Binding. The Administrator's interpretation of the Plan, any Awards granted pursuant to the Plan, any Program, any Award Agreement and all decisions and determinations by the Administrator with respect to the Plan are final, binding and conclusive on all parties.

11.6. Delegation of Authority. To the extent permitted by applicable law or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, the Board or Committee may from time to time delegate to a committee of one or more members of the Board or one or more officers of the Company the authority to grant or amend Awards or to take other administrative actions pursuant to this Article 11; provided, however, that in no event shall an officer of the Company be delegated the authority to grant awards to, or amend awards held by, the following individuals: (a) individuals who are subject to Section 16 of the Exchange Act or (b) officers of the Company (or Directors) to whom authority to grant or amend Awards has been delegated hereunder; provided further, that any delegation of administrative authority shall only be permitted to the extent it is permissible under applicable securities laws or the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded. Any delegation hereunder shall be subject to the restrictions and limits that the Board or Committee specifies at the time of such delegation, and the Board or Committee, as applicable, may at any time rescind the authority so delegated or appoint a new delegatee.

11.7. Provisions Applicable to Section 162(m) Participants. Notwithstanding any other provision of the Plan or any Award, each 162(m) Award (and each Award which was otherwise not subject to the deduction limitation of Section 162(m) of the Code) shall be subject to any additional limitations as the Committee determines necessary for such 162(m) Award to qualify as "performance-based compensation" as described in Section 162(m)(4)(C) of the Code prior to its repeal (or to be so exempt) pursuant to the transition relief rules in the TCJA, and to the extent any of the provisions of the Plan or any Award (or any amendments hereto pursuant to this amendment and restatement of the Plan) would cause any 162(m) Awards to fail to so qualify or other Awards to be so exempt, any such provisions shall not apply to such Awards to the extent necessary to ensure the continued qualification or exemption of such Awards. To the extent permitted by applicable law, the Plan and any such Awards shall be deemed amended to the extent necessary to conform to such requirements.

**ARTICLE 12.**

**MISCELLANEOUS PROVISIONS**

12.1. Amendment, Suspension or Termination of the Plan. Except as otherwise provided in this Section 12.1, the Plan may be wholly or partially amended or otherwise modified, suspended or terminated at

any time or from time to time by the Board. However, without approval of the Company's stockholders given within twelve (12) months before or after the action by the Administrator, no action of the Administrator may, except as provided in Section 12.2 hereof, (a) increase the Share Limit or increase the Individual Award Limits, (b) reduce the price per share of any outstanding Option or Stock Appreciation Right granted under the Plan or (c) cancel any Option or Stock Appreciation Right in exchange for cash or another Award when the Option or Stock Appreciation Right price per share exceeds the Fair Market Value of the underlying Shares. Except as provided in Section 12.10 hereof, no amendment, suspension or termination of the Plan shall, without the consent of the Participant, impair any rights or obligations under any Award theretofore granted or awarded, unless the Award itself otherwise expressly so provides. No Awards may be granted or awarded during any period of suspension or after termination of the Plan. Notwithstanding anything herein to the contrary, no Incentive Stock Option shall be granted under the Plan after the tenth (10th) anniversary of the Effective Date.

12.2. Changes in Common Stock or Assets of the Company, Acquisition or Liquidation of the Company and Other Corporate Events.

(a) In the event of any stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of the Company's stock or the share price of the Company's stock other than an Equity Restructuring, the Administrator shall make equitable adjustments, if any, to reflect such change with respect to (i) the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments of the Share Limit and Individual Award Limits, and adjustments of the manner in which shares subject to Full Value Awards will be counted); (ii) the number and kind of shares of Common Stock (or other securities or property) subject to outstanding Awards; (iii) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and/or (iv) the grant or exercise price per share for any outstanding Awards under the Plan. Any adjustment affecting a 162(m) Award intended to qualify as "performance-based compensation" shall be made consistent with the requirements of Section 162(m) of the Code unless otherwise determined by the Administrator.

(b) In the event of any transaction or event described in Section 12.2(a) hereof or any unusual or nonrecurring transactions or events affecting the Company, any Affiliate of the Company, or the financial statements of the Company or any Affiliate, or of changes in applicable laws, regulations or accounting principles, the Administrator, in its sole discretion, and on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event and either automatically or upon the Participant's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any Award under the Plan, to facilitate such transactions or events or to give effect to such changes in laws, regulations or principles:

(i) To provide for either (A) termination of any such Award in exchange for an amount of cash, if any, equal to the amount that would have been attained upon the exercise of such Award or realization of the Participant's rights (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction or event described in this Section 12.2, the Administrator determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment) or (B) the replacement of such Award with other rights or property selected by the Administrator in its sole discretion having an aggregate value not exceeding the amount that could have been attained upon the exercise of such Award or realization of the Participant's rights had such Award been currently exercisable or payable or fully vested;

(ii) To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar options, rights or awards covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and prices;

(iii) To make adjustments in the number and type of securities subject to outstanding Awards and Awards which may be granted in the future and/or in the terms, conditions and criteria included in such Awards (including the grant or exercise price, as applicable);

(iv) To provide that such Award shall be exercisable or payable or fully vested with respect to all securities covered thereby, notwithstanding anything to the contrary in the Plan or an applicable Program or Award Agreement; and

(v) To provide that the Award cannot vest, be exercised or become payable after such event.

(c) In connection with the occurrence of any Equity Restructuring, and notwithstanding anything to the contrary in Sections 12.2(a) and 12.2(b) hereof:

(i) The number and type of securities subject to each outstanding Award and/or the exercise price or grant price thereof, if applicable, shall be equitably adjusted. The adjustment provided under this Section 12.2(c)(i) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(ii) The Administrator shall make such equitable adjustments, if any, as the Administrator in its discretion may deem appropriate to reflect such Equity Restructuring with respect to the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments to the Share Limit and the Individual Award Limits). The adjustments provided under this Section 12.2(c) shall be nondiscretionary and shall be final and binding on the affected Participant and the Company.

(d) Change in Control.

(i) Notwithstanding any other provision of the Plan, in the event of a Change in Control, each outstanding Award shall be assumed or an equivalent Award substituted by the successor corporation or a parent or subsidiary of the successor corporation. For the purposes of this Section 12.2(d)(i), an Award shall be considered assumed or substituted if, following the Change in Control, the assumed or substituted Award confers the right to purchase or receive, for each share of Common Stock subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) received in the Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); provided, however, that if such consideration received in the Change in Control was not solely common stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the assumed or substituted Award, for each share of Common Stock subject to such Award, to be solely common stock of the successor corporation or its parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change in Control.

(ii) In the event that the successor corporation in a Change in Control and its parents and subsidiaries refuse to assume or substitute for any Award in accordance with Section 12.2(d)(i) hereof, each such non-assumed/substituted Award shall become fully vested and, as applicable, exercisable and shall be deemed exercised, immediately prior to the consummation of such transaction, and all forfeiture restrictions on any or all such Awards shall lapse at such time. If an Award vests and, as applicable, is exercised in lieu of assumption or substitution in connection with a Change in Control, the Administrator shall notify the Participant of such vesting and any applicable exercise, and the Award shall terminate upon the Change in Control. For the avoidance of doubt, if the value of an Award that is terminated in connection with this Section 12.2(d)(ii) is zero or negative at the time of such Change in Control, such Award shall be terminated upon the Change in Control without payment of consideration therefor.

(e) The Administrator may, in its sole discretion, include such further provisions and limitations in any Award, agreement or certificate, as it may deem equitable and in the best interests of the Company that are not inconsistent with the provisions of the Plan.

(f) No adjustment or action described in this Section 12.2 or in any other provision of the Plan shall be authorized to the extent that such adjustment or action would cause the Plan to violate Section 422(b)(1) of the Code. Furthermore, no such adjustment or action shall be authorized with respect to any Award to the extent such adjustment or action would result in short-swing profits liability under Section 16 or violate the exemptive conditions of Rule 16b-3 unless the Administrator determines that the Award is not to comply with such exemptive conditions.

(g) The existence of the Plan, any Program(s), any Award Agreement(s) and/or any Awards granted hereunder shall not affect or restrict in any way the right or power of the Company or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants or rights to purchase stock or of bonds, debentures, preferred or prior preference stocks whose rights are superior to or affect the Common Stock or the rights thereof or which are convertible into or exchangeable for Common Stock, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(h) No action shall be taken under this Section 12.2 which shall cause an Award to fail to comply with Section 409A of the Code or an exemption therefrom, in either case, to the extent applicable to such Award, unless the Administrator determines any such adjustments to be appropriate.

(i) In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other change affecting the shares of Common Stock or the share price of the Common Stock including any Equity Restructuring, for reasons of administrative convenience, the Company in its sole discretion may refuse to permit the exercise of any Award during a period of thirty (30) days prior to the consummation of any such transaction.

12.3. Approval of Plan by Stockholders. The Plan will be submitted for the approval of the Company's stockholders within twelve (12) months after the date of the Board's initial adoption of the Plan. Awards may be granted or awarded under the Plan and subject to the terms and conditions of the Prior Plan following the Board's adoption of the Plan unless and until the Plan receives stockholder approval. Awards granted from and after stockholder approval of the Plan will be subject to the terms and conditions of the Plan. If the Plan is not approved by the Company's stockholders within twelve (12) months after its adoption by the Board, then the Prior Plan shall continue on its existing terms and conditions and the Plan shall be of no force or effect. For purposes of this Section 12.3, references to the Plan shall mean to the Plan, as amended and restated (and not, for the avoidance of doubt, to the Prior Plan).

12.4. No Stockholders Rights. Except as otherwise provided herein or in an Award Agreement, a Participant shall have none of the rights of a stockholder with respect to shares of Common Stock covered by any Award until the Participant becomes the record owner of such shares of Common Stock.

12.5. Paperless Administration. In the event that the Company establishes, for itself or using the services of a third party, an automated system for the documentation, granting or exercise of Awards, such as a system using an internet website or interactive voice response, then the paperless documentation, granting or exercise of Awards by a Participant may be permitted through the use of such an automated system.

12.6. Effect of Plan upon Other Compensation Plans. The adoption of the Plan (as amended and restated) shall not affect any other compensation or incentive plans in effect for the Company or any Affiliate. Nothing in the Plan (as amended and restated) shall be construed to limit the right of the Company or any Affiliate: (a) to establish any other forms of incentives or compensation for Employees, Directors or Consultants of the Company or any Affiliate, or (b) to grant or assume options or other rights or awards otherwise than under the Plan in connection with any proper corporate purpose including without limitation, the grant or assumption of options in connection with the acquisition by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, partnership, limited liability company, firm or association.

12.7. Compliance with Laws. The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of Shares and the payment of money under the Plan or under Awards granted or

awarded hereunder are subject to compliance with all applicable federal, state, local and foreign laws, rules and regulations (including but not limited to state, federal and foreign securities law and margin requirements), the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded, and to such approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all applicable legal requirements. To the extent permitted by applicable law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

12.8. Titles and Headings, References to Sections of the Code or Exchange Act. The titles and headings of the sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. References to sections of the Code or the Exchange Act shall include any amendment or successor thereto.

12.9. Governing Law. The Plan and any agreements hereunder shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of laws thereof.

12.10. Section 409A. To the extent that the Administrator determines that any Award granted under the Plan is subject to Section 409A of the Code, the Plan, any applicable Program and the Award Agreement covering such Award shall be interpreted in accordance with Section 409A of the Code. In that regard, to the extent any Award under the Plan or any other compensatory plan or arrangement of the Company or any of its Subsidiaries is subject to Section 409A, and such Award or other amount is payable on account of a Participant's Termination of Service (or any similarly defined term), then (a) such Award or amount shall only be paid to the extent such Termination of Service qualifies as a "separation from service" as defined in Section 409A, and (b) if such Award or amount is payable to a "specified employee" as defined in Section 409A then to the extent required in order to avoid a prohibited distribution under Section 409A, such Award or other compensatory payment shall not be payable prior to the earlier of (i) the expiration of the six-month period measured from the date of the Participant's Termination of Service, or (ii) the date of the Participant's death. Notwithstanding any provision of the Plan to the contrary, in the event that, following the Effective Date, the Administrator determines that any Award may be subject to Section 409A of the Code, the Administrator may adopt such amendments to the Plan, any applicable Program and the Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to avoid the imposition of taxes on the Award under Section 409A of the Code, either through compliance with the requirements of Section 409A of the Code or with an available exemption therefrom. The Company makes no representations or warranties as to the tax treatment of any Award under Section 409A or otherwise. The Company shall have no obligation under this Section 12.10 or otherwise to take any action (whether or not described herein) to avoid the imposition of taxes, penalties or interest under Section 409A with respect to any Award and shall have no liability to any Participant or any other person if any Award, compensation or other benefits under the Plan are determined to constitute non-compliant, "nonqualified deferred compensation" subject to the imposition of taxes, penalties and/or interest under Section 409A.

12.11. No Rights to Awards. No Eligible Individual or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Administrator is obligated to treat Eligible Individuals, Participants or any other persons uniformly.

12.12. Unfunded Status of Awards. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Program or Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Affiliate.

12.13. Indemnification. To the extent allowable pursuant to applicable law, each member of the Board and any officer or other employee to whom authority to administer any component of the Plan is delegated shall be indemnified and held harmless by the Company from any loss, cost, liability or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit or proceeding to which he or she may be a party or in which he or she may be involved by reason of any

action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit or proceeding against him or her; provided, however, that he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Certificate of Incorporation or Bylaws, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

12.14. Relationship to other Benefits. No payment pursuant to the Plan shall be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

12.15. Expenses. The expenses of administering the Plan shall be borne by the Company and its Affiliates.

12.16. Arbitration. With the exception of any claims for workers compensation, unemployment insurance, claims before any governmental administrative agencies as required by applicable law, or claims related to the National Labor Relations Act, any controversy relating to this Plan shall be settled via binding arbitration according to the applicable employment dispute resolution rules of the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures (available at http://www.adr.org). Such arbitration shall be presided over by a single arbitrator in California. Such binding arbitration is applicable to any and all claims under state and federal employment related statutes including without limitation the Fair Employment and Housing Act, the Title VII of the Civil Rights Act, as well as any claims related to a claimed right under this Plan. The Company shall bear all costs uniquely associated with the arbitration process, including the arbitrator's fees, if required by applicable law. The arbitrator shall have the authority to award any damages authorized by law. The prevailing party shall be entitled to his/its attorneys' fees, unless otherwise prohibited by applicable law. This requirement to arbitrate shall apply to both the Company and Employee. The parties understand that they are giving up their right to a trial in a court of law.

OSI Systems, Inc.
c/o Broadridge Corporate Issuer Solutions
P O Box 1342
Brentwood, NY 11717

**VOTE BY INTERNET - www.proxyvote.com**
Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 P.M. ET on 12/09/2020. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 P.M. ET on 12/09/2020. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

KEEP THIS PORTION FOR YOUR RECORDS

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

DETACH AND RETURN THIS PORTION ONLY

The Board of Directors recommends you vote FOR the following:

| | For All | Withhold All | For All Except |
|---|---|---|---|
| 1. Election of Directors | ☐ | ☐ | ☐ |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) of the nominee(s) on the line below.

______________________

**Nominees**

01) Deepak Chopra
02) Steven C. Good
03) Meyer Luskin
04) William F. Ballhaus
05) James B. Hawkins
06) Gerald Chizever
07) Kelli Bernard

The Board of Directors recommends you vote FOR proposals 2, 3 and 4.

| | For | Against | Abstain |
|---|---|---|---|
| 2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2021. | ☐ | ☐ | ☐ |
| 3. Approval of Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan. | ☐ | ☐ | ☐ |
| 4. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2020. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|

0000474861_1 R1.0.1.18

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:** The Notice & Proxy Statement, 10K Wrap is/are available at www.proxyvote.com

**OSI SYSTEMS, INC.**
**Annual Meeting of Stockholders**
**December 10, 2020 10:00 A.M.**
**This proxy is solicited by the Board of Directors**

The undersigned appoints each of Deepak Chopra, Alan Edrick, and Victor Sze with power of substitution, attorneys and proxies, to vote all shares votable by the undersigned at the stockholders' annual meeting of OSI Systems, Inc., a Delaware corporation and at any adjournments. The meeting will be held in Hawthorne, California on December 10, 2020 at 10:00 A.M., Pacific Time. My voting instructions are on the reverse side of this proxy. I revoke any proxy previously given.

**This proxy, when properly executed, will be voted in the manner directed. If no direction is made, the proxy will be voted by the proxies named "FOR" proposals 1, 2, 3 and 4 and in their discretion on any other matters properly brought to a stockholder vote at the meeting.**

If the undersigned holds OSI Systems, Inc. shares in the OSI Systems, Inc. 401(k) Plan, this proxy constitutes voting instructions for any shares so held.

0000474861_2 R1.0.1.18

**Continued and to be signed on reverse side**

# Exhibit 48

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): December 10, 2020

# OSI SYSTEMS, INC.

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| **DELAWARE** | **000-23125** | **33-0238801** |
|---|---|---|
| **(STATE OR OTHER JURISDICTION OF INCORPORATION)** | **(COMMISSION FILE NUMBER)** | **(IRS EMPLOYER IDENTIFICATION NO.)** |

**12525 CHADRON AVENUE**
**HAWTHORNE, CA 90250**
**(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) (ZIP CODE)**

**(310) 978-0516**
**(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)**

N/A
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|

| Common Stock, $0.001 par value | OSIS | The Nasdaq Global Select Market |
| --- | --- | --- |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ¨

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ¨

**Item 5.07 Submission of Matters to a Vote of Security Holders**

OSI Systems, Inc. (the "Company") held its Annual Meeting of Stockholders on December 10, 2020. The results of the proposals voted on by the Company's stockholders at the Annual Meeting were as follows:

*1. Election of Directors*

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Deepak Chopra | 14,482,794 | 313,076 | 1,309,960 |
| Steven C. Good | 10,528,855 | 4,267,015 | 1,309,960 |
| Meyer Luskin | 13,909,174 | 886,696 | 1,309,960 |
| William F. Ballhaus | 14,657,429 | 138,441 | 1,309,960 |
| James B. Hawkins | 11,443,129 | 3,352,741 | 1,309,960 |
| Gerald Chizever | 13,791,970 | 1,003,900 | 1,309,960 |
| Kelli Bernard | 14,696,815 | 99,055 | 1,309,960 |

The seven nominees identified above were elected to the Board of Directors and will serve as directors until the Company's next annual meeting and until their successors are elected and qualified.

*2. Ratification of the appointment of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2021*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 15,964,683 | 101,482 | 39,665 | 0 |

The proposal was approved.

*3. Approval of the Amended and Restated OSI Systems, Inc. 2012 Incentive Award Plan*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 14,416,872 | 324,177 | 54,821 | 1,309,960 |

The proposal was approved.

*4. Advisory vote on the Company's executive compensation for the fiscal year ended June 30, 2020*

| For | Against | Abstentions | Broker Non-votes |
|---|---|---|---|
| 14,097,493 | 285,696 | 412,681 | 1,309,960 |

The proposal was approved.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OSI SYSTEMS, INC.

Date: December 11, 2020

By: /s/ Alan Edrick
       Alan Edrick
       EVP and Chief Financial Officer